UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | No. 3:02CR264 (AWT) |
| ) | |
| WALTER A. FORBES and ) | October 4, 2004 |
| E. KIRK SHELTON. ) | |

**MEMORANDUM IN SUPPORT OF MOTION OF WALTER
A. FORBES FOR AN ORDER REQUIRING THE
GOVERNMENT TO CONFER IMMUNITY ON STUART
BELL OR FACE THE SANCTION OF DISMISSAL, OR
STRIKING OF ALL EVIDENCE AND ALLEGATIONS
RELATING TO ALLEGED UNLAWFUL CONDUCT BY
MR. BELL
(Forbes Trial Motion No. 44) (FILED UNDER SEAL)**

Walter A. Forbes, through undersigned counsel, respectfully submits this memorandum in support of his motion for an order requiring the government to confer immunity on Stuart Bell or face the sanction of dismissal, or the sanction of striking all evidence and allegations relating to alleged unlawful conduct by Mr. Bell.

## INTRODUCTION

Mr. Forbes has already explained that Mr. Bell is a critical defense witness who could offer material, non-cumulative, exculpatory testimony that is not available from other sources. See Forbes Mot. Bell Immunity. Although the Court denied Mr. Forbes' motion seeking an order

requiring the government to immunize Mr. Bell,[1] Mr. Forbes files this further motion to request expressly that the government be given the alternative of immunizing Mr. Bell or facing dismissal of the indictment, or at least, striking of all evidence and allegations that Mr. Bell engaged in unlawful conduct at CUC. This further motion also explains why Mr. Bell's testimony is necessary to at least mitigate some of the constitutional and other violations caused by the government in this trial. The government has elicited improper testimony relating to Mr. Bell that has resulted in the filing of three substantial mistrial motions. See Forbes Mot. Mistrial Due to the Constructive Amendment Caused by the Testimony of Cosmo Corigliano (filed July 12, 2004); Forbes Mot. Mistrial Based on the Undisclosed Expert Testimony of Cosmo Corigliano (filed July 12, 2004); Forbes Mot. Mistrial Due to the Government's Presentation of Kevin Kearney's False Testimony (filed August 23, 2004). These errors caused by the government remain uncorrected, and the government's refusal to immunize Mr. Bell serves only to compound these errors, which Mr. Forbes cannot fully address without the testimony of Mr. Bell. Accordingly, the Court should provide the government with a choice—immunize Mr. Bell or face dismissal. As an alternative to dismissal, the Court could provide the government with the option of striking

---

[1] The government recognized that, if the Court concluded that Mr. Bell had to be immunized and the government refused, the remedy with respect to Forbes Trial Motion No. 36 was dismissal of the indictment. See Gov't Opp'n Forbes Mot. Compel Immunity at 3.

the offending testimony of Messrs. Corigliano and Kearney, and all other evidence or allegations that Mr. Bell engaged in unlawful conduct at CUC.

## ARGUMENT

The Second Circuit "has followed the carrot-and-stick approach, leaving the immunity decision to the executive branch but interposing the judicial power to subject the government to certain choices of action." United States v. Badhadar, 954 F.2d 812, 826 (2d Cir. 1992); accord United States v. Dolah, 245 F.3d 98, 105 n.5 (2d Cir. 2001), overruled on other grounds, Crawford v. Washington, 124 S. Ct. 1354 (2004). Those choices of action include the choice between conferring defense witness immunity or dismissal. See Badhadar, 954 F.2d at 825-26.

There is a "three-part test for requiring the government to grant defense witness immunity at the risk of dismissal of the indictment." Id. at 826.

> First, the district court must find that the government has engaged in discriminatory use of immunity to gain a tactical advantage or, through its own overreaching, has forced the witness to invoke the fifth amendment. Second, the witness's testimony must be "material, exculpatory, and not cumulative". Third, the testimony must be unobtainable from any other source.

Id.

