UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,          )
                                    )
                v.                  )
                                    )
WALTER A. FORBES and                )        No. 3:02CR264 (AWT)
E. KIRK SHELTON.                    )
                                    )        November 4, 2004
                                    )

# OBJECTIONS OF WALTER FORBES TO FINAL CHARGE

Brendan V. Sullivan, Jr. (Bar No. ct17115)
Barry S. Simon (Bar No. ct24159)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
COWDERY, ECKER & MURPHY, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

OBJECTIONS TO DEFINING THE ALLEGED FRAUD MORE
    BROADLY THAN THE INDICTMENT ........................................... 2

OBJECTIONS TO FAILURE TO INSTRUCT ON GENERALLY
    ACCEPTED ACCOUNTING PRINCIPLES ..................................... 8

OBJECTIONS TO FAILURE TO GIVE MISSING WITNESS
    INSTRUCTION ................................................................................ 15

OBJECTIONS TO REPEATED CHARGE ON CONSCIOUS AVOIDANCE ............ 16

OBJECTIONS TO REPEATED CHARGE ON PROOF OF INTENT ....................... 25

OBJECTIONS TO CHARGE I.A ....................................................................... 27

OBJECTIONS TO CHARGE I.D ....................................................................... 28

OBJECTIONS TO CHARGE I.G.1 .................................................................... 30

OBJECTIONS TO CHARGE I.L ....................................................................... 31

OBJECTIONS TO CHARGE II.A ..................................................................... 33

OBJECTIONS TO CHARGE II.C.1 ................................................................... 34

OBJECTIONS TO CHARGE II.C.2 ................................................................... 37

OBJECTIONS TO CHARGE II.C.2.a ................................................................ 39

OBJECTIONS TO CHARGE II.C.2.b ................................................................ 43

OBJECTIONS TO CHARGE II.C.2.c ................................................................ 50

OBJECTIONS TO CHARGE II.C.2.d ................................................................ 51

OBJECTIONS TO CHARGE II.D.1 ................................................................... 52

OBJECTIONS TO CHARGE II.D.2 ................................................................... 54

OBJECTIONS TO CHARGE II.D.2.a ................................................................ 56

OBJECTIONS TO CHARGE II.D.2.a ................................................................ 56

OBJECTIONS TO CHARGE II.D.2.b ................................................................ 61

OBJECTIONS TO CHARGE II.D.2.c ................................................................ 64

OBJECTIONS TO CHARGE II.D.2.c ................................................................ 65

OBJECTIONS TO CHARGE II.E.1 ................................................................... 66

OBJECTIONS TO CHARGE II.E.2 ................................................................... 68

OBJECTIONS TO CHARGE II.E.2.a ................................................................ 69

OBJECTIONS TO CHARGE II.E.2.b ................................................................ 71

OBJECTIONS TO CHARGE II.E.2.c ..................................................................73

OBJECTIONS TO CHARGE II.E.2.d ..................................................................74

OBJECTIONS TO CHARGE II.F.1 ......................................................................76

OBJECTIONS TO CHARGE II.F.2 ......................................................................78

OBJECTIONS TO CHARGE II.F.2.a ..................................................................81

OBJECTIONS TO CHARGE II.F.2.b ..................................................................89

OBJECTIONS TO CHARGE II.F.2.c ..................................................................90

OBJECTIONS TO CHARGE II.F.2.d ..................................................................91

OBJECTIONS TO CHARGE II.G ........................................................................93

OBJECTIONS TO CHARGE II.H.1 ....................................................................96

OBJECTIONS TO CHARGE II.H.2 ....................................................................98

OBJECTIONS TO CHARGE II.H.2.b ................................................................100

OBJECTIONS TO CHARGE II.H.2.d ................................................................103

OBJECTIONS TO CHARGE II.H.3 ..................................................................105

OBJECTIONS TO CHARGE II.J ......................................................................106

OBJECTIONS TO CHARGE III.A ....................................................................107

OBJECTIONS TO CHARGE IV.A ....................................................................109

OBJECTIONS TO CHARGE IV.C ....................................................................110

OBJECTIONS TO CHARGE IV.D ....................................................................111

OBJECTIONS TO CHARGE IV.F ....................................................................112

OBJECTIONS TO CHARGE IV.G ....................................................................113

OBJECTIONS TO CHARGE IV.K ....................................................................114

OBJECTIONS TO CHARGE IV.L ....................................................................115

OBJECTIONS TO CHARGE IV.M ..................................................................117

OBJECTIONS TO CHARGE IV.O ..................................................................118

OBJECTIONS TO CHARGE IV.Q ..................................................................119

OBJECTIONS TO CHARGE IV.S ..................................................................120

OBJECTIONS TO CHARGE V ......................................................................121

ADDITIONAL OBJECTIONS ........................................................................122

## INTRODUCTION

Mr. Forbes, through undersigned counsel, respectfully submits his objections to the Court's final charge.  Mr. Forbes also adopts the objections of defendant E. Kirk Shelton to the Court's final charge.

