**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) |
| WALTER A. FORBES. | ) |
| | ) |

No. 3:02CR264 (AWT)
July 14, 2005

**MEMORANDUM IN SUPPORT OF RENEWED MOTION OF
DEFENDANT WALTER A. FORBES TO PRECLUDE THE
GOVERNMENT FROM PRESENTING ITS PROPOSED
EXPERT TESTIMONY BECAUSE IT DOES NOT SATISFY
THE RELIABILITY REQUIREMENTS OF <u>DAUBERT</u> AND
FEDERAL RULE OF EVIDENCE 702
(<u>Forbes Retrial Motion <i>In Limine</i> No. 1</u>)**

By the close of the <u>Daubert</u> hearing, Mr. Heckler had proposed no less

than three alternative views of how he intended to support his opinions: one based

on his own independent "fact finding;" one based on him determining the facts by

listening to and evaluating the trial testimony itself; and yet a third where he would

abdicate any responsibility for the facts, and testify based upon "assumed" or

"stipulated" facts, virtually all of which were to be based upon his review of the

Audit Committee Investigation. <u>See</u> Post-Hearing Memorandum in Support of the

Motion of Defendant Walter A. Forbes to Preclude the Government from Presenting

Its Proposed Expert Testimony Because It Does Not Satisfy the Reliability

Requirements of <u>Daubert</u> and Federal Rule of Evidence 702 (Forbes Pretrial Motion

No. 49) at 3-9.

Mr. Heckler came to this third view – that his testimony would be based on assumed facts – after having to admit that he had not followed the appropriate accounting standards for conducting a factual investigation of his own. Heckler testified that "in the real world outside the courtroom," Generally Accepted Auditing Standards ("GAAS") would govern his evaluation of whether an account or an item on a financial statement complied with GAAP:

> Q.     In the real world outside of the courtroom, if you're
> out there acting as a CPA, somebody asks you to come
> and look at an account or an item of a financial statement
> and give an opinion in terms of whether or not it is fairly
> stated in conformity with GAAP, there are in fact
> accounting standards that address that issue, correct?
>
> A.  There are auditing standards.
>
> *  *  *  *  *  *  *
>
> Q. But if in fact somebody in the real world is looking for
> an opinion on a particular account, royalty account, lease
> account, something of that nature, there are auditing
> standards promulgated by the AICPA that govern that,
> correct?
>
> A.  That's right.
>
> Q.  And that in fact is Auditing Section 623, correct?
>
> A.  I don't have the Book.  You have it in front of you.  But
> if it says 623, that would be the standard.

Tr. 3/9/2004 at 1173-74.  To avoid the consequences of this admission – the exclusion of his testimony for failure to employ the same level of intellectual rigor inside the courtroom that characterizes the practice of that expert in the relevant field, Kumho Tire Company, Ltd. v. Carmichael, 526 U.S. 137, 152 (1999) – Mr. Heckler changed course in the middle of the Daubert hearing, and testified that his

opinions at trial would be based on *assumed* facts.  *See, e.g.,* Tr. 3/25/2004 at 2600-01.  Presumably in light of this testimony, the Court permitted Mr. Heckler's testimony to go forward.

The jury heard nothing about "assumed facts" or "hypotheticals" during Mr. Heckler's trial testimony, however.  Instead, Mr. Heckler reverted back to his other two positions – vacillating between representing himself as an independent "fact finder" and representing himself as the "thirteenth juror" – drawing conclusions regarding factual and accounting matters based on his interpretation of the trial evidence.  As demonstrated in our prior pleadings, neither formulation provides a reasonable basis for Mr. Heckler's opinion.

Mr. Forbes incorporates herein his prior arguments concerning the exclusion of Mr. Heckler and Mr. Sack as set forth in Motion of Defendant Walter A. Forbes to Preclude the Government from Presenting Its Proposed Expert Testimony Because It Does Not Satisfy the Reliability Requirements of <u>Daubert</u> and Federal Rule of Evidence 702 (Forbes Pretrial Motion No. 49) and related pleadings: docket numbers 277 (6/27/03), 278 (6/27/03), 281 (6/27/03), 404 (10/02/03), 507 (3/02/04), 602 (4/02/04), 621 (4/13/04) and 707 (5/10/04).  Mr. Forbes also incorporates the arguments advanced by Mr. E. Kirk Shelton, joined by Mr. Forbes, regarding the same subject:  docket numbers 314 (6/30/03), 315 (6/30/03), 316 (6/30/03), 317 (6/30/03), 318 (6/30/03), 327 (7/17/03), 405 (10/02/03), and 544 (3/19/04).

## ARGUMENT

By the conclusion of the <u>Daubert</u> hearing, where Mr. Heckler was

forced to admit that he had not followed the accounting standards that would apply

if he were conducting an investigation in the "real world," Mr. Heckler was claiming

that while he had ostensibly gone above and beyond what was required and done

some factual investigation as "background" work, his opinions were based upon

*assumed* facts, and thus his factual investigation should not be held up to the

standards of other accounting experts in the field.

