UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 3:02CR264 (AWT) |
| v. ) | |
| ) | |
| WALTER A. FORBES ) | July 14, 2005 |
| ) | |

MEMORANDUM IN SUPPORT OF MOTION
OF DEFENDANT WALTER A. FORBES
(1) FOR A BILL OF PARTICULARS AND (2) TO LIMIT THE EVIDENCE
PRESENTED AT TRIAL TO THE CHARGES IN THE INDICTMENT
(Forbes Retrial Motion No. 2)

Brendan V. Sullivan, Jr. (Bar No. ct17115)
Barry S. Simon (Bar No. ct24159)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
Cowdery, Ecker & Murphy, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

Oral Argument Requested

Defendant Walter A. Forbes, through undersigned counsel, respectfully submits this memorandum in support of his renewed motion (i) for a bill of particulars pursuant to Fed. R. Crim. P. 7(f) and (ii) to limit the evidence presented by the government at trial to the charges in the indictment.[1]

## ARGUMENT

### I. MR. FORBES REQUIRES PARTICULARS CONCERNING THE ALLEGED FRAUD DURING THE PERIOD BETWEEN THE LATE 1980'S AND FEBRUARY 1995.

One of the principal purposes of a bill of particulars is to "identify with sufficient particularity the nature of the charge pending against [the defendant], thereby enabling [him] to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987). Mr. Forbes requires particulars concerning the specific alleged accounting improprieties charged by the government for the period between the late 1980's and February 1995 in order to prepare for his retrial and prevent unfair surprise.

The evidence presented by the government at the 2004 trial demonstrates convincingly that Mr. Forbes has a critical need for particulars concerning the alleged accounting fraud at CUC prior to February 1995. At the trial, Mr. Forbes was confronted for the first time with an array of new allegations

---

[1] Mr. Forbes also continues to have a critical need for all of the particulars requested in Forbes Pretrial Motion Nos. 38 and 60 and Forbes Trial Motion No. 2, and has renewed those motions in the Renewed Fed. R. Crim. P. 12(b)(3) Motions of Walter A. Forbes (filed July 15, 2005).

concerning purported accounting improprieties that allegedly took place between the late 1980's and February 1995. See, e.g., Tr. (5/27/04) at 2470-72; Tr. (6/8/04) at 3681-86; Tr. (6/28/04) at 6238-328; Tr. (6/29/04) at 6337-454; Tr. (8/4/04) at 9700-29, 9732-35, 9748-49.

Mr. Forbes had no prior notice of these allegations. Neither the indictment nor any disclosure by the government identifies the allegedly fraudulent accounting that purportedly took place between the late 1980's and February 1995. Although the indictment charges that the alleged accounting misconduct took place from "at least as early as the late 1980's to in or about April 1998," Indict., Count 1 ¶ 17, and alleges in vague and conclusory terms that merger reserves, cancellation reserves, immediate and deferred revenue recognition programs, and membership cancellations costs were misused, see id. ¶¶ 30, 46, 49-50, 55, it fails to provide any specifics concerning the period between the late 1980s and February 1995. Similarly, the government's pretrial disclosures (including its "particulars" letters of December 2002 and May 2003, its expert disclosures, and the Cendant Audit Report) failed to identify the alleged accounting fraud during that time period. The indictment and the government's pretrial disclosures focused instead on accounting issues relating to a narrow three-year period between 1995 and 1998. See Tr. (10/15/03) at 132-34 (Mr. McMahon: "And what they should know is that in terms of specific fraudulent accounting entries or transactions, the case is going to be limited, the trial will be limited to 1995 to 1998.").

2

Mr. Forbes does not know what testimony or other evidence the government will present in a retrial concerning pre-1995 accounting. Without particulars concerning the specific alleged accounting improprieties at issue for this significant time frame, the government will be able to lodge entirely new allegations at a retrial and/or to significantly modify the allegations made at the 2004 trial. In addition, unless the government is required to supply Mr. Forbes with particulars in advance of trial, witnesses such as Mr. Corigliano, Ms. Pember, and Mr. Kearney will be free to testify at a retrial concerning purported pre-1995 improprieties about which they did not testify at the first trial and about which Mr. Forbes has no notice.

