UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:02CR00264 (AWT) |
| | : | |
| | : | |
| V. | : | July 18, 2005 |
| | : | |
| | : | |
| | : | |
| WALTER A. FORBES | : | |


MEMORANDUM OF THE UNITED STATES IN SUPPORT OF PRE-TRIAL MOTION IN
LIMINE

GOVERNMENT'S PRE-RETRIAL MOTION NO. 1

                              CHRISTOPHER J. CHRISTIE
                              NORMAN GROSS
                              MICHAEL MARTINEZ
                              CRAIG CARPENITO
                              Special Attorneys
                              U. S. Department of Justice
                              970 Broad Street, Room 700
                              Newark, New Jersey 07101
                              Tel: (973) 645-2700
                              Fax: (973) 645-2857

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

      I. EVIDENCE OF FORBES' SALES OF CUC AND CENDANT STOCK DURING
THE TERM OF THE CONSPIRACY IS ADMISSIBLE TO PROVE FORBES'
KNOWLEDGE OF, AND MOTIVE TO COMMIT THE FRAUD, EVEN IF THE
GOVERNMENT DOES NOT RETRY COUNTS 13-16, CHARGING INSIDER
TRADING . . . . . . . . . . . . . . . . . . . . . . . . . 3

      II.  THE TESTIMONY OF JAMES ROWAN REGARDING FORBES'
STATEMENTS DURING AN INVESTMENT CONFERENCE IN JANUARY 1998
SHOULD BE ADMITTED INTO EVIDENCE EVEN IF THE GOVERNMENT DOES
NOT RETRY COUNTS 7-12 CHARGING SECURITIES FRAUD . . . . . 9

      III. LIMITED PORTIONS OF FORBES' TESTIMONY FROM THE FIRST
TRIAL REGARDING SIX DISCRETE EVENTS SHOULD BE ADMITTED INTO
EVIDENCE AT THE RETRIAL WITHOUT OPENING THE DOOR TO HIS
PRIOR TESTIMONY REGARDING OTHER, UNRELATED EVENTS . . . 13

      IV.  EVIDENCE OF THE AMOUNT OF OVERSTATED OPERATING INCOME
IN CUC'S AND CENDANT'S SEC FILINGS IS RELEVANT TO PROVE
FORBES' KNOWLEDGE OF THE CHARGED CONSPIRACY . . . . . . 17

      V. THIS COURT SHOULD PRECLUDE FORBES FROM ASKING COSMO
CORIGLIANO ON CROSS-EXAMINATION WHETHER HE COMMITTED OR IS
GUILTY OF "INSIDER TRADING" . . . . . . . . . . . . . . 20

      VI. THIS COURT SHOULD DIRECT FORBES' COUNSEL IN ADVANCE OF
TRIAL TO REFRAIN FROM CERTAIN IMPROPER REMARKS THAT
CHARACTERIZED HIS OPENING STATEMENT AND SUMMATION . . . 26

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . 35

i

TABLE OF AUTHORITIES

FEDERAL CASES

Acito v. Imcera Group, Inc., 47 F.3d 47, 54 (2d Cir. 2001)  .  6

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
    509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . . . 5

Ernst & Ernst v. Hochfelder,
    425 U.S. 185 (1976) . . . . . . . . . . . . . . . . . . . 6

Herring v. New York,
    422 U.S. 853 (1975) . . . . . . . . . . . . . . . . . . . 32

In re AFC Enterprises, Inc. Securities Litigation,
    348 F. Supp. 2d 1363 (N.D.Ga. 2004) . . . . . . . . . 18, 19

In re Apple Computer Securities Litigation,
    886 F.2d 1109 (9th Cir. 1989) . . . . . . . . . . . . . . 6

In re Silicon Grahics Inc. Securities Litigation,
    183 F.3d 970 (9th Cir. 1999) . . . . . . . . . . . . . . 7

In re Xerox Corporation Securities Litigation,
    165 F. Supp. 2d 208 (D.Conn. 2001) . . . . . . . . . . . 6

United States v. Abrams,
    357 F.2d 539 (2d Cir. 1966) . . . . . . . . . . . . . . . 9

United States v. Bernhardt,
    642 F. 251 (8th Cir. 1981) . . . . . . . . . . . . . . . 26

United States v. Coriaty,
    300 F.3d 244 (2d Cir. 2002) . . . . . . . . . . . . . . . 2

United States v. Crowley,
    318 F.3d 401 (2d Cir. 2003) . . . . . . . . . . . . . . . 21

United States v. Dinitz,
    424 U.S. 600 (1976) . . . . . . . . . . . . . . . . . 27, 28

United States v. Flaherty,
    295 F.3d 182 (2d Cir. 2002) . . . . . . . . . . . . . . . 21

United States v. Guterma,
    281 F.2d 742 (2d Cir. 1960) . . . . . . . . . . . . . . . 8

United States v. Jackson,
    180 F.3d 55 (2d Cir. 1999) . . . . . . . . . . . . . . . . . 15

United States v. King,
    560 F.2d 122 (2d Cir. 1977) . . . . . . . . . . . . . . . . 8

United States v. Laljie,
    184 F.3d 180 (2d Cir. 1999) . . . . . . . . . . . . . 23, 24

United States v. Maldonado-Rivera,
    922 F.2d 934 (2d Cir. 1990) . . . . . . . . . . . . . . . . 22

United States v. Mennuti,
    679 F.2d 1032 (2d Cir. 1982) . . . . . . . . . . . . . . . 9

United States v. Moskovits,
    784 F. Supp. 193 (E.D.N.Y. 1992) . . . . . . . . . . . . . 32

United States v. Myers,
    972 F.2d 1566 (11th Cir. 1992) . . . . . . . . . . . . . . 16

United States v. Myerson,
    18 F.3d 153 (2d Cir. 1994) . . . . . . . . . . . . . . . . 32

United States v. Payton,
    159 F.3d 49 (2d Cir. 1998) . . . . . . . . . . . . . . . . 12

United States v. Peterson,
    808 F.2d 969 (2d Cir. 1987) . . . . . . . . . . . . . . . . 33

United States v. Ricks,
    882 F.2d 885 (4th Cir. 1989) . . . . . . . . . . . . . . . 16

United States v. Rivera,
    61 F.3d 131 (2d Cir. 1995) . . . . . . . . . . . . . . . . 16

United States v. Rivera,
    778 F.2d 591 (10th Cir. 1985) . . . . . . . . . . . . . . . 27

United States v. Roldan-Zapata,
    916 F.2d 795 (1990) . . . . . . . . . . . . . . . . . . . . 23

United States v. Salmeh,
    152 F.3d 88 (2d Cir. 1998) . . . . . . . . . . . . . . 24, 32

United States v. Salovitz,
    701 F.2d 17 (2d Cir. 1983) . . . . . . . . . . . . . . 26, 27

United States v. Scarpa,
    913 F.2d 993 (2d Cir. 1990) . . . . . . . . . . . . . 12, 22

United States v. Smith,
    918 F.2d 1032 (2d Cir. 1990) . . . . . . . . . . . . . . . 2

United States v. Somers,
    496 F.2d 73 (3d Cir. 1974) . . . . . . . . . . . . . . . 27

