**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **No. 3:02CR264 (AWT)** |
| **v.** | ) | |
| **WALTER A. FORBES** | ) | **September 2, 2005** |

**MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANT WALTER A. FORBES TO PRECLUDE THE GOVERNMENT FROM PRESENTING EVIDENCE, CROSS-EXAMINATION, OR ARGUMENT CONCERNING (1) MR. FORBES' JULY 1998 SEVERANCE AGREEMENT WITH CENDANT; (2) THE VALUE OF MR. FORBES' SEVERANCE; (3) THE JULY 28, 1998 CENDANT BOARD MEETING; OR (4) THE FINANCIAL AND OTHER PRESSURES ON CENDANT IN JULY 1998**
**(Forbes Retrial Motion *In Limine* No. 4)**

Defendant Walter A. Forbes, through undersigned counsel, respectfully submits this memorandum in support of his motion *in limine* to preclude the government from presenting evidence, cross-examination, or argument on retrial concerning: (i) Mr. Forbes' July 1998 severance agreement with Cendant; (ii) the value of the severance Mr. Forbes received from Cendant; (iii) the July 28, 1998 Cendant Board meeting; or (iv) the financial and other pressures on Cendant in July 1998.

## FACTUAL BACKGROUND

Mr. Forbes executed a severance agreement with Cendant in July 1998. See Exhibit 1 (severance agreement). The agreement was signed more than three

months after accounting irregularities at Cendant were publicly disclosed in April 1998, and more than three months after the conclusion of the alleged criminal conduct charged in the indictment. The July 28, 1998 Cendant board meeting that preceded the execution of the severance agreement, and the surrounding events of July 1998, also took place more than three months after the conclusion of the alleged conduct charged in the indictment.

During the 2004 trial, the government posed a series of questions to Mr. Forbes concerning his severance and the July 28, 1998 Cendant board meeting. See Tr. 14376-77, 14405-12, 14473-89.[1] The government also introduced Mr. Forbes' severance agreement into evidence. See Exhibit 1 (GX 20,244). Mr. Forbes was asked about the magnitude of his severance, the terms of his severance agreement, the board fight that took place at the July 28, 1998 meeting, the financial stresses on Cendant in July 1998, Mr. Forbes' alleged refusal to resign from Cendant unless he received his severance, and the resignations of other Cendant board members from the former CUC. See Tr. 14376-77, 14405-12, 14473-89. Counsel for Mr. Forbes interposed a series of objections during this questioning. See id.

---

1 On cross-examination, the government posed a series of questions to Mr. Forbes concerning his severance and his resignation from Cendant. On redirect examination, defense counsel attempted to respond to the government's questioning by establishing that the severance was approved by the Cendant board after consultation with counsel. See Tr. 14430-31. On re-cross-examination, the government was permitted, over Mr. Forbes' objection, to ask a series of questions concerning the July 28, 1998 Cendant board meeting.

The government's cross-examination concerning Mr. Forbes' severance was designed to portray Mr. Forbes as a person of bad character and to prejudice Mr. Forbes in the eyes of the jury. The government sought to bias the jury against Mr. Forbes by emphasizing the magnitude of the severance ($47 million) and suggesting that Mr. Forbes was a greedy and selfish man who demanded substantial compensation at a time when the average Cendant investor suffered serious losses. See, e.g., Tr. 14377 ("You were going to try to negotiate your way out, a nice big severance on the way out?); Tr. 14405 ("But even though you felt bad for the shareholders and you were still a multimillionaire by tens of millions of dollars, isn't it true you still wanted more money out of the company before you would agree to leave?");[2] Tr. 14488 ("Well, when you left were you given the $47 million?").

In a further effort to prejudice Mr. Forbes before the jury, the government's summation emphasized the amount of Mr. Forbes' severance and asserted that Mr. Forbes had no concern for Cendant shareholders because he accepted a large severance:

> Mr. Forbes tells us he was sorry for the shareholders. Felt sorry for them. He was so sorry that he wanted to take $47 million with him as part of his severance.

Tr. 15116.

---

[2] Mr. Forbes' objection to this question was sustained.

