UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:02CR00264 (AWT) |
| | : | |
| | : | |
| v. | : | September 12, 2005 |
| | : | |
| | : | |
| | : | |
| WALTER A. FORBES and | : | |


**MOTION OF THE UNITED STATES FOR LEAVE TO DISMISS WITH PREJUDICE CERTAIN COUNTS OF THE SUPERSEDING INDICTMENT PURSUANT TO FED. R. CRIM. P. 48(a) AND TO SUBMIT A REDACTED INDICTMENT TO THE JURY**

The United States respectfully moves for leave to dismiss with prejudice certain counts of the superseding indictment returned in this case on December 11, 2002 by the Grand Jury sitting in the District of Connecticut. Fed. R. Crim. P. 48(a) provides:

Rule 48. Dismissal

(A) By the Government. The government may, with leave of court, dismiss an indictment, information, or complaint. The government may not dismiss the prosecution during trial without the defendant's consent.

The rule permits a dismissal of fewer than all counts of the indictment. Wright, King & Klein, Federal Practice and Procedure: Criminal 3d, § 811 (2004); In re United States, 345 F.3d 450, 452 (7th Cir. 2003). As the Government is seeking dismissal of these counts with prejudice, for the legitimate reason of streamlining its trial presentation, and thereby reducing the burden on the Court and the parties, and not to

harass the defendant or otherwise to act in bad faith, the Court should grant this motion. <u>United States v. Goodson</u>, 204 F.3d 508, 512 (4th Cir. 2000); <u>United States v. Flemmi</u>, 283 F.Supp.2d 400, 407 (D.C.Mass. 2003); <u>United States v. Segal</u>, 2002 WL 538775, *3-6 (N.D.Ill., April 10, 2002)(granting the Government's motion to dismiss a felony complaint without prejudice given the absence of bad faith).

**Dismissed Counts**

In light of the Court's rulings on Issues 1 and 2 of the Government's Pre-Retrial Motion in Limine, the Government moves to dismiss with prejudice the following counts:

Count 2 (Mail Fraud)

Count 3 (Mail Fraud)

Count 4 (Wire Fraud)

Counts 7 through 11 (Securities Fraud - Hartford Steam Boiler)

Counts 13 through 16 (Insider Trading)

**Redacted Indictment**

If the Court grants this motion, the Government would submit a redacted indictment to the Court (copy appended as Exhibit 1 hereto), which would eliminate the dismissed counts and renumber the remaining counts as follows:

Count 1 (Conspiracy)

Count 2 (False Statement in Report Required to be Filed with the

2

SEC)(formerly Count 5)

Count 3 (False Statement in Report Required to be Filed with the

SEC)(formerly Count 6)

Count 4 (Securities Fraud, Purchase of 5000 shares of Cendant

stock on February 18, 1998)(formerly Count 12).

   Count 1 of the indictment would be further redacted to

charge in ¶17(a) only a dual object conspiracy, as follows:

   17.  From at least as early as the late 1980's to in or
about April 1998, in the Districts of Connecticut and New
Jersey, and elsewhere, defendant

**WALTER A. FORBES**

did knowingly and willfully conspire and agree with E. Kirk
Shelton, Cosmo Corigliano, Anne Pember, Casper Sabatino and
others to commit offenses against the United States, that
is:

(a) by use of the means and instrumentalities of interstate
commerce, the mails, and the facilities of national
securities exchanges, directly and indirectly, knowingly and
willfully to use and employ manipulative and deceptive
devices and contrivances in contravention of Title 17, Code
of Federal Regulations, Section 240.10b-5 ("Rule 10b-5") in
connection with the purchase and sale of CUC and Cendant
securities, by, in connection with such transactions, (i)
employing devices, schemes, and artifices to defraud holders
of CUC, HFS, and Cendant securities and other members of the
investing public; (ii) making untrue statements of material
facts and omitting to state material facts necessary in
order to make the statements made, in the light of the
circumstances under which they which they were made, not
misleading; and (iii) engaging in acts, practices, and
courses of business which operated and would operate as a
fraud and deceit on holders of CUC, HFS, and Cendant
securities and other members of the investing public,
contrary to Title 15, United States Code, Sections 78j(b)
and 78ff(a) and Rule 10b-5; and

(b) willfully and knowingly to make, and cause to be made, in quarterly reports on Form 10-Q, annual reports on Form 10-K, and other reports and documents filed with the SEC by CUC and Cendant pursuant to the Securities Exchange Act of 1934, Title 15, United States Code, Sections 78a et seq., statements which were false and misleading with respect to material facts, contrary to Title 15, United States Code, Section 78ff(a).

The indictment would be further redacted to eliminate all references to E. Kirk Shelton as a defendant, and to change all references to "defendants, Walter A. Forbes and E. Kirk Shelton" to read "defendant Walter A. Forbes." E.g. Count 1, ¶¶ 18-21. Remaining references in the indictment to E. Kirk Shelton in the indictment would refer to him as a co-conspirator, rather than a defendant. E.g., Count 1, ¶ 10.

**CONCLUSION**

Accordingly, the Government respectfully requests that the Court grant leave to dismiss Counts 2-4, 7-11, and 13-16 of the indictment, and to permit the Government to submit a redacted indictment.

