## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 3:02CR264 (AWT) |
| | ) | |
| WALTER A. FORBES | ) | September 22, 2005 |
| | ) | |

### MEMORANDUM IN SUPPORT OF MOTION OF WALTER A. FORBES FOR PERMISSION TO EXAMINE MR. CORIGLIANO ON POLYGRAPH EXAMINATIONS
### (Forbes Retrial Motion *In Limine* No. 21)

Walter A. Forbes, through undersigned counsel, respectfully submits this memorandum in support of his motion for an order permitting him to examine Mr. Corigliano about (i) his prior statements to the polygraph examiner(s) under Fed. R. Evid. 613(a); and (ii) his use of the alleged polygraph results to mislead the government under Fed. R. Evid. 608(b).  In the alternative, Mr. Forbes requests an evidentiary hearing outside the presence of the jury to determine the facts and circumstances of the polygraph examinations.

### BACKGROUND

On November 17, 1998, at a time when Mr. Corigliano was maintaining his innocence, his attorneys met with the government in an effort to persuade the government not to prosecute him.  Ex. 1 at 2 (Letter from Carney, et al. to Simon, June 30, 2004).  Mr. Corigliano's attorneys represented to the government, on his behalf, that:

Oral Argument Requested

> Corigliano was not a knowing participant in a
> fraud, he did not falsify or instruct anyone else to
> falsify any matter. If there were things that were
> wrong, Corigliano does not know about them. If
> some things do not comport with proper accounting,
> it was not because he knowingly did anything
> wrong.

Id. at 3. These representations were untrue. In an effort to bolster his false

claims of innocence, Mr. Corigliano took a polygraph examination and his

attorneys told the government during this meeting that "they had

polygraphed Corigliano and that he had done very well." Id. at 6.

During the first trial, the government disclosed that

"Corigliano's lawyers later informed the Government that Corigliano had

submitted to a second polygraph examination, but provided no additional

information about that examination." Mem. Supp. Mot. Preclude Cross-

Examination of Cosmo Corigliano Regarding Polygraph Examinations at 1

(filed June 29, 2004).[1] The government moved to preclude cross-examination

of Mr. Corigliano regarding the polygraph examination. See id. The Court

granted the motion. See Tr. at 8030-31.

---

[1]    The timing of the disclosure suggests that Mr. Corigliano may have
engaged in "cherry-picking" by disclosing the results of the favorable
polygraph exam and withholding the results of an unfavorable one. But the
parties and the Court should not be forced to speculate about the facts. Mr.
Corigliano's plea agreement requires him to disclose all information
requested by the government. See DX 300 at 2. The government apparently
did not ask Mr. Corigliano to disclose the questions posed during the alleged
polygraph tests, the alleged answers, the alleged results, the identities of the
alleged polygraphers, or the timing and sequence of the alleged polygraph
tests. It should do so now so that the Court does not have to decide the
pending issues in a partial vacuum.

The Court suggested, however, that it would permit limited cross-examination into whether Mr. Corigliano took polygraph tests and whether he lied to the polygraphers.

> THE COURT: If your questioning were limited to didn't you take a polygraph exam and didn't you lie to the polygrapher, that would be one thing. But you want to extend it to have the fact that there was a communication to the government that he did well on the polygraph exam. By doing so, you put a big sign up that says, "This guy is such a good liar he fools the polygrapher."

Tr. at 7799.

> MR. EDELMAN: So am I understanding Your Honor's tentative ruling would be that we would not be able to even question him about the false statements made to the polygrapher?
>
> THE COURT: Let me hear from counsel. If I - - let me make sure I understand the question. Is the question: Are you allowed to ask him, did you take a polygraph exam and did you make false statements to the polygraph examiner?
>
> MR. EDELMAN: Right.
>
> THE COURT: That's the question?
>
> MR. EDELMAN: That's one of the questions.
>
> THE COURT: Well, that's why I said, that's the question. What other questions?
>
> MR. EDELMAN: The problem with that is that creates a misleading conclusion.
>
> THE COURT: Well, it does. Well, not necessarily if what you're trying to show is he's lied left and right. It does show he lied to the polygrapher.

Tr. at 7802-03.

> THE COURT: Yesterday I indicated that, you
> know, there might be a very limited area where
> defense counsel could inquire. But it really doesn't
> help them to do that. So I guess if counsel - - I
> think Mr. Edelman correctly analyzed the
> situation. What I was allowing was of no use to the
> defense because it left the impression that they
> wouldn't want to leave. So I'm assuming there will
> be no mention of it. If there is going to be, I would
> like to be notified.

