# EXHIBIT 2

Case 3:02-cr-00264-AHN    Document 1785-3    Filed 10/03/2005    Page 2 of 22
redacted indictment - U.S. v. Walter Forbes, No. 3:02cr264
Page 1 of 2

**Romero, Tobin**

| | |
|---|---|
| **From:** | Simon, Barry |
| **Sent:** | Thursday, September 15, 2005 11:22 AM |
| **To:** | HARTFORD TRIAL TEAM |
| **Subject:** | FW: redacted indictment - U.S. v. Walter Forbes, No. 3:02cr264 |

**From:** Norman.Gross@usdoj.gov [mailto:Norman.Gross@usdoj.gov]
**Sent:** Thu 9/15/2005 9:51 AM
**To:** Simon, Barry
**Cc:** Michael.Martinez2@usdoj.gov; Craig.Carpenito@usdoj.gov
**Subject:** redacted indictment - U.S. v. Walter Forbes, No. 3:02cr264

Barry: Following my discussion yesterday with you, the Government has redrafted paragraph 2 of what is now Count 4 of the proposed redacted indictment, charging Securities Fraud, to read in pertinent part as follows:

3. On or about February 18, 1998, in the District of Connecticut, and elsewhere, defendant WALTER A. FORBES and others did willfully and knowingly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly use and employ manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5 in connection with the purchase of 5000 shares of Cendant common stock by Hartford Steam Boiler, by, in connection with such transaction . . .

We believe that this language, which specifies the stock transaction at issue by both date and amount of shares, clarifies that the Government seeks to dismiss Counts 7-11 of the indictment, and to proceed only on Count 12.

When reviewing our proposed redacted indictment again, I noticed two additional typographical errors attributable to our proposed renumbering of the counts. In paragraph 63(e) of Count 1, the reference to Count 5, charging false statements to the SEC, should now refer to Count 2. In paragraph 63(i) of Count 1, the reference to Count 6, also charging false statements to the SEC, should not refer to Count 3. I have made these changes to our proposed redacted indictment, which is attached. We will advise the Court that we intend to submit this revised version of the redacted indictment (subject to any additional errors), rather than the one that was attached to our motion to dismiss counts. Please let us know at your earliest convenience if you intend to oppose our motion to dismiss counts.

Thank you.

Norman Gross

-----Original Message-----
From: BSimon@wc.com [mailto:BSimon@wc.com]
Sent: Wednesday, September 14, 2005 1:34 PM
To: Gross, Norman; Martinez, Michael; Carpenito, Craig;
Christopher_Mattei@ctd.uscourts.gov; RCary@wc.com
Subject: RE: U.S. v. Walter Forbes 02CR264 - Copying of juror
questionnaires

Chris: We would like 2 copies for Mr Forbes. With respect to reporting time for counsel tomorrow and Friday, we understand that jurors are supposed to report to the jury assembly room at 8, and we assume that the first group of jurors would then be brought to the courtroom at 9, as they were last year. If that is the case, we would try to enter the courthouse at 8:45 to avoid unnecessary contact with prospective jurors. Is that acceptable to the Court? Thank you. Barry

9/16/2005

redacted indictment - U.S. v. Walter Forbes, No. 3:02cr264

From: Christopher_Mattei@ctd.uscourts.gov [mailto:Christopher_Mattei@ctd.uscourts.gov]
Sent: Wed 9/14/2005 12:22 PM
To: Simon, Barry; Cary, Rob; norman.gross@usdoj.gov; michael.martinez2@usdoj.gov; craig.carpenito@usdoj.gov
Subject: U.S. v. Walter Forbes 02CR264 - Copying of juror questionnaires

Counsel,

We need to let our photocopying people know how many copies of each completed juror questionnaire each side requires.
Please get back to me with that information?

Thanks.

Chris Mattei
Law Clerk for the Honorable Alvin W. Thompson
United States District Court
450 Main Street
Hartford, Connecticut 06103
860.240.3906
Christopher_Mattei@ctd.uscourts.gov

9/16/2005

NJ2001R00259

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA    :  No. 3:02CR00264 (AWT)
                                    :
                                    :  VIOLATIONS:
                                    :
          v.                  :
                                    :  18 U.S.C. § 371 (Conspiracy)
                                    :  15 U.S.C. §§ 78j(b) & 78ff
                                    :  17 C.F.R. § 240.10b-5
WALTER A. FORBES          :  (Securities Fraud/False
                                    :  Statements to SEC)

