UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA : No. 3:02CR00264 (AWT)

v. : October 5, 2005

WALTER A. FORBES :

MEMORANDUM OF THE UNITED STATES IN SUPPORT OF ITS SECOND PRE-TRIAL MOTION *IN LIMINE*

GOVERNMENT'S PRE-RETRIAL MOTION NO. 2

CHRISTOPHER J. CHRISTIE
NORMAN GROSS Norman Gross/dc
MICHAEL MARTINEZ Michael Martinez/dc
CRAIG CARPENITO
Special Attorneys
U. S. Department of Justice
Room 320
450 Main Street
Hartford, Connecticut 06103
Tel: (860) 240-3387
Fax: (860) 240-3391

TABLE OF CONTENTS

I. Government Exhibit 1813, the newspaper article authored by former New York Times Reporter Peter Lewis, containing the admissions of defendant Forbes, should be admitted during the retrial without the need to recall Lewis as a witness. . 1

II. Government Exhibit 616, a memorandum written by Forbes' co-conspirator Kirk Shelton during the course of and in furtherance of the conspiracy, should be admitted into evidence during the direct examination of Michael Monaco, subject to connection by the testimony of Cosmo Corigliano. . . . . . . . . . . . . . . . . . . . . . . . . 5

III. This Court should permit Steven Kernkraut to review and testify about GX 3059, the Government's summary chart showing the change in price of CUC/Cendant stock from 1990 to 1998. . . . . . . . . . . . . . . . . . . . . . . . . . . 9

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . 14

TABLE OF AUTHORITIES
UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:02CR00264 (AWT) |
| v. | : | October 4, 2005 |
| WALTER A. FORBES | : | |

**MEMORANDUM OF THE UNITED STATES IN SUPPORT OF MOTION TO IN LIMINE TO ADMIT CERTAIN EVIDENCE**

**GOVERNMENT'S PRE-RETRIAL MOTION NO. 2**

**ARGUMENT**

**I. Goverment Exhibit 1813, the newspaper article authored by former New York Times Reporter Peter Lewis, containing the admissions of defendant Forbes, should be admitted during the retrial without the need to recall Lewis as a witness.**

During the first trial, the Government presented the testimony of Peter Lewis, a former reporter for the New York Times, and at the time of the first trial a senior editor for Fortune Magazine. Tr. 10748-49. Lewis testified that he wrote an article for the Times in April 1996 regarding CUC's acquisition of Ideon. Tr. 10749-50. In researching the article, Lewis interviewed Forbes over the telephone. Because Lewis had no recollection at the time of the initial trial regarding the content of Forbes' interview statements, the Court permitted Lewis to read portions of the published article, Government Exhibit ("GX") 1813, without objection by Forbes, pursuant to

Fed. R. Evid. 803(5). Tr. 10751-52.[1] Although the Government sought to admit only those portions of the article in which Lewis had quoted Forbes' statements to Lewis during the telephone interview, Tr. 10751, Forbes asked that Lewis be directed to read the entire article into evidence. Tr. 10744-47. The Court granted Forbes' request, and Lewis read the entire article. Tr. 10753-57. Forbes admitted during the initial trial that he had been interviewed by Lewis, Tr. 13741-46, and never challenged the authenticity or accuracy of GX 1813.

At the time of the last trial, Lewis lived in San Antonio, Texas. The Government has no information that he has since moved. In order to spare Lewis the cross-country trip to Hartford in order to merely read his relatively brief newspaper article into evidence, the Government sought a stipulation from Forbes that GX 1813 was admissible without Lewis's authenticating testimony. Forbes declined the request. After Lewis appeared in court to testify at the initial trial, Forbes' lawyers informed the Government that they would not object to the admission of GX 1813 without Lewis' testimony. Given that the Government had

---

[1] Pursuant to Fed. R. Evid.803(5), a document made or adopted by a witness when the subject matter was fresh in the witness's memory may be read into evidence by the witness if the witness has no present recollection of the matter, and the document reflects the former knowledge correctly. The document itself may not be admitted by the proponent of the document. Fed. R. Evid. 803(5). See Parker v. Reda, 327 F.3d 211, 213 (2d Cir. 2003).

already gone to the expense of bringing Lewis to Hartford, and Lewis had gone to the trouble of making the trip, the Government elected to call Lewis as a witness.

The Government now seeks to have GX 1813 read into evidence by someone other than Lewis in order to save Lewis the trouble of again traveling across the country to testify briefly in this case, and to save the Government the not insubstantial travel and lodging expenses for bringing Lewis to Hartford. Given that Forbes' did not object during the first trial to the reading of GX 1813 into evidence, there would appear to be no compelling impediment to having the article read to the jury by someone other than Lewis during the retrial.

