finding some basis to recall Corigliano for purposes of challenging his credibility."[30]  Gvt. Mem. Opp'n Forbes Mot. Compel Aff., dated Oct. 4, 2004, at 2.  The Court agreed, and – after reviewing the affidavit and the non-disclosed exhibits *in camera, see id.* n.1 – denied defendant Forbes' motion.  *See* Tr. 10/5/04, at 14550.  Accordingly, because there is no basis to reconsider this ruling, defendant Forbes' duplicative demands for the affidavit and its exhibits should be summarily quashed.  *See also supra* Point III.C (holding that the narrower Rule 17(c) power cannot be used to circumvent the limits of discovery under Rule 16).

> ### H.    Documents Exchanged and Communications With the Government and/or Cendant

In addition to the foregoing categories of duplicative requests, defendant Forbes demands by his latest subpoenas to obtain, from Mr. Corigliano alone,[31] all documents concerning communications between him and the government concerning Cendant, CUC and/or Forbes; and from Mr. Corigliano and Kramer Levin, "all documents" that may have been exchanged by (i) Mr. Corigliano or his counsel on the one hand and (ii) the government or Cendant on the other, to the extent such documents were either cc'd to or are in the possession of Mr. Corigliano.  *See* CC#1/16-17 (Ex. A); KL#2/1-2 (Ex. E).  Needless to say, Forbes made multiple repeated demands for these same categories of documents in the 2004 trial, and – with

---

[30] The government also noted that "the Court has allowed Forbes to fully develop his theory concerning the benefits received by Corigliano," and "[a]ny additional inquiry in this area can only be sought to attack Corigliano's credibility and should not be permitted." *Id.* at 2-3.

[31] In an odd Alice-in-Wonderland like definitional twist, Forbes' subpoenas to Mr. Corigliano define "you" to include Kramer Levin (just as his subpoenas to Kramer Levin define "you" to include Mr. Corigliano).  *See also* Tr. 5/19/04, at 1511 (Court found "major problems" with subpoena to Ms. Pember because definition of "You" includes not only the subpoenaed party but also counsel and other third parties).

certain very limited exceptions that have already been disclosed – the demands for all such documents were quashed.[32]

The current overlapping demands should be quashed as well. Forbes apparently now believes that by making a cosmetic but substantively empty change – i.e., limiting his most recent demands to Kramer Levin for documents exchanged with the government and Cendant to those that were cc'd to Mr. Corigliano (KL#2/1-2) (Ex. E) – he somehow cures the multiple defects in his prior demands. He is wrong. The demands still constitute an incredibly broad, non-specific "all documents" "fishing expedition" covering multiple years and still not even limited by particular subject matter. The current demands still improperly seek materials for the obvious purpose of attempting to impeach Mr. Corigliano on collateral matters such as whether he was cc'd on certain correspondence with the SEC and what communications if any he was aware his counsel was having with the government or other third parties. In fact, the latest demands and the limitation to materials cc'd to or in the possession of Mr. Corigliano are even more objectionable than the predecessor requests, as Forbes now attempts to invade Mr.

---

[32] For example, as to communications with the government, defendant Forbes demanded in the November 21, 2001 subpoena (see Ex. S) that Mr. Corigliano produce "[a]ll documents concerning any communications between You and the Government concerning the Cendant Entities" (call #4); "[a]ll documents concerning any prior statements You have made that concerning Accounting or Auditing at any Cendant Entity" (call #5); and "[a]ll documents concerning any action taken against You or threatened to be taken against You by the Government" (call #50). All of these demands were quashed. See Tr. 5/13/04, at 596; 5/17/04, at 830.

Defendant Forbes nonetheless continued to demand such documents from Mr. Corigliano and from his attorneys at Kramer Levin. Thus, on March 19 and 22, 2004, he served on Mr. Corigliano and Kramer Levin nearly identical subpoenas seeking, among other things, "[a]ll documents relating to any request for factual information from the government" (call #29); "[a]ll documents describing or memorializing any request for factual information from the government" (call #30); "[a]ll documents relating to any factual information provided by you to the government" (call #31); and "[a]ll documents describing or memorializing any factual information provided by you to the government" (call #32) (Exs. T & U).

