and negotiation and settlement with the Board. This demand is a sub-set of a previously made and quashed demand calling for "all documents concerning any disciplinary actions arising from your employment with any Cendant entity." Forbes Subp. dated Nov. 21, 2001 (call #48) (Ex. S); Tr. 5/13/04, at 596; 5/17/04, at 830 (subpoena quashed). Forbes presents no basis for reconsidering this prior ruling and the repetitive demand should therefore be quashed. Moreover, the renewed demand, even if more limited, remains an improper "all documents" fishing expedition. It also fails the admissibility test: while counsel for defendant Forbes is certainly free to ask any relevant, non-cumulative questions about the status of Mr. Corigliano's CPA Certificate and any proceedings or settlements with the Connecticut Board, the only possible basis for attempting to admit into evidence any related documents would be as part of an effort to impeach Mr. Corigliano improperly on this plainly collateral issue. Finally, even to the extent any action by the Connecticut Board were deemed relevant to Mr. Corigliano's credibility, it surely would be cumulative and excludable under Rule 403.

**N.    Budget and Living Expense Information and Other Financial Information Mr. Corigliano Provided to His Counsel**

Next, defendant Forbes demands production of budget and living expense information, as well as other financial information, that Mr. Corigliano purportedly provided to his attorneys for purposes of such information being conveyed to the government, referring to Mr. Corigliano's testimony on July 19, 2004. *See* KL#3/10-11 (Ex. F). These requests are *identical* to demands previously made by defendant Forbes in a subpoena dated July 21, 2004 (*see* Ex. X), which were quashed by the Court. Indeed, on July 30, 2004, the Court ruled as to these demands that: "I can't figure out any theory under which the defendants are entitled to that information. And I read the papers over and over again and still can't." Tr. 7/30/04, at 16. These requests should therefore be summarily quashed.

KL3:2469827.2

### V. FORBES' "NEW" DEMANDS FAIL THE TESTS OF RELEVANCY, SPECIFICITY AND ADMISSIBILITY AND ARE "UNDULY BURDENSOME" AND "OPPRESSIVE"

#### A. The Court Should Quash the Many Demands Relating to Interactions with the Government and Benefits

##### i. Post-2004 Trial Communications Relating to the Government and Benefits

In calls KL#1/10 and KL#1/11, Forbes seeks "[a]ll documents describing or memorializing any communications between" (a) Kramer Levin or Mr. Corigliano and (b) the government concerning Mr. Corigliano's testimony in the 2004 trial and his potential testimony in the retrial. (Ex. D.) The short and dispositive answer is that, apart from the possibility of any Kramer Levin confidential internal work-product, which would be privileged, we are not aware of any such documents in the possession of either Kramer Levin or Mr. Corigliano. Even if any such non-privileged documents did exist, these calls should be quashed because: (1) they would amount to inadmissible hearsay unless signed or adopted by Mr. Corigliano, *see supra* Point IV.J ; (2) they are nothing more than a sweeping and improper "fishing expedition" to see what might turn up (*see supra* Point III.A); and, (3) to the extent any such documents theoretically could have reflected communications that properly might be used for material impeachment, the government would have been obligated to disclose the substance under *Brady/Giglio*, and thus the demand should have been directed to the government and is not properly put to the witness and his counsel by way of a Rule 17(c) subpoena. *See supra* Point III.C (citing cases).

In calls KL#1/12 and KL#1/13, Forbes seeks "[a]ll documents describing or memorializing any assistance, favorable treatment or benefits" requested from or offered by the government since June 26, 2004 (just days before Mr. Corigliano took the witness stand in the 2004 trial) (Ex. D). Again, the simple answer is that we are not aware of any such documents in the possession of either Kramer Levin or Mr. Corigliano. Nor is Mr. Corigliano aware of any

- 39 -

documents reflecting communications with the government since the end of his examination on August 2, 2004 concerning the "status" of his plea agreement (calls CC#1/22a-d) (Ex. A). And, as to all three of these demands, to the extent there theoretically were any such material requests for or offers of assistance or benefits from the government, or communications concerning the "status" of Mr. Corigliano's plea, the obligation to disclose would fall on the government and thus the demands on Mr. Corigliano and his counsel are – again – improper under Rule 17(c).

    ii.  Dates of Meetings With the Government Since the 2004 Trial

In calls CC#1/14, CC#1/18 and KL#1/14 (Exs. A & D), Forbes seeks documents sufficient to identify the dates of meetings and conversations between Mr. Corigliano and the government since the end of Mr. Corigliano's testimony on August 4, 2004.[44] These demands should be quashed because: (1) Mr. Corigliano has not kept any calendar entries or other records of the dates of his meetings with the government since the last trial ended; (2) to the extent such dates are deemed material and admissible (we do not think either is correct), they should be sought from the government under *Brady/Giglio*; and (3) as the Court ruled during the 2004 trial, it would be unduly burdensome and oppressive to require counsel for a cooperating witness to dig through and expose our own internal files and calendars to establish such dates. *See* Tr. 5/18/04 at 1052.

