not satisfied when a request calls for "all documents" is contrary to law.  Mot. at 13.

Nixon, 418 U.S. 683, itself upheld requests for "*all* tapes and other electronic and/or

mechanical recordings or reproductions, *and any* memoranda, papers, transcripts,

and other writing relating to" certain, specifically identified conversations.  Ex. 6

(subpoena requests addressed by the Court in Nixon) (emphasis added).  Moreover,

while the case cited by Mr. Corigliano and Kramer Levin, United States v. RW

Professional Leasing Services, 228 F.R.D. 158 (E.D.N.Y. 2005), found some "all

document" requests to be too broad, the court found other "all document" requests to

be sufficiently specific to meet the requirements of Rule 17(c).  In short, the requests

must be read as a whole.  As discussed in detail below, Mr. Forbes' requests have

been carefully drafted to meet this requirement, going so far as to use multiple calls

covering a single subject area in order to avoid any issue of over-breadth.  Indeed,

many of the requests that Mr. Corigliano and Kramer Levin object to as being

repetitive of prior, quashed requests are substantially revised from those prior

requests *specifically to meet the subpoenaed parties' prior objection that they were

not sufficiently particular.*  Having insisted on more specificity, Mr. Corigliano and

Kramer Levin should not be heard to now claim that these requests have previously

been ruled upon.

### A.    Rule 17(c) Subpoenas Extend to Prior Inconsistent Statements, Contradiction Evidence, and Evidence of Bias and Motive.

Rule 17(c) subpoenas are governed by the test set forth in Nixon, which

requires the party seeking production to show "that the documents are evidentiary."

418 U.S. at 699.  This Court has previously ruled that this requirement necessitates

that the documents being sought are potentially "admissible." See, e.g., Tr. 5/19/2004 at 1511.  Although Mr. Forbes respectfully disagrees with the Court's analysis, as discussed *infra*, even under an "admissibility" standard, prior inconsistent statements of a witness, documents that impeach by contradiction, and documents that impeach by establishing bias are procurable through Rule 17(c).

Mr. Corigliano and Kramer Levin attempt to narrow this category by arguing that "cumulative" documents should not be procurable pursuant to Rule 17(c).  Mot. at 17-18.  Neither Mr. Corigliano nor Kramer Levin can cite to any authority for this novel proposition that Rule 403 can be used to limit Rule 17(c), as opposed to limiting the introduction of documents produced.  To the contrary, their argument is flatly contradicted by the standard for Rule 17(c) subpoenas, which requires only that documents be *potentially* admissible.  See, e.g., Tr. 5/19/2004 at 1511.

Mr. Corigliano and Kramer Levin also attempt to narrow this category of documents by implying that if a document also demonstrates that Mr. Corigliano has lied, it is barred by Federal Rule of Evidence 608's prohibition against admitting extrinsic evidence for the purpose of attacking or supporting the witness' character for truthfulness.  Yet Federal Rule of Evidence 608 makes clear that evidence which contradicts a witness on a non-collateral matter, evidence that reveals his bias, or evidence which impeaches by way of a prior inconsistent statement is admissible, *even if it also reveals a lie*.  The 2003 amendments to Fed. R. Evid. 608 clarify this:

> The Rule has been amended to clarify that the absolute
> prohibition on extrinsic evidence applies only when the
> *sole reason* for proffering that evidence is to attack or
> support the witness' character for truthfulness.  On
> occasion the Rule's use of the overbroad term "credibility"
> has been read to bar extrinsic evidence for bias,
> competency and contradiction impeachment since they too
> deal with credibility.  The amendment conforms the
> language of the Rule to its original intent, which was to
> impose an absolute bar on extrinsic evidence only if the
> *sole purpose* for offering the evidence was to prove the
> witness' character for veracity.
>
> By limiting the application of the Rule to proof of a
> witness' character for truthfulness, the amendment leaves
> the admissibility of extrinsic evidence offered for other
> grounds of impeachment (such as *contradiction*, prior
> *inconsistent statement, bias* and mental capacity) to Rule
> 402 and 403.

Fed. R. Evid. 608, advisory committee's note, 2003 amendments (citations omitted,

quotations omitted & emphasis added).  Each of the relevant subcategories is

discussed below.

### 1.    Prior Statements of the Witness as Impeachment.

There is no question but that witness statements and documents

evidencing oral statements of a witness, including notes and memoranda, may be

obtained by subpoena.  Prior statements of a witness may be used in cross-

examination, and become admissible should the witness deny the statement.

> The admissibility facet of <u>Nixon</u> also must be assessed in
> perspective of the principle that a prior inconsistent
> statement, otherwise inadmissible as hearsay, may be
> admissible for the limited purpose of impeaching the
> witness.  And, of course, if the witness, after being
> afforded an opportunity to explain or deny the statement,
> does not admit having made the prior inconsistent
> statement, the statement itself is admissible as an
> exhibit.

