the legal fees of witnesses it deemed favorable to the government, such as Mr. Corigliano and Ms. Pember.

Second, the fact that the cooperators are being treated differently than other witnesses by Cendant evidences the cooperators' bias as well. They certainly have an incentive to assist Cendant in its efforts to secure the conviction of Walter Forbes, which would result in substantial gain to Cendant, so long as Cendant continues to pay their legal expenses, while simultaneously refusing to do so for other witnesses.

Further discussion of the facts which support Mr. Forbes' requests, but which reveals his confidential trial strategy, is set forth in the supplemental memorandum being filed *ex parte* and under seal.

### J.    Receiver Documents.[25]

Neither Mr. Corigliano nor Kramer Levin has pointed to any authority which would give them standing to object to the subpoenas served on the Receiver, Mr. Cartusciello. As Mr. Cartusciello has not filed a motion to quash, he should be required to produce the responsive documents promptly.

Even if Mr. Corigliano or Kramer Levin had standing, their motion should be denied. As explained above, there remain serious questions concerning whether Mr. Corigliano has complied with his obligations under the Consent

---

[25] This section corresponds to Section V(B)(vi) of the Motion to Quash (pp. 46-48), and addresses KL#2, call 3 (Corigliano Ex. E); Receiver Subpoena, all calls (Corigliano Ex. I); Crystal Journey Subpoena, call 1 (Corigliano Ex. J).

Agreement with the SEC, and whether there are additional agreements between

Mr. Corigliano and the SEC which permit him to retain benefits that would

otherwise be subject to disgorgement under the Consent. Communications with the

SEC concerning these topics – and even more importantly, documents reflecting the

Receiver's actual actions in these areas – are important evidence of what the true

agreement is between Mr. Corigliano and the government.

Further discussion of the facts which support Mr. Forbes' requests, but

which reveals his confidential trial strategy, is set forth in the supplemental

memorandum being filed *ex parte* and under seal.

### K.    Kramer Levin Retainer.[26]

Subsequent to the filing of their Motion, Mr. Corigliano and Kramer

Levin agreed to provide Mr. Forbes a letter reflecting the current balance of Mr.

Corigliano's retainer.

The retainer agreement is relevant and admissible for reasons

separate and apart from the original amount of the retainer (the information

previously sought by Mr. Forbes).[27] The Retainer Agreement is a prior statement

adopted by Mr. Corigliano. The retainer agreement between Mr. Corigliano and

Kramer Levin customarily would have made clear to Mr. Corigliano that the unused

portion of the retainer had to be returned to him upon termination of the

---

[26] This section corresponds to Section IV(B) of the Motion to Quash (pp. 19-22), and addresses KL#1, calls 1-2 (Corigliano Ex. D); CC#1, call 10 (Corigliano Ex. A).

[27] Mr. Forbes acknowledges that Mr. Shelton previously sought the retainer agreement itself, and Mr. Forbes joined in his arguments on this issue.

44

representation, including in the event Mr. Corigliano chose to terminate his counsel. The agreement would thus contradict Mr. Corigliano's purported understanding that the money did not "belong" to him, Tr. 7/20/2004 at 8110, and would be admissible as a prior inconsistent statement.

Moreover, it is clear that the SEC would have considered the retainers an asset of the Coriglianos as the SEC has long considered such retainers subject to disgorgement. See, e.g., SEC v. Credit Bancorp, Ltd., 109 F. Supp. 2d 142, 145 (S.D.N.Y. 2000) (evaluating the terms of the retainer agreement and holding that the retainer was part of the frozen receivership estate because it was the asset of the client, not the law firm); SEC v. Princeton Econ. Int'l Ltd., 84 F. Supp. 2d 443, 446 (S.D.N.Y. 2000); SEC v. Comcoa Ltd., 887 F. Supp. 1521, 1528 (S.D. Fla. 1995), aff'd subnom., Levine v. Comcoa Ltd., 70 F.3d 1191 (11th Cir. 1995).

While Mr. Corigliano and Kramer Levin would like the Court to believe this is a "collateral matter," next to the Old Saybrook properties, the Kramer Levin and Fried Frank retainers remain the largest assets left to the Coriglianos. Moreover, once again, to the extent the retainer agreement makes clear that Mr. Corigliano should have disclosed its existence in his various submissions to the SEC, it is evidence of yet another breach of the plea agreement, and provides one more reason for Mr. Corigliano to lie in hopes that he will curry favor with the government. See Lynn, 856 F.2d at 433. Thus, the retainer can hardly be considered a "collateral matter" in this case.

