# EXHIBIT 3

## Keeley, Meg

| | |
|---|---|
| **From:** | Keeley, Meg |
| **Sent:** | Monday, September 26, 2005 10:02 PM |
| **To:** | Tirschwell, Eric |
| **Subject:** | RE: Motion to Quash |

Eric,
We were going to suggest 10/7 and 10/14 given openings are scheduled for the 17th, and I assume the Judge is going to want some time to review the material submitted. Would that be agreeable to you?

---

**From:** Tirschwell, Eric [mailto:etirschwell@KRAMERLEVIN.com]
**Sent:** Mon 9/26/2005 7:32 PM
**To:** Keeley, Meg
**Subject:** RE: Motion to Quash

Meg--

We understand that openings were pushed back and are now scheduled for
10/17. In light of that, we would propose a more manageable briefing
schedule for both sides -- 10/6 for you and 10/19 for us -- which gives
13 days to each of us (although there are holidays in both periods,
including Columbus Day and Yom Kippur on our side). Please let me know
if this is acceptable. Thanks.


Eric



Eric Tirschwell
Partner
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Tel: 212-715-8404
Fax: 212-715-8394
Email: etirschwell@KRAMERLEVIN.com
http://www.kramerlevin.com



This communication (including any attachments) is intended solely for the recipient(s) named above and may contain
information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this
communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender
by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.


-----Original Message-----
From: Keeley, Meg [mailto:MKeeley@wc.com]
Sent: Thursday, September 22, 2005 10:49 AM
To: Tirschwell, Eric
Subject: RE: Motion to Quash

Eric,

We can agree to September 4th for our Opposition, and September 11th for
your Reply. We believe 7 days should be sufficient for a reply brief,
and the trial commencement date does not allow us to agree to any
further delay. If you wish to discuss this further, you should be able
to reach me at the hotel after 3pm today.

Regards,
Meg

------------------------------------------------------------

NOTICE:

This message is intended for the use of the individual or entity to
which it is addressed and may contain information that is privileged,
confidential and exempt from disclosure under applicable law. If the
reader of this message is not the intended recipient or the employee or
agent responsible for delivering this message to the intended recipient,
you are hereby notified that any dissemination, distribution or copying
of this communication is strictly prohibited. If you have received this
communication in error, please notify us immediately by reply or by
telephone (call us collect at (202) 434-5000) and immediately delete
this message and all its attachments.

=============================================================

# EXHIBIT 4

## DECLARATION OF BARRY S. SIMON

I, Barry S. Simon, counsel for Walter A. Forbes, declare as follows:

1.      I am a partner in the law firm of Williams & Connolly LLP ("Williams & Connolly"). I submit this affidavit in support of Mr. Forbes' Opposition to the Motion to Quash filed by Cosmo Corigliano and Kramer Levin Naftalis & Frankel LLP ("Kramer Levin").

2.      A meet and confer concerning the subpoenas served upon Cosmo Corigliano and Kramer Levin was held among counsel prior to Kramer Levin filing the Motion to Quash.

3.      During the meet and confer, Kramer Levin expressed its opinion that requests in the "non-renewal" subpoenas were in fact "renewals."

4.      Williams & Connolly responded that there were categories of documents that the Court had previously addressed that Mr. Forbes did intend to press further with the Court given the fact that many of the requests had been revised in response to Mr. Corigliano's and Kramer Levin's previous objections, and in light of the additional evidence garnered since the Court's prior rulings.

5.      Williams & Connolly was prepared to go through each subpoena request during the meet and confer, but Kramer Levin expressed its view that it would not be helpful to go through the subpoenas request by request.

6.      After Kramer Levin had filed the Motion to Quash, a second meet and confer was held in order to determine if the issues for the Court's consideration could be narrowed.

7.      The call proceeded much along the lines of the prior meet and confer.

8.      Counsel for Mr. Forbes reiterated that they were required to serve subpoenas for purposes of the retrial in order to preserve the requests.

