UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:02CR00264 (AWT) |
| | : | |
| v. | : | October 20, 2005 |
| | : | |
| | : | |
| WALTER A. FORBES | : | |

GOVERNMENT'S OPPOSITION TO DEFENDANT WALTER A. FORBES MOTION TO STRIKE IMPROPER LAY OPINION TESTIMONY BY STEVEN KERNKRAUT AND TO PRECLUDE FURTHER SUCH TESTIMONY

(Forbes Retrial Motion No. 16)

ARGUMENT

**KERNKRAUT'S TESTIMONY REGARDING HIS PERSONAL KNOWLEDGE ABOUT THE WORK OF A WALL STREET ANALYST, AND HIS PERSONAL OBSERVATIONS WHILE WORKING AS AN ANALYST, IS NOT IMPROPER LAY OPINION TESTIMONY.**

Forbes contends that various portions of the testimony of former Bear Stearns Vice President and Research Analyst Steven Kernkraut, presented on the first day of the retrial, amounted to improper lay opinion testimony, in violation of Fed. R. Evid. 701.[1] The Court repeatedly overruled most of Forbes' Rule 701 objections during the retrial, Tr. 110, 128, 144, 168, 170, 173; sustained others, Tr. 119, 168; and sought clarification in

---

[1] Forbes incorporates by reference his memorandum in support of his Retrial Motion *In Limine* No. 3, which raised similar challenges to the testimony of, inter alia, Cosmo Corigliano and Anne Pember. Forbes' Mem. in Support of Retrial Motion No. 16 ("FM") 1. The Government incorporates by references its "Memorandum in Opposition to Forbes Motion *In Limine* No. 3," Docket No. 1741, filed September 27, 2005.

another instance, Tr. 171-72. The Court properly exercised its substantial discretion in ruling on those objections, and Forbes' present motion should be rejected.

>     Fed. R. Evid. 701 provides:
>
>     If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.[2] The rule confers substantial discretion on the trial judge, Trademark Research Corp. v. Maxwell Online, Inc., 995 F.2d 326, 339 (2d Cir. 1993), and authorizes the court to implement "the desirability of allowing parties to introduce evidence in their own way," 4 Weinstein's Federal Evidence ("Weinstein") § 701.02 (2d ed.), § 701.02[2], and not according to rigid requirements. See generally In re Merritt Logan, Inc., 901 F.2d 349, 360 (3d Cir. 1990) (noting that "the modern trend

---

[2] Forbes does not appear to challenge Kernkraut's testimony on the ground that any of his opinions lack a rational connection between his observations and the opinion. He complains in a footnote that one portion of one of Kernkraut's answers was factually incorrect. FM 2, n.1. Testimony is not subject to exclusion merely because it is allegedly wrong; witness credibility is matter for the jury to resolve, and not a basis for exclusion of evidence. In any event, all of Kernkraut's challenged opinions was rationally based on the information available to him. See United States v. Saint Prix, 672F.2d 1077, 1084 (2d Cir. 1982) (tugboat inspector permissibly testified that a particular boat included a father and son, since his opinion was rationally based on observed facts).

favors admission of opinion testimony if founded on a witness's personal knowledge and is susceptible to cross-examination"), quoting Teen-Ed, Inc. v. Kimball Int'l, Inc., 620 F.2d 399, 403 (3d Cir. 1980). Because "Rule 701 liberalizes the common law lay witness rule," the trial court "should interpret the rule in a way that eliminates time-consuming quibbles over objections that would not affect the outcome of the case." Weinstein at § 701.02[2].

