meet the Rule 17(c) prerequisites of "relevancy" and "admissibility." And while of course Rule

16 (like the Jencks Act and *Brady/Giglio*) applies only to the government, the "end-run" cases

we cited in our opening brief, *see* Amended Motion at 15-16, provide strong support for the

proposition that courts should not allow defendants to end-run the carefully balanced limits of

discovery in federal criminal cases through expansive and unchecked use of the Rule 17(c)

power.

      As to the additional arguments made *ex parte* and under seal, we object, as noted

previously.

### H.    Documents Exchanged and Communications with the Government and/or Cendant (Forbes III(C), P. 30)

      - and -

### I.    Subpoena Exhibits A-V (Forbes III(C), P.30)

      Forbes does not dispute, but again refuses to acknowledge, that demands seeking

these categories of documents – including many of the specific demands relating to Exhibits A

through V – were made and quashed during the first trial. Instead, aside from citing certain of

Mr. Corigliano's testimony that Forbes' counsel finds "incredible," Forbes only repeats again the

non-specific and unpersuasive argument that he seeks such documents "to demonstrate the full

extent and actual nature of the relationship between the government and its key witness, the

benefits conferred upon him, and the manner in which those benefits were obtained." Forbes

Opp'n at 32. Again, there is nothing new, no basis for reconsideration, and nothing to refute our

argument that these demands continue to be a classic fishing expedition on, at best, collateral

impeachment issues.

      Forbes also erroneously contends that we claim these documents would be

privileged. *See id.* at 32. What we argued and continue strongly to believe is that these demands

KL3 2471699 2

to invade a cooperating witness's attorney's files to see what the client was copied on represent a pernicious, invasive and unwarranted assault on the attorney-client relationship that, as far as we are aware, is unsupported by a single precedent.

As to the additional arguments made *ex parte* and under seal, we object, as noted previously.

### J.    Communications Between Mr. Corigliano and Kramer Levin Between April 1998 and January 2000 (Forbes III(N), P. 46)

Forbes again does not dispute, but refuses to acknowledge, that such documents were sought during the first trial and that the Court granted our motion to quash these demands. Astonishingly, Forbes simply repeats his three strands of crime-fraud arguments (relating to Mr. Corgliano's letter to the Cendant Board, his so-called "innocence proffer" with the government, and his attorneys' pre-plea discussions seeking to persuade the government not to prosecute) – copying almost verbatim from his July 21, 2004 Supplemental Memorandum (Trial Motion No. 22) – without any acknowledgement whatsoever that all of these specious crime-fraud contentions were raised and rejected on multiple occasions, as we pointed out in our opening submission. *See* Amended Motion at 33 n.36. Apart from a few new citations to Mr. Corigliano's testimony, Forbes offers absolutely nothing new here and thus there is no reason for the Court to countenance Forbes' attempted third or fourth bite at the crime-fraud apple.

### K.    Polygraph-Related Demands (Forbes III(O), P. 52)

In support of his demands for documents reflecting the polygraph-related questions, answers, results, examiner identities and dates, Forbes relies entirely on his separate motion in limine (*see* Forbes Retrial Motion in Limine No. 21) seeking permission to examine Mr. Corigliano on polygraph examinations. But Forbes fails to acknowledge that the two arguments he makes in that pending motion – that he should be allowed (i) to inquire as to any

prior inconsistent statements Mr. Corigliano may have made to the polygrapher under Fed. R. Evid. 613(a), and (ii) under Fed. R. Evid. 608(b) to demonstrate Mr. Corigliano's alleged use of the polygraph results to mislead the government -- are exactly the same two arguments that were made during the first trial and rejected by the Court, as we set forth in detail in our opening memorandum. *See* Amended Motion at 34-35. *Accord* Tr. 7/19/04, at 7796 (where the Court summarized the two polygraph arguments presented during the first trial as relating to a prior inconsistent statements theory and an avoid prosecution by authorizing counsel to disclose a positive polygraph result to the government theory). Having offered no reason, much less a compelling reason, to reconsider those prior considered rulings rejecting the *exact same arguments*, Forbes' renewed demands – which specifically seek documents that he speculates would show the questions asked, answers given, results, and related communications – should be summarily quashed.

