# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>v. )<br><br>WALTER A. FORBES. ) | No. 3:02CR264 (AWT)<br>October 23, 2005 |

## MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANT WALTER A. FORBES FOR A MISTRIAL BASED ON THE TESTIMONY OF STEVEN KERNKRAUT
### (Forbes Retrial Motion No. 15)

Defendant Walter A. Forbes, through undersigned counsel, respectfully submits this memorandum in support of his motion for a mistrial based on the testimony of Steven Kernkraut.

## INTRODUCTION

Mr. Kernkraut never worked at CUC, never reviewed the books and records of CUC, is not a CPA or even an accountant, and the government did not tender him as an expert in this case subject to the disclosure requirements of Fed. R. Crim. P. 16(a)(1)(G) and the reliability requirements of Fed. R. Evid. 702. Nevertheless, he was permitted, over repeated objection, to offer wide-ranging opinion testimony that CUC's financial statements were false, that Walter Forbes lied to him about CUC's financial performance, that Cendant's announcement of accounting irregularities affected its stock price, and that (hypothetically) had it been known contemporaneously that CUC's financial statements were overstated, Mr. Kernkraut would have analyzed the stock differently and CUC's stock price

would have been lower.  This testimony violated numerous rules of evidence (including Fed. R. Evid. 401-403, 602, 701 and 802), Mr. Forbes' Sixth Amendment rights (because much of it was based on Cendant's April 15, 1998 press release announcing financial irregularities and its subsequent Restatement), and the Second Circuit's prohibition against opening a criminal case with an overview witness.

To make matters worse, the government blindsided the defense and expanded the charges in the indictment by eliciting testimony from Mr. Kernkraut that CUC falsely overstated its membership numbers and membership renewal rates.  Mr. Kernkraut's testimony constructively amended the indictment and caused a prejudicial variance.  In addition, it appears that this testimony was false; and the government's presentation of, and failure to correct, this testimony violated Mr. Forbes' Due Process rights.  Accordingly, the Court should declare a mistrial.

## BACKGROUND

The most egregious examples of improper testimony by Mr. Kernkraut are summarized and quoted in full in this background section below.  As a result, the background section is lengthy.  Other examples of improper testimony are set forth in the argument section of the brief.

On direct examination, Mr. Kernkraut testified about Cendant's announcement of alleged financial irregularities and his subjective reaction to that announcement; he opined (hypothetically) that had he known the supposed truth, his historical analysis of CUC's stock would have been different; he opined that

various CUC reported financial numbers were false; and he opined that but for the alleged accounting irregularities, CUC's stock price would have been lower.

Q.   Now, can we fast forward to April 15, 1998?

A.   Yes.

Q.   Do you remember that day?

A.   Yes, I do.

Q.   Why do you remember that day?

A.   It was really one of the worst days of my professional life.  It was the day that Cendant announced that they had financial irregularities.

Q.   And did you eventually learn what those financial irregularities were?

A.   Yes.

MR. SULLIVAN:  Objection, 401, 701, 403.

THE COURT:  You can answer the question "yes" or "no."

A.   Could you repeat the question?

4  BY MR. CARPENITO:

Q.   Sure.  The question was:  Did you eventually learn what the issues were regarding Cendant's financial irregularities?  And the Court's instructed you to answer the question "yes" or "no."

A.   Yes.

Q.   And what was your reaction to the news that Cendant had financial irregularities?

MR. SULLIVAN:  Same objection, Your Honor.

THE COURT:  Overruled.

A.   I felt shocked.  I felt betrayed, lied to.

BY MR. CARPENITO:

Q.   If you knew the numbers -- if you knew there were accounting irregularities, would that have affected your analysis of CUC stock when you wrote your reports?

A.   Yes, it would have vastly changed my analysis of CUC if I knew of those financial irregularities.  If I knew all through that '93 to '98 period what I found out after the

financial irregularities were announced or revealed, it would have changed the totality of my analysis.

Q.  Why would it have changed your analysis?

A.  Well --

MR. SULLIVAN:  Your Honor, same objection.

THE COURT:  Overruled.  Would you like a limiting instruction?

MR. SULLIVAN:  I'd like to know what it is.

THE COURT:  Hold on.  Let me get my new system in place here.  Instruction Number 3.

MR. SULLIVAN:  The answer is yes.

THE COURT:  Ladies and gentlemen, you just heard some testimony to which there's been an -- to which there have been objections that I've overruled.  I'm going to give you a limiting instruction as to those -- well, as to that testimony.  The testimony you have just heard may be considered only with respect to the question of whether any allegedly false statement was material.  I will provide you with specific instructions, including a definition concerning the element of materiality, in my final instructions.  You may not consider this evidence for any other purpose.

MR. CARPENITO:  Thank you, Your Honor.

