YEAR ENDED DECEMBER 31, 1996 VS. YEAR ENDED DECEMBER 31, 1995

| (IN MILLIONS) | YEAR ENDED DECEMBER 31, | | VARIANCE |
| --- | --- | --- | --- |
| | 1996 | 1995 | |
| CONTINUING OPERATIONS: | | | |
| Revenue .............................. | $ 3,237.7 | $ 2,616.1 | 24% |
| Operating expenses: | | | |
| Excluding Unusual Charges ......... | 2,580.5 | 2,152.2 | 20% |
| Unusual Charges (1) ............... | 109.4 | 97.0 | 13% |
| Operating income ..................... | 547.8 | 366.9 | 49% |
| Interest, net ....................... | 14.3 | 16.6 | (14%) |
| Pre-tax income ....................... | 533.5 | 350.3 | 52% |
| Provision for income taxes ........... | 220.2 | 143.2 | 54% |
| Income from continuing operations, net of taxes ........................ | 313.3 | 207.1 | 51% |
| Income from discontinued operations ........................... | 16.7 | 22.7 | (26%) |
| Net income ........................... | $ 330.0 | $ 229.8 | 44% |

----------
(1)   Merger-related costs and other unusual charges

Operating income from continuing operations increased $180.9 million (49%) due to a $621.6 million (24%) revenue increase and only a $440.7 million (20%) increase in operating expenses, which includes a $12.4 million increase in Unusual Charges (see Unusual Charge discussion below). This aggregate net increase is primarily the result of increases in the Travel and Real Estate Segments included in separate segment discussions to follow.

Pre-tax income from continuing operations increased $183.2 million (52%). Exclusive of the increase in operating income discussed above, interest, net decreased $2.3 million (14%) to $14.3 million. The decrease in interest, net resulted from incremental interest income in 1996 generated from excess of proceeds of the May 1996 offering of common stock which raised $1.2 billion of proceeds and funded the $745 million acquisition of Coldwell Banker in May 1996, and subsequently the cash portions of the Avis and RCI acquisitions which were completed in October and November of 1996, respectively.

Income from continuing operations increased $106.2 million (51%). This resulted from the favorable variance in pre-tax income discussed above offset by an increase in the effective income tax rate from 40.9% in 1995 to 41.2% in 1996.

Income from discontinued operations decreased $6.0 million (26%) to $16.7 million. Net income for 1996 included $24.9 million, after tax, of Unusual Charges incurred coincident to the July 1996 Davidson and Sierra mergers. Excluding the Unusual Charges, income from discontinued operations increased $18.9 million (83%) to $41.6 million. The increase was primarily attributable to a $19.3 million (95%) increase in software business net income, which was primarily generated from a $76.1 million (25%) increase in sales of software titles while operating expenses increased only $41.5 million (16%).

UNUSUAL CHARGE DISCUSSION

1996 UNUSUAL CHARGE

The Company incurred Unusual Charges of approximately $134.3 million in 1996 in connection with its August 1996 merger with Ideon and its July 1996 mergers with Davidson and Sierra. Unusual Charges of $109.4 million were related to continuing operations (substantially Ideon). Unusual Charges include $80.4 million of litigation related liabilities associated with the Company's determination to settle acquired

Ideon litigation upon the August 1996 merger date. The primary obligation
consists of litigation with the co-founder of SafeCard Services, Incorporated
("SafeCard") which was acquired by Ideon in 1995. The Company entered into a
settlement agreement in June 1997 requiring $70.5 million of payments through
2003. The Company paid $14.4 million for litigation related charges in 1997.

The balance of the Unusual Charges consists of $27.5 million of professional
fees incurred and paid in connection with the mergers, $7.5 million of
severance incurred and paid in connection with employee terminations and $18.9
million of facility related and other obligations for which $6.9 million of
payments and $9.7 million of leasehold improvement write-offs were made through
December 31, 1997.


1995 COSTS RELATED TO IDEON PRODUCTS ABANDONED AND RESTRUCTURING

During the year ended December 31, 1995, Ideon incurred special charges
totaling $43.8 million, net of recoveries, related to the abandonment of
certain new product developmental efforts and the related impairment of certain
assets and the restructuring of the SafeCard division of Ideon and the Ideon
corporate infrastructure as discussed below. The original charge of $45.0
million was composed of accrued liabilities of $36.2 million and asset
impairments of $8.8 million. In December 1995, Ideon recovered $1.2 million of
costs in the above charges. Also included in costs related to products
abandoned are marketing and operational costs incurred of $53.2 million. During
the year ended December 31, 1996, all remaining amounts that had been
previously accrued were paid.

During 1995, the following costs related to products abandoned and
restructuring were incurred. In early 1995, Ideon launched an expanded PGA TOUR
Partners program that provided various benefits to members and consumer
response rates after the launch were significantly less than Ideon management's
expectations. The product as configured was deemed not economically viable and
a charge of $18 million was incurred. Costs associated with the abandonment of
the product marketing included employee severance payments (approximately 130
employees), costs to terminate equipment and facilities leases, costs for
contract impairments and write-downs taken for asset impairments. In September
1995, after a period of product redesign and test marketing, Ideon discontinued
its PGA TOUR Partners credit card servicing role and recorded a charge of $3.6
million for costs associated with the abandonment of this role, including
employee severance payments (approximately 60 employees), costs to terminate
equipment and facilities leases and the recognition of certain commitments. In
April 1995, Ideon launched a nationwide child registration and missing child
search program. Consumer response rates after the launch were significantly
less than Ideon management's expectations and a charge of $9.0 million was
incurred to cover severance payments (approximately 100 employees), costs to
terminate equipment and facilities leases and write-down taken for asset
impairments. As a result of the discontinuance of these products, Ideon
undertook an overall restructuring of its operations and incurred charges of
$7.2 million to terminate operating leases and write-down assets to realizable
value, $3.0 million for restructuring its SafeCard division and $4.2 million
for restructuring its corporate infrastructure.


SEGMENT DISCUSSION -- 1996 VS. 1995

The underlying discussion of each segment's financial results focuses on
profits from continuing operations, excluding interest, taxes and Unusual
Charges ("Operating Income"). Management believes such discussion is the most
informative representation of recurring, non-transactional related operating
results of the Company's business segments.


TRAVEL SERVICES SEGMENT

|  | YEAR ENDED DECEMBER 31, | | |
|  | 1996 | 1995 | VARIANCE |
| (IN MILLIONS) | | | |
| Net revenues | $   802.4 | $   684.4 | 17% |
| Operating expenses | 548.1 | 488.2 | 12% |
| Operating income | $   254.3 | $   196.2 | 30% |

Operating income increased as a result of growth from businesses owned in both
1996 and 1995 and profits from car rental franchise and timeshare operations
acquired in the fourth quarter of 1996. Net revenues

increased $118.0 million (17%) to $802.4 million while expenses increased only $59.9 million (12%). The increase in operating income was generated primarily from $25.2 million and $22.0 million increases in the lodging franchise and fleet management services businesses, respectively, as well as $3.8 million of increases from acquired company operations. Lodging franchise operating income increased 21% to $145.8 million as a result of a $50.0 million (15%) increase in revenue and only a $24.9 million (12%) increase in expenses. The revenue increase resulted from a 13% increase in royalty fees and a 41% increase in fees from preferred alliance partners. As a result of high operating leverage, more than 50% of the revenue increase resulted in incremental operating income. PHH fleet management services operating income increased $19.3 million (34%) to $76.2 million as a result of an increase in fee-based services and an $11.7 million gain on the sale of a truck fuel management business in January 1996.

REAL ESTATE SERVICES SEGMENT

| | YEAR ENDED DECEMBER 31, | | |
| (IN MILLIONS) | 1996 | 1995 | VARIANCE |
| --- | --- | --- | --- |
| Net revenues | $ 782.4 | $ 504.3 | 55% |
| Operating expenses | 566.4 | 390.2 | 45% |
| Operating income | $ 216.0 | $ 114.1 | 89% |

Operating income increased as a result of acquired real estate franchise system operations and growth from businesses owned in both 1996 and 1995. Real estate franchise operating income increased $91.2 million (472%) in 1996 to $110.5 million which was primarily driven from the incremental operating results of Century 21, ERA and Coldwell Banker which were acquired in August 1995, February 1996 and May 1996, respectively. The increase in operating income was comprised of incremental revenue, including $162.8 million of royalty and $12.2 million of preferred alliance revenue offset by $97.2 million of incremental operating expenses. Corporate relocation operating income increased $12.6 million as a result of $23.5 million of operating income from acquired operations offset by a $10.9 million net decrease in relocation business operating profits associated with the development of an expanded full service infrastructure that supports a greater range of client services.

ALLIANCE MARKETING SEGMENT

| | YEAR ENDED DECEMBER 31, | | |
| (IN MILLIONS) | 1996 | 1995 | VARIANCE |
| --- | --- | --- | --- |
| Net revenues | $ 1,474.3 | $ 1,302.3 | 13% |
| Operating expenses | 1,316.0 | 1,166.5 | 13% |
| Operating income | $ 158.3 | $ 135.8 | 17% |

Operating income increased $22.5 million (17%) to $158.3 million due to a $172.0 million (13%) revenue increase being partially offset by an increase of $149.5 million (13%) in operating expenses.

Individual Membership operating income increased $2.7 million (15%) to $20.7 million. Revenue increased $40.8 million (8%) due primarily to a $21.9 million (4%) increase in annual billings while monthly billings increased by $10.7 million (510%). The annual billing increase was primarily due to increases of $21.1 million for the Travelers Advantage product and $14.8 million for the Privacy Guard product but was partially offset by decreases of $9.2 million and $6.5 million for the Shopping and Auto Advantage products, respectively. Cancellation rates remained relatively constant in both years. Individual membership operating expenses increased $45.9 million (8%) to $642.5 million due primarily as a result of increases in annual membership acquisition costs of $44.9 million (14%). As a percentage of annual revenues, membership acquisition costs increased from 57% in 1995 to 63% in 1996.

