Although the period of service for a vehicle is at the lessee's option, and the period a home is held for resale varies, management estimates, by using historical information, the rate at which vehicles will be disposed and the rate at which homes will be resold. Projections of estimated liquidations of assets under management and mortgage programs and the related estimated repayment of liabilities under management and mortgage programs as of December 31, 1997, are set forth as follows:

| (In millions) YEARS | ASSETS UNDER MANAGEMENT AND MORTGAGE PROGRAMS | LIABILITIES UNDER MANAGEMENT AND MORTGAGE PROGRAMS (1) |
|---|---|---|
| 1998 | $  3,321.3 | $  2,746.6 |
| 1999 | 1,855.2 | 1,702.6 |
| 2000 | 838.6 | 766.3 |
| 2001 | 272.8 | 245.8 |
| 2002 | 92.9 | 84.4 |
| 2003-2007 | 62.9 | 56.9 |
| | $  6,443.7 | $  5,602.6 |

------------
(1)  The projected repayments of liabilities under management and mortgage programs are different than required by contractual maturities.


15. DERIVATIVE FINANCIAL INSTRUMENTS

The Company uses derivative financial instruments as part of its overall strategy to manage its exposure to market risks associated with fluctuations in interest rates, foreign currency exchange rates, prices of mortgage loans held for sale and anticipated mortgage loan closing arising from commitments issued. The Company performs analyses on an on-going basis to determine that a high correlation exists between the characteristics of derivative instruments and the assets or transactions being hedged. As a matter of policy, the Company does not engage in derivatives activities for trading or speculative purposes. The Company is exposed to credit-related losses in the event of non-performance by counterparties to certain derivative financial instruments. The Company manages such risk by periodically evaluating the financial position of counterparties and spreading its positions among multiple counterparties. The Company presently does not expect non-performance by any of the counterparties.

INTEREST RATE SWAPS
If the interest characteristics of the funding mechanism that the Company uses does not match the interest characteristics of the assets being funded, the Company enters into interest rate swap agreements to offset the interest rate risk associated with such funding. The swap agreements correlate the terms of the assets to the maturity and rollover of the debt by effectively matching a fixed or floating interest rate with the stipulated revenue stream generated from the portfolio of assets being funded. Amounts to be paid or received under interest rate swap agreements are accrued as interest rates change and are recognized over the life of the swap agreements as an adjustment to interest expense. For the years ended December 31, 1997 and 1996, the Company's hedging activities increased interest expense $4.0 million and $4.1 million, respectively, and had no effect on its weighted average borrowing rate. The fair value of the swap agreements is not recognized in the consolidated financial statements since they are accounted for as hedges.

The following table summarizes the maturity and weighted average rates of the Company's interest rate swaps related to liabilities under management and mortgage programs at December 31, 1997:

| (Dollars in millions) | TOTAL | MATURITIES | | | | | |
|---|---|---|---|---|---|---|---|
| | | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
| **UNITED STATES** | | | | | | | |
| Commercial Paper: | | | | | | | |
| Pay fixed/receive floating: | | | | | | | |
| Notional value | $ 355.7 | $ 184.3 | $ 110.1 | $ 40.6 | $ 11.8 | $ 3.4 | $ 5.5 |
| Weighted average receive rate | | 5.68% | 5.68% | 5.68% | 5.68% | 5.68% | 5.68% |
| Weighted average pay rate | | 6.25% | 6.29% | 6.19% | 6.28% | 6.40% | 6.61% |
| Medium-Term Notes: | | | | | | | |
| Pay floating/receive fixed: | | | | | | | |
| Notional value | 586.0 | 500.0 | | 86.0 | | | |
| Weighted average receive rate | | 6.12% | | 6.71% | | | |
| Weighted average pay rate | | 5.89% | | 5.89% | | | |
| Pay floating/receive floating: | | | | | | | |
| Notional value | 965.0 | 965.0 | | | | | |
| Weighted average receive rate | | 5.76% | | | | | |
| Weighted average pay rate | | 5.70% | | | | | |
| **CANADA** | | | | | | | |
| Commercial Paper: | | | | | | | |
| Pay fixed/receive floating: | | | | | | | |
| Notional value | 54.8 | 29.6 | 18.4 | 5.9 | .9 | | |
| Weighted average receive rate | | 4.53% | 4.53% | 4.53% | 4.53% | | |
| Weighted average pay rate | | 5.36% | 5.12% | 4.89% | 4.93% | | |
| Pay floating/receive floating: | | | | | | | |
| Notional value | 59.8 | 31.2 | 16.7 | 6.5 | 5.1 | .3 | |
| Weighted average receive rate | | 5.88% | 5.88% | 5.88% | 5.88% | 5.88% | |
| Weighted average pay rate | | 4.91% | 4.91% | 4.91% | 4.91% | 4.91% | |
| Pay floating/receive fixed: | | | | | | | |
| Notional value | 28.3 | 28.3 | | | | | |
| Weighted average receive rate | | 3.68% | | | | | |
| Weighted average pay rate | | 4.53% | | | | | |
| **UK** | | | | | | | |
| Commercial Paper: | | | | | | | |
| Pay floating/receive fixed: | | | | | | | |
| Notional value | 491.4 | 174.6 | 167.5 | 113.9 | 35.4 | | |
| Weighted average receive rate | | 7.22% | 7.15% | 7.24% | 7.28% | | |
| Weighted average pay rate | | 7.69% | 7.69% | 7.69% | 7.69% | | |
| **GERMANY** | | | | | | | |
| Commercial Paper: | | | | | | | |
| Pay fixed/receive fixed: | | | | | | | |
| Notional value | 9.1 | 2.5 | (5.6) | 3.1 | 9.1 | | |
| Weighted average receive rate | | 3.76% | 3.76% | 3.76% | 3.76% | | |
| Weighted average pay rate | | 5.34% | 5.34% | 5.34% | 5.34% | | |
| Total | $ 2,550.1 | $ 1,915.5 | $ 307.1 | $ 256.0 | $ 62.3 | $ 3.7 | $ 5.5 |

FOREIGN EXCHANGE CONTRACTS

In order to manage its exposure to fluctuations in foreign currency exchange rates on a selective basis, the Company enters into foreign exchange contracts. Such contracts are utilized as hedges of intercompany loans to foreign subsidiaries. Market value gains and losses on the Company's foreign currency transaction hedges related to intercompany loans are deferred and recognized upon maturity of the loan. Such contracts effectively offset the currency risk applicable to approximately $409.8 million and $329.1 million of obligations at December 31, 1997 and 1996, respectively.

OTHER FINANCIAL INSTRUMENTS

With respect to both mortgage loans held for sale and anticipated mortgage loan closings arising from commitments issued, the Company is exposed to the risk of adverse price fluctuations. The Company uses forward delivery contracts, financial futures and option contracts to reduce such risk. Market value gains and losses on such positions used as hedges are deferred and considered in the valuation of cost or market value of mortgage loans held for sale.

The value of the Company's mortgage servicing rights is sensitive to changes in interest rates. The Company has developed and implemented a hedge program to manage the associated financial risks of loan prepayments. The Company has acquired certain derivative financial instruments, primarily interest rate floors, futures and options to administer its hedge program. Premiums paid or received on the acquired derivative instruments are capitalized and amortized over the life of the contract. Gains and losses associated with the hedge instruments are deferred and recorded as adjustments to the basis of the mortgage servicing rights. Deferrals under the hedge programs are allocated to each applicable stratum of mortgage servicing rights based upon its original designation and included in the impairment measurement.

16. FAIR VALUE OF FINANCIAL INSTRUMENTS AND SERVICING RIGHTS

The following methods and assumptions were used by the Company in estimating its fair value disclosures for material financial instruments. The fair values of the financial instruments presented may not be indicative of their future values.

MARKETABLE SECURITIES

The Company determines the appropriate classification of marketable securities at the time of purchase and reevaluates such designation as of each balance sheet date. All securities at December 31, 1997 and 1996 were classified as available-for-sale and were reported at fair value with the net unrealized holding gains and losses, net of tax, reported as a component of shareholders' equity until realized. Fair value was based upon quoted market prices or investment adviser estimates. Declines in the market value of available-for-sale securities deemed to be other than temporary result in charges to current earnings and the establishment of a new cost basis. Gross unrealized gains and losses on marketable securities were not material.

