UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:02CR00264 (AWT) |
| | : | |
| v. | : | November 3, 2005 |
| | : | |
| | : | |
| WALTER A. FORBES | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT WALTER A. FORBES' MOTION FOR A MISTRIAL DUE TO THE TESTIMONY OF KEVIN KEARNEY**

**(Forbes Retrial Motion No. 18)**

<u>INTRODUCTION</u>

Repeating yet again themes that this Court has repeatedly rejected in this case, Forbes moves for a mistrial based on the testimony of Kevin Kearney.  Forbes claims that Kearney's testimony -- that Stuart Bell and Cosmo Corigliano instructed Kearney to make unsupported topside adjustments because that's what Forbes wanted -- was intentionally false and that the Government knew it was false.  As this Court previously concluded in rejecting a similar attack on Kearney during the first trial, this claim fails.  Resurrecting his failed challenges to the testimony of other witnesses, Forbes also claims that Kearney gave improper opinion testimony in this case. Forbes' challenges to Kearney on this score are no more availing than his similar challenges to the testimony of other witnesses.

**ARGUMENT**

**I. Forbes Has Failed to Sustain His Burden of Demonstrating That Kearney Testified Falsely, Let Alone That He Did So Knowingly and with the Acquiescence of the Government.**

Expressly incorporating by reference his failed Trial Motion No. 30, Docket No. 1091, filed Aug. 23, 2004 during the initial trial, Mem. in Support of Forbes' Retrial Motion No. 18 ("FM") at p. 1,[1] Forbes again contends that Kearney intentionally lied during this trial, and that the Government knew that he lied, when he testified that his co-conspirators in the accounting scheme invoked Forbes' name to justify their directions that Kearney make unsupported topside adjustments. Relief based on "allegations of perjured testimony should be granted only with great caution and in the most extraordinary circumstances." United States v. McCarthy, 271 F.3d 387, 399 (2d Cir. 2001), quoting United States v. Zichettello, 208 F.3d 72, 102 (2d Cir. 2000)(collecting cases). In order to prevail on such a claim, the defendant must show: (i) the witness actually committed perjury; (ii) the alleged perjury was material; (iii) the government knew or should have known of the alleged perjury at the time of trial; and (iv) the perjured nature of the testimony remained undisclosed during trial. Id.; United States

---

[1] If this Court is inclined to consider any of the arguments set forth in Forbes' memorandum in support of his Trial Motion No. 30, the Government respectfully requests that this Court also consider the Government's opposition to that motion, Docket No. 1122, filed August 30, 2004.

v. Glover, 588 F.2d 876, 879 (2d Cir. 1978) (rejecting due process claim where the defendant "failed to establish either that [the challenged] testimony was perjurious or that the government's behavior was improper").

Forbes has failed to meet these demanding criteria. He identifies no evidence that Kearney ever repudiated his testimony that Bell and Corigliano instructed Kearney to make unsupported topside adjustments because that's what Forbes wanted. Nor has Forbes presented any other powerful evidence, such as documents authored or adopted by Kearney, or recordings of his prior statements, which contradict that testimony.

Rather, Forbes apparently believes that Kearney must have lied when he testified about statements made to him by his co-conspirators in which they invoked Forbes' name because: when interviewed by government officials on several occasions in advance of the first trial, Kearney did not volunteer that the co-conspirators made those statements, and Kearney's retrial testimony added some details that were not elicited from Kearney during the initial trial. FM 2 (complaining about Kearney's "'recollections' that he never described in the numerous government interviews or in the prior trial of this matter.") Forbes' apparent belief that he is entitled to a mistrial because a witness testifies to events which he did not mention in some

prior account is belied by all relevant caselaw.[2] Such "omissions" may be grist for cross-examination, but are hardly grounds to exclude the challenged testimony, much less grounds to

