UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,

v.

WALTER A. FORBES.

No. 3:02CR264 (AWT)
November 13, 2005

# REPLY MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANT WALTER A. FORBES FOR A MISTRIAL BASED ON THE TESTIMONY OF STEVEN KERNKRAUT
## (Forbes Retrial Motion No. 15)

Defendant Walter A. Forbes, through undersigned counsel, respectfully submits this reply memorandum in further support of his motion for a mistrial based on the testimony of Steven Kernkraut.

## ARGUMENT

The government effectively concedes that Mr. Kernkraut offered improper testimony both on direct and re-direct examination, but it urges the Court not to worry because, it claims, his improper testimony was not that important, was not that prejudicial, was offered for non-hearsay purposes, and supposedly can be cured by limiting instructions. It also has the audacity to essentially argue "no harm, no foul" because Mr. Forbes supposedly elicited improper testimony on cross-examination (to which the government did not object) after the Court repeatedly overruled his valid objections on direct examination. These arguments, individually and collectively, are frivolous.

Mr. Kernkraut's testimony was highly prejudicial and a mistrial is warranted. Mr. Kernkraut was the government's first witness. He did not testify in the first trial which, after prolonged deliberations, resulted in a hung jury. In this trial, he testified repeatedly about highly prejudicial matters that were not charged in the indictment, and were not part of the first trial. For example, he testified repeatedly over the course of two days that Mr. Forbes discussed membership numbers and renewal rates with him, the supposedly key variables of the business. See, e.g., Tr. at 139-40; Tr. at 142; Tr. at 230-31; Tr. at 330-31. Mr. Kernkraut testified that Mr. Forbes knew the membership numbers and the renewal rates. See Tr. at 144 (opining that "if anyone knew how the business worked, [Mr. Forbes] knew how the business worked" and that "he knew the key variables. He knew membership growth. He knew the renewal rates."). Mr. Kernkraut emphasized the alleged importance of the membership numbers and renewal rates and testified that he was unable to validate those figures other than through discussions with management. See Tr. at 274 ("[T]here were two key variables in CUC's business; the number of members they had and what the renewal rate of the company was. And there was no way for an outside analyst to validate that information aside from hearing it from the management's mouth."); see also Tr. at 262-63. Mr. Kernkraut testified that CUC overstated its membership numbers and renewal rates, see Tr. at 217-18, 229, and that Mr. Forbes made false representations to him about CUC's financial results, see Tr. at 335, 337.

That testimony alone is enough to warrant a mistrial, but that is only some of the improper testimony by Mr. Kernkraut. Mr. Kernkraut's testimony repeatedly violated numerous rules of evidence, Mr. Forbes' Sixth Amendment rights, and the Second Circuit's prohibition on opening a criminal case with an overview witness. His testimony constructively amended the indictment and caused a prejudicial variance. Moreover, he offered false testimony that the government has failed to correct. Mr. Forbes will not rehash all of these points but will address some of the specific arguments raised by the government, which primarily relate to the alleged lack of prejudice flowing from Mr. Kernkraut's admittedly improper testimony.

1. The government's argument that the prejudice from Mr. Kernkraut's testimony is minimal because his testimony purportedly relates only to whether the charged crimes occurred, not to whether Mr. Forbes allegedly committed them, see, e.g., Resp. at 2-3, cannot be squared with the government's repeated arguments elsewhere that the duration and magnitude of the alleged fraud are relevant to show Mr. Forbes' alleged knowledge. Mr. Kernkraut, without personal knowledge, falsely testified as if it was established that the financial results were overstated, including in the years 1993 and 1994—a point the government does not address in its brief. For example, he testified unequivocally that "The 77 cents that was reported in their actual financial statements as what CUC earned in 1993 was overstated and those earnings were much lower than that." Tr. 230 (emphasis added). As the government knows, Mr. Forbes has

vigorously objected to all testimony relating to alleged accounting improprieties in the time period before Cosmo Corigliano was CFO, and the Restatement simply does not address these years. Yet the government expressly and improperly asked Mr. Kernkraut to opine on the accuracy of the earnings projections in GX 1400, a 1994 analyst report that he had prepared. See Tr. 228-29.[1] Moreover, the government elicited testimony that Mr. Forbes allegedly knew the key financial variables, that he allegedly discussed them with Mr. Kernkraut, that those variables were allegedly overstated, that Mr. Forbes' representations were "essentially false," Tr. at 337, and that Mr. Kernkraut felt "betrayed, lied to." Tr. at 215. Obviously, the government was eliciting such testimony in an attempt to persuade the jury of Mr. Forbes' alleged culpability.

