## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | No. 3:02CR264 (AWT) |
| v. ) | |
| ) | |
| WALTER A. FORBES ) | November 18, 2005 |
| ) | |

# SUPPLEMENTAL PROPOSED JURY INSTRUCTIONS
# OF WALTER FORBES

Brendan V. Sullivan, Jr. (Bar No. ct17115)
Barry S. Simon (Bar No. ct24159)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
COWDERY, ECKER & MURPHY, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

Defendant Walter A. Forbes, through undersigned counsel, respectfully submits the following supplemental proposed jury instructions.  Mr. Forbes reserves the right to propose additional instructions and to make additional objections as the circumstances may warrant, including objections to the Court's actual jury instructions or failure to give a requested instruction pursuant to Fed. R. Crim. P. 30.

## SUPPLEMENTAL PROPOSED JURY INSTRUCTION NO. 1
### (Theory of the Defense)

That concludes the part of my instructions explaining the elements of the various charges.  Next, I will explain Mr. Forbes' theory of the case.

Mr. Forbes contends that he is innocent of each and every charge in the indictment, and that he had no knowledge of accounting wrongdoing at CUC or Cendant at any time prior to mid-April 1998.  Mr. Forbes denies that he ever entered into any agreement with anyone to fraudulently inflate CUC's or Cendant's financial results, denies that he knowingly and willfully caused false financial information to be reported to the SEC or the investing public, and denies that he engaged in any fraud relating to the stock of CUC or Cendant.

Mr. Forbes contends that he was not involved in the preparation of CUC's or Cendant's financial statements, SEC filings, or other financial information released to the public.  Mr. Forbes contends that he relied in good faith on CUC's professional outside auditors at Ernst & Young, and Cendant's professional outside auditors at Ernst & Young and Deloitte & Touche, as well as on CUC's and Cendant's internal professional accountants and CUC's and Cendant's Chief Financial Officers, to ensure that CUC's and Cendant's financial statements, SEC filings, and other financial information released to the public were properly prepared and fairly presented in compliance with all applicable laws and accounting rules.

2

Mr. Forbes contends that, at all times prior to mid-April 1998, he believed that CUC's and Cendant's financial statements, SEC filings, and other financial information released to the public were fairly presented and properly prepared in compliance with Generally Accepted Accounting Principles. Mr. Forbes contends that, when he signed CUC's and Cendant's SEC filings, signed his messages to shareholders in annual reports, and participated in the dissemination of financial information to the public, he did so believing in good faith that the information was accurate and fairly presented. Mr. Forbes also contends that, at all times that he sold CUC or Cendant stock, he believed in good faith that the company's financial statements, SEC filings, and other financial information were properly prepared and fairly presented, and that he had no knowledge that CUC's or Cendant's income had been fraudulently inflated.

Mr. Forbes contends that CUC always received clean annual audit opinions from its outside auditors at Ernst & Young, as well as clean quarterly review opinions from Ernst & Young. Mr. Forbes also contends that Cendant received clean audit opinions from both Ernst & Young and Deloitte & Touche with respect to the year and quarter ending December 31, 1997. Mr. Forbes contends that he relied, in good faith, on those clean audit opinions, in support of his belief that CUC's and Cendant's financial statements, SEC filings, and other financial information released to the public were properly prepared and fairly presented. Mr. Forbes contends that had no knowledge of improper accounting at either CUC or Cendant, and that he did not know about any improper accounting involving the

membership cancellation reserve, rejects-in-transit, revenue and expense allocation, unsupported topside adjustments, the improper use of merger reserves, or any other alleged accounting irregularity. Mr. Forbes contends that he did not participate in establishing merger reserves at CUC or Cendant, and did not participate in determining how merger reserves would be used. He contends that he properly left those determinations to other business executives and accountants, and that he relied upon the independent auditors to review the estimates made by those establishing the merger reserve amounts, as well as the eventual use of those reserve amounts. Mr. Forbes also contends that he did not know that Mr. Corigliano or anyone else was deceiving Ernst & Young or obstructing the audit process.

