# EXHIBIT 15

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**

919 THIRD AVENUE

NEW YORK, N.Y. 10022 - 3852

ALAN R. FRIEDMAN
PARTNER
TEL (212) 715-9300
FAX (212) 715-8000
afriedman@kramerlevin.com

47, AVENUE HOCHE
75008 PARIS
FRANCE

September 4, 2003

Without Prejudice and
For Settlement Purposes Only

Via Federal Express

James A. Kidney, Esq.
Assistant Chief Litigation Counsel
Securities and Exchange Commission
Division of Enforcement
450 Fifth Street, N.W., Stop 8-8
Washington, DC 20549-0808

DEFENDANT'S
EXHIBIT
49

Dear Jim:

I write in connection with our settlement meeting scheduled for Monday and the questions you left in your voicemail. This information is supplied to facilitate our settlement discussions, for settlement purposes only and without prejudice to either the Commission or our client.

In response to your questions, I enclose the following:

1. a recent insurance survey that puts a value of $50,000 on the sailboat.

2. Mr. Corigliano does not have a current valuation for the family home in Old Saybrook. I am attaching a brokerage listing for another house in the area that seems comparable. We believe that this listing goes back to at least May of this year, without the house being sold.

3. Option awards for the three sets of options that Mr. Corigliano holds. I am also supplying a Black Sholes analysis that we recently had done to value the options, assuming market prices for Cendant of $19 and $18 a share and using the same volatility assumptions that Cendant uses in its most recent 10K. The spread sheet also lists the strike price, expiry date, and number of options as well.

4. Financial statements for the candle company for the 2002 year and for the first 8 months of 2003. They are in the form regularly kept by the business. I

KL3-2156-051

3441

KRAMER LEVIN NAFTALIS & FRANKEL LLP

James A. Kidney, Esq.
September 4, 2003
Page 2

think you were also interested in any salary Cosmo or Mrs. Corigliano received from the business. Cosmo started to receive a salary at the end of 2002 -- when he had net earnings after taxes of approximately $11,075 (gross approximately $14,423). During 2003, he started the year with a salary of approximately $110,000 annually, but because of cash flow problems at the company, this was reduced to $25,000 a year around August 1. His approximate year-to-date (through August 31, 2003) wages have been $46,738 net ($63,943 gross). Mrs. Corigliano receives no salary from the candle company.

5. Mr. Corigliano has not yet filed tax returns for 2002.

Please let me know if you have any questions.

Sincerely,

*Alan R. Friedman*

Alan R. Friedman

ARF/air
Enc.

3442



Hull ID Number Etching
1985, 36', Sabre, Sloop
"Main Stay"
HIN: HWS36022D585

STAFFORD MARINE SERVICE, LLC
244 Bear Rock Road
Durham, Connecticut 06422



GEORGE STAFFORD
NO.
107-733

DEFENDANT'S
EXHIBIT
49 A

3443



# STAFFORD MARINE SERVICE, L.L.C.
244 Bear Rock Road
Durham, Connecticut 06422
Tel. (860) 349-0438 • Fax (860) 349-0720

## SURVEY REPORT
File #: 02-072

TO: Concerned Insurance Underwriters

OWNER: Mr. Cosmo Corigliano, 243 Stamford Ave., Stamford, CT., 06902

SCOPE OF SURVEY: Insurance C&V Survey

DATE OF SURVEY: April 29, 2002

LOCATION OF SURVEY: Chester Marina, Chester, Connecticut

## VESSEL PARTICULARS

NAME: " MAIN STAY "

HAILING PORT: Stamford, Connecticut

BUILDER: Sabre Yachts, P.O. Box 134, So. Casco, ME 04077

DESIGNER: Sabre Design Team & Mr. Roger Hewson N.A.

YEAR: 1985

MODEL: 36, diesel auxiliary, sloop rigged, sailboat

LOA: 36' 0"    LWL: 29' 4"    BEAM: 11' 3"    DRAFT: 4' 2" crt.board up / 7'2" c/b down

DISPLACEMENT: 13,500 lb.          BALLAST: 5,700 lb.

