# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____
)
UNITED STATES OF AMERICA,      )
)
      v.                      )
)      No. 3:02CR264 (AHN)
WALTER A. FORBES.      )      March 31, 2006
)
_____)

## MEMORANDUM IN SUPPORT OF MOTION OF WALTER A. FORBES FOR LEAVE TO ISSUE RULE 17(C) SUBPOENAS TO COSMO CORIGLIANO, KRAMER LEVIN, FRIED FRANK, NEIL CARTUCIELLO, CRYSTAL JOURNEY CANDLES AND THE SEC
### (Forbes Third Trial Motion No. 4)

WILLIAMS & CONNOLLY LLP
Brendan V. Sullivan, Jr. (Bar No. ct17115)
Barry S. Simon (Bar No. ct24159)
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

COWDERY, ECKER & MURPHY, L.L.C.
James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

*Attorneys for Walter A. Forbes*

Oral Argument Requested

# TABLE OF CONTENTS

I.    THE CONSTITUTION GUARANTEES A RIGHT TO COMPULSORY PROCESS AND EFFECTIVE CROSS-EXAMINATION. ................................................. 4

    A.    Prior Statements of the Witness as Impeachment. .................................................. 6

    B.    Impeachment with Evidence of Bias and Motive. .................................................... 7

    C.    Impeachment by Contradiction. ............................................................................ 8

        1.    Impeachment by Contradiction as to Non-Collateral Matters. ................... 8

        2.    Impeachment by Contradiction as to Collateral Matters When the Door Has Been Opened by Direct Examination. .................................. 9

II.    REQUESTS SEEKING SUPPLEMENTAL PRODUCTION. ........................................ 11

III.    REQUESTS THAT WERE PREVIOUSLY QUASHED DURING THE SECOND TRIAL. ................................................................................................... 12

    A.    Correspondence with the SEC and with the USAO Concerning the SEC. ....................................................................................................................... 13

    B.    Documents Reflecting Communications with the Government and Cendant That Were Copied to Cosmo Corigliano, Including Kramer Levin Subpoena Exhibits A-V. ........................................................................... 15

    C.    Budget and Living Expense Information and Other Financial Information Mr. Corigliano Provided His Counsel. ............................................. 18

    D.    September 2003 Asset Information. ...................................................................... 21

    E.    Receiver Documents. ............................................................................................ 21

    F.    Kramer Levin and Fried Frank Retainer Agreements. ......................................... 22

    G.    Communications Between Mr. Corigliano and Kramer Levin Between April 1998 and January 2000, and Kramer Levin's Proffer Sessions with the Government. ........................................................................................... 25

        1.    The False Exculpatory Letter to Cendant ................................................. 28

        2.    The False Exculpatory Proffer Session .................................................... 28

        3.    The False Exculpatory Attorney Proffer Sessions .................................... 30

    H.    Polygraph-Related Documents ............................................................................ 31

    I.    Post 2004-Trial Communications Relating to the Government and Benefits. ............................................................................................................... 32

    J.    Crystal Journey Candles Documents. .................................................................. 33

    K.    Credit Card Statements Covering the Period April 1, 2004 through July 7, 2004. ........................................................................................................ 35

# TABLE OF AUTHORITIES

Bowman Dairy Co. v. United States, 341 U.S. 214 (1951) ...............................................6

Brimley v. Hardee's Food Sys., No. 93 Civ 1797 (LAK), 1995 U.S. Dist. LEXIS 1471
    (S.D.N.Y. Feb. 8, 1995) .......................................................................................21

Brogan v. United States, 522 U.S. 398 (1998).............................................................30

Davis v. Alaska, 415 U.S. 308 (1974) ...........................................................................5

In re Grand Jury Proceedings, 417 F.3d 18 (1st Cir. 2005) ..........................................28

In re Grand Jury Subpoena, 731 F.2d 1032 (2d Cir. 1984) ...........................................27

Krishna v. Colgate Palmolive Co., No. 90 Civ. 4116 (CSH), 1993 U.S. Dist. LEXIS
    17935 (S.D.N.Y. Dec. 16, 1993).........................................................................21

In re Martin Marietta Corp., 856 F.2d 619 (4th Cir. 1988)........................................5, 8

Mead Data Central, Inc. v. Air Force, 566 F.2d 242 (D.C. Cir. 1977)..........................20

Olden v. Kentucky, 488 U.S. 227 (1988) .......................................................................5

In re Richard Roe, 168 F.2d 69 (2d Cir. 1999) .............................................................27

Rosario v. Kuhlman, 839 F.2d 918 (2d Cir. 1988) .......................................................10

SEC v. Comcoa Ltd., 887 F. Supp. 1521 (S.D. Fla. 1995), aff'd subnom., Levine v.
    Comcoa Ltd., 70 F.3d 1191 (11th Cir. 1995)........................................................26

SEC v. Credit Bancorp, Ltd., 109 F. Supp. 2d 142 (S.D.N.Y. 2000) ...........................26

SEC v. Princeton Econ. International Ltd., 84 F. Supp. 2d 443 (S.D.N.Y. 2000)..........26

United States ex rel. Stone v. Rockwell International Corp., 144 F.R.D. 396 (D. Colo.
    1992) ...............................................................................................................20, 21

United States v. Abel, 469 U.S. 45 (1984)......................................................................5

United States v. Benedetto, 571 F.2d 1246 (2d Cir. 1978)............................................10

United States v. Bufalino, 683 F.2d 639 (2d Cir. 1982) ...............................................11

United States v. Burr, 25 F. Cas. 30 (C.C.D. Va. 1807) .................................................5

