government). It also presents the issue of the government's continued presentation of Mr. Corigliano as a truthful, fully compliant witness, which runs afoul of the dictates of United States v. Wallach, 935 F.2d 445 (2d Cir. 1991) in light of Mr. Corigliano's breaches of the plea agreement. See Forbes Third Trial Motion in Limine No. 1. Mr. Forbes is entitled to full disclosure of these matters, and to present the full extent of Mr. Corigliano's bias to the jury.

### D. September 2003 Asset Information.

This section of the motion addresses the following subpoena requests:

- Corigliano Subpoena, Requests 9-10
- Kramer Levin Subpoena, Requests 14-15
- SEC Subpoena, Requests 12-13

In September 2003, Mr. Corigliano's counsel furnished to the SEC, at its request, information concerning the value of certain assets held by the Coriglianos, including their home. Ex. 9, Tab 1. As with the financial information discussed above, Mr. Corigliano claimed he had never seen the letter to the SEC.

There is no dispute that information was requested from, and produced to, the SEC. Nor is there a dispute that Mr. Corigliano had a legal obligation to provide this information, and that it had to be both complete and accurate. See Ex. 2 at 2 and Ex. 2 at Schedule A at 7, ¶ 12 (plea agreement, requiring Mr. Corigliano to provide complete and accurate information to the SEC upon request). As Mr. Corigliano's attorneys appear to have been nothing more than a conduit for this information, the subpoena should be allowed.

### E. Receiver Documents.

This section of the motion addresses the following subpoena requests:

- Neil Cartuciello Subpoena, All Requests

21

- SEC Subpoena, Requests 14-19

The actions the Receiver has taken are relevant to the benefits conferred upon Mr. Corigliano. While nothing in the text of the Consent Agreement between Mr. Corigliano and the SEC permits Mr. Corigliano to continue to benefit from the retainers at Kramer Levin and Fried Frank, and the text of the Consent Agreement did not permit Mr. Corigliano to continue to pay his "normal" expenses through July 7, 2004 out of the assets to be disgorged to the SEC, see Forbes Third Trial Motion No. 2, the Receiver does not appear to have taken any steps to secure control over the retainers, or to force Mr. Corigliano to repay the monies spent during this final period.

There must be an explanation for the Receiver's failure to carry out the plain terms of the Consent. For example, the defense is entitled to know if the SEC has informed the Receiver that, the plain language of the Consent notwithstanding, the SEC did in fact agree to allow Mr. Corigliano to use the retainer indefinitely. And the defense is entitled to know if the SEC has informed the Receiver that, the plain language of the Consent notwithstanding, the SEC did in fact agree to allow Mr. Corigliano to continue to pay his "normal" living expenses for one more quarter out of the assets to be disgorged to the SEC. In short, the defense is entitled to explore whether the SEC confirmed to the Receiver the existence of the "side agreements" that the government initially proffered existed, and thus to establish the full extent of Mr. Corigliano's benefits in this matter, including any benefits that take the form of the SEC, through the Receiver, declining to enforce Mr. Corigliano's obligations. The documents are relevant and admissible. They should be subject to subpoena.

F. **Kramer Levin and Fried Frank Retainer Agreements.**

This section of the motion addresses the following subpoena requests:

22

- Corigliano Subpoena, Requests 11-13[13]
- Kramer Levin Subpoena, Request 16
- Fried Frank Subpoena, Request 2

As discussed in Forbes Third Trial Motion No. 2, Mr. Corigliano and his wife had several million dollars of legal retainers on deposit with their counsel, the law firms of Kramer Levin and Fried Frank.[14] Yet the Coriglianos never identified either retainer in the quarterly financial reports that they filed with the SEC. Ex. 15 (compilation of the Coriglianos' quarterly reports). When asked about this lack of disclosure, Mr. Corigliano testified that he had not identified the retainers because it was not his money:

> Q. Now, is that $1.8 million or any part of it reflected under the assets listed here in the quarterly reports which we've just examined in the compiled binder, Defendants' Exhibit 20?
>
> A. No, it's not. It's not my money. It was given to my

---

[13] These requests were previously quashed by Judge Thompson with the one exception of Request No. 12, which is a new request seeking the date upon which a portion of the Retainer was refunded to Mr. Corigliano, as discussed below.

