# TABLE OF AUTHORITIES
(continued)

Page

SEC v. Patel, No. 93 Civ. 4603, 1994 WL 364089 (S.D.N.Y. July
13, 1994), aff'd in part and rev'd in part on other grounds, 61 F.3d
137 (2d Cir. 1995) ................................................................................20, 26

SEC v. Thomas James Assocs., Inc., 738 F. Supp. 88 (W.D.N.Y.
1990), aff'd sub nom. SEC v. Posner, 16 F.3d 520 (2d Cir. 1994) .................23 n.9

SEC v. Warde, 151 F.3d 42 (2d Cir. 1998) ................................................5 n.1

Schneider v. Vennard (In re Apple Computer Sec. Litig.), 886 F.2d
1109 (9th Cir. 1989) ..............................................................................8

Searls v. Glasser, 64 F.3d 1061 (7th Cir. 1995) ........................................8

USM Corp. v. Marson Fastener Corp., 392 Mass. 334, 467 N.E.2d
1271 (1984) ......................................................................................24

United States v. Smith, 155 F.3d 1051 (9th Cir. 1998) ..........................7 n.4, 11

United States v. Teicher, 987 F.2d 112 (2d Cir. 1993) ...............................5 n.1


Statutes, Legislative Authority, and Regulations:

15 U.S.C. §§ 77t(d), 78u(d)(3), 78u-2 ...................................................25

Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j(b) ..............7 n.4, 24 n.10

Securities Enforcement Remedies and Penny Stock Reform Act of
1990, Pub. L. No. 101-429, 104 Stat. 931 (1990) ......................................25

H.R. Rep. No. 101-616 (1990), reprinted in, 1990 U.S.C.C.A.N. 1379 ...............25

Rule 10b-5, 17 C.F.R. § 240.10b-5 (2000) .............................................7 n.4

64 Fed. Reg. 72,590 (1999) ................................................................6 n.3


SEC Authorities:

In re Presstek, Inc., Exchange Act Release No. 39,472 (Dec. 22, 1997) ...............16

KL3.2921176 14                                    - iv -

## TABLE OF AUTHORITIES
(continued)

Page

SEC v. Bond D. Fletcher & Mediajet, Inc., Litig. Release No. 15,548
(Oct. 31, 1997); Litig. Release No. 15,818 (July 21, 1998) ................................ 15

SEC v. Robert Howard & Robert E. Verrando, Litig. Release No.
15,599 (Dec. 22, 1997) ........................................................................ 16

In re Sensormatic Elecs. Corp., Exchange Act Release No. 7,518
(Mar. 25, 1998) ............................................................................ 15, 16


Other Authorities:

Lisa I. Fried, SEC Targets Financial Fraud, N.Y.L.J., Mar. 9, 2000, at 1 ...................... 12

James R. Hagerty, Worst 5-Year Performer Sensormatic Electronics
Corp., Wall St. J., Feb. 25, 1999, at R11 .................................................. 16

Houdini of the Drexel Scandal, Business Week, Dec. 9, 1991 ................................... 17

Insider Trading: Eleventh Circuit Adopts "Use" Test for Insider
Trading Liability, 30 Sec. Reg. & L. Rep. 513, Apr. 3, 1998 ......................... 6 n.3

Richard M. Phillips, "Settlements: Minimizing the Adverse Effects
of an SEC Enforcement," in The Securities Enforcement Manual
(Kirkpatrick & Lockhart, LLP eds., ABA 1997) ....................................... 23-24

Presstek Inc. Settles Class-Action Lawsuit on "False" Statements,
Wall St. J., Mar. 27, 2000, at B14 ....................................................... 16

SEC Enforcement: SEC Staff Willing to Consider Leniency in Return
for Cooperation, McLucas Says Leniency in Return for Cooperation,
McLucas Says, 29 Sec. Reg. & L. Rep. 309, Mar. 7, 1997 ............................ 13

## Preliminary Statement

This is an unusual Wells submission. Mr. Corigliano already has accepted responsibility for his participation in corporate accounting irregularities committed at CUC International, Inc., now known as Cendant Corp. (referred to jointly as "the Company") and has been cooperating with both federal prosecutors in New Jersey and with the Commission's own Enforcement Division staff in their investigation of senior management's role in the accounting scheme. In addition, there is no dispute that during the course of his extensive and ongoing cooperation, including at present approximately 84 hours of interviews over 13 days with the Justice Department and the Commission's staff, Mr. Corigliano has been totally forthright and candid, has not minimized his own responsibility, and has provided truthful information that will be of substantial assistance in these governmental investigations. Despite his complete cooperation, however, Mr. Corigliano has been unable to reach a settlement with the staff. This case, therefore, presents the unfortunate prospect of adversarial litigation between the Commission and a significant and valuable cooperating witness.

To date, the Enforcement Division staff has proffered only a settlement in which it would agree not to proceed with charges of insider trading, but would nonetheless inappropriately calculate remedies, including the maximum allowable civil penalty, using trading models, traditionally applicable only when insider trading charges are actually brought. The staff's position is in direct conflict with the evidence adduced in the investigation by the United States Attorney's Office for the District of New Jersey and its federal agents. The exhaustive investigation by that office has resulted in a formal stipulation within Mr. Corigliano's plea agreement, which states: "There is no evidence that Mr. Corigliano committed the offenses to which he has agreed to plead guilty in order to enrich himself personally." United States

KL3 20231176_14

162

Attorney, District of New Jersey, Plea Agreement with Cosmo Corigliano ("Plea Agreement"), Jan. 14, 2000, at 7.

Rather than credit this compelling finding by the Justice Department and Mr. Corigliano's extensive cooperation, the staff has sought to impose upon him severe sanctions, including permanent bars from ever acting as a director or officer of a public company or any practice at all before the Commission, in addition to disgorgement and a civil penalty in an amount calculated according to standards ordinarily imposed only in strict insider trading cases. The penalties sought by the staff are harsher penalties than those often received even by non-cooperators. In fact, the staff calculates disgorgement in ways that overstate substantially any benefit Mr. Corigliano actually received from the alleged fraud, seeks damages based on transactions during 1995 when he effectively increased his Cendant stock position, fails to adjust the 1995 sales for stock splits and demands penalties on trades that are outside the statute of limitations.

We submit this memorandum to highlight why the staff's approach to sanctions is not appropriate in this corporate earnings case in which Mr. Corigliano is a valuable cooperator in both the United States Attorney's and the Commission's ongoing investigations. The Commission's staff has long and publicly espoused a policy in which it seeks to credit cooperators for their assistance in investigating and revealing securities violations. Without assurances from the staff that cooperation will be credited, there will be little incentive for others — in this case or future ones — to come forward to provide such valuable assistance. Here, the penalties sought against Mr. Corigliano reflect essentially no credit for the substantial assistance he has and is continuing to provide to the government and may well deter others from agreeing to assist in these significant investigations.

