# EXHIBIT 1

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

BARRY S. SIMON
(202) 434-5005
bsimon@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

March 21, 2006

**Via Facsimile (973-297-2045) & First Class Mail**
Michael Martinez, Esq.
Craig Carpenito, Esq.
U.S. Attorney's Office
District of New Jersey
970 Broad Street, Suite 700
Newark, NJ 07102

Re:    **United States v. Forbes, 3:02CR264 (AHN)**

Dear Messrs. Martinez and Carpenito:

Pursuant to Fed. R. Crim. P. 16, Brady v. Maryland, 373 U.S. 83
(1963), United States v. Giglio, 405 U.S. 150 (1972), and the District of Connecticut
Standing Order on Discovery, Mr. Forbes requests that the government supply the
following information:

1.    It has come to our attention that Michael Monaco's conduct
during his employment at Cendant (on a matter not involving CUC) may be (or may have
have been) the subject of investigation by the government (for example, in the
Homestore, Inc. investigation).  If Mr. Monaco's conduct is, or has been, under
investigation by the government, he has a motive to curry favor with the
government through his testimony in this case.  Any information in the
government's possession, custody, or control concerning any government
investigation of Mr. Monaco's conduct constitutes Brady and Giglio material that
the government has a duty to disclose to the defense.  We request all such
information.

Michael Martinez, Esq.
Craig Carpenito, Esq.
March 21, 2006
Page 2


2.    A pleading filed by Kramer Levin on November 6, 2005 attached
as exhibits three letters between the SEC and Kramer Levin (dated May 16, 2000,
May 24, 2000, and May 25, 2000) that were never previously produced by the
government, Mr. Corigliano, or Kramer Levin.  One of the letters makes reference
to additional correspondence between Kramer Levin and the SEC (including a May
15, 2000 letter from Thomas Newkirk of the SEC to Kramer Levin and at least
three letters dated March 30, 2000) that has never been produced by the
government, Mr. Corigliano, or Kramer Levin.  See Ex. A to Opposition of Non-
Parties Cosmo Corigliano and Kramer Levin To Forbes' Motion for Enforcement of
Subpoena Calls (filed 11/6/05).  The letter also makes reference to a May 2, 2000
communication between Kramer Levin and Director Walker of the SEC.  Id. at 2.
Another letter appended to the Kramer Levin pleading makes reference to a
meeting between Mr. Naftalis and the SEC on May 19, 2000.  See Ex. B to 11/6/05
Kramer Levin Opp.  In light of the foregoing, we renew our requests for all
correspondence or other written communications between Mr. Corigliano and/or his
counsel and the SEC, including the March 30, 2000 and May 15, 2000
correspondence referenced above.  We also renew our requests for all information in
the government's possession concerning communications (whether written or oral)
between Mr. Corigliano and/or his counsel and the SEC from January 2000 to the
present, including the May 2, 2000 and May 19, 2000 communications.[1]

3.    The letters attached to the November 6, 2005 Kramer Levin
pleading indicate that, at least at one point in time, the SEC was dissatisfied with
the level of Mr. Corigliano's disclosure of financial information to the SEC.  See Exs.
A, B to 11/6/05 Kramer Levin Opp.  One of the letters further indicates that Mr.
Corigliano's counsel represented to the SEC that "Cosmo would fill out the financial
disclosure form" provided by the SEC, Ex. B to 11/6/05 Opp., and that "Cosmo is
working on the financial disclosure form."  Id.  The letter further states that

_____

[1]    The government represented in its August 2005 opposition to Mr. Forbes's
discovery motion that all materials in the possession of the SEC concerning its
investigation, prosecution, and settlement of claims involving Mr. Corigliano that
might conceivably contain Brady or Giglio material had been produced.  See Gov't
Opp. to Forbes Retrial Motion No. 3 at 7.  That representation clearly was
erroneous in light of the SEC correspondence attached to the November 2005
Kramer Levin pleading that was never produced by the government, as well as the
references in that correspondence to additional SEC correspondence with Kramer
Levin that has never been produced.

Michael Martinez, Esq.
Craig Carpenito, Esq.
March 21, 2006
Page 3

"providing the written responses to your detailed form would require some time"
and that "even small, minor or inadvertent inconsistencies could provide
unnecessary potential fodder for future cross-examination of Mr. Corigliano -- an
interest that the government shares." Id. A subsequent letter reflects that AUSA
Paul Weissman was acting as an intermediary between Mr. Corigliano and the SEC
in connection with the SEC's requests for financial information from Mr. Corigliano.
See Ex. C. to 11/6/05 Opp. Mr. Corigliano did not complete the SEC's financial
disclosure form.[2] This was a considerable benefit to him. We request all
information in the government's possession, custody, or control concerning: (i) all
requests made by the SEC (oral or written) for any type of financial or other
disclosure by Mr. Corigliano; (ii) all communications (oral or written) between or
among the SEC, the U.S. Attorney's Office, and/or Mr. Corigliano or his counsel
concerning all such requests; (iii) all requests made by the SEC (oral or written) for
Mr. Corigliano to personally provide financial or other information and/or for Mr.
Corigliano to personally fill out an SEC financial disclosure form; (iv) all
communications (oral or written) between or among the SEC, the U.S. Attorney's
Office, and/or Mr. Corigliano or his counsel concerning all such requests; (v) any
request for financial or other disclosure made by the SEC to Mr. Corigliano or his
counsel that was modified, delayed, or excused at Mr. Corigliano's request, at the
request of his counsel, or at the request of a representative of the U.S. Attorney's
Office; (vi) all communications (oral or written) between or among the SEC, the U.S.
Attorney's Office, and/or Mr. Corigliano or his counsel concerning all such requests,
modifications, delays, or excusals; (vii) all information concerning any
communications (oral or written) between the SEC and the U.S. Attorney's Office
concerning Mr. Corigliano's disclosure of financial information to the SEC or Mr.
Corigliano's compliance or lack of compliance with requests made by the SEC for
financial or other information; and (viii) all information concerning any direct
communications (oral or written) between Mr. Corigliano and either the SEC or the
U.S. Attorney's Office concerning requests made by the SEC for financial or other
information from Mr. Corigliano. The government also has an obligation under
Brady and Giglio to disclose any and all oral agreements between the government

---

[2]     More than four years later, after his settlement with the SEC, and after the
conclusion of his testimony in the 2004 trial, Mr. Corigliano completed a financial
affidavit for the SEC. The affidavit was produced to the defense on November 1,
2005 pursuant to Court Order, over both Mr. Corigliano's and the government's
objection.

