# EXHIBIT 16

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

November 13, 2005

BARRY S. SIMON
(202) 434-5005
bsimon@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

**By Facsimile & E-mail**
Michael Martinez, Esq.
Craig Carpenito, Esq.
450 Main Street, Room 320
Hartford, CT 06103

Re:   United States v. Forbes, 3:02CR264 (AWT)

Dear Messrs. Martinez and Carpenito:

I am writing with respect to the following pursuant to Brady, Giglio, and Wallach:

1.       During the government's cross-examination of Mr. Sabatino on November 10, 2005, Mr. Carpenito elicited testimony that Mr. Sabatino's memory had been refreshed by looking at a copy of GX 9322. Tr. 2633-35. Mr. Carpenito suggested that the prior proceeding was a different proceeding, and that Mr. Sabatino had never seen GX 9322 before. Id. We request that you provide answers to the following questions:

A.       Prior to Mr. Sabatino's testimony on November 10, 2005, did you make any attempt to inquire of the former prosecutors in this case (Weissman, Carney, Scechter, McMahon, and Cleary), the present or former government agents on this matter, and/or any SEC representative who has worked on the CUC/Cendant investigation, whether any of them had shown GX 9322 to Mr. Sabatino prior to his testimony at the 2004 trial? As you know, GX 9322 was on the government's 2004 exhibit list. As you also know, the question of whether unsupported topside adjustments were made under Mr. Bell was a significant issue in the 2004 trial, and Mr. Sabatino was asked about this issue in his government interviews prior to 2004. It seems highly unlikely that no one ever showed Mr. Sabatino GX 9322 until this trial.

B.       If the answer to Question A is yes, what information were you provided on this subject, and by whom?  If Mr. Sabatino was shown GX 9322 prior to November 10, 2005, and continued to recall that no unsupported topside adjustments were made under Mr. Bell, the government should supply that information forthwith under Brady, Giglio, and Wallach.

Michael Martinez and Craig Carpenito
November 13, 2005
Page 2

C.      If the answer to Question A is no, what was your good faith basis for suggesting during the government's questioning of Mr. Sabatino on November 10, 2005 that he had never seen GX 9322 before?

2.      Mr. Greiner's notes of his July 10, 2001 interview of Kevin Kearney indicate that Mr. Pazzamont, Ms. Markel, and Mark Gerber were present at the interview. We have never received any interview notes for this meeting other than Mr. Greiner's notes. We request that the government immediately produce any such notes by Mr. Pazzamont, Ms. Markel, Mr. Gerber, and any other government representative who attended that interview.

3.      The government suggested during its redirect examination of Mr. Kearney that he simply had never been asked any questions about Walter Forbes in his government interviews. <u>See</u> Tr. 1195-96. The July 10, 2001 interview of Mr. Kearney took place after Mr. Forbes had been indicted, when Mr. Forbes was clearly a focus of the investigation. Were Mr. Pazzamont, Ms. Markel, and/or Mr. Gerber ever asked whether Mr. Kearney stated at that interview that he had no information to provide concerning Walter Forbes? If so, what were their responses? If not, why were they not asked about this?

4.      Have you made any effort to determine whether Mr. Kearney was asked about Walter Forbes, or asked any questions that should have elicited information about Walter Forbes (or the invocation of Walter Forbes' name) at any government interview prior to April 2003? If so, what did you learn? If not, what was the good faith basis for the questioning you conducted of Mr. Kearney on redirect examination at pages 1195-96 of the transcript?

We request a prompt response to this letter.

Sincerely,

Barry S. Simon

# EXHIBIT 17



**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

*Securities & Health Care Fraud Unit*

---

*970 Broad Street, Suite 700*                                    *(973)645-2700*
*Newark, New Jersey 07102*

November 14, 2005

<u>**VIA Electronic Mail**</u>

Barry Simon, Esq.
c/o Residence Inn by Marriot
942 Main Street
Hartford, CT 06103

     Re:  **United States v. Walter A. Forbes**
          **No. 3:02CR264 (AWT)**

Dear Mr. Simon:

    In response to your letter to us of November 13, 2005, the Government strenuously disagrees with your mischaracterization of certain portions of the Government's examination of Casper Sabatino and Kevin Kearney during the retrial. Thus, the Government categorically rejects your assertion that the any questioning by the Government "suggested that . . . Mr. Sabatino had never seen GX 9322 before." To the contrary, the Government's cross-examination merely inquired if Mr. Sabatino was shown a copy of GX 9322 by either of us, Michael Martinez or Craig Carpenito. Tr. 2633-34.

