# EXHIBIT 29

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
919 THIRD AVENUE
NEW YORK 10022-3897
TEL: (212) 735-3000
FAX: (212) 735-2000
http://www.skadden.com

DIRECT DIAL
212-735-2870
DIRECT FAX
212-735-2036

August 16, 1999

**VIA TELECOPY AND**
**U.S. MAIL**

Thomas Newkirk, Esq.
Associate Director
Division of Enforcement
Securities and Exchange Commission
450 Fifth Street, N.W.
Mail Stop 8-5
Washington, D.C. 20549

Re: Cendant Corporation

Dear Mr. Newkirk:

We appreciate the opportunity that you have afforded us to submit this letter on behalf of our client, Cendant Corporation ("Cendant" or the "Company"), in furtherance of Cendant's request that the Staff refrain from asking Cendant to agree to entry of a cease and desist order by the Commission that includes a finding that Cendant violated Section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act") and Rule 10b-5 promulgated thereunder in connection with the accounting irregularities at former business units of CUC International Inc. ("CUC").

Cendant is prepared to work with the Staff to achieve an appropriate cease and desist order whereby Cendant neither admits nor denies any Commission finding. Cendant respectfully submits, however, that any such order should not be based in any way on a Commission finding that Cendant violated any of the antifraud provisions of the securities laws. As explained more fully below, such a finding would be unfair given the unique

circumstances of this case, unnecessary to satisfy the public interest and prejudicial to Cendant and its shareholders for the following reasons:

- Since discovery of the accounting irregularities 16 months ago, Cendant's current management and Board of Directors promptly disclosed and corrected the accounting irregularities and cooperated fully with the Staff and the United States Attorney for the District of New Jersey to determine those actually responsible for these acts. Charging Cendant with violating the antifraud provisions of the securities laws will deprive others of the incentive to make prompt corrective disclosures and to cooperate fully with federal law enforcement authorities upon discovery of problems similar to those faced by Cendant last year. It is not necessary effectively to punish a corporate citizen victimized by illegal acts to satisfy the public interest in this case. We submit that the public interest favors Commission action that encourage immediate and responsible corporate behavior upon discovery of illegality rather than sanctioning a company like Cendant, whose shareholders already have suffered greatly by virtue of the accounting irregularities, for the acts of a dishonorable few, with a finding that it committed securities fraud.

- Given the manner in which Cendant has behaved over the past 16 months, there simply is no basis on which to conclude that Cendant is likely to violate the antifraud provisions of the securities laws in the future.

- A cease and desist order based on a Commission finding that Cendant violated Section 10(b) and Rule 10b-5 would be prejudicial to Cendant because it would deprive Cendant, and persons who act on behalf of Cendant, of the "safe harbor" provisions recently added to the Securities Act of 1933 (the "1933 Act") and the

1934 Act. Under Sections 27A of the 1933 Act and 21E(b) of the 1934 Act, safe harbor protection does not apply to forward looking statements if, within 3 years preceding the date on which a challenged forward looking statement is made, the issuer has been made the subject of a cease and desist order requiring that it refrain from violating the antifraud provisions of the securities laws. Stripping Cendant and its incumbent officers and directors of this important statutory protection would not only be unnecessary but extremely ironic if not punitive given the manner in which incumbent Cendant management has caused the Company to behave following discovery of the accounting irregularities.

- A cease and desist order based on a Commission finding that Cendant violated Section 10(b) and Rule 10b-5 could also prejudice Cendant in pending civil litigation. Any such order would be premised on at least an implicit conclusion by the Commission that the state of mind of CUC's former chief financial officer and those who reported to him can be imputed to Cendant for purposes of establishing _scienter_, an indispensable element of any violation of Section 10(b) and Rule 10b-5. Although such a Commission finding would not be admissible or binding on Cendant, it would unfairly be used by plaintiffs' counsel to influence settlement negotiations and to affect the views of a judge or arbitrator.

From the outset, by its action and its words, Cendant has supported firm Commission action as a result of the fraud that took place at former CUC business units, including action based on Section 10(b) and Rule 10b-5. But Cendant submits that such action should be directed squarely and precisely at the parties who are in fact responsible for the fraud -- the _individuals_ who conceived it, implemented it and knew about it -- not a juridical entity that is comprised substantially of

assets contributed by an entity, HFS Incorporated ("HFS"), uninvolved in any accounting irregularities and that is currently managed by individuals, previously affiliated with HFS, who promptly disclosed and then corrected the very same fraud.

## Background

To put Cendant's views concerning this matter in an appropriate context, a brief review of certain background information will be helpful.

