UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 3:02CR264 (AHN) |
| v. | ) | |
| WALTER A. FORBES | ) | March 31, 2006 |

MEMORANDUM IN SUPPORT OF MOTION OF
DEFENDANT WALTER A. FORBES TO COMPEL DISCOVERY
AND PRODUCTION OF <u>BRADY/GIGLIO</u> MATERIAL
(<u>Forbes Third Trial Motion No. 2</u>)

Defendant Walter A. Forbes, through undersigned counsel, respectfully submits this memorandum in support of his motion to compel the government to comply with its obligations to provide discovery and <u>Brady/Giglio</u> material.[1]

## INTRODUCTION

Despite the advanced stage of these proceedings, Mr. Forbes has not received from the government all of the discovery and information to which he is entitled under Fed. R. Crim. P. 16, <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), <u>Giglio v. United States</u>, 405 U.S. 150 (1972), and this District's Standing Order on Discovery. The government has either failed or refused to produce important impeachment material relating to prosecution witnesses. The documents and information withheld by the government include significant impeachment

---

[1] In a separate pleading, Mr. Forbes also has renewed certain previously-filed motions for discovery and production of <u>Brady</u> and <u>Giglio</u> material. This memorandum addresses the issues as to which Mr. Forbes seeks additional argument at this juncture.

Oral Argument Requested

material concerning the government's key witness, Cosmo Corigliano.

The jury's assessment of Mr. Corigliano's credibility is of critical importance in this case. Mr. Corigliano is the only witness who claims to have personal knowledge of Mr. Forbes' purported involvement in criminal activity. Mr. Corigliano's uncorroborated testimony that he participated in a series of meetings and conversations with Mr. Forbes in which Mr. Forbes purportedly directed him to falsify CUC's accounting is the foundation of the government's case. If the jury does not credit Mr. Corigliano's testimony, Mr. Forbes will receive a not guilty verdict.

Mr. Corigliano is an acknowledged criminal and serial liar who is cooperating with the government in exchange for a staggering array of financial and other benefits. Yet both he and the government contend that, following Mr. Corigliano's January 14, 2000 plea agreement, Mr. Corigliano was transformed into a law-abiding citizen and a truth-teller. Mr. Corigliano is a carefully rehearsed witness who has had at least 85-95 meetings with the government, see Tr. (11/1/05) at 1453, including approximately twenty meetings devoted to preparing his testimony at Mr. Forbes' 2005 trial, id. at 1453, 1455-56. Although Mr. Corigliano was caught in a number of material lies at both the 2004 and 2005 trials, see Forbes Third Trial Motion in Limine No. 1 (filed herewith), the government continues to present him as a truthful witness who has fulfilled his obligations under his plea agreement and whose testimony the jury should believe.

"By definition, criminal informants are cut from untrustworthy cloth and must be managed and carefully watched by the government and the courts to prevent them from falsely accusing the innocent, from manufacturing evidence against those under suspicion of crime, and from lying under oath in the courtroom." United States v. Bernal-Obeso, 989 F.2d 331, 333 (9th

Cir. 1993); see also United States v. Prawl, 168 F.3d 622, 627-29 (2d Cir. 1999) (approving

pattern instructions requiring close scrutiny of accomplice testimony). The government's refusal

to provide significant impeachment material with respect to Mr. Corigliano and other

prosecution witnesses conflicts with its responsibility "to take all reasonable measures to

safeguard the system against treachery," including its "duty as required by Giglio to turn over to

the defense in discovery all material information casting a shadow on a government witness's

credibility." Bernal-Obeso, 989 F.2d at 334.

     The information and documents the government continues to withhold with

respect to Mr. Corigliano and other government witnesses is of critical importance to Mr.

Forbes' ability to impeach the prosecution's witnesses. We respectfully submit that the Court

should order the government to provide the documents and information enumerated below.[2]

## ARGUMENT

## I.    THE GOVERNMENT'S DISCOVERY OBLIGATIONS.

     Under the Due Process Clause of the Fifth Amendment, the government has an

obligation to disclose evidence favorable to the defendant that is material to either guilt or

punishment. See United States v. Bagley, 473 U.S. 667, 676 (1985); United States v. Agurs, 427

U.S. 97, 110-11 (1976); Giglio v. United States, 405 U.S. 150, 154 (1972); Brady v. Maryland,

373 U.S. 83, 87-88 (1963); United States v. Gil, 297 F.3d 93, 101 (2d Cir. 2002); Standing Order

¶ A(11).

---

[2]    On March 21, 2006, Mr. Forbes sent a discovery letter to the government. See Exhibits
in Support of Motions Filed by Walter A. Forbes on March 31, 2006, Exhibit 1. (To avoid
duplication, Mr. Forbes is filing a set of Exhibits which supports several of the motions he is
filing today, including this motion). The vast majority of the items discussed in the March 21,
2006 letter are not new requests, and have been the subject of one or more previous letters and/or
prior motions practice.

