# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 3:02CR264 (AHN) |
| | ) | |
| WALTER A. FORBES | ) | March 31, 2006 |
| | ) | |

## MOTION OF WALTER A. FORBES TO PRECLUDE THE GOVERNMENT FROM REFERENCING THE TRUTH-TELLING PROVISIONS IN COSMO CORIGLIANO'S PLEA AGREEMENT AND PRESENTING HIM AS HAVING COMPLIED WITH HIS OBLIGATIONS UNDER THAT AGREEMENT
### (Forbes Third Trial Motion *In Limine* No. 1)

Walter A. Forbes, through undersigned counsel, respectfully moves for an order precluding references to the truth-telling provisions in Cosmo Corigliano's plea agreement as well as any suggestion that Mr. Corigliano is in compliance with his plea agreement. The grounds for this motion are set forth in the accompanying memorandum of points and authorities.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: _____
Brendan V. Sullivan, Jr. (ct17115)
Barry S. Simon (ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

Oral Argument Requested

James T. Cowdery (ct05103)
Thomas J. Murphy (ct07959)
COWDERY, ECKER & MURPHY, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Motion of Defendant Walter A. Forbes to Preclude the Government from Referencing the Truth-Telling Provisions of Cosmo Corigliano's Plea Agreement and Presenting Him as Having Complied with that Agreement (Forbes Third Trial Motion *In Limine* No. 1) to be filed electronically and to be served on March 31, 2006 to the following via e-mail:

> Norman Gross, Esq. (norman.gross@usdoj.gov)
> Michael Martinez, Esq. (michael.martinez2@usdoj.gov)
> Craig Carpenito, Esq. (craig.carpenito@usdoj.gov)

Barry S. Simon

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 3:02CR264 (AHN) |
| | ) | |
| WALTER A. FORBES | ) | March 31, 2006 |
| | ) | |

## MEMORANDUM IN SUPPORT OF MOTION OF WALTER A. FORBES TO PRECLUDE THE GOVERNMENT FROM REFERENCING THE TRUTH-TELLING PROVISIONS IN COSMO CORIGLIANO'S PLEA AGREEMENT AND PRESENTING HIM AS HAVING COMPLIED WITH HIS OBLIGATIONS UNDER THAT AGREEMENT
### (Forbes Third Trial Motion *In Limine* No. 1)

Walter A. Forbes, through undersigned counsel, respectfully submits this

memorandum in support of his motion for an order precluding references to the truth-

telling provisions in Cosmo Corigliano's plea agreement as well as any suggestion that

Mr. Corigliano is in compliance with his plea agreement.

### ARGUMENT

"By definition, criminal informants are cut from untrustworthy cloth and

must be managed and carefully watched by the government and the courts to prevent

them from falsely accusing the innocent, from manufacturing evidence against those

under suspicion of crime, and from lying under oath in the courtroom." United States v.

Bernal-Obeso, 989 F.2d 331, 333 (9th Cir. 1993). The government's star witnesses,

Cosmo Corigliano, fits this definition quite well.

Mr. Corigliano, the former CFO of CUC International ("CUC") and the

only witness who claims to have had communications with Mr. Forbes about the alleged

Oral Argument Requested

fraud, has met with the government more than 85 to 95 times to shape his testimony.[1] And the government has rewarded him handsomely. He pled guilty in 2000, but has never served a day in jail. The government agreed not to oppose a sentence of home confinement, and he has not yet been sentenced. The government permitted Mr. Corigliano to keep approximately $4 million in assets and permitted him to live off an annual "budget" of more than $250,000 for four years while he worked with the government preparing his testimony. Even after he disgorged certain assets to the government, including a candle company for which he worked, he remained on the payroll through his testimony in the second trial, earning a six-figure salary that was more than he actually earned from the company in any year before he disgorged that asset to the government. An honest person might feel pressured to shade the truth under these circumstances; and Mr. Corigliano is no honest person.

Mr. Corigliano admits to telling repeated lies about his experience at CUC, including repeated lies to the government. The government, however, has presented Mr. Corigliano to two juries as a reformed man who has seen the error of his ways and is now telling the truth. To support the repackaged Corigliano, the government has emphasized the truth-telling provisions of his plea agreement, arguing that Mr. Corigliano has a strong incentive to tell the truth. See Second Tr. at 3,566 ("Ask yourself if Cosmo Corigliano's plea agreement provides him with a powerful incentive to tell the truth."). If Mr. Corigliano testifies falsely, goes the argument, his plea agreement would get "thrown out the window." First Tr. at 14,860; see also Second Tr. at 3,566 ("Cosmo

---

[1]     In addition, Mr. Corigliano has had numerous preparation and "homework" sessions with his team of lawyers who have been paid more than $7 million by Cendant Corporation, despite the fact that he entered into a plea agreement and began "cooperating" more than six years ago.

