necessary.  See, e.g., Tr.(8/3/04) at 9369-72, 9389, 9393-95, 9398-99.  Contrary to Mr.

Corigliano's "understanding," however, the written agreement required Mr. Corigliano to

disgorge his assets as of March 31, 2004 and did not permit him to continue paying expenses

through July 7, 2004 from the funds to be disgorged.  This is made clear throughout the

agreement:

* The list of assets to be disgorged contains one and only one date parameter: March 31, 2004 (Exhibit 13, ¶ 3);

* The accounting of assets owned was to be made as of March 31, 2004 (Id., ¶ 5);

* The accounting of all gifts, assignments and other transfers of assets in the amounts of $5,000 or more was to cover the period January 1, 1996 through March 31, 2004 (Id., ¶ 5(d)); and

* The transfer of assets was to take place "forthwith" (Id., ¶ 6), and in all events, "no later than sixty days from the entry of the Final Judgment" (Id., ¶ 3).

It would make no sense to require Mr. Corigliano to make accountings as of

March 31, 2004 if he were permitted to continue to spend funds through July 7, 2004.  Much less

would it make sense to demand that the assets be transferred "forthwith."[17]  Nor does the

agreement exempt legal fee retainers out of the assets to be forfeited by Mr. Corigliano.  To the

contrary, the agreement identifies the specific assets Mr. Corigliano was permitted to retain

_____

[17]    Unlike the period between August 2000 and March 31, 2004, which was governed by a written budget agreement that required Mr. Corigliano to supply quarterly reports to the SEC, there was no approved normal living expense budget for the period after March 31, 2004 and no requirement for Mr. Corigliano to report his living expenses for that period to the SEC -- consistent with the requirement in the settlement agreement that Mr. Corigliano disgorge the assets he held as of March 31, 2004.  Mr. Corigliano took advantage of his purported permission to continue paying purportedly normal living expenses from March 31, 2004 through July 7, 2004 to spend almost $100,000 during that period, see Tr. (11/8/05) at 2102-12, more than he spent in any quarter under his budget agreement (and an amount that, if annualized, would far exceed the annual budget to which the SEC had agreed in August 2000).  Mr. Corigliano never supplied any accounting to the SEC for his expenditures between March 31, 2004 and July 7, 2004.

(which do not include legal fee retainers) and requires him to disgorge everything else. See Exhibit 13, ¶¶ 3, 4, 6.

During the first trial, the government implicitly recognized that the language of the settlement agreement does not support Mr. Corigliano's understanding, but sought to buttress Mr. Corigliano's testimony by representing to the Court that there was an oral side agreement between Mr. Corigliano and the SEC concerning the legal fee retainers. See Docket No. 1147 at 6-8; Docket No. 1084, Ex. 1 (proposed government stipulation). After an SEC attorney testified that he was not aware of any oral agreements, the government reversed its position, asserting that there is no oral agreement between Mr. Corigliano and the SEC. Docket No. 1643 at 3.[18]

Mr. Forbes is entitled to know whether the government has or has not entered into an oral side agreement with Mr. Corigliano or his counsel to deviate from the express terms of the settlement agreement. If there is any such oral side agreement, it is a further benefit to Mr. Corigliano that should be disclosed under Brady and Giglio. If there is no such oral side agreement, then any documentation or information in the government's possession, custody, or control (such as internal SEC memoranda) that reflect the SEC's understanding of the requirements of the settlement agreement (and which would tend to show that Mr. Corigliano has violated the agreement) is Brady/Giglio material that the government should be required to produce. If the government was aware that Mr. Corigliano violated the terms of the settlement

---

[18]     The same SEC attorney, David Frohlich, testified that he understood that Mr. Corigliano could continue to pay his normal expenses, including legal fees, after March 31, 2004. Tr. (9/23/04) at 13,603-604. Not only does Mr. Frohlich's understanding find no support in the language of the Consent, but he believed that Mr. Corigliano could continue to use the funds only through the date of Final Judgment (May 6, 2004), not July 7, 2004 or later, as maintained by Mr. Corigliano. When pressed on whether Mr. Corigliano could continue to use the retainer past July 7, 2004, Mr. Frohlich gave the equivocal response that he was "not certain." Tr. (9/23/04) at 13,610-13,611.

