## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | No. 3:02CR264 (AHN) |
| ) | |
| WALTER A. FORBES ) | March 31, 2006 |
| ) | **(UNDER SEAL)** |

### MOTION OF WALTER A. FORBES FOR AN ORDER
### REQUIRING THE GOVERNMENT TO CONFER USE
### IMMUNITY ON STUART BELL
### (Forbes Third Trial Motion No. 3) (FILED UNDER SEAL)

Walter A. Forbes, through undersigned counsel, respectfully moves for an order requiring the government to confer use immunity on Stuart Bell or face the sanction of dismissal, or the sanction of excluding all evidence relating to alleged unlawful conduct by Mr. Bell. The grounds for this motion are set forth in the accompanying memorandum of points and authorities.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: _____

Brendan V. Sullivan, Jr. (ct17115)
Barry S. Simon (ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

James T. Cowdery (ct05103)
Thomas J. Murphy (ct07959)

Oral Argument Requested

COWDERY, ECKER & MURPHY, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Motion of Defendant Walter A. Forbes for an Order Requiring the Government to Confer Use Immunity on Stuart Bell (Forbes Third Trial Motion No. 3) (FILED UNDER SEAL) to be served on March 31, 2006 to the following via e-mail:

> Norman Gross, Esq. (norman.gross@usdoj.gov)
> Michael Martinez, Esq. (michael.martinez2@usdoj.gov)
> Craig Carpenito, Esq. (craig.carpenito@usdoj.gov)

Barry S. Simon

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 3:02CR264 (AHN) |
| | ) | |
| WALTER A. FORBES | ) | March 31, 2006 |
| | ) | **(UNDER SEAL)** |
| | ) | |

### MEMORANDUM IN SUPPORT OF MOTION OF WALTER A. FORBES FOR AN ORDER REQUIRING THE GOVERNMENT TO CONFER USE IMMUNITY ON STUART BELL
### (Forbes Third Trial Motion No. 3) (FILED UNDER SEAL)

Walter A. Forbes, through undersigned counsel, respectfully submits this memorandum in support of his motion for an order requiring the government to confer use immunity on Stuart Bell or face the sanction of dismissal, or the sanction of excluding all evidence relating to alleged unlawful conduct by Mr. Bell.[1]

### INTRODUCTION

Mr. Bell was the CFO of CUC International until January 31, 1995, when Cosmo Corigliano succeeded him in that position. A centerpiece of the government's case in both the first and second trials is a simple, misleading, one-sided argument: the alleged fraud lasted for a long period of time, spanning the tenure of two different CFOs (Mr. Bell and his alleged protégé, Mr. Corigliano); therefore, Mr. Forbes must have known about and participated in the alleged fraud.

---

[1] Judge Thompson denied similar motions during the first and second trials. Additional facts arising since the filing of those earlier motions further justify the requested relief. For example, the government emphasized Mr. Bell in its rebuttal summation during the second trial, and four additional months have passed since the Court last denied the motion, see Second Tr. at 2,641-44, without the government initiating an investigation or prosecution of Mr. Bell.

Oral Argument Requested

The government featured this two-CFO theory prominently during summation in both the first and second trials.

> You heard testimony and you saw documents which proved that this fraud, this manipulation of the earnings, was not something that was dreamed up or cooked up in '95, '96 or '97 after Mr. Corigliano was brought in as CFO. You heard evidence that this fraud existed long before, long before he was the CFO, long before Anne Pember was the controller, back when it was just Mr. Forbes as the chairman, Mr. Shelton as president or COO and a man named Stu Bell running the company.

First Tr. at 14,828; see, e.g., First Tr. at 16,025 ("You have two CFOs in the 1990 to 1998 period. What are the odds that they're both corrupt and they're both hiding the fraud from Walter Forbes and Kirk Shelton? Does that make Walter Forbes and Kirk Shelton the unluckiest CEO and the unluckiest president to ever serve on a public company?"); Second Tr. at 3,557 ("What an unfortunate coincidence for the defendant. Not just one but two corrupt CFOs when he was head of the company.").[2]

Mr. Bell's testimony would be material, exculpatory, and not cumulative because it would refute the government's two-CFO theory, which no other witness can do. Mr. Bell denies committing fraud at CUC and would provide legitimate explanations for the accounting at CUC during his tenure as CFO. See Ex. A (Simon Decl.); Ex. B (Cary Decl.). The significance of Mr. Bell's testimony is highlighted by the fact that at the first trial, the jury submitted two notes inquiring about Mr. Bell. After the second trial, the media reported that the jury foreman wondered, "Where was Stu Bell?" Jane

---

[2]     The "evidence" supporting the two-CFO theory consisted largely of testimony by Mr. Corigliano and Kevin Kearney, discussed below, and a few otherwise innocent documents that Mr. Corigliano interpreted through his testimony to be the instrumentalities of the alleged fraud.

