UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| v. | ) ) | No. 3:02CR264 (AHN) |
| WALTER A. FORBES. | ) ) ) ) | April 17, 2006 |

**MOTION OF DEFENDANT WALTER A. FORBES TO
PRECLUDE THE GOVERNMENT FROM PRESENTING
EXPERT TESTIMONY FROM JAMES ROWAN OF HARTFORD
STEAM BOILER COMPANY
(Forbes Third Trial Motion *In Limine* No. 15)**

Defendant Walter A. Forbes, through undersigned counsel, respectfully moves to preclude the government from soliciting any expert testimony from Mr. James Rowan, Chief Investment Officer for Hartford Steam Boiler Inspection and Insurance Corporation ("HSB"), including testimony that false earnings indicate that there is a flaw in a company's business model, or testimony concerning the propriety of particular merger charges (which he testified were based upon his personal experiences with HSB's merger reserve), or the documentation purportedly necessary to record those merger charges. The government has not qualified Mr. Rowan as an expert in finance or in Generally Accepted Accounting Principals ("GAAP"), he has no personal knowledge concerning the accounting transactions at CUC, and his personal experiences with merger reserves at HSB bear absolutely no relevance to the charges against Mr. Forbes. The grounds in support of this motion are set forth in the accompanying memorandum.

Oral Argument Requested

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: _____
Brendan V. Sullivan, Jr. (Bar No. ct17115)
Barry S. Simon (Bar No. ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
COWDERY, ECKER & MURPHY, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

Dated: April 17, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that I caused the foregoing Motion of Defendant Walter A. Forbes to Preclude the Government from Presenting Expert Testimony from James Rowan of Hartford Steam Boiler Company (Forbes Third Trial Motion *in Limine* No. 15) to be filed electronically and to be served on April 17, 2006 to the following via e-mail:

> Norman Gross, Esq. (norman.gross@usdoj.gov)
> Michael Martinez, Esq. (michael.martinez2@usdoj.gov)
> Craig Carpenito, Esq. (craig.carpenito@usdoj.gov)

_____
Barry S. Simon

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 3:02CR264 (AHN) |
| | ) | April 17, 2006 |
| WALTER A. FORBES. | ) | |

**MEMORANUM IN SUPPORT OF MOTION OF DEFENDANT
WALTER A. FORBES TO PRECLUDE THE GOVERNMENT
FROM PRESENTING EXPERT TESTIMONY FROM JAMES
ROWAN OF HARTFORD STEAM BOILER COMPANY
(Forbes Third Trial Motion *In Limine* No. 15)**

Defendant Walter A. Forbes, through undersigned counsel, respectfully submits this memorandum in support of his motion to preclude the government from soliciting any expert testimony from Mr. James Rowan, Chief Investment Officer for Hartford Steam Boiler Inspection and Insurance Corporation ("HSB"), including testimony that false earnings indicate that there is a flaw in a company's business model, or testimony concerning the propriety of particular merger charges (which he testified were based upon his personal experiences with HSB's merger reserve), or testimony concerning the documentation purportedly necessary to record those merger charges.[1]

---

[1] In the second trial, the Court precluded Mr. Rowan's testimony concerning his personal experiences at Hartford Steam Boiler Company ("HSB"), but nonetheless allowed him to testify to the propriety of certain merger reserve charges, even though Mr. Rowan's first trial testimony established that this opinion was premised on his experiences at HSB.

Oral Argument Requested

## BACKGROUND

James Rowan testified in the first trial regarding his decision to purchase Cendant stock on behalf of HSB. *See* Tr. 8/17/2004 at 10246-10272. In the course of that testimony, Mr. Rowan testified to the propriety of certain types of merger charges, making clear that this view was premised on his experience with merger reserves at HSB:

> Q. Can you give the jury an example of a one-time charge that you see as a chief investment officer of companies that you're interested in purchasing?
>
> A. Yes. One of the ones that you saw during the '90s, <u>and one of which even the Hartford Steam Boiler was involved in</u>, you might decide to realign your workforce, which is another way of saying having layoffs when you decide to exit a business. If you were to do that, you would have people that would have to be terminated. You would have termination expenses. You might have some physical property that would no longer be needed; cars, desks, lease expenses. And once they are done, they are extraordinary one-time events and they are not part of your normal business going forward.
>
> \* \* \* \* \* \* \* \* \* \* \*
>
> Q. And in January of 1998, making a decision as the chief investment officer of the Hartford Steam Boiler Company, how did you view or factor in one-time charges that you saw?
>
> A. Well, we looked at them as being just one-time. In other words, they were for a specific purpose. <u>As I said, we had gone through this exercise at the Hartford Steam Boiler so I was intimately familiar with how we had done it. I know they were rigorously reviewed by the accounting firms and, you know, that it wasn't just sort of a pull-a-number-out-of-the-sky, that you had to really carefully document all of the -- all of the things that were behind the charge.</u>

Tr. 8/17/2004 at 10266-68 (emphasis added). Mr. Rowan referred back to this improper testimony later in the day:

> Q. And in or about January and February of '98, had you known that CUC had used merger reserves for nonmerger-related expenses, would that have been a factor in your decision to invest --
>
> A. Yes.
>
> Q. -- Hartford Steam Boiler funds in Cendant stock in January and February of '98?
>
> A. Certainly that would have. <u>First of all, that's wrong, as I had described what you have to do in terms of documenting what your merger-related expenses are for</u>. And secondly, it would have again brought into question the validity of the business model.

