# EXHIBIT 1

*Ernst & Young LLP*      Manager/Senior Manager Periodic Performance Review

Reviewee: Bruce Botti                                    Location/Practice Unit: Stamford/Audit

Performance Period:     From  4/97     to  3/98          Approximate hours on assignment: 1400

Client Name/Activity:  Cendant Corporation (formerly CUC International Inc.)/Annual Audit

Reviewer: Simon Wood                                     Date Prepared: 3/25/98

A. Engagement Expectations. Were engagement expectations (e.g., key client considerations/issues, outputs/deliverables, time-tables and other expectations) discussed with the reviewee prior to or near the beginning of the engagement?   Yes  [x]  No  [ ]

B. Nature of Assignment. Briefly describe the assignment, including the scope of the work performed, specific tasks and responsibilities, and the degree of difficulty.

See attached supplement.

C. Performance Observations. Please review the behaviors listed under each of the five major performance areas below. Then, using these behaviors, comment about the individual's strengths and development needs for each area, and provide supporting examples where appropriate.

1.  PEOPLE (includes: Teamwork—encouraging collaboration among team members; helping to resolve team conflicts. Development of Others—coaching, developing, and mentoring others; providing constructive on-the-job feedback. Management Style—creating a positive work climate characterized by trust and open communications. Oral/Written Communications—effectively structuring, writing, or editing proposals and engagement reports and supporting documentation; clearly presenting information to others in individual and group situations.)

People Strengths/Development Needs (and supporting examples)
Teamwork - clearly a strength of Bruce's. Bruce was definitely in this demoralizing engagement for the long haul and was continually prepared to work exceptionally long hours during the week and also at the weekend when required (due to the significant number of SEC filings etc. such time commitments were throughout the year not just on the year end audit.). Development of Others - Bruce enjoys working in teams and makes a point of ensuring that the personal concerns of his staff are understood by him and where possible allowances made for their personal commitments. Bruce is a good developer of others and my only suggestion for him would be to try and increase the amount of work that he delegates to others as this will both improve their ability and give him and others above him more of a work/ life balance (Bruce has a tendency like most of us to feel that it is quicker for him to do many tasks although more efficient in the short-term is probably less efficient in the long-run). Management Style - Again another strength, Bruce has a relaxed style dealing with staff below him which makes it comfortable for them to approach him with questions - an example of this is that a number of seniors ask him questions about engagements that Bruce is not involved with - this is a tremendous reflection on Bruce, but Bruce should for his own sake be careful not to have them take too much advantage of his patience as this could place additional constraints on his work/ life balance in the future Oral/ Written Communications - Above crage for his level, work papers are very neat, concise and easy to follow and Bruce makes good use of his PC in presenting his work. Bruce has a good oral communication style and is clear in his explanations. Bruce should focus on being more forceful in presenting his personal opinions as he usually has very good points to make.

2.  CLIENT SERVICE (includes: providing value by listening, assessing, and properly diagnosing client business needs; providing client(s) with high quality work products that meet and/or exceed their expectations; providing ideas that improve client operations; demonstrating responsiveness and timeliness in addressing client issues and concerns.)

Client Service Strengths/Development Needs (and supporting examples)
This is a difficult engagement to discuss anybody's client skills for the reasons documented in the attached supplemental discussion. However, despite this and based upon my experience working with Bruce for over a year he has strong skills in this area. The last 6 months have been tremendously difficult and Bruce has tended to put off discussing issues with the former controller given her continued unprofessional and unresponsive manner which although entirely understandable and common amongst everyone on the engagement should be considered in any similar future situations (which I hope none of us ever have to face) as the only way to get to the end result required is to keep ignoring the personal slights and keep hounding the client. Other than this specific situation Bruce continued to work effectively with the CUC personnel despite their own continued, unbelievably incompetent performances and Bruce is to be praised and admired for putting up with this tremendously difficult environment. Due to the ineptitude of the client the preparation of a high-quality financial statement for the former CUC business relied upon the E&Y continually pointing out errors in client-prepared schedules and also significantly providing advice as to the disclosures and accounting that CUC should follow. The only reason CUC were able to produce a high-quality document that satisfied their new bosses (the Cendant Parsippany corporate office) and allowed a good Form 10-K filing to be achieved by Cendant itself was due to the 100% plus effort and technical skill of the E&Y team and Bruce was an instrumental part of this happening. SEC filings occurred at a tremendous rate throughout the year and Bruce provided responsive and well thought-out solutions to issues that arose as well as helping to ensure that all of these fire-drill deadlines were met.

3.  SALES (includes: developing contacts outside the firm; contributing to lead generation by identifying contacts and target accounts; translating client needs into opportunities for additional work during the engagement; effectively negotiating and closing engagement opportunities; bringing all firm resources to bear to effectively sell integrated services.)

NHR 9

CONFIDENTIAL                                    EY PER 003946


GOVERNMENT EXHIBIT
11,007

Sales Strengths/Development Needs (and supporting examples)

This was not the year for Bruce to be able to sell services on this client for the issues previously discussed. However, I know Bruce is aware of the need to sell services and I also know that he has a good understanding of all the services E&Y can provide - an example of this was the way he placed numerous calls to E&Y National staff to determine if there was a way to perform an agreed upon procedures project for the Wright Express subsidiary. Bruce was also part of the effort we made in pushing an accounts receivable systems installation project at the same subsidiary (we started off way behind 4 other vendors, incl. 2 Big 6 and ended up losing narrowly to a boutique firm purely on the basis of their prior successful projects with the subsidiary).

