# EXHIBIT 1



**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

---

*970 Broad Street, Suite 700*          *(973) 645-2700*
*Newark, New Jersey 07102*

June 30, 2004

BY HAND

Barry S. Simon, Esq.
Williams & Connolly, LLP
725 Twelfth Street, N.W.
Washington, DC 20005

      Re:  United States v. Forbes, et al.
          No. 3:02CR264 (AWT)

Dear Mr. Simon:

      We write in response to your request for further
details of the conversations between counsel for Mr. Corigliano
and the Government on August 7, 1998 and November 11, 1998.

Cosmo Corigliano

      Please be advised that on or about August 7, 1998
counsel for Cosmo Corigliano provided the following information:

      With respect to the meeting held on or about March 9,
1998, concerning the usage of the Ideon reserve, it was discussed
that Anne Pember created the schedules used at the meeting and
that both Corigliano and Shelton have never seen those schedules
before the meeting.  Anne Pember also made the presentation of
what is in reserves, why she put items in the reserves and things
to that effect.  After the meeting Rabinowitz came in and made a
defense of the Ideon reserve and the way Anne had used it.

      After the merger, he was no longer in the financial
area, he was in the International area,  and did not know what
costs were being charged to the Cendant reserve.  He had no
responsibility for these charges, but does not deny the policy

**REDACTED**

DEFENDANT'S
EXHIBIT
1100

PENGAD 800-631-6989

was to be aggressive.  Pember no longer reported to Cosmo, maybe
to Shelton, with a dotted line to Monaco, who is now CFO.

The philosophy for the reserves that came down to him
was that Silverman wanted them to be as big as possible.  He
understood that Silverman said to Forbes or Shelton that he,
Silverman, was the King of purchase price accounting.  Corigliano
understood that the reserve should be as large as it could be
within proper limits.

With respect to the establishment and use of merger
reserves by CUC, counsel advised that Corigliano speculated
whether Casper Sabatino, who was not all that swift, could have
screwed something up, possibly not keeping the necessary work
papers to support the reserve.  Corigliano second guesses
himself, but thought that the merger reserves were all right at
the time.  Corigliano believes that they are all pretty
competent. Anne Pember is very competent, but that Sabatino was
less competent and that could have contributed to any problem
with the reserves.

Corigliano was very upset about the Wall Street Journal
story where Silverman and Monaco announced that there was a
fraud.

Corigliano always wanted to explain himself. He did not
feel deceived by Shelton and Forbes and feels his level of
knowledge is not different than Shelton's, who was a very hands-
on operating guy.  Forbes was more remote, but not as remote as
he is saying now.

Please be advised that on or about November 17, 1998,
counsel for Cosmo Corigliano provided the following information:

Corigliano said he had been mistreated by the company
and that the audit report was biased.

On the evening of the 14th, both Corigliano and Shelton
received phone calls from Forbes who told them not to come into
the office anymore and that he can't talk to them.  Between then
and the 17th they never got calls.

At a board meeting to which they were not invited,
Silverman tried to get Corigliano fired.  They represented that
Corigliano refused to cooperate and be interviewed which was a

# REDACTED

deliberate lie.  It was falsely represented to the board that
Speaks and Sabatino's affidavits implicated Corigliano by name.

Corigliano thought the audit report understated the
knowledge of people on the HFS side regarding certain issues.
Monaco and Forbes signed the 10-K.

In the summer of 1997, Monaco told Corigliano that he
had no financial responsibilities until he took over in 2000.
Corigliano resisted and they told him not to worry and gave him
international responsibilities.  He had no financial
responsibility and did not function as CFO after 12/17/97.  On
4/9 Silverman went out of his way to say Corigliano was not in
the financial area.

Pre 12/97, Pember reported to Corigliano and Sabatino
reported to Pember and not Corigliano.  After the merger, Pember
reported to Shelton.  Corigliano was not in the chain of command
anymore, so Pember was the top ranking accountant at CUC.

Monaco and Forbes were told by Shelton on 3/6 and by
Pember on 3/9 that earnings were getting a boost from merger
reserves.  Everyone at both companies knew this including Walter
Forbes.  The notion that merger reserves were being used
aggressively to boost earnings was well known and had been going
on for years.

On 3/9 Pember showed up with a schedule showing how she
had used the Ideon reserve and gave them all copies and walked
them through the schedule.  They hadn't seen the schedule before,
but they knew what was going on.  Then Rabinowitz came in and
answered questions.  Forbes and Monaco signed the 10-K.

