UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


UNITED STATES OF AMERICA      :  No. 3:02CR00264 (AHN)
                              :
                              :
            v.                :  April 17, 2006
                              :
                              :
                              :
WALTER A. FORBES              :




GOVERNMENT'S OPPOSITION TO DEFENDANT WALTER A. FORBES' MOTION TO
COMPEL DISCOVERY AND PRODUCTION OF BRADY/GIGLIO MATERIAL

(Opposition to Forbes Third Trial Motion No. 2)




                              CHRISTOPHER J. CHRISTIE
                              NORMAN GROSS
                              MICHAEL MARTINEZ
                              Special Attorneys
                              U. S. Department of Justice
                              970 Broad Street
                              Room 700
                              Newark, N.J.  07102
                              (973) 645-2701

TABLE OF CONTENTS

**Page**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

I.  THE GOVERNMENT'S FULFILLMENT OF ITS DISCLOSURE
    OBLIGATIONS . . . . . . . . . . . . . . . . . . . . . 6

II. DOCUMENTS AND INFORMATION RELATING TO COSMO CORIGLIANO . 14

    A.  Communications Between Corigliano and/or his
        Counsel and the SEC . . . . . . . . . . . . . . . 14

        1.  Background . . . . . . . . . . . . . . . . . 14

        2.  SEC Requests for Financial Disclosure . . . . 18

            a.  SEC Financial Disclosure Form . . . . . . 18

            b.  SEC Requests for Tax Returns . . . . . . 23

        3.  Information Supplied to the SEC by Corigliano
            And His Counsel . . . . . . . . . . . . . . . 23

            a.  Asset Value Information . . . . . . . . . 23

            b.  Quarterly Financial Reports . . . . . . . 24

        4.  Settlement Negotiations with the SEC . . . . 26

        5.  Budget Negotiations with the SEC . . . . . . 28

        6.  Supposed Unwritten Agreements . . . . . . . . 29

    B.  Documents and Information Relating to Corigliano's
        Trial Testimony . . . . . . . . . . . . . . . . . 32

    C.  Documents and Information Relating to Corigliano's
        Polygraph Examinations . . . . . . . . . . . . . 34

    D.  Information Concerning Proffers by Corigliano's
        Counsel to the Government . . . . . . . . . . . . 36

III. DOCUMENTS AND INFORMATION RELATING TO KEVIN KEARNEY . . 37

i

IV.   ADDITIONAL DOCUMENTS AND INFORMATION . . . . . . . . . .   40

      A.   Documents and Information Relating to
           Michael Monaco . . . . . . . . . . . . . . . . . .   40

      B.   Documents and Information Relating to
           Steven Kernkraut . . . . . . . . . . . . . . . . .   41

      C.   Documents and Information Relating to
           Stuart Bell and Kirk Shelton . . . . . . . . . . .   42

      D.   Information Relating to Casper Sabatino . . . . . .   44

      E.   Statements by Government Witnesses . . . . . . . .   45

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . .   47

## INTRODUCTION

Seeking to take improper advantage of the transfer of this case from the Honorable Alvin W. Thompson to this Court, Forbes raises in a lengthy submission a panoply of discovery demands that Judge Thompson previously rejected.  By way of background, the charges in this case involve a massive fraud at a company called CUC International and its corporate successor, Cendant, between the late 1980's and April 1998, when the fraud was first publicly disclosed.  Defendant Walter Forbes was the Chief Executive Officer and Chairman of the Board of Directors of CUC during most of that period.  The fraud was disclosed to the investing public in April 1998 after CUC merged with a New Jersey based company, HFS, to form Cendant.  On the day following disclosure of the fraud, the price of Cendant's stock dropped over 40% and Cendant shareholders lost $14 billion in the value of their shares.  In re Cendant Corp. Litigation, 264 F.3d 201, 222 (3d Cir. 2001).

In 1998, the Securities and Exchange Commission ("SEC") began investigating the involvement of Cosmo Corigliano, the former chief financial officer of CUC, in the accounting fraud. Transcript of the first (2004) trial ("FTTr.") 7683-85. Corigliano subsequently pleaded guilty to federal criminal charges pursuant to a guilty plea agreement dated January 2000 for his role in the fraud at CUC, and has been a prosecution witness in this case.  Exhibit 2 to Forbes' Third Retrial Motion

No. 2 ("Forbes' Motion").  The SEC instituted a civil proceeding against Corigliano that was separate from the criminal case. FTTr. 7970.  In his plea agreement with the United States Attorney's Office for the District of New Jersey ("USAODNJ"), Corigliano promised to use his best efforts to settle the SEC charges, and also to provide complete and accurate information to the SEC.  Exhibit 2 to Forbes' Motion.  In 2004, Corigliano settled the SEC charges by disgorging property worth approximately $14 million.  FTTr. 7504; Exhibit 13 to Forbes' Motion.

Many of the demands in Forbes' present discovery motion pertain to correspondence between Corigliano's lawyers and SEC officials in the context of the SEC proceedings against Corigliano.  Forbes' Mem. in Support of Forbes' Third Retrial Motion No. 2 ("FM") 6-23.  Forbes sought these same documents from Corigliano's lawyers in a motion that Forbes filed before Judge Thompson during the second trial.  Forbes' Retrial Motion No. 19, Docket 1942.

Corigliano's lawyers filed a responsive brief, Forbes filed a reply brief, and Judge Thompson postponed the second trial for an entire day to entertain oral argument on the motion and resolve the issues.  Transcript of the second (2005) trial ("STTr.") 11/7/05.  At the conclusion of that hearing, Judge Thompson denied Forbes' motion for disclosure of these documents. STTr. 11/7/05, 30.  Judge Thompson concluded that the

correspondence was not subject to disclosure to the defense because it did not pertain to any relevant issue at trial.  <u>Id.</u> Documents created or received by Corigliano's lawyers that Judge Thompson ruled were inadmissible and not discoverable from Corigliano's lawyers do not become discoverable from the Government, assuming that members of the Government's prosecution team in this case ever received any of those (which, in many instances, they did not).

Nowhere in his lengthy brief in support of his discovery motion does Forbes mention that his prior demands for these documents were rejected by Judge Thompson.  The omission is apparently not inadvertent.  Forbes has failed to demonstrate that he was entitled to what is in effect reconsideration of his previously rejected discovery demands, and this Court should reject those demands for that reason.  A reconsideration motion will be denied unless the "moving party can point to controlling decisions or data that the court overlooked -- matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." <u>United States v. Fell</u>, 372 F. Supp. 2d 773, 780 (D. Vt. 2005).  "[T]he function of a motion for reconsideration is to present the court with an opportunity to correct manifest errors of law or fact or to consider newly discovered evidence." <u>LoSacco v. City of Middletown</u>, 822 F. Supp. 870, 876-77 (D. Conn. 1993)(internal quotation marks omitted), <u>aff'd</u>, 33 F.3d 50 (2d Cir. 1994).

Forbes has not even attempted to meet his heavy burden for obtaining reconsideration of his previously rejected discovery demands. <u>Shrader v. CSX Transp., Inc.</u>, 70 F.3d 255, 257 (2d Cir. 1995)(party seeking reconsideration must meet a "strict burden"); <u>accord</u> <u>United States v. Ocasio</u>, 2005 WL 1489462, *2 (D. Conn., June 20, 2005).  Reconsideration motions do not provide a litigant with a second bite at the apple.  <u>See</u> <u>Sequa Corp. v. GBJ Corp.</u>, 156 F.3d 136, 144 (2d Cir. 1998).[1]  As Forbes has failed to sustain his "strict burden," but has merely recycled his previous arguments, his discovery motion can be summarily rejected.

In addition, Judge Thompson's denial of Forbes' prior demands for these documents and related information have become the law of the case and Forbes has presented no compelling reason for this Court to revisit any of those rulings.  "The court's exercise of its power to reconsider and modify its prior interlocutory rulings is informed by the . . . law-of-the-case doctrine.  That principle is that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case." <u>United States v. Uccio</u>,

---

[1]  "[A] motion for reconsideration may not be used to plug gaps in an original argument or to argue in the alternative once a decision has been made." <u>Lopez v. Smiley</u>, 375 F. Supp. 2d 19, 21-22 (D. Conn., June 24, 2005); <u>Horsehead Resource Development Co., Inc. v. B.U.S. Environmental Services, Inc.</u>, 928 F. Supp. 287, 289 (S.D.N.Y., May 21, 1996) (internal citations and quotations omitted).

