

U.S. Department of Justice

*United States Attorney*
*District of New Jersey*

---

970 Broad Street, Suite 700        (973) 645-2700
Newark, New Jersey 07102

June 30, 2004

BY HAND

Barry S. Simon, Esq.
Williams & Connolly, LLP
725 Twelfth Street, N.W.
Washington, DC 20005

      Re:  United States v. Forbes, et al.
           No. 3:02CR264 (AWT)

Dear Mr. Simon:

      We write in response to your request for further details of the conversations between counsel for Mr. Corigliano and the Government on August 7, 1998 and November 11, 1998.

Cosmo Corigliano

      Please be advised that on or about August 7, 1998 counsel for Cosmo Corigliano provided the following information:

      With respect to the meeting held on or about March 9, 1998, concerning the usage of the Ideon reserve, it was discussed that Anne Pember created the schedules used at the meeting and that both Corigliano and Shelton have never seen those schedules before the meeting. Anne Pember also made the presentation of what is in reserves, why she put items in the reserves and things to that effect. After the meeting Rabinowitz came in and made a defense of the Ideon reserve and the way Anne had used it.

      After the merger, he was no longer in the financial area, he was in the International area, and did not know what costs were being charged to the Cendant reserve. He had no responsibility for these charges, but does not deny the policy

**NOTE: The information in this letter conveys only the substance of discussions between counsel for Mr. Corigliano and the Government based upon non-verbatim notes. The information does not necessarily reflect statements made by Mr. Corigliano or statements made on behalf of Mr. Corigliano by his counsel.**

Rec'd from M. Gerber

was to be aggressive. Pember no longer reported to Cosmo, maybe to Shelton, with a dotted line to Monaco, who is now CFO.

The philosophy for the reserves that came down to him was that Silverman wanted them to be as big as possible. He understood that Silverman said to Forbes or Shelton that he, Silverman, was the King of purchase price accounting. Corigliano understood that the reserve should be as large as it could be within proper limits.

With respect to the establishment and use of merger reserves by CUC, counsel advised that Corigliano speculated whether Casper Sabatino, who was not all that swift, could have screwed something up, possibly not keeping the necessary work papers to support the reserve. Corigliano second guesses himself, but thought that the merger reserves were all right at the time. Corigliano believes that they are all pretty competent. Anne Pember is very competent, but that Sabatino was less competent and that could have contributed to any problem with the reserves.

Corigliano was very upset about the Wall Street Journal story where Silverman and Monaco announced that there was a fraud.

Corigliano always wanted to explain himself. He did not feel deceived by Shelton and Forbes and feels his level of knowledge is not different than Shelton's, who was a very hands-on operating guy. Forbes was more remote, but not as remote as he is saying now.

Please be advised that on or about November 17, 1998, counsel for Cosmo Corigliano provided the following information:

Corigliano said he had been mistreated by the company and that the audit report was biased.

On the evening of the 14th, both Corigliano and Shelton received phone calls from Forbes who told them not to come into the office anymore and that he can't talk to them. Between then and the 17th they never got calls.

At a board meeting to which they were not invited, Silverman tried to get Corigliano fired. They represented that Corigliano refused to cooperate and be interviewed which was a

NOTE: The information in this letter conveys only the substance of discussions between counsel for Mr. Corigliano and the Government based upon non-verbatim notes. The information does not necessarily reflect statements made by Mr. Corigliano or statements made on behalf of Mr. Corigliano by his counsel.

deliberate lie. It was falsely represented to the board that Speaks and Sabatino's affidavits implicated Corigliano by name.

Corigliano thought the audit report understated the knowledge of people on the HFS side regarding certain issues. Monaco and Forbes signed the 10-K.

In the summer of 1997, Monaco told Corigliano that he had no financial responsibilities until he took over in 2000. Corigliano resisted and they told him not to worry and gave him international responsibilities. He had no financial responsibility and did not function as CFO after 12/17/97. On 4/9 Silverman went out of his way to say Corigliano was not in the financial area.

Pre 12/97, Pember reported to Corigliano and Sabatino reported to Pember and not Corigliano. After the merger, Pember reported to Shelton. Corigliano was not in the chain of command anymore, so Pember was the top ranking accountant at CUC.

Monaco and Forbes were told by Shelton on 3/6 and by Pember on 3/9 that earnings were getting a boost from merger reserves. Everyone at both companies knew this including Walter Forbes. The notion that merger reserves were being used aggressively to boost earnings was well known and had been going on for years.

On 3/9 Pember showed up with a schedule showing how she had used the Ideon reserve and gave them all copies and walked them through the schedule. They hadn't seen the schedule before, but they knew what was going on. Then Rabinowitz came in and answered questions. Forbes and Monaco signed the 10-K.

