UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


UNITED STATES OF AMERICA     :  No. 3:02CR00264 (AHN)
                               :
                               :
        V.              :  April 17, 2006
                               :
                               :
                               :
WALTER A. FORBES           :


MEMORANDUM OF THE UNITED STATES
IN SUPPORT OF ITS PRE-TRIAL MOTION IN LIMINE

<u>GOVERNMENT'S THIRD TRIAL MOTION NO. 1</u>


CHRISTOPHER J. CHRISTIE
NORMAN GROSS
MICHAEL MARTINEZ
Special Attorneys
U. S. Department of Justice
970 Broad Street, Room 700
Newark, New Jersey 07101
Tel: (973) 645-2700
Fax: (973) 645-2857

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . .   1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . .   5

I.   Evidence of Forbes' Sales of CUC and Cendant Stock
     During the Term of the Conspiracy Is Admissible to
     Prove Forbes' Knowledge of, Intent, and Motive to
     Commit the Crimes with Which He Is Charged . . . . . .   5

II.  The Testimony of James Rowan Regarding Forbes'
     Statements During an Investment Conference in January
     1998 Should Be Admitted into Evidence . . . . . . . .  14

III. Limited Portions of Forbes' Testimony from the First
     Trial Regarding Discrete Events Should Be Admitted into
     Evidence at the Retrial Without Opening the Door to His
     Prior Testimony Regarding Other, Unrelated Events . . .  16

IV.  Evidence of the Amount of Overstated Operating Income
     in CUC's and Cendant's SEC Filings Is Relevant to Prove
     Forbes' Knowledge of the Charged Conspiracy . . . . . .  20

V.   This Court Should Preclude Forbes from Asking Cosmo
     Corigliano on Cross-Examination Whether He Committed or
     Is Guilty of "Insider Trading" . . . . . . . . . . . .  23

VI.  The Parties Should Redact Bates Numbers and Legends on
     Documents to Be Introduced Or Displayed at Trial . . . .  31

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . .  32

## INTRODUCTION

The charges in this case involve a massive fraud at a company called CUC International and its corporate successor, Cendant, between the late 1980's and April 1998, when the fraud was first publicly disclosed.  During most of that period, defendant Walter Forbes was the Chief Executive Officer and Chairman of the Board of Directors of CUC and sold nearly $57 million in CUC and Cendant stock, including more than $11 million worth in March 1998 alone.  The fraud was disclosed to the investing public in April 1998 after CUC merged with a New Jersey based company, HFS, to form Cendant.  On the day following disclosure of the fraud, the price of Cendant's stock dropped more than 45% and Cendant shareholders lost $14 billion in the value of their shares.  In re Cendant Corp. Litig., 264 F.3d 201, 221 (3d Cir. 2001).

In the aftermath of the fraud, several former officers and employees of CUC pled guilty to various charges.  In addition, following a seven-month trial in 2004, a jury convicted E. Kirk Shelton, the former President and Chief Operating Officer of CUC, of all twelve counts with which he was charged:  conspiracy to commit securities, mail and wire fraud, and to make false statements in reports required to be filed with the SEC, and the substantive counts corresponding to those conspiracy objects.  (Shelton's appeal is pending.)  The jury failed to reach a verdict, however, on any of the counts charging Forbes, Shelton's

co-defendant during this prolonged trial.  Forbes was retried in
2005 on a Redacted Superseding Indictment on one conspiracy
count, two substantive counts for making false statements in SEC
filings, and one substantive count of securities fraud, but the
jury again failed to reach a verdict.

Prior to Forbes' second trial, the United States moved <u>in
limine</u> for a ruling from the Honorable Alvin W. Thompson regard-
ing the admissibility of certain evidence to assist the Govern-
ment in determining whether to pare down the charges against
Forbes (which the Government ultimately did), and in planning for
the retrial.  After extensive briefing by the parties, Docket
1624, 1653, 1694, 1709, the District Court granted the Govern-
ment's motion in almost all respects, Docket 1839 (Exhibit 1
hereto), ruling that:

- evidence of Forbes' sales of CUC and Cendant stock
  during the term of the conspiracy was admissible to
  prove his intent, knowledge, and motive concerning the
  crimes charged in the Superseding Indictment;

- testimony of James Rowan concerning Forbes' presenta-
  tion at an investor conference and its impact on Ro-
  wan's subsequent decision to purchase Cendant stock was
  admissible;

- limited portions of Forbes' testimony from the first
  trial concerning six discrete subjects were admissible
  without opening the door to his prior testimony regard-
  ing other, unrelated events;

- evidence of the amount of overstated operating income
  in CUC's and Cendant's SEC filings was admissible,
  given the relevance of the qualitative effect of vari-
  ous GAAP violations on CUC's and Cendant's reported
  earnings;

- Cosmo Corigliano, a cooperating witness and the former
  Chief Financial Officer of CUC, could not be cross-

2

examined about whether he believed that he was guilty of insider trading, and Forbes could not argue that Corigliano lied during the first trial when he denied that he was guilty of insider trading; and

- Forbes' counsel could not tell the jury during opening argument what Forbes "thought," "knew," "believed" or "was shocked by" without also stating that Forbes would testify, and counsel could not during summation impugn the motives of the prosecutors, as he had done during the first trial.

There is no basis for reconsidering Judge Thompson's rulings on those issues, which have become law of the case. When "a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case." United States v. Uccio, 940 F.2d 753, 758 (2d Cir. 1991); see United States v. Crowley, 318 F.3d 401, 420 (2d Cir. 2003). "[A]bsent cogent or compelling reasons to deviate," such as "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice," a court should adhere to its prior rulings. United States v. Tenzer, 213 F.3d 34, 39 (2d Cir. 2000) (internal quotation marks omitted). Thus, "[u]nder the law of the case doctrine, courts are understandably reluctant to reopen a ruling once made, especially when one judge or court is asked to consider the ruling of a different judge or court." Lillbask v. Connecticut Dept. of Educ., 397 F.3d 77, 94 (2d Cir. 2005) (internal quotation marks omitted).[1]

---

[1] Similarly, a reconsideration motion will be denied unless the "moving party can point to controlling decisions or data that
(continued...)

