# EXHIBIT 2

```
===============================================================================
                      SECURITIES AND EXCHANGE COMMISSION

                            WASHINGTON, D.C. 20549

                               ------------

                                 FORM 10-K/A
              ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
                       SECURITIES EXCHANGE ACT OF 1934
                  For the fiscal year ended December 31, 1997
                         COMMISSION FILE NO. 1-10308

                               ------------

                              CENDANT CORPORATION
              (Exact name of Registrant as specified in its charter)

        DELAWARE                                  06-0918165
(State or other jurisdiction                   (I.R.S. Employer
of incorporation or organization)            Identification Number)

        6 SYLVAN WAY                                07054
     PARSIPPANY, NEW JERSEY                      (Zip Code)
(Address of principal executive office)

                              (973) 428-9700
             (Registrant's telephone number, including area code)

                               ------------

         SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:


                                         NAME OF EACH EXCHANGE
        TITLE OF EACH CLASS               ON WHICH REGISTERED
        -------------------               ---------------------

    Common Stock, Par Value $.01         New York Stock Exchange
    5 7/8% Senior Notes due 1998         New York Stock Exchange
         FELINE PRIDES(SM)               New York Stock Exchange
         Income PRIDES(SM)               New York Stock Exchange
         Growth PRIDES(SM)               New York Stock Exchange
```

SECURITIES REGISTERED PURSUANT TO SECTION 12(G) OF THE ACT: NONE

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities and Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days: Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

The aggregate market value of the Common Stock issued and outstanding and held by nonaffiliates of the Registrant, based upon the closing price for the Common Stock on the New York Stock Exchange on September 25, 1998, was $11,480,920,000. All executive officers and directors of the registrant have been deemed, solely for the purpose of the foregoing calculation, to be "affiliates" of the registrant.

The number of shares outstanding of each of the Registrant's classes of common stock was 851,531,353 shares of Common Stock outstanding as at September 25, 1998.

===============================================================================

Providian Acquisition. On December 10, 1997, the Company announced that it had entered into a definitive agreement to acquire Providian Auto and Home Insurance Company ("Providian") and its subsidiaries from an Aegon N.V. subsidiary for approximately $219 million in cash. Providian sells automobile insurance to consumers through direct response marketing in 45 states and the District of Columbia. The closing of this transaction is subject to customary conditions, including regulatory approval and no assurances can be made that the acquisition will be completed. Prior to the acquisition the name of Providian will be changed to Cendant Auto Insurance Company ("Cendant Auto"). The Company intends to expand Cendant Auto's marketing channels to the Company's existing distribution channels, while also providing the Company's existing customer base with a new product offering.

National Parking Corporation. On April 27, 1998, the Company completed the acquisition of National Parking Corporation ("NPC") for $1.6 billion in cash, which included the repayment of approximately $227 million of outstanding NPC debt. NPC is the largest private (non-municipality owned) single car park operator in the United Kingdom, with a portfolio of approximately 500 owned and managed car parks in over 100 towns and city centers and major airport locations. NPC, through its acquisitions of National Breakdown Limited and UK Insurance Limited in 1984, has also developed a broad-based assistance group, under the brand name of Green Flag. Green Flag offers a wide range of emergency support and rescue services to approximately 3.5 million members.

RAC Motoring Services Acquisition. On May 21, 1998, the Company announced that it has reached definitive agreements with the Board of Directors of Royal Automobile Club ("RAC") to purchase RAC Motoring Services ("RACMS") for total consideration of \P450 million, or approximately $735 million in cash. As part of the purchase price, the Company has agreed to make a charitable endowment of \P13 million to the RAC Foundation to promote awareness and understanding of the environmental issues related to mobility and the use of motor vehicles, and to help promote, research and investigate solutions.

On June 19, 1998, members of the RAC approved the first stage of the two-step process to implement the sale of RACMS to the Company. On July 8, 1998, the U.K. Court approved the reorganization within the RAC group companies  The final stage of the process involves the sale of RACMS to the Company. On August 12, 1998, the shareholders of RACMS approved the sale of RACMS to the Company. On September 24, 1998, the U.K. Secretary of State for Trade and Industry referred the RACMS acquisition to the U.K. Monopolies and Mergers Commission (the "MMC"). The closing of this transaction is subject to certain conditions, including MMC approval. Although no assurances can be made, the Company currently anticipates that the transaction will be completed in the spring of 1999.

