# EXHIBIT 3

**U.S. Securities and Exchange Commission**

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

SECURITIES EXCHANGE ACT OF 1934
Release No. 42933 / June 14, 2000

ACCOUNTING AND AUDITING ENFORCEMENT
Release No. 1272 / June 14, 2000

ADMINISTRATIVE PROCEEDING
File No. 3-10225

| | |
|---|---|
| **In the Matter of** <br><br> **CENDANT CORPORATION,** <br><br> Respondent. | ORDER INSTITUTING PUBLIC ADMINISTRATIVE PROCEEDINGS PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that public administrative proceedings be, and hereby are, instituted pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") against CENDANT Corporation ("CENDANT" or "Respondent").

**II.**

In anticipation of the institution of these administrative proceedings, Cendant has submitted an Offer of Settlement ("Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings, and any other proceeding brought by or on behalf of the Commission, or in which the Commission is a party, without admitting or denying the findings set forth below, except as to jurisdiction of the Commission over it and over the subject matter of these proceedings, which Respondent admits, Respondent consents to the entry of this Order Instituting Public Administrative Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order") set forth below.

Accordingly, it is ordered that proceedings pursuant to Section 21C of the Exchange Act be, and hereby are, instituted.

III.

**FACTS**

The Commission makes the following findings:[1]

**A. RESPONDENT**

Cendant, a Delaware corporation with its headquarters in New York City, was created through the December 17, 1997, merger of HFS Incorporated ("HFS") and CUC International Inc. ("CUC"). Cendant provides certain membership-based and Internet-related consumer services and controls franchise brand names in the hotel, residential real estate brokerage, car rental, and tax preparation businesses. As of March 1, 2000, Cendant's common stock, Income PRIDES, and Growth PRIDES were registered pursuant to Section 12(b) of the Exchange Act and traded on the New York Stock Exchange ("NYSE"). Cendant's 6.45% Trust Originated Preferred Securities, 7 3/4% Notes due 2003, and 3% Convertible Subordinate Notes due 2002 were registered pursuant to Section 12(g) of the Exchange Act.

**B. OTHER RELEVANT ENTITIES**

**1. HFS Incorporated**

HFS, a Delaware corporation that had its headquarters in Parsippany, New Jersey, was principally a controller of franchise brand names in the hotel, real estate brokerage, and car rental businesses. Its securities were registered pursuant to Section 12(b) of the Exchange Act and traded on the NYSE.

**2. CUC International Inc.**

CUC, a Delaware corporation that had its headquarters in Stamford, Connecticut, was principally engaged in membership-based consumer services, such as auto, dining, shopping, and travel "clubs." CUC's largest division, Comp-U-Card, marketed individual memberships in these clubs. CUC's securities were registered pursuant to Section 12(b) and traded on the NYSE.

**C. THE CENDANT MERGER**

Pursuant to the Agreement and Plan of Merger between CUC and HFS, on December 17, 1997, HFS was merged with and into CUC, with CUC continuing as the surviving corporation and changing its name to Cendant Corporation. The transaction was structured as a "merger of equals." Moreover, upon consummation of the merger, Cendant attempted to conduct its business with parallel, but separate, financial reporting structures for the legacy HFS operations in New Jersey and the legacy CUC operations in Connecticut.[2]

**D. SUMMARY**

This proceeding involves a massive fraudulent financial reporting scheme

that caused dramatic investor losses. For more than twelve years, until its exposure in 1998, certain members of CUC's senior and middle management devised and operated a systemic, systematic scheme to inflate operating income at CUC.[3] The scheme was driven by senior management's determination that CUC would always meet the earnings expectations of Wall Street analysts and fueled by disregard for any obligation that the earnings reported needed to be "real."

CUC senior management overseeing the scheme maintained an annual schedule listing revenue and operating income for each of the company's divisions for its current fiscal year and coming fiscal year and setting forth the so-called "opportunities" or means available for inflating the company's operating income during the coming year. At the beginning of each fiscal year, management decided which of these opportunities to use for that fiscal year and the amount needed from each such opportunity. Accordingly, the schedule served as management's "cheat sheet" for any given year.

CUC management utilized four principal categories of opportunities to inflate the company's income and earnings. Two of those categories involved the company's sales of membership products. First, management manipulated recognition of the company's membership sales revenues. Second, management improperly utilized two liability accounts related to membership sales, consistently maintaining inadequate balances in the accounts and on occasion reversing the accounts directly into operating income. To hide the inadequate balances, management periodically kept certain membership sales transactions off-books.

