# EXHIBIT 2

United States v. Walter A. Forbes and E. Kirk Shelton
Daubert Hearing
Larry S. Murphy, CPA
Summary of Opinions
March 22, 2004

**Request**

1.  I have been requested to provide my professional opinion on whether Mr. Heckler, a
    Certified Public Accountant ("CPA"), adhered to professional standards in reaching his
    opinions in the above matter, as set forth in his Expert Witness Testimony Summary
    ("Summary"), dated August 12, 2002, regarding the alleged violations of Generally
    Accepted Accounting Principles ("GAAP") contained in the Superseding Indictment.

**Relevant Professional Standards**

2.  As a CPA, the relevant professional standards to which Mr. Heckler must adhere to
    determine whether the alleged accounting irregularities violated GAAP are set forth in
    American Institute of Certified Public Accountant's ("AICPA") Code of Professional
    Conduct, Statement on Standards for Consulting Services, along with the guidance
    provided in the Special Report 03-1 Litigation Services and Applicable Professional
    Standards, and Generally Accepted Auditing Standards.  These relevant professional
    standards are more fully described below.

**Code of Professional Conduct ("Code")**

3.  In any engagement performed by a CPA who is a member of the AICPA, the CPA must
    comply with the Code of Professional Conduct.  Relevant Rules within the Code are
    referred to below and include:

    a.  Rule 102, *Integrity and Objectivity* (Tab 4A)

        "In the performance of any professional service, a member shall maintain objectivity
        and integrity, shall be free of conflicts of interest, and shall not knowingly misrepresent
        facts or subordinate his or her judgment to others."

**FM22360**

United States v. Walter A. Forbes and E. Kirk Shelton
Larry S. Murphy, CPA Summary of Opinions
March 22, 2004

    b.  Rule 201, *General Standards* (Tab 4B)

        "*Professional Competence.* Undertake only those professional services that the member or the member's firm can reasonably expect to be completed with professional competence.

        *Due Professional Care.* Exercise due professional care in the performance of professional services.

        *Planning and Supervision.* Adequately plan and supervise the performance of professional services.

        *Sufficient Relevant Data.* Obtain sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation to any professional services performed."

**Statement on Standards for Consulting Services ("Consulting Standards")**

4.    Consulting Standards require adherence to the Code of Professional Conduct, including Rules 102 and 201, cited above. (Tab 5A)

**Special Report 03-1 Litigation Services and Applicable Professional Standards ("Litigation Guidance")**

5.    The AICPA's Litigation Guidance requires the CPA to adhere to, among others, Rules 102 and 201 of the Code, as cited above. The Litigation Guidance amplifies on Rule 201, General Standards as follows: (Tab 5B, annotated)

    a.  ***Professional competence.*** The CPA must be able to identify engagement needs, apply appropriate analytical approaches, and be knowledgeable of the technical areas involved. The CPA should consider possible challenges of his or her work based upon the Daubert and Kumho cases. (Paragraphs 15-17)

    b.  ***Due professional care.*** The CPA must exercise due professional care in the performance of services, including diligent and critical analysis of all work performed and compliance with the Code of Professional Conduct. The CPA must be able to evaluate and challenge the assumptions and calculations of other professionals, as well as defend his or her own assumptions and calculations under cross-examination. (Paragraphs 18-19)

    c.  ***Planning and supervision.*** Planning is essential to the engagement as it guides the conduct, supervision, control and completion of the engagement. Planning is a dynamic process, subject to modification as the engagement progresses. Supervision of assistants helps ensure quality of performance. The level of supervision is dependent

**FM22361**

United States v. Walter A. Forbes and E. Kirk Shelton
Larry S. Murphy, CPA Summary of Opinions
March 22, 2004

upon the experience of the assistants and complexity of the engagement, but the CPA is ultimately responsible for all of the work performed. (Paragraphs 20-22)

    d. ***Sufficient relevant data***. The CPA must gather and analyze sufficient relevant data in order to provide a reasonable basis for his or her opinions. (Paragraphs 23-24)

6.    In addition, a CPA is required to follow other relevant standards when his engagement involves matters covered by those other standards. In this matter, adherence to GAAS is necessary since the opinions expressed relate to compliance with Generally Accepted Accounting Principles ("GAAP"). See decision tree at page 15 of the Litigation Guidance.

