# EXHIBIT 3

**KPMG Overview Memo – Topside Adjustments**

**Purpose**

The purpose of this memorandum is to document and summarize the limited review procedures performed by KPMG in forming its opinion on the irregularities related to topsides identified by AA. These limited review procedures also includes reviewing the quantification of the irregularities by AA and the USAO (as applicable).

**Overview of evidence and summary of facts**

*Identification of facts and supporting documentation*

The detailed facts and accusations against the Conspirators (see Indictment for definition) are summarized and detailed in the following documents included as part of these workpapers in the Background section of this binder:

- Portions of the expert witness testimony summary documents relating to topside adjustments (section 2 of topside adjustment binder);
- Portions of the detailed testimony "notes" documenting opinion as to the appropriateness of application of GAAP by CUC with regards to topside adjustments (section 3);
- Portion of the Indictment related to topsides (sections 6); and
- Portion of the AA Report related to topsides (sections 4 & 5).

Principally, in the area of topsides, there are two primary issues as follows:

- Arbitrary adjustments to revenues/expenses and related balance sheet items to meet quarterly analyst projections and
- Adjustment for January 1997 results for changes from fiscal year end to calendar year end in 1997.

The procedures performed by KPMG to review and understand the first issue are documented below. The second issue noted above (January impact) is included in the "Other Irregularities" workpapers.

***Reconciliation of the effect of irregularities between AA and Indictment***

Topside adjustment amounts are not separately identified and quantified in the USAO Indictment. The topside adjustments quantified by AA Report are not included in the pretax earnings effects for the Restatement Period (due to their reversals in the subsequent quarter, with exception to the January 1997 impact) but are discussed in great detail in the AA Report (pages 71-99) due to their significant impacts on the first three quarters of each year during the Restatement Period.

**Impact on financial statements - Topside Adjustments**
**(in millions of $$)**

| | | 1995 | | 1996 | | 1997 | | Total |
|---|---|---|---|---|---|---|---|---|
| **Per AA Report:** | | | | | | | | |
| **Topside Adjustments** | $ | 31 ① | $ | 87 ① | $ | 176 ① | $ | 294 |
| **Jan 97 Impact of Topsides** | | | | | | 22 | | 22 |
| **Total Per AA Report** | *$* | *31* | *$* | *87* | *$* | *198* | *$* | *316* |
| **Per Indictment** | *$* | - | *$* | - | *$* | *22* | *$* | *22* |
| **AA Report vs. Indictment** | *$* | *(31)* | *$* | *(87)* | *$* | *(175)* | *$* | *(294)* |

① impact on the 1st 9 mos ended for those annual periods.

**Work performed**

***Interviews conducted***

[redacted]

The interview questions and supporting documentation identified has been included at Section 9 ✓.

See limited procedures performed by KPMG at Section 8 ✓.

***Summary of procedures performed by AA:***

- For each of the first three quarters for the year ended January 31, 1996, January 31, 1997 and December 31, 1997, AA took a number of forensic steps to confirm the quarterly income and balance sheet adjustments that had been made by CUC to essentially bring CUC's net income into line with Wall Street analysts' expectations. These steps included obtaining the original reporting packages of the subsidiaries and the Comp-U-Card division, comparing them with the consolidating Excel

spreadsheets and observing the adjustments made in the spreadsheet themselves. These steps confirmed the information provided by Sattler and others who were involved in making the decisions.

***Summary of additional procedures performed by KPMG (excluding procedures evident in this memo (i.e. interviews, review of AA w/p's, etc.):***

- KPMG randomly selected quarter ended ~~October 31,~~ April 30, 1996 for testing and performed the following steps: Obtained the original reporting package of Comp-U-Card division and compared the reporting package to the 4/30/96 consolidating Excel spreadsheet for the quarter ended ~~10/31/96~~. KPMG noted the adjustments that were made in the spreadsheet themselves. See Topside workpapers at section 8 of the Topside binder for additional information.
- In addition, KPMG reviewed the work performed by AA for the first three quarters of each yr during the Restatement Period.
- No other additional work was performed by KPMG in this area.

**Conclusions**

See conclusions included in the Summary Testimony Memo and the Detailed Testimony Notes at Sections 2 & 3

CONFIDENTIAL

# KPMG Overview Memo – Merger Reserves

**Purpose**

The purpose of this memorandum is to document and summarize the limited procedures performed by KPMG in forming its opinion on the irregularities related to merger reserves identified by AA and included in the USAO indictment. These limited procedures also included reading and understanding the quantification of the irregularities by AA and the USAO (as applicable).

**Overview of evidence and summary of facts**

*Identification of facts and supporting documentation*

The detailed facts and accusations against the Conspirators (see Indictment for definition) are summarized and detailed in the following documents included as part of these workpapers in the Background section of this binder:

- Portions of the expert witness testimony summary documents relating to merger reserves (section 2 of merger reserve binder);
- Portions of the detailed testimony "notes" documenting opinion as to the appropriateness of application of GAAP by CUC with regards to merger reserves (section 3 );
- Portion of the Indictment related to merger reserves (sections 6 ); and
- Portion of the AA Report related to merger reserves (sections 4-5 ).

Principally, in the area of merger reserves, there are three primary issues as follows:

- Set up and reversal of excess merger reserves into/against income/expense;
- Charging normal, recurring operating expenses against the reserve; and
- Charging asset impairments that were not part of the original reserve against the merger reserves.

The procedures performed by KPMG to understand and conclude on each of these issues is documented below.

