# EXHIBIT 5

# WILLKIE FARR & GALLAGHER

**MEMORANDUM**

PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

TO:      Files

FROM:    James H. Bicks

RE:      Cendant Corporation Investigation

AS TO:   Interview of Stephen A. Greyser

DATED:   July 23, 1998

---

On Wednesday, July 23, 1998, James Bicks ("JB") and Aida Bekele ("AB") of Willkie Farr & Gallagher ("WF&G") interviewed Stephen A. Greyser, a former member of the Audit Committee of CUC International, Inc. ("CUC") and a present member of the Board of Directors of Cendant Corporation, (the "Company") at the offices of Weil Gotshal & Manges ("WG&M"). Also present for the interview were Dennis Block and Greg Danilow of WG&M.

## INTRODUCTION

JB explained that WF&G had been retained by the Audit Committee of the Company to conduct a special investigation into the Company's accounting practices. JB explained that WF&G represents neither the Company nor its employees. JB informed Greyser that statements he made in the course of the interview may not be privileged. Greyser indicated that he understood and was prepared to proceed on that basis.

## BACKGROUND

Greyser was a member of the CUC Board from 1984 until the present. Greyser was a member of the Audit Committee of CUC until the merger. He could not recall the exact year that he became a member of the Audit Committee. He knew that he had been an Audit Committee member for at least the last ten years. Greyser said that the last Audit Committee meeting he attended was probably the fall of 1997 but he could not recall exactly.

Greyser said that the last Cendant Board meeting he attended was in April 1998.

Greyser is a professor at Harvard Business School of Marketing & Communications. He teaches courses on Marketing, Corporate Communications and the Business of Sports.

CENDANT 0000540

0477514.01

Greyser does not have a formal accounting background. He is not a C.P.A. Greyser received his M.B.A. from Harvard Business School where he took an accounting course.

## AUDIT COMMITTEE INVOLVEMENT

Greyser said that he developed a professional relationship with Walter Forbes prior to the creation of Comp-U-Card. Forbes was also a Harvard Business School alumnus and Forbes worked for the Management Analyst Center (MAC). They developed a relationship at that time because Greyser was a consultant to MAC. Greyser recalled talking to Forbes about electronic marketing and shopping. Greyser and Forbes strengthened their relationship through these discussions. Shortly thereafter, Forbes created Comp-U-Card International. Forbes asked Greyser if he would consider becoming a member of the Board of Comp-U-Card a few years after its inception.

Greyser said he became a member of the Audit Committee because he was a non-executive who had the experience of being on a number of boards. Greyser said that this quality made him a good fit for membership on CUC's Audit Committee. Greyser said he was currently on the board and audit committee of the Opinion Research Company, an intelligence gathering firm, and the Gruntal Company. In the past, he has been chairman of the audit committee and a member of the board of directors of Restaurant Associations and the Public Broadcasting System.

## AUDIT COMMITTEE ROLE

Greyser explained what he understood the role of the CUC Audit Committee to be. Greyser said that the Audit Committee of CUC engaged in surveillance, "as opposed to hands on" control, of the internal systems and accounting procedures of the Company. Greyser said that the Audit Committee picked the outside auditors, Ernst & Young. The auditors performed detailed reviews and prepared plans for the upcoming year that were presented to the Audit Committee at its meetings. The Audit Committee would review the plan and discuss it with the senior management of Ernst & Young.

JB asked Greyser about the recent subsidiary audits performed between 1994 and 1997. Greyser said that these audits included actual visits to subsidiaries by Ernst & Young. JB asked Greyser who decided which subsidiaries Ernst & Young should visit. Greyser said that this decision was a collaborative effort among the Audit Committee, management and Ernst & Young.

Greyser said that EPub presented unique concerns because it was an entertainment facility that handled a great deal of cash. The Audit Committee wanted to ensure

CENDANT 0000541

0477514.01

that internal procedures were in place because any cash business poses additional risks. Greyser remembered that questions would be raised at the Audit Committee meetings about EPub and its internal controls but that there were never any problems found. He recalled that CUC management was extremely responsive to the Audit Committee's specific concerns about EPub.

He said that Kim Ames, the head of Internal Audit, always sat in on Audit Committee meetings to discuss the subsidiary audits as well. Ames prepared a detailed memorandum for each meeting that provided an internal perspective on projects she was involved with along with follow-up on matters that the Audit Committee or management had asked her to look into. The Audit Committee would always review Ames' reports at the meetings.

