# EXHIBIT 2

MINUTES OF A SPECIAL MEETING OF
THE BOARD OF DIRECTORS
OF
CENDANT CORPORATION
HELD ON JULY 28, 1998

Minutes of a Special Meeting of the Board of Directors (the "Board") of Cendant Corporation (the "Company") held at the offices of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden, Arps"), 919 Third Avenue, New York, New York on July 28, 1998 at 10:00 a.m.

The following members of the Board were present in person:

| | |
|---|---|
| James E. Buckman | Robert E. Nederlander |
| Bartlett Burnap | Burton C. Perfit |
| Leonard S. Coleman | Anthony G. Petrello |
| T. Barnes Donnelley | Robert P. Rittereiser |
| Martin Edelman | E. John Rosenwald, Jr. |
| Walter A. Forbes | Stanley M. Rumbough, Jr. |
| Frederick Green | Leonard Schutzman |
| Dr. Carole G. Hankin | E. Kirk Shelton |
| Stephen P. Holmes | Henry R. Silverman |
| Robert D. Kunisch | Robert F. Smith |
| Christopher K. McLeod | John D. Snodgrass |
| Michael P. Monaco | Robert T. Tucker |
| Brian Mulroney | |

The following members of the Board participated by teleconference:

Stephen A. Greyser
Robert W. Pittman
Craig R. Stapleton

CONFIDENTIAL    HFS    0007737

Present by invitation were Thomas D. Christopoul, Executive Vice President, Human Resources of the Company; John H. Fullmer, Co-Chair and Co-Chief Executive, of the Company's Alliance Marketing Division; Samuel L. Katz, Executive Vice President - Strategic Development of the Company; Tony Menchaca, Co-Chair and Co-Chief Executive, of the Company's Alliance Marketing Division; Richard A. Smith, Chairman and Chief Executive Officer of the Company's Real Estate Division; Michael Wargotz, Chief Financial Officer of the Company's Alliance Marketing Division; Joseph H. Flom, David Fox, Eric Friedman, Samuel Kadet, Jonathan Lerner and Mitchell Gordon of Skadden, Arps, counsel to the Company; J. Michael Cook, Christopher Thompson, Ronald L. Rickles and Linda S. Bitteker of Deloitte & Touche LLP, the Company's independent auditors; Jack H. Nusbaum of Willkie Farr & Gallagher, special counsel to the Audit Committee of the Board; and David L. Stulb, Francis Nusspickel, Raymond J. Adiletta and Joseph F. Berardino of Arthur Andersen LLP, accounting advisors to the Audit Committee of the Board. Also present were Robert L. Friedman and James G. Kreissman of Simpson Thacher & Bartlett, special counsel to the members of the Board who were formerly directors of HFS Incorporated; Richard J. Schaeffer of Dornbush Mensch Mandelstam & Schaeffer LLP and Stephen Kaufman, special counsel to E. Kirk Shelton; and Dennis J. Block and Greg A. Danilow of Weil, Gotshal & Manges LLP, special counsel to the members of the Board who were formerly directors of CUC International (other than Mr. Shelton).

The Board had previously received an agenda for the meeting.

Mr. Forbes called the meeting to order and requested that Mr. Silverman conduct the meeting in accordance with the agenda.

Mr. Silverman reviewed the meeting agenda with the Board and stated that at the meeting, among other things, the Board would receive: (i) a presentation from the Audit Committee and its independent legal and accounting advisors relating to the status of their investigation into the accounting irregularities initially disclosed by the Company to the public on April 15, 1998; (ii) a presentation from the Company's independent auditors relating to the status of its audit review of the pending restatement of the Company's historical financial statements; (iii) presentations from senior officers of the Company's franchise, real estate, membership, software and mortgage business units and a presentation from the Company's senior Human Resources officer concerning the impact on the Company, its businesses and constituencies of the continuing crisis created by the accounting issues and the uncertainty regarding the Company's principal executive management

