# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA )
)
) No. 3:02CR264 (AHN)
v. )
)
) April 17, 2006
WALTER A. FORBES )
)

# MOTION OF DEFENDANT WALTER A. FORBES
## FOR LEAVE TO CROSS-EXAMINE COSMO CORIGLIANO CONCERNING
## (1) SEC REQUESTS PURSUANT TO MR. CORIGLIANO'S PLEA AGREEMENT,
## (2) MR. CORIGLIANO'S EFFORTS TO REACH A SETTLEMENT WITH THE SEC,
## AND (3) COMMUNICATIONS BETWEEN MR. CORIGLIANO'S COUNSEL AND
## THE SEC, AND TO INTRODUCE DOCUMENTS REFLECTING COMMUNICATIONS
## BETWEEN MR. CORIGLIANO'S COUNSEL AND THE SEC INTO EVIDENCE
### (Forbes Third Trial Motion In Limine No. 4)

Defendant Walter A. Forbes, through undersigned counsel, respectfully moves for

leave to cross-examine Cosmo Corigliano concerning (1) SEC requests for information and

documentation pursuant to Mr. Corigliano's obligations under the plea agreement and the

responses to such requests; (2) Mr. Corigliano's attempts to reach a settlement with the SEC; and

(3) communications between Mr. Corigliano's counsel and the SEC, and to introduce documents

reflecting communications between Mr. Corigliano's counsel and the SEC into evidence. The

grounds for this motion are set forth in the accompanying memorandum of points and authorities.

Oral Argument Requested

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By:_____
    Brendan V. Sullivan, Jr. (Bar No. ct17115)
    Barry S. Simon  (Bar No. ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

        - and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
Cowdery, Ecker & Murphy, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

2

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused the foregoing Motion of Defendant Walter A. Forbes for Leave to Cross-Examine Cosmo Corigliano Concerning (1) SEC Requests Pursuant to Mr. Corigliano's Plea Agreement, (2) Mr. Corigliano's Efforts to Reach a Settlement with the SEC, and (3) Communications Between Mr. Corigliano's Counsel and the SEC, and to Introduce Documents Reflecting Communications Between Mr. Corigliano's Counsel and the SEC into Evidence (Forbes Third Trial Motion <u>In Limine</u> No. 4) to be filed electronically and to be served on April 17, 2006 to the following via e-mail:

> Norman Gross, Esq. (norman.gross@usdoj.gov)
> Michael Martinez, Esq. (michael.martinez2@usdoj.gov)
> Craig Carpenito, Esq. (craig.carpenito@usdoj.gov)


_____

Barry S. Simon

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 3:02CR264 (AHN) |
| v. ) | |
| ) | April 17, 2006 |
| WALTER A. FORBES ) | |

## MEMORANDUM IN SUPPORT OF
## MOTION OF DEFENDANT WALTER A. FORBES
## FOR LEAVE TO CROSS-EXAMINE COSMO CORIGLIANO CONCERNING
## (1) SEC REQUESTS PURSUANT TO MR. CORIGLIANO'S PLEA AGREEMENT,
## (2) MR. CORIGLIANO'S EFFORTS TO REACH A SETTLEMENT WITH THE SEC,
## AND (3) COMMUNICATIONS BETWEEN MR. CORIGLIANO'S COUNSEL AND
## THE SEC, AND TO INTRODUCE DOCUMENTS REFLECTING COMMUNICATIONS
## BETWEEN MR. CORIGLIANO'S COUNSEL AND THE SEC INTO EVIDENCE
## (Forbes Third Trial Motion In Limine No. 4)

Defendant Walter A. Forbes, through undersigned counsel, respectfully submits this memorandum in support of his motion for leave to cross-examine Cosmo Corigliano concerning (1) SEC requests for information and documentation pursuant to Mr. Corigliano's obligations under the plea agreement and the responses to such requests; (2) Mr. Corigliano's attempts to reach a settlement with the SEC; and (3) communications between Mr. Corigliano's counsel and the SEC, and to introduce documents reflecting communications between Mr. Corigliano's counsel and the SEC into evidence.[1]

---

[1]      The communications between Mr. Corigliano's counsel and the SEC that have been produced to date, and which Mr. Forbes seeks to introduce into evidence, are appended to the Notice of Filing of Documents Relating to Cross-Examination of Mr. Corigliano Precluded By the Court (Docket No. 2000) (filed 11/21/05). The documents referenced herein are appended as exhibits to this memorandum.

