# EXHIBIT 1



**U.S. Department of Justice**

FILED (5)

*United States Attorney*
*District of New Jersey*

JUN 1 4 2000

AT 8:30 _____ M
WILLIAM T. WALSH
CLERK
(973) 645-2700

*970 Broad Street, Suite 700*
*Newark, NJ 07102*

January 14, 2000

Gary P. Naftalis, Esq.
Kramer, Levin, Naftalis & Frankel
919 Third Avenue
New York, NY 10022-3852

Re: <u>Plea Agreement with Cosmo Corigliano</u>  *CR-00-379*

Dear Mr. Naftalis:

This letter sets forth the full and complete plea agreement between your client, Cosmo Corigliano, and the United States Attorney for the District of New Jersey.

<u>Charge</u>

Conditioned on the understandings specified below, the United States will accept a guilty plea from Mr. Corigliano to a two-count Information charging him with (i) conspiracy to commit mail fraud and wire fraud and to cause false statements to be made in documents required to be filed with the Securities and Exchange Commission (the "SEC"), in violation of 18 U.S.C. § 371; and (ii) wire fraud in violation of 18 U.S.C. § 1343. If Mr. Corigliano enters a guilty plea and is sentenced on this charge, and if he otherwise fully complies with all of the terms of this agreement, this Office will not initiate any further charges against him arising from: (i) his participation in the misstating or falsification of any financial statements, reports, or other accounting documents or records of CUC International, Inc. and/or Cendant Corporation (collectively, "Cendant"); (ii) the providing of any misstated or falsified financial statements, reports, other accounting documents or records of Cendant, or other information to the SEC, other regulatory or governmental authorities, Cendant's auditors, members of the investing public, or other prospective purchasers of Cendant stock; or (iii) Mr. Corigliano's purchases or sales of Cendant stock. The scope of the protection offered in the previous sentence is further limited to the criminal activity known to this Office as of the date of this agreement.

DEFENDANT'S
EXHIBIT
300
PENGAD 800-631-6989

<u>Cooperation</u>

Mr. Corigliano shall cooperate fully with this Office. As part of that obligation, Mr. Corigliano shall truthfully disclose all information he possesses concerning any matters about which this Office and other government agencies designated by this Office, including without limitation the Federal Bureau of Investigation, the U.S. Postal Inspection Service, and the SEC, may inquire of him. Mr. Corigliano also shall make himself available at all reasonable times requested by representatives of the government and shall truthfully testify in all proceedings, including grand jury and trial proceedings, as to any subject about which he is questioned. Furthermore, Mr. Corigliano agrees to provide to this Office at its request any documents or records, whether personal, partnership, corporate or otherwise, in his possession, custody, or control.

Should Mr. Corigliano withdraw from this agreement, or should he commit any additional federal, state, or local crimes, or should it be established that he has intentionally given materially false, incomplete, or misleading testimony or information or otherwise has violated any provision of this agreement, the non-prosecution provisions of this agreement shall be null and void. All other provisions of this agreement shall remain in full force and effect. If the non-prosecution provisions of this agreement become null and void because of Mr. Corigliano's actions or omissions, Mr. Corigliano shall thereafter be subject to prosecution for any federal criminal violation of which this Office has knowledge, including, but not limited to, perjury and obstruction of justice. Any such prosecution may be premised upon any information provided by Mr. Corigliano, and all such information may be used against him. Moreover, any such prosecution that is not time-barred by the applicable statute of limitations on the date Mr. Corigliano signs this agreement may be commenced against him notwithstanding the expiration of the limitations period subsequent to that date. With respect to any such prosecution, Mr. Corigliano waives any right to claim that statements made by him before or after the execution of this agreement, including any statements made pursuant to any prior agreement between him and this Office, or any leads from such statements, should be suppressed under Fed. R. Crim. P. 11(e)(6) or Fed. R. Evid. 410.

<u>Sentence and Other Penalties</u>

Each of the violations of 18 U.S.C. § 371 and 18 U.S.C. § 1343 to which Mr. Corigliano agrees to plead guilty carries a statutory maximum prison sentence of five years and a statutory maximum fine equal to the greatest of: (i) $250,000; (ii) twice the gross amount of any pecuniary gain that any persons derived from the offense; or (iii) twice the gross amount of any pecuniary loss sustained by any victims of the offense. The Sentencing Reform Act and the Sentencing Guidelines may impose a minimum term of imprisonment and/or fine, and the Sentencing Guidelines may authorize departure from the minimum and maximum penalties under certain circumstances. Fines imposed by the sentencing judge may be subject to the payment of interest.

Further, in addition to imposing any other penalty on Mr. Corigliano, the sentencing judge: (i) will order Mr. Corigliano to pay an assessment of $200 pursuant to 18 U.S.C. § 3013, which assessment must be paid by the date of sentencing; (ii) may order Mr. Corigliano to pay restitution pursuant to 18 U.S.C. §§ 3663 et seq.; and (iii) pursuant to 18 U.S.C. § 3583 and § 5D1.2 of the Sentencing Guidelines, may require Mr. Corigliano to serve a term of supervised release of up to three years, which will begin at the expiration of any term of imprisonment imposed. Should Mr. Corigliano be placed on a term of supervised release and subsequently violate any of the conditions of that release before the expiration of its term, Mr. Corigliano may be sentenced to not more than two years' imprisonment in addition to any prison term previously imposed on him and in addition to the statutory maximum term of imprisonment set forth above.

The sentence to be imposed upon Mr. Corigliano is within the sole discretion of the sentencing judge. The government cannot and does not make any representation or promise either as to what guideline range will be found applicable to Mr. Corigliano or as to what sentence he will receive. Except as otherwise provided in this agreement, this Office reserves its right to take any position with respect to the appropriate sentence to be imposed on Mr. Corigliano by the sentencing judge. In addition, this Office will inform the sentencing judge and the U.S. Probation Office of: (i) this agreement; (ii) the full nature and extent of Mr. Corigliano's activities and relevant conduct with respect to this case; (iii) the full nature and extent of Mr. Corigliano's cooperation with this Office and the date when it commenced; and (iv) all other information relevant to sentence, favorable or otherwise, in the possession of this Office, including information provided by Mr. Corigliano both before and after signing this agreement.

