No disgorgement was required of any of the officers charged, and the civil penalties did not exceed $50,000 as to any single defendant. In re Sensormatic Elecs. Corp., Exchange Act Release No. 7518. Meanwhile, class action plaintiffs who brought a civil action against these same officers charging them with insider trading, settled for approximately $53 million. See James R. Hagerty, Worst 5-Year Performer Sensormatic Electronics Corp., Wall St. J., Feb. 25, 1999, at R11.

In another recent financial disclosure and fraud case, the Commission obtained civil penalties but not disgorgement, despite significant trading by the respondent. See In re Presstek, Inc., Exchange Act Release No. 39,472 (Dec. 22, 1997); SEC v. Robert Howard & Robert E. Verrando, Litig. Release No. 15,599 (Dec. 22, 1997). In that case, the Commission filed and settled a civil action against Presstek's chairman and president for causing the company to disseminate, through its own and third-party statements, materially false and misleading information about its sales and business prospects. The Commission settled for a total of $2.7 million in civil penalties against Presstek's chairman. Id. No insider trading charges were brought, no permanent bars from practice before the Commission or as an officer or director were imposed, nor disgorgement enforced, despite the fact that the chairman had been the subject of a prior Commission consent decree involving insider trading and that he had made $16.5 million in profits in company stock trades during the period of fraudulent disclosures. A class action suit was also filed in the Presstek matter, again charging insider trading violations and resulting in a settlement of $22 million. See Presstek Inc. Settles Class-Action Lawsuit on "False" Statements, Wall St. J., Mar. 27, 2000, at B14. As in the Sensormatic litigation, this case also did not involve a cooperating defendant.

KL3 2028176 14                        - 16 -

Although it is difficult to trace a record of how cooperators have fared in negotiations with the Commission, given the confidentiality of such matters, one case particularly stands out as a compelling example of the extent of credit awarded cooperators previously by the staff. James Dahl was a senior junk-bond salesman at Drexel Burnham Lambert, Inc., who admitted to receiving personally more than $100 million by fraudulently selling junk bonds in the 1980s. See Houdini of the Drexel Scandal, Business Week, Dec. 9, 1991. After receiving immunity from criminal prosecution from the Department of Justice, he began to cooperate extensively with several federal agencies in their Drexel investigation. In return for his cooperation, the Commission agreed not to take any action against Mr. Dahl. Id. In its letter to Mr. Dahl, the Commission detailed its agreement with him in these terms:

> The Securities and Exchange Commission agrees that, in light of the compulsion order obtained by the U.S. Attorney's Office and the Commission's desire to obtain your client's early meeting with the Commission's staff, the Commission shall not bring any action or proceeding, or seek any relief against your client under the securities laws (as that term is defined in Section 3(47) of the Exchange Act) based on any activity he engaged in prior to the date of this letter involving his employment at Drexel if, among other things set forth below, he agrees to meet with the staff of the Commission at the staff's request and inform the staff of his knowledge of any matters as to which he has received the protections afforded by 18 U.S.C. § 6001 et seq. for previous communications of such information.

Letter of Gary Lynch, Director of Division of Enforcement, September 28, 1998. In fact, Mr. Dahl continues to retain all of his securities licenses. Houdini of the Drexel Scandal, Business Week, Dec. 9, 1991.

The Commission's current investigation of CUC/Cendant resembles the Drexel case in its potential impact on corporate practice. We believe that Mr. Corigliano's cooperation is of a level at least as valuable as that provided by Mr. Dahl. But the staff to date has not accorded Mr. Corigliano any meaningful benefit at all, let alone a benefit that takes into account

KL3 2078176 14                     - 17 -

the value of his cooperation, in its treatment of him. Indeed, the staff is demanding a settlement involving harsher penalties than those issued in Sensormatic or Presstek, where the individuals were not cooperators and engaged in arguably more egregious conduct.

## III.   MR. CORIGLIANO'S PERSONAL AND FAMILY BACKGROUND ARE RELEVANT TO A DETERMINATION OF AN APPROPRIATE REMEDY

Mr. Corigliano requests that the Commission use its discretion in fashioning an equitable remedy in this case and consider the debilitating effect such a remedy may have on those persons close to and dependent upon him, who obviously did not commit any securities violations.

