# EXHIBIT 8

KRAMER LEVIN NAFTALIS & FRANKEL LLP

919 THIRD AVENUE

NEW YORK, N.Y. 10022 - 3852

ALAN R. FRIEDMAN
PARTNER

TEL (212) 715-9300
FAX (212) 715-8000
afriedman@kramerlevin.com

47, AVENUE HOCHE
75008 PARIS
FRANCE

September 4, 2003

Without Prejudice and
For Settlement Purposes Only

Via Federal Express

James A. Kidney, Esq.
Assistant Chief Litigation Counsel
Securities and Exchange Commission
Division of Enforcement
450 Fifth Street, N.W., Stop 8-8
Washington, DC 20549-0808

DEFENDANT'S
EXHIBIT
49

Dear Jim:

I write in connection with our settlement meeting scheduled for Monday and the questions you left in your voicemail. This information is supplied to facilitate our settlement discussions, for settlement purposes only and without prejudice to either the Commission or our client.

In response to your questions, I enclose the following:

1. a recent insurance survey that puts a value of $50,000 on the sailboat.

2. Mr. Corigliano does not have a current valuation for the family home in Old Saybrook. I am attaching a brokerage listing for another house in the area that seems comparable. We believe that this listing goes back to at least May of this year, without the house being sold.

3. Option awards for the three sets of options that Mr. Corigliano holds. I am also supplying a Black Sholes analysis that we recently had done to value the options, assuming market prices for Cendant of $19 and $18 a share and using the same volatility assumptions that Cendant uses in its most recent 10K. The spread sheet also lists the strike price, expiry date, and number of options as well.

4. Financial statements for the candle company for the 2002 year and for the first 8 months of 2003. They are in the form regularly kept by the business. I

KL3-2156483.1

3441

KRAMER LEVIN NAFTALIS & FRANKEL LLP

James A. Kidney, Esq.
September 4, 2003
Page 2

think you were also interested in any salary Cosmo or Mrs. Corigliano received from the business. Cosmo started to receive a salary at the end of 2002 -- when he had net earnings after taxes of approximately $11,075 (gross approximately $14,423). During 2003, he started the year with a salary of approximately $110,000 annually, but because of cash flow problems at the company, this was reduced to $25,000 a year around August 1. His approximate year-to-date (through August 31, 2003) wages have been $46,738 net ($63,943 gross). Mrs. Corigliano receives no salary from the candle company.

5. Mr. Corigliano has not yet filed tax returns for 2002.

Please let me know if you have any questions.

Sincerely,

Alan R. Friedman

ARF/air
Enc.

.3442

X13-21364151



HULL ID NUMBER ETCHING
1985 , 36' , SABRE , SLOOP
" MAIN STAY "
HIN = HWS36022D585

STAFFORD MARINE SERVICE, LLC
244 Bear Rock Road
Durham, Connecticut 06422



GEORGE STAFFORD
No.
107-703

DEFENDANT'S
EXHIBIT
49 A

3443



# STAFFORD MARINE SERVICE, L.L.C.

244 Bear Rock Road
Durham, Connecticut 06422
Tel. (860) 349-0438 • Fax (860) 349-0720

## SURVEY REPORT
### File #: 02-072

TO: Concerned Insurance Underwriters

OWNER: Mr. Cosmo Corigliano, 243 Stamford Ave., Stamford, CT., 06902

SCOPE OF SURVEY: Insurance C&V Survey

DATE OF SURVEY: April 29, 2002

LOCATION OF SURVEY: Chester Marina, Chester, Connecticut

## VESSEL PARTICULARS

NAME: " MAIN STAY "

HAILING PORT: Stamford, Connecticut

BUILDER: Sabre Yachts, P.O. Box 134, So. Casco, ME 04077

DESIGNER: Sabre Design Team & Mr. Roger Hewson N.A.

YEAR: 1985

MODEL: 36, diesel auxiliary, sloop rigged, sailboat

LOA: 36' 0"   LWL: 29' 4"   BEAM: 11' 3"   DRAFT: 4' 2" cxr.board up / 7'2" c/b down

DISPLACEMENT: 13, 500 lb.          BALLAST: 5,700 lb.

HULL ID NO.: HWS36022D585 (Etching made & on file)

USCG DOC. NO.: 694648

REGISTRATION NO.: CT 5255 AR

INTENDED USE: Near coastal and limited offshore sailing, cruising, recreational

3444

# HULL CONSTRUCTION

**HULL/KEEL/DESIGN:** External lead ballast fin keel shoal draft w/centerboard

**HULL MATERIAL:** Molded fiber reinforced plastic (FRP)

**FRAMES:** FRP liner and transverse plywood bulkheads tabbed to hull

**DECKS:** Molded non-skid FRP with 3/8" end grain balsa core material and gelcoat

**HULL/DECK JOINT:** Inside flange, through bolted, with teak toe rail & soft vinyl rubrail

**SUPERSTRUCTURE:** Molded FRP

**INTERIOR:** FRP and vinyl headliner, teak trim and veneer, formica and marine plywood

**LAYOUT:** Peak void space forward for anchor locker. Next aft is a large forward V-Berth with storage above and outboard port and starboard; additional storage in drawers and lockers. Opening overhead hatch and two fixed ports. There is also a privacy door. The head is to port forward with a manual toilet and Y valve to holding tank, stainless sink, shower and opening port. Directly opposite, to starboard is a large hanging locker next to a chest with 3 drawers. Next aft to midships is a large main salon with straight settee to starboard and "U" shaped to port. The port settee converts to a double berth. There is storage above and below both settees. There is a pedestal mounted dinette table. There is an opening overhead hatch and fixed ports to the sides. Next aft there is a "U" shaped galley to port with stainless steel sink, stove/oven and pressure hot/cold water. Opposite to starboard is a navigation station with full electronics and gauges. Aft of the nav station is a quarter berth to starboard. Out to a large "T" shaped cockpit with steering pedestal and dodger.

**REMARKS:** The vessel was inspected while hauled out. Electrical systems were not able to be tested. The bottom was inspected and sounded with a hammer. A moisture meter was not utilized. There did not appear to be any evidence of osmotic blistering. There was no electrolytic deterioration of any underwater metals noted. The hull to keel joint is slightly separated. This is not serious and somewhat normal for this vessel.

Topsides were the original gelcoat and were found in average condition. Topsides were sounded with a plastic hammer and a moisture meter was used. Relative moisture meter readings were normal. There did not appear to be any evidence of delamination. **We noted some minor cosmetic scrapes amidships on the starboard side and along the transom, perhaps from errant docking.

Decks were inspected and sounded with a plastic hammer. A moisture meter was not utilized on deck. The aft portion of the cockpit has evidence of minor core ply separation. This is not serious and normal for a boat of this vintage.

~3445

# MACHINERY

| | | |
|---|---|---|
| NO. OF ENGINES: One | STYLE: Inboard | CYLINDERS: 4 |
| MAKE: Westerbeke | FUEL: Diesel | MODEL: W27 |
| SERIAL #: 16769C41D | HOURS: 988.3 | HORSEPOWER: 30 |

COOLING: Closed fresh water cooled with heat exchanger

TRANSMISSION: Hurth short profile transmission, 2 to 1 reduction gear, model #: hbw100-2R, Lubricated separately from engine.

EXHAUST: Raw water cooled through a pot type muffler wet to transom

STEERING: Edson pedestal with 40" S.S. wheel, cable to quadrant (also an emergency tiller)

PROPELLERS: One, nibral, two-bladed, by Gori, 16 1/2" x 11", RH, folding, found in good condition

SHAFTS: 1" stainless steel, appeared straight on dial indicator **Cutlass worn, see notes

STRUTS: Single leg cast bronze

RUDDER: Molded FRP spade type with short skeg

CONTROLS: Push/pull single lever type controls by Morse on pedestal – good condition

BILGE PUMPS: Manual whale gusher type + one Rule 2000 GPH w/ auto float switch

THROUGH HULL FITTINGS: Flush mounted bronze with bronze ball valve, seacocks

BLOWERS: Yes-Attwood no test made          HVAC: No air-conditioning found

REMARKS: The inboard was not tested. Overall, our opinion is that the inboard engine is in fair condition, reflecting average maintenance. Machinery appears intact and well secured with evidence of some minor corrosion around the engine mounts, lower sections of the block and around the bottom of the oil pan. The engine oil is clean as is the transmission oil. We noted the engine coolant was also full. The exhaust manifold and riser may need replacement very soon with severe corrosion as well as hose clamps which are corroded. Overall, for the vintage the engine looks in average condition.

