UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | No. 3:02CR264 (AHN) |
| v. | ) ) | |
| WALTER A. FORBES | ) ) ) ) | April 17, 2006 |

MOTION OF DEFENDANT WALTER A. FORBES TO PRECLUDE THE
GOVERNMENT FROM ELICITING FALSE TESTIMONY FROM KEVIN KEARNEY
OR, IN THE ALTERNATIVE, FOR LEAVE TO PRESENT DOCUMENTARY
EVIDENCE TO IMPEACH FALSE TESTIMONY BY KEVIN KEARNEY
(Forbes Third Trial Motion In Limine No. 6)

Defendant Walter A. Forbes, through undersigned counsel, respectfully moves

(1) to preclude the government from eliciting false testimony from Kevin Kearney or, in the

alternative, (2) for leave to present documentary evidence to impeach false testimony by Kevin

Kearney. The grounds for this motion are set forth in the accompanying memorandum of points

and authorities.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: _____
    Brendan V. Sullivan, Jr. (Bar No. ct17115)
    Barry S. Simon  (Bar No. ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

Oral Argument Requested

- and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
Cowdery, Ecker & Murphy, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused the foregoing Motion of Defendant Walter A. Forbes to Preclude the Government from Eliciting False Testimony from Kevin Kearney or, in the Alternative, for Leave to Present Documentary Evidence to Impeach False Testimony by Kevin Kearney (Forbes Third Trial Motion <u>In Limine</u> No. 6) to be filed electronically and to be served on April 17, 2006 to the following via e-mail:

> Norman Gross, Esq. (norman.gross@usdoj.gov)
> Michael Martinez, Esq. (michael.martinez2@usdoj.gov)
> Craig Carpenito, Esq. (craig.carpenito@usdoj.gov)

_____
Barry S. Simon

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 3:02CR264 (AHN) |
| v. | ) | |
| WALTER A. FORBES | ) | April 17, 2006 |

### MEMORANDUM IN SUPPORT OF MOTION
### OF DEFENDANT WALTER A. FORBES TO PRECLUDE THE GOVERNMENT
### FROM ELICITING FALSE TESTIMONY FROM KEVIN KEARNEY OR, IN
### THE ALTERNATIVE, FOR LEAVE TO PRESENT DOCUMENTARY
### EVIDENCE TO IMPEACH FALSE TESTIMONY BY KEVIN KEARNEY
### (Forbes Third Trial Motion In Limine No. 6)

Defendant Walter A. Forbes, through undersigned counsel, respectfully submits this memorandum in support of his motion (1) to preclude the government from eliciting false testimony from Kevin Kearney or, in the alternative, (2) for leave to present documentary evidence to impeach false testimony by Kevin Kearney.

### BACKGROUND

Kevin Kearney is a government witness who testified at both the 2004 and 2005 trials. Mr. Kearney is an alleged co-conspirator who was involved in the use of unsupported "topside adjustments" at CUC that inflated CUC's reported quarterly earnings. He has received informal immunity from the government in exchange for his testimony. See Tr. (12/8/05) at 3811-12 (jury instruction concerning Mr. Kearney).

Oral Argument Requested

Mr. Kearney testified falsely about material matters at both the 2004 and 2005 trials.[1]  Yet the government continues to present Mr. Kearney as a truthful witness who has no reason to lie about Mr. Forbes.  See Tr. (10/26/05) at 1194-97.

**A.      Mr. Kearney's False 2004 Testimony.**

   **1.      False Testimony About Former CUC Chief Financial Officer Stuart Bell's Purported Invocation of Mr. Forbes' Name in Connection with Unsupported Topside Adjustments.**

Mr. Kearney was interviewed by the government on at least twelve occasions during the period between May 1998 and March 2004.  See Exs. 1-21, 23-25, 27.  During these interviews, Mr. Kearney was repeatedly asked about the process by which unsupported quarterly topside adjustments were made at CUC.  Mr. Kearney also was repeatedly asked about the quarterly meetings he attended to discuss unsupported topside adjustments.  In none of his interviews between 1998 and March 2004 did Mr. Kearney claim that he met with former CUC Chief Financial Office Stuart Bell every quarter to discuss unsupported topside adjustments or that Mr. Bell purportedly invoked Walter Forbes' name when discussing unsupported topside adjustments.

