# EXHIBIT 18

PW        GS        KK
MG        DF        RF
P
M
                                                                    4/29/99

Kevin    Kearney

— SOC [proffers; 1662; cnsl agrees warning still in effect].

—————→ allegations in ACR related to cancellations
              of reserves at FYE 96 + 97.

— first —→ mtg of controllers in late '97 or early '98;
    — prior to attending, asked AP if she should
        include the 9.8M draw-down; she
        said no
    — but —→ your letter w/her of that took place
        in '1/98 or 2/98 — how can be — [meeting
        was in 12/97.] —→ KK that meeting
        was later than that.
    — KK — do know I have the memo so pointed
        out — date should be on it;
    — on Spanish books, we switched to accrual
        basis from cash basis in early 97;
   [mtg KK remembers was in the large conf.
      room @ 707 Summer].
    — if meeting was in Dec, our books would
        not have shown the 9.5M.
    — do you think   conversation w/ AP
        was before sent in package w/ open
        YE results? think so, not sure

— response if no one says AP was your replacement
    KK — no — see CC memo arguing her
    promotion —→ she had resp. for accty of
    add'tl subs.

                        DF0551

DEFENDANT'S
EXHIBIT
1611

2.

— my resp. was just to oversee the completion
& oversee SEC filing; did not have
actg resp. for the subs.

GYS '/96 000480    — GTY w/ps w/ explanation attributed
to KK;

— recall this memo? never seen
memo itself;
— convenience? gen'ly the NAOC
rev. deferral (#4); in this a
common process? for some things;
what level person? probably a senior;
sign off—req? → "CS" Cindy Sotto
→ dnk
→ Ken Wolstfeld — and
that is his handwrtg in lower
rt. corn

— NAOG (#4) → as say, when we
acq'd them, they had life-time member —
30 yr recognit. period; we had ...
→ what gave rise to the issue? we decided
to accelerate their recog. period; at corp.
level, decision; we would adj; GTY
then asked about it.

" Restatement Explanation " → GETKO &
NAOG were pooling — so had to go back
& restate; these must be explanations
that show steps from orig p++ to the
restated fin'ls.

3

KK → know this being big issue..
→ other issue here in same category —
yes.

— rule → s/in yr after purchase res.
established; if excess determined, then
goodwill adjusted; if more than
yr → to P+L, but separate line
item.

CD  0158
CD  0159

— spreadsheet. → CUC Reconciliation
— familiar w/ these → ck yes
— created a sml? yes.

— did you do some of these? early on,
when I first started; but usually
done by person under me
— the format pre-dated you.

→ why used these → just way had
always been done; relied on us to
make sure everything reconciled; but
was a nightmare going thru this each
Q; the Trumbull acctg system bad
info everywhere → but whenever we
did top-side entries, we recorded them
on this; still Trumbull could have
done most of it.

— same w/ Trumbull cutting off each early,
so had flexibility w/ recording items...

DF0553

4

— when I was w/ O + Y, I proposed
     an entry to "cash" +
         "membership reserve" — proposal
   worked it's way up the chain +
     ultimately was rejected.

[ — KK's entry would have recognized
   that reserve needed to be higher
         b/c chg. bals were real].

— at the time I was a senior; I
   discussed it w/ my senior mngr →

→ ring name was ~~Barico~~ Enrico Treglia;
     — I later noted that no adj. had
         been made.

     — KK ~~Treglia~~ Treglia was a dir, but does
         not have particular recall.

— back to reconciliations →
         — we updated monthly.
         — in consolidation only → the tp-side adj.


— "Reserve" → how understand that term
         — KK → that was basically how
     we referred to the tp-side adj.


— we called them "Cup-O-cash post reconciliations"
     — we gave to O+Y only at year-end; they
         did not see Q
   → did take out "reserve" and "consolidation
     only" → KK — yearly a scaled down
   version.

DF0554

5

— when we that P+L final, then we
would give to B+Y.

