# EXHIBIT 24



**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

---

970 Broad Street, Suite 700                    (973)645-2700
Newark, NJ 07102

August 20, 2003

Barry S. Simon, Esq.
Williams & Connolly, LLP
725 Twelfth Street NW
Washington, DC 20005-5901

Thomas P. Puccio, Esq.
230 Park Avenue, Suite 301
New York, NY 10169

   Re: United States v. Forbes, et al.
     <u>No. 3:02CR00264 (AWT)</u>

Dear Counsel:

  Please be advised that Kevin Kearney indicated to the United States that:

  (1) When he worked at Ernst & Young, E & Y personnel working on the CUC account used the phrase "CUC shuffle". Kearney understood this phrase to refer to the huge swings in the analyticals that CUC presented to E & Y on a quarterly and on a yearly basis. The information provided by CUC showed that money was moving around from quarter to quarter between different categories. Kearney indicated that the information provided to E & Y by CUC raised the curiosity of E & Y. E & Y sought explanations for the analytical differences from Caspar Sabatino, Stu Bell and Cosmo Corigliano. E & Y was not always satisfied with the explanations. Kearney indicated that E & Y felt some type of earnings management was going on but did not know whether it was material. The managing of earnings involved adjusting the P & L to achieve a preferred earnings number as opposed to actual earnings. Kearney indicated that CUC's analytical differences from quarter to quarter were unusual compared to other public company clients of E & Y that Kearney worked on.

  (2) When he decided to work at CUC, the thought that CUC might have managed its earnings was not prevalent in his mind.



**DEFENDANT'S EXHIBIT**

2358

PENGAD 800-631-6989

(3) When Kearney was first directed to make unsupported topside entries at the end of the first quarter that he worked at CUC, he was directed by Lori Rosenberg, the person he replaced, to make adjustments that resulted in decreasing income. He was told by Rosenberg that the company had too much income in the quarter. He was directed to debit the P & L, credit the balance sheet and to decrease income. In Kearney's experience at CUC, this was the only time that topside adjustments resulted in a decrease in income.

(4) Generally, when Kearney was directed to make topside adjustments, there was no support provided. On some occasions, Kearney was told by Corigliano that some reserve was excessive and if need be could justify the topside adjustment.

(5) In at least two separate quarters, when Corigliano directed Kearney to make unsupported topside adjustments to achieve a desired earnings per share (EPS) figure, Corigliano invoked the name Walter Forbes. Corigliano indicated to Kearney that Walter wants the EPS figure to be a specific number. Kearney understood that Corigliano was referring to Walter Forbes when he indicated that Walter wants the EPS figure to be a specific number. It is Kearney's recollection that when Corigliano invoked Walter Forbes's name, Sabatino was also present. Sabatino was usually present when Corigliano gave directions to Kearney to make unsupported topside adjustments. While Kearney does distinctly recall two separate quarters where Corigliano invoked Walter Forbes's name, Corigliano may have also referred to Walter Forbes's name in every quarter when giving directions to make unsupported topside adjustments.

(6) Corigliano also invoked Stu Bell's name on at least two occasions by indicating that Stu Bell wants the EPS figure to be a specific number. It is Kearney's recollection that Sabatino was present when Corigliano invoked Stu Bell's name.

(7) Kearney is certain that upper management at CUC, Walter Forbes, Kirk Shelton and Stu Bell, were aware that CUC earnings were being managed. Kearney indicated that while upper management knew that CUC earnings were being managed, Walter Forbes and Kirk Shelton might not have been precisely aware of all the mechanics involved in managing the numbers.

(8) Kearney was never told by Corigliano or anyone else not to share the fact that he was making unsupported topside adjustments with Walter Forbes, Kirk Shelton or Stu Bell.

2

(9) Corigliano gave Kearney instructions not to give E & Y the consolidation until Corigliano had received final approval from Walter Forbes, Kirk Shelton or Stu Bell.

(10) Kearney observed that Corigliano worked closely with Shelton but was not sure how often Corigliano interacted with Walter Forbes.

