Corigliano breached his obligations to the government. Forbes' arguments have no merit and fail to disclose the actual bases of Judge Thompson's rulings. To the extent Judge Thompson upheld a tiny fraction of Forbes' prior subpoena demands, he did so only where he concluded that the documents sought went directly to establishing "benefits" to Mr. Corigliano that Forbes' could reasonably argue were allowed by the government and therefore might give rise to "bias" in the government's favor. Judge Thompson therefore allowed Forbes to establish: (1) the amount of money the Coriglianos were permitted to spend under the SEC budget agreement in place starting August 28, 2000 (as reflected on quarterly statements filed by the Coriglianos through March 31, 2004); (2) the amount of money the Coriglianos were permitted to spend following the last quarterly report on March 31, 2004 and up until the transfer of their assets to the Receiver on July 7, 2004 (pursuant to the SEC settlement); and (3) the amount of the legal fee retainers that, at the time of the SEC settlement, remained at Mr. Corigliano's law firm (Kramer Levin) and Mrs. Corigliano's firm (Fried Frank) and were available for their continuing legal expenses.

However, Judge Thompson drew a clear and firm line preventing Forbes from using Rule 17(c) subpoenas for obtaining documents in aid of his baseless and misleading arguments that Mr. Corigliano had breached his plea agreement and/or violated his SEC settlement by: (1) not including the amount of the Kramer Levin and Fried Frank retainers on quarterly reports filed with the SEC; (2) making expenditures between his last quarterly report prior to the SEC settlement (March 31, 2004) and the turnover of assets on July 7, 2004; or (3) failing to immediately transfer to the Receiver the balances of his and his wife's legal fee retainers.[16]

---

[16] The Coriglianos' financial disclosures to the SEC included the property in Old Saybrook for which they paid $1.7 million. That property included two adjoining parcels of land. In his pending Motion to Preclude (Forbes Third Trial Motion *In Limine* No. 1), at pages 15-16, Forbes continues to argue that the SEC consent settlement required the Coriglianos to disgorge the second plot, on which the Coriglianos' house is not physically situated. Again, however, Forbes' position is belied by the testimony of SEC attorney James Kidney, who confirmed that "[i]f they bought it in one piece, the negotiations were all about it in one piece," and that had he or the SEC focused on the

First, as to the legal fee retainers, and after extended motion practice and motions for reconsideration during the first trial, Judge Thompson made his findings clear:

- "[A] right to receive legal services valued at up to a certain amount . . . is a benefit . . . [a]nd the defense is entitled to put that benefit out before the jury." Tr. 7/30/04, at 8-9.[17]

- "I don't see how the retainer agreement does that." *Id.* at 10.

- Retainer-related documents were not admissible as "prior inconsistent statements" to challenge Mr. Corigliano's testimony that, once he paid the retainer to his lawyers, he no longer viewed it as his money. *Id.* at 12.

- There is no "legitimate basis to argue that Mr. Corigliano has cash on deposit with his counsel." *Id.* at 8.[18]

These rulings were reaffirmed by Judge Thompson during the second trial and are consistent with our argument that the premise of Forbes' position – that the legal retainer Mr. Corigliano paid Kramer Levin remained Mr. Corigliano's asset, and that therefore his testimony to

---

fact that there were two separate parcels, "I don't think it would have made any difference." Tr. 9/24/04, at 13531. This testimony is consistent with Mr. Corigliano's testimony that all of his total property was disclosed and "[n]othing was kept from them." Tr. 7/20/04, at 8171-72.

[17] As we note below, we will comply with Judge Thompson's prior rulings that Forbes is entitled to know the remaining balance of the Kramer Levin retainer and will provide that updated information in the form it was provided in the prior two trials – i.e., a letter from our accounting department setting forth the amount. Judge Thompson found that this letter "reflects all of the information defendant Forbes is entitles to introduce into evidence on this topic [and] any additional documents obtained by defendant Forbes pursuant to the subpoena would be excluded pursuant to Rule 403 as cumulative." Gonedes Ruling at 2 (Ex. C).

We add, however, that Forbes' argument that the SEC somehow conferred on Mr. Corigliano a special "benefit" by allowing him to continue to use the retainer for his legal defense is belied by the fact that defendant Forbes to this day enjoys the same so-called "benefit" of not having the SEC attempt to interfere with or confiscate the tens of millions of dollars paid to his attorneys to defend him, notwithstanding evidence from the 2005 trial establishing that Forbes attempted to secrete his assets – contrary to the advice of his then-counsel, *see* Tr. 11/9/05, at 2443-44 – by transferring millions of dollars worth of property to family members following the revelation of accounting irregularities at CUC/Cendant.

[18] Ignoring Judge Thompson's express finding on this point, Forbes continues to almost tauntingly characterize the retainers as monies the Coriglianos had "*on deposit*" with their counsel. Forbes Mem. at 23 (emphasis added).

the contrary must be false – is simply wrong.  Specifically, New York law is clear that an attorney may receive a retainer as an advance payment of legal fees and the funds so received are the lawyer's and are not client funds, absent explicit agreement to the contrary.    That is so notwithstanding the lawyer's obligation and agreement to return any portion of the fee that is not earned in rendering legal services.  In our prior briefs, we cited to the Court New York State Bar Association Committee on Professional Ethics Opinion 570 (June 7, 1985), 1985 WL 57057, at *1-3 (Ex. G), the leading authority on this point: "Although the lawyer receiving an advance fee payment has a legal and ethical obligation to render the services agreed upon and to refund any unearned portion of the fee advanced, it does not follow that the advance remains client property until earned.  Normally, when one pays in advance for services to be rendered or property to be delivered, ownership of the funds passes upon payment, absent an express agreement that the payment be held in trust or escrow, and notwithstanding the payee's obligation to perform or to refund the payment." *See also* KL Attorneys Ruling at 2 (Ex. D) (adopting our counter-statement of facts, including citation to Opinion 570).  The Opinion is fully consistent with Mr. Corigliano's common sense and accurate understanding that, once paid, the retainer was no longer his.[19]  *See* Tr. 7/30/04, at 10 (Court: "I've gotten representations from Mr. Corigliano's counsel and from the government which . . . are consistent with Mr. Corigliano's testimony that it's not his cash on deposit with the law firm."); 7/20/04, at 8127.

Second, as to the disposition of any remainder of the Kramer Levin and Fried Frank retainers, the undisputed facts in the record are that, prior to the signing of the SEC consent agreement, counsel specifically advised the SEC of Kramer Levin's retainer from Mr. Corigliano and Fried Frank's retainer from Mrs. Corigliano.  The record is similarly undisputed that we also

---

[19]  We note as well that the same arguments and conclusions with respect to the Kramer Levin retainer apply to the retainer paid by Mrs. Corigliano to Fried Frank, where her representation was led by Harvey Pitt, later appointed Chairman of the SEC.

