# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
------------------------------
UNITED STATES OF AMERICA     )
                             )
v.                           )    Criminal No. 3:02CR00264(AWT)
                             )
WALTER A. FORBES and         )
E. KIRK SHELTON              )
------------------------------
```

**RULING ON**
**MOTION OF NON-PARTIES KRAMER LEVIN NAFTALIS**
**& FRANKEL LLP AND PETER GONEDES TO QUASH**
**DEFENDANT FORBES' SUBPOENAS DATED AUGUST 19, 2004**

For the reasons set forth below, the Motion of Non-Parties Kramer Levin Naftalis & Frankel LLP and Peter Gonedes to Quash Defendant Forbes' Subpoenas Dated August 19, 2004 (Doc. No. 1105) is hereby GRANTED.

This motion is one of a series of motions to quash filed by or on behalf of persons who were served with a subpoena duces tecum and/or subpoena ad testificandum on behalf of defendant Forbes in connection with his case-in-chief. The court set out in its Ruling on the Motion of the Securities and Exchange Commission to Quash Subpoena Seeking Testimony and Documents from SEC Enforcement Attorney James Kidney, dated September 24, 2004, certain considerations that are important in its analysis of all of these motions to quash, and the discussion from that Ruling is hereby incorporated by reference.

As to Peter Gonedes, the motion is being quashed because the only legitimate purpose for service of the subpoena on Gonedes is to obtain evidence as to the amount of the legal fee retainer paid to Kramer Levin and the amount of the balance as of certain dates. The movants represent, and the government has confirmed, that the government does not object to the admission of Defendants' Exhibit 2340, which reflects all of the information defendant Forbes is entitled to introduce into evidence on this topic. Accordingly, any additional documents obtained by defendant Forbes pursuant to the subpoena would be excluded pursuant to Rule 403 as cumulative. In view of that fact, the subpoena served on Gonedes should be quashed because forcing him to appear would be unreasonable and oppressive. See Amsler v. United States, 381 F.2d 37, 51 (9th Cir. 1967) (affirming decision to quash subpoena served by criminal defendant on witness because it was oppressive and unreasonable where the defendant was seeking to re-examine the witness on the same issues on which the defendant had cross-examined the witness); United States v. Doolittle, 341 F. Supp. 163, 169 (M.D. Ga. 1972) (quashing criminal defendant's subpoena of the Attorney General of the United States where the only relevant testimony to be solicited had already been provided in an affidavit provided by the Attorney General), aff'd, 507 F.2d 1368 (5th Cir. 1975).

As to the subpoena served on the Kramer Levin custodian of

-2-

records, Calls 1, 2 and 3 should be quashed for the same reason
the subpoena served on Gonedes should be quashed, and Calls 4, 5,
6, 7 and 8 should be quashed because the documents called for
reflect lines of inquiry calculated solely to bolster the
defendants' attack on Corigliano's credibility during their
cross-examinations of him, as opposed to identifying particular
benefits that were or could be received by Corigliano as a result
of his settlement with the SEC.  In addition, the court agrees
with the movants' analysis of defendant Forbes' "opened the door"
argument, set forth in Part I of the movants' reply memorandum.
(See Reply Mem. (Doc. No. 1175) at 1-3.)

          Finally, so that the record as to these matters is clear,
the court notes that the movants have accurately summarized in
Part I.A. of their memorandum in law in support of the motion the
extensive background of the Rule 17(c) subpoenas relating to
Corigliano.   (See Mem. in Supp. (Doc. No. 1106) at 3-6.)

          It is so ordered.

          Dated this 24th day of September 2004, at Hartford,
Connecticut.

                                    _____/s/_____
                                       Alvin W. Thompson
                                    United States District Judge

-3-

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

———————————————————— x
                                        :
UNITED STATES OF AMERICA                :
                                        :
              v.                        :    No. 3:02CR264 (AWT)
                                        :
WALTER A. FORBES and                    :    August 25, 2004
E. KIRK SHELTON,                        :
                                        :
              Defendants.               :
———————————————————— x


**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF NON-PARTIES
KRAMER LEVIN NAFTALIS & FRANKEL LLP AND PETER GONEDES
TO QUASH DEFENDANT FORBES' SUBPOENAS DATED AUGUST 19, 2004**


                    KRAMER LEVIN NAFTALIS & FRANKEL LLP
                    Gary P. Naftalis
                    Alan R. Friedman
                    Eric A. Tirschwell
                    J. Wells Dixon
                    919 Third Avenue
                    New York, New York 10022
                    (212) 715-9100

                    -and-

                    JACOBS, GRUDBERG, BELT & DOW, P.C.
