# EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------
UNITED STATES OF AMERICA          )
                                  )
v.                                )    Criminal No. 3:02CR00264(AWT)
                                  )
WALTER A. FORBES and              )
E. KIRK SHELTON                   )
---------------------------------

RULING ON
MOTION OF NON-PARTIES GARY P. NAFTALIS AND
ALAN R. FRIEDMAN TO QUASH SUBPOENAS FOR TRIAL TESTIMONY

For the reasons set forth below, the Motion of Non-Parties
Gary P. Naftalis and Alan R. Friedman to Quash Subpoenas for
Trial Testimony (Doc. No. 1058) is hereby GRANTED.

This motion is one of a series of motions to quash filed by
or on behalf of persons who were served with a subpoena duces
tecum and/or subpoena ad testificandum on behalf of defendant
Forbes in connection with his case-in-chief. The court set out
in its Ruling on the Motion of the Securities and Exchange
Commission to Quash Subpoena Seeking Testimony and Documents from
SEC Enforcement Attorney James Kidney, dated September 24, 2004,
certain considerations that are important in its analysis of all
of these motions to quash, and the discussion from that Ruling is
hereby incorporated by reference.

Defendant Forbes' opposition to the instant motion makes it clear that his primary, if not sole, motivation in seeking to call Corigliano's attorneys, Gary Naftalis and Alan Friedman, to testify is to use the testimony of Corigliano's own counsel to attack Corigliano's credibility. Although defendant Forbes includes a reference to an intention to examine Naftalis and Friedman about the benefits that were or could be received by Corigliano as a result of his settlement with the SEC, any incidental probative value resulting from any proper questions defendant Forbes might ask Naftalis or Friedman on this topic would be substantially outweighed by the danger of unfair prejudice and misleading the jury.

Finally, so the record as to these matters is clear, the court notes that it has reviewed the "Counter-Statement of Certain Facts", set forth in the movants' reply memorandum at pages 2 through 4, and concluded that it is accurate. (See Reply Memorandum (Doc. No. 1140) at 2-4.)

It is so ordered.

Dated this 24th day of September 2004, at Hartford, Connecticut.

Alvin W. Thompson<br>
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------- x

UNITED STATES OF AMERICA                    :

                    v.                      :    No. 3:02CR264 (AWT)

                                            :
WALTER A. FORBES and                        :    September 2, 2004
E. KIRK SHELTON,                            :

                    Defendants.             :
---------------------------------------------------------- x

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
MOTION OF NON-PARTIES GARY P. NAFTALIS AND ALAN R.
FRIEDMAN TO QUASH SUBPOENAS FOR TRIAL TESTIMONY**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Gary P. Naftalis
Alan R. Friedman
Eric A. Tirschwell
J. Wells Dixon
919 Third Avenue
New York, New York 10022
(212) 715-9100

-and-

JACOBS, GRUDBERG, BELT & DOW, P.C.
Ira B. Grudberg
350 Orange Street
New Haven, Connecticut 06511
(203) 772-3100

Attorneys for Cosmo Corigliano

Oral Argument Requested

### Preliminary Statement

Defendant Forbes' arguments in opposition to our motion can be summarized as follows:

1. Any time a defendant believes that a cooperating witness has testified falsely about his agreement with the government, the defense should be permitted to call the witness's attorneys to the stand to attempt to contradict that testimony in front of the jury. 2. Such a subpoena to criminal defense attorneys, intended to elicit testimony to impeach or discredit their own client, should be treated no differently from a subpoena served on any ordinary witness. 3. The Court has no power to decide the propriety of such a subpoena in advance and the better procedure is to parade the attorneys in front of the jury and consider any objections on a question-by-question basis. 4. These attorneys' recollections of communications with their client and the government and their interpretations and explanations of agreements with the government do not implicate the work-product doctrine or attorney-client privilege.

As we demonstrate below, all of these arguments and claims are wrong. This Court *does* have the power to quash the attorney subpoenas now. Attorney subpoenas in this context are viewed with strong disfavor and are subjected to the most exacting scrutiny. Indeed, no court *anywhere* has *ever* endorsed the type of unabashed effort underway by defendant Forbes to pit a government witness's attorneys against him in open court and in front of a jury. And the work-product doctrine does protect attorneys and their clients from just this sort of improper attempt to pry into an attorney's recollections and thought processes in connection with representing a client during a criminal/regulatory investigation.

Additionally, and dispositively, the record is more than adequately developed on the alleged "benefits" that defendant Forbes claims he needs to establish through the testimony

of Kramer Levin attorneys. The true purpose of attempting to call Mr. Naftalis and Mr.

