vis-à-vis their decisions about what to say (and what not to say) to Mr. Corigliano as well as their confidential and protected advice to him.[9]

### VI. Defendants' "Opened the Door" Cases Are Inapposite Here

Defendant Forbes' attempt to evade the collateral impeachment rule by arguing that Mr. Corigliano's testimony "opened the door" to the presentation of extrinsic evidence concerning his settlement with the SEC and the purported benefits he received from the SEC should also be rejected. (*See* Forbes Opp'n at 17, 25-26.) As we pointed out in our July 26, 2004 submission to the Court, the cases he cites carve out a narrow exception to the collateral evidence rule that has no applicability here. These cases involve *testifying defendants* (not cooperating witnesses) who offered a broad disclaimer of misconduct -- essentially denying that they engaged in the charged crimes or any conduct that was remotely similar -- which, if true, would have exonerated the defendants from the charged crimes and thus could not be left unchallenged. In each case, the government was permitted to impeach the defendant's blatantly perjurious testimony.[10] Here, of course, far from issuing any blanket denial of wrongdoing, Mr.

---

[9] We note that defendant Forbes asserts in passing in a footnote -- but makes no effort to demonstrate -- that he has "substantial need" for the testimony of Mr. Naftalis and Mr. Friedman. (*See* Forbes Opp'n at 2 n.2.) The record suggests just the opposite, particularly as the government has offered to stipulate to the relevant facts concerning any oral representations to the SEC and the amount of the balance of the retainer (but not to the non-factual and argumentative add-ons that counsel for defendant Forbes demands as part of any such stipulation). (*See* Trial Tr. 8/2/04 at 9127, 9280-81.)

[10] *See Walder v. United States*, 347 U.S. 62, 64 (1954) (defendant charged with selling narcotics who testified that he had never purchased, sold or possessed any narcotics impeached by evidence of prior possession of heroin); *United States v. Bufalino*, 683 F.2d 639, 647 (2d Cir. 1982) (where defendant charged with conspiracy to violate civil rights and obstruction of justice arising from plan to murder witness testified that his acquaintance with alleged Mafia hitman was based on "chance meetings," "it became proper for the government to impeach him by introducing evidence of [his] longstanding relationship with La Cosa Nostra . . . . since without this evidence it was unlikely that the jury would believe that [the Mafia hitman] would agree to commit the crime"); *United States v. Benedetto*, 571 F.2d 1246, 1250 (2d Cir. 1978) (defendant charged with bribery who testified that the never took bribes impeached with evidence of prior bribes); *United States v. Cuadrado*, 413 U.S. 633 (2d Cir. 1969) (defendant charged with selling narcotics who testified that he had never dealt with narcotics

Corigliano has fully and repeatedly admitted his criminal conduct. Nor do his answers concerning the terms of his settlement with the SEC and the purported benefits he received from the SEC constitute a broad disclaimer of misconduct of the type that Courts have allowed prosecutors to impeach with extrinsic evidence. Accordingly, the door has not been opened to impeachment by extrinsic evidence.

### VII. Defendant's Demands to Introduce Additional Testimony on their False Claims of "Secret" "Undocumented" "Side Agreements" with the SEC Threaten to Further Distract and Confuse the Jury

As we argued in a recent submission,[11] defendant Forbes' demands to introduce further evidence concerning alleged "secret" or "undocumented" "side agreements" with the SEC serve the improper purpose of aiding an effort to distract and overwhelm the jury with false, misleading and/or unsupported arguments about the nature of the relationship and the course of dealings between Mr. Corigliano and the SEC. Having already allowed defendants latitude in eliciting the core facts, the Court need not give them further latitude to twist and distort them.

