# EXHIBIT H

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------x
UNITED STATES OF AMERICA          :
                                  :
              v.                  :   No. 3:02CR264 (AWT)
                                  :
WALTER A. FORBES,                 :   November 6, 2005
                                  :
              Defendant.          :
---------------------------------------x

**OPPOSITION OF NON-PARTIES COSMO CORIGLIANO AND KRAMER LEVIN TO FORBES' MOTION FOR ENFORCEMENT OF SUBPOENA CALLS (FORBES RETRIAL MOTION NO. 19)**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Gary P. Naftalis
Alan R. Friedman
Eric A. Tirschwell
J. Wells Dixon
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

-and-

JACOBS, GRUDBERG, BELT & DOW, P.C.
Ira B. Grudberg
350 Orange Street
New Haven, Connecticut 06511
(203) 772-3100

Attorneys for Cosmo Corigliano

KL3:2476571.1

### **Preliminary Statement**

Defendant Forbes' motion fails to focus on the issue the Court framed for further briefing – i.e., whether Forbes can properly attempt to impeach Mr. Corigliano concerning the completeness of asset "transfer" information that Mr. Corigliano's counsel (not Mr. Corigliano) sent to the SEC on May 26, 2000 (Tr. 11/3/05, at 2011-14). And perhaps because the answer to that question is so clearly no (for multiple reasons set forth below, including attorney-client privilege), Forbes instead attempts to capitalize on his own request for an opportunity to clarify that specific issue to improperly re-litigate the enforceability of several subpoena demands that the Court rejected just days ago as well as in the first trial.

As we explain below, the arguments in Forbes' latest submission are both meritless and misleading, not just to the Court but, potentially, to the jury as well. First, and dispositive of the specific issue raised in Court, we have found no responsive documents that would show that the two particular financial disclosure letters on which Forbes has placed primary reliance for his arguments, dated May 26, 2000 and September 4, 2003, were copied to Mr. Corigliano. Moreover, Forbes' principal proposed line of inquiry is predicated on the misleading assumption that counsel's May 26, 2000 letter to the SEC including certain asset, liability and asset "transfer" information was necessarily intended to be all-inclusive; in fact, as set out below, that letter followed discussions and negotiations by counsel for Mr. Corigliano that show that only certain asset "transfer" information was provided at that time. In any event, the letter is from Mr. Corigliano's counsel; it is signed only by counsel and not Mr. Corigliano; it reflects counsel's view as to what was to be provided at that point in time; and it is not, as a matter of black-letter law, a proper piece of evidence with which to attempt to discredit Mr.

KL3:2476571.1

Corigliano on the issue of whether he provided accurate and complete financial disclosure to the SEC.

Forbes' second argument -- that the correspondence reflecting settlement negotiations back and forth between counsel and the SEC concerning an asset preservation agreement and budget can be used to show that Mr. Corigliano knows he received alleged "special treatment" from the SEC because of his cooperator status and thus has a bias or motive to fabricate testimony -- similarly fails. Again, we have found no documents indicating that Mr. Corigliano was copied on or otherwise received the single SEC letter (of July 20, 2000) on which Forbes relies in attempting to show that the SEC Staff was at some point allegedly dissatisfied with the amount of his budget request or Mr. Corigliano's financial disclosure. Nor does the record bear out the view that Mr. Corigliano received (or that he or his counsel believed he was receiving) favored treatment from the SEC. In any event, to the extent Mr. Corigliano was "benefited" in connection with his efforts to settle with the SEC, those purported benefits are already fully disclosed (in the asset preservation and budget agreement as well as the final settlement agreement), and the differing views of counsel over whether the budget or settlement terms were fair and reasonable are both irrelevant and inadmissible. And even if the particular letter on which Forbes relies or others like it were copied to Mr. Corigliano, injecting such documents into the trial would distract the jury with a trial-within-the-trial on settlement negotiations and disagreements between counsel, negotiations and disagreements about which Mr. Corigliano would be unable to testify without drawing on and being improperly and unfairly forced to divulge privileged communications in which his attorneys advised him about the status and progress of those negotiations and disagreements.

