# EXHIBIT L

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED
2004 JUL 19  A 10: 47
U.S. DISTRICT COURT
HARTFORD, CT.

———————————————————— x
UNITED STATES OF AMERICA           :
                                   :
       v.                          :   No. 3:02CR264 (AWT)
                                   :
WALTER A. FORBES and               :   July 18, 2004
E. KIRK SHELTON,                   :
                                   :
              Defendants.          :
———————————————————— x

## MEMORANDUM IN RESPONSE TO CRIME-FRAUD ARGUMENTS RAISED BY DEFENDANT FORBES IN LETTER DATED JULY 16, 2004

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Gary P. Naftalis
Alan R. Friedman
Eric A. Tirschwell
J. Wells Dixon
919 Third Avenue
New York, New York 10022
(212) 715-9100

-and-

JACOBS, GRUDBERG, BELT & DOW, P.C.
Ira B. Grudberg
350 Orange Street
New Haven, Connecticut 06511
(203) 772-3100

Attorneys for Cosmo Corigliano and
Kramer Levin Naftalis & Frankel LLP

## Preliminary Statement

The latest submission from defendant Forbes – faxed to us at approximately 4:15 p.m. this past Friday afternoon – seeks to revive what is by now a tired and previously rejected argument: that what turn out to be false protestations of innocence and failed attempts to persuade the government not to prosecute somehow erase the privilege ordinarily applicable to related confidential communications and attorney work-product. Defendant Forbes' crime-fraud argument is nothing less than an unprecedented assault on the fundamental sixth amendment rights of individuals accused of wrongdoing to engage counsel and defend themselves. We remain unaware of any court in any jurisdiction ever endorsing such a view. And, as we argue below, any such rule would make it much more difficult if not impossible for criminal defense lawyers to do their jobs.

But before this Court even turns to these more sweeping issues, it remains our position that defendant Forbes' demands can and should be rejected on narrower and more well-trodden grounds. We thus argue first that the confidential attorney work product he apparently seeks via Rule 17(c) would not be admissible against Mr. Corigliano, and thus does not even make it past the *Nixon* threshold, a view that this Court already has adopted in its several prior rulings with respect to Ms. Pember's subpoenas.

To the extent the Court nevertheless determines that it should reach the crime-fraud issue, we argue next that, on the facts and record in this case, defendant Forbes has not established and cannot establish that this exception applies. Nothing in the record demonstrates that Mr. Corigliano engaged counsel for any reason other than to defend himself against accusations of past wrongdoing, or that his communications with counsel were in any way calculated or intended to further a planned future crime or fraud. Thus, the fact that Mr.

Corigliano's letter to the Cendant Board complaining about his discharge and complaining, accurately, about the lack of any process accorded him also contains false protestations of his innocence does not implicate the crime-fraud exception. Moreover, that he made false representations to the government during his January 1999 interview does not, standing alone, establish that all related communications with or work product of counsel fall prey to the crime-fraud exception. Additionally, the suggestion that our advocacy on Mr. Corigliano's behalf might constitute crimes or frauds to the extent it may have included reference to facts that turned out to be false is outrageous. Such presentations are explained and understood to be, and are in fact (as they were in this case) nothing more than arguments and advocacy and essentially hypothetical discussions concerning whether the government should proceed, what the facts might be and/or what a client might be able to say.

For these and the other reasons explained more fully below, we urge the Court to reject defendant Forbes' latest crime-fraud arguments in their entirety.

## Argument

I. **The Court Has Already Rejected the Crime-Fraud Argument with Respect to So-Called Attorney Proffers in Deciding Anne Pember's Motion to Quash the Third and Fifth Rule 17(c) Subpoenas Served on Her**

The defendant's crime-fraud argument is not new. Indeed, the Court has already rejected the crime-fraud argument with respect to attorney meetings with the government in granting Ms. Pember's motions to quash the third and fifth Rule 17(c) subpoenas served on her. As to the third subpoena, in quashing the defendants' request for all communications between counsel for Ms. Pember and the government or Cendant, including communications relating to so-called "innocence proffers," the Court determined that the proper approach was to require the government -- not Ms. Pember's counsel -- to provide its notes from those sessions to the Court for in camera inspection.

