## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

———————————————————  )
                                               )
UNITED STATES OF AMERICA,    )
                                               )
v.                                             )
                                               )        No. 3:02CR264 (AHN)
WALTER A. FORBES.               )        April 17, 2006
                                               )
———————————————————  )

## MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANT WALTER A. FORBES TO PRECLUDE THE GOVERNMENT FROM PRESENTING THE PROPOSED EXPERT TESTIMONY OF BRIAN HECKLER BECAUSE IT DOES NOT SATISFY THE RELIABILITY REQUIREMENTS OF <u>DAUBERT</u> AND FEDERAL RULE OF EVIDENCE 702 (Forbes Third Trial Motion *In Limine* No. 5)

Expert testimony must be based upon reliable information and methodology, which must be reliably applied to the facts of the case, in order to be admissible under Federal Rule of Evidence 702.  <u>See also</u> <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 595 (1993).  The expert testimony of Brian Heckler – and, in particular, his testimony purporting to quantify the alleged violations of Generally Accepted Accounting Principles ("GAAP") at issue in this case – fails this reliability requirement.[1]

### BACKGROUND

The government provided a summary of the proposed testimony of Brian Heckler, a partner in KPMG, in December 2002.  The defense subsequently

---

[1] Judge Thompson held a <u>Daubert</u> hearing prior to the first trial, but then denied the defense's motion to preclude Mr. Heckler's testimony.  <u>See</u> Docket No. 1954.

Oral Argument Requested

obtained additional expert material through subpoenas <u>duces</u> <u>tecum</u> to Mr. Heckler, and then subsequent "augmentations" of the summaries by the government. Based upon this information, the defense moved to preclude Mr. Heckler's testimony because it was based almost exclusively on the work performed in anticipation of litigation by Arthur Andersen on behalf of the Audit Committee of Cendant, which was fundamentally flawed work product, and which was insufficient to serve as a basis for an expert opinion under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 595 (1993).

A <u>Daubert</u> hearing was held, and extended for a significant number of days due to Mr. Heckler's repeated vacillations back and forth, both before and during the hearing, concerning the bases for his opinions. By the end of the <u>Daubert</u> hearing Mr. Heckler had presented no less than three alternative descriptions of the bases for his opinions: one based on his own independent "fact finding;" one based on him determining the facts by listening to and evaluating the trial testimony itself; and yet a third where he would abdicate any responsibility for the facts, and testify based upon "assumed" or "stipulated" facts, virtually all of which were to be based upon his review of the Audit Committee Investigation. <u>See</u> Post-Hearing Memorandum in Support of the Motion of Defendant Walter A. Forbes to Preclude the Government from Presenting Its Proposed Expert Testimony Because It Does Not Satisfy the Reliability Requirements of <u>Daubert</u> and Federal Rule of Evidence 702 (Forbes Pretrial Motion No. 49) at 3-9, Docket No. 602. Ultimately, Mr. Heckler's testimony came to rest on the third alternative – that his

trial testimony would be based upon "assumed facts," primarily those in the Audit Committee Report, and that it would be up to the government to prove those facts at trial.

But neither jury heard anything about "assumed facts" when it came time for Mr. Heckler actually to testify in each of the two trials against Mr. Forbes. Rather, contrary to where Mr. Heckler ultimately came out during the <u>Daubert</u> hearing, both juries were lead to believe that Mr. Heckler was basing his opinions on his own independent investigation of the company's records. Indeed, in the second trial, the government put in so little evidence concerning the accounting irregularities at CUC, Mr. Heckler had no choice but to go beyond the trial record in order to support his opinions.

The defense could not cross-examine Mr. Heckler concerning the inadequacies of his opinions without eliciting the unreliable hearsay of the Audit Committee Report – hearsay which he had a constitutional right to preclude under <u>Crawford v. Washington</u>, 541 U.S. 36, 42 (2004).[2] Thus, despite the serious flaws in Mr. Heckler's methodologies, Mr. Forbes had no choice but to forego cross-examination in each of the trials. Mr. Forbes should not be put in such an unacceptable position in the third trial. Mr. Heckler's testimony – and particularly his testimony purporting to quantify the violations of GAAP – should be excluded.

_____

[2] As discussed in Section III, B, <u>infra</u>, cross-examination also would have been at the risk of eliciting improper opinions concerning intent and materiality that the government initially asked Mr. Heckler to form.

Mr. Forbes incorporates herein his prior arguments concerning the exclusion of Mr. Heckler and Mr. Sack as set forth in Motion of Defendant Walter A. Forbes to Preclude the Government from Presenting Its Proposed Expert Testimony Because It Does Not Satisfy the Reliability Requirements of <u>Daubert</u> and Federal Rule of Evidence 702 (Forbes Pretrial Motion No. 49) [Docket Nos. 277 (6/27/03) & 278 (6/27/03)], and related pleadings: docket numbers 281 (6/27/03), 404 (10/02/03), 507 (3/02/04), 602 (4/02/04), 621 (4/13/04) and 707 (5/10/04). Mr. Forbes also incorporates the arguments advanced by Mr. E. Kirk Shelton, joined by Mr. Forbes, regarding the same subject: docket numbers 314 (6/30/03), 315 (6/30/03), 316 (6/30/03), 317 (6/30/03), 318 (6/30/03), 327 (7/17/03), 405 (10/02/03), and 544 (3/19/04).

## ARGUMENT

### I.    MR. HECKLER'S OPINIONS ARE BASED ON INSUFFICIENT FACTS AND DATA, AND SHOULD BE PRECLUDED.

#### A.    Expert Testimony Based on Unreliable Methodologies or Unreliable Information Must Be Excluded Under Federal Rule of Evidence 702.

Expert testimony, while useful to the trier of fact, "can be both powerful and quite misleading because of the difficulty in evaluating it." <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 595 (1993). Thus, the Federal Rules of Evidence provide that a witness qualified as an expert may testify to an opinion only "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has

applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

The trial judge is assigned the "gatekeeper" role in screening expert evidence under this standard. <u>General Electric Co. v. Joiner</u>, 522 U.S. 136, 142 (1997). Whenever expert testimony is offered, the trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." <u>Daubert</u>, 509 U.S. at 592-593.

> In short, the district court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, <u>employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field</u>."

<u>Amorgianos v. National RR Passenger Corp.</u>, 303 F.3d 256, 265-266 (2d Cir. 2002) (quoting <u>Kumho Tire Company, Ltd. v. Carmichael</u>, 526 U.S. 137 (1999)) (emphasis added). The source of an expert's information is particularly critical. When not being called to testify on the basis of hypothetical facts to be otherwise proven at trial, the expert must ascertain the facts he relies upon by methodologies acceptable in his field of expertise. Thus, experts are permitted to testify to opinions based on hearsay or other inadmissible evidence <u>only if experts in the field reasonably rely on such evidence in forming their opinions</u>. <u>United States v. Locascio</u>, 6 F.3d 924, 938 (2d Cir. 1993).

