# EXHIBIT A
# (PART 1)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA           No. 3:02CR264(AWT)

    vs.

E. KIRK SHELTON,
                                   HARTFORD, CONNECTICUT
            Defendant              FEBRUARY 17, 2006

- - - - - - - - - - - - - - - - -x


MOTION HEARING


BEFORE:

    HON. ALVIN W. THOMPSON, U.S.D.J


                              Corinna F. Thompson, RPR
                              Official Court Reporter

Page 2

```
 1  APPEARANCES:
 2
    FOR THE GOVERNMENT:
 3
       U.S. DEPARTMENT OF JUSTICE
 4        970 Broad Street, Suite 700
          Newark, New Jersey 07101
 5     BY: RICHARD SCHECHTER, SPECIAL ATTORNEY
           JAMES McMAHON, SPECIAL ATTORNEY
 6         JOHN G. SILBERMANN, SPECIAL ATTORNEY
 7
    FOR THE DEFENDANT:
 8
       THOMAS P. PUCCIO, ESQUIRE
 9        230 Park Avenue
          New York, NY  10169
10
       SANTOS & SEELEY
11        51 Russ Street
          Hartford, Connecticut 06106
12     BY: HOPE C. SEELEY, ESQUIRE
13
    FOR CENDANT CORPORATION:
14
       MURTHA CULLINA LLP
15        CityPlace I  185 Asylum Street
          Hartford, Connecticut  06103
16     BY: ROBERT E. KAELIN, ESQUIRE
17     SKADDEN, ARPS, SLATE, MEAGHER & FLOM
          Four Times Square
18        New York, New York  10036
       BY: SAMUEL KADET, ESQUIRE
19
20  ALSO IN ATTENDANCE:
21     Richard Schaeffer
22
23
24
25
```

Page 3

```
 1              10:17 a.m.
 2         THE COURT:  Good morning.
 3         Could I ask counsel to state their appearances
 4  for the record, please.  Counsel for the government and
 5  Cendant.
 6         MR. SCHECHTER:  Good morning, Your Honor.
 7  Special Attorney from the Department of Justice, Richard
 8  Schechter.
 9         MR. McMAHON:  Good morning, Your Honor.  Jay
10  McMahon, Special Attorney, U.S. Department of Justice.
11         MR. SILBERMANN:  Good morning, Your Honor.  John
12  Silbermann, Special Attorney, Department of Justice.
13         MR. KADET:  Good morning, Judge.  Sam Kadet of
14  Skadden, Arps for Cendant Corporation.
15         MR. KAELIN:  Good morning, Your Honor.  Robert
16  Kaelin, Murtha Cullina on behalf of Cendant Corporation.
17         MR. PUCCIO:  Good morning, Your Honor.  Tom
18  Puccio for Kirk Shelton.
19         MS. SEELEY:  Good morning, Your Honor.  Hope
20  Seeley on behalf of Mr. Shelton.
21         MR. SCHAEFFER:  Good morning, Your Honor.
22  Richard Schaeffer on behalf of Mr. Shelton.
23         THE COURT:  Thank you.
24         I scheduled this hearing to discuss some
25  specific motions, and let me just say what they are for
```

Page 4

```
 1  the record.
 2         We have Mr. Shelton's motion for stay of
 3  sentence providing for restitution.
 4         We have Cendant's motion for limited release of
 5  defendant E. Kirk Shelton's Presentence Report and
 6  quarterly financial progress reports.
 7         We have Cendant's motion for order in aid of
 8  execution.
 9         We have Cendant's motion to compel compliance
10  with restitution order.
11         I believe those are the four motions that are
12  pending.
13         I'm not going to handle this by going through
14  the motions.  I'm going to handle this as a higher level
15  and tell you where we are and, so you won't be arguing in
16  the blind, tell you where I think we ought to be at the
17  end of the day.  And then if we discuss sort of the
18  general principles, then I think how the motions should
19  fall out becomes more apparent, and then we can get to the
20  particulars of the various statutes that people have been
21  citing to.
22         As you know, Mr. Shelton was convicted and
23  sentenced.  Under the mandatory restitution statute, I had
24  no discretion in terms of whether or not to impose
25  restitution in the full amount.  I did have the ability to
```

