# EXHIBIT A (PART 2)

the Cendant stock. The stock apparently has collapsed somewhat from where it was. We could make that acquisition of that so we would at any point in time put the stock to the holder of that option and get for it what its worth today. But again, that involves an expenditure of money.

There are devices and we could obviously discuss this; to the extent that one could discuss this with Cendant, we would be happy to discuss it with Cendant to see if that makes sense to protect us against any further erosion. Of course, the stock could go up and that's another possibility. So that's something that might be considered.

Obviously, we'll do whatever we can to work with the Court and Probation and Cendant and the government in trying to keep the status quo.

THE COURT: I will say, though, that I'm not going to be placing the burden on Mr. Maxwell to understand and monitor finances of the defendant.

MR. PUCCIO: Well --

THE COURT: As good as he is, he's got other stuff and it's too time intensive.

MR. PUCCIO: We will try to do that and not involve Mr. Maxwell.

THE COURT: He'll be kept informed, but I'm



going to approach this in a way that I think is most appropriate for this kind of case, which is fairly unique.

MR. PUCCIO: And to the extent that we can't agree, Your Honor, obviously we would like to have access to the Court, because I have a feeling, just by the dynamic of this, it's not going to be too easy to reach agreement with Cendant Corporation. They have a very hard view of this case, perhaps fueled by the chief executive of the company feels that he was terribly wronged here, and spending, in my judgment, far beyond legal resources what's necessary and what's sensible. But that's the judgment of the Cendant Corporation. I just want to have access to the Court to resolve these disputes because I'm not terribly optimistic that we are going to be able to reach much accord.

THE COURT: I expect to be making decisions after parties have full information and an opportunity to try at least to narrow the areas of disagreement.

I should let counsel for the other two also have a few words to state whatever they want to state.

MR. KADET: Thank you, Your Honor. Sam Kadet from Skadden Arps firm.

Despite what Mr. Puccio's view may be on how Cendant should take a view on this matter, we have carefully considered our position. We think it's



critically important that Mr. Shelton comply with Your Honor's restitution order and his failure to do so should in no circumstance be excused.

Now, what he's done in terms of the insurance policy, I heard counsel get up and reference a Presentence Report, that we have not had access to, in which apparently there was a reference that the title of the policy is in dispute and it has been for some time. If Cendant is right that Mr. Shelton has no interest in the policy anymore, the $3.5 million doesn't exist. It's a total zero that he's put in.

But even if he's right, one thing I didn't hear counsel say is there's no dispute, indeed it's in one of the briefs that Mr. Shelton filed in this application, that Cendant has a right to receive back from the proceeds the premiums it advanced. That's not even in dispute. There's no mention about it. So the $3.5 million that Mr. Shelton's counsel ascribes to that insurance, at a rock bottom minimum, has to be reduced by the amount of the premiums advanced by Cendant less whatever loans have been taken against the policy, because we did stop advancing premiums a long time ago.

What I did, Judge, in an effort to give Your Honor more current information, I did have a declaration of someone from the company prepare that



brings the insurance data up to date through the end of the year. The data we put in our motion was as of June 30, 2005. I've given this to counsel. With Your Honor's permission, I would offer the Court this.

May I approach?

THE COURT: I'm not going to be making any decisions today. Are you going to file it with the Clerk's Office?

MR. KADET: We will. We understand at some point Your Honor will make a decision and I thought it would be Your Honor would desire as much current information in terms of Mr. Shelton's interest in the policy, which as you'll see in this declaration has to be reduced as of year-end by $920,000. So the 3.5 million value put on the policy for purposes of compliance with the restitution order on the insurance is $920,000 short as of December 31, 2005.

We would urge Your Honor, frankly, we don't think these insurance policies belong in this escrow account at all toward satisfaction because we think Mr. Shelton has no interest in them whatsoever. We would, as I point out, there are two grounds for that. I'm not going to reargue the point. One is we think he's breached the covenants and there's a reference, some reference to that in the briefing back and forth.

THE COURT: Can I just save you a little bit of time --

MR. KADET: Sure.

THE COURT: -- and tell you that had I understood there was a dispute, forget whose right, had I understood there was a dispute, I would not accept the insurance policies as a component. And there is a dispute.

MR. KADET: We would urge Your Honor not to do that now. These are not clean assignments. Your Honor used the word "clean assignments."

THE COURT: I don't intend to accept the insurance policies, and the question will be whether I will modify the order the way that the defendant is asking me to, or I will look at the defendant's other assets and decide that the amount has to be made up some other way.

MR. KADET: We certainly believe that the latter approach is more desirable from Cendant's perspective because those policies are ours, that's our money.

Second point, Judge, briefly, on the stock.

I wasn't here. I read the transcript. I find it amazing that someone can stand up and say wire transfer includes securities and not cash. I think it clearly meant cash.

