UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | No. 3:02CR264 (AHN) |
| ) | |
| WALTER A. FORBES ) | April 28, 2006 |
| ) | |

**REPLY MEMORANDUM IN SUPPORT OF MOTION OF
WALTER A. FORBES TO PRECLUDE THE GOVERNMENT
FROM REFERENCING THE TRUTH-TELLING PROVISIONS IN
COSMO CORIGLIANO'S PLEA AGREEMENT AND
PRESENTING HIM AS HAVING COMPLIED WITH HIS
OBLIGATIONS UNDER THAT AGREEMENT
(Forbes Third Trial Motion *In Limine* No. 1)**

Walter A. Forbes, through undersigned counsel, respectfully submits this reply memorandum in further support of his motion for an order precluding references to the truth-telling provisions in Cosmo Corigliano's plea agreement, as well as any suggestion that Mr. Corigliano is in compliance with his plea agreement.[1]

**ARGUMENT**

Mr. Forbes will attack Mr. Corigliano's credibility at the third trial. Following such an attack, it would normally be appropriate for the government to rely

---

[1] The government devotes several pages to its boilerplate reconsideration and law of the case arguments. See Opp'n at 3-5. Because Mr. Forbes has an obligation to reassert evidentiary arguments at this third trial to preserve error, among other reasons, this motion is not governed by the standards for reconsideration or law of the case doctrine. See Reply Mem. Forbes Third Trial Mot. No. 4 (filed April 28, 2006). Moreover, circumstances have changed since Mr. Forbes filed a similar motion in limine before the second trial. Mr. Corigliano again testified falsely in the second trial; this motion provides details about additional falsehoods that were not discussed in the prior motion; this motion is based in part on newly-disclosed evidence (the Corigliano Affidavit); and this motion seeks relief that was not sought in the prior motion (precluding any suggestion that Mr. Corigliano is in compliance with his plea agreement). See Docket Nos. 1679 & 1680.

upon the truth-telling provisions of Mr. Corigliano's plea agreement to rehabilitate his credibility. See Opp'n at 5-7. This case, however, is far from normal. Defense counsel are unaware of another case in which the government's star witness testified falsely in two prior trials, the government essentially concedes that some of his testimony was false, but excuses its witness on various grounds and refuses to revoke his plea agreement. If the government took appropriate action against Mr. Corigliano, there would be no third trial.[2]

Although the government blurs the two issues, Mr. Corigliano breached (1) the truth-telling provisions of his plea agreement by providing "materially false, incomplete, [and] misleading testimony"; and (2) the disclosure provisions of his plea agreement by failing to provide "complete and accurate information regarding his ability to pay" and to "truthfully disclose all information" requested by the SEC. Ex. 2, at 2, 7 (Plea Agreement).[3] As a result of these breaches, the plea agreement states that "the non-prosecution provisions of this agreement shall be null and void." Id. at 2. Despite this mandatory language, the government has not revoked the plea agreement. Under these circumstances, it would be false and misleading for the government to argue or introduce evidence that Mr. Corigliano has an obligation to testify truthfully under his plea agreement, that he is in compliance with his agreement, or that the non-prosecution

---

[2] The government's assertion that there is "abundant evidence of Forbes' guilt in this case, in addition to Corigliano's testimony," Opp'n at 2 n.1, is absurd. Two juries refused to convict Mr. Forbes after weeks of deliberations even when they were permitted to consider Mr. Corigliano's false testimony, and despite numerous erroneous evidentiary rulings and jury instructions.

[3] All citations to Exhibits are to the joint Exhibits in Support of Mr. Forbes' Motions Filed March 31, 2006 [Docket No. 2187].

provisions of his plea agreement are contingent upon his truthful cooperation. Due process prohibits the government from introducing such false and misleading evidence.

