# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 3:02CR264 (AHN) |
| WALTER A. FORBES. | ) | April 28, 2006 |
| | ) | |

## REPLY MEMORANDUM IN SUPPORT OF MOTION OF WALTER A. FORBES FOR LEAVE TO ISSUE RULE 17(C) SUBPOENAS TO COSMO CORIGLIANO, KRAMER LEVIN, FRIED FRANK, NEIL CARTUCIELLO, CRYSTAL JOURNEY CANDLES AND THE SEC
### (Forbes Third Trial Motion No. 4)

Not content to argue the merits of Mr. Forbes' requests, Mr. Corigliano's and Kramer Levin's Opposition attacks his counsel, accusing them of abusing the Court's process by filing a motion requesting permission to serve subpoenas that was not only appropriate, but required if Mr. Forbes is to preserve those requests for purposes of a third trial. More fundamentally, Mr. Forbes has a Sixth Amendment right to procure evidence to confront the witnesses against him, which is implemented through Rule 17(c) subpoenas. Moreover, contrary to the claims of the Opposition that Mr. Forbes "flouted" the Court's Orders governing subpoenas, Mr. Forbes raised the issue of Judge Thompson's "case management" Order concerning these Rule 17(c) subpoenas the first time he appeared before the Court. Tr. 3/6/2006 at 31-35. He advised the Court of Judge Thompson's Order, and explained that as a result of that Order he would be filing the present Motion for leave to serve the subpoenas rather than simply serving the subpoenas – as would be done in the normal course. Tr. 3/6/2006 at 31-35. That Motion was procedurally proper and cannot be viewed as "flouting" any order of the Court, as explained further in Section I below.

On the merits, the Opposition relies almost exclusively on Judge Thompson's prior rulings. Those decisions were in error for the reasons articulated in Mr. Forbes' Opening Memorandum, and discussed in more detail below.

Moreover, neither those rulings nor the Opposition ever address some of Mr. Forbes' most significant arguments. For example, Judge Thompson quashed all of Mr. Forbes' subpoenas for financial records on the grounds that, inter alia, they were fishing expeditions. But one subpoena recipient, Solomon Smith Barney, had fortuitously already produced documents pursuant to Mr. Forbes' Rule 17(c) subpoena prior to Judge Thompson quashing the subpoena upon the motion of Mr. Corigliano. It was from this production that Mr. Forbes learned of the nearly $3 million paid to Kramer Levin as a legal retainer.[1] Neither the government nor Mr. Corigliano produced any evidence of the retainer to Mr. Forbes before the first trial. Nor did Mr. Corigliano identify the retainer in any of the multiple financial disclosures he filed with the SEC. Nor was the retainer identified in the final Consent Agreement between Mr. Corigliano and the SEC. Indeed, the USAO claimed that it did not know about the retainer until after Mr. Corigliano admitted to it on cross-examination during the first trial. Tr. 8/2/04 at 9126-27; Tr. 8/4/04 at 9626-27; Gov't Opp'n to Forbes Retrial Motion No. 3, at 5 (Docket No. 1643). And attorneys from Kramer Levin, having successfully persuaded Judge Thompson to quash all of Mr. Forbes' subpoenas seeking Mr. Corigliano's financial records, sat quietly in the courtroom while Mr. Corigliano testified to what the government purportedly permitted him to keep in his settlement with the SEC, and failed to mention the approximately $2 million in legal retainers

---

[1] The Solomon Smith Barney documents evidenced $1.8 million in fees paid to Kramer Levin; once the existence of the retainer was revealed during the cross-examination of Mr. Corigliano in the first trial, it was ultimately disclosed that Kramer Levin received approximately $3 million from Mr. Corigliano, and that his wife's counsel, Fried Frank, had received $450,000.

<u>still on deposit with his and his wife's law firms</u>.

Thus, but for this production pursuant to a subpoena which Judge Thompson later quashed, along with all the other subpoenas for financial records, Mr. Forbes would never have learned of the more than $3 million paid to the Coriglianos' law firms as a legal retainer. Absent that, this benefit worth millions of dollars would have gone undisclosed to the jury, as would have Mr. Corigliano's false testimony on direct concerning what he was able to keep in his settlement with the SEC (which did not disclose these legal retainers). Neither the Opposition nor Judge Thompson's prior rulings ever address this.

Similarly, absent Mr. Forbes renewing his subpoena requests during the second trial, and Judge Thompson's decision to reverse his prior decision to quash the subpoena request for a financial affidavit Mr. Corigliano provided to the SEC, Mr. Forbes would never have known that after Mr. Corigliano signed his plea agreement in 2000, Mr. Corigliano received a $1 million refund from the retainer paid to Kramer Levin – casting even further doubt on Mr. Corigliano's incredible testimony that he had never disclosed the retainer in his quarterly reports because the money was "not his."[2]  Again, this fact is not addressed in either the Opposition or Judge Thompson's prior rulings.

Finally, the Opposition should not take comfort in its reliance on Judge Thompson's statements that he could not rely upon counsel for Mr. Forbes. Such statements were not justified. There is no question but that our advocacy on behalf of Mr. Forbes inexplicably caused Judge Thompson to make statements impugning the integrity and

---

[2] This affidavit was obtained by Mr. Forbes over vigorous objection from the government and Mr. Corigliano, and Mr. Forbes was erroneously precluded from using evidence of the $1 million refund to impeach Mr. Corigliano's testimony concerning the retainer in the second trial.

professionalism of defense counsel.  All defense counsel believe that these statements by Judge

Thompson were wholly baseless, inappropriate and unjustified.   For example, the Opposition

cites to a portion of the 2004 trial transcript where Judge Thompson stated that a pleading filed

by Mr. Forbes concerning the crime-fraud exception mischaracterized Mr. Corigliano's

testimony at page 7610 of the record, and that "[t]his assertion leaves me concerned as to

whether I can rely on counsel to not cite to the record inaccurately."  Tr. 7/26/2006 at 8813-14.

We respectfully submit that the statement in the pleading – that Mr. Corigliano testified that he

went into his meeting with the government on January 13, 1999 intending to make false

statements – was a fair and correct reading of his testimony that "I knew that I was going to lie to

them in hopes that it would go away."  Tr. 715/2004 at 7610, l. 8-11; see Docket No. 957.  We

believed then, and continue to believe now, that the description of Mr. Corigliano's testimony in

that pleading was accurate, and the Court's statements were at the time, and still are, baffling.[3]

We would urge the Court to consider the facts and the law, and not Judge Thompson's slights

against counsel, in deciding the issues presented.

## I.    MR. CORIGLIANO'S OPPOSITION ATTEMPTS TO DIVERT THE COURT'S ATTENTION AWAY FROM THE MERITS OF MR. FORBES' REQUESTS.

### A.    The Opposition Attacks Mr. Forbes for Moving to Serve Subpoena Requests That He Is Required to Renew During the Third Trial If He Is To Preserve Them.

Contrary to Mr. Corigliano's and Kramer Levin's argument, Mr. Forbes did not

seek to "flout the letter and spirit of this Court's March 31, 2006 Order," Opp. at 1, when he filed

his Motion to serve trial subpoenas on that same day.  Mr. Forbes could not simply file a

---

[3] There are many other examples of what defense counsel believe were inappropriate and baseless reactions by Judge Thompson outside the subpoena context.  Defense counsel see no purpose in re-hashing other such incidents here, unless the Court so requests.

certification with the Court pursuant to the Order because, as acknowledged by Mr. Forbes in his Opening Memorandum, the vast majority of his subpoena requests are not new. Moreover, the arguments that Mr. Forbes must seek "reconsideration" of Judge Thompson's earlier rulings, or that he must establish a basis for departing from the "law-of-the-case" are contrary to extensive circuit court precedent concerning the renewal of arguments in criminal retrials. Not only is Mr. Forbes permitted to serve new subpoenas in connection with the retrial, he is required to serve new subpoenas (or at least ask the Court for leave to do so) and reassert his evidentiary arguments at this retrial in order to preserve those issues. More fundamentally, Mr. Forbes hopes to avoid the need for a fourth trial by providing this Court the opportunity to correct the erroneous rulings of the first and second trials.

