**2.     Government Lobbying Efforts.**

The government does not dispute its obligation to supply information concerning efforts by the New Jersey U.S. Attorney's Office to lobby the SEC on Mr. Corigliano's behalf. See Opp. at 22-23.  While the government asserts that its additional inquiries after October 2003 "turned up no additional information," Opp. at 23, the May 25, 2000 letter supplied by Mr. Corigliano's counsel in November 2005, Ex. 5 to Docket No. 2187, reveals additional information about former AUSA Weissman's role in this regard that the government never disclosed.  The existence of the May 25, 2000 letter, and the information contained in that letter, raises serious questions about the accuracy of the government's representation that it has no additional information to supply on this subject.

The government should make inquiry regarding Mr. Weissman's role in communicating with the SEC about the financial disclosures requested of Mr. Corigliano by the SEC.  In addition, the government represented in March 2004 that there were notes of SEC communications with former AUSA Weissman.  See Docket No. 519 at 6.  The government has never produced those notes.  Given the government's failure to produce the May 25, 2000 letter revealing additional contacts between Mr. Weissman and the SEC that the government never disclosed, the government should either produce the notes or, at a minimum, provide the notes to the Court for in camera inspection.  Similarly, former AUSA James McMahon represented in October 2003 that Mr. McMahon had spoken with Mr. Weissman for approximately an hour on the subject of lobbying the SEC, see Tr. (10/23/03) at 139, but presented the information supplied by Mr. Weissman in extremely summary form.  Id. at 138-39.  The government should provide Mr. McMahon's notes of that conversation to Mr. Forbes or supply the notes to the Court for in camera review.

The government also should produce any other correspondence between Mr. Corigliano's counsel and the SEC that, like the May 25, 2000 letter, reveals contacts between AUSA Weissman and the SEC with respect to Mr. Corigliano, as well as any internal SEC memos or communications that reflect lobbying by representatives of the U.S. Attorney's Office on behalf of Mr. Corigliano. Finally, the government should produce any other information in its possession, custody, or control (including oral Brady and Giglio) concerning the efforts made by representatives of the U.S. Attorney's Office to mediate disputes between Mr. Corigliano and the SEC concerning Mr. Corigliano's obligations under his plea agreement and/or to persuade the SEC to excuse or modify demands for financial disclosure from Mr. Corigliano.

### 3. SEC Requests for Tax Returns.

Mr. Forbes has supplied the government with information tending to show that Mr. Corigliano refused to provide his 1999 and 2002 tax returns to the SEC, despite requests by the SEC that he do so. It is clear from the correspondence between the SEC and Mr. Corigliano's counsel that the SEC requested copies of these tax returns, and that Mr. Corigliano's counsel represented that the tax returns had not yet been filed. See Ex. 9, Tab 1 to Docket No. 2188; Exs. 10-11 to Docket No. 2187. Mr. Forbes also has supplied the government with information tending to show that Mr. Corigliano had filed his 2002 return prior to September 2003, when his counsel represented that he had not yet done so. See Ex. 9, Tabs 2-3 to Docket No. 2188.[15]

---

[15] As Mr. Forbes pointed out in his opening memorandum, there appear to be discrepancies between the income Mr. Corigliano reported to the SEC in his quarterly reports and the income he reported on his 2001 and 2002 tax returns (the only ones to which Mr. Forbes has had access). This may explain resistence on Mr. Corigliano's part to SEC requests for copies of his tax returns.

While the government asserts that Mr. Forbes "points to nothing which shows that Corigliano directed his lawyers to make those representations or knew about the representations after the fact," Opp. at 23, Mr. Corigliano is the only logical source of the information in his counsel's letters to the SEC.  If the SEC asked Mr. Corigliano's counsel for copies of Mr. Corigliano's tax returns (which it did), Mr. Corigliano's counsel had a duty to inquire whether he had filed his returns, which they presumably did.  Having presumably received an answer from Mr. Corigliano, his counsel reported that information to the SEC. Given Mr. Corigliano's personal obligations to the SEC under his plea agreement, and the apparently incorrect information his lawyers gave the SEC, Mr. Corigliano cannot avoid the consequences of any false or misleading information he supplied to his counsel on this subject.

