# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____
                        )

**UNITED STATES OF AMERICA**   )
                         )     **No. 3:02CR264 (AHN)**

       **v.**              )
                          )     **May 1, 2006**

**WALTER A. FORBES**         )
                          )
_____)

## MEMORANDUM OF WALTER A. FORBES IN OPPOSITION TO UNITED STATES' PRETRIAL MOTION <u>IN</u> <u>LIMINE</u> <u>(Government Third Trial Motion No. 1)</u>

Brendan V. Sullivan, Jr. (Bar No. ct17115)
Barry S. Simon  (Bar No. ct24159)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
Cowdery, Ecker & Murphy, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

Oral Argument Requested

Defendant Walter A. Forbes, through undersigned counsel, respectfully submits this memorandum in opposition to the government's motion in limine.[1]

**ARGUMENT**

## I.    THE COURT SHOULD PRECLUDE THE GOVERNMENT FROM PRESENTING EVIDENCE OF MR. FORBES' STOCK SALES.

The government seeks to offer evidence of Mr. Forbes' 1998 stock sales, as well as a chart concerning Mr. Forbes' sales of CUC and Cendant stock from 1991-1998. See Government Mem. ("Mem.") at 5; Ex. 2 to Mem. The Court should deny the government's request because this evidence is not probative of Mr. Forbes' knowledge or intent with respect to the four counts remaining in the redacted superseding indictment.[2]

As this Court observed in In re Xerox Corp. Securities Litigation, 165 F. Supp. 2d 208 (D. Conn. 2001) (Mem. at 10), "[i]nsider sales of stock may be evidence of scienter if the trades are unusual or suspicious in timing or amount." Id. at 222 (emphasis added). Here, neither the timing nor the amount of Mr. Forbes' stock sales was unusual or suspicious. With the sole exception of the March 1998 sales (discussed below), the government makes no attempt to argue that Mr. Forbes' stock sales during his tenure at CUC and Cendant were unusual or suspicious in timing or amount. Similarly, with the sole exception of the March 1998 sales, the government makes no attempt to argue that the sales were inconsistent with Mr. Forbes' "prior trad[e] history," In re Silicon Graphics Inc. Sec.

_____

[1]    As Mr. Forbes has argued elsewhere, the Court is not bound by Judge Thompson's prior rulings in this case. See generally Reply Memorandum in Support of Forbes Third Trial Motion No. 4 at 2-6 (Docket No. 2310) (filed 4/28/06).

[2]    The government has dismissed all of the insider trading counts in the December 2002 indictment.

Litig., 183 F.3d 970, 986 (9th Cir. 1999) (Mem. at 10).[3]  Accordingly, there is no

basis for admitting the government's chart concerning Mr. Forbes' history of stock

sales at CUC or Cendant as purported evidence of knowledge or intent to deceive.

　　　　　With respect to Mr. Forbes' March 1998 sales, there also is no basis to

admit this evidence to show Mr. Forbes' purported knowledge or intent.  First, there

is nothing unusual or suspicious about the amount of stock Mr. Forbes sold in

March 1998.  The $11 million in stock that Mr. Forbes sold in March 1998

constituted a small percentage (approximately 6%) of his overall holdings of stock

and exercisable options.  See Tr. (11/15/06) at 2995-96, 3038.  The sale of a small

percentage of an individual's overall holdings does not give rise to an inference of

scienter.  See Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995) (Mem. at

10) (rejecting contention that sale of less than 11% of an individual's holdings was

evidence of intent to deceive); see also In re Silicon Graphics, Inc., 183 F.3d at 987

(Mem. at 10) (sales of 2.6%, 7.7%, 4.1%, and 6.9% of respective holdings by various

defendants were not suspicious and did not support inference of scienter); In re

Apple Computer Sec. Litig. 886 F.2d 1109, 1117 (9th Cir. 1989) (Mem. at 10) (sale of

8% of holdings not probative of scienter); compare Goldman v. Belden, 754 F.2d

1059, 1070-71 (2d Cir. 1985) (Mem. at 10) (sale of 26% of holdings could raise

inference of scienter).

　　　　　Nor were Mr. Forbes' 1998 sales "dramatically out of line with prior

trading practices," In re Silicon Graphics, Inc., 183 F.3d at 987.  As the

---

[3]　　　Judge Thompson's ruling on this subject (Docket No. 1839) does not address
this point.

government's own chart reflects, Mr. Forbes sold millions of dollars of stock every year. He sold approximately $10 million in stock in 1992, and approximately $11 million in stock in 1993. Mr. Forbes (like numerous other Cendant executives) received a significant number of stock options in connection with the December 1997 Cendant merger. Notably, however, Mr. Forbes' 1998 stock sale paled in comparison to the $60 million in stock sold by Cendant CEO Henry Silverman in early 1998. See DX 1394 (Ex. 1 hereto); Tr. (9/28/04) at 13,841. Mr. Forbes sold the same number of shares as Jim Buckman, the General Counsel of Cendant, who sold 300,000 shares valued at $10.8 million in early 1998. See Buckman Form 144 (Ex. 2 hereto). Moreover, Mr. Forbes reduced his sale order from 400,000 shares to 300,000 shares (see Tr. (9/28/04) at 13,844, 13,850; Tr. (8/17/04) at 10,310) -- hardly the conduct of an individual seeking to cash out. There is nothing about the amount of Mr. Forbes' March 1998 stock sale that is probative of his purported knowledge of a fraud.

