UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


UNITED STATES OF AMERICA    :   No. 3:02CR00264 (AHN)
                            :
                            :
            v.              :   May 11, 2006
                            :
                            :
                            :
WALTER A. FORBES            :



GOVERNMENT'S AMENDED OPPOSITION TO DEFENDANT WALTER A. FORBES'
MOTION TO COMPEL DISCOVERY AND PRODUCTION OF BRADY/GIGLIO
MATERIAL

(Amended Opposition to Forbes Third Trial Motion No. 2)



CHRISTOPHER J. CHRISTIE
NORMAN GROSS
MICHAEL MARTINEZ
Special Attorneys
U. S. Department of Justice
970 Broad Street
Room 700
Newark, N.J.  07102
(973) 645-2701

TABLE OF CONTENTS

**Page**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

I.   THE GOVERNMENT'S FULFILLMENT OF ITS DISCLOSURE
     OBLIGATIONS . . . . . . . . . . . . . . . . . . . . 6

II.  DOCUMENTS AND INFORMATION RELATING TO COSMO CORIGLIANO . 13

     A.   Communications Between Corigliano and/or his
          Counsel and the SEC . . . . . . . . . . . . . 13

          1.   Background . . . . . . . . . . . . . . . 13

          2.   SEC Requests for Financial Disclosure . . . . 17

               a.   SEC Financial Disclosure Form . . . . . . 17

               b.   SEC Requests for Tax Returns . . . . . . 20

          3.   Information Supplied to the SEC by Corigliano
               And His Counsel . . . . . . . . . . . . . 21

               a.   Asset Value Information . . . . . . . . 21

               b.   Quarterly Financial Reports . . . . . . 22

          4.   Settlement Negotiations with the SEC . . . . . 23

          5.   Budget Negotiations with the SEC . . . . . . 25

          6.   Supposed Unwritten Agreements . . . . . . . 26

     B.   Documents and Information Relating to Corigliano's
          Trial Testimony . . . . . . . . . . . . . . . 28

     C.   Documents and Information Relating to Corigliano's
          Polygraph Examinations . . . . . . . . . . . . 29

     D.   Information Concerning Proffers by Corigliano's
          Counsel to the Government . . . . . . . . . . . 31

III. DOCUMENTS AND INFORMATION RELATING TO KEVIN KEARNEY . . 32

IV.  ADDITIONAL DOCUMENTS AND INFORMATION . . . . . . . . . . .  35

     A.  Documents and Information Relating to
         Michael Monaco . . . . . . . . . . . . . . . . .  35

     B.  Documents and Information Relating to
         Steven Kernkraut . . . . . . . . . . . . . . . .  35

     C.  Documents and Information Relating to
         Stuart Bell and Kirk Shelton . . . . . . . . . .  36

     D.  Information Relating to Casper Sabatino . . . . .  38

     E.  Statements by Government Witnesses . . . . . . .  38

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . .  40

## INTRODUCTION

The Government files this Amended Opposition to Forbes' Third Trial Motion No. 4, in compliance with the Court's order denying the Government's Motion to Exceed the Page Limit regarding its original opposition to this motion.

Seeking to take improper advantage of the transfer of this case from the Judge Thompson to this Court, Forbes raises in a lengthy submission a panoply of discovery demands that Judge Thompson previously rejected.  By way of background, the charges in this case involve a massive fraud at a company called CUC International and its corporate successor, Cendant, between the late 1980's and April 1998, when the fraud was first publicly disclosed.  Defendant Walter Forbes was the Chief Executive Officer and Chairman of the Board of Directors of CUC during most of that period.  The fraud was disclosed to the investing public in April 1998 after CUC merged with a New Jersey based company, HFS, to form Cendant.  On the day following disclosure of the fraud, the price of Cendant's stock dropped over 40% and Cendant shareholders lost $14 billion in the value of their shares.  In re Cendant Corp. Litigation, 264 F.3d 201, 222 (3d Cir. 2001).

In 1998, the Securities and Exchange Commission ("SEC") began investigating the involvement of Cosmo Corigliano, the former chief financial officer of CUC, in the accounting fraud.  Transcript of the first (2004) trial ("FTTr.") 7683-85.  Corigliano subsequently pleaded guilty to federal criminal charges pursuant to a guilty plea agreement dated January 2000

for his role in the fraud at CUC, and has been a prosecution witness in this case.  Exhibit 2 to Forbes' Third Retrial Motion No. 2 ("Forbes' Motion").  The SEC instituted a civil proceeding against Corigliano that was separate from the criminal case.  FTTr. 7970.  In his plea agreement with the U.S. Attorney's Office for the District of New Jersey ("USAODNJ"), Corigliano promised to use his best efforts to settle the SEC charges, and also to provide complete and accurate information to the SEC.  Exhibit 2 to Forbes' Motion.  In 2004, Corigliano settled the SEC charges by disgorging property worth approximately $14 million.  FTTr. 7504; Exhibit 13 to Forbes' Motion.

Many of the demands in Forbes' present discovery motion pertain to correspondence between Corigliano's lawyers and SEC officials regarding the SEC proceedings against Corigliano.  Forbes' Mem. in Support of Forbes' Third Retrial Motion No. 2 ("FM") 6-23.  Forbes sought these same documents from Corigliano's lawyers in a motion that Forbes filed before Judge Thompson during the second trial.  Docket 1942.

Corigliano's lawyers filed a responsive brief, Forbes filed a reply brief, and Judge Thompson postponed the second trial for an entire day to entertain oral argument on the motion and resolve the issues.  Transcript of the second (2005) trial ("STTr.") 11/7/05.  Judge Thompson denied Forbes' motion for disclosure of these documents, concluding that the correspondence was not probative of any material issue at trial.  STTr. 11/7/05,

2

30.  Documents created or received by Corigliano's lawyers that
Judge Thompson ruled were inadmissible and not discoverable from
Corigliano's lawyers do not become discoverable from the
Government, particularly where those documents were never
received by members of the Government's prosecution team.

     Nowhere in his lengthy brief in support of his discovery
motion does Forbes mention that his prior demands for these
documents were rejected by Judge Thompson.  The omission is
apparently not inadvertent.  Forbes has failed to demonstrate
that he was entitled to what is in effect reconsideration of his
previously rejected discovery demands, and this Court should
reject those demands for that reason.  A reconsideration motion
will be denied unless the "moving party can point to controlling
decisions or data that the court overlooked -- matters, in other
words, that might reasonably be expected to alter the conclusion
reached by the court."  United States v. Fell, 372 F. Supp. 2d
773, 780 (D. Vt. 2005).  "[T]he function of a motion for
reconsideration is to present the court with an opportunity to
correct manifest errors of law or fact or to consider newly
discovered evidence."  LoSacco v. City of Middletown, 822 F.
Supp. 870, 876-77 (D. Conn. 1993)(internal quotation marks
omitted), aff'd, 33 F.3d 50 (2d Cir. 1994).

     Forbes has not even attempted to meet his heavy burden for
obtaining reconsideration of his previously rejected discovery
demands.  Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir.

