


**U.S. Department of Justice**

*United States Attorney
District of New Jersey*

970 Broad Street, Suite 700　　　　　　　(973) 645-2700
Newark, New Jersey 07102

April 29, 2003

Martin J. Auerbach, Esq.
Dornbush, Mensch, Mandelstam
 & Schaeffer
747 3rd Avenue
New York, NY 10017

Paul A. Engelmayer, Esq.
Wilmer, Cutler & Pickering
399 Park Avenue
New York, NY 10022

Barry S. Simon, Esq.
Williams & Connolly, LLP
725 Twelfth Street, N.W.
Washington, DC 20005

**VIA FACSIMILE AND U.S. MAIL**

　　　　Re:  United States v. Forbes, et al.
　　　　　　 No. 3:02CR264 (AWT)

Dear Counsel:

　　　　We write in response to your request for any "innocence proffers" made by counsel for Government witnesses.

<u>Cosmo Corigliano</u>

　　　　Please be advised that on or about August 7, 1998 and November 17, 1998, counsel for Cosmo Corigliano provided the following information:

　　　　With respect to the establishment and use of merger reserves by CUC, the counsel advised that Corigliano speculated whether Casper Sabatino could have screwed something up, possibly not keeping the necessary work papers to support the reserve. Corigliano thought that the merger reserves were all right at the time. Corigliano believes that Anne Pember is competent, but

that Sabatino was less competent and that could have contributed to any problem with the reserves.

With respect to the meeting held on or about March 9, 1998, concerning the usage of the Ideon reserve, it was represented that Anne Pember created the schedules used at the meeting and that both Corigliano and Shelton have never seen those schedules before the meeting. Anne Pember also made the presentation of what is in reserves, why she put items in the reserves and things to that effect. After the merger, he was no longer in the financial area and did not know what costs were being charged to the Cendant Reserve. He had no responsibility for these charges.

Corigliano was not a knowing participant in a fraud, he did not falsify or instruct anyone else to falsify any matter. If there were things that were wrong, Corigliano does not know about them. If some things do not comport with proper accounting, it was not because he knowingly did anything wrong. He knew merger reserves were being used to increase earnings, but did not think this was improper. In meetings with Monaco and Silverman, Corigliano was told directly to make the Cendant merger reserves as large as possible. Walter Forbes also communicated this message to him. Corigliano was urged to estimate expenses liberally rather than conservatively as HFS was very comfortable with this position.

Cosmo Corigliano attended a meeting with the senior management of both CUC and HFS where Monaco explained reserves. During the meeting, CUC represented that its reserves were exhaustive. Henry Silverman said they should go back and find more reserves. The AA report understates the knowledge of the people on the HFS side.

What items Anne Pember charged against the Ideon reserve was not known to Corigliano until March 9, 1998. He found it very convincing, however, as did Shelton and Ernst and Young. Kirk Shelton did all the talking at the March 6, 1998 meeting. Mr. Shelton had knowledge roughly equivalent to Corigliano. Shelton was a very hands-on operating guy, while Forbes was more remote. Everyone agrees that Kirk did the talking on March 6 except that Shelton is presently denying that he did the talking. Monaco and Forbes were told by Shelton on March 6, and by Pember on March 9, that the earnings were getting a boost from merger reserves. Everyone at both companies knew this, including Walter Forbes. The notion that merger reserves were being used aggressively to boost earnings was well known and had been going on for years.

Corigliano does not understand how merger reserves can be allocated to revenues. Corigliano had no responsibility for charges to the Cendant merger reserves. Corigliano was supposedly shocked by the allegation that Anne Pember did things in the middle of the night. Corigliano believed that Ernst & Young had approved of everything that was done.

Corigliano never told anyone to make unsupported topside adjustments. He believed that the AA report was exculpatory in that Sabatino stated that he was unaware of unsupported topside adjustments while Stu Bell was CFO prior to 1995.

