UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 3:02CR264 (AHN) |
| v. | ) | |
| WALTER A. FORBES | ) | May 19, 2006 |

AMENDED REPLY MEMORANDUM IN SUPPORT OF MOTION OF
DEFENDANT WALTER A. FORBES TO COMPEL DISCOVERY
AND PRODUCTION OF BRADY/GIGLIO MATERIAL
(Forbes Third Trial Motion No. 2)

Brendan V. Sullivan, Jr. (Bar No. ct17115)
Barry S. Simon  (Bar No. ct24159)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
Cowdery, Ecker & Murphy, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

Oral Argument Requested

The government erroneously seeks to portray Mr. Forbes' motion as one for reconsideration of an earlier motion to subpoena documents from Cosmo Corigliano. Opp. at 2-3. Mr. Forbes' motion is not directed to Mr. Corigliano, but to the government. Unlike Mr. Corigliano, the government has a duty under Fed. R. Crim. P. 16 to produce documents material to the preparation of Mr. Forbes' defense, as well as a constitutional obligation to produce significant impeachment material concerning the government's key witness. The government also has an obligation under the Due Process Clause not to let false testimony go uncorrected.

While the government now attempts to distance itself from the SEC in an effort to avoid producing SEC materials, Opp. at 9-12, the government previously "agreed to produce all Brady and Giglio information in the SEC's possession." Docket No. 359 at 47. It also represented that it would produce "all [SEC] notes of witness interviews," id. at 49, and all documents in the possession of the SEC that pertained to the Corigliano investigation, Docket No. 1643 at 7 n.5; see also Docket No. 519 at 6-7; Tr. (4/6/04) at 92. The government cannot escape its own representations to Judge Thompson, by which it should be bound in this proceeding. Nor can it escape its prior representations to defense counsel. On October 17, 2001, the U.S. Attorney's Office made clear that "this Office has agreed to ask the SEC to produce documents to you as part of the government's production of discovery in this criminal case." Ex. 3 at 4 (emphasis added); see also Ex. 1 at 5; Ex. 2 at 2; Ex. 4; Ex. 5 at 3. Finally, the U.S. Attorney's Office cannot escape the extensive history of its cooperation with the SEC in the investigation of accounting irregularities at CUC and Cendant. The government has an approved access request on file with the SEC that gives the U.S. Attorney's Office access to documents and information in the possession, custody, or control of the SEC. See Ex. 6.[1] Given the history of cooperation

---

[1]    See 17 C.F.R. §§ 200.30-4(a)(7) & 240.24c-1(b)(1); SEC v. Dresser Indus., Inc., 628 F.2d 1368, 1383 (D.C. Cir. 1980) ("the SEC's general policy is to grant Justice continuing access

between the U.S. Attorney's Office and the SEC,[2] the government cannot claim that it has no obligation to produce materials from the SEC.[3]

## I.    DOCUMENTS AND INFORMATION RELATING TO COSMO CORIGLIANO.

The government repeatedly attempts to lodge objections to the admissibility of the materials Mr. Forbes seeks. E.g., Opp. at 18. The issue here, however, is not whether the materials are admissible, but whether they are subject to production under, inter alia, Rule 16. Rule 16 requires the production of any document that will assist the defense in "uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." United States v. Lloyd, 992 F.2d 348, 351 (D.C. Cir. 1993)

---

to the entirety of a given investigative file once the Commission formally grants access.").

