UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | No. 3:02CR264 (AHN) |
| ) | |
| WALTER A. FORBES ) | May 19, 2006 |
| ) | |

**AMENDED REPLY MEMORANDUM IN SUPPORT OF MOTION
OF WALTER A. FORBES TO PRECLUDE THE GOVERNMENT
FROM REFERENCING THE TRUTH-TELLING PROVISIONS IN
COSMO CORIGLIANO'S PLEA AGREEMENT AND
PRESENTING HIM AS HAVING COMPLIED WITH HIS
OBLIGATIONS UNDER THAT AGREEMENT
(Forbes Third Trial Motion *In Limine* No. 1)**

WILLIAMS & CONNOLLY LLP
Brendan V. Sullivan, Jr. (Bar No. ct17115)
Barry S. Simon (Bar No. ct24159)
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

COWDERY, ECKER & MURPHY, L.L.C.
James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

*Attorneys for Walter A. Forbes*

Defense counsel are unaware of another case in which the government's star witness testified falsely in two prior trials, the government essentially concedes that some of his testimony was false, but nonetheless rationalizes its continued portrayal of him as fully complying with his plea agreement.

Although the government blurs the two issues, Mr. Corigliano breached (1) the truth-telling provisions of his plea agreement by providing "materially false, incomplete, [and] misleading testimony"; and (2) the disclosure provisions of his plea agreement by failing to provide "complete and accurate information regarding his ability to pay" and to "truthfully disclose all information" requested by the SEC. Ex. 2, at 2, 7.[1] As a result of these breaches, the plea agreement states that "the non-prosecution provisions of this agreement shall be null and void." Id. at 2. Despite this mandatory language, the government has not revoked the plea agreement. Under these circumstances, it would be false and misleading for the government to argue or introduce evidence that Mr. Corigliano has an obligation to testify truthfully under his plea agreement, that he is in compliance with his agreement, or that the non-prosecution provisions of his plea agreement are contingent upon his truthful cooperation. Due process prohibits the government from introducing such false and misleading evidence.

The government does not take issue with the general proposition that due process precludes it from introducing false or misleading evidence, or with the specific argument here—that reliance upon the truth-telling provisions or presentation of Mr. Corigliano as in compliance with the plea agreement would be misleading if Mr.

---

[1] All citations to Exhibits are to the joint Exhibits in Support of Mr. Forbes' Motions Filed March 31, 2006 [Docket No. 2187].

Corigliano breached the agreement. Instead, the government offers various excuses for Mr. Corigliano's breaches, but none of those excuses absolves Mr. Corigliano.[2]

    1. <u>The Fabricated March 1998 Meeting.</u>  Mr. Corigliano breached the truth-telling provisions of his plea agreement when he testified in the first trial about an alleged meeting with Mr. Forbes in Mr. Shelton's Stamford, Connecticut office that had to have happened (if at all) within a few days of March 11 or 12, 1998.  Documentary evidence proves that during the relevant time period, between March 9-22, Mr. Forbes was traveling on business on the West Coast and on vacation in Hawaii.  <u>See</u> Tr. (08/04/04) at 9,631-52.  The government attempts to excuse Mr. Corigliano's false testimony by arguing that he was simply mistaken about the date, and tries to imply that he was unfairly pinned down to a particular date.  This excuse fails.

    On direct <u>and</u> redirect examination, Mr. Corigliano placed bookends around the alleged meeting, tying it to other events with verifiable dates.  On direct, Mr. Corigliano testified that the alleged meeting involved a discussion of the events of March 9, and he put specific (made up) words in Mr. Forbes' mouth.  Mr. Corigliano testified that the purported meeting happened "[w]ithin a few days" of March 11 or 12.  Tr. (07/14/04) at 7,488-89.  The government concedes that any such meeting must have occurred after March 9, because it supposedly involved a discussion of the events of March 9.  <u>See</u> Opp'n at 10.  On redirect, Mr. Corigliano testified that the meeting happened before Mr. Forbes' Hawaii vacation.  <u>See</u> Tr. (08/04/04) at 9,574; <u>see also</u> <u>id.</u> at 9,647.  According to Mr. Corigliano, the meeting <u>had to be after March 11 or 12 and</u>

---

[2] The government's boilerplate reconsideration and law of the case arguments are addressed in the Memorandum of Walter A. Forbes in Opposition to Motion of Cosmo Corigliano and Kramer Levin Naftalis & Frankel LLP to Quash Rule 17(c) Subpoenas at pp. 9-16 [Docket No. 1830].

