UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


UNITED STATES OF AMERICA    :  No. 3:02CR00264 (AHN)
                            :
                            :
            v.              :  May 19, 2006
                            :
                            :
                            :
WALTER A. FORBES            :



GOVERNMENT'S OPPOSITION TO DEFENDANT WALTER A. FORBES' MOTION TO
PRECLUDE THE GOVERNMENT FROM PRESENTING ITS PROPOSED EXPERT
TESTIMONY BECAUSE IT SUPPOSEDLY DOES NOT SATISFY THE RELIABILITY
REQUIREMENTS OF DAUBERT AND FEDERAL RULE OF EVIDENCE 702

(Opposition to Forbes Third Trial Motion *In Limine* No. 5)

CHRISTOPHER J. CHRISTIE
NORMAN GROSS
MICHAEL MARTINEZ
Special Attorneys
U. S. Department of Justice
970 Broad Street
Room 700
Newark, N.J.  07102
(973) 645-2701

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.    JUDGE THOMPSON PROPERLY CONCLUDED, FOLLOWING A FIFTEEN DAY
      DAUBERT HEARING AND EXTENSIVE BRIEFING, THAT HECKLER'S
      EXPERT OPINIONS WERE THOROUGHLY SUPPORTED BY HIS RIGOROUS
      ANALYSIS. . . . . . . . . . . . . . . . . . . . . . . . 4

      A.    Judge Thompson Properly Applied the Liberal Standards
            for the Admission of Expert Testimony. . . . . . . 4

      B.    Judge Thompson Properly Rejected Forbes' Contention
            That Heckler's Opinion Testimony Was Deficient Because
            it Did Not Comply with Generally Accepted Auditing
            Standards, since Heckler's Expert Testimony Did Not
            Purport to Be an "Audit." . . . . . . . . . . . . 7

      C.    Heckler Considered Sufficiently Reliable Information in
            Formulating His Expert Opinion. . . . . . . . . . 13

            1.    Judge Thompson Properly Credited Heckler's
                  Testimony That He Conducted an Independent
                  Investigation and Analysis of the Fraud. . . . 13

            2.    Heckler Permissibly Considered, but Did Not "Rely
                  Upon" the Audit Committee Report and Witness
                  Interviews Undertaken by the Audit Committee
                  Investigators. . . . . . . . . . . . . . . . 17

                  a.    The Audit Committee Report And the Witness
                        Interviews Conducted by the Audit Committee
                        Investigators Were Permissible Sources of
                        Information for Heckler to Consider. . . 17

                        I.  The Audit Committee Report. . . . . 17

                        ii. The Witness Interviews. . . . . . . 21

                  b.    Heckler Had a Sufficient Understanding of the
                        Audit Committee Report to Consider it in
                        Formulating His Opinions. . . . . . . . 26

3. Heckler Did Not Merely "Parrot" the Audit
Committee Report and its Supporting Work
Papers. . . . . . . . . . . . . . . . . . 27

II. HECKLER'S TRIAL TESTIMONY DID NOT UNDERMINE JUDGE THOMPSON'S
CONCLUSION THAT THE TESTIMONY WAS PROPERLY ADMITTED. . 28

III. JUDGE THOMPSON PROPERLY CONCLUDED THAT HECKLER'S EXPERT
TESTIMONY DID NOT VIOLATE FORBES' CONFRONTATION
RIGHTS. . . . . . . . . . . . . . . . . . . . . . . 32

A. Because Heckler Is Subject to Cross-examination, the
Fact That He Considered Out-of-court Statements Does
Not Create a Confrontation Problem. . . . . . . . 32

B. Forbes' Self-serving Speculation That He Cannot Cross-
examine Heckler Without Eliciting Improper Opinions Is
No Basis for this Court to Reconsider Judge Thompson's
Considered Ruling. . . . . . . . . . . . . . . . 36

IV. HECKLER HAS SUFFICIENT EXPERTISE TO TESTIFY ABOUT SEC
FINANCIAL AND DISCLOSURE REQUIREMENTS. . . . . . . . 38

CONCLUSION . . . . . . . . . . . . . . . . . . . . . 40

**INTRODUCTION**

Before the first trial, the Government provided the defense with summaries of proposed expert testimony about some of the accounting issues in this case from Brian Heckler, a certified public accountant and partner at KPMG, and Professor Robert Sack of the Darden School of Business at the University of Virginia. Forbes objected to the admission of the Government's proposed expert testimony on numerous grounds, including Fed. R. Crim. P. 16(a)(1)(G), Fed. R. Evid. 702, 703, and 704, <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 589 (1993), and the confrontation clause of the United States Constitution.

After forcing the Court and the Government to expend many weeks on these issues,[1] Forbes effectively conceded that he had no real challenge to the substance of the proposed expert

---

[1]    Judge Thompson conduced a fifteen day <u>Daubert</u> hearing between December 16, 2003 and March 25, 2004 to address the objections of Forbes and his co-defendant Kirk Shelton to the proposed testimony of the Government's accounting experts.  The transcript of that hearing ("DHT") was paginated separately from the transcript of the first and second trials.

Forbes' lawyers cross-examined Heckler for seven days during the <u>Daubert</u> hearing.  DHT at 989-2314.  Notwithstanding this extensive "deposition," Forbes apparently did not find a single chink in Heckler's expert testimony that Forbes felt was worth bringing to the attention of the juries in the first two trials, as he did not pose a single question to Heckler in either trial. First Trial Transcript ("FTTr.") 10668; Second Trial Transcript ("STTr.) 2427.  Forbes nevertheless claims that the <u>Daubert</u> hearing was "extended" because of Heckler's supposed "vacillations," which Forbes did not bother to address at either trial.  Forbes' Mem. in Support of Third Trial Motion in Limine No. 5 ("FM") at 2.  The Government will address Forbes' contention that Heckler presented three "alternative descriptions of the basis for his opinions" in Section II of this memorandum.

testimony: that certain persons involved in the accounting function at CUC had engaged in a host of practices that violated Generally Accepted Accounting Principles ("GAAP")[2] and had inflated the publicly reported operating income of CUC and Cendant on a quarter-by-quarter basis for the fiscal years ending January 31, 1996 (CUC), January 31, 1997 (CUC), and December 31, 1997 (Cendant).  Rather, Forbes embraced the Government's proof of a massive accounting fraud at CUC and Cendant, and deployed the undisputed occurrence of that fraud to challenge the credibility of Cosmo Corigliano.[3]  Forbes has never contended in this case that the fraudulent accounting practices at CUC while he was CEO and Chairman of the Board were anything but fraudulent.  See Exhibit A hereto, July 28, 1998 press release in which Forbes acknowledged that CUC had engaged in fraudulent accounting practices.

Forbes nevertheless renews his objections to Heckler's testimony, raising the same or similar claims that he

---

[2]  "Generally Accepted Accounting Principles are the official standards adopted by the American Institute of Certified Public Accountants, a private professional association, through three successor groups it established: the Committee on Accounting Procedure, the Accounting Principles Board, and the Financial Accounting Standards Board." Ganino v. Citizens Utilities Co., 228 F.3d 154, 160 n.4 (2d Cir. 2000).

[3]  Even in his current papers, Forbes effectively concedes that he will not challenge the Government's evidence that the charged fraud occurred and the magnitude of the fraud.  See Forbes' Third Trial Motion in Limine No. 11 at 4 and n.4 (stating that Forbes is not challenging the materiality of CUC's false statements).

unsuccessfully presented before the first and second trials.[4]  He cannot satisfy the heavy burden of demonstrating that this Court should reconsider and reverse Judge Thompson's admission of Heckler's testimony, informed as it was by presiding over the lengthy <u>Daubert</u> hearing and Heckler's testimony at the first trial.  That ruling is now the law of this case.  <u>See</u> Government's Response to Forbes' Third Trial Motion In Limine No. 1, pp. 3-5 (setting forth the standard for obtaining reconsideration and for overcoming the law of the case).[5]

Because Forbes has not even attempted to show that he has satisfied the heavy requirements for obtaining reconsideration or avoiding the law of the case, this Court, which, unlike Judge Thompson, did not have the benefit of presiding over the lengthy <u>Daubert</u> hearing, need not consider the merits of Forbes' present motion.  For the reasons stated herein, those claims are

---

[4]    In his motion, but not in his memorandum in support of that motion, Forbes identifies and incorporates by reference his prior submissions to Judge Thompson as the sole grounds for his objection to the testimony of Professor Sack.  This Court should decline to address Forbes' undeveloped challenges to the testimony of Professor Sack that were all properly rejected by Judge Thompson.  <u>See</u> <u>United States v. Wilson</u>, 390 F.3d 1003, 1009 (7th Cir. 2004).

