

**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

*Criminal Division*

---

*John J. Carney*
*Chief, Securities and Health Care Fraud Unit*

970 Broad Street, Suite 700
Newark, NJ 07102

(973)645-6112
Fax: (973)645-2857

December 16, 2002

**BY FACSIMILE & OVERNIGHT COURIER**

Martin J. Auerbach, Esq.
Dornbush, Mensch, Mandelstam
 & Schaeffer
747 3rd Avenue
New York, NY 10017

Barry S. Simon, Esq.
Williams & Connolly, LLP
725 Twelfth Street, N.W.
Washington, DC 20005

Peter K. Vigeland, Esq.
Wilmer, Cutler & Pickering
399 Park Avenue
New York, NY 10022

      Re: United States v. Walter A. Forbes
          And E. Kirk Shelton No. 3:02CR264 (AWT)

Dear Counsel:

    Please find enclosed the expert witness testimony summary of Professor Robert J. Sack and Brian L. Heckler, C.P.A. The government's list of trial witnesses and Giglio materials will be provided shortly.

                        Yours very truly,

                        CHRISTOPHER J. CHRISTIE
                        United States Attorney

        By:    JOHN J. CARNEY
                    Special Attorney
                    U.S. Department of Justice

Enclosures

Confidential                              Page 1                              8/12/2002

**Project Cendant**
**Expert Witness Testimony Summary**
**August 12, 2002**

1. **Introductory paragraph**

    a. **Items Covered:** Pursuant to the Federal Rules of Criminal Procedure, the following is a summary of the Expert Witness Testimony that I am prepared to provide in the matter, *United States of America v. Walter. A. Forbes and E. Kirk Shelton.* This summary describes the documents that I considered and my opinions for each of the accounting irregularities identified in the Superseding Indictment handed down by the Grand Jury for the District of New Jersey at Newark. The basis for my opinions that those irregularities violated generally accepted accounting principles ("GAAP") that were relevant during the financial reporting periods in question is also provided. Finally, I describe my qualifications to act as an accounting expert in GAAP and as an expert in Securities and Exchange Commission ("SEC") financial reporting and related disclosure requirements in the areas cited in this matter.

2. **Documents Reviewed**

    a. In preparing for my Expert Witness Testimony, I considered and read the following information:

      - The Company's[1] publicly filed financial reports with the SEC on Forms 10K and 10Q for the fiscal years ended ("FYE") January 31, 1996 and 1997 and the calendar year ended December 31, 1997;

      - The restated form 10K/A for the year ended December 31, 1997 and for the fiscal years presented therein filed by the Company;

      - Certain of the Company's Press Releases, and all the Annual Reports and President's Letters (included in the Annual Reports) during the relevant time periods;

TestimonySummary_Final.doc                                                     3:28 PM

Confidential                               Page 2                               8/12/2002

- The Report to the Audit Committee of the Board of Directors of Cendant dated August 24, 1998, prepared by Willkie Farr and Gallagher ("WFG") and Arthur Andersen LLP ("AA"), as well as the supporting AA workpapers thereto;

- The Superseding Indictment ("Indictment") handed down by the Grand Jury in and for the District of New Jersey to Walter A. Forbes and E. Kirk Shelton ("defendants");

- Selected interview memoranda prepared by WFG documenting the interviews conducted by WFG and AA of various Company personnel, including, but not limited to, Walter A. Forbes, E. Kirk Shelton, Casper Sabatino and Steve Speaks;

- Transcript of Pleas of Cosmo Corigliano, Anne Pember and Casper Sabatino;

- Selected Ernst & Young workpapers during the relevant periods and;

- Various source documents, including journal entries, spreadsheets, etc. prepared by the Company in support of the original accounting entries used to prepare the Company's financial statements during the relevant periods and by AA in connection with the Report to the Audit Committee dated August 24, 1998.

