UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


UNITED STATES OF AMERICA      :   No. 3:02CR00264 (AHN)
                              :
                              :
            v.                :   May 23, 2005
                              :
                              :
                              :
WALTER A. FORBES              :


**GOVERNMENT'S RESPONSE TO DEFENDANT WALTER A. FORBES' MOTION TO PRECLUDE THE GOVERNMENT FROM PRESENTING SUPPOSEDLY IMPROPER LAY OPINION TESTIMONY AT TRIAL**

**(Opposition to Forbes Third Trial Motion In Limine No. 10)**


CHRISTOPHER J. CHRISTIE
NORMAN GROSS
MICHAEL MARTINEZ
MARK E. COYNE
Special Attorneys
U. S. Department of Justice
970 Broad Street
Room 700
Newark, N.J.  07102
(973) 645-2701

<u>TABLE OF CONTENTS</u>

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.   THIS COURT, LIKE JUDGE THOMPSON, SHOULD PERMIT THE
     COOPERATING WITNESSES WHO PARTICIPATED IN THE CHARGED FRAUD
     TO TESTIFY ABOUT HOW THEY COOKED THE BOOKS AT CUC AND THE
     CONSEQUENCES OF THOSE EFFORTS. . . . . . . . . . . . . . 5

     A.   The Challenged Testimony Concerned the Witness's
          Observations of Facts, Not Opinion Testimony. . . . 5

     B.   The Challenged Testimony Did Not Involve "Specialized
          Knowledge." . . . . . . . . . . . . . . . . . . . 10

     C.   To the Extent That the Challenged Testimony Involves
          "Lay Opinions," It is Admissible Under Fed. R. Evid.
          701. . . . . . . . . . . . . . . . . . . . . . . . 16

II.  AS DURING THE FIRST TRIAL, THE COOPERATING WITNESSES WILL
     NOT SPECULATE ABOUT FORBES' GUILTY STATE OF MIND. . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . 24

i

**INTRODUCTION**

Hoping that the fourth time is the charm, Forbes raises a claim that Judge Thompson has already rejected three times. Forbes again seeks the exclusion of testimony from admitted participants in the charged conspiracy that they intentionally cooked the books at CUC in order to fraudulently inflate CUC's publicly reported financial results, and that their fraudulent conduct was intended to and did in fact inflate those results by particular amounts.[1]  In his present motion, Forbes does not even attempt to demonstrate that this Court should reconsider Judge Thompson's repeated denials of this claim, see Sequa Corp. v. GBJ Corp., 156 F.3d 136, 144 (2d Cir. 1998), or that this Court should depart from the law of the case, see United States v. Uccio, 940 F.2d 753, 758 (2d Cir. 1991).

Even if this Court were to consider Forbes' arguments anew, they fail on their own terms.  Forbes challenges the testimony as improper "lay opinion" under Fed. R. Evid. 701, which restricts "testimony in the form of opinions or inferences."  The challenged testimony, however, sets forth the witnesses' descriptions of their own conduct and the intended and actual

---

[1]    Forbes unsuccessfully raised this claim: (a) before the first trial, Docket 595 (Forbes' Motion In Limine No. 1); 645 (Government's opposition); 771 (Forbes' supplemental memorandum); 797 (Judge Thompson's ruling, denying the motion); (b) during the first trial, Docket 955 (Forbes' Trial Motion No. 21); 1074 (Government's opposition); 1264 (Judge Thompson's oral order denying the motion); and (c) before the second trial, Docket 1662 (Forbes' Retrial Motion In Limine No. 3); 1741 (Government's opposition); 1813 (Forbes' reply memorandum); 1901 (Judge Thompson's written order denying the motion)(Exhibit A hereto).

consequences of their conduct, not "testimony in the form of opinions or inferences."

Specifically, the witnesses did not relate their "opinions" or draw "inferences" about whether they intended to and did in fact cook the books or cause their subordinates to cook the books at CUC in order to inflate CUC's publicly reported earnings over the course of several years, and whether their conduct achieved its intended consequences of cooking those books by particular amounts. Rather, they testified about facts as to which they had personal knowledge, such as the fact that co-conspirator Anne Pember directed her subordinates at CUC to fraudulently increase CUC's publicly reported revenue by particular amounts. She also testified that her subordinates followed her directives by making fraudulent adjustments to CUC's general ledger, with the result that CUC's reported revenues were fraudulently inflated by the amount of that adjustment.

