UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:02CR00264 (AHN) |
| | : | |
| v. | : | May 23, 2006 |
| | : | |
| WALTER A. FORBES | : | |

**OPPOSITION OF THE UNITED STATES TO FORBES' MOTION TO PRECLUDE THE GOVERNMENT FROM PRESENTING EVIDENCE, CROSS-EXAMINATION, OR ARGUMENT CONCERNING (1) FORBES' JULY 1998 SEVERANCE AGREEMENT WITH CENDANT; (2) THE VALUE OF FORBES' SEVERANCE; (3) THE JULY 28, 1998 CENDANT BOARD MEETING; OR (4) THE FINANCIAL AND OTHER PRESSURES ON CENDANT IN JULY 1998**

(<u>Opposition to Forbes' Third Trial Motion In Limine No. 14</u>)

## INTRODUCTION

Forbes' defense in this case is that he had no knowledge of, and did not participate in the charged fraud. He testified to that effect during the first and second trials. <u>E.g.</u>, First Trial Transcript ("FTTr.") 13537-40; Second Trial Transcript ("STTr.") 2692-94.

During the first trial, in order to demonstrate one of Forbes' many possible motives to falsely exonerate himself, the Government questioned Forbes about a July 28, 1998 agreement (the "Severance Agreement," Exhibit 1 to Forbes' Third Trial Motion <u>In Limine</u> No. 14 ("Forbes' Motion")) that he entered into with his corporate employer, Cendant Corporation, by which Forbes agreed

to the termination of his employment at Cendant in return for what amounted to a $47 million dollar severance payment.  FTTr. 14408-09.  Forbes acknowledged that, pursuant to the Severance Agreement, Cendant paid Forbes $35 million in cash and $12 million in other benefits to resign his position at Cendant.  FTTr. 14409-10.  In the severance agreement, Cendant promised that it:

> will not bring or assert against [Forbes] any claim or cause of action, whether in law or equity, based upon any of the Accounting Issues[1] and hereby releases [Forbes] from any and all claims, causes of action, debts, contracts, promises and demands, whether in law or equity, based upon the Accounting Issues, except as expressly set forth in this Agreement; provided however, that this Section 2 shall in all respects be null, void and of no effect if [Forbes] is convicted of or pleads guilty to any crime based upon any of the Accounting Issues.

Exhibit 1 to Forbes' Motion, Section 2.  Forbes understood that provision to mean that if he was "convicted of . . . the crimes [he was charged with in this case], that [Cendant] could then go back and seek all of the $47 million back from" him.  FTTr. 14411.

Before the second trial, Forbes moved to exclude the same four items he seeks to exclude in the present motion.  Docket 1664.  Judge Thompson granted the motion insofar as it sought to

---

[1] The "Accounting Issues" were those "disclosed by [Cendant] in a press release dated July 14, 1998," Exhibit 1 to Forbes' Motion at 1, second "Whereas" clause.  Those "Accounting Issues" are the fraudulent misrepresentations of CUC's and Cendant's publicly reported financial results at issue in this case.

exclude from the Government's case-in-chief the Severance Agreement and the value of Cendant's payments to Forbes under that agreement. Docket 1845 at 1-2 (Exhibit A hereto). The Government will comply with that ruling during the third trial, and will not offer the Severance Agreement or testimony about the amount of the severance payment on direct examination of any witness during its case-in-chief.

Judge Thompson denied Forbes' motion insofar as it sought to preclude impeachment of Forbes by reference to the Severance Agreement. Id. at 2-3. As Judge Thompson properly concluded, evidence that Forbes would likely lose $47 million in the event of a conviction in this case (in addition to any other penalties) was relevant to prove his powerful incentive to falsely exculpate himself on the witness stand. Forbes has neither demonstrated cause for this Court to reconsider Judge Thompson's previous rulings on these matters, see Sequa Corp. v. GBJ Corp., 156 F.3d 136, 144 (2d Cir. 1998), nor shown that this Court should depart from the law of the case, see United States v. Uccio, 940 F.2d 753, 758 (2d Cir. 1991).

