UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:02CR00264 (AHN) |
| | : | |
| | : | |
| v. | : | May 23, 2005 |
| | : | |
| | : | |
| WALTER A. FORBES | : | |

GOVERNMENT'S OPPOSITION TO DEFENDANT WALTER A. FORBES' TO
PRECLUDE THE GOVERNMENT FROM PRESENTING SUPPOSED EXPERT TESTIMONY
FROM JAMES ROWAN'S OF HARTFORD STEAM BOILER COMPANY

(Opposition to Forbes Third Trial Motion In Limine No. 15)

INTRODUCTION

Forbes again seeks to exclude relevant and admissible
testimony from James Rowan, the Chief Investment Officer of the
Hartford Steam Boiler and Inspection Company ("HSB").  HSB is
one of the victims of the charged fraud in this case.  It lost
hundreds of thousands of dollars in the value of its stock
holdings when the fraud was disclosed in April 1998 and the value
of its 32,500 shares of recently purchased Cendant stock declined
by approximately one-third.  Second Trial Testimony ("STTr.")
362.  According to Forbes, Rowan's challenged testimony about the
improper accounting for merger reserves by Cendant and its
corporate predecessor, CUC International, amounts to an improper
expert opinion.

In rejecting this claim, Judge Thompson concluded that
Rowan's challenged testimony was properly admitted because it
pertained to his own understanding and knowledge of the

accounting fraud at CUC.  Docket 1846, Exhibit A hereto.  Rowan's understanding and knowledge was relevant to the materiality of the false statements and omissions in CUC's publicly disclosed financial statements, which caused investors such as HSB to pay much more for Cendant's and CUC's stock than they would have had they been fully informed about the fraudulent accounting.  Forbes has neither demonstrated cause for this Court to reconsider Judge Thompson's prior ruling on this matter, see Sequa Corp. v. GBJ Corp., 156 F.3d 136, 144 (2d Cir. 1998), nor shown that this Court should depart from the law of the case, see United States v. Uccio, 940 F.2d 753, 758 (2d Cir. 1991).

## BACKGROUND

Before the second trial, the Government voluntarily moved to dismiss 12 of the 16 counts of the indictment returned by a federal grand jury sitting in Bridgeport ("Connecticut Indictment").  Docket 1706; see also Docket 1995 (order granting motion).  The Government dismissed those counts primarily to streamline the Government's presentation during the second trial.  The unredacted Connecticut Indictment had charged Forbes with, inter alia, six counts of securities fraud, in violation of 15 U.S.C. § 78j(b) and Rule 10b-5, based on six separate purchases of Cendant stock by the employee's pension trust fund of the Hartford Steam Boiler and Inspection Company ("HSB").  Docket 68.

In a concession to Forbes, Judge Thompson directed the Government to eliminate from the indictment the allegation, and

2

to present no evidence about the fact that the stock had been purchased for the benefit of HSB's employee pension trust fund. Docket 1967, Part B (Ruling on Docket 454, Government's Motion <u>In Limine</u>).  Instead, the juries in this case heard a fiction that the Cendant stock was owned for the benefit of the HSB corporation.  Judge Thompson's ruling was predicated on a concern that the jury might be inflamed by evidence that some of the millions of victims of the charged fraud were pensioners and working people, and not merely corporations or other entities.

Count 4 of the redacted indictment charges that Forbes committed securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff(a), 18 U.S.C. § 2, and 17 C.F.R. § 240.10b-5 ("Rule 10b-5").  Because an element of Rule 10b-5 securities fraud is that the fraudulent statements or omissions be "in connection with the purchase or sale of a security," STTr. 3760-61 (jury instructions), the indictment alleges that the false statements and material omissions about the financial results of the Cendant Corporation and its corporate predecessor, CUC International, Inc. at issue in this case were made in connection with HSB's purchases of Cendant stock in February of 1998.  Redacted Indictment, Count, 4, ¶ 3.

An element of the offense of making false statements in reports required to be filed with the SEC, the crimes charged in Counts 2 and 3 of the indictment, is that the false statements be "material."  <u>See</u> <u>United States v. Pope</u>, 189 F.Supp. 12, 19

(S.D.N.Y. 1960).  Materiality of false statements or omissions is also an element of Rule 10b-5 securities fraud.  In re Corning, Inc. Securities Litigation, 349 F.Supp.2d 698, 717 (S.D.N.Y. 2004).  To be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988); accord, Caiola v. Citibank, N.A., New York, 295 F.3d 312, 329 (2d Cir. 2002); STTr. 3756 (jury instructions).

