```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA        :   No. 3:02CR00264 (AHN)
                                :
                                :
        v.                      :   May 24, 2005
                                :
                                :
WALTER A. FORBES                :
```

**GOVERNMENT'S RESPONSE TO DEFENDANT WALTER A. FORBES' MOTION TO PRECLUDE IMPROPER TESTIMONY OF STEVEN KERNKRAUT**

(Response to Forbes Third Trial Motion <u>In</u> <u>Limine</u> No. 3)

INTRODUCTION

Contrary to Forbes' mischaracterization, Forbes' Mem. in Support of Third Trial Motion <u>In</u> <u>Limine</u> No. 3 ("FM") at 1-2, the Government did not elicit "wide-ranging" testimony from Steven Kernkraut that was "improper." Kernkraut, a securities analyst for Bear Stearns who specialized in retail businesses such as that conducted by CUC International, testified at length about his personal knowledge of the business practices and financial results of the company that Forbes ran for more than twenty years, CUC International, Inc. <u>E.g.</u>, Second Trial Transcript ("STTr.") 97-99, 112-179. When Kernkraut was responsible for analyzing and reporting on CUC's financial results at Bear Stearns, he typically spoke to members of CUC's senior management 15 to 20 times a year. STTr. 130. Kernkraut testified at length about his numerous and periodic personal conversations with Forbes regarding CUC's business practices and financial results. <u>E.g.</u>, STTr. 129-167, 175-76, 179. Forbes concedes that

Kernkraut's testimony about his conversations with Forbes were properly admitted into evidence during the second trial.  FM 7, 8.[1]

Forbes moved for a mistrial during the second trial regarding a wide range of Kernkraut's testimony.  Docket 1886.  Following extensive briefing, Docket 1913 and 1977, Judge Thompson denied that motion.  The Government acknowledged that Kernkraut's testimony on two subjects did not constitute proper lay opinion testimony under Fed. R. Evid. 701: (1) Forbes had made misstatements to Kernkraut about CUC's financial results; and (2) CUC's publicly reported financial results were false.  Docket 1913 at 5.  Although the Government proved both of those propositions through other witnesses, and Forbes has not disputed in either the first or second trials that CUC had fraudulently overstated its publicly reported earnings, the Government acknowledged that Kernkraut, who was not a participant in the

---

[1] Forbes points out that Kernkraut was the Government's lead witness during the second trial, but did not testify during the first trial, FM 1, as if the presentation of Kernkraut during the second trial was somehow nefarious.  It was entirely appropriate for the Government to change its presentation during the second trial after the first trial jury was unable to reach a verdict.  The Government vastly streamlined its presentation during the second trial, starting with its dismissal of 12 of the 16 counts against Forbes.  Docket 1706.  As a result, the second trial (in which Forbes was the only defendant, unlike the first, in which he was tried jointly with Kirk Shelton) consumed 22 trial days, rather than the 80 trial days consumed by the first trial.  Given the Government's different focus and strategy in the second trial, Kernkraut's testimony is hardly a cause for criticism.

fraud, had no personal knowledge that CUC's reported earnings were overstated.  Id.

Forbes evidently complains about the timing of Judge Thompson's curative instruction, coming as it did during the final jury charge.  FM 3.  The Government, however, offered a curative instruction regarding the portions of Kernkraut's testimony identified above, Docket 1913 at 5.  Forbes did not take the Government up on this offer.  Over the Government's partial objection, during the final charge to the jury, Judge Thompson struck certain portions of Kernkraut's testimony that did not pertain to the two issues identified above.  STTr. 3801.

In addition to the two issues discussed above, Forbes requested that another portion of Kernkraut's testimony be stricken: that CUC had inflated its reported membership numbers and the growth in membership renewal rates.  Judge Thompson struck that testimony as well.  STTr. 3801.  The Government will not repudiate the positions it took during the second trial, and will not elicit any testimony from Kernkraut during his direct examination in the third trial regarding those three subjects.  Accordingly, this Court need not direct the Government to refrain from eliciting testimony on those three subjects.[2]

---

[2] Although the Government has conceded that it had elicited opinion testimony from Kernkraut that did not satisfy the requirements of Fed. R. Evid. 701, it should note that it was not alone in this error.  Judge Thompson concluded that Forbes also elicited improper lay opinion testimony from several witnesses.
(continued...)

