UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


UNITED STATES OF AMERICA　　　:　No. 3:02CR00264 (AHN)
　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　:
　　　　　　　v.　　　　　　　　:　May 24, 2006
　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　:
WALTER A. FORBES　　　　　　　:


GOVERNMENT'S OPPOSITION TO DEFENDANT WALTER A. FORBES' MOTION TO
PRECLUDE THE GOVERNMENT FROM PRESENTING EVIDENCE, CROSS-
EXAMINATION, OR ARGUMENT CONCERNING THE CHARGING OF FORBES'
AIRPLANE EXPENSES TO THE CENDANT MERGER RESERVE

(Opposition to Forbes Third Trial Motion In Limine No. 22)


CHRISTOPHER J. CHRISTIE
NORMAN GROSS
MICHAEL MARTINEZ
MARK E. COYNE
Special Attorneys
U. S. Department of Justice
970 Broad Street
Room 700
Newark, N.J.  07102
(973) 645-2701

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

I.  EVIDENCE THAT FORBES SIGNED AN EXPENSE VOUCHER WHICH
    STATED THAT A HALF MILLION DOLLARS OF FORBES' NON-
    MERGER RELATED TRAVEL EXPENSES SHOULD BE CHARGED TO THE
    CENDANT MERGER RESERVE IS RELEVANT TO PROVE HIS
    KNOWLEDGE OF THE FRAUDULENT PRACTICE OF INFLATING CUC'S
    OPERATING INCOME BY TREATING ORDINARY BUSINESS EXPENSES
    AS MERGER-RELATED. . . . . . . . . . . . . . . . . . . 10

II. FORBES HAS FAILED TO SUSTAIN HIS BURDEN OF ESTABLISHING
    THAT PHOTOCOPIES OF GX 158 AND GX 388 ARE NOT ACCURATE
    DUPLICATES OF THE ORIGINAL EXPENSE REPORT SIGNED BY
    FORBES. . . . . . . . . . . . . . . . . . . . . . . . 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . 26

**INTRODUCTION**

During the first and second trials, Forbes did not dispute the occurrence of a massive accounting fraud perpetrated by officials of CUC, Inc., where Forbes was the Chief Executive Officer ("CEO") and Chairman of the Board throughout the charged conspiracy period in this case.  Rather, his defense was that the fraud was perpetrated by his subordinates without his knowledge or involvement.  First Trial Transcript ("FTTr.") 13537-40; Second Trial Transcript ("STTr.") 2692-2704.  Government Exhibit 158 ("GX 158"), an expense report by which Forbes sought reimbursement from CUC of over a half million dollars in travel expenses that he incurred in 1995 and 1996, tells a different story.  Because that exhibit tends to show that Forbes may have known about a crucial aspect of the charged fraud, the fraudulent manipulation of merger reserves, he seeks to preclude its admission, as well as any testimony, cross-examination, or argument about the exhibit.  The challenged evidence, however, is relevant to the most hotly contested issue in this case, Forbes' knowledge of the charged fraud.

Although Forbes' alternate argument, that the supposedly prejudicial effect of the evidence substantially outweighs its probative value, should also be rejected, Judge Thompson reached a contrary conclusion before the second trial.  Nevertheless, this Court should deny Forbes' present motion if it declines to treat Judge Thompson's prior evidentiary rulings as the "law of

the case," and declines to hold Forbes (and, in this instance, the Government) to the rigorous standard for reconsideration of Judge Thompson's prior rulings.

## BACKGROUND

The indictment charges that Walter Forbes, while the Chief Executive Officer and Chairman of the Board of CUC, Inc., directed his subordinates, including Chief Financial Officer ("CFO") Cosmo Corigliano, to fraudulently inflate CUC's publicly reported earnings. They did so in order to cause the investing public to bid up the price of CUC stock to higher levels than it would have fetched had investors known what CUC's true earnings were. Redacted Indictment, Count 1, ¶¶ 18, 20-22; FTTr. 6464-69, 6514, 6762, 7056-78. As part of that conspiracy, the conspirators fraudulently manipulated a series of "merger reserves" on the books of CUC. Redacted Indictment, Count 1 at ¶ 29-31; e.g., FTTr. 2382-2417, 2433-55. A merger reserve is an expense item on the company's income statement that is to be used exclusively for the payment of merger-related expenses, such as legal and investment banker's fees incurred as part of the merger, the costs of closing duplicate facilities, and severance payments to employees whose jobs are terminated as a result of the merger. Redacted Indictment, Count 1 at ¶ 31-33; FTTr. 444-45, 731-32, 1493-94, 1959-67, 2007, 4924, 5778, 8488-89.

2

By far the largest of CUC's merger reserves, the "Cendant Merger Reserve," was established in 1997 to pay for the expenses arising from the merger of CUC and HFS to form Cendant. Redacted Indictment, Count 1, ¶¶ 37-38; FTTr. 7222-36. Merger discussions between the two companies were initiated in January 1997, terminated that same month, resumed in April, 1997, and concluded with the signing of a merger agreement in May 1997. FTTr. 246-53. The merger was finalized in December 1997. FTTr. 2565.

