UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:02CR00264 (AHN) |
| | : | |
| | : | |
| | : | |
| v. | : | May 25, 2006 |
| | : | |
| | : | |
| | : | |
| WALTER A. FORBES | : | |

MEMORANDUM OF THE UNITED STATES IN OPPOSITION TO DEFENDANT WALTER
A. FORBES' MOTION FOR LEAVE TO CROSS-EXAMINE COSMO CORIGLIANO
CONCERNING (1) SEC REQUESTS PURSUANT TO MR. CORIGLIANO'S PLEA
AGREEMENT,(2) MR. CORIGLIANO'S EFFORTS TO REACH A SETTLEMENT WITH
THE SEC, AND (3) COMMUNICATIONS BETWEEN MR. CORIGLIANO'S COUNSEL
AND THE SEC, AND TO INTRODUCE DOCUMENTS REFLECTING COMMUNICATIONS
BETWEEN MR. CORIGLIANO'S COUNSEL AND THE SEC INTO EVIDENCE

(Opposition to Forbes Third Trial Motion In Limine No. 4)

CHRISTOPHER J. CHRISTIE
NORMAN GROSS
MICHAEL MARTINEZ
MARK E. COYNE
Special Attorneys
U.S. Department of Justice
970 Broad Street, Room 700
Newark, New Jersey 07102
Tel: (973) 645-2700
Fax: (973) 645-2857

## **TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . .  1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . .  3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . .  8

I.   This Court Has Broad Discretion to Limit Cross-
     Examination . . . . . . . . . . . . . . . . . . . . .  8

II.  This Court Should Prohibit Cumulative and Misleading
     Cross-Examination Whose Primary, If Not Exclusive,
     Purpose Is to Impeach Corigliano on Collateral Matters .  11

     A.   The Proposed Cross-Examination Is Not Necessary to
          Demonstrate Corigliano's Alleged Bias and Motive
          to Lie . . . . . . . . . . . . . . . . . . . . . . .  14

     B.   The Proposed Cross-Examination Is Not Proper
          Impeachment by Contradiction . . . . . . . . . . .  17

     C.   "Opening the Door" Does Not Justify Otherwise
          Impermissible Cross-Examination That Will Result
          in Time-Consuming Mini-Trials . . . . . . . . . .  23

III. This Court Should Prohibit Cross-Examination for Which
     There Is No Good Faith Basis . . . . . . . . . . . . .  25

IV.  Forbes Should Not Be Permitted To Impeach Corigliano
     with Documents Not Authored by Him . . . . . . . . . .  30

V.   Much of Forbes' Proposed Cross-Examination Would Be
     Barred by the Attorney-Client Privilege . . . . . . .  33

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . .  35

## INTRODUCTION

In papers that are long on mischaracterizations of the facts and short on the law, defendant Forbes asks this Court to give him carte blanche to cross-examine Cosmo Corigliano about certain financial information requested by the Securities and Exchange Commission ("SEC"), his settlement negotiations with the SEC, and his counsel's communications with the SEC.  Forbes also seeks carte blanche to introduce 18 documents concerning communications between Corigliano's counsel and the SEC in the course of the settlement negotiations.[1]

Although Forbes acknowledges that Judge Thompson precluded cross-examination on these subjects at the second trial, FM 8, 9-10, 13, 14,[2] he fails to acknowledge the basis for Judge Thompson's rulings:

- the proposed cross-examination was unnecessarily cumulative, concerned collateral or tangential matters, and would cause a distracting trial-within-a-trial;

- Forbes's counsel lacked a good faith basis to pursue much of the proposed cross-examination;

- Corigliano could not be impeached with statements neither made nor adopted by him; and

---

[1] These 18 documents are appended to Docket 2000, which also included two other documents that, unlike the first 18, summarize certain communications between Corigliano's counsel and members of the prosecution team in this case.  These latter two documents appear to be the subject of different motions by Forbes.  Thus, the Government will not address their admissibility here.

[2] Citations to "FM" and "Ex." are to Forbes' memorandum in support of, and the exhibits appended to, his motion.  Citations to "FTTr." and "STTr." are to the transcripts of the first and second trials.

- much of the proposed cross-examination and discovery demands related to it intruded upon matters protected by the attorney-client privilege.

There is no basis to reconsider Judge Thompson's rulings at this juncture, which have become law of the case. When "a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case." United States v. Uccio, 940 F.2d 753, 758 (2d Cir. 1991); see United States v. Crowley, 318 F.3d 401, 420 (2d Cir. 2003). "[A]bsent cogent or compelling reasons to deviate," such as "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice," a court should adhere to its prior rulings. United States v. Tenzer, 213 F.3d 34, 39 (2d Cir. 2000) (internal quotation marks omitted). Thus, "[u]nder the law of the case doctrine, courts are understandably reluctant to reopen a ruling once made, especially when one judge or court is asked to consider the ruling of a different judge or court." Lillbask v. Connecticut Dept. of Educ., 397 F.3d 77, 94 (2d Cir. 2005) (internal quotation marks omitted).[3]

---

[3] Similarly, a reconsideration motion will be denied unless the "moving party can point to controlling decisions or data that the court overlooked." Sequa Corp. v. GBJ Corp., 156 F.3d 136, 144 (2d Cir. 1998); see LoSacco v. City of Middletown, 822 F. Supp. 870, 876-77 (D. Conn. 1993) ("the function of a motion for reconsideration is to present the court with an opportunity to correct manifest errors of law or fact or to consider newly discovered evidence") (internal quotation marks omitted), aff'd, 33 F.3d 50 (2d Cir. 1994).

Criminal defendants such as Forbes are not entitled to "'cross-examination that is effective in whatever way, and to whatever extent, the defense might wish,' but rather 'an <u>opportunity</u> for effective cross-examination.'"  <u>United States v. Laljie</u>, 184 F.3d 180, 192-93 (2d Cir. 1999) (quoting <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 679 (1986) (internal quotation marks omitted)).  Far from having an insufficient opportunity to confront Corigliano at the second trial, Forbes' cross-examination spanned more than 750 pages of transcript over five days.  <u>See</u>, <u>e.g.</u>, <u>United States v. Mobley</u>, 462 F.2d 69, 71 (2d Cir. 1972) (per curiam) ("the trial judge did no more than keep the cross-examination within reasonable bounds" where defendants "had ample opportunity fully to attack and impeach [the witness's] credibility and to expose his motivations to testify falsely in aid of the Government's case" and "[t]he areas which [defendants] were not allowed to explore were largely cumulative or of dubious relevancy").  If anything, Judge Thompson erred by permitting Forbes to engage in repetitive cross-examination.  Forbes' present motion should be denied.

