UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:02CR00264 (AHN) |
| | : | |
| | : | |
| | : | |
| v. | : | May 25, 2006 |
| | : | |
| | : | |
| | : | |
| WALTER A. FORBES | : | |

OPPOSITION OF THE UNITED STATES TO
DEFENDANT WALTER A. FORBES' MOTION TO PRECLUDE
THE GOVERNMENT FROM INTRODUCING ANALYSTS' REPORTS

(<u>Opposition to Forbes Third Trial Motion In Limine No. 7</u>)

<u>INTRODUCTION</u>

Defendant Forbes in this motion again asks this Court to reconsider and reject a ruling by Judge Thompson.  Just as in the first and second trials, the Government will offer examples of Wall Street securities analyst reports, not for the truth of the matters asserted, but rather to show what was being communicated to investors by and through analysts about CUC and its successor, Cendant, and the materiality of those communications to investors.  And just as in the second trial, the Government will offer redacted copies of these reports, thereby mooting Forbes' ill-founded complaints about prejudicial hearsay.  Accordingly, Forbes' motion should be denied.

<u>BACKGROUND</u>

The Government has maintained throughout this case that Forbes and his co-conspirators used Wall Street stock analysts to

advance the charged fraud upon the investing public. The indict-
ment alleges that:

- CUC management provided analysts with "'predictions of,
  or guidance regarding" CUC's "anticipated earnings
  . . . for upcoming reporting periods";

- "[r]elying at least in part on" that "guidance, many
  professional securities analysts then" published "their
  own estimates of" CUC's performance";

- the analysts' "earnings estimates or analyst expecta-
  tions were closely followed by investors" and by Forbes
  and his co-conspirators;

- a particularly important "earnings figure" was "'oper-
  ating income,'" which was "generally considered by
  securities analysts and the investing public to be a
  more accurate indicator of the company's performance"
  than "net income";

- Forbes ensured "that the earnings CUC reported . . .
  closely matched the results predicted by Wall Street
  analysts, for fear that any shortfall could trigger a
  decline in the price of CUC stock";

- Forbes "kept members of the analyst community well
  informed as to the amount of growth in earnings CUC was
  targeting";

- Forbes "sought to support and increase the price of CUC
  stock by causing CUC to misrepresent the true growth
  rate of the company to the SEC and the investing pub-
  lic"; and

- Forbes directed his co-conspirators to adjust CUC's
  reported earnings, particularly its operating earnings,
  to meet or exceed the analysts' expectations, thereby
  keeping CUC's stock price artificially inflated.

Ind. ¶¶ 15-16, 20-25.[1]

---

[1] Citations to "Ind." are to the Redacted Indictment, see
Docket 1995. Citations to "FTTr." and "STTr." are to the tran-
scripts of the first and second trials. Citations to "GX" are to
exhibits introduced by the Government during the previous trials.
Citations to "FM" are to Forbes' memorandum in support of his
present motion.

During the first trial, Judge Thompson permitted the Government to introduce 15 separate analyst reports in their entirety, all for the limited, non-hearsay purpose of showing "what was communicated to investors" by and through analysts about CUC and its successor, Cendant.  FTTr. 177; see FTTr. 13002 (confirming that the analyst reports were "not admitted for the truth of the facts contained in them" but rather "for the purpose of what information was disseminated").  Judge Thompson expressly instructed the jury that

> [t]he Government makes certain allegations with respect to communications with investors.  This testimony and any exhibits that come in related to it may be considered by you only with respect to the issue of communications with investors.  You may not consider this evidence for any other purpose.

FTTr. 202.[2]

During the second trial, Judge Thompson permitted the Government to introduce two of the analyst reports -- GX 1400 and 1409 (Exhibits A and B hereto), both authored by Bear Sterns analyst Steven Kernkraut -- for the same limited purpose as in the first trial, i.e., to prove what was being communicated to

---

[2] Although the Government also sought to introduce the analyst reports as business records, Docket 819, it did not press that argument during the first trial after Judge Thompson tentatively ruled that "some portions of" an analyst report "may well qualify to be admitted as a business record if a proper foundation is laid," while "[t]he other portions of the document, even though they may not be admissible as a business record, could be admitted for a limited purpose, namely, to show what analysts did, how analysts use information, what kinds of information analysts look at, things like that."  FTTr. 176.

