UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:02CR00264 (AHN) |
| | : | |
| | : | |
| | : | |
| v. | : | May 26, 2006 |
| | : | |
| | : | |
| | : | |
| WALTER A. FORBES | : | |


GOVERNMENT'S OPPOSITION TO FORBES' RENEWED MOTION TO PRECLUDE
EVIDENCE, CROSS-EXAMINATION, OR ARGUMENTS CONCERNING (1) THE
DECLINE IN CENDANT'S STOCK PRICE ON AND AFTER APRIL 15, 1998 OR
(2) INVESTOR LOSS

(Opposition to Forbes Third Trial Motion In Limine No. 11)


CHRISTOPHER J. CHRISTIE
NORMAN GROSS
MICHAEL MARTINEZ
MARK E. COYNE
Special Attorneys
U. S. Department of Justice
970 Broad Street
Room 700
Newark, N.J.  07102
(973) 645-2701

## TABLE OF CONTENTS

INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

JUDGE THOMPSON PROPERLY DECLINED TO EXCLUDE THE CHALLENGED
EVIDENCE UNDER FED. R. EVID. 403.  . . . . . . . . . . . . . 4

A.    The Loss Evidence Is Relevant to Prove the Materiality of
      the Conspirators' Fraudulent Statements and Omissions about
      CUC's Financial Results.  . . . . . . . . . . . . . . . 4

B.    The Probative Value of the Loss Evidence Is Not
      Substantially Outweighed by its Supposed "Prejudicial
      Effect."  . . . . . . . . . . . . . . . . . . . . . . . 9

C.    Forbes' Meritless Claims of Prosecutorial Misconduct Do Not
      Justify Exclusion of the Challenged Evidence.  . . . . . 18

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . 23

## INTRODUCTION

The indictment charges that Forbes and his coconspirators perpetrated an almost decade-long fraudulent scheme to inflate the publicly reported earnings of CUC, Inc. while Forbes was the Chief Executive Officer and Chairman of the Board of that company. The purpose of the scheme was to falsely represent to the investing public and to the SEC in CUC's SEC filings and in press releases that CUC had met or exceeded its quarterly and annual earnings "targets" published by Wall Street securities analysts. Redacted Indictment, Count 1, ¶¶ 15-19. One of the goals of the scheme was to cause investors to bid up the price of CUC's stock to higher levels than it would have attained had investors known CUC's true earnings. Id. at ¶ 18.

The fraudulent scheme was highly successful. While the scheme was in operation, the share price of CUC stock rose dramatically from $1.56 in August 1989 to $32.12 in December 1997. First Trial Transcript ("FTTr.") 6465-66; Government Trial Exhibit ("GX") 3058 (Exhibit A hereto). In December 1997, CUC and HFS merged to form Cendant. FTTr. 2565. In early April 1998, some lower-level participants in the fraud from the CUC side of Cendant disclosed the existence of the scheme to their corporate superiors, former officials from the HFS side of the company. FTTr. 1443-49. Several days later, on April 15, 1998, Cendant announced that it had discovered "potential accounting irregularities in the former CUC business unit . . . [and that]

it expects to restate annual and quarterly net income and earnings per share for 1997 and may restate certain other previous periods related to the former CUC business." FTTr. 254-60, 1460; GX 827 (Exhibit B hereto). Cendant further disclosed that, based on then available information, the effect on its 1997 results was expected to be a reduction in net income prior to restructuring and unusual charges of approximately $100 to $115 million and earnings per share of 11 to 13 cents. Exhibit B.

The price of Cendant's stock dropped precipitously following disclosure of the fraud. On April 16, 1998, the day following the disclosure, the price of Cendant's stock fell 47%, from $35 and 5/8 per share, to $19 and 1/16 per share. FTTr. 260, 1461; GX 3059, (Exhibit C hereto); see also In re Cendant Securities Litigation, 264 F.3d 201, 221 (3d Cir. 2001). On July 14, 1998, Cendant announced that it would restate CUC's annual and quarterly financial statements for 1995 and 1996, as well as for 1997. The following day, Cendant's stock fell another 9%, to $15 and 11/16 per share. In re Cendant, 264 F.3d at 221. On August 28, 1998, Cendant filed with the SEC the report of the Cendant Audit Committee's investigation of the accounting fraud. The Audit Committee Report revealed that Cendant would restate its 1995, 1996 and 1997 financial statements, and adjust downward its reported earnings for those years by a total of approximately $500 million. On August 31, 1998, the first trading day after

disclosure of the Audit Committee Report, the price of Cendant's stock fell another 11%, to $11 and 5/8.  Id. at 221-22.[1]  During the four months immediately following the April 15, 1998 disclosure of the accounting fraud, the total loss in market capitalization (the price per share multiplied by number of shares outstanding) sustained by the shareholders was more than $20 billion.  The price of Cendant's stock has never fully recovered.[2]