Mr. Forbes has already explained why all three of these prongs are satisfied. See Forbes Mot. Bell Immunity.[2] He writes now to provide additional reasons why the first prong has been satisfied. The first prong of the test—government overreaching—may be satisfied by the government's "deliberate denial of immunity for the purpose of withholding exculpatory evidence and gaining a tactical advantage through such manipulation." Blissett v. LaFavre, 924 F.2d 434, 442 (2d Cir. 1991). Here, the government is gaining a significant tactical advantage through its deliberate denial of immunity to Mr. Bell. Not only is the government's unwarranted refusal to immunize Mr. Bell depriving Mr. Forbes of exculpatory evidence, it is depriving Mr. Forbes of evidence to address Mr. Corigliano's improper testimony about new charges of alleged accounting misconduct during the late 1980s to January 1995 time period; it is depriving Mr. Forbes of evidence to address Mr. Corigliano's undisclosed expert testimony concerning the accounting in that same time period; and it is depriving Mr. Forbes of evidence to address Mr. Kearney's false testimony concerning alleged meetings with Mr. Bell and Mr. Bell's alleged invocation of the name Walter Forbes in connection with purported accounting manipulations.

---

[2] The Second Circuit in Dolah, 245 F.3d at 106, expressly reserved the issue of whether the first prong must be satisfied when extraordinary circumstances exist. We submit that the facts here, including those set forth in Forbes Trial Mot. Nos. 20-21 and 30, constitute extraordinary circumstances. Moreover, the government did manipulate the use of proffer agreements (a form of partial informal immunity) to identify those witnesses who would be helpful to its case.

The New Charges Concerning the Late 1980s to January 1995.

Although the indictment charges that the alleged accounting misconduct took place from "at least as early as the late 1980's to in or about April 1998," Indict., Count 1 ¶ 17, and alleges in vague and conclusory terms that merger reserves, cancellation reserves, immediate and deferred revenue recognition programs, and membership cancellations costs were misused, see id. ¶¶ 30, 46, 49-50, 55, it fails to provide specifics concerning the period between the late 1980s and January 1995. Similarly, the government's pretrial disclosures failed to identify the alleged accounting fraud during that time period.[3]

Thus, the late 1980s to January 1995 remained shrouded in mystery until Mr. Corigliano testified at trial and blindsided Mr. Forbes with a day and a half of prejudicial testimony concerning alleged accounting misconduct during this time period. See Tr. (06/28/04) at 6238-328; Tr. (06/29/04) at 6337-454. Mr. Corigliano testified about the alleged use of various specific improper accounting practices to improve CUC's operating

---

[3] Because the indictment and the government's disclosures provided no detail on the more than five-year period between the late 1980s and January 1995, Mr. Forbes moved for a bill of particulars. See Forbes Pretrial Motion No. 38. In his memorandum in support of that motion and his reply memorandum, Mr. Forbes detailed the shortcomings of the indictment and the government's disclosures. The government was unable to point to disclosures that shed light upon the late 1980s to January 1995 time period. Mr. Forbes made supplemental requests for particulars requesting, among other things, identification of the alleged fraud during this lengthy time period. See Forbes Pretrial Motion No. 60; Forbes Trial Motion No. 2. Nevertheless, each of Mr. Forbes' requests for particulars was denied.