## OBJECTIONS TO DEFINING THE ALLEGED FRAUD MORE BROADLY THAN THE INDICTMENT

Mr. Forbes objects to the Court's instructions because they define the alleged fraud more broadly than the indictment. See Charge II.C.2, II.D.2, II.F.2. Although there are various types of fraud that can be alleged and proven under the mail fraud, wire fraud, and securities fraud statutes, only one type of fraud is alleged in Counts 1-12 of the indictment—the alleged dissemination of materially false financial information in specific SEC filings, annual reports, and press releases. However, the Court's instructions and the government's presentation of the case invite the jury to convict the defendants for other types of alleged fraud that are not charged in this case. This is an unconstitutional amendment of the indictment and/or a prejudicial variance. See, e.g., Stirone v. United States, 361 U.S. 212 (1960); United States v. Wozniak, 126 F.3d 105, 109 (2d Cir. 1997) ("A constructive amendment of an indictment is a per se violation of the Grand Jury Clause of the Fifth Amendment that requires reversal even without a showing of prejudice to the defendant." (quotation & brackets omitted)); United States v. Mollica, 849 F.2d 723, 729 (2d Cir. 1988) ("In light of the current broad range of conduct covered by the federal fraud statutes, it is critical that courts vigilantly enforce the Fifth Amendment requirement that a person be tried only on the charges contained in the indictment returned by the grand jury." (quotation omitted)). The Court's instructions should clearly define the fraud to involve only the alleged dissemination of materially false financial information in specific SEC filings, annual reports, and press releases, and, in instructing the jury on the

- 2 -

requirement of unanimity, should identify the particular false statement(s) at issue in each count.[1]

1.    The mail and wire fraud charges of the indictment are predicated only on alleged false statements, not on omissions or other types of fraud. See Indict., Count 2 ¶ 5 ("falsely stated that CUC had earned $ .24 per share"); id., Count 3 ¶ 3 ("the proxy statement set forth falsified earnings figures"); id., Count 4, ¶ 2 ("the schedule overstated the revenue of CMS for the year ending December 31, 1997 by approximately $139 million"). Indeed, the government's proposed jury instructions acknowledge that to establish the mail and wire fraud charges, the government must prove a false statement. See, e.g., Government Revised Requests to Charge (filed October 5, 2004) Nos. 35 (mail fraud) ("All twelve of you must agree that the particular statement or statements were materially false or misleading."), 45-46 (wire fraud incorporating mail fraud instructions).

2.    The instructions on mail and wire fraud nevertheless define the fraud to encompass more than false statements. For example, Charge II.D.2.a instructs the jury on "concealment of material facts," "the expression of opinion not honestly entertained," and "omissions." Moreover, the instructions do not identify the alleged false statements at issue, but instead invite the jury to convict the

---

[1]    When the Court gave a limiting instruction during the trial, the Court recognized the essence of the alleged criminal conduct. See Charge IV.E (Testimony Concerning Alleged Co-Conspirator's Beliefs) (stating that evidence can be considered only with respect to the question of whether a conspiracy existed among two or more people to "fraudulently inflate financial results during the period between the late 1980's and April 1998").

defendants for whatever they each deem the fraud to be. An instruction on the alleged false statements at issue is necessary to ensure that the defendants are tried only on the charges in the indictment, that the jury unanimously agrees on the same alleged false statement, and that the jury conducts a proper evaluation of materiality. It is particularly necessary in light of the Court's insistence on giving a conscious avoidance charge, which requires as a predicate that the defendant be aware of a high probability that a particular statement is false.

3.      The securities fraud charges of the indictment are similarly predicated solely on alleged false statements. Counts 7-12 of the indictment do not identify the substance of the alleged fraud, but state that the "substance" of the alleged fraud is set forth in paragraphs 18 through 63 of Count 1. See Indict., Counts 7-12 ¶ 3. Paragraphs 18 through 63 of Count 1 allege that the defendants were responsible for various purported accounting irregularities that resulted in the alleged fraudulent overstatement of CUC's and Cendant's financial results. Those paragraphs further allege that the defendants caused these allegedly overstated financial results to be reported to the SEC and to the investing public in periodic filings with the SEC and in press releases. These paragraphs of the indictment identify the following specific SEC filings and press releases, which allegedly contained false statements—(1) a March 19, 1996 CUC press release; (2) an April 25, 1996 CUC Form 10-K; (3) a March 11, 1997 CUC press release; (4) a May 1, 1997 CUC Form 10-K; (5) a December 15, 1997 CUC Form 10-Q; (6) a February 4, 1998 Cendant press release; (7) a March 31, 1998 Cendant Annual Report; and (8) a