> The facts are stipulated to me. I've actually gone over and
> above doing a lot of analysis with those facts to ensure
> that I understand what was happening as best as I could
> with the facts provided to me, that I understood that to be
> able to draw a conclusion on how GAAP would apply, I
> investigated whether there were other reasons why GAAP
> would make sense given what the company may have
> done, that I considered all those other things in assessing
> the materiality. *But that I'm not responsible nor do I need*
> *to under my professional standards to validate the facts.*

Tr. 3/25/2004 at 2600-01 (emphasis added).  Mr. Heckler re-emphasized that his

opinion at trial would be based upon assumed facts a little later in the <u>Daubert</u>

hearing:

> I did understand that my role as an expert was to use my
> training, education and experience to assess which facts
> were relevant and then to be prepared to analyze the facts
> I chose as relevant out of that population and to testify.
> And that those *assumed facts* I would not be responsible
> for proving; instead, the government would be responsible
> for proving through its case or that you, as the defense,
> would be in a position to disprove through your case.

Tr. 3/25/2004 at 2654 (emphasis added).

4

No assumptions or hypotheticals were discussed during Mr. Heckler's trial testimony, however. Instead, Mr. Heckler improperly suggested to the jury that he *had* conducted a factual investigation sufficient to support his opinions. He then proceeded to testify to the "facts" as he understood them, implying that he had verified these "facts" through his own, independent factual investigation. Nor did Mr. Heckler stop at his own alleged investigation. He went one step further, implying that the testimony of the government's witnesses comported with his own fact finding, thereby improperly vouching for the credibility of these key government witnesses.

Mr. Heckler implied, for example, that he had conducted his own investigation into the cancellation reserve at CUC:

> Q. And what type of work -- what items did you consider -- first of all, let me ask you: Did you form an opinion as to whether or not there was a violation of GAAP in this area?
>
> A. Yes, I did.
>
> Q. And were you able to quantify the violation?
>
> A. I was able to quantify the violation.
>
> Q. And what were some of the items you considered in getting there?
>
> [OBJECTION OVERRULED]
>
> A. Some of the items that I considered in formulating my opinion was to look at the trial testimony, the exhibits introduced as part of the trial, to look at company records, how the company reported or estimated this cancellation reserve in the first place, to look at supporting documentation that the company provided to auditors and others to help justify what they did the first time when they recorded these cancellation reserves. I looked at transactions that the company either delayed the

recognition of or chose not to report on a timely basis, or
in some cases where the company recorded transactions to
reverse out part of these cancellation reserves into
income. And then I looked at accounting literature and
other information that governs how these estimates are to
be made.

\* \* \* \* \* \* \*

Q.  And again briefly, do you have an opinion as to why
this is a violation of GAAP?

A.  The violation is that in order to recognize any revenue
related to these programs, the company would be
obligated to estimate a good faith estimate of how much
it's going to have to give back and to only reflect the net
amount. So, for example, if we had $100 in a membership
that we thought $5 was going to need to be given back, we
would only be allowed to show $95 as income and we need
to set the $5 aside for a potential refund when and if it
occurs. The violation here is that because the estimate
was an error, and in some cases that estimate was used
for other purposes, that there wasn't enough set aside of
those revenues to cover the cancellations that were
expected to occur.

Tr. at 10,641-42, 10,645-46.  Mr. Heckler's suggestion was further fortified by the

fact that the jury had no evidence before it by which one could quantify the effect of

the cancellation reserve issue for fiscal year 1/31/96, yet Heckler testified that he

had quantified the effect to be at least $48 million – testimony for which there was

no record evidence.

Similarly, when it came to the Commissions Payable issue, the jury

had no choice but to believe that Mr. Heckler had conducted his own investigation.

His testimony did not disclose any assumptions, and there was no record evidence

for his opinion that there was at least a $4 million effect in January 1997, and at

least a $2 million effect in December 1997. Tr. at 10,658. Rather, the only record evidence concerning the Commissions Payable was Pember's testimony that she had improperly utilized $9 million of Commissions Payable to inflate income in January 1997, Tr. 2,456-2,466, and an e-mail from Speaks in April 1998 reflecting his belief that the Commissions Payable account was understated by as much as $10 million, GX31. Thus the jury was left to believe either that Mr. Heckler plucked his $2 million and $4 million figures out of thin-air because these amounts were at least less than what other witnesses had said, or, more plausibly, that Mr. Heckler had conducted an investigation beyond the evidence presented in Court and reached the "expert" opinion that the financials were overstated by at least these amounts. As discussed at length in our earlier pleadings, however, Mr. Heckler's investigation failed to provide a sufficient basis for an expert opinion, and he should not have been permitted to imply the contrary to the jury.