To prevent unfair surprise to Mr. Forbes, and to enable Mr. Forbes to prepare his defense, the government should be required to provide particulars concerning the precise alleged accounting improprieties it contends took place during the period between the late 1980's and February 1995. In the alternative, the Court should require the government to make a binding representation that it will not present any argument, testimony or documentary evidence concerning alleged pre-1995 accounting irregularities that it did not present at the 2004 trial. The Court has the discretion to treat the government's prior disclosures as a bill of particulars by which it will be bound at trial. See United States v. Laughlin, 768 F. Supp. 957, 967 (N.D.N.Y. 1991) (government would be bound by factual representations in pleading concerning chemical at issue in indictment; "if the government intends to establish defendant's liability in these Counts by reference to

3

[a different chemical], it must provide defendant with this information in a bill of particulars.").

## II. THE COURT SHOULD LIMIT THE GOVERNMENT'S EVIDENCE TO THE ACCOUNTING IRREGULARITIES CHARGED IN THE INDICTMENT, AS REFLECTED IN THE GOVERNMENT'S DECEMBER 2002 AND MAY 2003 DISCLOSURES.

During the 2004 trial, the government presented evidence of alleged accounting improprieties outside the scope of the indictment. Because such evidence constitutes a constructive amendment of the indictment, the Court should preclude the government from presenting this evidence at Mr. Forbes' retrial.

The Fifth Amendment provides that "[n]o person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend V. A material deviation from the allegations in the indictment violates this constitutional mandate because (1) "it requires a defendant to answer a criminal charge that was not brought by a grand jury" and (2) "it denies the defendant sufficient notice to prepare and present an adequate defense." United States v. Wallace, 59 F.3d 333, 336 (2d Cir. 1995) (quotation omitted).

A constructive amendment takes place when the government presents evidence at trial that broadens the scope of the indictment beyond that returned by the grand jury, or when the government presents evidence that is based on facts

4

different than those found by the grand jury.[2/] A constructive amendment of an indictment is a per se violation of the Grand Jury Clause of the Fifth Amendment that requires reversal even without a showing of prejudice to the defendant." Wozniak, 126 F.3d at 109 (quotation omitted); see also United States v. Leichtnam, 948 F.2d 370, 377 (7th Cir. 1991) ("Any broadening of the possible bases for conviction from that which appeared in the indictment is fatal. It is reversible per se." (quotations & alterations omitted)).

At the 2004 trial, the government presented evidence of alleged accounting improprieties outside the scope of the indictment. For example, Mr. Corigliano offered extensive testimony concerning the alleged misuse of general reserves. See, e.g., Tr. (06/28/04) at 6298-99, 6322-25, 6327-28; Tr. (06/29/04) at 6361-62. The indictment charges the misuse of only merger reserves, see Indict. at 18, and membership cancellation reserves, see id. at 19. It says nothing

---

[2/]   See, e.g., Stirone v. United States, 361 U.S. 212, 217-19 (1960) (finding constructive amendment, and reversing conviction, when indictment charged interference with interstate shipments of sand, but government also offered evidence of interference with interstate shipments of steel); United States v. Wozniak, 126 F.3d 105, 109-11 (2d Cir. 1998) (finding constructive amendment, and reversing conviction, when indictment charged defendant with conspiracy to distribute cocaine, but government offered evidence of both cocaine and marijuana distribution); United States v. Zingaro, 858 F.2d 94, 103 (2d Cir. 1988) (finding constructive amendment, and reversing conviction, when government offered evidence of loan that fell outside scope of scheme alleged in indictment); United States v. Mollica, 849 F.2d 723, 729 (2d Cir. 1988) (finding constructive amendment, and reversing conviction, when indictment charged conspiracy to impair IRS in collection of taxes, but evidence permitted jury to convict defendant of conspiracy to commit any fraudulent act against the United States).

about the alleged manipulation of <u>general reserves</u>. Nor did the government otherwise disclose that it would present such new charges at trial.