United States v. Stevens,
    83 F.3d 60 (2d Cir. 1996) . . . . . . . . . . . . . . . . 6

United States v. Teicher,
    987 F.2d 112 (2d Cir. 1993) . . . . . . . . . . . . . . 25

United States v. Valdez,
    16 F.3d 1324 (2d Cir. 1994) . . . . . . . . . . . . . . . 5

United States v. Wallace,
    59 F.3d 333 (2d Cir. 1995) . . . . . . . . . . . . . . 2, 4

United States v. Wellons,
    32 F.3d 117 (4th Cir. 1994) . . . . . . . . . . . . . . 21

United States v. Wilson,
    307 F.3d 596 (7th Cir. 2002) . . . . . . . . . . . . . . 21

United States v. Young,
    470 U.S. 1 (1985) . . . . . . . . . . . . . . . . . 27, 32

United States v. Young & Rubicam,
    741 F.2d 334 (D.Conn. 1990) . . . . . . . . . . . . . . 26

United States v. Zackson,
    12 F.3d 1178 (2d Cir. 1993) . . . . . . . . . . . . . . 32

United States v. Zeile,
    734 F.2d 1447 (11th Cir. 1984) . . . . . . . . . . . . . 28

## FEDERAL STATUTE, REGULATION, AND COURT RULES

15 U.S.C. Section 10j(b)  . . . . . . . . . . . . . . . . . .  6, 7

17 C.F.R. 240.10b-5 . . . . . . . . . . . . . . . . . . . .  6, 7

Fed. R. Evid. 106 . . . . . . . . . . . . . . . . . . . . .  14

Fed. R. Evid. 401  . . . . . . . . . . . . . . . . . . . .  5

Fed. R. Evid. 402 . . . . . . . . . . . . . . . . . . . . .  5

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . .  21

Fed. R. Evid. 611 . . . . . . . . . . . . . . . . . . . . .  21, 22

Fed. R. Evid. 801(d)(2)(A) . . . . . . . . . . . . . . . .  13

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:02CR00264 (AWT) |
| | : | |
| | : | |
| v. | : | JULY 18, 2005 |
| | : | |
| | : | |
| | : | |
| WALTER A. FORBES | : | |

**MEMORANDUM OF THE UNITED STATES IN SUPPORT OF MOTION TO IN LIMINE TO ADMIT CERTAIN EVIDENCE**

<u>GOVERNMENT'S PRE-RETRIAL MOTION NO. 1</u>

**INTRODUCTION**

As this Court knows better than anyone, the protracted initial trial in this case consumed a substantial volume of the resources of the Court, the Government, the defendants, and even of Cendant, which advanced at least a portion of Forbes' legal fees and expenses.  The burden on the Government to retry this case is exacerbated for the reasons set forth in the Government's unsuccessful Motion to Retransfer this case back to the District of New Jersey, Docket No. 1433.

In order to reduce the burden on the Court and the parties, the Government is considering reducing the number of counts on which it will seek a verdict in the retrial.  Although no final decision has yet been reached, the Government may elect not to retry Counts 2-4, charging mail fraud and wire fraud, Counts 7-12, charging securities fraud, and Counts 13-16, charging insider trading.  If the

1

Government elects not to retry those counts, the Government would also redact Count 1 of the indictment to charge a single object conspiracy to make false statements in a report required to be filed with the SEC ("false statements to the SEC").[1]

   To better inform its decision about the scope of the charges that should be retried, the Government seeks a ruling *in limine* from this Court regarding the admissibility of certain evidence in the event that the Government seeks a verdict on only a single-object conspiracy and the two counts of making false statements to the SEC. As will be demonstrated below, this evidence should be admitted at the retrial even if the Government declines to retry the mail, wire, and securities fraud and insider trading counts. This motion will also address other evidentiary issues and improper arguments of counsel that may arise at the retrial.

---

[1] Eliminating from the jury's consideration less than all of the object offenses of the conspiracy charge would obviously benefit Forbes and would not work a constructive amendment of the indictment. See United States v. Coriaty, 300 F.3d 244, 249 (2d Cir. 2002) (affirming the district court's denial of a motion to dismiss a count charging conspiracy to commit wire fraud and securities fraud after that court vacated the securities fraud conviction because of insufficient evidence); accord United States v. Wallace, 59 F.3d 333, 337-38 (2d Cir. 1995)(reversing the dismissal of a multi-object conspiracy conviction after the district court determined that the evidence was insufficient to support one of the objects of the conspiracy); United States v. Smith, 918 F.2d 1032, 1036-37 (2d Cir. 1990)(rejecting the claim that the multi-object conspiracy count had to be dismissed following a determination that the mail fraud object was invalid).

ARGUMENT

**I. EVIDENCE OF FORBES' SALES OF CUC AND CENDANT STOCK DURING THE TERM OF THE CONSPIRACY IS ADMISSIBLE TO PROVE FORBES' KNOWLEDGE OF AND MOTIVE TO COMMIT THE FRAUD, EVEN IF THE GOVERNMENT DOES NOT RETRY COUNTS 13-16, CHARGING INSIDER TRADING.**

The Indictment charged four counts of insider trading against Forbes, based on his sales of Cendant stock on March 5 and 6, 1998.  Indictment, Counts 13-16.  At the first trial, the Government presented evidence regarding those sales, which yielded proceeds to Forbes of over $11,300,000.  Tr. 10278-91, 10313-17; GX 433, 434. That evidence was plainly relevant to prove the insider trading counts, which required proof of, *inter alia*, Forbes' sales of Cendant stock.  Tr. 16373.  Evidence of those sales, as well as evidence of Forbes' other sales of CUC and Cendant stock during the conspiracy period of the late 1980's until April 15, 1998, is also relevant and admissible to prove Forbes' knowledge of a conspiracy to make false statements to the SEC, regardless of whether Forbes is also charged with insider trading.

As this Court instructed during the first trial, in order to prove that Forbes is guilty of conspiracy to make false statements to the SEC, the Government must prove, *inter alia*, that Forbes:

> 1) "knowingly and willfully became a member of the conspiracy, and did so with the requisite unlawful intent," Tr. 16295;
>
> 2) "knew that the financial information [at issue] was materially false," Tr. 16296;
>
> 3) acted "with the intent to do something the law forbids,

3

that is to say, with bad purpose to disobey or to disregard the law," Tr. 16297; and

4) "acted with the same unlawful intent that must be proven with respect to [the] alleged object of the alleged conspiracy." Tr. 16301.

In order to prove that Forbes is guilty of making false statements to the SEC, the Government must prove, *inter alia,* that Forbes acted with "the intent to deceive," Tr. 16303, <u>i.e.</u>, that he acted "with the intent to mislead another or to cause another to believe that a falsehood is true, but not necessarily for the purpose of causing some financial loss to another." <u>Id.</u> As Forbes pointed out with regularity in advance of and during the first trial, whether Forbes knew about the charged fraud and acted with the requisite intent is the most hotly contested matter in this case.