The government also attempted to portray Mr. Forbes as a bad person and to prejudice Mr. Forbes before the jury by suggesting during cross-examination that Mr. Forbes would not resign from Cendant unless he received his $47 million. Through these questions, the government suggested that Mr. Forbes was selfish, greedy, and insensitive. See Tr. 14408-09 ("This is your agreement that you negotiated in exchange for your resigning from the board, right? . . . . Well, you wouldn't leave the company, would you, voluntarily?");[3] Tr. 14479 ("And you refused to leave without your 47 million; is that correct, Mr. Forbes?"); Tr. 14480 ("So you opposed leaving unless you got the 47 million?"); Tr. 14483 ("Well, Mr. Forbes, the bottom line is, you wouldn't leave unless you got the 47 million, right?"); Tr. 14483 ("the answer is yes, you wouldn't leave without your 47 million? . . . . Can we agree it was 47 million?"); Tr. 14488 ("Is it true that you were not going to leave, not resign as the chairman of the board unless you got your $47 million?"). The government repeated this theme in summation, asserting that Mr. Forbes "wouldn't leave the company; wouldn't leave the company, ladies and gentlemen, unless he got one more payment, one more chance to get paid." Tr. 15116.

The government also suggested that Mr. Forbes acted improperly by accepting his severance, despite the fact that Mr. Forbes' conduct in July 1998 was entirely lawful. See, e.g., Tr. 14483 ("And can we agree, and I'll try to wrap this up,

---

[3] Mr. Forbes' objection to the second question was sustained.

the former HFS directors said you should leave without it"); Tr. 14489 ("And before you left -- before you agreed to leave, did people want you to leave without your $47 million?"). Finally, the government suggested that Mr. Forbes had "47 million reasons to lie," Tr. 15117, because he could be sued by Cendant and required to forfeit the severance in the event he were convicted. See Tr. 14411. In fact, Mr. Forbes has already been sued by Cendant for return of his severance. In June 1999, Cendant filed claims against Mr. Forbes that seek full recovery of Mr. Forbes' severance.

## ARGUMENT

### I. MR. FORBES' SEVERANCE, AND THE EVENTS SURROUNDING IT, ARE NOT RELEVANT TO ANY ISSUE IN THIS CASE.

The Court should preclude the government from presenting any evidence concerning Mr. Forbes' severance pursuant to Fed. R. Evid. 401. The severance agreement has no relevance to this action. It was executed in July 1998, months after the conclusion of the alleged conduct charged in the indictment -- which was publicly disclosed in April 1998. The severance agreement has no bearing on any element of the charged offenses and proves nothing with respect to the pending charges against Mr. Forbes. Similarly, the July 1998 Cendant board meeting, the financial stresses on Cendant in July 1998, and the discussion that took place at the July 1998 meeting concerning the terms of Mr. Forbes' resignation and severance have no bearing on any issue in this case. Such evidence does nothing "to make the

existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

While the government asserts that the severance agreement is relevant to Mr. Forbes' credibility because it creates a motive for him to testify falsely in the criminal action, see Tr. 14411, that argument misses the mark. The only conceivable relevance of the severance agreement to this case is that the agreement authorizes Cendant to bring an action against Mr. Forbes for recovery of the severance in the event he were convicted of a crime. See Exhibit 1, section 2. Nothing in the agreement ensures that Cendant would prevail in any such action. Rather, the agreement simply gives Cendant a right to pursue legal remedies against Mr. Forbes in the event of a criminal conviction. See id.

The severance agreement could not give rise to any purported motive to testify falsely in any retrial because Cendant has already sued Mr. Forbes for recovery of his severance; it filed such a claim in 1999. The government knows that this is the case; it represented in a recent pleading that Mr. Forbes "has been sued by Cendant to recover the $47 million 'severance' payment that Cendant paid Forbes in 1998, based on Cendant's claim that Forbes was involved in the accounting fraud at issue in this case." Gov't Opp. to Forbes Motion to Compel Discovery (Forbes Retrial Motion No. 3) (filed August 15, 2005) at 16-17. Thus, it is undisputed that Cendant has already availed itself of any claimed right it has under the agreement to sue Mr. Forbes for recovery of the severance payment. Given that incontrovertible fact, it

makes no sense for the government to contend that Mr. Forbes is shading his testimony in order to avoid a Cendant lawsuit seeking recovery of his severance. Accordingly, the government should be precluded from questioning Mr. Forbes about the severance under the pretext that it is relevant to a purported motive to testify falsely in these proceedings.