Respectfully submitted,

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice

Norman Gross/s

By: NORMAN GROSS
Special Attorney
U.S. Department of Justice
Federal Bar No. 24933

4

```
Dated: September 12, 2005
Camden, New Jersey
```

**EXHIBIT 1 (PROPOSED REDACTED INDICTMENT)**

NJ2001R00259

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:02CR00264 (AWT) |
| | : | |
| | : | VIOLATIONS: |
| v. | : | |
| | : | 18 U.S.C. § 371 (Conspiracy) |
| | : | 15 U.S.C. §§ 78j(b) & 78ff |
| | : | 17 C.F.R. § 240.10b-5 |
| WALTER A. FORBES | : | (Securities Fraud/False |
| | : | Statements to SEC) |

SUPERSEDING INDICTMENT

The Grand Jury charges that:

COUNT 1

(Conspiracy to Commit Securities Fraud and to Make
False Statements in Reports Required to Be Filed with the SEC)

BACKGROUND

CUC

1.  Prior to December 17, 1997:

    a.  CUC International, Inc. ("CUC") was a publicly

held corporation with headquarters in Stamford, Connecticut; and

    b.  CUC's principal business was selling

memberships in its buying clubs, which included programs for

home shoppers, travelers, restaurant patrons, and automobile

purchasers, among others.  CUC marketed these membership

programs primarily through its Comp-U-Card Division ("Comp-U-

Card"), its largest business unit, which maintained separate

offices in Trumbull, Connecticut.

2.  In or about 1983, CUC, then known as Comp-U-Card International, Inc., conducted an initial public offering of its stock.  Its stock was then traded on the over-the-counter market.  On or about August 23, 1989, CUC stock was listed for trading on the New York Stock Exchange.

3.  From at least as early as the mid-1980's, CUC pursued a strategy of fueling its growth with frequent acquisitions.  From in or about the mid-1980's to in or about 1997, CUC purchased more than 25 other companies, which it then either operated as subsidiaries or consolidated with its existing businesses.  In most of these cases, CUC paid at least a substantial part of the purchase price with CUC stock.

4.  In 1996, CUC made the three largest acquisitions in its history.  In July 1996, it acquired two software publishers, Davidson & Associates, Inc. ("Davidson") and Sierra On-Line, Inc. ("Sierra"), for a total of approximately $1.858 billion.  In August 1996, it acquired Ideon Group, Inc. ("Ideon"), a provider of credit card enhancement packages, for approximately $393 million.  CUC paid for all three purchases with CUC stock.

- -

2

The Formation of Cendant

5.   Prior to December 17, 1997, HFS, Inc. ("HFS") was a publicly-held corporation with headquarters in Parsippany, New Jersey.  Its principal business was the franchising of brand-name hotels, rental car agencies, and real estate brokerage offices.

6.   In or about May 1997, CUC and HFS agreed to merge into a single company.  The merger was approved by the shareholders of CUC and HFS on or about October 1, 1997 and became effective on December 17, 1997.  The resulting new company adopted the name Cendant Corporation ("Cendant").  Cendant established its headquarters in Parsippany, New Jersey.

7.   After the Cendant merger became effective, the former CUC businesses continued to be grouped together for management purposes within Cendant under the name Cendant Membership Services, Inc. ("CMS").  CMS maintained its headquarters, including its own separate accounting unit, in the former CUC offices in Stamford, Connecticut.

8.   Before the Cendant merger, CUC's fiscal year ended on January 31.  After the merger, Cendant adopted a fiscal year ending December 31.

- -

<u>The Defendant</u>

9.   From at least as early as in or about 1980 to in
or about December 1997, defendant **WALTER A. FORBES**, who received
a Master in Business Administration degree from Harvard
University in 1968, was employed as the Chief Executive Officer
of CUC.  From in or about 1983 to in or about December 1997,
defendant **FORBES** also served as the Chairman of CUC's Board of
Directors.  From on or about December 17, 1997 to in or about
July 1998, he held the title of Chairman of the Board of
Cendant.

<u>Named Co-conspirators</u>

10.   E. Kirk Shelton, who is named as a co-conspirator
but not as a defendant herein, received a Master in Business
Administration degree with distinction from Harvard University
in 1978.  From in or about 1981 to in or about 1991, Shelton was
employed in various senior executive positions at CUC.  From in
or about 1991 to in or about December 1997, Shelton was employed
as CUC's President and Chief Operating Officer.  From on or
about December 17, 1997 to in or about April 1998, he held the
title of Executive Vice President and Vice Chairman of Cendant.

11.   Cosmo Corigliano, who is named as a co-
conspirator but not as a defendant herein, was licensed as a

- -

4

Certified Public Accountant in or about 1983.  From in or about
1983 to in or about December 1994, Corigliano was employed as
the Controller of CUC.  From in or about December 1994 to the
day the Cendant merger became effective, he served as both CUC's
Chief Financial Officer and a Senior Vice President.  From on or
about December 17, 1997 to in or about April 1998, he held the
title of Executive Vice President of Cendant.  Among other
duties, he reported financial results for CMS for the year
ending December 31, 1997 to Cendant's corporate headquarters.

            12.  Anne Pember, who is named as a co-conspirator but
not as a defendant herein, was licensed as a Certified Public
Accountant in or about 1983.  Pember was employed as Director of
Accounting at Comp-U-Card from in or about 1989 to in or about
June 1997 and as the Controller of CUC from in or about June
1997 until the Cendant merger on or about December 17, 1997.
From in or about 1996 to on or about December 17, 1997, she also
held the title of Senior Vice President of CUC.  From on or
about December 17, 1997 to in or about March 1998, Pember was
employed in the accounting unit at CMS.