Tr. at 8031.

## ARGUMENT

The Court's inclination to permit cross-examination concerning Mr. Corigliano's statements to the polygraphers and the fact that he lied is consistent with cases holding that evidence unrelated to the substantive correctness of polygraph results is admissible for limited purposes. One such purpose is to impeach a witness with his prior statements under Fed. R. Evid. 613(a). Irrespective of whether the polygraph examination results correctly showed deception, no deception or were inconclusive, Rule 613(a) permits Mr. Forbes to cross-examine Mr. Corigliano about his prior statements to the polygraphers, a point the Court appeared to accept.

Another permissible use of polygraph evidence is to impeach a witness with specific instances of conduct probative of untruthfulness under Fed. R. Evid. 608(b). Thus, the Court was correct in suggesting that the defense could cross-examine Mr. Corigliano about whether he lied to the polygraphers. Rule 608(b) likewise permits Mr. Forbes to cross-examine Mr. Corigliano about his efforts to use a polygraph examination to mislead the

government about his culpability because such conduct is probative of Mr. Corigliano's character for untruthfulness.  This is true whether Mr. Corigliano performed poorly on the test, but nevertheless represented to the government that he had performed well; Mr. Corigliano did not even take a test, but represented to the government that he had; Mr. Corigliano answered irrelevant or misleading questions, but represented to the government that he had performed well on the test; or (as some people have speculated) Mr. Corigliano falsely answered relevant questions, performed well on the test, and disclosed his performance to the government.  Like the other lines of cross-examination discussed above, this questioning does not depend on the substantive correctness of the polygraph results.

Mr. Corigliano is the critical witness in this case.  Without his testimony, there would be no case.  Because most of what he says is uncorroborated, Mr. Corigliano's credibility is the key issue in the case. Under these circumstances, complete foreclosure of cross-examination on the issue of Mr. Corigliano's polygraph examinations, which is highly probative of his character for untruthfulness, would violate Mr. Forbes' Sixth Amendment right of confrontation.

I.   **EVIDENCE UNRELATED TO THE SUBSTANTIVE CORRECTNESS OF THE POLYGRAPH RESULTS IS ADMISSIBLE FOR LIMITED PURPOSES.**

Evidence concerning polygraph examinations is admissible for limited purposes unrelated to the substantive correctness of the polygraph results.  See United States v. Lynn, 856 F.2d 430, 433 (1st Cir. 1988)

("[P]olygraph results are admissible for reasons other than proving the substance contained."); United States v. Hart, 344 F. Supp. 522, 523 (E.D.N.Y. 1971) ("Evidence of lie detector tests is admissible for some purposes under prior decisions.").[2]  For example, courts have permitted cross-examination concerning a witness's refusal to take a polygraph examination to show motive and to impeach the witness's credibility.  See Underwood v. Colonial Penn Ins. Co., 888 F.2d 588, 590-91 (8th Cir. 1990).  Similarly, courts have permitted a witness to testify about his willingness to take a polygraph examination because it was probative of "his credibility and the [insurance company's] motive in refusing the claim."  Murphy v. Cincinnati Ins. Co., 772 F.2d 273, 277 (6th Cir. 1985) ("An insured's willingness to cooperate in an insurance company's investigation and request for a polygraph examination does not depend on the scientific acceptability which is necessary to support the admissibility of polygraph test results."); see also United States v. Matthews, 20 F.3d 538, 552 (2d Cir. 1994) (government cross-examined defendant about subsequent refusal to take polygraph

_____

[2]     Although Mr. Forbes is not now seeking to introduce the results of Mr. Corigliano's polygraph examinations for their substantive correctness, some courts have ruled that polygraph results may be admissible for such purposes.  See United States v. Scheffer, 523 U.S. 303, 311 (1998) (noting that "some Federal Courts of Appeals have abandoned the per se rule excluding polygraph evidence, leaving its admission or exclusion to the discretion of district courts under Daubert").  The Second Circuit has not yet decided whether polygraphy has reached a sufficient state of reliability for polygraph results to be admissible for their substantive correctness.  See, e.g., United States v. Messina, 131 F.3d 36, 42 (2d Cir. 1997).

examination after defendant elicited testimony that he initially offered to take polygraph examination).