<u>INDICTMENT</u>

The Grand Jury charges that:

<u>COUNT 1</u>

(Conspiracy to Commit Securities Fraud and to Make
False Statements in Reports Required to Be Filed with the SEC)

[ <u>BACKGROUND</u> ]  

<u>CUC</u>

1.  Prior to December 17, 1997:

    a.  CUC International, Inc. ("CUC") was a publicly
held corporation with headquarters in Stamford, Connecticut; and

    b.  CUC's principal business was selling
memberships in its buying clubs, which included programs for home
shoppers, travelers, restaurant patrons, and automobile
purchasers, among others.  CUC marketed these membership programs
primarily through its Comp-U-Card Division ("Comp-U-Card"), its
largest business unit, which maintained separate offices in
Trumbull, Connecticut.

    2.  In or about 1983, CUC, then known as Comp-U-Card

International, Inc., conducted an initial public offering of its stock.  Its stock was then traded on the over-the-counter market. On or about August 23, 1989, CUC stock was listed for trading on the New York Stock Exchange.

3.  From at least as early as the mid-1980's, CUC pursued a strategy of fueling its growth with frequent acquisitions.  From in or about the mid-1980's to in or about 1997, CUC purchased more than 25 other companies, which it then either operated as subsidiaries or consolidated with its existing businesses.  In most of these cases, CUC paid at least a substantial part of the purchase price with CUC stock.

4.  In 1996, CUC made the three largest acquisitions in its history.  In July 1996, it acquired two software publishers, Davidson & Associates, Inc. ("Davidson") and Sierra On-Line, Inc. ("Sierra"), for a total of approximately $1.858 billion.  In August 1996, it acquired Ideon Group, Inc. ("Ideon"), a provider of credit card enhancement packages, for approximately $393 million.  CUC paid for all three purchases with CUC stock.


## The Formation of Cendant

5.  Prior to December 17, 1997, HFS, Inc. ("HFS") was a publicly-held corporation with headquarters in Parsippany, New Jersey.  Its principal business was the franchising of brand-name

hotels, rental car agencies, and real estate brokerage offices.

6.  In or about May 1997, CUC and HFS agreed to merge into a single company.  The merger was approved by the shareholders of CUC and HFS on or about October 1, 1997 and became effective on December 17, 1997.  The resulting new company adopted the name Cendant Corporation ("Cendant").  Cendant established its headquarters in Parsippany, New Jersey.

7.  After the Cendant merger became effective, the former CUC businesses continued to be grouped together for management purposes within Cendant under the name Cendant Membership Services, Inc. ("CMS").  CMS maintained its headquarters, including its own separate accounting unit, in the former CUC offices in Stamford, Connecticut.

8.  Before the Cendant merger, CUC's fiscal year ended on January 31.  After the merger, Cendant adopted a fiscal year ending December 31.


The Defendant

9.  From at least as early as in or about 1980 to in or about December 1997, defendant **WALTER A. FORBES**, who received a Master in Business Administration degree from Harvard University in 1968, was employed as the Chief Executive Officer of CUC. From in or about 1983 to in or about December 1997, defendant

**FORBES** also served as the Chairman of CUC's Board of Directors. From on or about December 17, 1997 to in or about July 1998, he held the title of Chairman of the Board of Cendant.

<u>Named Co-conspirators</u>

10.  E. Kirk Shelton, who is named as a co-conspirator but not as a defendant herein, [received a Master in Business Administration degree with distinction from Harvard University in 1978]  From in or about 1981 to in or about 1991, Shelton was employed in various senior executive positions at CUC.  From in or about 1991 to in or about December 1997, Shelton was employed as CUC's President and Chief Operating Officer.  From on or about December 17, 1997 to in or about April 1998, he held the title of Executive Vice President and Vice Chairman of Cendant.

11.  Cosmo Corigliano, who is named as a co-conspirator but not as a defendant herein, was licensed as a Certified Public Accountant in or about 1983.  From in or about 1983 to in or about December 1994, Corigliano was employed as the Controller of CUC.  From in or about December 1994 to the day the Cendant merger became effective, he served as both CUC's Chief Financial Officer and a Senior Vice President.  From on or about December 17, 1997 to in or about April 1998, he held the title of Executive Vice President of Cendant.  Among other duties, he reported financial results for CMS for the year ending December 31, 1997 to Cendant's corporate headquarters.