If Forbes nevertheless objects to this proposal, this Court should still permit the article to be read into evidence by someone other than Lewis. Lewis' and Forbes' testimony from the first trial established that GX 1813 accurately memorializes Forbes' relevant admissions to Lewis in April 1996 regarding the amount of the Ideon merger reserve established by CUC. This Court "is not bound by the rules of evidence except those with respect to privilege" in ruling on "the admissibility of evidence." Fed. R. Evid. 104(a). Accordingly, even if Lewis' prior testimony, which was subject to Forbes' cross-examination, is regarded as "hearsay" for purposes of this request, the Court can still consider that hearsay pursuant to Rule 104(a) and find

that GX 1813 contains relevant and admissible evidence regarding Forbes' admissions.

Additionally, the unchallenged admissibility of the article was established during the initial trial, and that determination need not be disturbed during the retrial. See United States v. Tham, 960 F.2d 1391, 1397-98 (9th Cir. 1992) (during a retrial following a hung jury, the district court should admit evidence that was admitted during the first trial under the law of the case doctrine, "barring clear error or a change in circumstances").[2] Forbes had an unfettered opportunity to cross-examine Lewis during the first trial but declined to ask him a single question. Tr. 10757. Lewis should not be required

---

[2] The Second Circuit has not determined whether a district court's evidentiary rulings are subject to the "law of the case" doctrine during a retrial following a hung jury. United States v. Williams, 205 F.3d 23, 34 (2d Cir. 2000)("assuming, without deciding," that the law of the case doctrine applies to evidentiary rulings in a retrial of the same case following a hung jury, but concluding that the district court did not abuse its discretion by admitting evidence regarding the defendant's uncharged criminal conduct during the retrial which was not admitted during the first trial, since the "the district court's evidentiary rulings were sound when modified," and explaining that the law of the case doctrine is a "discretionary doctrine which does not constitute a limitation on the court's power but merely expresses the general practice of refusing to open what has been decided"). Cf. United States v. Akers, 702 F.2d 1145, 1147-48 (D.C. Cir. 1983)(law of the case doctrine does not apply during a retrial to the district court's evidentiary rulings during the first trial, since a declaration of a mistrial following a hung jury renders the first trial a nullity); but see Tham, 960 F.2d at 1397, n. 3 ("reject[ing] the holding of Akers because it "provides no rationale for ignoring a previous evidentiary ruling rendered in the same case").

to testify again merely to authenticate his article.

**II. Government Exhibit 616, a memorandum written by Forbes' co-conspirator Kirk Shelton during the course of and in furtherance of the conspiracy, should be admitted into evidence during the direct examination of Michael Monaco, subject to connection by the testimony of Cosmo Corigliano.**

During the initial trial, the Court denied Forbes' Motion to exclude GX 616, an October 12, 1997 memorandum from Forbes' co-conspirator Kirk Shelton to Henry Silverman. Tr. 1766. Forbes admitted during the initial trial that he received a copy of the memo, consistent with its "cc: Walter [Forbes]" notation. Tr. 14360-61.[3] In that memo, Shelton sought to convince Silverman to retain Pember in "the accounting loop for the old CUC businesses" following the pending merger between CUC and HFS, GX 616, even though HFS CFO Michael Monaco, the designated CFO for Cendant after the merger became effective, had sought to consolidate the accounting function for all of Cendant's businesses under his control in Parsipanny. Tr. 1565.[4]

---

[3] Additionally, Shelton confirmed during his testimony at the first trial that he wrote GX 616 and sent it to Silverman, Tr. 12376-80.

[4] The memorandum stated in pertinent part:

> In addition, we also believe that keeping Anne Pember in the accounting loop for the old CUC businesses make sense for the following reasons. She can handle all budgeting and consolidation functions with one person. Since moving this to Parsippany will take some manpower, my guess is that our cost here is at worse a half body. Walter and I are concerned that we don't lose key people. Everyone is comfortable with Anne and she understands the businesses

(continued...)

Forbes also acknowledged during the first trial that: he "may have" discussed with Shelton the desire to keep Pember in the accounting loop; and he wanted to prevent Pember and other CUC employees from losing their jobs as a result of the merger. Tr. 14357-58.

During the first trial, Forbes also objected to admission of the exhibit during the testimony of Monaco. The Court reserved ruling on that objection. Tr. 1989-92. Thereafter, the Government did not seek the admission of GX 616 during Monaco's testimony, but waited to offer it until July 13, 2004, during the testimony of Corigliano, after the trial had been underway for over two months. Tr. 7293.