KL3:2469827.2

Corigliano's attorney-client relationship, to "fish" around and see what Mr. Corigliano's counsel sent him and didn't send him, and to put that collateral, distracting, confusing and irrelevant issue before the jury. Accordingly, the Court should not revisit – and should again quash – demands for documents and communications exchanged with the government and Cendant.

## I.    Subpoena Exhibits A – V

Forbes attaches to one of his subpoenas to Kramer Levin a binder of twenty-two exhibits, corresponding to demands – which are in effect interrogatories – that we produce documents "sufficient to identify" whether the attached exhibit items (or drafts thereof) were sent to or received by Mr. Corigliano (KL#2/4-5) (Ex. E), and, as to one particular letter (Ex. M thereto), all documents indicating whether Mr. Corigliano was sent or received documents indicating that the attachments to this letter would be sent to the government (KL#2/6) (Ex. E).

The referenced exhibits include correspondence between (a) Kramer Levin and/or Fried Frank on the one hand, and (b) the SEC and/or Receiver Neil Cartusciello on the other, relating to: (i) Mr. Corigliano's Wells submission dated May 11, 2000; (ii) the Coriglianos' August 28, 2000 budget agreement with the SEC; (iii) the Coriglianos' April 16, 2004 settlement with the SEC; and (iv) the liquidation of the Coriglianos' assets in July 2004. We note specifically that these exhibits include Mr. Corigliano's actual Wells submission (Exhibit A); a letter from David Frohlich of the SEC to Gary Naftalis, dated April 9, 2004, enclosing a draft settlement agreement (Exhibit N); a letter from David Frohlich of the SEC to Gary Naftalis, dated April 13, 2004, enclosing a revised settlement agreement (Exhibit O); and a September 4, 2003 letter from Alan Friedman to James Kidney of the SEC (Exhibit M).

Again, however, this type of demand – including many of the exact same requests made again in this new subpoena to Kramer Levin – was already addressed by the Court during the first trial. For example, in his August 19, 2004 subpoena to Kramer Levin (Ex. BB),

defendant Forbes specifically demanded production of "[a]ll documents reflecting that the Wells submission filed with the SEC on Cosmo Corigliano's behalf on or about May 11, 2000 was communicated to Cosmo Corigliano (call #7); "[a]ll documents reflecting that any of the following letters from the SEC to Kramer, Levin were sent to Cosmo Corigliano: (1) a letter from David Frohlich to Gary Naftalis dated April 12, 2004[33]; (2) a letter from David Frohlich to Gary Naftalis dated April 9, 2004 (call #8); and "[a]ll documents reflecting that a copy of Alan R. Friedman's September 4, 2003 letter to James A. Kidney was communicated to Cosmo Corigliano" (call #6).

The Court quashed all of these demands in its September 24, 2004 rulings – as it should quash these latest demands – on the ground that "the documents called for reflect lines of inquiry calculated solely to bolster the defendants' attack on Corigliano's credibility during their cross-examinations of him." *See* Gonedes Ruling at 3 (Ex. JJ).   Moreover, the current demands are additionally objectionable for the reasons set forth in the prior point, i.e., they threaten an invasion of the attorney-client relationship to obtain details concerning lawyer-client communications that could only be used to attempt to impeach on collateral issues and to confuse and distract the jury.

## J.    Communications Between Mr. Corigliano and Kramer Levin Between April 1998 and January 2000

Defendant Forbes further seeks from Kramer Levin and from Mr. Corigliano "*all documents* describing or memorializing" information that Mr. Corigliano provided to Kramer Levin relating to (i) "the events at Cendant," (ii) "denials of wrongdoing by Mr. Corigliano," and

---

[33] While the August 19, 2004 subpoena requested a letter dated April *12*, 2004, we assume that this was an error and that, consistent with the current subpoena, defendant Forbes actually sought the letter from Mr. Frohlich to Mr. Naftalis dated April *13*, 2004.