---

[44] Call KL#1/14 seeks materials relating to a sub-set of that date range, i.e., from January 4, 2005 to the present. (Ex. D.)

KL3:2469827.2

### B. The Court Should Quash the Many Improper Demands that Constitute Fishing Expeditions and/or Do Not Meet the *Nixon* Criteria

#### i. Credit Card and Loan Applications

Reflecting the grossest form of overreaching and an undisguised desire to rummage through the Corigliano's personal finances in the hope of turning up some piece of paper with which to attempt to impeach Mr. Corigliano on wholly collateral issues, Forbes seeks: (1) from Mr. Corigliano, documents from which to identify *all* of the Corigliano family credit card accounts that were adverted to in quarterly statements the Coriglianos filed with the SEC and/or in the financial disclosures made to the court-appointed Receiver (CC#1/8) (Ex. A); (2) from Citibank and MBNA (the institutions through which the Coriglianos have their personal credit cards), "*all documents*" describing or memorializing applications for credit accounts for Mr. Corigliano and his wife from August 2000 through July 2004 (*see* Citibank#1/1, 3, 9 and 11; MBNA/1, 3, 5 and 7 (emphasis added) (Exs. L-M) (as modified in our second meet and confer)); (3) from People's Bank, "*all documents*" relating to loans or lines of credit issued to Mr. or Mrs. Corigliano and secured in any way by their Old Saybrook residence (*see* People's Bank/5a-c) (Ex. K))[45]; and (4) from Mr. Corigliano, "*all documents*" describing or memorializing loan applications since April 15, 1998 and "*all documents*" describing or memorializing mortgage applications since August 4, 2004 (*see* CC#1/20, 21) (Ex. A)). Each of these "all documents" demands constitutes improper "fishing." *See supra* Point III.C. None would produce any information that could be properly be used to show any new or different bias or benefit from the

---

[45] This demand calls for "*any*" appraisals" of the Coriglianos' property, "*any*" application papers for any "line of credit or loan" and "*any*" loan papers signed by Mr. Corigliano or Mrs. Corigliano.

government or that might otherwise be admissible. At best, Forbes might try to use documents demanded by these calls to attempt to impeach Mr. Corigliano on collateral matters. For these reasons, the demands are improper and should be quashed.[46]

### ii. Crystal Journey Candles Documents

In another classically improper "all documents" subpoena served on Crystal Journey Candles (through the Receiver who now holds title to and runs the company), Forbes seeks: (1) *"all documents"* describing or memorializing the ownership status of the company, including *"all documents"* describing or memorializing both the transfer of the company to the Receiver and any efforts to sell the company (Crystal Journey/1); (2) *"all documents"* describing or memorializing benefits provided to Mr. or Mrs. Corigliano (Crystal Journey/2 & 3); (3) *"all agreements"* between Mr. Corigliano and the company or the receiver (Crystal Journey/4); and (4) documents sufficient to identify whether Mr. Corigliano is still employed at the company and, if not, his last date of employment (Crystal Journey/5 & 6). (Ex. J.) Similar demands served directly on Mr. Corigliano call for documents sufficient to establish "benefits" provided by Crystal Journey Candles – again, to both Mr. Corigliano and Mrs. Corigliano – for the periods (1) August 2000 through July 7, 2004 and (2) from July 7, 2004 to the present. *See* CC#1/1-4 (Ex. A).

These demands for essentially "all documents" relating to benefits that may have flowed from the candle company to Mr. Corigliano or Mrs. Corigliano represent a text-book

---

[46] The fact that Forbes may through these calls be fishing for additional appraisals of the Corigliano family home does not salvage the plainly improper demands. Any additional appraisal information, if it exists, would at best be cumulative, could only prolong the distracting and confusing retrial-within-the-retrial that Forbes no doubt will attempt to repeat concerning what Mr. Corigliano believed with respect to the value of his family's residence, and should be excluded under Rule 403.