United States v. King, 194 F.R.D. 569, 574 (E.D. Va. 2000) (citation & internal
quotation omitted).  See also Martin Marietta Corp., 856 F.2d at 621-22 ("interview
notes, transcripts, and electronic recordings" reflecting witness statements are
"evidentiary"); United States v. LaRouche Campaign, 841 F.2d 1176, 1180 (1st Cir.
1988) (videotape of interview likely to reveal "inconsistent statements"); United
States v. Cuthbertson, 630 F.2d 139, 144 (3d Cir. 1980) ("Under the 'evidentiary'
standard of Bowman, rule 17(c) permits a party to subpoena materials that may be
used for impeaching a witness called by the opposing party, including prior
statements of the witness."); King, 194 F.R.D. at 574 ("[S]tatements useful for
impeachment purposes are evidentiary within the meaning of Nixon. . . ."); United
States v. Messino, 882 F. Supp. 115, 115-16 (N.D. Ill. 1995) (defendant "entitled to
subpoena [impeachment] material under Rule 17(c)" including "reports of interview"
when witness testifies at trial); United States v. Myerson, 684 F. Supp. 41, 45-46
(S.D.N.Y. 1988) (ordering production of the accounts of interviews).   Moreover,
when a prior inconsistent statement of a witness is reflected in notes taken by a
third party, the notes may be used to impeach the witness if they contain a
substantially verbatim statement of the witness or have been adopted by the
witness, and if the proper foundation is laid for the notes to constitute a past
recollection recorded of the note-taker under Fed. R. Evid. 803(5).  See United
States v. Almonte, 956 F.2d 27, 29 (2d Cir. 1992) (per curiam).

### 2.    Impeachment with Evidence of Bias and Motive.

Documents reflecting negotiations with the government, benefits
conferred by the government, and other documents evidencing bias or motive are

also procurable by a Rule 17(c) subpoena.  See Martin Marietta Corp., 856 F.2d at

622 (correspondence and notes reflecting settlement negotiations between

corporation and government are "evidentiary" to defendant's allegation that

corporation made him a scapegoat); LaRouche Campaign, 841 F.2d at 1180

(documents evidencing "bias"); Messino, 882 F. Supp. at 116 (defendant "entitled to

subpoena [impeachment] material under Rule 17(c)" including "documents

reflecting any agreements, promises, plea bargains, immunity letters or orders, or

any other benefit conferred" when witness testifies at trial).  Documents in this

category can always be used as the basis for cross-examination, and may be

admitted into evidence if the witness denies the evidence of bias after being given

an opportunity to explain or deny it.  See United States v. Harvey, 547 F.2d 720,

722 (2d Cir. 1976).

Bias evidence includes not only that evidence tending to show that the

witness may have lied in order to obtain a beneficial plea agreement, but anything

that could "reveal any present and continuing reasons for the witness to fabricate

his testimony in return for *future* prosecutorial favors."  United States v. Lynn, 856

F.2d 430, 433 (1st Cir. 1988) (emphasis added).  This latter category of bias would

include evidence that the witness had breached his plea agreement with the

government, and thus has motive to fabricate testimony in hopes that the

government will not act upon the breach.  In Lynn, for example, the court held that

it was error to exclude evidence that the witness had not successfully completed a

polygraph exam when successful completion was a condition of the plea agreement.

"There is no question of the relevance of the intended area of inquiry – [the witness's] motivation to lie to continue to curry favor with the government." Id. Similarly, the court noted that a desire to protect assets that may still be subject to forfeiture can provide a witness with motive to fabricate testimony. Id. at n.5.

### 3.     Impeachment by Contradiction.

Impeachment by contradiction is not governed by Rule 608(b), which prohibits the use of extrinsic evidence of conduct to impeach a witness's character for truthfulness.  A witness can always be impeached on a non-collateral matter. And even extrinsic evidence of collateral matters can be admitted if the door has been opened during direct examination.

### a.     Impeachment by Contradiction as to Non-Collateral Matters.

It is axiomatic that extrinsic evidence which contradicts a witness's testimony on a *non-collateral* matter can be admitted into evidence.  Moreover, in the Second Circuit, ***"[t]he determinative question in deciding whether extrinsic evidence contradicting a witness's testimony is admissible is not whether the contradicting extrinsic evidence is material or collateral, but rather whether the assertions that the impeaching party seeks to contradict are themselves material or collateral."*** Rosario v. Kuhlman, 839 F.2d 918, 925-26 (2d Cir. 1988) (emphases added).  Thus, even if the extrinsic evidence itself is collateral, it is admissible if it contradicts the witness's testimony on a material matter.  Rosario is illustrative.  There, the defendant's conviction rested on the testimony of an eye-witness who claimed to have been in the neighborhood to visit

his girlfriend.  The state court had precluded the proffered testimony of a witness

who stated that the witness had not even met the girlfriend until months after the

incident.  The Second Circuit affirmed the issuance of a writ of *habeus corpus*,

finding that the eye-witness's account concerning his girlfriend "was part of the

background and circumstances of his observation of the crime.  Moreover, as a

matter of human experience, he could not have been mistaken about [the girlfriend]

if his story was true."  Id. at 926 (internal quotations and citations omitted).