45

L.    **Fried Frank Retainer.**[28]

Fried Frank has objected to producing the retainer agreement between Mrs. Corigliano and the law firm. For the reasons stated above with regard to the Kramer Levin retainer agreement, the Fried Frank agreement should be produced.

M.    **Kramer Levin Billing Records Provided to Cendant.**[29]

Discussion of the facts which support Mr. Forbes' requests, but which reveals his confidential trial strategy, is set forth in the supplemental memorandum being filed *ex parte* and under seal.

N.    **Communications Between Mr. Corigliano and Kramer Levin Between April 1998 and January 2000, and Kramer Levin's Proffer Sessions with the Government.**[30]

Mr. Forbes seeks documents evidencing Mr. Corigliano's communications with Kramer Levin between April 1998 and January 2000, and documents describing or memorializing Kramer Levin's proffers to the United States government during the same period. Any communications with Kramer Levin which Mr. Corigliano intended to be disclosed to a third party are not privileged. See United States v. Tellier, 255 F.2d 441, 447 (2d Cir. 1958). But even if they were, the crime/fraud exception would vitiate the privilege.

---

[28] This section corresponds to Section IV(C) of the Motion to Quash (p. 22), and addresses KL #1, call 3 (Corigliano Ex. D); CC#1, call 11 (Corigliano Ex. A).

[29] This section corresponds to Section IV(D) of the Motion to Quash (pp. 23-24), and addresses KL#1, call 8 (Corigliano Ex. D).

[30] This section corresponds to Section IV(J) of the Motion to Quash (pp. 31-33), and addresses KL#3, calls 12-15 (Corigliano Ex. F); CC#2, calls 3-6 (Corigliano Ex. B).

When investigators began to focus on Mr. Corigliano's past misconduct at CUC, he made the decision to lie in order to save himself – to proclaim his innocence. To implement this strategy of lying to proclaim his innocence, he employed his lawyers as instrumentalities of his fraud.[31] Mr. Forbes is not seeking to discover communications and work product concerning crimes Mr. Corigliano committed before he retained counsel. Mr. Forbes is seeking to discover communications and work product concerning frauds and crimes that were committed or ongoing *after* Mr. Corigliano retained counsel; frauds and crimes that were committed using his counsel. This is classic conduct subject to the crime-fraud exception to the privilege.

The crime-fraud exception applies when (1) the client communication or attorney work product in question was itself made in furtherance of the crime or fraud; and (2) probable cause exists to believe that the particular communication or attorney work product was intended in some way to facilitate or to conceal the criminal activity. In re Richard Roe, 168 F.2d 69, 71 (2d Cir. 1999). The second element focuses on the intent of the client, not the lawyer. Indeed, the crime-fraud exception applies when the lawyer is unwittingly used as a tool to perpetrate a fraud. See In re Grand Jury Subpoena, 731 F.2d 1032, 1038 (2d Cir. 1984) ("Such communications are properly excluded from the scope of the privilege even if the attorney is unaware that his advice is sought in furtherance of such an improper

---

[31] Mr. Forbes is not alleging that Kramer Levin was aware that the facts that it was relaying from Mr. Corigliano to the government were false; however, the fact that Kramer Levin may have been used unwittingly is of no consequence.

purpose." (collecting cases)); cf. 18 U.S.C. § 2(b) (criminalizing the act of willfully

causing an innocent actor to commit a crime).

The meaning of "probable cause" in this context was recently discussed

at length by the First Circuit in In re Grand Jury Proceedings, 417 F.3d 18 (1st Cir.

2005). There the Court reviewed a plethora of decisions from across the country

and concluded:

> As we read the consensus of precedent in the circuits, it is
> enough to overcome the privilege that there is a
> reasonable basis to believe that the lawyer's services were
> used by the client to foster a crime or fraud. The circuits
> – although divided on the articulation and on some
> important practical details – all effectively allow piercing
> of the privilege on something *less* than a mathematical
> (more likely than not) probability that the client intended
> to use the attorney in furtherance of a crime or fraud.
> This is a compromise based on policy but so is the
> existence and measure of the privilege itself.

Id. at 23 (emphasis added).

As the Supreme Court itself has recognized, a lesser showing is

required to "trigger in camera review than is required ultimately to overcome the

privilege." United States v. Zolin, 491 U.S. 554, 572 (1989). To obtain in camera

review, the party seeking disclosure need only present evidence to "support a

reasonable belief that in camera review may yield evidence that establishes the

exception's applicability." Id. at 574-75. The reason for this lower standard was

also explained by the First Circuit:

> Precisely because of the initial barrier of the privilege, it
> is very hard for an adversary unaided to show that the
> privileged communications were themselves corrupt, so
> the requirements for access cannot be set too high. And,

48

if the communications were innocent, the initial look may
often not damage the client.