9.      Williams & Connolly also confirmed that Mr. Forbes intended to include additional argument in his Opposition as to the categories of documents Kramer Levin addressed in Section IV of its Motion.

10.      Williams & Connolly also advised Kramer Levin that Mr. Forbes would be including additional argument concerning the subpoenas issued to financial institutions through which the proceeds of Mr. Corigliano's stock sales flowed.

11.      Kramer Levin agreed to provide a letter reflecting the balance of Mr. Corigliano's retainer, as it had been ordered to do in the first trial.

12.     Williams & Connolly agreed to narrow the request for credit card applications to the time period of the SEC budget agreement – August 2000 through July 2004, but Kramer Levin stated that it nonetheless still objected to this narrowed request for credit card applications.

13.     I and the other attorneys from Williams & Connolly participated in both meet and confers in good faith, and consistent with our duties to our client, Walter A. Forbes.


I declare under penalty of perjury under the laws of the Untied States

of America that the foregoing is true and correct.  Executed this 11th day of October

2005.


_____
Barry S. Simon

2

# EXHIBIT 5

## DECLARATION OF ROBERT M. CARY

I, Robert M. Cary, counsel for Walter A. Forbes, declare as follows:

1.      I am a partner in the law firm of Williams & Connolly LLP ("Williams & Connolly"). I submit this affidavit in support of Mr. Forbes' Opposition to the Motion to Quash filed by Cosmo Corigliano and Kramer Levin Naftalis & Frankel LLP ("Kramer Levin").

2.      A meet and confer concerning the subpoenas served upon Cosmo Corigliano and Kramer Levin was held among counsel prior to Kramer Levin filing the Motion to Quash.

3.      During the meet and confer, Kramer Levin expressed its opinion that requests in the "non-renewal" subpoenas were in fact "renewals."

4.      Williams & Connolly responded that there were categories of documents that the Court had previously addressed that Mr. Forbes did intend to press further with the Court given the fact that many of the requests had been revised in response to Mr. Corigliano's and Kramer Levin's previous objections, and in light of the additional evidence garnered since the Court's prior rulings.

5.      Williams & Connolly was prepared to go through each subpoena request during the meet and confer, but Kramer Levin expressed its view that it would not be helpful to go through the subpoenas request by request.

6.      After Kramer Levin had filed the Motion to Quash, a second meet and confer was held in order to determine if the issues for the Court's consideration could be narrowed.

7.      The call proceeded much along the lines of the prior meet and confer.

8.      Counsel for Mr. Forbes reiterated that they were required to serve subpoenas for purposes of the retrial in order to preserve the requests.

9.      Williams & Connolly also confirmed that Mr. Forbes intended to include additional argument in his Opposition as to the categories of documents Kramer Levin addressed in Section IV of its Motion.

10.      Williams & Connolly also advised Kramer Levin that Mr. Forbes would be including additional argument concerning the subpoenas issued to financial institutions through which the proceeds of Mr. Corigliano's stock sales flowed.

11.      Kramer Levin agreed to provide a letter reflecting the balance of Mr. Corigliano's retainer, as it had been ordered to do in the first trial.

12.    Williams & Connolly agreed to narrow the request for credit card applications to the time period of the SEC budget agreement – August 2000 through July 2004, but Kramer Levin stated that it nonetheless still objected to this narrowed request for credit card applications.

13.    I and the other attorneys from Williams & Connolly participated in both meet and confers in good faith, and consistent with our duties to our client, Walter A. Forbes.


I declare under penalty of perjury under the laws of the Untied States of America that the foregoing is true and correct.  Executed this 11th day of October 2005.


*Robert M. Cary*

Robert M. Cary

# EXHIBIT 6

41A

## United States District Court for the District of Columbia

### No. 74–110

#### UNITED STATES OF AMERICA

*v.*

### JOHN N. MITCHELL, ET AL.

To Richard M. Nixon, The White House, Washington, D.C., or any subordinate officer, official, or employee with custody or control of the documents or objects hereinafter described on the attached schedule.