As to the first requirement of Rule 701, all of Kernkraut's challenged testimony was based on "some combination of his . . . own personal observation, knowledge, and past experience." Weinstein, § 701.03. Kernkraut testified, for instance, that: there were very few companies that repeatedly had 20 per cent annual growth in earnings, Tr. 114; that CUC's stock price increase was "phenomenal" because only 10 to 20 other companies experienced similar results, Tr. 128-29; and that CUC had engaged in an unusually large number of acquisitions, Tr. 166. Those opinions were based on Kernkraut's extensive observations, experience, and knowledge, compiled during his ten year career as a securities analyst and specialist in retail companies for Bear Stearns, a leading Wall Street brokerage firm. Tr. 97-99. His opinions were also properly informed by his other extensive work experience in business and finance for Dunn & Bradstreet, Manufacturers Hanover Trust, J.C. Penny, and R.H.

Macy, Tr. 96-97, and his present work managing an investment fund. Tr. 94. Kernkraut's extensive personal experience and knowledge acquired on the job is a proper basis for lay opinion testimony. See Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 265 (2d Cir. 1995) (president of a company could testify to how lost profits could be calculated since his testimony was based on his personal knowledge of the business); Wactor v. Spartan Transp. Corp., 27 F.3d 347, 351 (8th Cir. 1994) (lay witnesses could testify about the improper procedure of employing lock lines on tows through locks since it was based on their perceptions and extensive work experience as lockmen).

Likewise, Kernkraut's extensive experience and background in evaluating the financial results of publicly held companies, Tr. 102-08, and his knowledge of financial reporting, Tr. 100-02, fully supported his ability to describe for the jury such concepts as merger reserves, operating earnings, and reported earnings. Tr. 168-70, 172-74.

Kernkraut's testimony that he had developed expertise in the analysis of retail companies, and was regarded as a highly competent analyst by his peers, Tr. 98, 134-35, does not mean that he was offering expert testimony that is circumscribed by Rule 702. For instance, Rule 701 permits a physician to testify as a lay witness pursuant to Rule 701 by describing his medical training and experiences, then describing his observations and

4

treatment of a patient, so long as the witness does not opine about matters that require "scientific, technical, or other specialized knowledge." Davoll v. Webb, 194 F.3d 1116, 1138-39 (10th Cir. 1999)(treating physician could testify as a lay witness in order to establish his medical credentials and his observations based on his personal knowledge, including his treatment of the patient). That is all that Kernkraut's challenged testimony amounts to here.

Forbes erroneously argues that Kernkraut's challenged testimony was "based on reasoning processes that are unfamiliar to the average person in everyday life." FM 3. To the contrary, Kernkraut's challenged testimony was all based on elementary reasoning and the application of, at most, middle school mathematics. None of it was informed by arcane reasoning processes known only to highly-trained specialists. See Brady v. Chemical Const. Corp., 740 F.2d 195, 200 (2d Cir. 1984) (lay witness permissibly "described the facts that he personally had learned during his investigation . . . [and] the conclusions he had reached," which "did not require any specialized knowledge and could have been reached by any ordinary person"); Brandon v. Village of Haywood, 179 F.Supp.2d 847, 858-59 (N.D.Ill. 2001) (treating physician's testimony about his observations of the patient's condition, the treatment provided, and even the diagnosis that the patient had a gunshot wound to his leg, was

5

not subject to the requirements of expert opinion under Fed. R. Evid. 702, although "a doctor would clearly rely on specialized knowledge to distinguish a case of inhalation anthrax and a mere case of pneumonia"); see Commentary to 2000 Amendments to Rule 701 (permissible "lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field,'" citing State v. Brown, 836 S.W.2d 530, 549 (Tenn. 1992).

For instance, Kernkraut's challenged testimony that only a few companies consistently had reported earnings growth of 20% or more, or that CUC had engaged in a large number of mergers, was based on his observations and knowledge of publicly available information that, owing to the nature of his job, he had a professional interest to obtain, study, and understand. See Mattison v. Dallas Carrier Corp., 947 F.2d 95, 110-11 (4th Cir. 1991)(although a "close call," the district court did not abuse its discretion by permitting an eyewitness to testify that flashers did not provide an adequate warning under weather conditions at the time of the accident, where the witness based her opinion on her observations of the accident).  In order for "an average person in everyday life" to reach the same conclusions that Kernkraut did, they would have to merely compare the same, easily understood data that Kernkraut compared.  They