Forbes also does not dispute the dispositive point we made during the 2004 trial and repeated in our opening memorandum, *see* Amended Motion at 35 n. 37: the questions the polygrapher asked, the answers Mr. Corigliano gave, any conclusions the polygrapher came to, and whatever else Mr. Corigliano may know concerning the polygraph are all privileged and protected communications. *See also* Tr. 7/19/04, 7807-08 (Mr. Naftalis: "Our position would be that . . . the polygrapher comes within our attorney-client privilege . . . . Whatever knowledge Mr. Corigliano has or doesn't have with respect to the polygraph examination he learned in a privileged conversation with his counsel."). In our opening brief we re-cited the well-settled case law in support of this proposition, *see* Amended Motion at 35 n.37, and add here that additional courts across the country consistently have come to the conclusion that communications with polygraphers hired and directed by a client's attorney, and any results of

KL3:2471699.2

such examinations, are privileged.[9]  Forbes' failure to offer any response to this argument effectively concedes that none of the polygraph-related documents he seeks (and none of the testimony he would like to elicit) could satisfy the admissibility requirement because all would be privileged, and thus all such demands should be quashed.

Finally, with respect to the more specific arguments and case citations raised in Forbes' in limine motion on the polygraph issue, we adopt and incorporate herein by reference all of the government's legal arguments as set forth in their opposition papers dated October 6, 2005.[10]  We add only that our single passing reference to a polygraph test in a meeting with the government seven years ago, in our capacity as attorneys and advocates for Mr. Corigliano, with no further disclosure at any time of questions asked, answers given, results, or even the name of

---

[9] *See Bankers Ins. Co. v. Florida Dep't of Ins. and Treasurer*, 755 So. 2d 729, 729 (Fla. Dist. Ct. App. 2000); *Carmona v. State*, 941 S.W.2d 949, 953-54 (Tex. Ct. Crim. App. 1997); *State v. Juarez*, 570 A.2d 1118, 1119-20 (R.I. 1990); *State v. Post*, 32 Ohio St. 3d 380, 385 (1987); *State v. Rickabaugh*, 361 N.W.2d 623, 625 (S.D. 1985); *Brown v. State*, 448 N.E.2d 10, 14 (Ind. 1983); *People v. Marcy*, 283 N.W.2d 754, 757 (Mich. Ct. App. 1979) (holding that under Michigan and Delaware law polygraph examiner would be covered by privilege).

*See also United States Postal Serv. v. Phelps Dodge Refining Corp.*, 852 F. Supp. 156, 161 (E.D.N.Y. 1994) (noting that attorney-client privilege applies under *Kovel* to non-testifying experts such as a polygraph operator hired by an attorney to assist in forming a defense); *Eversole v. Butler County Sheriff's Office*, No. C-1-99-789, 2001 WL 1842461, *2 (S.D. Ohio Aug. 7, 2001) ("[T]he [polygraph] documents and reports . . . were created by persons working in a representative capacity for a party . . . in anticipation of litigation.  Thus, the work product privilege is applicable and the documents are not discoverable.")

[10] We diverge from the government only to the extent they have interpreted the Court's statements at pages 7802-03 of the transcript as a ruling allowing cross-examination about whether Mr. Corigliano took a polygraph and whether he lied to the polygrapher.  Gov't Opp'n at 2.  As we read the transcripts at 7803-03 and 8031, at most the Court merely "suggested" (a word Forbes' counsel uses as well, *see* Forbes Retrial Motion in Limine No. 21, at 3) that it "might" have allowed a limited area of inquiry but was never asked to – and never did – rule that such limited inquiry would in fact be permitted.  To the contrary, as even counsel for Forbes concedes, the Court granted the government's motion to preclude with respect to the polygraph, *see* Forbes Opp'n at 2, and, as we pointed out in our opening brief, the Court later denied Forbes' attempt to reopen the issue. *See* Amended Motion at 35; *see also* Tr. 8/2/04, at 9121.

the examiner, simply cannot bear the weight of the imagined plot by Mr. Corigliano to mislead the government that Forbes' counsel makes the centerpiece of his polygraph argument.[11]

**L.     Documents Concerning "Benefits" from Cooperation (Forbes III(P), P. 52)**

Forbes does not dispute, but refuses to acknowledge, that demands for such documents were made in two different subpoenas in connection with the first trial and that both sets of demands were quashed. Nor does he dispute that such demands for alleged government benefits are properly directed to the government, not to the witness and his attorneys by way of a Rule 17(c) subpoena. Forbes makes no attempt to justify revisiting this issue, and his demand that we confirm in admissible form our representation that Mr. Corigliano is not aware of any additional such benefit-related documents is neither supported by Rule 17(c) or necessary in light of Forbes' ability to simply pose the question to Mr. Corigliano at trial.