BY MR. CARPENITO:

Q.  Now, I believe the question that I asked before the instruction was:  Why would that have affected your analysis of CUC stock, the fact that there was announcement that there were accounting irregularities?

MR. SULLIVAN:  Your Honor, could I have a continuing objection?

THE COURT:  Yes, and the continuing limiting instruction as to those questions.

MR. CARPENITO:  Thank you, Your Honor.

A.  Okay.  Yeah, the analysis would have been changed on a number of levels.  First and foremost, the size of how much CUC earned was misstated to me, and the financial irregularities said that they were much lower than was actually reported.  So if -- without citing the exact

numbers, if the financial report said that CUC had earned $100 million, the amount of the earnings may have only been 60 or $70 million, a vastly lower number in terms of how much they really earned. So that was very important. Secondly, the earnings growth rate was much lower than was reported where the earnings growth rate had been reported historically from that '92 to '97 period as 20, 25, 30 percent, numbers in those range, and the growth rate was far lower than that. And the number of members that they had added was overstated and the renewal rate of how many members had actually renewed the following year, how many members they retained had been overstated significantly, where the actual renewal rate was closer to 50 percent. So all those numbers would have led to a significantly different conclusion where we would have had -- the company's earnings would have been lower than what was reported, our earnings estimates going forward would have been far lower, and the earnings growth rate for the company would have been far lower, and the stock price would have never attained the stock price that it did.

MR. SULLIVAN: Excuse me, Your Honor. May I add variance as well?

THE COURT: Objection noted. Overruled.

Tr. at 214-18.

Mr. Kernkraut further opined that his historical opinions regarding CUC changed as a result of Cendant's announcement of accounting irregularities; he opined that CUC's reported financial results were overstated; he opined (hypothetically) that his historical analysis of CUC's stock would have been different had he known the alleged truth; and he opined that CUC's stock price would have been lower had it accurately reported its financial results.

Q. Mr. Kernkraut, on April 15, 1998, after you learned of the announcement of accounting irregularities by Cendant, did the opinion as to the accuracy of your earnings projections in this particular report, Exhibit 1400, change?

- 5 -

A.  Yes, they did.

MR. SULLIVAN:  Same objection.

THE COURT:  Overruled.

BY MR. CARPENITO:

Q.  How did they change?

MR. SULLIVAN:  Same objection.

THE COURT:  Same ruling.

A.  The way they changed is the earnings -- what was announced in the 1998 period was that the historical earnings of this company and the number of members, the revenues, the renewal rates, all the assumptions were overstated, okay?  So what that would have meant is if you see on this first page on this report where -- let's see if I can get this pen to work again.  In 1993 they earned 77 cents a share in earnings per share in 1993.  From what you learned in 1998, it became apparent to --

MR. SULLIVAN:  Excuse me, Your Honor.  I hate to interrupt.  Objection.

THE COURT:  Overruled.

MR. SULLIVAN:  It is apparently beyond April 15 as well.  Providing answers based on information learned after April 15, not from the announcement.

THE COURT:  Oh, I understand that.  I'll give a limiting instruction as to materiality if you'd like.  It's overruled.

MR. CARPENITO:  Thank you, Your Honor.

BY MR. CARPENITO:

Q.  I'm sorry Mr. Kernkraut.  Please continue.

A.  The 77 cents that was reported in their actual financial statements as what CUC earned in 1993 was overstated and those earnings were much lower than that.  So if I was projecting -- if I had that information and I would not have assumed that in 1994 they would have earned $1 and 1995 they would have earned $1.30, my estimates of what their future earnings would have been would have been far lower than what I projected.  If I would have projected earnings far lower, the way the markets work, their stock price would have been much lower.

- 6 -

Q.  Who provided up with the numbers that you mentioned you based your analysis on, the earnings, the membership rates, et cetera?

A.  It was a combination of the CUC 10-Ks, 10-Qs, and the financial reports that they published and I -- and I added to that the management meetings and the kicking the tires in terms of trying to refine that model to be able to understand what the future business would be.

Q.  What individuals at those management meetings provided you with those numbers?

A.  It was a combination of the CEO, Walter Forbes; the president, Kirk Shelton; the CFO at this time, and the time period that you're reflecting in 1994 was Stu Bell; and his controller, Cosmo Corigliano at that time; and other members of management.

Q.  Now, how did you eventually learn that the numbers were -- that the numbers that you based your analysis on were incorrect?

MR. SULLIVAN:  Same objection, Your Honor.

THE COURT:  I'm not sure what the same objection is.

MR. SULLIVAN:  All of this is hearsay.

THE COURT:  Overruled.

MR. SULLIVAN:  And 401, 402 and 403.

THE COURT:  401, 402 overruled.  701 overruled.  403, the question is how did he learn?

MR. CARPENITO:  Yes, Your Honor.