Insurance/Wholesale operating income increased $36.5 million (62%) to $95.4 million. Revenues increased $93.9 million (27%) to $448.0 million and were partially offset by an increase in expenses of $57.4 million (19%). Domestic revenue increased $57.1 million (18%) to $376.2 million reflecting the addition of 1.7 million new customers, 1996 acquisitions and a reduction in insurance claims and premiums

49

(which are accounted for as a reduction in revenues) from 30.3% to 27.6% of revenue. Domestic expenses increased $23.9 million (9%) due to 1996 acquisitions and increased marketing and servicing expenses associated with additional revenue. International revenue increased $36.8 million (105%) to $71.8 million while expenses increased $33.5 million (87%) to $72.1 million. The small prior year base of international revenue coupled with continued expansion into new countries and markets accounted for accelerated growth in both revenue and expenses.

Lifestyle operating income decreased to $42.1 million from $59.0 million in 1995. This reduction was due to revenue increases of $29.4 million (9%) being offset by expense increases of $46.2 million (17%). Revenue and operating income at EPub decreased by $23.9 million (12%) and $20.4 million (56%) respectively due primarily to revenue declines resulting from a decrease in coupon book prices. Revenue and operating income at the Company's dating membership business increased by $17.5 million (477%) and $4.9 million respectively due primarily to the addition of 70 new participating radio stations. The NAOG generated revenue and operating income increases of $18.2 million (28%) and $9.2 million (154%) respectively due primarily to increased book/video sales and increased membership in the Handyman Club. Revenues at NUMA Corporation increased by $16.9 million (33%) but were more than offset by operating expense increases of $24.6 million (66%) due primarily to an increase in advertising costs from 27% to 34% of sales.

OTHER SERVICES SEGMENT

| (IN MILLIONS) | YEAR ENDED DECEMBER 31, | | VARIANCE |
| | 1996 | 1995 | |
|---|---|---|---|
| Net revenues | $ 178.6 | $ 125.1 | 43% |
| Operating expenses | 150.0 | 107.3 | 40% |
| Operating income | $ 28.6 | $ 17.8 | 61% |

The increase in operating income primarily includes $9.5 million in consideration received during 1996 for the termination of a corporate services agreement and $9.5 million from the equity in earnings of Avis, representing the Company's proportionate share of Avis's car rental operating results since the October 1996 acquisition date, partially offset by incremental corporate related expenses due to infrastructure growth in 1996.

LIQUIDITY AND CAPITAL RESOURCES

BUSINESS COMBINATIONS

1997 Poolings

Cendant. The Cendant Merger was completed on December 17, 1997 pursuant to which CUC issued approximately 440.0 million shares of its common stock for all of the outstanding common stock of HFS. Pursuant to the agreement and plan of merger, HFS stockholders received 2.4031 shares of CUC common stock for each share of HFS common stock.

On December 17, 1997, as directed by the Federal Trade Commission in connection with the Cendant Merger, the Company sold all of the outstanding shares of one of its timeshare exchange businesses Interval for net proceeds of $240.0 million in cash less transaction related costs. The Company is precluded from soliciting any of Interval's employees, customers or clients for a period of two years from the closing date of the transaction. Also in conjunction with the sale, the Company agreed to continue to provide services to certain of Interval's customers for a specified period, guarantee performance of certain responsibilities to third parties (i.e., lease payments and certain other contracts) and absorb certain additional transitional costs related to the transaction.

PHH. On April 30, 1997, the Company issued 72.8 million shares of Company common stock in exchange for all of the outstanding common stock of PHH. PHH operates the world's largest provider of corporate relocation services and also is a leading provider of mortgage and fleet management services.

Numa. In February 1997, the Company issued 3.0 million shares of its common stock for all the outstanding capital stock of Numa Corporation ("Numa"). Numa publishes and markets personalized heritage publications.

1996 Poolings

Ideon. In August 1996, the Company acquired all of the outstanding capital
stock of Ideon, principally a provider of credit card enhancement services, for
a purchase price approximating $393 million, which was satisfied by the
issuance of 16.6 million shares of Company common stock.

Other. In 1996, the Company acquired the outstanding stock of certain other
entities by issuing 4.8 million shares of its common stock.

1995 Poolings

Getko, NAOG and Advance Ross. In June 1995, the Company issued 5.6 million
shares of its common stock for all of the outstanding capital stock of Getko
Group Inc. ("Getko"). Getko distributes complimentary welcoming packages to new
homeowners throughout the United States and Canada. In September 1995, the
Company issued 2.3 million shares of its common stock for all of the
outstanding capital stock of North American Outdoor Group, Inc. ("NAOG"). NAOG
owns one of the largest for-profit hunting and general interest fishing
membership organizations in the United States, and also owns various other
membership organizations. In January 1996, the Company issued 8.9 million
shares of its common stock for all of the outstanding capital stock of Advance
Ross Corporation ("Advance Ross"). Advance Ross is the parent company to Global
Refund, a subsidiary which processes value-added tax refunds for travelers in
over 20 European countries.

Pending Acquisitions

American Bankers. On March 23, 1998, the Company entered into a definitive
agreement (the "ABI Merger Agreement") to acquire American Bankers Insurance
Group, Inc. ("American Bankers") for $67 per share in cash and stock, for
aggregate consideration of approximately $3.1 billion. The Company has agreed
to purchase 23.5 million shares of American Bankers at $67 per share through
its pending cash tender offer, to be followed by a merger in which the Company
has agreed to deliver Cendant shares with a value of $67 for each remaining
share of American Bankers common stock outstanding. The Company has received
anti-trust clearance to acquire American Bankers. The tender offer is subject
to the receipt of tenders representing at least 51 percent of the common shares
of American Bankers as well as customary closing conditions, including
regulatory approvals. The Company plans to fund this acquisition with proceeds
received from either its new term loan arrangement, borrowings under other
committed facilities, operating cash flow or a combination of the above. The
Company may also fund a portion of the purchase price with equity or proceeds
from the disposition of its consumer software and classified advertising
businesses. From time to time representatives of the Company and
representatives of American Bankers have discussed possible modifications to
the terms of the ABI Merger Agreement, including a change in the mix of
consideration to increase the cash component and decrease the stock component
and changing the transaction to a taxable transaction. No agreement regarding
any such modification has been reached and there can be no assurance that such
discussion will result in any agreement being reached. If no agreement
regarding the terms of any modification to the terms of the ABI Merger
Agreement is reached, the current ABI Merger Agreement will remain in effect in
accordance with its terms. The transaction is expected to be completed in the
fourth quarter of 1998 or the first quarter of 1999. American Bankers provides
affordable, specialty insurance products and services through financial
institutions, retailers and other entities offering consumer financing.

Providian. On December 10, 1997, the Company announced that it had entered into
a definitive agreement to acquire Providian Auto and Home Insurance Company
("Providian") and its subsidiaries from an Aegon N.V. subsidiary for
approximately $219 million in cash. Providian sells automobile insurance to
consumers through direct response marketing in 45 states and the District of
Columbia. The closing of this transaction is subject to customary conditions,
including regulatory approval and no assurances can be made that the
acquisition will be completed. Prior to the acquisition the name of Providian
will be changed to Cendant Auto Insurance Company ("Cendant Auto"). The Company
intends to expand Cendant Auto's marketing channels to the Company's existing
distribution channels, while also providing the Company's existing customer
base with a new product offering.

RAC Motoring Services. On May 21, 1998, the Company announced that it has reached a definitive agreement with the Board of Directors of Royal Automobile Club Limited ("RACL") to acquire their RAC Motoring Services subsidiary for approximately $735 million in cash. The sale of RAC Motoring Services has subsequently been approved by its shareholders. Closing is subject to certain conditions, regulatory approval. Although no assurances can be made, the Company currently anticipates that the transaction will be completed in the spring of 1999. The Company plans to fund this acquisition with proceeds from either its new term loan arrangement, borrowings under other committed facilities, operating cash flow or a combination of the above.


Completed Acquisitions

National Parking Corporation. On April 27, 1998, the Company acquired National Parking Corporation ("NPC") for $1.6 billion in cash, which included the repayment of approximately $227.0 million of outstanding NPC debt. NPC is substantially comprised of two operating subsidiaries. National Car Parks is the largest private (non-municipal) single car park operator in the UK with approximately 500 locations. Green Flag operates the third largest roadside assistance group in the UK and offers a wide-range of emergency support and rescue services to approximately 3.5 million members. The Company funded the NPC acquisition with borrowings under its revolving credit facilities.

Harpur Group. On January 20, 1998, the Company completed the acquisition of Harpur, a leading fuel card and vehicle management company in the UK, from privately held H-G Holdings, Inc. for approximately $186 million in cash plus future contingent payments of up to $20.0 million over the next two years.

Jackson Hewitt. On January 7, 1998, the Company completed the acquisition of Jackson Hewitt Inc. for approximately $480.0 million in cash. Jackson Hewitt operates the second largest tax preparation service franchise system in the United States. The Jackson Hewitt franchise system specializes in computerized preparation of federal and state individual income tax returns.

Other Completed 1998 Acquisitions. Subsequent to December 31, 1997, the Company acquired certain entities for an aggregate purchase price of $348.5 million in cash.


1997 Purchase Acquisitions and Investments

Investment in NRT. During the third quarter of 1997, the Company executed an agreement with NRT Incorporated ("NRT") (a corporation created to acquire residential real estate brokerage firms) and the principal stockholders' of NRT, which permitted the Company, at its discretion, to acquire up to $263.3 million of NRT preferred stock and $446.0 million of intangible assets of real estate brokerage firms acquired by NRT. During the third quarter of 1997, the Company acquired $182.0 million of NRT preferred stock and through June 30, 1998 the Company had also acquired $359.3 million of certain intangible assets including trademarks associated with real estate brokerage firms acquired by NRT which are subject to a 50 year franchise agreement.