MORTGAGE LOANS HELD FOR SALE

Fair value is estimated using the quoted market prices for securities backed by similar types of loans and current dealer commitments to purchase loans. These loans are priced to be sold with servicing rights retained. Gains (losses) on mortgage-related positions, used to reduce the risk of adverse price fluctuations, for both mortgage loans held for sale and anticipated mortgage loan closings arising from commitments issued, are included in the carrying amount of mortgage loans held for sale.

MORTGAGE SERVICING RIGHTS

Fair value is estimated based on market quotes and discounted cash flow analyses based on current market information including market prepayment rate consensus. Such market information is subject to change as a result of changing economic conditions.

LONG-TERM DEBT

The fair values of the Company's Senior Notes, Convertible Notes and Medium-term Notes are estimated based on quoted market prices or market comparables.

F-43

INTEREST RATE SWAPS, FOREIGN EXCHANGE CONTRACTS, FUTURES CONTRACTS AND
OPTIONS

The fair values of these instruments are estimated, using dealer quotes, as
the amount that the Company would receive or pay to execute a new agreement
with terms identical to those remaining on the current agreement,
considering interest rates at the reporting date.

The carrying amounts and fair values of the Company's financial instruments
at December 31, are as follows:

| (In millions) | 1997 | | | 1996 | | |
|---|---|---|---|---|---|---|
| | NOTIONAL/ CONTRACT AMOUNT | CARRYING AMOUNT | ESTIMATED FAIR VALUE | NOTIONAL/ CONTRACT AMOUNT | CARRYING AMOUNT | ESTIMATED FAIR VALUE |
| ASSETS | | | | | | |
| Marketable securities: | | | | | | |
| Debt securities | $  -- | $  21.7 (a) | $  21.7 | $  -- | $  69.4 (a) | $  69.4 |
| Equity securities | -- | 22.5 | 22.5 | -- | 22.5 | 22.5 |
| Investment in mortgage related securities | -- | 48.0 | 48.0 | -- | -- | -- |
| ASSETS UNDER MANAGEMENT AND MORTGAGE PROGRAMS | | | | | | |
| Relocation receivables | -- | 775.3 | 775.3 | -- | 773.3 | 773.3 |
| Mortgage loans held for sale | -- | 1,636.3 | 1,668.1 | -- | 1,248.3 | 1,248.3 |
| Mortgage servicing rights | -- | 373.0 | 394.6 | -- | 288.9 | 324.1 |
| OFF BALANCE SHEET DERIVATIVES RELATING TO LONG-TERM DEBT | | | | | | |
| Foreign exchange forwards | 5.5 | | -- | -- | -- | -- |
| LIABILITIES UNDER MANAGEMENT AND MORTGAGE PROGRAMS | | | | | | |
| Debt | -- | 5,607.6 | 5,604.2 | -- | 5,089.9 | 5,089.9 |
| OFF BALANCE SHEET DERIVATIVES RELATING TO LIABILITIES UNDER MANAGEMENT AND MORTGAGE PROGRAMS | | | | | | |
| Interest rate swaps | 2,550.1 | -- | -- | 1,670.2 | -- | -- |
| In a gain position | -- | -- | 5.6 | -- | -- | 2.5 |
| In a loss position | -- | -- | (3.9) | -- | -- | (10.7) |
| Foreign exchange forwards | 415.5 | -- | 2.5 | 329.1 | -- | 10.0 |
| MORTGAGE-RELATED POSITIONS | | | | | | |
| Forward delivery commitments (b) | 2,562.5 | 19.4 | (16.2) | 1,703.5 | 11.4 | 7.4 |
| Option contracts to sell (b) | 290.0 | .5 | -- | 265.0 | 1.0 | .7 |
| Option contracts to buy (b) | 705.0 | 1.1 | 4.4 | 150.0 | 1.3 | (.5) |
| Treasury options used to hedge servicing rights (c) | 331.5 | 4.8 | 4.8 | 313.9 | 1.3 | .3 |
| Constant maturity treasury floors (c) | 825.0 | 12.5 | 17.1 | -- | -- | -- |
| Interest rate swaps (c) | 175.0 | 1.3 | 1.3 | -- | -- | -- |

------------

(a) All debt securities mature within one year and are classified as other
    current assets in the consolidated balance sheets.

(b) Carrying amounts and gains (losses) on these mortgage-related positions
    are already included in the determination of the respective carrying
    amounts and fair values of mortgage loans held for sale.

(c) Carrying amounts on these mortgage-related positions are capitalized and
    recorded as mortgage servicing rights. Gains (losses) on such positions
    are included in the determination of fair value of mortgage servicing
    rights.

17. COMMITMENTS AND CONTINGENCIES

LEASES

The Company has noncancelable operating leases covering various facilities and equipment, which expire through the year 2004. Rental expense for the years ended December 31, 1997, 1996 and 1995 was $91.3 million, $75.3 million and $62.5 million respectively. The Company has been granted rent abatements for varying periods on certain of its facilities. Deferred rent relating to those abatements is being amortized on a straight-line basis over the applicable lease terms. Commitments under capital leases are not significant.

Future minimum lease payments required under noncancelable operating leases as of December 31, 1997 are as follows:

(In millions)

| YEAR | AMOUNT |
| --- | --- |
| 1998 | $ 70.3 |
| 1999 | 64.4 |
| 2000 | 55.3 |
| 2001 | 41.2 |
| 2002 | 29.5 |
| Thereafter | 78.2 |
| Total minimum lease payments | $ 338.9 |

LITIGATION

Company Investigation and Litigation

On April 15, 1998, as a result of the discovery of accounting irregularities in former CUC business units and the investigation of the Audit Committee of the Company's Board of Directors into such matters, the Company has restated its previously reported financial results for 1997, 1996 and 1995.

Since the Company's announcement of the discovery of such accounting irregularities on April 15, 1998, and prior to the date hereof, seventy-one purported class action lawsuits and one individual lawsuit have been filed against the Company, and certain current and former officers and directors of the Company and HFS, asserting various claims under the federal securities laws (the "Federal Securities Actions"). Some of the actions also name as defendants Merrill Lynch & Co. and, in one case, Chase Securities, Inc., underwriters for the Company's PRIDES securities offering; two others also name Ernst & Young LLP, the Company's former independent accountants. Sixty-four of the Federal Securities Actions were filed in the United States District Court for the District of New Jersey, six were filed in the United States District Court for the District of Connecticut (including the individual action), one was filed in the United States District Court for the Eastern District of Pennsylvania, and one was filed in New Jersey Superior Court. The Federal Securities Actions filed in the District of Connecticut and Eastern District of Pennsylvania have been transferred to the District of New Jersey. On June 10, 1998, the Company moved to dismiss or stay the Federal Securities Actions filed in New Jersey Superior Court on the ground that, among other things, it is duplicative of the actions filed in federal courts. The court granted that motion on August 7, 1998, without prejudice to the plaintiff's right to re-file the case in the District of New Jersey.

Certain of these Federal Securities Actions purport to be brought on behalf of purchasers of the Company's common stock and/or options on common stock during various periods, most frequently beginning May 28, 1997 and ending April 15, 1998 (although the alleged class periods begin as early as March 21, 1995 and end as late as July 15, 1998). Others claim to be brought on behalf of persons who exchanged HFS common stock for the Company's common stock in connection with the Merger. Some plaintiffs purport to represent both of these types of investors. In addition, eight actions pending in the District of New Jersey purport to be brought, either in their entirety or in part, on behalf of purchasers of the Company's PRIDES securities. The complaints in the Federal Securities Actions allege, among other things, that as a result of accounting irregularities, the Company's

previously issued financial statements were materially false and misleading and that the defendants knew or should have known that these financial statements caused the prices of the Company's securities to be inflated artificially. The Federal Securities Actions variously allege violations of Section 10(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, Section 14(a) of the Exchange Act and SEC 14a-9 promulgated thereunder, Section 20(a) of the Exchange Act, and Sections 11, 12 and 15 of the Securities Act of 1933, as amended (the "Securities Act"). Certain actions also allege violations of common law. The individual action also alleges violations of Section 18(a) of the Exchange Act and the Florida securities law. The class action complaints seek damages in unspecified amounts. The individual action seeks damages in the amount of approximately $9 million plus interest and expenses.