---

[2] E.g. United States v. Borkoski, 154 F.Supp.2d 262, 266-67, 270-71 (D.Conn. 2001), citing United States v. Gambino, 59 F.3d 353, 365 (2d Cir. 1995)("even a direct conflict in testimony does not in itself constitute perjury"); Mason v. Phillips, 548 F.Supp. 674, 675 (S.D.N.Y. 1982)(Weinfeld, J.) (defendant failed to demonstrate a due process violation based on claimed perjury of a prosecution witness where "the trial record simply establishes that a police officer's trial testimony was inconsistent with a previous unsworn statement"); Thomas v. Cockrell, 2004 WL 856609, *11 (W.D.Tex. April 16, 2004)("Perjury is not established merely by . . . conflicts between reports, written statements, and trial testimony of a prosecution witness."); Malcum v. Burt, 276 F.Supp.2d 664, 684 (E.D.Mich. 2003)("the fact that a witness contradicts himself or herself or changes his or her story . . . does not establish perjury"); see also United States v. Verser, 916 F.2d 1268, 1270-71 (7th Cir. 1990) (no due process violation because the Government did not "correct the inconsistency" after a prosecution witness who had previously testified under oath that he and the defendant received cocaine from the defendant's brother, but testified at trial that he received the cocaine from another person, because "mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony"); United States v. Peak, 856 F.2d 825, 830 (7th Cir. 1988) (defendant failed to demonstrate the intentional elicitation of perjury, because the witness's internally inconsistent testimony could have been caused by confusion, imperfect memory, or other mistake); see generally Hays v. State of Alabama, 85 F.3d 1492, 1499 (11th Cir. 1996) (rejecting due process/perjured testimony claim based on contradiction between witness's trial testimony and his prior guilty plea allocution, where "there has been no showing that [the witness's] later, rather than earlier, testimony was false," court notes that it found "no case holding that plea testimony must be consistent with later testimony"); United States v. Martin, 59 F.3d 767, 770 (8th Cir. 1995)(a challenge to evidence through prior inconsistent statements is insufficient to establish prosecutorial use of false testimony.); United States v. Gibbs, 662 F.2d 728, 730 (11th Cir. 1981) (to show knowing prosecutorial use of false evidence, "it is not enough that the testimony is . . . inconsistent with prior statements.")

grant a mistrial.[3]

## II. Kearney's Testimony Did Not Contain Improper Lay Opinions, in Violation of Fed. R. Evid. 701.

Forbes contends that Kearney's testimony -- that certain adjustments of consolidated financial results in which Kearney personally participated were "unsupported" -- amounted to impermissible lay opinion in violation of Fed. R. Evid. 701. By ruling dated October 27, 2005, Docket No. 1901, this Court rejected a similar challenge to the anticipated testimony of two of Kearney's co-conspirators in the charged accounting fraud scheme. It should reject Forbes' current challenges to Kearney's testimony as well.

Initially, as with Corigliano's and Pember's challenged

---

[3] Additionally, Forbes has failed to demonstrate that the jury can possibly be misled by Kearney's allegedly false testimony, because all of the information on which Forbes now grounds his claim of perjury has been disclosed by the Government to Forbes, and by Forbes to the jury. E.g. Tr. 1146-64, 1168-70, 1173-76, 1179-81, 1186-90 (cross-examination regarding Kearney's prior statements in which he did not mention that others had invoked Forbes' name in their justifications to Kearney for the unsupported topside adjustments).

As the Second Circuit has held, even the Government's knowing elicitation of perjured testimony does not violate a defendant's due process rights if the evidence which demonstrates that the testimony was false is presented to the jury during trial. McCarthy, 271 F.3d at 399 (rejecting due process claim where defense counsel addressed the conflicting testimony on cross-examination, and "[t]he jury was entitled to weigh the evidence and decide the credibility issues for itself"); United States v. Joyner, 201 F.3d 61, 82 (2d Cir. 2000) ("cross-examination and jury instructions regarding witness credibility will normally purge the taint of false testimony").

testimony under Rule 701, Kearney's challenged testimony is not "opinion" for purposes of that rule. The challenged testimony was properly admitted because it was based on Kearney's "inside information" about how the fraud was executed and why the publicly reported financial results of CUC were fraudulent. The testimony describes Kearney's personal observations and decision-making, not his opinions. He described what he knew about the conspirators' fraudulent topside adjustments, what he and his conspirators did to undertake those adjustments, why they did so, and that they had no support for those practices. Kearney's challenged testimony concerned events and conversations in which he personally participated. See United States v. Fawaz, 881 F.2d 259, 266-67 (6th Cir. 1989) (accountant's testimony about how defendant's tax return was prepared was admissible because the witness was asked about his own direct knowledge of returns in the context of his knowledge of defendant's personal financial condition at the time). Accordingly, Forbes' motion can be rejected for that reason alone.

    **A.  Kearney's Challenged Testimony Is Thoroughly Grounded in His Personal Knowledge, Observations, and Experience.**

Forbes contends that Kearney did not have personal knowledge that topside adjustments made in the fiscal quarter ended July 31, 1993 or in the years before 1995 were unsupported. To the contrary, Kearney had abundant, first-hand experience,

6

knowledge, and observations about that subject.  Indeed, the evidence established that Kearney was in the thick of the conspirators' manipulation of the unsupported topside adjustments undertaken during the consolidation process throughout the period that he worked at CUC, which began in July, 1993.  Tr. 1064.