2. The government argues that Mr. Kernkraut's testimony about membership numbers and renewal rates was not deliberately false, see Resp. at 26, which, even if true, does not matter because the government now knows it was false. The government states that it will not argue to the jury that Mr. Forbes could be convicted on the basis of this testimony, see Resp. at 26 n.10, but this does not address the government's duty to correct. In addition, the government attempts to defend the testimony by mixing apples and oranges (here, cancellation reserves and renewal rates) and claims that CUC "was, at least implicitly overstating the total

[1] Having introduced the fact that Mr. Kernkraut analyzed the company since 1993, see Tr. at 112, the government also expressly elicited Mr. Kernkraut's opinion that the Restatement lead him to change his opinion "as it was articulated in all the reports" where he had indicated whether his customers should purchase CUC stock. Tr. at 335-36 (emphasis added).

number of members." Resp. at 27-28 (emphasis added). This analysis is flat wrong and, in any event, Mr. Kernkraut did not testify that renewal rates and membership numbers were "implicitly" overstated; he testified that they were false and provided the false and misleading impression that his testimony was supported by the Restatement. Moreover, the government's analysis actually underscores the prejudicial nature of the improperly admitted evidence. If the government, which should know better, makes the "implicit" overstatement argument about membership numbers, and confuses cancellation reserves and renewal notes, jurors are even more likely to be confused. Indeed, during the testimony of witnesses such as Mr. Corigliano, the government repeatedly elicited testimony about improper "membership accounting," e.g., Tr. at 1381, 1486-93, a term that jurors can easily interpret to include the testimony about false membership numbers improperly elicited from Mr. Kernkraut.

3. The government's repeated suggestion that it was offering the improper testimony for a non-hearsay purpose, see, e.g., Resp. at 2, makes no sense (and does not address the many objections other than hearsay). Indeed, the government fails to explain coherently the supposed non-hearsay purpose. The government's claim that the Court instructed the jury about non-hearsay uses, see Resp. at 2, is not accurate. The Court instructed the jury that certain testimony could be considered "only with respect to the question of whether any allegedly false statement was material," Tr. at 216, not that the testimony could not be considered for the truth. The question of materiality turns on the truth of the testimony.

In any event, Mr. Kernkraut, over objection, explicitly gave testimony about the alleged falsity of CUC's financial data (including financial data for 1993 and 1994), and the alleged falsity of the membership numbers and renewal rates, and the government cannot credibly argue that that improper testimony was elicited on the issue of "materiality." When Mr. Kernkraut offered testimony that the reported financial results were allegedly false, that Mr. Forbes supposedly knew the numbers, and that Mr. Forbes allegedly lied to him, it is fair to say that Mr. Kernkraut was testifying about falsity and knowledge, not about materiality. Indeed, the government effectively concedes as much. See, e.g., Resp. at 5 ("To the extent that Kernkraut testified that CUC's or Cendant's publicly disclosed financial results were inaccurate, or that Forbes' statements to Kernkraut regarding CUC's results were essentially false, the Government would not oppose an appropriate instruction striking only those limited portions of Kernkraut's testimony." (quotations & citations omitted)).[2]

4. The government repeatedly argues that the prejudice of the improper testimony admitted over objection on direct and re-direct examination is somehow mitigated by the fact that Mr. Forbes asked questions of Mr. Kernkraut on cross-examination, without objection, that the government now claims were objectionable. See, e.g., Resp. at 8. The government distorts the Second Circuit's

[2] The government does not explain how this can be done without repeating and highlighting the improper testimony. In any event, Mr. Forbes obviously objects to all of the improperly elicited testimony, and wants all of it stricken, with an instruction that it is being stricken because the testimony elicited by the government was unreliable and, in many respects, inaccurate.

decision in United States v. Diaz, 176 F.3d 52, 104 (2d Cir. 1999), by citing it in support of this far-fetched proposition. In that case, defendant Morales argued that the trial court abused its discretion in denying severance. See id. at 102. Among other things, he argued that his defense was antagonistic with that of his co-defendant, Rios. See id. at 103. Rios testified that Morales tried to kill him, but "Morales did not object to Rios' direct testimony on the same point, and he elicited similar testimony when he cross-examined Rios. Such actions or lack thereof by Morales do not support a finding of prejudice." Id. at 104.[3] This case does not remotely support the proposition that the government's introduction of inadmissible evidence over a defense objection is excused when the defendant subsequently introduces evidence on a different subject matter without objection – in this case, testimony that, unlike the testimony elicited by the government, was predicated on Mr. Kernkraut's personal observations during the relevant time period, and was not objectively and demonstrably false.