Mr. Forbes contends that CUC engaged in mergers and acquisitions for legitimate business reasons, and that he never caused CUC to acquire any other company, or to merge with any other company, in order to create merger reserves. Mr. Forbes contends that the idea of CUC merging with HFS was proposed by Bear Stearns, an independent investment bank, and that the CUC/HFS merger was done solely because of the valid business reasons for the merger, including the fact that both CUC and HFS were bidding on the Signature business, the fact that CUC was concerned that HFS would become CUC's major competitor in CUC's core membership businesses in the same way that HFS had recently become a direct competitor in CUC's timeshare exchange business, and the fact that there were business synergies between CUC and HFS, as demonstrated by the successful

Transfer Plus relationship between the two companies and the analyses and fairness opinion prepared for CUC by Goldman Sachs, an independent investment bank. Mr. Forbes contends that the Ideon acquisition also was done solely for valid business reasons, and that the Ideon acquisition made perfect sense from a business perspective because Ideon had membership businesses and channels of distribution that were extremely compatible with CUC's membership businesses. Similarly, Mr. Forbes contends that the Sierra and Davidson acquisitions were done solely for valid business reasons, including the fact that Sierra and Davidson provided educational and entertainment content for CUC's interactive site, the fact that Sierra and Davidon already had a presence on the internet, and the fact that both companies had excellent software engineers who could help CUC realize its goal of succeeding in the interactive world.

Mr. Forbes contends that he genuinely believed that CUC was a healthy, growing, successful company. Mr. Forbes contends that he saw CUC grow from a small company with less than 20 employees to a much larger company with numerous divisions, over $2 billion in annual revenue, and 15,000 employees. Mr. Forbes contends that he was not involved in the day-to-day management of CUC, that he had handed over the day-to-day management of CUC's business to the Office of the President in 1987, and that the information he received from top CUC managers was consistent with Mr. Forbes' understanding that CUC was a thriving, prospering company. Mr. Forbes contends that he consistently received positive feedback about CUC's financial success from the heads of the various divisions of

CUC, that CUC's cash position was strong, and that its membership numbers were steadily growing.   Mr. Forbes contends that he did not know that the financial information CUC reported to the public was in any way false or misleading.

Finally, Mr. Forbes contends that, prior to April 1998, he believed that Cosmo Corigliano was a competent, honest, professional who could be trusted to ensure that CUC's financial statements and SEC filings were properly prepared. Mr. Forbes contends that he relied on Mr. Corigliano, who Mr. Forbes believed was a person of integrity, and that Mr. Corigliano betrayed Mr. Forbes' trust by engaging in a scheme to fraudulently inflate CUC's and Cendant's financial results. Mr. Forbes contends that Mr. Corigliano repeatedly lied to him, to other members of CUC's management, to the CUC Board of Directors, to HFS, and to CUC's outside auditors, to conceal the fraud that Mr. Corigliano and Mr. Corigliano's subordinates were perpetrating.   Mr. Forbes also contends that Mr. Corigliano and others undermined the established accounting controls that Mr. Forbes believed were in place at the company.   Mr. Forbes contends that he understood that the outside auditors regularly reviewed the sufficiency of the company's internal controls, and that they regularly advised the company that those internal controls were adequate.

Keep in mind that, while this is the theory of the defense, the defense has no burden of proof.   The government has the burden of proving that Mr. Forbes is guilty beyond a reasonable doubt.   If the government fails to prove beyond a reasonable doubt that Mr. Forbes knowingly and willfully participated in a scheme to fraudulently inflate CUC's and Cendant's earnings, and that Mr. Forbes did not

act in good faith with respect to the financial information publicly reported by CUC

and Cendant, you must return a verdict of not guilty as to Mr. Forbes.


See United States v. Crowley, 236 F.3d 104, 111 (2d Cir. 2000) (affirming grant of
new trial because a "criminal defendant is entitled to have instructions presented
relating to any theory of the defense for which there is any foundation in the
evidence, no matter how weak or incredible that evidence may be" (quotation
omitted)); United States v. Dove, 916 F.2d 41, 47 (2d Cir. 1990) (reversing conviction
and stating that "a criminal defendant is entitled to instructions relating to his
theory of defense, for which there is some foundation in the proof, no matter how
tenuous that defense may appear to the trial court"); United States v. Pedroza, 750
F.2d 187, 205 (2d Cir. 1984) (holding that trial court should have given theory of the
defense charge and stating that "[w]e do not view the court's instructions on
knowledge, aiding and abetting, or 'mere presence,' etc., which were general in form,
as adequate to inform the jury that if it believed the defendants' theory it was
entitled to conclude that they did not have the requisite intent to be convicted of the
offenses charged").

## SUPPLEMENTAL PROPOSED JURY INSTRUCTION NO. 2
### (No Duty of CEO or Chairman to Read 10-K's or 10-Q's)

I instruct you that, prior to April 15, 1998, a corporation's Chief
Executive Officer (CEO) or the Chairman of a corporation's Board of Directors had
no legal duty or obligation to read any Form 10-Q or Form 10-K that he or she
signed.