HULL ID NO.: HWS36022D585 (Etching made & on file)

USCG DOC. NO.: 694648

REGISTRATION NO.: CT 5255 AR

INTENDED USE: Near coastal and limited offshore sailing, cruising, recreational

3444

Page 2 of 9
File #: 02-072

# HULL CONSTRUCTION

HULL/KEEL/DESIGN: External lead ballast fin keel shoal draft w/centerboard

HULL MATERIAL: Molded fiber reinforced plastic (FRP)

FRAMES: FRP liner and transverse plywood bulkheads tabbed to hull

DECKS: Molded non-skid FRP with 3/8" end grain balsa core material and gelcoat

HULL/DECK JOINT: Inside flange, through bolted, with teak toe rail & soft vinyl rubrail

SUPERSTRUCTURE: Molded FRP

INTERIOR: FRP and vinyl headliner, teak trim and veneer, formica and marine plywood

LAYOUT: Peak void space forward for anchor locker. Next aft is a large forward V-Berth with storage above and outboard port and starboard; additional storage in drawers and lockers. Opening overhead hatch and two fixed ports. There is also a privacy door. The head is to port forward with a manual toilet and Y valve to holding tank, stainless sink, shower and opening port. Directly opposite, to starboard is a large hanging locker next to a chest with 3 drawers. Next aft to midships is a large main salon with straight settee to starboard and "U" shaped to port. The port settee converts to a double berth. There is storage above and below both settees. There is a pedestal mounted dinette table. There is an opening overhead hatch and fixed ports to the sides. Next aft there is a "U" shaped galley to port with stainless steel sink, stove/oven and pressure hot/cold water. Opposite to starboard is a navigation station with full electronics and gauges. Aft of the nav station is a quarter berth to starboard. Out to a large "T" shaped cockpit with steering pedestal and dodger.

REMARKS: The vessel was inspected while hauled out. Electrical systems were not able to be tested. The bottom was inspected and sounded with a hammer. A moisture meter was not utilized. There did not appear to be any evidence of osmotic blistering. There was no electrolytic deterioration of any underwater metals noted. The hull to keel joint is slightly separated. This is not serious and somewhat normal for this vessel.

Topsides were the original gelcoat and were found in average condition. Topsides were sounded with a plastic hammer and a moisture meter was used. Relative moisture meter readings were normal. There did not appear to be any evidence of delamination. **We noted some minor cosmetic scrapes amidships on the starboard side and along the transom, perhaps from errant docking.

Decks were inspected and sounded with a plastic hammer. A moisture meter was not utilized on deck. The aft portion of the cockpit has evidence of minor core ply separation. This is not serious and normal for a boat of this vintage.

Page 3 of 9
File #: 02-072

## MACHINERY

NO. OF ENGINES: One   STYLE: Inboard   CYLINDERS: 4

MAKE: Westerbeke   FUEL: Diesel   MODEL: W27

SERIAL #: 16769C410   HOURS: 988.3   HORSEPOWER: 30

COOLING: Closed fresh water cooled with heat exchanger

TRANSMISSION: Hurth short profile transmission, 2 to 1 reduction gear, model #: hbw100-2R, Lubricated separately from engine.

EXHAUST: Raw water cooled through a pot type muffler wet to transom

STEERING: Edson pedestal with 40" S.S. wheel, cable to quadrant (also an emergency tiller)

PROPELLERS: One, nibral, two-bladed, by Gori, 16 1/2" x 11", RH, folding, found in good condition

SHAFTS: 1" stainless steel, appeared straight on dial indicator **Cutlass worn, see notes

STRUTS: Single leg cast bronze

RUDDER: Molded FRP spade type with short skeg

CONTROLS: Push/pull single lever type controls by Morse on pedestal - good condition

BILGE PUMPS: Manual whale gusher type + one Rule 2000 GPH w/ auto float switch

THROUGH HULL FITTINGS: Flush mounted bronze with bronze ball valve, seacocks

BLOWERS: Yes-Attwood no test made   HVAC: No air-conditioning found

REMARKS: The inboard was not tested. Overall, our opinion is that the inboard engine is in fair condition, reflecting average maintenance. Machinery appears intact and well secured with evidence of some minor corrosion around the engine mounts, lower sections of the block and around the bottom of the oil pan. The engine oil is clean as is the transmission oil. We noted the engine coolant was also full. The exhaust manifold and riser may need replacement very soon with severe corrosion as well as hose clamps which are corroded. Overall, for the vintage the engine looks in average condition.