United States v. Caruso, 948 F. Supp. 382 (D.N.J. 1996) .......................................5

United States v. Cuadrado, 413 F.2d 633 (2d Cir. 1969)......................................11

United States v. Cuthbertson, 630 F.2d 139 (3d Cir. 1980)....................................8

United States v. Doe, 429 F.3d 450 (3d Cir. 2005) ..............................................28

United States v. Garcia, 900 F.2d 571 (2d Cir. 1990) ..........................................11

United States v. Harvey, 547 F.2d 720 (2d Cir. 1976) ...........................................9

United States v. King, 194 F.R.D. 569 (E.D. Va. 2000)..........................................8

United States v. LaRouche Campaign, 841 F.2d 1176 (1st Cir. 1988)......................8

United States v. Lynn, 856 F.2d 430 (1st Cir. 1988) ...............................9, 21, 26

United States v. Messino, 882 F. Supp. 115 (N.D. Ill. 1995) ...................................8

United States v. Myerson, 684 F. Supp. 41 (S.D.N.Y. 1988) ..................................8

United States v. Nixon, 418 U.S. 683 (1974) ...................................................5, 6

United States v. Olin Mathieson Chemical Corp., 36 F.R.D. 18 (S.D.N.Y. 1964) .........6

United States v. Oloyede, 982 F.2d 133 (4th Cir. 1992) ......................................21

United States v. Orena, 883 F. Supp. 849 (E.D.N.Y. 1995) ....................................6

United States v. Palmer, 122 F.3d 215 (5th Cir. 1997)........................................14

United States v. Rosenthal, 142 F.R.D. 389 (S.D.N.Y. 1992).................................20

United States v. Seijo, 514 F.2d 1357 (2d Cir. 1975)..........................................12

United States v. Silverman, 745 F.2d 1386 (11th Cir. 1984)...................................7

United States v.  Tellier, 255 F.2d 441 (2d Cir. 1958) ....................................19, 20, 27

United States v. Wallach, 935 F.2d 445 (2d Cir. 1991).................................3, 11, 12, 19, 22

United States v. White, 950 F.2d 426 (7th Cir. 1991) ..........................................21

United States v. Zolin, 491 U.S. 554 (1989)......................................................28

Walder v. United States, 347 U.S. 62 (1954)...............................................................11

Walter A. Forbes, through undersigned counsel, respectfully submits this memorandum in support of his Motion for leave to serve the Rule 17(c) subpoenas attached hereto as Exhibits A-F.[1]  Mr. Forbes is filing this Motion pursuant to Judge Thompson's Order that he seek leave of the Court prior to issuing any Rule 17(c) subpoenas.[2]

## BACKGROUND

The case against Mr. Forbes essentially comes down to one witness:  the former Chief Financial Officer of CUC, Cosmo Corigliano.  Mr. Forbes seeks production, pursuant to Federal Rule of Criminal Procedure 17(c), of critical materials concerning this key witness, who struck a deal with the government to cooperate and testify against Walter Forbes.  Never in the experience of any of Mr. Forbes' counsel has there been a cooperating witness who has been more prepared – participating in more than 85 meetings with the government by the time of the second trial.  Tr. 11/3/2005 at 2051-54.  Nor in the experience of any of Mr. Forbes' counsel has there ever been a cooperating witness who received the level of special treatment afforded Mr. Corigliano, or who stood to gain the benefits that the government has conferred upon him, despite the fact that he has now demonstrably lied in two different trials against Mr. Forbes.  Yet

---

[1] To avoid duplication, Mr. Forbes is filing a set of Exhibits which supports several of the motions he is filing today.  Documents from this shared set of exhibits are referenced by number (*e.g.*, 1, 2, 3), while documents attached to this Memorandum are referenced by letter (*e.g.*, A, B, C).

[2] Judge Thompson's Order required that as a matter of "case management," prior to issuing any additional Rule 17(c) subpoenas, *inter alia*, Mr. Forbes was either to file a certification with the Court verifying that the court had not already quashed a prior subpoena demand calling for identical or substantially similar documents or to file a motion for reconsideration of the Court's prior Order to quash.  The Court's Order does not specifically address the circumstances of a third trial, where Mr. Forbes is required to re-serve quashed subpoena requests in order to preserve them for purposes of any appeal.  But out of an abundance of caution, Mr. Forbes is filing this motion for leave to serve the attached subpoenas.

the full extent of these benefits has yet to be revealed to the defense.  Both Mr. Corigliano and the government have objected to the production of documents that would demonstrate the true nature of the relationship between the government and Mr. Corigliano – including the ordinary procedures that have been waived, and the lies and violations of Mr. Corigliano's plea agreement that have been forgiven.  Mr. Forbes is entitled to such information in order to confront Mr. Corigliano, the chief witness against him.

That two separate juries have failed to reach consensus – meaning that at least some jurors must have still believed that Mr. Corigliano was telling the truth – demonstrates that further poof of Mr. Corigliano's bias and untruthfulness is neither cumulative nor inconsequential.  Mr. Forbes should be provided all documentation which can be used to properly impeach this "bought and paid for" witness.[3]

### A. Subpoenas Served for the Production of Documents Prior to and During the First Trial.

Prior to and during the first trial, Mr. Forbes issued a number of Rule 17(c) subpoenas seeking production of records pertaining to Cosmo Corigliano.  Some material was produced pursuant to these subpoenas, but Mr. Corigliano moved to quash substantial portions of the pre-trial subpoenas on numerous grounds, including, *inter alia*, that the subpoenas sought impeachment material not subject to pre-trial production, and that the subpoenas were overbroad and lacking in specificity.  The Court granted this motion, presumably in part because of this specificity objection, although the grounds relied upon by the Court were not made clear in its ruling.  See Docket No. 1935, Tr. 5/13/04 at 596 & Tr. 5/17/04 at 823.