[14] Prior to Cosmo Corigliano moving to quash Mr. Forbes' pre-trial subpoenas to, inter alia, various financial institutions (a motion which was granted by Judge Thompson), Solomon Smith Barney produced a number of documents, including checks drawn upon Mr. Corigliano's brokerage account with Solomon Smith Barney. It was from these records that Mr. Forbes was first able to determine that Mr. Corigliano had paid at least $1.8 million to his attorneys as a retainer for legal fees and expenses. This retainer was not disclosed by Mr. Corigliano or the government in any other documentation provided to the defense, and the United States Attorney's Office claimed that it did not know about the retainer until after Mr. Corigliano testified to it on cross-examination during the first trial. Tr. 8/2/04 at 9126-27; Tr. 8/4/04 at 9626-27; Gov't Opp'n to Forbes Retrial Motion No. 3, at 5 (Docket No. 1643). Thus, had the defense not received these documents from Solomon Smith Barney prior to Mr. Corigliano filing his motion to quash that subpoena, it would never have known about the retainer paid to Mr. Corigliano's counsel (or Mrs. Corigliano's counsel) and a potential benefit worth millions of dollars would have gone undisclosed to the jury, and the falsity of Mr. Corigliano's direct testimony about what he was able to keep in his settlement with the SEC (which did not disclose these legal retainers) would have been unknown as well. Mr. Forbes, whose very liberty is at stake here, should not have to rely upon such fortuity in a third trial.

> attorneys.
>
> Q. In other words, your attorneys had an amount of money, which had to exceed $1 million, and it was your money, right?
>
> A. No, I gave it to them to represent me. It was their money.
>
> Q. Well, was it based on an hourly work?
>
> A. It was a retainer.
>
> Q. Well, you're an accountant. When you have money on deposit at a law firm for future services, isn't that an asset that you would normally reflect on your books and records?
>
> A. I didn't view it as my money. I don't view it as my money.

Tr. 7/20/2004 at 8110.

Mr. Corigliano's claim is preposterous on its face – <u>particularly in light of the fact that some of the original retainer money had already been refunded to him.</u>  See Ex. 20 (affidavit that Mr. Corigliano filed with the SEC after he completed his trial testimony in 2004 which reflects that $1,000,000 of the original retainer was refunded to Mr. Corigliano <u>after he entered into his plea agreement</u>).

The retainer agreement between Mr. Corigliano and Kramer Levin customarily would have made clear to Mr. Corigliano that the unused portion of the retainer had to be returned to him upon termination of the representation, including in the event Mr. Corigliano chose to terminate his counsel. The agreement would thus contradict Mr. Corigliano's purported

24

understanding that the money did not "belong" to him, and would be admissible as a prior inconsistent statement of Mr. Corigliano's.[15]

Moreover, to the extent the retainer agreement makes clear that Mr. Corigliano should have disclosed its existence in his various submissions to the SEC, it is evidence of yet another breach of the plea agreement, and provides one more reason for Mr. Corigliano to lie in hopes that he will curry favor with the government. See Lynn, 856 F.2d at 433.