KL3 2071170 14

- 2 -

In addition to his cooperation, Mr. Corigliano presents the staff with overwhelming facts that underscore why the Justice Department found no evidence to indicate that Mr. Corigliano's conduct was intended "to enrich himself personally." First, in 1995, Mr. Corigliano sold only a minor portion of his holdings and, in fact, increased his overall Company stock ownership. Second, Mr. Corigliano's early 1998 stock sales, which the staff has cited as the principal evidence of insider trading, were the direct result of advice from the Company's general counsel, who Mr. Corigliano also trusted as a friend. In his conversations with the general counsel, who then was also selling Company stock, Mr. Corigliano was advised not to keep all of his net worth in one stock, particularly since, as a result of the HFS merger, Mr. Corigliano knew that his employment with the Company was coming to an end. Secondly, even after these 1998 sales, Mr. Corigliano still maintained a large Cendant stock and option position. In February and March 1998, he also exercised options, paid taxes on the income he then recognized, and added and held approximately 50,000 new Company shares as a result of those exercises. At the same time, he took his bonus for 1997 and his entire salary for 1998 in the form of long-term, not currently exercisable stock options, foregoing cash payments of $500,000. These actions are clearly inconsistent with any notion of loss avoidance in anticipation of any disclosure of accounting irregularities at the Company.

The equities in this case similarly support a different sanctions position by the staff. As explained more fully below, Mr. Corigliano is the lifeline of support for at least seven people, including his wife, Terri; their three young children; his elderly parents; and his wife's widowed mother. All depend on Mr. Corigliano for financial means. He has never shunned these family duties and should not be forced to abandon his family now, especially considering his conduct as a valuable cooperator to the Commission.

KL3 2072170.14

- 3 -

The staff should also recognize that no additional deterrent value exists in seeking punitively calculated disgorgement or severe civil penalties on top of the multiple layers of punishment that Mr. Corigliano already faces, not the least of which are imprisonment and criminal fines. In this context, the imposition of such civil sanctions by the Commission strongly resembles punitive measures rather than the equitable relief which Congress intended when it extended this authority to the Commission. Such a result would also run counter to the Commission's stated policy of rewarding substantive and valuable cooperation in ongoing investigations.

For all these reasons, Mr. Corigliano respectfully urges the Commission staff to use this unusual Wells submission to revisit and revise its settlement position so that this case may reach an expeditious and fair resolution that avoids litigation and the prospects of an adversarial proceeding with the Commission's own valuable cooperating witness.

## Argument

I.   **THE COMMISSION SHOULD NOT BRING INSIDER TRADING CHARGES OR SEEK TO IMPOSE INSIDER TRADING TYPE PENALTIES AGAINST MR. CORIGLIANO BECAUSE THE EVIDENCE DOES NOT SUPPORT A FINDING THAT HIS CONDUCT WAS FOCUSED ON A SCHEME OR INTENT TO ENRICH HIMSELF PERSONALLY**

The United States Attorney's Office concluded from its complete investigation of all relevant sources, including its exhaustive interrogation of Mr. Corigliano as a cooperating witness, that "no evidence" exists to conclude that Mr. Corigliano acted with intent "to enrich himself personally." Plea Agreement, at 7. The evidence reflects that from early on in Mr. Corigliano's tenure at CUC, the highest levels of management perverted the accounting department with programs and policies that went well beyond the limits of generally accepted

KL3 2029170 14                    - 4 -

accounting principles. It was in this context that Mr. Corigliano began his ill-fated career at CUC and it was in this context that he regrettably carried out the desires of upper management at the Company. At no time, however, had Mr. Corigliano schemed with members of senior management to inflate his compensation through either the issuance of stock options or sudden sales of Company stock. Instead, Mr. Corigliano was a corporate "foot-soldier," completing his work to please his supervisors, who from all accounts were the true architects of the "financial engineering" at the Company.

### A.    The Staff Cannot Demonstrate the Requisite Scienter to Bring Insider Trading Charges

In order to establish insider trading liability under the federal securities laws, the Commission must prove that the inside trader acted with "scienter." E.g., Aaron v. SEC, 446 U.S. 680, 695-96, 100 S. Ct. 1945, 1955 (1980). Scienter necessarily requires that the insider have possession of material nonpublic information at the time the insider trades. The logical corollary in determining scienter is that such material nonpublic information is then used in subsequent trading. The Commission staff, however, continues to recommend that the inquiry end after possession of inside information is established, a holding that courts have consistently refused to adopt.[1]

---

[1]    The only instance in which a federal appellate court suggested that a mere possession test had merit was a discussion added as dicta in a criminal case, United States v. Teicher, 987 F.2d 112 (2d Cir. 1993). However, in the six years since Teicher was decided, neither the Supreme Court nor any other federal appellate court has accepted a strict possession standard. In fact, even the Second Circuit in a post-Teicher case has impliedly endorsed a "use" test. See SEC v. Warde, 151 F.3d 42, 47-48 (2d Cir. 1998) (holding that "[t]he inference that [the defendant] traded on inside information was reinforced by the manner in which [the defendant] made his purchases," and concluded that "[t]his evidence amply supports a jury finding that [the defendant] was in possession of, and traded upon, inside information.") (emphasis added).

The Commission's position on what showing is necessary to establish scienter for insider trading charges has itself undergone significant fluctuation — in earlier times focusing on knowing use, then urging a mere possession test, and more recently following the lead of certain court decisions and moving toward a modified possession rule.[2] The federal appellate courts that have addressed this issue have repeatedly endorsed some version of a knowing use test in connection with an insider's trading, and the issue remains open in the Third Circuit.

We respectfully submit that, as several courts have held, scienter requires a knowing use of the material inside information, and such a standard cannot be met here. Moreover, we note that while its litigation position has differed over time, as a charging matter, the staff's review has, in fact, followed the analysis conducted by the United States Court of Appeals for the Eleventh Circuit in SEC v. Adler, 137 F.3d 1325 (11th Cir. 1998).[3] In that case,

---

[2]  See In re Investors' Mgmt. Co., [1970-71 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 78,163 at 80,514 (SEC July 29, 1971) (requiring a causal connection between the material nonpublic information and the trading at issue); compare Report of Investigation in re Sterling Drug, Inc., [1978 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 81,570, at 80,295, 80,298 (SEC Apr. 18, 1978) (rejecting evidence of an insider's preexisting plan to sell, stating that "Rule 10b-5 does not require a showing that the insider sold his securities for the purpose of taking advantage of material nonpublic information"). In its Sterling Drug opinion, the Commission offered no explanation for its changed position. In fact, it failed to even acknowledge its earlier decision in In re Investors' Management.

[3]  In response to Adler and subsequent decisions, the Commission has now "recognize[d] that an absolute standard based on knowing possession, or awareness, could be overbroad in some respects." Proposed Rules, Securities and Exchange Commission, Selective Disclosure and Insider Trading, 17 CFR Parts, 230, 240, 243, and 249, 64 Fed. Reg. 72,590, 72,600 (1999). Commenting on the Adler court's ruling, the Commission's Solicitor admitted, "[The Adler court's test] is not a bad test. It's our fallback position." Insider Trading: Eleventh Circuit Adopts "Use" Test for Insider Trading Liability, 30 Sec. Reg. & L. Rep. 513, Apr. 3, 1998. In fact, the Commission has recognized that an Adler-type analysis is normally conducted at the charging stage anyway. Id.

KL3 2028170.14

- 6 -

the court required the Commission to prove "actual use" of insider information in trading, but permitted a rebuttable evidentiary presumption of use from actual possession of inside information. Id. at 1340.[4]

In this case, Mr. Corigliano can rebut any inference of insider trading that may arise from his periodic and piecemeal sales of Company stock in 1995 and 1998. These sales were not causally connected to any specific scheme to enrich Mr. Corigliano personally. This finding already has been made by the Department of Justice. See Plea Agreement, at 7. The pattern of Mr. Corigliano's stock sales are not particularly unusual or extensive to raise an inference that his trades were "focus[ed] on fraud, deception, and manipulation." Adler, 137 F.3d at 1333. To the contrary, the entirety of his trading, including the decision to take his 1997 bonus and 1998 salary in long-term, not immediately exercisable stock options, undercuts any such claim. Mr. Corigliano has repeatedly denied that he engaged in insider trading, and the evidence confirms that he never connected the tasks he performed at the Company with any personal stock sales that he made.