Michael Martinez, Esq.
Craig Carpenito, Esq.
March 21, 2006
Page 4

and Mr. Corigliano's counsel, see Silva v. Brown, 416 F.3d 980, 986 (9th Cir. 2005), even if Mr. Corigliano himself is unaware of them. See Hayes v. Brown, 399 F.3d 972 (9th Cir. 2005) (en banc) (due process violated when cooperating witness testified falsely about oral agreement reached between witness's counsel and government even though witness did not know about agreement).

      4.    The government has elicited testimony from Mr. Corigliano concerning his purported compliance with his plea agreement, including his obligation to "truthfully disclose all information he possess[es] concerning any matters about which this office and other government agencies designated by this office, including without limitation, the Federal Bureau of Investigation, the US Postal Inspection Service, and the SEC, may inquire of him." Tr. 1452. On November 4, 2005, we wrote to you concerning information in our possession that indicates that Mr. Corigliano failed to supply his 2002 tax return to the SEC in the fall of 2003, despite its request for that material. See Letter of November 4, 2005 from Barry S. Simon to Messrs. Martinez & Carpenito. As we explained in that letter, in September 2003, the SEC asked Mr. Corigliano's counsel about his 2002 tax return. It appears that the SEC requested a copy of the return. See September 4, 2003 letter from Alan Friedman to SEC counsel James Kidney (Tab 1 to 11/4/05 letter). On September 4, 2003, Mr. Corigliano's counsel wrote to Mr. Kidney regarding "the questions you left in your voicemail." Id. at 1. In the letter, Mr. Corigliano's counsel stated that "Mr. Corigliano has not yet filed tax returns for 2002." Id. at 2. Defense counsel are in the possession of information indicating that that representation may have been inaccurate. The information in our possession indicates that Mr. Corigliano's accountant provided him his completed 2002 tax return on or about March 19, 2003, presumably for filing by April 15, 2003. See Tab 2 to 11/4/05 letter. The 2002 tax return signed by Mr. Corigliano is identical to the return supplied to him by his accountant in March 2003. See Tab 3 to 11/4/05 letter. In addition, Mr. Corigliano's quarterly report for the quarter ending June 2003 (consisting of April, May, and June 2003) indicates that Mr. Corigliano made federal and state tax payments that quarter, consistent with a tax filing on or before April 15, 2003. See Tab 4 to 11/4/05 letter (quarterly report) at 3. Even if Mr. Corigliano had requested an extension for the filing of his 2002 tax return, the return would have been due by August 15, 2003 absent exceptional circumstances. If Mr. Corigliano filed his 2002 tax return before September 4, 2003, his counsel's response to the SEC's request for the return would be inaccurate and would constitute a violation of Mr. Corigliano's disclosure obligations under his plea

Michael Martinez, Esq.
Craig Carpenito, Esq.
March 21, 2006
Page 5

agreement. We again request that the government make inquiry, pursuant to 26 U.S.C. § 6103 and the government's <u>Brady</u> and <u>Giglio</u> obligations, to determine the date on which Mr. Corigliano filed his 2002 tax return and whether the representation made to the SEC on his behalf concerning that matter was true or false. We also request a copy of Mr. Corigliano's filed 2002 tax return and an explanation of the basis on which the return was filed after September 4, 2003 (if the return was in fact filed after that date).

     5.    Documents in the possession of the defense raise serious questions about whether Mr. Corigliano committed tax fraud and/or made materially false representations with respect to his 2002 tax return. Documents in the possession of the defense also raise questions about whether Mr. Corigliano disclosed all of his and his wife's income to the SEC in his quarterly reports, as he was required to do. If Mr. Corigliano made false representations on a tax return or to the SEC after he executed his plea agreement in January 2000, that information is clearly <u>Brady</u> and <u>Giglio</u> material and should be produced to the defense. We request copies of all tax returns filed by Mr. Corigliano from January 2000 to the present.

     6.    During closing arguments at Mr. Forbes' first trial, the government asserted that, if a witness with a plea agreement lied or testify falsely, "the agreement gets thrown out the window." Tr. (10/18/04) at 14,860; <u>see also</u> <u>id.</u> at 14,861 ("if they testify falsely, if they lie, the agreement says it goes out the window. No reduction in sentence. And they're open to being prosecuted for more crimes. Right in the agreement."). Please notify us: (i) whether any present or former employee of the United States Attorney's Office or any other representative or agent of the government has come to the conclusion that Mr. Corigliano lied or testified falsely with respect to any matter at either trial of Mr. Forbes; (ii) whether, in light of overwhelming evidence that Mr. Corigliano testified falsely at both trials, the government has taken any steps to determine whether Mr. Corigliano in fact lied or testified falsely; and (iii) whether Mr. Corigliano's plea agreement has been revoked or "thrown out the window" due to his false testimony at two trials.

     7.    In light of Mr. Corigliano's false testimony in two trials regarding an alleged incident in which the CUC offices were swept for listening devices in or about November 1997, we request: (i) the dates and substance of all communications between the government and Cosmo Corigliano concerning the

Michael Martinez, Esq.
Craig Carpenito, Esq.
March 21, 2006
Page 6

documents introduced into evidence as Government Exhibit 430; (ii) the dates and
substance of all communications between the government and Cosmo Corigliano
concerning an alleged incident in which the CUC offices were swept for listening
devices in or about November 1997; (iii) the dates and substance of all
communications between the government and Cosmo Corigliano concerning
whether Mr. Corigliano testified truthfully about Government Exhibit 430 and/or
the alleged incident in which the CUC offices were swept for listening devices in
connection with the HFS merger; (iv) the dates and substance of all communications
between the government and Cosmo Corigliano concerning preparation for Mr.
Corigliano's testimony at Mr. Forbes' second trial concerning an alleged incident in
which the CUC offices were swept for listening devices in or about November 1997;
and (v) all documents reflecting any communication between the government and
Cosmo Corigliano concerning Government Exhibit 430 and/or the date of the alleged
incident in which the CUC offices were swept for listening devices in connection
with the HFS merger.