    Since all of your inquiries regarding point 1 of your letter depend on the accuracy of your (mis)characterization of the Government's purported "suggestion," the Government believes that there is nothing that needs to be produced in response to that mischaracterization. In any event, the Government does not have any materials in its possession regarding Mr. Sabatino, other than the voluminous materials previously disclosed to the defense, that must be disclosed under either <u>Brady</u>, <u>Giglio</u>, or <u>Wallach</u>. The same holds for your request for additional disclosures regarding Kevin Kearney in points 2-4 of your letter.

Nevertheless, in response to your November 13 letter, and consistent with the Government's on-going practice in this case to err on the side of disclosure, we inquired of Mr. Schechter and Ms. Mathews if Mr. Sabatino was ever shown a copy of GX 9322 by them. Mr. Schechter recalled that he had shown Sabatino a copy of GX 9322 before Mr. Sabatino testified during the first trial. Mr. Schechter recalled that, after looking at that document, Mr. Sabatino acknowledged that it was consistent with the unsupported topside adjustments made after 1995, and that he did not dispute that unsupported topside adjustments were made prior to 1995. Mr. Sabatino did not, however, indicate that the document refreshed his recollection about participating in the unsupported topside adjustments prior to 1995. Mr. Schechter's recollection is that Mr. Sabatino could not say he recalled the pre-1995 unsupported adjustments. Mr. Sabatino did agree that such fraud was committed, based on the document, and based on the plea allocution of Mr. Corigliano that Mr. Sabatino witnessed. Mr. Sabatino was not arguing that there was no such fraud. Since Mr. Sabatino's statements to Mr. Schechter regarding GX 9322 did not become even arguably relevant until Mr. Sabatino's recross-examination during the retrial, the Government was under no obligation to disclose that statement to you before that time.

In response to your letter, the Government also confirmed with Mr. Gerber that all notes taken by him during any and all witness interviews during the course of the investigation in this case have been turned over to the defense long ago, even though such disclosure goes far beyond the Government's disclosure obligations.

In additional response to points 2-3 of your letter, the Government does not possess any notes prepared by either Mr. Pazzamont or Ms. Markel regarding the July 10, 2001 interview of Mr. Kearney. Moreover, since neither of those persons, unlike Mr. Gerber, have ever been members of the prosecution team in this case, the Government is under no obligation to obtain their notes and turn them over to the defense. E.g., United States v. Locascio, 6 F.3d 924, 949-50 (2d Cir. 1993); United States v. Pelullo, 399 F.3d 197, 216 (3d Cir. 2005). In any event, the members of the Government's prior prosecution team have confirmed to us that the Government has already disclosed to the defense all relevant materials from the files of the SEC that were ever possessed by any members of that prosecution team in this case, again consistent with its approach throughout this case to disclose voluminous materials to the defense beyond those which the Government was obligated to disclose. We have received no

additional materials from the SEC since the first trial was
completed that have not been disclosed to the defense.

                        Sincerely,

                        /s/ Michael Martinez

                        MICHAEL MARTINEZ
                        United States Department of Justice
                        Special Attorney

                        /s/ Craig Carpenito

                        CRAIG CARPENITO
                        United States Department of Justice
                        Special Attorney



**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

*Securities & Health Care Fraud Unit*

---

*970 Broad Street, Suite 700*          *(973)645-2700*
*Newark, New Jersey 07102*

November 14, 2005

**VIA Electronic Mail**

Barry Simon, Esq.
c/o Residence Inn by Marriot
942 Main Street
Hartford, CT 06103

> Re:  **United States v. Walter A. Forbes**
>      **No. 3:02CR264 (AWT)**

Dear Mr. Simon:

In response to your letter to us of November 13, 2005, the Government strenuously disagrees with your mischaracterization of certain portions of the Government's examination of Casper Sabatino and Kevin Kearney during the retrial. Thus, the Government categorically rejects your assertion that the any questioning by the Government "suggested that . . . Mr. Sabatino had never seen GX 9322 before." To the contrary, the Government's cross-examination merely inquired if Mr. Sabatino was shown a copy of GX 9322 by either of us, Michael Martinez or Craig Carpenito. Tr. 2633-34.

Since all of your inquiries regarding point 1 of your letter depend on the accuracy of your (mis)characterization of the Government's purported "suggestion," the Government believes that there is nothing that needs to be produced in response to that mischaracterization. In any event, the Government does not have any materials in its possession regarding Mr. Sabatino, other than the voluminous materials previously disclosed to the defense, that must be disclosed under either <u>Brady</u>, <u>Giglio</u>, or <u>Wallach</u>. The same holds for your request for additional disclosures regarding Kevin Kearney in points 2-4 of your letter.