### A. Immediate Corrective Action Was Taken By Cendant Upon Discovery of the Accounting Irregularities

The CUC accounting irregularities were initially brought to the attention of Cendant's senior executive management late in the afternoon on Thursday, April 9, 1998. The following few days were devoted to intensive efforts to confirm the existence of the irregularities and to ascertain on a preliminary basis the nature of the irregularities and magnitude of their impact on Cendant's recently filed 1997 financial statements.

Based on its preliminary findings, the Company began the process of correction on April 15, 1998, less than one week after its senior executive team learned about the irregularities:

- Cendant terminated for cause the employment of Cosmo Corigliano, the former Chief Financial Officer of CUC and then the Chief Financial Officer of the Cendant subsidiary (Cendant Membership Services) in which the former CUC businesses were held. (Anne Pember, who was then believed to have participated in the accounting irregularities, had left Cendant in March 1998.);
- Cendant issued a press release disclosing to the investing public that it had discovered

potential accounting irregularities at former CUC business units, that it would restate its 1997 financial statements and that financial statements for prior periods might also be restated; and

- Cendant also announced that the Audit Committee of its Board of Directors had commenced an investigation into the accounting irregularities; that the Audit Committee retained an independent law firm, Willkie Farr & Gallagher ("Willkie Farr"), to assist it in investigating the accounting fraud; and that Willkie Farr, in turn, retained the accounting firm of Arthur Andersen LLP to provide accounting advice and assistance.

The Audit Committee investigation concluded in August 1998. Willkie Farr and Arthur Andersen delivered a 260 page report (the "Audit Committee Report") and accompanying binders of exhibits to the Audit Committee, all of which were provided to the Commission (and to the public) by Cendant. The Audit Committee Report became the primary basis on which Cendant subsequently restated its 1997 financial statements; CUC's financial statements for the years ended January 31, 1997 and January 31, 1996; and CUC's quarterly financial statements filed during calendar 1997 and 1996.

B. Cendant Has Cooperated Fully
<u>With the Staff and U.S. Attorney</u>

From the very outset of this unfortunate series of events, Cendant has provided the Staff and the United States Attorney for the District of New Jersey with immediate and full cooperation. More specifically, on behalf of Cendant, we contacted the Staff on the afternoon of April 15, 1998 and requested a prompt meeting. Our initial meeting with the Staff took place on Monday, April 20, 1998, during which Cendant shared with the Staff everything it had learned, and what it intended to do, about the accounting irregularities.

Over the following 16 months, Cendant has made Company representatives and advisers available to meet with the Staff on several occasions, provided the Staff with voluminous documentation and made appropriate personnel available to respond to the Staff's questions. Among the documents Cendant delivered to the Staff were copies of the interview memoranda prepared by Willkie Farr, and work papers prepared by Arthur Andersen in the context of the Audit Committee investigation. Significantly, Cendant elected to comply fully with the Staff's request for these materials, and did not invoke the attorney-client or work product privileges in response to the Staff's request (while preserving the privileged nature of these materials as to others).

Cendant also immediately and fully complied with the views of Division of Enforcement accounting personnel concerning how it should record revenues from membership businesses. Cendant agreed to comply with the Staff's views even though it had been advised by Arthur Andersen, and Cendant's auditor, Deloitte & Touche, was prepared to opine, that the accounting treatment Cendant previously had intended to use fully complied with generally accepted accounting principles.

Cendant has provided similar cooperation to the United States Attorney for the District of New Jersey and federal agencies assisting the U.S. Attorney, including United States Postal Inspector and Federal Bureau of Investigation (collectively, the "U.S. Attorney"). Cendant has delivered to the U.S. Attorney the same documents it has provided to the Staff over the past 16 months. Cendant has made numerous employees available to the U.S. Attorney for interviews. At its own considerable expense, Cendant also has arranged for the U.S. Attorney to have access to Arthur Andersen personnel in aid of the government's investigation.

C. Civil Litigation

As a result of the CUC accounting irregularities, Cendant is currently involved in an avalanche of civil litigation. The most substantial of these proceed-

ings is a consolidated class action pending in the United States District Court for the District of New Jersey on behalf of all purchasers of CUC or Cendant securities (other than PRIDES) after May 25, 1995. The complaints in all of the civil actions and arbitrations include claims under the Section 10(b) and Rule 10b-5. Each of those proceedings is at a relatively early stage, with various motions to dismiss having recently been denied in the New Jersey action.

**A Cease and Desist Order Based on a Commission Finding That Cendant Violated Section 10(b) and Rule 10b-5 Would Not Further the Public Interest**

A corporation can act only through individuals. Fraud can be conceived and implemented only by individuals. And fraud can be revealed and corrected only by individuals. These self-evident principles have been vividly illustrated by events involving Cendant over the past 16 months.