The government's constitutional duty to disclose encompasses not only exculpatory evidence, but impeachment evidence as well. See Kyles v. Whitley, 514 U.S. 419, 433 (1995) ("[T]he Court [has] disavowed any difference between exculpatory and impeachment evidence for Brady purposes . . . ."); Bagley, 473 U.S. at 676 ("Impeachment evidence, . . . as well as exculpatory evidence, falls within the Brady rule."); Giglio, 405 U.S. at 154; Gil, 297 F.3d at 101; Standing Order ¶ A(10). The Supreme Court has recognized that "if disclosed and used effectively, [impeachment evidence] may make the difference between conviction and acquittal." Bagley, 473 U.S. at 676.

The government's Brady and Giglio obligations in this case clearly extend to documents and information in the possession of the SEC. The prosecution has an affirmative duty to review and produce such materials and information. See, e.g., Kyles, 514 U.S. at 437 (prosecutor has a "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case"); United States v. Payne, 63 F.3d 1200, 1208 (2d Cir. 1995) (quoting Kyles). Mr. Forbes also is entitled to discovery of internal government documents containing Brady or Giglio material even where work product protection otherwise applies. See United States v. Jackson, 850 F. Supp. 1481, 1505 (D. Kan. 1994) (ordering government to review internal documents to "determine if they contain material impeachment evidence"); United States v. Goldman, 439 F. Supp. 337, 350 (S.D.N.Y. 1977) ("reports, memoranda, or other internal government documents" must be produced "if the material [is] of a Brady nature") (quotation omitted).[3]

_____

[3]    See also United States v. American Cyanamid Co., No. 60 Civ. 3857-CLB, 1975 WL 987, at *1 (S.D.N.Y. Oct. 28, 1975), modified, 1975 WL 992 (S.D.N.Y. Nov. 12, 1975) (ordering in camera review of "internal Government memoranda, containing some legal opinions and evaluations by staff attorneys"; "the protection granted to 'work product' will not rise to the

Under Fed. R. Crim. P. 16(a)(1)(C), the government is required to produce any document that will assist the defense in "uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." United States v. Lloyd, 992 F.2d 348, 351 (D.C. Cir. 1993) (quotation omitted). Indeed,

> [a] narrow view of Rule 16(a)(1)(C) is inappropriate; failure to provide reasonably available material that might be helpful to the defense and which does not pose any risks to witnesses or to ongoing investigation is contrary to requirements of due process and to the purpose of the Confrontation Clause.

United States v. Zanfordino, 833 F. Supp. 429, 432 (S.D.N.Y. 1993).[4] The government's discovery obligations encompass all documents that are in its control, but not its physical possession, that constitute Rule 16, Brady, or Giglio material. See, e.g., United States v. Skeddle, 176 F.R.D. 258, 261 n.5 (N.D. Ohio 1997); Scott v. Arex, Inc., 124 F.R.D. 39, 41 (D.

---

point of frustrating what has apparently been deemed to be a right of constitutional dimensions. The Brady rule requires the Government to disclose those materials which are "favorable to an accused" and which "tend to exculpate or reduce the penalty"); United States v. Eley, 335 F. Supp. 353, 354, 357-58 (N.D. Ga. 1972) (ordering government to produce "[a]ll reports and memoranda prepared on behalf of the Government or otherwise in connection with the investigation of this case" that contain Brady material); 2 Charles Alan Wright, Federal Practice & Procedure § 254.2, at 141 (3d ed. 2000) ("Because Brady is based on the Constitution, it overrides court-made rules of procedure. Thus, the work-product immunity for discovery in Rule 16(a)(2) prohibits discovery under Rule 16 but it does not alter the prosecutor's duty to disclose material that is within Brady."), quoted in United States v. Armstrong, 517 U.S. 456, 475 (1996) (Breyer, J., concurring).

[4]    See also United States v. Lloyd, 71 F.3d 408, 413 (D.C. Cir. 1995) (reversing and remanding for new trial on certain counts based on government's failure to produce material documents); United States v. Halpin, 145 F.R.D. 447, 450 (N.D. Ohio 1992) ("[E]vidence that is material to the preparation of the defendant's defense has been broadly construed to allow discovery of documents for which there is a strong indication that they will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment and rebuttal.") (internal quotations omitted); United States v. Poindexter, 727 F. Supp. 1470, 1473 (D.D.C. 1989) ("The language and the spirit of [Rule 16] are designed to provide to a criminal defendant, in the interest of fairness, the widest possible opportunity to inspect and receive [discoverable] materials . . . .").

Conn. 1989) ("The word 'control' is to be broadly construed.  A party controls documents that it has the right, authority, or ability to obtain upon demand.").