Corigliano's plea agreement says if it is established that he intentionally gave materially false testimony, the United States can prosecute him for all of his crimes, not just the ones he pled guilty to. And the United States can prosecute him for perjury and obstruction of justice. Ask yourselves: Does that give him a strong motive to tell the truth?").[2]

Reliance on the truth-telling provisions of Mr. Corigliano's plea agreement to bolster his credibility is improper because he has never stopped lying. Although Mr. Corigliano is a skilled, highly-prepared witness, who carefully avoids providing specifics, Mr. Corigliano was caught offering false testimony in the first and second trials of Mr. Forbes when he provided too much detail. Nevertheless, his plea agreement was not "thrown out the window" and the government has not "prosecute[d] him for all of his crimes." Under these circumstances, reliance on the truth-telling provisions and presentation of Mr. Corigliano as in compliance with his plea agreement runs afoul of the constitutional prohibition against the use of false or misleading evidence. See, e.g., Napue v. Illinois, 360 U.S. 264 (1959); United States v. Wallach, 935 F.2d 445 (2d Cir. 1991). Accordingly, Mr. Forbes respectfully requests that the Court preclude the government from arguing or introducing evidence that Mr. Corigliano has an obligation to testify truthfully under his plea agreement, that the non-prosecution provisions of his plea agreement are contingent upon his truthful cooperation, and that he is in compliance with his plea agreement.

---

[2]    At one point, the government suggested, improperly, that Judge Thompson stood behind Mr. Corigliano's testimony as truthful because his plea agreement had not been revoked. See, e.g., First Tr. at 9,457 ("Q. And the last question: If the government or the Court would believe that you lied, how does that affect your plea? A. It makes it null and void."). Judge Thompson struck this testimony and provided a limiting instruction. See id. at 9,499.

## I.    MR. CORIGLIANO HAS BREACHED HIS PLEA AGREEMENT.

Mr. Corigliano's plea agreement provides that he "shall truthfully disclose all information he possesses concerning any matters about which" the government "may inquire of him" and "shall truthfully testify in all proceedings, including grand jury and trial proceedings, as to any subject about which he is questioned." Ex. 2, at 2 (Corigliano Plea Agreement).[3] The agreement further provides that "should it be established that he has intentionally given materially false, incomplete, or misleading testimony or information or otherwise has violated any provision of this agreement the non-prosecution provisions of this agreement shall be null and void." Id.

Mr. Corigliano breached his plea agreement by providing materially false, incomplete and misleading testimony on numerous topics. For example, he testified in rich detail about an alleged conspiratorial meeting in Stamford, Connecticut with Mr. Forbes that had to have occurred (if at all) at a certain period in time. Documents prove that this meeting did not happen because Mr. Forbes was thousands of miles away during the entire relevant time period. Mr. Corigliano testified about a supposed bug-sweeping incident that was disproved by the very documents he relied upon to "corroborate" his story. Mr. Corigliano failed to comply with his plea agreement in other respects. In an apparent effort to maintain as much of his wealth as possible, he provided incomplete and misleading financial information to the Securities and Exchange Commission ("SEC"), and then, continuing his pattern of deception, he provided false, incomplete and misleading testimony at trial about his settlement with the SEC.

---

[3]    To avoid duplication, Mr. Forbes is filing a set of Exhibits which supports several of the motions he is filing today. Documents from this shared set of exhibits are referenced by number (e.g., 1, 2, 3).

This brief highlights some of Mr. Corigliano's most blatant and most demonstrably false and misleading testimony, but is by no means comprehensive. Mr. Corigliano has lied repeatedly after signing his plea agreement, making a mockery of its truth-telling provisions.[4]

### A.    Mr. Corigliano Provided False and Misleading Testimony About an Alleged Conspiratorial Meeting.

During the first trial, Mr. Corigliano testified that Mr. Forbes participated in an alleged conspiratorial meeting in Kirk Shelton's office in Stamford, Connecticut, which was supposedly precipitated by a March 9, 1998 meeting in which CUC merger partner HFS inquired about the accuracy of CUC's financial results. Mr. Corigliano provided elaborate detail about the alleged meeting, including the location, the participants, and even where the participants were in the office and whether they were standing or sitting. See First Tr. at 9,640 ("I'm by Kirk's couch. Kirk is standing to the left of me. Walter's standing to the right, and he's inside Kirk's doorway."). Mr. Corigliano attributed specific words to Mr. Forbes. See id. at 9,634 ("I could remember being in Kirk's office and Walter comes in and he said, Henry [Silverman of HFS] -- even though it's only a penny or two off, he's not doing anything, but he says he has management issues and wants to meet with me."); id. at 9,636 ("Walter said that Henry told him that after Mike [Monaco of HFS] and Scott [Forbes of HFS] looked at it, they concluded that it was only one or two cents off, meaning earnings per share, one or two pennies off. So they weren't going to do anything. They were going to let it go."). Mr. Corigliano testified that he remembered this specific conversation well, see id. at 9,640

---

[4]    For additional detail regarding Mr. Corigliano's false and misleading testimony, see, e.g., Mot. Mistrial Due to Corigliano's False and Misleading Testimony [Docket No. 1084].