agreement, but took no adverse action against him and/or did not seek the disgorgement of funds

or property that he improperly used or failed to turn over to the receiver, that also is

Brady/Giglio information that the government should be required to disclose.[19]

**B.    Documents and Information Relating to Mr. Corigliano's False Testimony in Two Trials.**

During closing arguments at Mr. Forbes' first trial, the government asserted that,

if a witness with a plea agreement lied or testified falsely, "the agreement gets thrown out the

window." Tr. (10/18/04)at 14,860; see also id. at 14,861. As set forth in the memorandum in

support of Forbes Third Trial Motion in Limine No. 1, filed contemporaneously herewith, Mr.

Corigliano testified falsely about material matters in both the 2004 and 2005 trials.

Pursuant to Brady and Giglio, the government should be required to disclose:

(i) whether any present or former employee of the United States Attorney's Office or any other

representative or agent of the government has come to the conclusion that Mr. Corigliano lied or

testified falsely with respect to any matter at either trial of Mr. Forbes; (ii) whether, in light of

overwhelming evidence that Mr. Corigliano testified falsely at both trials, the government has

taken any steps to determine whether Mr. Corigliano in fact lied or testified falsely; and (iii)

whether Mr. Corigliano's plea agreement has been revoked or "thrown out the window" due to

his false testimony at two trials. The government also should be required to disclose the

---

[19]    The government also should be required to disclose any other benefit it has conferred upon Mr. Corigliano. For example, the final SEC settlement excused Mr. Corigliano from paying full interest, see Exhibit 13, ¶ 9. If the SEC accorded the benefit of a partial interest waiver to Mr. Corigliano without requiring him to complete a financial disclosure form under oath, that information should be disclosed. In addition, according to Mr. Corigliano's June 14, 2000 Order of Release, Mr. Corigliano was not required to report to Pretrial Services as a condition of his bail. The government should be required to state whether it is correct that Mr. Corigliano has not been required to report to Pretrial Services during the past five-plus years.

23

substance of its communications with Mr. Corigliano concerning the matters set forth in Forbes

Third Trial Motion in Limine No. 1, including all communications about the manner in which

Mr. Corigliano's 2005 and expected 2006 testimony should deal with those issues and the extent

to which the government would omit from its 2005 or 2006 examinations matters about which

Mr. Corigliano was shown to have testified falsely in earlier proceedings.

      C.      **Documents and Information Relating to Mr. Corigliano's Polygraph Examinations.**

      On November 18, 1998, at a time when Mr. Corigliano was maintaining his

innocence, his attorneys met with the government in an effort to persuade the government not to

prosecute him.  In an effort to bolster Mr. Corigliano's false claims of innocence, his attorneys

told the government that "they had polygraphed Corigliano and that he had done very well."

Exhibit 14 at 6.  The government disclosed during the 2004 trial that Mr. Corigliano's lawyers

had later informed the government "that Corigliano had submitted to a second polygraph

examination."  Memorandum in Support of Government Motion to Preclude Cross-Examination

of Cosmo Corigliano Regarding Polygraph Examinations (Docket No. 885) at 1.  The

government represented that Mr. Corigliano's counsel "provided no additional information about

that examination."  Id.

      Mr. Corigliano's efforts to mislead the government about his culpability with

representations about a polygraph examination are probative of his character for untruthfulness.

The government should disclose, pursuant to Brady/Giglio, whether it has made any effort to

investigate whether Mr. Corigliano, through his counsel, employed representations about his

performance on a polygraph examination in an effort to mislead the government into believing

that he had done nothing wrong.  The government should further disclose when it learned that

Mr. Corigliano had submitted to a second polygraph examination and whether it made any effort

to determine whether Mr. Corigliano "cherry picked" among the results of the two polygraphs to

create the false impression that he had done well on the examinations and was innocent. Finally,

the government should disclose the following information: (i) the questions posed to Mr.