Mills, Cendant Juror Ken Premo Comments on Walter Forbes Retrial, Bloomberg, Feb. 15, 2006.

Mr. Forbes subpoenaed Mr. Bell to testify in both trials, required him to come to Court and was prepared to put him on the witness stand. Mr. Bell, however, was unavailable to the defense because he invoked his Fifth Amendment privilege. Defense counsel has recently contacted counsel for Mr. Bell, who confirmed that Mr. Bell's position has not changed; he will again invoke his Fifth Amendment privilege if called to testify at this trial.[3] The government has refused to confer use immunity on Mr. Bell, although it has used its immunity power to obtain inculpatory testimony from other witnesses, and the government does not appear to have any legitimate reason for refusing to compel Mr. Bell to testify, only the illegitimate concern that he will provide critical testimony helpful to the defense. Under these circumstances, due process requires that the government confer use immunity on Mr. Bell, or face the sanction of dismissal, or the sanction of excluding all evidence relating to alleged unlawful conduct by Mr. Bell.

## ARGUMENT

### I.    THE SECOND CIRCUIT EMPLOYS A THREE-PART TEST TO REQUESTS FOR DEFENSE WITNESS IMMUNITY.

The Second Circuit "has followed the carrot-and-stick approach, leaving the immunity decision to the executive branch but interposing the judicial power to subject the government to certain choices of action." United States v. Bahadar, 954 F.2d 821, 826 (2d Cir. 1992); accord United States v. Dolah, 245 F.3d 98, 105 n.5 (2d Cir.

---

[3]    The privilege serves to protect the innocent because "truthful responses of an innocent witness . . . may provide the government with incriminating evidence from the speaker's own mouth." Ohio v. Reiner, 532 U.S. 17, 21 (2001) (per curiam); see also Grunewald v. United States, 353 U.S. 391, 421 (1957) ("The privilege serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances." (quotation omitted)).

2001), overruled on other grounds, Crawford v. Washington, 541 U.S. 36 (2004). Those choices of action include the choice between conferring defense witness immunity or dismissal. See Bahadar, 954 F.2d at 825-26. As an alternative to dismissal, the Court could exclude all evidence that Mr. Bell allegedly engaged in unlawful conduct.[4]

There is a "three-part test for requiring the government to grant defense witness immunity at the risk of dismissal of the indictment." Bahadar, 954 F.2d at 826.

> First, the district court must find that the government has engaged in discriminatory use of immunity to gain a tactical advantage or, through its own overreaching, has forced the witness to invoke the fifth amendment. Second, the witness's testimony must be "material, exculpatory, and not cumulative". Third, the testimony must be unobtainable from any other source.

Id. Moreover, the Second Circuit has "explicitly left open the issue of whether under extraordinary circumstances, due process may require that the government confer use immunity on a witness for the defendant" in the absence of "discriminatory use of immunity." Dolah, 245 F.3d at 106 (internal quotation omitted).

_____

[4]    This remedy would not prevent the prosecution from going forward, but would prevent the distorted picture of the accounting during the pre-1995/Bell era. Moreover, the Court could simply exclude evidence regarding Mr. Bell under its authority to control the presentation of evidence so as to "make the interrogation and presentation effective for ascertainment of the truth." See Fed. R. Evid. 611; see also Fed. R. Evid. 403. There are serious problems with the evidence regarding the pre-1995 time period beyond the government's refusal to immunize Mr. Bell. Among other issues, the government has no expert witness to testify about the accuracy of the accounting in that time period; documents from that time period are not available to refute Mr. Corigliano's testimony; and improper testimony by Messrs. Corigliano and Kearney about this time period have been the basis for multiple mistrial motions. See Mot. Mistrial Due to Constructive Amendment and/or Prejudicial Variance and Notice Violations [Docket Nos. 953-54]; Mot. Mistrial Based on Undisclosed Expert Testimony [Docket Nos. 955-56]; Mot. Mistrial Due to Kearney's False and Misleading Testimony [Docket No. 1091]; Mot. Mistrial Due to Testimony of Kearney [Docket No. 1911]; see also Mot. Mistrial Based on Testimony of Steven Kernkraut [Docket No. 1886].