Tr. 8/17/2004 at 10271 (emphasis added).

In the second trial, Mr. Rowan offered similar opinions, simply excising the basis of the opinion – his experience with the merger reserve at HSB:

> Q. Would you please provide an example of one-time costs related to mergers?
>
> A. Sure.
>
> [Objection Overruled]
>
> A. For example, if you -- okay. If you're going to merge two companies, you are probably going to eliminate one or the other of the chief executive officers and one or the other of the treasurers, the secretaries of the company. You'll probably eliminate some of the office space. You'll have to terminate the leases. You probably have to terminate some employees. You may have contracts, insurance contracts, those sorts of things that will need to be terminated. And you're required to enumerate all of these charges and come up with the total. And some of them, granted, are estimates because you don't know for certain exactly what they're going to be. And then as the

3

>expenses come in, you mark those expenses off against what you did and you could come up with a deficit or maybe not. I mean, you may have been able to do it for less than what you thought you were going to be; it may cost you more.

Tr. 10/18/2005 at 365-66.

In addition, in the second trial Mr. Rowan proffered his view of what false earnings "probably" signify:

>Q. Had you known that the earnings per share that had been reported by CUC before the merger weren't accurate, would that have been a factor in your decision to purchase Cendant stock?
>
>A. Absolutely. Because if the numbers were not accurate, that would mean that the earnings number, to pick a single one, was inaccurate. If the earnings number was inaccurate, then that probably flowed from the fact that the business model –
>
>[Objection Overruled]
>
>A. Okay. -- that the business model that was supposed to have produced those earnings, that there was something wrong with it; either the retention ratio wasn't what they were saying it was, their costs that generate the business were higher than they said they were. All of those things would have made you look at it and say: Well, I guess it's not such a good business.

Tr. 10/18/2005 at 363. See also id. at 365-66. The government then implied that the false earnings per share resulted in a false growth rate, one of the factors Mr. Rowan testified had been a significant factor in his investment decisions:

>Q. At the time that you bought Cendant stock on behalf of the Hartford Steam Boiler, what did you believe about the reported growth rate of CUC as reported in its financial statements before its merger with HFS?

4

> A.  Well, it was definitely one of our A companies, which meant that it existed in an atmosphere where it was typically in the -- there were probably typically be somewhere between 90 and 120 companies out of 5,000 that would meet the four criteria that I mentioned to you for screening.  And this company had consistently been in that group.  So, you know, that was a critical factor in what we were looking at.
>
> Q.  Had you known that the growth rate reported by CUC before the merger was inaccurate, would that have been a factor in your decision to buy Cendant stock?
>
> A.  Absolutely.  Because then it would not have met our criteria.  If it hadn't met our criteria, frankly, to go back to the investment conference that I had attended, then it would have become one of another 30 ideas, some of which were good, some of which were bad, some of which worked and some didn't.  This really was an idea, plus the financial results.  And that was what was critical to what we were interested in.

Tr. 10/18/2005 at 364-365.

## **ARGUMENT**

Mr. Forbes does not object to Mr. Rowan testifying that he relied on the accuracy of the merger reserve line in CUC's financial statements, or on CUC's historic operating income figures, as reported in CUC's SEC filings, when, on behalf of HSB, he purchased Cendant stock.  What Mr. Forbes does object to is (1) the testimony Mr. Rowan gave in the first two trials which discussed what types of costs could allegedly be charged to a merger reserve properly, and what level of documentation was purportedly needed for such charges, (2) the testimony that Mr. Rowan would not have purchased Cendant stock had he known that non-merger related costs were charged to the merger reserve, and (3) the testimony that Mr. Rowan believes a false earnings per share number indicates that there is a problem

5

with a company's fundamental business model.[2] See also Forbes Third Trial Motion *in Limine* No. 10 (filed April 17, 2006).