4.   KNOWLEDGE (includes: within bounds of professional standards, formulating creative solutions to client's business problems; actively sharing functional/industry knowledge and expertise with others; effectively applying technical/industry knowledge to client business issues; identifying the impact of emerging industry issues on client operations; effectively utilizing industry-specific firm methodologies, techniques, tools, and information.)
   Knowledge Strengths/Development Needs (and supporting examples)

Bruce has a strong technical ability and for his level a very good SEC knowledge. Bruce was comfortable producing the first draft of a set of complex financial statements which were basically prepared from scratch and he produced a high-quality draft. Bruce is confident in utilizing the new E&Y resources and methodology that we have available at E&Y.

5.   MANAGING PROJECTS (includes: Financial Management—developing comprehensive and responsive engagement plans; billing for services commensurate with value provided to client; maximizing appropriate economic standards [e.g., realization, utilization, leverage, etc.]; controlling and minimizing discounts. Resource Utilization—effectively utilizing the skills and abilities of others; demonstrating and instilling in others a concern for efficiency, productivity, and cost-effectiveness.)
   Managing Projects Strengths/Development Needs (and supporting examples)

I believe Bruce is aware of the need to meet budgetary concerns although due to the inherent nature of this engagement it was impossible to produce a budget and the significant amount of time spent by the engagement team was a function of the inefficiencies and inadequacies of the client. Occasionally and not surprisingly given the fact that there was 2 managers and a senior manager on this engagement and given the sheer demoralizing environment created by the client, Bruce did not take on as aggressive a manager role, in terms of resolving some outstanding open items in as timely a manner as I may have expected. However, Bruce was instrumental in ensuring that all open items on this engagement were finally completed.

Conclusion - An excellent performance, Bruce has demonstrated that his promotion to manager was well justified and with more experience reporting directly to partners he will develop into an exceptional manager and be ready for the next promotion.

D.   Performance Review Timeliness. Indicate whether the reviewee completed performance reviews for others in a timely manner (i.e., within 30-60 days following the completion of the performance period).    ☑ Yes    ☐ No    ☐ N/A

E.   Sign-offs. Has this review been discussed with the reviewee in person?    ☑ Yes    ☐ No

Reviewer's Signature: _____    Date: 4/2/98    Reviewer's Signature: _____    Date: 4/2/98

Optional: Reviewee should provide his or her comments on additional sheet, if necessary.

Second-level Reviewer's Signature: _____    Date: 4/3/98

F.   Overall Rating. Considering this individual's level of experience, the difficulty and complexity of the assignment, accomplishment of engagement expectations (from Section A) and the individual's performance in each of the five major performance areas included in Section C, select the rating that most accurately reflects your judgment of this individual's overall performance.

   o 5 = Outstanding (performance significantly and consistently exceeds all expectations and is of the highest quality and value);
   o 4 = Very Good (performance frequently exceeds all expectations);
   o 3 = Good (performance fully meets all expectations);
   o 2 = Needs Improvement (performance meets some, but not all, expectations);
   o 1 = Unacceptable (performance does not meet minimal expectations).

NOTE: A copy of the completed form should be routed to the reviewee's counselor.

Overall Rating

4.5

Attachment to Bruce Botti's Review.

Nature of Assignment

This review is written against the backdrop of the most mentally and physically grueling audit engagement that I have ever encountered and which I believe few E&Y audit staff have fortunately had to endure. The client staff that we had to deal with met the following criteria (1) they did not care about the product they were creating (due to either frustration on their part about the effective takeover of their positions by former HFS personnel and/or the fact that the large amount of money they had made through the aforementioned takeover meant they would not need to work again if they did not want too), (2) they did not have the technical ability to handle the issues involved and (3) they felt they were overworked. All of these conditions led to the following situations:

(1) Client schedules were consistently wrong, needed to be revised and required multiple versions in order to arrive at a final schedule.
(2) Client personnel were frequently evasive and often tried all kinds of techniques to ensure that they did not deal with us on a timely basis.
(3) There was often low morale among the client personnel which contributed to a difficult work environment.
(4) Client personnel were often reticent about working overtime so the overtime we worked was often without any client personnel being there.
(5) Our overtime was increased in order to mitigate the fact that the work product of the client staff was insufficient and poorly executed.

Specifically on this engagement Bruce was responsible for the day to day managing of the Corporate part of this engagement, for which he had 2 seniors and 1 staff report to him at various points during the year. Additionally, Bruce worked throughout the year on a tremendous amount of SEC filings (including S-3, S-4, S-8, 8-K and 10-K filings which in the aggregate involved 15-25 filings during the last 12 months). Bruce dealt specifically with a large amount of reporting issues (both SEC and non-SEC) and the restructuring reserve as well the review of a large amount of the work produced by the team under him. Bruce also was involved in the production of some technical memo's on very complex issues. This was an exceptionally difficult assignment for a manager due to the issues discussed above.

CONFIDENTIAL

EY PER 003948

NOV 03 '05 11:07 FR MAYER,BROWN,ROWE&MAW 212 262 1910 TO 918602403399    P.02

Received 11/03/2005 10:52AM in 00:56 on line [0] for TN006315 * Pg 2/2
11-03-2005   11:53   From-ERNST & YOUNG LLP                    2127793028         T-860  P.002/002  F-618

## DECLARATION

My name is Michele S. Grossman.  I am of sound mind and capable of making this Declaration.  I am an employee of Ernst & Young LLP ("Ernst & Young").  Based on personal knowledge and inquiry, I am familiar with the regularly conducted activities of Ernst & Young, and documents created during the course of those regularly conducted activities.

I have reviewed the document bearing Ernst & Young Bates-stamp numbers EY PER 003946-3948.  It is a performance review prepared at or near the time by a person with knowledge of the reviewee and the audit that was kept in the course of Ernst & Young's regularly conducted business activities.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 3rd day of November 2005.