Corigliano was not a knowing participant in a fraud, he
did not falsify or instruct anyone else to falsify any matter.
If there were things that were wrong, Corigliano does not know
about them.  If some things do not comport with proper
accounting, it was not because he knowingly did anything wrong.
He knew merger reserves were being used to increase earnings, but
did not think this was improper.  In meetings with Monaco and
Silverman, Corigliano was told directly to make the Cendant
merger reserves as large as possible.  Walter Forbes also
communicated this message to him.   Corigliano was urged to
estimate expenses liberally rather than conservatively as HFS was
very comfortable with this position.


# REDACTED

Cosmo Corigliano attended a meeting with the senior management of both CUC and HFS where Monaco explained reserves. During the meeting, CUC represented that its reserves were exhaustive. Henry Silverman said they should go back and find more reserves. The AA report understates the knowledge of the people on the HFS side.

What items Anne Pember charged against the Ideon reserve was not known to Corigliano until March 9, 1998. He found it very convincing, however, as did Shelton and Ernst and Young. He understood Ernst & Young worked on reserves with Pember. Corigliano had a good memory of the 3/6-3/10 time period regarding what documents were created, who reviewed them, etc.

Kirk Shelton did all the talking at the March 6, 1998 meeting. Mr. Shelton had knowledge roughly equivalent to Corigliano. Shelton was a very hands-on operating guy, while Forbes was more remote. Everyone agrees that Kirk did the talking on March 6 except that Shelton is presently denying that he did the talking.

Corigliano does not understand how merger reserves can be allocated to revenues. Corigliano had no responsibility for charges to the Cendant merger reserves. Corigliano was supposedly shocked by the allegation that Anne Pember did things in the middle of the night. Corigliano believed that Ernst & Young had approved of everything that was done.

Corigliano never told anyone to make unsupported topside adjustments. He believed that the AA report was exculpatory in that Sabatino stated that he was unaware of unsupported topside adjustments while Stu Bell was CFO prior to 1995.

Prior to 1995 while Bell was there and Corigliano was responsible for topside adjustments, they were all supported. After Corigliano became CFO and Sabatino assumed responsibility for this area, the numbers were now unsupportable. Corigliano

**REDACTED**

maintains that if any of the adjustments were made on an unsupported basis, it was done by Sabatino alone.  Sabatino lied about who is involved in the making of unsupported topside adjustments.  Corigliano believed that whatever adjustments were being made at that time were justified.  Corigliano denies that he told Sabatino what adjustments to make.  It was Sabatino's job to make the adjustments and Corigliano maintains that he lied about Corigliano's directive.  Corigliano does not know if the figures for the topsides are false or not.  Corigliano has no knowledge of adjustments to revenue, including whether they were part of topside adjustments in 1997.  These adjustments do not make sense to Corigliano.  Sabatino was upset about not getting the controller's job which Shelton decided to leave vacant.  Rivalry existed between Pember and Sabatino. When Pember got the controller's job Sabatino was very bitter.  Corigliano got vibes from Ernst & Young that Sabatino wasn't up to his job.  At one point Corigliano stood up for Sabatino to keep him from getting fired.  Sabatino had failed to provided Ernst & Young with support for entries that he was too inept to find.  Sabatino was incompetent and/or Sabatino cheated to make himself look good.

Corigliano thinks that management from HFS took advantage of the situation and tried to make the accounting problems appear as bad as possible.  It was never expected that the stock would drop by 50 percent, maybe 5 percent.

Benefits attributable to the reserves were expected from the beginning of the year. If they can see from the beginning of the year that operations are at certain levels and they know about reserves, they have every reason to suppose that there are going to be adjustments, then they can do this.

**REDACTED**

Counsel informed the government that they had polygraphed Corigliano and that he had done very well.  They invited the government to polygraph Mr. Sabatino.

Very truly yours,

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice

By:   JOHN J. CARNEY
Special Attorney
U.S. Department of Justice

By:   JAMES MCMAHON
Special Attorney
U.S. Department of Justice

By: RICHARD SCHECHTER
Special Attorney
U.S. Department of Justice

cc:   Thomas P. Puccio, Esq.
      Scott Edelman, esq.