940 F.2d 753, 758 (2d Cir. 1991); see United States v. Crowley, 318 F.3d 401, 420 (2d Cir. 2003); United States v. Quintieri, 306 F.3d 1217, 1225 (2d Cir. 2002); United States v. Tenzer, 213 F.3d 34, 39-40 (2d Cir. 2000). "[A]bsent cogent or compelling reasons to deviate, such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice," a court should adhere to its prior rulings. Uccio, 940 F.2d at 758.

"Under the 'law of the case' doctrine, 'courts are understandably reluctant to reopen a ruling once made,' especially 'when one judge or court is asked to consider the ruling of a different judge or court.'" Lillbask v. Connecticut Dept. of Educ., 397 F.3d 77, 94 (2d Cir. 2005) (quoting 18B Wright, Miller & Cooper, Federal Practice and Procedure, § 4478 (2d ed. 2002)); see Chiu v. United States, 948 F.2d 711, 717 (Fed. Cir. 1991) ("A successor judge steps into the shoes of his or her predecessor, and is thus bound by the same rulings and given the same freedom as the first judge."); Philadelphia Housing Auth. v. American Radiator & Standard Sanitary Corp., 323 F. Supp. 381, 383 (E.D. Pa. 1970) ("Nor is there any apparent reason why the rule of the law of the case should not be applied merely because a different judge has now been assigned to this litigation."). For that reason as well, this motion should be denied without consideration of the merits.

Nevertheless, the Government will show why Judge Thompson's

5

denials of Forbes' multitudinous discovery requests were a proper exercise of Judge Thompson's discretion.  United States v. Gel Spice Co., Inc., 773 F.2d 427, 434 (2d Cir. 1985)(applying abuse of discretion standard to defense discovery request); see generally United States v. Sanders, 211 F.3d 711 (2d Cir. 2000) (district court's denial of discovery to support a selective prosecution claim is reviewed only for an abuse of discretion).

**ARGUMENT**

**I. THE GOVERNMENT'S FULFILLMENT OF ITS DISCLOSURE OBLIGATIONS.**

Forbes has intimately learned the Government's case during the course of two extensive trials, the first of which consumed over seven months.[2]  In his present motion for additional

---

[2]  Before the first trial, Forbes received a virtual mountain of discovery, including: (1) a 260-page report, describing the fraud in detail, which was prepared in August 1998 by counsel for the Audit Committee of Cendant's Board of Directors; (2) 120 binders of workpapers prepared by the Audit Committee's accounting firm; (3) 12 binders of memoranda of interviews of 81 Cendant, CUC and HFS employees, directors and auditors; (4) more than 3000 pages of attorney and agent notes of interviews of approximately 86 people; (5) more than 3 million documents obtained pursuant to Rule 17(c) subpoenas; (6) more than 1 million documents and approximately 200 deposition transcripts obtained from related civil cases; and (7) summaries of expert testimony, along with all corresponding drafts, workpapers and correspondence.  See Tr. of Motion Hearing, 12/17/03, 299-300 (acknowledgment of Forbes' counsel that "there are 3 million documents in the case" that the defense had received).  The Government also provided the defense in December of 2002 with a compilation which identifies all relevant false or fraudulent accounting entries and all relevant false statements.

Since the start of the first trial, Forbes has received additional discovery from the Government, including documents referenced in Forbes' discovery motion.  See, e.g. Exhibits 14
(continued...)

discovery, he continues to take the position, repeatedly rejected

by Judge Thompson, that he is entitled to virtually every shred

of information that might theoretically prove helpful to his

defense.  The law is otherwise.

Although the prosecution team must disclose information that

is material to the defense, it need not disclose, as Forbes would

have it, everything that any government official knows about what

a prosecution witnesses or his or her attorney ever said that

might be relevant to this case.  "<u>Brady</u> does not . . . require

the prosecution to disclose all exculpatory and impeachment

material; it need disclose only material 'that, if suppressed,

would deprive the defendant of a fair trial.'"  <u>United States v.</u>

<u>Coppa</u>, 267 F.3d 132, 135 (2d Cir. 2001) (<u>quoting</u> <u>United States v.</u>

<u>Bagley</u>, 473 U.S. 667, 675 (1985)).

Undisclosed information is not "material" in a

constitutional sense simply because it might "help[] the defense"

or might "affect[] the outcome of the trial."  <u>United States v.</u>

<u>Agurs</u>, 427 U.S. 97, 109-10 (1976).  <u>See</u> <u>United States v. LeRoy</u>,

---

[2](...continued)
and 17 to Forbes' Motion.  Additionally, the Government
recognizes that its discovery obligations are on-going.  By
letter dated April 3, 2006, the Government turned over to Forbes'
lawyers the notes of several interviews of Cosmo Corigliano that
were prepared by a former FBI agent who previously served on the
prosecution trial team.  The Government did so not because such
disclosure is required by the Constitution, Fed. R. Crim. P. 16,
or the discovery orders in this case.  Rather, it did so because
the Government has previously represented that, in an abundance
of caution, all agent notes of interviews of prosecution
witnesses would be disclosed to the defense.

687 F.2d 610, 619 (2d Cir. 1982) ("The rationale underlying <u>Brady</u>
is not to supply a defendant with all the evidence in the
Government's possession which might conceivably assist the
preparation of his defense, but to assure that the defendant will
not be denied access to exculpatory evidence only known to the
Government."); <u>accord</u> <u>Pruitt v. McAdory</u>, 337 F.3d 921, 926 (7th
Cir. 2003). Rather, information possessed by the prosecution
team must be disclosed under <u>Brady</u> and its progeny only if there
is a "reasonable probability" that the information would
"affect[] the outcome of the case," or would "put the whole case
in such a different light as to undermine confidence in the
verdict." <u>Coppa</u>, 267 F.3d at 135 (internal quotation marks
omitted).

Judge Thompson acted well within his discretion in denying
the similar discovery demands with which Forbes is now burdening
this Court and the Government. Given the extensive material
already at Forbes' disposal to challenge the prosecution
witnesses, and particularly to show the supposed bias of
Corigliano, Judge Thompson properly concluded that more of the
same would not be material. <u>United States v. Zackson</u>, 6 F.3d
911, 919 (2d Cir. 1993) ("we believe that Zackson had sufficient
access to the essential facts enabling him to take advantage of
any exculpatory material that may have been available"); <u>United
States v. Gaggi</u>, 811 F.2d 47, 59 (2d Cir. 1987) ("[N]o <u>Brady</u>
violation occurs if the defendant knew or should have known the

8

essential facts permitting him to take advantage of any exculpatory evidence.").

Indeed, the exhibits to Forbes' motion are replete with documents that, he claims, are relevant to impeach the prosecution witnesses and that Forbes has already secured through his own extensive and well-funded investigation.  Having obtained from the Government or through his own devices a virtual mountain of impeachment information, Forbes should not be heard to demand that even greater burdens be placed on the prosecution team to advance his defense.  The "purpose [of <u>Brady</u>] is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur."  <u>United States v. Bagley</u>, 473 U.S. 667, 675 (1985). <u>Brady</u> does not place any burden upon the prosecution team "to conduct a defendant's investigation or assist in the presentation of the defense's case."  <u>United States v. Aubin</u>, 87 F.3d 141, 148 (5th Cir. 1996) (quotations omitted).  Evidence is not suppressed within the meaning of <u>Brady</u> "if the defendant either knew . . . or should have known. . . of the essential facts permitting him to take advantage of any exculpatory evidence."  <u>United States v. LeRoy</u>, 687 F.2d 610, 618 (2d Cir. 1982); <u>United States v. Brown</u>, 582 F.2d 197, 200 (2d Cir. 1978).

Additionally, the bulk of the information sought by Forbes in this motion regarding Corigliano pertains to his dealings not with the USAODNJ, but with the SEC.  FM 6-23.  Forbes continues

to insist that he is entitled to a virtually verbatim account of the oral and written communications between the prosecution witnesses and "the government," as well as the dates of such communications.  This demand extends beyond communications involving the members of the prosecution team in this case: the former and current Assistant United States Attorneys who personally worked on this case,[3] and the agents of the FBI and the United States Postal Inspection Service who worked on this case.[4]  Rather, Forbes contends that the Government's disclosure obligations extend to officials of the SEC, because that agency instituted a parallel civil proceeding against Corigliano while the criminal investigation was being conducted by the USAODNJ. FM 4.  Thus, Forbes asserts that he has "consistently sought the production of all communications between Corigliano or his counsel and the SEC."  FM 6.  As Judge Thompson properly concluded, however, Forbes is not entitled to all of those

---

[3]  Those persons are principally AUSAs Michael Martinez and Craig Carpenito, the trial prosecutors from the second trial; John Carney, James McMahon, and Richard Schechter, the trial prosecutors from the first trial, and Paul Weissman, Mark Winston, and former U.S. Attorney Robert Cleary, who participated in witness interviews before the first trial.  Several other AUSAs have assisted in this extensive case, but have not communicated directly with the witnesses at issue in Forbes' Motion.