Corigliano was not a knowing participant in a fraud, he did not falsify or instruct anyone else to falsify any matter. If there were things that were wrong, Corigliano does not know about them. If some things do not comport with proper accounting, it was not because he knowingly did anything wrong. He knew merger reserves were being used to increase earnings, but did not think this was improper. In meetings with Monaco and Silverman, Corigliano was told directly to make the Cendant merger reserves as large as possible. Walter Forbes also communicated this message to him. Corigliano was urged to estimate expenses liberally rather than conservatively as HFS was very comfortable with this position.

**NOTE: The information in this letter conveys only the substance of discussions between counsel for Mr. Corigliano and the Government based upon non-verbatim notes. The information does not necessarily reflect statements made by Mr. Corigliano or statements made on behalf of Mr. Corigliano by his counsel.**

Cosmo Corigliano attended a meeting with the senior management of both CUC and HFS where Monaco explained reserves. During the meeting, CUC represented that its reserves were exhaustive. Henry Silverman said they should go back and find more reserves. The AA report understates the knowledge of the people on the HFS side.

What items Anne Pember charged against the Ideon reserve was not known to Corigliano until March 9, 1998. He found it very convincing, however, as did Shelton and Ernst and Young. He understood Ernst & Young worked on reserves with Pember. Corigliano had a good memory of the 3/6-3/10 time period regarding what documents were created, who reviewed them, etc.

Kirk Shelton did all the talking at the March 6, 1998 meeting. Mr. Shelton had knowledge roughly equivalent to Corigliano. Shelton was a very hands-on operating guy, while Forbes was more remote. Everyone agrees that Kirk did the talking on March 6 except that Shelton is presently denying that he did the talking.

Corigliano does not understand how merger reserves can be allocated to revenues. Corigliano had no responsibility for charges to the Cendant merger reserves. Corigliano was supposedly shocked by the allegation that Anne Pember did things in the middle of the night. Corigliano believed that Ernst & Young had approved of everything that was done.

Corigliano never told anyone to make unsupported topside adjustments. He believed that the AA report was exculpatory in that Sabatino stated that he was unaware of unsupported topside adjustments while Stu Bell was CFO prior to 1995.

Prior to 1995 while Bell was there and Corigliano was responsible for topside adjustments, they were all supported. After Corigliano became CFO and Sabatino assumed responsibility for this area, the numbers were now unsupportable. Corigliano

**NOTE: The information in this letter conveys only the substance of discussions between counsel for Mr. Corigliano and the Government based upon non-verbatim notes. The information does not necessarily reflect statements made by Mr. Corigliano or statements made on behalf of Mr. Corigliano by his counsel.**

maintains that if any of the adjustments were made on an unsupported basis, it was done by Sabatino alone. Sabatino lied about who is involved in the making of unsupported topside adjustments. Corigliano believed that whatever adjustments were being made at that time were justified. Corigliano denies that he told Sabatino what adjustments to make. It was Sabatino's job to make the adjustments and Corigliano maintains that he lied about Corigliano's directive. Corigliano does not know if the figures for the topsides are false or not. Corigliano has no knowledge of adjustments to revenue, including whether they were part of topside adjustments in 1997. These adjustments do not make sense to Corigliano. Sabatino was upset about not getting the controller's job which Shelton decided to leave vacant. Rivalry existed between Pember and Sabatino. When Pember got the controller's job Sabatino was very bitter. Corigliano got vibes from Ernst & Young that Sabatino wasn't up to his job. At one point Corigliano stood up for Sabatino to keep him from getting fired. Sabatino had failed to provided Ernst & Young with support for entries that he was too inept to find. Sabatino was incompetent and/or Sabatino cheated to make himself look good.

Corigliano thinks that management from HFS took advantage of the situation and tried to make the accounting problems appear as bad as possible. It was never expected that the stock would drop by 50 percent, maybe 5 percent.

Benefits attributable to the reserves were expected from the beginning of the year. If they can see from the beginning of the year that operations are at certain levels and they know about reserves, they have every reason to suppose that there are going to be adjustments, then they can do this.

**NOTE: The information in this letter conveys only the substance of discussions between counsel for Mr. Corigliano and the Government based upon non-verbatim notes. The information does not necessarily reflect statements made by Mr. Corigliano or statements made on behalf of Mr. Corigliano by his counsel.**

      Counsel informed the government that they had polygraphed Corigliano and that he had done very well. They invited the government to polygraph Mr. Sabatino.

Very truly yours,

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice

By: JOHN J. CARNEY
Special Attorney
U.S. Department of Justice

By: JAMES MCMAHON
Special Attorney
U.S. Department of Justice

By: RICHARD SCHECHTER
Special Attorney
U.S. Department of Justice

cc: Thomas P. Puccio, Esq.
    Scott Edelman, esq.

NOTE: The information in this letter conveys only the substance of discussions between counsel for Mr. Corigliano and the Government based upon non-verbatim notes. The information does not necessarily reflect statements made by Mr. Corigliano or statements made on behalf of Mr. Corigliano by his counsel.