3

Accordingly, the Government seeks an _in limine_ ruling permitting the Government to introduce at the third trial Forbes' testimony concerning the same six subjects that Judge Thompson ruled were admissible -- supplemented by Forbes' testimony at the first trial concerning another asset transfer and purported advice of counsel he received concerning the transfers and his testimony at the second trial on two more discrete subjects -- and imposing the same restrictions on Forbes' cross-examination of Corigliano that Judge Thompson imposed before.[2]  In addition, because the jury in the second trial was instructed to disregard any Bates numbers and legends in trial exhibits affixed during discovery, the Government requests a ruling requiring the parties to redact such material from the documents to be used or displayed at this trial.

---

[1] (...continued)
the court overlooked." _Sequa Corp. v. GBJ Corp._, 156 F.3d 136, 144 (2d Cir. 1998); _see_ _LoSacco v. City of Middletown_, 822 F. Supp. 870, 876-77 (D. Conn. 1993) ("the function of a motion for reconsideration is to present the court with an opportunity to correct manifest errors of law or fact or to consider newly discovered evidence") (internal quotation marks omitted), _aff'd_, 33 F.3d 50 (2d Cir. 1994).

[2] The Government does not at this time seek a ruling reminding defense counsel of his obligations not to suggest during opening that counsel has personal knowledge about Forbes' state of mind or impugn during summation the motives and conduct of opposing counsel.

**ARGUMENT**

I.    **Evidence of Forbes' Sales of CUC and Cendant Stock During the Term of the Conspiracy Is Admissible to Prove Forbes' Knowledge of, Intent, and Motive to Commit the Crimes with Which He Is Charged.**

Forbes is charged with one count of conspiracy to commit securities fraud and to make false statements in documents required to be filed with the SEC, two counts of making false statements in those SEC filings, and one count of securities fraud.  As Judge Thompson ruled prior to the second trial, evidence that Forbes sold nearly $57 million in CUC and Cendant stock during the conspiracy period, including a sale reaping more than $11.3 million in proceeds just six weeks before the fraud was disclosed, is relevant and admissible to prove Forbes' knowledge of, intent, and motive to commit these crimes.  Thus, this evidence should be admitted at the third trial.

Evidence is relevant if it has "<u>any tendency</u> to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401 (emphasis added).  "The Rule's basic standard of relevance thus is a liberal one," <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 587 (1993): the proponent need show only that the proffered evidence would "appear to alter the probabilities of a consequential fact" in the case, <u>i.e.</u>, that "a reasonable person might believe the probability of the truth of the consequential fact to be differ-

5

ent if that person knew of the proffered evidence." 2 <u>Wein-</u>
<u>stein's Federal Evidence</u> § 401.04[2][b] & [c] (Hon. Joseph M.
McLaughlin ed., 2d ed. 2006) ["<u>Weinstein</u>"]; <u>see</u> <u>New Jersey v.</u>
<u>T.L.O.</u>, 469 U.S. 325, 345 (1985).

Evidence need not make the proposition for which it is
offered "appear more probable than not," so long as it advances
the inquiry "in some degree." 2 <u>Weinstein</u> § 401.04[2][b]; <u>see</u>
<u>United States v. Carmona</u>, 873 F.2d 569, 571-72 (2d Cir. 1989).
Moreover, "[a]ll relevant evidence is admissible unless excluded
by the constitution, a statute, or a rule." Fed. R. Evid. 402.
The trial court "is in the best position to evaluate the admissi-
bility of offered evidence," <u>United States v. Valdez</u>, 16 F.3d
1324, 1332 (2d Cir. 1994), and its evidentiary rulings are
reviewed only for an abuse of discretion. <u>United States v.</u>
<u>Stevens</u>, 83 F.3d 60, 68 (2d Cir. 1996).

In order to prove Forbes guilty of conspiracy to make false
statements to the SEC, the Government must prove, <u>inter</u> <u>alia</u>,
that Forbes:

1)  "knowingly and willfully became a member of the con-
    spiracy, and did so with the requisite unlawful in-
    tent," FTTr. 16295;[3]
2)  "knew that the financial information [at issue] was
    materially false," FTTr. 16296;

---

[3] Citations to "FTTr." and "STTr." are to the transcripts of
the first and second trials, respectively. Citations to "GX" are
to exhibits introduced by the Government at the first trial.

3)    acted "with the intent to do something the law forbids, that is to say, with bad purpose to disobey or to disregard the law," FTTr. 16297; and

4)    "acted with the same unlawful intent that must be proven with respect to [the] alleged object of the alleged conspiracy."  FTTr. 16301.

In order to prove Forbes guilty of making false statements to the SEC, the Government must prove, inter alia, that he acted with "the intent to deceive," FTTr. 16303, i.e., that he acted "with the intent to mislead another or to cause another to believe that a falsehood is true, but not necessarily for the purpose of causing some financial loss to another."  Id.  And in order to prove Forbes guilty of securities fraud, the Government must prove, inter alia, that he acted "knowingly, willfully, and with the intent to defraud." FTTr. 16357.  Thus, for all four counts, the Government must prove scienter:  "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193, n.12 (1976).

As Forbes has argued regularly in this case, whether he knew about the charged fraud and acted with the requisite intent is the most hotly contested matter in this case.  In that regard, the timing and size of Forbes' stock sales help prove his scienter and motive to commit the crimes with which he is charged. The Government's proposed evidence regarding Forbes' stock sales is summarized in a chart appended as Exhibit 2 hereto.  That chart shows that during March 1991 through March 1998, Forbes repeatedly divested himself of large blocks of CUC and Cendant

7

stock, ultimately selling more than two million shares resulting in total proceeds of almost $57 million.  The net proceeds of those sales amount to a substantial percentage of Forbes' self-declared net worth of approximately $200 million in 1998. Moreover, the evidence will further show that the price of CUC's and Cendant's stock was substantially inflated during this period by the fraud, so that Forbes' take from his stock sales was much greater than it would have been had the fraud not occurred. Forbes' substantial profits from the fraud created a powerful incentive for him to engage in the fraud.