RACMS operates in three principal segments -- The RAC, the U.K.'s second largest roadside assistance company with over 6 million associate members, including 2.7 million under fleet programs and car manufacturers warranty programs, and 2.9 million direct individual members, and London Wall Insurance, a provider of auto warranty products. RACMS also owns the British School of Motoring (BSM), the U K.'s largest driving school company. Sales for 1997, adjusted for the acquisition of BSM, were approximately $500 million.

Sale of Hebdo Mag and Plan to Sell Software Business. On August 12, 1998, the Company announced that it agreed to sell 100% of its Hebdo Mag International, Inc. ("Hebdo Mag") subsidiary to a company organized by Hebdo Mag management for approximately 7 million shares of Company common stock and $410 million in cash. The sale of Hebdo Mag is conditioned upon, among other things, the receipt of certain governmental approvals and financing. The transaction is expected to be completed in the fourth quarter of 1998.

The Company also announced that it has engaged Credit Suisse First Boston to analyze strategic alternatives in regard to the potential 100% initial public offering or a third party sale of its entire consumer software business unit.

Interval Divestiture. On December 17, 1997, in connection with the Merger, the Company completed the divestiture of its timeshare exchange subsidiary, Interval International Inc., as contemplated by a consent decree with the Federal Trade Commission.

MATTERS RELATING TO THE ACCOUNTING IRREGULARITIES AND ACCOUNTING POLICY CHANGE

Accounting Irregularities. On April 15, 1998, the Company announced that in the course of transferring responsibility for the Company's accounting functions from the former CUC personnel to HFS accounting personnel and preparing for the reporting of first quarter 1998 financial results, it had

3

discovered accounting irregularities in certain CUC business units. As a result, upon discovering such accounting irregularities in certain former CUC business units, the Company together with its counsel and assisted by auditors, immediately began an intensive investigation (the "Company Investigation"). In addition, the Audit Committee of the Board of Directors engaged Willkie Farr & Gallagher ("Willkie Farr") as special legal counsel and Willkie Farr engaged Arthur Andersen LLP to perform an independent investigation into these accounting irregularities (the "Audit Committee Investigation," together with the Company Investigation, the "Investigations"). On July 14, 1998, the Company announced that the accounting irregularities were greater than those initially discovered in April and that the irregularities affected the accounting records of the majority of the CUC business units. On August 13, 1998, the Company announced that the Company Investigation was complete. On August 27, 1998, the Company announced that the Audit Committee of the Board of Directors had submitted its report (the "Report") to the Board of Directors on the Audit Committee Investigation into the accounting irregularities and its conclusions regarding responsibility for those actions. A copy of the Report has been filed as an exhibit to the Company's Current Report on Form 8-K dated August 28, 1998. As a result of the findings of the Investigations, the Company has restated its previously reported financial results for 1997, 1996 and 1995. The restated financial statements also include the cumulative effect of a change in accounting, effective January 1, 1997, related to revenue and expense recognition for memberships (see Note 3 to the consolidated financial statements).

The restated net income (loss) totalled $(217.2) million, $330.0 million and $229.8 million in 1997, 1996 and 1995, respectively ($(0.27), $0.41 and $0.31 per diluted share, respectively). The Company originally reported corresponding net income of $55.4 million, $423.6 million and $302.8 million in 1997, 1996 and 1995, respectively ($0.06, $0.52 and $0.42 per diluted share, respectively).

The Company originally reported $872.2 million of 1997 net income excluding merger-related costs and other unusual charges ("Unusual Charges") or $1.00 per diluted share which included $816.2 million or $.94 per diluted share from continuing operations. The restated income from continuing operations excluding Unusual Charges, extraordinary gain and the cumulative effect of a change in accounting totalled $571.0 million or $.66 per diluted share. The $245.2 million or $.28 per diluted share decrease in income from continuing operations represents additional after tax expense of $15.3 million ($.02 per diluted share) due to the aforementioned change in accounting and $229.9 million ($.26 per diluted share) of accounting errors and irregularities.

The Company originally reported $542.3 million and $364.9 million of 1996 and 1995 net income excluding Unusual Charges, respectively ($0.67 and $0.50 per diluted share, respectively). The restated income from continuing operations excluding Unusual Charges totalled $383.3 million and $269.2 million in 1996 and 1995, respectively ($0.47 and $0.36 per diluted share, respectively). The $159.0 million and $95.7 million decreases in 1996 and 1995, respectively, primarily represent accounting errors and irregularities in both periods.