The remaining two categories of opportunities involved the company's merger and purchase reserves.[4] In what was the most significant category quantitatively, CUC management intentionally overstated merger and purchase reserves and subsequently reversed those reserves directly into operating expenses and revenues. Finally, management improperly wrote off assets -- including assets that were unimpaired -- and improperly charged the write-offs against the company's merger reserves. The improper write-offs inflated operating income in various ways. CUC management directed some of the write-offs to improper reporting periods, thereby manipulating results by avoiding charges in the period in which the write-offs should have been taken. In some instances, write-offs should have been taken against operating income but instead were improperly charged against merger reserves. In other cases, the assets were not impaired, and by taking the write-offs management avoided continuing depreciation or amortization costs. Together, the four categories of opportunities added an aggregate of more than $500 million to the company's pre-tax operating income during the fiscal years ended January 31, 1996; January 31, 1997; and December 31, 1997.[5] Of that amount, more than half -- approximately $260 million -- was added to the fiscal year ended December 31, 1997.[6]

CUC senior management supervised the scheme over the course of each fiscal year. Beginning in at least 1988, management regularly made certain aggregate changes to CUC's reported quarterly financial results. Accordingly, at the end of each of the company's first three fiscal quarters, senior managers took the company's actual results for the quarter and compared them with the quarterly expectations of analysts. The senior

managers then directed mid-level financial reporting managers at CUC corporate headquarters to add whatever amounts were needed in order to bring CUC's quarterly income up to analysts' expectations. Thus, for each of the first three quarters of a CUC fiscal year, the managers artificially inflated revenues and decreased operating expenses. In conjunction with these income statement changes, the managers also cosmetically altered certain CUC balance sheet items.

The fraudulent and artificial income statement and balance sheet alterations were simply inserted quarterly into a spreadsheet kept at CUC's financial reporting operations at Stamford, Connecticut. The quarterly changes were made solely as top-side adjustments in the spreadsheet -- that is, no journal entries were made, the company's general ledger was not altered, and the changes were not carried down to the books of the company's divisions. The spreadsheet was then used to generate consolidated financial statements for the company, and those consolidated financial statements were used for the company's press releases and quarterly reports. Accordingly, the company's quarterly reports filed with the Commission and released to investors did not accurately reflect the company's books and records. Moreover, quarter by quarter, the discrepancy between the company's quarterly reports and its books and records grew wider and wider. For example, the quarterly top-side alterations aggregated $31 million for the company's fiscal year ended January 31, 1996; an additional $87 million for its fiscal year ended January 31, 1997; and another $176 million for its fiscal year ended December 31, 1997.

At the end of each fiscal year, the CUC managers implementing the scheme utilized the previously targeted opportunities to inflate the company's annual results as recorded on its books and records, so that the books and records would be consistent with the financial results already released and so that CUC's reported annual income would, in fact, meet the expectations of Wall Street analysts. As the scheme progressed over the course of several years, larger and larger opportunities were required. Eventually, only massive merger-related opportunities could sustain the scheme, and the need for such opportunities ultimately led CUC to seek a merger with HFS.

In furtherance of their scheme, CUC managers falsified the company's books and records and failed to implement a system of internal accounting controls. In general, the managers simply created whatever entries were needed to accomplish their goals, regardless of whether the entries were in any way grounded in the fiscal or business realities of CUC. Moreover, to conceal the scheme, at year-end they repeatedly and regularly used unsupported post-closing journal entries carrying effective dates spread retroactively over prior months.[2] At times, an unsupported entry would be broken into smaller component entries to make the adjustments less noticeable. Other entries were intentionally created in odd amounts to hide the fact that the entries were completely fictitious. When merger reserves were initially established, amounts were routinely and intentionally overstated. At times, reversals of merger reserves were designated as revenues. As noted, the quarterly consolidated financial statements were largely fictional. Membership sales cancellations and rejects were intentionally kept off-books for extended periods of time. At times, intercompany transactions were used to hide the offsets to specific entries.

The scheme was designed to inflate CUC's income and earnings, and it did just that: as a result of the scheme, CUC filed periodic reports and other filings that overstated income, earnings, and certain of its assets. In sum, those reports and filings misrepresented the company's true financial condition and results of operations.

### E. THE SCHEME

#### 1. Ensuring That Results Will Be What the Street Expects

Beginning as early as 1985, certain members of CUC's senior management implemented a scheme designed to ensure that CUC always met the financial results anticipated by Wall Street analysts. Analysts were led to expect gradual, constantly increasing earnings growth at CUC, with increases of about a penny per share each quarter. Senior management utilized a variety of means -- or so-called opportunities -- to achieve their goals. In the earlier years of the scheme, senior management relied in large part on manipulating recognition of the company's membership sales revenue. An additional set of procedures involved understating the membership sales cancellation reserve and the commissions payable liability, as well as an annual manipulation of the balance in the membership sales cancellation reserve. As time went on, however, CUC became increasingly dependent on acquisitions and mergers to sustain the scheme. Purchase and merger reserves were intentionally overstated at the time they were established, and the inflated amounts were used in subsequent periods to inflate operating income at CUC. When it suited management's purposes, assets were written off against these overstated reserves. In short, each year, senior CUC management would review the opportunities available for inflating the company's income and would determine how much would be needed from each opportunity that year. The result was an annual cheat sheet that assured senior management that that year's results were under control.

#### 2. Simply Inflating Quarterly Results to What the Street Expects

The process of consolidating CUC's quarterly results took place at the company's financial reporting operations in Stamford, Connecticut. Each month, each of CUC's divisions would send its financial results to Stamford. At the end of each fiscal quarter, the financial reporting personnel in Stamford would enter all the divisions' results into an electronic spreadsheet. Once the data had been entered into the spreadsheet, the financial reporting personnel would print preliminary consolidated quarterly financial results.