## Generally Accepted Auditing Standards ("GAAS")

7.    A litigation engagement can require the application of other professional standards set forth by the AICPA. In this matter, because Mr. Heckler was engaged to render an opinion on GAAP, GAAS is applicable. The particular auditing standard is AU623 – Special Reports, Specified Elements, Accounts or Items of a Financial Statement. This standard states, in part: (Tab 6)

"When expressing an opinion on one or more specified elements, accounts, or items of a financial statement, the auditor should plan and perform the audit and prepare his or her report with a view to the purpose of the engagement. With the exception of the first standard of reporting, the ten generally accepted auditing standards are applicable to any engagement to express an opinion on one or more specified elements, accounts, or items of a financial statement." (AU623.12)

8.    In undertaking to render an opinion on GAAP, Mr. Heckler must give consideration to AU623.12. In doing so, Mr. Heckler is, therefore, bound by Generally Accepted Auditing Standards (AU150). (Tab 7A) The Statements on Auditing Standards ("Statements") more fully explore and explain the meaning of these generally accepted auditing standards. The most relevant of these Statements are: (annotated)

    a. **Adequate technical training and proficiency (AU210)** – "The audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor." (Tab 7B)

    b. **Independence (AU220)** – "In all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors." (Tab 7C)

    c. **Due professional care (AU230)** – Requires the CPA to exercise professional skepticism while performing his or her work which is an attitude that includes a questioning mind and critical assessment of evidence. The CPA must consider the competency and sufficiency of the evidence. (Tab 7D)

FM22362

United States v. Walter A. Forbes and E. Kirk Shelton
Larry S. Murphy, CPA Summary of Opinions
March 22, 2004

    d.  **Adequate planning and supervision (AU311)** – At the outset and during the engagement, the CPA should develop work programs setting forth in reasonable detail the procedures believed necessary to accomplish the objective. Supervision involves directing the efforts of assistants, including instructing assistants, keeping informed of problems encountered, reviewing work preformed, and dealing with differences of opinions. (Tab 7E)

    e.  **Consideration of Fraud in a Financial Statement Audit (AU316A)**
This standard provides a description of fraud, as referred to by Mr. Heckler. In addition, this standard emphasizes the need for professional skepticism relating to the following: (AU316A.27-.28) (Tab 7F)

- Increasing sensitivity in the selection of the nature and extent of documentation to be examined in support of material transactions. This may require obtaining evidence that is more reliable and increasing sample sizes.
- Increasing recognition of the need to corroborate management explanations or representations concerning material matters.
- Conducting interviews of personnel involved in the areas of concern.

    f.  **Sufficient competent evidential matter (AU326)** - The competency of evidence includes the following: (AU326.21) (Tab 7G)

- Evidence obtained from third parties provides greater assurance of reliability than evidence obtained within the entity.
- The more effective the internal controls, the more reliable the data is from the systems with effective internal controls.
- Direct evidence from personal knowledge obtained through physical examination, observation, computation, and inspection is more persuasive than evidence obtained indirectly.

    g.  **Documentation (AU339)** - The CPA's work should be sufficiently documented to show that the work was adequately planned and supervised, and that sufficient competent evidential matter was obtained to afford a reasonable basis for an opinion. The documentation would include work programs, analyses, memoranda, etc. and be sufficient to understand the nature, timing, extent and results of procedures performed and evidence obtained. (Tab 7H)

    h.  **Special Reports (AU623)** - An engagement to render an opinion on a specified account of a financial statement should consider materiality as to the specific element; thus, the examination of the specified account is more extensive than if the same information were being considered in connection with an examination of the financial statements taken as a whole. Further, as many accounts are interrelated, the CPA should be satisfied that such interrelated accounts have been considered. (AU623.11-13) (Tab 6)