***Reconciliation of the effect of irregularities between AA and Indictment***

KPMG noted that the amounts included in the Indictment versus the AA report were as follows:

| | 1995 | | 1996 | | 1997 | | Total |
|---|---|---|---|---|---|---|---|
| **Per AA Report:** | | | | | | | |
| **Reversals into income** | $ | 11 | $ | 59 | $ | 115 | $ 165 |
| **Jan 97 impact of Reversals** | | | | | | 32 (f) | 32 |
| **Other Improper Utilizations** | | 6 | | 12 | | 29 | 47 |
| ***Total Per AA Report*** | $ | 17 | $ | 71 | $ | 177 | $ 264 |
| ***Per Indictment*** | $ | 10 (c) | $ | 23 (d) | $ | 110 (e) | $ 143 |
| ***AA Report vs. Indictment*** | $ | (6) | $ | (48) | $ | (67) | $ (121) |

See reconciliation as Section 7 for explanation of reconciling items.

**Work performed**

***Interviews conducted***

[redacted]

The interview questions and supporting documentation identified has been included at Section 13.

See KPMG procedures at Section 12 to support conclusions of the following:

- Set up and reversal of excess merger reserves into/against income/expense;
- Charging normal, recurring operating expenses against the reserve; and
- Charging asset impairments that were not part of the original reserve against the merger reserves.

***Summary of procedures performed by AA (documented at CDAA 12-0006 to 0034 (Cendant) and CDAA 110-0010 to 0022(Ideon)):***

- o Cendant: For year ended December 31, 1997, AA tested the transactions posted to the HFS/Cendant merger reserve (acct #23333). AA received a detailed general ledger printout which included every journal entry posted to the #23333 account since its inception and analyzed every individual entry greater than $100,000 (debit or credit) and several entries below this scope, which amounts to approximately 99% of all account activity

through March. For accounts payable transactions, AA obtained applicable voucher packers (incl. check copies, invoices, etc), in addition to contacting the CUC employee responsible for preparing each entry. AA also requested the available backup for each entry. In the event this backup was insufficient to determine the propriety of the entry, AA held discussions w/CUC personnel to gain an understanding of the purpose of the entries.

- o Ideon: Identical approach as used to test the Cendant reserve was used to test the Ideon reserve for the years ended January 31, 1997 and December 31, 1997. Testing covered in excess of 98% of the aggregate amount charged against the Ideon Reserve.
- o Note: The propriety of the *original* Cendant and Ideon Reserves were not tested by AA.

***Summary of additional procedures performed by KPMG (excluding procedures evident in this memo (i.e. interviews, review of AA w/p's, etc.):***

- For the years ended January 31, 1996, January 31, 1997 and December 31, 1997, KPMG agreed the merger irregularities identified by AA to original source documents and supporting documentation (i e. CUC internal memos, emails, etc) to the extent possible. See wps at Section 12.
- For the years noted above, KPMG read both E&Y and AA wps to determine whether there was documentation of testing of asset impairments performed by CUC and was unable to locate existing documentation.
- In addition, KPMG considered whether the original Cendant and Ideon Reserves complied with existing literature to be included in the original reserve. Based on the lack of detail showing the build-up of the original reserve amounts, KPMG is unable to support that the amounts qualified to be included in the original reserve and were permitted to be accrued in advance of when they were incurred. See original reserve wps at Sections 9 & 10 & 11
- No other work was performed by KPMG in this area.

**Conclusions**

See conclusions included in the Summary Testimony Memo and the Detailed Testimony Notes at Sections 2 & 3.

KPMG 09199

**KPMG Overview Memo – Membership Cancellation Reserves**

**Purpose**

The purpose of this memorandum is to document and summarize the procedures performed by KPMG in forming its opinion on the misapplication of GAAP and the resulting misstatements arising from the irregularities identified by AA and included in the USAO indictment. These procedures also include reading the quantification of the irregularities by AA and the USAO (as applicable)

**Overview of evidence and summary of facts**

*Identification of facts and supporting documentation*

The detailed facts and accusations against the Conspirators (see Indictment for definition) are summarized and detailed in the following documents included as part of these workpapers in the Background section of this binder:

- Summary of our expert witness analysis and conclusions relating to membership cancellation reserves;
- Portions of the detailed "notes" documenting opinion as to the appropriateness of application of GAAP by CUC with regards to membership cancellation reserves,
- Portion of the Indictment related to membership cancellation reserves; and
- Portion of the AA Report related to membership cancellation reserves

While not considered necessary to summarize this information again for documentation purposes, KPMG read the Indictment and AA Report to identify and summarize the pertinent facts detailed in these documents and identified supporting documentation included in the AA report (if any) This workpaper has been included at w/p <C-9>

Principally, in the area of membership cancellation reserves, there are four primary issues as follows:

- Adequacy of the membership cancellation reserve;
- Timely recognition of known claims against the reserve (i.e. delay caused by the holding of rejects in transit at year-end);
- Various inappropriate JE's were made subsequent to year-end to record 1) the prior year-end rejects in transit, 2) fictitious adjustments to move the recorded rejects to A/R and increase the membership cancellation reserve, and 3) subsequent reversal of the entry recorded in 2) above, and
- Certain "P" entries were inappropriately made during Q4 in certain years to reverse cancellation reserves to income NOTE: FYE January 31, 1997 appears to be the most significant year this was done. No entries were identified during FYE December 31, 1997

The procedures performed by KPMG to understand and conclude on each of these issues is documented separately below.