Greyser emphasized that the Audit Committee examined the financials of all the units and subsidiaries to the extent that it was "germane to the audit of collective CUC." Greyser said that the Audit Committee reviewed Ernst & Young's reports but that they were discussed in more detail by the CUC Board. Greyser said his understanding was the Audit Committee's review of the subsidiary audits concentrated on priority areas like internal procedures controls.

## AUDIT COMMITTEE MEETINGS

The Audit Committee usually held a meeting in connection with the Board retreat in January which Ernst & Young attended. This meeting was prior to both the fourth quarter close and the issuance of the annual report. The Audit Committee would generally discuss the preliminary results of Ernst & Young's audits at this meeting.

JB asked Greyser if there were any areas in particular on which Ernst & Young focused. Greyser said that the Audit Committee would examine any areas which were of emerging concern to management. For example, the issue of currency exchange and matching became more important of an issue as CUC started growing globally. The Audit Committee examined this issue because it was significant to the future of CUC even though it was not a typical issue which the Audit Committee would address.

Greyser did not recall any particular concerns or issues that Ernst & Young raised during Audit Committee meetings. Greyser did not recall any discussions related to reserves at Audit Committee meetings. He did recall that reserves were an item of discussion at Board meetings in connection with any ongoing acquisitions taking place. Greyser did not recall any particular discussions relating to revenue recognition or expense recognition at Audit Committee meetings. Greyser said that Ernst & Young never

CENDANT 0000542

0477514.01

raised any issues to them besides what was mentioned in the management letters that Ernst & Young issued each year.

Greyser stressed that the Audit Committee asked management to leave the room at the end of every meeting so that Ernst & Young could raise issues in private with only the Audit Committee present. The Audit Committee would specifically ask Ernst & Young whether there were any items of concern or if there were any issues which Ernst & Young thought the Audit Committee should focus on with management. Ernst & Young never raised any issues at this time either. Greyser said that the Audit Committee was very concerned about performing "very assiduous" surveillance and not operating as merely an "annual check-up."

JB asked Greyser if he or Ernst & Young were ever concerned about internal controls or the qualifications of people who held certain positions at the subsidiaries. Greyser said that any concern was focused more on whether a particular division could be properly managed by the person in charge. For example, Greyser said that the Audit Committee would have been concerned that EPub was headed by someone who understood how to run a cash business because of the specific concerns relevant to that kind of operation.

Greyser said that Ernst & Young never seemed to exhibit any concern for the qualifications of individual division heads. Greyser did state that certain observations might prompt some comments from Ernst & Young or management about how certain divisions could be managed better or more efficiently. Greyser could not recall any specific individuals about whom Ernst & Young or management expressed concern. But Greyser stated that Ames, Stuart Bell and Cosmo Corigliano were in the best position to evaluate the people who were in control of the subsidiaries.

IDEON RESERVES

Greyser stated that reserves were discussed at Board Meetings in connection with CUC's acquisition of Ideon. Greyser could not specifically recall the amount of the reserves. When JB mentioned the figure of $127 million, Greyser said that amount sounded right. Greyser remembered a presentation by Amy Lipton, the General Counsel, where Lipton discussed legal matters and the topic of reserves as it related to Ideon. Greyser said he had assumed that because it was Lipton's presentation, she probably supported the reserve number. He remembers that Lipton, Kirk Shelton, Forbes and Corigliano were involved in this discussion with the Board but Greyser said that Corigliano may not have commented on the reserves. Greyser said that Ernst & Young may have informally told management about its view on the reserve amount but Greyser does not recall any official opinion.

CENDANT 0000543

0477514.01

Greyser did not recall that the Board was informed of how the reserves were ultimately utilized. Greyser could not recall any discussion about reserves being set aside for integration costs in connection with the Ideon acquisition.

Greyser recalled that substantial reserves were set up to cover the potential exposure related to Peter Halmos and the class action lawsuits. Greyser said that the Ideon reserve discussion stood out in his mind for two reasons. First, Greyser was acutely aware of the reputation of Halmos and, second, because of the large amount that had been set aside for the potential exposure.

Greyser said that the Board was continually informed about the Halmos litigation and received updates about the class action suits. Greyser remembered that the Board got status updates on the progress of the litigation and the status of settlement discussions at every meeting.