2

succession stemming from the contractual and by-law provisions which require that Mr. Forbes become the Company's President and Chief Executive Officer on January 1, 2000 and that Mr. Silverman become the Company's Chairman at such time and from the supermajority vote and other by-law provisions which were intended to ensure joint governance of the Company for three years following the merger of CUC International ("CUC") and HFS Incorporated ("HFS") by a Board and its committees comprised of equal numbers of representatives who were formerly associated with, or designated by, CUC and representatives who were formerly associated with HFS; (iv) a presentation regarding the impact of the accounting issues and senior management uncertainty on the Company's recent acquisition efforts; (v) a presentation from Mr. Flom on the legal responsibilities of directors under Delaware law; and (vi) a presentation from Mr. Fox on the terms of a tentative resolution to the governance issues that includes a draft employment separation agreement between the Company and Mr. Forbes.

Mr. Nusbaum presented an overview of the status of the Audit Committee's investigation and noted, among other things, that the forensic accounting portion of the investigation was virtually complete. Mr. Nusbaum indicated, however, that the Audit Committee was not ready to report or otherwise comment at this time upon the aspects of the Audit Committee investigation pertaining to the individuals responsible for the accounting irregularities.

Mr. Stulb presented a brief overview of Arthur Andersen's investigation on behalf of the Audit Committee and reviewed generally for the Board the different categories of accounting issues that had been identified: (i) accounting irregularities, which are defined to involve intentional misstatements made with an intent to deceive; (ii) a "grey area" of accounting misstatements where the intent is unknown; and (iii) accounting errors, which are defined to involve unintentional misstatements. Mr. Stulb noted that, as additional information becomes available, Arthur Andersen expected that approximately 90 percent of the "grey area" items would be classified as accounting irregularities and that the remaining 10 percent of the "grey area" items would be classified as accounting errors. Mr. Stulb stated, among other things, that there were numerous long-term, systematic accounting irregularities at approximately 70 percent of the former CUC businesses and provided an overview of the various categories of accounting irregularities -- the creation of fictitious earnings; premature recording of revenues; misuse of merger reserves; and the failure to recognize expenses -- and the financial impact of such irregularities to the Board. Mr. Stulb also stated that the accounting irregularities appear to have been carefully designed to avoid detection. Mr. Stulb indicated that the Audit Committee was given a full

3

report on the status of Arthur Andersen's investigation on July 27, 1998 and that all members of the Audit Committee were in agreement with Arthur Andersen's findings.

The Board was provided with the written materials regarding Arthur Andersen's findings attached hereto as Exhibit A, which Mr. Nusspickel then reviewed in detail. Mr. Nusspickel commented that, based upon the nature of the irregularities, Arthur Andersen believed that all of the activity behind the irregularities was directed by CUC personnel located at CUC's Stamford, Connecticut headquarters.

Mr. Stulb then reported on the independent nature of Arthur Andersen's investigation.

The Board members then had an opportunity to ask the Arthur Andersen representatives questions regarding their presentation. Following conclusion of the question and answer session, Deloitte & Touche was introduced to report on the status of its audit review of the pending restatement of the Company's historical financial statements.

Mr. Cook reviewed the scope of Deloitte & Touche's audit activities and noted that Deloitte & Touche was working to conform unacceptable accounting practices to acceptable accounting practices, and was not merely changing acceptable accounting practices to more preferable accounting practices. Mr. Cook also noted that Deloitte & Touche was not immediately concerned with classifying the various accounting issues within the categories identified by Arthur Andersen, but rather was conducting its audit in order to enable the Company to restate its financial statements to address all of the accounting issues identified by Arthur Andersen and Deloitte & Touche.

The Board was provided with the written materials regarding Deloitte & Touche's findings of accounting errors at certain former CUC business units attached hereto as Exhibit B, which Mr. Rickles then reviewed in detail.