Oral Argument Requested

# BACKGROUND

**A.     The Government's Presentation of Mr. Corigliano as a Reformed Individual in Full Compliance with His Obligations Under His Plea Agreement.**

Mr. Corigliano entered into a plea agreement with the government on January 14, 2000.  See Ex. 1(Corigliano plea agreement).  The agreement requires Mr. Corigliano, inter alia, to "truthfully disclose all information he possesses concerning any matters about which [the U.S. Attorney's] Office and other government agencies designated by this Office, including . . . the SEC, may inquire of him."  Id. at 2.  The agreement also requires Mr. Corigliano to "use his best efforts" to settle any claims asserted by the SEC, and "to provide the SEC, upon request, with complete and accurate information regarding his ability to pay any such settlement in the form ordinarily required by the SEC."  Id., Schedule A ¶ 12.

The government has presented Mr. Corigliano to two juries as a reformed man who has been cooperating fully with the government since January 2000, and who has at all times faithfully complied with all of his obligations under his plea agreement.  At the 2005 trial, the government elicited testimony on direct examination from Mr. Corigliano that Mr. Corigliano is in compliance with his obligations under the plea agreement:

Q.     Let's turn to the next part of your plea agreement.  Mr. Corigliano, would you please read the highlighted portion?

A.     "Cooperation.  Mr. Corigliano shall cooperate fully with this office.  As part of that obligation, Mr. Corigliano shall truthfully disclose all information he possess[es] concerning any matters about which this office and other government agencies designated by this office, including without limitation, the Federal Bureau of Investigation,  the US Postal Inspection Service, and the SEC, may inquire of him."

Q.      Mr. Corigliano, do you think that you satisfied that obligation?

A.      Yes, I did.

                              * * * *

Q.      Mr. Corigliano, I'm going to highlight the next sentence.  Would you
        please read the next sentence?

A.      "Mr. Corigliano also shall make himself available at all reasonable times
        requested by representatives of the  government and shall truthfully testify
        in all  proceedings, including grand jury and trial proceedings, as to any
        subject about which he is questioned."

Q.      Do you think that you've satisfied that obligation?

A.      Yes, I do.

                              * * * *

Q.      Let's return to your plea agreement.  I'm going to highlight the first
        sentence of the next paragraph.  Would you please read the highlighted
        sentence?

A.      "Should Mr. Corigliano withdraw from this agreement, or should he
        commit any additional federal, state or local crimes, or should it be
        established that he has intentionally given materially false, incomplete, or
        misleading testimony or information or otherwise has violated any
        provision of this agreement, the non-prosecution provisions of this
        agreement shall be null and void."

Q.      What do you understand that sentence to mean?

A.      That if I don't tell the truth, if I haven't told the  truth during these
        sessions, the agreement is null and void, goes away, and the government
        can charge me with additional crimes.

Q.      Does this provision cover your testimony here today?

A.      Yes, it does.

                                   3

> Q.    What is your understanding of what happens if you lie or provide false
> information on the witness stand today?
>
> A.    I'd be committing another crime, that this agreement would go away, and I
> could be prosecuted for that crime.

Tr. (11/1/05) at 1452-53, 1456-57.

The government also elicited direct testimony from Mr. Corigliano concerning his obligation under the plea agreement to use his best efforts to settle any claims asserted by the SEC, see Tr. (11/1/05) at 1467-68, and his purported willingness, after entering into his plea agreement, to pay back to the SEC all of the net proceeds of the stock he sold during his tenure at CUC and Cendant. See id. at 1471-72. In so doing, the government portrayed Mr. Corigliano as a changed man who had no desire to hold on to his ill-gotten gains after he entered into his plea agreement. In an effort to explain Mr. Corigliano's failure to settle with the SEC for more than four years after he entered into his plea agreement, the government elicited testimony from Mr. Corigliano that the settlement was delayed because the SEC refused to credit him for approximately $6 million in taxes that he had paid on the proceeds of his stock sales. See Tr. (11/1/05) at 1472.[2]

---

[2]    Mr. Corigliano testified as follows:

> Q.    Mr. Corigliano, between the time that you signed your [plea] agreement in
> January 2000 and the time that you entered into a negotiated settlement with the
> SEC in April 2004, what were you negotiating with the SEC generally?
>
> A.    The general difference, because I was -- at that  point I was always willing to give
> back the profits that I made, but there were taxes I had paid to the government,
> about $6 million as I remember it, that the SEC didn't give me credit for and they
> wanted me to pay that again to them.  And that was the single biggest difference
> that we had.

Id. He gave similar testimony on direct examination in 2004:

**B.    The Undisclosed Truth About Mr. Corigliano.**

   The government is in possession of documentary evidence that is inconsistent

with Mr. Corigliano's testimony concerning his purported compliance with his obligation to

"truthfully disclose all information he possesses concerning any matters about which this Office

and other government agencies designated by this Office, including without limitation, the

Federal Bureau of Investigation,  the US Postal Inspection Service, and the SEC, may inquire of

him."  Ex. 1 at 2.  The government also is in possession of documentary evidence that is

inconsistent with Mr. Corigliano's claims about his efforts to reach a settlement with the SEC.