If Mr. Corigliano fully complies with this agreement and, prior to his sentencing, provides substantial assistance in the investigation or prosecution of one or more persons who have committed offenses, this Office will move the sentencing judge, pursuant to § 5K1.1 of the Sentencing Guidelines, to depart downward from the otherwise applicable guideline range. Whether the sentencing judge does in fact depart downward from the otherwise applicable guideline range is a matter committed solely to the Court's discretion. The determination whether Mr. Corigliano has provided substantial assistance to the government rests solely in the discretion of this Office. Mr. Corigliano may not withdraw his plea if this Office determines that Mr. Corigliano has not rendered substantial assistance or if the Court refuses to grant this Office's motion for a downward departure.

Mr. Corigliano specifically waives any right to appeal the validity of a plea he enters pursuant to this agreement. This Office reserves the right to take any position in post-sentencing motions or proceedings and to appeal, or oppose any appeal of, Mr. Corigliano's sentence.

<u>Stipulations</u>

This Office and Mr. Corigliano agree to stipulate at sentencing to the statements set forth in the attached Schedule A, which is hereby made a part of this plea agreement. This agreement

- 3 -

to stipulate, however, cannot and does not bind the sentencing judge, who may make independent factual findings and may reject any or all of the stipulations entered into by the parties. To the extent that the parties do not stipulate, each reserves the right to argue the effect of any fact upon sentencing. Moreover, this agreement to stipulate on the part of this Office is based on the information and evidence that this Office possesses as of the date of this agreement. Thus, if this Office obtains or receives additional evidence or information prior to sentencing that it determines to be credible and to be materially in conflict with any stipulation in the attached Schedule A, this Office shall not be bound by any such stipulation. A determination that any stipulation is not binding shall not release either this Office or Mr. Corigliano from any other portion of this plea agreement, including any other stipulation.

### Other Provisions

This agreement does not prohibit the United States, any agency thereof (including the IRS), or any third party from initiating or prosecuting any civil proceeding against Mr. Corigliano.

This agreement is limited to the United States Attorney's Office for the District of New Jersey and cannot bind other federal, state, or local authorities. However, this Office will bring this agreement and Mr. Corigliano's cooperation to the attention of other prosecuting offices and the parties in any civil proceeding, if requested by Mr. Corigliano to do so.

This agreement constitutes the full and complete plea agreement between Mr. Corigliano and this Office and supersedes any previous agreement between them. No additional promises, agreements, or conditions have been entered into with respect to Mr. Corigliano's criminal liability other than those set forth in this letter, and none will be entered into unless in writing and signed by the parties.

Very truly yours,

ROBERT J. CLEARY
United States Attorney

PAUL A. WEISSMAN
Deputy Chief, Fraud and Public
    Protection Division

- 4 -

I have received the foregoing letter from my attorney, Gary P. Naftalis, Esq. I have read it and I understand it fully. I hereby acknowledge that it fully sets forth my agreement with the Office of the United States Attorney for the District of New Jersey. I state that there have been no additional promises or representations made to me by any officials or employees of the United States government or by my attorneys in connection with this matter.

COSMO CORIGLIANO

WITNESSED:

GARY P. NAFTALIS, Esq.
Counsel for Cosmo Corigliano

Date: ___1/17/00___

- 5 -

## PLEA AGREEMENT WITH COSMO CORIGLIANO

### Schedule A

As part of the foregoing plea agreement, and subject to the conditions set forth therein, the United States and Cosmo Corigliano agree to stipulate to the following statements:

1. Mr. Corigliano committed the offenses to which he agrees to plead guilty prior to November 1, 1998. Accordingly, in view of certain amendments which took effect as of November 1, 1998, Mr. Corigliano's sentencing is governed by the United States Sentencing Guidelines which took effect as of November 1, 1997.

2. The offense guideline applicable to the above offenses is U.S.S.G. § 2F1.1, which carries a base offense level of 6. U.S.S.G. § 2F1.1(a).

3. The above offenses caused losses in excess of $80 million. However, taking into account all the circumstances of this case and the nature of Mr. Corigliano's role in the offense, the total loss caused by the offenses significantly overstates the seriousness of Mr. Corigliano's conduct, and excessive weight would be attached to this factor by applying the full adjustment which might otherwise be indicated under U.S.S.G. § 2F1.1(b)(1) based on that amount of loss.

4. The above offenses involved more than minimal planning on Mr. Corigliano's part. Accordingly, his offense level should be increased by 2 levels pursuant to U.S.S.G. § 2F1.1(b)(2).

5. Mr. Corigliano was a manager and a supervisor in the above offenses, which involved five or more participants. Accordingly, his offense level should be increased by 3 levels pursuant to U.S.S.G. § 3B1.1(b).

6. Mr. Corigliano's offenses involved an abuse of a position of trust, namely his position as Chief Financial Officer of CUC International, Inc. Accordingly, his offense level should be increased by 2 levels pursuant to U.S.S.G. § 3B1.3.

7. As of the date of this agreement, Mr. Corigliano has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If Mr. Corigliano continues to demonstrate such recognition and acceptance through the date of his sentencing, he will become entitled to a 2-point reduction in his offense level pursuant to U.S.S.G. § 3E1.1(a).

8. Mr. Corigliano has assisted authorities in the investigation and prosecution of his own misconduct by timely providing complete information to the government concerning his own involvement in the offense and timely notifying authorities of his intention to enter a plea of

guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Accordingly, if Mr. Corigliano enters a plea pursuant to this agreement and qualifies for a 2-point reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a), and if in addition Mr. Corigliano's offense level under the Guidelines prior to the operation of § 3E1.1(a) is 16 or greater, Mr. Corigliano will be entitled to a further 1-point reduction in his offense level pursuant to U.S.S.G. § 3E1.1(b).

9.  No grounds exist for any upward or downward adjustment in Mr. Corigliano's offense level under any provision of U.S.S.G. Chapters 2 and 3 other than those referred to in paragraphs 3 through 8 above.

10.  In the event that the Court in its discretion departs downward to a Guidelines range in which substitutes for imprisonment are permitted by the Guidelines, the government will not oppose a request by Mr. Corigliano that he be sentenced to some form of substitute punishment.