Cosmo Corigliano is forty years old, married, and the father of three young children, ages 5, 7, and 9. He presently is the sole financial provider for his wife and children. Cosmo comes from humble origins, the son of an immigrant father who worked his way up from driving a bakery truck to eventually owning a small bakery shop. However, Cosmo is now also the sole financial support of his retired parents, who are without savings.

Cosmo's mother, 75, suffered a stroke approximately five years ago and requires much medical attention. Cosmo insures that both his parents receive all necessary medical care as part of his financial support of them. In fact, he pays for virtually all of his parents' significant expenses, from utility to food bills. In addition, he supplements their Social Security income, the only other income that they receive.

Cosmo also provides extensive financial support to his mother-in-law. Cosmo's wife, Terri, lost her father in a fire many years ago, the tragic result of behavior caused by acute alcoholism that plagued him and his family for many years. Terri's mother, 75, now lives alone, is retired, also has significant health problems, and depends on Cosmo's financial support. Like

KL3 2028170 14

- 18 -

Cosmo's parents, his mother-in-law is without financial savings and needs Cosmo's support to pay real estate taxes on her house and to provide for living expenses and medical bills.

In addition to offering care and financial support to their parents, Cosmo and Terri Corigliano have always contributed to various charitable and church-related organizations in Connecticut, where both have lived all their lives. Another insight into the character of Cosmo and Terri Corigliano is evidenced by how they dealt with particular family tragedy in their lives. Terri's older brother died three years ago of a sudden heart attack. He left behind a three-month old daughter, who suffers from a Down syndrome-like disease, known as Smith-Magenis syndrome. Cosmo and Terri both have given special attention and assistance to the handicapped child and her widowed mother.

This is but a small snapshot of the character and background of Cosmo Corigliano. He remains deeply devoted to his family and, despite his actions in this case, does not deserve to face the possibility of abandoning those dependent family members for whom he has gladly accepted the burden of care. Certainly, the Commission's staff cannot claim to advance a social cause by leaving these people, who also are the innocent victims in this case, without means of economic support.

IV.    **THE COMMISSION SHOULD CONSIDER MULTIPLE FACTORS IN DETERMINING AN OVERALL REMEDY, INCLUDING, AMONG OTHER THINGS, AN OFFSET FOR TAXES PAID ON SPECIFIC FUNDS AND A CONSIDERATION OF OTHER PUNISHMENT ALREADY IMPOSED**

As this submission reflects, and as Mr. Corigliano has repeated during the course of his cooperation, he fully admits his wrongful participation in the accounting irregularities that infected the financial statements and reports at CUC/Cendant. We have also advised the staff that Mr. Corigliano is willing to make a substantial financial settlement that reflects the true

KL3 2028179.14                        - 19 -

180

benefit he allegedly received. Mr. Corigliano, however, disputes the formula suggested by the staff as inappropriate and unduly harsh under the circumstances. It is contrary to the economic evidence and legal authority and overstates substantially any benefit Mr. Corigliano actually obtained.

The staff has proposed a broad disgorgement formula based strictly upon Mr. Corigliano's trading proceeds. This formula is ordinarily applied when the Commission actually brings insider trading charges — charges which cannot be supported here. In this matter, the Commission should take into account a variety of factors, including the difference between the mental state and level of culpability posed by the "corporate crime" of misstatements in financial reports and the more individual and personally motivated crime of insider trading.

A fair determination of Mr. Corigliano's alleged unjust enrichment from his individual participation in a corporate scheme to misrepresent company earnings should consider several additional matters, such as: the fact that "there is no evidence that Mr. Corigliano committed the offenses to which he has agreed to plead guilty in order to enrich himself personally," see Plea Agreement, at 7; Mr. Corigliano's acceptance of responsibility and his cooperation with authorities against the organizers of the corporate scheme; the causal connection of the accounting irregularities to the Company stock price; any offset from profits received for taxes paid; and the overall punishment Mr. Corigliano already faces. This approach has been endorsed by at least one district court, see SEC v. Patel, No. 93 Civ. 4603, 1994 WL 364089 (S.D.N.Y. July 13, 1994) (holding that in determining fair remedy, the total punishment imposed on a defendant should be considered among other factors), aff'd in part and rev'd in part on other grounds, 61 F.3d 137 (2d Cir. 1995). We encourage the Commission to adopt that court's analysis here.