*Note well that the scope of this survey is a visual examination only. Unless otherwise indicated, the machinery was not inspected internally or operated.*

3446

# ELECTRICAL SYSTEM

**SHIPS SYSTEM VOLTAGE:** 12 volt DC

**WIRING:** Original, copper stranded, well secured where visible

**OVERCURRENT PROTECTION:** Breakers at panel aft of nav station

**NO. OF BATTERIES/LOCATION:** Two, #27 lead acid, by Interstate

**SECURED/COVERED:** Yes/Yes

**MASTER SWITCH:** Yes, one disconnect switch by Perko

**BATTERY CHARGER:** Alternator 65 amp + battery charger by Newmar 15 amp unit

**SHORE SYSTEM VOLTAGE:** 125 VAC system from shorepower

**NO. OF CIRCUITS:** One

**AMPERAGE:** 30 amps

**WIRING:** Original copper stranded, well secured

**OVERCURRENT PROTECTION:** Yes, breakers at panel aft of nav station

**POLARITY INDICATOR:** Yes, visual          **GFCI:** Yes-Ok

**SHORE INLET:** 30 amp twist lock type located starboard side aft in cockpit, outboard on

**THROUGH HULL BONDING:** Yes, by #8 AWG black wires

**REMARKS:** The 12 VDC system and 110 VAC system were not energized on the vessel. The systems were winterized therefore we could not energize. Systems were not tested. Overall, the systems appeared to be in good order without any problems noted. We found most wires properly secured, unfortunately, a majority of the wires in this boat are hidden behind a panel board and bulkhead. Therefore, wiring was not fully accessible. *There did appear to be a lightning protection system observed. All the chainplates are grounded to the keel bolts as ABYC recommended back when this vessel was built in 1985 however by todays standard (year 2002) the system is considered totally inadequate.*

-3447

# TANKS

**NO. OF FUEL TANKS:** One

**SHAPE:** Rectangular

**LOCATION OF FUEL TANKS:** Aft, mounted under the cockpit (not fully accessible due to the installation)

**CAPACITY/CONSTRUCTION:** Approximately 20 gallons/ #5052 welded aluminum

**FILL/VENT LINES:** Copper + neoprene hose 1 1/2" fill + 5/8" vent lines

**SUPPLY/RETURN LINES:** 5/16" copper – some corrosion w/anti-siphon. **See notes

**FUEL FILL GROUNDED?/DOUBLE CLAMPED?:** Yes/Yes

**DOES OVERFILL VENT OVERBOARD:** Yes

**VALVES:** Bronze petcock at engine port side

**NO. OF WATER TANKS/CAPACITY/MATERIAL:** Two, 38 gallons each, plastic type, under port and starboard settees, approximately 76 gallons total

**HOT WATER TANKS:** One, Raritan, 6 gallon, located in stbd. quarter berth locker

**NO. OF DOMESTIC TANKS:** Two

**FUEL/CAPACITY:** CNG, 10 lb., aft mounted in starboard cockpit locker

**LINES/VENTING:** Rubber line, appears good/Vented from inside locker to atmosphere

**SHUT OFF VALVE:** At tank and at stove

**NO. OF HOLDING TANKS:** None. Plastic under forward V-berth

**REMARKS:** All tanks appear intact. The older copper 5/16" fuel supply lines should be considered to be changed soon for the diesel engine as they are corroded.

~ 3448

# GALLEY

**STOVE MAKE/ # BURNERS:** CSI, gimbaled, CNG, 2 burner with oven

**FUEL:** CNG                    **MICROWAVE:** None

**REFRIGERATION:** Ice box + Reefer unit by Sea Frost

**WATER SYSTEM:** Galley and head, pressure hot and cold water 110 VAC and engine hot water

**REMARKS:** Clean, uncluttered, with good light and ventilation

---

# SPARS/SAILS/RIGGING/DECK HARDWARE

**STYLE:** Sloop rigged and keel stepped

**MASTS/BOOMS:** Extruded aluminum, Awlgripped white, Hallspars, "D" shaped section, double spreader, internal main and jib halyards

**STANDING RIGGING:** Rod rigging, #10 + #8 stainless steel with s.s. turnbuckles

**CHAINPLATES:** Tied to internal bulkhead hull structure. Appear OK, ***not fully visible due to construction of vessel

**HARDWARE/FITTINGS:** Harken Roller Furling, cabin top mounted Schaeffer traveler with cars, outboard & inboard genoa tracks, Schaeffer main sheet 4:1, and halyards lead aft to cockpit with line clutches, spinnaker gear with pole, boom vang, and jiffy reefing.

**WINCHES:** Five total all by Lewmar (2) #46 CST two-speed, self tailing primaries, (1) #24 (1) #16 two-speed and (1) #24 two speed. All appear good.

**SAIL INVENTORY:** Not inspected. Said to be: two genoas roller furled by North, one mainsail by North and one spinnaker by North.

**REMARKS:** When was the last time the mast was unstepped and checked on the ground by a professional rigger? If more than three years, then it is time to do this now.

## GROUND TACKLE

ANCHOR & RODE: (1.) 25 lb. CQR plow anchor w/ 15' 7/16" chain + 200' x 5/8" nylon rode. (2.) Also spare Danforth #20lb. with spare braided rode. **Swivel and shackle very rusted-time to replace both.

## SAFETY GEAR/REQUIRED EQUIPMENT

PORTABLE FIRE EXTINGUISHERS: Two USCG approved, dry chemical, American LaFrance, 2¾ lb. Needles in green zone-Ok. Good extinguishers for the vessel.

PERSONAL FLOTATION DEVICES: Six USCG approved Type II and four Type IV. Also, Life Sling on stern rail.

EPIRB/VISUAL DISTRESS SIGNALS/VALID DATES: Olin flare kit **Expired flares EPIRB is by ACR, model: RLB21, older class "B" **w/expired battery-replace

HORN/BELL: Yes, both-Ok

OIL DISCHARGE PLAQUE/MARPOL PLAQUE: OK – present

CARBON MONOXIDE DETECTOR: None **To be added

REMARKS: Safety gear is in need of updating now.

## NAVIGATION/ELECTRONICS

COMPASS: Ritchie 5", pedestal mount

LORAN/GPS: (1.) Raynav 575, Loran-C (2.) Garmin hand held GPS

VHF RADIOS: Icom ICM 80

DEPTH: Datamarine, Model: S200DL

KNOT/LOG: Datamarine, Model: S100KL

NAV REPEATER: By KVH bulkhead mounted

WIND SPEED/DIRECTION: (1.) windex (2.) Datamarine, model: LX3600

STEREO: Sony AM/FM with CD player and four Cybernet speakers

3450

# OTHER EQUIPMENT

OTHER EQUIPMENT: Dodger & sail cover all in good condition. Weems and Plath barometer and clock. Dock lines, fenders, locking winch handles, first aid kit, boat hook, boom vang, radar reflector, cockpit cushions, emergency tiller, shore power cord, interior fans, cushions, spare parts, cockpit table, stern gate with ladder and teak cockpit grates. Boat shipped w/teak trim package, additional CNG tank, hatch screens, double bow cleats, preventer, flag halyard, folding cockpit table, cabin trunk teak grab rails and teak outboard bracket mounted on transom.