Throughout Mr. Kearney's government  interviews prior to 2003, he consistently informed the government that he attended quarterly meetings to discuss topside adjustments with Cosmo Corigliano and Casper Sabatino -- not Stuart Bell.  Mr. Kearney also consistently informed the government that he did not meet with Mr. Bell, and that Cosmo Corigliano -- not

---

[1]      See Motion of Walter A. Forbes for a Mistrial Due to the Government's Presentation of, and Failure to Correct, Kevin Kearney's False and Misleading Testimony (filed Aug. 23, 2004) (Docket No. 1091) (incorporated herein by reference); Motion of Defendant Walter A. Forbes for a Mistrial Due to the Testimony of Kevin Kearney (filed Oct. 31, 2005) (Docket No. 1911) (incorporated herein by reference).

Mr. Kearney -- met with Mr. Bell. See, e.g., Ex. 3 at PAW0732 (former AUSA Paul Weissman's notes of July 15, 1998 interview reflecting that Mr. Kearney stated that "Cosmo would have them make topside adjustments. Cosmo told him what adjustments to make (he + Casper w[oul]d meet [with] Cosmo")); Ex.4 at PAW0716 (former AUSA Paul Weissman's notes of August 24, 1998 interview reflecting that Mr. Kearney stated that "[a]t ends of q[uarter]'s, he + Casper w[oul]d meet [with] Cosmo; Cosmo w[oul]d then go over results [with] Stu Bell"); Ex. 6 at XMW004 (former AUSA Mark Winston's notes of August 24, 1998 interview in which Mr. Kearney stated "Casper, Kevin would meet with Cosmo, not with Stu Bell"); Ex. 7 at PAW0699, PAW0701, PAW0703 (former AUSA Paul Weissman's notes of March 4, 1999 interview reflecting that Mr. Kearney stated that quarterly meetings involved "him, Casper, + Cosmo" and that Mr. Kearney "DNB [does not believe] he ever met [with] Cosmo and Bell"); Ex. 9 at MG00171-72 (former FBI agent Mark Gerber's notes of March 4, 1999 interview stating "Qtrly meetings. Attended by Cosmo, Casper + Kevin"; "After this process was complete, Cosmo would get a clean set of adjusted financials and then Cosmo would take them to Stu Bell"); Ex. 23 at MGR 181 (SEC attorney Matthew Greiner's notes of July 10, 2001 meeting in which Mr. Kearney stated "K$^2$ [KK, or Kearney] dealt with C$^2$ [CC, or Corigliano] when Bell there"); id. at MGR 182 (Greiner notes that while Mr. Kearney "doesn't think C$^2$ doing this on his own," he "DK [doesn't know] more").

In addition, Mr. Kearney repeatedly told government investigators that he had no information with respect to Walter Forbes. See, e.g., Ex. 5 at DF0375 (SEC attorney David Frohlich notes of August 24, 1998 interview in which Mr. Kearney stated "he had no evid. he could pt. to involving WAF"); Ex. 23 at MGR 173 (SEC attorney Matthew Greiner's notes of

3

July 10, 2001 interview in which Mr. Kearney stated that he had "nada w/r/t Walter"). Former

AUSA Paul Weissman interviewed Mr. Kearney at least five times in 1998 and 1999 and took

extremely detailed notes of his interviews. See Exs. 3, 4, 7, 10, 17. There is no reference to Mr.

Forbes in any of Mr. Weissman's voluminous notes of those interviews, many of which are

devoted to the subject of unsupported topside adjustments. See Tr. (9/2/04) at 11,443-49; Tr.

(11/14/05) at 2678-87 (Weissman testimony).[2]

   At the 2004 trial, however, Mr. Kearney dramatically changed his story, claiming

for the first time that he met with Mr. Bell every quarter to discuss unsupported topside

adjustments, and asserting for the first time that Mr. Bell purportedly told him that Walter Forbes

wanted the company's EPS to be a certain number when Mr. Bell and Mr. Kearney purportedly

discussed unsupported topside adjustments. See Tr. (8/4/04) at 9715-25. That testimony

consisted of fabrications invented by Mr. Kearney for the first time in 2004, six years after he

began cooperating with the government. It was flatly inconsistent with Mr. Kearney's statements

in numerous prior interviews.[3] But the government elicited it anyway, and failed at any point to

_____

[2]  In 2001, Mr. Kearney also signed interrogatory responses, under oath, in the Cendant civil litigation which indicated that he had no information with respect to Mr. Forbes. See Ex. 22 (stating that Mr. Kearney has "no information in his possession" that would support or refute a contention that the CUC Director Defendants (a term defined to include Walter Forbes) had knowledge of or participated in accounting irregularities).