— KK → at yr-end, we would
"reinut" the yr-end adj to the
reconciliation (for Cap-v-Cost); 

[KK — also, each Qtune month would clear
out the Tp-cadis (zero out the "reserve"
line) — so, when CC saw it he
was looking at real data]

      —[since reserve had been cleared
      out; once CC decided what P+L
      needed to be, he knew how
      much addl needed; would then
      come up w/ the adj.]
— CC could look at the spdsheet
+ keep up the reserve "even"
— s, tries would directly of AP +
re-work reserves — say membership
reserve

[in the yr-end process, the Cap-v-Cost P+L Reconcilen
would be re-done several times.
      — once w/all the yr-end adj in Cap-v-Co
      later, w/ the Y/C adjs allocated to
           where they eventually would go.
⟶ at each pt, needed to generate a new
      Cap-v-Cost Reconcilen in order to see
      where we were.
— when first to the Reconcilen at y/e,
      what about "reserve" line → zero
— then adj's made, + a new Reconciltn
      generated.

DF0555

6

— did s. time happen that 2d-round
still needed adjust'g → yes; think so;
think always was that way.

→ you would have been done if just
the "real" or "usual" process —
those kind of adj. were made —
this addit'l process is just to
get where needed. → yes (KK)

— so, every yr 3 or 4 Reconciliation — yes
KK — + had to wait for CCE blessing
before could get to B+Y.
— pressure from B+Y — yes?
kept asking us for consolidat'n +
other support — we had to tell
them didn't have approval yet,
not final
— what asking for? all — the consolidating,
reconciliation; cash flows etc. — everything
they needed to roll up the +S.; they
had the other div's, but not cap-v-hold

— but you had been on other side of
that process? yes
— going on even before you got to
B+Y? yes, i think b/c of some
process even back then? yes
— how much before press rel. typically
get final package? a few days (3 or 4
probably).

7

— part of rationale we were given
was that less time they had to spend
on it, the better — who told you
that → CS ; s. turia CC wanted to
hold them off longer, but CS + KK
had to deal w/ them + would push
to have it go out to B+Y.

— but → the press release never
changed → if B+Y had to work all
night, fine ; the release did not
change
→ for ye → 3-4 wk of March ; and,
only years tried to push it up a
day or two.
[6-7 weeks after yr-end].

— what was sense of desperation on B+Y
pull → as each day went by, more frustrating;
if got to be late enough, they would have
done call CC.
— voices raised? yes ; would push me as
far as could, + then at some pt I would
tell them to talk to CS if want

— at times would you go to CS + say have to
give it to them → yes ; what would he
do → say he knew + maybe call CC to
see where were ; even say to C what
have to give it to them & think I did

DF0557

8

— remember Cygnelli says to CS one time, "I know what you guys are doing, you have certain #s you have to meet" → he said it as if joking; CS didn't really respond.

— understood that can't give to B+F until CC says OK → yes, just understood lip-v-card #'s don't go to them until signed off on

— ever worry about them getting one of the early versions? we were always careful not to leave things sitting out; destroy prev. drafts → once release done + all final, we would go through [there was a lot of paper] + just check all the old paper → piles + piles of it around.

— CS would also say to make sure we get rid of all the old stuff — I don't think he said it b/c of saving space

CDAA 102-0053+ 3 → a typed list of these around? no

ACR 460 → Reconciliation from after KK's time — he is used to format shown above.

→

— were "consolidating entries" that printed out & went to B+F → e.g., the tax provision, re-class, "eg legit adj".

DF0558

9

— Mary or KM would do these.

— at one pt, told me CC had said to told
EKS about the adj (said when CC became
CFO)? yes; remember more? don't
remember what Q — just remember that
CC told EKS, he said he wanted
him to know what the effect on
the P+L was; only remember
CC saying that to me once;

CDAA 77-0090[+]
and CDAA 77-0123[+]

— often MS would type them out
(or KM) and I would put in the
explanation — and if I could
not explain —then might ask CS

[CDAA 77-0093-96] — are these examples? — pp. 3, 4, 5, 6 are
But this is later than me — don't
remember the lst couple of pp's here

— KK → but this same type of format

— also, "p. 11" is a diff format — don't
remember

— EKY gave me the scope; both prong? yes

— these analyticals contain the top-side
—/or in Exp-0-Cml.