(11) On some occasions when Corigliano was giving directions to Kearney and Sabatino to make unsupported topside adjustments, Corigliano would close the door or make an effort to keep the meeting private. It was Kearney's impression that Corigliano was not trying to hide the directions from Walter Forbes or Kirk Shelton. It was Kearney's impression that Corigliano did not want CUC employees not involved in the management of earnings to hear what Corigliano had to say. Corigliano did not close the door on each occasion that Corigliano gave Kearney and Sabatino directions to make unsupported topside adjustments.

(12) While at CUC, Kearney did not report any misconduct regarding the management of earnings to superiors above Corigliano since it was Kearney's understanding that Walter Forbes, Kirk Shelton and Stu Bell knew that earnings were being managed to meet a specific target.

(13) Kearney believes that his CPA license from the State of Connecticut has been suspended for the same time period as the SEC suspended his ability to practice before the SEC as an accountant.

(14) Kearney recalled that in at least 3 or 4 quarters, he observed Corigliano referring to analyst forecasts for CUC and Corigliano indicated that this number is what they are all expecting the EPS figure to be.

3

Please note that in March 2003, Kearney met with the United States pursuant to the terms of the proffer agreement dated April 29, 1999.  Present for this discussion was Kearney, his counsel Robert Fettweis, Esq., John Carney, Richard Schechter, Mark Gerber and Pat Matthews. Please note in August 2003, Kearney spoke to the United States.  Included in this discussion were Kearney, Schechter, James McMahon, Gerber and John Pittman.

Very truly yours,

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice

By:  JOHN J. CARNEY (By RJS)
Special Attorney
U.S. Department of Justice

By:  JAMES MCMAHON
Special Attorney
U.S. Department of Justice

By:  RICHARD J. SCHECHTER
Special Attorney
U.S. Department of Justice

4

# EXHIBIT 25



**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

_____

970 Broad Street, Suite 700          (973) 645-2700
Newark, New Jersey 07102

October 10, 2003

Thomas P. Puccio, Esq.
230 Park Avenue
Suite 301
New York, New York 10169

Barry S. Simon, Esq.
Williams & Connolly, LLP
725 Twelfth Street, N.W.
Washington, DC 20005

VIA FEDERAL EXPRESS

     Re:  United States v. Forbes, et al.
         No. 3:02CR264 (AWT)

Dear Counsel:

     We write to address several issues:

Deleted Files from Corigliano Computer

     Please find enclosed a compact disk prepared by Kevin Mandia. It contains all the deleted files found on the Corigliano laptop. Counsel for Corigliano has reviewed the disk and is not asserting any privilage claims.

Kevin Kearney

     Please be advised that in or about October 2003, Kevin Kearney met with Richard Schechter, James McMahon and John Pittman and then spoke with Richard Schechter, John Carney, John Pittman and Mark Gerber by telephone. Mr. Kearney indicated that:

     1. After making topside adjustments to a quarterly consolidation that inflated the earnings per share for a quarter without support, Stu Bell directed him to adjust the EPS number again. Kearney indicated that Sabatino may have been present when Stu Bell gave this directive. Kearney does not recall if Stu Bell wanted the EPS number to be higher or lower. Kearney

DEFENDANT'S
EXHIBIT

2269

does not recall whether Stu Bell invoked Walter Forbes's name when giving the directive but Kearney understood that Stu Bell had reviewed the proposed EPS number with Walter Forbes and was directing the adjustment as a result of Bell's review with Walter Forbes;

2. Corigliano had instructed Kearney to be aggressive in charging Sparks expenses to the merger reserves whenever possible and Kearney did charge expenses to the Sparks reserves even where the expense did not technically qualify as a merger related expense;

3. He had very little interaction with Shelton when Kearney was the controller of Sparks but does recall Rick Fernandez telling Kearney that he (Fernandez) did keep Shelton informed of what was happening at Sparks; and

4. Stu Bell and Corigliano requested Kearney's assistance to enable them to increase the number of weighted shares outstanding so that a prior year's EPS number would be effectively lowered. Kearney understood that the request was made to enable the company to grow off a lower base. Kearney assisted Stu Bell and Corigliano by changing the effective tax rate to compute the common share equivalents used to build the previous years weighted average shares outstanding.