KL3 2511034 11

confirmed to the SEC staff that none of these amounts would ever go back to the Coriglianos, and to the extent some or all of it was left after payment of legal expenses, it would be given to the receiver. *See* Tr. 8/2/04, at 9124-26. The government confirmed on the record our representations concerning the disclosure of the retainers. *See* Tr. 8/2/04, at 9279, 9284-85; 7/26/04, at 8715-16. And Mr. Corigliano testified consistently with these representations that "whatever is left [of the retainers] I have no expectations of getting. It will go to the receiver and the receiver will do with it what is appropriate." Tr. 7/20/04, at 8113-14. SEC Enforcement attorneys James Kidney and David Frohlich also confirmed in their testimony that before entering into the April 16, 2004 settlement with the Coriglianos, the SEC was aware of the retainers and how they would be treated. *See* Tr. 9/23/04, at 13512-14; Tr. 9/27/04, at 13602-03. And as Judge Thompson found, attorney Frohlich specifically testified that Mr. Corigliano could use the remainder of the Kramer Levin retainer to pay "reasonable ongoing legal fees," and "the question of the use of the retainer was covered by the consent and judgment between Corigliano and the S.E.C." Nov. 1, 2005 Order at 4-5 (Ex. A) (quoting Tr. 9/27/04, at 13604:13-16).

Third, as to whether under the terms of his SEC consent settlement Mr. Corigliano properly made expenditures between March 30, 2004 and the turnover of his assets on July 7, 2004, Forbes fails to disclose that, contrary to his own self-serving and far-fetched interpretation of that agreement, Mr. Corigliano's understanding of the SEC settlement – that it allowed him to continue to pay ordinary and reasonable expenses up to the turnover of assets, *see* Tr. 8/3/04, at 9389-412 – is shared by the only other party to that agreement, the SEC. As Judge Thompson noted in agreeing that Forbes was "pressing [a] self-created fiction" on this point, SEC attorney Frohlich testified that Mr. Corigliano could continue his "reasonable expenses." Nov. 1, 2005 Order at 3-4 (Ex. A) (quoting Tr. 9/27/04, at 13608:15-23). Judge Thompson further noted that "Frohlich also testified that 'he could make reasonable expenses. Everything would be subject, however to the receiver's

report to the court pursuant to the consent and judgment which was going to come after this.'" *Id.* at 4 (quoting Tr. 9/27/04, at 13609:22-25).

Fourth, on the general issue of whether Mr. Corigliano violated his financial disclosure obligations with respect to the government, Judge Thompson squarely rejected Forbes' reliance – which continues in his most recent submissions – on *United States v. Lynn*, 856 F.2d 430, 432-33 (1st Cir. 1988), in which a conviction was reversed because the district court had improperly cut off cross-examination of a cooperating witness concerning a possible violation of his plea agreement. As Judge Thompson recognized, in *Lynn*, the facts that the defense was arguing breached the cooperation agreement – specifically, an inconclusive result on a lie detector test, where the agreement required that the witness pass such a test – were essentially undisputed by the parties. Contrasting *Lynn* with the situation here, Judge Thompson explained:

> Here, what I see in front of me, is a situation where there's an agreement between the government, the U.S. Attorney's Office in New Jersey and Mr. Corigliano. It incorporates an obligation to the SEC. And the SEC, as I understand the testimony and everything I've seen from the SEC, has not said anything that really supports a conclusion that Mr. Corigliano is in breach of the plea agreement.
>
> U.S. Attorney's Office in New Jersey isn't persuaded, based on what I see and hear, that Mr. Corigliano has breached the agreement. Mr. Corigliano has taken the position he's complied with the plea agreement.
>
> So we have a third party coming in where everybody who's involved in the agreement is saying, there is no breach, and wanting to now have a trial off to the side to show there was a breach. And in order to show there was a breach, bring out in front of the jury a lot of things that otherwise would not come before the jury.

*See* Tr. 11/7/05, at 19-20. Judge Thompson further found: "[T]he defense had quite an opportunity to probe and try to demonstrate that Mr. Corigliano had not been living up to his obligations . . . which he's required to live up to under the plea agreement. I think everything that came out showed that the defense's contentions lacked merit." *Id.* at 22. In addition, as set forth below, Judge Thompson made similar findings in his written ruling quashing Forbes' Rule 17(c) subpoenas issued to the SEC during the 2005 trial. *See infra* note 22 & Ex. I ("Forbes is the only person taking

21

the position that Corigliano has failed to live up to his obligation under the plea agreement to provide complete and accurate information to the SEC.").

Finally, Forbes' continuing baseless assertion that Mr. Corigliano received "special treatment" from the SEC because of his cooperator status is flatly contradicted by the testimony of SEC attorney James Kidney. When asked whether Mr. Corigliano or Ms. Pember were "given any special accommodations because they're cooperators here in this federal case," Mr. Kidney responded unequivocally that they "were not." Tr. 9/23/04, at 13527. He also testified that Mr. Corigliano did not get a "sweetheart deal" and added that "in terms of this case, . . . Mr. Newkirk [then Associate Director of the SEC Division of Enforcement] in particular is very strongly against arguments that cooperating witnesses should get special treatment with the SEC." *Id.*

## V.    THE COURT SHOULD ADHERE TO JUDGE THOMPSON'S MANY PRIOR RULINGS AND DENY FORBES LEAVE TO SERVE HIS DUPLICATIVE DEMANDS

Forbes concedes in his motion for leave to issue Rule 17(c) subpoenas relating to Mr. Corigliano that the overwhelming number of his proposed subpoena demands – 149 out of 157 calls – are "substantially identical" to requests served prior to or during the first two trials, which Judge Thompson quashed.[20]  Forbes Mem. at 13.  As we now explain, Forbes provides no basis for this Court to reject Judge Thompson's carefully considered prior rulings.

---

[20] As to Forbes' 8 requests seeking supplemental production, Forbes Ex. A, 1-4; Forbes Ex. B, 1-3; Forbes Ex. C, 1, we will provide the same information in the same format as was provided in the prior trials – i.e., a letter from Kramer Levin with an updated balance of the retainer (we understand Fried Frank will do the same with respect to their retainer) and of the amount of fees advanced by Cendant during the relevant time period. As for the requests for documents from Mr. Corigliano sufficient to establish the dates of meetings with the government following the 2005 trial, we again represent that Mr. Corigliano has no such records.

A.    **Correspondence with the SEC and with the
United States Attorney's Office Concerning the SEC**

Forbes seeks production from Mr. Corigliano and Kramer Levin of all correspondence with the SEC or with the U.S. Attorney's Office relating to the SEC from January 1, 2000 to the present. *See* Forbes Ex. A, 5-6; Forbes Ex. B, 4-5. These duplicative requests were quashed by Judge Thompson on multiple occasions, most recently following extensive briefing and oral argument on November 7, 2005, in the midst of the second trial, principally for the reasons set forth in our Memorandum dated November 6, 2005. *See* Tr. 11/7/05, at 29-30.