                    Ira B. Grudberg
                    350 Orange Street
                    New Haven, Connecticut 06511
                    (203) 772-3100

                    Attorneys for Cosmo Corigliano,
                    Kramer Levin Naftalis & Frankel LLP and
                    Peter Gonedes

## Preliminary Statement

We thought that having served more than *thirty* Rule 17 subpoenas relating to Mr. Corigliano, with more than *380* separate "calls," over a period of more than *two and a half years*, defendant Forbes' counsel would by now have demanded any and every document for which their expansive (if not boundless) imagination could conjure up an argument as to how the information sought was somehow relevant to their client's defense. With the service of the latest two additional Rule 17 subpoenas relating to Mr. Corigliano -- one on Kramer Levin's custodian of records (attached as Exhibit A) and another on an employee in Kramer Levin's accounting department (attached as Exhibit B) -- we are left to wonder when and if defendant Forbes' abuse of the compulsory process power will ever end.

Defendant Forbes' newest subpoenas represent a continuation of his anything-but-the-merits-defense and his on-going efforts -- heretofore unsuccessful -- to use the Rule 17 power to secure documents to attempt to impeach Mr. Corigliano on collateral matters. If Forbes is permitted to go forward, the Court and the jury will face the prospect of a defense case consisting of mini-trial after mini-trial in which his counsel continues to distort and twist the truth to support false and misleading characterizations of the relationship between Mr. Corigliano and the government.

Thus, defendant Forbes seeks additional documents and the live testimony of a member of Kramer Levin's accounting department all relating to the legal fee retainer that Mr. Corigliano paid to Kramer Levin. But the Court has already thoroughly addressed this issue; indeed, the Court has heard argument and re-argument. Pursuant to the Court's ruling, Kramer Levin has already disclosed the only facts that the Court ruled would be relevant and admissible, counsel for Mr. Forbes has already exhaustively cross-examined Mr. Corigliano on this subject,

and the defense has expressly sworn off any intention to seek the Court's approval to introduce further evidence on this point during the defense case. Nothing more on this tired topic is required or appropriate.

Similarly, Forbes seeks documents relating to alleged "secret" or "undisclosed" "side agreements" with the SEC, concerning the disposition of the Corigliano family's assets and of any remaining balance of the Kramer Levin retainer. In fact, there are no such "secret" or "undisclosed" "side agreements" and defendant Forbes' arguments to the contrary are based on unsupported and misleading portrayals of Mr. Corigliano's SEC settlement, the way attorney fee retainers are ordinarily dealt with in SEC cases, and the context and substance of the specific representations we made to the SEC in this case.

Last but not least, defendant Forbes expressly seeks documents that could only be used to impeach Mr. Corigliano's prior testimony, elicited on cross-examination, about the wholly collateral issues of whether and to what degree he was aware of certain written communications between his counsel and the SEC. This proposed line of inquiry is flatly prohibited under long-standing rules of admissibility relating to extrinsic evidence.

For all of these reasons, and because the latest demands are for documents that, if produced, would be used to further the readily apparent defense strategy of misleading and confusing the jury by subjecting it to convoluted mini-trials on collateral matters, the subpoenas on Kramer Levin and its employee Peter Gonedes should be quashed.

2

**Argument**

**I.     The Demands Concerning the Amount of the Kramer
        Levin Legal Fee Retainer Are Neither New Nor Proper**

> **A.     The Court Has Already Addressed and Resolved Rule 17(c)
>        Demands for Documents Concerning the Kramer Levin Retainer**

The issue of what information and what documents the defendants are entitled to

receive in order to put before the jury the "benefit" they allege Mr. Corigliano received in

connection with the retainer he paid to Kramer Levin many years ago has already been fully

litigated and decided by the Court.  In subpoenas dated July 20, 2004, defendant Shelton

demanded that Mr. Corigliano and Kramer Levin produce "any" documents concerning the legal

fee retainer that Mr. Corigliano had testified he paid to Kramer Levin.  (*See* Exhibit C, attached

hereto.)  Among other things, defendant Shelton claimed he needed such documents for his

cross-examination to show an alleged government "benefit to Mr. Corigliano." (Shelton Opp'n

dated July 24, 2004, at 8.)  Although the Court initially granted our motion to quash this

subpoena because it sought documents for collateral impeachment purposes (*see* Trial Tr.