Friedman is instead to contradict Mr. Corigliano's testimony on these and other matters in an

attempt to discredit him in front of the jury. That procedure is not permitted under the

controlling rules of law. And further evidence on the identified issues, particularly coming from

Mr. Corigliano's own attorneys, will only serve to further confuse and distract the jury from the

actual task before it of judging whether defendants Forbes and Shelton are guilty of the charged

crimes.

For all of these reasons, as more fully set forth below and in our opening

memorandum, we respectfully urge the Court to grant our motion to quash the unprecedented

subpoenas for the testimony of Mr. Naftalis and Mr. Friedman.

### Counter-Statement of Certain Facts

Defendant Forbes' inattention to the record and refusal to adhere to the rulings in

this case are well documented. (*See, e.g.,* Trial Tr. 7/26/04 at 8811-15.) His latest submission

opposing our motion to quash the subpoenas for the testimony of Mr. Corigliano's attorneys

represents a continuation of his efforts to relitigate or otherwise challenge the Court's prior

rulings and to hide the ball about his true intentions. Before we turn to our substantive

arguments, we point out the more egregious instances of distortions of the record and ignoring, if

not defying, the Court's rulings found in Forbes' papers:

- First, defendant Forbes continues to argue that he is entitled to know when
  precisely the SEC learned about the Kramer Levin retainer (Forbes Opp'n at
  13-14). He thus fails even to acknowledge the Court's clear ruling that when
  the SEC learned about the retainer prior to settling with Mr. Corigliano is *not*
  subject to disclosure. (*See* Trial Tr. 8/2/04 at 9284-85.)

- Second, defendant Forbes again argues that the retainer fees Mr. Corigliano
  paid to his attorneys continued to be "his asset." (Forbes Opp'n at 23.) But
  the Court has already made a contrary ruling: "Let me say one thing about the
  $1.8 million retainer. *I don't see, based on the representations that have been*

2

*made by counsel, where there is a legitimate basis to argue that Mr. Corigliano has cash on deposit with his counsel,* . . . but he has . . . the right to receive a certain amount of legal services. And if he doesn't use them, then the proceeds get turned over to the receiver, the proceeds would be the cash refund that would otherwise be due to Mr. Corigliano." (Tr. 7/30/04 at 8 (emphasis added).) The Court also added: "I've gotten representations from Mr. Corigliano's counsel and from the government which . . . are consistent with Mr. Corigliano's testimony that it's not his cash on deposit with the law firm." (*See id.* at 10; *see also* Tr. 7/20/04 at 8127.) Mr. Forbes nowhere acknowledges these findings.

- <u>Third</u>, defendant Forbes claims that the on-point and controlling ethics opinion we cited on the retainer issue "does not establish legal *property rights*" (Forbes Opp'n at 23 (emphasis in original)), ignoring the express language of the opinion *rejecting* the very argument that an "advance fee retainer" such as the one we obtained from Mr. Corigliano "remains client *property* until earned." NY Eth. Op. 570, 1985 WL 57057, at *3 (June 7, 1985) (emphasis added).

- <u>Fourth</u>, defendant Forbes states that he "would not have been forced to subpoena Messrs. Naftalis and Friedman if the government had not elicited false and misleading testimony . . . [and] had not rejected stipulations to correct the record." (Forbes Opp'n at 3.) We understand, however, that counsel for Mr. Forbes expressly informed counsel for the government that he intended to subpoena Mr. Naftalis and Mr. Friedman *whether or not the government agreed to a stipulation* concerning the retainer.

- <u>Fifth</u>, defendant Forbes misrepresents his own intentions with respect to our work-product. At the outset of his submission he unequivocally proclaims that he does "not intend to examine [Mr. Naftalis and Mr. Friedman] about information protected from disclosure by the attorney-client privilege or the work product doctrine." (Forbes Opp. at 1-2.). But he then immediately back-tracks, stating in a footnote that "[t]o the extent there is any argument about *fact work product*, Mr. Forbes has a substantial need for the information." (*Id.* at 2 n.2 (emphasis added).) Later still, defendant Forbes again contradicts his own initial unqualified proclamation that he is not seeking protected work product, this time stating that his proposed examination of Mr. Naftalis and Mr. Friedman will not focus on matters that "do not constitute *opinion work product.*" (*Id.* at 11 (emphasis added).) In short, it appears that defendant Forbes most assuredly does seek *fact work product*, and, as we further explain below, it is virtually certain that his proposed examinations of Mr. Naftalis and Mr. Friedman, if allowed, also would invade *opinion work product*.[1]