#### A. The Retainer

Citing a small handful of litigated SEC asset freeze cases that represent the exception and not the rule (*see* Forbes Opp'n at 29), defendant Forbes continues to imply that, upon filing a civil suit or administrative enforcement action, the SEC routinely seizes or exercises some control over attorney fee retainers that have been paid to lawyers, and that by not doing so with respect to Mr. Corigliano, the government accorded him some material "benefit" that allegedly goes to his "bias" or "motive."

---

except on one instance and did not intend to derive personal benefit impeached by evidence of heroin sale).

[11] *See* Kramer Levin/Gonedes Mem. dated Aug. 25, 2004, at 11-15.

19

This suggestion is false and misleading. As the SEC's own published statistics show, such asset freeze cases are rare, representing only approximately 10% of all enforcement actions. *See* SEC Record of Enforcement, FY 2000-2002 (showing that in fiscal 2000, when the SEC brought its action against Mr. Corigliano, asset freezes were obtained in only 56 of 503 enforcement actions).[12] It is, in other words, routine that the SEC, during the course of its investigation, and even after charges have been initiated, does not interfere with the attorney-client relationship or with the funds paid to a defendant's attorneys to secure representation. This is so notwithstanding the facts that it also is routine that those being investigated by the SEC retain counsel and pay counsel a retainer, which is often substantial. The reality, in short, is that in the vast majority of enforcement actions, the SEC does not freeze assets, much less take the more drastic step of seizing or freezing or otherwise monitoring moneys that a "target" or a defendant has paid to his attorneys in the form of a retainer.

For further proof that this is so we need look no further than this very case. Following the disclosure of accounting irregularities in early April 1998, defendants Forbes and Shelton retained counsel and presumably paid and are paying sizeable legal fees. Yet neither defendant (to our knowledge) has ever faced any action by the SEC to seize, freeze or otherwise monitor such funds.[13] So too with respect to Mr. Corigliano: at no point in our interactions with the SEC – from the day we learned they were investigating Mr. Corigliano back in 1998 through 2004 – did the Enforcement Staff demand that our attorneys fees be turned over or monitored in connection with any settlement or settlement discussions. Nor are we aware of the SEC seeking

---

[12] Found at www.sec.gov/news/extra/enfrecfy2002.htm (copy attached as Exhibit A hereto).

[13] This is so notwithstanding the government's position that Forbes improperly transferred many millions of dollars in assets in anticipation of the indictment in this case. (*See* Gvt. Mem. Opp'n Forbes Mots. Preclude dated Aug. 29, 2004.)

20

to interfere in any way with the attorney retainers paid by any of the other individuals who have been investigated by the SEC in this case, whether cooperating witnesses or not.

In light of this backdrop, it becomes clear why our representations to the SEC about the disposition of any unused legal fees cannot accurately be understood or described as some sort of "undocumented" or "secret" "side agreement." What we said as relevant here was simply that (1) instead of returning any unused funds to our client at the end of our representation, as we otherwise would have done under the ethical rules, we would turn over any such monies to the SEC or the receiver, and (2) our client -- Mr. Corigliano -- understood that he was forfeiting that right.[14] In other words, our representations amounted to an *abandonment* by Mr. Corigliano of a right he otherwise had to the return, at the conclusion of our representation, of any unused portion of the retainer he had paid us. The Court recognized this in its rulings during the telephonic conference on July 30, 2004, noting that Mr. Corigliano has "the right to receive a certain amount of legal services. . . . [a]nd if he doesn't use them, then the proceeds get turned over to the receiver, the proceeds would be the cash refund that would otherwise be due to Mr. Corigliano." (Tr. 7/30/04 at 8.)

In sum, then, our representations about the disposition of any remaining balance of the retainer paid to us by Mr. Corigliano are fully consistent with Mr. Corigliano's testimony that while he understood that any such moneys would go to the receiver (i.e., he understood that he had given up his right to the return of any unused portion of such monies), he was not aware

---

[14] *See* Corigliano Mem. Further Opp'n Crime-Fraud dated July 26, 2004, at 3-4, ¶3; Trial Tr. 8/2/04 at 9123-26, 9129 (describing these disclosures made to the SEC, as well as the disclosure as to the remaining balance of the retainer).