KL3:2476571.1

For these reasons, as developed more fully below, Forbes' motion for enforcement of subpoena calls should be denied and his proposed improper lines of cross-examination should not be allowed.

## I. BACKGROUND TO THE MAY 26, 2000 LETTER FROM KRAMER LEVIN TO THE SEC

Between the signing of Mr. Corigliano's plea agreement in January 2000 and the signing of his asset preservation and budget agreement with the SEC in August 2000, there were extensive – and at times heated – exchanges and discussions between Mr. Corigliano's attorneys and the SEC Staff, relating to, among other things, the possible terms of settlement and what financial information Mr. Corigliano should or would provide in connection with those discussions. There were, as the correspondence reflects, sharp disagreements between counsel for the parties. Forbes' motion attaches some, but not all of the relevant correspondence, and thus presents a partial but incomplete picture of those negotiations and the related financial disclosures.

Specifically, Forbes' exhibits fail to include at least two Kramer Levin letters and one letter from the SEC that provide background and context to a proper and fair consideration of the May 26, 2000 letter by counsel to the SEC that includes the asset "transfer" information that Mr. Sullivan referenced in court this past Thursday and led to the current round of briefing.

First, in a May 16, 2000 letter to the SEC (attached hereto as Exhibit A), counsel for Mr. Corigliano disagreed with the SEC Staff's contentions – repeated here by Forbes as if undisputed – that Mr. Corigliano was somehow dragging his feet with respect to financial disclosure matters. Counsel stated in that letter, *inter alia*:

> . . . [T]he Staff has never previously requested that Mr. Corigliano supply it with financial information pursuant to paragraph 12 of the plea agreement. The Staff did demand that Mr. Corigliano pay more than $16 million in disgorgement, plus interest, plus a penalty equal to the disgorgement. And the Staff indicated it

> would recommend waiving full payment of this amount if Mr. Corigliano was unable to pay. In that event, the Staff would leave Mr. Corigliano with his house, car, legal fees and walking around money. *The subject of financial disclosure arose only in connection with the waiver policy and that financial disclosure would be required if Mr. Corigliano sought to avail himself of that policy. To date, we have not availed ourselves of the waiver policy.* Instead, we have repeatedly argued that because Mr. Corigliano is not guilty of insider trading, the Staff's disgorgement calculations are inaccurate and punitive, and the fair and equitable disgorgement amount is only a small fraction of the Staff's calculations.

(Emphasis added.)

About a week later, in a May 24, 2000 letter to the SEC (attached hereto as Exhibit B), counsel reiterated that Mr. Corigliano would be "providing ... financial disclosure in aid of our attempts to reach an amicable resolution of this matter." Counsel also noted that the SEC Staff had specifically inquired about "transfers made by Cosmo to his wife and children," that Mr. Corigliano was "working on the financial disclosure form" and that "we will supply that information to you as promptly as we possibly can."

The next day, May 25, 2000, the SEC sent us a letter (attached hereto as Exhibit C) stating that they understood that "at least *some* of the financial information we have been seeking" was ready for "transmittal" (emphasis added) including "the information concerning Mr. Corigliano's assets and asset transfers," and requested that we send that information "without awaiting completion of the other information."[1]

It was against this back-drop that one day later, on May 26, 2000, we sent to the SEC certain information, including a Statement of Assets and Liabilities as well as information relating to asset "transfers" between Mr. Corigliano and his wife and children about which the

---

[1] We note that we do not have any documents showing that drafts or copies of the letters we are attaching hereto as Exhibits A through C were provided to Mr. Corigliano.

SEC had inquired during a prior meeting and which we promised to provide (as reflected in the May 24, 2000 letter, described above).