(Tr. 5/18/04 at 1050-52.) After reviewing those notes, the Court later determined that there was nothing further to be disclosed to the defendants. (Tr. 6/2/04 at 2865-67; Tr. 6/3/04 at 3194.)

Similarly, in granting Ms. Pember's motion to quash the fifth Rule 17(c) subpoena served on her, the Court again rejected the argument by counsel for Mr. Shelton that communications relating to the three meetings between Ms. Pember's counsel and the government were not privileged under the crime-fraud exception. In reaching this conclusion, the Court apparently considered the argument by Ms. Pember's counsel, based on *United States v. Newell*, 192 F.R.D. 587, 589 (N.D. Ill. 2000), that statements made during such meetings with the government in no way call into question the privileged status of any pre-meeting communications between a client and her attorney; and as a matter of practice presentations by attorneys at such meetings involve nothing more than hypotheticals. The Court also reiterated its prior determination that presentations by an attorney to the government are not admissible unless they are statements explicitly made or adopted by the client. (Tr. 6/1/04 at 2644-59.)

II. **The Court Need Not Even Reach the Crime-Fraud Issue as *Nixon* Continues to Stand as an Insurmountable Hurdle to Defendants' Demands for Kramer Levin Work Product**

Although it is not clear from the letter, defendant Forbes apparently is contending that his crime-fraud arguments entitle him to all written work product in Kramer Levin's files "between April 1998 and January 11, 2000 with respect to the subject matters addressed in (i) the April 17, 1998 letter; (ii) the attorney proffer sessions with the government; and (iii) the January 13, 1999 interview." Letter at 3. The short and dispositive answer to this argument lies in a ruling that this Court has already made more than once, but one that defendant Forbes apparently refuses to acknowledge, much less accept: as reiterated as recently as our last submission of June 30, 2004, attorney notes or memoranda that were never adopted by Mr. Corigliano are simply not statements attributable to him; as such they are not admissible at trial; and

- 3 -

accordingly, demands for their production cannot satisfy *Nixon's* admissibility requirement. *See* Tr. 5/20/04 at 1530 (citing, among other cases, *United States v. Almonte*, 956 F.2d 27 (2d Cir. 1992), and *United States v. Weissman*, No. 01 CR 529 (BSJ), 2002 WL 31875410 (S.D.N.Y. Dec. 26, 2002)). *Accord United States v. Perez*, No 3:02CR7 (JBA) (D. Conn. Apr. 23, 2004) (Arterton, D.J.) (quashing subpoena calling for attorney notes of client proffer sessions); *United States v. Triumph Capital Group, Inc.*, No. 3:00CR217 (EBB), 2003 WL 23318898, at *1 (D. Conn. June 5, 2003) (Burns, D.J.) (same).[1]

### III. Defendant Forbes Has Not Established Applicability of the Crime-Fraud Exception

"A party wishing to invoke the crime-fraud exception must demonstrate that there is a factual basis for a showing of probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of the crime or fraud." *United States v. Jacobs*, 117 F.3d 82, 88 (2d Cir. 1997). Here, as we now demonstrate, defendant Forbes has not satisfied this burden as to any of the three alleged crimes or frauds that he invokes – i.e., the April 1998 letter to the Cendant Board, the Kramer Levin meetings with the government in the fall of 1998, or Mr. Corigliano's January 1999 proffer.

#### A. The Crime-Fraud Argument Fails Because Mr. Corigliano Consulted with Counsel For Advice About How to Deal with a Past Crime or Fraud, Not For The Purpose of Committing Future Ones

We begin with the "in furtherance" prong of the required showing, because defendant Forbes' argument falls short in this respect as to all three of the alleged crimes or frauds.