**B.    Mr. Heckler Failed to Apply the Same Level of Intellectual Rigor Inside the Courtroom as He Would Outside the Courtroom.**

Mr. Heckler has proffered an opinion as to whether certain accounting treatments employed by CUC complied with Generally Accepted Accounting Principles ("GAAP"), and has purported to quantify the effect the alleged non-compliance had on CUC's financial statements. The only methodology accepted by the accounting community when expressing such opinions is that dictated by Generally Accepted Auditing Standards ("GAAS"). As explained by Mr. Jackson, an expert called by the defense to testify at the <u>Daubert</u> hearing,

> to issue an opinion on generally accepted accounting principles, their application, the only standard that exist[s] is generally accepted auditing standards. There is no other standard by which a CPA can issue any opinion with respect to generally accepted accounting principles and their application.

Tr. 3/24/2004 at 2362. Turning to the Auditing Standards themselves, AU Section 623.12 specifically provides that it applies "to any engagement to express an opinion on one or more specified elements, accounts, or items of a financial statement." Ex. 1 at 29 (excerpts of testimony exhibits of defense expert Daniel L. Jackson); Tr. 3/24/2004 at 2376.

Even Mr. Heckler had to admit that in the "real world" outside the courtroom he would have to follow GAAS in order to render an opinion on items of a financial statement:

> Q.    In the real world outside of the courtroom, if you're out there acting as a CPA, somebody asks you to come and look at an account or an item of a financial statement

and give an opinion in terms of whether or not it is fairly
stated in conformity with GAAP, there are in fact
accounting standards that address that issue, correct?

A.  There are auditing standards.

\* \* \* \* \* \* \*

Q. But if in fact somebody in the real world is looking for
an opinion on a particular account, royalty account, lease
account, something of that nature, there are auditing
standards promulgated by the AICPA that govern that,
correct?

A.  That's right.

Q.  And that in fact is Auditing Section 623, correct?

A.  I don't have the Book.  You have it in front of you.  But
if it says 623, that would be the standard.

Tr. 3/9/2004 at 1173-74.  <u>See also</u> Tr. 12/16/2003 at 40-41 (testimony of Mr. Heckler

that during this engagement he turned to the auditing standards for guidance in

evaluating whether CUC's financial statements complied with GAAP because "the

auditing standards" "tell an auditor what to think about when they're looking at

whether financial statements comply with GAAP.  These inherently were the same

kinds of things that I went through when I was trying to frame my analysis.")

Nonetheless, Mr. Heckler acknowledges that he did not follow GAAS in

forming his opinions in this case.  Tr. 3/25/2004 at 2600-01.[3]  He tried to excuse this

---

[3] As opined by defense accounting experts Messrs. Jackson and Murphy, under
GAAS Heckler should have, *inter alia*:

- reviewed the D&T workpapers prior to issuing his opinion in August 2002
  (which Mr. Heckler did not do) (Tr. 3/24/2004 at 2516);

- considered other items and accounts which were interrelated to the ones
  upon which he opined, pursuant to AU 623  (which Mr. Heckler did not do)

7

failure by claiming that he did not need to follow such standards when employed to perform "litigation consulting."[4]

> So as I understand it and as my colleagues understand it, you normally, if you're giving an opinion on application of GAAP and you're not the auditor, you're normally in [AU section] 625. But the fact that you're giving an expert witness opinion, you're not in 625.

Tr. 3/25/2004 at 2590.

It is precisely such a double standard for expert testimony that the Supreme Court rejected in requiring an expert to employ the same level of intellectual rigor inside the courtroom that characterizes the practice of that expert in the relevant field. <u>Kumho Tire</u>, 526 U.S. at 152.

<u>First</u>, contrary to Mr. Heckler's testimony, the application of the "litigation consulting" standards does not exempt him from the other applicable standards promulgated by the AICPA. As defense expert Mr. Jackson explained,

---

(Ex. 1 at 55-58 (excerpts of trial exhibits of defense expert Daniel Jackson); Tr. 3/24/2004 at 2403);

- conducted a thorough search for evidentiary matter and be unbiased in its evaluation, which he failed to do when he limited himself to documents selected by the Audit Committee investigation and the government, pursuant to AU 326 (Ex. 1 at 59-65; Tr. 3/24/2004 at 2405);

- not subordinated his own judgment to the Audit Committee investigators rather than performing the work independently and arriving at his own conclusions, in violation of both the Auditing Standards and the Code of Professional Ethics (Ex. 1 at 83-84; Tr. 3/24/2004 at 2415-16; Ex. 2 at 5-6 (summary of opinions of defense expert Larry Murphy); Tr. 3/24/2004 at 2486-87).

[4] The accounting profession has promulgated a separate set of standards specific to "litigation consulting," which, on their own, are less rigorous than the standards applied to an accountant performing an attestation, audit, review or compilation.

even when performing litigation functions, a certified public accountant must also follow any other AICPA standards applicable to the type of work the accountant is doing. Tr. 3/24/2004 at 2366-68. Thus, for example, if an accountant is retained to provide expert testimony on the value of a business, he cannot exempt himself from the Standards of Professional Appraisal Practice by claiming that he is performing only "litigation services." Id. Similarly, an accountant retained to provide expert testimony on whether an account or an item on a financial statement complied with GAAP must follow the Generally Accepted Auditing Standards, just as would be done in the "real world." Tr. 3/9/2004 at 1173-74. See also Tr. 3/24/2004 at 2525-26 (Mr. Murphy, an accounting expert who testified at the Daubert hearing at the request of the defense, opines that GAAS, not the consulting standards, apply to the determination of whether an account is in accordance with GAAP).

Second, even if Mr. Heckler's view of the AICPA's position were correct (which it is not), the accounting profession cannot simply circumvent the requirements articulated by the Supreme Court in Kumho Tire by creating a special set of rules applicable to "litigation consulting." Such an approach would be antithetical to the fundamental principle that a testifying expert employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. Kumho Tire, 526 U.S. 137.

Mr. Heckler's admitted failure to follow the Auditing Standards – the only methodology that has been peer reviewed and generally accepted by accountants practicing in the field of opining upon a financial statement's

compliance with GAAP – renders his opinions unreliable and inadmissible under GAAS.