Page 5

```
 1  make some judgments in determining what was the
 2  appropriate full amount of the loss to the victim, and I
 3  think you all recall that I chose an amount that I thought
 4  was completely indisputable.  It happened to be the lowest
 5  amount.  It also happened to be well in excess of the
 6  defendant's ability to pay, but that's what the statute
 7  provides for.
 8         I ordered a $15 million lump sum payment.  That
 9  was referred to in the Presentence Report.  In making the
10  decision to order that $15 million lump sum -- and I put
11  "lump sum" in quotation marks -- payment, I relied on a
12  discussion we had here in court.
13         And just so it's clear how I view things, I
14  don't think there's an issue as to whether the defendant
15  has complied with the order.  He hasn't complied with the
16  order, period.  Rather, I think the issue is whether I
17  should waive that noncompliance or modify the order.
18         Let me just note a few things for the record.
19         I think on one of our calls there was a
20  reference as to whether there had been a meeting of the
21  minds between the probation officer and defense counsel.
22  The probation officer's mind isn't the one that matters.
23  What matters is the order I entered.  I didn't need an
24  agreement from the defendant to enter the restitution
25  order.  I listened to people's arguments, I looked at the
```

Page 6

1  Presentence Report, the financial condition of the
2  defendant and I concluded that $15 million was a
3  reasonable lump sum payment to order based on what I knew
4  at the time.
5      I will note, just so you all know what I'm
6  looking at, because I looked at the transcript just to
7  confirm my recollection, and I was concerned that the
8  defendant had had an opportunity to read the
9  recommendation in Paragraph 148 of the Presentence Report,
10 and I said I want to make sure he's had an opportunity to
11 read that paragraph. That's at page 452, line 3 of the
12 July 22nd transcript.
13     And we had some discussion about the payment,
14 and there was a reference at page 454, line 23 that other
15 than what was accounted for by Mr. Shelton's interest in
16 certain insurance policies -- that phrase appears at line
17 14 of page 454 -- the remainder would be coming to the
18 Clerk's Office via check or wire transfer. And I note
19 that some of the -- some of what was deposited was shares
20 of stock in Cendant Corporation and I'm not aware of any
21 mechanism for transferring shares of stock by check or
22 wire transfer. So I think you'll understand why it came
23 as a surprise to me to see that shares were deposited.
24     So for that reason I believe the requirement
25 that the $15 million lump sum payment be made has not been

Page 7

1  complied with.
2      And I will also say my understanding, and I
3  think it is reflected by the concern I expressed about the
4  fact that there be no diminution in value with respect to
5  the insurance policies, was that what would be deposited
6  would be clearly Mr. Shelton's interest in insurance
7  policies. And had I been told at the time that there was
8  some dispute about who had what interest in the policies,
9  I would have said that was unacceptable. And to the
10 extent that the policies that have been deposited are not
11 in amounts that constitute his interest, the restitution
12 order requirement of the $15 million lump sum payment has
13 not been complied with.
14     I guess it is my understanding that the
15 condominium in Vail has been transferred, based on what
16 I've read. I guess if that's not true, I would like
17 somebody to tell me now. I read it was transferred
18 September 9th.
19     MR. PUCCIO: He liquidated his interest in order
20 to contribute to the $15 million. That's a matter of
21 public record.
22     THE COURT: There was a bond package -- let me
23 back up.
24     When I set the conditions of bond, the -- let me
25 get this correct.