The stock has not performed as well as we like,



but the effect of it is that the stock is worth nearly $400,000 less than the value Mr. Shelton ascribed to it last October. It closed yesterday at $15 and I believe 37 cents. So it's $4.03 per share under the $19.40 value per share that was ascribed to it when it went into the court registry. That's nearly $400,000. We don't think the stock is proper at all. We think that should be replaced by hard cold cash to insure strict compliance with Your Honor's $15 million requirement.

Now, there was also a reference to tax and I heard Mr. Puccio get up and talk about some fancy put/call arrangement. We are not interested in that. The tax issue we don't quite understand -- I'm not a tax lawyer -- why Mr. Shelton's allowed to take securities that apparently have unrealized gain in them and use them to discharge an obligation Your Honor has placed on him and yet avoid all tax. This is not a charitable endeavor; taking stock that was stepped up unrealized gain and give it to a charity, take a donation for the full amount and there's no tax due on the unrealized gain. This is not charity. I don't know that he can right the premise of the whole tax position. It may or may not be right, but I think there's at least a question there.

We're not happy about the stock. We would like cold cash. We think that's what the Court contemplated



and we think he should be ordered to do that.

I would like to say a word about the Vail transfer, if I may, Your Honor. We're very disturbed about that. We certainly agree with the Court's observation that there's double-counting going on, and frankly, it's at our expense because what happened here when you cut through all this, Mr. Shelton had a 50 percent interest in a condominium in Vail, Colorado. He no longer has that. Now it's owned by his wife and some trust, as I understand it.

So at the end of the day, his 50 percent interest is not available for restitution even if it still secures the terms under which he's released on bail. So we agree with the double-counting.

What's missing here, Judge, and the question I rose a minute ago to raise, if you look at the deed, it says that he and his wife transferred the entire Vail condominium for $700,000. That's what it says. Mr. Puccio stood up and said he needed that cash to include in the cash he actually did deposit with the court.

We understand -- I'm not making a representation of fact, but we'll try and get at this with the mechanism Your Honor gave us -- I understand Your Honor is considering giving us -- that this condominium in Vail was



purchased 10 years for $700,000. We do believe real estate values in Vail have appreciated significantly over that period of time. We've heard nothing about an appraisal. What is this property really worth? If it's worth $2 million, purely hypothetical, and Mr. Shelton's half-interest is a million dollars and it's been, in effect, transferred to his family for $350,000, guess who loses out on the $650,000 difference in my hypothetical? My client.

We have some very severe problems with the whole circumstances under which this condominium transaction took place immediately after Your Honor imposed the sentence in this matter.

We would like to be heard, moving to another topic, on the monthly living allowance. We think $45,000 is just beyond the pale from the victim's perspective. That's a king's life-style that's simply not warranted here. We certainly understand Your Honor would start with the allowance given to Mr. Corigliano, but we would like to have input on that as this matter goes forward. That may be substantially more than appropriate under the circumstances.

Lastly, Judge, we would like, if Your Honor contemplates going forward that additional assets can be secured and placed in escrow pending appeal, we are

amenable to that. We don't want the situation in any way, shape or form the status quo as it exists today necessarily to be preserved. We subscribe to what I think understood Your Honor to be saying that additional assets can be placed in escrow and made available later for restitution.

Thank you, Judge.

THE COURT: Counsel for the government?

MR. SCHECHTER: If I can, just briefly, Your Honor. Richard Schechter.

Just so the record is clear, Mr. Puccio, at the time he surrendered or he spoke of the insurance policies, the Presentence Report has a value for the insurance policies and that value is $3.3 million. And Your Honor was rather prescient, whether you realized it or not, when you specifically asked: If there's a diminution in value, what will happen? And Mr. Puccio said, we'll just add it on the second payment.

The whole point of my speaking, Your Honor, is to make certain that at the end, there's no benefit to Mr. Shelton for having not complied with the restitution order and having not complied with the Probation Department.

If I can just direct Your Honor to the Presentence Report at page 36, Your Honor will have the



benefit of this in the transcript. Mr. Shelton's total assets are listed in the Presentence Report at $25 million, and that includes assets of his dependents as well as assets of his wife. But it was from that figure, Your Honor, that the $15 million was derived from.

The burden is on a defendant to prove to the court that he doesn't have the money. It's not the burden on the victim or the government to prove that he does. When Mr. Puccio suggests that he would like a new order from Your Honor that let's him out from under the insurance 3.3 million, it's their burden to demonstrate to this Court that Mr. Shelton, who had $25 million in assets at the time of the sentencing, now no longer has any money whatsoever to repay the insurance diminution, if you will, and what I gather from Your Honor, the stock as well.

And for having not complied with Probation's order, for having transferred property that was subject to this Court's bail order, at the end, Your Honor, all we're asking, I just want to put on the record now so there is no suggestion later that we didn't object now, that he not profit from having not complied with Probation and the Court's order.