The government does not take issue with the general proposition that due process precludes it from introducing false or misleading evidence, or with the specific argument here—that reliance upon the truth-telling provisions or presentation of Mr. Corigliano as in compliance with the plea agreement would be misleading if Mr. Corigliano breached the agreement. Instead, the government offers various excuses for Mr. Corigliano's breaches, but none of those excuses absolves Mr. Corigliano.

        1.      <u>The Fabricated March 1998 Meeting in Mr. Shelton's Office.</u> Mr. Corigliano breached the truth-telling provisions of his plea agreement when he testified in the first trial about an alleged meeting with Mr. Forbes in Mr. Shelton's Stamford, Connecticut office that had to have happened (if at all) within a few days of March 11 or 12, 1998. Documentary evidence proves that during the relevant time period, between March 9th and March 22nd, Mr. Forbes was traveling on business on the West Coast and on vacation in Hawaii. <u>See</u> Tr. (08/04/04) at 9,631-52. The government attempts to excuse Mr. Corigliano's false testimony by arguing that he was simply mistaken about the date, and tries to imply that he was unfairly pinned down to a particular date. This excuse fails.

On direct examination <u>and</u> redirect examination by the government, Mr. Corigliano placed bookends around the alleged meeting, tying it to other events, the dates of which are verifiable. On direct examination, Mr. Corigliano testified that the alleged meeting involved a discussion of the events of March 9th, and he put specific (made up) words in Mr. Forbes' mouth. Mr. Corigliano testified that the purported meeting

supposedly happened "[w]ithin a few days" of March 11th or 12th. Tr. (07/14/04) at 7,488-89. The government concedes that any such meeting must have occurred after March 9th, because it supposedly involved a discussion of the events of March 9th. See Opp'n at 10 ("The meeting occurred after March 9, 1998, when Corigliano and Shelton met with Michael Monaco, Scott Forbes and others to address CUC's use of a merger reserve in 1997."). On redirect examination, Mr. Corigliano testified that the meeting happened before Mr. Forbes' Hawaii vacation. See Tr. (08/04/04) at 9,574 ("And as I remember it, Walter and Kirk and their families were going on vacation, I think it was around the same time frame, and going to Hawaii."); see also id. at 9,647 ("Q. And you yourself mentioned in your direct testimony today that you knew he was going to Hawaii, correct? A. I said I thought it was later in the month, yes."). According to Mr. Corigliano's testimony, the meeting had to be after March 11th or 12th and before Mr. Forbes left for Hawaii. Mr. Forbes was not in Stamford, Connecticut during this time period.

The cross-examination block-quoted in the government's brief was not, as the government implies, an effort to pin Mr. Corigliano down to a date before confronting him with the travel records. See Opp'n at 11-12 (quoting Tr. (08/04/04) at 9,650). To the contrary, defense counsel had already confronted Mr. Corigliano with the travel records before these questions and answers. See Tr. (08/04/04) at 9,641-50. These questions simply gave Mr. Corigliano a chance to back away from his prior testimony, to admit that he had fabricated the meeting, or to assert that he was simply wrong about the date as the government now argues. But contrary to the government's current argument, Mr. Corigliano did not testify that he was "mistaken" about the date. After being

confronted with the fact that Mr. Forbes was thousands of miles away from Stamford, Connecticut when the supposed meeting took place, Mr. Corigliano stuck with his story about an alleged meeting "two, three, four, five" days after March 10th or 11th. Tr. (08/04/04) at 9,650. Indeed, the government's block quote omits the final question and answer that put the lie to the government's "mistaken date" argument.