It is well-established that "[a] retrial following a mistrial is both in purpose and effect a new trial. Accordingly, objections made at the aborted trial have no bearing on the retrial, as the two are entirely separate affairs." United States v. Palmer, 122 F.3d 215, 221 (5th Cir. 1997). A defendant in a criminal trial, therefore, has an "obligation" to renew requests and arguments at retrial to preserve error. See id. ("Palmer had an obligation [at retrial] to reassert her severance motion in a timely fashion if she wished to preserve error.").

Numerous circuit court opinions confirm this fundamental proposition. See, e.g., United States v. Dixon, 273 F.3d 636, 639 (5th Cir. 2001) ("Because defendant did not object during his second trial to the kidnapping instruction, we review that instruction only for plain error."); United States v. Gomez, 67 F.3d 1515, 1526 n.13 (10th Cir. 1995) ("[I]t is fundamental that, in cases where a new trial has been ordered, objections made during the first proceeding do not preserve issues for appeal in the second."); United States v. Hill, 60 F.3d 672, 675 n.2 (10th Cir. 1995) (holding that defendant failed to preserve argument when he objected "during his first

trial, which ended without conviction," but "failed to object to the same testimony at the second trial before the new jury that rendered the convictions Hill challenges in this appeal"); <u>Savage v. United States</u>, 295 F. 686, 687 (4th Cir. 1924) (declining to address objections at first trial that were not renewed at retrial and stating that "the exceptions . . . apply to the court's ruling and action at and during the first trial, when there was a disagreement of the jury, and hence are of no avail to the defendant upon the second trial").  As the First Circuit explained, the "argument that the district court's rulings at the mistrial two days earlier made objection unnecessary cannot be accepted; a rule that one objection preserves an issue during any retrials would make the domain of a trial judge more of a mine field than ever."  <u>United States v. Mann</u>, 590 F.2d 361, 371 (1st Cir. 1978).[4]

Although a district court <u>may</u> adhere to its prior rulings on retrial, it is not required to do so.  <u>See</u> <u>Palmer</u>, 122 F.3d at 221; <u>United States v. Todd</u>, 920 F.2d 399, 404 (6th Cir. 1990).  Indeed, the D.C. Circuit characterized as "baseless" the suggestion (which Corigliano and Kramer Levin make here) that a trial court, on retrial, <u>must</u> adhere to its prior evidentiary rulings.  <u>United States v. Akers</u>, 702 F.2d 1145, 1148 (D.C. Cir. 1983).

> No doctrine of the law of the case operates under <u>these circumstances.</u>  The evidentiary ruling at issue was rendered in a <u>new trial</u> which was ordered pursuant to a mistrial.  When, as here, "the previous trial [is] a nullity," the court in the new trial tries "the case as if it were being tried for the first time . . . , as if there had been no prior trial."

<u>Id.</u> (emphasis and alterations in original) (footnotes omitted).  The Second Circuit has declined to answer the question whether law of the case can <u>ever</u> be applicable in a retrial, but has explicitly

---

[4] Mr. Corigliano's and Kramer Levin's reliance on Local Civil Rule 7(c) regarding motions for reconsideration is also misplaced.  Rule 7(c)'s mandatory ten-day limit makes clear that it cannot apply to renewed arguments at a criminal retrial.  To find otherwise would mean that every unsuccessful argument renewed on retrial would be time-barred.

upheld a district court's refusal to apply the doctrine to evidentiary rulings raised in a retrial.

United States v. Williams, 205 F.3d 23 (2d Cir. 2000).  There the Court explained:

> Also unavailing is Williams's assertion that the district court
> violated the law of the case by reconsidering at the second trial
> several of the evidentiary rulings it had made at the first.
> Specifically, Williams challenges certain modifications by the
> district court of its prior rulings on evidence of other crimes and
> innocent trips to Jamaica.  Assuming, without deciding, that the
> law of the case doctrine even applies to mere evidentiary rulings in
> a second trial of the same case, but see United States v. Akers, 702
> F.2d 1145, 1147-48 (D.C.Cir.1983) (holding that the doctrine does
> not apply in such circumstances), we find no abuse of discretion in
> the district court's modification of its earlier rulings.   The law of
> the case doctrine is, at best, a discretionary doctrine which does not
> constitute a limitation on the court's power but merely expresses
> the general practice of refusing to reopen what has been decided.

Id. at 34 (quotation omitted); see also United States v. Dovico, 261 F. Supp. 862, 869 (S.D.N.Y.

1966) ("[E]ven if we read Judge Sugarman's persuasive disposition [of the motion for a new

trial] as setting a rule to be followed at the retrial, we cannot conclude that it determines the law

of the case concerning admissibility of evidence, such question resting in the discretion of the

trial judge." (emphasis added)), aff'd, 380 F.2d 325, 326 n.1 (2d Cir. 1967).

Notably, the Williams decision was in the context of a court at a second trial

reversing prior rulings that had been favorable to the defendant.  The need to re-evaluate in the

context of a new trial the decisions that had previously been made against a defendant is of

course even greater.  For if there is reversible error in the prior record, and the issue is properly

renewed in the context of a retrial, the Court must correct it without regard to "law of the case."

If it did not, the Court would simply be guaranteeing another trial in the event of a conviction.  It

cannot be, as suggested by the Opposition, that a defendant must make a stronger showing in a

trial court that a ruling is erroneous than he would have to make on appeal from a conviction.

The Second Circuit case law cited by Mr. Corigliano's and Kramer Levin's

Opposition is not to the contrary, as none of these cases address application of the doctrine in the context of <u>evidentiary issues raised in a retrial</u>. <u>See</u> Opp. at 8-9.[5]  Indeed, in <u>United States v. Uccio</u>, 940 F.2d 753 (2d Cir. 1991), the Second Circuit <u>rejected</u> the argument that law-of-the-case prohibited the District Court from reversing an earlier ruling.  The Court explained that there are various branches of the law-of-the-case doctrine, "one deals with decisions of a lower court that have been ruled on on appeal, and another deals with decisions that have not been ruled on on appeal." 940 F.2d at 757.  The doctrine is binding only in the first situation, <u>i.e.</u>, a district court cannot disregard a prior ruling of the Second Circuit.  <u>Id.</u>  A district court is free to revisit its own prior interlocutory rulings.  Although the law of the case doctrine "informs the court's discretion, [it] does not limit the tribunal's power." <u>Id.</u> at 758 (quotation omitted).  Moreover, the district court's decision to apply the law of the case doctrine to its prior rulings is:

> informed principally by the concern that disregard of an earlier ruling not be allowed to prejudice the party seeking the benefit of the doctrine.  In this context, "prejudice" does not mean harm resulting from the failure to adhere to the prior decision; "rather, it refers to a lack of sufficiency of notice" or a lack of sufficient "opportunity to prepare armed with the knowledge that the prior ruling is not deemed controlling."