Nor may the government "consciously avoid[] recognizing the obvious," Wallach, 935 F.2d at 457.  The government is on notice of potentially false information supplied to the SEC on Mr. Corigliano's behalf, which would be a serious violation of his plea agreement. It cannot simply hide its head in the sand and ignore that information.  At a minimum, the government should determine (from Mr. Corigliano or otherwise) the date on which Mr. Corigliano filed his 1999 and 2002 tax returns and disclose that information to Mr. Forbes.  The government also should be required to disclose whether Mr. Corigliano ever supplied his 1999 or 2002 tax return, or any other tax return, to the SEC or whether the SEC excused those obligations on his part.

### 4.    False Information Supplied to the SEC.

#### a.    Asset Valuation Information.

The government asserts that Mr. Forbes already has sufficient information from which to argue that Mr. Corigliano underestimated the value of his real property in his

disclosures to the SEC. Opp. at 24. While the government has produced some documents on

this subject, it should be required to supply all information in its possession, custody, or control

concerning the SEC's efforts to obtain asset valuation information from Mr. Corigliano and the

accuracy or falsity of any such information supplied to the SEC by Mr. Corigliano or his

counsel.

### b.     Quarterly Financial Reports.

The government asserts that it cannot confirm that there are discrepancies

between the information in Mr. Corigliano's 2001 and 2002 tax returns and the information in

Mr. Corigliano's quarterly reports for those years. Opp. at 25. Mr. Forbes has supplied copies

of those tax returns to the government; the government also has Mr. Corigliano's quarterly

reports. The government thus is on notice of this issue and has the ability to determine whether

the income and financial information on the tax returns (or on the other tax returns filed by Mr.

Corigliano after he entered into his plea agreement) is at odds with the quarterly reports. The

government also has access to Mr. Corigliano. If Mr. Corigliano made false representations in

his quarterly reports to the SEC or on a tax return after he executed his plea agreement in

January 2000, that information is clearly Brady and Giglio material and should be produced to

the defense.[16]

---

[16]     While the government relies on United States v. Stofsky, 527 F.2d 237 (2d Cir. 1975)
(Opp. at 25 n.11), the government there produced tax records of a government witness to the
defense during trial, id. at 242, and tax returns were used during the witness's cross-examination,
id. at 244 n.6. Stofsky undermines the government's claim that it cannot access Mr. Corigliano's
returns and has no obligation to obtain them once it is on notice of potential irregularities
involving those returns.

5.    **Settlement Negotiations with the SEC.**

While the government attempts to portray Mr. Corigliano's settlement

negotiations with the SEC as a collateral matter, Opp. at 26-27, the government elicited direct

testimony on this subject at both the 2004 and 2005 trials. See Tr. (11/1/05) at 1467-68, 1471-

72; Tr. (7/14/04) at 7503.  The government cannot present direct testimony by Mr. Corigliano

on this subject in an effort to portray him as a changed individual who eagerly sought to return

his ill-gotten gains as soon as he entered into his plea agreement and then assert that the matter is

collateral.  Nor can the government present direct testimony that a purported $6 million tax issue

was the barrier to Mr. Corigliano's settlement for four years, in an effort to explain Mr.

Corigliano's failure to settle with the SEC until April 2004, and then contend that this matter is

collateral.  At a minimum, Mr. Forbes is entitled to cross-examine Mr. Corigliano on these

subjects, and present extrinsic evidence on these subjects, under the doctrine of impeachment by

contradiction.

The government's contention that Mr. Corigliano's testimony is not inconsistent

with the record produced thus far of his counsel's settlement negotiations with the SEC (Opp. at

26) ignores the fact that Mr. Corigliano has falsely portrayed himself as always willing to pay

$13-14 million to the SEC, and that Mr. Corigliano blames the SEC's purported position on a $6

million tax issue as the barrier to his settlement.  A jury would have a very different view of Mr.