Nor was the timing of Mr. Forbes' March 1998 stock sale unusual or suspicious. Mr. Forbes sold at a time when he was legally permitted to do so after the merger, see DX 2247 (Ex. 3 hereto), when numerous other Cendant insiders sold stock as well. Mr. Forbes presented unrefuted documentary evidence at two trials demonstrating that he initiated his 1998 stock sales on February 9, 1998, well before Mr. Silverman made any decision to terminate Ms. Pember. See DX 2240 (Ex. 4 hereto). Government witness Michael McCormick, a UBS Paine Webber representative, confirmed that the record reflecting the February 9, 1998 date was created by Paine Webber in the ordinary course of business. Tr. (8/17/04) at 10.291-

92. Yet the government continues to assert that the removal of Anne Pember from the CUC accounting function almost a month later, in early March 1998. "created the incentive for" this sale.  Mem. at 8.

The government implicitly acknowledges that its theory that Mr. Forbes initiated his stock sales in March 1998 (Opp. at 8) is erroneous, because it argues in the alternative that, even if Mr. Forbes initiated his stock sales in February 1998, they are still purportedly probative of his intent and knowledge. See Opp. at 11-12.  The government's alternative theory fails as well.  While the government now speculates that Mr. Forbes could have known in early February 1998 that Anne Pember "would be removed from her key role in the fraud," Opp. at 12, there is no evidence whatsoever to support the government's speculation.  To the contrary, the government affirmatively elicited testimony that Mr. Silverman decided to remove Ms. Pember from the CUC accounting function on approximately March 4, 1998, when he became infuriated with Ms. Pember.  It elicited this testimony from its key witness, Cosmo Corigliano:[4]

> Q.    On or about March 4th, 1998, did you hear from anyone that Ms. Pember's position might be changing inside the organization?
>
> A.    Yes.
>
> Q.    Who did you hear from?
>
> A.    From Kirk.
>
> Q.    Okay.  In person?

---

[4]    Mr. Corigliano is a serial liar who testified falsely at two trials.  Mr. Forbes cites this testimony only to point out that the government's own witnesses contradict the government's revised theory about the purported reason for Mr. Forbes' 1998 stock sales.

> A.    Kirk said, you know that Henry was just beside himself, very mad because there was reports that our Accounting Department, Anne Pember's department was supposed to give and she missed deadlines or the report was inaccurate. There was some problem, again, with Anne's department. And Kirk said, Henry wants Anne out, doesn't want her to have anything to do with the financials. She doesn't have to leave the company, just doesn't want her to be involved at all in the financials of Cendant.

Tr. (7/14/04) at 7433-34. The government elicited similar testimony from Anne Pember:

> Q.    All right. Let's go ahead to March 4, the next day. Do you remember what happened that day?
>
> A.    Yes.
>
> Q.    Okay. What happened on March 4?
>
> A.    Mr. Corigliano contacted me and told me that Mr. Silverman was livid that I had interfered with not providing information to New Jersey and that he wanted me to get the hell out of there.

Tr. (6/2/04) at 2920.

Neither of the government's alternative theories about the purported reasons for Mr. Forbes' 1998 stock sale is supported by the factual record. The first theory is contradicted by unrefuted documentary evidence showing that Mr. Forbes initiated the sale in question in early February 1998, well before Mr. Silverman made any decision to remove Ms. Pember from the accounting function. The second theory is contradicted by the testimony of the government's own witnesses and rests, at best, on sheer speculation.[5] Because the timing of Mr. Forbes' 1998 stock

---

[5]    To the extent the government points to events of the fall of 1997 concerning Anne Pember's status at CUC, Mem. at 11, there is no evidence that they had anything to do with Mr. Forbes's 1998 stock sales, let alone that they were the precipitating factor or reason for those sales.

sales was neither unusual nor suspicious, this evidence has no probative value with respect to Mr. Forbes' knowledge or intent and should be excluded under Fed. R. Evid. 401.

The government's contention that the Court should admit evidence of Mr. Forbes' stock sales to show motive should be rejected as well. The fact that Mr. Forbes was compensated in part with stock options and sold stock during his tenure at CUC and Cendant, like numerous other individuals, proves nothing about whether he engaged in a fraud. Thus, for example, the fact that Cendant CEO Henry Silverman sold $60 million in Cendant stock in early 1998, or that Mr. Buckman sold almost $11 million in Cendant stock in early 1998, proves nothing about whether Mr. Silverman or Mr. Buckman was a participant in the fraud. As the Second Circuit has observed, "[i]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated." Acito, 47 F.3d at 54 (collecting cases). The fact that an executive receives incentive-based compensation such as stock options is not probative of motive to commit a fraud -- otherwise, a significant percentage of corporate America would be so motivated.

The cases cited by the government do not support its contention that evidence of Mr. Forbes' stock sales is probative of a purported motive to commit fraud. United States v. Guterma, 281 F.2d 742 (2d Cir. 1960) (Mem. at 9 n.5), involved evidence of the undisclosed acquisition of numerous shares, see id. at 746, not routine stock sales that were well documented and publicly disclosed. United States v. LaFlam, 369 F.3d 153 (2d Cir. 2004) (Mem. at 9), involved evidence of uncharged drug use and drug debts, not stock sales. United States v. Gonzalez, 110

6

F.3d 936 (2d Cir. 1997) (Mem. at 9), involved evidence of a failed burglary and does not support the claimed relevance of the evidence the government seeks to offer. The government's reliance on United States v. Gutierrez, 181 F. Supp. 2d 350 (S.D.N.Y. 2002) (Mem. at 13), is equally misplaced. Gutierrez was an insider trading case in which the government presented evidence that family members of the defendant traded on inside information in an effort to show that the defendant's entire family had received such information. Id. at 353-54. The evidence was not admitted to show motive.