3

1995)(party seeking reconsideration must meet a "strict burden");
accord United States v. Ocasio, 2005 WL 1489462, *2 (D. Conn.,
June 20, 2005).  Reconsideration motions do not provide a
litigant with a second bite at the apple.  See Sequa Corp. v. GBJ
Corp., 156 F.3d 136, 144 (2d Cir. 1998).[1]  As Forbes has failed
to sustain his "strict burden," but has merely recycled his
previous arguments, his discovery motion can be summarily
rejected.

     In addition, Judge Thompson's denial of Forbes' prior
demands for these documents and related information have become
the law of the case and Forbes has presented no compelling reason
for this Court to revisit any of those rulings.  "The court's
exercise of its power to reconsider and modify its prior
interlocutory rulings is informed by the . . . law-of-the-case
doctrine.  That principle is that when a court has ruled on an
issue, that decision should generally be adhered to by that court
in subsequent stages in the same case."  United States v. Uccio,
940 F.2d 753, 758 (2d Cir. 1991); see United States v. Crowley,
318 F.3d 401, 420 (2d Cir. 2003); United States v. Quintieri, 306
F.3d 1217, 1225 (2d Cir. 2002); United States v. Tenzer, 213 F.3d

---

[1]  "[A] motion for reconsideration may not be used to plug
gaps in an original argument or to argue in the alternative once
a decision has been made." Lopez v. Smiley, 375 F. Supp. 2d 19,
21-22 (D. Conn., June 24, 2005); Horsehead Resource Development
Co., Inc. v. B.U.S. Environmental Services, Inc., 928 F. Supp.
287, 289 (S.D.N.Y., May 21, 1996) (internal citations and
quotations omitted).

34, 39-40 (2d Cir. 2000).  "[A]bsent cogent or compelling reasons

to deviate, such as an intervening change of controlling law, the

availability of new evidence, or the need to correct a clear

error or prevent manifest injustice," a court should adhere to

its prior rulings.  Uccio, 940 F.2d at 758.

    "Under the 'law of the case' doctrine, 'courts are

understandably reluctant to reopen a ruling once made,'

especially 'when one judge or court is asked to consider the

ruling of a different judge or court.'"  Lillbask v. Connecticut

Dept. of Educ., 397 F.3d 77, 94 (2d Cir. 2005) (quoting 18B

Wright, Miller & Cooper, Federal Practice and Procedure, § 4478

(2d ed. 2002)); see Chiu v. United States, 948 F.2d 711, 717

(Fed. Cir. 1991) ("A successor judge steps into the shoes of his

or her predecessor, and is thus bound by the same rulings and

given the same freedom as the first judge."); Philadelphia

Housing Auth. v. American Radiator & Standard Sanitary Corp., 323

F. Supp. 381, 383 (E.D. Pa. 1970) ("Nor is there any apparent

reason why the rule of the law of the case should not be applied

merely because a different judge has now been assigned to this

litigation.").  For that reason as well, this motion should be

denied without consideration of the merits.

    In any event, Judge Thompson's denials of Forbes' present

discovery were a proper exercise of his discretion.  United

States v. Gel Spice Co., Inc., 773 F.2d 427, 434 (2d Cir.

1985)(applying abuse of discretion standard to defense discovery

request).

**ARGUMENT**

**I. THE GOVERNMENT'S FULFILLMENT OF ITS DISCLOSURE OBLIGATIONS.**

Forbes has learned all of the details of the Government's case during the course of two extensive trials, the first of which consumed over seven months.[2]  In his present motion for additional discovery, he continues to take the position,

---

[2]  Before the first trial, Forbes received a virtual mountain of discovery, including: (1) a 260-page report, describing the fraud in detail, which was prepared in August 1998 by counsel for the Audit Committee of Cendant's Board of Directors; (2) 120 binders of workpapers prepared by the Audit Committee's accounting firm; (3) 12 binders of memoranda of interviews of 81 Cendant, CUC and HFS employees, directors and auditors; (4) more than 3000 pages of attorney and agent notes of interviews of approximately 86 people; (5) more than 3 million documents obtained pursuant to Rule 17(c) subpoenas; (6) more than 1 million documents and approximately 200 deposition transcripts obtained from related civil cases; and (7) summaries of expert testimony, along with all corresponding drafts, workpapers and correspondence.  See Tr. of Motion Hearing, 12/17/03, 299-300 (acknowledgment of Forbes' counsel that "there are 3 million documents in the case" that the defense had received).  The Government also provided the defense in December of 2002 with a compilation which identifies all relevant false or fraudulent accounting entries and all relevant false statements.

Since the start of the first trial, Forbes has received additional discovery from the Government, including documents referenced in Forbes' discovery motion.  See, e.g. Exhibits 14 and 17 to Forbes' Motion.  Additionally, the Government recognizes that its discovery obligations are on-going.  By letter dated April 3, 2006, the Government turned over to Forbes' lawyers the notes of several interviews of Cosmo Corigliano that were prepared by a former FBI agent who previously served on the prosecution trial team.  The Government did so not because such disclosure is required by the Constitution, Fed. R. Crim. P. 16, or the discovery orders in this case.  Rather, it did so because the Government has previously represented that, in an abundance of caution, all agent notes of interviews of prosecution witnesses would be disclosed to the defense.

6

repeatedly rejected by Judge Thompson, that he is entitled to virtually every shred of information that might theoretically prove helpful to his defense.  The law is otherwise.

Although the prosecution team must disclose information that is material to the defense, it need not disclose, as Forbes would have it, everything that any government official knows about what a prosecution witnesses or his or her attorney ever said that might be relevant to this case.  "<u>Brady</u> does not . . . require the prosecution to disclose all exculpatory and impeachment material; it need disclose only material 'that, if suppressed, would deprive the defendant of a fair trial.'"  <u>United States v. Coppa</u>, 267 F.3d 132, 135 (2d Cir. 2001) (<u>quoting</u> <u>United States v. Bagley</u>, 473 U.S. 667, 675 (1985)).

Undisclosed information is not "material" simply because it might "help[] the defense" or might "affect[] the outcome of the trial." <u>United States v. Agurs</u>, 427 U.S. 97, 109-10 (1976).  <u>See</u> <u>United States v. LeRoy</u>, 687 F.2d 610, 619 (2d Cir. 1982) ("The rationale underlying <u>Brady</u> is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the Government."); <u>accord</u> <u>Pruitt v. McAdory</u>, 337 F.3d 921, 926 (7th Cir. 2003).  Rather, information possessed by the prosecution team must be disclosed under <u>Brady</u> and its progeny only if there is a "reasonable probability" that

7

the information would  "affect[] the outcome of the case," or
would "put the whole case in such a different light as to
undermine confidence in the verdict."  <u>Coppa</u>, 267 F.3d at 135
(internal quotation marks omitted).

Judge Thompson acted well within his discretion in denying
discovery demands similar to those with which Forbes is now
burdening this Court and the Government.  Given the extensive
material already at Forbes' disposal to challenge the prosecution
witnesses, and particularly to show the supposed bias of
Corigliano, Judge Thompson properly concluded that more of the
same would not be material.  <u>United States v. Zackson</u>, 6 F.3d
911, 919 (2d Cir. 1993); <u>United States v. Gaggi</u>, 811 F.2d 47, 59
(2d Cir. 1987).