When Corigliano was responsible for topside adjustments, prior to 1995, they were all supported. After Corigliano became CFO and Sabatino assumed responsibility for this area, the numbers were now unsupportable. Corigliano maintains that if any of the adjustments were made on an unsupported basis, it was done by Sabatino alone. Sabatino lied about who is involved in the making of unsupported topside adjustments. Corigliano believed that whatever adjustments were being made at that time were justified. Corigliano denies that he told Sabatino what adjustments to make. It was Sabatino's job to make the adjustments and Corigliano maintains that he lied about Corigliano's directive. Corigliano does not know if the figures for the topsides are false or not. Corigliano has no knowledge of adjustments to revenue, including whether they were part of topside adjustments in 1997. These adjustments do not make sense to Corigliano. Sabatino was incompetent and/or Sabatino cheated to make himself look good.

Corigliano thinks that management from HFS took advantage of the situation and tried to make the accounting problems appear as bad as possible. It was never expected that the stock would drop by 50 percent, maybe 5 percent.

Counsel informed the government that they had polygraphed Corigliano and that he had done very well. They invited the government to polygraph Mr. Sabatino.

Anne Pember

On May 26, 1998, June 19, 1998 and July 10, 1998, counsel for Anne Pember stated as follows to the Government:

Cosmo Corigliano was the chief architect of CUC's overstated earnings. Anne Pember played no part in formulating these practices. Walter Forbes and Kirk Shelton knew of, and

3

approved of, these practices. The auditors suspected but closed their eyes. Whatever data she gave to the former HFS people in New Jersey was also presented to E&Y.

She was one of the people assimilated into helping, mostly at the end of the 1997 fiscal year and the end of the 1997 calendar year, with her involvement being largely in January through March of 1998.

Pember's job at CUC initially related to operational accounting and was very much divorced from the preparation of financial statements. She felt very much at sea in that world since she had not been involved in financial reporting for her prior nine years at Comp-U-Card. Her environment at Comp-U-Card had been accounts payable, accounts receivable, etc. She was neither knowledgeable about, nor experienced with, merger reserve accounting, at least at the start of 1997.

Her promotion was in name only. She was not an authorized signatory for SEC filings. She was not involved in the world of earnings projections. She learned only recently that analysts focus on projections. She was surprised that people out there spent time trying to project earnings, that predictions were published, and that failure to meet the projections could affect the stock price.

She relied heavily on what Corigliano and Shelton told her was proper. She did not think she was falsifying numbers. She thought this was standard business practice. She was confused and asked herself 'who am I to be questioning this?' With respect to merger reserves, she used numbers Corigliano gave her. She reversed Ideon reserves into an operating account in February 1997 when Corigliano and Sabatino asked her to do so. She was told it was okay.

She learned monthly earnings figures being provided to former HFS people were being adjusted upwards on the theory that there would be merger-related savings because some costs could be charged to the merger reserves. She and Sabatino urged breaking out these numbers. Corigliano declined. They raised this with Shelton, who supported Corigliano. Shelton consulted with Walter Forbes and came back and said the numbers were fine. There was a similar practice with respect to projected earnings.

At the time, she was under enormous strain due to family circumstances. She was on autopilot during that time and could not object as loudly because of that. Early September, her father-in-law had open heart surgery and had a stroke on the

4

operating table. He ultimately died on Christmas Eve. In addition, a close friend had terminal cancer and died. Pember was in a car accident and was very ill in December 1997. Her mother in nursing home had a persistent, unexplained fever.

She nonetheless expressed concern about what was happening to Corigliano and Shelton and did things that hurt as much as they helped. For example, she sent a schedule to the auditors that left $45 million out of the Ideon reserve balance. She deliberately left it out because there was no documentation for it. What followed this convinced her that the auditors did not care and that this was acceptable. She got better at refusing to do things later. For example, she refused to instruct Speaks to book reserves on a monthly basis in March 1998. She wouldn't ask Sattler to do something that was misleading.

Pember observed, and objected to, the inflation of earnings for the month of January as described in paragraph 58 of the superseding indictment. She thought this practice ultimately had no net effect because they had to tie off the quarters.

She bought options with some of her severance money when she left Cendant, which indicates that she did not believe the stock price was inflated.

Sabatino had a greater appreciation than Pember regarding what was going into the financials. Sabatino reported to Corigliano, not to her.

Very truly yours,

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice

By: JOHN J. CARNEY
Special Attorney
U.S. Department of Justice

By: JAMES MCMAHON
Special Attorney
U.S. Department of Justice

5

By: RICHARD SCHECHTER
Special Attorney
U.S. Department of Justice