[2]    Among other things, SEC representatives regularly participated in witness interviews conducted by the U.S. Attorney's Office, Tr. (4/6/04) at 69-70; the SEC "knew the dates on which th[e] cooperators were going to enter their pleas," Tr. (10/23/03) at 147, and filed suit against them on the day they entered their pleas, see Docket No. 359 at 50; the SEC gave the U.S. Attorney's Office a draft of its complaint against the cooperators before it was filed; the SEC press release announcing its action against the cooperators makes reference to the U.S. Attorney's investigation, see Ex. 7 at 4; the SEC filed its civil action against Mr. Forbes on the same day as the first indictment returned in this case; the SEC press release announcing the action "acknowledges the assistance provided by the U.S. Attorney for the District of New Jersey," Ex. 9 at 2; the SEC is specifically referenced in Mr. Corigliano's plea agreement as an entity to which he owes obligations, see Ex. 2 to Docket No. 2187 at 2 & Schedule A ¶ 12; and the SEC settled its civil claims against Mr. Corigliano in April 2004 in order to have the claims resolved prior to Mr. Forbes' trial, see Exs. 12-13 to Docket No. 2273.

[3]    The government's obligations are not limited to the "members of the prosecution team." Opp. at 10. They encompass documents and information in the possession of entities aligned with the prosecution, such as the SEC. See Kyles v. Whitley, 514 U.S. 419, 437 (1995); United States v. Bhutani, 175 F.3d 572, 577 (7th Cir. 1999); United States v. Wood, 57 F.3d 733, 737 (9th Cir. 1995); United States v. Brooks, 966 F.2d 1500, 1503 (D.C. Cir. 1992). The government's claim that no SEC employees "jointly participate[d] in the office's investigation," Opp. at 12, cannot be reconciled with the undisputed fact that SEC representatives participated in numerous joint witness interviews with the U.S. Attorney's Office. Tr. (4/6/04) at 69-70. It also ignores the fact that the SEC is identified in Mr. Corigliano's plea agreement as an entity to which he owes obligations pursuant to the plea agreement. See Ex. 2 to Docket No. 2187 at 2.

(quotation omitted).  It is not limited to documents that may be introduced into evidence.

The materials Mr. Forbes seeks are necessary to correct false and misleading testimony presented by the government.  See Docket No. 2273.  The government elicited direct testimony from Mr. Corigliano concerning his purported compliance with his obligations under his plea agreement with respect to the SEC.  Tr. (11/1/05) at 1452-53, 1456-57.  The government also elicited direct testimony from Mr. Corigliano concerning his obligation under the plea agreement to use his best efforts to settle any claims asserted by the SEC, id. at 1467-68, and his purported willingness, after entering into his plea agreement, to pay back to the SEC all of the net proceeds of his stock sales.  Id. at 1471-72.  Mr. Forbes is entitled to impeach this testimony.

The materials Mr. Forbes seeks also go to the heart of Mr. Corigliano's relationship with the government and his motive and bias to testify falsely against Mr. Forbes.  "[B]ias of a witness is not a collateral issue and extrinsic evidence is admissible to prove that a witness has a motive to testify falsely."  United States v. Harvey, 547 F.2d 720, 722 (2d Cir. 1976).  Bias includes evidence that a witness breached his plea agreement with the government.  See United States v. Lynn, 856 F.2d 430, 433 (1st Cir. 1988).  The Court should reject the government's contention that there should be no inquiry into whether Mr. Corigliano has breached his plea agreement or received special treatment because neither the SEC nor the U.S. Attorney's Office has concluded that he has done so (Opp. at 17-18).  Both have a vested interest in protecting the government's key witness against Mr. Forbes.[4]

---

[4]     In United States v. Wallach, 935 F.2d 445 (2d Cir. 1991), the government, rather than acknowledging the truth about its central witness, "sought to rehabilitate the witness on redirect," id. at 457, and "consciously avoided recognizing the obvious -- that is, that [the witness] was not telling the truth."  Id.  The Second Circuit reversed the convictions.