<u>before Mr. Forbes left for Hawaii</u>. Mr. Forbes was not in Stamford, Connecticut during this time period.

The cross-examination block-quoted in the government's brief was not, as the government implies, an effort to pin Mr. Corigliano down to a date before confronting him with the travel records. See Opp'n at 11-12 (quoting Tr. (08/04/04) at 9,650). To the contrary, defense counsel had <u>already</u> confronted Mr. Corigliano with the travel records <u>before</u> these questions and answers. See Tr. (08/04/04) at 9,641-50. These questions simply gave Mr. Corigliano a chance to back away from his prior testimony. But contrary to the government's current argument, <u>Mr. Corigliano did not testify that he was "mistaken" about the date</u>. After being confronted with the fact that Mr. Forbes was thousands of miles away from Stamford, Connecticut when the supposed meeting took place, Mr. Corigliano stuck with his story about an alleged meeting "two, three, four, five" days after March 10 or 11. Tr. (08/04/04) at 9,650. The government's block quote omits the final question and answer that put the lie to its "mistaken date" argument.

> Q. . . . So the time you placed him in the meeting in the office of Kirk Shelton, no matter what version of the meeting you're describing, it appears clear, from the records at least, that Walter Forbes was two to 6,000 miles away from where you placed him; isn't that accurate, sir?
>
> A. No. Because I remember the meeting. I remember it being in Kirk's office. I remember it being after Walter told me that penny wasn't going to do anything. And that's what I remember.

Id. at 9,650-51.

Mr. Corigliano did not claim to be "mistaken" about the date because he knew that a meeting after March 22, when Mr. Forbes returned from Hawaii, would not have made sense. Indeed, if Mr. Corigliano was simply "mistaken" about the date, he could have corrected his testimony in the second trial. <u>But he did not do that. Instead, the</u>

- 3 -

government dropped the testimony about the alleged meeting entirely. Mr. Corigliano either manufactured the meeting out of whole cloth, or he falsely put Mr. Forbes in it. In either event, he lied about what Mr. Forbes supposedly said in that meeting.[3]

        2.    The Fabricated Bug-Sweeping Incident in November 1997.

Documents also demonstrate that Mr. Corigliano's testimony about an alleged bug-sweeping incident in November 1997 was false. The government's argument that "[t]he jury could have reasonably concluded from all of the documentary evidence . . . that GX 430 accurately reflected the sweeping incident in the fall of 1997 about which Corigliano testified," Opp'n at 13-14, is a red-herring. The question is not what the jury believed, but whether Mr. Corigliano lied. If he lied about this alleged incident, he is in violation of his plea agreement, irrespective of whether he fooled the jury. In any event, the suggestion that GX 430 may have accurately reflected a bug-sweeping incident in the fall of 1997, as opposed to the fall of 1996, is preposterous. Although the EED invoice in GX 430 is dated November 17, 1997, the second page of GX 430 is dated November 17, 1996; Mr. Corigliano's calendar indicates a scheduled meeting with an EED representative on November 16, 1996; a CUC check and CUC's general ledger indicate a payment to EED in December 1996 based on a November 17, 1996 invoice, which just happen to match up penny for penny with the EED invoice dated November 17, 1997. See Exs. 24-27. Moreover, the government had the EED records and had access to all CUC records and there are no CUC records of a payment to EED based on a November 1997 invoice and no EED records of a receipt of a payment from CUC based on a

---

[3] The government's reliance upon United States v. Glover, 588 F.2d 876 (2d Cir. 1978), is misplaced. The possibility of a "mistake" about dates was real in that case because the date of the alleged event that was ultimately disproved was not tied logically in proximity to another significant, undisputed date.