[5]  As if Forbes' lawyers have not given this Court enough to read with their 22 "Third Trial Motions in Limine" filed as of April 17, 2006, on top of their 13 other pre-trial motions, Forbes "incorporates . . . his prior arguments" set forth in no fewer than 7 prior submissions, <u>and</u> in 8 submissions by his co-defendant, Kirk Shelton.  FM 4.  This Court should not be burdened with reading <u>15</u> additional briefs in addition to the 37 page memorandum that Forbes has filed in support of this motion.

meritless in any event.

**ARGUMENT**

I.   **JUDGE THOMPSON PROPERLY CONCLUDED, FOLLOWING A FIFTEEN DAY <u>DAUBERT</u> HEARING AND EXTENSIVE BRIEFING, THAT HECKLER'S EXPERT OPINIONS WERE THOROUGHLY SUPPORTED BY HIS RIGOROUS ANALYSIS.**

   **A.   Judge Thompson Properly Applied the Liberal Standards for the Admission of Expert Testimony.**

Judge Thompson did not abuse his very broad discretion by admitting Brian Heckler's expert testimony over Forbes' objections.  <u>See</u> <u>General Elec. Co. v. Joiner</u>, 522 U.S. 136, 141 (1997)("abuse of discretion is the proper standard of review of a district court's evidentiary rulings [regarding expert testimony]").  This Court should be particularly deferential to Judge Thompson's ruling on that point, as it was informed by several rounds of thorough briefing and a fifteen day <u>Daubert</u> hearing.

Fed. R. Evid. 702 provides:

   If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

As the leading commentator on the Federal Rules of Evidence has explained:

4

> Expert testimony is liberally admissible under the
> Federal Rules of Evidence.  The general approach of the
> Rules is to relax traditional barriers to expert
> opinion testimony.  The presumption under the Rules is
> that expert testimony is admissible.

4 Weinstein's Federal Evidence ("Weinstein"), §702.02 (2d ed.
2006), citing United States v. Boissoneault, 926 F.2d 230 (2d
Cir. 1991); see also Daubert v. Merrell Dow Pharm., Inc., 509
U.S. 579, 588 (1993)(Rule 702 is part of the "liberal thrust" of
the Federal Rules of Evidence and their "general approach to
relaxing the traditional barriers to opinion testimony");
Borawick v. Shay, 68 F.3d 597, 610 (2d Cir. 1995) ("Daubert
reinforces the idea there should be a presumption of
admissibility of evidence."); see generally Archer Daniels
Midland Co. v. Aon Risk Services, Inc. of Minnesota, 356 F.3d
850, 858 (8th Cir. 2004) ("An expert's opinion must be excluded
only if it is so fundamentally unsupported that it can offer no
assistance to the jury.")(internal citations and quotation marks
omitted).

In assessing the admissibility of proposed expert testimony
under Rule 702, the trial court must first determine whether the
proffered expert testimony is relevant, i.e., whether it has "any
tendency to make the existence of any fact that is of consequence
to the determination of the action more probable or less probable
than it would be without the evidence."  Fed. R. Evid. 401; see

Daubert, 509 U.S. at 587.[6]  Forbes does not argue that Heckler's testimony is irrelevant, and Judge Thompson properly concluded that it was.[7]

After Judge Thompson properly found that Heckler's proposed testimony was relevant, he also properly concluded that it had a sufficiently "reliable foundation" to be admissible.  Daubert,

---

[6]  In Daubert, the Supreme Court addressed the application of Rule 702 to the admission of expert testimony based on scientific methods.  The Court suggested a non-exclusive list of factors for courts to consider when deciding whether proposed scientific expert testimony is sufficiently "reliable," including (1) whether a theory or technique has been or can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the technique has been accepted by a relevant scientific community.  509 U.S. at 593-594.  Those factors, however, are not particularly helpful in assessing the reliability of the expert testimony of an accountant.  Tuf Racing Products Inc. v. American Suzuki Motor Corp., 223 F.3d 585, 591 (7th Cir. 2000) (Posner, J.) (CPA who testified about damages was not doing science, and therefore his testimony was not subject to Daubert's stricter test for science).  Accordingly, Judge Thompson had "broad latitude" to determine the factors which informed his decision regarding the admissibility of Heckler's testimony.

[7]  To prove that Forbes caused false statements to be made to the SEC and committed securities fraud, the Government must prove that Forbes caused false or misleading statements to be made, and that those statements were material.  Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 177 (1994).  Heckler has testified that CUC's accounting practices for the fiscal years 1995 through 1997 violated GAAP, and that the financial statements for those years overstated the Company's earnings by at least certain amounts for particular fiscal years.  First Trial Transcript ("FTTr.") at 10611-68.  Violations of GAAP are relevant to prove that misstatements of financial information are intentional and material.  In re Daou Systems Inc., 411 F.3d 1006, 1022 (9th Cir. 2005); In re McKesson HBOC, Inc. Sec. Litig., 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000).

509 U.S. at 597.  Judge Thompson recognized that his role "as the gatekeeper [under <u>Daubert</u> against unreliable expert testimony] was tempered by the liberal thrust of the Federal Rules of Evidence and the 'presumption of admissibility.'"  <u>Bunt v. Altec Industries, Inc.</u>, 962 F. Supp. 313, 317 (N.D.N.Y. 1997), <u>quoting</u> <u>Borawick</u>, 68 F.3d at 610.

**B.    Judge Thompson Properly Rejected Forbes' Contention That Heckler's Opinion Testimony Was Deficient Because it Did Not Comply with Generally Accepted Auditing Standards, since Heckler's Expert Testimony Did Not Purport to Be an "Audit."**

Brian Heckler is a heavily credentialed CPA and partner at one of the major national accounting firms, KPMG.[8]  Forbes never

_____

[8]    After working as a staff auditor at KPMG, Heckler was promoted to a group that answered questions of other KPMG employees about technical accounting and SEC reporting requirements.  DHT 36-38.  In 1995, he was awarded a prestigious two year fellowship at the Office of the Chief Accountant ("OCA") of the SEC, which oversees the application of GAAP to public companies in the U.S.  DHT 31-32; FTTr. 10619.

As a Fellow in the OCA, Heckler answered technical accounting questions posed to the SEC by public companies; adjudicated disputes between SEC registrants and other branches of the SEC; provided technical support to other branches of the SEC; oversaw the setting of accounting standards by the private sector, and made public speeches on behalf of the SEC.  FTTr. 10619-20.  He specialized in a number of the accounting issues involved in this case, including accounting for merger reserves, consolidation accounting, and accrual based accounting for the recognition of revenue.  DHT 33-34; FTTr. 10621.  Heckler rendered opinions on over 1,000 matters while serving as a Fellow at the OCA.

Since returning to private practice, Heckler practices in the area of mergers and acquisitions, writes articles for technical accounting journals, gives lectures, and has testified in other cases as an expert regarding GAAP.  DHT 39; FTTr. 10622.
(continued...)

challenged Heckler's qualifications to provide expert testimony in this case. Nor did Forbes dispute that the subject of Heckler's testimony -- that the conspirators in this case violated GAAP in a number of significant ways, and the quantitative effect of those GAAP violations on CUC's and Cendant's publicly reported earnings -- is a proper subject for expert testimony.

Instead, relying exclusively on the testimony of his own paid experts, FM 6 and 7 n.3, Forbes asserts that Heckler's expert testimony was inadmissible because he did not comply with Generally Accepted Auditing Standards ("GAAS") in formulating his opinions. FM 6-7.[9] Judge Thompson properly rejected the testimony of Forbes' partisan experts, because Heckler's expert testimony in this case did not constitute an "audit," as that term is defined in the accounting profession.