3. **Alleged Accounting Irregularities**

   a. According to the Indictment, the defendants are alleged, among other things, to have fraudulently[2] inflated the reported earnings of CUC International, Inc. and Cendant Corporation (hereinafter collectively referred to as the "Company") for FYE January 31, 1996 and 1997 and calendar year ended December 31, 1997 (the latter representing a change in the reporting year from January 31, 1998, to a calendar year period as a result of the CUC/HFS merger.)  Specifically, it is alleged that certain items of revenues, expenses, assets and liabilities and certain

   aggregated amounts, such as operating income and net income, were intentionally misstated by the Company.

   b. These alleged violations involve six principal areas in which the defendants are accused of employing improper accounting practices and policies that violated GAAP by manipulating the Company's financial position and results of operations and misleading investors by failing to disclose critical financial information related to the Company's economic resources, obligations to others, and operating performance. This information is commonly used by investors and creditors to identify and assess a company's financial strengths and weaknesses.

My testimony will include my opinion with regard to the application of GAAP and SEC financial reporting and disclosure requirements and the basis for my opinion on these six principal areas as follows:

1. **Arbitrary adjustments were made to quarterly unaudited revenues and expenses during the consolidation process**[3] to increase reported revenues, reduce expenses, and show additional accounts receivable, deferred revenue and cash or decreased liability balances. These arbitrary adjustments to amounts reported in the Company's financial statements were not disclosed and violated GAAP because:

   a. These arbitrary adjustments had no basis in a past transaction(s) or event(s) (i.e. services rendered) and there was no basis in GAAP to justify the recognition of these adjustments in the financial statements.[4]

   b. There was no exchange of consideration or a transaction with a customer.[5]

   c. There was no claim to cash or other asset that met the definition of an asset.[6]

   d. The revenue recognized failed to meet the definition of revenue[7] and failed to qualify for recognition since it did not meet the realizability and earned criteria that GAAP requires.[8]

Confidential                         Page 4                         8/12/2002

  e. Company management failed to disclose the accounting practices that they employed in preparing the Company's financial statements, the impact that these accounting practices had on reported revenues, expenses and balance sheet amounts, and the favorable impact the unsupported revenues had on reported membership revenues.[9]

**Effect of the arbitrary adjustments to quarterly revenues and expenses:**

The cumulative impact on reported revenues, expenses and pre-tax income due to the topside adjustments were as follows:

| | |
|---|---|
| Nine months ended 10/31/97: | overstated by $176 million |
| Nine months ended 10/31/96: | overstated by $87 million |
| Nine months ended 10/31/95: | overstated by $31 million |

2. **Revenue recognition practices that did not conform to stated Company policy:**

Reported revenues were accelerated for certain programs to the beginning of the membership term in violation of the Company's stated accounting policy and related disclosure, which states that "membership fees are recognized over the average membership period, generally one to three years."[11] This occurred for all of the revenues for certain immediate recognition programs and a portion of the revenues for other recognition programs that were normally deferred and recognized in accordance with the Company's stated policy.

Accelerated revenue recognition violated GAAP because:

  a. The Company failed to meet the GAAP revenue recognition criteria as these revenues were not earned before they were recognized in the financial statements.[5]

  b. This distorted a user's view of currently earned revenues, anticipated future

TestimonySummary_Final.doc                                      3:28 PM

Confidential                               Page 5                               8/12/2002

revenues, and the growth in memberships[10] because this practice was not properly and completely disclosed. The Company was required to provide appropriate disclosures about how the Company recognized and accounted for revenues and the material impact this practice had on reported revenues.[9]

**Effect of this practice on reported revenues:**

As a result of the above practice, the Company overstated reported revenues that violated GAAP by at least:

FYE Dec 31, 1997     $17 million

FYE Jan 31, 1997     $10 million

FYE Jan 31, 1996     $3 million

3. **Cancellation Reserves:**

A. The Company purported to reduce reported revenues by a reserve for rejected billing attempts and membership cancellations that was adequate to provide for such amounts. The Company failed to provide a sufficient estimate of these rejects and future cancellations.[12] The Company estimated the amount of the required reserve by using an inadequate formula based on inappropriate data using selected historical cancellation rates that were not representative of all membership programs resulting in a distortion in the amount of the reduction from revenues.[13] In addition, the estimate of rejects and future membership cancellations was not based on all information then currently available to management since "known" rejects and cancellations were not recorded on a timely basis for the last three months of the Company's fiscal year.[14]

These practices violated GAAP because:

i. Significant events (i.e. non-payment/rejection of membership fees billed to a member's credit card) were not recorded in the Company's financial statements when they occurred nor where they considered in assessing the adequacy of the

       remaining reserve to absorb future refunds of membership fees resulting from cancellations.[12]

  ii. The effect of not recording these "rejects in transit" in the Company's financial statements was to present cash that no longer existed in the Company's bank accounts.[6]

  iii. The Company failed to recognize an additional charge against revenues to establish the reserve for rejects and cancellations of the amounts the Company believed were necessary.[12]

  iv. The Company failed to disclose its accounting practice of delaying the recognition of the rejects for the last three months of the reporting year and the material impact the practice had on cash balances, the cancellation reserve, cash flows and the actual level of cancellations[9] and uncollectible receivables.

B. The Company recognized fictitious and improper entries to adjust the level of the cancellation reserve through other balance sheet accounts (i.e. accounts receivable during interim reporting periods and at year-end). These actions violated GAAP because:

  i. There were no underlying transactions (i.e. an exchange with a customer for services rendered, actual accounts receivable from customers, or additions to the cancellation reserve through charges against revenues) to justify certain entries made to the cancellation reserves and other balance sheet accounts.[4]

  ii. The entries that increased receivables and other assets did not represent assets as defined in GAAP as there were no customers to which the Company had a future benefit in the form of a claim to cash.[6]

  iii. The Company did not disclose this practice and its effect on the cancellation reserve, revenues, and the balance sheet accounts involved.[9]

    iv. Certain entries made at year-end resulted in reversing a portion of the cancellation reserve into income without justifiable evidence that the reserve was not necessary. In fact, evidence existed to the contrary and the reversals were not justified.[12]

    v. These reversals of cancellation reserves into income resulted in increases/decreases to certain income/expense accounts that were not associated with the cancellation reserves or the revenues to which the cancellation reserves related. The adjustments to the income and expense items resulted in misstating the actual levels of these income and expense amounts.

    vi. The Company was required to provide disclosure of the effect of these reversals of the cancellation reserve into income and failed to do so.[15]

**Effect on cancellation reserves:**

The adjustments and practices described above had the effect of overstating reported pre-tax income by at least:

| | |
|---|---|
| FYE Dec 31, 1997 | $12 million |
| FYE Jan 31, 1997 | $19 million |
| FYE Jan 31, 1996 | $48 million |

4. **Merger Reserves:** Costs associated with activities such as a realignment of a previously separate strategy, management, employees, operations, facilities, products, etc. of two entities in a business combination are commonly called "restructuring" or "exit costs." These costs and certain transaction-related costs are often referred to as "merger-related" costs. Frequently, merger-related costs are displayed in the income statement separately and portrayed as being out of the ordinary, unusual, infrequent or non-recurring. The timing of when restructuring costs incurred in connection with a merger are recorded in

the financial statements has been addressed in GAAP. Typically, the costs will be accrued and recognized in the financial statements when an obligation exists to pay cash or otherwise sacrifice enterprise assets. In certain circumstances, GAAP requires that exit costs and involuntary employee severance be accrued upon intended actions of management at a point prior to when the costs otherwise would be recognized under GAAP.[16]

The Company included certain costs in its merger reserve accrual that did not qualify for accrual at the time of the charge. In addition, the original charges to create the Ideon and Cendant merger reserves were intentionally overstated with excess amounts. The Company also improperly included amounts related to asset impairment charges in the original merger reserves and improperly wrote-off assets as impaired against the merger reserves for assets that either were not actually impaired or the impairment was not the direct result of the merger to which the write-off was purportedly made. Furthermore, the Company misclassified certain normal, recurring, operating expenses as merger-related costs when they charged those normal expenses against a previously established merger reserve. The expenses had no relation to the mergers for which the reserves were established, did not qualify as exit costs under GAAP, and were inappropriately charged to the merger reserve instead of being shown in the customary expense category used for the cost. Finally, the Company recognized excess merger reserves into income in subsequent periods after the reserves were established and in different income statement captions than where the original reserve was presented.