Even treating the challenged testimony as "lay opinion" does not advance Forbes' cause. He effectively concedes that the challenged testimony satisfies two of the three requirements of Fed. R. Evid. 701: that it was based on the personal knowledge of the witnesses, and that it was helpful to the jury. Forbes is left to argue that the testimony was the product of "specialized knowledge" about accrual accounting and Generally Accepted Accounting Principles ("GAAP"). This argument misses the mark:

none of the witnesses testified on direct examination that
fraudulent actions they undertook violated GAAP.[2]

Rather, they testified that they intended to and did in fact
fraudulently misrepresent to the investing public and the SEC
CUC's actual financial results as they were reflected on the
books and records of CUC before the witnesses tampered with those
records.  Some of the witnesses also identified the quantitative
effect of their fraudulent conduct, but did so without resort to
specialized knowledge.  None of the cases cited by Forbes hold
that a lay witness cannot testify about her own conduct and
observations, and the observable results of her conduct, simply
because the witness has specialized knowledge that she did not

---

[2]  Rather, Brian Heckler, a properly qualified accounting
expert who was not involved in the fraud, will again establish
that the accounting manipulations at issue in this case,
including the misuse of merger and membership cancellation
reserves, the improper recognition of revenue and expenses, and
the "made-up numbers" derived during the consolidation of the
financial results for CUC's 22 operating divisions, violated
GAAP.  Heckler will also testify that those GAAP violations
caused CUC's publicly reported financial results to be misstated
by particular amounts during the fiscal years ending January 31,
1996 and  January 31, 1997.  They also caused Cendant's publicly
reported financial results to be misstated by particular amounts
during the fiscal year ending December 31, 1997.  FTTr. 10611-68.

Forbes points out that the Government can seek to prove the
fact and quantitative effect of CUC's GAAP violations through
Heckler's testimony, and that the testimony of the cooperators is
not needed for that purpose.  Forbes' Memorandum in Support of
Third Trial Motion In Limine No. 10 ("FM") 11.  Forbes declines
to mention that in another of his motions in limine, he seeks the
exclusion of Hecker's proposed testimony in its entirety.  Forbes
Third Trial Motion In Limine No. 5.

employ in committing the charged crime or in describing that
crime on the witness stand at trial.[3]

    Additionally, this motion would appear to be much ado about
nothing.  Forbes has conceded during the first and second trials
that the charged fraud in this case occurred, and that the
cooperating witnesses such as Corigliano and Pember participated
in that fraud.  His defense is that he ignorant of the fraud.
Second Trial Transcript ("STTr.") 59 (stating that Corigliano
engaged in criminal conduct); 68 (Corigliano conspired with his
subordinates in CUC's Accounting Department to "manipulat[e] the
books and records"); 68-70 (Corigliano hid the accounting
manipulation from the auditors); 71 (Corigliano "ma[de] up
numbers" and was "success[ful in] pulling this thing off").
Forbes has even offered not to contest that the false statements
in CUC's publicly reported financial results were material.
Forbes' Third Trial Motion In Limine No. 11, at p.4, n.4.  The
challenged evidence goes only to prove elements of the charged
crimes which Forbes has not previously contested, but nonetheless
declines to concede.

---

    [3]  Thus, in United States v. Peoples, 250 F.3d 360 (8th Cir.
2001), the district court erroneously admitted the opinion
testimony of a law enforcement agent about the supposed meaning
of plain language, not coded words, uttered in recorded
conversations involving the defendant.  The Court noted that the
agent "lacked first-hand knowledge of the matters about which she
testified.  Her opinions were based on her investigation after
the fact, not on her perception of the facts."  250 F.3d at 641.

As for Forbes' secondary claim that this Court should not permit the cooperating co-conspirators to testify about their beliefs about Forbes' guilty knowledge, the Government has previously acknowledged that it would elicit no such testimony from those witnesses on direct examination, and Forbes concedes in his present motion that the Government was as good as its word.  Forbes' Mem. in Support of Third Trial Motion In Limine No. 10 ("FM") 15 n.8.  There was no reason for Forbes to bother the Court with this uncontested issue.

### ARGUMENT

**I.  THIS COURT, LIKE JUDGE THOMPSON, SHOULD PERMIT THE COOPERATING WITNESSES WHO PARTICIPATED IN THE CHARGED FRAUD TO TESTIFY ABOUT HOW THEY COOKED THE BOOKS AT CUC AND THE CONSEQUENCES OF THOSE EFFORTS.**

#### A.  The Challenged Testimony Concerned the Witness's Observations of Facts, Not Opinion Testimony.

At the portions of the transcript cluster-cited by Forbes, FM 8, cooperating coconspirators such as Anne Pember and Cosmo Corigliano testified that they personally engaged in or had personal knowledge of the charged fraudulent accounting practices or other fraudulent conduct.[4]  That testimony was not the