**I.  AS JUDGE THOMPSON PROPERLY CONCLUDED, FORBES' SEVERANCE IS RELEVANT TO THE CREDIBILITY OF HIS TESTIMONY THAT HE HAD NO KNOWLEDGE OF AND NO INVOLVEMENT IN THE CHARGED CRIMES.**

Forbes makes the same argument in the present motion that he made before Judge Thompson in his Retrial Motion No. 4: since the severance agreement authorizes Cendant to merely sue Forbes in the event of his conviction in this case, and because Cendant has

already brought suit against Forbes for recovery of the severance payment, Forbes has nothing more to lose vis-a-vis the Cendant lawsuit if he were convicted in this case. In other words, evidence that Forbes will have to return his $47 million severance payment to Cendant if he is convicted in this case is <u>irrelevant</u> to an assessment of his credibility. Forbes' claim that a potential $47 million loss in the event of conviction is irrelevant to his credibility is, to put it charitably, strikingly inconsistent with his persistent claims that any and all benefits that Cosmo Corigliano obtained from his guilty plea is relevant to attack the credibility of Corigliano's testimony in this case, including such purported <u>de minimis</u> benefits as the SEC's failure to demand that Corigliano prepare a financial disclosure form as part of its settlement negotiations. <u>See</u> Forbes' Third Trial Motion <u>In Limine</u> No. 4, Docket 2273 at 10-11.

Judge Thompson properly brushed aside Forbes' claim that the evidence at issue is irrelevant to an assessment of Forbes' credibility. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Evidence is relevant if it merely "alters the probabilities" of the existence of a consequential fact, and need not make the proposition more probable than not. <u>Weinstein's Federal Evidence</u> ("<u>Weinstein</u>") § 401.04[2][b] (2d ed., 2006); <u>see</u> <u>United States v.</u>

4

Schultz, 333 F.3d 393, 415 (2d Cir. 2003); United States v. Schneider, 111 F.3d 197, 202 (1st Cir. 1997).  This is a lenient standard.  Weinstein, § 401.04[2][c].  "The evidence need only alter the probabilities of a proposition; it need not sway the balance to any particular degree."  Weinstein at § 401.04[2][c][ii]; see Doe v. New York City Dep't of Social Services, 649 F.2d 134, 147 (2d Cir. 1981).

As Judge Thompson correctly acknowledged, once Forbes testified at trial, any evidence that tended to prove his bias was relevant for impeachment.  United States v. Abel, 469 U.S. 45, 52 (1984) ("Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."); Davis v. Alaska, 415 U.S. 308, 316 (1974) ("The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.'")(quoting 3A J. Wigmore, Evidence § 940, p. 775 (Chadbourne rev. 1970).  If a witness will receive a financial benefit depending on the outcome of the proceeding at which he is testifying, evidence of that benefit is relevant to his credibility.  Wheeler v. United States, 351 F.2d 946, 948 (1st Cir. 1965) (reversing the conviction where trial court limited cross-examination concerning Government witness's financial motive for testifying).

Judge Thompson noted that the Severance Agreement and the amount of the severance payment "are relevant to whether defendant Forbes has an incentive to be untruthful because of the fact that a conviction in this case could make it more difficult for him to be successful in Cendant's civil litigation against him." Exhibit A at 3. That assessment was accurate. The Severance Agreement was expressly designed to "confirm the rights and obligations of [Forbes] under the Employment Agreement" of May 27, 1997. Exhibit 1 to Forbes Motion at 1, fifth "Whereas" clause. The Severance Agreement provides that the termination of Forbes' employment was a "Without Cause Termination" under the terms of the Employment Agreement. Id., Section 1(b). In the severance agreement, Forbes:

> represents and warrants to the Company that he did not have knowledge of or participate in the Accounting Issues and no event, circumstance or other reason exists that would entitle [Cendant] to terminate his Period of Employment under the Employment Agreement through a "Termination for Cause" (as defined in the Employment Agreement).

Exhibit 1(d) (emphasis added). "Termination for Cause," in turn, is defined in Forbes' "Restated Employment Agreement," dated May 27, 1997 ("Employment Agreement," Exhibit 4 to Forbes' Motion) as termination

> due to [Forbes'] serious, willful misconduct with respect to his duties under this Agreement (including but not limited to conviction for a felony or perpetration of a common law fraud) which has resulted or is likely to result in material economic damage to [Cendant] . . .