In order to prove that HSB purchased the 32,500 shares of Cendant stock in January and February of 1998, and to prove that Forbes made or caused others to make materially false statements and material omissions about Cendant's and CUC's past financial results, the Government presented the testimony of James Rowan, a Chartered Financial Analyst for twenty years and the Chief Investment Officer for HSB for fifteen years at the time of the first trial.  FTTR 10247, 10249.[1]  In that capacity, Rowan was responsible for all of HSB's investments, including decisions about which stocks to purchase, reporting his investment decisions to the HSB Board of Directors, and handling investor relations.  Id.

---

[1]  HSB is in the business of inspecting steam boilers and other machinery, and insuring that machinery against mechanical breakdown.  HSB has been a public company since 1866.  FTTr. 10247.

During the first trial, Rowan testified that HSB's portfolio was weighted with "growth-oriented" stocks, i.e., those issued by companies in which the growth of the stock price had, for a protracted period, exceeded the average price growth for companies included in the Standard and Poor's ("S&P") 500 index. FTTR. 10249-50.  Rowan focused on four factors in identifying and selecting stocks to include in the HSB portfolio: earnings per share; sales per share (both of which were evaluated in terms of their growth rates); return on total invested capital; and operating margins.  Rowan sought stocks that were "the cream of the crop" because they exceeded the growth rates of the S&P 500 by twenty to twenty-five per cent.  FTTr. 10250.[2]

In January 1998, Rowan attended a conference for institutional investors that had been organized by the investment banking firm, Morgan Stanley.  The conference focused upon Internet and software companies.  Rowan was seeking information about the more mature and stable companies with historic growth rates from amidst the many start-up companies discussed at that conference.  FTTr. 10252.  Forbes, who was then "the CEO in waiting" of Cendant, spoke about that company during that conference.  FTTr. 10253.  Forbes gave a twenty-five to thirty-five minute presentation about Cendant, focusing upon its

---

[2]  Rowan employed an S&P service called Compustat to collect and analyze information about the four indices, which collects and organizes between 150 and 200 data items from the publicly filed financial statements of public companies.  FTTr. 10251.

Internet-based travel services.  FTTr. 10254.  Forbes had a
strong grasp on the business, was an impressive speaker, and did
not use prepared notes.  FTTr. 10255.

Following that conference, Rowan returned to Hartford and
conducted a review of Cendant's and CUC's publicly reported
historical financial information.  FTTr. 10256.  That analysis
revealed that when CUC had been run by Forbes as Chief Executive
Officer and Chairman of the Board of Directors, it had been an "A
company" in terms of sales, growth of sales per share, growth of
earnings per share, return on total investment and operating
margins, all of which exceeded HSB's screening levels for many
years.  FTTr. 10257.  Based on that review, Rowan decided to make
a substantial purchase of Cendant stock on behalf of HSB,
purchasing 32,500 shares between January 22 through February 18,
1998.  FTTr. 10263-65.

Rowan testified that, in deciding which stocks to purchase
for HSB, he considered "one-time, extraordinary charges," such as
those incurred as the result of a merger.  FTTr. 10266.  Based on
his own experience at HSB, Rowan knew that merger reserves were
rigorously reviewed by the public accounting firms, and the
company which established the merger reserve had to carefully
document its merger-related charges.  FTTr. 10268.  Rowan
testified that when he purchased the 32,500 shares of Cendant
stock in early 1998, he had faith in the publicly stated and
audited earnings of the company, and believed that they were

6

honestly stated and had been carefully audited.  FTTr. 10268-69.
In particular, he believed that the merger-related expenses
identified in CUC's financial statements were "spot-on," _i.e._
completely and totally accurate.  FTTr. 10271.