3

**ARGUMENT**

I.  **THE GOVERNMENT WILL NOT ELICIT TESTIMONY FROM KERNKRAUT ON DIRECT EXAMINATION REGARDING THE ACCURACY OF CUC'S REPORTED FINANCIAL RESULTS.**

Consistent with the position that it took during the second trial, the Government will not elicit any testimony from Kernkraut on direct examination regarding the accuracy of CUC's reported financial results.  The Government agrees with Forbes' contention that Kernkraut has no personal knowledge of the accuracy of those results.  Instead, the Government will prove that certain of CUC's reported financial results were materially false through other witnesses and documentary evidence.[3]

---

[2] (...continued)
See Ruling on Forbes Retrial Motion In Limine No. 3, Docket No. 1901, filed Oct. 27, 2005, at p. 4 (noting that "during the first trial, and already during this [re]trial, defense counsel elicited, without objection, improper lay opinion testimony from government witnesses on cross-examination").

[3] Forbes' asserts that Cendant's April 15, 1998 press release announcing the financial irregularities and its subsequent Restatement are inadmissible hearsay, citing to his Third Trial Motion In Limine No. 9.  FM 5.  Judge Thompson did not admit the Restatement into evidence at either trial.  For the reasons stated in the Government's Opposition to Forbes Third Trial Motion In Limine No. 9, Judge Thompson properly admitted evidence **about** the Restatement in order to prove that CUC's prior financial statements that had to be restated were material.  The April 15, 1998 press release was not offered for the truth of the matter asserted, but rather to prove what information was communicated to the marketplace about the charged fraud, and to give context to the properly admitted evidence that the stock price declined by approximately 47% immediately after the fraud was disclosed, thus proving the materiality of the fraudulent financial statements. United States v. Bilzerian, 926 F.2d 1285, 1298 (2d Cir. 1991) ("whether a public company's stock price moves up or down or stays the same after [information is publicly
(continued...)

4

Forbes has effectively conceded during the first and second trials that a large fraud occurred at CUC while Forbes was the CEO and Chairman of the Board for that company. During his opening statement for the second trial, Forbes stuck to his ostrich defense: that he was ignorant of the accounting fraud that Corigliano and perhaps others were responsible for. STTr. 59 (stating that Corigliano engaged in criminal conduct); 68 (Corigliano conspired with his subordinates in CUC's Accounting Department to "manipulat[e] the books and records"); 68-70 (Corigliano hid the accounting manipulation from the auditors); 71 (Corigliano "ma[de] up numbers" and was "success[ful in] pulling this thing off").

In a footnote, without argument or authority, Forbes contends that this Court should also preclude Kernkraut from "speculating" about what would have happened in a hypothetical world in which CUC contemporaneously reported lower financial results. FM 8, n.4. This Court should reject that claim, as did Judge Thompson. Kernkraut's testimony that he would have "changed his analysis" had he known that CUC's reported financial results were fraudulent, STTr. 215-17, pertains to a matter about which Kernkraut obviously had personal knowledge, and is highly relevant to prove that the conspirators' fraudulent reported

---

[3] (...continued)
disclosed] is a factor the jury may consider relevant" in assessing materiality).

financial results were material. Judge Thompson overruled Forbes' objections to that testimony and expressly instructed the jury to that effect. STTr. 216-18. The same analysis applies to Forbes' objection to Kernkraut's testimony at STTr. 229-30 and STTr. 338-39.

### II.  THE GOVERNMENT WILL NOT ELICIT TESTIMONY FROM KERNKRAUT ON DIRECT EXAMINATION THAT FORBES LIED TO HIM ABOUT CUC'S FINANCIAL RESULTS.