In order to establish a merger reserve, Generally Accepted Accounting Principles ("GAAP") require the company to make a good-faith estimate of its merger-related expenses in advance, fund the merger reserve by the amount of that estimate, and pay the merger-related expenses as they become due. Redacted Indictment, Count 1, ¶ 33; FTTr. 445-48, 731-32, 944. A key component of the company's financial performance, operating income, is calculated without consideration of the one-time, extraordinary expenses incurred as a result of the merger, in order to show what the company earned as a result of its normal and recurring operations. Redacted Indictment, Count 1, ¶ 32; FTTr. 449-51, 3784. For that reason, investors often focus upon operating income as a more accurate measure of future performance than "net income," the amount of earnings that are reduced by merger-related expenses. Redacted Indictment, Count 1, ¶ 16; FTTR. 356-75, 451, 1492-95, 1964, 5678-81, 6607-14, 6742, 10266.

3

Corigliano and Anne Pember, the former controller of CUC, testified about how they manipulated CUC's merger reserves to fraudulently inflate CUC's publicly reported operating income. Instead of undertaking a good-faith estimate of CUC's merger-related expenses, they deliberately over-estimated those expenses in order to create a merger reserve that was greater than needed to pay CUC's legitimate, merger-related expenses. FTTr. 7214-15, 7223-25, 7234-38, 7245-47, 7266-68. They treated the excess amount of the merger reserve above that which was needed to pay the merger-related expenses as a "cushion" which they used to inflate CUC's reported earnings. For instance, at the end of the fiscal year, they intentionally charged, or caused their subordinates at CUC to charge ordinary operating expenses against the merger reserve. FTTr. 752-54, 2333-35, 2401-17, 2435-66, 3790-91. Since operating income is the difference of revenues minus operating expenses, Corigliano and Pember falsely increased CUC's operating income by improperly reducing the operating expenses charged to an operating expense account.

The first trial evidence established that, in the fall of 1997, Forbes, then the Chief Executive Officer and Chairman of the Board of CUC, sought reimbursement from CUC for hundreds of thousands of dollars of air travel expenses that he incurred while on CUC business during 1995 and 1996. In September or October of 1997, Forbes gave Corigliano an expense report, GX 158

4

(Exhibit 1 to Forbes' Third Trial Motion In Limine No. 22
("Forbes' Motion")), seeking over one million dollars in
reimbursement for those expenses.  FTTr. 7374-75.

The evidence adduced during the first trial showed that
Forbes' co-defendant, Kirk Shelton, while President and Chief
Operating Officer of CUC, approved the decision to charge Forbes'
airplane expense to the Cendant merger reserve.  After receiving
the expense report from Forbes, Corigliano, gave the report to
Shelton for his approval.  FTTr. 7374.  Some time later, Shelton
told Corigliano that Forbes had agreed to reduce his request for
reimbursement by approximately one-half, seeking about $220,000
for 1995 and $370,000 for 1996.  FTTr. 7375-76.

According to Corigliano, it was his idea to charge those
expenses to the Cendant Merger Reserve, even though Forbes' 1995
and 1996 travel was unrelated to that 1997 merger.  FTTr. 7378-
79.  As shown above, charging Forbes' 1995 and 1996 travel
expenses to the Cendant Merger Reserve would further an important
component of the charged fraud, which was to pay ordinary, non-
merger related expenses from the merger reserve, which would have
the effect of fraudulently increasing CUC's publicly reported
operating income.  FTTr. 7380-81, 12321-24.  By improperly
charging Forbes' travel expenses against the Cendant Merger
Reserve, the conspirators would achieve a "dollar for dollar"
increase in CUC's operating income.  FTTr. 7380-81.  Shelton

5

agreed with Corigliano's suggestion, and wrote on the expense report that the expenses should be payed out of "the merger reserve."  FTTr. 12321-24; GX 158.

Shelton testified at the first trial that he had several conversations with Forbes before approving Forbes' request for reimbursement.  According to Shelton, Forbes had complained that it was unfair that he had to reimburse CUC for his non-business travel on private commercial jets, because Henry Silverman, the CEO of HFS, traveled on jets leased by HFS free of charge to him. Shelton concluded that Forbes' request was reasonable.  FTTr. 12314-16.  When Shelton mentioned this issue to Corigliano, the latter suggested that the expenses should be paid from the merger reserve.  FTTr. 12317-18.

After further discussions with Forbes and Corigliano regarding the documentation that Forbes had submitted in support of the expense report, Shelton filled out the section of the report which authorized payment of the expenses, attached all of the documentation for the expenses to the report, and he and Forbes then signed the report.  FTTR. 12319-24.  At some point during this process, Shelton wrote "charge to the merger reserve" on the report and sent it to the accounting department for processing.  Id.  Shelton claimed that Forbes never told Shelton to have the reimbursement for the airplane expenses paid from the

merger reserve.  FTTr. 13178-82.[1]  Forbes testified to the same effect.  FTTr. 13836-37.