<u>BACKGROUND</u>

The premise of Forbes' present motion is his claim -- repeated in several other motions presently pending before this Court, <u>e.g.</u>, Docket 2164, 2186, 2189, 2190, and rejected many times previously by Judge Thompson -- that Corigliano lied in prior trials about his dealings with the SEC, and breached his

plea agreement because of his dealings with the SEC.  In the
latest incarnation of these claims, Forbes contends that Corigli-
ano:

- lied when he testified that he was "always willing to
  give back" to the SEC the net proceeds of his stock
  sales, less taxes;
- lied when he testified as to his understanding of why
  it took approximately four years to resolve the SEC's
  civil suit against him;
- failed to provide information requested by the SEC and,
  through his counsel, provided purportedly misleading or
  incomplete information to the SEC;
- permitted his counsel to misrepresent to the SEC that
  his parents -- whom he supported financially -- were
  "aged and infirm."

FM 5-14.  Forbes also claims the prosecution "withheld informa-
tion from the jury," allowing "Corigliano to create the false
impression that" he "has fully complied with his obligations
under the plea agreement and he eagerly sought to return his ill-
gotten gains to the SEC after January 2000."  FM 5-6.

As more fully briefed for the most part many times before by
the Government and Corigliano, most recently on April 17, 2006,
these claims are baseless.  See Docket 2268, Point IV.C (Govern-
ment), Docket 2278, Points I, III.C, IV, V.A-E (Corigliano);
Docket 2332, Point II.A (Government).  First, that Corigliano's
counsel tried to negotiate a favorable settlement with the SEC
hardly contradicts Corigliano's testimony that he was always
willing to pay to the SEC his net proceeds from his 1998 sales of
CUC/Cendant stock.  Corigliano ultimately disgorged those pro-

ceeds, and his plea agreement did not prevent his counsel from trying to negotiate a lower amount.  Docket 2332, Point II.A.4.[4]

Second, that Corigliano's counsel "raised a host of objections to the SEC's settlement demand that went far beyond the issue of taxes paid on Corigliano's stock sales," FM 9, does not mean that he lied when testifying that he believed the tax issue was the principal impediment to a settlement.  In the very May 16, 2000 letter that Forbes cites in his brief, Corigliano's counsel noted that it would be "extremely misleading" and unfair to calculate a disgorgement figure without taking into consideration "the cost of option exercises and the payment of many millions of dollars of taxes" by Corigliano.  Ex. 3 at 2.  The Wells submission from Corigliano's counsel likewise argued that "in determining an overall remedy," the SEC should consider "an offset for taxes paid on" the proceeds of Corigliano's sales of Cendant stock.  Ex. 2 at 19; see id. at 23-25 (explaining why the SEC "Should Offset Taxes Paid by Corigliano On Profits Received from Stock Sales").  Besides, even Forbes concedes that Corigliano may have been merely mistaken in this regard.  FM 9.

Third, although Forbes persists in alleging that Corigliano "defied SEC requests for financial disclosure and provided false and misleading information the SEC," FM 10, neither the SEC nor

---

[4] The Government has already addressed Forbes' baseless contention that it did not satisfy its disclosure obligations with respect to the documents appended to the present motion. Docket 2332, Points I, II.A.1, II.A.2.a.

Judge Thompson agreed with this mischaracterization of the
record.  Docket 2268, Point IV.C, and 2332, Point II.A (Govern-
ment); Docket 2278, Points I, III.C, IV, V.A-E (Corigliano).  As
Judge Thompson noted during the second trial, two SEC officials
had testified that Corigliano had not misled the SEC:

> we did have Mr. Kidney's testimony, we had Mr. Froh-
> lich's testimony at the last trial, and I think the
> defense had quite an opportunity to probe and try to
> demonstrate that Corigliano had not been living up to
> his obligations under the -- his obligations to the
> SEC, I'll say, which he's required to live up to under
> the plea agreement.  I think everything that came out
> showed that the defense's contentions lacked merit.

STTr. 11/7/05 Tr. at 22; see FTTr. 13530 (testimony of James
Kidney), FTTr. 13602-13603 (testimony of David Frohlich).  In
fact, Kidney's and Frolich's testimony at the first trial was so
unhelpful to Forbes that he did not call them as witnesses at the
second trial.

Fourth, illustrating the pettiness of his proposed cross-
examination, Forbes questions representations made by Corigli-
ano's counsel, Kramer Levin, to the SEC in 2000 about Corigli-
ano's elderly parents.  FM 13-14.  According to Forbes, that
Corigliano's father had been working part-time for 3-4 years in
November 2005 for the princely sum of $10 an hour, STTr. 2159-
2160, necessarily means that Corigliano through his counsel lied
when Kramer Levin pleaded with the SEC in 2000 not to take all of
Corigliano's assets because he was supporting his parents,
mother-in-law, wife, and three young children.  This latest

6

scorched earth tactic takes "zealously defending the interests of its clients" and "creative legal arguments" to a new low. Williams & Connelly LLP, <u>Our Practice: Criminal Defense</u>, available at <u>http://wc.com/practice.cFM ?practice_id=34</u>.

When asked at trial on November 8, 2005 how long his father had "worked for the candle company," Corigliano testified "I think three or four years." STTr. 2159. That Corigliano's father began working part-time for $10 per hour in 2001 or 2002 does not contradict representations by Kramer Levin in mid-2000 that "[t]he only sources of income for Cosmo's parents are social security payments and support from Cosmo." Ex. 9, Revised Annualized Budget for the Corigliano Family at 2 n.3. Moreover, Kramer Levin's representations to the SEC on this issue made crystal clear that "elderly and infirm" referred to Corigliano's then-75-year-old mother, who had "suffered a stroke approximately five years ago and requires much medical attention," and his then-75-year-old mother-in-law, who "also has significant health problems." Ex. 2 at 18.

<u>Fifth</u>, notwithstanding Forbes' misrepresentation of the record, the Government has <u>not</u> "presented Corigliano to two juries as a reformed man." FM 2. In fact, Corigliano rejected defense efforts to goad him into claiming that he had undergone a moral transformation:

> Q.   And you now have undergone a transformation; is
> that right?

7

A.    Not a transformation.  I just realized that what I had been doing for a very long period of time was wrong and I'm now accepting responsibility for that.

Q.    I see.  So the old Cosmo, the lying Cosmo lives no more, right?  Is that right?

A.    I lied in the past with respect to my employment at CUC inflating the operating earnings.  I don't do that anymore.

Q.    The old Cosmo is dead, right?  Long live the new Cosmo, right?

A.    I'm the same person.  I've lied in the past.

Q.    You're the same person, though, right?  Right? That's not a hard question.  You're the same person, right?

A.    I have the same morals and the same values.

Q.    But you're the new Cosmo, right?

A.    I don't know what you mean by that.

Q.    The new Cosmo, the Cosmo who doesn't lie, right?

A.    I'm telling the truth now.

Q.    Because you've undergone a transformation, right? Am I correct?

A.    I'm telling the truth now.

FTTr. 8182-8183.

## **ARGUMENT**

## I.    **This Court Has Broad Discretion to Limit Cross-Examination.**

In resolving Forbes' latest effort to prolong cross-examination beyond all reasonable bounds, this Court should "begin with bedrock":

> The right to cross-examine adverse witnesses in crimi-
> nal cases is constitutionally protected, and courts
> historically have given criminal defendants consider-
> able latitude in pursuing that right. Nevertheless,
> cross-examination is not a freestyle exercise, but,
> rather, must be conducted within reasonable limits.
> Suitable boundaries can and should be set by the trial
> judge.