3

investors by and through analysts concerning CUC and Cendant. STTr. 194; see Docket 1859 (Government's Additional Response to Forbes Retrial Motion in Limine No. 6).[3]  Forbes rejected Judge Thompson's offer of a limiting instruction, contending it would be "more confusing" to the jury than no instruction at all. STTr. 194-195.  Unlike the first trial, the Government redacted these two exhibits so that only the first page of each exhibit was visible, removing any possibility that Forbes might be prejudiced by the contents of the other pages of those reports. STTr. 195-198; see Exhibits A and B attached hereto.

Furthermore, Judge Thompson permitted the Government to introduce two other analyst reports -- GX 68 and 288 (Exhibits C and D hereto) -- to illustrate that CUC management made particular representations to analysts, thereby illustrating an essential vehicle of the fraud.  STTr. 1248-1249 (explaining that the exhibits would be admitted "to show that CUC management reported, in one case, an amount of merger reserve and the other case, [an] amount of certain financial numbers to the investment community"), 1330 (admitting GX 68), 1353 (admitting GX 288).  Judge

---

[3] Judge Thompson also ruled that the Government could introduce GX 1407 for the same limited purpose, STTr. 192-194, but the Government did not use that exhibit at the second trial.  In addition, based upon Kernkraut's answer to a carefully phrased leading question by Forbes' counsel in voir dire, Judge Thompson concluded that the Government had failed to demonstrate that GX 1400, 1407 and 1409 were business records of Bear Sterns.  STTr. 165.  Judge Thompson rejected Forbes' argument that analyst reports could never qualify as business records, however.  Docket 1865 at 1-3.

Thompson instructed the jury that these two exhibits were admitted for "the limited purpose of materiality and not for the truth of the statements contained [t]herein."  STTr. 1353; see STTr. 1330 (GX "68 is admitted for the limited purpose of materiality only").  The Government redacted these exhibits, as well, to focus the jury's attention on only the first page of each of the reports and the specific representations at issue and to prevent the jury from considering any other portions of these reports. STTr. 1330, 1353; see Exibits C and D hereto.

**ARGUMENT**

Forbes' present motion merely recycles arguments already rejected by Judge Thompson in denying similar motions during the first and second trials.  See Docket 734 and 2140 (first trial); Docket 1667 and 1865 (second trial).  Forbes has shown no reason to reconsider Judge Thompson's rulings at this juncture, which have become law of the case.  See Lillbask v. Connecticut Dept. of Educ., 397 F.3d 77, 94 (2d Cir. 2005); United States v. Crowley, 318 F.3d 401, 420(2d Cir. 2003); Sequa Corp. v. GBJ Corp., 156 F.3d 136, 144 (2d Cir. 1998); LoSacco v. City of Middletown, 822 F. Supp. 870, 876-77 (D. Conn. 1993), aff'd, 33 F.3d 50 (2d Cir. 1994).

**First**, without citing a shred of authority, Forbes contends that an out-of-court statement is hearsay even when it is offered merely to prove that the statement had been made, rather than for the truth of the matter asserted in the statement.  FM 4-5.  Not

so.  "Under the Federal Rules of Evidence, '[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, [then] the statement is not hearsay.'"  United States v. Cardascia, 951 F.2d 474, 486 (2d Cir. 1991) (quoting Fed. R. Evid. 801 advisory committee's note to subdivision (c)); accord, e.g., United States v. Faulkner, 439 F.3d 1221, 1226 (10th Cir. 2006); United States v. Saada, 212 F.3d 210, 212 n.8 (3d Cir. 2000); Macuba v. Deboer, 193 F.3d 1316, 1324 n.15 (11th Cir. 1999); United States v. Branham, 97 F.3d 835, 851 (6th Cir. 1996); United States v. Cantu, 876 F.2d 1134, 1137 (5th Cir. 1989); United States v. Legarda, 17 F.3d 496, 499 (1st Cir. 1994).[4]