For the third time, Forbes seeks the exclusion of "any evidence, cross-examination, or argument" regarding the decline in Cendant's stock price and investor loss following disclosure of the fraud.  As Forbes concedes, Judge Thompson rejected Forbes' requests to exclude this highly probative evidence of an element of each of the crimes charged in the redacted indictment: materiality.  Judge Thompson denied the Government's request to

---

[1]  In the aftermath of the disclosure of the accounting fraud scheme, numerous lawsuits were filed by holders of Cendant's securities against Cendant, Cendant's outside auditors, Ernst and Young ("E&Y"), and various individuals, including Forbes.  In re Cendant, 264 F.3d at 222.  In one such case, involving claims brought by a certified class of shareholders alleging claims under, inter alia, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5, Cendant settled the claims in return for payment to the plaintiff class of $2.8 billion.  Id. at 226.  E&Y settled the claims against it in exchange for a payment of $335 million.  Id. at 227.  The plaintiffs in that case had proffered expert testimony that damages to the class were between $8.5 and $8.8 billion, but agreed to a reduced settlement amount due to litigation risk.  Id. at 238-38.

[2]  The current price is $ 16.20.  www.nyse.com/marketinfo, visited May 24, 2006.

also admit the loss evidence as proof of fraudulent intent.

Government's Motion In Limine and Mem. of Law, Dockets 454 and

455; FTTr. 6 (ruling granting Government's motion to admit loss

evidence to prove materiality); Forbes Retrial Motion In Limine

No. 24, Docket 1855; Government's Opposition, Docket 1858; Docket

1966 (Judge Thompson's ruling, denying Forbes' motion).  Forbes

has failed to demonstrate that this Court should reconsider Judge

Thompson's ruling, see Sequa Corp. v. GBJ Corp., 156 F.3d 136,

144 (2d Cir. 1998), or that this Court should depart from the law

of the case, see United States v. Uccio, 940 F.2d 753, 758 (2d

Cir. 1991).

## ARGUMENT

**JUDGE THOMPSON PROPERLY DECLINED TO EXCLUDE THE CHALLENGED
EVIDENCE UNDER FED. R. EVID. 403.**

**A.    The Loss Evidence Is Relevant to Prove the Materiality of
the Conspirators' Fraudulent Statements and Omissions about
CUC's Financial Results.**

In his present motion, Forbes has effectively abandoned

other challenges he previously raised to the loss evidence and

primarily claims that the evidence should be excluded pursuant to

Fed. R. Evid. 403 because its probative value is supposedly

substantially outweighed by its prejudicial effect.  This Court,

like Judge Thompson, should reject this claim.

Materiality is an element of the two substantive offenses

charged in the redacted indictment: securities fraud (Count 4)

4

and the crime of making false statements in a report required to
be filed with the SEC (Counts 2 and 3). <u>S.E.C. v. Monarch
Funding Corp.</u>, 192 F.3d 295, 308 (2d Cir. 1999) (materiality is
an element of securities fraud under § 10j(b) and Rule 10b-5;
<u>United States v. Natelli</u>, 527 F.2d 311, 319 (2d Cir. 1975) (same
for the crime of making false statements to the SEC in violation
of 15 U.S.C. § 78ff(a)).  In a prosecution for securities fraud,
non-disclosed information is material if there is "a substantial
likelihood that the disclosure of the omitted fact would have
been viewed by the reasonable investor as having significantly
altered the total mix of information made available." <u>Basic Inc.
v. Levinson</u>, 485 U.S. 224, 231-32 (1988) (internal quotation
marks omitted).