results, including the alleged manipulation of general reserves, merger reserves, membership cancellation reserves, profit sharing receivables, and deferred and immediate revenue recognition categories. See id. He further testified that he learned these illicit techniques under the tutelage of the then-CFO, Mr. Bell. See, e.g., Tr. (06/28/04) at 6245 ("Stu Bell told me how to prepare the membership analysis to give to the auditors and told me how it should differ from the internal records."); Tr. (06/28/04) at 6251 (testifying that he and Bell allegedly made up artificially low membership cancellation reserve rates); Tr. (06/28/04) at 6282-95 (testifying about "cheat sheet" allegedly used to identify potential adjustments for "plug" to meet analyst expectations in fiscal year 1991, which Mr. Corigliano maintained purportedly at the direction of his superior); Tr. (06/28/04) at 6303 (testifying that Mr. Bell purportedly reviewed and gave directions about "cheat sheet" prepared by Mr. Corigliano); Tr. (06/28/04) at 6318 (testifying that alleged miscellaneous reserve and membership reserve manipulations were Mr. Bell's idea, not Mr. Corigliano's); Tr. (06/29/04) at 6344-47 (testifying that he received directions from Mr. Bell about improper adjustments); Tr. (06/29/04) at 6348 (testifying that he entered into agreement with Mr. Bell to manipulate the earnings of the company); Tr. (06/29/04) at 6349 (testifying that he allegedly had meetings with Mr. Bell to discuss improper adjustments almost every quarter from 1991 to 1994); Tr. (06/29/04) at 6350-51 (testifying that Mr. Bell instructed him to make improper adjustments in

third quarter ended October 31, 1990); Tr. (06/29/04) at 6354 (testifying about Mr. Bell's alleged instruction to use profit sharing receivable as a plug to meet analyst expectations); Tr. (06/29/04) at 6356 (testifying that Mr. Bell made decisions about whether to make adjustments); Tr. (06/29/04) at 6361 ("I followed Stu's instructions to take $2 million out of the general reserve and put it into operating earnings for the first quarter."); Tr. (06/29/04) at 6365 (testifying that he made unsupported topside adjustments at Mr. Bell's direction); Tr. (06/29/04) at 6367 ("Initially, when we first started doing it, [Mr. Bell] told me not to record the membership rejects for the end of the year."); Tr. (06/29/04) at 6372 ("Stu Bell asked me to move members out of the deferred category and put them in the immediate category so we could increase -- so the company could increase its operating income."); Tr. (06/29/04) at 6401 ("The substance of the conversation was that Stu asked Tom to create some reserves indicating that it would be real nice if we had some cushions, some excess reserves when we took the company over."); Tr. (06/29/04) at 6411-18 (testifying about Mr. Bell's alleged instructions to hide information from auditors).

The government attempted to link Mr. Forbes to this alleged conduct by eliciting testimony from Mr. Corigliano that Mr. Forbes walked into an unidentified meeting between Messrs. Corigliano and Bell, who were purportedly discussing alleged accounting manipulations. See Tr. (06/29/04) at 6423-24.

third quarter ended October 31, 1990); Tr. (06/29/04) at 6354 (testifying about Mr. Bell's alleged instruction to use profit sharing receivable as a plug to meet analyst expectations); Tr. (06/29/04) at 6356 (testifying that Mr. Bell made decisions about whether to make adjustments); Tr. (06/29/04) at 6361 ("I followed Stu's instructions to take $2 million out of the general reserve and put it into operating earnings for the first quarter."); Tr. (06/29/04) at 6365 (testifying that he made unsupported topside adjustments at Mr. Bell's direction); Tr. (06/29/04) at 6367 ("Initially, when we first started doing it, [Mr. Bell] told me not to record the membership rejects for the end of the year."); Tr. (06/29/04) at 6372 ("Stu Bell asked me to move members out of the deferred category and put them in the immediate category so we could increase -- so the company could increase its operating income."); Tr. (06/29/04) at 6401 ("The substance of the conversation was that Stu asked Tom to create some reserves indicating that it would be real nice if we had some cushions, some excess reserves when we took the company over."); Tr. (06/29/04) at 6411-18 (testifying about Mr. Bell's alleged instructions to hide information from auditors).

The government attempted to link Mr. Forbes to this alleged conduct by eliciting testimony from Mr. Corigliano that Mr. Forbes walked into an unidentified meeting between Messrs. Corigliano and Bell, who were purportedly discussing alleged accounting manipulations. See Tr. (06/29/04) at 6423-24.