- 4 -

March 31, 1998 Cendant Form 10-K. Indict., Count 1 ¶¶ 63(a)-(e) & (m)-(o). Thus, the indictment charges only false statements, not some other device, scheme, or artifice to defraud; not omissions; and not some other transaction, practice, or course of business that would operate as a fraud. The government effectively concedes that the substance of the alleged securities fraud consisted of the purported making of materially false statements in the particular SEC filings and press releases identified in the indictment. See United States Opp'n Forbes Mot. Mistrial Due to Constructive Amendment (filed July 30, 2004) at 33 ("Forbes was entitled to disclosure of the particular public filings or press releases by CUC or Cendant that were materially false or misleading, but not to each and every non-public statement or omission which made those public filings and statements false or misleading. No bill of particulars was needed for that purpose, since the indictment identified in exacting detail the particular public filings and press releases of CUC and Cendant which contain false and misleading information."); see also Gov't Response to Preliminary Proposed Jury Instructions (filed Oct. 8, 2004) at 27 ("The Government does not oppose a properly worded instruction that, in order to convict a defendant for securities fraud, the jury must unanimously agree on at least one materially false or misleading statement.").

4.    The instructions on securities fraud nevertheless define the fraud to encompass more than false statements. For example, Charge II.F.2.a instructs the jury on "omission[s]," "device[s]," "scheme[s]," "artifice[s]," and "trick[s]." Moreover, the instructions do not identify the alleged false statements at

issue, but instead invite the jury to convict the defendants for whatever they each deem the fraud to be. An instruction on the alleged false statements at issue is necessary to ensure that the defendants are tried only on the charges in the indictment, that the jury unanimously agrees on the same alleged false statement, and that the jury conducts a proper evaluation of materiality.

5.    The government has also invited the jury to convict the defendants for alleged frauds that are not charged in the indictment. The government argued in summation that many matters other than false statements in particular SEC filings, annual reports and press releases constituted the alleged fraud. For example, the government argued that the fraud consisted of the dissemination of false information through analyst reports. See Tr. (10/18/04) at 14825 ("And you also heard about the analysts. And you've seen stock analyst reports in this case. And these reports disseminated the lies over and over again from the early '90s all the way up until the end. Lie after lie after lie. All about the numbers."). This was not charged in the indictment. The government argued that CUC's annual reports contained material omissions. See Tr. (10/19/04) at 15004-05 ("Additionally, ladies and gentlemen, if you look in this annual report, if you look at 634, as you look at the other annual reports, there's no disclosure about what's going on. There is an omission of the facts necessary to make clear what's going on here."). The indictment does not charge omissions. The government also improperly argued that the fraud consisted of the non-disclosure of the alleged fact that reserves were appropriately taken back in. See Tr. (10/19/04) at 15102 ("When

you have a chance to deliberate, ladies and gentlemen, when you have the chance to look at all the annual reports and the 10K filings and 10Q filings, see if the company ever disclosed that there were reserves that had been appropriately taken back in. In Mr. Forbes' letters to the shareholders, did he ever say, I knew there were reserves that were appropriately taken back in? Or was that the kind of omission that serves as a basis for a securities fraud count?").[2] This was not charged in the indictment. The government argued that the fraud consisted of the non-disclosure in SEC filings of the existence of non-operating income. See Tr. (11/01/04) at 16092 ("Ladies and gentlemen, if everybody knows there is operating and non-operating income, go back to the public filings in this case, the 10Ks. Is there any mention in the public filings that there's something called non-operating income?"). This was not charged in the indictment.

        6.    The government, over objection, adduced evidence during trial about alleged fraudulent activity not alleged in the indictment (for example, Mr. Forbes' alleged failure to disclose and intent to trade before a 1998 road show, and alleged accounting irregularities, including Getko merger reserves, profit sharing receivables, and general reserves during the Bell era). In light of this evidence and the government's closing argument, it is critical that the jury be carefully instructed about what fraudulent conduct must actually be proven. The charge fails to do so.

---

[2]    This argument was based upon the purported statements that were erroneously attributed to Mr. Forbes by the Oller memorandum.