Mr. Heckler's testimony was particularly prejudicial when he used the charade of his "independent investigation" to vouch for the credibility of the government's witnesses. For example, Mr. Heckler implied that he had independently investigated the top-side adjustments and calculated the effect these adjustments had on CUC's financial statements. He then proceeded to vouch for Mr. Sabatino's testimony by telling the jury that Mr. Sabatino's testimony was "confirming" of his own work:

> Q. And was -- did you review the testimony of Mr. Sabatino?
> A. Yes, I did.

7

Q.  And did you review the exhibits which came into evidence during his testimony?

A.  That's correct.

Q.  And did this help -- how, if at all, did this help you in this area?

A.  Well, it confirmed what I had already calculated as the potential areas.

[OBJECTION OVERRULED]

A.  It confirmed what I had already calculated as the errors of the topside adjustments that were unsupported through my own work.  I was able to match up the amounts I had calculated to what Mr. Sabatino had provided in summaries entered in as evidence to the exhibits.

Tr. 10,629-30.  Similarly, when it came time to discuss Mr. Heckler's opinion regarding CUC's use of merger reserves, Mr. Heckler testified that he had concluded the reserves were misused and then continued on to vouch for Mr. Cosmo Corigliano:

Q.  Did you -- was the testimony of any particular witnesses helpful to you in making that determination?

A.  Yes.

[OBJECTION OVERRULED]

A.  Yes, there was testimony that helped.

BY MR. CARNEY:

Q.  And whose testimony was that?

A.  A number of people.  In particular, Mr. Corigliano.  To a lesser degree, Mr. Sabatino.  Ms. Pember.  All to some degree or another and with different degrees of detail described how some of these reserves were initially put into excess reserves or extra reserves, cushion, a lot of different words were used.  And that in and of itself would be a violation of GAAP.

Tr. 10,651-52.

\* \* \* \* \* \* \* \*

Rule 16 requires that expert testimony summaries "describe the witness's opinions, the bases and the reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(a)(1)(G). Yet in the case of Mr. Heckler, the bases of his opinion has been a constantly shifting target – swinging from independent fact investigation, to trial evidence, to assumed facts. This uncertainty alone prejudiced Mr. Forbes, making it impossible for the defense to prepare or conduct an adequate cross-examination of Mr. Heckler. Indeed, any cross-examination the defense may have attempted would have been at the risk of eliciting additional improper testimony concerning Mr. Heckler's "investigation."

Even more damaging, however, was the fact that Mr. Heckler's trial testimony then falsely suggested to the jury (1) that Mr. Heckler had performed a fact investigation of the type an expert in accounting would rely upon in forming the opinions testified to by Mr. Heckler, and (2) that the government's witnesses could be trusted because their testimony comported with the results of Mr. Heckler's "independent investigation." The government should not be allowed to repeat this prejudicial presentation in the retrial. The testimony of Mr. Heckler should be excluded, or in the alternative, Mr. Heckler should be precluded from either suggesting in any way that he conducted his own factual investigation, or bolstering other witnesses' credibility by suggesting that his work confirmed their testimony.

Nor should Mr. Heckler be permitted to "quantify" the alleged accounting errors. To the extent he is simply repeating what other witnesses have

said, his testimony is cumulative, unnecessary and prejudicial; to the extent it is based upon his "independent" analysis, it is a contrary to the position he ultimately took during the <u>Daubert</u> hearing – that he would be testifying based on "assumed" or "stipulated" facts – and does not satisfy the requirements of <u>Daubert</u> and Rule 702.

## **CONCLUSION**

For the foregoing reasons, as well as the reasons stated in Mr. Forbes' earlier pleadings, incorporated herein, Mr. Forbes respectfully requests that the Court preclude the testimony of the government's experts, Mr. Heckler and Mr. Sack, or in the alternative, that the Court preclude Mr. Heckler from (1) suggesting in any way that he conducted his own factual investigation, or (2) bolstering other witnesses' credibility by suggesting that his work confirmed their testimony, or (3) purporting to quantify the amount of the alleged accounting errors.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: _____

Brendan V. Sullivan, Jr. (Bar No. ct17115)
Barry S. Simon (Bar No. ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
COWDERY, ECKER & MURPHY, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

Dated:  July 14, 2005

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Memorandum in Support of the Renewed Motion of Defendant Walter A. Forbes to Preclude the Government from Presenting Its Proposed Expert Testimony Because It Does Not Satisfy the Reliability Requirements of Daubert and Federal Rule of Evidence 702 (Forbes Retrial Motion *In Limine* No. 1) to be sent on July 14, 2005 to the following via FedEx:

Norman Gross, Esq.
U.S. Attorney's Office
District of New Jersey
401 Market Street
Fourth Floor
Camden, NJ 08101


_____
Barry S. Simon