Similarly, Mr. Corigliano testified about purportedly fraudulent accounting in connection with profit sharing receivables. See, e.g., Tr. (06/28/04) at 6292 (testifying that "profit sharing receivable on FISI's and BCI's books could be adjusted to increase the receivable and increase operating earnings"; "[a]nother potential adjustment to be used as a plug to get to operating earnings"); Tr. (06/28/04) at 6301-02 (testifying that profit sharing receivable was listed as a potential adjustment in document used to manipulate financial statements); Tr. (06/29/04) at 6354 ("And each quarter, if the company fell short from meeting the operating earnings, he frequently had me increase the profit sharing receivable, use it as a plug number, in a sense, to get to the desired results, get to the desired operating results."); Tr. (06/29/04) at 6355-56 (opining that calculation of profit sharing receivable was not "based upon a good faith analysis of the facts," but rather "on the need to find more operating income" and "hit the operating numbers"); Tr. (06/29/04) at 6357-59 (testifying that $2.4 million from potential profit sharing receivable adjustments is included in year to date operating earnings number or EBIT); Tr. (07/01/04) at 6721-22 (testifying about allegedly taking $500,000 into Q4 1996 from FISI division for profit sharing). The indictment identifies various categories of alleged accounting fraud, but these charges relating to alleged manipulations of profit sharing receivables are not contained in the indictment, and

the government did not otherwise notify Mr. Forbes that it intended to confront him with these new charges at trial.

Mr. Corigliano also testified about another new charge -- the alleged misuse of merger reserves in connection with the Getko acquisition. See, e.g., Tr. (06/30/04) at 6532-62 (thirty pages of testimony on Getko); Tr. (06/30/04) at 6536-41 (testifying about alleged establishment of excess merger reserves in connection with the Getko acquisition to be used to increase operating earnings); Tr. (06/30/04) at 6542-48 (testifying about alleged discussion of these issues with Mr. Shelton); Tr. (06/30/04) at 6549 (testifying that he and Shelton allegedly performed calculations concerning adjustments to EBIT). Although the indictment mentions other specific acquisitions, including Ideon, Davidson, and Sierra, see Indict., Count 1 ¶ 34, it does not mention the Getko acquisition. Nor do the government's other disclosures.

Mr. Corigliano's testimony concerning general reserves, profit sharing receivables, and the Getko acquisition constituted an unconstitutional constructive amendment of the indictment. See Motion for a Mistrial Due to the Constructive Amendment and/or Prejudicial Variance, and Notice Violations, Caused By the Testimony of Cosmo Corigliano (Forbes Trial Motion No. 20) (filed July 21, 2004) (incorporated herein by reference). The Court should preclude the government from presenting any evidence or argument on these subjects at Mr. Forbes' retrial.[3]

---

[3] Any testimony by Mr. Corigliano testimony concerning pre-1995 matters not charged in the indictment, such as the alleged misuse of general reserves and the

In order to prevent unfair surprise to Mr. Forbes and to preclude the government from presenting evidence of alleged accounting improprieties beyond the scope of the indictment, the Court also should enter an Order that the government is bound by the disclosures in its December 31, 2002 "particulars" letter and May 2003 supplement concerning the specific allegedly false accounting entries at issue for the period between 1995 and 1998.  See Laughlin, 768 F. Supp. at 967. The government previously represented to the Court and defense counsel that the December 31, 2002 letter (as supplemented) "identified all accounting entries on the books of CUC, Cendant and their subsidiaries that the Government will contend at trial were fraudulent," Government Opposition to Forbes Pretrial Motion No. 38 (filed June 2, 2003) at 15 (emphasis added), and "exactly which entries relate to the fraudulent use of merger reserves." Tr. of 10/15/2003 at 140 (emphasis added). The