As the Government argued during the first trial, evidence that Forbes sold a substantial percentage of his shares of Cendant stock in March 1998 is relevant to prove Forbes' knowledge of and participation in the fraud. The argument was that Forbes decided to sell his Cendant stock in March 1998 only after learning that Henry Silverman had decided that Anne Pember would no longer be in charge of managing the accounting for the former CUC divisions. Tr. 15011-13, 15076.[2] According to the Government, Forbes realized that once Pember was removed from her

---

[2] Forbes, on the other hand, claimed that he first decided to sell a large volume of Cendant stock in February of 1998.

4

involvement in the CMS accounting, the fraud would be unable to continue, and the previous manipulation of CUC's financial results would be exposed to Cendant's management.  Forbes' realization that the days of the fraudulent manipulation of the accounting records were numbered created the incentive for his large divestment of Cendant stock.

       For that reason, evidence of Forbes' March 1998 sales would be relevant and admissible at the retrial, even if the Government did not retry the insider trading counts.  Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401 (emphasis added).  "The Rule's basic standard of relevance thus is a liberal one."  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 587 (1993).  Moreover, "[a]ll relevant evidence is admissible unless excluded by the constitution, a statute, or a rule."  Fed. R. Evid. 402.  The trial court "is in the best position to evaluate the admissibility of offered evidence," United States v. Valdez, 16 F.3d 1324, 1332 (2d Cir. 1994), and its evidentiary rulings are reviewed only for an abuse of discretion.  United States v. Stevens, 83 F.3d 60, 68 (2d Cir. 1996).

       As this Court explained in another case, "'[i]nsider

sales of stock may be evidence of *scienter*[3] if the trades are

unusual or suspicious in timing or amount.'" In re Xerox

Corporation Securities Litigation, 165 F.Supp.2d 208, 222

(D.Conn. 2001) (Thompson, J.)(quoting Acito v. Imcera Group,

Inc., 47 F.3d 47, 54 (2d Cir. 2001).[4] See also In re Apple

Computer Securities Litigation, 886 F.2d 1109, 1117 (9th Cir.

1989)("Insider trading in suspicious amounts or at suspicious

times is probative of bad faith and scienter."), citing Goldman

---

[3] As applied to civil actions alleging securities fraud in violation of Rule 10b-5, "the term 'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193, n. 12 (1976). As shown above, to convict Forbes of conspiring to make false statements to the SEC and of making false statements to the SEC, the Government must prove, *inter alia*, that he acted with "intent to deceive." Accordingly, caselaw regarding the *scienter* requirement for private lawsuits brought under Rule 10b-5 apply by analogy to this criminal case.

[4] In Acito, the Court of Appeals affirmed the dismissal of a private complaint for securities fraud, concluding that evidence of the insider sales by a single outside director was insufficient to plead *scienter* on behalf of all of the defendants, which included several members of corporate management. Most of those sales took place before the occurrence of a key event (the failure of one of the company's drug-manufacturing plants to pass an FDA on-site inspection, causing the company to have to temporarily close the plant) which, according to the complaint, caused the defendant insiders to realize that the company's stock was going to fall precipitously. 47 F.3d at 54. Given the timing of the supposedly suspicious sales before the event which, when disclosed, undermined the company's stock price, the timing of the sales "fail[ed] to provide any inference of an intent to deceive the public." Id. Here, by contrast, Forbes sold 400,000 shares of Cendant stock after learning that Silverman had decided to remove Pember from the accounting loop. Tr. 13844-45, 14350-63; GX 498. Forbes had inside information, not only of Silverman's decision, but also of the long-standing accounting fraud at CUC that would come to a crashing halt because Pember would no longer be able to facilitate the fraud.

v. Belden, 754 F.2d 1059, 1070 (2d Cir. 1985).

In determining whether "unusual or suspicious stock sales by corporate insiders may constitute circumstantial evidence of *scienter*," a court should consider:

> (1) the amount and percentage of shares sold by insiders;
> (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trade history.

In re Silicon Grahics Inc. Securities Litigation, 183 F.3d 970, 986 (9th Cir. 1999); accord Gaylinn v. 3COM Corp., 2000 WL 33598337 (N.D.Cal., June 9, 2000).

Accordingly, the entire history of Forbes's sales of CUC and Cendant stock is highly relevant to the hotly contested issue of his *scienter*, or knowledge of the fraudulent scheme and intent to deceive.[5]  This is particularly so, given Forbes' testimony at the first trial that he sold the stock in order to acquire and refurbish a house, and because he typically sold CUC stock during the first fiscal quarter, just after the company had

---

[5]  In Xerox, this Court overruled the defendants' motion to dismiss a private action for securities fraud, alleging violations of 15 U.S.C. Section 10j(b) and 17 C.F.R. 240.10b-5. Id. at 223.  This Court held that the stock sales by defendant insiders "appear to be substantial in amount" because the proceeds of the sales totaled nearly $31.4 million, an amount which more than doubled the aggregate of the collective annual compensation for the individual defendants for two successive years.  Id.  Additionally, the insider sales for any particular month during the class period was higher than the monthly volume for the preceding years.  Id.

Here, Forbes sold over $11 million of Cendant stock during the first quarter of 1998, just a little over one month before the fraud was publicly disclosed.

issued its annual report, because this was a permissible period during which corporate insiders could trade. Tr. 13837-39, 14269-70.

Additionally, evidence that Forbes reaped substantial profits from his sales of CUC and Cendant stock throughout the conspiracy period is highly relevant to prove Forbes' motive for conspiring to make false statements to the SEC, regardless of whether or not Forbes is also charged with insider trading. See United States v. Guterma, 281 F.2d 742, 746 (2d Cir. 1960)(in a prosecution for inter alia, conspiracy to obstruct the making and filing of annual reports with SEC, the district court properly admitted evidence which showed "that the conspiracy was motivated by a scheme to appropriate assets of [the company] for defendants' benefit and to demonstrate what the facts were that defendants wished to conceal from the SEC and the public"). As the holder of a large volume of CUC, then Cendant stock, Forbes was positioned to reap substantial profits from selling the stock while its price was fraudulently inflated. Evidence that Forbes obtained millions of dollars selling CUC's and Cendant's inflated stock is highly relevant to prove his knowledge of and participation in the scheme. "It is in the trial judge's discretion to admit evidence suggesting the defendant's motive for the crime charged." United States v. King, 560 F.2d 122, 132-22 (2d Cir. 1977)(in a prosecution for conspiracy to engage

in sham transactions for oil and gas interests, the district
court properly admitted evidence of the defendant's high profits
from their other sales of those interests to a third party, where
the defendants participated in the sham transactions in order to
induce the third party to continue to purchase the oil and gas
interests); accord United States v. Mennuti, 679 F.2d 1032, 1037
(2d Cir. 1982)(in a prosecution for conspiracy to commit mail
fraud through arson designed to obtain insurance proceeds, the
district court properly admitted evidence regarding the
defendant's profit from selling the fire-damaged premises, which
was relevant to prove his motive for participating in the
scheme); see generally United States v. Abrams, 357 F.2d 539, 546
(2d Cir. 1966)(in a prosecution for the sale of unregistered
securities, "it was relevant for the government to show that the
failure to file a registration statement was motivated by the
desire of [the defendants] to conceal their fraudulent
activities").