It is obvious that Mr. Forbes has a great deal at stake in this case, including his liberty. The government is free to point that out in the event Mr. Forbes testifies in a retrial. The government also is free to argue to the jury that the high stakes in this case are a relevant factor in assessing Mr. Forbes' credibility. But the possibility that Cendant could sue Mr. Forbes for recovery of the severance if he were convicted -- a non-issue, because Cendant has already sued Mr. Forbes for recovery of the severance -- is not a relevant factor in assessing Mr. Forbes' credibility.

The remaining evidence the government seeks to elicit concerning the severance -- Mr. Forbes' conduct at the July 1998 Board meeting, the Board fight, the views expressed by various Board members at the July 1998 meeting, Mr Forbes' alleged refusal to resign without a severance, the resignations of other Cendant board members, and the financial pressures on Cendant in July 1998 -- have no conceivable relevance to Mr. Forbes' credibility or any other legitimate issue in this

case.[4] The events of July 1998 are not charged in the indictment, and they have no probative value with respect to the offenses charged. The Court should preclude the government from presenting any evidence, cross-examination, or argument on these subjects pursuant to Rule 401.

## II. THE COURT SHOULD EXCLUDE EVIDENCE RELATING TO THE SEVERANCE AND THE JULY 1998 BOARD MEETING UNDER RULE 403.

The Court also should exclude evidence concerning Mr. Forbes' severance and the July 1998 Cendant board meeting pursuant to Fed. R. Evid. 403. The nonexistent probative value of this evidence is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Id. Indeed, it is evident from the government's cross-examination of Mr. Forbes and closing argument at the 2004 trial that the government's real purpose in offering evidence concerning the severance and the July 1998 board meeting is improper and prejudicial. The government seeks to highlight Mr. Forbes' wealth, to incite juror emotion and anger at the fact that Mr. Forbes received $47 million after the disclosure of the fraud, and to portray Mr. Forbes as a bad person.

---

[4] Evidence concerning the views of other Cendant board members about whether Mr. Forbes should have accepted the severance also is inadmissible pursuant to Fed. R. Evid. 701 (prohibiting lay opinion testimony) and because it is hearsay.

"Unfair prejudice," for purposes of Rule 403, is "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403, advisory committee notes. Evidence is properly excluded under Rule 403 where there is a "genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence." United States v. Bailey, 990 F.2d 119, 122 (4th Cir. 1993) (citation omitted); see also United States v. Blackstone, 56 F.3d 1143, 1146 (9th Cir. 1995) ("Evidence is prejudicial if it 'appeals to the jury's sympathies, arouses its sense of horror, provokes its instincts to punish, or triggers other mainsprings of human action.'") (quoting 1 Weinstein's Federal Evidence § 403[3]); United States v. Lachman, 48 F.3d 586, 592 (1st Cir. 1995) ("The concern is with any pronounced tendency of evidence to lead the jury, often for emotional reasons, to desire to convict a defendant for reasons other than the defendant's guilt.").

The government's clear purpose in questioning Mr. Forbes about his severance, and introducing the severance agreement into evidence, is to arouse juror emotion and anger. The government seeks to incite resentment and ire among jurors by emphasizing the fact that Mr. Forbes demanded and received a $47 million severance package (which was entirely lawful) at a time when the average Cendant investor was suffering losses. This is a classic "appeal to class prejudice," United States v. Stahl, 616 F.2d 30, 33 (2d Cir. 1980), which the Second Circuit has condemned as "improper and hav[ing] no place in a court room." Id. (collecting

cases). Indeed, in Stahl, the Second Circuit reversed a conviction where the government sought to "appeal to the potential bias of not-so-wealthy jurors" by emphasizing the defendant's wealth and "equat[ing] wealth with wrongdoing." Id. at 31.

There was nothing unlawful or improper about Mr. Forbes' acceptance of his severance in July 1998[5] or Mr. Forbes' alleged conduct at the July 1998 Cendant board meeting. Yet the government seeks to emphasize the amount of the severance, and Mr. Forbes' alleged refusal to resign from Cendant unless he received his severance, in an effort to "equate wealth with wrongdoing." Id. The government also seeks to suggest that Mr. Forbes is a person of poor character because did not forfeit his severance at a time when Cendant was under financial duress and Cendant shareholders were suffering losses. Because this evidence has no probative value and is extremely prejudicial, the Court should preclude the government from making any reference to either Mr. Forbes' severance or the July 1998 board meeting in any retrial.