            13.  Before the Cendant merger became effective,
Casper Sabatino, who is named as a co-conspirator but not as a
defendant herein, was employed as an accountant in CUC's
corporate accounting department from in or about 1985 to on or

about December 17, 1997.  From in or about December 1994 to in

or about late 1997, Sabatino was the member of the department in

charge of CUC's external reporting, including its quarterly and

annual reports to the Securities & Exchange Commission ("SEC").

After the Cendant merger became effective, he was employed in

the accounting unit at CMS.

<u>The SEC and Publicly Held Companies</u>

14.  At all times relevant to this Indictment:

a.  the SEC was an independent agency of the

United States government which was charged by law with

preserving honest and efficient markets in securities;

b.  federal law required publicly held companies

to submit various reports containing detailed financial data to

the SEC, including quarterly reports on Form 10-Q and annual

reports on Form 10-K.  Federal law required this data to be

truthful and consistent with the underlying facts and further

required the accounting treatments employed in these reports to

be in accordance with generally accepted accounting principles

("GAAP"); and

c.  federal law required all publicly held

- -

6

companies to undergo an annual audit by an independent
accounting firm to ensure that its financial data was prepared
and reported in accordance with GAAP.

<u>Communications With Investors</u>

15.  At all times relevant to this Indictment, the
management officials of many public companies, including CUC and
Cendant, provided the investing public with predictions of, or
"guidance" regarding, the anticipated earnings of the companies
for upcoming reporting periods.  Relying at least in part on a
company's guidance, many professional securities analysts then
disseminated to the public their own estimates of that company's
expected performance.  These earnings estimates or analyst
expectations were closely followed by investors.  Typically, if
a company announced earnings that failed to meet or exceed
analysts' expectations, the price of that company's securities
declined.

16.  In addition to the above, CUC and Cendant issued
periodic reports of its financial performance to its
shareholders and the investing public in the form of annual and
quarterly reports and periodic press releases.  Among the

- -

7

financial data CUC and Cendant included in these reports and releases was an earnings figure referred to at different times as "operating income" or "income before one-time charges" (hereafter "operating income").  In calculating operating income, CUC and Cendant regularly excluded non-recurring expenses, including merger costs, and often excluded the impact of taxes and interest.  Operating income or similar figures were generally considered by securities analysts and the investing public to be a more accurate indicator of the company's performance than net income because these figures eliminated the impact of one-time, or unusual, events on a company's earnings, while net income included the impact of those events.

- -

<u>THE CONSPIRACY</u>

17.  From at least as early as the late 1980's to in or about April 1998, in the Districts of Connecticut and New Jersey, and elsewhere, defendant

**WALTER A. FORBES**

did knowingly and willfully conspire and agree with E. Kirk Shelton, Cosmo Corigliano, Anne Pember, Casper Sabatino and others to commit offenses against the United States, that is:

> (a) by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly, knowingly and willfully to use and employ manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5 ("Rule 10b-5") in connection with the purchase and sale of CUC and Cendant securities, by, in connection with such transactions, (i) employing

- -

9

devices, schemes, and artifices to defraud holders of CUC, HFS, and Cendant securities and other members of the investing public; (ii) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they which they were made, not misleading; and (iii) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit on holders of CUC, HFS, and Cendant securities and other members of the investing public, contrary to Title 15, United States Code, Sections 78j(b) and 78ff(a) and Rule 10b-5; and

(b) willfully and knowingly to make, and cause to be made, in quarterly reports on Form 10-Q, annual reports on Form 10-K, and other reports and documents filed with the

- -

10

SEC by CUC and Cendant pursuant to the

Securities Exchange Act of 1934, Title 15,

United States Code, Sections 78a <u>et</u> <u>seq.</u>,

statements which were false and misleading

with respect to material facts, contrary to

Title 15, United States Code, Section

78ff(a).

The Principal Goals of the Conspiracy
<u>and the Role of The Defendant</u>

18.   The principal goals of the conspiracy were: a) to

fraudulently inflate the earnings CUC reported to the SEC and

the investing public in order to artificially increase the price

of CUC stock; b) to fraudulently inflate the earnings of CMS,

which fraudulently inflated earnings Cendant reported to the SEC

and the investing public, and thereby artificially increased the

price of Cendant stock; c) to use CUC stock, the price of which

had been artificially increased, to pay for CUC's acquisition of

other companies; d) to use the artificially increased price of

CUC stock, CUC's fraudulently inflated earnings reports, and

fraudulently inflated projections of CUC's future earnings to

induce HFS and its shareholders to merge with CUC; and e) for

- -

11

defendant **WALTER A. FORBES** to personally enrich himself through salary, bonuses, stock options and capital appreciation of shares they held.

19.  Defendant **WALTER A. FORBES**, who was a principal officer and director of CUC and Cendant, engaged in the conspiracy with the assistance of co-conspirators who were his corporate subordinates.

<u>The Conspirators' Execution of Their Fraudulent Scheme</u>

20.  From at least as early as in or about the late 1980's to in or about 1997, defendant **WALTER A. FORBES**, along with other members of the conspiracy, sought to support and increase the price of CUC stock by causing CUC to misrepresent the true growth rate of the company to the SEC and the investing public.