When a defendant attacked the quality of the government's investigation, the court admitted evidence that a full-scale investigation was not necessary because the defendant had failed a polygraph examination. See United States v. Hall, 805 F.2d 1410, 1416-17 (10th Cir. 1986). Courts have also admitted evidence relating to failed polygraph examinations followed by confessions when defendants claimed the confessions were involuntary. See, e.g., United States v. Kampiles, 609 F.2d 1233, 1244 (7th Cir. 1979) ("The probative value of the evidence in sustaining the specific point for which it was being offered here is substantial, and the party offering the evidence was not asserting the accuracy of the test results.").

Where a criminal defendant seeks to cross-examine a witness concerning a polygraph examination, courts must grant considerable latitude because of the defendant's Sixth Amendment right of confrontation. The First Circuit's decision in Lynn, 856 F.2d 430, is instructive. In that case, Bryon, a key government witness, testified pursuant to a plea agreement that required him to submit to a polygraph examination and further provided that the government could nullify the agreement if he failed to complete the examination successfully. Id. at 432. The polygrapher deemed some of Bryon's answers to be "inconclusive." Id. Lynn sought to impeach Bryon by showing that he had not successfully completed the test and therefore had

reason to continue to please the government by lying about Lynn. The

district court precluded cross-examination about the polygraph examination.

The First Circuit held that this restriction of cross-examination

violated Lynn's Sixth Amendment right of confrontation.

> In this case, we are faced with the district court's
> complete foreclosure of cross-examination on the
> issue of Bryon's polygraph examination. There is
> no question of the relevance of the intended area of
> inquiry - Bryon's motivation to lie to continue to
> curry favor with the government. Moreover,
> polygraph results are admissible for reasons other
> than proving the substance contained . . . . We find
> that by cutting off all cross-examination into a
> relevant and not fully explored area, the district
> court abused its discretion. The constitutional
> right to confront and cross-examine witnesses was
> impaired.

Id. at 433-34.[3]

## II.    RULE 613(a) PERMITS MR. FORBES TO EXAMINE MR. CORIGLIANO ABOUT HIS PRIOR STATEMENTS TO THE POLYGRAPHERS.

Fed. R. Evid. 613(a) permits impeachment of a witness with a

prior statement by questioning the witness about whether he made the

statement.

> **(a) Examining witness concerning prior
> statement.** In examining a witness concerning a
> prior statement made by the witness, whether
> written or not, the statement need not be shown

---

[3]    See also Hart, 344 F. Supp. at 523 (when witness failed government polygraph exam, but government disregarded results and put witness on stand in first trial, court permitted defendants in retrial to inquire about polygraph exam as well as any investigations made by government which might have put it on notice that government witness was untruthful).

nor its contents disclosed to the witness at that
time, but on request the same shall be shown or
disclosed to opposing counsel.

Id.; see also United States v. Adamson, 291 F.3d 606, 612 (9th Cir. 2002)

("When exploring the credibility of a government witness who testifies

against a criminal defendant at trial, it is axiomatic that the defendant may

employ the witness's prior inconsistent statements in order to impeach the

credibility of the witness." (citing United States v. Hale, 422 U.S. 171, 176

(1975))).  Under Rule 613(a), a party can cross-examine a witness about a

prior written statement or about a prior oral statement.  See Jankins v. TDC

Mgmt. Corp., 21 F.3d 436, 442 (D.C. Cir. 1994) ("Fed. R. Evid. 613(a) clearly

contemplates that a witness's prior oral statement may be the subject of

cross-examination, as it explicitly addresses 'examining a witness concerning

a prior statement made by the witness, whether written or not.'" (emphasis

added)).

Consistent with this Court's suggestion during the first trial,

courts have permitted cross-examination of a witness concerning the fact that

he took a polygraph examination and the statements he made to the

polygrapher.  See, e.g., United States v. Melton, 27 Fed. Appx. 664, 666 (7th

Cir. 2001) (unpublished) ("Here, the district court allowed [defendant] to

cross-examine Lemus about his responses to the polygraph questions and to

establish that Lemus decided to cooperate after Agent Smith communicated

to him his belief that Lemus had lied in response to those questions."); see

also Jacobs v. Singletary, 952 F.2d 1282, 1287-89 (11th Cir. 1992) (prior

inconsistent statements to polygrapher should have been disclosed under Brady); Anderson v. United States, 788 F.2d 517, 520 (8th Cir. 1986) (remanding for in camera review of polygraph statements and stating that "results of the polygraph examination would not be Jencks material, but the statements that Clinton made during the examination may be").