12.   Anne Pember, who is named as a co-conspirator but not as a defendant herein, was licensed as a Certified Public Accountant in or about 1983.   Pember was employed as Director of Accounting at Comp-U-Card from in or about 1989 to in or about June 1997 and as the Controller of CUC from in or about June 1997 until the Cendant merger on or about December 17, 1997.   From in or about 1996 to on or about December 17, 1997, she also held the title of Senior Vice President of CUC.   From on or about December 17, 1997 to in or about March 1998, Pember was employed in the accounting unit at CMS.

13.   Before the Cendant merger became effective, Casper Sabatino, who is named as a co-conspirator but not as a defendant herein, was employed as an accountant in CUC's corporate accounting department from in or about 1985 to on or about December 17, 1997.   From in or about December 1994 to in or about late 1997, Sabatino was the member of the department in charge of CUC's external reporting, including its quarterly and annual reports to the Securities & Exchange Commission ("SEC").   After the Cendant merger became effective, he was employed in the accounting unit at CMS.

The SEC and Publicly Held Companies

14.   At all times relevant to this Indictment:

a.   the SEC was an independent agency of the United States government which was charged by law with preserving honest

and efficient markets in securities;

      b.  federal law required publicly held companies to submit various reports containing detailed financial data to the SEC, including quarterly reports on Form 10-Q and annual reports on Form 10-K.  Federal law required this data to be truthful and consistent with the underlying facts and further required the accounting treatments employed in these reports to be in accordance with generally accepted accounting principles ("GAAP"); and

      c.  federal law required all publicly held companies to undergo an annual audit by an independent accounting firm to ensure that its financial data was prepared and reported in accordance with GAAP.

<u>Communications With Investors</u>

    15.  At all times relevant to this Indictment, the management officials of many public companies, including CUC and Cendant, provided the investing public with predictions of, or "guidance" regarding, the anticipated earnings of the companies for upcoming reporting periods.  Relying at least in part on a company's guidance, many professional securities analysts then disseminated to the public their own estimates of that company's

expected performance. These earnings estimates or analyst expectations were closely followed by investors. Typically, if a company announced earnings that failed to meet or exceed analysts' expectations, the price of that company's securities declined.

16. In addition to the above, CUC and Cendant issued periodic reports of its financial performance to its shareholders and the investing public in the form of annual and quarterly reports and periodic press releases. Among the financial data CUC and Cendant included in these reports and releases was an earnings figure referred to at different times as "operating income" or "income before one-time charges" (hereafter "operating income"). In calculating operating income, CUC and Cendant regularly excluded non-recurring expenses, including merger costs, and often excluded the impact of taxes and interest. Operating income or similar figures were generally considered by securities analysts and the investing public to be a more accurate indicator of the company's performance than net income because these figures eliminated the impact of one-time, or unusual, events on a company's earnings, while net income included the impact of those events.

THE CONSPIRACY

17.   From at least as early as the late 1980's to in or about April 1998, in the Districts of Connecticut and New Jersey, and elsewhere, defendant

**WALTER A. FORBES**

did knowingly and willfully conspire and agree with E. Kirk Shelton, Cosmo Corigliano, Anne Pember, Casper Sabatino and others to commit offenses against the United States, that is:      ✳

(a) by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly, knowingly and willfully to use and employ manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5 ("Rule 10b-5") in connection with the purchase and sale of CUC and Cendant securities, by, in connection with such transactions, (i) employing devices, schemes, and artifices to defraud holders of CUC, HFS,

ℛ   ℛ

⏮

✳  The Court replaced the phrase "and others" with the names Stuart Bell, Kevin Kearney, Mary Sattler and Steven Speaks.

and Cendant securities and other members of
the investing public; (ii) making untrue
statements of material facts and omitting to
state material facts necessary in order to
make the statements made, in the light of the
circumstances under which they which they
were made, not misleading; and (iii) engaging
in acts, practices, and courses of business
which operated and would operate as a fraud
and deceit on holders of CUC, HFS, and
Cendant securities and other members of the
investing public, contrary to Title 15,
United States Code, Sections 78j(b) and
78ff(a) and Rule 10b-5; and

(b) willfully and knowingly to make, and
cause to be made, in quarterly reports on
Form 10-Q, annual reports on Form 10-K, and
other reports and documents filed with the
SEC by CUC and Cendant pursuant to the
Securities Exchange Act of 1934, Title 15,
United States Code, Sections 78a et seq.,

statements which were false and misleading
with respect to material facts, contrary to
Title 15, United States Code, Section
78ff(a).