During the retrial, Corigliano, who will testify after Monaco, will authenticate GX 616 as the memorandum which Shelton sent to Silverman in order to convince him to retain Pember in her accounting position at CMS. Tr. 7293-94. The Government now renews its unresolved request from the first trial to offer GX 616 into evidence during Monaco's testimony, subject to

---

[4](...continued)
extremely well. Keeping her in the loop will go a long way to calming down the troops. If she reports to Cosmo, she can continue to review the CUC businesses and use her experience to add value to the review process. Since we propose that Cosmo has a dotted line to Mike Monaco, there should be no problem [sic] information flow. This structure may not be the first choice from a purely logical perspective, but we feel that the intangible benefits make it a winner, at least for the next year.

connection through the testimony of Corigliano.

This Court has broad discretion regarding the order of proof. Fed. R. Evid. 611(a); United States v. Dittrich, 100 F.3d 84, 86 (8th Cir. 1996). Monaco will be the first witness with any relevant information about GX 616. If permitted to do so, Monaco will testify during the retrial that Shelton's proposal was not only inefficient and illogical, but it was also inconsistent with Monaco's own decision to remove Pember from the consolidation process for the former CUC entities in order to combine the accounting for all of Cendant's divisions, regardless of whether they were formerly part of HFS or of CUC, under Monaco's supervision in Parsipanny.[5]

Under Fed. R. Evid. 104(b),

> When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, **or subject to**, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

Fed. R. Evid. 104(b). The "requirement [under Fed. R. Evid. 901(a)] of authentication or identification is the paradigm of preliminary question under Rule 104(b)." 1 Weinstein's Federal Evidence, § 104.30[3] (2d ed. 2000)("Weinstein's Federal

---

[5] The Government contends that Shelton's recommendation to Silverman that Pember be permitted to manage the consolidation of the former CUC entities from Stamford, without direct oversight by her future colleagues from the former HFS, was an action undertaken by Forbes' co-conspirator, in furtherance of and during the course of the conspiracy, and so is admissible pursuant to Fed. R. Evid. 801(d)(2)(E). The Court admitted GX 616 without limitation during the initial trial. Tr. 7293-94.

Evidence"). Although such conditional admission of evidence "subject to connection" is most commonly applied in the context of co-conspirator statements pursuant to Fed. R. Evid. 801(d)(2)(E), see Bourjaily v. United States, 483 U.S. 171, 175-76 (1987), it is not limited to that context. E.g. United States v. Peoples, 250 F.3d 630, 638 (8th Cir. 2001)(provisional admission of evidence of a defendant's uncharged crimes pursuant to Fed. R. Evid. 404(b)); United States v. Emery, 186 F.3d 921, 926-27 (8th Cir. 1999)(provisional admission of hearsay statements of the murder victim, where the defendant procured the victim's unavailability by killing her, and noting that "a procedure adapted from the co-conspirator cases was appropriate in the present context").

By operation of Rule 104(b), the Court may conditionally admit GX 616 during Monaco's testimony, "subject to the introduction of" Corigliano's testimony, which will be "sufficient to support a finding" that GX 616 is in fact the memorandum that Shelton sent to Silverman on October 31, 1997 regarding Shelton's recommendation that Silverman should retain Pember in the "accounting loop." Absent the admission of GX 616 during Monaco's testimony, the Government will be forced to recall Monaco to testify after Corigliano, solely to describe his assessment of GX 616. Such a bifurcated presentation of Monaco's testimony would unnecessarily waste the time of the witness, the

jury, the Court, and the parties, and would detract from the jury's understanding of the context of Monaco's testimony about GX 616. See United States v. Bailey, 444 U.S. 394, 413 n. 9 (1980)("The convenience of the jurors, the court, and the witnesses may all be best served by receiving the testimony 'out of order' in certain circumstances, subject to an avowal by counsel that such testimony will later be 'tied in' . . . "); see 4 Weinstein's Federal Evidence, § 611.02[2][a][i] ("Rule 611 entrusts to the trial court the ultimate authority to see that a trial accomplishes its fundamental truth-seeking purpose.") (internal quotation marks omitted). Accordingly, this Court should permit Monaco to testify about GX 616 before Corigliano testifies.

**III. This Court should permit Steven Kernkraut to review and testify about GX 3059, the Government's summary chart showing the change in price of CUC stock from 1990 to 1998.**

Steven Kernkraut, who did not testify during the first trial, will testify as a prosecution witness during the retrial. During the conspiracy period, Kernkraut was a managing director and securities analyst for Bear Stearns, the well-known investment banking and securities trading and brokerage firm. Tr. 196, 6461, 10753-54; GX 1813. Kernkraut authored a series of reports regarding CUC on behalf Bear Stearns, which were circulated to, *inter alia*, Bear Stearns' securities customers. Those reports were generally very favorable to CUC, and touted

its stock. Tr. 196-202, 219-36; GX 1401, 1402, 1407, 1409. Kernkraut's reports described such factors as CUC's revenue, earnings, and member growth rates, and focused upon CUC's operating income (before unusual charges such as those associated with corporate acquisitions). Tr. 6608-11, 6614.