KL3:2469827.2

(iii) "allegations that persons other than Mr. Corigliano were responsible for wrongdoing at Cendant," as well as "*all documents* describing or memorializing any communications with the government prior to January 2000 advising any representative of the government of any of" these three categories of the information. KL#3/12-15 (emphasis added) (Ex. F); CC#2/3-6 (emphasis added) (Ex. B).

As the Court will recall, during the first trial both defendants Forbes and Shelton tried repeatedly to obtain from Ms. Pember's counsel and from Kramer Levin all documents – including documents relating to privileged attorney-client conversations – concerning our pre-plea attorney discussions with the government, and, from Kramer Levin, all documents concerning Mr. Corigliano's so-called "innocence proffer" in January 1999.[34] After extensive briefing and argument,[35] the Court repeatedly rejected these requests, after we and Ms. Pember's counsel argued, under *United States v. Newell*, 192 F.R.D. 587, 589 (N.D. Ill. 2000), that statements made during attorney proffers with the government in no way call into question the privileged status of any pre-meeting communications between a client and his or her attorney and that, as a matter of practice, presentations by attorneys at such meetings involve nothing more than hypotheticals. In addition, the Court reiterated its determination that presentations by an attorney to the government are not admissible unless they are statements explicitly made or adopted by the client. *See* Tr. 6/1/04, at 2644-59; 6/2/04, at 2865-67; 6/3/04, at 3194.

---

[34] *See* Forbes Subpoenas, dated March 19 and 22, 2004 (demanding, among other things, all documents concerning communications with the government) (Exs. T & U).

[35] *See* Corigliano Mem. dated Mar. 31, 2004; Corigliano Reply Mem. dated May 6, 2004; *see also* Tr. 5/17/04, at 823-24; Tr. 5/18/04, at 1050-54, 1205-06; 5/19/04, at 1511-12; 5/20/04, at 1528-32.

The Court further concluded that attorney notes or memoranda that were never adopted by Mr. Corigliano are simply not statements attributable to him, and as such they are not admissible at trial. Accordingly, demands for their production could not satisfy *Nixon's* admissibility requirement. *See* Tr. 5/20/04, at 1530 (citing, among other cases, *United States v. Almonte*, 956 F.2d 27 (2d Cir. 1992), and *United States v. Weissman*, No. 01 CR 529 (BSJ), 2002 WL 31875410 (S.D.N.Y. Dec. 26, 2002)). *Accord United States v. Perez*, No. 3:02 CR 7 (JBA) (D. Conn. Apr. 23, 2004) (Arterton, D.J.) (quashing subpoena calling for attorney notes of client proffer sessions); *United States v. Triumph Capital Group, Inc.*, 3:00 CR 217 (EBB), 2003 WL 23318898, at *1 (D. Conn. June 5, 2003) (Burns, D.J.) (same). *See also United States v. Cuevas-Pimental*, 815 F. Supp. 81, 83 (D. Conn. 1993) (Cabranes, C.J.) ("It is clear that, as a general matter, Rule 613(b) does not permit an attorney's statements to be introduced as prior inconsistent statements of that attorney's client.").[36]

In short, these issues have been litigated and re-litigated, and there is no basis for the Court to reconsider its prior considered rulings. Demands for our files relating to communications with our client during the pre-plea period up through January 2000 should therefore be quashed.

### K.    Polygraph-Related Documents

The issue whether defendant Forbes may introduce evidence or cross-examine Mr. Corigliano about two polygraph exams has already been the subject of extensive briefing, oral argument, and at least two prior rulings by the Court *precluding all such evidence or*

---

[36] As to defendants' prior claims that any privilege as to these attorney-client communications was vitiated by the crime-fraud exception, the Court rejected their attempts to satisfy the burden of showing "probable cause" and rebuffed demands for an evidentiary hearing on multiple occasions. *See* Tr. 7/19/04 at 7820-21; Tr. 7/20/04 at 8030; Tr. 8/2/04 at 9121.

KL3:2469827.2

*inquiry.* Nevertheless, acting as if those rulings never occurred, Forbes' latest subpoenas contain no fewer than 5 separate calls demanding polygraph-related documents. *See* KL#3/1-7 (Ex. F); CC#2/7-13 (Ex. B).