"fishing expedition" to see what turns up and should be quashed on that ground alone. In addition, as counsel for Forbes knows, Mr. Corigliano's salary from the company was disclosed on the quarterly reports to the SEC that continued until April 15, 2004; moreover, the issue was explored on cross-examination. *See* Tr. 8/3/04, at 9359-65.

In addition, the compensation information sought does not represent and could not properly be admitted to show a "benefit" conferred on Mr. Corigliano by the government. Between August 2000 and July 2004, the Coriglianos' finances were controlled by an asset preservation agreement with the SEC and the Coriglianos were required to live within an annual budget. *See* KL#2/Ex. K (August 28, 2000 agreement with the SEC) (Ex. E). Whatever Mr. Corigliano's salary or other monetary compensation from the candle company may have been during that period,[47] it had no impact on the amount the Coriglianos were permitted to spend under that budget. In addition, to the extent Forbes wishes and will be allowed to continue to attempt to persuade the jury that being required to live within a budget constituted a "benefit" to the Coriglianos, Forbes is fully aware of the amounts the Coriglianos spent during that time period from the budget documents, the Coriglianos' quarterly reports to the SEC, and other documents described previously, and thus can more than adequately quantify for the jury the alleged "benefits" received on account of the August 2000 SEC asset preservation agreement (as counsel for Forbes did at length during the 2004 trial. *See* Tr. 7/20/04, at 8053-100 (where Mr. Sullivan added up on a chart for the jury the amounts of money Mr. Corigliano and his family were "allowed" to spend during the pendency of the SEC asset preservation agreement)).

As to salary or other benefits that Mr. Corigliano has received from the candle company since the turnover of assets to the SEC on July 7, 2004, that information is irrelevant

---

[47] Mrs. Corigliano has never taken a salary or received any payments from the candle company.

- 43 -

and therefore inadmissible. As of that date the candle company was owned and run by an independent court-appointed Receiver, who determines Mr. Corigliano's employment status and compensation. That the Receiver has decided to keep Mr. Corigliano on the payroll (which, as of the date of this submission, he has), and what he has chosen to pay him, are in no sense "benefits" bestowed by the government because of Mr. Corigliano's cooperation; to the contrary, as Mr. Corigliano understands it, his continued employment there is a reflection of the company's need for his services in order to keep the company running.

### iii. 2000-2003 Property Taxes

Call CC#1/9 (Ex. A) demands that Mr. Corigliano produce copies of checks for property tax payments between 2000 and 2003. But the Coriglianos' quarterly statements to the SEC during those same years disclosed all such property tax payments (as each was over $5,000), *see also, e.g.,* Tr. 7/20/04, at 8090 (Forbes' counsel questioning Mr. Corigliano concerning property tax payments disclosed on quarterly report), and thus these latest demands can only be understood as a speculative effort to uncover some inconsistency and attempt to impeach Mr. Corigliano on this collateral matter. Moreover, as just noted, the property tax payments made during those years, while the SEC budget was in place, cannot independently establish the amount of the arguably relevant so-called "benefit" to the Coriglianos. That alleged "benefit" is the overall amount the Coriglianos were permitted to spend; allocation for property tax payments was specifically made part of the budget; and whether the tax payments constituted a smaller or larger percentage of the overall budgeted amount is not relevant and thus would not be admissible to show the overall "benefit" claimed.

### iv. September 2003 Asset Information

In CC#2/1-2 and KL#3/8-9 (Exs. B & F), Forbes seeks "*all documents*" provided by, and "*all documents*" describing or memorializing information provided by Mr. Corigliano to

Kramer Levin, apparently relating to a September 4, 2003 letter from Kramer Levin to the SEC providing certain information about the value of the Coriglianos' assets. To the extent any such documents or information was turned over to the government, Forbes has it – in the form of the September 4, 2003 letter and the exhibits thereto, which Forbes has attached to subpoena KL#2 as Exhibit M – and he is entitled to nothing more. His demands to know what else Mr. Corigliano may have provided to Kramer Levin that he speculates may not have been disclosed to the government and to inspect imagined internal Kramer Levin confidential work-product relating to any such information are nothing more than improper attempts to pry into the attorney-client relationship, fish around to see what might turn up, and gain access to privileged and confidential client-to-attorney communications and attorney work-product, all for the improper purpose of hoping to find something with which to impeach Mr. Corigliano on a collateral issue. The demands should therefore be quashed.