> **b.    Impeachment by Contradiction as to Collateral
> Matters When the Door Has Been Opened by Direct
> Examination.**

The Second Circuit also permits impeachment on *collateral* matters

when the witness' direct testimony opens the door to such impeachment.  See

United States v. Benedetto, 571 F.2d 1246, 1250 (2d Cir. 1978) ("Once a witness

(especially a defendant-witness) testifies as to any specific fact on direct testimony,

the trial judge has broad discretion to admit extrinsic evidence tending to contradict

the specific statement, *even if such statement concerns a collateral matter in the*

*case*." (emphasis added)) (citing Walder v. United States, 347 U.S. 62 (1954)); see

also United States v. Garcia, 900 F.2d 571, 575 (2d Cir. 1990) ("It was only after

Camacho reopened the issue on redirect-examination and created the false

impression that the arrest had *not* involved drugs that the court allowed admission

of the arrest record.  Thus the record was admitted not to impeach Camacho's

general credibility through extrinsic evidence, see Fed. R. Evid. 608(b), but to

contradict a false statement made by Camacho in his redirect testimony.").

For example, in <u>Walder</u>, 347 U.S. 62, a defendant charged with the unlawful sale of narcotics testified not only that he had not committed the crime alleged in the indictment, but also that he had *never* possessed illegal narcotics. The Supreme Court upheld the trial court's subsequent admission of a police officer's testimony that drugs had previously been seized at the defendant's home – *an incident not charged in the indictment* – holding that "there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the [opposing party's] disability to challenge his credibility." <u>Id</u>. at 65; <u>accord</u> <u>United States v. Bufalino</u>, 683 F.2d 639 (2d Cir. 1982) (defendant testified that not only did he not order that a particular person be killed as charged in the indictment, but that he had never told anyone to kill the person, thus opening the door to a tape recording from an *earlier crime* when he had ordered that the person be eliminated); <u>United States v. Cuadrado</u>, 413 F.2d 633, 635 (2d Cir. 1969) ("Where a defendant in his direct testimony falsely states a specific fact, the prosecution will not be prevented from proving, either through cross-examination or by calling its own witnesses, that he lied as to that fact.") (internal quotations omitted).

Second Circuit precedent makes clear that this principle applies to witnesses with equal force as to defendants. For example, in <u>United States v. Wallach</u>, 935 F.2d 445 (2d Cir. 1991), the key witness against the defendant had lied during his direct examination about his compulsive gambling – claiming that he had stopped gambling after he began cooperating with the government. The witness's gambling had nothing to do with the substantive charges in the case, so

the fact that he lied about his gambling went only to his character for truthfulness. The Second Circuit nonetheless reversed the conviction because evidence that the witness had lied about gambling had not been put before the jury. The court based its decision on the finding that the government should have known of the witness's perjury and thus corrected the record. The court also held, however, that "[e]ven assuming the government had no knowledge of the perjury at the time of trial, we believe that reversal would still be warranted" because additional evidence that the witness had in fact continued to gamble had come out months after the trial. Id. at 458. "This additional information in itself provides a sufficient basis for granting the defendants a new trial." Id. Of course, there would be no point in granting a new trial based upon newly discovered evidence if the new evidence were not admissible.

Similarly, in United States v. Seijo, 514 F.2d 1357 (2d Cir. 1975), the Second Circuit granted a new trial because there was evidence that the government's star witness had lied about his past marijuana use, and evidence of that lie had not been made available to the defense. As in Wallach, the false testimony affected "only his credibility as a witness." Id. at 1364. Nonetheless, the court reversed the conviction noting that "the test is whether there was a significant chance that this added item, developed by skilled counsel . . . could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." Id. Again, implicit in the test articulated by the court and in the reversal itself, is the premise that this extrinsic evidence should have been admitted even though it went solely to

the witness's character for truthfulness.

### B. Extrinsic Evidence Which Can Be Used To Confront a Witness, but Which Is Inadmissible in and of Itself, Is Nonetheless Discoverable Under Rule 17(c).