In re Grand Jury Proceedings, 417 F.3d at 23.

Several examples of conduct by Mr. Corigliano meeting this "probable
cause" standard for application of the crime fraud exception are described below.

### 1.    The False Exculpatory Letter to Cendant

The facts relating to this issue are simple.  Mr. Corigliano testified
that on April 17, 1998, he knowingly provided a false exculpatory letter to Cendant.
Tr. 7024-28.  His lawyers assisted in preparing the letter.  Tr. 7676, 7679.  This
evidence provides probable cause to conclude that Mr. Corigliano used his lawyers
to commit frauds and crimes against Cendant.

This conduct arguably constitutes mail fraud, among other things.
There was a scheme to defraud and to obtain money or property from Cendant by
means of materially false and fraudulent pretenses.  Mr. Corigliano, employing the
assistance of his lawyers, was seeking to obtain money (such as severance
payments) from Cendant based on false representations. Mr. Corigliano knowingly
and willfully participated in the scheme with the specific intent to defraud Cendant;
and there was a use of the mails.  See 18 U.S.C. § 1341.  Thus, at a minimum, the
communications between Mr. Corigliano and his counsel concerning the preparation
of this letter are subject to the crime-fraud exception.

### 2.    The False Exculpatory Proffer Session

The facts here are also straightforward.  At trial, Mr. Corigliano
conceded that he committed crimes on January 13, 1999 by making numerous false

49

statements to the government.  See, e.g., 18 U.S.C. § 1001 (proscribing material

false statements to government agent), 18 U.S.C. § 1505 (proscribing obstruction of

justice).[32]

> Moreover, that Mr. Corigliano's decision to lie was not an impromptu
decision is evidenced by his testimony that he had come up with the "cover" story he
told the United States Attorney's Office concerning the March 6, 1998 meeting
previously, and had discussed it on several earlier occasions.  Tr. 7/12/2004 at 7033.

> Mr. Corigliano also testified that, with respect to communications with
counsel, he "had many discussions with my counsel in preparation for the meeting."
Tr. at 7610.  He further testified:

> Q.   You thought long and hard about what you were going to say at
>       the meeting?
>
> A.    I -- as I said before, I knew that I was going to lie to them in hopes
>       that it would go away.

Tr. at 7610.

> Given these facts, the preparation sessions conducted by his attorneys
are precisely the types of matters covered by the crime-fraud exception to the
privilege, and the defense has a right to cross-examine Mr. Corigliano about these
sessions.  Indeed, such evidence showing Mr. Corigliano's ability to manipulate and
deceive several experienced counsel, at a time when he was not responsible to, or
being directed by, anyone from CUC, is critical to respond to the government's

---

[32] The Supreme Court has held that a mere exculpatory "no" is a violation of 18
U.S.C. § 1001.  Brogan v. United States, 522 U.S. 398 (1998).  Here, the lies of Mr.
Corigliano were elaborate, extensive, and numerous.

efforts to portray Mr. Corigliano as lying only when required to do so by his job.

### 3.    The False Exculpatory Attorney Proffer Sessions

Not only did Mr. Corigliano himself provide false exculpatory statements to the government, but his lawyers did the same on August 7, 1998 and November 17, 1998. See Ex. 7 (letter from the government). Mr. Corigliano's false statements, made knowingly and directly to the government, were violations of 18 U.S.C. § 1001. The attorney proffer sessions were also part of Corigliano's fraudulent conduct. The mere fact that his lawyers were intermediaries through whom his lies were conveyed to the government does not change the analysis. Willfully causing an innocent actor to make a material false statement to the government is a violation of 18 U.S.C. §§ 1001 and 2(b). The unresolved question is whether Mr. Corigliano knew that his lawyers would make false exculpatory statements to the government.

Based on the evidence already in the record, there is a reasonable basis to conclude that Mr. Corigliano did know his attorneys would make false exculpatory statements on his behalf to the government. First, Mr. Corigliano clearly developed a strategy to lie his way out of trouble, as evidenced by the letter to Cendant's Board of Directors, and his continued protestations of innocence until January 2000. Second, an attorney would certainly not make unauthorized statements to the government in a matter as serious as the one facing Mr. Corigliano. Third, the false exculpatory statements provided by Mr. Corigliano's lawyers were consistent with the false exculpatory statements that he later provided to the government directly, and that he had previously communicated to

51

Cendant with the assistance of his counsel.[33]

\* \* \* \* \* \* \* \*

Each of these instances warrants application of the crime fraud exception in this

case.