You are hereby commanded to appear in the United States District Court for the District of Columbia at Constitution Ave. & John Marshall Place in the city of the District of Columbia on the        day of                  1974 at ten o'clock A.M. to testify in the case of *United States v. John N. Mitchell, et al.* and bring with you the documents or objects listed on the attached schedule.

This subpoena is issued upon application of the [1] United States.

APRIL 16, 1974.

LEON JAWORSKI,
*Attorney for the United States,*
1425 K St. N.W., Washington, D.C.
*Address*

JAMES F. DAVEY,
*Clerk.*

By ROBERT L. LINE,
*Deputy Clerk.*

[1] Insert "United States," or "defendant" as the case may be.

42A

**RETURN**

Received this subpoena at                            on
and on                    at                  served it on the
within named                                by delivering a copy to
h          and tendering to h          the fee for one day's
attendance and the mileage allowed by law.[2]

By ......................

Dated : ....................... 19..

Service Fees
    Travel ..........  $
    Service ..........
        Total ..........  $

## SCHEDULE OF DOCUMENTS AND OBJECTS TO BE PRODUCED
### BY OR ON BEHALF OF RICHARD M. NIXON

All tapes and other electronic and/or mechanical recordings
or reproductions, and any memoranda, papers, transcripts, and
other writings, relating to:

1. (a) Meeting on June 20, 1972, between the President
and Charles W. Colson from 2:20 to 3:30 p.m. in the
President's Executive Office Building office ("EOB");
(b) telephone conversation on June 20, 1972, between
the President and Mr. Colson from 8:04 to 8:21 p.m.
(placed from the EOB); and (c) telephone conversa-
tion between the President and Mr. Colson from 11:33
p.m. on June 20, 1972, to 12:05 a.m. on June 21, 1972
(placed from residence portion of the White House).

2. Three meetings on June 23, 1972, between the Pres-
ident and H. R. Haldeman from 10:04 to 10.39 a.m.,
from 1:04 to 1:13 p.m., and from 2:20 to 2:45 p.m. Ac-
cording to information furnished by the White House,
the first meeting occurred in the Oval Office, and the
third, in the EOB, with Ronald Ziegler in both cases
present for part of the time. According to Mr. Halde-
man's logs, the second meeting occurred in the Oval
Office.

[2] Fees and mileage need not be tendered to the witness upon service of a
subpoena issued in behalf of the United States or an officer or agency thereof.
28 USC 1825.

13a

3. Meeting on the morning of November 15, 1972, among or between Messrs. Haldeman, John Ehrlichman, and John W. Dean, III in the President's office at Camp David.

4. Meeting and telephone conversation on January 5, 1973, between the President and Mr. Colson from 12:02 to 1:02 p.m. in the EOB and from 7:38 to 7:58 p.m. (placed from Camp David) respectively.

5. Meeting or telephone conversation in or about late January 1973 between the President and Mr. Colson in which E. Howard Hunt, Jr. was discussed.

6. Meetings between the President and Mr. Colson in the Oval Office on February 13, 1973, from 9:48 to 10:52 a.m. and on February 14, 1973, from 10:13 to 10:49 a.m. respectively.

7. Meeting on or about February 20, 1973, between the President and Mr. Haldeman in which Jeb Stuart Magruder was discussed.

8. Meeting on February 27, 1973, between the President and Mr. Dean from 3:55 to 4:20 p.m. in the Oval Office.

9. Meeting on March 17, 1973, between the President and Mr. Dean from 1:25 to 2:10 p.m. in the Oval Office.

10. Meetings on March 20, 1973, between the President and Mr. Haldeman from 10:47 a.m. to 12:10 p.m. (with Mr. Ehrlichman present from 11:40 a.m. on) and from 6:00 to 7:10 p.m. According to Mr. Haldeman's logs, these meetings occurred in the Oval Office.