would not have to understand advanced accounting or financial concepts to reach that conclusion. The fact that most people are unaware of that information does not mean that the inferences that Kernkraut drew from that information is beyond the ken of lay persons. See United States v. Martinez-Figueroa, 363 F.3d 679, 682-83 (8th Cir. 2004) (highway patrol officer permissibly gave lay opinion testimony about the purpose of a tractor-trailer operator, since the witness had "first-hand knowledge" of the subject, the explanation "was not particularly technical," even though it "required a knowledge of trucking regulations that an untrained layman might lack"), vacated on other grounds, 125 S.Ct. 1020 (2005); Soden v. Freightliner Corp., 714 F.2d 498, 510-12 (5th Cir. 1983) (lay witness who observed damage to truck when he removed it from the accident site, and who had extensive experience in truck repair and maintenance, permissibly testified that truck design was defective; his conclusion had a rational basis because it would have been apparent to anyone with the same perceptions, knowledge, and experience as the witness).[3]

---

[3] United States v. Garcia, 413 F.3d 201 (2d Cir. 2005), on which Forbes principally relies, is not to the contrary. There, the Court held that the testimony of a DEA agent on the ultimate issue of whether the defendant was guilty of the charged crime, was based on specialized knowledge, because it was informed by his review of thousands of intercepted conversations in the course of various narcotics investigations, as well as his interviews of cooperating witnesses. 413 F.3d at 216. In formulating his opinion that the defendant was a member of the charged conspiracy, the witness also considered "database
(continued...)

Finally, Forbes erroneously complains that Kernkraut's testimony about his personal observations of Forbes' understanding of CUC's business operations and financial results will not be "helpful" to the jury. FM 4-5. This Court did not abuse its discretion by overruling Forbes' objection to this line of testimony.[4]

---

[3](...continued)
information and surveillance observations." Id.

Here, by contrast, Kernkraut's challenged opinions were not informed by his knowledge of arcane information that is exclusively or uniquely available only to a highly specialized group of professionals of whom Kernkraut is a member. Although Kernkraut testified that he had greater access to CUC's corporate management in general, and to Walter Forbes in particular, than most other persons, none of the challenged testimony was predicated, as was the objectionable opinion testimony in Garcia, on that restricted information.

Additionally, the Court's "overarching concern" with the agent's testimony in Garcia, 413 F.3d at 210, was that, unlike Kernkraut's challenged testimony here, the witness testified that it was his conclusion that the defendant was a partner in the charged narcotics-trafficking conspiracy, i.e., that it was the witness's opinion that the defendant was guilty of the charged crime, and that the opinion was based "on the totality of information gathered in the course of [the] investigation." 413 F.3d at 210-11. Here, Kernkraut has offered nothing resembling an opinion that Forbes is guilty of any of the charged crimes, nor has he predicated his opinions on, for instance, the investigations of the Government, the Cendant Audit Committee, or any other group of persons.

[4] The testimony to which Forbes objects on "helpfulness" grounds is contained in the following portion of Kernkraut's testimony (the highlighted portions are those identified by Forbes as objectionable):

   Q. Was it your practice to question Walter Forbes about those key variables of the company?

(continued...)

Forbes' opening statement established that, as during the initial trial in this case, a primary claim of the defense is that Forbes was ignorant of, and therefore did not participate

---

⁴(...continued)
A. Yes, it was my practice to ask about those key variables.

Q: And was Walter Forbes able to answer your questions?

A. Walter Forbes was more than able to answer the questions. **He was very articulate in those matters**.

Q. What do you mean he was more than able to answer them?

MR. SULLIVAN: Sorry. I didn't hear it.

MR. CARPENITO: Okay.

BY MR. CARPENITO:

Q. Sorry, the question again was: What did you mean Mr. Forbes was more able to answer your questions?

THE COURT: I think the response was "more than able."