**M.     Connecticut Board of Accountancy (Forbes III(Q), P. 53)**

In support of this demand, Forbes speculates that Mr. Corigliano may have "attempted to justify his actions to the [Accountancy] Board, such as by explaining why he believed certain transactions complied with GAAP," and claims he could use such information to impeach Mr. Corigliano. With this understanding of what Forbes seeks, we can now represent – and Forbes' counsel of course remains free to confirm on cross-examination – that Mr. Corigliano did not make any statements to the Accountancy Board relating to his activities at Cendant.

---

[11]With respect to the second polygraph examination that Mr. Corigliano took, we note that we disclosed the fact of that examination – but nothing else – to the government for the first time in the summer of 2004, in connection with motion practice related to the polygraph issue, only to ensure that the record on this issue would be accurate and complete.

**N.    Budget and Living Expense Information and Other Financial
Information Mr. Corigliano Provided to His Counsel (Forbes III(D), P. 33)**

Forbes does not dispute but refuses to acknowledge that identical demands were
made and quashed by the Court in the middle of the 2004 trial. Instead, he simply rehashes his
previously rejected arguments relating to privilege and then re-invokes his "benefits" mantra
(notwithstanding that the "benefit" he sees in the agreed-to budget has been fully disclosed and
was fully explored in the 2004 trial), again providing no basis for reconsideration.

**V.    FORBES' NEW DEMANDS ALSO FAIL TO MEET THE *NIXON* CRITERIA**

**A.    Post-2004 Trial Communications Relating
to the Government and Benefits (Forbes III(R), P. 54)**

Notwithstanding our written representations that we are not aware of the existence
of any responsive documents,[12] Forbes continues to demand "written confirmation" of the same,
again without providing any basis in law or in Rule 17(c) that would support such a demand and
without explaining why he cannot simply ask Mr. Corigliano about any conversations with the
government in which he participated or about any new, post-2004 trial agreements with the
government. In addition, as we argued above, *see supra* at 15, Forbes is simply wrong as a
matter of law when he argues that the fact that any such agreements would have to be disclosed
by the government does not provide a basis to quash demands for the same information made on
a non-party pursuant to a Rule 17(c) subpoena.

---

[12] We carved out "the possibility of any Kramer Levin confidential internal work-product, which
would be privileged," Amended Motion at 39, to which Forbes responds that any such internal
documents "that memorialize an agreement with a third party" would not be privileged. *See*
Forbes Opp'n at 55. To this we respond by representing that, although we disagree with Forbes'
legal analysis and continue to take strong exception to his relentless improper demands to invade
our confidential and privileged attorney files, we are not aware of any documents, privileged or
otherwise, reflecting any post-2004-trial agreements with or benefits from the government.

**B.      Date of Meetings with the Government (Forbes III(H), P. 41)**

Forbes cites no authority for the proposition that the attorneys for a cooperating witness can be forced, through a Rule 17(c) subpoena served directly on their firm, to comb through their personal calendars or other internal records and documents to re-create and then produce a list of dates of meetings between the witness and the government. Nor does Forbes even acknowledge – as we pointed out in our opening submission, *see* Amended Motion at 40 – that the Court specifically rejected this very argument during the first trial. Forbes fails to argue persuasively why he cannot and should not seek this information, to the extent it is relevant and admissible, from the government or by questioning Mr. Corigliano when he is on the witness stand. And his complaint that he is "deeply troubl[ed]" by the fact that Mr. Corigliano did not record the dates of his meetings – without citation to any authority or directive that would have required Mr. Corigliano to maintain such records – is of no consequence.

**C.      Credit Card and Loan Applications (Forbes III(S), P. 56)**

Forbes makes plain that through these demands he hopes to get his hands on income and asset valuations in an attempt to establish the "true value" of certain assets and income and impeach Mr. Corigliano's testimony on these valuation issues. As we pointed out in our opening memorandum, this overbroad request is pure fishing on a collateral issue with the "hope" that something favorable turns up, and as such it is an impermissible use of the Rule 17(c) power.

**D.      Crystal Journey Candles Documents (Forbes III(T), P. 56)**

As we anticipated, Forbes also invokes his "benefits" mantra in support of his demands relating to Crystal Journey Candles. But he completely fails to address our arguments that he already has Mr. Corigliano's salary information, that the Coriglianos lived within an agreed-on budget with the SEC that allowed them to spend money (in Forbes' view, a "benefit")

in an amount that did not vary depending on Mr. Corigliano's monetary compensation, or that salary or other benefits after the turnover of assets to the SEC post-July 7, 2004 are completely irrelevant. Instead of responding on the merits, Forbes hides his response in his *ex parte* sealed submission, to which we object, as outlined above.[13]

**E.     2000-2003 Property Taxes (Forbes III(U), P. 57)**

Other than making arguments *ex parte* and under seal, to which we object as previously stated, Forbes' only response on the Coriglianos' property taxes is to complain that the disclosures in the quarterly reports to the SEC fail to break out the Old Saybrook property taxes from the taxes on Mr. Corigliano's father's home or on the Corigliano motor vehicles. This quibble, considered in conjunction with Forbes' failure to refute our argument that the property tax payments cannot measure any "benefit" in light of the overall SEC budget, reinforces the correctness of our assertion that Forbes seeks this information to attempt improper impeachment on the collateral matter of the precise amounts of the Coriglianos' property tax payments.