THE COURT:  Overruled.

A.  Could up repeat the question?

BY MR. CARPENITO:

Q.  Sure.  Mr. Kernkraut, can you please tell us how you learned that CUC's -- the financial numbers that you based your analysis on from CUC were inaccurate?

A.  I learned it through two facts.  One, when Cendant announced on April 15th that they had financial irregularities but did not specify what they were was fact A.  Fact B was that four or five months later after the Cendant –

MR. SULLIVAN: Objection.

THE COURT: One second. What's the purpose of asking him to go into this?

MR. CARPENITO: Your Honor, we're just seeking to elicit the fact that he did eventually learn the numbers were false and how he learned what the actual numbers were without referring to the source by name.

THE COURT: I think I should probably let counsel know what I'm thinking about at the sidebar.

(Discussion at sidebar off the record.)[1]

THE COURT: We'll come back to this point after we've had a chance to discuss it at the break. And if the examination is concluded before then, we'll do it during redirect.

MR. CARPENITO: Thank you, Your Honor.

BY MR. CARPENITO:

Q. Mr. Kernkraut, what effect did the announcement of accounting irregularities by Cendant Corporation on April 15, 1998 have on you as the analyst, I believe you used the term, the ax on the stock covering CUC at the time of the irregularities?

A. It had a tremendous impact on me as the analyst in the sense where we did not --

MR. SULLIVAN: Excuse me, Your Honor. 401, 403, 701.

THE COURT: Sustained pursuant to 403.

Tr. 228-33.

On re-direct examination, Mr. Kernkraut opined that Mr. Forbes made

false representations to him about CUC's financial numbers; he testified that

Cendant announced financial irregularities and issued a restatement; and he

opined that the Restatement was significant to his analysis and changed his

---

[1]    At sidebar, defense counsel requested that the sidebar be recorded and moved for a mistrial. Subsequently, the motion for a mistrial was made on the record. See Tr. at 256.

opinions regarding buy recommendations, price targets, and earning projections

reflected in his historical reports on CUC.

> Q.  Did you rely upon Walter Forbes' representations about the CUC financial numbers?
>
> A.  Yes, I did.
>
> Q.  On April 15th, 1998, what did you find out about those representations?
>
> MR. SULLIVAN:  Same objections, Your Honor.  Could we have a continuing objection here?  It also is not -- it's beyond the scope.
>
> THE COURT:  I'll sustain it on that basis.
>
> MR. CARPENITO:  Your Honor --
>
> THE COURT:  Unless you can point to a question that Mr. Sullivan asked.
>
> MR. CARPENITO:  Well, Your Honor, I was bringing this up actually because during the direct I was stopped from asking questions.
>
> THE COURT:  You got to the point that I asked you --
>
> MR. CARPENITO:  Yes, Your Honor.
>
> THE COURT:  Okay.
>
> MR. SULLIVAN:  Could we have a continuing objection on that part?
>
> THE COURT:  You may.
>
> MR. SULLIVAN:  Okay.
>
> MR. CARPENITO:  Your Honor, may I ask the question again?
>
> THE COURT:  Yes.
>
> MR. CARPENITO:  Thank you, Your Honor.
>
> BY MR. CARPENITO
>
> Q.  On April 15th, 1998, what did you find out about the representations that you relied on that were made to you by Mr. Forbes?
>
> A.  That they were essentially false.

Q.  Now, at any point in time following the announcements of the accounting irregularities by Cendant relating to the former CUC businesses on April 18th, 1998, did you come to learn anything about the accuracy of the numbers you based your reports upon?

A.  Yes, I did.  Yes, I did.

Q.  And what did you learn about those numbers?

A.  I found about five months after the initial release, there was a report issued that --

MR. SULLIVAN:  Excuse me.  Objection for the record.

THE COURT:  Objection noted.

MR. SULLIVAN:  It's continuing.  I don't want to keep objecting.

BY MR. CARPENITO

Q.  Please, Mr. Kernkraut, you can continue.

A.  There was -- after the initial statement of financial irregularities, all I knew is that something was wrong, I didn't know what and the magnitude of how things were misstated.  There was -- Cendant as a corporation retained forensic accountants that kind of combed the books of the company.  And about five months after this April date, they released --

MR. SULLIVAN:  Objection, Your Honor.

THE COURT:  Sustained.  Let's narrow this.

MR. SULLIVAN:  Ask that it be stricken.

THE COURT:  I'll strike the last sentence, the partial sentence.

Q.  Mr. Kernkraut, now focusing on just the vehicle through which that you learned about those inaccuracy, can you tell me what that was?

A.  The vehicle that I learned of the inaccuracies were a report that was issued by Cendant restating their numbers.

Q.  Now, without getting into what the numbers were, was the announcement of the restatement, the amounts within it, significant in your analysis?