In September 1997, NRT acquired the real estate brokerage business and operations of the National Realty Trust (the "Trust"), and two other regional real estate brokerage businesses. The Trust is an independent trust to which the Company contributed the brokerage offices formerly owned by Coldwell Banker in connection with the Company's acquisition of Coldwell Banker in 1996. NRT is the largest residential brokerage firm in the United States.

Other. The Company acquired certain entities in 1997 for an aggregate purchase price of $289.5 million, comprised of $267.9 million in cash and $21.6 million in Company common stock (0.9 million shares).


1996 Purchase Acquisitions and Investments

RCI. In November 1996, the Company completed the acquisition of all the outstanding common stock of RCI for $487.1 million comprised of $412.1 million in cash and $75.0 million (approximately 2.4 million shares) in Company common stock plus future contingent payments of up to $200.0 million over the next five years. The Company made a contingent payment of $100.0 million during the first quarter of 1998. RCI is the world's largest provider of timeshare exchange.

Avis. In October 1996, the Company completed the acquisition of all of the outstanding capital stock of Avis Inc. ("Avis"), including payments under certain employee stock plans of Avis and the redemption of certain series of preferred stock of Avis for $806.5 million. The purchase price was comprised of approximately $367.2 million in cash, $100.9 million in indebtedness and $338.4 million (approximately 11.1 million shares) in Company common stock. Subsequently, the Company made contingent cash payments of $26.0 million in 1996 and $60.8 million in 1997. The contingent payments made in 1997 represented the incremental amount of value attributable to Company common stock as of the stock purchase agreement date in excess of the proceeds realized upon subsequent sale of such Company common stock.

Prior to the consummation of the acquisition, the Company announced its strategy to dilute its interest in the Avis car rental operations while retaining assets that are consistent with its service provider business profile, including the trademark, franchise agreements, reservation system and information technology system assets. In September 1997, ARAC (the company which operated the rental car operations of Avis) completed an initial public offering ("IPO") resulting in a 72.5% dilution of the Company's equity interest in ARAC. Net proceeds of $359.3 million were retained by ARAC. The Company's interest in ARAC was further diluted to 20.4% due to a primary offering by ARAC and a secondary offering of common stock in March 1998.

Coldwell Banker. In May 1996, the Company acquired by merger Coldwell Banker Corporation, the largest gross revenue producing residential real estate company in North America and a leading provider of corporate relocation services. The Company paid $640.0 million in cash for all of the outstanding capital stock of Coldwell Banker and repaid $105.0 million of Coldwell Banker indebtedness. The aggregate purchase price for the transaction was financed through the May 1996 sale of an aggregate 46.6 million shares of Company common stock generating $1.2 billion of proceeds pursuant to a public offering.

Other. During 1996, the Company acquired certain other entities for an aggregate purchase price of $281.5 million comprised of $224.0 million in cash, $52.5 million of Company common stock (2.5 million shares) and $5.0 million of notes.


1995 Purchase Acquisitions

Century 21. In August 1995, a majority owned (87.5%) subsidiary of the Company, C21 Holding Corp. ("Holding"), acquired Century 21 Real Estate Corporation ("Century 21"), the world's largest residential real estate brokerage franchisor. The Aggregate purchase price of $245.0 million for the acquisition consisted of $100.2 million in cash, $64.8 million in Company common stock (9.6 million shares), and $80.0 million of preferred stock. Pursuant to an agreement, as amended, between the Company and a management group of Holding, the Company acquired the remaining 12.5% interest in Holding for $52.8 million in 1997.

Other. The Company acquired certain other entities for an aggregate purchase price of $163.3 million comprised of $122.5 million in cash and $40.8 million in Company common stock (6.0 million shares).


DISCONTINUED OPERATIONS

Classified Advertising Acquisition. In October 1997, the Company issued 14.2 million shares of its common stock for all of the outstanding capital stock of Hebdo Mag International ("Hebdo Mag"). Hebdo Mag is a publisher and distributor of international classified advertising information.

Software Acquisitions. In July 1996, the Company issued 45.1 million shares and 38.4 million shares of Company common stock for all of the outstanding capital stock of Davidson and Sierra, respectively. Davidson and Sierra develop, publish and distribute educational and entertainment software for home and school use and comprise the majority of the Company's wholly owned subsidiary, Cendant Software Corporation ("Cendant Software").

Divestitures. On August 12, 1998, the Company announced that its Executive Committee of the Board of Directors committed to discontinue the Company's classified advertising and consumer software

businesses by disposing of Hebdo Mag and Cendant Software, respectively. The Company has since entered into a definitive agreement to sell Hebdo Mag to its former 50% owners for 7.1 million shares of Company common stock and approximately $400 million in cash. The transaction is expected to consummate in the fourth quarter of 1998 and is subject to certain conditions, including regulatory approval and financing by the purchaser. The Company expects to recognize a gain of approximately $250 million upon the disposal of Hebdo Mag assuming a Company stock price of $15.66 per share. In addition, the Company has engaged investment bankers to analyze various strategic alternatives in regard to the disposition of Cendant Software. The Company anticipates that the disposition of Cendant Software will also result in a significant gain. The Company believes that the divesting of its Hebdo Mag and Cendant Software subsidiaries will generate significant proceeds, thereby increasing equity while reducing debt.

FINANCING (EXCLUSIVE OF MANAGEMENT AND MORTGAGE PROGRAM FINANCING)

The Company believes that it has excellent liquidity and access to liquidity through various sources. The Company has also demonstrated its ability to access equity and public debt markets and financial institutions to generate capital for strategic acquisitions. The Company is unable to access equity and public debt markets until the filing of restated financial statements with the Securities and Exchange Commission. Accordingly, the Company has secured additional liquidity through other sources including a 364-day, $3.25 billion term loan facility and committed revolving credit facilities of $2.65 billion, including a bank commitment to provide a $650 million, 364-day revolving facility, which is available to partially fund the American Bankers acquisition.

On May 29, 1998 the Company entered into a 364-day term loan facility with a syndicate of financial institutions which provides for borrowings of up to $3.25 billion (the "Term Loan Facility"). The Term Loan Facility bears interest at LIBOR plus the applicable LIBOR spread, as defined. The Company intends to repay all outstanding borrowings under the Term Loan Facility as soon as practicable. Upon the execution of the Term Loan Facility, temporary credit agreements, which provided for $1.0 billion of borrowings, were terminated. The Term Loan Facility contains certain restrictive covenants, which are substantially similar to and consistent with the covenants in effect for the Company's existing revolving credit agreements. At June 30, 1998, the full amount of the commitment under the Term Loan Facility was drawn. The Company used $2 billion of the proceeds from the Term Loan Facility to refinance the outstanding borrowings under its revolving credit facilities and intends to use the remainder for the acquisition of American Bankers, RAC Motors Services (See Note 26) and for general corporate purposes.

The Company's primary credit facility consists of (i) a $750.0 million, five year revolving credit facility (the "Five Year Revolving Credit Facility") and (ii) a $1.25 billion, 364 day revolving credit facility (the "364 Day Revolving Credit Facility") (collectively, the "Revolving Credit Facilities"). The 364 Day Revolving Credit Facility will mature on October 31, 1998, but may be renewed on an annual basis for an additional 364 days upon receiving lender approval. The Company has submitted an extension request to the lenders under the 364 Day Revolving Credit Facility and anticipates that approximately $1.0 billion will be renewed. The Five Year Revolving Credit Facility will mature on October 1, 2001. Borrowings under the Revolving Credit Facilities, at the option of the Company, bear interest based on competitive bids of lenders participating in the facilities, at prime rates or at LIBOR, plus a margin of approximately 22 basis points. The Company is required to pay a per annum facility fee of .08% and .06% of the average daily unused commitments under the Five Year Revolving Credit Facility and 364 Day Revolving Credit Facility, respectively. The interest rates and facility fees are subject to change based upon credit ratings of the Company's senior unsecured long-term debt by nationally recognized debt rating agencies. The Revolving Credit Facilities contain certain restrictive covenants including restrictions on indebtedness, mergers, liquidations and sale and leaseback transactions and requires the maintenance of certain financial ratios, including a 3:1 minimum interest coverage ratio and a 3.5:1 maximum debt coverage ratio, as defined.

Long-term debt increased $465.2 million to $1.2 billion at December 31, 1997 when compared to amounts outstanding at December 31, 1996, primarily as a result of the $550 million issuance of 3% Notes in February 1997, the proceeds of which were used to repay outstanding revolving credit facility borrowings

at the Cendant Merger date. The Company's debt was $4.0 billion at June 30, 1998 which primarily consisted of $3.25 billion of borrowings under the Company's Term Loan Facility and $700 million of publicly issued fixed rate debt.

The Company filed an amended shelf registration statement (the "Shelf Registration Statement") on February 6, 1998 with the Securities and Exchange Commission for the issuance of up to an aggregate $4.0 billion of debt and equity securities. Pursuant to the Shelf Registration Statement, the Company issued 29.9 million FELINE PRIDESSM and 2.3 million trust preferred securities on March 2, 1998 and received approximately $1.4 billion in gross proceeds therefrom. The issuance of the FELINE PRIDES resulted in the utilization of approximately $3 billion of availability under the Shelf Registration Statement. The FELINE PRIDES consist of 27.6 million Income PRIDES and 2.3 million Growth PRIDES, each with a face amount of $50 per PRIDE. The Income PRIDES consist of trust preferred securities and stock purchase contracts under which the holders will purchase common stock from the Company in February of 2001. The Growth PRIDES consist of stock purchase contracts under which the holders will purchase common stock from the Company in February of 2001 and zero coupon U.S. Treasury securities. The trust preferred securities will bear interest at the annual rate of 6.45 percent, and the forward purchase contract forming a part of the Income PRIDE will pay 1.05 percent annually in the form of a contract adjustment payment. The forward purchase contract forming a part of the Growth PRIDES will pay 1.3 percent annually in the form of a contract adjustment payment. The forward purchase contracts call for the holder to purchase a minimum of 1.0395 shares and a maximum of 1.3514 shares of Company common stock per PRIDES security, depending upon the average of the closing price per share of Company common stock for a 20 consecutive trading day period ending in mid-February of 2001.