On May 29, 1998, United States Magistrate Judge Joel A. Pisano entered an Order consolidating the 50 Federal Securities Actions that had at that time been filed in the United States District Court for the District of New Jersey, under the caption In re: Cendant Corporation Litigation, Master File No. 98-1664 (WHW). Pursuant to the Order, all related actions subsequently filed in the District of New Jersey are to be consolidated under that caption. United States District Court Judge William H. Walls has selected lead plaintiffs to represent all potential class members in the consolidated action. He has also ordered that applications seeking appointment as lead counsel to represent the lead plaintiffs are to be filed with the Court by September 17, 1998. The selection of lead counsel is pending.

In addition, on April 27, 1998, a purported shareholder derivative action, Deutch v. Silverman, et al., No. 98-1998 (WHW), was filed in the District of New Jersey against certain of the Company's current and former directors and officers; The Bear Stearns Companies, Inc.; Bear Stearns & Co., Inc. and, as a nominal party, the Company. The complaint in the Deutch action alleges that certain individual officers and directors of the Company breached their fiduciary duties by selling shares of the Company's stock while in possession of non-public material information concerning the accounting irregularities. The complaint also alleges various other breaches of fiduciary duty, mismanagement, negligence and corporate waste, and seeks damages on behalf of the Company.

Another action, entitled Corwin v. Silverman, et al., No. 16347-NC, was filed on April 29, 1998 in the Court of Chancery for the State of Delaware. The Corwin action is purportedly brought both derivatively, on behalf of the Company, and as a class action, on behalf of all shareholders of HFS who exchanged their HFS shares for the Company's shares in connection with the Merger. The Corwin action names as defendants HFS and twenty-eight individuals who are and were directors of Cendant and HFS. The complaint in the Corwin action, as amended on July 28, 1998, alleges that HFS and its directors breached their fiduciary duties of loyalty, good faith, care and candor in connection with the Merger, in that they failed to properly investigate the operations and financial statements of the Company before approving the Merger at an allegedly inadequate price. The amended complaint also alleges that the Company's directors breached their fiduciary duties by entering into an employment agreement with Cendant's former Chairman, Walter Forbes, in connection with the Merger that purportedly amounted to corporate waste. The Corwin action seeks, among other things, recission of the Merger and compensation for all losses and damages allegedly suffered in connection therewith.

The staff of the Securities and Exchange Commission (the "SEC") and the United States Attorney for the District of New Jersey are conducting investigations relating to the matters referenced above. The SEC staff has advised the Company that its inquiry should not be construed as an indication by the SEC or its staff that any violations of law have occurred.

In connection with the Merger, certain officers and directors of HFS exchanged their shares of HFS common stock and options exercisable for HFS common stock for shares of the Company's common stock and options exercisable for the Company's common stock, respectively. As a result of the aforementioned accounting irregularities, such officers and directors have advised the Company that they believe they have claims against the Company in connection with such exchange. In addition, certain current and former officers and directors of the Company would consider themselves to be members of any class ultimately certified in the Federal Securities Actions now pending in which the Company is named as a defendant by virtue of their having been HFS stockholders at the time of the Merger.

While it is not feasible to predict or determine the final outcome of these proceedings or to estimate the amounts or potential range of loss with respect to these matters, management believes that an adverse outcome with respect to such proceedings could have a material adverse impact on the financial condition, results of operations and cash flows of the Company.

Ideon settlement. On June 13, 1997, the Company entered into a settlement agreement (the "Agreement") with Peter Halmos, the co-founder of SafeCard Services, Incorporated ("SafeCard"), which was reorganized in 1995 as Ideon and then acquired by the Company in August 1996. The Agreement, which became effective in July 1997, provided for the settlement of outstanding litigation matters involving Peter Halmos, SafeCard and Ideon. The Agreement called for the dismissal with prejudice of such litigation matters and the payment of $70.5 million to Peter Halmos, over a six-year period comprised of one up-front payment of $13.5 million and six subsequent annual payments of $9.5 million. The Company had previously provided a reserve for this litigation in the charge recorded coincident with the Ideon Merger. (See Note 7 -- Merger-Related Costs and Other Unusual Charges -- 1996 Poolings -- Ideon Merger Charge.)

Acquired Company Litigation. One of the Company's subsidiaries currently faces liability to third parties for damages due to property damage allegedly caused by environmental contamination at four former manufactured gas plants and one related waterway site located in the States of Washington and Oregon. Various third parties, including governmental entities and other potentially responsible parties, have alleged that such subsidiary is legally obligated to pay damages and/or take actions to investigate or clean up property damage to surface water, ground water, land or other property resulting from the purported presence of hazardous substances allegedly generated or released during the historical operation of the manufactured gas plants for which such subsidiary allegedly is responsible. Such subsidiary is currently defending itself vigorously in these matters but concurrently is seeking to effect an out-of-court settlement that, if successful, would result in another party providing an indemnification to such subsidiary for future liabilities relating to these claims.

Messrs. Paul A. Kruger, Warren F. Kruger and Lyle Miller (collectively, the "Plaintiffs") have sued the Company and its wholly-owned subsidiary, SafeCard. The complaint alleges that the Company wrongfully controlled, influenced and dominated SafeCard's affairs and that SafeCard, under the direction and control of the Company, wrongfully impeded the Plaintiffs' ability to achieve their contingent payments due under a stock purchase agreement. The complaint contains, in addition to other counts against the Company and SafeCard, one count of tortious interference with contract (against the Company) and one count of intentional interference with economic opportunity (also against the Company). The complaint seeks actual damages in an amount of $22 million. The Plaintiffs are also currently seeking court approval to amend the complaint to claim unspecified punitive damages. The Company and SafeCard have objected to such amendment and are awaiting a court decision with respect thereto.

Other pending litigation. The Company is subject to certain other legal proceedings and claims arising in the ordinary course of its business. Management does not believe that the outcome of such matters will have a material adverse effect on the Company's financial position, liquidity or operating results.

18. INCOME TAXES

The income tax provision (benefit) consists of:

| (In millions) | FOR THE YEAR ENDED DECEMBER 31, | | |
|---|---|---|---|
| | 1997 | 1996 | 1995 |
| Current | | | |
| Federal | $ 155.1 | $ 101.1 | $ 38.4 |
| State | 24.4 | 13.3 | 14.4 |
| Foreign | 28.5 | 18.1 | 10.1 |
| | 208.0 | 132.5 | 62.9 |
| Deferred | | | |
| Federal | (16.8) | 70.4 | 73.7 |
| State | (3.4) | 16.5 | 2.7 |
| Foreign | 3.2 | .8 | 3.9 |
| | (17.0) | 87.7 | 80.3 |
| Provision for income taxes | $ 191.0 | $ 220.2 | $ 143.2 |

Net deferred income tax assets and liabilities are comprised of the following:

| (In millions) | DECEMBER 31, | |
|---|---|---|
| | 1997 | 1996 |
| CURRENT NET DEFERRED INCOME TAXES | | |
| Merger and acquisition-related liabilities | $ 102.9 | $ 54.6 |
| Accrued liabilities and deferred income | 225.8 | 132.6 |
| Insurance retention refund | (19.3) | (13.7) |
| Provision for doubtful accounts | 4.0 | 8.1 |
| Franchise acquisition costs | (2.6) | (2.6) |
| Deferred membership acquisition costs | 8.6 | (40.0) |
| Other | (7.5) | (2.1) |
| Current net deferred tax asset | $ 311.9 | $ 136.9 |
| NON-CURRENT NET DEFERRED INCOME TAXES | | |
| Depreciation and amortization | $ (277.1) | $ (169.6) |
| Deductible goodwill -- taxable poolings | 44.2 | -- |
| Merger and acquisition-related liabilities | 35.0 | -- |
| Accrued liabilities and deferred income | 66.9 | 46.3 |
| Acquired net operating loss carryforward | 59.9 | 85.9 |
| Other | .2 | (25.0) |
| Non-current net deferred tax asset (liability) | $ (70.9) | $ (62.4) |
| MANAGEMENT AND MORTGAGE PROGRAM DEFERRED INCOME TAXES | | |
| Depreciation | $ (233.1) | $ (245.1) |
| Unamortized mortgage servicing rights | (74.6) | (51.2) |
| Accrued liabilities | 9.5 | 1.3 |
| Alternative minimum tax carryforwards | 2.5 | 13.1 |
| Net deferred tax liabilities under management and mortgage programs | $ (295.7) | $ (281.9) |

The Company has recorded deferred tax assets of $ 44.2 million primarily attributed to the difference in book and tax basis of assets acquired and accounted for using the pooling-of-interests method of accounting. The deferred tax asset recorded in connection with the above acquisitions, resulted in a corresponding $44.2 million increase to shareholders' equity.