For instance, Kearney personally oversaw the entire "consolidation process" when he worked in the Corporate Accounting Department at CUC.  Tr. 1067.  That process involved "gathering financial statements from each of [CUC's] divisions, consolidating those to get the consolidated numbers for the company."  Id.  Kearney was involved in making "topside adjustments" to the consolidated figures, which were "adjustments that were made [during the consolidation process] over and above the reported numbers that came in from each of the divisions." Tr. 1069.  The unsupported topside adjustments had the effect of increasing Comp-U-Card's, and ultimately CUC's reported earnings that were published on its SEC filings, such as the 10Q and 10K SEC reports.  Tr. 1072-74, 176-78.  Kearney was instructed to make unsupported topside adjustments to CUC's consolidated financial results "during every quarter" that he worked for CUC. Tr. 1078-80.  In early 1998 or late 1997, after Kearney transferred from the CUC corporate accounting department to the accounting department of the Spark subsidiary, he was instructed by Pember to reverse a portion of the Spark purchase reserve

directly into Spark's revenue account.  Tr. 1079-82.

The unsupported topside adjustments were tracked by a spreadsheet document maintained by CUC accountants known as the "P&L Reconciliation."  Tr. 1070-74.  When Kearney worked in the CUC accounting department, he helped to prepare versions of that document, Tr. 1071, and knew that prior versions of the document existed before he joined CUC in 1993.  Tr. 1064, 1075.  At the direction of Corigliano and Sabatino, Kearney made unsupported topside adjustments to Comp-U-Card's financial results, as reflected in GX 9322, the reconciliation for the quarter ended July, 1993.  Tr. 1074, 1076, 1096.[4]  For every quarter from 1993 into 1997, Corigliano directed Kearney to make such unsupported topside adjustments in order to achieve EPS targets.  Corigliano told Kearney that Stu Bell or Walter Forbes wanted those adjustments to be made, "because that was what Wall Street [analysts were] expecting."  Tr. 1104-08.  Kearney then would make the topside adjustments needed to achieve those EPS targets Tr. 1109-10.

Kearney helped prepare the quarterly reconciliation

---

[4] When Kearney worked as an auditor for E&Y and participated in quarterly reviews and annual audits of CUC, he was never informed of the existence of the reconciliation documents.  Tr. 1061-63, 1075-76.  When Kearney crossed over to the other side of the auditing relationship and worked for CUC, he followed Corigliano's and Sabatino's directives to withhold the reconciliations from the E&Y auditors, because those documents set forth the unsupported topside adjustments.  Tr. 1113-15.

document, and also helped to prepare the financial information contained in GX 9320, CUC's press release regarding its financial results for that fiscal quarter,[5] and in GX 9321, the consolidated financial results for the fiscal quarter ending July 1993. Tr. 1091-93. The press release and consolidated financial results, like the reconciliation document from which it was partially derived, both contained unsupported topside adjustments to Comp-U-Card's operating income totaling $1.7 million. Tr. 1092-96. As far as Kearney knew, "there was no basis" for that topside adjustment for the July 1993 fiscal quarter. Tr. 1096.

When Bell was the CFO of CUC in 1993-95, he directed Kearney, at the end of each fiscal quarter, to make unsupported topside adjustments to the consolidated financial results for CUC, which were on top of the unsupported topside adjustments that Corigliano and Sabatino had previously directed Kearney to make. Tr. 1097-98, 1102. In that context, Bell told Kearney to make adjustments that would overstate CUC's earnings and thereby increase CUC's EPS, because Walter Forbes "wanted it to be a certain number." Tr. 1099-1100, 1103-04.

Notwithstanding Kearney's wealth of personal knowledge that the topside adjustments were without any basis in CUC's actual transactions such as sales or expenditures, and where

---

[5] See Tr. 1138, 1193 (court's ruling that GX 9320 was admitted into evidence, subject to connection under Fed. R. Evid. 801(d)(2)(E)).

therefore "unsupported" by the company's actual business operations, Forbes contends that Kearney could not testify that those adjustments were unsupported because Kearney testified on cross-examination that Corigliano had provided Kearney with "rationalizations" and "excuses" for the practice, and Kearney initially accepted those excuses "to a degree." FM 4-6, citing Tr. 1165-67.

This claim fails. Whether or not Corigliano occasionally lied to Kearney about the reasons for the topside adjustments, and at other times frankly admitted to Kearney that the adjustments were made in order to satisfy Forbes' desire to hit Wall Street analysts' earning targets for CUC, has nothing to do with whether or not Kearney had sufficient personal knowledge to give the challenged testimony. Kearney had a sufficient personal basis to testify about all of his conversations with his co-conspirators regarding the reasons, "rationalizations," and "excuses" offered for those topside adjustments. With the benefit of all of that first-hand information, however, Kearney could properly testify that, as far as he knew, the adjustments were unsupported. If Forbes wants to argue to the jury that the adjustments were supported and proper, notwithstanding Kearney's contrary conclusion, he is free to do so, and can use the cross-examination testimony cited in his memorandum to bolster such an argument. That Forbes can posit challenges to the accuracy of

Kearney's testimony, however, is hardly grounds to preclude its admission under Rule 701, much less award Forbes a mistrial. See United States v. Strauss, 999 F.2d 692, 696 (2d Cir. 1993)("the jury is exclusively responsible for determining a witness' credibility").