5. Contrary to the government's suggestion, a limiting instruction cannot cure the prejudice caused by Mr. Kernkraut's improper and inadmissible testimony. As set forth in the opening memorandum, a limiting instruction cannot make otherwise inadmissible evidence admissible. This is not a situation where the testimony was admissible for some purposes, but not others. The testimony was

3 At some point, Morales moved for a mistrial. See id.

inadmissible and improper for the multiple reasons Mr. Forbes identified in his opening memorandum.[4]

6. The government's efforts to defend the challenged testimony are unfounded. Although the government concedes that some of the challenged testimony was improper, it defends other portions of that testimony. None of the challenged testimony is defensible for the reasons set forth in Mr. Forbes' opening memorandum, but Mr. Forbes writes to address one point raised by the government.

As set forth in the opening memorandum, Mr. Kernkraut's opinion testimony that CUC's earnings and growth rates had been overstated was inadmissible. Contrary to the government's suggestion, see Resp. at 8-9, these opinions could not be supported simply by comparing what he was allegedly told with the Restatement, even ignoring the fact that the Restatement did not even address all of the years about which Mr. Kernkraut testified. Testimony about the accuracy of the reported financial results requires (1) personal knowledge of the underlying data and facts behind the financial statements (which Mr. Kernkraut admitted he did not have); (2) and specialized knowledge to determine how the underlying data and facts should have been presented in the financial statements (which takes this testimony outside the scope of proper lay opinion). Even Mr. Heckler could not tie the entries in the Restatement to the Audit Committee's work,

---

4 The fact that the Court gave a limiting instruction regarding GX 827—a document that was not identified or admitted in Mr. Kernkraut's testimony—when the government introduced the document through a subsequent witness, Resp. at 4, is totally irrelevant.

or to the quantification of specific alleged accounting improprieties at Cendant/CUC. Among other things, the Restatement covered different time periods than CUC's financial statements, and the restated numbers were all presented on a calendar year basis (CUC's prior years were presented on a 1/31 fiscal year basis). And the Restatement presented the figures for each year as if CUC and HFS were always a single entity, whereas CUC's prior filings did not include HFS. Moreover, even if the Restatement could be accepted as fact (it cannot),[5] an opinion that earnings growth rates were overstated does not flow from the alleged fact that earnings were overstated. Even if earnings were overstated, earnings growth rates could have been accurate (or even understated) if earnings were consistently overstated over time. To calculate the proper growth rate would require personal knowledge that Mr. Kernkraut does not have, and specialized knowledge that is not permissible when a lay witness offers an opinion.

---

5 The government asserts that Mr. Kernkraut did not predicate his testimony on investigations of the Cendant Audit Committee. Opp. at 10 n.4. In a sentence that the Court did not strike, Mr. Kernkraut stated that "Cendant as a corporation retained forensic accountants that kind of combed the books of his company." Tr. 337-38. The Restatement itself stated that "As a result of the findings of the Audit Committee Investigation and Company investigation, the Company has restated previously reported annual results including the 1997, 1996 and 1995 financial information set forth herein," Restatement at F-17, and that "management has made all adjustments considered necessary as a result of the investigation." See id.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: ______________________________
Brendan V. Sullivan, Jr. (Bar No. ct17115)
Barry S. Simon (Bar No. ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
COWDERY, ECKER & MURPHY, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

Dated: November 13, 2005

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Reply Memorandum in Support of Motion of Defendant Walter A. Forbes for a mistrial based on the testimony of Steven Kernkraut to be sent to the following via e-mail on November 13, 2005, and via hand delivery on November 14, 2005:

Michael Martinez, AUSA
Craig Carpenito, AUSA
U.S. Department of Justice
450 Main Street, Room 320
Hartford, CT 06103

and to the following via e-mail on November 13, 2005:

Norman Gross, AUSA
U.S. Attorney's Office
District of New Jersey
401 Market Street
Fourth Floor
Camden, NJ 08101

Barry S. Simon