Response to Government Cross-Examination of Mr. Forbes. The requirement that a
CEO certify that he or she has reviewed a 10-K or 10-Q before signing it commenced
with the Sarbanes-Oxley Act of 2002. See Exhibit 1 hereto (2002 SEC news release
explaining new requirement).

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: _____

Brendan V. Sullivan, Jr. (Bar No. ct17115)
Barry S. Simon (Bar No. ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
COWDERY, ECKER & MURPHY, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

Dated:  November 18, 2005

9

# EXHIBIT 1

This is **G o o g l e**'s cache of http://www.sec.gov/news/press/2002-128.htm as retrieved on Nov 9, 2005 07:48:02 GMT.
**G o o g l e**'s cache is the snapshot that we took of the page as we crawled the web.
The page may have changed since that time. Click here for the current page without highlighting.
This cached page may reference images which are no longer available. Click here for the cached text only.
To link to or bookmark this page, use the following url: http://www.google.com/search?
q=cache:excL0Sgi8fMJ:www.sec.gov/news/press/2002-128.htm+Sarbanes+Oxley+certify+10K&hl=en

*Google is neither affiliated with the authors of this page nor responsible for its content.*

These search terms have been highlighted: **sarbanes oxley certify**
These terms only appear in links pointing to this page: **10k**

Home | Previous Page

**U.S. Securities and Exchange Commission**

## Commission Approves Rules Implementing Provisions of Sarbanes-Oxley Act, Accelerating Periodic Filings, and Other Measures

**FOR IMMEDIATE RELEASE
2002-128**

*Washington, D.C., August 27, 2002* —The Commission took the following actions at its open meeting today. The full text of detailed releases concerning each of these items will be posted to the SEC Web site as soon as possible.

1.  The Commission approved a delegation to the General Counsel to issue certain orders in Commission administrative proceedings. The delegation authorizes the General Counsel to issue orders, pursuant to Rule of Practice 411(b), under which the Commission would take up on its own motion the issue of what sanctions are appropriate in the public interest.

2.  The Commission adopted amendments to accelerate the filing deadlines for quarterly reports on Form 10-Q, and annual reports on Form 10-K, required under the Exchange Act. The Commission also adopted new disclosure regarding access to reports on company Web sites.

    The changes accelerate reports for domestic companies that:

    - Have a public float of at least $75 million;
    - Have been reporting for at least 12 months;
    - Have previously filed one annual report; and
    - Are not eligible to use the Commission's special forms for small business issuers.

    The changes to filing deadlines will be phased in over three years, with no change for the first year. The annual report deadline will remain 90 days for the first year, change to 75 days for year two, and change to 60 days for year three and thereafter. The quarterly report deadline will remain 45 days for the first

year, change to 40 days for year two, and change to 35 days for year three and thereafter. The first reductions-to 75 days for annual reports and 40 days for quarterly reports-would occur for accelerated filers with fiscal years ending on or after Dec. 15, 2003.

Regarding disclosure of Web site access to reports, an accelerated filer will be required to disclose in its Form 10-K, beginning with reports for fiscal years ending on or after Dec.15 of this year, whether the company makes its periodic and current reports available, free of charge, on its Web site as soon as reasonably practicable after such material is electronically filed with, or furnished to, the Commission.

This acceleration of the periodic reports will occur less quickly than originally proposed by the Commission in April. The original proposals would have accelerated annual reports from 90 to 60 days and quarterly reports from 45 to 30 days. The proposals did not include a phase-in period. The Commission received responses from more than 300 commentators, falling generally into two groups. The first group, representing investors and other users of company reports, uniformly supported the proposals and the Commission's objective to provide investors with more timely access to company filings. The other group, consisting primarily of companies, business associations, law firms and accounting firms, opposed the proposals as written because, in their view, the proposed timeframes were too short, and could result in less accurate filings. While many did not believe any acceleration was warranted, a large number, including most business associations, generally supported the Commission's objectives, and offered alternatives to reduce potential costs and burdens. These included a more gradual phase-in or transition period, and a less extensive acceleration of deadlines. Also, while comments were mixed, more believed it would be more difficult to accelerate the quarterly report, than the annual report. As the Commission stated in its proposing release, establishing filing deadlines requires a balance between the market's need for information with the time companies need to prepare that information. Accordingly, after carefully studying the comments, the Commission staff recommended the modifications that were adopted today by the Commission.