*Note well that the scope of this survey is a visual examination only. Unless otherwise indicated, the machinery was not inspected internally or operated.*

3446

Page 4 of 9
File #: 02-072

## ELECTRICAL SYSTEM

SHIPS SYSTEM VOLTAGE: 12 volt DC

WIRING: Original, copper stranded, well secured where visible

OVERCURRENT PROTECTION: Breakers at panel aft of nav station

NO. OF BATTERIES/LOCATION: Two, #27 lead acid, by Interstate

SECURED/COVERED: Yes/Yes

MASTER SWITCH: Yes, one disconnect switch by Perko

BATTERY CHARGER: Alternator 65 amp + battery charger by Newmar 15 amp unit

SHORE SYSTEM VOLTAGE: 125 VAC system from shorepower

NO. OF CIRCUITS: One

AMPERAGE: 30 amps

WIRING: Original copper stranded, well secured

OVERCURRENT PROTECTION: Yes, breakers at panel aft of nav station

POLARITY INDICATOR: Yes, visual         GFCI: Yes-Ok

SHORE INLET: 30 amp twist lock type located starboard side aft in cockpit, outboard on

THROUGH HULL BONDING: Yes, by #8 AWG black wires

REMARKS: The 12 VDC system and 110 VAC system were not energized on the vessel. The systems were winterized therefore we could not energize. Systems were not tested. Overall, the systems appeared to be in good order without any problems noted. We found most wires properly secured, unfortunately, a majority of the wires in this boat are hidden behind a panel board and bulkhead. Therefore, wiring was not fully accessible. *There did appear to be a lightning protection system observed. All the chainplates are grounded to the keel bolts as ABYC recommended back when this vessel was built in 1985 however by todays standard (year 2002) the system is considered totally inadequate.*

-3447

Page 5 of 9
File #: 02-072

# TANKS

NO. OF FUEL TANKS: One

SHAPE: Rectangular

LOCATION OF FUEL TANKS: Aft, mounted under the cockpit (not fully accessible due to the installation)

CAPACITY/CONSTRUCTION: Approximately 20 gallons/ #5052 welded aluminum

FILL/VENT LINES: Copper + neoprene hose 1 1/2" fill + 5/8" vent lines

SUPPLY/RETURN LINES: 5/16" copper - some corrosion w/anti-siphon. **See notes

FUEL FILL GROUNDED?/DOUBLE CLAMPED?: Yes/Yes

DOES OVERFILL VENT OVERBOARD: Yes

VALVES: Bronze petcock at engine port side

NO. OF WATER TANKS/CAPACITY/MATERIAL: Two, 38 gallons each, plastic type, under port and starboard settees, approximately 76 gallons total

HOT WATER TANKS: One, Raritan, 6 gallon, located in stbd. quarter berth locker

NO. OF DOMESTIC TANKS: Two

FUEL/CAPACITY: CNG, 10 lb., aft mounted in starboard cockpit locker

LINES/VENTING: Rubber line, appears good/Vented from inside locker to atmosphere

SHUT OFF VALVE: At tank and at stove

NO. OF HOLDING TANKS: None. Plastic under forward V-berth

REMARKS: All tanks appear intact. The older copper 5/16" fuel supply lines should be considered to be changed soon for the diesel engine as they are corroded.

-3448

## GALLEY

STOVE MAKE/ # BURNERS: CSI, gimbaled, CNG, 2 burner with oven

FUEL: CNG                          MICROWAVE: None

REFRIGERATION: Ice box + Reefer unit by Sea Frost

WATER SYSTEM: Galley and head, pressure hot and cold water 110 VAC and engine hot water

REMARKS: Clean, uncluttered, with good light and ventilation

---

## SPARS/SAILS/RIGGING/DECK HARDWARE

STYLE: Sloop rigged and keel stepped

MASTS/BOOMS: Extruded aluminum, Awlgripped white, Hallspars, "D" shaped section, double spreader, internal main and jib halyards

STANDING RIGGING: Rod rigging, #10 + #8 stainless steel with s.s. turnbuckles

CHAINPLATES: Tied to internal bulkhead hull structure. Appear OK, ***not fully visible due to construction of vessel.