---

[3] Moreover, as discussed at length in Forbes Third Trial Motion *In Limine* No. 1 and Forbes Third Trial Motion No. 2, the documents sought through these Rule 17(c) subpoenas are necessary to combat the government's presentation of Cosmo Corigliano as a truthful, cooperating witness who has fully complied with his plea agreement, in a manner inconsistent with its obligations under United States v. Wallach, 935 F.2d 445 (2d Cir. 1991).

**B.     Subpoenas Served for the Production of Documents During the Second Trial.**

Prior to the second trial of Mr. Forbes, Mr. Forbes issued a number of new subpoenas, including subpoenas containing requests identical to those issued before and during the first trial.  The remaining requests fell into two categories – requests that had not been made before and requests that had been revised in an effort to respond to the objections of Mr. Corigliano and his counsel, Kramer Levin Naftalis & Frankel LLP ("Kramer Levin").

The Court quashed the majority of Mr. Forbes' requests.  See Tr. 11/1/2005 at 1441-49 & Docket No. 1927.

**C.     Subpoenas for the Production of Documents During the Third Trial.**

The current subpoenas contain requests substantially similar to requests served prior to, or during, the first two trials.  For purposes of ordering the discussion, this motion will divide the attached subpoena requests into two categories:  (1) requests substantially identical to requests that were not quashed, and that Mr. Forbes seeks to re-serve in order to supplement documents previously produced with any new documents generated since the commencement of the second trial against Mr. Forbes, and (2) requests that are substantially identical to requests previously quashed during either the first and/or second trial against Mr. Forbes, but which he now wishes to renew for purposes of the third trial.

With regard to this second category, for those requests where Mr. Forbes is seeking to persuade this Court to rule differently than Judge Thompson, see Tr. 3/23/2006 at 6-7, argument is provided below.  Each section will specify which requests it is addressing.  Unless otherwise noted, each of the requests that were previously quashed is addressed in Judge Thompson's Order of November 1, 2005.  See also Tr. 11/1/2005 at 1441-49.

## I.    THE CONSTITUTION GUARANTEES A RIGHT TO COMPULSORY PROCESS AND EFFECTIVE CROSS-EXAMINATION.

The Compulsory Process Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. More than a century ago, Chief Justice Marshall held that the right of compulsory process includes the right to secure papers, in addition to the testimony of witnesses. See United States v. Burr, 25 F. Cas. 30, 34-35 (C.C.D. Va. 1807). The Confrontation Clause of the Sixth Amendment secures the right of cross-examination, which includes impeachment. See Olden v. Kentucky, 488 U.S. 227, 231 (1988) (per curiam); United States v. Abel, 469 U.S. 45, 50 (1984); Davis v. Alaska, 415 U.S. 308, 316 (1974).

In criminal cases, these constitutional rights are implemented, in part, by Fed. R. Crim. P. 17. See United States v. Nixon, 418 U.S. 683, 711 (1974); In re Martin Marietta Corp., 856 F.2d 619, 621 (4th Cir. 1988) ("Rule 17(c) implements the Sixth Amendment guarantee that an accused have compulsory process to secure evidence in his favor.").

> The right to the production of all evidence at a criminal trial similarly has constitutional dimensions. The Sixth Amendment explicitly confers upon every defendant in a criminal trial the right "to be confronted with the witnesses against him" and "to have compulsory process for obtaining witnesses in his favor." Moreover, the Fifth Amendment also guarantees that no person shall be deprived of liberty without due process of law.

Nixon, 418 U.S. at 711.

To the extent that specificity is required, the subpoena is satisfactory so long as it is "as specific as could be reasonably expected under the circumstances." United States v. Caruso, 948 F. Supp. 382, 399 (D.N.J. 1996). "The degree of particularity required must

necessarily vary with the facts of each case." United States v. Olin Mathieson Chem. Corp., 36 F.R.D. 18, 22 (S.D.N.Y. 1964).

Judge Thompson previously held that documents had to meet one additional requirement in order to be procurable through a Rule 17(c) subpoena: admissibility at trial. In this respect, Mr. Forbes respectfully disagrees with the Court's ruling. Although the Court in Nixon used the term "admissibility" in describing one of the three hurdles a prosecutor must clear when issuing a Rule 17(c) subpoena, it also used the term "evidentiary," Nixon, 418 U.S. at 699, as did Bowman Dairy Co. v. United States, 341 U.S. 214, 219-20 (1951). Use of a document to form the good faith basis for a cross-examination question is certainly "evidentiary," and Mr. Forbes is unaware of any controlling authority which precludes the use of a Rule 17(c) *trial* subpoena (as opposed to a *pre-trial* subpoena) to procure documents that could provide the good faith basis for cross-examination questions, even if the document itself is inadmissible.

Moreover, at least one case from a district court within the Second Circuit, United States v. Orena, 883 F. Supp. 849 (E.D.N.Y. 1995), implies that Rule 17(c) can be used as Mr. Forbes contends. In Orena, the defendant sought the production of surveillance reports through a Rule 17(c) subpoena. The government objected on the grounds that the reports were inadmissible hearsay, and thus were not subject to subpoena under Rule 17(c). The court rejected the government's argument. The court first noted that the surveillance reports were "at least potentially admissible" as either a recorded recollection under Rule 803(5) or as a business record under Rule 803(6). Id. at 868. The court also proffered an alternative basis for holding the records met the "evidentiary" requirement of Nixon – that they "*might also form the basis for eliciting certain testimony at trial.*" Id. (emphasis added).