G. **Communications Between Mr. Corigliano and Kramer Levin Between April 1998 and January 2000, and Kramer Levin's Proffer Sessions with the Government.**

This section of the motion addresses the following subpoena requests:

- Corigliano Subpoena, Requests 14-17
- Kramer Levin Subpoena, Requests 17-21

It is undisputed that from 1998 until January 2000 Mr. Corigliano elected to lie about his involvement in the accounting irregularities at CUC. During this period of time, Mr. Corigliano's attorneys made at least two proffers to the United States government, Ex. 14, and Mr. Corigliano himself participated in an interview with the government in January 1999. Mr. Corigliano admits that he lied to the prosecutors that day. See, e.g., Tr. 11/1/2005 at 1544. Mr. Forbes thus seeks documents evidencing Mr. Corigliano's communications with Kramer Levin between April 1998 and January 2000, and documents describing or memorializing Kramer Levin's proffers to the United States government during the same period. Any communications

---

[15] It is clear that the SEC would have considered the retainers an asset of the Coriglianos as the SEC has long considered such retainers subject to disgorgement. See, e.g., SEC v. Credit Bancorp, Ltd., 109 F. Supp. 2d 142, 145 (S.D.N.Y. 2000) (evaluating the terms of the retainer agreement and holding that the retainer was part of the frozen receivership estate because it was the asset of the client, not the law firm); SEC v. Princeton Econ. Int'l Ltd., 84 F. Supp. 2d 443, 446 (S.D.N.Y. 2000); SEC v. Comcoa Ltd., 887 F. Supp. 1521, 1528 (S.D. Fla. 1995), aff'd subnom., Levine v. Comcoa Ltd., 70 F.3d 1191 (11th Cir. 1995).

with Kramer Levin which Mr. Corigliano intended to be disclosed to a third party are not privileged. See United States v. Tellier, 255 F.2d 441, 447 (2d Cir. 1958). But even if they were, the crime/fraud exception would vitiate the privilege.

When investigators began to focus on Mr. Corigliano's past misconduct at CUC, he made the decision to lie in order to save himself – to proclaim his innocence. Tr. 11/1/2005 at 1540-45. To implement this strategy of lying to proclaim his innocence, he employed his lawyers as instrumentalities of his fraud.[16] Id. Mr. Forbes is not seeking to discover communications and work product concerning crimes Mr. Corigliano committed before he retained counsel. Mr. Forbes is seeking to discover communications and work product concerning frauds and crimes that were committed or ongoing *after* Mr. Corigliano retained counsel; frauds and crimes that were committed using his counsel. This is classic conduct subject to the crime-fraud exception to the privilege.

The crime-fraud exception applies when (1) the client communication or attorney work product in question was itself made in furtherance of the crime or fraud; and (2) probable cause exists to believe that the particular communication or attorney work product was intended in some way to facilitate or to conceal the criminal activity. In re Richard Roe, 168 F.2d 69, 71 (2d Cir. 1999). The second element focuses on the intent of the client, not the lawyer. Indeed, the crime-fraud exception applies when the lawyer is unwittingly used as a tool to perpetrate a fraud. See In re Grand Jury Subpoena, 731 F.2d 1032, 1038 (2d Cir. 1984) ("Such communications are properly excluded from the scope of the privilege even if the attorney is

---

[16] Mr. Forbes is not alleging that Kramer Levin was aware that the facts that it was relaying from Mr. Corigliano to the government were false; however, the fact that Kramer Levin may have been used unwittingly is of no consequence. In re Grand Jury Subpoena, 731 F.2d 1032, 1038 (2d Cir. 1984).

26

unaware that his advice is sought in furtherance of such an improper purpose." (collecting cases)); United States v. Doe, 429 F.3d 450 (3d Cir. 2005) (crime-fraud exception applied when target consulted attorney on means of making an investment indirectly that he was prohibited from making directly); cf. 18 U.S.C. § 2(b) (criminalizing the act of willfully causing an innocent actor to commit a crime).

The meaning of "probable cause" in this context was recently discussed at length by the First Circuit in In re Grand Jury Proceedings, 417 F.3d 18 (1st Cir. 2005). There the Court reviewed a plethora of decisions from across the country and concluded:

> As we read the consensus of precedent in the circuits, it is enough to overcome the privilege that there is a reasonable basis to believe that the lawyer's services were used by the client to foster a crime or fraud. The circuits – although divided on the articulation and on some important practical details – all effectively allow piercing of the privilege on something *less* than a mathematical (more likely than not) probability that the client intended to use the attorney in furtherance of a crime or fraud. This is a compromise based on policy but so is the existence and measure of the privilege itself.