---

[4] The Adler court based its holding on several grounds. First, the court concluded that the inference of use would alleviate the Commission's evidentiary difficulties. Second, the court found that the use test "best comports" with the language of § 10(b) and Rule 10b-5, and with Supreme Court precedent, that focus insider trader liability on "fraud and deception." Id. at 1338. Third, trading with material, nonpublic information does not "always and inevitably" constitute a breach of the Supreme Court maxim of a duty to disclose or abstain, making the knowing possession test overly broad. Id. Finally, the court refused to defer to the Commission's preference for the "knowing possession" test because it found the Commission itself had not been consistent on the issue. Id. at 1338-39.

The Adler court's analysis was, in substantial part, quickly accepted and adopted by the Ninth Circuit as well. See United States v. Smith, 155 F.3d 1051 (9th Cir. 1998). After analyzing all existing authority on the subject, the Smith court concluded that the Eleventh Circuit's arguments in Adler were most consistent with Supreme Court dicta, which it said "consistently suggested . . . that Rule 10b-5 requires that the government prove causation in insider trading prosecutions." Id. at 1067. The court reasoned that the requirement of an "intent to defraud" dictates that only intentional conduct be prohibited. Id.

1.    Mr. Corigliano's 1995 Stock Sales Represented But a Small
Portion of His Holdings and Arose During a Period in Which He
Was Steadily Increasing His Ownership of Company Shares

Mr. Corigliano voluntarily advised the staff that he sold approximately 80,000 shares of CUC stock in 1995.[5] It is clear that these sales represented only a small fraction of the stock he owned outright or had options to purchase. Indeed, during 1995, he nearly doubled his common stock ownership, starting from approximately 27,000 post-split shares at the end of 1994 and finishing with about 51,000 shares at the end of 1995. From the end of 1994 to the end of 1997, Mr. Corigliano ultimately increased his position in Company stock from 27,000 post-split shares to over 200,000 shares.

There is nothing about his pattern of stock trades in 1995 that suggests unusual or suspicious behavior raising any inference of bad faith. If anything, his pattern of trading that year was consistent with his trading in the surrounding three-year period, which showed a steady movement to increase his overall holdings. Similarly, there is no principled basis to suggest that at a time when Mr. Corigliano was increasing his overall CUC stock position, he was seeking to benefit from any alleged fraud. See Searls v. Glasser, 64 F.3d 1061, 1068 (7th Cir. 1995) (inferences of scienter can be undermined when an insider's sales of stock are offset by even larger stock acquisitions during the relevant time period); Schneider v. Vennard (In re Apple Computer Sec. Litig.), 886 F.2d 1109, 1117-18 (9th Cir. 1989) (no inference of scienter where defendants retained much of their holdings in Apple stock).

---

[5]    Although the staff requested information as to Mr. Corigliano's trades only for the period subsequent to February 1, 1995, we voluntarily informed the staff that Mr. Corigliano had sold 5,000 CUC shares in January 1995. The staff added these sales to its disgorgement calculation, plus demanded penalties for them, although they are well outside the five-year limitations period. See Johnson v. SEC, 87 F.3d 484 (D.C. Cir. 1996). Similarly, in computing damages with respect to his January and November 1995 sales, the staff failed to take into account the 3 for 2 stock splits that took place in July 1995 and October 1996.

2.    Scienter Cannot Be Predicated On Mr. Corigliano's 1998 Stock
      Sales Given His Overall Pattern of Conduct

Mr. Corigliano's pattern of stock trading in 1998 is also insufficient to raise an inference of scienter. By early 1998, as a long-time employee of the Company, almost all of Mr. Corigliano's net worth was invested in CUC/Cendant stock and options. His lack of diversification, however, only became an issue for him after a conversation he had with the Company's General Counsel, who advised him that it was imprudent and "silly" for him to hold so much of his net worth in one investment, particularly when Mr. Corigliano knew at the time that he would shortly leave the Company as it emerged from the HFS merger. Therefore, pursuant to the advice of the general counsel, Mr. Corigliano sold a portion of his Company stock in February and March 1998. See Freeman v. Decio, 584 F.2d 186, 197 n.44 (7th Cir. 1978) (inference that defendants were acting in bad faith "can be nullified by a showing that sales in question were consistent in timing and amount with . . . other circumstances [that] might reasonably account for their occurrence"); see also Adler, 137 F.3d at 1329 (defendant's communication to company's general counsel explaining intention to sell stock factor used to rebut any negative inference of insider trading).

Net of his stock sales and option exercises, Mr. Corigliano only reduced his ownership in Cendant common stock from a little more than 200,000 shares to approximately 131,000 shares. He continued to maintain nearly half his net worth in the Company's stock and in 380,000 stock options, that were then fully vested and "in-the-money." He also held approximately 900,000 additional options that had not yet vested. His decision to keep most of his net worth invested in Company stock strongly implies a confidence in the continued value of this investment, not a desire to unload the stock on an unsuspecting market. See, e.g., Miller v. Pezzani (In re Worlds of Wonder Sec. Litig.), 35 F.3d 1407, 1425 (9th Cir. 1994) (affirming

KL3 2028170.14

- 9 -

district court's determination that "[a]ny remote inference of bad faith arising from the defendants' stock sales is completely dispelled by the defendants' overall pattern of conduct," including the fact that they "retained the great bulk of their holdings, and held on" while the share price declined) (citation omitted).

In February and March 1998, Mr. Corigliano also exercised options and kept approximately 50,000 Cendant shares from this conversion. He paid taxes on the retained stock at the maximum applicable rate on the ordinary income he recognized as measured by the difference between the option strike price and the market price of the stock at the time he exercised the options. Clearly, if Mr. Corigliano, who knew he would soon leave the Company, was acting to avoid future losses as a result of the Company's accounting scheme, he would not have exercised options, paid tax based on the current market price, and then hold the stock. His retention of Company's shares after exercising options only makes economic sense if he believed that the stock price was going to increase over time.

Mr. Corigliano's lack of scienter is also dramatically underscored by his decision in the early months of 1998 to take his 1997 bonus compensation and entire 1998 salary in Cendant stock. Rather than receive cash payments of $500,000, as he was entitled to, he took his bonus and salary in the form of Cendant stock options which only became exercisable over a three-year period. Again, he chose to remain a long term investor in Cendant stock. He was not cashing out his position or dumping his shares. See, e.g., Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995) (defendant director's sale of substantial amounts of his stock for a profit of more than $2 million just days before the release of information causing the company's stock to drop "fail[s] to provide any inference of an intent to deceive the public," when sales were result of exercises in stock options that had become exercisable and the defendant director had recently

KL3.2029170.14

- 10 -

retired as an officer of the company; the Court also noted that even after the sale of nearly 350,000 shares, defendant retained 192,000 shares, which showed "he was confident about IMCERA's future").[6]

This pattern of conduct is not indicative of someone who has the intent to enrich himself in a careful scheme of deception by selling stock based on inside information. It is consistent, however, with the notion of a loyal corporate operative, who maintained his conviction and trust in Company management and in the delusion of their false optimism that pervaded Mr. Corigliano's fourteen years at the Company. It is also consistent with the stipulation in Mr. Corigliano's plea agreement. There is no evidence that he acted with the requisite scienter to enrich himself personally from CUC's fraudulent financial reporting practices at the time of his sales of Company stock. According to the dictates of Adler and Smith, if a person in possession of inside information does not trade on the basis of that information, there is no intent to deceive and therefore, the scienter required for an insider trading violation is lacking. Mr. Corigliano should not face insider trading charges here, nor be subject to penalties appropriate only in egregious insider trading cases.