        8.      In light of Mr. Corigliano's false testimony at the 2004 trial
regarding a detailed account of an alleged meeting in CUC's Stamford, Connecticut
offices among Mr. Corigliano, Mr. Forbes, and Mr. Shelton a few days after March
9, 1998 (a time when Mr. Forbes indisputably was traveling thousands of miles
away from Connecticut), and the government's decision to avoid this matter entirely
during Mr. Corigliano's 2005 testimony, we request: (i) the dates and substance of
all communications between the government and Cosmo Corigliano concerning a
purported meeting in CUC's Stamford offices among Mr. Corigliano, Mr. Forbes,
and Mr. Shelton a few days after March 9, 1998; (ii) the dates and substance of all
communications between the government and Cosmo Corigliano concerning
whether Mr. Corigliano testified truthfully about a purported meeting in CUC's
Stamford offices among Mr. Corigliano, Mr. Forbes, and Mr. Shelton a few days
after March 9, 1998; (iii) the dates and substance of all communications between the
government and Cosmo Corigliano concerning preparation for Mr. Corigliano's
testimony at Mr. Forbes' second trial with respect to a purported meeting in CUC's
Stamford offices among Mr. Corigliano, Mr. Forbes, and Mr. Shelton a few days
after March 9, 1998; and (iv) all documents reflecting any communication between
the government and Cosmo Corigliano concerning a purported meeting in CUC's
Stamford offices among Mr. Corigliano, Mr. Forbes, and Mr. Shelton a few days
after March 9, 1998.

Michael Martinez, Esq.
Craig Carpenito, Esq.
March 21, 2006
Page 7

9.      We again request that the government disclose: (i) the full terms
(whether written or oral) of all attorney proffers made by Mr. Corigliano's counsel to
the government; (ii) whether Mr. Corigliano's counsel ever represented to the
government[3] that Mr. Corigliano was the source of any information supplied by
counsel to the government (and, if the response is affirmative, identify the date(s)
on which Mr. Corigliano's counsel supplied such information and the substance of
the information supplied on each date); (iii) whether Mr. Corigliano's counsel
ever stated that Mr. Corigliano had authorized his counsel to make a representation to
the government on his behalf (and, if the response is affirmative, identify the date
and substance of each such representation); and (iv) whether Mr. Corigliano's
counsel ever represented to the government that counsel would communicate
information from the government to Mr. Corigliano (and, if the response is
affirmative, identify the date on which any such representation made and the
substance of any such information).

10.     According to Mr. Corigliano's June 14, 2000 Order of Release,
Mr. Corigliano was not required to report to Pretrial Services as a condition of his
bail. We again request confirmation that it is correct that Mr. Corigliano has not
been required to report to Pretrial Services during the past five-plus years.

11.     The government's June 27, 2003, July 28, 2003, and January 9,
2004 letters concerning Mr. Corigliano contain exculpatory information but do not
identify (i) the date(s) on which Mr. Corigliano provided the information or (ii) the
person(s) present during the interview(s) or conversation(s). This information is
critical to cross-examination of Mr. Corigliano concerning the information in the
letters and to Mr. Forbes' ability to present testimony concerning Mr. Corigliano's
prior inconsistent statements. We also request that the government produce its
notes of the interviews or conversations referenced in these letters in order to
ensure that all of the pertinent information provided by Mr. Corigliano to the
government is encompassed by the government's letters.

12.     On November 18, 1998, at a time when Mr. Corigliano was
maintaining his innocence, his attorneys met with the government in an effort to
persuade the government not to prosecute him. In an effort to bolster Mr.

-------------------------------------------------------------------

[3]      As defined herein, "the government" includes the SEC and any other
government entity aligned with the prosecution.

Michael Martinez, Esq.
Craig Carpenito, Esq.
March 21, 2006
Page 8

Corigliano's false claims of innocence, his attorneys told the government that "they had polygraphed Corigliano and that he had done very well." Letter from John Carney, et al. to Barry Simon (6/30/04) at 6. The government disclosed during the 2004 trial that Mr. Corigliano's lawyers had later informed the government "that Corigliano had submitted to a second polygraph examination." Memorandum in Support of Government Motion to Preclude Cross-Examination of Cosmo Corigliano Regarding Polygraph Examinations (filed 6/29/04) at 1. The government represented that Mr. Corigliano's counsel "provided no additional information about that examination." Id. Mr. Corigliano's efforts to mislead the government about his culpability with representations about a polygraph examination are probative of his character for untruthfulness. The government should disclose whether it has made any effort to investigate whether Mr. Corigliano, through his counsel, employed representations about his performance on a polygraph examination in an effort to mislead the government into believing that he had done nothing wrong. The government should further disclose when it learned that Mr. Corigliano had submitted to a second polygraph examination and whether it made any effort to determine whether Mr. Corigliano "cherry picked" among the results of the two polygraphs to create the false impression that he had done well on the examinations and was innocent. Finally, the government should disclose the following information: (i) the questions posed to Mr. Corigliano in all of his polygraph examinations; (ii) Mr. Corigliano's answers during his polygraph examinations; (iii) the results of each polygraph examination; (iv) the identities of the polygraphers who performed the examinations; and (v) the timing and sequence of the examinations. If this information is not in the government's possession, it is within the government's custody and control because Mr. Corigliano is a cooperating government witness.

    13. In light of Kevin Kearney's false testimony at two trials, we again request that the government notify us: (i) whether any present or former employee of the United States Attorney's Office or any other representative or agent of the government has come to the conclusion that Mr. Kearney lied or testified falsely with respect to any matter at either trial; (ii) whether, in light of overwhelming evidence that Mr. Kearney testified falsely at two trials, the government has taken any steps to determine whether Mr. Kearney in fact lied or testified falsely; (iii) the first time (in terms of the number of interviews before the statement was first made and the first date of the statement) that Mr. Kearney stated in substance that Mr. Bell instructed him to make topside adjustments;