Nevertheless, in response to your November 13 letter, and consistent with the Government's on-going practice in this case to err on the side of disclosure, we inquired of Mr. Schechter and Ms. Mathews if Mr. Sabatino was ever shown a copy of GX 9322 by them. Mr. Schechter recalled that he had shown Sabatino a copy of GX 9322 before Mr. Sabatino testified during the first trial. Mr. Schechter recalled that, after looking at that document, Mr. Sabatino acknowledged that it was consistent with the unsupported topside adjustments made after 1995, and that he did not dispute that unsupported topside adjustments were made prior to 1995. Mr. Sabatino did not, however, indicate that the document refreshed his recollection about participating in the unsupported topside adjustments prior to 1995. Mr. Schechter's recollection is that Mr. Sabatino could not say he recalled the pre-1995 unsupported adjustments. Mr. Sabatino did agree that such fraud was committed, based on the document, and based on the plea allocution of Mr. Corigliano that Mr. Sabatino witnessed. Mr. Sabatino was not arguing that there was no such fraud. Since Mr. Sabatino's statements to Mr. Schechter regarding GX 9322 did not become even arguably relevant until Mr. Sabatino's recross-examination during the retrial, the Government was under no obligation to disclose that statement to you before that time.

In response to your letter, the Government also confirmed with Mr. Gerber that all notes taken by him during any and all witness interviews during the course of the investigation in this case have been turned over to the defense long ago, even though such disclosure goes far beyond the Government's disclosure obligations.

In additional response to points 2-3 of your letter, the Government does not possess any notes prepared by either Mr. Pazzamont or Ms. Markel regarding the July 10, 2001 interview of Mr. Kearney. Moreover, since neither of those persons, unlike Mr. Gerber, have ever been members of the prosecution team in this case, the Government is under no obligation to obtain their notes and turn them over to the defense. E.g., United States v. Locascio, 6 F.3d 924, 949-50 (2d Cir. 1993); United States v. Pelullo, 399 F.3d 197, 216 (3d Cir. 2005). In any event, the members of the Government's prior prosecution team have confirmed to us that the Government has already disclosed to the defense all relevant materials from the files of the SEC that were ever possessed by any members of that prosecution team in this case, again consistent with its approach throughout this case to disclose voluminous materials to the defense beyond those which the Government was obligated to disclose. We have received no

additional materials from the SEC since the first trial was
completed that have not been disclosed to the defense.

                    Sincerely,

                    /s/ Michael Martinez

                    MICHAEL MARTINEZ
                    United States Department of Justice
                    Special Attorney

                    /s/ Craig Carpenito

                    CRAIG CARPENITO
                    United States Department of Justice
                    Special Attorney

# EXHIBIT 18

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

BARRY S. SIMON
(202) 434-5005
bsimon@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

November 16, 2005

**By Facsimile & E-mail**
Michael Martinez, Esq.
Craig Carpenito, Esq.
450 Main Street, Room 320
Hartford, CT 06103

Re:    <u>United States v. Forbes</u>, 3:02CR264 (AWT)

Dear Messrs. Martinez and Carpenito:

I am writing in response to your November 14, 2005 letter.

First, contrary to the suggestion in your letter, the clear import of the government's re-cross-examination of Mr. Sabatino was that Mr. Sabatino had not seen GX 9322 since 1993 and was suddenly refreshed upon reviewing it. The government now acknowledges that Mr. Sabatino <u>was</u>, in fact, shown a copy of GX 9322 at least once by the prosecution team before the 2004 trial and that it did <u>not</u> refresh his recollection about participating in alleged pre-1995 unsupported topside adjustments. 11/14/05 letter at 2.[1] The government has an obligation under <u>Napue</u>, <u>Wallach</u>, and their progeny to correct the misleading and false impression it conveyed to the jury during Mr. Sabatino's examination that Mr. Sabatino was not previously shown GX 9322 by the government. The government also has an obligation under <u>Napue</u>, <u>Wallach</u>, and their progeny to inform the jury that Mr. Sabatino <u>was in fact</u> shown GX 9322 prior to the 2004 proceeding and that it did not refresh his recollection or change his testimony about alleged pre-1995 unsupported topside adjustments.