According to the Audit Committee Report, it was individuals such as Mr. Corigliano, Ms. Pember and persons who reported to them who directed and implemented the accounting irregularities. In sharp contrast to this misconduct, it was the individual members of Cendant's newly installed executive management team and Board of Directors, such as Henry Silverman and James Buckman, who caused Cendant promptly to disclose discovery of the accounting irregularities last April, who authorized the ensuing investigation into the accounting irregularities and who have committed Cendant to provide the Staff and the U.S. Attorney with cooperation in respect of these matters. Under these circumstances, we submit that a Commission finding that Cendant violated the antifraud provisions of the federal securities laws, and a related cease and desist order directing Cendant to refrain from committing any such violations, will tarnish the wrong people and is not necessary in this case.

Cease and desist orders are intended to deal with future misconduct. Thus, a cease and desist order

issued pursuant to Section 21C of the 1934 Act directs the respondent to refrain from future violation of the 1934 Act. Senate Report No. 101-337, 101st Cong., 2nd Session 1990 at 16 (concerning the Securities Law Enforcement Remedies Act of 1990, which added Section 21C to the 1934 Act). A cease and desist order also can provide a deterrent against future violations, which, unlike judicial injunctions, can be punished by penalties for violating the prior order. Id. Thus, even if a continuing or likely future violation is not an indispensable legal prerequisite to issuance of a cease and desist order pursuant to Section 21C of the 1934 Act, as it is in the context of an court-issued injunction, see S.E.C. V. Steadman, 967 F.2d 636,647 (D.C. Cir. 1992), it certainly is, at a minimum, an important if not controlling factor. Compare In the Matter of Warren Trepp, 1997 SEC Lexis 1682 (1997) (Foelak, ALJ) (proof of likelihood of future violation required); In the Matter of Joel Zbar, 1994 SEC Lexis 1289 (1994) (likelihood of recurrence not required but is material consideration) (Murray, ALJ). See also In the Matter of Alfred Bauer, 1999 SEC Lexis 19 (1999) (Foelak, ALJ).

Here, there simply is no on-going violation, and no likelihood of any future violation, of Section 10(b) or Rule 10b-5 by Cendant. All of the persons identified in the Audit Committee Report as having directed the fraud, and all of the CUC officers and directors to whom such persons reported, are no longer associated with Cendant. Moreover, incumbent Cendant management has demonstrated through its actions over the past 16 months that it is more than able and willing to cause the Company to disclose adverse information promptly, even at great personal expense.[1]

---

[1] The Cendant executive team, led by Mr. Silverman, had individually and collectively a substantial personal stake in Cendant securities as of April 15, 1998. In short, these individuals lost a vast amount of personal assets as a result of the decline in the market price of Cendant stock following the (continued...)

In addition, given the prompt corrective disclosure Cendant consistently has made, and given the nature and extent of the cooperation Cendant has supplied (and is continuing to supply) to the Staff and U.S. Attorney, charging Cendant with violating the antifraud provisions of the federal securities laws would not further -- and might well undermine -- an important public interest. Specifically, managers of public companies should be provided with an incentive to make prompt corrective disclosure, even if such disclosure would harm their company and result in personal losses, and cooperate fully with the Staff and other law enforcement authorities, when their firms are confronted with challenges similar to those faced by Cendant last year. To encourage such responsible corporate conduct, the right administrative response to an issuer such as Cendant, which already has suffered massively and which chose on its own to make such prompt disclosure and full cooperation (and not engage in further concealment, delay and stonewalling), should be to refrain from finding that the issuer committed fraud, especially in light of the consequences that would flow from such a finding, as described immediately below.

A Commission Finding That Cendant Violated Section 10(b) and Rule 10b-5 Would Unnecessarily Prejudice Cendant

A Commission finding that Cendant violated the antifraud provisions of the securities laws would be prejudicial to Cendant in two respects. First, Cendant and persons acting on behalf of Cendant would be deprived for three years of the protections of the safe harbor provisions of the 1933 and 1934 Acts. As you know, Sections 27A of the 1933 Act and 21E of the 1934 Act provide an issuer and those acting on its behalf with special statutory protections from securities litigation concerning forward looking statements. However, this

---

8 (...continued)
Company's April 15, 1998 and July 14, 1998 press releases.

"safe harbor" is not available if the issuer, within three years preceding a challenged forward looking statement, has been made the subject of an administrative decree that requires the issuer to cease and desist from violating the antifraud provisions of the securities laws.