## II.    DOCUMENTS AND INFORMATION RELATING TO COSMO CORIGLIANO.

The categories of impeachment material withheld by the government with respect to Mr. Corigliano are set forth below.

### A.    Communications Between Mr. Corigliano and/or His Counsel and the SEC.

#### 1.    Background.

Mr. Corigliano entered into a plea agreement with the government on January 14, 2000.  See Exhibit 2 (Corigliano plea agreement).[5]  The agreement requires Mr. Corigliano, inter alia, to "truthfully disclose all information he possesses concerning any matters about which [the U.S. Attorney's] Office and other government agencies designated by this Office, including . . . the SEC, may inquire of him."  Id. at 2.  The agreement also requires Mr. Corigliano, inter alia, to "use his best efforts" to settle any claims asserted by the SEC, and "to provide the SEC, upon request, with complete and accurate information regarding his ability to pay any such settlement in the form ordinarily required by the SEC."  Id., Schedule A ¶ 12.  At the 2005 trial, the government affirmatively elicited testimony from Mr. Corigliano concerning his purported compliance with his obligations under the plea agreement, including his disclosure obligations with respect to the SEC.  See Tr. (11/1/05) at 1452-53.

Mr. Forbes has consistently sought the production of all communications between Mr. Corigliano or his counsel and the SEC.  The New Jersey U.S. Attorney's Office and the SEC have been conducting a joint investigation of accounting irregularities at CUC and Cendant since

---

[5]    All Exhibit references herein are to the Exhibits in Support of Motions Filed by Walter A. Forbes on March 31, 2006, filed contemporaneously herewith.

1998. The government has an open-access letter with respect to the SEC and has repeatedly acknowledged its obligation to produce materials in the possession of the SEC. See, e.g., Tr. (7/27/04) at 9026 (Mr. Carney: "whatever the SEC had, they've given to the Justice Department. Whatever the Justice Department has, we've given to the defense."); Docket No. 1643 at 7 & n.5.

During the 2004 trial, the government belatedly produced significant correspondence between Mr. Corigliano's counsel and the SEC. See Docket No. 990. In August 2005, in response to a renewed discovery motion filed by Mr. Forbes, the government represented that "[a]s of July 24, 2004, the Government transmitted to the defendants all remaining documents in possession of the SEC that pertained to the Corigliano investigation" that had not previously been disclosed to the defense. See Docket No. 1643 at 7 n.5.

The government's August 15, 2005 representation was demonstrably inaccurate. On November 6, 2005, Mr. Corigliano's counsel attached as exhibits to a pleading three significant letters between Mr. Corigliano's counsel and the SEC that had never been produced by either the government or Mr. Corigliano. See Exhibits 3-5 (Exhibits A-C to Opposition of Non-Parties Cosmo Corigliano and Kramer Levin to Forbes' Motion for Enforcement of Subpoena Calls) (Docket No. 1944). The three letters address SEC demands for information from Mr. Corigliano pursuant to his plea agreement, reveal conflicts between Mr. Corigliano's counsel and the SEC concerning the extent to which Mr. Corigliano had complied with SEC requests for financial disclosure, and reflect that then-AUSA Paul Weissman acted as an intermediary with the SEC on Mr. Corigliano's behalf. See id. The letters also make reference to additional correspondence between Mr. Corigliano's counsel and the SEC which still has not

been produced to the defense.[6]

Immediately after receiving the November 6, 2005 pleading, counsel for Mr. Forbes wrote to the government to renew Mr. Forbes' request for all communications between Mr. Corigliano or his counsel and the SEC. See Exhibit 6. Defense counsel also renewed Mr. Forbes' request, under Brady and Giglio, for all information in the government's possession (whether written or oral) concerning communications between Mr. Corigliano and/or his counsel and the SEC, including the specific communications referenced in the correspondence disclosed for the first time on November 6, 2005. See id. The government responded that it had no additional correspondence or written communications between the SEC and Mr. Corigliano or his counsel that it was required to disclose. See Exhibit 34. Defense counsel renewed Mr. Forbes' request for these materials (as well as oral Brady and Giglio) in a March 21, 2006 discovery letter (see Exhibit 1, ¶¶ 2-3), to which the government has not responded.