("Q. I take it this is a conversation, since you attribute the words to Walter Forbes, you have a pretty good memory of; am I correct?  A.  I can remember being right by the doorway, yes."), and testified generally that in the few instances where he claimed to be able to recall specific conversations, his recollection was clear.  See, e.g., id. at 8,063 ("The specific conversations that I stated here, very clear in my mind, very easy to remember because they were very memorable to me.").[5]

Although Mr. Corigliano has studiously avoided placing dates on alleged conversations, lest he be caught in a lie, he testified that this meeting was within "[t]wo, three, four, five" days of March 11 or 12.  Id. at 9,650; see also id. at 7,488-89 ("I can't be more specific than sometime after the 11th or 12th of March, but not a month later, obviously.  Within a few days.").[6]  Travel records, however, establish that, in fact, Mr. Forbes was thousands of miles away from Stamford, Connecticut between March 9 and March 22 when this alleged meeting took place.  See id. at 9,641-51; Ex. 23 (Travel Records).  When confronted with documentary evidence that he had fabricated this meeting, Mr. Corigliano claimed, "I remember the meeting.  I remember it being in Kirk's office.  I remember it being after Walter told me that [Henry] wasn't going to do anything.  And that's what I remember."  Id. at 9,651.

---

[5]    On redirect, Mr. Corigliano described this alleged conversation somewhat differently, claiming that the purported participants also discussed Mr. Silverman being upset about a budget shortfall and that they were not going to use $165 million in merger reserves to make-up this shortfall, see id. at 9,570-73, and that Mr. Shelton said that Mr. Forbes should not meet with Mr. Silverman until after he signed the Form 10-K, see id. at 9,574.  See id. at 9,637-40 (acknowledging that he described the conversation differently on re-direct examination).

[6]    In the first trial, the government said that March 6, 1998 was "probably the single most important date in this case," First Tr. at 59, and the events of March 6 to March 9, 1998 played a significant role in the case.  The supposed meeting with Mr. Forbes had to have been after March 9, because the alleged topic of discussion was the events that indisputably occurred on March 9.

Tellingly, the government repackaged Mr. Corigliano's testimony for the second trial and omitted completely his story about this alleged conspiratorial meeting, even though it was one of the few conversations he claimed to remember specifically.[7] Excising the lie does not solve the problem. Mr. Corigliano breached his plea agreement and lied in an effort to secure a conviction of Mr. Forbes. If the truth-telling provisions of Mr. Corigliano's plea agreement mean anything, the government should have revoked his agreement, not sanitized his testimony, and it certainly should not have continued to elicit testimony in the second trial about his being a truth teller in full compliance with his obligations under that agreement.

### B.     Mr. Corigliano Provided False and Misleading Testimony About an Alleged Bug-Sweeping Incident in the Fall of 1997.

During the first trial, Mr. Corigliano testified that in November 1997 Mr. Forbes had CUC's offices swept for listening devices to ensure that Henry Silverman of HFS, CUC's potential merger partner, was not listening to their conversations, implying that Mr. Forbes was concerned that HFS would learn about the alleged fraud. First Tr. at 7,344-51. Mr. Corigliano detailed a story in which he was alone at the offices late in the afternoon when one or two employees of EED, the electronic eavesdropping detection service, arrived. Id. at 7,347. Mr. Corigliano testified that he directed them to the executive area of the office, waited a while, and then left because they were taking their time. Id. Mr. Corigliano further testified that he signed an invoice and left his business card and home number in case the workers had any problems. Id. at 7,348-49. In an

---

[7]     The bulk of Mr. Corigliano's testimony consisted of a vague mantra in which he alleged that there were periodic meetings to discuss the fraud with Mr. Forbes, but he provided essentially no specifics.

- 7 -

effort to corroborate this tale, the government introduced GX 430, the first page of which is an EED invoice dated November 17, 1997.  See Ex. 24 (Invoice & Authorization).

Again, documentary evidence shown to Mr. Corigliano on cross-examination put the lie to his testimony.  The invoice was misdated and the bug-sweeping occurred one year earlier, in November 1996, long before there would have been a reason to be concerned that Mr. Silverman or HFS would be bugging the offices.  See First Tr. at 8,146 ("Of course, if this was actually 1996, then that could not have applied to Henry Silverman because he hadn't rode onto the ranch yet, had he?  A. That's right.").  First, the second page of GX 430, the document the government used to "corroborate" Mr. Corigliano, bears the date November 17, 1996.  See Ex. 24 (Invoice & Authorization).  Notably, Mr. Corigliano's business card and home number that he testified about on direct examination are attached to this second page.  See id.  Mr. Corigliano "noticed [this date] in preparation for [his] testimony," but nevertheless proceeded to tell his false story, claiming on cross-examination that "[t]hey put the wrong year on" and that he "remember[ed] it being the fall of '97."  First Tr. at 8,145.