Corigliano in all of his polygraph examinations; (ii) Mr. Corigliano's answers during his

polygraph examinations; (iii) the results of each polygraph examination; (iv) the identities of the

polygraphers who performed the examinations; and (v) the timing and sequence of the

examinations. If this information is not already in the government's possession, it is within the

government's custody and control because Mr. Corigliano is a cooperating government witness.

**D.    Information Concerning Proffers Made by Mr. Corigliano's Counsel to the Government.**

In August and November 1998, Mr. Corigliano's counsel participated in proffer

sessions with the government in which they made factual representations in support of Mr.

Corigliano's claims of innocence. See Exhibit 14. Mr. Corigliano has testified that he knew that

his lawyers had discussions with the government prior to his January 13, 1999 government

interview, and that he had many discussions with his counsel in preparation for his January 13,

1999 interview, but that he does not know what his attorneys represented to the government in

conversations prior to January 1999. See Tr. (7/15/04) at 7610, 7671-74.[20] If the government is

in possession of any information inconsistent with Mr. Corigliano's testimony, such as

information that Mr. Corigliano authorized his counsel to make certain factual representations to

the government, the government should disclose that information under Brady/Giglio. The

---

[20]    Despite the preposterous nature of Mr. Corigliano's testimony, defense counsel were precluded at the 2005 trial from inquiring of Mr. Corigliano concerning his attorney's proffer sessions with the government. See Docket Entry No. 2000.

25

government also should be required to disclose: (i) the full terms (whether written or oral) of all attorney proffers made by Mr. Corigliano's counsel to the government; (ii) whether Mr. Corigliano's counsel ever represented to the government that Mr. Corigliano was the source of any information supplied by counsel to the government (and, if the response is affirmative, the date(s) on which Mr. Corigliano's counsel supplied such information and the substance of the information supplied on each date); (iii) whether Mr. Corigliano's counsel ever stated that Mr. Corigliano had authorized his counsel to make a representation to the government on his behalf (and, if the response is affirmative, the date and substance of each such representation); and (iv) whether Mr. Corigliano's counsel ever represented to the government that counsel would communicate information from the government to Mr. Corigliano (and, if the response is affirmative, the date on which any such representation made and the substance of any such information).

## III.    DOCUMENTS AND INFORMATION RELATING TO KEVIN KEARNEY.

Kevin Kearney is a cooperating government witness who testified at both the 2004 and 2005 trials.  Mr. Kearney is an alleged co-conspirator who was involved in the use of unsupported "topside adjustments" at CUC that inflated CUC's reported quarterly earnings.  He has received informal immunity from the government in exhange for his testimony.  See Tr. (12/8/05) at 3811-12 (jury instruction concerning Mr. Kearney).

Mr. Kearney was interviewed by the government on multiple occasions between 1998 and 2005.  The government has produced a number of notes of government interviews with respect to Mr. Kearney, but has withheld other notes of Mr. Kearney's government interviews (such as notes taken by the current and former government trial teams).  The government also has refused to provide information to the defense concerning dramatic changes in Mr. Kearney's

26

recollection of events. The documents and information that Mr. Forbes seeks with respect to Mr. Kearney are critical impeachment material that should be produced under Brady and Giglio.

At both the 2004 and 2005 trials, Mr. Kearney gave testimony that was flatly inconsistent with the information he provided to the government in earlier interviews. See Motion of Walter A. Forbes for a Mistrial Due To the Government's Presentation of, and Failure To Correct, Kevin Kearney's False and Misleading Testimony (filed Aug. 23, 2004) (Docket No. 1091) ("2004 Kearney Mistrial Motion"); Motion of Defendant Walter A. Forbes for a Mistrial Due To the Testimony of Kevin Kearney (filed Oct. 31, 2005) (Docket No. 1911) ("2005 Kearney Mistrial Motion"). Yet the government continues to present Mr. Kearney as a truthful witness who has no reason to lie about Mr. Forbes. See Tr. (10/26/05) at 1194-97. The information that Mr. Forbes seeks is relevant both to impeach Mr. Kearney's testimony about Mr. Forbes and to respond to the government's attempts to rehabilitate Mr. Kearney. See id.