## II.    THE THREE-PART TEST IS SATIFIED.

Mr. Bell's testimony is material, exculpatory, and not cumulative; his testimony is unobtainable from other sources; and the government has engaged in the discriminatory use of immunity to gain a tactical advantage.  In addition, extraordinary circumstances are present to satisfy the first part of the test irrespective of the discriminatory use of immunity.

### A.    Mr. Bell's Testimony Is Material, Exculpatory, And Not Cumulative.

The government primarily attempted to support its two-CFO theory at the first two trials with testimony of Messrs. Corigliano and Kearney.  In both trials, Mr. Corigliano testified on direct examination about the alleged use of various improper accounting practices to improve CUC's operating results during the Bell era.  See First Tr. at 6,238-328, 6,337-454; Second Tr. at 1,267-306.

Mr. Corigliano claimed that he learned these illicit accounting techniques under the tutelage of Mr. Bell.  See, e.g., First Tr. at 6,245 ("Stu Bell told me how to prepare the membership analysis to give to the auditors and told me how it should differ from the internal records."); id. at 6,361 ("I followed Stu's instructions to take $2 million out of the general reserve and put it into operating earnings for the first quarter."); id. at 6,367 ("Initially, when we first started doing it, [Mr. Bell] told me not to record the membership rejects for the end of the year."); id. at 6,372 ("Stu Bell asked me to move members out of the deferred category and put them in the immediate category so we could increase -- so the company could increase its operating income."); id. at 6,401 ("The substance of the conversation was that Stu asked Tom to create some reserves indicating that it would be real nice if we had some cushions, some excess reserves when we took the company over."); Second Tr. at 1,272 ("Stu said, Oh, come on Tom . . . . It's

- 5 -

a good idea to have some excess reserves. You should go ahead and do it."); id. at 1,275 (testifying that Mr. Bell "told me to use that excess reserve to increase, to artificially increase operating income"); id. at 1,277 (testifying that Mr. Bell "told me . . . in establishing the [membership cancellation] reserve to use a lower cancellation rate than what history told us was actually going to be the case"); id. at 1,290 (testifying that Mr. Bell "told me not to record some of the rejects-in-transit at the end of the year"); id. at 1,294 (testifying that Mr. Bell "told me to move members from the deferral, from the shopping area, for instance, recognized over the course of the year, he told me to move those into the category of immediate recognition").

Mr. Kearney also offered testimony on direct examination concerning Mr. Bell's tenure as CFO. During the first trial, Mr. Kearney claimed for the first time that he met with Mr. Bell every quarter to discuss improper topside adjustments when Mr. Bell was CFO, and that Mr. Bell allegedly invoked Walter Forbes' name each quarter in connection with these adjustments. See Tr. at 9,715-25. He repeated this new "recollection" during the second trial. See Second Tr. at 1,096-104.[5]

---

[5]     The government interviewed Mr. Kearney at least twelve times between May 1998 and March 2004 in advance of the first trial. The government repeatedly questioned Mr. Kearney about improper quarterly topside adjustments, but he never claimed that he met with Mr. Bell each quarter to discuss topside adjustments or that Mr. Bell allegedly invoked Mr. Forbes' name when discussing topside adjustments. At the first trial, nearly six years after he began cooperating with the government and ten years after Mr. Bell stepped down as the CFO of CUC, Mr. Kearney changed his story. He claimed for the very first time that he met with Mr. Bell every quarter to discuss topside adjustments and that Mr. Bell allegedly invoked the name Walter Forbes each quarter in connection with topside adjustments. See Mem. Supp. Mot. Mistrial Due to Kearney's False and Misleading Testimony at 4-11 [Docket No. 1,091]; Mot. Compel Discovery and Production of Brady/Giglio Material (Forbes Third Trial Motion No. 2) (filed March 31, 2006).

Two other cooperating witnesses, Anne Pember and Casper Sabatino, testified about accounting in the Bell era. Ms. Pember, the former controller of CUC, offered only limited testimony about allegedly improper accounting during the Bell-era. Mr. Sabatino, the former head of financial reporting for CUC, offered inconsistent testimony. In the first trial, he testified, consistent with his statements in numerous government interviews, that he was not asked to make improper topside adjustments when Mr. Bell was the CFO and that this practice began after Mr. Corigliano became CFO. See First Tr. at 4,664-66. The government declined to call him as a witness in the second trial, and Mr. Forbes called him as a defense witness. In the second trial, Mr. Sabatino repeated his earlier testimony, see Second Tr. at 2,524-27, but on cross-examination his recollection was "refreshed" by a document that he had seen before, and he stated for the first time that improper topside adjustments were done during the Bell era, see id. at 2,606-08. See Mot. Compel Discovery and Production of Brady/Giglio Material (Forbes Third Trial Motion No. 2) (filed March 31, 2006) (explaining issues regarding Mr. Sabatino's testimony in greater detail).