First, Mr. Rowan has not been qualified as an expert on merger reserves or their use. Thus, he should not be permitted to testify regarding what types of costs can appropriately be charged to a merger reserve, or what level of documentation is purportedly required under GAAP. Moreover, it is clear from the first trial testimony that Mr. Rowan's opinions on this are a result of his personal experience with a merger reserve at HSB. Mr. Rowan's personal experiences at HSB bear no relevance to the charges against Mr. Forbes. Costs that HSB may or may not have charged to its merger reserve are not at issue here. Mr. Rowan may be able to testify that he expected the information provided in the publicly available financial information to be accurate, but he should not be permitted to go further and testify regarding what types of merger charges are allegedly accurate, and which are allegedly inaccurate.[3]

---

[2] There can be no reasonable dispute that each of these three subjects requires "scientific, technical, or other specialized knowledge," Fed. R. Evid. 701 & 702, and thus are properly the subject of expert testimony and the strictures attaching to such testimony under Fed. R. Evid. 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 595 (1993). Indeed, Rule 701 was specifically amended to ensure that the reliability requirements set forth in Rule 702 would not be evaded through the simple expedient of proffering an expert in lay witness clothing. See Rule 701, Advisory Committee Notes to 2000 Amendments.

[3] Mr. Rowan's lack of expertise is particularly problematic because GAAP's guidance is continually evolving. Indeed, two landmark position papers were issued by the Financial Accounting Standards Board's Emerging Issues Task Force ("EITF") in the area of merger reserves alone, one in 1994 and one in 1995: EITF 94-3: Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity (Including Certain Costs Incurred in a Restructuring) and EITF

6

<u>Second</u>, Mr. Rowan does not have any personal knowledge about what costs were charged to the merger reserves at Cendant. The only thing Mr. Rowan knew about the Cendant merger reserve at the time he purchased the stock – and thus the only thing he could have relied upon – was the total size of the merger reserve as reported in company's financial statements. "Facts" that he learned only after he made the stock purchase, such as any evidence indicating that costs unrelated to the merger were charged to the reserve, are irrelevant, not to mention beyond his personal knowledge. Indeed, the question posed to him about what he would have done "had he known" that costs unrelated to the merger were charged to the reserve was an improper hypothetical under Federal Rule of Evidence 701.

<u>Third</u>, Mr. Rowan has not been qualified as an expert in finance or business modeling. Thus his opinion that CUC's inaccurate earnings per share number "probably" flowed from the fact there was something wrong with its business model constitutes improper expert testimony, and is based on nothing but pure speculation. Indeed, the trial evidence established just the opposite: that CUC had a sound business model. <u>See</u>, <u>e.g.</u>, Tr. 10/24/2005 at 953-954 (testimony of Anne Pember, an admitted co-conspirator, explaining that she believed in the company despite the fraud because it had "good services", "good products" and "smart people").

Mr. Rowan's attempt to tie the allegation of false earnings to a false retention ratio was particularly prejudicial because he had just testified that the

---

<u>95-3: Recognition of Liabilities in Connection with a Purchase Business Combination</u>.

7

retention rates were "critical issues to the company's business" that Mr. Forbes had discussed at an investor meeting attended by Mr. Rowan. Tr. 10/24/2005 352-354. Yet like the business model as a whole, there is no allegation in this case that CUC had falsified the retention rates communicated to the public. See Tr. 11/29/2005 at 3083-84 (instructing the jury that there is no evidence that CUC's renewal rates were inflated, and that it is not an issue in the case). See also Forbes Third Trial Motion *in Limine* No. 3 (filed April 17, 2006), incorporated herein.

Similarly, Mr. Rowan's testimony implying that Cendant's growth rates had been misrepresented requires expertise. Inflated earnings do not necessarily translate into inflated earnings' growth. Backing out the inflation, and then recalculating growth rates based on the lower base year going forward is a complicated task requiring considerable expertise. Yet again, Mr. Rowan is not being offered as an expert. This testimony should not be allowed.

## CONCLUSION

For the foregoing reasons, the government should be prohibited from eliciting any expert testimony from Mr. James Rowan, including testimony that false earnings indicate that there is a flaw in a company's business model, or testimony concerning the propriety of particular merger charges, or the documentation purportedly necessary to record those merger charges.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: _____
Brendan V. Sullivan, Jr. (Bar No. ct17115)
Barry S. Simon (Bar No. ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
COWDERY, ECKER & MURPHY, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

Dated: April 17, 2006

9

**CERTIFICATE OF SERVICE**

I hereby certify that I caused the foregoing Memorandum in Support of Motion of Defendant Walter A. Forbes to Preclude the Government from Presenting Expert Testimony from James Rowan of Hartford Steam Boiler Company (Forbes Third Trial Motion *in Limine* No. 15) to be filed electronically and to be served on April 17, 2006 to the following via e-mail:

Norman Gross, Esq. (norman.gross@usdoj.gov)
Michael Martinez, Esq. (michael.martinez2@usdoj.gov)
Craig Carpenito, Esq. (craig.carpenito@usdoj.gov)

_____
Barry S. Simon