MICHELE S. GROSSMAN

# EXHIBIT 2

1        IN THE UNITED STATES DISTRICT COURT

          FOR THE DISTRICT OF NEW JERSEY

2         DOCKET NO. 98-CV-1664 (WHW)

3

4  IN RE:  CENDANT CORPORATION

                       DEPOSITION UPON

5      SECURITIES LITIGATION   ORAL EXAMINATION

                          OF

6                        SIMON WOOD

                        VOLUME III

7  ------------------------------

8

B E F O R E:  ROBERT E. TARLETON, J.S.C, RET.

9            Special Discovery Master

10

  ------------------------------

11

12     T R A N S C R I P T  of the stenographic

13  notes of SUSAN E. GIOFFRE, a Notary Public and

14  Certified Shorthand Reporter, taken at the offices

15  of PATTERSON, BELKNAP, WEBB & TYLER, ESQS.,

16  1133 Avenue of the Americas, New York, New York

17  on Wednesday, January 9, 2002, commencing at 9:35

18  a.m.

19

20

21

22

23

24

25

**1/9/2002  Simon Wood Volume III**

1          So I believe that partly answers your

2     question.

3          Q     Did you want to make any further

4     statement with respect to this?

5     A     Can I go back through it again?

6          Q     Sure.

7              (Witness reviewing exhibit.)

8     A     I would just say again that in connection

9     with this financial statement process that

10    Mr. Ippolito was aware of the problems that were

11    having -- that were happening and, in fact, that

12    was what caused him to request us to perform this

13    additional work.

14         Q     Finished your answer?

15    A     Yes, I believe so.

16         Q     Mr. Wood, did you ever discuss or

17    communicate the substance of any of the comments

18    which are contained in Botti Exhibit 24 with any

19    member of the audit committee of the board of

20    directors of Cendant Corporation?

21    A     No, sir.

22         Q     Did you ever communicate, sir, the

23    substance of any of the comments which are

24    contained in Botti Exhibit 24 to any director of

25    Cendant Corporation?

**1/9/2002  Simon Wood Volume III**

1    understanding of the word was in this context.

2        Q    Well, if you'll just tell me what

3    your understanding of the word "evasive" is.

4    A    In the context of this review, I think it's

5    quite clear that it relates to my frustrations

6    with Ms. Pember and her inability to meet with us

7    in as professional way as I would have liked.

8        Q    I believe you testified that the

9    basis for -- in large part, the basis for the

10   substance of your comments that are contained in

11   Botti Exhibit 24 related to actions or inactions

12   that took place following the audit committee

13   meeting in February of 1998.

14            Is that correct, sir?

15   A    Yes, sir.

16       Q    Between February of 1998 and March 25

17   of 1998, did you recommend to Mr. Rabinowitz or

18   any other employee, partner or principal of

19   Ernst & Young that the planning materiality for

20   this audit should be changed?

21   A    No, I don't recall doing so.

22       Q    Between February 3, 1998 and

23   March 25, 1998, did you suggest to Mr. Rabinowitz

24   or any other partner, principal or employee of

25   Ernst & Young that the tolerable error that had

1            IN THE UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF NEW JERSEY

2              DOCKET NO. 98-CV-1664 (WHW)

3

4    IN RE:  CENDANT CORPORATION

                                    DEPOSITIION UPON

5        SECURITIES LITIGATION    ORAL EXAMINATION

                                         OF

6                                    SIMON WOOD

                                    VOLUME VI

7    -------------------------------

8

     B E F O R E:   ROBERT E. TARLETON, J.S.C, RET.

9                   Special Discovery Master

10

     -------------------------------

11

12          T R A N S C R I P T  of the stenographic

13   notes of SUSAN E. GIOFFRE, a Notary Public and

14   Certified Shorthand Reporter, taken at the offices

15   of PATTERSON, BELKNAP, WEBB & TYLER, ESQS.,

16   1133 Avenue of the Americas, New York, New York

17   on Wednesday, January 16, 2002, commencing at

18   10:08 a.m.

19

20

21

22

23

24

25

1    see it's her handwriting that ticks and ties it to

2    other sections of the work paper.

3            I'm not sure I would call that

4    substantive procedures, but you know, it's a

5    procedure.

6            I don't specifically recall what

7    Ms. Dolan did, but if we looked at the work papers

8    we could probably see her handwriting and her

9    sign-off to see if she performed any, you know,

10   mathematical things or maybe anything more

11   substantial, but I'm not specifically recalling

12   something.

13           MR. LoBUE:  Let me ask the witness

14   now to be shown Exhibit 24.

15           That's Botti Exhibit 24.

16           (Witness reviewing exhibit.)

17       Q    Mr. Wood, you are familiar with this

18   document, are you not?

19   A    Yes, sir.  I've testified at length on this

20   document.

21       Q    And you testified earlier that the

22   comments in this review concerning the competence

23   and cooperativeness of the client were observed by

24   you in connection with the preparation of Wood

25   Exhibit 11.

1                Is that correct?

2                THE WITNESS:  Could you repeat that

3        question, please?

4                (Question read back as follows:

5                "QUESTION:  And you testified earlier

6                that the comments in this review

7                concerning the competence and

8                cooperativeness of the client were

9                observed by you in connection with

10               the preparation of Wood Exhibit 11.

11               Is that correct?")

12   A     Yes, sir.

13       Q     And it's your testimony that none of

14   the observations in Botti-24 concerning the

15   competence and cooperativeness of the client

16   pertained to any matters that occurred before

17   February 3, 1998.

18           Correct?

19   A     Yes, sir.

20       Q     When you wrote this review, which is

21   now Botti-24, did you ever expect it to be seen

22   outside of Ernst & Young?

23   A     No, sir.

24       Q     When you wrote this review you

25   understood it was important that the information

1    part about the effective takeover of their

2    positions by former HFS personnel and/or the fact

3    that the large amount of money they had made

4    through the aforementioned takeover meant they

5    would not need to work again if they did not want

6    to," close parentheses.