**REDACTED**

# EXHIBIT 2



U.S. Department of Justice

FILED

*United States Attorney*
*District of New Jersey*

⠀⠀1 4 2000

AT 8:30 _____ M
WILLIAM T. WALSH
CLERK

*970 Broad Street, Suite 700*
*Newark, NJ 07102*

*(973) 645-2700*

January 14, 2000

Gary P. Naftalis, Esq.
Kramer, Levin, Naftalis & Frankel
919 Third Avenue
New York, NY 10022-3852

Re: <u>Plea Agreement with Cosmo Corigliano</u>   CR-00-379

Dear Mr. Naftalis:

This letter sets forth the full and complete plea agreement between your client, Cosmo Corigliano, and the United States Attorney for the District of New Jersey.

<u>Charge</u>

Conditioned on the understandings specified below, the United States will accept a guilty plea from Mr. Corigliano to a two-count Information charging him with (i) conspiracy to commit mail fraud and wire fraud and to cause false statements to be made in documents required to be filed with the Securities and Exchange Commission (the "SEC"), in violation of 18 U.S.C. § 371; and (ii) wire fraud in violation of 18 U.S.C. § 1343. If Mr. Corigliano enters a guilty plea and is sentenced on this charge, and if he otherwise fully complies with all of the terms of this agreement, this Office will not initiate any further charges against him arising from: (i) his participation in the misstating or falsification of any financial statements, reports, or other accounting documents or records of CUC International, Inc. and/or Cendant Corporation (collectively, "Cendant"); (ii) the providing of any misstated or falsified financial statements, reports, other accounting documents or records of Cendant, or other information to the SEC, other regulatory or governmental authorities, Cendant's auditors, members of the investing public, or other prospective purchasers of Cendant stock; or (iii) Mr. Corigliano's purchases or sales of Cendant stock. The scope of the protection offered in the previous sentence is further limited to the criminal activity known to this Office as of the date of this agreement.

DEFENDANT'S
EXHIBIT

300

PENGAD 800-631-6989

## Cooperation

Mr. Corigliano shall cooperate fully with this Office. As part of that obligation, Mr. Corigliano shall truthfully disclose all information he possesses concerning any matters about which this Office and other government agencies designated by this Office, including without limitation the Federal Bureau of Investigation, the U.S. Postal Inspection Service, and the SEC, may inquire of him. Mr. Corigliano also shall make himself available at all reasonable times requested by representatives of the government and shall truthfully testify in all proceedings, including grand jury and trial proceedings, as to any subject about which he is questioned. Furthermore, Mr. Corigliano agrees to provide to this Office at its request any documents or records, whether personal, partnership, corporate or otherwise, in his possession, custody, or control.

Should Mr. Corigliano withdraw from this agreement, or should he commit any additional federal, state, or local crimes, or should it be established that he has intentionally given materially false, incomplete, or misleading testimony or information or otherwise has violated any provision of this agreement, the non-prosecution provisions of this agreement shall be null and void. All other provisions of this agreement shall remain in full force and effect. If the non-prosecution provisions of this agreement become null and void because of Mr. Corigliano's actions or omissions, Mr. Corigliano shall thereafter be subject to prosecution for any federal criminal violation of which this Office has knowledge, including, but not limited to, perjury and obstruction of justice. Any such prosecution may be premised upon any information provided by Mr. Corigliano, and all such information may be used against him. Moreover, any such prosecution that is not time-barred by the applicable statute of limitations on the date Mr. Corigliano signs this agreement may be commenced against him notwithstanding the expiration of the limitations period subsequent to that date. With respect to any such prosecution, Mr. Corigliano waives any right to claim that statements made by him before or after the execution of this agreement, including any statements made pursuant to any prior agreement between him and this Office, or any leads from such statements, should be suppressed under Fed. R. Crim. P. 11(e)(6) or Fed. R. Evid. 410.

## Sentence and Other Penalties

Each of the violations of 18 U.S.C. § 371 and 18 U.S.C. § 1343 to which Mr. Corigliano agrees to plead guilty carries a statutory maximum prison sentence of five years and a statutory maximum fine equal to the greatest of: (i) $250,000; (ii) twice the gross amount of any pecuniary gain that any persons derived from the offense; or (iii) twice the gross amount of any pecuniary loss sustained by any victims of the offense. The Sentencing Reform Act and the Sentencing Guidelines may impose a minimum term of imprisonment and/or fine, and the Sentencing Guidelines may authorize departure from the minimum and maximum penalties under certain circumstances. Fines imposed by the sentencing judge may be subject to the payment of interest.