[4]  The agents are former FBI Agent Mark Gerber and current FBI Agent John Pittman, who served on the trial team through the first trial, U.S. Postal Inspection Service Inspector Patricia Matthews, who served on the trial team through the second trial, and FBI Timothy Michaud, who served on the trial team during the second trial.

10

communications.

The prosecution team in this case turned over materials from the SEC files out of an abundance of caution, and not out of legal compulsion.  The Government's disclosure obligations extend only to material evidence that is known to the members of the prosecution team.  <u>Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995).  A prosecutor has a duty to learn of any favorable evidence known to the others acting on the Government's behalf in the case.  <u>Id.</u>; <u>see also</u> <u>United States v. Payne</u>, 63 F.3d 1200, 1208 (2d Cir. 1995).  A prosecutor's disclosure obligations under <u>Brady</u>, however, do not "embrace materials that the prosecution team has never had in its files, never inspected, and never knew about." <u>Morgan v. Salamack</u>, 735 F.2d 354, 358 (2d Cir. 1984) (quoting <u>United States v. Hutcher</u>, 622 F.2d 1083, 1088 (2d Cir. 1980)). Imposition of a duty on a prosecutor to obtain and disclose information known by officials from other agencies who are not assigned to the criminal prosecution would inappropriately adopt "a monolithic view of government" that would "condemn the prosecution of criminal cases to a state of paralysis."  <u>United States v. Avellino</u>, 136 F.3d 249, 255 (2d Cir. 1998) (<u>quoting</u> <u>United States v. Gambino</u>, 835 F. Supp. 74, 95 (E.D.N.Y. 1993), <u>aff'd</u>, 59 F.3d 353 (2d Cir. 1995)).  Forbes' ceaseless discovery demands in this case seek precisely that result.

In <u>United States v. Locascio</u>, 6 F.3d 924, 949 (2d Cir. 1993), the Court of Appeals held that the prosecution team did

not suppress highly impeaching information about the
prosecution's star witness in an organized crime prosecution in
which the FBI was the lead investigative agency.  The impeaching
information was memorialized in a report prepared by FBI agents
who were not members of the Locascio prosecution team, but who
were investigating other organized criminal activity involving
the same witness, which was prosecuted by the same U.S.
Attorney's Office that prosecuted the Locascio case.  6 F.3d at
948-49.  The Court explained that "[e]ven assuming the
[undisclosed] reports' materiality, there is no evidence that the
prosecution team in the instant case was aware of the reports
that have subsequently come to light.  We will not infer the
prosecutors' knowledge simply because some other government
agents knew about the report."  Id. at 949.  See also United
States v. Pelullo, 399 F.3d 197, 216-19 (3d Cir. 2005)
(prosecution team had no obligation to find and disclose
documents possessed by officials at the Department of Labor who
were not members of the prosecution team, even though one DOL
employee was a member of that team); Lavallee v. Coplan, 374 F.3d
41, 44 -45 (1st Cir. 2004)(declining to find that child welfare
agency was part of the prosecution team because it was "neither
the police nor the equivalent of the police in assisting the
prosecution").[5]

---

[5]  Accord United States v. Quinn, 445 F.2d 940, 944 (2d Cir.
(continued...)

Thus, the prosecution team is charged only with constructive knowledge of information possessed by persons who can fairly be treated as an "arm of the prosecutor." United States v. Morell, 524 F.2d 550, 555 (2d Cir. 1975).  Persons are members of the prosecution team for this purpose if they jointly participate in the office's investigation, assist in preparing the case for trial or function under the prosecutor's authority or control. See Stano v. Butterworth, 51 F.3d 942, 945-46 (11th Cir. 1995). The employees of the SEC who were working on the parallel civil investigation of the CUC fraud did none of those things and were not members of the USAODNJ prosecution team.  They did not jointly participate in the criminal investigation (indeed, no SEC employee had access to any grand jury materials generated in this investigation); did not assist in preparing the criminal case for trial; and did not function under the authority or control of the prosecution team.  Judge Thompson properly rejected Forbes' contention that the prosecution team was obligated to turn over documents in the SEC's files that might prove useful to the

---

[5](...continued)
1971)(declining to impute to an AUSA in New York knowledge of a sealed indictment returned in Florida against a witness in the New York case, and rejecting the "completely untenable position that knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor"); Shakur v. United States, 32 F. Supp. 2d 651, 663-66  (S.D.N.Y. 1999) (refusing to impute to the prosecution team information known to members of the New York City Police Department who were not members of the team, even though the prosecution team included other NYPD officers).

defense.

**II.  DOCUMENTS AND INFORMATION RELATING TO COSMO CORIGLIANO.**

    **A.  Communications Between Corigliano and/or his Counsel and the SEC.**

        **1.  Background.**

Although no SEC official or employee was a member of the USAODNJ prosecution team, the prosecutors from the initial trial team, in an abundance of caution, obtained numerous documents from the SEC files, reviewed those documents, and turned over to the defense the documents that arguably contained Brady or Giglio material.  FTTr. 8076, 8128-30, 8613-16, 8620-21, 9023, 9026; see FM 7.  Not content with this disclosure, Forbes now complains that the prosecution team made a "demonstrably inaccurate" representation in a response to one of Forbes' previous discovery motions.  FM 7 and 13, n.11.  In that response, the prosecution team stated that it had repeatedly requested and received from the SEC all documents in the SEC files pertaining to its proceedings against Corigliano, had reviewed those documents, and had turned over to the defense anything that is arguably discoverable under Brady, Giglio, the Jencks Act, and Rule 16.  According to Forbes, that representation was inaccurate because Forbes subsequently received three letters between Corigliano's lawyers and the SEC that the prosecution team had never produced to Forbes.  FM 7.  The representation was hardly false, because the letters

14

identified by Forbes contain no discoverable information, as Judge Thompson concluded during the second trial.

Essential to Judge Thompson's conclusion that Forbes was not entitled to additional disclosures about the interactions between Corigliano's lawyers and the SEC was Forbes' examination of SEC officials during the first trial. For instance, Forbes speculates that Corigliano received "special treatment by the SEC" because of his cooperator status. FM 11. That speculation was contradicted by the testimony of SEC attorney James Kidney, Assistant Chief Litigation Counsel for the SEC, during the first trial in this case. Kidney testified that Corigliano was not "given any special accommodations because [he was a] cooperator[] here in this federal case," and did not receive a "sweetheart deal." FTTr. 13527. Kidney also testified that the Associate Director of the SEC's Division of Enforcement opposed giving cooperating witnesses in criminal cases "special treatment [from] the SEC." Id.; see also STTr. 11/7/05, 8. The SEC's settlement offer of May 2000 (which would have left Corigliano with his house, car, legal fees and "walking around money") was essentially the same as the final settlement agreement reached in the spring of 2004. STTr. 11/7/05, 8. Thus, Corigliano ultimately was accorded no "special treatment" by the SEC on account of his cooperation. The record fully supported Judge Thompson conclusion that Forbes' assertions that Corigliano breached his plea agreement vis-a-vis his dealings with the SEC

15

"lack merit."  STTr. 11/7/05, 22.

Forbes extensively cross-examined Corigliano during the first trial about matters affecting his credibility and his supposed motive to falsely implicate Forbes, including Corigliano's: (1) substantial involvement in the charged fraud, during which he lied repeatedly to CUC's outside auditors, other CUC officials and employees, the investing public, and the SEC, FTTr. 7613-15, 7712-74, 7830-96, 7903-17; (2) false denials of complicity to the Cendant Board of Directors when the fraud was first publicly disclosed, FTTr. 7675-83, 7826-29; (3) false denials of complicity when he first spoke to the USAODNJ and investigating agents in this case, FTTr. 7581-7611, 7617-70; (4) sale of CUC and Cendant stock when the price had been inflated by the fraud, FTTr. 7775-80, 7898-7903; (5) efforts to obtain a reduced sentence in exchange for his cooperation with the prosecution, FTTr. 7921-68; and (6) additional "benefits" to Corigliano supposedly attributable to his cooperation, including his resolution of the civil charges brought against him by the SEC, FTTr. 7970-96, 8037-57, 8071-80, 8089-8115, 8152-78.  In the face of this onslaught, additional disclosures by the prosecution team regarding Corigliano's supposed bias are not required. United States v. Fallon, 348 F.3d 248, 252 (7th Cir. 2003) (prosecution team did not violate Brady by declining to disclose cumulative and therefore immaterial impeachment information regarding a prosecution witness who had admitted his previous

lies and participation in a fraud).