The timing of Forbes' sale of shares of Cendant stock in March 1998 is especially telling.  It occurred only after Forbes learned that Cendant CEO Henry Silverman had decided that Anne Pember, one of Forbes' co-conspirators, would no longer be in charge of managing the accounting for the former CUC divisions. FTTr. 15011-13, 15076.[4]  According to the Government, Forbes realized that once Pember was removed from her involvement in the CUC accounting, the fraud would be unable to continue, and the previous manipulation of CUC's financial results would be exposed to Cendant's management.  Forbes' realization that the days of the fraudulent manipulation of the accounting records were numbered created the incentive for his large divestment of Cendant stock.

---

[4] Forbes, on the other hand, claimed that he first decided to sell a large volume of Cendant stock in February of 1998.

Thus, the proffered evidence tends to prove Forbes' motive to commit the charged crimes, which is typically relevant in a criminal prosecution.  E.g., United States v. LaFlam, 369 F.3d 153, 157 (2d Cir. 2004); United States v. Gonzalez, 110 F.3d 936, 941-42 (2d Cir. 1997).[5]  As the holder of a large volume of CUC, then Cendant stock, Forbes could reap substantial profits from selling the stock while its price was fraudulently inflated.  The jury can rationally conclude that Forbes would have been more highly motivated to participate in the fraud if it had provided him with substantial tangible benefits than if it did not.  The point is not that Forbes was motivated to commit the charged fraud because he was compensated, in part, by stock options.  Rather, the point of the proffered evidence is that he was motivated to commit the fraud because it increased the value of his stock holdings, whether acquired by option or otherwise, and that he realized that increased value when he sold the stock.

Furthermore, evidence that Forbes garnered tens of millions of dollars from the sale of fraudulently inflated CUC and Cendant stock makes it more likely that he also knew about and intended to facilitate the charged fraudulent scheme than if he had not

---

[5] For example, in United States v. Guterma, 281 F.2d 742 (2d Cir. 1960), which involved a prosecution for conspiracy to obstruct the making and filing of annual reports with SEC, the Second Circuit affirmed the district court's admission of evidence showing "that the conspiracy was motivated by a scheme to appropriate assets of [the company] for defendants' benefit and to demonstrate what the facts were that defendants wished to conceal from the SEC and the public."  281 F.2d at 746.

9

made a single red cent from selling CUC and Cendant stock during
the conspiracy period.  That is, these sales help to demonstrate
that Forbes acted with scienter.  "'Insider sales of stock may be
evidence of scienter if the trades are unusual or suspicious in
timing or amount.'" In re Xerox Corp. Sec. Litig., 165 F. Supp.
2d 208, 222 (D. Conn. 2001) (quoting Acito v. Imcera Group, Inc.,
47 F.3d 47, 54 (2d Cir. 1995); see In re Apple Computer Sec.
Litig., 886 F.2d 1109, 1117 (9th Cir. 1989) ("Insider trading in
suspicious amounts or at suspicious times is probative of bad
faith and scienter.") (citing Goldman v. Belden, 754 F.2d 1059,
1070 (2d Cir. 1985)).

        In determining whether "unusual or suspicious stock sales by
corporate insiders may constitute circumstantial evidence of
scienter," a court should consider:

>    (1) the amount and percentage of shares sold by insid-
>    ers; (2) the timing of the sales; and (3) whether the
>    sales were consistent with the insider's prior trade
>    history.

In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 986 (9th
Cir. 1999).  In that regard, as Judge Thompson ruled, Exhibit 1
at 2, evidence of Forbes' sale of 300,000 shares of Cendant stock
in March 1998 is particularly relevant to prove Forbes' scienter.
Although Forbes sold large blocks of CUC stock repeatedly during
the conspiracy period, the sale of the 300,000 Cendant shares was
the single largest sale of shares that he ever undertook on a
single day, by a substantial margin.  See Exhibit 2.  Not only

10

was the amount of the sale suspiciously large relative to Forbes'
prior stock sales, but the timing of the sale was likewise
suspicious, coming less than six weeks before the fraud was
disclosed and the market price for the stock crashed, and shortly
after Forbes learned that Pember would be removed from her
position as CUC Controller and therefore unable to continue to
facilitate the fraud.[6]

Even if, as Forbes has claimed, he first notified his stock
brokers in February 1998 of his intent to sell the shares, the
sale was hardly inexorable until the shares were actually sold.
Forbes did not finally decide to sell the shares until after he
learned that Pember would be sacked.  Additionally, Forbes
admittedly knew as early as the fall of 1997 that Silverman was
thinking of removing Pember from her position in the accounting
function of the company, and that Pember was unhappy with how the
impending merger was affecting her job responsibilities, and was
considering leaving the company.  FTTr. 14350-54.  Thus, the

---

[6] Under similar circumstances, the court in <u>Xerox</u> denied the
defendants' motion to dismiss a private action for securities
fraud, alleging violations of 15 U.S.C. Section 10j(b) and 17
C.F.R. 240.10b-5.  <u>See</u> <u>In re Xerox Corp.</u>, 165 F. Supp. 2d at 223.
The stock sales by defendant insiders "appear[ed] to be substan-
tial in amount" because the proceeds of the sales totaled nearly
$31.4 million, an amount which more than doubled the aggregate of
the collective annual compensation for the individual defendants
for two successive years.  <u>Id.</u>  Additionally, the insider sales
for any particular month during the class period was higher than
the monthly volume for the preceding years.  <u>Id.</u>  Here, Forbes'
$11 million sale of stock on March 6, 1998 represents his largest
CUC/Cendant stock sale in the seven-year period between March 6,
1991 and March 6, 1998.  <u>See</u> Exhibit 2.