Class Action Litigation and Government Investigation. As a result of the aforementioned accounting irregularities, numerous purported class action lawsuits, two purported derivative lawsuits and an individual lawsuit have been filed against the Company, and among others, its predecessor, HFS, and certain current and former officers and directors of the Company and HFS, asserting various claims under the federal securities laws and certain state statutory and common laws. SEE "ITEM 3. LEGAL PROCEEDINGS".

In addition, the staff of the Securities and Exchange Commission (the "SEC") and the United States Attorney for the District of New Jersey are conducting investigations (the "Government Investigations") relating to the accounting irregularities. The SEC staff has advised the Company that its inquiry should not be construed as an indication by the SEC or its staff that any violations of law have occurred. While management has made all adjustments considered necessary as a result of the findings of the Investigations and the restatement of the Company's financial statements for 1997, 1996 and 1995, there can be no assurances that additional adjustments will not be required as a result of the Government Investigations.

Management and Corporate Governance Changes. On July 28, 1998, Walter A. Forbes resigned as Chairman of the Company and as a member of the Board of Directors. Henry R. Silverman, Chief Executive Officer of the Company, was unanimously elected by the Board of Directors to be Chairman and will continue to serve as Chief Executive Officer and President of the Company. Ten members of the Board formerly associated with CUC also resigned, leaving the Company with 18 directors.

4

ITEM 2. PROPERTIES

The principal executive offices of the Company are located in a building owned by the Company and situated at 6 Sylvan Way, Parsippany, New Jersey 07054.

The Travel Services Division owns two properties, a 166,000 facility in Virginia Beach, Virginia which serves as a satellite administrative and reservations facility for Wizcom and ARAC, and a property located in Kettering, Europe which is the European office for RCI. The Travel Services Division also leases space for its reservations centers and data warehouse in Winner and Aberdeen, South Dakota; Phoenix, Arizona; Knoxville and Elizabetown, Tennessee; Tulsa and Drumright, Oklahoma; Indianapolis, Indiana; Orangeburg, South Carolina and St. John, New Brunswick, Canada pursuant to leases that expire in 2000, 2003, 2007, 2015, 2004, 1999, 2001, 2000/2001, 2008, 2008 and 2008 respectively. The Tulsa, Oklahoma location serves as an Avis car rental reservations center. In addition, the Travel Services Division has 38 leased offices spaces located in various countries outside the United States.

The Real Estate Services Division has two owned buildings in Mission Viejo, California, one in Westbury, New York and one owned internationally in Swindon, UK. The Real Estate Services Division has leased properties located in Danbury, Connecticut; Oak Brook and Schaumburg, Illinois, Mount Laurel, New Jersey and Walnut Creek, CA, pursuant to leases that expire in 2003, 2001, 2001, and 2003, respectively. The Real Estate Services Division shares approximately 6 leases with the Travel Services Division in various locations that function as sales offices.

The Alliance Marketing Division's principal offices are located in Stamford and Trumbull, Connecticut. The Alliance Marketing Division has an owned building that is located in Cheyenne, Wyoming and also leases space for several of its call centers in Aurora, Colorado; Westerville, Ohio, Brentwood, Tennessee; Nashville, Tennessee; Houston and Arlington, Texas; San Carlos, California and Woburn, Massachusetts and Great Falls, Montana pursuant to leases that expire in 2000, 2005, 2002, 2006, 2000, 2000, 2003, 2001 and 1999, respectively. In addition, the Alliance Marketing Division has leased smaller space in various locations for business unit and ancillary needs. Internationally, the Alliance Marketing Division has approximately 45 leased office spaces located in various countries.

The Company owns properties located in Torrance and Oakhurst, California and Virginia Beach, Virginia and leases 9 office spaces internationally, which represent space for businesses classified as "Other". In addition, there are approximately 66 sales offices and other ancillary office space leased in locations around the country.

Management believes that such properties are sufficient to meet its present needs and does not anticipate any difficulty in securing additional space, as needed, on terms acceptable to the Company.

ITEM 3. LEGAL PROCEEDINGS

As described in Item 1 above, as a result of the discovery of accounting irregularities in the former CUC business units and the investigation of the Audit Committee of the Company's Board of Directors into such matters, the Company has restated its previously reported financial results for 1997, 1996 and 1995.