Beginning in at least 1988, certain members of CUC's senior management started the process of directing unsupported top-side adjustments to the company's quarterly results. The senior managers would compare CUC's preliminary consolidated quarterly results with the published earnings expectations of analysts at brokerage firms and would direct that consolidated quarterly income be adjusted to correspond with those expectations. Specific lump-sum amounts were simply added to reported revenues or deducted from reported expenses to accomplish the desired result.

Once income had been adjusted, the managers would make additional

alterations among the line items for marketing, general and administrative, and operating expenses. The managers had specific percentage targets, which required that each of these expense categories be set at approximately the same percentage of revenues as that particular category had held in the previous quarter. From quarter to quarter, therefore, each of these expense line items, after adjustment, would remain at a fairly constant percentage level relative to revenues. These profit-and-loss adjustments were almost always made exclusively in the spreadsheet column devoted to the results of CUC's largest division, Comp-U-Card.

In addition to these adjustments to income statement items, the CUC managers implementing the scheme would make cosmetic alterations to certain balance sheet items, most notably directing that cash be adjusted upward to whatever level the managers believed was desirable. Once all the quarterly adjustments had been made, the managers would sometimes tweak the numbers slightly a second time, making small additional adjustments. These additional adjustments, for example, might be made if a comparison with the previous quarter or with the same quarter from the previous year revealed that a particular line item would stand out as a result of the contemplated adjustments. The Stamford financial reporting personnel would enter all the quarterly adjustments into the electronic spreadsheet and then use the spreadsheet to generate the consolidated quarterly results that CUC issued in its quarterly earnings press release and filed with the Commission in its quarterly Report on Form 10-Q.

In sum, for any given fiscal quarter at CUC, CUC's reported quarterly results matched the consensus quarterly expectations of analysts on Wall Street. The company's operating income was what it had been expected to be -- and each major expense category bore approximately the same percentage relationship to revenues as in the quarter before. These changes were directed by management in a deliberate, top-down process of "reverse engineering," virtually divorced from whatever fiscal and business realities actually had transpired that quarter at CUC. Accordingly, the quarterly reports that CUC filed with the Commission and released to investors were equally divorced from those realities.

The unsupported quarterly adjustments to income were made entirely as top-side adjustments. Although the adjustments were entered into the spreadsheet at Stamford, no journal entries were created, no entries were made to CUC's general ledger, and the adjustments were not carried down to the books and records of any of the company's divisions.[8] Accordingly, the gap that existed between CUC's reported quarterly results and the company's actual results was mirrored in the disparity between CUC's reported results and the books and records of CUC. From quarter to quarter, this gap continued to grow, and from fiscal year to fiscal year, the aggregate of each year's unsupported quarterly adjustments also increased. The quarterly top-side alterations aggregated $31 million for the company's fiscal year ended January 31, 1996; an additional $87 million for its fiscal year ended January 31, 1997; and another $176 million for its fiscal year ended December 31, 1997.

At each fiscal year-end, the CUC managers overseeing the scheme had to make certain that the opportunities targeted for that year were, in fact, utilized. Moreover, since most of the artificial CUC income had simply been added top-side at the quarters, and did not appear on the company's books

and records, corrective measures were needed prior to the company being audited by its outside auditors. One area, however, almost never involved year-end entries -- that of revenue recognition.

### 3. Revenue Recognition: CUC's Starting Point for Making the Numbers Work

In the earliest years of the scheme, membership sales revenue recognition was the principal means of inflating CUC results. The Comp-U-Card division, where most membership sales took place, marketed a variety of membership products, with membership terms varying from twelve to thirty-six months. Moreover, Comp-U-Card did not always recognize, or amortize, revenue from the sales of its membership products over the same period of time as it amortized solicitation costs related to those products' sales. Accordingly, Comp-U-Card used certain grids or matrices to project the amortization of its membership sales revenue and costs. In connection with those calculations, the grids also made deductions from certain membership product revenues to account for expected cancellations by individuals who had purchased the membership products. Ostensibly, and perhaps originally, the grids were created to match membership revenue more precisely with corresponding membership sales expense. The grids, however, soon came to be used for additional, less laudable tasks.

In CUC's early years, the membership sales products were relatively few in number, and the grids were not complex. In each of those years, members of CUC senior management would review projected membership sales figures and calculate the additional amount of revenue needed to inflate CUC income to the level desired. The required amounts were then simply entered manually into the appropriate cells of the membership grid spreadsheets. Because the grids were used to generate operating results of the Comp-U-Card division, the resulting membership revenue recognition opportunity would be embedded in that division's results. Accordingly, the opportunity did not require a separate line item on management's annual schedule or cheat sheet for the scheme.[9]

Over time, the Comp-U-Card division membership sales business grew, and Comp-U-Card began to market a considerable variety of membership products. For purposes of revenue recognition, these membership products were divided into two types: those for which revenues from new membership sales were recognized immediately in their entirety, with the corresponding solicitation costs spread over a trailing period of several months or years; and those for which both the revenues from and the costs of new membership sales were recognized on a deferred basis over a multi-month period.[10]