FM22363

United States v. Walter A. Forbes and E. Kirk Shelton
Larry S. Murphy, CPA Summary of Opinions
March 22, 2004

## Other Professional Guidance

9.  Among the relevant information a CPA turns to for guidance is the AICPA's *Fraud Investigations in Litigation and Dispute Resolution Services*. This guide offers many relevant points in the conduct of a fraud investigation, particularly the following: (Tab 8)

    a.  The CPA should review records during a fraud investigation with skepticism and use them cautiously, understanding that they may be inauthentic, inaccurate, unreliable, and irrelevant. (75/135.08)

    b.  Records are often difficult to identify without gathering information through interviews of individuals possibly having knowledge; the CPA should strive to maintain control of the interview. The purpose of the interview is to gather background information and other relevant data. (75/135.12-.13) The CPA should maintain healthy skepticism about information obtained from any witness, even an apparently cooperative one. (75/135.18)

## Summary of Opinions

10. In my opinion the methodology applied by Mr. Heckler as a basis for his opinions set forth in the Summary violates professional standards. Mr. Heckler did not comply with relevant professional standards in order to provide a reasonable basis for the opinions expressed.

11. As more fully detailed below, Mr. Heckler, in violation of professional standards, subordinated his judgment to others outside of his supervision and review, relied upon evidence not independently obtained or tested, and failed to conduct basic investigative procedures in order to verify and corroborate information on which he states he relies as a basis for his opinions.

## Information Considered

12. Information considered includes: (Tab 9)

    a.  Superseding Indictment
    b.  Various court filings relating to the motion to preclude the testimony of Brian Heckler
    c.  KPMG documents
    d.  Relevant professional standards and other professional guidance
    e.  Daubert Hearing transcripts and exhibits for December 2003
    f.  Daubert Hearing transcripts and exhibits for March 2004
    g.  Cendant Form 10-K and Form 10-KA for 1997
    h.  Report to Audit Committee by Willkie Farr & Gallagher ("ACR") and accompanying exhibits and work papers
    i.  Deloitte & Touche documents
    j.  Ernst & Young documents
    k.  Plea Allocutions of Pember, Sabatino and Corigliano

FM22364

United States v. Walter A. Forbes and E. Kirk Shelton
Larry S. Murphy, CPA Summary of Opinions
March 22, 2004

**Findings and Bases for Opinions**
(Page references are to Daubert Hearing transcripts.)

13.   In violation of the Code, Rule 102, Mr. Heckler subordinates his judgment to the Audit
      Committee Report ("ACR") placing substantial and inappropriate reliance on the ACR in
      the following ways:

      a.   Substantially all critical "company" documents referred to or used by Mr. Heckler came
           from the ACR.
      b.   Mr. Heckler did not discuss with those who prepared the ACR the methods used to
           investigate any of the matters.
      c.   Mr. Heckler is not aware of the qualification of those who prepared the ACR
           (attorneys, accountants, consultants, or others).
      d.   Mr. Heckler is not aware of the approach taken during the interviews conducted in
           connection with the ACR other than as set forth in the interview summaries.
      e.   Mr. Heckler does not know the extent of the utilization of the ACR findings in the
           restatement of Cendant's 1997 financial statements.
      f.   Mr. Heckler inappropriately accepts the ACR although it was prepared in
           contemplation of possible litigation.