*Reconciliation of the effect of irregularities between AA and Indictment*

KPMG noted that the amounts included in the Indictment were also those detailed in the AA report as follows:

| ($ in millions) | January 31, 1996 | 1997 | Dec 31, 1997 |
|---|---|---|---|
| **Cancellation Reserves:** | | | |
| Earnings overstatement per Indictment (page 11) | 48 | 19 | 12 |
| Earnings overstatement per AA Report (page 238) | 48 | 19 | 12 |
| Difference | - | - | - |

Therefore, KPMG procedures will concentrate on gaining an understanding of how AA arrived at those amounts by reading and understanding the underlying supporting documentation. The AA computations of these amounts are summarized at w/p <C-16>.

**Work performed**

**Interviews conducted**

KPMG summarized the interviews conducted by AA and Willkie Farr & Gallagher with Steven Speaks at w/p <C-21>

Certain interview questions and supporting documentation identified has been included at w/p <C-17>.

**Adequacy of the membership cancellation reserve**

*Summary of procedures performed by AA (documented at CDAA 42-0016 to 0022)(NOTE: these workpapers should be read in conjunction with membership reserve analysis for 12/31/1997 at w/p <C-33>):*

- AA obtained the re-stated membership reserve calculations prepared by Speaks and Casper Sabatino;
- AA then performed the following for renewals:
  - Renewal revenue – agreed all balances to CUC's general ledger and Safeguard Monthly Financial reports on a program-by-program basis, noting only typographical errors which were corrected by Speaks subsequently;
  - Renewal cancel rate – Agreed cancel rates on a program-by-program basis to cancel reports generated by CUC from its VAX system (AA's Computer Risk Management Group also performed

testwork on the reliability of the membership/cancellation information generated by CUC's VAX system. This testwork is not documented herein.);

- Estimated cancels in transit – AA obtained the related CUC curve analysis and discussed underlying assumptions used in deriving the curve analysis, noting them to be reasonable as the curve showed that after 3-4 months into a membership, most members that will cancel have already cancelled as per AA most members cancel after the charge hits their credit card; and
- Commission receivable % - AA reviewed CUC's listing of client commission rates and agreed five client contracts to this list, noting only immaterial differences. AA then compared, on average, the commissions for generic clients and direct clients by program to the commission percentages in the membership cancellation reserve analysis, noting the rates are consistent with supporting documentation;

- AA then performed the following for new members:
  - New revenue – AA agreed (on a scope basis) the gross new revenue included in the reserve calculation to the general ledger and Safeguard Monthly Financial Reports for five months and five different forms of media, noting only typographical errors subsequently corrected by Speaks;
  - Gross new revenue – after trial – AA agreed, on a scope basis, the new revenue after trial amounts to the general ledger for five months and five different forms of media, noting only typographical errors subsequently corrected by Speaks;
  - Cancel rates 100% - AA agreed rates on a program-by-program basis to the cancellation reports generated by CUC's VAX system Alternative procedures were performed for programs and media types where cancel reports were not available (i.e. typically new programs with no history);
  - Cancels in transit – AA obtained the related CUC curve analysis and discussed underlying assumptions used in deriving the curve analysis, noting them to be reasonable; and
  - Commission receivable % - AA reviewed CUC's listing of client commission rates and agreed five client contracts to this list, noting only immaterial differences. AA then compared, on average, the commissions for generic clients and direct clients by program to the commission percentages in the membership cancellation reserve analysis, noting the rates are consistent with supporting documentation

*Summary of additional procedures performed by KPMG:*

- Obtained CUC calculation of original membership cancellation reserve and documented an understanding of how this reserve was calculated;

- Agreed net membership cancellation reserves to the CUC final trial balance contained in the E&Y workpapers for 1/31/1996 and 1/31/1997 and 12/31/1997,
- Obtained an electronic version of the final membership reserve calculation prepared by CUC from AA (via the USAO) and documented a basic understanding of the methodology employed in calculating the reserve.

**Rejects in transit held at year-end**

*Summary of procedures performed by AA (documented at CDAA 43-0005 to 0008 and continues from CDAA 42-0008 to 42-0014):*

- For FYE January 31, 1996 and 1997 and FYE December 31, 1997, AA obtained schedules prepared by CUC personnel (Maria Pinsker) detailing the amounts of rejects and chargebacks then outstanding. A similar schedule was obtained for FYE January 31, 1995 in order to properly re-state opening retained earnings for February 1, 1995 (i.e. FYE January 31, 1996).
- In order to test these CUC prepared schedules, AA obtained ***all*** the bank reconciliations and agreed the balances of rejects, chargebacks and credit files (cancellations) included in the bank reconciliations as reconciling items.
- For any missing bank reconciliations, AA reviewed the general ledger and noted/concluded that the related account balances were immaterial at year-end.
- In performing their testwork, AA noted that at January 31, 1997 and December 31, 1997 there were additional rejects included in accounts receivable reconciliations. AA obtained a listing of these rejects from CUC and separately complied a list from the accounts receivable reconciliations to the sub-ledger, noting the AA amount was not materially different from the one calculated by CUC.
- For December 31, 1997 (*ONLY*), AA examined the billing confirmation reports obtained by CUC by outside billing processors (this is what CUC uses to identify rejects to include on bank reconciliations). The difference between the original ACH reports submitted by CUC and the confirmed billings from the processor is equal to the amount of the rejects. In particular, AA:
    - examined the ACH reports attached to the bank reconciliations for CUC's two largest cash accounts;
    - obtained the billing confirmations received from the third party billing processor (Nabanco);
    - Recalculated the difference between what was submitted and what was confirmed to calculate the amount of the rejects, and
    - Compared the recalculated amount to that included by CUC on the bank reconciliations.
    - AA obtained a 85% coverage of the total rejects outstanding as of December 31, 1997.
- In order to test that the rejects were actually recorded by CUC subsequent to the appropriate year-end, (except for rejected recorded during Q1/Q2 FYE

January 31, 1996 relating to FYE January 31, 1995) AA selected certain cash accounts each year (to achieve a high coverage ratio) and identified and examined the journal entries used by CUC to record the rejects/chargebacks. AA reviewed the general ledger detail for the account (#24000), identified the journal entries that recorded the rejects, and noted that for the accounts reviewed all balances were subsequently recorded by CUC. AA achieved coverage of 59%, 65% and 79% for rejects outstanding as of January 31, 1996 and 1997 and December 31, 1997 (and recorded by CUC subsequent to these periods) by performing the above procedures.