Greyser did not remember much about the settlement. Greyser recalls not having strong feelings about the settlement either way. Greyser thought the fact that CUC actually came to a settlement with Halmos was good. JB asked Greyser about his recollection of CreditLine. Greyser said "it didn't ring any bells" but it may have been discussed. Greyser said that he did not know how the settlement impacted reserves.

Greyser said that he did not recall the discussion of reserves in connection with the acquisition of Sierra and Davidson. But Greyser said that both these companies were scrutinized in much detail prior to their acquisitions.

BOARD MEETINGS

Greyser said that budgets for CUC and the subsidiaries were presented at the January Board Meeting. Greyser said that he received a detailed budget from the division heads in different written formats. Some of the budgets were handed out prior to the meeting for "advanced study" and others were distributed at the meeting. Whether it was a hard copy or computer-driven slide depended on the division but Greyser could not remember details for any particular division. The Board would follow each presentation with a query session for that division head. Greyser said the division head was usually questioned about how confident he was with the numbers he presented.

After the series of presentations and query sessions were completed, CUC would present its consolidated budget. Greyser recalls that CUC's consolidated budget would be set forth in a written document that was included as part of the Board Package. This budget was an annual budget and was not broken down by quarters. The Board would discuss and approve the budgets. There was no special vote

-5-

0477514.01

to approve the budget. Greyser said that there was always a hard copy of the consolidated budget.

JB showed Greyser a copy of the minutes from the January 1996 Board Meeting, and a copy of a document called "CUC International Budget Summary" (Exhibit A attached hereto was obtained from the January 1996 Board Package in Robert Tucker's files). JB pointed out to Greyser that the board minutes reflect that the Board approved the budget for FY 1997. Greyser was then asked if Exhibit A appeared to be the budget that was approved at that meeting. Greyser could not identify the document or the numbers. He could not recall if this particular document contained the budget that w.s approved for FY 1997. He said that his recollection was that the budget ultimately approved contained more detail than that contained in Exhibit A. Greyser remembered that there was usually about 8-10 pages of organized supporting material distributed with the budget.

JB then showed Greyser a copy of the minutes from the January 1997 Board Meeting. JB pointed out to Greyser that the board minutes indicated that the budget was approved for FY 1998. Then JB showed Greyser a copy of a document called "CUC International Budget Summary January 31, 1998" (Exhibit B attached hereto). JB asked Greyser if he recalled whether this was the budget that was approved at the January 1997 Board Meeting. He could not specifically identify this document or say whether it was the budget that was approved. JB asked Greyser if he had any recollection of the figure for net operating income of $459 million in 1998. Greyser said that he had no recollection of that number. Greyser said that $459 million did not seem familiar to him but that he did recall that the total operating income for each year always improved.

JB showed Greyser a copy of the Due Diligence Presentation from April 1997 (Exhibit C attached hereto). Greyser said Exhibit C looked "not unfamiliar" for the membership services program. He said it provided the type of information that was provided to the Board members to keep track of the "ebb and flow of member acquisitions." JB asked Greyser if the numbers from Exhibit C on the page containing the Financial Summary for 1/31/98 looked familiar. Greyser said that these numbers did not look familiar to him.

1997 Performance

JB asked Greyser about his general recollection of CUC's 1997 performance. Greyser could not recall anything out of the ordinary. Greyser said that he always took the time at the meetings to compare the current year's numbers with the prior year's numbers and the planned budget numbers. He said that the actual results as reported to the Board were always in line with what was originally budgeted

-6-

CENDANT 0000545

0477514.01

at the beginning of the year. Greyser could not remember anything specific about discussions of Software's performance except that there were some conversations about market responsiveness to certain product development offerings.

JB showed Greyser a Board Package dated June 10-11, 1997. This package contained a comparison of the Company's "actual" results for the first quarter of 1997 to what was budgeted for that quarter at the beginning of the year. It was his understanding, that CUC did not change the "budgeted" figure as the year progressed. He said that the format of this document is similar to the format of the budget that was approved in January (although the budget approved in January was not broken out by quarters).

JB showed Greyser the agenda for a December 17 meeting. JB pointed out to Greyser that this document indicated that the third quarter results were reviewed. JB asked Greyser if he recalled reviewing third quarter results or receiving a document comparing third quarter results to what was budgeted. Greyser said that he had no recollection of reviewing third quarter results or receiving such a document. Greyser said that it would have been unusual not to receive the third quarter results at this meeting.