In response to a question from Mr. Holmes, Mr. Rickles noted that the corrections of the accounting errors identified by Deloitte & Touche were not intended to make good accounting better, but rather were to bring these accounting practices up to a minimum level of acceptability. Mr. Rickles also noted that Deloitte & Touche was working closely with Arthur Andersen to enable Arthur Andersen to determine the appropriate nature and category of particular accounting issues.

4

Mr. Stulb commented that Arthur Andersen has been very conservative in categorizing specific accounting issues as accounting irregularities as opposed to accounting errors and that, unless it is clear that an item is an "irregularity", it was left in the error category.

In response to a question from Mr. Buckman as to whether accounting irregularities were the same as fraud, Mr. Stulb indicated that accounting irregularities is a phrase that is defined in applicable accounting literature as intentional misstatements made with an intent to deceive. Mr. Silverman then noted that the Company reported approximately $170 million of earnings in the past three years that did not exist.

In response to a question from Mr. Smith as to whether Mr. Forbes or Mr. Shelton had any comment on the foregoing accounting presentations, Mr. Forbes and Mr. Shelton each responded no.

Mr. Mulroney commented that, as these accounting issues occurred under Messrs. Forbes' and Shelton's management at CUC, the Board was entitled to hear their reactions to the accounting presentations.

In response to Mr. Mulroney's comments, Mr. Forbes stated that he is outraged by the accounting irregularities, supported the Audit Committee's investigation and was anxious to get to the bottom of the investigation. Mr. Shelton stated that he never participated in, nor was he aware of, any fraudulent activities.

Mr. Holmes was then requested to furnish the Board with information as to the impact of the accounting issues and management uncertainty on the Company's businesses and operations. Commenting on the impact of the accounting issues, Mr. Holmes noted that employee morale, retention and recruitment has been adversely affected and that customer and client relationships have also been adversely affected. Mr. Holmes also noted that, due to the accounting issues, the Company's ability to conduct franchise sales have been adversely affected, resulting in the loss of key commission sales people.

Mr. Holmes emphasized that the continuing uncertainty surrounding the Company's principal executive management is exacerbating the crisis. In this regard, Mr. Holmes noted, among other things, that several franchisees have questioned the Company's ability to conduct its business in the current environment and that potential franchisees have been

5

CONFIDENTIAL     HFS     0007741

reluctant to commit to one of the Company's franchises until the management uncertainty is resolved.

Mr. Richard Smith reported on the adverse impact of the accounting issues and the management uncertainty on the Company's real estate businesses. Mr. Smith noted, among other things, that recruitment of sales associates was problematic due to the uncertainties surrounding the Company. Mr. Smith also noted that the Company had lost, or been threatened with the loss of, a substantial amount of relocation business due to these issues, which will impact the Company's ability to obtain new business.

Mr. Menchaca then reported on the adverse impact of the accounting issues and the management uncertainty on the Company's alliance marketing division. Mr. Menchaca stated, among other things, that certain business has been put on hold because partners are awaiting completion of the Audit Committee's investigation and resolution of the management uncertainty. Mr. Menchaca also stated that these issues have adversely impacted the Company's ability to win new business because new partners rely on the Company's track record and reputation.

Mr. Fullmer reported on the employee crisis at the Company's alliance marketing division. Mr. Fullmer noted, among other things, that employee retention was a significant issue and that the Company is unable to attract high caliber replacements due to the accounting and management uncertainty issues. Mr. Fullmer indicated that they were looking to the Board to take action to resolve these issues.

Mr. Wargotz reported on, among other things, changes being made to the financial controls at the Company's alliance marketing division to ensure that its accounting practices conform with GAAP.

Mr. McLeod reported on the employee retention problems at the Company's software division. Mr. McLeod noted, among other things, that the outstanding stock incentives which previously helped retain employees were no longer effective at current Company stock price levels and also noted that the retention issues also stem from the Company having identified the software business as non-strategic.