The evidence in the government's possession includes the <u>Wells</u> submission made to the SEC on

Mr. Corigliano's behalf and significant correspondence between Mr. Corigliano's counsel and

the SEC.

   The government did not disclose the information in its possession to the jury in

either the 2004 or 2005 trials.  To the contrary, it withheld the information from the jury and

allowed Mr. Corigliano to create the false impression that Mr. Corigliano has fully complied with

---

| Q. | Did you settle with the SEC? |
|----|------|
| A. | I did. |
| Q. | When? |
| A. | Approximately April of this year. |
| Q. | So how long did it take you to settle? |
| A. | Too long.  It took almost over four year. |
| Q. | Was that your best efforts? |
| A. | I kept trying.  I wanted to settle as soon as possible to get this uncertainty behind us.  It just -- there was -- the major point of disagreement was that the $6 million of taxes that I paid, the SEC didn't want to give me credit for that. |
| Q. | What do you mean? |
| A. | They wanted me to pay that $6 million again to them even though I paid it to the IRS. |

Tr. (7/14/04) at 7503.

5

his obligations under the plea agreement and that he eagerly sought to return his ill-gotten gains

to the SEC after January 2000.

1. **The Undisclosed Truth About Mr. Corigliano's Settlement Offers to the SEC.**

Mr. Corigliano testified on direct examination at the 2005 trial that, after he

entered into his plea agreement, he was "always willing to give back" to the SEC the proceeds of

his stock sales, reduced for the cost of the options and for taxes. Tr. (11/1/05) at 1471-72. Mr.

Corigliano testified that this amount was $13-14 million. Id. Mr. Corigliano further claimed (on

cross-examination) that, "[o]nce I entered into the plea agreement it was always my intention to

give back the proceeds, the net proceeds that I had made from the stock sales" Tr. (11/3/05) at

1946; see also id. at 1947 ("I focused on always giving back everything that I made.").

The Wells submission made to the SEC on Mr. Corigliano's behalf in May 2000,

after he had entered into a plea agreement, in fact proposed a settlement amount of only $3.4

million. See Ex. 2 (Wells submission) at 22. In a subsequent letter to the SEC, dated May 16,

2000, Mr. Corigliano's counsel characterized the $3.4 million settlement offer as "a substantial

settlement proposal" and "a figure which fairly measures the benefit Mr. Corigliano allegedly

received." See Ex. 3.[3]

The settlement offer contained in the Wells submission, which was made almost

four months after Mr. Corigliano entered into his January 2000 plea agreement, was far less than

---

[3]    Despite repeated representations that it was fully complying with its obligations under
Fed. R. Crim. P. 16, Brady, and Giglio, the government never produced either this letter or the
letter appended hereto as Ex. 5. They were disclosed to the defense for the first time in a
pleading filed by Mr. Corigliano's counsel on November 6, 2005. Indeed, the government is still
refusing to produce documents and other information relevant to this issue. See generally Forbes
Third Trial Motion No. 2 (Docket No. 2189) (filed 3/31/06).

the $13-14 million that Mr. Corigliano claims he was "always willing to give back." Tr.

(11/1/05) at 1472.  If a jury were to learn of this information, it would raise serious questions

concerning the veracity of Mr. Corigliano's testimony, as well as the government's presentation

of him as a reformed man who willingly sought to return his ill-gotten gains to the SEC after

entering into his plea agreement.  Yet neither jury heard anything about the $3.4 million

settlement offer made on Mr. Corigliano's behalf to the SEC.  The jury also heard nothing about

a subsequent settlement offer made by Mr. Corigliano's counsel to the SEC that was millions of

dollars less than the $13-14 million that Mr. Corigliano claimed he was "always willing to give

back," id., after entering into his January 2000 plea agreement.  See Ex. 4.[4]

In 2004, defense counsel inquired of Mr. Corigliano concerning the settlement

offers made on his behalf.  Mr. Corigliano claimed "I was aware that my attorneys went back

and forth with the SEC trying to settle it because I was anxious to get it settled, but I don't

remember ever knowing the specific amounts that they offered to the SEC." Tr. (7/19/04) at

7991; see also id. (Q. "In other words, your lawyers would talk to the SEC and possibly offer

multi-millions of dollars and you wouldn't know what those amounts were?"  A. "Well, it was

based on conversations that I had with them.  But I didn't see documents and they didn't tell me

specifically what they were going to say to the SEC.").

When defense counsel inquired in 2004 about the Wells submission submitted to

the SEC, Mr. Corigliano testified that was aware of the fact that a Wells submission had been

made, but claimed that he did not recall reading the Wells submission and did not know what it

---

[4]      That settlement offer purported to be worth "in excess of $11 million." Ex. 4 at 1.  In
fact, the offer included potentially worthless or low value Cendant stock options that were valued
by Mr. Corigliano's counsel for purposes of the settlement offer at $4-5 million. Id. at 2.

contained. Tr. (7/19/04) at 7973; Tr. (7/20/04) at 8038-39, 8059.[5]  During this line of

questioning, the government lodged a series of objections and asserted privilege on Mr.