11.  An order of restitution would be inappropriate in the context of a criminal proceeding against Mr. Corigliano because the number of identifiable victims is so large as to make restitution impracticable and determining complex issues of fact related to the cause or amount of the victims' losses would complicate and prolong the sentencing process to a degree that the need to provide restitution to any victim in the context of a criminal proceeding is outweighed by the burden on the sentencing process.

12.  There is no evidence that Mr. Corigliano committed the offenses to which he has agreed to plead guilty in order to enrich himself personally. Mr. Corigliano acknowledges, however, that in light of those offenses, certain of the proceeds he received from sales of CUC International, Inc. and Cendant stock in the period prior to in or about April 1998 are subject to civil recovery. Mr. Corigliano agrees to use his best efforts to settle any claims the SEC may assert to recovery of such proceeds prior to his sentencing pursuant to this agreement. As part of those efforts, Mr. Corigliano agrees to provide the SEC, upon request, with complete and accurate information regarding his ability to pay any such settlement in the form ordinarily required by the SEC.

# EXHIBIT 2

CONFIDENTIAL PURSUANT
TO 17 C.F.R. § 200.83

### BEFORE THE UNITED STATES
### SECURITIES AND EXCHANGE COMMISSION

| | |
|---|---|
| In the Matter of | : |
| Cendant Corporation | : |
| No. HO-3401 | : |

## WELLS SUBMISSION ON BEHALF OF
## COSMO CORIGLIANO

Kramer-Levin Naftalis & Frankel LLP
919 Third Avenue
New York, New York 10022
(212) 715-9100

Attorneys for Cosmo Corigliano

May 11, 2000

Cosmo Corigliano claims confidential treatment of this submission for all purposes pursuant to 17 C.F.R. § 200.83, and requests that it not be disclosed pursuant to a request under the Freedom of Information Act or in response to any subpoena or other request.



DEFENDANT'S
EXHIBIT
950

156

# TABLE OF CONTENTS

Page

Table of Authorities ..................................................................................................... iii

Preliminary Statement ................................................................................................... 1

Argument ....................................................................................................................... 4

I.  THE COMMISSION SHOULD NOT BRING INSIDER
    TRADING CHARGES OR SEEK TO IMPOSE INSIDER
    TRADING TYPE PENALTIES AGAINST MR. CORIGLIANO
    BECAUSE THE EVIDENCE DOES NOT SUPPORT A
    FINDING THAT HIS CONDUCT WAS FOCUSED ON A
    SCHEME OR INTENT TO ENRICH HIMSELF PERSONALLY ............... 4

    A.  The Staff Cannot Demonstrate the Requisite Scienter to
        Bring Insider Trading Charges ............................................................ 5

        1.  Mr. Corigliano's 1995 Stock Sales Represented But
            a Small Portion of His Holdings and Arose During a
            Period in Which He Was Steadily Increasing His
            Ownership of Company Shares .............................................. 8

        2.  Scienter Cannot Be Predicated On Mr. Corigliano's
            1998 Stock Sales Given His Overall Pattern of
            Conduct ................................................................................. 9

II. THE COMMISSION SHOULD ADHERE TO ITS PUBLIC
    POLICY AND PRECEDENT OF REWARDING
    COOPERATION AND ACKNOWLEDGE MR. CORIGLIANO'S
    SUBSTANTIAL ASSISTANCE TO THE INVESTIGATION IN
    THIS CASE ................................................................................................ 12

    A.  Commission Staff Has Strongly Endorsed a Policy of
        Rewarding Cooperation ...................................................................... 12

    B.  Commission Precedent Provides Examples of Discretionary
        Charging Policy and Benefits to Cooperators .................................... 14

III. MR. CORIGLIANO'S PERSONAL AND FAMILY
     BACKGROUND ARE RELEVANT TO A DETERMINATION
     OF AN APPROPRIATE REMEDY ............................................................. 18

## TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| IV. | THE COMMISSION SHOULD CONSIDER MULTIPLE FACTORS IN DETERMINING AN OVERALL REMEDY, INCLUDING, AMONG OTHER THINGS, AN OFFSET FOR TAXES PAID ON SPECIFIC FUNDS AND A CONSIDERATION OF OTHER PUNISHMENT ALREADY IMPOSED | 19 |
| A. | The Commission Should Consider the Causal Connection Between Accounting Misstatements and the Cendant Stock Price | 21 |
| B. | The Commission Should Offset Taxes Paid By Mr. Corigliano On Profits Received from Stock Sales | 23 |
| C. | The Facts of This Case Do Not Warrant the Imposition of a Civil Penalty Against Mr. Corigliano as the Goal of Deterrence is Sufficiently Achieved by Existing Punishment | 25 |
| Conclusion | | 27 |

# TABLE OF AUTHORITIES

**Page**

Cases:

Aaron v. SEC, 446 U.S. 680, 100 S. Ct. 1945 (1980) ...................................... 5

Acito v. IMCERA Group, Inc., 47 F.3d 47 (2d Cir. 1995) ............................ 10-11

CFTC v. American Metals Exch. Corp., 991 F.2d 71 (3d Cir. 1993) .................. 22

Fidelity Mgmt. & Research Co. v. Ostrander, 40 Mass. App. Ct. 195,
    662 N.E.2d 699 (1996) .......................................................................... 24

Freeman v. Decio, 584 F.2d 186 (7th Cir. 1978) ........................................... 9

Gilford Partners, L.P. v. Sensormatic Elecs. Corp., No. 96 C 4072,
    1997 WL 757495 (N.D. Ill. Nov. 24, 1997) ........................................ 15

Greebel v. FTP Software, Inc., 194 F.3d 185 (1st Cir. 1999) ..................... 11 n.6

In re Investors' Mgmt. Co., [1970-71 Transfer Binder] Fed. Sec. L. Rep.
    (CCH) ¶ 78, 163 (SEC July 29, 1971) ................................................ 6 n.2

Johnson v. SEC, 87 F.3d 484 (D.C. Cir. 1996) .......................................... 8 n.5

Miller v. Pezzani (In re Worlds of Wonder Sec. Litig.), 35 F.3d 1407
    (9th Cir. 1994) ................................................................................. 9-10

Randall v. Loftsgaarden, 478 U.S. 647, 106 S. Ct. 3143 (1986) ............. 24 n.10