KL3:2025170 14

- 20 -

## A.   The Commission Should Consider the Causal Connection Between Accounting Misstatements and the Cendant Stock Price

The staff has chosen to compute a disgorgement amount based upon the difference between the price at which Mr. Corigliano sold stock in 1995 and 1998 and the lowest price of Cendant stock within five days of the Company's announcement on July 14, 1998 of additional restatements to its reported financial statements. This method of computation attributes 100% of the stock price differential to the announcement of the new accounting information and then makes this entire amount chargeable to Mr. Corigliano. It also unfairly attributes to him the full decline in the stock price resulting from events that took place subsequent to his termination and the Company's April 1998 announcement of the accounting irregularities. The staff's methods would be aggressive and economically flawed if this were an insider trading case, which it is not.

We suggest to the Commission that this calculation is too simplistic and unrealistic in a context other than insider trading and becomes de facto punitive.[7] In this case, the Commission should employ an econometric event study methodology that accounts for market and company items that combine to affect the price movement of a stock. Such an analysis here should result in a finding that the drop in price of Cendant stock cannot entirely be attributed to the restatement of earnings announcement and therefore not all of the price differential should be charged to Mr. Corigliano.

We retained experienced and recognized econometric consultants on Mr. Corigliano's behalf to analyze any benefit Mr. Corigliano allegedly realized based on the

---

[7]   Courts have long recognized disgorgement as an equitable remedy that may not be used punitively. SEC v. First City Fin. Corp., 890 F.2d 1215, 1230 (D.C. Cir. 1989); SEC v. Blatt, 583 F.2d 1325, 1335 (5th Cir. 1978); SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1104 (2d Cir. 1972).

XL) 2028379 14                            - 21 -

restatements. These experts performed substantial and detailed work. Among other things, they reviewed the movement of Cendant's stock price in the Spring of 1998 and isolated the earnings restatement item from other "event" effects, such as the HFS merger and market responses to apparent synergy deficiencies in the combined entity, the Company's litigation exposure, and the rebound in the stock price following the shareholder settlements. By isolating these different "events," these experts concluded that from the stock proceeds received by Mr. Corigliano in 1998, approximately $3.4 million in pre-tax dollars, and approximately $1.9 million post-tax, represents the amount of loss avoided reasonably attributable to Cendant's earnings restatement.[8] We are happy to discuss further this expert analysis with the staff. However, we wish to underscore that Mr. Corigliano is prepared, for settlement purposes only, to pay an amount that rationally reflects the true economic benefit he allegedly received, as these experts have calculated it.

In a similar context, an appellate court remanded a district court's findings on disgorgement when the district court relied upon the SEC's calculation based only on general investor losses and did not tailor its calculation to the particular facts of the case. CFTC v. American Metals Exch. Corp., 991 F.2d 71, 78 (3d Cir. 1993). Importantly, the Third Circuit said in that case: "The hardship of investor losses should not, however, be used as an excuse to impose a remedy under circumstances in which the scope of relief falls outside that remedy's recognized parameters." Id. To avoid such a result here, Mr. Corigliano urges the Commission

---

[8]    Indeed, in the class action litigations, class plaintiffs, also assisted by experienced experts, contended that their total damages were only a little over a third of the total market capitalization drop. Cendant disputed this amount and settled for an amount equal to approximately one-third of plaintiffs' damage figures — or slightly more than one-ninth of the market capitalization drop.

KL3.2021179 14

- 22 -

to apply a rationally based econometric formula similar to the one described above in considering any disgorgement amount.