---

## GENERAL FINDINGS & RECOMMENDATIONS

This will certify that the undersigned conducted an insurance C&V survey of the subject vessel in Chester, Connecticut while the vessel was hauled. Our survey was conducted on April 29, 2002. The owner was not in attendance at the time of the survey. During the course of our examination the following deficiencies were noted:

(1) Check circuit protection for battery charger.
(2) When was the mast last unstepped and inspected by a professional rigger on the ground? If more than three seasons, time to do it now.
(3) Need to recertify all dry chemical fire extinguishers (have them weighed and tagged).
(4) Flares in flare kit expired. Replace before navigating.
(5) Corrosion to copper fuel lines. Information only.
(6) Suggest the vessel be equipped with a search light for night time use.
(7) Appears engine may be 'eating the fan belt' with black colored dust all over the front of the block. Repair flywheel or re-adjust belt as needed.
(8) Anchor swivel and shackle badly rusted-replace.
(9) Please be advised we could not examine the centerboard wire pennant because of the way the boat was blocked.
(10) Replace 3/4" head inlet hose-found cracked at bend at toilet.
(11) Add a carbon monoxide detector for safety sake.
(12) Cutlass bearing found well worn-replace.
(13) Port quarter berth minor internal leak aft. Rebed teak toe rail fastener.
(14) Old damage: starboard side amidships just above waterline deep gouges in gelcoat and area 8" x 4" starboard side transom gelcoat abrasion damage. Information only.
(15) Portside amidships bottom-through hull fitting found with cracked fitting. Reseal as needed before launching.
(16) Clean and grease seacocks for engine raw water inlet and head seacocks. Found difficult to operate.

**~NOTE: PLEASE NOTE THE ABOVE RECOMMENDATIONS ARE BASED UPON STANDARDS AND CODES SET FORTH BY THE AMERICAN BOAT AND YACHT COUNCIL, NATIONAL FIRE PROTECTION ASSOCIATION AND THE UNITED STATES COAST GUARD. IN ADDITION, SOME OF THE COMMENTS MAY BE BASED UPON GOOD MARINE PRACTICE AND EXPERIENCE OF THE SURVEYOR AS THEY RELATE TO THE VESSEL OPERATION AND MAINTENANCE.**

3451

Page 9 of 9
FIle #: 02-072

## VALUATION

CURRENT FAIR MARKET VALUE: Approximately $50,000 with all equipment

REPLACEMENT COST: Approximately $165,000 with similar equipment

VALUATION OF THIS VESSEL IS BASED UPON THE COMPARABLE APPROACH. SOURCES OF
INFORMATION MAY INCLUDE, BUT ARE NOT LIMITED TO CURRENT CLASSIFIEDS,
BROKERS ADVERTISING, TRADE JOURNALS, BUC, NADA ABOS, ACTUAL SALES, BROKERS,
UNDERWRITERS, MARINE SURVEYORS AND OTHER SOURCES KNOWN TO BE RELIABLE.

## SURVEY/APPRAISAL PRACTICE STATEMENT

This report is based upon a visual examination of the subject vessel on the dates so noted.
If an item of the vessel, system or piece of equipment is missing from this report it is not
included. The findings, opinions and conclusions are based upon the best professional
judgment of the undersigned surveyor. While every effort has been made to conduct a
thorough survey, there can be no guarantee or warranty, express or implied, as to the
condition or suitability of the vessel and its machinery and fittings. There is no way to
predict latent defects or other failures, which may occur in the future. Neither can we
make observations or conditions hidden by machinery, tanks, bulkheads or other items
prohibiting access or due to the inability to operate equipment/machinery. Neither the
undersigned nor any principal or employee of Stafford Marine Service LLC has any present
or prospective interest in the subject vessel. There is no bias or interest toward the parties
involved. Compensation for this service is not contingent on any action or event resulting
from the findings, opinions or conclusions in this report.

*PLEASE BE ADVISED THAT THIS IS AN INSURANCE C&V SURVEY ONLY-THIS IS NOT A BUYERS
SURVEY AND CAN NOT BE USED AS THE BASIS FOR A DECISION TO BUY OR SELL THIS VESSEL.*

**WARNING** NOTE WELL THAT THE ULTIMATE RESPONSIBILITY FOR THE SAFE
OPERATION AND MAINTENANCE OF THE VESSEL AND SAFETY OF THE CREW OR
PASSENGERS LIES WITH THE OWNER/MASTER.

Date of report: April 30th, 2002                Total number of pages: 9

If you or your insurance company have any questions concerning this report, please do not
hesitate to call. This survey issued without prejudice. Thank you for your business.

George Stafford
Marine Surveyor

Member: National Association of Marine Surveyors, NAMS-CMS
        Society of Accredited Marine Surveyors, SAMS-AMS

GEORGE STAFFORD
No.
107-722

3452

REALTOR.com: Find a Home - Printable Brochure



Single Family Property, Area: 89. Approximately 1.32 acre(s). Year built: 1965. Waterfront property. Contemporary style. Two story. Garage. Central air conditioning. Basement. Fireplace(s). Dining room. Office.

To access this listing directly, use http://www.realtor.com/Prop/1026252442



**ESSEX, CT06426**

**$2,250,000**
4 Bed, 3.5 Bath
3,910 Sq. Ft.
MLS ID#: M9074418

RICHARD WEINER
Cell (860)227-3151
Office 5117 (860)767-3631
Residence (860)767-2291

The Mitchel Agency, LLC
: (860) 767-2621
toll free (800) 333-3534
fax (860) 767-77-9

## Property Features

- Single Family Property
- Area: 89
- Contemporary style
- Two story
- Year built: 1965
- 4 total bedroom(s)
- 3.5 total bath(s)
- 3 total full bath(s)
- 1 total half bath(s)
- 8 total rooms
- Master bedroom
- Dining room
- Family room
- Foyer
- Maid suite/quarter(s)
- Office
- Study
- Workshop
- Attic storage

- Approximately 3910 sq. ft.
- Bedroom(s) on lower level
- Bedroom(s) on 1st floor/level
- Master bedroom on 1st floor/level
- Laundry on 1st floor/level
- 3 fireplace(s)
- Carpet
- Tile flooring
- Wood floors
- Central air conditioning
- Forced air heat
- Multicore heat
- Oil heating
- Dishwasher
- Disposal
- Refrigerator
- Microwave oven
- Range and oven

- Exhaust fan/hood
- Kitchen island
- Thermal window(s)
- 2 car garage
- Attached garage
- Circular driveway
- Full basement
- Partially finished basement
- Deck
- Fire/smoke alarm(s)
- Security system
- Waterfront property
- Approximately 1.32 acre(s)
- TV cable available
- Septic sewer system
- Water supply from well(s)
- Elementary School: ESSEX
- High School: VRHS

DEFENDANT'S
EXHIBIT
49 B

PENGAD 800-631-6989

- 3453



Formatted for easy printing so you can take this with you. Remember to say you found it on REALTOR.com®.

This information has been secured from sources we believe to be reliable, but we make no representations or warranties, expressed or implied, as to the accuracy of the information. You must verify the information and bear all risk for inaccuracies.

http://www.realtor.com/FindHome/Brochure.asp?frm=byxmls&xlid=1026252442&lnksrc=00029&poe...   9/4/0.

707 Summer Street
P.O. Box 10049
Stamford, CT 06904-2049
203-324-9261

## CUC INTERNATIONAL

07/24/1996

CUC
CUC-TRAVEL

Dear Cosmo          Corigliano

I am pleased to advise you that the Compensation Committee (the "Committee") of the Board of Directors of CUC International Inc. (the "Corporation") on 07/24/1996 authorized the granting to you of a non-statutory option to purchase   100,000 shares of common stock, $.01 par value, of the Corporation (the "Common Stock") at a price of  $33.5000 per share (the "Exercise Price"), which the Committee believes to be the fair market value on that date.  Your option has been granted under the Company's 1987 Stock Option Plan (the "Plan").

Terms not defined herein shall have the meaning set forth in the Plan.

Your option may be exercised under the following terms:

(a)   This option shall not be transferrable except by will or the laws of descent and distribution, unless such transfer is permitted by Rule 16b-3 under the Securities Exchange Act of 1934, as amended, and is approved by the Committee.

(b)   Subject to the provisions of paragraphs (e), (f) and (g) hereof, this option may be exercisable by you as follows:

You may purchase twenty percent (20%) of the Common Stock for which options are herein granted on or after February 1, 1998 and an additional twenty percent (20%) on or after each successive February 1.

Your right to exercise this option shall be cumulative.  The Board of Directors of the Corporation may at any time accelerate the vesting of this option.  This option shall expire on the tenth anniversary of the date of grant.