[3]  In 2003, after numerous government interviews, five years after the disclosure of financial irregularities at CUC and Cendant, and eight years after Mr. Corigliano had succeeded Mr. Bell as CFO of CUC, Mr. Kearney began to change his story with respect to topside adjustments. Even Kearney's new claims, however, did not involve any assertion that he met with Mr. Bell every quarter to discuss topside adjustments or that Mr. Bell invoked Walter Forbes' name when discussing topside adjustments. In an August 2003 letter, the government represented for the first time that Mr. Kearney claimed that Mr. Corigliano invoked Mr. Forbes' name in connection with topside adjustments. See Ex. 24 at 2, ¶ 5. The letter made no reference to any claim by Mr. Kearney that he met directly with Mr. Bell to discuss topside adjustments or

correct it.[4]

      On cross-examination, defense counsel attempted to confront Mr. Kearney with his prior inconsistent statements to the government. Nevertheless, Mr. Kearney insisted -- contrary to the notes of his government interviews -- that he had told the government that Mr. Bell purportedly said that Mr. Forbes wanted EPS to be a certain number, and that this story was not a recent "recollection":

> Q.    Now, on page 9720 is this correct testimony? You said:
>
> "Question: When Stu Bell came to you, did he indicate to you who wanted these changes to be made?
>
> "Answer: Yes.
>
> "Question: What did Stu Bell tell you with respect to that?
>
> "Answer: He would often come back to us and say Walter Forbes wanted EPS to be a different number than what we had so we needed to make those changes."

---

that Mr. Bell invoked Walter Forbes' name. In October 2003, Mr. Kearney changed his story again, claiming for the first time that he met with Mr. Bell in one quarter. See Ex. 25 at 1, ¶ 1. At that time, Mr. Kearney informed the government that he "does not recall whether Stu Bell invoked Walter Forbes's name when giving the directive . . . ." Id. at 2 (emphasis added). In March 2004, Mr. Kearney modified his story to claim that he met with Mr. Bell on more than one occasion. See Ex. 27 at 2, ¶ 4. The letters say nothing about Mr. Kearney's current claims that he met with Mr. Bell every quarter to discuss topside adjustments, or that Mr. Bell purportedly invoked Walter Forbes' name every quarter.

[4]    Mr. Kearney's testimony was contradicted by then-government witness Casper Sabatino, Mr. Kearney's former boss and an alleged co-conspirator testifying pursuant to a plea agreement. Mr. Kearney testified that Mr. Sabatino was present at Mr. Kearney's purported quarterly meetings with Mr. Bell. See Tr. (8/4/04) at 9716-18, 9723-24; Tr. (8/5/04) at 9879. Mr. Sabatino testified that he did not attend any such meetings. See Tr. (6/15/04) at 4665 (Q. "And when Mr. Bell was the CFO before 1995, you, Mr. Sabatino, never attended any quarterly meetings to discuss unsupported topside adjustments, correct?" A. "That's correct."). The government did not call Mr. Sabatino at the 2005 trial.

Do you see that?

A.    Yes.

Q.    Sir, is it fair to say that in all of these interviews that you had, you certainly never said that in the first 13 interviews?

A.    <u>No.</u>
Q.    You think you said that earlier to the government investigators?

A.    <u>Yes.</u>

Q.    You think you said it as early as the first two, three, four interviews?

A.    <u>I believe so</u>.

Q.    Well, do you know or do you not know or is this a recent piece of information that you might have been refreshed on?

A.    <u>No.</u>

Q.    No?

A.    No.  I've -- <u>I answered that way in several interviews</u>.

Tr. (8/5/04) at 9876-77 (emphasis added).

The underscored testimony was false.  It cannot be squared with the complete absence of such a reference in the notes and letters provided by the government.  The government knew or should have known that the testimony was false.  Yet, rather than correct Mr. Kearney's false testimony, or acknowledge that Mr. Kearney had never before stated that Mr. Bell purportedly invoked Walter Forbes' name in connection with topside adjustments, the government allowed the false testimony to stand uncorrected.

The government exacerbated the problem by emphasizing Mr. Kearney's false testimony on redirect examination.   On redirect, the government asked Mr. Kearney to reaffirm

6

and repeat his recent fabrications, and elicited testimony from Mr. Kearney that these claims

were truthful:

> Q.     Same questions with respect to Stu Bell: Do you have a general
> recollection of Stu Bell invoking Walter Forbes' name in giving you
> instructions to make unsupported topside adjustments?
>
> A.     Yes.
>
> Q.     What's your general recollection of Stu Bell invoking Walter Forbes'
> name?
>
> A.     It was, again, multiple conversations with Stu Bell with respect to
> adjusting EPS at the end of a quarter based on what Walter Forbes wanted.
>
> Q.     Do you recall those conversations with Cosmo Corigliano and Stu Bell
> happening?
>
> A.     Yes.
>
> Q.     Mr. Kearney, did you make that up to please anyone, that testimony? Did
> you make that up?
>
> A.     No.