— Doesn't that create problem w/ fluctuation?
5 times.

— KK → that we talked about this before;
49/39 could look especially weird →

DF0559

(0

— the problem of 3Qs being all Corp-V-Crd; but yr-end adj in several divisions.

— and — would not be as big a problem for CVC analyticals (whole co.)? right

— there were cases where swings were so pronounced that CS would tell me just not to give them to BHY. [remember specific instance? no — but more than once].

[happened for Subs + for Corp-V-Crd div].

— at some pt, we had the Subs start preparing analyticals for us.

— s-time — since there were many comparisons in the analytical, we just left out the one w/ the problematic fluctuation.

[this is the CETRO/ seasonality instance KK discussed in an earlier interview].

( seasonality explant → when an BHY ptin asked for explnt — & u think was actual even a time item on a prented analytical].

— yr-end push-down to books of subs → adj to Corp-V-Crd b/c that cause Recomultn to be redone → how much you involved in getting the entries on books of Corp-V-Crd: — in some cases I was — b/c we had

DF0560

11

ability to write out T/Es in Stanford &
have entered — some done this way
others done by AP & staff; think that
early on, KM just keyed in T/Es
for Cap-o-Lux) from Stanford.
— at some pt, system changes —
that is, the procedures changed; and
at some pt, AP & her group take it
over entirely → probably after 1/25 ? 1/26?

— remember b/c was an entry I made that
was not correct expense act, AP said
will just do them all ourselves.

— KM probably did in part b/c KM had
been at Trumbull & knew their gul
ldgrs well.

→ ye 1/31/97 → ACR: 35 M of Idenres. to
reduce Cap-o-Lux expense; would
entries be made at Trumbull? yes
part of that process? if was, only to
convey CS or CC instructions on how
much to reduce reserve by; s-o-e would

— ACR # 71 → the T/Es → whose holding →
not ment

— KK does not remember telling AP
the cuts for this reversal-

— KK thinks that CC dealt directly w/ AP
with adjs to membership cancellat. reserve.

— w/ regard to the merger reserves, and
purchase reserve — he let me handle the
smaller ones — he may have dealt

DF0561

12

Directly w/ her on the larger item / reserve.

— know of merger reserve reversal
1/31/96 at Aug-0- and → think so;
— earlier? think were purchase reserve
we did entries for.

CDAA 102-0052 →
KK → think this is list we asked
AP for, giving us amts could come
up w/ → must have been some
reserve we were told to reduce →
not sure what offset was.

— is this related to entry for
13.409M on CDAA 102-0055
KK → here "A/P" means accts payable or
accrued liabilities.

102-0055   — "to reclass on accrued" → "our own notes"
→ may relate to membership res. reversal
on ACR pp. 224+

102-0053+ → KK handwriting →
list of JEs for Post-close 1/31/96
→ Some of MS handwriting → 0057, 0058

DF0562

Plextel ⟶

13

ACR ex 79

ACR— portion of Idem reserve set aside for Plextel
avg ⟶ ~~totals~~ 4.1m
— 2.2 m used to pay CBA
— then .
— KK ⟶ the 2.2 was accrued for 2 phases ⟶
Plextel bodies (+ ptl) and an exp-o-cal's
books —— the Sylvester one were used to
income

KK — thinks AA got confused.
⟶ KK agree w/ ACR that intended to
post-date so that never shows up on anyone's books
⟶ CC handwrtg ⟶ instructs how to set
up the 2/14/97 memo — how much
real + how much cushion [bac the
2/14/97 amts on it].

⟶

CC agreed w/ E+Y that the "smaller"
policies would be treated as purchase, effecters
at begng of ~~the~~ P agrd; so CC had us set up
BLS adj accordingly; (CC knows from
"agreement" that caught away w/ ⟶ that the
back-dated entry will never show up.
— So ⟶ here 10/31/96 ⟶ actually 11/1/96 effecti
date.
— why made the 2/14/97 memo; understand
that the 2.2m had already been reserved
for and ptl. ⟶ yes ; did CC understood ⟶
yes (would have had to approve)

DF0563

14

rest of the 4.5 m
— Some are real costs — some are just
more cushions.
— then to allow for unusthan act $ &
chg-back were real + rest excess.