<u>Anne Pember</u>

Anne Pember met with the Government in Hartford on September 30 and October 1, 2003. James McMahon, Richard Schechter, John Carney, FBI Special Agents John Pittman and Mark Gerber, Postal Inspector Pat Mathews and Pember's attorney were present. At this meeting, Pember made the following statements that are not otherwise recorded in discovery already produced by the Government in this case:

1. Pember recognized the format of the September 13, 1995 "cheat sheet" bearing Bates number 702456 but did not remember seeing this particular document.

2. Kirk Shelton would refer to Corigliano's "forecast" when referring to the "cheat sheet." Corigliano told Pember that only Shelton and he received the cheat sheets.

3. Pember typed a Fall 1997 version of the cheat sheet into her computer.

4. The controllers of the CUC subsidiaries and

divisions were not aware of the topside adjustments.

5.  At the quarter ending October 1997, she noticed that Sabatino was making large adjustments to CUC's financial results.  She asked Corigliano if he knew about these adjustments.  Corigliano responded by saying, in substance, that Sabatino used to have support for these adjustments.  Pember stated that Corigliano used the word "support" loosely, meaning that he would refer to documents as support when, in fact, they were fraudulent or not at all supporting.

6.  In the quarter ending October 1997, she realized that the topside adjustments had been done in the past when the previous topsides were reversed out.

7.  Shelton got the monthly financial reporting packages that Sabatino received from the divisional and subsidiary controllers.  He also received the projection models for those divisions that did them, including Comp U Card.

8.  In October 1997, Pember learned that she would be reporting to Scott Forbes once the merger was finalized.  At that point, she decided that she wanted to leave CUC.  She arranged to meet with Corigliano on the morning of Columbus Day to tell him she wanted to leave.  When she arrived in Corigliano's office, she found Shelton and Corigliano there waiting for her.  The three of them discussed how to deal with the proposal that Pember report to Scott Forbes.  Shelton offered to put her in charge of all subsidiaries or divisions that had merger reserves.

9.  After Shelton left this meeting, Pember told Corigliano she wanted to resign.  Corigliano at first attempted to talk her out of resigning.  The two of them then discussed the possible terms of Pember's severance package.

10.  Corigliano subsequently met with Pember again.  He encouraged her to stay at CUC and told her that Shelton wanted her to stay.  He said that Shelton was willing to give her a bonus of $125,000 if she stayed at CUC through May 1.  Pember agreed to think about it.

11.  Later that day or the next day, Shelton called Pember into his office to verify that Corigliano had extended the above offer to her.  He assured Pember he would work out an arrangement with HFS in which she would not have to report to Scott Forbes.

12.  During this time period, Pember received calls

3

from CUC executives Anthony Menchaca, Kathy Pirro and John Fullmer in which those individuals encouraged her to stay at CUC.

13.  Pember eventually signed an agreement with CUC that contained, among other things, the stay bonus described above.

14.  In or about November 1997, Pember went on a business trip to Europe with other CUC executives and Henry Silverman.  Walter Forbes saw Pember in the hallway of the hotel and told her in substance that we're going to take care of you.

15.  Pember gave various versions of the spreadsheet entitled twinres.xls to Shelton at Corigliano's request.

16.  Corigliano told her to charge Walter Forbes' plane expenses against the HFS merger reserve.  The handwriting identifying the account number as that for the HFS merger reserve is hers.  She recognizes Shelton's and Menchaca's signatures. She does not recognize the other handwriting.

17.  If these plane expenses had not been charged to the merger reserve, they would have been classified as travel and entertainment expenses and thus reported to the Board of Directors.

18.  Walter Forbes would have received a check for the plane expenses.

Mary Polverari

Mary Polverari met with the Government in White Plains on October 7, 2003.  James McMahon, Richard Schechter, FBI Special Agent John Pittman and Polverari's attorneys were present.  At this meeting, Polverari made the following statements that are not otherwise recorded in discovery already produced by the Government in this case:

1.  She remembers that: 1) former First Assistant U.S. Attorney Robert Cleary told her that she would not be prosecuted for crimes she may have committed while employed at CUC; 2) Cleary did not attach any conditions to this statement; 3) former AUSA Paul Weissman was less precise about her status; and 4) she believed that Weissman was subordinate to Cleary.