In that Memorandum, which is attached hereto as Exhibit H, we pointed out that Forbes was proceeding on the misleading assumption that certain asset "transfer" information that we provided to the SEC was intended to be all-inclusive, when in fact, following negotiations between counsel, only certain asset "transfer" information was provided at that time. *Id.* at 5-7. We also argued, as Judge Thompson repeatedly found, that because the documents sought by Forbes were prepared and signed only by Mr. Corigliano's counsel, they were not admissible to impeach him by contradiction or prior inconsistent statement or otherwise.[21] Finally, we pointed out that injecting correspondence with the SEC would distract the jury with a trial-within-the-trial on settlement negotiations and disagreements between counsel, which Mr. Corigliano would not be able to testify about without divulging privileged communications.

Forbes simply repeats his baseless claims that: (1) Mr. Corigliano resisted providing financial information to the SEC; (2) he received special treatment from the government; and (3) his financial disclosures to the SEC were inaccurate and amount to a breach of his plea agreement. The absence of any grounds for reconsideration is reason enough to deny Forbes' application. And as

---

[21] *E.g.*, Tr. 6/1/04, at 2648-49 ("You cannot impeach someone with their attorney's statements."); *United States v. Cuevas Pimentel,* 815 F. Supp. 81, 83 (D. Conn. 1993) (Cabranes, C.J.) ("[I]t is clear that, as a general matter, Rule 613(b) does not permit an attorney's statements to be introduced as prior inconsistent statements of that attorney's client.").

previously set out in Point IV, and argued in greater detail in our November 6, 2005 Memorandum, the record belies any claim that Mr. Corigliano received "special treatment" or hid his assets from the SEC (and to the extent he received any "benefit," it was reflected in the consent agreement, which Forbes has had for two years).[22]

> ### B.    Documents Reflecting Communications with the Government and Cendant that Were Copied to Cosmo Corigliano, Including Kramer Levin Subpoena Exhibits A-V

Forbes demands from Kramer Levin "all documents" that may have been exchanged by (1) Mr. Corigliano or his counsel, and (2) the government or Cendant, to the extent such documents were either cc'd to or are in the possession of Mr. Corigliano. *See* Forbes Ex. B, 6-11. These requests are identical to the six subpoena demands issued to Kramer Levin in connection with the 2005 retrial, all of which Judge Thompson quashed for "substantially the reasons set forth at pp. 28-31 of the Amended Memorandum and pp. 15-16 of the Reply memorandum" filed by Kramer Levin.[23]  Nov. 1, 2005 Order at 7 (Ex. A).  As we argued there:

> The demands still constitute an incredibly broad, non-specific "all documents" "fishing expedition" covering multiple years and still not even limited by particular subject matter. The current demands still improperly seek materials for the obvious purpose of attempting to impeach Mr. Corigliano on collateral matters such as whether he was cc'd on certain correspondence with the SEC and what communications if any he was aware his counsel was having with the government or other third parties. In fact, the latest demands and the limitation to materials cc'd to or in the possession of Mr. Corigliano are even more objectionable than the predecessor requests, as Forbes now attempts to invade Mr. Corigliano's attorney-client relationship, to "fish" around and see what Mr. Corigliano's counsel sent him

---

[22] Forbes also seeks similar documents directly from the SEC and the U.S. Attorney's Office.  Prior substantially identical requests were quashed by Judge Thompson.  Ruling on Motion of the Securities and Exchange Commission to Quash Two Subpoenas Seeking Testimony and Documents from its Records Custodian (Nov. 5, 2005) [hereinafter SEC Ruling] (Ex. I).  In addition, as we previously argued, *see supra* note 11, Rule 17(c) should not be used to circumvent limits on discovery imposed by Rule 16 and the Jencks Act, and thus to the extent there is any argument that such correspondence with the government is producible at all, it should be decided as a question of the government's discovery obligations.

[23] These memoranda are attached hereto as Exhibits J and K, respectively.

and didn't send him, and to put that collateral, distracting, confusing and irrelevant issue before the jury.

Forbes offers no basis for reconsideration of Judge Thompson's rulings. The predicates for Forbes' arguments are, moreover, specious and misleading. He claims that Mr. Corigliano used his attorneys as a "shield" to provide misleading information to the SEC about the value of his assets, including by disclosing to the SEC only the purchase price of his property. Forbes Mem. at 15-18. But the Coriglianos' SEC quarterly reports clearly and consistently disclosed that the value of the Corigliano residence had not been recalculated from the original purchase price (an example is attached as Exhibit N) and was not being adjusted on a quarterly basis. As to the "comparable" property forwarded to the SEC by counsel, Forbes essentially concedes that he is fishing for documents to impeach Mr. Corigliano's testimony on the wholly collateral issue of what Mr. Corigliano knew about the back-and-forth between his attorneys and the SEC. As such collateral impeachment is plainly prohibited, it provides no basis for reconsidering Judge Thompson's prior rulings.

C.    **Budget and Living Expense Information and Other Financial Information Mr. Corigliano Provided to His Counsel**

Forbes next demands production of budget and living expense information, as well as other financial information, that Mr. Corigliano provided to his attorneys. *See* Forbes Ex. A, 7-8; Forbes Ex. B, 12-13. In quashing identical prior demands, and in response to Forbes' argument – repeated in his present memorandum – that such information is relevant to show the benefits received by Mr. Corigliano, Judge Thompson ruled during the 2005 retrial that "the benefits that the government permitted Corigliano to enjoy are reflected in the periodic reports sent by Corigliano's counsel to the S.E.C. (all of which have been provided to defendant Forbes), and it is clear that defendant Forbes seeks Corigliano's communications with his counsel solely with a view toward finding support for a back door attack on Corigliano's credibility" on a collateral matter. Nov. 1,

2005 Order at 8 (Ex. A). During the 2004 trial, Judge Thompson similarly stated with respect to these same demands, "I can't figure out any theory under which the defendants are entitled to that information. And I read the papers over and over again and still can't." Tr. 7/30/04, at 16.

Forbes simply rehashes his previously rejected arguments, including the claim that these communications between Mr. Corigliano and his counsel are not privileged. Forbes' argument on the privilege point continues to be erroneous as a matter of law and on the factual record in this case.[24] Moreover, Forbes proffers no basis for reconsideration of Judge Thompson's rulings that the documents sought are neither admissible nor necessary to make his points – whether privileged or not. And his continuing speculation that these documents could establish that Mr. Corigliano breached his plea agreement by not disclosing the retainer he had paid to Kramer Levin is based on false premises, as discussed in Point IV, above.

---

[24] The cases Forbes continues to cite involved circumstances where information conveyed by a client to an attorney that expressly was intended to be, and in fact was, reduced by the attorney to a writing for public disclosure. *See United States v. Tellier*, 255 F.2d 441, 447 (2d Cir. 1958) (information not privileged where attorney says he will write letter "substantially setting forth the telephone conversation" with client and send it to third parties); *United States v. Rosenthal*, 142 F.R.D. 389, 391-92 (S.D.N.Y. 1992) (information relating to auditor's report not privileged where report was expressly intended for disclosure, and was disclosed, to government); *United States ex rel. Stone v. Rockwell Int'l Corp.*, 144 F.R.D. 396, 399 (D. Colo. 1992) ("counsel merely acted as a conduit in taking factual material supplied by the client and relaying that material to the government" in form of written *qui tam* disclosure statement).