7/26/04 at 8607), the defendants moved for reconsideration, arguing that the documents were

needed for "cross-examination" to show a "significant benefit the government provided to Mr.

Corigliano" and as evidence of a "bias" in favor of the government.  (Shelton Mot. for Reconsid.

dated July 27, 2004, at 2-3.)

In connection with the motion for reconsideration filed by defendant Shelton, the

defendants expressly withdrew a prior request that the Court consider the admissibility of the

subpoenaed documents during the defense case, representing instead that they sought only to

"use the subpoenaed documents during Mr. Corigliano's cross-examination." (*Id.* at 1 & n.1.)

Defendant Forbes joined in this motion for reconsideration without qualification (*see* Forbes'

3

Supplemental Mem. in Support of Request for Ruling on Outstanding Written and Oral Motions Relating to Cosmo Corigliano dated July 30, 2004, at 2).

On July 30, 2004, during a telephonic conference, the Court granted the motion for reconsideration in part, finding that "a right to receive legal services valued at up to a certain amount . . . is a benefit . . . [a]nd the defense is entitled to put that benefit out before the jury." (Trial Tr. 7/30/04 at 8-9.) But the Court also specifically rejected defendants' alternative argument that any documents relating to the retainer could properly be subpoenaed or admitted to show "prior inconsistent statements." (*Id.* at 12.)

In compliance with the Court's ruling, we agreed to make a representation regarding the unused balance of Mr. Corigliano's legal fees. On August 2, 2004, a letter, signed by Peter Gonedes of Kramer Levin's accounting department (who has now been subpoenaed to testify), was read into the record. The letter set forth the precise dollar amounts of the remaining balance of Mr. Corigliano's retainer both at that time and -- in response to a request from counsel for Mr. Forbes (*see* Trial Tr. 7/30/04 at 13-14) -- at the time of the SEC settlement. (*See* Trial Tr. 8/2/04 at 9123-24; Letter from Peter Gonedes dated July 31, 2004 (attached as Exhibit D).) The government subsequently offered to stipulate to the amounts set forth in our letter (*see* Trial Tr. 8/2/04 at 9127 (MR. CARNEY: "We don't contest the amount."); *id.* at 9280 (MR. CARNEY: "The parties stipulate that the amount of a retainer . . . maintained by his law firm is approximately . . . $1.5 million . . .")), which reflect the only facts that the Court ruled the defense is entitled to put before the jury in this respect, while maintaining their position that this information (or such a stipulation) is neither relevant nor admissible (*see id.* at 9127, 9280-81).[1]

---

[1] Because defendant Forbes apparently believes he is entitled to a stipulation that reflects additional arguments he would like to make to the jury (*see* Forbes Notice Filing Correspondence Concerning Proposed Stips. dated Aug. 5, 2004; Forbes Mem. Regarding

4

Both before and after the Court's July 30, 2004 ruling as to the admissibility of the balance of the retainer on the issue of "bias," the defendants and the Court recognized that, for purposes of examining Mr. Corigliano on this point, the only relevant and admissible documents that properly could be obtained by a Rule 17(c) subpoena would be documents that Mr. Corigliano actually received, saw or otherwise knew of. Defendant Shelton explicitly conceded that point when, in opposing our motion to quash his subpoena for records relating to the Kramer Levin retainer, he agreed to narrow his demands to eliminate "documents that Mr. Corigliano did not receive or review or discuss with his counsel." (*See* Shelton's July 24, 2004 Opp'n Mem. at 9.) Later, on August 2, 2004, the Court quashed an additional subpoena that had been issued by defendant Forbes calling for, among other things, six years of Kramer Levin's billing records, focusing in particular on our representations that no piece of paper that Kramer Levin ever sent to Mr. Corigliano – whether in the form of a bill or some other type of document – stated the remaining balance of the retainer. (*See* Kramer Levin Mem. Opp'n Forbes Request for Billing Records dated Aug. 1, 2004, at 14; Trial Tr. 8/2/04 at 9122 (THE COURT: "And my understanding is that none of the bills that Mr. Corigliano received stated the remaining amount of his retainer." MR. NAFTALIS: "That's correct, Your Honor."); *id.* at 9129 (MR. ARENA: "[N]one of the bills sent to Mr. Corigliano stated the remaining amount of his retainers. Does the term 'bills' include all documents that he received from Kramer Levin?" MR. NAFTALIS: "Yes, it does.").)