---

[1] As we previously have pointed out, past representations that counsel for defendant Forbes has made to us and to counsel for Ms. Pember that he was not seeking materials protected by the attorney-

3

We note, finally, that defendant Forbes continues to refuse to disclose all of the topics about which he wishes to examine Mr. Naftalis and Mr. Friedman, preventing us from properly moving to preclude and the Court from timely considering the issues. Immediately following the service of the subpoenas on Mr. Naftalis and Mr. Friedman some four weeks ago, we directly inquired of Mr. Sullivan but he flatly refused to tell us the subject matters of his intended inquiries. We were thus left with no choice but to move to quash in the dark, not knowing what defense counsel intended. Two weeks after we filed our papers, defendant Forbes finally responded with a 26-page memorandum received by us after the close of business on the Friday, at a time when defense counsel knew that Mr. Naftalis and Mr. Friedman would be away on vacation. But even in those tactically timed papers, defendant Forbes still refuses to put all of his cards on the table, stating that the examples in his submission are "illustrative" only (Forbes Opp'n at 12), and purporting to reserve his right to spring other areas of questioning on the witnesses before we or the Court has a chance to address their propriety.

---

client privilege or work product doctrine were later reneged on. (*See* Corigliano Mem. dated Mar. 31, 2004 at 5 & nn.3-4.)

4

## **Argument**

### I.    **This Motion to Quash Is Properly Made and Decided Now**

Defendant Forbes weakly contends that "[a]lthough courts have granted motions to quash, the better practice in *ordinary* cases is to require the witness to appear and claim any privilege or immunity he may have." (Forbes Opp'n at 9 (quoting 2 Charles Alan Wright & Arthur Miller, Fed. Prac. & P. Crim. 3d § 273, at 236-37) (emphasis added).)  Of course, nothing about these particular subpoenas, or Mr. Forbes' relentless series of subpoenas, is "ordinary."  In any event, "courts have repeatedly, when the interests of justice have so warranted, heard and granted (and denied) motions to quash subpoenas to compel testimony." *United States v. Klubock*, 639 F. Supp. 117, 123 (D. Mass. 1986), *aff'd*, 832 F.2d 649, *aff'd en banc*, 832 F.2d 664 (1st Cir. 1987).  Nothing in the two cases we cited where the attorneys actually showed up for questioning addresses the propriety of such a motion, much less suggests its impropriety.[2] Here, the trial record is well-developed, the arguments and issues pertaining to the subpoenas have been litigated and relitigated, and there is every reason to decide this important issue now, outside the presence of the jury.[3]

---

[2] *See In re Grand Jury Proceedings*, 473 F.2d 840 (8th Cir. 1973); *In re Solomon B. Terkeltoub*, 256 F. Supp. 683 (S.D.N.Y. 1966).

[3] Decisions from various other courts further support the proposition that the Court may quash a subpoena for testimony in a criminal proceeding without requiring the witness to take the stand. *E.g.*, *United States v. Berberian*, 767 F.2d 1324, 1326 (9th Cir. 1985) (affirming decision to quash subpoena served on indicted witness to testify in related criminal trial); *Amsler v. United States*, 381 F.2d 37, 51 (9th Cir. 1967) (affirming grant of motion to quash); *May v. United States*, 175 F.2d 994, 1011 (D.C. Cir. 1949) (same); *United States v. McGoldrick*, 796 F. Supp. 178, 180 (E.D. Pa. 1992) (granting motion to quash); *In re Grand Jury Subpoena*, 438 F. Supp. 1176, 1179 (S.D.N.Y. 1977) (quashing a grand jury subpoena served on a lawyer for a subject of the investigation); *United States v. Doolittle*, 341 F. Supp. 163, 169 (M.D. Ga. 1972), *aff'd*, 507 F.2d at 1368 (5th Cir. 1975).

We also note that in support of the so-called "better practice," Mr. Forbes cites only one district court decision, *United States v. Seeger*, 180 F. Supp. 467 (S.D.N.Y. 1960), which is inapposite. *Seeger* involved a subpoena served on a non-attorney witness whose testimony was material to the actual

## II.    What Defendant Forbes Proposes to Do with Mr. Corigliano's Attorneys Is Unprecedented and Strongly Disfavored and Should Be Subjected to the Strictest of Judicial Scrutiny

Although he had some two weeks to prepare his opposition to our motion, and spends some twenty-six pages responding with citations to dozens of different cases, defendant Forbes remains unable to identify a single case in which a judge in any federal or state court has ever held, stated, suggested or even hinted that, after a cooperating witness testifies and is exhaustively cross-examined, his lawyers can be called to the witness stand for the sole purpose of impeaching their own client.