21

of any additional "agreement" on this point. (*See* Trial Tr. 8/3/04 at 9367-70.) No further evidence, whether in the form of documents or testimony, is necessary or appropriate.[15]

### B.    Post-March 31, 2004 Expenditures

With respect to Mr. Corigliano's testimony, elicited on cross-examination, that he understood that, up to the point when he and his family transferred their assets to the SEC-appointed receiver, he could continue to pay his family's bills as they came due (*see* Trial Tr. 8/3/04 at 9367-70, 9376-78, 9389-403), counsel for Mr. Forbes continues to argue that such expenditures were unauthorized and/or inconsistent with the SEC settlement agreement.

But defendant Forbes was not a party to the agreement between Mr. Corigliano and the SEC and he misquotes it to the Court and misrepresents it in front of the jury. Forbes thus claims (for a second time[16]) that Mr. Corigliano's settlement with the SEC "broadly required him to disgorge *all* 'assets of a value of $1,000 or more in which he [or his wife] had any direct or indirect legal or beneficial ownership as of March 31, 2004.'" (Forbes Opp'n at 22-23.) But in purporting to quote the language from the SEC settlement document (specifically, ¶ 3(vi)) of DX 1060), Forbes omits the words "any other," which describe a sub-category of unenumerated assets, existing as of March 31, 2004, that were to be turned over, and substitutes (outside of quotation marks) instead his own word -- "all." This misleading substitution of critical words creates the erroneous impression that the SEC settlement -- which did not even

---

[15] Defendant Forbes misses the mark by citing to *United States v. Wolfson*, 437 F.2d 862, 874 (2d Cir. 1970). The problem in *Wolfson* was that the Court cut off all cross-examination of the cooperating witness on an indisputable benefit conferred by the SEC (a no-action letter) following the cooperating witness's provision of favorable testimony to the government. Here, in sharp contrast, defendant Forbes has had more than sufficient opportunity to examine Mr. Corigliano about every last detail of his interactions and settlement with the SEC.

[16] *See also* Forbes Mot. for Mistrial Due to Gvt.'s Presentation of, and Failure to Correct, Cosmo Corigliano's False and Misleading Test. dated Aug. 20, 2004, at 18.

22

become effective until May 7, 2004 (when Final Judgment was entered (*see* ¶ 3 of DX 1060)) -- somehow retroactively forbade Mr. Corigliano from continuing to pay his family's bills as he had for the prior four years. It did not, and there is nothing inaccurate about Mr. Corigliano's testimony and nothing improper about his conduct in this respect. Again, no further evidence is necessary or appropriate.

### C.  The Dangers of Multiple Trials-Within-the-Trial

We have little doubt that Defendant Forbes' strategy with respect to these issues is to put on multiple trials-within-the-trial to distract and confuse the jury. Take, for example, defendants' "benefit" and "bias" theory with respect to the retainer. To try to demonstrate the untrue proposition that Mr. Corigliano received some extraordinary or unusual dispensation by virtue of his cooperation that would cause him to be biased in favor of the government, defendant Forbes has subpoenaed no fewer than six individuals and three record custodians, including Mr. Naftalis and Mr. Friedman; a member of Kramer Levin's accounting department (Mr. Gonedes); a Kramer Levin custodian of records; a senior partner (Audrey Strauss, Esq.) and the custodian of records from the law firm representing his wife; at least two members of the SEC's enforcement staff who were involved in negotiating the settlement agreement (Mr. Frohlich and Mr. Kidney); and an SEC custodian of records. We can only imagine the lengthy roster of witnesses and documents that the government might reasonably wish to offer in rebuttal.