## II.  FORBES' PLEA VIOLATION THEORY FAILS

Forbes' principal argument is that the documents sought are admissible to show that Mr. Corigliano allegedly violated his plea agreement.[2] This theory has three predicates: (1) that the documents sought would show that Mr. Corigliano was "on notice of the representations made by his counsel to the SEC;" (2) that "[h]aving received or reviewed the correspondence in question (or drafts thereof), Mr. Corigliano would have learned that the information was inaccurate and/or incomplete," and (3) if this is the case and he "did nothing to correct that information," Mr. Corigliano "violated his obligations under the plea agreement." (Forbes Mem. at 6-7.)

The first point to make about this theory is that it is, by its own terms, limited to correspondence from counsel – not Mr. Corigliano -- to the SEC in which financial information was disclosed. In his brief, Forbes makes specific arguments based upon only two such letters containing financial and/or asset disclosure information: (a) counsel's May 26, 2000 letter that includes certain asset "transfer" information and was the subject of the colloquy between the Court and counsel for Forbes this past Thursday, and (b) counsel's September 4, 2003 letter, sent for settlement purposes only, and in advance of an *unsuccessful* settlement meeting, that includes certain additional information relating to Mr. Corigliano's assets and financial situation.

The second and related point is that, as to the May 26, 2000 and September 4, 2003 letters, we have diligently searched and can find no documents indicating that drafts,

---

[2] It bears emphasizing here that Forbes' attempt to re-litigate the subpoena issues is strictly limited to correspondence to or from the SEC that was copied to Mr. Corigliano. (Forbes Mem. at 1.)

- 5 -

KL3:2476571.1

carbon copies or blind carbon copies of either of these letters were sent to Mr. Corigliano. Accordingly, even were the Court to credit Forbes' "violation of the plea agreement" argument (which it should not, as we now explain), there simply are no further documents to be produced with respect to these two letters.

The third point, with respect to the May 26, 2000 letter in particular, is that even if Forbes were to somehow establish (or would like to argue, contrary to Mr. Corigliano's expected testimony) that Mr. Corigliano received a draft and/or copy of this letter, that fact would not itself show, as Forbes claims, that Mr. Corigliano would have known "that the information was inaccurate and/or incomplete." Forbes argument in this respect is premised on another one of his self-created misleading assumptions: that the May 26, 2000 letter was intended to be a complete and full response to the items contained in the SEC's Statement of Financial Condition disclosure form (Forbes Ex. 2).

In fact, as Forbes' papers later concede, Mr. Corigliano was never required to submit that disclosure form, which requested *inter alia*, a complete list of all "transfers of cash in an amount of $1000 or more, or assets or property with a cost or fair market value of $1000 or more" (*id.* at 7) and Mr. Corigliano's sworn signature under "penalties of perjury" (*id.* at 8). Instead, the SEC was sent only letters from counsel that, on their face, contained what Forbes also is forced to concede was only "some, but not all of the information requested by the form" (Forbes Mem. at 9) and responded, in part, to the SEC Staff's inquiries about asset transfers to Mr. Corigliano's wife and children (as described in Point I above).

In light of this undisputed record, it is not proper or fair to attempt to discredit Mr. Corigliano and/or attempt to show that he somehow provided inadequate disclosure by juxtaposing his counsel's letter providing "transfer" information that related to his wife and

children with what Forbes claims to be evidence of additional "transfers" that – for any variety of perfectly legitimate reasons arising from counsel's view of the negotiations (in which Mr. Corigliano did not participate[3]) or even from counsel's disagreements with the SEC's position – may not have been included at that time.