---

[1] As we argued previously, defendants' demands for Kramer Levin materials protected by the attorney-client and work-product privileges represent a renege and about-face from prior

The Second Circuit has repeatedly emphasized that the crime or fraud must "have been the objective of the client's communication." *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d 1032, 1039 (2d Cir. 1984) ("*Marc Rich*"), quoted in *In re Richard Roe Inc.*, 68 F.3d 38, 40 (2d Cir. 1995). Because the communications being challenged must be shown to "'actually have been made with an intent to further an unlawful act,'" an important question is whether the person "had set upon a criminal course *before* consulting counsel." *Jacobs*, 117 F.3d at 88 (citation omitted) (emphasis in original). And it is firmly settled that "communications with respect to advice as to past or completed frauds are within the privilege." *Marc Rich*, 731 F.2d at 1041.

Here, the record shows nothing more than that Mr. Corigliano – having participated in a *past* accounting fraud at CUC and Cendant – consulted with and communicated with counsel for the purpose of defending himself and staying out of trouble. In this regard Mr. Corigliano testified repeatedly on cross-examination that in sending the April 17, 1998 letter to the Cendant Board his intention was just to protest his innocence with the hope that the matter would go away. (*E.g.*, Tr., 7/15/04 at 7593, 7682.) Likewise, in later making his proffer to the government on January 13, 1999, his intention also was to defend himself and stay out of trouble (including avoiding prosecution) by attempting to persuade the government that he had not done anything wrong. (*E.g.*, Trial Tr. 7/15/04 at 7585, 7600, 7603-04, 7628, 7670, 7685.) In addition, there is nothing to suggest that Mr. Corigliano intended or even knew that any or all of what he communicated to his lawyers – whether true or false – later would be utilized by us in connection with our attempts to persuade the government not to prosecute him. Indeed, to the contrary, Mr. Corigliano testified on cross-examination that he was never told "what specifically [my attorneys told the government] my actions

---

representations that they did not seek such materials. *See* Corigliano Memorandum of Law dated March 31, 2004 at 5.

were with respect to the accounting irregularities," or what the government said to his attorneys, or even the "substance or "gist" of those discussions. Nor is he aware of all of the times his attorneys may have met with or otherwise communicated with the government. (Tr. 7/15/04 at 7698-99.)

Perhaps more importantly, nothing in the record suggests that Mr. Corigliano first decided he would write a false protestation of innocence to the Cendant Board and then hired, consulted and communicated with counsel in furtherance of that purpose; or that he first decided that, in order to avoid prosecution, he would send his counsel in to talk to the government armed with false information, and then hired and communicated with counsel to achieve that goal; or that he first decided he would go in and make false statements himself to the government, also in an effort to avoid prosecution, and then hired and communicated with counsel to further that goal. Rather, as is true in virtually all cases, decisions as to tactics and strategy and presentations, including the selection of argument, are and were made by counsel.[2]

These facts clearly distinguish the case at bar from the classic crime-fraud scenario -- such as in the cases previously cited by defendants on this point -- where a lawyer is utilized, wittingly or unwittingly, as part of a client's preconceived scheme and plan to commit a future criminal act. *Compare United States v. Ruhbayan*, 201 F. Supp. 2d 682, 686 (E.D. Va. 2002) (crime-fraud exception applies where government submitted evidence showing that defendant had a preconceived plan to procure a witness to provide false exculpatory testimony in his defense and then communicated with counsel in furtherance of that criminal scheme), and *In re Grand Jury Subpoena to Francis D. Carter*, No. 98-068 (NHJ), 1998 U.S. Dist. LEXIS 19497, at *4-5 (D.D.C. Apr. 28,

---

[2] And of course, as Mr. Corigliano testified, his lawyers "did not tell [him] to lie." Trial Tr., 7/15/04, at 7692.