### C.   The Facts Heckler Relies Upon Do Not Otherwise Provide an Adequate Basis for His Opinion.

Mr. Heckler's admitted failure to follow GAAS should be the end of any expert opinion based on his alleged "investigation." Even putting this failure aside, however, a review of the "investigation" Mr. Heckler did perform reveals that his opinions are not based on reliable evidence.

### 1.   Mr. Heckler's Opinion is Premised Primarily on the Investigation and Report of the Audit Committee.

Mr. Heckler did not perform his own investigation into the alleged accounting irregularities, but instead relied on Arthur Andersen for his understanding of the accounting practices at CUC. See Ex. 3 (collection of memoranda describing the work performed by Mr. Heckler on each accounting issue addressed by his report). These memoranda describing KPMG's "investigation" reveal that Mr. Heckler's work consisted almost exclusively of "reading" and "reviewing" Arthur Andersen's workpapers to gain an understanding of Arthur Andersen's procedures and conclusions, and occasionally "testing" Arthur Andersen's work by tracing a few of its conclusions back to original source documents contained within the Arthur Andersen workpapers. Id.

More notable is what Mr. Heckler did not do. He did not conduct any interviews. Id. He did not review any of the deposition transcripts from the civil litigation, including the available deposition transcripts of the E&Y accountants

who had audited CUC's financials during the relevant period. <u>Id.</u> And there is no evidence that he went back to any original source documents unless they were already part of Arthur Andersen's workpapers. <u>Id.</u> He simply reviewed the information that had already been selected and pre-packaged by Arthur Andersen.

Mr. Heckler claimed at the <u>Daubert</u> hearing that his opinions are based on the books and records of the company rather than the Audit Committee investigation, but that claim is belied by the record. His own testimony confirms what his workpapers themselves demonstrate:[5] that the bulk of KPMG's work consisted of "reviewing" and "understanding" the Audit Committee investigation, and occasionally selecting out items on a test basis to tie back to company records pre-selected by Arthur Andersen and Willkie, Farr & Gallagher ("WF&G"). Moreover, Mr. Heckler admits that what little "fact finding" he did was limited to the universe of documents gathered by Arthur Andersen or selected by the government, and that he did not go back to the actual books and records of the company. Tr. 3/8/2004 at 1025-26. Indeed, approximately one-third of the "company source" documents he identified for the Court came straight out of the two volume appendices to the Audit Committee Report. Tr. 3/15/2004 at 1922. A good number of the remaining "source documents" are simply duplicates of these exhibits. Tr. 3/15/2004 at 1923.

---

[5] <u>See</u> Memorandum in Support of Forbes Motion No. 49, Docket No. 278, at 6-8, discussing KPMG's workpapers.

That Mr. Heckler's opinions are premised on the work of the Audit Committee investigation is further confirmed by KPMG's extensive efforts at "reconciling" the Audit Committee Report's quantification of the irregularities to the quantification in the indictment. If Mr. Heckler were quantifying the numbers on his own, there would be no need to reconcile the Audit Committee Report to the indictment. However, because Mr. Heckler is in fact relying on the Audit Committee Report – to the point of rejecting more recent evidence gathered and credited by the government[6] – he deemed it necessary to attempt a reconciliation of the two sets of numbers. Indeed, when confronted with the fact that the company's ultimate cancellation reserve analysis did not match his own, Mr. Heckler conceded that his erroneous belief that he had been reviewing the company's restated figures was premised on the Audit Committee investigation. See Tr. 3/17/2004 at 2299-2304.

> THE COURT: How did you get to your number, 114,975?
>
> THE WITNESS: This calculation was what was done and issued in the final Audit Committee Investigation. It was attached -- this calculation was attached as an exhibit or as an appendix to that.
> The underlying supporting details that were used in this calculation were part of the supporting work papers for that investigation.

Tr. 3/17/2004 at 2303.

---

[6] See Tr. 3/11/2004 at 1630-33 (Mr. Heckler continues to credit the Audit Committee Report's quantification of irregular merger reserve charges for fiscal year 1997 even though the government has reduced the amount it is alleging is improper on the basis of the statements of Anne Pember).

Mr. Heckler's repeated explanation that he needed a reconciliation to determine which items were within the scope of his engagement, and to ensure that the matters on which he was opining were in fact in the indictment, see, e.g., Tr. 3/15/2004 at 1618-20, 1772-73, is nonsensical. Mr. Heckler should have been able to determine what was in the indictment from the indictment itself; he should not need a reconciliation of what is in the indictment versus the Audit Committee Report unless the Audit Committee Report served as the premise of his opinions in the first instance.

> **2.    The Audit Committee Investigation and Report Does Not Provide a Reliable Basis for Mr. Heckler's Opinions.**

The Audit Committee Report constitutes unreliable work product containing multiple layers of inadmissible hearsay. See Forbes Third Trial Motion *In Limine* No. 8 (filed April 17, 2006), incorporated herein.

> **a.    The Audit Committee Report Constitutes Unreliable Work Product Containing Multiple Layers of Unreliable Hearsay.**

As discussed at length in Mr. Forbes' first motion to preclude Mr. Heckler's testimony, Docket Nos. 277 & 278, the Audit Committee Report constitutes unreliable work product prepared in anticipation of litigation, and contains far too many layers of hearsay to serve as a reliable basis for Mr. Heckler's expert testimony. Id. at 9-13.

First, the Audit Committee Report was the product of a biased investigation conducted in anticipation of litigation. Although the investigation was billed as an "independent" one, in fact both the interview memoranda and the final

report were the result of a process of selection and elimination which necessarily incorporated their authors' (and the witnesses') prejudices and biases. Many of the witnesses interviewed had a stake in the outcome of the investigation, and several of them were motivated by the express desire to protect HFS management and to put the top 4 or 5 members of CUC's management in jail, and to make sure that CUC management was "gone." See Ex. 31 of the Exhibits in Support of Mr. Forbes Motions Filed on March 31, 2006 (April 13, 1998 notes of Cendant chief accounting officer Scott Forbes referring to "protect mgt") and Ex. 32 of the Exhibits in Support of Mr. Forbes Motions Filed on March 31, 2006 (April 13, 1998 notes of Willkie Farr & Gallagher partner Michael Young referring to objectives of "Top 4-5 at CUC in iron" and "gone"). Mr. Heckler admitted that he was unaware of this bias when he relied upon the Audit Committee investigation. See Tr. 3/9/2004 at 1189-91.