Page 8

1      MR. PUCCIO: Judge, if I may. The condominium
2  and the residence were both put up, if I recall, as part
3  of bond, and then the lien against both is still in
4  existence so that that has not changed.
5      THE COURT: I know the lien --
6      MR. PUCCIO: So in other words --
7      THE COURT: I guess my first question is there
8  was a letter from the courtroom deputy that went to
9  Mr. Puccio February 17th forwarding the bond package, and
10 I think the instruction was to return the documents to the
11 United States Attorney's Office in Newark.
12     MR. PUCCIO: I'm informed that that was done.
13     THE COURT: Are those documents -- where are
14 those documents now?
15     MR. PUCCIO: Presumably they are with the United
16 States.
17     THE COURT: I was actually asking the question
18 of the U.S. Attorney's Office in Newark.
19     MR. SCHECHTER: Your Honor, we have no knowledge
20 of it. It's possible it's in Newark, but Mr. Silbermann,
21 who's in Newark, doesn't know anything about it.
22     MR. PUCCIO: May I approach, Your Honor?
23     THE COURT: I don't need to see them now.
24     MR. PUCCIO: But there is a cover letter dated
25 May 4, 2005, and it's addressed from the firm of

Page 9

1  Santos & Seeley to John J. Carney with full compliance
2  with that directive. It's here if anybody wants to look
3  at it.
4      THE COURT: I don't usually get involved in
5  this. In this district, the U.S. Attorney's Office takes
6  care of it. They have a checklist and I believe it
7  provides for filing the mortgage deed. Whether that's
8  actually done, I just got the package. I don't get
9  involved in the mechanics, but one concern I have is that
10 if the documents have been signed -- and I haven't
11 reviewed these. It's not my job, I don't think. I rule
12 on issues as they are raised. But one concern I have is
13 it's normally the case when you have documents like these,
14 at least when I used to deal with them, that you have
15 restrictions on the transfer of the property, and if the
16 deed was not recorded and there's been a transfer of the
17 property, then I have a concern about priority of the
18 lien.
19     MR. SILBERMANN: Your Honor, if I may?
20     THE COURT: Yes.
21     MR. SILBERMANN: We filed liens, I believe, in
22 Eagle County, Colorado. It took a couple of weeks back
23 and forth with the county clerk out there to get if right
24 with some filing fees and what have you. Turns out, right
25 after our final lien was filed we learned it had been

Page 10

1  transferred prior to that. It's a matter of days or weeks
2  of our filing of the lien vis-a-vis the transfer.
3       THE COURT: So your lien was filed after the
4  transfer?
5       MR. SILBERMANN: Post transfer apparently.
6       THE COURT: That's a problem.
7       MR. SILBERMANN: Yes, sir.
8       If that's an extra copy, if we could have that?
9       MR. PUCCIO: Sure. I could make it available
10 for them to look at.
11      THE COURT: We'll get to that later. We'll get
12 to that later.
13      So that's a problem from my perspective. And I
14 asked Mr. Maxwell -- and this is going to cause me to
15 decide we have to do things differently -- whether -- I
16 believe the amendment to the order setting conditions of
17 release provided that without the prior permission of the
18 Probation Office there would be no transfer in any month
19 of assets in excess of a total of $45,000.
20      Mr. Maxwell is confident that he got a report
21 after the transfer was made, but he cannot recall or find
22 any records as to the prior permission.
23      Do you have anything that would help us pin that
24 point down?
25      MR. PUCCIO: We can look for that, Judge.

Page 11

1       THE COURT: Okay. I'll accept that you have
2  that. I just wanted to clarify that.
3       I think it points out to me a flaw in how this
4  is structured because I really shouldn't have left it as
5  "without the prior permission of the Probation Office."
6  It should have been "without my prior permission," because
7  I would not have permitted the transfer because that
8  property was collateral for the bond.
9       MR. PUCCIO: It still is. It's full collateral
10 for the bond.
11      THE COURT: I would not have permitted it. I
12 don't care what your opinion is.
13      MR. PUCCIO: I understand, Judge.
14      THE COURT: I don't take your opinion on
15 commercial law matters.
16      MR. PUCCIO: I'm not an expert on commercial
17 law.
18      THE COURT: I know.
19      MR. PUCCIO: I know a little bit about real
20 estate.
21      THE COURT: I do, too.
22      MR. PUCCIO: There is a lien on the property.
23      THE COURT: I would not count that twice.
24 That's what that constitutes. It's being counted as
25 collateral for the bond and it's also being used to pay