Your Honor, we would reserve our right when we do obtain all the financial information to seek to revoke Mr. Shelton's bail. I want to reserve that right so



there's no suggestion that by coming today we've given up that opportunity. We'll look at the financial information, Your Honor, and if warranted, as Your Honor said, we should come back to Your Honor and we reserve that right to revoke the bail, Your Honor, in light of the circumstances.

THE COURT: Move to revoke the bail.

MR. SCHECHTER: Move to revoke the bail.

THE COURT: Just so we're clear.

MR. SCHECHTER: We still understand that Your Honor would have to rule on that. I haven't forgotten that part of the law.

MR. PUCCIO: May I respond briefly to a couple points? I do have a couple of points that I want to make.

First of all, the point that was made about the diminution in value of the policies that I addressed at the time of the hearing on this, I'm not sure where that goes, putting the dispute aside. There was no diminution. There was actually an enhancement of the cash surrender value, sort of the opposite of what happened in the stock situation.

So all I was saying then, and I was operating under the assumption that it was a certain amount of millions of dollars at that point. The question I think Your Honor raised was that going to be the amount at the



time.

THE COURT: Well, my concern was whether the premiums were paid out of the cash value.

MR. PUCCIO: Right, right. I think I said at that point, well, if there was any difference, we'll make it up at the time. Actually, what happened is the amount became greater.

With respect to the stock again, I really don't think -- I can understand where the other side is coming from -- that Mr. Shelton should be pilloried over this because again, if this was raised at the time, in my experience, the clerk's normally take collateral --

THE COURT: The clerk did come up and tell me the stock came in, and I was surprised. And I said, well, I'll wait for the government to file something. It's been filed.

MR. PUCCIO: All right.

THE COURT: You don't know that because I said that --

MR. PUCCIO: I wasn't here and --

THE COURT: -- I'll wait for the government to file.

MR. PUCCIO: We tried to comply with the order, and everything that Mr. Shelton has been asked to do he's done in terms of getting permission.

Perhaps I was too kind to Mr. Kadet to let him off the hook on all the mistakes in his papers by suggesting, well, he made the mistakes because he doesn't have the information. He gets up and says no appraisals. Sometimes it's better to keep your mouth shut. We have an appraisal.

THE COURT: Mr. Puccio, Mr. Puccio, Mr. Puccio, I think you've been here long enough in Connecticut to know that we don't do that here.

MR. PUCCIO: All right. In any event, sometimes I can't resist, Your Honor. I spend some of my time in places other than Connecticut.

THE COURT: I'm going to help you.

MR. SILBERMANN: Your Honor?

THE COURT: Yes, Mr. Silbermann.

MR. SILBERMANN: Good morning, Your Honor. I'm new to this proceeding. I'm with the U.S. Attorney's office in New Jersey. I'm in the civil division and I do almost 100 percent of my work collecting restitution orders. This is what my office does. My office in fact has been charged with the responsibility for collecting this restitution order pursuant to the terms thereof and any stays that may be in place. So Your Honor, we have a very keen interest in seeing how the Court rules on these issues.



To that extent, Your Honor, I would like to mention to the Court the concerns that we have, that I have.

THE COURT: Sure.

MR. SILBERMANN: I've spoken with Mr. Maxwell on several occasions and he has done a fabulous job in trying to get his arms around this very complex estate that Mr. Shelton has.

I believe that Mr. Shelton has made it more complex than would otherwise be because of his lingering -- back then, his then lingering criminal problems. And the Court noted the transfer of the Vail condo just this past fall. That certainly was of concern to us.

However, Your Honor, the bigger concern, a much bigger concern, and I hope the Court is aware of this, that the transfer that created the children's trust back in 1999, Your Honor, that is a tremendous asset that was created and funded, I believe, and I'm sure the evidence will bear out at the end of the day, with the full intent to evade his creditors; namely, Cendant Corporation.

That statute of limitation, it's eerie, the timing of some of these things. I don't think that Mr. Shelton, he may or may not have been advised on some of the timing of statutes of limitations, but it's eerie



some of the timing.

He made a disclosure to the Probation Office on January 13th of '05. The trust was funded and founded January 15th of 1999, almost exactly six years to the day, Your Honor. That is the statute of limitations under the federal statute. I'm not sure -- I think that Connecticut has adopted Uniform Fraudulent Transfers Act, which would also provide, I hope, for a six-year period.

But more importantly is the two-year discovery limitations period. So that you have two years from when you learned or should have learned of the transfer. That period was triggered, I think arguably, might have been triggered by Mr. Shelton's disclosure to Probation about a year ago, now less than a year ago, Your Honor. Eleven months ago.

So what we have now is roughly an 11-month clock to get a fraudulent transfer action filed. I foresee, I've looked over all this and I think I have a good lay of the land based on what's been filed, I see that as the biggest collection effort that will be done in this case. It will be that trust, the children's trust.