> Q. Let's use five. Color five more days, Patrick. All right. Now, give me another calendar, please. Keep that on the board, please, and give me another calendar of March right beside it. Now, from the records, from your testimony, you knew that Walter left town on March 9th. Could you put some color on March 9th? All right. We know from the plane records that he was on private planes some 2,000 miles away from the place you placed him on March 10th, 12th, all the way through until he leaves for Hawaii on the 13th. So block off travel from the 10th to the 13th, if you would, Patrick. And then on the 13th he leaves for Hawaii, am I correct, according to the data we've seen? And he remains in Hawaii until the 22nd of March. Block those dates off to the 22nd. He comes home late on the 22nd of March. So the time you placed him in the meeting in the office of Kirk Shelton, no matter what version of the meeting you're describing, it appears clear, from the records at least, that Walter Forbes was two to 6,000 miles away from where you placed him; isn't that accurate, sir?
>
> A. No. Because I remember the meeting. I remember it being in Kirk's office. I remember it being after Walter told me that penny wasn't going to do anything. And that's what I remember.

Id. at 9,650-51.

Mr. Corigliano did not claim to be "mistaken" about the date because he knew that a meeting after March 22nd, when Mr. Forbes returned from Hawaii, would not have made sense. Indeed, if Mr. Corigliano was simply "mistaken" about the date, he could have corrected his testimony in the second trial. <u>But he did not do that. Instead, the government dropped the testimony about the alleged meeting entirely.</u> Mr. Corigliano

either manufactured the meeting out of whole cloth, or he falsely put Mr. Forbes in it. In either event, he lied about what Mr. Forbes supposedly said in that meeting.[4]

    2. <u>The Fabricated Bug-Sweeping Incident in November 1997</u>.

Documents also demonstrate that Mr. Corigliano's testimony about an alleged bug-sweeping incident in November 1997 was false—in <u>both</u> trials. The government's argument that "[t]he jury could have reasonably concluded from all of the documentary evidence . . . that GX 430 accurately reflected the sweeping incident in the fall of 1997 about which Corigliano testified," Opp'n at 13-14, is a red-herring. The question is not what the jury believed, but whether Mr. Corigliano lied. If Mr. Corigliano lied about this alleged incident, his plea agreement must be revoked, irrespective of whether he successfully fooled the jury.

    In any event, the suggestion that GX 430 may have accurately reflected a bug-sweeping incident in the fall of 1997, as opposed to the fall of 1996, is preposterous. Although the EED invoice in GX 430 is dated November 17, 1997, the second page of GX 430 is dated November 17, <u>1996</u>; Mr. Corigliano's calendar indicates a scheduled meeting with an EED representative on November 16, <u>1996</u>; a CUC check and CUC's

---

[4] The government's reliance upon <u>United States v. Glover</u>, 588 F.2d 876 (2d Cir. 1978), is misplaced. The possibility of a "mistake" about dates was real in that case. The date of the alleged event that was ultimately disproved was not tied logically in proximity to another significant, undisputed date. There, the witness Hardy testified that in late 1974 or early 1975, the defendant introduced him to a potential drug supplier. <u>Id.</u> at 879. The defendant argued that this testimony was false because he was incarcerated from July 16, 1974 to April 4, 1975. <u>Id.</u> The Court could not conclude that the testimony was intentionally false because it was possible that Hardy was simply mistaken about the date. <u>Id.</u> (Also, a meeting in April 1975, after the defendant's release, arguably would have been consistent with Hardy's testimony about an early 1975 meeting.) Finally, "firm information on the inaccuracies" in Hardy's testimony was not received until after the verdict. <u>Id.</u> at 879. Thus, there is no indication that Hardy (like Mr. Corigliano) maintained his story after being confronted with the contrary documents.

general ledger indicate a payment to EED in December <u>1996</u> based on a November 17, <u>1996</u> invoice, which just happen to match up penny for penny with the EED invoice dated November 17, 1997. See Exs. 24-27. Moreover, the government had the EED records and had access to all CUC records and <u>there are no CUC records of a payment to EED based on a November 1997 invoice and no EED records of a receipt of a payment from CUC based on a November 1997 invoice</u>. Indeed, in the face of this evidence, the government does not argue in its brief that Mr. Corigliano's testimony was factually correct, but half-heartedly suggests that the documents upon which Mr. Forbes relies "do not necessarily contradict" Mr. Corigliano's testimony. Opp'n at 14. Nor did it make such an argument in the second trial. To the contrary, the government did not rely upon GX 430 as supportive of an alleged November 1997 incident; it omitted any mention of GX 430, and intentionally avoided placing a date on the alleged incident in Mr. Corigliano's direct examination.