<u>Id.</u> at 758 (citations & brackets omitted).  The Second Circuit found no error in the district court's reversal of its prior ruling in favor of the defendant because Uccio had more than two

---

[5] Mr. Corigliano and Kramer Levin cite only one case from other Circuits that comes close to addressing the issue presented here—renewal of an evidentiary argument at a criminal retrial, <u>see</u> <u>United States v. Tham</u>, 960 F.2d 1391 (9th Cir. 1992), but they buried that citation in a footnote. <u>See</u> Opp. at 9 n.6.  <u>Tham</u> states that the law of the case doctrine applies when the issue is "identical," there has been no "change in circumstances," and there was no "clear error" in the prior ruling.  960 F.2d at 1397.  In any event, it held that the doctrine did not preclude the district court on retrial from changing its erroneous evidentiary ruling from the first trial (and that ruling had been in <u>favor</u> of the defendant, not against the defendant, as here).  <u>See id.</u>  Moreover, <u>Tham</u> does not suggest in any way that a defendant need not renew his arguments at retrial to preserve them.

weeks to submit his position in writing. Id.[6]

United States v. Quintieri, 306 F.3d 1217 (2d Cir. 2002), Opp. at 8-9, addressed the application of law-of-the-case after a remand for re-sentencing. The Court held that if the remand was for sentencing de novo, the defendant could raise anew an argument previously waived, but if the remand was limited, the mandatory prong of the law-of-the-case doctrine barred any new issues being raised. Thus Quintieri supports Mr. Forbes' position, not Mr. Corigliano's, standing for the proposition that the law-of-the-case doctrine does not apply to de novo proceedings such as a retrial.

Finally, United States v. Tenzer, 213 F.3d 34, 39-40 (2d Cir. 2000), Opp. at 8-9, involved the question of whether the Court of Appeals is bound by its prior ruling on a motion to dismiss an indictment (a non-evidentiary matter). There, the defendant argued that new evidence indicated that the factual underpinnings of the Court's prior decision were wrong. The appellate Court held that while it was not bound by its own prior ruling on an earlier appeal, under the discretionary prong of the law-of-the-case doctrine, it would follow its prior ruling absent compelling new evidence. Again, that case is irrelevant in the context of adverse evidentiary rulings being re-raised in a retrial before the trial court.

Mr. Forbes' motion was therefore not only appropriate, but legally required in order to preserve his subpoena requests in the event of any appeal. Moreover, as discussed in Mr. Forbes' Opening Memorandum, and further below, Judge Thompson's rulings on these subpoena requests were erroneous, and those errors cannot be considered harmless in a case where two juries have already been deadlocked after deliberating for more than 60 days

---

[6] Mr. Corigliano and Kramer Levin cannot complain that they have been prejudiced by any lack of notice. They have known about the subpoenas for several weeks, and they were able to marshal the resources to file a forty-page brief opposing them.

combined.

**B.      Mr. Forbes Had Justification Each Time He Renewed Issues in the First Two Trials, and Was Not Simply Seeking "Second," "Third" or "Fourth" Bites at the Apple.**

Mr. Corigliano and Kramer Levin complain that Mr. Forbes' motions practice simply seeks a second, third or fourth "bite at the apple", relying again on Judge Thompson's prior comments concluding that this was the case in some instances. See, e.g., Opp. at 4.

Mr. Forbes openly acknowledges that he has consistently sought the production of all communications between Mr. Corigliano or his counsel and the SEC, as well as communications from Mr. Corigliano to his counsel that contained information intended for the SEC. While full disclosure of this critical evidence has yet to occur, Mr. Forbes has been provided some of this evidence in piece-meal fashion over the years. Much of the information produced confirmed Mr. Forbes' position that he is entitled to full production of these materials, as described in Mr. Forbes' Opening Memorandum and in Forbes Third Trial Motion No. 2 [Docket No. 2189], and Mr. Forbes appropriately brought the new information to the Court's attention in further support of his consistent request that he be provided full disclosure.

Mr. Forbes also moved for reconsideration of many of the Court's erroneous legal rulings concerning both the relevance and admissibility of the SEC communications and other evidence of Mr. Corigliano's bias and motive. As discussed in the introduction above, the Court never addressed some of the more significant issues raised by Mr. Forbes, such as the fact that millions of dollars of legal retainers had been discovered only through a Rule 17(c) subpoena that the Court subsequently quashed.

There was nothing inappropriate in Mr. Forbes renewing his requests with the Court. In each circumstance where Mr. Forbes renewed an issue for the Court's consideration,

one of the following applied: (1) additional facts had been deduced that counsel believed affected the analysis of the issue, (2) Mr. Forbes set forth legal analysis which he believed demonstrated that the Court's earlier ruling was in error, and/or (3) a new trial was commencing, necessitating that Mr. Forbes renew the issue in order to preserve it.

**C.    The Court's Prior "Findings" Concerning the Evidence of Mr. Corigliano's Agreements with the SEC, and the Evidence Concerning Mr. Corigliano's Retainer, Relied Upon by Mr. Corigliano and Kramer Levin in Their Opposition, Were Erroneous and Contrary to the Evidence.**

Mr. Corigliano and Kramer Levin assert that Mr. Forbes is proceeding on "false factual premises" as well, relying on certain so-called "findings" of the Court during the first two trials. Specifically, Mr. Corigliano and Kramer Levin argue that Mr. Forbes' claim that Mr. Corigliano breached his obligations to the government under his plea agreement with the USAO and his consent agreement with the SEC by (1) not including the amount of the Kramer Levin and Fried Frank retainers on quarterly reports filed with the SEC; (2) making expenditures between his last quarterly report prior to the SEC settlement (March 31, 2004) and the turnover of assets on July 7, 2004; or (3) failing to immediately transfer to the Receiver the balances of his and his wife's legal fee retainers is a "unilateral interpretation" not shared by any of the parties to those agreements. Opp. at 16-17.[7]

First, as to the retainer, as discussed in Mr. Forbes' Opening Memorandum, Mr. Corigliano's trial testimony that he did not believe the retainer to be "his money," and thus did

---

[7]    Although these are the breaches cited and addressed in the Opposition, apparently because Mr. Corigliano and Kramer Levin believe that they can respond to these issues, they are not all of Mr. Corigliano's breaches. See Opening Memorandum; Forbes Third Trial Motion No. 2 (Docket 2189); and Forbes Third Trial Motion in Limine Nos. 1 & 4 (Docket Nos. 2190 & 2273).

not list it among his assets, is preposterous.[8]  No one would pay an attorney $3 million with the understanding that the money was no longer his, and that he could not obtain a refund of any unearned portions by terminating the relationship at any time.  Indeed, Mr. Corigliano had already received a $1 million refund from the retainer, a fact unknown to Mr. Forbes during the first trial, and a fact which he was erroneously precluded from eliciting during the second trial. Ex. 20.[9]  The retainer should shed additional light on the matter in any event, and as a statement previously adopted by Mr. Corigliano when he signed it, the agreement satisfies any "admissibility" test under Nixon.  Judge Thompson's previous "findings" that retainer related documents were not admissible to challenge Mr. Corigliano's testimony that the money was "not his," and that there was no legitimate basis to argue that Mr. Corigliano had cash on deposit with his counsel, see Opp. at 18, were simply in error, and do not address the impact of the $1 million refund.

        Mr. Corigliano's and Kramer Levin's reliance on New York ethical decisions is also misplaced.  That opinion addresses only whether retainers paid to an attorney are considered the client's funds for purposes of determining whether the State's ethical rules require the funds to be placed in a client trust account.  The opinion does not establish legal property rights, and indeed recognizes that any unearned funds must be returned to the client.  Indeed, these disciplinary rules did not create any bar to the government's seizure of retainer funds in the two New York cases cited in Mr. Forbes' Opening Memorandum:  SEC v. Credit Bancorp, Ltd., 109

---

[8] Of course, even if Mr. Corigliano – a trained CPA – is considered to have a right to $1.8 million in legal services rather than $1.8 million cash, it still does not justify or explain his failure to list that right to services in his financial statements to the SEC.

[9] Unless otherwise noted, all citations to Exhibits are to the joint Exhibits in Support of Mr. Forbes' Motions Filed March 31, 2006 (Docket No. 2187).