Corigliano's claims if it were to learn that his counsel offered the SEC only $3.4 million in

settlement and that there was no $6 million tax issue that held up the settlement.  The documents

produced to date reflect that, contrary to Mr. Corigliano's portrayal of himself as a reformed

individual who sought to return his ill-gotten gains, Mr. Corigliano greedily sought for years to

<u>keep</u> as much as he could of the proceeds of his CUC stock sales.  The government should be

required to produce all information in its possession, custody, or control (including both documents and oral <u>Brady</u>/<u>Giglio</u>) concerning the settlement negotiations between the SEC and Mr. Corigliano or his counsel between January 2000 and April 2004, including all settlement demands made by the SEC and all settlement offers made by Mr. Corigliano or his counsel.[17]

## 6.     Budget Negotiations with the SEC.

At the time the SEC filed a civil action against Mr. Corigliano in June 2000, Mr. Corigliano had admitted engaging in extensive criminal conduct at CUC and Cendant.  On the same day the SEC filed its civil complaint, Mr. Corigliano entered his guilty plea.  Yet instead of proceeding with its slam-dunk civil case, where it was entitled to summary judgment on the issue of liability, and obtaining a civil judgment against Mr. Corigliano for disgorgement, penalties, and interest, the SEC allowed the civil action to be stayed (at the request of the U.S. Attorney's Office).  The SEC also allowed Mr. Corigliano to retain possession of the millions of dollars of proceeds of his crimes and to live off of those proceeds for almost four years on a generous annual budget in excess of $250,000 a year (for a family with no home mortgage expense).  <u>See</u> Ex. 12 to Docket No. 2187.

The documents produced to date reveal that the SEC believed that Mr. Corigliano's proposed budget was "unreasonable."  <u>See</u> Ex. 10 to Docket No. 2187.  Yet the SEC relented and agreed to Mr. Corigliano's generous annual budget after being reminded what a "valuable, cooperating witness" Mr. Corigliano was.  <u>See</u> Ex. 11 to Docket No. 2187. While the government and Mr. Corigliano now, unsurprisingly, deny that he received favorable

---

[17]     At a minimum, the correspondence between Mr. Corigliano's counsel and the SEC on this subject is Rule 16 material that should be produced irrespective of the government's claims concerning the admissibility of this material.

treatment from the SEC, <u>see</u> Opp. at 29, the contemporaneous record reveals otherwise.  The government should be required to produce all documents and information in its possession, custody, or control concerning communications between the SEC and Mr. Corigliano or his counsel concerning his annual budget for "living expenses."  To the extent the SEC allowed Mr. Corigliano to continue to reap the benefits of his budget agreement despite Mr. Corigliano's failure to provide information or documentation requested by the SEC (such as Mr. Corigliano's 2002 tax returns, which the SEC requested in September 2003), the government should supply that information as well pursuant to its <u>Brady</u> and <u>Giglio</u> obligations.

### 7.     Unwritten Agreements.

The government does not dispute the fact that it has made inconsistent representations about whether there was an oral side agreement between Mr. Corigliano's counsel and the SEC that allowed Mr. Corigliano to continue using his legal fee retainers. <u>See, e.g.</u>, Docket No. 1147 at 6-8; Docket No. 1084, Ex. 1 (proposed government stipulation); Docket No. 1643 at 3.  While the government now seeks to portray this matter as resolved, SEC attorney David Frohlich testified that he was "not certain," Tr. (9/27/04) at 13,610-13,611, whether Mr. Corigliano could continue using the retainers past July 7, 2004.  Mr. Forbes is entitled to know whether or not the SEC has agreed that Mr. Corigliano may use his legal fee retainers indefinitely.  The government should produce all contemporaneous documents in the possession, custody, or control of the SEC concerning the terms of the April 2004 settlement -- including any memorandum prepared for the SEC Commissioners who had to approve the settlement -- describing the assets that Mr. Corigliano was being permitted to retain.[18]

---

[18]     As discussed in Mr. Forbes' opening memorandum (at pp. 21-22), the government's current interpretation of the settlement agreement is at odds with the plain language of the

Similarly, while the government seeks to portray Mr. Corigliano's purported ability to continue living off the proceeds of his crimes through July 7, 2004 as a settled matter, Opp. at 31 & n.13, SEC attorney Frohlich apparently believed that Mr. Corigliano could continue to use the funds only through the date of Final Judgment (May 6, 2004), not July 7, 2004 or later, as maintained by Mr. Corigliano. See Tr. (9/27/04) at 13,608 ("I don't see this as a benefit under the agreement. Mr. Corigliano had expenses, ongoing expenses for years. And in my mind what the judgment did was put an end to it by making him turn over everything to the receiver except for certain listed assets."). Mr. Forbes is entitled to know whether the SEC did or did not agree that Mr. Corigliano could continue paying living expenses through July 7, 2004 from the funds he was required to disgorge to the receiver. The government should produce all documents and other information in the possession, custody, or control of the SEC concerning the SEC's understanding of the terms of the April 2004 settlement with Mr. Corigliano.