Evidence of Mr. Forbes' stock sales also should be excluded under Fed. R. Evid. 403 because it places undue emphasis on Mr. Forbes' wealth, see United States v. Stahl, 616 F.2d 30, 32 (2d Cir. 1980), and because its prejudicial effect substantially outweighs its nonexistent probative value. This case is very different from United States v. Quattrone, 441 F.3d 153 (2d Cir. 2006) (Opp. at 13), where the government was careful to inform the jury that evidence of compensation "was to be used for the limited purpose of establishing a motive to obstruct." Id. at 187. Here, as in Stahl, the government seeks to "appeal to the potential bias of not-so-wealthy jurors" by emphasizing the defendant's wealth and "equat[ing] wealth with wrongdoing." 616 F.2d at 31.[6]

---

[6]    While the government observes that a limiting instruction could be given concerning the issue of wealth, Mem. at 13, the Stahl jury was given an instruction "against drawing adverse inferences from the defendant's wealth or social status." 616 F.2d at 32. The Second Circuit nevertheless concluded that the government's emphasis on the defendant's wealth and its appeals to class prejudice required a new trial. Id. at 33.

The government has consistently emphasized Mr. Forbes' wealth and income in both its arguments to the jury and during Mr. Forbes' cross-examination. It has consistently, and improperly, contrasted Mr. Forbes' financial success with the losses suffered by Cendant shareholders on and after April 15, 1998 in an effort to arouse juror anger and class prejudice. See, e.g., Tr. (11/15/05) at 3001 (Q. "Now, during the time that these accounting irregularities, Mr. Forbes, that caused shareholders to lose billions of dollars were going on, you would agree that you made millions of dollars at CUC, right?"); Tr. (11/29/05) at 3092 ("The defendant said that he felt very badly for the shareholders after Cendant's stock price collapsed and he was shocked to learn of the fraud. That's what the defendant said. What does the evidence show? The evidence shows that the defendant took another $47 million in severance from the company and then he walked away.");[7] see generally Forbes Third Trial Motion In Limine Nos. 11 & 14 (Docket Nos. 2266, 2272 (filed 4/17/06).

The government also has made great efforts to appeal to class prejudice and has attempted to equate Mr. Forbes' wealth with wrongdoing. E.g., Tr. (10/17/05) at 31-32 ("The United States will prove that while the defendant directed this quarter billion dollar fraud, the defendant lined his own pockets with tens of millions of dollars with salary, stock and stock options."); Tr. (11/29/05) at 3091 ("the undisputed evidence shows that while this massive fraud was perpetrated by CUC employees, the defendant made more than $100 million. That

---

[7]    This argument was stricken by Judge Thompson. See id.

$100 million dwarfs what Cosmo Corigliano made, dwarfs what Anne Pember made, dwarfs what Kevin Kearney made.  Ladies and gentlemen, that the defendant made $100 million during this massive fraud is also beyond dispute.  So in sum, there's no question that CUC employees committed a massive fraud, that the defendant was the man in charge of the company while this massive fraud was going on, and that the defendant made $100 million during this massive fraud.").

It is evident from the government's brief that the government once again seeks to improperly equate wealth with wrongdoing in Mr. Forbes' third trial. See Mem. at 9-10 ("evidence that Forbes garnered tens of millions of dollars from the sale of fraudulently inflated CUC and Cendant stock makes it more likely that he knew about and intended to facilitate the charged fraudulent scheme than if he had not made a single red cent from selling CUC and Cendant stock during the conspiracy period.").  Because evidence of Mr. Forbes' stock sales has no probative value in this case, and the government seeks to improperly use this evidence to arouse juror anger and resentment against Mr. Forbes. the Court should exclude this evidence under Fed. R. Evid. 401 and 403.

## II.    THE DEFENSE DOES NOT OBJECT TO TESTIMONY CONCERNING STATEMENTS PURPORTEDLY MADE BY MR. FORBES DURING AN INVESTMENT CONFERENCE IN JANUARY 1998.

Assuming the issue of materiality is not removed from the case, see Forbes Third Trial Motion in Limine No. 11 (Docket No. 2266), Mr. Forbes does not object to the testimony of Mr. Rowan concerning statements that Mr. Forbes purportedly made during an investment conference in January 1998, or the testimony that Mr. Rowan relied upon those statements in purchasing Cendant

9

stock on behalf of Hartford Steam Boiler shortly thereafter. Mr. Forbes

acknowledges that such evidence (while insufficient) is relevant to the issue of

materiality in the securities fraud count alleged against Mr. Forbes. Indictment,

Count 4.

Mr. Forbes <u>does</u> <u>dispute</u> the government's assertion that this evidence

is also relevant to Mr. Forbes' knowledge of the fraud, however, and objects to any

such argument being made to the jury.