Indeed, the exhibits to Forbes' motion are replete with
documents that, he claims, are relevant to impeach the
prosecution witnesses and that Forbes has already secured through
his own extensive investigation.  Having obtained from the
Government or through his own devices a virtual mountain of
impeachment information, Forbes should not be heard to demand
that even greater burdens be placed on the prosecution team to
advance his defense.  The "purpose [of <u>Brady</u>] is not to displace
the adversary system as the primary means by which truth is
uncovered, but to ensure that a miscarriage of justice does not
occur."  <u>United States v. Bagley</u>, 473 U.S. 667, 675 (1985).
<u>Brady</u> does not place any burden upon the prosecution team "to

conduct a defendant's investigation or assist in the presentation of the defense's case." United States v. Aubin, 87 F.3d 141, 148 (5th Cir. 1996) (quotations omitted).  Evidence is not suppressed within the meaning of Brady "if the defendant either knew . . . or should have known. . . of the essential facts permitting him to take advantage of any exculpatory evidence." United States v. LeRoy, 687 F.2d 610, 618 (2d Cir. 1982); United States v. Brown, 582 F.2d 197, 200 (2d Cir. 1978).

Additionally, the bulk of the information sought by Forbes in this motion regarding Corigliano pertains to his dealings not with the USAODNJ, but with the SEC.  FM 6-23.  Forbes continues to insist that he is entitled to all oral and written communications between the prosecution witnesses and "the government," as well as the dates of such communications.  This demand extends beyond communications involving the members of the prosecution team in this case: the former and current Assistant United States Attorneys who personally worked on this case, and the agents of the FBI and the United States Postal Inspection Service who worked on this case.  Rather, Forbes contends that the Government's disclosure obligations extend to officials of the SEC, because that agency instituted a parallel civil proceeding against Corigliano while the criminal investigation was being conducted by the USAODNJ.  FM 4.  Thus, Forbes asserts that he has "consistently sought the production of all communications between Corigliano or his counsel and the SEC."

FM 6.  As Judge Thompson properly concluded, however, Forbes is not entitled to all of those communications.

The prosecution team turned over materials from the SEC files out of an abundance of caution, not legal compulsion.  The Government's disclosure obligations extend only to material evidence that is known to the members of the prosecution team. Kyles v. Whitley, 514 U.S. 419, 437 (1995).  A prosecutor has a duty to learn of any favorable evidence known to the others acting on the Government's behalf in the criminal prosecution. Id.; see also United States v. Payne, 63 F.3d 1200, 1208 (2d Cir. 1995).  A prosecutor's disclosure obligations under Brady, however, do not "embrace materials that the prosecution team has never had in its files, never inspected, and never knew about." Morgan v. Salamack, 735 F.2d 354, 358 (2d Cir. 1984) (quoting United States v. Hutcher, 622 F.2d 1083, 1088 (2d Cir. 1980)). Imposition of a duty on a prosecutor to obtain and disclose information known by officials from other agencies who are not assigned to the criminal prosecution would inappropriately adopt "a monolithic view of government" that would "condemn the prosecution of criminal cases to a state of paralysis."  United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998) (quoting United States v. Gambino, 835 F. Supp. 74, 95 (E.D.N.Y. 1993), aff'd, 59 F.3d 353 (2d Cir. 1995)).  Forbes' ceaseless discovery demands in this case seek precisely that result.

In United States v. Locascio, 6 F.3d 924, 949 (2d Cir.

1993), the Court of Appeals held that the prosecution team did
not suppress impeachment information about the prosecution's star
witness in an organized crime prosecution in which the FBI was
the lead investigative agency.  The impeachment information was
memorialized in a report prepared by FBI agents who were not
members of the Locascio prosecution team, but who were
investigating other organized criminal activity involving the
same witness, which was prosecuted by the same U.S. Attorney's
Office that prosecuted the Locascio case.  6 F.3d at 948-49.  The
Court explained that

> [e]ven assuming the [undisclosed] reports' materiality,
> there is no evidence that the prosecution team in the
> instant case was aware of the reports that have
> subsequently come to light.  We will not infer the
> prosecutors' knowledge simply because some other
> government agents knew about the report.

Id. at 949.  See also United States v. Pelullo, 399 F.3d 197,
216-19 (3d Cir. 2005) (prosecution team had no obligation to find
and disclose documents possessed by officials at the Department
of Labor who were not members of the prosecution team, even
though one DOL employee was a member of that team); Lavallee v.
Coplan, 374 F.3d 41, 44 -45 (1st Cir. 2004)(declining to find
that child welfare agency was part of the prosecution team
because it was "neither the police nor the equivalent of the
police in assisting the prosecution").[3]

---

   [3]  Accord United States v. Quinn, 445 F.2d 940, 944 (2d Cir.
1971)(declining to impute to an AUSA in New York knowledge of a
                                        (continued...)

The prosecution team is charged only with constructive knowledge of information possessed by persons who can fairly be treated as an "arm of the prosecutor." United States v. Morell, 524 F.2d 550, 555 (2d Cir. 1975). Persons are members of the prosecution team if they jointly participate in the office's investigation, assist in preparing the case for trial or function under the prosecutor's authority or control. See Stano v. Butterworth, 51 F.3d 942, 945-46 (11th Cir. 1995). The employees of the SEC who were working on the parallel civil investigation of the CUC fraud did none of those things and were not members of the USAODNJ prosecution team. They did not jointly participate in the criminal investigation (indeed, no SEC employee had access to any grand jury materials generated in this investigation); did not assist in preparing the criminal case for trial; and did not function under the authority or control of the prosecution team. Judge Thompson properly rejected Forbes' contention that the prosecution team was obligated to turn over additional documents in the SEC's files that might prove useful to the defense.

---

[3](...continued)
sealed indictment returned in Florida against a witness in the New York case, and rejecting the "completely untenable position that knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor"); Shakur v. United States, 32 F. Supp. 2d 651, 663-66 (S.D.N.Y. 1999) (refusing to impute to the prosecution team information known to members of the New York City Police Department who were not members of the team, even though the prosecution team included other NYPD officers).

II.   **DOCUMENTS AND INFORMATION RELATING TO COSMO CORIGLIANO.**

    A.   **Communications Between Corigliano and/or his Counsel and the SEC.**

        1.  **Background.**

Although no SEC official or employee was a member of the USAODNJ prosecution team, the prosecutors from the initial trial team, in an abundance of caution, obtained numerous documents from the SEC files, reviewed those documents, and turned over to the defense the documents that arguably contained Brady or Giglio material.  FTTr. 8076, 8128-30, 8613-16, 8620-21, 9023, 9026; see FM 7.  Not content with this disclosure, Forbes now complains that the prosecution team made a "demonstrably inaccurate" representation in a response to one of Forbes' previous discovery motions.  FM 7 and 13, n.11.  In that response, the prosecution team stated that it had repeatedly requested and received from the SEC all documents in the SEC files pertaining to its proceedings against Corigliano, had reviewed those documents, and had turned over to the defense anything that is arguably discoverable under Brady, Giglio, the Jencks Act, and Rule 16.  According to Forbes, that representation was inaccurate because Forbes subsequently received three letters between Corigliano's lawyers and the SEC that the prosecution team had never produced to Forbes.  FM 7.  The representation was hardly false, because the letters identified by Forbes contain no discoverable information, as

Judge Thompson concluded during the second trial.