Finally, the Court should reject the government's contention that Mr. Forbes already has a "virtual mountain of impeachment information." Opp. at 8. Much of the so-called "mountain" consists of information about Mr. Corigliano's conduct <u>before</u> he entered into his plea agreement. The information Mr. Forbes seeks relates to Mr. Corigliano's conduct <u>after</u> he entered into his plea agreement and after his purported transformation into a truth-teller. In <u>Wallach</u>, the Second Circuit rejected a similar government argument, reasoning that the information not revealed to the jury was material because there (as here) the government had led the jury to believe that its key witness "had undergone a radical moral transformation" after agreeing to cooperate with the government, 935 F.2d at 458, and because there (as here) the government emphasized that the witness's cooperation agreement gave him a powerful motive to testify truthfully, <u>id.</u> at 458-59. If the jury concludes that Mr. Corigliano is testifying untruthfully about his purported transformation following his plea agreement, it will "call[] into question the veracity of the rest of his statements." <u>Id.</u> at 458. In a case that hinges on Mr. Corigliano's credibility, the information Mr. Forbes seeks is neither cumulative nor immaterial.

A.     **SEC Financial Disclosure Form.** Beginning in early 2000, the SEC requested that Mr. Corigliano complete its standard financial disclosure form under oath.[5] That form would have required Mr. Corigliano, <u>inter alia</u>, to disclose matters such as his substantial cash

---

[5]     The government observes that Mr. Corigliano was required to fill out an extensive affidavit "[i]n conjunction with his $14 million settlement with the SEC." Opp. at 17. That affidavit was submitted in September 2004, <u>after</u> Mr. Corigliano's settlement with the SEC, and <u>after</u> cross-examination of Mr. Corigliano in 2004 that brought to light matters not contained in his pretrial financial disclosures to the SEC. Even under the government's current theory, Mr. Corigliano would have been required to complete the form in advance of the April 2004 settlement, because the agreement contained a partial interest waiver based on Mr. Corigliano's purported financial circumstances. <u>See</u> Ex. 13 to Docket No. 2187 ¶ 13. He never did so.

4

transfers to his father and the $3 million retainer he paid to his counsel.[6] Mr. Corigliano either

defied the SEC's request that he complete the form or was excused by the SEC from that

obligation.[7] Either way, all communications between Mr. Corigliano or his counsel and the SEC

concerning SEC requests for financial disclosure constitute <u>Brady/Giglio</u> and Rule 16 material

that should be produced.

     **B.    Government Lobbying Efforts.** The May 25, 2000 letter supplied by Mr.

Corigliano's counsel in November 2005, Ex. 5 to Docket No. 2187, reveals additional,

<u>documentary</u> information about former AUSA Weissman's role as an intermediary between Mr.

Corigliano and the SEC which the government never disclosed. The letter shows that Mr.

Weissman's role was different, and more extensive, than what the government reported to the

defense in October 2003, and raises serious questions about the accuracy of the government's

representation that it has "no additional information," Opp. at 20, on this subject. In addition,

the government represented in March 2004 that there were notes of SEC communications with

Mr. Weissman, <u>see</u> Docket No. 519 at 6, and former AUSA James McMahon represented in

October 2003 that he had spoken with Mr. Weissman for approximately an hour on the subject

of lobbying the SEC, <u>see</u> Tr. (10/23/03) at 139. Given the government's failure to produce the

May 25, 2000 letter, the government should, at a minimum, produce the SEC notes and any

McMahon notes or provide those notes to the Court for <u>in camera</u> inspection.

---

[6]    Mr. Forbes has identified specific communications between the SEC and Mr. Corigliano's counsel on the subject of Mr. Corigliano's financial disclosures that have not been produced, including a May 15, 2000 letter from the SEC to Mr. Corigliano's counsel and at least three letters dated March 30, 2000. <u>See</u> Docket No. 2189 at 8 n.6.

[7]    This was not an "inconsequential," Opp. at 18, breach of the plea agreement. It was part of an effort to conceal assets from the SEC, including the $3 million retainer Mr. Corigliano paid to his counsel and a separate parcel of property in excess of three acres owned by his wife.