<u>November 1997 invoice</u>. In the face of this evidence, the government does not now argue that Mr. Corigliano's testimony was factually correct, but half-heartedly suggests that the documents "do not necessarily contradict" Mr. Corigliano's testimony. Opp'n at 14. Significantly, however, the government omitted any mention of GX 430 in the second trial and intentionally avoided placing a date on the alleged incident in Mr. Corigliano's direct examination.

The government also defends Mr. Corigliano's testimony on the grounds that Mr. Corigliano "may have honestly recalled a conversation in the fall of 1997 when Forbes suggested that the CUC offices be swept for bugs, <u>but mistakenly believed that an actual sweep had taken place then</u>." Opp'n at 14 (emphasis added). This cover story bears no resemblance to Mr. Corigliano's testimony in either the first or the second trial, and it demonstrates the lengths to which the government will go to protect Mr. Corigliano and ignore violations of his plea agreement. In the first trial, Mr. Corigliano provided elaborate detail about the alleged bug-sweeping incident and testified that <u>he was present when EED conducted the sweep</u>. Tr. (07/13/04) at 7,347-49. Mr. Corigliano and the government had several months to fix Mr. Corigliano's testimony between the first and second trials, but they must not have come up with the idea that he "mistakenly believed that an actual sweep had taken place," Opp'n at 14, because on direct examination in the second trial, <u>he testified again that a sweep in fact happened</u>. Tr. (10/31/05) at 1,364.

The government's argument that Mr. "Corigliano could have been honestly mistaken in his recollection of the timing of those events," Opp'n at 14, fares no better than its prior "mistaken date" argument. Like the supposed conspiratorial meeting in Mr. Shelton's office, the alleged bug-sweeping incident is not floating in time

- 5 -

unmoored to some other identifiable event. According to Mr. Corigliano's testimony, the bug-sweeping related to concerns about the proposed merger with HFS. Therefore, the bug-sweeping had to have occurred (if at all) during the period around the merger. The documents prove that no bug-sweeping occurred in this time period.

        3.    <u>The Undisgorged Retainer Funds.</u> By failing to list the retainer funds on the quarterly SEC asset schedules, Mr. Corigliano breached the disclosure obligations of his plea agreement. The government nevertheless claims that he did not intentionally breach his disclosure obligation because he testified that "it was his understanding that, once he paid the retainer fees to the lawyers, no portion of the fees would be returned to him." Opp'n at 16. In fact, <u>his lawyers returned $1,000,000 of the retainer funds to him at some point after he entered into his plea agreement.</u> Ex. 20. Mr. Corigliano was required to list all assets that he or his wife owned "directly or indirectly" or that were "subject to their possession, enjoyment or control, regardless of whether legal title or ownership" was held by someone else. Ex. 12 at SEC 0050. He knew that the retainer funds fit this description because he could use them to pay legal fees and some of the funds were returned to him.[4]

---

[4] The government asserts that Mr. Corigliano's attorney and David Frohlich of the SEC "confirmed that Corigliano did not breach . . . by declining to list the retainer amounts on Corigliano's quarterly reports." Opp'n at 16-17. First, it is not surprising that his own attorney would argue that he is in compliance with his plea agreement. Second, an argument by the government that he is in compliance supports this motion, which argues that the government looks the other way when Mr. Corigliano breaches his agreements. In any event, at none of the cited pages does Mr. Corigliano's attorney or Mr. Frohlich state that the quarterly asset schedules did not require disclosure of the retainer funds. Rather, they both said that counsel discussed the retainers with the SEC prior to the settlement (after he had failed to list the retainer funds on numerous quarterly reports). Tr. (08/02/04) at 9,124 ("prior to the settlement of the case, the SEC was advised of the approximate amount of the remaining legal fees"); Tr. (09/27/04) at 13,602-03 ("There was a discussion prior to the consent and judgment being executed.").