Heckler testified at the Daubert hearing that his objective in this engagement was to provide an expert opinion about two

---

[8] (...continued)
He was the lead KPMG partner regarding the merger and acquisition segment of the restatement audit for MCI/WorldCom, in which he supervised a staff of 30 persons. DHT 38-39.

[9] At the Daubert hearing, Forbes' own experts claimed that Heckler should have complied with GAAS in formulating his expert testimony. FM 6. Sitting as the fact finder at that hearing, Judge Thompson was entitled to reject the defense testimony. See United States v. Ragsdale, 426 F.3d 765, 772 (5th Cir. 2005). Judge Thompson could have reasonably concluded that Heckler, an admitted accounting expert who fundamentally disagreed with the defense experts, had the better of the argument on this point.

overarching issues.  First, he sought to determine whether the conspirators violated GAAP in the manners alleged in the indictment.  DHT 22.  Second, he sought to calculate the quantitative effect of those violations on the reported earnings of CUC and Cendant for the fiscal years ending January 31, 1996 (CUC), January 31, 1997 (CUC), and December 31, 1997 (Cendant).  Id.  To give those opinions, Heckler was not required to perform an audit or an expression of an opinion as to CUC's or Cendant's financial statements taken as a whole, or even as to elements of the financial statements such as total revenues.  Rather, his inquiry addressed only those matters identified in the indictment as potential errors and how those errors affected the relevant results in CUC's or Cendant's financial statements.  DHT 22-23.

As Heckler explained, he was not required to apply GAAS procedures for conducting an audit because his expert witness testimony did not require that he give an "audit" or "attest" opinion about the financial statements at issue in this case. DHT 313-16, 2558-94.  Rather, his work as an expert witness was governed by the consulting standards of the American Institute of Certified Public Accountants ("AICPA").  Id.  Heckler's testimony was fully supported by the relevant authority from the AICPA. See Exhibit B hereto, AICPA Consulting Services Special Report 03-1 "Litigation Services and Applicable Professional Standards," ¶ 45 ("The litigation services practitioner is not exempt from professional standards but must comply with standards different

9

from those that apply to attestation services"); ¶ 46
("Attestation standards do not apply to litigation engagements
when the practitioner does not issue a report expressing an
opinion about the assertion of another party. . . . <u>The
practitioner is not subject to generally accepted auditing
standards (GAAS</u>.)(emphasis added); <u>see also Heller Healthcare
Finance, Inc. v. Boyes</u>, 2002 WL 1558340, * pp. 13-14 (N.D. Tex.,
July 5, 2002) (rejecting the claim that the plaintiff's expert
opinion regarding compliance with GAAP was inadmissible because
the expert did not perform a compilation, review, or audit of the
financial statements and because he did not state an opinion,
where the expert fully complied with the relevant AICPA Standards
for Consulting Services).

Because Heckler based his investigation and analysis on the
AICPA standards for consulting, rather than on GAAS, Forbes
contends that Heckler failed to undertake the same "intellectual
rigor" required in the expert's field outside the courtroom. FM
6-10.  Judge Thompson rejected that assertion and accepted
Heckler's <u>Daubert</u> hearing testimony that he could reliably opine
that certain accounting practices undertaken at CUC violated
GAAP, and had a quantitative effect on the reported income of CUC
of at least a particular amount, without conducting a GAAS-
compliant audit of CUC's books and records.  DHT 2562-71, 2576-
86, 2593-94; <u>see also</u> DHT 2610 (Heckler explaining that, in
conducting his investigation and formulating his expert opinion,

10

he adhered to "the same standard of intellectual rigor that's demanded of accountants in this area").  Forbes does not dispute Heckler's testimony that he complied faithfully with the AICPA standards for the provision of expert testimony.  DHT 2595.

Forbes contends that, because an accountant must apply GAAS in the "real world" in formulating an audit opinion, Heckler was required to apply GAAS in formulating his expert testimony in the "legal world."  FM 7.  As Heckler explained, the GAAS standards are a set of rules designed to accomplish a specific and particular task which accountants perform in the "real world," an "audit."  DHT 22-23.  Accountants, however, offer a number of different kinds of opinions based on the requirements of the client.  DHT 313-16. For instance, accountants can give an "attest opinion," which requires a less rigorous analysis of data than an audit.  Id.  In addition, the AICPA standards for consulting apply when an accountant is giving expert testimony in court.  DHT 2561.

Forbes' contrary claim, that the only kind of opinion that an accountant can render in any setting is one that is based on GAAS is supported by his own expert witnesses but nothing else. As such, the disagreement between the experts is one that is properly submitted to the fact finder, but not a basis to exclude Heckler's testimony.  See Walker v. Consolidated Rail Corp., 111 F. Supp. 2d 1016, 1019 (N. D. Ind. 2000)("That two different experts reach opposing conclusions from the same information does

11

not render their opinions inadmissible.")(internal citations
omitted); <u>Heller Healthcare</u>, 2002 WL 1558340, * p. 13
(contradiction between experts "goes to the weight of [their]
testimony, not its reliability or admissibility").

In the end, whether Heckler could apply the AICPA standards
for consulting services or instead had to apply GAAS in
formulating his expert opinion was an issue upon which the expert
witnesses disagreed at the <u>Daubert</u> hearing.  Stripped of its
rhetoric, Forbes' argument is simply that Judge Thompson erred
because he credited the testimony of the Government's expert on
the issue of which professional standard to apply rather than the
testimony of the defense experts.  FM 9 (citing the testimony of
the defense expert that GAAS is the applicable standard for
expert testimony).  As the fact finder during the Daubert
hearing, Judge Thompson was entitled to accord whatever weight to
the clashing accounts that he saw fit.  <u>See</u> Fed. Rule Evid. 104,
Advisory Committee Note to Subdivision (a) ("To the extent that
[inquiries regarding admissibility of evidence] are factual, the
judge acts as trier of fact.")  Forbes cannot meet his burden of
demonstrating a right to reconsideration and avoidance of the law
of the case merely by complaining that Judge Thompson credited
the testimony of Heckler over that of the defense witnesses.[10]

---

[10]  Forbes asserts that, even if Heckler properly applied
the AICPA consulting standards rather than GAAS in formulating
his expert opinions, his testimony was still inadmissible because
(continued...)

12

C.    **Heckler Considered Sufficiently Reliable Information in Formulating His Expert Opinion.**

After Cendant announced on April 15, 1998 that its Audit Committee would undertake an investigation of the Company's alleged accounting irregularities, the Audit Committee hired the prominent New York City law firm Wilkie, Farr & Gallagher ("WFG") to conduct the investigation, and WFG retained the accounting firm, Arthur Andersen LLP ("AA"), to assist in the investigation. On August 28, 1998, the Audit Committee issued its 260 page report ("Audit Committee Report") which summarized the results of the investigation.

1.    **Judge Thompson Properly Credited Heckler's Testimony That He Conducted an Independent Investigation and Analysis of the Fraud.**

In his present motion Forbes repeats his allegation, rejected as a matter of fact by Judge Thompson following the lengthy <u>Daubert</u> hearing, that Heckler did not conduct his own investigation into the fraudulent accounting practices of CUC. According to Forbes, Heckler merely read and regurgitated the Audit Committee Report.  FM 10-11.  For starters, Heckler testified at the <u>Daubert</u> hearing that he did no such thing.  DHT

---

[10] (...continued)
Heckler was not permitted to "creat[e] a special set of rules for application to 'litigation consulting.'" FM 9.  As Heckler explained, he manifestly did not create a special set of rules, but followed the rules created by the same professional organization, AICPA, that Forbes cites in support of his claim that Heckler was required to apply GAAS.  DHT 2558-61, 2569-71, 2580-81.

13

52-54.  Judge Thompson permissibly credited Heckler's <u>Daubert</u>
hearing testimony that, although he read and considered the Audit
Committee Report, his investigation extended to voluminous
materials in addition to the report.