The use of merger reserves[17] and the treatment and characterization of merger-related costs by the Company violated GAAP because:

  a. Certain of the costs included in the Exit Plan and accrued in the merger reserves were not qualifying Exit Costs under GAAP.[18]

b. The Ideon and Cendant merger reserves did not represent valid estimates of anticipated exit costs associated with the respective Exit Plans for those mergers.[19]

c. The asset impairments recognized did not qualify to be recognized under GAAP and were improperly recorded.[20][21]

d. Expenses were mischaracterized in the Income Statement and expenses were not recognized in the period in which they were incurred.[22]

e. The Company inappropriately corrected the error manifested in the excess merger reserves. The Company inappropriately reversed excess merger reserves into revenue. GAAP requires that the unsubstantiated amount of the original reserve should have been corrected in the original period and income statement caption that it was originally presented by restating those financial statements.[23]

f. The Company was obligated to provide required disclosures for these practices related to the Exit Plan and related Exit Costs included in the merger reserves, costs charged to the merger reserves, asset impairments, and the corrections of errors as to the level of Exit Costs and failed to do so.[24]

**Effect of the merger reserves items discussed above:**

These actions had the effect of overstating reported pre-tax operating income[25] by at least:

FYE Dec 31, 1997    $110 Million

FYE Jan 31, 1997    $23 Million

FYE Jan 31, 1996    $10 Million

5. **Other Accounting Irregularities**

a. **Unsupported Reversal of Operating Expenses to Deferred Marketing:**

Certain expenses that were unrelated to marketing efforts were reversed from the calculation of pre-tax income and included in the balance sheet Deferred

Marketing account without justifiable support.[27] These unsupported reversals to operating expenses and the deferred marketing account violated GAAP because:

i. These expenses did not meet the GAAP criteria for qualifying marketing expenses subject to deferral.[28]

ii. These expenses were not recognized in the period incurred or in the income statement caption to which they belonged.

iii. These expenses failed to meet the definition of assets, as they did not represent probable future economic benefits.[29]

iv. There was no support or justification under GAAP to base these entries since there was no basis in a transaction(s), an allocation or an event(s).[30]

v. The Company failed to disclose the effect of these adjustments on the deferred marketing asset or on reported expenses.[31]

**Effect of the adjustments to deferred marketing:**

These actions had the effect of overstating reported pre-tax income by at least:

FYE Jan 31, 1996    $17 Million

**b. Unsupported Reductions to Commission Payable:** The Company reversed portions of the commissions payable into revenue without support. These actions violated GAAP because:

i. The amounts did not meet the definition of revenue.[7]

ii. The Company was not relieved of the obligation embodied by the liability that was removed from the balance sheet.[32]

      iii. There was no basis for the entry in an underlying transaction(s) or event(s).[30]

      iv. The Company failed to disclose the effect of this adjustment on the commissions liability or on reported revenues.[33]

**Effect of the commissions payable adjustments:**

These adjustments had the effect of overstating reported pre-tax income by at least:

| | |
|---|---|
| FYE Dec 31, 1997 | $2 Million |
| FYE Jan 31, 1997 | $4 Million |

  c. **Deferred Tax Valuation Allowance Reversed into Income:** The Company recognized a deferred tax asset that was subject to a valuation allowance as it was not likely that the Company would receive the tax benefit. The deferred tax valuation allowance was subsequently reversed and recognized into income. This action violated GAAP because:

      i. The deferred tax asset that did not meet the GAAP qualifications to be recognized.[34]

      ii. Reversing the valuation allowance into income was inappropriate.[35]

      iii. The Company was required to disclose the effect of the change in the valuation allowance and the impact its reversal had on income.[36]