---

[4]  E.g., **Pember**, First Trial Transcript ("FTTr.") 2332-33 (Pember's inappropriate use of merger reserves); 2435-37 (Pember's authorization of improper transfers from the merger reserves); 2815-16 (Pember's knowledge of CUC's false statements made to CUC's outside auditors); 2819 (Pember's knowledge that a particular document was not given to CUC's auditors); **Corigliano**: FTTr. 6308-18 (Corigliano's knowledge that earnings figures on CUC's financial statements are false); 6344-47 (Corigliano's entering into an agreement with his superior, Stu Bell, to
(continued...)

expression of improper lay opinion in violation of Fed. R. Evid. 701. Rather, the conspirators' challenged testimony described their personal observations and decision-making, and not their opinions. They described what they knew about CUC's fraudulent accounting practices, what they did to advance those practices, and why they did so. Their challenged testimony concerned events and conversations in which they personally participated, or personally observed. See United States v. Fawaz, 881 F.2d 259, 266-67 (6th Cir. 1989) (accountant's testimony about the preparation of defendant's tax return did not violate Rule 701 where he testified about his personal knowledge of the returns in the context of his personal knowledge of defendant's finances).

To use an example highlighted by Forbes, in 1997, Anne Pember was the Controller of CUC, with overall responsibility for the preparation CUC's financial statements. STTr. 837-38. Pember was directed by her boss, CUC Chief Financial Officer Corigliano to deliberately overstate the publicly reported operating earnings for CUC during the fiscal year ending ("FYE") December 31, 1997. STTr. at 873-74.[5] After the CUC merger with

---

[4] (...continued)
fraudulently adjust the publicly reported earnings of CUC in order to hit Wall Street earnings targets); 6377 (Corigliano's knowledge of adjusting CUC's records to move members of deferred revenue recognition programs into immediate revenue recognition programs).

[5] Corigliano, in turn, supervised the fraud at the behest and direction of CUC Chief Executive Officer and Chairman of the
(continued...)

HFS became effective in December 1997, the newly combined entity, Cendant, issued financial statements in its annual report on SEC Form 10-K for the fiscal year ending December 31, 1997 which represented the combined financial results for CUC and HFS. FTTr. 5706-07, 5747-52. The overstatement of CUC's reported earnings during that fiscal year therefore overstated the reported earnings of its corporate successor, Cendant.

To accomplish Corigliano's directive to overstate CUC's reported earnings, Pember instructed her subordinate, Steven Speaks, the controller for the Comp-U-Card division of CUC, to make fraudulent journal entries of particular amounts selected by Pember on CUC's general ledger. Those fraudulent journal entries had the effect of overstating CUC's revenue and understating its operating expenses, with a corresponding overstatement of CUC's publicly reported operating income, or earnings (the difference between revenues and operating expenses). STTr. 874.

Pember oversaw the fraudulent overstatement of CUC's publicly reported earnings primarily through the use of three fraudulent accounting practices. The first was the fraudulent manipulation of two merger reserves established by CUC, the Ideon

---

[5] (...continued)
Board Walter Forbes, and of CUC President and Chief Operating
Officer Kirk Shelton.  FTTr. 6193-96, 6232-37, 6430, 6455-56,
6494-95, 6511, 6520-21, 6572, 6588-94, 6605, 6455-56, 6714-16,
6945-49, 8444.

and Cendant merger reserves.  STTr. at 874-79.[6]  The result of
the improper manipulation of the Ideon and Cendant merger
reserves that Pember personally directed was an overstatement of
CUC's publicly reported earnings of $85 million for the FYE
12/31/97.  STTr. at 879.

Another fraudulent accounting practice that Pember directed
involved inflating the amount of revenue (and thereby operating
income) that CUC was supposed to recognize for that fiscal year
by $46 million.  STTr. at 874, 881.  The third fraudulent
practice that Pember oversaw was the manipulation of CUC's
membership cancellation reserve to understate ordinary expenses
and thus overstate earnings by $100 million.  STTr. at 874, 879-
81.[7]  The cumulative impact on Cendant's publicly reported
earnings from Pember's manipulation of the accounting for the
merger reserves, revenue recognition, and membership cancellation
reserve, for Cendant's FYE 12/31/97 exceeded $200 million.
Pember deliberately caused Speaks to make the fraudulent journal
entries that overstated Cendant's publicly reported earnings even

---

[6]  A merger reserve is a liability account for one-time
expenses that arise solely from the merger of two companies, such
as occurred between CUC and HFS in 1997.  Examples of such costs
are legal and investment banker fees attributable to the merger.
Merger-related costs are contrasted to ordinary operating
expenses, which may not be paid out of the merger reserve.  STTr.
874-75.

[7]  The Comp-U-Card division offered a full refund of the
membership fee to its customers upon request at any time during
the membership period.  The membership cancellation reserve was
an expense account established to pay those refunds.  STTr. 879.

though Pember had no subjective, good-faith basis for instructing Speaks to make those entries. STTr. at 877-78.