Forbes' Employment Agreement also provided for the payment to Forbes of a substantial severance package, including $25 million in cash and stock options with a Black Scholes value of $12,500,000 in the event of a "Without Cause Termination." Exhibit 2 to Forbes' Motion, Section VIII(B).  Taken together, Forbes' Employment Agreement and his Severance Agreement granted Forbes a generous severance package if and only if he was terminated "without cause," meaning that he did not engage in "serious, willful misconduct . . . including . . . conviction for a felony or perpetration of a common law fraud."  If Forbes did engage in such misconduct or fraud, he was subject to termination for cause, and entitled only to "earned but unpaid base salary" and earned but unpaid incentive compensation awards."  In that event, however, "no other payments (i.e., the $37 million severance) will be made or benefits provided by [Cendant]," except for certain vesting rights in stock options then held by Forbes.  Exhibit 4 to Forbes' Motion, Section VIII(A).

In the Severance Agreement, Forbes "warrant[ed]" that he did not "have knowledge or participate" in the "Accounting Issues." Cendant's payment of benefits under Section 1(b) of the Severance Agreement was made "in consideration of the mutual agreements and understandings" set forth in the Settlement Agreement.  Exhibit 1 to Forbes' Motion, p. 1, "NOW, THEREFORE" clause.  Forbes' representations and warranties that he had no involvement in the "Accounting Issues" were "important factors" and substantial

7

consideration for receiving the $47 million severance payment. "Minutes of a Special Meeting of The Board of Directors of Cendant Corporation, Held on July 28, 1998 ("Board Minutes")," Exhibit 2 to Forbes' Motion.  That warranty was also required to justify Forbes' termination without cause, for if he did "participate" in the "Accounting Issues," his termination would be for cause, and his entitlement to the severance package set forth in the Employment Agreement would be lost.

    If Forbes' "warranty" under the Severance Agreement that he had no knowledge or participation in the "Accounting Issues" is proven false by his conviction in this case, Cendant will almost certainly obtain a judgment in its civil lawsuit against Forbes to recover the $47 million severance payment.  The loss of $47 million, even by one as wealthy as Forbes, would create a potent hardship, particularly since Forbes has spent tens of millions of dollars on his legal defense in this case which would not be reimbursed by Cendant in the event of his conviction.  Although Forbes could face other severe penalties if he was convicted, Judge Thompson properly concluded that the loss of Forbes' contractual right to retain the $47 million severance payment provides a separate and independent incentive for him to falsely exonerate himself.  Because Forbes' chances of success in Cendant's civil action against him will be materially affected by a criminal conviction in this case, his severance package, the attendant circumstances, and the terms of his $47 million deal

8

are relevant to the jury's assessment of Forbes' self-exonerating testimony.  See Marcic v. Reinauer Transp. Co., 397 F.3d 120, 125 (2d Cir. 2005) ("A claim for money damages does create a financial incentive to be untruthful, and it was not improper for [defense] counsel to invoke this incentive in an attempt to impeach plaintiff.")

Since Cendant has already sued Forbes, he argues that his severance agreement is a "non-issue," insofar as the agreement confers on Cendant the right to sue Forbes if he is convicted of participating in the accounting fraud at CUC.  Forbes Memorandum in Support of Forbes' Motion ("FM") at 7.  Forbes ignores that if he were convicted of criminal conduct in this case, his likelihood of ultimately prevailing in his civil lawsuit against Cendant will be drastically reduced, because Cendant likely will be able to show that the issue of Forbes' involvement in the fraud has been conclusively resolved against him.  See United States v. Frank, 494 F.2d 145, 159-60 (2d Cir. 1974) (convictions of the defendant in prosecution on charges of conspiracy and underlying substantive counts would operate as collateral estoppel in favor of the prosecuting witness in her civil suit against same defendants).  Because Forbes' severance package bears significantly upon whether the jury should believe his prior testimony, evidence about it should be admitted.[2]

---

[2] Forbes makes the irrelevant point that his acceptance of the severance payment was "lawful and proper."  FM 11.  A witness

II. **EVIDENCE OF THE JULY 1998 "BOARD FIGHT" OVER FORBES' SEVERANCE AGREEMENT MAY BE RELEVANT TO PLACE IN PROPER CONTEXT THE MOTIVES OF PROSECUTION WITNESSES WHO FORMERLY WORKED FOR HFS.**

Forbes also seeks the exclusion of evidence regarding the July 28, 1998 Cendant Board of Directors meeting and the financial pressures to which Cendant was subject following the disclosure of the accounting fraud in April 1998. Judge Thompson previously ruled that evidence regarding those matters would be admissible if Forbes' "opens the door" to "inquiring into these areas." Exhibit A at 2. That meeting and those pressures are summarized by the Board Minutes. According to the Board Minutes, disclosure of the fraud had precipitated a "management crisis" at Cendant. Exhibit 2 to Forbes' Motion at 8;[3] see also FTTr.