Had Rowan known that the CUC's historic, publicly disclosed
earnings had not been accurately reported, he probably would not
have purchased the stock.  FTTr. 10269.  Had he known that CUC's
and Cendant's merger reserves were used to pay for ordinary
expenses, rather than only for merger-related expenses, that
would have been an important factor in his decision, because
Rowan understood that such a treatment of the merger reserve is
improper.  FTTr. 10271.[3]  In Rowan's view, the improper use of
merger reserves to pay ordinary expense would have brought CUC's
business model into question.  _Id._  When Rowan purchased the
stock in January and February of 1998, CUC and Cendant had
consistently reported 20% growth in earnings for six or seven

---

[3]  Forbes contends that Rowan's testimony on this point
should have been excluded, and points to the evolving standards
for the use of merger reserves established by the professional
entities that establish those standards.  FM 6 n.3.  Forbes does
not contend, however, that there was ever any justification for
charging ordinary business expenses to a merger reserve, or to
transfer amounts from a merger reserve account to a revenue
account of the same company, as occurred at CUC.  FTTr. 2333-34,
2354-417, 2433-56, 2503-49, 2566-602.  Moreover, even if Rowan
was not qualified to testify as an accounting expert regarding
the proper use of merger reserves, he could certainly testify
that, had he known about the publicly disclosed accounting
manipulations that the conspirators undertook in this case, which
he regarded as improper, he would have considered them in
deciding whether or not to invest hundreds of thousands of
dollars of HSB's money in Cendant stock.

years.  Had Rowan known that the growth rate had not been
accurately stated, that would have been a very important factor
in his decision about whether or not to buy the stock.  FTTr.
10269-70.

Before the second trial, Forbes moved for the exclusion of
Rowan's testimony regarding CUC's and Cendant's misuse of its
merger reserves.  Docket 1669.  Judge Thompson denied that motion
in part, and granted it in part.  Docket 1846, Exhibit A hereto.
Forbes' present motion essentially repeats the same arguments
that Judge Thompson rejected before the second trial.[4]

## ARGUMENT

The Government has presented the testimony of two highly
qualified expert witnesses regarding various accounting issues
that are relevant to this case.  They are Robert Sack, Professor
of Accounting at the Darden School of Business at the University
of Virginia, and Brian Heckler, a certified public accountant at
a Big Five public accounting firm, KPMG, and former Fellow at the
Office of the Chief Accountant at the SEC.  Both testified that a
merger reserve is a liability account established to keep track
of "one-time" expenses that arise during a business combination
such as an acquisition or a merger, and that only such unusual

---

[4]  Judge Thompson granted Forbes' prior motion in part
solely with respect to Forbes' request that Rowan not be
permitted to testify about his own experiences regarding the use
of merger reserves at HSB.  Exhibit A at 3.  As Forbes
effectively concedes, the Government fully complied with that
ruling during the second trial.  In all other respects, Forbes'
motion to exclude Rowan's testimony was denied.  Id.

and "one-time" expenses may be paid out of the merger reserve. FTTr. 443-50 (Sack); FTTr. 10647-56 (Heckler).  It is therefore a violation of Generally Accepted Accounting Principles ("GAAP") to pay ordinary expenses from a merger reserve, and it is also a violation to transfer amounts from a merger reserve account to a revenue account.

The conspirators in this case engaged in both of those improper accounting practices in furtherance of the charged conspiracy.  FTTr. 752-54, 2333-35, 2401-17, 2435-66, 3790-91 (misclassification of ordinary expenses as merger-related); FTTr. 567-68, 725-27, 733-76, 935, 987-92, 3591-92, 3606-17 (transfers from the merger reserves into the revenue accounts of various CUC subsidiaries).  Both practices have the effect of fraudulently inflating the operating income, which is calculated without consideration of one-time and unusual expenses such as those attributable to a merger reserve.  FTTr. 10648-50 (Heckler).

Even though Forbes retained his own expert witnesses in this case, he has never suggested or offered to prove that the kinds of accounting chicanery that the conspirators undertook in this case, including using merger reserves to pay ordinary expenses and to inflate revenue, had any possible justification under GAAP.  Indeed, Forbes has never disputed that a massive accounting fraud occurred under his watch at CUC, and indeed acknowledged that such a fraud did occur, but claimed that he was ignorant of it.  See Exhibit B hereto (July 28, 1998 press

9

release in which Forbes acknowledges the occurrence of the
fraud).

Rowan's limited testimony regarding his understanding of the
fraudulent accounting practices at CUC during the years 1995-97
that were publicly disclosed and described by Cendant when it
released the Audit Committee Report in August 1998, including the
improper use of merger reserves, goes to a wholly uncontested
issue in this case.  Rowan's testimony was not offered to prove
that the conspirators did in fact violate the accounting rules by
their manipulation of the merger reserves at CUC and Cendant.
Rather, Rowan's testimony was offered to prove that CUC's
fraudulent practices were  something that informed investors such
as Rowan would regard as important in deciding whether or not to
invest in Cendant's stock in early 1998.  The testimony was also
offered to demonstrate why an informed investor such as Rowan
believed that the fraudulent manipulation of the merger reserve
mattered in evaluating the publicly disclosed financial results
of the company.