Consistent with the position that it took during the second trial, the Government will not elicit any testimony from Kernkraut on direct examination that Forbes made representations to Kernkraut about CUC's financial numbers that were "essentially false." The Government agrees with Forbes' contention that Kernkraut has no personal knowledge of the truth or falsity of Forbes' statements to Kernkraut. Instead, the Government will prove that certain of Forbes' statements to Kernkraut were "essentially false" through other witnesses and documentary evidence.[4]

---

[4] Forbes complains that Kernkraut's subjective beliefs about Forbes' state of mind is irrelevant. FM 9. This position is hard to square with the opinion testimony from Kernkraut about Forbes' thoughts, knowledge, and state of mind that Forbes himself elicited during the second trial. See STTr. 294 (Forbes "had a vision that the Internet would be used for commerce"); 294-95 (Forbes "started embracing the Internet and a computer as the transaction device" and "was always searching for the device that would take his business away from a telephone- based service to an interactive-based service"); 326-27 (Forbes had "a very good instinct" about what was going on at CUC, but he was not a "detail guy"). Forbes evidently sought Kernkraut's opinions on these matters to support a key aspect of his ostrich defense

(continued...)

**III. AS DID JUDGE THOMPSON, THIS COURT SHOULD ADMIT KERNKRAUT'S RELEVANT TESTIMONY ABOUT FORBES' STATEMENTS TO KERNKRAUT ABOUT CUC'S MEMBERSHIP NUMBERS AND MEMBERSHIP RENEWAL RATES.**

   **A.   The Government Will Not Elicit Testimony From Kernkraut On Direct Examination That CUC's Membership Numbers and Membership Renewal Rates Were Overstated.**

Consistent with the position it ultimately took during the second trial, the Government will not elicit testimony from Kernkraut on direct examination that CUC's membership numbers and membership renewal rates were overstated.

   **B.   Judge Thompson Properly Admitted Kernkraut's Testimony That Forbes Was Knowledgeable About CUC's Membership Numbers and Membership Renewal Rates, In Order to Rebut Forbes' Defense That He Was Ignorant of CUC's Financial Results.**

As Forbes acknowledges, FM 15, n. 7, even though Judge Thompson struck Kernkraut's testimony that CUC's reported membership numbers and membership renewal rates were overstated, he refused to strike Kernkraut's testimony about Forbes' knowledge of those numbers and rates. That ruling was proper, and Forbes has failed to demonstrate that this Court should reconsider Judge Thompson's ruling that Forbes has failed to demonstrate that Kernkraut committed perjury, see Sequa Corp. v. GBJ Corp., 156 F.3d 136, 144 (2d Cir. 1998), or that this Court

---

[4] (...continued)
(which he also advanced during the initial trial): that Forbes was unaware of the accounting manipulations at CUC because he concentrated on long-term strategic matters. STTr. 80-81 (opening statement for the defense).

should depart from the law of the case, see United States v. Uccio, 940 F.2d 753, 758 (2d Cir. 1991).

Kernkraut's testimony that Forbes spoke authoritatively and accurately about CUC's publicly reported membership numbers and membership renewal rates is admissible not only to prove Forbes' knowledge of the charged fraud, see Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1234 (9th Cir. 2004) (it was "reasonable to infer that" Larry Ellison's "detail-oriented management style led [him] to become aware of" such significant "improper revenue recognition . . . that the company would have missed its quarterly earnings projection but for the adjustments"), but also to rebut Forbes' defense that he was a "visionary" who focused on the future direction of CUC, and did not concern himself with past financial performance.  STTr. 80 (opening statement); 3347 (summation).  Evidence that contradicts a defendant's testimony on direct examination which is material to his defense is properly admitted for impeachment.  See Udemba v. Nicoli, 237 F.3d 8, 18 (1st Cir. 2001) (affirming admission of extrinsic evidence to impeach by contradiction regarding matters that "are not tangential to the case, but, rather, implicate material matters"); United States v. Roulette, 75 F.3d 418, 423 (8th Cir. 1996)(district court properly admitted testimony that contradicted the testimony of a defense witness that he had never seen the defendant sell drugs).