Forbes testified at the first trial that the travel expenses for which he sought reimbursement via GX 158 were not related to the Cendant merger.  FTTr. 14258.  Such an admission was compelled by the fact that the expenses were incurred in 1995 and 1996, but the Cendant merger reserve was not established until 1997.  FTTr. 866-67.  Nevertheless, GX 158 states, on its face, that the "Balance due to plane hrs for CUC business" should be "charge[d] to Merger Reserve."  Exhibit 1 to Forbes' Motion.  The account number on GX 158, 13333, is identified on that document as "HFS Merger Costs."  Id.; FTTr. 2626.  Forbes admittedly signed the document.  FTTr. 14249.  In accordance with the instructions on the expense report, and consistent with Pember and Corigliano's testimony regarding the merger reserve fraud, those ordinary operating expenses were improperly charged against the Cendant Merger Reserve.  FTTr. 1379-82.

Before the second trial, Forbes moved to exclude all evidence, cross-examination, and argument regarding the improper accounting for Forbes' airplane expenses.  Forbes' Retrial Motion

---

[1]  Shelton's contention during the 2004 first trial that he decided to have the reimbursement paid from the merger reserve because of the "fairness issue," and not because he was seeking to facilitate the fraudulent manipulation of the Cendant Merger Reserve, was undermined by his failure to mention that reason when he was questioned in 1998 by investigators of the Cendant Audit Committee regarding the expense report.  FTTr. 13183-84.

In Limine No. 2, Docket 1660.  He raised the same arguments in
that motion that he raises in the instant motion: that the
evidence is irrelevant to the charges against him; that any
probative value is outweighed by the supposed prejudicial effect
of the evidence; and that the exhibits offered by the Government
to prove the improper accounting for Forbes' airplane expenses
were not what they purported to be.  Compare Docket 1660 with
Forbes' Third Trial Motion In Limine No. 22, Docket 2311.

     The Government opposed Forbes' prior motion to exclude this
evidence, on the ground that it was relevant to prove Shelton's
involvement in the conspiracy, and that the conspiracy had in
fact occurred.  The Government did not argue in its response to
Forbes' prior motion that Forbes' signature on the expense report
bearing a notation that the reimbursement should be paid out of
the merger reserve was relevant to prove that Forbes knew about
and participated in the charged fraud to, inter alia,
fraudulently manipulate the merger reserve.  Docket 1740.

     By order dated November 12, 2005, Docket 1965, Judge
Thompson granted Forbes' motion, solely on the ground that "the
jury could be confused or misled by the evidence to believe that
defendant Forbes was somehow involved in the decision or had
knowledge of" the improper accounting for Forbes' airplane
expenses.  Docket 1965 at 1-2 (Exhibit A hereto).  Judge Thompson
thus excluded the evidence under Fed. R. Evid. 403.  Id. at 2.

In his instant motion, Forbes again seeks to exclude any evidence, cross-examination, or argument regarding the improper accounting for his airplane expenses, and the Government again opposes that motion.  For the reasons that follow, this Court should deny Forbes' motion if the Court declines to treat Judge Thompson's previous evidentiary rulings as the "law of the case" and declines to hold the parties to the rigorous requirements for obtaining reconsideration of evidentiary issues that Judge Thompson previously resolved.[2]

---

[2]  Forbes accurately points out that the Government, acting in compliance with Judge Thompson's prior ruling on this issue, initially informed Forbes that it would not seek to offer evidence about the improper accounting for Forbes' airplane expenses during the third trial.  The Government has consistently argued in response to Forbes' third trial motions in limine which seek to relitigate issues that were previously resolved by Judge Thompson that this Court should not reconsider those issues, but should apply the law of the case.  The Government does not believe that there are valid grounds for this Court to reconsider Judge Thompson's ruling on the issue presented in the instant motion, or for this Court to depart from the law of the case.

Forbes has argued, however, that this Court may not apply the law of the case with respect to evidentiary rulings by Judge Thompson, and has asked this Court to conduct an independent review of Judge Thompson's denials of many of Forbes prior motions in limine.  If this Court decides that it will not apply the law of the case and that it will not treat Forbes' present motions as seeking reconsideration of prior rulings, what's sauce for the goose is sauce for the gander, and this Court should not afford law of the case treatment to this issue either.  Cf. United States v. Diallo, 40 F.3d 32, 35 (2d Cir. 1994) (McLaughlin, J.) ("Turnabout is fair play, even in the federal courts.").

**ARGUMENT**

I. **EVIDENCE THAT FORBES SIGNED AN EXPENSE VOUCHER WHICH STATED THAT A HALF MILLION DOLLARS OF FORBES' NON-MERGER RELATED TRAVEL EXPENSES SHOULD BE CHARGED TO THE CENDANT MERGER RESERVE IS RELEVANT TO PROVE HIS KNOWLEDGE OF THE FRAUDULENT PRACTICE OF INFLATING CUC'S OPERATING INCOME BY TREATING ORDINARY BUSINESS EXPENSES AS MERGER-RELATED.**

Contrary to Forbes' principal argument, the present record does not compel the conclusion that Forbes had no knowledge that his 1995 and 1996 business travel expenses were fraudulently charged to the Cendant Merger Reserve.  The only witness who testified that Forbes signed the expense report <u>before</u> Kirk Shelton wrote the merger reserve instructions was Forbes himself. Forbes – who testified falsely on multiple occasions during the two trials[3] – has an obvious motive to distance himself from his signed document, as it is direct evidence of his participation in the merger reserve fraud.