8

United States v. Zaccaria, 240 F.3d 75, 80 (1st Cir. 2001); see
Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986).

Defendants -- even well-funded ones like Forbes -- "cannot
run roughshod, doing precisely as they please simply because
cross-examination is underway." Zaccaria, 240 F.3d at 80.  To
the contrary, "so long as a reasonably complete picture of the
witness' veracity, bias, and motivation is developed, the judge
enjoys power and discretion to set appropriate boundaries.
Indeed, the judge has a responsibility to do so." Id. (citations
omitted); see United States v. Scarpa, 913 F.2d 993, 1018 (2d
Cir. 1990) ("It is settled that the scope and extent of cross-
examination lies within the discretion of the trial judge.").

As the Second Circuit "repeatedly has emphasized," Crowley,
318 F.3d at 417, although "[t]he Confrontation Clause guarantees
the defendant in a criminal case the right to cross-examine the
witnesses against [him]," this "right is not illimitable,"
United States v. Laljie, 184 F.3d 180, 192-93 (2d Cir. 1999).
"What the Clause guarantees is 'not cross-examination that is
effective in whatever way, and to whatever extent, the defense
might wish,' but rather 'an opportunity for effective
cross-examination.'" Id. (quoting Van Arsdall, 475 U.S. at 679
(internal quotation marks omitted)).  Thus:

> trial judges retain wide latitude insofar as the Con-
> frontation Clause is concerned to impose reasonable
> limits on such cross-examination based on concerns
> about, among other things, harassment, prejudice,
> confusion of the issues, the witness' safety, or inter-

9

rogation that is repetitive or only marginally rele-
vant.

Van Arsdall, 475 U.S. at 679.

Indeed, the Federal Rules of Evidence expressly acknowledge
this Court's power and duty to set reasonable limits upon cross-
examination.  Rule 403 authorizes this Court to limit defense
cross-examination when the testimony to be elicited will unduly
confuse the jury, relative to the probative value of that testi-
mony.  See Crowley, 318 F.3d at 417; United States v. Flaharty,
295 F.3d 182, 190-91 (2d Cir. 2002).  Rule 611 provides further
authority to limit defense cross-examination regarding marginally
relevant issues.  United States v. Maldonado-Rivera, 922 F.2d
934, 955-56 (2d Cir. 1990).[5]  These "well-established rules of
evidence permit trial judges to exclude evidence if its probative
value is outweighed by certain other factors such as unfair
prejudice, confusion of the issues, or potential to mislead the
jury," because "the Constitution permits judges 'to exclude
evidence that is repetitive . . . , only marginally relevant or
poses an undue risk of harassment, prejudice, [or] confusion of

---

[5] Rule 611 provides in part that "[t]he court shall exercise
reasonable control over the mode and order of interrogating
witnesses and presenting evidence so as to (1) make the interro-
gation and presentation effective for the ascertainment of the
truth, (2) avoid needless consumption of time, and (3) protect
witnesses from harassment or undue embarrassment."  Fed. R. Evid.
611(a).  It further provides that "[c]ross-examination should be
limited to the subject matter of the direct examination and
matters affecting the credibility of the witness."  Fed. R. Evid.
611(b).

the issues.'"  Holmes v. South Carolina, 126 S. Ct. 1727, 1732

(2006) (quoting Crane v. Kentucky, 476 U.S. 683, 689-90 (1986)

(internal quotation marks omitted)).

This Court will not abuse its considerable discretion to

curtail cross-examination "[s]o long as the jury has before it

sufficient information to make a discriminating appraisal of the

witness's possible motives for testifying falsely in favor of the

government."  United Stated v. Concepcion, 983 F.2d 369, 391 (2d

Cir. 1992); accord United States v. Salameh, 152 F.3d 88, 131 (2d

Cir. 1998) (per curiam); see Laljie, 184 F.3d at 192 ("[c]ross-

examination is not improperly curtailed if the jury is in posses-

sion of facts sufficient to make a discriminating appraisal of

the particular witness's credibility").  When the trial court

otherwise permits extensive cross-examination of a prosecution

witness, as certainly occurred here during the first and second

trials, even otherwise "problematic" limitations on cross-exami-

nation are well within the court's broad discretion.  United

States v. Roldan-Zapata, 916 F.2d 795, 806 (2d Cir. 1990).

**II.  This Court Should Prohibit Cumulative and Misleading Cross-
     Examination Whose Primary, If Not Exclusive, Purpose Is to
     Impeach Corigliano on Collateral Matters.**

Reading Forbes' present motion, one would never suspect

that, far from being denied "an opportunity for effective

cross-examination," Van Arsdall, 475 U.S. at 679, Forbes if

anything abused that opportunity in the first and second trials.

During the first trial, Forbes' counsel subjected Corigliano to

11

more than <u>three days</u> of cross-examination, covering in consider-
able detail such topics as Corigliano's:

- substantial involvement in the charged fraud, during
  which he lied repeatedly to CUC's outside auditors,
  other CUC officials and employees, the investing pub-
  lic, and the SEC, FTTr. 7613-15, 7712-74, 7830-96,
  7903-17;

- false denials of complicity to the Cendant Board of
  Directors when the fraud was first publicly disclosed,
  FTTr. 7675-83, 7826-29;

- false denials of complicity when he first spoke to
  prosecutors and investigating agents in this case,
  FTTr. 7581-7611, 7617-70;

- sale of CUC and Cendant stock when the price had been
  inflated by the fraud, FTTr. 7775-80, 7898-7903;

- efforts to obtain a reduced sentence in exchange for
  his cooperation with the prosecution, FTTr. 7921-68;
  and

- additional "benefits" to Corigliano supposedly attrib-
  utable to his cooperation, including his resolution of
  the civil charges brought against him by the SEC, FTTr.
  7970-96, 8037-57, 8071-80, 8089-8115, 8152-78.

During the retrial, the Government pared down its case
considerably. Not only did the Government retry Forbes on just
four counts instead of sixteen, but also the Government's direct
and re-direct examination of Corigliano at the second trial
lasted roughly one day. STTr. 1259-1433, 1450-1501, 2307-2347.
Nonetheless, despite representing to the Government that "there
would be no more than 2 days of cross," STTr. 1871, and a repre-
sentation during the first trial about wanting to pursue "a
focused and proper cross-examination," FTTr. 8130, Forbes'
counsel cross-examined Corigliano for <u>four days</u>. STTr. 1503-
2303; <u>see</u> STTr. 2347-2363 (re-cross). In addition to covering

the same ground he did in the first trial, Forbes' counsel spent
considerable time exploring purported inconsistencies between
Corigliano's testimony during the first and second trials.  STTr.
2181-2276.  All told, Forbes' cross and re-cross examination of
Corigliano at the second trial filled more than 750 pages of
transcript.