The Government did not offer the analyst reports in the first and second trials -- and will not offer these reports in the third trial -- as proof that the financial information and projections about CUC/Cendant contained therein were true.  In fact, that information and those projections were demonstrably false, though the analysts did not realize this at the time. See, e.g., United States v. Pratt, 239 F.3d 640, 644 (4th Cir.

---

[4] See, e.g., United States v. Sorrentino,72 F.3d 294, 298 (2d Cir. 1995) ("[t]he statements of the CI were not offered to prove the truth of the matters asserted but only to render what Sorrentino said in these conversations intelligible"; they thus were not "hearsay evidence"); United States v. Kohan, 806 F.2d 18, 21-22 (2d Cir. 1986) (statements of third party to defendant about source of checks were not hearsay because they were offered not for the truth but rather as proof that defendant believed them and was not aware the checks were stolen).

2001) ("Strachan's statement that he and Pratt had car trouble was not offered to prove that they actually did experience car trouble; in fact, they did not"; "[s]uch statements are admissible regardless of whether they meet the requirements of" a hearsay exception); United States v. Murphy, 193 F.3d 1, 5 (1st Cir. 1999) ("[s]o long as out-of-court statements are not offered for their truth, they are not hearsay").

Furthermore, to the extent that the analyst reports contain non-historic financial information, such as the analysts' recommendation to buy, sell, or hold a particular stock, those statements do not purport to describe events, nor will they be offered by the Government for the truth of the matter asserted.  Rather, those recommendations will be offered to prove that they were made, and to explain the effect of the conspirators' false statements and omissions on the price of CUC's stock.  See Akin v. Q-L Invs., Inc., 959 F.2d 521, 530 (5th Cir. 1992) (out-of-court statements "were offered only to show . . . reliance," not for their truth, and therefore should have been considered by district court in motion for summary judgment), called into doubt on other grounds by Shapiro v. Cantor, 123 F.3d 717, 721 n.2 (2d Cir. 1997).[5]  This component of the analysts' reports is crucial

---

[5] Cf. United States v. Bellomo, 176 F.3d 580, 586 (2d Cir. 1999) ("[s]tatements offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay"); Murphy, 193 F.3d at 5 ("while Brazil certainly testified to statements made by the
(continued...)

evidence regarding the mechanism by which the charged fraud was perpetrated on the investing public.  Other evidence will prove that the conspirators sought to influence such analysts' reports by causing the analysts to predict that CUC's stock price would increase or maintain its value, thereby causing members of the investing public to continue to hold or acquire additional shares.

**Second**, for similar reasons, "[w]hat any particular analyst may have thought about CUC" during the term of the charged conspiracy is <u>not</u> "irrelevant to the allegations of the indict-ment." FM 8.  Even Forbes "does not dispute that the projected earnings published in analysts reports may be relevant in light of" the allegations that Forbes and his co-conspirators used analysts to help perpetrate the massive CUC fraud.  FM 6.  But so, too, are "the discussion and recommendation portion of analysts' reports," <u>id.</u>, because "analysts' optimistic view of the Company's stock could demonstrate that Defendants' statements and non-disclosures disguised the Company's true financial condition." <u>In re Scientific-Atlanta, Inc. Sec. Litig.</u>, 239 F. Supp. 2d 1351, 1366 (N.D. Ga. 2002); <u>see</u> <u>Lentell v. Merrill Lynch & Co.</u>, 396 F.3d 161, 177 (2d Cir. 2005) ("[w]e do not suggest

---

[5] (...continued)
detectives out of court, those statements -- namely, the instruc-tions given to Brazil to falsify applications and withhold information about seizures -- were not offered for the truth of the matter asserted but rather to show that the detectives gave such instructions").

that . . . 'systematically overly optimistic' ratings of the type published by the Internet Group are categorically beyond the reach of the securities laws").[6]  Thus, as Judge Thompson ruled, "the reports at issue are relevant."  Docket 1865 at 1.