Evidence which proves that the price of Cendant's stock
declined by almost 50% immediately after the conspirators' false
statements and omissions were first disclosed to the investing
public is relevant to prove that those statements and omissions
were material to investors' decisions about whether to buy, sell,
or hold their positions in Cendant stock.  <u>See United States v.
Bilzerian</u>, 926 F.2d 1285, 1298 (2d Cir. 1991) (in assessing the
materiality of certain statements, "stock movement is a factor
the jury may consider relevant"); <u>In re Merck & Co., Inc.
Securities Litigation</u>, 432 F.3d 261, 269 (3d Cir. 2005) ("the
materiality of disclosed information may be measured <u>post hoc</u> by

5

looking to the movement, in the period immediately following disclosure, of the price of the firm's stock"), quoting Oran v. Stafford, 226 F.3d 275, 282 (3d Cir. 2000); No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp., 320 F.3d 920, 948 (9th Cir. 2003) ("Stock price changes - or lack thereof - are also relevant to the determination of materiality."). Indeed, it is hard to imagine more compelling evidence of materiality. The loss evidence is relevant and admissible even if it does not conclusively prove materiality. See United States v. Schultz, 333 F.3d 393, 416 (2d Cir. 2003) ("Evidence need not be conclusive in order to be relevant.").[3]

Forbes claims that the drop in Cendant's stock price on a single day is not evidence of the materiality of any of the particular fraudulent statements made over the course of the multi-year scheme in this case, wishfully thinking that there is no "temporal link" to the "vast majority of those statements." Forbes' Memorandum in Support of Third Trial Motion In Limine No. 11 ("FM") 8. The relevant "temporal link" is not between the reaction of the stock market and the date when the false statements (then unknown by investors to be false) were publicly

---

[3] The conspirators themselves acutely recognized the importance of meeting earnings forecasts. Forbes' now convicted co-defendant from the first trial, Kirk Shelton, the former President and Chief Operating Officer of CUC during the conspiracy period, stated in a company-wide memo that if CUC missed earnings predictions "by one cent," the market would "punish us." FTTr. 7208-09.

disclosed.  Rather, the relevant temporal link is between the reaction of the stock market and the public disclosure that CUC's and Cendant's prior public filings contained financial statements that were false.  See SEC v. Penthouse Int'l Inc., 390 F. Supp. 2d 344, 352-54 (S.D.N.Y. 2005) (where the stock price did not drop after the issuer first announced that its previously filed financial statements had been challenged by its auditor, but the price dropped after fully corrective disclosures were made, materiality was sufficiently pled).

The challenged evidence shows that Cendant's stock price substantially declined repeatedly, over the course of more than four months.  The stock price experienced its three sharpest declines on the three days after Cendant made public disclosures about the fraud, each of which revealed that the fraud was more extensive than previously revealed.  From the fact that each public disclosure about the fraud corresponded with a substantial drop in the stock price, the jury can reasonably infer that the fraudulent statements and omissions that were the sum and substance of the fraud were material.  Rowe v. Maremont Corp., 850 F.2d 1226, 1242 (7th Cir. 1988) (movement of stock price in close proximity to defendant's announcement of its intention to make a tender offer for the stock "raises the inference that the tender offer was a substantial factor in [the issuer's] increased price").

Additionally, although the Government is required to prove materiality with respect to the particular false statements identified in Counts 2 and 3 of the redacted indictment, the loss evidence is relevant to prove materiality even if the stock market was reacting on April 16, 1998 to the first disclosure of the outlines of the fraud, and not to all of its particulars. The close temporal proximity (24 hours) of Cendant's disclosure of the fraud and the sharp price decline, the magnitude and alacrity of the price decline, the logical relationship between disclosure of the fraud and the decline in the stock price, and the express purpose of the charged fraudulent scheme to inflate the stock price, together create a reasonable inference that the disclosure of the fraud was "a substantial factor" which contributed to the loss.[4]  <u>Rowe</u>, 850 F.2d at 1242.  Although the

---

[4]  As a plurality of the Supreme Court has acknowledged, the "efficient market hypothesis" provides that all publicly available information about a publicly held company is reflected in the price of its stock. <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 246 (1988).  Moreover, an efficient market such as the New York Stock Exchange on which Cendant's stock was traded quickly incorporates any material information into the stock price.  <u>In re Executive Telecard, Ltd. Securities Litigation</u>, 979 F. Supp. 1021, 1028 (S.D.N.Y. 1997).

The cases cited by Forbes are not to the contrary.  <u>Spielman v. General Host Corporation</u>, 402 F. Supp. 190, 194 (S.D.N.Y. 1975) (no suggestion that factors accompanying stock price decline were irrelevant to materiality); <u>Ganino v. Citizens Utilities Company</u>, 228 F.3d 154, 166-67 (2d Cir. 2000) (reversing the dismissal of a private 10b-5 lawsuit where the district court improperly ignored the allegation that the "stock price did experience a precipitous drop . . . when reports of [the] poor
(continued...)