\* \* \*

Mr. Corigliano's testimony about the late 1980s to 1995 time period expanded and altered the charges in the indictment, resulting in a constructive amendment and a prejudicial variance. This constitutional violation is exacerbated by the government's refusal to immunize Mr. Bell, who is in a unique position to address Mr. Corigliano's allegations. As the transcript citations above indicate, Mr. Corigliano testified that Mr. Bell acted as a mentor who taught Mr. Corigliano how to commit the fraud and how to deceive the auditors. Mr. Bell will refute these accusations, put the lie to Mr. Corigliano's testimony, undermine the foundation of the government's entire case, and allow Mr. Forbes to address these new charges that were levied against him for the first time at trial.[4]

Mr. Corigliano's Undisclosed Expert Testimony. Mr. Corigliano opined as to the propriety of numerous alleged accounting decisions, and opined on and purported to quantify the impact of these accounting decisions on CUC's financial results. Much of this testimony related to the pre-1995 time period when Mr. Bell was the CFO. See, e.g., Tr. (06/28/04) at 6256 (opining that GX 667 was a "more accurate analysis to calculate what the membership cancellation reserve should be at 1/31/91"); Tr. (06/28/04) at 6272

---

[4] The government has argued that Mr. Bell's testimony denying the fraud in the late 1980s to 1995 time period would not be material because it would "not mean that Forbes did not commit fraud from 1995 to 1998 with other coconspirators." Gov't Opp'n Forbes Mot. Compel Immunity at 5. If that is truly the government's view, it should have no objection to striking the evidence from the late 1980s to 1995 time period.

(opining that membership cancellation reserves on general ledger were "$9 million short" for fiscal year 1991); Tr. (06/28/04) at 6277-78 (opining that membership cancellation reserves were "understated" in years 1991 to 1997); Tr. (06/28/04) at 6308-18 (opining that accounting information in 1991 CUC annual report was "inaccurate"); Tr. (06/28/04) at 6322-24 (opining that there was "no basis in fact" for including $2 million of general reserves in CUC earnings in fiscal year 1991); Tr. (06/29/04) at 6344-47 (opining that accounting adjustments in fiscal year 1991 were not "legitimate" and that earnings of company were manipulated); Tr. (06/29/04) at 6377 (opining that final numbers for fiscal year 1994 included adjustments that were not "[l]egitimate"); Tr. (06/29/04) at 6388-95 (opining that adjustments that had "no basis" resulted in $6 million increase in gross profits for fiscal year 1994); Tr. (06/29/04) at 6403-04 (opining that financial information in 1992 CUC annual report was "false"); Tr. (06/29/04) at 6404-05 (opining that financial information in 1993 CUC annual report was "not correct"); Tr. (06/29/04) at 6405-06 (opining that financial information in 1994 CUC annual report was "[i]naccurate"); Tr. (06/29/04) at 6406 (opining that financial information in 1995 CUC annual report was "inaccurate"); Tr. (06/29/04) at 6474-75 (opining that revenues and earnings reported in press release concerning fiscal year 1994 were not "accurate"); Tr. (06/29/04) at 6479-80 (opining that earnings per share in press release concerning fiscal year 1993 were "false").[5]

---

[5] Many of the quotations in these parentheticals come from the improper leading questions of government counsel.

* * *

Mr. Corigliano's numerous opinions and conclusions on these various accounting issues constituted classic expert testimony that should have been disclosed pursuant to Fed. R. Crim. P. 16(a)(1)(G), and subjected to an admissibility analysis pursuant to the requirements of Fed. R. Evid. 702 and <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993). The government failed to make the required disclosures and thereby violated Rule 16 and evaded the admissibility requirements of Rule 702 and <u>Daubert</u>. Mr. Forbes moved for a mistrial and for a continuance to obtain expert testimony to address these new opinions, but the Court has not granted a continuance. Mr. Bell, as the former CFO of CUC, could refute much of Mr. Corigliano's expert testimony by explaining the legitimate reasons for the accounting decisions during Mr. Bell's tenure as CFO. Although this would not cure the government's disclosure violation, it would at least mitigate the harm caused by this violation.