## OBJECTIONS TO FAILURE TO INSTRUCT ON GENERALLY ACCEPTED ACCOUNTING PRINCIPLES

Mr. Forbes objects to the Court's failure to give instructions on generally accepted accounting principles ("GAAP") and on the interaction between GAAP and the elements of falsity and intent.  <u>See</u> Forbes Instr. Nos. 31, 38, 43, 50, 52, 54, 62, 68, 73, 78, 84, 89, 94, 99, 103.

1.    The government must prove GAAP violations because all of the substantive charges in the indictment are predicated upon GAAP violations.  A failure to provide GAAP instructions would constitute a constructive amendment and/or a prejudicial variance.  The indictment alleges that CUC and Cendant failed to comply with GAAP in accounting for merger reserves, membership cancellation reserves, revenue recognition, and other items <u>and that as a result CUC and Cendant fraudulently inflated their financial results</u> by specific amounts.  <u>See, e.g.</u>, Indict., Count 1 ¶¶ 31-33 (alleging GAAP standards for merger reserves, <u>i.e.</u>, that reserve must be based on good faith estimate of one-time merger costs), 35-36 (alleging that Ideon reserve did not comply with standards set forth in paragraphs 31-33, <u>i.e.</u>, that it was not based on a good faith estimate of one-time merger costs), 39-40 (alleging that Cendant reserve did not comply with standards set forth in paragraphs 31-33, <u>i.e.</u>, that it was not based on a good faith estimate of one-time merger costs), 42-43 (alleging that treatment of merger reserves violated "GAAP" and that as a result CUC and Cendant fraudulently overstated operating income in the specified amounts), 47-48 (alleging that treatment of membership cancellation reserve violated "GAAP" and that as a result CUC and Cendant fraudulently

- 8 -

overstated earnings in the specified amounts), 52-53 (alleging that allocation between deferred and immediate revenue recognition programs violated "GAAP" and that as a result CUC and Cendant fraudulently overstated earnings in the specified amounts), 55-59 (alleging that other accounting entries violated "GAAP" and that as a result CUC and Cendant fraudulently overstated earnings). These allegations are incorporated in each substantive count of the indictment. See Indict., Count 2-16 ¶ 1. Moreover, these alleged GAAP violations, which purportedly resulted in overstated financial results, are alleged to be the substance of the purported fraud charged in Counts 2-4 and 7-16. See Indict., Count 2 ¶ 2; id., Count 3 ¶ 1; id., Count 4 ¶ 1; id., Counts 7-12 ¶ 3; id., Counts 13-16 ¶ 4; see also Indict., Count 2 ¶¶ 3, 5 (alleging that earnings per share before one time charges violated "GAAP" and that earnings per share before one time charges were false); id., Count 3 ¶ 2 (alleging that earnings per share before one time charges violated "GAAP"). Having charged that CUC's and Cendant's operating results were overstated because of the alleged GAAP violations, the government cannot now amend the indictment.[3]

2.    The government must prove that a GAAP violation occurred to establish falsity, which is an essential element of the substantive charges in the indictment. The government's proposed jury instructions acknowledge that to establish the mail fraud, wire fraud, false statements and securities fraud charges,

_____

[3]    The government argued in summation that there were GAAP violations. See Tr. (10/19/04) at 15095-96. This is an additional reason to provide instructions on GAAP.

- 9 -

the government must prove a false statement. <u>See, e.g.</u>, Government Revised

Requests to Charge (filed October 5, 2004) Nos. 35 (mail fraud) ("All twelve of you

must agree that the particular statement or statements were materially false or

misleading."), 45-46 (wire fraud incorporating mail fraud instructions); 50 (false

statements) ("You may not convict a defendant of this offense unless you

unanimously agree about which statement or statements at issue were materially

false."); 55 (securities fraud) (stating that with respect to subsection (b), the only

subsection at issue, "you must be unanimous as to the particular alleged false

statement or statements which you find to have been proven"); <u>see also</u> Gov't

Response to Preliminary Proposed Jury Instructions (filed Oct. 8, 2004) at 27 ("The

Government does not oppose a properly worded instruction that, in order to convict

a defendant for securities fraud, the jury must unanimously agree on at least one

materially false or misleading statement.").  Falsity is also a necessary component

of the insider trading charges because an essential element of those charges is that

the defendant traded based on material non-public information, and the purported

material non-public information at issue in this case is that the earnings of CUC

and Cendant were allegedly fraudulently inflated in the manner set forth in Count

1 of the indictment. <u>See</u> Government Revised Requests to Charge (filed October 5,

2004) No. 62 (insider trading) (stating that the government must prove "that the

earnings of CUC and Cendant had in fact been fraudulently inflated in [the]

manner [described in paragraphs 18 through 63 of Count 1 of the indictment]").