---

Getko acquisition, would be particularly prejudicial because the documentary record prior to 1995 is extremely sparse.  Unlike the 1995-1998 period, where there are accounting records that can be used to verify or challenge a witness's testimony concerning allegedly improper accounting, there are very few accounting records for the pre-1995 period.  Indeed, Cendant representative Toby Ippolito, who describes himself as the person most familiar with the restatement process (which covered fiscal years 1/31/96, 1/31/97 and 12/31/97) stated in a court hearing that "it is an impossible task to restate those earlier periods." Tr. (11/17/99) (Ex. 1 hereto) at 91. Mr. Ippolito explained that, for the pre-1995 period, "certain electronic data was destroyed," id. at 84, and that "[w]e did not go back because we could not do that. It was impossible to do that." Id.  Mr. Corigliano's testimony at the 2004 trial that merger reserves were improperly inflated during Mr. Bell's tenure as CFO was particularly suspect.  The only other witnesses to those matters who testified at the trial, Tom Albright and Joel Zychick, directly contradicted Mr. Corgliano's testimony that merger reserves set up when Mr. Bell was CFO were excessive or improper.

Court should bind the government to its representations and limit its evidence at trial for the period between 1995 and 1998 to the accounting entries identified in its previous disclosures. If the Court declines to enter such an Order, then, at a minimum, the Court should require the government to supply Mr. Forbes with particulars -- by which it will be bound at trial -- specifying the precise allegedly false accounting entries at issue for the period between 1995 and 1998.

## CONCLUSION

For the foregoing reasons, Mr. Forbes respectfully requests that the Court enter an Order (i) requiring the government to provide the particulars requested herein and (ii) binding the government to the representations in its December 31, 2002 "particulars" letter and May 2003 supplement concerning the specific allegedly false accounting entries at issue for the period between 1995 and 1998.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: _____
Brendan V. Sullivan, Jr. (Bar No. ct17115)
Barry S. Simon (Bar No. ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
Cowdery, Ecker & Murphy, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