    Accordingly, evidence of the timing and volume of
Forbes' history of selling CUC and Cendant stock during the
conspiracy period should be admitted at the retrial.

**II. THE TESTIMONY OF JAMES ROWAN REGARDING FORBES'
STATEMENTS DURING AN INVESTMENT CONFERENCE IN JANUARY 1998
SHOULD BE ADMITTED INTO EVIDENCE EVEN IF THE GOVERNMENT DOES
NOT RETRY COUNTS 7-12 CHARGING SECURITIES FRAUD.**

    During the initial trial, Forbes testified, and his
attorney argued, that Forbes' job at CUC was to undertake

9

"strategic thinking" and to focus upon the company's plans for developing an "interactive" computer-based marketing capability that presaged the Internet.[6]  Forbes testified that he delegated the day-to-day operations of CUC to other members of the Office of the President, including Stu Bell, Kirk Shelton and Christopher McLeod, and to their subordinates.  Tr. 13561-72. He further testified that he relied heavily on his subordinates and on the outside auditors from E&Y to ensure that CUC's SEC filings fairly represented the company's financial results, and personally did not participate in that endeavor.  Tr. 13630-44, 13644-53, 13662-65, 13674-75 (Forbes testimony), see also Tr. 15162-65 (Sullivan summation).  Forbes testified that he did not concern himself with detailed accounts of the company's financial results, and indeed, did not even trouble himself to carefully read the company's quarterly and annual SEC filings.  Tr. 13657, 13667, 13671, 14087.

At the first trial, James Rowan, the chief investment officer of the Hartford Steam Boiler Company ("HSB"), testified

---

[6]  E.g. Tr. 107 (Sullivan opening statement)("[Forbes] was never a hands-on executive and no one will ever come in here and call him a detail man.  His focus as an executive was on such things as overall strategy for the company, how to make use of the interactive computerized world."); Tr. 15168 (Sullivan summation)("[Forbes] [c]reated an office of the president, he left it to others.  Why?  Because he's lazy and he liked to travel around on his jet?  No.  Because he thought it was the best thing for the company, to advance the company.  He had different talents.  He was the so-called visionary.  He was the guy who predicted the world would change.")

that he attended a conference in January 1998 that was sponsored
by Morgan Stanley, the investment and securities brokerage firm.
Tr. 10252-53.  Rowan testified without objection that Forbes,
working without notes, gave a twenty-five to thirty-five minute
presentation, which included a question and answer session,
during which Forbes demonstrated his firm grasp on many of the
details of the business of the newly formed Cendant.  Tr. 10253-
55.  Rowan was so impressed by Forbes' performance that, upon
returning to Hartford, Rowan conducted additional research about
CUC and Cendant, then successfully recommended to HSB's
investment committee that HSB purchase a total of 35,500 shares
of Cendant stock in six separate transactions during January and
February 1998.  Tr. 10256-66.  In purchasing that stock, Rowan
assumed and relied upon the accuracy of the financial data set
forth in CUC's and Cendant's quarterly and annual SEC filings.
Tr. 10269-71.

        Rowan's testimony about HSB's purchase of the Cendant
stock was relevant and necessary to prove that Forbes was guilty
of the securities fraud charges set forth in Counts 7-12 of the
Indictment, and in particular, that Forbes participated in making
false or fraudulent representations in connection with the
purchase or sale of securities that are subject to the federal
securities laws.  Tr. 16357.

        That testimony would still be relevant and admissible,

11

however, even if the Government did not retry the securities
fraud counts, and redacted the Count 1 conspiracy charge to
remove the securities fraud object of the conspiracy.  As Forbes
repeatedly acknowledged during trial, the core factual dispute in
this case is what Forbes knew and when he knew about CUC's actual
financial results and how they varied from its reported results.
Rowan's testimony is highly relevant to corroborate Corigliano's
testimony that Forbes was involved in directing the fraudulent
misuse of merger reserves and to rebut Forbes' defense that he
was purposefully ignorant of CUC's and Cendant's historic
performance, and thus had no opportunity or reason to know that
CUC was reporting financial results which were at odds with the
company's actual results.  See United States v. Payton, 159 F.3d
49, 58-59 (2d Cir. 1998)(affirming the admission, in a
prosecution for a firearms offense, of evidence of the
defendant's uncharged possession of heroin, which was pertinent
to rebut the defendant's trial testimony that he had "nothing to
hide" when he was confronted by the police shortly before they
discovered and seized the unlawfully possessed firearm); see
generally United States v. Scarpa, 913 F.2d 993, 1015-16 (2d Cir.
1990)(affirming the admission of a newspaper story, over the
defendant's relevance and Rule 403 objections, which corroborated
a portion of the testimony of the cooperating co-conspirators

12

whose credibility had come under withering defense attack).[7]

**III. LIMITED PORTIONS OF FORBES' TESTIMONY FROM THE FIRST TRIAL REGARDING SIX DISCRETE EVENTS SHOULD BE ADMITTED INTO EVIDENCE AT THE RETRIAL WITHOUT OPENING THE DOOR TO HIS PRIOR TESTIMONY REGARDING OTHER, UNRELATED EVENTS.**

During the retrial, the Government will offer portions of Forbes' testimony from the first trial as the statement of a party pursuant to Fed. R. Evid. 801(d)(2)(A). Those portions of Forbes' prior testimony address:

1) Forbes' conversation with Henry Silverman around the Labor Day weekend of 1997 regarding Forbes' request that Silverman not remove Pember from her position in the accounting function of CMS, Tr. 14350-64;

2) Forbes' claim that he did not urge the Cendant Executive Committee to retain E&Y as the independent auditors of the former CUC divisions of Cendant, Tr. 14340-44;

3) Forbes' transfers of three expensive parcels of real property from the joint tenancy of Forbes and his wife to his wife's exclusive ownership, Tr. 14386-97;

4) Forbes' desire to know if CUC had "hit the range" of estimates established by Wall Street analysts, Tr. 13968-69; Forbes kept track of and occasionally spoke to Corigliano about whether CUC's earnings were meeting those targets, Tr. 13969-70;

5) Forbes' attendance during meetings at CUC when "forecasts" were discussed, Tr. 13977; and

---

[7]    Rowan's testimony that he relied on the accuracy of the CUC and Cendant quarterly and annual SEC filings is also relevant to prove the materiality of the false and misleading statements contained in CUC's quarterly report on Form 10-Q for the third fiscal quarter ending October 31, 1997 (Count 5) and in Cendant's annual report on Form 10-K for its fiscal year ending December 31, 1997 (Count 6), which is another element of the charged crimes that will be at issue in the retrial, and which element Forbes has never conceded.

13

6) Forbes' knowledge that CUC was establishing merger reserves for CUC's large acquisitions and knew that such reserves were important to the company, Tr. 14191-92.[8]

Each of the foregoing items is relevant to prove Forbes' knowledge of and participation in the conspiracy to make false statements to the SEC, so elision of the mail and wire fraud, securities fraud, and insider trading counts pose no impediment to admission of that evidence. The Government moves for a ruling by this Court *in limine* that, by offering that evidence, the Government will not open the door to any other portions of Forbes' testimony from the first trial that pertain to subjects other than those identified above.