The Court also should exclude this evidence because it is misleading and prejudicial. The government wants the jury to infer that Mr. Forbes is a bad person, and is likely guilty of the charged offenses, because he greedily demanded his

---

[5] To the contrary, Michael Monaco testified that it would be unusual for executives not to accept compensation that is offered to them. Tr. 2103. Mr. Monaco accepted a $7 million severance when he resigned from Cendant. Tr. 2101-02.

$47 million severance at the July 1998 board meeting while Cendant's shareholders were suffering. This is highly misleading, because neither the amount of the severance nor Mr. Forbes' acceptance of his severance has any legitimate probative value with respect to the charged offenses.[6] Indeed, had Mr. Forbes not accepted his severance, the government likely would argue that such conduct demonstrated consciousness of guilt. Given the Catch-22 nature of the situation, it is both misleading and fundamentally unfair for the government to emphasize the amount of the severance or to suggest that Mr. Forbes acted improperly by accepting it. Accordingly, the Court should preclude the government from presenting any evidence, cross-examination, or argument concerning Mr. Forbes' severance or the July 1998 board meeting pursuant to Fed. R. Evid. 403.

## CONCLUSION

For the foregoing reasons, the Court should preclude the government from presenting evidence, cross-examination, or argument concerning: (i) Mr. Forbes'

---

6 Cendant executives from the former HFS, including Mr. Silverman and Mr. Monaco, also received generous financial packages after the merger. There is no indication that Mr. Silverman, Mr. Monaco, or any other high-level Cendant personnel declined to accept any compensation after Cendant's stock price suffered following the disclosure of the fraud in April 1998. To the contrary, Mr. Monaco testified that, although his compensation package following the merger was excessive, Tr. 2102, he accepted all of the compensation offered to him. Yet the government does not accuse Mr. Monaco, Mr. Silverman, or any other Cendant executive from the former HFS, of any wrongdoing. Mr. Forbes' acceptance of his compensation package, including his severance, proves nothing about whether he is guilty of the charged offenses.

July 1998 severance agreement with Cendant; (ii) the value of the severance Mr. Forbes received from Cendant; (iii) the July 28, 1998 Cendant Board meeting; or (iv) the financial and other pressures on Cendant in July 1998.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: ______________________________
Brendan V. Sullivan, Jr. (Bar No. ct17115)
Barry S. Simon (Bar No. ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
Cowdery, Ecker & Murphy, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

# EXHIBIT 1

**AGREEMENT**

AGREEMENT (this "Agreement"), dated as of July 28, 1998, between Cendant Corporation, a Delaware corporation (the "Company"), and Walter A. Forbes (the "Executive").

W I T N E S S E T H

WHEREAS, the Company and the Executive are parties to a Restated Employment Agreement, dated as of May 27, 1997 (the "Employment Agreement);

WHEREAS, the Audit Committee of the Company's Board of Directors has reported to the Board of Directors on an interim basis with respect to its investigation of the accounting issues at CUC International, Inc. businesses as disclosed by the Company in a press release dated July 14, 1998 (the "Accounting Issues");

WHEREAS, the members of the Board of Directors of the Company are divided with respect to the governance of the Company;

WHEREAS, the Executive and the Company have agreed as provided herein for the termination of the Executive's employment and other positions with the Company; and

WHEREAS, the Company and the Executive desire to confirm the rights and obligations of Executive under the Employment Agreement as a result of the termination of the Executive's employment with the Company.

NOW, THEREFORE, in consideration of the mutual agreements and understandings set forth herein, the parties hereto hereby agree as follows:

Section 1. Termination of Employment; Benefits.

(a) Resignation. Effective at the Effective Time (as defined below), the Executive hereby terminates his Period of Employment (as defined in the Employment Agreement) with the Company and resigns as Chairman of the Board of Directors, Chairman of the Executive Committee of the Board of Directors and as a director of the Company.

(b) Benefits. The Company and the Executive agree that the termination of the Executive's Period of Employment pursuant to Section 1(a) of this Agreement