21.  From at least as early as in or about the late 1980's to in or about 1997, defendant **WALTER A. FORBES**, along with other members of the conspiracy, acted to ensure that the earnings CUC reported each quarter closely matched the results predicted by Wall Street stock analysts, for fear that any shortfall could trigger a decline in the price of CUC stock.

- -

12

22.  To ensure that the earnings CUC reported would meet the expectations of analysts, defendant **WALTER A. FORBES**, along with co-conspirator Cosmo Corigliano, kept members of the analyst community well informed as to the amount of growth in earnings CUC was targeting.

The Conspirators' Inflation of Reported
Earnings to Meet Their Targets

23.  At the end of the first three quarters of each fiscal year, each of CUC's operating units reported its quarterly earnings figures to the company's Stamford headquarters.  These earnings figures were consolidated into one earnings figure for the company.  These earnings from the operating units' books had typically been inflated by the methods described in paragraphs 44 through 53 below.

24.  After the earnings for the operating units were consolidated into one quarterly earnings figure for CUC, defendant **WALTER A. FORBES** and other conspirators reviewed that figure to determine whether it met their earnings target for the quarter.  If the consolidated quarterly earnings failed to meet the earnings target, defendant **FORBES** directed other conspirators to increase the earnings figure so that it met or

- -

13

exceeded that target.

25.   These increases had no basis in fact.   The
purpose of these increases was to meet or exceed CUC's quarterly
earnings target.   After CUC's quarterly earnings figure was
fraudulently increased in this manner, defendant **WALTER A.
FORBES** and his co-conspirators caused the fraudulently increased
quarterly earnings figure to be reported to the SEC and the
investing public.

The Fraudulent Methods Used by the Conspirators to
Cover Up Their Inflation of CUC's and Cendant's Earnings

26.   Because CUC's independent accounting firm
audited the company's books only at the end of each fiscal year,
the conspirators typically found it unnecessary to make detailed
entries on the company's books at the end of the first three
quarters of the fiscal year to cover up their fraudulent
inflation of the company's consolidated quarterly earnings
figures.   As a result, the conspirators typically changed only
the consolidated quarterly earnings figure at the end of the
first three fiscal quarters.

27.   At the end of the fourth fiscal quarter, which
was also the end of the fiscal year, defendant **WALTER A. FORBES**

- -

14

directed other conspirators to increase the consolidated earnings figures for that quarter and the fiscal year by the amounts necessary to meet or exceed their respective earnings targets for that quarter and fiscal year. Defendant **FORBES** and his co-conspirators caused these fraudulently inflated earnings figures to be reported to the SEC and the investing public.

28. In order to permit CUC to withstand the scrutiny of its required annual audit, the conspirators caused fraudulent entries to be made to CUC's books andknowingly failed to make accurate entries to CUC's books that would negatively impact CUC's earnings. These fraudulent entries and failures to make accurate entries were designed to support all fraudulent increases in earnings that the conspirators had made during the past fiscal year.

29. In order to disguise their fraudulent inflation of CUC's earnings, defendant **WALTER A. FORBES** and his conspirators used fraudulent accounting machinations, including: a) using merger reserves to inflate operating income, as described in paragraphs 30 through 43 below; b) failing to maintain an adequate membership cancellation reserve at Comp-U-

- -

15

Card, as described in paragraphs 44 through 48 below; c)

misallocating revenues and expenses among Comp-U-Card programs

so as to qualify them for more favorable accounting treatment,

as described in paragraphs 49 through 53 below; d) making

various other fraudulent accounting entries, as described in

paragraphs 54 through 59 below; and e) falsely representing to

the SEC and the investing public that the company was following

its publicly declared accounting policies.

<u>Merger Reserves</u>

30.  From at least as early as the late 1980's to in

or about 1998, defendant **WALTER A. FORBES** and his co-

conspirators established excessive merger reserves and then drew

upon them to fraudulently inflate the reported operating income

of CUC and Cendant.

31.  Acquisition and merger reserves ("merger

reserves") were permitted by GAAP as a means of accounting for

one-time expenses arising from an acquisition or a merger.

These one-time expenses included professional fees, employee

severance or relocation costs, and the costs of consolidating

operations.

- -

32.   Under GAAP, a company engaged in an acquisition
or merger could establish a merger reserve in the year the
acquisition or merger took place.  Once a company's managers
made a good faith estimate of the total of the one-time costs
arising from an acquisition or merger, they created a merger
reserve in that amount.  Generally, the creation of a merger
reserve reduced the company's net income for that year, but not
its operating income.

33.   After the establishment of the merger reserve,
one-time costs resulting from the merger were deducted from the
merger reserve rather than current income, in contrast to
expenses arising from the normal operation of the company that
directly reduced income.  GAAP did not permit companies to
establish excessive merger reserves that were not based on good-
faith estimates of the costs of the merger or acquisition and
further did not allow companies to use merger reserves to offset
normal expenses not related to the merger or acquisition.  The
use of merger reserves to increase revenue was also not
permitted under GAAP.

CUC's Acquisition of Ideon,<br><u>Davidson, and Sierra</u>

- -

17

34.  CUC acquired Ideon, Davidson and Sierra in 1996 as described in paragraph 4 above.  During CUC's fiscal year ending January 31, 1997, defendant **WALTER A. FORBES** and his co-conspirators caused CUC to establish a merger reserve of approximately $127 million to pay expenses arising from CUC's acquisition of Ideon, and additional merger reserves totaling approximately $53 million to pay expenses arising from CUC's acquisition of Davidson, Sierra, and other, smaller companies. All these reserves together, totaling approximately $180 million, were known at CUC, and are hereafter collectively referred to, as the "Ideon reserve."