Accordingly, the Court should permit Mr. Forbes to cross-examine Mr. Corigliano about his prior statements to the polygraphers. This line of cross-examination is unrelated to the substantive correctness of the polygraph results and is expressly permitted by Rule 613(a).[4]

### III. RULE 608(b) PERMITS MR. FORBES TO EXAMINE MR. CORIGLIANO ABOUT HIS EFFORTS TO USE THE POLYGRAPH EXAMINATION TO MISLEAD THE GOVERMENT.

Fed. R. Evid. 608(b) permits cross-examination concerning "[s]pecific instances of the conduct of a witness, for the purpose of attacking . . . the witness' character for truthfulness . . . if probative of truthfulness or untruthfulness." Under this Rule, the Second Circuit has "upheld, for example, cross-examination into an attorney's disbarment, into a witness's failure to disclose a prior arrest on his bar application, and into a prior finding by an Immigration Judge that the witness's testimony in a deportation proceeding was not credible." Hynes v. Coughlin, 79 F.3d 285,

---

[4]    Mr. Forbes still does not know the basic facts and circumstances surrounding the polygraph examinations, such as the dates, the questions, the answers, and whether there were one or two polygraphers. He has subpoenaed the documents, but this is information available to the government that should be produced under Brady/Giglio.

294 (2d Cir. 1996) (citations omitted); see also Chnapkova v. Koh, 985 F.2d 79, 83 (2d Cir. 1993) (district court abused discretion by precluding cross-examination under Rule 608(b) regarding failure to file tax returns because plaintiff's credibility "was of such crucial importance, and because her failure to file tax returns bore directly on her credibility"); United States v. Jones, 900 F.2d 512, 520 (2d Cir. 1990) (Rule 608(b) permits cross-examination regarding false statements "on applications for employment, an apartment, a driver's license, a loan, membership in the National Association of Securities Dealers, and on her income tax returns"); United States v. Sperling, 726 F.2d 69, 75 (2d Cir. 1984) (Rule 608(b) permits cross-examination regarding "false credit card applications").

Thus, the Court was correctly inclined to permit cross-examination about whether Mr. Corigliano lied to the polygraphers because prior false statements are probative of character for untruthfulness. Mr. Corigliano's efforts to mislead the government about his culpability with representations about a polygraph examination are even more probative of his character for untruthfulness. In the fall of 1998, the government was investigating whether Mr. Corigliano had engaged in fraudulent accounting practices at CUC. Knowing full well that he had engaged in fraudulent accounting practices, Mr. Corigliano maintained his innocence and sought to avoid prosecution. To achieve his goal of avoiding prosecution, he apparently took a polygraph examination, knowing in advance that favorable results

would be misleading.  His attorneys then represented to the government that

Mr. Corigliano "was not a knowing participant in a fraud" and that "they had

polygraphed Corigliano and that he had done very well."  Ex. 1 at 3, 6 (Letter

from Carney, et al. to Simon, June 30, 2004).

Whether Mr. Corigliano performed poorly on the test, but

nevertheless represented to the government that he had performed well; Mr.

Corigliano did not even take a test, but represented to the government that

he had; Mr. Corigliano answered irrelevant or misleading questions, but

represented to the government that he had performed well; or (as some

people have speculated) Mr. Corigliano falsely answered relevant questions,

performed well on the test, and disclosed his performance to the government,

this evidence is probative of Mr. Corigliano's character for untruthfulness.

Mr. Corigliano knew that he had engaged in fraudulent accounting practices,

yet he employed representations about a powerful device (the polygraph) in

an effort to mislead the government into believing that he had not.

## CONCLUSION

Accordingly, Mr. Forbes respectfully requests that the Court

enter an order permitting him to examine Mr. Corigliano about (i) his prior

statements to the polygraph examiners under Fed. R. Evid. 613(a); and

(ii) his use of the alleged polygraph results to mislead the government under

Fed. R. Evid. 608(b).  In the alternative, Mr. Forbes requests an evidentiary

hearing outside the presence of the jury to determine the facts and

circumstances of the polygraph examinations.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP


By: _____

Brendan V. Sullivan, Jr. (ct17115)
Barry S. Simon (ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

James T. Cowdery (ct05103)
Thomas J. Murphy (ct07959)
COWDERY, ECKER & MURPHY, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

# EXHIBIT 1



**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

---

*970 Broad Street, Suite 700*          *(973) 645-2700*
*Newark, New Jersey 07102*

June 30, 2004

BY HAND

Barry S. Simon, Esq.
Williams & Connolly, LLP
725 Twelfth Street, N.W.
Washington, DC 20005

      Re:  United States v. Forbes, et al.
        No. 3:02CR264 (AWT)

Dear Mr. Simon:

      We write in response to your request for further
details of the conversations between counsel for Mr. Corigliano
and the Government on August 7, 1998 and November 11, 1998.