The [Principal] Goals of the Conspiracy
and the Role of The Defendant

18.   The [principal] goals of the conspiracy were: a) to
fraudulently inflate the earnings CUC reported to the SEC and the
investing public in order to artificially increase the price of
CUC stock; b) to fraudulently inflate the earnings of CMS, which
fraudulently inflated earnings Cendant reported to the SEC and
the investing public, and thereby artificially increased the
price of Cendant stock; c) to use CUC stock, the price of which
had been artificially increased, to pay for CUC's acquisition of
other companies; d) to use the artificially increased price of
CUC stock, CUC's fraudulently inflated earnings reports, and
fraudulently inflated projections of CUC's future earnings to
induce HFS and its shareholders to merge with CUC; [and e) for
defendant **WALTER A. FORBES** to personally enrich himself through
salary, bonuses, stock options and capital appreciation of shares
they held.]

19.   Defendant **WALTER A. FORBES**, who was a principal

officer and director of CUC and Cendant, engaged in the conspiracy with the assistance of co-conspirators who were his corporate subordinates.

<u>The Conspirators' Execution of Their Fraudulent Scheme</u>

20.  From at least as early as in or about the late 1980's to in or about 1997, defendant **WALTER A. FORBES**, along with other members of the conspiracy, sought to support and increase the price of CUC stock by causing CUC to misrepresent the true growth rate of the company to the SEC and the investing public.

21.  From at least as early as in or about the late 1980's to in or about 1997, defendant **WALTER A. FORBES**, along with other members of the conspiracy, acted to ensure that the earnings CUC reported each quarter closely matched the results predicted by Wall Street stock analysts, for fear that any shortfall could trigger a decline in the price of CUC stock.

22.  To ensure that the earnings CUC reported would meet the expectations of analysts, defendant **WALTER A. FORBES**, along with co-conspirator Cosmo Corigliano, kept members of the analyst community well informed as to the amount of growth in earnings CUC was targeting.

The Conspirators' Inflation of Reported
Earnings to Meet Their Targets

23. At the end of the first three quarters of each fiscal year, each of CUC's operating units reported its quarterly earnings figures to the company's Stamford headquarters. These earnings figures were consolidated into one earnings figure for the company. These earnings from the operating units' books had typically been inflated by the methods described in paragraphs 44 through 53 below.

24. After the earnings for the operating units were consolidated into one quarterly earnings figure for CUC, defendant **WALTER A. FORBES** and other conspirators reviewed that figure to determine whether it met their earnings target for the quarter. If the consolidated quarterly earnings failed to meet the earnings target, defendant **FORBES** directed other conspirators to increase the earnings figure so that it met or exceeded that target.

25. These increases had no basis in fact. The purpose of these increases was to meet or exceed CUC's quarterly earnings target. After CUC's quarterly earnings figure was fraudulently increased in this manner, defendant **WALTER A. FORBES** and his co-conspirators caused the fraudulently increased quarterly earnings

figure to be reported to the SEC and the investing public.

The Fraudulent Methods Used by the Conspirators to
Cover Up Their Inflation of CUC's and Cendant's Earnings

26.    Because CUC's independent accounting firm audited
the company's books only at the end of each fiscal year, the
conspirators typically found it unnecessary to make detailed
entries on the company's books at the end of the first three
quarters of the fiscal year to cover up their fraudulent
inflation of the company's consolidated quarterly earnings
figures.  As a result, the conspirators typically changed only
the consolidated quarterly earnings figure at the end of the
first three fiscal quarters.

27.    At the end of the fourth fiscal quarter, which was
also the end of the fiscal year, defendant **WALTER A. FORBES**
directed other conspirators to increase the consolidated earnings
figures for that quarter and the fiscal year by the amounts
necessary to meet or exceed their respective earnings targets for
that quarter and fiscal year.  Defendant **FORBES** and his co-
conspirators caused these fraudulently inflated earnings figures
to be reported to the SEC and the investing public.

28.    In order to permit CUC to withstand the scrutiny
of its required annual audit, the conspirators caused fraudulent

entries to be made to CUC's books and knowingly failed to make accurate entries to CUC's books that would negatively impact CUC's earnings.  These fraudulent entries and failures to make accurate entries were designed to support all fraudulent increases in earnings that the conspirators had made during the past fiscal year.