Forbes testified at the first trial that he periodically spoke to Kernkraut and other Wall Street analysts to discuss CUC's financial results. Tr. 13914, 13918-19. In doing so, Forbes also focused upon CUC's operating income. Tr. 6611-12. Forbes, Shelton, and Corigliano also paid close attention to Kernkraut's and other analysts' reports on CUC, particularly when reviewing Corigliano's cheat sheets. Tr. 7085-86.

During the initial trial, the Court admitted into evidence GX 3059, a chart that accurately summarized the change in CUC's/Cendant's stock price from January 1990 to April 1998. Tr. 6465-67.[6] The Government was also permitted to use that chart during its summation. Tr. 14822. That chart was compiled from stock price data published by Bloomberg, LLP, as set forth in another exhibit that was admitted into evidence, GX 3058. Tr. 6465, 6931-33.

Given the nature of the charged conspiracy to

---

6 Forbes' initially objected to admission of any records memorializing CUC's and Cendant's historical stock prices, Forbes' Motion in Limine No. 9, Docket 692, filed May 7, 2004; Tr. 5855-64. He later withdrew his objection to that evidence. Tr. 6095-97.

fraudulently increase the price of CUC's and Cendant's stock,[7] evidence regarding CUC's historically upward trending stock price is highly relevant to the charges in this case. Evidence that the price of CUC/Cendant's stock rose dramatically during the conspiracy is highly relevant to prove that the conspirators engaged in conduct that was intended to effectuate that result. II Wigmore, Evidence § 302 (3d ed., 1977).[8]

---

[7] Paragraph 18 of Count 1 of the proposed redacted indictment describes the principal goals of the Count 1 conspiracy as follows:

> 18. The principal goals of the conspiracy were: a) to fraudulently inflate the earnings CUC reported to the SEC and the investing public in order to artificially increase the price of CUC stock; b) to fraudulently inflate the earnings of CMS, which fraudulently inflated earnings Cendant reported to the SEC and the investing public, and thereby artificially increased the price of Cendant stock; c) to use CUC stock, the price of which had been artificially increased, to pay for CUC's acquisition of other companies; d) to use the artificially increased price of CUC stock, CUC's fraudulently inflated earnings reports, and fraudulently inflated projections of CUC's future earnings to induce HFS and its shareholders to merge with CUC; and e) for defendant WALTER A. FORBES to personally enrich himself through salary, bonuses, stock options and capital appreciation of shares he held.

[8] As Professor Wigmore explains in the cited section of his treatise:

> In short, similar results do not usually occur through abnormal causes; and the recurrence of a similar result (here in the shape of an unlawful act) tends (increasingly with each instance) to negative accident or inadvertence or self-defence or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e. criminal, intent

(continued...)

GX 3059 provides a graphic illustration of the steady and dramatic increase in the price of CUC/Cendant stock during the conspiracy period. The Government now seeks permission to show GX 3059 to Kernkraut during his direct examination in the retrial, and have him comment on the fact that, consistent with his periodic reports regarding CUC, the chart shows that CUC's stock price consistently rose, increasing over ten fold from January 1990 to January 1995 alone. Tr. 6467. Kernkraut will be the first prosecution witness who will give relevant testimony about the increase in CUC/Cendant's stock price during the conspiracy period, and the Government seeks to present easily understood evidence of this key feature of the conspiracy as early in the case as possible.

The Government proposes to offer GX 3058 into evidence during the retrial pursuant to certification, before Kernkraut testifies. Kernkraut will then testify that he has reviewed the data in GX 3058, and that the summary chart, GX 3059, accurately reflects the data contained in GX 3058. Kernkraut's proposed testimony regarding the data reflected on GX 3059 will be similar to that of a "summary witness" who "may testify in order to give the jury a clear picture of the entire mass of evidence." 6

---

[8](...continued)
accompanying such an act; and the force of each additional instance will vary in each kind of offence according to the probability that the act could be repeated, within a limited time and under given circumstances, with an innocent intent.

Weinstein's Federal Evidence, § 1006.08[4] (2d ed. 2000). As such, it should be admitted.

**CONCLUSION**

For the foregoing reasons, the Government respectfully requests that the Court grant the Government's motion *in limine* in all respects.

Respectfully submitted,

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice

/s/ Norman Gross

By: NORMAN GROSS
MICHAEL MARTINEZ
CRAIG CARPENITO
Special Attorneys
U.S. Department of Justice
Federal Bar No. pending

Dated: October 5, 2005
Hartford, Connecticut