The Court's first ruling on the polygraph issues came in response to the government's motion to preclude dated June 29, 2004, in which the government argued, *inter alia,* that evidence regarding the polygraph test or its results were inadmissible as unreliable under *Daubert v. Merrell-Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Fed R. Evid. 702, and because any probative value was outweighed by the substantial risk of misleading and confusing the jury under Fed. R. Evid. 403. *See* Gvt. Mot. Limine Exclude Evid. & Cross-Exam. Cosmo Corigliano Regarding Polygraph Exams., dated June 29, 2004. Defense counsel argued that they should be permitted to cross-examine Mr. Corigliano concerning any inconsistent statements he made during the polygraph examination and his efforts to avoid prosecution by authorizing his counsel to advise the government that he had done well on a polygraph examination, despite his guilt.

During oral argument on July 19, 2004, the Court rejected as a matter of fact the defense argument that Mr. Corigliano authorized his counsel to advise the government that he had done well on a polygraph examination – "Mr. Corigliano's testimony has established that he didn't authorize his counsel to do anything," Tr. 7/19/04, at 7796 – and that any contrary suggestion by the defense "isn't supported by his testimony." *See id.* at 7803. The Court also expressed concern that the defendants' prior inconsistent statements theory did not have high probative value, and that without knowing what questions were asked in each of the two polygraph examinations there was a risk that any inquiry into them might lead to a "battle of the polygraph examiners," and thereby invade the province of the jury. *See id.* at 7796, 7813-14.

- 34 -

The Court concluded that the probative value of the polygraph evidence was substantially outweighed by its prejudicial effects. *See id.* at 7814.

On July 20, 2004, the Court granted the government's motion. *See* Tr. 9/20/04, at 8030-31. Unwilling to accept the Court's ruling, defendant Forbes attempted to relitigate the polygraph issues the very next day. *See* Forbes Mem. dated July 21, 2004.[37] On August 2, 2004, the Court denied defendant Forbes' second-bite-at-the-apple motion to question Mr. Corigliano on the polygraph examinations. *See* Tr. 8/2/04, at 9121.

Nothing has changed since the Court ruled – and then ruled again – that the polygraph evidence should not be admitted. The Court's decisions are consistent with the overwhelming weight of authority finding that polygraph evidence is generally unreliable,[38]

---

[37] In response to defendant Forbes' attempt to take a second bite at this apple, we reiterated that "[e]verything Mr. Corigliano knows about the polygraph is part of protected attorney-client communications and the work of the polygraph examiner is also protected by the attorney-client privilege. *See* Mem. Opp'n Forbes Request Evid. Hearing, dated July 23, 2004, at 10 n.4 (citing *Brown v. Trigg*, 791 F.2d 598, 601 (7th Cir. 1986) (attorney's agent hired to administer a polygraph test was protected by the attorney-client privilege, although the privilege was later waived); *Occidental Chemical Corp. v. OHM Remediation Servs.*, 175 F.R.D. 431, 436-37 (W.D.N.Y. 1997) (citing *Weinstein's Federal Evidence* for the point that the attorney-client privilege applies under *Kovel* to non-testifying experts such as a polygraph operator hired by an attorney to assist in forming a defense); *People v. George*, 104 Misc. 2d 630, 633 (N.Y. Sup. Ct. Bronx County 1980) (concluding that a polygraphist retained by an attorney for the purpose of administering a lie detector test to the defendant is covered by the attorney-client privilege)).

[38] *United States v. Scheffer*, 523 U.S. 303, 303, 309 (1998) ("there is simply no consensus that polygraph evidence is reliable"); *United States v. Messina*, 131 F.3d 36, 42 (2d Cir. 1997) declining to hold "for the first time that polygraph evidence may be taken into account" and affirming district court determination that proffered polygraph evidence was "not worthy of credit"); *United States v. D'Angelo*, No. 02-CR-399 (JG), 2004 WL 315237, at *27 (E.D.N.Y. 2004) ("Polygraphs are insufficiently reliable even for use as impeachment, let alone as affirmative evidence."); *Meyers v. Arcudi*, 947 F. Supp. 581, 583-85, 587-88 (D. Conn. 1996) (Dorsey, J.) (canvassing Second Circuit case law on the admissibility of polygraph evidence before and after *Daubert* and finding the proffered polygraph evidence insufficiently reliable to be admissible under *Daubert* and Rule 702).