      v.      Legal Fees Advanced By Cendant

In calls KL#1/6, 7 and 9 (Ex. D) and CC#1/12 and 13 (Ex. A), counsel for Forbes demands from Kramer Levin and from Mr. Corigliano documents relating to legal fees paid by Cendant for services rendered after April 15, 1998, including specific requests concerning fees for services rendered "in connection with the 2004 trial." As the Court is aware from prior briefing, Cendant's advancement of legal fees on behalf of Mr. Corigliano, like its advancement of legal fees on behalf of defendants Shelton and Forbes, arises out a legal duty imposed under Cendant's by-laws to advance such fees until there is a "final disposition" of any actions against him. Case law dispositively establishes that a guilty plea is not a "final disposition" in a criminal case. *See Bergonzi v. Rite Aid Corp.*, No. Civ. A 20453-NC, 2003 WL 22407303 (Del. Ch. Oct. 20, 2003) (holding that Rite Aid was required to continue to advance

KL3:2469827.2

attorney's fees to a former officer who was a cooperating government witness until there was a "final disposition" of that witness's case, and that a guilty plea was not a "final disposition").

The fact that Cendant has advanced fees on behalf of defendants Forbes and Shelton – who have persisted in denying their culpability in the Cendant/CUC earnings fraud, but who nevertheless have by all reports received much larger advancements than those made to Mr. Corigliano's attorneys – further demonstrates that such advancement is not in any sense a reward for or benefit of cooperation. And as noted at the outset of this memorandum, it would be particularly ironic for counsel for Forbes to argue that legal fees advanced by Cendant constitute a "benefit" to Mr. Corigliano when a significant portion of those fees were incurred and continue to be incurred responding to and fighting off the torrent of improper subpoenas served on, and unfounded accusations leveled against, Mr. Corigliano and his attorneys by Forbes' counsel.

Accordingly, there is no proper basis on which evidence of Cendant's advancement of fees could be admissible and all of the calls demanding documents for the purpose of establishing the amount of those advancements with respect to Mr. Corigliano should be quashed.

    vi.  Receiver Documents

In a separate subpoena served on Neil Cartusciello, Esq., the court-appointed Receiver overseeing Mr. Corigliano's SEC settlement, counsel for Forbes includes fourteen separate calls – every one of which begins with the presumptively improper fishing expedition language "*all documents*" – seeking in effect the Receiver's entire file, including but not limited to: (i) communications between the Receiver and (a) Mr. Corigliano, (b) his wife, (c) his mother-in-law, (d) all of their counsel, (e) the SEC, and (f) the U.S. Attorneys Office, all concerning the

SEC settlement (Receiver/1-5) and the Kramer Levin and Fried Frank retainers (Receiver/6-9); and (ii) all documents relating to the turnover of the Corigliano family assets to the Receiver (including, as noted above, a special demand for documents relating to the transfer to the Receiver of the lot known as 38 Watrous Point Road, which transfer counsel for Forbes knows never took place) (Ex. I). In addition, counsel for Forbes seeks again to invade Mr. Corigliano's attorneys' work files, demanding that Kramer Levin produce "all documents" sent to or received from the Receiver, to the extent copies of such documents were also sent to or received by Mr. Corigliano. KL#2/3 (Ex. E).

It hardly needs repeating that this series of "all documents" demands, which would capture virtually every memo, email and note that the Receiver (or his counsel) created in discharging his obligations and every document exchanged between Kramer Levin and the Receiver, represents a classic improper fishing expedition in the "hope" that something might turn up. *See supra* Point III.C (citing cases). In addition, it is difficult to imagine how the Receiver's notes or memos concerning hearsay conversations with Mr. Corigliano's wife or mother-in-law or their attorneys, or even with counsel for the SEC or representatives of the U.S. Attorney's Office, could be anything more than inadmissible double or triple hearsay, failing the most basic test for a Rule 17(c) demand – admissibility. As to the demand for all documents provided by Kramer Levin to the Receiver, as noted in Point IV.G, *supra*, the Court has already ruled on the September 4, 2004 Affidavit that we forwarded to the Receiver (granting Forbes certain parts and denying him others) and Forbes has no idea about – and therefore is simply improperly fishing around for – any additional documents we might have provided in our capacity as Mr. Corigliano's counsel.