Documents may also be secured through Rule 17(c) if they can be used to confront a witness with facts inconsistent with his testimony, even if the document itself is not admissible. In this respect, Mr. Forbes respectfully disagrees with the Court's ruling that only documents that can be *admitted* during the trial can be subpoenaed pursuant to Rule 17(c). Mr. Forbes is unaware of any controlling authority which precludes the use of a Rule 17(c) *trial* subpoena (as opposed to a *pre-trial* subpoena) to procure documents that could provide the good faith basis for a cross-examination question, even if the document itself is inadmissible. Moreover, at least one case from a district court within the Second Circuit, <u>United States v. Orena</u>, 883 F. Supp. 849 (E.D.N.Y. 1995), implies that Rule 17(c) can be used as Mr. Forbes contends. In <u>Orena</u>, the defendant sought the production of surveillance reports through a Rule 17(c) subpoena. The government objected on the grounds that the reports were inadmissible hearsay, and thus not subject to subpoena under Rule 17(c). The court rejected the government's argument. The court first noted that the surveillance reports were "at least potentially admissible" as either a recorded recollection under Rule 803(5) or as a business record under Rule 803(6). <u>Id</u>. at 868. The court also proffered an alternative basis for holding the records met the "evidentiary" requirement of <u>Nixon</u> – *that they "might also form the basis for*

27

*eliciting certain testimony at trial."* Id. (emphasis added).[9]  Mr. Forbes respectfully submits that the Orena court had it right; documents that may themselves be excludable as extrinsic evidence, but which nonetheless can form the basis for a cross-examination question, should be produced in response to a Rule 17(c) subpoena.

## III.    THE DOCUMENTS SOUGHT HERE SHOULD BE PRODUCED.

### A.    The "Renewal Subpoenas".[10]

Mr. Forbes served Cosmo Corigliano and Kramer Levin with one subpoena each that simply renewed, word-for-word, requests served upon them prior to or during the first trial (the "Renewal Subpoenas"). As explained in the cover letter accompanying these subpoenas, they were served to make clear that Mr. Forbes was seeking these documents for return during his retrial as opposed to pre-trial or at the first trial. See Corigliano Ex. GG and Section I(A), *supra*. Mr. Forbes relies on the arguments made in his earlier pleadings with regard to these requests, as well as his arguments below to the extent they address requests that may constitute a subset of the requests in the Renewal Subpoenas.[11]

---

[9] Although the Court in Nixon used the term "admissibility" in describing the three hurdles a prosecutor must clear when issuing a Rule 17(c) subpoena, it also used the term "evidentiary," Nixon, 418 U.S. at 699, as did Bowman Dairy Co. v. United States, 341 U.S. 214, 219-20 (1951). Use of a document to form the good faith basis for a cross-examination question is certainly "evidentiary."

[10] This section corresponds to Section IV(A) of the Motion to Quash (p. 19), and addresses KL#4/Renewal (Corigliano Ex. G) and CC#3/Renewal (Corigliano Ex. C).

[11] See, e.g., CC#3/Renewal, calls 21 & 22 (Corigliano Ex. C) and KL#4/Renewal, call 1 (Corigliano Ex. G), which overlap with the subpoena requests discussed below.

Kramer Levin included a number of subpoenas served on financial institutions in its discussion of the "renewal" subpoenas. Corigliano Exs. N-R. Mr. Forbes did serve subpoenas on these entities prior to the first trial, but his retrial subpoenas are substantially narrower. Thus Mr. Forbes addresses them in Section III(F), *infra,* rather than here.

### B.    The Coriglianos' Expenditures Between April and July 2004.[12]

There can be no serious dispute that between April 1, 2004 and July 7, 2004, Mr. Corigliano paid a number of expenses out of the assets to be disgorged to the SEC. Thus, Mr. Corigliano's expenditures between April and July 2004 constitute a benefit to him, regardless of how or when the government decided to allow Mr. Corigliano to make these expenditures. In the first trial, Mr. Forbes requested documents sufficient to identify any such expenditures over $1,000, Corigliano Ex. AA, and the Court ordered that those documents be produced, Tr. 8/2/2004 at 9121. Mr. Corigliano subsequently produced a printout of expenditures from the personal finance files he maintained on his computer. See DX2336.

Mr. Forbes has now requested any other expenditures made during this same period, regardless of amount. Contrary to Mr. Corigliano's and Kramer Levin's argument, Motion at 25-26, the Court has not ruled on such a request in the past, although it follows from the Court's prior ruling that such material should be

---

[12] This section corresponds to Section IV(F) of the Motion to Quash (pp. 25-26), and addresses CC#1, calls 5-8 (Corigliano Ex. A); People's, calls 1-4 (Corigliano Ex. K); MBNA, calls 2, 4, 6 & 8 (Corigliano Ex. L); Citibank #1, calls 2, 4, 10 & 12 (Corigliano Ex. M).

produced.  Nor can the Court's *denial* of Mr. Corigliano's motion to quash the prior

subpoena be construed as a decision that Mr. Corigliano's prior production was *all*

Mr. Forbes is entitled to in this area.

Mr. Forbes is entitled to a full accounting of these expenditures.  His

requests to Mr. Corigliano, Citibank, MBNA and People's Bank seeking this

information should not be quashed.

Further discussion of the facts which support Mr. Forbes' requests, but

which reveals his confidential trial strategy, is set forth in the supplemental

memorandum being filed *ex parte* and under seal.