### O.    Polygraph-Related Documents[34]

Mr. Forbes relies upon, and incorporates herein, the arguments he

made in his Motion for Permission to Examine Mr. Corigliano on Polygraph

Examinations (Forbes Retrial Motion *In Limine* No. 21), Docket No. 1730, filed on

September 22, 2005.

### P.    Documents Concerning "Benefits" from Cooperation.[35]

It is undisputed that the benefits conferred upon Mr. Corigliano as a

result of his cooperation go to the heart of Mr. Forbes' defense. And as the Court

held in the first trial, evidence of such benefits is both relevant and admissible.

---

[33] Moreover, the fact that the purported results of a polygraph examination were used to bolster Mr. Corigliano's credibility and denials of wrongdoing in the November proffer is a critical line of inquiry. Of particular importance to the crime-fraud issues are (1) whether Mr. Corigliano understood when he took the polygraph exam that positive results would be communicated to the government; (2) whether Mr. Corigliano was told that his lawyers were going to communicate the alleged positive polygraph results to the government, or was told after the fact about such disclosure (it is difficult to imagine that he was wholly unaware of the disclosure); and (3) the circumstances surrounding the second polygraph exam, including when it was taken, when it was disclosed to the government, and what was said about it when it was disclosed. See Tr. 8032-33.

[34] This section corresponds to Section IV(K) of the Motion to Quash (pp. 33-36), and addresses KL#3, calls 1-7 (Corigliano Ex. F); CC#2, calls 7-13 (Corigliano Ex. B).

[35] This section corresponds to Section IV(L) of the Motion to Quash (pp. 36-37), and addresses CC#1, call 15 (Corigliano Ex. A).

See, e.g., Tr. 8/3/04 at 9340-45 (Court's ruling with regard to the People's Bank appraisal, finding *inter alia*, that the appraisal was relevant to Mr. Corigliano's bias). Thus, Mr. Forbes' request for documents evidencing any such benefits should not be quashed.

Nor should Mr. Corigliano's assertion that he is not aware of any documents responsive to this request be a basis for quashing the requests. Rather, Mr. Corigliano and his counsel should be required to respond to the subpoenas with written confirmation that no responsive documents exist.

### Q.   Connecticut Board of Accountancy.[36]

Mr. Corigliano and Kramer Levin erroneously argue that Mr. Forbes' request for communications between Mr. Corigliano and the Connecticut Board of Accountancy has already been quashed. As Mr. Corigliano and Kramer Levin acknowledge, the request to which they refer was a much broader request that called for all documents concerning any disciplinary proceeding arising from his employment at Cendant. *Mr. Corigliano objected to this prior request on the grounds that it was not sufficiently specific, and that it called for the production of impeachment material prior to trial.* Mr. Forbes' current request cures both objections.

First, the information now sought is narrowly tailored to

---

[36] This section corresponds to Section IV(M) of the Motion to Quash (p. 37-38), and addresses CC#1, call 19 (Corigliano Ex. A) specifically. As discussed throughout this pleading, many of Mr. Forbes' other requests go to specific benefits already known to have been conferred upon Mr. Corigliano.

communications concerning the possible revocation of Mr. Corigliano's C.P.A.

license as a result of his activities at Cendant.  Second, the information is not

"collateral," as the request is limited to any potential revocation based on the very

subject matter of this case – Mr. Corigliano's activities at Cendant.  To the extent

Mr. Corigliano attempted to justify his actions to the Board, such as by explaining

why he believed certain transactions complied with GAAP, that information can be

admitted as both impeachment by contradiction and impeachment by prior

inconsistent statement – that is, to impeach his current position that he was

engaged in an ongoing fraud at the direction of his bosses.

### R.    Post 2004-Trial Communications Relating to the Government and Benefits.[37]

Mr. Corigliano and Kramer Levin deny that there are any documents,

other than Kramer Levin's work product, that are responsive to these requests.

Again, the fact that no documents exist is not a reason to quash a subpoena.  Mr.

Corigliano and his counsel should be required to respond to the subpoenas with

written confirmation that no responsive documents exist.

Moreover, with respect Mr. Corigliano's and Kramer Levin's claim that

the documents are privileged, Mr. Forbes respectfully submits that they are not.