11. Telephone conversation on March 20, 1973, between the President and Mr. Dean from 7:29 to 7:43 p.m.

12. Meeting on March 21, 1973, between the President and Mr. Ehrlichman from 9:15 to 10:12 a.m. in the Oval Office.

13. Telephonic conversation on March 21, 1973, between the President and Mr. Colson from 7:53 to 8:24 p.m.

14. Meeting on March 22, 1973, between the President and Mr. Haldeman from 9:11 to 10:35 a.m. According to Mr. Haldeman's logs, this meeting occurred in the EOB.

15. Meeting on March 27, 1973, between the President and Mr. Ehrlichman from 11:10 a.m. to 1:30 p.m.,

**44A**

with Mr. Haldeman present from 11:35 a.m. on. Mr. Ziegler and Stephen B. Bull were also present for parts of the time. According to Mr. Haldeman's logs, this meeting occurred in the EOB.

16. Meeting on March 30, 1973, between the President and Mr. Ehrlichman from 12:02 to 12:18 p.m. Mr. Ziegler may also have been present.

17. Telephone conversation on April 12, 1973, between the President and Mr. Colson from 7:31 to 7:48 p.m. (placed from residence portion of the White House).

18. Meeting on April 14, 1973, between the President and Mr. Ehrlichman from 8:55 to 11:31 a.m. in the EOB, with Mr. Haldeman present from 9:00 to 11:30 a.m.

19. Meeting on April 14, 1973, between the President and Mr. Haldeman from 1:55 to 2:13 p.m. in the Oval Office.

20. Meetings on April 14, 1973, among or between the President and Messrs. Ehrlichman and Haldeman from 2:24 to 3:55 p.m. and from 5:15 to 6:45 p.m. in the Oval Office and the EOB respectively.

21. Telephone conversation on April 14, 1973, between the President and Mr. Haldeman from 11:02 to 11:16 p.m. (placed from residence portion of the White House).

22. Telephone conversation on April 14, 1973, between the President and Mr. Ehrlichman from 11:22 to 11:53 p.m. (placed from residence portion of the White House).

23. Meeting on April 15, 1973, between the President and Mr. Ehrlichman from 10:35 to 11:15 a.m. (time approximate) in the Oval Office.

24. Telephone conversation on April 15, 1973, between the President and Mr. Haldeman from 3:27 to 3:44 p.m. (placed from the EOB).

25. Telephone conversation on April 16, 1973, between the President and Mr. Haldeman from 12:08 to 12:23 a.m. (placed from residence portion of the White House).

26. Telephone conversations on April 16, 1973, between the President and Mr. Ehrlichman from 8:18 to 8:22 a.m. and from 9:27 to 9:49 p.m. (placed from and

45ᴀ

received in residence portion of the White House respectively).

27. Meetings on April 16, 1973, among or between the President and Messrs. Haldeman and Ehrlichman from 9:50 to 9:59 a.m. and from 10:50 to 11:04 a.m., both in the Oval Office.

28. Meeting on April 16, 1973, between the President and Mr. Haldeman from noon to 12:31 p.m. in the Oval Office.

29. Meeting on April 16, 1973, between the President and Mr. Ehrlichman from 3:27 to 4:02 p.m. in the EOB. Mr. Ziegler was present from 3:35 p.m. on.

30. Meeting on April 17, 1973, between the President and Mr. Haldeman from 9:47 to 9:59 a.m. in the Oval Office.

31. Three meetings on April 17, 1973, among or between the President and Messrs. Haldeman and Ehrlichman from 12:35 to 2:20 p.m. in the Oval Office (with Mr. Ziegler present for part of the time), from 3:50 to 4:35 p.m. in the Oval Office, and from 5:50 to 7:14 p.m. in the EOB (with then Secretary William P. Rogers present for part of the time).

32. Telephone conversation on April 18, 1973, between the President and Mr. Haldeman from 12:05 to 12:20 a.m. (placed from residence portion of the White House).