MR. CARPENITO: More than able.

MR. SULLIVAN: Objection. 403, 602, 701 and <u>Garcia</u>.

THE COURT: Overruled.

A. What I meant by that is this was -- the CUC membership business was a business that Walter Forbes invented. He created the business, he created this membership business service. So **if anyone knew how the business worked, he knew how the business worked**. And it was a brilliant business. And **he knew the key variables. He knew membership growth. He knew the renewal rates.** And he would describe that in detail. So he would be able to describe it in our conversations in terms of we added a million members this quarter or this year, whatever the time period is we were discussing.

Tr. 143-44.

in, the charged accounting fraud. Tr. 59-60, 67. Accordingly, as in the first trial, the extent of Forbes' knowledge about CUC's business, and in particular, the financial results of the company, may be a hotly contested fact. For that reason, Kernkraut's testimony that implicates Forbes' understanding of CUC's business was highly relevant, and properly admitted under Rule 701. See United States v. Polishan, 336 F.3d 234, 243 (3d Cir. 2003)(in securities fraud prosecution involving accounting irregularities, lay witness permissibly testified, based on his day-to-day knowledge of the operation of the issuer company, that the defendant was "completely knowledgeable about what was going on in my divisions" and "incredibly . . . knowledgeable about . . . the financial aspects of the business and intimately knew the details"); United States v. Fowler, 932 F.2d 306, 312 (4th Cir. 1991) (admitting lay opinion testimony that was "helpful to the jury in determining the nature and extent of [the defendant's] knowledge . . . and whether he acted through negligence, accident, inadvertence, mistake, or confusion."). As the Second Circuit has explained, "there is no theoretical prohibition against allowing lay witnesses to give their opinions as to the mental states of others." United States v. Rea, 958 F.2d 1206, 1214-15 (2d Cir. 1992)(rejecting a defense claim that lay opinion testimony that the defendant "had to" have known about the charged scheme was inadmissible because "knowledge was an

ultimate issue in the case"); accord Weinstein, § 701.06[2].

Lay opinion testimony meets the "helpfulness" requirement of Rule 701 if the witness is "in a better position than the jury to form the opinion," and the witness "has specialized knowledge that the jury does not have." Weinstein, § 701.05. That requirement is fully satisfied here. Kernkraut thoroughly studied CUC's business for five years while he was an analyst at Bear Stearns. He did so by, *inter alia*: reviewing CUC's SEC filings; speaking to members of CUC management; personally speaking to Forbes about CUC's business on a quarterly basis; attending retail business conferences and meetings of institutional investors where Forbes was a speaker; and participating in "earnings conference calls" involving CUC. Tr. 112-20, 129-40, 142-59. Kernkraut therefore knew how CUC's business worked, including the "the key variables" of that business. Tr. 142-43. For that reason, he was in a far better position than the jurors to opine that Forbes also understood how CUC's business worked because he "created this membership services business," knew the key variables, and could articulately explain those matters. Tr. 143-44. See Fowler, 932 F.2d at 312 (4th Cir. 1991) (helpfulness requirement was fulfilled where government lay witnesses testified that a person with defendant's experience would understand the rules regarding classified budget documents, where their opinions were based on

11

their familiarity with those kinds of documents and the nature of the defendant's work).

United States v. Rea, 958 F.2d 1206, 1219 (2d Cir. 1992), cited by Forbes, does not compel the exclusion of Kernkraut's challenged testimony.  In Rea, the Second Circuit held that the district court abused its discretion by admitting the testimony of a cooperating conspirator that the defendant "had to" have known about the charged scheme to avoid payment of federal gasoline taxes.  958 F.2d at 1219.  The Court explained that:

> when a witness has fully described what a defendant was in a position to observe, what the defendant was told, and what the defendant said or did, the witness's opinion as to the defendant's knowledge will often not be "helpful" within the meaning of Rule 701 because the jury will be in as good a position as the witness to draw the inference as to whether or not the defendant knew.