---

[13] Forbes mentions in passing, and without citing any authority, that Mr. Corigliano lacks standing to quash the Crystal Journey subpoena. The argument is not a serious one, as a cooperating witness' standing to move to quash subpoenas seeking personal financial records in which he has "legitimate" and "proprietary" interest follows, *a fortiori*, from the consistent line of cases going even further and granting standing on the government to move to quash on such a witness' behalf. *See, e.g.*, *United States v. Nektalov*, No. S 203 CR 828 (PKL), 2004 WL 1574721, at *1 (S.D.N.Y. July 14, 2004); *United States v. Orena*, 883 F. Supp. 849, 869 (E.D.N.Y. 1995); *United States v. Giampa*, 1992 WL 296440 at *1 (S.D.N.Y. Oct. 7, 1992).

Courts also routinely address motions to quash notwithstanding challenges to standing "because it is the Court's responsibility to ensure that the subpoena is for a proper purpose and complies with the requirements of Rule 17(c)." *United States v. Weissman*, No. 01 CR 529, 2002 WL 31875410, at *1 n.1 (S.D.N.Y. Dec. 26, 2002). *See also United States v. Leaver*, 358 F. Supp. 2d 273, 275 n. 6 (S.D.N.Y. 2005) (declining to resolve defendant's standing to move to quash subpoenas for credit card records and addressing objections under court's power to ensure propriety of subpoenas).

- 22 -

**F.    September 2003 Asset Information (Forbes III(E), P. 36)**

With respect to the 2003 asset information that Mr. Corigliano provided to Kramer Levin, Forbes simply incorporates the arguments he makes with respect to the budget, living expense and other financial information that Mr. Corigliano provided to his attorneys in 2000 – i.e., that Kramer Levin was a "conduit" for providing such information to the government, that such information was requested by the SEC and that it had to be accurate and complete. But none of this provides any basis for showing that asset-related documents that Forbes speculates Mr. Corigliano provided to counsel and may not have been turned over to the SEC would be relevant and admissible; to the contrary, Forbes' argument reinforces that at best he is on a fishing expedition for documents which, if any exist, could be used only to improperly attempt to impeach Mr. Corigliano's testimony concerning his beliefs about the values of his assets.

**G.    Legal Fees Advanced by Cendant (Forbes III(I), P.42)**

Forbes argues that documents showing the legal fees advanced by Cendant on Mr. Corigliano's behalf should be produced because they evidence the bias of Cendant, but fails to explain any possible relevance to Mr. Corigliano's credibility – or to any issue in the trial – of Cendant's alleged bias. His theory that such documents could show that Mr. Corigliano is biased in favor of Cendant because he allegedly is getting better treatment than other former officers and directors vis-à-vis fee advancement – an assertion of fact that is nowhere substantiated in Forbes' papers – also fails, as Forbes does not even argue, much less offer proof showing that Mr. Corigliano is even aware of any such alleged disparities. Nor does Forbes dispute that he has himself received advancements of fees from Cendant far in excess of those made on behalf of Mr. Corigliano, again showing that such advancements are not in any sense rewards reserved

- 23 -

for those who cooperate and testify at the trial of United States against Forbes. As to Forbes' additional secret arguments filed under seal, we object, as stated above.

### H.    Receiver Documents (Forbes III(J), P. 43)

Finally, with respect to the subpoena on the Receiver, Forbes argues he is entitled to rummage through the Receiver's files in search of evidence of the "true" or any additional agreement(s) between Mr. Corigliano and the SEC and any heretofore undisclosed benefits afforded Mr. Corigliano under such agreement(s). But as we have represented elsewhere, there are no additional or secret or undisclosed agreements with the SEC, and thus these demands remain speculative fishing expeditions, many of which are in search of documents that at best might constitute inadmissible double or triple hearsay (a point we made in our opening brief and that Forbes does not refute). Forbes' standing argument with respect to the Receiver also lacks merit, for the reasons set forth above in point IV(D). To the extent Forbes attempts to supplement these deficient arguments with a secret submission made *ex parte* and under seal, we object again, as outlined above.