A.  Yes, it was very significant to my analysis.

Q. And did that announcement, the restatement, lead you to change your opinion as it was articulated in all the reports that you indicated for the old CUC businesses on whether or not your customers should have bought or sold or held CUC stock?

A. Yes.

MR. SULLIVAN: Objection, Your Honor.

THE COURT: Overruled.

A. Yes, it did.

BY MR. CARPENITO

Q. A did it also change your opinion as to your projections as to the price target of CUC stock?

A. Yes.

Q. Did it also change your opinion as to the earnings projections relating to CUC stock?

A. Yes, it did.

Tr. at 335-39.

## ARGUMENT

Although the Court issued a limiting instruction with respect to at least some of this testimony, a limiting instruction cannot make otherwise inadmissible evidence admissible. The testimony quoted above was inadmissible for any purpose under Fed. R. Evid. 401-403, 602, 701 and 802. Moreover, the testimony regarding allegedly overstated membership numbers and renewal rates caused a constructive amendment and/or a prejudicial variance. In addition, it appears that the testimony regarding overstated membership numbers and renewal rates was false.

## I.     MR. KERNKRAUT'S TESTIMONY VIOLATED THE FEDERAL RULES OF EVIDENCE.

Under Fed. R. Evid. 401-403, a witness can only offer testimony that is relevant and not unduly prejudicial, confusing, misleading or cumulative.  Under Fed. R. Evid. 602, a witness can only offer testimony that is based on personal knowledge.  Under Fed. R. Evid. 701, a lay witness, like Mr. Kernkraut, is not permitted to offer opinion testimony unless the proponent of the testimony satisfies all three of the rule's foundation requirements:  (1) personal knowledge; (2) helpfulness; and (3) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.  See United States v. Garcia, 413 F.3d 201, 211 (2d Cir. 2005); see also Memorandum in Support of Forbes Retrial Motion In Limine No. 3 (filed Sept. 6, 2005) [Docket No. 1663] (incorporated herein by reference).  Under Fed. R. Evid. 802, hearsay is inadmissible.

### A.     Mr. Kernkraut's Testimony Was Not Based on Personal Knowledge, But Rather on Hearsay.

Much of Mr. Kernkraut's testimony quoted above was based on the factual premise that CUC's reported financial results were falsely overstated.  Mr. Kernkraut, however, has no personal knowledge of whether CUC's reported financial results were in fact false.  He never worked at CUC and he never reviewed the underlying books and records of CUC.  See Tr. at 333 ("Q.  Did you review any of the underlying books and records of CUC International?  A.  No, none of those were ever available to me."); see also Tr. at 262-63 ("Doing independent research on CUC was a bit more difficult because their business model was somewhat like a black

box.  You could not see how many members they had.").  Mr. Kernkraut's testimony

was based entirely on hearsay—Cendant's April 15, 1998 announcement of financial

irregularities and its subsequent Restatement.  See Tr. at 231-32; Tr. at 255 ("MR.

CARPENITO:  Your Honor, we anticipate Mr. Kernkraut would get to eventually he

learned from a subsequent financial statements filed by CUC International [sic]

that earlier periods, periods he relied on, were false numbers and that he eventually

learned what the correct numbers were."); Tr. at 337-38.

   Thus, Mr. Kernkraut has "personal knowledge" about the alleged

fraud in the same way that the attorneys in this case and the Court have personal

knowledge, but that does not make any of us competent to testify as lay witnesses.

Only an expert witness may testify without personal knowledge.  But the

government did not tender Mr. Kernkraut as an expert witness.

**B. Mr. Kernkraut Offered Improper Lay Opinion Testimony Regarding the Accuracy of CUC's Reported Financial Results.**

   Mr. Kernkraut opined that "the size of how much CUC earned was

misstated to me, and the financial irregularities said that they were much lower

than reported."  Tr. at 217; see also Tr. at 229-30.  He also opined that "earnings

growth rate was much lower than was reported where the earnings growth rate had

been reported historically from that '92 to '97 period as 20, 25, 30 percent, numbers

in those range, and the growth rate was far lower than that."  Tr. at 217.  This

testimony failed all three foundation requirements of Rule 701.