The Company filed a shelf registration statement with the Securities and Exchange Commission which has not yet become effective for the aggregate issuance of up to $3.0 billion of debt and equity securities.

On May 4, 1998, the Company redeemed all of the outstanding ($144.5 million principal amount) of 4 3/4% Convertible Senior Notes due 2003 at a price of 103.393% of the principal amount, together with interest accrued to the redemption date. Prior to May 4, 1998, $90.5 million of such notes were exchanged for 2.5 million shares of Company common stock.

On April 8, 1998, the Company exercised its option to call its 6 1/2% Convertible Subordinated Notes (the "6 1/2% Notes") for redemption on May 11, 1998, in accordance with the provisions of the indenture relating to the 6 1/2% Notes. Prior to the redemption date, all of the outstanding 6 1/2% Notes were converted into 2.1 million shares of Company common stock.

MANAGEMENT AND MORTGAGE PROGRAM FINANCING

PHH operates their mortgage services, fleet management services and relocation services businesses as a separate public reporting entity and supports purchases of leased vehicles and originated mortgages primarily by issuing commercial paper and medium term notes. Financial covenants related to such debt are designed to ensure the self-sufficient liquidity status of PHH. Accordingly, PHH's publicly filed financial statements and underlying publicly issued debt were not impacted by the accounting irregularities previously disclosed and PHH continues to issue debt securities in public markets. Such borrowings are not classified based on contractual maturities, but rather are included in liabilities under management and mortgage programs rather than long-term debt since such debt corresponds directly with high quality related assets. Additionally, PHH continues to pursue opportunities to reduce its borrowing requirements by securitizing increasing amounts of its high quality assets. In May 1998, PHH commenced a program to sell originated mortgage loans to an unaffiliated buyer, at the option of the Company, up to the buyer's asset limit of $1.5 billion. The buyer may sell or securitize such mortgage loans into the secondary market, however, servicing rights are retained by the Company.

PHH debt is issued without recourse to the Company. PHH expects to continue to have broad access to global capital markets by maintaining the quality of its assets under management. This is achieved by establishing credit standards to minimize credit risk and the potential for losses. Depending upon asset growth and financial market conditions, PHH utilizes the United States, European and Canadian commercial paper markets, as well as other cost-effective short-term instruments. In addition, PHH will

55

continue to utilize the public and private debt markets as sources of financing. Augmenting these sources, PHH will continue to manage outstanding debt with the potential sale or transfer of managed assets to third parties while retaining fee-related servicing responsibility. At June 30, 1998, PHH's outstanding debt was comprised of commercial paper, medium-term notes and other borrowings of $3.2 billion, $3.4 billion and $.2 billion, respectively. PHH's aggregate borrowings at the underlying balance sheet dates were as follows ($ billions):

|                    | DECEMBER 31, | |
|                    | 1997 | 1996 |
|--------------------|------|------|
| Commercial paper   | $ 2.6 | $ 3.1 |
| Medium-term notes  | 2.7  | 1.7  |
| Other              | 0.3  | 0.3  |
|                    | $ 5.6 | $ 5.1 |

PHH filed a shelf registration statement with the Securities and Exchange Commission, which became effective March 2, 1998, for the aggregate issuance of up to $3 billion of debt securities. These securities may be offered from time to time, together or separately, based on terms to be determined at the time of sale. The proceeds will be used to finance assets PHH manages for its clients and for general corporate purposes. As of July 31, 1998, PHH had issued $795 million of medium-term notes under this shelf registration statement.

To provide additional financial flexibility, the Company's current policy is to ensure that minimum committed facilities aggregate 80 percent of the average amount of outstanding commercial paper. PHH maintains a $2.5 billion syndicated unsecured credit facility which is backed by domestic and foreign banks and is comprised of $1.25 billion of lines of credit maturing in March 1999, which may be extended upon receiving lender approval, $1.25 billion maturing in the year 2000 and a $200 million facility maturing in June 1999. In addition, PHH has approximately $186 million of uncommitted lines of credit with various financial institutions which were unused at June 30, 1998. Management closely evaluates not only the credit of the banks but also the terms of the various agreements to ensure ongoing availability. The full amount of PHH's committed facilities at June 30, 1998 was undrawn and available. Management believes that its current policy provides adequate protection should volatility in the financial markets limit PHH's access to commercial paper or medium-term notes funding.

PHH minimizes its exposure to interest rate and liquidity risk by effectively matching floating and fixed interest rate and maturity characteristics of funding to related assets, varying short and long-term domestic and international funding sources, and securing available credit under committed banking facilities.

On July 10, 1998, the Company entered into a Supplemental Indenture No. 1 (the "Supplemental Indenture") with The First National Bank of Chicago, as trustee, under the Senior Indenture dated as of June 5, 1997, which formalizes the policy for PHH of limiting the payment of dividends and the outstanding principal balance of loans to the Parent Company to 40% of consolidated net income (as defined in the Supplemental Indenture) for each fiscal year. The Supplemental Indenture prohibits PHH from paying dividends or making loans to the Parent Company if upon giving effect to such dividends and/or loan, PHH's debt to equity ratio exceeds 8 to 1.

CREDIT RATINGS

The Company's long-term debt credit ratings from S&P, Duff & Phelps ("Duff") and Moody's remain at A, A and A3, respectively; however such ratings are being reviewed by such agencies with negative implications following the Company's March 23, 1998 announcements relating to the Company's agreements to acquire American Bankers and NPC and its April 15, 1998 announcement regarding accounting irregularities discovered at the former CUC business units. PHH's present long term and short term debt ratings are A+/A1, A2/P1, A+/F1, A/D1 with Standard & Poor's (S&P), Moody's Investor Service (Moody's), Fitch IBCA and Duff & Phelps Credit Rating Co. (Duff), respectively. Presently, the

ratings of both S&P and Moody's related to PHH debt are on watch with negative implications. While this negative watch period has caused PHH to incur a marginal increase in its cost of funds, management believes its sources of liquidity continue to be adequate. (A security rating is not a recommendation to buy, sell or hold securities and is subject to revision or withdrawal at any time).

CASH FLOWS (1997 VS. 1996)

The Company generated $1.2 billion of cash flows from operations in 1997 representing a $312.6 million decrease from 1996. The decrease in cash flows from operations was primarily due to a $314.7 million increase in mortgage loans held for sale due to increased mortgage loan origination volume.

The Company used $2.3 billion of cash flows for investing activities in 1997, consisting of approximately $1.5 billion of a net investment in assets under management and mortgage programs and $568.2 million for acquisition costs, including ARAC and RCI. In 1996, the Company used $3.1 billion for investing activities including a $1.3 billion net investment in assets under management and mortgage programs and $1.6 billion of acquisition costs. In 1997, cash flows from financing activities of approximately $900.1 million, primarily consisted of net borrowings totaling $435.9 million including net proceeds of $543.2 million from the issuance of the 3% Convertible Notes in February 1997 and management and mortgage program financing consisting of $509.9 million of net borrowings which funded the Company's purchases of assets under management and mortgage programs. In 1996, cash flows from financing activities of approximately $1.8 million consisted of public offerings of common stock that resulted in $1.2 billion of net proceeds and $241.9 million of net borrowings which funded the Company's purchase of assets under management and mortgage programs.

Deferred membership income at December 31, 1997 of $1.3 billion primarily represents fees collected for the sale of one year memberships to individual consumers. In accordance with the Company's membership agreement, members have the right to a full refund at any time during the active membership period. Based on the Company's experience, approximately 45% of fees billed will be refunded to new members prior to expiration of the membership term. Deferred membership income at December 31, 1996 of $900.9 million primarily represents the estimated unamortized portion of the aggregate membership fees billed primarily in 1996 net of estimated cancellation refunds. Such deferral was calculated prior to the change in accounting for memberships. Deferred membership acquisition costs of $269.9 million at December 31, 1996 represents direct member solicitation costs which were amortized to expense over the membership period prior to the Company adopting the new policy for accounting for memberships effective January 1, 1997. Solicitation costs were expensed as incurred in 1997.

SEVERANCE AGREEMENT

On July 28, 1998, the Company announced that Walter A. Forbes resigned as Chairman of the Company and as a member of the Board of Directors. The severance agreement reached with Mr. Forbes gives him the benefits required by his employment contract relating to a termination of Mr. Forbes' employment with the Company for reasons other than for cause. Those benefits total $35 million in cash and include the granting of approximately 1.3 million stock options. The benefits to Mr. Forbes will result in the Company recording an unusual expense of approximately $47.5 million in the third quarter of 1998.

REPRICING OF STOCK OPTIONS

On July 28, 1998, the Compensation Committee of the Board of Directors approved, in principle, a program to reprice certain Company stock options granted to employees of the Company, other than executive officers, during December 1997 and the first quarter of 1998. The new option price for such stock options is to be the market price of the Company's common stock as reported on the New York Stock Exchange shortly after the filing of the Company's Annual Report on Form 10-K/A for the year ended December 31, 1997. On September 23, 1998, the Compensation Committee extended such repricing program to certain executive officers and senior managers of the Company subject to certain conditions including revocation of a portion of existing options plus repricing of other portions at prices at and above fair market value at the time of repricing. Additionally, a management equity ownership program was adopted that requires these executive officers and senior managers to acquire Company common stock at various levels commensurate with such manager's compensation.

57

LITIGATION

As a result of the aforementioned accounting irregularities, which were discovered in the former CUC business units, numerous purported class action lawsuits, a purported derivative lawsuit and an individual lawsuit have been filed against the Company and, among others, its predecessor HFS, and certain current and former officers and directors of the Company and HFS, asserting various claims under the federal securities laws and certain state statutory and common laws. In addition, the staff of the SEC and the United States Attorney for the District of New Jersey are conducting investigations relating to the accounting issues. The SEC staff has advised the Company that its inquiry should not be construed as an indication by the SEC or its staff that any violations of law have occurred.