F-48

Net operating loss carryforwards at December 31, 1997 acquired in connection with the acquisition of Avis, Inc. expire as follows: 2002, $30.2 million; 2005, $7.2 million; 2009, $17.7 million; and 2010, $116.0 million.

The Company's effective income tax rate differs from the statutory federal rate as follows:

|  | FOR THE YEAR ENDING DECEMBER 31, | | |
|---|---|---|---|
|  | 1997 | 1996 | 1995 |
| Federal statutory rate | 35.0% | 35.0% | 35.0% |
| State income taxes net of federal benefit | 5.3% | 3.6% | 3.2% |
| Non-deductible merger-related costs | 29.1% | -- | -- |
| Amortization of non-deductible goodwill | 4.3% | 1.5% | 1.2% |
| Foreign taxes differential | .3% | .5% | .6% |
| Other | .3% | .6% | .9% |
| Effective tax rate | 74.3% | 41.2% | 40.9% |

## 19. STOCK OPTION PLANS

In connection with the Cendant Merger, the Company adopted its 1997 Stock Incentive Plan (the "Incentive Plan"). The Incentive Plan authorizes the granting of up to 25 million shares of Company common stock through awards of stock options (which may include incentive stock options and/or nonqualified stock options), stock appreciation rights and shares of restricted Company common stock. All directors, officers and employees of the Company and its affiliates are eligible to receive awards under the Incentive Plan. Options granted under the Incentive Plan generally have a ten year term and are exercisable at 20% per year commencing one year from the date of grant. During 1997, the Company also adopted two other stock plans: the 1997 Employee Stock Plan (the "1997 Employee Plan") and the 1997 Stock Option Plan (the "1997 SOP"). The 1997 Employee Plan authorizes the granting of up to 25 million shares of Company common stock through awards of nonqualified stock options, stock appreciation rights and shares of restricted Company common stock to employees of the Company and its affiliates. The 1997 SOP provides for the granting of up to 10 million shares of Company common stock to key employees (including employees who are directors and officers) of the Company and its subsidiaries through awards of incentive and/or nonqualified stock options. Options granted under the 1997 Employee Plan and the 1997 SOP generally have ten year terms and are exercisable at 20% per year commencing one year from the date of grant.

The Company also grants options to employees pursuant to three additional stock option plans under which the Company may grant options to purchase in the aggregate up to 70.8 million shares of Company common stock. Annual vesting periods under these plans range from 20% to 33%, all commencing one year from the respective grant dates. At December 31, 1997, there were 35.5 million shares outstanding collectively under these plans.

The table below summarizes the annual activity of Cendant's pooled stock option plans:

| (Shares in millions) | OPTIONS OUTSTANDING | WEIGHTED AVG. EXERCISE PRICE |
|---|---|---|
| BALANCE AT DECEMBER 31, 1994 | 92.7 | $ 6.20 |
| Granted | 21.1 | 10.74 |
| Canceled | (2.7) | 8.48 |
| Exercised | (12.4) | 5.39 |
| BALANCE AT DECEMBER 31, 1995 | 98.7 | 7.21 |
| Granted | 36.1 | 22.14 |
| Canceled | (2.8) | 18.48 |
| Exercised | (14.0) | 5.77 |
| BALANCE AT DECEMBER 31, 1996 | 118.0 | 11.68 |
| Granted | 78.8 | 27.94 |
| Canceled | (6.4) | 27.29 |
| Exercised | (14.0) | 7.20 |
| PHH conversion (1) | (4.4) | -- |
| BALANCE AT DECEMBER 31, 1997 | 172.0 | 18.66 |

----------

(1) In connection with the PHH Merger, all unexercised PHH stock options were canceled and converted into 1.8 million shares of Company common stock.

The Company utilizes the disclosure-only provisions of SFAS No. 123 "Accounting for Stock-Based Compensation" and applies Accounting Principle Board Opinion ("APB") No. 25 and related interpretations in accounting for its stock option plans. Under APB No. 25, because the exercise prices of the Company's employee stock options are equal to the market prices of the underlying Company stock on the date of grant, no compensation expense is recognized.

Had the Company elected to recognize compensation cost for its stock option plans based on the calculated fair value at the grant dates for awards under such plans, consistent with the method prescribed by SFAS No. 123, net income (loss) per share would have reflected the pro forma amounts indicated below:

| | YEAR ENDED DECEMBER 31, | | |
|---|---|---|---|
| (In millions, except per share data) | 1997(1) | 1996 | 1995 |
| Net income (loss): | | | |
| as reported | $ (217.2) | $ 330.0 | $ 229.8 |
| pro forma | (663.9)(3) | 245.1 | 201.8 |
| Net income (loss) per share: | | | |
| Basic    as reported | $ (.27) | $ .44 | $ .33 |
| pro forma (2) | (.82)(3) | .32 | .29 |
| Diluted  as reported | (.27) | .41 | .31 |
| pro forma (2) | (.82)(3) | .31 | .27 |

----------

(1) Includes an after-tax charge of $283.1 million or $.35 per share, to account for the cumulative effect of a change in accounting related to revenue and expense recognition for memberships (see Notes 2 and 3).

(2) The effect of applying SFAS No. 123 on the pro forma net income per share disclosures is not indicative of future amounts because it does not take into consideration option grants made prior to 1995 or in future years.

(3) Includes incremental compensation expense of $335.4 million ($204.9 million, after tax) or $.25 per basic and diluted share as a result of the immediate vesting of HFS options upon consummation of the Cendant Merger.

The fair values of the stock options are estimated on the dates of grant using the Black-Scholes option-pricing model with the following weighted average assumptions for options granted in 1997, 1996 and 1995:

| | CENDANT PLANS | CUC PLANS | | HFS PLANS | | PHH PLANS | |
|---|---|---|---|---|---|---|---|
| | 1997 | 1996 | 1995 | 1996 | 1995 | 1996 | 1995 |
| Dividend Yield | -- | -- | -- | -- | -- | 2.8% | 3.5% |
| Expected volatility | 32.5% | 28.0% | 26.0% | 37.5% | 37.5% | 21.5% | 19.0% |
| Risk-free interest rate | 5.4% | 6.3% | 5.3% | 6.4% | 6.4% | 6.5% | 6.9% |
| Expected holding period | 7.8 years | 5.0 years | 5.0 years | 9.1 years | 9.1 years | 7.5 years | 7.5 years |

The weighted average fair value of Cendant stock options granted during the year ended December 31, 1997 was $13.71. The weighted average fair values of stock options granted under the former CUC plans (inclusive of plans acquired) during the years ended December 31, 1996 and 1995 were $7.51 and $6.69, respectively. The weighted average fair values of stock options granted under the former HFS plans (inclusive of the PHH plans) during the years ended December 31, 1996 and 1995 were $10.96 and $4.79, respectively.