    **B.    Kearney's Challenged Testimony Is Not Based on Specialized Knowledge.**

Forbes also claims that Kearney's testimony that the topside adjustments were unsupported required specialized knowledge and training as to which only a properly qualified expert witness can give. FM 6-7. To the contrary, Kearney has sufficient personal knowledge and observations to conclude that the adjustments that he personally undertook, at the direction of his corporate superiors, based on their directives that the adjustments were needed to meet the earnings targets of Wall Street analysts, were unsupported, without the benefit of any specialized knowledge and training. Forbes' contrary argument is precisely the same as this Court rejected in denying Forbes' Retrial Motion In Limine No. 3, seeking to exclude opinion testimony of Corigliano and Pember.

Kearney did not need specialized knowledge to testify that he made up the numbers that found their way into CUC's press releases and financial reports. Kearney testified primarily about the discrepancy between the numbers that he and his conspirators calculated and the numbers they reported. When

11

Kearney testified about CUC's reported consolidated financial results for the fiscal quarter ended July 1993, as memorialized in GX 9320 and GX 9321, he was not giving his "opinion" based on "scientific, technical, or other specialized knowledge." Rather, he was testifying that, by virtue of his position in the CUC accounting department at that time, he had personal knowledge about what actual results were supposed to be, based on the financial results of CUC's operating divisions that were reported to Kearney and others, and the consolidated results that Kearney and others calculated by making topside adjustments, so that the divisional and consolidated results simply "didn't add up." See Teen-Ed, Inc. v. Kimball Int'l, Inc., 620 F.2d 399, 403 (3d Cir. 1980) (witness's personal knowledge of company's balance sheets acquired in course of his accounting duties "was clearly sufficient under Rule 602 to qualify him as a witness eligible under Rule 701 to testify to his opinion of how lost profits could be calculated and to inference that he could draw from his perception of Teen-Ed's books.").[6]

       Subtracting the actual amount of the consolidated results for CUC for that fiscal quarter from the reported

---

[6] See generally DIJO, Inc. v. Hilton Hotels Corp., 351 F.3d 679, 685 (5th Cir. 2003) (recognizing that the 2000 amendment to Federal Rule of Evidence 701 "'did not place any restrictions on the pre-amendment practice of allowing business <u>owners or officers</u> to testify based on <u>particularized knowledge</u> derived from their position.'") (emphases added).

consolidated results to yield an overstatement of $1.7 million is not a matter about which "scientific, technical, or other specialized knowledge" is required. Rather, it is a fact, not an opinion, that derives from third grade level mathematics, for which expert testimony is wholly unnecessary. See Commentary to 2000 Amendments to Rule 701 (permissible "lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field,'" citing State v. Brown, 836 S.W.2d 530, 549 (Tenn. 1992). Kearney's testimony about relatively straightforward facts and the easily understood inferences arising from those facts did not rely on "scientific, technical, or other specialized knowledge within the scope of Rule 702," and did not amount to improper lay opinion testimony that is prohibited by Rule 701. See Fed. R. Evid. 701, Advisory Committee's Note, 2000 Amendment (revised Rule 701 does not prohibit testimony about "manner of conduct" or "an endless number of items that cannot be described factually in words apart from inferences.").

      The Advisory Committee's Note to Rule 701 is clear: business executives (such as Kearney) can permissibly testify about their companies' financial practices. This type of testimony is admissible because of the executive's "knowledge and participation in the day-to-day affairs of the business." Fed.

R. Evid. 701, Advisory Committee's Note to 2000 Amendment.

Stated differently, a corporate insider's opinion testimony about the company:

> is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business. The [2000] amendment [to Rule 701] does not purport to change this analysis.

Advisory Committee's Note to 2000 Amendment. Forbes' meritless Rule 701 challenge to Kearney's testimony should be rejected.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully requests that this Court deny Forbes' Retrial Motion No. 18.

Respectfully submitted,

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice


By:  NORMAN GROSS
     MICHAEL MARTINEZ
     CRAIG CARPENITO
     Special Attorneys
     U.S. Department of Justice


Dated: November 3, 2005
Hartford, Connecticut

**CERTIFICATE OF SERVICE**

       The undersigned certifies that on this day I caused to be served copies of the foregoing upon the following by hand delivery:

Barry S. Simon, Esq.
Williams & Connolly LLP

                                            DEBRA ELLIOTT
                                            U.S. Department of Justice

Dated: November 3, 2005
       Hartford, Connecticut