3. The Commission adopted rules under the Securities Exchange Act of 1934 and the Investment Company Act of 1940 that require an issuer's principal executive officer and principal financial officer to **certify** the contents of the issuer's quarterly and annual reports. The rules will implement Section 302 of the **Sarbanes-Oxley** Act of 2002, which was enacted into law on July 30, 2002. Section 302 directed the Commission to adopt, by Aug. 29, 2002, rules requiring issuers' principal executive and financial officers to **certify** their quarterly and annual reports. These new rules supersede the certification proposal included in the Commission's June 14, 2002 release.

## Highlights of the New Rules

### Contents of Certification

New Exchange Act Rules 13a-14 and 15d-14 will require an issuer's principal executive and financial officers each to **certify**, with respect to the issuer's quarterly and annual reports filed or submitted under Section 13(a) or 15(d) of the Securities Exchange Act of 1934, that:

- he or she has reviewed the report;

- based on his or her knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under

which such statements were made, not misleading;

- based on his or her knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition and results of operations of the issuer as of, and for, the periods presented in the report;

- he or she and the other certifying officers:

  o are responsible for establishing and maintaining "disclosure controls and procedures" (a newly-defined term reflecting the concept of controls and procedures related to disclosure) for the issuer;

  o have designed such disclosure controls and procedures to ensure that material information is made known to them, particularly during the period in which the periodic report is being prepared;

  o have evaluated the effectiveness of the issuer's disclosure controls and procedures within 90 days of the date of the report; and

  o have presented in the report their conclusions about the effectiveness of the disclosure controls and procedures based on the required evaluation;

- he or she and the other certifying officers have disclosed to the issuer's auditors and to the audit committee of the board of directors (or persons fulfilling the equivalent function):

  o all significant deficiencies in the design or operation of internal controls (a pre-existing term relating to internal controls regarding financial reporting) which could adversely affect the issuer's ability to record, process, summarize and report financial data and have identified for the issuer's auditors any material weaknesses in internal controls; and

  o any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal controls; and

- he or she and the other certifying officers have indicated in the report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

The new rules will apply to the principal executive and financial officers of any issuer that files quarterly and annual reports with the Commission under either Section 13(a) or 15(d) of the Exchange Act, including foreign private issuers and small business issuers. The new rules will require that the certification be included in annual reports on Forms 10-K, 10-KSB, 20-F and 40-F, quarterly reports on Forms 10-Q and 10-QSB and amendments to any of the foregoing reports. The staff of the Commission's Division of Corporation Finance will release a statement regarding compliance with the certification requirements of Exchange Act Rules 13a-14 and 15d-14 by asset-backed issuers.

## Disclosure Controls and Procedures

New Exchange Act Rules 13a-15 and 15d-15 will require an issuer to establish and maintain an overall system of disclosure controls and procedures that is adequate to meet its Exchange Act reporting obligations. These rules are

intended to complement existing requirements for reporting companies to establish and maintain systems of internal controls with respect to their financial reporting obligations.

Comments on the question of certification of proxy statements should be received within 30 days of the date of publication of the rules in the *Federal Register*. The rules will apply to reports filed after Aug. 29, 2002.

## Registered Investment Companies

New Investment Company Act Rule 30a-2 will implement the certification requirement of Section 302 for registered investment companies. Rule 30a-2 will require the principal executive and financial officers of a registered investment company that files periodic reports under Section 13(a) or 15(d) of the Exchange Act to **certify** the company's semi-annual reports on Form N-SAR, as well as the financial statements on which the financial information in Form N-SAR is based. Form N-SAR is the form designated for registered investment companies to comply with their periodic reporting requirements under the Exchange Act.

In addition, the Commission voted to propose amendments designed to better implement the intent of Section 302 of the **Sarbanes-Oxley** Act of 2002 with respect to registered investment companies. These proposed amendments would:

- require registered management investment companies, including mutual funds, to file certified shareholder reports with the Commission, on a new Form N-CSR. These certified shareholder reports would consist of a copy of any required shareholder report, information regarding the company's disclosure controls and procedures, and the certifications required by Section 302;

- require all registered investment companies to maintain, and regularly evaluate, disclosure controls and procedures designed to ensure that the information required in all its disclosure documents is collected, processed, and disclosed on a timely basis; and

- uniformly apply to all registered investment companies, and not just those required to file periodic reports under the Exchange Act, the requirement to include a certification of their principal executive and financial officers in their reports on Form N-SAR.

Comments on the proposed amendments should be received within 30 days of the date of their publication in the *Federal Register*. The rules will apply to reports filed after Aug. 29, 2002.