HARDWARE/FITTINGS: Harken Roller Furling, cabin top mounted Schaeffer traveler with cars, outboard & inboard genoa tracks, Schaeffer main sheet 4:1, and halyards lead aft to cockpit with line clutches, spinnaker gear with pole, boom vang, and jiffy reefing.

WINCHES: Five total all by Lewmar (2) #46 CST two-speed, self tailing primaries, (1) #24 (1) #16 two-speed and (1) #24 two speed. All appear good.

SAIL INVENTORY: Not inspected. Said to be: two genoas roller furled by North, one mainsail by North and one spinnaker by North.

REMARKS: When was the last time the mast was unstepped and checked on the ground by a professional rigger? If more than three years, then it is time to do this now.

-3449

## GROUND TACKLE

ANCHOR & RODE: (1.) 25 lb. CQR plow anchor w/ 15' 7/16" chain + 200' x 5/8" nylon rode. (2.) Also spare Danforth #20lb. with spare braided rode. **Swivel and shackle very rusted-time to replace both.

## SAFETY GEAR/REQUIRED EQUIPMENT

PORTABLE FIRE EXTINGUISHERS: Two USCG approved, dry chemical, American LaFrance, 2 3/4 lb. Needles in green zone-Ok. Good extinguishers for the vessel.

PERSONAL FLOTATION DEVICES: Six USCG approved Type II and four Type IV. Also, Life Sling on stern rail.

EPIRB/VISUAL DISTRESS SIGNALS/VALID DATES: Olin flare kit **Expired flares EPIRB is by ACR, model: RLB21, older class "B" **w/expired battery-replace

HORN/BELL: Yes, both-Ok

OIL DISCHARGE PLAQUE/MARPOL PLAQUE: OK – present

CARBON MONOXIDE DETECTOR: None **To be added

REMARKS: Safety gear is in need of updating now.

## NAVIGATION/ELECTRONICS

COMPASS: Ritchie 5", pedestal mount

LORAN/GPS: (1.) Raynav 575, Loran-C (2.) Garmin hand held GPS

VHF RADIOS: Icom ICM 80

DEPTH: Datamarine, Model: S200DL

KNOT/LOG: Datamarine, Model: S100KL

NAV REPEATER: By KVH bulkhead mounted

WIND SPEED/DIRECTION: (1.) windex (2.) Datamarine, model: LX3600

STEREO: Sony AM/FM with CD player and four Cybernet speakers

3450

# OTHER EQUIPMENT

OTHER EQUIPMENT: Dodger & sail cover all in good condition. Weems and Plath barometer and clock. Dock lines, fenders, locking winch handles, first aid kit, boat hook, boom vang, radar reflector, cockpit cushions, emergency tiller, shore power cord, interior fans, cushions, spare parts, cockpit table, stern gate with ladder and teak cockpit grates. Boat shipped w/teak trim package, additional CNG tank, hatch screens, double bow cleats, preventer, flag halyard, folding cockpit table, cabin trunk teak grab rails and teak outboard bracket mounted on transom.

# GENERAL FINDINGS & RECOMMENDATIONS

This will certify that the undersigned conducted an insurance C&V survey of the subject vessel in Chester, Connecticut while the vessel was hauled. Our survey was conducted on April 29, 2002. The owner was not in attendance at the time of the survey. During the course of our examination the following deficiencies were noted:

(1) Check circuit protection for battery charger.
(2) When was the mast last unstepped and inspected by a professional rigger on the ground? If more than three seasons, time to do it now.
(3) Need to recertify all dry chemical fire extinguishers (have them weighed and tagged).
(4) Flares in flare kit expired. Replace before navigating.
(5) Corrosion to copper fuel lines. Information only.
(6) Suggest the vessel be equipped with a search light for night time use.
(7) Appears engine may be 'eating the fan belt' with black colored dust all over the front of the block. Repair flywheel or re-adjust belt as needed.
(8) Anchor swivel and shackle badly rusted-replace.
(9) Please be advised we could not examine the centerboard wire pennant because of the way the boat was blocked.
(10) Replace 3/4" head inlet hose-found cracked at bend at toilet.
(11) Add a carbon monoxide detector for safety sake.
(12) Cutlass bearing found well worn-replace.
(13) Port quarter berth minor internal leak aft. Rebed teak toe rail fastener.
(14) Old damage: starboard side amidships just above waterline deep gouges in gelcoat and area 8" x 4" starboard side transom gelcoat abrasion damage. Information only.
(15) Portside amidships bottom-through hull fitting found with cracked fairing. Reseal as needed before launching.
(16) Clean and grease seacocks for engine raw water inlet and head seacocks. Found difficult to operate.