Similarly, in <u>United States v. Silverman</u>, 745 F.2d 1386 (11th Cir. 1984), the court held that a rule 17(c) subpoena could be used to obtain bar complaints filed against an attorney who was charged with the attempted extortion of a client.  While the court there articulated an "admissibility" standard, the court then held:

> The subpoenaed complaints clearly possessed evidentiary potential for impeachment purposes if Silverman, in his testimony, denied that he had ever taken advantage of a client as he allegedly did in [this client's] case. . . . <u>Also, the complaints would have evidenced the prosecutor's good faith in cross-examining Silverman's character witnesses concerning specific incidents</u>.

<u>Id</u>. at 1397 (emphasis added).

Mr. Forbes respectfully submits that the <u>Orena</u> and <u>Silverman</u> courts had it right: documents that may themselves be excludable as extrinsic evidence, but which nonetheless can form the basis for cross-examination, should be subject to production in response to a Rule 17(c) subpoena.

Even if the Court were to apply an "admissibility" standard, however, the documents sought by the attached subpoenas would meet the test because each falls into one of three categories of admissible evidence:  (1) prior statements of a witness that can be used as impeachment; (2) evidence of bias or motive; or (3) evidence that can be used to impeach by contradiction.

A.    **Prior Statements of the Witness as Impeachment**.

There is no question but that witness statements and documents evidencing oral statements of a witness, including notes and memoranda, may be obtained by subpoena.  Prior statements of a witness may be used in cross-examination, and become admissible should the witness deny the statement.

> The admissibility facet of <u>Nixon</u> also must be assessed in perspective of the principle that a prior inconsistent statement,

6

> otherwise inadmissible as hearsay, may be admissible for the
> limited purpose of impeaching the witness. And, of course, if the
> witness, after being afforded an opportunity to explain or deny the
> statement, does not admit having made the prior inconsistent
> statement, the statement itself is admissible as an exhibit.

United States v. King, 194 F.R.D. 569, 574 (E.D. Va. 2000) (citation & internal quotation

omitted). See also Martin Marietta Corp., 856 F.2d at 621-22 ("interview notes, transcripts, and

electronic recordings" reflecting witness statements are "evidentiary"); United States v.

LaRouche Campaign, 841 F.2d 1176, 1180 (1st Cir. 1988) (videotape of interview likely to

reveal "inconsistent statements"); United States v. Cuthbertson, 630 F.2d 139, 144 (3d Cir. 1980)

("Under the 'evidentiary' standard of Bowman, rule 17(c) permits a party to subpoena materials

that may be used for impeaching a witness called by the opposing party, including prior

statements of the witness."); United States v. Myerson, 684 F. Supp. 41, 45-46 (S.D.N.Y. 1988)

(ordering production of the accounts of interviews).

## B. Impeachment with Evidence of Bias and Motive.

Documents reflecting negotiations with the government, benefits conferred by the

government, and other documents evidencing bias or motive are also procurable by a Rule 17(c)

subpoena. See Martin Marietta Corp., 856 F.2d at 622 (correspondence and notes reflecting

settlement negotiations between corporation and government are "evidentiary" to defendant's

allegation that corporation made him a scapegoat); LaRouche Campaign, 841 F.2d at 1180

(documents evidencing "bias"); United States v. Messino, 882 F. Supp. 115, 116 (N.D. Ill. 1995)

(defendant "entitled to subpoena [impeachment] material under Rule 17(c)" including

"documents reflecting any agreements, promises, plea bargains, immunity letters or orders, or

any other benefit conferred" when witness testifies at trial). Documents in this category can

always be used as the basis for cross-examination, and may be admitted into evidence if the

witness denies the evidence of bias after being given an opportunity to explain or deny it. See United States v. Harvey, 547 F.2d 720, 722 (2d Cir. 1976).

Bias evidence includes not only that evidence tending to show that the witness may have lied in order to obtain a beneficial plea agreement, but anything that could "reveal any present and continuing reasons for the witness to fabricate his testimony in return for *future* prosecutorial favors." United States v. Lynn, 856 F.2d 430, 433 (1st Cir. 1988) (emphasis added). This latter category of bias would include evidence that the witness had breached his plea agreement with the government, and thus has a motive to fabricate testimony in hopes that the government will not act upon the breach. In Lynn, for example, the court held that it was error to exclude evidence that the witness had not successfully completed a polygraph exam when successful completion was a condition of the plea agreement. "There is no question of the relevance of the intended area of inquiry – [the witness's] motivation to lie to continue to curry favor with the government." Id. Similarly, the court noted that a desire to protect assets that may still be subject to forfeiture can provide a witness with motive to fabricate testimony. Id. at n.5.

## C.    Impeachment by Contradiction.

Impeachment by contradiction is not governed by Rule 608(b), which prohibits the use of extrinsic evidence to impeach a witness's character for truthfulness. A witness can always be impeached on a non-collateral matter. And even extrinsic evidence of collateral matters can be admitted if the door has been opened during direct examination.