Id. at 23 (emphasis added).

As the Supreme Court itself has recognized, a lesser showing is required to "trigger in camera review than is required ultimately to overcome the privilege." United States v. Zolin, 491 U.S. 554, 572 (1989). To obtain in camera review, the party seeking disclosure need only present evidence to "support a reasonable belief that in camera review may yield evidence that establishes the exception's applicability." Id. at 574-75. The reason for this lower standard was also explained by the First Circuit:

> Precisely because of the initial barrier of the privilege, it is very hard for an adversary unaided to show that the privileged communications were themselves corrupt, so the requirements for access cannot be set too high. And, if the communications were innocent, the initial look may often not damage the client.

In re Grand Jury Proceedings, 417 F.3d at 23.

Several examples of conduct by Mr. Corigliano meeting this "probable cause" standard for application of the crime fraud exception are described below.

### 1. The False Exculpatory Letter to Cendant

The facts relating to this issue are simple. Mr. Corigliano testified that on April 17, 1998, he knowingly provided a false exculpatory letter to Cendant. Tr. 7/12/2004 at 7024-28. His lawyers assisted in preparing the letter. Tr. 7/15/2004 at 7676, 7679. This evidence provides probable cause to conclude that Mr. Corigliano used his lawyers to commit frauds and crimes against Cendant.

This conduct arguably constitutes mail fraud, among other things. There was a scheme to defraud and to obtain money or property from Cendant by means of materially false and fraudulent pretenses. Mr. Corigliano, employing the assistance of his lawyers, was seeking to obtain money (such as severance payments) from Cendant based on false representations. Mr. Corigliano knowingly and willfully participated in the scheme with the specific intent to defraud Cendant; and there was a use of the mails. See 18 U.S.C. § 1341. Thus, at a minimum, the communications between Mr. Corigliano and his counsel concerning the preparation of this letter are subject to the crime-fraud exception.

### 2. The False Exculpatory Proffer Session

The facts here are also straightforward. At trial, Mr. Corigliano conceded that he committed crimes on January 13, 1999 by making numerous false statements to the government. See, e.g., 18 U.S.C. § 1001 (proscribing material false statements to government agent), 18

U.S.C. § 1505 (proscribing obstruction of justice).[17] He also conceded that he knew it was a crime when he did it. Tr. 11/1/2005 at 1545.

Moreover, that Mr. Corigliano's decision to lie was not an impromptu decision is evidenced by his testimony that he had come up with the "cover" story he told the United States Attorney's Office concerning the March 6, 1998 meeting previously, and had discussed it on several earlier occasions. Tr. 7/12/2004 at 7033.

Mr. Corigliano also testified that, with respect to communications with counsel, he "had many discussions with my counsel in preparation for the meeting." Tr. 7/15/2004 at 7610. He further testified:

> Q. You thought long and hard about what you were going to say at the meeting?
>
> A. I -- as I said before, I knew that I was going to lie to them in hopes that it would go away.

Id.

Given these facts, the preparation sessions conducted by his attorneys are precisely the types of matters covered by the crime-fraud exception to the privilege, and the defense has a right to cross-examine Mr. Corigliano about these sessions. Indeed, such evidence showing Mr. Corigliano's ability to manipulate and deceive several skilled, experienced counsel, at a time when he was not responsible to, or being directed by, anyone from CUC, is critical to respond to the government's efforts to portray Mr. Corigliano as lying only when required to do so by his job – the excuse he proffered at both trials as to the reason he lied while employed at CUC.

---

[17] The Supreme Court has held that a mere exculpatory "no" is a violation of 18 U.S.C. § 1001. Brogan v. United States, 522 U.S. 398 (1998). Here, the lies of Mr. Corigliano were elaborate, extensive, and numerous.