---

[6] Similarly, scienter is not established merely by the size of the trading proceeds. See Greebel v. FTP Software, Inc., 194 F.3d 185, 206 (1st Cir. 1999) (finding sales were not suspicious despite receipt of over $23 million); In re Silicon Graphics Inc. Sec. Litig., 195 F.3d 521 (9th Cir. 1999) (finding sales were not unusual despite receipt of over $13 million).

II.   **THE COMMISSION SHOULD ADHERE TO ITS PUBLIC POLICY AND PRECEDENT OF REWARDING COOPERATION AND ACKNOWLEDGE MR. CORIGLIANO'S SUBSTANTIAL ASSISTANCE TO THE INVESTIGATION IN THIS CASE**

A.   **Commission Staff Has Strongly Endorsed a Policy of Rewarding Cooperation**

At the recent 2000 "SEC Speaks" Conference, senior members of the Commission's Enforcement Division Staff strongly reiterated the Commission's longstanding favorable position toward cooperators in ongoing SEC investigations. Repeatedly, the staff has stated to the public that, as has been its practice, cooperators will be treated more favorably than other respondents, and will be given considerable credit in return for their assistance. One senior official represented at the recent Commission conference, "cooperat[ors] do better than those who don't, and it is as simple as that." Lisa I. Fried, SEC Targets Financial Fraud, N.Y.L.J., Mar. 9, 2000, at 1.

At that same conference, another senior Enforcement Division official elaborated on this point, stating that the Division has discretion in determining what charges to bring, whether to proceed before the Commission or in court, what sanctions to seek, and what language to include in its complaint. According to this official, the Commission consistently has used its discretion to reward cooperators. He concluded that generally those who cooperate with the Commission face lesser penalties than those who do not. The Commission's policy of rewarding cooperation, consistent with the same policy of other law enforcement agencies, serves sound public policies of encouraging the investigation and prosecution of fraud and acknowledging the contrition and remorse of wrongdoers.

The Commission has, in fact, long and publicly articulated a policy of rewarding cooperation. At the SEC Speaks Conference in 1997, the then Director of Enforcement, William

KL3 2021170.14                              - 12 -

173

McLucas, publicly explained that the division does strike "deals" with cooperators for lesser sanctions given the appropriate facts and circumstances. <u>SEC Enforcement: SEC Staff Willing to Consider Leniency in Return for Cooperation, McLucas Says Leniency in Return for Cooperation, McLucas Says,</u> 29 Sec. Reg. & L. Rep. 309, Mar. 7, 1997. The division's chief counsel, Joan McGown, added that "[i]t is frustrating [for the Commission] as an institution that you can't let people know all the times" someone has been given a "pass" because of their level of cooperation. <u>Id.</u>

In this case, however, the staff's position on settlement is inconsistent with the public assurances it has previously made to induce cooperation. The staff has not proposed a settlement offer to Mr. Corigliano that differs in any material way from sanctions imposed upon non-cooperators in egregious cases. It has taken this position despite the fact that since the signing of Mr. Corigliano's plea agreement with federal prosecutors on January 14, 1999, he has made himself available to the United States Attorney's Office and the Commission's staff on a virtually full-time basis. Thus far, he has attended 13 full-day sessions, often traveling more than five hours per visit and sometimes on very short notice. He also has spent innumerable hours in meetings with counsel reviewing documents and discussing recollections of events in preparation for the government sessions. In addition, he has spent significant time alone poring over office files, Company documents, computer files and databases. He has used his accounting knowledge to conduct analyses for government investigators, to clarify issues, and to satisfy any lingering inquiries. In his sessions with the government, Mr. Corigliano has provided extensive insight into the accounting operations at CUC/Cendant. He has provided substantial information as to the role of the Company's most senior management in the irregularities. Mr. Corigliano's

KL3 2929170.14

- 13 -

knowledge of the origins and planning of the accounting scheme at CUC/Cendant is plainly unique.

At no time in any of these sessions has Mr. Corigliano attempted to minimize his own responsibility in the events that occurred at CUC. He has been complete and truthful in every step of this very difficult process and has prepared himself for the unpleasant eventuality of testifying in future trials against his former colleagues.

This level of sincere and valuable cooperation should not go unnoticed and unrewarded by the Commission. Mr. Corigliano is a first-time offender with real remorse and contrition for his actions. His subsequent behavior, although not lessening the effects of the offense, should be credited by the Commission as a means of encouraging cooperation in future cases as well as to recognize the positive steps taken by Mr. Corigliano since the discovery of the misconduct. The Commission cannot do justice to its pronounced policy of rewarding cooperation if it imposes sanctions on Mr. Corigliano that are no different from and may exceed those that the staff would seek against non-cooperators.

This would be the case even were Mr. Corigliano able to point solely to the fact of his extensive cooperation. It is especially true in light of the substantial evidence that Mr. Corigliano did not seek to profit personally from his wrongdoing.

B.    **Commission Precedent Provides Examples of Discretionary Charging Policy and Benefits to Cooperators**

The staff indicated that it intends to seek monetary penalties in this case that are significantly greater than those that have been generally extracted from individuals in the context of earnings disclosure offenses, even among non-cooperators. Our research has revealed that the largest single amount obtained by the Commission in the form of monetary penalties against an individual in an earnings disclosure case was $3 million, in a matter involving a chief executive

KL3 2021170 14                                              - 14 -

officer, who was not a cooperator and who was an architect of the fraud. <u>See</u> <u>SEC v. Bond D. Fletcher & Mediajet, Inc.</u>, Litig. Release No. 15,548 (Oct. 31, 1997); Litig. Release No. 15,818 (July 21, 1998). Therefore, before even considering the effects of cooperation, the Commission has not previously received monetary penalties in the amounts discussed here.

In other earnings disclosure cases — not involving cooperators — the Commission has failed to require disgorgement, even though the defendants traded in company stock during the period of financial reporting fraud. For example, in <u>In re Sensormatic Electronics Corp.</u>, Exchange Act Release No. 7,518 (Mar. 25, 1998), the Commission brought a civil action against the company's individual officers, including the chief executive officer, the chief operating officer, and the vice president of finance. The Commission charged that these officers manipulated corporate quarterly revenues to meet analysts' projections, recognized revenues early, misrepresented the shipment of goods, and committed other reporting irregularities. <u>Id.</u> According to the Commission, overstatements of earnings ranged as high as $30.2 million in a single quarter. <u>Id.</u>

During the period of this conduct, these same Sensormatic officers liquidated large positions in company stock. The Chief Executive Officer had over $500,000 in stock sales; the COO sold over $1 million in stock representing 100 percent of his holdings; and the vice president of finance sold over $220,000 in Sensormatic stock, representing more than 90 percent of his holdings. <u>See</u> <u>Gilford Partners, L.P. v. Sensormatic Elecs. Corp.</u>, No. 96 C 4072, 1997 WL 757495, at *2 (N.D. Ill. Nov. 24, 1997). Despite this fact, the Commission's settlement with these officers did not result in insider trading charges or remedies. No permanent director or officer bars or permanent bars from practicing before the Commission were levied against any of these senior officers, and only temporary suspensions were imposed against more junior ones.