Michael Martinez, Esq.
Craig Carpenito, Esq.
March 21, 2006
Page 9

(iv) the first time (in terms of the number of interviews before the statement was first made and the first date of the statement) that Mr. Kearney stated in substance that he met with Mr. Bell to discuss topside adjustments; (v) the first time (in terms of the number of interviews before the statement was first made and the first date of the statement) that Mr. Kearney stated in substance that Mr. Bell invoked the name Walter Forbes in connection with topside adjustments and/or wanting EPS to be a certain number; (vi) the first time (in terms of the number of interviews before the statement was first made and the first date of the statement) that Mr. Kearney stated in substance that Cosmo Corigliano or anyone else invoked the name Walter Forbes in connection with topside adjustments and/or wanting EPS to be a certain number; (vii) the first time (in terms of the number of interviews before the statement was first made and the first date of the statement) that Mr. Kearney stated in substance that Cosmo Corigliano, Casper Sabatino, or anyone else invoked the name Walter Forbes in connection with hiding information from Ernst & Young; (viii) the first time (in terms of the number of interviews before the statement was first made and the first date of the statement) that Mr. Kearney stated in substance that Cosmo Corigliano, Casper Sabatino or anyone else stated that information should not be released to Ernst & Young until Walter Forbes signed off on the press release; (ix) the first time (in terms of the number of interviews before the statement was first made and the first date of the statement) that Mr. Kearney stated in substance that Stuart Bell, Cosmo Corigliano or anyone else stated that topside adjustments were made to achieve an EPS number that Mr. Bell and/or Walter Forbes wanted; and (x) the total number of interviews Mr. Kearney has had with the government to date (including all interviews in preparation for and during the 2004 trial and any subsequent interviews) and the dates of all such interviews to the extent those dates have not previously been disclosed by the government.

14.    SEC attorney Matthew Greiner's notes of his July 10, 2001 interview of Kevin Kearney indicate that Roger Pazzamont, Susan Markel, and Mark Gerber were present at the interview. We have never received any interview notes for this meeting other than Mr. Greiner's notes. We again request that the government immediately produce any such notes by Mr. Pazzamont, Ms. Markel, and any other government representative who attended that interview.[4] In

---

[4]    The government's previous assertion that it has no obligation to turn over Ms. Markel's or Mr. Pazzamont's notes to the defense is erroneous and inconsistent with the government's prior representations in this matter. The government has an

Michael Martinez, Esq.
Craig Carpenito, Esq.
March 21, 2006
Page 10

addition, if any government representative is aware of the fact that Mr. Kearney indicated on July 10, 2001 that he had no information to provide about Mr. Forbes, the government has an obligation to disclose that information to the defense.

15.    The government suggested during its redirect examination of Mr. Kearney that he simply had never been asked any questions about Walter Forbes in his government interviews. See Tr. 1195-96. The July 10, 2001 interview of Mr. Kearney took place after Mr. Forbes had been indicted, when Mr. Forbes was clearly a focus of the government's investigation. Mr. Greiner's notes make reference to Mr. Forbes. Have you made any effort to determine whether Mr. Kearney was asked about Walter Forbes, or asked any questions that should have elicited information about Walter Forbes (or the purported invocation of Walter Forbes' name) at any government interview prior to April 2003? If so, what did you learn? If not, what was the good faith basis for the questioning you conducted of Mr. Kearney on redirect examination at pages 1195-96 of the transcript?

16.    With respect to Mr. Kernkraut, we request that the government disclose all information in its possession, custody, or control that indicates or tends to prove that CUC did not conduct any quarterly earnings conference calls with analysts prior to May 1997.

17.    Because the government has and will offer out of court statements from Stuart Bell and E. Kirk Shelton in this case, please provide all Brady/Giglio material concerning these witnesses, see Fed. R. Evid. 806, including,

---

open-access letter with respect to the SEC, conducted a coordinated investigation with the SEC, and has repeatedly acknowledged its obligation to produce materials in the possession of the SEC. See, e.g., 2004 Tr. at 9026 (Mr. Carney: "whatever the SEC had, they've given to the Justice Department. Whatever the Justice Department has, we've given to the defense."); Gov't Opp. to Forbes Retrial Motion No. 3 at 7 & n.5. The government's current position also is at odds with the law. See, e.g., Kyles v. Whitley, 514 U.S. 419, 437 (1995) (prosecutor has a "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case"); United States v. Payne, 63 F.3d 1200, 1208 (2d Cir. 1995) (quoting Kyles). In August 2005, the government represented that, with the exception of notes taken by the 2004 trial team, all notes of interviews of government witnesses had been produced. See Gov't Opp. to Forbes Retrial Motion No. 3 at 12.

Michael Martinez, Esq.
Craig Carpenito, Esq.
March 21, 2006
Page 11

but not limited to the following: (i) all documents and information concerning plea discussions or negotiations with these witnesses or their attorneys; (ii) all documents and information concerning immunity discussions or negotiations with these witnesses or their attorneys; (iii) all documents and information concerning discussions or negotiations with these witnesses or their attorneys regarding potential or actual interviews, proffers or testimony; (iv) all documents and information concerning discussions or negotiations concerning a reduction of sentence with Mr. Shelton or his attorneys; (v) all documents and information concerning denials of the alleged fraud by these witnesses, whether directly or through counsel; and (vi) all documents and information concerning denials of knowledge of Mr. Forbes' alleged knowledge of or participation in the alleged fraud by these witnesses, whether directly or through counsel.

   18. During the government's cross-examination of Mr. Sabatino on November 10, 2005, Mr. Carpenito elicited testimony that Mr. Sabatino's memory had been refreshed by looking at a copy of GX 9322. Tr. 2633-35. The government's November 13, 2005 letter regarding this matter disclosed that the government had inquired of Pat Matthews and Richard Schechter concerning whether Mr. Sabatino had seen GX 9322 before his testimony at the 2004 trial. We request that the government disclose whether it made any attempt to inquire of any of the other former prosecutors in this case (Weissman, Carney, McMahon, and Cleary), any other present or former government agent on this matter, and/or any SEC representative who has worked on the CUC/Cendant investigation whether any of them had shown the document marked as GX 9322 to Mr. Sabatino prior to his testimony at the 2004 trial. If Mr. Sabatino was shown the document marked as GX 9322 prior to November 10, 2005 by anyone other than Mr. Schechter, and continued to recall that no unsupported topside adjustments were made under Mr. Bell, the government should supply that information.

   19. We again request all notes of (i) government interviews of cooperating witnesses and/or (ii) factual information received from cooperating witnesses, including, but not limited to, all notes taken by Messrs. Carney, Schechter, and/or McMahon of interviews of cooperating witnesses.