Second, the government elicited testimony from Mr. Sabatino on cross-examination that he saw GX 9322 "at that time" when it was created in 1993. Tr. 2610. The government's November 14, 2005 letter indicates that Mr. Sabatino did not recall contemporaneously seeing the document when it was shown to him by Mr. Schechter in 2004. According to your letter, Mr. Sabatino indicated to Mr. Schechter that "it was consistent with the unsupported topside adjustments made after 1995," 11/14/05 letter at 2, <u>not</u> that he had seen it before. That statement by Mr. Sabatino was a prior inconsistent statement relevant to the jury's

---

[1]    There is also the question of whether Mr. Sabatino was shown GX 9322 during <u>multiple</u> interviews, but still adhered to his testimony that he did not participate in unsupported topside adjustments before Mr. Corigliano became CFO.

Michael Martinez and Craig Carpenito
November 16, 2005
Page 2

assessment of his credibility. The government has an obligation to inform the jury that Mr. Sabatino indicated to the government in 2004 that he did not recall seeing the document in 1993.

Third, the government has not indicated whether it made any attempt to look for Mr. Gerber's notes, if any, of the July 10, 2001 Kevin Kearney interview. Nor has the government responded to our question whether Mr. Pazzamont, Ms. Markel, and/or Mr. Gerber were ever asked whether Mr. Kearney stated at that interview that he had no information to provide concerning Walter Forbes. If any government representative is aware of the fact that Mr. Kearney indicated on July 10, 2001 that he had no information to provide about Mr. Forbes, the government has an obligation to disclose that information to the defense forthwith and to correct the false and misleading testimony the government elicited from Mr. Kearney about his government interviews.

Fourth, with respect to Ms. Markel and Mr. Pazzamont, the government's assertion that it has no obligation to turn over their notes to the defense is erroneous and inconsistent with the government's prior representations in this matter. The government has an open-access letter with respect to the SEC, conducted a coordinated investigation with the SEC, and has repeatedly acknowledged its obligation to produce materials in the possession of the SEC. See, e.g., 2004 Tr. at 9026 (Mr. Carney: "whatever the SEC had, they've given to the Justice Department. Whatever the Justice Department has, we've given to the defense."); Gov't Opp. to Forbes Retrial Motion No. 3 at 7 & n.5. The government's current position also is at odds with the law. See, e.g., United States v. Brooks, 966 F.2d 1500, 1503 (D.C. Cir. 1992) (Brady obligations required prosecution to review files of government agencies closely aligned with the prosecution) (collecting cases); United States v. Bryant, 439 F.2d 642, 650 (D.C. Cir. 1971) (duty of disclosure under Rule 16 and Jencks "affects not only the prosecutor, but the Government as a whole"), overruled in part on other grounds, In re: Sealed Case, 99 F.3d 1175 (D.C. Cir. 1996); United States v. Hankins, 872 F. Supp. 170, 172 (D.N.J.) ("Courts nationwide have held that prosecutors have an affirmative duty to search files maintained by different branches of government closely aligned with the prosecutor in order to fulfil their Brady obligations.") (internal quotation omitted) (collecting cases), aff'd mem., 61 F.3d 897 (3d Cir. 1995), and aff'd mem. sub nom., United States v. Hepburn, 61 F.3d 897 (3d Cir. 1995). We renew our request for Ms. Markel's and Mr. Pazzamont's notes of the July 10, 2001 Kevin Kearney interview.[2]

---

[2]    In August 2005, the government represented that, with the exception of notes taken by the 2004 trial team, all notes of interviews of government witnesses had been produced. See Gov't Opp. to Forbes Retrial Motion No. 3 at 12.

Michael Martinez and Craig Carpenito
November 16, 2005
Page 3

Fifth, the narrow view of the government's disclosure obligations set forth in your November 14, 2005 letter raises additional questions about the government's compliance with Brady, Giglio, and Rule 16 -- particularly in light of the SEC correspondence attached to a recent Kramer Levin pleading that was never previously produced to the defense and the references in that correspondence to other letters that have never been produced by the government. The government represented in its August 2005 opposition to Mr. Forbes's discovery motion that all materials in the possession of the SEC concerning its investigation, prosecution, and settlement of claims involving Mr. Corigliano that might conceivably contain Brady or Giglio material had been produced. Gov't Opp. to Forbes Retrial Motion No. 3 at 7. That representation clearly was erroneous in light of the SEC correspondence attached to the recent Kramer Levin pleading that was never produced by the government, as well as the references in that correspondence to additional SEC correspondence with Kramer Levin that has never been produced. We again renew our requests under Brady, Giglio, and Rule 16 for all communications between Mr. Corigliano or his counsel and the SEC from January 14, 2000 to the present.