Accordingly, to recommend that the Commission issue such a cease and desist order would not only be unnecessary but extremely unfair in view of the manner in which Cendant, and those who act on its behalf, have behaved over the past 16 months. In short, under the circumstances of this case, it would be manifestly unjust to deprive Cendant and its present officers and directors of this important statutory protection because of misconduct by others who are no longer associated with the Company.

A Commission finding that Cendant violated Section 10(b) and Rule 10b-5 and related cease and desist order could also prejudice Cendant's ability to protect its interests (and thus the interests of the thousands of investors who currently own Cendant securities) in the context of the existing civil litigation. Based on our meeting last week, we understand that the Staff does not at this time intend to recommend that the Commission make findings of fact beyond the information obtained in the Audit Committee Report. Thus, we understand that the Staff will not recommend that the Commission find that Walter Forbes (CUC's Chief Executive Officer and Chairman), E. Kirk Shelton (CUC's Chief Operating Officer) or any of the members of CUC Board of Directors knew about or participated in the accounting irregularities. Rather, based on the Audit Committee Report, recommended findings of fact concerning individual participants in the fraud will be focused on Mr. Corigliano, Ms. Pember and possibly other, more subordinate CUC employees who reported to them.

Under these circumstances, a finding by the Commission that Cendant violated Section 10(b) and Rule 10b-5 would necessarily imply that, in the Commission's view, the knowledge and state of mind of Mr. Corigliano

and Ms. Pember could properly be imputed to Cendant for purposes of establishing scienter on the part of Cendant. This could prejudice Cendant's ability to defend itself in the civil litigation in two respects.

First, Cendant intends to rely on a principle of agency law that the knowledge of an agent is not imputed to the principal where the agent is acting adversely to the principal's interests or is engaged in a fraud that would cause the principal to terminate the agent if it were disclosed. Thus, Cendant intends to establish that the knowledge of corporate agents like Corigliano, Pember and others who knew about or participated in the accounting irregularities can not be imputed to Cendant because those persons were acting adversely to the interest of Cendant (and CUC). See Kaplan v. Utilicorp United, Inc., 9 F.3d 405 (5th Cir. 1993) (holding in a securities litigation that adverse acts of an employee should not be imputed to the corporation); FDIC v. O'Melveny & Meyers, 969 F.2d 744, 750 (9th Cir. 1992), rev'd on other grounds, 512 U.S. 79, 1994); In re Phar-Mor, Inc. Securities Litigation, 900 F. Supp. 784, 786-87 (W.D. Pa. 1995).

Establishing this point will not require proof of looting or embezzlement by the disloyal agent. Beck v. Deloitte & Touche, 144 F.3d 732, 736-37 (11th Cir. 1998). As one district court has stated in this context, "a reasonable trier of fact could conclude that the true motive of the wrongdoers was the preservation of their employment, salaries and emoluments and reputation as well their liberty at the expense of [the issuer's] corporate well being." In re Phar-Mor, Inc. Securities Litigation, 900 F. Supp. at 786-787.

As you will recall, Mr. Corigliano or Ms. Pember refused to cooperate with the Audit Committee investigation. As far as we are aware, except for "general denials" by their lawyers, they have made no statements of any kind about the CUC accounting irregularities, including statements explaining their motivation for participating in the irregularities. Accordingly, we submit that the Commission should not, through a cease

and desist order against Cendant, effectively rush to judgment on the question of imputation, especially given the lack of any likelihood of a future violation by Cendant.

In addition, in defending the civil litigation, Cendant intends to rely on Section 201(a) of the Private Securities Litigation Reform Act ("PSLRA"), which is codified as Section 21D(g) of the 1934 Act. This statute provides that if an final judgment is entered against an issuer such as Cendant, the issuer is "liable jointly and severally for damages only if the trier of fact specifically determines that [the issuer] knowingly committed a violation of the securities laws." Under the PSLRA, a knowing violation occurs if the issuer makes an untrue statement of material fact with "actual knowledge" that the statement is false, or omits a material fact with "actual knowledge" that, as a result of such omission, a material representation is false. 15 U.S.C. § 78u-4(g)(10)(A)(i).

The PSLRA and the pertinent legislative history offer no direct guidance with respect to whether the acts of corporate agents can be imputed to a corporation and, if so, in what manner, for purposes of proportionate liability. There also has been, to our knowledge, no court rulings on these issues. Nonetheless, Cendant believes that there is a basis on which to conclude that (a) no such imputation is permissible as a matter of law; and (b) in any event, Cendant, the issuer, should bear little or no proportionate liability as a matter of fact.