2.    **Mr. Corigliano's Failure To Comply with SEC Requests for Financial Disclosure.**

a.    **Completion of SEC Financial Disclosure Form.**

The three letters attached to the November 6, 2005 Corigliano pleading (and never produced by the government) are highly significant, and raise serious questions about the veracity of Mr. Corigliano's testimony that he has fully complied with his obligations under the

---

[6]    The first of the three letters attached to the Corigliano pleading makes reference to a May 15, 2000 letter from Thomas Newkirk of the SEC to Kramer Levin and at least three letters dated March 30, 2000, none of which has been produced by the government or Mr. Corigliano. See Exhibit 3 (Exhibit A to Docket No. 1944). The letter also makes reference to a May 2, 2000 communication between Mr. Corigliano's counsel and Director Walker of the SEC. Id. at 2. The second letter appended to the pleading makes reference to a meeting between Mr. Corigliano's counsel and the SEC on May 19, 2000. See Exhibit 4 (Exhibit B to Docket No. 1944). Neither the government nor Mr. Corigliano has supplied any information to the defense concerning those communications.

plea agreement with respect to the SEC. The first of the three letters, dated May 16, 2000, reflects a dispute between the SEC and Mr. Corigliano's counsel concerning the SEC's requests for financial disclosure by Mr. Corigliano. The letter, from Mr. Corigliano's counsel to the SEC (and copied to AUSA Weissman), reflects that the SEC took the position that it had repeatedly requested financial disclosure from Mr. Corigliano pursuant to the plea agreement, but had not received the requested information. See Exhibit 3 at 1. Mr. Corigliano's counsel took issue with the SEC's position, id., but assured the SEC that Mr. Corigliano would meet all of his obligations under the plea agreement. Id.

The second letter, dated May 24, 2000, from Mr. Corigliano's counsel to the SEC, again assured the SEC that Mr. Corigliano would comply with his financial disclosure obligations under the plea agreement. See Exhibit 4. The letter states that Mr. Corigliano's counsel represented to SEC staff on May 19, 2000 "that Cosmo would fill out the financial disclosure form you have provided -- which also requests transfer information." Id. (emphasis added). The letter acknowledged that the SEC wished to receive certain information "from Cosmo directly as part of any financial disclosure rather than from Fried Frank." Id. (emphasis added). It also represented that "Cosmo is working on the financial disclosure form, and we will supply that information to you as promptly as we possibly can." Id. (emphasis added).

The form referenced in the May 24, 2000 letter is the SEC's standard Statement of Financial Condition form. See Exhibit 7. The SEC provided the form to Mr. Corigliano's counsel in March 2000. See id. The form required a variety of detailed financial information, including information about all asset or cash transfers in excess of $1000 during the prior five years, and was to be signed by Mr. Corigliano under penalty of perjury. Id.

9

In the May 24, 2000 letter, Mr. Corigliano's counsel cautioned that "providing the written responses to [the SEC's] detailed form would require some time" as he "was cognizant of the need in representing an important cooperating witness to be precise and accurate in our written responses since even small, minor or inadvertent inconsistencies could provide unnecessary potential fodder for future cross-examination of Mr. Corigliano – an interest the government shares." Exhibit 4. The next day the SEC wrote back stating that it had been informed by AUSA Weissman that at least some of the financial information – including asset valuation and asset transfer information – was ready for transmittal. Exhibit 5. On May 26, 2000, Mr. Corigliano's counsel supplied a letter to the SEC that was not signed by Mr. Corigliano himself and did not provide all of the information sought by the SEC standard disclosure form. See Exhibit 8. The May 26, 2000 letter failed to disclose a number of significant asset transfers and expenditures that were called for by the standard SEC form, such as Mr. Corigliano's payment to his counsel of a legal retainer exceeding two million dollars and several substantial payments to Mr. Corigliano's father.[7]

---

[7]    By not completing the standard SEC financial disclosure form, which clearly required disclosure of all cash transfers in excess of $1000, Mr. Corigliano avoided disclosing to the SEC, inter alia, the existence of the substantial retainer he paid his counsel in 1998 and 1999. Mr. Forbes learned about some of the significant retainer payments from documents produced pursuant to a third party subpoena. The retainer was never disclosed by the government. It appears that Mr. Corigliano did not disclose the existence of this retainer (or the existence of a separate retainer paid to the firm representing Mr. Corigliano's wife) to the SEC until sometime in 2004. See Tr. (7/26/04) at 8715. Mr. Corigliano claimed that he did not list the retainer as an asset in any of his quarterly reports to the SEC because he did not view it as his money. Tr. (7/20/04) at 8110. In fact, as a document produced to the defense in November 2005 (over objection by Mr. Corigliano and the government) reveals, Mr. Corigliano received a refund of $1,000,000 from his counsel "as unneeded after he entered into his plea agreement." Exhibit 20, Ex. C.

Despite Mr. Corigliano's obligation under the plea agreement to "truthfully disclose all information he possesses concerning any matters about which . . . . the SEC[] may inquire of him," Exhibit 2 at 2, and "provide the SEC, upon request, with complete and accurate information regarding his ability to pay any . . . settlement in the form ordinarily required by the SEC," id., Schedule A ¶ 12, and despite the representations made by Mr. Corigliano's counsel to the SEC on May 24, 2000, Mr. Corigliano did not provide an executed copy of the standard SEC financial disclosure form, under oath, to the SEC.[8]  Instead, in the words of Mr. Corigliano's counsel, Mr. Corigliano "ultimately decided to provide the SEC Staff with something less than the complete and sworn Statement of Financial Condition form." Docket No. 1944 at 9.