Second, the EED invoice contained in GX 430 was signed by "Rainer Melucci," Ex. 24 (Invoice & Authorization), and Mr. Corigliano's calendar indicates an appointment with "Ray Malucci" on November 16, 1996.  Ex. 25 (Corigliano Calendar).  Caught in another lie, Mr. Corigliano refused to concede that these were the same person, acknowledging only that the names were "similar."  First Tr. at 8,147-48.  Mr. Corigliano steadfastly maintained that he remembered "very clearly this being done in the fall of '97."  Id. at 8,150.

Third, a CUC check stub indicates a payment to EED based on a November 17, <u>1996</u> invoice. Ex. 26 (Check Stub). The amount on the check stub reflects a $2,500 payment, which matches up penny for penny with the amount reflected on the EED invoice contained in GX 430. <u>See</u> Ex. 24 (Invoice & Authorization). Confronted with this document, Mr. Corigliano stuck with his story, testifying that "I remember in '97 being there in the office during the week towards the end of the day." First Tr. at 8,151. Finally, CUC's general ledger reflects a December <u>1996</u> payment on the EED invoice. <u>See</u> Ex. 27 (CUC Ledger); First Tr. at 8,151-52.

Instead of surgically removing this lie from Mr. Corigliano's testimony during the second trial as the government did with the fabrication about the alleged conspiratorial mid-March meeting, the government simply streamlined Mr. Corigliano's story and omitted mention of any date or GX 430, the document it had previously used to "corroborate" Mr. Corigliano's testimony about the alleged bug sweeping. <u>See</u> Second Tr. at 1,364 (testifying that bug-sweeping "happened in connection with the HFS merger. Walter was concerned that Henry was listening in on our conversations"). On cross-examination, Mr. Corigliano retracted his "clear" recollection about the date from the first trial, claimed that his prior testimony was "mistaken," <u>id.</u> at 2,264, and refused to testify to a date for this alleged incident because "<u>I would rather not be pinned down</u>." <u>Id.</u> at 2,200 (emphasis added).

The most he would say was that he believed that the alleged bug sweeping happened in "the second half of '97." <u>Id.</u> But that, too, was untrue. The government had the entire EED/Melucci file and had access to <u>all</u> CUC/Cendant payment records to EED/Melucci, and there is <u>no record</u> of services being conducted in the second half of

- 9 -

1997—no invoice, no check stub, no general ledger entry reflecting a payment, and no entry in Mr. Corigliano's calendar. Mr. Corigliano's testimony was false and the documents prove it. Yet the government argued that Mr. Corigliano told the truth and that Mr. Forbes was lying about this alleged incident, a classic violation of <u>United States v. Wallach</u>, 935 F.2d 445 (2d Cir. 1991), and its progeny. <u>See</u> Mot. Strike Improper Rebuttal and for Curative Instruction and Notice of Continuing <u>Wallach</u> Objection [Docket No. 2017].[8]

### C.    Mr. Corigliano Provided Incomplete and Misleading Financial Information to the SEC and Provided False and Misleading Testimony about His SEC Settlement.

As part of his plea agreement, Mr. Corigliano agreed to "use his best efforts" to settle claims brought by the SEC and to "provide the SEC, upon request, with complete and accurate information regarding his ability to pay any such settlement in the form ordinarily required by the SEC." Ex. 2, at 7 (Corigliano Plea Agreement). He further agreed to disclose "all information he possesses concerning any matters about

---

[8]    Mr. Corigliano reshaped his testimony in other misleading ways between the first and second trials. For example, in the first trial, he testified about an alleged phone conversation between Mr. Forbes, Mr. Shelton and Chris McLeod, in which Mr. Forbes allegedly discussed the need to "build reserves that's going to help us make the numbers this year." First Tr. at 6,789. Recognizing that this story makes no sense with Mr. McLeod on the phone (because he is not alleged to be a coconspirator and Mr. Corigliano testified that he was not a participant in the fraud), and perhaps knowing that Mr. McLeod denied the conversation in the first trial, <u>see</u> First Tr. at 10,899-901, in the second trial, Mr. Corigliano simply omitted any mention of Mr. McLeod being on the phone. When confronted with this curious inconsistency, Mr. Corigliano testified that he omitted mention of Mr. McLeod in the second trial because the question in the first trial was "more broadly put." Second Tr. at 2,357. This was untrue. In the first trial, the government posed a general question ("Can you tell us how it came up?") to which Mr. Corigliano provided a narrative response indicating that "Walter got on the phone and was talking to Kirk and Chris." First Tr. at 6,789. In the second trial, the government explicitly asked Mr. Corigliano—"Who was [Mr. Forbes] on the phone with?"—to which he responded, "He was on the phone with Kirk Shelton," <u>id.</u> at 1,338, omitting any mention of Mr. McLeod. This testimony was incomplete and misleading. <u>See generally</u> Second Tr. at 2,198-206, 2,355-63.

which . . . the SEC . . . may inquire of him." Id. at 2.  The non-prosecution provisions of Mr. Corigliano's plea agreement purport to be contingent upon compliance with these promises.  Id.