For example, Mr. Kearney claimed during the 2004 trial that both Cosmo Corigliano and former CUC CFO Stuart Bell repeatedly invoked Mr. Forbes' name when giving instructions to Mr. Kearney regarding improper topside adjustments. See Tr. (8/4/04) at 9715-25, 9727-29, 9734-37, 9751-52. This testimony was completely inconsistent with repeated earlier government interviews in which Mr. Kearney indicated that he had no information with respect to Walter Forbes.[21] Yet, on cross-examination, Mr. Kearney insisted that he had

---

[21]    See Ex. 5 to 2004 Kearney Mistrial Motion at DF0375 (David Frohlich notes of August 24, 1998 interview in which Kearney stated "he had no evid. he could pt. to involving WAF"); Ex. 23 to 2004 Kearney Mistrial Motion at MGR 173 (SEC representative Matthew Greiner's notes of July 10, 2001 Kearney interview stating "nada w/r/t Walter"). In addition, Mr. Kearney was interviewed at least five times in 1998 and 1999 by former AUSA Paul Weissman, who took extremely detailed notes of his interviews. There is no reference to Mr. Forbes in any of Mr. Weissman's voluminous notes of those interviews, many of which are devoted to the subject of unsupported topside adjustments. See Tr. (9/2/04) at 11,443-49; Tr. (11/14/05) at2678-87

27

provided the same information to the government in his early interviews and that his testimony was not a recent fabrication. Tr. (8/5/04) at 9876-77; Tr. (8/16/04) at 9938. On redirect examination, the government asked Mr. Kearney to reaffirm his new claims. Tr. (8/16/04) at 9993-94. The government also attempted to rehabilitate Mr. Kearney by suggesting that his new claims were not recent fabrications and that he had simply not been asked about certain subjects in earlier interviews. Id. at 9991-92.[22]

In 2005, Mr. Kearney further changed his story, claiming for the first time that Cosmo Corigliano repeatedly told him that unsupported topside adjustments were necessary because Mr. Forbes wanted to achieve a certain EPS to meet Wall Street expectations. See Tr. (10/25/05) at 1106-08. On cross-examination, Mr. Kearney acknowledged that he did not make this claim either in the 2004 trial or in fifteen government interviews. See id. at 1186-87. On redirect examination, however, the government presented Mr. Kearney's new claims as truthful testimony and attempted to rehabilitate him by suggesting that the notes of his government interviews could be inaccurate. See id. at 1194-98.

---

(Weissman testimony). In 2001, Mr. Kearney also signed interrogatory responses, under oath, in the Cendant civil litigation which indicated that he had no information with respect to Mr. Forbes. See Ex. 22 to 2004 Kearney Mistrial Motion, Response to Interrogatory No. 1 (stating that Kearney has "no information in his possession" that would support or refute a contention that the CUC Director Defendants (a term defined to include Walter Forbes) had knowledge or participated in accounting irregularities).

[22]    Mr. Kearney also gave other testimony at the 2004 trial that was at odds with his government interview notes, including his claim that he met with Mr. Bell on a quarterly basis to discuss unsupported topside adjustments and his claim that both Cosmo Corigliano and Casper Sabatino (another CUC accountant) instructed him not to release information to CUC's outside audit firm until Mr. Forbes approved the quarterly earnings press release. See generally 2004 Kearney Mistrial Motion (Docket No. 1091).

Under Brady and Giglio, the government should be required to disclose if Mr. Kearney was, in fact, asked about Mr. Forbes in any government interview prior to his 2004 trial testimony but said nothing about the purported invocation of Mr. Forbes' name during discussions about topside adjustments. The government also should be required to disclose if Mr. Kearney was asked questions in government interviews about his conversations with other CUC personnel regarding unsupported topside adjustments but said nothing about the purported invocation of Mr. Forbes' name during those conversations or any purported statements about Mr. Forbes' desire to achieve a certain EPS. In addition, the government should disclose the dates of every interview in which Mr. Kearney was asked about the foregoing subjects, the substance of Mr. Kearney's statements during each such interview, and the names of the government attorneys and/or agents present during such interviews (including SEC personnel).