If Mr. Bell testified, he would deny participation in any fraud at CUC. His testimony would undermine the government's theory that the alleged fraud began in the 1980s under Mr. Bell and continued throughout his tenure as CFO. Mr. Bell's testimony also would contradict Mr. Corigliano's testimony that he learned how to commit accounting fraud from Mr. Bell and that Mr. Bell (as opposed to Mr. Corigliano) was the architect of CUC's allegedly improper accounting. Mr. Bell would be able to explain that the few documents introduced into evidence by the government concerning the pre-1995

period do not reflect improper accounting as alleged by Mr. Corigliano.[6]  Mr. Bell would similarly refute Mr. Kearney's testimony that Mr. Bell instructed him to make improper topside adjustments and invoked the name Walter Forbes in doing so.  Accordingly, Mr. Bell's testimony is material, exculpatory, and not cumulative.[7]

### B.    The Testimony Is Unobtainable From Any Other Source.

Mr. Forbes has no other means of presenting the testimony that Mr. Bell can offer.  Mr. Bell is the only witness who can refute Mr. Corigliano's testimony concerning allegedly improper accounting during Mr. Bell's tenure as CFO.  Much of Mr. Corigliano's testimony concerning Mr. Bell involved purported conversations in which only Mr. Corigliano and Mr. Bell were present.  Only Mr. Bell could contradict Mr. Corigliano's testimony concerning those conversations.  Moreover, as the former CFO, Mr. Bell is uniquely qualified to explain CUC's accounting during the pre-1995 period and refute Mr. Corigliano's nefarious spin on the small number of documents introduced by the government from that time period.  Likewise, Mr. Bell is the only witness who can refute Mr. Kearney's testimony about what Mr. Bell supposedly said.

---

[6]    Adjustments in the pre-1995 documents that Mr. Corigliano testified about are broken down into components involving estimates that are adjusted both upwards and downwards within the same category of revenues or expenses, suggesting that they were legitimate adjustments, unlike the pure fabrication of numbers alleged in the Corigliano era.  See, e.g., Ex. C (listing at the bottom of the second page potential adjustments to income and to profit sharing that are positive and negative).

[7]    The government obviously expects that Mr. Bell's testimony would be exculpatory, or it would have compelled him to testify long ago.  Indeed, the government has argued that Mr. Bell's exculpatory testimony would be "self-serving" and "highly suspect" because he "is still facing potential civil liability" and "has never previously provided such an account to the Government."  Opp'n to Forbes Trial Mot. No. 44, at 10 [Docket No. 1,252].  That may be a basis for cross-examination, but it is not a basis to deprive Mr. Forbes of the testimony.  See United States v. Mackey, 117 F.3d 24, 28 (1st Cir. 1997) ("But one might think that it was a matter for the jury, not the prosecutor, to decide whether testimony seemingly helpful to the defendant was actually false.").

C.    **The Government Has Engaged In Discriminatory Use of Immunity And, In Any Event, Extraordinary Circumstances Are Present.**

By offering immunity only as necessary to those witnesses who provide inculpatory testimony and depriving Mr. Forbes of access to Mr. Bell, the government has engaged in the discriminatory use of immunity. Alternatively, extraordinary circumstances support an order to the government to confer defense witness immunity.

1.    **The Government Has Engaged in the Discriminatory Use of Immunity.**

Only those witnesses who have offered testimony damaging to Mr. Forbes or testimony admitting to fraud at CUC have obtained any form of immunity. The government entered into an agreement with Steven Speaks that provides him with transactional immunity in the District of New Jersey from "criminal charges arising from any acts or conduct of Mr. Speaks within the scope of his authority as an employee of CUC or Cendant during the period from in or about August 1996 through April 1998" so long as he complies with the agreement. Ex. D at SPS 343 (Cooperation Agreement, Oct. 7, 1998). The government entered into plea agreements with Cosmo Corigliano, Anne Pember, and Casper Sabatino that provide transactional immunity in the District of New Jersey from charges for known criminal activity other than the counts to which they each pled guilty. See, e.g., Ex. E at 1 (Corigliano Plea Agreement) ("If Mr. Corigliano enters a guilty plea and is sentenced on this charge, and if he otherwise fully complies with all of the terms of this agreement, this Office will not initiate any further charges against him arising from [alleged accounting misconduct at CUC or insider trading]."); Ex. F at 1 (Sabatino Plea Agreement) ("If Mr. Sabatino enters a guilty plea and is sentenced on this charge, and if he otherwise fully complies with all of the terms of this agreement, this Office will not initiate any further charges against him arising from [alleged accounting