7              Mr. Wood, did you believe that

8    statement was accurate at the time you made it?

9              MR. SALPETER:  Objection.  It's got

10   several pieces to it, your Honor.

11             SPECIAL MASTER:  I think the witness

12   can respond to it by reading it and commenting

13   either by phrase-by-phrase or

14   statement-by-statement.

15             THE WITNESS:  Thank you, your Honor.

16   A     This actually just reminds that one of my

17   earlier answers about putting a time frame around

18   this.

19             Obviously, this puts a time frame

20   around the review.

21             You had that earlier question about

22   time frame.

23             SPECIAL MASTER:  Before the break?

24             THE WITNESS:  Yes.

25   A     But, sorry, moving on.  I believe I've

1    testified before, and obviously this again was my

2    opinion at the time it was clearly event, that in

3    my opinion when it came to these financial

4    statements, that the level of care had -- had

5    diminished.

6              Mr. Sabatino had been able to do cash

7    flows the year before.  I didn't quite understand

8    why he couldn't do cash flows to the degree we

9    would have liked this year.

10             Do I think that there was

11   frustration?  Clearly there was frustration

12   indicated to me by them, as again I previously

13   testified.

14             The next sentence regarding the money

15   was a little flip.  I have no idea if they had

16   enough money that they never had to work again, so

17   that was a little flip.

18        Q    Which client staff were you referring

19   to when you made the statement that "They did not

20   care about the product they were creating"?

21   A        Again, I've testified before I would -- in

22   this case my recollection is I would single out

23   Mr. Sabatino, because as you very well pointed

24   out, my opinion was he was a very good accountant

25   and I was really frustrated about those cash

1            IN THE UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF NEW JERSEY

2            DOCKET NO. 98-CV-1664 (WHW)

3

4    IN RE:  CENDANT CORPORATION

                                    DEPOSITIION UPON

5        SECURITIES LITIGATION    ORAL EXAMINATION

                                        OF

6                                   SIMON WOOD

                                    VOLUME VII

7    -------------------------------

8

    B E F O R E:    ROBERT E. TARLETON, J.S.C, RET.

9                    Special Discovery Master

10

    -------------------------------

11

12            T R A N S C R I P T  of the stenographic

13    notes of SUSAN E. GIOFFRE, a Notary Public and

14    Certified Shorthand Reporter, taken at the offices

15    of PATTERSON, BELKNAP, WEBB & TYLER, ESQS.,

16    1133 Avenue of the Americas, New York, New York

17    on Tuesday, January 22, 2002, commencing at

18    9:43 a.m.

19

20

21

22

23

24

25

```
 1                         SPECIAL MASTER:  And you're going to
 2          stay here?
 3                         MR. SALPETER:  Yeah, I'll stay here.
 4                         SPECIAL MASTER:  No, I'm only
 5          kidding.
 6                         MR. SILVERSTEIN:  I'm not sure -- let
 7          me -- let me reframe the question because I think
 8          it's --
 9                         SPECIAL MASTER:  Let's get a comfort
10          level from the witness.
11                         Can you, in your judgment, hang in
12          here for two more minutes?
13                         THE WITNESS:  Two more minutes.  I
14          can do two.
15                         SPECIAL MASTER:  All right.
16          BY MR. SILVERSTEIN:
17                 Q     The question is simply this:
18                         When you said last week that you were
19          venting in Wood Exhibit 24 because you were
20          frustrated with people, you didn't mean that you
21          had failed to tell the truth in -- I'm sorry --
22          it's Botti Exhibit 24, did you?
23   4:43P                 SPECIAL MASTER:  The objections have
24          been considered and overruled.
25                         You may answer that and you may refer
```

1          to the document too before you answer.

2          A       As I believe I've testified before

3          regarding Exhibit 24, Botti-24, I was obviously

4          telling the truth, but I think, particularly when

5          it comes to an internal document that, you know,

6          I'm putting together at the end of an audit and

7          you know, you can vent and you can go a little

8          overboard on how much you say things and you know,

9          if I did this at a different time, I don't know if

10         I would have said exactly the same things.

11               Q       Will you read to me anything in

12         Botti Exhibit 24 that you consider false or

13         misleading?

14                     MR. SALPETER:  Can he do that after

15         he goes to the bathroom?

16                     SPECIAL MASTER:  Yes, all right.

17                     MR. SILVERSTEIN:  Can we have a

18         request, since there's a pending question, that

19         there be no conference with counsel?

20                     SPECIAL MASTER:  Absolutely.

21                     MR. SALPETER:  I won't even go out of

22         the room.

23                     SPECIAL MASTER:  He volunteered and

24         he's adhered to that all the way.

25                     You can go, sir, and come back.

# EXHIBIT 3

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

------------

Form 8-K
CURRENT REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934

------------

January 22, 1998 (January 20, 1998)
(Date of Report (date of earliest event reported))

Cendant Corporation
(Exact name of Registrant as specified in its charter)

| Delaware | 1-10308 | 06-0918165 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File No.) | (I.R.S. Employer Identification Number) |

6 Sylvan Way
Parsippany, New Jersey                                    07054
(Address of principal executive office)                  (Zip Code)

(973) 428-9700
(Registrant's telephone number, including area code)

None
(Former name, former address and former fiscal year, if applicable)

DEFENDANT'S
EXHIBIT
1309

PENGAD 800-631-6989

Item 4.                Changes In Registrant's Certifying Accountant

   (a) Previous independent accountants

   (i) On January 20, 1998, in connection with the Company's previously announced plan to name a successor accountant following the Company's merger with HFS Incorporated (the "Merger"), the Company dismissed Ernst & Young LLP, which served as the Company's independent accountants, and engaged Deloitte & Touche LLP, the auditor of HFS Incorporated prior to the Merger, as its new independent accountants. Ernst & Young LLP will continue to audit and report on the Company's former CUC businesses as of and for the year ended December 31, 1997.