Further, in addition to imposing any other penalty on Mr. Corigliano, the sentencing judge: (i) will order Mr. Corigliano to pay an assessment of $200 pursuant to 18 U.S.C. § 3013, which assessment must be paid by the date of sentencing; (ii) may order Mr. Corigliano to pay restitution pursuant to 18 U.S.C. §§ 3663 et seq.; and (iii) pursuant to 18 U.S.C. § 3583 and § 5D1.2 of the Sentencing Guidelines, may require Mr. Corigliano to serve a term of supervised release of up to three years, which will begin at the expiration of any term of imprisonment imposed. Should Mr. Corigliano be placed on a term of supervised release and subsequently violate any of the conditions of that release before the expiration of its term, Mr. Corigliano may be sentenced to not more than two years' imprisonment in addition to any prison term previously imposed on him and in addition to the statutory maximum term of imprisonment set forth above.

The sentence to be imposed upon Mr. Corigliano is within the sole discretion of the sentencing judge. The government cannot and does not make any representation or promise either as to what guideline range will be found applicable to Mr. Corigliano or as to what sentence he will receive. Except as otherwise provided in this agreement, this Office reserves its right to take any position with respect to the appropriate sentence to be imposed on Mr. Corigliano by the sentencing judge. In addition, this Office will inform the sentencing judge and the U.S. Probation Office of: (i) this agreement; (ii) the full nature and extent of Mr. Corigliano's activities and relevant conduct with respect to this case; (iii) the full nature and extent of Mr. Corigliano's cooperation with this Office and the date when it commenced; and (iv) all other information relevant to sentence, favorable or otherwise, in the possession of this Office, including information provided by Mr. Corigliano both before and after signing this agreement.

If Mr. Corigliano fully complies with this agreement and, prior to his sentencing, provides substantial assistance in the investigation or prosecution of one or more persons who have committed offenses, this Office will move the sentencing judge, pursuant to § 5K1.1 of the Sentencing Guidelines, to depart downward from the otherwise applicable guideline range. Whether the sentencing judge does in fact depart downward from the otherwise applicable guideline range is a matter committed solely to the Court's discretion. The determination whether Mr. Corigliano has provided substantial assistance to the government rests solely in the discretion of this Office. Mr. Corigliano may not withdraw his plea if this Office determines that Mr. Corigliano has not rendered substantial assistance or if the Court refuses to grant this Office's motion for a downward departure.

Mr. Corigliano specifically waives any right to appeal the validity of a plea he enters pursuant to this agreement. This Office reserves the right to take any position in post-sentencing motions or proceedings and to appeal, or oppose any appeal of, Mr. Corigliano's sentence.

## Stipulations

This Office and Mr. Corigliano agree to stipulate at sentencing to the statements set forth in the attached Schedule A, which is hereby made a part of this plea agreement. This agreement

- 3 -

to stipulate, however, cannot and does not bind the sentencing judge, who may make independent factual findings and may reject any or all of the stipulations entered into by the parties. To the extent that the parties do not stipulate, each reserves the right to argue the effect of any fact upon sentencing. Moreover, this agreement to stipulate on the part of this Office is based on the information and evidence that this Office possesses as of the date of this agreement. Thus, if this Office obtains or receives additional evidence or information prior to sentencing that it determines to be credible and to be materially in conflict with any stipulation in the attached Schedule A, this Office shall not be bound by any such stipulation. A determination that any stipulation is not binding shall not release either this Office or Mr. Corigliano from any other portion of this plea agreement, including any other stipulation.

Other Provisions

This agreement does not prohibit the United States, any agency thereof (including the IRS), or any third party from initiating or prosecuting any civil proceeding against Mr. Corigliano.

This agreement is limited to the United States Attorney's Office for the District of New Jersey and cannot bind other federal, state, or local authorities. However, this Office will bring this agreement and Mr. Corigliano's cooperation to the attention of other prosecuting offices and the parties in any civil proceeding, if requested by Mr. Corigliano to do so.

This agreement constitutes the full and complete plea agreement between Mr. Corigliano and this Office and supersedes any previous agreement between them. No additional promises, agreements, or conditions have been entered into with respect to Mr. Corigliano's criminal liability other than those set forth in this letter, and none will be entered into unless in writing and signed by the parties.

Very truly yours,

ROBERT J. CLEARY
United States Attorney

PAUL A. WEISSMAN
Deputy Chief, Fraud and Public
Protection Division

- 4 -

I have received the foregoing letter from my attorney, Gary P. Naftalis, Esq. I have read it and I understand it fully. I hereby acknowledge that it fully sets forth my agreement with the Office of the United States Attorney for the District of New Jersey. I state that there have been no additional promises or representations made to me by any officials or employees of the United States government or by my attorneys in connection with this matter.