Forbes nevertheless contends that whether Corigliano breached his plea agreement is an issue as to which he is entitled to bring all conceivably relevant information to bear. Judge Thompson appropriately drew the line at Forbes' efforts to use the correspondence between Corigliano's lawyers and the SEC.[6] See United States v. Weiss, 930 F.2d 185, 198 (2d Cir. 1991) (excluding  cumulative extrinsic evidence of the bias of a prosecution witness who had already admitted the principal sources of his bias); United States v. Gomes, 177 F.3d 76, 81 (1st Cir. 1999) ("the trial judge had discretion to exclude such an excursion into extrinsic evidence [about a witness's alleged bias] that would distract the jury from the main issues in this case").

Accordingly, the prosecution team was under no obligation to disclose that information.  United States v. Amiel, 95 F.3d 135, 145-46 (2d Cir. 1996)(no Brady violation for non-disclosure of cumulative impeachment evidence regarding a prosecution witness,

---

[6]  As Judge Thompson explained, Forbes' proposed impeachment would result in

> a real detour in terms of all of the negotiations
> between Mr. Corigliano's counsel and the SEC.  I mean,
> you can take 57 steps that led to the signing of the
> [SEC] settlement agreement and the budget agreement and
> you can break each one down, each point that was
> negotiated and say it's a separate benefit.  I think
> that's misleading to the jury.

STTr. 11/7/05, 46.

who was extensively cross-examined about his guilty plea, his
cooperation agreement with the government, and lies he had
previously told while under oath); United States v. Knight, 342
F.3d 697, 706 (7th Cir. 2003)("Given the effective cross-
examination conducted on each of [the prosecution witnesses at
issue], which extensively covered their motivation to trade their
testimony against [the defendant] in exchange for the promise of
lenient treatment by the government," undisclosed information was
"cumulative on the issue of motivation and bias"); United States
v. Aubin, 87 F.3d 141, 149 (5th Cir. 1996)(additional impeachment
evidence "would have been merely cumulative" where "[t]he record
[was] filled with evidence" of the participation of the
prosecution witnesses in the charged scheme and their involvement
in other fraudulent activities).  The prosecution team does not
violate its disclosure obligations by declining to conduct
additional review of its files to secure information regarding a
subject that the District Court has properly excluded.  Wood v.
Bartholomew, 516 U.S. 1, 8 (1995).

In light of that background, the Government addresses
Forbes' particular requests regarding communications between
Corigliano and/or his counsel and the SEC.

**2.    SEC Requests for Financial Disclosure.**

**a.    SEC Financial Disclosure Form.**

In conjunction with his $14 million settlement with the
SEC, Corigliano was required to fill out an extensive affidavit,

describing in detail his assets, liabilities, and expenditures over a certain dollar amount during a multi-year period.  A copy of that affidavit was turned over by the prosecution team to the defense in discovery in this case.  STTr. 11/7/05, 10.  Forbes cross-examined Corigliano extensively at trial by reference to the SEC settlement.  E.g., FTTr. 7924-26, 7968-77, 7986-96, 8099-8108, 8152-60.

Forbes now seeks "all communications between Mr. Corigliano or his counsel and the SEC concerning requests for financial disclosure."  FM 12.  Forbes contends that correspondence between Corigliano's lawyers and SEC officials that Forbes has already obtained, Exhibits 3, 4, and 5 to Forbes' Motion, "raise serious questions" about Corigliano's testimony that he complied with his obligations under the plea agreement.  FM 8.

Forbes' claim that the three letters should have been disclosed because they show that Corigliano was permitted to violate his plea agreement was properly rejected by Judge Thompson.  As Judge Thompson accurately pointed out, the SEC, the only party that was adverse to Corigliano in the civil lawsuit, never concluded that Corigliano had violated his plea agreement in his dealings with the SEC.  STTr. 11/7/05, 19.  Likewise, the USAODNJ did not conclude that Corigliano had breached his plea agreement.  Id.[7]

_____

[7]  Forbes points out that Corigliano failed to disclose to
(continued...)

19

Forbes contends that Corigliano was permitted to breach the plea agreement by failing to provide the SEC with an executed copy of a standard financial disclosure form.  FM 11.  Corigliano did not submit that form based on the advice of his attorneys that it was required only if the parties were on the verge of a settlement.  STTr. 11/7/05, 9.  Because settlement negotiations had broken down in May 2000, Corigliano's lawyers made the determination that completion of the standard form was not required.  Id.  Forbes' speculation that Corigliano was permitted to breach his plea agreement in this very limited and inconsequential manner was properly excluded by Judge Thompson as an unnecessary side-show in this very protracted case.[8]  Because Corigliano has been thoroughly cross-examined about his many

---

[7](...continued)
the SEC the retainers that he had paid his lawyers in 1998 and 1999, and complains (again) that the Government had not disclosed the existence of those retainers to the defense before the first trial.  FM 10 n.7.  As the Government explained when this issue arose during the first trial, no one on the prosecution team was aware of the retainers until Forbes' lawyers ambushed Corigliano on cross-examination about the retainers.  FTTr. 9126-27, 9625-28.

[8]  As Judge Thompson remarked, Forbes' proposal to seek to impeach Corigliano based on the statements of Corigliano's lawyers to the SEC would amount to

a third party coming in where everybody who's involved in the [guilty plea] agreement is saying, there is no breach, and wanting to now have a trial off to the side to show there was a breach.  And in order to show there was a breach, bring out in front of the jury a lot of things that otherwise would not come before the jury.

SSTr. 11/7/05, 20.

supposed motives to testify falsely in this case, Judge Thompson acted well within his discretion by excluding what is at best cumulative evidence that would likely confuse and distract the jury.

Judge Thompson also properly exercised his discretion by excluding correspondence that memorialized disagreements between Corigliano's lawyers and SEC officials during their negotiations regarding a settlement of the SEC's charges against Corigliano in the civil lawsuit.  Simply put, although obligated by the plea agreement to use his "best efforts" to settle the SEC lawsuit, and to provide accurate financial information to the SEC, Corigliano did not breach that obligation because his attorneys engaged in the normal give and take with an adverse party in negotiating the settlement.

Forbes' claim suffers from an additional infirmity.  His impeachment theory assumes that Corigliano received copies of letters from his lawyers to the SEC; knew from his receipt of those letters that they contained inaccurate or incomplete information; and did not correct the inaccuracies.  Corigliano's lead counsel represented to Judge Thompson, however, that Corigliano had not received those letters.  STTr. 11/7/05, 11. Simply put, any disagreements between the SEC and Corigliano's lawyers in the on-going settlement negotiations regarding the SEC lawsuit, as to which Corigliano did not directly participate, cannot fairly demonstrate that Corigliano knowingly breached his

plea agreement.  See United States v. Cuevas Pimentel, 815 F.
Supp. 81, 83 (D. Conn. 1993) (Cabranes, C.J.) ("[I]t is clear
that, as a general matter, Rule 613(b) does not permit an
attorney's statements to be introduced as prior inconsistent
statements of that attorney's client.").

     In any event, during the second trial, when Forbes sought
disclosure of additional documents regarding Corigliano's
supposed breach of the plea agreement in his dealings with the
SEC, Corigliano's lawyers represented to Judge Thompson that they
had conducted a diligent search of their files and could "find no
documents indicating that drafts, carbon copies or blind carbon
copies" of those documents were sent to Corigliano.  Corigliano's
Opposition to Forbes' Retrial Motion No. 19, Docket 1944, at 5-6.
Thus, for all the record reflects, there are no further documents
to be produced with respect to Corigliano's supposed non-
disclosure of financial information.