11

timing of Forbes' stock sales in March 1998 bears a logical and temporal relationship to his knowledge that Pember would be removed from her key role in the fraud, and therefore evidence concerning these sales should be admitted.  Cf. United States v. Santagata, 924 F.2d 391, 394 (1st Cir. 1991) (documents that memorialized the defendant's orders to purchase merchandise from defrauded manufacturers were relevant to the existence of a scheme to defraud, even though they did not pertain to the particular enumerated mail fraud counts of the indictment).  Moreover, given the need to determine whether this or any of Forbes' other "sales were consistent with the insider's prior trade history," In re Silicon Graphics, 183 F.3d at 986, the jury must review the entire history of Forbes's sales of CUC and Cendant stock.  This is particularly so, given Forbes' purport- edly innocent explanations for his stock sales.  FTTr. 13837-39, 14269-70.

Nor should evidence of Forbes' stock sales be excluded under Rule 403 because it supposedly places undue emphasis on his wealth, as Forbes unsuccessfully argued before the second trial. Relevant evidence may not be excluded under Rule 403 unless, inter alia, its "probative value is substantially outweighed by the danger of unfair prejudice."  Fed. R. Evid. 403 (emphasis added).  Under Rule 403, "unfair prejudice 'means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  United States v.

Brady, 26 F.3d 282, 287 (2d Cir. 1994) (quoting the Advisory
Committee Notes to Rule 403).  As the Second Circuit recently
held, evidence of a defendant's substantial monetary gain is not
unduly prejudicial, if accompanied by appropriate instructions or
other safeguards.  United States v. Quattrone, 441 F.3d 154, 187
(2d Cir. 2006).

       That Forbes reaped almost $57 million in proceeds from his
stock sales created a greater incentive to engage in a serious
crime than had he reaped a much smaller sum, so evidence that
Forbes obtained substantial, rather than paltry sums, from the
crime has substantial probative value.  This Court should decline
to exclude, under Rule 403, evidence which shows that Forbes
committed the charged crimes out of greed, and that he continued
to commit the crime over many years because his criminal activi-
ties increased his wealth.  See United States v. Ballesteros
Gutierrez, 181 F. Supp. 2d 350, 354 (S.D.N.Y. 2002) (evidence
that the defendants earned substantial sums from insider trading
was properly admitted over their Rule 403 objection that it would
cause antipathy based on their wealth).  Any risk that this
"evidence of compensation [or] wealth" might "unduly prejudice
jury deliberations" can be avoided by employing such "safeguards"
as "limiting instructions or restrictions confining the govern-
ment's references to that wealth."  Quattrone, 441 F.3d at 187.

       Accordingly, like Judge Thompson, this Court should admit
evidence of all of Forbes' stock sales during the conspiracy.

II.  **The Testimony of James Rowan Regarding Forbes' Statements During an Investment Conference in January 1998 Should Be Admitted into Evidence.**

During the first and second trials, Forbes testified, and his attorney argued, that Forbes' job at CUC was to undertake "strategic thinking" and to focus upon the company's plans for developing an "interactive" computer-based marketing capability that presaged the Internet.  E.g., FTTr. 107 (defense opening statement), 15168 (defense summation).  Forbes testified that he delegated the day-to-day operations of CUC to other members of the Office of the President, including Stu Bell, Kirk Shelton and Christopher McLeod, and to their subordinates.  FTTr. 13561-72. He further testified that he relied heavily on his subordinates and on outside auditors from Ernst & Young ("E&Y") to ensure that CUC's SEC filings fairly represented the company's financial results, and personally did not participate in that endeavor. FTTr. 13630-44, 13644-53, 13662-65, 13674-75.  Forbes testified that he did not concern himself with detailed accounts of the company's financial results, and indeed, did not even trouble himself to carefully read the company's quarterly and annual SEC filings.  FTTr. 13657, 13667, 13671, 14087.

At the first and second trials, James Rowan, the chief investment officer of the Hartford Steam Boiler Company ("HSB"), testified that he attended a conference in January 1998 that was sponsored by Morgan Stanley, the investment and securities brokerage firm.  FTTr. 10252-53.  Rowan testified that Forbes,

14

working without notes, gave a twenty-five to thirty-five minute presentation, which included a question and answer session, during which Forbes demonstrated his firm grasp of many of the details of the business of the newly formed Cendant.  FTTr. 10253-55.  Rowan was so impressed by Forbes' performance that, upon returning to Hartford, Rowan conducted additional research about CUC and Cendant, then successfully recommended to HSB's investment committee that HSB purchase a total of 35,500 shares of Cendant stock in six separate transactions during January and February 1998.  FTTr. 10256-66.  In purchasing that stock, Rowan assumed and relied upon the accuracy of the financial data set forth in CUC's and Cendant's quarterly and annual SEC filings. FTTr. 10269-71.

As Judge Thompson ruled prior to the second trial in adopting the Government's arguments on this score, Exhibit 1 at 4, Rowan's testimony is admissible for two purposes.  First, his testimony about attending the January 1998 investor conference at which Forbes spoke is relevant to prove Forbes' knowledge and intent regarding the crimes with which he is charged.  Second, Rowan's testimony about his reliance on CUC's and Cendant's false, publicly filed financial statements is relevant to prove the materiality of those false statements.

Indeed, Forbes has never disputed that most of Rowan's testimony is relevant to prove the materiality of the false statements in CUC/Cendant's SEC filings and public statements.

15

But Rowan's testimony also helps prove that Forbes knew those statements were false.  According to Rowan, Forbes demonstrated at the presentation that he "knew the business, the nuances of the business and knew it very, very well and could speak to it. And that's essentially the type of presentation that Mr. Forbes did."  FTTr. 10254-55.  Thus, Rowan's testimony will rebut the frequent defense trial theme that, as a non-accountant, Forbes did not have the expertise to personally manage or even under-stand all of the accounting manipulations involved in the con-spiracy.  Forbes' impressive performance during the January 1998 conference will demonstrate that Forbes was indeed capable of understanding sophisticated concepts and mastering minutiae.[7]

**III. Limited Portions of Forbes' Testimony from the First and Second Trials Regarding Discrete Events Should Be Admitted into Evidence at the Retrial Without Opening the Door to His Prior Testimony Regarding Other, Unrelated Events.**

During the third retrial, the Government may offer portions of Forbes' testimony from the first and second trials as the statement of a party pursuant to Fed. R. Evid. 801(d)(2)(A). Those portions of Forbes' prior testimony address:

> 1)     Forbes' conversation with Henry Silverman around the Labor Day weekend of 1997 regarding Forbes' request

---

[7] See United States v. Calandrella, 605 F.2d 236, 253-54 (6th Cir. 1979) (rejecting Rule 403 challenge to evidence that was "relevant to show [defendant's] business acumen"; defendant's "basic defense was that he was not aware of the nature of the transactions [at issue in the charged crimes] and that he was in effect duped," and the "evidence tended to show [his] level of business sophistication in transactions involving his companies and thus it tended to contradict this claim").