Since the Company's announcement of the discovery of such irregularities on April 15, 1998, and prior to the date hereof, seventy-one purported class action lawsuits and one individual lawsuit have been filed against the Company, and certain current and former officers and directors of the Company and HFS, asserting various claims under the federal securities laws (the "Federal Securities Actions"). Some of the actions also name as defendants Merrill Lynch & Co. and, in one case, Chase Securities Inc., underwriters for the Company's PRIDES securities offerings; two others also name Ernst & Young LLP, the Company's former independent accountants. Sixty-four of the Federal Securities Actions were filed in the United States District Court for the District of New Jersey, six were filed in the United States District Court for the District of Connecticut (including the individual action), one was filed in the United States District Court for the Eastern District of Pennsylvania and one was filed in New Jersey Superior Court. The Federal Securities Actions filed in the District of Connecticut and the Eastern District of Pennsylvania have been transferred to the District of New Jersey. On June 10, 1998, the Company moved to dismiss or

32

stay the Federal Securities Action filed in New Jersey Superior Court on the ground that, among other things, it is duplicative of the actions filed in federal courts. The court granted that motion on August 7, 1998, without prejudice to the plaintiff's right to re-file the case in the District of New Jersey

Certain of the Federal Securities Actions purport to be brought on behalf of purchasers of the Company's common stock and/or options on common stock during various periods, most frequently beginning May 28, 1997 and ending April 15, 1998 (although the alleged class periods begin as early as March 21, 1995 and end as late as July 15, 1998). Others claim to be brought on behalf of persons who exchanged HFS common stock for the Company's common stock in connection with the Merger. Some plaintiffs purport to represent both of these types of investors. In addition, eight actions pending in the District of New Jersey purport to be brought, either in their entirety or in part, on behalf of purchasers of the Company's PRIDES securities. The complaints in the Federal Securities Actions allege, among other things, that as a result of accounting irregularities, the Company's previously issued financial statements were materially false and misleading and that the defendants knew or should have known that these financial statements caused the prices of the Company's securities to be inflated artificially. The Federal Securities Actions variously allege violations of Section 10(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, Section 20(a) of the Exchange Act, and Sections 11, 12 and 15 of the Securities Act of 1933, as amended (the "Securities Act"). Certain actions also allege violations of common law. The individual action also alleges violations of Section 18(a) of the Exchange Act and the Florida securities law. The class action complaints seek damages in unspecified amounts. The individual action seeks damages in the amount of approximately $9 million plus interest and expenses.

On May 29, 1998, United States Magistrate Judge Joel A. Pisano entered an Order consolidating the 50 Federal Securities Actions that had at that time been filed in the United States District Court for the District of New Jersey under the caption In re: Cendant Corporation Litigation, Master File No. 98-1664 (WHW). Pursuant to the Order, all related actions subsequently filed in the District of New Jersey are also to be consolidated under that caption United States District Judge William H. Walls has selected lead plaintiffs to represent all potential class members in the consolidated action. He has also ordered that applications seeking appointment as lead counsel to represent the lead plaintiffs are to be filed with the Court by September 17, 1998. The selection of lead counsel is pending

In addition, on April 27, 1998, a purported shareholder derivative action, Deutch v. Silverman, et al., No. 98-1999 (WHW), was filed in the District of New Jersey against certain of the Company's current and former directors and officers; The Bear Stearns Companies, Inc., Bear Stearns & Co., Inc.; and, as a nominal party, the Company. The complaint in the Deutch action alleges that certain individual officers and directors of the Company breached their fiduciary duties by selling shares of the Company's stock while in possession of non public material information concerning the accounting irregularities. The complaint also alleges various other breaches of fiduciary duty, mismanagement, negligence and corporate waste, and seeks damages on behalf of the Company

Another action, entitled Corwin v. Silverman, et al., No. 16347-NC, was filed on April 29, 1998 in the Court of Chancery for the State of Delaware. The Corwin action is purportedly brought both derivatively, on behalf of the Company, and as a class action, on behalf of all shareholders of HFS who exchanged their HFS shares for the Company's shares in connection with the Merger The Corwin action names as defendants HFS and twenty-eight individuals who are or were directors of Cendant and HFS. The complaint in the Corwin action, as amended on July 28, 1998, alleges that HFS and its directors breached their fiduciary duties of loyalty, good faith, care and candor in connection with the Merger, in that they failed to properly investigate the operations and financial statements of the Company before approving the Merger at an allegedly inadequate price. The amended complaint also alleges that the Company's directors breached their fiduciary duties by entering into an employment agreement with Cendant's former Chairman, Walter Forbes, in connection with the Merger that purportedly amounted to corporate waste. The Corwin action seeks, among other things, rescission of the Merger and compensation for all losses and damages allegedly suffered in connection therewith.