The increasing variety of membership products resulted in increasingly more complex amortization grids. The increased complexity of the grids and the difficulty of tracking the manually entered adjustments led to a change in how management manipulated the grids. Beginning in about 1994, specific "allocation" columns were added to the grids and replaced the manually entered adjustments as the means for shifting revenue. For any given year, management would determine the amount of revenue that needed to be moved between the revenue categories and would calculate the multipliers required to accomplish that task. The multipliers were then added to the allocation columns in the grids. These allocation columns

skewed the membership cancellation and membership sales revenue calculations in two ways -- they moved revenue from the deferred recognition membership products to the immediate recognition membership products, and they moved revenue from earlier months to months near the end of the fiscal year. Moreover, the allocations weighted these revenue shifts in a manner that increased income dramatically as the end of the fiscal year approached.[11] The allocation alterations resulted in the company overstating income by $26.7 million for its fiscal year ended January 31, 1996; by $22.7 million for its fiscal year ended January 31, 1997; and by $41.4 million for its fiscal year ended December 31, 1997.[12]

Because the revenue recognition opportunity was embedded in the reported results of the Comp-U-Card division, it inflated CUC operating income annually without additional action being taken by CUC management at fiscal year-end. The remaining opportunities required more active intervention on the part of those overseeing the scheme.

### 4. Utilizing the Membership Cancellation Reserve and the Commissions Payable Liability: A Seasonal Approach to Inflating Income

Another category of opportunities involved the company's reserve for membership sales cancellations and its liability account for commissions payable on membership sales. By posting certain fictitious entries, periodically keeping membership sales rejects off-books, intentionally understating CUC's membership cancellation reserve, and occasionally simply reversing the cancellation reserve or the commissions payable liability directly into revenue or operating expense accounts, the managers established an ongoing and systematic procedure for inflating CUC's operating income annually.

Certain Comp-U-Card membership products were processed through various financial institutions that billed their members' credit cards for new sales and charges related to the various membership products. When Comp-U-Card recorded membership sales revenue from such a sale, it would allocate a percentage of the recorded revenue to cover estimated cancellations of the specific membership product being sold, as well as allocating a percentage to cover estimated rejects and chargebacks. Rejects resulted when the credit card to be charged was over its limit, closed, or reported as lost or stolen. Chargebacks resulted when a credit card holder disputed specific charges related to a particular membership program. The result of these Comp-U-Card percentage allocations was the Comp-U-Card membership cancellation reserve.

In the late 1980s, senior management at CUC encountered a sudden, unexpected spike in membership chargebacks from one financial institution. Faced with this exigency, CUC management refused to take the required, one-time charge to the membership cancellation reserve, instead electing to hold the chargebacks off-books for one month and smooth out the impact to the reserve. That decision served as precedent, and the off-books lag was increased in future reporting periods when management was looking for additional opportunities to inflate income and further its scheme. Eventually, CUC developed a policy of keeping rejects and cancellations off the Comp-U-Card general ledger during the last three months of each fiscal year. Instead, those rejects and cancellations appeared only on cash

account bank reconciliations compiled by the Comp-U-Card accounting personnel in Trumbull, Connecticut. Because the rejects and cancellations for the final three months were not recorded against the membership cancellation reserve, the policy allowed CUC to hide the fact that the reserve was dramatically understated at each fiscal year-end.[13]

Holding rejects and cancellations off-books in the fourth quarter each year was just one step in an annual ritual that CUC management used to exploit the membership cancellation reserve. In the first three months of each ensuing fiscal year, the previously held rejects and cancellations were booked against the reserve. Because the reserve was significantly understated, however, those bookings required simultaneous remedial entries designed to inflate the reserve. Accordingly, at the same time the CUC managers were booking the rejects and cancellations, they also were creating fictitious accounts receivable and crediting the cancellation reserve. Finally, as each fiscal year drew to a close, the annual cycle would begin to repeat itself: the fictitious accounts receivable would be reversed and the company would begin to hold rejects and cancellations off its books.

This annual ritual allowed the company to avoid the charges needed to bring the cancellation reserve up to the proper amount. Moreover, in some years, the membership cancellation reserve was depleted even further at year-end by post-closing entries that reversed amounts from the reserve directly into revenue and operating expense accounts. Combined, these membership cancellation reserve opportunities resulted in the company overstating income by $48 million for its fiscal year ended January 31, 1996; by $19 million for its fiscal year ended January 31, 1997; and by $12 million for its fiscal year ended December 31, 1997.[14]

CUC paid commissions to certain institutions on sales of Comp-U-Card membership products sold through those institutions. Accordingly, at the time that it recorded revenue from those sales, CUC created a liability to cover its commissions payable obligation. As with the cancellation reserve, Comp-U-Card used false schedules and other devices to support its understating of the commissions payable liability and to avoid the impact that would have resulted if the liability had been properly calculated. Furthermore, on occasion, CUC management utilized this liability account by directing post-closing entries moving amounts from the liability directly into revenue. In connection with the January 31, 1997, fiscal year-end, CUC managers directed post-closing entries moving $9.12 million from the commissions payable liability to revenue.

By the mid-1990s, opportunities related to CUC's membership sales could no longer sustain the scheme. Increases in the company's business meant greater and greater dollar amounts of artificial income were needed each year just to keep artificial income at the same percentage level of overall "reported" income as in previous years. Moreover, the overall scheme called for prepping analysts to expect increased earnings every quarter. Management directing the scheme agreed that the membership-related opportunities probably had been maximized. The managers therefore decided to keep membership-related opportunities at approximately the same percentage of company income going forward and to look to other opportunities to fuel needed growth in the scheme. Those growth requirements forced CUC management to look increasingly to another area

of opportunities -- the company's merger and purchase reserves.