14.   In violation of the Code, Rule 102, Mr. Heckler subordinates his judgment to his client, the
      United States Attorney's Office ("USAO") as exemplified in an email from Ms. Patel to
      Mr. Heckler, dated May 2, 2002, which states: "They [USAO] want us to use the USAO
      indictment numbers and to use language such as 'the irregularity relating to the merger
      reserves was at least $x ($x being the indictment number)'…..Wants us to leverage the use
      of the interviews [ACR interviews] as much as possible.  For example, instead of detail
      testing items for all three years, maybe test one year in addition to performing an interview
      of someone like Speaks….**rejects in transit**: don't see the 'bang for the buck' for
      reviewing every bank rec, bank stmt, etc;" (Exhibit F-124 - KPMG16647) (Tab 10A)

15.   Mr. Heckler affirms the subordination of his judgment to the USAO in his Letter of
      Presentation to the USAO, dated August 12, 2002, in which he states "The nature of our
      analysis was limited in nature and scope following the procedures selected by you."  This
      statement is not included in Mr. Heckler's Summary, thus the reader is unaware of this
      important limitation on Mr. Heckler's opinion.  It is unreasonable for Mr. Heckler to state
      that an account or transaction is not in compliance with GAAP when the scope of his
      examination was restricted.

16.   In violation of the Code, Rule 102, on Integrity and Objectivity and AU220 on
      Independence, Mr. Heckler did not conduct his work with objectivity as he defaulted to the
      USAO's desire not to have a "third set of numbers," and merely expresses that the amounts
      are "at least" the amounts in the indictment.

17.   In violation of the Code, Rule 201 on Sufficient Relevant Data and AU326 on Sufficient
      Competent Evidential Matter, Mr. Heckler did not conduct any independent interview of

**FM22365**

United States v. Walter A. Forbes and E. Kirk Shelton
Larry S. Murphy, CPA Summary of Opinions
March 22, 2004

any Cendant, WFG, AA, D&T, E&Y or other person having direct knowledge of the issues.

18.    In violation of the Code, Rule 201, and AU230 on Due Professional Care, Mr. Heckler inappropriately relies on Mr. Speaks who presumably initially made many of the alleged improper entries.  (page 259, ln. 3-10) (Tab 10B)

19.    In violation of the Code, Rule 201 on Sufficient Relevant Data and AU326 on Sufficient Competent Evidential Matter, Mr. Heckler did not obtain any information directly from Cendant.  Mr. Heckler did not seek to examine any original documents at Cendant's offices.

20.    In violation of Code, Rule 201 and AU230 on Due Professional Care, Mr. Heckler's testing is limited to work performed within documents accompanying the ACR; Mr. Heckler simply verifies the mathematical accuracy of certain calculations accompanying the ACR.

21.    In violation of the Code, Rule 201 and AU230 on Due Professional Care, Mr. Heckler questioned, but did not determine, whether journal entries claimed to be inappropriate were actually recorded in the general ledger of Cendant.  Mr. Heckler did not review the general ledger to determine if other entries reversed or justified the entries claimed to be inappropriate.

22.    In violation of the Code Rule 201 and AU230 on Due Professional Care, Mr. Heckler failed to adhere to a significant procedure of his own work plan which included conducting key interviews.  (Exhibit F-122) (Tab 10C)

23.    For certain issues (cancellation reserves and topside entries), Mr. Heckler applied sampling tests to only certain allegations; thus, applying inappropriate sampling techniques.   Each issue for each year is a stand-alone issue, which cannot be considered with the same issue for other years.  It is unreasonable to assume that the underlying internal controls, financial statements, motivations, and personnel involved in these issues were consistent during the period subject to analysis.

24.    Mr. Heckler did not request and, thus, did not consider information contained in the testimony of Cendant, E&Y, D&T and other individuals taken in the various civil litigation and regulatory investigations that may have been relevant to Mr. Heckler's work.  He is unaware of whether this information might support or refute his opinions.