- NOTE: It does not appear that any work was performed by AA to test the amount of cancellations not recorded, although it appears to be included in the AA adjustment.

*Summary of additional procedures performed by KPMG (excluding procedures evident in this memo (i e interviews, review of AA w/p's, etc.)*

- For the year ended January 31, 1997, KPMG agreed the amount of the rejects/chargebacks and cancellations included in AA's spreadsheet detailing these items to the actual bank (or accounts receivable) reconciliations included in AA's workpapers at CDAA 43-0009 to CDAA 43-0347, noting only minor exceptions. KPMG also noted how these reconciling items were described in the reconciliations and that these items were shown as deductions from the book balance.
- No other additional work was performed by KPMG in this area.

**Q4 "P" Entries made to membership cancellation reserve and JE's made for presentation purposes**

*Summary of AA testwork*

***JE's made for presentation purposes***

- AA obtained a detailed listing of the JE's affecting the Membership Tape In-transit account (a/c# 1200000, a receivable account) and identified the JE's recorded by CUC to reverse the debit entry made to the membership reserve account (when the rejects were subsequently recorded) and the JE's recorded to reverse this entry;
- AA examined the related JE's, noting the affected general ledger accounts affected,
- No further testwork appears to have been performed by AA on these items (NOTE: these entries affect balance sheet accounts only, thus no effect on the p&l)

***"P" Entries***

- AA reviewed the membership cancellation reserve account general ledger detail for the periods October 15, 1995 through December 31, 1997 to identify all "P" entries affecting the membership reserve account (account #24000) while simultaneously increasing income,

- To ensure completeness, AA obtained a comprehensive listing of all "P" entries for the relevant period and examined this listing for any entries not already identified. None were noted; and
- AA examined the respective "P" entry, noting the affected general ledger accounts;
- For those JE's which could not be located (only relating to November and December 1995 and January 1996), AA examined the comprehensive listing of all "P" entries, noting accounts reflected in the adjustments.
- AA also reviewed the CUC prepared analysis of all decreases to the membership cancellation reserve for the relevant periods, noting no significant non-operating decreases to the reserve (other than the "P" entries identified);
- No further work noted

**KPMG Overview Memo – Revenue Recognition**

**Purpose**

The purpose of this memorandum is to document and summarize the limited procedures performed by KPMG in forming its opinion on the irregularities identified by AA and included in the USAO indictment relating to revenue recognition. These limited procedures also include reading the quantification of the irregularities included in the AA report and the USAO Indictment (as applicable).

**Overview of evidence and summary of facts**

*Identification of facts and supporting documentation*

The detailed facts and accusations against the Conspirators (see Indictment for definition) are summarized in the following documents included as part of these workpapers in the Reporting and Case Background sections of this binder:

- Portions of the final expert witness report relating to revenue recognition;
- Portions of the "detailed notes" supporting the expert witness opinion as to the appropriateness of application of GAAP by CUC with regards to revenue recognition;
- Portions of the Indictment related to revenue recognition; and
- Portions of the AA Report related to revenue recognition.

While not considered necessary to summarize this information again for documentation purposes, KPMG did read and understand the information contained in the Indictment and the AA Report in order to identify and summarize the pertinent facts detailed in these documents as well as identify any supporting documentation included in the AA report (if any) which support the facts. This workpaper has been included at w/p <R-10>.

Principally, in the area of revenue recognition, there are three primary issues as follows:

- Reallocations of revenues from deferred recognition programs to immediate recognition programs, which was not in accordance with GAAP or CUC's stated accounting policy;
- CUC deferred certain expenses relating to immediate recognition programs where the related revenues were recognized immediately (i.e. no matching of expenses with revenues); and
- Amortization of certain expenses related to deferred recognition programs was delayed by one month.

As the amount of the misstatement included in the Indictment only relates to the reallocations of the revenues between deferred and immediate recognition programs, the procedures performed by KPMG to read and understand this issue is documented separately below. However, with regard to the matching of expenses and delay of expenses by one month, KPMG only identified and read the appropriate AA workpapers

concerning these issues. No additional procedures were performed for these two issues relating to expenses.

*Reconciliation of the effect of irregularities between AA and Indictment*

The effect of the irregularities in connection with revenue recognition as included in the Indictment and detailed in the AA report are as follows:

| ($ in 000s) | January 31, 1996 | January 31, 1997 | Dec 31, 1997 |
|---|---|---|---|
| **Revenue recognition:** | | | |
| Earnings overstatement per Indictment (page 11) | 'millions of $' | 10,000 | 17,000 |
| Earnings overstatement per AA Report (page 238) | 26,730 | 22,724 | 41,420 |
| Difference | (26,730) | (12,724) | (24,420) |

The reason for the discrepancy between the two amounts is due to AA's amounts taking into account not only the effect of reallocating revenues between deferred and immediate programs, but also the effect of deferring certain expenses for immediate recognition programs and correcting for certain errors identified by AA during their testwork. The amount included in the Indictment only takes into account the effect of reallocating revenues from deferred to immediate recognition programs Both of the computations of these amounts are summarized at w/p <R-27> and <R-28>.