## ACCOUNTING PROCEDURES

Greyser could not recall discussions at Audit Committee Meetings or Board Meetings about the following topics: expense recognition, revenue recognition, shifting revenues from one program to another, reserves being taken into income, reserves being used to manage income, operating budget versus non-operating budget, rejects in transit and creating reserves in connection with membership programs.

Greyser did recall general discussions of cancellation rates in which reserves were mentioned along with other items. Greyser remembered that the travel and shopping units would discuss cancellation rates at the Board meetings. These discussions were about historical rates. He could not recall any discussions about projected cancellation rates.

Greyser said that he, along with the rest of the Board, was aware that a reserve was established for the HFS/CUC merger but doesn't recall any details about the substance or the nature of that knowledge. Greyser said that he had "no clue" about the components of the reserve or if reserves were set aside for litigation exposure.

Greyser said he had no knowledge of any accounting irregularities or problems prior to April 15, 1998.

## STOCK SALES

-7-

CENDANT 0000546

0477514.01

options. Greyser owns a substantial amount of stock through options. He has never sold any stock or exercised any

J.B.

-8-

CENDANT 0000547

# EXHIBIT 6

PRIVILEGED AND CON.
SUBJECT TO ATTORNEY,
ATTORNEY WORK PROD

F

To:        Memo to Files

From:      Helena Lau, Tony Horton, Ruben Robles, Robert Corti, New York

Date:      June 1998

Subject:   Billing Process

---

This memorandum summarizes discussions with Ken Kellogg, VP of Marketing Ops, John Moroniti, Manger of Production System Control, Denise Spear, Manager of Input/Output, regarding the ACH Billing process. Meetings regarding the ACH Billing System were attended by:

- Arthur Andersen: Helena Lau, Tony Horton, Ruben Robles Robert Corti; and
- Deloitte & Touche: Anthony DeGregorio, Lorraine Peoples and Dmitriy Borovik.

Overview
Members are billed for purchases and membership fees. Each membership has a trial period associated with it (from 0 - 3 Months) that allows the member to try the service without being billed.

The Operations department runs Schedule Billing jobs, referred to as NEGOPS, which "sweep" the membership database for members that are to be billed. Billing criteria include may factors such as bill date ranges, active member, billable member, by cash types (for example trial billing, first full term billing and subsequent renewal).

Billing Process (x-ref F/1)
Note: All references to "cash" refer to billings, not actual cash.

I.    The NEGOPS job is run on Saturday for all billings that have a bill date between the Saturday on which the job is run through the following Friday. All files have an .ACHTRN extension, are written in binary format and are placed in a holding area on the VAX. The scheduling department and the accounting department must sign off on the NEGOPS job before it is sent to the ACH_Router.

      Note: The scheduling department signs off on the job and account signs-off on the aggregate numbers.

II.   The extract from the NEGOPS job is processed by the ACH_ Router. The ACH_Router is a program which sorts and creates cash file by client IDs. It generates a Rejected Billings and a Pending Cash Report. Rejected Billings reports are researched and corrected by the Marketing Operations Department and the Pending Cash Reports and associated files are sent to the I/O group for additional formatting.

Confidential, Produced Pursuant to 10/30/98 Letter to Giekel, AUSA, to Weissman

PRIVILEGED AND CONFIDENTIAL          2
SUBJECT TO ATTORNEY/CLIENT AND
ATTORNEY WORK PRODUCT PRIVILEGE.

Date:       June 29, 1998

Subject:    Billing Process

III. The formatting and merging of client information is processed in stages. Each stage is identified by a status number. After each stage the I/O group manually reviews the information for accuracy and completeness. The stages are listed below: (**Please refer to F/2 for test and F/3 for flow process**)

   a) *Status 100* - I/O receives the Pending Cash Report and reconciles the net totals with the onscreen net totals.
      - If the totals do not reconcile, Operations is contacted to reconcile the problem.
      - If the totals reconcile the files are given a status of 150.

   b) *Status 150* - I/O reconciles the hardcopy total record counts, debit amounts, and credit amounts by Merge Code to the screen output. Next, they I/O compares the files being processed to a hardcopy list of files that have been designated for holding.
      - If totals do not reconcile Operations is contacted.
      - Files on the list are given a status of 300 until approved for holding release.
      - Files not on the list are given a status of 200.