Mr. Christopoul reported on employee issues at the Company in general. Mr. Christopoul reported on the Company's difficulties in attracting top quality personnel in light of the accounting issues and the uncertainty over the Company's senior management.

CONFIDENTIAL    HFS    0007742

Mr. Christopoul noted, among other things, that employee morale was suffering and cited diminished employee retirement savings due to the decline in the market price of the Company's stock and the loss of stock option value as significant contributors to the employee morale problem.

Mr. Katz reported on the current status of the Company's pending acquisitions of American Bankers Insurance Group and RAC Motoring Services. Mr. Katz noted, among other things, that the Company needed regulatory approval for both transactions and that the recent press reports about the uncertainty surrounding the Company's senior management and questions regarding the management fitness of former CUC representatives were threatening the Company's ability to obtain the required approvals.

Mr. Buckman reported on certain legal issues relating to the American Bankers transaction and noted, among other things, that informal reports from the Florida insurance department indicated that the Company would need to convince the insurance department that those individuals that were responsible for the accounting irregularities are no longer with the Company. Mr. Buckman also reported on meetings he and other representatives of the Company had with representatives of the Securities and Exchange Commission, the United States Attorney's office in Newark, New Jersey and the United States Postal Inspector in regard to the accounting issues.

Mr. Monaco then reported to the Board on the impact of the accounting issues and the management uncertainty on the Company's and PHH Corporation's debt and cash position. Mr. Monaco noted, among other things, that, due to the accounting issues, the Company has been unable to access the public equity or public debt markets. Mr. Monaco also noted that the Company was on credit watch by all of the major rating agencies and that the Company had expected to be taken off credit watch following public announcement of the magnitude of the accounting irregularities but that the rating agencies are concerned about the uncertainty regarding the Company's senior management and apparently are going to await the outcome. Mr. Monaco noted that PHH's commercial paper was trading below A2/P2 from A1/P1 and that the size of the A2/P2 market was about one-tenth the size of the A1/P1 market, significantly restricting liquidity. Mr. Monaco then reviewed various alternatives to address the Company's and PHH's liquidity needs.

CONFIDENTIAL    HFS    0007743

The meeting was then temporarily adjourned during which the directors who were formerly directors of CUC met with their legal counsel, and the directors who were formerly directors of HFS met with their legal counsel.

The meeting was reconvened and Mr. Flom reviewed the legal responsibilities of directors under Delaware law in the context of the Company's existing management crisis. Mr. Flom indicated that the Board could determine to terminate Mr. Forbes' employment without cause if 80 percent of the directors voted to do so. Mr. Flom also indicated, however, that if the Board was at an impasse regarding the management issues because the required number of votes needed to terminate Mr. Forbes' Employment Agreement without cause could not be obtained, the Board could consider a negotiated resolution between the Company and Mr. Forbes. In this regard, a separation agreement had been negotiated between the Company and Mr. Forbes regarding the termination of his employment with the Company which could be presented to the Board for consideration.

Mr. Mulroney commented on the directors' responsibilities to shareholders and then moved to adopt a resolution terminating Mr. Forbes' employment with the Company for cause and the termination of Mr. Shelton as an employee for cause. Mr. Smith seconded Mr. Mulroney's motion.

Mr. Silverman noted that the Board had three alternative courses of affirmative conduct with respect to Mr. Forbes: termination of his employment with the Company for cause; termination of his employment with the Company without cause; or termination of his employment with the Company pursuant to the terms of the draft separation agreement.