Corigliano's behalf. E.g., Tr. (7/19/04) at 7973-76.  In 2005, the presiding judge ruled, based on

Mr. Corigliano's prior testimony, that counsel could not inquire about either the Wells

submission or other communications between the SEC and Mr. Corigliano's counsel. See Tr.

(11/7/05) (motions hearing); Tr. (11/9/05) at 2284; Notice of Filing of Documents Relating to

Cross-Examination of Mr. Corigliano Precluded By the Court (filed 11/21/05) (Docket No.

2000).

> **2.    The Undisclosed Truth About the Reasons Mr. Corigliano Did Not Settle
> with the SEC Prior to April 2004.**

Mr. Corigliano testified that the reason he did not settle with the SEC prior to

April 2004 was that the SEC refused to credit him for approximately $6 million in taxes that he

had paid on the proceeds of his stock sales. See Tr. (11/1/05) at 1472; Tr. (11/3/05) at 1946

("The issue, the difference, I think as I mentioned in direct, was that I had already paid taxes, and

I think it was around $6 million.  And the SEC didn't give me credit for paying those taxes.

They wanted me to pay it again, in essence, to them.  As I understand it, that was the single

reason that kept us from settling early on.").[6]

---

[5]    According to Mr. Corigliano, "I just had a general understanding that my attorneys were
arguing the case as they deemed appropriate to the SEC.  I wasn't aware of all the points that they
were making."  Tr. (7/19/04) at 7973.

[6]    See also Tr. (11/3/05) at 1947 (Q.  "Isn't it a fact that your effort in dealing with the SEC
was to keep as many millions of dollars as you could?"  A.  "It wasn't an effort to keep as many
as I could.  It was to -- my hope was that the SEC would give me credit  for the taxes that I paid
so I didn't in a sense pay it twice.  That's what I was hoping for."); id. at 1973 ("I wasn't aware
of all the discussions that my lawyers had with the SEC, but it was always my intention to try to
settle it as quickly as possible and, as I mentioned earlier, it was the taxes that caused the

The <u>Wells</u> submission made on Mr. Corigliano's behalf reveals that, contrary to Mr. Corigliano's testimony, there was no $6 million tax issue that "was the single reason," Tr. (11/3/05) at 1946, that precluded a settlement with the SEC.  In fact, the <u>Wells</u> submission raised a host of objections to the SEC's settlement demand that went far beyond the issue of taxes paid on Mr. Corigliano's stock sales.  <u>See</u> Ex. 2.  A May 16, 2000 letter from Mr. Corigliano's counsel to the SEC also contradicts Mr. Corigliano's claim about a purported $6 million tax issue that was the barrier to settlement.  The letter indicates that the SEC's demand was that Mr. Corigliano "pay more than $16 million in disgorgement, plus interest, plus a penalty equal to the disgorgement," Ex. 3, but that the SEC would "recommend waiving full payment of this amount if Mr. Corigliano was unable to pay," <u>id.</u>, in which case "the Staff would leave Mr. Corigliano with his house, car, legal fees, and walking around money." <u>Id.</u>  According to a pleading by Mr. Corigliano's counsel, the SEC's May 2000 settlement demand was "essentially" the same as the final April 2004 SEC settlement.  <u>See</u> Docket No. 1944 at 12.  That representation undermines Mr. Corigliano's claim about a $6 million tax issue that was the purported barrier to his settlement with the SEC.

Mr. Corigliano's 2005 testimony about the purported reason he did not settle with the SEC prior to April 2004 is, at best, erroneous.  Yet the government never brought that fact to the jury's attention and affirmatively elicited incorrect and misleading testimony from Mr. Corigliano on this subject.  Because defense counsel were precluded from inquiring of Mr. Corigliano concerning the <u>Wells</u> submission or other communications between Mr. Corigliano's

---

problem for us."); Tr. (7/14/04) at 7503 (quoted <u>supra</u>); Tr. (7/19/04) at 7989 ("I wanted to settle before four and a half years.  I was -- I -- I wanted to settle before four and a half years.").

counsel and the SEC at the 2005 trial, the jury was never apprised of the falsity of Mr.

Corigliano's claims about the purported reason he did not settle with the SEC until April 2004.[7]

3.    **The Undisclosed Truth About Mr. Corigliano's Responses to SEC Demands for Financial Disclosure.**

Mr. Corigliano testified on direct examination in 2005 that he had complied with

the requirements of his plea agreement, including his disclosure obligations with respect to the

SEC.  See Tr. (11/1/05) at 1452-53.  Yet documents in the government's possession reflect that

Mr. Corigliano, through his counsel, defied SEC requests for financial disclosure and provided

false and misleading information to the SEC.