Report of Investigation in re Sterling Drug, Inc., [1978 Transfer
    Binder] Fed. Sec. L. Rep. (CCH) ¶ 81,570 (SEC Apr. 18, 1978) ......... 6 n.2

SEC v. Adler, 137 F.3d 1325 (11th Cir. 1998) ................ 6-7, 6 n.3, 7 n.4, 9, 11

SEC v. Blatt, 583 F.2d 1325 (5th Cir. 1978) ............................................ 21 n.7

SEC v. First City Fin. Corp., 890 F.2d 1215 (D.C. Cir. 1989) .............. 21 n.7, 23

SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082 (2d Cir. 1972) ............. 21 n.7

SEC v. Palmisano, 135 F.3d 860 (2d Cir.), cert. denied, 525 U.S.
    1023 (1998) ....................................................................................... 25

KL3 2028170.14

# TABLE OF AUTHORITIES
(continued)

Page

SEC v. Patel, No. 93 Civ. 4603, 1994 WL 364089 (S.D.N.Y. July
13, 1994), aff'd in part and rev'd in part on other grounds, 61 F.3d
137 (2d Cir. 1995) ......................................................................................20, 26

SEC v. Thomas James Assocs., Inc., 738 F. Supp. 88 (W.D.N.Y.
1990), aff'd sub nom. SEC v. Posner, 16 F.3d 520 (2d Cir. 1994) ....................23 n.9

SEC v. Warde, 151 F.3d 42 (2d Cir. 1998) ...........................................................5 n.1

Schneider v. Vennard (In re Apple Computer Sec. Litig.), 886 F.2d
1109 (9th Cir. 1989) ..............................................................................................8

Searls v. Glasser, 64 F.3d 1061 (7th Cir. 1995) ...................................................8

USM Corp. v. Marson Fastener Corp., 392 Mass. 334, 467 N.E.2d
1271 (1984) ........................................................................................................24

United States v. Smith, 155 F.3d 1051 (9th Cir. 1998) ..........................7 n.4, 11

United States v. Teicher, 987 F.2d 112 (2d Cir. 1993) ....................................5 n.1


Statutes, Legislative Authority, and Regulations:

15 U.S.C. §§ 77t(d), 78u(d)(3), 78u-2 .................................................................25

Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j(b) .................7 n.4, 24 n.10

Securities Enforcement Remedies and Penny Stock Reform Act of
1990, Pub. L. No. 101-429, 104 Stat. 931 (1990) ............................................25

H.R. Rep. No. 101-616 (1990), reprinted in, 1990 U.S.C.C.A.N. 1379 ............25

Rule 10b-5, 17 C.F.R. § 240.10b-5 (2000) .......................................................7 n.4

64 Fed. Reg. 72,590 (1999) .............................................................................6 n.3


SEC Authorities:

In re Presstek, Inc., Exchange Act Release No. 39,472 (Dec. 22, 1997) ............16

KL3 2931170_14

## TABLE OF AUTHORITIES
(continued)

Page

SEC v. Bond D. Fletcher & Mediajet, Inc., Litig. Release No. 15,548
    (Oct. 31, 1997); Litig. Release No. 15,818 (July 21, 1998) ..................................15

SEC v. Robert Howard & Robert E. Verrando, Litig. Release No.
    15,599 (Dec. 22, 1997) .............................................................................16

In re Sensormatic Elecs. Corp., Exchange Act Release No. 7,518
    (Mar. 25, 1998) .................................................................................15, 16

Other Authorities:

Lisa I. Fried, SEC Targets Financial Fraud, N.Y.L.J., Mar. 9, 2000, at 1 .....................12

James R. Hagerty, Worst 5-Year Performer Sensormatic Electronics
    Corp., Wall St. J., Feb. 25, 1999, at R11 ...........................................................16

Houdini of the Drexel Scandal, Business Week, Dec. 9, 1991 ..................................17

Insider Trading: Eleventh Circuit Adopts "Use" Test for Insider
    Trading Liability, 30 Sec. Reg. & L. Rep. 513, Apr. 3, 1998 ..............................6 n.3

Richard M. Phillips, "Settlements: Minimizing the Adverse Effects
    of an SEC Enforcement," in The Securities Enforcement Manual
    (Kirkpatrick & Lockhart, LLP eds., ABA 1997) ...........................................23-24

Presstek Inc. Settles Class-Action Lawsuit on "False" Statements,
    Wall St. J., Mar. 27, 2000, at B14 ................................................................16

SEC Enforcement: SEC Staff Willing to Consider Leniency in Return
    for Cooperation, McLucas Says Leniency in Return for Cooperation,
    McLucas Says, 29 Sec. Reg. & L. Rep. 309, Mar. 7, 1997 ....................................13

KL3:2028170.14

- v -

### Preliminary Statement

This is an unusual Wells submission.  Mr. Corigliano already has accepted responsibility for his participation in corporate accounting irregularities committed at CUC International, Inc., now known as Cendant Corp. (referred to jointly as "the Company") and has been cooperating with both federal prosecutors in New Jersey and with the Commission's own Enforcement Division staff in their investigation of senior management's role in the accounting scheme.  In addition, there is no dispute that during the course of his extensive and ongoing cooperation, including at present approximately 84 hours of interviews over 13 days with the Justice Department and the Commission's staff, Mr. Corigliano has been totally forthright and candid, has not minimized his own responsibility, and has provided truthful information that will be of substantial assistance in these governmental investigations.  Despite his complete cooperation, however, Mr. Corigliano has been unable to reach a settlement with the staff.  This case, therefore, presents the unfortunate prospect of adversarial litigation between the Commission and a significant and valuable cooperating witness.

To date, the Enforcement Division staff has proffered only a settlement in which it would agree not to proceed with charges of insider trading, but would nonetheless inappropiately calculate remedies, including the maximum allowable civil penalty, using trading models, traditionally applicable only when insider trading charges are actually brought.  The staff's position is in direct conflict with the evidence adduced in the investigation by the United States Attorney's Office for the District of New Jersey and its federal agents.  The exhaustive investigation by that office has resulted in a formal stipulation within Mr. Corigliano's plea agreement, which states: "There is no evidence that Mr. Corigliano committed the offenses to which he has agreed to plead guilty in order to enrich himself personally."  United States

KL3 2022178.34

162

Attorney, District of New Jersey, Plea Agreement with Cosmo Corigliano ("Plea Agreement"),
Jan. 14, 2000, at 7.