**B.      The Commission Should Offset Taxes Paid By Mr.
Corigliano On Profits Received from Stock Sales**

The Commission bears the ultimate burden of persuasion that its disgorgement figures reasonably approximate the amount of unjust enrichment. First City Financial Corp., 890 F.2d at 1231. In this case, Commission staff claims the disgorgement amount is based upon the total proceeds received by Mr. Corigliano from various stock sales he made in 1995 and 1998. This calculation fails to account for taxes in the amount of approximately $9.4 million that Mr. Corigliano paid in connection with these option exercises and sales. The taxes paid on Mr. Corigliano's stock trades are relevant because they are an expense he immediately remitted on these proceeds and can be directly traced to the specific funds. Any calculation that omits these tax payments necessarily overstates amounts actually retained by Mr. Corigliano and, therefore, no longer becomes a measure to recover only the amounts by which he was "unjustly enriched" but becomes a punitive measure against him.[9]

Authoritative treatises support the argument that contemporaneous taxes should be deducted from any disgorgement analysis. See Richard M. Phillips, "Settlements:

---

[9]   In SEC v. Thomas James Assoc., Inc., 738 F. Supp. 88, 94-95 (W.D.N.Y. 1990), aff'd sub nom. SEC v. Posner, 16 F.3d 520 (2d Cir. 1994), the court underscored that disgorgement is an equitable remedy and should take into account expense incurred in obtaining the unlawful gains. In that case, the Commission resisted any offset of disgorgement amounts for expenses incurred in generating profits received from a broker-dealer's excessive markups. Id. The court concluded, however, that "[t]he SEC's argument simply misconstrues both the nature and extent of the equitable power of the Court to order disgorgement" and ordered the disgorgement amount be offset for specific expenses incurred in generating the illegal profits. Id. at 94. Similarly, in this case, Commission staff would violate "both the nature and extent of its equitable power" of disgorgement by rejecting any offset of actual taxes paid by Mr. Corigliano on his 1998 Cendant stock trades.

KL3 2028170 14                                     - 23 -

Minimizing the Adverse Effects of an SEC Enforcement," in <u>The Securities Enforcement</u> <u>Manual</u>, at 198 (Kirkpatrick & Lockhart, LLP eds., ABA 1997). State disgorgement actions, which also support the deduction of taxes paid on illegal gains, are instructive. See e.g., <u>USM</u> <u>Corp. v. Marson Fastener Corp.</u>, 392 Mass. 334, 338-47, 467 N.E.2d 1271, 1276-81 (1984) (holding that allowances for income taxes are appropriate because "[t]he over-all object is to render 'the ultimate recovery a sound reflection of [the defendants'] unjust enrichment due to the [breach of the fiduciary duty], and no more'") (citation omitted); see also <u>Fidelity Mgmt. &</u> <u>Research Co. v. Ostrander</u>, 40 Mass. App. Ct. 195, 201, 662 N.E.2d 699, 705 (1996) (finding authority to deduct actual taxes paid on illegal profits received by an investment firm employee in disgorgement suit brought by employer firm). [10]

---

[10]  The staff has argued that Supreme Court precedent supports the argument that taxes paid on profits received cannot be offset for disgorgement purposes. We believe the staff refers to <u>Randall v. Loftsgaarden</u>, 478 U.S. 647, 106 S. Ct. 3143 (1986). But, the staff's reliance on <u>Randall</u> is misplaced. In that case, the Court held that any rescission remedy available under §10(b) of the Securities Exchange Act of 1934 was not subject to offset for tax benefits received by the defrauded investor while owning the security. <u>Id.</u> at 662-63, 106 S. Ct. at 3152-53. The <u>Randall</u> case involved the offering and marketing of fraudulent tax shelter investments. The defendants in that case argued that despite the fraudulent nature of the investments, plaintiffs' recovery should be offset by the tax benefits that they actually received, concluding that absent the fraud, which induced the investment purchases, plaintiffs would probably have made other investments which produced temporary tax savings, but without the total loss of the investments. <u>Id.</u> at 652, 106 S. Ct. at 3147. The Court rejected this argument largely on grounds that any tax benefits received by plaintiffs did not fit the statutory definition in the Securities Act of 1933 for income received as an express offset for rescissionary damages. <u>Id.</u> at 660, 106 S. Ct. at 3151.