(c)   If required by the Corporation, prior to the delivery to you of a certificate or certificates representing the shares of Common Stock purchased by you upon the exercise of this option, you shall have deposited with the Corporation a non-disposition letter (restricting disposition by you of the shares of Common Stock) in form satisfactory to counsel for the Corporation;

Confidential Treatment Requested by Mr. Cosmo Corigliano

DEFENDANT'S
EXHIBIT
49 C

~3455

CC 1881

-2-

(d)  In the event of a stock split, stock dividend, recapitalization, reorganization, merger, consolidation, extraordinary dividend, split-up, spin-off, combination, stock repurchase, exchange of shares, warrants or rights offering to purchase stock at a price substantially below fair market value or other similar corporate event affecting the Common Stock, the number and kind of shares subject to this option and the Exercise Price shall be equitably adjusted (including by payment of cash to you) in the discretion of the Committee in order to preserve the benefits or potential benefits intended to be made available to you under this option. The determination of the Committee as to what adjustments shall be made, and the extent thereof, shall be final.  Unless otherwise determined by the Committee, such adjustments shall be subject to the same vesting schedule and restrictions to which this option is subject. No fractional shares of Common Stock shall be reserved or authorized or made subject to this option by any such adjustment.

(e)  Notwithstanding anything herein to the contrary, if you die while in the employ of the Corporation or any of its subsidiaries or if you die within a period of three (3) months after your employment has terminated or if your employment is terminated by reason of total and permanent disability (as defined in Section 22(e)(3) of the Internal Revenue Code of 1986, as amended (the "Code")), this option shall become immediately exercisable in full and, in the case of your death, your estate shall have the right to exercise your rights hereunder.

(f)  Notwithstanding anything herein to the contrary, in the event your employment or relationship with the Corporation or any of its subsidiaries is terminated for any reason other than death or total and permanent disability (as defined in Section 22(e)(3) of the Code,) you shall be entitled to exercise your options hereunder, to the extent exercisable on the date of termination, for a period of four (4) months from such termination, but in no event after the expiration of the term of the option.

(g)  You may pay for shares purchased pursuant hereto as follows:

(i)  You may pay the Exercise Price per share in cash or check at the time of exercise.

Confidential Treatment Requested by Mr. Cosmo Corigliano

3456

CC 1882

-3-

(ii)     You may pay the Exercise Price by remitting to the Corporation in cash or by check an amount equal to or greater than the product of (a) the par value of the Corporation's Common Stock and (b) the number of shares of Common Stock acquired pursuant to the exercise of this option (such amount is hereinafter referred to as the "Minimum Payment") and by executing a promissory note for the balance equal to (A) the product of (i) the Exercise Price and (ii) the number of shares of Common Stock acquired pursuant to the exercise of this option less (B) the Minimum Payment (such balance is hereinafter referred to as the "Principal Amount"). Pursuant to the terms of the promissory note, interest will be charged per year at the lowest interest rate in effect at the time of exercise, which will prevent any imputation of income under Sections 483 or 7872 of the Code. Five years from the date of exercise, the Principal Amount plus interest compounded annually will be due. In the discretion of the Corporation's Board of Directors, the Corporation may demand repayment of the Principal Amount plus accrued interest upon a termination of your employment with the Corporation or any of its subsidiaries. With notice of your exercise of your option, you must give notice of your election to use the loan arrangement described above. In the discretion of the Corporation's Board of Directors, you may be required to execute a pledge agreement. The Corporation will retain possession of certificates representing shares of Common Stock acquired pursuant to the exercise of this option until the loan is repaid in full;

(iii)    Provided that at the time of exercise, Common Stock is publicly traded and quoted regularly in the Wall Street Journal, you may pay for the shares of Common Stock purchased pursuant hereto by delivery of already-owned shares of Common Stock owned by you free and clear of any liens, claims, encumbrances or security interests, which Common Stock shall be valued (a) if listed on a national securities exchange, at the average closing price for the ten (10) trading days immediately preceding the date of exercise, or (b) otherwise at the average of the closing bid and ask quotations published in the Wall Street Journal for the ten (10) trading days immediately preceding the date of exercise (as so valued, the "Fair Market Value");

(iv)     If approved by the Committee, you may request that the Corporation withhold from the number of shares of Common Stock which you would otherwise acquire upon exercise of your option and payment of the Exercise Price therefor, that number of shares of Common Stock which have an aggregate Fair Market Value equal to the aggregate Exercise Price of all or any portion of the options which you are then exercising; or

(v)      You may pay with any other legal consideration that may be acceptable to the Committee in its sole discretion at the time of exercise.

Confidential Treatment Requested by Mr. Cosmo Corigliano

-3457

CC 1883

-4-

Unless the shares of Common Stock received upon the exercise of your stock option shall have been registered under an effective registration statement under the Securities Act of 1933, such shares shall be acquired for investment and not with a view to distribution thereof, and such shares may not be sold except in compliance with the applicable provisions of such Act.

When you wish to exercise your stock option in whole or in part, please refer to the provisions of this letter and correspond in writing with the Secretary of the Corporation. This is not an incentive stock option under Section 422A of the Code.

Very truly yours,

E. Kirk Shelton
President and Chief Operating Officer


EKS:feh
1987plan

Confidential Treatment Requested by Mr. Cosmo Corigliano

3458

CC 1884

707 Summer Street
P O Box 10049
Stamford, CT 06904-2049
203-324-9261

 CUC INTERNATIONAL

DEFENDANT'S
EXHIBIT
49 D

04/21/1997

CUC

Dear COSMO          CORIGLIANO

I am pleased to advise you that the Compensation Committee (the
"Committee") of the Board of Directors of CUC International Inc.
(the "Corporation") on 04/21/1997 authorized the granting to you of
a non-statutory option to purchase   230,000 shares of common stock,
$.01 par value, of the Corporation (the "Common Stock") at a price
of  $20.5000 per share (the "Exercise Price"), which the Committee
believes to be the fair market value on that date.  Your option has been
granted under the Company's 1987 Stock Option Plan (the "Plan").

Terms not defined herein shall have the meaning set forth in the Plan.

Your option may be exercised under the following terms:

(a)  This option shall not be transferrable except: by will or the
     laws of descent and distribution; pursuant to a domestic relations
     order, as defined in the Internal Revenue Code of 1986, as amended
     (the "Code") or Title I of the Employee Retirement Security Act or
     the rules thereunder; or as a gift to your family memebers, trusts
     for the benefit of your family members or charities or other not-
     for-profit organizations.

(b)  Subject to the provisions of paragraphs (e), (f) and (g) hereof,
     this option may be exercisable by you as follows:

     You may purchase twenty percent (20%) of the Common Stock for
     which options are herein granted on or after February 1, 1998
     and an additional twenty percent (20%) on or after each
     successive February 1.

     Your right to exercise this option shall be cumulative.  The
     Board of Directors of the Corporation may at any time accelerate
     the vesting of this option.  This option shall expire on the
     tenth anniversary of the date of grant:

(c)  If required by the Corporation, prior to the delivery to you of
     a certificate or certificates representing the shares of Common
     Stock purchased by you upon the exercise of this option, you shall
     have deposited with the Corporation a non-disposition letter
     (restricting disposition by you of the shares of Common Stock)
     in form satisfactory to counsel for the Corporation.

Confidential Treatment Requested by Mr. Cosmo Corigliano

CC 1885          ~3459

(2)

(d) In the event of a stock split, stock dividend, recapitalization, reorganization, merger, consolidation, extraordinary dividend, split-up, spin-off, combination, stock repurchase, exchange of shares, warrants or rights offering to purchase stock at a price substantially below fair market value or other similar corporate event affecting the Common Stock, the number and kind of shares subject to this option and the Exercise Price shall be equitably adjusted (including by payment of cash to you) in the discretion of the Committee in order to preserve the benefits or potential benefits intended to be made available to you under this option. The determination of the Committee as to what adjustments shall be made, and the extent thereof, shall be final. Unless otherwise determined by the Committee, such adjustments shall be subject to the same vesting schedule and restrictions to which this option is subject. No fractional shares of Common Stock shall be reserved or authorized or made subject to this option by any such adjustment.