Tr.(8/16/04) at 9993-94.

The government also attempted to rehabilitate Mr. Kearney on redirect

examination, posing questions that improperly suggested that Mr. Kearney's new claims were not

recent fabrications and that Mr. Kearney had simply not been asked about these subjects in his

prior interviews:

> Q.     Mr. Kearney, you recall Mr. Sullivan asking you some questions about
> meetings that you had with government investigators?
>
> A.     Yes.
>
> Q.     During the meetings you had with government investigators, were you
> asked questions?

7

A.     Yes.

Q.     Did you, Kevin Kearney, answer the questions that you were asked?

A.     Yes.

Q.     Let me ask you this, Mr. Kearney: What about the questions you were not asked?

MR. SULLIVAN: Objection.
THE COURT: Sustained.

Q.     Well, Mr. Kearney, at these sessions with the government, did you make speeches?

A.     No.

Q.     Did you answer questions?

A.     Yes.

Q.     Did you answer the questions asked of you?

A.     Yes.

Q.     Did you answer the questions that were not asked of you?

MR. SULLIVAN: Objection.
THE COURT: As to the last question, sustained.

Q.     Did you answer the questions that you were asked truthfully?

A.     Yes.

Q.     Did you answer the questions you were asked to the best of your recollection?

A.     Yes.

Tr. (8/16/04) at 9991-92.  This testimony was highly misleading and designed to create the false

impression that Mr. Kearney had simply not been asked in earlier government interviews any

8

question that should have elicited a response about Mr. Bell purportedly invoking Walter Forbes'

name. In fact, Mr. Kearney was repeatedly asked about both Mr. Bell and the process by which

unsupported quarterly topside adjustments were made in his government interviews between

1998 and March 2004. In <u>none</u> of those interviews did Mr. Kearney assert that Mr. Bell invoked

Walter Forbes' name when discussing unsupported topside adjustments. And, prior to October

2003, Mr. Kearney consistently informed the government that he met with Messrs. Corigliano

and Sabatino -- not Mr. Bell -- to discuss unsupported quarterly topside adjustments.[5]

### 2.     False Testimony About Casper Sabatino's Purported Invocation of Mr. Forbes' Name.

Mr. Kearney's false testimony in 2004 was not limited to his claims about Mr.

Bell. On direct examination, Mr. Kearney claimed for the first time that CUC Vice-President of

Accounting (and alleged co-conspirator) Casper Sabatino told Mr. Kearney not to release

financial information to CUC's outside auditors (Ernst & Young ("E&Y")) until Walter Forbes

signed off on the draft press release. <u>See</u> Tr. (8/4/04) at 9752.

<u>None</u> of the notes, memoranda, or letters reflecting Mr. Kearney's numerous

government interviews between 1998 and 2004 contain this claim. There is no indication from

the notes, memoranda, or letters that Mr. Kearney ever asserted that Casper Sabatino invoked

Walter Forbes' name <u>at all</u>, let alone with respect to providing financial information to E&Y.

Moreover, Mr. Kearney consistently told the government that it was <u>Cosmo Corigliano</u> -- not

---

[5]     As discussed <u>supra</u>, in October 2003, Mr. Kearney claimed for the first time that he met with Mr. Bell in <u>one quarter</u>. <u>See</u> Ex. 25 at 1, ¶ 1. At that time, Mr. Kearney informed the government that he "<u>does not recall</u> whether Stu Bell invoked Walter Forbes's name when giving the directive." <u>Id.</u> at 2 (emphasis added). In March 2004, Mr. Kearney modified his story to claim that he met with Bell on more than one occasion. <u>See</u> Ex. 27 at 2, ¶ 4.

Walter Forbes -- who had to approve the numbers before they were released to Ernst & Young. See, e.g., Ex. 18 at DF0556 (SEC attorney David Frohlich's notes of April 29, 1999 interview in which Mr. Kearney reported that he "had to wait for CC's blessing before could give to E&Y"); id. at 558 ("understood that can't give to E&Y until CC says OK"); Ex. 20 (Mark Gerber's notes of April 29, 1999 interview in which Mr. Kearney stated "[h]ad to wait for Cosmo blessing b/f they (Kevin) would give E&Y the 'CUC P&L reconciliation' and consolidation"); Ex.21 at RC 0158 (former U.S. Attorney Robert Cleary's notes of Mr. Kearney's April 29, 1999 interview where Mr. Kearney stated "E&Y wanted the dox -- CUC wouldn't give them until CC signed off on them"); Ex. 17 at PAW0668 (former AUSA Paul Weissman's notes of April 29, 1999 interview where Mr. Kearney stated "until Cosmo gives the word, it's understood they can't turn the stuff over"); Ex. 19 at PM000250 (agent Pat Matthews' notes of April 29, 1999 interview in which Mr. Kearney stated "CC had to bless it [referring to P&L reconciliation] before it could be given to E&Y"); Ex. 23 at MGR 180 (SEC attorney Matthew Greiner's notes of July 10, 2001 interview in which Kearney stated he could not provide materials to E&Y "b/c C$^2$ hasn't 'blessed consolidation'").[6]