2.2 m —> the ?????? —> transfered to Cap-U-line
(ACR p. 152); KK thinks only he
2.2 m come back-through criterea. ->
rest KK thinks went to real Pleptel
expenses (thinks that maybe chg-bahn
were more than the line item allowance)

— what about the 4.1 M of the Ideon reserve
set aside for Pleptel — other than the
2.2 m —> KK thinks CC just allocated
that much of Pleptel cey to Ideon —>
no other "real expenses".

— Sierra and Davidson
— deal w/? yes
— who Slam Fruk Schepelhoum & Mike Conway
oby —> Pam Drake & Jack Allewart
— what about? just used —> coordinating getting
these info into one consolidating format —
that type of thing
— remember dealing w/ them on one transaction
where they gave in some resistance
— KK that had s-thing to do w/
recurables
AER x. 80 + 81.

DF0564

15

— stuff off of 81 → on Sierra's system →
    doesn't bring anything back to me

→ 80 → dnr any opinion about it.
— Showed KK p. 153, 154.
        → any recollection? only slightly
KK → seem we were aching them to externize
    their internal costs in connect w/ avg —
    + AA aching what. that is legit. merger-related
    cost.
        — I do think now that this in the
        matter & remember.
    → not sure particular of how externize →
        but do remember that there was
        disagreement over the matter — believe
        that CS had to get involved at some pt
        — [before they would accept the J/85].
    — but remember specifics of issue? nope
    — was the entry justifiable? probably
        not — probably internal costs were easy to
        to even arguing.
    — KK not entirely sure of rules
    — when we set up the reserves w/ pooling,
        & that clearly tie'd to SVY that included
        integration costs; apparently AA doesn't agree.
— KK not sure if had impression which.
    proper or improper at time of transmit
    — both MC + FS seemed competent to
        KK
    — only met FS in person
    — ever talked to Hayre → no.

DF0565

16

— Pam Drake — did not seen competent
— why → just never seemed very sharp,
        very difficult to deal w/;
    — a gen'l recollection
— MC + FS seemed to be sharp + pick up on
        things
— Brian Foster — dealt w/him? d n th so
— Jay Mashek → no [did not deal w/him].
— n.13? → did termin w/ FS + MC →
        but.

➛ Sentinel / CUC Super
— Dyner 1- Metr
        — may be in June.

KK → Hudsa Prbblh.com deposition may be
        complete before mid-June.

# EXHIBIT 19

AU    MG
FS    PM
GS
JP

4/29/99
Kevin Kearney
Bob Fortweiss, attny

AP did not replace KK as corp. AP had much
higher position w/ greater oversight responsibility. AP's
title became Corporate Controller of CUC while KK
never had acctg responsibility for any divisions.
KK did not function as controller.

Common practice for E&Y to come to KK — probably
senior at E&Y    1st Cindy Inote - E&Y    Ken Wildfort - E&Y

Getto & Waag were pushing so required restatements

CUC P&L reconciliation -
Q. spreadsheet formats predated KK. KK did some
early on, but generally done by MS or KPM — the person below
KK    "Reserves" — referred to the topside adjustments
E&Y did not see on quarterly basis, only at YE —
took out word "reserve" on topside consolidation
KK oversaw YE version prepared by MS or KPM — ensured
topside adj did not appear in YE version — wouldn't
give until complicated P&L was final (including adjustments)
CC had to bless it before it could be given to E&Y. E&Y had
info on other division except Comp U bad. KK believes
this process took place even while KK was at E&Y.
"The less time E&Y had to spend on it, the less
time to ask questions" — per Casper.
Casper would say to get rid of all the old drafts
once the financials were finalized.
    Joe Coscelli of E&Y made comment re. getting finance

PM000250

DEFENDANT'S
EXHIBIT
2362

Legit adjs. would be typed and provided to E&Y
KK said CC told KS about adj. to the P&L

Ms. or KRM would print out analyticals and KK would
provide explorations and if he couldn't he'd ask CS.

Early in AM would directly input adjs. from Stanford,
then memos would be sent to Comp. & Card div. for them
to make the entries - after 1/95 or 1/96   KK had chosen the wrong
acct to charge something to.