2.  While employed at E&Y, she worked on an initial public offering of an E&Y client.

4

3.  The Excel spreadsheet on which she did the monthly consolidations of the financial statements of CUC's subsidiaries and divisions was on her computer.  Her computer was located in her office on the third floor of CUC's office at 707 Summer Street in Stamford.  When CUC remodeled this office in or about 1996, she was moved to a cubicle on the same floor.  Her computer was then located in her cubicle.  She subsequently moved to an office on the first floor of CUC's other building on Summer Street.

4.  She does not remember whether she needed a password to gain access to her computer.  She remembers that she received e-mail on this computer.

5.  The monthly financial reporting packages came in from the subsidiaries and divisions approximately 21 days into the next month.  The Comp U Card division would sometimes be late with the monthly reporting package. It took her two to three days to complete her consolidations.  She input both income statement and balance sheet information into her consolidation spreadsheet. She did not ask anyone to check her work.  She believed that she input the figures she received accurately because the income statements and balance sheets would balance.

6.  At the quarter ends, she gave a copy of the spreadsheet to Kearney and Sabatino and, later, to Pember and Sabatino once she input the information she received from the subsidiaries and divisions into her spreadsheet.  She sometimes included a draft press release with the spreadsheet.

7.  No one told her not to discuss the topside adjustments she made.  Based on the nature of the topside adjustments, she eventually came to believe that she should not discuss them with E&Y.

## Issues Outstanding in Discovery Brief

In addition, we have some outstanding issues that were raised in our response to Forbes Motion 50 and Shelton Motions 18 and 19.

On pages 39-40 and 46-47 of this brief, we stated that we would contact former AUSAs to determine if they were aware of any oral communications with witnesses or courts, respectively, relating to the administrative stay of the SEC's civil case against the cooperators that could possibly be considered Brady or Giglio.  There is no such information.

5

On page 44 of this brief, we stated that we would contact former AUSAs to determine if they were aware if any <u>Brady</u> or <u>Giglio</u> information existed with regard to the Government's and grand juries' decisions about who should be charged in this matter. There is no such information.

On page 50 of this brief, we stated that we would contact former AUSAs to determine if there was any information regarding any efforts by the Government to lobby the SEC on behalf of the three cooperating witnesses. Both Messrs. Cleary and Weissman recall that they suggested to SEC representatives that the SEC consider these witnesses' cooperation to date in the negotiations between the SEC and the witnesses to settle the SEC's civil case. The SEC representatives did not agree with these suggestions. Mr. Weissman also mediated discussions between the SEC and counsel for Corigliano and Pember relating to the arrangement under which these witnesses submit quarterly financial statements to the SEC.

Counsel for the SEC have completed their review and production of their documents to us. We have produced all such documents to you. Accordingly, the production of documents from the SEC to the defense, including all Wells submissions, all settlement agreements, all financial data provided by the witnesses and all notes of witness interviews, is complete. In addition, SEC counsel has advised us that they have no undisclosed <u>Brady</u> or <u>Giglio</u> information.

Very truly yours,

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice

By: JOHN J. CARNEY
Special Attorney
U.S. Department of Justice

By: JAMES MCMAHON
Special Attorney
U.S. Department of Justice

6

By:  RICHARD SCHECHTER
Special Attorney
U.S. Department of Justice

# EXHIBIT 26



**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

---

970 Broad Street, Suite 700                    (973) 645-2700
Newark, New Jersey 07102

March 10, 2004

ADVANCE COPY VIA FACSIMILE

Barry S. Simon, Esq.
Williams & Connolly, LLP
725 Twelfth Street, N.W.
Washington, DC 20005

Thomas P. Puccio, Esq.
230 Park Avenue
Suite 301
New York, New York 10169

Thomas A. Arena, Esq.
Scott A. Edelman, Esq.
Milbank, Tweed, Hadley & McCloy
One Chase Manhattan Plaza
New York, NY 10005

    Re:  United States v. Forbes, et al.
      <u>No. 3:02CR264 (AWT)</u>

Dear Counsel:

    Steven Speaks, and his counsel Steven Grossman, Esq.
and James Pickerstein, Esq. met with Richard Schechter and Mark
Gerber in Southport, CT on February 27, 2004. Mr. Speaks
provided the following information that may not otherwise have
been provided in materials already produced by the Government.
This letter does not contain a full description of all
information discussed by Mr. Speaks on this date.