In contrast to *Tellier* and these other cases, however, we never acted as "mere conduits" of information between Mr. Corigliano and the government in any respect. Indeed, as indicated above, Judge Thompson repeatedly rejected such arguments based on our representations as well as the evidence presented at trial. *See, e.g.*, Tr. 11/3/05, at 1989-94, 2000; Tr. 11/7/05, at 29-31. *See In re Von Bulow*, 828 F.2d 94, 102 (2d Cir. 1987) (holding that "the extrajudicial disclosure of an attorney-client communication – one not subsequently used by the client in a judicial proceeding to his adversary's prejudice – does not waive the privilege as to the undisclosed portions of the communication," and distinguishing *Tellier*).

**D.** **September 2003 Asset Information**

Forbes seeks "*all documents*" provided by, and "*all documents*" describing or memorializing information provided by Mr. Corigliano to Kramer Levin, apparently relating to a September 4, 2003 letter from Kramer Levin to the SEC providing certain information, including information concerning the Coriglianos' assets. *See* Forbes Ex. A, 9-10; Forbes Ex. B, 14-15. In quashing prior identical demands, Judge Thompson adopted the reasons set forth in our Amended Memorandum (Ex. J at 44-45) and our Reply Memorandum (Ex. K at 23), *see* Nov. 1, 2004 Order at 10 (Ex. A):

> To the extent any such documents or information was turned over to the government, Forbes has it – in the form of the September 4, 2003 letter and the exhibits thereto . . . and he is entitled to nothing more. His demands to know what else Mr. Corigliano may have provided to Kramer Levin that he speculates may not have been disclosed to the government and to inspect imagined internal Kramer Levin confidential work-product relating to any such information are nothing more than improper attempts to pry into the attorney-client relationship, fish around to see what might turn up, and gain access to privileged and confidential client-to-attorney communications and attorney work-product, all for the improper purpose of hoping to find something with which to impeach Mr. Corigliano on a collateral issue. . . .

Again, Forbes does not even attempt to provide any new argument or facts to warrant reconsideration. Instead, he simply repeats his contention – rejected and discredited by Judge Thompson on multiple occasions, *see supra* Part I – that "Mr. Corigliano's attorneys appear to have been nothing more than a conduit for this information," and then, in conclusory fashion and without any attempt to address issues of relevancy or admissibility or "fishing expedition," simply asserts that "the subpoena should be allowed." Forbes Mem. at 21.

**E.** **Receiver Documents**

Forbes' current subpoena to Neil Cartusciello, Esq., the court-appointed receiver overseeing Mr. Corigliano's SEC settlement, contains fourteen separate calls – every one of which begins with the presumptively improper fishing expedition language "*all documents*" – seeking in effect the Receiver's entire file, including but not limited to: (1) communications between the

27

Receiver and (a) Mr. Corigliano, (b) his wife, (c) his mother-in-law, (d) all of their counsel, (e) the

SEC, and (f) the U.S. Attorneys Office, all concerning the SEC settlement and the Kramer Levin

and Fried Frank retainers; and (2) all documents relating to the turnover of the Corigliano family

assets to the Receiver. *See* Forbes Ex. D.[25]  In addition, counsel for Forbes seeks again to invade

Mr. Corigliano's attorneys' work files, demanding that Kramer Levin produce "all documents" sent

to or received from the Receiver, to the extent copies of such documents were also sent to or

received by Mr. Corigliano. *See* Forbes Ex. B, 8.

   Judge Thompson quashed these identical demands for the reasons set forth in our

Amended Memorandum (Ex. J at 46-48) and our Reply Memorandum (Ex. K at 24). *See* Nov. 1,

2005 Order at 10 (Ex. A).  As we pointed out in these pages:

> It hardly needs repeating that this series of "all documents" demands, which would
> capture virtually every memo, email and note that the Receiver (or his counsel)
> created in discharging his obligations and every document exchanged between
> Kramer Levin and the Receiver, represents a classic improper fishing expedition in
> the "hope" that something might turn up. . . .  In addition, it is difficult to imagine
> how the Receiver's notes or memos concerning hearsay conversations with Mr.
> Corigliano's wife or mother-in-law or their attorneys, or even with counsel for the
> SEC or representatives of the U.S. Attorney's Office, could be anything more than
> inadmissible double or triple hearsay, failing the most basic test for a Rule 17(c)
> demand – admissibility.

   Unable to point to any errors or new facts that would support reconsideration of the

prior ruling, Forbes recasts his arguments as challenges to the Receiver's actions – specifically, the

Receiver's alleged "failures to carry out the plain terms of the consent."  Forbes Mem. at 22.

Forbes then resuscitates his specious assertions that, under the terms of the SEC settlement, Mr.

Corigliano should have disgorged the balance of the Kramer Levin and Fried Frank retainers and

---

[25] Forbes also seeks exactly the same documents from the SEC. *See* Forbes Ex. F, 14-19.  These
requests in turn are identical to requests served on the SEC in connection with the 2005 trial, which
Judge Thompson quashed in large part as described above. *See* SEC Ruling (Ex. I).

also was not permitted to make ordinary expenditures between March 31, 2004 and the turnover of

his assets on July 7, 2004. Neither of these claims has merit, as we established in Point IV.

### F.    Kramer Levin and Fried Frank Retainer Agreements

With respect to the retainer agreements between Mr. Corigliano and Kramer Levin

and Mrs. Corigliano and Fried Frank, the repetitive 2006 demands include: (1) "all documents

describing or memorializing agreements" between Mr. Corigliano and Kramer Levin with respect to

the retainer; and (2) "all documents describing or memorializing agreements" between Mr.

Corigliano and the SEC pertaining to the retainer. *See* Forbes Ex. A, 11, 13; Forbes Ex. B, 16;

Forbes Ex. C, 2. These documents were specifically requested and subject to briefing numerous

times during the 2004 and 2005 trials and were the subject of at least four separate rulings – each

one rejecting the demand for the retainer and any related agreements.

Thus, during the first trial in 2004, Judge Thompson concluded that the requested

documents were being sought to impeach Mr. Corigliano's testimony that once he paid the retainer

to Kramer Levin he did not view it as his money, *see, e.g.,* Tr. 7/20/04, at 8110-14, and not to show

bias or a benefit conferred by the government. *See* Tr. 7/26/04, at 8606-07. Judge Thompson again

rejected renewed demands for the retainer and related agreements prior to the 2005 retrial, *see* Nov.