Although Mr. Corigliano thus never received any piece of paper informing him of the remaining amount, lead counsel for Mr. Forbes specifically questioned Mr. Corigliano about

---

Proposed Stips. Concerning Corigliano Atty. Fee Retainers dated Aug. 5, 2004), we understand the parties still have not been able to reach any agreement on this issue.

5

the letter that Mr. Gonedes of Kramer Levin's accounting department signed on July 31, 2004,

disclosing that figure. Thus, on August 3, 2004, the following colloquy took place:

> Q [by Mr. Sullivan]:  Sir, isn't it a fact that the legal fees are actually about
> 1,500,000 that remain in your attorney's account?
>
> A [by Mr. Corigliano]:  I'm not aware of the exact number. I thought it was
> greater than a million, so it could be.
>
> Q:  Could be. Take a look at Tab 22 [the Kramer Levin letter] . . . and see if that
> refreshes your recollection that the amount on the account is rounded out,
> $1,500,000?
>
> A:  Uh-hu. That's what it says there, yes.
>
> Q:  Does that refresh your recollection that it's probably closer to a million and a
> half dollars than it was to what you testified to, a million plus?
>
> A:  I didn't know. I thought it was, it was more than a million. So it's more than
> a million.

(Trial Tr. 8/3/04 at 9373.)

        With this extensive history as background, we now explain why the demands for

further evidence on this topic are meritless.

    **B.     Defendant Forbes' Recycled Demands for Records Concerning the
            Balance of the Kramer Levin Retainer Constitute an Unwarranted
            and Untimely Second Request for Reconsideration and Seek
            Inadmissible, Cumulative and Unnecessary Evidence**

        Notwithstanding the considerable time and attention that the Court and the parties

have already devoted to this issue, as just outlined, the first three demands in defendant Forbes'

latest documents subpoena seek documents "sufficient to establish" facts relating to the Kramer

Levin retainer that either (1) the Court has already decided the defense is *not* entitled to, or (2)

have been provided to the defense, cannot properly be used in the defense case-in-chief, are not

in dispute, and/or are already before the jury.

6

As to the first demand -- for documents "sufficient to establish the amount of any legal retainer paid to Kramer Levin . . . from 1998 to the present" -- the Court already has clearly ruled that the only facts admissible on defendants' "benefit theory" relate to the remaining amount of the retainer, not how much was originally paid. And as also set forth above, the Court specifically rejected the defense argument that documents relating to the retainer could properly be subpoenaed to impeach Mr. Corigliano's prior testimony on that issue. (*See* Trial Tr. 7/30/04 at 12 ("I didn't find any basis for granting [Shelton's subpoena demands] based on prior inconsistent statements.").) Accordingly, Forbes' latest demand #1 -- a third bite at the apple -- seeks documents to show facts that are neither relevant nor admissible and should be quashed.

Demands 2 and 3 -- seeking documents "sufficient to establish" the amount of the remaining balance of the Kramer Levin retainer at the time of the SEC settlement and currently -- also should be quashed because, consistent with the Court's July 30, 2004 ruling, Kramer Levin has already provided a document "sufficient to establish" these amounts in the form of the July 31, 2004 letter from Peter Gonedes.