Defendant Forbes instead pretends that an attorney subpoena for testimony arising out of the attorney's representation of a criminal defendant is no different than any other subpoena for the testimony of an ordinary witness. But such a subpoena is different, and the courts have consistently so recognized, as evidenced by the many decisions cited in our opening memorandum reflecting strong judicial disfavor of such a practice because of the significant detrimental impact on the attorney-client relationship, the client's Fifth and Sixth Amendment rights, and the adversary system as a whole. (*See* Naftalis/Friedman Mem. dated Aug. 16, 2004, at 10-15.)

In a footnote, Forbes asserts that the *Terkeltoub* line of authority is inapposite because it comes in the grand jury context where "there was no countervailing Sixth Amendment right to examine the attorneys." (Forbes Opp'n at 10 n.5.) In so doing he suggests that the Rule 17 power to issue a subpoena *ad testificandum,* when wielded by a criminal defendant, is broader

---

merits of the underlying criminal proceeding, and the only objection raised to the subpoena was that the proposed testimony was potentially duplicative of documentary evidence. *Id.* at 468 (denying motion to quash subpoena served on Chairman of the House Committee on Un-American Activities where defendant charged with willful refusal to answer questions posed to him during Committee's investigation).

6

and less fettered than a grand jury subpoena. This assertion is both unsupported by any authority and flies in the face of the fact, noted in our opening papers (and ignored by Forbes), that in the grand jury context the "public's claim to each person's evidence" is at its absolute strongest. (*See* Naftalis/Friedman Mem. dated Aug. 16, 2004, at 11 (quoting *In re Sealed Case*, 676 F.2d 793, 806 (D.C. Cir. 1982).)

Forbes also claims the cases we cited are inapposite because they are work-product cases, and here what he proposes to ask Mr. Naftalis and Mr. Friedman is not protected work product. We refute the latter assertion in Point V, below. As to the former, while *Terkeltoub* certainly draws on some of the policies underlying the work-product doctrine, its holding is broader, and also reflects Sixth Amendment concerns that defendant Forbes completely ignores (here, relating to the rights of Mr. Corigliano vis-à-vis his own counsel). *See In re Grand Jury Proceedings*, 605 F. Supp. 839, 847 n.10 (S.D.N.Y. 1985) (describing *Terkeltoub* as a case "where the court quashed a grand jury subpoena issued to [a] defense attorney on sixth amendment grounds"). Similarly, the decisions we cited from the First and Tenth Circuits addressing the propriety of local rules limiting a prosecutor's ability to subpoena an attorney to testify about his or her client also draw broadly on concerns about the attorney-client relationship, the adversary system and the client's Fifth and Sixth Amendment rights. (*See* Naftalis/Friedman Mem. dated Aug. 16, 2004, at 12-13 (quoting *Whitehouse v. United States Dist. Ct.*, 53 F.3d 1349, 1358 (1st Cir. 1995); *United States v. Colo. Sup. Ct.*, 189 F.3d 1281, 1288 (10th Cir. 1999)).) And even decisions addressing attorney subpoenas on work-product grounds -- such as the one we cited in our opening memorandum in which counsel for Mr. Forbes intervened and succeeded in contesting a grand jury subpoena for the testimony of a Williams & Connolly attorney concerning his work in representing a client during a government

7

investigation -- reinforce the importance of carefully considering "the degree of danger that the attorney would become a witness against the client, or that the attorney-client relationship would be disrupted in any other way," and "whether the letter or spirit of the Fifth and Sixth Amendments would be infringed." *In re Grand Jury Subpoena dated November 8, 1979,* 622 F.2d 933, 936 n.3 (6th Cir. 1980).

The cases Forbes cites in his opposition only reinforce our point that subpoenas to criminal defense attorneys for testimony arising out of their representation of their client have been upheld in the narrowest of circumstances and only upon a showing of the most compelling of needs. These decisions involve situations where (1) the attorney's testimony was essential to prove a necessary element of a crime by his client, (2) the attorney was the only one in a position to provide the needed evidence, and (3) the attorney "served merely as a conduit for transmission of a message" from the government. *See United States v. Hall,* 346 F.2d 875, 882 (2d Cir. 1965) (in bail jumping prosecution, attorney required to testify about "instructions" he conveyed from the government to his client concerning when his presence was required in court); *In re Grand Jury Testimony of Attorney X,* 621 F. Supp. 590, 591-92 (E.D.N.Y. 1985) (in obstruction of justice investigation, attorney required to testify to what he told his client about a pending grand jury investigation).