This is but one example of the many trials-within-the trial that defendant Forbes apparently seeks to conduct as part of his defense case. Others could include a trial-within-the trial on whether Mr. Corigliano properly continued to pay his family's bills pending turn-over of

23

their assets to the SEC-appointed receiver, whether Mr. Corigliano was aware of specific interactions between his counsel and the SEC staff, and so on and so on.

We respectfully submit that Rule 403 provides this Court with more than sufficient discretion -- discretion that we urge the Court to exercise -- to rebuff these improper attempts by the defendants to distract, confuse and mislead the jury into focusing on issues that are far afield from the ultimate decisions that they will have to make: whether Walter Forbes and Kirk Shelton knowingly participated in one of the largest earnings fraud crimes in U.S. history. *See United States v. Bowe*, 360 F.2d 1, 15-16 (2d Cir. 1966) ("On the other hand, it is apparent, as the trial judge stated after hearing extensive argument, that the introduction of the proffered testimony would have opened up a trial within a trial. . . . The trial judge correctly concluded that the confusion and delay which would have resulted from the introduction of [the disputed] testimony outweighed its slight probative value.").

## Conclusion

For the foregoing reasons as well as those set forth in our opening memorandum, we respectfully urge the Court to quash in their entirety the subpoenas for trial testimony of Mr. Naftalis and Mr. Friedman.

Respectfully submitted,

Kramer Levin Naftalis & Frankel LLP

By: _____
Gary P. Naftalis (ct 24510)
Alan R. Friedman (ct 14926)
Eric A. Tirschwell (ct 25626)
J. Wells Dixon (ct 22932)
919 Third Avenue
New York, New York 10022
(212) 715-9100

-and-

Jacobs, Grudberg, Belt & Dow, P.C.
Ira B. Grudberg (ct 00178)
350 Orange Street
New Haven, Connecticut 06511
(203) 772-3100

Attorneys for Cosmo Corigliano

# EXHIBIT A

Record of Enforcement FY 2000 - 2002 (Complete)                                              Page 1 of 1



Home | Previous Page

U.S. Securities and Exchange Commission

### Record of Enforcement
### FY 2000 - 2002

|  | FY 2000 | FY 2001 | FY 2002 |
|---|---|---|---|
| Total Enforcement actions filed | 503 | 484 | 598 |
| Financial fraud and issuer reporting actions filed | 103 | 112 | 163 |
| Officer and director bars sought (in all categories of cases) | 38 | 51 | 126 |
| Temporary Restraining Orders filed (in all categories of cases) | 33 | 31 | 48 |
| Asset Freezes (in all categories of cases) | 56 | 43 | 63 |
| Trading Suspensions | 11 | 2 | 11 |
| Subpoena enforcement proceedings | 8 | 15 | 19 |
| Disgorgement Ordered (in millions)* | $463 | $530 | $1,328 |
| Penalties Ordered (in millions)* | $43.7 | $56.1 | $116.4 |

\* Includes amounts disbursed to the NASD as part of the Credit Suisse First Boston settlement.

*http://www.sec.gov/news/extra/enfrecfy2002.htm*

Home | Previous Page                                                     Modified: 10/22/2002

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that a copy of the foregoing reply memorandum, dated September 2, 2004, was served via facsimile this 2nd day of September, 2004 upon the following parties:

John J. Carney, Esq.
Special Attorney
U.S. Department of Justice
450 Main Street, Room 617
Hartford, CT 06103
Fax: (860) 240-3021

Barry S. Simon, Esq.
Williams & Connolly LLP
c/o Marriott Residence Hotel
942 Main Street
Hartford, CT 06103
Fax: (860) 293-1651

Thomas P. Puccio, Esq.
230 Park Avenue, Suite 301
New York, NY 10172
Fax: (212) 883-6388

Scott A. Edelman, Esq.
Thomas A. Arena, Esq.
Milbank, Tweed, Hadley & McCloy LLP
One Chase Manhattan Plaza
New York, NY 10005
Fax: (212) 530-5219

_____
J. Wells Dixon