In the end, the thrust of what Forbes is trying to accomplish through this line of examination is precisely what the Court suggested: "to hold [Mr. Corigliano] accountable for the [May 26, 2000] letter that his lawyers sent" (Tr. 11/3/05, at 2006) even though it is not his letter. In other words, as Forbes' papers make plain, he is interested in and intent on pursuing "cross-examination about the accuracy or inaccuracy of the [May 26, 2000] letter," as well as the "September 4, 2003 letter to the SEC and other correspondence between Mr. Corigliano's counsel and the SEC." (Forbes Mem. at 3.)

But as Your Honor has ruled in the prior trial in this case, and as the precedents clearly establish, attempted impeachment of a witness with statements made by his lawyer that were not signed or otherwise adopted by the witness is plainly improper. *E.g.*, Tr. 6/1/04, at 2648-49 ("You cannot impeach someone with their attorney's statements."); *United States v. Cuevas Pimentel*, 815 F. Supp. 81, 83 (D. Conn. 1993) (Cabranes, C.J.) ("[I]t is clear that, as a general matter, Rule 613(b) does not permit an attorney's statements to be introduced as prior inconsistent statements of that attorney's client."). *See generally Palermo v. United States*, 360 U.S. 343, 350-52 (1959) (explaining in an analogous context that Congress limited the disclosure requirements under the Jencks Act (18 U.S.C. Sec. 3500) to only those statements that were either expressly adopted by the witness or were a "substantially verbatim" recitation of what the

---

[3] And to the extent Mr. Corigliano may have been informed about such conversations, it would have been in the privileged context of the rendering of legal advice, as his prior testimony makes plain. See, e.g. Tr. 7/19/04, at 7970-76; 7/20/04, at 8104-08, 8174.

witness said because it would be "grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own"); *United States v. Almonte*, 956 F.2d 27, 29 (2d Cir. 1992) (explaining that because third party's notes reflect only that note-taker's summary characterization of witness's prior statement, notes are irrelevant as impeaching prior inconsistent statement and inadmissible).

### III. FORBES' "NATURE OF THE RELATIONSHIP" THEORY FAILS AS WELL

Forbes also argues that the demanded documents should be produced and are admissible to show "the nature of the relationship between the government and Mr. Corigliano" and "the government's willingness to bend, over and over again, to accommodate the special requests of its star witness and to forgive his failure to comply with the SEC's requests for information." (Forbes Mem. at 8-9.) This theory fails as well, also on multiple grounds.

To begin and state the obvious, this "new" argument with respect to these documents is particularly non-responsive to the issue as to which the Court invited briefing during Thursday's colloquy. Instead, it is an attempted third bite at an apple that was litigated and lost during the first trial, and then re-litigated and lost just days ago during this trial. In fact, the "nature of the relationship" argument was made, but with less elaboration, in Forbes' most recent opposition to our motion to quash (at pp. 31-32) and was expressly rejected by the Court in its Order of just days ago quashing virtually all of Forbes' Rule 17(c) demands. In addition, the "nature of the relationship" argument is based on correspondence with the SEC that Forbes has had for a long time (and certainly well prior to the briefing on the 2005 subpoenas) and is therefore an argument that could have, and should have been raised and elaborated on well before now. It therefore should be rejected first and foremost as another improper and uninvited attempt to reargue without meeting the demanding reconsideration criteria.

In addition, the factual predicates for Forbes' arguments are again based on misleading assumptions. Forbes claims first that the correspondence shows that "the government allowed Mr. Corigliano to circumvent its ordinary form, providing far less detailed information, and through his attorney rather [than] by his own signature, under penalty of perjury," and that this "demonstrates the government's willingness to bend the rules time and again for Mr. Corigliano" and "to let Mr. Corigliano violate his obligations under the plea agreement – which specifically required him to provide this information to the SEC in the form ordinarily used – with impunity." (Forbes Mem. at 10.)