1998) (crime-fraud exception applies where Office of Independent Counsel had established that Monica Lewinsky "consulted with" an attorney "for the purpose of committing perjury and obstruction of justice," "purposefully and actively used [the attorney] to commit" those crimes, and "made the privileged communications with the intent and the express purpose to further unlawful acts").[3]

Judge Cedarbaum's decision concerning a government Rule 17(c) subpoena in *United States v. Martha Stewart*, No. 03 CR 717 (MGC), 2003 WL 23024461 (S.D.N.Y. Dec. 29 2003), is directly on point. In that case, Ms. Stewart was charged with, among other things, making false statements to government prosecutors and agents and obstructing justice. The government served a Rule 17(c) subpoena on Ms. Stewart's attorneys seeking their confidential work product relating to the allegedly false statements Ms. Stewart had made, and argued that the privilege that normally would attach to such materials was vitiated by the crime-fraud exception. Judge Cedarbaum flatly rejected the government's position on this issue, pointing out that, if accepted, it would stand for the absurd proposition that "every defendant accused of a crime involving the making of false statements to a government agency would lose the protection of the attorney-client privilege with respect to prior statements to his lawyer concerning the same subject matter." *Id.* at *2. The same is true here, where defendant Forbes' crime-fraud argument, if adopted by this court, would mean that every individual who, like Mr. Corigliano,

---

[3] As we noted in our prior submission on this point, defendant Forbes violated Second Circuit rules by citing as authority *Doe v. United States*, No. 03-6145, 2003 U.S. App. LEXIS 24433, at *5 (2d Cir. Dec. 4, 2003), failing to disclose to this Court that *Doe* is a Summary Order that by appellate rule "shall not be cited or otherwise used in unrelated cases before this or any other court." See 2d Cir. R. 0.23. In any event, *Doe* does nothing more than suggest the possibility that the crime-fraud exception "might apply" if it were established that a communication of false information to counsel (in that case concerning record-keeping practices) was expressly intended to be communicated to the government as part of a planned obstruction of justice. Here, as just explained, defendant Forbes simply has not made and cannot make such a showing.

makes what turn out to be false denials of guilt to the government or third parties, loses the privilege as to all prior communications with their lawyer concerning the same subject matter.

In sum, the record, combined with a common sense view of the reality of the situation, establishes nothing other than that the purpose Mr. Corigliano was pursuing in communicating with counsel from the very first day was to receive advice about how to defend himself and avoid prosecution in connection with accusations that he had been involved in fraudulent accounting at CUC and Cendant. He was, in other words, seeking advice as to a "past . . . fraud," and the crime-fraud exception accordingly cannot and does not vitiate the confidentiality of the communications and work product generated in connection with the rendering of that advice.

### B. Attorney Presentations -- Even on Behalf of Clients Who Turn Out to Be Guilty -- Are Not Crimes or Frauds

With respect to the two cited meetings Kramer Levin attorneys had with the government in 1998, defendant Forbes' crime-fraud argument fails for the additional reason that such presentations are by definition a form of advocacy -- they are arguments -- and therefore they cannot provide the requisite crime or fraud that would trigger the crime-fraud exception.

The two presentations to the government in 1998 were just that: argument and advocacy by us, as attorneys, as to why our client Mr. Corigliano should not be prosecuted. And we made clear to everyone in that room what is commonly and well understood in such situations – that we, the attorneys, did not have first-hand knowledge of the facts, and of course could not vouch and were not vouching for the accuracy of everything that we were saying, and to the extent that we adverted to any facts, we were speaking hypothetically and the government understood that it would have to speak to Mr. Corigliano directly to obtain his actual knowledge.

-8-

*Accord* Trial Tr., 6/1/04, 2653 (where attorney Helen Gredd describes her attorney proffers on behalf of Ms. Pember as "the functional equivalent of a hypothetical conversation with the government"). Indeed, as the government's letter to defense counsel of June 30, 2004 clearly states at the bottom, the notes that were taken during these "discussions" do "not necessarily reflect statements made by Mr. Corigliano or statements made on behalf of Mr. Corigliano by his counsel."[4]

We respectfully submit that it is nothing short of ludicrous to suggest that when a lawyer makes such a presentation to persuade a government official not to proceed against his client, and it later turns out the client actually is guilty, this time-honored mode of proceeding could properly be viewed as a fraudulent act or even a crime such that it vitiates all related privileged communications and work product.