Second, Arthur Andersen's conclusions rest on far too many layers of hearsay to be reasonably relied upon. Many of the witnesses interviewed during the investigation relayed "facts" based not on their own personal knowledge, but on what they were told by yet other witnesses, thus creating hearsay within hearsay in the memoranda that purported to summarize the witness interviews. These double hearsay summary memoranda were in turn relied upon by the Audit Committee and its attorneys in drafting the Audit Committee Report. Then Mr. Heckler relied upon that Audit Committee Report, which is itself hearsay. Thus, by this time the original declarants' purported statements had reached the level of at least triple hearsay – hardly evidence of a quality an expert would reasonably rely upon in

14

concluding that accounting irregularities had occurred, or in calculating the effect those alleged irregularities had on the company's financial statements.

In fact, each layer of the hearsay has proven to contain the very types of inaccuracies which cause courts to be suspicious of hearsay in the first instance. the Audit Committee Report itself contradicts the interview memoranda at times. For example, the Audit Committee Report states that Tom Albright, Chief Operating Officer of Essex, told Kevin Crowe, Chairman of Essex, that CUC wanted Albright to make some accounting entries that were "less than pristine" at year-end in fiscal 1996.  Ex. 4 at 158-159 (excerpt from the Audit Committee Report). According to the Audit Committee Report, Crowe responded by telling Albright to book the entries if Corporate wanted them booked.  Id.  According to the WF&G interview memoranda, however, Crowe was never asked about this transaction, and Albright could not recall what Crowe said in response to Albright raising the issue. See Ex. 5 (Crowe Interview Memorandum) & Ex. 6 at 3 (Albright Interview Memorandum).

At the Daubert hearing, Mr. Heckler himself testified to inconsistencies in witness interviews that remained unresolved by the Audit Committee investigation.  Tr. 3/15/2004 at 1791-92.  Mr. Heckler further acknowledged that because the Audit Committee interviews could not be taken as "complete truth," he would need testimony in some form or another to draw conclusions concerning what actually happened at CUC.  Tr. 3/15/2004 at 1791-92. Yet Mr. Heckler's proposal to fill this gap with witness interviews was rejected by

the government. Tr. 3/15/2004 at 1792-96; Tr. 12/10/03 at 10-11. Thus he was left to rely on the Audit Committee interviews which he conceded were unreliable.[7] Tr. 3/15/2004 at 1791-92.

In re Imperial Credit Industries, Inc. Securities Litigation, 252 F. Supp.2d 1005 (C.D. Calif. 2003) (hereafter "Imperial Credit") is instructive here. Like Heckler, the accounting expert at issue in Imperial Credit proposed to testify that certain financial statements were inflated and violated GAAP because they contained an overvalued asset. Id. at 1008. The expert's opinion was challenged on the grounds that it was based upon another expert's opinion, which was prepared for purposes of a related litigation. Id. at 1011. The court agreed with the moving party, holding that the non-testifying expert's opinion could not constitute reliable "facts and data" under Federal Rules of Evidence 702 and 703 because, like the opinions of the Audit Committee here, they were developed for purposes of litigation. Id. at 1012. The court recognized that there were circumstances when an expert may rely upon the conclusions of another, such as a testifying medical expert who relies on the records of a treating physician. Id. But the court held that there was a critical distinction between the reliability of opinions that were

---

[7] Mr. Heckler also had the plea allocutions of Cosmo Corigliano, Anne Pember and Casper Sabatino. But these allocutions contain little detail concerning the alleged fraud, and almost no information concerning the quantification of the accounting irregularities. Mr. Heckler did try later to supplement this information by posing a few questions to Mr. Corigliano and Ms Pember through the USAO. He did not receive the proffered answers to his questions until July 1, 2002, however, after he had already provided the government a draft of his expert testimony summary. Thus his "reliance" on these materials cannot be given much weight. See Tr. 3/16/2004 at 1995-1996 & 2055-56.

generated for purposes <u>other</u> than litigation and opinions which are generated

solely for purposes of litigation.  <u>Id</u>.

The court further found that the defendants had presented evidence

that it was

> unprecedented for an auditor to rely upon excerpts from
> an opinion given in adversarial litigation as a basis for
> reaching an audit opinion concerning a company's
> financial statements and that excerpts from such an
> opinion are not of a type reasonably relied upon by
> accountants in forming audit opinions.

<u>Id</u>.

As in <u>Imperial Credit</u>, here the opinions expressed in the Audit

Committee Report are unreliable, and Mr. Heckler should be precluded from

testifying.

**b.    Mr. Heckler Lacks Knowledge of the Scope and Methodology of the Audit Committee Investigation.**

Mr. Heckler also acknowledged that he lacked critical information

concerning the scope and methodology of the Audit Committee investigation.  He

does not know if Arthur Andersen conducted any of the witness interviews.  Tr.

3/9/2004 at 1182.  He does not know how the interview memoranda were prepared –

how long after the interviews they were prepared, whether more than one person

contributed to them, or whether anyone edited them.   Tr. 3/9/2004 at 1182-83.   Mr.

Heckler never reviewed Arthur Andersen's work plan.  Tr. 3/9/2004 at 1183-85.  Nor

does he know how Arthur Andersen and WF&G determined what to copy, even

though he limited himself to their universe of documents and did not go back to the

company's original books and records himself:

> Q.    Do you know how Willkie Farr or Arthur Andersen
> determined which documents to collect?
>
> A.    No.
>
> Q.    Do you have any idea how Willkie Farr or Arthur
> Andersen determined which electronic files to search?
>
> A.    No.
>
> Q.    So you have no information about what the
> instructions were to Willkie Farr or Arthur Andersen in
> terms of the gathering of documents, correct?
>
> A.    That's correct.
>
> Q.    And I believe you've already said you never spoke
> with somebody from Arthur Andersen –
>
> A.    Right.

Tr. 3/9/2004 at 1186.  Indeed, Mr. Heckler has no idea whether Arthur Andersen

copied only those documents that supported its ultimate conclusions, choosing not to

include in its workpapers those documents that contradicted its conclusions.  Tr.

3/9/2004 at 1194-95.[8]

Mr. Heckler's failure to dig into the company's documents might not be

fatal if he were only to offer opinions on whether the accounting treatments testified

to by the alleged co-conspirators were in fact improper under GAAP.  But Mr.

Heckler's proposed testimony goes far beyond that – purporting to <u>quantify</u> the

effect the alleged GAAP violations had on the financial statements, which

necessitates a judgment as to whether particular journal entries lacked support.

---

[8] Mr. Heckler also agreed that an accountant's workpapers are <u>not</u> a substitute for
the books and records of the company.  Tr. 3/9/2004 at 1196.

See Memorandum in Support of Forbes Pretrial Motion No. 49, Docket No. 278, at 18-21 & Tr. 12/16/2003 at 55-56 (Mr. Heckler confirms that his task in essence involved proving a negative). To prove such a negative, one would have to have first looked for the support in the company's books and records. Yet Mr. Heckler neither looked for documents on his own, nor investigated the procedures employed by Arthur Andersen in selecting documents to review. Mr. Heckler cannot reliably opine that there is a lack of support for these transactions when he has not conducted the necessary investigation of the underlying documents.