Page 12

1  the restitution. That wasn't the way I envisioned things
2  working.
3       MR. PUCCIO: Your Honor, I did not give any
4  thought to that.
5       If I were the U.S. Attorney and someone asked me
6  to approve or disapprove it, which is the procedure
7  apparently used, to me it's a no-brainer. If the property
8  is still there and you have the first lien -- it's just
9  like the house in Connecticut. He doesn't own that house
10 either and they have a lien against it.
11      It strikes me as maybe a distinction without a
12 difference, but I'm not quarreling with Your Honor, but
13 the procedure we followed --
14      THE COURT: I think what I'm pointing out is
15 that this points out to me the need for me to be the
16 person who makes the decision as to permission as opposed
17 to leaving it to the Probation Office.
18      MR. PUCCIO: Or the U.S. Attorney.
19      THE COURT: And I make that decision with input
20 and notice to, and input from the government and the
21 victim, i.e., Cendant, the beneficiary of the restitution
22 order, because I think had that been in place, we would
23 not be in a situation where the government's lien was
24 filed subsequent to the transfer.
25      I probably would have asked some questions. And

Page 13

1  I would have asked counsel for the government and the
2  victim to also tell me if they had any questions that
3  should have been asked at that time.
4       MR. PUCCIO: Judge, I wasn't aware of that, but
5  I do know that when we discussed this package, it had to
6  be months before this transaction took place.
7       THE COURT: When we discussed what package?
8       MR. PUCCIO: When the package was discussed, the
9  bond package was discussed with me. I got a note from the
10 court on the bond package and I discussed it with
11 Ms. Seeley and she prepared the package and sent it. It
12 was in May. This transaction did not take place until
13 many months later.
14      THE COURT: I understand it was September.
15      MR. PUCCIO: I would assume that sometime in
16 May, May 5, sometime in May, if not a few days thereafter,
17 all of this would have been liened.
18      THE COURT: Recorded.
19      MR. PUCCIO: Recorded. I didn't do a title
20 search, but --
21      THE COURT: I'm just saying it points out to me
22 a structural flaw from my perspective and I'm going to
23 make adjustments based on that, because I think that with
24 a little more discussion up front, there will be more
25 clarity as to exactly what's going on and the things that

Page 14

1  I think need to be covered will be covered properly.
2      MR. PUCCIO: Judge, just to complete --
3      THE COURT: I want to finish what I'm doing.
4      When I step back and look at this big picture,
5  what I think ought to happen is we ought to have the
6  status quo maintained during the appeal in terms of
7  Mr. Shelton's assets. I don't think things ought to be
8  taken away from him and I don't think he ought to be
9  transferring things away unless it's with the knowledge of
10 everyone and their ability to give me input and my
11 approval.
12     The fact of the matter is that his financial
13 situation is sufficiently complicated that the Probation
14 Office cannot police it. I'm not going to police it. I
15 think Cendant and the government need complete information
16 so that they can be in a position to raise any concerns
17 that they might have, to be resolved by me, as to whether
18 the defendant's assets are being dissipated or put beyond
19 the reach of efforts to collect on the restitution order.
20     I also will say that -- I mean I saw a couple of
21 things that were sort of, in my mind, conflicting in the
22 defendant's papers in terms of the -- I think at one point
23 there was a reference to a request for tolling agreement
24 as to the statute of limitations for claims as to
25 fraudulent conveyances and then a response that said, no,

Page 15

1  you can go ahead and exercise your rights.
2      It seems to me that the victim here and the
3  government, which is authorized, and maybe I should be
4  saying required, to act in terms of collecting
5  restitution, ought not be taking any risk that the statute
6  of limitation runs, and things must be structured to take
7  care of that.
8      When I say there should be no taking of assets
9  from the defendant, I am carving out one area because I
10 think what I'm hearing from both sides, indirectly at
11 least, at least from their perspective, the defendant's
12 financial situation is not what at least I thought it was
13 on the date I imposed the restitution order.
14     There is a provision for modifications and I
15 think to the extent that it becomes apparent that
16 additional assets can be placed in escrow, that that would
17 be appropriate, to me, because that would safeguard the
18 ability to pay restitution. Particularly so in a case
19 where it seems to me that there's absolutely no way that
20 the full amount of restitution will ever be paid.
21     I guess I want to be clear on exactly what
22 transfers have been made since the date of the posting --
23 the entering of my order as to conditions of release,
24 because that's when I first started placing restrictions
25 on that, and I think to me it seems appropriate that I let