As Your Honor knows from the brief that was filed December 16th by Mr. Shelton, it lays out a string of 11 steps that Mr. Shelton engaged in to help fund this lump sum payment. It's kind of convoluted, but it begs



several questions, and frankly, what it does to me is it raises many red flags where this trust may not be on such stable ground.

Your Honor, we put in our brief and you may have seen yourself that at paragraph numbered 8 on page 4 of this brief, docket entry 2030 --

THE COURT: You're talking about Mr. Shelton's brief?

MR. SILBERMANN: It's one of the reply memoranda, Your Honor, in the motions that are pending here today. Defendant's reply memorandum to government's opposition to the defendant's motion to travel.

THE COURT: I have that.

MR. SILBERMANN: In that pleading, Your Honor, Mr. Shelton lays out the string of events leading up to the down payment. He talks about how there were these loans from the Ceniarth Corporation, which we're not quite sure who Ceniarth is, Ceniarth Wales. It's shrouded in mystery, Your Honor, and I'm sure intentionally so.

These are the kinds of issues that we need to get discovery on. I would like the Court to know that in pursuing our obligation to enforce this order, what we really have to be doing -- and I think the Court is leaning this way and I hope it is -- is allowing discovery in aid of execution.

Page 42

What we would do immediately, Your Honor, is we would issue subpoenas to third parties; namely in this case, SCIP Management Company, Ceniarth Wales, Merrill Lynch, Smith Barney, all the parties that took place in the funding of this trust, transfers to and from this trust, liquidation of assets within this trust, et cetera, et cetera, Your Honor.

We really do have a lot of work ahead of us on this and we've only got 11 months to file. At a minimum we would ask that the Court allow us to engage in this kind of discovery, and I would suggest that prior to us filing that complaint, which I foresee happening, we then report back to the Court and move to lift whatever stay may be in place to allow the filing of that action.

THE COURT: Given the fact that there's going to be no agreement as to the tolling, it's my intention to allow the parties to do what they need to do to protect their rights.

MR. SILBERMANN: Yes, Your Honor. I can't agree more strongly. And even the tolling agreement I think would be the alternative. The tolling will toll the limitations period, but as to you know, documents disappear, memories are clouded. We need to get on this right away.

THE COURT: When I said earlier that Cendant

Page 43

should not be taking a risk with respect to tolling, I was really saying something broader than it may have appeared I was saying. To the extent that it would be disadvantaged by having a tolling agreement, I would not require it to be satisfied with a tolling agreement.

MR. SILBERMANN: Thank you.

There is one other issue that I would like to raise and it is our relationship with Cendant going forward.

We talked about this most recently yesterday afternoon and I think Cendant -- and I can't speak for them -- but I think they are comfortable with this arrangement, which is that the United States Attorney's Office, as special counsel appointed in this case, my office would go forward with discovery and preparing any kind of pleadings for a civil fraudulent transfer action, et cetera, et cetera, collection restitution order, working in cooperation and maybe even coplaintiffs, when it comes to civil litigation, with Cendant Corporation under their rights, Cendant's rights under this 3664(m) provision, Your Honor.

The main Justice Department component in Washington that handles financial litigation collection has a keen interest in how we go forward with this victim's enforcement under 3664(m). It's new law. We

Page 44

want to be careful to make sure it's done properly and not have victims out on their own, although presumably that's what the statute allows. We would like to work with them as coplaintiffs. And if their standing as coplaintiff is challenged down the road, that's something we could litigate and get some case law on 3664(m), but meanwhile the United States would be a solid plaintiff to hold the action together, with the glue to hold the action together. So we would work with them, Your Honor, and keep the Court apprised at every turn, Your Honor.

Thank you.

THE COURT: Okay. I guess where we are at this juncture, from my perspective, I believe the way I want to proceed, the government and Cendant need to be given information, and what I want to focus on at this point is what information I should be authorizing them to get and from whom.

Do you all need to caucus about that or do you have a list?

MR. SILBERMANN: One thing, Your Honor. Just procedurally, it's very important that the Court not order or allow the Probation Office to provide this information to the victim. I think it's important that the Probation Office is standing as an arm of the court be allowed to maintain its integrity. So that the disclosure of this

Page 45

information, while it's important and we want it and we hope that the Court will order it, rather have it come from the defendant to the victim, Probation Office to the United States we would ask. We believe that there's a common interest between the Probation Office and the United States, and that the United States is allowed to have access to it.

But vis-a-vis the victim and the Probation Office, we want to be careful of that, Your Honor.

THE COURT: If information is disclosed from the Probation Office to the government -- I'm just trying to remember whether we've done that in the past.

Can you recall having done that in the past, Mr. Maxwell?

MR. MAXWELL: Typically we get the Court's permission to release the financial information to the Financial Litigation Unit of the U.S. Attorney's Office.

THE COURT: I was trying to remember a specific case and nothing was coming to mind.

MR. PUCCIO: Judge, if I may --

THE COURT: One second, please.

If I authorize the Probation Office to release information to the government and the government and Cendant are working on a cooperative basis, how do we have in place a barrier?