The government also defends Mr. Corigliano's testimony on the grounds that Mr. Corigliano "may have honestly recalled a conversation in the fall of 1997 when Forbes suggested that the CUC offices be swept for bugs, <u>but mistakenly believed that an actual sweep had taken place then</u>." Opp'n at 14 (emphasis added). This cover story bears no resemblance to Mr. Corigliano's testimony in either the first or the second trial, and it demonstrates the lengths to which the government will go to protect Mr. Corigliano and ignore his violations of his plea agreement. In the first trial, Mr. Corigliano provided elaborate detail about the alleged bug-sweeping incident and testified that <u>he was present</u>

when EED conducted the sweep.[5]  Mr. Corigliano and the government had several months to fix Mr. Corigliano's testimony between the first and second trials, but they must not have come up with the idea that he "mistakenly believed that an actual sweep had taken place," Opp'n at 14, because on direct examination in the second trial, he testified again that a sweep in fact happened. Tr. (10/31/05) at 1,364 (testifying that bug-sweeping "happened in connection with the HFS merger. Walter was concerned that Henry was listening in on our conversations.").

The government's argument that Mr. "Corigliano could have been honestly mistaken in his recollection of the timing of those events," Opp'n at 14, fares no better than its prior "mistaken date" argument.  Like the supposed conspiratorial meeting in Mr. Shelton's office, the alleged bug-sweeping incident is not floating in time unmoored to some other identifiable event.  According to Mr. Corigliano's testimony, the bug-sweeping related to concerns about the proposed merger with HFS.  Therefore, the bug-sweeping had to have occurred (if at all) during the period around the merger.  The documents prove that no bug-sweeping occurred in this time period.  Mr. Corigliano made it up in an effort to frame Mr. Forbes.

        3.      The Undisgorged Retainer Funds.  By failing to list the retainer funds on the quarterly SEC asset schedules, Mr. Corigliano breached the disclosure obligations of his plea agreement.  The government nevertheless claims that he did not

---

[5] He testified on direct examination that he was alone at the offices late in the afternoon when one or two EED employees arrived. Tr. (07/13/04) at 7,347. He supposedly directed them to the executive area of the office, waited a while, and then left because they were taking their time. Id. Mr. Corigliano further testified that he signed an invoice and left his business card and home number in case the workers had any problems. Id. at 7,348-49.

intentionally breach his disclosure obligation because he testified that "it was his understanding that, once he paid the retainer fees to the lawyers, no portion of the fees would be returned to him." Opp'n at 16. In fact, <u>his lawyers returned $1,000,000 of the retainer funds to him at some point after he entered into his plea agreement.</u> Ex. 20 (Corigliano Aff., Ex. C). Mr. Corigliano was required to list all assets that he or his wife owned "directly or indirectly" or that were "subject to their possession, enjoyment or control, regardless of whether legal title or ownership" was held by someone else. Ex. 12 at SEC 0050 (Budget Agreement). He knew that the retainer funds fit this description because he could use them to pay legal fees and some of the funds were returned to him. More fundamentally, Mr. Corigliano is not an unsophisticated person. He is a CPA and former CFO who knows that prepaid legal expenses are an asset.[6]

In addition to breaching his disclosure obligations, Mr. Corigliano breached the truth-telling provisions of his plea agreement when he testified at trial that he and his wife disgorged "everything we had except for our house, except for a 1993 Acura, a '96 Lexus, $100,000 in each of our three kids' trusts. And my father's house