F. Supp. 2d 142, 145 (S.D.N.Y. 2000) (evaluating the terms of the retainer agreement and holding that the retainer was part of the frozen receivership estate because it was the asset of the client, not the law firm) and <u>SEC v. Princeton Econ. Int'l Ltd.</u>, 84 F. Supp. 2d 443, 446 (S.D.N.Y. 2000). Moreover, the opinion does not conclude that all retainer funds are treated as attorney funds under the disciplinary rules, but rather that this question is determined by the agreement between the attorney and client – an agreement that has not been disclosed in this case. <u>See</u> N.Y. St. Bar Ass'n comm. on Prof. Ethics, Op. No. 570, 1985 WL 57057 at *1 (1985) ("[T]he lawyer may agree to treat advance payments of legal fees as client funds . . . .").

<u>Second</u>, as to Mr. Corigliano's continued use of the retainer funds, the Opposition and Judge Thompson's rulings ignore the discrepancy between Mr. Corigliano's testimony and that of Mr. Frohlich, an SEC attorney who participated in the negotiation of the agreement. As discussed in Forbes Third Trial Motion No. 2, Docket No. 2189, <u>whereas Mr. Corigliano testified that he could use the retainer indefinitely, Mr. Frohlich testified that he was not certain if Mr. Corigliano could use the retainer beyond July 7, 2004</u>:

> Q.    Were the retainers to be turned over 60 days after the final judgment [July 7, 2004] or could Mr. Corigliano continue to use the retainers to cover reasonable legal fees indefinitely?
>
> A.    I'm not certain.

Tr. 9/27/2004 at 13610-611.[10]

More importantly, the plain language of the settlement agreement did not permit Mr. Corigliano to keep the retainer. The agreement was structured such that Mr. Corigliano was to disgorge everything other than a specific list of assets. That list of assets Mr. Corigliano could

---

[10] After he had made the "findings" relied upon by Mr. Corigliano and Kramer Levin, Judge Thompson admitted that he did not recall this testimony. Tr. 11/7/2005 at 36-37.

retain makes no mention of either the retainer, or the right to legal services to which the retainer

entitled Mr. Corigliano.  In fact, the retainer is not mentioned anywhere in the agreement.  Thus

the text simply does not support Mr. Corigliano's purported understanding that he could continue

to use the retainer indefinitely.[11]

        <u>Third</u>, as for Mr. Forbes' position that the consent agreement did not permit Mr.

Corigliano to continue to pay his living expenses up through July 7, 2004 out of funds to be

disgorged to the SEC, contrary to Mr. Corigliano's and Kramer Levin's claim that this position is

a "far-fetched interpretation" of the agreement, Mr. Forbes' reading comes straight from the text

of the document:

> \*     The list of assets to be disgorged contains one and only one date
> parameter:  March 31, 2004 (Exhibit 13, ¶ 3);
>
> \*     The accounting of assets owned was to be made as of March 31, 2004 (<u>Id.</u>,
> ¶ 5);
>
> \*     The accounting of all gifts, assignments and other transfers of assets in the
> amounts of $5,000 or more was to cover the period January 1, 1996
> through March 31, 2004 (<u>Id.</u>, ¶ 5(d)); and
>
> \*     The transfer of assets was to take place "forthwith" (<u>Id.</u>, ¶ 6), and in all
> events, "no later than sixty days from the entry of the Final Judgment"
> (<u>Id.</u>, ¶ 3) (presumably to account for any time needed to arrange the
> transfer of non-cash assets such as Mr. Corigliano's car and sailboat).

It would make no sense to require Mr. Corigliano to make accountings as of  March 31, 2004 if

he were permitted to continue to spend funds through July 7, 2004.  Much less would it make

sense to demand that the assets be transferred "forthwith."[12]  Neither the Opposition nor Judge

---

[11] The Opposition argues that the retainer is not a "benefit" in any event, as evidenced by the fact
that the SEC has not seized any legal retainer from Mr. Forbes either.  Opp. at 18, n.17.  There
can be no comparison between Mr. Forbes, who has maintained his innocence throughout, and
against whom no judgment has been entered, and Mr. Corigliano, who has both pled guilty to
multiple crimes and settled with the SEC, purportedly agreeing to turn over all assets other than a
limited number of specifically identified assets (which did <u>not</u> include any legal retainers).

[12] Unlike the period between August 2000 and March 31, 2004, which was governed by a written

Thompson's prior rulings ever addressed this language, or how it could possibly comport with Mr. Frohlich's testimony that the judgment "covered" the retainer.  See Docket 1927 at 5 (Court ruling relying on Frohlich's testimony that the judgment against Corigliano covered the retainer agreement).

Nor, contrary to the findings in Judge Thomspon's Order of November 1, 2005, did Mr. Frohlich's testimony support Mr. Corigliano's position that he could continue to pay his normal living expenses through July 7, 2004.  Rather, Mr. Frohlich testified that he understood Mr. Corigliano could continue to pay his normal living expenses (including attorney fees) through the date of Final Judgment, which was May 6, 2004:

> Q.    Was Mr. Corigliano permitted to use the proximately $1,500,000 in legal fees if he needed to and then return the balance to the receiver, if there was any?
>
> A.    My understanding was that his use of the retainer for legal fees continued to be the same as it was right up to the time that the judgment was entered.  Nothing had changed.
>
> Q.    In other words, nothing had changed, meaning he could use the legal fees?  The answer to my question, I gather, is yes?
>
> A.    He had certain regular expenses that he was always allowed to incur and pay, and I viewed these as the same as any of those other ongoing expenses.

Tr. 9/27/2004 at 13603-04 (emphasis added).  The fact that Mr. Frohlich's testimony also finds no support in the text of the agreement only demonstrates the need to have full disclosure of the negotiations and agreements between Mr. Corigliano and the SEC pertaining to this matter,

---

budget agreement that required Mr. Corigliano to supply quarterly reports to the SEC, there was no approved normal living expense budget for the period after March 31, 2004 and no requirement for Mr. Corigliano to report his living expenses for that period to the SEC -- consistent with the requirement in the settlement agreement that Mr. Corigliano disgorge the assets he held as of March 31, 2004.

including the communications with the receiver, who is charged with carrying out the dictates of the agreement.

Fourth, with regard to the defense's position that Mr. Corigliano has ignored the plain requirements of his plea agreement, even the limited information produced to date supports Mr. Forbes' contention. As discussed at length in Forbes Third Trial Motion No. 2 (Docket No. 2189) and Forbes Third Trial Motion in Limine No. 4 (Docket No. 2273), there can be little doubt that Mr. Corigliano resisted the financial disclosure requests of the SEC in derogation of his obligations under the plea agreement. And although the Opposition and Judge Thompson's rulings rely upon the claim that neither Mr. Corigliano nor the government allege a breach, Opp. at 21-22, belatedly produced correspondence between the SEC and Kramer Levin in the spring of 2000 reveals that the SEC was in fact claiming that Mr. Corigliano's failure to comply with the SEC's requests for financial disclosure was contrary to the obligations he had agreed to in his plea agreement. See Forbes Third Trial Motion No. 2, Docket No. 2189 at 8-12 (discussing this correspondence at length). Again, this fact was never addressed in the rulings of the prior Presiding Judge.

* * * * * * * * *

In any event, to the extent that there are conflicting interpretations of the issues, they are ultimately for the jury to decide. At a minimum, the defense is entitled to the evidence from which we can make the arguments that Mr. Corigliano has breached his agreements with the government and that the government has chosen to ignore those breaches, rather than have the government simply present Mr. Corigliano as a "new man" who has fully complied with his obligations.