**B.     Documents and Information Relating to Mr. Corigliano's False Testimony in Two Trials.**

The government reiterates its contention that "no member of the prosecution team concluded that Corigliano lied during either trial." Opp. at 33. Here, as in Wallach, the government is on notice that its chief witness testified falsely at trial (indeed, in two trials). The government has implicitly acknowledged Mr. Corigliano's 2004 false testimony by tailoring his 2005 testimony to either ignore certain matters or to embrace matters as to which Mr. Corigliano

---

agreement, further demonstrating the need for contemporaneous records reflecting the SEC's understanding of the terms of the agreement at the time it was executed. As set forth in the reply memorandum in support of Forbes Third Trial Motion In Limine No. 1 (filed 4/17/06), the government has gone out of its way to engage in revisionist history in an effort to protect Mr. Corigliano.

previously testified falsely. See Forbes Third Trial Motion In Limine No. 1 (Docket No. 2190) (filed 3/31/06). Under Brady and Giglio the government should, inter alia, be required to disclose the substance of its communications with Mr. Corigliano concerning the matters set forth in Forbes Third Trial Motion in Limine No. 1, including all communications about the manner in which Mr. Corigliano's 2005 and expected 2006 testimony should deal with those issues and the extent to which the government would omit from its 2005 or 2006 examinations matters about which Mr. Corigliano was shown to have testified falsely in earlier proceedings.

C.    **Documents and Information Relating to Mr. Corigliano's Polygraph Examinations.**

Mr. Forbes discusses the relevance and admissibility of the information he seeks concerning Mr. Corigliano's polygraph examinations in Forbes Third Trial Motion in Limine No. 19 (Docket No. 2257) (filed 4/17/06), incorporated herein.

D.    **Information Concerning Proffers Made by Mr. Corigliano's Counsel to the Government.**

The government observes that it previously provided information to Mr. Forbes concerning Mr. Corigliano's counsel's proffer sessions with the government. Opp. at 36. While that is correct, Mr. Forbes seeks additional information on this subject. Mr. Corigliano denies any knowledge of what his attorneys represented to the government in conversations prior to January 1999. See Tr. (7/15/04) at 7610, 7671-74. If the government is in possession of any information inconsistent with Mr. Corigliano's testimony, such as information that Mr. Corigliano authorized his counsel to make certain factual representations to the government, the government should disclose that information under Brady/Giglio. The government also should be required to disclose: (i) the full terms (whether written or oral) of all attorney proffers made by Mr. Corigliano's counsel to the government; (ii) whether Mr. Corigliano's counsel ever

26

represented to the government that Mr. Corigliano was the source of any information supplied by counsel to the government (and, if the response is affirmative, the date(s) on which Mr. Corigliano's counsel supplied such information and the substance of the information supplied on each date); (iii) whether Mr. Corigliano's counsel ever stated that Mr. Corigliano had authorized his counsel to make a representation to the government on his behalf (and, if the response is affirmative, the date and substance of each such representation); and (iv) whether Mr. Corigliano's counsel ever represented to the government that counsel would communicate information from the government to Mr. Corigliano (and, if the response is affirmative, the date on which any such representation was made and the substance of any such information). This information is directly relevant to impeach Mr. Corigliano's claims that he knew nothing about his attorneys' proffer sessions with the SEC.

## II.    DOCUMENTS AND INFORMATION RELATING TO KEVIN KEARNEY.

As set forth in detail in Forbes Third Trial Motion In Limine No. 6 (Docket No. 2272) (incorporated herein by reference), Kevin Kearney testified falsely concerning material matters at both the 2004 and 2005 trials. While the government asserts that Mr. Kearney simply was not directly asked about Mr. Forbes in his "initial" government interviews, Opp. at 37 n. 18, the government ignores at least two sets of interview notes that reflect that Mr. Kearney told the government he had no information concerning Mr. Forbes. This includes SEC attorney David Frohlich's notes of an August 24, 1998 interview in which Mr. Kearney stated "he had no evid. he could pt. to involving WAF," Ex. 5 to Docket No. 2272, and Mr. Greiner's notes of Mr. Kearney's July 10, 2001 interview, which reflect that Mr. Kearney had "nada" with respect to Mr. Forbes, Ex. 23 to Docket No. 2272. The government's facile response ignores the numerous interviews in which Mr. Kearney told the government information that is totally inconsistent