The fact that Mr. Forbes gave a presentation to Mr. Rowan about the

synergies between CUC and HFS and the ways in which the two companies would

work together, <u>see</u> Tr. (8/17/2004) at 10,253-24, proves nothing about Mr. Forbes'

"knowledge and intent," by helping to prove that "Forbes knew those [financial]

statements were false." Mem. at 15-16. Nor does it do anything to "rebut the

frequent defense trial theme that, as a non-accountant, Forbes did not have the

expertise to personally manage or even understand all the accounting

manipulations involved in the conspiracy." <u>Id.</u> Certainly a corporate executive can

speak about his company's strategy, objectives and key financial parameters

without being involved in a fraud.[8] Henry Silverman, Chris McLeod, Tony

Menchaca, Laura Hamilton, and numerous other executives at CUC and Cendant

who the government concedes had no knowledge of the fraud gave presentations

concerning the businesses of CUC and/or HFS, but the government does not contend

---

[8]    Mr. Forbes objects to testimony concerning financial parameters that are not
part of the fraud alleged in the indictment, however, such as membership numbers
and renewal rates. <u>See</u> Forbes Third Trial Motion <u>In</u> <u>Limine</u> No. 3 (Docket 2253).
If such testimony is allowed over Mr. Forbes' objection, at a minimum a limiting
instruction should be given. <u>Id.</u>

that their general knowledge of the business is evidence that they engaged in criminal wrongdoing. The fact that Mr. Forbes could discuss CUC's and HFS's general business strategy and synergies simply is not probative of whether Mr. Forbes knowingly and willfully engaged in a fraud with respect to CUC's or Cendant's reported earnings.[9]

## III.    THE COURT SHOULD PRECLUDE THE GOVERNMENT FROM PRESENTING ANY PRIOR TESTIMONY BY MR. FORBES AT THE THIRD TRIAL.

### A.    Mr. Forbes' Testimony Was Coerced by the False Testimony of the Government's Witnesses and Is Inadmissible.[10]

When a defendant's testimony from a prior trial was induced by the admission of unlawful evidence in the government's case, it may not be introduced in a subsequent trial. See Harrison v. United States, 392 U.S. 219, 225 (1968). In Harrison, the Supreme Court held that a defendant's testimony from a prior trial was inadmissible in his retrial because the testimony had been provoked by the improper admission of the defendant's unlawfully obtained confessions. Id. at 226; see also United States v. Pelullo, 173 F.3d 131, 134-35 (3d Cir. 1999) (government was required to establish that defendant's testimony at prior trial was not impelled by Brady violation in order to introduce testimony at retrial).

---

[9]    Mr. Forbes has additional objections to the testimony of Mr. Rowan, set forth in Forbes Third Trial Motion in Limine No. 15 (Docket 2247).

[10]    The government's contention that Mr. Forbes "did not dispute the relevance of the excerpts from the first trial transcript" cited by the government, with one exception, Mem. at 18 n.8. is erroneous. Mr. Forbes objected to the admission of any of his prior testimony in the government's case-in-chief and filed two memoranda in opposition to the government's 2005 motion in limine on this subject. See Docket Nos. 1653, 1853.

Here, Mr. Forbes was forced to testify at the 2004 and 2005 trials in response to unlawful evidence presented by the government in its case-in-chief. For example, in 2005, the government was (erroneously) permitted to offer Mr. Forbes' prior testimony on the subject of asset transfers in its case-in-chief. In addition, the government presented false testimony from both Cosmo Corigliano and Kevin Kearney in both 2004 and 2005 in an effort to implicate Mr. Forbes in the fraud.[11] Like the unlawful confession in Harrison, the presentation of false testimony by the government is a matter of constitutional dimension. See, e.g., Napue v. Illinois, 360 U.S. 264, 269 (1959); United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991). The government's case against Mr. Forbes was almost entirely based on Mr. Corigliano's testimony, as purportedly corroborated by Mr. Kearney. Had Mr. Corigliano and Mr. Kearney not testified falsely in an effort to implicate Mr. Forbes, Mr. Forbes would not have testified. Because Mr. Forbes' 2004 and 2005 trial testimony was induced by the government's presentation of false and improper evidence, in violation of the Due Process Clause, the Court should not permit the government to introduce any of Mr. Forbes' trial testimony at the retrial.

**B.    The Government Cannot Present Mr. Forbes' Prior Testimony in Its Case-in-Chief for the Purpose of Impeaching that Testimony.**

In the event the Court does not exclude all of Mr. Forbes' prior testimony for the foregoing reasons, the Court should preclude the government from presenting any of Mr. Forbes' prior testimony in the government's case-in-chief for

---

[11]    See Forbes Third Trial Motion In Limine Nos. 1 & 6 (Docket Nos. 2190, 2274), filed 3/31/06 and 4/17/06, respectively.

the purpose of attempting to impeach that testimony.[12]  Mr. Forbes has an absolute right not to testify.  See Brooks v. Tennessee, 406 U.S. 605, 609 (1972).  While a defendant's choice to testify "carries with it serious risks of impeachment and cross-examination," id., if a defendant does not testify in a criminal case, the government is not permitted to present evidence offered solely for impeachment.  "[A]s a general matter of relevance, a person who does not testify at trial and who is not the source of statements admitted for their truth is not subject to impeachment."  United States v. Finley, 708 F. Supp. 906, 909 (N.D. Ill. 1989); see also United States v. Kabbaby, 672 F.2d 857, 863-84 (11th Cir. 1982).

The government is free to cross-examine Mr. Forbes about his prior testimony, and present any allegedly inconsistent prior testimony by Mr. Forbes, on cross-examination in the event Mr. Forbes testifies.  The government would violate Mr. Forbes' Fifth Amendment rights, however, if it offered testimony by Mr. Forbes in its case-in-chief for the purpose of attempting to impeach Mr. Forbes' credibility.  The Court should not permit the government to offer portions of Mr. Forbes' 2004 or 2005 testimony for the purpose of impeaching Mr. Forbes' credibility.