Judge Thompson's conclusion that Forbes was not entitled to additional disclosures about the interactions between Corigliano's lawyers and the SEC was fortified by the testimony of SEC officials during the first trial in this case. For instance, Forbes speculates that Corigliano received "special treatment by the SEC" because of his cooperator status. FM 11. That speculation was contradicted by the testimony of SEC attorney James Kidney, Assistant Chief Litigation Counsel for the SEC, that Corigliano was not "given any special accommodations because [he was a] cooperator[] here in this federal case," and did not receive a "sweetheart deal." FTTr. 13527. Kidney also testified that the Associate Director of the SEC's Division of Enforcement opposed giving cooperating witnesses in criminal cases "special treatment [from] the SEC." Id.; see also STTr. 11/7/05, 8. The SEC's settlement offer of May 2000 (which would have left Corigliano with his house, car, legal fees and "walking around money") was essentially the same as the final settlement agreement between Corigliano and the SEC reached in the spring of 2004. STTr. 11/7/05, 8. Thus, Corigliano ultimately was accorded no "special treatment" by the SEC. The record fully supported Judge Thompson conclusion that Forbes' assertions that Corigliano breached his plea agreement vis-a-vis his dealings with the SEC "lack merit." STTr. 11/7/05, 22.

Forbes extensively cross-examined Corigliano during the

14

first trial about matters affecting his credibility and his
supposed motive to falsely implicate Forbes, including
Corigliano's: (1) substantial involvement in the charged fraud,
during which he lied repeatedly to CUC's outside auditors, other
CUC officials and employees, the investing public, and the SEC,
FTTr. 7613-15, 7712-74, 7830-96, 7903-17; (2) false denials of
complicity to the Cendant Board of Directors when the fraud was
first publicly disclosed, FTTr. 7675-83, 7826-29; (3) false
denials of complicity when he first spoke to the USAODNJ and
investigating agents in this case, FTTr. 7581-7611, 7617-70; (4)
sale of CUC and Cendant stock when the price had been inflated by
the fraud, FTTr. 7775-80, 7898-7903; (5) efforts to obtain a
reduced sentence in exchange for his cooperation with the
prosecution, FTTr. 7921-68; and (6) additional "benefits" to
Corigliano supposedly attributable to his cooperation, including
his resolution of the civil charges brought against him by the
SEC, FTTr. 7970-96, 8037-57, 8071-80, 8089-8115, 8152-78.  In the
face of this onslaught, additional disclosures by the prosecution
team regarding Corigliano's supposed bias are not required.
United States v. Fallon, 348 F.3d 248, 252 (7th Cir. 2003)
(prosecution team did not violate Brady by declining to disclose
cumulative and therefore immaterial impeachment information
regarding a prosecution witness who had admitted his previous
lies and participation in a fraud).

    Forbes nevertheless contends that whether Corigliano

15

breached his plea agreement is an issue as to which he is entitled to bring all conceivably relevant information to bear. Judge Thompson appropriately drew the line at Forbes' efforts to use the correspondence between Corigliano's lawyers and the SEC.[4] See United States v. Weiss, 930 F.2d 185, 198 (2d Cir. 1991); United States v. Gomes, 177 F.3d 76, 81 (1st Cir. 1999).

Accordingly, the prosecution team was under no obligation to disclose that information. United States v. Amiel, 95 F.3d 135, 145-46 (2d Cir. 1996)(no Brady violation for non-disclosure of cumulative impeachment evidence regarding a prosecution witness, who was extensively cross-examined about his guilty plea, his cooperation agreement with the government, and lies he had previously told while under oath); accord United States v. Knight, 342 F.3d 697, 706 (7th Cir. 2003); United States v. Aubin, 87 F.3d 141, 149 (5th Cir. 1996).  The prosecution team does not violate its disclosure obligations by declining to conduct additional review of its files to secure information regarding a subject that the District Court has properly

---

[4]  As Judge Thompson explained, Forbes' proposed impeachment would result in

> a real detour in terms of all of the negotiations between Mr. Corigliano's counsel and the SEC.  I mean, you can take 57 steps that led to the signing of the [SEC] settlement agreement and the budget agreement and you can break each one down, each point that was negotiated and say it's a separate benefit.  I think that's misleading to the jury.

STTr. 11/7/05, 46.

excluded.  <u>Wood v. Bartholomew</u>, 516 U.S. 1, 8 (1995).

In light of that background, the Government addresses Forbes' particular requests regarding communications between Corigliano and/or his counsel and the SEC.

**2.  SEC Requests for Financial Disclosure.**

**a.  SEC Financial Disclosure Form.**

In conjunction with his $14 million settlement with the SEC, Corigliano had to fill out an affidavit, describing in detail his assets, liabilities, and expenditures over a certain dollar amount for several years.  A copy of that affidavit was turned over to the defense in discovery.  STTr. 11/7/05, 10. Forbes cross-examined Corigliano extensively at trial by reference to the SEC settlement.  <u>E.g.</u>, FTTr. 7924-26, 7968-77, 7986-96, 8099-8108, 8152-60.

Forbes now seeks "all communications between Mr. Corigliano or his counsel and the SEC concerning requests for financial disclosure."  FM 12.  Forbes contends that correspondence between Corigliano's lawyers and SEC officials that Forbes has already obtained, Exhibits 3, 4, and 5 to Forbes' Motion, "raise serious questions" about Corigliano's testimony that he complied with his obligations under the plea agreement.  FM 8.

Forbes' claim that the three letters should have been disclosed because they show that Corigliano was permitted to violate his plea agreement was properly rejected by Judge Thompson.  As he accurately pointed out, the SEC, the only party

17

that was adverse to Corigliano in the civil lawsuit, never
concluded that Corigliano had violated his plea agreement in his
dealings with the SEC.  STTr. 11/7/05, 19.  Nor did the USAODNJ
conclude that Corigliano had breached his plea agreement.  Id.

Forbes contends that Corigliano was permitted to breach the
plea agreement by failing to provide the SEC with an executed
copy of a standard financial disclosure form.  FM 11.  Corigliano
did not submit that form based on the advice of his attorneys
that it was required only if the parties were on the verge of a
settlement.  STTr. 11/7/05, 9.  Because settlement negotiations
had broken down in May 2000, Corigliano's lawyers made the
determination that completion of the standard form was not
required.  Id.  Forbes' speculation that Corigliano was permitted
to breach his plea agreement in this very limited and
inconsequential manner was properly excluded by Judge Thompson as
an unnecessary side-show in this very protracted case.  See STTr.
11/7/05, 20.  Judge Thompson acted well within his discretion by
excluding what is at best cumulative evidence that would likely
confuse and distract the jury.

Judge Thompson also properly exercised his discretion by
excluding correspondence that memorialized disagreements between
Corigliano's lawyers and SEC officials during their negotiations
regarding a settlement of the SEC's civil lawsuit.  Simply put,
although obligated by the plea agreement to use his "best
efforts" to settle the SEC lawsuit, and to provide accurate

18

financial information to the SEC, Corigliano did not breach that obligation because his attorneys engaged in the normal give-and-take with an adverse party in negotiating the settlement.