**C.     SEC Requests for Tax Returns.**  The government is on notice of potentially false information supplied to the SEC on Mr. Corigliano's behalf, which would be a serious violation of his plea agreement.  <u>See</u> Docket No. 2189 at 13-15.[8]  At a minimum, the government should determine (from Mr. Corigliano or otherwise) and disclose (1) the dates on which Mr. Corigliano filed his 1999 and 2002 tax returns and (2) whether (and, if so, when) Mr. Corigliano ever supplied any tax returns to the SEC.[9]

**D.     False Information Supplied to the SEC.**  Mr. Forbes has supplied copies of Mr. Corigliano's 2001 and 2002 tax returns to the government; the government also has Mr. Corigliano's quarterly reports.  The government is on notice of this issue and has the ability to determine whether the information on the tax returns is at odds with the information in the quarterly reports.[10]  The government also has access to Mr. Corigliano.  If Mr. Corigliano made false representations to the SEC or on a tax return after he executed his plea agreement, that information is clearly <u>Brady/Giglio</u> material.

**E.     Settlement Negotiations with the SEC.**  While the government attempts to

---

[8]     While the government claims that there is no evidence that Mr. Corigliano "directed his lawyers to make those representations," Opp. at 21, Mr. Corigliano is the only logical source of information concerning when and whether he filed certain tax returns.

[9]     In <u>United States v. Stofsky</u>, 527 F.2d 237 (2d Cir. 1975) (Opp. at 22 n.6), the government produced tax records of a government witness to the defense, <u>id.</u> at 242, and tax returns were used during the witness's cross-examination, <u>id.</u> at 244 n.6.  Here, the government is on notice of issues pertaining to Mr. Corigliano's tax returns.  The government may obtain Mr. Corigliano's tax records pursuant to 26 U.S.C. § 6103(i)(1), and the Court may order them produced pursuant to 26 U.S.C. § 6103(i)(4), which permits such production under Rule 16 and the <u>Jencks</u> Act.

[10]     The government's failure to investigate this matter, or to take any steps to determine whether Mr. Corigliano's counsel erroneously represented to the SEC that Mr. Corigliano had not filed certain tax returns, demonstrates the government's willingness to overlook and ignore evidence of serious potential violations of Mr. Corigliano's plea agreement (just as it disregards overwhelming evidence of Mr. Corigliano's false testimony in two proceedings).

portray Mr. Corigliano's settlement negotiations with the SEC as a collateral matter, Opp. at 23,

the government elicited direct testimony on this subject at two trials. See p.3, supra. At a

minimum, Mr. Forbes is entitled to cross-examine Mr. Corigliano on these subjects under the

doctrine of impeachment by contradiction. Mr. Corigliano has falsely portrayed himself as

always willing to pay $13-14 million to the SEC and blames the SEC's purported position on a

$6 million tax issue as the barrier to his settlement. A jury would have a very different view of

these claims if it were to learn that Mr. Corigliano's counsel offered the SEC only $3.4 million

in settlement and that there was no $6 million tax issue that held up the settlement for years. The

government should be required to produce all documents and oral Brady/Giglio concerning all

settlement negotiations between the SEC and Mr. Corigliano or his counsel through April 2004.

     **F.**     **Budget Negotiations with the SEC.** On the same day the SEC filed its civil

complaint, Mr. Corigliano entered his guilty plea. Yet instead of proceeding with its civil case,

where it was entitled to summary judgment on the issue of liability, the SEC allowed the action

to be stayed at the request of the U.S. Attorney's Office. The SEC also allowed Mr. Corigliano

to retain possession of the proceeds of his crimes and to live off of them for almost four years on

a generous budget in excess of $250,000 a year. See Ex. 12 to Docket No. 2187. The SEC did

this although it believed that Mr. Corigliano's proposed budget was "unreasonable." See Ex. 10

to id. The government's assertion that the SEC acted "punitively," Opp. at 26, and that these

were "hardly" benefits, id., simply underscores the government's lack of understanding of its

Brady/Giglio obligations. The government should be required to produce all documents and oral

Brady/Giglio concerning Mr. Corigliano's annual budget for "living expenses."