In addition to breaching his disclosure obligations, Mr. Corigliano breached his truth-telling obligation when he testified that he and his wife disgorged "everything we had except for" certain specific items. Tr. (07/14/04) at 7,504. In fact, they had not disgorged the retainer funds, but were permitted to use them (in lieu of, for example, his children's trust funds) to pay legal fees. The government ignores this point.[5]

    4.    <u>The Undisgorged Second Parcel.</u> By failing to list the second lot on the quarterly SEC asset schedules, Mr. Corigliano breached his disclosure obligation. By testifying at trial that he disgorged everything, except for his house and other limited assets, Tr. (07/14/04) at 7,504, he violated the truth-telling provisions of his plea agreement. The government does not argue that Mr. Corigliano disclosed the existence of the second parcel to the SEC or that his trial testimony was accurate. Instead, the

---

[5] When it was suggested in the first trial that Mr. Corigliano had concealed the existence of the retainer funds from the SEC, the government provided a cover story for its star witness, offering to stipulate that there was an "oral agreement" about the retainer funds. See Ex. 28. The government now claims that this was a mistake, "attributable to the fact that the Government's understanding of those agreements was incomplete when the government first offered to stipulate that Corigliano and the SEC had an 'oral side agreement.'" Opp'n at 17 n.6. This about-face, which suggests that the government did not have time to figure out whether there was an oral agreement, flies in the face of what happened contemporaneously. Mr. Corigliano was first cross-examined about the retainer funds on July 20, 2004. See Tr. (07/20/04) at 8,109-15. Six days later, the lead prosecutor represented that he had spoken with the SEC about the retainer funds, but did not suggest in any way that his opportunity to do so was inadequate. Tr. (07/26/04) at 8,715. Eight days later, the government drafted and submitted a proposed stipulation, which stated that there was an "oral agreement between the SEC and counsel for Mr. and Mrs. Corigliano." Ex. 28. On September 7, 2004, <u>seven weeks after defense counsel first examined Mr. Corigliano about the retainer funds</u>, the government submitted a brief, which repeatedly relied upon the "oral agreement" with the SEC as a basis to defend Mr. Corigliano's false and misleading testimony about the retainer funds. See Docket No. 1147 at 6-7 ("there is an oral agreement"); id. at 7 ("By operation of the oral agreement"); id. at 8 ("the Government offered to stipulate to the existence of the oral agreement"); id. at 9, 10. This pattern shows that the government has done whatever appears necessary at the time to protect Mr. Corigliano, without regard to the truth.

government defends Mr. Corigliano's breaches by arguing that he "plausibly explained that he regarded the two adjoining but separately taxed parcels of real property . . . as a single piece of property." Opp'n at 18. Even if his explanation were plausible (it is not), this does not explain why now, after the government learned of the second lot, it took no steps to seek disgorgement of it under the SEC settlement agreement which required him to turn over all real property with the exception of his residence located at a different address and his father's home. Ex. 13 ¶ 6(i), (iii). Furthermore, that the "SEC was likely unconcerned about Corigliano's characterization of his real estate holdings in Old Saybrook," Opp'n at 18,[6] underscores, not undermines, the point of this motion. Mr. Corigliano can violate his agreements with the government and the government takes no action against him.

     5.    The Understated Value of the Corigliano Home. Mr. Corigliano, in an effort to horde as many assets as he could, intentionally low-balled the value of his home to the SEC and to the jury. In the quarterly asset schedules, he listed the purchase price of the home, not the "fair market value" as the standard SEC form requested. Ex. 12 at SEC 0050. In response to a specific inquiry by the SEC about the value of his home, he tried to pass off as "comparable" a property consisting of a single lot of 1.32 acres, in contrast to his two lots totaling 11 acres. Mr. Corigliano thereby violated the

---

[6] The government's characterization of the testimony of SEC attorney Kidney is inaccurate. Although he testified that, in his personal opinion, disclosure of the second parcel "would [not] have made any difference" (apparently an argument that the non-disclosure was immaterial), Mr. Kidney acknowledged that "It's hard to go back in hindsight, you know." Tr. (09/23/04) at 13,531. These subsequent government rationalizations underscore the need for full disclosure (if necessary, to the Court in camera) of any contemporaneous SEC documents – including any memorandum prepared for the SEC Commissioners who had to approve the settlement – describing the assets that Mr. Corigliano was being permitted to retain. See Forbes Third Trial Motion No. 2.