Although Heckler carefully read and considered the report as
important background information for his own work, DHT 52-54, he
undertook substantial independent investigation and analysis
beyond his consideration of the report.[11]  For instance, Heckler
has stated that:

> 2.  In forming my opinion that the accounting practices
> detailed in the superseding indictment violated GAAP, I
> substantially relied upon my own independent review and
> analysis of the books and records of CUC and Cendant . . . .
>
> 3.  As a part of my independent review and analysis, my
> staff and I spent hundreds of hours examining thousands of
> pages of CUC and Cendant documents that were contained with
> the files of Arthur Andersen and Ernst & Young.  These
> documents included, but were not limited to, the journal
> entries, spreadsheets, schedules and internal correspondence
> that caused, or served as the foundation for, the improper
> accounting practices that are the subject of my expert
> opinion.  My independent review and analysis of those
> sources documents, along with the allocutions and proffered

_____

[11]  <u>E.g.</u>, DHT 80-117 (Heckler describing the materials that
he considered and the analysis he conducted regarding the
conspirators' improper topside adjustments); DHT 118-155 (same
for the conspirators' improper allocations of revenue and
expenses between immediate and deferred programs); DHT 157-175
(same for the understated and underfunded cancellation reserve);
DHT 176-182, 200-225 (same for the conspirators' failure to
timely record "rejects-in-transit"); DHT 226-284 (same for the
conspirators' improper accounting for the use of merger
reserves); DHT 286-302 (same for the other accounting errors
alleged in the indictment regarding the improper accounting for
commissions payable, a deferred tax asset, and deferred marketing
expenses).  <u>See also</u> Exhibit C hereto, December 16, 2002 Summary
of Heckler's Proposed Testimony in this case, pp. 1-2.

oral answers to my questions, constituted the most important bases for my opinion.

Aug. 14, 2003 Declaration of Brian Heckler, CPA (Exhibit D hereto (including Heckler's Aug. 12, 2003 letter to AUSA John Carney)).

The source documents reviewed by Heckler are so inherently reliable that they are independently admissible into evidence under Fed. R. Evid. 803(6), and are a proper basis for Heckler's opinions regarding the financial condition of the Company. United States v. Affleck, 776 F.2d 1451, 1456-57 (10th Cir. 1985) (in prosecution for securities fraud, the Government's expert witness was properly permitted to testify about the financial condition of the subject company to determine "whether any financial information was altered or misrepresented to investors" based on, inter alia, his evaluation of the company's business records); Wechsler v. Hunt Health Systems, Ltd., 381 F. Supp. 2d 135, 144-45 (S.D.N.Y. 2003) (accounting expert permissibly relied on defendant's "internal accounting records, statements of financial position and . . . monthly general ledger reports"). accord Int'l Adhesive Coating Co. v. Bolton Emerson Int'l, Inc., 851 F.2d 540, 544-45 (1st Cir. 1988); Paddack v. Dave Christensen, Inc., 745 F.2d 1254, 1258-63 (9th Cir. 1984). Forbes does not show that the source documents that Heckler considered did not provide a reliable basis for his testimony.

Forbes complains that many of the CUC "source documents"

15

that Heckler reviewed had been previously identified and collected by the Audit Committee Investigators.  FM 11. Heckler was hardly remiss for examining those documents.  The Audit Committee investigators conducted a comprehensive review of the fraudulent accounting at CUC, and had identified and retained copies of most of the relevant business records during its own investigation, which preceded Heckler's.  DHT 52-54.  Forbes does not identify a single document that Heckler should have reviewed which he did not.  In any event, the absence of an encyclopedic review is not fatal to Heckler's conclusions.  See Archer Daniels Midland Co., 356 F.3d at 858 (expert's failure to account for the "hedging" in calculating the plaintiff's extra expense for corn caused by flooding did not render his testimony inadmissible).

Judge Thompson also appropriately rejected Forbes' contention that Heckler's opinion was deficient because he did not personally interview any CUC employees who were involved in the fraud.  Several of those persons have testified in this case that they intentionally cooked the books at CUC in precisely the manner that Heckler has opined.  Compare, FTTr. 2333-54 (testimony of Anne Pember regarding CUC's fraudulent accounting for merger reserves, membership cancellation reserves, allocation of revenues and expenses) and FTTr. 4027-57 (testimony of Casper Sabatino about fraudulent topside adjustments) with FTTr. 10630-61 (testimony of Heckler on those subjects).  Heckler permissibly considered their sworn testimony in formulating his opinions in

16

this case.  FTTr. 10629-30; DHT 54-55, 68.

Nor was Heckler's expert opinion inadmissible because he sought to reconcile the quantitative effect of the fraud on CUC's reported financial results as alleged in the indictment with the quantitative effect calculated by the authors of the Audit Committee Report.  FM 12-13.  As Heckler testified, the Audit Committee investigators conducted an exceedingly thorough analysis of the fraud, DHT 52-54, and it was prudent for Heckler to compare his own analysis with that of the Audit Committee investigators as a check on his own work.

> **2.  Heckler Permissibly Considered, but Did Not "Rely Upon" the Audit Committee Report and Witness Interviews Undertaken by the Audit Committee Investigators.**

Based on his repudiated premise that Heckler regurgitated the Audit Committee Report, Forbes argues that the Report "does not provide a reliable basis for Heckler's opinions."  FM 13. Because Heckler permissibly considered but did not "rely upon" the Report in reaching his independent conclusions, Forbes' claim fails for want of an accurate predicate.

> **a.  The Audit Committee Report And the Witness Interviews Conducted by the Audit Committee Investigators Were Permissible Sources of Information for Heckler to Consider.**

> **I.  The Audit Committee Report.**

Forbes claims that Heckler could not rely upon the Audit Committee Report, because it was prepared in anticipation of litigation and because it is grounded upon the out-of-court

17

statements by persons whom Heckler did not personally interview, and who were biased against Forbes and had an interest in the outcome of the investigation.  FM 13-14.[12]  Heckler did not rely on any of the conclusions of the Report in formulating his own opinions in this case.  Rather, he considered the Report as a map to help him locate the Company's source documents on which he principally relied.  Heckler Declaration, Exhibit D, ¶ 4.

The Audit Committee Report was a permissible source of information for Heckler to consider, even if it was prepared in anticipation of litigation.  See In re TMI Litigation, 193 F.3d 613, 698 (3d Cir. 1999) (noting that "there is nothing improper about [an expert witness considering] a medical report prepared solely for litigation"), amended on other grounds, 199 F.3d 158 (3d Cir. 2000).  Reports that are prepared in anticipation of litigation are not for that reason necessarily an unreliable source of information for an expert witness to consider.  United States v. Brown, 7 F.3d 648, 652-53 (7th Cir. 1993) (narcotics expert reasonably considered police reports); Metabolife Int. Inc. v. Wornick, 264 F.3d 832, 842-44 (9th Cir. 2001) (expert

---

[12]    Referring to a hand-written notes allegedly written by persons who attended a meeting at Cendant before the Audit Committee investigation was launched, Forbes asserts that the purpose of the Report was to falsely accuse him of participating in the fraud.  FM 14.  Forbes does not  mention, however, that the Audit Committee Report expressly declined to conclude that Forbes was involved in the accounting fraud.  As the Audit Committee Report did not attribute any wrong-doing to Forbes, his assertion that the Report was designed to frame him should be rejected.

18

testimony was admissible even though it was based in part on a
research study which was commissioned by the plaintiff, was not
subject to peer review, and had not been completed before the
outset of litigation); see also Ratliff v. Schiber Truck Co., 150
F.3d 949, 955 (8th Cir. 1998); Manocchio v. Moran, 919 F.2d 770,
779 (1st Cir. 1990).[13]  Heckler is particularly adept in
evaluating the reliability and weight that should be accorded to
the Report, given his expertise as a partner at a major
accounting firm who gives advice to other accountants in response
to technical inquiries about the application of U.S. GAAP and SEC
regulations, regarding some of the very accounting issues and
practices that are implicated by the Report.  DHT 33-34.