**Effect of the deferred tax valuation allowance reversal:**

The reversal of the deferred tax valuation allowance had the effect of overstating reported pre-tax income by at least:

    FYE Dec 31, 1997      $2 Million

6. **January 1997 Impact**

In addition to the cumulative impact on reported pre-tax income noted in the Arbitrary Adjustments section above, the Company also inflated pre-tax income in January 1997 by an additional $22 million by showing fictitious revenues and reduced expenses which impacted income for the year ended December 31, 1997. Arbitrary adjustments were made in January 1997 and not reversed at year-end (which was typically the pattern followed by the Company for these types of adjustments in prior periods). This practice violated GAAP because the arbitrary adjustments recorded by the Company failed to meet the criteria noted above in the Arbitrary Adjustments section and should not have been recognized in the financial statements.

In addition to the cumulative impact on pre-tax operating income due to the reversals of merger reserves noted in the Merger Reserve section above, the Company knowingly inflated pre-tax operating income by at least an additional $11 million for the year ended December 31, 1997, due to reversals of merger reserves that were made in January 1997 which impacted both FYE January 31, 1997 and calendar year ended December 31, 1997.[26] These reversals violated GAAP because the original reserve was created in error and the reversal of the reserve was not treated properly and disclosed.

**Effect of the January 1997 adjustments:**

The effect on reported pre-tax income was as follows:

Year ended 12/31/1997:                    overstated by $33 million

1. **Qualifications of Designated Expert**
    a. I am a certified public accountant licensed to practice in the states of New York and Illinois and have practiced as a public accountant since 1984. During this time, I have staffed and supervised the planning of and participated in audits of a

Confidential                                       Page 13                                        8/12/2002

variety of enterprises. These activities included conducting tests of internal control and account balances, and assessing whether reported amounts in financial statements provided to users and filed with the Securities and Exchange Commission complied with GAAP in all material respects and met GAAP and SEC disclosure requirements.

    a. I have served for four years, two as senior manager and two as partner, in KPMG's Department of Professional Practice where I was responsible for answering technical inquiries on the application of US GAAP and SEC Rules and Regulations from operating offices throughout the world. These technical areas included those applicable in this case, SEC reporting and disclosure rules and practices, revenue recognition, consolidation accounting, merger related reserves and costs, income tax accounting, and deferred marketing, customer solicitation costs, and income tax accounting.

    b. I have served as a Professional Accounting Fellow in the SEC's Office of Chief Accountant from July 1995 to June 1997 where I was responsible for assessing matters raised by the SEC staff and SEC registrants regarding application of US GAAP and SEC Rules and Regulations for accounting, reporting, and disclosure to provide the official interpretation of the SEC. Also, I participated in monitoring activities and providing the SEC's perspective on the projects conducted by the various private-sector accounting standard setting authorities.

TestimonySummary_Final.doc                                                                         3:28 PM

Confidential                               Page 14                              8/12/2002

    c. Since July 1997, I have been a Partner in KPMG focusing my practice on the application of GAAP and compliance with disclosure requirements and SEC reporting Rules and Regulations. Specifically, my areas of focus have included accounting matters arising in mergers and acquisitions, including the use of merger related reserves. I also have been involved in providing clients with guidance for the application of revenue recognition and income tax accounting.

    d. I have served as an expert witness in accounting matters involving GAAP and SEC financial reporting and related disclosure requirements in two other cases.

    e. I have participated as a subject matter expert in speaking engagements, in interviews, and by authoring articles in the topics described above over the past nine years.

---

[1] References to the "Company" refers to Cendant for the year ending December 31, 1997, and Comp-U-Card International (or CUC) for the two fiscal year periods ending January 31, 1997 and January 31, 1996.

[2] Fraud in financial reporting as herein utilized is defined as "intentional misstatements or omissions of amounts or disclosures in financial statements to deceive financial statement users." (para. 4, Statement on Auditing Standards ("SAS") No. 82, *Consideration of Fraud in Financial Statement Audits*.) This may include:
- Manipulation, falsification, or alteration of accounting records or supporting documents from which financial statements are prepared
- Misrepresentation in, or intentional omission from, the financial statements of events, transactions, or other significant information
- Intentional misapplication of accounting principles relating to amounts, classification, matter of presentation, or disclosure

[3] In large organizations with multiple operating subsidiaries, it is not uncommon for the need to record certain adjustments, so-called "consolidating entries or topside entries," in the process of consolidating the results of the individual companies into what purports to represent the results of the consolidating reporting entity. In addition, it is not uncommon that certain interim amounts must be adjusted as a result of the

differences between reporting quarterly compared with reporting on an annual basis, so-called "intra-period allocations." This process in and of itself is not improper when there is support for the amounts used and justification in GAAP for these entries. The adjustments made by the Company in this case, do not constitute these types of customary or legitimate consolidating entries and intra-period allocations. Instead, the adjustments were unsubstantiated additions to income.

[4] SFAC No. 5, paras. 63-77.

[5] SFAC No. 5, para. 83a, 84a and d.

[6] SFAC No. 6, paras. 25-33.

[7] SFAC No. 6, paras. 78 and 79.

[8] SFAC No 5, paras. 83a and b.

[9] SFAC No.2, paras. 79 and 80; APB No. 22, paras 6-8, 12, and Items 101 and 303 of SEC Regulation S-X.

[10] In addition to the stated accounting policies noted in footnote 11, the Company made the following disclosures to describe the trends in revenue:
- In the Company's Form 10-K for the year ended December 31, 1997: "The Company derives its Membership Services revenues principally from membership fees. Membership fees vary depending upon the particular membership program, and annual fees to consumers generally range from $6 to $250 per year. Most of the Company's memberships are for one-year renewable terms, and members are generally entitled to unlimited use during the membership period of the service for which the members have subscribed. Members generally may cancel their memberships and obtain a full refund at any point during the membership term."
- In the Company's Form 10-K for the year ended January 31, 1997: "The Company's overall membership base continues to grow at a rapid rate, which is the largest contributing factor to the 20% increase in membership revenues (from $1,643.2 million in fiscal 1996 to $1,972.4 million in fiscal 1997). While the overall membership base increased by 15% (before giving effect to Ideon acquired members) during the year, the average annual fee charged for the Company's membership services increased by approximately 4%."
- In the Company's Form 10-K for the year ended January 31, 1996: "Except principally for the sale of discount coupon program memberships, the Company's business is not seasonal. For financial statement purposes, the Company recognizes these membership fees over the service period."

[11] Footnote No. 2, "Core Business Operations and Revenue Recognition", in the Company's financial statements for the year ended December 31, 1997, as included in the Company's Form 10-K dated March 31, 1998, states, "membership fees are ...recorded as deferred membership income upon acceptance of the membership, net of estimated cancellations. Membership fees are recognized over the *average membership period*, generally one to three years. A similar policy was included in Footnote A of the Company's financial statements for the years ended January 31, 1997 and January 31, 1996 that states, "Membership fees are ...recorded as deferred membership income upon acceptance of membership, net of estimated cancellations, and *pro-rated* over the membership period."

[12] SFAS No. 5, para 8a and b, 11, 22 and 23.

[13] SFAS No. 48, paras 6-8.

[14] SFAS No. 5, para 8a and b; SFAC No. 6, paras. 35-36.

[15] APB 20, paras 33 and 37; APB 22, paras 6-8 and 12 and Items 101 and 303 of SEC Regulation S-X.

[16] EITF 94-3 provides specific guidance on when restructuring costs are permitted to be accrued upon the intended actions of management.

[17] Of the merger-related reserves that the Company accrued during the period under scrutiny – two are of interest in my testimony, the Cendant Reserve and the Ideon Reserve. The two reserves were for:
*Cendant Reserve:* On December 17, 1997, HFS merged with CUC International to form Cendant Corporation. This business combination was accounted for using the pooling-of-interests method. Management of CUC recorded a $556.4 million accrual for anticipated merger-related expenses related to the Cendant Reserve.
*Ideon Reserve:* During fiscal year 1996, CUC acquired Davidson & Associates, Inc. ("Davidson"), Sierra On-Line ("Sierra") and Ideon Group, Inc. ("Ideon"). All three business combinations were accounted for using the pooling-of-interests method. In connection with the Davidson, Sierra and Ideon mergers, management recognized a $179.9 million accrual for anticipated merger-related expenses.

[18] EITF 94-3(B) Discussion defines the criteria of when costs qualify as exit costs and can be recognized and accrued at the exit plan commitment date.

[19] EITF 94-3(B) Discussion defines the criteria of when costs qualify as exit costs and can be recognized and accrued at exit plan commitment date. In addition, SFAS No 5, para. 14, states that no accrual shall be made for so-called "reserve for general contingencies" as these do not meet the conditions for accrual in para. 8 of SFAS 5, which states that costs must be estimable and probable to be accrued and charged to income.

[20] SFAS 121, paras 6, 7 and 15.

[21] See discussion of representational faithfulness in SFAC No. 2, para.63.

[22] SFAS 5, paras 8 and 14.

[23] APB 20, paras. 13, 36 and 37 and Items 101 and 103 of SEC Regulation S-X.

[24] See EITF 94-3(B) Discussion for disclosure requirements of exit plans and exit costs. Also, APB 20, paras 33 and 37, SFAS 121, paras. 13, 14, 18 and 19 and Items 101 and 103 of SEC Regulation S-X.

[25] The term operating income lacks any generally accepted definition. The Standard & Poor's "Measures of Corporate Earnings" paper dated May 14, 2002 (originally released November 7, 2001) notes the following: "Operating income tends to focus on the earnings from a company's principal operations, with the goal of making the numbers comparable across different time periods. Operating earnings are usually considered to be as reported earnings with some charges reversed to exclude corporate or one-time expenses. Despite the lack of any generally accepted definition, operating earnings are increasingly popular in corporate reports. The use of this measure seems to come from internal management controls used when a business unit manager is not responsible for managing corporate-level costs." Per the Company's 12/31/97 10K, "comparative operating income" represents income excluding merger-related costs and other unusual charges and interest expense.

[26] Because CUC did not have monthly financials, it was necessary for the Company to calculate its January 1997 results at the time it prepared its December 31, 1997 financials. The results of January 1997 were then combined with those eleven months. Since the accounting irregularities related to the $110 million in overstated income occurred in the latter part of 1997, the $11 million in irregularities in January is in addition to the $110 million at calendar year ended December 31, 1997.

[27] SOP 93-7, *Reporting on Advertising Costs*, provides broad guidance on reporting the costs of advertising. See paragraphs 33-35 and 41.

[28] SOP 93-7, paras. 26-28, 33-35 and 41.

[29] SFAC No. 6, paras. 25 and 26.

[30] SFAC No. 5, para. 63.

[31] SOP 93-7, paras 49 and 50, and Items 101 and 303 of SEC Regulation S-X.

[32] SFAC No. 6, paras. 35 and 36.

[33] SFAC No. 2, para. 79 and Items 101 and 303 of SEC Regulation S-X.

[34] SFAC No. 5, paras. 63-77; SFAS 109, paras. 16 and 17.

[35] SFAS 109, para. 26.

[36] SFAS 109, paras. 26, 43-49 and Items 101 and 303 of SEC Regulation S-X.

TestimonySummary_Final.doc                                          3:28 PM