Pember also personally participated in the overstatement of CUC's reported income for the previous fiscal year, which ended on January 31, 1997.[8] STTr. at 883-84. Pember was the controller of the Comp-U-Card Division during that fiscal year, before she was succeeded by Speaks in that position and promoted in the summer of 1997 to the position of controller of CUC. STTr. 830, 883. As she did the following year, and acting pursuant to orders from Corigliano, Pember directed members of the Comp-U-Card accounting staff to make fraudulent journal entries in the Comp-U-Card general ledger. STTr. at 884-85. As a result of those fraudulent journal entries, Pember deliberately caused: (1) the Ideon merger reserve to be used to fraudulently inflate CUC's reported earnings by $45 million; (2) $40 million of revenue to be immediately and fraudulently recognized; and (3) the membership cancellation reserve to be used to overstate earnings by $100 million. STTr. at 885.

As the challenged testimony shows, Pember did not "opine" or draw inferences from the facts. Rather, she testified about the facts that she observed, or about her own mental processes, in order to prove that her superiors at CUC directed her to

---

[8] Consequent to the CUC/HFS merger to form Cendant, the fiscal year end was changed from January 31 to December 31. STTr. 882-83.

9

participate in the fraudulent overstatement of CUC's publicly reported financial results, that she followed those orders, that she directed others to help her effectuate those orders, and that when those orders were effectuated, the publicly reported financial results of CUC were overstated by the amounts by which the conspirators had decided to overstate them.  Such testimony is not subject to the strictures of Rule 701, and was properly admitted during the first and second trials by Judge Thompson. Testimony by a witness which explains her own knowledge and thinking, as opposed to the thought processes of another person, does not require specialized training and knowledge about which only expert witnesses can testify.  <u>Bennett v. Pippin</u>, 74 F.3d 578, 589 (5th Cir. 1996) (witness was competent to testify about her own state of mind, which was not a matter exclusively for expert testimony); <u>cf.</u> <u>United States v. D'Ana</u>, 450 F.2d 1201, 1205 (2d Cir. 1971) (affirming the exclusion of the testimony of physicians about what the defendant had told them in order to prove the defendant's state of mind, where the defendant testified and explained her state of mind to the jury).

**B.    The Challenged Testimony Did Not Involve "Specialized Knowledge."**

Forbes effectively concedes that the challenged testimony involved the witnesses' personal observations.  FM 10 ("Irrespective of whether the testimony is based upon the personal knowledge of the witness . . . ").  He claims that the

10

challenged testimony should nevertheless be excluded because the witnesses relied on "specialized knowledge" which can serve as the basis only for expert opinion testimony, not for lay opinion testimony. Id. Forbes' current complaint that the cooperating witnesses improperly opined about specialized and technical accounting matters is at odds with his trial strategy to inquire about those matters on cross-examination, or to voice no objection when his co-defendant did so at the first trial.

The conspirators did not need specialized knowledge to testify that they made up the numbers that found their way into CUC's press releases and publicly disclosed financial statements. They testified primarily about the discrepancy between CUC's actual financial results and the financial results that CUC publicly reported to the SEC and the investing public. They did not testify in an expert capacity regarding GAAP on direct examination. To use Forbes' example again, Pember's testimony regarding the fact and amount of the fraudulent overstatement of CUC's publicly reported earnings for the FYE 1/31/97 was not an "opinion" based on "scientific, technical, or other specialized knowledge." Rather, she was testifying that, by virtue of her position in the CUC or Comp-U-Card accounting departments, she had personal knowledge about what CUC's actual earnings were, and the difference between what they were and what they were reported to be in CUC's public disclosures.

11

Medforms Inc. v. Healthcare Management Solutions, Inc., 290 F.3d 98 (2d Cir. 2002), supports Judge Thompson's admission of the challenged testimony.  That case involved a copyright infringement suit involving modifications to a computer program for creating and printing forms used by physicians to obtain reimbursement for their services from insurance companies. Modlin was a programmer who claimed that his modifications of a pre-existing program created "original material" that was entitled to copyright protection.  Gold, another programmer and one-time supervisor of Modlin testified that Modlin had merely followed Gold's directions in formulating the modifications.

On appeal, the Second Circuit rejected the plaintiff's contention that the district court violated Rule 701 by permitting Gold to testify about the significance of Modlin's work on the computer program, and about the meaning of the term "programs" as it was used in the copyright registrations.  The Court explained that Gold's:

> opinions were rationally based on his perceptions as
> Modlin's supervisor and as a person who worked on
> [developing the revised programs]. . . .  Gold's
> testimony was not based on scientific, technical or
> other specialized knowledge within the scope of "expert
> testimony." . . . Gold's testimony was based on his
> everyday experience as a computer programmer and
> specifically on his work on [the programs].  Therefore,
> the testimony did not have to satisfy the requirements
> for expert testimony under Fed. R. Evid. 702.