---

can be impeached by reference to perfectly lawful conduct. If a defendant's mother testifies as an alibi witness, it is entirely permissible for the prosecutor to inquire if the mother loves the defendant, even though motherly love is "lawful and proper." Of course, if a jury determines that Forbes committed the charged crimes, his acceptance of the severance will not have been "lawful and proper," because under the terms of his Employment Agreement and the Severance Agreement, he was lawfully entitled to that payment only if he had no knowledge and involvement in the charged crimes.

[3] For instance, disclosure of the fraud had: adversely affected employee morale, retention, and recruitment, particularly of "high caliber" employees, Board Minutes at 5-6; impaired Cendant's ability to conduct franchise sales, id. at 5-6; caused the loss of a substantial amount of Cendant's relocation business and impaired recruitment of sales associates in its real estate business, id. at 6; prevented the consummation of agreements in the "alliance marketing division" and "adversely impacted the Company's ability to win new business because new partners rely on the Company's track record and reputation," id. at 6; rendered Cendant's outstanding stock incentives ineffective to retain employees, because the value of those incentives had

14480-82 (Forbes acknowledging that "we had to clarify the management issues" which "had to be resolved for the interest of the shareholders").

The management crisis at Cendant was resolved only when Cendant was able to terminate Forbes' entitlement under the Cendant merger agreement to replace Henry Silverman as the CEO of Cendant on January 1, 2000.  See Exhibit 3 to Forbes' Motion (August 28, 1998 press release announcing Forbes' resignation) (noting that uncertainty about Forbes' future role at Cendant was "a serious impediment to conducting our business and the process of restoring trust in our company").  To that end, the Cendant Board of Directors considered a resolution to terminate Forbes's employment for cause.  That resolution failed to pass when all 14 members of the Cendant board members who were former CUC directors refused to terminate Forbes' employment with or without cause.  Exhibit 2 to Forbes' Motion at 9-10.  Because the Board of Directors was "divided with respect to the governance of the Company," the Board determined that it was in the best interests of the Company and its shareholders to enter into the Severance

---

plummeted as Cendant's share price had fallen, id. at 6-7; and threatened Cendant's ability to obtain required regulatory approvals for pending acquisitions of other entities, id. at 7. State regulatory agencies were demanding that Cendant fire the persons who were responsible for the fraud, id. at 7.  Cendant was placed on a "credit watch" by all of the major credit rating agencies, and was "unable to access the public equity and public debt markets" as a result of the disclosure of the fraud, which significantly restricted the liquidity of Cendant's commercial paper.  Id.

11

Agreement.  Id. at 10-11.

Forbes' request for a pre-trial order excluding evidence of the financial and management crises precipitated at Cendant by disclosure of the fraud is premature.  During the first trial, Forbes testified that the former HFS officials had not entered into the merger with the intention of treating their new colleagues from CUC as equal partners, as the merger agreement had contemplated.  Rather, according to Forbes, the former HFS officials were intent on taking over the combined company.  FTTr. 13775-78, 13813-15.[4]

During the third trial, Forbes may seek to challenge the testimony of former HFS officials on the grounds of their supposed bias against Forbes.  In that event, evidence regarding Forbes' refusal to voluntarily depart from Cendant without receiving his $47 million severance package is highly relevant to put any such claims of bias in proper context.  See Townsend v. Benya, 287 F. Supp. 2d 868, 875 (N.D. Ill. 2003) (in a § 1983 lawsuit against police officers for unlawful arrest, evidence about an official investigation into the arrests was admissible to give context to prior statements of the defendants to the investigators, which plaintiffs intended to use for impeachment); cf. United States v. Ellis, 121 F.3d 908, 921 & n.4 (4th Cir.

---

[4] Shelton's defense attorney also elicited testimony from prosecution witness Cosmo Corigliano to that effect.  FTTr. 9185-90.

1997) (by seeking to impeach a witness with a portion of his prior statement that was inconsistent with her trial testimony, the defendant opened the door to other portions that were consistent, offered only to assess the witness's credibility, and not as substantive evidence).  Forbes should not be permitted to present to the third trial jury a one-sided picture of the disputes between himself and the former HFS officials after the Cendant merger agreement was signed.  Exclusion of the challenged evidence about the July 1998 Cendant board fight would improperly create a false impression that Forbes was the victim of a corporate vendetta, of which the testimony of HFS officials in this case is merely the latest chapter.  Rather, the jury should understand the full context of any disputes between Forbes and the former HFS officials.