In response to Forbes' prior effort to bar Rowan's testimony
on these points, the Government offered to stipulate to a
properly crafted instruction that Rowan's testimony on those
points was limited to the jury's assessment of materiality.
Docket 1743 at 2-3.  Judge Thompson also offered to give such a
limiting instruction.  Docket 1846 at 1 n.1.  The Government also
represented in its opposition to Forbes' prior motion on this

point that, "[d]uring the retrial . . . the Government will
question Rowan to carefully elicit testimony about what he
believes and understands about the proper use of merger
reserves."  Id. at 3.

The Government was as good as its word.  Forbes declined to
ask for such a limiting instruction, perhaps because the
Government's examination of Rowan during the second trial could
not have been more clearly pitched to eliciting Rowan's personal
understanding of the accounting machinations at CUC, and how
those machinations would have affected his investment decisions
had he known about them before he purchased Cendant stock:

Q.   Mr. Rowan, you purchase stocks as a chief investment officer
     for the Hartford Steam Boiler.  **What consideration did you
     give to one-time costs related to mergers**?

A.   Well, in terms of a merger, because they're a one-time
     charge . . . it's looked at as an ability to make the
     business more efficient, and so therefore it's perfectly
     logical that you're going to have these reductions and you
     relied on them to be completely accurate . . . . The notion
     of merging two companies is typically to reduce some
     overlapping factors within the company.

Q.   Mr. Rowan, which financial number **was more important to you
     as an investor, income before one-time costs or income
     including one-time costs**?

A.   **We looked at both of those numbers**.  The income before
     one-time costs is clearly important because it tends to flow
     year over year over year.  We allowed for the one-time costs
     because, as I said, we understood what they were meant for
     and how they were one-time in nature.  But, in reality, what
     you were looking for was the ongoing operating profit of the
     company.

Q.   Mr. Rowan, at the time that you made the decision to
     purchase Cendant stock on behalf of the Hartford Steam
     Boiler, **what did you believe with respect to the earnings**

11

**per share that had been reported by CUC before the merger**?

A.   Well, **I believed that they were absolutely and totally
     correct**; that, you know, for example, all of the factors
     that I had mentioned when talking about what we would see
     from the company in terms of their customers, the
     consistency of their business, the consistent renewals and
     things like that, that those numbers were all accurate and
     that they provided accurate earnings numbers. **It was
     absolutely critical to our investment process** because we
     were looking for companies that had that kind of record.

Q.   **Had you known that the earnings per share that had been
     reported by CUC before the merger weren't accurate**, would
     that have been a factor in your decision to purchase Cendant
     stock?

A.   Absolutely.  Because if the numbers were not accurate, that
     would mean that the earnings number, to pick a single one,
     was inaccurate.  If the earnings number was inaccurate, then
     that probably flowed from the fact that the business model
     --

MS. KEELEY:      Objection, Your Honor; 601.

THE COURT:      **He's giving his understanding?**

MR. MARTINEZ:   **Yes, Your Honor.**

THE COURT:      Overruled.

MS. KEELEY:      Your Honor, 701 as well.

THE COURT:      Overruled.

A.   Okay.  -- that the business model that was supposed to have
     produced those earnings, that there was something wrong with
     it; either the retention ratio wasn't what they were saying
     it was, their costs that generate the business were higher
     than they said they were.  All of those things would have
     made you look at it and say:  Well, I guess it's not such a
     good business.  And as I said, **we were not in the process of
     -- you know, it wasn't our position to buy not-so-good
     businesses.  We were looking for really good businesses**.

Q.   At the time that you bought Cendant stock on behalf of the
     Hartford Steam Boiler, **what did you believe** about the
     **reported growth rate of CUC** as reported in its financial

statements before its merger with HFS?

A.   Well, it was definitely one of our A companies, which meant
     that it existed in an atmosphere where it was typically in
     the -- there were probably typically be somewhere between 90
     and 120 companies out of 5,000 that would meet the four
     criteria that I mentioned to you for screening.  And this
     company had consistently been in that group.  **So, you know,
     that was a critical factor in what we were looking at.**

Q.   **Had you known that the growth rate reported by CUC before
     the merger was inaccurate**, would that have been a factor in
     your decision to buy Cendant stock?