Forbes contends that Kernkraut's testimony concerning CUC's membership numbers and membership renewal rate constituted a constructive amendment of and a prejudicial variance from the indictment.  FM 12.  Forbes focuses upon the Government's concession during the second trial that the indictment, which identified certain publicly reported financial results that were materially false, did not identify the publicly reported membership numbers and membership renewal rates as materially false.  FM 13.

The Government, however, correctly argued that Kernkraut's testimony about Forbes' knowledge of CUC's total membership numbers and membership renewal rates did not constructively amend the indictment.  A constructive amendment of the indictment occurs only "when the charging terms are altered, either literally or constructively," United States v. Clemente, 22 F.3d 477, 482 (2d Cir. 1994), i.e. when the trial evidence "modif[ies] essential elements of the offense charged to the point that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged by the grand jury."  United States v. Vebeliunas, 76 F.3d 1283, 1290 (2d Cir. 1996).[5]  So long as the "the allegations and the proof substantially correspond," and the trial evidence is consistent

---

[5] Accord United States v. Joyner, 201 F.3d 61, 69 (2d Cir. 2000); United States v. Mucciante, 21 F.3d 1228, 1234 (2d Cir. 1994); United States v. Weiss, 752 F.2d 777, 787 (2d Cir. 1985).

with the "core of criminality" alleged in the indictment, there is no constructive amendment. United States v. Danielson, 199 F.3d 666, 670 (2d Cir. 1999).[6]

The Second Circuit has reiterated that:

> Because proof at trial need not, indeed cannot, be a precise replica of the charges contained in the indictment, this court has consistently permitted significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at trial.

United States v. Frank, 156 F.3d 332, 338 (2d Cir. 1998).[7]  In assessing a constructive amendment claim, the court must examine the totality of the indictment, and not merely a particular averment which allegedly conflicts with the trial evidence. United States v. Ansaldi, 372 F.3d 118, 127 (2d Cir. 2004); United States v. Teitler, 802 F.2d 606, 617 (2d Cir. 1986).

The indictment charges that the conspirators fraudulently inflated CUC's earnings by intentionally underfunding CUC's membership cancellation reserve.  Redacted Indictment, Count 1, ¶¶ 44-48.  Specifically, the indictment alleges that the defendant and his co-conspirators "were able to estimate from

---

[6] Accord United States v. Salmonese, 352 F.3d 608, 620 (2d Cir. 2003); United States v. Delano, 55 F.3d 720, 729-30 (2d Cir. 1995).

[7] See also United States v. LaSpina, 299 F.3d 165, 181 (2d Cir. 2002); United States v. Patino, 962 F.2d 263, 265-66 (2d Cir. 1992)(no constructive amendment where the prosecutor argued that the defendant had illegally used three separate guns in furtherance of a crime of violence, where the indictment charged the use of a different gun on a different date).

CUC's and Cendant's experience how many members would cancel or fail to pay their membership fees upon renewal each year." Redacted Indictment, Count 1, ¶ 45.  Forbes and his co-conspirators "represented that the amount of membership fees placed into the membership cancellation reserve was sufficient, based on their experience, to cover what they called 'estimated cancellations.'"  Id.  The indictment further alleges that "the conspirators intentionally underfunded this membership cancellation reserve, thereby fraudulently increasing earnings." Redacted Indictment, Count 1, ¶ 46.

The trial evidence showed that the conspirators intentionally manipulated the historic cancellation rates for various programs in order to justify to CUC's outside auditors, Ernst and Young, the (insufficient) cancellation reserve.  FTTr. 2476; STTr. 1275-81, 1283-87.  By understating that reserve, the conspirators misled the auditors and the investing public to think that CUC was losing fewer members to cancellation than it actually did.  That being so, Kernkraut's testimony about Forbes' familiarity with the number of CUC's members and CUC's membership renewal rate pertains to conduct that is clearly within the "core of criminality" charged in the indictment.