Even though he sought to exonerate himself and Forbes at virtually every turn during his first trial testimony, Kirk Shelton did not testify that he filled in the "charge to the merger reserve" language <u>after</u> Forbes signed an incomplete

---

[3] <u>See</u>, <u>e.g.</u>, Government's Opposition to Forbes' Third Trial Motion In Limine No. 2, Docket 2263 at 1-3 (describing Forbes' false testimony regarding his conversation with attorney Greg Danilow about Forbes' transfer of assets to his family members after the fraud in this case was disclosed and while it was under official investigation).

10

expense report.  Rather, Shelton testified that he did not

remember when he asked Forbes to sign the expense report.

> Q.  And this is Mr. Forbes' signature on the left.
>
> A.  Right.  At some point I had asked Walter to sign
> it.  I don't remember where it was in the process.  I
> put the date on it.  And I signed it.

FTTr. 12322.

Although Corigliano testified about his own meetings with

Shelton regarding Forbes' expense report for the 1995 and 1996

airplane travel, Corigliano testified that he did not see what

Shelton wrote on the expense report after Corigliano suggested

that the reimbursement for those travel expenses be charged to

the merger reserve.  FTTr. 7378.  At no point did Corigliano

testify that he saw Forbes's signature on the expense report

during this meeting with Shelton.  Thus, Shelton's and

Corigliano's testimony fail to corroborate Forbes's testimony

that he signed the expense report before the incriminating text

was filled in by Shelton.

Not only does the record evidence not compel the conclusion

that Forbes signed the expense report <u>before</u> Shelton wrote the

incriminating text on the document, but the Government has a good

faith basis to believe that Forbes himself indicated that the

merger reserve was to be charged.  That basis comes from the

mouth of Forbes' own executive assistant, Beth Freimour.

Beginning in April 1998, the law firm Wilkie, Farr and Gallagher

and the accounting firm Arthur Andersen ("AA") conducted an
intensive investigation, on behalf of the Cendant Audit
Committee, into the charged fraud in this case.  FTTr. 1446-69.
An AA employee assigned to that investigation, Christina Dresch,
spoke to Freimour about the expense report for Forbes' 1995 and
1996 airplane travels.  Dresch wrote a memorandum to file dated
June 29 1998, stating:

> Per Beth Freimour, Forbes' Executive Assistant, **the
> expense report was prepared by Forbes himself who
> indicated that the merger reserve was to be charged**.
> Walter Forbes and Kirk Shelton signed the report. . . .

Exhibit B hereto at 1 (emphasis added).

According to Dresch's memo, Freimour has personal knowledge
that Forbes, Freimour's immediate supervisor, participated in the
decision to charge his 1995 and 1996 airplane expenses to the
Cendant merger reserve.  Because GX 158, particularly when
coupled with Freimour's account, supports an inference that
Forbes' signed that document after Shelton wrote the instruction
to charge the reimbursement for Forbes' 1995 and 1996 travel
expenses to the Cendant Merger Reserve, the document tends to
prove that Forbes knew about the fraudulent accounting for those
expenses.  It therefore easily meets the low relevance threshold
under Fed. R. Evid. 401.[4]

---

[4]  Evidence is relevant if it has "any tendency to make the
existence of any fact that is of consequence to the determination
of the action more probable or less probable than it would be
(continued...)

12

Additionally, evidence that would support a reasonable inference that Forbes knew that his 1995 and 1996 travel expenses were improperly charged to the Cendant Merger Reserve is highly relevant directly contradicts his testimony that he had no knowledge of that fact.  FTTr. 13836-37.  Evidence that directly refutes a defendant's exculpatory testimony is relevant.  For instance, in <u>United States v. Gustafson</u>, 728 F.2d 1078 (8th Cir. 1984), a prosecution for making false entries in bank records, defendants challenged the admission of a letter from a bank examiner to the bank's board of directors.  The letter tended to show that the defendants had knowledge that suspicious "floating" activity involving a misapplication of funds by bank examiners had occurred at the bank.  The Court of Appeals affirmed, concluding that the letter was relevant to rebut the defendants' claim (identical to that presented by Forbes here) that they had innocently relied on subordinates to handle such day-to-day transactions.  728 F.2d at 1083.  <u>See</u> <u>also</u> <u>United States v. </u>

---

[4](...continued)

without the evidence."  Fed. R. Evid. 401.  Evidence is relevant if it merely "alters the probabilities" of the existence of a consequential fact, and need not make the proposition more probable than not.  <u>Weinstein's Federal Evidence</u> ("<u>Weinstein</u>") § 401.04[2][b] (2d ed., 2006); <u>see</u> <u>United States v. Schultz</u>, 333 F.3d 393, 415 (2d Cir. 2003); <u>United States v. Schneider</u>, 111 F.3d 197, 202 (1st Cir. 1997).  This is a lenient standard. Weinstein, § 401.04[2][c].  "The evidence need only alter the probabilities of a proposition; it need not sway the balance to any particular degree."  <u>Id.</u> at § 401.04[2][c][ii]; <u>see</u> <u>Doe v. New York City Dep't of Social Servs.</u>, 649 F.2d 134, 147 (2d Cir. 1981).