Thus, during both trials, Forbes had ample opportunity to
cross-examine Corigliano about matters affecting his credibility
and his supposed motive to falsely implicate Forbes.  In the face
of this onslaught, which counsel no doubt will repeat during the
third trial,[6] Forbes cannot credibly contend that the additional
cross-examination he wishes to pursue is necessary to ensure his
rights under the Confrontation Clause.  United States v. Mobley,
462 F.2d 69, 71 (2d Cir. 1972) (per curiam) (rejecting defen-
dants' claim "that the trial court committed reversible error in
limiting their cross-examination of" key witness where "[t]he

_____

[6] Of course, "[i]n a long trial, marked by repetitive
cross-examination by the defense, the court ha[s] the discretion
to impose reasonable time limits on the examination of the
witnesses."  United States v. Rutgard, 116 F.3d 1270, 1279 (9th
Cir. 1997); see United States v. Vest, 116 F.3d 1179, 1187 (7th
Cir. 1997) (defendant "had the 'reasonable chance' to pursue
matters covered on direct that the Confrontation Clause protects"
where the "District Court's time limits were reasonably anchored
to the defendant's own requests for time and to the amount of
time the Government used on direct" and the "District Court's
willingness to bend the time limits shows flexibility and its
decision to end cross-examination only after concluding that
[defense] counsel was wasting time with repetitive questions
shows the particularized judgment necessary for limiting
cross-examination") (citation omitted).

cross-examination and the evidentiary discussions incidental to it, covered more than two full court days and filled considerably more than 300 pages of transcript").[7]  Quite the contrary: permitting cross-examination into the additional areas Forbes wishes to pursue would be like carrying coals to Newcastle.  See, e.g., Laljie, 184 F.3d at 192 ("[c]ross-examination is not improperly curtailed if the jury is in possession of facts sufficient to make a discriminating appraisal of the particular witness's credibility").

### A. The Proposed Cross-Examination Is Not Necessary to Demonstrate Corigliano's Alleged Bias and Motive to Lie.

The cross-examination that Forbes seeks is hardly necessary to demonstrate Corigliano's alleged bias and motive to lie. Forbes is not entitled to bring all conceivably relevant information to bear on these issues.  Judge Thompson appropriately drew the line at Forbes' efforts to use the correspondence between

---

[7] See United States v. Dischner, 974 F.2d 1502, 1514 (9th Cir. 1992) ("the district court did not improperly restrict cross-examination" where "the defense cross-examined Brower for three days, providing the jury with ample opportunity to judge Brower's possible biases and motivations"); United States v. Pedraza, 27 F.3d 1515, 1529 (10th Cir. 1994) ("restriction of [defendants'] cross-examinations of Seek did not violate their Sixth Amendment rights to confrontation" because "the record reflects that [defendants] exhaustively cross-examined Seek for three days"); McKenna v. United States, 232 F.2d 431, 437-38 (8th Cir. 1956) (rejecting claim that defendant was "denied a fair trial" where trial court curtailed cross-examination of a witness after the witness "had been under cross-examination for two or three days"; "the cross-examination was exhaustive and time-consuming").

Corigliano's lawyers and the SEC.  See, e.g., United States v.
Weiss, 930 F.2d 185, 198 (2d Cir. 1991) (excluding cumulative
extrinsic evidence of the bias of a prosecution witness who had
already admitted the principal sources of his bias); United
States v. Gomes, 177 F.3d 76, 81 (1st Cir. 1999) ("the trial
judge had discretion to exclude such an excursion into extrinsic
evidence [about a witness's alleged bias] that would distract the
jury from the main issues in this case").

As Judge Thompson explained, Forbes' proposed impeachment
would result in

> a real detour in terms of all of the negotiations
> between Corigliano's counsel and the SEC.  I mean, you
> can take 57 steps that led to the signing of the [SEC]
> settlement agreement and the budget agreement and you
> can break each one down, each point that was negotiated
> and say it's a separate benefit.  I think that's mis-
> leading to the jury.

STTr. 11/7/05 at 46.

United States v. Lynn, 856 F.2d 430 (1st Cir. 1988) -- cited
by Forbes, FM  18-19 nn.17-18 -- is not to the contrary.  There,
although a cooperating witness's plea agreement required him to
successfully pass a lie detector test, the district court improp-
erly precluded "all cross-examination" that would have impeached
the witness "by implying before the jury that he had not 'suc-
cessfully completed' the test and therefore had reason to con-
tinue to please the government by lying."  Lynn, 856 F.2d at 432,
434.  As Judge Thompson noted in distinguishing Lynn, "it was an
established fact . . . that this person had taken the test and

15

the answers were inconclusive," so there was no "back and forth
and disagreement" about whether the witness had breached his plea
agreement in this regard.  STTr. 11/7/05 Tr. at 19.

Here in contrast, Judge Thompson found that, based upon the
testimony of SEC officials at the first trial, Forbes' conten-
tions that "Corigliano had not been living up to . . . his
obligations to the SEC" were shown to have "lacked merit."  Id.
at 22.  Moreover, unlike the prolonged cross-examination of
Corigliano during the first and second trials, in Lynn, "there
were relatively few questions concerning [the witness's] continu-
ing reasons to lie to please the government."  Lynn, 856 F.2d at
433.  Finally, Lynn confirms that "trial judges possess the
discretion to limit or even totally prohibit cross-examination
into certain areas" where, as happened in the first and second
trials in this case, "the jury is provided with sufficient
information concerning formative events to make a discriminating
appraisal' of a witness's motives and bias."  Id. (internal
quotation marks omitted).

Moreover, Forbes' claim that he merely wants to demonstrate
Corigliano's "motive to testify falsely," FM18, is a red herring.
For example, Forbes contends that he was precluded from eliciting
the fact that, after he pled guilty, Kramer Levin refunded to
Corigliano $1 million of the retainer he had paid them.  Accord-
ing to Forbes, this refund shows that Corigliano viewed the
retainer as his property, which in turn he failed to disclose to

16

the SEC, thereby breaching the agreement.  But Forbes learned
about the refund only because Judge Thompson, changing course
from the first trial, concluded that an exhibit to Corigliano's
SEC affidavit, which in turn listed the refund, should be dis-
closed for the limited purpose of establishing "bias" on the part
of (i.e., a benefit to) Corigliano.  STTr. 1441-1442; Docket 1927
at 6.[8]  Nonetheless, after receiving this ruling, Forbes decided
not to even attempt to elicit the fact of the refund during the
second trial.  This puts the lie to any claim that the refund was
relevant to Corigliano's "bias."[9]

> **B.    The Proposed Cross-Examination Is Not Proper
>         Impeachment by Contradiction.**

Nor is the cross-examination that Forbes seeks appropriate
to show impeachment by contradiction.  It is well-settled that
"[e]xtrinsic evidence offered for impeachment on a collateral

---

[8] During the first trial, the Government produced the affi-
davit and certain exhibits appended to it, but argued that this
particular exhibit should not be disclosed because Forbes wanted
to use it as a "fishing expedition" for challenging Corigliano's
credibility.  Docket 1250 at 2.  Judge Thompson agreed, and after
reviewing the exhibit in camera, denied Forbes' motion to compel.
Docket 1264, 1922; FTTr. 14550.