Nor did the Government act improperly by simplifying its presentation at the second trial to focus on only a few analysts, and Kernkraut in particular.  During much of the term of the conspiracy charged in the Redacted Indictment, Kernkraut was the so-called "ax on the stock" among the analysts who followed CUC's financial results during the conspiracy period.  STTr. 134.  That is, Kernkraut understood that because his "earnings estimates were right on target" and his reports were "much more detailed," Kernkraut was "the most influential analyst on Wall Street on this company."  STTr. at 135.  Thus, Kernkraut is a reasonable, short-hand proxy for the long and repetitive testimony about "consensus" analyst earnings estimates that extended the first trial.

**Third**, the Government did not improperly use the analyst reports during either trial.  FM 6-8.  Given the pivotal role that analysts unwittingly played in artificially inflating the price of CUC stock during the conspiracy period, it was perfectly appropriate to ask Kernkraut during the second trial to explain

---

[6] Cf. Ambassador Hotel Co. v. Wei-Chuan Investment, 189 F.3d 1017, 1026 (9th Cir. 1999) (noting that misrepresentation of "recommendations of Merrill Lynch analysts as to four specific stocks" could support fraud claim).

what his "Strong Buy" recommendation on GX 1400 meant.  FM 7.  As
Kernkraut testified:

> it means that it was our highest rating within the Bear
> Stearns system at the time where we thought there was
> going to be a significant upside stock potential, where
> we thought the stock was going to go up greater than 20
> percent over the next year.

STTr. 226.  That recommendation was based in part on "the finan-
cial reports, the 10-Ks, the 10-Qs, all the published financials
attested to by their accounting firm and internal management's
statement of what their reports are," as well as "extensive
conversations" Kernkraut "had with" Forbes, Corigliano, Stu Bell
(Corigliano's predecessor as CUC's Chief Financial Officer), and
other CUC managers.  STTr. 227.  Using this information, Kernkra-
ut provided investors with projections "as to CUC's future
earnings":

> On the front page . . . it shows earnings per share on
> a full year basis.  It shows they actually earned 70
> cents a share in 1993 and our estimate was for them to
> earn $1.00 in 1994 and to earn $1.30 in 1995, which
> reflects about a 30 percent earnings increase each
> year.

STTr. 226-227.[7]

Nor was it improper to have Corigliano read into the record
an unredacted portion of GX 68 during the second trial.  FM 7-8.
That excerpt recounted that CUC would "be establishing a $100
million reserve for outstanding litigation, transaction fees and

---

[7] Tellingly, during the first trial, Forbes did not specifi-
cally object when Corigliano read a similar "Strong Buy" recom-
mendation from another analyst aloud.  FTTr. at 6839.

restructuring costs" in connection with CUC's 1996 merger with another company, Ideon, and that "CUC's management believes that this reserve will amply cover any potential liability that might arise from these lawsuits." STTr. 1335.  Immediately prior to that testimony, Corigliano testified that he had imparted that information to the analysts at the direction of Forbes and his now convicted co-conspirator, Kirk Shelton, CUC's former President and Chief Operating Officer:

> Q.  Did you have any conversations with the defendant that day regarding the Ideon merger reserve?
>
> A.  Yes, I did.
>
> Q.  How many conversations did have you with the defendant regarding the Ideon merger reserve that day?
>
> A.  At least two that I can remember.
>
> Q.  Where did those conversations take place?
>
> A.  They both took place in my office.
>
> Q.  Who was present?
>
> A.  For the first meeting, Walter, Kirk and I were present.  For the second meeting, just Walter and I.
>
> Q.  Let's start with the first meeting.  When did the first meeting occur?
>
> A.  In the morning before the press release announcing [the] Ideon merger went out.
>
> Q.  What were you doing in your office?
>
> A.  We were -- Kirk, Walter and I were discussing what to say about the merger reserve that was going to be established for Ideon.
>
> Q.  What did the defendant say during that conversation?
>
> A.  Walter said that we need to remember that we want to make the reserve as big as possible because that was one of the reasons why this acquisition, this merger was such a positive thing for us.
>
> Q.  Did Kirk Shelton say anything?