8

stock price drop may be insufficient to prove materiality as to any particular false statement, it is nevertheless relevant and admissible evidence of materiality. See S.E.C. v. Penthouse Int'l, Inc., 390 F. Supp. 2d at 353 (under Second Circuit law, "[t]here is no requirement that stock prices fluctuate as a result of a defendant's misstatements or omissions in order for them to be material").

**B.    The Probative Value of the Loss Evidence Is Not Substantially Outweighed by its Supposed "Prejudicial Effect."**

Forbes argues that the loss evidence should be excluded under Rule 403 because the Government has other evidence of materiality. FM 9. Judge Thompson properly rejected that argument as well. As in his previous attempts to exclude the loss evidence, Forbes has refused to stipulate that the fraudulent statements and omissions at issue here were material. FM 4, n.4. In a self-serving ploy masquerading as a concession, he offers to "agree to eliminate the element of materiality from the case." Id. Forbes' Trojan Horse suggestion must be rejected, as this Court is without authority to eliminate an element of any of the charged crimes from the jury's consideration. See United States v. Amante, 418 F.3d 220, 223 (2d Cir. 2005) (granting mandamus and reversing district court's

---

⁴(...continued)
earnings outlook first emerged").

bifurcation of an 18 U.S.C. § 922(g) "felon in possession of a firearm" trial to prevent the jury from learning of the defendant's prior conviction; "the jury must know why it is convicting or acquitting the defendant, because that is simply how our judicial system is designed to work") (internal quotation marks and citation omitted); United States v. Chevere, 368 F.3d 120, 122 (2d Cir. 2004) (reversing district court's ruling that the Government could not prove, in a § 922(g) trial, that the defendant was a previously convicted felon; "there are no circumstances under which a district court may remove the element of a prior felony conviction entirely from the jury's consideration by accepting a defendant's stipulation to that element").

It is precisely because the conspirators' false statements and omissions regarding CUC's true earnings were highly material to the investing public, and caused such a massive loss to Cendant's shareholders that Forbes' conduct was particularly wrongful and blameworthy.  United States v. Velazquez, 246 F.3d 204, 211 (2d Cir. 2001) (affirming the admission of evidence of the extent of the victim's injuries over the defendant's objection, which properly "underscored the moral blame attaching" to the crime).  Forbes' willingness to conceal from the jury the consequences of his crime provides no basis for this Court to exclude the challenged evidence.  As the Supreme Court has

10

explained, a "full evidentiary account" of the crime is necessary "not just to prove a fact but to establish its human significance, and to implicate the law's moral underpinnings and the jurors' obligation to sit in judgment." Old Chief v. United States, 519 U.S. 172, 187 (1997).

Hampering the Government's ability to present evidence to prove the crime, and forcing it to rely on dry stipulations (or as Forbes suggests, elimination of any mention of a necessary element altogether), would ignore the "need for evidence in all its particularity to satisfy the jurors' expectations about what proper proof should be." Old Chief, 519 U.S. at 188.  For that reason, "the prosecution is entitled to prove its case by evidence of its own choice, or more exactly, . . . a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it." Id. at 186-87; accord United States v. Salameh, 152 F.3d 88, 122 (2d Cir. 1998).  Evidence showing that the defendant's conduct caused harm to the victims is patently not "unfairly prejudicial" for purposes of Rule 403, but is "legally and morally relevant to the conduct constituting the offenses." Velazquez, 246 F.3d at 211.

For that reason, Forbes is not entitled to conceal from the jury the "legally and morally relevant" element of the charged crimes that the financial results which he directed his

subordinates to disseminate to the investing public were not merely false, but "materially false." Amante, 418 F.3d at 225 (the Government would be "unfairly prejudiced" by exclusion of any evidence regarding an element "because the jurors are being asked to deliberate about facts that they most likely would not consider a crime") (emphasis in original). Forbes' attempt to "remove from the jury's consideration an element of the crime" is objectionable for the same reason that a defendant may not prevent relevant evidence from being presented to the jury by stipulating away an element: both would "violate the very foundation of the jury system." United States v. Gilliam, 994 F.2d 97, 100 (2d Cir. 1993).