<u>Kevin Kearney's False Testimony.</u> At trial, <u>six years</u> after Kevin Kearney began cooperating with the government and <u>ten years</u> after Mr. Bell was CFO of CUC, Mr. Kearney claimed <u>for the first time</u> that he met with Mr. Bell every quarter to discuss topside adjustments, and asserted <u>for the first time</u> that Mr. Bell invoked Walter Forbes' name each quarter in connection with topside adjustments. <u>See</u> Tr. 9715-25. This testimony, which was flatly inconsistent with Mr. Kearney's statements in numerous

prior interviews with the government, was false. In <u>none</u> of his interviews between 1998 and March 2004 did Mr. Kearney claim that he met with Mr. Bell each quarter to discuss topside adjustments or that Mr. Bell invoked Walter Forbes' name when discussing topside adjustments.[6] During numerous pretrial interviews prior to 2003, Mr. Kearney consistently informed the government that he attended quarterly meetings to discuss topside adjustments with only <u>Mr. Corigliano and Casper Sabatino</u>—not with Mr. Bell. Mr. Kearney also consistently informed the government that <u>he did not</u> meet with Mr. Bell, but, rather, that <u>Mr. Corigliano</u> met with Mr. Bell.[7]

---

[6] Because notes or summaries of the most recent interview and preparation sessions have not been provided to the defendants, it is possible that Mr. Kearney first made these accusations in a session between March 2004 and his trial testimony.

[7] <u>See, e.g.</u>, Forbes Mot. Mistrial Kearney False Testimony, Ex. 3 at PAW0732 (Paul Weissman's notes of July 15, 1998 interview reflecting that Kearney stated that "Cosmo told him what adjustments to make (he + Casper wd meet [with] Cosmo")); <u>id.</u>, Ex. 4 at PAW0716 (Paul Weissman's notes of August 24, 1998 interview reflecting that Kearney stated that "[a]t end of q's, he and Casper wd meet [with] Cosmo; Cosmo wd then go over results [with] Stu Bell"); <u>id.</u>, Ex. 6 at MW004 (Mark Winston's notes of August 24, 1998 interview in which Kearney states that "Casper, Kevin would meet with Cosmo, not with Stu Bell"); <u>id.</u>, Ex. 7 at PAW0699, PAW0701, PAW0703 (Paul Weissman's notes of March 4, 1999 interview reflecting that Kearney stated that quarterly meetings involved "him, Casper, + Cosmo" and that Kearney "DNB he ever met [with] Cosmo and Bell"); <u>id.</u>, Ex. 9 at MG00171-72 (Mark Gerber's notes of March 4, 1999 interview stating "Qtrly meetings. Attended by Cosmo, Casper + Kevin"; "After this process was complete, Cosmo would get a clean set of adjusted financials and then Cosmo would take them to Stu Bell"); <u>id.</u>, Ex. 23 at MGR 181 (SEC representative Matthew Greiner's notes of July 10, 2001 meeting in which Kearney stated "K2 [KK, or Kearney] dealt with C2 [CC, or Corigliano] when Bell there").

In 2003, Mr. Kearney began to change his story about meeting with Mr. Bell. Even Mr. Kearney's new claims, however, did not involve any

On cross-examination, defense counsel confronted Kearney with his prior inconsistent statements to the government. Nevertheless, Mr. Kearney insisted—contrary to the notes of the interviews—that he told the government that Mr. Bell purportedly said that Mr. Forbes wanted EPS to be a certain number, and that this story was not a recent "recollection." See Tr. 9877 ("No. I've -- <u>I answered that way in several interviews.</u>" (emphasis added)). Mr. Kearney's testimony cannot be squared with the complete absence of such a reference in the notes and letters provided by the government. The government knew that the testimony was false. Yet, rather than correct Mr. Kearney's false testimony, or acknowledge that Mr. Kearney had never before stated that Mr. Bell purportedly invoked Walter Forbes' name in connection with topside adjustments, the government allowed the false testimony to stand uncorrected.