The specific purportedly false statements charged in the indictment consist of

financial figures contained in CUC's and Cendant's SEC filings, annual reports, and

press releases. See, e.g., United States Opp'n Forbes Mot. Mistrial Due to

Constructive Amendment (filed July 30, 2004) at 33 ("Forbes was entitled to

disclosure of the particular public filings or press releases by CUC or Cendant that

were materially false or misleading, but not to each and every non-public statement

or omission which made those public filings and statements false or misleading.  No

bill of particulars was needed for that purpose, since the indictment identified in

exacting detail the particular public filings and press releases of CUC and Cendant

which contain false and misleading information.").  The truth or falsity of these

figures cannot be determined by comparison to the objective truth as in a false

statement case in which a government contractor is charged with falsely stating

that it paid $500,000 for supplies when, in fact, it paid $5,000 for the supplies.  Nor

can the truth or falsity of these figures be determined by application of a

mathematical formula.  The truth or falsity of these figures is determined by

reference to GAAP.  Indeed, according to the securities laws, GAAP is the standard

by which the accuracy of financial statements filed with the SEC is measured.  See

Regulation S-X, 17 C.F.R. § 210.4-01(a)(1) ("Financial statements filed with the

Commission which are not prepared in accordance with generally accepted

accounting principles will be presumed to be misleading or inaccurate . . . .").

Because falsity is an element of the substantive offenses, and because falsity turns

on non-compliance with GAAP, the government must establish non-compliance with

GAAP.[4]

      3.     Because GAAP is not a mathematical formula, but requires

judgments and estimates, the question of falsity involves an interpretive question.[5]

When the question of falsity involves an interpretive question, the government

must prove beyond a reasonable doubt that the statement was false under any

reasonable interpretation. See, e.g., United States v. Whiteside, 285 F.3d 1345,

1351 (11th Cir. 2002) ("In a case where the truth or falsity of a statement centers on

an interpretive question of law, the government bears the burden of proving beyond

a reasonable doubt that the defendant's statement is not true under a reasonable

---

[4]     The Second Circuit's holding in United States v. Simon, 425 F.2d 796 (2d Cir.
1969), that compliance with GAAP is not a "complete defense" in a securities fraud
case predicated on purportedly false accounting should not control. First, Simon
predates the revision of Regulation S-X on September 25, 1980, in which the SEC
promulgated the rule adopting GAAP as the standard by which to judge the
accuracy of financial statements. See 17 C.F.R. § 210.4-01(a)(1). Second, Simon
predates the establishment of the Financial Accounting Standards Board, and the
promulgation of a substantial body of standards for financial accounting to guide
the accounting profession. Third, if there is no established set of rules by which to
determine the truth or falsity of accounting, a prosecution based on allegedly false
accounting would violate fundamental principles of fair notice. If not to GAAP,
where could an individual who wanted to comply with the law look to guide his
behavior? According to the government's theory, the individual would have
nowhere to look, but would have to rely upon prosecutors and juries to determine,
long after the fact, what the accounting figures should have been based on whatever
standards they deem appropriate.

[5]     The government's summation suggested incorrectly that GAAP is akin to a
mathematical formula. See Tr. (10/18/04) at 14833 ("2 plus 2 equals 4. Not so
hard."); id. at 14835 ("2 plus 2 is 4 until Stu Bell and Walter Forbes got involved.");
id. at 14858 ("He has a calculator and a computer and with that you can do
anything."); id. at 14862 ("two plus two wasn't four anymore"). This argument
underscores the need for jury instructions on GAAP.

interpretation of the law."); United States v. Migliaccio, 34 F.3d 1517, 1525 (10th

Cir. 1994) (government must "negate any reasonable interpretations that would

make a defendant's statement factually correct where reporting requirements are

ambiguous"); United States v. Gahagan, 881 F.2d 1380, 1384 (6th Cir. 1989); United

States v. Race, 632 F.2d 1114, 1120 (4th Cir. 1980); United States v. Anderson, 579

F.2d 455, 460 (8th Cir. 1978).

        4.     The government must prove that the defendants knew that the

reported financial results violated GAAP to establish knowledge of falsity, which is

an essential element of the charges in the indictment.  To satisfy this burden, the

government must prove knowledge of a GAAP violation.

        5.     There is an evidentiary basis for the proposed instructions on

the interaction between GAAP and the elements of falsity and intent.   There is

evidence that relevant GAAP was subject to multiple reasonable interpretations

and that accounting at issue complied with reasonable interpretations of GAAP.