Exh. 1

```
                                                    Page 1
 1                  REPORTER'S RECORD
 2                  VOLUME 1 OF 2
 3         TRIAL COURT CAUSE NO. cc-98-12602-b
 4
   GEORGE M. KEVLIN, ET AL.    )
 5              Plaintiff,     )   IN THE COUNTY COURT
                               )
 6   VERSUS                    )   AT LAW NUMBER TWO
                               )
 7   CENDANT CORP., ET AL.     )
                Defendant.     )   DALLAS COUNTY, TEXAS
 8
 9
10
11
12   *******************************************************
13                    MOTION TO COMPEL
14   *******************************************************
15
16
17
18
19         On the 17th day of November, 1999, the
20   following proceedings came on to be heard in the
21   above-entitled and numbered cause before the
22   Honorable Carlos Lopez, Judge presiding of the County
23   Court at Law No. 2 of Dallas, Dallas County, Texas,
24         Proceedings reported by machine shorthand,
25   transcript produced by computer.
```

```
                                                    Page 2
 1   APPEARANCES:
 2     MR. C. GREGORY SHAMOUN
       MR. HOWARD J. KLATSKY
 3     Law Offices of C. Gregory Shamoun
       3710 Rawlins, Suite 1210, LB 84
 4     Dallas, Texas  75219-4217
       214-987-1745 and fax 214-521-9033
 5     and
       MR. BRAD JACKSON
 6     3701 Turtle Creek, Suite 12G
       Dallas, Texas 75219
 7     214-526-7800
                    FOR THE PLAINTIFFS
 8
 9     MR. RALPH H. DUGGINS
       Cantey & Hanger
10     2100 Burnett Plaza
       801 Cherry Street
11     Fort Worth, Texas  76102
       817-429-3815 and fax 817-877-2807
12     and
       MR. SAMUEL KADET
13     Skadden, Arps, Slate, Meagher & Flom
       919 Third Avenue
14     New York 10022-3897
       212-735-3000 and fax 212-735-2000
15                FOR THE DEFENDANT CENDANT
16
       MR. ROBERT W. COLEMAN
17     Vial, Hamilton, Koch & Knox
       1717 Main Street, Suite 4400
18     Dallas, Texas  75201
       214-712-4400 and fax 214-712-4402
19                FOR THE DEFENDANT ERNST & YOUNG
20
21
22
23
24
25
```

```
                                                    Page 3
 1                      I N D E X
 2
 3              CHRONOLOGICAL WITNESS INDEX
 4   WITNESS           Direct  Cross  Redirect  Recross
 5   Vic Moore            7      52      61       --
 6   Tobia Ippolito      63      72     115       --
 7   Vic Moore          134     139     147      148
 8   Gregory Shamoun    156      --      --       --
 9   Tobia Ippolito     159     163     168       --
10
11              ALPHABETICAL WITNESS INDEX
12   WITNESS           Direct  Cross  Redirect  Recross
13   Tobia Ippolito      63      72     115       --
14   Tobia Ippolito     159     163     168       --
15   Vic Moore            7      52      61       --
16   Vic Moore          134     139     147      148
17   Gregory Shamoun    156      --      --       --
18
19   (Argument too commingled to list specific pages.)
20
21
22   Reporter's Certificate . . . . . . . . . . . 234
23
24
25
```

```
                                                    Page 4
 1              PLAINTIFF'S EXHIBITS INDEX
 2                                       (Excluded)
 3   Number   Description            Offered   Admitted
 4     1    Plf Interrogatories         6         6
 5     2    Dft Production Responses    6         6
 6     3    Dft Interrog Responses      7         7
 7     4    Dft Supplemental Answer     7         7
 8     5    Dft Admission Responses     7         7
 9     6    Dft Admission Responses     7         7
10     7    Dft Production Responses    7         7
11     8    Form 8-K                    7         7
12     9    Form 10-K/A                 7         7
13    10    Ippolito Affidavit         14        (15)
14    11    Vic Moore Literature       16         17
15
16
17              DEFENDANT'S EXHIBITS INDEX
18                                       (Excluded)
19   Number   Description            Offered   Admitted
20     1    Form 10-K/A               100        100
21     2    Plf Interrog Answers      101        101
22     3    Pooling Adjustments       115        115
23
24
25
```

Page 81

1 specifically says CUC. He is saying he didn't know
2 what CUC was.
3         THE WITNESS: Which CUC? Which CUC?
4         MR. KADET: Can I ask --
5         MR. JACKSON: How many CUC's are there?
6         MR. KADET: Can I ask a question, Your
7 Honor.
8         THE COURT: We'll get to that. Go
9 ahead.
10     Q (By Mr. Kadet) The adjustments that were
11 made to the January 31, 1995, balance sheet, did
12 those adjustments relate in any way to HFS
13 adjustments or all of the adjustments on the CUC side
14 of the house so to speak?
15     A All of the errors and irregularities
16 included in the Form 10-K/A, under the heading
17 accounting errors and irregularities, related to a
18 former CUC business.
19     Q That's true for all three years?
20     A That is true for the years ended -- for the
21 years ending December 31, 1995, and 1996.
22     Q Okay. And whatever adjustments you made to
23 the balance sheet as of January 31, '95, they were
24 adjustments coming out of the CUC side, correct?
25     A That's correct.