Fed. R. Evid. 106 provides:

> When a . . . recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other . . . recorded statement which ought in fairness to be considered contemporaneously with it.

The Government would not object to the admission of any other part of Forbes' testimony from the prior trial that pertains to the six subjects identified above: Forbes' conversation with Silverman about retaining Pember; Forbes' denial that he urged the Cendant Executive Committee to retain E&Y; Forbes' transfer of assets to his wife; Forbes attentiveness to whether CUC was achieving the financial targets established by

---

[8]  The Government expressly reserves its right to seek the admission of other portions of Forbes' prior testimony as the retrial progresses.

Wall Street analysts; Forbes' participation in meetings at CUC at which acquisitions and "forecasts" were discussed; and Forbes' knowledge of the existence and importance of merger reserves on the books of CUC.  Forbes should not be permitted, however, under the guise of Rule 106, to offer any other portions of his prior trial testimony which does not pertain directly to those three subjects.

United States v. Jackson, 180 F.3d 55 (2d Cir. 1999) is highly instructive on this point.  There, the Government offered into evidence a 90 second excerpt from a 42 minute long recorded conversation.  In the excerpted portion of the conversation, a person named Thompson warned defendant Jackson that the scheme in which Jackson was engaged amounted to extortion.  The excerpt was offered to prove the awareness of another defendant, Medina, of the illegality of the extortion scheme.  Medina unsuccessfully sought admission of the entire taped conversation pursuant to Rule 106, claiming that other portions of the conversation would show that Thompson's statements were exaggerated.  Id. at 73. The Second Circuit affirmed the district court's exclusion of all but the 90 second excerpt, concluding that portions of the conversation offered by Medina were "neither explanatory of nor relevant to the admitted passages."  Id.  Additionally, "the portions of the tape proffered by Medina consisted largely of Medina's own self-serving statements, which, as offered by him,

are inadmissible hearsay." Id.

        Likewise here, Forbes is not entitled to offer into evidence his own self-serving statements from the first trial which are not necessary to explain or put into context the six limited portions of Forbes' prior trial testimony. See United States v. Ricks, 882 F.2d 885, 892-93 (4th Cir. 1989)(district court erred by admitting the entire cross-examination of a missing witness given in a previous trial; "Rule 106 does not necessitate the introduction of those portions of [the] cross-examination testimony which do not explain or clearly pertain to the limited portions [a defendant] sought to introduce"); see also United States v. Myers, 972 F.2d 1566, 1575-76 (11th Cir. 1992)(affirming the district court's exclusion of the defendant's entire statement to police, after the Government obtained the admission of only the inculpatory portions of the statement; the rule of completeness "does not entitle the defendant to introduce portions of his statement that are neither explanatory of nor relevant to those portions of the statement introduced by the prosecution"); cf. United States v. Rivera, 61 F.3d 131, 135-36 (2d Cir. 1995)(district court committed reversible error by admitting, pursuant to Rule 106, a stipulation to the plea agreement of a cooperating witness which set forth information from an apparently reliable informant that implicated the defendant in the charged offense, after the defendant cross-

16

examined the witness by reference to other portions of the plea agreement).

   **IV.  EVIDENCE OF THE AMOUNT OF OVERSTATED OPERATING INCOME IN CUC'S AND CENDANT'S SEC FILINGS IS RELEVANT TO PROVE FORBES' KNOWLEDGE OF THE CHARGED CONSPIRACY.**

        During the first trial, the Court admitted evidence of the amount of Cendant's lost market capitalization following the company's disclosure of the fraud.  That evidence was admitted solely to prove that the false statements and omissions involved in this case were material.[9]  The Court also admitted evidence at the first trial, through the testimony of Brian Heckler, regarding the conspirators' violation of GAAP, and the quantitative effects of those GAAP violations on the company's stated financial results.  Heckler testified that, for the fiscal years ending January 31, 1996 and January 31, 1997, CUC had overstated its operating income by at least $61 million and $56 million, respectively.  Tr. 10664-66; GX 10110.  Heckler further

---

        [9]  Immediately after admitting evidence regarding the drop in Cendant's stock price following disclosure of the fraud on April 15, 1998, the Court instructed:

        The testimony that you've just heard may be considered only with respect to the question of whether any allegedly false statement was material.  I will provide you with specific instructions concerning the element of materiality in my final instructions.  But I want you to understand that you may not consider this evidence for any other purpose other than with respect to the question of whether any allegedly false statement was material.

Tr. 260-61.

testified that, for the fiscal year ending December 31, 1997,
Cendant overstated its operating income by at least $176 million.
Tr. 10666-68; GX 10110.  The defendants did not seek, and the
Court did not give, a limiting instruction regarding the
quantitative effect of the GAAP violations on CUC's and Cendant's
reported earnings, as opposed to the amount of the loss in market
capitalization.

        During the retrial, the Government will argue that the
quantitative effect of the various GAAP violations on CUC's and
Cendant's reported earnings constitutes circumstantial evidence
of Forbes' knowledge of the fraud.  Such reasoning would not run
afoul of the Court's limiting instruction regarding the amount of
the loss in Cendant's market capitalization occasioned by the
fraud.  For instance, In re AFC Enterprises, Inc. Securities
Litigation, 348 F.Supp.2d 1363 (N.D.Ga. 2004) involved a private
securities fraud class action lawsuit brought after the defendant
corporation (as Cendant did here) restated its financial
statements because the original statements were not prepared in
accordance with GAAP.  In opposition to a defense motion to
dismiss the complaint for failure to sufficiently plead *scienter*
under the strict pleading requirements of the Private Securities
Litigation Reform Act ("PSLRA"), the plaintiffs argued that the
GAAP violations were large enough and egregious enough to
demonstrate the defendant's constructive knowledge of the

violations.  The Court noted that

> alleged GAAP violations combined with a profound
> overstatement of financial results of a company may
> establish severe recklessness. The issuance of a restatement
> may also contribute to the establishment of *scienter*.  Where
> the number, size, timing, nature, frequency, and context of
> the GAAP violations or restatement are taken into account,
> the balance of the inferences to be drawn from such
> allegations may shift significantly in favor of *scienter*.

Id. at 1372.[10]

    So here, the substantial amounts of the fraudulent

overstatement of CUC's and Cendant's earnings is circumstantial

evidence that Forbes knew about the fraud.  Simply put, evidence

that the false statements involved an overstatement of the

company's operating income by tens of millions of dollars would

make it more likely that the CEO of the company was aware of the

false statements than if the overstatement involved a

significantly smaller amount.

---

    [10]  In AFC Enterprises, the court noted that the
overstatements represented only 0.3% and 0.8% differences in
reported revenues and 1.9% and 4.4% differences in expenses.  The
court agreed with the defendants that the differences were not so
large as to be "glaringly obvious and, thus, constructively known
by the defendants to be erroneous when reported."  Id. at 1373,
n.3.