shall be deemed a "Without Cause Termination" under the terms of the Employment Agreement and accordingly, the Executive shall be entitled to receive the following payments and benefits in accordance with Sections VIII B, C and D of the Employment Agreement: (i) $35,000,000 in cash in full satisfaction of the Company's obligations under Sections VIII B(x) and VIII C(x) of the Employment Agreement; (ii) fully vested options to purchase 1,266,500 shares of common stock of the Company at an exercise price of $17.00 per share, subject to the same terms and conditions (other than vesting) as the Initial Options (as defined in the Employment Agreement), pursuant to a grant substantially in the form attached hereto as Annex A, in full satisfaction of the Company's obligations under Section VIII B (y) of the Employment Agreement; (iii) $753,205.13 in cash in full satisfaction of the Company's obligations under Section VIII C (y)(a) of the Employment Agreement; and (iv) until the fifth anniversary of the Effective Time, the continuation of the welfare benefits otherwise provided to the Executive under Section IV D of the Employment Agreement and, to the extent applicable, the Executive's spouse. In addition, as a result of such termination: (i) all stock options granted to the Executive prior to the Effective Time shall become fully vested at the Effective Time and shall remain exercisable for the remainder of their terms without regard to the termination of the Executive's Period of Employment; (ii) any restrictions on shares of restricted Company common stock issued to the Executive prior to the Effective Time shall lapse at the Effective Time; and (iii) the Company shall contribute $2,149,172.00 in cash to the escrow agent to be held pursuant to the escrow agreement, substantially in the form attached hereto as Annex B, with all interest and/or dividends thereon to be paid periodically to the Company, such contribution to be in full satisfaction of the Company's obligations under Section VIII C(y)(d) of the Employment Agreement. The cash payments to the Executive, the cash contribution to the Escrow Agent and the grant of stock options to the Executive pursuant to this Section 1(b) shall be made by the Company (in the case of cash, by wire transfer of immediately available funds to one or more accounts designated by the Executive or the Escrow Agent, as the case may be) on or before the Effective Time. In accordance with Section XIV of the Employment Agreement and as detailed in Schedule A attached hereto, all payments made by the Company to the Executive pursuant to this Section 1(b) shall be reduced by all federal, state, city or other taxes that are required to be withheld pursuant to any law or governmental regulation.

(c) Continuing Rights and Obligations under Employment Agreement. The parties hereto agree that the rights and obligations under the Employment Agreement which continue by their terms after termination of the Period of Employment shall be unaffected by the execution of this Agreement, including without limitation the indemnification provisions of Section XI thereof, except to the extent the parties' respective rights and obligations under Article VIII of the Employment Agreement are provided for in .

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
IN Civil Action No. 98-1664 (WHW)

CEN 0392957

CEN0392957

Section 1(b) hereof. The Executive agrees that within thirty (30) days after the Effective Time he shall vacate his offices at the Company and at any of its subsidiaries and return to the Company all property of the Company and any of its subsidiaries, including without limitation, files, records, access cards, computer cards, computer equipment and software, facsimile machines, automobiles. The Executive agrees that promptly following the Effective Time he shall return to the Company all cellular telephones, credit cards and debit cards.

(d) Representations and Warranties of the Executive. The Executive hereby represents and warrants to the Company that he did not have knowledge of or participate in the Accounting Issues and no event, circumstance or other reason exists that would entitle the Company to terminate his Period of Employment under the Employment Agreement through a "Termination for Cause" (as defined in the Employment Agreement).

Section 2. Additional Agreements. The Company covenants that it will not bring or assert against the Executive any claim or cause of action, whether in law or equity, based upon any of the Accounting Issues and hereby releases the Executive from any and all claims, causes of action, debts, contracts, promises and demands, whether in law or equity, based upon the Accounting Issues, except as expressly set forth in this Agreement; provided however, that this Section 2 shall in all respects be null, void and of no effect if the Executive is convicted of or pleads guilty to any crime based upon any of the Accounting Issues. In the event that the Executive has received any direct benefit or consideration relating to any of the Accounting Issues (it being understood that, for purposes of this Agreement, receipt by the Executive of his compensation and other benefits pursuant to the terms of his employment by the Company or trading in the Company's securities shall not be considered such benefit or consideration), the Company's remedy in any proceeding against the Executive with respect to such benefits or consideration shall be limited to the recovery of any such benefit or consideration. The covenant and release in this paragraph shall in no way eliminate, limit or waive the Company's right to bring or assert against any other person a claim or cause of action, whether in law or equity, based upon any of the Accounting Issues. The Executive agrees that for a period of ten (10) years from the date hereof, he will not interpose as a defense or otherwise assert any legal doctrine or theory based upon the passage of time, including without limitation the statute of limitations and laches, in or in connection with any action, proceeding, claim, or cause of action brought against him by the Company based upon any of the Accounting Issues to the extent consistent with the terms of this Agreement.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
IN Civil Action No. 98-1664 (WHW)

CEN 0392958

CEN0392958