35.  The conspirators falsely represented, and caused CUC to falsely represent, to the SEC and the investing public that the size of the Ideon reserve was based on CUC's good-faith estimate of the probable amount of such acquisition-related costs.  In fact, the conspirators knew that they had fraudulently included tens of millions of dollars in the Ideon reserve in excess of that amount.

36.  The conspirators caused CUC and Cendant to falsely represent to the SEC and the investing public that

- -

18

expenses charged to the Ideon reserve were non-recurring costs incurred principally in connection with the acquisitions of Ideon, Davidson and Sierra.

The Cendant Merger

37.   In or about early 1997, defendant **WALTER A. FORBES** and his co-conspirators caused CUC to merge with HFS to form Cendant.  To induce HFS and its shareholders to agree to the merger, the conspirators referred HFS and its shareholders to CUC's fraudulently inflated earnings reports and provided them with projections of CUC's future earnings which they had fraudulently inflated beyond their actual expectations.

38. On or about December 17, 1997, defendant **WALTER A. FORBES** and his co-conspirators caused CMS to establish a merger reserve of approximately $556 million (the "Cendant reserve") to pay costs arising from CUC's merger with HFS and its acquisition of another company.

39.   The conspirators falsely represented, and caused Cendant to falsely represent, to the SEC and the investing public that the size of the Cendant reserve was based on their good-faith estimate of the probable amount of such merger

- -

related expenses.  In fact, the conspirators knew that they had intentionally included more than $200 million in the Cendant reserve in excess of that amount.

40.  The conspirators caused Cendant to falsely represent to the SEC and the investing public that expenses charged to the Cendant reserve were non-recurring costs incurred principally in connection with the merger with HFS.

<u>Fraudulent Use of Merger Reserves</u>

41.  Defendant **WALTER A. FORBES** and his co-conspirators fraudulently charged expenses not related to the mergers described above against the excess funds in the Ideon and Cendant reserves so that those expenses would not reduce operating income below target levels.  Defendant **FORBES** and his co-conspirators also fraudulently credited a portion of the excess funds in the Ideon and Cendant reserves directly to revenue.

42.  As the defendant and his co-conspirators knew, there was no justification in fact, or under GAAP, for this treatment of the merger reserves.  The defendant and his co-conspirators caused these fraudulent accounting treatments to be

- -

20

used while knowing and intending that:  a) they would ultimately
be reflected in CUC's and Cendant's financial statements and
public filings with the SEC; b) CUC's and Cendant's financial
statements and public filings would falsely overstate CUC's and
Cendant's operating income; and c) the investing public would
rely upon such overstated operating income.

43.  By the above means, defendant **WALTER A. FORBES**
and his co-conspirators fraudulently caused: a) the operating
income CUC reported for many of its fiscal years from in or
about the late 1980's through January 31, 1995 to be overstated
by millions of dollars; b) the operating income CUC reported for
its fiscal year ending January 31, 1996 to be overstated by
approximately $10 million; c) the operating income CUC reported
for its fiscal year ending January 31, 1997 to be overstated by
approximately $23 million; and d) the CMS operating income that
Cendant reported for its fiscal year ending December 31, 1997 to
be overstated by at least $110 million.  In addition, defendant
**FORBES** and his co-conspirators took steps to similarly draw on
the Cendant reserve to meet their target for the CMS operating
income to be reported in the fiscal year ending December 31,

- -

1998.

<u>Underfunding of the Company's Membership Cancellation Reserve</u>

44.    Members of CUC's and Cendant's buying and other clubs were required to pay their membership fees in full upon joining the clubs or upon renewal of their memberships.  Some members subsequently canceled their memberships and obtained refunds, while other members failed to pay their membership fees upon renewal.

45.    Defendant **WALTER A. FORBES** and his co-conspirators represented to the SEC and the investing public that CUC and Cendant placed a portion of the membership fees received into a membership cancellation reserve to allow both for cancellations and refunds and for the failure of some members to pay membership fees upon renewal.  The conspirators were able to estimate from CUC's and Cendant's experience how many members would cancel or fail to pay their membership fees upon renewal each year.  The conspirators represented that the amount of membership fees placed into the membership cancellation reserve was sufficient, based on their experience, to cover what they called "estimated cancellations."

- -

46.  Rather than follow the stated practice, from at least the late 1980's to in or about 1998, the conspirators intentionally underfunded this membership cancellation reserve, thereby fraudulently increasing earnings.

47.  As the defendant knew, there was no justification in fact, or under GAAP, for his treatment of this membership cancellation reserve.  By failing to set aside sufficient amounts of membership fees in the membership cancellation reserve, the defendant and his co-conspirator knew and intended that: a) their fraudulent treatment of the membership cancellation reserve would ultimately be reflected in CUC's and Cendant's financial statements and public filings with the SEC; b) CUC's and Cendant's financial statements and public filings would falsely overstate CUC's and Cendant's earnings; and c) the investing public would rely upon such overstated earnings.