<u>Cosmo Corigliano</u>

      Please be advised that on or about August 7, 1998
counsel for Cosmo Corigliano provided the following information:

      With respect to the meeting held on or about March 9,
1998, concerning the usage of the Ideon reserve, it was discussed
that Anne Pember created the schedules used at the meeting and
that both Corigliano and Shelton have never seen those schedules
before the meeting.  Anne Pember also made the presentation of
what is in reserves, why she put items in the reserves and things
to that effect.  After the meeting Rabinowitz came in and made a
defense of the Ideon reserve and the way Anne had used it.

      After the merger, he was no longer in the financial
area, he was in the International area,  and did not know what
costs were being charged to the Cendant reserve.  He had no
responsibility for these charges, but does not deny the policy

**REDACTED**

DEFENDANT'S
EXHIBIT
1100

was to be aggressive.  Pember no longer reported to Cosmo, maybe to Shelton, with a dotted line to Monaco, who is now CFO.

The philosophy for the reserves that came down to him was that Silverman wanted them to be as big as possible.  He understood that Silverman said to Forbes or Shelton that he, Silverman, was the King of purchase price accounting.  Corigliano understood that the reserve should be as large as it could be within proper limits.

With respect to the establishment and use of merger reserves by CUC, counsel advised that Corigliano speculated whether Casper Sabatino, who was not all that swift, could have screwed something up, possibly not keeping the necessary work papers to support the reserve.  Corigliano second guesses himself, but thought that the merger reserves were all right at the time.  Corigliano believes that they are all pretty competent. Anne Pember is very competent, but that Sabatino was less competent and that could have contributed to any problem with the reserves.

Corigliano was very upset about the Wall Street Journal story where Silverman and Monaco announced that there was a fraud.

Corigliano always wanted to explain himself. He did not feel deceived by Shelton and Forbes and feels his level of knowledge is not different than Shelton's, who was a very hands-on operating guy.  Forbes was more remote, but not as remote as he is saying now.

Please be advised that on or about November 17, 1998, counsel for Cosmo Corigliano provided the following information:

Corigliano said he had been mistreated by the company and that the audit report was biased.

On the evening of the 14th, both Corigliano and Shelton received phone calls from Forbes who told them not to come into the office anymore and that he can't talk to them.  Between then and the 17th they never got calls.

At a board meeting to which they were not invited, Silverman tried to get Corigliano fired.  They represented that Corigliano refused to cooperate and be interviewed which was a

# REDACTED

deliberate lie.  It was falsely represented to the board that Speaks and Sabatino's affidavits implicated Corigliano by name.

Corigliano thought the audit report understated the knowledge of people on the HFS side regarding certain issues. Monaco and Forbes signed the 10-K.

In the summer of 1997, Monaco told Corigliano that he had no financial responsibilities until he took over in 2000. Corigliano resisted and they told him not to worry and gave him international responsibilities.  He had no financial responsibility and did not function as CFO after 12/17/97.  On 4/9 Silverman went out of his way to say Corigliano was not in the financial area.

Pre 12/97, Pember reported to Corigliano and Sabatino reported to Pember and not Corigliano.  After the merger, Pember reported to Shelton.  Corigliano was not in the chain of command anymore, so Pember was the top ranking accountant at CUC.

Monaco and Forbes were told by Shelton on 3/6 and by Pember on 3/9 that earnings were getting a boost from merger reserves.  Everyone at both companies knew this including Walter Forbes.  The notion that merger reserves were being used aggressively to boost earnings was well known and had been going on for years.

On 3/9 Pember showed up with a schedule showing how she had used the Ideon reserve and gave them all copies and walked them through the schedule.  They hadn't seen the schedule before, but they knew what was going on.  Then Rabinowitz came in and answered questions.  Forbes and Monaco signed the 10-K.