29.  In order to disguise their fraudulent inflation of CUC's earnings, defendant **WALTER A. FORBES** and his conspirators used fraudulent accounting machinations[ including]: a) using merger reserves to inflate operating income, as described in paragraphs 30 through 43 below; b) failing to maintain an adequate membership cancellation reserve at Comp-U-Card, as described in paragraphs 44 through 48 below; c) misallocating revenues and expenses among Comp-U-Card programs so as to qualify them for more favorable accounting treatment, as described in paragraphs 49 through 53 below; d) making various other fraudulent accounting entries, as described in paragraphs 54 through 59 below; and e) falsely representing to the SEC and the investing public that the company was following its publicly declared accounting policies.

<u>Merger Reserves</u>

30. From at least as early as the late 1980's to in or about 1998, defendant **WALTER A. FORBES** and his co-conspirators established excessive merger reserves and then drew upon them to fraudulently inflate the reported operating income of CUC and Cendant.

31. Acquisition and merger reserves ("merger reserves") were permitted by GAAP as a means of accounting for one-time expenses arising from an acquisition or a merger. These one-time expenses included professional fees, employee severance or relocation costs, and the costs of consolidating operations.

32. Under GAAP, a company engaged in an acquisition or merger could establish a merger reserve in the year the acquisition or merger took place. Once a company's managers made a good faith estimate of the total of the one-time costs arising from an acquisition or merger, they created a merger reserve in that amount. Generally, the creation of a merger reserve reduced the company's net income for that year, but not its operating income.

33. After the establishment of the merger reserve, one-time costs resulting from the merger were deducted from the merger reserve rather than current income, in contrast to

expenses arising from the normal operation of the company that directly reduced income.  GAAP did not permit companies to establish excessive merger reserves that were not based on good-faith estimates of the costs of the merger or acquisition and further did not allow companies to use merger reserves to offset normal expenses not related to the merger or acquisition.  The use of merger reserves to increase revenue was also not permitted under GAAP.

CUC's Acquisition of Ideon,<br>Davidson, and Sierra

34.  CUC acquired Ideon, Davidson and Sierra in 1996 as described in paragraph 4 above.  During CUC's fiscal year ending January 31, 1997, defendant **WALTER A. FORBES** and his co-conspirators caused CUC to establish a merger reserve of approximately $127 million to pay expenses arising from CUC's acquisition of Ideon, and additional merger reserves totaling approximately $53 million to pay expenses arising from CUC's acquisition of Davidson, Sierra, and other, smaller companies. All these reserves together, totaling approximately $180 million, were known at CUC, and are hereafter collectively referred to, as the "Ideon reserve."

35.  The conspirators falsely represented, and caused

CUC to falsely represent, to the SEC and the investing public
that the size of the Ideon reserve was based on CUC's good-faith
estimate of the probable amount of such acquisition-related
costs. In fact, the conspirators knew that they had fraudulently
included tens of millions of dollars in the Ideon reserve in
excess of that amount.

  36. The conspirators caused CUC and Cendant to falsely
represent to the SEC and the investing public that expenses
charged to the Ideon reserve were non-recurring costs incurred
principally in connection with the acquisitions of Ideon,
Davidson and Sierra.

The Cendant Merger

  37. In or about early 1997, defendant **WALTER A. FORBES**
and his co-conspirators caused CUC to merge with HFS to form
Cendant. To induce HFS and its shareholders to agree to the
merger, the conspirators referred HFS and its shareholders to
CUC's fraudulently inflated earnings reports and provided them
with projections of CUC's future earnings which they had
fraudulently inflated beyond their actual expectations.

  38. On or about December 17, 1997, defendant **WALTER A.
FORBES** and his co-conspirators caused CMS to establish a merger

reserve of approximately $556 million (the "Cendant reserve") to pay costs arising from CUC's merger with HFS and its acquisition of another company.

39.  The conspirators falsely represented, and caused Cendant to falsely represent, to the SEC and the investing public that the size of the Cendant reserve was based on their good-faith estimate of the probable amount of such merger related expenses.  In fact, the conspirators knew that they had intentionally included more than $200 million in the Cendant reserve in excess of that amount.

40.  The conspirators caused Cendant to falsely represent to the SEC and the investing public that expenses charged to the Cendant reserve were non-recurring costs incurred principally in connection with the merger with HFS.

### Fraudulent Use of Merger Reserves

41.  Defendant **WALTER A. FORBES** and his co-conspirators fraudulently charged expenses not related to the mergers described above against the excess funds in the Ideon and Cendant reserves so that those expenses would not reduce operating income below target levels.  Defendant **FORBES** and his co-conspirators also fraudulently credited a portion of the excess funds in the