tends to usurp the credibility determination reserved for the jury,[39] is more prejudicial and misleading than probative,[40] and is inappropriate as a basis for cross-examination of a government cooperating witness.[41]  It follows, necessarily, that all of Forbes' new demands for polygraph-related documentation -- which represent at minimum an attempted third-bite at the apple – are patently improper under Rule 17(c)'s admissibility and relevancy requirements and should be summarily quashed.

### L.    Documents Concerning "Benefits" From Cooperation

In call CC#1/15 (Ex. A), Forbes seeks "[a]ll documents" related to benefits Mr. Corigliano "received or may receive" because of his cooperation with the government or his "testifying."  This demand is almost word-for-word the same as at least two demands – one in a Rule 17(c) demand on Mr. Corigliano dated November 21, 2001, the other in a renewed motion

---

[39] *Scheffer*, 523 U.S. at 313-14.

[40] *See, e.g., United States v. Kwong*, 69 F.3d 663, 668 (2d Cir. 1995); *United States v. Canter*, 338 F. Supp. 2d 460, 465 (S.D.N.Y. 2004) ("In light of the strong likelihood that a jury would place great weight on this type of evidence, its minimal probative value in this case is significantly outweighed by its highly prejudicial effect."); *Meyers*, 947 F. Supp. at 589-90.

[41] *United States v. Williams*, 95 F.3d 723, 728-30 (8th Cir. 1996) (affirming exclusion of evidence regarding polygraph taken by prosecution witness offered to impeach his testimony); *United States v. Johnson*, 904 F. Supp. 1303, 1311 (M.D. Ala. 1995) (precluding impeachment of prosecution witness by reference to his performance on polygraph examination).

KL3:2469827.2

for impeachment material dated June 29, 2004[42] – that were rejected by the Court at the outset of the 2004 trial (in May) and then again during Mr. Corigliano's cross-examination in August.[43]

Moreover, as we said then and repeat now, to the extent this call purports to refer to benefits conferred by the government, Mr. Corigliano is not aware of any documents reflecting benefits received or to be received other than documents relating to those "benefits" that have already been disclosed and were the subject of exhaustive (if not abusive) cross-examination of Mr. Corigliano during the 2004 trial. And again, demands for such documents are only properly directed at the government pursuant to Rule 16 and *Brady/Giglio*, not to Mr. Corigliano and his counsel by way of a Rule 17(c) subpoena. *See supra* Point III.C. To the extent this call seeks documents relating to benefits Mr. Corigliano received or may receive on account of his cooperation and testimony from any person or entity other than the government, Mr. Corigliano is not aware of any such documents.

### M.    Connecticut Board of Accountancy

In CC#1/19 (Ex. A), Forbes seeks "*all documents*" describing or memorializing "any" communications with the Connecticut State Board of Accountancy concerning potential revocation of Mr. Corigliano's CPA Certificate, investigation of his conduct at CUC or Cendant,

---

[42] For example, the November 21, 2001 subpoena demanded "[a]ll documents concerning any benefits You have received or may receive as a result of providing information to the Government, cooperating with the Government or testifying." Ex. S (call #2). Forbes' renewed demand for impeachment material similarly demanded "[d]ocuments memorializing or describing any benefits sought or received by Cosmo Corigliano from the government." Suppl. Mem. Forbes Supp. Rule 17(c) Subps. & Discovery Gvt. Impeachment Material, dated June 29, 2004, at 2, 9, 12.

[43] *See* Tr. 5/13/04, at 596; 5/17/04, at 830; 8/2/04, at 9121. We are advised that counsel for Forbes conceded that the same demands included in their 2005 subpoenas to Ms. Pember were duplicative of demands made of her in connection with the 2004 trial and were being made to preserve the record. Inexplicably, Forbes' counsel declined to make the same concession to us, thereby compelling us to needlessly brief the issue and to ask the Court to decide it.

KL3:2469827.2