### C.    Documents Exchanged and Communications with the Government and Cendant, Including Subpoena Exhibits A-V.[13]

Time and again, Mr. Corigliano used his counsel as a shield, arguing

that he had no idea what had been submitted to the government on his behalf, or

even that the government was requesting certain information.  For example, when

questioned about the house valuation he had provided to his attorneys in 2003, Mr.

Corigliano denied all knowledge that the information was to be forwarded to the

SEC:

> Q.   You felt that that was comparable to your property.
> And that is the document that was provided as a
> comparable; am I correct?
>
> A.   To my attorneys only.

---

[13] This section corresponds to Sections IV(H) & (I) of the Motion to Quash (pp. 28-31), and addresses KL#1, calls 1, 2, 4-6 (Corigliano Ex. D); CC#1, calls 16-17 (Corigliano Ex. A).

Q.  Through your attorneys?

A.  To my attorneys.  That was my understanding.

Q.  Right.  And I gather -- I'll pull this back.

You understood that they were assembling materials, like
the sailboat valuation and like the financials on the
candle company, in order to provide valuation information
to the SEC in the context of negotiations, right?

A.  No, I didn't have an understanding that they were
going to give it to the SEC.  That was not my
understanding.

Tr. 8/3/2004 at 9352-53.  When confronted with the financial statement submitted

by his attorneys to the SEC during the negotiation of the budget agreement in 2000,

Mr. Corigliano testified that he had not reviewed the financial statement before it

was submitted, and did not think he had ever seen it.  Tr. at 7976-78.  He

acknowledged, however, that he had provided his attorneys with "all his financial

information" at the time, and thus he did not deem it necessary to review what they

submitted to the SEC.  Id.  Mr. Corigliano gave similar testimony concerning the

annualized budget forwarded to the SEC, Tr. at 7990, and the Wells submission

communicated on his behalf, Tr. 7/20/2004 at 8038.

Mr. Forbes does not seek documents reflecting that these items were

copied to Mr. Corigliano simply to impeach Mr. Corigliano's testimony that he did

not receive these items.  Indeed, Mr. Corigliano's testimony is incredible enough on

its face, particularly when considered in light of the fact that a lawyer would

typically keep a client informed of significant developments in a case, especially the

forwarding of financial information that the client was legally obligated to provide

to the government.  Rather, Mr. Forbes seeks to admit the documents – and

31

evidence of Mr. Corigliano's knowledge of them – to demonstrate the full extent and actual nature of the relationship between the government and its key witness, the benefits conferred upon him, and the manner in which those benefits were obtained.

Mr. Corigliano's and Kramer Levin's objection that these documents are privileged should be rejected out of hand. The attorney-client privilege does not attach unless information is transmitted for the purpose of obtaining legal advice, and does not extend to shield every piece of paper exchanged between attorney and client. Documents to or from third parties, copied to the client, fall well outside the purview of the privilege. See, e.g., United States v. Hall, 346 F.2d 875, 882 (2d Cir. 1965) (message conveyed from USAO to client through defense counsel not privileged because "[d]efense counsel served merely as a conduit for transmission of a message"). Indeed, Mr. Corigliano was legally obligated to provide information to the SEC upon request. DX300, Schedule A at 7. He cannot avoid that obligation by having his attorneys perform it, and then claim privilege to protect the underlying information provided to his counsel.[14]

Further discussion of the facts which support Mr. Forbes' requests, but which reveals his confidential trial strategy, is set forth in the supplemental memorandum being filed *ex parte* and under seal.

---

[14] Any legal advice that may have accompanied the transmittal of the documents may simply be redacted, and cannot justify withholding the document altogether.

### D. Budget and Living Expense Information and Other Financial Information Mr. Corigliano Provided His Counsel.[15]

As discussed above, Mr. Corigliano attempted to distance himself from the financial and living expense information provided to the SEC in the spring of 2000 by claiming that he had simply provided the requested information to his counsel, and then never saw what was actually submitted by his counsel to the SEC. Tr. at 7976-78, 7990. Mr. Corigliano cannot shield this financial information by passing it to the SEC through his counsel – particularly in light of his legal obligation to provide the material to the SEC. DX300, Schedule A at 7. "[I]t is well established that communications between an attorney and his client, though made privately, are not privileged if it was understood that the information communicated in the conversation was to be conveyed to others." United States v. Tellier, 255 F.2d 441, 447 (2d Cir. 1958). If a client intends that the information he provides to counsel will be disclosed to third parties, then his communications with counsel concerning that information are not protected by the attorney client privilege. See id.; United States v. Rosenthal, 142 F.R.D. 389, 392 (S.D.N.Y. 1992) ("If a client communicates material to his attorney with an understanding that it will be communicated to others, the communication as well as related details will not be considered privileged because the requisite confidentiality has not existed from the outset.") (citing Tellier); Mead Data Cent., Inc. v. Air Force, 566 F.2d 242, 253 (D.C. Cir. 1977) ("If the information has been or is later shared with third

---

[15] This section corresponds to Section IV(N) of the Motion to Quash (p. 38), and addresses KL#3, calls 10-11 (Corigliano Ex. F).

parties, the privilege does not apply.").