Documents that memorialize an agreement with a third-party, even if only internal

notations of an oral conversation, are not privileged.  The participation of the third

---

[37] This section corresponds to Section V(A)(i) of the Motion to Quash (pp. 39-40), and addresses calls KL#1, calls 10-13 (Corigliano Ex. D); CC#1, call 22 (Corigliano Ex. A).

party vitiates any claim of attorney/client privilege. Nor can any such documents
have been prepared in anticipation of litigation as they concern an *agreement*
between Mr. Corigliano and the government. Thus the requested documents cannot
qualify for work product protection either.

　　　　To the extent the Court finds that the documents nonetheless contain
some fact work product of the author, and the protected information is not capable
of redaction, the defense's overriding need for the information in this case would
overcome any fact work product privilege. See United States v. Marcus Schloss &
Co., Inc., No. 88 CR 796 (CSH) 1989 WL 62729 (S.D.N.Y. June 5, 1989) (balancing
the defendant's need against the lack of prejudice to the witness, and ordering the
production of an attorney's notes of its client's meetings with the government); see
also United States v. Skeddle, 989 F. Supp. 912, 916-17 (N.D. Ohio 1997) (enforcing
trial subpoenas to third parties that called for notes and memoranda prepared by
private investigators of interviews of government witnesses).

　　　　The argument that this information is not discoverable pursuant to a
Rule 17(c) subpoena because it should be produced by the government as
Brady/Giglio material must also be rejected. As discussed above in Section III(F),
the law governing discovery from the government does not limit a defendant's right
to seek similar information directly from a witness pursuant to Rule 17(c).

## S.    Credit Card and Loan Applications.[38]

Counsel for Mr. Forbes previously agreed to limit the requests for credit card and loan applications to the period between August 2000 and July 7, 2004 – the period Mr. Corigliano claims he was subject to the budget agreement with the SEC.  Mr. Forbes is also prepared to revise the request for credit card applications to call only for documents describing or memorializing the Coriglianos' statements concerning their income.

Loan applications are relevant to the true value of Mr. Corigliano's assets – both the assets he was able to keep, and the assets he has disgorged – and thus go to bias.  Moreover, as prior statements by Mr. Corigliano, income, asset and liability valuations in these documents are admissible as prior inconsistent statements to the extent that they are contrary to the valuations to which Mr. Corigliano testified at trial.  These subpoena requests should not be quashed.

## T.    Crystal Journey Candles Documents.[39]

First, neither Mr. Corigliano nor Kramer Levin has pointed to any authority which would give them standing to object to the subpoenas served on Crystal Journey Candles, which Mrs. Corigliano no longer owns.  As the candle

---

[38] This section corresponds to Section V(B)(i) of the Motion to Quash (p. 40), and addresses CC#1, calls 20-21 (Corigliano Ex. A); People's, call 5 (Corigliano Ex. K); MBNA, calls 1, 3, 5, & 7 (Corigliano Ex. L); Citibank #1, calls 1, 3, 9 & 11 (Corigliano Ex. M).

[39] This section corresponds to Section V(B)(ii) of the Motion to Quash (pp. 42-44), and addresses CC#1, calls 1-4 (Corigliano Ex. A); Crystal Journey LLC, calls 2-6 (Corigliano Ex. J).

company has not filed a motion to quash, it should be required to produce the responsive documents promptly.

Even if Mr. Corigliano or Kramer Levin had standing, their motion should be denied. Mr. Forbes' request for documents relating to the benefits received by Mr. and Mrs. Corigliano from Crystal Journey Candles is far from a fishing expedition. It is well known that Mrs. Corigliano purchased the company in 1999 with the illicit proceeds of Mr. Corigliano's stock sales, and that Mr. Corigliano has been employed by the company since that time. Again, any benefits they derived from the company go directly to Mr. Corigliano's bias.

Further discussion of the facts which support Mr. Forbes' requests, but which reveals his confidential trial strategy, is set forth in the supplemental memorandum being filed *ex parte* and under seal.

U.    **2000-2003 Property Taxes.**[40]

Mr. Corigliano erroneously claims that the property tax payments to Old Saybrook are disclosed in the quarterly statements filed with the SEC. In fact, the quarterly statements combine all property taxes into a single line entry – making it impossible to determine what taxes were paid for Mr. Corigliano's two pieces of real estate in Old Saybrook and what taxes were paid for his parents' home in Trumbull or his personal property (automobiles).

Further discussion of the facts which support Mr. Forbes' requests, but

---

[40] This section corresponds to Section V(B)(iii) of the Motion to Quash (p. 44), and addresses CC#1, call 9 (Corigliano Ex. A).

which reveals his confidential trial strategy, is set forth in the supplemental

memorandum being filed *ex parte* and under seal.