33. Meeting on April 18, 1973, between the President and Mr. Ehrlichman from 3:05 to 3:23 p.m. in the Oval Office.

34. Meeting on April 18, 1973, among or between the President and Messrs. Haldeman and Ehrlichman from 6:30 to 8:05 p.m. in Aspen Lodge, Camp David.

35. Meeting on April 19, 1973, among or between the President and Messrs. Haldeman and Ehrlichman from 9:31 a.m. to 10:12 a.m. in the Oval Office.

36. Meetings on April 19, 1973, between the President and Mr. Ehrlichman from 1:03 to 1:30 p.m. and from 5:15 to 5:45 p.m. in the Oval Office and the EOB respectively.

37. Telephone conversation on April 19, 1973, between the President and Mr. Haldeman from 9:37 to 9:35 p.m (placed from the EOB).

46A

38. Telephone conversation on April 19, 1973, between the President and Mr. Ehrlichman from 10:54 to 11:04 p.m. (received in residence portion of the White House).

39. Meetings on April 20. 1973. between the President and Mr. Haldeman from 8:15 to 8:39 a.m. and from 11:07 to 11:23 a.m., both in the Oval Office.

40. Meeting on April 20. 1973, among or between the President and Messrs. Haldeman and Ehrlichman from 12:16 to 12:34 p.m. in the Oral Office.

41. Meeting on April 25. 1973. among or between the President and Messrs. Haldeman and Ehrlichman from 11:06 a.m. to 1:55 p.m. According to Mr. Haldeman's logs, this meeting occurred in the EOB.

42. Meeting on April 25. 1973. between the President and Mr. Haldeman from 4:40 to 5:35 p.m. According to Mr. Haldeman's logs, this meeting occurred in the EOB.

43. Telephone conversations on April 25. 1973. between the President and Mr. Haldeman from 6:57 to 7:14 p.m. and from 7:46 to 7:53 p.m.

44. Telephone conversations on April 25. 1973. between the President and Mr. Ehrlichman from 7:17 to 7:19 p.m. and from 7:25 to 7:39. p.m.

45. Meetings on April 26. 1973. between the President and Mr. Haldeman from 8:55 to 10:24 a.m. and from 3:59 to 9:03 p.m., the latter with Mr. Ehrlichman present from 5:57 to 7:14 p.m. Messrs. Bull and Ziegler were also present at the second meeting for parts of the time. According to Mr. Haldeman's logs, the first meeting occurred in the Oval Office. and the second, in the EOB.

46. Telephone conversations on June 4. 1973. between the President and Mr. Haldeman from 10:05 to 10:20 p.m. and from 10:21 to 10:22 p.m. (both placed from residence portion of the White House).

# EXHIBIT 7

**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

970 Broad Street, Suite 700                                    (973) 645-2700
Newark, New Jersey 07102

April 29, 2003

Martin J. Auerbach, Esq.
Dornbush, Mensch, Mandelstam
 & Schaeffer
747 3rd Avenue
New York, NY 10017

Paul A. Engelmayer, Esq.
Wilmer, Cutler & Pickering
399 Park Avenue
New York, NY 10022

Barry S. Simon, Esq.
Williams & Connolly, LLP
725 Twelfth Street, N.W.
Washington, DC 20005

**VIA FACSIMILE AND U.S. MAIL**

             Re:  United States v. Forbes, et al.
                  No. 3:02CR264 (AWT)

Dear Counsel:

        We write in response to your request for any "innocence
proffers" made by counsel for Government witnesses.

Cosmo Corigliano

        Please be advised that on or about August 7, 1998 and
November 17, 1998, counsel for Cosmo Corigliano provided the
following information:

        With respect to the establishment and use of merger
reserves by CUC, the counsel advised that Corigliano speculated
whether Casper Sabatino could have screwed something up, possibly
not keeping the necessary work papers to support the reserve.
Corigliano thought that the merger reserves were all right at the
time. Corigliano believes that Anne Pember is competent, but

that Sabatino was less competent and that could have contributed to any problem with the reserves.