958 F.2d at 1216.

Read in context, Kernkraut's challenged testimony is distinguishable from the objectionable testimony in Rea.[5]  First, unlike the witness in Rea, Kernkraut never testified that Forbes "knew" or "had to know" about the charged fraudulent scheme in this case.  Unlike the witness in Rea (and the witness in Garcia), then, Kernkraut did not opine that Forbes was (or "had

---

[5] Kernkraut's challenged testimony that Forbes was "very articulate" in speaking about the "key variables" does not purport to say anything about Forbes' knowledge, and therefore is not inadmissible under the reasoning of Rea.

to be") guilty of the charged crimes.

Second, the context of Kernkraut's challenged testimony that Forbes "knew <u>how</u> the business worked . . . . And he knew the key variables. He knew membership growth," Tr. 144 (emphasis added) demonstrates that Kernkraut was explaining how and why Forbes "understood" the mechanics of CUC's business. That testimony did not purport to show that Forbes knew a particular fact.

The distinction is an important one. Unlike the "yes or no" question of whether the defendant knew a particular fact, a defendant's understanding of a complex process such as CUC's business operations is a matter of degree. In <u>Rea</u>, the Second Circuit noted that lay opinion testimony regarding knowledge is more likely to be objectionable than lay opinion testimony regarding "intent or motivation," since

> there are a number of objective factual bases from which it is possible to infer with some confidence that a person knows a given fact. . . . includ[ing] what the person was told directly, what he was in a position to see or hear, what statements he himself made to others, conduct in which he engaged, and what his background and experience were.

958 F.2d at 1216.

Here, Kernkraut's testimony about Forbes' understanding of CUC's business addresses a more complex mental state, like motive and intent, than the unhelpful testimony in <u>Rea</u> about the defendant's knowledge of the criminal scheme. More significantly, unlike the situation in <u>Rea</u>, Kernkraut was in a

13

much better position than the jurors to assess whether and to what extent Forbes understood the mechanics of CUC's business. Kernkraut, unlike the jurors, was present when Forbes made statements evincing his understanding and knowledge of CUC's business. Unlike the jurors, Kernkraut therefore had the opportunity to evaluate the depth of Forbes' understanding in light of the innumerable pieces of verbal and non-verbal information that is communicated during conversational speech. Kernkraut's observations of, for instance, the confidence with which Forbes discussed CUC's business gave Kernkraut a much better vantage to assess Forbes' understanding than if he had merely read a transcript of Forbes' remarks. See United States v. Estrada, 39 F.3d 772, 773 (7th Cir. 1994)(lay witness permissibly explained his understanding of his coded conversations with the defendant).[6]

Accordingly, Forbes' challenge to the helpfulness of Kernkraut's testimony should be rejected.

---

[6] If the Court concludes that Kernkraut's challenged testimony regarding Forbes' understanding of CUC's business touches too closely on the kind of improper testimony identified in Rea, the Government would not oppose a limiting instruction to the effect that the testimony was offered only to explain what Kernkraut believed that Forbes understood about CUC's business, and not to establish that Forbes knew any particular fact or event.

**CONCLUSION**

      For the foregoing reasons, the Government respectfully requests that this Court deny Forbes' Retrial Motion No. 16.

                              Respectfully submitted,

                              CHRISTOPHER J. CHRISTIE
                              Special Attorney
                              U.S. Department of Justice

                              NORMAN GROSS
                              MICHAEL MARTINEZ
                              CRAIG CARPENITO
                              Special Attorneys
                              U.S. Department of Justice

Dated: October 20, 2005
Hartford, Connecticut

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this day I caused to be served copies of the foregoing upon the following by hand delivery:

Barry S. Simon, Esq.
Williams & Connolly LLP


                                              /s/ Debra Elliott
                                              DEBRA ELLIOTT
                                              U.S. Department of Justice

Dated: October 20, 2005
       Hartford, Connecticut