    (1) Personal knowledge—Mr. Kernkraut, who never
worked at CUC or reviewed their books and records, has
no personal knowledge of whether CUC's earnings were
"misstated," whether CUC's earnings were "much lower

than reported," or whether CUC's "earnings growth rate was much lower than was reported" for the years 1992-97. His testimony was based on hearsay—CUC's press release and Restatement. Moreover, contrary to Mr. Kernkraut's testimony, those documents do not state that the alleged fraud dated back to 1992. The Restatement covers the period from 1995 to 1997. See, e.g., Ex. 1 at 4 (Cendant Amended Form 10-K) ("[T]he Company has restated its previously reported financial results for 1997, 1996 and 1995."); id. at 32, 38, F-14, F-17. The April 15, 1998 press release states only that Cendant expects to restate net income and EPS for 1997 and may restate for previous periods. See GX 827.[2]

(2) Helpfulness—Mr. Kernkraut's testimony was not helpful because he lacks the qualifications to offer expert testimony on the accuracy and amount of CUC's earnings and earnings growth rate. The government has already identified an expert to testify about the accuracy of CUC's reported financial results. Mr. Kernkraut's personal opinion on the accuracy of CUC's reported financial results adds nothing to the jury's consideration of that issue. In addition, his testimony that CUC's results were "misstated" to him was not helpful and usurped the jury's role. Mr. Kernkraut could properly testify about what was allegedly said to him (if he could recall). But, it is the jury's function, after hearing evidence of what was allegedly said, to determine, based on the other admissible evidence, whether the alleged statements were accurate.

(3) Not based on scientific, technical, or other specialized knowledge—An opinion on the accuracy and amount of earnings or earnings growth rate is based on specialized accounting knowledge and is not "the product of reasoning processes familiar to the average person in everyday life." Garcia, 413 F.3d at 215.

---

[2]    At transcript pages 229-30, Mr. Kernkraut testified that CUC's earnings per share were "overstated" in 1993 and that actual earnings per share were "much lower." See also Tr. at 215 (1993-98). As set forth above, however, Cendant's Restatement does not cover that time period. This is one of the dangers of allowing a witness to testify without personal knowledge. The witness may testify to supposed "facts" that do not exist.

The government was not content to have Mr. Kernkraut offer improper testimony on these issues. He also opined that "the number of members that [CUC] had added was overstated and the renewal rate of how many members had actually renewed the following year, how many members they retained had been overstated significantly, where the actual renewal rate was closer to 50 percent." Tr. at 217-18; see also Tr. at 229. This testimony, too, failed all three requirements of Rule 701.

> (1) Personal knowledge—Mr. Kernkraut, who never worked at CUC or reviewed their books and records, has no personal knowledge of whether CUC's membership number or renewal rates were "overstated" or whether "the actual renewal rate was closer to 50 percent." Indeed, Mr. Kernkraut volunteered on cross-examination that he could not see how many members CUC had because CUC was like a "black box," and that he was incapable of validating CUC's membership numbers or renewal rates because only management knew those numbers. See Tr. at 262-63 ("Doing independent research on CUC was a bit more difficult because their business model was somewhat like a black box. You could not see how many members they had."); Tr. at 274 ("[T]here were two key variables in CUC's business; the number of members they had and what the renewal rate of the company was. And there was no way for an outside analyst to validate that information aside from hearing it from the management's mouth."). This testimony was not even based on Cendant's press release or Restatement because those documents do not say that membership numbers or renewal rates were overstated or that actual renewal rates were closer to 50%. This is one of the dangers of allowing a witness to testify without personal knowledge. The witness may testify to supposed "facts" that do not exist.
>
> (2) Helpfulness—Mr. Kernkraut's testimony was not helpful because he lacks the qualifications to offer expert testimony on the accuracy of CUC's membership numbers or renewal rates. Moreover, as set forth more fully below,

this testimony caused a constructive amendment and/or a prejudicial variance, and it was apparently false.

(3) Not based on scientific, technical, or other specialized knowledge—An opinion on the accuracy of CUC's membership numbers and renewal rates is based on specialized accounting knowledge and is not "the product of reasoning processes familiar to the average person in everyday life." Garcia, 413 F.3d at 215.

## C.    Mr. Kernkraut Offered Improper Lay Opinion Testimony That Walter Forbes Lied to Him.

Mr. Kernkraut opined that Mr. Forbes made false representations to him about CUC's financial numbers. See Tr. at 335, 337 ("Q. Did you rely upon Walter Forbes' representations about the CUC financial numbers? A. Yes, I did . . . . Q. On April 15th, 1998, what did you find out about the representations that you relied on that were made to you by Mr. Forbes? A. That they were essentially false."). Although it was proper for Mr. Kernkraut to testify as to what Mr. Forbes allegedly said, his testimony that Mr. Forbes lied to him about CUC's financial numbers was improper because he lacked personal knowledge of whether any of the alleged representations were in fact false, and he lacked the expertise and information to determine whether the alleged representations were in fact false. Moreover, this testimony was not helpful because it usurped the jury's function of deciding whether any alleged statements were false. This testimony is essentially an opinion that Mr. Forbes committed a crime. Therefore, this testimony, like the testimony described above, failed all three foundation requirements of Rule 701.[3]

---

[3]    All of these problems are exacerbated by the fact that Mr. Kernkraut was unable to attribute any specific alleged statements to Mr. Forbes (other than the alleged statements regarding the Ideon merger reserve). It is unclear how Mr.