While it is not feasible to predict or determine the final outcome of these proceedings or to estimate the amounts or potential range of loss with respect to these matters, management believes that an adverse outcome with respect to such proceedings could have a material impact on the financial condition, results of operations and cash flows of the Company. See "ITEM 3. LEGAL PROCEEDINGS."

CAPITAL EXPENDITURES

The Company anticipates investing approximately $250 million in capital expenditures in 1998, representing approximately 6% of 1997 consolidated revenue. Such capital expenditures are primarily associated with the development of integrated corporate relocation business systems in accordance with the merger plan developed upon the PHH merger date, mortgage services office and system additions to support the rapid growth in origination volume and the consolidation of internationally-based call centers.

YEAR 2000 COMPLIANCE

The Year 2000 presents the risk that information systems will be unable to recognize and process date-sensitive information properly from and after January 1, 2000.

To minimize or eliminate the effect of the year 2000 risk on the Company's business systems and applications, the Company is continually identifying, evaluating, implementing and testing changes to its computer systems, applications and software necessary to achieve Year 2000 compliance. The Company's predecessor implemented a Year 2000 initiative in March 1996 that has now been adopted by all business units of the Company. As part of such initiative, the Company has selected a team of managers to identify, evaluate and implement a plan to bring all of the Company's critical business systems and applications into Year 2000 compliance prior to December 31, 1999. The Year 2000 initiative consists of four phases: (i) identification of all critical business systems subject to Year 2000 risk (the "Identification Phase"); (ii) assessment of such business systems and applications to determine the method of correcting any Year 2000 problems (the "Assessment Phase"); (iii) implementing the corrective measures (the "Implementation Phase"); and (iv) testing and maintaining system compliance (the "Testing Phase"). The Company has substantially completed the Identification and Assessment Phases and has identified and assessed five areas of risk: (i) internally developed business applications; (ii) third party vendor software, such as business applications, operating systems and special function software; (iii) computer hardware components; (iv) electronic data transfer systems between the Company and its customers; and (v) embedded systems, such as phone switches, check writers and alarm systems. Although no assurances can be made, the Company believes that it has identified substantially all of its systems, applications and related software that are subject to Year 2000 compliance risk and has either implemented or initiated the implementation of a plan to correct such systems that are not Year 2000 compliant. The Company has targeted December 31, 1998 for completion of the Implementation Phase. Although the Company has begun the Testing Phase, it does not anticipate completion of the Testing Phase until sometime prior to December 1999.

The Company relies on third party service providers for services such as telecommunications, internet service, utilities, components for its embedded and other systems and other key services. Interruption of those services due to Year 2000 issues could affect the Company's operations. The Company has initiated an evaluation of the status of such third party service providers' efforts and to determine alternative and contingency requirements. While approaches to reducing risks of interruption of business operations vary

by business unit, options include identification of alternative service providers available to provide such services if a service provider fails to become Year 2000 compliant within an acceptable timeframe prior to December 31, 1999.

The total cost of the Company's Year 2000 compliance plan is anticipated to be $53 million. Approximately $17 million of these costs had been incurred through August 31, 1998, and the Company expects to incur the balance of such costs to complete the compliance plan. The Company has been expensing and capitalizing the costs to complete the compliance plan in accordance with appropriate accounting policies. Variations from anticipated expenditures and the effect on the Company's future results of operations are not anticipated to be material in any given year. However, if Year 2000 modifications and conversions are not made, or are not completed in time, the Year 2000 problem could have a material impact on the operations and financial condition of the Company.

THE ESTIMATES AND CONCLUSIONS HEREIN ARE FORWARD-LOOKING STATEMENTS AND ARE BASED ON MANAGEMENT'S BEST ESTIMATES OF FUTURE EVENTS. RISKS OF COMPLETING THE PLAN INCLUDE THE AVAILABILITY OF RESOURCES, THE ABILITY TO DISCOVER AND CORRECT THE POTENTIAL YEAR 2000 SENSITIVE PROBLEMS WHICH COULD HAVE A SERIOUS IMPACT ON CERTAIN OPERATIONS AND THE ABILITY OF THE COMPANY'S SERVICE PROVIDERS TO BRING THEIR SYSTEMS INTO YEAR 2000 COMPLIANCE.


IMPACT OF INFLATION AND SEASONALITY

To date, inflation has not had a material impact on Company operations. The third quarter represented 27% of annual revenue as a result of peak leisure travel and real estate sales in summer months.

IMPACT OF NEW ACCOUNTING PRONOUNCEMENTS

In June 1997, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards ("SFAS") No. 130, "Reporting Comprehensive Income" which establishes standards for reporting and display of an alternative income measurement and its components in the financial statements. This statement is effective for fiscal years beginning after December 15, 1997. The Company adopted SFAS No. 130 in 1998.

In June 1997, the FASB issued SFAS No. 131 "Disclosures About Segments of an Enterprise and Related Information" effective for periods beginning after December 15, 1997. SFAS No. 131 establishes standards for the way that public business enterprises report information about their operating segments in their annual and interim financial statements. It also requires public enterprises to disclose company-wide information regarding products and services and the geographic areas in which they operate. The Company will adopt SFAS No. 131 in 1998.

In February 1998, the FASB issued SFAS No. 132 "Employers' Disclosures about Pensions and Other Postretirement Benefits" effective for periods beginning after December 15, 1997. The Company will adopt SFAS No. 132 effective in the 1998 calendar year end.

The aforementioned recently issued accounting pronouncements establish standards for disclosures only and therefore will have no impact on the Company's financial position or results of operations.

In June 1998, the FASB issued SFAS No. 133 "Accounting for Derivative Instruments and Hedging Activities" effective for fiscal years beginning after June 15, 1999. SFAS No. 133 requires the recognition of all derivatives in the consolidated balance sheet as either assets or liabilities measured at fair value. The Company will adopt SFAS No. 133 effective for the 2000 calendar year end. The Company has not yet determined the impact SFAS No. 133 will have on its financial position or results of operations when such statement is adopted.


FORWARD LOOKING STATEMENTS

    Certain statements in this Management's Discussion and Analysis of Financial Condition and Results of Operations constitute "forward looking statements" within the meaning of the Private Securities

Litigation Reform Act of 1995. Such forward looking statements involve known and unknown risks, uncertainties and other factors which may cause the actual results, performance, or achievements of the Company to be materially different from any future results, performance, or achievements expressed or implied by such forward looking statements. These forward looking statements were based on various factors and were derived utilizing numerous important assumptions and other important factors that could cause actual results to differ materially from those in the forward looking statements. Important assumptions and other factors that could cause actual results to differ materially from those in the forward looking statements, include, but are not limited to: the outcome of the pending litigation relating to the previously announced accounting irregularities, uncertainty as to the Company's future profitability, the Company's ability to develop and implement operational and financial systems to manage rapidly growing operations; competition in the Company's existing and potential future lines of business; the Company's ability to integrate and operate successfully acquired and merged businesses and the risks associated with such businesses, including the Company's ability to obtain financing on acceptable terms to finance the Company's growth strategy and for the Company to operate within the limitations imposed by financing arrangements; uncertainty as to the future profitability of acquired businesses, the ability of the Company and its vendors to complete the necessary actions to achieve a year 2000 conversion for its computer systems and applications and other factors. Other factors and assumptions not identified above were also involved in the derivation of these forward looking statements, and the failure of such other assumptions to be realized as well as other factors may also cause actual results to differ materially from those projected. The Company assumes no obligation to update these forward looking statements to reflect actual results, changes in assumptions or changes in other factors affecting such forward looking statements.

ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

In recurring operations, the Company must deal with effects of changes in interest rates and currency exchange rates. The following discussion presents an overview of how such changes are managed and a view of their potential effects.

The Company uses various financial instruments, particularly interest rate and currency swaps and currency forwards, to manage its respective interest rate and currency risks. The Company is exclusively an end user of these instruments, which are commonly referred to as derivatives. The Company does not engage in trading, market-making or other speculative activities in the derivatives markets. Established practices require that derivative financial instruments relate to specific asset, liability or equity transactions or to currency exposures. More detailed information about these financial instruments, as well as the strategies and policies for their use, is provided in Notes 15 and 16 to the financial statements.

The Securities and Exchange Commission requires that registrants include information about potential effects of changes in interest rates and currency exchange in their financial statements. Although the rules offer alternatives for presenting this information, none of the alternatives is without limitations. The following discussion is based on so-called "shock tests," which model effects of interest rate and currency shifts on the reporting company. Shock tests, while probably the most meaningful analysis permitted, are constrained by several factors, including the necessity to conduct the analysis based on a single point in time and by their inability to include the extraordinarily complex market reactions that normally would arise from the market shifts modeled. While the following results of shock tests for interest rate and currencies may have some limited use as benchmarks, they should not be viewed as forecasts.

o One means of assessing exposure to interest rate changes is a duration-based analysis that measures the potential loss in net earnings resulting from a hypothetical 10% change (decrease) in interest rates across all maturities (sometimes referred to as a "parallel shift in the yield curve"). Under this model, it is estimated that, all else constant, such a decrease would not adversely impact the 1998 net earnings of the Company based on year-end 1997 positions.

o One means of assessing exposure to changes in currency exchange rates is to model effects on future earnings using a sensitivity analysis. Year-end 1997 consolidated currency exposures, including financial instruments designated and effective as hedges, were analyzed to identify the

60

Company's assets and liabilities denominated in other than their relevant functional currency. Net unhedged exposures in each currency were then remeasured assuming a 10% change (decrease) in currency exchange rates compared with the U.S. dollar. Under this model, it is estimated that, all else constant, such a decrease would not adversely impact the 1998 net earnings of the Company based on year-end 1997 positions.

The categories of primary market risk exposure of the Company are: (i) long-term U.S. interest rates due to mortgage loan origination commitments and an investment in mortgage loans held for resale; (ii) short-term interest rates as they impact vehicle and relocation receivables; and (iii) LIBOR and commercial paper interest rates due to their impact on variable rate borrowings.

ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

See Financial Statements and Financial Statement Schedule Index commencing on page F-1 hereof.

ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

(a) Previous independent accountants

(i) On January 20, 1998, in connection with the Company's previously announced plan to name a successor independent auditor following the Merger, the Company replaced Ernst & Young LLP, which served as the Company's independent accountants, and engaged Deloitte & Touche LLP, the independent auditor of HFS Incorporated prior to the Merger, as its new independent accountants. As of January 20, 1998, Ernst & Young LLP was to continue to audit and report on the Company's former CUC businesses as of and for the year ended December 31, 1997. However, on May 11, 1998, the Company dismissed Ernst & Young LLP.

(ii) The reports of Ernst & Young LLP on the financial statements for the past two fiscal years of the Company contained no adverse opinion or disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope of accounting principles.

(iii) The Audit Committee of the Company's Board of Directors participated in and approved the decision to change independent accountants.

(iv) In connection with its audit for the two most recent fiscal years and through May 11, 1998, there were no disagreements with Ernst & Young LLP on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreements if not resolved to the satisfaction of Ernst & Young LLP would have caused Ernst & Young LLP to make reference thereto in their report on the financial statements for such years.

(v) During the two most recent fiscal years and through May 11, 1998, there were no reportable events as that term is defined in Item 304(a)(1)(v) of Regulation S-K. However, as previously reported, the Audit Committee of the Board of Directors of the Company conducted an investigation into accounting irregularities at former CUC business units which were audited by Ernst & Young LLP. The results of such investigation required a restatement of previously reported financial statements of the Company. Such investigation may result in disagreements by the Company with Ernst & Young LLP in the future with respect to previously reported financial statements of the Company which were audited by Ernst & Young LLP.

(vi) The Company requested that Ernst & Young LLP furnish it with letters addressed to the Commission stating whether or not it agrees with the above statements. A copy of a letter, dated January 22, 1998, is filed as Exhibit 16 to the Current Report on Form 8-K of the Company dated January 27, 1998 and a copy of a letter, dated May 11, 1998, is filed as Exhibit 16 to the Annual Report on Form 8-K of the Company dated May 18, 1998.

(b) New independent accountants

As stated above, the Company engaged Deloitte & Touche LLP as its new independent accountants as of January 20, 1998. Such engagement was approved by the Audit Committee of the Company's Board of Directors on January 20, 1998. During the two most recent fiscal years and through January 20, 1998, the Company has not consulted with Deloitte & Touche LLP regarding either:

(i) The application of accounting principles to a specified transaction, either completed or proposed; or the type of audit opinion that might be rendered on the Company's financial statements, and neither a written report was provided to the registrant nor oral advice was provided that Deloitte & Touche concluded was an important factor considered by the registrant in reaching a decision as to the accounting, auditing or financial reporting issue; or

(ii) Any matter that was either the subject of a disagreement, as that term is defined in Item 304(a)(1)(iv) of Regulation S-K, and the related instructions to Item 304 of Regulation S-K, or a reportable event, as that term is defined in Item 304(a)(1)(v) of Regulation S-K.

PART III

ITEM 10. DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

The information contained in the Company's Proxy Statement under the sections titled "Proposal 1: Election of Directors" and "Executive Officers" is incorporated herein by reference in response to this item.

ITEM 11. EXECUTIVE COMPENSATION

The information contained in the Company's Proxy Statement under the section titled "Executive Compensation and Other Information" is incorporated herein by reference in response to this item, except that the information contained in the Proxy Statement under the sub-headings "Pre-Merger Compensation Committee Report on Executive Compensation" and "Performance Graph" is not incorporated herein by reference and is not to be deemed "filed" as part of this filing.

ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND
          MANAGEMENT

The information contained in the Company's Proxy Statement under the section titled "Security Ownership of Certain Beneficial Owners and Management" is incorporated herein by reference in response to this item.

ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

The information contained in the Company's Proxy Statement under the section titled "Certain Relationships and Related Transactions" is incorporated herein by reference in response to this item.

PART IV

ITEM 14. EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON FORM 8-K

ITEM 14(A)(1) FINANCIAL STATEMENTS

See Financial Statements and Financial Statements Index commencing on page F-1 hereof.

ITEM 14(A)(3) EXHIBITS

See Exhibit Index commencing on page E-1 hereof.

ITEM 14(B) REPORTS ON FORM 8-K

On October 31, 1997, the Company filed a Current Report on Form 8-K to report the execution of a Stock Purchase Agreement to sell all of the outstanding stock of Interval Holdings, Inc. and CUC Vacation Exchange. Inc.

On November 4, 1997, the Company filed a Current Report on Form 8-K to report the post-merger financial results relating to the acquisition of Hebdo Mag International Inc.

On December 18, 1997, the Company filed a Current Report on Form 8-K to report the completion of the Merger.

62

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

CENDANT CORPORATION

By: /s/ James E. Buckman
    ------------------------------------

    James E. Buckman

    Senior Executive Vice President
    and General Counsel
    Date: September 28, 1998

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
| --- | --- | --- |
| /s/ Henry R. Silverman<br>------------------------<br>(Henry R. Silverman) | Chairman of the Board, President,<br>Chief Executive Officer and Director | September 28 , 1998 |
| /s/ Michael P. Monaco<br>------------------------<br>(Michael P. Monaco) | Vice Chairman, Chief Financial Officer<br>and Director (Principal Financial<br>Officer) | September 28, 1998 |
| /s/ Scott E. Forbes<br>------------------------<br>(Scott E. Forbes) | Executive Vice President -- Finance<br>(Principal Accounting Officer) | September 28, 1998 |
| /s/ Stephen P. Holmes<br>------------------------<br>(Stephen P. Holmes) | Vice Chairman and Director | September 28, 1998 |
| /s/ Robert D. Kunisch<br>------------------------<br>(Robert D. Kunisch) | Vice Chairman and Director | September 28, 1998 |
| /s/ Christopher K. McLeod<br>------------------------<br>(Christopher K. McLeod) | Vice Chairman and Director | September 28, 1998 |
| /s/ James E. Buckman<br>------------------------<br>(James E. Buckman) | Senior Executive Vice President,<br>General Counsel and Director | September 28, 1998 |
| /s/ John D. Snodgrass<br>------------------------<br>(John D. Snodgrass) | Director | September 28, 1998 |
| /s/ Leonard S. Coleman<br>------------------------<br>(Leonard S. Coleman) | Director | September 28, 1998 |
| /s/ Martin L. Edelman<br>------------------------<br>(Martin L. Edelman) | Director | September 28, 1998 |
| /s/ Dr. Carole G. Hankin<br>------------------------<br>(Dr. Carole G. Hankin) | Director | September 28, 1998 |

63

```
SIGNATURE                        TITLE                              DATE
---------                        -----                              ----

/s/ Brian Mulroney               Director                 September 28, 1998
-----------------------------
(The Rt. Hon. Brian Mulroney,
P.C., LL.D)

/s/ Robert W. Pittman            Director                 September 28, 1998
-----------------------------
(Robert W. Pittman)

/s/ E. John Rosenwald, Jr.       Director                 September 28, 1998
-----------------------------
(E. John Rosenwald, Jr.)

/s/ Robert P. Rittereiser        Director                 September 28, 1998
-----------------------------
(Robert P. Rittereiser)

/s/ Leonard Schutzman            Director                 September 28, 1998
-----------------------------
(Leonard Schutzman)

/s/ Robert F. Smith              Director                 September 28, 1998
-----------------------------
(Robert F. Smith)

/s/ Craig R. Stapleton           Director                 September 28, 1998
-----------------------------
(Craig R. Stapleton)

/s/ Robert E. Nederlander        Director                 September 28, 1998
-----------------------------
(Robert E. Nederlander)
```

64

EXHIBITS:

| EXHIBIT NO. | DESCRIPTION |
| --- | --- |
| 2.1 | Agreement and Plan of Merger, dated March 23, 1998 among the Company, Season Acquisition Corp. and American Bankers Insurance Group, Inc. (incorporated by reference to Exhibit C-2 to the Schedule 14-D-1 (Amendment 31), dated March 23, 1998, filed by the Company and Season Acquisition Corp.)* |
| 3.1 | Amended and Restated Certificate of Incorporation of the Company (incorporated by reference to Exhibit 4.1 to the Company's Post-Effective Amendment No. 2 on Form S-8 to the Registration Statement on Form S-4, No. 333-34517, dated December 17, 1997)* |
| 3.2 | Amended and Restated By-Laws of the Company (incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K dated August 4, 1998)* |
| 4.1 | Form of Stock Certificate (filed as Exhibit 4.1 to the Company's Registration Statement, No. 33-44453, on Form S-4 dated December 19, 1991)* |
| 4.2 | Indenture dated as of February 11, 1997, between CUC International Inc. and Marine Midland Bank, as trustee (filed as Exhibit 4(a) to the Company's Report on Form 8-K filed February 13, 1997)* |
| 4.3 | Indenture between HFS Incorporated and Continental Bank, National Association, as trustee (Incorporated by reference to HFS Incorporated's Registration Statement on Form S-1 (Registration No. 33-71736), Exhibit No. 4.1)* |
| 4.4 | Indenture dated as of February 28, 1996 between HFS Incorporated and First Trust of Illinois, National Association, as trustee (Incorporated by reference to HFS Incorporated's Current Report on Form 8-K dated February 28, 1996, Exhibit 4.01)* |
| 4.5 | Supplemental Indenture No. 1 dated as of February 28, 1996 between HFS Incorporated and First Trust of Illinois, National Association, as trustee (Incorporated by reference to HFS Incorporated's Current Report on Form 8-K dated March 8, 1996, Exhibit 4.02)* |
| 4.6 | Indenture, dated as of February 24, 1998, between the Company and The Bank of Novia Scotia Trust Company of New York, as Trustee (incorporated by reference to Exhibit 4.4 to the Company's Current Report on Form 8-K dated March 6, 1998)* |
| 4.7 | First Supplemental Indenture dated February 24, 1998, between the Company and The Bank of Novia Scotia Trust Company of New York, as Trustee (incorporated by reference to Exhibit 4.5 to the Company's Current Report on Form 8-K, dated March 6, 1998)* |
| 4.8 | Amended and Restated Declaration of Trust of Cendant Capital I. (incorporated by reference to Exhibit 4.1 to the Company's Current Report on Form 8-K dated March 6, 1998)* |
| 4.9 | Preferred Securities Guarantee Agreement dated March 2, 1998, between by Cendant Corporation and Wilmington Trust Company. (incorporated by reference to Exhibit 4.2 to the Company's Current Report on Form 8-K dated March 6, 1998)* |
| 4.10 | Purchase Contract Agreement (including as Exhibit A the form of the Income PRIDES and as Exhibit B the form of the Growth PRIDES), dated March 2, 1998, between Cendant Corporation and The First National Bank of Chicago (incorporated by reference to Exhibit 4.3 to the Company's Current Report on Form 8-K dated March 6, 1998)* |
| 10.1--10.47 | Material Contracts, Management Contracts, Compensatory Plans and Arrangements |