The tables below summarize information regarding Cendant stock options outstanding and exercisable as of December 31, 1997:

(Shares in millions)

| | OPTIONS OUTSTANDING | | | OPTIONS EXERCISABLE | |
|---|---|---|---|---|---|
| RANGE OF EXERCISE PRICES | SHARES | WEIGHTED AVG. REMAINING CONTRACTUAL LIFE | WEIGHTED AVERAGE EXERCISE PRICE | SHARES | WEIGHTED AVERAGE EXERCISE PRICE |
| $.01 to $ 10.00 | 48.9 | 5.4 | $ 4.16 | 47.5 | $ 4.09 |
| $10.01 to $ 20.00 | 29.2 | 7.1 | 14.60 | 23.1 | 14.99 |
| $20.01 to $ 30.00 | 46.5 | 8.9 | 23.55 | 35.3 | 23.75 |
| $30.01 to $ 40.00 | 47.4 | 9.8 | 31.35 | 18.1 | 31.40 |
| Total | 172.0 | 7.8 | 16.66 | 121.8 | 15.69 |

Shares exercisable and available for grant at December 31, 1997 and 1996 were as follows:

| | 1997 | 1996 | |
|---|---|---|---|
| (In millions) | CENDANT OPTIONS | CUC OPTIONS | HFS OPTIONS (INCLUSIVE OF PHH OPTIONS) |
| Shares exercisable | 121.8 | 11.8 | 46.2 |
| Shares available for grant | 49.3 | 8.4 | 5.1 |

The Company reserved 11.4 million shares of Company common stock for issuance in connection with its Restricted Stock Plan. As of December 31, 1997, 10.6 million shares of restricted common stock have been granted of which 10.4 million shares have vested under this plan.

The Company has reserved 1.1 million shares of Company common stock in connection with its 1994 Employee Stock Purchase Plan, which enables employees to purchase shares of common stock from the Company at 90% of the fair market value on the fifteenth day following the last day of each calendar quarter, in an amount up to 25% of the employees' year-to-date earnings.

20. EMPLOYEE BENEFIT PLANS

PENSION AND RETIREMENT PLANS
The Company sponsors several defined contribution plans that provide
certain eligible employees of the Company an opportunity to accumulate
funds for their retirement. The Company matches the contributions of
participating employees on the basis of the percentages specified in the
plans.

F-51

During 1996, a Deferred Compensation Plan (the "Plan") was implemented providing senior executives with the opportunity to participate in a funded, deferred compensation program. The assets of the Plan are held in an irrevocable rabbi trust. Under the Plan, participants may defer up to 80% of their base compensation and up to 98% of bonuses earned. The Company contributes $0.50 for each $1.00 contributed by a participant, regardless of length of service, up to a maximum of six percent of the employee's compensation. The Plan is not qualified under Section 401 of the Internal Revenue Code. The Company's matching contributions relating to the above plans were not material to the consolidated financial statements.

The Company's PHH subsidiary has a non-contributory defined benefit pension plan covering substantially all domestic employees of PHH and its subsidiaries. PHH's subsidiary located in the United Kingdom has a contributory defined benefit pension plan, with participation at the employee's option. Under both the domestic and foreign plans, benefits are based on an employee's years of credited service and a percentage of final average compensation. The policy for both plans is to contribute amounts sufficient to meet the minimum requirements plus other amounts as the Company deems appropriate from time to time. The projected benefit obligations of the funded plans were $108.1 million and $97.1 million and funded assets, at fair value (primarily common stock and bond mutual funds) were $102.7 million and $88.4 million at December 31, 1997 and 1996, respectively. The net pension cost and the recorded liability were not material to the accompanying consolidated financial statements.

The Company also sponsors two unfunded retirement plans to provide certain key executives with benefits in excess of limits under the federal tax law and to include annual incentive payments in benefit calculations. The projected benefit obligation, net pension cost and recorded liability related to the unfunded plans were not material to the accompanying consolidated financial statements.

POSTRETIREMENT BENEFITS OTHER THAN PENSIONS
The Company's PHH subsidiary provides health care and life insurance benefits for certain retired employees up to the age of 65. The net periodic postretirement benefit costs and the recorded liability were not material to the accompanying consolidated financial statements.

21. INVESTMENTS

ARAC
Upon entering into a definitive merger agreement to acquire Avis in 1996, the Company announced its strategy to dilute its interest in ARAC while retaining assets associated with the franchise business, including trademarks, reservation system assets and franchise agreements with ARAC and other licensees. Since the Company's control was planned to be temporary, the Company accounted for its 100% investment in ARAC under the equity method. The Company's equity interest was diluted to 27.5% pursuant to an IPO by ARAC in September 1997 and was further diluted to 20.4% as a result of a secondary offering in March 1998.

The Company licenses the Avis trademark to ARAC pursuant to a 50-year master license agreement and receives royalty fees based upon 4% of ARAC revenue, escalating to 4.5% of ARAC revenue over a 5-year period. In addition, the Company operates the telecommunications and computer processing system which services ARAC for reservations, rental agreement processing, accounting and fleet control for which the Company charges ARAC at cost.

NRT
During the third quarter of 1997, the Company executed an agreement with NRT Incorporated ("NRT") (a corporation created to acquire residential real estate brokerage firms) and the principal stockholders' of NRT, which permitted the Company, at its discretion, to acquire up to $263.3 million of NRT preferred stock and $446.0 million of intangible assets of real estate brokerage firms acquired by NRT. During the third quarter of 1997, the Company acquired $182.0 million of NRT preferred stock and through December 31, 1997, the Company had also acquired $216.1 million of certain intangible assets including trademarks associated with real estate brokerage firms acquired by NRT which are subject to a 50 year franchise agreement.

In September 1997, NRT acquired the real estate brokerage business and operations of National Realty Trust ("the Trust"), and two other regional real estate brokerage businesses. The Trust is an independent trust to which the Company contributed the brokerage offices formerly owned by Coldwell Banker in connection with the Company's acquisition of Coldwell Banker. NRT is the largest residential brokerage firm in the United States.

22. DIVESTITURE

On December 17, 1997, as directed by the Federal Trade Commission in connection with the Cendant Merger, CUC sold immediately preceding the Cendant Merger all of the outstanding shares of its timeshare exchange businesses, Interval International Inc. ("Interval"), for net proceeds of $240.0 million less transaction related costs pursuant to a Stock Purchase Agreement ("Interval Agreement"). The Company is restricted in its solicitation of Interval's employees, customers or clients for a period of two years from the closing date of the transaction pursuant to the Interval Agreement. In conjunction with the sale, the Company agreed to continue to provide services to certain of Interval's customers for a specified period, guarantee performance of certain responsibilities to third parties (i.e., lease payments and certain other contracts), and absorb certain additional transitional costs related to the transaction. The estimated fair value of the services to be provided to Interval's customers of $57.6 million was recorded as a non-current liability. The value assigned will be amortized over the average life of the servicing period. After considering all these factors, the Company recognized a gain on the sale of Interval of $76.6 million ($26.4 million, after tax), which has been reflected as an extraordinary gain in the consolidated statements of operations.

23. FRANCHISING AND MARKETING/RESERVATION ACTIVITIES

Revenue from franchising activities includes initial franchise fees charged to lodging properties and real estate brokerage offices upon execution of a franchise contract. Initial franchise fees amounted to $26.0 million, $24.2 million and $15.7 million for the years ended December 31, 1997, 1996 and 1995, respectively.

Franchising activity for the years ended December 31, 1997, 1996 and 1995 is as follows:

|  | LODGING | | | REAL ESTATE | | |
| --- | --- | --- | --- | --- | --- | --- |
|  | 1997 | 1996 | 1995 | 1997 | 1996 | 1995 |
| FRANCHISE IN OPERATION | | | | | | |
| Units at end of year | 5,566 | 5,397 | 4,603 | 11,715 | 11,349 | 5,990 |
| EXECUTED BUT NOT OPENED | | | | | | |
| Acquired | -- | 24 | 31 | -- | 110 | 104 |
| New agreements | 1,205 | 1,142 | 983 | 1,107 | 829 | 248 |

The Company receives marketing and reservation fees from several of its lodging and real estate franchisees. Marketing and reservation fees related to the Company's lodging brands' franchisees are calculated based on a specified percentage of gross room revenues. Marketing and reservation fees received from the Company's real estate brands' franchisees are based on a specified percentage of gross closed commissions earned on the sale of real estate. As provided in the franchise agreements, at the Company's discretion, all of these fees are to be expended for marketing purposes and the operation of a centralized brand-specific reservation system for the respective franchisees and are controlled by the Company until disbursement. Membership and service fee revenues included marketing and reservation fees of $170.0 million, $157.6 million and $140.1 million for the years ended December 31, 1997, 1996 and 1995, respectively.