4. The Commission voted to adopt rule and form amendments to implement the accelerated filing deadline applicable to change of beneficial ownership reports required to be filed by officers, directors and principal security holders under Section 16(a) of the Securities Exchange Act of 1934, as amended by Section 403 of the **Sarbanes-Oxley** Act of 2002. The Commission announced in Exchange Act Release No. 46313 (Aug. 6, 2002) that it would consider adopting such amendments. The amendments:

- Conform all references to the Form 4 filing deadline to the amended statutory filing deadline;

- Require transactions between officers or directors and the issuer previously reportable on an annual basis on Form 5 to be reported within

two business days on Form 4; and

- Modify the Form 4 reporting deadline for certain transactions, if the insider does not select the date of execution. For these transactions, the reports must be filed within two business days after the insider receives notice of the transaction, but the notification date may be no later than the third business day after the transaction is executed. These transactions are:

  o Transactions pursuant to Rule 10b5-1(c) arrangements; and

  o Specified plan transactions defined as "Discretionary Transactions," such as fund-switching transactions, pursuant to employee benefit plans.

The rule and form amendments apply to transactions executed on or after Aug. 29, 2002. Comments on the amendments and related issues should be received no later than Sept. 30, 2002.

5. The Commission voted to grant a de minimis exemption from the trade-through restrictions of the Intermarket Trading System Plan for transactions in exchange-traded funds tracking the Nasdaq-100 Index (QQQs), the Dow Jones Industrial Average (DIAMONDs), and the Standard and Poors 500 Index (SPDRs). The exemption will cover transactions that are executed at no more than three cents ($0.03) away from the national best bid and offer displayed in the Consolidated Quote. The exemption will be effective for nine months commencing on the date of publication of the order in the *Federal Register*.

   The Commission also directed the Division of Market Regulation to present a proposal for a series of interactive public meetings on aspects of market structure. In order to facilitate the Commission's decisionmaking, and give the public the opportunity to become better informed on this range of important issues, the Commission expects that the meetings will involve market participants, as well as experts from the financial service industry, corporate America and academics, in discussions of the steps, and alternatives, for improving the national market system.

6. The Commission voted to adopt rule amendments and a new rule under the Securities Exchange Act of 1934 that were proposed for comment in the *Federal Register* on June 10, 2002. New paragraph (e) of Rule 10b-10 and new Rule 11d2-1 are designed to clarify the disclosures broker-dealers effecting transactions in security futures products in futures accounts must make in the confirmations sent to customers regarding those transactions.

7. The Commission decided to propose amendments to Exhibit A to Exchange Act Rule 15c3-3 in light of the anticipated trading of security futures products under the Commodity Futures Modernization Act of 2000. Exhibit A sets forth the formula, commonly called the "Reserve Formula," for calculating the amount a broker-dealer must deposit in a reserve bank account for the protection of customer assets, as required under Rule 15c3- 3. The proposed amendments delineate the treatment under the Reserve Formula of customer margin related to security futures products required and on deposit with clearing entities. The proposed amendments are designed to minimize regulatory costs associated with conducting a customer business in security futures products. Generally, the proposed changes would permit a broker-dealer, subject to specified conditions, to include the amount of customer security futures product margin required and on deposit at a clearing house as a debit in the Reserve Formula. One of those conditions is that a broker-dealer obtain from its DCO an undertaking, which is provided to the Commission, that confirms that representatives of the Commission may examine the DCO for compliance with

requirements of Rule 15c3-3a. The Commission solicits comments on the proposed amendments. In particular, the Commission seeks comment on whether the undertaking is necessary to protect customers. Comments should be received no later than 30 days after publication of the proposals in the *Federal Register*. Security futures products may begin trading before adoption of final rule amendments to the Reserve Formula in Exhibit A to Rule 15c3-3. Any concerns that arise with regard to the treatment under the Reserve Formula of customer security futures product margin before commencement of trading should be brought to the attention of the Division of Market Regulation.

*http://www.sec.gov/news/press/2002-128.htm*

Home | Previous Page                                    Modified: 08/27/2002

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that I caused the foregoing Supplemental Proposed Jury Instructions of Walter Forbes to be sent on November 18, 2005 to the following via Federal Express and email:

       Michael Martinez, Esq.
       Craig Carpenito, Esq.
       U.S. Attorney's Office
       District of New Jersey
       970 Broad Street, Suite 700
       Newark, NJ  07102

and to the following via email:

       Norman Gross, Esq.
       U.S. Attorney's Office
       District of New Jersey
       401 Market Street
       Fourth Floor
       Camden, NJ  08101

               _____
               Barry S. Simon