**NOTE: PLEASE NOTE THE ABOVE RECOMMENDATIONS ARE BASED UPON STANDARDS AND CODES SET FORTH BY THE AMERICAN BOAT AND YACHT COUNCIL, NATIONAL FIRE PROTECTION ASSOCIATION AND THE UNITED STATES COAST GUARD. IN ADDITION, SOME OF THE COMMENTS MAY BE BASED UPON GOOD MARINE PRACTICE AND EXPERIENCE OF THE SURVEYOR AS THEY RELATE TO THE VESSEL OPERATION AND MAINTENANCE.*

## VALUATION

**CURRENT FAIR MARKET VALUE:** Approximately $50,000 with all equipment

**REPLACEMENT COST:** Approximately $165,000 with similar equipment

VALUATION OF THIS VESSEL IS BASED UPON THE COMPARABLE APPROACH. SOURCES OF INFORMATION MAY INCLUDE, BUT ARE NOT LIMITED TO CURRENT CLASSIFIEDS, BROKERS ADVERTISING, TRADE JOURNALS, BUC, NADA ABOS, ACTUAL SALES, BROKERS, UNDERWRITERS, MARINE SURVEYORS AND OTHER SOURCES KNOWN TO BE RELIABLE.

## SURVEY/APPRAISAL PRACTICE STATEMENT

This report is based upon a visual examination of the subject vessel on the dates so noted. If an item of the vessel, system or piece of equipment is missing from this report it is not included. The findings, opinions and conclusions are based upon the best professional judgment of the undersigned surveyor. While every effort has been made to conduct a thorough survey, there can be no guarantee or warranty, express or implied, as to the condition or suitability of the vessel and its machinery and fittings. There is no way to predict latent defects or other failures, which may occur in the future. Neither can we make observations or conditions hidden by machinery, tanks, bulkheads or other items prohibiting access or due to the inability to operate equipment/machinery. Neither the undersigned or any principal or employee of Stafford Marine Service LLC has any present or prospective interest in the subject vessel. There is no bias or interest toward the parties involved. Compensation for this service is not contingent on any action or event resulting from the findings, opinions or conclusions in this report.

*PLEASE BE ADVISED THAT THIS IS AN INSURANCE C&V SURVEY ONLY-THIS IS NOT A BUYERS SURVEY AND CAN NOT BE USED AS THE BASIS FOR A DECISION TO BUY OR SELL THIS VESSEL.*

**\*\*WARNING\*\*** NOTE WELL THAT THE ULTIMATE RESPONSIBILITY FOR THE SAFE OPERATION AND MAINTENANCE OF THE VESSEL AND SAFETY OF THE CREW OR PASSENGERS LIES WITH THE OWNER/MASTER.

Date of report: April 30th, 2002                Total number of pages: 9

If you or your insurance company have any questions concerning this report, please do not hesitate to call. This survey issued without prejudice. Thank you for your business.

George Stafford
Marine Surveyor

Member: National Association of Marine Surveyors, NAMS-CMS
Society of Accredited Marine Surveyors, SAMS-AMS

[Seal: GEORGE STAFFORD No. 107-732]

3452

REALTOR.com: Find a Home - Printable Brochure                                  Page 1 of 2



ESSEX, CT 06426

$2,250,000
4 Bed, 3.5 Bath
3,910 Sq. Ft.
MLS ID#: M9074418

**RICHARD WEINER**
Cell (860)227-3191
Office x117 (860)767-2621
Residence (860)767-7281

**The Mitchel Agency, LLC**
: (860) 767-2621
toll free (800) 333-5526
fax (860) 767-7749



Single Family Property, Area: 89. Approximately 1.32 acre(s), Year built: 1965, Waterfront property, Contemporary style, Two story, Garage, Central air conditioning, Basement, Fireplace(s), Dining room, Office