### 1.    Impeachment by Contradiction as to Non-Collateral Matters.

It is axiomatic that extrinsic evidence which contradicts a witness's testimony on a *non-collateral* matter can be admitted into evidence. Moreover, in the Second Circuit, "[t]he

determinative question in deciding whether extrinsic evidence contradicting a witness's

testimony is admissible is not whether the contradicting extrinsic evidence is material or

collateral, <u>but rather whether the assertions that the impeaching party seeks to contradict are</u>

<u>themselves material or collateral.</u>" <u>Rosario v. Kuhlman</u>, 839 F.2d 918, 925-26 (2d Cir. 1988)

(emphasis added). Thus, even if the extrinsic evidence itself is collateral, it is admissible if it

contradicts the witness's testimony on a material matter. <u>Rosario</u> is illustrative. There, the

defendant's conviction rested on the testimony of an eye-witness who claimed to have been in

the neighborhood to visit his girlfriend. The state court had precluded the proffered testimony of

a witness who stated that the witness had not even met the girlfriend until months after the

incident. The Second Circuit affirmed the issuance of a writ of *habeus corpus*, finding that the

eye-witness's account concerning his girlfriend "was part of the background and circumstances

of his observation of the crime. Moreover, as a matter of human experience, he could not have

been mistaken about [the girlfriend] if his story was true." <u>Id</u>. at 926 (internal quotations and

citations omitted).

### 2.    Impeachment by Contradiction as to Collateral Matters When the Door Has Been Opened by Direct Examination.[4]

The Second Circuit also permits impeachment on *collateral* matters when the

witness's direct testimony opens the door to such impeachment. <u>See</u> <u>United States v. Benedetto</u>,

571 F.2d 1246, 1250 (2d Cir. 1978) ("Once a witness (especially a defendant-witness) testifies as

to any specific fact on direct testimony, the trial judge has broad discretion to admit extrinsic

evidence tending to contradict the specific statement, *even if such statement concerns a*

*collateral matter in the case.*" (emphasis added)) (citing <u>Walder v. United States</u>, 347 U.S. 62

---

[4] Judge Thompson precluded admission of evidence in this category, and thus quashed subpoena requests seeking such evidence. <u>See, e.g.</u>, Tr. 11/7/2005 (motions hearing).

9

(1954)); see also United States v. Garcia, 900 F.2d 571, 575 (2d Cir. 1990) ("It was only after

Camacho reopened the issue on redirect-examination and created the false impression that the

arrest had *not* involved drugs that the court allowed admission of the arrest record. Thus the

record was admitted not to impeach Camacho's general credibility through extrinsic evidence,

see Fed. R. Evid. 608(b), but to contradict a false statement made by Camacho in his redirect

testimony.").

      For example, in Walder, 347 U.S. 62, a defendant charged with the unlawful sale

of narcotics testified not only that he had not committed the crime alleged in the indictment, but

also that he had *never* possessed illegal narcotics.  The Supreme Court upheld the trial court's

subsequent admission of a police officer's testimony that drugs had previously been seized at the

defendant's home – *an incident not charged in the indictment* – holding that "there is hardly

justification for letting the defendant affirmatively resort to perjurious testimony in reliance on

the [opposing party's] disability to challenge his credibility." Id. at 65; accord United States v.

Bufalino, 683 F.2d 639 (2d Cir. 1982) (defendant testified that not only did he not order that a

particular person be killed as charged in the indictment, but that he had never told anyone to kill

the person, thus opening the door to a tape recording from an *earlier crime* when he had ordered

that the person be eliminated); United States v. Cuadrado, 413 F.2d 633, 635 (2d Cir. 1969)

("Where a defendant in his direct testimony falsely states a specific fact, the prosecution will not

be prevented from proving, either through cross-examination or by calling its own witnesses, that

he lied as to that fact.") (internal quotations omitted).

      Second Circuit precedent makes clear that this principle applies to witnesses with

equal force as to defendants.  For example, in United States v. Wallach, 935 F.2d 445 (2d Cir.

1991), the key witness against the defendant had lied during his direct examination about his

10

compulsive gambling – claiming that he had stopped gambling after he began cooperating with the government. The witness's gambling had nothing to do with the substantive charges in the case, so the fact that he lied about his gambling went only to his character for truthfulness. The Second Circuit nonetheless reversed the conviction because evidence that the witness had lied about gambling had not been put before the jury. The court based its decision on the finding that the government should have known of the witness's perjury and thus corrected the record. The court also held, however, that "[e]ven assuming the government had no knowledge of the perjury at the time of trial, we believe that reversal would still be warranted" because additional evidence that the witness had in fact continued to gamble had come out months after the trial. Id. at 458. "This additional information in itself provides a sufficient basis for granting the defendants a new trial." Id. Of course, there would be no point in granting a new trial based upon newly discovered evidence if the new evidence were not admissible.

Similarly, in United States v. Seijo, 514 F.2d 1357 (2d Cir. 1975), the Second Circuit granted a new trial because there was evidence that the government's star witness had lied about his past marijuana use, and evidence of that lie had not been made available to the defense. As in Wallach, the false testimony affected "only his credibility as a witness." Id. at 1364. Nonetheless, the court reversed the conviction noting that "the test is whether there was a significant chance that this added item, developed by skilled counsel . . . could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." Id. Again, implicit in the test articulated by the court and in the reversal itself, is the premise that this extrinsic evidence should have been admitted even though it went solely to the witness's character for truthfulness.

## II.    REQUESTS SEEKING SUPPLEMENTAL PRODUCTION.

This section of the motion addresses the following subpoena requests:

- Corigliano Subpoena, Requests 1-4

- Kramer Levin Subpoena, Requests 1-3
- Fried Frank Subpoena, Request 1

These requests seek documents pertaining to legal fees advanced by Cendant on behalf of Mr. Corigliano, meetings between the government and Mr. Corigliano, and the current balance of the legal retainers paid by Mr. and Mrs. Corigliano.