29

### 3. The False Exculpatory Attorney Proffer Sessions

Not only did Mr. Corigliano himself provide false exculpatory statements to the government, but his lawyers (unwittingly) did the same on August 7, 1998 and November 17, 1998. See Ex. 14 (letter from the government). Mr. Corigliano's false statements, made knowingly and directly to the government, were violations of 18 U.S.C. § 1001. The attorney proffer sessions were also part of Corigliano's fraudulent conduct. The mere fact that his lawyers were innocent intermediaries through whom his lies were conveyed to the government does not change the analysis. Willfully causing an innocent actor to make a material false statement to the government is a violation of 18 U.S.C. §§ 1001 and 2(b). The unresolved question is whether Mr. Corigliano knew that his lawyers would make false exculpatory statements to the government.

Based on the evidence already in the record, there is a reasonable basis to conclude that Mr. Corigliano did know his attorneys would make false exculpatory statements on his behalf to the government. First, Mr. Corigliano clearly developed a strategy to lie his way out of trouble, as evidenced by the letter to Cendant's Board of Directors, and his continued protestations of innocence until January 2000. Second, an attorney would certainly not make unauthorized statements to the government in a matter as serious as the one facing Mr. Corigliano. Third, the false exculpatory statements provided by Mr. Corigliano's lawyers were consistent with the false exculpatory statements that he later provided to the government directly, and that he had previously communicated to Cendant with the assistance of his counsel.[18]

---

[18] Moreover, the fact that the purported results of a polygraph examination were used to bolster Mr. Corigliano's credibility and denials of wrongdoing in the November proffer is a critical line of inquiry. Of particular importance to the crime-fraud issues are (1) whether Mr. Corigliano understood when he took the polygraph exam that positive results would be communicated to the government (it is difficult to imagine that he did not understand this, as presumably he would not

30

* * * * * * * *

Each of these instances warrants application of the crime fraud exception in this case, or at a very minimum in camera inspection of the documents to determine if the crime fraud exception should be applied.

### H.    Polygraph-Related Documents

This section of the motion addresses the following subpoena requests:

- Corigliano Subpoena, Requests 18-24
- Kramer Levin Subpoena, Requests 22-28

On November 17, 1998, at a time when Mr. Corigliano was maintaining his innocence, his attorneys met with the government in an effort to persuade the government not to prosecute him. Ex. 14 at 2 (Letter from Carney, et al. to Simon, June 30, 2004). Mr. Corigliano's attorneys represented to the government, on his behalf, that:

> Corigliano was not a knowing participant in a fraud, he did not falsify or instruct anyone else to falsify any matter. If there were things that were wrong, Corigliano does not know about them. If some things do not comport with proper accounting, it was not because he knowingly did anything wrong.

Id. at 3. In an effort to bolster these false claims of innocence, Mr. Corigliano took a polygraph examination and his attorneys told the government during this meeting that "they had polygraphed Corigliano and that he had done very well." Id. at 6.

During the first trial, the government disclosed that "Corigliano's lawyers later informed the Government that Corigliano had submitted to a second polygraph examination, but

---

think the exam was for purposes of convincing his attorneys he was innocent); and (2) whether Mr. Corigliano was told that his lawyers were going to communicate the positive polygraph results to the government, or was told after the fact about such disclosure (again, it is difficult to imagine that he was wholly unaware of the disclosure). See Tr. 7/20/2004 at 8032-33.

provided no additional information about that examination." Mem. Supp. Mot. Preclude Cross-Examination of Cosmo Corigliano Regarding Polygraph Examinations at 1 (Docket No. 885). Mr. Forbes is entitled to cross-examine Mr. Corigliano concerning these polygraph examinations, and is entitled to the underlying information necessary to do so.[19] For example, what did Mr. Corigliano tell the polygraph examiners, and is it consistent with what he says now? When was the second polygraph exam taken, and for what purpose? Did Mr. Corigliano breach his obligations to the government – or commit yet another crime – in failing to disclose it? All these issues are the fair subject of cross-examination, and thus the documents sought should be subject to subpoena.