KL) 2021170 14

- 15 -

No disgorgement was required of any of the officers charged, and the civil penalties did not exceed $50,000 as to any single defendant. In re Sensormatic Elecs. Corp., Exchange Act Release No. 7518. Meanwhile, class action plaintiffs who brought a civil action against these same officers charging them with insider trading, settled for approximately $53 million. See James R. Hagerty, Worst 5-Year Performer Sensormatic Electronics Corp., Wall St. J., Feb. 25, 1999, at R11.

In another recent financial disclosure and fraud case, the Commission obtained civil penalties but not disgorgement, despite significant trading by the respondent. See In re Presstek, Inc., Exchange Act Release No. 39,472 (Dec. 22, 1997); SEC v. Robert Howard & Robert E. Verrando, Litig. Release No. 15,599 (Dec. 22, 1997). In that case, the Commission filed and settled a civil action against Presstek's chairman and president for causing the company to disseminate, through its own and third-party statements, materially false and misleading information about its sales and business prospects. The Commission settled for a total of $2.7 million in civil penalties against Presstek's chairman. Id. No insider trading charges were brought, no permanent bars from practice before the Commission or as an officer or director were imposed, nor disgorgement enforced, despite the fact that the chairman had been the subject of a prior Commission consent decree involving insider trading and that he had made $16.5 million in profits in company stock trades during the period of fraudulent disclosures. A class action suit was also filed in the Presstek matter, again charging insider trading violations and resulting in a settlement of $22 million. See Presstek Inc. Settles Class-Action Lawsuit on "False" Statements, Wall St. J., Mar. 27, 2000, at B14. As in the Sensormatic litigation, this case also did not involve a cooperating defendant.

KL3:2021076.14

- 16 -

Although it is difficult to trace a record of how cooperators have fared in negotiations with the Commission, given the confidentiality of such matters, one case particularly stands out as a compelling example of the extent of credit awarded cooperators previously by the staff. James Dahl was a senior junk-bond salesman at Drexel Burnham Lambert, Inc., who admitted to receiving personally more than $100 million by fraudulently selling junk bonds in the 1980s. See Houdini of the Drexel Scandal, Business Week, Dec. 9, 1991. After receiving immunity from criminal prosecution from the Department of Justice, he began to cooperate extensively with several federal agencies in their Drexel investigation. In return for his cooperation, the Commission agreed not to take any action against Mr. Dahl. Id. In its letter to Mr. Dahl, the Commission detailed its agreement with him in these terms:

> The Securities and Exchange Commission agrees that, in light of the compulsion order obtained by the U.S. Attorney's Office and the Commission's desire to obtain your client's early meeting with the Commission's staff, the Commission shall not bring any action or proceeding, or seek any relief against your client under the securities laws (as that term is defined in Section 3(47) of the Exchange Act) based on any activity he engaged in prior to the date of this letter involving his employment at Drexel if, among other things set forth below, he agrees to meet with the staff of the Commission at the staff's request and inform the staff of his knowledge of any matters as to which he has received the protections afforded by 18 U.S.C. § 6001 et seq. for previous communications of such information.

Letter of Gary Lynch, Director of Division of Enforcement, September 28, 1998. In fact, Mr. Dahl continues to retain all of his securities licenses. Houdini of the Drexel Scandal, Business Week, Dec. 9, 1991.

The Commission's current investigation of CUC/Cendant resembles the Drexel case in its potential impact on corporate practice. We believe that Mr. Corigliano's cooperation is of a level at least as valuable as that provided by Mr. Dahl. But the staff to date has not accorded Mr. Corigliano any meaningful benefit at all, let alone a benefit that takes into account

KL3 2021170 14

- 17 -

the value of his cooperation, in its treatment of him. Indeed, the staff is demanding a settlement involving harsher penalties than those issued in <u>Sensormatic</u> or <u>Presstek</u>, where the individuals were not cooperators and engaged in arguably more egregious conduct.

## III.    MR. CORIGLIANO'S PERSONAL AND FAMILY BACKGROUND ARE RELEVANT TO A DETERMINATION OF AN APPROPRIATE REMEDY

Mr. Corigliano requests that the Commission use its discretion in fashioning an equitable remedy in this case and consider the debilitating effect such a remedy may have on those persons close to and dependent upon him, who obviously did not commit any securities violations.

Cosmo Corigliano is forty years old, married, and the father of three young children, ages 5, 7, and 9. He presently is the sole financial provider for his wife and children. Cosmo comes from humble origins, the son of an immigrant father who worked his way up from driving a bakery truck to eventually owning a small bakery shop. However, Cosmo is now also the sole financial support of his retired parents, who are without savings.

Cosmo's mother, 75, suffered a stroke approximately five years ago and requires much medical attention. Cosmo insures that both his parents receive all necessary medical care as part of his financial support of them. In fact, he pays for virtually all of his parents' significant expenses, from utility to food bills. In addition, he supplements their Social Security income, the only other income that they receive.

Cosmo also provides extensive financial support to his mother-in-law. Cosmo's wife, Terri, lost her father in a fire many years ago, the tragic result of behavior caused by acute alcoholism that plagued him and his family for many years. Terri's mother, 75, now lives alone, is retired, also has significant health problems, and depends on Cosmo's financial support. Like

Cosmo's parents, his mother-in-law is without financial savings and needs Cosmo's support to pay real estate taxes on her house and to provide for living expenses and medical bills.

In addition to offering care and financial support to their parents, Cosmo and Terri Corigliano have always contributed to various charitable and church-related organizations in Connecticut, where both have lived all their lives. Another insight into the character of Cosmo and Terri Corigliano is evidenced by how they dealt with particular family tragedy in their lives. Terri's older brother died three years ago of a sudden heart attack. He left behind a three-month old daughter, who suffers from a Down syndrome-like disease, known as Smith-Magenis syndrome. Cosmo and Terri both have given special attention and assistance to the handicapped child and her widowed mother.

This is but a small snapshot of the character and background of Cosmo Corigliano. He remains deeply devoted to his family and, despite his actions in this case, does not deserve to face the possibility of abandoning those dependent family members for whom he has gladly accepted the burden of care. Certainly, the Commission's staff cannot claim to advance a social cause by leaving these people, who also are the innocent victims in this case, without means of economic support.

IV.  **THE COMMISSION SHOULD CONSIDER MULTIPLE FACTORS IN DETERMINING AN OVERALL REMEDY, INCLUDING, AMONG OTHER THINGS, AN OFFSET FOR TAXES PAID ON SPECIFIC FUNDS AND A CONSIDERATION OF OTHER PUNISHMENT ALREADY IMPOSED**

As this submission reflects, and as Mr. Corigliano has repeated during the course of his cooperation, he fully admits his wrongful participation in the accounting irregularities that infected the financial statements and reports at CUC/Cendant. We have also advised the staff that Mr. Corigliano is willing to make a substantial financial settlement that reflects the true

KL3 2028170 14

- 19 -

benefit he allegedly received. Mr. Corigliano, however, disputes the formula suggested by the staff as inappropriate and unduly harsh under the circumstances. It is contrary to the economic evidence and legal authority and overstates substantially any benefit Mr. Corigliano actually obtained.