Michael Martinez, Esq.
Craig Carpenito, Esq.
March 21, 2006
Page 12


   20. We again request a list of every date on which the government interviewed or obtained factual information from each of its cooperating witnesses to the extent that information has not already been supplied.  <u>See</u> Tr. 10/16/03 at 160.


   We request a prompt response to this letter.  Please notify us by March 24, 2006 whether the government will supply the requested information and documents so that we can bring any disputes to the Court's attention by the March 31, 2006 deadline for pretrial motions.  Thank you for your attention to this matter.


    Sincerely,


    Barry S. Simon

# EXHIBIT 2



**U.S. Department of Justice**

FILED ⑤

*United States Attorney*
*District of New Jersey*

JUN 1 4 2000

AT 8:30 _____ M
WILLIAM T. WALSH
CLERK

*970 Broad Street, Suite 700*                                            *(973) 645-2700*
*Newark, NJ 07102*

January 14, 2000

Gary P. Naftalis, Esq.
Kramer, Levin, Naftalis & Frankel
919 Third Avenue
New York, NY  10022-3852

Re: <u>Plea Agreement with Cosmo Corigliano</u>  *CR-00-379*

Dear Mr. Naftalis:

       This letter sets forth the full and complete plea agreement between your client, Cosmo
Corigliano, and the United States Attorney for the District of New Jersey.

<u>Charge</u>

       Conditioned on the understandings specified below, the United States will accept a guilty
plea from Mr. Corigliano to a two-count Information charging him with (i) conspiracy to commit
mail fraud and wire fraud and to cause false statements to be made in documents required to be
filed with the Securities and Exchange Commission (the "SEC"), in violation of 18 U.S.C. § 371;
and (ii) wire fraud in violation of 18 U.S.C. § 1343. If Mr. Corigliano enters a guilty plea and is
sentenced on this charge, and if he otherwise fully complies with all of the terms of this agree-
ment, this Office will not initiate any further charges against him arising from:  (i) his participa-
tion in the misstating or falsification of any financial statements, reports, or other accounting
documents or records of CUC International, Inc. and/or Cendant Corporation (collectively,
"Cendant"); (ii) the providing of any misstated or falsified financial statements, reports, other
accounting documents or records of Cendant, or other information to the SEC, other regulatory or
governmental authorities, Cendant's auditors, members of the investing public, or other
prospective purchasers of Cendant stock; or (iii) Mr. Corigliano's purchases or sales of Cendant
stock. The scope of the protection offered in the previous sentence is further limited to the
criminal activity known to this Office as of the date of this agreement.

PENGAD 800-631-6989

**DEFENDANT'S
EXHIBIT**

300

Cooperation

Mr. Corigliano shall cooperate fully with this Office. As part of that obligation, Mr. Corigliano shall truthfully disclose all information he possesses concerning any matters about which this Office and other government agencies designated by this Office, including without limitation the Federal Bureau of Investigation, the U.S. Postal Inspection Service, and the SEC, may inquire of him. Mr. Corigliano also shall make himself available at all reasonable times requested by representatives of the government and shall truthfully testify in all proceedings, including grand jury and trial proceedings, as to any subject about which he is questioned. Furthermore, Mr. Corigliano agrees to provide to this Office at its request any documents or records, whether personal, partnership, corporate or otherwise, in his possession, custody, or control.

Should Mr. Corigliano withdraw from this agreement, or should he commit any additional federal, state, or local crimes, or should it be established that he has intentionally given materially false, incomplete, or misleading testimony or information or otherwise has violated any provision of this agreement, the non-prosecution provisions of this agreement shall be null and void. All other provisions of this agreement shall remain in full force and effect. If the non-prosecution provisions of this agreement become null and void because of Mr. Corigliano's actions or omissions, Mr. Corigliano shall thereafter be subject to prosecution for any federal criminal violation of which this Office has knowledge, including, but not limited to, perjury and obstruction of justice. Any such prosecution may be premised upon any information provided by Mr. Corigliano, and all such information may be used against him. Moreover, any such prosecution that is not time-barred by the applicable statute of limitations on the date Mr. Corigliano signs this agreement may be commenced against him notwithstanding the expiration of the limitations period subsequent to that date. With respect to any such prosecution, Mr. Corigliano waives any right to claim that statements made by him before or after the execution of this agreement, including any statements made pursuant to any prior agreement between him and this Office, or any leads from such statements, should be suppressed under Fed. R. Crim. P. 11(e)(6) or Fed. R. Evid. 410.

Sentence and Other Penalties

Each of the violations of 18 U.S.C. § 371 and 18 U.S.C. § 1343 to which Mr. Corigliano agrees to plead guilty carries a statutory maximum prison sentence of five years and a statutory maximum fine equal to the greatest of: (i) $250,000; (ii) twice the gross amount of any pecuniary gain that any persons derived from the offense; or (iii) twice the gross amount of any pecuniary loss sustained by any victims of the offense. The Sentencing Reform Act and the Sentencing Guidelines may impose a minimum term of imprisonment and/or fine, and the Sentencing Guidelines may authorize departure from the minimum and maximum penalties under certain circumstances. Fines imposed by the sentencing judge may be subject to the payment of interest.

Further, in addition to imposing any other penalty on Mr. Corigliano, the sentencing judge: (i) will order Mr. Corigliano to pay an assessment of $200 pursuant to 18 U.S.C. § 3013, which assessment must be paid by the date of sentencing; (ii) may order Mr. Corigliano to pay restitution pursuant to 18 U.S.C. §§ 3663 et seq.; and (iii) pursuant to 18 U.S.C. § 3583 and § 5D1.2 of the Sentencing Guidelines, may require Mr. Corigliano to serve a term of supervised release of up to three years, which will begin at the expiration of any term of imprisonment imposed. Should Mr. Corigliano be placed on a term of supervised release and subsequently violate any of the conditions of that release before the expiration of its term, Mr. Corigliano may be sentenced to not more than two years' imprisonment in addition to any prison term previously imposed on him and in addition to the statutory maximum term of imprisonment set forth above.