Finally, the government has not responded to our question whether it has made any effort to determine whether Mr. Kearney was asked about Walter Forbes, or asked any questions that should have elicited information about Walter Forbes (or the invocation of Walter Forbes' name) at any government interview prior to April 2003. Nor has the government indicated what its good faith basis was for the questioning conducted of Mr. Kearney on redirect examination at pages 1195-96 of the transcript.

We request a prompt response to this letter. The issues raised in this letter are particularly significant in light of the false, misleading, and improper testimony the government has elicited from a series of witnesses in this case, including Mr. Kernkraut, Mr. Kearney, and Mr. Corigliano. We also request a prompt response to the other letters to which the government has not responded, including our letter concerning Mr. Corigliano's tax returns and the letter concerning settlement discussions with or plea offers to Mr. Bell, Mr. Shelton, and/or their counsel.

Sincerely,

Barry S. Simon

# EXHIBIT 19

CONFIDENTIAL PURSUANT
TO 17 C.F.R. § 200.83

BEFORE THE UNITED STATES
SECURITIES AND EXCHANGE COMMISSION

| | |
|---|---|
| In the Matter of | : |
| Cendant Corporation | : |
| No. HO-3401 | : |

## WELLS SUBMISSION ON BEHALF OF
## COSMO CORIGLIANO

Kramer-Levin Naftalis & Frankel LLP
919 Third Avenue
New York, New York 10022
(212) 715-9100

Attorneys for Cosmo Corigliano

May 11, 2000

Cosmo Corigliano claims confidential treatment of this submission for all purposes pursuant to
17 C.F.R. § 200.83, and requests that it not be disclosed pursuant to a request under the Freedom
of Information Act or in response to any subpoena or other request.

DEFENDANT'S
EXHIBIT
950

156

# TABLE OF CONTENTS

**Page**

Table of Authorities ..................................................................................... iii

Preliminary Statement ................................................................................... 1

Argument ......................................................................................................... 4

I.  THE COMMISSION SHOULD NOT BRING INSIDER
    TRADING CHARGES OR SEEK TO IMPOSE INSIDER
    TRADING TYPE PENALTIES AGAINST MR. CORIGLIANO
    BECAUSE THE EVIDENCE DOES NOT SUPPORT A
    FINDING THAT HIS CONDUCT WAS FOCUSED ON A
    SCHEME OR INTENT TO ENRICH HIMSELF PERSONALLY ................. 4

    A.  The Staff Cannot Demonstrate the Requisite Scienter to
        Bring Insider Trading Charges ................................................................. 5

        1.  Mr. Corigliano's 1995 Stock Sales Represented But
            a Small Portion of His Holdings and Arose During a
            Period in Which He Was Steadily Increasing His
            Ownership of Company Shares ................................................... 8

        2.  Scienter Cannot Be Predicated On Mr. Corigliano's
            1998 Stock Sales Given His Overall Pattern of
            Conduct .......................................................................................... 9

II. THE COMMISSION SHOULD ADHERE TO ITS PUBLIC
    POLICY AND PRECEDENT OF REWARDING
    COOPERATION AND ACKNOWLEDGE MR. CORIGLIANO'S
    SUBSTANTIAL ASSISTANCE TO THE INVESTIGATION IN
    THIS CASE ........................................................................................................ 12

    A.  Commission Staff Has Strongly Endorsed a Policy of
        Rewarding Cooperation ............................................................................. 12

    B.  Commission Precedent Provides Examples of Discretionary
        Charging Policy and Benefits to Cooperators .......................................... 14

III. MR. CORIGLIANO'S PERSONAL AND FAMILY
     BACKGROUND ARE RELEVANT TO A DETERMINATION
     OF AN APPROPRIATE REMEDY ..................................................................... 18

KLJ.2020170.14

- i -

## TABLE OF CONTENTS
### (continued)

Page

IV.   THE COMMISSION SHOULD CONSIDER MULTIPLE FACTORS IN DETERMINING AN OVERALL REMEDY, INCLUDING, AMONG OTHER THINGS, AN OFFSET FOR TAXES PAID ON SPECIFIC FUNDS AND A CONSIDERATION OF OTHER PUNISHMENT ALREADY IMPOSED ..........................................................................19

    A.   The Commission Should Consider the Causal Connection Between Accounting Misstatements and the Cendant Stock Price ..........................................................................21