It bears emphasis that Cendant is not asking the Staff or the Commission to adopt or otherwise approve our analysis concerning imputation generally or proportionate liability under the PSLRA. We are, however, emphasizing that a cease and desist order, based even in part on a Commission finding that Cendant violated Section 10(b) and Rule 10b-5, would, at least by implication, be premised on the theory that the misconduct of Mr. Corigliano and Ms. Pember and the persons who reported to them as set forth in the Audit Committee Report can be imputed to Cendant. Thus, such an order could

Thomas Newkirk, Esq.
August 16, 1999
Page 13

substantially prejudice Cendant. More specifically, although any such order or finding by the Commission would not be preclusive under principles of res judicata and related doctrines, it could be used by plaintiffs' counsel in an effort to influence settlement negotiations and to affect a judge's or arbitrator's views.

## Conclusion

Under the unique circumstances of this matter, we respectfully urge the Staff to refrain from requesting that Cendant agree to issuance of a cease and desist order that includes a finding by the Commission that Cendant violated Section 10(b) and Rule 10b-5. We look forward to discussing this matter further with you at your convenience.

Very truly yours,

Samuel Kadet

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
IN Civil Action No. 98-1664 (WHW)

SKD 001793

# EXHIBIT 30

ROBERT G. TORRICELLI
NEW JERSEY

COMMITTEES
GOVERNMENT AFFAIRS
JUDICIARY
RULES AND ADMINISTRATION

United States Senate

113 DIRKSEN SENATE OFFICE BUILDING
WASHINGTON, DC 20510-3003
(202) 224-3224

ONE RIVERFRONT PLAZA
[illegible] FLOOR
NEWARK, NEW JERSEY [illegible]
[illegible]

420 BENIGNO BLVD
KORMAN INTERSTATE BUSINESS [illegible]
SUITE [illegible]
BELLMAWR, NEW JERSEY [illegible]
[illegible]
http://www.senate.gov/[illegible]

## Memorandum

To: United States Attorney Faith Hochberg
Fr: United States Senator Robert Torricelli
Re: Cendant Corporation Investigation
Dt: July 28, 1998

As you well know, the shareholders of the newly created Cendant Corporation, located in Parsippany, have been victimized by the outrageous conduct of one of the [illegible]poration's new partners. It now appears that CUC International, which merged with HFS [illegible]ldings to form Cendant, allegedly fabricated significant amounts of business and sales in [illegible]er to make itself an enticing prospect for this partnership with HFS. CUC's Chief Financial [illegible]er has been fired, and audits conducted by outside agencies have now found a lengthy list o[illegible]egedly fraudulent and often completely fabricated, transactions.

The consequences for the shareholders have been dramatic, as I am certai[illegible]u have read in the newspaper

I understand from Mr. Henry Silverman, Cendant's CEO, that your offic[illegible] been examining this matter to further explore the nature of the conduct by CUC. Mr. Silv[illegible]n and his company are among the primary victims of this devious activity, which according t[illegible]dia reports may be one of the greatest corporate fraud actions in our nation's business history[illegible]roved true

Mr. Silverman would appreciate the opportunity to meet with you in order to thank you for your assistance. Mr. Silverman is very grateful for the U.S. Attorney's work on this matter. Furthermore, he would like to make clear that he and his colleagues remain ready and willing to provide any cooperation and assistance your office may need in pursuing this investigation. I believe it would be appropriate and courteous gesture if you would be able [illegible] meet with Mr. Silverman.

PRINTED ON RECYCLED PAPER

# EXHIBIT 31

4/13/98

Per WS to Jack Nussbaum
WS objectives:
1. Preservation of Co.
2. Protect Mgt
3. CUC mgt - fix appropriate responsibility and punish
4. CK D&O - handle as appropriate

Per Jack Nussbaum: - Process is:
1. Determine the facts
a. Not criticize if act properly
b. Can't sit, must take steps
c. Want cooperation of people (staff)

2. Could go to SEC [illegible]
[illegible] since don't know, don't go to SEC yet

3. [illegible] different.
Determine
Once determined [illegible] and [illegible]
B Managements [illegible] the [illegible]

4 Process includes getting financial:
a. [illegible]
b. [illegible]

# EXHIBIT 32

[illegible]

1st Q
Amazing [illegible] for 12 months / to [illegible] category.
1998 - [illegible] running
[illegible] the [illegible].
Not anticipated so [illegible] in 1st Q.

Cosmo Corigliano
Corporate Secretary
Amy Pember

Who's "they"?
old CFO (Cosmo Corigliano)
Asst to (Corporate Secretary) - VP Consolidations.
Cor

[illegible] Q - [illegible] what's that? [illegible]
Cosmo [illegible] (Kirk Shelton) had to know.