Thus, Mr. Corigliano either defied the SEC's request that he complete the ordinary SEC financial disclosure form under penalty of perjury or was excused by the SEC from that obligation.  If the former is the case, then Mr. Corigliano violated his financial disclosure obligations under the plea agreement and falsely testified to his full compliance with the agreement.  If the latter is the case, then Mr. Corigliano was permitted to disregard the obligations enumerated in the plain language of his plea agreement and was accorded special treatment by the SEC in light of his status as "an important cooperating witness." Exhibit 4.[9]  In

---

[8]    No such document has ever been produced to the defense.  According to Mr. Corigliano's counsel, "Mr. Corigliano was never required to submit that disclosure form." Docket No. 1944 at 6.  In September 2004, after Mr. Corigliano's final settlement with the SEC, and after Mr. Coriglaino was cross-examined concerning the retainer payments at the 2004 trial, he executed a financial affidavit under oath disclosing the payments. See Exhibit 20, Exhibit C.

[9]    To the extent that the SEC relented from its initial request for full and complete asset transfer information from Mr. Corigliano (as required by the financial disclosure form the SEC gave to Mr. Corigliano's counsel in March 2000) (Exhibit 7), that would be a further benefit to Mr. Corigliano and further evidence that he was permitted to violate his obligations under the plea agreement with impunity.

either case, all communications between Mr. Corigliano or his counsel and the SEC concerning

requests for financial disclosure constitute Brady, Giglio, and Rule 16 material that should be

produced by the government.  Similarly, the government should be required to produce all oral

Brady and Giglio concerning this subject matter, including the substance of all oral

communications between the SEC and Mr. Corigliano or his counsel on these subjects.[10]

In addition, the government should produce all information in its possession,

custody, or control (including oral Brady and Giglio) concerning the efforts made by

representatives of the U.S. Attorney's Office, including former AUSA Weissman, to mediate

disputes between Mr. Corigliano and the SEC concerning Mr. Corigliano's obligations under his

plea agreement and/or to persuade the SEC to excuse Mr. Corigliano from his disclosure

obligations or to modify the SEC's demands for financial disclosure.[11]  The government also

---

[10]    To comply with its Brady/Giglio obligations, the government must, inter alia, disclose agreements with and promises to cooperating witnesses whether or not they are in writing.  See Giglio, 405 U.S. at 154-55; Silva v. Brown, 416 F.3d 980, 986 (9th Cir. 2005); see also Hayes v. Brown, 399 F.3d 972 (9th Cir. 2005) (en banc) (due process violated when cooperating witness testified falsely about oral agreement between witness's counsel and government even though witness was unaware of it).

[11]    In a 2003 response to a motion filed by Mr. Forbes, the government represented:  "Forbes seeks information regarding any efforts by the Government to lobby on behalf of the cooperating witnesses.  The Government will produce such impeaching information, if it exists, and is contacting the former AUSAs on the case to determine what, if any, information exists in this area."  Docket No. 359 (filed 8/5/03) at 50.  On October 10, 2003, the government supplied a letter to defense counsel in which it stated that both former U.S. Attorney Cleary and former AUSA Weissman had suggested to the SEC that it consider the cooperating witnesses' cooperation, but that the SEC had disagreed.  See Exhibit 35 at 6.  The government also disclosed that Mr. Weissman "mediated discussions between the SEC and counsel for Corigliano and Pember relating to the arrangement under which these witnesses would submit quarterly financial statements to the SEC."  Id.  In a hearing on October 23, 2003, defense counsel challenged the adequacy of the information supplied by the government, and government counsel represented that additional inquiries would be made.  Tr. (10/23/03) at 138-43.  Despite that representation, the government never produced the May 2000 letters attached to the November 2005 Corigliano pleading, which indicate that Mr. Weissman was involved in

12

should supply all information concerning any communications (oral or written) between the SEC

and the U.S. Attorney's Office concerning Mr. Corigliano's disclosure of financial information

to the SEC or his compliance or lack of compliance with requests made by the SEC for financial

or other information.  To the extent the government was aware of and excused Mr. Corigliano's

failure to comply with his obligations to the SEC under the plain language of his plea agreement,

that is further evidence of the special treatment the government's star witness has received in this

case.[12]

### b.    SEC Requests for Tax Returns.

Defense counsel are in possession of information indicating that Mr. Corigliano

failed to supply his 2002 tax return to the SEC in the fall of 2003, despite the SEC's request for

that document.  If that is the case, it is further evidence of Mr. Corigliano's ability to violate his

obligations under his plea agreement without suffering adverse consequences.