In August 2000, Mr. Corigliano entered into an agreement with the SEC under which the government permitted him to live off a large annual budget and required him to submit quarterly schedules itemizing his assets.  Ex. 12 (Budget Agreement).  Four years later, on the eve of Mr. Forbes' first trial, the SEC entered into a settlement agreement with Mr. Corigliano, allowing him to keep certain enumerated assets, and requiring him and his wife to disgorge all remaining assets to a receiver.  Ex. 13 (SEC Consent).  Throughout this process, the SEC inquired about Mr. Corigliano's financial resources, but it appears that he fought them tooth and nail, refusing to complete the SEC's standard financial disclosure form under oath, refusing to provide tax returns, and providing misleading asset valuation information in violation of his plea agreement.

Mr. Corigliano's quarterly asset schedules did not disclose the existence of substantial retainer funds on deposit with his and his wife's lawyers, and he testified falsely about this asset that should have been disgorged under the plain language of the written settlement agreement, but was not.  The government belatedly claimed that there was an oral side agreement that permitted Mr. and Mrs. Corigliano to use the retainer funds to pay their ongoing legal expenses and required that any remaining balance ultimately be disgorged to the receiver.[9]  Mr. Corigliano provided false, incomplete, and

_____

[9]    The government has made irreconcilable representations on this issue.  During the first trial, the government proposed a stipulation that there was an oral side agreement with the SEC.  See Ex. 28 (Proposed Government Stipulation).  Before the second trial, the government did an about face and asserted that "there were no side agreements between the SEC and Corigliano."  Gov't Opp'n Mot. Compel Discovery at 3 [Docket

misleading information about the value of the house he was permitted to keep, and he hid

the existence of a second parcel of land adjacent to his house that was not disgorged to

the receiver. Furthermore, the written SEC settlement agreement required Mr. Corigliano

to disgorge all assets as of March 31, 2004, but after that date, he paid purportedly

"normal" living expenses and future taxes out of the funds and assets that were to be

transferred to the receiver. Mr. Corigliano also offered false and misleading testimony on

this issue.[10]

### 1.    The Undisgorged Retainer Funds

The quarterly SEC asset schedules required Mr. Corigliano to identify and

provide a value for "all assets owned by Cosmo Corigliano, Agnes T. Corigliano or any

other member of their household, directly or indirectly, and all assets which are subject to

their possession, enjoyment or control, regardless of whether legal title or ownership is

held by a relative, trustee, lessor, or any other intermediary." Ex. 12 at SEC 0050

(Budget Agreement). Nevertheless, Mr. Corigliano did not identify the existence or the

---

No. 1643]. During the second trial, the government elicited testimony from Mr.
Corigliano that that as part of the settlement with the SEC "[a]ny amounts that are left [in
the retainer account] will be paid over to the receiver." Second Tr. at 1,475.

[10]    It appears that Mr. Corigliano repeatedly refused to provide financial information
that the SEC sought, despite his obligation under his plea agreement to do so.
Nevertheless, the government, to this day, objects to disclosing in discovery information
about Mr. Corigliano's negotiations and deal with the SEC. See Mot. Compel Discovery
and Production of Brady/Giglio Material (Forbes Third Trial Motion No. 2) (filed March
31, 2006). This information is critical to Mr. Corigliano's credibility, his incentive to
curry favor with the government, and the government's claim that he has abided by the
terms of his plea agreement. Moreover, the withholding of impeachment material to
prevent Mr. Forbes from exposing Mr. Corigliano's lies creates a classic Wallach
situation. Compare United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991)
(reversing conviction when government witness testified falsely that he had stopped
gambling and government successfully argued that extrinsic evidence of witness'
continued gambling should be excluded under Fed. R. Evid. 608(b)).

amount of the very large retainer funds on deposit with his and his wife's respective attorneys on any of the fifteen quarterly reports he submitted to the SEC. The settlement agreement with the SEC required Mr. Corigliano to disgorge all "assets of a value of $1,000 or more in which [he or his wife] had any direct or indirect legal or beneficial ownership interest," with the exception of certain enumerated assets. Ex. 13 ¶ 3(vi) (SEC Consent). The retainer funds were not among the items excepted from this disgorgement requirement, see id. ¶ 6, but Mr. Corigliano did not disgorge the retainer funds.

During the first trial, Mr. Corigliano testified on direct examination that under the settlement with the SEC, he and his wife disgorged "everything that we had except for our house, except for a 1993 Acura, a '96 Lexus, $100,000 in each of our three kids' trusts. And my father's house happened to be in my name, we kept that as well." First Tr. at 7,504; see also id. at 8,154, 8,156, 8,158-60 (reaffirming this testimony on cross-examination). This testimony was false because the Coriglianos did not disgorge almost $2 million in retainer funds then on deposit with their respective attorneys, which the SEC could have required that they disgorge for the benefit of Mr. Corigliano's victims. See, e.g., SEC v. Credit Bancorp, Ltd., 109 F. Supp. 2d 142, 145 (S.D.N.Y. 2000); SEC v. Princeton Econ. Int'l Ltd., 84 F. Supp. 2d 443, 446 (S.D.N.Y. 2000); SEC v. Comcoa, Ltd., 887 F. Supp. 1521, 1528 (S.D. Fla.), aff'd, 70 F.3d 1191 (11th Cir. 1995).