The government also should disclose (i) the first time (in terms of the number of interviews before the statement was first made and the first date of the statement) that Mr. Kearney stated in substance he met with or talked to Mr. Bell concerning unsupported topside adjustments; (ii) the first time (in terms of the number of interviews before the statement was first made and the first date of the statement) that Mr. Kearney stated in substance that Mr. Bell, Cosmo Corigliano or anyone else invoked the name Walter Forbes in connection with topside adjustments and/or wanting EPS to be a certain number; (iii) the first time (in terms of the number of interviews before the statement was first made and the first date of the statement) that Mr. Kearney stated in substance that Cosmo Corigliano, Casper Sabatino or anyone else stated that information should not be released to Ernst & Young until Walter Forbes signed off on the press release; and (iv) the first time (in terms of the number of interviews before the statement was first made and the first date of the statement) that Mr. Kearney stated in substance that

29

Stuart Bell, Cosmo Corigliano or anyone else stated that topside adjustments were made to achieve an EPS number that Mr. Bell and/or Walter Forbes wanted.

The government also should supply additional information concerning Mr. Kearney's July 10, 2001 government interview, which took place after Mr. Forbes had been indicted. See Exhibit 1, Request Nos. 14 & 15. At least four government representatives, including former FBI agent Mark Gerber, SEC attorney Matthew Greiner, and SEC representatives Roger Pazzamont and Susan Markel, were present at that interview. The only notes of this interview that have been produced by the government are Mr. Greiner's notes, which state "nada w/r/t Walter." See Ex. 23 to 2004 Kearney Mistrial Motion at MGR 173. Mr. Greiner testified at the 2005 trial that he had no recollection whether this notation meant that Mr. Kearney simply said nothing about Mr. Forbes during the interview or whether it meant that Mr. Kearney gave affirmatively exculpatory information about Mr. Forbes. See Tr. (11/14/05) at 2673-74 ("I think that I wrote this either because Mr. Kearney said nothing about Mr. Forbes, or he in fact said, Mr. Forbes wasn't involved in these conversations. It's either reflecting an absence of commentary or affirmative representation of a lack of involvement. And between those two, I can't speak."). If the government has other notes of this interview in its possession, custody, or control, or has any information about whether Mr. Kearney was asked about Walter Forbes or gave exculpatory information concerning Mr. Forbes during this interview or any other interview, it should supply that information pursuant to Brady and Giglio. Finally, the government should disclose whether, in light of significant evidence that Mr. Kearney testified falsely at two trials, the government has taken any steps to determine whether Mr. Kearney in fact lied or testified falsely.

## IV.    ADDITIONAL DOCUMENTS AND INFORMATION.

### A.    Documents and Information Relating to Michael Monaco.

Michael Monaco, the former Chief Financial Officer of Cendant, testified as a government witness in both the 2004 and 2005 trials. In the 2005 trial, Mr. Monaco testified for the first time to a purportedly incriminating conversation with Mr. Forbes concerning CUC controller Anne Pember in September 1997. See Tr. (10/20/05) at 568-69; Tr. (10/24/05) at 778-85. Mr. Monaco made no reference to this purported conversation during the 2004 trial or in witness interviews. See Tr. (10/24/05) at 778-85.[23]

When defense counsel raised issues during the 2005 trial concerning the credibility of Mr. Monaco's new testimony, the government repeatedly argued to the jury that Mr. Monaco had no motive to falsify his testimony. See, e.g., Tr. (11/29/05) at 3102 ("Ladies and gentlemen, ask yourselves, what motive does Mike Monaco have to make up this conversation with the defendant? Unlike Cosmo Corigliano and Anne Pember, Mike Monaco hasn't pled guilty to a crime. Mike Monaco isn't hoping that the United States will write a downward departure letter in exchange for his cooperation in this case. So what motive does Mike Monaco have to lie?").

Defense counsel have received information that Mr. Monaco may very well have a motive to falsify his testimony in order to curry favor with the government. It has come to our attention that Mr. Monaco's conduct during his employment at Cendant (on a matter not

---

[23]    Anne Pember was a major participant in improper accounting at CUC. During the 2004 trial, Mr. Monaco testified to a conversation he had with CUC President Kirk Shelton concerning Ms. Pember's employment status. See Tr. (5/20/04) at 1570-71. Mr. Monaco said nothing about any purported conversation with Mr. Forbes concerning Anne Pember.

involving CUC) may be (or may have been) the subject of investigation by the government.[24]  If Mr. Monaco's conduct is, or has been, under investigation by the government, he has a motive to testify in a manner that will advance the government's interests.