- 9 -

misconduct at CUC]."); Ex. G at 1 (Pember Plea Agreement) ("If Ms. Pember enters a

guilty plea and is sentenced on this charge, and if she otherwise fully complies with all of

the terms of this agreement, this Office will not initiate any further charges against her

arising from [alleged accounting misconduct at CUC or insider trading]."). The

government also entered into a proffer agreement with Mr. Kearney that provided limited

informal use immunity, see Ex. H ¶ 1 (Proffer Agreement, Apr. 29, 1999) (providing that

"no statements made by your client during the interview will be used against your client

in the government's case-in-chief at trial or for purposes of sentencing, except as

provided below"), and at some point during Mr. Kearney's cooperation, the government

agreed that it would not prosecute him.  See First Tr. at 9,881.[8]

By immunizing where necessary any alleged coconspirator that the

government can convince to testify against Mr. Forbes, but denying immunity to those

who exculpate him, the government engages in the discriminatory use of immunity.  See

Dolah, 245 F.3d at 105-06.  The government cannot refuse to grant immunity solely to

withhold exculpatory evidence from the defense, when it has used its immunity power to

procure inculpatory evidence.  Therefore, due process mandates that the Court compel the

government to confer use immunity upon Mr. Bell or face appropriate sanction.

>    **2.    Extraordinary Circumstances Support Defense Witness
>           Immunity.**

Even if the Court does not find that the government has engaged in the

discriminatory use of immunity, extraordinary circumstances "require that the

---

[8]    Informal immunity agreements are fully enforceable against the government.  See,
e.g. United States v. Aleman, 286 F.3d 86, 89-90 (2d Cir. 2002).

government confer use immunity on" Mr. Bell.  Dolah, 245 F.3d at 106.  Several extraordinary circumstances are present here.

### a.      Extensive testimony regarding Bell

At both trials, the government presented extensive testimony concerning Mr. Bell's alleged statements and actions, including numerous hearsay statements purportedly made by Mr. Bell.  It is fundamentally unfair for the government to feature Mr. Bell's alleged misconduct prominently in its case-in-chief, and to claim that Mr. Bell initiated the accounting fraud and taught Mr. Corigliano how to commit the fraud, while denying Mr. Forbes the testimony of the key witness who would deny these claims.  Mr. Bell's testimony is crucial to the judicial fact-finding process.  Without his testimony, the fact-finding process will necessarily be distorted.  Such distortion is contrary to the very purpose of a trial and our system of criminal justice.  See Nix v. Whiteside, 475 U.S. 157, 158 (1986) ("the very nature of a trial [is] as a search for [the] truth"); Arizona v. Fulminate, 499 U.S. 279, 295 (1991) ("The search for truth is . . . central to our system of justice.").

### b.      No intent to prosecute Bell

The government has a trivial interest in withholding immunity because it does not intend to prosecute Mr. Bell.  Since at least 2000, the government has been on notice of Mr. Corigliano's claim that Mr. Bell engaged in wrongdoing.  Nevertheless, the government has not sought to charge Mr. Bell for his purported involvement in accounting wrongdoing at CUC and has not represented or stated in its pleadings opposing Mr. Forbes' immunity requests in the first and second trials that it has any intention to do so now, eight years after accounting irregularities at CUC were disclosed to the public, and more than eleven years after Mr. Bell stepped down as CFO of CUC.

- 11 -

The government has not even stated that Mr. Bell is under investigation. If the government had any serious interest in pursuing criminal charges against Mr. Bell, it would have done so long ago. See United States v. Mackey, 117 F.3d 24, 28 (1st Cir. 1997) (stating that due process might require court to compel prosecutor to grant immunity over good faith objection when prosecutor has "trivial interest in withholding immunity" and "the defendant has an overwhelming need for specific exculpatory evidence that can be secured in no way other than through the grant of immunity").

### c.    Immunity would not preclude Bell prosecution

Providing use immunity to Mr. Bell would not preclude a future prosecution of Mr. Bell because the government completed its investigation years ago. The federal immunity statute does not provide transactional immunity from prosecution, but rather prevents the government from using immunized testimony (or any information directly or indirectly derived from such testimony) against the witness in a criminal case, except in a prosecution for perjury or false statements. See 18 U.S.C. § 6002. Here, the government has already completed its investigation into alleged accounting fraud at CUC. It has identified the witnesses, the documents, and the testimony that it believes support its case. If the government takes appropriate steps to protect this "evidence" from any taint by immunized testimony, it should be able to satisfy its burden under Kastigar of proving that it derived its evidence from legitimate sources "wholly independent" of the immunized testimony. Kastigar v. United States, 406 U.S. 441, 460-61 (1972). Furthermore, if the government believes that Mr. Bell's testimony denying criminal conduct is false, statutory immunity would not preclude the government from charging Mr. Bell with perjury or false statements. See 18 U.S.C. § 6002; United States v. Apfelbaum, 445 U.S. 115 (1980). The interests of justice are served by immunizing

Mr. Bell because the government could prosecute him as it sees fit, irrespective of a grant of immunity.