   (ii) The reports of Ernst & Young LLP on the financial statements for the past two fiscal years of the Company contained no adverse opinion or disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope or accounting principles.

   (iii) The Audit Committee of the Company's Board of Directors participated in and approved the decision to change independent accountants.

   (iv) In connection with its audit for the two most recent fiscal years and through January 20, 1998, there were no disagreements with Ernst & Young LLP on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreements if not resolved to the satisfaction of Ernst & Young LLP would have caused Ernst & Young LLP to make reference thereto in their report on the financial statements for such years.

   (v) During the two most recent fiscal years and through January 20, 1998, there were no reportable events as that term is defined in Item 304 (a) (1) (v) of Regulation S-K.

   (vi) The Company has requested that Ernst & Young LLP furnish it with a letter addressed to the Commission stating whether or not it agrees with the above statements. A copy of such letter, dated January 22, 1998, is filed as Exhibit 16 of this Form 8-K.

   (b) New independent accountants

   As stated above, the Company engaged Deloitte & Touche LLP as its new independent accountants as of January 20, 1998. Such engagement was approved by the Audit Committee of the Company's Board of Directors on January 20, 1998. During the two most recent fiscal years and through January 20, 1998, the Company has not consulted with Deloitte & Touche LLP regarding either:

   (i) the application of accounting principles to a specified transaction, either completed or proposed; or the type of audit opinion that might be rendered on the Company's financial statements, and neither a written report was provided to the registrant nor oral advice was provided that Deloitte & Touche concluded was an important factor considered by the registrant in reaching a decision as to the accounting, auditing or financial reporting issue; or

   (ii) any matter that was either the subject of a disagreement, as that term is defined in Item 304 (a) (1) (iv) of Regulation S-K and the related instructions to Item 304 of Regulation S-K, or a reportable event, as that term is defined in Item 304 (a) (1) (v) of Regulation S-K.

Item 5.    Other

On January 20, 1998, the Company completed its acquisition of The Harpur Group Ltd., a leading fuel card and vehicle management company in the United Kingdom, from privately held H-G Holdings, Inc. for approximately $186 million in cash plus contingent payments of up to $20 million over the next two years. A copy of the press release is attached hereto as Exhibit 99 and incorporated herein by reference.

Item 7.    Exhibits

Exhibit
No.        Description

16         Letter from Ernst & Young LLP regarding change in certifying accountant.

99         Press Release: Cendant Completes Acquisition of Harpur Group Ltd. Dated January 20, 1998

SIGNATURE


        Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.


                        CENDANT CORPORATION


                        By:  /s/    James E. Buckman
                             James E. Buckman
                             Senior Executive Vice President
                             and General Counsel


    Date: January 22, 1998

CENDANT CORPORATION
CURRENT REPORT ON FORM 8-K
Report Dated January 22, 1998 (January 20, 1998)

EXHIBIT INDEX

Exhibit No.     Description

16              Letter from Ernst & Young LLP regarding change in certifying
                accountant.

99              Press Release: Cendant Completes Acquisition of Harpur Group Ltd.
                Dated January 20, 1998

EXHIBIT 16


January 22, 1998


Securities and Exchange Commission
Mail Stop 9-5
450 Fifth St., N.W.
Washington, DC 20549

Dear Sirs:

We have read Item 4 of Form 8-K dated January 22, 1998 of Cendant Corporation and are in agreement with the statements contained in paragraphs (a)(i) and (a)(ii) and (a)(iv) through and including (a)(vi) on Page 2 therein. We have no basis to agree or disagree with other statements of the registrant contained therein.

Very truly yours,


/s/ Ernst & Young LLP
Ernst & Young LLP

EXHIBIT 99

PRESS RELEASE

### CENDANT COMPLETES ACQUISITION OF HARPUR GROUP LTD.

Stamford, CT and Parsippany, NJ, January 20, 1998 - Cendant Corporation (NYSE: CD) announced today that it has completed its acquisition of The Harpur Group Ltd., a leading fuel card and vehicle management company in the UK, from privately held H-G Holdings, Inc. for approximately $186 million in cash plus contingent payments of up to $20 million over the next two years. It is anticipated that the acquisition will be immediately accretive to Cendant's earnings per share.

The Harpur Group (Trowbridge, UK) provides fuel card services in the United Kingdom, offering the Dialcard and Overdrive fuel card brands. The Company also services the vehicle management market which includes the provision of fleet, maintenance and accident management services. With about 350,00 active fuel cards accepted at more than 12,000 petrol stations in the UK, The Harpur Group will be a strong strategic fit within Cendant's existing fuel card and fleet management businesses. Combined with Cendant's existing PHH fleet management operations, the Harpur acquisition creates a network of over 900,000 fuel cards and a fleet of 275,000 vehicles in the UK.

The transaction does not include Harpur's Australian fuel card business or its private label card processing business, based in Sophia Antipolis, France. Both businesses will be retained by H-G Holdings, Inc. within a newly formed business unit, International Card Enterprises.

Cendant Corporation is a global provider of consumer and business services, and operates in three principal segments: Membership, Travel and Real Estate Services. In Membership Services, Cendant provides access to travel, shopping, auto, dining and other services through more than 73 million memberships worldwide. In Travel Services, Cendant is the leading franchisor of hotels and rental car agencies worldwide, the premier provider of vacation exchange services and the second largest fleet management company. In Real Estate Services, Cendant is the world's premier franchisor of residential real estate brokerage offices, a major provider of mortgage services to consumers and a global leader in corporate employee relocation.