_____
COSMO CORIGLIANO

WITNESSED:

_____
GARY P. NAFTALIS, Esq.
Counsel for Cosmo Corigliano

Date: _____1/14/00_____

- 5 -

## PLEA AGREEMENT WITH COSMO CORIGLIANO

### Schedule A

As part of the foregoing plea agreement, and subject to the conditions set forth therein, the United States and Cosmo Corigliano agree to stipulate to the following statements:

1. Mr. Corigliano committed the offenses to which he agrees to plead guilty prior to November 1, 1998. Accordingly, in view of certain amendments which took effect as of November 1, 1998, Mr. Corigliano's sentencing is governed by the United States Sentencing Guidelines which took effect as of November 1, 1997.

2. The offense guideline applicable to the above offenses is U.S.S.G. § 2F1.1, which carries a base offense level of 6. U.S.S.G. § 2F1.1(a).

3. The above offenses caused losses in excess of $80 million. However, taking into account all the circumstances of this case and the nature of Mr. Corigliano's role in the offense, the total loss caused by the offenses significantly overstates the seriousness of Mr. Corigliano's conduct, and excessive weight would be attached to this factor by applying the full adjustment which might otherwise be indicated under U.S.S.G. § 2F1.1(b)(1) based on that amount of loss.

4. The above offenses involved more than minimal planning on Mr. Corigliano's part. Accordingly, his offense level should be increased by 2 levels pursuant to U.S.S.G. § 2F1.1(b)(2).

5. Mr. Corigliano was a manager and a supervisor in the above offenses, which involved five or more participants. Accordingly, his offense level should be increased by 3 levels pursuant to U.S.S.G. § 3B1.1(b).

6. Mr. Corigliano's offenses involved an abuse of a position of trust, namely his position as Chief Financial Officer of CUC International, Inc. Accordingly, his offense level should be increased by 2 levels pursuant to U.S.S.G. § 3B1.3.

7. As of the date of this agreement, Mr. Corigliano has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If Mr. Corigliano continues to demonstrate such recognition and acceptance through the date of his sentencing, he will become entitled to a 2-point reduction in his offense level pursuant to U.S.S.G. § 3E1.1(a).

8. Mr. Corigliano has assisted authorities in the investigation and prosecution of his own misconduct by timely providing complete information to the government concerning his own involvement in the offense and timely notifying authorities of his intention to enter a plea of

- 6 -

guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Accordingly, if Mr. Corigliano enters a plea pursuant to this agreement and qualifies for a 2-point reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a), and if in addition Mr. Corigliano's offense level under the Guidelines prior to the operation of § 3E1.1(a) is 16 or greater, Mr. Corigliano will be entitled to a further 1-point reduction in his offense level pursuant to U.S.S.G. § 3E1.1(b).

9. No grounds exist for any upward or downward adjustment in Mr. Corigliano's offense level under any provision of U.S.S.G. Chapters 2 and 3 other than those referred to in paragraphs 3 through 8 above.

10. In the event that the Court in its discretion departs downward to a Guidelines range in which substitutes for imprisonment are permitted by the Guidelines, the government will not oppose a request by Mr. Corigliano that he be sentenced to some form of substitute punishment.

11. An order of restitution would be inappropriate in the context of a criminal proceeding against Mr. Corigliano because the number of identifiable victims is so large as to make restitution impracticable and determining complex issues of fact related to the cause or amount of the victims' losses would complicate and prolong the sentencing process to a degree that the need to provide restitution to any victim in the context of a criminal proceeding is outweighed by the burden on the sentencing process.

12. There is no evidence that Mr. Corigliano committed the offenses to which he has agreed to plead guilty in order to enrich himself personally. Mr. Corigliano acknowledges, however, that in light of those offenses, certain of the proceeds he received from sales of CUC International, Inc. and Cendant stock in the period prior to in or about April 1998 are subject to civil recovery. Mr. Corigliano agrees to use his best efforts to settle any claims the SEC may assert to recovery of such proceeds prior to his sentencing pursuant to this agreement. As part of those efforts, Mr. Corigliano agrees to provide the SEC, upon request, with complete and accurate information regarding his ability to pay any such settlement in the form ordinarily required by the SEC.