     Forbes also demands that the prosecution team should produce
all information in its possession concerning efforts made by
representatives of the USAODNJ to mediate disputes between the
SEC and Corigliano, and to excuse Corigliano from his disclosure
obligations.  FM 12.  As Forbes concedes, however, the Government
provided the defense in October 2003 with information regarding
efforts by the USAODNJ to lobby the SEC on Corigliano's behalf.
FM 12, n.11.  The Government also represented that it would make
additional inquiries about such lobbying.  Id.  Those inquiries

turned up no additional information.  Forbes has received
sufficient disclosures on this subject.

    **b.  SEC Requests for Tax Returns**

    Forbes contends that Corigliano breached his plea
agreement based on letters that Corigliano's lawyers wrote to the
SEC regarding whether or not Corigliano had filed tax returns in
1999 and 2002.  According to Forbes, certain documents supposedly
contradict statements made by Corigliano's lawyers to the SEC
that Corigliano had not yet filed returns for those tax years.
FM 13-15.  Forbes' premise is that if Corigliano's lawyers made
inaccurate representations to the SEC about whether Corigliano
had filed tax returns, that "would constitute a violation of Mr.
Corigliano's disclosure obligations under the plea agreement."
FM 14.

    Forbes points to nothing which shows that Corigliano
directed his lawyers to make those representations or knew about
the representations after the fact.  His argument, again, is
based upon surmise and an improper attempt to impeach Corigliano
on a collateral matter based on supposed inaccurate remarks, not
by Corigliano, but by his attorneys.  See Cuevas Pimentel, 815 F.
Supp. at 83.  Forbes raised this precise issue before Judge
Thompson during the second trial.  STTr. 11/7/05, 27-28.  Judge
Thompson properly denied that request.  Id. at 30.

3.   **Information Supplied to the SEC by Corigliano and His Counsel**

   a.  **Asset Value Information.**

   Forbes demands additional information regarding Corigliano's supposedly misleading statements to the SEC about the value of Corigliano's home in Old Saybrook, Connecticut.  FM 17.  As Forbes' present memorandum makes clear, Forbes already has obtained extensive information with which to argue that Corigliano under-estimated the value of his home in his disclosures to the SEC.  FM 16-17.[9]  Forbes was permitted to cross-examine Corigliano at length regarding his supposed intentional underestimate of the value of his home. FTTr. 8161-78, 9347-57.[10]

   Thus, Forbes had an adequate opportunity to develop this line of impeachment, and no further disclosure obligations should be imposed on the prosecution team.

_____

   [9]  Corigliano's ownership of his home was a matter of public real estate records.  "Brady cannot be violated if the defendants had actual knowledge of the relevant information or if the documents are part of public records and 'defense counsel should know of them and fails to obtain them because of lack of diligence in his own investigation.'"  United States v. Zagari, 111 F.3d 307, 320 (2d Cir. 1997) (quoting United States v. Payne, 63 F.3d 1200, 1208 (2d Cir. 1995)).

   [10]  Corigliano testified, however, that he made a good-faith estimate of the value of his home which his lawyers communicated to the SEC; that he was unaware of a 2004 assessment of his property when he communicated his estimate to the SEC; and that he had a reasonable basis for treating another, smaller property in Old Saybrook as roughly comparable to his in estimating the value of his property.  FTTr. 8162, 9347-51.

24

b.  **Quarterly Financial Reports.**

Forbes speculates that, based on documents which he declines to identify in his brief, FM 17, Corigliano failed to disclose all of his and his wife's income in his quarterly financial reports to the SEC.  Without providing any specificity, Forbes asserts that there "appears to be" material discrepancies between financial information in Corigliano's 2002 tax return and his quarterly financial reports to the SEC for that year.[11] Based on these musings, Forbes demands disclosure of all of Corigliano's tax returns from January 2000 to the present.  FM 18.

According to Forbes' implicit theory of impeachment, he is entitled to disclosure of evidence which might show that Corigliano made false statements on his quarterly financial reports because Corigliano might be motivated to frame Forbes in order to escape the consequences of those false statements.

Forbes should not be heard to make unsupported assertions that Corigliano violated the plea agreement, assertions which the prosecution team members cannot confirm based on the information known to them, and then use those baseless assertions to demand production of Corigliano's tax returns, which are statutorily

---

[11]  Knowledge of any such alleged inconsistency cannot be imputed to the prosecution team, because information in Corigliano's federal income tax returns may not be imputed to the prosecution team.  United States v. Stofsky, 527 F.2d 237, 244 n.7 (2d Cir. 1975).

protected against disclosure.  See 26 U.S.C. § 6103.  If that
were permissible, the only limits on the prosecution team's
disclosure obligations would be the breadth of defense counsel's
imagination in concocting creative accusations.

   **4.  Settlement Negotiations with the SEC.**

   As Forbes points out, FM 18, he sought to impeach
Corigliano's testimony during the first trial that he was always
willing to disgorge the approximately $14 million in proceeds of
his sales of CUC and Cendant stock by reference to a Wells
submission made to the SEC on Corigliano's behalf, which proposed
disgorging only $3.4 million.  Corigliano testified that he did
not know that his attorneys had proposed a $3.4 million
settlement in the Wells submission.  FTTr. 7972-73, 8039.

   Forbes demands any information or documents in possession of
the Government that would contradict Corigliano's testimony about
his lack of knowledge of the $3.4 million settlement proposal in
the Wells submission.  FM 18.  Forbes should not be permitted to
impeach Corigliano with extrinsic evidence on this collateral
issue.  United States v. Mulinelli-Navas, 111 F.3d 983, 989 (1st
Cir. 1997).  That Corigliano was always "willing" to disgorge $14
million in proceeds, and actually did disgorge that amount, FTTr.
7503-04, is not at all contradicted by the fact that his
attorneys sought to convince the SEC to accept a smaller sum in
settlement.  See United States v. Barnes, 604 F.2d 121, 150 (2d
Cir. 1979) (no Brady violation where, inter alia, any

inconsistencies between the witness's testimony and an agent's report were "not so great as to be completely contradictory"). Since Forbes' cross-examination of Corigliano regarding the content of the <u>Wells</u> submission was collateral, any effort to impeach Corigliano's collateral testimony with extrinsic evidence should be precluded.  <u>United States v. Purdy</u>, 144 F.3d 241, 245-46 (2d Cir. 1998); <u>United States v. Blackwood</u>, 456 F.2d 526, 531 (2d Cir. 1972).

    Even treating the efforts of Corigliano's lawyers to obtain the most favorable possible settlement for their client -- a result which the plea agreement did not forbid, expressly or impliedly -- as somehow a breach of the plea agreement by Corigliano, any such "breach" would have been immaterial in the context of the plea agreement.  After all, Corigliano ultimately disgorged $14 million in assets to the SEC, and testified in repeated trials.  The Government would arguably have no basis to sanction Corigliano for such an immaterial breach.  <u>See</u> <u>generally</u> <u>United States v. Castaneda</u>, 162 F.3d 832, 836-40 (5th Cir. 1998).

    Forbes also seeks extrinsic evidence to challenge another collateral matter, Corigliano's testimony about the reason why he did not settle with the SEC before 2004.  Forbes contends that Corigliano's testimony about why he did not settle in 2000 is inconsistent with a pleading filed by his attorneys.  FM 19.  As Judge Thompson correctly concluded, Forbes should not be permitted to impeach Corigliano by reference to statements of his

attorneys.  STTr. 11/7/05, 46.

Forbes nevertheless seeks information regarding any settlement negotiations between the SEC and Corigliano or his attorneys between January 2000 and April 2004.  Whether Corigliano did not settle with the SEC because of the SEC's refusal to give Corigliano credit for $6 million that he had previously paid in taxes on the gain from his stock sales or for other reasons is entirely collateral to Corigliano's testimony that Forbes committed the charged crimes.  <u>United States v. Dorfman</u>, 470 F.2d 246, 248 (2d Cir. 1972)(rejecting a challenge to restrictions on cross-examination of a prosecution witness to show bias; "In cases in which the alleged motive of a government witness is hope for prosecutorial leniency there will always be conflict between the need to keep the trial from being sidetracked on collateral issues and the right of the defendant to establish a witness' bias or motive to lie.").

   **5.  Budget Negotiations with the SEC.**

Forbes contends that correspondence between Corigliano's lawyers and the SEC showing that the SEC agreed to allow Corigliano and his family to spend his assets pursuant to budget which the SEC initially regarded as unreasonably generous "is further evidence of the special treatment" that the Government afforded Corigliano.  FM 19-20.  Forbes demands all information known to the Government "concerning communications between the SEC and Mr. Corigliano or his counsel concerning" Corigliano's

budget.  FM 20.