16

that Silverman not remove Pember from her position in the accounting function of CMS [FTTr. 14350, ln.15 - 14364, ln.9];

2)   Forbes' claim that he did not urge the Cendant Executive Committee and the Cendant Audit Committee to retain E&Y as the independent auditors of the former CUC divisions of Cendant [FTTr. 14340, ln.1 - 14344, ln.24; STTr.3030, ln.2 - ln.23; STTr. 3031, ln.24 - 3032, ln.4; STTr. 3032, ln.13 - 3033, ln.6].

3)   Forbes' transfer of real estate assets to his wife and daughters, the total value of the transferred assets, and Forbes' claim that his attorney, Greg Danilow, told him that such transfers were lawful [**wife**:  FTTr. 14386, ln.3 - 14386, ln.6 (ending after "687 Smith Ridge Road."); FTTr. 14386, ln.9 - 14389, ln.1; FTTr. 14389, ln.15 - 14390, ln.4; FTTr. 14390, ln.8 - 14,390, ln.9; FTTr. 14390, ln.15 - 14391, ln.5; FTTr. 14391, ln.10 - 14392, ln.24; FTTr. 14393, ln.5 - 14393, ln.6; FTTr. 14393, ln.10 - 14393, ln.21; FTTr. 14394, ln.2 - 14394, ln.20; FTTr. 14395 ln.2 - 14395, ln.4; FTTr. 14395, ln.13 - 14395, ln.25; FTTr. 14396, ln.6 - 14397, ln.4; **daughters and total value:**  FTTr. 14401, ln.10 - 14403, ln.6; and **advice:**  FTTr. 14432, ln.25 - 14433, ln.6];

4)   Forbes' desire to know if CUC had "hit the range" of estimates established by Wall Street analysts [FTTr. 13968,  ln.4 - 13969, ln.6]; Forbes kept track of and occasionally spoke to Corigliano about whether CUC's earnings were meeting those targets [FTTr. 13969, ln.21 - 13970, ln.21];

5)   Forbes' attendance during meetings at CUC when "forecasts" were discussed [FTTr. 13977, ln.6 - ln.17];

6)   Forbes' knowledge that CUC was establishing merger reserves for CUC's large acquisitions and knew that such reserves were important to the company [FTTr. 14191, ln.11 - 14192, ln.19].

7)   Forbes' claim that in September 1997 he did not have a conversation with Michael Monaco in which Forbes requested that Monaco reconsider his proposal to remove Anne Pember from the consolidation function for the CUC division [STTr. 3009, ln.20 - 3010, ln.1]; and

8)   Forbes' claim that between April 22, 1996 and December 1996, he did not have a conversation with Steven Kernkraut in which Forbes explained the reasons for CUC's

17

> decision to increase the Ideon merger reserve by $27.2
> million [STTr. 3023, ln.14 - STTr. 3024, ln.4].[8]

Each of these items is relevant to prove Forbes' knowledge of and
participation in the conspiracy to make false statements to the
SEC.

The Government moves for a ruling by this Court in limine
that, by offering that evidence, the Government will not open the
door to any other portions of Forbes' testimony from the first
trial that pertain to subjects other than those identified above.
Fed. R. Evid. 106 provides:

> When a . . . recorded statement or part thereof is
> introduced by a party, an adverse party may require the
> introduction at that time of any other part or any
> other . . . recorded statement which ought in fairness
> to be considered contemporaneously with it.

Thus, if this Court admits the foregoing excerpts pursuant to
Rule 801(d)(2)(A), Forbes is entitled under Rule 106 to the
admission of only those other portions of his prior testimony
that are needed to satisfy the "rule of completeness." United
States v. Jackson, 180 F.3d 55, 73 (2d Cir. 1999). "The com-
pleteness doctrine," in turn, "does not . . . require the admis-

---

[8] At the second trial, Forbes did not dispute the relevance
of the excerpts from the first trial transcript noted above
(excepting his testimony concerning his transferring an asset to
his daughters and the total value of the assets he transferred to
his wife and daughters, which testimony the Government did not
proffer at the second trial in its case-in-chief). Furthermore,
abiding by Judge Thompson's ruling on the issue before the second
trial, the Government will exclude from transcript excerpts it
proffers during its case-in-chief any read-backs of excerpts of
testimony from other witnesses whom the Government will call at
the third trial.

sion of portions of a statement that are neither explanatory of nor relevant to the admitted passages." Id.; see United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982) (district court properly declined to admit that portion of the defendant's prior statement to police which contained his claim that another person was responsible for the drugs found in the defendant's car; the omitted portion of the statement "was not needed, in fairness, to make complete the portions of [his] statement that were admitted against him").[9] Moreover, Forbes' "own self-serving statements" from the first and second trials, "as offered by him, are inadmissible hearsay." Jackson, 180 F.3d at 73.

Forbes may regurgitate his prior objections that the Government should be precluded from presenting any of his previous trial testimony because he purportedly was coerced to testify in order to respond to false testimony by Cosmo Corigliano and Kevin Kearney, and that his trial testimony concerning his transferring

---

[9] That certainly is the case when the shoe is on the other foot and the Government seeks to introduce under the rule of completeness testimony or other evidence. See United States v. Ricks, 882 F.2d 885, 892-93 (4th Cir. 1989) ("Rule 106 does not necessitate the introduction of those portions of [the] cross-examination testimony which do not explain or clearly pertain to the limited portions [a defendant] sought to introduce"); cf. United States v. Rivera, 61 F.3d 131, 135-36 (2d Cir. 1995) (district court committed reversible error by admitting, pursuant to Rule 106, a stipulation to the plea agreement of a cooperating witness which set forth information from an apparently reliable informant that implicated the defendant in the charged offense, after the defendant cross-examined the witness on other portions of the plea agreement). "Turnabout is fair play, even in the federal courts." United States v. Diallo, 40 F.3d 32, 35 (2d Cir. 1994).