The staff of the SEC and the United States Attorney for the District of New Jersey are conducting investigations relating to the matters referenced above. The SEC staff has advised the Company that its inquiry should not be construed as an indication by the SEC or its staff that any violations of law have occurred

33

ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND
        RESULTS OF OPERATIONS

GENERAL OVERVIEW

On December 17, 1997, Cendant Corporation (the "Company") was created through the merger (the "Cendant Merger") of HFS Incorporated ("HFS") and CUC International Inc. ("CUC"). The Company is one of the foremost consumer and business services companies in the world. The combination of HFS and CUC provides the Company's businesses new access to consumer contacts through the Company's expanded consumer base, while providing such businesses with the direct marketing expertise necessary to successfully cross market within its existing business units.

The Company provides fee-based services to consumers within the Travel, Real Estate and Alliance Marketing business segments. The Company generally does not own the assets or share the risks associated with the underlying businesses of its customers. In the Travel Services segment, the Company is the world's largest franchisor of lodging facilities and rental car facilities, the leading provider of vacation timeshare exchange services and a leading provider of international fleet management services. In the Real Estate Services segment, the Company is both the world's largest franchisor of residential real estate brokerage offices and provider of corporate relocation services and is a leading mortgage lender in the United States. In the Alliance Marketing segment, the Company is a leading provider of membership consumer services and products.

As publicly announced on April 15, 1998, the Company discovered accounting irregularities in the former CUC business units. The Audit Committee of the Company's Board of Directors (the "Audit Committee") initiated an investigation into such matters, which has since been completed (see "Litigation"). As a result of the findings of the Audit Committee investigation and the Company's investigation, the Company has restated its financial results for the years 1995 through 1997. The financial information contained herein has been restated to incorporate all relevant information obtained from the aforementioned investigations. The 1997 annual results, presented herein, have also been restated for a change in accounting, effective January 1, 1997, related to revenue and expense recognition for memberships (See Notes 2 and 3 to the consolidated financial statements).

The restated net income (loss) totalled $(217.2) million, $330.0 million and $229.8 million in 1997, 1996 and 1995, respectively ($(0.27), $0.41, and $0.33 per diluted share, respectively). The Company originally reported corresponding net income of $55.4 million, $423.6 million and $302.8 million in 1997, 1996 and 1995, respectively ($0.06, $0.52 and $0.42 per diluted share, respectively).

The Company originally reported $872.2 million of 1997 net income excluding merger-related costs and other unusual charges ("Unusual Charges") or $1.00 per diluted share which included $816.2 million or $.94 per diluted share from continuing operations. The restated income from continuing operations excluding Unusual Charges, extraordinary gain and the cumulative effect of a change in accounting totalled $571.0 million or $.66 per diluted share. The $245.2 million or $.28 per diluted share decrease in income from continuing operations represents additional after-tax expense of $15.3 million ($.02 per diluted share) due to the aforementioned change in accounting and $229.9 million ($.26 per diluted share) of accounting errors and irregularities.

The Company originally reported $542.3 million and $364.9 million of 1996 and 1995 net income excluding Unusual Charges, respectively ($0.67 and $0.50 per diluted share, respectively). The restated income from continuing operations excluding Unusual Charges totalled $383.3 million and $269.2 million in 1996 and 1995, respectively ($0.47 and $0.36 per diluted share, respectively). The $159.0 million and $95.7 million decreases in 1996 and 1995, respectively, primarily represent accounting errors and irregularities in both periods.

RESULTS OF OPERATIONS

This discussion should be read in conjunction with the information contained in the Company's Consolidated Financial Statements and accompanying Notes thereto appearing elsewhere in this Form 10-K/A.