### 5. Manipulating Merger and Purchase Reserves: Turning Unusual Charges into an Ordinary Income Source

In what was quantitatively the most significant category of opportunities utilized by CUC managers, reserves established in connection with the company's mergers and purchase acquisitions were regularly but improperly reversed directly into operating expense accounts and revenue accounts. This practice grew in magnitude over time as the company became increasingly acquisitive and did larger and larger deals. Larger mergers presented the opportunity for larger merger reserves, and by the latter years of the scheme only large reserves could keep management's income scheme on track. In 1996, CUC established a large merger reserve for several new acquisitions, and management envisioned years of benefit. Those hopes were short-lived. Operating shortfalls at CUC's new software division forced the CUC managers to deplete this new opportunity much more quickly than they had planned. By 1997, CUC management was desperate for a major business combination, and, early in 1997, that desperation led management to renew previously ended merger discussions with HFS. By May of 1997, those discussions had resulted in the Cendant merger agreement, and the possibility of a merger reserve large enough to keep the scheme alive.

Generally Accepted Accounting Principles ("GAAP") allow companies undertaking business combinations to account for certain preacquisition contingencies and for liabilities for certain costs associated with a business combination, provided that the contingencies meet certain specified criteria and the costs fall within specific, delineated categories of expenses, are properly planned for, and are properly documented.[15] In the event that an acquiring entity meets these criteria, GAAP allows the entity to establish appropriate liabilities -- what issuers sometimes refer to as "reserves." The charges for a reserve so established in connection with a business combination accounted for as a pooling of interests appear in the entity's income statement as a separate expense item designated as unusual or transaction-related charges, to distinguish them from the entity's usual operating expenses. [16] For example, in CUC's Report on Form 10-K for its fiscal year ended January 31, 1997, this line item was designated "[m]erger, integration, restructuring and litigation charges associated with business combinations," while in Cendant's Report on Form 10-K for its fiscal year ended December 31, 1997, the line item was designated "[m]erger-related costs and other unusual charges." [17]

At CUC, however, accounting for such liabilities in business combinations went far beyond what GAAP permitted. Acquisitions were viewed in large part as opportunities to ensure the viability of future "earnings" at CUC. Reserves were established to stockpile future income, and the reserves were subsequently reversed to bring those future earnings to fruition.

During the period 1995 through 1997, CUC completed a series of mergers and purchase acquisitions, and, in undertaking these transactions, CUC recognized as liabilities certain transactional costs, including legal and investment bankers' fees, severance payments, and business line termination costs. As a regular part of CUC's accounting for these business combinations, however, the CUC managers implementing the scheme

arbitrarily determined the amounts that CUC would reserve for certain of these liabilities.[18] At times, the managers simply doubled the amounts that had been calculated as CUC's true costs. On other occasions, when various CUC divisions were involved, the CUC managers would summarily inform controllers at those divisions of the aggregate amounts that they should reserve, without bothering to consult the controllers on what, if any, actual costs had been, or would be, incurred. In order to help plan reserve reversals, the financial reporting personnel at Stamford regularly canvassed the divisions throughout the year, keeping track of what reserves each division had and whether the division anticipated having an "excess" balance in the reserve at year-end. References to the "real" and the "cushion" parts of reserves became part of the vernacular at CUC.

Each fiscal year, at year-end, the CUC managers utilized the opportunities of these inflated reserves. In large part, the managers simply directed entries that reversed the reserves directly into revenue or operating expense accounts. The majority of those direct reversals took place at the Comp-U-Card division, or at subsidiaries of Comp-U-Card.[19] The arbitrary nature of the reversals was evidenced by the manner in which they were made: at times, the responsible CUC managers would summarily direct subordinates to reverse a specific aggregate amount out of merger reserves and to increase revenue or to decrease operating expenses, as the case may be, leaving it to the subordinates to decide arbitrarily which accounts should benefit and in what amounts. On occasion, the CUC managers used direct reversals of acquisition reserves to increase operating income at divisions other than Comp-U-Card. In some cases, divisions carrying relatively small acquisition reserves on their books were directed by CUC managers to reverse those reserves directly into income on the divisions' own books. Some of those reserves had been established only a short time before, at the insistence of CUC managers.

The CUC managers also used these reserves in a less direct manner, channeling reserve reversals through CUC's intercompany accounts. In some transactions, the managers would first transfer part of an acquisition reserve to a specific CUC intercompany account, essentially creating an intercompany payable for a specific division. The managers would then inform the specific division of the intercompany transfer and direct the division to move the intercompany credit to income accounts on that division's books. On other occasions, the managers directed Stamford financial reporting personnel to reverse a merger reserve into a division's CUC intercompany payable account and then immediately transfer the reversal back out of that intercompany account and into income accounts at Comp-U-Card. Finally, in a method used to inflate income for the fiscal year ended December 31, 1997, the CUC managers transferred amounts from a merger reserve to a specific division's CUC intercompany account and then increased the division's operating income on a top-side basis only, in the electronic spreadsheet kept by the financial reporting personnel in Stamford. The division was not informed of the transfer or the top-side increase. Once the annual audit was completed, however, Stamford personnel directed the division to make journal entries decreasing its intercompany receivable and crediting the division's retained earnings account.[20] For these transactions, the managers generally selected divisions that they knew would not be fully audited.[21]

Improper reversals of merger and purchase reserves resulted in the

company overstating income by $11 million for its fiscal year ended January 31, 1996; by $59 million for its fiscal year ended January 31, 1997; and by $147 million for its fiscal year ended December 31, 1997.[22] More than $135 million of this income effect came from one CUC merger reserve, the so-called "Ideon reserve," established in connection with business combinations undertaken by CUC in 1996 and early 1997.[23] It was the rapid depletion of the Ideon reserve that drove CUC's need for the Cendant merger. Approximately $37 million of improper reserve reversals for the December 31, 1997, fiscal year came from the Cendant merger reserve.