**Topside Adjustments**

25.    There are 9 quarterly periods and one 12/31/97 year-end period on which Mr. Heckler renders an opinion for a total of 10 periods.  Mr. Heckler relied exclusively on documents accompanying the ACR, or as exhibits to the ACR.  Mr. Heckler relied upon the ACR as a basis for his understanding of the consolidation of Cendant's financial statements.  (page 2247-8, ln. 10-3) (Tab 11A)

**FM22366**

United States v. Walter A. Forbes and E. Kirk Shelton
Larry S. Murphy, CPA Summary of Opinions
March 22, 2004

26.  All documents in "Section 8, T work papers" of the KPMG work papers were obtained
     from the ACR and its accompanying documents.  (Tab 11B)

27.  As of August 12, 2002, Mr. Heckler had performed only limited testing of the 10 periods.
     April 30, 1996 was selected for "detail testing" to documents included in the ACR.  Any
     conclusions reached by Mr. Heckler as a result of this test on the April 30, 1996 period
     cannot be applied to other periods.  Mr. Heckler did not agree any information to original
     Cendant documents.

28.  By limiting testing to the ACR documents, Mr. Heckler cannot answer the question of
     whether or not the claimed inappropriate adjustments were corrections of transactions
     recorded at the subsidiary level.  Mr. Heckler did not seek to perform any investigation to
     determine whether there was support for these entries; he relies on the characterization of
     the entries in the ACR.  (page 2252, ln. 15-19) (Tab 11C)

29.  Mr. Heckler relies on an ACR interview of Ms. Sattler to indicate that the entries were
     inappropriate.  Mr. Heckler did not conduct a personal interview of Ms. Sattler to
     corroborate the ACR interview.

30.  Mr. Heckler did not agree any subsidiary reporting package to the subsidiary's general
     ledger. (Mr. Heckler testified that the general ledger aggregates a company's accounting
     transactions. (page 206, ln. 9-16)) (Tab 11D)

31.  The allocutions did not specify amounts relating to Topside adjustments; thus, Mr. Heckler
     cannot rely directly on the allocutions as a basis for any period.  (page 2253, ln. 1-4) (Tab
     11C)

**Merger Reserves**

32.  Mr. Heckler relied exclusively on the ACR and its accompanying documents.  Mr. Heckler
     affirmatively states this in the summary of work performed:  "KPMG agreed the merger
     irregularities identified by AA to original source documents and supporting
     documentation."  All original source documents used by Mr. Heckler accompanied the
     ACR.

33.  KPMG prepared a number of spreadsheets which all appear to have been sourced to the
     ACR documents.  (KPMG09404 refers to 09405 which is a summary of information taken
     from the ACR.) (Tab 12A)

34.  Mr. Heckler did not discuss with E&Y its review of the charges to the merger reserve for
     any of the years investigated; thus, Mr. Heckler did not seek to understand a potential
     contrary opinion.

FM22367

United States v. Walter A. Forbes and E. Kirk Shelton
Larry S. Murphy, CPA Summary of Opinions
March 22, 2004

35. Mr. Heckler's work papers demonstrate that he relied on the USAO for a reconciliation between indictment amounts and the ACR. (KPMG09403: "The following comments are based on discussions with Mark Gerber and John Pittman of the USAO.") (Tab 12B)

36. Mr. Heckler did not agree journal entries to the general ledger. In his personal notes Mr. Heckler appears to question this weakness; Mr. Heckler writes on KPMG61474: "Where we see a JE# - how do we know posted to the G/L [general ledger] [and/or] F/S [financial statement]." (This comment appears to apply all issues involving journal entries.) (Tab 12C)

37. Mr. Heckler testified that KPMG noticed that the ACR did not have underlying support for the journal entries. (page 251, ln. 1-5) This should have alerted Mr. Heckler to perform an independent test to confirm whether or not there was support for the journal entries. In doing so, Mr. Heckler demonstrates his complete reliance on the ACR. (Tab 12D)

38. Mr. Heckler testified that "in his experience" the journal entries would have supporting documentation. (page 272, ln. 17-25) However, without having reviewed Cendant original journal entries apart from those at issue, he is unable to confirm that his experience is applicable to Cendant's policies. (Tab 12E)

39. Mr. Heckler relies on Ms. Pember's allocution (page 259, ln. 11-18); however, the allocution does not indicate any amounts or specific transactions. Mr. Heckler ignores investigating and discounts the statement to his staff by the USAO regarding Ms. Pember's statement to the USAO that a number of items in the ACR relating to merger reserves were in fact proper uses of the reserves. (page 1633, ln. 11-21) (Tab 12F)

40. Mr. Heckler refers to Mr. Speaks; however, Mr. Heckler should be skeptical of his comments due to his apparent involvement in the initial journal entries. Again, without directly interviewing Mr. Speaks and Ms. Pember, Mr. Heckler cannot adequately verify or assess the credibility of their comments.