## Work performed

**Understanding CUC's business**

In order to understand the issues identified by AA in their report, KPMG performed additional procedures to increase our understanding of the nature of CUC's business as it relates to the membership programs. These procedures are documented below and are in addition to reading the Indictment and AA Report.

*Summary of additional procedures performed by KPMG:*

- Read the 10K's and 10Q's and the restated 10KA for 1997 filed by CUC with the SEC;
  - Read the Description of CUC's business, specifically on membership services, as included in the 1997 Original 10K and Restated 10K/A. These sections describe certain of the membership programs offered by CUC;
  - Read and compare the CUC disclosures relating to its policy for revenue recognition for membership programs and membership acquisition costs;

- Graphically compare the originally reported revenue and net income/(loss) amounts included in the original 1997 10K to the restated amounts audited by D&T as included in the 1997 10K/A; and
  - Read the Description of CUC's business and the MD&A sections and compare the disclosures made to the requirements of Item 101 and Item 303 of Regulation S-K.
- Read summarized AA workpapers describing the revenue process followed by CUC and develop an understanding of how CUC recognized revenues.

**Interviews conducted**

KPMG summarized the interviews conducted by AA and Willkie Farr & Gallagher with Steven Speaks at w/p <R-10-2>.

The interview questions and supporting documentation identified has been included at w/p <R-9>.

**Reallocation of revenue from deferred to immediate recognition programs**

*Summary of procedures performed by AA (documented at CDAA 49-0005 to 49-0028)*

- AA developed an understanding of CUC's revenue process at both the Trumbull, CT and the Cheyenne, WY locations;
- AA reviewed certain automated procedures in the revenue recognition process;
- AA obtained, through discussions with Speaks, an understanding of the original projection models and amortization grids utilized by CUC to record revenue during the relevant period. AA also obtained an understanding of the restated amortization grids prepared by CUC (Speaks) in order to restate revenues and expenses. (NOTE: no periods prior to February 1, 1995 were investigated by AA);
  - AA reviewed and documented the revenue allocations from deferred to immediate recognition programs recorded in the original projection models;
  - For the restated amortization grids, AA traced and agreed the revenue/expense amounts entered into the amortization grids to the underlying Modified Cash Basis P&L's, verifying the amounts were included in the proper reporting period;
  - AA reviewed the revenue and expense amortization grids that are used to convert the modified cash basis p&l's to a GAAP basis in order to determine that the amortization periods used are 1) consistent for both revenue and expenses related to the applicable programs and 2) in accordance with CUC's corrected amortization policies;

- AA tested for proper revenue recognition and tested for existence of CUC's members by selecting 5 billing files (documents that record the receipt of cash from the respective banks and include information related to cash receipts from the actual member) and traced the billing files from the cash receipts to the modified cash basis general ledger;
    - In addition, AA agreed the revenue amounts per the general ledger to the modified p&l and then reconciled the monthly totals from the modified p&l's to the Membership Detail Report, which includes cash receipts and revenue recognized on a monthly basis
- AA reviewed and tested amounts of revenues being accrued (per modified cash basis g/l) and subsequently reversed (until billing occurs) to ensure proper revenue recognition (see revenue process memo);
- AA reviewed the analysis of CUC's trial cancel rate to ensure the rates used to record revenue were reasonable; and
- AA reviewed significant post close ("P") entries which impacted revenue or expense recognition.

*Summary of additional procedures performed by KPMG:*

- KPMG obtained and read the complete AA workpaper binders (#1 and 2 of 2) labeled "Revenue recognition and amortization" to gain an understanding of CUC's business as documented by AA and the testwork performed by AA;
- Original projection models and amortization grids:
    - KPMG read the original projection models and amortization grids included in Section #4 of AA binder 1 of 2, noting columns labeled "allocation", which is how CUC purportedly transferred deferred revenues to immediate recognition programs; and
    - Using the 12/31/1997 projection model and amortization grids, KPMG documented an understanding of how the projection model operated to support our understanding that the amounts included in the "allocation" column of the projection model achieved a transfer of revenue from deferred programs to immediate recognition programs.
- Re-stated amortization grids:
    - KPMG read the restated amortization grids and documented an understanding how of the amount of the misstatement was calculated by AA and read the related AA workpapers in order to understand the testwork performed by AA on the restated grids.

**<u>Deferral of expenses/Delay of amortization by one month</u>**

*Summary of procedures performed by AA (documented at CDAA 49-0005 to 49-0028):*

In addition to the procedures performed by AA on the reallocations of revenues between deferred and immediate programs, AA also performed the following procedures:

- AA obtained, through discussions with Speaks, an understanding of the original projection models and amortization grids utilized by CUC to record revenue during the relevant period. AA also obtained an understanding of the restated amortization grids prepared by CUC (Speaks) in order to restate revenues and expenses. (NOTE: no periods prior to February 1, 1995 were investigated by AA);
  - For the restated amortization grids, AA traced and agreed the revenue/expense amounts entered into the amortization grids to the underlying Modified Cash Basis P&L's, verifying the amounts were included in the proper reporting period;
  - AA used the Modified Cash Basis P&L's and the expense amortization grids to determine which expense line items were deferred and discussed these items with CUC personnel in order to understand the types of costs captured in these line items
  - AA reviewed the revenue and expense amortization grids that are used to convert the modified cash basis p&l's to a GAAP basis in order to determine that the amortization periods used are 1) consistent for both revenue and expenses related to the applicable programs and 2) in accordance with CUC's corrected amortization policies
- AA reviewed significant post close ("P") entries which impacted revenue or expense recognition

*Summary of additional procedures performed by KPMG (excluding procedures evident in this memo (i.e. interviews, review of AA w/p's, etc.)*

- No other additional work was performed by KPMG in this area.