   c) *Status 200* - I/O generates a new status 150 report (to list all billings that have not been upgraded). This is compared to the billing cycle calendar to ensure that clients remaining at the 150 status are not supposed to be billed that day.
      - If a client is suppose to be billed on that day and is still listed on the "full" (Full - all billings for a particular status) 150 report, Operations is contacted.
      - I/O generates a "full" 200 report and a 200 report that is billing schedule specific for the client (daily, weekly, monthly, etc.); these reports are reconciled to each other.
      - If the client files do not appear on both reports, I/O will attempt to determine the reason and remedy. If they are unable to do so, Operations is contacted.
      - If the files balance, they are segmented by client via the Router and given a status of 299.
      - Files with a status of 299 are automatically merged into a client specific file and given a status of 600.

   d) *Status 300 – Files put on "Hold"*
      - Files approved for hold release (taken off status 300) that are to be billed on the current day are changed to a status of 200.
      - Files approved for hold release (taken off Status 300) that are not to be billed on the current day are given a status of 150.
      - Files that are not to be released are giv⸺

Confidential,
Produced Pursuant to Weissman,
AUSA, 10/30/98 Letter to Glekel.

CDAA 47-0248

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO ATTORNEY/CLIENT AND
ATTORNEY WORK PRODUCT PRIVILEGE.

3

Confidential,
Produced Pursuant to Weissman,
AUSA, 10/30/98 Letter to Glekel.

Date:      June 29, 1998

Subject:   Billing Process

e) *Status 400* - Files that are designated to be VOID are retained for seven years. These file can be designated as VOID for a variety of reasons i.e. technical problems on client side and are put on hold for seven year for audit purposes.

f) *Status 600* - Next, an Invoice Tracking Report is generated and reconciled with a Tie-Out report that was created independently of the ACH Billing System. Record and dollar variances are generated and communicated via e-mailed to I/O.
   - If the variances are zero or judged acceptable by the software, the bill is sent out.
   - If the variances are not zero or acceptable, Operations is contacted.

g) *Status 700* - Upon confirmation of file receipt from the client, the status of the file is updated to status 700 (the process has been completed).

IV. <u>Regeneration and Retransmissions</u>
A cash file may be re/generated and retransmitted for several reasons:
  a) the client has changed the required format and this has not been communicated to CUC. These are directed to Software Development;
  b) in some (rare) instances, erroneous data may have been sent, such as wrong prices. In this case, Marketing Operations must prepare a job request to have the file content changed;
  c) the tape on which the file was sent to the client was damaged; or
  d) There was a EFT transmission error.

**Dummy Routing**
Dummy routing routines are run to ensure certain files are never processed. For example, there should never be TNEW file types for Mobil, because the Mobil club never bills members during the trial period. The dummy routing will send the files to a holding area and generate an error report.

The file is typically voided by Software Development after approval has been obtained from Marketing Operations.

**Membership Client Returns (MCR)**
The MCR jobs process all files are returned by financial institutions. These files are placed in a holding area, which MCR sweeps periodically. Each file, is reformatted back into CUC format. The formatter also "maps" the financial institution's rejection reason codes to CUC reason codes.

The CUC reason codes indicate whether a return transaction is a "hard" decline or a "soft" decline. A "hard" decline typically occurs when the credit card number provided by the

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO ATTORNEY/CLIENT AND
ATTORNEY WORK PRODUCT PRIVILEGE.

4

Confidential,
Produced Pursuant to Weissman,
AUSA, 10/30/98 Letter to Glekel.

Date:      June 29, 1998

Subject:   Billing Process

member has been reported lost/stolen, which represents a fraudulent transaction. A "soft" decline typically occurs when a member has provided a valid credit card number, but is not deemed "billable" because the member has exceeded his/her credit limit.

Hard declines result in the cancellation of membership. The membership database is updated with the reason "rejected billing transaction".

Soft declines are reprocessed. The number of times the transaction is re-cycled varies by client. The Pending Rebill database is used to track the number of "re-bills" for each transaction. The cash type for such transactions is "RBLS". Once a transaction has reached the maximum number of re-bills, MCR will alter the "soft" decline to a "hard" decline.

Maintenance of the MCR codes is performed by Software Development under the direction of Marketing Systems Support.

CDAA 47-0250