Mr. Flom noted that none of the information presented at this meeting seemed to be clear and unequivocal grounds for terminating Mr. Forbes' employment with the Company for cause pursuant to the terms of his employment agreement with the Company. Mr. Flom also noted that if the Board would vote to terminate Mr. Forbes' employment with the Company without cause, there would be no need for the separation agreement releasing Mr. Forbes from liability relating to the accounting issues. Mr. Flom noted, however, that, pursuant to the draft separation agreement, Mr. Forbes would represent and warrant that he did not have knowledge of or participate in the accounting irregularities, and Mr. Forbes would also represent and warrant that no event, circumstance or other reason exists that would entitle the Company to terminate his employment under his employment agreement for cause, and that these representations and warranties were important factors for the Board to consider during its deliberations regarding the various

8

provisions of the separation agreement, including the release and the severance payments Mr. Forbes would receive. Mr. Mulroney noted his view that there was common law justification for terminating Mr. Forbes' employment with the Company for cause. Mr. Flom stated that Mr. Forbes' employment agreement would control the elements of cause.

Drafts of the separation agreement and related annexes, including the proposed Amended and Restated By-laws of the Company, as well as draft Board resolutions relating thereto were distributed to the Board.

Mr. Fox then reviewed the material terms of the current draft separation agreement and related annexes and the Board resolutions.

Mr. Monaco described certain issues related to Mr. Forbes' travel and entertainment expenses and noted that Mr. Forbes had indicated that his accountant would review these matters and a response would be forthcoming promptly. Mr. Fox noted that, in addition to the representations and warranties in the separation agreement, simultaneously with the execution of the separation agreement, Mr. Forbes would commit in writing to reimburse any improper expense amounts to the Company.

Mr. Forbes stated that he had no knowledge of any of his expenses being charged to the Company's merger reserves, that all of his expenses had been approved, that his accountant will put the requested information together and that he is confident that it will all be explained.

In response to a question from Mr. Silverman, Mr. Forbes stated that he was prepared to sign the separation agreement and related materials.

The meeting was then temporarily adjourned.

The meeting was reconvened and then Mr. Flom stated that while he would let Mr. Block speak for himself, he had talked to Mr. Block and that Mr. Block had talked to his clients and Mr. Shelton and Mr. Block had stated that all 14 directors who were former CUC directors would not vote to terminate Mr. Forbes' employment with the Company with cause or without cause. Mr. Flom then noted that there was, therefore, a deadlock on that issue.

9

CONFIDENTIAL    HFS    0007745

Mr. Block confirmed to the Board that he had consulted with the 13 directors who were former CUC directors that he is representing, and had spoken with Mr. Shelton, and that, based on the representations made at this meeting, none of those directors would vote to remove Mr. Forbes as Chairman of the Board, whether with cause or without cause. Mr. Flom then asked if there was any dissent from the former CUC directors and none was expressed.

Mr. Mulroney then asked if he should conclude that the 14 directors who were former CUC directors would vote against his motion to remove Mr. Forbes as Chairman of the Board for cause to which the response was yes. Mr. Mulroney then noted that, in light of apparent rejection of his motion and in the interests of resolving the Company's management issues, he would withdraw his motion.

Mr. Robert Friedman then confirmed to the Board that he had consulted with the 14 directors who were former HFS directors and that all of them confirmed that they would vote to terminate Mr. Forbes' employment with the Company, if such a vote was conducted.

Mr. Fox then reviewed with the Board the substantive changes made during the course of the meeting to the terms of the draft separation agreement and related annexes, including the proposed Amended and Restated By-laws of the Company, and to the draft Board resolutions previously distributed. The revised resolutions were then distributed to the Board.

Following further discussion, the Board unanimously adopted the following resolutions:

WHEREAS, it is in the best interests of the Company that the uncertainty relating to its governance arrangements be resolved immediately;

WHEREAS, the Audit Committee of the Board of Directors has reported to the Board of Directors on an interim basis with respect to its investigation of the accounting issues at CUC businesses as disclosed by the Company in a press release dated July 14, 1998 (the "Accounting Issues");

WHEREAS, the members of the Board of Directors of the Company are divided with respect to the governance of the Company;