For example, the SEC provided a standard financial disclosure form to Mr.

Corigliano's counsel in March 2000.  See Ex. 6.  The form required a variety of detailed financial

information, including information about all asset or cash transfers in excess of $1000 during the

prior five years, and was to be personally signed by Mr. Corigliano under penalty of perjury.  Id.

It is evident from correspondence between Mr. Corigliano's counsel that the SEC requested that

---

[7]     Based on the documents produced to date by the government, it appears that Mr.
Corigliano made no effort to settle with the SEC between mid-2000 and the fall of 2003.  The
documents also reveal that, contrary to Mr. Corigliano's initial claim that the timing of his
settlement in April 2004 had nothing to do with the impending commencement of Mr. Forbes'
2004 trial, see Tr. (7/19/04) at 7987-89; Tr. (7/20/04) at 8154, the settlement was in fact rushed
so that it could be completed before the commencement of the trial.  See Ex. 12 ("[D]ue to the
extreme time constraints facing any settlement that could be authorized by the Commission prior
to the impending criminal trial of Walter A. Forbes and E. Kirk Shelton, the Commission staff is
forwarding these documents to you now, so that you can view their operative provisions at the
earliest possible date."); Ex. 13 ("We are sending these documents to you in an attempt to get this
matter before the Commission before the rapidly approaching trial.").  Mr. Forbes was not
permitted to offer these documents into evidence or even to cross-examine Mr. Corigliano about
them in 2005.  See Docket No. 2000.

Mr. Corigliano complete this form.  See Ex. 5.[8]  Indeed, Mr. Corigliano's counsel represented to the SEC in May 2000 that Mr. Corigliano would complete the form, and that he was in the process of doing so.  See id. (asserting that, during a meeting with the SEC on May 19, 2000, "I explicitly stated that Cosmo would fill out the financial disclosure form you have provided"); id. at 2 (asserting that "Cosmo is working on the financial disclosure form, and we will supply that information to you as promptly as we possibly can.").

Despite those representations, Mr. Corigliano never supplied a completed financial disclosure form to the SEC.  Instead, according to Mr. Corigliano's counsel, his counsel "ultimately decided to provide the SEC Staff with something less than the complete and sworn Statement of Financial Condition form."  Docket No. 1944 at 9.  On May 26, 2000, Mr. Corigliano's counsel supplied a letter to the SEC that was not signed by Mr. Corigliano himself and did not provide all of the information sought by the SEC form.  See Ex. 7.  The May 26, 2000 letter failed to disclose a number of significant asset transfers and expenditures that were called for by the standard SEC form, such as Mr. Corigliano's payment to his counsel of a legal retainer exceeding three million dollars[9] and several substantial payments to Mr. Corigliano's father.  See generally Forbes Third Trial Motion No. 2 (Docket No. 2189) (filed 3/31/06)

---

[8]     The SEC sent a letter to Mr. Corigliano's counsel on May 15, 2000 demanding financial disclosure from Mr. Corigliano.  The letter is referenced in a May 16, 2000 letter from Mr. Corigliano's counsel to the SEC, see Ex. 3 at 1, and alluded to in the May 24, 2000 letter from Mr. Corigliano's counsel to the SEC, see Ex. 5 at 1, but has never been produced.  Counsel for Mr. Forbes have repeatedly requested this letter, and all communications between Mr. Corigliano's counsel and the SEC, from the government.  See generally Forbes Third Trial Motion No. 2 (filed 3/31/06) (Docket No. 2189).

[9]     Mr. Corigliano received a $1 million refund from his retainer on an undisclosed date.  See Corigliano Financial Affidavit, attachment C (attached as Exhibit 20 to the Motion of Walter A. Forbes to Seal the Attached Exhibits) (Docket No. 2188) (filed 3/31/06)).

(incorporated herein by reference).[10]

Mr. Corigliano also supplied false and/or misleading information to the SEC

through his counsel. For example, the SEC specifically requested evidence of the value of

certain assets in September 2003, including the value of Mr. Corigliano's house. See Ex. 8. The

valuation information supplied to the SEC concerning the house consisted of a purported

"comparable" house for sale in the neighborhood. See id. The "comparable" was hardly

comparable, however. Mr. Corigliano's property consisted of two lots, totaling over eleven

acres, and his house was located on only one of those lots. Tr. (8/3/04) at 9348-53. The internet

listing supplied to the SEC was a house on a single lot of 1.32 acres. See Ex. 8 at Bates No.