Rather than credit this compelling finding by the Justice Department and Mr.
Corigliano's extensive cooperation, the staff has sought to impose upon him severe sanctions,
including permanent bars from ever acting as a director or officer of a public company or any
practice at all before the Commission, in addition to disgorgement and a civil penalty in an
amount calculated according to standards ordinarily imposed only in strict insider trading cases.
The penalties sought by the staff are harsher penalties than those often received even by non-
cooperators. In fact, the staff calculates disgorgement in ways that overstate substantially any
benefit Mr. Corigliano actually received from the alleged fraud, seeks damages based on
transactions during 1995 when he effectively increased his Cendant stock position, fails to adjust
the 1995 sales for stock splits and demands penalties on trades that are outside the statute of
limitations.

We submit this memorandum to highlight why the staff's approach to sanctions is
not appropriate in this corporate earnings case in which Mr. Corigliano is a valuable cooperator
in both the United States Attorney's and the Commission's ongoing investigations. The
Commission's staff has long and publicly espoused a policy in which it seeks to credit
cooperators for their assistance in investigating and revealing securities violations. Without
assurances from the staff that cooperation will be credited, there will be little incentive for others
— in this case or future ones — to come forward to provide such valuable assistance. Here, the
penalties sought against Mr. Corigliano reflect essentially no credit for the substantial assistance
he has and is continuing to provide to the government and may well deter others from agreeing
to assist in these significant investigations.

KL3 2021170 14

- 2 -

163

In addition to his cooperation, Mr. Corigliano presents the staff with overwhelming facts that underscore why the Justice Department found no evidence to indicate that Mr. Corigliano's conduct was intended "to enrich himself personally." First, in 1995, Mr. Corigliano sold only a minor portion of his holdings and, in fact, increased his overall Company stock ownership. Second, Mr. Corigliano's early 1998 stock sales, which the staff has cited as the principal evidence of insider trading, were the direct result of advice from the Company's general counsel, who Mr. Corigliano also trusted as a friend. In his conversations with the general counsel, who then was also selling Company stock, Mr. Corigliano was advised not to keep all of his net worth in one stock, particularly since, as a result of the HFS merger, Mr. Corigliano knew that his employment with the Company was coming to an end. Secondly, even after these 1998 sales, Mr. Corigliano still maintained a large Cendant stock and option position. In February and March 1998, he also exercised options, paid taxes on the income he then recognized, and added and held approximately 50,000 new Company shares as a result of those exercises. At the same time, he took his bonus for 1997 and his entire salary for 1998 in the form of long-term, not currently exercisable stock options, foregoing cash payments of $500,000. These actions are clearly inconsistent with any notion of loss avoidance in anticipation of any disclosure of accounting irregularities at the Company.

The equities in this case similarly support a different sanctions position by the staff. As explained more fully below, Mr. Corigliano is the lifeline of support for at least seven people, including his wife, Terri; their three young children; his elderly parents; and his wife's widowed mother. All depend on Mr. Corigliano for financial means. He has never shunned these family duties and should not be forced to abandon his family now, especially considering his conduct as a valuable cooperator to the Commission.

KL3 2029179 16

- 3 -

The staff should also recognize that no additional deterrent value exists in seeking punitively calculated disgorgement or severe civil penalties on top of the multiple layers of punishment that Mr. Corigliano already faces, not the least of which are imprisonment and criminal fines. In this context, the imposition of such civil sanctions by the Commission strongly resembles punitive measures rather than the equitable relief which Congress intended when it extended this authority to the Commission. Such a result would also run counter to the Commission's stated policy of rewarding substantive and valuable cooperation in ongoing investigations.

For all these reasons, Mr. Corigliano respectfully urges the Commission staff to use this unusual Wells submission to revisit and revise its settlement position so that this case may reach an expeditious and fair resolution that avoids litigation and the prospects of an adversarial proceeding with the Commission's own valuable cooperating witness.

## Argument

1.    **THE COMMISSION SHOULD NOT BRING INSIDER TRADING CHARGES OR SEEK TO IMPOSE INSIDER TRADING TYPE PENALTIES AGAINST MR. CORIGLIANO BECAUSE THE EVIDENCE DOES NOT SUPPORT A FINDING THAT HIS CONDUCT WAS FOCUSED ON A SCHEME OR INTENT TO ENRICH HIMSELF PERSONALLY**

The United States Attorney's Office concluded from its complete investigation of all relevant sources, including its exhaustive interrogation of Mr. Corigliano as a cooperating witness, that "no evidence" exists to conclude that Mr. Corigliano acted with intent "to enrich himself personally." Plea Agreement, at 7. The evidence reflects that from early on in Mr. Corigliano's tenure at CUC, the highest levels of management perverted the accounting department with programs and policies that went well beyond the limits of generally accepted

KL3 2929170 14                    - 4 -

accounting principles. It was in this context that Mr. Corigliano began his ill-fated career at CUC and it was in this context that he regrettably carried out the desires of upper management at the Company. At no time, however, had Mr. Corigliano schemed with members of senior management to inflate his compensation through either the issuance of stock options or sudden sales of Company stock. Instead, Mr. Corigliano was a corporate "foot-soldier," completing his work to please his supervisors, who from all accounts were the true architects of the "financial engineering" at the Company.

### A.    The Staff Cannot Demonstrate the Requisite Scienter to Bring Insider Trading Charges

In order to establish insider trading liability under the federal securities laws, the Commission must prove that the inside trader acted with "scienter." E.g., Aaron v. SEC, 446 U.S. 680, 695-96, 100 S. Ct. 1945, 1955 (1980). Scienter necessarily requires that the insider have possession of material nonpublic information at the time the insider trades. The logical corollary in determining scienter is that such material nonpublic information is then used in subsequent trading. The Commission staff, however, continues to recommend that the inquiry end after possession of inside information is established, a holding that courts have consistently refused to adopt.[1]

---

[1]    The only instance in which a federal appellate court suggested that a mere possession test had merit was a discussion added as dicta in a criminal case, United States v. Teicher, 987 F.2d 112 (2d Cir. 1993). However, in the six years since Teicher was decided, neither the Supreme Court nor any other federal appellate court has accepted a strict possession standard. In fact, even the Second Circuit in a post-Teicher case has impliedly endorsed a "use" test. See SEC v. Warde, 151 F.3d 42, 47-48 (2d Cir. 1998) (holding that "[t]he inference that [the defendant] traded on inside information was reinforced by the manner in which [the defendant] made his purchases," and concluded that "[t]his evidence amply supports a jury finding that [the defendant] was in possession of, and traded upon, inside information.") (emphasis added).