The holding and analysis by the <u>Randall</u> court does not apply here. In this matter, Mr. Corigliano can show that he remitted specific taxes on the alleged "unjust" profits from which the Commission seeks disgorgement. The taxes paid by Mr. Corigliano are not speculative or subsequent expenses but direct and contemporaneous deductions from the proceeds of his stock transactions. Insofar as disgorgement is an equitable remedy, it seeks to recover the actual profits received from the causally connected illegal activities. Therefore, any disgorgement of profits from Mr. Corigliano must account only for the monies he received, not the theoretical values of the trades. This differs markedly from the

KL3 3028 176 14

- 24 -

In this case, Mr. Corigliano can present specific evidence of taxes paid on the relevant sales of Cendant stock. Upon such a showing, the Commission ought to reduce Mr. Corigliano's disgorgement amount to reflect taxes paid in order to recover a reasonable approximation of profits actually received by Mr. Corigliano, rather than distorting its equitable powers by seeking punitive damages.

> C.  **The Facts of This Case Do Not Warrant the Imposition of a Civil Penalty Against Mr. Corigliano as the Goal of Deterrence is Sufficiently Achieved by Existing Punishment**

Under the Securities Enforcement Remedies and Penny Stock Reform Act of 1990 ("Remedies Act"), Pub. L. No. 101-429, 104 Stat. 931 (1990), Congress granted the Commission the authority to seek "[m]oney penalties" in civil actions and administrative proceedings, as a "civil penalty." 15 U.S.C. §§ 77t(d), 78u(d)(3), 78u-2. Congress had a clear view that giving authority to the SEC to seek or impose civil penalties "would greatly increase deterrence." H.R. Rep. No. 101-616, at 17 (1990), reprinted in, 1990 U.S.C.C.A.N. 1379, 1384.

Courts have since had the opportunity to interpret the civil penalty provisions in the Remedies Act and clearly have found the goal of these fines to be deterrence — without having a punitive effect. See SEC v. Palmisano, 135 F.3d 860, 865-66 (2d Cir.) (holding that civil penalty provisions of Remedies Act "have a clear rational purpose other than punishment" in rejecting a double jeopardy challenge to imposition of civil penalties in addition to criminal fines for same conduct), cert. denied, 525 U.S. 1023 (1998).

Any civil penalty imposed on Mr. Corigliano in this proceeding would be tantamount to punitive damages. The Commission should exercise its discretion and decline to

---

situation in Randall in which the defendants were speculating about the "benefits" received by the defrauded investors despite the fraud.

KL3:2078170.14

- 25 -

impose such a penalty because Mr. Corigliano has already suffered significant penalties in many different arenas that sufficiently further the goal of deterrence intended by the Remedies Act. Based on his involvement in the accounting irregularities uncovered at CUC/Cendant, Mr. Corigliano: (i) has agreed to plead guilty to two federal felony offenses with a maximum prison sentence of ten years; (ii) faces criminal fines equal to the greater of $250,000 or twice the gross amount of any pecuniary gain he received; (iii) faces civil liability from Cendant itself; (iv) is a defendant in the derivative plaintiff's lawsuit, in which the plaintiff seeks a $2.85 billion judgment against him, jointly and severally; (v) faces civil liability in at least five indemnification suits brought by Ernst & Young; and (vi) faces additional civil liability in serious litigation by plaintiffs who have opted out of the class action and/or filed individual suits in both federal and state courts.

Under similar facts, the United States District Court for the Southern District of New York conducted this same analysis in determining whether civil penalties should apply under the Insider Trading Sanctions Act of 1984 ("ITSA"). See Patel, 1994 WL 364089. In Patel, the district court considered the fact that defendant was criminally punished and fined in addition to paying private suit settlements. Id. at *4 n.4. After determining that "[t]he penalties which [defendant] has already suffered . . . sufficiently further the goal of deterrence, making imposition of ITSA penalty unwarranted here." Id. The court in that case declined to assert its discretion and impose civil penalties "because imposition of such a penalty would be unduly harsh and unnecessary." Id. at *3.

A civil penalty in this case would not serve to add any deterrent effect that has not already been realized by Mr. Corigliano. His punishment here has been severe and plentiful; any

KL3.2920170.14

- 26 -

additional fine would only be excessive and punitive, in violation of Congress' goal in enacting the Remedies Act.