(e) Notwithstanding anything herein to the contrary, if you die while in the employ of the Corporation or any of its subsidiaries or if you die within a period of three (3) months after your employment has terminated or if your employment is terminated by reason of total and permanent disability (as defined in Section 22(e)(3) of the Code), this option shall become immediately exercisable in full and, in the case of your death, your estate shall have the right to exercise your rights hereunder.

(f) Notwithstanding anything herein to the contrary, in the event your employment or relationship with the Corporation or any of its subsidiaries is terminated for any reason other than death or total and permanent disability (as defined in Section 22(e)(3) of the Code,) you shall be entitled to exercise your options hereunder, to the extent exercisable on the date of termination, for a period of four (4) months from such termination, but in no event after the expiration of the term of the option.

(g) You may pay for shares purchased pursuant hereto as follows:

    (i) You may pay the Exercise Price per share in cash or check at the time of exercise;

    (ii) You may pay the Exercise Price by remitting to the Corporation in cash or by check an amount equal to or greater than the product of (a) the par value of the Corporation's Common Stock and (b) the number of shares of Common Stock acquired pursuant to the exercise of this option (such amount is hereinafter referred to as the "Minimum Payment") and by executing a promissory note for the balance equal to (A) the product of (i) the Exercise Price and (ii) the number of shares of Common Stock acquired pursuant to the exercise of this option less (B) the Minimum Payment (such balance is hereinafter referred to as the "Principal Amount"). Pursuant to the terms of the promissory note, interest will be charged per year at the lowest interest rate in effect at the time of exercise, which will prevent any imputation of income under Sections 483 or 7872 of the Code. Five years from the date of exercise, the Principal Amount plus interest compounded annually will be due. In the discretion of the Corporation's Board

1987 plan
9/20/96

Confidential Treatment Requested by Mr. Cosmo Corigliano

3460

CC 1886

(3)

of Directors, the Corporation may demand repayment of the Principal Amount plus accrued interest upon a termination of your employment with the Corporation or any of its subsidiaries. With notice of your exercise of your option, you must give notice of your election to use the loan arrangement described above. In the discretion of the Corporation's Board of Directors, you may be required to execute a pledge agreement. The Corporation will retain possession of certificates representing shares of Common Stock acquired pursuant to the exercise of this option until the loan is repaid in full;

(iii)    Provided that at the time of exercise, Common Stock is publicly traded and quoted regularly in the Wall Street Journal, you may pay for the shares of Common Stock purchased pursuant hereto by delivery of already-owned shares of Common Stock owned by you free and clear of any liens, claims, encumbrances or security interests, which Common Stock shall be valued (a) if listed on a national securities exchange, at the average closing price for the ten (10) trading days immediately preceding the date of exercise, or (b) otherwise at the average of the closing bid and ask quotations published in the Wall Street Journal for the ten (10) trading days immediately preceding the date of exercise (as so valued, the "Fair Market Value");

(iv)    If approved by the Committee, you may request that the Corporation withhold from the number of shares of Common Stock which you would otherwise acquire upon exercise of your option and payment of the Exercise Price therefor, that number of shares of Common Stock which have an aggregate Fair Market Value equal to the aggregate Exercise Price of all or any portion of the options which you are then exercising; or

(v)    You may pay with any other legal consideration that may be acceptable to the Committee in its sole discretion at the time of exercise.

When you wish to exercise your stock option in whole or in part, please refer to the provisions of this letter and correspond in writing with the Secretary of the Corporation. This is not an incentive stock option under Section 422A of the Code.

Very truly yours,

E. Kirk Shelton
President and Chief Operating Officer

EKS:kg

1987 plan
7/10/96

Confidential Treatment Requested by Mr. Cosmo Corigliano

3461

CC 1887

 **CENDANT**

DEFENDANT'S
EXHIBIT
49 E

CENDANT-STAMFORD

03/02/1998

Dear Cosmo          Corigliano

I am pleased to advise you that the Board of Directors of Cendant
Corporation (the "Corporation") on 03/02/1998 authorized the
granting to you of a non-statutory option to purchase     82,316 shares
of common stock, $.01 par value, of the Corporation (the "Common Stock")
at a price of  $37.5000 per share (the "Exercise Price"), which the Board
has determined to be the fair market value on that date in accordance with
the terms of the Corporation's 1992 Bonus and Salary Replacement Stock
Option Plan (the "Plan"), under which your option has been granted.

Terms not defined herein shall have the meaning set forth in the Plan.

Your option has the following terms:

(a)  Subject to the provisions of paragraphs (d), (e), (f) and (g) hereof,
     this option may be exercisable by you as follows:

     You may purchase    27,438 shares of the Common Stock for which
     options are herein granted on or after January 1, 1999, and an
     additional   27,438 shares of the Common Stock on or after each
     successive January 1, through January 1, 2001.

     Your right to exercise this option shall be cumulative. The Board of
     Directors of the Corporation may at any time accelerate the vesting
     of this option. This option shall expire on the tenth anniversary of
     the date of grant.

(b)  If required by the Corporation and applicable laws, rules and
     regulations, prior to the delivery to you of a certificate or
     certificates representing the shares of Common Stock purchased by you
     upon the exercise of this option, you shall have deposited with the
     Corporation a non-disposition letter (restricting disposition by you of
     the shares of Common Stock) in form satisfactory to counsel for the
     Corporation.

(c)  In the event of a stock split, stock dividend, recapitalization,
     merger, consolidation, reorganization, split-up, combination, or
     exchange of shares or the like, the number and kind of shares subject
     to this option and the Exercise Price shall be appropriately adjusted
     by the Board of Directors. The determination of the Board of Directors
     shall be final.

Cendant Corporation
6 Sylvan Way, Parsippany, NJ 07054 Tel: 973 428-9700 Fax: 973 496-7325
707 Summer Street, Stamford, CT 06901 Tel: 203 324-9261 Fax: 203 348-4528

Confidential Treatment Requested by Mr. Cosmo Corigliano

· 3462

CC 1938

- 2 -

(d)   Notwithstanding anything herein to the contrary, if the Board of Directors of the Corporation or any committee of the Board of Directors, after full consideration of the facts, finds by majority vote that you have engaged in fraud, embezzlement, theft, commission of a felony, or dishonesty in the course of your employment by the Corporation, you shall forfeit all unexercised options for which the Corporation has not yet delivered share certificates, in each case whether such options are granted by this letter or otherwise. The decision of the Board of Directors of the Corporation or such committee shall be final.

(e)   Subject to paragraph (d) hereof, if you die while in the employ or engagement of the Corporation or any of its affiliates or subsidiaries or if you die within a period of three (3) months after your employment or engagement has terminated, or if your employment or engagement is terminated by reason of permanent and total disability (as defined in Section 22(e)(3) of the Internal Revenue Code of 1986, as amended (the "Code")), this option shall become immediately exercisable in full and, in the case of your death, your estate shall have the right to exercise your options hereunder.

(f)   Subject to paragraph (d) hereof, in the event your employment or engagement with the Corporation or any of its affiliates or subsidiaries is terminated for any reason other than death or permanent and total disability (as defined in Section 22(e)(3) of the Code), you shall be entitled to exercise your rights hereunder as if your employment or engagement had not been terminated.

(g)   In the event of a "change in control," as hereinafter defined, your options shall become immediately exercisable. A "change in control" shall be deemed to have occurred if (i) a tender offer shall be made and consummated for the ownership of 51% or more of the outstanding voting securities of the Corporation, (ii) the Corporation shall be merged or consolidated with another corporation and as a result of such merger or consolidation less than 60% of the outstanding voting securities of the surviving or resulting corporation shall be owned in the aggregate by the former shareholders of the Corporation, other than affiliates (within the meaning of the Securities and Exchange Act of 1934, as amended (the "1934 Act")) of any party to such merger or consolidation, as the same shall have existed immediately prior to such merger or consolidation, (iii) the Corporation shall sell substantially all of its assets to another corporation which is not a wholly owned subsidiary, or (iv) a person within the meaning of Section 3 (a)(9) or of Section 13(d)(3) (as in effect on the date hereof) of the 1934 Act, shall acquire 40% or more of the outstanding voting securities of the Corporation (whether directly, indirectly, beneficially or of record). For purposes hereof, ownership of voting securities shall take into account and shall include ownership as determined by applying the provisions of Rule 13d-3(d)(1)(i) (as in effect on the date hereof) pursuant to the 1934 Act.