Mr. Kearney's testimony that Mr. Sabatino instructed him not to release financial information to E&Y until Walter Forbes approved the draft press release was false, and was flatly inconsistent with the information provided by Kearney in numerous government interviews. The

---

[6]     In 2003, Mr. Kearney claimed for the first time that Mr. Corigliano instructed him not to release financial information to E&Y until Mr. Corigliano had obtained final approval from Walter Forbes, Kirk Shelton, or Stu Bell. See Ex. 24 at 3, ¶ 9. Prior to the 2004 trial, however, Mr. Kearney never claimed that Mr. Sabatino made any such statement. Mr. Sabatino (an alleged co-conspirator with a plea agreement) testified that he never made any such statement to Mr. Kearney, and that he never heard Mr. Corigliano make any such statement. See Tr. (6/15/04) at 4642; Tr. (11/10/05) at 2569.

government elicited this testimony at the 2004 trial and allowed it to stand uncorrected.

### 3.    False Testimony About Cosmo Corigliano's Purported Invocation of Mr. Forbes' Name in Connection with Unsupported Topside Adjustments.

Mr. Kearney also testified falsely in 2004 that Cosmo Corigliano invoked Walter Forbes' name both when giving Mr. Kearney instructions to make topside adjustments and with respect to the timing of providing information to E&Y. Tr. (8/4/04) at 9727-29, 9734-37, 9751-52. Mr. Kearney claimed that Mr. Corigliano informed him each quarter that Walter Forbes desired a certain EPS when Mr. Corigliano gave Mr. Kearney instructions to make unsupported topside adjustments. E.g., id. at 9727-29, 9736.

Mr. Kearney's testimony was, once again, fundamentally inconsistent with his numerous government interviews prior to 2003.[7] In none of those interviews did Mr. Kearney assert that Mr. Corigliano invoked Walter Forbes' name with respect to either topside adjustments or the release of financial information to E&Y.[8] Moreover, Mr. Kearney described a topside adjustment process in which Mr. Corigliano came up with the desired EPS for the quarter during the quarterly meetings with Mr. Sabatino and Mr. Kearney by reviewing analyst reports -- not based on instructions Mr. Corigliano supposedly received from Walter Forbes. See, e.g., Ex. 8 at DF 0534-35 (SEC attorney David Frohlich's notes of March 4, 1999 interview in which Mr. Kearney described the process by which Mr. Corigliano came up with the desired EPS for the

---

[7]     Mr. Kearney also contradicted his own testimony by testifying that Mr. Corigliano gave him explanations for the adjustments that sounded legitimate to him. Tr. (8/16/04) at 9953-55.

[8]     In 2003, Mr. Kearney claimed to have a recollection that Mr. Corigliano purportedly invoked Mr. Forbes' name in two quarters. See Ex. 24 at 2 ¶ 5. Mr. Kearney further claimed that, while he recalled this purportedly happening in two quarters, it purportedly "may have" happened every quarter. Id.

quarter by reviewing analyst reports during meetings with Messrs. Sabatino and Kearney); id. at DF0540 (explaining that Mr. Corigliano developed the desired EPS for quarter by reviewing analyst reports to develop a consensus); Ex. 9 at MG0171-72 (former FBI agent Mark Gerber's notes of March 4, 1999 interview explaining same process); id. at 174 ("Cosmo would start from the analyst report, decide what EPS needed to be and then work up from the EPS figure").[9]

On cross-examination, defense counsel attempted to confront Mr. Kearney with his prior inconsistent statements. Again, Mr. Kearney denied that his claims that Mr. Corigliano routinely invoked Walter Forbes' name in connection with topside adjustments were fabrications invented for the first time in 2003:

> Q.    You have no sense that you had years pass when you didn't provide that testimony that you did here in court about invoking Walter Forbes' name? You have no sense that you didn't discuss that for years and then all of a sudden in 2003 you mentioned it for the first time?
>
> A.    I don't believe that's accurate.

Tr. (8/16/04) at 9938.