CC dealt directly w/ AB re: membership reserves (cancellation reserves
and maybe other reserve. $35 mil.

CC was aware Revel was reserved for twice.

Schapelhouman ⎱ 53
Crite Cexway ⎰
Jack ⎫  Sierra & Davidson
Stewart ⎬  - differences re: receivables, KS had to get credits
Drake ⎭  KK doesn't know if it went further
        KK met Schapelhouman - seemed competent
        KK said Drake didn't seem sharp - seemed difficult
        KK didn't deal w/ Krechel or Foster.

PM000251

# EXHIBIT 20

Bob Fetteris
PW      DF          JP    BM
                Greg (Sec)

Kevin Kearney (4/29/99)

GetKO & NAOG where poolings doing the 7/E 1/31/96. This
memo (E4S 1/96 006480) discusses the acctng charges made
by CUC were the poolings which resulted in restatements of
GetKO & NAOG. This memo reflects E&Y understanding of
the charges based on conversations they had w/ Kevin.

- "CUC P&L reconciliation" - Kevin's term to describe the spreadshe
used to reconcile + adjust the Comp-u-Card internal financial
statements to the information used to update the consolidation.

Kevin recalled being @ E&Y + making the recommendation that
Comp-u-Card make an adjustment that would have reduced
cash + the chargeback reserve resulting from all the
bank reconciliation items.

- Had to wait for Cosmo's blessing b/f they (Kevin) would give
E&Y the "CUC P&L reconciliation" and consolidation.

**REDACTED**

- Binders 39-41.

PENGAD 800-631-6989

DEFENDANT'S
EXHIBIT

1612

# EXHIBIT 21

4/29/99    Reed Kearney Interview - today

Doc't which lists the TSA &
calls them "reserves"

- Mills thought J went to E+Y

reconcil'n spreadsheet after 4Q for
the CompU Cd #'s (changes cash to GAAP)

This goes to CC → decide what adjust

Is pushed down to CompU Cd
(& others subs)

→ reserves + CompU Cd sends
a new package w/the push down
entries

→ new reconcil'n spreadsheet
a new reconcil'n "

(this process repeats as they
tweak the #'s

RC0157

DEFENDANT'S
EXHIBIT
2361

PENGAD 800-631-6989

E+Y wanted the docs ⇒ CHC wouldn't
give them until CC signs off on
them

CC told him - "let's wait a little
longer, the less time they have
the letter"

⇒ produced @ 3-4 days
before the press release

Gave E+Y reconcil that spreadsheet
w/o the "reserve" ⇒ so split
merg'd into add'l revenues +
fewer expenses

**REDACTED**

# EXHIBIT 22



WOLF, BLOCK, SCHORR and SOLIS-COHEN LLP
One Gateway Center
Suite 2600
Newark, New Jersey 07102
(973) 353-6212
Attorneys for Third-Party Defendant Kevin T. Kearney

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| IN RE: CENDANT CORPORATION LITIGATION | : : : : | Honorable William H. Walls<br>Master File No. CV-98-1664 (WHW)<br><br>KEVIN T. KEARNEY'S RESPONSE<br>TO THE CUC DIRECTOR<br>DEFENDANTS INTERROGATORIES |

TO:    Steven S. Radin, Esq.
       Sills Cummis Radin Tischman Epstein & Gross
       One Riverfront Plaza
       Newark, New Jersey 07102

GENERAL OBJECTIONS AND DEFINITIONS

1.    Kearney objects to the CUC Director Defendants' Interrogatories to the extent that they are overly broad, unduly burdensome and call for the production of information not reasonably calculated to lead to the discovery of admissible evidence.

2.    Kearney objects to the CUC Director Defendants' Interrogatories to the extent that they call for the production of privileged information and/or information protected by the work-product doctrine.

3.    Kearney objects to the CUC Director Defendants' Interrogatories to the extent that they call for the production of information not currently in his possession, custody or control.

4.    Kearney objects to the CUC Director Defendants' Interrogatories to the extent that they purport to impose obligations on him different from, or inconsistent with, those set forth in Fed.R.Civ.P. 26 or 33 or the Local Rules.