    1. Speaks recalls that when he was instructed by Pember and
Corigliano to present Ex. 20 (to the Audit Committee Report) at
the December 11, 1997 controllers meeting, he was told that the
changes made to Ex. 19 (to that report) to create Ex. 20 were due
to merger related activity. Speaks does not recall whether he
was told it was also due to topside adjustments. Speaks was
aware of no support for the changes made to Ex. 19 to create Ex.
20.

DEFENDANT'S
EXHIBIT
2359

2. At a meeting with Shelton (which Speaks thinks was dated March 6, 1998 but he is not certain of the date), Speaks recalls that it was Shelton who explained to Scott Forbes that they, CMS, did better than expected in January 1998 and therefore, only needed to use $20 million of merger reserves to meet the budget and not the $25 million of merger reserves that had been planned to be used. While Speaks recalls Shelton providing the aforementioned explanation to Scott Forbes, it could have been Corigliano who gave the explanation.

3. In January 1998, Speaks prepared two income statements for the Comp-U-Card division for the year ending December 31, 1997. After he submitted the first income statement, he was directed by Pember to make adjustments to the income statement. When Speaks submitted the second income statement, he was instructed by Pember to remove the columns on the income statement that would show the budget numbers and the variance numbers. Before submitting the second income statement that contained the changes directed by Pember, Speaks copied the income statement by covering the last four columns of the income statement that showed budget and variance numbers. Speaks understood that Pember's instruction to cover up the last four columns would prevent the auditors from seeing whether the second income statement figures exceeded the budget and by how much.

4. The entries that were created to support the underfunded cancellation reserve at Comp-U-Card had the effect of putting cash on the books of the company that did not in fact exist.

Please note that the interview of Mr. Speaks in or about May 2003 occurred on or about May 13, 2003. Please note that the interview of Kevin Kearney that occurred in or about March 2003 occurred on or about March 23, 2003 in Newark, NJ. Please note that the interview of Mr. Kearney that occurred in or about August 2003, occurred on or about August 6, 2003 over the telephone. Please note that the interview of Mr. Kearney that occurred in or about October 2003, occurred on or about October 4, 2003 in Darien, CT and on or about October 8, 2003 over the telephone. Please note that the interview of Henry Silverman that occurred in or about September 2003, occurred on or about September 16, 2003 in Newark, NJ. Please note that the interview of Casper Sabatino that occurred in or about March 2003 occurred on or about March 31, 2003 in Newark, NJ. The reference to an April 2003 interview of Mr. Sabatino in the letter to you dated September 19, 2003 refers to the interview that occurred on or about March 31, 2003.

2

On or about August 5, 1998, James Plaisted, Esq. and an associate, counsel for Steven Speaks, made a proffer to AUSA Paul Weissman and FBI Special Agent Jerry Richards. This letter does not contain a full description of all information discussed by Mr. Speaks' counsel.  Counsel proffered the following:

1.  The way Speaks handled things at Ideon was different.

2.  Most of Mr. Speaks' dealings were with Pember but he had significant dealings with Corigliano and Shelton.

3.  Maybe in late summer 1997, Speaks raises the revenue and expense allocation issue with Corigliano and Pember because it does not look right to him. They say this is their system, they think it's fair, and E&Y approved it.

4.  In December, Speaks is supposed to meet with Forbes and Monaco, he has figures for them.  Pember and Corigliano meet with him first, they increase his numbers by approximately $20 million.  Speaks sees it as an arbitrary increase in the figures. Counsel does not know whether this is the first time Speaks is told to lie.

5.  During the meeting with HFS referenced in paragraph 4 above, Speaks sometimes turns to Pember and Corigliano to let them give the numbers.

6.  Speaks sees Pember as stuck in between, in a difficult spot.

7.  They were giving E&Y as little as possible as late as possible.

8.  Reserves issue doesn't hit home until December 1997.

9.  Speaks sits through a meeting where Shelton explains a chart on the reserves – – they will be using reserves to increase revenue.  January figures were high enough so they only had to use $20 million of the $25 million allocated.  Speaks says Forbes did not react but later was upset.

10.  Speaks could not understand how the reserves could be allocated from the top down. It should be his job to designate expenses caused by the merger.

11. They gave Speaks adjustments, they look like plugs to Speaks' counsel – – one as early as April 1997, but they gave him an explanation for this. Others as they go along. Speaks is troubled. At one point he raises something with Geneen of E&Y,

3

she doesn't react.

12. After the March 6 meeting, Speaks talk to Pember and says he wants to raise issues, she says no, don't talk to him, she will do it.

13. Sometime before April 9, Speaks talks to Pember and Corigliano, they try to justify it. Speaks says to Corigliano at some point he will raise it with Cendant. Corigliano says do what you have to do.

14. After the April 9 meeting, Speaks calls Pember and says this is serious, they are talking about restating financials. Did not believe her response is significant. So Speaks trusted her, did not call Corigliano. Speaks feels comfortable enough with her to raise the issues as they go along. Speaks conveys concerns to Pember, apparently she says she covered it, let's go on.

15. Speaks raises a lot of issues.

16. After March 6, Speaks starts to realize from things he's hearing that HFS has concerns and he starts thinking about telling them. At the end of March, Speaks writes memo to Pember saying in effect, maybe just implicitly, if you won't raise these issues with HFS, he will. This is the one she had told Speaks to send to her, not to Corigliano. The memo gets shrugged off again, Speaks thought she had done her best.

17. Counsel thinks Speaks would have revealed things even if Corigliano had not resigned.

On a date that is unknown, Edward Dauber, Esq., counsel for Casper Sabatino, made a proffer to AUSA Paul Weissman. This letter does not contain a full description of all information discussed by Mr. Sabatino's counsel. Counsel proffered the following:

1. Sabatino reported directly to Corigliano. Pember was at times in between, at times parallel. Direction was pretty much direct to Sabatino, but Speaks reported to Pember.

2. Sabatino and Speaks came forward sort of independently, but events made it joint.

3. Speaks was objecting to Pember, saying you have to object to new management, HFS.

4. For Sabatino, it was Corigliano doing it over 2 years.

4

Corigliano started telling Sabatino in 96 year. For Speaks it begins in 1997, when he arrives.

5. Sabatino has more of an interaction with Scott Forbes, mentions it in a preliminary way even before Corigliano leaves.

6. Corigliano originally was going to take over in two years.

7. Corigliano said to Sabatino, don't worry, it'll be made up for, said the company would do better and then they didn't.

8. There was questioning by Sabatino, then he followed orders. But he thought, he's here 13 years, in his 40s, he will lose his job.

9. Corigliano made a fortune in stock.

10. The initiation of the inquiry was from the fact that HFS was told 1998 operating results would be significantly less than projected. Sabatino was responsive, albeit quietly, while Corigliano was still there.

11. Sabatino comes across very well. Comes across as anguished. For the first 2 years, he has nowhere to go to.

Very truly yours,

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice

BY: JOHN J. CARNEY
Special Attorney
U.S. Department of Justice

BY: JAMES F. MCMAHON
Special Attorney
U.S. Department of Justice

BY: RICHARD J. SCHECHTER
Special Attorney
U.S. Department of Justice

5

# EXHIBIT 27



**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

_____

*970 Broad Street, Suite 700*                                    *(973) 645-2700*
*Newark, New Jersey 07102*

March 22, 2004

ADVANCE COPY VIA FACSIMILE

Barry S. Simon, Esq.
Williams & Connolly, LLP
725 Twelfth Street, N.W.
Washington, DC 20005

Thomas P. Puccio, Esq.
230 Park Avenue
Suite 301
New York, New York 10169

Thomas A. Arena, Esq.
Scott A. Edelman, Esq.
Milbank, Tweed, Hadley & McCloy
One Chase Manhattan Plaza
New York, NY 10005

              Re:  United States v. Forbes, et al.
                   No. 3:02CR264 (AWT)

Dear Counsel:

        Kevin Kearney met with Richard Schechter and Special
Agent John Pitman in Bridgeport, CT on March 17, 2004.  Mr.
Kearney provided the following information that may not otherwise
have been provided in materials already produced by the
Government.  This letter does not contain a full description of
all information discussed by Mr. Kearney on this date.

        1. Before Corigliano was CFO, Corigliano told Kearney not to
release the quarterly consolidations to E & Y until Walter and/or
Stu had an opportunity to bless the numbers in the draft press
release. Kearney understood the reference to Walter to mean
Walter Forbes and the reference to Stu to mean Stu Bell.  Kearney
does not know if Walter Forbes and Stu Bell reviewed the
consolidation. Kearney thinks based on what Corigliano told him
that Walter Forbes and Stu Bell reviewed the numbers in the draft
press release before Kearney was given permission to release the

DEFENDANT'S
EXHIBIT
2360

consolidation to E & Y.

2.  Kearney indicated that unsupported topside adjustments were made to the CUC column of the consolidated income statement. He thinks in later years, unsupported topside adjustments were made in the consolidated income statement to divisions or subsidiaries other than CUC.

3. Sabatino instructed Kearney that E & Y did not get a copy of the P & L reconciliation of the Comp-U-Card division. Sabatino also explained to Kearney that when an unsupported topside adjustment was made during the first three quarters of the fiscal year, the division whose financial information was adjusted was not notified and the unsupported topside adjustment was not pushed down to the subsidiary.

4.  Kearney recalls Stu Bell telling him, Corigliano and/or Sabatino on more than one occasion, that earnings per share ("EPS") needed to be a certain number. In response to Bell's statements, unsupported topside adjustments were made to achieve the EPS figure directed by Bell.

5.  Kearney does not think he sent the revised 1997 Sparks income statement that showed the addition of $9.5 million to revenue to any office other than the Stamford accounting department. Kearney did discuss the $9.5 million change to the income statement with Rick Fernandez.

6.  When Kearney worked in the Stamford accounting office he would review the reporting packages submitted by CUC International divisions and subsidiaries. Kearney noted that many of these packages indicated that the packages had been copied to Shelton. When Kearney was the controller at Sparks, he recalls submitting the Sparks monthly reporting packages to Shelton.

7.  Kearney indicated that it was Ted Gonzalez who he worked with at E & Y that used the phrase "CUC shuffle" to refer to the analytical comparisons of CUC International earnings.

8.  Kearney recalls that it was Corigliano that told him and Rick Fernandez to set up a $5.0 million purchase reserve for Spark's acquisition of Tango Communications and that it was Corigliano that later told Kearney to increase this purchase reserve by $2.0 million.

9.  Kearney was present when Corigliano, who was then CFO, and Sabatino discussed the size of an unsupported quarterly topside adjustment. Kearney heard Corigliano tell Sabatino that

2

Shelton was aware of the size of the unsupported topside adjustment.

10. Kearney did not attend any meeting with Walter Forbes and Walter Forbes did not tell Kearney directly to increase EPS. Kearney does recall that Corigliano told Kearney on more than one occasion and in almost every quarter that Walter wants the EPS to be a certain figure. Kearney understood the reference to Walter to mean Walter Forbes.  In response to Corigliano's statements, unsupported topside adjustments were made to the consolidated income statement to achieve the EPS figure that Corigliano said Walter wanted.

11. Kearney said that the word "reserves" that appears in the CUC P & L reconciliation represents unsupported topside adjustments and refers to the fact that reserves, such as merger reserves, were used at the end of the year to fill the earnings gap created by the unsupported topside adjustments.

12. When Kearney began working at CUC International in 1993, he was shown financial information by Lori Rosenberry (or Lori Rosenberg) who explained to him that unsupported topside adjustments had been made to adjust the quarterly results reported by the CUC International subsidiaries.

13. Kearney indicated that moving merger reserves into revenue is not proper accounting, there is no transaction and thus, revenue is not earned. It is Kearney's understanding that moving merger reserves into revenue at Sparks violates GAAP.

Very truly yours,

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice

By: JOHN J. CARNEY
Special Attorney
U.S. Department of Justice

By: JAMES MCMAHON
Special Attorney
U.S. Department of Justice

3

BY: RICHARD J. SCHECHTER
Special Attorney
U.S. Department of Justice

4