1, 2005 Order at 2-3 (Ex. A), adopting the reasons set forth in our memoranda in support of our

motion to quash, including our argument that:

> As we pointed out in our opening memorandum, *see* Amended Motion at 20-21, the
> Court has already rejected each of these arguments more than once – finding among
> other things that the whole line of inquiry represents an improper attempt to impeach
> Mr. Corigliano on a plainly collateral issue and that the retainer agreement was not
> discoverable by way of a Rule 17(c) subpoena – and Forbes offers no reason
> whatsoever to revisit those correct prior rulings. We add only that, as to the
> continuing baseless claim that the retainer was an "asset" of the Coriglianos that was
> not properly disclosed to the SEC, the government has joined us in representing that
> the retainer was disclosed prior to the SEC settlement, *see* Tr. 7/26/04, at 8715-16;
> Tr. 8/2/04, at 9279, 9285, the Court has found that there is no "legitimate basis to
> argue that Mr. Corigliano has cash on deposit with his counsel," Tr. 7/30/04, at 8,
> and the Court also has rejected Forbes' crime-fraud argument based on the claim that

the retainers (held by both us and, as to Mrs. Corigliano, separately by lawyers at the Fried Frank firm) should have been included in written disclosures to the SEC. *See* Tr. 8/2/04, at 9121.

Reply Mem. at 12 (Ex. K).[26]

> Forbes offers no new argument in support of his demands for the Kramer Levin and Fried Frank retainer agreements.[27]  Instead, he simply repeats the same arguments made during the first two trials, refuted in Point IV, above.  Forbes attempts to make much of the fact – disclosed prior to Mr. Corigliano's cross-examination at the 2005 retrial – that, after Mr. Corigliano entered into his plea agreement in this case, Kramer Levin voluntarily refunded $1 million of the retainer.  Forbes Mem. at 24.  But this fact in no way undermines the correctness of Judge Thompson's prior rulings, consistent with governing New York law and the factual record, that there is no "legitimate basis to argue that Mr. Corigliano has cash on deposit with his counsel," *see* Tr. 7/30/04, at 8 (quoted in Point IV, *supra*), or Mr. Corigliano's common sense and accurate understanding that, once paid, and unless and until refunded in part or in whole, the retainer was no longer his.[28]

---

[26] As to the continuing demands for imagined additional "secret side agreements" between the Mr. Corigliano and the SEC, it suffices to say – as we have stated many times before – that there are no additional written agreements.  The understanding between the parties as to the disposition of the retainers is as described in Point IV, above.

[27] Forbes' demands for documents relating to the retainer that Mrs. Corigliano paid to her attorneys at Fried Frank similarly have been previously rejected by Judge Thompson, who found during the 2004 trial that "the documents called for reflect lines of inquiry calculated solely to bolster the defendants' attack on Corigliano's credibility during their cross-examinations of him, as opposed to identifying particular benefits that were or could be received by Corigliano as a result of his settlement with the SEC." *See* Ruling on Motion of Non-Parties Audrey Strauss and Fried Frank to Quash Subpoenas Seeking Trial Testimony and Documents at 2.  Judge Thompson reaffirmed this ruling in the face of identical demands prior to the 2005 retrial, *see* Nov. 1, 2005 Order at 3 (Ex. A), adopting our point that "not even counsel for Mr. Forbes contends that Mrs. Corigliano's retainer agreement with the Fried Frank firm could be a 'statement' admissible to impeach Mr. Corigliano." Reply Mem. at 12 (Ex. K).

[28] Forbes' single new proposed subpoena demand in this respect – aimed at determining the precise date when the $1 million was returned to Mr. Corigliano – is supported by no argument and is irrelevant and inadmissible for all of the reasons previously stated.  It also bears noting that the $1

**G.    Communications Between Mr. Corigliano and
        Kramer Levin Between April 1998 and January 2000,
        and Kramer Levin's Attorney Presentations to the Government**

In a series of proposed demands that comprise what is perhaps the most egregious attempt to invade the privileged attorney-client relationship between Mr. Corigliano and Kramer Levin, defendant Forbes seeks from Kramer Levin and from Mr. Corigliano "all documents describing or memorializing" information that Mr. Corigliano provided to Kramer Levin relating to: (1) "the events at Cendant," (2) "denials of wrongdoing by Mr. Corigliano," and (3) "allegations that persons other than Mr. Corigliano were responsible for wrongdoing at Cendant," as well as "all documents describing or memorializing any communications with the government prior to January 2000 advising any representative of the government of any of" these three categories of the information. *See* Forbes Ex. A, 14-17; Forbes Ex. B, 18-21.  Forbes also requests "all documents describing or memorializing" Kramer Levin communications with the government prior to January 1999, including any attorney notes of such communications. *See* Forbes Ex. B, 17.

Collectively these repeat demands comprise Forbes' crime-fraud arguments – i.e., his claims that Mr. Corigliano's communications with Kramer Levin during the period prior to his guilty plea when he (falsely) was denying his guilt, and our work product reflecting those communications, have lost their privileged status.[29]  Identical subpoena demands issued by Forbes in connection with the 2005 trial were quashed by Judge Thompson for the reasons set forth in our Amended Memorandum (Ex. J at 31-33) and our Reply Memorandum (Ex. K at 16).  *See* Nov. 1, 2005 Order at 7 (Ex. A).  As we explained in those pages:

---

million that was returned to Mr. Corigliano was reflected in the assets he disclosed to the SEC, and which were ultimately disgorged to the Receiver.

[29] Similar arguments were made – and rejected by Judge Thompson – with respect to another government witness, Anne Pember, and communications with and by her counsel, Helen Gredd. *See* Tr. 6/1/04, at 2644-59.

KL3:2511034.11

[D]uring the first trial both defendants Forbes and Shelton tried repeatedly to obtain from Ms. Pember's counsel and from Kramer Levin all documents – including documents relating to privileged attorney-client conversations – concerning our pre-plea attorney discussions with the government, and, from Kramer Levin, all documents concerning Mr. Corigliano's so-called "innocence proffer" in January 1999.  After extensive briefing and argument, the Court repeatedly rejected these requests, after we and Ms. Pember's counsel argued, under *United States v. Newell*, 192 F.R.D. 587, 589 (N.D. Ill. 2000), that statements made during attorney proffers with the government in no way call into question the privileged status of any pre-meeting communications between a client and his or her attorney and that, as a matter of practice, presentations by attorneys at such meetings involve nothing more than hypotheticals.   In addition, the Court reiterated its determination that presentations by an attorney to the government are not admissible unless they are statements explicitly made or adopted by the client.  *See* Tr. 6/1/04, at 2644-59; 6/2/04, at 2865-67; 6/3/04, at 3194.

The Court further concluded that attorney notes or memoranda that were never adopted by Mr. Corigliano are simply not statements attributable to him, and as such they are not admissible at trial.  Accordingly, demands for their production could not satisfy *Nixon's* admissibility requirement.  *See* Tr. 5/20/04, at 1530 (citing, among other cases, *United States v. Almonte*, 956 F.2d 27 (2d Cir. 1992), and *United States v. Weissman*, No. 01 CR 529 (BSJ), 2002 WL 31875410 (S.D.N.Y. Dec. 26, 2002)).  *Accord United States v. Perez*, No. 3:02 CR 7 (JBA) (D. Conn. Apr. 23, 2004) (Arterton, D.J.) (quashing subpoena calling for attorney notes of client proffer sessions); *United States v. Triumph Capital Group, Inc.*, 3:00 CR 217 (EBB), 2003 WL 23318898, at *1 (D. Conn. June 5, 2003) (Burns, D.J.) (same).  *See also United States v. Cuevas-Pimental*, 815 F. Supp. 81, 83 (D. Conn. 1993) (Cabranes, C.J.) ("[I]t is clear that, as a general matter, Rule 613(b) does not permit an attorney's statements to be introduced as prior inconsistent statements of that attorney's client."). (Footnotes omitted.)

Also, and dispositively with respect to Forbes' proposed new demands, we noted in the pages of our argument adopted by Judge Thompson that: "as to defendants' prior claims that any privilege as to these attorney-client communications was vitiated by the crime-fraud exception, the Court rejected their attempts to satisfy the burden of showing 'probable cause' and rebuffed demands for an evidentiary hearing on multiple occasions," *see* Amended Mem. at 33 n.36 (Ex. J) (citing Tr. 7/19/04 at 7820-21; Tr. 7/20/04 at 8030; Tr. 8/2/04 at 9121), and "there is no reason for the Court to countenance Forbes' attempted third or fourth bite at the crime fraud apple."  Reply Mem. at 16 (Ex. K).

Forbes' current crime-fraud arguments are taken almost verbatim from his Supplemental Memorandum dated July 21, 2004 (Forbes Trial Motion No. 22) at pages 3-5, point to no new facts, and do not even attempt to identify any clear legal error. Indeed, he offers this Court no explanation as to how the documents he seeks – including privileged notes and memoranda written by Kramer Levin attorneys – could possibly be admissible to impeach Mr. Corigliano, notwithstanding Judge Thompson's prior correct rulings that such materials would not be admissible for that purpose. Instead, he simply argues that such documents would not be privileged – which hardly proves that they satisfy the *Nixon* criteria.

Beyond these overarching procedural and *Nixon* deficiencies, the fact remains that Forbes' crime-fraud arguments are without legal or factual merit for the reasons that previously persuaded Judge Thompson to repeatedly reject them – i.e., the arguments set out principally at pages 4 through 12 of our July 18, 2005 Memorandum in Response to Crime-Fraud Arguments Raised by Defendant Forbes in Letter Dated July 16, 2004, which we incorporate herein by reference and attach in relevant part as Exhibit L hereto.[30]

## H.    Polygraph-Related Documents

Whether Forbes may introduce evidence or cross-examine Mr. Corigliano about two polygraph exams has already been the subject of extensive briefing, oral argument, and at least *four* prior rulings by Judge Thompson *precluding all such evidence or inquiry*.

Judge Thompson's first ruling on the polygraph issues arose during the first trial in response to the government's motion to preclude, dated June 29, 2004. While defense counsel

---

[30] Similarly, with respect to Forbes' half-hearted demand for an evidentiary hearing outside the presence of the jury to attempt to bolster a crime-fraud argument that is otherwise unsubstantiated, we note that Judge Thompson rejected this request during the 2004 trial, *see* Tr. 8/2/04, at 9121, following our arguments that Forbes failed to cite a single precedent authorizing or allowing such a procedure and that his invocation of *United States v. Zolin*, 491 U.S. 554 (1989), was misplaced, as that case says nothing about evidentiary hearings and requires the party challenging the privilege to make an initial showing of crime fraud, which Forbes has failed to do here. *See* Kramer Levin Mem. dated July 23, 2004, at 11-12.

argued that they should be permitted to cross-examine Mr. Corigliano concerning any inconsistent statements he made during the polygraph examination and his efforts to avoid prosecution by authorizing his counsel to advise the government that he had done well on a polygraph examination, despite his guilt, Judge Thompson expressed concern that the defendants' prior inconsistent statements theory did not have high probative value, and that without knowing what questions were asked in each of the two polygraph examinations there was a risk that any inquiry into them might lead to a "battle of the polygraph examiners," and thereby invade the province of the jury. *See* Tr. 7/19/04, at 7796, 7813-14. The next day Judge Thompson granted the government's motion to preclude, *see* Tr. 7/20/04, at 8030-31, and also quashed a subsequent attempt to relitigate the polygraph issues the very next day, *see* Tr. 8/2/04, at 9121.

Prior to the 2005 retrial, Judge Thompson again quashed these demands, adopting the arguments set forth in our Amended Memorandum (Ex. J at 33-35) and our Reply Memorandum (Ex. K at 16-19), *see* Nov. 1, 2005 Order at 7 (Ex. A):

> Nothing has changed since the Court ruled – and then ruled again – that the polygraph evidence should not be admitted. The Court's decisions are consistent with the overwhelming weight of authority finding that polygraph evidence is generally unreliable,[31] tends to usurp the credibility determination reserved for the jury,[32] is more prejudicial and misleading than probative,[33] and is inappropriate as a

---

[31] *United States v. Scheffer*, 523 U.S. 303, 303, 309-12 (1998) ("there is simply no consensus that polygraph evidence is reliable"); *United States v. Messina*, 131 F.3d 36, 42 (2d Cir. 1997) declining to hold "for the first time that polygraph evidence may be taken into account" and affirming district court determination that proffered polygraph evidence was "not worthy of credit"); *United States v. D'Angelo*, No. 02-CR-399 (JG), 2004 WL 315237, at *27 (E.D.N.Y. Feb. 18, 2004) ("Polygraphs are insufficiently reliable even for use as impeachment, let alone as affirmative evidence."); *Meyers v. Arcudi*, 947 F. Supp. 581, 583-85, 587-88 (D. Conn. 1996) (Dorsey, J.) (canvassing Second Circuit case law on the admissibility of polygraph evidence before and after *Daubert* and finding the proffered polygraph evidence insufficiently reliable to be admissible under *Daubert* and Rule 702).

[32] *Scheffer*, 523 U.S. at 313-14.

[33] *See, e.g., United States v. Kwong*, 69 F.3d 663, 668 (2d Cir. 1995); *United States v. Canter*, 338 F. Supp. 2d 460, 465 (S.D.N.Y. 2004) ("In light of the strong likelihood that a jury would place

basis for cross-examination of a government cooperating witness.[34]  It follows, necessarily, that all of Forbes' new demands for polygraph-related documentation – which represent at minimum an attempted third-bite at the apple – are patently improper under Rule 17(c)'s admissibility and relevancy requirements and should be summarily quashed.

Judge Thompson also denied an *in limine* motion filed by Forbes for permission to examine Mr. Corigliano on polygraph examinations, holding: "As a threshold matter, the court notes that what Corigliano knows about the polygraph examination is part of protected attorney-client communication and that the work of the polygraph examiner is also protected by the attorney-client privilege."  Ruling on Forbes' Retrial Motion *in Limine* No. 21 (Nov. 12, 2005), at 1 (Ex. M) (citing *Brown v. Trigg*, 791 F.2d 598, 601 (7th Cir. 1986), and *Occidental Chem. Corp. v. OHM Remediation Servs.*, 175 F.R.D. 431, 436-37 (W.D.N.Y. 1997), among other cases).[35]  Judge Thompson also reiterated his ruling from the first trial that "the probative value of the polygraph evidence was substantially outweighed by its unfairly prejudicial effect," *id.* at 3 (citing Tr. 7/19/04, at 7814), and found specifically that "Corigliano did not use polygraph results in an effort to mislead the government."  *Id.* at 4.

---

great weight on this type of evidence, its minimal probative value in this case is significantly outweighed by its highly prejudicial effect."); *Meyers*, 947 F. Supp. at 589-90.

[34] *United States v. Williams*, 95 F.3d 723, 728-30 (8th Cir. 1996) (affirming exclusion of evidence regarding polygraph taken by prosecution witness offered to impeach his testimony); *United States v. Johnson*, 904 F. Supp. 1303, 1311 (M.D. Ala. 1995) (precluding impeachment of prosecution witness by reference to his performance on polygraph examination).

[35] *See also* Tr. 7/19/04, 7807-08 (Mr. Naftalis:  "Our position would be that . . . the polygrapher comes within our attorney-client privilege . . . . Whatever knowledge Mr. Corigliano has or doesn't have with respect to the polygraph examination he learned in a privileged conversation with his counsel.").  We also cited additional case law, including: *Bankers Ins. Co. v. Florida Dep't of Ins. and Treasurer*, 755 So. 2d 729, 729 (Fla. Dist. Ct. App. 2000); *Carmona v. State*, 941 S.W.2d 949, 953-54 (Tex. Ct. Crim. App. 1997); *State v. Juarez*, 570 A.2d 1118, 1119-20 (R.I. 1990); *State v. Post*, 32 Ohio St. 3d 380, 385 (1987); *State v. Rickabaugh*, 361 N.W.2d 623, 625 (S.D. 1985); *Brown v. State*, 448 N.E.2d 10, 14 (Ind. 1983); *People v. Marcy*, 283 N.W.2d 754, 757 (Mich. Ct. App. 1979) (holding that under Michigan and Delaware law polygraph examiner would be covered by privilege).

Forbes' current arguments with respect to the polygraph are essentially identical to the failed positions that he took during the 2004 and 2005 trials. No new evidence is offered, and no attempt to identify manifest error is made. Forbes now ponders whether, in not disclosing that he had taken a second polygraph until the summer of 2004,[36] Mr. Corigliano may have breached his obligations to the government or committed an additional crime. *See* Forbes Mem. at 32. But he offers no argument as to why Mr. Corigliano previously would have been required to reveal this privileged information or how Forbes' proposed subpoena demands for documents could help him establish any such breach or crime.

## I.     Post 2004-Trial Communications Relating to the Government and Benefits

Forbes demands "[a]ll documents describing or memorializing any communications with the government" since August 2004, including but not limited to communications relating to whether he has breached his plea agreement and his sentencing. *See* Forbes Ex. A, 25. But as we noted at the time of the 2005 retrial – and reiterate here – the short and dispositive answer to Forbes' demand is that apart from the possibility of any Kramer Levin confidential internal work-product, which would be privileged, we are not aware of any such documents in the possession of either Kramer Levin or Mr. Corigliano. It was on this basis that Judge Thompson previously quashed these demands as moot. *See* Nov. 1, 2005 Order at 9 (Ex. A).[37]

---

[36] As we have previously stated, in the summer of 2004, we, as Mr. Corigliano's counsel, advised the government of the second polygraph in connection with polygraph-related motion practice, only to ensure that the record on this issue would be accurate.

[37] Even if any non-privileged documents of this ilk did exist, the proposed request remains meritless because: (1) it is nothing more than a sweeping and improper "fishing expedition" to see what might turn up; and (2) to the extent any such documents theoretically could have reflected communications that properly might be used for material impeachment, the government would have been obligated to disclose the substance under *Brady/Giglio*, and thus the demand should have been directed to the government and is not properly put to the witness and his counsel by way of a Rule 17(c) subpoena. We also note that Forbes' speculation about documents from the government or Mr. Corigliano "acknowledging" that Mr. Corigliano intentionally lied during his testimony at the

**J.**    **Crystal Journey Candles Documents**

In another classically improper "all documents" subpoena proposed to be served on Crystal Journey Candles (through the Receiver who, following the SEC settlement and the disgorgement of the Coriglianos' assets, now holds title to and runs the company that was formerly owned and run by Mr. Corigliano and his wife), Forbes seeks: (1) "*all documents*" describing or memorializing the ownership status of the company, including "*all documents*" describing or memorializing both the transfer of the company to the Receiver and any efforts to sell the company; (2) "*all documents*" describing or memorializing benefits provided to Mr. or Mrs. Corigliano; (3) "*all agreements*" between Mr. Corigliano and the company or the receiver; and (4) documents sufficient to identify whether Mr. Corigliano is still employed at the company and, if not, his last date of employment. *See* Forbes Ex. E. Forbes also seeks leave to serve similar demands directly on Mr. Corigliano for documents sufficient to establish "benefits" provided by Crystal Journey Candles – again, to both Mr. Corigliano and Mrs. Corigliano – for the periods (1) August 2000 through July 7, 2004 (the date of the turnover to the Receiver of the Corigliano family assets) and (2) from July 7, 2004 to the present. *See* Forbes Ex. A, 26-29.[38]

With one exception – a demand for "[a]ll documents describing or memorializing any benefit" to Mr. Corigliano's father – these demands are simply repeats that were quashed by Judge Thompson in 2005 for the reasons set forth in our Amended Memorandum (Ex. J at 42-44) and our Reply Memorandum (Ex. K at 21-22), *see* Nov. 1, 2005 Order at 9 (Ex. A), as follows:

> These demands for essentially "all documents" relating to benefits that may have
> flowed from the candle company to Mr. Corigliano or Mrs. Corigliano represent a

prior trials is far-fetched at best, as the government has stated. In any event, we can represent that we are aware of no such documents in the possession of Mr. Corigliano or Kramer Levin.

[38] In his current proposed subpoena to the SEC, Forbes demands exactly the same documents concerning the ownership status of Crystal Journey Candles that he demanded during the 2005 retrial. Judge Thompson quashed that prior request as well. *See* SEC Ruling (Ex. I).

text-book "fishing expedition" to see what turns up and should be quashed on that ground alone. In addition, as counsel for Forbes knows, Mr. Corigliano's salary from the company was disclosed on the quarterly reports to the SEC that continued until April 15, 2004; moreover, the issue was explored on cross-examination. *See* Tr. 8/3/04, at 9359-65.

In addition, the compensation information sought does not represent and could not properly be admitted to show a "benefit" conferred on Mr. Corigliano by the government. Between August 2000 and July 2004, the Coriglianos' finances were controlled by an asset preservation agreement with the SEC and the Coriglianos were required to live within an annual budget. . . . Whatever Mr. Corigliano's salary or other monetary compensation from the candle company may have been during that period,[39] it had no impact on the amount the Coriglianos were permitted to spend under that budget. In addition, to the extent Forbes wishes and will be allowed to continue to attempt to persuade the jury that being required to live within a budget constituted a "benefit" to the Coriglianos, Forbes is fully aware of the amounts the Coriglianos spent during that time period from the budget documents, the Coriglianos' quarterly reports to the SEC, and other documents described previously. . .

As to salary or other benefits that Mr. Corigliano has received from the candle company since the turnover of assets to the SEC on July 7, 2004, that information is irrelevant and therefore inadmissible. As of that date the candle company was owned and run by an independent court-appointed Receiver, who determines Mr. Corigliano's employment status and compensation. That the Receiver has decided to keep Mr. Corigliano on the payroll (which, as of the date of this submission, he has[40]), and what he has chosen to pay him, are in no sense "benefits" bestowed by the government because of Mr. Corigliano's cooperation; to the contrary, as Mr. Corigliano understands it, his continued employment there is a reflection of the company's need for his services in order to keep the company running.[41]

Forbes offers no new facts and fails to attempt to even show any manifest error in these rulings. Instead, taking his "benefits" theory to an absurd extreme, he can muster only

---

[39] Mrs. Corigliano has never taken a salary or received any payments from the candle company.

[40] This is still the case as of the date of this filing.

[41] In the pages of our reply memorandum adopted by Judge Thompson, we also refuted Forbes' passing mention, without citing to any authority, that Mr. Corigliano lacks standing to quash the Crystal Journey subpoena, citing, among other cases, *United States v. Nektalov*, No. S 203 CR 828 (PKL), 2004 WL 1574721, at *1 (S.D.N.Y. July 14, 2004); *United States v. Orena*, 883 F. Supp. 849, 869 (E.D.N.Y. 1995); *United States v. Giampa*, No. S 92 Cr. 437, 1992 WL 296440 at *1 (S.D.N.Y. Oct. 7, 1992). *See also United States v. Weissman*, No. 01 CR 529, 2002 WL 31875410, at *1 n.1 (S.D.N.Y. Dec. 26, 2002); *United States v. Leaver*, 358 F. Supp. 2d 273, 275 n.6 (S.D.N.Y. 2005) (declining to resolve defendant's standing to move to quash subpoenas for credit card records and addressing objections under court's power to ensure propriety of subpoenas).

speculation that Mr. Corigliano may have received non-monetary benefits (such as the use of a car or insurance) that would not be reflected on the Coriglianos' quarterly statements. He also casts aspersions on the court-appointed Receiver, wondering whether the sale of the company has "been postponed in order to keep Mr. Corigliano gainfully employed until after his testimony against Mr. Forbes in concluded" and why "Mr. Corigliano has continued to draw a salary from the company" "*if*" it is "not profitable (and/or cannot be sold)." Forbes Mem. at 35 (emphasis added). Far from providing any basis to reconsider, such speculation only reinforces the correctness of Judge Thompson's ruling that Forbes wishes to use the Rule 17(c) power to engage in a classic but prohibited fishing expedition to see what might turn up. *See* Point I.A.

These same arguments against enforcement apply with even greater force to Forbes' single new demand for information concerning benefits received by Mr. Corigliano's father, who is a part-time hourly worker at the company. Forbes already knows that Mr. Corigliano's father has worked at the candle company for many years and is paid $10 per hour, having elicited that wholly irrelevant information during the 2005 retrial. *See* Tr. 11/8/05, at 2159-60. He offers no explanation as to how or why compensation information relating to Mr. Corigliano's father could properly be admitted to show a "benefit" conferred on Mr. Corigliano by the government.

### K.  Credit Card Statements Covering the Period April 1, 2004 Through July 7, 2004

As noted above, Judge Thompson previously ruled that Forbes was entitled to quantify the Coriglianos' total expenditures in the period between the filing of their last quarterly report (as of March 31, 2004) and the turnover of their assets on July 7, 2004. Mr. Corigliano produced the required documentation.

Forbes now seeks leave to re-serve demands that Mr. Corigliano produce "[a]ll credit card statements for the period April 1, 2004 through July 7, 2004." Forbes Ex. A, 30. These additional demands (and similar demands served on the banks through which the Coriglianos' credit

cards were issued) – which Forbes acknowledges are for the express purpose of going beyond the amount of money the Coriglianos spent to determine precisely how and on what the Coriglianos spent their funds – were previously quashed by Judge Thompson in his November 1, 2005 Order, finding among other things that "Forbes has not met his burden of demonstrating that he is not engaging in a 'fishing expedition' into the Corigliano family finances" and that "requiring Corigliano to produce information on expenditures regardless of amount is in the context of this case unreasonable." Nov. 1, 2005 Order at 6 (Ex. A).

Forbes speculates that, instead of paying "normal" living expenses during this period, the Coriglianos may have been making "luxury purchases." Forbes Mem. at 35. Again, such speculation provides no basis for reconsideration of Judge Thompson's carefully limited rulings on this subject, particularly where, at best, such documents could be used for nothing more than impeachment on a wholly collateral matter.

## CONCLUSION

For all of the reasons outlined above, and in our motion papers filed in connection with the 2004 and 2005 trials, we respectfully urge the Court to deny Forbes' motions.

Dated: New York, New York
April 17, 2006

Respectfully submitted,

KRAMER LEVIN NAFTALIS & FRANKEL LLP

By: _____
Gary P. Naftalis (ct 24510)
Alan R. Friedman (ct 14926)
Eric A. Tirschwell (ct 25626)
J. Wells Dixon (ct 22932)
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

KL3:2511034.11

-and-

JACOBS, GRUDBERG, BELT,
   DOW & KATZ, P.C.


By: _Ira B. Grudberg_
    Ira B. Grudberg (ct 00178)
    350 Orange Street
    New Haven, Connecticut  06511
    (203) 772-3100

Attorneys for Cosmo Corigliano

KL3:2511034.11

## CERTIFICATE OF SERVICE

I, the undersigned attorney, hereby certify that I caused copies of the foregoing document, dated April 17, 2006, to be served via electronic mail this 17th day of April, 2006 upon the following parties:

> Michael Martinez, Esq.
> Norman Gross, Esq.
> United States Attorney's Office
> District of New Jersey
> 970 Broad Street, 7th Floor
> Newark, New Jersey 07102
> michael.martinez@usdoj.gov
> norman.gross@usdoj.gov
>
> Barry S. Simon, Esq.
> Margaret A. Keeley, Esq.
> Williams & Connolly LLP
> 725 Twelfth Street, N.W.
> Washington, D.C. 20005
> bsimon@wc.com
> mkeeley@wc.com

J. Wells Dixon