Indeed, Mr. Sullivan already has used Mr. Gonedes' letter on behalf of Kramer Levin to question Mr. Corigliano and to establish in the record a fully adequate foundation from which to argue about the amount of the alleged potential "benefit" relating to the retainer. In response to this questioning, Mr. Corigliano expressly acknowledged that the balance of the retainer is "more than a million" and did not dispute Mr. Sullivan's assertion that it was "closer to a million and a half dollars." (Trial Tr. 8/3/04 at 9373.) The government of course ethically cannot and will not dispute any argument – if such argument is deemed proper and relevant – that the actual remaining amount is as we represented it to the Court and the parties. In other words, the record is fully developed on the only issue even arguably relevant to Mr. Corigliano's

7

alleged "bias," which is his own actual understanding of the amount of legal fees remaining in

his attorney's account, and no further proof is needed or appropriate. *See United States v. Weiss*,

930 F.2d 185, 198 (2d Cir. 1991) (finding no error in the exclusion, as cumulative, of extrinsic

evidence of prosecution witness's bias where defense counsel already caused the witness to

"admit [ ] to the main circumstances from which any bias supposedly arose. All the relevant

information was obtained and there is no evidence that the testimony would have added anything

of probative value") (internal citation omitted); *United States v. Blackwood*, 456 F.2d 526, 530

(2d Cir. 1972) (explaining that "[a] defendant's right to elicit such [bias] evidence . . . is not

boundless, but is subject to reasonable limitations imposed by the trial judge in the exercise of

sound discretion," and holding that "[t]he test for determining whether there has been an abuse of

discretion is whether 'the jury was otherwise in possession of sufficient information concerning

formative events to make a 'discriminating appraisal' of a witness's motives and bias'") (internal

citation omitted).[2]

       Finally, even if the Court were to determine that the defense is entitled to put into

the record some additional piece of evidence reflecting the exact amount of the balance of the

retainer, there still is no need for the production of further documents (much less for a member of

Kramer Levin's accounting department to be forced travel to Hartford to testify as to such facts).

While, as noted above, the government continues to assert its view that such evidence is not

admissible, if the Court were to decide otherwise, the government has made it perfectly clear that

it would stipulate to the basic facts and figures reflected in Mr. Gonedes' letter, which is the only

---

[2] To the extent defendant Forbes would try to use any further documentation or testimony
concerning the retainer to *impeach* Mr. Corigliano – as opposed to showing the actual amount of
the so-called "benefit" – any such evidence would be barred by the collateral impeachment
doctrine, which (as we have argued in prior submissions) bars a party from presenting extrinsic
evidence to "impeach a witness by contradiction on a collateral matter." *E.g., United States v.
Beauchamp*, 986 F.2d 1, 3-4 (1st Cir. 1993).

information Mr. Gonedes knows.  In light of this repeated offer to stipulate, subpoenas demanding further documents to establish such facts (as well as one demanding the presence of a Kramer Levin employee in Hartford to testify as to such facts) cannot be viewed as anything other than "unreasonable" and "oppressive" within the meaning of Rule 17.[3]

## II.    The Subpoena for the Testimony of Kramer Levin Accounting Employee Peter Gonedes Should Be Quashed as He Has No First-Hand Knowledge of Any Relevant Facts and Could Only Testify to Collateral Matters that Are Not in Dispute

In further aid of their strategy to confuse and mislead the jury about the Kramer Levin retainer, defendant Forbes has also issued a subpoena *ad testificadum* to Peter Gonedes, the Kramer Levin accounting department employee who had the misfortune of signing a letter on behalf of our firm concerning the balance of the retainer.

Any testimony Mr. Gonedes could offer is by definition collateral and limited strictly to the issue of the amount of the outstanding balance of the retainer. He of course has no first-hand knowledge of the facts relevant to the case against defendants Forbes and Shelton. He simply signed a letter setting forth the only facts that the Court had ruled were relevant and admissible on this issue.

As noted in Point I, above, any such testimony could therefore do nothing more than establish a fact -- the exact amount of the remainder of the retainer -- that was not known to Mr. Corigliano, was fully explored on cross-examination of Mr. Corigliano, and is not in dispute

---

[3] We note also that in issuing new subpoenas as part of the defense case to obtain further documentation relating to the retainer, defendant Forbes has effectively reneged on the prior express representation to the Court, described above, that the defense was withdrawing a prior request that the Court consider the admissibility of such documents during the defense case-in-chief and only was pressing their demands to use the documents in cross-examining Mr. Corigliano. (*See* Shelton Mot. For Reconsid. dated July 27, 2004 at 1 & n.1; Forbes' Supplemental Mem. in Support of Request for Ruling on Outstanding Written and Oral Motions Relating to Cosmo Corigliano dated July 30, 2004, at 2 (joining Shelton's brief without qualification).)

by any of the parties. The subpoena to Mr. Gonedes should therefore be quashed for the same reasons that the subpoena for documents to establish these same facts should be quashed.

In addition, while we expect defendant Forbes will deny that his efforts to secure Mr. Gonedes' presence are intended to contradict or impeach Mr. Corigliano's prior testimony concerning the retainer (something the rules of evidence prevent him from doing), it is difficult to imagine how the jury is supposed to understand such live testimony -- elicited during the defense case and from a government witness's own law firm -- other than as an effort to do just that. Indeed, other recent submissions made by defendant Forbes confirm that his true purpose is to impeach and to mis-characterize Mr. Corigliano's testimony on this issue as false and "evasive." (*See* Forbes Mot. for Mistrial Due to Gvt.'s Presentation of, and Failure to Correct, Cosmo Corigliano's False and Misleading Test. dated Aug. 20, 2004, at 10.)

For all of these reasons, the subpoena for Mr. Gonedes' testimony should be quashed.

**III.    Demands for Documents "Describing or Memorializing" Alleged Agreements with the SEC Concerning the Retainer or the Use or Disposition of the Corigliano Family Assets Are Baseless and Should Be Quashed**

     **A.    Kramer Levin Has No Documents, and Certainly No Relevant, Admissible and Non-Privileged Documents, Showing Alleged "Undisclosed" or "Secret" "Side Agreements" with the SEC**

Demands 4 and 5 of defendant Forbes' latest subpoena to Kramer Levin call for documents "describing or memorializing" alleged undisclosed "agreements" with the SEC concerning the "use or disposition" of the Kramer Levin retainer or the "existence, use or disposition" of the Corigliano family assets. In other papers, defendant Forbes has described these alleged agreements as "secret" and/or "undisclosed" "side agreements." (*See, e.g.,* Forbes

10

Mot. for Mistrial Due to Gvt.'s Presentation of, and Failure to Correct, Cosmo Corigliano's False and Misleading Test. dated Aug. 20, 2004, at 8-14.)

The first and dispositive reason to quash these demands is that, other than the signed, written agreements that the defense already has (i.e., the budget agreement from August 2000 and the settlement agreement from April 2004), we have no documents in our files signed by or otherwise shared with the SEC that "describe or memorialize" any additional "agreements" on any subject, including the subjects identified in demands 4 and 5.

Second, and because there are no further relevant documents, the defense has already had a full opportunity to explore these issues with Mr. Corigliano on cross-examination with the benefit of all of the relevant information. Counsel for Mr. Forbes repeatedly questioned Mr. Corigliano about his understanding of the ultimate disposition of any remainder of the Kramer Levin retainer and also thoroughly explored whether continuing to pay his family's expenses as they came due, up until the turnover of assets to the SEC-appointed receiver, was consistent with the terms of Mr. Corigliano's agreement with the SEC. (*See* Trial Tr. 7/20/04 at 8109-14; Trial Tr. 8/3/04 at 9367-70, 9376-78, 9389-403.) To the extent these areas of examination are arguably relevant to show some alleged "bias" or "benefit," there is more than ample evidence in the record from which the defense can make their arguments and no further extrinsic evidence on these points is required or should be allowed. *See Weiss*, 930 F.2d at 198; *Blackwood*, 456 F.2d at 530.

**B.    Defendant's Claims of "Secret" and/or "Undocumented"**
       **"Side Agreements" with the SEC Are False and Misleading**

In truth, demands 4 and 5 only serve the improper purpose of aiding an effort to distract and overwhelm the jury with false, misleading and/or unsupported arguments about the nature of the relationship and the course of dealings between Mr. Corigliano and the SEC.

11

Having already allowed defendants latitude in eliciting the core facts, the Court need not give them further latitude to twist and distort them.

### 1.    The Retainer

Citing a small handful of litigated SEC asset freeze cases that represent the exception and not the rule, defendant Forbes repeatedly has implied that, upon filing a civil suit or administrative enforcement action, the SEC routinely seizes or exercises some control over attorney fee retainers that have been paid to lawyers, and that by not doing so with respect to Mr. Corigliano, the government accorded him some material "benefit" that allegedly goes to his "bias" or "motive."

This suggestion is false and misleading. As the SEC's own published statistics show, such asset freeze cases are rare, representing only approximately 10% of all enforcement actions. *See* SEC Record of Enforcement, FY 2000-2002 (showing that in fiscal 2000, when the SEC brought its action against Mr. Corigliano, asset freezes were obtained in only 56 of 503 enforcement actions).[4] It is, in other words, thus routine that the SEC, during the course of its investigation, and even after charges have been initiated, does not interfere with the attorney-client relationship or with the funds paid to a defendant's attorneys to secure representation. This is so notwithstanding the facts that it also is routine that those being investigated by the SEC retain counsel and pay counsel a retainer, which is often substantial. The reality, in short, is that in the vast majority of enforcement actions, the SEC does not freeze assets, much less take the more drastic step of seizing or freezing or otherwise monitoring moneys that a "target" or a defendant has paid to his attorneys in the form of a retainer.

---

[4] Found at www.sec.gov/news/extra/enfrecfy2002.htm (copy attached as Exhibit E hereto).

For further proof that this is so we need look no further than this very case. Following the disclosure of accounting irregularities in early April 1998, defendants Forbes and Shelton retained counsel and presumably paid and are paying sizeable legal fees. Yet neither defendant (to our knowledge) has ever faced any action by the SEC to seize, freeze or otherwise monitor such funds.[5] So too with respect to Mr. Corigliano: at no point in our interactions with the SEC – from the day we learned they were investigating Mr. Corigliano back in 1998 through 2004 – did the Enforcement Staff demand that our attorneys fees be turned over or monitored in connection with any settlement or settlement discussions. Nor are we aware of the SEC seeking to interfere in any way with the attorney retainers paid by any of the other individuals who have been investigated by the SEC in this case, whether cooperating witnesses or not.

In light of this backdrop, it becomes clear why our representations to the SEC about the disposition of any unused legal fees cannot accurately be understood or described as some sort of "undocumented" or "secret" "side agreement." What we said as relevant here was simply that (1) instead of returning any unused funds to our client at the end of our representation, as we otherwise would have done under the ethical rules, we would turn over any such monies to the SEC or the receiver, and (2) our client -- Mr. Corigliano -- understood that he was forfeiting that right.[6] In other words, our representations amounted to an *abandonment* by Mr. Corigliano of a right he otherwise had to the return, at the conclusion of our representation, of any unused portion of the retainer he had paid us.

---

[5] This is so notwithstanding the government's position that he improperly transferred many millions of dollars in assets in anticipation of the indictment in this case. (*See* Gvt. Mem. Opp'n Forbes Mots. Preclude dated Aug. 29, 2004.)

[6] *See* Corigliano Mem. Further Opp'n Crime-Fraud dated July 26, 2004, at 3-4, ¶3; Trial Tr. 8/2/04 at 9123-26, 9129 (describing these disclosures made to the SEC, as well as the disclosure as to the remaining balance of the retainer).

In sum, then, our representations about the disposition of any remaining balance
of the retainer paid to us by Mr. Corigliano are fully consistent with Mr. Corigliano's testimony
that while he understood that any such moneys would go to the receiver (i.e., he understood that
he had given up his right to the return of any unused portion of such monies), he was not aware
of any additional "agreement" on this point.  (*See* Trial Tr. 8/3/04 at 9367-70.)  No further
evidence, whether in the form of documents or testimony, is necessary or appropriate.

### 2.    The Coriglianos' Assets

Defendant Forbes' demand #5 -- calling for "documents describing or
memorializing any agreement with the SEC concerning the existence, use, or disposition of any
assets" of the Coriglianos other than the budget agreement and the settlement agreement -- is
also predicated on a faulty premise.

Based on other submissions, we imagine defendant Forbes is referring in this
request to Mr. Corigliano's testimony on cross-examination that he understood that, up to the
point when he and his family transferred their assets to the SEC-appointed receiver, he could
continue to pay his family's bills as they came due.  (*See* Trial Tr. 8/3/04 at 9367-70, 9376-78,
9389-403.)  Counsel for Mr. Forbes seems to think -- and has argued in various places, including
through cross-examination of Mr. Corigliano -- that such expenditures were unauthorized and/or
inconsistent with the SEC settlement agreement.

But defendant Forbes was not a party to the agreement between Mr. Corigliano
and the SEC and he misquotes it to the Court and misrepresents it in front of the jury.  Forbes
thus claims in a recent submission that Mr. Corigliano's settlement with the SEC "required him
to disgorge *all* 'assets of a value of $1,000 or more in which he [or his wife] had any direct or

14

indirect legal or beneficial ownership <u>as of March 31, 2004.</u>"[7]  But in purporting to quote the

language from the SEC settlement document (specifically, ¶ 3(vi)) of DX 1060), Forbes omits

the words "any other," which describe a sub-category of unenumerated assets, existing as of

March 31, 2004, that were to be turned over, substituting (outside of quotation marks) instead his

own word -- "all."  This misleading substitution of critical words creates the erroneous

impression that the SEC settlement -- which did not even become effective until May 7, 2004

(when Final Judgment was entered (*see* ¶ 3 of DX 1060)) -- somehow retroactively forbids Mr.

Corigliano from continuing to pay his family's bills as he had for the prior four years.  It did not,

and there is nothing inaccurate about Mr. Corigliano's testimony and nothing improper about his

conduct in this respect.

## IV.   Demands 6 Through 8 – Calling for Documents Reflecting Whether Certain Written Communications with the SEC Were Sent to Mr. Corigliano – Improperly Seek Extrinsic Evidence that at Best Would Constitute Inadmissible Collateral Impeachment

In what is perhaps the most blatant of an endless series of attempts to use extrinsic

evidence improperly to impeach Mr. Corigliano on collateral matters, defendant Forbes makes

several new demands calling for Kramer Levin to produce documents solely to show whether

certain other documents were sent to Mr. Corigliano.  The documents at issue are a September 4,

2003 letter to the SEC from Kramer Levin enclosing certain asset-related materials in

anticipation of a settlement meeting, Mr. Corigliano's Wells submission (submitted by Kramer

Levin to the SEC on our client's behalf in May 2000), and two letters from the SEC to Kramer

Levin, dated April 9 and 12, 2004, relating to finalizing Mr. Corigliano's SEC settlement.

Lead counsel for Mr. Forbes already has cross-examined Mr. Corigliano about

each one of these documents and/or the substance of such documents, exploring with him --

---

[7] Motion for Mistrial at 18 (underlining in original, italics added).

sometimes in great detail -- whether he saw the documents and/or the degree of his knowledge
(or lack thereof) of what the defense apparently views as the material substance of the
documents. (*See, e.g.,* Trial Tr. 8/2/04 at 9311-9315; Trial Tr. 8/3/04 at 9348-49, 9353, 9356,
9367 (September 2003 communication to the SEC); Trial Tr. 7/19/04 at 7972-76 (Wells
submission); Trial Tr. 8/3/04 at 9412-15 (April 2004 interactions with the SEC).) In the course
of doing so, Mr. Sullivan minced no words in describing his intent: "if there's any secret, I'm
trying to show he's a liar." (Trial Tr. 8/2/04 at 9320-21 (referring to questioning about the
September 2003 letter to the SEC).)

    In light of this clear record, the only conceivable purpose for demanding that
Kramer Levin produce evidence to show whether these documents were sent to Mr. Corigliano is
to further attempt to impeach Mr. Corigliano's prior testimony.    Whether viewed as
impeachment by contradiction, or more generally as impeachment by showing character for
untruthfulness, such extrinsic evidence -- which is plainly collateral (if not wildly irrelevant) to
the issues properly before the jury -- is simply not admissible. *See Beauchamp,* 986 F.2d at 3-4
("a party may not present extrinsic evidence to impeach a witness by contradiction on a collateral
matter"); *Walker v. Firestone Tire & Rubber Co.,* 412 F.2d 60, 63 (2d Cir. 1969) (noting "well
settled" rule that an opposing party may "ask questions" but "is not permitted to adduce extrinsic
evidence that a witness lied on a previous occasion"); *United States v. Mulinellli-Navas,* 111
F.3d 983, 989 (1st Cir. 1997) ("in order to be admissible," extrinsic evidence "must not only
contradict a statement of the [witness], but must also be material to [the defendant's] guilt or
innocence"); *United States v. Marino,* 277 F.3d 11, 24 (1st Cir. 2002) (district court properly
excluded extrinsic evidence offered to impeach government's primary witness where that
evidence "was not relevant to [the defendant's] guilt or innocence"); *see also* Fed. R. Evid.

16