In the end, defendant Forbes' opposition does nothing to refute the proposition that the cases we cited provide a context and framework for analysis here and counsel strongly against upholding defendant Forbes' unprecedented demand; at the very least, they demand the strictest of scrutiny of defendant Forbes' proffered explanations for why he allegedly wants and needs the testimony of Mr. Corigliano's criminal defense counsel.

8

III.    **The True and Improper Purpose of the Subpoenas to Mr. Naftalis and Mr. Friedman Is to Challenge the Credibility of Mr. Corigliano's Testimony on Areas Purportedly Related to Bias or Motive**

Your Honor has previously recognized the critical distinction between extrinsic evidence being offered to *establish* bias or motive, which may be proper, and extrinsic evidence being offered to *impeach* Mr. Corigliano's testimony concerning matters relating to bias and motive, which is improper and certainly excludable under Rule 403. (*See* Trial Tr. 7/26/04 at 8606-08.) While the Court later ruled on reconsideration that certain narrow pieces of evidence -- specifically, the remaining balance of the Kramer Levin retainer and the value of the Corigliano home (*see* Tr. 7/30/04 at 8-9) -- could be offered into evidence under the former theory, the issue now, as then, is whether, as Your Honor put it, "the real probative impact" of the evidence being sought (Trial Tr. 7/26/04 at 8607) falls into the permissible establishing bias/motive category or instead into the impermissible impeaching Mr. Corigliano's testimony category.

Here, there can be little doubt that the "real probative impact" of what defendant Forbes hopes to accomplish through his subpoenas for the testimony of Mr. Corigliano's attorneys is to challenge the truthfulness of Mr. Corigliano's testimony on the issues identified in his opposition papers (and other issues still undisclosed). In those papers, defendant Forbes makes perfectly clear that, as to each topic about which he says he wishes to examine Mr. Naftalis and Mr. Friedman, he believes Mr. Corigliano has lied. He thus claims that, while Mr. Corigliano testified that he wanted to settle with the SEC "as soon as possible," other evidence is "in contrast to this testimony" and the government has done nothing to "correct Mr. Corigliano's testimony." (Forbes Opp'n at 3-4 & 17.) With respect to the Kramer Levin retainer, he claims that Mr. Corigliano "gave the false and misleading impression that there is no oral side agreement with the SEC," but elsewhere acknowledges (as he must) that Mr. Corigliano testified

9

-- as we and the government have confirmed -- that "any funds remaining at the end of the representation would revert to the receiver." (*Id.* at 6, 23.) On the issue of post-March 31, 2004 expenditures, Forbes claims that, although Mr. Corigliano "admitted to these expenditures and conceded they were a benefit," he nevertheless "deceived . . . the jury by hiding yet another undocumented side agreement with the SEC." (*Id.* at 7.) And with respect to Mr. Corigliano's home and property, he asserts that Mr. Corigliano's testimony was "false" and "untrue," but again does not and cannot claim that the testimony of Mr. Naftalis or Mr. Friedman is necessary to show the value of that purported benefit. (*Id.*)[4]

      Having thus spent several pages of his opposition to our motion to quash pointing out what he contends are false and misleading aspects of Mr. Corigliano's testimony, Mr. Forbes cannot seriously argue that in calling Mr. Naftalis and Mr. Friedman to the stand to testify about these very topics, he is attempting to do anything other than contradict Mr. Corigliano's testimony on these issues and attack his credibility more generally. Indeed, it is difficult to imagine how the jury is supposed to understand such live testimony -- elicited during the defense case and from a government witness's own attorneys -- other than as an effort to do just that.[5]

      Accordingly, because the "real probative impact" of what defendant Forbes seeks to accomplish by subpoenaing Mr. Naftalis and Mr. Friedman is to discredit Mr. Corigliano's testimony on the identified topics (and more generally), the subpoenas should be quashed under

---

[4] Other recent submissions to the Court also make plain defendant Forbes' urgent desire to demonstrate that Mr. Corigliano testified falsely on the identified issues (among others). (*See* Forbes Mot. for Mistrial Due to Gvt.'s Presentation of, and Failure to Correct, Cosmo Corigliano's False and Misleading Test. dated Aug. 20, 2004, at 7-20.)

[5] Further proof of defendant Forbes' true motives can be found in particular in one of the topics identified as a possible area of examination -- whether certain alleged requests by the SEC were communicated to Mr. Corigliano (*see* Forbes Opp'n at 15-16) -- as to which defendant Forbes does not even attempt to argue that the testimony he seeks to elicit from Mr. Corigliano's lawyers relates to, much less could be used to establish, a "benefit" or "bias" or "motive."

the collateral impeachment cases and Rule 608(b). *See United States v. Beauchamp*, 986 F.2d 1,

3-4 (1st Cir. 1993) ("a party may not present extrinsic evidence to impeach a witness by

contradiction on a collateral matter"); *Walker v. Firestone Tire & Rubber Co.*, 412 F.2d 60, 63

(2d Cir. 1969) (noting "well settled" rule that an opposing party may "ask questions" but "is not

permitted to adduce extrinsic evidence that a witness lied on a previous occasion"); *United States

v. Mulinellli-Navas*, 111 F.3d 983, 989 (1st Cir. 1997) ("in order to be admissible," extrinsic

evidence "must not only contradict a statement of the [witness], but must also be material to [the

defendant's] guilt or innocence"); *United States v. Marino*, 277 F.3d 11, 24 (1st Cir. 2002)

(district court properly excluded extrinsic evidence offered to impeach government's primary

witness where that evidence "was not relevant to [the defendant's] guilt or innocence"); *see also*

Fed. R. Evid. 608(b) & Advisory Committee Note, 2003 Amendments (explaining that the Rule

bars evidence "'designed to show that the witness has done things, unrelated to the suit being

tried, that make him more or less believable per se.'") (quoting *United States v. Fusco*, 748 F.2d

996, 998 (5th Cir. 1984)).

## IV.    A Defendant's Ability to Offer Evidence of Alleged "Bias" and "Motive" Is Not Boundless and All Purported "Benefits" Accorded Mr. Corigliano Have Been More than Adequately Developed in the Record

Defendant Forbes apparently believes that by continuing to dangle the "bias" and

"motive" keys, he unlocks a door to the limitless introduction of evidence to establish the

purported "benefits" giving rise to the alleged "bias" or "motive." He is incorrect.

It is well-established that where the jury is "in possession of sufficient

information concerning formative events to make a 'discriminating appraisal' of a witness's

motives and bias,'" the district court has ample discretion under Rule 403 to exclude additional

extrinsic evidence on those same issues. *United States v. Blackwood*, 456 F.2d 526, 530 (2d Cir.

1972) (explaining that "[a] defendant's right to elicit such [bias] evidence . . . is not boundless, but is subject to reasonable limitations imposed by the trial judge in the exercise of sound discretion"). *Accord United States v. Weiss*, 930 F.2d 185, 198 (2d Cir. 1991) (finding no error in the exclusion, as cumulative, of extrinsic evidence of prosecution witness's bias where defense counsel already caused the witness to "admit [ ] to the main circumstances from which any bias supposedly arose,. "[a]ll the relevant information was obtained[,] and there is no evidence that the testimony would have added anything of probative value") (internal citation omitted). This is particularly so where such evidence would be likely to confuse and distract the jury vis-à-vis the real issues and defendants on trial. *See United States v. Gomes*, 177 F.3d 76, 81 (1st Cir. 1999) (agreeing that while certain extrinsic evidence might show "bias," "the trial judge had discretion to exclude such an excursion into extrinsic evidence that would distract the jury from the main issues in this case"). *See generally* Trial Tr. 6/1/04 at 2656 (The Court: "There's lots of evidence that you could go out and try to use to show that a witness has a bias. The fact that you could try to use that evidence to show the witness has a bias doesn't necessarily make it admissible.").

Here, both of these principles -- that the jury already has sufficient information to assess the defendants' benefits/bias/motive theory, and that the jury will be confused, distracted and even misled if defendants are permitted to pursue their theories further -- counsel strongly in favor of quashing the subpoenas for the testimony of Mr. Naftalis and Mr. Friedman.

With respect to the retainer issue, counsel for Mr. Forbes fully explored this topic and put before the jury all of the facts that the Court has ruled are arguably relevant to establish a "benefit." Mr. Sullivan's cross-examination of Mr. Corigliano made it perfectly clear to the jury that: (1) at the end of our representation of Mr. Corigliano, any unused portion of our retainer

12

would go to the SEC-appointed receiver and not back to him; and (2) until that time, we would

continue to employ those funds to provide legal services to him. (*See* Trial Tr. 8/3/04 at 9369-

72.) During part two of his cross-examination, Mr. Sullivan also put before the jury the *amount*

of the alleged potential "benefit" relating to the retainer, using a letter prepared by Kramer Levin

in response to the Court's ruling that "a right to receive legal services valued at up to a certain

amount . . . is a benefit . . . [a]nd the defense is entitled to put that benefit out before the jury."

(Trial Tr. 7/30/04 at 8-9.) Mr. Corigliano acknowledged in this connection that the balance of

the retainer is "more than a million" and did not dispute Mr. Sullivan's assertion -- based on our

representations in the letter -- that it was "closer to a million and a half dollars." (Trial Tr. 8/3/04

at 9373.) The government of course ethically cannot and will not dispute any argument – if such

argument is deemed proper and relevant – that the actual remaining amount is as we represented

it to the Court and the parties.[6]

The evidence before the jury is similarly well-developed with respect to Mr.

Corigliano's expenditures following the filing of his last quarterly report with the SEC on March

31, 2004 and up until the turnover of his family's assets on July 7, 2004. According to Mr.

Forbes' own papers: "Mr. Corigliano admitted to these expenditures and conceded they were a

benefit." (Forbes Opp'n at 7.) Indeed, in response to a defense subpoena, Mr. Corigliano

produced documents reflecting the amounts of such expenditures over $1,000, and Mr. Sullivan

---

[6] As we have noted elsewhere, even if the Court were to determine that the defense is entitled to put
into the record some additional piece of evidence reflecting the exact amount of the balance of the
retainer, there still is no need for the testimony of Mr. Naftalis and Mr. Friedman. While the
government continues to assert its view that such evidence is not admissible, if the Court were to
decide otherwise, the government has made it perfectly clear that it would stipulate to the basic facts
and figures reflected in Mr. Gonedes' letter. (*See* Trial Tr. 8/2/04 at 9127, 9280-81.)

then questioned him and put before the jury the actual dollar amounts involved. (*See* Trial Tr. 8/3/04 at 9378-80, 9389, 9393-9412.)[7]

So too with respect to the Corigliano family home. The jury knows there are technically two plots of land (*see, e.g.,* Trial Tr. 7/20/04 at 8166-69), they know about Mr. Corigliano's internet search concerning a nearby property (*see, e.g.,* Trial Tr. 8/3/04 at 9347-53), they know what the SEC settlement agreement says (*see, e.g.,* Trial Tr. 7/20/04 at 8153-61), and they have heard Mr. Corigliano's testimony on these issues (*see id.*).

In sum, to the extent these areas of examination are arguably relevant to show some alleged "bias" or "benefit," the jury already has been made aware of all of the material facts, there is more than ample evidence in the record from which the defense can make those arguments that the Court deems proper, and no further extrinsic evidence on these points is required or should be allowed, particularly from Mr. Corigliano's own attorneys.

## V.    Defendants' Work-Product "Analysis" Is Wrong

Defendant Forbes misconstrues our work-product argument. Our position is not that the terms of the SEC settlement, or the amount of the retainer balance, or what the SEC said to us, constitutes privileged information. Instead, our position is that requiring Mr. Naftalis or Mr. Friedman to testify as to their *recollections* of conversations and communications about these topics (whether with the SEC or with Mr. Corigliano), as well as their *understandings* of certain related issues, necessarily implicates work-product concerns, threatens disclosure of

---

[7] In addition, with respect to both of the alleged "side agreements" with the SEC, we have represented that, other than the signed, written agreements that the defense already has (i.e., the budget agreement from August 2000 and the settlement agreement from April 2004), we have no documents in our files signed by or otherwise shared with the SEC that "describe or memorialize" any additional "agreements" on the subjects of the Kramer Levin retainer or post-March 31, 2004 expenditures. (*See* Kramer Levin/Gonedes Mem. dated Aug. 25, 2004, at 11.)

absolutely protected mental processes and attorney-client legal advice, and weighs heavily against requiring them to provide such testimony.

Among the cases we cited on this point, which defendant Forbes fails to even address in this respect, is *In re Grand Jury Proceedings ("Duffy")*, 473 F.2d 840 (8th Cir. 1973). The court there noted that what was at issue was the attorney's "personal recollections" of "interviewees' assertions of fact," *not* "legal conclusions or opinions." *Id.* at 841-42. The court nevertheless found that the attorney's "personal recollections . . . pertaining to his conversations with nonemployees of his client" constituted work product that was "absolutely, rather than conditionally, protected." *Id.* at 848. A similar result was reached in *In re Grand Jury Subpoena ("Zerendow")*, 925 F. Supp. 849, 854 (D. Mass. 1995), which Forbes does not even bother to acknowledge, where the court quashed on work-product grounds a subpoena seeking an attorney's "recollection" of a conversation, citing the "risk" that the attorney would be "required to expose his thought process to opposing counsel and, even worse, risk becoming a witness against his client." And Forbes also ignores our citation to the Sixth Circuit's decision in *In re Grand Jury Subpoena dated November 8, 1979*, 622 F.2d 933 (6th Cir. 1980), in which his own counsel participated (on our side of the issue), where the court ruled that the work-product doctrine broadly precluded a wide range of questions that a grand jury wished to pose to a Williams & Connolly lawyer arising out of his representation of a target of a government investigation.

To this list we would add *United States v. District Council of New York City*, 1992 WL 208284 (S.D.N.Y. Aug. 18, 1992). There, the Court made the point that while "an attorney[] may possess factual information that is not privileged and that must be divulged," "when a party seeks discovery directly from an attorney . . . , there is more than a strong

likelihood that the work product doctrine will be violated." *Id.* at *12. The court further explained that "[r]equiring an attorney to give his or her personal recollection of . . . interviews would create as great or greater threat to disclosing his thoughts, opinions and strategies as would disclosure of his written notes reflecting those interviews." *Id.* at *7.

These cases, unrebutted by defendant Forbes, have direct application here and belie any claim that work-product concerns are not implicated by the areas of testimony sought from Mr. Naftalis and Mr. Friedman. Consider, for example, the proposed questioning of these attorneys on the topic of the Kramer Levin retainer. Defendant Forbes contends there is an undisclosed "side agreement." We have stated our position (below and in a previous submission) that this description of the retainer issue is inaccurate and misleading. Surely any questioning of Mr. Naftalis or Mr. Friedman on such topics as whether what transpired is properly characterized as an "agreement" or a "benefit," or whether the retainer should have been listed on certain documents, will not just *threaten* exposure of these attorneys' thought processes. Such questioning *necessarily* will call for revelation of those protected mental thought processes, as well as interpretation and explanation, and confidential advice and communications with Mr. Corigliano, all of which is most assuredly protected by the work-product doctrine and/or attorney-client privilege. Similarly, as to Mr. Corigliano's expenditures after March 31, 2004 and up to the turn-over of assets in July 2004, we argue below (as we did in a prior submission) that defendant Forbes' interpretation of the SEC settlement agreement and other documents differs from our own (and is wrong). Any questioning of Mr. Naftalis or Mr. Friedman about their basis for advising Mr. Corigliano on this issue again will necessarily entail explanation that draws on their protected mental processes and opinions. Additionally, even if the questions on these or other topics do not expressly demand the disclosure of protected

16

attorney thoughts and communications, they nevertheless may require such disclosure to provide

the jurors with a complete and accurate picture and the proper context to ensure that the jurors

are not misled by arguments of counsel.

We also note that the "mere messenger" cases cited by defendant Forbes -- such

as *United States v. Hall*, 346 F.2d 875, 882 (2d Cir. 1965) and *In re Grand Jury Testimony of

Attorney X*, 621 F. Supp. 590, 591-92 (E.D.N.Y. 1985) -- are factually inapposite here. Mr.

Corigliano's consistent testimony -- which the Court acknowledged on several occasions[8] -- has

been that he did not use his own counsel as a mere messenger to transmit information to or from

the government. He testified that he did not direct his counsel to make specific representations

to the Justice Department or the SEC, that he did not know specifically when his attorneys

communicated with the government or what exactly was said during those communications, and

his attorneys did not report back to him on what specifically the government said in such

meetings. (*See, e.g.,* Trial Tr. 7/15/04 at 7671-74, 7678, 7691-95, 7698-99; 7/19/04 at 7973-

7975, 7989-91; 7/20/04 at 8104-08, 8173-74; 8/2/04 at 9298, 9302, 9312-15; 8/3/04 at 9355-56.)

We too have represented that all of our meetings and communications with our client have been

an integral part of a continuing process by which we provide legal advice to him, as his

attorneys, as to how to proceed. (*See, e.g.,* Corigliano Reply Mem. dated May 26, 2004, at 7-8.)

In light of this record, there is every reason to conclude that questioning of Mr. Naftalis or Mr.

Friedman as to what they conveyed to Mr. Corigliano concerning their conversations with the

SEC necessarily will infringe on and require the divulgence of the attorneys' thought processes

---

[8] *See* Tr. 7/15/04 at 7795; Tr. 7/19/04 at 7803-05, 7810; Tr. 7/20/04 at 8021, 8033-34; Tr. 7/27/04 at 9039; Tr. 8/2/04 at 9323-27.