But the full record of relevant correspondence shows that while the SEC took the position for some time that Mr. Corigliano should fill out the Statement of Financial Condition form, Mr. Corigliano's counsel differed with the SEC Staff on the issue of what they had requested previously and what was required under the plea agreement, and ultimately decided to provide the SEC Staff with something less than the complete and sworn Statement of Financial Condition form. More specifically, as our May 16, 2000 letter to the SEC (Ex. A hereto) clearly states (as quoted in Point I, above), we differed with the Staff over whether the Statement of Financial Condition form was called for in light of the fact that Mr. Corigliano was not then seeking to avail himself of the SEC's "waiver policy," under which a portion of a agreed-to settlement amount would be waived if the defendant showed himself unable to pay.[4] The suggestion that this back-and-forth between SEC counsel and Mr. Corigliano's counsel, and the more limited form of disclosure that ultimately was provided, could be used as evidence of a

---

[4] Stipulation 12 of Mr. Corigliano's plea agreement states in general terms that he was required "to provide the SEC, *upon request*, with complete and accurate information *regarding his ability to pay any such settlement* in the form ordinarily required by the SEC" (emphasis added).

breach of Mr. Corigliano's obligations under his plea agreement or to show that Mr. Corigliano has been allowed to violate his agreement with "impunity" is simply ludicrous.

Similarly unpersuasive is Forbes' second argument, that the SEC correspondence could properly and fairly be used to establish that, in being required to live for close to four years under an asset preservation and budget agreement, Mr. Corigliano was "afforded extraordinary, special treatment" because of his status as a cooperating witness that "goes directly to his motive and bias." (Forbes Mem. at 11.) Again, a fuller picture of the correspondence shows that Mr. Corigliano's counsel (consistent with prior testimony of Mr. Corigliano) viewed the SEC's settlement posture as "punitive" (*see* May 16, 2000 letter to the SEC, attached as Ex. A hereto) and hardly viewed being required to live under a government-imposed budget as a benefit. Indeed, counsel wrote that the Coriglianos' budget was "a very substantial reduction from their prior normal expenses, which were not at all extravagant." (See July 19, 2000 letter to the SEC, attached as Forbes' Ex. 5.) More importantly, the admissible evidence of the purported "benefit" to Mr. Corigliano in this respect, such as it is, is the amount of the budget ultimately agreed to; whether counsel for the SEC thought that amount "reasonable" or high or low is not admissible evidence that could properly be used to establish the purported benefit itself.

Moreover, we have not found any documents that would show that Mr. Corigliano received or was shown a copy of the single letter that Forbes' relies on for the SEC's views that (a) Mr. Corigliano's financial disclosure had been "limited" and (b) his budget requests were not "reasonable." *See* Forbes Mem. at 10 (citing Ex. 6, a July 20, 2000 letter from the SEC to Mr. and Mrs. Corigliano's counsel).

Whether or not we have documents showing that Mr. Corigliano received copies of any similar correspondence (or even if Mr. Corigliano testifies that he is familiar with such

- 10 -

KL3:2476571.1

documents), the documents should not be admitted into evidence (and therefore are not properly subpoenaed under Rule 17(c)). Nothing prevents Forbes from asking Mr. Corigliano whether, during his counsel's settlement negotiations with the SEC Staff (including agreeing on a budget), he believes he received any special accommodation or consideration because of his status as a cooperating witness. But assuming Mr. Corigliano will not agree to Forbes' counsel's characterization of the interactions with the SEC as some kind of "benefit" or "special treatment" that he received, the fact that Mr. Corigliano may have been copied on certain correspondence between his counsel and the SEC Staff cannot properly be used to challenge that testimony.

The correspondence reflects what for a period of time were two different views at play in a (sometimes rancorous) settlement negotiation between the SEC Staff and defense counsel for Mr. Corigliano. To the extent Mr. Corigliano testifies (as he has already) that he believes the SEC was asking for more than he thought was fair in the context of settlement negotiations, *see* Tr. 11/3/05, at 1946-47, 1973, 1981, or disagreed with the SEC's position on the need for as well as the amount of his family's budget, those views would not properly or fairly be impeached or contradicted even if we did have documents that might show that Mr. Corigliano received copies of communications between the SEC and his counsel reflecting diverging takes on what a fair settlement or a reasonable budget should look like.

Parading such lawyer back and forth in front of the jury, particularly in light of the sometimes strong rhetoric that negotiating counsel used, would be a classic trial-within-the trial that would have Forbes' intended effect of distracting and confusing the jury, which is almost certainly unfamiliar with the style and customs according to which these kinds of negotiations sometimes proceed. For all of these reasons, such a line of inquiry is properly

KL3:2476571.1

excluded under Fed. R. Evid. 403, from which it follows that Rule 17(c) demands for documents in support of that line should be quashed.

Finally, Forbes' baseless assertion that Mr. Corigliano received "special treatment" from the SEC because of his cooperator status is flatly contradicted by the testimony of SEC attorney James Kidney. When asked whether Mr. Corigliano or Ms. Pember were "given any special accommodations because they're cooperators here in this this federal case," Mr. Kidney responded unequivocally that they "were not." (Tr. 9/23/04 at 13527.) SEC Attorney Kidney also testified that he did not believe Mr. Corigliano got a "sweetheart deal" and added that "in terms of this case, . . . Mr. Newkirk [at the time the Associate Director of the SEC's Division of Enforcement] in particular is very strongly against arguments that cooperating witnesses should get special treatment with the SEC." (*Id.*) Indeed, when the Staff's settlement offer of May 2000 (which would have left Mr. Corigliano with "his house, car, legal fees and walking around money" (Ex. A hereto)) is compared with the ultimate resolution in the spring 2004 (which afforded him essentially just that, with some money for his children's education rather than "walking around money"), it becomes apparent that Mr. Corigliano ultimately was accorded no "special treatment" at all by the SEC on account of his cooperation.[5]

### IV. FORBES' PROPOSED LINES OF CROSS-EXAMINATION IMPROPERLY CALL FOR OR WOULD IMPINGE UPON THE PRIVILEGED RENDERING OF LEGAL ADVICE

Insisting that he be allowed to "cross-examine Mr. Corigliano concerning his understanding of what was being sent to the SEC on his behalf even if he did not see the

---

[5] The claim that alleged "special treatment" from the SEC between the spring and fall of 2000 shows that Mr. Corigliano had a motive to fabricate evidence to please the government is further belied by the fact that Mr. Corigliano had informed the government of his knowledge of Walter Forbes' knowing participation in the CUC/Cendant fraud months before the wrangling between his counsel and the SEC over financial matters even began.

KL3:2476571.1

correspondence between his counsel and the SEC," Forbes continues to press his claim – rejected and rejected again by this Court – that "[a]ny communication between Mr. Corigliano and his counsel concerning information that would be provided to the SEC is not privileged." (Forbes Mem. at 3 n.3 (citing, *e.g., United States v. Tellier*, 255 F.2d 441, 447 (2d Cir. 1958)). But as Your Honor noted on Thursday, Mr. Corigliano's prior testimony "made it clear that his attorneys were not a mere conduit, as that term is used in the case law." (Tr. 11/3/05, at 2000.) And as we have previously argued, Forbes still cites no case -- and we are aware of none -- holding that all confidential communications between a cooperating witness and his attorneys that relate in any way to the subject matter of information later shared with the government or other third parties are subject to disclosure. In fact, the law of the Second Circuit is to the contrary. *See In re Von Bulow*, 828 F.2d 94, 102 (2d Cir. 1987) (holding that "the extrajudicial disclosure of an attorney-client communication -- one not subsequently used by the client in a judicial proceeding to his adversary's prejudice -- does not waive the privilege as to the undisclosed portions of the communication," and distinguishing *United States v. Tellier*, 255 F.2d 441 (2d Cir. 1958)); *In re Grand Jury Subpoena*, 731 F.2d 1032, 1037 (2d Cir. 1984) ("the fact that certain information might later be disclosed to others" does not "create the factual inference that the communications were not intended to be confidential at the time they were made").[6]

---

[6] *Compare United States v. Tellier*, 255 F.2d 441, 447 (2d Cir. 1958) (information not privileged where attorney says he will write letter "substantially setting forth the telephone conversation" with client and send it to third parties); *United States v. Rosenthal*, 142 F.R.D. 389, 391-92 (S.D.N.Y. 1992) (information relating to auditor's report not privileged where report was expressly intended for disclosure, and was disclosed, to government). Forbes also continues to cite *Mead Data Central, Inc. v. Dep't of Air Force*, 566 F.2d 242, 253 (D.C. Cir. 1997), which did not resolve the issue of whether certain attorney-client communications were protected from disclosure under the Freedom of Information Act. That case is therefore irrelevant here.

- 13 -

KL3 2476571.1

Further, as argued during the last trial, and reiterated to Your Honor on Thursday in the specific context of the asset and transfer information that we disclosed to the SEC on Mr. Corigliano's behalf, from the beginning of our representation of Mr. Corigliano and continuing through the present, meetings and conversations during which we discussed the case and he shared information with us have been an integral part of a continuing process by which counsel provided legal advice to him, as his attorneys, as to how to proceed. While what we or he ultimately disclosed to the government may not itself be privileged, the antecedent process of gathering and sifting through the information, providing legal advice and making judgments about what to disclose and what not to disclose – and more specifically our conversations with him that reflect that process – are and must be privileged and confidential. *See United States v. Newell*, 192 F.R.D. 587, 588-89 (N.D. Ill. 2000) (quashing government Rule 17(c) demand for attorney's notes relating to client's proffer, noting that "discussions about what to include or exclude in the proffer, how to frame it, and so forth, were decidedly not the sort of thing that was intended to be communicated to the government," and concluding that attorney's notes are "as privileged as any attorney-client confidences could be"). Similarly, whatever conversations we had with Mr. Corigliano concerning or arising out of the communications and correspondence between Kramer Levin and the SEC that Forbes now focuses on would also clearly be privileged communications in which we did not serve as mere "conduits" passing along what the SEC was saying but rather advised and counseled Mr. Corigliano based on our communications with the SEC Staff.

For all of these reasons, Forbes should not be allowed to pursue a line of questioning that is calculated to and will necessarily require Mr. Corigliano to divulge the substance of communications with his counsel concerning the provision of financial information

- 14 -

KL3:2476571.1

to the SEC. Nor should Forbes be allowed to pursue any line of questioning that would require Mr. Corigliano to reveal the advice his attorneys were giving him about the progress and status of settlement negotiations with the SEC Staff.

Finally, we note that, fourteen pages of briefing later, counsel for Forbes has continued to refuse to answer the direct question repeatedly posed to Mr. Sullivan by Your Honor in open court on Thursday, i.e., whether his questioning in these areas was intended to or would be relied on to make either a "conduit" or "waiver" argument. (Tr. 11/3/05, at 1994-98.)

### Conclusion

For the reasons stated above, Forbes' Motion for Enforcement of Subpoena Calls (Forbes Retrial Motion No. 19) should be denied.

Dated: New York, New York
November 6, 2005

Respectfully submitted,

KRAMER LEVIN NAFTALIS & FRANKEL LLP

By: _____
Gary P. Naftalis (ct 24510)
Alan R. Friedman (ct 14926)
Eric A. Tirschwell (ct 25626)
J. Wells Dixon (ct 22932)
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

-and-

- 15 -

JACOBS, GRUDBERG, BELT & DOW, P.C.

By: _____/s/ Ira B. Grudberg_____
    Ira B. Grudberg (ct 00178)
    350 Orange Street
    New Haven, Connecticut 06511
    (203) 772-3100

Attorneys for Cosmo Corigliano