### C. Mr. Corigliano's Letter of Protest to the Cendant Board Cannot Trigger the Crime-Fraud Exception, Notwithstanding its Inclusion of Generalized but False Denials of Wrongdoing

Not every false statement ever made in any context is sufficient to trigger the crime-fraud exception. To the contrary, there must be a crime or fraud "serious enough to defeat the privileges." *In re Sealed Case*, 754 F.2d 395, 399 (D.C. Cir. 1985); *Alexander v. FBI*, 192 F.R.D. 32,

---

[4] We note as well that the government's letters dated April 29, 2003 and June 30, 2004, describing these two meetings, were signed by members of the current prosecution team who were not present for the described meetings and apparently were drafted in discharge of the government's *Brady* and *Giglio* obligations.

We also submit that persuasive proof that the government understands attorney proffers to be a completely different species than client proffers can be found in the facts that in our experience: (1) proffer agreements, with their threats of prosecution if false statements are made, are used only in connection with client proffers, and (2) prosecutors almost always will require that a successful attorney presentation be followed by a client proffer, so that the lawyer's hypothetical presentation of what the client might or would say can be tested and verified by questioning the client himself or herself.

36 & n.4 (D.D.C. 2000). The April 1998 letter that Mr. Corigliano sent to the Cendant board simply does not rise to that level. It was at its core a protest letter, protesting Mr. Corigliano's termination and the lack of due process in connection with that termination. It did of course include a false protestation of innocence, as Mr. Corigliano has testified, but that does not alter the essential fact that at the time, the letter was nothing more than a return salvo in a dispute among private parties. No authority is cited, and we are aware of none, suggesting that such private correspondence, even if it includes a generalized denial of wrongdoing that turns out be false, rises to the level of "seriousness" required before sacrificing the important interests served by the attorney-client and work product privileges.

### IV. Defendant Forbes' Crime Fraud Argument Is Unprecedented, Sweeping in Its Implications, and Would Substantially Interfere with the Sixth Amendment Rights of Those Accused of Wrongdoing

As we previously argued, although Rule 17(c) has been on the books for some sixty years, and while clients who are targets of investigations have been falsely protesting their innocence for even longer, defendant Forbes has not cited, and we are not aware of a single precedent from any jurisdiction holding that such protestations of innocence automatically vitiate the privilege for all related communications and work product. And as noted above, Judge Cedarbaum's decision in *United States v. Martha Stewart*, 2003 WL 23024461, rejected a similar argument.

We also pointed out in earlier papers that the rule proposed by defendants – that any time a defendant attempts to persuade the government (or his former employer) of his innocence and fails, his attorney's work product is open to subpoena by some third party or the government – would cripple all such defendants' Sixth Amendment rights to be competently represented. To illustrate the point, our prior submission noted that no defense counsel could ever responsibly jot a single note or generate a memorandum relating to information provided by such a client without risking that his client's confidential communications later would be exposed to third parties or the government.

To that example we add here several additional problems that would follow were defendant Forbes' position to be adopted. First, almost all forms of attorney advocacy would become rife with danger, including attorney proffers and similar types of written submissions, such as Wells submissions (typically submitted to persuade the SEC not to proceed against a client). If it turned out that any factual assertion in such a submission was false, privilege would be erased for all communications and work-product on the same subject matter. Second, defense counsel would be put in the untenable position of having to advise clients at the outset of the representation that if anything the client tells the attorney turns out to be false -- and any such false fact is used by the attorney or the client in attempting to defend the client's position -- there would be a real risk of loss of privilege for all related conversations and work-product.

Third, lawyers also could and would routinely be disqualified from representing cooperating witnesses who initially falsely protested their innocence, a not insubstantial risk that we face as Mr. Corigliano's attorneys here if this Court were to adopt defendant Forbes' proposed rule. If our work product and internal memoranda relating to the April 1998 Board letter or the 1998 attorney presentations or Mr. Corigliano's January 13, 1999 proffer were ordered produced, we very well might find ourselves on the stand as witnesses being asked to testify against our own client. Both this Court's Local Rules and the disciplinary rules that govern us in New York discourage putting defense counsel in such a situation, and such a scenario under the rules might very well require our withdrawal from representing Mr. Corigliano. *See, e.g.*, District of Connecticut, Local Rule 83.13(b)(2) (an attorney who learns that he or she "may be called as a witness other than on behalf of his or her client. . . may continue the representation until it is apparent that his or her testimony is or *may be* prejudicial to the client") (emphasis added).

- 11 -

We also argued previously that, if taken seriously, defendants' crime-fraud argument would mean that in this case the government would be free to subpoena for impeachment purposes the notes and memoranda generated by the attorneys for both Mr. Forbes and Mr. Shelton in connection with their clients' interviews to the Cendant Audit Committee, in which they similarly protested their innocence and denied knowledge or participation in the accounting fraud, the notes and other work product of Mr. Shelton's counsel connected to his client's "innocence proffers" with the government, and any written or oral submissions or arguments made to the government by counsel for Forbes or Shelton that their clients were not participants in the fraud and should not be indicted. The indictment before this Court would provide the probable cause to believe that all of these interviews and presentations were false, and thus for purposes of crime-fraud analysis there would be no difference between Messrs. Shelton and Forbes, who apparently maintain their innocence, and Mr. Corigliano, who has admitted his guilt.

In sum, because defendant Forbes' crime-fraud argument has no support in the case law and would open the door to disclosure of attorney work product and privileged attorney-client communications in connection with every failed effort by a client to persuade the government or a third party of his innocence, it should (again) be rejected.

## Conclusion

For the foregoing reasons, as well as those cited in our prior memoranda, we respectfully urge the Court to reject defendant Forbes' latest salvo in his continuing efforts to improperly invade Mr. Corigliano's attorney-client privilege and obtain his attorneys' confidential work product.

Dated:  New York, New York
        July 18, 2004

                         Respectfully submitted,

                         Kramer Levin Naftalis & Frankel LLP

                         By: _____
                             Gary P. Naftalis (ct 24510)
                             Alan R. Friedman (ct 14926)
                             Eric A. Tirschwell (ct 25626)
                             J. Wells Dixon (ct 22932)
                             919 Third Avenue
                             New York, New York  10022
                             (212) 715-9100

                         -and-

                         Jacobs, Grudberg, Belt & Dow, P.C.
                         Ira B. Grudberg (ct 00178)
                         350 Orange Street
                         New Haven, Connecticut  06511
                         (203) 772-3100

                         Attorneys for Cosmo Corigliano and
                         Kramer Levin Naftalis & Frankel LLP

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that a copy of the foregoing memorandum, dated July 18, 2004, was served via facsimile this 18th day of July, 2004 upon the following parties:

John J. Carney, Esq.
Special Attorney
U.S. Department of Justice
450 Main Street, Room 617
Hartford, CT 06103
Fax: (860) 240-3021

Barry S. Simon, Esq.
Williams & Connolly LLP
c/o Marriott Residence Hotel
942 Main Street
Hartford, CT 06103
Fax: (860) 293-1651

James T. Cowdery, Esq.
Thomas J. Murphy, Esq.
Cowdery, Ecker & Murphy, L.L.C.
750 Main Street
Hartford, CT 06103
Fax: (860) 249-0012

Thomas P. Puccio, Esq.
230 Park Avenue, Suite 301
New York, NY 10172
Fax: (212) 883-6388

Scott A. Edelman, Esq.
Thomas A. Arena, Esq.
Milbank, Tweed, Hadley & McCloy LLP
One Chase Manhattan Plaza
New York, NY 10005
Fax: (212) 530-5219

Stanley A. Twardy, Jr., Esq.
Gary H. Collins, Esq.
Day, Berry & Howard LLP
City Place I, 185 Asylum Street
Hartford, CT 06103
Fax: (860) 275-0343

_____
J. Wells Dixon

KL3:2353800.1