### 3. Mr. Heckler's Opinion Improperly Parrots the Arthur Andersen Report.

Even if it would be reasonable for an expert to rely upon Arthur Andersen's work product (which it clearly is not, as discussed above), here Mr. Heckler is not truly "relying" upon Arthur Andersen – he is adopting its opinions wholesale, and presenting Arthur Andersen's testimony under the guise of "reliance."[9]

If an expert were permitted to simply present the opinion of another expert, rather than or in addition to his own opinion, the defendant's right to cross-examine the witnesses against him would be entirely undermined. See Hutchinson v. Groskin, M.D., 927 F.2d 722 (2d Cir. 1991) (error to allow one expert to introduce

---

[9] Initially, the government elicited similar opinions from Mr. Sack, who after approximately 25 hours of work on the case was prepared to opine that CUC had misstated its financials to the tune of $250 million. The government has since excised this portion of Mr. Sack's opinion, but Mr. Heckler's opinion is really no different – it is simply dressed up in more expensive clothing.

the corroborating opinions of other experts); <u>United States v. Grey Bear</u>, 883 F.2d 1382, 1392 (8th Cir. 1989) (court properly excluded expert testimony that other, nontestifying experts agreed with the testifying expert's conclusion).

In <u>TK-7 Corporation v. Estate of Babrouti</u>, 993 F.2d 722 (10th Cir. 1993), the court rejected an attempt to circumvent hearsay by having one expert testify to another expert's report under the guise of "reliance." There, the plaintiff wished to have its financial expert rely upon a non-testifying expert's report of projected sales in the United Kingdom.

> Based upon the evidence presented in the trial court, Dr. Boswell's assumption of the Werber sales figures cannot be considered "reasonable reliance" for purposes of forming his own opinion of the amount of lost profits. A determination of profits for the joint venture was wholly dependent upon a projection of future sales. *By assuming the sales projections made by Werber, Dr. Boswell in essence assumed the very matter at issue on which he was called to express his opinion.*

<u>Id.</u> at 732 (emphasis added).

The court reached the same conclusion in <u>In re James Wilson Associates</u>, 965 F.2d 160 (7th Cir. 1992), where an architect expert proposed to testify to the condition of a building based on the report of a non-testifying engineer. The court affirmed the exclusion of the evidence. "The issue was the state of the building, and the expert who had evaluated that state – the consulting engineer – was the one who should have testified." <u>Id.</u> at 173. <u>Accord</u> <u>Lithuanian Commerce Corp. v. Sara Lee Hosiery</u>, 177 F.R.D. 245, 264 (D.N.J. 1997) (expert could not solicit other expert's opinions and then incorporate them into his own report as a

substitute for doing the relevant analysis himself), <u>rev'd on other grounds</u>, 179

F.R.D. 450 (D.N.J. 1998); <u>Tran Trong Cuong, M.D.</u>, 18 F.3d at 1143 (error to allow

testifying physician to testify to report of non-testifying physician); <u>Valentin v. New

York City</u>, Civ. No. 94-3911, 1997 WL 33323099, *27 (E.D.N.Y. Sept. 9, 1997)

(excluding expert testimony based primarily on the assessments of the expert's

advisees; "Neither this Court nor the jurors can assess the trustworthiness or the

reliability of Dr. Leinen's advisees who will not be testifying.  <u>An expert cannot act

as a mere conduit for the opinions of other persons</u>") (emphasis added).

Nor can an expert convert another's opinion into his own by simply

"spot-checking" portions of the underlying opinion.  In <u>American Key Corp. v. Cole

National Corp.</u>, 762 F.2d 1569 (11th Cir. 1985), for example, the plaintiff alleged

antitrust violations resulting from the alleged use of a monopoly power.  The

plaintiff attempted to establish the relevant market for the claim through both lay

witness and expert witness affidavits.  The expert affidavit simply relied upon the

lay witness's affidavit, however.  <u>Id.</u> at 1580.  And although the expert had "spot

checked" the lay witness's affidavit, he had not conducted his own factual

investigation.  <u>Id.</u>  The court therefore rejected the testimony.  <u>Id.</u>

Mr. Heckler's proposed testimony is no different than that rejected in

<u>TK-7 Corp.</u> and <u>American Key Corp</u>.  Arthur Andersen does not provide a narrow

premise upon which Mr. Heckler's own testimony rests.  Rather, Arthur Andersen's

work and conclusions address the <u>very same issues</u> upon which Mr. Heckler is being

called to opine, thereby failing the litmus test of "reliance" under Rule 703.  <u>Id.</u>  Mr.

Heckler's "investigation" amounts to nothing more than a review of Arthur Andersen's procedures to gain an understanding of Arthur Andersen's conclusions, so that he can step into the shoes of Arthur Andersen and testify to its conclusions. That Mr. Heckler "spot checked" some of Arthur Andersen's work does not change this fact. American Key Corp., 762 F.2d at 1580. Mr. Heckler's testimony should be precluded.

## II.    MR. HECKLER'S TRIAL TESTIMONIES CONFIRM THAT MR. HECKLER IMPROPERLY RELIED UPON ARTHUR ANDERSEN'S WORK.

Having been challenged concerning his failure to follow GAAS, and having admitted to many of the flaws inherent in the Audit Committee investigation and Report, Mr. Heckler reversed positions during the Daubert hearing, abdicating any responsibility for the facts in order to get out from under these flaws:

> I did understand that my role as an expert was to use my training, education and experience to assess which facts were relevant and then to be prepared to analyze the facts I chose as relevant out of that population and to testify. And that those assumed facts I would not be responsible for proving; instead, the government would be responsible for proving through its case or that you, as the defense, would be in a position to disprove through your case.

Tr. 3/25/2004 at 2654 (emphasis added). See also, Tr. 3/25/2004 at 2600-01. Mr. Heckler subsequently made clear that these "assumed facts" came in large part from the Audit Committee Report:

> Q.  Did they [the government] <u>give you the facts in the Audit Committee Report and tell you that you should base your opinion on those given facts</u>?
>
> A.  <u>I think that's a fair statement, yes</u>.

Tr. 3/25/2004 at 2651 (emphasis added).

In direct contrast to these ultimate representations made by Mr. Heckler during the <u>Daubert</u> hearing, his two trial testimonies make clear that he was <u>not</u> relying on assumed facts, but rather continuing to suggest that he had conducted his own "investigation" – which, as discussed at length above, was an unreliable basis for expert testimony.

### A.    **Mr. Heckler's Testimony in the First Trial.**

No assumptions or hypotheticals were discussed during Mr. Heckler's first trial testimony.  Instead, Mr. Heckler improperly suggested to the jury that he <u>had</u> conducted a factual investigation sufficient to support his opinions.  He then proceeded to testify to the "facts" as he understood them, implying that he had verified these "facts" through his own, independent factual investigation.  Nor did Mr. Heckler stop at his own alleged investigation.  He went one step further, implying that the testimony of the government's witnesses comported with his own fact finding, thereby improperly vouching for the credibility of these key government witnesses.

Mr. Heckler implied, for example, that he had conducted his own investigation into the cancellation reserve at CUC:

Q.   And what type of work -- what items did you consider -- first of all, let me ask you:  Did you form an opinion as to whether or not there was a violation of GAAP in this area?

A.   Yes, I did.

Q.   And were you able to quantify the violation?

A.   I was able to quantify the violation.

Q.   And what were some of the items you considered in getting there?

[OBJECTION OVERRULED]

A.   Some of the items that I considered in formulating my opinion was to look at the trial testimony, the exhibits introduced as part of the trial, <u>to look at company records, how the company reported or estimated this cancellation reserve in the first place, to look at supporting documentation that the company provided to auditors and others to help justify what they did the first time when they recorded these cancellation reserves.  I looked at transactions that the company either delayed the recognition of or chose not to report on a timely basis, or in some cases where the company recorded transactions to reverse out part of these cancellation reserves into income</u>. And then I looked at accounting literature and other information that governs how these estimates are to be made.

Tr. 8/23/2004 at 10,641-42, 10,645-46 (emphasis added).  Mr. Heckler's suggestion

was further fortified by the fact that the jury had no evidence before it by which one

could quantify the effect of the cancellation reserve issue for fiscal year 1/31/96, yet

Heckler testified that he had quantified the effect to be at least $48 million —

testimony for which there was no record evidence.  Tr. 8/23/2004 at 10,644-45.

Similarly, when it came to the Commissions Payable issue, the jury

had no choice but to believe that Mr. Heckler had conducted his own investigation.

His testimony did not disclose any assumptions, and there was no record evidence

for his opinion that there was at least a $4 million effect in January 1997, and at least a $2 million effect in December 1997. Tr. 8/23/2004 at 10,658. Rather, the only record evidence concerning the Commissions Payable was Pember's testimony that she had improperly utilized $9 million of Commissions Payable to inflate income in January 1997, Tr. 5/27/2004 at 2,456-2,466, and an e-mail from Speaks in April 1998 reflecting his belief that the Commissions Payable account was understated by as much as $10 million, Ex. 7. Thus the jury was left to believe either that Mr. Heckler plucked his $2 million and $4 million figures out of thin-air because these amounts were at least less than what other witnesses had said, or, more plausibly, that Mr. Heckler had conducted an investigation beyond the evidence presented in Court and reached the "expert" opinion that the financials were overstated by at least these amounts.

### B.    Mr. Heckler's Testimony in the Second Trial.

As in the first trial, Mr. Heckler relied upon non-record evidence in the second trial against Mr. Forbes as well. When asked what he had done to complete his assignment, he immediately referred to information that was not admitted into evidence: "First, it involved reviewing information, the facts that had been introduced in this case, testimony, other information that's been produced in other proceedings, [and technical research]." Tr. 11/9/2005 at 2384 (emphasis added). Mr. Heckler expanded upon this later in this testimony:

> Q.    In addition to the exhibits, did you look at any other documents relating to this matter?

> A.     I did.  I had a variety of documents, in some ways you can group these into categories as well.  There were <u>government documents like the indictment and other matters related to the case</u>.  There were publicly filed documents like the financial statements and the annual reports and press releases, analysts' reports and other things like that.  There were documents in the public domain like accounting literature and interpretations and cases in accounting that I looked at and considered.  <u>And then there were company-specific documents.  There were things like journal entries or books and records like the general ledger or excerpts from that, invoices or other details that were prepared by the company</u>.

Tr. 11/9/2005 at 2389 (emphasis added).  <u>See also</u> Tr. 11/9/2005 at 2391-93 (describing non-record evidence relied upon in forming opinions concerning top-side adjustments); <u>id</u>. at 2400-01 (describing non-record evidence relied upon in forming opinions concerning revenue recognition); <u>id</u>. at 2407-08 (describing non-record evidence relied upon in forming opinions concerning cancellation reserves); <u>id</u>. at 2414 (describing non-record evidence relied upon in forming opinions concerning merger reserves).

Indeed, Mr. Heckler had no choice but to look beyond the facts introduced during the government's case-in-chief in order to form his opinions, because the government had elected to introduce very little evidence of the accounting irregularities in the second trial.  Having made that election, the government improperly used Mr. Heckler as a "stop gap" to testify concerning issues not otherwise presented, and for which there could be no basis other than the improper, non-evidentiary material reviewed by Mr. Heckler.

For example, Mr. Heckler opined that CUC had misused $146.8 million in Ideon and Cendant reserves at year end 12/31/1997. Yet the government had presented contradictory testimony concerning the use of merger reversals at year end 12/31/1997, none of which supported the conclusion to which Mr. Heckler opined. Ms. Pember testified that earnings were overstated by approximately $85 million at year end 12/31/1997 by the combined misuse of the Cendant and Ideon merger reserves. Tr. 10/24/2005 at 879. Mr. Corigliano, in contrast, testified that the Cendant merger reserve had not been utilized at year end 12/31/1997. Tr. 11/1/2005 at 1608-09. No exhibits were admitted reflecting the actual use of either merger reserve. Thus there simply was no evidence to support Mr. Heckler's opinion. See Tr. 11/9/2005 at 2419-20.

* * * * * * * * *

In sum, while at the Daubert hearing Mr. Heckler attempted to cure the unreliable bases for his opinion by representing that he would testify based upon "assumed facts" that the government would then have to prove, Mr. Heckler's two trial testimonies demonstrate that Mr. Heckler's opinions are in fact based upon his own "fact finding." As discussed in Section I, this "fact finding" was not conducted in accordance with GAAS, and instead was based upon the inherently unreliable Audit Committee's investigation and report. Mr. Heckler's opinions must be precluded under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 595 (1993).

### III. PERMITTING MR. HECKLER TO TESTIFY IN RELIANCE ON THE AUDIT COMMITTEE INVESTIGATION AND REPORT VIOLATES MR. FORBES' SIXTH AMENDMENT RIGHT OF CONFRONTATION.

#### A. Because Mr. Heckler's Opinion Relies Upon the Testimonial Statements Given During the Audit Committee Investigation, His Testimony Would Violate Mr. Forbes' Sixth Amendment Right of Confrontation.

Permitting Mr. Heckler to testify to conclusions based upon the work conducted by the Audit Committee would violate Mr. Forbes' Sixth Amendment right to confront and cross-examine the witnesses against him. For example, in the first trial, the government called only 7 of the 81 witnesses interviewed by Arthur Andersen. In the second trial, they cut this number back to 2. Should Mr. Heckler be permitted to offer opinions based on the statements of any of the dozens of witnesses who were not called as witnesses by the government, it would essentially introduce the testimony of those witnesses without at the same time subjecting those witnesses to cross-examination. This is particularly problematic in this case because of the bias of many of these witnesses. As discussed supra, the former HFS employees were seeking to put the senior CUC people in "irons," and the former CUC employees of course also had an interest in the outcome of the investigation.

Although the hearsay rules and the Confrontation Clause of the Sixth Amendment are designed to protect similar values, the Supreme Court has explicitly recognized that evidence which may surmount the hearsay rules does not necessarily survive the Confrontation Clause. Idaho v. Wright, 497 U.S. 805, 814 (1990). "The Confrontation Clause, in other words, bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay

rule." Id. In Wright, the Court addressed the testimony of an examining physician who had relayed to the jury statements made to him by his three year old patient. Agreeing with the Idaho Supreme Court that the statements were "fraught with the dangers of unreliability which the Confrontation Clause is designed to highlight and obviate," the United States Supreme Court reversed the defendant's conviction. Id. at 816. See also Cotto v. Herbert, 331 F.3d 217, 229 (2d Cir. 2003) ("cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested, the opportunity for cross-examination, protected by the Confrontation Clause, is critical for ensuring the integrity of the fact-finding process.") (internal quotations and citations omitted).

The Supreme Court recently reaffirmed this "bedrock procedural guarantee," holding that the Sixth Amendment required the exclusion of testimonial statements, even when they met an accepted exception to the hearsay rule. Crawford v. Washington, 541 U.S. 36, 42 (2004). The Court explained that with respect to testimonial statements, the Confrontation Clause commands that "reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined." Id. at 61. The Supreme Court then announced a per se bar on the admission of out-of-court testimonial statements unless the declarant is unavailable, and his or her prior statements were subject to cross-examination.

While the Court did not "spell out a comprehensive definition of 'testimonial,'" it provided examples, including prior testimony and responses to police interrogation.  Id. at 68.  These statements "all involve a declarant's knowing responses to structured questioning in an investigative environment or a courtroom setting, where the declarant would reasonably expect that his or her responses might be used in future judicial proceedings."  United States v. Saget, 377 F.3d 223, 228 (2d Cir. 2004).  The Second Circuit has interpreted Crawford as suggesting that "the determinative factor in determining whether a declarant bears testimony is the declarant's awareness or expectation that his or her statement may later be used at a trial."  Id.

The 81 interviews on which the Audit Committee Report is premised "all involve a declarant's knowing responses to structured questioning in an investigative environment . . . where the declarant would reasonably expect that his or her responses might be used in future judicial proceedings."  See id.  At the time of the interviews, civil suits relating to the same issues had already been filed, and both criminal and SEC investigations had commenced.  Although the government was not conducting the interviews, Cendant was cooperating with the government, investigating the same matters, and it ultimately disclosed the interview memoranda to the government.  At the time the interviews were conducted, witnesses were advised that the interviewers did not represent them and some were advised that their statements might be disclosed.  Thus, these witnesses could

reasonably expect that their statements might be used in future judicial proceedings.

Because the Audit Committee Report and the underlying witness interviews constitute testimonial hearsay, the prior statements were not subject to cross-examination, and there has been no showing that all declarants are unavailable, admission of Mr. Heckler's testimony, which is based on this testimonial hearsay, would violate the Confrontation Clause.

The fact that Mr. Heckler does not intend to recite any of these testimonial statements during his direct examination is of no moment. <u>First</u>, his opinion is premised upon them, and therefore they are in effect being introduced without Mr. Forbes ever having had the opportunity to cross-examine the declarants.[10] <u>Second</u>, Mr. Forbes cannot effectively cross-examine Mr. Heckler concerning the bases of his opinions without running head-first into these testimonial statements.

The Second Circuit held that expert testimony was improperly admitted in analogous circumstances in <u>Howard v. Walker</u>, 406 F.3d 114 (2d Cir. 2005). There, three of the defendants co-conspirators had provided statements to the police that were held inadmissible under <u>Bruton v. United States</u>, 391 U.S. 123 (1968). Nonetheless, a state pathologist was permitted to testify to opinions

---

[10] Mr. Heckler had to rely upon these 81 interviews because the nature of his task, especially in quantifying the accounting irregularities, was proving a negative. <u>See</u> Section I(C)(2)(b), <u>supra</u>. Moreover, this reliance was evidenced by his need to "reconcile" the quantification in the Audit Committee Report with the quantification in the indictment. <u>Id</u>. at I(C)(1).

premised in part on at least one of the <u>Bruton</u>-infected statements, which the Court

had described as "inherently unreliable hearsay." <u>Id</u>. at 127.  The Court would not

allow the Bruton-infected statement to be introduced during the expert's direct

examination, but the defendant was warned that if he challenged the basis of the

pathologist's opinion, or called his own expert pathologist, the <u>Bruton</u>-infected

statement would be allowed into evidence.  Under these circumstances, the Court

held:

> By conditioning Howard's right to cross-examine [the
> expert] on the surrender of another constitutional right,
> the court effectively foreclosed Howard's opportunity to
> engage in cross-examination that would challenge "the
> nature and reasonableness of [the expert's] reliance" on
> [the Bruton-infected statement], or any other basis upon
> which she reached her conclusion."

<u>Id</u>. at 130.[11]

    As in <u>Howard</u>, here the Audit Committee interviews relied upon by Mr.

Heckler are testimonial statements that could not come into evidence directly, and

are inherently unreliable, having been prepared in anticipation of litigation.  <u>See</u>

Section I, <u>supra</u>.  Permitting Mr. Heckler to testify puts Mr. Forbes in the

unacceptable position of foregoing his constitutional right to cross-examine Mr.

Heckler, or foregoing his constitutional right to exclude these testimonial

statements from being heard against him.  This Hobson's choice denies Mr. Forbes

---

[11] The Court declined to hold that allowing an expert to rely upon <u>Bruton</u>-infected
statements would be a per se violation of <u>Crawford</u>, reserving on that question for
the time being.  <u>Howard</u>, 406 F.3d at 128.

his rights under "one of the most firmly established principles under Supreme Court law." Id. at 131 (citing Cotto, 331 F.3d at 248).

### B. It Will Be Impossible To Conduct an Effective Cross-examination of Mr. Heckler Without Eliciting Improper Opinions.

The Sixth Amendment's confrontation clause guarantees a defendant not only the right to confront the witnesses against him, but also "an opportunity for effective cross-examination." Delaware v. Van Arsdall, 475 U.S. 673, 678-79 (1986) (emphasis added).

The government initially requested that Mr. Heckler form an opinion on whether the alleged accounting errors were intentional.[12] The government knew that there was no justification for its request; no expert can permissibly testify to the ultimate issue of intent in a criminal case. Yet the government asked Mr. Heckler to do so, and now the defense cannot effectively cross-examine Mr. Heckler without fear that his improper conclusions about intent may come forth.

The catch-22 this places the defense in was highlighted by the examination of Mr. Heckler during the Daubert hearing regarding the materiality of the alleged irregularities. As Mr. Heckler himself acknowledged, materiality is a critical component to the assessment of whether there has been a violation of GAAP, and thus is an area upon which the defense must be able to freely cross-

---

[12] The government adopted this same procedure with Professor Sack – asking him to form improper opinions regarding intent based upon the Audit Committee Report (albeit at a much lower cost than Mr. Heckler, and without the ruse of purported "fact finding").

examine Mr. Heckler.  Tr. 3/9/2004 at 1155-56.  Yet each time the defense began to explore Mr. Heckler's determination of materiality, his findings of intent came seeping out.  For example, Mr. Heckler testified that his materiality assessment for "smaller" items – of which he admitted there were many – was based on his prior, improper conclusion that the accounting irregularities were intentional.  Tr. 3/9/2004 at 1164-65.

Mr. Heckler also formed opinions regarding a number of matters outside the scope of the indictment, and the government improperly elicited these opinions as part of his testimony on direct examination during the <u>Daubert</u> hearing. In addition to unfairly prejudicing Mr. Forbes, these opinions on matters outside the indictment are also inadmissible because they would be of no assistance to the jurors, who must deliberate on the allegations in the indictment – not newly alleged errors that a witness has conjured up after the government brought its case.

<u>These improper opinions included Mr. Heckler's conclusion that all of the company's merger charges were improper because the company had not developed a sufficient exit plan to justify a merger reserve in the first instance</u>.  Tr. 12/17/2003 at 255-56.  This "error" is not alleged in the indictment, and is contrary to the three other auditors who have opined on or investigated CUC's financials – Ernst & Young, Deloitte & Touche, and Arthur Andersen.  Yet Mr. Heckler not only testified to it during his direct examination at the <u>Daubert</u> hearing, <u>but also admitted that this theory was one of the underpinnings to his conclusions that at</u>

<u>least the amount alleged in the indictment was inappropriately charged to the</u>

<u>merger reserve</u>.  Tr. 12/17/2003 at 256-57.

With regard to revenue recognition, the government alleges only that the reallocation of revenues from deferred to immediate programs was a violation of GAAP.  Mr. Heckler went much further in his expert testimony summary and in his Daubert hearing testimony, opining that <u>all</u> immediate revenue recognition by the company violated GAAP.  Tr. 12/16/2003 at 132-34.

Mr. Heckler also has concluded that the company violated GAAP by not including certain disclosures in the Management Discussion and Analysis ("MD&A") section of the Financial Statements.  <u>See</u>, <u>e.g.</u>, 3/11/2004 at 1583-84.  The indictment contains no allegations regarding the failure to make these disclosures, however.  Moreover, the government, in response to the defendants' Motion for Bill of Particulars, expressly stated that it has identified all allegedly false statements upon which it intends to rely at trial.  Nowhere has the government identified the allegedly misleading omissions or inadequate disclosures opined upon by Mr. Heckler.

Should any one of Mr. Heckler's improper opinions come tumbling out before the jury, Mr. Forbes would be unfairly prejudiced, and a mistrial would be necessary.[13]  That is too great a risk to take with this witness – particularly given

---

[13] Introducing new theories of fraud not pled in the indictment would create an improper variance with the indictment.  <u>See</u> Forbes Third Trial Motion in Limine No. 3 at Section III(A), (filed April 17, 2006).

the fact that the government itself explicitly elicited a number of the improper opinions when it knew that there was no justification for doing so.

## IV.    MR. HECKLER SHOULD NOT BE PERMITTED TO TESTIFY REGARDING SEC FINANCIAL AND ACCOUNTING DISCLOSURE REQUIREMENTS.

Finally, "it is not for witnesses to instruct the jury as to applicable principles of law, but for the judge." <u>United States v. Bilzerian</u>, 926 F.2d 1285, 1294-95 (2d Cir. 1977).  Nevertheless, the government sought during the <u>Daubert</u> hearing to have Mr. Heckler testify regarding the "financial and accounting disclosure requirements" of the SEC.  Tr. 12/16/2003 at 21-22.  While the government did not elicit any such testimony from Mr. Heckler during the first two trials, Mr. Forbes should be assured that the government will not resurrect this testimony for the third trial because such opinion testimony invades the province of the Court.  The jury is to receive proper instruction on the law from the Court.  The jurors will not need Mr. Heckler's recitation of what he believes the law provides, and it would be improper to give it to them.

## CONCLUSION

For the foregoing reasons, Mr. Forbes respectfully requests that the Court preclude the testimony of Brian Heckler.  In the alternative, Mr. Forbes requests that the Court limit the scope of Mr. Heckler's testimony to those opinions that he can reach based upon the evidence introduced during the government's case-in-chief, and preclude Mr. Heckler from testifying to issues of intent, issues of law, and issues not plead in the indictment.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: _____

Brendan V. Sullivan, Jr. (Bar No. ct17115)
Barry S. Simon (Bar No. ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
COWDERY, ECKER & MURPHY, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

Dated:  April 17, 2006

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Memorandum in Support of Motion of Defendant Walter A. Forbes to Preclude the Government from Presenting the Proposed Expert Testimony of Brian Heckler Because It Does Not Satisfy the Reliability Requirements of <u>Daubert</u> and Federal Rule of Evidence 702 (Forbes Third Trial Motion *in Limine* No. 5) to be filed electronically and to be served on April 17, 2006 to the following via e-mail:

<div style="margin-left:2em">

Norman Gross, Esq. (norman.gross@usdoj.gov)
Michael Martinez, Esq. (<u>michael.martinez2@usdoj.gov</u>)
Craig Carpenito, Esq. (craig.carpenito@usdoj.gov)

</div>

Barry S. Simon