Page 16

1  the government and Cendant do the work on making sure that
2  I have a correct analysis on that. I think you all
3  understand the implications of that in terms of the
4  release of financial information.
5      So here I'm not really dealing with the motion
6  for an order in aid of execution. I'm really dealing with
7  how I structure a situation where I maintain the status
8  quo, and that would be really proceeding under Rule 38(e)
9  as opposed to the other statutes that you all have
10 mentioned. And to the extent we need to get to those
11 other statutes, I think we can.
12     The other things that struck me as I was reading
13 the papers are that I have taken steps so that Mr. Shelton
14 can be employed. That is a significant economic
15 circumstance that needs to be considered. We do have some
16 trusts and we have a monthly budget. I think -- I
17 apologize because I -- well, there's a lot going on, but I
18 was under the impression that the government and parties
19 knew about the amounts that were going into the monthly
20 budget.
21     MR. SCHECHTER: What we understood was when you
22 entered an order in March of 2005 requiring Mr. Shelton to
23 get prior approval from the Probation Office to transfer
24 assets in excess of $45,000. We did not understand, at
25 least I did not understand that that meant that he had a

Page 17

1  budget to spend 45,000.
2      The reason I say that, Your Honor, is because
3  the Presentence Report prior to the time Mr. Shelton was
4  convicted showed that he monthly living expenses of
5  $32,000. So it would not be clear to the government that
6  after he was convicted he would now be allowed to spend,
7  in essence, more money than had he spent prior to that.
8      We read that $45,000 to mean he could transfer
9  $45,000 without notification to Probation, and if he
10 wanted to transfer more than 45, he needed approval. Then
11 we believed that at the end of month Mr. Shelton would
12 report to Probation and give them a monthly summary of how
13 he spent his money. We had asked to see that monthly
14 summary back in January, Your Honor, and at that time Your
15 Honor denied the request.
16     And I take it in light of what I'm hearing, Your
17 Honor is more inclined now to give the government and
18 Cendant access to the financial filings and I think that
19 would help us understand, because we really have no idea
20 how much money he spent because Probation gave him
21 approval beyond 45 -- I'm not suggesting for a moment that
22 Probation did anything wrong -- we didn't get notice of
23 that and we've been operating in the blind, Your Honor.
24     THE COURT: That's very helpful. Thank you,
25 Mr. Schechter.

Page 18

1    I think that the question of the monthly budget
2    is something that the government and Cendant ought to have
3    input on. And in looking at the budget and reading the
4    papers and focusing on the fact that we have these trusts,
5    as to which I have a general impression but not specific
6    detailed knowledge, it occurred to me that one important
7    question is whether there are expenses that are being paid
8    out of the allotment for the monthly budget that really
9    can and should be paid out of the trusts.
10        And then there are some items, looking at the
11   one report that I looked at, that I thought were just -- I
12   had no idea what they were and I think it's appropriate
13   that there be a thoughtful consideration of what an
14   appropriate budget is.
15        And I note that we did have budgets that were
16   put in place for Ms. Pember and Mr. Corigliano. It seemed
17   that everyone thought the budget for Mr. Corigliano was
18   quite generous, and to me, that seems to be an appropriate
19   place for me to at least start thinking in terms of
20   whether Mr. Shelton needs a higher or lower budget than
21   that and what is the justification for it.
22        And then to the extent that there is additional
23   income, I think I made it clear that the reason I was
24   approaching this question in a conference that we had that
25   was under seal in the way I was approaching it was because

Page 19

1    I saw the opportunity for Mr. Shelton to earn additional
2    income as something that inured to the benefit of the
3    beneficiary of the restitution order. And consistent with
4    that, I think that it is not uncommon for that additional
5    asset in the form of income to be looked at as a source
6    for satisfying the restitution order.
7         Coming back to my initial point, all of that
8    said, I think it's appropriate that to the extent that
9    additional funds are ordered to be paid so that we are
10   maintaining the status quo, they be paid into some sort of
11   an escrow account.
12        So that's where I am in my thinking and I
13   suspect Mr. Shelton's counsel probably has a few things
14   they'd like to say, so let me hear you.
15        MR. PUCCIO: First thing I like to say, I don't
16   recall saying Mr. Corigliano's budget was generous. Maybe
17   Mr. Sullivan --
18        THE COURT: You were much more flamboyant in
19   your language. I understated it, along with the, was the
20   phrase, "the estate on the Connecticut River"?
21        MR. PUCCIO: Well, that's not the budget, Judge.
22        THE COURT: No, no.
23        MR. PUCCIO: I would just like to address a
24   couple of things. I appreciate your inviting me up here.
25   I didn't expect to be here until the retrial, but I'm

Page 20

1    here.
2         THE COURT: I was missing you.
3         MR. PUCCIO: Same here, Judge.
4         Let me just say, and I think you may have passed
5    this and I don't know that I should revisit it, but with
6    respect to the compliance issue, just so the record is
7    clear, Your Honor, I do not doubt Your Honor has the
8    authority to call a lump sum we'll call quote/unquote
9    payment; an advance payment.
10        Normally what's done is Your Honor I guess would
11   recognize that there's a payment schedule that usually
12   takes effect after someone is released from custody. But
13   in this case I don't quarrel with Your Honor's approach as
14   being appropriate to order a lump sum payment.
15        You did ask us, as the record indicates, to take
16   special note of that -- you reminded me of that paragraph,
17   the recommendation of Mr. Maxwell was for 15 million, and
18   I think preliminary to Your Honor ordering it, you asked
19   me to make sure that it was something I didn't have
20   something to say about. So what we did do was confer with
21   Mr. Maxwell and confer with my client.
22        The insurance policies were something that -- I
23   think the conference included the government, I'm sure it
24   did -- were something that, at least my recollection were
25   included in the components of that payment.

Page 21

1         However, in the Presentence -- as a result of
2    the Presentence Investigation, and our responses to the
3    report, at page 38 of our objections, which are next to
4    the report, top of the page, we deal with the life
5    insurance issue and we do flag it. We say, "Life
6    insurance: Should be noted that Cendant claims ownership
7    of a life insurance. Mr. Shelton is willing to sign over
8    the policies if Cendant is the rightful owner."
9         No one was hiding the ball here. We did flag
10   for the Court the fact there was some issue as to
11   ownership.
12        We happen to believe and I looked at the
13   documents --
14        THE COURT: You may have flagged it, but you'll
15   recall how many pages of documents I got to read in
16   connection with the sentencing.
17        MR. PUCCIO: Judge, the fact that you may have
18   missed this is not something I'm being critical of.
19        THE COURT: I think if you're going to tell me
20   that it's 3.3 insurance policies and that there's an
21   issue, I would have expected to be reminded of it.
22        MR. PUCCIO: At the time, Judge, to be brutally
23   frank, I'm not sure that I knew that myself.
24        THE COURT: I believe you.
25        MR. PUCCIO: The fact of the matter is, I think

Page 22

1  the better view is that there is 3.3 million. It's part
2  of some litigation somewhere, someplace, maybe New Jersey,
3  that I'm not handling.
4        Mr. Shelton was very forthright in his
5  description. He valued these as zero when he was putting
6  in his net worth statement with the Probation Office.
7        Be that as it may, I just want to tell the Court
8  I believe we acted in good faith.
9        Second thing, with respect to the stock, again,
10 I don't know that I gave it much thought. I did find out
11 and I was very surprised to learn that the Clerk's Office
12 does not have a custody account, because of course you can
13 wire securities into a custody account. It's done all the
14 time. One would think in a district as busy as this one
15 that there would be many situations where securities have
16 to be wired into the court's custody account at a bank and
17 held in that form, but apparently, I'm told by Ms. Seeley,
18 that is not the case. You must post cash.
19       I was not here the day that this was done, but
20 my understanding of what occurred is that this was -- the
21 Clerk of the Court did examine the posting. I'm informed
22 it was discussed with the Court and it took place.
23       Now, again, if someone had said on that day,
24 well, this is not acceptable, then I'm sure I would have
25 been alerted and we would have discussed some other way of

Page 23

1  doing this, perhaps.
2        One of the ways I would suggest you don't
3  approach this, particularly if I were creditor's counsel,
4  is to cause the liquidation of the stock and to pay assets
5  of Mr. Shelton to the U.S. government, which means it's
6  not going to the creditor. So I don't know that I would
7  have handled this by selling the stock.
8        At this point we are where we are. I would ask
9  the Court to consider, in your overall decision-making
10 here, the fact that we acted, Mr. Shelton particularly,
11 acted in good faith and has tried to comply with all the
12 directives of the Court. If we have not complied, you
13 feel there hasn't been compliance, I ask that we be
14 excused for our noncompliance and then so modify the lump
15 sum payment.
16       In any event, that's the big picture.
17       I don't know how much more -- there are a number
18 of inaccuracies in some of the papers. I don't know if
19 they are particularly relevant at this point because some
20 of the inaccuracies can perhaps be the result of exuberant
21 lawyers acting on very little information making
22 assertions that they don't have the facts to back up. For
23 instance, when this trust was created, that's all wrong.
24 It wasn't created a certain amount of days after a meeting
25 with the U.S. Attorney's office. There's documents that

Page 24

1  they can look at that show when it was created.
2        There are a lot of inaccuracies and I don't want
3  to waste your time with that.
4        THE COURT: That's why I really started off with
5  the big picture and where I want to go. I don't want to
6  get mired in that.
7        MR. PUCCIO: Having said that, I don't really
8  know where Your Honor wants to make information available
9  to the creditors, or the creditor in this case and the
10 government, to help fashion some approach to keep the
11 status quo.
12       I would ask the Court to be mindful of the fact
13 that Mr. Shelton does have living expenses and Your Honor
14 is going to take that in consideration in fixing some
15 amount.
16       He does have -- Judge, I was tempted to send a
17 bus down to New York and bring up eight more lawyers so
18 that we have the same number of lawyers as the other side.
19 As you can imagine, there's a tremendous amount of legal
20 expense associated with getting into this. I don't know
21 if I was a creditor I would be so aggressive in a lot of
22 this wheel spinning has cost a lot of money on both sides.
23       THE COURT: Doesn't seem to be you're that badly
24 outnumbered in terms of lawyers.
25       MR. PUCCIO: I take that as a compliment, Judge.

Page 25

1        THE COURT: I'm just looking at the numbers.
2        MR. PUCCIO: In any event, so I would ask you to
3  take that into consideration.
4        Cendant, in its infinite wisdom, decided at some
5  point during the trial to stop paying my fee, but no one
6  was going to run out of here and go to Delaware to try to
7  sue them to get them to reinstate that. I guess after the
8  verdict they have more of a basis to say we don't want to
9  pay for legal fees. If I understand Delaware corporation
10 law, they of course could agree to it but, they of course
11 chose not to.
12       That's a serious consideration considering, I
13 think Mr. Maxwell has an understanding of what the current
14 state of the finances are. And if one were to take into
15 consideration living expenses and legal fees and the
16 amount of time that it's going to take, I suspect, to get
17 to a resolution of this matter, at least in the Second
18 Circuit, there isn't a heck of a lot of money to go
19 around.
20       To summarize, with respect to insurance policies
21 and the stock, I would ask Your Honor to amend your order
22 to accommodate the lack of compliance.
23       We did discuss last evening a possible approach.
24 It would require spending some money. We could purchase a
25 security for $135,000. That would cover us on any drop in