MR. SILBERMANN: We would not disclose it, Your Honor. We believe the Probation Office materials generated by Probation or in the possession of the Probation Office are sacrosanct and that their disclosure to the government is as far as it should go. We will not disclose that to the victim.

THE COURT: I just wanted to make that clear.

MR. SILBERMANN: The source of that information can be and should be obtained elsewhere through third party discovery, and to that extent it should be a very transparent effort that Cendant would have access to all this information, Your Honor, just not from Probation.

MR. KADET: We have a motion pending for release of the portion of the Presentence Report that simply lists assets and then provides all the updates. We have no interest in the rest of it.

I think, while we certainly are amenable and happy to work cooperatively with the United States Attorney, it is going to make it cumbersome if there's a bunch of things that they learn from Probation and can't share with us with respect to Mr. Shelton's assets. That's our only interest. We tried to write that motion very narrowly. We just want to find out what assets, what they are, what's happened to them. That's it.

THE COURT: I think what Mr. Silbermann is



saying is that you can get that information through another means.

MR. KADET: He's suggesting that. All I'm suggesting in response is that that to some degree undermines the cooperative effort that he alluded to that we support. It means we have to go out and ferret out information on our own. I just see it as creating an unnecessary obstacle, but Your Honor will make a ruling on that point.

The other thing I wanted to say for purposes of the record, we learned about the trust that was referenced earlier that past summer when we read reference to it in the government's presentencing memo. Obviously, we didn't know what Mr. Shelton may or may not have told Probation six months before that.

The first indication we knew of that was in a footnote to the government's sentencing brief filed mid last year.

THE COURT: Mr. Puccio, did you have something you wanted to say?

MR. PUCCIO: I'm not sure that I would endorse the notion that the Probation Department has some common interest with the government. The Probation Office is an arm of the court.

I do remember arguing a case years ago in



another circuit where the Court as part of its sentence ordered -- I guess I'll have to find the citation -- ordered the defendant who had been sentenced to make reports to the U.S. Attorney's Office and financial reports over a period of time, and that was overturned, probably for the reason that reporting to Probation is one thing, but having to give financial information to the government through the Probation Department is something else quite again.

I like to be able to look into this.

Here we have a situation where, in effect, you're ordering, if this takes place, Mr. Shelton to report to the U.S. government. There may be another way of doing this that will --

THE COURT: Can you say last part again?

MR. PUCCIO: Yeah. By ordering this, Probation to turn over information to the government, you have Mr. Shelton reporting to the government post-sentence on his financial affairs. I don't think the Probation Department can be used as a vehicle for doing that.

THE COURT: What I was thinking was authorizing the government and Cendant to get the information directly from Mr. Shelton.

MR. PUCCIO: That's a totally different story.

MR. SILBERMANN: Yes, Your Honor. As part of



the aid of execution, we would also ask that Mr. Shelton be made available to testify. One of the first things we would do in this case is sit him down--

THE COURT: I'm not thinking more in terms of aid of execution. I'm thinking in terms of how I get the information I need to put in place the conditions for the stay. That's where I am.

In order to intelligently fashion a stay, I need to have input from the government and Cendant and from the defense as to what conditions should I put in place. I can't get the input from the government or Cendant until they get information concerning Mr. Shelton's finances. So what I want to do is figure out how they get that information concerning Mr. Shelton's finances, because the other option is to say, no stay. That's where we are. We have a stay or no stay. If we have a stay, then we have no tolling and there are the disadvantages of tolling. Then I need to have the two parties here in a position to give me informed input as to what they think I ought to put in place as conditions of the stay.

MR. PUCCIO: Well, I thought what we were proposing here was Mr. Shelton would give information to them about his current financial situation. Now I'm hearing depositions and motion practices. Then there's no stay. I thought the idea was to have a stay while the

appeal is pending to avoid all this litigation.

THE COURT: I think what I will do is -- I can anticipate, I believe, that we'll have a production of documents that currently exist and there will be questions. And I suspect if there are, then I will authorize that they are entitled to examine Mr. Shelton. Maybe you're able to work out a cooperative relationship where that's not necessary.

MR. PUCCIO: Maybe there'll be peace in the Middle East.

THE COURT: I don't think so.

MR. PUCCIO: We would like a stay. If we're going to have depositions, as I said, I don't know -- I mean, what are we staying? They want full litigation.

THE COURT: You're staying the transfer of assets out of Mr. Shelton's estate to Cendant, which I think is a valuable consideration. That's maintaining the status quo.

MR. PUCCIO: We're going to try to work this out, if we can.

THE COURT: No, no, no. No, no. You're going to meet with a magistrate judge and talk about it, who's going to report to me and keep me fully informed.

MR. PUCCIO: All right. Fine. Well, that's what I meant, Judge, when I --



THE COURT: Thank you.

MR. PUCCIO: -- when I said we were going to try to work this out.

THE COURT: Actually, I think Judge Smith is somewhat familiar with at least the case, so I'm going to see if he would be willing to meet with you all.

I think in the meantime it would be -- it might help sort of smooth things and make for a more effective working relationship if we just started producing things you think the government and Cendant might want. And if you could tell them what you're expecting, that would also be helpful.

I think I'd like to get this done quickly, for a number of reasons, one of which you can probably surmise about since I have an April jury selection date in another case that I have been told is going to proceed, at least it's the government's present intention to proceed.

So I'd like -- I guess I'd like documents exchanged -- today is Friday -- by Monday. I'm going to ask Judge Smith to be available any time from Tuesday on.

MR. PUCCIO: Monday -- I'm perfectly prepared, Judge, to work, but I think it's a federal holiday and everything is closed.

THE COURT: But you all aren't.

MR. PUCCIO: Well, I would like to be closed on



Monday.

THE COURT: Sorry. I'm going to be here.

MR. PUCCIO: The banks are closed.

THE COURT: The banks are closed, yes, but let's get the documents exchanged by Monday.

Mr. Kadet?

MR. KADET: To be clear, what is Your Honor contemplating taking place by Monday, just so I'm clear?

THE COURT: Documents being delivered. You tell them what you're expecting and then I'll ask Judge Smith to be available.

MR. KADET: If I might ask Your Honor a question. Would it be consistent or inconsistent with Your Honor's ruling with respect to the portion of the Presentence Report that Your Honor feels my client should not apparently have access to, if Mr. Shelton voluntarily send that over to us, the same information.

THE COURT: I would assume you would get the information that's in that report but more current.

MR. KADET: I'm sorry?

THE COURT: Updated.

MR. KADET: Yes. Presumably it will be taken right out of the report and just hand it over.

THE COURT: Well, he didn't prepare the report, so I don't think he would be taking it out of the report.



MR. KAELIN: Your Honor, I would request that we take that five-minute break just to talk amongst ourselves. I don't know how fast you're getting to concluding this.

THE COURT: If you want to have five minutes and have me be available in case there are questions.

MR. KAELIN: I have a couple of issues running through my mind as a collections attorney and I wanted to talk to Attorney Silbermann.

THE COURT: Why don't we recess and I'll come back in if you need me, and I can see what I got in terms of a TRO that was filed this morning.

We'll recess.

(Whereupon, a recess followed)

THE COURT: Please be seated everyone.

Did the parties have anything they wanted to address?

MR. PUCCIO: Your Honor, I'd like to put on the record where I think we are, and I think counsel for Cendant and the government also have something to put on the record.

Out of our discussions, the following game plan has emerged:

We'll put together, directly from us, a package

of materials which will resemble, if not be identical, to what was given to Probation. In other words, Mr. Shelton's net worth, his financial statement as of the time of the verdict, his financial statement currently, and information regarding all of the dispositions or transfers between that time and today, so one could see how much he was worth at the time of the verdict and how much he's worth now.

We'll do that --

THE COURT: Actually, let me tell you that I talked to Judge Smith, who is available to do this, but he cannot meet with you until March 3rd at 10:00.

MR. PUCCIO: I'm in court on March 3rd someplace else, Judge, but maybe I can work that out. They may not need me.

But in any event --

THE COURT: What I was saying is that Monday, we can be flexible in terms of Monday.

MR. PUCCIO: They begged off. Everybody is out at the beach on Monday or something. Nobody is available Monday so they're happy.

THE COURT: By when?

MR. PUCCIO: How about Wednesday because FedEx doesn't work Monday.

MR. SILBERMANN: Tuesday, Your Honor.



MR. PUCCIO: I'll drive over, Judge, to New Jersey. I have nothing to do anyway.

The second part of it --

THE COURT: I think either I or Mr. Maxwell should get a copy of what's exchanged.

MR. PUCCIO: Okay. Who would you like the copy to go to? Or both?

MR. SILBERMANN: Your Honor, if it's to insure that it most closely resembles what Mr. Maxwell originally received, we would ask that Mr. Maxwell get a copy.

THE COURT: Fine.

MR. PUCCIO: That's fine. We'll send Mr. Maxwell a copy.

The second part of what we discussed is what comes after that, and what we've discussed is that after they get the materials that we're turning over, if they want something in addition to that, they should present us with a list and we'll get back to them in a timely manner and tell them what we believe they should have and what they shouldn't have.

THE COURT: And then I'll resolve any disputes.

MR. PUCCIO: That's right. That's what was contemplated, at least from my thinking. That's the plan.

THE COURT: Okay.

MR. PUCCIO: We also would like to have -- this



was agreed to -- a confidentiality agreement.

THE COURT: Actually, I forgot to mention that but I was assuming that. Do you want to file a proposed order?

MR. PUCCIO: We'll work it out, but that was agreed to.

THE COURT: Okay.

MR. KAELIN: I think some of that is correct, Your Honor. Again, Attorney Kaelin on behalf of Cendant. I speak somewhat for the government, but the government can speak for themselves.

I think it's the second phase, Your Honor, that we are most concerned with. We need a snapshot looking back into time as well.

What we're prepared to do today is within a day, hopefully, put together a list almost like a document request of the type of documents, financial information documents we believe are relevant and pertinent and what we would like. We would get that list to them by next Tuesday.

I'd rather work off dates than reasonable time and timely manner. We'll end up litigating that. By next Tuesday we would get that list.

The defendant would have until February 28th, is our proposal, to tell us -- sort of like when you're



responding to a document request, yes, this is what we'll produce and no, this is what we object to.

For those items which they agree they will produce, they would produce that documentation we propose by March 6th. And I will state we haven't agreed to these dates. This is a framework of how we would like to work.

For those items they object, we would then try, of course as we are ordinarily obligated to do under discovery, to work it out, or go see Magistrate Smith. So it would be a hybrid. We're going to produce it and you get it by a date and we know when we're getting it. We're going to dispute, we'll get to Magistrate Smith as fast as we can, and that would be probably some time after the week of the 3rd and it sounds like he's available.

We would get that list on the 28th, which I believe is a Tuesday, telling us, no, we're not going to produce, for example, tax returns. We could say, Here's why they're relevant; well, we don't think they're relevant and we call Magistrate Smith and have a conference with Magistrate Smith.

I will tell you, just so there's no surprise, I would like to put on the record quickly that among the items we're looking for are copies of the defendant's tax returns, state and federal, from 1997 to the present.

We would also be looking for -- if some of this

Page 58

is what's going to get produced on Tuesday as part of what was sent to Probation, fine, but we're going to be seeking all documents evidencing the $7.5 million Shelton children's trust, all documents evidencing SCIP Partners, LP.

We would like to see the documents relating to the $2 million that was provided to legal counsel, which, as you've seen in our papers, we contended was potentially allegedly to shield.

And then the classic things, Your Honor; documents regarding bank accounts that have been held in the last so many years, any money market accounts evidencing the transfers of any real property.

But clearly, I always see that the tax returns are a great snapshot of what was there or what has been moved.

Two other points, Your Honor.

The government and Cendant firmly believe that this should not limit us; that after we get this documentation from hopefully a cooperative defendant, that if we see there are third parties in possession of information, we can subpoena those third parties. Many times you will see that assets have been transferred from one mutual fund to another, one brokerage company.

The last point, Your Honor, is that -- and I

Page 59

think Attorney Silbermann will address this as well -- we want to be clear that we all understand something today and that there's no surprises later, that the government and Cendant is free to proceed with any fraudulent transfer actions against third parties who would not be subject to the stay with one caveat, that typically in those cases we would have to name the defendant to the extent is he in fact a transferor. You typically name the transferor and you name the transferee. He would only be named as a nominal defendant. It would not be the purpose or intent of such action to seek to collect money from the defendant, but you need them typically as a party to such action.

You may feel differently about that, but we wanted to be on the record that if we see that information, nothing is staying us from bringing such an action. And I think it was stated in one of their earlier briefs that nothing stops Cendant from bringing a fraudulent transfer action.

So I thank you for that, Your Honor.

THE COURT: Okay.

MR. SCHECHTER: Your Honor, I just had a practical concern regarding the existing bail.

I'm not certain if Your Honor wanted everybody to look at all the financial information and then come

Page 60

back and then discuss a new bail, or that Your Honor wanted to amend the current bail conditions today.

THE COURT: I wanted everybody to look at the information first and then talk about it in the big picture.

MR. SCHECHTER: So the record is clear, the existing bail order, if you will, will remain in full force and effect now until such time as Your Honor would modify it?

THE COURT: Yes.

MR. SCHECHTER: Just so I'm clear then, Probation, Your Honor, is still in the loop regarding the current bail because the current bail permits $45,000 a month expenditures and that after that he seeks the permission of the Probation Department.

THE COURT: Well, actually, I think if there's anything above that, I will tell you Mr. Maxwell is going to be consulting with me every month anyway while this is going on.

MR. SCHECHTER: The government would reserve the right to come back after we see all the finances to talk about a new modification to this bail order.

THE COURT: Correct.

MR. SCHECHTER: Just so I can help Your Honor, you put on the record something before about you wanted a

Page 61

budget consistent with the budget that the SEC had established for Mr. Corigliano.

THE COURT: Actually, I said we've had a lot of discussion about his budget and I would think starting there and then saying should it be more or less to me seemed like a reasonable point to begin the analysis.

MR. SCHECHTER: Just to help Your Honor, we went back to the first trial transcript and at page 7995 there's a reference to the $233,000 SEC budget regarding Mr. Corigliano. Just to make sure everybody is clear.

THE COURT: Yes. And I think -- I don't know which trial this is, but Defendants' Exhibit 400 --

MR. SCHECHTER: Is the budget.

THE COURT: -- is the budget.

MR. SCHECHTER: The other question: Your Honor had also mentioned that you thought -- and the government wholeheartedly agrees -- that any additional income that Mr. Shelton should receive, Your Honor wanted to talk about some type of escrow account.

I guess if I can just find out if there can be an agreement until such time as Your Honor revisits the whole issue that any income earned by Mr. Shelton during the period between now and whenever Your Honor is able to revise the bail be held in the escrow account of perhaps Hope Seeley as a lawyer's escrow account so that money

Page 62

would at least be available.

THE COURT: I guess what I would do is I would look at -- if there is some I think should have been put in, I would treat it all at one time. I would like to see the whole picture as opposed to dealing with pieces of it.

MR. SILBERMANN: Your Honor, briefly. There is one issue.

I believe Mr. Shelton represented recently that his one remaining asset today is a bank account with two-odd million dollars in it, and I'm not quite sure as to the status of that account.

Is that account free to be used for any kind of discretionary income or is it subject to his monthly expenses?

THE COURT: It's subject to the monthly expenses.

MR. SILBERMANN: So it would be subject to the $45,000, Your Honor?

THE COURT: Yes.

MR. SILBERMANN: Thank you, Your Honor.

MR. PUCCIO: Mr. Maxwell has the correct information. He's in the ballpark, but there may be two or three accounts that has a certain amount of money. All of it is on record. Maybe two and a half million. I'm not sure.

Page 63

THE COURT: Sure.

Mr. Kaelin gave a schedule and he said it was just his proposal. I don't hear any objection to it.

MR. PUCCIO: The schedule sounds fine with me expect for the appearance at court. Maybe that can be worked out with the magistrate. It's after the 3rd anyway so that's solves that problem.

THE COURT: I'm going to stay in the loop. I just don't want to have lengthy meetings about you, that's all. No offense intended.

Actually, I would have had a more aggressive schedule, but if this one seems to work for you all --

MR. PUCCIO: It's good that you didn't decide the schedule.

THE COURT: It is. You have a better sense of how long it will take you to do things than I do and I'll honor that.

Sounds like we're set for now?

Anything else?

So you have Judge Smith will see you on March 3rd at 10:00 a.m.

MR. PUCCIO: I thought that was changed, wasn't it? Because there's something --

THE COURT: That why I'm asking.

MR. PUCCIO: I thought the date for Judge Smith

Page 64

was left open after the 6th or something.

THE COURT: I will find out when he's available after what date?

MR. KAELIN: They would have to respond to us by the 28th as to what they would not want to produce or were unwilling to produce. The following week I think is the week of March 3rd. That would be the week we would go in to try to see Magistrate Smith.

THE COURT: Actually, I think if there's a dispute over what's going to be produced and what's not going to be produced, I'm going to decide that, so copy me on things and I'll tell you what's produced and what's not.

Judge Smith I really have in mind in terms of talking through the details once the information has been exchanged.

MR. KAELIN: My sense is we get something in writing on Tuesday the 28th of February, probably the next day we're going to be talking -- that's what I meant by you're supposed to try to cooperate and reconcile amicably -- and it's a day or two thereafter. As soon as we can get in to see you or Magistrate Smith, we're going to want to do that because we do want to get that information sooner.

MR. SILBERMANN: Your Honor, I heard no

Page 65

objection, but does the Court have a position on third party discovery and third party subpoenas and actions for fraudulent transfer, Your Honor?

MR. PUCCIO: If I may. I was about to -- great minds think alike.

THE COURT: You only say great minds think alike when somebody agrees with you.

MR. PUCCIO: I knew you would catch on to that, Judge.

My question is: What is at stake in this stay? What are we talking about?

I'm hoping we can give everybody what they want and we won't have any disputes.

If there is going to be a stay, what will be stayed I guess is my question?

THE COURT: I thought I had sort of indicated earlier that assets won't be taken away from Mr. Shelton.

MR. PUCCIO: Okay.

MR. KAELIN: Recently, the Connecticut Appellate Court has ruled that while someone is on an appeal of a judgment, it stays the enforcement. I does not stay the discovery of those assets and the preservation of those assets, which is what you were intending.

We want to find out where they are and make sure we don't miss anything. We're not trying to take money





out of a bank account.

THE COURT: To be clear, I should ask Judge Smith to tell you what date he is available after what date?

MR. KAELIN: I would say the 28th.

THE COURT: After the 28th. I'll have him hold March 3rd and have him set aside other dates as well.

MR. KAELIN: Thank you, Your Honor.

THE COURT: Okay. Thank you very much. We'll recess.

(Whereupon, a recess followed)



CERTIFICATE

UNITED STATES v. E. KIRK SHELTON
3:02CR264(AWT)

I, Corinna F. Thompson, RPR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

CORINNA F. THOMPSON, RPR
Official Court Reporter
450 Main Street, Room #225
Hartford, Connecticut 06103
(860) 547-0580