---

[6] The government asserts that Mr. Corigliano's attorney and David Frolich of the SEC "confirmed that Corigliano did not breach . . . by declining to list the retainer amounts on Corigliano's quarterly reports." Opp'n at 16-17. First, it is not surprising (nor is it convincing) that his own attorney would argue that he is in compliance with his plea agreement. Second, an argument by the government that he is in compliance would support this motion. The entire point of this motion is that the government looks the other way when Mr. Corigliano breaches his agreements. In any event, at none of the cited pages does Mr. Corigliano's attorney or Mr. Frolich state that the quarterly asset schedules did not require disclosure of the retainer funds. Rather, they both said that counsel discussed the retainers with the SEC prior to the settlement (after he had failed to list the retainer funds on numerous quarterly reports). Tr. (08/02/04) at 9,124 ("prior to the settlement of the case, the SEC was advised of the approximate amount of the remaining legal fees that we were holding"); Tr. (09/27/04) at 13,602-03 ("There was a discussion prior to the consent and judgment being executed. There was a discussion between the Commission staff and counsel for Mr. Corigliano about retainer.").

happened to be in my name, we kept that as well." Tr. (07/14/04) at 7,504. In fact—despite the fact that the SEC settlement agreement says nothing about the retainer funds, and purported to require disgorgement of <u>everything</u> other than specifically identified assets—they had not disgorged the retainer funds, but were permitted to use those funds (in lieu of, for example, his children's trust funds) to pay legal fees. The government ignores this point.[7]

    4.    <u>The Undisgorged Second Parcel.</u> By failing to list the second lot on the quarterly SEC asset schedules, Mr. Corigliano breached his disclosure obligation. By testifying at trial that he disgorged everything, except for his house and other limited assets, Tr. (07/14/04) at 7,504, he violated the truth-telling provisions of his plea

---

[7] When it was suggested in the first trial that Mr. Corigliano had concealed the existence of the retainer funds from the SEC, the government immediately provided a cover story for its star witness, offering to stipulate that there was an "oral agreement" with the SEC about the retainer funds. See Ex. 28 (Proposed Stipulation). The government now claims that this was a mistake, "attributable to the fact that the Government's understanding of those agreements was incomplete when the government first offered to stipulate that Corigliano and the SEC had an 'oral side agreement.'" Opp'n at 17 n.6. This about-face, which suggests that the government did not have time to figure out whether there was an oral agreement with the SEC, flies in the face of what happened contemporaneously. Mr. Corigliano was first cross-examined about the retainer funds on July 20, 2004. See Tr. (07/20/04) at 8,109-15. Six days later, the lead prosecutor represented that he had spoken with the SEC about the retainer funds, but did not suggest in any way that his opportunity to do so was inadequate. Tr. (07/26/04) at 8,715. Eight days later, the government drafted and submitted a proposed stipulation, which stated that there was an "oral agreement between the SEC and counsel for Mr. and Mrs. Corigliano." Ex. 28 (Proposed Stipulation). On September 7, 2004, <u>seven weeks after defense counsel first examined Mr. Corigliano about the retainer funds</u>, the government submitted a brief, which repeatedly relied upon the "oral agreement" with the SEC as a basis to defend Mr. Corigliano's false and misleading testimony about the retainer funds. See Docket No. 1147 at 6-7 ("there is an oral agreement"); id. at 7 ("By operation of the oral agreement"); id. at 8 ("the Government offered to stipulate to the existence of the oral agreement regarding the retainers, shortly after the prosecutors in this case first became aware of the agreement"); id. at 9 ("the oral agreement"; "an oral agreement"); id. at 10 ("the oral agreement" "the oral agreement"). This pattern of behavior shows that the government has done whatever appears necessary at the time to protect Mr. Corigliano, without regard to the truth.

agreement. The government does not argue that Mr. Corigliano disclosed the existence of the second parcel to the SEC or that his trial testimony was accurate. Instead, the government defends Mr. Corigliano's breaches by arguing that he "plausibly explained that he regarded the two adjoining but separately taxed parcels of real property . . . as a single piece of property." Opp'n at 18. Even if his explanation were plausible (it is not), this does not explain why now, after the government learned of the second lot, it took no steps to seek disgorgement of it under the plain language of the SEC settlement agreement which required him to turn over all real property with the exception of his residence located at a different address and his father's home. Ex. 13 ¶ 6(i), (iii) (SEC Consent). Furthermore, that the "SEC was likely unconcerned about Corigliano's characterization of his real estate holdings in Old Saybrook," Opp'n at 18,[8] underscores, not undermines, the point of this motion. Mr. Corigliano can violate his agreements with the government and the government takes no action against him.

     5.    **The Understated Value of the Corigliano Home.** Mr. Corigliano, in an apparent effort to horde as many assets as he could, intentionally low-balled the value of his home to the SEC and to the jury. In the quarterly asset schedules, he listed the purchase price of the home, not the "fair market value" as the standard SEC form requested. Ex. 12 at SEC 0050 (Budget Agreement). In response to a <u>specific</u> inquiry by

---

[8] The government's characterization of the testimony of SEC attorney Kidney is inaccurate. Although he testified that, in his personal opinion, disclosure of the second parcel "would [not] have made any difference" (apparently an argument that the non-disclosure was immaterial), Mr. Kidney acknowledged that "It's hard to go back in hindsight, you know." Tr. (09/23/04) at 13,531. Of course, these subsequent government rationalizations underscore the need for full disclosure (if necessary, to the Court <u>in camera</u>) of any contemporaneous SEC documents—including any memorandum prepared for the SEC Commissioners who had to approve the settlement—describing the assets that Mr. Corigliano was being permitted to retain. See Reply Mem. Forbes Third Trial Motion No. 2 (filed April 28, 2006).

the SEC about the value of his home, he tried to pass off as "comparable" a property consisting of a single lot of 1.32 acres, in contrast to his <u>two</u> lots totaling 11 acres. Mr. Corigliano thereby violated the disclosure obligations of his plea agreement. To cover up his efforts to mislead the SEC, he provided false, incomplete and misleading testimony at trial and thereby violated the truth-telling provisions of his plea agreement as well. At trial, he testified first to the purchase price and then to a value of $2 million (based on the 1.32-acre "comparable"), even though the two properties had just been assessed for more than $3.6 million.

The government does not argue that the properties were in fact worth $1.7 million or $2 million, or that the lot Mr. Corigliano tried to pass of as a comparable was in fact comparable. Instead, the government states that "Corigliano testified at the first trial without contradiction that he was unaware of" the recent tax assessment, suggesting that he did not know the value of his home. Opp'n at 19. Who was going to contradict his testimony about not seeing the tax assessment? His wife, to whom he claims the tax assessment would have been addressed? <u>See</u> Tr. (07/20/04) at 8,162-63. He knew that his home had been reassessed. <u>Id.</u> at 8,162. He knew that there were two separate lots, since he personally paid two separate tax bills for the two lots annually. He knew that his taxes on both pieces of property had gone up as a result of the assessment; he received and paid both tax bills himself. <u>Id.</u> at 8,165-66, 8,169-70. Even if one could stomach the far-fetched notion that he was unaware of the results of the tax assessment, the suggestion that he did not know the true value of his home, <u>his single most valuable asset</u>, at a time when he had just disgorged what he claims were the vast majority of his assets, is incredible on its face.

6. <u>The Post-March 31, 2004 Dissipation of Assets.</u> The government concedes that Mr. Corigliano paid his future living expenses and property taxes out of the funds and assets that were "slated for transfer to the receiver." Opp'n at 20. The government does not argue that the SEC settlement agreement permitted him to do this, but rather that "nothing in the settlement agreement expressly forbade such payments," <u>id.</u> at 22, and that there is no evidence that he "should have known that such payments were forbidden." <u>Id.</u> at 21. To the contrary, the settlement agreement required him to disgorge all "assets of a value of $1,000 or more in which [he or his wife] had any direct or indirect legal or beneficial ownership interest <u>as of March 31, 2004</u>." Ex. 13 ¶ 3(vi) (SEC Consent) (emphasis added). This language obviously precluded him from liquidating those assets for his own beneficial use after March 31, 2004, but before the transfer. The government does not suggest in any way that Mr. Corigliano told the prosecution team or the SEC about these expenditures. It appears then that Mr. Corigliano made these expenditures in violation of the SEC settlement agreement and he violated the truth-telling provisions of his plea agreement by testifying that he was not hiding anything from the SEC when he liquidated assets to pay his property taxes and personal living expenses. <u>See</u> Tr. (08/03/04) at 9,458.

\*     \*     \*

Because Mr. Corigliano provided false, incomplete and misleading testimony and the government has not enforced the truth-telling provisions of his plea agreement, the government cannot rely on those provisions to bolster his credibility. In addition, because Mr. Corigliano breached the truth-telling provisions of his plea agreement and failed to provide complete and accurate information to the SEC, the

government cannot present Mr. Corigliano as in compliance with his plea agreement. Doing so would mislead the jury and violate Mr. Forbes' Due Process rights.[9]

                        Respectfully submitted,

                        WILLIAMS & CONNOLLY LLP

By:    */s/ Brendan V. Sullivan, Jr.*
        Brendan V. Sullivan, Jr. (ct17115)
        Barry S. Simon (ct24159)

        725 Twelfth Street, N.W.
        Washington, D.C. 20005
        (202) 434-5000 (phone)
        (202) 434-5029 (fax)
        bsimon@wc.com (e-mail)

        - and -

---

[9] If the Court denies this motion, the government is correct that the challenges to Mr. Corigliano's "testimony should be resolved by the jury based on all relevant information." Opp'n at 7 (initial caps omitted); see also id. at 24 (asserting, incorrectly, that Mr. Forbes "has been permitted to parade all of his challenges to the truthfulness of Corigliano's testimony to the jury"). Mr. Forbes should be permitted to introduce extrinsic evidence to show that Mr. Corigliano "can testify falsely against Forbes with impunity, and that the truth-telling provision is an ineffective deterrent against Corigliano's . . . false testimony." Opp'n at 9. Of course, the government prefaces that argument with the caveat that Mr. Forbes can make the argument "if the evidence supports it." Id. But due process precludes the government from introducing false evidence and then using evidentiary objections to preclude the truth from being disclosed to the jury, as the government did in the prior trials. See United States v. Wallach, 935 F.2d 445 (2d Cir. 1991); see also Forbes Third Trial Motion In Limine No. 4 [Docket No. 2273]. Furthermore, bias and the true nature of Mr. Corigliano's plea agreement may be established by extrinsic evidence. See, e.g., United States v. Abel, 469 U.S. 45, 52 (1985); United States v. Harvey, 547 F.2d 720, 722 (2d Cir. 1976) ("The law is well settled in this Circuit, as in others, that bias of a witness is not a collateral issue and extrinsic evidence is admissible to prove that a witness has a motive to testify falsely.").

James T. Cowdery (ct05103)
Thomas J. Murphy (ct07959)
COWDERY, ECKER & MURPHY, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

- 15 -

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Reply Memorandum in Support of Motion of Defendant Walter A. Forbes to Preclude the Government from Referencing the Truth-Telling Provisions of Cosmo Corigliano's Plea Agreement and Presenting Him as Having Complied with that Agreement (Forbes Third Trial Motion *In Limine* No. 1) to be filed electronically and to be served on April 28, 2006 to the following via e-mail:

>Norman Gross, Esq. (norman.gross@usdoj.gov)
>Michael Martinez, Esq. (michael.martinez2@usdoj.gov)
>Craig Carpenito, Esq. (craig.carpenito@usdoj.gov)

_____
Barry S. Simon