## II.    MR. CORIGLIANO MISCONSTRUES THE REQUIREMENTS OF <u>NIXON</u>.

### A.    The Standard for Production Under Rule 17(c) Is Properly One of Evidentiary Use, Not Admissibility.

Even if the Court applies a standard of "admissibility," as discussed in Mr.

Forbes' Opening Memorandum, and further below, the documents at issue here are producible

pursuant to Mr. Forbes' Rule 17(c) subpoenas.  But, as discussed at length in Mr. Forbes'

Opening Memorandum, Mr. Forbes respectfully disagrees with Judge Thompson's ruling that a

document must be admissible into evidence in order to be procurable through a Rule 17(c)

subpoena.  <u>See</u> Mem. at 5-6.  Rather, documents that may serve as the good faith basis for cross-

examination also have "evidentiary use," and thus may be secured through a Rule 17(c)

subpoena.  See <u>United States v. Orena</u>, 883 F. Supp. 849 (E.D.N.Y. 1995) and <u>United States v.</u>

<u>Silverman</u>, 745 F.2d 1386 (11th Cir. 1984).

Contrary to the arguments of Mr. Corigliano and Kramer Levin, documents meet

this "evidentiary" requirement when they could be used for impeachment purposes.  <u>See</u> <u>Nixon</u>,

418 U.S. 683, 701 (1974); <u>United States v. Compton</u>, Nos. 93-1649, 93-1712, 1994 WL 328303,

at *3 (6th Cir. July 1, 1994) (subpoena "reasonably calculated to produce impeachment

materials"); <u>United States v. LaRouche Campaign</u>, 841 F.2d 1176, 1180 (1st Cir. 1988)

(enforcing subpoena seeking materials for "sole purpose of impeaching [government witness] at

trial"); <u>United States v. Silverman</u>, 745 F.2d 1386, 1397 (11th Cir. 1984) (subpoenaed materials

"clearly possessed evidentiary potential for impeachment purposes"); <u>United States v.</u>

<u>Cuthbertson</u>, 630 F.2d 139, 144 (3d Cir. 1980); <u>United States v. Shackney</u>, 31 F.R.D. 550, 552

(D. Conn. 1962) (enforcing subpoena for documents that might be used for impeachment);

<u>United States v. Carter</u>, 15 F.R.D. 367, 371 (D.D.C. 1954) ("Rule 17(c) is applicable only to

such documents or objects as would be admissible in evidence at the trial, or which may be used

for impeachment purposes.").

Accordingly, witness statements and documents evidencing oral statements of a witness, including notes and memoranda, may be obtained by subpoena. See United States v. Martin Marietta Corp., 856 F.2d 619, 621-22 (4th Cir. 1988) ("interview notes, transcripts, and electronic recordings" reflecting witness statements are "evidentiary"); LaRouche Campaign, 841 F.2d at 1180 ("inconsistent statements"); Cuthbertson, 630 F.2d at 144 ("Under the 'evidentiary' standard of Bowman, rule 17(c) permits a party to subpoena materials that may be used for impeaching a witness called by the opposing party, including prior statements of the witness."); Fryer v. United States, 207 F.2d 134, 137 (D.C. Cir. 1953) ("[S]tatements by the witnesses, which might have been introduced for impeachment purposes, were clearly 'evidentiary,' as Bowman requires."); United States v. King, 194 F.R.D. 569, 574 (E.D. Va. 2000) ("[S]tatements useful for impeachment purposes are evidentiary within the meaning of Nixon. . . ."); United States v. Messino, 882 F. Supp. 115, 115-16 (N.D. Ill. 1995) (defendant "entitled to subpoena [impeachment] material under Rule 17(c)" including "reports of interview" when witness testifies at trial); United States v. Myerson, 684 F. Supp. 41, 45-46 (S.D.N.Y. 1988) (interview notes are "evidentiary").

The cases cited by Mr. Corigliano and Kramer Levin are inapposite. Opp. at 10 United States v. Jasper, No. 00 CR. 825 (PKL), 2003 WL 1107526 (S.D.N.Y. March 13, 2003) and United States v. Holihan, 248 F. Supp. 2d 179, 183 (W.D.N.Y. 2003) address subpoenas that sought the production of impeachment material in advance of trial, prior to the witness having testified. Here, in contrast, there is no question but that Mr. Corigliano will testify (the government has no case without him), and Mr. Forbes is seeking production of documents during the trial itself. And while United States v. Cherry, 876 F. Supp. 547, 553 (S.D.N.Y. 1995) does

not specify whether it is addressing a pre-trial subpoena as opposed to a trial subpoena, it must be doing so, or else it is against the overwhelming weight of the authority cited above, including appellate decisions.

**B.**    **The Documents Sought Are Admissible in Any Event.**

Mr. Corigliano and Kramer Levin dispute the admissibility of many of these documents on the grounds that they impeach Mr. Corigliano on "collateral" matters, defining "collateral" to mean anything that does not directly implicate Mr. Forbes' guilt or innocence. See, e.g., Opp. at 12-13. Even the case cited by Mr. Corigliano defines "collateral" more narrowly than that:

> A matter is considered collateral if the matter itself is <u>not relevant in the litigation to establish a fact of consequence</u>, <u>i.e.</u>, not relevant for a purpose other than mere contradiction of the in-court testimony of the witness.

United States v. Mulinelli-Navas, 111 F.3d 983, 988 (1st Cir. 1997) (emphasis added).

Here, the documents sought through Mr. Forbes' Rule 17(c) subpoenas are either relevant to material matters, most often bias and motive, or impeach Mr. Corigliano by contradiction on such material matters. The fact that the documents may also impeach Mr. Corigliano's general credibility does not bar their admission into evidence. To the contrary, as explained at length in Mr. Forbes' Opening Memorandum, documents that impeach by demonstrating a prior inconsistent statement, motive or bias, documents that contradict a witness on a non-collateral matter, and even documents that contradict a witness on a collateral matter where the door has been opened by the direct examination, are all potentially admissible, and thus procurable by a Rule 17(c) subpoena.[13]

---

[13] Mr. Corigliano and Kramer Levin attempt to distinguish the cases cited by Mr. Forbes, Open.

### C.    "All Document" Requests Are Not Insufficiently Specific Per Se.

Mr. Corigliano's and Kramer Levin's suggestion that the specificity requirement of United States v. Nixon, 418 U.S. 683, 711 (1974) is not satisfied when a request calls for "all documents" about a specific subject is contrary to law. Opp. at 11. Nixon, 418 U.S. 683, itself upheld requests for "all tapes and other electronic and/or mechanical recordings or reproductions, and any memoranda, papers, transcripts, and other writing relating to" certain specifically identified conversations. Ex. A, attached hereto (subpoena requests addressed by the Court in Nixon) (emphasis added). Moreover, while the case cited by Mr. Corigliano and Kramer Levin, United States v. RW Professional Leasing Services, 228 F.R.D. 158 (E.D.N.Y. 2005),[14] found some "all document" requests to be too broad, the court found other "all document" requests to be sufficiently specific to meet the requirements of Rule 17(c). In short, the requests must be read as a whole.

Mr. Forbes' requests have been carefully drafted to be as specific as the

---

Mem. at 9-11, where impeachment was permitted on even collateral matters because the witness had opened the door during direct examination on the grounds that these cases involved a defendant making "a broad disclaimer of misconduct." Opp. at 13-14. There is no basis to distinguish between a defendant and a non-defendant witness under the applicable Rules of Evidence, however, and Mr. Corigliano cites to no authority to support such a distinction. Indeed, United States v. Benedetto, 571 F.2d 1246, 1250 (2d Cir. 1978), cited in Mr. Forbes' Opening Memorandum, implies that there is no distinction, stating: "Once a witness (especially a defendant-witness) testifies as to any specific fact on direct testimony, the trial judge has broad discretion to admit extrinsic evidence tending to contradict the specific statement, even if such statement concerns a collateral matter in the case." (emphasis added).

Moreover, Mr. Corigliano's claim that he has fully cooperated with the government since the day he signed his plea agreement, and that he has never breached that agreement, is akin to the "broad disclaimers of misconduct" at issue in the cases cited by Mr. Forbes.

[14] For example, the court permitted requests for "All documents relating or referring to CIT's knowledge of bankruptcies relating to any [RW] customer," but denied a request for "All documents relating or referring to [RW] customers, including but not limited to, pay history statements."

circumstances warrant, going so far as to use multiple calls covering a single subject area in order to avoid any issue of over-breadth.  Indeed, many of the requests that Mr. Corigliano and Kramer Levin object to were substantially revised from Mr. Forbes' initial requests <u>specifically to meet the subpoenaed parties' prior objection that they were not sufficiently particular</u>.  Having insisted on more specificity, Mr. Corigliano and Kramer Levin should not be heard to now complain that the number of requests is itself evidence of overbreadth.  <u>See</u> Opp. at 1-2.

> **D.    Federal Rule of Evidence 403 Has No Application in the Context of a Rule 17(c) Subpoena.**

Mr. Corigliano and Kramer Levin also attempt to narrow the category of procurable documents by arguing that "cumulative" documents should not be subject to Rule 17(c) because the Court has the discretion to exclude such documents from evidence under Fed. R. Evid. 403.  Opp. at 15-16.  They cannot and do not cite to any controlling authority for the novel proposition that Rule 403 can be used to limit what documents can be subpoenaed pursuant to Rule 17(c) (as opposed to Rule 403 being used to limiting the introduction of documents produced), which implements a defendant's fundamental Sixth Amendment right to compulsory process.  To the contrary, their argument is flatly contradicted by the standard for Rule 17(c) subpoenas, which requires only that documents be <u>potentially</u> admissible.  <u>See</u> <u>Orena</u>, 883 F. Supp. at 868.

## III.    THE SPECIFIC CATEGORIES OF DOCUMENTS REQUESTED.

> **A.    <u>Correspondence with the SEC and with the USAO Concerning the SEC.</u>**

As discussed in Mr. Forbes' Opening Memorandum, in Forbes Third Trial Motion No. 2, Docket No. 2189, Forbes Third Trial Motion <u>in Limine</u> No. 4, Docket No. 2273, and above, the correspondence produced thus far demonstrates that Mr. Corigliano resisted providing the SEC with all of the financial information the agency requested, <u>despite the fact he had</u>

promised, pursuant to his plea agreement, to provide the SEC complete and accurate information it response to any requests that it made. Ex. 2 at 2. Mr. Forbes is entitled to the evidence necessary to demonstrate the full extent of Mr. Corigliano's resistance, as well as any ultimate decision by the SEC to allow Mr. Corigliano to produce less than the SEC originally requested despite the promises in his plea agreement. This information goes both to the true nature of the agreement between Mr. Corigliano and the government, as well as the question of whether Mr. Corigliano in fact breached his plea agreement by either giving the SEC less than requested or, worse yet, false, incomplete or misleading information.

Mr. Corigliano's compliance with his plea agreement was placed directly at issue by the government during Mr. Corigliano's direct examination in the second trial, and absent the granting of Forbes Third Trial Motion in Limine No. 1, Docket No. 2190, the government is almost certain to place it at issue in the third trial. Under the doctrine of impeachment by contradiction, the defense should be permitted to establish that in fact Mr. Corigliano is not in full compliance with his plea agreement (or at least the written agreement) because he breached that agreement in refusing to provide the SEC all the information it requested, and in providing them information that was incomplete or inaccurate.

It is axiomatic that documents that contradict a witness's testimony on a non-collateral matter may be admitted into evidence. In the Second Circuit, "[t]he determinative question in deciding whether extrinsic evidence contradicting a witness's testimony is admissible is not whether the contradicting extrinsic evidence is material or collateral, but rather whether the assertions that the impeaching party seeks to contradict are themselves material or collateral." Rosario v. Kuhlman, 839 F.2d 918, 925-26 (2d Cir. 1988). Here, Mr. Corigliano's compliance or lack of compliance with his obligations under the plea agreement is not a collateral matter.

Similarly, the government's willingness to ignore or minimize apparent breaches of his plea

agreement is directly relevant to the actual nature of the agreement between Mr. Corigliano and

the government. These issues are directly relevant to his bias and motive. They should be

produced to enable Mr. Forbes to respond to the testimony elicited by the government on direct

examination about Mr. Corigliano's purported compliance with his plea agreement, and to enable

Mr. Forbes to impeach Mr. Corigliano by contradiction.[15]

      The admissibility of this evidence is discussed further in Forbes Third Trial

Motion in Limine No. 4, Docket No. 2273, incorporated herein.

**B.    Documents Reflecting Communications with the Government and Cendant That Were Copied to Cosmo Corigliano, Including Kramer Levin Subpoena Exhibits A-V.**

      Contrary to the assertions of Mr. Corigliano and Kramer Levin, Opp. at 24-25,

these documents are not being sought to impeach Mr. Corigliano's testimony that he did not

receive the documents, but to establish that Mr. Corigliano understood what was being asked for

by the SEC, and what was being provided to the SEC in response. This information is clearly

material because, pursuant to his plea agreement, Mr. Corigliano was required to provide the

SEC complete and accurate information upon its request. That these documents may also show

that Mr. Corigliano lied during his prior trial testimony when he denied having ever seen these

documents cannot be used to negate their admissibility.

      Mr. Corigliano's and Kramer Levin's repeated claim that Mr. Corigliano did not

---

[15] Mr. Forbes is also entitled to these documents under Brady and Fed. R. Crim. Proc. 16. (Indeed, presumably because of these obligations on the part of the government, Kramer Levin appeared to believe that the defendant already had this correspondence. See Docket No. 1945 at 3-5). Should the government comply with its obligations under those authorities, there is no need for Mr. Corigliano or Kramer Levin to produce identical documents.

mislead the SEC concerning the value of his property because he consistently told the SEC

quarter after quarter that the value of his property had not been "recalculated" tells only part of

the story.  First, Mr. Corigliano and Kramer Levin fail to account for the evidence that Mr.

Corigliano's property was re-appraised by the Town of Old Saybrook prior to Mr. Corigliano's

settlement with the SEC (at more than twice the purchase price disclosed by Mr. Corigliano).

Second, Mr. Corigliano and Kramer Levin fail to account for the fact that Mr. Corigliano's

property was comprised of two separate parcels – one of which remains unimproved, and can be

sold at any time.  Third, the arguments set forth in the Opposition ignore the fact that the SEC

specifically asked about the present value of the house in September 2003, despite the

disclosures in the quarterly statements.  Fourth, Mr. Corigliano and Kramer Levin fail to account

for the fact that the "comparable" submitted to the SEC in September 2003 in response to its

specific inquiry hid the first two facts by comparing Mr. Corigliano's two parcels – which total

more than 11 acres, and which are appraised at $3.8 million – with a single parcel of less than 2

acres, marketed for just over $2 million.

Mr. Corigliano successfully hid this information from the SEC prior to his

settlement, which provided only that he could keep his "residence at 38 Watrous Point Road"

(with no mention of the second parcel at 36 Watrous Point Road); Mr. Corigliano should not be

permitted to hide it from the jury as well, who ultimately are the ones who have to decide

whether Mr. Corigliano is credible.  The government cannot present Mr. Corigliano as a "new

man," fully compliant with the obligations of his plea agreement, and then deprive the defense of

even the ability to present the evidence to the contrary.

### C.    Budget and Living Expense Information and Other Financial Information Mr. Corigliano Provided His Counsel.

Mr. Corigliano and Kramer Levin also claim that financial information provided

by Mr. Corigliano to his counsel for purposes of responding to the SEC's financial disclosure requests is collateral. For the reasons stated above, however, such material cannot be collateral as Mr. Corigliano was obligated to provide the information to the SEC under his plea agreement, and is clearly subject to cross-examination about the completeness or incompleteness of his response. That cross-examination would be relevant both to show that Mr. Corigliano did not comply with his plea agreement – despite his testimony that he is fully compliant – and to show that the government has done nothing in response to that non-compliance, thereby implying to Mr. Corigliano that he is free to breach his agreement with impunity. The same is true with respect to the other correspondence between Mr. Corigliano's counsel and the SEC.

Nor can Mr. Corigliano's claim of privilege withstand scrutiny given his legal obligation to provide this information to the government. Under such circumstances, he could not have intended his financial information to be a confidential communication. Nor could his attorneys be considered anything more than mere conduits for the information. See Forbes' Opening Mem. at 18-21. The Opposition's reliance on Judge Thompson's statement that Mr. Corigliano's first trial testimony established that his counsel was not a conduit, see Tr. 11/3/2005 at 1988-2019, must be rejected upon examination of the evidence.[16]

Mr. Corigliano's testimony in the first trial did not establish that his counsel was more than a "conduit." Rather, Mr. Corigliano testified only that he had provided all his financial information to his attorneys, and had purportedly never seen the correspondence from his attorneys to the SEC:

---

[16] Kramer Levin has also represented that it was not a "conduit" for the information. With all due respect, Mr. Forbes should not have to take Kramer Levin's conclusory assertion at face value; he has a right to probe Mr. Corigliano concerning this subject, and what his understandings were at the time.

Q:      Tab 5 is marked as Defendant's Exhibit 951, a letter from – it's actually a fax cover sheet and a letter from your lawyer to the SEC with a  financial statement; am I correct?

A.:     That's correct.

Q:      Is this a financial statement which you would have reviewed to ensure its accuracy before submitting it to the SEC?

A.      I didn't review this before it was sent to the SEC.  I don't believe I ever saw this before.

Q.      You never reviewed the financial statement?

A.      I gave my attorneys my financial information.

Q.      In other words, sir, this particular – does this particular document relate your accurate financial statement at the time reflected on the document as of April 2000?

A.      I hadn't seen this before.  I gave my attorneys all of my financial information.  That's all I can say.

* * * * * * *

Q.      Tab Number 5 [of another binder] is marked Defendant's Exhibit 960 and it's a communication between your lawyers and the SEC apparently forwarding a document called Annualized Budget.  Do you see that.

A.      I do.

Q.      Prior to the time that was sent, did you review the document which is titled "Draft," quote, "Annualized Budget" reflected in that exhibit?

A.      I didn't review this document, although I gave my attorneys our living expenses for the previous 12 months.

Tr. 7/19/2004 at 7976-77 & 7990.  Mr. Corigliano successfully evaded testimony concerning whether he was aware that the SEC had requested information, however, and if so what information it requested.  He also evaded testifying whether he knew the information he provided to his counsel was going to be forwarded to the SEC.  Thus, while the Court stated that

his testimony established his counsel was not a "conduit," this simply is not the case.[17]

**D.      September 2003 Asset Information.**

The SEC specifically requested evidence of the value of certain assets in

September 2003, including the value of Mr. Corigliano's house.  See Ex. 8.  The valuation

information supplied to the SEC concerning the house consisted of a purported "comparable"

house for sale in the neighborhood.  See id.  The "comparable" was hardly comparable, however.

Mr. Corigliano's property consisted of two lots, totaling over eleven acres, and his house was

located on only one of those lots.  Tr. (8/3/04) at 9348-53.  The internet listing supplied to the

SEC was a house on one lot of less than two acres.  See Ex. 8 at Bates No. 3453.[18]

When defense counsel inquired in 2004 about the information Mr. Corigliano's

counsel supplied to the SEC concerning the purported "comparable" property, Mr. Corigliano

claimed that he provided this information only to his attorneys and had no knowledge that it was

going to be forwarded to the SEC.  See Tr. 8/3/2004 at 9348-49, 9352-53.[19]  In 2005, defense

---

[17] Judge Thompson terminated this line of questioning as a result of his "finding" that the testimony in the first trial established that Corigliano's counsel was not a "conduit," and thus there could be no good faith basis to inquire in this area during the second trial.  As discussed, that finding resulted from an erroneous reading of the testimony from the first trial.  There was more than a sufficient good faith basis to make these inquiries during the second trial, and it was error for the Court to terminate this line of cross-examination, particularly given Mr. Corigliano's non-delegable obligations under his plea agreement to provide complete and accurate responses to any inquiry from the SEC.

[18] As set forth in Forbes Third Trial Motion in Limine No. 1 (Docket No. 2190), Mr. Corigliano also misled the SEC about the fact that his "real estate" in Old Saybrook consisted of two separate parcels in an apparent effort to prevent the SEC from seeking disgorgement of the second parcel.

[19] Mr. Corigliano initially testified that he obtained information concerning the "comparable" to facilitate settlement discussions with the SEC.  Tr. (8/3/04) at 9347.  He then claimed "[m]y understanding was that my attorneys wanted to get a sense for what the house was worth and together we saw this on the internet."  Id. at 9348-49.  He denied having any knowledge that the valuation information he gave his counsel would be given to the SEC.  See id. at 9352-53.

counsel were precluded from even inquiring about these subjects during Mr. Corigliano's cross-examination.  <u>See</u> Tr. 11/9/2005 at 2284; Notice of Filing of Documents Relating to Cross-Examination of Mr. Corigliano Precluded By the Court (Docket No. 2000).  As a result, the 2005 jury was left with the erroneous and misleading impression that Mr. Corigliano had complied fully with his obligation to make truthful financial disclosures to the SEC and to respond to SEC inquiries for financial information.

Mr. Forbes is entitled to the September 2003 asset information in order to put Mr. Corigliano's lies and violations of his legal obligations under the plea agreement before the jury – conduct that he engaged in years after he purportedly became a "new man" by signing his plea agreement with the United States, and just months prior to taking the stand in the first trial.

**E.    <u>Receiver Documents.</u>**

As detailed above and in Mr. Forbes' related pleadings, Mr. Corigliano's "understanding" of his obligations under the Consent Agreement is contrary to the plain text of the agreement itself.  Thus, in order to establish the true nature of his obligations under the agreement, and the government's apparent willingness to ignore those violations, Mr. Forbes is entitled to discovery concerning any other expressions of the agreement's terms.  An obvious source of such expression is the information communicated to and from the Receiver, the person charged with enforcing Mr. Corigliano's obligations.  This information should be produced.

**F.    <u>Kramer Levin and Fried Frank Retainer Agreements.</u>**

Evidence that Mr. Corigliano gave false or incomplete information to the SEC by failing to identify the retainers paid to Kramer Levin and Fried Frank is <u>not</u> collateral.  Mr. Corigliano's plea agreement required him to provide complete and accurate information to the SEC.  Thus Mr. Corigliano's failure to include the retainers paid to Kramer Levin and Fried

Frank in his quarterly financial disclosures to the SEC constituted a breach of the plea agreement. The government's failure to take any action in response to that breach both constitutes another benefit to Mr. Corigliano, and impeaches the government's presentation to the jury of Mr. Corigliano as a witness who has fully complied with his obligations since deciding to plead guilty.

As discussed in detail in Section I(C) above, the retainer agreements themselves are relevant to Mr. Corigliano's claim that he did not include the retainers in his quarterly financial statements because the money was "not his." See also Forbes Third Trial Motion in Limine No. 4, Docket No. 2273. Because the failure to disclose the retainers is not collateral, impeachment as to Mr. Corigliano's purported reasons for not disclosing the retainers is not collateral. Rosario v. Kuhlman, 839 F.2d 918, 925-26 (2d Cir. 1988).

**G.**    **Communications Between Mr. Corigliano and Kramer Levin Between April 1998 and January 2000, and Kramer Levin's Proffer Sessions with the Government.**

Mr. Corigliano's and Kramer Levin's Opposition relies on the prior ruling of Judge Thompson, which found that there was insufficient evidence to hold an evidentiary hearing on the application of the crime-fraud exception – a ruling acknowledged by Mr. Forbes in his Opening Memorandum. Mr. Forbes respectfully submits that Judge Thompson's finding was in error, however, for the reasons stated in his Opening Memorandum. At a minimum, there should be an evidentiary hearing on the application of the crime-fraud exception, although for the reasons previously stated, Mr. Forbes believes that there is already sufficient evidence to find that the exception applies, and that the privilege is vitiated.

**H.**    **Polygraph-Related Documents**

Mr. Forbes discusses the relevance and admissibility of the documents sought

29

through these requests in Forbes Third Trial Motion in Limine No. 19, [Docket No. 2257], incorporated herein.

**I.        Post 2004-Trial Communications Relating to the Government and Benefits.**

Mr. Corigliano and Kramer Levin represent that there are no documents responsive to this request "apart from the possibility of any Kramer Levin confidential internal work-product." Opp. at 36.

To the extent these documents contain some fact work product of the author (although it is not clear what "litigation" was anticipated), and the protected information is not capable of redaction, the defense's overriding need for the information in this case would overcome any fact work product privilege. See United States v. Marcus Schloss & Co., Inc., No. 88 CR 796 (CSH) 1989 WL 62729 (S.D.N.Y. June 5, 1989) (balancing the defendant's need against the lack of prejudice to the witness, and ordering the production of an attorney's notes of its client's meetings with the government); see also United States v. Skeddle, 989 F. Supp. 912, 916-17 (N.D. Ohio 1997) (enforcing trial subpoenas to third parties that called for notes and memoranda prepared by private investigators of interviews of government witnesses). Documents reflecting agreements between the government and Mr. Corigliano's counsel concerning benefits are critical evidence of Mr. Corigliano's bias. Indeed, even if Mr. Corigliano is purportedly unaware of the benefit, the information must be produced, and is admissible evidence for the jury's consideration. Hayes v. Brown, 399 F.3d 972 (9th Cir. 2005) (en banc) (due process violated when cooperating witness testified falsely about oral agreement between witness's counsel and government even though witness was unaware of it).

**J.        Crystal Journey Candles Documents.**

Mr. Corigliano remains employed by the Crystal Journey Candles company – an

entity his wife purchased with the proceeds of Mr. Corigliano's illicit stock sales, and which is now controlled by a Receiver acting on behalf of the Securities and Exchange Commission. Nonetheless, Mr. Corigliano claims that benefits conferred upon him through his continued employment are not benefits conferred by the government but "a reflection of the company's need for his services." This claim should be summarily rejected.

As discussed in Mr. Forbes' Opening Memorandum at 34-35, it is doubtful that Mr. Corigliano could find a similar job at any other company given his current circumstances. He thus remains dependent on the government to provide him an income – the very government on whose behalf he is testifying against Walter Forbes. The potential bias this creates is undeniable, and the documents evidencing the extent of this benefit should be produced.

**K.    Credit Card Statements Covering the Period April 1, 2004 through July 7, 2004.**

Mr. Corigliano and Kramer Levin argue that evidence Mr. Corigliano charged "luxury items" rather than "normal living expenses" to his credit cards during the last quarter he used funds that would otherwise have been disgorged to the SEC, goes solely to "impeachment on a wholly collateral matter." Once again, Mr. Corigliano and Kramer Levin ignore the fact that benefits conferred upon Mr. Corigliano are not "collateral." The types of expense Mr. Corigliano was permitted to pay in this "final quarter" go to the nature of his agreement with the SEC, and thus the benefits he received from the SEC.[20] For example, no one could reasonably

---

[20] The government has backed Mr. Corigliano's claim – stating in its Opposition to Forbes Third Trial Motion in Limine No. 1 (Docket No. 2268) that, contrary to the written terms of the settlement agreement, Mr. Corigliano was permitted to pay "ordinary" living expenses during this "final quarter". Thus, while the government disputes Mr. Forbes' claim that no expenditures were authorized during this term (based on the written terms of the agreement), the government would appear to agree that Mr. Corigliano's payment of "non-ordinary" expenditures would be a breach of the agreement. Of course, the government does not appear to have done anything to explore this possible breach of the agreement.

dispute that permitting the Coriglianos to purchase a plasma screen television would be qualitatively different than permitting the Coriglianos to purchase groceries for the family during this "final quarter."

Moreover, Mr. Forbes is not on a "fishing expedition." The financial records produced from Mr. Corigliano's own computer reflect an unusually high number of credit card payments during this "final quarter," totaling almost $49,000. Indeed, <u>his total expenditures for this "final quarter" exceeded that of any other quarter during the almost four years Mr. Corigliano was subject to the budget agreement</u>. This, of course, is at the very time that Cosmo Corigliano knew that his four-year gravy train was ending, and he was being required to disgorge his assets to the SEC. Nonetheless, Mr. Corigliano has never had to account for this final quarter through a quarterly report or otherwise. Nor is there evidence that the government ever investigated these expenditures. It is hardly a "fishing expedition" to request a more detailed accounting in these circumstances. To the contrary, this request seeks very specific, identifiable information, which is both relevant and potentially admissible.

<u>CONCLUSION</u>

For the foregoing reasons, Mr. Forbes respectfully requests that the Court grant him leave to serve the subpoenas attached to his Motion on Cosmo Corigliano, Kramer Levin Naftalis & Frankel LLP (in its capacity as counsel to Cosmo Corigliano), Fried, Frank, Harris, Shriver & Jacobson LLP (in its capacity as counsel to Agnes Corigliano), Neil Cartuciello (in his capacity as the Receiver appointed pursuant to the Consent Agreement between Cosmo Corigliano and the Securities and Exchange Commission), Crystal Journey Candles, and the SEC.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: _____
　　　Brendan V. Sullivan, Jr. (Bar No. ct17115)
　　　Barry S. Simon (Bar No. ct24159)

　　　725 Twelfth Street, N.W.
　　　Washington, D.C. 20005
　　　(202) 434-5000 (phone)
　　　(202) 434-5029 (fax)
　　　bsimon@wc.com (e-mail)

　　　- and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
COWDERY, ECKER & MURPHY, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

Dated:  April 28, 2006

CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Reply Memorandum in Support of Motion of Walter A. Forbes for Leave to Issue Rule 17(c) Subpoenas to Cosmo Corigliano, Kramer Levin, Fried Frank, Neil Cartuciello, Crystal Journey Candles and the SEC (Forbes Third Trial Motion No. 4) to be filed electronically and to be served on April 28, 2006 to the following via e-mail:

>Norman Gross, Esq. (norman.gross@usdoj.gov)
>Michael Martinez, Esq. (michael.martinez2@usdoj.gov)
>Craig Carpenito, Esq. (craig.carpenito@usdoj.gov)

and to be sent on April 28, 2006 to the following by Fed Ex:

>Susan Brune, Esq.
>Brune & Richard LLP
>80 Broad Street, 30th Floor
>New York, NY 10004
>
>Kathleen Cody, Esq.
>Securities and Exchange Commission
>100 F Street, N.E.
>Washington, D.C. 20549-9162

_____
Barry S. Simon