27

with his 2004 and 2005 trial testimony.  For example, while Mr. Kearney now claims that former CUC CFO Stuart Bell repeatedly invoked Mr. Forbes' name at quarterly meetings concerning topside adjustments, Mr. Kearney told the government in multiple interviews that he did <u>not</u> meet with Mr. Bell to discuss quarterly topside adjustments.  <u>See generally</u> Docket No. 2272.

The government's claim that Mr. Kearney purportedly "implicate[d]" Mr. Forbes when he was directly asked about him," Opp. at 37 n.18, highlights the need for the government to produce <u>all</u> notes of the July 10, 2001 Kearney interview, where it appears from Mr. Greiner's notes that Mr. Kearney indicated that he had no information to provide regarding Mr. Forbes. The government does not dispute that two other SEC representatives were present at Mr. Kearney's July 10, 2001 government interview.  Opp. at 40.  While the government asserts that it has no obligation to turn over the notes of SEC representatives Susan Markel and Roger Paszamont, <u>id.</u>, the government previously represented that it would produce all SEC notes of witness interviews, Docket No. 359 at 49.  As Mr. Forbes demonstrated <u>supra</u>, the government has an obligation to produce SEC materials because of the close working relationship between the SEC and the New Jersey U.S. Attorney's Office in the investigation of accounting fraud at CUC and Cendant, and because the U.S. Attorney's Office has been given access to those materials.

The notes taken by SEC attorney Matthew Greiner of this interview are highly significant, because they reflect that Mr. Kearney knew "nada" about Mr. Forbes.  The notes of the remaining individuals present at the interview should shed additional light on Mr. Kearney's statements about Mr. Forbes at this interview.  Given the government's failure to locate any notes taken by FBI agent Mark Gerber of this interview, it is particularly important that the

government produce the notes taken by the SEC representatives who attended this interview.[19]  It

is clearly <u>Brady</u> and <u>Giglio</u> material with respect to Mr. Kearney, who now claims that Mr.

Forbes' name was repeatedly invoked by at least three different people at CUC in connection

with improper quarterly topside adjustments.  <u>See</u> Forbes Third Trial Motion <u>In Limine</u> No. 6

(Docket No. 2274) (filed 4/17/06).

         The government also should produce the "work-product notes," Opp. at 38, of the

members of the 2004 trial team concerning their interviews of Mr. Kearney.  Because Mr.

Kearney's 2004 trial testimony was a stark departure from his previous government interviews,

the summary letters provided by the government with respect to Mr. Kearney's 2003 and 2004

government interviews do not adequately convey the ever-evolving nature of his changing

claims about Mr. Forbes or the context in which Mr. Kearney's changing statements were made.

Nor do the government letters reveal when (or whether) Mr. Kearney informed the government

about several claims to which he testified at the 2004 trial.  <u>See</u> <u>United States v. Service Deli,</u>

<u>Inc.</u>, 151 F.3d 938, 942-43 (9th Cir, 1998) (<u>Brady</u> violation where unproduced interview notes

contained material information not disclosed in government summaries of notes; conviction

---

[19]     Mr. Forbes requests that the government renew its search for Mr. Gerber's notes of this significant interview.  The government has never produced a Form 302 of that interview, despite FBI requirements that agents record on a Form 302 the substance of any interview that may become the subject of court testimony.  <u>See</u> Manual of Administrative Operations and Procedure, § 10-13.3(3). If an agent is asked not to record an interview, the FBI manual provides that the agent "should decline to participate in the interview and should not be present when the interview takes place." <u>Id.</u> at § 10-13.3(13).  On April 3, 2006, the government produced Mr. Gerber's notes of several interviews that had never previously been produced.  <u>See</u> Ex. 8 hereto (enclosures omitted).  The government's failure to locate several sets of Gerber notes until a few weeks ago suggests that there may be additional Gerber notes that have not been produced.

reversed).  Rule 16(a)(2), upon which the government relies, Opp. at 38,  has no application with respect to <u>Brady</u> and <u>Giglio</u> material.[20]

In addition, the government has never supplied Mr. Forbes with any information concerning the interviews it conducted of Mr. Kearney after the 2004 trial, or the circumstances under which Mr. Kearney purportedly recalled the information to which he testified for the first time at the 2005 trial.  <u>See generally</u> Docket No. 2274.  The government should supply this information, as well as any other information in its possession, custody, or control that impeaches Mr. Kearney's 2004 and 2005 trial testimony concerning Mr. Forbes.[21]

_____

[20]    <u>See</u> <u>United States v. Goldman</u>, 439 F. Supp. 337, 350 (S.D.N.Y. 1977) ("reports, memoranda, or other internal government documents" must be produced "if the material [is] of a <u>Brady</u> nature") (quotation omitted); <u>United States v. American Cyanamid Co.</u>, No. 60 Civ. 3857-CLB, 1975 WL 987, at *1 (S.D.N.Y. Oct. 28, 1975), <u>modified</u>, 1975 WL 992 (S.D.N.Y. Nov. 12, 1975) (ordering <u>in camera</u> review of "internal Government memoranda, containing some legal opinions and evaluations by staff attorneys"; "the protection granted to 'work product' will not rise to the point of frustrating what has apparently been deemed to be a right of constitutional dimensions.  The <u>Brady</u> rule requires the Government to disclose those materials which are "favorable to an accused" and which "tend to exculpate or reduce the penalty") (quotation omitted); <u>United States v. Eley</u>, 335 F. Supp. 353, 354, 357-58 (N.D. Ga. 1972) (ordering government to produce "[a]ll reports and memoranda prepared on behalf of the Government or otherwise in connection with the investigation of this case" that contain <u>Brady</u> material); 2 Charles Alan Wright, <u>Federal Practice and Procedure</u> § 254.2, at 141 (3d ed. 2000) ("Because <u>Brady</u> is based on the Constitution, it overrides court-made rules of procedure.  Thus, the work-product immunity for discovery in Rule 16(a)(2) prohibits discovery under Rule 16 but it does not alter the prosecutor's duty to disclose material that is within <u>Brady</u>."), <u>quoted in</u> <u>United States v. Armstrong</u>, 517 U.S. 456, 475 (1996) (Breyer, J., concurring).

[21]    In a March 2004 pleading, the government asserted that on certain occasions "SEC attorneys did not take notes at the interviews and hours or days later recorded their impressions of interviews.  Notes of these impressions are clearly work product and are not subject to disclosure."  Docket No. 519 at 7.  If the Markel or Paszamont notes of the July 10, 2001 Kearney interview fall into that category -- or if any such "impressions" reflect that Mr. Kearney did <u>not</u> say what he first testified to in 2004 and 2005, almost a decade after the relevant events -- they are still subject to production under <u>Brady</u> and <u>Giglio</u>; at a minimum the government should disclose the <u>Brady</u> and <u>Giglio</u> information in the notes and tender the notes to the Court for <u>in camera</u> inspection.  Similarly, if Mr. Greiner, any other SEC representative, or any other government agent or attorney prepared any internal memorandum reflecting that Mr. Kearney

## III.    ADDITIONAL DOCUMENTS AND INFORMATION.

### A.    Documents and Information Relating to Michael Monaco.

Mr. Forbes has received information that Mr. Monaco is aware of a pending investigation into his conduct during his tenure at Cendant. Mr. Forbes requests that the government renew its inquiry into this matter in light of that information. The government should inquire of Mr. Monaco, who has been cooperating with the government, whether he is aware of <u>any</u> government investigation into his conduct. It also should make inquiry of the SEC with respect to this matter. Any information in the government's possession, custody, or control concerning any government investigation of Mr. Monaco's conduct constitutes <u>Brady</u> and <u>Giglio</u> material that the government has a duty to disclose to the defense.

### B.    Documents and Information Relating to Steven Kernkraut.

The government has represented that it is unaware of any information "which tends to prove that CUC did not conduct any quarterly earnings conference calls with analysts between 1995 and 1997," Opp. at 41, and that it is aware of its obligation to produce such information "if it becomes known to the prosecution team," <u>id.</u> It appears from the government's new witness list that the government may be interviewing analysts other than Mr. Kernkraut who covered CUC. The government should disclose, <u>inter alia</u>, any information it learns during the course of those interviews that tends to show that CUC did not conduct quarterly conference calls with analysts about earnings releases prior to May 1997.

---

had no information to offer with respect to Mr. Forbes, that information is clearly <u>Brady/Giglio</u> that must be disclosed.

### C.    Documents and Information Relating to Stuart Bell and Kirk Shelton.

The government asserts that it understands its disclosure obligations to Mr.

Forbes with respect to Mr. Shelton, and that it never engaged in any plea discussions with Mr.

Bell.  Opp. at 43.  The government is on notice of the information requested by Mr. Forbes

concerning these matters.  The government also is on notice of the statements made by Mr.

Shelton's counsel and others on the record at Mr. Shelton's sentencing hearing concerning the

matters raised in Mr. Forbes' motion.  The government has not stated whether there were plea or

cooperation discussions with Mr. Shelton in connection with his proffer sessions with the

government.

### D.    Information Relating to Casper Sabatino.

The government should produce the information Mr. Forbes seeks concerning Mr.

Sabatino as <u>Brady</u> and <u>Giglio</u> material.  Mr. Sabatino was called as an <u>adverse</u> witness by the

defense, and he is cooperating with the government pursuant to a plea agreement.  According,

the requirements of <u>Brady/Giglio</u> should apply with full force to Mr. Sabatino.

While the government asserts that Mr. Forbes "declined to examine Sabatino

during the second trial" about the matters disclosed in the government's November 14, 2005

letter, Opp. at 44, Mr. Sabatino concluded his testimony on November <u>10</u>, 2005, before Mr.

Forbes' counsel received this information.  Thus, Mr. Forbes did not make any decision not to

cross-examine Mr. Sabatino on this matter.

Any information in the government's possession, custody, or control that tends to

show that CUC did not engage in unsupported or improper quarterly topside adjustments when

Mr. Bell was CFO is exculpatory information that should be produced, irrespective of whether

Mr. Sabatino is called as a government witness.  If Mr. Sabatino was shown the document

32

marked as GX 9322 on more than one occasion prior to the 2005 trial, or otherwise was repeatedly pressed about any alleged improper topside adjustments prior to the time Mr. Corigliano became CFO, and continued to recall that no unsupported topside adjustments were made under Mr. Bell, the government should supply that information pursuant to Brady/Giglio.

### E.  Statements by Government Witnesses.

Mr. Forbes renews his requests for all interview notes withheld by the government and a list of every date on which the government interviewed or obtained factual information from each of its cooperating witnesses to the extent this information has not been produced.[22]

The government does not address the fact that it has not supplied any information to Mr. Forbes concerning the interviews of government witnesses that took place after approximately July 2004.  It has not supplied any information concerning its witness interviews prior to or during the 2005 trial, or subsequent to that trial.  Whether or not the former or present prosecutors took notes of those sessions, the government must provide all Brady/Giglio material arising from those sessions.  The government also should supply its withheld interview notes concerning Mr. Kearney for the reasons discussed in Section II, supra.  Finally, the government should supply all Brady/Giglio information contained in any alleged "work product" notes or memoranda concerning witnesses interviews.

---

[22]     The government represented in a March 2004 pleading that it would provide such information on an "ongoing basis" as of October 2003.  See Docket No. 519 at 9.

## CONCLUSION

For the foregoing reasons, and the reasons set forth in Mr. Forbes' opening memorandum, Mr. Forbes respectfully requests that the Court order the government to provide the requested documents and information.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: _____
Brendan V. Sullivan, Jr. (Bar No. ct17115)
Barry S. Simon (Bar No. ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
Cowdery, Ecker & Murphy, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

34

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused the foregoing Reply Memorandum in Support of

Motion of Defendant Walter A. Forbes to Compel Discovery and Production of <u>Brady/Giglio</u>

Material (Forbes Third Trial Motion No. 2) to be filed electronically and to be served on April

28, 2006 to the following via e-mail:


Norman Gross, Esq. (norman.gross@usdoj.gov)
Michael Martinez, Esq. (michael.martinez2@usdoj.gov)
Craig Carpenito, Esq. (craig.carpenito@usdoj.gov)


_____
Barry S. Simon