### C. Mr. Forbes' Testimony Concerning Asset Transfers Is Irrelevant and Should Be Excluded.

If the Court permits the government to introduce portions of Mr. Forbes' 2004 and 2005 trial testimony into evidence (over Mr. Forbes' objection), the

---

[12]     It appears that a great deal of the testimony the government seeks to present in its case-in-chief is testimony the government seeks to offer for purposes of impeachment.  This includes, inter alia, Items 2, 7, and 8 on pages 16-17 of the government's memorandum and portions of Item 3 on page 17 of the government's memorandum.

Court should preclude the government from presenting any testimony (or other evidence) relating to Mr. Forbes' transfer of certain real estate to his wife and children in 1998 and 1999.  See Mem. at 17, Item 3.  Mr. Forbes incorporates herein by reference his opening and reply memoranda in support of Forbes Third Trial Motion In Limine No. 2 (Docket Nos. 2185, 2314), which address this subject.

**D.  In the Event the Court Permits Mr. Forbes' Testimony To Be Introduced, the Court Should Permit Mr. Forbes To Present Related Testimony Under Fed. R. Evid. 106.**

Finally, in the event that the Court (over Mr. Forbes' objection) permits the government to introduce portions of Mr. Forbes' 2004 or 2005 testimony at Mr. Forbes' third trial, the Court should allow Mr. Forbes to introduce under Fed. R. Evid. 106 the portions of Mr. Forbes' testimony "which ought in fairness to be considered contemporaneously with it."  Id.  Mr. Forbes will counter designate appropriate testimony in the event the Court permits the government to introduce portions of Mr. Forbes' prior testimony in the government's case-in-chief.[13]

**IV.  THE GOVERNMENT SHOULD NOT BE PERMITTED TO ARGUE THAT THE MAGNITUDE OF THE ALLEGED GAAP VIOLATIONS CONSTITUTES CIRCUMSTANTIAL EVIDENCE OF PURPORTED KNOWLEDGE.**

The government seeks to argue to the jury that the magnitude of the allegedly improper accounting at CUC and Cendant, "when viewed in combination with other evidence in the case," Mem. at 21, is circumstantial evidence of Mr. Forbes' alleged knowledge of the fraud.  The Court should not permit such an

---

[13]    Mr. Forbes' counter-designations to the testimony previously identified by the government were made over objection and are set forth at page 12 of Docket No. 1653 and discussed in Docket No. 1853.  To the extent Mr. Forbes previously counter-designated testimony on the subject of asset transfers, he did so over objection.  See Docket No. 1653 at 12 n.8.

argument for several reasons.

First, the only case cited by the government in support of the claimed propriety of this argument is a <u>civil</u> case in which the plaintiffs asserted that the magnitude of the improper accounting "suggest[ed] that the Defendants knew <u>or were severely reckless in not knowing</u> about the GAAP violations." <u>In re AFC Enterprises, Inc. Sec. Litig.</u>, 348 F. Supp. 2d 1363, 1372 (N.D. Ga. 2004) (Mem. at 21) (emphasis added). The standard for proving knowledge in this criminal case is much different than the civil standard for liability. The government has the burden of proving <u>actual knowledge</u> of the fraud by Mr. Forbes, not recklessness. The government has not cited any case holding that the magnitude of the alleged fraud may be offered as evidence of the defendant's purported knowledge in a criminal case.

Second, there is nothing about the magnitude of the alleged GAAP violations that could establish that Mr. Forbes had purported knowledge of the fraud. CUC's and Cendant's reported revenue, expenses, and earnings were publicly disclosed in SEC filings and audited by Big 5 accounting firms. There was nothing about the amount of revenue, expenses, or earnings reported by either CUC or Cendant that would have placed anyone on notice of a "red flag." Indeed, Steven Kernkraut, a government witness and former Bear Stearns analyst who followed CUC and Cendant for years and was a self-proclaimed expert on CUC, testified that there was nothing about the financial information reported by CUC, or the increases in CUC's reported earnings over the years, that gave any indication of financial wrongdoing by the company. Tr. (10/18/05) at 243-48; <u>see also</u> Tr.

(6/16/04) at 4784-86 (testimony by government cooperator and alleged co-conspirator Casper Sabatino about the successful concealment of the fraud and the absence of red flags in CUC's SEC filings).

Third, the evidence at the 2004 and 2005 trials established beyond any doubt that the fraud was extremely well hidden by those involved in it, and that trained auditors at E&Y were unable to detect it for years, despite annual audits of CUC's financial records. E.g., Tr. (6/16/04) at 4714-16, 4786-87. The evidence also is undisputed that sophisticated businessmen and/or CPAs such as Cendant CEO Henry Silverman, Cendant CFO Michael Monaco, Cendant Chief Accountant Scott Forbes, CUC executive and Board member Chris McLeod, and CUC executive Tony Menchaca knew nothing about the fraud, despite the magnitude of it. E.g., Tr. (6/16/04) at 4723, 4787-93. It is further undisputed that the fraud was never detected by anyone, but came to light only after Casper Sabatino and Steve Speaks came forward and disclosed it in April 1998. Tr. (6/16/04) at 4792-93, 4794-98; Tr. (6/17/04) at 5139-40. The defense also established at the 2004 trial that the amount of revenue and expenses adjusted at CUC was a very small percentage of CUC's overall revenue and expenses. E.g., Tr. (6/17/04) at 5105-12. Given the record of this case, and the undisputed fact that the fraud was extremely well hidden and successfully concealed from those not involved in it, the government should not be permitted to assert that the amount of the alleged fraud somehow establishes that Mr. Forbes purportedly had knowledge of it.

Fourth, the government's contention that the magnitude of the fraud would supposedly motivate Mr. Corigliano to seek approval of the fraud from his

16

corporate superiors, Opp. at 22, is inconsistent with the government's theory of the case and would constitute a constructive amendment of the indictment. The theory the government has presented to the jury in two trials is not that Mr. Corigliano engaged in fraud, saw that the fraud was becoming large, and then sought approval for it from his superiors, but that Mr. Forbes purportedly directed Mr. Corigliano at every step in the fraud once Mr. Corigliano was elevated to CFO. The government claims that Mr. Forbes purportedly initiated discussion with Mr. Corigliano concerning the fraud shortly after Mr. Corigliano learned that he would become the CFO of CUC, see Tr. (10/31/05) at 1306-08,[14] that Mr. Forbes purportedly directed the fraud, and that Mr. Forbes and Mr. Corigliano purportedly discussed the fraud as a routine matter on a quarterly basis.[15] Thus, there is no support for the government's current theory that the magnitude of the fraud gave Mr. Corigliano a motive to ensure that Mr. Forbes approved of it. The government should not be permitted to make this argument to the jury unless it is prepared to acknowledge that Mr. Corigliano's testimony at two prior trials about Mr. Forbes' purported direction of the fraud was false.

The government's current theory also is at odds with the indictment, which unequivocally alleges that Mr. Forbes directed the alleged fraud and directed the improper accounting that constituted the alleged fraud. See, e.g., Indictment,

---

[14]    Mr. Forbes does not credit this testimony, or any other testimony by Mr. Corigliano concerning Mr. Forbes' purported involvement in the fraud. Mr. Forbes simply points out that the government's current theory in support of the claimed relevance of this evidence is at odds with testimony it has presented to two juries.

[15]    The government withdrew its initial request for a conscious avoidance instruction at the 2005 trial and has represented that it will not seek such an instruction at Mr. Forbes' third trial. See Tr. (3/23/06) at 15.

Count 1, ¶ 24 ("If the consolidated quarterly earnings failed to meet the earnings target, defendant FORBES <u>directed</u> other conspirators to increase the earnings figure so that it met or exceeded that target" (emphasis added)); <u>id.</u> ¶ 27 ("defendant WALTER A. FORBES <u>directed</u> other conspirators to increase the consolidated earnings figures for th[e] quarter and the fiscal year by the amounts necessary to meet or exceed their respective earnings targets for that quarter and fiscal year" (emphasis added)).

The same is true of the government's only other argument in support of the claimed relevance of this evidence to Mr. Forbes' purported knowledge -- that "the larger number of conspirators required to execute a large-scale fraud provided a greater incentive for Corigliano to ensure that his corporate superiors approved the unlawful conduct." Mem. at 22. This theory also would constructively amend the indictment, which alleges that Mr. Forbes directed the fraud, not that Mr. Corigliano made Mr. Forbes aware of it. Similarly, this theory rests on the assumption that Mr. Corigliano's testimony that Mr. Forbes purportedly initiated discussion with Mr. Corigliano concerning the fraud in late 1994, and that Mr. Forbes purportedly directed Mr. Corigliano in the commission of the fraud, is false. Finally, it rests on the erroneous assumption that the commission of the fraud at CUC required the involvement of a large number of people. To the contrary, the evidence presented at two trials was that a small number of people in the CUC corporate accounting department and the CUC division accounting department committed the fraud, <u>e.g.</u>, Tr. (6/17/04) at 4960-61, and that the overwhelming majority of CUC accountants, employees, and executives had no knowledge of it.

18

E.g., Tr. (6/16/04) at 4718-22, 4787-89.

In sum, the government's claim that the magnitude of the alleged fraud somehow establishes purported knowledge on the part of Mr. Forbes lacks any evidentiary foundation and would constructively amend the indictment. The Court should preclude the government from making any argument that the magnitude of the improper accounting at CUC is evidence that Mr. Forbes had purported knowledge of the fraud.[16]

## V.    THE GOVERNMENT'S MOTION TO PRECLUDE MR. CORIGLIANO'S INCREDIBLE TESTIMONY THAT WHEN HE SOLD $23 MILLION OF CENDANT STOCK, HE BLOCKED OUT HIS KNOWLEDGE OF THE FRAUD, MUST BE REJECTED.

The government concedes that Mr. Forbes has a right to cross-examine Mr. Corigliano concerning his past criminal conduct, and in particular the crimes with which the government could have charged him, but agreed not to do so. Mem. at 28. The government nonetheless seeks to prevent the defense from asking Mr. Corigliano whether he engaged in insider trading, arguing that this line of inquiry impermissibly crosses into lay "opinion" testimony regarding the legal requirements for insider trading, and is unnecessary for showing Mr. Corigliano's bias. Id. at 23-31. The government's argument fails for at least three reasons.

First, it is based on the mistaken premise that the defense previously challenged Mr. Corigliano's understanding of what constituted insider trading; in

---

[16]    To the extent the government presents evidence concerning the magnitude of the improper accounting (including any Heckler testimony introduced over Mr. Forbes' objection, see Forbes Third Trial Motion In Limine No. 5, Docket No. 2261), the Court should give a limiting instruction to the jury that makes clear that the only relevance of this evidence is to the materiality of the allegedly false statements in CUC's and Cendant's financial disclosures.

fact, the defense did not challenge Mr. Corigliano's understanding of the law, but Mr. Corigliano's incredible testimony that, <u>as a factual matter</u>, while he sold millions of dollars of stock during the very period of time he was orchestrating a massive fraud within CUC's accounting department, he never "put the two points together." <u>See</u>, <u>e.g.</u>, Tr. (7/15/2004) at 7588.

Judge Thompson's finding that this contention was "unpersuasive" in light of the cross-examination cited by the government in the first trial (Tr. (7/27/2004) at 8937-38 & 8944-46) is clearly in error. <u>The testimony cited by the government was cross-examination conducted by counsel for Mr. Shelton, Thomas Puccio, not counsel for Mr. Forbes.</u>

<u>Second</u>, in focusing solely on what might be necessary to establish bias, the government ignores the fact that this testimony arose in the context of cross-examining Mr. Corigliano concerning his past lies – specifically his lies to the government in January 1999 when he denied all wrongdoing. Tr. (7/15/2004) at 7597-98. Particularly where, as here, the government's case relies heavily on the testimony of one witness, it is "especially important that the defense have a fair opportunity to cross examine and to impeach [the witness's] testimony." <u>St. Germain v. United States</u>, No. 03CV8006(CM), S1 99CR339(CM), 2004 WL 1171403 (S.D.N.Y. May 11, 2004) (granting a new trial on the grounds that the government withheld material impeachment material concerning its key witness). The government's motion should be denied.

<u>Third</u>, Mr. Forbes should be entitled to cross-examine Mr. Corigliano concerning his understanding of the company's policies concerning insider trading

<u>because Mr. Corigliano was identified as one of four persons at CUC to whom</u>

<u>employees could go with questions regarding the insider trading policy</u>.  Such

testimony was permitted during the first trial during the cross-examination

conducted by Mr. Puccio, but was not addressed by the Court's ruling on the

Government's Motion <u>in</u> <u>Limine</u> in the second trial.

> **A.**   **The Defense Did Not (and Does Not) Seek to Challenge Cosmo Corigliano's Understanding of the Law of Insider Trading.**

The government claims that the defense called Mr. Corigliano a liar in

the first trial because Mr. Corigliano testified that one who possesses material,

inside information, but does not "use" that information when he trades stock, is not

guilty of insider trading.  Mem. at 28-29.  The government's claim fundamentally

mischaracterizes Mr. Forbes' cross-examination.  Not once did Mr. Forbes question

Mr. Corigliano about his understanding of the legal requirements of insider trading.

Rather, Mr. Forbes questioned Mr. Corigliano concerning the <u>factual</u> assertion that

he did not use his knowledge of the fraud when trading stock:

> Q.  Well, when you sold the stock, you certainly had in mind that the stock was inflated because of all the financial misconduct that you had engaged in in all the years prior to January 1999; am I not correct?
>
> A.  I had that information but I never connected that with me selling stock.  Me selling stock was a personal individual decision.  I never put the two points together.
>
> Q.  In other words, you sold stock, as you described yesterday, in March of 1998, I think for almost $23 million, and you never put together the fact that the stock was inflated based upon your misconduct over many years?
>
> A.  I never put those two points together, which is why around that same time frame, I took my $200,000 bonus, my $300,000 salary, I didn't take the cash, I converted that into more stock options.  I thought I was just taking some off the table and leaving just as much, if not more, still on the

21

table in Cendant stock.

* * * * * * *

Q.  You didn't focus on the fact when you sold the stock, that the price had been inflated by your own misconduct; is that your statement?

A.  I didn't put those two facts together.  I sold the stock.

Q.  In other words, when you sold the stock, you had a clear mind that somehow you had blocked out all of the prior years of financial misconduct. You simply sold the stock thinking it was an honest transaction and that you were not using insider information to benefit; is that your testimony?

A.  I sold the stock as a personal decision between my wife and I.  What I did at CUC was my job and I'd never put those two things together.

Tr. (7/15/2004) at 7589-90.  Cf. id. at 7594-98 (questioning Corigliano's claim that he blocked out his insider information when he traded shares).

Mr. Forbes then argued in closing that this testimony by Mr. Corigliano was too incredible to believe – particularly in light of Mr. Corigliano's testimony that two days before one of his largest stock sales he had been "shocked," "scared," and unable to "process information" because Mr. Silverman had suggested they might need to go to the SEC.  Tr. (10/20/2004) at 15,177.  Thus, Mr. Forbes argued, Mr. Corigliano was in fact guilty of insider trading – and lying in denying it – not because Mr. Corigliano's stated understanding of the law was wrong, but because he could not be believed when he testified that, as a factual matter, he had not used the information pertaining to the fraud he was orchestrating when he traded $23 million in shares.

Moreover, exploration of Mr. Corigliano's purported failure to "put those two things together" is critical in light of the government's stipulation in Mr. Corigliano's plea agreement that Mr. Corigliano did not engage in the fraud in order

to enrich himself personally.  <u>See</u> Ex. 2 of Exhibits in Support of Motions Filed by Walter Forbes on March 31, 2006 (Docket No. 2187) at Schedule A, ¶ 12.  In light of this stipulation, Mr. Forbes has the right to explore the facts surrounding Mr. Corigliano's sales, and to then argue to the jury that the government's stipulation was yet another benefit to the government given the weighty evidence indicating that Mr. Corigliano did indeed commit the fraud in order to enrich himself personally.

### B. Mr. Corigliano's Testimony Regarding Insider Trading Went Not Only to Bias, But Also to Mr. Corigliano's Credibility In Denying the Facts Underlying His Insider Trading to the Government in January 1999.

The government acknowledges that Mr. Forbes has a right to establish Mr. Corigliano's bias by cross-examining him concerning criminal conduct that went uncharged by the government.  The government argues that Mr. Forbes need not question Mr. Corigliano about whether he committed insider trading, however, because he can establish bias in favor of the government "through testimony that Corigliano sold a large volume of Cendant stock while possessing material inside information which had drastically inflated the price of that stock, coupled with the fact that Corigliano was never charged with illegal insider trading."  Mem. at 28.  The government's argument ignores the second, equally important aim of Mr. Forbes' cross-examination in this area:  to establish that Mr. Corigliano lied when he denied the facts underlying his insider trading to the government in January 1999.

23

The issue of insider trading first arose during Mr. Forbes' cross-examination concerning Mr. Corigliano's lies to the government in January 1999. See Tr. (7/15/2004) at 7587-7598. Mr. Corigliano admitted during this cross-examination that he had denied all knowledge of financial wrongdoing when he met with the government in January 1999. Id. at 7587. It was in this context that Mr. Forbes then asked Mr. Corigliano if his denial of wrongdoing included a claim that his profits from the sale of stock were legitimate. Id. It was this question that lead to the testimony concerning Mr. Corigliano's use of insider information, in particular his testimony that when he sold $23 million worth of stock, he never connected those sales to the knowledge he had of the fraud he was carrying out at CUC. Tr. (7/15/2004) at 7587-98. If the jury rejected Mr. Corigliano's incredible claim that he did "not put the two points together," it would have to conclude that Mr. Corigliano lied twice – first to the government in January 1999, and second to the jury itself. Such powerful impeachment evidence goes well beyond bias, and cannot be shown through the more limited cross-examination suggested by the government. For this second and independent reason, the government's motion should be denied.

### C.    Mr. Forbes Should Be Able to Question Mr. Corigliano Concerning the Company's Policy Against Insider Trading.

CUC had a policy governing insider trading which was circulated to the employees at CUC. See, e.g., Ex. 5. Mr. Corigliano was identified in that memorandum as one of four persons at CUC to whom employees could go with any

questions that they may have concerning the Company's policy.  Id..[17]  Mr. Forbes

should be able to cross-examine Mr. Corigliano concerning this policy, and the fact

that he violated it, both because it demonstrates his character for untruthfulness

and because it underscores the absurdity of Mr. Corigliano's claim that he did not

focus on the fact that his fraudulent acts had inflated the price of the stock when he

sold his stock for millions of dollars in 1998.  See, e.g., Tr. (7/27/04) at 8943-45 &

8947-48 (Corigliano admits that he violated the policy upon questioning by Mr.

Puccio, counsel for Kirk Shelton).

## VI.    THE GOVERNMENT'S REQUEST THAT BATES NUMBERS AND LEGENDS BE REDACTED FROM DOCUMENTS TO BE INTRODUCED OR DISPLAYED AT TRIAL WOULD BE UNDULY BURDENSOME.

During the first and second trials, the Court gave a limiting

instruction advising the jurors that they were to draw no inference from the fact

that some of the documents had been stamped "confidential" or had identification

numbers/and or letters on them from civil litigation.  The government did not object

to this instruction during either trial.  Nor does the government provide any reason

in its Opposition for replacing this instruction with the burdensome process of

redacting such identifying information from virtually ever page of the exhibits

entered into evidence during the third trial.

Almost all the exhibits in this case were bates stamped for production

by the producing parties.  In addition, many of the exhibits have additional legends

from the civil litigation as a result of the protective order entered in that case.  Mr.

---

[17]    The other three persons were Walter Forbes, Kirk Shelton and Amy Lipton (the general counsel).

Forbes does not object to the redaction of these markings on a limited basis should the government have a reasonable concern about the labeling of a particular document.  However, approximately four boxes worth of exhibits were introduced during the second trial, and a similar number of exhibits is expected to be introduced in the third trial.  It would be unduly burdensome to redact the bates stamps and other labeling information from every page of those exhibits.

In addition, for some of the exhibits, the bates stamp page is the only means of directing a witness to a particular page in lengthy exhibits.  Absent the bates stamp, examinations would be significantly interrupted and lengthened just to ensure that counsel and witness are on the same page.  Similarly, sometimes notes or prior testimony reference the bates numbers of particular documents rather than, or in addition to, the exhibit number.  The use of such documents to either impeach a witness, or refresh the witness's recollection, will be much more laborious and time consuming if the bates numbers have been redacted from the version used in Court.  Accordingly, Mr. Forbes respectfully requests that the Court deny the government's request that all bates numbers and legends on documents to be introduced or displayed at trial be redacted.

## CONCLUSION

For the foregoing reasons, the government's motion in limine should be denied.

26

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: _____
     Brendan V. Sullivan, Jr. (Bar No. ct17115)
     Barry S. Simon  (Bar No. ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

        - and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
Cowdery, Ecker & Murphy, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

May 1, 2006

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Memorandum of Walter A. Forbes in Opposition to United States' Pretrial Motion In Limine (Government Third Trial Motion No. 1) to be filed electronically and to be served on May 1, 2006 to the following via e-mail:

Norman Gross, Esq. (norman.gross@usdoj.gov)
Michael Martinez, Esq. (michael.martinez2@usdoj.gov)
Craig Carpenito, Esq. (craig.carpenito@usdoj.gov)

Barry S. Simon