Forbes' claim suffers from an additional infirmity. His impeachment theory assumes that Corigliano received copies of letters from his lawyers to the SEC; knew from his receipt of those letters that they contained inaccurate or incomplete information; and did not correct the inaccuracies. Corigliano's lead counsel represented to Judge Thompson, however, that Corigliano had not received those letters. STTr. 11/7/05, 11. Simply put, any disagreements between the SEC and Corigliano's lawyers in the on-going settlement negotiations regarding the SEC lawsuit, as to which Corigliano did not directly participate, cannot fairly demonstrate that Corigliano knowingly breached his plea agreement. See United States v. Cuevas Pimentel, 815 F. Supp. 81, 83 (D. Conn. 1993) (Cabranes, C.J.) ("[I]t is clear that, as a general matter, Rule 613(b) does not permit an attorney's statements to be introduced as prior inconsistent statements of that attorney's client.").

In any event, during the second trial, when Forbes sought disclosure of additional documents regarding Corigliano's supposed breach of the plea agreement in his dealings with the SEC, Corigliano's lawyers represented to Judge Thompson that they had conducted a diligent search of their files and could "find no documents indicating that drafts, carbon copies or blind carbon

19

copies" of those documents were sent to Corigliano.  Docket 1944, at 5-6.  Thus, for all the record reflects, there are no further documents to be produced with respect to Corigliano's supposed non-disclosure of financial information.

Forbes also demands that the prosecution team should produce all information in its possession concerning efforts made by representatives of the USAODNJ to mediate disputes between the SEC and Corigliano, and to excuse Corigliano from his disclosure obligations.  FM 12.  As Forbes concedes, however, the Government provided the defense in October 2003 with information regarding efforts by the USAODNJ to lobby the SEC on Corigliano's behalf.  FM 12, n.11.  The Government also represented that it would make additional inquiries about such lobbying.  Id.  Those inquiries turned up no additional information.  Forbes has received sufficient disclosures on this subject.

### b.  SEC Requests for Tax Returns

Forbes contends that Corigliano breached his plea agreement based on letters that Corigliano's lawyers wrote to the SEC regarding whether or not Corigliano had filed tax returns in 1999 and 2002.  According to Forbes, certain documents supposedly contradict statements made by Corigliano's lawyers to the SEC that Corigliano had not yet filed returns for those tax years.  FM 13-15.  Forbes' premise is that if Corigliano's lawyers made inaccurate representations to the SEC about whether Corigliano had filed tax returns, it would amount to a violation of the plea

agreement by Corigliano.  FM 14.

Forbes points to nothing which shows that Corigliano directed his lawyers to make those representations or knew about the representations after the fact.  His argument, again, is based upon surmise and an improper attempt to impeach Corigliano on a collateral matter based on supposed inaccurate remarks, not by Corigliano, but by his attorneys.  See Cuevas Pimentel, 815 F. Supp. at 83.  Forbes raised this precise issue before Judge Thompson during the second trial.  STTr. 11/7/05, 27-28.  Judge Thompson properly denied that request.  Id. at 30.

### 3. Information Supplied to the SEC by Corigliano and His Counsel

#### a. Asset Value Information.

Forbes demands additional information regarding Corigliano's supposedly misleading statements to the SEC about the value of Corigliano's home in Old Saybrook, Connecticut.  FM 17.  As Forbes' present memorandum reveals, he already has extensive information with which to argue that Corigliano under-estimated the value of his home in his disclosures to the SEC. FM 16-17.  Forbes was permitted to cross-examine Corigliano at length regarding his supposed intentional underestimate of the value of his home. FTTr. 8161-78, 9347-57.[5]  Thus, Forbes had an

---

[5]  Corigliano testified, however, that he made a good-faith estimate of the value of his home which his lawyers communicated to the SEC; that he was unaware of a 2004 assessment of his property when he communicated his estimate to the SEC; and that

(continued...)

21

adequate opportunity to develop this line of impeachment, and no further disclosure obligations should be imposed on the prosecution team.

### b.  Quarterly Financial Reports.

Forbes speculates that, based on documents which he declines to identify, FM 17, Corigliano failed to disclose all of his and his wife's income in his quarterly financial reports to the SEC.  Without providing any specificity, Forbes asserts that there "appears to be" material discrepancies between financial information in Corigliano's 2002 tax return and his quarterly financial reports to the SEC for that year.[6]  Based on these musings, Forbes demands disclosure of all of Corigliano's tax returns from January 2000 to the present.  FM 18.

Forbes should not be heard to make unsupported assertions that Corigliano violated the plea agreement, assertions which the prosecution team members cannot confirm based on the information known to them, and then use those baseless assertions to demand production of Corigliano's tax returns, which are statutorily protected against disclosure.  See 26 U.S.C. § 6103.  If that

---

[5](...continued)
he had a reasonable basis for treating another, smaller property in Old Saybrook as roughly comparable to his in estimating the value of his property.  FTTr. 8162, 9347-51.

[6]  Because information in Corigliano's federal income tax returns may not be imputed to the prosecution team, United States v. Stofsky, 527 F.2d 237, 244 n.7 (2d Cir. 1975), members of the team cannot be charged with knowledge of any alleged inconsistencies based on that information.

were permissible, the only limits on the prosecution team's
disclosure obligations would be the breadth of defense counsel's
imagination in concocting creative accusations.

**4.  Settlement Negotiations with the SEC.**

As Forbes points out, FM 18, he sought to impeach
Corigliano's testimony during the first trial that he was always
willing to disgorge the approximately $14 million in proceeds of
his sales of CUC and Cendant stock by reference to a <u>Wells</u>
submission made to the SEC on Corigliano's behalf, which proposed
disgorging only $3.4 million.  Corigliano testified that he did
not know that his attorneys had proposed a $3.4 million
settlement in the <u>Wells</u> submission.  FTTr. 7972-73, 8039.

Forbes demands any information or documents in possession of
the Government that would contradict Corigliano's testimony about
his lack of knowledge of the $3.4 million settlement proposal in
the <u>Wells</u> submission.  FM 18.  Forbes should not be permitted to
impeach Corigliano with extrinsic evidence on this collateral
issue.  <u>United States v. Mulinelli-Navas</u>, 111 F.3d 983, 989 (1st
Cir. 1997).  That Corigliano was always "willing" to disgorge $14
million in proceeds, and actually did disgorge that amount, FTTr.
7503-04, is not contradicted by his attorneys' efforts to
convince the SEC to accept a smaller sum in settlement.  <u>See</u>
<u>United States v. Barnes</u>, 604 F.2d 121, 150 (2d Cir. 1979) (no
<u>Brady</u> violation where, <u>inter</u> <u>alia</u>, any inconsistencies between
the witness's testimony and an agent's report were "not so great

23

as to be completely contradictory").  Since Forbes' cross-examination of Corigliano regarding the content of the <u>Wells</u> submission was collateral, any effort to impeach Corigliano's collateral testimony with extrinsic evidence should be precluded. <u>United States v. Purdy</u>, 144 F.3d 241, 245-46 (2d Cir. 1998); <u>United States v. Blackwood</u>, 456 F.2d 526, 531 (2d Cir. 1972).

Even treating the efforts of Corigliano's lawyers to obtain the most favorable possible settlement for their client -- a result which the plea agreement did not forbid, expressly or impliedly -- as somehow a breach of the plea agreement by Corigliano, any such "breach" would have been immaterial in the context of the plea agreement.  After all, Corigliano ultimately disgorged $14 million in assets to the SEC, and testified in repeated trials.  The Government would arguably have no basis to sanction Corigliano for such an immaterial breach.  <u>See generally</u> <u>United States v. Castaneda</u>, 162 F.3d 832, 836-40 (5th Cir. 1998).

Forbes also seeks extrinsic evidence to challenge another collateral matter, Corigliano's testimony about the reason why he did not settle with the SEC before 2004.  Forbes contends that Corigliano's testimony about why he did not settle in 2000 is inconsistent with a pleading filed by his attorneys.  FM 19.  As Judge Thompson correctly concluded, Forbes should not be permitted to impeach Corigliano by reference to statements of his attorneys.  STTr. 11/7/05, 46.

Forbes nevertheless seeks information regarding any

24

settlement negotiations between the SEC and Corigliano or his
attorneys between January 2000 and April 2004.  Whether
Corigliano did not settle with the SEC because of the SEC's
refusal to give Corigliano credit for $6 million that he had
previously paid in taxes on the gain from his stock sales or for
other reasons is entirely collateral to Corigliano's testimony
that Forbes committed the charged crimes.  United States v.
Dorfman, 470 F.2d 246, 248 (2d Cir. 1972)(rejecting a challenge
to restrictions on cross-examination of a prosecution witness to
show bias; "In cases in which the alleged motive of a government
witness is hope for prosecutorial leniency there will always be
conflict between the need to keep the trial from being
sidetracked on collateral issues and the right of the defendant
to establish a witness' bias or motive to lie.").

    5.  **Budget Negotiations with the SEC.**

    Forbes contends that correspondence between Corigliano's
lawyers and the SEC showing that the SEC agreed to allow
Corigliano and his family to spend his assets pursuant to a
budget which the SEC initially regarded as unreasonably generous
"is further evidence of the special treatment" that the
Government afforded Corigliano.  FM 19-20.  Forbes demands all
information known to the Government "concerning communications
between the SEC and Mr. Corigliano or his counsel concerning"
Corigliano's budget.  FM 20.

    If Corigliano received "special treatment" from the SEC, it

was hardly a benefit.  As his lawyer explained, the SEC acted
punitively by demanding that Corigliano abide by a budget, an
asset preservation agreement, and quarterly financial reporting
requirements, even though such restrictions are not required in
every SEC case.  STTr. 11/7/05, 9-10; Exhibit 3 to Forbes'
Motion.

Evidence regarding the negotiations between the SEC and
Corigliano's lawyers in the SEC civil lawsuit is not proper
impeachment material.  Forbes cross-examined Corigliano at length
regarding his purported benefit, the budget that was ultimately
negotiated.  FTTr. 7995-96, 8037-42, 8046-57, 8089-8102.  Whether
counsel for the SEC thought that amount was reasonable is
irrelevant to whether Corigliano was supposedly permitted to
breach his plea agreement because his lawyers did not accept the
SEC's opening settlement offer.  Additionally, Corigliano's lead
counsel represented to Judge Thompson that they "have not found
any documents that would show that Corigliano received or was
shown" letters between his lawyers and the SEC regarding the
negotiations over the proposed budget.  Docket 1944 at 10.

**6.  Supposed Unwritten Agreements.**

During the first trial, Forbes was permitted to cross-
examine Corigliano at length regarding supposed "side deals"
between him and the SEC regarding: the fact that Corigliano's
real property in Old Saybrook was recorded on the town's property
records as two separate parcels rather than one, FTTr. 8161-78,

26

8502-10, 9347-57; Corigliano's payment of retainers to his lawyers and to his wife's lawyers, FTTr. 8109-11, 9365-78; and Corigliano's payment of his family's expenses under a settlement agreement he had reached with the SEC, FTTr. 7990, 7996, 8071-80, 8096-8103, 9393-9411.

As SEC lawyer David Frohlich testified, however, there were no side agreements between the SEC and Corigliano. FTTr. 13600-02. Corigliano's payment of retainers and his payment of his living expenses with assets that were later surrendered to the SEC were not inconsistent with Corigliano's written settlement with the SEC. FTTr. 13603-07. That Corigliano made those payments does not mean that he and the SEC entered into undisclosed oral agreements that he could do so, or that the prosecution team failed to disclose material impeachment information. See Shabazz v. Artuz, 336 F.3d 154, 163-65 (2d Cir. 2003) (that cooperating witnesses sought and received sentencing leniency for cooperation did not contradict the prosecutor's testimony that he did not promise to recommend such leniency).

Forbes reiterates his prior arguments, which Judge Thompson repeatedly rejected, that under the terms of his settlement with the SEC, Corigliano was not permitted to make expenditures in the ordinary course during the period between April 16, 2004 (when the SEC settlement was signed) and the July 2004 turnover of the

Corigliano family assets.  FM 21.[7]  Based on those rejected arguments, Forbes demands disclosure of additional information regarding any supposed oral side agreements.  FM 23.

Forbes' present claim is nothing more than speculation that the prosecution team <u>must</u> have undisclosed information regarding supposed oral side agreements between Corigliano and the SEC. Forbes' speculation is an insufficient basis for this Court to direct the prosecution team to make additional disclosures.  <u>See United States v. Navarro</u>, 737 F.2d 625, 631-32 (7th Cir. 1984)("A due process standard which is satisfied by mere speculation would convert <u>Brady</u> into a discovery device and impose an undue burden upon the district court"); <u>accord</u> <u>United States v. Milikowsky</u>, 896 F. Supp. 1285, 1309 n.38 (D. Conn. 1994).

**B.    Documents and Information Relating to Corigliano's Trial Testimony.**

Forbes again inquires, as he did following the first trial, Docket 1608, whether Corigliano's plea agreement has been revoked because he supposedly testified falsely in this case.[8]  FM 23. The Government has disputed and continues to dispute Forbes'

---

[7]  As the Government previously explained, Docket 1147 at 14-17, Corigliano did not breach the SEC settlement agreement by making these  expenditures.

[8]  Although a ruling on this motion does not appear on the docket, Judge Thompson did not grant the motion, effectively denying it.

self-serving characterizations of Corigliano's testimony.[9]  The
Government has not sought to revoke Corigliano's plea agreement
for supposed lying that the prosecution team does not believed
occurred.  Revocation of Corigliano's plea agreement would
violate the Government's obligations under the agreement and
serve no legitimate purpose, although it would obviously advance
Forbes' defense in this trial.  Forbes also demands to know, as
he did previously, Docket 1608, if the prosecution team took
affirmative steps to determine if Corigliano testified falsely at
trial.  He cites no authority and makes no argument to
demonstrate that he is entitled to information describing the
prosecution team's investigative efforts, as opposed to the
results of those efforts.

   **C.  Documents and Information Relating to Corigliano's
       Polygraph Examinations.**

   Forbes reiterates his demand for documents and information
relating to Corigliano's submission to two private polygraph
examinations arranged for by his attorneys, which no Government
official attended and as to which the Government had no prior
notice.  FM 24.  Forbes declines to mention that Judge Thompson
has rejected on three occasions Forbes' prior demands for this
information.  During the first trial, the Government moved to
preclude cross-examination of Corigliano by reference to the

---

   [9]  See Docket 1147; Judge Thompson's oral order of 11/01/04,
denying that motion.

private polygraph examinations.  Docket 885.  The defendants
filed a brief in opposition to that motion.  Docket 899.

During oral argument on that motion, Judge Thompson
rejected the defense argument that Corigliano authorized his
counsel to advise the Government that he had done well on a
polygraph examination.  FTTr. 7796, 7803.  Judge Thompson also
expressed concern that any inquiry into Corigliano's polygraphs
might lead to a "battle of the polygraph examiners," and thereby
invade the province of the jury.  FTTr. 7796, 7813-14.  The Court
granted the Government's motion and excluded the polygraph
evidence under Fed. R. Evid. 403.  FTTr. 7814, 8030-31; oral
ruling, docketed July 20, 2004.  The next day, Forbes attempted
to relitigate the polygraph issues, but Judge Thompson denied
that request as well.  FTTr. 9121.  Forbes raised this issue
again with another motion before the second trial.  Docket 1730.
Judge Thompson denied that motion.  Oral ruling, docketed on
November 7, 2005.  Those rulings are consistent with the weight
of authority finding that polygraph evidence is generally
inadmissible, as substantive evidence, or for impeachment.[10]

Forbes nevertheless seeks a laundry list of items regarding
Corigliano's private polygraphs.  FM 25.  The prosecution team is

---

[10] See United States v. Scheffer, 523 U.S. 303, 303, 309
(1998); United States v. Messina, 131 F.3d 36, 42 (2d Cir. 1997);
United States v. Canter, 338 F. Supp. 2d 460, 465 (S.D.N.Y.
2004); Meyers v. Arcudi, 947 F. Supp. 581, 583-85, 587-88 (D.
Conn. 1996); United States v. D'Angelo, No. 02-CR-399 (JG), 2004
WL 315237, at *27 (E.D.N.Y. 2004).

not required to respond to what are, in form and effect, Forbes' interrogatories. See United States v. Linen Supply Institute of Greater New York, 18 F.R.D. 452, 453 (S.D.N.Y. 1955)("The Federal Rules of Criminal Procedure make no provision for answers to interrogatories."); United States v. Acosta, 357 F. Supp. 2d 1228, 1244 (D. Nev. 2005) (although the prosecution team must produce the prior inconsistent statements of a cooperating witness, "[i]t does not follow . . . that all of the notes, memoranda, and mental impressions of the participants are necessarily Brady material"); United States v. Wright, 2001 WL 523394, *23 (D. Kan. 2001) (rejecting as "overbroad" the defendant's discovery demands for the "identification of each time the witness has testified in relation to this case or narrated the details of this investigation" and "identification of each occasion any . . . accomplice. . . has . . . furnished a statement in any case" and "all matters useful to the defense in impeaching the government's witness").

**D.  Information Concerning Proffers by Corigliano's Counsel to the Government**

Forbes seeks another laundry list of information regarding, inter alia, "the full terms (whether written or oral) of all attorney proffers made by Mr. Corigliano's counsel to the Government."  FM 26.  The prosecution team has already given the defense all potential Brady and Giglio information from any oral statements made by Corigliano's attorneys.  Judge Thompson

31

previously concluded that presentations by an attorney to the Government are not admissible unless they contain statements explicitly made or adopted by the client. FTTr. 2644-59; 2865-67; 3194.[11]  Nevertheless, following extensive litigation on this subject, Judge Thompson directed the prosecution team to disclose certain information regarding proffers made by the cooperators' attorneys, which was done. FTTr. 6100-01, 7810-11, 8015-33. Corigliano was closely cross-examined regarding these subjects. E.g., FTTr. 7671-73, 7692-93, 7698, 7976-77, 8060, 8173-74, 9298-99, 9313.  No more is required.

## III.  DOCUMENTS AND INFORMATION RELATING TO KEVIN KEARNEY.

According to Forbes, Kevin Kearney's testimony that Stuart Bell told Kearney that Forbes was aware of the fraud is inconsistent with documents which purport to memorialize Kearney's pre-trial interviews with government officials, in which Kearney did not implicate Forbes.[12]  The prosecution team was not required to disclose Kearney's failure to volunteer information that implicated Forbes before Kearney was specifically asked about Forbes.  See United States v. Zuno-Arce,

---

[11] Judge Thompson rejected Forbes' arguments based on the "crime-fraud exception" to the attorney-client privilege, because Forbes had failed to satisfy his burden of showing "probable cause" of a crime or fraud.  FTTr. 7820-21, 8030, 9121.

[12] Forbes points to his mistrial motions based on his claims that Kearney's testimony was false.  FM 27.  Forbes declines to mention that Judge Thompson denied the first of those motions, Docket 1264 (ruling), and did not grant the second, effectively denying it.  Docket 1911 (motion).

44 F.3d 1420, 1426 (9th Cir. 1995); <u>United States v. Deleo</u>, 1991 WL 111172, *2 (N.D. Ill., June 5, 1991).

Nevertheless, the prosecution team, in an abundance of caution, provided Forbes with **<u>all</u>** notes prepared by agents and lawyers other than AUSAs Schechter, Carney, and McMahon (the first trial team) memorializing interviews of Kearney. The prosecution team withheld work-product notes prepared by the first trial team prosecutors, <u>see</u> Fed. R. Crim. P. 16(a)(2), but turned over additional information obtained by those prosecutors by way of letters. FTTr. 9909-11 (discussion regarding prosecution team's disclosures to Forbes' lawyers by way of letters), <u>see also</u> Exhibits 1 and 2, hereto.

Kearney testified at trial about the timing of his prior statements to the prosecution team. FTTr. 9849-53, 9862, 9876-78. Forbes exploited the disclosed interview notes to cross-examine Kearney regarding his supposed prior omissions. FTTr. 9865, 9876-78, 9888-94, 9917-18, 9920-23, 9930-39. No additional disclosures are required.

Forbes also points to what he claims is an inconsistency between Kearney's testimony during the second trial regarding Corigliano's statements that Forbes wanted earnings per share to meet Wall Street estimates and the fact that Kearney supposedly did not testify about those statements during the first trial or in his interviews before trial. FM 28. This again is attempted impeachment by omission, which does not give rise to a disclosure

obligation by the Government.

Forbes again propounds interrogatories demanding, <u>inter alia</u>, "the dates of every interview in which Mr. Kearney was asked about" the Forbes' statements about earnings per share.  FM 29.  Forbes also demands "the substance" of all of Kearney's statements during each such interview, and the names of all persons who were present during those interviews.  <u>Id.</u>  As shown above, the prosecution team is not required to provide information in the form demanded in Forbes' interrogatories. Based on the information Forbes already has, he can try to impeach Kearney by reference to the fact that Kearney's testimony at that trial included matters about which he supposedly did not testify during the first trial.

Forbes demands production of notes of an interview of Kearney on July 10, 2001 by persons other than SEC official Matthew Griener, whose notes of that interview Forbes has received.  FM 30.  The prosecution team has not turned over any notes of that interview by former FBI agent and prosecution team member Mark Gerber because, based on a search of its files, it has not located any such notes.  The prosecution team has no obligation to turn over any notes that were taken by SEC representatives that are not already in the possession of the prosecution team.

Forbes also demands to know if the Government took affirmative steps to determine if Kearney testified falsely at

34

trial.  FM 30.  For the same reasons that Forbes' request for
similar information regarding Corigliano is meritless, his
parallel request regarding Kearney should also be rejected.

## IV.  ADDITIONAL DOCUMENTS AND INFORMATION

### A.  Documents and Information Relating to Michael Monaco.

Forbes asserts that "the government" may have investigated
prosecution witness Michael Monaco regarding his conduct while
employed at Cendant on a matter not involving CUC, and demands
information from the prosecution team regarding any such
investigation.  FM 31-32.  Forbes provides no additional
information about this investigation.

Although Forbes has given the prosecution team little to
work with, the prosecutors have made a sufficient inquiry under
the circumstances, and are aware of no discoverable information.
Additionally, Forbes has not alleged that Monaco is even aware
any pending investigation.  If there is a pending investigation
of Monaco of which he is unaware, that unknown investigation
could provide no incentive for him to falsely accuse Forbes of
the charged crimes in this case.  United States v. Veksler, 62
F.3d 544, 550 (3d Cir. 1995) (pending grand jury investigation of
a government witness was not material Brady information, where
the witness was unaware of the investigation and never asked the
government to intercede on his behalf).

### B.  Documents and Information Relating to Steven Kernkraut.

In his discovery motion, Forbes reiterates his argument to

35

the jury during the second trial that Wall Street securities
analyst Steven Kernkraut testified erroneously that Forbes
participated in CUC's quarterly earnings conference calls with
analysts between 1995 and 1997.  STTr. 3458-63.  Forbes points
out that the prosecution team informed Forbes' lawyers during the
second trial that the team was then unable to locate any records
that corroborated Kernkraut's testimony about those conference
calls.  FM 32-33.

Forbes demands any information which tends to prove that CUC
did not conduct any quarterly earnings conference calls with
analysts before May 1997.  The prosecution team is presently
unaware of any such information, and understands its on-going
obligation to provide such information to the defense.

**C.    Documents and Information Relating to Stuart Bell and
        Kirk Shelton.**

During the first trial, Forbes' co-defendant and close
friend Kirk Shelton testified at length that he did not
participate in the charged fraud.  He also denied any knowledge
that Forbes had participated in the fraud.

Based on the sequence and content of the jury's notes to
Judge Thompson during the deliberations in the first trial,
members of the prosecution team surmised that the jury had
convicted Shelton and was still deliberating only over the
charges against Forbes.  AUSA John Carney discussed with
Shelton's lead lawyer, Thomas Puccio, an offer to accept

36

Shelton's guilty plea to the conspiracy count of the indictment and to dismiss the remaining charges in exchange for a waiver of all his post-verdict, appeal, and post-appeal rights.  Shelton declined the offer.  Shortly thereafter, the jury convicted Shelton of all counts.  During Shelton's sentencing hearing, the parties placed on the record their accounts of the those plea negotiations.  Tr. of Shelton Sentencing, 7/20/05, 102-06.

Forbes contends that the prosecution team must disclose any information pertaining to any plea discussions between the prosecution team and Shelton.  FM 33-34.  Shelton spoke to members of the prosecution team twice before he was first indicted, and denied any involvement in the charged crimes. FTTr. 12531-32.  Any documents which memorialize Shelton's proffer statements to the prosecution team during those two encounters were disclosed to Forbes years ago.  Other than those proffer sessions, Shelton never again met with or discussed the case, or a possible plea, with members of the prosecution team. Everything that the prosecution team knows about Shelton's self-exonerating and Forbes-exonerating accounts is derived from Shelton's testimony at the first trial, which Forbes and his lawyers attended, and Shelton's sentencing hearing, to which Forbes had complete access.  The prosecution team understands its on-going obligation to provide such information to the defense if it becomes known to the prosecution team.

Forbes also seeks similar information regarding any plea

37

negotiations with Stuart Bell.  Bell has not been charged by the Government, and no plea discussions have ever taken place between the Government and Bell.

**D.    Information Relating to Casper Sabatino.**

Casper Sabatino, who has pleaded guilty to the charged fraud, testified as a defense witness at the second trial, Sabatino was called as a defense witness.  Forbes now demands disclosures regarding subject matters covered during the cross-examination of Sabatino during the second trial.  The prosecution team does not intend to present Sabatino as a witness during the third trial.  Forbes is not entitled to pre-trial disclosure of impeachment information regarding a defense witness.  Cf. United States v. Delia, 944 F.2d 1010, 1018 (2d Cir. 1991) ("We know of no legal principle that requires the prosecution to disclose its proposed rebuttal evidence to the defendant, to help him decide whether to pursue a particular contention.").

**E.    Statements by Government Witnesses.**

Forbes again seeks disclosure of all of the notes created by the three prosecutors from the initial trial (Carney, Schechter, and McMahon) regarding interviews of and preparation sessions for prosecution witnesses.  FM 36-38.[13]  At the insistence of the

---

[13]  Forbes again requests the dates on which all of the cooperating witnesses were interviewed by the Government.  FM 37. As Judge Thompson previously determined, the prosecution team is not required to attempt to reconstruct this information.  FTTr. 9042, 9047.  See United States v. Upton, 856 F. Supp. 727, 746 (continued...)

defense, Judge Thompson reviewed in camera during the first trial some of the interview notes prepared by those prosecutors.  FTTr. 2853-54, 2865-67, 3194.  Judge Thompson has repeatedly declined to order the prosecution team to disclose the prosecutors' notes, most recently in connection with Forbes' Retrial Motion No. 3, which was filed before the second trial.

The Government has reviewed all of these notes and has disclosed, by way of a series of letters to the defense, any information that could be considered Brady or Giglio contained in the notes.  E.g., Exhibit 14 to Forbes' Motion; Exhibits 1 and 2 hereto.  See Milikowsky, 896 F. Supp. at 1308 (directing the Government to comply with Brady by producing "detailed summaries of exculpatory statements" made during witness interviews).  Nothing more should be required.

---

[13](...continued)
(E.D.N.Y. 1994) (noting that "the government is under no obligation to turn over that which it does not have").

**CONCLUSION**

The prosecution team has discharged and will continue to discharge its disclosure obligations. This Court should reject Forbes' continuing efforts to expand those obligations beyond those established by law. The Government respectfully requests that Forbes' Third Trial Motion No. 2 be denied.

Respectfully submitted,

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice

*Norman Gross/s*

NORMAN GROSS
Federal Bar Number 24933
MICHAEL MARTINEZ
Federal Bar Number PHVO243
Special Attorneys
U.S. Department of Justice

Newark, New Jersey
Date: April 17, 2006

**EXHIBIT 1**

EXHIBIT 2

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that on this day I caused to be served a copy of the Government's Amended Opposition to Defendant Walter A. Forbes' Motion to Compel Discovery and Production of <u>Brady</u>/<u>giglio</u> Material (Amended Opposition to Forbes Third Trial Motion No. 2) via email on:

Barry S. Simon, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005-5901
(202) 434-5005
bsimon@wc.com


*Norman Gross/s*
_____
NORMAN GROSS


Dated: May 11, 2006
       Camden, New Jersey