     **G.**     **Unwritten Agreements.** The government does not dispute the fact that it has

made inconsistent representations about whether there was an oral side agreement that allowed

Mr. Corigliano to continue using his legal fee retainers. See, e.g., Docket No. 1147 at 6-8;

Docket No. 1084, Ex. 1; Docket No. 1643 at 3. While the government now seeks to portray this

matter as resolved, Opp. at 27, SEC attorney Frohlich testified that he was "not certain," Tr.

(9/27/04) at 13,610-11, whether Mr. Corigliano could continue using the retainers past July 7,

2004. The government should produce all contemporaneous documents concerning the terms of

the April 2004 settlement -- including any memorandum prepared for the SEC Commissioners

who had to approve the settlement -- describing the assets that Mr. Corigliano was permitted to

retain. Similarly, Mr. Frohlich apparently believed that Mr. Corigliano could continue to use

funds to pay living expenses only through the date of the final judgment (May 6, 2004), not July

7, 2004. See Tr. (9/27/04) at 13,608. The government should produce all documents concerning

the SEC's understanding of the terms of the April 2004 settlement with Mr. Corigliano.[11]

## II.    DOCUMENTS AND INFORMATION RELATING TO KEVIN KEARNEY.

As set forth in Docket No. 2272, Kevin Kearney testified falsely concerning material

matters at both the 2004 and 2005 trials. The government's facile response ignores the

numerous interviews in which Mr. Kearney told the government information that is totally

---

[11]    With respect to Mr. Corigliano's prior testimony (Opp. at 28-29), the government is on
notice that its chief witness testified falsely at two trials. Under Brady/Giglio the government
should be required to disclose the substance of its communications with Mr. Corigliano
concerning the matters set forth in Docket No. 2190, including all communications about the
manner in which Mr. Corigliano's 2005 and expected 2006 testimony should deal with those
issues and the extent to which the government would omit from its examinations matters about
which Mr. Corigliano was shown to have testified falsely. Mr. Forbes discusses the relevance
and admissibility of the information he seeks concerning Mr. Corigliano's polygraph
examinations (Opp. at 29-31) in Docket No. 2257, incorporated herein. With respect to attorney
proffers (Opp. at 31-32), Mr. Corigliano denies any knowledge of what his attorneys represented
to the government in conversations prior to January 1999. See Tr. (7/15/04) at 7610, 7671-74.
If the government is in possession of any information inconsistent with Mr. Corigliano's
testimony, it should disclose that information under Brady/Giglio.

inconsistent with his 2004 and 2005 trial testimony. For example, while Mr. Kearney now

claims that former CUC CFO Stuart Bell repeatedly invoked Mr. Forbes' name at quarterly

meetings concerning topside adjustments, Mr. Kearney repeatedly told the government that he

did not meet with Mr. Bell to discuss quarterly topside adjustments. See Docket No. 2272.

The government's claim that Mr. Kearney purportedly "implicate[d]" Mr. Forbes when

"specifically asked" about him," Opp. at 32, highlights the need for the government to produce

all notes of the July 10, 2001 Kearney interview, where it appears from Mr. Greiner's notes that

Mr. Kearney indicated that he had no information to provide regarding Mr. Forbes. The

government does not dispute that two other SEC representatives were present at this interview.

Opp. at 34. While the government asserts that it has no obligation to turn over the notes of SEC

representatives Susan Markel and Roger Paszamont, id., the government has an obligation to

produce SEC materials for the reasons set forth at pp. 1-2, supra. Given the government's failure

to locate any notes taken by FBI agent Gerber of this interview, it is critical that the government

produce the notes taken by the SEC representatives who attended this interview.[12]

The government also should produce the notes of the members of the 2004 trial team

concerning their interviews of Mr. Kearney. The letters provided by the government do not

adequately convey the ever-evolving nature of Mr. Kearney's changing claims about Mr. Forbes

or the context in which his changing statements were made. Nor do the government letters

---

[12]     The government has never produced a Form 302 by Mr. Gerber of that interview, despite
FBI requirements that agents record on a Form 302 the substance of any interview that may
become the subject of court testimony. See Manual of Administrative Operations and
Procedure, § 10-13.3(3). On April 3, 2006, the government produced Gerber notes of several
interviews that had never previously been produced. See Ex. 8 hereto (enclosures omitted). It
should renew its search for Mr. Gerber's notes of this interview in light of the existence of other
Gerber notes that apparently were not discovered until recently.

reveal when (or whether) Mr. Kearney informed the government about several claims to which

he testified at the 2004 trial.  See United States v. Service Deli, Inc., 151 F.3d 938, 942-43 (9th

Cir. 1998) (Brady violation based on failure to produce interview notes).[13]

## III.     ADDITIONAL DOCUMENTS AND INFORMATION.[14]

The government has not supplied any information to Mr. Forbes concerning the

interviews of government witnesses that took place after approximately July 2004.  It has not

supplied any information concerning its witness interviews prior to or during the 2005 trial, or

subsequent to that trial.  Whether or not the prosecutors took notes of those sessions, the

government must provide all Brady/Giglio material arising from those sessions.  Finally, the

government should supply all Brady/Giglio information contained in any alleged "work product"

notes or memoranda concerning witnesses interviews.  See Docket No. 2189 at 4 & n.3.

---

[13]     If Mr. Greiner or any other government agent or attorney prepared any internal
memorandum reflecting that Mr. Kearney had no information to offer with respect to Mr.
Forbes, that information is clearly Brady/Giglio that must be disclosed.

[14]     With respect to Mr. Monaco (Opp. at 35), Mr. Forbes has received information that Mr.
Monaco is aware of a pending investigation into his conduct during his prior employment.  Mr.
Forbes requests that the government renew its inquiry into this matter in light of that
information, including seeking the information from Mr. Monaco and the SEC.  With respect to
Mr. Kernkraut (Opp. at 36), it appears from the government's new witness list that the
government may be interviewing analysts other than Mr. Kernkraut who covered CUC.  The
government should disclose any information it learns during those interviews that tends to show
that CUC did not conduct quarterly conference calls with analysts about earnings releases prior
to May 1997.  With respect to Messrs. Bell and Shelton (Opp. at 36-38), the government is on
notice of the information requested by Mr. Forbes, as well as the statements made by Mr.
Shelton's counsel and others on the record at Mr. Shelton's sentencing hearing concerning the
matters raised in Mr. Forbes' motion.  The government has not stated whether there were plea or
cooperation discussions with Mr. Shelton in connection with his proffer sessions with the
government.  With respect to Mr. Sabatino (Opp. at 38), Mr. Sabatino was called as an adverse
witness by the defense, and he is cooperating with the government pursuant to a plea agreement.
Any information that tends to show that CUC did not engage in unsupported or improper
quarterly topside adjustments when Mr. Bell was CFO is exculpatory Brady information that
should be produced, irrespective of whether Mr. Sabatino is called as a government witness.

10

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: _____
Brendan V. Sullivan, Jr. (Bar No. ct17115)
Barry S. Simon (Bar No. ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
Cowdery, Ecker & Murphy, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

11

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused the foregoing Amended Reply Memorandum in

Support of Motion of Defendant Walter A. Forbes to Compel Discovery and Production of

<u>Brady</u>/<u>Giglio</u> Material (Forbes Third Trial Motion No. 2) to be filed electronically and to be

served on May 19, 2006 to the following via e-mail:


　　　　　Norman Gross, Esq. (norman.gross@usdoj.gov)
　　　　　Michael Martinez, Esq. (michael.martinez2@usdoj.gov)
　　　　　Craig Carpenito, Esq. (craig.carpenito@usdoj.gov)


Barry S. Simon