- 8 -

disclosure obligations of his plea agreement. To cover up his efforts to mislead the SEC, he provided false, incomplete and misleading testimony at trial and thereby violated the truth-telling provisions of his plea agreement as well. At trial, he testified first to the purchase price and then to a value of $2 million (based on the 1.32-acre "comparable"), even though the two properties had just been assessed for more than $3.6 million.

The government does not argue that the properties were in fact worth $1.7 or $2 million, or that the lot Mr. Corigliano tried to pass off as a comparable was in fact comparable. Instead, the government states that "Corigliano testified at the first trial without contradiction that he was unaware of" the recent tax assessment, suggesting that he did not know the value of his home. Opp'n at 19. Who was going to contradict his testimony about not seeing the tax assessment? His wife, to whom he claims the tax assessment would have been addressed? See Tr. (07/20/04) at 8,162-63. He knew that his home had been reassessed. Id. at 8,162. He knew that there were two separate lots, since he personally paid two separate tax bills for the two lots annually. He knew that his taxes on both pieces of property had gone up as a result of the assessment; he received and paid both tax bills himself. Id. at 8,165-66, 8,169-70. Even if one could stomach the far-fetched notion that he was unaware of the results of the tax assessment, the suggestion that he did not know the value of his home, <u>his single most valuable asset</u>, at a time when he had just disgorged what he claims were the vast majority of his assets, is incredible.

6.      **The Post-March 31, 2004 Dissipation of Assets.** The government concedes that Mr. Corigliano paid his future living expenses and property taxes out of funds and assets that were "slated for transfer to the receiver." Opp'n at 20. The government does not argue that the SEC settlement agreement permitted this, but rather

that "nothing in the settlement agreement expressly forbade such payments," id. at 22, and that there is no evidence that Mr. Corigliano "should have known that such payments were forbidden." Id. at 21. To the contrary, the settlement agreement required him to disgorge all "assets of a value of $1,000 or more in which [he or his wife] had any direct or indirect legal or beneficial ownership interest as of March 31, 2004." Ex. 13 ¶ 3(vi). This language obviously precluded him from liquidating those assets for his own beneficial use after March 31, 2004, but before the transfer. The government does not suggest in any way that Mr. Corigliano told the prosecution or the SEC about these expenditures. It appears then that Mr. Corigliano made these expenditures in violation of the SEC settlement agreement and he violated the truth-telling provisions of his plea agreement by testifying that he was not hiding anything from the SEC when he liquidated assets to pay his property taxes and "normal" living expenses. See Tr. 8/03/04 at 9,458.

\*   \*   \*

Because Mr. Corigliano provided false, incomplete and misleading testimony and the government has not enforced the truth-telling provisions of his plea agreement, the government cannot rely on those provisions to bolster his credibility. In addition, because Mr. Corigliano breached the truth-telling provisions and failed to provide complete and accurate information to the SEC, the government cannot present Mr. Corigliano as in compliance with his plea agreement. Doing so would mislead the jury and violate Mr. Forbes' Due Process rights.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: _____
Brendan V. Sullivan, Jr. (ct17115)
Barry S. Simon (ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

James T. Cowdery (ct05103)
Thomas J. Murphy (ct07959)
COWDERY, ECKER & MURPHY, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Amended Reply Memorandum in Support of Motion of Defendant Walter A. Forbes to Preclude the Government from Referencing the Truth-Telling Provisions of Cosmo Corigliano's Plea Agreement and Presenting Him as Having Complied with that Agreement (Forbes Third Trial Motion *In Limine* No. 1) to be filed electronically and to be served on May 19, 2006 to the following via e-mail:

Norman Gross, Esq. (norman.gross@usdoj.gov)
Michael Martinez, Esq. (michael.martinez2@usdoj.gov)
Craig Carpenito, Esq. (craig.carpenito@usdoj.gov)

_____
Barry S. Simon