       Forbes has also overstated the supposed shortcomings of the
Report.  The Report was prepared by attorneys at a distinguished
law firm and accountants at what was then one of the Big Five

---

       [13] United States v. Tran Trong Cuong, 18 F.3d 1132 (4th
Cir. 1994), cited by Forbes, is inapposite.  The error there,
which is absent here, arose when a physician/expert witness
testified that his conclusions that the defendant had improperly
prescribed controlled substances were "essentially the same" as
those of the non-testifying physician.  Id.    Along the way, the
Court in Tran explained that this expert "could testify that he
reviewed [the report of another physician who did not testify]
and that he relied upon it in reaching his opinion."  Id. at
1143.  The Court also explained that an expert may base his
opinion on the underlying information contained in a report
"prepared for purposes of litigation," but that "otherwise
inadmissible evidence may [not] come into evidence."  18 F.3d at
1143-44.  Here, Heckler will not testify about the opinions of
any other persons or otherwise serve as a conduit for the
opinions of others, the error identified in Tran.  Id. at 1142-
43.

Accounting Firms.  Unlike a mere audit or a routine forensic engagement, WFG and AA were retained to investigate and describe what was then one of the largest accounting frauds ever in this country.  To that end, AA took possession of Cendant's original accounting records, files, memoranda and computers.  FTTr. 1454. WFG and AA performed a broad and intensive investigation, devoting more than 3,700 person days to the task, conducting more than 80 interviews and amassing more than 120 binders of work product.  Exhibit E hereto, Audit Committee Report at p. 5.

Both WFG and AA had legally-enforceable ethical obligations to use their best professional efforts to get to the bottom of what the Company's management ultimately concluded was a massive overstatement of its earnings.  Given the wealth of intellectual resources devoted to the Report, and the legally-imposed obligation of the Audit Committee to accurately restate the Company's finances, Heckler did not act unreasonably when he considered the Report in reaching his own conclusions about the accounting irregularities at issue here.  See United States v. Frazier, 53 F.3d 1105, 1110 (10th Cir. 1995) (audit report was properly admitted into evidence because the author: (1) was "bound by contract to prepare the report and was interested in insuring the report was accurate," (2) "had ten years experience in preparing" similar reports, and (3) "was a neutral third party with nothing to gain from any possible litigation against" the defendant).  Forbes' present challenges to the Report, and to the

alleged motives of the authors and sponsors of the Report, may be appropriate grist for cross-examination of Heckler, but do not justify preclusion of his testimony.

### ii.  The Witness Interviews.

Forbes repeats his assertions that Heckler impermissibly relied on the interview memoranda prepared by Audit Committee investigators.  Forbes argues that those memoranda constitute unreliable multiple-layer hearsay.  FM 13-17.  Although he read and considered the summaries of the witness interviews, Heckler did not substantially rely upon, or uncritically accept, the contents of those summaries.  Rather, he read the witness summaries to provide context for his review and analysis of the Company's financial records.  Heckler Declaration, Exhibit D, ¶ 5; DHT 53-54.  It is precisely because Heckler did not regard the interview statements as the "complete truth," DHT 1791-92, that Heckler's consideration of those statements was a proper exercise of his professional judgment.  The primary grounds for Heckler's conclusions were the source documents of the Company; the guilty plea allocutions of the co-conspirators; and the answers of Corigliano and Pember to Heckler's written questions.  Heckler Declaration, Exhibit D,  ¶ 2.[14]  By the time of Heckler's first

---

[14]  Forbes contends that some of the persons who were interviewed in the Audit Committee investigation have given conflicting statements regarding events that are relevant to this case.  FM 15 (discussing interview memoranda of Tom Albright and Kevin Crowe).  Forbes is entitled to call those persons at trial
(continued...)

and second trial testimony, there were many hundreds of transcript pages of sworn testimony of the cooperating witnesses that Heckler also considered in reaching his opinions.

In any event, it was entirely proper for Heckler to consider the witness summaries, notwithstanding their hearsay character. "The facts or data upon which an expert bases his opinion or inference . . . **need not be admissible in evidence in order for the opinion or inference to be admitted.**  Fed. R. Evid. 703 (emphasis added).  Unlike fact witnesses, expert witnesses are permitted wide latitude to offer opinions that are not based on their firsthand knowledge or observations.  4 Weinstein, § 702.02[2] at p. 702-8; Daubert, 509 U.S. at 592; see United States v. Feliciano, 223 F.3d 102, 121 (2d Cir. 2000).

For example, in United States v. Locascio, 6 F.3d 924 (2d Cir. 1993), the Second Circuit rejected a claim that expert testimony was improperly admitted under Fed. R. Evid. 703, even though the expert there, an FBI agent, had testified about the nature and function of organized crime families based on the out-

---

¹⁴ (...continued)
and demonstrate that their out-of-court statements included in the  Report are unreliable.  See Reardon, 806 F.2d at 42 ("it has become settled that, at least in those borderline cases where the likely utility of producing the witness is remote, the Sixth Amendment's guarantee of an opportunity for effective cross-examination [of an expert witness] is satisfied where the defendant himself had the opportunity to call the declarant as a witness"), citing United States v. Inadi, 475 U.S. 387 (1986). As Judge Thompson properly concluded, however, any errors in those statements do not justify the exclusion of Heckler's testimony.

of-court statements of former criminals turned informants, and
the recorded, out-of-court conversations of criminals.  6 F.3d at
938.  The Second Circuit acknowledged that the statements of
former mobsters to their law enforcement contacts contained "the
type of information" on which the law enforcement officers
traditionally relied.  <u>Id.</u>  That reliance was reasonable, even
though the credibility of those former mobsters speaking in that
context would be subject to reasonable challenges for
reliability.  Similarly, in <u>United States v. Mulder</u>, 273 F.3d 91,
100-03 (2d Cir. 2001), the Second Circuit affirmed the admission
of the expert testimony of a police investigator concerning labor
coalitions and their goals, which was based "largely on the
statements of detectives he supervised, victim contractors, and
informants," because "each of those sources normally would be
relied on by expert police officers."[15]

        As <u>Locasio</u> and <u>Mulder</u> teach, an expert's informed reliance
upon out-of-court statements may be reasonable even if it relies
upon hearsay statements from declarants with substantial
credibility problems, including a motive to falsely accuse the
defendant of the charged crimes.

        If the out-of-court statements of the former mobsters could

---

[15] <u>Accord</u>, <u>Sphere Drake Ins. PLC v. Trisko</u>, 226 F.3d 951,
954-55 (8th Cir. 2000)(detective, who opined that loss of the
defendant's jewelry was not a "mysterious disappearance,"
permissibly relied on statements from two paid informants that
the jewelry had been stolen by third persons).

provide an appropriate basis for expert testimony in <u>Locasio</u>, statements of the CUC employees who were interviewed by WFG and AA could provide such a basis in this case. <u>See Affleck</u>, 776 F.2d at 1456-57 (Government's accounting expert permissibly considered interviews with accountants and "other former employees of the organization" in order to opine about "whether any financial information was altered or misrepresented to investors"; those statements "are of the type reasonably relied on by other experts in the accounting field in a case such as this"); <u>Westfield Insurance Company v. Harris</u>, 134 F.3d 608, 611-13 (4th Cir. 1998) (district court improperly excluded expert opinion of a fire marshal regarding the incendiary cause of a fire because it was based on information provided by the plaintiff's investigator; marshal ordinarily relies on that kind of information when investigating suspicious fires); <u>Weinstein</u>, § 703.06 (noting that effective cross-examination of an expert is achieved by "giving the defendant access to the hearsay information relied on by the expert").

That Heckler did not personally interview any of the persons who were interviewed by WFG or AA may be an appropriate basis for cross-examination, but does not justify exclusion of his testimony. <u>See</u> <u>generally</u> <u>Daubert</u>, 509 U.S. at 596 ("[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking" expert testimony); <u>Sphere Drake</u>

Ins. PLC, 226 F.3d at 954 ("Attacks on the foundation for an
expert's opinion, as well as the expert's conclusions, go to the
weight rather than the admissibility of the expert's
testimony."); 4 Weinstein, § 702.05[3].[16]

Forbes notes that Heckler asked the Government to allow him
to interview Corigliano and Pember, but ultimately did not do so.
FM 16, n.7.  Heckler did not personally  interview those persons,
however, because he submitted written questions for them to
answer, and received and reviewed their oral responses to those
questions.  DHT 54-55, 66-67.  Forbes declines to mention that
Heckler also considered the extensive trial testimony of the
Government's cooperating witnesses in deciding whether the
challenged accounting practices complied with GAAP. DHT 23-24,
54-55, 65-68, 236-44; FTTr. 10623, 10629-30, 10641-42, 10658.  In
deciding whether the books at CUC were "cooked," Heckler

---

[16]    Forbes extensively relies on In re Imperial Credit
Industries, Inc. Securities Litigation, 252 F. Supp. 2d 1005
(C.D. Cal. 2003), which is inapposite.  FM 16-17.  There, the
plaintiffs' expert witness -- Moore -- sought to testify that
"financial statements during a particular time were inflated and
did not comply with GAAP."  See id. at 1013.  Moore based his
proposed opinion entirely upon excerpts from another expert
witness -- Davidson -- who had generated his expert report during
class action litigation in a different case in a different
federal district court.  See id. at 1012.  The Court concluded
that it was "unprecedented for an auditor to rely upon excerpts
from an opinion given in adversarial litigation as a basis for
reaching an audit opinion concerning a company's financial
statements . . . ."  Id. at 1013 (emphases added).  As shown
above, Heckler was not hired to perform an audit and his expert
opinion is based on far more analysis than the cursory review
that was rejected in Imperial Credit.

reasonably relied on sworn testimony from admitted members of the
conspiracy that it was their conscious decision to do the
cooking.   That testimony was against the penal interest of the
witnesses and therefore particularly reliable.[17]

> **b.   Heckler Had a Sufficient Understanding of the
> Audit Committee Report to Consider it in
> Formulating His Opinions.**

Selectively quoting from Heckler's <u>Daubert</u> hearing
testimony, Forbes contends that Heckler did not have a sufficient
understanding of the scope and methodology of the Audit Committee
investigators to rely on their report.  FM 17-19.  Because, as
demonstrated above, Heckler did not "rely" on the conclusions of
the Report, but merely considered its analysis and findings,
Heckler was not required to know every detail about how the Audit
Committee investigators went about their business.

Forbes repeats his factual assertions that Heckler limited
his review of CUC's books and records to those identified by the
Audit Committee Report, FM 18, but Judge Thompson permissibly
credited Heckler's <u>Daubert</u> hearing testimony that his review was
not so limited.  Because Heckler conducted an independent
investigation of CUC's books and records, any deficiencies in the

---

[17]   Where, as here, the testimony of a cooperating witness
is subject to dispute between the parties, "the expert may assume
the truth of [that] trial testimony and thereafter offer an
opinion based on the substance of the testimony."  <u>United States
v. Scop</u>, 846 F.2d 135, 143 (2d Cir. 1988); Graham, <u>Handbook of
Federal Evidence</u>, Article VII, "Opinions and Expert Testimony;"
Rule 703, "Bases of Opinion Testimony by Experts," n. 18 (2005).

Audit Committee's investigation does not undermine the reliability of Heckler's investigation. Additionally, because the Audit Committee Report was a carefully crafted and thorough assessment by highly competent professionals, Heckler permissibly considered the report even if he could not answer all of Forbes' questions about how the report was prepared.

### 3. Heckler Did Not Merely "Parrot" the Audit Committee Report and its Supporting Work Papers.

Judge Thompson rejected Forbes' claim that Heckler merely "parroted" the Audit Committee Report. Heckler testified at the Daubert hearing, that he considered that Report, but reached his own conclusions, based on his review of numerous other materials, that the conspirators violated GAAP and that the quantitative effects of those violations were at least as much as the amounts alleged in the indictment. DHT 52-54; FTTr. 10664-65.

Forbes fails to demonstrate that Judge Thompson erred by crediting Heckler's testimony. Instead, he cites a raft of inapposite caselaw in which proposed experts did what Forbes accuses Heckler of doing, but which Judge Thompson concluded that Heckler did not do. Judge Thompson correctly concluded that those cases do not mandate exclusion of Heckler's testimony.[18]

---

[18]  In TK-7 Corp. v. Estate of Barbouti, 993 F.2d 722 (10th Cir. 1993), the plaintiff's proposed expert did not undertake any analysis whatsoever of the technical problems at issue, but merely reviewed a study undertaken by others and was not qualified to evaluate the reliability of the study on which he purported to rely. Id. at 730-32. There was no showing that the
(continued...)

## II. HECKLER'S TRIAL TESTIMONY DID NOT UNDERMINE JUDGE THOMPSON'S CONCLUSION THAT THE TESTIMONY WAS PROPERLY ADMITTED.

Forbes also contends that Heckler's trial testimony that he conducted an "independent investigation" was inconsistent with his testimony during the Daubert hearing that his opinion was based on "assumed facts" or "hypothetical facts."  FM 22-27.

---

[18] (...continued)
underlying assumptions of the expert's purported calculations were accurate, or that study on which the expert purported to rely was of the type on which other experts in his field of expertise would rely.  Id. at 732-33.  Here, in contrast, Forbes does not claim that Heckler is unqualified to opine on GAAP. Unlike the proposed expert in TK-7, Heckler relied on business records and other "raw data," and undertook an independent analysis of that data.

For similar reasons, Forbes' reliance on American Key Corp. v. Cole National Corp., 762 F.2d 1569 (11th Cir. 1985) is unavailing.  There, the Court held that proposed expert testimony of an economist was inadmissible because his findings were "based entirely on otherwise inadmissible lay testimony," and the economist "did nothing to verify the facts submitted to him by" the lay witness.  Id. at 1579.  Other cases cited by Forbes involved similar errors that are absent here.  Cf. Hutchinson v. Groskin, 927 F.2d 722, 724-25 (2d Cir. 1991) (physician improperly testified that the conclusions of other, prominent physicians who did not testify were consistent with the witness's conclusions); United States v. Grey Bear, 883 F.2d 1382, 1392-93 (8th Cir. 1989) (testimony of pathologist that his opinions were consistent with those of two other pathologists who did not testify was properly excluded); In the Matter of James Wilson Associates, 965 F.2d 160, 172-73 (7th Cir. 1992) (testimony of an architect, who planned to testify about the physical condition of a building as reported to him by an engineer, was properly excluded); Valentin v. New York City, 1997 WL 33323099 *27 (E.D.N.Y. 1997) (excluding proposed expert testimony which was merely a conduit for out-of-court statements made to the witness); Lithuanian Commerce Corp. v. Sara Lee Hosiery, 177 F.R.D. 245 (D.N.J. 1997) (testimony of attorney regarding Lithuanian law was excluded because he engaged in no independent analysis of that law and did not analyze the law by reference to the facts of the case, but merely incorporated statements made to him by Lithuanian officials).

There was no inconsistency.  As Heckler explained during the
Daubert hearing, his use of the term, "assumed facts" referred to
the information contained in all of the material that he reviewed
in his investigation of the alleged GAAP errors at issue in this
case, including the source documents of CUC, the statements of
the cooperating witnesses, and information contained in the Audit
Committee Report or the voluminous supporting documents for that
report.  DHT 2641-55, 2665-66.  Although Heckler was initially
asked to assume the accuracy of the facts set forth in Audit
Committee Report, DHT 2651, the scope of the engagement expanded
thereafter and Heckler did not assume the accuracy of those facts
in reaching his final conclusions.  DHT 2651-53.  Accordingly,
Heckler did not "assume" that the information contained in the
source materials, such as the statements of various witnesses to
the investigators of the Cendant Audit Committee, was actually
true, however.  DHT 2651-54.  Indeed, some of that information
was mutually contradictory.  DHT 2667-68.

     Heckler was not restricted by the Government in the
materials that he could consider, and he used his training,
expertise, and judgment in deciding what information to consider,
and what significance it had in formulating his opinion.  DHT
2641-42, 2650-53.  His engagement was to render an expert opinion
based on the information that he reviewed (e.g. CUC's general
ledger, journal entries, internal memoranda, emails).  DHT 21-23,
40-47, 59-60, 2598-99.  That information contained the "assumed

                              29

facts" for Heckler's analysis insofar as he assumed that the documents that he reviewed were what they purported to be.  DHT 2649.  Heckler was not told by the Government, however, that he had to assume the truth of the information in the source materials, and did not do so.  DHT 2650-53, 2668.  As Heckler accurately explained, it was up to the jury to find the facts, and to determine, based on the adversarial process, whether his opinion was worthy of consideration based in part on its assessment of those facts.  DHT 2594, 2599.

That Heckler considered such "assumed facts" does not mean, however, that he did not also engage in fact-finding regarding other sources of information on which his expert opinion was based.  In this regard, Heckler testified about his extensive factual investigation, which included a review of numerous original source documents from Cendant's and CUC's accounting files.  DHT 43-46, 52-54, 59-60, 62, 69-72, 87.  <u>See Fiataruolo v. United States</u>, 8 F.3d 930, 942 (2d Cir. 1993) (district court properly admitted testimony of an expert witness accountant to demonstrate a violation of established accounting principles, where the witness "went through and explained in some detail" the documents that he examined; "he couched his opinion specifically 'on the evidence that I looked at and the work I did.'").  Thus, Forbes' argument that Heckler could not both consider "assumed facts" and have engaged in independent fact finding is contradicted by the record, and by logic.

Forbes variously complains that Heckler did not testify about the underlying data for his opinions regarding the quantitative effect of certain aspects of the fraud, FM 24-25; "relied upon non-record evidence in the second trial," as well as in the first, FM 25; and "had no choice but to look beyond the facts introduced during the government's case-in-chief in order to form his opinions." FM 26. Any shortcoming in that regard is entirely attributable to Forbes. Expert testimony is not inadmissible, as Forbes would have it, merely because the expert does not painstakingly present to the jury his "work product" which supports his conclusions. To the contrary, Fed. R. Evid. 705 "allows an expert to state an opinion without disclosing the basis for it." Scop, 846 F.2d at 142. The Government's decision not to elicit Heckler's complicated work product for the jury went only to the weight that the jury would attribute to Heckler's conclusions, not its admissibility.

If Forbes truly believed that Heckler's factual basis was insufficient, he could have challenged Heckler's conclusions on cross-examination. As a consequence of the extensive Daubert hearing, on top of the substantial pre-trial documentary discovery provided to Forbes regarding Heckler's testimony, Forbes had every opportunity to challenge the accuracy of Heckler's quantitative conclusions regarding the effect of the fraudulent accounting practices on CUC's and Cendant's reported income. His failure to do so reflects either his understanding

that Heckler's conclusions were unassailable, or that Heckler's testimony did not bear upon the theme of his defense, which was that Corigliano undertook the fraud without Forbes' knowledge or involvement.

### III. JUDGE THOMPSON PROPERLY CONCLUDED THAT HECKLER'S EXPERT TESTIMONY DID NOT VIOLATE FORBES' CONFRONTATION RIGHTS.

#### A. Because Heckler Is Subject to Cross-examination, the Fact That He Considered Out-of-court Statements Does Not Create a Confrontation Problem.

Forbes' contention that Heckler's testimony will violate the Confrontation Clause of the Sixth Amendment was properly rejected by Judge Thompson.  Because Heckler testified in person at both trials, Forbes was "confronted [by] the witnesses against him." Const., Amend. VI.  Forbes had an opportunity for effective cross-examination of Heckler.  Reardon v. Manson, 806 F.2d 39, 42 (2d Cir. 1986) (no violation of the defendant's confrontation rights where the expert witness was available for cross-examination regarding the nature and reasonableness of his reliance on the out-of-court statements of others in formulating his in-court opinions); see Locasio, 6 F.3d at 938 (rejecting confrontation claim and explaining that "[t]he fact that [the expert] relied upon inadmissible evidence is therefore less of an issue of admissibility for the court than an issue of credibility for the jury").

Forbes nevertheless claims that his Sixth Amendment confrontation right was violated because the Government did not

present as trial witnesses all of the persons who were
interviewed by the Audit Committee investigators.  FM 28.  He
claims that Heckler's testimony, which is based on those out-of-
court interviews, "would essentially introduce the testimony of
those witnesses."  Id.  Judge Thompson properly rejected this
contention.

    Heckler's trial testimony in the first two trials did not
purport to recount the out-of-court statements of any of the
persons who were interviewed in connection with the Audit
Committee report.  Forbes' confrontation claim therefore fails
for want of an accurate predicate.  Affleck, 776 F.2d at 1457 (no
violation of the Confrontation Clause in a securities fraud
prosecution even though the government's expert witness, an
accountant, based his opinions in part on out-of-court statements
of the defendant's employees, where "the expert's testimony was
not simply a summarizing of the out-of-court statements of
others," but "consisted primarily of his conclusions based on
[the defendant's] financial records"); see also United States v.
Dico, Inc., 266 F.3d 864, 871 (8th Cir. 2001); United States v.
Corey, 207 F.3d 84, 89-90 (1st Cir. 2000).  Because the out-of-
court statements summarized in the Audit Committee Report will
not be offered for the truth of the matter asserted, they are not
even hearsay, and the defendants' need to confront anyone
regarding the truth of any of those statements is correspondingly
eliminated.  See Barrett v. Acevedo, 169 F.3d 1155, 1163-64 (8th

33

Cir. 1999).[19]

Forbes places heavy reliance on Howard v. Walker, 406 F.3d 114 (2d Cir. 2005), but as he obliquely concedes in a footnote, FM 32 n.11, the Court of Appeals did not even reach the claim that Forbes presents here.  In Howard, the elderly victim died from a heart attack during the charged burglary, and the defendants were charged with felony murder.  In a post-arrest statement, one of the Howard's co-conspirators claimed that Howard had struck the victim shortly before she died.  A pathologist who testified as a prosecution witness admittedly relied on that out-of-court statement in concluding that the victim died as a result of the burglary.  406 F.3d at 126.

The co-conspirator did not testify at trial, so his prior statement was inadmissible under Bruton v. United States, 391 U.S. 123 (1968).  The trial judge nevertheless ruled that if Howard's lawyer attempted to cross-examine the pathologist by

---

[19]  For that reason, Idaho v. Wright, 497 U.S. 805 (1990) and Crawford v. Washington, 541 U.S. 36 (2004), cited by Forbes, are inapposite.  In Wright, the trial court admitted out-of-court statements of the child/victim, made in response to suggestive questions, which directly implicated the defendant.  497 U.S. at 809-11.  Likewise in Crawford, the trial court admitted the out-of-court statement of the defendant's wife, made to police shortly after the charged crime occurred under circumstances which would have led the wife to believe that the police would seek to use her statement at trial.  The Supreme Court held that the admission into evidence of such "testimonial" out-of-court statements violated the confrontation clause.  541 U.S. at 51-52. Here, unlike Wright and Crawford, Heckler did not recount during the first and second trials, and will not recount in the third, the out-of-court statements of any other person.

reference to the out-of-court statement, the prosecution could place that statement into evidence.  The Second Circuit held that the "trial court's ruling that, if the defense challenged the basis of [the pathologist's] opinion, the State would be permitted to admit [the co-conspirator's] statement in its entirety, offered Howard a constitutionally impermissible choice."  406 F.3d at 129.

Unlike Howard, Forbes does not claim that the district court threatened to admit any out-of-court statements that the expert considered if Forbes challenged the expert about his consideration of those statements.  Rather, Forbes claims that the mere admission of Heckler's testimony would violate his confrontation rights, because of the "possibility" that his cross-examination would cause Heckler to mention those out-of-court statements.  FM 32.  The Second Circuit in Howard, however, expressly declined to hold that the mere admission of expert testimony that was admittedly based on a Bruton ineligible confession violated the defendant's confrontation rights.  406 F.3d at 128.  The Court cited with approval its prior decision in Locasio that expert witnesses "can testify to opinions based on hearsay or other inadmissible evidence if experts in the field reasonably rely on such evidence in forming their opinions."  Id. at 127. Accordingly, Howard provides no support for Forbes'

confrontation challenge to Heckler's testimony.[20]

**B.    Forbes' Self-serving Speculation That He Cannot Cross-examine Heckler Without Eliciting Improper Opinions Is No Basis for this Court to Reconsider Judge Thompson's Considered Ruling.**

After inducing Judge Thompson to conduct a fifteen day pre-trial _Daubert_ hearing, much of which was devoted to Forbes' cross-examination of Heckler, Forbes did not pose a single question to Heckler on cross-examination at either the first or second trials.  FTTr. 10668; STTr. 2427.[21]  Forbes' decision not to cross-examine Heckler during the first two trials was

---

[20] Moreover, the pathologist in _Howard_ admitted that, absent her review of the out-of-court statement, she could not have reliably opined that the burglary was a cause of the victim's death.  _Id._ at 126.  There is no comparable testimony in this case.  Heckler has never stated that any of his expert opinions in this case would be compromised if he had not considered the statements of the witnesses who were interviewed by the Audit Committee investigators.  Although Heckler relied in part on the trial testimony of several of the admitted conspirators, particularly Corigliano, Pember, and Sabatino, those persons were all subject to Forbes' cross-examination or direct examination at trial.

Second, at neither trial did Forbes challenge Heckler's testimony that the fraudulent accounting at CUC violated GAAP or that the GAAP violations resulted in overstated reported earnings by particular amounts.  Rather, Forbes' defense is that he had no knowledge of the fraud.  In _Howard_, however, the pathologist's testimony that the burglary caused the victim's death went to the crux of the defense, that the defendant committed the burglary but played no role in the victim's death.  406 F.3d at 134-35.

[21]    Forbes' trial strategy to effectively concede the accuracy of Heckler's opinions was at odds with his counsel's statement during the _Daubert_ hearing that the defense needed several months to prepare for cross-examination of Heckler during that hearing because his opinions pertained to "a critical matter in this case."  DHT 327.

completely consistent with his trial strategy of conceding the
incontestable existence and scope of the massive accounting fraud
at CUC for many years while Forbes was the CEO and Chairman of
the Board of Directors, but blaming all of the fraudulent
activity on Cosmo Corigliano and his subordinates in the CUC
Accounting Department.  FTTr. 88-100 (Forbes' opening statement
at first trial).

Forbes nevertheless blames the Government for his own
strategic decision not to cross-examine Heckler.  He claims that,
when Heckler admitted during the <u>Daubert</u> hearing that his
assessment of the materiality of certain errors in CUC's
financial statements was based on his prior "improper conclusion
that the accounting irregularities were intentional."  FM 34,
citing DHT 1164-65.  Heckler made no such admission.  Rather, he
explained that if an error had been intentionally included in a
financial statement, it was a GAAP violation regardless of the
quantitative effect of the misstatement.  DHT 1166-67.[22]

---

[22]   Forbes also claims that Heckler formed opinions about
accounting issues that are beyond the scope of the indictment, FM
34-35, and that his testimony on those matters would
constructively amend the indictment.  Forbes effectively concedes
that Heckler did not testify to any of those opinions at either
the first or second trials, so those unstated opinions could not
have constructively amended the indictment.  To the extent that
Forbes contends that Heckler's opinions that were expressed
during the first and second trials were improperly colored by his
unstated conclusions on other matters, <u>id.</u>, Forbes can seek to
challenge Heckler's opinions on that ground, and obtain a
limiting instruction that Heckler's conclusions on matters
outside the indictment are relevant only for impeachment.

In any event, Forbes points to no authority for the remarkable proposition that otherwise relevant and admissible testimony can be excluded because a witness had previously testified, in a separate proceeding, about matters that would be inadmissible at trial.  If that were the case, whenever a suppression motion was granted as to a particular piece of evidence known to a witness, the defense would be entitled to exclude other, relevant and admissible testimony of that witness because of the "possibility" that he might testify about the suppressed evidence.  This is plainly not the law.

Forbes also complains because Heckler has supposedly formed opinions about accounting practices at CUC that are not identified in the indictment.  FM 34-35.  Forbes seeks to exclude Heckler's testimony in toto because of the "possibility" that his testimony about those matters might "come tumbling out before the jury."  FM 35.  Forbes declines to mention that Heckler made no mention of those matters in either of the first two trials.

## IV. HECKLER HAS SUFFICIENT EXPERTISE TO TESTIFY ABOUT SEC FINANCIAL AND DISCLOSURE REQUIREMENTS.

During his two year fellowship in the Office of the Chief Accountant for the SEC, as well as his work in private practice at KPMG, Heckler developed substantial expertise regarding SEC financial and accounting reporting requirements and GAAP.  DHT 31-40; FTTr. 10618-622.  Forbes contends that Heckler is not permitted to testify about those requirements, because they

38

pertain to matters of law which may be addressed only in the jury instructions.

To the contrary, so long as Heckler does not opine that the charged conduct in this case violated the statutes which define the charged crimes, and does not refer to the particular phrases employed by those statutes to define the crimes, or to the caselaw interpreting those phrases, he may permissibly describe the SEC's reporting and accounting requirements in general terms. Untied States v. Feliciano, 223 F.3d 102, 120-121 (2d Cir. 2000) (law enforcement official/expert witness permissibly testified that a particular group was involved in drug trafficking, where the witness did not rely on phrases from the charging statute, such as "enterprise" or "racketeering activity"); United States v. Duncan, 42 F.3d 97, 100 (2d Cir. 1994)(affirming the admission of expert testimony that the filing of false tax returns obstructs and defeats "the entire process," where the witness did not employ phrases derived from judicial interpretations of the charging statutes).  Any testimony by Heckler about SEC reporting and financial requirements will not make use of the relevant statutory language.[23]

Particularly in cases involving complex regulatory systems

---

[23]  Examples of such statutory language would include the definitions of the conduct that is prohibited by 15 U.S.C. § 78j(b) and by 17 C.F.R. § 240.10b-5.  These include "knowingly employing a device, scheme, or artifice to defraud," or "knowingly making an untrue statement of a material fact."

such as the federal securities laws, the Second Circuit has "generally permitted the elicitation of testimony from expert witnesses that shed light on activities not within the common knowledge of the average juror." <u>Duncan</u>, 42 F.3d at 102 n. 3 (affirming admission of expert testimony "concerning the proper functioning of the [federal] tax system and the importance of filing fax returns accurately"). This Court should not preclude Heckler from offering such relevant and helpful testimony during the third trial.

## <u>CONCLUSION</u>

The Government requests that Forbes' Third Trial Motion <u>In Limine</u> No. 5. be denied.

> Respectfully submitted,
>
> CHRISTOPHER J. CHRISTIE
> Special Attorney
> U.S. Department of Justice
>
> *Norman Gross/s*
>
> NORMAN GROSS
> Federal Bar Number 24933
> MICHAEL MARTINEZ
> Federal Bar Number PHV0423
> Special Attorneys
> U.S. Department of Justice
> 970 Broad Street
> Room 700
> Newark, N.J.  07102
> (973) 645-2701

Newark, New Jersey
Date: May 19, 2006

**EXHIBIT A**

**(Cendant Corporation Press Release, July 28, 1998)**

**EXHIBIT B**

**(AICPA Consulting Services Report)**

**EXHIBIT C**

**(Summary of Expert Testimony of Brian Heckler)**

**EXHIBIT D**

**(Declaration of Brian Heckler, August 14, 2003 and August 12, 2003 Letter from Heckler to AUSA John Carney)**

**EXHIBIT E**

**(Portion of Cendant Audit Committee Report)**

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that on this day I caused to be served a copy of the Government's Opposition(Opposition to Forbes Third Trial Motion *in Limine* No. 5) via email on:

Barry S. Simon, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005-5901
(202) 434-5005
bsimon@wc.com


<u>*Norman Gross/s*</u>
NORMAN GROSS


Dated: May 19, 2006
       Camden, New Jersey