290 F.3d at 111 (citations to Fed. R. Evid. 701 omitted).

Likewise here, the conspirators' testimony about their fraudulent manipulations of CUC's reported financial results were "based on [their] perceptions as" supervisors of the persons whom they directed to undertake the fraudulent accounting. Their testimony was "not based on scientific, technical, or other specialized knowledge," even though they had specialized knowledge about GAAP that is not known to most lay people, just as Gold had specialized knowledge about computer programming and copyright registrations that is not known to most lay people.

Forbes contends that Pember could only know what CUC's earnings actually were because she was a certified public accountant with specialized knowledge of accrual accounting and GAAP, which is not understood by untrained lay persons.  FM 10-11.  Not so.  Pember testified that she deliberately caused CUC's publicly reported earnings figures to be fraudulently overstated through the use of particular accounting manipulations, even though Pember had no <u>subjective</u> basis for those manipulations. STTr. 877-78.  Judge Thompson sustained Forbes' objection, based on Fed. R. Evid. 701, as to whether there was an <u>objective basis</u> for those journal entries.  <u>Id.</u> at 877.

At no time did Pember testify that her deliberate manipulations and the fraudulent overstatement of CUC's reported earnings violated GAAP, or failed to comply with accrual

13

accounting.[9]  The reported earnings were fraudulently overstated
by particular amounts because Pember intended them to be
fraudulently overstated by those amounts.  Pember caused her
subordinates to inflate the financial results by those amounts,
and they did.  Whether the pre-inflated results were properly
calculated according to GAAP and accrual accounting was of no
moment.

     Pember's challenged testimony that CUC and Cendant
overstated their reported financial results by particular amounts
is based on simple mathematics within the ken of ordinary
persons, and not the result of specialized knowledge.  By adding
the amounts of overstated operating income caused by each of the
three different accounting manipulations, Pember was able to
arrive at the total overstatement for a particular fiscal year.
Similarly, Pember's calculation of the total amount of the
fraudulent journal entries to the general ledger was a function
of simple addition.  Pember's testimony about those amounts does
not require "scientific, technical, or other specialized

---

     [9] On direct examination, the accountant witnesses from CUC
who participated in the conspiracy testified that they had "no
support" for various accounting manipulations that they
undertook, but did not testify that those manipulations violated
GAAP.  E.g. FTTr. 699, 991 (Speaks); FTTr. 9764 (Kearney).  On
the other hand, Forbes elicited Pember's testimony on cross-
examination that the accounting manipulations in which she
participated were "illegal."  FTTr. 3441.  When Shelton's lawyer
questioned Pember and Corigliano on cross-examination during the
first trial about GAAP, Forbes did not object.  E.g., FTTr. 3231
(Pember); 8198, 8643-44, 8982-83, 9007, 9099, 9101 (Corigliano).

14

knowledge."  Rather, it is a fact, not an opinion, that derives
from grade school mathematics, for which expert testimony is
wholly unnecessary.  <u>See</u> Commentary to 2000 Amendments to Rule
701 (permissible "lay testimony 'results from a process of
reasoning familiar in everyday life,' while expert testimony
'results from a process of reasoning which can be mastered only
by specialists in the field,'" <u>citing</u> <u>State v. Brown</u>, 836 S.W.2d
530, 549 (Tenn. 1992)).

Simply because Pember's fraudulent actions also resulted in
violations of GAAP does not mean that she had to be qualified as
an expert in accounting before telling the jury what she did, why
she did it, and what she understood to be the results of her
actions.  Her testimony about facts and the easily understood
inferences arising from those facts did not rely on "scientific,
technical, or other specialized knowledge within the scope of
Rule 702," and did not amount to improper lay opinion testimony
that is prohibited by Rule 701.  <u>See</u> Fed. R. Evid. 701, Advisory
Committee's Note, 2000 Amendment (revised Rule 701 does not
prohibit testimony about "manner of conduct" or "an endless
number of items that cannot be described factually in words apart
from inferences.").[10]  Forbes' claims to the contrary fail.

---

[10]    The Government has previously advanced the following
analogy to illustrate this point: a wildlife biologist who
conducted a census of the fish in a particular lake could
testify, consistent with Rule 701, that he caught, tagged, and
released 400 different fish of six inches or more during a one-
(continued...)

15

**C.    To the Extent That the Challenged Testimony Involves
"Lay Opinions," It is Admissible Under Fed. R. Evid.
701.**

Even if this Court were to conclude that the challenged
testimony articulated lay opinions in addition to statements of
fact, it should still deny Forbes' motion.  Judge Thompson
properly admitted the testimony that was based on the witnesses'
"inside information" about how the fraud was executed and why the
publicly reported financial results of CUC and Cendant were
fraudulent.  <u>United States v. Cassese</u>, 428 F.3d 92, 107 (2d Cir.
2005) (noting that "lay opinion testimony assists the jury by
affording it an insight into an event that was uniquely available
to a direct participant") (internal citations and quotation marks

---

[10] (...continued)
month period, but that he falsely wrote in his report that he
counted 700 such fish.  Such testimony would not require
specialized knowledge because it is understandable to a lay
juror, regardless of whether or not the juror is schooled in
ichthyology.  <u>See</u> <u>Soden v. Freightliner Corp.</u>, 714 F.2d 498,
510-12 (5th Cir. 1983) (lay witness's conclusion had a rational
basis because it would have been apparent to anyone with the same
perceptions, knowledge, and experience as the witness).  If
however, the witness sought to testify that he had concluded,
based on his examination of the fish that he had captured and
released, that they had been exposed to certain water-borne
toxins, such testimony would be subject to the requirements of
Rule 702.  <u>See</u> <u>United States v. 0.59 Acres of Land</u>, 109 F.3d
1493, 1495-96 (9th Cir. 1997) (homeowner's lay opinion about the
effects of electromagnetic fields on the value of her home was
inadmissible).  Here, the challenged testimony is analogous only
to counting fish, not diagnosing them.  <u>Cf.</u> <u>Williams v. Roberts</u>,
202 F.R.D. 294 (M.D. Ala. 2001) (cited by Forbes) (toxicologist
who was not qualified as an expert could not testify as a lay
witness that the groundwater concentration levels of
trichloroethylene did not present a health hazard and "pose[d] no
threat to human health").

omitted); <u>United States v. Rivera</u>, 22 F.3d 430, 434 (2d Cir. 1994) (affirming the admission of lay opinion testimony by a co-conspirator regarding the meaning of drug-trafficking records that she did not create, based on her first-hand knowledge of how the organization operated).

To the extent that any of the challenged testimony amounted to an expression of opinion, it was well supported by the witnesses' business experience, developed during years of employment with CUC, and was helpful to the jury's understanding of the disputed factual issues.  That testimony was not based on any specialized knowledge, expertise, or skill, and so was not subject to the constraints of Fed. R. Evid. 701.  <u>See Teen-Ed, Inc. v. Kimball Int'l, Inc.</u>, 620 F.2d 399, 403 (3d Cir. 1980) (accountant/witness's personal knowledge of company's balance sheets acquired during the course of his duties "was clearly sufficient under Rule 602 to qualify him as a witness eligible under Rule 701 to testify to his opinion of how lost profits could be calculated and to inference that he could draw from his perception of Teen-Ed's books."); <u>see</u> <u>generally</u> <u>In re Merritt Logan, Inc.</u>, 901 F.2d 349, 360 (3d Cir. 1990) (noting that the modern trend favors admission of opinion testimony if founded on witness's personal knowledge and susceptible to cross-examination).

The Advisory Committee's Note to the 2000 amendment to Rule 701 (which added the restriction against the use of specialized

knowledge) explains that business executives (such as Corigliano and Pember) can permissibly testify about their companies' financial practices, the manner in which their companies conduct business, and the way in which their companies may have been damaged by tortious or criminal conduct.  This type of testimony is admissible because of the executive's "knowledge and participation in the day-to-day affairs of the business."  Fed. R. Evid. 701, Advisory Committee's Note to 2000 Amendment. Stated differently, a corporate insider's opinion testimony about the company:

> is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.  The [2000] amendment [to Rule 701] does not purport to change this analysis.

Id. (adding that "most courts have permitted the . . . officer of a business to testify to the value of projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert").  See generally Weinstein's Federal Evidence, (2d ed. 2006) § 701.03[3] ("Lay opinion testimony has been admitted liberally whenever it might conceivably assist the trier of fact in its deliberations.").

The cooperators' challenged testimony, if opinion testimony it was, was admissible because it was supported by an adequate foundation, namely their personal and particularized knowledge about CUC's accounting practices and actions.  See Securitron

18

Magnalock Corp. v. Schnabolk, 65 F.3d 256, 265 (2d Cir. 1995) (president of a company could testify as to how lost profits could be calculated since his testimony was based on his personal knowledge of the business); Lightning Lube, Inc. v. Witco Corp., 4 F.3d at 1153, 1175 (3d Cir. 1993) (company's founder was "not required to qualify as an expert to offer opinion testimony concerning [his business's] lost profits."); Williams Enterprises, Inc. v. Sherman R. Smoot Co., 938 F.2d 230, 234 (D.C. Cir. 1991) (broker permissibly testified as a lay witness based on facts, such as an account history, of which he had personal knowledge); Merritt Logan, 901 F.2d at 360 ("Mr. Logan's personal knowledge of his business . . . [was] sufficient to make [this] witness[] eligible under Rule 701 to testify as to how lost profits could be calculated."); see generally DIJO, Inc. v. Hilton Hotels Corp., 351 F.3d 679, 685 (5th Cir. 2003) (recognizing that the 2000 amendment to Federal Rule of Evidence 701 "did not place any restrictions on the pre-amendment practice of allowing business owners or officers to testify based on particularized knowledge derived from their position").[11]

---

[11]    None of the cases cited by Forbes prohibits a lay witness from describing her own conduct and the observable and quantifiable effects of that conduct. For instance, in Wechsler v. Hunt Health Sys. Ltd., 198 F. Supp. 2d 508 (S.D.N.Y. 2002), an accountant proposed to testify that disputed receivables were properly represented on the financial statements under the applicable accounting rules. The opinion was based on the accountant's "understanding as a Texas certified public accountant." Id. at 529. Consistent with their testimony at the
(continued...)

Even if Corigliano or Pember could have been qualified as experts, they were still not precluded from giving non-expert testimony based on their personal knowledge about CUC's accounting practices.  See Teen-Ed, 620 F.2d at 403 ("The fact that Zeitz [the company's accountant] may have been able to qualify as an expert witness <u>on the use of accepted accounting principles</u> in the calculation of business losses should not have prevented his testifying on the basis of his knowledge of

---

[11] (...continued)
first two trials, none of the cooperating coconspirators in this case will articulate similar opinions that require accounting expertise.

Other cases cited by Forbes are even farther afield.  <u>Cf. United States v. Garcia</u>, 413 F.3d 201 (2d Cir. 2005) (law enforcement official's testimony that in his opinion, the defendant was guilty of the charged crimes was inadmissible under Rule 701); <u>United States v. Glenn</u>, 312 F.3d 58 (2d Cir. 2002) (drug dealer had insufficient personal knowledge to opine that the defendant was carrying a concealed firearm under his shirt where he briefly observed a three to four inch bulge under the defendant's shirt from a distance of five or six houses away, and relied on "casual sporadic observations" of drug dealers to support his opinion); <u>Black v. Consolidated Freightways Corp. of Delaware</u>, 219 F. Supp. 2d 243 (E.D.N.Y. 2002) (excluding testimony of a forklift operator that the hole in the floor of a trailer "had existed for weeks or months" before the plaintiff tripped over it; the testimony was expressly based on the witness's "extensive experience working with trailers with wooden floors," and was therefore predicated on his "specialized knowledge"); <u>Faryniarz v. Nike Inc.</u>, 2002 WL 1968351 (S.D.N.Y. August 23, 2002) (an associate professor of biomechanics and kinesiology was offered as an expert, not as a lay witness, so Rule 701 was not at issue).

appellant's records about how lost profits could be calculated from the data contained therein.")(emphasis added).[12]

## II.   AS DURING THE FIRST TRIAL, THE COOPERATING WITNESSES WILL NOT SPECULATE ABOUT FORBES' GUILTY STATE OF MIND.

Forbes also contends that this Court should preclude opinion testimony by the cooperating witnesses regarding his "knowledge, intent, or state of mind." FM 13-20. Then he concedes that none of the cooperating witnesses purported to testify about Forbes' mental state during either the first or second trials. FM 15, n. 8. As the Government explained when Forbes' raised this concern before the first and second trials, the Government does not intend to elicit any such testimony during its direct examination of any of its witnesses in the third trial. For instance, Cosmo Corigliano will permissibly testify about his own personal knowledge of conversations and

---

[12] In his current motion, Forbes has dropped the argument he previously advanced that the testimony of the cooperating conspirator/accountants regarding their manipulation of CUC's books and records should be excluded for failing to satisfy the "helpfulness" requirement of Rule 701. Now, he raises a "helpfulness" challenge only to any testimony from the cooperators about Forbes' guilty state of mind. FM 17-20. Since the Government does not plan to present the latter testimony on direct examination during its case-in-chief, Forbes' helpfulness challenge to that kind of testimony need not be addressed by this Court.

If Forbes impermissibly attempts to resuscitate in his reply brief a helpfulness challenge to the cooperators' testimony about cooking the books at CUC, the Government would rely on its prior submissions in opposition to Forbes' prior motions to exclude lay opinion testimony, which address the helpfulness requirement. E.g. Docket 1741 at 10-12.

21

other events which provide direct and circumstantial proof of

Forbes' knowledge of the charged conspiracy.[13]  Forbes does not

claim that such testimony is improper.[14]  Corigliano's testimony

_____

[13] For that reason, <u>United States v. Garcia</u>, cited
repeatedly by Forbes, does not apply to this case.  In that case,
the Second Circuit criticized the testimony of a law enforcement
agent that it was his opinion that the defendant was guilty of
the charged crime, and that the opinion was based "on the
totality of information gathered in the course of [the]
investigation."  413 F.3d at 210-11.  Here, none of the
cooperating witnesses will offer opinions based on the collective
knowledge of other persons.  On the other hand, the Court in
<u>Garcia</u> noted that a person who was personally involved in the
criminal conduct could testify that another person was also
criminally involved in that conduct.  413 F.3d at 211-12.

Likewise inapposite is <u>United States v. Rea</u>, 958 F.2d 1206,
1219 (2d Cir. 1992).  There, the Second Circuit determined that
lay opinion testimony was improperly admitted because the only
thing to which the witness could testify was that the defendant
"had to" know (or "must have known") about the methods used to
achieve the conspiracy's illegal object.  The court held such
speculation "was not 'helpful' within the meaning of Rule 701."
<u>Id.</u>  Here, by contrast, none of the cooperating coconspirators
will testify about what Forbes "had to know."  (Likewise, Forbes
should not be permitted to elicit testimony from any other
witness that he "could not have known" about the fraud.)  To the
extent that those witnesses will testify about how the fraud was
executed, they were deeply and directly involved with CUC's
fraudulent accounting practices.  Their testimony will be far
more helpful to the jury than the speculation conveyed to the
jury in <u>Rea</u>.

[14]   Forbes' reliance on <u>Hester v. BIC Corp.</u>, 225 F.3d 178,
185 (2d Cir. 2000) is misplaced.  There, the Second Circuit
rejected lay witness testimony constituting "naked speculation"
about an actor's <u>motivation</u> for engaging in a disputed activity.
225 F.3d at 185.  The court explained why Hester's witnesses were
not qualified to offer lay opinion testimony about the reason for
plaintiff's termination, which led to her Title VII lawsuit:

    None of Hester's four witnesses was involved in
    [defendant's] decision-making processes, or had
    personal knowledge of it.  Nor had they any basis for
                                        (continued...)

will allow the jury to infer that Forbes was fully aware of and participated in the charged fraud.  See United States v. Polishan, 336 F.3d 234, 242-43 (3d Cir. 2003) (testimony of prosecution witness that defendant chief financial officer knew about accounting regularities was admissible lay opinion testimony in securities fraud action, because the it was based on the witness's day-to-day knowledge of their business and left the ultimate conclusion about whether the defendant knew about the accounting irregularities to the jury).

---

[14] (...continued)
knowing whether Hester was adequately performing her duties as a Group leader.  Their testimony about Beck's racist motivations was not "focused on objective fact," but instead consisted of the witnesses' subjective impressions that Beck's condescension to Hester was attributable to Hester's race.

Id. at 184.  Here, by contrast, Corigliano will testify, as he did during the first trial, that he met periodically with Forbes precisely to make decisions about, inter alia, how to manipulate the merger reserves to increase operating income.  FTTr. 6193-96, 6235-37, 6430, 6455-56, 6520-21, 6572-73, 6588-94, 6605, 6714-18, 6945-51, 8444.  Corigliano's personal knowledge of his own conspiratorial conversations with Forbes is a far cry from the "naked speculation" that was improperly admitted in Hester.

**CONCLUSION**

The Government requests that Forbes' Third Trial Motion In Limine No. 10 be denied.

Respectfully submitted,

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice

*Norman Gross/s*

NORMAN GROSS
Federal Bar Number 24933
MICHAEL MARTINEZ
Federal Bar Number PHV0423
MARK E. COYNE
Federal Bar Number PHV01079
Special Attorneys
U.S. Department of Justice
970 Broad Street
Room 700
Newark, N.J.  07102
(973) 645-2701

Newark, New Jersey
Date: May 23, 2006

24

**EXHIBIT A**

**(DOCKET 1901 – JUDGE THOMPSON'S ORDER DENYING FORBES' RETRIAL
MOTION <u>IN</u> <u>LIMINE</u> NO. 3)**

### CERTIFICATE OF SERVICE

The undersigned certifies that on this day I caused to be served a copy of the Government's Response to Defendant Walter A. Forbes' Motion to Preclude the Government from Presenting Supposedly Improper Lay Opinion Testimony at Trial (Opposition to Forbes Third Trial Motion In Limine No. 10 via email on:

Barry S. Simon, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005-5901
(202) 434-5005
bsimon@wc.com


*Norman Gross/s*

NORMAN GROSS

Dated: May 23, 2006
       Camden, New Jersey