**III. AS JUDGE THOMPSON PROPERLY CONCLUDED, THE PROBATIVE VALUE OF EVIDENCE OF FORBES' ADDITIONAL MOTIVE TO FALSELY EXONERATE HIMSELF IS NOT SUBSTANTIALLY OUTWEIGHED BY POTENTIAL UNFAIR PREJUDICE.**

Judge Thompson also properly rejected Forbes' argument, repeated in the instant motion, that because evidence about the Severance Agreement has no probative value, it should be excluded under Fed. R. Evid. 403 because it is prejudicial.  Exhibit A at 4.  As Judge Thompson pointed out, evidence regarding the Severance Agreement has probative value to impeach, and Forbes has failed to demonstrate that the "probative value is <u>substantially outweighed</u> by the danger of <u>unfair prejudice</u>."

13

Fed. R. Evid. 403 (emphases added).  Consistent with Rule 403, "unfair prejudice 'means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  United States v. Brady, 26 F.3d 282, 287 (2d Cir. 1994) (quoting the Advisory Committee Notes to Rule 403).  Any potentially unfair prejudicial effect can be minimized by an instruction that limits the jury's consideration of the evidence to the purposes for which it is admitted.  See United States v. Pitre, 960 F.2d 1112, 1120 (2d Cir. 1992).

The mere fact that the jury will hear evidence concerning Forbes' sizable severance does not render such evidence inadmissible under Rule 403.  Evidence that is relevant to the highly consequential matter of Forbes' credibility should not be excluded under Rule 403 merely because it casts light on Forbes' wealth.  United States v. Quattrone, 441 F.3d 153, 187 (2d Cir. 2006) (relevant evidence of the defendant's high compensation was not unduly prejudicial).  As in Quattrone, and contrary to Forbes' present claims, evidence about Forbes' Severance Agreement is relevant to his credibility if he testifies during the third trial.  As earned wealth is something about which many Americans are either favorably disposed or ambivalent, the supposed unfair prejudicial effect of evidence that Forbes received a $47 million severance is not so great as to outweigh its probative effect under Rule 403.  See United States v. Ballesteros Gutierrez, 181 F. Supp. 2d 350, 354 (S.D.N.Y. 2002)

14

(insider trading allegations involving purchases of more than $5.7 million worth of stock, resulting in profits of $3.4 million, were "probative" because, "[w]hile there is a risk of unfair prejudice based on jealousy or antipathy to the [defendants'] wealth, that risk does not substantially outweigh the probative value of the evidence."); Kunzman v. Enron Corp., 941 F. Supp. 853, 867 (N.D. Iowa 1996) (admitting evidence concerning the defendant-corporation's (seemingly) robust financial health because such evidence impacted defendant's purportedly legitimate, non-discriminatory reason for firing the plaintiff).[5]

Additionally, Judge Thompson instructed the first and second trial juries that they should not permit their deliberations to be affected by any bias based on "wealth, compensation, or life-style." E.g., STTr. 3694. The Government will seek a similar instruction for the third trial, which will be sufficient to ensure Forbes is not unfairly prejudiced by his wealth. Contrary to Forbes' present claims, such instructions are presumptively

---

[5] Forbes purports to distinguish Ballestros Gutierrez and Kunzman on the ground that the wealth evidence in that case was "probative of the underlying offense" or a "substantive issue." FM 9. n.7. Because the assessment of the credibility of a testifying defendant is a crucial function of the jury, and because evidence about the Severance Agreement is highly relevant to that function, Forbes' purported distinction fails. Rule 403 requires a balancing of probative value against unfair prejudicial effect, and does not distinguish between evidence that is probative for impeachment as opposed to evidence that is probative for substantive purposes.

sufficient to dispel any possible class-based prejudice arising from a defendant's wealth.  See Quattrone, 441 F.3d at 187 (prosecutors' statements during summation and opening statement regarding limited purpose of wealth evidence was sufficient to dispel prejudice).[6]

Forbes erroneously contends that the Government improperly sought to inflame the jury during the first and second trials by portraying Forbes as a greedy person who refused to resign from Cendant unless he was paid the severance, even while other

---

[6] Forbes again relies on the inapposite case of United States v. Stahl, 616 F.2d 30, 32 (2d Cir. 1980).  There, the Government went "to great lengths [during summation] to appeal to class prejudice in characterizing the defendant as a very rich man."  Berman Enters. Inc. v. Local 333, Int'l Longshoremen's Ass'n, 644 F.2d 930, 939 (2d Cir. 1981).

Although appeals to class prejudice are improper, evidence of the defendant's financial motive to engage in unlawful conduct is not.  Quattrone, 441 F.3d at 187 (distinguishing Stahl and affirming district court's admission of evidence of the defendant's high compensation as proof of his motive to commit the charged crimes); United States v. Derman, 211 F.3d 175, 180 (1st Cir. 2000) (distinguishing Stahl and finding no misconduct based on the Government's statements during the trial and closing arguments that addressed the defendant's financial motive for the charged crimes, which "did not impermissibly stray into class bias"); United States v. Little, 753 F.2d 1420, 1441 (9th Cir. 1984) (distinguishing Stahl where the prosecutor's summation arguments that the defendant was motivated by money and greed to commit the charged crimes was appropriate advocacy, and did not involve an appeal to class prejudice).

Here, the Government properly argued that the $47 million severance payment gave Forbes a powerful financial motive to testify falsely in this case.  STTr. 3562 ("Well, the defendant has at least 47 million reasons to deny these conversations with Corigliano, Monaco and Kernkraut.  You saw the defendant's July 1998 severance agreement with Cendant.")  That was permissible advocacy, not an improper appeal to class prejudice.

Cendant shareholders lost billions of dollars as a result of the fraud. FM 3-4. Forbes declines to mention that the Government sought to impeach Forbes's self-serving and false contention that he felt sorry for the shareholders who lost money as a result of the fraud. FTTr. 14404-05; STTr. 3003. Forbes' claims of supposed remorse were at least arguably inconsistent with his refusal to resolve the management crises at Cendant without a substantial buy-out

    The Government's challenged cross-examination during the first trial, as to which Judge Thompson denied several of Forbes' objections, FTTr. 14483-84, was intended to highlight the contradiction between Forbes' self-serving statements of concern for the shareholder victims, and his insistence that he receive the $47 million severance payment from Cendant that reduced that company's assets by that amount, and thereby further eroded the value of Cendant's stock. FTTr. 15116 (Government summation: "Mr. Forbes tells us he was sorry for the shareholders. Felt sorry for them. He was so sorry that he wanted to take $47 million with him as part of his severance."). During the second trial, Judge Thompson precluded the Government from arguing during summation that Forbes' acceptance of the severance agreement was substantive evidence of his guilty knowledge. STTr. 3092. The Government will abide by that ruling and not make that argument during the third trial.

17

**CONCLUSION**

The Government respectfully requests that the Court deny Forbes' Third Trial In Limine No. 14.

> Respectfully submitted,
>
> CHRISTOPHER J. CHRISTIE
> Special Attorney
> U.S. Department of Justice
>
> *Norman Gross/s*
>
> NORMAN GROSS
> Federal Bar Number 24933
> MICHAEL MARTINEZ
> Federal Bar Number PHV0423
> MARK E. COYNE
> Federal Bar Number PHV01079
> Special Attorneys
> U.S. Department of Justice
> 970 Broad Street
> Room 700
> Newark, N.J.  07102
> (973) 645-2701

Newark, New Jersey
Date: May 23, 2006

**EXHIBIT A**

**(DOCKET 1845, JUDGE THOMPSON OPINION DENYING FORBES RETRIAL MOTION IN LIMINE NO. 4)**

**CERTIFICATE OF SERVICE**

    The undersigned certifies that on this day I caused to be served a copy of the Opposition of the United States to Forbes' Motion to Preclude the Government from Presenting Evidence, Cross-examination, or Argument Concerning (1) Forbes' July 1998 Severance Agreement with Cendant; (2) the Value of Mr. Forbes' Severance; (3) the July 28, 1998 Cendant Board Meeting; or (4) the Financial and Other Pressures on Cendant in July 1998 Opposition to Forbes' Third Trial Motion <u>In</u> <u>Limine</u> No. 14) via email on:

Barry S. Simon, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005-5901
(202) 434-5005
bsimon@wc.com


                                              *Norman Gross/s*
                                              NORMAN GROSS


Dated: May 23, 2006
       Camden, New Jersey