A.   **Absolutely.  Because then it would not have met our
     criteria**. . . .

Q.   At the time that you bought Cendant stock on behalf of the
     Hartford Steam Boiler, **what did you believe** about the use of
     **merger reserves by CUC before its merger with HFS?**

A.   Well, I know that they had purchased a couple of companies
     to, if you will, they were gaming companies, but actually
     gaming is similar to what you use for internet purchasing
     decisions.  And they provided programmers and whatever.  **And
     I had believed that those merger costs would have been
     accounted for exactly as I described earlier when I
     testified.**  You know, you'd closed an office, you take a
     write-down for the space.  You lay off some people, you move
     some people, those are what the expenses are.  You run those
     expenses against them and those are the only expenses you
     run.

Q.   Had you known that CUC had used merger reserves for non-
     merger-related expenses, **would that have been a factor in
     your decision to buy Cendant stock?**

A.   Well, absolutely.  Because if you can't trust the accounting
     and you can't trust the company to do the accounting
     according to the rules and regulations that are out there,
     then that would be a big factor to begin with. . . . And if
     they're not going to follow accounting principles, then
     obviously you wouldn't want to own the company.

STTr. 361-66 (emphasis added).

     As seen from the foregoing, all of Rowan's challenged

testimony during the second trial went to **his** understanding of
CUC's belatedly disclosed fraudulent accounting practices, and
did not purport to represent an objective, expert opinion about
whether those practices violated any established accounting
rules.  Rowan's understanding of CUC's accounting practices, and
how those practices affected the reliability and accuracy of
CUC's publicly reported financial results, was relevant and
admissible to explain why CUC's false statements and omissions
were material.  It is the affect of the disclosure of the fraud
on the hypothetically reasonable investor that determines
materiality.  <u>Basic</u>, 485 U.S. at 231-32.  Rowan was an
appropriate proxy for that hypothetical investor.

The Government was not restricted, as Forbes suggests, to
eliciting Rowan's conclusory statement that he regarded the false
statements and omissions in CUC's and Cendant's SEC filings and
press releases about the companies' financial performance as
significant to him.  To give the jury context, and to enable the
jury to conclude that Rowan's assessment was that of a
"reasonable investor," the Government properly elicited Rowan's
explanation for his conclusion.  Rowan's assessment could not
have amounted to improper expert testimony.  Testimony by a
witness which explains his own knowledge and thinking, as opposed
to the thought processes of another person, does not require
specialized training and knowledge about which only expert
witnesses can testify.  <u>Bennett v. Pippin</u>, 74 F.3d 578, 589 (5th

Cir. 1996) (witness was competent to testify about her own state of mind, which was not a matter exclusively for expert testimony); cf. United States v. D'Ana, 450 F.2d 1201, 1205 (2d Cir. 1971) (affirming the exclusion of the testimony of physicians about what the defendant had told them in order to prove the defendant's state of mind, where the defendant testified and explained her state of mind to the jury). Additionally, Rowan's testimony about his own thinking satisfies the "personal knowledge" requirements of Rule 602 and 701. Forbes' objection to Rowan's testimony was properly rejected by Judge Thompson.

**CONCLUSION**

The Government respectfully requests that the Court deny
Forbes' Third Trial <u>In Limine</u> No. 15.

Respectfully submitted,

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice

*Norman Gross/s*

NORMAN GROSS
Federal Bar Number 24933
MICHAEL MARTINEZ
Federal Bar Number PHV0423
MARK E. COYNE
Federal Bar Number PHV01079
Special Attorneys
U.S. Department of Justice
970 Broad Street
Room 700
Newark, N.J.  07102
(973) 645-2701

Newark, New Jersey
Date: May 23, 2006

**EXHIBIT A**

**(DOCKET 1846, JUDGE THOMPSON'S ORDER DENYING FORBES' RETRIAL MOTION <u>IN LIMINE</u> NO. 7)**

**EXHIBIT B**

**(JULY 28, 1998 PRESS RELEASE OF THE CENDANT CORPORATION)**

## CERTIFICATE OF SERVICE

        The undersigned certifies that on this day I caused to be
served a copy of the Government's Opposition to Defendant Walter
A. Forbes' to Preclude the Government from Presenting Supposed
Expert Testimony from James Rowan's of Hartford Steam Boiler
Company (Forbes Third Trial Motion In Limine No. 15) via email
on:

Barry S. Simon, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005-5901
(202) 434-5005
bsimon@wc.com


                              *Norman Gross/s*
                              NORMAN GROSS


Dated: May 23, 2006
        Camden, New Jersey