The principle is well illustrated in United States v. Skelly, 442 F.3d 94 (2d Cir. 2006), another prosecution for securities fraud.  The indictment charged the defendants with "causing retail brokers . . . to employ a variety of fraudulent

11

and illegal sales practices in order to induce customers to buy the securities."  The Second Circuit held that the indictment was not constructively amended by evidence that the defendants "substantially enhanced compensation to 'push' the house stocks" even though evidence about that practice "was not specified [in the indictment]."  The Court of Appeals held that the "general language [of the indictment] was more than sufficient to encompass it, as well as to put the defendants on fair notice that all their practices used to promote the house stocks were included in the charge".  Id. at 99.

That the indictment does not allege that CUC's publicly reported membership and membership renewal numbers were false does not mean that Kernkraut's testimony about those numbers and rates constructively amended the indictment.  The indictment must set forth only a "plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  It cannot, by definition, describe in detail all of the relevant evidence regarding a complex accounting fraud that spanned the better part of a decade.  See United States v. Cooper, 384 F. Supp. 2d 958, 960 (W.D. Va., 2005) (Rule 7(c) "does not contemplate the inclusion [in the indictment] of every piece of evidence that ultimately may be relevant"); United States v. Cisneros, 26 F. Supp. 2d 24, 46 (D.D.C. 1998) ("an indictment is an instrument of accusation, not of proof").  Accordingly, the Government cannot be limited to

proving only those facts that are identified in the indictment. See United States v. Janati, 374 F.3d 263, 270 (4th Cir. 2004) (reversing, on the Government's appeal, a pre-trial ruling limiting the government to proving only those overt acts alleged in the indictment).

Forbes contends that Kernkraut cannot testify about what Forbes "knew" about CUC's membership numbers and renewal rates because Kernkraut is not a "mind reader."  FM 14.  Fair enough.[8] Kernkraut can testify, however, about what Forbes told Kernkraut about CUC's publicly reported membership numbers and renewal rates, and such testimony is highly relevant to rebut Forbes' "visionary" defense.  Kernkraut was a Wall Street analyst who followed CUC's financial reporting carefully, and was regarded by his peers as particularly knowledgeable about CUC's financial results.  STTr. 134.  Owing to his personal knowledge about CUC's publicly reported membership numbers and renewal rates, Kernkraut could compare Forbes' statements to him about CUC's membership numbers and renewal rates with CUC's publicly reported numbers

---

[8] But cf. United States v. Polishan, 336 F.3d 234, 243 (3d Cir. 2003)(in prosecution for securities fraud, district court properly admitted testimony of persons who worked with the defendant that he "knew about anything and everything that went on in our company," and was "completely knowledgeable about what was going on in my divisions" and "incredibly knowledgeable about . . . all financial aspects of the business and intimately knew the details," where the witnesses did not expressly opine on the ultimate issue of the defendant's guilty knowledge, but "provided several reasons to support the unstated conclusion that he did") (citing United States v. Anderskow, 88 F.3d 245, 250 (3d Cir. 1996)).

13

and rates, and thereby determine whether Forbes was conversant with those figures, or rather was someone who did not trouble himself with past financial performance, as he claimed.[9] Kernkraut's testimony that Forbes was up to date about the "key drivers" of CUC's business put the lie to Forbes' "visionary" defense, and undermines his claim that he was too busy thinking about the future to have participated in the charged fraud which focused on CUC's past performance.

> **C. This Court Should Decline to Reconsider Forbes' Rule 403 Challenge to Kernkraut's Testimony About Forbes' Knowledge of CUC's Membership Numbers.**

This Court should also decline to reconsider Judge Thompson's ruling that Kernkraut's testimony about what Forbes told Kernkraut about CUC's membership numbers and renewal rates should not be excluded under Fed. R. Evid. 403. Relevant evidence may not be excluded under Rule 403 unless, <u>inter alia</u>, its "probative value is <u>substantially outweighed</u> by the danger of <u>unfair prejudice</u>." Fed. R. Evid. 403 (emphases added). Consistent with Rule 403, "unfair prejudice 'means an undue

---

[9] Forbes points to Kernkraut's testimony that he did not know what CUC's <u>actual</u> membership numbers, as opposed to its publicly reported membership numbers were, because Kernkraut did not have access to CUC's books and records. FM 14-15. Kernkraut did know what CUC's <u>reported</u> membership numbers were, because he carefully studied CUC's public filings with the SEC. STTr. 114-15. Thus, Kernkraut was clearly in a position to compare Forbes' statements to Kernkraut about membership numbers with CUC's reported membership numbers and assess whether or not Forbes "knew" the reported numbers. Evidence that Forbes knew the reported membership numbers is relevant to rebut his "visionary" defense.

tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  United States v. Brady, 26 F.3d 282, 287 (2d Cir. 1994) (quoting the Advisory Committee Notes to Rule 403).

Evidence that refutes a cental aspect of Forbes' "visionary" defense is relevant to the jury's resolution of the charges.  See United States v. DeCastris, 798 F.2d 261, 265 (7th Cir. 1986) (the risks of admitting potentially prejudicial evidence "are not one-sided," and a jury forced to assess a defense claim without being able to assess contrary evidence could "have been led to error").  Nor would this evidence incite an undue emotional response against Forbes.  The indictment and the evidence will prove that the conspirators caused CUC to fraudulently report their results regarding critical financial benchmarks such as revenue, expenses, and profits, and that Forbes actively participated in that fraud.

Given that background, evidence that Forbes was knowledgeable about CUC's publicly reported membership numbers and renewal rates is far less shocking than the allegations set forth in the indictment.  Courts routinely admit much more prejudicial evidence than this when the challenged evidence is no more shocking than other proof of the charged crime.  E.g. United States v. Abel, 469 U.S. 45, 54-55 (1984)(evidence of the defendant's and defense witness's membership in the same "murderous" prison gang was properly admitted in a prosecution

15

for bank robbery, because it was relevant to the witness's bias).[10]  The same result obtains here.

## CONCLUSION

The Government requests that Forbes' Third Trial Motion In Limine No. 3 be denied.

                                Respectfully submitted,

                                CHRISTOPHER J. CHRISTIE
                                Special Attorney
                                U.S. Department of Justice

                                *Norman Gross/s*

                                NORMAN GROSS
                                Federal Bar Number 24933
                                MICHAEL MARTINEZ
                                Federal Bar Number PHV0423
                                MARK E. COYNE
                                Federal Bar Number PHV01079
                                Special Attorneys
                                U.S. Department of Justice
                                970 Broad Street
                                Room 700
                                Newark, N.J.  07102
                                (973) 645-2701

Newark, New Jersey
Date: May 24, 2006

---

[10] See also United States v. Cusack, 229 F.3d 344, 347-48 (2d Cir. 2000) (in context of the charged fraudulent sale of forged documents purportedly belonging to former President Kennedy, evidence that the defendant fabricated his military career was not unduly prejudicial); United States v. Wong, 40 F.3d 1347, 1378 (2d Cir. 1994) (evidence regarding uncharged criminal conduct of a gunfight between defendant's criminal gang and a rival gang was properly admitted in a prosecution for murder, racketeering, and extortion); United States v. Smith, 292 F.3d 90, 98-100 (1st Cir. 2002) (evidence of drug-trafficking was properly admitted in a prosecution for unlawful possession of a firearm, even though it was an "emotionally-charged issue").

16

**CERTIFICATE OF SERVICE**

    The undersigned certifies that on this day I caused to be served a copy of the Government's Response to Defendant Walter A. Forbes' Motion to Preclude Improper Testimony of Steven Kernkraut (Opposition to Forbes Third Trial Motion <u>In</u> <u>Limine</u> No. 3) via email on:

Barry S. Simon, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005-5901
(202) 434-5005
bsimon@wc.com


                                                *Norman Gross/s*
                                                NORMAN GROSS

Dated: May 24, 2006
       Camden, New Jersey