13

Wenger, 427 F.3d 840, 855 (10th Cir. 2005) (in a prosecution for securities fraud, evidence of the defendant's previous acts of the same kind of securities fraud was properly admitted to rebut his defense of good-faith reliance on counsel and his claim that he had disclosed all relevant facts to his lawyer; the probative value of the evidence outweighed its potential for undue prejudice).[5]

The Government did not call Dresch or Freimour as witnesses during the first or second trials, or offer Dresch's memorandum into evidence.  Nevertheless, this Court should not at this stage of the proceedings preclude the Government from presenting any evidence, cross-examination, or argument regarding the expense report.  At the very least, Dresch's memorandum provides the Government with a good-faith basis to cross-examine Forbes about Freimour's allegations if Forbes takes the stand and again denies any knowledge of the decision to improperly charge his 1995 and 1996 travel expenses to the Cendant Merger Reserve.

---

[5]  See also United States v. Murillo, 255 F.3d 1169, 1175 (9th Cir. 2001) (in a prosecution for drug-trafficking, evidence of defendant's suspicious history of numerous car rentals was relevant to rebut his defense that he was driving a long distance in a short time period to pick up his mother); Bertolotti v. Dugger, 883 F.2d 1503, 1528 (11th Cir. 1989) (in a prosecution for felony-murder, evidence about the murder victim's fearfulness of answering her door when strangers knocked was relevant to rebut the defendant's claim that he had been invited into the victim's home).

14

To be sure, Forbes' loyal lieutenant and co-defendant Kirk
Shelton testified at the first trial that Forbes was not involved
in the decision to charge the plane expenses to the Cendant
Merger Reserve.  FTTr. 12314-24.  The jury, however, would not be
obligated to credit that testimony if it was presented during the
third trial.  <u>United States v. Baptiste</u>, 264 F.3d 578, 589 (5th
Cir. 2001) (jury was entitled to discredit all defense
evidence).[6]  Nor is the Government precluded from presenting
relevant evidence merely because it might be contradicted by
other evidence in the case.  Resolution of conflicting accounts
is for the jury, and not a basis to exclude relevant evidence.
<u>See</u> <u>United States v. McBride</u>, 786 F.2d 45, 51 (2d Cir. 1986).

Judge Thompson excluded this evidence under Rule 403
because the Government had offered the evidence only to prove
Shelton's involvement in the fraudulent accounting for Forbes'
airplane expenses.  Judge Thompson concluded that the jury might
be confused by the fact that Forbes' signature appears on GX 158,
and mistakenly believe that the document was relevant to prove

---

[6]  Indeed, Shelton vociferously denied any involvement in
the charged fraud during his first trial testimony, but the jury
convicted him.  At the conclusion of the Shelton sentencing
hearing, Judge Thompson made detailed factual findings and
concluded that Shelton had repeatedly committed perjury during
the first trial, thereby warranting an enhanced sentence for
obstruction of justice pursuant to U.S.S.G. § 3C1.1.  Transcript
of Shelton Sentencing Hearing, July 26, 2005, 490-506.  Judge
Thompson expressly declined to make a finding about whether
Shelton's testimony about his conversations with Forbes about
Forbes' business travel expenses was perjured.  <u>Id.</u> at 494-95.

15

Forbes' involvement in the decision to charge his plane expenses
to the Cendant Merger Reserve.  Docket 1965 at 1-2.  Now that the
Government seeks to admit the evidence to prove Forbes' knowledge
of the fraud, the possible confusion identified by Judge Thompson
as the sole basis to exclude the evidence under Rule 403 is
removed.

Forbes points out that the Government has previously
represented during the sentencing hearing for Forbes' co-
defendant, Kirk Shelton, that Forbes was not involved in the
decision to charge his plane expenses to the Cendant merger
reserves.  FM 2-3.  That representation was a reasonable
interpretation of the record evidence in this case at that time.
However, the prosecutors in the case have changed since then.  In
reviewing the record evidence in light of the Dresch memorandum,
the present prosecutors have not concluded that Forbes had no
role in the fraudulent accounting for his airplane expenses.  Cf.
Henry v. United States, 361 U.S. 98, 105-05 (1959) (Clark, J.,
joined by Warren, C.J., dissenting) ("While the Government,
unnecessarily it seems to me, conceded that the arrest was made
at the time the car was stopped, this Court is not bound by the
Government's mistakes"); United States v. Zukowski, 851 F.2d 174,
179 (7th Cir. 1988) ("The district court . . . did not believe
that the government should be bound by the mistaken statements of
its attorney and the court in Florida."); Alexander v. United

States, (5th Cir. 1968) (accepting "Justice Clark's proposition in his dissent in Henry" that "'this Court is not bound by the Government's mistakes'").

## II. FORBES HAS FAILED TO SUSTAIN HIS BURDEN OF ESTABLISHING THAT PHOTOCOPIES OF GX 158 AND GX 388 ARE NOT ACCURATE DUPLICATES OF THE ORIGINAL EXPENSE REPORT SIGNED BY FORBES.

Forbes next argues that Government Exhibits ("GX") 158 and 388 should be excluded from evidence because the Government has failed to demonstrate that those exhibits are accurate copies of the original documents. As Forbes points out, FM 10, n.2, Judge Thompson previously rejected these same authenticity challenges to those exhibits when they were raised by Forbes during the first trial. Forbes has neither demonstrated cause for this Court to reconsider Judge Thompson's prior ruling on this matter, see Sequa Corp. v. GBJ Corp., 156 F.3d 136, 144 (2d Cir. 1998), nor shown that this Court should depart from the law of the case, see United States v. Uccio, 940 F.2d 753, 758 (2d Cir. 1991).

Even were this Court to reconsider Judge Thompson's ruling that GX 158 and GX 388 survive an authenticity challenge, it should reject that challenge. Fed. R. Evid. 1003 provides that:

> A duplicate is admissible to the same extent as an
> original unless (a) a genuine question is raised as to
> the authenticity of the original or (2) in the
> circumstances it would be unfair to admit the duplicate
> in lieu of the original.

Under the rule, a "duplicate" should be admitted into evidence and treated for all purposes as if it were an original

17

if the authenticity of the original is not seriously questioned, and admission of the duplicate would not be unfair.[7]  The party opposing admission of the duplicate bears the burden of establishing a genuine and substantial question about the authenticity of the original.  <u>United States v. Bakhtiar</u>, 994 F.2d 970, 979 (2d Cir. 1993) (affirming admission of duplicates of counterfeit bank checks, where the defendants raised "no serious questions" regarding authenticity or fairness, and the duplicates were clear photographs and photocopies of the checks and were authenticated at trial); <u>United States v. Chang An-Lo</u>, 851 F.2d 547, 557 (2d Cir. 1988) (duplicate hotel telephone logs were properly admitted as originals because defendant failed to raise a genuine issue of their authenticity); <u>see</u> <u>Moretti v. C.I.R.</u>, 77 F.3d 637, 645 (2d Cir. 1996) (Tax Court abused its discretion by refusing to admit a xerox photocopy of a sales agreement, in violation of Tax Court Rule analogue to Rule 1003).  A genuine challenge to the authenticity of the original must be established by evidence, not mere speculation.  <u>Chang An-Lo</u>, 851

---

[7]  Forbes effectively concedes that both GX 388 and GX 158 are "duplicates" of the original documents as that term is defined by Fed. R. Evid. 1001(4) (defining a duplicate as a "counterpart produced by the same impression as the original . . . or by other equivalent techniques which accurately reproduces the original.") <u>See</u> <u>United States v. Wagoner</u>, 713 F.2d 1371, 1377 (8th Cir. 1983) (photocopies of documents are "duplicates" for purposes of Rule 1001(4)).

F.2d at 557; <u>United States v. Mulinelli-Navas</u>, 111 F.3d 983, 989-90 (1st Cir. 1997).

Forbes has failed to present such a genuine challenge here. During the initial trial, witnesses with knowledge testified that GX 388 was an accurate copy of Forbes' expense report that was signed by Forbes, and which bore Kirk Shelton's hand-written instruction to charge Forbes' travel expenses to the Cendant merger reserve. FTTr. 10036-40 (testimony of Anthony Menchaca); FTTr. 10481-82 (testimony of John Oller regarding Shelton's admission that he signed GX 388). Likewise, witnesses with knowledge testified that GX 158 was an accurate copy of Forbes' signed expense report with two Post-It notes affixed to it. Steven Speaks testified that he was the person who wrote the Post-It note that was addressed to "Nancy" and signed, "Steve." FTTr. 851-65. He further testified that the other Post-It note, addressed to "Steve" and signed, "Anne," was written by Anne Pember. <u>Id.</u> Pember confirmed Speaks' testimony that she and Speaks authored the two Post-It notes that appear on GX 158. FTTr. 2623-25. Finally, Corigliano testified that GX 158 was an accurate copy of the version of the expense report that he had seen. FTTr. 7376-77, 9590-92. This testimony was more than sufficient to demonstrate the authenticity of both GX 388 and GX 158, and justify their admission. <u>Chang An-Lo</u>, 851 F.2d at 557 (deputy manager of the hotel was qualified to authenticate copies

19

of the hotel's telephone logs, even though he did not compare the
duplicate with the original, where he recognized the names of
hotel employees that appeared on the copies, the room numbers,
and the printed format of the logs).

During his protracted testimony in the first trial, Shelton
never denied that he personally wrote "charge to merger reserve"
on the expense report, copies of which were admitted as GX 388
(as a copy of the report without Post-It notes attached to it),
and GX 158 (as a copy of the same report with two Post-It notes
attached).  Nor did Shelton otherwise challenge the authenticity
of the original expense report.  Likewise, during his protracted
testimony in the first trial, Forbes never denied that he
personally signed the expense report, or otherwise challenged the
authenticity of the original report.  Nor does Forbes, in his
current motion, claim that he or anyone else has personal
knowledge that the original expense report is not authentic.  For
that reason, Forbes' contention that the originals of GX 158 and
GX 388 might reveal that the handwriting on different versions of
the document "was written in different ink," FM 10, is of no
moment: the relevant handwriting on the document is that of
Shelton and Forbes, and both have admitted that what purports to
be their handwriting is in fact their handwriting, regardless of
what color ink appears on the originals.

20

Forbes' other complaint, that without the originals of GX 158 and GX 388, one cannot determine whether other documents were ever attached to those exhibits, is also a red herring.  The missing attachments, according to the notation identified by Forbes, provide support for the statement on GX 158 and GX 388 that the voucher seeks reimbursement for the "balance due to plane hrs for CUC business."  Forbes himself has testified that the challenged exhibits, which are form documents titled "CUC International Employee Expense Report," were submitted and signed by him in order to obtain reimbursement for money that he paid out of his own pocket for airplane travel undertaken for the business of CUC.  FTTr. 14245-58.  Thus, the attachments would merely support an uncontested matter in this case.  The exhibits are being offered to prove something else entirely: that Forbes, Shelton and Corigliano each decided to charge Forbes' airplane expenses for CUC business that had nothing to do with the Cendant merger to the Cendant merger reserve.  On that point, the missing attachments evidently say nothing.

In any event, the fact that a document does not purport to contain all relevant information on a subject does not make it inadmissible, much less something other than what it purports to be.  The missing attachments are not needed for the jury to understand the import of the travel voucher: that Shelton authorized the improper payment of Forbes' non-merger related

21

travel expenses out of the Cendant merger reserve and that Forbes himself intended that outcome.  See United States v. Panza, 750 F.2d 1141, 1151 (2d Cir. 1984) (district court properly overruled objections to admission of documents as business records on the ground that a few documents were missing; "minor incompleteness of the files went to the weight rather than to the admissibility of the evidence"); see also United States v. Schwartz, 464 F.2d 499, 511 (2d Cir. 1972); United States v. Re, 336 F.2d 306, 313 (2d Cir. 1964).[8]

Thus, Forbes has failed to raise a genuine issue, through the submission of admissible evidence or otherwise, regarding the authenticity of the original expense report.  United States v. Patten, 826 F.2d 198, 199 (2d Cir. 1987).  Accordingly, the first prong of Rule 1003 has been satisfied.  United States v. DiMatteo, 716 F.2d 1361, 1368 (11th Cir. 1983) (copies of tapes were properly admitted where defendant failed to meet his burden

---

[8]  Accord United States v. Bland, 961 F.2d 123, 127 (9th Cir. 1992) (document properly admitted as a business record even though "it contained erasures [and] was incomplete"); United States v. Foster, 711 F.2d 871, 882 (9th Cir. 1983) (district court properly admitted documents purporting to be drug ledgers, even though the ledgers did not record every drug transaction, and contained blank pages and unrelated entries); United States v. Hathaway, 798 F.2d 902, 907 (6th Cir. 1986) (incompleteness of business records does not preclude their admission into evidence; "it is an argument which best goes to the weight to be given that evidence"); Matador Drilling Co., Inc. v. Post, 662 F.2d 1190, 1199 (5th Cir. 1981) (the defendant's "general complaint that the reports are incomplete and inaccurate are matters going to the weight of this evidence and not its admissibility").

under Rule 1003 of raising a genuine issue as to authenticity),
vacated on other grounds, 469 U.S. 1101 (1985).

Nor has Forbes raised a genuine issue that either GX 388 or
GX 158 is an inaccurate copy of the original expense report.
Modern methods for the reproduction of documents, such as the
photocopying used to create GX 388 and GX 158, supports the
admission of duplicates.  See United States v. Enstam, 622 F.2d
857, 866 (5th Cir. 1980).  Forbes has failed to show that either
GX 388 or GX 158 is an inaccurate reproduction of Forbes'
original expense report that he personally signed, and on which
Shelton wrote "charge to the merger reserve" (by showing, for
example, that the copy has been mutilated, erased, or is
illegible).  United States v. Feldhacker, 849 F.2d 293, 297 (8th
Cir. 1988) (affirming the admission of duplicate copies which the
district court concluded were "legible enough"); cf. Ruberto v.
C.I.R., 774 F.2d 61, 63 (2d Cir. 1985) (incomplete copies of
canceled checks were inadmissible, because the proponent could
not match the front and the back of the checks).  Neither Forbes
nor Shelton claimed during the first trial that either exhibit
was an inaccurate copy of the original expense report.  Thus,
Forbes has failed to show that admission of the copies of the
expense report will be "unfair."

Because an accurate copy is admissible to the same extent
and for the same purpose as an original pursuant to Rule 1003,

the Government need not satisfy the requirements of Fed. R. Evid.
1004 for the submission of "other evidence of contents" of an
original writing.  <u>United States v. Buck</u>, 1987 WL 19300, *9
(S.D.N.Y., Oct. 28, 1987) ("Rule 1004 does not apply to
'duplicates' . . . which are specifically addressed by Rule
1003."). This is because a "'duplicate original' under Rule 1003
[meets] the 'original writing' rule's requirements head on," and
therefore need not "qualify as secondary evidence of the
writing's contents under Rule 1004."  <u>In re Macmillan, Inc.</u>, 186
B.R. 35, 48 (Bankr. S.D.N.Y. 1995).[9]

---

[9]  In any event, Rule 1004 permits the use of "other
evidence of the contents of a writing" and dispenses with the
need for the original if any one of four conditions are
satisfied, including evidence that "all originals are lost or
have been destroyed, unless the proponent lost or destroyed them
in bad faith."  Fed. R. Evid. 1004(1).  In seeking the admission
of GX 388 and GX 158 in advance of the initial trial, the
Government proffered, and Forbes did not dispute, that the
Government had no involvement in the loss of the original expense
report, which was never in the Government's possession, and that
Government's investigators and former CUC officials have
conducted a reasonable but unsuccessful search for the original.
<u>Burt Rigid Box, Inc. v. Travelers Property Cas. Corp.</u>, 302 F.3d
83, 91 (2d Cir. 2002) (affirming the district court's admission
of secondary evidence of the existence and terms of insurance
policies, where the insured made a diligent effort to locate the
policies).  Good faith destruction or loss of an original
document, by Government officials or others, satisfies the
requirement of Rule 1004(1) and paves the way for admission of
other evidence of the contents of the destroyed documents.
<u>United States v. Maxwell</u>, 383 F.2d 437, 442-43 (2d Cir. 1967)
(transcript of tape recording properly admitted where Government
did not destroy original recordings in bad faith); <u>United States
v. Balzano</u>, 687 F.2d 6, 7 (1st Cir. 1982) (duplicate tape
properly admitted where government knowingly erased the original,
but not in bad faith); <u>United States v. Capanelli</u>, 257 F.Supp.2d
                                                  (continued...)

24

Forbes contends that the authenticity of GX 388 and GX 158 is undermined by the fact that different Post-It notes were affixed to Forbes' expense report at different times.  FM 9. That fact hardly undermines the authenticity of the original or the accuracy of either GX 388 or GX 158.  The purpose and nature of Post-It notes is that they can be affixed to or removed from another document without altering the other document in any way. The Government presented GX 388 and GX 158 to demonstrate that Forbes submitted a request to be reimbursed for ordinary business expenses with the intent that the Cendant merger reserve be charged, and that his co-conspirators Corigliano and Shelton decided to improperly charge those ordinary business expenses to that reserve.  The Post-It notes do not undermine the fact that Forbes' signature is on the expense report.

Notwithstanding his burden, Forbes has proffered no sufficient reason to believe that the original expense report was not authentic, the proffered copies are inaccurate, or that the Government has attempted to commit a fraud on the court by

---

[9](...continued)
678, 681 (S.D.N.Y. 2003) (rejecting defense request to exclude voice recordings after the Government destroyed the original, digital chip recordings, because "the recordings produced from [the chips] are duplicates and admissible under the protocol established by Rules 1001-1003"; problems arising from the "software-assisted reproduction of the recordings may be fully explored by a defense expert witness").  A fortiori, loss or destruction of the original expense report by someone other than a Government official satisfies the requirement of Fed. R. Evid. 1004(1).

altering the original or the copies.  United States v. Childs, 5 F.3d 1328, 1334-35 (9th Cir. 1993) (admitting duplicates where opponent proffered no evidence of alteration of the original or duplicate records).  Accordingly, this Court should admit into evidence GX 388 and GX 158 as accurate duplicates of Forbes' expense report pursuant to Rule 1003.

**CONCLUSION**

The Government respectfully requests that the Court deny Forbes' Third Trial In Limine No. 22.

Respectfully submitted,

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice

*Norman Gross/s*

NORMAN GROSS
Federal Bar Number 24933
MICHAEL MARTINEZ
Federal Bar Number PHV0423
MARK E. COYNE
Federal Bar Number PHV01079
Special Attorneys
U.S. Department of Justice
970 Broad Street
Room 700
Newark, N.J.  07102
(973) 645-2701

Newark, New Jersey
Date: May 24, 2006

EXHIBIT A

(DOCKET 1965, JUDGE THOMPSON'S RULING ON FORBES' RETRIAL MOTION
<u>IN</u> <u>LIMINE</u> NO. 2)

**EXHIBIT B**

**(JUNE 29, 1998 MEMORANDUM TO FILE, FROM CHRISTINA A. DRESCH,
ARTHUR ANDERSEN, RE: HFS MERGER RESERVE, CHECK # 189279)**

## CERTIFICATE OF SERVICE

    The undersigned certifies that on this day I caused to be served a copy of the Government's Opposition to Defendant Walter A. Forbes' Motion to Preclude the Government from Presenting Evidence, Cross-examination, or Argument Concerning the Charging of Mr. Forbes' Airplane Expenses to the Cendant Merger Reserve (Opposition to Forbes Third Trial Motion *in Limine* No. 22) via email on:

Barry S. Simon, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005-5901
(202) 434-5005
bsimon@wc.com


*Norman Gross/s*

NORMAN GROSS


Dated: May 24, 2006
      Camden, New Jersey