[9] The retainer-related benefit to Corigliano, such as it is,
lies in the dollar value of legal services he was allowed to con-
tinue to use in defending the SEC's enforcement action against
him.  The refund -- which Kramer Levin has represented was
disclosed in the assets Corigliano reported to the SEC, and later
disgorged to the Receiver -- is irrelevant to this issue.  It can
only be used for the improper purpose of misleadingly challenging
Corigliano's credibility on the collateral issue of whether he
reasonably believed the money he paid to his attorneys was no
longer his.

issue is properly excluded." United States v. Purdy, 144 F.3d
241, 245-46 (2d Cir. 1998); see United States v. Mulinelli-Navas,
111 F.3d 983, 989 (1st Cir. 1997); United States v. Payne, 102
F.3d 289, 294-95 (7th Cir. 1996). While courts have "broad
discretion" to admit extrinsic evidence if it contradicts a
witness's testimony on direct concerning a "specific fact" that
is "closely intertwined with the central issue of th[e] case,"
United States v. Benedetto, 571 F.2d 1246, 1250 (2d Cir. 1978),
"extrinsic evidence to impeach is only admissible for contradic-
tion where the prior testimony being contradicted was itself
material to the case at hand." United States v. Perez-Perez, 72
F.3d 224, 227 (1st Cir. 1995).[10]  Even where "extrinsic evidence"
is admissible "to impeach specific error or falsehoods in a
witness's direct testimony," it remains "subject to Rule 403
considerations." Benedetto, 571 F.2d at 1250 n.7.

---

[10] Although Benedetto suggests in dicta that courts may
"admit extrinsic evidence tending to contradict [a] specific
statement, even if such statement concerns a collateral matter,"
the "specific statement" there "was closely intertwined with the
central issue of th[e] case, namely whether [defendant] had
received money in connection with his official duties at certain
plants." 571 F.2d at 1250. The defendant "testified on direct
examination that he had never taken bribes from anybody." Id.
"The admission of contradictory evidence" that the defendant had
taken bribes on occasions other than those charged in the indict-
ment "was thus warranted" to "impeach [his] credibility." Id.
In any event, Benedetto was based upon "the totality of the
circumstances" of the case before it, id., as the Second Circuit
subsequently has emphasized, United States v. Colon, 880 F.2d
650, 661 (2d Cir. 1989).

18

Here, just as in <u>Perez-Perez</u>, the extrinsic evidence that Forbes is proffering is "not material to" his "guilt or innocence." <u>Id.</u>  Instead, as Forbes concedes, admitting this extrinsic evidence would help him to the extent that it undermines Corigliano's overall credibility, which in turn might cause the jury to question the veracity of other aspects of Corigliano's testimony.  FM 18-19.  This is the epitome of "collateral."  <u>See</u>, <u>e.g.</u>, <u>United States v. Olivo</u>, 80 F.3d 1466, 1470-71 (10th Cir. 1996) (district court properly excluded extrinsic evidence of state court arrest warrant offered to impeach witness).

Moreover, as already shown, Forbes has ample ammunition for challenging Corigliano's credibility without delving into the areas that are the subject of his present motion.  <u>See</u> <u>United States v. Perez</u>, 217 F.3d 323, 330-31 (5th Cir. 2000) (rejecting claim that curtailed cross-examination was "crucial in establishing that [the witness] had lied at either his deposition or at trial" because "[d]efense counsel had an ample opportunity to impeach [the witness's] credibility").  After all, Corigliano has pled guilty to serious crimes, has admitted that he lied repeatedly to perpetrate and conceal the fraud at CUC/Cendant, and has admitted that he has benefitted in certain respects through his decision to become a cooperating witness.  In contrast, whether the back-and-forth between Kramer Levin and the SEC contradicts Corigliano's testimony about his willingness to settle and the reason why settling took as long as it did, or casts doubt upon

19

Corigliano's candor during that process "is too remote or periph-
eral, vis-à-vis the issues in the case, to be admitted into
evidence." <u>Zaccaria</u>, 240 F.3d at 81.  Its "relevance to [defen-
dant's] guilt or innocence is so tenuous as to place it at the
margins of allowable cross-examination (and, therefore, within
the discretion of the presider to admit or exclude)." <u>Id.</u>

The cases cited by Forbes, FM 15-19, do not support his
claim that he is entitled to limitless cross-examination merely
to contradict Corigliano's testimony.  His principal case, <u>United</u>
<u>States v. Wallach</u>, 935 F.2d 445 (2d Cir. 1991), FM 16-19, in-
volved the reversal of "a conviction on the ground that the
prosecution should have known that a Government witness's trial
testimony was false." <u>United States v. Wallach</u>, 979 F.2d 912,
913 (2d Cir. 1992).[11]  As Judge Arterton has explained, the
witness in question:

> offered "the only testimony that directly linked the
> defendants with the admittedly illegal conduct" of a
> company, and the Government conceded that the witness
> had committed perjury at the trial when he testified
> that he had not gambled for a certain period of time,
> and that he had stopped gambling at the direction of
> the prosecutors because of a "moral transformation."

<u>United States v. Borkoski</u>, 154 F. Supp. 2d 262, 270 (D. Conn.

---

[11] The witness "violated a bankruptcy court order restrain-
ing" him from gambling and then lied while testifying against the
<u>Wallach</u> defendants "that he had not gambled after the summer of
1988, when he in fact gambled in the fall of that same year."
<u>United States v. Guariglia</u>, 962 F.2d 160, 161 (2d Cir. 1992).
After the <u>Wallach</u> trial, the witness was convicted of criminal
contempt of court and perjury.  <u>Guariglia</u>, 962 F.2d at 162.

2001) (quoting Wallach, 935 F.2d at 457).  Moreover, during the
Wallach trial, defense counsel "placed before the government and
the court powerful evidence that [the witness] was lying."  935
F.2d at 457.

Here, Judge Thompson rejected Forbes' claims that Corigliano
perjured himself during the first and second trials.  E.g.,
Docket 1839 at 5 ("on each of the repeated occasions when defen-
dant Forbes has raised it the court has concluded that he failed
to demonstrate that [Corigliano] gave perjured testimony";
"[c]ontinuously repeating the assertion does nothing to make it
meritorious").  Thus, as in Borkoski, there is nothing in
Corigliano's testimony that "rise[s] to the level of the deliber-
ate perjury found in Wallach."  154 F. Supp. 2d at 271; see
United States v. Milikowsky, 896 F. Supp. 1285, 1306 (D. Conn.)
(distinguishing Wallach because "the facts as adduced at trial --
and, indeed, the facts as presently known to the parties, whether
or not introduced into evidence -- do not necessarily lead to the
conclusion that DeBerry committed perjury on the stand during the
instant case"), aff'd, 65 F.3d 4 (2d Cir. 1995).[12]  Nor has the

_____

[12] Since Wallach, the Second Circuit has reaffirmed that
"[t]he importance of [evidence of alleged perjury] is, of course,
lessened when the perjury involves some collateral matter con-
cerning the witness, rather than testimony about facts relevant
to the merits of the case."  United States v. White, 972 F.2d 16,
20-21 (2d Cir. 1992); see United States v. Roman, No. 3:94-cr-112
(AHN), 1997 WL 695537, at *3 (D. Conn. 1997) (in assessing
whether allegedly perjured testimony unknown to prosecution
warrants new trial, court must:  (1) "determine whether the false
                                                    (continued...)

21

Government presented Corigliano as a man who had undergone any sort of "radical moral transformation," 935 F.2d at 458.  Indeed, Corigliano has denied that he has undergone such a transformation.  FTTr. 8182.

Furthermore, unlike <u>Wallach</u>, Forbes has not proffered "powerful evidence" contradicting Corigliano's testimony that he satisfied his obligation to negotiate in good faith with the SEC. Judge Thompson found just the opposite:

> what I see in front of me, is a situation where there's an agreement between the government, the U.S. Attorney's Office in New Jersey and Corigliano.  It incorporates an obligation to the SEC.  And the SEC, as I understand the testimony and everything I've seen from the SEC, has not said anything that really supports a conclusion that Corigliano is in breach of the plea agreement.
>
> U.S. Attorney's Office in New Jersey isn't persuaded, based on what I see and hear, that Corigliano has breached the plea agreement.  Corigliano has taken the position he's complied with the plea agreement.
>
> So we have a third party coming in where everybody who's involved in the agreement is saying, there is no breach, and wanting to now have a trial off to the side to show there was a breach.  And in order to show there was a breach, bring out in front of the jury a lot of things that otherwise would not come before the jury.

STTr. 11/7/05 at 19-20.

---

[12] (...continued)
testimony related to the merits of the case, or merely to tangential questions concerning misconduct by the witness"; (2) "determine whether the new information would have provided merely additional, cumulative, impeachment information"; and (3) "evaluate the existence of evidence independent of the witness's testimony establishing the defendant's guilt") (internal quotation marks omitted).

In the remaining cases cited by Forbes, FM 15 n.15, the prosecutors either had personal knowledge about the falsity of the testimony because it pertained to the witness's dealings with the prosecutor or the prosecutor's office, or the prosecutors otherwise knew and conceded that the testimony was false.  <u>See</u> <u>Napue v. Illinois</u>, 360 U.S. 264, 265 (1959) (former prosecutor filed petition stating that he had promised key prosecution witness consideration for his testimony, but the witness had falsely denied such a promise in his trial testimony); <u>United States v. Sanfilippo</u>, 564 F.2d 176, 177 (5th Cir. 1977) (prosecutor told defense counsel that the Government had agreed to drop charges against a key prosecution witness in exchange for his testimony, but the witness repeatedly denied such an agreement during his trial testimony).  That is not the case here.  <u>See generally</u> Docket 2268, Points IV.C & V.

**C.**  **"Opening the Door" Does Not Justify Otherwise Impermissible Cross-Examination That Will Result in Time-Consuming Mini-Trials.**

Forbes' "opened the door" theory is no basis for prolonging cross-examination with time-consuming and distracting mini-trials concerning, at best, marginally relevant matters.  It is one thing when a testifying <u>defendant</u> perjuriously offers a broad disclaimer of misconduct -- essentially denying that he engaged in the charged crimes or any conduct even remotely similar -- which if believed would exonerate the defendant from the charged crimes.  In such cases, prosecutors are rightly permitted to

23

impeach the perjurious testimony by contradiction.  See, e.g.,
Walder v. United States, 347 U.S. 62, 64 (1954) (defendant
charged with selling narcotics who testified that he had never
purchased, sold or possessed narcotics was properly impeached by
otherwise inadmissible evidence of his prior possession of
heroin).  It is an entirely different matter, however, when a
cooperating witness does not categorically deny any wrongdoing,
but instead pleads guilty to serious crimes and repeatedly admits
his misconduct, as Corigliano has done here in connection with
the perpetration and concealment of the CUC fraud.

    Moreover, Forbes' theory of "door opening" cuts both ways.
For example, at the first trial, during his opening statement,
Forbes' counsel made a point of telling the jury "a little bit
about" Forbes and his family because "[a]fter all, he's on trial
here."  FTTr. 104-105.  On direct, counsel asked Forbes "some
personal questions," eliciting that Forbes had been married to
his second wife for 23 years, had "two daughters" with her aged
17 and 13, and had "two more daughters" from his "first marriage"
aged 34 and 31.  FTTr. 13710.  Forbes pursued a similar approach
during the second trial.  STTr. 80 (opening statement); STTr.
2690 (Forbes' direct examination).  Under Forbes' theory of
excessive and abusive cross-examination, because he permitted
counsel at both trials to depict him as a family man, Forbes
"opened the door" to cross-examination about whether his "fre-
quent infidelities" led to the dissolution of his first marriage,

24

and whether he became romantically involved with his second wife while still married to his first. Greg Farrell, <u>Trial digs up two views of Walter Forbes</u>, USA Today, July 7, 2004. The Government, however, did not pursue such cross-examination at either trial because it pertained to a collateral matter.

## III. This Court Should Prohibit Cross-Examination for Which There Is No Good Faith Basis.

What Forbes misrepresents as "The Undisclosed Truth About Corigliano," FM 5; <u>see</u> FM 5-14, is merely his latest regurgitation of allegations that Corigliano breached his plea agreement by not using his best efforts to settle with the SEC, by not providing information requested by the SEC, and by misrepresenting other information to the SEC. As the Government has explained time and again, most recently in Docket 2332, Point II.A, these allegations have no merit. Accordingly, as Judge Thompson previously ruled, Forbes has no good faith basis to claim that Corigliano in fact breached his plea agreement in connection with his dealings with the SEC. <u>E.g.</u>, STTr. 11/7/05 at 19-22; Docket 1927 at 3; Docket 1939 at 5-6.

It is beyond cavil that "[t]he trial court may, in its discretion, preclude questions for which the questioner cannot show a good faith basis." <u>United States v. Scotti</u>, 47 F.3d 1237, 1248 (2d Cir. 1995) (quoting <u>Concepcion</u>, 983 F.2d at 391). "Although counsel may explore certain areas of inquiry in a criminal trial without full knowledge of the answer to antici-

25

pated questions, he must, when confronted with a demand for an offer of proof, provide some good faith basis for questioning that alleges adverse facts." United States v. Katsougrakis, 715 F.2d 769, 779 (2d Cir. 1983). Mere "suspicions" are not enough, id., and doubly so when "there [is] no dearth of other material on which" the witness "could be cross-examined," Concepcion, 983 F.2d at 392.

Here, as Judge Thompson found during the second trial, Forbes cannot allege in good faith that Corigliano breached his plea agreement in his dealings with the SEC because the SEC, the only party that was adverse to Corigliano in the civil lawsuit, never concluded that Corigliano had violated his plea agreement. STTr. 11/7/05 at 19. Likewise, this Office has not concluded that Corigliano had breached his plea agreement. Id. Although Forbes argued that the SEC's and the U.S. Attorney's views in this regard should not be credited because they were "interested parties," Judge Thompson disagreed:

> You say they are interested parties. The SEC and the
> U.S. Attorney's Office are obviously both the govern-
> ment, but I think we did have a -- we did have Mr.
> Kidney's testimony, we had Mr. Frohlich's testimony at
> the last trial, and I think the defense had quite an
> opportunity to probe and try to demonstrate that
> Corigliano had not been living up to his obligations
> under the -- his obligations to the SEC, I'll say,
> which he's required to live up to under the plea agree-
> ment. I think everything that came out showed that the
> defense's contentions lacked merit.

STTr. 11/7/06 at 22.

26

Judge Thompson reiterated these findings in written rulings. For example, in granting a motion to quash by the SEC, Judge Thompson found that:

> defendant Forbes ignores the fact the SEC, as reflected
> in Frolich's testimony, does not view Corigliano as
> having failed to comply with his obligations under the
> plea agreement.  Rather, defendant Forbes is the only
> person taking the position that Corigliano has failed
> to live up to his obligations under the plea agreement
> to provide complete and accurate information to the
> SEC, and defendant Forbes' contention is premised on
> what he argues is the appropriate way to interpret the
> Final Judgment in Corigliano's SEC case and other
> documents the SEC has itself received and found accept-
> able.  Because both the SEC and Corigliano disagree
> with defendant Forbes' interpretation of these docu-
> ments, it is apparent that defendant Forbes' line of
> inquiry is calculated solely to bolster his attack on
> Corigliano's credibility and, possibly, to attack the
> credibility of the government.  This is far removed
> from a legitimate, good faith inquiry into motive on
> the part of Corigliano to fabricate testimony in the
> hope that the government will not find him in breach of
> the terms of the plea agreement.

Docket 1939 at 5-6.  Similarly, in granting in substantial part a motion by Corigliano and Kramer Levin to quash, Judge Thompson agreed that Forbes was "[p]ersisting in pressing" a "self-created fiction" that Corigliano had breached his plea agreement.  Docket 1927 at 3 (internal quotation marks omitted).

Judge Thompson's findings were amply supported by the testimony of SEC witnesses at the first trial.  James Kidney of the SEC testified unequivocally at the first trial that Corigli-ano did <u>not</u> receive a "sweetheart deal" and was <u>not</u> accorded special treatment as a cooperating witness:

Q.   Was there anything unusual with respect to how
Corigliano or Ms. Pember's case was handled inside the
SEC?

A.   No, nothing unusual other than that there's been
-- well, nothing unusual, really.

Q.   Were they given any special accommodations because
they're cooperators here in this federal case?

A.   No, I can say that they were not.  And I can say
that, speaking generally at least, and I think in terms
of this case, that Mr. Newkirk in particular is very
strongly against arguments that cooperating witnesses
should get special treatment with the SEC.

Q.   So was Corigliano's deal or Ms. Pember's deal a
sweetheart deal?

A.   I don't believe so.

FTTr. 13527.

In a similar vein, Kidney testified at the first trial that:

- permitting Corigliano and his family a budget to live
  on was not "a special accommodation," because "we
  assumed the judge would have given them something to
  live on";

- even in cases where the SEC has obtained a freeze of
  assets, while "we sometimes argue that they shouldn't
  be permitted to spend frozen money for legal defenses,"
  most "judges order an exemption to pay legal fees" and
  the SEC does not "go out where fees have been spent
  [to] try to get it back, hold the party responsible for
  that;" and

- the ultimate settlement represented what "we thought we
  could get and probably as much as we thought it likely
  that many judges would give us."

FTTr. 13523, 13528-13530.

Kidney also put the lie to Forbes' insinuation that

Corigliano breached his plea agreement by not informing the SEC

that the 11-acre property where he and his family resided con-

sisted of two lots, not one.  When asked whether the SEC was

"deceived or otherwise deprived of any information from Corigli-

28

ano or his lawyers" about the Corigliano's home "in making the SEC settlement," Kidney testified that the SEC received the information it needed:

> we knew what the purchase price was as far as when I was last involved in it. Apparently that included two parcels of land. I don't think that would have made any big difference to us. We generally -- with the Securities and Exchange Commission we don't go out and do land surveys. 500 acres in Fairfield County, Connecticut, that would be an eyebrow raiser and the SEC might have thought about partitioning that or something. I don't think it would be a significant factor.
>
> If they bought it all in one piece, the negotiations were all about it in one piece. It's hard to go back in hindsight, you know. But I don't think it would have made any difference.

FTTr. 13531.

As for Corigliano's purported failure to disclose retainers paid to Kramer Levin and Fried Frank, David Frohlich of the SEC confirmed that the SEC had been advised of these retainers prior to execution of the settlement agreement. FTTr. 13602-13603. Frohlich further testified that:

> [c]ounsel for Corigliano informed the Commission that there were retainers at Kramer Levin and at Fried Frank and that they would not in any way go or be returned to the Coriglianos. That statement was made to the staff. There was no further -- no one promised, there was no documentation of it. In my view, the judgment covered the matter anyway.

FTTr. 13603. Frohlich added that Corigliano "had certain regular expenses that he was always allowed to incur and pay, and I

viewed these as the same as any of those other ongoing expenses."
FTTr. 13604.[13]

Although Kidney and Frolich did not expressly address
Forbes' latest flight of fancy, FM 13-14, as shown at pages 6-7
above, a rational juror could not conclude that Corigliano
misrepresented to the SEC his parents' physical and financial
condition in 2000.  Cf. United States v. Rosa, 11 F.3d. 315, 336
(2d Cir. 1993) ("court did not abuse its discretion in excluding
evidence proffered as showing inconsistencies in testimony that
was not inconsistent").  Forbes' arguments on this score seem to
ignore the Second Circuit's admonition that "[t]rial practice,
whether criminal or civil, is not a contact sport" and "its
tactics do not include eye-gouging or shin-kicking."  United
States v. Cutler, 58 F.3d 825, 840 (2d Cir. 1995).

IV.  **Forbes Should Not Be Permitted To Impeach Corigliano with
     Documents Not Authored by Him.**

It is settled in this and other Circuits that "statements of
an attorney cannot be used to impeach the testimony of a client"
where that client is merely a witness, as opposed to a party.
United States v. Cuevas Pimentel, 815 F. Supp. 81, 82 (D. Conn.

---

[13] Forbes may repeat his false claim that Frohlich under-
stood that "Corigliano could continue to pay his normal living
expenses (including attorney fees)" only "through the date of the
Final Judgment, which was May 6, 2004."  Docket 2343 at 6.  In
fact, when Frohlich was specifically asked whether Corigliano
"was able from April 1, 2004 to July 1 or 2, 200[4], to continue
to spend out of that fund," Frohlich replied that "[h]e could"
pay for his "reasonable expenses."  FTTr. 13609.

1993) (Cabranes, then-C.J.); <u>see</u>, <u>e.g.</u>, <u>United States v. Almonte</u>, 956 F.2d 27, 29 (2d Cir. 1992) (per curiam) ("in the absence of endorsement by the witness, a third party's notes of a witness's statement may not be admitted as a prior inconsistent statement unless they are a verbatim transcript of the witness's own words"); <u>Garcia-Martinez v. City and County of Denver</u>, 392 F.3d 1187, 1194 (10th Cir. 2004) ("implicit in the use of prior inconsistent statements to impeach is the requirement that the impeached witness actually made the prior statement"); <u>United States v. Tarantino</u>, 846 F.2d 1384, 1416 (D.C. Cir. 1988) ("witnesses are not impeached by prior inconsistent statements of <u>other</u> witnesses, but by their <u>own</u> prior inconsistent statements").

As then-Chief Judge Cabranes explained in <u>Cuevas Pimental</u>, "as a general matter, Rule 613(b) does not permit an attorney's statements to be introduced as prior inconsistent statements of that attorney's client."  815 F. Supp. at 83.  Furthermore, although "under Rule 801(d)(2) an attorney's statement can sometimes be used as an admission of the party on whose behalf the statement was made," that Rule "permits admissions to be introduced only against <u>parties</u> -- not against all witnesses." 815 F. Supp. at 83-84.  Thus, "a statement is admissible as a statement of a witness <u>only</u> where that statement was in fact made by the witness."  <u>Id.</u> at 83.

31

Applying these principles, Judge Thompson rebuffed numerous attempts to impeach Corigliano and other witnesses with statements made by their respective lawyers to the SEC. As Judge Thompson explained, "[y]ou cannot impeach someone with their attorney's statements," because "you can only impeach a witness with his own words; in other words, a statement made by her or one adopted by her." FTTr. 2648; see also FTTr. 1515 ("A lawyer's impressions, notes as to what the lawyer chose to put down as to what a witness said, under the case law is not a verbatim statement by the witness. So it's not admissible on that basis."); STTr. 2006 (noting Forbes' attempt to hold Corigliano "accountable for the letter that his lawyers sent").

Forbes nonetheless persists in trying to impeach Corigliano with documents prepared by others and not signed by him. FM Exs. 2-10, 12-13; Docket 2000, Exs. 1-18. These documents all are communications between Kramer Levin and the SEC. Furthermore, Kramer Levin has represented that it possesses no documents "showing that drafts or copies" of at least five of these documents were ever provided to Corigliano, Docket 1944 at 3-6, and Corigliano testified at the first trial that he "didn't see" or recall reading other of these documents, FTTr. 7990-7992, 8037-8040, 8059. As such, under settled law and the law of this case, such documents cannot be used as prior inconsistent statements to impeach Corigliano. They therefore should not be admitted at the third trial.

32

V.    **Much of Forbes' Proposed Cross-Examination Would Be Barred by the Attorney-Client Privilege.**

Judge Thompson's decision to preclude at the second trial the cross-examination that Forbes seeks here was prompted in part by the court's well-justified concern that Forbes was improperly attempting to encroach upon privileged communications between Corigliano and Kramer Levin.  Both Corigliano at trial and Kramer Levin in representations to the court maintained that Kramer Levin exercised its own judgment as to what information counsel received from Corigliano should be passed on the SEC during the course of settlement negotiations.  As Judge Thompson ruled during the second trial:

> it's pretty clear to me at this point at least, after all this time dealing with counsel, that the represen- tations I have been receiving from Kramer Levin have been accurate and it's pretty obvious to me at least that Mr. Naftalis, who is quite senior from what I can tell, and knows how to structure a representation of a cooperating witness to the client's maximum benefit, including how to structure it in such a way as to not waive the attorney/client privilege. . . . So I really don't give any credit to the suggestions that counsel for the cooperating witnesses have not structured things in a way to maximize the effectiveness of their representation of cooperating witnesses and that they could not possibly have done the things they said they did because it all fits -- it all works the way they've presented to me what they have done.  They've been doing an effective job, skillful and very competent job of representing their client.

STTr. 11/7/05 at 30.

Nonetheless, Forbes' counsel tried repeatedly during the second trial to encroach upon the privilege by, <u>inter alia</u>, serving overbroad discovery requests upon Kramer Levin and by

33

posing misleading questions to Corigliano during cross-examina-
tion that appeared to be designed to elicit an unknowing waiver
of the privilege.  E.g., STTr. 1998-2019.  Although preservation
of his privilege is Corigliano's concern, not the Government's,
Judge Thompson rightly put a stop to such tactics.  It is well-
settled that "the district court can bar cross-examination of
communication protected by an attorney/client privilege."  United
States v. Dennis, 843 F.2d 652, 656 (2d Cir. 1988).[14]  This is
especially true where -- as Judge Thompson worried would happen
here -- the proposed intrusion on the attorney-client privilege
concerns "a collateral matter going only to [the witness's]
general credibility."  United States v. Coven, 662 F.2d 162, 171
(2d Cir. 1981).[15]

---

[14] See, e.g., United States v. Gatzonis, 805 F.2d 72, 74-75
(2d Cir. 1986) ("the court's limitation of cross-examination,
based on the attorney-client privilege, was within its discre-
tion"); United States v. Sindona, 636 F.2d 792, 804-05 (2d Cir.
1980) ("affirm[ing] the lower court's ruling precluding the
cross-examination of Bordoni based upon material obtained from
Bordoni's Venezuelan attorney" because "[i]f information obtained
as a result of a violation of that privilege were permitted to be
used against the client on cross-examination, it would destroy
the attorney-client privilege").

[15] See United States v. Fox, 396 F.3d 1018, 1024 (8th Cir.
2005) ("[t]o allow defense counsel to inquire about the substance
of Carter's conversations with his counsel and to put such
evidence before the jury would not have resulted in the jury
having a significantly different impression of Carter than they
already had"); United States v. Rainone, 32 F.3d 1203, 1207 (7th
Cir. 1994) ("[a] trial judge does not violate the Constitution
when he limits the scope of cross-examination for a good reason,
and here as in the usual case desire to protect the
attorney-client privilege was a good reason").

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that Forbes' Third Trial Motion in Limine No. 4 be denied.  Judge Thompson properly precluded during the second trial the cumulative and at best marginally relevant cross-examination that Forbes seeks carte blanche to pursue in this trial, and this Court should do likewise.

Respectfully submitted,

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice

*Norman Gross/s*

NORMAN GROSS
Federal Bar Number 24933
MICHAEL MARTINEZ
Federal Bar Number phv0243
MARK E. COYNE
Federal Bar Number phv01079
Special Attorneys
U.S. Department of Justice

Newark, New Jersey
Date:  May 25, 2006

35

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this day I caused to be served a copy of the Government's Memorandum of the United States in Opposition to Forbes' Motion to Preclude the Government from Presenting Evidence, Cross-examination, or Argument Concerning Property Transfers (Opposition to Forbes' Third Trial Motion <u>In Limine</u> Motion No. 4) via email on:

Barry S. Simon, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005-5901
(202) 434-5005
bsimon@wc.com


*Norman Gross/s*
NORMAN GROSS


Dated:  May 25, 2006
        Camden, New Jersey