A.    Kirk did.  Kirk said that we want to make sure that the investment community views this as a positive announcement because that's what it is.  We don't want to put out such a large reserve that it creates any kind of negative connections with the merger, with the announcement.

Q.    Did Kirk Shelton recommend a certain number for the size of the merger reserve?

A.    He did.

Q.    What did Kirk Shelton say?

A.    Kirk said that we should tell the investment community that we're going to be establishing a $100 [million] reserve.  And he went on to say that Ideon, by the time we complete the merger, should have about a hundred million dollars in cash and so we can point out that's how we'll fund it.

Q.    What did the defendant say in response?

A.    He said, Okay, let's go out and tell everyone that we're going to establish $100 million reserve.  And he said, We won't put it in the press release, but when we talk to the analysts each one of us will mention it in our conversations with the analysts that we talk to.

Q.    Did you say anything before that comment that the defendant made?

A.    Yes.

Q.    What did you say?

A.    Walter asked me also if we put $100 million re-serve, how much of a cushion would we have, how much of an excess?

Q.    What did you say?

A.    I said that given that the lawyers are suggesting that litigation settlement should be around 60 or $70 million and that there will be some transaction costs, not a lot of integration costs, we should have at least 20 to $30 million of cushion of excess reserve if we establish $100 million reserve.

Q.    What did you tell the stock analysts that day about the size of the merger reserve?

A.    I told them that we were establishing [an] approximately $100 million reserve.

12

STTr. 1332-1334.  Thus, the challenged testimony was relevant to show that the conspirators had fraudulently inflated the Ideon merger reserve in the manner alleged in the indictment in order to create a "cushion" that could be used later to fraudulently overstate earnings.  Ind. ¶¶ 30-36.  Evidence that directly proves how the charged fraud was perpetrated is plainly relevant and properly admitted.

Forbes' remaining complaints about the Government's use of analyst reports during the first trial are similarly unavailing. FM 5-7.  Long after it was admitted in its case-in-chief, the Government used GX 68 to cross-examine Shelton about whether he had known that the Ideon reserve initially would be $100 million instead of "$125 million" from "the start."  FTTr. 12995. Shelton's testimony on this issue contradicted Corigliano's testimony that Shelton had advocated the lower number at first and that it was Shelton's idea "to use the $100 million cash on Ideon's books to fund this reserve."  FTTr. 6781.  The Government was entitled to explore that contradiction.

Nor was it improper for the Government to cross-examine Forbes about statements contained in the analyst reports concern- ing CUC's "growth rate," trading "multiple," projected "target price," and the "pressure" its "stock" suffered when CUC "an- nounced its intent to buy two software companies."  FM 7 (quoting FTTr. 13909, 13925).  This examination was particularly proper given Forbes' defense that he was a "visionary" who did not

13

trouble himself with the historic financial performance of the company he managed. FTTr. 10868, 13868, 15168; STTr. 18, 3347. The examination also revealed that Forbes was acutely concerned about the effect of analysts' reports on CUC's share price. For instance, Forbes admitted that he: understood that "we were liked on Wall Street" and that "most analysts were favorable on the company"; "knew what was expected of us"; "shared" with the CFO the "duties" of speaking with analysts; was "capable of handling analysts and institutional investors alone without having" his CFO present; and took efforts to prop up analysts' confidence in CUC after its stock declined, in Forbes' own words, "very dramatically" in 1996. FTTr. 13909-13010, 13914, 13917, 13919-13920.

**Fourth** and finally, because the Government does not intend to offer any of the analyst reports for the truth of their contents, this Court need not address whether analyst reports qualify as business records under Fed. R. Evid. 803(6). Contrary to Forbes' regurgitated contention, however, FM 2, Judge Thompson ruled that it was "<u>not</u> well settled that analyst reports do not qualify as business records," STTr. 4 (emphasis added); <u>see</u> Docket 1865 at 1-2. Indeed, Judge Thompson ruled that "none of" the cases cited by Forbes "supports the broad proposition urged by the defendant." Docket 1865 at 2; <u>see id.</u> at 2-3 (distin-guishing <u>Eisenstadt v. Allen</u>, 1997 U.S. App. Lexis 9587 (9th Cir. Apr. 28, 1997); <u>In re Sybase, Inc. Sec. Litig.</u>, 48 F. Supp. 2d

958 (N.D. Cal. 1999); and In re Cirrus Logic Sec. Litig., 946 F.
Supp. 1446 (N.D. Cal. 1996)).[8]  Should circumstances unfold
during the third trial necessitating admission of all or redacted
portions of the analyst reports as business records, the Govern-
ment will give notice, and this Court can resolve the issue then.

---

[8] Forbes' reliance on Eisenstadt -- an unpublished disposi-
tion from another Circuit -- is especially misplaced.  That
disposition, which does not even mention the business records
exception, is "not binding precedent" even in the Ninth Circuit,
and it "may not be cited to or by the courts of" the Ninth
Circuit, except in limited circumstances that do not apply here.
9th Cir. Loc. App. R. 36-3.  As for Sybase, although the district
court there suggested that "analyst reports are inadmissible
hearsay when offered for the purpose of establishing what Sybase
actually told analysts," the court did not expressly address the
business records exception and held that such reports could be
considered in determining what information was "known to the
market."  48 F. Supp. 2d at 960-62.  Similarly, Cirrus Logic held
that where, as here, the party proffering analysts' reports "can
prove . . . from evidence other than" the reports themselves
"that defendants made the allegedly misleading statements to" the
analysts, the "published reports should be admissible . . . as
evidence that the statements reached the market."  946 F. Supp.
at 1470.  Crystal v. Foy, 562 F. Supp. 422 (S.D.N.Y. 1983), the
only case cited by Forbes not expressly distinguished by Judge
Thompson, merely acknowledges that analyst reports constitute
hearsay if offered for the truth of the matters asserted in them.
Foy does not address whether such reports may qualify as business
records.  Of these four cases, only Cirrus Logic held that an
analyst report did not qualify as a business record, and then
largely because it was "unfair to hold defendants liable for the
reporting of their statements by third parties without independ-
ent corroboration of the accuracy of the reported statements."
946 F. Supp. at 1469.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that this Court deny Forbes' Third Trial Motion In Limine No. 7.

Respectfully submitted,

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice

*Norman Gross/s*

NORMAN GROSS
Federal Bar Number 24933
MICHAEL MARTINEZ
Federal Bar Number phv0243
MARK E. COYNE
Federal Bar Number phv01079
Special Attorneys
U.S. Department of Justice
970 Broad Street, Room 700
Newark, New Jersey 07102
Tel:  (973) 645-2700
Fax:  (973) 645-2857

Newark, New Jersey
Date:  May 25, 2006

16

**EXHIBIT A**
**(Redacted GX 1400)**

**EXHIBIT B**
**(Redacted GX 1409)**

**EXHIBIT C**
**(Redacted GX 68)**

**EXHIBIT D**
**(Redacted GX 288)**

## CERTIFICATE OF SERVICE

The undersigned certifies that on this day I caused to be served a copy of the Government's Memorandum of the United States in Opposition to Forbes' Motion to Preclude the Government from Introducing Analysts' Reports (Opposition to Forbes' Third Trial Motion in Limine Motion No. 7) via email on:

Barry S. Simon, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005-5901
(202) 434-5005
bsimon@wc.com


*Norman Gross/s*

NORMAN GROSS


Dated:  May 25, 2006
        Camden, New Jersey