That the Government has "other evidence" of materiality is likewise not a reason to exclude the challenged evidence of investor loss. As Judge Thompson correctly and expressly concluded during the second trial, Second Trial Transcript ("STTr.") 606, the Government should not be prevented from presenting all available evidence that supports an element of the charged crimes merely because the Government may have other evidence which the jury may or may not deem sufficient to sustain its burden of proof. See United States v. Mohr, 318 F.3d 613, 618-19 (4th Cir. 2003).[5]

---

[5] Forbes argument is disingenuous as well. In other motions in limine currently pending before this Court, Forbes has
(continued...)

<u>United States v. Awadallah</u>, 436 F.3d 125 (2d Cir. 2006),
cited by Forbes, supports the Government's position instead.
There, the defendant was charged with committing perjury before a
grand jury by denying his familiarity with two of the September
11 hijackers.  He defended on the ground that any false
statements he made before the grand jury were the result of
confusion, fatigue, or intimidation.  The Government sought to
present the testimony of some of the grand jurors regarding the
objective circumstances in the grand jury room when the defendant
testified, <u>e.g.</u>, the temperature in the room, and whether anyone
raised their voice during the defendant's testimony.  The
Government also sought to have the grand jurors describe their
subjective beliefs about the defendant's mental state when he
testified.

The district court permitted testimony about the objective
factors but not the subjective factors, grounding its ruling in
part on Rule 403.  The Second Circuit affirmed, relying on the

---

[5](...continued)
sought to either exclude in its entirety the Government's "other
evidence" of materiality, Forbes' Third Trial Motion <u>In</u> <u>Limine</u>
No. 5, Docket 2261 (seeking to exclude all testimony of the
Government's expert witnesses), or to exclude or impair portions
of the testimony of witnesses who will testify about materiality.
<u>E.g.</u>, Forbes' Third Trial Motion <u>In</u> <u>Limine</u> No. 1, Docket 2190
(seeking to undermine the testimony of Cosmo Corigliano); Forbes'
Third Trial Motion <u>In</u> <u>Limine</u> No. 3, Docket 2253 (seeking to
exclude portions of the testimony of Steven Kernkraut); Forbes'
Third Trial Motion <u>In</u> <u>Limine</u> No. 15, Docket 2247 (seeking to
limit the testimony of James Rowan).

district court's very broad discretion regarding Rule 403
objections.  436 F.3d at 131.  Significantly, the Court of
Appeals explained that the grand jurors could permissibly testify
about the "materiality" of the defendant's false statement,
because "[t]estimony about materiality involves factual
statements, such as the subject matter of the grand jury
investigation, not the mental impressions of grand jurors."  Id.
at 134.  Likewise here, the challenged evidence about Cendant's
stock price decline and investor losses is established by highly
objective and quantitative facts.  Under Awadallah, it is
properly admitted.[6]

In conducting Rule 403 balancing, the Court should assess
any potential prejudice in light of the nature of the charges in
the case.  See United States v. Livoti, 196 F.3d 322, 326 (2d
Cir. 1999).  Here, the potentially prejudicial effect of the

_____

[6]  Forbes cites Awadallah for the proposition that, in
conducting Rule 403 balancing, the district court should consider
whether the Government has other evidence to prove the same fact
that is not as inflammatory as the challenged evidence.  In
Awadallah, the Court noted that persons other than the grand
jurors, such as the court reporter, could testify about the
defendant's demeanor when he uttered the false statements.  Here,
Forbes does not object to the identity of the witnesses who will
testify about the stock price drop and loss evidence.  Rather, he
seeks to exclude all evidence about loss.  The Awadallah Court,
however, did not exclude all testimony about the defendant's
demeanor when he testified, but only the proposed testimony of
the grand jurors.  The challenged evidence in Awadallah involved
a substantial risk that the trial jurors might give inordinate
weight to the views of the grand jurors, given their similar
function.  436 F.3d at 134.  No grand jurors will testify about
the challenged evidence here.

14

proffered evidence is slight, because it involves only financial
harm to the victims, which is precisely the kind of harm that
financial crimes would be expected to cause.  The proffered
evidence will not suggest that the defendants engaged in any
criminal conduct beyond that charged in the indictment.

Any risk that the jurors would base their verdict on
unsolicited sympathy for the victims can be sufficiently
dispelled by appropriate jury instructions.  <u>Hooper v. Mullin</u>,
314 F.3d 1162, 1173 (10th Cir. 2002); <u>see also</u> <u>Richardson v.
Marsh</u>, 481 U.S. 200, 211 (1987) ("juries are presumed to follow
their instructions").  Evidence describing harms to crime victims
which were far more inflammatory than the challenged evidence
here is routinely admitted.  <u>United States v. Rezaq</u>, 134 F.3d
1121, 1138-39 (D.C. Cir. 1998) (rejecting defendant's Rule 403
objection, in a prosecution for air piracy, of autopsy
photographs which graphically depicted a bullet embedded in a
victim's brain, and evidence that commandoes who stormed the
hijacked aircraft inadvertently killed 53 passengers);[7] <u>United
States v. Rivera</u>, 83 F.3d 542, 544-47 (1st Cir. 1996) (rejecting
a Rule 403 challenge, in a car-jacking prosecution, to evidence
that the defendant raped the victim); <u>United States v. Lopez</u>, 271

---

[7]  The autopsy photographs were properly admitted in <u>Rezaq</u>
even though the defendant offered to stipulate that the victim
had been killed, and requested that the Government be forced to
accept the stipulation.  134 F.3d at 1137.

15

F.3d 472, 482 (3d Cir. 2001) (rejecting a Rule 403 challenge, in a prosecution for mayhem, of gruesome photographs of the victim's mutilated hand). Forbes is not entitled to have the evidence "sterilized" to prevent the jury from learning that the victims lost money. United States v. Rivera-Gomez, 67 F.3d 993, 996-98 (1st Cir. 1995) (rejecting a Rule 403 challenge to evidence that the defendants murdered one of the victims during the charged car-jacking; "although a controlled environment for the reception of proof is essential, an artificially sterile environment is neither necessary nor desirable"), overruled on other grounds as stated in United States v. Mojica-Baez, 229 F.3d 292, 310 n. 12 (1st Cir. 2000).[8]

Forbes argues, as he did previously, that the loss evidence would supposedly invoke the widely publicized investment losses caused by accounting fraud at other corporations. FM 7. As

---

[8] United States v. Prater, 805 F.2d 1441 (11th Cir. 1986), cited by Forbes, does not justify exclusion of the challenged evidence. There, the Court stated in a footnote, without analysis, that the trial court committed harmless error by admitting evidence, the implication of which was "that defendant's investment activity caused" his own company "to suffer a loss." 805 F.2d at 1443, n. 2. Prater does not discuss the possible relevance of loss evidence to prove materiality.

Likewise inapposite is United States v. Lane, 323 F.3d 568 (7th Cir. 2003). There, the Court of Appeals held that the district court permissibly excluded evidence that the victim banks did not sustain a loss, because loss was not an element of the charged offense in that case, 18 U.S.C. § 1014, making false statements to a federally insured bank. 323 F.3d at 583-84. The Court did not have occasion to address the relevance of the challenged evidence to prove materiality.

during the previous trials, the Government will present no evidence or argument during the third trial about misconduct at other corporations.  Negative publicity about crime in general or particular kinds of crime should have little if any impact on a court's evidentiary rulings.[9]  Appropriate <u>voir</u> <u>dire</u> and cautionary instructions will substantially reduce any possible risk that the loss evidence will cause the jury to decide this case based on an emotional response.[10]

Absent proof that the stock price declined upon disclosure of the fraud, Forbes will be able to create the misleading appearance that any increases in the price of the stock helped, rather than hurt the shareholders.  Alternatively, exclusion of the loss evidence could leave the jury with the erroneous impression that the conspirators' false statements had no effect on the stock price.  This would permit Forbes to plausibly argue

---

[9]  The potential for news about corporate crime to inflame the jury has likely been reduced by the sheer volume of recent news stories on the subject.  <u>United States v. Adams</u>, 759 F.2d 1099, 1109 (3d Cir. 1985) (rejecting a Rule 403 challenge in a drug-trafficking case to evidence of the seizure of semi-automatic firearms and other "weapons of extreme violence [that] looked like they were taken from the set of a Hollywood gangster movie," because "it is well known that continued exposure to even emotion-arousing objects tends to reduce their effect") (internal quotation marks omitted).

[10]  Forbes cites <u>Old Chief</u>, which, as shown above, contradicts his current claim.  The exclusionary rule announced in <u>Old Chief</u> was expressly limited to "cases involving proof of felon status."  519 U.S. at 183 n.7.  The challenged evidence here does not involve Forbes' status, only the consequences of his criminal conduct.

that, since there was no evidence that the charged fraud had achieved its intended goal, there must have been no fraud.

The Court should prevent the jury from being misled in this manner.  See United States v. DeCastris, 798 F.2d 261, 265 (7th Cir. 1986) (the risks of admitting potentially prejudicial evidence "are not one-sided," and a jury forced to assess a defense claim without being able to assess contrary evidence could "have been led to error").  Exclusion of the loss evidence will inform the jury of only the rise of CUC's stock, and cover-up the fall.  It would tell only a misleading half of the story.  This Court should admit the entire story of the rise and fall.

**C.    Forbes' Meritless Claims of Prosecutorial Misconduct Do Not Justify Exclusion of the Challenged Evidence.**

Because his legal arguments fail, Forbes resorts to mind reading, contending that the Government intends to "incite juror anger and resentment" against Forbes.  FM 5.  As support for this spurious accusation, Forbes points to portions of the Government's cross-examination of Forbes during the second trial regarding the stock price decline, investor losses, and the fact that Forbes earned many millions of dollars during the conspiracy period.  FM 5, citing STTr. 3000-04.  At trial, however, Forbes did not even bother to object to many of the questions which he now claims were inflammatory.  STTr. 3000 (no objection to question about whether Cendant's stock price dropped by 45% following disclosure of the fraud); 3001 (shareholders lost

18

"billions of dollars"); 3001-02 (Forbes made millions of dollars during the conspiracy period).

Forbes properly declined to object because evidence about his substantial financial compensation during the conspiracy period was relevant to prove his motive to engaged in the charged fraud.  See generally United States v. Salameh, 152 F.3d 88, 111 (2d Cir. 1998) (noting that motive evidence is "commonly admitted"); United States v. Reed, 639 F.2d 896, 907 (2d Cir. 1981) (affirming the admission of motive evidence in a prosecution for conspiracy to commit securities fraud).  The Government properly questioned Forbes about his own compensation from CUC and Cendant, as it was a matter about which he, more than anyone, had accurate personal knowledge.

Additionally, as shown above, evidence of the stock price drop and investor loss was properly admitted by Judge Thompson to prove materiality.  The Government properly questioned Forbes about the stock price drop and investor loss to secure Forbes' concession that those material events occurred.  There was nothing improper about the Government juxtaposing Forbes' financial gains and the losses to the shareholders: evidence that a defendant obtained money and the victims lost money is relevant to prove that a fraud has occurred, and does not create the kind of "unfair prejudice" that Rule 403 is designed to preclude.  See generally Weinstein's Federal Evidence (2d ed., 2006), §

403.04[1][a] ("Virtually all evidence is prejudicial to one party
or another.  To justify exclusion under Rule 403, the prejudice
must be unfair."); <u>United States v. Cusak</u>, 229 F.3d 344, 347-48
(2d Cir. 2000).  That Forbes made a lot of money and the victims
collectively lost a lot of money was a predictable consequence of
the kind of fraud on the market that Forbes chose to direct.  <u>Cf.</u>
<u>United States v. Copple</u>, 24 F.3d 535, 545-46 (3d Cir. 1994)
(although extensive victim impact evidence should have been
excluded under Rule 403, evidence that the victims lost money as
a result of the charged fraudulent scheme was properly admitted
to prove fraudulent intent).  The Government never argued in
summation that Forbes should be convicted because he was a "bad"
or "greedy" person, or because he brought financial harm to his
victims.

Forbes also contends that the Government deliberately
violated Judge Thompson's directives during its second trial
summation when one of the prosecutors made a remark that was
stricken by the Court.  FM 4-5.[11]  To the contrary, there was no

_____

[11] Although Forbes accuses the Government of intentionally
violating Judge Thompson's directive, it was Forbes' counsel whom
Judge Thompson took to task for that reason.  STTr. 1995-97
(Judge Thompson explaining to Forbes' counsel that he appeared to
be "circumventing my rulings").  Judge Thompson also complained
that Forbes' counsel had misrepresented the record in its
submissions to the Court.  <u>E.g.</u>, FTTr. 16400-01 (Judge Thompson
stating that "I've concluded that I cannot rely on counsel for
Mr. Forbes to act in good faith not only towards opposing counsel
but towards the Court.  And I have never ever concluded that
                                                    (continued...)

20

misconduct nor any attempt to improperly prejudice Forbes.

Before the Government's summation, in response to an "anticipatory objection" by Forbes, Judge Thompson advised the Government that he would sustain an objection if the Government made an argument "contrasting Mr. Forbes compensation or stock sales with alleged losses to investors in Cendant stock." STTr. 3080. The reasonable interpretation of that admonition was that the Government could not argue that the size of Forbes' compensation or the size of investor losses was substantive proof of any of the charged crimes. The Government made no such argument. Rather the prosecutor attempted to juxtapose Forbes' self-serving testimony that he felt badly for the shareholders who suffered financial reversals when the fraud was disclosed with Forbes' insistence that he would not surrender his right to assume the position of CEO of Cendant in January 2000 until Cendant agreed to pay him a $47 million severance. The Government's proper argument was directed to discrediting Forbes' testimony by contradiction.[12]

---

[11](...continued)
about any lawyer who has ever appeared before me."); <u>see also</u> STTr. 869. Speaking generally, Judge Thompson decried "the pattern of unseemly tactics used by counsel for the defendant Forbes in this case.") <u>United States v. Forbes</u>, 2006 WL 680562, *1 (D. Conn., March 16, 2006).

[12] The prosecutor stated:

You saw the defendant testify. The defendant said that
(continued...)

Although Judge Thompson sustained Forbes' objection and struck the remark, Forbes did not argue, and Judge Thompson did not conclude that the challenged remark amounted to a violation of the court's prior admonition.  Indeed, Forbes did not offer any basis for the objection, and Judge Thompson did not elaborate on his ruling.  Had Forbes articulated the claim he belatedly makes now when the challenged summation remark was made, the prosecutor could have placed on the record the basis for the challenged remark, and the reasons why he believed that the remark was not prohibited by the Court's prior warning.  Having failed to seek an opinion from Judge Thompson that the prosecutor intended to flout the Court's admonition, Forbes' belated accusation, advanced only after Judge Thompson, who heard the remark first-hand, is out of the picture, should be rejected.

---

[12](...continued)
he felt very badly for the shareholders after Cendant's stock price collapsed and he was shocked to learn of the fraud.  **That's what the defendant said**.

**What does the evidence show?** The evidence shows that the defendant took another $47 million in severance from the company and then he walked away.

STTr. 3092 (emphasis added).  The prosecutor's intent was to contrast "what the defendant said" with "what the evidence showed."  Forbes' objection, sustained by Judge Thompson, prevented the prosecutor from driving home the point that the jury should discredit Forbes' testimony because it was inconsistent with his conduct.  Such impeachment by contradiction was permissible.  See Government's Opposition to Forbes' Third Trial Motion In Limine No. 14, Docket 2352 at 17-18.

**<u>CONCLUSION</u>**

The Government respectfully requests that this Court deny

Forbes' Third Trial Motion <u>In</u> <u>Limine</u> No. 11.


                              Respectfully submitted,

                              CHRISTOPHER J. CHRISTIE
                              Special Attorney
                              U.S. Department of Justice

                              *Norman Gross/s*

                              NORMAN GROSS
                              Federal Bar Number 24933
                              MICHAEL MARTINEZ
                              Federal Bar Number PHV0423
                              MARK E. COYNE
                              Federal Bar Number PHV01079
                              Special Attorneys
                              U.S. Department of Justice
                              970 Broad Street
                              Room 700
                              Newark, N.J.  07102
                              (973) 645-2701


Newark, New Jersey
Date: May 26, 2006

23

**EXHIBIT A**

**(GOVERNMENT TRIAL EXHIBIT 3058)**

**EXHIBIT B**

**(GOVERNMENT TRIAL EXHIBIT 827)**

EXHIBIT C

(GOVERNMENT TRIAL EXHIBIT 3059)

## CERTIFICATE OF SERVICE

The undersigned certifies that on this day I caused to be served a copy of the Government's Opposition to Forbes Renewed Motion to Preclude Evidence, Cross-examination, or Arguments Concerning (1) the Decline in Cendant's Stock Price on and after April 15, 1998 or (2) Investor Loss (Forbes Retrial Third Trial Motion In Limine No. 11) via email on:

Barry S. Simon, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005-5901
(202) 434-5005
bsimon@wc.com


_Norman Gross/s_

NORMAN GROSS


Dated: May 26, 2006
       Camden, New Jersey