The government exacerbated the problem on redirect examination by asking Mr. Kearney to <u>reaffirm</u> and <u>repeat</u> his recent fabrications, and by eliciting testimony from Mr. Kearney that these claims were truthful. See Tr. 9993-94. The government also attempted to rehabilitate Mr. Kearney on redirect examination, posing questions that improperly suggested that Mr. Kearney's new claims were not recent fabrications, but that Mr. Kearney had simply not been asked about these

---

assertion that Mr. Kearney met with Mr. Bell every quarter to discuss topside adjustments or that Mr. Bell invoked Walter Forbes' name when discussing topside adjustments. See Forbes Mot. Mistrial Kearney False Testimony at 6 n.3.

subjects in his prior interviews. See Tr. 9991-92. In fact, as the government well knew, Mr. Kearney was repeatedly asked about both Mr. Bell and the topside adjustment process in his government interviews between 1998 and March 2004.[8]

* * *

Mr. Kearney testified falsely about a significant matter. The government elicited the testimony on direct examination, allowed it to stand uncorrected on cross examination, and affirmatively elicited it again on redirect examination. Mr. Bell is a witness who could expose Mr. Kearney's falsehoods to the jury. The government has an affirmative duty to correct Mr. Kearney's false testimony. Instead of fulfilling that obligation, the government, by refusing to immunize Mr. Bell, is preventing Mr. Forbes from correcting the record and presenting the truth to the jury. Compare United States v. Wallach, 935 F.2d 445, 456 (1991) (reversing conviction when government witness testified falsely that he had stopped gambling and government successfully argued that extrinsic evidence of witness' continued gambling should be excluded under Fed. R. Evid. 608(b)).

## CONCLUSION

For the reasons set forth above, Mr. Forbes respectfully requests that the Court provide the government with a choice—immunize Mr. Bell or

---

[8] Mr. Weissman's testimony provided further evidence that Mr. Kearney's trial testimony was false, see Tr. (09/02/04) at 11444-46, but Mr. Weissman's testimony about Mr. Kearney's prior inconsistent statements/omissions is not substantive evidence.

- 13 -

face dismissal. As an alternative to dismissal, the Court could provide the government with the option of striking the offending testimony of Messrs. Corigliano and Kearney, and all other evidence or allegations that Mr. Bell engaged in unlawful conduct at CUC.

                Respectfully submitted,

                WILLIAMS & CONNOLLY LLP

By: *[signature]*
      Brendan V. Sullivan, Jr. (ct17115)
      Barry S. Simon (ct24159)

      725 Twelfth Street, N.W.
      Washington, D.C. 20005
      (202) 434-5000 (phone)
      (202) 434-5029 (fax)
      bsimon@wc.com (e-mail)

      - and -

      James T. Cowdery (ct05103)
      Thomas J. Murphy (ct07959)
      COWDERY, ECKER & MURPHY, L.L.C.
      750 Main Street
      Hartford, CT 06103-2703
      (860) 278-5555 (phone)
      (860) 249-0012 (fax)
      tmurphy@cemlaw.com (e-mail)

      Attorneys for Walter A. Forbes

Dated: October 4, 2004

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Motion of Walter A. Forbes for an Order Requiring the Government to Confer Immunity on Stuart Bell or Face the Sanction of Dismissal, or Striking of All Evidence and Allegations Relating to Alleged Unlawful Conduct by Mr. Bell (Forbes Trial Motion No. 44) and memorandum in support thereof to be served on October 4, 2004 to the following:

Via Hand Delivery

John J. Carney, Esq.
Special Attorney
U.S. Department of Justice
450 Main Street, Room 617
Hartford, CT 06103

Stanley A. Twardy, Jr., Esq.
Gary H. Collins, Esq.
Day Berry & Howard LLP
CityPlace I
Hartford, CT 06103

Via Federal Express

Thomas P. Puccio, Esq.
230 Park Ave.
Suite 301
New York, NY 10169

Scott A. Edelman, Esq.
Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, NY 10005

Barry S. Simon