For example, there was testimony that under GAAP a merger reserve must be

based on good faith estimates of merger related costs.  See, e.g., Tr. (05/12/04) at

444-49; id. at 508-13; Tr. (07/22/04) at 8488; see also Indict., Count 1 ¶¶ 31-33

(alleging GAAP standards for merger reserves, i.e., that reserve must be based on

good faith estimate of one-time merger costs), 35-36 (alleging that Ideon reserve did

not comply with standards set forth in paragraphs 31-33, i.e., that it was not based

on a good faith estimate of one-time merger costs).  There is also evidence that the

- 13 -

Halmos litigation reserve, the largest component of the Ideon reserve, was based on a good faith estimate, see Tr. (09/01/04) at 11132-33.

      6.     There is also a basis for the requested instruction defining GAAP and the instructions which state that there is not <u>always</u> a right answer under GAAP.  As the Supreme Court has recognized: "[f]ar from a single-source accounting rulebook, GAAP encompasses the conventions, rules, and procedures that define accepted accounting practice at a particular point in time.  GAAP changes and, even at any one point, is <u>often indeterminate</u>.  The determination that a particular accounting principle is generally accepted may be difficult because no single source exists for all principles."  <u>Shalala v. Guernsey Mem'l Hosp.</u>, 514 U.S. 87, 101 (1995) (quotation & citation omitted) (emphasis added).  Testimony supports this point.  <u>See, e.g.,</u> Tr. (05/12/04) at 480-86.

## OBJECTIONS TO FAILURE TO GIVE MISSING WITNESS INSTRUCTION

Mr. Forbes objects to the Court's failure to give a missing witness instruction. See Forbes Instr. No. 11.1; see also Forbes Trial Motion No. 36 (filed Sept. 27, 2004); Forbes Trial Motion No. 44 (filed Oct. 4, 2004).

## OBJECTIONS TO REPEATED CHARGE ON CONSCIOUS AVOIDANCE

Mr. Forbes objects to the Court's conscious avoidance instruction and to the incorporation of that instruction into each of the instructions on the mental states required for the various offenses. <u>See</u> Charge II.C.2.b, II.D.2.b, II.E.2.d. II.F.2.d, II.H.2.d.

1.    The jury instruction concerning conscious avoidance constitutes a constructive amendment of the indictment and/or a prejudicial variance. The indictment unequivocally alleges that the defendants <u>directed</u> the alleged fraud and <u>directed</u> the improper accounting that constituted the alleged fraud. <u>See, e.g.,</u> Indictment, Count 1, ¶ 24 ("If the consolidated quarterly earnings failed to meet the earnings target, defendants FORBES and SHELTON <u>directed</u> other conspirators to increase the earnings figure so that it met or exceeded that target" (emphasis added)); <u>id.,</u> ¶ 27 ("defendants WALTER A. FORBES and E. KIRK SHELTON <u>directed</u> other conspirators to increase the consolidated earnings figures for th[e] quarter and the fiscal year by the amounts necessary to meet or exceed their respective earnings targets for that quarter and fiscal year" (emphasis added)). Conscious avoidance is irreconcilable with knowing direction. The indictment also alleges actual knowledge of improper accounting on the part of Messrs. Forbes and Shelton and active participation in improper accounting by Messrs. Forbes and Shelton—not willful blindness. <u>See, e.g.,</u> Indictment, Count 1, ¶ 47 ("As the defendants <u>knew</u>, there was no justification in fact, or under GAAP, for their treatment of this membership cancellation reserve." (emphasis added)); <u>id.,</u> ¶ 51

- 16 -

("defendants WALTER A. FORBES and E. KIRK SHELTON and their co-conspirators deliberately misallocated revenue generated from deferred recognition programs to immediate recognition programs" (emphasis added)); id., ¶ 52 ("As the defendants knew, there was no justification in fact or under GAAP for the misallocations set forth in paragraph 51" (emphasis added)); id., ¶ 59 ("The defendants and their co-conspirators committed these acts knowing and intending that: a) that [sic] these fraudulent acts would ultimately be reflected in CUC's and Cendant's financial statements and public filings with the SEC; (b) CUC's and Cendant's financial statements would falsely overstate CUC's and Cendant's earnings; and (c) the investing public would rely upon such overstated earnings."). Conscious avoidance is fundamentally inconsistent with active, knowing, intentional participation in accounting manipulations, as alleged in the indictment. Consequently, any instruction on that subject would constitute a constructive amendment of the indictment and/or a prejudicial variance.

      2.    The government did not argue conscious avoidance in its principal closing argument. To the contrary, the government repeatedly argued, consistent with the indictment, that the defendants directed the alleged fraud and actively and intentionally participated in it. See, e.g., Tr. (10/18/04) at 14,824 ("the fraudulent earnings machine that Mr. Shelton, Forbes built"); id. at 14,827 ("the knowledge, involvement and direction of the two defendants in the fraud"); id. at 14,835 ("Walter Forbes knew all about this fraud and directed this fraud"); id. at 14,843 ("Walter Forbes, the man running this fraud"); id. at 14,845 ("Mr. Forbes

- 17 -

paid attention because he was involved, Mr. Forbes paid attention because he ran

this fraud with Mr. Shelton"); id. at 14,856 ("[Corigliano] tells you, he gives them

the cheat sheets.  He goes over how they're cooking the books, in essence.  Meeting

after meeting."); id. at 14,893-94 ("These men, Forbes, Shelton and Corigliano, had

built a massive cookie jar in 1996.  A massive cookie jar filled with tens of millions

of dollars of reserves, reserves that could be used any time they want, any way they

wanted in order to pump the earnings of this company up.").[6]  Indeed, the

government concluded its initial summation with the (improper) rhetorical flourish

---

[6]    See also id. at 14,929 ("There was a fake layer of earnings with this company,
ladies and gentlemen, and Kirk Shelton knew about it. . . . He knew very well, fully
well, because he was a member, a director of this conspiracy."); id. at 14,936-37
("This cushion, one of the setups for the fraud, was built by hand with the hands of
Ms. Pember, the hands of Mr. Shelton, and the hands of Mr. Forbes, all working
together to build this reserve, to continue the fraud"); id. at
14,950 ("The men running the fraud signed the agreement to keep Anne Pember,
the gatekeeper of the fraud, in place."); id. at 14,959 ("Kirk Shelton's directing the
fraud"); id. at 14, 962 ("[Mr. Shelton] was running the fraud along with Mr. Forbes
and Mr. Corigliano"); Tr. (10/19/04) at 14,983 ("what was done here was on purpose,
what was done here was expressly directed by the defendants down the chain of the
conspiracy"); id. at 14,991 ("directing Cosmo Corigliano . . . and his staff to
perpetrate the fraud . . . . Directing Cosmo Corigliano to manage the numbers, to
make the numbers up"); id. at 15,010 ("Mr. Shelton and Mr. Forbes directed this
fraud, were in on this fraud, pushed this fraud along"); id. at 15,013 ("Mr. Forbes
knew about the fraud, directed the fraud, was involved in every way in this fraud.");
id. at 15,015 ("the knowledge, involvement and direction of these two men in this
fraud"); id. at 15,027 ("Anne Pember told you time and time again that this man,
Mr. Shelton, was in on the fraud, directed the fraud, told her what to do."); id. at
15,044 ("They were doing what their boss wanted them to do.  They were doing
what Mr. Shelton instructed Mr. Corigliano to do."); id. at 15,045 ("the defendant
Walter Forbes was busy, too.  He was busy, too, trying to keep the fraud going,
busy, too, trying to keep the fraudulent manipulation of the revenue through
merger reserves going."); id. at 15,051 ("he's in on the fraud and he's doing what he
has to do. . . . The only one with the authority to step in and push for what they
need to keep the fraud going is Walter Forbes, and so he comes out."); id. at 15,058
("This is one example of Kirk Shelton affirmatively involved in cooking the books.");
id. at 15,118 ("they ran a fraud").

that the government was not seeking guilty verdicts because the defendants ran the

company, but because the defendants purportedly "ran a fraud." Tr. (10/19/04) at

15,118. When the defendants stated that they would not argue multiple

conspiracies in closing argument, the Court ruled that a multiple conspiracies

charge was inappropriate and might confuse the jury. See Tr. (10/14/04) at 14,598;

Tr. (10/15/04) at 14,666. Under this reasoning, a conscious avoidance instruction is

similarly inappropriate in this case. The government did not argue conscious

avoidance in its principal summation; to the contrary, the arguments advanced by

the government—that the defendants directed the fraud, and were actively and

intentionally engaged in fraudulent accounting—are fundamentally inconsistent

with the notion of conscious avoidance. Under these circumstances, a jury

instruction on conscious avoidance is unwarranted and will confuse the jury.[7]

---

[7] The government has suggested that it did argue conscious avoidance in its
principal summation. See Gov't Opp'n Forbes Mot. Preclude Conscious Avoidance
(filed Oct. 26, 2004) at 5 n.2. First, the quoted argument applies to Mr. Shelton, not
to Mr. Forbes. Second, the quoted argument is not a willful blindness argument—
that Mr. Shelton was aware of a high probability that CUC's reported financial
results were materially false, but that he consciously avoided confirming the fact by
not reading the e-mail. To the contrary, the government was arguing that Mr.
Shelton's testimony that he did not read the e-mail was not credible. Indeed, a few
lines after the portion of summation quoted in the government's brief, the
government explicitly argued that Mr. Shelton did read the e-mail. See Tr.
(10/19/04) at 15027 ("This e-mail doesn't have to cooperate. This e-mail just has to
exist and speak to you and it speaks to you now here today in this courtroom like it
spoke to Kirk Shelton six and a half years ago."). Third, to the extent that the
government now claims it was arguing that Mr. Forbes was aware of a high
probability that CUC's reported financial results were materially false, but that he
consciously avoided confirming the fact by not reading 10-Qs and 10-Ks, the same
analysis applies. The government was not arguing that, in fact, Mr. Forbes did not
read the SEC filings; it was arguing that this testimony was not credible, and the
government used pointed sarcasm to make this argument. See Tr. (10/18/04) at

3.     The government similarly failed to argue conscious avoidance in its rebuttal summation, but instead continued to argue that the defendants <u>directed</u> the alleged fraud.  <u>See</u> Tr. (11/01/04) at 16017 ("And the question that we're going to talk about today which I want you to think about is whether or not Cosmo Corigliano and Anne Pember were master criminals who were so clever, so cunning that they hid the fraud from Walter Forbes and Kirk Shelton, or whether they were ordinary conspirators who followed the directions and engaged in their fraud."); <u>id.</u> at 16070 ("Is this just an example of what this case is about, instructions going from the top down to the bottom?"); <u>id.</u> at 16071("[H]ave you heard credible testimony that this was a fraud where the instructions were passed from the top down?").

4.     There is not an adequate evidentiary basis for a conscious avoidance instruction as to Mr. Forbes—that Mr. Forbes was aware of a high probability of a fact but consciously avoided confirming that fact.  <u>See</u> Tr. (11/02/04)

---

14891 ("Now, Mr. Forbes would have seen his if he read the documents before he signed them as chairman and chief executive officer of the company.  But, as Mr. Forbes testified repeatedly, he didn't read these things.  At best, he skimmed them.  <u>Issue of credibility.  Can you believe that testimony?</u>" (emphasis added)); <u>id.</u> at 14844 ("Amazing.  Back in the press release, he knows what operating earnings are.  To a shareholder he seems like the guy in charge.  When he's on the witness stand, well, let's just say he didn't read much, certainly didn't read what he signed, and was looking to misdirect responsibility to everyone but himself, except when it came to getting paid."); <u>id.</u> at 14890 ("Now, we know, ladies and gentlemen, that Walter Forbes didn't read this 10Q because, you know, he signs things he never reads, skims them.  So he couldn't possibly have been aware of that.").  In any event, any argument on conscious avoidance first requires the predicate <u>evidence</u> that the defendant was aware of a high probability that the statements about CUC and Cendant's earnings made to the SEC and the investing public were false, but the government never made any such argument, and there is no evidentiary basis in the record for such an argument as to Mr. Forbes.

at 16204-25. As discussed above, the government marshaled no evidence of willful blindness in its closing argument, but instead argued that the evidence establishes that the defendants directed the alleged fraud and actively participated in it. Indeed, the government's argument to the Court on conscious avoidance was premised on the bizarre theory that Mr. Corigliano, its chief and only witness against Mr. Forbes, will be disbelieved by the jury with respect to the vast majority of his testimony, but believed as to some unspecified extent[8]—an argument that the government obviously could not make to the jury, and which underscores the fact that the government is seeking a conviction based on testimony that it knows or should know is false and misleading, in violation of the Wallach line of cases. See, e.g., Forbes Mot. Mistrial Based on Corigliano False Testimony (filed July 12, 2004). Under similar circumstances, the Second Circuit determined in United States v. Ferrarini, 219 F.3d 145 (2d Cir. 2000), that a conscious avoidance charge was unwarranted:

> We conclude that the evidence does not establish the requisite factual predicate for the charge. The evidence shows that Vieira actually knew of the frauds; it is not sufficient to permit a finding that he consciously avoided confirming them. The fact that a jury can -- on the evidence -- find actual knowledge does not mean that it can also find conscious avoidance. If conscious avoidance could be found whenever there was evidence of actual knowledge, a jury could be given a conscious avoidance instruction in a case where there was only equivocal

---

[8]    The government never explained what testimony of Mr. Corigliano, if believed, would establish the factual predicate that Mr. Forbes was aware of a high probability that CUC's and Cendant's reported financial results were false, but did not have actual knowledge of such falsity. See Tr. (11/02/04) at 16212-25.