Page 82

1     Q Let's look at B. B asks for adjustments
2 from errors and irregularities for the consolidated
3 balance sheet of CUC as of January 31, '96. Okay.
4 And that one is admitted. All right.
5         And again, what balance sheet, in
6 making that admission, what specific balance sheet or
7 adjustments made to, in connection with last year's
8 restatement?
9     A Okay. Again, since CUC was not defined, I
10 interpreted the term "CUC" to mean CUC as restated.
11     Q So in other words, it was the CUC balance
12 sheet as it had been restated over a period of years
13 and as published in the 10-K/A?
14         MR. SHAMOUN: Your Honor, I object. It
15 assumes facts not in evidence. There has been no CUC
16 restatements in the 10-K/A. None.
17         MR. JACKSON: And it says --
18         MR. SHAMOUN: There's been none.
19         MR. JACKSON: It says CUC as of
20 January 31, '96.
21         THE COURT: That's fine. Your
22 objection is preserved. I expect to you go through
23 that in cross-examination.
24     Q (By Mr. Kadet) Okay. Mr. Ippolito, the
25 adjustments that were made to the January 31, 1996,

Page 83

1 balance sheet, appearing in the 10-K/A, did those
2 adjustments come from the CUC side of the house, or
3 the HFS side of the house, or both?
4     A All of the adjustments related to the
5 business of -- the former business of CUC.
6     Q Now, C is denied, and it's a question asking
7 us to admit concerning adjustments to the CUC
8 stand-alone income statements for the fiscal year end
9 of January 31, '95. Do you see that?
10    A Yes, I do.
11    Q And what was the basis for the denial there?
12    A Two components. The first one is there is a
13 focus here on the words "stand alone," and never did
14 Cendant Corporation restate the original --
15 originally published CUC financial statements.
16 That's number one.
17        Number two is this refers to the annual
18 period, consistent in the 10-K/A of 1994, and that
19 period has never been restated.
20    Q So there were no restatements made, again,
21 either publicly or privately, for any financial
22 statements ending January 31, '95? We didn't go
23 back -- we did not go back into 1994 in connection
24 with this effort last year at all, publicly or
25 privately, correct?

Page 84

1     A Yeah. Let me be clear. We did not go back
2 because we could not go back. It was impossible to
3 do that.
4     Q Why is that?
5     A Certainly. There -- number one, in
6 connection with the errors and irregularities,
7 certain electronic data was destroyed. That
8 information is integral to the restatement process.
9 Therefore, because it is destroyed, it does not exist
10 anywhere.
11    Q Let me interrupt you for one second. There
12 was an implication from Mr. Moore that the
13 destruction took place sometime after the restatement
14 process. Could you elaborate on when this
15 electronically-stored data was destroyed, please?
16    A Sure. Absolutely. Based on my
17 understanding, through a query of the individuals
18 responsible for maintaining that electronic data -- I
19 personally conducted that interview -- the
20 information was regularly overwritten on a three
21 month rolling basis. So we had access to
22 approximately four to five months worth of tapes
23 because certain ones were in transit. All
24 information prior to that was nonexistent. It was
25 overwritten.

Page 85

1 MR. SHAMOUN: Objection to hearsay and
2 move to strike.
3 MR. JACKSON: It's something somebody
4 else told him.
5 THE COURT: I will sustain that.
6 Q (By Mr. Kadet) Do you have any information
7 about any electronic data being destroyed last year,
8 after the beginning of the restatement process in
9 which you participated?
10 A Absolutely not. Specifically, we were
11 required by law not to destroy any information.
12 Q And in fact, was there information that was
13 not available to you for periods prior to 1998 that,
14 if available, you would have used in connection with
15 the restatement process?
16 A Yes.
17 Q And that information had been electronically
18 stored; is that correct?
19 A There is a small component of information
20 that was electronically stored, and every bit of the
21 information that we could obtain was utilized, and
22 the information for the earlier periods does not
23 exist.
24 Q All right. Now, let's turn to D, the
25 adjustments to the CUC stand-alone income statements

Page 86

1 for the fiscal year end January 31, '96. Now, that
2 one we admitted as to the income statement for the
3 fiscal year ended January 31, 1996. Is that an
4 accurate statement, in your view, sitting here now?
5 A The answer is no.
6 Q Why not?
7 A I believe -- my own personal opinion is that
8 there was a typographical error with the insertion of
9 "stand alone." But to be clear, maybe --
10 MR. SHAMOUN: Judge, can I have a
11 running objection to this testimony? It's contrary
12 to the judicial admission.
13 THE COURT: Yes.
14 MR. SHAMOUN: He is trying to change
15 his admission and I want an objection running. Thank
16 you.
17 THE COURT: All right. That's
18 sustained.
19 Q (By Mr. Kadet) Go ahead.
20 A Okay.
21 THE COURT: I mean, your request for a
22 running objection is sustained.
23 THE WITNESS: The information -- the
24 adjustments, as they relate to the year ended 1995,
25 also known as the fiscal year 1-31-1996, the

Page 87

1 adjustments relate to the restated CUC International
2 financials, not the CUC originally reported financial
3 statements.
4 MR. KADET: Your Honor, if this is
5 going to be read by Your Honor as an admission that
6 there was an adjustment made to the stand alone or
7 initially published CUC income statements for the
8 year end of January 31, 1996, we would respectfully
9 move to withdraw the admission as error.
10 MR. DUGGINS: And this would not have
11 come up -- and this is one of the reasons we filed
12 special exceptions. Had the grounds of the
13 plaintiffs motion been set forth in the motion, we
14 would have known that and filed whatever papers were
15 necessary to correct this.
16 You can't reconcile a response to
17 subpart C and D, so good cause exists, and there is
18 no prejudice. We haven't taken a single deposition
19 in this case, and this deals with trying to convince
20 you to order this party to do something that cannot
21 be done.
22 MR. SHAMOUN: Judge, I asked this
23 witness, specifically, was he aware of the
24 adjustments in my specific direct examination. This
25 gentlemen, under oath today, said yes.

Page 88

1 THE COURT: Yeah. I know. And we're
2 getting to the answer. Your request is under
3 advisement to be able to do that. At the end of the
4 entire hearing, I will decide how to handle this.
5 Q (By Mr. Kadet) Mr. Ippolito, were
6 adjustments made to the income statement for the year
7 end of January 31, 1996, as restated based on pooling
8 acquisitions? Were adjustments made last year to the
9 CUC income statement for the year end January 31,
10 '96, as restated based on subsequent acquisitions?
11 A Yes. The adjustments related to the as
12 restated financial statements.
13 Q Now, just to clean up this 107, the last
14 one. On E, it refers to adjustments made to quarters
15 ended April, '96, and July 31 of '96, and there is an
16 admission that adjustments were calculated for those
17 quarters.
18 Again, what quarterly financial
19 statements were the adjustments made to? Were they
20 just made to the quarterly financial statements as
21 originally published by CUC back in '96, or were they
22 made to those quarterly financial statements as
23 restated based on a series of subsequent pooling
24 transactions identified in your affidavit?
25 A These relate to the as restated financial

## Page 89

1 statements.
2     MR. KADET: Now, just to tie this down,
3 Judge, may I have -- I believe it's Exhibit 1, which
4 I think is an interrogatory -- this is an exhibit to
5 it.
6   Q (By Mr. Kadet) And Mr. Ippolito, this is
7 the --
8   A Can I just say --
9   Q Yes.
10   A I'm sorry, but I didn't finish my complete
11 answer as to why we cannot restate the earlier
12 periods. Is it appropriate at this time?
13   Q Let me go back to that. Please complete
14 your answer.
15   A Okay. So, fact number one is that there is
16 information integral to the restatement process which
17 does not exist today. Fact number two is during the
18 course of the previous year, Cendant Corporation has
19 sold 18 businesses, substantially all of which were
20 businesses that comprised -- were components of CUC
21 International.
22     Those entities are no longer under the
23 control of Cendant Corporation and, therefore, we do
24 not have access. We would not have the ability to
25 restate the financial statements of those entities

## Page 90

1 for those periods back in time.
2     The next point, which is why I believe
3 it is -- which is why I am certain, in my opinion,
4 that it is impossible to restate those earlier years,
5 is specifically relating to the various acquisitions
6 by CUC accounted for using the pooling of interests
7 method.
8     I do believe in one of my affidavits
9 there is a long list of acquisitions which identifies
10 the method of accounting, the date of acquisition,
11 and the date of disposition, and that information, in
12 my opinion, is -- it creates a very significant
13 hurdle to the restatement process. And I caveat that
14 in saying that when I use the word "hurdle," in some
15 cases it is just very difficult, and in other cases,
16 it is impossible.
17     The other point that I would like to
18 emphasize is that this would be a significant
19 business disruption to the organization. And I do
20 believe, in my opinion, that the corporation would
21 lose significant financial staff given the trauma
22 that was forced onto people in connection with the
23 first restatement process. I personally worked 7
24 days a week, between 14 and 20 hours a day, for one
25 complete year. That four-and-a-half month time

## Page 91

1 period was in there.
2     I will tell you that there was no
3 person, no matter how many documents are public
4 and how many rooms of information that people can go
5 through, there no person that is familiar with the
6 restatement process closer than I.
7     I have the broadest understanding of
8 the various business units and the compilation of
9 those financial statements. And as a result of that
10 experience, I can stand here today and tell you that
11 it is an impossible task to restate those earlier
12 periods.
13   Q This is attached to the attachment to
14 Interrogatory Number 1 that brings us all here today.
15     MR. KADET: And first of all, let me
16 hand it up to you. May I approach?
17     THE COURT: Yeah. I have to leave in 5
18 minutes. I've got someone who lives in Mesquite --
19 Judge Stokes is going with me this afternoon. We
20 need to leave now if we're going to be on time. If
21 you want to go 5 minutes now, we can do it, if you
22 are trying to make a point. If not, we stop there
23 and --
24     MR. KADET: I think this will be a
25 quick point, Your Honor, and stop.

## Page 92

1     THE COURT: Okay.
2   Q (By Mr. Kadet) Mr. Ippolito, if you will
3 take a look at this document, which I'm representing
4 is the attachment to Interrogatory Number 1.
5     It contains, Judge, the numbers from
6 the CUC financial statements as originally published
7 for the periods ended January 31, '95, January 31,
8 '96, and a couple of quarters in calendar '95 and
9 '96. That was -- the interrogatory takes those
10 originally published answers and asks us, next to
11 each line item, to put in an adjustment.
12     Was that done, that process of finding
13 adjustments for each of those line items, either
14 publicly or privately last year in connection with
15 the restatement activity Cendant undertook and spent
16 $18 million doing?
17   A The answer to that question is no.
18   Q Is that because what was restated were the
19 already restated CUC financials based on subsequent
20 acquisitions, most of which or all of which are
21 listed in Exhibit 2 to your first affidavit?
22   A Absolutely. The adjustments related to
23 adjustments to the restated financial statements, not
24 the originally published financial statements of CUC.
25     MR. KADET: All right. Now would be a

## CERTIFICATE OF SERVICE

      I hereby certify that I caused the foregoing Memorandum in Support of Motion of Defendant Walter A. Forbes (1) for a Bill of Particulars and (2) to Limit the Evidence Presented at Trial to the Charges in the Indictment (Forbes Retrial Motion No. 2) to be served on July 14, 2005 to the following via FedEx:

      Norman Gross, Esq.
      U.S. Attorney's Office
      District of New Jersey
      401 Market Street
      Fourth Floor
      Camden, NJ 08101

      Michael Martinez, Esq.
      Craig Carpenito, Esq.
      U.S. Attorney's Office
      District of New Jersey
      970 Broad Street, Suite 700
      Newark, NJ 07102

_____
Barry S. Simon