    Here, the Government will present direct evidence of
Forbes' knowledge of the fraud and his intent to deceive, and
will not rely solely on inferences arising from circumstantial
evidence to prove Forbes' *scienter*.  Because the AFC Enterprises
court assumed that evidence of the company's GAAP violations was
admissible to prove *scienter* but insufficient to get past the
strict pleading requirements of the PSLRA, the court's dismissal
of the complaint poses no impediment to the Government's proposed
argument here regarding evidence of the GAAP violations as proof
of Forbes' *scienter*.

**V. THIS COURT SHOULD PRECLUDE FORBES FROM ASKING COSMO CORIGLIANO ON CROSS-EXAMINATION WHETHER HE COMMITTED OR IS GUILTY OF "INSIDER TRADING."**

During the first trial, Corigliano testified that he was aware that the price of CUC's and Cendant's stock had been artificially inflated because of the fraudulent overstatement of CUC's and CUC's publicly disclosed operating income.  Tr. 7587-89.  He also effectively admitted that, when he sold approximately $27 million of Cendant stock from June 1990 to February 1998, he knew that the investing public was still unaware of the company's false statements in quarterly and annual SEC filings, since the fraud was not publicly disclosed until April 15, 1998.  Tr. 7898-7913, 9602-04.

Pursuant to his plea agreement, Corigliano pleaded guilty to conspiracy to commit mail and wire fraud and to make false statements to the SEC, and also to a substantive wire fraud count.  Tr. 7498-7500; GX 1546.  Forbes was permitted to elicit Corigliano's testimony on cross-examination that he did not believe that he committed the crime of insider trading because, although he possessed material non-public information, he did not "use" that information in deciding to sell CUC and Cendant stock.  Tr. 7598; see also Tr. 8937-39 (Puccio cross-examination).  Corigliano later conceded that he was not denying that he was guilty of insider trading, since he was not a lawyer.  Tr. 8945-46.

The Government now requests that Forbes be barred from questioning Corigliano during the retrial about Corigliano's understanding or belief about whether he committed the crime of insider trading, as Corigliano's lay opinion about whether he was guilty of a particular federal crime is irrelevant to any issue in dispute, and will improperly confuse the jury.

Fed. R. Evid. 403[11] authorizes this Court to limit defense cross-examination when the testimony to be elicited will unduly confuse the jury, relative to the probative value of that testimony.  See United States v. Crowley, 318 F.3d 401, 417 (2d Cir. 2003); United States v. Flaherty, 295 F.3d 182, 190-91 (2d Cir. 2002); cf. United States v. Wilson, 307 F.3d 596, 601 (7th Cir. 2002)(affirming the exclusion, pursuant to Rule 403, of affirmatively exculpatory, "reverse 404(b)" evidence offered by the defendant to prove that someone else committed the charged fraudulent offense); United States v. Wellons, 32 F.3d 117, 120 n. 3 (4th Cir. 1994)(affirming the exclusion, under Rule 403, of the defendant's proffered testimony about the circumstances of his prior criminal offenses after the Government was permitted to

---

[11]  Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403.

confront defense character witnesses about their knowledge of those crimes). Fed. R. Evid. 611[12] is another source of this Court's authority to limit defense cross-examination regarding marginally relevant issues. United States v. Maldonado-Rivera, 922 F.2d 934, 955-56 (2d Cir. 1990). As the Court of Appeals has explained:

> It is settled that the scope and extent of cross-examination lies within the discretion of the trial judge. A trial judge does not abuse his discretion by curtailing cross-examination as long as the jury has sufficient information to make a discriminating appraisal of the particular witness's possible motives for testifying falsely in favor of the government.

United States v. Scarpa, 913 F.2d 993, 1018 (2d Cir. 1990) (internal citations and quotation marks omitted)(affirming the district court's prohibition, pursuant to Rule 403, against cross-examination of the Government's key cooperating witness about an attempted contract murder, where the court permitted "searching cross-examination" of the witness on other grounds,

---

[12] Rule 611 provides in pertinent part:

**(a) Control by court.** The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

**(b) Scope of cross-examination.** Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness.

Fed. R. Evid. 611.

22

including his plea agreement, money he received from the Government in exchange for his cooperation, and his numerous arrests). When the trial court otherwise permits extensive cross-examination of a prosecution witness, as occurred here during the first trial, any particular limitation on cross-examination is well within the court's broad discretion. United States v. Roldan-Zapata, 916 F.2d 795, 806 (1990)(even a "problematic" limitation on defense cross-examination was within the district court's discretion given "the extensive cross-examination" of the witness, which "adequately apprised the jury of information enabling them to make a discerning appraisal of [the witness's] credibility").

In United States v. Laljie, 184 F.3d 180 (2d Cir. 1999), the Court of Appeals affirmed a limitation on defense cross-examination similar to that requested here. Laljie was charged with mail and bank fraud resulting from her defalcations of funds from the account of her employer, a man named Schmeelk. Laljie admitted that she appropriated funds from Schmeelk in various ways, but claimed that she was authorized by Schmeelk to do so, partly in exchange for her romantic involvement with him. The Government moved in limine to preclude the defense from cross-examining Schmeelk about his alleged erectile dysfunction, which would have corroborated Laljie's testimony that Schmeelk had initiated the romantic relationship because of sexual

23

problems he was experiencing with this wife.  The Government

argued that such testimony would be "unfairly prejudicial"

because it would "serv[e] only to harass and embarrass Schmeelk

and to distract the jury." Id. at 192.  The district court

granted the motion, and the Court of Appeals affirmed, pointing

out that Laljie "had ample opportunity to present her defense

that Schmeelk had authorized her personal use of his funds

because the two were having an affair." Id. at 193.  The Second

Circuit explained that:

> The Confrontation Clause guarantees the defendant in a
> criminal case the right to cross-examine the witnesses
> against her.  Nonetheless, the right is not illimitable:
> trial judges retain wide latitude to impose reasonable
> limits on such cross-examination based on concerns about,
> among other things . . . confusion of the issues . . . or
> interrogation that is repetitive or only marginally
> relevant.  Cross-examination is not improperly curtailed if
> the jury is in possession of facts sufficient to make a
> discriminating appraisal of the particular witness's
> credibility.  What the Clause guarantees is not cross-
> examination that is effective in whatever way, and to
> whatever extent, the defense might wish, but rather an
> opportunity for effective cross-examination.

Id. at 192-93 (internal citations and punctuation omitted);

accord United States v. Salmeh, 152 F.3d 88, 131 (2d Cir. 1998).

     Likewise here, Forbes will be able to fully establish

Corigliano's alleged bias in favor of the Government through

testimony that Corigliano sold a large volume of Cendant stock

while in possession of material inside information which had

drastically inflated the price of that stock, coupled with the

fact that Corigliano was never charged with insider trading.

From that evidence, Forbes will be able to argue that, among the benefits that Corigliano received in return for his cooperation was a promise that he would not be prosecuted for insider trading.

What Forbes should not be entitled to argue however, as he did during the initial trial, Tr. 15138-39, 15179-81, is that Corigliano lied to the jury when he claimed that he does not subjectively believe that he was guilty of insider trading. As is obvious from Corigliano's testimony during the first trial, his belief that he was not guilty of insider trading was the result of advice he received from his attorneys, and was based on the defense-favorable position -- a position that Forbes himself advanced in this case but which this Court rejected[13] -- that one who possesses material insider information when he sells stock is not guilty of insider information if he did not "use" that information in deciding whether or not to trade.

The Second Circuit itself has cast doubt on that position, but ultimately has not ruled as the holding of a published opinion that one who trades while in possession of material inside information commits insider trading regardless of

_____

[13]  Compare Forbes' Proposed Preliminary Jury Instructions, Request No. 95 (insider trading requires proof of a "causal relationship" between the defendant's possession of material non-public information and his decision to trade) with Tr. 16373 (court's instruction regarding insider trading, which omits such a requirement).

whether he subjectively "uses" that information.  <u>United States</u>
<u>v. Teicher</u>, 987 F.2d 112, 119-21 (2d Cir. 1993).  Particularly in
a case where Forbes testified that he relied on the opinion of
counsel that he could lawfully transfer his interest in millions
of dollars of real property to his wife after the fraud in this
case was publicly disclosed, Tr. 14432-33, it is misleading in
the extreme for Forbes to claim that Corigliano is lying because
he followed his lawyer's advice that he was not guilty of insider
trading.  The jury is not properly equipped to make, and should
not be required to make determinations about issues of law in
deciding whether or not a witness's testimony is truthful.  <u>See</u>
<u>United States v. Bernhardt</u>, 642 F. 251, 253 (8th Cir. 1981)
(affirming the exclusion from evidence pursuant to Rule 403, in a
prosecution for failing to file income tax returns, of a judicial
decision which the defendant claimed that he read and relied upon
in deciding that he was not obligated to file returns; admission
of the opinion "would no doubt have resulted in the jury being
faced to some extent with legal rather than factual questions").

### VI. THIS COURT SHOULD DIRECT FORBES' COUNSEL IN ADVANCE OF TRIAL TO REFRAIN FROM CERTAIN IMPROPER REMARKS THAT CHARACTERIZED HIS OPENING STATEMENT AND SUMMATION.

The Government requests that this Court instruct the
defense, in advance of trial, to avoid improper arguments that
characterized the defense's opening statement and summation at
the first trial.  Since this Court has discretion to eliminate

opening statements altogether, <u>United States v. Salovitz</u>, 701 F.2d 17, 21 (2d Cir. 1983); <u>United States v. Young & Rubicam</u>, 741 F.2d 334, 352 (D.Conn. 1990); D.Conn.L.Cr.R. 1(c), it is well within this Court's authority to preclude improper use of an opening statement. Opening statements are "not an occasion for argument." <u>United States v. Dinitz</u>, 424 U.S. 600, 612 (1976) (Burger, C.J., concurring)(purposes of an opening statement are "to state what evidence will be presented, to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony to the whole . . .") (Burger, C.J., concurring); <u>accord</u> <u>United States v. Salovitz</u>, 701 F.2d 17, 21 (2d Cir. 1983). Nor are they an opportunity for defense counsel to undertake "unfair appeals to sympathy or prejudice." <u>United States v. Rivera</u>, 778 F.2d 591, 593 (10th Cir. 1985); <u>cf. also</u> <u>United States v. Somers</u>, 496 F.2d 73, 737-38 (3d Cir. 1974) (declaring that the Court "categorically disapprove[s] of remarks which serve only to color objectively the minds of the jury at the outset of the trial").[14] Instead, opening statements are intended "to state what evidence will be presented, to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony to the whole."

---

[14] Although the case law regarding opening statements and summations primarily focuses on comments made by a prosecutor, "[i]t is clear that counsel on both sides of the table share a duty to confine arguments to the jury within proper bounds." <u>United States v. Young</u>, 470 U.S. 1, 8-9 (1985).

<u>Dinitz</u>, 424 U.S. at 612; <u>United States v. Zeile</u>, 734 F.2d 1447,

(11th Cir. 1984) (explaining that the purpose of opening

statements is to give "counsel the opportunity to present the

case to the jury and to outline the proof").[15]   Defense counsel,

therefore, should not be permitted in their opening statements to

make remarks to the jury that go beyond what the evidence will

likely show or not show, weaknesses in the Government's evidence,

or an alternative theory for viewing the evidence.

It should go without saying that a lawyer of Brendan

Sullivan's caliber knows how to make a proper opening statement.

Indeed, he repeatedly demonstrated that capacity during the first

trial.[16]   On the other hand, Sullivan improperly crossed the line

when, without reference to what he expected the evidence to show,

he made statements about  Forbes' alleged state of mind, couched

---

[15] The Connecticut Rules of Professional Conduct ("CT RPC")
and the A.B.A. Standards for Criminal Justice ("A.B.A.
Standards") incorporate these principles.  Specifically, CT RPC
3.4 prohibits a lawyer from asserting "personal knowledge of
facts in issue except when testifying as a witness, or state a
personal opinion as to the justness of a cause, the credibility
of a witness . . . or the guilt or innocence of an accused."  CT
RPC 3.4(5).

Similarly, the A.B.A. Standards state that an
attorney's opening statement "should be confined to a brief
statement of the issues in the case and evidence the lawyer
intends to offer which the lawyer believes in good faith will be
available and admissible."  A.B.A. Standard for Crim. Just. § 4-
7.4.

[16] <u>E.g.</u>, Tr. 85 ("The evidence will demonstrate that when
[Cosmo Corigliano] says Walter Forbes was involved in the
financial wrongdoing, his testimony will be false.")

in terms suggesting Sullivan himself had personal knowledge about

Forbes' thoughts, beliefs, and knowledge.[17]

---

[17]    Sullivan offered the following remarks during his
opening:

> First, Walter Forbes had no knowledge of wrongdoing.  That's
> the central theme and core of the defense.  One, no
> knowledge.  The most important point that you'll hear from
> me now and at the end of the case.

Tr. 84

> Walter Forbes . . . certainly knows what is honest and not
> honest.  And he certainly knows right from wrong.

Tr. 87.

> At the time of the merger discussed, at the time during 1997
> and at the close of this merger, Walter Forbes had
> absolutely no idea that there could have been anything wrong
> with the finances when he decided to hand over financial
> control of CUC, now merged into Cendant, to perfect
> strangers.

Tr. 93.

> On April 15th, 1998, the disclosures were made public to the
> world.  They came as a complete shock to Walter Forbes and
> hundreds of others in the company that knew the company
> inside out.

Tr. 96.

> Walter Forbes believed at all times, with perfect
> justification, that his company was healthy, functioning and
> running.
>
> *  *  *  *
>
> With respect to the accounting, [Forbes] had no indication
> that there was any wrongdoing in the Accounting Department,
> ever.

Tr. 108.

Even though Forbes alone was privy to his thoughts,
beliefs, and knowledge, Sullivan never stated during his opening
that Forbes would testify to any of those matters.  Even assuming
that, by the time of Sullivan's opening, Forbes had already
informed Sullivan of Forbes' unequivocal and irrevocable decision
to testify in this case, Sullivan's opening was not couched in
terms of what Forbes' testimony would demonstrate, but suggested
Sullivan's own omniscient understanding of Forbes' thoughts.
This is improper advocacy during an opening statement,
particularly since the jury is likely to understand that Forbes'
lawyers had unique access to Forbes' explanations of his
thoughts, beliefs, and knowledge, and that Sullivan was in a
better position than most to advise the jury about Forbes'
thinking.

During his summation in the initial trial, Sullivan was
not content to argue that the Government had failed to sustain
its burden of proof or to challenge the credibility of the
prosecution witnesses.  Nor was he content to comment on the
state of mind of his own client.  Rather, he improperly impugned
the motives of the prosecutors, expressly accusing them of trying

_____

[Forbes] never contemplated and could not have imagined that
anyone would make up numbers.  Inconceivable to him that it
could happen, that it did happen, or that it wasn't seen or
stopped by somebody.

Tr. 108-09.

30

to persuade the jury to convict in violation of the law.[18]
Additionally, Sullivan argued that the prosecutors had misled the
jury by pointing out that Corigliano's plea agreement contained a
provision which obviated his benefits under the agreement if he
testified falsely at trial.[19]

---

[18]  For instance, Sullivan purported to read the prosecutors'
minds by asserting that:

> The government hopes that you'll be blinded by the fact that
> there was a large, they call it massive fraud.

Tr. 15133.

> Secondly, ladies and gentlemen, the government hopes you'll
> be blinded by something else:  By the money.  By the
> enormous amount of money that Walter Forbes earned.

Tr. 15133-34.

> By the hopes that you'll be blinded by the fraud on the one
> hand and the money on the other, [the government] hopes that
> you won't see -- and we didn't hear much about it -- the
> credibility of Cosmo Corigliano.

Tr. 15134.

[19]  In this regard, Sullivan argued:

> Just one word about government counsel's reference to the
> provision in the paragraph.  You can look at it when you're
> in there in the jury room.  It's on the second page under
> the word "cooperation."  It talks in that agreement about if
> he doesn't tell the truth and cooperate and he lies, deal's
> out the window.  That was the phrase, out the window.  And
> he could be prosecuted.  The deal is off the table.  Ladies
> and gentlemen, you're supposed to bring here your common
> sense.  The chances of throwing that deal out the window are
> about the same as throwing the deal out the window in this
> courtroom.  There are no windows.

> The government has worked with this man for four and a half
> years, 65 to 75 interviews.  They brought him into court and

31

Defense counsel are not entitled to "uncontrolled" or "unrestrained" argument during summation.  <u>Herring v. New York</u>, 422 U.S. 853, 862 (1975) (the trial judge has broad discretion to "ensure that argument does not stray unduly from the mark").  Closing argument is an opportunity for defense counsel to argue to the jury "the inferences to be drawn from all the testimony," to "point out the weaknesses of the[] adversaries' positions," and to attempt "to persuade the . . . [jury] that there is a reasonable doubt of the defendant's guilt."  <u>Id.</u>  "Defense counsel, like his adversary, must [also] not be permitted to make

---

put him on the witness stand.  If you think -- the fact of the matter is it would be easy to think that that is a deterrent to Mr. Corigliano, or that it was a possibility of happening.  When the government wrote its letter of January 13th warning it was a crime to lie in the meeting, that didn't phase him a bit.  He just lied.  And yet they didn't prosecute him for those lies, by the way.  Hey, forget it.  You're our witness.  All those lies on January 13th went by the board.  They're not even mentioned in the letter.

So when you read that, think about whether that's an effective deterrent to Cosmo Corigliano that somehow that paragraph, which the government often uses to say, oh, he's got to tell the truth.  If he doesn't tell the truth, the deal is out the window.  **My kids say, "Come on, dad.  You know, it doesn't happen, not in the real world."  That's common sense.**

Tr. 15239-40 (emphasis added).

Defense counsel is certainly entitled to point out that Corigliano lied to federal officials during the course of this investigation before he signed his plea agreement, and that his trial testimony can be discredited for that reason.  There is no basis, however, for counsel to "predict" that the Government would decline to enforce the truth-telling requirement of Corigliano's plea agreement if the Government determined that Corigliano had lied after signing the agreement.

32

unfounded and inflammatory attacks on the opposing advocate."
Young, 470 U.S. at 9. In addition, as with in opening statements,
appeals to sympathy, passion, or prejudice are not appropriate
for closing argument.[20]

Arguments that impugn the motives of opposing counsel,
rather than attacking the arguments and evidence presented by
counsel, are improper. See United States v. Zackson, 12 F.3d
1178, 1183 (2d Cir. 1993); see generally United States v.
Salameh, 152 F.3d 88, 139 (2d Cir. 1998); United States v.
Myerson, 18 F.3d 153, 163 (2d Cir. 1994); cf. United States v.
Moskovits, 784 F.Supp. 193, 197 n. 3 (E.D.N.Y. 1992). The only
purpose of such (baseless) attacks on the prosecutors' integrity
is to improperly "appeal to the jury's emotions or to 'inflame
the passions or prejudices of the jury.'" United States v.

---

[20]  With regard to closing argument to a jury, the A.B.A.
Standards declare that it is unprofessional conduct for a lawyer
to, inter alia:

(1)  "express a personal belief or opinion in his or her
     client's innocence or personal belief or opinion in the
     truth or falsity of any testimony or evidence . . .";

(3)  "make arguments calculated to inflame the passions or
     prejudices of the jury"; and

(4)  make arguments that "would divert the jury from its
     duty to decide the case on the evidence by injecting
     issues broader than the guilt or innocence of the
     accused under the controlling law or by making
     predictions of the consequences of the jury's verdict."

A.B.A. Standards, § 4-7.8.

Peterson, 808 F.2d 969, 977 (2d Cir. 1987)(quoting American Bar Association Standard 3-5.8(c)).[21]  In order to avoid the need for the Government to object to counsel's summation at the retrial, or seek an instruction from the Court that counsel's summation was improper, the Government requests that the Court direct Forbes' counsel in advance from again presenting opening remarks and summation arguments that run afoul of the law.

---

[21]  The impropriety of Sullivan's personal attacks on the integrity of the prosecutors was exacerbated by his irrelevant and thinly veiled allusion to his own military service, Tr. 15131 ("Some of my friends served full military service in six months in the National Guard."), and religious practices.  Tr. 15144 ("I'm a guy that falls asleep after 15 minutes of church and has to be nudged by my wife to keep me awake.").  Closing argument is no place for a lawyer to drop such irrelevant biographical tidbits designed to distract the jury from the evidence and the law, or curry favor with jurors based on their military or religious backgrounds.

34

**CONCLUSION**

For the foregoing reasons, the Government respectfully requests that the Court grant the Government's motion *in limine* in all respects.

Respectfully submitted,

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice

/s/ Norman Gross

By: NORMAN GROSS
Special Attorney
U.S. Department of Justice
Federal Bar No. 24933


/s/ Michael Martinez

By: MICHAEL MARTINEZ
Special Attorney
U.S. Department of Justice
Federal Bar No. pending


/s/ Craig Carpenito

By: CRAIG CARPENITO
Special Attorney
U.S. Department of Justice
Federal Bar No. pending


Dated: July 18, 2005
        Newark, New Jersey