48.  By failing to set aside sufficient amounts of membership fees in the membership cancellation reserve, the conspirators fraudulently caused:  a) the earnings CUC reported for each of its fiscal years from in or about the late 1980's through January 31, 1995 to be overstated by millions of

- -

dollars; b) the earnings CUC reported for its fiscal years ending January 31, 1996 and January 31, 1997 to be overstated by approximately $48 million and $19 million, respectively; and c) the earnings Cendant reported for its fiscal year ending December 31, 1997 to be overstated by approximately $12 million.

<u>Misallocation of Comp-U-Card Program Revenues and Expenses</u>

49.    From at least as early as the late 1980's to in or about 1998, defendant **WALTER A. FORBES** and his co-conspirators inflated CUC's and Cendant's reported earnings by falsely attributing revenues and expenses that had arisen from certain membership programs to other membership programs that qualified for more favorable accounting treatment.

50.    CUC immediately recognized membership fees as revenue in some membership programs (the "immediate recognition programs").  In other membership programs, CUC was required to recognize membership fees as revenue on a pro-rated basis over the life of the membership (the "deferred recognition programs").  The company disclosed to the SEC and the investing public that it recognized membership fees as revenue it received on a pro-rated basis over the "average membership period," which

- -

24

it represented to be "generally one to three years."  CUC also
disclosed that it recognized expenses incurred by a particular
program over approximately the same period of time that it
recognized the revenue from that program.

       51.  However, from at least as early as the late
1980's, defendant **WALTER A. FORBES** and his co-conspirators
deliberately misallocated revenue generated from deferred
recognition programs to immediate recognition programs.  As a
result, the conspirators fraudulently accelerated Comp-U-Card's
recognition of that revenue in a manner contrary to CUC's stated
policy.  In addition, on at least one occasion during this
period, the conspirators deliberately misallocated expenses from
a program in which expenses would have been recognized
immediately to another program in which expenses were to be
recognized over a one-year period.  By this action, the
conspirators fraudulently decelerated Comp-U-Card's expense
recognition in a manner contrary to CUC's stated policy.  By
increasing revenue and decreasing expenses in this manner, the
defendant and his co-conspirators fraudulently inflated
earnings.

- -

52.  As the defendant knew, there was no justification in fact or under GAAP for the misallocations set forth in paragraph 51.  The defendant and his co-conspirators made these misallocations knowing and intending that: a) the misallocations would ultimately be reflected in CUC's and Cendant's financial statements and public filings with the SEC; b) CUC's and Cendant's financial statements and public filings would falsely overstate CUC's and Cendant's earnings; and c) the investing public would rely upon such overstated earnings.

53.  By the actions set forth in paragraph 51, the defendant and his co-conspirators fraudulently caused:  a) the earnings CUC reported for each of its fiscal years from in or about the late 1980's through January 31, 1996 to be overstated by millions of dollars; b) the earnings CUC reported for its fiscal year ending January 31, 1997 to be overstated by approximately $10 million; and c) the earnings Cendant reported for its fiscal year ending December 31, 1997 to be overstated by approximately $17 million.

<u>Other Fraudulent Accounting Entries</u>

54.  From at least as early as the late 1980's to in

- -

or about 1998, defendant **WALTER A. FORBES** and his co-
conspirators fraudulently inflated the reported earnings of CUC
and Cendant by knowingly causing CUC and CMS to make a variety
of other fraudulent accounting entries, including those set
forth in paragraphs 55 through 58 below.

      55.  From in or about the late 1980's to in or about
early 1996, the conspirators routinely manipulated some standard
calculations of membership solicitation costs so as to
fraudulently reduce the expenses recognized by CUC.  By so
doing, the conspirators fraudulently caused the earnings CUC
reported for many of its fiscal years from in or about the late
1980's through January 31, 1997 to be overstated by millions of
dollars.     56.  At various times, including in or about early
1997, the conspirators caused CUC to arbitrarily reduce the
liability for commission expenses arising from the solicitation
of new members that Comp-U-Card carried on its books.  The
reduced liability was credited directly to revenue or against
operating expenses.  By so doing, the conspirators fraudulently
caused the earnings CUC reported for its fiscal year ending
January 31, 1997 to be overstated by at least approximately $4.5

- -

27

million.

57.  In or about January 1998, the conspirators caused Sierra retroactively to credit approximately $2.6 million to revenue on the basis of an unsubstantiated entry in Sierra's books indicating that the company might receive an unspecified future tax benefit.  By so doing, the conspirators fraudulently caused the earnings Cendant reported for its fiscal year ending December 31, 1997 to be overstated by approximately $2.6 million.

58.  The conspirators knew that January 1997 was the only month of CUC's fiscal year ending January 31, 1997 which was included in Cendant's fiscal year ending December 31, 1997. The conspirators deliberately credited approximately $22 million which CUC had earned in the months prior to January 1997 to CUC's January 1997 earnings.  The conspirators had already fraudulently inflated CUC's January 1997 earnings in the previous year with approximately $11 million which they had drawn from merger reserves as set forth in paragraph 43 above. Therefore, by inflating CUC's earnings for January 1997 as described in this paragraph, the conspirators fraudulently

- -

caused the earnings Cendant reported for its fiscal year ending December 31, 1997 to be overstated by approximately $33 million.

59. As the defendant knew, there was no justification in fact, or under GAAP, for the fraudulent acts set forth in paragraphs 55 through 58. The defendant and his co-conspirators committed these acts knowing and intending that: a) that these fraudulent acts would ultimately be reflected in CUC's and Cendant's financial statements and public filings with the SEC; b) CUC's and Cendant's financial statements and public filings would falsely overstate CUC's and Cendant's earnings; and c) the investing public would rely upon such overstated earnings.

The Impact on Earnings Reports of CUC and Cendant and
The Losses to Holders of Cendant Securities

60. By the means set forth above, defendant **WALTER A. FORBES** and his co-conspirators fraudulently caused CUC and Cendant to misreport their earnings as set forth below:

a. The conspirators caused CUC to report operating income for its fiscal year ending January 31, 1996 which was overstated, in all, by at least $60 million, or more than 28 percent. The conspirators thus caused CUC to report earnings per share for that year before one-time expenses of

- -

29

$.86, when the true figure was no more than $.67;

       b.  The conspirators caused CUC to report operating income for its fiscal year ending January 31, 1997 which was overstated, in all, by at least $56 million, or more than 14 percent.  The conspirators thus caused CUC to report earnings per share for that year before one-time expenses of $.70, when the true figure was no more than $.61; and

       c.  The conspirators caused Cendant to report operating income for its fiscal year ending December 31, 1997 which was overstated by at least $170 million, which was more than 12 percent of Cendant's total operating income and more than 36 percent of the CMS operating income.  The conspirators thus caused Cendant to report earnings per share for that year before one-time expenses of $1.00, when the true figure was no more than $.88.

       61.  By causing CUC to report such rapid and consistent growth in operating income, the conspirators helped cause the price of CUC stock to rise from approximately $1.56 on August 23, 1989 to approximately $32.13 on December 17, 1997. (The price on August 23, 1989, the first day CUC stock was

- -

traded on the New York Stock Exchange, has been adjusted to reflect stock splits between that date and December 17, 1997.) This increase in the stock pricefrom 1989 through 1997 helped the conspirators to continue making new acquisitions, since such acquisitions could largely be paid for with stock.

62.    By the above means, defendant **WALTER A. FORBES** and his co-conspirators caused holders of Cendant securities to sustain billions of dollars in losses after the fraudulent inflation of Cendant's reported earnings for the year ending December 31, 1997 was disclosed to the public on or about April 15, 1998.

<u>Overt Acts</u>

63.    In furtherance of the conspiracy and to accomplish its unlawful objects, defendant **WALTER A. FORBES** and his co-conspirators committed and caused to be committed the following overt acts in the District of Connecticut, the District of New Jersey, and elsewhere:

a.    On or about March 19, 1996, at Stamford, Connecticut, defendant **FORBES** and his co-conspirators caused CUC to issue a press release announcing its earnings for the fiscal

- -

31

year ending January 31, 1996 in which those earnings were overstated as set forth in paragraph 60(a) above.

b. On or about April 25, 1996, at Stamford, Connecticut, defendant **FORBES** and his co-conspirators caused CUC to file with the SEC an annual report on Form 10-K for the fiscal year ending January 31, 1996 in which CUC's operating income for that year was overstated by at least $60 million, or more than 28 percent.

c. On or about March 11, 1997, at Stamford, Connecticut, defendant **FORBES** and his co-conspirators caused CUC to issue a press release announcing its earnings for the fiscal year ending January 31, 1997 in which those earnings were overstated as set forth in paragraph 60(b) above.

d. On or about May 1, 1997, at Stamford, Connecticut, defendant **FORBES** and his co-conspirators caused CUC to file with the SEC an annual report on Form 10-K for the fiscal year ending January 31, 1997 in which CUC's operating income for that year was overstated by at least $56 million, or more than 14 percent.

e. On or about December 15, 1997, defendant

- -

**FORBES** and his co-conspirators caused CUC to file with the SEC CUC's quarterly report on Form 10-Q for the third fiscal quarter ending October 31, 1997 which contained the false statements set forth in paragraph 2(a) through 2(h) of Count 5 of this Indictment.

f.  On or about February 2, 1998, at Stamford, Connecticut, defendant **FORBES** and his co-conspirators caused the CMS accounting unit to transmit by facsimile to Cendant headquarters in Parsippany, New Jersey a schedule of the CMS earnings which were to be included in the reported earnings of Cendant for the fiscal year ending December 31, 1997.  The schedule overstated the revenue of CMS for the year ending December 31, 1997 by approximately $139 million.

g.  On or about February 4, 1998, at Parsippany, New Jersey, defendant **FORBES** and his co-conspirators caused Cendant to issue a press release announcing its earnings for the fiscal year ending December 31, 1997 in which Cendant's results were overstated as set forth in paragraph 60(c) above.

h.  On or about March 31, 1998, at Parsippany, New Jersey, defendant **FORBES** and his co-conspirators caused Cendant

- -

to distribute to Cendant's shareholders and the investing public
Cendant's 1997 Annual Report for the fiscal year ending December
31, 1997 in which Cendant's operating income for that year was
overstated by at least $170 million, or more than 12 percent.

        i.    On or about March 31, 1998, at Parsippany,
New Jersey, defendant **FORBES** and his co-conspirators caused
Cendant to file with the SEC Cendant's annual report on Form 10-
K for the year ending December 31, 1997 which contained the
false statements set forth in paragraph 2(a) through 2(b) of
Count 6 of this Indictment.

        All in violation of Title 18, United States Code,
Section 371.

- -

COUNT 2

(False Statement in Report
Required to Be Filed with the SEC)

1.  The allegations set forth in paragraphs 1 through 16 and 18 through 63 of Count 1 of this Indictment are hereby realleged and incorporated as though set forth in full herein.

2.  On or about December 15, 1997, in the District of Connecticut, and elsewhere, defendant

**WALTER A. FORBES**

knowingly and willfully made and caused to be made a statement in a report and document required to be filed under the Securities Exchange Act of 1934, Title 15, United States Code, Sections 78a et seq., and the rules and regulations promulgated thereunder, which was false and misleading with respect to material facts, in that the defendant filed and caused to be filed with the SEC CUC's quarterly report on Form 10-Q for the third fiscal quarter ending October 31, 1997, in which, as the defendant knew, CUC's filing had misstated the following:

a.  For the three months ending October 31, 1997, total revenue was stated to be approximately $775 million when, in fact, total revenue was approximately $44 million less;

- -

35

b.  For the three months ending October 31, 1997, total expenses were stated to be approximately $612 million when, in fact, total expenses were approximately $9 million greater;

c.  For the three months ending October 31, 1997, income before taxes was stated to be approximately $163 million when, in fact, it was overstated by 48 per cent, or approximately $53 million;

d.  For the nine months ending October 31, 1997, total revenue was stated to be approximately $2,168 million when, in fact, total revenue was approximately $149 million less;

e.  For the nine months ending October 31, 1997, total expenses were stated to be approximately $1,735 million when, in fact, total expenses were approximately $27 million greater;

f.  For the nine months ending October 31, 1997, income before taxes was stated to be approximately $433 million when, in fact, it was overstated by 68 per cent, or approximately $176 million;

- -

36

g.  On October 31, 1997, current assets, primarily cash, were stated to be approximately $2,117 million when, in fact, it was overstated by approximately $124 million; and

h.  On October 31, 1997, accounts payable and accrued expenses, were stated to be approximately $464 million when, in fact, it was understated by approximately $77 million.

In violation of Title 15, United States Code, Section 78ff(a) and Title 18, United States Code, Section 2.

- -

<u>COUNT 3</u>

(False Statement in Report
Required to Be Filed with the SEC)

1.   The allegations set forth in paragraphs 1 through 16 and 18 through 63 of Count 1 of this Indictment are hereby realleged and incorporated as though set forth in full herein.

2.   On or about March 31, 1998, in the District of Connecticut and elsewhere, defendant

**WALTER A. FORBES**

knowingly and willfully made and caused to be made a statement in a report and document required to be filed under the Securities Exchange Act of 1934, Title 15, United States Code, Sections 78a <u>et</u> <u>seq.</u>, and the rules and regulations promulgated thereunder, which was false and misleading with respect to material facts, in that the defendant filed and caused to be filed with the SEC Cendant's annual report on Form 10-K for its fiscal year ending December 31, 1997, in which, as the defendant knew, Cendant's filing had misstated the following:

a.   Net revenues for the fiscal year ending December 31, 1997 was stated to be approximately $5,315 million when, in fact, this amount was overstated by approximately $139

- -

38

million; and

        b.  Merger-related costs and other unusual charges for the fiscal year ending December 31, 1997 was stated to be approximately $1,148 million when, in fact, this amount was overstated by approximately $200 million.

        In violation of Title 15, United States Code, Section 78ff(a) and Title 18, United States Code, Section 2.

- -

<u>COUNT 4</u>

(Securities Fraud - Hartford Steam Boiler)

1.   The allegations set forth in paragraphs 1 through 16 and 18 through 63 of Count 1 of this Indictment are hereby realleged and incorporated as though set forth in full herein.

2.   The Hartford Steam Boiler Inspection and Insurance Company ("Hartford Steam Boiler") was a public company based in Hartford, Connecticut, that provided insurance to commercial clients.  It invested in various securities, including Cendant.

3.   On or about the dates set forth below, in the District of Connecticut, and elsewhere, defendant

**WALTER A. FORBES**

and others did willfully and knowingly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly use and employ manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5 in connection with the purchases of Cendant common stock by Hartford Steam Boiler on or before February 18, 1998, by, in connection with such transaction, (i)

- -

40

employing devices, schemes, and artifices to defraud; (ii)

making untrue statements of material facts and omitting to state

material facts necessary in order to make the statements made,

in the light of the circumstances under which they which they

were made, not misleading; and (iii) engaging in acts,

practices, and courses of business which operated and would

operate as a fraud and deceit on the Hartford Steam Boiler

Employees' Retirement Trust, all as set forth in substance in

paragraphs 18 through 63 of Count 1 of this Indictment.

   In violation of Title 15, United States Code, Sections

78j(b) and 78ff(a), Title 17, Code of Federal Regulations,

Section 240.10b-5, and Title 18, United States Code, Section 2.

- -

A TRUE BILL:


_____
FOREPERSON



_____
CHRISTOPHER J. CHRISTIE
SPECIAL ATTORNEY
UNITED STATES DEPARTMENT OF JUSTICE

UNITED STATES ATTORNEY
DISTRICT OF NEW JERSEY

- -

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this day I caused to be served copies of the foregoing upon the following via email and United States Mail:

Barry S. Simon, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005-5901
(202) 434-5005


  /s/ Lynda Powers
LYNDA POWERS
U.S. Department of Justice

Dated: September 12, 2005
Camden, New Jersey

- -