Corigliano was not a knowing participant in a fraud, he did not falsify or instruct anyone else to falsify any matter. If there were things that were wrong, Corigliano does not know about them.  If some things do not comport with proper accounting, it was not because he knowingly did anything wrong. He knew merger reserves were being used to increase earnings, but did not think this was improper.  In meetings with Monaco and Silverman, Corigliano was told directly to make the Cendant merger reserves as large as possible.  Walter Forbes also communicated this message to him.  Corigliano was urged to estimate expenses liberally rather than conservatively as HFS was very comfortable with this position.

# REDACTED

Cosmo Corigliano attended a meeting with the senior management of both CUC and HFS where Monaco explained reserves. During the meeting, CUC represented that its reserves were exhaustive. Henry Silverman said they should go back and find more reserves. The AA report understates the knowledge of the people on the HFS side.

What items Anne Pember charged against the Ideon reserve was not known to Corigliano until March 9, 1998. He found it very convincing, however, as did Shelton and Ernst and Young. He understood Ernst & Young worked on reserves with Pember. Corigliano had a good memory of the 3/6-3/10 time period regarding what documents were created, who reviewed them, etc.

Kirk Shelton did all the talking at the March 6, 1998 meeting. Mr. Shelton had knowledge roughly equivalent to Corigliano. Shelton was a very hands-on operating guy, while Forbes was more remote. Everyone agrees that Kirk did the talking on March 6 except that Shelton is presently denying that he did the talking.

Corigliano does not understand how merger reserves can be allocated to revenues. Corigliano had no responsibility for charges to the Cendant merger reserves. Corigliano was supposedly shocked by the allegation that Anne Pember did things in the middle of the night. Corigliano believed that Ernst & Young had approved of everything that was done.

Corigliano never told anyone to make unsupported topside adjustments. He believed that the AA report was exculpatory in that Sabatino stated that he was unaware of unsupported topside adjustments while Stu Bell was CFO prior to 1995.

Prior to 1995 while Bell was there and Corigliano was responsible for topside adjustments, they were all supported. After Corigliano became CFO and Sabatino assumed responsibility for this area, the numbers were now unsupportable. Corigliano

**REDACTED**

maintains that if any of the adjustments were made on an unsupported basis, it was done by Sabatino alone. Sabatino lied about who is involved in the making of unsupported topside adjustments. Corigliano believed that whatever adjustments were being made at that time were justified. Corigliano denies that he told Sabatino what adjustments to make. It was Sabatino's job to make the adjustments and Corigliano maintains that he lied about Corigliano's directive. Corigliano does not know if the figures for the topsides are false or not. Corigliano has no knowledge of adjustments to revenue, including whether they were part of topside adjustments in 1997. These adjustments do not make sense to Corigliano. Sabatino was upset about not getting the controller's job which Shelton decided to leave vacant. Rivalry existed between Pember and Sabatino. When Pember got the controller's job Sabatino was very bitter. Corigliano got vibes from Ernst & Young that Sabatino wasn't up to his job. At one point Corigliano stood up for Sabatino to keep him from getting fired. Sabatino had failed to provided Ernst & Young with support for entries that he was too inept to find. Sabatino was incompetent and/or Sabatino cheated to make himself look good.

Corigliano thinks that management from HFS took advantage of the situation and tried to make the accounting problems appear as bad as possible. It was never expected that the stock would drop by 50 percent, maybe 5 percent.

Benefits attributable to the reserves were expected from the beginning of the year. If they can see from the beginning of the year that operations are at certain levels and they know about reserves, they have every reason to suppose that there are going to be adjustments, then they can do this.

**REDACTED**

Counsel informed the government that they had polygraphed Corigliano and that he had done very well. They invited the government to polygraph Mr. Sabatino.

Very truly yours,

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice

By: JOHN J. CARNEY
Special Attorney
U.S. Department of Justice

By: JAMES MCMAHON
Special Attorney
U.S. Department of Justice

By: RICHARD SCHECHTER
Special Attorney
U.S. Department of Justice

cc:  Thomas P. Puccio, Esq.
     Scott Edelman, esq.

**REDACTED**

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Memorandum in Support of

Motion of Walter A. Forbes for Permission to Examine Mr. Corigliano on Polygraph

Examinations (Forbes Retrial Motion *In Limine* No. 21), to be served on September

22, 2005 to the following via e-mail and hand-delivery:

        Norman Gross, Esq.
        Michael Martinez, Esq.
        Craig Carpenito, Esq.
        United States Attorneys
        The Federal Building
        U.S. Department of Justice
        450 Main Street, Room 320
        Hartford, CT  06103

Barry S. Simon