In <u>Tellier</u>, for example, the Second Circuit held that attorney-client communications were not privileged where the client expected his attorney to prepare a letter to a third party that reflected the substance of the communications. 255 F.2d at 447.  The Court held that communications closely related to the disclosure were not privileged either:  the privilege did not apply to any information communicated between the client and the attorney that was "closely connected with the information which was intended to be communicated to [a third party]," <u>id</u>. at 448, and could not be "severed from the entire subject matter" of the contemplated third-party communication.  <u>Id</u>.   Moreover, where "information is given and it is agreed that it is to be transmitted to a third party, then not only the specific information, but the more detailed circumstances relating to it are subject to disclosure," <u>id</u>., as well.

In <u>United States ex rel. Stone v. Rockwell International Corp.</u>, 144 F.R.D. 396 (D. Colo. 1992), the court similarly held that communications between a client and his counsel were not privileged because "the information was provided to counsel so that it could be reduced to written form and submitted to the government."  <u>Id</u>. at 399.  The court observed that, "[i]n essence, counsel merely acted as a conduit in taking factual material supplied by the client and relaying that material to the government."  <u>Id</u>.  The court further determined that the client could not have had any "expectation of privacy" in the communications at issue: "[t]he fact that Stone chose to channel the information through his counsel, rather

than provide it to the government directly, cannot provide a basis for invoking the privilege." Id. at 400.[16]

Nor is this information collateral. It goes to the heart of Mr. Corigliano's bias as it provides the foundation for two of Mr. Corigliano's greatest benefits – the budget he was permitted to live under for nearly four years, and the Consent he ultimately entered into with the SEC. Similarly, to the extent the information provided by Mr. Corigliano failed to satisfy his obligation under the plea agreement to provide the SEC with complete and accurate financial information – by failing, for example, to disclose the retainer agreement – that is evidence of Mr. Corigliano's continued motive to lie in hopes that the government will not act upon the Corigliano's breach of the plea agreement. See Lynn, 856 F.2d at 433. Mr. Forbes is entitled to full disclosure of these matters, and to present the full extent of Mr. Corigliano's bias to the jury.

---

[16] See also United States v. White, 950 F.2d 426, 430 (7th Cir. 1991) (information provided by client to counsel in connection with preparation of bankruptcy petition not privileged "because the information is to be disclosed on documents publicly filed with the bankruptcy court"); United States v. Oloyede, 982 F.2d 133, 141 (4th Cir. 1992) (information communicated by clients to an attorney with the expectation that it would be used in a citizenship application filed with the INS was not privileged); Brimley v. Hardee's Food Sys., No. 93 Civ. 1797 (LAK), 1995 U.S. Dist. LEXIS 1471, at *4, *6 (S.D.N.Y. Feb. 8, 1995) (communications from client to lawyer not privileged where lawyer "was acting as a conduit of information from one side to the other"; "the privilege does not extend to the portion of the client's communication with the lawyer that constitutes the substance of what the client intends the lawyer to communicate to the third party"); Krishna v. Colgate Palmolive Co., No. 90 Civ. 4116 (CSH), 1993 U.S. Dist. LEXIS 17935, at *2 (S.D.N.Y. Dec. 16, 1993) ("Communications made by a client to an attorney with the intent that they be communicated in turn to a third party are not privileged.").

## E.    September 2003 Asset Information.[17]

For the same reasons, the information that Mr. Corigliano provided

Kramer Levin in September 2003 regarding the valuation of his assets for the SEC

should be produced.  There is no dispute that information was requested from, and

produced to, the SEC.  Nor is there a dispute that Mr. Corigliano had a legal

obligation to provide this information, and that it had to be both complete and

accurate.  See DX300, Schedule A at 7 (plea agreement, requiring Mr. Corigliano to

provide complete and accurate information to the SEC upon request).  As Mr.

Corigliano's attorneys appear to have been nothing more than a conduit for this

information, the motion to quash should be denied.

## F.    Documents Concerning the Disposition of the Proceeds of Mr. Corigliano's Illicit Stock Sales.[18]

### 1.    The Coriglianos' SEC Affidavit.

The SEC affidavit constitutes a prior statement of Mr. Corigliano, and

is critical, *inter alia*, to the determination of what benefits Mr. Corigliano has

received from the government.  Mr. Forbes has not sought the affidavit Mr.

Corigliano filed with the SEC by way of a 17(c) subpoena prior to now.  He did seek

a copy of the affidavit by way of a motion to compel filed against the government,

---

[17] This section corresponds to Section V(B)(iv) of the Motion to Quash (pp. 44-45), and addresses KL#3, calls 8-9 (Corigliano Ex. F); CC#2, calls 1-2 (Corigliano Ex. B).

[18] This section corresponds to Section IV(G) of the Motion to Quash (pp. 27-28), and addresses KL#3, call 16 (Corigliano Ex. F); CC#2, call 14 (Corigliano Ex. B).  It also addresses all calls in the subpoenas to Solomon Smith Barney, Fidelity, Fleet Bank, Liberty Bank, and T. Rowe Price, Corigliano Exs. N through R.  Mr. Corigliano and Kramer Levin acknowledge that these subpoenas have been substantially narrowed, yet nonetheless lump them in with the "renewed" requests.  Mot. at 19.

and the Court denied that motion without explanation on October 5, 2004.[19] See Tr. at 14,550.

The Court should reject Mr. Corigliano's and Kramer Levin's contention that the Court's prior ruling resolves the matter, and that the subpoenas are an improper attempt to evade the limitations on discovery under Giglio, Jencks, and Rule 16. Mot. at 15-17. A defendant's Sixth Amendment right to compulsory process and to confront the witnesses against him is not limited by the government's discovery obligations under Giglio, Jencks, and Rule 16. Moreover, Rule 16, Giglio, and Jencks apply to discovery a defendant seeks from the government, not from third party witnesses. Rule 16 of the Federal Rules of Criminal Procedures applies only to the discovery obligations of the government and defendants. It has no application to documents in Mr. Corigliano's possession, custody or control. Similarly, the Jencks Act, by its own terms, applies only to statements in the "possession of the United States." 18 U.S.C. § 3500. It has no application to documents in the possession, custody or control of Cosmo Corigliano. The constitutional obligations imposed by Brady and Giglio also apply only to the government, not to third party witnesses.

The cases that Mr. Corigliano and Kramer Levin cite are not to the contrary. For example, in United States v. Carter, 15 F.R.D. 367 (D.D.C. 1954), the

_____

[19] Mr. Corigliano's testimony was completed prior to the date he was to file the SEC Affidavit, so the motion to compel was necessarily filed after Mr. Corigliano's cross-examination had been completed. Here, of course, we are able to request the document while it can still be used during the cross-examination of Mr. Corigliano.

court addressed a Rule 17(c) subpoena that sought, prior to trial, "all statements of potential witnesses in the files of the Government." Id. at 368 (emphasis added). The court concluded that Rule 16 governed the scope of discovery to which a defendant was entitled from the government, and that Rule 17(c) could not be used to expand a defendant's right to discovery from the government. Id. at 371. Here, of course, Mr. Forbes has not served a Rule 17(c) subpoena on the government, but on a third party witness. And in United States v. Beckford, 964 F. Supp. 1010 (E.D. Va. 1997), the defendants in a federal murder case sought to subpoena state law enforcement agencies. State law enforcement agencies had initiated the investigation of the offenses in question and had subsequently worked together with the federal government on the investigation. Id. at 1013. The government asserted that the documents sought by the Rule 17(c) subpoenas were "in the hands, or under the control, of the [federal] Government." Id. As a result, the government asserted that discovery of the documents was governed by Brady, Jencks, and Giglio. Id. The court approved the subpoenas to the extent they sought materials from entities that were not "part of the Government for Jencks and Brady purposes." Id. at 1014. Thus Beckford does not support Mr. Corigliano's and Kramer Levin's claim that subpoenas to third party witnesses are governed by Brady, Jencks, Giglio, or any other limitations on discovery from the government.

Further discussion of the facts which support Mr. Forbes' requests, but which reveals his confidential trial strategy, is set forth in the supplemental memorandum being filed *ex parte* and under seal.

38

### 2.    Financial Records for Mr. Corigliano's Illicit Proceeds.

Mr. Forbes has also served Rule 17 subpoenas on a number of financial institutions that appear to have received proceeds of Mr. Corigliano's sales of Cendant[20] stock: Citibank (Corigliano Ex. N), T. Rowe Price (Corigliano Ex. O), Liberty Bank (Corigliano Ex. P), Fidelity (Corigliano Ex. Q), and Fleet Bank (Corigliano Ex. R). Although Mr. Forbes did serve subpoenas on these same financial institutions prior to the first trial, in light of Mr. Corigliano's objection that the requests were too broad, Motion of Non-Party Cosmo Corigliano to Quash Rule 17(c) Subpoenas, dated February 14, 2003, at 10 n.5, Mr. Forbes has narrowed the requests substantially in order to make clear that he seeks only those documents sufficient to trace the proceeds of Mr. Corigliano's illicit stock sales. Like the SEC affidavit discussed above, these subpoenas to Mr. Corigliano's financial institutions specifically describe documents concerning the disposition of the illicit proceeds from Mr. Corigliano's Cendant stock sales, and should be produced.

Further discussion of the facts which support Mr. Forbes' requests, but which reveals his confidential trial strategy, is set forth in the supplemental memorandum being filed *ex parte* and under seal.

---

[20] As used herein, the term Cendant includes its predecessor CUC and all of the other Cendant Entities described in the subpoenas.

G.   **Agreements with the SEC Concerning Expenditures Between April 16, 2004 and July 7, 2004, and Concerning the Coriglianos' Retainers.**[21]

Mr. Corigliano testified that he was permitted to continue to pay ordinary and reasonable expenses up to July 7, 2004, the date by which he had to turn over his assets, Tr. 8/3/04 at 9389, and that he was able to continue to use the retainer to pay his legal expenses so long as his legal troubles continued, Tr. 8/3/2004 at 9367-72.  Contrary to Mr. Corigliano's and Kramer Levin's arguments, nothing in the text of the Consent Agreement (DX1060) supports either interpretation.  Mot. at 24-25.  Nor, contrary to the assertions of Mr. Corigliano and Kramer Levin, does Mr. Frohlich's testimony support Mr. Corigliano's understanding, which may explain why they cite back to Mr. Corigliano's testimony in their Motion, and not to the testimony of Mr. Frohlich.  Id.

The Court did not have the benefit of Mr. Frohlich's testimony when it quashed Mr. Forbes' request for this information during the first trial.  Nor did the Court know at that time that the government would reverse positions – initially offering to stipulate that there was an oral agreement concerning the retainer accounts, Gov't Opp'n to Forbes Trial Motion No. 28, at 6-8, but now claiming that there is no oral agreement between Mr. Corigliano and the SEC, Gov't Opp'n to Forbes Retrial Mot. No. 3, at 3.  Further discussion of these requests' relevance, but which reveals Mr. Forbes' confidential trial strategy, is set forth in the

---

[21] This section corresponds to Sections IV(E) and (B) of the Motion to Quash (pp. 19-22 & 24-25), and addresses KL#1, calls 3 & 5 (Corigliano Ex. D).

supplemental memorandum being filed *ex parte* and under seal.

Indeed, Mr. Corigliano and Kramer Levin do not argue that the requested documents are irrelevant. Instead, they argue that no agreements – and thus no responsive documents – exist. Mot. at 24-25. That documents do not exist is not a basis for quashing a subpoena, however. Mr. Corigliano and his counsel should be required to respond to the subpoenas with written confirmation that no responsive documents exist, in a form admissible at trial, in order that the absence of any such documents may be demonstrated to the jury.

## H.    Dates of Meetings with the Government Since the 2004 Trial.[22]

The dates that Mr. Corigliano met with the government since the end of his testimony on August 4, 2004 are relevant to his bias. There has probably never been a more prepared witness than Cosmo Corigliano; he met with the government no less than 65-75 times prior to his testimony in the first trial. Tr. 7/14/2004 at 7500. Undoubtedly, he has continued to have multiple meetings with the government in preparation for the second trial. The extent of these meetings is clearly evidence of his bias, and demonstrates what has no doubt been a significant amount of time devoted to refining and reshaping his testimony.

That Mr. Corigliano appears to have either purposely failed to create documents memorializing these dates, or discarded those documents, when he knew that the Court required him to produce such records in the first trial, is deeply

---

[22] This section corresponds to Section V(A)(i) of the Motion to Quash (p. 40), and addresses KL#1, call 14 (Corigliano Ex. D); CC#1, call 18 (Corigliano Ex. A).

troubling. Mot. at 40. Given the fact that Mr. Corigliano has made it impossible to establish these dates through his own documents, his counsel should be required to produce documents from their own records – whether it be billing records (with privileged material redacted), calendars, or expense reports – sufficient to establish these dates.

As discussed *supra* in Section III(F), the fact that the government is also obligated to produce such information under Brady/Giglio does not relieve Mr. Corigliano of his obligations under Rule 17(c).

## I.    Legal Fees Advanced by Cendant.[23]

The legal fees advanced by Cendant are evidence of bias in several respects. First, the advancement of fees to the cooperating witnesses for their assistance in the case against Mr. Forbes (as opposed to their own cases) is evidence of the bias of *Cendant*.[24] While Mr. Corigliano and Kramer Levin argue that Cendant is obligated to pay these fees, Cendant has taken the position that it need not pay the legal fees of former officers and directors when they are appearing as mere witnesses. Cendant has invoked this interpretation of its indemnification obligations in denying fees to those witnesses who testified on behalf of the defense in the first trial, such as Chris McLeod and Robert Tucker, while continuing to pay

---

[23] This section corresponds to Section V(B)(v) of the Motion to Quash (pp. 45-46), and addresses KL #1, calls 6-7, 9 (Corigliano Ex. D); CC#1, calls 12-13 (Corigliano Ex. A).

[24] Cendant stands to gain substantially if Mr. Forbes is convicted, and several Cendant-affiliated persons are named in the government's witness list, including the company's Chief Executive Officer, Henry Silverman.