## IV. SHOULD THE COURT QUASH ANY OF MR. FORBES' SUBPOENA REQUESTS, RESPONSIVE DOCUMENTS SHOULD BE SUBMITTED UNDER SEAL SO THAT THE FULL RECORD IS PRESERVED FOR ANY APPEAL.

For the reasons articulated above, each of the subpoena requests

served by Mr. Forbes is appropriate under Rule 17(c).  Should the Court grant Mr.

Corigliano's or Kramer Levin's Motion to Quash in any respect, however, any

responsive documents should be filed under seal with the Court in order to preserve

a record of the denied material for purposes of any appeal.

## CONCLUSION

For the foregoing reasons, Mr. Forbes respectfully requests that the

Court deny Mr. Corigliano's and Kramer Levin's Motion to Quash.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: _Brendan V. Sullivan_

Brendan V. Sullivan, Jr. (Bar No. ct17115)
Barry S. Simon (Bar No. ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
COWDERY, ECKER & MURPHY, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

Dated:  October 11, 2005

# EXHIBIT 1

**INDEX TO ARGUMENTS**

| Subpoena | Call # | Motion to Quash Argument Section | Opposition Argument Section |
|---|---|---|---|
| Kramer Levin Subpoena #1 (KL#1) | 1. | IV(B) | III(K) |
| | 2. | IV(B) | III(K) |
| | 3. | IV(B) | III(G) |
| | 4. | IV(C) | III(L) |
| | 5. | IV(E) | III(G) |
| | 6. | V(B)(v) | III(I) |
| | 7. | V(B)(v) | III(I) |
| | 8. | IV(D) | III(M) |
| | 9. | V(B)(v) | III(I) |
| | 10. | V(A)(i) | III(R) |
| | 11. | V(A)(i) | III(R) |
| | 12. | V(A)(i) | III(R) |
| | 13. | V(A)(i) | III(R) |
| | 14. | V(A)(ii) | III(H) |
| Kramer Levin Subpoena #2 (KL#2) | 1. | IV(H) | III(C) |
| | 2. | IV(H) | III(C) |
| | 3. | V(B)(vi) | III(J) |
| | 4. | IV(I) | III(C) |
| | 5. | IV(I) | III(C) |
| | 6. | IV(I) | III(C) |
| Kramer Levin Subpoena #3 (KL#3) | 1. | IV(K) | III(O) |
| | 2. | IV(K) | III(O) |
| | 3. | IV(K) | III(O) |
| | 4. | IV(K) | III(O) |
| | 5. | IV(K) | III(O) |
| | 6. | IV(K) | III(O) |
| | 7. | IV(K) | III(O) |
| | 8. | V(B)(iv) | III(E) |
| | 9. | V(B)(iv) | III(E) |
| | 10. | IV(N) | III(D) |
| | 11. | IV(N) | III(D) |
| | 12. | IV(J) | III(N) |
| | 13. | IV(J) | III(N) |
| | 14. | IV(J) | III(N) |
| | 15. | IV(J) | III(N) |
| | 16. | IV(G) | III(F) |
| Kramer Levin Subpoena #4 Renewal (KL#4 Renewal) | 1. | IV(A) | III(A) |
| | 2. | IV(A) | III(A) |
| | 3. | IV(A) | III(A) |
| | 4. | IV(A) | III(A) |
| | 5. | IV(A) | III(A) |
| | 6. | IV(A) | III(A) |
| | 7. | IV(A) | III(A) |

### INDEX TO ARGUMENTS

|  |  |  |  |
|---|---|---|---|
|  | 8. | IV(A) | III(A) |
|  | 9. | IV(A) | III(A) |
|  | 10. | IV(A) | III(A) |
|  | 11. | IV(A) | III(A) |
|  | 12. | IV(A) | III(A) |
|  | 13. | IV(A) | III(A) |
|  | 14. | IV(A) | III(A) |
|  | 15. | IV(A) | III(A) |
|  | 16. | IV(A) | III(A) |
|  | 17. | IV(A) | III(A) |
|  | 18. | IV(A) | III(A) |
|  | 19. | IV(A) | III(A) |
|  | 20. | IV(A) | III(A) |
|  | 21. | IV(A) | III(A) |
|  | 22. | IV(A) | III(A) |
|  | 23. | IV(A) | III(A) |
|  | 24. | IV(A) | III(A) |
|  | 25. | IV(A) | III(A) |
|  | 26. | IV(A) | III(A) |
|  | 27. | IV(A) | III(A) |
|  | 28. | IV(A) | III(A) |
|  | 29. | IV(A) | III(A) |
|  | 30. | IV(A) | III(A) |
|  | 31. | IV(A) | III(A) |
|  | 32. | IV(A) | III(A) |
| Cosmo Corigliano Subpoena #1 (CC#1) | 1. | V(B)(ii) | III(T) |
|  | 2. | V(B)(ii) | III(T) |
|  | 3. | V(B)(ii) | III(T) |
|  | 4. | V(B)(ii) | III(T) |
|  | 5. | IV(F) | III(B) |
|  | 6. | IV(F) | III(B) |
|  | 7. | IV(F) | III(B) |
|  | 8. | V(B)(i) | III(B) |
|  | 9. | V(B)(iii) | III(U) |
|  | 10. | IV(B) | III(K) |
|  | 11. | IV(C) | III(L) |
|  | 12. | V(B)(v) | III(I) |
|  | 13. | V(B)(v) | III(I) |
|  | 14. | V(A)(ii) | III(H) |
|  | 15. | IV(L) | III(P) |
|  | 16. | IV(H) | III(C) |
|  | 17. | IV(H) | III(C) |
|  | 18. | V(A)(ii) | III(H) |
|  | 19. | IV(M) | III(Q) |
|  | 20. | V(B)(i) | III(S) |
|  | 21. | V(B)(i) | III(S) |
|  | 22. | V(A)(i) | III(R) |
| Cosmo Corigliano | 1. | V(B)(iv) | III(E) |

## INDEX TO ARGUMENTS

| | | | |
|---|---|---|---|
| Subpoena #2 (CC#2) | 2. | V(B)(iv) | III(E) |
| | 3. | IV(J) | III(N) |
| | 4. | IV(J) | III(N) |
| | 5. | IV(J) | III(N) |
| | 6. | IV(J) | III(N) |
| | 7. | IV(K) | III(O) |
| | 8. | IV(K) | III(O) |
| | 9. | IV(K) | III(O) |
| | 10. | IV(K) | III(O) |
| | 11. | IV(K) | III(O) |
| | 12. | IV(K) | III(O) |
| | 13. | IV(K) | III(O) |
| | 14. | IV(G) | III(F) |
| Cosmo Corigliano Subpoena #3 (CC#3/Renewal) | 1. | IV(A) | III(A) |
| | 2. | IV(A) | III(A) |
| | 3. | IV(A) | III(A) |
| | 4. | IV(A) | III(A) |
| | 5. | IV(A) | III(A) |
| | 6. | IV(A) | III(A) |
| | 7. | IV(A) | III(A) |
| | 8. | IV(A) | III(A) |
| | 9. | IV(A) | III(A) |
| | 10. | IV(A) | III(A) |
| | 11. | IV(A) | III(A) |
| | 12. | IV(A) | III(A) |
| | 13. | IV(A) | III(A) |
| | 14. | IV(A) | III(A) |
| | 15. | IV(A) | III(A) |
| | 16. | IV(A) | III(A) |
| | 17. | IV(A) | III(A) |
| | 18. | IV(A) | III(A) |
| | 19. | IV(A) | III(A) |
| | 20. | IV(A) | III(A) |
| | 21. | IV(A) | III(A) |
| | 22. | IV(A) | III(A) |
| Neil Cartusciello/Crystal Journey LLC | 1. | IV, V(B)(ii) | III(J) |
| | 2. | V(B)(ii) | III(T) |
| | 3. | V(B)(ii) | III(T) |
| | 4. | V(B)(ii) | III(T) |
| | 5. | V(B)(ii) | III(T) |
| | 6. | V(B)(ii) | III(T) |
| MBNA America Bank | 1. | V(B)(i) | III(S) |
| | 2. | IV(F) | III(B) |
| | 3. | V(B)(i) | III(S) |
| | 4. | IV(F) | III(B) |
| | 5. | V(B)(i) | III(S) |
| | 6. | IV(F) | III(B) |

**INDEX TO ARGUMENTS**

|  |  |  |  |
|---|---|---|---|
|  | 7. | V(B)(i) | III(S) |
|  | 8 | IV(F) | III(B) |
| People's Bank | 1. | IV(F) | III(B) |
|  | 2. | IV(F) | III(B) |
|  | 3. | IV(F) | III(B) |
|  | 4. | IV(F) | III(B) |
|  | 5. | V(B)(i) | III(S) |
| Citibank #1 | 1. | V(B)(i) | III(S) |
|  | 2. | IV(F) | III(B) |
|  | 3. | V(B)(i) | III(S) |
|  | 4. | IV(F) | III(B) |
|  | 5-8 | Omitted in Subpoena |  |
|  | 9. | V(B)(i) | III(S) |
|  | 10. | IV(F) | III(B) |
|  | 11. | V(B)(i) | III(S) |
|  | 12. | IV(F) | III(B) |
| Citibank #2 | All | IV | III(F)(2) |
| Receiver #1 | 1. | IV(G), V(B)(vi) | III(J); III(F) |
|  | 2. | IV, V(B)(vi) | III(J) |
|  | 3. | IV, V(B)(vi) | III(J) |
|  | 4. | IV, V(B)(vi) | III(J) |
|  | 5. | IV, V(B)(vi) | III(J) |
|  | 6. | IV, V(B)(vi) | III(J) |
|  | 7. | IV, V(B)(vi) | III(J) |
|  | 8. | IV, V(B)(vi) | III(J) |
|  | 9. | IV, V(B)(vi) | III(J) |
|  | 10. | IV | III(J) |
|  | 11. | IV | III(J) |
|  | 12. | IV | III(J) |
|  | 13. | IV | III(J) |
|  | 14. | IV | III(J) |
| T. Rowe Price | All | IV | III(F)(2) |
| Liberty Bank | All | IV | III(F)(2) |
| Fidelity | All | IV | III(F)(2) |
| Fleet | All | IV | III(F)(2) |

# EXHIBIT 2

## DECLARATION OF MARGARET A. KEELEY

I, Margaret A. Keeley, counsel for Walter A. Forbes, declare as follows:

1. I am a partner in the law firm of Williams & Connolly LLP ("Williams & Connolly"). I submit this affidavit in support of Mr. Forbes' Opposition to the Motion to Quash filed by Cosmo Corigliano and Kramer Levin Naftalis & Frankel LLP ("Kramer Levin").

2. Kramer Levin asked for a meet and confer telephone conference concerning the subpoenas dated July 17, 2005.

3. Williams & Connolly concurred, but explained that additional subpoenas were being prepared.

4. It was thus agreed that Williams & Connolly would send Kramer Levin the schedules to be attached to the forthcoming subpoenas in advance of the teleconference. Williams & Connolly further agreed to extend the return date of the subpoenas already served so that all the subpoenas could be addressed together in a single motion.

5. I called Eric Tirschwell of Kramer Levin on the day of the teleconference to obtain the appropriate e-mail address for this purpose, but did not hear back from Mr. Tirschwell until shortly before the call was scheduled.

6. I suggested at that time that the meet and confer call be postponed to allow Kramer Levin time to review the subpoena schedules e-mailed to it.

7. During the meet and confer itself, Kramer Levin expressed its opinion that requests in the "non-renewal" subpoenas were in fact "renewals."

8. Williams & Connolly responded that there were categories of documents that the Court had previously addressed that Mr. Forbes did intend to press further with the Court given the fact that many of the requests had been revised in response to Mr. Corigliano's and Kramer Levin's previous objections, and in light of the additional evidence garnered since the Court's prior rulings.

9. Williams & Connolly was prepared to go through each subpoena request during the meet and confer, but Kramer Levin expressed its view that it would not be helpful to go through the subpoenas request by request.

10. After Kramer Levin had filed the Motion to Quash, a second meet and confer was held in order to determine if the issues for the Court's consideration could be narrowed.

11.    The call proceeded much along the lines of the prior meet and confer.

12.    Counsel for Mr. Forbes reiterated that they were required to serve subpoenas for purposes of the retrial in order to preserve the requests.

13.    Williams & Connolly also confirmed that Mr. Forbes intended to include additional argument in his Opposition as to the categories of documents Kramer Levin addressed in Section IV of its Motion.

14.    Williams & Connolly also advised Kramer Levin that Mr. Forbes would be including additional argument concerning the subpoenas issued to financial institutions through which the proceeds of Mr. Corigliano's stock sales flowed.

15.    Kramer Levin agreed to provide a letter reflecting the balance of Mr. Corigliano's retainer, as it had been ordered to do in the first trial.

16.    Williams & Connolly agreed to narrow the request for credit card applications to the time period of the SEC budget agreement – August 2000 through July 2004, but Kramer Levin stated that it nonetheless still objected to this narrowed request for credit card applications.

17.    I and the other attorneys from Williams & Connolly participated in both meet and confers in good faith, and consistent with our duties to our client, Walter A. Forbes.


        I declare under penalty of perjury under the laws of the Untied States

of America that the foregoing is true and correct.  Executed this 11th day of October

2005.


                                        Margaret A. Keeley