With respect to the meeting held on or about March 9, 1998, concerning the usage of the Ideon reserve, it was represented that Anne Pember created the schedules used at the meeting and that both Corigliano and Shelton have never seen those schedules before the meeting. Anne Pember also made the presentation of what is in reserves, why she put items in the reserves and things to that effect. After the merger, he was no longer in the financial area and did not know what costs were being charged to the Cendant Reserve. He had no responsibility for these charges.

Corigliano was not a knowing participant in a fraud, he did not falsify or instruct anyone else to falsify any matter. If there were things that were wrong, Corigliano does not know about them. If some things do not comport with proper accounting, it was not because he knowingly did anything wrong. He knew merger reserves were being used to increase earnings, but did not think this was improper. In meetings with Monaco and Silverman, Corigliano was told directly to make the Cendant merger reserves as large as possible. Walter Forbes also communicated this message to him. Corigliano was urged to estimate expenses liberally rather than conservatively as HFS was very comfortable with this position.

Cosmo Corigliano attended a meeting with the senior management of both CUC and HFS where Monaco explained reserves. During the meeting, CUC represented that its reserves were exhaustive. Henry Silverman said they should go back and find more reserves. The AA report understates the knowledge of the people on the HFS side.

What items Anne Pember charged against the Ideon reserve was not known to Corigliano until March 9, 1998. He found it very convincing, however, as did Shelton and Ernst and Young. Kirk Shelton did all the talking at the March 6, 1998 meeting. Mr. Shelton had knowledge roughly equivalent to Corigliano. Shelton was a very hands-on operating guy, while Forbes was more remote. Everyone agrees that Kirk did the talking on March 6 except that Shelton is presently denying that he did the talking. Monaco and Forbes were told by Shelton on March 6, and by Pember on March 9, that the earnings were getting a boost from merger reserves. Everyone at both companies knew this, including Walter Forbes. The notion that merger reserves were being used aggressively to boost earnings was well known and had been going on for years.

2

Corigliano does not understand how merger reserves can be allocated to revenues. Corigliano had no responsibility for charges to the Cendant merger reserves. Corigliano was supposedly shocked by the allegation that Anne Pember did things in the middle of the night. Corigliano believed that Ernst & Young had approved of everything that was done.

Corigliano never told anyone to make unsupported topside adjustments. He believed that the AA report was exculpatory in that Sabatino stated that he was unaware of unsupported topside adjustments while Stu Bell was CFO prior to 1995.

When Corigliano was responsible for topside adjustments, prior to 1995, they were all supported. After Corigliano became CFO and Sabatino assumed responsibility for this area, the numbers were now unsupportable. Corigliano maintains that if any of the adjustments were made on an unsupported basis, it was done by Sabatino alone. Sabatino lied about who is involved in the making of unsupported topside adjustments. Corigliano believed that whatever adjustments were being made at that time were justified. Corigliano denies that he told Sabatino what adjustments to make. It was Sabatino's job to make the adjustments and Corigliano maintains that he lied about Corigliano's directive. Corigliano does not know if the figures for the topsides are false or not. Corigliano has no knowledge of adjustments to revenue, including whether they were part of topside adjustments in 1997. These adjustments do not make sense to Corigliano. Sabatino was incompetent and/or Sabatino cheated to make himself look good.

Corigliano thinks that management from HFS took advantage of the situation and tried to make the accounting problems appear as bad as possible. It was never expected that the stock would drop by 50 percent, maybe 5 percent.

Counsel informed the government that they had polygraphed Corigliano and that he had done very well. They invited the government to polygraph Mr. Sabatino.

<u>Anne Pember</u>

On May 26, 1998, June 19, 1998 and July 10, 1998, counsel for Anne Pember stated as follows to the Government:

Cosmo Corigliano was the chief architect of CUC's overstated earnings. Anne Pember played no part in formulating these practices. Walter Forbes and Kirk Shelton knew of, and

3

approved of, these practices. The auditors suspected but closed their eyes. Whatever data she gave to the former HFS people in New Jersey was also presented to E&Y.

She was one of the people assimilated into helping, mostly at the end of the 1997 fiscal year and the end of the 1997 calendar year, with her involvement being largely in January through March of 1998.

Pember's job at CUC initially related to operational accounting and was very much divorced from the preparation of financial statements. She felt very much at sea in that world since she had not been involved in financial reporting for her prior nine years at Comp-U-Card. Her environment at Comp-U-Card had been accounts payable, accounts receivable, etc. She was neither knowledgeable about, nor experienced with, merger reserve accounting, at least at the start of 1997.

Her promotion was in name only. She was not an authorized signatory for SEC filings. She was not involved in the world of earnings projections. She learned only recently that analysts focus on projections. She was surprised that people out there spent time trying to project earnings, that predictions were published, and that failure to meet the projections could affect the stock price.

She relied heavily on what Corigliano and Shelton told her was proper. She did not think she was falsifying numbers. She thought this was standard business practice. She was confused and asked herself 'who am I to be questioning this?' With respect to merger reserves, she used numbers Corigliano gave her. She reversed Ideon reserves into an operating account in February 1997 when Corigliano and Sabatino asked her to do so. She was told it was okay.

She learned monthly earnings figures being provided to former HFS people were being adjusted upwards on the theory that there would be merger-related savings because some costs could be charged to the merger reserves. She and Sabatino urged breaking out these numbers. Corigliano declined. They raised this with Shelton, who supported Corigliano. Shelton consulted with Walter Forbes and came back and said the numbers were fine. There was a similar practice with respect to projected earnings.

At the time, she was under enormous strain due to family circumstances. She was on autopilot during that time and could not object as loudly because of that. Early September, her father-in-law had open heart surgery and had a stroke on the

4

operating table.  He ultimately died on Christmas Eve.  In
addition, a close friend had terminal cancer and died.  Pember
was in a car accident and was very ill in December 1997.  Her
mother in nursing home had a persistent, unexplained fever.

        She nonetheless expressed concern about what was
happening to Corigliano and Shelton and did things that hurt as
much as they helped.  For example, she sent a schedule to the
auditors that left $45 million out of the Ideon reserve balance.
She deliberately left it out because there was no documentation
for it.  What followed this convinced her that the auditors did
not care and that this was acceptable.  She got better at
refusing to do things later.  For example, she refused to
instruct Speaks to book reserves on a monthly basis in March
1998.  She wouldn't ask Sattler to do something that was
misleading.

        Pember observed, and objected to, the inflation of
earnings for the month of January as described in paragraph 58 of
the superseding indictment.  She thought this practice ultimately
had no net effect because they had to tie off the quarters.

        She bought options with some of her severance money
when she left Cendant, which indicates that she did not believe
the stock price was inflated.

        Sabatino had a greater appreciation than Pember
regarding  what was going into the financials.  Sabatino reported
to Corigliano, not to her.

                              Very truly yours,

                              CHRISTOPHER J. CHRISTIE
                              Special Attorney
                              U.S. Department of Justice


                              By: JOHN J. CARNEY
                              Special Attorney
                              U.S. Department of Justice


                              By: JAMES MCMAHON
                              Special Attorney
                              U.S. Department of Justice

                              5

By: RICHARD SCHECHTER
Special Attorney
U.S. Department of Justice

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Memorandum of Walter A. Forbes in Opposition to Motion of Cosmo Corigliano and Kramer Levin Naftalis & Frankel LLP to Quash Rule 17(c) Subpoenas to be sent on October 11, 2005 to the following via e-mail and FedEx:

Gary P. Naftalis
Eric A. Tirschwell
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

Norman Gross, AUSA
U.S. Attorney's Office
District of New Jersey
401 Market Street
Fourth Floor
Camden, NJ 08101

Michael Martinez, AUSA
Craig Carpenito, AUSA
U.S. Department of Justice
450 Main Street, Room 320
Hartford, CT 06103

Margaret A. Keeley