**D.    Mr. Kernkraut Offered Improper Lay Opinion Testimony Speculating as to What Would Have Happened Had CUC's Supposedly True Financial Results Been Reported Contemporaneously.**

The government invited Mr. Kernkraut to speculate and opine as to what would have happened in a hypothetical world in which CUC contemporaneously reported lower financial results. See, e.g., Tr. at 215 ("[I]f you knew there were accounting irregularities, would that have affected your analysis of CUC stock when you wrote your reports?"). Mr. Kernkraut responded to this invitation with speculation about how his contemporaneous analysis of the stock would have been changed and how CUC's stock price would have been lower, making himself an expert in the complex subject of loss causation. See Tr. at 215 (speculating that "it would have vastly changed my analysis of CUC if I knew of those financial irregularities. If I knew all through that '93 to '98 period what I found out after the financial irregularities were announced or revealed, it would have changed the totality of my analysis."); Tr. at 217 (speculating that "the analysis would have changed on a number of levels"); Tr. at 218 (speculating that "all those numbers would have led to a significantly different conclusion where we would have had - - the company's earnings would have been lower than what was reported, our earnings estimates going forward would have been far lower, and the earnings growth rate for the company would have been far lower, and the stock price would have never attained the stock price that it did"); Tr. at 229 (testifying

---

Kernkraut could opine that Mr. Forbes lied to him when he could not remember what Mr. Forbes said.

that his opinion, as reflected in his July 1994 report (GX 1400), changed after he

learned of the announcement of accounting irregularities by Cendant); Tr. at 229-30

("The way they changed is the earnings -- what was announced in the 1998 period

was that the historical earnings of this company and the number of members, the

revenues, the renewal rates, all the assumptions were overstated, okay? . . . . The 77

cents that was reported in their actual financial statements as what CUC earned in

1993 was overstated and those earnings were much lower than that.  So if I was

projecting -- If I had that information and I would not have assumed that in 1994

they would have earned $1 and 1995 they would have earned $1.30, my estimates of

their future earnings would have been far lower than what I projected.  If I would

have projected earnings far lower, the way the markets work, their stock price

would have been much lower."); Tr. at 338-39 (opining that Restatement was

significant to his analysis and that it lead him to change his opinions on buy

recommendations, price targets, and earnings projections that he had articulated in

his prior analyst reports on CUC).  Again, this testimony failed to meet all three

foundation requirements of Rule 701.

### E.    Mr. Kernkraut Offered Improper Lay Opinion Testimony on Other Various Matters.

Mr. Kernkraut offered additional improper lay opinion testimony on

such matters as the impact of the announcement of accounting irregularities on

Cendant's stock price, the significance of management signatures on SEC filings,

and the reaction of the stock market to missed earnings projections.  See, e.g., Tr. at

220 (opining that announcement of accounting irregularities on April 15, 1998

affected stock price); Tr. at 333 (opining on significance of management signatures on Form 10-K and 10-Q); Tr. at 335 (opining that if stock misses earning projections by a penny "the market will bring the stock down precipitously" and that he has never seen a company's stock price go up after the company missed its earnings by a penny); Forbes Retrial Motion No. 16 (filed Oct. 18, 2005) [Docket No. 1857] (identifying additional improper lay opinion testimony) (incorporated herein by reference). Again, this testimony failed to meet all three foundation requirements of Rule 701.

### F.    Mr. Kernkraut's Testimony Violated Fed. R. Evid. 401-403.

Mr. Kernkraut's testimony concerning CUC's membership numbers and renewal rates should have been excluded under Rules 401-403 because there is no allegation in the indictment that CUC's membership numbers or renewal rates were overstated. Mr. Kernkraut's testimony about the accuracy of CUC's other reported financial results should have been excluded under Rules 401-403 because his untrained and unfounded lay opinion is not relevant (and in some respects is cumulative of testimony to be offered by the government's real expert witnesses). Mr. Kernkraut's testimony that he believes that Mr. Forbes lied to him should have been excluded under Rules 401-403 because his subjective belief is irrelevant and unduly prejudicial. It is the jury's duty to decide, based on admissible evidence, whether the government has carried its burden of proving that Mr. Forbes knowingly participated in a fraud. Mr. Kernkraut's testimony of whether his analysis of the stock would have been different is similarly irrelevant under Rules 401-403. In addition, Mr. Kernkraut's testimony describing his subjective reaction

to Cendant's announcement of financial irregularities was irrelevant to any issue in the case and was unduly prejudicial.  See Tr. at 214-15 (testifying that "the day that Cendant announced that they had financial irregularities" was "one of the worst days of my professional life," that he learned what financial irregularities were, and that he "felt shocked . . . betrayed, lied to").

### G.     Mr. Kernkraut's Testimony Violated Fed. R. Evid. 802 and the Sixth Amendment.

Cendant's April 15, 1998 press release and its subsequent Restatement are inadmissible hearsay.  By eliciting testimony from Mr. Kernkraut concerning and based on the alleged content of those documents, the government made an end-run around the hearsay rule.[4]  This testimony should have been excluded under Fed. R. Evid. 802.  In addition, by putting the hearsay in through a witness without personal knowledge, the government deprived Mr. Forbes of his Sixth Amendment right to cross-examine the hearsay declarants.  This violation was substantial because Cendant restated its previously filed financial results "[a]s a result of the findings of the" Cendant investigation and the Audit Committee investigation, Ex. 1 at 4 (Cendant Amended Form 10-K), which was based in part on the testimonial interviews of 81 individuals, some of whom were interviewed one more than one occasion.

---

[4]     All of the "facts" that Mr. Kernkraut supposedly learned after the fact were hearsay.  Mr. Kernkraut often reported these "facts" inaccurately.  That is one of the critical dangers of permitting testimony that is not based on personal knowledge.

**H.    Mr. Kernkraut's Testimony Violated the Prohibition Against Opening a Criminal Case with an Overview Witness.**

The Second Circuit recently held that "it is generally viewed as improper . . . for a party to open its case with an overview witness who summarizes evidence that has not yet been presented to the jury. Indeed, as two of our sister circuits have observed, this practice is particularly problematic in criminal cases because it allows the government to paint a picture of guilt before the supporting evidence has been introduced. We share this concern and similarly condemn the practice of having a case agent offer a summary opinion as to culpability before any evidence to support such a conclusion has been presented for jury review." Garcia, 413 F.3d at 214 (quotations, citations, brackets & footnote omitted) (ellipse in Garcia). Although Mr. Kernkraut is not a case agent, his testimony created the same problem. It allowed the government to offer a summary opinion as to Mr. Forbes' alleged culpability before any evidence to support such a conclusion was introduced.

Over the course of two days, Mr. Kernkraut testified repeatedly that Mr. Forbes discussed membership numbers and renewal rates with him. See, e.g., Tr. at 139-40; Tr. at 142; Tr. at 230-31; Tr. at 330-31. Mr. Kernkraut testified that Mr. Forbes knew the membership numbers and the renewal rates. See Tr. at 144 (opining that "if anyone knew how the business worked, [Mr. Forbes] knew how the business worked" and that "he knew the key variables. He knew membership growth. He knew the renewal rates."). Mr. Kernkraut emphasized the alleged importance of the membership numbers and renewal rates and testified that he was

unable to validate those figures other than through discussions with management. See Tr. at 274 ("[T]here were two key variables in CUC's business; the number of members they had and what the renewal rate of the company was. And there was no way for an outside analyst to validate that information aside from hearing it from the management's mouth."); see also Tr. at 262-63. Mr. Kernkraut testified that CUC overstated its membership numbers and renewal rates, see Tr. at 217-18, 229, and that Mr. Forbes made false representations to him about CUC's financial results, see Tr. at 335, 337. Mr. Kernkraut also testified that Cendant's April 15, 1998 announcement of accounting irregularities affected its stock price, see Tr. at 220, and that "the shareholders of the company lost half their value if not more," Tr. at 221.

Mr. Kernkraut, a witness with almost no relevant personal knowledge, was permitted to testify in essence that Mr. Forbes knowingly made material false statements in connection with the purchase or sale of securities regarding matters that were not charged in the indictment. Mr. Kernkraut also testified to the alleged fact of fraud in years before 1995, which is the government's "Two-CFO" theory, and the alleged fact that membership numbers and renewal rates were overstated, even though neither of these supposed facts is in Cendant's Restatement. Accordingly, a mistrial is warranted.

## II.  MR. KERNKRAUT'S TESTIMONY CONSTRUCTIVELY AMENDED THE INDICTMENT AND/OR CAUSED A PREJUDICIAL VARIANCE.

A constructive amendment takes place when the government presents evidence at trial that broadens the scope of the indictment beyond that returned by

the grand jury, or when the government presents evidence that is based on facts different than those found by the grand jury.  See, e.g., United States v. Milstein, 401 F.3d 53, 64-66 (2d Cir. 2005) (finding constructive amendment and vacating conviction on relevant count when indictment charged defendant with misbranding drugs because they were re-packaged, but government offered evidence that the drugs were misbranded because they were not sterile); Forbes Trial Motion No. 20 (filed July 21, 2004) [Docket No. 953] (legal discussion incorporated herein by reference).  A constructive amendment "is a *per se* violation of the Fifth Amendment."  Milstein, 401 F.3d at 65.

Similarly, when the evidence offered by the government at trial establishes "facts materially different from those alleged in the indictment," and a defendant is thereby prejudiced in his ability to defend himself, the variance constitutes reversible error.  United States v. Thomas, 274 F.3d 655, 670 (2d Cir. 2001) (quotation omitted); see also Forbes Trial Motion No. 20 (filed July 21, 2004) [Docket No. 953] (legal discussion incorporated herein by reference).

The Second Circuit has warned that courts should be particularly vigilant in preventing deviations from the indictment in conspiracy and fraud cases because of the already broad nature of such prosecutions.

> [W]e must be especially alert to subtle attempts to
> broaden the already pervasive and widesweeping nets of
> conspiracy prosecutions.  In light of the current broad
> range of conduct covered by the federal fraud statutes, it
> is critical that courts vigilantly enforce the Fifth
> Amendment requirement that a person be tried only on
> the charges contained in the indictment returned by the
> grand jury.  In order to avoid amending an indictment in

violation of the Fifth Amendment, the government in
fraud cases should think through the nature of the crime
it wishes to allege and then spell out the offense in a
carefully drafted indictment, instead of confronting the
defendant with its theory of criminality for the first time
at trial.

United States v. Mollica, 849 F.2d 723, 729 (2d Cir. 1988) (quotations

omitted).

Mr. Kernkraut's testimony injected new charges of accounting fraud into the case when he alleged that CUC falsely overstated its membership numbers and membership renewal rates. The indictment does not contain any allegations regarding overstated membership numbers or membership renewal rates. The indictment charges allegedly fraudulent accounting practices regarding the use of topside adjustments, see Indict. ¶¶ 23-25, the use of merger reserves, see id. ¶¶ 30-43, the underfunding of membership cancellation reserves, see id. ¶¶ 44-48, the misallocation of revenues and expenses among immediate and deferred recognition categories, see id. ¶¶ 49-53, the manipulation of membership solicitation costs, see id. ¶ 55, the reduction of the liability for commission expenses, see id. ¶ 56, the entry of a credit based on an unspecified future tax benefit, see id. ¶ 57, and the crediting of $22 million to CUC's January 1997 earnings for money earned in prior periods, see id. ¶ 58. By confronting Mr. Forbes with a new theory of criminality for the first time at this retrial, the government constructively amended the indictment and caused a prejudicial variance.

## III.  THE GOVERNMENT MAY HAVE ELICITED FALSE TESTIMONY FROM MR. KERNKRAUT.

As the government is well aware, because the issue has been briefed before in this case, due process prohibits the government from eliciting testimony that it knew or should have known was false or misleading.  See, e.g., Napue v. Illinois, 360 U.S. 264, 269 (1959); United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991); Memorandum in Support of Forbes Trial Motion No. 28 (filed Aug. 20, 2004) [Docket No. 1084] (legal discussion incorporated herein by reference).  In addition, the government has a duty to correct false testimony when it appears. See, e.g., Napue, 360 U.S. at 269-70 ("A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth." (quotation omitted)).

Mr. Kernkraut's testimony that CUC's membership numbers and membership renewal rates were overstated does not appear to have any factual basis whatsoever.  Cendant's April 15, 1998 press release and its subsequent Restatement, upon which Mr. Kernkraut's testimony appears to be based, do not support his testimony.  If the government claims to have evidence to support the new theory it is now pushing for the first time, it should provide that evidence forthwith because the government should have provided the evidence pursuant to its Rule 16 obligations long ago.  If, as it appears, Mr. Kernkraut's testimony was false, the government has a constitutional duty to correct the falsehood.  Similarly unfounded is Mr. Kernkraut's testimony suggesting that Cendant's Restatement

established that CUC's financial results were overstated for periods before 1995. As set forth above, Cendant restated financial results only for the years 1995-97.

## CONCLUSION

For the reasons set forth above, Mr. Forbes respectfully requests that the Court grant a mistrial or, in the alternative, strike the improper testimony of Mr. Kernkraut and issue a curative instruction that his stricken testimony was both unreliable and false.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: _Bary D. Simon for_

Brendan V. Sullivan, Jr. (Bar No. ct17115)
Barry S. Simon (Bar No. ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
COWDERY, ECKER & MURPHY, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

Dated:  October 23, 2005

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANT WALTER A. FORBES FOR A MISTRIAL BASED ON THE TESTIMONY OF STEVEN KERNKRAUT to be sent to the following via e-mail (and will cause the foregoing to be hand delivered to the following on October 24):

> Michael Martinez, AUSA
> Craig Carpenito, AUSA
> U.S. Department of Justice
> 450 Main Street, Room 320
> Hartford, CT 06103

and to the following via e-mail:

> Norman Gross, AUSA
> U.S. Attorney's Office
> District of New Jersey
> 401 Market Street
> Fourth Floor
> Camden, NJ 08101

Barry S. Simon