EXHIBIT NO.                                         DESCRIPTION
-----------                                         -----------

10.1        Agreement with E. Kirk Shelton, dated as of May 27, 1997 (filed as Exhibit 10.1 to
            the Company's Registration Statement on Form S-4, Registration No. 333-34571,
            July 31, 1996)*

10.2        Agreement with Christopher K. McLeod, dated as of May 27, 1997 (filed as
            Exhibit 10.2 to the Company's Registration Statement on Form S-4, Registration
            No. 333-34571)*

10.3        Restated Employment Contract with Walter A. Forbes, dated as of May 27, 1997 (filed
            as Exhibit 10.3 to the Company's Registration Statement on Form S-4, Registration
            No. 333-34571)*

10.3(a)     Agreement, dated July 28, 1998, between Cendant Corporation and Walter A. Forbes
            (filed as Exhibit 10.2 to the Company's Form 8-K, dated July 29, 1998)*

10.4        Agreement with Henry R. Silverman, dated May 27, 1997 (filed as Exhibit 10.6 to the
            Company's Registration Statement on Form S-4, Registration No. 333-34571)*

10.5        Agreement with Stephen P. Holmes, dated May 27, 1997 (filed as Exhibit 10.7 to the
            Company's Registration Statement on Form S-4, Registration No. 333-34571)*

10.6        Agreement with Michael P. Monaco, dated May 27, 1997 (filed as Exhibit 10.8 to the
            Company's Registration Statement on Form S-4, Registration No. 333-34571)*

10.7        Agreement with James E. Buckman, dated May 27, 1997 (filed as Exhibit 10.9 to the
            Company's Registration Statement on Form S-4, Registration No. 333-34571)*

10.8        1987 Stock Option Plan, as amended (filed as Exhibit 10.16 to the Company's
            Form 10-Q for the period ended October 31, 1996)*

10.9        1990 Directors Stock Option Plan, as amended (filed as Exhibit 10.17 to the Company's
            Form 10-Q for the period ended October 31, 1996)*

10.10       1992 Directors Stock Option Plan, as amended (filed as Exhibit 10.18 to the Company's
            Form 10-Q for the period ended October 31, 1996)*

10.11       1994 Directors Stock Option Plan, as amended (filed as Exhibit 10.19 to the Company's
            Form 10-Q for the period ended October 31, 1996)*

10.12       Restricted Stock Plan and Form of Restricted Stock Plan Agreement (filed as Exhibit
            10.24 to the Company's Annual Report on Form 10-K for the fiscal year ended
            January 31, 1991, as amended December 12, 1991, and December 19, 1991.)*

10.13       1997 Stock Option Plan (filed as Exhibit 10.23 to the Company's Form 10-Q for the
            period ended April 30, 1997)*

10.14       1996 Executive Retirement Plan (filed as Exhibit 10.22 to the Company's Form 10-Q
            for the period ended April 30, 1997)*

10.15       1997 Stock Incentive Plan (filed as Appendix E to the Joint Proxy Statement/
            Prospectus included as part of the Company's Registration Statement, No. 333-34517,
            on Form S-4 dated August 28, 1997)*

10.16       HFS Incorporated's Amended and Restated 1993 Stock Option Plan (Incorporated by
            reference to HFS Incorporated's Registration Statement on Form S-8 (Registration
            No. 33-83956), Exhibit 4.1)*

10.17(a)    First Amendment to the Amended and Restated 1993 Stock Option Plan dated May 5,
            1995. (Incorporated by reference to HFS Incorporated's Registration Statement on
            Form S-8 (Registration No. 33094756), Exhibit 4.1)*

66

EXHIBIT NO.                                    DESCRIPTION
-----------                                    -----------

10.17(b)        Second Amendment to the Amended and Restated 1993 Stock Option Plan dated
                January 22, 1996. (Incorporated by reference to the HFS Incorporated's Annual Report
                on Form 10-K for fiscal year ended December 31, 1995, Exhibit 10.21(b))*

10.17(c)        Third Amendment to the Amended and Restated 1993 Stock Option Plan dated
                January 22, 1996. (Incorporated by reference to the HFS Incorporated's Annual Report
                on Form 10-K for fiscal year ended December 31, 1995, Exhibit 10.21(c))*

10.17(d)        Fourth Amendment to the Amended and Restated 1993 Stock Option Plan dated
                May 20, 1996. (Incorporated by reference to HFS Incorporated's Registration
                Statement on Form S-8 (Registration No. 333-06733), Exhibit 4.5)*

10.17(e)        Fifth Amendment to the Amended and Restated 1993 Stock Option Plan dated
                July 24, 1996 (Incorporated by reference to the HFS Incorporated's Annual Report on
                Form 10-K for fiscal year ended December 31, 1995, Exhibit 10.21(e))*

10.17(f)        Sixth Amendment to the Amended and Restated 1993 Stock Option Plan dated
                September 24, 1996 (Incorporated by reference to the HFS Incorporated's Annual
                Report on Form 10-K for fiscal year ended December 31, 1995, Exhibit 10.21(e))*

*10.17(g)       Seventh Amendment to the Amended and Restated 1993 Stock Option Plan dated as
                of April 30, 1997

*10.17(h)       Eighth Amendment to the Amended and Restated 1993 Stock Option Plan dated as of
                May 27, 1997

10.18           Chicago Agreement and Plan of Merger, by and among HFS Incorporated, HJ
                Acquisition Corp. and Jackson Hewitt, Inc., dated as of November 19, 1997.
                (Incorporated by reference to Exhibit 10.1 to HFS Incorporated's Current Report on
                Form 8-K dated August 14, 1997, File No. 1-11402)*

10.19           Agreement and Plan of Merger, dated as of July 19, 1996, by and among Ideon Group,
                Inc., CUC International Inc. and IG Acquisition Corp. (filed as Exhibit 10.21 to the
                Company's Annual Report on Form 10-K for the fiscal year ended January 31, 1996)*

10.20           Form of U.S. Underwriting Agreement dated October 1996, among CUC International
                Inc., certain selling stockholders and the U.S. Underwriters (filed as Exhibit 1.1(a) to
                the Company's Registration Statement on Form S-3, Registration No. 333-13537, filed
                on October 9, 1996)*

10.21           Form of International Underwriting Agreement dated October 1996, among CUC
                International Inc., certain selling stockholders and the International Underwriters (filed
                as Exhibit 1.1 (b) to the Company's Registration Statement on Form S-3, Registration
                No. 333-13537, filed on October 9, 1996)*

10.22           Registration Rights Agreement dated as of February 11, 1997, between CUC
                International Inc. and Goldman, Sachs & Co. (for itself and on behalf of the other
                purchasers party thereto) (filed as Exhibit 4(b) to the Company's Report on Form 8-K
                filed February 13, 1997)*

10.23           Agreement and Plan of Merger between CUC International Inc. and HFS
                Incorporated, dated as of May 27, 1997 (filed as Exhibit 2.1 to the Company's Report
                on Form 8-K filed on May 29, 1997)*

10.24           Plan for Corporate Governance of CUC International Inc. following the Effective Time
                (filed as Exhibit 99.2 to the Company's Report on Form 8-K filed on May 29, 1997)*

67

| EXHIBIT NO. | DESCRIPTION |
| --- | --- |
| 10.25 | $750,000,000 Five Year Revolving Credit and Competitive Advance Facility Agreement, dated as of October 2, 1996, among the Company, the several banks and other financial institutions from time to time parties thereto and The Chase Manhattan Bank, as Administrative Agent and CAF Agent (Incorporated by reference to Exhibit (b)(1) to the Schedule 14D-1 filed by the Company on January 27, 1998, File No. 5-31838)* |
| 10.26(a) | $1,250,000 364-Day Revolving Credit and Competitive Advance Facility Agreement, dated October 2, 1996 among the Company, the several banks and other financial institutions from time to time parties thereto, and The Chase Manhattan Bank, as Administrative Agent and CAF Advance Agent. (Incorporated by reference to Exhibit (b)(2) to the Schedule 14D-1 filed by the Company on January 27, 1998, File No. 5-31838).* |
| 10.26(b) | Amendment and Waiver, dated as of April 15, 1998, to the Five Year Competitive Advance and Revolving Credit Agreement and the 364-Day Competitive Advance and Revolving Credit Agreement, each of which is dated as of October 2, 1996, by and among the Company and the financial institutions parties thereto (Incorporated by reference to Exhibit 99.2 to the Company's Current Report on Form 8-K, dated May 5, 1998).* |
| 10.26(c) | Amendment, dated as of May 6, 1998, to the Five Year Competitive Advance and Revolving Credit Agreement and the 364-Day Competitive Advance and the Revolving Credit Agreement, each of which is dated October 2, 1998, by and among the Company and the financial institutions parties thereto (Incorporated by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K, dated June 4, 1998).* |
| 10.26(d) | Amendment and Waiver, dated as of August 26, 1998, to the Five Year Competitive Advance and Revolving Credit Agreement and the 364-Day Competitive Advance and Revolving Credit Agreement by and among the Company and the financial institutions parties thereto. |
| 10.26(e) | Extension Agreement, dated as of August 31, 1998, under the 364-Day Competitive Advance and Revolving Credit Agreement among the Company and the financial institutions parties thereto. |
| 10.26(f) | Amendment, dated September 28, 1998, to the Five Year Competitive Advance and Revolving Credit Agreement and the 364-Day Competitive Advance and Revolving Credit Agreement by and among the Company and the financial institutions parties thereto. |
| 10.27 | Cendant Corporation Acquisition Revolving Credit Facility Commitment Letter, dated January 23, 1998, among Chase Securities Inc., The Chase Manhattan Bank and Cendant Corporation (Incorporated by reference to exhibit (b)(3) to the Schedule 14D-1 filed by the Company on January 27, 1998, File No. 5-31838)* |
| 10.28 | Distribution Agreement, dated March 5, 1998, among the Company, Bear, Stearns & Co., Inc., Chase Securities Inc., Lehman Brothers and Merrill Lynch & Co., Merrill Lynch, Pierce, Fenner & Smith Incorporated (incorporated by reference to the Company's Current Report on Form 8-K, dated March 10, 1998)* |
| 10.29(a) | 364-Day Credit Agreement Among the Company, PHH Vehicle Management Services, Inc., the Lenders, the Chase Manhattan Bank, as Administrative Agent and the Chase Manhattan Bank of Canada, as Canadian Agent, Dated March 4, 1997, filed as Exhibit 10.1 to Registration Statement 333-27715* |
| 10.29(b) | Five-year Credit Agreement among the Company, the Lenders, and Chase Manhattan Bank, as Administrative Agent, dated March 4, 1997 filed as Exhibit 10.2 to Registration Statement 333-27715* |

EXHIBIT NO.                                         DESCRIPTION
-----------                                         -----------

10.29(c)    Second Amendment to PHH Credit Agreements (incorporated by reference to PHH
            Incorporated's Quarterly Report on Form 10-Q for the quarterly period ended
            September 30, 1997, Exhibit 10.1)*

10.29(d)    Third Amendment to PHH Credit Agreements (incorporated by reference to PHH
            Incorporated's Quarterly Report on Form 10-Q for the quarterly period ended
            September 30, 1997, Exhibit 10.1)*

10.30       Indenture between the Company and Bank of New York, Trustee, dated as of May 1,
            1992, filed as Exhibit 4(a)(iii) to Registration Statement 33-48125*

10.31       Indenture between the Company and First National Bank of Chicago, Trustee, dated as
            of March 1, 1993, filed as Exhibit 4(a)(i) to Registration Statement 33-59376*

10.32       Indenture between the Company and First National Bank of Chicago, Trustee, dated as
            of June 5, 1997, filed as Exhibit 4(a) to Registration Statement 333-27715*

10.33       Indenture between the Company and Bank of New York, Trustee dated as of June 5,
            1997, filed as Exhibit 4(a)(11) to Registration Statement 333-27715*

10.34       Distribution Agreement between the Company and CS First Boston Corporation;
            Goldman, Sachs & Co.; Merrill Lynch & Co.; Merrill Lynch, Pierce, Fenner & Smith,
            Incorporated; and J.P. Morgan Securities, Inc. dated November 9, 1995, filed as
            Exhibit 1 to Registration Statement 33-63627*

10.35       Distribution Agreement between the Company and Credit Suisse; First Boston
            Corporation; Goldman Sachs & Co. and Merrill Lynch & Co., dated June 5, 1997 filed
            as Exhibit 1 to Registration Statement 333-27715*

10.36       Distribution Agreement, dated March 2, 1998, among PHH Corporation, Credit Suisse
            First Boston Corporation, Goldman Sachs & Co., Merrill Lynch & Co., Merrill Lynch,
            Pierce, Fenner & Smith, Incorporated and J.P. Morgan Securities, Inc., filed as
            Exhibit 1 to Form 8-K dated March 3, 1998, File No. 1-07797*

10.37       Agreement and Plan of Merger dated as of May 1, 1996 among HFS Incorporated,
            CBC Acquisition Corp., Fremont Investors, Inc. and Coldwell Banker Corporation.
            (Incorporated by reference to HFS Incorporated's Quarterly Report on Form 10-Q for
            the quarterly period ended March 31, 1996, Exhibit 2.4)*

10.38       Agreement and Plan of Merger dated as of August 23, 1996 among HFS Incorporated,
            Avis Acquisition Corp., U.S. Trust Company of California, N.A. as Trustee of the Trust
            forming a part of the Avis, Inc. Employee Stock Ownership Plan and Avis, Inc.
            (Incorporated by reference to HFS Incorporated's Registration Statement on Form S-3
            Registration No. 333-11029, Exhibit 2.1)*

10.39       Stock Purchase Agreement dated as of October 6, 1996 by and among HFS
            Incorporated, Ms. Christel DeHaan and Resort Condominiums International, Inc.
            (Incorporated by reference to HFS Incorporated's Quarterly Report on Form 10-Q for
            the quarterly period ended September 30, 1996, Exhibit 2.1)*

10.40       Registration Rights Agreement, dated as of November 12, 1996, by and between HFS
            Incorporated and Ms. Christel DeHaan (Incorporated by reference to HFS
            Incorporated's Registration Statement on Form S-3 (Registration No. 333-17371),
            Exhibit 2.2)*

10.41       Agreement and Plan of Merger dated as of November 10, 1996, by and among HFS
            Incorporated, PHH Corporation and Mercury Acquisition Corp. (Incorporated by
            reference to HFS Incorporated's Current Report on Form 8-K dated November 14,
            1996, Exhibit 2.1)*

69

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| 10.42 | License Agreement dated as of September 18, 1989 amended and restated as of July 15, 1991 between Franchise System Holdings, Inc. and Ramada Franchise Systems, Inc. (Incorporated by reference to HFS Incorporated's Registration Statement on Form S-1 (Registration No. 33-51422), Exhibit No. 10.2)* |
| 10.43 | Restructuring Agreement dated as of July 15, 1991 by and among New World Development Co., Ltd., Ramada International Hotels & Resorts, Inc. Ramada Inc., Franchise System Holdings, Inc., HFS Incorporated and Ramada Franchise Systems, Inc. (Incorporated by reference to HFS Incorporated's Registration Statement on Form S-1 (Registration No. 33-51422), Exhibit No. 10.3)* |
| 10.44 | License Agreement dated as of November 1, 1991 between Franchise Systems Holdings, Inc. and Ramada Franchise Systems, Inc. (Incorporated by reference to HFS Incorporated's Registration Statement on Form S-1 (Registration No. 33-51422), Exhibit No. 10.4)* |
| 10.45 | Amendment to License Agreement, Restructuring Agreement and Certain Other Restructuring Documents dated as of November 1, 1991 by and among New World Development Co., Ltd., Ramada International Hotels & Resorts, Inc., Ramada Inc., Franchise System Holdings, Inc., HFS Incorporated and Ramada Franchise Systems, Inc. (Incorporated by reference to HFS Incorporated's Registration Statement on Form S-1 (Registration No. 33-51422), Exhibit No. 10.5)* |
| 10.46 | Master License Agreement dated July 30, 1997, among HFS Car Rental, Inc., Avis Rent A Car System, Inc. and Wizard Co. (incorporated by reference to HFS Incorporated Form 10-Q for the quarter ended June 30, 1997, Exhibit 10.1)* |
| 10.47 | HFS Incorporated's 1992 Incentive Stock Option Plan and Form of Stock Option Agreement. (Incorporated by reference to HFS Incorporated's Registration Statement on Form S-1 (Registration No. 33-51422), Exhibit No. 10.6)* |
| 10.48(a)* | Term Loan Agreement, dated as of May 29, 1998, among Cendant Corporation, as Borrower, the Lenders referred therein, Bank of America NT & SA, as Syndication Agent, Barclays Bank PLC, The Bank of Nova Scotia, Credit Lyonnais New York Branch, NationsBank, N.A., as Co-Documentation Agents, CIBC Inc., First Union National Bank, The Industrial Bank of Japan, Limited, New York Branch, as Managing Agents, Bank of Tokyo Mitsubishi Trust Company, Credit Suisse, First Boston, Fleet National Bank, The Sumitomo Bank, Limited, New York Branch, Banque Paribas, as Co-Agents and The Chase Manhattan Bank, as Administrative Agent (incorporated by reference to Cendant Corporation's Form 8-K dated June 4, 1998 (File No. 1-10308)). |
| 10.48(b) | Amendment, dated as of August 26, 1998, to the Term Loan Agreement among the Company and the financial institutions parties thereto. |
| 10.48(c) | Amendment, dated as of September 28, 1998, to the Term Loan Agreement among the Company and the financial institutions parties thereto. |
| 12 | Statement Re: Computation of Consolidated Ratio to Earnings to Combined Fixed Charges and Preferred Stock Dividends |
| 16.1 | Letter re: change in certifying accountant (Incorporated by reference to the Company's Form 8-K dated January 27, 1998)* |
| 16.2 | Letter re: change in certifying accountant of a significant subsidiary (Incorporated by reference to the Company's Form 8-K dated May 18, 1998)* |
| 18 | Letter regarding change in accounting principles |
| 21 | Subsidiaries of Registrant** |
| 23.1 | Consent of Deloitte & Touche LLP related to the financial statements of Cendant Corporation |

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| 23.2 | Consent of KPMG Peat Marwick LLP relating to the financial statements of PHH Corporation |
| 23.3 | Consent of KPMG Peat Marwick LLP relating to the financial statements of Davidson & Associates, Inc. |
| 23.4 | Consent of PricewaterhouseCoopers LLP relating to the financial statements of Ideon Group, Inc. |
| 27 | Financial data schedule |

----------

\*       Incorporated by reference

\*\*      Previously filed

71