24. INDUSTRY SEGMENT INFORMATION

The Company operates within three principal industry segments -- alliance marketing, travel and real estate. A description of the Company's segments, and the services provided within its underlying businesses, are as follows:

ALLIANCE MARKETING SEGMENT
Individual, wholesale and discount program membership services are provided to consumers and are distributed through various channels, including financial institutions, credit unions, charities, other cardholder-based organizations and retail establishments. These memberships include such components as shopping, travel, auto, dining, home improvement, lifestyle, credit card and checking account enhancement packages, financial products and discount programs. The Company also administers insurance package programs, which are generally combined with discount shopping and travel for credit union members and publishes a coupon book which is sold through schools and other not-for- profit organizations.

TRAVEL SERVICES SEGMENT
Franchising (Lodging and car rental). As a franchisor of guest lodging facilities and car rental agency locations, Cendant licenses the independent owners and operators of hotels and car rental agencies to use its brand names. Operational and administrative services are provided to franchisees, which include access to a national reservation system, national advertising and promotional campaigns, co-marketing programs and volume purchasing discounts.

Fleet management. Fleet management services primarily consist of the management, purchasing, leasing, and resale of vehicles for corporate clients and government agencies. These services also include fuel, maintenance, safety and accident management programs and other fee-based services for clients' vehicle fleets.

Timeshare. Timeshare exchange programs, publications and other travel-related services are provided to the timeshare industry.

Value-added tax services. Cendant processes value-added tax refunds for travelers abroad.

REAL ESTATE SERVICES SEGMENT
Franchising (Real estate brokerage). As a franchisor of real estate brokerage offices, Cendant licenses the owners and operators of independent real estate brokerage offices to use its brand names. Operational and administrative services are provided to franchisees, which are designed to increase franchisee revenue and profitability. Such services include advertising and promotions, referrals, training and volume purchasing discounts.

Relocation. Relocation services are provided to client corporations and include the selling of transferee residences, providing equity advances on transferee residences for the purchase of new homes and home management services. Cendant also offers fee-based programs such as home marketing assistance, household goods moves, destination services and property dispositions for financial institutions and government agencies.

Mortgage. Mortgage services primarily include the origination, sale and servicing of residential first mortgage loans. Cendant markets a variety of first mortgage products to consumers through relationships with corporations, affinity groups, financial institutions, real estate brokerage firms and other mortgage banks.

New mover services. Welcoming packages are distributed to new homeowners which provides them with discounts from local merchants.

OTHER SERVICES SEGMENT
Financial services and marketing. Cendant (i) markets financial product memberships, generally annuities, mutual funds, and life insurance for financial institutions; (ii) provides marketing and other services to casino gaming facilities; and (iii) operates the telecommunications and computer system which facilitates hotel and car rental agency reservations and rental agreement processing.

The following table presents industry segment and geographic data of the Company for the years ended December 31, 1997, 1996 and 1995. Operating income consists of net revenues less operating expenses (total expenses excluding interest--net).

INDUSTRY SEGMENT DATA

| (In millions) | Travel Services | Real Estate Services | Alliance Marketing(5) | Other Services | Consolidated |
|---|---|---|---|---|---|
| **1997** | | | | | |
| Net revenues | $ 1,337.2 | $ 987.0 | $ 1,570.3 | $ 345.6 | $ 4,240.0 |
| Operating income(1) | 272.6 | 280.7 | 125.0 | (370.4) | 307.9 |
| Identifiable assets | 6,700.4 | 5,113.1 | 1,395.8 | 864.1 (4) | 14,073.4 |
| Depreciation and amortization | 102.7 | 58.4 | 42.0 | 34.6 | 237.7 |
| Capital expenditures | 51.6 | 65.4 | 23.3 | 42.4 | 182.7 |
| **1996** | | | | | |
| Net revenues | $ 802.4 | $ 782.4 | $ 1,474.3 | $ 178.6 | $ 3,237.7 |
| Operating income | 254.3 | 216.0 | 48.9 (2) | 28.6 | 547.8 |
| Identifiable assets | 6,685.3 | 4,170.0 | 1,395.9 | 511.3 (4) | 12,762.5 |
| Depreciation and amortization | 55.5 | 44.5 | 34.8 | 10.7 | 145.5 |
| Capital expenditures | 47.6 | 30.4 | 19.0 | 43.5 | 140.6 |
| **1995** | | | | | |
| Net revenues | $ 684.4 | $ 504.3 | $ 1,302.3 | $ 125.1 | $ 2,616.1 |
| Operating income | 196.2 | 114.1 | 38.8 (3) | 17.8 | 366.9 |
| Identifiable assets | 4,449.4 | 2,406.0 | 1,072.1 | 592.0 (4) | 8,519.5 |
| Depreciation and amortization | 46.9 | 18.0 | 30.5 | 5.0 | 100.4 |
| Capital expenditures | 37.3 | 14.4 | 44.2 | 32.8 | 108.7 |

------------

(1) Includes merger-related costs and other unusual charges which were allocated to the business segments as follows: Travel--$186.0 million, Real estate--$65.3 million, Alliance Marketing--$12.7 million, Other-- (substantially Corporate-related)--$440.1 million.

(2) Includes merger-related costs and other unusual charges of $109.4 million.

(3) Includes costs related to Ideon products abandoned and restructuring of $97.0 million.

(4) Includes net assets of discontinued operations of $273.3, $120.1 and $188.9 in 1997, 1996 and 1995, respectively.

(5) 1997 Alliance Marketing segment data has been restated for a change in accounting, effective January 1, 1997, related to revenue and expense recognition for memberships (see Notes 2 and 3).

GEOGRAPHIC DATA

| (In millions) | NORTH AMERICA | EUROPE AND OTHER | CONSOLIDATED |
|---|---|---|---|
| **1997** | | | |
| Net revenues | $ 3,731.2 | $ 508.8 | $ 4,240.0 |
| Operating income | 210.3 | 97.6 | 307.9 |
| Identifiable assets | 12,640.0 | 1,433.4 | 14,073.4 |
| **1996** | | | |
| Net revenues | $ 3,042.2 | $ 195.5 | $ 3,237.7 |
| Operating income | 508.1 | 39.7 | 547.8 |
| Identifiable assets | 11,981.2 | 781.3 | 12,762.5 |
| **1995** | | | |
| Net revenues | $ 2,435.3 | $ 180.8 | $ 2,616.1 |
| Operating income | 332.7 | 34.2 | 366.9 |
| Identifiable assets | 7,775.4 | 744.1 | 8,519.5 |

25. SELECTED QUARTERLY FINANCIAL DATA -- (UNAUDITED)

Provided below is the selected unaudited quarterly financial data for 1997 and 1996, as restated for (i) the findings from the independent investigation confirming accounting irregularities in certain CUC business units and the preparation and audit of the Company's restated financial statements (collectively classified as "Accounting errors and irregularities"); (ii) the change in accounting for memberships; and (iii) discontinued operations. See Notes 2, 3 and 6 for a description of such accounting adjustments. The underlying per share information is calculated based on weighted average shares outstanding during each quarter, and therefore, the sum of the quarters may not equal the total year amounts.

### FIRST QUARTER 1997

| (in millions, except per share data) | AS PREVIOUSLY REPORTED | ADJUSTMENTS(2) | RECLASSIFICATION FOR DISCONTINUED OPERATIONS | AS RESTATED |
|---|---|---|---|---|
| Net revenues | $ 1,158.2 | $ (67.2) | $ (137.3) | $ 953.7 |
| Operating income | 297.2 | (84.7) | (11.5) | 201.0 |
| Income from continuing operations before cumulative effect of accounting change | 166.0 | (49.4) | (2.8) | 113.8 |
| Income from discontinued operations, net of taxes | -- | -- | 2.8 | 2.8 |
| Cumulative effect of accounting change, net of tax | -- | (283.1) | -- | (283.1) |
| Net income (loss) | $ 166.0 | $ (332.5) | $ -- | $ (166.5) |
| Per Share Information: | | | | |
| Income from continuing operations before cumulative effect of accounting change | | | | |
| Basic | $ 0.21 | | | $ 0.14 |
| Diluted | 0.19 | | | 0.13 |

### SECOND QUARTER 1997

| (in millions, except per share data) | AS PREVIOUSLY REPORTED | ADJUSTMENTS(2) | RECLASSIFICATION FOR DISCONTINUED OPERATIONS | AS RESTATED(1) |
|---|---|---|---|---|
| Net revenues | $ 1,300.5 | $ (173.0) | $ (127.9) | $ 999.6 |
| Operating income (loss) | 70.9 | (122.0) | 18.2 | (32.9) |
| Loss from continuing operations | (13.4) | (70.6) | 14.6 | (69.4) |
| Loss from discontinued operations, net of taxes | -- | -- | (14.6) | (14.6) |
| Net loss | $ (13.4) | $ (70.6) | $ -- | $ (84.0) |
| Per Share Information: | | | | |
| Loss from continuing operations | | | | |
| Basic | $ (0.02) | | | $ (0.09) |
| Diluted | (0.02) | | | (0.09) |

----------

(1)   Includes Unusual Charges, related to continuing operations, of $295.4 million primarily associated with the PHH Merger in April 1997. Unusual Charges of $278.9 million ($208.4 million, after-tax or $.24 per share) pertained to continuing operations and $16.5 million were associated with discontinued operations.

(2)   Includes adjustments for accounting errors and irregularities and a change in accounting.

THIRD QUARTER 1997

| (in millions, except per share data) | AS PREVIOUSLY REPORTED | ADJUSTMENTS(2) | RECLASSIFICATION FOR DISCONTINUED OPERATIONS | AS RESTATED |
|---|---|---|---|---|
| Net revenues | $ 1,431.3 | $ (102.8) | $ (142.0) | $ 1,186.5 |
| Operating income | 429.8 | (74.2) | (1.5) | 354.1 |
| Income from continuing operations | 248.3 | (45.7) | 0.4 | 203.0 |
| Loss from discontinued operations, net of taxes | -- | -- | (0.4) | (0.4) |
| Net income | $ 246.3 | $ (45.7) | $ - | $ 202.6 |
| Per Share Information: | | | | |
| Income from continuing operations | | | | |
| Basic | $ 0.31 | | | $ 0.25 |
| Diluted | 0.29 | | | 0.24 |

FOURTH QUARTER 1997

| (in millions, except per share data) | AS PREVIOUSLY REPORTED | ADJUSTMENTS(2) | RECLASSIFICATION FOR DISCONTINUED OPERATIONS | AS RESTATED(3) |
|---|---|---|---|---|
| Net revenues | $ 1,424.7 | $ (89.5) | $ (235.0) | $ 1,100.2 |
| Operating income | (436.9) | 232.9 | (10.3) | (214.3) |
| Loss from continuing operations before extraordinary gain | (345.5) | 165.0 | (0.6) | (181.1) |
| Loss from discontinued operations before extraordinary gain, net of taxes | -- | -- | (14.6) | (14.6) |
| Extraordinary gain, net of tax | . | 11.2 | 15.2 | 26.4 (4) |
| Net loss | $ (345.5) | $ 176.2 | $ -- | $ (169.3) |
| Per Share Information: | | | | |
| Loss from continuing operations before extraordinary gain | | | | |
| Basic | $ (0.42) | | | $ (0.22) |
| Diluted | (0.42) | | | (0.22) |

----------

(2)  Includes adjustments for accounting errors and irregularities and a change in accounting.

(3)  Includes Unusual Charges in the net amount of $442.6 million substantially associated with the Cendant and Hebdo Mag mergers during the fourth quarter of 1997. Net Unusual Charges of $425.2 million ($296.3 million, after-tax or $.34 per share) pertained to continuing operations and $17.4 million were associated with discontinued operations.

(4)  Represents the gain on the sale of Interval International, Inc. in December 1997, a Company subsidiary which was sold in consideration of Federal Trade Commission anti-trust concerns within the timeshare industry.

F-57

FIRST QUARTER 1996

| (in millions, except per share data) | AS PREVIOUSLY REPORTED | ACCOUNTING ERRORS AND IRREGULARITIES | RECLASSIFICATION FOR DISCONTINUED OPERATIONS | AS RESTATED |
|---|---|---|---|---|
| Net revenues | $ 821.4 | $ (65.8) | $ (94.7) | $ 660.9 |
| Operating income | 165.8 | (60.1) | (0.5) | 105.2 |
| Income from continuing operations | 96.0 | (40.8) | 1.3 | 56.5 |
| Loss from discontinued operations, net of taxes | -- | -- | (1.3) | (1.3) |
| Net income | $ 96.0 | $ (40.8) | $ -- | $ 55.2 |
| Per Share Information: Income from continuing operations | | | | |
| Basic | $ 0.14 | | | $ 0.08 |
| Diluted | 0.12 | | | 0.07 |

SECOND QUARTER 1996

| (in millions, except per share data) | AS PREVIOUSLY REPORTED | ACCOUNTING ERRORS AND IRREGULARITIES | RECLASSIFICATION FOR DISCONTINUED OPERATIONS | AS RESTATED |
|---|---|---|---|---|
| Net revenues | $ 935.7 | $ (53.7) | $ (106.7) | $ 775.3 |
| Operating income | 186.7 | (54.7) | 13.8 | 145.8 |
| Income from continuing operations | 101.0 | (34.1) | 20.3 | 87.2 |
| Loss from discontinued operations, net of taxes | -- | -- | (20.3) | (20.3) (5) |
| Net income | $ 101.0 | $ (34.1) | $ -- | $ 66.9 (5) |
| Per Share Information: Income from continuing operations | | | | |
| Basic | $ 0.14 | | | $ 0.12 |
| Diluted | 0.13 | | | 0.11 |

----------

(5)   Includes Unusual Charges of $24.9 million associated with the Davidson and Sierra mergers in July 1996.

F-58

THIRD QUARTER 1996

| (in millions, except per share data) | AS PREVIOUSLY REPORTED | ACCOUNTING ERRORS AND IRREGULARITIES | RECLASSIFICATION FOR DISCONTINUED OPERATIONS | AS RESTATED |
|---|---|---|---|---|
| Net revenues | $ 1,042.9 | $ 43.1 | $ (132.4) | $ 953.6 |
| Operating income | 115.0 | 33.7 | (29.0) | 119.7 (6) |
| Income from continuing operations | 68.5 | 13.6 | (15.5) | 66.6 (6) |
| Income from discontinued operations, net of taxes | -- | -- | 15.5 | 15.5 |
| Net income | $ 68.5 | $ 13.6 | $ -- | $ 82.1 (6) |
| Per Share Information: Income from continuing operations | | | | |
| Basic | $ 0.09 | | | $ 0.09 |
| Diluted | 0.08 | | | 0.08 |

----------
(6)   Includes Unusual Charges of $109.4 million ($70.0 million, after tax or
      $.09 per share) associated with the Ideon Merger in August 1996.


FOURTH QUARTER 1996

| (in millions, except per share data) | AS PREVIOUSLY REPORTED | ACCOUNTING ERRORS AND IRREGULARITIES | RECLASSIFICATION FOR DISCONTINUED OPERATIONS | AS RESTATED |
|---|---|---|---|---|
| Net revenues | $ 1,108.8 | $ (83.8) | $ (177.1) | $ 847.9 |
| Operating income | 271.6 | (51.2) | (43.3) | 177.1 |
| Income from continuing operations | 158.1 | (32.3) | (22.8) | 103.0 |
| Income from discontinued operations, net of taxes | -- | -- | 22.8 | 22.8 |
| Net income | $ 158.1 | $ (32.3) | $ -- | $ 125.8 |
| Per Share Information: Income from continuing operations | | | | |
| Basic | $ 0.20 | | | $ 0.13 |
| Diluted | 0.19 | | | 0.13 |

26. SUBSEQUENT EVENTS

PENDING ACQUISITIONS
American Bankers. On March 23, 1998, the Company entered into a definitive
agreement (the "ABI Merger Agreement") to acquire American Bankers Insurance
Group, Inc. ("American Bankers") for $67 per share in cash and stock, for
aggregate consideration of approximately $3.1 billion. The Company has
agreed to purchase 23.5 million shares of American Bankers at $67 per share
through its pending cash tender offer, to be followed by a merger in which
the Company has agreed to deliver Cendant shares with a value of $67 for
each remaining share of American Bankers common stock outstanding. The
Company has already received anti-trust clearance to acquire American
Bankers. The tender offer is subject to the receipt of tenders representing
at least 51 percent of the common shares of American Bankers as well as
customary closing conditions, including regulatory approvals. From time to
time representatives of the Company and representatives of American Bankers
have discussed possible modifications to the terms of the ABI Merger
Agreement, including a change in

F-59

the mix of consideration to increase the cash component and decrease the stock component and changing the transaction to a taxable transaction. No agreement regarding any such modification has been reached and there can be no assurance that such discussion will result in any agreement being reached. The transaction is expected to be completed in the fourth quarter of 1998 or the first quarter of 1999. If no agreement regarding the terms of any modification to the terms of the ABI Merger Agreement is reached, the current ABI Merger Agreement will remain in effect in accordance with its terms. American Bankers provides affordable, specialty insurance products and services through financial institutions, retailers and other entities offering consumer financing.

In connection with the Company's proposal to acquire American Bankers, the Company has a bank commitment to provide a $650 million, 364-day revolving credit facility which will bear interest, at the option of the Company, at rates based on prime rates, as defined, or LIBOR plus an applicable variable margin.

RAC Motoring Services. On May 21, 1998, the Company announced that it has reached a definitive agreement with the Board of Directors of Royal Automobile Club Limited ("RACL") to acquire their RAC Motoring Services subsidiary for approximately $735 million in cash. The sale of RAC Motoring Services has subsequently been approved by its shareholders. Closing is subject to certain conditions, including regulatory approval. Although no assurances can be made, the Company currently anticipates that the transaction will be completed in the spring of 1999. RAC Motoring Services is the second-largest roadside assistance company in the UK and also owns the UK's largest driving school company.

Providian. On December 9, 1997, the Company executed a definitive agreement to acquire Providian Auto and Home Insurance Company for approximately $219.0 million in cash. Closing is subject to receipt of required regulatory approval and accordingly, no assurance can be made that the acquisition will be completed. Providian sells automobile insurance to consumers through direct response marketing.

COMPLETED ACQUISITIONS
National Parking Corporation. On April 27, 1998, the Company completed the acquisition of National Parking Corporation ("NPC") for $1.6 billion in cash, which included the repayment of approximately $227 million of outstanding NPC debt. NPC is substantially comprised of two operating subsidiaries. National Car Parks is the largest private (non-municipal) single car park operator in the United Kingdom ("UK") with approximately 500 locations. Green Flag operates the third largest roadside assistance group in the UK and offers a wide-range of emergency support and rescue services to approximately 3.5 million members.

Harpur Group. On January 20, 1998, the Company completed the acquisition of The Harpur Group Ltd. ("Harpur"), a leading fuel card and vehicle management company in the UK, from privately held H-G Holdings, Inc. for approximately $186.0 million in cash plus future contingent payments of up to $20.0 million over the next two years.

Jackson Hewitt. On January 7, 1998, the Company completed the acquisition of Jackson Hewitt Inc. ("Jackson Hewitt"), for approximately $480.0 million in cash. Jackson Hewitt operates the second largest tax preparation service franchise system in the United States. The Jackson Hewitt franchise system specializes in computerized preparation of federal and state individual income tax returns.

Other. Subsequent to December 31, 1997, the Company acquired certain other entities for an aggregate purchase price of approximately $348.5 million in cash. Such acquisitions will be accounted for under the purchase method of accounting.

FINANCING TRANSACTIONS
Term Loan Facility. On May 29, 1998, the Company entered into a 364-day term loan agreement with a syndicate of financial institutions which provided for borrowings of $3.25 billion (the "Term Loan Facility"). The Term Loan Facility, as amended, bears interest at LIBOR plus an applicable LIBOR spread, as defined. Upon the execution of the Term Loan Facility, temporary credit

agreements, which provided for $1.0 billion of borrowings, were terminated. The Term Loan Facility, as amended, contains certain restrictive covenants, which are substantially similar to and consistent with the covenants in effect for the Company's existing revolving credit agreements.

Issuance Of Mandatorily Redeemable Preferred Securities. On March 2, 1998, the Company issued 29.9 million FELINE PRIDES and 2.3 million trust preferred securities and received approximately $1.4 billion in gross proceeds therefrom. The FELINE PRIDES consist of 27.6 million Income PRIDES and 2.3 million Growth PRIDES, each with a face amount of $50 per PRIDE. The Income PRIDES consist of trust preferred securities and stock purchase contracts under which the holders will purchase common stock from the Company in February 2001. The Growth PRIDES consist of stock purchase contracts under which the holders will purchase common stock from the Company in February 2001 and zero coupon U.S. Treasury securities. The trust preferred securities will bear interest, in the form of preferred stock dividends, at the annual rate of 6.45 percent. Such preferred stock dividends are presented as minority interest, net of tax in the consolidated statements of income. The forward purchase contract forming a part of the Income PRIDES will pay 1.05 percent annually in the form of a contract adjustment payment. The forward purchase contract forming a part of the Growth PRIDES will pay 1.3 percent annually in the form of a contract adjustment payment. The forward purchase contracts call for the holder to purchase the minimum of 1.0395 shares and a maximum of 1.3514 shares of Company common stock per PRIDES security, depending upon the average of the closing price per share of Company common stock for a 20 consecutive day period ending in mid-February of 2001.

Redemption of 4 3/4% Notes. On May 4, 1998, the Company redeemed all of its outstanding ($144.5 million principal amount) 4 3/4% Convertible Senior Notes at a price of 103.393% of the principal amount together with interest accrued to the redemption date. Prior to May 4, 1998, holders of such notes exchanged $90.5 million of the 4 3/4% Notes for 2.5 million shares of Company common stock.

Redemption of 6 1/2% Notes. On April 8, 1998, the Company exercised its option to call its 6 1/2% Convertible Subordinated Notes (the "6 1/2% Notes") for redemption on May 11, 1998, in accordance with the provisions of the indenture relating to the 6 1/2% Notes. Prior to the redemption date, all of the outstanding 6 1/2% Notes were converted into 2.1 million shares of Company common stock.

SEVERANCE AGREEMENT
On July 28, 1998, the Company announced that Walter A. Forbes resigned as Chairman of the Company and as a member of the Board of Directors. The severance agreement reached with Mr. Forbes gives him the benefits required by his employment contract relating to a termination of Mr. Forbes' employment with the Company for reasons other than for cause. Those benefits total $35 million in cash and include the granting of approximately 1.3 million stock options.

REPRICING OF STOCK OPTIONS
On July 28, 1998, the Compensation Committee of the Board of Directors approved, in principle, a program to reprice certain Company stock options granted to employees of the Company, other than executive officers, during December 1997 and the first quarter of 1998. The new option price for such stock options is to be the market price of the Company's common stock as reported on the New York Stock Exchange shortly after the filing of the Company's Annual Report on Form 10-K/A for the year ended December 31, 1997. On September 23, 1998, the Compensation Committee extended such repricing program to certain executive officers and senior managers of the Company subject to certain conditions including revocation of a portion of existing options plus repricing of other portions at prices at and above fair market value at the time of repricing. Additionally, a management equity ownership program was adopted that requires executive officers and these senior managers to acquire Company common stock at various levels commensurate with such manager's compensation.