To access this listing directly, use http://www.realtor.com/Prop/1026252442

## Property Features

- Single Family Property
- Area: 89
- Contemporary style
- Two story
- Year built: 1965
- 4 total bedroom(s)
- 3.5 total bath(s)
- 3 total full bath(s)
- 1 total half bath(s)
- 9 total rooms
- Master bedroom
- Dining room
- Family room
- Foyer
- Maid suite/quarter(s)
- Office
- Study
- Workshop
- Attic storage

- Approximately 3910 sq. ft.
- Bedroom(s) on lower level
- Bedroom(s) on 1st floor/level
- Master bedroom on 1st floor/level
- Laundry on 1st floor/level
- 3 fireplace(s)
- Carpet
- Tile flooring
- Wood floors
- Central air conditioning
- Forced air heat
- Multizone heat
- Oil heating
- Dishwasher
- Disposal
- Refrigerator
- Microwave oven
- Range and oven

- Exhaust fan/hood
- Kitchen island
- Thermal window(s)
- 2 car garage
- Attached garage
- Circular driveway
- Full basement
- Partially finished basement
- Deck
- Fire/smoke alarm(s)
- Security system
- Waterfront property
- Approximately 1.32 acre(s)
- TV cable available
- Septic sewer system
- Water supply from well(s)
- Elementary School: ESSEX
- High School: VRHS

DEFENDANT'S EXHIBIT 49 B

3453



Formatted for easy printing so you can take this with you. Remember to say you found it on REALTOR.com®.

This information has been secured from sources we believe to be reliable, but we make no representations or warranties, expressed or implied, as to the accuracy of the information. You must verify the information and bear all risk for inaccuracies.

-3454

http://www.realtor.com/FindHome/Brochure.asp?frm=byxmls&xlid=1026252442&lnksrc=00029&poe... 9/4/0.

707 Summer Street
P.O. Box 10049
Stamford, CT 06904-2049
203-324-9261



## CUC INTERNATIONAL

07/24/1996

CUC
CUC-TRAVEL

Dear Cosmo            Corigliano         :

I am pleased to advise you that the Compensation Committee (the "Committee") of the Board of Directors of CUC International Inc. (the "Corporation") on 07/24/1996 authorized the granting to you of a non-statutory option to purchase   100,000 shares of common stock, $.01 par value, of the Corporation (the "Common Stock") at a price of $33.5000 per share (the "Exercise Price"), which the Committee believes to be the fair market value on that date. Your option has been granted under the Company's 1987 Stock Option Plan (the "Plan").

Terms not defined herein shall have the meaning set forth in the Plan.

Your option may be exercised under the following terms:

(a)   This option shall not be transferrable except by will or the laws of descent and distribution, unless such transfer is permitted by Rule 16b-3 under the Securities Exchange Act of 1934, as amended, and is approved by the Committee.

(b)   Subject to the provisions of paragraphs (e), (f) and (g) hereof, this option may be exercisable by you as follows:

You may purchase twenty percent (20%) of the Common Stock for which options are herein granted on or after February 1, 1998 and an additional twenty percent (20%) on or after each successive February 1.

Your right to exercise this option shall be cumulative. The Board of Directors of the Corporation may at any time accelerate the vesting of this option. This option shall expire on the tenth anniversary of the date of grant.

(c)   If required by the Corporation, prior to the delivery to you of a certificate or certificates representing the shares of Common Stock purchased by you upon the exercise of this option, you shall have deposited with the Corporation a non-disposition letter (restricting disposition by you of the shares of Common Stock) in form satisfactory to counsel for the Corporation;

DEFENDANT'S
EXHIBIT
49 C

Confidential Treatment Requested by Mr. Cosmo Corigliano

-3455

CC 1881

-2-

(d) In the event of a stock split, stock dividend, recapitalization, reorganization, merger, consolidation, extraordinary dividend, split-up, spin-off, combination, stock repurchase, exchange of shares, warrants or rights offering to purchase stock at a price substantially below fair market value or other similar corporate event affecting the Common Stock, the number and kind of shares subject to this option and the Exercise Price shall be equitably adjusted (including by payment of cash to you) in the discretion of the Committee in order to preserve the benefits or potential benefits intended to be made available to you under this option. The determination of the Committee as to what adjustments shall be made, and the extent thereof, shall be final. Unless otherwise determined by the Committee, such adjustments shall be subject to the same vesting schedule and restrictions to which this option is subject. No fractional shares of Common Stock shall be reserved or authorized or made subject to this option by any such adjustment.

(e) Notwithstanding anything herein to the contrary, if you die while in the employ of the Corporation or any of its subsidiaries or if you die within a period of three (3) months after your employment has terminated or if your employment is terminated by reason of total and permanent disability (as defined in Section 22(e)(3) of the Internal Revenue Code of 1986, as amended (the "Code")), this option shall become immediately exercisable in full and, in the case of your death, your estate shall have the right to exercise your rights hereunder.

(f) Notwithstanding anything herein to the contrary, in the event your employment or relationship with the Corporation or any of its subsidiaries is terminated for any reason other than death or total and permanent disability (as defined in Section 22(e)(3) of the Code,) you shall be entitled to exercise your options hereunder, to the extent exercisable on the date of termination, for a period of four (4) months from such termination, but in no event after the expiration of the term of the option.

(g) You may pay for shares purchased pursuant hereto as follows:

(i) You may pay the Exercise Price per share in cash or check at the time of exercise.

Confidential Treatment Requested by Mr. Cosmo Corigliano

3456

CC 1882

-3-

(ii) You may pay the Exercise Price by remitting to the Corporation in cash or by check an amount equal to or greater than the product of (a) the par value of the Corporation's Common Stock and (b) the number of shares of Common Stock acquired pursuant to the exercise of this option (such amount is hereinafter referred to as the "Minimum Payment") and by executing a promissory note for the balance equal to (A) the product of (i) the Exercise Price and (ii) the number of shares of Common Stock acquired pursuant to the exercise of this option less (B) the Minimum Payment (such balance is hereinafter referred to as the "Principal Amount"). Pursuant to the terms of the promissory note, interest will be charged per year at the lowest interest rate in effect at the time of exercise, which will prevent any imputation of income under Sections 483 or 7872 of the Code. Five years from the date of exercise, the Principal Amount plus interest compounded annually will be due. In the discretion of the Corporation's Board of Directors, the Corporation may demand repayment of the Principal Amount plus accrued interest upon a termination of your employment with the Corporation or any of its subsidiaries. With notice of your exercise of your option, you must give notice of your election to use the loan arrangement described above. In the discretion of the Corporation's Board of Directors, you may be required to execute a pledge agreement. The Corporation will retain possession of certificates representing shares of Common Stock acquired pursuant to the exercise of this option until the loan is repaid in full;

(iii) Provided that at the time of exercise, Common Stock is publicly traded and quoted regularly in the Wall Street Journal, you may pay for the shares of Common Stock purchased pursuant hereto by delivery of already-owned shares of Common Stock owned by you free and clear of any liens, claims, encumbrances or security interests, which Common Stock shall be valued (a) if listed on a national securities exchange, at the average closing price for the ten (10) trading days immediately preceding the date of exercise, or (b) otherwise at the average of the closing bid and ask quotations published in the Wall Street Journal for the ten (10) trading days immediately preceding the date of exercise (as so valued, the "Fair Market Value");

(iv) If approved by the Committee, you may request that the Corporation withhold from the number of shares of Common Stock which you would otherwise acquire upon exercise of your option and payment of the Exercise Price therefor, that number of shares of Common Stock which have an aggregate Fair Market Value equal to the aggregate Exercise Price of all or any portion of the options which you are then exercising; or

(v) You may pay with any other legal consideration that may be acceptable to the Committee in its sole discretion at the time of exercise.

Confidential Treatment Requested by Mr. Cosmo Corigliano

3457

CC 1883

-4-

Unless the shares of Common Stock received upon the exercise of your stock option shall have been registered under an effective registration statement under the Securities Act of 1933, such shares shall be acquired for investment and not with a view to distribution thereof, and such shares may not be sold except in compliance with the applicable provisions of such Act.

When you wish to exercise your stock option in whole or in part, please refer to the provisions of this letter and correspond in writing with the Secretary of the Corporation. This is not an incentive stock option under Section 422A of the Code.

Very truly yours,

*[signature]*

E. Kirk Shelton
President and Chief Operating Officer

EKS:feh
1987plan

Confidential Treatment Requested by Mr. Cosmo Corigliano

3458

CC 1884