Documents have previously been produced pursuant to requests substantially identical to those identified above. Mr. Forbes seeks to re-serve the subpoena requests simply for purposes of obtaining additional, responsive documents that may have been created since the second trial. For example, during the second trial of Mr. Forbes, Mr. Corigliano disclosed the total amount of legal fees paid by Cendant as of the date his testimony commenced, as well as the portion of those fees that was attributable to the time period of the first trial against Mr. Forbes. Mr. Forbes now seeks documents sufficient to determine if Cendant has paid any additional legal fees on behalf of Mr. Corigliano since the time of his last disclosure, and, if so, what portion of those fees is attributable to the time period of the second trial against Mr. Forbes.

## III.    REQUESTS THAT WERE PREVIOUSLY QUASHED DURING THE SECOND TRIAL.

This section of the motion addresses the following subpoena requests:

- Corigliano Subpoena, Requests 5-45
- Kramer Levin Subpoena, Requests 4-51
- Fried Frank Subpoena, Requests 2-4
- Neil Cartuciello Subpoena, All Requests
- Crystal Journey Candles Subpoena, All Requests
- SEC Subpoena, All Requests

Requests substantially identical to these requests were served prior to, or during, the first and/or second trial, but were quashed by Judge Thompson. As explained in detail in Mr.

12

Forbes' prior Opposition to the Motion to Quash filed by Cosmo Corigliano and Kramer Levin during the second trial, Docket No. 1830, Mr. Forbes is required to re-serve these subpoena requests in order to preserve the requests for purposes of the third trial. See, e.g., United States v. Palmer, 122 F.3d 215, 221 (5th Cir. 1997) ("[a] retrial following a mistrial is both in purpose and effect a new trial. Accordingly, objections made at the aborted trial have no bearing on the retrial, as the two are entirely separate affairs."). Mr. Forbes discusses below those requests where he is seeking to persuade this Court to rule differently than Judge Thompson. See Tr. 3/23/2006 at 6-7.

A.    **Correspondence with the SEC and with the USAO Concerning the SEC.**

This section of the motion addresses the following subpoena requests:

- Corigliano Subpoena, Requests 5-6
- Kramer Levin Subpoena, Requests 4-5
- SEC Subpoena, Requests 1-11

Mr. Forbes seeks the production of all correspondence between the SEC and Mr. Corigliano subsequent to Mr. Corigliano entering his plea agreement in January 2000, as well as all correspondence with the United States Attorney's Office subsequent to that date that concerns the SEC.[5]

As described more fully in Forbes Third Trial Motion No. 2, only some of the correspondence between the SEC and Mr. Corigliano has been produced to date, but that correspondence reveals both that Mr. Corigliano fought tooth and nail against providing financial information to the SEC, despite the fact that Mr. Corigliano agreed in his plea agreement to, inter

---

[5] These two requests are a subset of a request served on Mr. Corigliano prior to the first trial, specifically Request #61 of the subpoena dated January 15, 2002, quashed by Judge Thompson in May 2004. See Tr. 5/13/04 at 596 & Tr. 5/17/04 at 823.

alia, "truthfully disclose all information he possesses concerning any matters about which [the U.S. Attorney's] Office and other government agencies designated by this Office, including . . . the SEC, may inquire of him," Ex. 2 at 2, and "provide the SEC, upon request, with complete and accurate information regarding his ability to pay any [settlement] in the form ordinarily required by the SEC." Ex. 2, Schedule A at 7, ¶ 12.[6]  Yet despite this resistance on Mr. Corigliano's part, which was inconsistent with his obligations under the plea agreement, the government has bent over backward to accommodate him.  See Forbes Third Trial Motion No. 2.

Indeed, the government sought to buttress Mr. Corigliano's credibility by arguing to the jury in the first trial that his plea agreement would be "ripped up" if he lied.  See, e.g., Tr. 8/3/2004 at 7447-79.  The government subsequently presented Mr. Corigliano in the second trial as a witness who had fully complied with the requirements of his plea agreement.  Tr. 11/1/2005 at 1452-69.  Yet the documents sought here demonstrate that Mr. Corigliano knows that he can in fact ignore his obligations under the plea agreement with impunity.

Moreover, Mr. Corigliano's resistance to the SEC was not without purpose.  Each of his steps appears aimed at one goal:  the preservation of Mr. Corigliano's illicit wealth.  To this end, Cosmo Corigliano has been willing to ignore the financial disclosure obligations set forth in his plea agreement, hide monetary transfers made before his budget agreement with the SEC, hide millions of dollars in legal retainers, and lie to the SEC about the value of his home and adjacent property.  See Forbes Third Trial Motion No. 2; Forbes Third Trial Motion in

---

[6] Three of these key letters were not provided to Mr. Forbes until the second trial, at which time he was precluded from using any of the correspondence to impeach Mr. Corigliano.  See Tr. 11/3/2005 at 1986-2019 and Tr. 11/7/2005 (motions hearing).

*Limine* No. 1. Mr. Forbes has a right to obtain and present the evidence of Mr. Corigliano's actions to the jury.[7]

Mr. Corigliano's failure to comply with the requirements of his plea agreement – and the additional benefits conferred upon him by the government in spite of his non-compliance – is very much at issue in this case, and goes far beyond matters of general credibility. These issues go to the heart of Mr. Corigliano's motive and bias in testifying against Mr. Forbes in this case, as well as the actual nature of Mr. Corigliano's plea agreement, and also provide evidence for impeachment by contradiction. Mr. Forbes is entitled to the full exchange of correspondence on these issues.

**B.    Documents Reflecting Communications with the Government and Cendant That Were Copied to Cosmo Corigliano, Including Kramer Levin Subpoena Exhibits A-V.**

This section of the motion addresses the following subpoena requests:

- Kramer Levin Subpoena, Requests 6-11

Time and again during Mr. Corigliano's first trial testimony, he used his counsel as a shield, arguing that he had no idea what had been submitted to the government on his behalf,

---

[7] The partial negotiations between the SEC and Corigliano disclosed thus far also demonstrate exactly how extraordinary the budget agreed to between Mr. Corigliano and the SEC was. The SEC thought Mr. Corigliano's budget was "unreasonable" and not worthy of "hand wringing," pointing out that the median income for a married couple with children is less than $60,000 *gross*. Ex. 10. Yet the SEC nonetheless agreed to Mr. Corigliano's budget after being reminded what a "valuable, cooperating witness" Mr. Corigliano was. Ex. 11. The SEC's willingness to agree to such an extraordinary budget is highly probative of the special status afforded Mr. Corigliano in this case. Similarly, the fact that in Mr. Corigliano's Wells submission, his counsel pointed to Mr. Corigliano's cooperation as grounds for the SEC being lenient demonstrates yet another benefit that Mr. Corigliano hoped to – and did – receive in exchange for his cooperation.

or even that the government was requesting certain information.[8]  For example, when confronted

with the financial statement submitted by his attorneys to the SEC during the negotiation of the

budget agreement in 2000, discussed above, Mr. Corigliano testified that he had not reviewed the

financial statement before it was submitted, and did not think he had ever seen it.  Tr. 7/19/2004

at 7976-78.  He acknowledged, however, that he had provided his attorneys with "all his

financial information" at the time, and thus he did not deem it necessary to review what they

submitted to the SEC.  Id.  Mr. Corigliano gave similar testimony concerning the annualized

budget forwarded to the SEC, Tr. at 7990, and the Wells submission communicated on his

behalf, Tr. 7/20/2004 at 8038.

       Similarly, Mr. Corigliano used his attorneys as a shield when it came to asset

valuation information provided to the SEC in September 2003.  A letter from Mr. Corigliano's

attorneys to the SEC reveals that the SEC expressly requested evidence of the value of certain

assets in September 2003, including the value of Mr. Corigliano's house.  Ex. 9, Tab 1.  Mr.

Corigliano provided the information to Kramer Levin, Tr. 8/3/2004 at 9347-48, and the attorneys

forwarded it to the SEC.  Id.  The "comparable" house forwarded to the SEC as evidence of the

properties' value was hardly comparable.  Mr. Corigliano's property consisted of two separate

lots, totaling over 11 acres (a fact he did not reveal when the SEC agreed to let him keep his

"residence at [REDACTED]," Ex. 13 (SEC Consent)).  See Tr. 8/3/2004 at 9348-53.  And his

actual home was located entirely within the confines of one of the two lots, leaving the

unimproved lot free and clear.  In contrast, the internet listing faxed to the SEC was a property of

less than 2 acres, comprising a single lot.  Ex. 9, Tab 1.  Moreover, although the Town of Old

---

[8] Mr. Forbes was erroneously precluded from even inquiring of Mr. Corigliano about these communications in the second trial.  See Tr. 11/3/2005 at 1986-2019 and Tr. 11/7/2005 (motions hearing).  Mr. Forbes will be filing a motion *in limine* addressed to this issue on April 14, 2006.

Saybrook subsequently appraised Mr. Corigliano's two properties at a combined value of $3.6

million – almost double the listing price of the so-called "comparable" – neither Mr. Corigliano

nor his counsel informed the SEC of this new information prior to the settlement.[9]  Instead, Mr.

Corigliano continued to list the property in quarterly reports he was required to file with the SEC

pursuant to the budget agreement at its purchase price, misleadingly noting that the property

value had not been recalculated.  See Ex. 15.

            Of course, Mr. Corigliano denied that he had any knowledge that the SEC had

requested the information concerning the value of his property, testifying that he thought that the

"comparable" property he identified was for the use of his attorneys alone.  See Tr. 8/3/2004 at

9352-53.[10]  Yet it is certainly reasonable to assume that Mr. Corigliano's attorneys provided the

documents at issue, or drafts thereof, to him, or at least advised him of the SEC's request and the

intended response.  After all, Mr. Corigliano was obligated under the plea agreement to provide

this information upon request from the SEC, and a failure to do so would constitute a breach of

the agreement.  Ex. 2.  Moreover, documents produced from the Receiver reflect that at least one

piece of correspondence from Mr. Corigliano's attorneys to the SEC was blind carbon copied to

Mr. Corigliano.  See Ex. 21 (containing a "bcc" page to Mr. Corigliano).

            That Mr. Corigliano was aware of the extraordinary, special treatment conferred

upon him by the government goes directly to his motive and bias.  These documents are also

relevant to the extent that they contradict Mr. Corigliano's prior testimony, including his

---

[9] SEC Attorney James Kidney testified during the first trial that he did not know there was a
separate lot.  Tr. 9/23/2004 at 13,524.  Mr. Forbes was erroneously precluded from presenting
this testimony in the second trial.

[10] Again, Mr. Forbes was erroneously precluded from repeating this line of inquiry in the second
trial.

testimony that he has fully complied with his obligations under the plea agreement, and thus are admissible as impeachment by contradiction. Any responsive documents should be subject to subpoena.[11]

### C. Budget and Living Expense Information and Other Financial Information Mr. Corigliano Provided His Counsel.

This section of the motion addresses the following subpoena requests:

- Corigliano Subpoena, Requests 7-8
- Kramer Levin Subpoena, Requests 12-13

As discussed above, Mr. Corigliano attempted to distance himself from the financial and living expense information provided to the SEC in the spring of 2000, after he had entered into his plea agreement, by claiming that he never saw what was actually submitted by his counsel to the SEC. Tr. 7/19/2004 at 7976-78, 7990. Yet Mr. Corigliano has simultaneously objected to the production of what he acknowledges he did see – the information he provided his attorneys in order for them to respond to the SEC's requests.

Mr. Corigliano cannot shield this financial information by passing it to the SEC through his counsel – particularly in light of his legal obligation to provide the material to the SEC. Ex. 2, Schedule A at 7, ¶ 12. "[I]t is well established that communications between an attorney and his client, though made privately, are not privileged if it was understood that the information communicated in the conversation was to be conveyed to others." United States v.

---

[11] The prejudice suffered by Mr. Forbes as a result of the erroneous Order quashing these subpoena requests was compounded by the fact that Mr. Forbes was precluded from asking Mr. Corigliano about this correspondence during the second trial. Thus not only was the government able to preclude admission of documents which would have impeached Mr. Corigliano's testimony, raising issues under United States v. Wallach, 935 F.2d 445 (2d Cir. 1991), but also the defense was denied the opportunity even to argue the preposterous nature of Mr. Corigliano's answers, as the defense was at least able to do in the first trial.

Tellier, 255 F.2d 441, 447 (2d Cir. 1958).  If a client intends that the information he provides to counsel will be disclosed to third parties, then his communications with counsel concerning that information are not protected by the attorney client privilege.  See id.; United States v. Rosenthal, 142 F.R.D. 389, 392 (S.D.N.Y. 1992) ("If a client communicates material to his attorney with an understanding that it will be communicated to others, the communication as well as related details will not be considered privileged because the requisite confidentiality has not existed from the outset.") (citing Tellier); Mead Data Cent., Inc. v. Air Force, 566 F.2d 242, 253 (D.C. Cir. 1977) ("If the information has been or is later shared with third parties, the privilege does not apply.").

In Tellier, for example, the Second Circuit held that attorney-client communications were not privileged where the client expected his attorney to prepare a letter to a third party that reflected the substance of the communications.  255 F.2d at 447.  The Court held that communications closely related to the disclosure were not privileged either:  the privilege did not apply to any information communicated between the client and the attorney that was "closely connected with the information which was intended to be communicated to [a third party]," id. at 448, and could not be "severed from the entire subject matter" of the contemplated third-party communication.  Id.  Moreover, where "information is given and it is agreed that it is to be transmitted to a third party, then not only the specific information, but the more detailed circumstances relating to it are subject to disclosure," id., as well.

In United States ex rel. Stone v. Rockwell International Corp., 144 F.R.D. 396 (D. Colo. 1992), the court similarly held that communications between a client and his counsel were not privileged because "the information was provided to counsel so that it could be reduced to written form and submitted to the government."  Id. at 399.  The court observed that, "[i]n

essence, counsel merely acted as a conduit in taking factual material supplied by the client and relaying that material to the government." Id. The court further determined that the client could not have had any "expectation of privacy" in the communications at issue: "[t]he fact that Stone chose to channel the information through his counsel, rather than provide it to the government directly, cannot provide a basis for invoking the privilege." Id. at 400.[12]

Nor is this information collateral. It goes to the heart of Mr. Corigliano's bias as it provides the foundation for two of Mr. Corigliano's greatest benefits – the budget he was permitted to live under for nearly four years, and the Consent he ultimately entered into with the SEC.

Similarly, to the extent the information provided by Mr. Corigliano failed to satisfy his obligation under the plea agreement to provide the SEC with complete and accurate financial information – by failing, for example, to disclose the millions of dollars deposited with counsel as a legal retainer – that is evidence of Mr. Corigliano's continued motive to lie in hopes that the government will not act upon the Corigliano's breach of the plea agreement. See United States v. Lynn, 856 F.2d 430, 433 (1st Cir. 1988) (holding that evidence that a witness breached his plea agreement provided an incentive to fabricate testimony in order to curry favor with the

---

[12] See also United States v. White, 950 F.2d 426, 430 (7th Cir. 1991) (information provided by client to counsel in connection with preparation of bankruptcy petition not privileged "because the information is to be disclosed on documents publicly filed with the bankruptcy court"); United States v. Oloyede, 982 F.2d 133, 141 (4th Cir. 1992) (information communicated by clients to an attorney with the expectation that it would be used in a citizenship application filed with the INS was not privileged); Brimley v. Hardee's Food Sys., No. 93 Civ. 1797 (LAK), 1995 U.S. Dist. LEXIS 1471, at *4, *6 (S.D.N.Y. Feb. 8, 1995) (communications from client to lawyer not privileged where lawyer "was acting as a conduit of information from one side to the other"; "the privilege does not extend to the portion of the client's communication with the lawyer that constitutes the substance of what the client intends the lawyer to communicate to the third party"); Krishna v. Colgate Palmolive Co., No. 90 Civ. 4116 (CSH), 1993 U.S. Dist. LEXIS 17935, at *2 (S.D.N.Y. Dec. 16, 1993) ("Communications made by a client to an attorney with the intent that they be communicated in turn to a third party are not privileged.").