## I.  Post 2004-Trial Communications Relating to the Government and Benefits.

This section of the motion addresses the following subpoena requests:

- Corigliano Subpoena, Request 25

More than six years have passed since Mr. Corigliano signed his plea agreement. He has met with the government over eighty-five times, and testified in two separate trials – one ending in the conviction of CUC's former President, E. Kirk Shelton. According to the government, Mr. Corigliano has satisfied the requirements of his plea agreement, and his sentence does not depend on the outcome of the case against Walter Forbes. See, e.g., Tr. 11/1/2005 at 1451-61. Yet Mr. Corigliano has yet to be sentenced. Thus, despite the government's protestations to the contrary, some portion of his deal must in fact depend upon the case against Walter Forbes. Mr. Forbes is entitled to any documents that reflect the

---

[19] On April 14, 2006, Mr. Forbes will file a motion *in limine* addressed to the appropriate area of inquiry concerning the polygraph examinations undertaken by Mr. Corigliano. That motion will provide additional detail as to the admissibility of the documents sought by the attached subpoena request.

32

communications between Mr. Corigliano and the government in this respect. Moreover, any acknowledgement by either the USAO or Mr. Corigliano that Mr. Corigliano lied during his trial testimonies would be further evidence of the government's willingness to allow Mr. Corigliano to violate his plea agreement with impunity.

Mr. Corigliano and Kramer Levin have previously denied that there are any such documents, other than Kramer Levin's work product, that are responsive to these requests (at least as of the time the second trial against Mr. Forbes began). But the fact that no documents exist is not a reason to quash a subpoena. Mr. Corigliano and his counsel should be required to respond.

### J.     Crystal Journey Candles Documents.

This section of the motion addresses the following subpoena requests:

- Corigliano Subpoena, Requests 26-29
- Crystal Journey Candles Subpoena, All Requests[20]
- SEC Subpoena, Request 20

In 1999, prior to entering into a budget agreement with the SEC, Mr. Corigliano used some of his illicit stock sale proceeds to purchase a company named Crystal Journey Candles LLC. Ownership of the company was transferred to the Receiver in July 2004 pursuant to Mr. Corigliano's settlement with the SEC. Yet Mr. Corigliano remained employed by the company as recently as his trial testimony in 2005, Tr. 11/1/2005 at 1531-32, and may well

---

[20] These requests are identical to requests quashed during the second trial with the one exception that we have added a request seeking information concerning benefits conferred upon Mr. Corigliano's father, Frank Corigliano, who is also employed by the company. Tr. 11/8/2005 at 2159.

remain employed there today. Again, any benefits they derived from the company go directly to Mr. Corigliano's bias.

### 1. Benefits Received During Term of the Budget Agreement.

Any benefits received by the Coriglianos during the term of the budget agreement are relevant to reflect bias. First, Mr. Forbes seeks non-monetary benefits provided to the Coriglianos (such as use of company cars, insurance benefits, etc.) as well as monetary compensation. Such non-monetary benefits would not be reflected in the quarterly statements Mr. Corigliano filed with the SEC, but provide no less of an incentive to lie than the monetary benefits disclosed during the first two trials. Second, as demonstrated by the retainer for legal fees and expenses, Mr. Corigliano's statements in the budget agreement and quarterly filings with the SEC cannot be trusted to establish the benefits conferred upon Mr. Corigliano. Mr. Forbes is entitled to have access to the actual source records which reflect benefits paid or extended to Mr. Corigliano, rather than relying upon Mr. Corigliano's self-serving representations concerning the benefits he received, particularly in light of Mr. Corigliano's lack of candor to date on these matters.

### 2. Benefits Received Since July 2004.

That Mr. Corigliano is benefiting from his continued employment at the Candle Company cannot be denied. Given his past conviction and impending sentencing, it is doubtful Mr. Corigliano could find a similar job at any other company. Indeed, the fact that the government has postponed his sentencing, allowing him to continue to be gainfully employed in any position, is a benefit in and of itself. That the government may be getting some benefit from his experience at the company may go to the weight of this bias evidence, but does not affect its admissibility.

Moreover, Mr. Corigliano's employment extended for at least a year after transfer of the asset to the Receiver, and the company had yet to be sold as of the time Mr. Corigliano testified in 2005. Mr. Forbes is entitled to explore whether the sale of the company has been postponed in order to keep Mr. Corigliano gainfully employed until after his testimony against Mr. Forbes is concluded. Indeed, if the candle company is not profitable (and/or cannot be sold), Mr. Forbes should be entitled to explore why Mr. Corigliano has continued to draw a salary from the company while he remains the government's star witness.

### K.    Credit Card Statements Covering the Period April 1, 2004 through July 7, 2004.

This section of the motion addresses the following subpoena requests:

- Corigliano Subpoena, Request 30

As discussed above, although the Consent Agreement between the SEC and Mr. Corigliano required that he turn over all assets held by him on March 31, 2004. Despite this requirement, Mr. Corigliano claims that he could continue to pay his "normal living expenses" until July 7, 2004. Tr. 8/3/2004 at 9399. Mr. Corigliano produced a summary of these "normal living expenses" he made in this final quarter, Ex. 22, which reveal a large number of credit card payments totaling almost $49,000.

Mr. Forbes seeks the production of the credit card statements from this period in order to determine the exact nature of the benefit provided to Mr. Corigliano in this "final quarter." For example, was Mr. Corigliano truly charging "normal" living expenses such as groceries and gasoline, or was he making luxury purchases, or taking out cash advances? While the pure monetary value of Mr. Corigliano's expenditures may be known, the qualitative nature of the benefit goes beyond that monetary value. Mr. Forbes is entitled to know exactly what

costs are buried in this almost $49,000 category. Moreover, to the extent the credit card statements reveal that Mr. Corigliano was doing more than simply paying his "normal" living expenses, the records are admissible as impeachment by contradiction.

## **CONCLUSION**

For the foregoing reasons, Mr. Forbes respectfully requests that the Court grant him leave to serve the attached subpoenas on Cosmo Corigliano, Kramer Levin Naftalis & Frankel LLP (in its capacity as counsel to Cosmo Corigliano), Fried, Frank, Harris, Shriver & Jacobson LLP (in its capacity as counsel to Agnes Corigliano), Neil Cartuciello (in his capacity as the Receiver appointed pursuant to the Consent Agreement between Cosmo Corigliano and the Securities and Exchange Commission), Crystal Journey Candles, and the SEC.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: _____
Brendan V. Sullivan, Jr. (Bar No. ct17115)
Barry S. Simon (Bar No. ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

36

                    James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
COWDERY, ECKER & MURPHY, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

Dated:  March 31, 2006

37

CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Memorandum In Support of Motion of Walter A. Forbes for Leave to Issue Rule 17(c) Subpoenas to Cosmo Corigliano, Kramer Levin, Fried Frank, Neil Cartuciello, Crystal Journey Candles and the SEC (Forbes Third Trial Motion No. 4) to be filed electronically and to be served on March 31, 2006 to the following via e-mail:

Norman Gross, Esq. (norman.gross@usdoj.gov)
Michael Martinez, Esq. (michael.martinez2@usdoj.gov)
Craig Carpenito, Esq. (craig.carpenito@usdoj.gov)

and to be sent on March 31, 2006 to the following by Fed Ex:

Susan Brune, Esq.
Brune & Richard LLP
80 Broad Street, 30th Floor
New York, NY 10004

Kathleen Cody, Esq.
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-9162

Notice of this filing will be sent to all proposed subpoena recipients by operation of the Court's electronic filing system or by Fed Ex to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.

Barry S. Simon