The staff has proposed a broad disgorgement formula based strictly upon Mr. Corigliano's trading proceeds. This formula is ordinarily applied when the Commission actually brings insider trading charges — charges which cannot be supported here. In this matter, the Commission should take into account a variety of factors, including the difference between the mental state and level of culpability posed by the "corporate crime" of misstatements in financial reports and the more individual and personally motivated crime of insider trading.

A fair determination of Mr. Corigliano's alleged unjust enrichment from his individual participation in a corporate scheme to misrepresent company earnings should consider several additional matters, such as: the fact that "there is no evidence that Mr. Corigliano committed the offenses to which he has agreed to plead guilty in order to enrich himself personally," see Plea Agreement, at 7; Mr. Corigliano's acceptance of responsibility and his cooperation with authorities against the organizers of the corporate scheme; the causal connection of the accounting irregularities to the Company stock price; any offset from profits received for taxes paid; and the overall punishment Mr. Corigliano already faces. This approach has been endorsed by at least one district court, see SEC v. Patel, No. 93 Civ. 4603, 1994 WL 364089 (S.D.N.Y. July 13, 1994) (holding that in determining fair remedy, the total punishment imposed on a defendant should be considered among other factors), aff'd in part and rev'd in part on other grounds, 61 F.3d 137 (2d Cir. 1995). We encourage the Commission to adopt that court's analysis here.

KL3 2021170 14

- 20 -

A.    The Commission Should Consider the Causal Connection Between
Accounting Misstatements and the Cendant Stock Price

The staff has chosen to compute a disgorgement amount based upon the difference between the price at which Mr. Corigliano sold stock in 1995 and 1998 and the lowest price of Cendant stock within five days of the Company's announcement on July 14, 1998 of additional restatements to its reported financial statements.  This method of computation attributes 100% of the stock price differential to the announcement of the new accounting information and then makes this entire amount chargeable to Mr. Corigliano.  It also unfairly attributes to him the full decline in the stock price resulting from events that took place subsequent to his termination and the Company's April 1998 announcement of the accounting irregularities.  The staff's methods would be aggressive and economically flawed if this were an insider trading case, which it is not.

We suggest to the Commission that this calculation is too simplistic and unrealistic in a context other than insider trading and becomes de facto punitive.[7]  In this case, the Commission should employ an econometric event study methodology that accounts for market and company items that combine to affect the price movement of a stock.  Such an analysis here should result in a finding that the drop in price of Cendant stock cannot entirely be attributed to the restatement of earnings announcement and therefore not all of the price differential should be charged to Mr. Corigliano.

We retained experienced and recognized econometric consultants on Mr. Corigliano's behalf to analyze any benefit Mr. Corigliano allegedly realized based on the

---

[7]    Courts have long recognized disgorgement as an equitable remedy that may not be used punitively.  SEC v. First City Fin. Corp., 890 F.2d 1215, 1230 (D.C. Cir. 1989); SEC v. Blatt, 583 F.2d 1325, 1335 (5th Cir. 1978); SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1104 (2d Cir. 1972).

KL3 2021170 14

- 21 -

restatements. These experts performed substantial and detailed work. Among other things, they reviewed the movement of Cendant's stock price in the Spring of 1998 and isolated the earnings restatement item from other "event" effects, such as the HFS merger and market responses to apparent synergy deficiencies in the combined entity, the Company's litigation exposure, and the rebound in the stock price following the shareholder settlements. By isolating these different "events," these experts concluded that from the stock proceeds received by Mr. Corigliano in 1998, approximately $3.4 million in pre-tax dollars, and approximately $1.9 million post-tax, represents the amount of loss avoided reasonably attributable to Cendant's earnings restatement.[8] We are happy to discuss further this expert analysis with the staff. However, we wish to underscore that Mr. Corigliano is prepared, for settlement purposes only, to pay an amount that rationally reflects the true economic benefit he allegedly received, as these experts have calculated it.

In a similar context, an appellate court remanded a district court's findings on disgorgement when the district court relied upon the SEC's calculation based only on general investor losses and did not tailor its calculation to the particular facts of the case. CFTC v. American Metals Exch. Corp., 991 F.2d 71, 78 (3d Cir. 1993). Importantly, the Third Circuit said in that case: "The hardship of investor losses should not, however, be used as an excuse to impose a remedy under circumstances in which the scope of relief falls outside that remedy's recognized parameters." Id. To avoid such a result here, Mr. Corigliano urges the Commission

---

[8]  Indeed, in the class action litigations, class plaintiffs, also assisted by experienced experts, contended that their total damages were only a little over a third of the total market capitalization drop. Cendant disputed this amount and settled for an amount equal to approximately one-third of plaintiffs' damage figures — or slightly more than one-ninth of the market capitalization drop.

to apply a rationally based econometric formula similar to the one described above in considering any disgorgement amount.

B.    **The Commission Should Offset Taxes Paid By Mr. Corigliano On Profits Received from Stock Sales**

The Commission bears the ultimate burden of persuasion that its disgorgement figures reasonably approximate the amount of unjust enrichment. First City Financial Corp., 890 F.2d at 1231. In this case, Commission staff claims the disgorgement amount is based upon the total proceeds received by Mr. Corigliano from various stock sales he made in 1995 and 1998. This calculation fails to account for taxes in the amount of approximately $9.4 million that Mr. Corigliano paid in connection with these option exercises and sales. The taxes paid on Mr. Corigliano's stock trades are relevant because they are an expense he immediately remitted on these proceeds and can be directly traced to the specific funds. Any calculation that omits these tax payments necessarily overstates amounts actually retained by Mr. Corigliano and, therefore, no longer becomes a measure to recover only the amounts by which he was "unjustly enriched" but becomes a punitive measure against him.[9]

Authoritative treatises support the argument that contemporaneous taxes should be deducted from any disgorgement analysis. See Richard M. Phillips, "Settlements:

_____

[9]   In SEC v. Thomas James Assoc., Inc., 738 F. Supp. 88, 94-95 (W.D.N.Y. 1990), aff'd sub nom. SEC v. Posner, 16 F.3d 520 (2d Cir. 1994), the court underscored that disgorgement is an equitable remedy and should take into account expense incurred in obtaining the unlawful gains. In that case, the Commission resisted any offset of disgorgement amounts for expenses incurred in generating profits received from a broker-dealer's excessive markups. Id. The court concluded, however, that "[t]he SEC's argument simply misconstrues both the nature and extent of the equitable power of the Court to order disgorgement" and ordered the disgorgement amount be offset for specific expenses incurred in generating the illegal profits. Id. at 94. Similarly, in this case, Commission staff would violate "both the nature and extent of its equitable power" of disgorgement by rejecting any offset of actual taxes paid by Mr. Corigliano on his 1998 Cendant stock trades.

KL3 2076170 14

- 23 -

Minimizing the Adverse Effects of an SEC Enforcement," in The Securities Enforcement Manual, at 198 (Kirkpatrick & Lockhart, LLP eds., ABA 1997). State disgorgement actions, which also support the deduction of taxes paid on illegal gains, are instructive. See e.g., USM Corp. v. Marson Fastener Corp., 392 Mass. 334, 338-47, 467 N.E.2d 1271, 1276-81 (1984) (holding that allowances for income taxes are appropriate because "[t]he over-all object is to render 'the ultimate recovery a sound reflection of [the defendants'] unjust enrichment due to the [breach of the fiduciary duty], and no more'") (citation omitted); see also Fidelity Mgmt. & Research Co. v. Ostrander, 40 Mass. App. Ct. 195, 201, 662 N.E.2d 699, 705 (1996) (finding authority to deduct actual taxes paid on illegal profits received by an investment firm employee in disgorgement suit brought by employer firm). [10]

---

[10]  The staff has argued that Supreme Court precedent supports the argument that taxes paid on profits received cannot be offset for disgorgement purposes. We believe the staff refers to Randall v. Loftsgaarden, 478 U.S. 647, 106 S. Ct. 3143 (1986). But, the staff's reliance on Randall is misplaced. In that case, the Court held that any rescission remedy available under §10(b) of the Securities Exchange Act of 1934 was not subject to offset for tax benefits received by the defrauded investor while owning the security. Id. at 662-63, 106 S. Ct. at 3152-53. The Randall case involved the offering and marketing of fraudulent tax shelter investments. The defendants in that case argued that despite the fraudulent nature of the investments, plaintiffs' recovery should be offset by the tax benefits that they actually received, concluding that absent the fraud, which induced the investment purchases, plaintiffs would probably have made other investments which produced temporary tax savings, but without the total loss of the investments. Id. at 652, 106 S. Ct. at 3147. The Court rejected this argument largely on grounds that any tax benefits received by plaintiffs did not fit the statutory definition in the Securities Act of 1933 for income received as an express offset for rescissionary damages. Id. at 660, 106 S. Ct. at 3151.

The holding and analysis by the Randall court does not apply here. In this matter, Mr. Corigliano can show that he remitted specific taxes on the alleged "unjust" profits from which the Commission seeks disgorgement. The taxes paid by Mr. Corigliano are not speculative or subsequent expenses but direct and contemporaneous deductions from the proceeds of his stock transactions. Insofar as disgorgement is an equitable remedy, it seeks to recover the actual profits received from the causally connected illegal activities. Therefore, any disgorgement of profits from Mr. Corigliano must account only for the monies he received, not the theoretical values of the trades. This differs markedly from the

KL3 2021 70 14                                  - 24 -

In this case, Mr. Corigliano can present specific evidence of taxes paid on the relevant sales of Cendant stock. Upon such a showing, the Commission ought to reduce Mr. Corigliano's disgorgement amount to reflect taxes paid in order to recover a reasonable approximation of profits actually received by Mr. Corigliano, rather than distorting its equitable powers by seeking punitive damages.

### C. The Facts of This Case Do Not Warrant the Imposition of a Civil Penalty Against Mr. Corigliano as the Goal of Deterrence is Sufficiently Achieved by Existing Punishment

Under the Securities Enforcement Remedies and Penny Stock Reform Act of 1990 ("Remedies Act"), Pub. L. No. 101-429, 104 Stat. 931 (1990), Congress granted the Commission the authority to seek "[m]oney penalties" in civil actions and administrative proceedings, as a "civil penalty." 15 U.S.C. §§ 77t(d), 78u(d)(3), 78u-2. Congress had a clear view that giving authority to the SEC to seek or impose civil penalties "would greatly increase deterrence." H.R. Rep. No. 101-616, at 17 (1990), reprinted in, 1990 U.S.C.C.A.N. 1379, 1384.

Courts have since had the opportunity to interpret the civil penalty provisions in the Remedies Act and clearly have found the goal of these fines to be deterrence — without having a punitive effect. See SEC v. Palmisano, 135 F.3d 860, 865-66 (2d Cir.) (holding that civil penalty provisions of Remedies Act "have a clear rational purpose other than punishment" in rejecting a double jeopardy challenge to imposition of civil penalties in addition to criminal fines for same conduct), cert. denied, 525 U.S. 1023 (1998).

Any civil penalty imposed on Mr. Corigliano in this proceeding would be tantamount to punitive damages. The Commission should exercise its discretion and decline to

---

situation in Randall in which the defendants were speculating about the "benefits" received by the defrauded investors despite the fraud.

impose such a penalty because Mr. Corigliano has already suffered significant penalties in many different arenas that sufficiently further the goal of deterrence intended by the Remedies Act. Based on his involvement in the accounting irregularities uncovered at CUC/Cendant, Mr. Corigliano: (i) has agreed to plead guilty to two federal felony offenses with a maximum prison sentence of ten years; (ii) faces criminal fines equal to the greater of $250,000 or twice the gross amount of any pecuniary gain he received; (iii) faces civil liability from Cendant itself; (iv) is a defendant in the derivative plaintiff's lawsuit, in which the plaintiff seeks a $2.85 billion judgment against him, jointly and severally; (v) faces civil liability in at least five indemnification suits brought by Ernst & Young; and (vi) faces additional civil liability in serious litigation by plaintiffs who have opted out of the class action and/or filed individual suits in both federal and state courts.

Under similar facts, the United States District Court for the Southern District of New York conducted this same analysis in determining whether civil penalties should apply under the Insider Trading Sanctions Act of 1984 ("ITSA"). See Patel, 1994 WL 364089. In Patel, the district court considered the fact that defendant was criminally punished and fined in addition to paying private suit settlements. Id. at *4 n.4. After determining that "[t]he penalties which [defendant] has already suffered . . . sufficiently further the goal of deterrence, making imposition of ITSA penalty unwarranted here." Id. The court in that case declined to assert its discretion and impose civil penalties "because imposition of such a penalty would be unduly harsh and unnecessary." Id. at *3.

A civil penalty in this case would not serve to add any deterrent effect that has not already been realized by Mr. Corigliano. His punishment here has been severe and plentiful; any

KL3.2029176 14

- 26 -

187

additional fine would only be excessive and punitive, in violation of Congress' goal in enacting the Remedies Act.

## Conclusion

For all the reasons set forth above and in our settlement presentations, the Commission should credit the stipulation by the United States Attorney's Office in Mr. Corigliano's plea agreement and reject the imposition of insider trading remedies against him. The Commission also should craft a remedy consistent with Mr. Corigliano's unique and valuable cooperation and compelling family circumstances. This case requires a more equitable and nuanced remedy calculation that considers these factors as well as the organizational nature of the offense, Mr. Corigliano's role in this "corporate" crime, the causal connection of the accounting irregularities to the calculation of an appropriate remedy, taxes paid on any profits received, and the overall punishment already imposed. We look forward to re-open settlement discussions pursuant to the considerations presented here.

Dated:  May 11, 2000

Respectfully Submitted,

Gary P. Naftalis
Alan R. Friedman
Henry E. Mazurek
Kramer Levin Naftalis & Frankel LLP
919 Third Avenue
New York, New York 10022
(212) 715-9100

Attorneys for Cosmo Corigliano

KL3.2073170.14

- 27 -

# EXHIBIT B-B

KRAMER LEVIN NAFTALIS & FRANKEL LLP

919 Third Avenue

New York NY 10022

(212) 715-9100

Fax Department: (212) 715-9191

Fax Number: (212) 715-8000

FROM:   Alan R. Friedman, Esq.          DATE:

PHONE:  212-715-9300                                    May 26, 2000

PLEASE DELIVER AS SOON AS POSSIBLE TO:

| RECIPIENT | COMPANY | FAX NO. | PHONE NO. |
|-----------|---------|---------|-----------|
| 1. Thomas C. Newkirk, Esq. | Securities and Exchange Commission | 202-942-9636 | 202-942-4550 |

Total number of pages including this page:  6

The documents accompanying this facsimile transmission are intended only for the use of the addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination of the communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone. Thank you.

KL3 2036444.1

DEFENDANT'S
EXHIBIT
951

KRAMER LEVIN NAFTALIS & FRANKEL LLP

919 THIRD AVENUE

NEW YORK, N.Y. 10022 - 3852

ALAN R. FRIEDMAN
PARTNER

TEL (212) 715-9300
FAX (212) 715-8000
gnaftalis@kramerlevin.com

47, AVENUE HOCHE
75008 PARIS
FRANCE

May 26, 2000

For Settlement Purposes Only
Via Facsimile

Thomas C. Newkirk, Esq.
Associate Director -
Division of Enforcement
Securities and Exchange Commission
450 Fifth Street, N.W.
Washington, D.C.  20549

Re:    In the Matter of Cendant Corporation, No. HO-3401

Dear Tom:

Pursuant to paragraph 12 of Mr. Corigliano's plea agreement and as part of his best efforts to settle any claims by the Commission, I enclose his asset, liability and asset transfer information.

When Gary returns to the office on Tuesday, we can discuss the remaining items on the financial disclosure form.

Best regards.

Yours sincerely,

*Alan L. Friedman*

Alan R. Friedman

Enclosure

KL3:2034567.1

05/26/00  FRI 17:14 FAX 212 888 7066        KRAMER LEVIN                              @003

United States
Securities And Exchange Commission

Statement Of Financial Condition
Of Cosmo Corigliano

I.    Statement of Assets and Liabilities as of, or about, April 2000[1]

A.    Assets:

1.    Cash

Joint Checking Account with his wife, Terri
Corigliano, at People's Bank[2]                              $5,700

Joint Savings Account with Terri Corigliano at
People's Bank                                                9,300

Joint Checking Account with Terri Corigliano at
People's Bank                                               44,400

2.    Real Estate

Trumbull, Connecticut house where Mr.
Corigliano's parents have resided since 1967[3]            180,000

3.    Automobiles

1993 Acura                              approximately 6,700[4]

1965 Mercedes 230                       approximately 6,500[5]

---

[1]   All numbers rounded to the nearest hundred dollars and reflect best estimates based on
      currently available information.  Amounts represent Mr. Corigliano's individual holdings,
      unless otherwise noted.

[2]   For purposes of this disclosure statement, we have listed the full balances in accounts
      owned jointly by Mr. and Mrs. Corigliano.

[3]   The Trumbull house was originally purchased by Mr. Corigliano's parents in about 1967,
      or approximately 33 years ago.  They have continuously resided there since then.  The
      house was transferred to Mr. Corigliano approximately eight years ago in or around 1992
      when his parents were unable based on their own credit to obtain additional financing on
      the home.  Mr. Corigliano became the owner of the property and then obtained the
      borrowing for his parents' benefit, based on his own credit as obligor.

[4]   Based on Kelley Blue Book (May 2000 edition)  trade-in value.

[5]   Estimate based on NADA Guides Appraisal Report (May 2000 edition).

CCQ170

| | | | |
|---|---|---|---|
| 4. | Securities | | in excess of 8,071,900 |
| 5. | IRA, Keogh, 401(k) or Pension Accounts | | 327,500 |
| 6. | Other | | |
| | 1985 Sabre sailboat, purchased 1994, joint ownership | | approximately 45,000 |

**B.**  **Liabilities:**

| | |
|---|---|
| Negative Balance Due on Smith Barney Money Market Account | ($206,000) |

**C.**  **Description of Assets:**

| | |
|---|---|
| One-family house in Trumbull, Connecticut, where Mr. Corigliano's parents have lived continuously since approximately 1967, estimate. | $180,000 |
| People's Bank, Special Savings, joint ownership | 9,300 |
| People's Bank, Checking, joint ownership | 5,700 |
| People's Bank, Checking, joint ownership | 44,400 |
| 1993 Acura, estimate based on Kelley Blue Book (May 2000 edition) trade-in value. | approximately 6,700 |
| 1965 Mercedes 230, estimate based on NADA Guides Appraisal Report (May 2000 edition) | approximately 6,500 |
| 1985 Sabre sailboat, jointly owned, estimate | approximately 45,000 |

See response to paragraph I.E. for securities assets.

**D.**  **Description of Liabilities:**

| | |
|---|---|
| Smith Barney Money Market Account Due | (206,000) |

**E.**  **Description of Securities Assets and Accounts:**

| | |
|---|---|
| Fidelity CT Muni MM, joint ownership | 1,200 |
| Smith Barney Investment Funds, individual ownership | 2,042,300 |

- 2 -

| | |
|---|---|
| Fairfield Capital Partners Investment Fund | 1,254,700 |
| Cendant Stock, individual ownership | 1,773,700[6] |
| Stock Options to Purchase Cendant Stock[7] | in excess of 3,000,000[8] |

F.    Description of Retirement Accounts:

Smith Barney, IRA                                                    327,500

G.    Description of Credit Card Accounts:

Citibank, credit limit $21,000

Bank One, credit limit $10,500

---

[6]    130,777 shares at $13.5625 per share.  Closing price at 5/25/2000.

[7]    Mr. Corigliano presently holds Cendant stock options in the following amounts:  (i) 150,000 options with a strike price at $22.33 and an expiry date of July 24, 2006; (ii) 230,000 options with a strike price at $20.50 and an expiry date of April 21, 2007; and (iii) 82,316 options with a strike price at $37.50 and an expiry date of March 2, 2008. Mr. Corigliano received the 82,316 options in lieu of cash compensation of $500,000, to which he was otherwise entitled.  Moreover, prior to his termination by Cendant, Mr. Corigliano also held additional options to purchase 600,000 Cendant shares with a strike price of $31.375 and an expiry date of December 17, 2007, and options to purchase 300,000 Cendant shares with a strike price of $34.3125 and an expiry date of January 27, 2008, which he lost following his termination.

[8]    Valuations of the 380,000 options presently held by Mr. Corigliano are based on binomial or Black-Scholes models, which result in a value in excess of $3 million.  This estimated value does not include the 900,000 options he received in December 1997 and January 1998 and that he lost following his termination.

- 3 -

II.     Asset transfers subsequent to February 1, 1995:[9]

      Dividing family assets based on financial and estate planning advice: Terri Corigliano, investment accounts in amount of $3,950,000.

      Establishment of daughter Mary Corigliano's trust fund: $200,000.

      Establishment of son Michael Corigliano's trust fund: $200,000

      Establishment of son David Corigliano's trust fund: $200,000

      $10,000 gift to each child's trust fund from joint account: total of $30,000

---

[9]     Pursuant to a real estate contract executed in October 1997, Terri Corigliano purchased a house in Greenwich, Connecticut for approximately $2,500,000. While not technically a transfer, Cosmo Corigliano was the original source of the funds used for the purchase of the home and the paydown of the mortgage on it (for which he was the obligor). The Corigliano family never resided in this house, which was sold in December 1998. The proceeds of that sale were paid to Mrs. Corigliano. The Corigliano family now lives in Old Saybrook, Connecticut in a home purchased by Terri Corigliano for approximately $1,745,000. Mrs. Corigliano also purchased Crystal Journey Candles, LLC for approximately $750,000, plus broker and other fees.

The Coriglianos' prior home in Stamford was jointly owned by them. The proceeds from the sale of that house, approximately $735,000, were paid to Mrs. Corigliano.

- 4 -