The sentence to be imposed upon Mr. Corigliano is within the sole discretion of the sentencing judge. The government cannot and does not make any representation or promise either as to what guideline range will be found applicable to Mr. Corigliano or as to what sentence he will receive. Except as otherwise provided in this agreement, this Office reserves its right to take any position with respect to the appropriate sentence to be imposed on Mr. Corigliano by the sentencing judge. In addition, this Office will inform the sentencing judge and the U.S. Probation Office of: (i) this agreement; (ii) the full nature and extent of Mr. Corigliano's activities and relevant conduct with respect to this case; (iii) the full nature and extent of Mr. Corigliano's cooperation with this Office and the date when it commenced; and (iv) all other information relevant to sentence, favorable or otherwise, in the possession of this Office, including information provided by Mr. Corigliano both before and after signing this agreement.

If Mr. Corigliano fully complies with this agreement and, prior to his sentencing, provides substantial assistance in the investigation or prosecution of one or more persons who have committed offenses, this Office will move the sentencing judge, pursuant to § 5K1.1 of the Sentencing Guidelines, to depart downward from the otherwise applicable guideline range. Whether the sentencing judge does in fact depart downward from the otherwise applicable guideline range is a matter committed solely to the Court's discretion. The determination whether Mr. Corigliano has provided substantial assistance to the government rests solely in the discretion of this Office. Mr. Corigliano may not withdraw his plea if this Office determines that Mr. Corigliano has not rendered substantial assistance or if the Court refuses to grant this Office's motion for a downward departure.

Mr. Corigliano specifically waives any right to appeal the validity of a plea he enters pursuant to this agreement. This Office reserves the right to take any position in post-sentencing motions or proceedings and to appeal, or oppose any appeal of, Mr. Corigliano's sentence.

<u>Stipulations</u>

This Office and Mr. Corigliano agree to stipulate at sentencing to the statements set forth in the attached Schedule A, which is hereby made a part of this plea agreement. This agreement

- 3 -

to stipulate, however, cannot and does not bind the sentencing judge, who may make independent factual findings and may reject any or all of the stipulations entered into by the parties. To the extent that the parties do not stipulate, each reserves the right to argue the effect of any fact upon sentencing. Moreover, this agreement to stipulate on the part of this Office is based on the information and evidence that this Office possesses as of the date of this agreement. Thus, if this Office obtains or receives additional evidence or information prior to sentencing that it determines to be credible and to be materially in conflict with any stipulation in the attached Schedule A, this Office shall not be bound by any such stipulation. A determination that any stipulation is not binding shall not release either this Office or Mr. Corigliano from any other portion of this plea agreement, including any other stipulation.

<u>Other Provisions</u>

This agreement does not prohibit the United States, any agency thereof (including the IRS), or any third party from initiating or prosecuting any civil proceeding against Mr. Corigliano.

This agreement is limited to the United States Attorney's Office for the District of New Jersey and cannot bind other federal, state, or local authorities. However, this Office will bring this agreement and Mr. Corigliano's cooperation to the attention of other prosecuting offices and the parties in any civil proceeding, if requested by Mr. Corigliano to do so.

This agreement constitutes the full and complete plea agreement between Mr. Corigliano and this Office and supersedes any previous agreement between them. No additional promises, agreements, or conditions have been entered into with respect to Mr. Corigliano's criminal liability other than those set forth in this letter, and none will be entered into unless in writing and signed by the parties.

Very truly yours,

ROBERT J. CLEARY
United States Attorney

PAUL A. WEISSMAN
Deputy Chief, Fraud and Public
  Protection Division

- 4 -

I have received the foregoing letter from my attorney, Gary P. Naftalis, Esq. I have read it and I understand it fully. I hereby acknowledge that it fully sets forth my agreement with the Office of the United States Attorney for the District of New Jersey. I state that there have been no additional promises or representations made to me by any officials or employees of the United States government or by my attorneys in connection with this matter.

_____
COSMO CORIGLIANO

WITNESSED:

_____
GARY P. NAFTALIS, Esq.
Counsel for Cosmo Corigliano

Date: _____1/17/00_____

- 5 -

## PLEA AGREEMENT WITH COSMO CORIGLIANO

### Schedule A

As part of the foregoing plea agreement, and subject to the conditions set forth therein, the United States and Cosmo Corigliano agree to stipulate to the following statements:

1. Mr. Corigliano committed the offenses to which he agrees to plead guilty prior to November 1, 1998. Accordingly, in view of certain amendments which took effect as of November 1, 1998, Mr. Corigliano's sentencing is governed by the United States Sentencing Guidelines which took effect as of November 1, 1997.

2. The offense guideline applicable to the above offenses is U.S.S.G. § 2F1.1, which carries a base offense level of 6. U.S.S.G. § 2F1.1(a).

3. The above offenses caused losses in excess of $80 million. However, taking into account all the circumstances of this case and the nature of Mr. Corigliano's role in the offense, the total loss caused by the offenses significantly overstates the seriousness of Mr. Corigliano's conduct, and excessive weight would be attached to this factor by applying the full adjustment which might otherwise be indicated under U.S.S.G. § 2F1.1(b)(1) based on that amount of loss.

4. The above offenses involved more than minimal planning on Mr. Corigliano's part. Accordingly, his offense level should be increased by 2 levels pursuant to U.S.S.G. § 2F1.1(b)(2).

5. Mr. Corigliano was a manager and a supervisor in the above offenses, which involved five or more participants. Accordingly, his offense level should be increased by 3 levels pursuant to U.S.S.G. § 3B1.1(b).

6. Mr. Corigliano's offenses involved an abuse of a position of trust, namely his position as Chief Financial Officer of CUC International, Inc. Accordingly, his offense level should be increased by 2 levels pursuant to U.S.S.G. § 3B1.3.

7. As of the date of this agreement, Mr. Corigliano has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If Mr. Corigliano continues to demonstrate such recognition and acceptance through the date of his sentencing, he will become entitled to a 2-point reduction in his offense level pursuant to U.S.S.G. § 3E1.1(a).

8. Mr. Corigliano has assisted authorities in the investigation and prosecution of his own misconduct by timely providing complete information to the government concerning his own involvement in the offense and timely notifying authorities of his intention to enter a plea of

- 6 -

guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Accordingly, if Mr. Corigliano enters a plea pursuant to this agreement and qualifies for a 2-point reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a), and if in addition Mr. Corigliano's offense level under the Guidelines prior to the operation of § 3E1.1(a) is 16 or greater, Mr. Corigliano will be entitled to a further 1-point reduction in his offense level pursuant to U.S.S.G. § 3E1.1(b).

9.  No grounds exist for any upward or downward adjustment in Mr. Corigliano's offense level under any provision of U.S.S.G. Chapters 2 and 3 other than those referred to in paragraphs 3 through 8 above.

10.  In the event that the Court in its discretion departs downward to a Guidelines range in which substitutes for imprisonment are permitted by the Guidelines, the government will not oppose a request by Mr. Corigliano that he be sentenced to some form of substitute punishment.

11.  An order of restitution would be inappropriate in the context of a criminal proceeding against Mr. Corigliano because the number of identifiable victims is so large as to make restitution impracticable and determining complex issues of fact related to the cause or amount of the victims' losses would complicate and prolong the sentencing process to a degree that the need to provide restitution to any victim in the context of a criminal proceeding is outweighed by the burden on the sentencing process.

12.  There is no evidence that Mr. Corigliano committed the offenses to which he has agreed to plead guilty in order to enrich himself personally. Mr. Corigliano acknowledges, however, that in light of those offenses, certain of the proceeds he received from sales of CUC International, Inc. and Cendant stock in the period prior to in or about April 1998 are subject to civil recovery. Mr. Corigliano agrees to use his best efforts to settle any claims the SEC may assert to recovery of such proceeds prior to his sentencing pursuant to this agreement. As part of those efforts, Mr. Corigliano agrees to provide the SEC, upon request, with complete and accurate information regarding his ability to pay any such settlement in the form ordinarily required by the SEC.

# EXHIBIT 3

KRAMER LEVIN NAFTALIS & FRANKEL LLP

919 THIRD AVENUE

NEW YORK, N.Y. 10022 - 3852

GARY P. NAFTALIS
PARTNER
TEL (212) 715-9253
FAX (212) 715-8000
gnaftalis@kramerlevin.com

47, AVENUE HOCHE
75008 PARIS
FRANCE

May 16, 2000

<u>Via Facsimile</u>

Thomas C. Newkirk, Esq.
Associate Director
United States Securities and Exchange Commission
Mail Stop 8-1
450 5th Street, N.W.
Washington, DC 20549

Re:    <u>In the Matter of Cendant Corporation, No. HO-3401</u>

Dear Tom:

I have your May 15 letter. Regrettably, it does not fairly reflect our prior dealings. I write to set the record straight.

First, the Staff has never previously requested that Mr. Corigliano supply it with financial information pursuant to paragraph 12 of the plea agreement. The Staff did demand that Mr. Corigliano pay more than $16 million in disgorgement, plus interest, plus a penalty equal to the disgorgement. And the Staff indicated it would recommend waiving full payment of this amount if Mr. Corigliano was unable to pay. In that event, the Staff would leave Mr. Corigliano with his house, car, legal fees and walking around money. The subject of financial disclosure arose only in connection with the waiver policy and that financial disclosure would be required if Mr. Corigliano sought to avail himself of that policy. To date, we have not availed ourselves of the waiver policy. Instead, we have repeatedly argued that because Mr. Corigliano is not guilty of insider trading, the Staff's disgorgement calculations are inaccurate and punitive, and the fair and equitable disgorgement amount is only a small fraction of the Staff's calculations.

Second, the Staff did not repeat "several times" any request for financial disclosure, nor was David Frohlich's March 30, 2000 letter in any way a follow up request for any previously sought financial disclosure. As part of our settlement discussions, the Staff asked that we voluntarily supply information concerning Mr. Corigliano's sales of Cendant stock from February 1, 1995 forward. We provided that information under cover of my letter dated March 30, 2000. Apparently, David was unaware that I had already sent the material directly to you, and that same day, he wrote me requesting this information. In his letter, he also asked for the first time for schedule D's to Mr. Corigliano's tax returns, in order to obtain historical information about Mr. Corigliano's trades so computations could be made. I immediately wrote back to David on March 30, 2000, pointing out that his letter had crossed with my letter to you and enclosing a copy of my earlier letter with the detailed trading information the Staff had

KRAMER LEVIN NAFTALIS & FRANKEL LLP

requested. In fact, we provided more information than had been sought; we also listed Mr. Corigliano's Cendant stock sales in January 1995. Following my March 30 letter, we did not receive any communications from the Staff suggesting that it required additional information concerning Mr. Corigliano's stock sales or any other financial information from him.

Third, there was nothing vague or incomplete about my response to Mr. Walker on May 2 when he asked about the proceeds from Mr. Corigliano's 1998 sales. We explained that the $23 million figure is extremely misleading because it does not reflect what gains Mr. Corigliano in fact received. We went on to explain with some specificity that after taking into account the cost of option exercises and the payment of many millions of dollars in taxes, Mr. Corigliano realized cash proceeds of approximately $8 million from his 1998 sales. We also pointed out that Mr. Corigliano has not been regularly employed since April 1998 (or more than two years), is incurring substantial legal fees and is the sole support of seven people.

Fourth, what the plea agreement says is that Mr. Corigliano, prior to his sentencing, will use his "best efforts" to settle claims that the SEC may assert for recovery of "certain of the proceeds" from his sales of Cendant stock. We have plainly complied with that provision and the other provisions of the plea argument. We have been trying diligently to settle the case. Both orally and in our Wells submission, we reiterated Mr. Corigliano's desire to negotiate a good faith settlement. In our Wells submission at page 22, we also made a substantial settlement proposal of $3.4 million -- a figure which fairly measures the benefit Mr. Corigliano allegedly received. We offered to meet with the Staff to explain the economic basis for our position, as supported by leading econometric experts, and why the Staff's calculations overstated any benefit Mr. Corigliano allegedly obtained. The Staff's response to date has been one of take it or leave it; either we accept the Staff's incorrect disgorgement number or litigate. I called you on Friday to request an additional short meeting with Director Walker to continue our settlement discussions. You advised that you would recommend against such a meeting or any further meetings with the Staff. Given that position, I was surprised by the timing of your new request for financial information and the arbitrary and unrealistic deadlines it purports to set.

I trust that the Staff is still interested in negotiating a settlement of the matter. To that end, I reiterate my request for a prompt meeting with Mr. Walker so that we can attempt to avoid the unseemly prospect of adversary litigation between the Commission and a significant cooperating witness who has provided substantial assistance to your ongoing investigations.

In all events, you can be assured that we will continue to meet all our obligations under the plea agreement.

Sincerely yours,

Gary P. Naftalis

cc:    Paul A. Weissman, Esq.

KL3:2034390.1

# EXHIBIT 4

KRAMER LEVIN NAFTALIS & FRANKEL LLP

919 THIRD AVENUE

NEW YORK, N.Y. 10022 - 3852

GARY P. NAFTALIS
PARTNER
TEL (212) 715-9253
FAX (212) 715-8000
gnaftalis@kramerlevin.com

47, AVENUE HOCHE
75008 PARIS
FRANCE

May 24, 2000

<u>For Settlement Purposes Only</u>
<u>Via Facsimile</u>

Thomas C. Newkirk, Esq.
Associate Director
United States Securities and Exchange Commission
Mail Stop 8-1
450 5th Street, N.W.
Washington, DC  20549

Re:     <u>In the Matter of Cendant Corporation, No. HO-3401</u>

Dear Tom:

I write to reconfirm that our client Cosmo Corigliano will be promptly providing you with financial disclosure in aid of our attempts to reach an amicable resolution of this matter.

In my May 16, 2000 letter, I represented, in response to what we understood to be your first request for financial disclosure pursuant to the plea agreement, that "you can be assured that we will continue to meet all our obligations under the plea agreement." I meant what I said. Cosmo will comply with all his obligations under the plea agreement, including paragraph 12's provision on financial disclosure.

At our meeting on Friday afternoon, May 19, I delineated for the Staff in detail the proceeds Cosmo received from his 1998 stock sales, the amounts paid for option exercises and the taxes he incurred. I described with specificity the form and approximate value of his assets. I also told you that his wife and children have assets as well, that they are separately represented by Harvey Pitt and Audrey Strauss of Fried, Frank, Harris, Shriver & Jacobson, and that questions concerning their assets should be directed to Harvey and Audrey. In response to the Staff's question relating to transfers made by Cosmo to his wife and children, I advised that Harvey and Audrey would provide you with information concerning such transfers. I understand that you subsequently initiated conversations with them on this subject. Moreover, I explicitly stated that Cosmo would fill out the financial disclosure form you have provided -- which also requests transfer information. But I noted that providing the written responses to your detailed form would require some time and that I was cognizant of the need in representing an important cooperating witness to be precise and accurate in our written responses since even small, minor or inadvertent inconsistencies could provide unnecessary potential fodder for future cross-examination of Mr. Corigliano -- an interest that the government shares.

KRAMER LEVIN NAFTALIS & FRANKEL LLP

Thomas C. Newkirk, Esq.
May 24, 2000
Page 2


       In my voicemail to you of yesterday, I told you that, consistent with my representation on Friday, Harvey and Audrey would call you today to provide you with information relating to transfers between Cosmo and his wife or children.  Based on the voicemail you left me this morning, I understand that you wish to receive such information from Cosmo directly as part of any financial disclosure rather than from Fried Frank.  Accordingly, Cosmo is working on the financial disclosure form, and we will supply that information to you as promptly as we possibly can.

       Best regards.

                   Sincerely yours,

                   Gary P. Naftalis

GPN/asb
cc:    Richard Walker, Esq.
       Paul A. Weissman, Esq.
       Harvey Pitt, Esq.
       Audrey Strauss, Esq.

# EXHIBIT 5





**UNITED STATES**
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

**DIVISION OF
ENFORCEMENT**

May 25, 2000

BY FAX (212) 715-8253

Gary P. Naftalis, Esq.
Kramer Levin Naftalis & Frankel LLP
919 Third Avenue
New York, NY 10022-3852

Re: *In the Matter of Cendant Corporation, No. HO-3401*

Dear Mr. Naftalis:

Assistant United States Attorney Paul Weissman has advised me that you have told him
that at least some of the financial information we have been seeking from your client
Cosmo Corigliano is ready for transmittal to us. As I understand it, this includes the
information concerning Mr. Corigliano's assets and asset transfers. Please send us this
information and such other information and schedules as are currently available by
overnight delivery or by fax to me at 202.946.9636 immediately and without awaiting
completion of the other information.

Sincerely yours,

Thomas C. Newkirk
Associate Director

cc: Paul A. Weissman, Deputy Chief
     Fraud and Public Protection Division
     U.S. Attorney's Office (D.N.J.)

# EXHIBIT 6

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

BARRY S. SIMON
(202) 434-5005
bsimon@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

November 6, 2005

**By Facsimile & E-mail**
Michael Martinez, Esq.
Craig Carpenito, Esq.
450 Main Street, Room 320
Hartford, CT 06103

Re:    **United States v. Forbes, 3:02CR264 (AWT)**

Dear Messrs. Martinez and Carpenito:

The pleading e-mailed by Kramer Levin today attaches as exhibits three letters between the SEC and Kramer Levin (dated May 16, 2000, May 24, 2000, and May 25, 2000) that were never previously produced by the government, Mr. Corigliano, or Kramer Levin. One of the letters attached to Kramer Levin's motion also makes reference to additional correspondence between Kramer Levin and the SEC (including a May 15, 2000 letter from Tom Newkirk of the SEC to Kramer Levin and at least 3 letters dated March 30, 2000) that has never been produced by the government, Mr. Corigliano, or Kramer Levin. See Ex. A to Kramer Levin Opp. The letter also makes reference to a May 2, 2000 communication of some sort between Kramer Levin and Director Walker of the SEC. Id. at 2. Another letter appended to the Kramer Levin motion makes reference to a meeting between Mr. Naftalis and the SEC on May 19, 2000. See Ex. B to Kramer Levin Opp.

In light of the foregoing, we again renew our requests, under Fed. R. Crim. P. 16, Brady, Giglio, and Jencks, for all correspondence or other written communications between Mr. Corigliano and/or his counsel and the SEC, including the March 30, 2000 and May 15, 2000 correspondence referenced above. We also renew our requests, under Brady and Giglio, for all information in the government's possession (whether written or oral) concerning communications between Mr. Corigliano and/or his counsel and the SEC, including the May 2, 2000 and May 19, 2000 communications.

We request a prompt response to this letter.

Sincerely,

Barry S. Simon