    B.   The Commission Should Offset Taxes Paid By Mr. Corigliano On Profits Received from Stock Sales..................23

    C.   The Facts of This Case Do Not Warrant the Imposition of a Civil Penalty Against Mr. Corigliano as the Goal of Deterrence is Sufficiently Achieved by Existing Punishment..........................................................................25

Conclusion ..........................................................................27

KL3 2028170 14

- ii -

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

<u>Cases:</u>

<u>Aaron v. SEC</u>, 446 U.S. 680, 100 S. Ct. 1945 (1980) ...........................................5

<u>Acito v. IMCERA Group, Inc.</u>, 47 F.3d 47 (2d Cir. 1995) ...............................10-11

<u>CFTC v. American Metals Exch. Corp.</u>, 991 F.2d 71 (3d Cir. 1993) .....................22

<u>Fidelity Mgmt. & Research Co. v. Ostrander</u>, 40 Mass. App. Ct. 195,
  662 N.E.2d 699 (1996) .............................................................................24

<u>Freeman v. Decio</u>, 584 F.2d 186 (7th Cir. 1978) ..............................................9

<u>Gilford Partners, L.P. v. Sensormatic Elecs. Corp.</u>, No. 96 C 4072,
  1997 WL 757495 (N.D. Ill. Nov. 24, 1997) ...............................................15

<u>Greebel v. FTP Software, Inc.</u>, 194 F.3d 185 (1st Cir. 1999) .......................11 n.6

<u>In re Investors' Mgmt., Co.</u>, [1970-71 Transfer Binder] Fed. Sec. L. Rep.
  (CCH) ¶ 78, 163 (SEC July 29, 1971) ....................................................6 n.2

<u>Johnson v. SEC</u>, 87 F.3d 484 (D.C. Cir. 1996) ...........................................8 n.5

<u>Miller v. Pezzani (In re Worlds of Wonder Sec. Litig.)</u>, 35 F.3d 1407
  (9th Cir. 1994) ........................................................................................9-10

<u>Randall v. Loftsgaarden</u>, 478 U.S. 647, 106 S. Ct. 3143 (1986) ................24 n.10

<u>Report of Investigation in re Sterling Drug, Inc.</u>, [1978 Transfer
  Binder] Fed. Sec. L. Rep. (CCH) ¶ 81,570 (SEC Apr. 18, 1978) ...............6 n.2

<u>SEC v. Adler</u>, 137 F.3d 1325 (11th Cir. 1998) ..................6-7, 6 n.3, 7 n.4, 9, 11

<u>SEC v. Blatt</u>, 583 F.2d 1325 (5th Cir. 1978) ..............................................21 n.7

<u>SEC v. First City Fin. Corp.</u>, 890 F.2d 1215 (D.C. Cir. 1989) ...............21 n.7, 23

<u>SEC v. Manor Nursing Ctrs., Inc.</u>, 458 F.2d 1082 (2d Cir. 1972) ................21 n.7

<u>SEC v. Palmisano</u>, 135 F.3d 860 (2d Cir.), <u>cert. denied</u>, 525 U.S.
  1023 (1998) ................................................................................................25

KL3 2928179 14

- iii -

## TABLE OF AUTHORITIES
(continued)

Page

SEC v. Patel, No. 93 Civ. 4603, 1994 WL 364089 (S.D.N.Y. July
13, 1994), aff'd in part and rev'd in part on other grounds, 61 F.3d
137 (2d Cir. 1995) ............................................................................20, 26

SEC v. Thomas James Assocs., Inc., 738 F. Supp. 88 (W.D.N.Y.
1990), aff'd sub nom. SEC v. Posner, 16 F.3d 520 (2d Cir. 1994) .................23 n.9

SEC v. Warde, 151 F.3d 42 (2d Cir. 1998) .................................................5 n.1

Schneider v. Vennard (In re Apple Computer Sec. Litig.), 886 F.2d
1109 (9th Cir. 1989) ..............................................................................8

Searls v. Glasser, 64 F.3d 1061 (7th Cir. 1995) ..........................................8

USM Corp. v. Marson Fastener Corp., 392 Mass. 334, 467 N.E.2d
1271 (1984) .........................................................................................24

United States v. Smith, 155 F.3d 1051 (9th Cir. 1998) ...........................7 n.4, 11

United States v. Teicher, 987 F.2d 112 (2d Cir. 1993) .................................5 n.1

Statutes, Legislative Authority, and Regulations:

15 U.S.C. §§ 77t(d), 78u(d)(3), 78u-2 ....................................................25

Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j(b) ..............7 n.4, 24 n.10

Securities Enforcement Remedies and Penny Stock Reform Act of
1990, Pub. L. No. 101-429, 104 Stat. 931 (1990) ......................................25

H.R. Rep. No. 101-616 (1990), reprinted in, 1990 U.S.C.C.A.N. 1379 ..............25

Rule 10b-5, 17 C.F.R. § 240.10b-5 (2000) ............................................7 n.4

64 Fed. Reg. 72,590 (1999) ...............................................................6 n.3

SEC Authorities:

In re Presstek, Inc., Exchange Act Release No. 39,472 (Dec. 22, 1997) ...............16

KL3:2921170.14

- iv -

## TABLE OF AUTHORITIES
(continued)

Page

SEC v. Bond D. Fletcher & Mediaiet, Inc., Litig. Release No. 15,548
(Oct. 31, 1997); Litig. Release No. 15,818 (July 21, 1998) ...................15

SEC v. Robert Howard & Robert E. Verrando, Litig. Release No.
15,599 (Dec. 22, 1997) ........................................................16

In re Sensormatic Elecs. Corp., Exchange Act Release No. 7,518
(Mar. 25, 1998) ...........................................................15, 16


Other Authorities:

Lisa I. Fried, SEC Targets Financial Fraud, N.Y.L.J., Mar. 9, 2000, at 1 ...................12

James R. Hagerty, Worst 5-Year Performer Sensormatic Electronics
Corp., Wall St. J., Feb. 25, 1999, at R11 ...................................16

Houdini of the Drexel Scandal, Business Week, Dec. 9, 1991 ...................17

Insider Trading: Eleventh Circuit Adopts "Use" Test for Insider
Trading Liability, 30 Sec. Reg. & L. Rep. 513, Apr. 3, 1998 ...............6 n.3

Richard M. Phillips, "Settlements: Minimizing the Adverse Effects
of an SEC Enforcement," in The Securities Enforcement Manual
(Kirkpatrick & Lockhart, LLP eds., ABA 1997) ......................... 23-24

Presstek Inc. Settles Class-Action Lawsuit on "False" Statements,
Wall St. J., Mar. 27, 2000, at B14 ..........................................16

SEC Enforcement: SEC Staff Willing to Consider Leniency in Return
for Cooperation, McLucas Says Leniency in Return for Cooperation,
McLucas Says, 29 Sec. Reg. & L. Rep. 309, Mar. 7, 1997 ...................13

KL3:2029170 14

- v -

### Preliminary Statement

This is an unusual Wells submission. Mr. Corigliano already has accepted responsibility for his participation in corporate accounting irregularities committed at CUC International, Inc., now known as Cendant Corp. (referred to jointly as "the Company") and has been cooperating with both federal prosecutors in New Jersey and with the Commission's own Enforcement Division staff in their investigation of senior management's role in the accounting scheme. In addition, there is no dispute that during the course of his extensive and ongoing cooperation, including at present approximately 84 hours of interviews over 13 days with the Justice Department and the Commission's staff, Mr. Corigliano has been totally forthright and candid, has not minimized his own responsibility, and has provided truthful information that will be of substantial assistance in these governmental investigations. Despite his complete cooperation, however, Mr. Corigliano has been unable to reach a settlement with the staff. This case, therefore, presents the unfortunate prospect of adversarial litigation between the Commission and a significant and valuable cooperating witness.

To date, the Enforcement Division staff has proffered only a settlement in which it would agree not to proceed with charges of insider trading, but would nonetheless inappropiately calculate remedies, including the maximum allowable civil penalty, using trading models, traditionally applicable only when insider trading charges are actually brought. The staff's position is in direct conflict with the evidence adduced in the investigation by the United States Attorney's Office for the District of New Jersey and its federal agents. The exhaustive investigation by that office has resulted in a formal stipulation within Mr. Corigliano's plea agreement, which states: "There is no evidence that Mr. Corigliano committed the offenses to which he has agreed to plead guilty in order to enrich himself personally." United States

KL3 2021770.14

162

Attorney, District of New Jersey, Plea Agreement with Cosmo Corigliano ("Plea Agreement"), Jan. 14, 2000, at 7.

Rather than credit this compelling finding by the Justice Department and Mr. Corigliano's extensive cooperation, the staff has sought to impose upon him severe sanctions, including permanent bars from ever acting as a director or officer of a public company or any practice at all before the Commission, in addition to disgorgement and a civil penalty in an amount calculated according to standards ordinarily imposed only in strict insider trading cases. The penalties sought by the staff are harsher penalties than those often received even by non-cooperators. In fact, the staff calculates disgorgement in ways that overstate substantially any benefit Mr. Corigliano actually received from the alleged fraud, seeks damages based on transactions during 1995 when he effectively increased his Cendant stock position, fails to adjust the 1995 sales for stock splits and demands penalties on trades that are outside the statute of limitations.

We submit this memorandum to highlight why the staff's approach to sanctions is not appropriate in this corporate earnings case in which Mr. Corigliano is a valuable cooperator in both the United States Attorney's and the Commission's ongoing investigations. The Commission's staff has long and publicly espoused a policy in which it seeks to credit cooperators for their assistance in investigating and revealing securities violations. Without assurances from the staff that cooperation will be credited, there will be little incentive for others — in this case or future ones — to come forward to provide such valuable assistance. Here, the penalties sought against Mr. Corigliano reflect essentially no credit for the substantial assistance he has and is continuing to provide to the government and may well deter others from agreeing to assist in these significant investigations.

KL3.2028170.14

- 2 -

In addition to his cooperation, Mr. Corigliano presents the staff with overwhelming facts that underscore why the Justice Department found no evidence to indicate that Mr. Corigliano's conduct was intended "to enrich himself personally." First, in 1995, Mr. Corigliano sold only a minor portion of his holdings and, in fact, increased his overall Company stock ownership. Second, Mr. Corigliano's early 1998 stock sales, which the staff has cited as the principal evidence of insider trading, were the direct result of advice from the Company's general counsel, who Mr. Corigliano also trusted as a friend. In his conversations with the general counsel, who then was also selling Company stock, Mr. Corigliano was advised not to keep all of his net worth in one stock, particularly since, as a result of the HFS merger, Mr. Corigliano knew that his employment with the Company was coming to an end. Secondly, even after these 1998 sales, Mr. Corigliano still maintained a large Cendant stock and option position. In February and March 1998, he also exercised options, paid taxes on the income he then recognized, and added and held approximately 50,000 new Company shares as a result of those exercises. At the same time, he took his bonus for 1997 and his entire salary for 1998 in the form of long-term, not currently exercisable stock options, foregoing cash payments of $500,000. These actions are clearly inconsistent with any notion of loss avoidance in anticipation of any disclosure of accounting irregularities at the Company.

The equities in this case similarly support a different sanctions position by the staff. As explained more fully below, Mr. Corigliano is the lifeline of support for at least seven people, including his wife, Terri; their three young children; his elderly parents; and his wife's widowed mother. All depend on Mr. Corigliano for financial means. He has never shunned these family duties and should not be forced to abandon his family now, especially considering his conduct as a valuable cooperator to the Commission.

KL3 2029170.14

- 3 -

164

The staff should also recognize that no additional deterrent value exists in seeking punitively calculated disgorgement or severe civil penalties on top of the multiple layers of punishment that Mr. Corigliano already faces, not the least of which are imprisonment and criminal fines. In this context, the imposition of such civil sanctions by the Commission strongly resembles punitive measures rather than the equitable relief which Congress intended when it extended this authority to the Commission. Such a result would also run counter to the Commission's stated policy of rewarding substantive and valuable cooperation in ongoing investigations.

For all these reasons, Mr. Corigliano respectfully urges the Commission staff to use this unusual Wells submission to revisit and revise its settlement position so that this case may reach an expeditious and fair resolution that avoids litigation and the prospects of an adversarial proceeding with the Commission's own valuable cooperating witness.

## Argument

1. **THE COMMISSION SHOULD NOT BRING INSIDER TRADING CHARGES OR SEEK TO IMPOSE INSIDER TRADING TYPE PENALTIES AGAINST MR. CORIGLIANO BECAUSE THE EVIDENCE DOES NOT SUPPORT A FINDING THAT HIS CONDUCT WAS FOCUSED ON A SCHEME OR INTENT TO ENRICH HIMSELF PERSONALLY**

The United States Attorney's Office concluded from its complete investigation of all relevant sources, including its exhaustive interrogation of Mr. Corigliano as a cooperating witness, that "no evidence" exists to conclude that Mr. Corigliano acted with intent "to enrich himself personally." Plea Agreement, at 7. The evidence reflects that from early on in Mr. Corigliano's tenure at CUC, the highest levels of management perverted the accounting department with programs and policies that went well beyond the limits of generally accepted

KL3 2020170 14                          - 4 -