(Ann Pember) Controller. Became resp. for CEC Corp group financial reporting.

Still with co?
Pember resigned 2 weeks ago
Cosmo - [illegible] his resignation. (Do [illegible])

[illegible]
[illegible] ; [illegible] -- [illegible]
"[illegible]"

Kristi in CUC F/S [illegible] them?
[illegible].

[illegible]
1) [illegible] co.
2) [illegible] not tainted
3) Top 4-5 at CUC in [illegible], all out of CUC [illegible].
4) All Os/Ds totally gone. Our s/[illegible] totally [illegible]
[illegible] -

[illegible] A/A.
D:T - [illegible]
B: [illegible]
May 5-6 -- [illegible] 1st Q #5. [illegible]. STK Trading.

# EXHIBIT 33

# United States District Court

DISTRICT OF NEW JERSEY

TO:

CUSTODIAN OF RECORDS OR
ANY RESPONSIBLE OFFICER
CENDANT CORPORATION

SUBPOENA TO TESTIFY
BEFORE GRAND JURY

SUBPOENA FOR:
☒ PERSON ☒ DOCUMENTS OR OBJECT(S)

YOU ARE HEREBY COMMANDED to appear and testify before the Grand Jury of the United States District Court at the place, date, and time specified below.

| PLACE | ROOM / DATE AND TIME |
|---|---|
| UNITED STATES DISTRICT COURT<br>U.S.P.O. & COURTHOUSE BUILDING<br>FEDERAL SQUARE<br>NEWARK, NEW JERSEY 07101 | ROOM: GRAND JURY ROOM 483<br>DATE AND TIME: May 8, 1998 9:45am |

YOU ARE ALSO COMMANDED to bring with you the following document(s) or object(s):*

Any and all documents, records, or information of any type, whether in hard copy or on a computer, pertaining in any way to the preparation and filing of Cendant's most recent annual report, Form 10-K, with the Securities and Exchange Commission in or about March 1998.

Any and all documents, records, or information of any type, whether in hard copy or on a computer, pertaining in any way to the preparation of any corporate earnings estimates from January 1997 to the present.

☐ Please see additional information on reverse

This subpoena shall remain in effect until you are granted leave to depart by the court or by an officer acting on behalf of the court.

| CLERK | DATE |
|---|---|
| WILLIAM T. WALSH<br>(BY) DEPUTY CLERK<br>[signature] | April 17, 1998 |

| This subpoena is issued upon application of the United States of America | NAME, ADDRESS AND PHONE NUMBER OF ASSISTANT U.S. ATTORNEY |
|---|---|
| FAITH S. HOCHBERG<br>UNITED STATES ATTORNEY | MARK E. WINSTON, AUSA<br>(973) 645-2874 |

*If not applicable, enter "none."

To be used in lieu of AO110

FORM OBD-227

CONFIDENTIAL WFG 0037965

# EXHIBIT 34

**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

*Securities & Health Care Fraud Unit*

*970 Broad Street, Suite 700*
*Newark, New Jersey 07102*

*(973)645-2700*

November 7, 2005

**VIA Electronic Mail**

Honorable Alvin W. Thompson
United States District Court
for the District of Connecticut
Abraham Ribicoff Building
450 Main Street
Hartford, CT 06103

**Re: United States v. Walter A. Forbes**
**No. 3:02CR264 (AWT)**

Dear Judge Thompson:

Towards the conclusion of today's proceedings, you directed the Government to provide a response to Mr. Simon's letter to the Government dated Sunday, November 6, 2005, seeking "all correspondence or other written communications between Mr. Corigliano and/or his counsel and the SEC." That letter sought this disclosure "under Fed. R. Crim. P. 16, Brady, Giglio, and Jencks." Please allow this letter to set forth the Government's response to Mr. Simon's November 6 letter.

The Government does not possess any correspondence or other written communications between Mr. Corigliano and/or his counsel and the SEC, not previously disclosed to the defense, for which disclosure is required under either Fed. R. Crim. P. 16, Brady, Giglio, and Jencks. Mindful of its continuing disclosure obligations, if the Government receives any such material, it will promptly disclose it to the defense.

# EXHIBIT 35

**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

*970 Broad Street, Suite 700*
*Newark, New Jersey 07102*

*(973) 645-2700*

October 10, 2003

Thomas P. Puccio, Esq.
230 Park Avenue
Suite 301
New York, New York 10169

Barry S. Simon, Esq.
Williams & Connolly, LLP
725 Twelfth Street, N.W.
Washington, DC 20005

VIA FEDERAL EXPRESS

Re: United States v. Forbes, et al.
No. 3:02CR264 (AWT)

Dear Counsel:

We write to address several issues:

Deleted Files from Corigliano Computer

Please find enclosed a compact disk prepared by Kevin Mandia. It contains all the deleted files found on the Corigliano laptop. Counsel for Corigliano has reviewed the disk and is not asserting any privilege claims.

Kevin Kearney

Please be advised that in or about October 2003, Kevin Kearney met with Richard Schechter, James McMahon and John Pittman and then spoke with Richard Schechter, John Carney, John Pittman and Mark Gerber by telephone. Mr. Kearney indicated that:

1. After making topside adjustments to a quarterly consolidation that inflated the earnings per share for a quarter without support, Stu Bell directed him to adjust the EPS number again. Kearney indicated that Sabatino may have been present when Stu Bell gave this directive. Kearney does not recall if Stu Bell wanted the EPS number to be higher or lower. Kearney

does not recall whether Stu Bell invoked Walter Forbes's name when giving the directive but Kearney understood that Stu Bell had reviewed the proposed EPS number with Walter Forbes and was directing the adjustment as a result of Bell's review with Walter Forbes;

2. Corigliano had instructed Kearney to be aggressive in charging Sparks expenses to the merger reserves whenever possible and Kearney did charge expenses to the Sparks reserves even where the expense did not technically qualify as a merger related expense;

3. He had very little interaction with Shelton when Kearney was the controller of Sparks but does recall Rick Fernandez telling Kearney that he (Fernandez) did keep Shelton informed of what was happening at Sparks; and

4. Stu Bell and Corigliano requested Kearney's assistance to enable them to increase the number of weighted shares outstanding so that a prior year's EPS number would be effectively lowered. Kearney understood that the request was made to enable the company to grow off a lower base. Kearney assisted Stu Bell and Corigliano by changing the effective tax rate to compute the common share equivalents used to build the previous years weighted average shares outstanding.

<u>Anne Pember</u>

Anne Pember met with the Government in Hartford on September 30 and October 1, 2003. James McMahon, Richard Schechter, John Carney, FBI Special Agents John Pittman and Mark Gerber, Postal Inspector Pat Mathews and Pember's attorney were present. At this meeting, Pember made the following statements that are not otherwise recorded in discovery already produced by the Government in this case:

1. Pember recognized the format of the September 13, 1995 "cheat sheet" bearing Bates number 702456 but did not remember seeing this particular document.

2. Kirk Shelton would refer to Corigliano's "forecast" when referring to the "cheat sheet." Corigliano told Pember that only Shelton and he received the cheat sheets.

3. Pember typed a Fall 1997 version of the cheat sheet into her computer.

4. The controllers of the CUC subsidiaries and

divisions were not aware of the topside adjustments.

5. At the quarter ending October 1997, she noticed that Sabatino was making large adjustments to CUC's financial results. She asked Corigliano if he knew about these adjustments. Corigliano responded by saying, in substance, that Sabatino used to have support for these adjustments. Pember stated that Corigliano used the word "support" loosely, meaning that he would refer to documents as support when, in fact, they were fraudulent or not at all supporting.

6. In the quarter ending October 1997, she realized that the topside adjustments had been done in the past when the previous topsides were reversed out.

7. Shelton got the monthly financial reporting packages that Sabatino received from the divisional and subsidiary controllers. He also received the projection models for those divisions that did them, including Comp U Card.

8. In October 1997, Pember learned that she would be reporting to Scott Forbes once the merger was finalized. At that point, she decided that she wanted to leave CUC. She arranged to meet with Corigliano on the morning of Columbus Day to tell him she wanted to leave. When she arrived in Corigliano's office, she found Shelton and Corigliano there waiting for her. The three of them discussed how to deal with the proposal that Pember report to Scott Forbes. Shelton offered to put her in charge of all subsidiaries or divisions that had merger reserves.

9. After Shelton left this meeting, Pember told Corigliano she wanted to resign. Corigliano at first attempted to talk her out of resigning. The two of them then discussed the possible terms of Pember's severance package.

10. Corigliano subsequently met with Pember again. He encouraged her to stay at CUC and told her that Shelton wanted her to stay. He said that Shelton was willing to give her a bonus of $125,000 if she stayed at CUC through May 1. Pember agreed to think about it.

11. Later that day or the next day, Shelton called Pember into his office to verify that Corigliano had extended the above offer to her. He assured Pember he would work out an arrangement with HFS in which she would not have to report to Scott Forbes.

12. During this time period, Pember received calls

from CUC executives Anthony Menchaca, Kathy Pirro and John Fullmer in which those individuals encouraged her to stay at CUC.

13. Pember eventually signed an agreement with CUC that contained, among other things, the stay bonus described above.

14. In or about November 1997, Pember went on a business trip to Europe with other CUC executives and Henry Silverman. Walter Forbes saw Pember in the hallway of the hotel and told her in substance that we're going to take care of you.

15. Pember gave various versions of the spreadsheet entitled twinres.xls to Shelton at Corigliano's request.

16. Corigliano told her to charge Walter Forbes' plane expenses against the HFS merger reserve. The handwriting identifying the account number as that for the HFS merger reserve is hers. She recognizes Shelton's and Menchaca's signatures. She does not recognize the other handwriting.

17. If these plane expenses had not been charged to the merger reserve, they would have been classified as travel and entertainment expenses and thus reported to the Board of Directors.

18. Walter Forbes would have received a check for the plane expenses.

Mary Polverari

Mary Polverari met with the Government in White Plains on October 7, 2003. James McMahon, Richard Schechter, FBI Special Agent John Pittman and Polverari's attorneys were present. At this meeting, Polverari made the following statements that are not otherwise recorded in discovery already produced by the Government in this case:

1. She remembers that: 1) former First Assistant U.S. Attorney Robert Cleary told her that she would not be prosecuted for crimes she may have committed while employed at CUC; 2) Cleary did not attach any conditions to this statement; 3) former AUSA Paul Weissman was less precise about her status; and 4) she believed that Weissman was subordinate to Cleary.

2. While employed at E&Y, she worked on an initial public offering of an E&Y client.

3. The Excel spreadsheet on which she did the monthly consolidations of the financial statements of CUC's subsidiaries and divisions was on her computer. Her computer was located in her office on the third floor of CUC's office at 707 Summer Street in Stamford. When CUC remodeled this office in or about 1996, she was moved to a cubicle on the same floor. Her computer was then located in her cubicle. She subsequently moved to an office on the first floor of CUC's other building on Summer Street.

4. She does not remember whether she needed a password to gain access to her computer. She remembers that she received e-mail on this computer.

5. The monthly financial reporting packages came in from the subsidiaries and divisions approximately 21 days into the next month. The Comp U Card division would sometimes be late with the monthly reporting package. It took her two to three days to complete her consolidations. She input both income statement and balance sheet information into her consolidation spreadsheet. She did not ask anyone to check her work. She believed that she input the figures she received accurately because the income statements and balance sheets would balance.

6. At the quarter ends, she gave a copy of the spreadsheet to Kearney and Sabatino and, later, to Pember and Sabatino once she input the information she received from the subsidiaries and divisions into her spreadsheet. She sometimes included a draft press release with the spreadsheet.

7. No one told her not to discuss the topside adjustments she made. Based on the nature of the topside adjustments, she eventually came to believe that she should not discuss them with E&Y.

Issues Outstanding in Discovery Brief

In addition, we have some outstanding issues that were raised in our response to Forbes Motion 50 and Shelton Motions 18 and 19.

On pages 39-40 and 46-47 of this brief, we stated that we would contact former AUSAs to determine if they were aware of any oral communications with witnesses or courts, respectively, relating to the administrative stay of the SEC's civil case against the cooperators that could possibly be considered Brady or Giglio. There is no such information.

On page 44 of this brief, we stated that we would contact former AUSAs to determine if they were aware if any Brady or Giglio information existed with regard to the Government's and grand juries' decisions about who should be charged in this matter. There is no such information.

On page 50 of this brief, we stated that we would contact former AUSAs to determine if there was any information regarding any efforts by the Government to lobby the SEC on behalf of the three cooperating witnesses. Both Messrs. Cleary and Weissman recall that they suggested to SEC representatives that the SEC consider these witnesses' cooperation to date in the negotiations between the SEC and the witnesses to settle the SEC's civil case. The SEC representatives did not agree with these suggestions. Mr. Weissman also mediated discussions between the SEC and counsel for Corigliano and Pember relating to the arrangement under which these witnesses submit quarterly financial statements to the SEC.

Counsel for the SEC have completed their review and production of their documents to us. We have produced all such documents to you. Accordingly, the production of documents from the SEC to the defense, including all Wells submissions, all settlement agreements, all financial data provided by the witnesses and all notes of witness interviews, is complete. In addition, SEC counsel has advised us that they have no undisclosed Brady or Giglio information.

Very truly yours,

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice

By: JOHN J. CARNEY
Special Attorney
U.S. Department of Justice

By: JAMES MCMAHON
Special Attorney
U.S. Department of Justice

By: RICHARD SCHECHTER
Special Attorney
U.S. Department of Justice