In September 2003, the SEC asked Mr. Corigliano's counsel about his 2002 tax

return.  It appears that the SEC requested a copy of the return.  See Exhibit 9, Tab 1.  On

---

mediating SEC requests for financial disclosure at a time well before the subject of quarterly
financial reports was raised.  Nor did the government disclose that Mr. Weissman was involved
in the SEC's requests that Mr. Corigliano supply asset transfer information.  As discussed supra,
in August 2005 the government erroneously represented that it had produced "all remaining
documents in possession of the SEC that pertained to the Corigliano investigation."  Docket No.
1643 at 7 n.5.

[12]    During the 2005 trial, Judge Thompson erroneously precluded cross-examination of Mr.
Corigliano concerning, inter alia, his counsel's communications with the SEC.  See Notice of
Filing of Documents Relating to Cross-Examination of Mr. Corigliano Precluded By the Court
(filed 11/21/05) (Docket No. 2000).  Any testimony elicited by the government concerning Mr.
Corigliano's purportedly full compliance with his obligations under the plea agreement raises
issues under Napue v. Illinois, 360 U.S. 264 (1959), United States v. Wallach, 935 F.2d 445 (2d
Cir. 1991), and their progeny.  Mr. Forbes will address this issue  (as well as additional Wallach
issues concerning Mr. Corigliano) in a motion in limine to be filed on April 14, 2006.

September 4, 2003, Mr. Corigliano's counsel wrote to SEC counsel James Kidney regarding "the questions you left in your voicemail." Id. at 1. In the letter, Mr. Corigliano's counsel asserted that "Mr. Corigliano has not yet filed tax returns for 2002." Id. at 2. Documents produced by third parties, however, indicate that Mr. Corigliano's accountant provided him his completed 2002 tax return on or about March 19, 2003, presumably for filing by April 15, 2003. See Exhibit 9, Tab 2. The (undated) 2002 tax return signed by Mr. Corigliano is identical to the return supplied to him by his accountant in March 2003. See Exhibit 9, Tab 3. In addition, Mr. Corigliano's quarterly report to the SEC for the quarter ending June 2003 indicates that Mr. Corigliano made federal and state tax payments that quarter. See Exhibit 9, Tab 4 at 3. Even if Mr. Corigliano had requested an extension for the filing of his 2002 tax return, the return would have been due by August 15, 2003 absent exceptional circumstances that would have required a written explanation to the IRS.

If Mr. Corigliano filed his 2002 tax return before September 4, 2003, his counsel's response to the SEC's request for the return would be inaccurate and would constitute a violation of Mr. Corigliano's disclosure obligations under his plea agreement. On November 4, 2005 and March 21, 2006, defense counsel wrote to the government concerning this issue and requested, pursuant to Brady and Giglio, that the government make inquiry concerning the matter. See Exhibit 9; Exhibit 1, ¶ 5. The government has never responded to either request. The government should be required to disclose the date on which Mr. Corigliano filed his 2002 tax return. The government also should be required to disclose whether Mr. Corigliano ever supplied his 2002 tax return to the SEC or whether the SEC excused that obligation on his part.[13]

_____

[13]     As discussed infra, there appear to be inconsistencies between the financial information contained in Mr. Corigliano's quarterly reports and the financial information in two of Mr.

The SEC also requested Mr. Corigliano's 1999 tax return. On July 20, 2000, the SEC explained in a letter that it needed the return in order to verify financial information supplied to the SEC by Mr. Corigliano's counsel. See Exhibit 10. Id. The SEC further stated that tax returns were commonly supplied to the SEC. Id. On July 26, 2000, counsel for Mr. Corigliano responded that Mr. Corigliano had not yet filed his 1999 tax return. See Exhibit 11. The government should be required to disclose whether that representation was inaccurate and whether Mr. Corigliano ever supplied his 1999 tax return, or any other tax return, to the SEC pursuant to his obligations under his plea agreement.

If Mr. Corigliano, through his counsel, provided erroneous information to the SEC in an effort to avoid producing tax returns to the SEC, then Mr. Corigliano violated his obligation under the plea agreement to "truthfully disclose all information he possesses concerning any matters about which [the U.S. Attorney's] Office and other government agencies designated by this Office, including . . . the SEC, may inquire of him." Exhibit 2 at 2. In the alternative, if the SEC excused Mr. Corigliano from his obligation to provide copies of tax returns, that is another benefit the government conferred upon Mr. Corigliano and that information should be disclosed. The government also should be required to disclose whether Mr. Corigliano was excused from any other request by the SEC to provide financial or other information or documentation.

---

Corigliano's tax returns (which were produced by third parties). Those inconsistencies raise questions about whether Mr. Corigliano sought to deny the SEC access to his tax returns in order to preclude the SEC from learning about those discrepancies.

### 3.    False Information Supplied to the SEC.

#### a.    Asset Valuation Information.

A letter from Mr. Corigliano's attorneys to the SEC reveals that the SEC expressly requested evidence of the value of certain assets in September 2003, including the value of Mr. Corigliano's house. See Exhibit 9, Tab 1. Mr. Corigliano's counsel forwarded information to the SEC in response to that request, id., and Mr. Corigliano confirmed during the first trial that he had provided the information to his counsel (although he denied that he had any knowledge that it was going to be produced to the SEC). Tr. (8/3/04) at 9352-53.

The valuation information supplied to the SEC concerning the house consisted of a "comparable" house for sale in the neighborhood. See Exhibit 9, Tab 1. This "comparable" was hardly comparable, however. Mr. Corigliano's property consisted of two lots, totaling over eleven acres, and his house was located on only one of those lots. Tr. (8/3/04) at 9348-53. The internet listing faxed to the SEC was a house on a single lot of less than two acres. See Exhibit 9, Tab 1 at Bates No. 3453.[14]

---

[14]    A few months later, the Town of Old Saybrook determined that the fair market value of Mr. Corigliano's two properties totaled more than $3.6 million – almost double the listing price of the so-called "comparable." Tr. (9/23/04) at 13,496-97 (testimony of town assessor). Neither Mr. Corigliano nor his counsel informed the SEC of that fact prior to the final SEC settlement. Mr. Corigliano never changed the representation on his quarterly reports to the SEC concerning the value of the Old Saybrook property. In each report, he listed the $1.745 million purchase price as the fair market value of the property and asserted that "[r]eal estate values have not been recalculated." See Exhibit 15. Mr. Corigliano testified in 2004 that he understood that the town of Old Saybrook was reassessing property in the fall of 2003, but that he was not aware of the reassessed value of his property. See Tr. (7/20/04) at 8162-65; Tr. (7/22/04) at 8502-05; Tr. (8/3/04) at 9354-55. As set forth in Forbes Third Trial Motion in Limine No. 1 (filed herewith), Mr. Corigliano also misled the SEC about the fact that his "real estate" in Old Saybrook consisted of two separate parcels in an apparent effort to prevent the SEC from seeking disgorgement of the second parcel. SEC attorney James Kidney testified that he did not know about a separate lot. See Tr. (9/23/2004) at 13,524, 13,530-31. The SEC settlement agreement permitted the Coriglianos to keep "their residence," Exhibit 13 ¶ 6(i), located at a specific

16

The government should be required to supply all information in its possession, custody, or control concerning the SEC's efforts to obtain asset valuation information from Mr. Corigliano and the accuracy or falsity of any such information supplied to the SEC by Mr. Corigliano or his counsel. This information is directly relevant to the issues of Mr. Corigliano's purported compliance with his obligation under the plea agreement to provide truthful and complete information to the SEC, as well as the government's willingness to allow Mr. Corigliano to violate his obligations under his plea agreement with impunity.

### b.    Quarterly Financial Reports.

In August 2000, Mr. Corigliano entered into an agreement with the SEC which allowed him to retain possession of ill-gotten gains valued in excess of $16 million and to live off of the proceeds of those assets on an annual budget in excess of $250,000. See Exhibit 12 (budget agreement). Pursuant to the budget agreement, Mr. Corigliano was required to spend any earned income generated by him or his wife before spending monies derived from his ill-gotten gains. Mr. Corigliano also was required to disclose all of his and his spouse's earned income in quarterly reports submitted to the SEC. See id.

Documents in the possession of the defense raise questions about whether Mr. Corigliano disclosed all of his and his wife's income to the SEC in his quarterly reports, as he was required to do under the terms of the August 2000 budget agreement.[15] Documents in the possession of the defense also raise questions about whether Mr. Corigliano made inaccurate

---

address, with no reference to the second parcel located at a different address.

[15]    Mr. Corigliano's 2001 and 2002 tax returns appear to identify income that was not reported on Mr. Corigliano's quarterly reports for those years. If the Court seeks further information concerning this matter, Mr. Forbes requests the opportunity to supply the information in camera in order to avoid disclosing privileged defense strategy.

representations on his 2002 tax return, because the financial information contained on the tax

return appears to be materially different from the information contained in Mr. Corigliano's

quarterly reports for that year.  If Mr. Corigliano made false representations to the SEC or on a

tax return after he executed his plea agreement in January 2000, that information is clearly <u>Brady</u>

and <u>Giglio</u> material and should be produced to the defense.  We request that the government be

required to produce copies of all tax returns filed by Mr. Corigliano from January 2000 to the

present.

       **4.      Settlement Negotiations with the SEC.**

       Mr. Corigliano's plea agreement required him to, <u>inter alia</u>, use his "best efforts"

to settle any claims asserted by the SEC.  Exhibit 2, Schedule A ¶ 12.  Mr. Corigliano testified

on direct examination at the 2005 trial that, after he entered into his plea agreement, he was

"always willing to give back" to the SEC the proceeds of his stock sales, reduced for the cost of

the options and for taxes.  Tr. (11/1/05) at 1471-72.  Mr. Corigliano testified that this amount

was $13-14 million.  <u>Id.</u>  The <u>Wells</u> submission made to the SEC on Mr. Corigliano's behalf in

May 2000, however, proposed a settlement amount of only $<u>3.4 million</u> -- far less than the value

of the proceeds of his stock sales after taxes and the cost of options.  <u>See</u> Exhibit 19 (<u>Wells</u>

submission).

       Mr. Corigliano testified that was aware of the fact that a <u>Wells</u> submission was

made on his behalf, but that he did not recall reading a <u>Wells</u> submission and did not know what

it contained.  Tr. (7/19/04) at 7973; Tr. (7/20/04) at 8038-39, 8059.  If the government has any

information or documentation in its possession, custody, or control indicating that the <u>Wells</u>

submission was provided to, or reviewed by, Mr. Corigliano, or that Mr. Corigliano had notice of

the $3.4 million settlement offer made on his behalf, it should be produced so that defense

counsel can use it to impeach Mr. Corigliano's testimony.

Mr. Corigliano also testified that the purported reason he did not settle with the SEC prior to April 2004 was that the SEC refused to credit him for approximately $6 million in taxes that he had paid on the proceeds of his stock sales. Tr. (11/1/05) at 1472. According to a pleading by Mr. Corigliano's counsel, however, the SEC's May 2000 settlement demand was "essentially" the same as the final April 2004 SEC settlement (with the exception of $300,000 Mr. Corigliano was allowed to keep for his children's education). See Docket No. 1944 at 12. If that is the case, then Mr. Corigliano's testimony that the SEC was demanding $6 million for tax payments, but finally relented on that point before the April 2004 settlement, is not accurate. The government should be required to produce all information in its possession, custody, or control (including both documents and oral Brady/Giglio) concerning the settlement negotiations between the SEC and Mr. Corigliano or his counsel between January 2000 and April 2004, including all settlement demands made by the SEC and all settlement offers made by Mr. Corigliano or his counsel.

### 5.    Budget Negotiations with the SEC.

The generous annual budget the SEC allowed Mr. Corigliano and his family to live on for almost four years was a significant benefit to Mr. Corigliano. Documents produced by the government thus far demonstrate that the SEC believed that Mr. Corigliano's proposed budget was "unreasonable." See Exhibit 10. Yet, the SEC ultimately relented and agreed to Mr. Corigliano's generous budget after being reminded what a "valuable, cooperating witness" Mr. Corigliano was. See Exhibit 11. The SEC's willingness to agree to a budget that it considered unreasonable, despite Mr. Corigliano's failure to provide financial information and documentation requested by the SEC, is further evidence of the special treatment and benefits

Mr. Corigliano has received from the government. The government should be required to produce all documents and information in its possession, custody, or control concerning communications between the SEC and Mr. Corigliano or his counsel concerning his annual budget for "living expenses." To the extent the SEC allowed Mr. Corigliano continue to reap the benefits of his budget agreement despite Mr. Corigliano's failure to provide information or documentation requested by the SEC, the government should supply that information as well pursuant to its Brady and Giglio obligations.

### 6.    Unwritten Agreements.

Mr. Corigliano ultimately entered into a final settlement with the SEC in the spring of 2004.[16] The settlement agreement permitted Mr. Corigliano to keep a specified list of assets, but required him to transfer all other assets to a court- appointed receiver. See Exhibit 13. As with the plea agreement, there remain serious questions concerning whether Mr. Corigliano has complied with his obligations under the SEC settlement agreement. There also are serious questions about whether there are additional unwritten agreements between Mr. Corigliano that are inconsistent with terms of the written agreement.

Mr. Corigliano testified that he understood that the settlement agreement permitted him to continue to pay his "normal" living expenses through July 7, 2004, and that he could continue to use two legal retainers then totaling approximately $1.9 million for as long as

---

[16]    The agreement was executed on April 16, 2004, a few days before the commencement of jury selection for the 2004 trial. In July 2004, Mr. Corigliano testified that the execution of the agreement had nothing to do with the start of the 2004 trial. See Tr. (7/19/04) at 7987-89; Tr. (7/20/04) at 8154. Following that testimony, the government produced for the first time documents showing that, in fact, the settlement had been rushed because of the imminent commencement of the 2004 trial. See attachments to Docket No. 990. After those documents came to light, Mr. Corigliano revised his testimony. See Tr. (8/3/04) at 9412-15.