Although Mr. Forbes had sought information concerning Mr. Corigliano's deal with the government and the benefits that he had received, and the government had represented that it had complied with its obligations under Brady/Giglio, see, e.g., Gov't Resp. Supplemental Mem. Rule 17(c) Subpoenas and Discovery from Gov't of

Impeachment Material at 9 [Docket No. 887], the government did not disclose Mr.

Corigliano's legal retainer benefit.  Instead, Mr. Forbes learned about the retainer funds

originally deposited with Mr. Corigliano's lawyers because Salomon Smith Barney

produced three checks from Mr. Corigliano to his lawyers pursuant to a defense subpoena

before any motion to quash was filed by Mr. Corigliano's counsel.  The government did

not know that Mr. Forbes had evidence of the original retainer because, although the

government was advised that the Salomon Smith Barney documents were available for its

inspection and copying, the government did not inspect or copy the documents before

Mr. Corigliano's examination.  Judge Thompson quashed all of the other subpoenas that

might have resulted in production of this information.

        When cross-examined about the retainer funds, Mr. Corigliano provided

evasive testimony, understating the balance, see First Tr. at 8,113 ("a little over a

million"), and he omitted any mention of an oral side agreement with the government.[11]

After Mr. Forbes completed his cross-examination of Mr. Corigliano, the government

belatedly disclosed that retainer funds also were on deposit with the attorneys for Mrs.

Corigliano and that there was an alleged oral side agreement under which the Coriglianos

were permitted to use the retainer funds to pay for legal services.  See Ex. 28 (Proposed

---

[11]     His testimony that "[i]t wasn't my money," id. at 8,715, was also misleading at
best because he had a property interest in the retainer funds, which creditors, like the
SEC, could attach, and which should have been disgorged under the settlement agreement
with the SEC, which extends to all "assets of a value of $1,000 or more in which [he or
his wife] had any direct or indirect legal or beneficial ownership interest as of March 31,
2004." Ex. 13 ¶ 3(vi) (SEC Consent).  Mr. Corigliano's testimony that any funds
remaining at the end of the representation would revert to the receiver, see First Tr. at
8,113, confirms at least an indirect legal or beneficial ownership interest.  Indeed, after
the first trial, it was revealed that at sometime after Mr. Corigliano entered into his plea
agreement, his lawyers returned to him more than $1 million from the retainer account.
See Ex. 20 (Corigliano Aff., Ex. C) (noting that attorneys "later refunded $1,000,000 to
Mr. Corigliano as unneeded after he entered into his plea agreement").

Government Stipulation) ("Pursuant to an oral agreement between the SEC and counsel for Mr. and Mrs. Corigliano, the Corigliano's [sic] are allowed to use [the retainer] funds for legal services, and at the completion of Mr. and Mrs. Corigliano's need for legal representation, the balance, if any remaining in the retainer accounts will be provided to the Receiver under Mr. Corigliano's settlement agreement with the SEC."); Gov't Opp'n Mot. Mistrial Due to Corigliano's False and Misleading Testimony at 6-7 [Docket No. 1147] ("[T]here is an oral agreement between the SEC and counsel for the Coriglianos that the retainers will be used solely for legal representation.").

In the second trial, the government did not omit or streamline the testimony about the SEC settlement to deal with Mr. Corigliano's previously-exposed false, incomplete and misleading testimony. It employed a third technique—the embrace. Mr. Corigliano testified on direct examination that he paid a retainer to his attorneys and that as part of the settlement with the SEC "[a]ny amounts that are left will be paid over to the receiver." Second Tr. at 1,475. Embracing what he falsely omitted in the first trial does not cure the breach of his plea agreement, which states that "should it be established that he has intentionally given materially false, incomplete, or misleading testimony or information or otherwise has violated any provision of this agreement the non-prosecution provisions of this agreement shall be null and void." Id.

## 2.    The Undisgorged Second Parcel

The Coriglianos own two distinct lots, with separate tax bills and separate addresses. See First Tr. at 8,166-68. However, the quarterly asset schedules that Mr. Corigliano submitted to the SEC do not reference a second lot. In addition, the SEC settlement agreement permits the Coriglianos to keep only "their residence," located at a

specific address, Ex. 13 ¶ 6(i) (SEC Consent), <u>with no reference to the second parcel located at a different address</u>.

Mr. Corigliano testified on direct examination in the first trial that he and his wife disgorged "everything that we had except for our house, except for a 1993 Acura, a '96 Lexus, $100,000 in each of our three kids' trusts. And my father's house happened to be in my name, we kept that as well." First Tr. at 7,504. This was untrue because the Coriglianos did not disgorge the three-acre parcel of land adjacent to their house that was valued by the Town of Old Saybrook at more than $400,000. When confronted with documents on cross-examination, Mr. Corigliano admitted that he owned two lots and offered evasive testimony about whether he had previously provided complete information to the SEC.

> A. I don't know what conversations my attorneys had with the SEC, but there was no hiding the fact that there were two lots that the Town of Old Saybrook maintained for recordkeeping. We didn't -- certainly didn't hide it from them and didn't intend to. We paid $1.7 million for our home which included all the acres that it included. Included both these lots.
>
> Q. Can you name one person among the government, the SEC, the U.S. Attorney's Office, the receiver or their staffs that know that there's actually a separate piece of property there?
>
> A. I don't know if my attorneys told them.

First Tr. at 8,173 (emphasis added).

Mr. Corigliano failed to comply with the provisions of his plea agreement, but the government took no action against him. Instead, in the second trial, the government employed the embrace to deal with Mr. Corigliano's prior misrepresentations about his property. <u>See</u> Second Tr. at 1,471 (testifying on direct examination that he owns "[t]wo plots").

### 3.    The Value of the Corigliano Home

Mr. Corigliano's fifteen quarterly reports to the SEC state that the "Old Saybrook" property was purchased for $1.7 million (with a footnote that the property had not been revalued), see First Tr. at 8,172-73. On September 4, 2003, in response to an express SEC question regarding the value of Mr. Corigliano's home, he submitted as a "comparable" property a brokerage listing for a house with a $2,250,000 asking price. Ex. 9, Tab 1 (Letter dated Sept. 4, 2003) (attaching brokerage listing for a home that "seems comparable"). The listed property had approximately 1.32 acres of land in contrast to the two lots totaling about 11 acres held by the Coriglianos. See First Tr. at 9,347-53.[12]

During the first trial, Mr. Corigliano offered incomplete and misleading testimony, understating the value of the waterfront estate that the government permitted him to keep under the SEC settlement. On direct examination when asked about the value of the home, he testified that he "paid a little less than $1.7 million." First Tr. at 7,504. On cross examination, he estimated that the house was then worth approximately $2 million. Id. at 7,986-87, 8,156. In fact, a recent tax assessment had valued the two parcels at more than $3.6 million, but Mr. Corigliano (the former CFO who was desperately trying to maintain as much of his wealth as possible) claimed never to have seen the assessment, although he paid the tax bill (which reflected the assessed value) himself shortly before his trial testimony. See id. at 8,162-66. In the second trial, after

---

[12]    Mr. Corigliano claimed that he did not know that this "comparable" was submitted to the SEC in response to a question about valuation, see First Tr. at 9,356, even though the letter from his attorney to the SEC states that it was. See Ex. 9, Tab 1 (Letter dated Sept. 4, 2003). Curiously, Mr. Corigliano relied upon the same "comparable" property in testifying about the purported value of his property to the jury. See First Tr. at 7,986 ("[T]here was another property in the area that I thought was similar that was selling for around $2 million.").

his lies at the first trial had been exposed, Mr. Corigliano again employed the embrace and testified on direct examination that his two plots were assessed at a value of approximately "$3.6 million" Second Tr. at 1,471.

### 4.    The Post-March 31, 2004 Dissipation of Assets

The settlement agreement required Mr. Corigliano to disgorge all "assets of a value of $1,000 or more in which [he or his wife] had any direct or indirect legal or beneficial ownership interest as of March 31, 2004," with the exception of certain enumerated assets. Ex. 13 ¶ 3(vi) (SEC Consent) (emphasis added). The agreement further required the Coriglianos to "undertake and agree to transfer forthwith . . . all assets described in Paragraph 3," id.¶ 6 (emphasis added), and set an outside deadline of 60 days from the entry of final judgment to complete this transfer, see id. ¶ 3. The written agreement did not permit Mr. Corigliano to use these assets to pay living expenses or future property taxes.

Cross-examination, however, demonstrated that after March 31, 2004, Mr. Corigliano made a last second grab to keep as much as he could for himself before turning the required assets over to the receiver. He paid living expenses and future property taxes out of the funds and assets that were supposed to be transferred to the receiver. See, e.g., First Tr. at 9,393-412. On redirect examination, the government attempted to show that Mr. Corigliano was forthright with the SEC concerning his post-March 31, 2004 expenditures. Id. at 9,458. ("Q. Were you trying to hide anything from the SEC or from the receiver when you made those transfers for your property taxes and personal living expenses? A. No, not at all.").

Whatever the SEC knew about these payments, Mr. Corigliano's testimony was misleading at best. If he made these expenditures with the SEC's

knowledge and consent, he again deceived the jury when he stated that he disgorged everything, while hiding an arrangement with the SEC that is inconsistent with the written settlement agreement and that provided a substantial benefit to Mr. Corigliano by permitting him (apparently in his own unfettered discretion) to use funds and assets that were otherwise supposed to be transferred to the receiver to pay his living expenses and property taxes. If Mr. Corigliano made these expenditures without the knowledge and consent of the SEC, his testimony that he was not hiding anything from the SEC was simply false. Under either scenario, Mr. Corigliano failed to comply with the terms of his plea agreement.

## II.     DUE PROCESS PROHIBITS THE GOVERNMENT FROM RELYING ON THE TRUTH-TELLING PROVISIONS OF MR. CORIGLIANO'S PLEA AGREEMENT OR OTHERWISE PRESENTING HIM AS IN COMPLIANCE WITH HIS AGREEMENT.

Despite this sordid history, Mr. Corigliano's plea agreement was not "thrown out the window." The government should not be permitted to argue or introduce evidence that Mr. Corigliano has an obligation to testify truthfully under his plea agreement or that the non-prosecution provisions of his plea agreement are contingent upon his truthful cooperation. Although that is what the plea agreement says, the government has not enforced those provisions of the agreement against Mr. Corigliano. Indeed, the evidence demonstrates that Mr. Corigliano can lie and get away with it. Similarly, the government should not be permitted to portray Mr. Corigliano as in compliance with his plea agreement, because he is not.

Due process prohibits the government from introducing false or misleading evidence. See Napue v. Illinois, 360 U.S. 264 (1959); United States v.

Wallach, 935 F.2d 445 (2d Cir. 1991).[13]   Introduction of the truth-telling provisions of

Mr. Corigliano's plea agreement or otherwise presenting him as in compliance with his

agreement would run afoul of this well-established constitutional prohibition. See, e.g.,

Napue, 360 U.S. at 269-70 (due process violated when government witness provided

false testimony about government's promises of leniency); Hayes v. Brown, 399 F.3d

972 (9th Cir. 2005) (en banc) (due process violated when cooperating witness testified

falsely about oral agreement between witness's counsel and government even though

witness did not know about agreement); Shih Wei Su v. Filion, 335 F.3d 119, 129 (2d

Cir. 2003) (due process violated when government witness provided false testimony

about deal with government and sentencing judge); Jenkins v. Artuz, 294 F.3d 284, 289,

294 (2d Cir. 2002) (due process violated when witness offered "at-best-ambiguous

testimony about the existence of a plea agreement" on cross-examination, and prosecutor

"re[i]nforced the impression that no agreement existed" on re-direct examination; "That a

statement standing alone is factually correct obviously does not mean that it cannot

mislead based on the natural and reasonable inferences it invites."); DeMarco v. United

States, 928 F.2d 1074, 1077 (11th Cir. 1991) (due process violated when government

witness misrepresented cooperation agreement); Du Bose v. Lefevre, 619 F.2d 973, 979

(2d Cir. 1980) (due process violated when government witness provided false testimony

about deal with government); United States v. Sanfilippo, 564 F.2d 176, 178 (5th Cir.

1977) (due process violated when government witness misrepresented cooperation

agreement).

---

[13]     See also Giglio v. United States, 405 U.S. 150, 153 (1972); Miller v. Pate, 386
U.S. 1, 7 (1967); Alcorta v. Texas, 355 U.S. 28, 31 (1957) (per curiam); White v. Ragen,
324 U.S. 760, 764 (1945) (per curiam); Pyle v. Kansas, 317 U.S. 213, 216 (1942);
Mooney v. Holohan, 294 U.S. 103, 112 (1935) (per curiam).

Because the government has not enforced the truth-telling provisions of Mr. Corigliano's plea agreement, it cannot rely on those provisions to bolster his credibility. Because Mr. Corigliano is not in compliance with his plea agreement, the government cannot say that he is. Doing so would mislead the jury and violate Mr. Forbes' Due Process rights.

## CONCLUSION

For the reasons set forth above, Mr. Forbes respectfully requests that the Court enter an order precluding references to the truth-telling provisions in Mr. Corigliano's plea agreement as well as any suggestion that Mr. Corigliano is in compliance with his plea agreement.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: _____
Brendan V. Sullivan, Jr. (ct17115)
Barry S. Simon (ct24159)
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

James T. Cowdery (ct05103)
Thomas J. Murphy (ct07959)
COWDERY, ECKER & MURPHY, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

- 21 -

## **CERTIFICATE OF SERVICE**

I hereby certify that I caused the foregoing Memorandum in Support of

Motion of Defendant Walter A. Forbes to Preclude the Government from Referencing the

Truth-Telling Provisions of Cosmo Corigliano's Plea Agreement and Presenting Him as

Having Complied with that Agreement (Forbes Third Trial Motion *In Limine* No. 1) to be

filed electronically and to be served on March 31, 2006 to the following via e-mail:

> Norman Gross, Esq. (norman.gross@usdoj.gov)
> Michael Martinez, Esq. (michael.martinez2@usdoj.gov)
> Craig Carpenito, Esq. (craig.carpenito@usdoj.gov)

Barry S. Simon