The government must disclose information that the defense could use "to impeach the Government's witnesses by showing bias or interest." Horton v. Mayle, 408 F.3d 570, 578 (9th Cir. 2005) (quoting United States v. Bagley, 473 U.S. 667, 676 (1985)).  Any information in the government's possession, custody, or control concerning any government investigation of Mr. Monaco's conduct constitutes Brady and Giglio material that the government has a duty to disclose to the defense.

## B.    Documents and Information Relating to Steven Kernkraut.

Steven Kernkraut, a former Bear Stearns analyst who covered CUC and Cendant, did not testify at the 2004 trial.  At the 2005 trial, he testified, inter alia, that Mr. Forbes spoke on quarterly earnings conference calls involving various analysts conducted by CUC every quarter between 1995 and 1997.  See Tr. (10/17/05) at 130-31, 147-48; Tr. (10/18/05) at 301-03.  This testimony was significant, because Mr. Kernkraut relied on these alleged quarterly earnings conference calls as a basis for his testimony about the extent of his alleged interactions with Mr. Forbes concerning CUC's finances, see id., and the government suggested that Mr. Forbes' testimony that such conference calls did not begin until mid-1997, after the CUC-HFS merger announcement, was false, see Tr. (12/4/05) at 3563-64.  In fact, contrary to Mr. Kernkraut's testimony, CUC did not conduct any quarterly earnings conference calls until mid-1997, after CUC and HFS announced their intent to merge.  See Tr. (11/14/05) at 2763-65.

---

[24]    If the Court would like additional information concerning the basis for this inquiry, Mr. Forbes requests the opportunity to supply the information in camera.

At a hearing on December 6, 2005, government counsel represented that the government believed that quarterly earnings conference calls took place at CUC, but that the government had not located any records of such calls.[25]  Tr. (12/6/05) at 3666.  Pursuant to Brady and Giglio, the government should disclose all information in its possession, custody, or control that indicates or tends to prove that CUC did not conduct any quarterly earnings conference calls with analysts prior to May 1997.

### C.    Documents and Information Relating to Stuart Bell and Kirk Shelton.

In both the 2004 and 2005 trials, the government offered out of court statements from alleged co-conspirators Stuart Bell and E. Kirk Shelton pursuant to Fed. R. Evid. 801(d)(2)(E).  Pursuant to Fed. R. Evid. 806, Mr. Forbes is entitled to offer evidence of a statement or conduct "at any time" that is inconsistent with the hearsay statement, including post-conspiracy statements denying Mr. Forbes' participation in the alleged conspiracy.[26]

If the government has any information in its possession, custody, or control that Mr. Shelton and/or Mr. Bell made statements or engaged in conduct inconsistent with either their or Mr. Forbes' alleged participation in a conspiracy to inflate reported earnings by CUC or

---

[25]    Government counsel indicated that the government had records of certain conference calls announcing acquisitions made by CUC, but not of quarterly earnings conference calls.  Id.

[26]    See United States v. Grant, 256 F.3d 1146, 1153-54, 1156 (11th Cir. 2001) (post-conspiracy affidavit exculpating defendant admissible to impeach 801(d)(2)(E) evidence; reversing conviction); United States v. Vegas, 27 F.3d 773, 782 (2d Cir. 1994) (trial court admitted post-conspiracy statements to law enforcement and court, which exculpated defendant, to impeach Rule 801(d)(2)(E) evidence); United States v. Myerson, 18 F.3d 153, 161-62 (2d Cir. 1994) (court erréd in excluding post-conspiracy statements to another witness denying overbilling to impeach 801(d)(2)(E) evidence); United States v. Wali, 860 F.2d 588, 591-92(3d Cir. 1989) (post-conspiracy statements to law enforcement exculpating defendant admissible to impeach 801(d)(2)(E) evidence; vacating conviction); United States v. Shafi, No. 92cr274, 1993 WL 14483, at *1 (S.D.N.Y. Jan. 11, 1993) (admitting post-conspiracy statements exculpating defendant to impeach Rule 801(d)(2)(E) evidence tending to show existence of conspiracy).

Cendant, that information constitutes <u>Giglio</u> material and should be produced.  For example, during Mr. Shelton's sentencing hearings, former lead prosecutor John Carney stated that the government had offered a plea deal to Mr. Shelton during the 2004 trial that Mr. Shelton had rejected.  <u>See</u> Tr. (7/20/05) at 102-03.  Similarly, during Mr. Shelton's sentencing hearings, Mr. Shelton's wife stated that the government had repeatedly offered leniency to Mr. Shelton if he would provide information against Mr. Forbes.  Mrs. Shelton asserted that Mr. Shelton refused all of those offers "because he could not lie and knowingly destroy another person's life," and stated that "if my husband had any information that would have assisted the government in their case against Walter Forbes, he certainly would have provided it.  We wouldn't be standing here today."  Tr. (7/26/05) at 569-71.

    The government should produce any documents and information in its possession, custody, or control concerning the foregoing plea discussions, as well as: (i) all documents and information concerning any other plea discussions or negotiations with Mr. Bell, Mr. Shelton, or their attorneys; (ii) all documents and information concerning any immunity discussions or negotiations with these witnesses or their attorneys; (iii) all documents and information concerning discussions or negotiations with these witnesses or their attorneys regarding potential or actual interviews, proffers or testimony; (iv) all documents and information concerning discussions or negotiations concerning a reduction of sentence with Mr. Shelton or his attorneys; (v) all documents and information concerning denials of the alleged fraud by these witnesses, whether directly or through counsel; and (vi) all documents and information concerning denials of knowledge of Mr. Forbes' alleged knowledge of or participation in the alleged fraud by these witnesses, whether directly or through counsel.

34

**D.  Information Relating to Casper Sabatino.**

Mr. Sabatino was a key participant in unsupported quarterly topside adjustments at CUC.[27]  He testified at both the 2004 and 2005 trials, consistent with his statements in numerous government interviews, that he was not asked to do any unsupported topside adjustments when Mr. Bell was the CFO of CUC and that such unsupported topside adjustments began after Mr. Corigliano became CFO.  See, e.g., Tr. (6/15/04) at 4664-66; Tr. (11/10/05) at 2524-27.  This testimony directly contradicted testimony by other government witnesses that this practice began under Mr. Bell.

On cross-examination by the government at the 2005 trial, however, Mr. Sabatino changed his testimony, asserting for the first time that unsupported topside adjustments were done during Mr. Bell's tenure as CFO, Tr. (11/10/05) at 2606-08, and that a document (GX 9322) had refreshed his recollection on that point.  See Tr. (11/10/05) at 2606-08, 2633-35.  Upon inquiry by defense counsel, see Exhibit 16, the government disclosed that Mr. Sabatino was, in fact, shown a copy of GX 9322 at least once by the prosecution team before the 2004 trial and that it did not refresh his recollection about participating in alleged pre-1995 unsupported topside adjustments.  See Exhibit 17 at 2.  The government did not disclose whether it had shown Mr. Sabatino GX 9322 during multiple interviews, or whether it had inquired of anyone other than agent Pat Matthews and former prosecutor Richard Schechter concerning whether Mr. Sabatino had seen GX 9322 before his testimony at the 2004 trial.  See Exhibit 18.

_____

[27]     Mr. Sabatino was a Vice-President of Accounting at CUC responsible for SEC financial reporting.  He is cooperating with the government pursuant to a plea agreement and has plead guilty to a felony offense based on his participation in unlawful conduct at CUC.  In 2004, Mr. Sabatino was called as a government witness.  In 2005, he was not called by the government and was called as a defense witness.

If Mr. Sabatino was shown the document marked as GX 9322 on more than one occasion prior to

the 2005 trial, or otherwise was repeatedly pressed about any alleged improper topside

adjustments prior to the time Mr. Corigliano became CFO, and continued to recall that no

unsupported topside adjustments were made under Mr. Bell, the government should supply that

information pursuant to Brady and Giglio.

      **E.**      **Statements by Government Witnesses.**

      Inconsistent or exculpatory statements that government witnesses made during

government interviews constitute classic Brady/Giglio material that the government must

disclose.  See, e.g., United States v. Serv. Deli, 151 F.3d 938, 943 (9th Cir. 1998) (Brady

obligation to turn over original notes from witness interview that contained three key pieces of

impeachment information); United States v. Vozzella, 124 F.3d 389, 392 (2d Cir. 1997)

(reversing conviction and stating that the undisclosed "statements made by Pietrosanti during the

proffer session were highly exculpatory as to [defendant's] participation in a conspiracy"); see

also United States v. Pelullo, 105 F.3d 117, 122-23 (3d Cir. 1997); United States v. Sudikoff, 36

F. Supp. 2d 1196, 1201 (C.D. Cal. 1999).

      Prior to the 2004 trial, the government provided some, but not all, notes of

witness interviews.  Those it did provide contained substantial amounts of Brady/Giglio

material.  Indeed, defense counsel frequently used the notes on cross-examination and in some

instances called government agents to testify to the prior inconsistent statements reflected in the

notes.  The government refuses, however, to provide the remaining witness interview notes.

      Among the interview notes the government refuses to produce are notes taken by

the members of the government 2004 trial team -- John Carney, Richard Schechter, and James

McMahon.  The government supplied defense counsel with letters summarizing some of the

interviews conducted by the former prosecution team but stopped providing such summaries on or about June 24, 2004. Attorneys Carney, Schechter, and McMahon continued to meet with witnesses after that date and throughout the first trial (which concluded on January 4, 2005). Whether or not the former prosecutors took notes of those sessions, the government must provide all Brady/Giglio material arising from those sessions.

The government also has failed to produce any agent notes of witness interviews since July 2004. The government should either produce all such notes or disclose all oral Brady/Giglio from those interviews. Nor has the government provided any information concerning the witness interviews conducted by its current trial team members. It is undisputed that current government counsel met with witnesses to prepare them for their 2005 trial testimony.[28] Whether or not there are notes of those sessions, the government has an obligation to disclose all Brady/Giglio from those sessions.[29] At a minimum, the government should provide all interview notes that it has not produced to the defense to the Court for in camera inspection.

The government also should supply a list of every date on which the government interviewed or obtained factual information from each of its cooperating witnesses to the extent this information has not been produced. Mr. Forbes requires this information to conduct

---

[28]    Mr. Corigliano testified that he met with the current prosecutors approximately 20 times to prepare for his 2005 testimony. Tr. (11/1/05) at 1455-56.

[29]    For example, the government should disclose whether any government witness made any statement during his or her 2005 preparation sessions that was inconsistent with his or her 2004 or 2005 trial testimony or prior government interviews. To the extent that witnesses (such as Kevin Kearney and Michael Monaco) gave testimony at the 2005 trial concerning purported events that they did not disclose to the government in earlier interviews, the government should supply that information as well.

37

meaningful cross-examinations with respect to changes in witnesses's stories over time.[30]

## CONCLUSION

Mr. Forbes respectfully requests that the Court order the government to provide the requested documents and information.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: _____
Brendan V. Sullivan, Jr. (Bar No. ct17115)
Barry S. Simon (Bar No. ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
COWDERY, ECKER & MURPHY, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

---

[30]    In October 2003, the government represented that it would keep such a record on a going-forward basis, see Tr. (10/16/03) at 159-60, and Judge Thompson ruled that Mr. Forbes "was entitled to attempt to introduce the dates through the testimony of the former federal prosecutors unless the parties entered into a stipulation." Docket No. 1138.

CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Memorandum in Support of Motion of

Defendant Walter A. Forbes to Compel Discovery and Production of Brady/Giglio Material

(Forbes Third Trial Motion No. 2) to be filed electronically and to be served on March 31, 2006

to the following via e-mail:

Norman Gross, Esq. (norman.gross@usdoj.gov)
Michael Martinez, Esq. (michael.martinez2@usdoj.gov)
Craig Carpenito, Esq. (craig.carpenito@usdoj.gov)

Barry S. Simon