### d.    Abuse of immunity power in favor of Mr. Corigliano

The government has permitted Mr. Corigliano to violate the transactional immunity provisions of his plea agreement without sanction. The plea agreement expressly conditions the immunity promise on Mr. Corigliano's provision of truthful testimony and complete information in response to government inquiries. See Ex. E at 2 (Corigliano Plea Agreement) ("[S]hould it be established that he has intentionally given materially false, incomplete, or misleading testimony or information . . . the non-prosecution provisions of this agreement shall be null and void."). Mr. Corigliano breached the agreement by providing materially false, incomplete and misleading testimony on numerous topics. See, e.g., Mot. Preclude References to Truth-Telling Provisions In Cosmo Corigliano's Plea Agreement (Forbes Trial Motion *In Limine* No. 1) (filed March 31, 2006).

For example, during the first trial, Mr. Corigliano put Mr. Forbes in an alleged conspiratorial meeting in Kirk Shelton's office in Stamford when travel records establish that, in fact, Mr. Forbes was thousands of miles away. See First Tr. at 9,631-51; see also Mot. Preclude References to Truth-Telling Provisions In Cosmo Corigliano's Plea Agreement (Forbes Trial Motion *In Limine* No. 1) (filed March 31, 2006) (explaining fabrication in greater detail). When confronted with documentary evidence that he had lied, Mr. Corigliano stood by his lie because, he testified, "I remember the meeting. I remember it being in Kirk's office. I remember it being after Walter told me that [Henry] wasn't going to do anything. And that's what I remember." First Tr. at 9,651.

Despite this demonstrably false testimony, the government did not seek to revoke Mr. Corigliano's plea agreement. Instead, the government reshaped his testimony, excising the proven lie, and proceeded to present him to a new jury as a truth teller who had faithfully abided by the provisions of his plea agreement. See Second Tr. at 3,566 ("Ask yourself if Cosmo Corigliano's plea agreement provides him with a powerful motive to tell the truth."). The truth is that Mr. Corigliano has violated his plea agreement with impunity. This is further evidence that the government has abused its immunity power.

### e.    Additional tactical advantages

The government is gaining a significant tactical advantage through its deliberate denial of immunity to Mr. Bell beyond depriving Mr. Forbes of exculpatory evidence. It is also depriving Mr. Forbes of evidence to address various constitutional and other violations caused by the government, including Mr. Corigliano's improper testimony about new charges of alleged accounting misconduct during the late 1980s to January 1995 time period, see Mot. Mistrial Due to Constructive Amendment and/or Prejudicial Variance and Notice Violations [Docket Nos. 953-54]; Mr. Corigliano's improper expert testimony concerning the accounting in that same time period, see Mot. Mistrial Based on Undisclosed Expert Testimony [Docket Nos. 955-56]; and Mr. Kearney's false testimony concerning alleged meetings with Mr. Bell and Mr. Bell's alleged invocation of the name Walter Forbes in connection with purported accounting manipulations, see Mot. Mistrial Due to Kearney's False and Misleading Testimony [Docket No. 1091]; Mot. Mistrial Due to Testimony of Kearney [Docket No. 1911].[9]

---

[9]    Compare United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991) (reversing conviction when government witness testified falsely that he had stopped gambling and

Admission of Mr. Bell's testimony would not cure these other violations if they are repeated at the third trial, but would serve to mitigate them.

## CONCLUSION

For the reasons set forth above, Mr. Forbes respectfully requests that the Court provide the government with a choice—immunize Mr. Bell or face dismissal. As an alternative to dismissal, the Court could exclude evidence that Mr. Bell allegedly engaged in unlawful conduct at CUC.[10]

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: _____
Brendan V. Sullivan, Jr. (ct17115)
Barry S. Simon (ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

James T. Cowdery (ct05103)
Thomas J. Murphy (ct07959)
COWDERY, ECKER & MURPHY, L.L.C.
750 Main Street

---

government successfully argued that extrinsic evidence of witness' continued gambling should be excluded under Fed. R. Evid. 608(b)).

[10]    If the Court denies this motion, and Mr. Bell does not otherwise testify at trial, Mr. Forbes will request a missing witness instruction making it clear that the jury may conclude that Mr. Bell's testimony would have been harmful to the government.  See United States v. Myerson, 18 F.3d 153, 160 (2d Cir. 1994) ("[I]n the absence of circumstances that indicate the government has failed to immunize an exculpatory witness, a district court does not abuse its discretion by refusing to give a missing witness charge."); Notice of Issues Concerning Jury Instructions (filed March 31, 2006).

Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused the foregoing Memorandum in Support of Motion of

Defendant Walter A. Forbes for an Order Requiring the Government to Confer Use Immunity on

Stuart Bell (Forbes Third Trial Motion No. 3) (FILED UNDER SEAL) to be served on March

31, 2006 to the following via e-mail:

> Norman Gross, Esq. (norman.gross@usdoj.gov)
> Michael Martinez, Esq. (michael.martinez2@usdoj.gov)
> Craig Carpenito, Esq. (craig.carpenito@usdoj.gov)

Barry S. Simon

# EXHIBIT  A

## Declaration of Barry S. Simon

Barry S. Simon, counsel for Walter A. Forbes, hereby declares as follows:

1. Counsel for Mr. Stuart Bell has informed me that absent a grant of immunity by the government, Mr. Stuart Bell will invoke the privilege not to testify under the Fifth Amendment if called to testify in the matter of <u>United States v. Forbes</u>, No. 3:02CR264 (AWT) (D. Conn.).

2. Counsel for Mr. Stuart Bell further informed me that should Mr. Bell testify pursuant to a grant of immunity, Mr. Bell would deny committing any fraud at CUC.

3. In earlier discussions, counsel for Mr. Bell informed me, among other things, that Mr. Bell did not engage in financial wrongdoing at CUC, that Mr. Corigliano's testimony about Mr. Bell's alleged involvement in unlawful conduct at CUC is wrong, and that there are legitimate explanations for the accounting done at CUC during Mr. Bell's tenure as CFO.

I declare under penalty of perjury that the foregoing is true and correct.

_Barry S. Simon / Rm e_
Barry S. Simon
September 25, 2004

# EXHIBIT  B

### Declaration of Robert M. Cary

Robert M. Cary, counsel for Walter A. Forbes, hereby declares as follows:

1. Counsel for Mr. Stuart Bell has informed me that absent a grant of immunity by the government, Mr. Stuart Bell will invoke the privilege not to testify under the Fifth Amendment if called to testify in the matter of <u>United States v. Forbes</u>, No. 3:02CR264 (AWT) (D. Conn.).

2. Counsel for Mr. Stuart Bell further informed me that should Mr. Bell testify pursuant to a grant of immunity, Mr. Bell would deny committing any fraud at CUC.

I declare under penalty of perjury that the foregoing is true and correct.

_Robert M. Cary_
_____
Robert M. Cary
September 25, 2004

# EXHIBIT  C



GOVERNMENT
EXHIBIT
Ex. 663

08-Nov-90



```
CUC
FOURTH QUARTER              EARNINGS :            REVENUES :
1/31/91
                         PROJECTED    YTD       PROJECTED    YTD

CUC (INC. $3.4 RESERVE REVERSAL)    6,162    15,124     77,762    274,801
BCI (W/O CAP)                         350    (2,232)    15,550     62,175
FISI (WITH ADJ. CAP PER BCI)        8,273    31,976     22,763     87,015
TSI                                (1,975)   (4,693)     4,165     20,491
NCCI                                  789     3,891      2,491     10,926
CUC PUBLISHING                        250       (68)     1,500      2,775
INTERCOMPANY ELIM.                               0      (3,673)   (12,459)
COST OF BASIC                                    0         889      1,694
CAP PROFIT SHARING                               0         315        605
OTHER - EQUIBANK                             3,000          0      3,000
FISI OVER ACCRUAL                     500     1,000                    0
MISC. ADJ.                          3,000     3,000      2,750      2,750
                                                                      0
              EBIT                 17,349    50,998                    0
RECAP (INT.,REST.STK.,TRAN.COSTS)  (4,500)  (20,056)                   0

INCOME                             12,849    30,942    124,512    453,773
PROV.  @    39.12%    5,027
ADD'L. PROVISION
                     ---------
TOT PROV.                  4,756    5,027     12,105

NET INCOME                          7,822    18,837


W.A. SHARES                        23,150    23,129


E.P.S.                              0.3379    0.8144


GENERAL RESERVES @ 1/31/90          5,228

GENERAL RESERVES @ 8/31/90          6,384


POTENTIAL ADJ. :           INCOME     REVENUE

1) RECORD ITT GOODWILL        200
2) ADJUST DEFERRED INCOME FOR
    DISCOVER CANCELLATION    1,500      1,500
3) HEALTH OVER ACCRUAL        400
4) PROF. FEE OVERACCRUAL      500
5) AMAX / CNA UNDERREC.     1,250      1,250
6) INCREASE DISC. ON SOLIC COST    ?????
7) TWO STEP ADJ. 1/90       (850)
8) BCI ACCT. ADJ            (450)

TOTAL OVER ACCUALS          3,000      2,750
```

PROFIT SHARING :

```
AMAX C/R 1/91                          4,000
CNA CR 1/91                            1,000
IBNR AMAX                                750
IBNR CNA                               1,100

EST. REC. BAL @1/91                    5,600

ADD'L. REC.                            1,250
```

# EXHIBIT  D



U.S. Departm    of Justice

*United States Attorney*
*District of New Jersey*

---

*970 Broad Street*                                    *(201) 645-2700*
*Newark, New Jersey  07102*

October 7, 1998

James Plaisted, Esq.
Walder, Sondak, Berkeley & Brogan
5 Becker Farm Road
Roseland, NJ   07068

        Re:  <u>Cooperation Agreement with Steven Speaks</u>

Dear Mr. Plaisted:

        This letter sets forth the full and complete agreement
between your client, Steven Speaks, and the United States Attor-
ney's Office for the District of New Jersey.  This agreement is
based on this Office's investigation into allegations of account-
ing irregularities at CUC International, Inc. ("CUC") and Cendant
Corporation ("Cendant") and on information which Mr. Speaks has
voluntarily provided to this Office in that investigation con-
cerning his activities as an employee of CUC and Cendant during
the period from in or about August 1996 through April 1998.

        Mr. Speaks shall truthfully disclose to this Office and
other government agencies designated by this Office, including
the Securities and Exchange Commission, all information known to
him concerning any activities by himself and others about which
this Office or those other government agencies may inquire.  Mr.
Speaks shall make himself available at all reasonable times
requested by representatives of the Government and shall truth-
fully testify in all criminal, civil, and administrative proceed-
ings, including grand jury and trial proceedings, as to any
subject about which he is questioned.  Mr. Speaks shall also,
upon request, provide representatives of the Government with any
documents, records or other materials which are in his posses-
sion, custody, or control, other than materials that are the sole
property of CUC or Cendant.

        It is understood that Mr. Speaks must at all times give
complete, truthful, and accurate information and testimony.  This
requirement applies not only to any interviews or debriefings in
which Mr. Speaks provides information to this Office or other
Government agencies and to any grand jury or criminal trial
testimony he may give, but also to any sworn testimony he may
give in the context of a civil or administrative proceeding.

SPS 342

- 2 -

Should it be established that Mr. Speaks has intentionally given materially false, incomplete or misleading testimony or information; or should Mr. Speaks participate or attempt to participate in any criminal act subsequent to the date of this agreement; or should Mr. Speaks otherwise withdraw from or violate any provision of this agreement, the non-prosecution provisions of this agreement shall be null and void, and Mr. Speaks shall thereafter be subject to prosecution for any federal criminal violation of which this Office has knowledge, including, but not limited to, perjury and obstruction of justice. Any such prosecution may be premised upon any testimony or information provided by Mr. Speaks, and all such testimony or information may be used against him.

It is therefore agreed between the United States Attorney's Office for the District of New Jersey and Mr. Speaks that, if he fully complies with the terms of this agreement, no criminal charges arising from any acts or conduct of Mr. Speaks within the scope of his authority as an employee of CUC or Cendant during the period from in or about August 1996 through April 1998 will be brought against him by the United States Attorney for the District of New Jersey.

This agreement is made solely by the United States Attorney's Office for the District of New Jersey and cannot bind other federal, state, or local prosecuting authorities, although this Office will bring this agreement to the attention of other such offices and authorities, if requested to do so. In addition, this agreement does not prohibit the United States, any agency thereof, or any third party from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving Mr. Speaks, including, but not limited to, proceedings by the Securities and Exchange Commission and proceedings by the Internal Revenue Service relating to potential civil tax liability.

This written agreement constitutes the full and complete agreement between Mr. Speaks and the United States Attorney's Office for the District of New Jersey and supersedes any previous agreement between them. No additional promises, agreements, or conditions have been entered into with respect to Mr. Speaks's criminal liability other than those set forth in this

SPS 343