# EXHIBIT 4

```
 1            IN THE UNITED STATES DISTRICT COURT        FOR THE DISTRICT OF

 2                 DOCKET NO. 98-CV-1664 (WHW)

 3

 4    IN RE:  CENDANT CORPORATION                            DEPOSITION

 5            SECURITIES LITIGATION     ORAL EXAMINATION

 6                                      MARC RABINOWITZ

 7    ------------------------------

 8    B E F O R E:   ROBERT E. TARLETON, J.S.C, RET.

 9                   Special Discovery Master

10    ------------------------------

11

12            T R A N S C R I P T  of the stenographic

13    notes of SUSAN E. GIOFFRE, a Notary Public and

14    Certified Shorthand Reporter, taken at the offices

15    of PATTERSON, BELKNAP, WEBB & TYLER, ESQS.,

16    1133 Avenue of the Americas, New York, New York

17    on Tuesday, January 29, 2002, commencing at

18    9:33 a.m.

19

20

21

22

23

24

25
```

1              Botti Exhibit 24, did you read the sentence which

2              I'm about to read into the record?

3                        It appears on page 1 about the third

4              or second line under number two, "Client Service."

5                        Quote, "The last six months have been

6              tremendously difficult and Bruce has tended to put

7              off discussing issues with the former controller

8              given her continued unprofessional and

9              unresponsive manner, which although entirely

10             understandable and common amongst everyone on the

11             engagement, should be considered in any similar

12             future situations" paren "which I hope none of us

13             ever have to face" end paren "as the only way to

14             get to the end result required is to keep ignoring

15             the personal slights and keep hounding the

16             client," period end quote.

17    4:39P             Did you read that sentence before you

18             signed Botti Exhibit 24?

19             A      Well, I read the review, so I must have

20             read the sentence.

21                    Q      And did you understand that the

22             reference to "the former controller" was a

23             reference to Ann Pember?

24             A      Yes.

25                    Q      Did you agree, when you signed this

1       review on or about April 3 of 1998, that during

2       the course of the 12/31/97 audit for CMS, that Ann

3       Pember acted in an unprofessional and unresponsive

4       manner?

5       A       I didn't provide Simon with commentary on

6       every single sentence that was placed in the

7       review.

8               I read the review to make sure Bruce

9       got the recognition that he deserved, and I felt

10      that came across correctly.

11              The difficulties, frustration that

12      Simon experienced, I think Simon can be the one

13      who can talk to that.

14              I didn't look at it the way -- I

15      didn't dissect it sentence-by-sentence.

16              I was aware of what was going on at

17      the company.  I would characterize it as we were

18      in the middle of trying to serve two taskmasters.

19      I would characterize it that it was frustrating

20      for people on the engagement team.

21              There were different tasks being put

22      forth.  Former CUC people were no longer in

23      charge, so they were re -- they were being --

24      requesting numerous information, and it made it

25      difficult necessarily to Simon and us to meet the

```
 1              IN THE UNITED STATES DISTRICT COURT       FOR THE DISTRICT OF

 2                  DOCKET NO. 98-CV-1664 (WHW)

 3

 4    IN RE:  CENDANT CORPORATION                              DEPOSITION

 5           SECURITIES LITIGATION      ORAL EXAMINATION

 6                                      MARC RABINOWITZ

 7    ------------------------------

 8    B E F O R E:   ROBERT E. TARLETON, J.S.C, RET.

 9                   Special Discovery Master

10    ------------------------------

11

12            T R A N S C R I P T  of the stenographic

13    notes of SUSAN E. GIOFFRE, a Notary Public and

14    Certified Shorthand Reporter, taken at the offices

15    of PATTERSON, BELKNAP, WEBB & TYLER, ESQS.,

16    1133 Avenue of the Americas, New York, New York

17    on Monday, February 11, 2002, commencing at

18    9:35 a.m.

19

20

21

22

23

24

25
```

```
 1                  A      No, I did not.

 2                         Q      Did you tell Mr. Silverman?

 3                  A      No.

 4                         Q      Did you tell Mr. Kennedy?

 5                  A      No.

 6                         Q      Did you tell Lou Scerra?

 7                  A      No.

 8                         Q      Did you tell the Willkie Farr

 9           investigators that E&Y was continually pointing

10           out errors in client prepared schedules?

11   3:00P     A      I did not tell Willkie Farr that because I

12           didn't believe -- I don't believe the

13           characterization you used for Willkie Farr or the

14           previous six people and I continue to believe that

15           you're taking it out of context.

16                         So I'm responding to your question

17           "no" because I didn't factually say that, not

18           because I agree with your characterization, the

19           same way I didn't agree with your characterization

20           for any of the previous people that you've asked

21           me about.

22                         And I know that's long winded, but I

23           think that it would be misleading if I didn't say

24           it.

25   3:01P              Q      At the time you signed Botti-24, did
```

1          you tell Mr. Wood that you disagreed with his

2          characterization as to the ineptitude of the

3          client?

4          A      I didn't believe the client was inept.

5                      MR. LoBUE:  Move to strike as

6          nonresponsive, and clearly so, your Honor.

7                      SPECIAL MASTER:  All right.  That

8          application is granted.

9                      I don't think you did respond to the

10         question, so I will have it repeated again for

11         you.

12                     (Question read back.)

13         A      No, I did not, but I didn't believe the

14         client was inept.

15         Q      I direct your attention to the next

16         sentence in the memo which reads as follows:  "The

17         only reason CUC were able to produce a high

18         quality document that satisfied their new bosses

19         (the Cendant Parsippany Corporate Office) and

20         allowed a good Form 10-K filing to be achieved by

21         Cendant itself was due to the 100 percent plus

22         effort and technical skill of the E&Y team, and

23         Bruce was an instrumental part of this happening."

24  3:03P                   Did you agree with that statement?

25         A      I believe we put 100 percent plus effort

**Rabinowitz 2/19/02**

```
1              IN THE UNITED STATES DISTRICT COURT        FOR THE DISTRICT OF

2                  DOCKET NO. 98-CV-1664 (WHW)

3

4     IN RE:  CENDANT CORPORATION                              DEPOSITION

5           SECURITIES LITIGATION      ORAL EXAMINATION

6                                     MARC RABINOWITZ

7     ------------------------------

8     B E F O R E:   ROBERT E. TARLETON, J.S.C, RET.

9                    Special Discovery Master

10    ------------------------------

11

12          T R A N S C R I P T  of the stenographic

13    notes of SUSAN E. GIOFFRE, a Notary Public and

14    Certified Shorthand Reporter, taken at the offices

15    of PATTERSON, BELKNAP, WEBB & TYLER, ESQS.,

16    1133 Avenue of the Americas, New York, New York

17    on Tuesday, February 19, 2002, commencing at

18    9:34 a.m.

19

20

21

22

23

24

25
```

1       you had prior to April 15, 1998 concerning the

2       Cendant reserves, did anyone discuss with you the

3       possibility of a charge being taken for costs

4       relating to any of Mr. Corigliano, Mr. Shelton or

5       Ms. Lipton leaving Cendant?

6       A       No.

7                       MR. HOEFFNER:   Okay.   I'd like to

8       show the witness a document that's been marked as

9       Botti Exhibit 24 that we've discussed at length

10      during this deposition.

11  2:33P               (Witness reviewing exhibit.)

12              Q       Focusing on page 2, your signature is

13      there as the second level reviewer's signature.

14                      Correct?

15      A       Yes.

16              Q       Am I correct that at the time you

17      signed this document you did not view your

18      sign-off as a second level reviewer as signifying

19      that you agreed with all of the comments that are

20      set forth in this document that were provided by

21      the primary level reviewer?

22      A       Yes.

23              Q       Turning to the attachment to

24      Exhibit 24, if you could read the first paragraph.

25  2:34P               (Witness reviewing exhibit.)

# EXHIBIT 5

1              UNDER PROTECTIVE ORDER

2          IN THE UNITED STATES DISTRICT COURT          FOR THE DIS

3          DOCKET NO. 98-CV-1664 (WHW)

4    ------------------------------------------xIn Re:    CENDANT CORPORATION

5                          TRANSCRIPTSECURITIES LITIGATION

6                    PROCEEDINGS              Defendant.

7    ------------------------------------------x

8              BRUCE BOTTI          1633 Avenue of the America

9          New York, New York          Monday, June 4, 2001

10              9:56 a.m.

11   B E F O R E :

12        ROBERT E. TARLETON, J.S.C., RET.      Special Discovery Mast

13

14   A P P E A R A N C E S :

15

16   MAYER, BROWN & PLATT, ESQS.,190 South LaSalle Street

17   Chicago, Illinois  60603BY:  CARYN JACOBS, ESQ.

18        CARRIE RAVER, ESQ.For Ernst & Young.

19

20   PATTERSON, BELKNAP, WEBB & TYLER, ESQS.,

21   1133 Avenue of the AmericasNew York, New York  10038-6710

22   BY:  ROBERT LoBUE, ESQ.,      NICOLE TELL, ESQ.

23   For Cendant (As Cross-Claimant) and,Cendant Capital I (all claims except

24

25

1

**6/4/2001 Botti**

1    statements he made in the sentences I have just read

2    to you?

3         A.    I don't recall a specific discussion,

4    although I wouldn't rule out the possibility that we

5    discussed some of the subject matter.

6         Q.    My prior question was who was the former

7    controller to whom Mr. Wood makes reference in the

8    sentence I read to you a moment ago.

9         A.    I believe he is referring to Anne

10   Pember.

11        Q.    Did Ms. Pember exhibit an unprofessional

12   and unresponsive manner during the calendar year '97

13   audit?

14        A.    As I'm sitting here today, I don't

15   recall that being the case.  I wouldn't necessarily

16   characterize it that way.

17        Q.    How would you characterize her behavior

18   during the calendar year '97 audit?

19        A.    Rather than unresponsive, I would use

20   the term less available than we would have liked.

21        Q.    How about unprofessional, would you use

22   that term?

23        A.    I don't recall and I don't believe that

24   she was unprofessional.  I thought once you were able

25   to schedule a meeting, that she was quite

**6/4/2001 Botti**

1    professional.

2         Q.    So you disagree with Mr. Wood's judgment

3    that she was unprofessional?

4         A.    I would characterize it differently.

5         Q.    Do you recall ever expressing to

6    Mr. Wood your disagreement with his characterization

7    of Ms. Pember as unprofessional and unresponsive?

8              MR. JACOBS:  Asked and answered.

9              SPECIAL MASTER TARLETON:  Overruled.

10   You can answer that.

11        A.    I don't recall.

12        Q.    You don't recall ever doing so, is that

13   correct?

14        A.    That's correct.

15        Q.    I direct your attention to the sentence

16   beginning right after the section I read to you

17   previously.

18              The sentence begins with the words

19   "other than."  Do you see that?

20        A.    I believe so.

21        Q.    The sentence reads, "Other than this

22   specific situation Bruce continued to work effectively

23   with the CUC personnel despite their own continued,

24   unbelievably incompetent performances and Bruce is to

25   be praised and admired for putting up with this

**6/4/2001 Botti**

1      Q.      When you were performing the calendar

2  '97 audit, were you aware that CUC staff with whom you

3  were dealing had made or stood to make a great deal of

4  money as a result of the CUC-HFS merger?

5              MR. JACOBS:  Objection to form.

6              SPECIAL MASTER TARLETON:  Overruled.

7  You can answer.

8      A.      I guess, sitting here today, my

9  recollection was that the former CUC was the issuer of

10  the stock, so I'm not sure how they would have made

11  money by diluting their own stock.

12      Q.      Is it your testimony that Mr. Wood was

13  mistaken in making reference to the large amount of

14  money they had made through the aforementioned

15  takeover?

16              MR. JACOBS:  Object to form.

17              SPECIAL MASTER TARLETON:  Overruled.

18  You can answer that.

19      A.      I'm not saying that he is wrong because

20  I'm not sure he is referring to the same thing, that

21  his intention is the same way as I'm interpreting it

22  today.

23      Q.      Is it true that the CUC staff did not

24  care about the product they were creating in

25  connection with the calendar '97 financial statements?

**6/4/2001 Botti**

1        A.      I'm not sure that I necessarily agree

2     with that, sitting here today.

3        Q.      Did you tell Mr. Wood that he was

4     incorrect in stating that the CUC staff did not care

5     about the product they were creating?

6        A.      I don't recall discussing that.

7        Q.      Do you recall telling Mr. Wood that he

8     was mistaken in referring to the large amount of money

9     they had made?

10       A.      No, I don't.

11       Q.      Did Mr. Wood ever retract the statements

12    in the portion of the sentence I have just read to

13    you?

14       A.      Not that I'm aware of.

15       Q.      With respect to the section of the

16    sentence under number (2) which reads as follows,

17    "They did not have the technical ability to handle the

18    issues involved," did Mr. Wood ever retract that

19    statement, to your knowledge?

20       A.      Not to my knowledge.

21       Q.      Did you ever tell him that he was wrong

22    in asserting that they did not have the technical

23    ability to handle the issues involved?

24       A.      Not that I recall.

25       Q.      With respect to point (3) in this

**6/4/2001 Botti**

1    sentence, which asserts that they felt they were

2    overworked, was it your observation that the CUC staff

3    with whom you were dealing on calendar '97 was

4    overworked?

5        A.    I guess I only know what I saw when I

6    was there on site and I didn't think they were hardly

7    overworked, in my opinion.

8        Q.    Mr. Wood continues as follows:  "All of

9    these conditions led to the following situations: (1)

10   client schedules were consistently wrong, needed to be

11   revised and required multiple versions in order to

12   arrive at a final schedule."

13           Is Mr. Wood's observations as set forth

14   in that numbered point (1) accurate?

15       A.    I guess I can't know whether they were

16   consistently wrong.  My recollection is there were

17   certain items that were revised.  I don't remember

18   which, but none of it struck me as particularly odd.

19       Q.    Are you disagreeing with Mr. Wood's

20   assertion that client schedules were consistently

21   wrong?

22           MR. JACOBS:  Objection to form.

23           SPECIAL MASTER TARLETON:  Overruled.

24       A.    I guess what I'm saying is I'm not in a

25   position to say one way or another whether they were

**6/4/2001 Botti**

1    consistently wrong.

2           Q.     In your experience in participating in

3    the calendar '97 year audit of CMS, were client

4    schedules consistently wrong?

5           A.     Sitting here today, I don't recall it

6    being that way.

7           Q.     Do you recall expressing to Mr. Wood

8    that he was incorrect, that it was not correct to say

9    client schedules are consistently wrong?

10          A.     I don't recall having that discussion.

11          Q.     Do you ever recall telling Mr. Wood that

12   he was incorrect in asserting that client schedules

13   required multiple versions in order to arrive at a

14   final schedule?

15          A.     I'm sorry, could you repeat that

16   question.

17                 (The record was read.)

18          A.     No, I don't recall.

19          Q.     Is it a fact that there were client

20   schedules that required multiple versions in order to

21   arrive at a final schedule?

22          A.     I believe that there were some.

23          Q.     One of them was the schedule with

24   respect to charges to the Ideon reserve, true?

25          A.     I'm not sure at this time.

1          IN THE UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF NEW JERSEY

2          DOCKET NO. 98-CV-1664 (WHW)

3

4    IN RE:  CENDANT CORPORATION

                                    DEPOSITION UPON

5        SECURITIES LITIGATION    ORAL EXAMINATION

                                         OF

6                                   BRUCE BOTTI

                                    VOLUME V

7    ------------------------------

8

     B E F O R E:   ROBERT E. TARLETON, J.S.C, RET.

9                   Special Discovery Master

10

     ------------------------------

11

12        T R A N S C R I P T  of the stenographic

13   notes of SUSAN E. GIOFFRE, a Notary Public and

14   Certified Shorthand Reporter, taken at the offices

15   of PATTERSON, BELKNAP, WEBB & TYLER, ESQS.,

16   1133 Avenue of the Americas, New York, New York,

17   on Monday, December 3, 2001, commencing at 9:35

18   a.m.

19

20

21

22

23

24

25

1   need you to read -- I'm just noting that you

2   didn't read it all the way through.

3        Q    For the sake of completeness, I'll

4   continue the sentence.  "And Bruce is to be

5   praised and admired for putting up with this

6   tremendously difficult environment."

7   A        Yes, I see that.

8        Q    Did you ever bring this to the

9   attention of E. Kirk Shelton, that there was a

10  difficult environment at Cendant or CUC?

11              MS. JACOBS:  Object to form.

12              SPECIAL MASTER:  Now, mindful, this

13  witness is not the author of that statement.

14              MR. BERNADUCI:  I understand.

15              SPECIAL MASTER:  All right.

16              Accepting that premise, the objection

17  will be overruled.

18  A      I would like to qualify my answer by saying

19  that I don't necessarily agree with the statements

20  that are written here by the author, but I

21  don't --  I didn't have any discussions with

22  E. Kirk Shelton about this particular point.

23        Q    Do you have any knowledge of any

24  employee at E&Y bringing to the attention of

25  E. Kirk Shelton that they believed that CUC