If Corigliano received "special treatment" from the SEC, it
was hardly a benefit.  As Corigliano's counsel explained, the SEC
acted punitively when it demanded that Corigliano abide by a
budget, an asset preservation agreement, and quarterly financial
reporting requirements during the pendency of the SEC lawsuit,
even though such restrictions are not required in every SEC case.
STTr. 11/7/05, 9-10; Exhibit 3 to Forbes' Motion (letter from
Corigliano's lawyers stating that the SEC's settlement offer was
unduly harsh).

Evidence regarding the negotiations between the SEC and
Corigliano's lawyers in the SEC civil lawsuit is not proper
impeachment material.  Forbes cross-examined Corigliano at length
regarding his purported benefit, the budget that was ultimately
negotiated.  FTTr. 7995-96, 8037-42, 8046-57, 8089-8102.  Whether
counsel for the SEC thought that amount was reasonable is
irrelevant to whether Corigliano was supposedly permitted to
breach his plea agreement because his lawyers did not accept the
SEC's opening settlement offer.  Additionally, Corigliano's lead
counsel represented to Judge Thompson that they "have not found
any documents that would show that Corigliano received or was
shown" letters between his lawyers and the SEC regarding the
negotiations over the proposed budget.  Docket 1944 at 10.

29

### 6.  Supposed Unwritten Agreements.

During the first trial, Forbes was permitted to cross-examine Corigliano at length regarding supposed "side deals" between him and the SEC regarding: the fact that Corigliano's real property in Old Saybrook was recorded on the town's property records as two separate parcels rather than one, FTTr. 8161-78, 8502-10, 9347-57; Corigliano's payment of retainers to his lawyers and to his wife's lawyers, FTTr. 8109-11, 9365-78; and Corigliano's payment of his family's expenses under a settlement agreement he had reached with the SEC, FTTr. 7990, 7996, 8071-80, 8096-8103, 9393-9411.

As SEC lawyer David Frohlich testified at the initial trial, however, there were no side agreements between the SEC and Corigliano.  FTTr. 13600-02.  Additionally, Corigliano's payment of retainers to his attorneys and his wife's attorneys, and his payment of his living expenses with assets that were later surrendered to the SEC were not inconsistent with Corigliano's written settlement with the SEC.  FTTr. 13603-07.[12]  The fact

---

[12]  Although Forbes now attacks Frohlich's testimony as inconsistent with Forbes' own reading of the SEC settlement agreement, FM 22 and n. 18, the bottom line is that no one at the SEC or the USAODNJ concluded that Corigliano had been allowed to breach the SEC settlement agreement or the plea agreement in the criminal case.  Forbes' "heads I win tails you lose" argument (any oral side agreements were a benefit subject to disclosure, and the absence of an oral side agreement would show that Corigliano violated the settlement agreement and therefore obtained the benefit of the violation) should be rejected as inconsistent with the only relevant testimony on the issue:
(continued...)

that Corigliano made those payments does not establish that he
and the SEC had entered into undisclosed oral agreements that he
could do so, or that the prosecution team failed to disclose
material impeachment information.  See Shabazz v. Artuz, 336 F.3d
154, 163-65 (2d Cir. 2003) (the fact that cooperating witnesses
sought and received sentencing leniency for their cooperation did
not contradict the prosecutor's testimony that he did not promise
to recommend such leniency).

        Forbes reiterates his prior arguments, which Judge Thompson
repeatedly rejected, that under the terms of his settlement with
the SEC, Corigliano was not permitted to make expenditures in the
ordinary course during the period between April 16, 2004 (when
the SEC settlement was signed) and the July 2004 turnover of the
Corigliano family assets.  FM 21.[13]  Based on those rejected
arguments, Forbes demands disclosure of additional information
regarding any supposed oral side agreements.  FM 23.

        Forbes' present claim is nothing more than speculation that
the prosecution team must have undisclosed information regarding
supposed oral side agreements between Corigliano and the SEC.
Since the members of the prosecution team were unaware of

_____

        [12](...continued)
Corigliano did not breach the SEC settlement agreement.

        [13]  As the Government explained in its Opposition to one of
Forbes' mistrial motions, Docket 1147 at 14-17, Corigliano did
not breach the SEC settlement agreement by making these
expenditures.

Corigliano's payment of retainers to lawyers before Forbes identified those retainers at the first trial, the prosecution team could not disclose the existence of the retainers to the defense. E.g., FTTr. 9126-27, 9625-28. Forbes' speculation is an insufficient basis for this Court to direct the prosecution team to make additional disclosures. See United States v. Navarro, 737 F.2d 625, 631-32 (7th Cir. 1984)("A due process standard which is satisfied by mere speculation would convert Brady into a discovery device and impose an undue burden upon the district court"); United States v. Milikowsky, 896 F. Supp. 1285, 1309 n.38 (D. Conn. 1994) ("Were this court to grant the Defendants' motion, it would set an absurd precedent, allowing defendants to scour the working notes of prosecutors upon the mere accusation that the government has not sufficiently disclosed every potentially exculpatory detail.").

**B.   Documents and Information Relating to Corigliano's Trial Testimony.**

Forbes again inquires, as he did following the first trial, Forbes' Retrial Motion No. 3, Docket 1608, whether Corigliano's plea agreement has been revoked because he supposedly testified falsely in this case.[14]   FM 23.   The Government has disputed and continues to dispute Forbes' self-serving characterizations of

---

[14]   Although a ruling on this motion does not appear on the docket, Judge Thompson did not grant the motion, effectively denying it.

Corigliano's testimony.[15]  The Government has not sought to revoke Corigliano's plea agreement for supposed lying that the prosecution team does not believed occurred.  Revocation of Corigliano's plea agreement would violate the Government's obligations under the agreement and serve no legitimate purpose, although it would obviously advance Forbes' defense in this trial.

Forbes also demands to know, as he did previously, Docket 1608, if the prosecution team took affirmative steps to determine if Corigliano testified falsely at trial.  He cites no authority and makes no argument to demonstrate that he is entitled to information describing the prosecution team's investigative efforts, as opposed to the results of those efforts.  Forbes was represented by the most able attorneys that money can buy, who spared no expense in obtaining information used to challenge the testimony of Corigliano and other prosecution witnesses.  Even though Forbes threw everything but the proverbial kitchen sink at Corigliano during cross-examination in the first and second trials, no member of the prosecution team concluded that Corigliano lied during either trial.

---

[15]  See Government's Opposition to Forbes' Mistrial Motion Due to Testimony of Corigliano, Docket 1147; Judge Thompson's oral order of 11/01/04, denying that motion.

33

### C.  Documents and Information Relating to Corigliano's Polygraph Examinations.

Forbes reiterates his demand for documents and information relating to Corigliano's submission to two private polygraph examinations arranged for by his attorneys, which no Government official attended and as to which the Government had no prior notice.  FM 24.  Forbes declines to mention that Judge Thompson has rejected on three occasions Forbes' prior demands for this information.  During the first trial, the Government moved to preclude cross-examination of Corigliano by reference to the private polygraph examinations.  Docket 885.  The defendants filed a brief in opposition to that motion.  Docket 899.

During oral argument on that motion, Judge Thompson rejected as a matter of fact the defense argument that Corigliano authorized his counsel to advise the Government that he had done well on a polygraph examination.  FTTr. 7796, 7803.  Judge Thompson also expressed concern that any inquiry into Corigliano's polygraphs might lead to a "battle of the polygraph examiners," and thereby invade the province of the jury.  FTTr. 7796, 7813-14.  The Court granted the Government's motion and excluded the polygraph evidence under Fed. R. Evid. 403.  FTTr. 7814, 8030-31; oral ruling, docketed July 20, 2004.  The next day, Forbes attempted to relitigate the polygraph issues, but Judge Thompson denied that request as well.  FTTr. 9121.  Forbes raised this issue again with another motion before the second

trial.  Forbes Retrial Motion In Limine No. 21, Docket 1730.
Judge Thompson denied that motion.  Oral ruling, docketed on
November 7, 2005.  Those rulings are consistent with the
overwhelming weight of authority finding that polygraph evidence
is generally inadmissible, as substantive evidence, or for
impeachment.[16]

Forbes nevertheless seeks a laundry list of items regarding
Corigliano's private polygraphs.  FM 25.  The prosecution team is
not required to respond to what are, in form and effect, Forbes'
interrogatories.  See United States v. Linen Supply Institute of
Greater New York, 18 F.R.D. 452, 453 (S.D.N.Y. 1955)("The Federal
Rules of Criminal Procedure make no provision for answers to
interrogatories."); United States v. Acosta, 357 F. Supp. 2d
1228, 1244 (D. Nev. 2005) (although the prosecution team must
produce the prior inconsistent statements of a cooperating

---

[16] United States v. Scheffer, 523 U.S. 303, 303, 309 (1998)
("there is simply no consensus that polygraph evidence is
reliable"); United States v. Messina, 131 F.3d 36, 42 (2d Cir.
1997)(declining to hold "for the first time that polygraph
evidence may be taken into account"); United States v. Kwong, 69
F.3d 663, 668 (2d Cir. 1995)(affirming exclusion of polygraph
evidence which would "confuse and mislead the jury"); United
States v. Canter, 338 F. Supp. 2d 460, 465 (S.D.N.Y. 2004) ("In
light of the strong likelihood that a jury would place great
weight on this type of evidence, its minimal probative value in
this case is significantly outweighed by its highly prejudicial
effect."); Meyers v. Arcudi, 947 F. Supp. 581, 583-85, 587-88 (D.
Conn. 1996) (canvassing Second Circuit case law on the subject
and finding the proffered polygraph evidence was insufficiently
reliable to be admissible); United States v. D'Angelo, No. 02-CR-
399 (JG), 2004 WL 315237, at *27 (E.D.N.Y. 2004) ("Polygraphs are
insufficiently reliable even for use as impeachment.").

witness, "[i]t does not follow . . . that all of the notes, memoranda, and mental impressions of the participants are necessarily Brady material"); United States v. Wright, 2001 WL 523394, *23 (D. Kan. 2001) (rejecting as "overbroad" the defendant's discovery demands for the "identification of each time the witness has testified in relation to this case or narrated the details of this investigation" and "identification of each occasion any . . . accomplice. . . has . . . furnished a statement in any case" and "all matters useful to the defense in impeaching the government's witness").

### D. Information Concerning Proffers by Corigliano's Counsel to the Government

Forbes seeks another laundry list of information regarding, inter alia, "the full terms (whether written or oral) of all attorney proffers made by Mr. Corigliano's counsel to the Government." FM 26. The prosecution team has already given the defense all potential Brady and Giglio information from any oral statements made by Corigliano's attorneys. When this issue was presented during the first trial, Judge Thompson concluded that presentations by an attorney to the Government are not admissible unless they contain statements explicitly made or adopted by the client. FTTr. 2644-59; 2865-67; 3194.[17] Nevertheless,

---

[17] Judge Thompson rejected Forbes' arguments based on the "crime-fraud exception" to the attorney-client privilege, because Forbes had failed to satisfy his burden of showing "probable cause" of a crime or fraud. FTTr. 7820-21, 8030, 9121.

following extensive litigation on this subject, Judge Thompson
directed the prosecution team to disclose certain information
regarding proffers made by the cooperators' attorneys, which was
done.  FTTr. 6100-01, 7810-11, 8015-33.  Corigliano was closely
cross-examined regarding these subjects.  E.g., FTTr. 7671-73,
7692-93, 7698, 7976-77, 8060, 8173-74, 9298-99, 9313.  No more is
required.

### III.   DOCUMENTS AND INFORMATION RELATING TO KEVIN KEARNEY.

According to Forbes, Kevin Kearney's testimony that Stuart
Bell told Kearney that Forbes was aware of the fraud is
inconsistent with documents which purport to memorialize
Kearney's pre-trial interviews with government officials, in
which Kearney did not implicate Forbes.[18]  The prosecution team
was not required to disclose Kearney's failure to volunteer
information that implicated Forbes before Kearney was
specifically asked about Forbes.  See United States v. Zuno-Arce,

---

[18]   Forbes points to his mistrial motions based on his
claims that Kearney's testimony was false.  FM 27.  Forbes
declines to mention that Judge Thompson denied the first of those
motions, Docket 1264 (ruling), and did not grant the second,
effectively denying it.  Docket 1911 (motion).  Even assuming
that Kearney did not implicate Forbes during his initial
interviews with investigators, Kearney explained that he did
implicate Forbes when he was asked directly whether or not Forbes
was involved in the fraud.  FTTr. 9991-94.  Judge Thompson
therefore properly concluded that Forbes has failed to
demonstrate that Kearney's testimony about Forbes' involvement in
the fraud is false.  United States v. McCarthy, 271 F.3d 387, 399
(2d Cir. 2001) (relief based on "allegations of perjured
testimony should be granted only with great caution and in the
most extraordinary circumstances"), quoting United States v.
Zichettello, 208 F.3d 72, 102 (2d Cir. 2000)(collecting cases).

44 F.3d 1420, 1426 (9th Cir. 1995)(failure of an eyewitnesses to identify the defendant was "too weak" an inference to amount to exculpatory evidence); <u>United States v. Deleo</u>, 1991 WL 111172, *2 (N.D. Ill., June 5, 1991) (disclosure of a witness's prior failure to implicate the defendant need be disclosed only if the omission occurred "in a context in which the [witness] likely would have mentioned" the defendant if the witness believed that the defendant had committed the charged crimes).

Nevertheless, the prosecution team, in an abundance of caution, provided Forbes with **<u>all</u>** notes prepared by agents and lawyers other than AUSAs Schechter, Carney, and McMahon (the first trial team) memorializing interviews of Kearney.  The prosecution team withheld work-product notes prepared by the first trial team prosecutors, <u>see</u> Fed. R. Crim. P. 16(a)(2), but turned over additional information obtained by those prosecutors by way of letters.  FTTr. 9909-11 (discussion regarding prosecution team's disclosures to Forbes' lawyers by way of letters), <u>see</u> <u>also</u> Exhibits 1 and 2, hereto.

Kearney testified at trial about the timing of his prior statements to the prosecution team.  FTTr. 9849-53, 9862, 9876-78.  Forbes exploited the disclosed interview notes to cross-examine Kearney regarding his supposed prior omissions.  FTTr. 9865, 9876-78, 9888-94, 9917-18, 9920-23, 9930-39.  No additional disclosures are required.

Forbes also points to what he claims is an inconsistency

between Kearney's testimony during the second trial regarding Corigliano's statements that Forbes wanted earnings per share to meet Wall Street estimates and the fact that Kearney supposedly did not testify about those statements during the first trial or in his interviews before trial.  FM 28.  This again is attempted impeachment by omission, which does not give rise to a disclosure obligation by the Government.

Nevertheless, Forbes again propounds interrogatories demanding, inter alia, "the dates of every interview in which Mr. Kearney was asked about" the Forbes' statements about earnings per share.  FM 29.  Forbes also demands "the substance" of all of Kearney's statements during each such interview, and the names of all persons who were present during those interviews.  Id.  As shown above, the prosecution team is not required to provide information in the form demanded in Forbes' interrogatories. Based on the information Forbes already has, he can try to impeach Kearney, as he did during the second trial, by reference to the fact that Kearney's testimony at that trial included matters about which he supposedly did not testify during the first trial.

Next, Forbes demands production of notes of an interview of Kearney on July 10, 2001 by persons other than SEC official Matthew Griener, whose notes of that interview Forbes has already received.  FM 30.  The prosecution team has not turned over any notes of that interview by prosecution team member Mark Gerber

because, based on a search of its files, it has not located any such notes.  As shown above, the prosecution team has no obligation to turn over any notes that were taken by SEC representatives that are not already in the possession of the prosecution team.

As he did with respect to Corigliano, Forbes also demands to know if the Government took affirmative steps to determine if Kearney testified falsely at trial.  FM 30.  For the same reasons that Forbes' request for similar information regarding Corigliano is meritless, his parallel request regarding Kearney should also be rejected.

## IV.  ADDITIONAL DOCUMENTS AND INFORMATION

### A.  Documents and Information Relating to Michael Monaco.

Forbes elliptically asserts that "the government" may have previously or currently investigated prosecution witness Michael Monaco regarding his conduct while employed at Cendant on a matter not involving CUC, and demands information from the prosecution team regarding any such investigation.  FM 31-32. Forbes provides no additional information about this investigation.

Although Forbes has given the prosecution team little to work with, the prosecutors have nevertheless made what they deem to be a suitable inquiry under the circumstances, and are aware of no discoverable information.  Additionally, Forbes has not alleged that Monaco is even aware any pending investigation.  If

there is a pending investigation of Monaco of which he is unaware, that unknown investigation could provide no incentive for him to falsely accuse Forbes of the charged crimes in this case.  United States v. Veksler, 62 F.3d 544, 550 (3d Cir. 1995) (pending grand jury investigation of a government witness was not material Brady information, where the witness was unaware of the investigation and never asked the government to intercede on his behalf).

   **B.   Documents and Information Relating to Steven Kernkraut.**

   In his discovery motion, Forbes reiterates his argument to the jury during the second trial that Wall Street securities analyst Steven Kernkraut testified erroneously that Forbes participated in CUC's quarterly earnings conference calls with analysts between 1995 and 1997.  STTr. 3458-63.  Forbes points out that the prosecution team informed Forbes' lawyers during the second trial that the team was then unable to locate any records that corroborated Kernkraut's testimony about those conference calls.  FM 32-33.

   Forbes demands that the prosecution team provide him with any information it has which tends to prove that CUC did not conduct any quarterly earnings conference calls with analysts before May 1997.  The prosecution team is unaware of any such information, and understands its on-going obligation to provide such information to the defense if it becomes known to the prosecution team.

C.    **Documents and Information Relating to Stuart Bell and Kirk Shelton.**

During the first trial, Forbes' co-defendant and close friend Kirk Shelton testified at length that he did not participate in the charged fraud.  He also denied any knowledge that Forbes had participated in the fraud.

Based on the sequence and content of the jury's notes to Judge Thompson during the deliberations in the first trial, members of the prosecution team surmised that the jury had convicted Shelton and was still deliberating only over the charges against Forbes.  AUSA John Carney discussed with Shelton's lead lawyer, Thomas Puccio, an offer to accept Shelton's guilty plea to the conspiracy count of the indictment and to dismiss the remaining charges in exchange for a waiver of all his post-verdict, appeal, and post-appeal rights.  Shelton declined the offer.  Shortly thereafter, the jury convicted Shelton of all counts.  During Shelton's sentencing hearing, the parties placed on the record their accounts of the those plea negotiations.  Tr. of Shelton Sentencing, 7/20/05, 102-06.

Forbes now contends that the prosecution team must disclose any information pertaining to any plea discussions between the prosecution team and Shelton during the jury deliberations, and at any other time.  FM 33-34.  As Forbes is aware, Shelton spoke to members of the prosecution team on two occasions before the first indictment was issued in this case, and denied any

42

involvement in the charged crimes.  FTTr. 12531-32.  Any
documents which memorialize Shelton's proffer statements to the
prosecution team during those two encounters were disclosed to
Forbes years ago.  Other than those proffer sessions, Shelton
never again met with or discussed the case, or a possible plea,
with members of the prosecution team.  Everything that the
prosecution team knows about Shelton's self-exonerating and
Forbes-exonerating accounts is derived from Shelton's testimony
at the first trial, which Forbes and his lawyers attended, and
Shelton's sentencing hearing, to which Forbes had complete
access.  The prosecution team understands its on-going obligation
to provide such information to the defense if it becomes known to
the prosecution team.

Forbes also seeks similar information regarding any plea
negotiations with Stuart Bell.  As Forbes well knows from the
prior proceedings in this case, Bell has declined to speak to any
members of the prosecution team (or to private lawyers and
accountants retained by Cendant's Internal Audit Committee to
investigate the fraud immediately after it was publicly disclosed
in April 1998) about his alleged involvement in the charged
fraud.  Nor has Bell been charged by the Government.
Accordingly, no plea discussions have ever taken place between
the Government and Bell.

**D.    Information Relating to Casper Sabatino.**

Casper Sabatino, who has pleaded guilty to the charged fraud, testified as a prosecution witness in the first trial.  At the second trial, Sabatino was called as a defense witness. Sabatino testified on cross-examination that his review of a particular document, GX 9322, had refreshed his recollection that the fraud at CUC had taken place before Corigliano became the CFO in early 1995.  STTr. 2606-08.

Following that testimony, Forbes' lawyers demanded that the prosecution team inform them whether GX 9322 previously had been shown to Sabatino by anyone on the prosecution team.  Exhibit 16 to Forbes' Motion.  The Government responded the following day by letter dated November 14, 2005 to Forbes' lawyers that Sabatino had been shown that document by AUSA Richard Schechter, a member of the first trial team but not the second.  Exhibit 17 to Forbes' Motion.  That November 14 letter also described Sabatino's statements to Schechter regarding GX 9322, which could be construed as inconsistent with Sabatino's testimony during the second trial that GX 9322 had refreshed Sabatino's recollection that the fraud at CUC had taken place before Corigliano became the CFO.  Id.  Notwithstanding the information in the November 14 letter, Forbes declined to examine Sabatino during the second trial about his prior statements to Schechter.

Notwithstanding his failure to make use of the disclosures in the prosecution team's November 14 letter, Forbes now demands

additional disclosures regarding Sabatino's review of GX 9322
before the second trial.  FM 35-36.  Having failed to make use
during the second trial of Sabatino's arguably prior inconsistent
statements, Forbes has acknowledged that those statements are
inconsequential to his defense.  Forbes' demand for additional
information about Sabatino's prior statements to members of the
prosecution team regarding GX 9322, such as whether Sabatino had
seen GX 9322 on multiple occasions, or was "pressed" about his
statements to Schechter, FM 35-36, therefore seeks additional,
immaterial information.  The November 14, 2005 letter contains
all of the relevant information regarding Sabatino's prior
statements to members of the prosecution team regarding his
review of GX 9322.

Additionally, the prosecution team does not intend to
present Sabatino as a witness during the third trial.  Forbes is
not entitled to pre-trial disclosure of impeachment information
regarding a defense witness.  Cf. United States v. Delia, 944
F.2d 1010, 1018 (2d Cir. 1991) ("We know of no legal principle
that requires the prosecution to disclose its proposed rebuttal
evidence to the defendant, to help him decide whether to pursue a
particular contention.").

E.   Statements by Government Witnesses.

Forbes again seeks disclosure of all of the notes created by
the three prosecutors from the initial trial (Carney, Schechter,
and McMahon) regarding interviews of and preparation sessions for

45

prosecution witnesses.  FM 36-38.[19]  At the insistence of the defense, Judge Thompson reviewed in camera during the first trial some of the interview notes prepared by those prosecutors.  FTTr. 2853-54, 2865-67, 3194.  Judge Thompson has repeatedly declined to order the prosecution team to disclose the prosecutors' notes, most recently in connection with Forbes' Retrial Motion No. 3, which was filed before the second trial.

The Government has reviewed all of these notes and has disclosed, by way of a series of letters to the defense, any information that could be considered Brady or Giglio contained in the notes.  E.g., Exhibit 14 to Forbes' Motion; Exhibits 1 and 2 hereto.  See Milikowsky, 896 F. Supp. at 1308 (directing the Government to comply with Brady by producing "detailed summaries of exculpatory statements" made during witness interviews).  Nothing more should be required.

---

[19]  Forbes again requests, as he did before the first trial, "every date on which the government interviewed or obtained factual information from each of its cooperating witnesses to the extent that information has not been produced."  FM 37.  As Judge Thompson determined before the first trial, the prosecution team is not required to attempt to reconstruct this immaterial information for the defense.  FTTr. 9042, 9047.  Neither Brady nor Giglio require the prosecution team to reconstruct the dates of the few undated notes for the defense.  See United States v. Upton, 856 F. Supp. 727, 746 (E.D.N.Y. 1994) (noting that "the government is under no obligation to turn over that which it does not have").

**<u>CONCLUSION</u>**

The prosecution team has discharged and will continue to discharge its disclosure obligations. This Court should reject Forbes' continuing efforts to expand those obligations beyond those established by law. The Government respectfully requests that Forbes' Third Trial Motion No. 2 be denied.

Respectfully submitted,

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice

*Norman Gross/s*

NORMAN GROSS
Federal Bar Number 24933
MICHAEL MARTINEZ
Federal Bar Number PHVO243
Special Attorneys
U.S. Department of Justice


Newark, New Jersey
Date: April 17, 2006

47

**EXHIBIT 1**

**EXHIBIT 2**

## CERTIFICATE OF SERVICE

The undersigned certifies that on this day I caused to be served a copy of the Government's Opposition to Defendant Walter A. Forbes' Motion to Compel Discovery and Production of <u>Brady</u>/<u>giglio</u> Material (Forbes Third Trial Motion No. 2) via email on:

Barry S. Simon, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005-5901
(202) 434-5005
bsimon@wc.com


*Norman Gross/s*
_____
NORMAN GROSS


Dated: April 17, 2006
       Camden, New Jersey