19

of certain assets is purportedly irrelevant and unfairly prejudi-
cial.  (Indeed, in "Forbes Third Trial Motion in Limine No. 2,"
Forbes seeks to preclude the Government from "presenting any
evidence, cross-examination, or argument at the retrial concern-
ing [his] transfers of his interest in certain real property to
his wife.")  Judge Thompson properly rejected both objections
prior to the second trial, however, and there is no reason for
this Court to reconsider this law of the case.[10]

IV.  **Evidence of the Amount of Overstated Operating Income in
     CUC's and Cendant's SEC Filings Is Relevant to Prove Forbes'
     Knowledge of the Charged Conspiracy.**

During the first and second trials, the Court admitted
evidence, through the testimony of expert witness Brian Heckler,
regarding the conspirators' violation of Generally Accepted
Accounting Principles ("GAAP"), and the quantitative effects of
those GAAP violations on the company's stated financial results.
Heckler testified that, for the fiscal years ending January 31,
1996 and 1997, CUC had overstated its operating income by at
least $61 million and $56 million, respectively.  FTTr. 10664-66;
GX10110.  Heckler further testified that, for the fiscal year
ending December 31, 1997, Cendant overstated its operating income
by at least $176 million.  FTTr. 10666-68; GX10110.  In the
second trial, Judge Thompson permitted the Government to argue

---

[10] To spare the Court repetitive briefing, the Government
incorporates by reference its responses to Forbes Third Trial
Motions in Limine Nos. 1 and 2, which address these issues at
greater length.

20

that the quantitative effect of the various GAAP violations on CUC's and Cendant's reported earnings, "when viewed in combination with other evidence in the case," Exhibit 1, at 10, constituted circumstantial evidence of Forbes' knowledge of the fraud.

This was entirely appropriate. See, e.g., In re AFC Enterprises, Inc. Securities Litigation, 348 F. Supp. 2d 1363 (N.D. Ga. 2004) (evidence of substantial GAAP violations is relevant to scienter).[11]  The substantial amounts of the fraudulent overstatement of CUC's and Cendant's earnings, when coupled with other evidence in the case, is circumstantial evidence that Forbes knew about the fraud.  For at least two reasons, evidence that the false statements involved an overstatement of the company's operating income by tens of millions of dollars would make it more likely that the CEO of the company was aware of the false statements than if the overstatement involved a significantly smaller amount.  First, a large scale fraud which created

---

[11] In AFC Enterprises, the court noted that the overstatement represented only 0.3% and 0.8% differences in reported revenues and 1.9% and 4.4% differences in expenses.  The court agreed with the defendants that the differences were not so large as to be "glaringly obvious and, thus, constructively known by the defendants to be erroneous when reported."  Id. at 1373, n.3. Here, the Government will present direct evidence of Forbes' knowledge of the fraud and his intent to deceive, and will not rely solely on inferences arising from circumstantial evidence to prove Forbes' scienter.  Because the AFC Enterprises court assumed that evidence of the company's GAAP violations was admissible to prove scienter but insufficient to get past the strict pleading requirements of the PSLRA, the court's dismissal of the complaint poses no impediment to the Government's proposed argument here regarding evidence of the GAAP violations as proof of Forbes' scienter.

21

a large discrepancy between CUC's actual and reported earnings
would be harder for admitted conspirators such as Corigliano to
conceal from other CUC accountants than a smaller fraud with a
more limited impact on CUC's reported earnings.  Because of the
heightened difficulty of concealing a large fraud with large
results, Corigliano would be more strongly motivated to insure
that his corporate superiors such as Forbes had approved
Corigliano's malfeasance, as Corigliano testified was the case.

    Second, the evidence showed that the large quantitative
effect of the fraud on CUC's reported earnings was the result of
several different accounting manipulations that spanned several
operating units of CUC.  As a result, Corigliano had to conspire
with other CUC employees to execute the fraud.  The number of
conspirators was therefore necessarily greater than it would have
been had the fraud been smaller and more contained.  Each of
Corigliano's subordinate co-conspirators could potentially betray
the conspiracy to Corigliano's superiors, as indeed happened when
alleged co-conspirators Casper Sabatino and Steven Speaks dis-
closed the fraud to former HFS officials in April 1998.  Thus,
the larger number of conspirators required to execute a large-
scale fraud provided a greater incentive for Corigliano to ensure
that his corporate superiors had approved the unlawful conduct.
In this light, evidence of the large size of the fraud is rele-
vant to Forbes' knowledge because a large fraud made it more
likely that Corigliano told Forbes about the fraud than if the

fraud had been small.  The evidence therefore satisfies the low threshold of Fed. R. Evid. 401 for mere relevance.

**V.   This Court Should Preclude Forbes from Asking Cosmo Corigliano on Cross-Examination Whether He Committed or Is Guilty of "Insider Trading."**

During the first trial, Corigliano testified that he was aware that the price of CUC's and Cendant's stock had been artificially inflated because of the fraudulent overstatement of CUC's and CUC's publicly disclosed operating income.  FTTr. 7587-89.  He also effectively admitted that, when he sold approximately $27 million of Cendant stock from June 1990 to February 1998, he knew that the investing public was still unaware of the company's false statements in quarterly and annual SEC filings, since the fraud was not publicly disclosed until April 15, 1998. FTTr. 7898-7913, 9602-04.

Pursuant to his plea agreement, Corigliano pleaded guilty to conspiracy to commit mail and wire fraud and to make false statements to the SEC, and also to a substantive wire fraud count.  FTTr. 7498-7500; GX1546.  During the first trial, Forbes was permitted to elicit Corigliano's testimony on cross-examination that he did not believe that he committed the crime of insider trading because, although he possessed material non-public information, he did not "use" that information in deciding to sell CUC and Cendant stock.  FTTr. 7598; see also FTTr. 8937-39 (Puccio cross-examination).  Corigliano later conceded that he

23

was not denying that he was guilty of insider trading, since he was not a lawyer.  FTTr. 8945-46.

Prior to the second trial, the Government requested that Forbes be barred from cross-examining Corigliano about Corigliano's understanding or belief about whether he committed the crime of insider trading, as Corigliano's lay opinion about whether he was guilty of a particular federal crime was irrelevant to any issue in dispute, and would improperly confuse the jury.  Judge Thompson granted the request, because "Corigliano's lay opinion about whether he was guilty of the crime of insider trading is not admissible under Fed. R. of Evid. 701 and is in any event excludable pursuant Fed. R. Evid. 403 because of the danger of confusing the jury."  Exhibit 1, at 11.  Judge Thompson also rejected Forbes' argument that "his cross-examination of Corigliano during the first trial was properly limited to factual matters."  Exhibit 1, at 11.  Accordingly, Judge Thompson prohibited Forbes "from questioning Corigliano about his lay person's understanding of the law and from arguing that Corigliano lied when he denied that he was guilty of insider trading."  Exhibit 1, at 11.

This ruling was entirely appropriate, and there is no reason to revisit it.  <u>First</u>, "lay opinion testimony is not admissible if it will not assist the trier of fact," and testimony by a lay witness that "is an opinion or inference of law" is a paradigm of lay opinion that "does not assist the trier of fact."  4 <u>Wein-</u>

stein § 701.03[3]; see, e.g., United States v. Griffin, 324 F.3d 330, 348 (5th Cir. 2003) ("the record also reflects that [the lay witness] testified to her own interpretation of the law, which is error"); United States v. Espino, 32 F.3d 253, 257 (7th Cir. 1994) ("the question posed to Espino, '[Y]ou're admitting to the conspiracy, aren't you,' required a conclusion regarding the legal implications of his conduct," and his "law answer to this question was therefore . . . unhelpful opinion testimony and should have been excluded"); United States v. Ness, 665 F.2d 248, 250 (8th Cir. 1981) ("where" a cross-examination question "neces-sarily encompasses a legal conclusion, a trial court may very properly conclude that a response would not be helpful to the trier of fact").  "In general, lay witnesses may not testify to an opinion that is simply a legal conclusion; lay testimony containing a legal conclusion conveys what may be erroneous legal standards to the jury, and invades the court's province in determining the applicable law and then instructing the jury." 4 Weinstein § 701.04 (citing numerous cases).

United States v. Baskes, 649 F.2d 471 (7th Cir. 1980), is especially instructive.  There, the Seventh Circuit held that the district court properly prohibited cross-examination of a key prosecution witness as to whether he "unlawfully, knowingly and wilfully conspire[d]" with the defendant and others to defraud the United States.  649 F.2d at 478.  The Seventh Circuit held

25

that this questioning contained legal terms of art and called for
improper opinion testimony by a non-expert witness:

> When, as here, a witness is asked whether the conduct
> in issue was "unlawful" or "wilful" or whether the
> defendants "conspired," terms that demand an under-
> standing of the nature and scope of the criminal law,
> the trial court may properly conclude that any response
> would not be helpful to the trier of fact.  The wit-
> ness, unfamiliar with the contours of the criminal law,
> may feel that the legal standard is either higher or
> lower than it really is.  If either event is true the
> jury may accord too much weight to such a legal conclu-
> sion.

Id. Here, contrary to Baskes and settled law, Forbes' cross-
examination of Corigliano during the first trial repeatedly
solicited Corigliano's lay opinion about whether he was "guilty
of the crime of insider trading." FTTr. 8944-46.  As Judge
Thompson ruled, Exhibit 1, at 10, such questioning calls for
legal conclusions from a lay witness, and is unhelpful to the
jury.

Second, Rule 403 authorizes this Court to limit defense
cross-examination when the testimony to be elicited will unduly
confuse the jury, relative to the probative value of that testi-
mony. See United States v. Crowley, 318 F.3d 401, 417 (2d Cir.
2003); United States v. Flaharty, 295 F.3d 182, 190-91 (2d Cir.
2002).  Fed. R. Evid. 611 is another source of this Court's
authority to limit defense cross-examination regarding marginally
relevant issues.  United States v. Maldonado-Rivera, 922 F.2d

934, 955-56 (2d Cir. 1990).[12]  As the Second Circuit has ex-

plained:

> It is settled that the scope and extent of cross-exami-
> nation lies within the discretion of the trial judge.
> A trial judge does not abuse his discretion by curtail-
> ing cross-examination as long as the jury has suffi-
> cient information to make a discriminating appraisal of
> the particular witness's possible motives for testify-
> ing falsely in favor of the government.

United States v. Scarpa, 913 F.2d 993, 1018 (2d Cir. 1990)

(internal citations and quotation marks omitted).

When the trial court otherwise permits extensive cross-

examination of a prosecution witness, as certainly occurred here

during the first and second trials, any particular limitation on

cross-examination is well within the court's broad discretion.

United States v. Roldan-Zapata, 916 F.2d 795, 806 (1990) (even a

"problematic" limitation on defense cross-examination was within

the district court's discretion given "the extensive cross-

examination" of the witness, which "adequately apprised the jury

of information enabling them to make a discerning appraisal of

[the witness's] credibility").  As the Second Circuit has ex-

plained:

-------

[12] Rule 611 provides in part that "[t]he court shall exer-
cise reasonable control over the mode and order of interrogating
witnesses and presenting evidence so as to (1) make the interro-
gation and presentation effective for the ascertainment of the
truth, (2) avoid needless consumption of time, and (3) protect
witnesses from harassment or undue embarrassment."  Fed. R. Evid.
611(a).  It further provides that "[c]ross-examination should be
limited to the subject matter of the direct examination and
matters affecting the credibility of the witness."  Fed. R. Evid.
611(b).

The Confrontation Clause guarantees the defendant in a criminal case the right to cross-examine the witnesses against her.  Nonetheless, the right is not illimitable:  trial judges retain wide latitude to impose reasonable limits on such cross-examination based on concerns about, among other things . . . confusion of the issues . . . or interrogation that is repetitive or only marginally relevant.  Cross-examination is not improperly curtailed if the jury is in possession of facts sufficient to make a discriminating appraisal of the particular witness's credibility.

United States v. Laljie, 184 F.3d 180, 192-93 (2d Cir. 1999)

(internal citations and punctuation omitted); accord United

States v. Salameh, 152 F.3d 88, 131 (2d Cir. 1998).

Here, as he did in the prior two trials, Forbes will be able to fully establish Corigliano's alleged bias in favor of the Government through testimony that Corigliano sold a large volume of Cendant stock while possessing material inside information which had drastically inflated the price of that stock, coupled with the fact that Corigliano was never charged with illegal insider trading.  From that evidence, Forbes can argue that, among the benefits that Corigliano received in return for his cooperation was a promise that he would not be prosecuted for insider trading.

What Forbes should not be entitled to argue however, as he did during the first trial, FTTr. 15138-39, 15179-81, but was prohibited from doing in the second, is that Corigliano lied to the jury when he claimed that he does not subjectively believe

28

that he was guilty of insider trading.[13]  As is obvious from
Corigliano's testimony during the first trial, his belief that he
was not guilty of insider trading was the result of advice he
received from his attorneys, and was based on the position that
one who possesses material inside information when he sells stock
is not guilty of insider trading if he did not "use" that infor-
mation in deciding whether or not to trade.  (Forbes took a
similar position at the first trial in Request No. 95 of his
Proposed Preliminary Jury Instructions.)[14]

---

[13] Forbes' counsel argued that Corigliano lied, not simply
because he denied selling stock when he had inside information
about the fraud, but specifically when he denied that he was
guilty of insider trading:

> As we'll see in more detail, in June of 2000, the time
> he entered his plea, the SEC files a lawsuit to recoup
> money that he earned by virtue of his stock sales,
> **which he said is not insider trading, one of the clas-
> sic lies of all time, which I'll describe in more
> detail later.**

Tr. 15138-39 (emphasis added).

[14] The Second Circuit has cast doubt on this position, but
ultimately has not held in a published opinion that one who
trades while in possession of material inside information commits
illegal insider trading regardless of whether he subjectively
"uses" that information.  United States v. Teicher, 987 F.2d 112,
119-21 (2d Cir. 1993).  Since Teicher, however, the SEC has
promulgated a regulation that "defines when a purchase or sale
constitutes trading 'on the basis of' material nonpublic informa-
tion in insider trading cases brought under Section 10(b) of the
Act and Rule 10b-5 thereunder."  17 C.F.R. § 240.10b5-1, prelimi-
nary note.  Rule 10b5-1 "is in the spirit of" Teicher, SEC v.
Lipson, 278 F.3d 656, 661 (7th Cir. 2002), and adopts safe
harbors that do not apply to Forbes in this case.

Particularly in a case where Forbes testified that he relied on the opinion of counsel that he could lawfully transfer his interest in millions of dollars of real property to his wife and daughters after the fraud in this case was publicly disclosed, FTTr. 14432-33, it would be extremely misleading for Forbes to claim that Corigliano is lying because he followed his lawyer's advice that he was not guilty of insider trading.  The jury is not properly equipped to make, and should not be required to make determinations about issues of law in deciding whether or not a witness's testimony is truthful.  See United States v. Bernhardt, 642 F. 2d 251, 253 (8th Cir. 1981).

Thus, because Corigliano, a non-lawyer, is not competent to determine whether or not he was guilty of insider trading, it would be improper for defense counsel to argue during summation (as counsel did during the first trial but was prohibited from doing in the second) that Corigliano had lied when he denied that he was guilty of insider trading.  Exhibit 1, at 10-11.  And because Corigliano's opinion about the crime of insider trading is incompetent regardless of when it was held, defense counsel should be precluded from arguing that, to the extent that he denied that he was guilty of insider trading when he spoke to Government investigators in January 1999, he was lying then as well.

Accordingly, during the third trial -- as Judge Thompson ruled in connection with the second trial -- defense counsel

should be prohibited from questioning Corigliano about his
layperson's understanding of the law, and from again arguing that
Corigliano lied when he denied that he was guilty of insider
trading.

**VI.  The Parties Should Redact Bates Numbers and Legends on
Documents to Be Introduced Or Displayed at Trial.**

During the second trial, with neither party objecting, the
jury received the following instruction:

> Many of the exhibits in this case were stamped "confi-
> dential" or with identification numbers and/or letters
> before being provided to the parties as part of the
> litigation process.  Many were stamped confidential
> pursuant to what is known as a protective order in
> civil litigation.  It is routine to stamp documents
> confidential or with identification numbers and/or
> letters before providing them in the litigation pro-
> cess, and protective orders are routine in civil liti-
> gation.  You are to draw no inference from the fact
> that a document was stamped confidential or with iden-
> tification numbers and/or letters before being pro-
> vided.  You are likewise to draw no inference from the
> fact that there was civil litigation, that a document
> was provided in civil litigation or that there was a
> protective order in that civil litigation.

Final Jury Charge, Section IV.B.  To avoid the need for such a
charge in this trial, the Government requests that the parties be
required to redact from any document that they wish to introduce
or display at trial any such identification marks and confidenti-
ality designations.  If this Court agrees, it should also require
that such material not be redacted from a document unless the
material was not part of the document originally but instead was
added to the document when responding to a formal or informal
discovery request.

31

**CONCLUSION**

For the foregoing reasons, the Government respectfully requests that the Court grant the Government's motion in limine in all respects.

Respectfully submitted,

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice

*Norman Gross/s*

By: NORMAN GROSS
    Special Attorney
    U.S. Department of Justice
    Federal Bar No. 24933
    MICHAEL MARTINEZ
    Special Attorney
    U.S. Department of Justice
    Federal Bar No. PHV0423

Dated: April 17, 2006
       Newark, New Jersey

EXHIBIT 1

EXHIBIT 2