The operating results of the Company and its underlying business segments are comprised of business combinations, which were accounted for as poolings of interests. Accordingly, all financial information has been restated as if all of the pooled companies operated as one entity since inception. In addition, the Company and certain of its business segments also include businesses, which were acquired and accounted

38

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

                          CENDANT CORPORATION

                          By: /s/ James E. Buckman
                          -----------------------------------

                          James E. Buckman

                          Senior Executive Vice President
                          and General Counsel
                          Date: September 28, 1998

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
| --- | --- | --- |
| /s/ Henry R. Silverman<br>(Henry R. Silverman) | Chairman of the Board, President, Chief Executive Officer and Director | September 28, 1998 |
| /s/ Michael P. Monaco<br>(Michael P. Monaco) | Vice Chairman, Chief Financial Officer and Director (Principal Financial Officer) | September 28, 1998 |
| /s/ Scott E. Forbes<br>(Scott E. Forbes) | Executive Vice President -- Finance (Principal Accounting Officer) | September 28, 1998 |
| /s/ Stephen P. Holmes<br>(Stephen P Holmes) | Vice Chairman and Director | September 28, 1998 |
| /s/ Robert D. Kunisch<br>(Robert D Kunisch) | Vice Chairman and Director | September 28, 1998 |
| /s/ Christopher K. McLeod<br>(Christopher K. McLeod) | Vice Chairman and Director | September 28, 1998 |
| /s/ James E. Buckman<br>(James E. Buckman) | Senior Executive Vice President, General Counsel and Director | September 28, 1998 |
| /s/ John D. Snodgrass<br>(John D. Snodgrass) | Director | September 28, 1998 |
| /s/ Leonard S. Coleman<br>(Leonard S. Coleman) | Director | September 28, 1998 |
| /s/ Martin L. Edelman<br>(Martin L. Edelman) | Director | September 28, 1998 |
| /s/ Dr. Carole G. Hankin<br>(Dr. Carole G. Hankin) | Director | September 28, 1998 |

| SIGNATURE | TITLE | DATE |
|---|---|---|
| /s/ Brian Mulroney<br>(The Rt. Hon. Brian Mulroney, P.C., LL.D) | Director | September 28, 1998 |
| /s/ Robert W. Pittman<br>(Robert W. Pittman) | Director | September 28, 1998 |
| /s/ E. John Rosenwald, Jr.<br>(E. John Rosenwald, Jr.) | Director | September 28, 1998 |
| /s/ Robert P. Rittereiser<br>(Robert P. Rittereiser) | Director | September 28, 1998 |
| /s/ Leonard Schutzman<br>(Leonard Schutzman) | Director | September 28, 1998 |
| /s/ Robert F. Smith<br>(Robert F. Smith) | Director | September 28, 1998 |
| /s/ Craig R. Stapleton<br>(Craig R. Stapleton) | Director | September 28, 1998 |
| /s/ Robert E. Nederlander<br>(Robert E. Nederlander) | Director | September 28, 1998 |

Mortgage. Loan origination fees, commitment fees paid in connection with the sale of loans, and direct loan origination costs associated with loans held for resale, are deferred until the loan is sold. Fees received for servicing loans owned by investors are based on the difference between the weighted average yield received on the mortgages and the amount paid to the investor, or on a stipulated percentage of the outstanding monthly principal balance on such loans. Servicing fees are credited to income when received. Costs associated with loan servicing are charged to expense as incurred.

Sales of mortgage loans are generally recorded on the date a loan is delivered to an investor. Sales of mortgage securities are recorded on the settlement date. The Company acquires mortgage-servicing rights by originating or purchasing mortgage loans and selling those loans with servicing retained, or it may purchase mortgage-servicing rights separately. The carrying value of mortgage-servicing rights is amortized over the estimated life of the related loan portfolio. Such amortization is recorded as a reduction of loan servicing fees in the consolidated statements of operations. Gains or losses on the sale of mortgage servicing rights are recognized when title and all risks and rewards have irrevocably passed to the buyer and there are no significant unresolved contingencies. Gains or losses on sales of mortgage loans are recognized based upon the difference between the selling price and the carrying value of the related mortgage loans sold. Such gains and losses are also increased or decreased by the amount of deferred mortgage-servicing fees recorded.

Lifestyle product sales. Product sale revenue primarily represents the sale of entertainment books, gift wrapping and other products to schools, churches and other charitable organizations on a consignment basis. Revenue is recognized when the consignee generates a sale to the ultimate consumer.

Insurance. Insurance premiums received for the sale of accidental death and dismemberment insurance ("AD&D") are recognized upon execution of underlying agreements with consumers. The Company transfers the risk of insurance, administration of claims and balance of premiums to third party insurance companies. Also, the Company recognizes its percentage share of the excess of premiums transferred over claims costs and insurance company administrative retention, based on actual and actuarially determined future claims costs.

Membership. Prospective club members receive a free three month trial membership for which they are under no obligation to commit to purchase nor pay for such membership. Memberships are generally billed to credit cards upon expiration of the trial period. Memberships are cancellable for a full refund of the membership fee during the entire membership period, generally 1 year. Membership revenue is recognized upon the expiration of the membership period (See ACCOUNTING CHANGE FOR MEMBERSHIPS).

ACCOUNTING CHANGE FOR MEMBERSHIPS
Prior to 1997, the Company recorded deferred membership income, net of estimated cancellations, at the time members were billed (upon expiration of the free trial period), which was recognized as revenue ratably over the membership term and modified periodically based on actual cancellation experience. In addition, membership acquisition and renewal costs, which related primarily to membership solicitations were capitalized as direct response advertising costs due to the Company's ability to demonstrate that the direct response advertising resulted in future economic benefits. Such costs were amortized on a straight-line basis as revenues were recognized (over the average membership period). The Company believed that such accounting policies were appropriate and consistent with industry practice.

In August 1998, in connection with the Company's cooperation with the Securities and Exchange Commission ("SEC") investigation of accounting irregularities discovered in the former CUC business units, the SEC concluded that when membership fees are fully refundable during the entire membership period, membership revenue should be recognized at the end of the membership period upon the expiration of the refund offer. The SEC Staff further concluded that non-refundable solicitation costs should be expensed as incurred since such costs are not recoverable if membership fees are refunded.

The Company agreed to adopt such accounting policies effective January 1, 1997 and recorded a cumulative adjustment on such date for the cumulative impact of the accounting change (see Note 3--Restatement--Accounting Change).

ADVERTISING EXPENSES
The Company formerly expensed all advertising costs, other than direct response advertising costs, in the period incurred. As a result of the change in accounting for memberships (see Accounting change for memberships), the Company's policy is to expense all advertising costs in the period incurred. Advertising expenses for the years ended December 31, 1997, 1996 and 1995 were $898.2 million, $805.6 million and $653.9 million, respectively.

INCOME TAXES
The provision for income taxes includes deferred income taxes resulting from items reported in different periods for income tax and financial statement purposes. Deferred tax assets and liabilities represent the expected future tax consequences of the differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. The effects of changes in tax rates on deferred tax assets and liabilities are recognized in the period that includes the enactment date. No provision has been made for U.S. income taxes on approximately $199.6 million of cumulative undistributed earnings of foreign subsidiaries at December 31, 1997 since it is the present intention of management to reinvest the undistributed earnings indefinitely in foreign operations. The determination of unrecognized deferred U.S. tax liability for unremitted earnings is not practicable.

TRANSLATION OF FOREIGN CURRENCIES
Assets and liabilities of foreign subsidiaries are translated at the exchange rates as of the balance sheet dates, equity accounts are translated at historical exchange rates and revenues, expenses and cash flows are translated at the average exchange rates for the periods presented. Translation gains and losses are included as a component of shareholders' equity.

NEW ACCOUNTING STANDARD
In June 1998, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards ("SFAS") No. 133 "Accounting for Derivative Instruments and Hedging Activities" for fiscal years beginning after June 15, 1999. SFAS No. 133 requires the recognition of all derivatives in the consolidated balance sheet as either assets or liabilities measured at fair value. The Company will adopt SFAS No. 133 effective for the 2000 calendar year end. The Company has not yet determined the impact SFAS No. 133 will have on its financial position or results of operations when such statement is adopted

3. RESTATEMENT

As publicly announced on April 15, 1998, the Company discovered accounting irregularities in certain business units of CUC. The Audit Committee of the Company's Board of Directors initiated an investigation into such matters (See Note 17). As a result of the findings of the Audit Committee investigation and Company investigation, the Company has restated previously reported annual results including the 1997, 1996 and 1995 financial information set forth herein. The 1997 annual results have also been restated for a change in accounting, effective January 1, 1997, related to revenue and expense recognition for memberships (see "Accounting Change")

While management has made all adjustments considered necessary as a result of the investigation into accounting irregularities and the preparation and audit of the restated financial statements for 1997, 1996 and 1995, there can be no assurances that additional adjustments will not be required as a result of the SEC investigation.

The following statements of operations and balance sheets reconcile previously reported and restated financial information.

F-17