### 6. Writing-Off Assets Against the Cendant Merger Reserve: Pushing the Balance Sheet over the Edge

Another category of reserve-related opportunities was utilized principally in connection with the Cendant merger and Cendant's December 31, 1997, year-end close. In fiscal years immediately prior to the Cendant merger, the CUC managers implementing the scheme had failed to write off impaired assets held by CUC. Then, in connection with the December 31, 1997, year-end close, the managers directed that millions of dollars of CUC assets -- both impaired and unimpaired -- be written off against the Cendant reserve.

GAAP requires that long-lived assets and certain identifiable intangibles that are held and used by a company be reviewed whenever events or changes in circumstances call into question the company's ability to recover the carrying amounts for those assets. [24] If the carrying amount for such an asset is not recoverable, the company must recognize an impairment loss equal to the amount by which the carrying amount exceeds the fair value of the asset. Moreover, the impairment loss so calculated must be recognized in the fiscal period in which the asset became impaired, and the charge for such a loss must be reported as a component of the company's income from continuing operations.

For CUC management, these principles were little more than convenient justifications -- to be trotted out when it served their purposes and to be ignored when it did not. For the fiscal years ended January 31, 1996, and January 31, 1997, the managers ignored the impairment of certain CUC assets. In so doing, they inflated CUC operating income for those years by avoiding required charges that would have been incurred if CUC had properly recognized its impairment loss.

In the December 1997 Cendant merger reserve, the CUC managers perceived an opportunity to take massive asset-related charges without impacting income from continuing operations. The managers availed themselves of the opportunity by directing that goodwill, receivables, and other assets, impaired and unimpaired, be written off against the Cendant reserve. Accordingly, in connection with the close for Cendant's December 31, 1997, year-end, CUC management transmitted a memorandum to various CUC divisional controllers directing the controllers to transmit approximately $75 million in assets to CUC Corporate through the CUC intercompany accounts. The managers then directed that these assets be written off against the Cendant reserve. In addition, the managers directed that other assets, not itemized in the memorandum, also be written off against the reserve.

These transactions inflated CUC operating income in various ways. As noted, some of the assets written off against the merger reserve had become impaired in previous fiscal years. For those assets, the CUC managers already had avoided an impact to operating income in the previous years by failing to write off the assets as required. By subsequently writing the assets off against the Cendant reserve, the managers ensured that the charges would appear under the rubric of unusual charges rather than as charges to income from operations. For those assets that were not impaired, but written off anyway, the transactions allowed the managers to avoid the ongoing depreciation or amortization charges that Cendant would have recognized for these assets in future years, while, again, reporting the present charges as unusual ones. Overall, the write-off of assets to the Cendant merger reserve at year-end December 31, 1997, and the concomitant failure to recognize certain asset impairments in the proper fiscal year, artificially inflated the company's income by $6 million for its fiscal year ended January 31, 1996; by $12 million for its fiscal year ended January 31, 1997; and by $29 million for its fiscal year ended December 31, 1997.[25]

### F. FALSE FILINGS

From 1985 until Cendant management's discovery of the accounting fraud in April 1998, the company filed with the Commission false and misleading periodic reports and other filings. Those reports and filings included, directly or by incorporation, financial statements that misrepresented the company's financial results, massively overstating its income from operations and its earnings. Because the misstatements covered such a long period of time, it is not always possible to quantify the precise impact of the irregularities for any given year. Nevertheless, for some periods, the misstatement of income was of historic proportions.

For the last three fiscal years of the scheme, pre-tax income was artificially overstated by nearly one-third, an aggregate misstatement of approximately one-half billion dollars. During those years, the company's Reports on Form 10-Q reported income reflecting the scheme's top-side quarterly adjustments. Those adjustments alone caused the company's reported quarterly pre-tax income to be misstated by an aggregate amount of $31 million for the first three quarters of the company's fiscal year ended January 31, 1996; by an aggregate amount of $87 million for the first three quarters of the company's fiscal year ended January 31, 1997; and by an aggregate amount of $176 million for the first three quarters of the company's fiscal year ended December 31, 1997. During that same period, the company's Reports on Form 10-K misstated annual pre-tax income from operations by $127 million for its fiscal year ended January 31, 1996; by $122 million for its fiscal year ended January 31, 1997; and by $262 million for its fiscal year ended December 31, 1997. The consequences for the company's shareholders were devastating.[26]

### IV.

### VIOLATIONS OF THE EXCHANGE ACT REPORTING, RECORD-KEEPING, AND INTERNAL CONTROLS PROVISIONS

Section 13(a) of the Exchange Act and Rules 13a-1 and 13a-13 thereunder require issuers with securities registered under Section 12 of the Exchange

Act to file annual and quarterly reports with the Commission and to keep this information current. The obligation to file such reports embodies the requirement that they be true and correct. *See, e.g., SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1165 (D.C. Cir. 1978), *cert. denied*, 440 U.S. 913 (1979). Exchange Act Rule 12b-20 further requires the inclusion of any additional material information that is necessary to make required statements, in light of the circumstances under which they were made, not misleading. Information regarding the financial condition of a company is presumptively material. *SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985).

As discussed above, from 1985 until Cendant management's discovery of the accounting fraud in April 1998, the company filed false and misleading periodic reports with the Commission that misrepresented the financial results of the company, overstating operating income and earnings and failing to disclose that the financial results were falsely represented.

Section 13(b)(2)(A) of the Exchange Act requires Section 12 registrants to make and keep books, records, and accounts that accurately and fairly reflect the transactions and dispositions of their assets. Rule 13b2-1 prohibits the falsification of any book, record, or account subject to Section 13(b)(2)(A). Section 13(b)(2)(B) of the Exchange Act requires Section 12 registrants to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are properly executed and recorded, that access to assets is properly controlled, and that accountability for assets is properly recorded and analyzed.

From 1985 until April 1998, the company's books and records reflecting the transactions and dispositions of its assets were inaccurate and had been falsified. The company intentionally failed to devise and maintain an adequate system of internal accounting controls.

For the foregoing reasons, CENDANT violated Section 13(a) and (b) of the Exchange Act and Rules 12b-20, 13a-1, 13a-13, and 13b2-1 thereunder.

**V.**

Based on the foregoing, the Commission finds that:

CENDANT committed violations of Section 13(a) and (b) of the Exchange Act and Rules 12b-20, 13a-1, 13a-13, and 13b2-1 thereunder.

**VI.**

In view of the foregoing, the Commission deems it appropriate to accept Cendant's Offer and to impose the sanctions agreed to therein. In determining to accept the Offer, the Commission considered remedial acts promptly undertaken by Cendant and cooperation afforded the Commission and other authorities.

Accordingly, **IT IS HEREBY ORDERED** that

CENDANT, pursuant to Section 21C of the Exchange Act, cease and desist from committing or causing any violation, and any future violation, of

Section 13(a) and (b) of the Exchange Act, and Rules 12b-20, 13a-1, 13a-13, and 13b2-1 thereunder.

By the Commission.

Jonathan G. Katz<br>Secretary

---

**Footnotes**

[1]

The Commission's findings herein are made pursuant to Cendant's Offer and are not binding upon any other person or entity in these or any other proceedings.

[2] In April 1998, Cendant senior management, consisting primarily of legacy HFS officials, learned of facts which led to the discovery of the massive financial fraud conducted by former management of CUC. Cendant management promptly reported the discovery of the fraud and its attendant accounting irregularities to the Commission staff; conducted a thorough internal investigation and compiled an extensive report thereon; waived privileges as to the report and filed the report, and the accompanying exhibits, as Exhibits to a Report on Form 8-K; and cooperated with the staff in its investigation of this matter. As noted in Section VI., below, the Commission, in fashioning the remedial sanction in this matter, considered Cendant's prompt remedial acts and cooperation.

[3] "Operating income" here denotes income from operations, prior to any one-time or unusual charges or gains.

[4] Although the term "reserve" is not formal accounting terminology, the term is used in this Order because the term was used by CUC and Cendant and is used commonly by issuers.

[5] CUC's fiscal year ended on January 31. After the December 17, 1997, merger, Cendant adopted a fiscal year ending December 31.

[6] Due to a variety of factors, such as changes in accounting methodology or comparability issues related to acquisitions or to dispositions of discontinued business operations, income impact figures used in this Order may not necessarily tie to figures set forth in CUC and Cendant financial statements included in filings with the Commission.

[7] Post-closing journal entries at CUC were entries made after a reporting period had ended and the books were closed, but with effective dates spread retroactively over prior weeks or months.

[8] Although the quarterly adjustments to income were made almost exclusively to the Comp-U-Card division results, they did not appear on the books and records of Comp-U-Card. The allocation of adjustments to Comp-U-Card meant only that the adjustments would be placed in that column of

the Stamford spreadsheet that was used for Comp-U-Card results.

[9] In the early years of the scheme, the schedule might include a footnote reminding management that the revenue recognition benefit was embedded in Comp-U-Card's results, but any such note became unnecessary over time.

[10] From the late 1980s to October 1996, the solicitation costs for all products were recognized over a twelve-month period. After October 1996, the solicitation costs for thirty-six-month memberships were amortized over the entire thirty-six-month membership term.

[11] Given CUC's policy of recognizing the solicitation costs of "immediate" membership products on a deferred basis, sales revenues of the immediate recognition type were especially valuable when the sales were recognized during the company's fiscal fourth quarter. In such situations, the new sales revenue would be recognized entirely in the current fiscal year, while the corresponding costs would be expensed over the ensuing multi-month period. Moreover, beginning in at least 1995, recognition of new sales solicitation costs was further delayed by a CUC policy dictating a one-month lag between the initial recognition of new membership sales revenues and the recognition of the corresponding solicitation costs.

[12] The increased impact for the 1997 calendar year resulted, in part, from certain post-closing journal entries that were used to alter membership income to an even greater degree than that achieved by the grids. Thus, in connection with 1997 year-end procedures, the CUC managers implementing the scheme used journal entries to move an additional $6.5 million of deferred recognition membership revenues into immediate recognition membership revenues and to move $3 million of solicitation costs from immediate recognition products to deferred recognition products. These entries created an additional $9.5 million in CUC operating income for the year.

[13] Failing to book cancellations and rejects at each fiscal year-end had the added effect of overstating the company's cash position on its year-end balance sheet. In fact, Cendant's Report on Form 10-Q for the quarter ended March 31, 1998, stated that the company had discovered that its balance sheet as of December 31, 1997, had "an approximate $100 million overstatement in cash." This reported overstatement equaled approximately two-thirds of the $149.5 million in "cash and cash equivalents" set forth on the company's balance sheet as of December 31, 1997, and included in its Report on Form 10-K for the year then ended.

[14] The reduced income impact for the fiscal year ended December 31, 1997, reflects the fact that no post-closing entries reversing the cancellation reserve directly into income were used in conjunction with that year-end.

[15] Applicable criteria are set forth in the relevant accounting literature, including: (i) *Accounting for Contingencies*, Statement of Financial Accounting Standards ("FAS") No. 5 (Fin. Accounting Standards Bd. ("FASB") 1975); (ii) *Accounting for Preacquisition Contingencies of Purchased Enterprises*, FAS No. 38 (FASB 1980); (iii) *Business Combinations*, Accounting Principles Bd. Opinion No. 16 (American Inst. of

Certified Pub. Accountants 1970); (iv) *Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity (Including Certain Costs Incurred in a Restructuring)*, Emerging Issues Task Force ("EITF") Issue 94-3 (FASB EITF 1995); and (v) *Recognition of Liabilities in Connection with a Purchase Business Combination*, EITF Issue 95-3 (FASB EITF 1995).

[16] For business combinations accounted for under the purchase method, an amount equal to the reserves is added to goodwill.

[17] In recent years, financial analysts have increasingly focused on issuers' operating income -- that is, income from an issuer's ongoing business operations, prior to any one-time or unusual charges -- largely applauding, or at worst ignoring, an issuer's announcement of large one-time or unusual charges.

[18] In addition, the liabilities established at CUC, in large part, included amounts that did not meet the criteria set forth in the applicable accounting literature. *See, e.g.*, EITF Issue 94-3; EITF Issue 95-3.

[19] Because the Comp-U-Card division general ledger served as the general ledger for CUC, entries made at Comp-U-Card could reverse the largest CUC merger reserve accounts directly into income accounts at Comp-U-Card.

[20] Divisions were specifically informed that the off-setting entry should be to their retained earnings in order to avoid opening their books for the previous fiscal year.

[21] For some of CUC's smaller divisions, CUC's outside auditors conducted only limited review procedures, forgoing a full-scope audit. CUC management knew which divisions would be subjected to such reviews and intentionally directed intercompany merger reversals to those divisions.

[22] The aggregate amount of merger and purchase reserves improperly reversed into income by the CUC managers in connection with the December 31, 1997, fiscal year-end close was actually only $115 million. However, the December 31, 1997, year-end income overstatement included an additional $32 million of reserve reversals as a result of CUC's change from a January 31 fiscal year-end to a Cendant fiscal year-end of December 31. As a function of that change, CUC's January 1997 financial results were reported in both the CUC fiscal year ended January 31, 1997, and the Cendant fiscal year ended December 31, 1997. Because $32 million of the improper January 31, 1997, year-end reserve reversals had been allocated to CUC's January 1997 books, that $32 million also inflated Cendant's income for the fiscal year ended December 31, 1997.

[23] These business combinations included CUC's acquisitions of Davidson & Associates, Inc.; Sierra On-Line, Inc.; Ideon Group, Inc.; and Plextel Telecommunications, Inc. The CUC reserve for these charges is referenced here as the "Ideon reserve." In fact, that reserve encompassed two CUC general ledger accounts, generally referred to as the "Ideon Reserve Account" and the "Accrued Other Account."

[24] *See Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed of*, FAS No. 121 (FASB 1995).

[25] Two other transactions directed by the CUC managers utilized the balance sheet in another way. Those transactions increased income for CUC's fiscal year ended January 31, 1996, by approximately $18 million and for its fiscal year ended January 31, 1997, by approximately $2 million, by improperly capitalizing certain operating expenses, essentially moving the expenses from the income statement to the balance sheet.

[26] On April 15, 1998, after the markets closed, the company announced that accounting irregularities had been uncovered and that a restatement of the company's financial statements would be necessary. On the day of the announcement, Cendant common stock closed at $35 5/8. The trading day after the announcement, the stock closed at $19 1/16. On July 14, 1998, the company announced that the accounting irregularities were more extensive than had been anticipated originally and that the company would restate its consolidated financial statements for the previous three fiscal years. After the July news, Cendant common stock fell to a closing price of $14 5/8 on July 16.

*http://www.sec.gov/litigation/admin/34-42933.htm*