41. The KPMG work papers do not indicate a search for or attempt to determine the basis for possible unidentified, yet supported, journal entries at issue. Mr. Heckler accepts the representations of the ACR that an adequate search was conducted.

**Revenue Recognition**

42. Mr. Heckler obtained virtually all information for his calculation from the documents accompanying the ACR. Mr. Heckler did not attempt to separately obtain information from Cendant or interview those responsible for membership revenue accounting and processing. (page 2230, ln. 1-10) (Tab 13A)

43. Mr. Heckler relied upon an ACR interview of Mr. Speaks who appears to have been involved in the original recording of membership revenue. Mr. Heckler should have been

**FM22368**

United States v. Walter A. Forbes and E. Kirk Shelton
Larry S. Murphy, CPA Summary of Opinions
March 22, 2004

skeptical of the revised information provided by Mr. Speaks because of his involvement in the original recording of membership revenue. (KPMG06158) (Tab 13B)

44.    Mr. Heckler appears to perform only limited testing of the ACR source documents to determine whether they are in agreement with actually reported membership revenues.

45.    The allocations do not provide specific amounts relating to this issue.

**Membership Cancellation Reserves**

46.    Mr. Heckler's amounts are the same as in the ACR.

47.    Mr. Heckler relies on documents accompanying the ACR for his original calculations. (page 2304, ln. 10-19) (Tab 14A)

48.    Mr. Heckler did not test the process by which the underlying computer information reported the various cancellation rates used in the calculations. (page 2306, ln. 7-16) (Tab 14B)

49.    Mr. Heckler did not test rebills as of 12/31/97. Mr. Heckler's work papers do not indicate that he considered rebills for earlier years.

50.    Mr. Heckler did not perform a sufficient review of bank reconciliations relating to rejects. He reviewed only one bank reconciliation of perhaps over 50 bank reconciliations influencing the cancellation reserve calculation. This limited testing does not provide a reasonable basis for his analysis of rejects. (page 2192, ln. 2-21) (Tab 14C)

51.    The allocutions do not specify any amounts relating to cancellation reserves.

**Other Irregularities**

52.    Mr. Heckler adopted the ACR statements and supporting documents for all "other irregularities" items.

53.    The statements in Government Exhibit 1 regarding "Other Errors" confirm the inadequacy of Mr. Heckler's work in this area. Simply "observing" information is not a reasonable basis of support for the expression of a violation of GAAP.

54.    Deferred Marketing - $17 million

    a.    Mr. Heckler accepts, without independent validation, the information contained in the ACR.
    b.    Mr. Heckler did not agree journal entries to the general ledger.

FM22369

United States v. Walter A. Forbes and E. Kirk Shelton
Larry S. Murphy, CPA Summary of Opinions
March 22, 2004

55. Deferred Tax Asset - $2.6 million

    a.  Mr. Heckler limited his work to reading of AA work papers.

    b.  Mr. Heckler did not agree the related journal entries to the general ledger or appropriate subsidiary reporting packages.

56. Commission Expense

    a.  January 31, 1997: $4.5 million – Mr. Heckler accepted USAO's arbitrary amount at 50% of the ACR amount of $9 million.

    b.  Mr. Heckler limited his work to reading of ACR documents.

    c.  December 31, 1997: $2 million – the source for this amount is a portion of the January 31, 1997 amount for January 1997.  Mr. Heckler's basis for this amount is restricted to the ACR as he performed no independent testing.

57. Merger Reserves January 31, 1997 - $11 million

    a.  This amount is based upon the journal entries contained in the ACR.

    b.  Mr. Heckler did not agree the entries to the general ledger or financial reporting packages.

58. Topside Adjustments as of December 31, 1997 from January 31, 1997 - $22 million

    a.  All support is based upon documents accompanying the ACR.

    b.  See comments on Topside Adjustments above.

**Mr. Heckler's Admitted Scope Limitations**

59. Mr. Heckler's Summary does not contain a qualification of the scope of work he performed to reach his conclusions or a statement that he is relying on the work of others as a foundation for his opinions.  Thus, a reader will assume that Mr. Heckler has complied with all appropriate professional standards in completing his work as of August 12, 2002.  Mr. Heckler has admitted that:

    a.  He is relying on the expected testimony at the time of trial by certain individuals to support his opinions that the allegations in the indictment violated GAAP. (pages 1032, ln. 8-17; 1191-2, ln. 24-6; 1467, ln. 1-23; 1485-6, ln. 13-1; 1515-6, ln. 2-15; 1792, ln. 16-18) (Tab 15A)

    b.  He requires the information contained in the ACR as a foundation for his opinions. (page 2325, ln. 10-17) (Tab 15B)

    c.  He cannot reach his conclusions based simply on the "company" documents he considered.  (page 1831, ln. 3-6) (Tab 15C)

FM22370

United States v. Walter A. Forbes and E. Kirk Shelton
Larry S. Murphy, CPA Summary of Opinions
March 22, 2004

    d.  His work was based on a set of implicit assumptions, including that he was provided company documents, no additional information could be found if he performed further investigations, and interviews were conducted appropriately. (pages 1758-9, ln. 4-14) (Tab 15D)

    e.  Mr. Heckler believes that he did not do the best possible job in documenting the work he performed in support of his Summary. (pages 1013, ln. 8-13; 2193, ln. 11-14) (Tab 15E)

60.  Having admitted the above, it is my opinion that Mr. Heckler has failed to adhere to the following professional standards:

    a.  Code of Professional Conduct – Rules 102 and 201.
    b.  Statement on Standards for Consulting Services (CS101.06) requiring adherence to the Code of Professional Conduct.
    c.  Generally Accepted Auditing Standards – AU210, 230, 311, 326, and 339.

61.  In my opinion, Mr. Heckler testified about certain beliefs about the methodology to employ in an engagement such as this one. However, he did not follow those beliefs. They include:

    a.  His belief that it is always helpful to talk to those potentially involved in the allegations. He conducted no interviews in this matter. (pages 1514, ln. 9-19; 1642, ln. 8-16) (Tab 16A)

    b.  His belief that direct observation of evidence is preferable to receiving evidence indirectly. He never requested nor obtained evidence directly from Cendant. (pages 1479-80, ln. 1-8; 1516, ln. 5-9; 1645-46, ln. 22-16; 1768, ln. 1-4) (Tab 16B)

    c.  His belief that interviews cannot be taken as complete truths. He relies on interviews conducted by others outside of his control and supervision. (pages 1759, ln. 15-23; 1767, ln. 16-19; 1791, ln. 18-21; 1817, ln. 4-11; 1824, ln. 16-22; 2332-3, ln. 23-19) (Tab 16C)

    d.  He considered it obvious that the Deloitte & Touche working papers should be reviewed in connection with his examination. He did not review them. (pages 1246-7, ln. 3-1) (Tab 16D)

**Independence, Integrity and Objectivity (Code, Rule 102 and AU220)**

62.  It is my opinion that Mr. Heckler has failed to adhere to professional standards with regard to independence, integrity and objectivity. (AU220 and Code Rule 102) While the criticisms discussed herein demonstrate violations of these standards, there are certain general matters that impact these standards. Based upon his testimony, the appearance of Mr. Heckler's independence is impaired because of the significant amount of fees which, as

FM22371

United States v. Walter A. Forbes and E. Kirk Shelton
Larry S. Murphy, CPA Summary of Opinions
March 22, 2004

I understand, remain outstanding and unapproved by the USAO. It is my understanding that KPMG is due a significant portion of its total fees. In order to assure approval and payment of these unpaid fees, Mr. Heckler's integrity and objectivity may be impaired. Further, Mr. Heckler has testified that cost was a consideration in his engagement. The scope limitations discussed above suggest that he reduced his scope in response to cost considerations. Such cost considerations may have influenced the nature and extent of procedures performed, such as Mr. Heckler's decision not to interview key Cendant employees and not to review Deloitte & Touche working papers. Additionally, Mr. Heckler has testified that he and perhaps his staff did not record all of the time they incurred on this matter in order to improve engagement profitability. Thus, these actions suggest that Mr. Heckler's independence, integrity and objectivity may have been impaired.

**Comments on Post August 12, 2002 Work**

63.    Subsequent to August 12, 2002, in 2003 Mr. Heckler and his staff performed certain additional procedures. I have the following specific comments on the additional work:

   a.    Review of Deloitte & Touche ("D&T") working papers for the reaudit of Cendant for the years 1995, 1996 and 1997. My review of KPMG's work performed indicates that no substantial additional support for Mr. Heckler's opinions has been provided. To the contrary, his review failed to uncover what appears to be a substantial variance in the amount of the cancellation reserve audited by D&T and the amount on which Mr. Heckler renders his opinion. For example, his calculation of the cancellation reserve adjustment for December 31, 1997 is $114 million, while the amount appearing in the D&T working papers is $69 million. Mr. Heckler was unaware of this difference, thus suggesting that Mr. Heckler did not conduct a thorough review of the D&T working papers. Additionally, Mr. Heckler did not attempt to locate information which might reconcile amounts in his Summary to the amounts included in Cendant's Form 10KA. (Tab 17A)

   b.    Topside Adjustments. Additional comments in Mr. Heckler's working papers suggest that additional quarters were tested in a similar way to that of the April 30, 1996 quarter tested for the August 12, 2002 Summary. However, my review of the working papers indicates that the testing of all quarters remains substantially incomplete. Post August 12, 2002 comments suggest that the same work performed on the quarter ended April 30, 1996 entries was performed on the other 8 quarters. Based upon my review of the documents added to KPMG's work papers, only April 30, 1995 contains similar information as April 30, 1996. The remaining 7 quarters are incomplete.

   c.    Revenue Recognition. Mr. Heckler claims to understand a methodology of reallocating membership revenues, but does not determine why, in some cases, the claimed amount of inappropriate reallocations from deferred to immediate recognition programs do not match. For example, the documents on which Mr. Heckler relies show that for January 31, 1995 reallocations do not match by $3.4 million. Subsequent to August 12, 2002,

FM22372

United States v. Walter A. Forbes and E. Kirk Shelton
Larry S. Murphy, CPA Summary of Opinions
March 22, 2004

Mr. Heckler modified his calculations of membership revenue using a methodology provided by the USAO and an electronic model presumably prepared by Cendant. KPMG's post-August 12, 2002 calculation is in error as $6,350,000 was used in its amortization model as reallocated Fee Card revenue when the documents show the amount to be $500,000.  (Tab 17B)

d.  Cancellation Reserves.  After August 12, 2002, Mr. Heckler attempted to determine in separate calculations what Cendant's cancellation reserve rates should have been. However, it appears that the utilization in a calculation of actual cancellation reserve amounts was abandoned without comment.  Mr. Heckler continues to accept the amounts reported in the ACR.  This appears to be another example of subordination of judgment to the ACR.  (Tab 17C)

64.  Based upon my review of the information contained in Mr. Heckler's working papers which appear to relate to post August 12, 2002 work, it remains my opinion that Mr. Heckler violated professional standards and did not obtain a reasonable basis for his opinions expressed in the Summary.

**FM22373**