CONFIDENTIAL

R-27

| ($ in 000s) | January 31, 1996 | January 31, 1997 | Dec 31, 1997 |
|---|---|---|---|
| **Revenue recognition:** | | | |
| Earnings overstatement per Indictment (page 11) <R-60> | "millions of $" | 10,000 | 17,000 |
| Earnings overstatement per AA Report (page 238) <R-27-1> | 26,730 | 22,724 | 41,420 |
| Difference | (26,730) | (12,724) | (24,420) |

**NOTE:**

Per the USAO, the difference above is due to the methodology applied in determining the effect of the misstatement. The amounts included in the Indictment take into account ONLY the effect of the "reallocations", while AA's amounts take into account the misstatement related to the matching of expenses with revenues, the delay of expenses by one month, the underaccrual of commissions and corrections for other accounting and clerical errors identified by AA during their testwork. See <R-60>.

| ($ in 000s) | | January 31, 1996 | January 31, 1997 | Dec 31, 1997 |
|---|---|---|---|---|
| *Supporting documents examined to support conclusion* <R-27-1/2> | | | | |
| *Source: AA w/ps:* | | | | |
| Adjustment to re-state original revenue grids | A | 7,496 | 37,493 | 36,137 |
| Net other revenue adjustments | A/B | 4,419 | (7,303) | (215) <R-27-2> |
| Overstatement of income for adjustments examined | | 11,915 | 30,190 | 35,922 |
| *Supporting documents not examined to support conclusion* | | | | |
| *Source: AA w/ps)* | | | | <R-27-2> |
| Clerical errors - revenues | B | (333) | 758 | (2,141) |
| Adjustment to re-state (increase) original expense grids | C | 13,427 | (15,380) | 1,704 |
| Celerical errors - expenses | B | (20) | (318) | (228) <R-27-2> |
| Understatement of commission expenses | B | 1,744 | 7,478 | 6,166 |
| Net other expense adjustments | B | (3) | (4) | (3) |
| Total overstatement per AA | | 26,730 | 22,724 | 41,420 |
| *Check* | | - | - | - |

A KPMG has focused its efforts in considering the effect of these adjustments on reported results and compliance with GAAP

B KPMG only read the related AA workpapers relating to these items as they did not impact the reallocation of revenues from deferred to immediate recognition programs. These workpapers are included in the section labeled "Expenses" (See w/p's <R-100> to <R-106>, and <R-43>. The nature of these adjustments are described at w/p <R-27-2>.

C As these amounts do not relate to the reallocations of revenue, KPMG read the related workpapers and gained an understanding of how the differences were calculated ONLY. No further procedures were performed by KPMG. The adjustment reflects the corrective effects of a) elimination of certain period expenses previously capitalized and amortized by CUC (i.e. crative costs, 3rd party costs and certain database accrual costs, b) matching immediate program expenses with immediate revenue recognition previously deferred over a 12 month period by CUC, and c) delay of amortization of expenses by 1 month

KPMG 06159

CONFIDENTIAL

#3246 P.011

R-27-1

**Restatement Period**
**Earnings Impact of Improper Accounting Entries**
**($ Millions)**

| Description | 1997 | 1996 | 1995 |
|---|---|---|---|
| Quarterly Topside Adjustments (1) | 176 | 87 | 31 |
| January 1997 Calendar Adjustment | 22 | 0 | 0 |
| Reversals of Merger Reserves Into Income at December 31, 1997 | 115 | 0 | 0 |
| Reversals of Merger Reserves (and other Liabilities) into Income at January 31, 1997 | 32 | 59 | 0 |
| Reversals of Merger Reserves Into Income at January 31, 1996 | 0 | 0 | 11 |
| Asset Writeoffs Against the Cendant Reserve - Income Statement Effect | 29 | 12 | 6 |
| Revenue Recognition Practices | 48 | 23 | 27 |
| Membership Reserve Correcting Entries ① | 12 ✓ | 19 ✓ | 48 ✓ |
| Other Matters | 11 | 9 | 35 |
| Total Pretax Effect | 282 | 122 | 127 |
| Tax Effect @ 39% | (102) | (48) | (50) |
| Earnings Impact | 160 | 74 | 77 |

(R-27) (Addressed in this 6) See Cancellations binder = $511M

= $311M

(1) Entries recorded topside on a quarterly basis and reversed in the following quarter. These amounts are not included in the total Earnings Impact.

① See separate binder on membership reserves.

Note: Summary of the effect on irregular items as included in the AA report.

KPMG 06160

CONFIDENTIAL

R-27-2

| ($ in 000s) | | January 31, 1996 | January 31, 1997 | Dec 31, 1997 |
|---|---|---|---|---|
| Other revenue adjustments (overstatement/understatement) of income: | | | | |
| *Clerical errors:* | | | | |
| Amortized effects of discrepancies between restated grids and modified cash basis P&L's | A | (333,000) | 758,000 | (2,141,000) |
| *Net other revenue adjustments:* | | | | |
| Removal of immediate recognition 12/1995 Safecard revenue | B | 6,291,000 | - | |
| Deferral of 12/1995 Safecard revenue | B | (1,048,000) | (5,240,000) | - |
| Deferral of pre-2/1997 Pet program revenues | C | (824,000) | (2,063,000) | (896,000) |
| Removal of immediate recognition Pet program revenues | D | - | - | 1,596,000 |
| Deferral of Pet program revenues previously recognized immediately | D | - | - | (915,000) |
| Net effect of other revenue adjustments (under)/overstatement of income | | 4,419,000 | (7,303,000) | (215,000) |
| | | 4,086,000 | (6,545,000) | (2,356,000) |

| ($ in 000s) | | January 31, 1996 | January 31, 1997 | Dec 31, 1997 |
|---|---|---|---|---|
| Other expense adjustments (overstatement/understatement) of income: | | | | |
| *Clerical errors:* | | | | |
| Amortized effects of discrepancies between restated grids and modified cash basis P&L's | E | (20,000) | (318,000) | (228,000) |
| *Net other expense adjustments:* | | | | |
| Understatement of commissions expense | F | 1,744,000 | 7,478,000 | 6,166,000 |
| Rounding | | (3,000) | (4,000) | (3,000) |
| | | 1,721,000 | 7,156,000 | 5,935,000 |

NOTE: The above adjustments represent adjustments AA proposed to the restated grids AA was originally presented by CUC for testing. The above adjustments are included in AA's calculation of the net effect on income resulting from the irregularities and included in their report. See page 213 of the AA Report and w/p <R-27>

A These adjustments represent the net effect of all the differences between the restated amortization grids prepared by Steve Speaks and the modified cash basis p&l's which AA identified during their testing of the restated grids. These amounts were calculated by AA on a month-to-month basis and then either amortized over a 12 month period or recognized immediately, depending on the membership program. See CDAA 49-0228 to CDAA 49-0248 for documentation of testwork by AA.

B During its testwork, AA concluded that Safecard revenues were inappropriately included as immediate revenues in the restated grids and should be treated as deferred. The above entry reverses the effect of immediately recognizing these revenues and deferring them over a 12 month period.

C This adjustment records $3,800,000 of pet program revenues that was not included in the restated amortization grids and defers over a 12 month period, which AA determined was the appropriate treatment.

D AA determined that the restated grids improperly recognized immediately $1,600,000 of pet program revenues immediately. AA determined that these revenues should be recognized over 12 months.

E These adjustments represent the net effect of all the differences between the restated amortization grids prepared by Steve Speaks and the modified cash basis p&l's which AA identified during their testing of the restated grids. These amounts were calculated by AA on a month-to-month basis and then amortized over a 12 month period. See CDAA 49-0228 to CDAA 49-0248 for documentation of testwork by AA.

F As part of AA's testwork of the commission accrual, AA determined that the accrual, and thus, commission expense was understated. As commission expenses flow through the amortization grids, AA calculated the p&l impact of this underaccrual in the adjustment figure. AA noted that the impact of the underaccrual is amortized each respective year beginning in December of that year. For example, the underaccrual of $3,000,000 for the year ended January 31, 1996 is amortized monthly beginning in December 1995. See separate KPMG binder on the commission accrual.

KPMG 06161

CONFIDENTIAL

**KPMG Overview Memo – Other Irregularities**

**Purpose**

The purpose of this memorandum is to document and summarize the limited review procedures performed by KPMG in forming its opinion on other accounting irregularities identified by AA. These limited review procedures also includes reviewing the quantification of the irregularities by AA and the USAO (as applicable).

**Overview of evidence and summary of facts**

*Identification of facts and supporting documentation*

The detailed facts and accusations against the Conspirators (see Indictment for definition) are summarized and detailed in the following documents included as part of these workpapers in the Background section of this binder:

- Portions of the expert witness testimony summary documents relating to other irregularities (section 2 of other irregularities binder);
- Portions of the detailed testimony "notes" documenting opinion as to the appropriateness of application of GAAP by CUC with regards to other irregularities (section 3 );
- Portion of the Indictment related to other irregularities (sections 6 ); and
- Portion of the AA Report related to other irregularities (sections 4+5 ).

Principally, in the area of other irregularities, there are three primary issues as follows:

- Deferred tax asset created by recognizing income without support
- Normal, recurring operating expenses were reclassified as deferred marketing and
- Commission payable was reversed into income without support

The procedures performed by KPMG to review and understand the issues are documented below.

***Reconciliation of the effect of irregularities between AA and Indictment***

KPMG noted that the amounts included in the Indictment versus the AA report were as follows:

CONFIDENTIAL

KPMG 10212

**Impact on financial statements - Other Irregularities**
**(In millions of $$)**

| | | 1995 | | 1996 | | 1997 | | Total |
|---|---|---|---|---|---|---|---|---|
| Total Per AA Report | $ | 35 | $ | 9 | $ | 11 | $ | 55 |
| Per Indictment | $ | - | $ | 4.5 | $ | 35.6 (c) | $ | 40 |
| AA Report vs. Indictment | $ | (35) (a) | $ | (4.5) (b) | $ | 24.6 (d) | $ | (15) |

See reconciliation at Section 7 for explanation of reconciling items

**Work performed**

***Interviews conducted***

[redacted]

The interview questions and supporting documentation identified has been included at Section 9.

***Summary of procedures performed by AA:***

- For the other irregularities identified above, AA reviewed unsupported journal entries and documentation, in addition to interviewing relevant company personnel to determine that irregularities existed with the above items.

***Summary of additional procedures performed by KPMG (excluding procedures evident in this memo (i.e. interviews, review of AA w/p's, etc.):***

- No other additional work was performed by KPMG in this area.

**Conclusions**

See conclusions included in the Summary Testimony Memo and the Detailed Testimony Notes at Sections 2 + 3.

# EXHIBIT 4

PRIVILEGED & CONFIDENTIAL
SUBJECT TO ATTORNEY-CLIENT AND
ATTORNEY WORK PRODUCT PRIVILEGES

# REPORT TO THE AUDIT COMMITTEE OF THE BOARD OF DIRECTORS OF CENDANT CORPORATION

PREPARED BY:

WILLKIE FARR & GALLAGHER

-and-

ARTHUR ANDERSEN LLP

August 24, 1998

2. Reversal of $2.3 million of Welcome Wagon Purchase Reserves into Income

In connection with the acquisition of Welcome Wagon and Gifts International, Inc. (collectively "Welcome Wagon"), CUC set up $3.4 million of purchase reserves at February 1, 1995. In post-close journal entries prepared in February, 1996 (but backdated to October, 1995 and January, 1996), Welcome Wagon reversed $2.3 million of the purchase reserves into income. Revenues were increased by $1 million ($500,000 each to two different revenue accounts), and expenses were decreased by $1.3 million (seven different accounts). See Appendix Ex. 85. Sabatino said there was no support for these entries. As the reversal of the reserve occurred less than a year after the reserve was established, the appropriate treatment would have been to credit goodwill rather than income.[141]

3. Reversal of $2.1 million of Essex Reserves into Income

In January, 1995, CUC acquired Essex, a private company. Prior to the close of the transaction, Essex's Executive Vice President and Chief Operating Officer, Tom Albright, had discussions with Corigliano and Bell about the need for Essex to establish certain reserves, including for the potential loss of Essex's bank clients who had the right to terminate their contracts with Essex upon a change of control.

---

141 Neither Plucinski, who booked the entries, nor Breitenbach, who approved them, had any recollection of the entries.

A reserve of $1,290,000 was recorded in December, 1994 to cover potential client cancellations, software integration costs, marketing expenses and other items. Albright said he thought the reserve was somewhat excessive but that he was comfortable with about $900,000 of the amount.

In connection with the acquisition, in January, 1995 a purchase reserve of $570,000 also was established on Essex's books. Albright said this figure was provided to Essex based on goodwill calculations performed by Corigliano.

In November, 1995, Elisa Lanthier, Vice President and Controller of Essex, received a telephone call from either Corigliano or Sabatino instructing her to reverse (debit) $1.1 million of the reserve established in December, 1994 and to decrease (credit) operating expenses, effective to October, 1995. By this time Essex already had submitted its October, 1995 reporting package to Stamford. Lanthier was told not to submit a revised October reporting package but instead to make sure that the entries were reflected in the November package to be submitted the following month.

After Lanthier informed Albright of these instructions, Albright said he called Corigliano to inquire as to the justification for the reversal of the reserve into income. Albright said he told Corigliano the expense credits were not a clean offset to the reserves since the expenses being credited were not related. Albright said Corigliano acknowledged this to be true but told him not to worry because the amount was immaterial to CUC's overall operations and would be taken care of

at CUC Corporate in some manner. Albright said he told Kevin Crowe, Essex's chairman, that CUC Corporate wanted Essex to make some entries that Albright thought were less than pristine accounting, and that Crowe told him that if Corporate wanted it done he should do it. The entries were booked.

Albright said that in December, 1995, he and Crowe traveled to Stamford to discuss their fiscal 1997 budget, and they met with Shelton, Corigliano and Sabatino. The fiscal 1997 budget (for the year ended January 31, 1997) projected expenses much higher than those shown on Essex's year-to-date fiscal 1996 financials, and Albright said Shelton asked for an explanation for the variance. Albright then said that this was due to the $1.1 million entry Corigliano had asked Essex to book. Albright said Corigliano acknowledged that to be the case and there was no further discussion on the point. Shelton did not recall any discussion about this item.

In January, 1996, Lanthier received a telephone call from either Corigliano or Sabatino instructing her to reverse approximately another $1 million of reserves into income, including the balance remaining from the $1,290,000 reserve as well as the balance of the purchase reserve and other reserves Essex had previously established. Again the credit to be made was to operating expenses. Again Albright called Corigliano and said this was not a proper offset, which he said Corigliano acknowledged. Corigliano again said the amount was immaterial to CUC and would be taken care of at Corporate. The entries were booked.

Albright said there was no basis for the reversal of the reserves into operating income. He said the reserves were no longer needed at the time they were reversed (Essex in fact lost no clients due to the merger). The credit should have reduced goodwill rather than having increased operating income.

E. Other Information Pertaining To Knowledge of Merger Reserve Reversals

The above sections describe what persons interviewed have said about their role in the reversal of merger reserves and what they have stated about the knowledge and participation of others. Certain additional information is summarized below.

Sabatino said that in years prior to 1997, he periodically prepared a schedule for Corigliano listing all of the reserves, generally purchase reserves, that had been established at each subsidiary. The schedule would contain a column listing the "excess" in each reserve.[142] Sabatino said that at year-end Corigliano would review the schedule and determine which reserves should be taken into income. Sabatino said that sometimes Kearney would be present for these discussions.

Sabatino said that in late 1997 he prepared a document for Corigliano listing various "reserves available" to be taken into income at year-end 1997. See Appendix Ex. 44. The document (which bears handwriting identified by Sabatino as that of

---

142 We have been unable to locate any copies of these schedules.

405667