10

WHEREAS, the Board of Directors has determined that it is in the best interests of the Company and its stockholders for the Company to enter into the Agreement, dated as of July 28, 1998, between the Company and Mr. Forbes, in the form attached hereto as Exhibit C (the "Forbes Agreement");

WHEREAS, it is in the best interests of the Company that certain provisions in the Company's Amended and Restated By-Laws (the "By-Laws") be amended;

WHEREAS, there are currently two (2) vacancies on the Board of Directors of the Company following the resignations of two (2) directors;

WHEREAS, nine (9) members of the Board of Directors of the Company have tendered their irrevocable resignations (the "Resignations") as directors of the Company, effective immediately following the approval of these resolutions; and

WHEREAS, Frederick D. Green has tendered his irrevocable resignation as a director of the Company and Chairman of the Audit Committee, effective immediately following the adoption of a resolution of the Audit Committee approving its final report concerning the Accounting Issues.

NOW, THEREFORE, BE IT:

RESOLVED, that the form, terms and provisions of the Forbes Agreement and the performance by the Company of its obligations thereunder, be authorized, adopted and approved in all respects; and that the President and Chief Executive Officer or any Senior Executive Vice President of the Company be, and each of them individually hereby is, authorized, empowered and directed to execute and deliver, in the name and on behalf of the Company, the Forbes Agreement; and be it further

RESOLVED, that, in accordance with Section 1 of Article VIII of the By-Laws, the By-Laws be, and they hereby are, amended and restated in the form of the Amended and Restated By-Laws attached hereto as Exhibit D, and that such Amended and Restated By-Laws be approved and adopted as the by-laws of the Company, effective upon adoption of this resolution; and be it further

RESOLVED, that, in accordance with Section 1 of Article III of the Amended and Restated By-Laws, the size of the Board of Directors is hereby decreased to nineteen

11

CONFIDENTIAL    HFS    0007747

(19), effective immediately following the effectiveness of the Resignations, until hereafter changed from time to time by resolution of the Board of Directors; and be it further

RESOLVED, that the Board of Directors hereby repeals the resolutions adopted by the Board of Directors of CUC on September 9, 1997 in connection with the implementation of a governance plan for the Company following the merger between CUC and HFS; and be it further

RESOLVED, that, in accordance with Section 3(d) of Article V of the Amended and Restated By-Laws, the initial number of directors comprising the Litigation Committee established in the By-Laws shall be four and the following directors are hereby appointed as members of such committee: Robert P. Rittereiser, Craig R. Stapleton, E. John Rosenwald and Robert E. Nederlander; and be it further

RESOLVED, that the officers of the Company be, and each of them individually hereby is, authorized, empowered and directed, in the name of and on behalf of the Company, to take all such actions, to cause to be prepared and filed all such documents, to make all expenditures (consistent with any existing policies of this Board of Directors) and to execute all instruments deemed by any of them to be necessary or appropriate for carrying out the intents and purposes of the foregoing resolutions; and that the performance of such acts by them shall be conclusive evidence of the approval thereof and the authority therefor by and from the Company; and be it further

RESOLVED, that all actions taken by the officers in connection with or in furtherance of the foregoing resolutions be, and each of them hereby is ratified, confirmed and approved in all respects.

Following adoption of the foregoing resolutions, the Board unanimously adopted the following additional resolutions:

RESOLVED, that, in accordance with Article II, Section 1 of the Bylaws, the Board hereby directs that the 1998 Annual Meeting of Stockholders of the Company is to be held on or about October 1, 1998 or such other date as shall be established by any of the Chairman of the Board or any Vice Chairman (the "Authorized Officers") at the Ramada Inn, East Hanover, New Jersey or at such other location as the Authorized Officers shall determine and the record date (the "Record Date") for determination of the

CONFIDENTIAL    HFS    0007748

stockholders entitled to notice of and to vote at such meeting shall be established by any of the Authorized Officers; and be it further

RESOLVED, that any of the Authorized Officers be, and each of them individually hereby is, authorized, empowered and directed to set the Record Date and a meeting date with regard to such annual meeting; and be it further

RESOLVED, that the matters to be transacted at the 1998 Annual Meeting of Stockholders shall be the election of directors, the approval of the 1998 Stock Option Plan substantially in the form attached hereto as Exhibit E, the approval of the 1998 Employee Stock Purchase Plan substantially in the form attached hereto as Exhibit F, the approval of the appointment of Deloitte & Touche LLP as the auditors of the Company's financial statements for 1998 and such other matters as are approved by the Executive Committee of the Board of Directors; and be it further

RESOLVED, that Messrs. Henry R. Silverman, James E. Buckman and Stephen P. Holmes are hereby appointed as a proxy committee of the Company for the purposes of obtaining proxies from the stockholders of the Company to vote on their behalf at the 1998 Annual Meeting of Stockholders; and be it further

RESOLVED, that the officers of the Company be, and each of them individually hereby is, authorized, empowered and directed to prepare and distribute to all stockholders of record as of the Record Date a notice of the 1998 Annual Meeting of Stockholders, a related proxy statement and form of proxy and an annual report, each in the form complying with the applicable provisions of Delaware law and the Securities Exchange Act of 1934, as amended (the "Act"), and to file such proxy statement, proxy and annual report with the Securities and Exchange Commission and with the New York Stock Exchange in accordance with the provisions of the Act and the requirements of the New York Stock Exchange and to take any and all other actions as may be necessary or appropriate in order to call and convene such Annual Meeting of Stockholders for the above stated purposes; and be it further

RESOLVED, that the Executive Committee of the Board, acting in its capacity as the Board's Nominating Committee, be, and it hereby is, authorized, empowered and directed to nominate, on behalf of the full Board, the candidates for election as directors at the 1998 Annual Meeting of Stockholders and that such nomination by the Nominating Committee shall have the same effect and be treated for purposes of the definition of "Change in Control" in the Competitive Advance and Revolving Credit Agreements, dated as of October 2, 1996, among the Company, the lenders named therein and The Chase

13

CONFIDENTIAL    HFS    0007749

Manhattan Bank, as Administrative Agent, as the nomination of such candidates by the unanimous vote of all of the directors; and be it further

RESOLVED, that the officers of the Company be, and each of them individually hereby is, authorized, empowered and directed, in the name of and on behalf of the Company, to take all such actions, to cause to be prepared and filed all such documents, to make all expenditures (consistent with any existing policies of this Board of Directors) and to execute all instruments deemed by any of them to be necessary or appropriate for carrying out the intents and purposes of the foregoing resolutions; and that the performance of such acts by them shall be conclusive evidence of the approval thereof and the authority therefor by and from the Company; and be it further

RESOLVED, that all actions taken by the officers in connection with or in furtherance of the foregoing resolutions be, and each of them hereby is, ratified, confirmed and approved in all respects.

There being no further business before the Board, the meeting was adjourned.

*[signature]*
James E. Buckman
Secretary for the Meeting

0253787.04-New York52A                    14

CONFIDENTIAL    HFS    0007750

# EXHIBIT 3

 **CENDANT**

**news** release

## WALTER FORBES STEPS DOWN AS CENDANT CHAIRMAN

### CEO Henry Silverman Elected New Chairman

### Nine CUC Board Members Resign; One Additional Director to Leave by Year-End

### 80% Vote on Corporate Governance Provisions Eliminated

PARSIPPANY, NJ, July 28, 1998 -- Cendant Corporation [NYSE: CD] today announced that Walter A. Forbes resigned as Chairman of the Company and as a member of the Board of Directors, effective immediately. Henry R. Silverman, Chief Executive Officer of Cendant, was unanimously elected by the Board of Directors to be Chairman and will continue to serve as CEO and President.

Nine members of the Board formerly associated with CUC International, including Mr. Forbes, also resigned effective immediately. One other Board member formerly associated with CUC will leave the Board by year end, leaving Cendant with 18 directors.

The Board also voted to eliminate the governance plan adopted as part of the CUC-HFS merger, including the 80% super-majority provisions of the Company's By-Laws which include limitations on the removal of the Chairman and the CEO. In addition, the Board rescheduled Cendant's annual meeting of shareholders for October 1, 1998.

Mr. Silverman said, "Walter Forbes's decision and the corporate governance changes approved today end any uncertainty about the future direction and leadership of Cendant. That uncertainty was a serious impediment to conducting our business and the process of restoring trust in our company.

"Now we can focus all of our energies on rebuilding confidence in our Company and value for Cendant's shareholders," Mr. Silverman added. "The company's earnings and cash flow remain strong. We have some of the most valuable businesses in the world. Most importantly, we have outstanding people who are passionate about Cendant and its future."

Cendant Corporation
6 Sylvan Way, Parsippany, NJ 07054 Tel: 973 428-9700 Fax: 973 496-7325
707 Summer Street, Stamford CT 06901 Tel: 203 324-9261 Fax: 203 348-4528

RF 00122

Commenting on his action, Mr. Forbes said, "I leave with tremendous confidence in the future success of Cendant. The vision and rationale behind its creation remain as compelling as ever. Its business fundamentals are strong. The operations are sound and profitable. The opportunities for synergy are numerous. The action I am taking today eliminates speculation about the future leadership of Cendant and helps the company focus all of its attention and resources on restoring the faith of its shareholders, its customers and its people."

(Note: full statements by Mr. Silverman and Mr. Forbes are attached.)

### Terms of Severance Agreement with Mr. Forbes Outlined

The severance agreement reached with Mr. Forbes gives him the benefits required by his contract should he be terminated for reasons other than for cause. These benefits total $35 million in cash and include the grant of certain options. In addition, the Company provided a limited release for Mr. Forbes. The payments to Mr. Forbes will cause Cendant to record an unusual expense of approximately $0.03 per share in the third quarter.

### Board Members Resign, Size of Board Reduced

The immediate departure of nine Directors formerly associated with CUC, and the planned departure of one additional CUC Director, Frederick D. Green, will result in Cendant having a Board with 18 Directors. Mr. Green, Chairman of the Audit Committee, has agreed to resign effective upon completion of the final Audit Committee report.

Certain matters discussed in this news release and the attached statements are forward-looking statements, as defined in the Private Securities Litigation Reform Act of 1995. Such forward-looking statements are subject to a number of known and unknown risks and uncertainties including, but not limited to, the outcome of the Audit Committee's investigation; uncertainty as to the Company's future profitability; the Company's ability to develop and implement operational and financial systems to manage rapidly growing operations; competition in the Company's existing and potential future lines of business; the Company's ability to integrate and operate successfully acquired businesses and the risks associated with such businesses; the Company's ability to obtain financing on acceptable terms to finance the Company's growth strategy and for the Company to operate within the limitations imposed by financing arrangements; uncertainty as to the future profitability of acquired businesses; and other factors. Other factors and assumptions not identified above were also involved in the derivation of these forward-looking statements, and the failure of such other assumptions to be realized as well as other factors may also cause actual results to differ materially from those projected. The Company assumes no obligation to

RF 00123

update these forward-looking statements to reflect actual results, changes in assumptions or changes in other factors affecting such forward-looking statements.

Cendant is the world's premier provider of consumer and business services. Cendant operates in three principal segments: Alliance Marketing, Travel and Real Estate Services. Headquartered in Parsippany, NJ, the company has more than 40,000 employees, operates in over 100 countries and makes approximately 100 million customer contacts annually.

*Contact:*
Media:
Jim Fingeroth/Victoria Weld
Kekst and Company
212/521-4800

Investors:
David M. Johnson
Cendant
973/496-7909

For Mr. Forbes:
Nicole Reilly
212/885-0353