3453.[11]

The government never presented this information to the jury. When defense

counsel inquired in 2004 about the May 26, 2000 letter (marked for identification as DX 951),

Mr. Corigliano claimed that he had never seen it before. Tr. (7/19/04) at 7976-77. According to

Mr. Corigliano, he supplied financial information to his attorneys but did not review the

information the attorneys supplied to the SEC on his behalf. Id. at 7977.[12] Similarly, when

defense counsel inquired in 2004 about the information Mr. Corigliano's counsel supplied to the

---

[10]     It also appears that Mr. Corigliano, through his counsel, defied SEC requests for copies of his tax returns. See Forbes Third Trial Motion No. 2 (Docket No. 2189) (filed 3/31/06).

[11]     As set forth in Forbes Third Trial Motion in Limine No. 1 (Docket No. 2190) (filed 3/31/06), Mr. Corigliano also misled the SEC about the fact that his "real estate" in Old Saybrook consisted of two separate parcels in an apparent effort to prevent the SEC from seeking disgorgement of the second parcel.

[12]     Mr. Corigliano also denied seeing other communications between his counsel and the SEC. See Tr. (7/19/04) at 7991-92.

SEC concerning the purported "comparable" property, <u>Mr. Corigliano claimed that he provided</u> <u>this information only to his attorneys and had no knowledge that it was going to be forwarded to</u> <u>the SEC</u>. <u>See</u> Tr. (8/3/04) at 9348-49, 9352-53.[13]  In 2005, defense counsel were precluded from even inquiring about these subjects during Mr. Corigliano's cross-examination.  <u>See</u> Tr. (11/9/05) at 2284; Notice of Filing of Documents Relating to Cross-Examination of Mr. Corigliano Precluded By the Court (filed 11/21/05) (Docket No. 2000).  As a result, the 2005 jury was left with the erroneous and misleading impression that Mr. Corigliano had complied fully with his obligation to make truthful financial disclosures to the SEC and to respond to SEC inquiries for financial information.

### 4. The Undisclosed Truth About Mr. Corigliano's Misrepresentations to the SEC Concerning His "Aged and Infirm" Parents.

Mr. Corigliano's counsel repeatedly represented to the SEC that Mr. Corigliano's parents were elderly and infirm and had no source of income apart from Social Security and support from Mr. Corigliano.  <u>See, e.g.</u>, Ex. 2 (<u>Wells</u> submission) at 18; Ex. 9 (July 13, 2000 letter) at 2 n.3; Ex. 10 (July 19, 2000 letter) at 2 n.3.  The SEC ultimately agreed to a living expense budget for Mr. Corigliano that contained an allocation of funds for his parents' living

---

[13]     Mr. Corigliano initially testified that he obtained information concerning the "comparable" to facilitate settlement discussions with the SEC.  Tr. (8/3/04) at 9347.  He then claimed "[m]y understanding was that my attorneys wanted to get a sense for what the house was worth and together we saw this on the internet."  <u>Id.</u> at 9348-49.  He denied having any knowledge that the valuation information he gave his counsel would be given to the SEC.  <u>See</u> <u>id.</u> at 9352-53 (Q.  "And that is the document that was provided as a comparable; am I correct? A. "To my attorneys only."  Q.  "Through your attorneys?"  A.  "To my attorneys.  That was my understanding."  Q.  "Right.  And I gather -- I'll pull this back.  You understood that they were assembling materials, like the sailboat valuation and like the financials on the candle company, in order to provide valuation information  to the SEC in the context of negotiations, right?"  A.  No, I didn't have an understanding that they were going to give it to the SEC.  That was not my understanding.").

expenses, <u>see</u> Ex. 11, attachment B, presumably based on Mr. Corigliano's counsel's representations.

In fact, although Mr. Corigliano's mother was infirm, his father is not. Documents produced in 2004 by the receiver appointed by the SEC to collect Mr. Corigliano's assets revealed that Mr. Corigliano's father is <u>actively working</u> for the candle company that was owned by Mr. Corigliano's wife and is now owned by the receiver. Mr. Corigliano conceded this fact on cross-examination at the 2005 trial, <u>see</u> Tr. (11/8/05) at 2159-60. He further testified that his father has been employed at the candle company for "several years," <u>id.</u> at 2159,[14] and that he is "one of the hardest working people there." <u>Id.</u> at 2160. At the 2005 trial, however, defense counsel were precluded from cross-examining Mr. Corigliano about the representations his counsel made to the SEC about his parents because Mr. Corigliano had disclaimed knowledge of communications between his counsel and the SEC. <u>See</u> Tr. (11/9/05) at 2284; Notice of Filing of Documents Relating to Cross-Examination of Mr. Corigliano Precluded By the Court (filed 11/21/05) (Docket No. 2000).

## ARGUMENT

If the government once again presents testimony from Mr. Corigliano concerning his purported compliance with his obligations under the plea agreement, his purported willingness as of January 2000 to pay back all of the net proceeds of his stock sales to the SEC, and/or a purported $6 million issue that was the barrier to settlement with the SEC for four years, the Court should permit defense counsel to cross-examine Mr. Corigliano about these subjects

---

[14]     Mrs. Corigliano purchased the candle company in 1999. Defense counsel do not have information concerning the date on which Mr. Corigliano's father began working at the candle company.

and to introduce documentary and other evidence that impeaches Mr. Corigliano's claims.[15]  The

Court should permit inquiry of Mr. Corigliano concerning (i) Mr. Corigliano's knowledge of

SEC requests for information and documentation pursuant to Mr. Corigliano's obligations under

the plea agreement; (ii) Mr. Corigliano's efforts to respond to such requests and his

understanding of what was and was not supplied to the SEC; (iii) the SEC financial disclosure

form that Mr. Corigliano purportedly was filling out in May 2000; (iv) the efforts Mr. Corigliano

made to settle with the SEC; (v) Mr. Corigliano's knowledge of the settlement offers made to the

SEC on his behalf and settlement demands made by the SEC; and (vi) the communications

between Mr. Corigliano's counsel and the SEC.  The Court also should permit counsel to

introduce into evidence written communications between Mr. Corigliano's counsel and the

SEC.[16]

       The Court should not allow the government to rely on evidentiary objections to

conceal this critical information from the jury.  The revelation to the jury that the government's

key witness lied on the stand and/or violated the terms of his plea agreement may be enough to

convince the jury to acquit.  The concealment of the truth from the jury in such circumstances

---

[15]     Given the government's knowledge that Mr. Corigliano's testimony on these subjects was false, the government should not elicit any testimony from Mr. Corigliano about these subjects at Mr. Forbes' third trial.  The Supreme Court has long made clear that due process is violated when the government obtains a conviction based on the introduction of false evidence.  See Napue v. Illinois, 360 U.S. 264, 269 (1959).  The government also violates due process "when the prosecutor, although not soliciting false evidence from a Government witness, allows it to stand uncorrected when it appears."  United States v. Sanfilippo, 564 F.2d 176, 178 (5th Cir. 1977); see also Forbes Third Trial Motion In Limine No. 1 (Docket No. 2190); United States v. Wallach, 935 F.2d 445 (2d Cir. 1991).

[16]     Mr. Forbes also seeks to present testimony from SEC witnesses James Kidney and Thomas Newkirk.  See Forbes Third Trial Motion No. 5 (Docket No. 2164) (filed 3/31/06) (incorporated herein by reference).

would violate due process.

In <u>United States v. Wallach</u>, 935 F.2d 445 (2d Cir. 1991), the Second Circuit

reversed a conviction where the government's primary witness testified falsely and the

government lodged evidentiary objections to withhold critical information from the jury that

would have exposed the falsity of the testimony.  There (as here), the government's principal

witness entered into a cooperation agreement with the government and was presented by the

government as a reformed individual who was telling the truth.  <u>Id.</u> at 458-59.  The witness

testified on direct examination "that he had not gambled from the summer of 1988 to the time of

the trial in June 1989."  <u>Id.</u> at 455.  He admitted on cross-examination that he had signed

gambling markers in the fall of 1988, but denied that he had gambled on those occasions.  <u>Id.</u> at

455-56.  The defendants sought to admit testimony and documents to impeach this testimony.

"The government objected to the testimony . . . and the introduction of the records under Fed. R.

Evid. 608(b), arguing that the records and testimony were extrinsic evidence offered to impeach

Guariglia's credibility and therefore subject to exclusion.  The district court sustained the

government's objection."  <u>Id.</u> at 456.

> The Second Circuit reversed because:
>
> Guariglia was the centerpiece of the government's case.  <u>Had it been brought to the attention of the jury that Guariglia was lying after he had purportedly undergone a moral transformation and decided to change his ways, his entire testimony may have been rejected by the jury.</u>  It was one thing for the jury to learn that Guariglia had a history of improprieties; <u>it would have been an entirely different matter for them to learn that after having taken an oath to speak the truth he made a conscious decision to lie</u> . . . .  Accordingly, because we are convinced that the government should have known that Guariglia was committing perjury, all the convictions must be reversed.

<u>Id.</u> at 457 (emphasis added).

16

Here, as in <u>Wallach</u>, the government seeks to present Mr. Corigliano as a reformed man who has "undergone a moral transformation and decided to change his ways." <u>Id.</u> The government seeks to portray Mr. Corigliano, falsely, as a man in full compliance with his plea agreement who eagerly sought to return his ill-gotten gains to the SEC after January 2000. The jury should be permitted to learn that Mr. Corigliano has not changed his ways since January 2000, that he has not fully complied with his obligations under the plea agreement, and that he is testifying falsely about both his purported compliance with his plea agreement and his purported willingness since January 2000 to return the net proceeds of his stock sales to the SEC.  The Court should preclude the government from invoking evidentiary objections to conceal this information from the jury.

While Mr. Corigliano may once again deny any knowledge of the SEC's requests for financial disclosure from him, or his attorneys' responses to those requests, Mr. Corigliano has a non-delegable duty under his plea agreement to "truthfully disclose all information he possesses concerning any matters about which [the U.S. Attorney's] Office and other government agencies designated by this Office, including . . . the SEC, may inquire of him." Ex. 1 at 2.  The jury should be permitted to hear Mr. Corigliano's incredible claims about his purported lack of knowledge of the financial information his counsel supplied to the SEC pursuant to his plea agreement and his purported unawareness of the factual representations made by his counsel to the SEC in response to inquires made under the terms of his plea agreement.  The jury should be allowed to evaluate Mr. Corigliano's denials in the context of his duties to the SEC under his plea agreement, his counsel's defiance of SEC requests for financial disclosure, and the false and/or misleading representations his counsel made to the SEC on his behalf.

17

Similarly, Mr. Corigliano had a non-delegable duty under his plea agreement to "use his best efforts" to settle any claims asserted by the SEC, and "to provide the SEC, upon request, with complete and accurate information regarding his ability to pay any such settlement in the form ordinarily required by the SEC." Id., Schedule A ¶ 12.  Mr. Corigliano seeks to falsely portray himself in a favorable light by testifying that he always intended to pay back the net proceeds of his stock sales after he entered into his plea agreement.  The jury should be permitted to learn the truth about the actual settlement proposals made on his behalf to the SEC, which were far lower than the $13-14 million he professes he was always willing to pay back, and to hear Mr. Corigliano's incredible claim that he lacked knowledge of the settlement offers his counsel made to the SEC.  The jury also should be permitted to learn that Mr. Corigliano never filled out the SEC financial disclosure form, despite the SEC's request that he do so and his counsel's May 2000 representation to the SEC that he would fill out the form.

If the jury is permitted to learn the truth about the communications between Mr. Corigliano's counsel and the SEC, and the representations made to the SEC on his behalf, it will have critical information it needs to evaluate Mr. Corigliano's credibility, assess his motive to testify falsely against Mr. Forbes,[17] and assess the government's presentation of Mr. Corigliano as a man who has "undergone a radical moral transformation," Wallach, 935 F.2d at 458, since entering into his plea agreement.  If the jury concludes that Mr. Corigliano has not been morally transformed since entering into his plea agreement, and that he is testifying falsely about his efforts to settle with the SEC and/or his compliance with his obligations to the SEC under the

---

[17]    See United States v. Lynn, 856 F.2d 430, 433 (1st Cir. 1988) (evidence that a witness breached his plea agreement provided an incentive for the witness to fabricate testimony in order to curry favor with the government).

plea agreement, it may "call[] into question the veracity of the rest of his statements."  Id.

Accordingly, the Court should allow defense counsel to inquire about these matters on cross-

examination and introduce communications between Mr. Corigliano's counsel and the SEC into

evidence in the event the government presents testimony by Mr. Corigliano concerning his

purported compliance with his obligations under his plea agreement or his purported eagerness to

give back all of the net proceeds of his stock sales to the SEC after January 2000.[18]

<div style="margin-left:40%">

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: _____

    Brendan V. Sullivan, Jr. (Bar No. ct17115)
    Barry S. Simon  (Bar No. ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

      - and -

</div>

---

[18]     In the unlikely event the government does not affirmatively elicit testimony on these subjects from Mr. Corigliano, Mr. Forbes would still seek to cross-examine Mr. Corigliano concerning the foregoing matters and to introduce extrinsic evidence on these subjects because, inter alia, they are relevant to: (1) his motive to testify falsely against Mr. Forbes, see Lynn, 856 F.2d at 433, and (2) additional benefits the government has conferred on Mr. Corigliano by allowing him to violate his obligations under the plea agreement with impunity.

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
Cowdery, Ecker & Murphy, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

20

CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Memorandum in Support of Motion of Defendant Walter A. Forbes for Leave to Cross-Examine Cosmo Corigliano Concerning (1) SEC Requests Pursuant to Mr. Corigliano's Plea Agreement, (2) Mr. Corigliano's Efforts to Reach a Settlement with the SEC, and (3) Communications Between Mr. Corigliano's Counsel and the SEC, and to Introduce Documents Reflecting Communications Between Mr. Corigliano's Counsel and the SEC into Evidence (Forbes Third Trial Motion In Limine No. 4) to be filed electronically and to be served on April 17, 2006 to the following via e-mail:

Norman Gross, Esq. (norman.gross@usdoj.gov)
Michael Martinez, Esq. (michael.martinez2@usdoj.gov)
Craig Carpenito, Esq. (craig.carpenito@usdoj.gov)

Barry S. Simon