KL3 2023176 14                      - 5 -

The Commission's position on what showing is necessary to establish scienter for insider trading charges has itself undergone significant fluctuation — in earlier times focusing on knowing use, then urging a mere possession test, and more recently following the lead of certain court decisions and moving toward a modified possession rule.[2] The federal appellate courts that have addressed this issue have repeatedly endorsed some version of a knowing use test in connection with an insider's trading, and the issue remains open in the Third Circuit.

We respectfully submit that, as several courts have held, scienter requires a knowing use of the material inside information, and such a standard cannot be met here. Moreover, we note that while its litigation position has differed over time, as a charging matter, the staff's review has, in fact, followed the analysis conducted by the United States Court of Appeals for the Eleventh Circuit in SEC v. Adler, 137 F.3d 1325 (11th Cir. 1998).[3]  In that case,

---

[2]  See In re Investors' Mgmt. Co., [1970-71 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 78,163 at 80,514 (SEC July 29, 1971) (requiring a causal connection between the material nonpublic information and the trading at issue); compare Report of Investigation in re Sterling Drug, Inc., [1978 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 81,570, at 80,295, 80,298 (SEC Apr. 18, 1978) (rejecting evidence of an insider's preexisting plan to sell, stating that "Rule 10b-5 does not require a showing that the insider sold his securities for the purpose of taking advantage of material nonpublic information"). In its Sterling Drug opinion, the Commission offered no explanation for its changed position.  In fact, it failed to even acknowledge its earlier decision in In re Investors' Management.

[3]  In response to Adler and subsequent decisions, the Commission has now "recognize[d] that an absolute standard based on knowing possession, or awareness, could be overbroad in some respects." Proposed Rules, Securities and Exchange Commission, Selective Disclosure and Insider Trading, 17 CFR Parts, 230, 240, 243, and 249, 64 Fed. Reg. 72,590, 72,600 (1999).  Commenting on the Adler court's ruling, the Commission's Solicitor admitted, "[The Adler court's test] is not a bad test.  It's our fallback position."  Insider Trading: Eleventh Circuit Adopts "Use" Test for Insider Trading Liability, 30 Sec. Reg. & L. Rep. 513, Apr. 3, 1998.  In fact, the Commission has recognized that an Adler-type analysis is normally conducted at the charging stage anyway. Id.

KL3 2929170.14                                - 6 -

the court required the Commission to prove "actual use" of insider information in trading, but permitted a rebuttable evidentiary presumption of use from actual possession of inside information. Id. at 1340.[4]

In this case, Mr. Corigliano can rebut any inference of insider trading that may arise from his periodic and piecemeal sales of Company stock in 1995 and 1998. These sales were not causally connected to any specific scheme to enrich Mr. Corigliano personally. This finding already has been made by the Department of Justice. See Plea Agreement, at 7. The pattern of Mr. Corigliano's stock sales are not particularly unusual or extensive to raise an inference that his trades were "focus[ed] on fraud, deception, and manipulation." Adler, 137 F.3d at 1333. To the contrary, the entirety of his trading, including the decision to take his 1997 bonus and 1998 salary in long-term, not immediately exercisable stock options, undercuts any such claim. Mr. Corigliano has repeatedly denied that he engaged in insider trading, and the evidence confirms that he never connected the tasks he performed at the Company with any personal stock sales that he made.

---

[4]  The Adler court based its holding on several grounds. First, the court concluded that the inference of use would alleviate the Commission's evidentiary difficulties. Second, the court found that the use test "best comports" with the language of § 10(b) and Rule 10b-5, and with Supreme Court precedent, that focus insider trader liability on "fraud and deception." Id. at 1338. Third, trading with material, nonpublic information does not "always and inevitably" constitute a breach of the Supreme Court maxim of a duty to disclose or abstain, making the knowing possession test overly broad. Id. Finally, the court refused to defer to the Commission's preference for the "knowing possession" test because it found the Commission itself had not been consistent on the issue. Id. at 1338-39.

The Adler court's analysis was, in substantial part, quickly accepted and adopted by the Ninth Circuit as well. See United States v. Smith, 155 F.3d 1051 (9th Cir. 1998). After analyzing all existing authority on the subject, the Smith court concluded that the Eleventh Circuit's arguments in Adler were most consistent with Supreme Court dicta, which it said "consistently suggested . . . that Rule 10b-5 requires that the government prove causation in insider trading prosecutions." Id. at 1067. The court reasoned that the requirement of an "intent to defraud" dictates that only intentional conduct be prohibited. Id.

1. **Mr. Corigliano's 1995 Stock Sales Represented But a Small Portion of His Holdings and Arose During a Period in Which He Was Steadily Increasing His Ownership of Company Shares**

Mr. Corigliano voluntarily advised the staff that he sold approximately 80,000 shares of CUC stock in 1995.[5] It is clear that these sales represented only a small fraction of the stock he owned outright or had options to purchase. Indeed, during 1995, he nearly doubled his common stock ownership, starting from approximately 27,000 post-split shares at the end of 1994 and finishing with about 51,000 shares at the end of 1995. From the end of 1994 to the end of 1997, Mr. Corigliano ultimately increased his position in Company stock from 27,000 post-split shares to over 200,000 shares.

There is nothing about his pattern of stock trades in 1995 that suggests unusual or suspicious behavior raising any inference of bad faith. If anything, his pattern of trading that year was consistent with his trading in the surrounding three-year period, which showed a steady movement to increase his overall holdings. Similarly, there is no principled basis to suggest that at a time when Mr. Corigliano was increasing his overall CUC stock position, he was seeking to benefit from any alleged fraud. See Searls v. Glasser, 64 F.3d 1061, 1068 (7th Cir. 1995) (inferences of scienter can be undermined when an insider's sales of stock are offset by even larger stock acquisitions during the relevant time period); Schneider v. Vennard (In re Apple Computer Sec. Litig.), 886 F.2d 1109, 1117-18 (9th Cir. 1989) (no inference of scienter where defendants retained much of their holdings in Apple stock).

---

[5]   Although the staff requested information as to Mr. Corigliano's trades only for the period subsequent to February 1, 1995, we voluntarily informed the staff that Mr. Corigliano had sold 5,000 CUC shares in January 1995. The staff added these sales to its disgorgement calculation, plus demanded penalties for them, although they are well outside the five-year limitations period. See Johnson v. SEC, 87 F.3d 484 (D.C. Cir. 1996). Similarly, in computing damages with respect to his January and November 1995 sales, the staff failed to take into account the 3 for 2 stock splits that took place in July 1995 and October 1996.

RLJ 2073370.14            - 8 -

169

2.     Scienter Cannot Be Predicated On Mr. Corigliano's 1998 Stock
Sales Given His Overall Pattern of Conduct

Mr. Corigliano's pattern of stock trading in 1998 is also insufficient to raise an inference of scienter. By early 1998, as a long-time employee of the Company, almost all of Mr. Corigliano's net worth was invested in CUC/Cendant stock and options. His lack of diversification, however, only became an issue for him after a conversation he had with the Company's General Counsel, who advised him that it was imprudent and "silly" for him to hold so much of his net worth in one investment, particularly when Mr. Corigliano knew at the time that he would shortly leave the Company as it emerged from the HFS merger. Therefore, pursuant to the advice of the general counsel, Mr. Corigliano sold a portion of his Company stock in February and March 1998. See Freeman v. Decio, 584 F.2d 186, 197 n.44 (7th Cir. 1978) (inference that defendants were acting in bad faith "can be nullified by a showing that sales in question were consistent in timing and amount with . . . other circumstances [that] might reasonably account for their occurrence"); see also Adler, 137 F.3d at 1329 (defendant's communication to company's general counsel explaining intention to sell stock factor used to rebut any negative inference of insider trading).

Net of his stock sales and option exercises, Mr. Corigliano only reduced his ownership in Cendant common stock from a little more than 200,000 shares to approximately 131,000 shares. He continued to maintain nearly half his net worth in the Company's stock and in 380,000 stock options, that were then fully vested and "in-the-money." He also held approximately 900,000 additional options that had not yet vested. His decision to keep most of his net worth invested in Company stock strongly implies a confidence in the continued value of this investment, not a desire to unload the stock on an unsuspecting market. See, e.g., Miller v. Pezzani (In re Worlds of Wonder Sec. Litig.), 35 F.3d 1407, 1425 (9th Cir. 1994) (affirming

KL3 2023170 14                                    - 9 -

district court's determination that "[a]ny remote inference of bad faith arising from the defendants' stock sales is completely dispelled by the defendants' overall pattern of conduct," including the fact that they "retained the great bulk of their holdings, and held on" while the share price declined) (citation omitted).

In February and March 1998, Mr. Corigliano also exercised options and kept approximately 50,000 Cendant shares from this conversion. He paid taxes on the retained stock at the maximum applicable rate on the ordinary income he recognized as measured by the difference between the option strike price and the market price of the stock at the time he exercised the options. Clearly, if Mr. Corigliano, who knew he would soon leave the Company, was acting to avoid future losses as a result of the Company's accounting scheme, he would not have exercised options, paid tax based on the current market price, and then hold the stock. His retention of Company's shares after exercising options only makes economic sense if he believed that the stock price was going to increase over time.

Mr. Corigliano's lack of scienter is also dramatically underscored by his decision in the early months of 1998 to take his 1997 bonus compensation and entire 1998 salary in Cendant stock. Rather than receive cash payments of $500,000, as he was entitled to, he took his bonus and salary in the form of Cendant stock options which only became exercisable over a three-year period. Again, he chose to remain a long term investor in Cendant stock. He was not cashing out his position or dumping his shares. See, e.g., Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995) (defendant director's sale of substantial amounts of his stock for a profit of more than $2 million just days before the release of information causing the company's stock to drop "fail[s] to provide any inference of an intent to deceive the public," when sales were result of exercises in stock options that had become exercisable and the defendant director had recently

KL3.2029170.14                              - 10 -

retired as an officer of the company; the Court also noted that even after the sale of nearly 350,000 shares, defendant retained 192,000 shares, which showed "he was confident about IMCERA's future").[6]

       This pattern of conduct is not indicative of someone who has the intent to enrich himself in a careful scheme of deception by selling stock based on inside information. It is consistent, however, with the notion of a loyal corporate operative, who maintained his conviction and trust in Company management and in the delusion of their false optimism that pervaded Mr. Corigliano's fourteen years at the Company. It is also consistent with the stipulation in Mr. Corigliano's plea agreement. There is no evidence that he acted with the requisite scienter to enrich himself personally from CUC's fraudulent financial reporting practices at the time of his sales of Company stock. According to the dictates of Adler and Smith, if a person in possession of inside information does not trade on the basis of that information, there is no intent to deceive and therefore, the scienter required for an insider trading violation is lacking. Mr. Corigliano should not face insider trading charges here, nor be subject to penalties appropriate only in egregious insider trading cases.

---

[6]  Similarly, scienter is not established merely by the size of the trading proceeds. See Greebel v. FTP Software, Inc., 194 F.3d 185, 206 (1st Cir. 1999) (finding sales were not suspicious despite receipt of over $23 million); In re Silicon Graphics Inc. Sec. Litig., 195 F.3d 521 (9th Cir. 1999) (finding sales were not unusual despite receipt of over $13 million).

KL3 2028170 14         - 11 -

II.    **THE COMMISSION SHOULD ADHERE TO ITS PUBLIC POLICY AND PRECEDENT OF REWARDING COOPERATION AND ACKNOWLEDGE MR. CORIGLIANO'S SUBSTANTIAL ASSISTANCE TO THE INVESTIGATION IN THIS CASE**

A.    **Commission Staff Has Strongly Endorsed a Policy of Rewarding Cooperation**

At the recent 2000 "SEC Speaks" Conference, senior members of the Commission's Enforcement Division Staff strongly reiterated the Commission's longstanding favorable position toward cooperators in ongoing SEC investigations. Repeatedly, the staff has stated to the public that, as has been its practice, cooperators will be treated more favorably than other respondents, and will be given considerable credit in return for their assistance. One senior official represented at the recent Commission conference, "cooperat[ors] do better than those who don't, and it is as simple as that." Lisa I. Fried, SEC Targets Financial Fraud, N.Y.L.J., Mar. 9, 2000, at 1.

At that same conference, another senior Enforcement Division official elaborated on this point, stating that the Division has discretion in determining what charges to bring, whether to proceed before the Commission or in court, what sanctions to seek, and what language to include in its complaint. According to this official, the Commission consistently has used its discretion to reward cooperators. He concluded that generally those who cooperate with the Commission face lesser penalties than those who do not. The Commission's policy of rewarding cooperation, consistent with the same policy of other law enforcement agencies, serves sound public policies of encouraging the investigation and prosecution of fraud and acknowledging the contrition and remorse of wrongdoers.

The Commission has, in fact, long and publicly articulated a policy of rewarding cooperation. At the SEC Speaks Conference in 1997, the then Director of Enforcement, William

KL3.2021170.14                - 12 -

McLucas, publicly explained that the division does strike "deals" with cooperators for lesser sanctions given the appropriate facts and circumstances. SEC Enforcement: SEC Staff Willing to Consider Leniency in Return for Cooperation, McLucas Says Leniency in Return for Cooperation, McLucas Says, 29 Sec. Reg. & L. Rep. 309, Mar. 7, 1997. The division's chief counsel, Joan McGown, added that "[i]t is frustrating [for the Commission] as an institution that you can't let people know all the times" someone has been given a "pass" because of their level of cooperation. Id.

In this case, however, the staff's position on settlement is inconsistent with the public assurances it has previously made to induce cooperation. The staff has not proposed a settlement offer to Mr. Corigliano that differs in any material way from sanctions imposed upon non-cooperators in egregious cases. It has taken this position despite the fact that since the signing of Mr. Corigliano's plea agreement with federal prosecutors on January 14, 1999, he has made himself available to the United States Attorney's Office and the Commission's staff on a virtually full-time basis. Thus far, he has attended 13 full-day sessions, often traveling more than five hours per visit and sometimes on very short notice. He also has spent innumerable hours in meetings with counsel reviewing documents and discussing recollections of events in preparation for the government sessions. In addition, he has spent significant time alone poring over office files, Company documents, computer files and databases. He has used his accounting knowledge to conduct analyses for government investigators, to clarify issues, and to satisfy any lingering inquiries. In his sessions with the government, Mr. Corigliano has provided extensive insight into the accounting operations at CUC/Cendant. He has provided substantial information as to the role of the Company's most senior management in the irregularities. Mr. Corigliano's

KL3 2829170 14

- 13 -

174

knowledge of the origins and planning of the accounting scheme at CUC/Cendant is plainly unique.

At no time in any of these sessions has Mr. Corigliano attempted to minimize his own responsibility in the events that occurred at CUC. He has been complete and truthful in every step of this very difficult process and has prepared himself for the unpleasant eventuality of testifying in future trials against his former colleagues.

This level of sincere and valuable cooperation should not go unnoticed and unrewarded by the Commission. Mr. Corigliano is a first-time offender with real remorse and contrition for his actions. His subsequent behavior, although not lessening the effects of the offense, should be credited by the Commission as a means of encouraging cooperation in future cases as well as to recognize the positive steps taken by Mr. Corigliano since the discovery of the misconduct. The Commission cannot do justice to its pronounced policy of rewarding cooperation if it imposes sanctions on Mr. Corigliano that are no different from and may exceed those that the staff would seek against non-cooperators.

This would be the case even were Mr. Corigliano able to point solely to the fact of his extensive cooperation. It is especially true in light of the substantial evidence that Mr. Corigliano did not seek to profit personally from his wrongdoing.

**B.    Commission Precedent Provides Examples of Discretionary Charging Policy and Benefits to Cooperators**

The staff indicated that it intends to seek monetary penalties in this case that are significantly greater than those that have been generally extracted from individuals in the context of earnings disclosure offenses, even among non-cooperators. Our research has revealed that the largest single amount obtained by the Commission in the form of monetary penalties against an individual in an earnings disclosure case was $3 million, in a matter involving a chief executive

KL3 2923170.14                                   - 14 -

officer, who was not a cooperator and who was an architect of the fraud. See SEC v. Bond D. Fletcher & Mediajet, Inc., Litig. Release No. 15,548 (Oct. 31, 1997); Litig. Release No. 15,818 (July 21, 1998). Therefore, before even considering the effects of cooperation, the Commission has not previously received monetary penalties in the amounts discussed here.

In other earnings disclosure cases — not involving cooperators — the Commission has failed to require disgorgement, even though the defendants traded in company stock during the period of financial reporting fraud. For example, in In re Sensormatic Electronics Corp., Exchange Act Release No. 7,518 (Mar. 25, 1998), the Commission brought a civil action against the company's individual officers, including the chief executive officer, the chief operating officer, and the vice president of finance. The Commission charged that these officers manipulated corporate quarterly revenues to meet analysts' projections, recognized revenues early, misrepresented the shipment of goods, and committed other reporting irregularities. Id. According to the Commission, overstatements of earnings ranged as high as $30.2 million in a single quarter. Id.

During the period of this conduct, these same Sensormatic officers liquidated large positions in company stock. The Chief Executive Officer had over $500,000 in stock sales; the COO sold over $1 million in stock representing 100 percent of his holdings; and the vice president of finance sold over $220,000 in Sensormatic stock, representing more than 90 percent of his holdings. See Gilford Partners, L.P. v. Sensormatic Elecs. Corp., No. 96 C 4072, 1997 WL 757495, at *2 (N.D. Ill. Nov. 24, 1997). Despite this fact, the Commission's settlement with these officers did not result in insider trading charges or remedies. No permanent director or officer bars or permanent bars from practicing before the Commission were levied against any of these senior officers, and only temporary suspensions were imposed against more junior ones.

KL3 2823170 14

- 15 -