## Conclusion

For all the reasons set forth above and in our settlement presentations, the Commission should credit the stipulation by the United States Attorney's Office in Mr. Corigliano's plea agreement and reject the imposition of insider trading remedies against him. The Commission also should craft a remedy consistent with Mr. Corigliano's unique and valuable cooperation and compelling family circumstances. This case requires a more equitable and nuanced remedy calculation that considers these factors as well as the organizational nature of the offense, Mr. Corigliano's role in this "corporate" crime, the causal connection of the accounting irregularities to the calculation of an appropriate remedy, taxes paid on any profits received, and the overall punishment already imposed. We look forward to re-open settlement discussions pursuant to the considerations presented here.

Dated: May 11, 2000

Respectfully Submitted,

Gary P. Naftalis
Alan R. Friedman
Henry E. Mazurek
Kramer Levin Naftalis & Frankel LLP
919 Third Avenue
New York, New York 10022
(212) 715-9100

Attorneys for Cosmo Corigliano

KL3:2028178.14

- 27 -

188

# EXHIBIT 3

KRAMER LEVIN NAFTALIS & FRANKEL LLP

919 THIRD AVENUE
NEW YORK, N.Y. 10022 - 3852

GARY P. NAFTALIS
PARTNER
TEL (212) 715-9253
FAX (212) 715-8000
gnaftalis@kramerlevin.com

47, AVENUE HOCHE
75008 PARIS
FRANCE

May 16, 2000

**Via Facsimile**

Thomas C. Newkirk, Esq.
Associate Director
United States Securities and Exchange Commission
Mail Stop 8-1
450 5th Street, N.W.
Washington, DC 20549

DEFENDANT'S
EXHIBIT
1370
PENGAD 800-631-6989

Re:     In the Matter of Cendant Corporation, No. HO-3401

Dear Tom:

I have your May 15 letter. Regrettably, it does not fairly reflect our prior dealings. I write to set the record straight.

First, the Staff has never previously requested that Mr. Corigliano supply it with financial information pursuant to paragraph 12 of the plea agreement. The Staff did demand that Mr. Corigliano pay more than $16 million in disgorgement, plus interest, plus a penalty equal to the disgorgement. And the Staff indicated it would recommend waiving full payment of this amount if Mr. Corigliano was unable to pay. In that event, the Staff would leave Mr. Corigliano with his house, car, legal fees and walking around money. The subject of financial disclosure arose only in connection with the waiver policy and that financial disclosure would be required if Mr. Corigliano sought to avail himself of that policy. To date, we have not availed ourselves of the waiver policy. Instead, we have repeatedly argued that because Mr. Corigliano is not guilty of insider trading, the Staff's disgorgement calculations are inaccurate and punitive, and the fair and equitable disgorgement amount is only a small fraction of the Staff's calculations.

Second, the Staff did not repeat "several times" any request for financial disclosure, nor was David Frohlich's March 30, 2000 letter in any way a follow up request for any previously sought financial disclosure. As part of our settlement discussions, the Staff asked that we voluntarily supply information concerning Mr. Corigliano's sales of Cendant stock from February 1, 1995 forward. We provided that information under cover of my letter dated March 30, 2000. Apparently, David was unaware that I had already sent the material directly to you, and that same day, he wrote me requesting this information. In his letter, he also asked for the first time for schedule D's to Mr. Corigliano's tax returns, in order to obtain historical information about Mr. Corigliano's trades so computations could be made. I immediately wrote back to David on March 30, 2000, pointing out that his letter had crossed with my letter to you and enclosing a copy of my earlier letter with the detailed trading information the Staff had

KL3:2034390.1

KRAMER LEVIN NAFTALIS & FRANKEL LLP

requested. In fact, we provided more information than had been sought; we also listed Mr. Corigliano's Cendant stock sales in January 1995. Following my March 30 letter, we did not receive any communications from the Staff suggesting that it required additional information concerning Mr. Corigliano's stock sales or any other financial information from him.

Third, there was nothing vague or incomplete about my response to Mr. Walker on May 2 when he asked about the proceeds from Mr. Corigliano's 1998 sales. We explained that the $23 million figure is extremely misleading because it does not reflect what gains Mr. Corigliano in fact received. We went on to explain with some specificity that after taking into account the cost of option exercises and the payment of many millions of dollars in taxes, Mr. Corigliano realized cash proceeds of approximately $8 million from his 1998 sales. We also pointed out that Mr. Corigliano has not been regularly employed since April 1998 (or more than two years), is incurring substantial legal fees and is the sole support of seven people.

Fourth, what the plea agreement says is that Mr. Corigliano, prior to his sentencing, will use his "best efforts" to settle claims that the SEC may assert for recovery of "certain of the proceeds" from his sales of Cendant stock. We have plainly complied with that provision and the other provisions of the plea argument. We have been trying diligently to settle the case. Both orally and in our Wells submission, we reiterated Mr. Corigliano's desire to negotiate a good faith settlement. In our Wells submission at page 22, we also made a substantial settlement proposal of $3.4 million -- a figure which fairly measures the benefit Mr. Corigliano allegedly received. We offered to meet with the Staff to explain the economic basis for our position, as supported by leading econometric experts, and why the Staff's calculations overstated any benefit Mr. Corigliano allegedly obtained. The Staff's response to date has been one of take it or leave it; either we accept the Staff's incorrect disgorgement number or litigate. I called you on Friday to request an additional short meeting with Director Walker to continue our settlement discussions. You advised that you would recommend against such a meeting or any further meetings with the Staff. Given that position, I was surprised by the timing of your new request for financial information and the arbitrary and unrealistic deadlines it purports to set.

I trust that the Staff is still interested in negotiating a settlement of the matter. To that end, I reiterate my request for a prompt meeting with Mr. Walker so that we can attempt to avoid the unseemly prospect of adversary litigation between the Commission and a significant cooperating witness who has provided substantial assistance to your ongoing investigations.

In all events, you can be assured that we will continue to meet all our obligations under the plea agreement.

Sincerely yours,

Gary P. Naftalis

cc:    Paul A. Weissman, Esq.

KL3:2034390.1

# EXHIBIT 4

JUN 29 '00  08:38PM DCO 8TH FLOOR CORP                                    P.2

## Settlement Proposal

For purposes of resolving pending and proposed litigation, we propose the following settlement offer on behalf of Cosmo and Terri Corigliano. In making this offer, no admission is intended, implied or may be inferred, nor may any reference be made to this document in any context whatsoever other than the internal deliberations of the SEC and its Staff. If any aspect of this proposal is unclear, or unsatisfactory, we urge the Staff to consult with us so that we can achieve a meeting of the minds and resolve these matters consensually.

1.     Total payment by the Coriglianos of cash and securities with a current value in excess of $11 million. We believe this amount exceeds what both parties could agree to as a figure that represents any unjust enrichment by virtue of trading activity in Cendant securities. It exceeds what the plaintiffs' expert in the civil litigation estimates is the actual unjust enrichment, which is $8 million. That amount ($8 million) is also the figure that would be reached if one applied the analysis the Commission used in the Patel case. Indeed, even on the way the Staff calculates disgorgement, if one used the five-day average close after April 15, 1998, instead of the low closing price over those days, the Staff's number would be only $10.9 million. *The Coriglianos will be giving up more than was actually received from the trading, and they will not keep a penny of any unjust trading gains.*

2.     To achieve this payment, Cosmo would give up all his assets, except for an old car, his IRA, and his parents' home in Trumbull. The latter — the house of his parents, has been their abode for 33 years, and was not a device designed to siphon off assets to thwart disgorgement. This proposed payment includes securities with a current value in excess of $9 million, consisting of: approximately $3 million of mutual fund assets; 130,777 shares of Cendant stock (worth approximately $2 million based on Wednesday's close of $15.00 a share);

DEFENDANT'S
EXHIBIT
994

plus options to purchase 462,316 Cendant shares, that depending on the trading model used to value them, are presently worth between $4 and $5 million.[1]

3.    Terri would add $2.0 million.  This would leave her with about $2.5 million of liquid assets, the Old Saybrook house, and the Candle Business.

4.    Prior to the '98 stock trading, the Coriglianos had significant assets, resulting from the prior 15 years of work and savings. Their pre-'98 assets included:

|       |     |                                                  |
|-------|-----|--------------------------------------------------|
|       | a.  | $2.55 million in mutual funds                    |
|       | b.  | $500,000 of equity in their Stamford house       |
|       | c.  | $3.6 million from the SERP payment (before taxes)|
| Total |     | $6.65 million                                    |

This excludes 200,000 Cendant shares he owned in 1998 before his trading, and 900,000 options he lost after being terminated.

We hope this is perceived as a substantial effort to bridge the gap that currently exists.  Please let us know how we can finalize a consensual resolution of this matter.

---

[1]    These options consist of (i) options to purchase 150,000 shares at a strike price at $22.33 and an expiry date of July 24, 2006; (ii) options to purchase 230,000 shares with a strike price at $20.50 and an expiry date of April 21, 2007; and (iii) options to purchase 82,316 shares with a strike price at $37.50 and an expiry date of March 2, 2008. Mr. Corigliano received the 82,316 options in lieu of cash compensation of $500,000, to which he was otherwise entitled.

Settlement Proposal

# EXHIBIT 5

KRAMER LEVIN NAFTALIS & FRANKEL LLP

919 THIRD AVENUE

NEW YORK, N.Y. 10022 - 3852

GARY P. NAFTALIS
PARTNER

TEL (212) 715-9253
FAX (212) 715-8000
gnaftalis@kramerlevin.com

47. AVENUE HOCHE
75008 PARIS
FRANCE

May 24, 2000

<u>For Settlement Purposes Only</u>
<u>Via Facsimile</u>

Thomas C. Newkirk, Esq.
Associate Director
United States Securities and Exchange Commission
Mail Stop 8-1
450 5th Street, N.W.
Washington, DC 20549

DEFENDANT'S
EXHIBIT
1371

Re:     <u>In the Matter of Cendant Corporation, No. HO-3401</u>

Dear Tom:

        I write to reconfirm that our client Cosmo Corigliano will be promptly providing you with financial disclosure in aid of our attempts to reach an amicable resolution of this matter.

        In my May 16, 2000 letter, I represented, in response to what we understood to be your first request for financial disclosure pursuant to the plea agreement, that "you can be assured that we will continue to meet all our obligations under the plea agreement." I meant what I said. Cosmo will comply with all his obligations under the plea agreement, including paragraph 12's provision on financial disclosure.

        At our meeting on Friday afternoon, May 19, I delineated for the Staff in detail the proceeds Cosmo received from his 1998 stock sales, the amounts paid for option exercises and the taxes he incurred. I described with specificity the form and approximate value of his assets. I also told you that his wife and children have assets as well, that they are separately represented by Harvey Pitt and Audrey Strauss of Fried, Frank, Harris, Shriver & Jacobson, and that questions concerning their assets should be directed to Harvey and Audrey. In response to the Staff's question relating to transfers made by Cosmo to his wife and children, I advised that Harvey and Audrey would provide you with information concerning such transfers. I understand that you subsequently initiated conversations with them on this subject. Moreover, I explicitly stated that Cosmo would fill out the financial disclosure form you have provided -- which also requests transfer information. But I noted that providing the written responses to your detailed form would require some time and that I was cognizant of the need in representing an important cooperating witness to be precise and accurate in our written responses since even small, minor or inadvertent inconsistencies could provide unnecessary potential fodder for future cross-examination of Mr. Corigliano -- an interest that the government shares.

KL3 2004129.1

KRAMER LEVIN NAFTALIS & FRANKEL LLP

Thomas C. Newkirk, Esq.
May 24, 2000
Page 2

      In my voicemail to you of yesterday, I told you that, consistent with my representation on Friday, Harvey and Audrey would call you today to provide you with information relating to transfers between Cosmo and his wife or children. Based on the voicemail you left me this morning, I understand that you wish to receive such information from Cosmo directly as part of any financial disclosure rather than from Fried Frank. Accordingly, Cosmo is working on the financial disclosure form, and we will supply that information to you as promptly as we possibly can.

      Best regards.

              Sincerely yours,

              Gary P. Naftalis

GPN/asb
cc:   Richard Walker, Esq.
      Paul A. Weissman, Esq.
      Harvey Pitt, Esq.
      Audrey Strauss, Esq.

KL3:2034120.1