(h)   You may pay for shares purchased pursuant hereto (together with any withholding taxes due with respect thereto) in cash or by check at the time of exercise or with any other legal consideration that may be acceptable to the Board of Directors of the Corporation in its sole discretion at the time of exercise.

Bonrep92
1/25/96

Confidential Treatment Requested by Mr. Cosmo Corigliano

3463

CC 1939

- 3 -

(i)     This option shall not be transferable except by will or the laws of descent and distribution; pursuant to a domestic relations order, as defined in the Code or Title I of the Employee Retirement Security Act, as amended, or the regulations thereunder; or as a gift to your family members, trusts for the benefit of your family members or charities or other not-for-profit organizations.  If you wish to transfer your option, contact the Corporation first for more information.

(j)     In the event of any conflict between this Agreement and the Plan, this Agreement shall control. In the event of any ambiguity in this Agreement, any term not defined in this Agreement, or any matters as to which this Agreement is silent, the Plan shall govern.

When you wish to exercise your stock option in whole or in part, please refer to the provisions of this letter and correspond in writing with the Secretary of the Corporation.  This is not an incentive stock option under Section 422A of the Code.  This option may be subject to approval by the Corporation's stockholders.

Very truly yours,

E. Kirk Shelton
Vice Chairman

Bonrep92
02/12/98

Confidential Treatment Requested by Mr. Cosmo Corigliano

3464

CC 1940

## Option Value Calculation
### (as of September 3, 2003)

| Expir. Date | Strike Price | Asset Price | Days to Expir. | % of Year | Risk-free Rate | St. Dev.[1] | d1 | d2 | Est. Price | Hedge Ratio | No. of Contracts | Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01/24/06 | $22.33 | $19.00 | 1,055 | 2.89% | 4.37% | 0.5 | 0.3837 | -0.4663 | $6.03 | 0.63 | 150,000 | $ 904,793.68 |
| 04/21/07 | $20.50 | $19.00 | 1,326 | 3.63% | 4.37% | 0.5 | 0.5625 | -0.3595 | $7.46 | 0.71 | 230,000 | $ 1,716,162.19 |
| 03/02/08 | $37.50 | $19.00 | 1,642 | 4.50% | 4.37% | 0.5 | 0.0746 | -0.9859 | $5.07 | 0.53 | 82,316 | $ 417,504.55 |
| | | | | | | | | | | | | $ 3,038,462.41 |

Note: [1]Based on volatility as reported by Cendant in its 2002 Form 10-K, footnote 62.



DEFENDANT'S EXHIBIT 49 F

PENGAD 800-631-6989

~ 3465

## Option Value Calculation
### (as of September 3, 2003)

| Expir. Date | Strike Price | Asset Price | Days to Expir. | % of Year | Risk-free Rate | St. Dev.[1] | d1 | d2 | Est. Price | Hedge Ratio | No. of Contracts | Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/24/06 | $22.33 | $18.00 | 1,055 | 2.89% | 4.37% | 0.5 | 0.3201 | -0.5399 | $5.39 | 0.63 | 150,000 | $ 809,149.39 |
| 04/21/07 | $20.50 | $18.00 | 1,326 | 3.63% | 4.37% | 0.5 | 0.5067 | -0.4463 | $6.76 | 0.69 | 230,000 | $ 1,554,294.71 |
| 03/07/08 | $37.50 | $18.00 | 1,642 | 4.50% | 4.37% | 0.5 | 0.0236 | -1.0369 | $4.55 | 0.51 | 82,316 | $ 374,726.13 |
| | | | | | | | | | | | | $ 2,738,170.24 |

Note: [1] Based on volatility as reported by Cendant in its 2002 Form 10-K, footnote 62.

DEFENDANT'S
EXHIBIT

49 G

PENGAD 800-631-6989

**Crystal Journey Candles, L.L.C.**
**Balance Sheet**
As of December 31, 2002

5:55 PM
03/26/03
Accrual Basis

|  | Dec 31, 02 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| 1000 · Operating | 133,699.40 |
| 1005 · Store | 1,451.66 |
| 1010 · PAYROLL | 19,696.94 |
| **Total Checking/Savings** | 154,848.00 |
| **Accounts Receivable** | |
| 1200 · Accounts Receivable | 261,127.10 |
| **Total Accounts Receivable** | 261,127.10 |
| **Other Current Assets** | |
| 1720 · RAW MATERIALS INVENTORY | 75,830.24 |
| 1725 · Store Fixtures | 14,500.00 |
| 1745 · FINISHED GOODS INVENTORY | 21,815.00 |
| 1750 · Inventory (Packaging) | 72,302.75 |
| 1900 · Prepaid Insurance | 6,043.00 |
| **Total Other Current Assets** | 190,491.00 |
| **Total Current Assets** | 606,466.10 |
| **Fixed Assets** | |
| 1500 · Machinery and Equipment | 139,148.56 |
| 1550 · Office equipment | 34,165.01 |
| 1600 · Leasehold Improvements | 3,570.00 |
| 1700 · Accumulated depreciation | -146,809.31 |
| **Total Fixed Assets** | 30,072.26 |
| **Other Assets** | |
| 1855 · Rent Deposit | 8,098.45 |
| 1860 · Section 197 costs - goodwill | 445,000.00 |
| 1910 · Other Intangibles | 79,649.00 |
| 1911 · Accumulated Amortization | -163,426.90 |
| **Total Other Assets** | 369,320.55 |
| **TOTAL ASSETS** | 1,005,858.91 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| 2000 · Accounts Payable | 43,629.07 |
| **Total Accounts Payable** | 43,629.07 |
| **Other Current Liabilities** | |
| 2155 · Accrued Bonuses | 27,500.00 |
| **Total Other Current Liabilities** | 27,500.00 |
| **Total Current Liabilities** | 71,129.07 |
| **Total Liabilities** | 71,129.07 |
| **Equity** | |
| 1110 · Retained Earnings | -180,868.99 |
| 3010 · Capital | 1,046,206.55 |
| Net Income | 78,193.28 |
| **Total Equity** | 934,729.84 |
| **TOTAL LIABILITIES & EQUITY** | 1,005,858.91 |



DEFENDANT'S
EXHIBIT
49 H

3467

DEFENDANT'S EXHIBIT
49 I

PENGAD 800-631-6989

Page 1

6:50 PM
03/26/03
Accrual Basis

## Crystal Journey Candles, L.L.C.
## Profit & Loss
### January through December 2002

| | Jan - Dec 02 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| 4001 · Distributor Discount | -2,505.55 |
| 4003 · Trad. Votive Sales | 292,373.41 |
| 4004 · Trad. Votive Discount | 6,096.50 |
| 4008 · Two Tone Votives | 140,316.34 |
| 4009 · Two Tone Votive Discount | 18.00 |
| 4010 · Sales | 11,780.50 |
| 4011 · Pillar Sales | 402,198.62 |
| 4012 · HERBAL INCENSE | 39,646.52 |
| 4014 · AROMATHERAPY SQUARE VOTIVES | 94,078.92 |
| 4015 · Herbal Magic Votive Sales | 257,190.88 |
| 4016 · Herbal Single Votive (Quantity D) | 4,189.00 |
| 4018 · VOTIVE/13 SET - FRAGRILIGHT | 180,327.47 |
| 4425 · NATURAL AROMA PILLARS | 9,901.20 |
| 4035 · PORTABLE CANDLE | 41,480.50 |
| 4040 · HUNTER GREEN BOWL | 12.00 |
| 4065 · ONE MIST | 23,054.48 |
| 4105 · Pillar 3x6 | 22,688.40 |
| 4106 · Pillar 3 x 6 | 26,232.87 |
| 4107 · MASTERPIECE CANDLES | 9,622.00 |
| 4108 · RETRO CANDLE COLLECTION | -7,306.84 |
| 4121 · Candle & Card Line | 26,490.20 |
| 4209 · Gift Set Luxury Candles | 660,435.69 |
| 4399 · ALL NATURAL FELVOTES | 101,158.18 |
| 4370 · ALL NATURAL SKU VOTIVES | 32,403.50 |
| 4375 · MERLITE SPECIAL PRODUCT SALES | 1,460.00 |
| **Total Income** | 2,346,444.44 |
| **Cost of Goods Sold** | |
| **5000 · COS** | |
| 5001 · COS - Wax | 311,168.24 |
| 5002 · COS - Oils | 143,562.39 |
| 5003 · COS - Shipping | 54,664.08 |
| 5004 · COS - Prod. Packaging | 158,113.51 |
| 5005 · COS - Other | 85,180.98 |
| 5010 · COS - NEW PRODUCT DEV. | 31,569.85 |
| 5100 · COS - ONE MIST | 10,000.39 |
| **Total 5000 · COS** | 779,066.43 |
| 5400 · Production Salaries | |
| 5401 · OUTSIDE LABOR | 67,907.30 |
| 5402 · Production Salaries - Other | 431,126.69 |
| **Total 5400 · Production Salaries** | 499,033.99 |

3468

Page-1

8:30 PM
08/16/03
Accrual Basis

# Crystal Journey Candles, L.L.C.
## Profit & Loss
### January through December 2002

| | Jan - Dec 02 |
|---|---|
| 4900 · Commissions | 163,374.98 |
| **Total COGS** | **1,497,167.23** |
| | |
| **Gross Profit** | **691,298.21** |
| | |
| **Expense** | |
| 4916 · MARKETING - NEW CUST. & OTHER | |
| 4027 · National Sales Manager | 42,300.00 |
| 4031 · New Customer Discount | 124.59 |
| 4051 · FREE MERCHANDISE OFFER | 2,860.20 |
| L916 · Show Fees | 31,927.99 |
| 7216 · Advertising - Other | 30,071.58 |
| 1016 · SAMPLES - FREIGHT | 12,186.89 |
| 8700 · Free Shipping Cost Over $400 | 65,008.10 |
| 8760 · FREE SHIPPING | 605.67 |
| 4022 · MARKETING - NEW CUST, & OTHER - Other | 21,168.72 |
| **Total 4916 · MARKETING - NEW CUST, & OTHER** | **22,448.42** |
| 6389 · Rent | 53,860.23 |
| 6400 · Gas and Electric | 15,714.66 |
| 6410 · Water | 735.54 |
| 6890 · Admin Salaries | 166,366.10 |
| 6760 · Marketing Supplies | 20,363.39 |
| 6790 · Office Supplies | 24,653.14 |
| 6820 · Property Taxes | 4,791.54 |
| 6166 · Health Insurance | 33,181.81 |
| 1800 · Misc. Warehouse Exp. | 14,185.37 |
| 1919 · Trash | 5,301.82 |
| 6130 · Bank Service Charges | 19,667.79 |
| 6140 · Commissions | 860.00 |
| 6146 · Bad Debts expense | 7,645.39 |
| 6180 · Insurance | 17,077.03 |
| 6166 · Liability Insurance | 3,869.45 |
| 6166 · WORKERS' COMP | 14,373.04 |
| 9206 · Payroll Taxes | 63,103.36 |
| 7256 · Postage and Delivery | 1,634.23 |
| 1270 · Professional Fees | 10,215.60 |
| 1010 · Payroll Proc. Fee | 3,804.27 |
| 1191 · 401K Match & Fees | 8,840.60 |
| 6446 · Telephone | 11,786.46 |
| 1340 · Travel & Ent | 8,664.20 |
| 6166 · PROFIT SHARING DISTRIBUTION | 35,466.91 |
| | |
| **Total Expense** | **605,066.74** |
| | |
| **Net Ordinary Income** | **85,230.47** |

3469

Page 1

8:40 PM
06/24/03
Accrual Basis

# Crystal Journey Candles, L.L.C.
## Profit & Loss
### January through December 2002

| | Jan - Dec 01 |
|---|---:|
| **Other Income/Expense** | |
| **Other Income** | |
| 4012 · SALES - CANDLE ACCESSORIES | 123,256.13 |
| 4017 · Bath Salts | 781.00 |
| 4020 · ALL NATURAL SOAP | 16,086.28 |
| 4031 · TAPERS | 9,050.00 |
| 4101 · Store Sales | 117,914.20 |
| 4200 · SALES - DISPLAYS | 9,401.50 |
| 4300 · SALES - BATH SALTS & SACHETS | 25,776.73 |
| 4710 · ACRYLIC DISPLAYS | 2,263.00 |
| 4701 · Freight Income | 232,665.91 |
| 4792 · HANDLING FEE | 1,216.30 |
| 4101 · Gain/(Loss) on sale of assets | -6,465.58 |
| **Total Other Income** | 532,688.67 |
| **Other Expense** | |
| 4927 · TAPER EXPENSE | 6,449.45 |
| 5015 · CANDLE ACCESSORIES | 43,123.48 |
| 5201 · Bath Salts & Pot Pourri | 7,272.41 |
| 5241 · Western Display Racks | 16,261.96 |
| 5300 · SOAP EXPENSE | 9,658.12 |
| 5700 · Reimbursed Freight Expense | 262,685.47 |
| 5800 · ACRYLIC DISPLAY EXPENSE | 15,732.81 |
| 6601 · Store Expense | |
| 6302 · Store Purchases | 46,032.78 |
| 6900 · Store Rent | 25,541.00 |
| 6902 · Store - Marketing | 14,483.38 |
| 6903 · Store - Overhead | 11,107.34 |
| 6904 · Store Payroll | 24,188.09 |
| Total 6601 · Store Expense | 128,432.67 |
| 7234 · GIFT SET DISPLAY | 8,420.12 |
| 9140 · Amortization | 48,611.50 |
| 9150 · Depreciation Expense | 61,177.45 |
| **Total Other Expense** | 539,646.78 |
| **Net Other Income** | -7,037.10 |
| **Net Income** | 18,183.10 |

3470

5:40 PM
09/04/03
Accrual Basis

# Crystal Journey Candles, L.L.C.
## Balance Sheet
### As of August 31, 2003

|  | Aug 31, 03 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| 1000 · Operating | 37,507.00 |
| 1005 · Store | 3,989.47 |
| 1910 · PAYROLL | 103.82 |
| **Total Checking/Savings** | 41,600.29 |
| | |
| **Accounts Receivable** | |
| 1200 · Accounts Receivable | 232,074.82 |
| **Total Accounts Receivable** | 232,074.82 |
| | |
| **Other Current Assets** | |
| 1120 · RAW MATERIALS INVENTORY | 78,084.90 |
| 1499 · Undeposited Funds | 3,474.30 |
| 1725 · Store Fixtures | 15,309.87 |
| 1745 · FINISHED GOODS INVENTORY | 21,815.00 |
| 1750 · Inventory (Packaging) | 91,882.76 |
| 1800 · Prepaid Insurance | 8,043.90 |
| **Total Other Current Assets** | 218,610.73 |
| | |
| **Total Current Assets** | 488,294.84 |
| | |
| **Fixed Assets** | |
| 1500 · Machinery and Equipment | 228,362.87 |
| 1550 · Office equipment | 35,165.01 |
| 1600 · Leasehold Improvements | 3,570.00 |
| 1705 · Accumulated depreciation | -145,809.31 |
| **Total Fixed Assets** | 121,288.57 |
| | |
| **Other Assets** | |
| 1850 · Rent Deposit | 8,098.45 |
| 1900 · Section 197 costs - goodwill | 445,000.00 |
| 1910 · Other Intangibles | 79,649.00 |
| 1911 · Accumulated Amortization | -163,426.90 |
| **Total Other Assets** | 369,320.55 |
| | |
| **TOTAL ASSETS** | 978,903.96 |
| | |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| 2000 · Accounts Payable | 34,356.38 |
| **Total Accounts Payable** | 34,356.38 |
| | |
| **Total Current Liabilities** | 34,356.38 |
| | |
| **Total Liabilities** | 34,356.38 |
| | |
| **Equity** | |
| 1110 · Retained Earnings | -111,476.71 |
| 3000 · Opening Bal Equity | -2,490.58 |
| 3010 · Capital | 1,046,226.55 |
| Net Income | 12,288.32 |
| **Total Equity** | 944,547.58 |
| | |
| **TOTAL LIABILITIES & EQUITY** | 978,903.96 |



DEFENDANT'S
EXHIBIT
49 J

Page 1 of 1

- 3471

5:57 PM
09/04/03
Accrual Basis

# Crystal Journey Candles, L.L.C.
## Profit & Loss
### January through August 2003

| | Jan - Aug 03 |
|---|---:|
| **Ordinary Income/Expense** | |
| **Income** | |
| 4001 · Distributor Discount | -1,308.01 |
| 4005 · Trad. Votive Sales | 192,070.03 |
| 4006 · Trad. Votive Discount | 3,303.00 |
| 4008 · Two Tone Votives | 72,200.77 |
| 4010 · Sales | 1,244.00 |
| 4011 · Pillar Sales | 286,342.47 |
| 4013 · HERBAL INCENSE | 16,023.17 |
| 4014 · AROMATHERAPY SQUARE VOTIVES | 31,898.34 |
| 4015 · Herbal Magic Votive Sales | 151,054.64 |
| 4016 · Herbal Magic Votive Quandty Di | 1,767.40 |
| 4018 · VOTIVE 12 SET - FRAGLIGHT | 42,998.58 |
| 4025 · NATURAL AROMA PILLARS | 6,882.50 |
| 4035 · PORTABLE CANDLE | 0.00 |
| 4040 · HUNTER GREEN BOWL | 1,644.87 |
| 4098 · ONE NEST | 29,889.18 |
| 4105 · Pillars 3x3 | 35,910.80 |
| 4106 · Pillars 3 x 6 | 11,049.28 |
| 4107 · MASTERPIECE CANDLES | 58,687.70 |
| 4108 · RETRO CANDLE COLLECTION | 64.80 |
| 4115 · DESIGNER PILLAR 6X6 | 40.80 |
| 4116 · DESIGNER PILLARS 4X6 | 18.80 |
| 4117 · DESIGNER PILLAR 4X9 | 756.80 |
| 4118 · DESIGNER PILLARS - SET | 6,117.50 |
| 4120 · CANDLE TOP JAR CANDLE | 13,804.80 |
| 4121 · Candle & Card Line | 374.00 |
| 4122 · TARTS | 834.00 |
| 4123 · CERAMIC ACCESSORIES | 99.80 |
| 4124 · MISTER SPRAYS | 354,817.44 |
| 4206 · Gift Set Square Candles | 41,864.43 |
| 4300 · ALL NATURAL PILLARS | 13,832.40 |
| 4315 · ALL NATURAL SQ. VOTIVES | 0.00 |
| 4875 · MERLITE SPECIAL PRODUCT SALES | |
| **Total Income** | 1,416,778.46 |
| | |
| **Cost of Goods Sold** | |
| **5000 · CGS** | |
| 5001 · CGS- Wax | 109,025.47 |
| 5002 · CGS - Oils | 78,048.58 |
| 5003 · CGS- Shipping | 27,265.58 |
| 5004 · CGS - Prod. Packaging | 71,484.52 |
| 5005 · CGS - Other | 28,857.58 |
| 5006 · CGS - NEW PRODUCT DEV. | 7,273.64 |
| 5945 · Inventory Adjustments | 0.00 |
| **Total 5000 · CGS** | 392,493.35 |
| | |
| **5500 · Production Salaries** | |
| 5501 · OUTSIDE LABOR | 26,008.70 |
| 5500 · Production Salaries - Other | 277,106.18 |
| **Total 5500 · Production Salaries** | 303,205.86 |
| | |
| 5900 · Commissions | 126,564.56 |
| **Total COGS** | 812,453.79 |
| | |
| **Gross Profit** | 606,324.67 |
| | |
| **Expense** | |
| 4025 · MARKETING - NEW CUST. & OTHER | |
| 4027 · National Sales Manager | 61,850.00 |
| 4031 · New Customer Discount | 481.84 |
| 4032 · FREE MERCHANDISE OFFER | 15,889.01 |
| 6500 · Show Fees | 36,643.49 |
| 7275 · Advertising - Other | 18,778.12 |
| 7276 · Trade Advertising | 800.00 |
| 7277 · Outbound Telemarketing | 2,508.41 |
| 7278 · Customer Mailings | 5,174.21 |
| 8678 · SAMPLES - FREIGHT | 5,800.00 |
| 8700 · Free Shipping Cost Over $500 | 43,015.24 |
| 8750 · FREE SHIPPING | 2,911.12 |
| 4025 · MARKETING - NEW CUST. & OTHER - Other | 11,733.06 |



DEFENDANT'S
EXHIBIT
49 K
PSS 000 001-6000

3472

3:37 PM
03/04/03
Accrual Basis

## Crystal Journey Candles, L.L.C.
## Profit & Loss
### January through August 2003

|  | Jan - Aug 03 |
|---|---|
| Total 4025 - MARKETING - NEW CUST. & OTHER | 166,055.70 |
|  |  |
| 6290 - Rent | 44,619.93 |
| 6400 - Gas and Electric | 18,576.64 |
| 6410 - Water | 536.10 |
| 6560 - Admin Salaries | 192,296.71 |
| 6730 - Marketing Supplies | 5,925.64 |
| 6730 - Office Supplies | 13,977.35 |
| 6850 - Property Taxes | 4,109.42 |
| 6895 - Health Insurance | 21,336.92 |
| 7208 - Misc. Wharehouse Exp. | 12,005.32 |
| 8100 - Trash | 2,857.45 |
| 9120 - Bank Service Charges | 14,264.76 |
| 9140 - Contributions | 650.00 |
| 9155 - Bad Debts expense | 7,579.71 |
| 9164 - WORKERS COMP | 20,201.31 |
| 9200 - Payroll Taxes | 41,225.27 |
| 9255 - Postage and Delivery | 1,536.25 |
| 9270 - Professional Fees | 12,505.79 |
| 9300 - Payroll Proc. Fee | 3,587.43 |
| 9301 - 401K Match & Fees | 3,701.28 |
| 9340 - Telephone | 9,606.87 |
| 9350 - Travel & Ent | 6,738.80 |
| Total Expense | 816,822.11 |
|  |  |
| Net Ordinary Income | -9,087.44 |
|  |  |
| Other Income/Expense |  |
| Other Income |  |
| 4012 - SALES - CANDLE ACCESSORIES | 62,191.98 |
| 4017 - Bath Salts | 637.31 |
| 4020 - ALL NATURAL SOAP | 5,321.50 |
| 4029 - TAPERS | 3,628.00 |
| 4704 - Store Sales | 40,973.47 |
| 5099 - SALES - DISPLAYS | 36,223.15 |
| 5200 - SALES - BATH SALTS & SACHETS | 11,248.56 |
| 5280 - ACRYLIC DISPLAYS | 950.00 |
| 5794 - Freight Income | 151,291.91 |
| 5795 - HANDLING FEE | 549.00 |
| Total Other Income | 324,814.97 |
|  |  |
| Other Expense |  |
| 6027 - TAPER EXPENSE | 4,727.92 |
| 6085 - CANDLE ACCESSORIES | 42,193.06 |
| 5291 - Bath Salts & Pot Pourri | 802.37 |
| 5230 - Non Reimb. Freight Exp. | 8,901.86 |
| 5251 - Wooden Display Racks | 43,223.37 |
| 5280 - SOAP EXPENSE | 5,676.83 |
| 5704 - Reimbursed Freight Expense | 152,320.87 |
| 5880 - ACRYLIC DISPLAY EXPENSE | 3,210.25 |
| 5851 - Store Expenses |  |
| 5252 - Store Purchases | 22,970.88 |
| 9000 - Store Rent | 17,608.57 |
| 9002 - Store Marketing | 3,114.49 |
| 9003 - Store Overhead | 2,878.50 |
| 9004 - Store Payroll | 21,058.29 |
| Total 5851 - Store Expenses | 67,611.15 |
|  |  |
| Total Other Expense | 303,539.21 |
|  |  |
| Net Other Income | 21,275.76 |
|  |  |
| Net Income | 12,258.32 |

3:276