That testimony was false as well. It cannot be reconciled with the complete absence of any such indication in the notes and memoranda provided by the government of Mr. Kearney's interviews prior to 2003. The government knew or should have known that the testimony was false but allowed it to stand uncorrected. To the contrary, on redirect examination, the

---

[9]    Mr. Kearney's testimony was contradicted by then-government witness Casper Sabatino. Mr. Kearney testified that Mr. Sabatino was present at the quarterly meetings with Mr. Corigliano regarding unsupported topside adjustments. Tr. (8/16/04) at 9949, 9951. Mr. Sabatino testified that Mr. Corigliano never invoked Mr. Forbes' name during the quarterly meetings concerning unsupported topside adjustments. Tr. (6/15/04) at 4640-42. Mr. Sabatino further testified that Mr. Corigliano never told him that he was waiting for a sign-off from Mr. Forbes before information could be released to E&Y. Id. at 4642.

government reaffirmed Mr. Kearney's false testimony concerning Mr. Corigliano's purported invocation of Walter Forbes' name. See Tr. (8/16/04) at 9993-94.

**B.      Mr. Kearney's False 2005 Testimony.**

During the 2005 trial, Mr. Kearney repeated his false testimony from 2004 that Stuart Bell allegedly instructed him to make unsupported topside adjustments every quarter, that Mr. Bell and Cosmo Corigliano purportedly invoked the name Walter Forbes in connection with unsupported topside adjustments, and that Cosmo Corigliano and Casper Sabatino supposedly instructed Mr. Kearney to withhold information from the company's auditors until Mr. Forbes approved earnings press releases. See, e.g., Tr. (10/25/05) at 1097-110, 1113. Counsel for Mr. Forbes again attempted to cross-examine Mr. Kearney with his prior inconsistent statements to the government. E.g., Tr. (10/25/05) at 1123-25, 1126-27; Tr. (10/26/05) at 1157-77, 1179-81. Mr. Kearney generally disclaimed any recollection of his earlier interviews and stuck with his 2004 testimony. See id.

To make matters worse, Mr. Kearney changed his story yet again in 2005. Mr. Kearney claimed for the first time at the 2005 trial that Cosmo Corigliano repeatedly told him that unsupported topside adjustments were necessary because Mr. Forbes wanted to achieve a certain EPS to meet Wall Street expectations. See Tr. (10/25/05) at 1106-08. On cross-examination, Mr. Kearney acknowledged that he did not make this claim either in the 2004 trial or in fifteen government interviews. See id. at 1186-87. On redirect examination, however, the government presented Mr. Kearney's new claims as truthful testimony and attempted to rehabilitate him by suggesting that the notes of his government interviews could be inaccurate. See id. at 1194-98.

13

During the 2005 trial, counsel for Mr. Forbes attempted to present evidence that Mr. Kearney made statements during government interviews that were fundamentally inconsistent with his trial testimony. See Tr. (11/14/05) at 2646-90. Mr. Weissman testified outside the presence of the jury that a passage in his notes reflected the substance of Mr. Kearney's statement during an interview, id. at 2652-53, but the Court precluded Mr. Weissman from testifying to that information, id. at 2658. Defense counsel inquired of Mr. Greiner outside the presence of the jury concerning his notes of Mr. Kearney's July 10, 2001 interview, which state "nada w/r/t Walter." See Ex. 23 at MGR 173. Mr. Greiner testified that he had no recollection whether this notation meant that Mr. Kearney simply said nothing about Mr. Forbes during the interview or whether it meant that Mr. Kearney gave affirmatively exculpatory information about Mr. Forbes. See Tr. (11/14/05) at 2673-74 ("I think that I wrote this either because Mr. Kearney said nothing about Mr. Forbes, or he in fact said, Mr. Forbes wasn't involved in these conversations. It's either reflecting an absence of commentary or affirmative representation of a lack of involvement. And between those two, I can't speak.").[10] Based on that testimony, the Court precluded Mr. Forbes from eliciting testimony from Mr. Greiner about this note. Id. at 2676.

---

[10]     Mr. Greiner's testimony that the notation could simply reflect the absence of a statement by Mr. Kearney concerning Mr. Forbes was, at best, improbable. The "nada w/r/t WAF" notation is in the middle of Mr. Greiner's lengthy notes of the July 10, 2001 interview. It would be extremely odd to write during the midst of an interview that was still in progress that the witness had said nothing regarding Mr. Forbes. Mr. Forbes has repeatedly requested from the government the notes taken by the three other government representatives present at this interview (Mark Gerber, Susan Markel, and Roger Pazzamont), none of which has been produced. See Forbes Third Trial Motion No. 2 (Docket No. 2189) (filed 3/31/06). The government has an obligation to preserve exculpatory material, such as notes of this critical interview.

14

**ARGUMENT**

The government cannot elicit testimony from Kevin Kearney that it knows, or has reason to know, is false, and allow that testimony to stand uncorrected.  In the event the government is permitted to elicit such testimony at Mr. Forbes' third trial, the Court should permit Mr. Forbes' counsel to introduce into evidence documentary evidence (such as excerpts of interview notes or a stipulation concerning the pertinent excerpts of interview notes) that impeaches Mr. Kearney's false testimony.

**I.     DUE PROCESS IS VIOLATED WHEN THE GOVERNMENT INTRODUCES OR FAILS TO CORRECT FALSE OR MISLEADING EVIDENCE.**

The Supreme Court has long made clear that due process is violated when the government obtains a conviction based on the introduction of false evidence.  See Napue v. Illinois, 360 U.S. 264, 269 (1959).[11]  The government also violates due process "when the prosecutor, although not soliciting false evidence from a Government witness, allows it to stand uncorrected when it appears."  United States v. Sanfilippo, 564 F.2d 176, 178 (5th Cir. 1977).  Indeed, the Supreme Court unanimously held that a prosecutor's inaction, after evidence has been presented that the prosecutor knows is false, is as much a denial of due process as is the deliberate presentation of false evidence:

> [I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.  The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.

---

[11]    See also Giglio v. United States, 405 U.S. 150, 153 (1972); Miller v. Pate, 386 U.S. 1, 7 (1967); Alcorta v. Texas, 355 U.S. 28, 31 (1957) (per curiam); White v. Ragen, 324 U.S. 760, 764 (1945) (per curiam); Pyle v. Kansas, 317 U.S. 213, 216 (1942); Mooney v. Holohan, 294 U.S. 103, 112 (1935) (per curiam).

<u>Napue</u>, 360 U.S. at 269 (citations omitted).  The prosecutor therefore has a "duty to correct the false testimony of a Government witness," and "[t]hat duty arises when (the false evidence) appears."  <u>Sanfilippo</u>, 564 F.2d at 178 (quotation omitted); <u>see</u> <u>also</u> <u>Napue</u>, 360 U.S. at 269-70 ("A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth." (quotation omitted)).

These well-established principles apply not only to perjurious testimony and false evidence, but also to testimony and other evidence that would be misleading to the jury.  <u>See</u> <u>United States v. Vozzella</u>, 124 F.3d 389, 393 (2d Cir. 1997) (reversing convictions when government "should have known that introduction of the records with Stirling's unqualified testimony concerning their significance conveyed a message so misleading as to amount to falsity"); <u>United States v. Rivera Pedin</u>, 861 F.2d 1522, 1530 (11th Cir. 1988) (reversing convictions and rejecting argument that witness' false "denial was unwitting rather than knowing" as "without merit because the <u>Napue</u> rule applies where testimony, even though technically not perjurious, would surely be highly misleading to the jury" (quotation omitted)); <u>Dupart v. United States</u>, 541 F.2d 1148, 1150 (5th Cir. 1976) (per curiam) (reversing denial of motion for post-conviction relief when government witness offered testimony concerning cooperation and benefits that "even though technically not perjurious, would surely be highly misleading to the jury . . .").

Moreover, the <u>Napue</u> rule is implicated when the prosecutor "knew or should have known" that the evidence was false.  <u>United States v. Wallach</u>, 935 F.2d 445, 456 (2d Cir. 1991); <u>see</u> <u>Vozzella</u>, 124 F.3d at 393 (reversing convictions when government "should have

16

<u>known</u> that introduction of the records with Stirling's unqualified testimony concerning their significance conveyed a message so misleading as to amount to falsity" (emphasis added)).

## II. THE COURT SHOULD PRECLUDE THE GOVERNMENT FROM PRESENTING FALSE TESTIMONY BY KEVIN KEARNEY; IN THE ALTERNATIVE, THE COURT SHOULD PERMIT MR. FORBES TO INTRODUCE EVIDENCE THAT IMPEACHES MR. KEARNEY'S TESTIMONY.

The Court should preclude the government from presenting testimony by Kevin Kearney concerning his purported interactions with Mr. Bell, the purported invocation of Mr. Forbes' name by Messrs. Bell, Corigliano, and Sabatino, or Cosmo Corigliano's purported statement that unsupported topside adjustments were necessary because Mr. Forbes wanted to achieve a certain EPS to meet Wall Street expectations. "[G]iven the inconsistencies in [Mr. Kearney's] statements, the government should [be] on notice," <u>Wallach</u>, 935 F.2d at 457, that Mr. Kearney's testimony on these subjects is false. In the event the government is permitted to elicit testimony from Mr. Kearney on these subjects, the Court should allow Mr. Forbes' counsel to introduce documentary evidence that impeaches Mr. Kearney's claims, such as excerpts of interview notes. The Court should not allow the government to rely on evidentiary objections to conceal this critical information from the jury. The concealment of the truth from the jury in such circumstances would violate due process.

In <u>Wallach</u>, 935 F.2d 445, the Second Circuit reversed a conviction where the government's primary witness testified falsely and the government lodged evidentiary objections to withhold critical information from the jury that would have exposed the falsity of the testimony. The witness testified on direct examination "that he had not gambled from the summer of 1988 to the time of the trial in June 1989." <u>Id.</u> at 455. He admitted on cross-

17

examination that he had signed gambling markers in the fall of 1988, but denied that he had

gambled on those occasions. Id. at 455-56. The defendants sought to admit testimony and

documents to impeach this testimony. "The government objected to the testimony . . . and the

introduction of the records under Fed. R. Evid. 608(b), arguing that the records and testimony

were extrinsic evidence offered to impeach Guariglia's credibility and therefore subject to

exclusion. The district court sustained the government's objection." Id. at 456.

> The Second Circuit reversed because:
>
> Guariglia was the centerpiece of the government's case. Had it been brought to
> the attention of the jury that Guariglia was lying after he had purportedly
> undergone a moral transformation and decided to change his ways, his entire
> testimony may have been rejected by the jury. It was one thing for the jury to
> learn that Guariglia had a history of improprieties; it would have been an entirely
> different matter for them to learn that after having taken an oath to speak the truth
> he made a conscious decision to lie . . . . Accordingly, because we are convinced
> that the government should have known that Guariglia was committing perjury,
> all the convictions must be reversed.

Id. at 457 (emphasis added).

Here, the jury should be permitted to learn the truth about Mr. Kearney's

numerous government interviews and to compare the information Mr. Kearney gave the

government during his interviews over the course of several years with his trial testimony. Mr.

Kearney has gone from having "nada" with respect to Mr. Forbes, Ex. 23 at MGR 173, to

claiming that Mr. Forbes' name was repeatedly invoked, quarter after quarter, by three different

people in connection with improper accounting at CUC. He told the government for years that

he did not meet with Mr. Bell to discuss topside adjustments, then stated that he met with Mr.

Bell in one quarter, then stated that he met with Mr. Bell in more than one quarter, then testified

that he met with Mr. Bell in every quarter. He said nothing to the government for years about

18

Mr. Bell purportedly invoking Mr. Forbes' name with respect to topside adjustments, then said he did not recall whether Mr. Bell invoked Mr. Forbes' name, then testified that this happened quarter after quarter. He said nothing to the government for years about Cosmo Corigliano purportedly invoking Mr. Forbes' name, then claimed to recall that it happened on two occasions, then testified that this happened every quarter. He testified about Casper Sabatino's purported invocation of Mr. Forbes' name, a claim that its not reflected in any of his government interviews. He testified in 2005 to purported statements by Mr. Corigliano about which he said nothing at the 2004 trial or in numerous government interviews. If the jury is able to see the information Mr. Kearney gave the government in his interviews, and compare it to his trial testimony, it will be evident that Mr. Kearney's recent "recollections" are fabrications that have evolved and morphed over time.

       The government cannot present Mr. Kearney's false testimony and allow it to go uncorrected. If the government continues to elicit this testimony, then, at the very least, Mr. Forbes should be allowed to introduce documentary evidence that impeaches Mr. Kearney's false claims.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: _____
    Brendan V. Sullivan, Jr. (Bar No. ct17115)
    Barry S. Simon  (Bar No. ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

        - and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
Cowdery, Ecker & Murphy, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)
Attorneys for Walter A. Forbes

20

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused the foregoing Memorandum in Support of Motion of

Defendant Walter A. Forbes to Preclude the Government from Eliciting False Testimony from

Kevin Kearney or, in the Alternative, for Leave to Present Documentary Evidence to Impeach

False Testimony by Kevin Kearney (Forbes Third Trial Motion <u>In</u> <u>Limine</u> No. 6) to be filed

electronically and to be served on April 17, 2006 to the following via e-mail:

Norman Gross, Esq. (norman.gross@usdoj.gov)
Michael Martinez, Esq. (michael.martinez2@usdoj.gov)
Craig Carpenito, Esq. (craig.carpenito@usdoj.gov)

_____
Barry S. Simon