DEFENDANT'S
EXHIBIT
1616

5.    Kearney objects to the CUC Director Defendants' Definitions and Instructions to the extent that they are unduly burdensome, inadequate or confusing.

6.    The "Report" means the Report to the Audit Committee of the Board of Directors of Cendant Corporation, prepared by Wilkie Farr & Gallagher and Arthur Anderson LLP, dated August 24, 1998, which may, or may not be, the Cendant Corporation Form 8-K referred to in the CUC Directors' interrogatories.

7.    Where Kearney has refused to provide documents pursuant to his right against self-incrimination under the Fifth Amendment, he has similarly refused to identify any such documents. He will, if necessary, make them available for review in camera by the Court.

Subject to the foregoing General Objections, which are hereby incorporated by reference in each response, and the more specific objections set forth herein, Kearney responds to the CUC Director Defendants' Interrogatories below. In making these responses, Kearney expressly preserves and does not waive his right to invoke the privileges and protections afforded by the federal and state constitutions.

## INTERROGATORY ANSWERS AND OBJECTIONS

INTERROGATORY No. 1:

Do you contend that any of the CUC Director Defendants had knowledge of or participated in any of the accounting irregularities identified in Cendant Corporation's Form 8-K, filed with the Securities & Exchange Commission on August 28, 1998? If so, as to each of the CUC Director Defendants, identify each irregularity of which you claim that they had knowledge or in which you claim they participated, and identify all facts and all documents supporting your belief.

Answer:    At this time, Kearney has no information in his possession that would either support or refute any such contention.

## INTERROGATORY No. 2:

Do you contend that any of the CUC Director Defendants made false statements or omitted to state material facts regarding Cendant's financial condition which acting with reckless disregard for the truth regarding such condition?  If so, identify all such statements or material facts and all facts and all documents supporting your belief as to each such CUC Director Defendant.

Answer:    See answer to Interrogatory 1.

## INTERROGATORY No. 3:

Do you contend that any of the CUC Director defendants purchased/sold Cendant securities while in possession of material non-public information?  If so, identify each such trade and the material non-public information possessed by each such CUC Director Defendant when he made each such trade.

Answer:    See answer to Interrogatory 1.

## INTERROGATORY No. 4:

State whether, at any time in the period commencing with May 31, 1995 and continuing through the date of your response hereto, you or any of your representatives has had any communications with any person working at or affiliated with the Securities and Exchange Commission or any other federal or state government agency, board, authority, commission or

political subdivision or department thereof concerning Cendant, and, if so, identify each such communication and the names of the participants in each such communication.

    <u>Answer</u>:    Kearney objects to this Interrogatory on the grounds that it seeks information that is privileged and/or is not reasonably calculated to lead to the discovery of admissible evidence. Without waiving this objection, Kearney has from time to time met with attorneys from both the Office of the United States Attorney and the Securities and Exchange Commission concerning Cendant. He declines to provide further information based upon his right against self-incrimination under the Fifth Amendment to the U.S. Constitution.

<u>INTERROGATORY No. 5</u>:

    Identify all lawsuits in which you have been a party, including the name and Court index number of the action, the Court in which such action was or is pending, the nature of the claims asserted, the outcome of the action, and whether you were a plaintiff or a defendant.

    <u>Answer</u>:    None, other than the Cendant Litigations.

    As to objections:

    **WOLF, BLOCK, SCHORR**
    **and SOLIS-COHEN LLP**

By: _____

    Robert J. Fettweis

Dated: January 16, 2001

Jan-16-01  02:43pm  From-SPARK NETWORK SERVICES              2033444861          7-035  P.02/02  F-993

## CERTIFICATION

I certify that the foregoing answers made by me are true. I am aware that if any of the foregoing answers made by me are willfully false, I am subject to punishment.

I further certify that the copies of the reports annexed hereto rendered by proposed expert witnesses are exact copies of the entire report or reports rendered by them, that the existence of other reports of said experts, either written or oral, are unknown to me and if such become later known or available, I shall serve them promptly on the propounding party.

Kevin T. Kearney

Date: