UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:02CR00264 (AHN) |
| | : | |
| | : | |
| | : | |
| v. | : | May 26, 2006 |
| | : | |
| | : | |
| | : | |
| WALTER A. FORBES | : | |

GOVERNMENT'S OPPOSITION TO FORBES' MOTION TO PRECLUDE THE
GOVERNMENT FROM INTRODUCING THE HEARSAY STATEMENTS OF E. KIRK
SHELTON

(Opposition to Forbes Third Trial Motion In Limine No. 18)

CHRISTOPHER J. CHRISTIE
NORMAN GROSS
MICHAEL MARTINEZ
MARK E. COYNE
Special Attorneys
U.S. Department of Justice
970 Broad Street, Room 700
Newark, New Jersey 07102
Tel: (973) 645-2700

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT

I.  PEMBER'S TESTIMONY OF SHELTON'S STATEMENT TO HER IS NOT
    INADMISSIBLE HEARSAY. . . . . . . . . . . . . . . . . . . 6

II. FORBES HAS FAILED TO DEMONSTRATE THAT PEMBER'S TESTIMONY
    ABOUT SHELTON'S STATEMENT TO HER WILL CAUSE A CONSTRUCTIVE
    AMENDMENT OF OR A PREJUDICIAL VARIANCE FROM THE
    INDICTMENT. . . . . . . . . . . . . . . . . . . . . . . 11

III. THE PROBATIVE VALUE OF PEMBER'S TESTIMONY OF SHELTON'S
    STATEMENT TO HER FAR OUTWEIGHS ANY CLAIM OF PREJUDICE.   17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . 21

**INTRODUCTION**

This motion involves an out-of-court statement made by one of defendant Walter Forbes' coconspirators in this case, Kirk Shelton (who was convicted following the first trial in this case of all 12 charges against him), to Anne Pember, another of Forbes' coconspirators.  Shelton's statement to Pember concerned the "performance" of an Ernst & Young ("E&Y") auditor, Marc Rabinowitz, in a meeting between officials from CUC and HFS regarding the accuracy of CUC's accounting for the Ideon merger reserve.  In an effort to reassure Pember that the fraud had not been exposed, Shelton told Pember that Rabinowitz deserved an "Academy Award for his performance in the meeting."  Second Trial Transcript ("STTr.") 937.

Forbes contends that the Government should be precluded from introducing, through Pember's testimony, Shelton's so-called "casual aside" to Pember because it is hearsay.  Forbes' Memorandum in Support of Third Trial Motion In Limine No. 18 ("FM") 3-5.  He also argues that admission of Shelton's statement would cause a constructive amendment of, or prejudicial variance from, the indictment because it suggests that Rabinowitz was "involved in the conspiracy."  FM 5-6.  Finally, Forbes seeks to exclude Shelton's statement under Fed. R. Evid. 403.  FM 5. Judge Thompson properly admitted Shelton's statement into evidence at both of the previous trials, and did so over Forbes' objection in the second trial.  FTTr. 2960; STTr. 936.  There is

no reason for this Court to reconsider Judge Thompson's ruling.[1]
As shown herein, Forbes' current claims also fail on their own
terms.

### FACTUAL BACKGROUND

In December 1997, CUC International, of which Forbes was the
Chief Executive Officer and Chairman of the Board, merged with
HFS to form Cendant.  On Friday, March 6, 1998, several Cendant
officials who were former officials of CUC, including the former
President and Chief Operating Officer, Kirk Shelton, the former
Chief Financial Officer, Cosmo Corigliano, and the former
Controller, Anne Pember, met with Scott Forbes (no relation to
defendant Walter Forbes), a former official of HFS and then the
Chief Accounting Officer of Cendant.  STTr. 932, 1400.  During
that meeting, Shelton (who was then responsible for the former
CUC operating divisions that were now part of Cendant), told
Scott Forbes that Shelton needed help in "finding a home" for
$165 million from the former CUC's merger reserve.  STTr. 1398-
99.  Unbeknownst to Scott Forbes, the $165 million represented

---

[1] When "a court has ruled on an issue, that decision should
generally be adhered to by that court in subsequent stages in the
same case."  United States v. Uccio, 940 F.2d 753, 758 (2d Cir.
1991).  "[A]bsent cogent or compelling reasons to deviate," a
court should adhere to its prior rulings.  United States v.
Tenzer, 213 F.3d 34, 39 (2d Cir. 2000) (internal quotation marks
omitted).  Thus, "[u]nder the law of the case doctrine, courts
are understandably reluctant to reopen a ruling once made,
especially when one judge or court is asked to consider the
ruling of a different judge or court."  Lillbask v. Connecticut
Dep't of Educ., 397 F.3d 77, 94 (2d Cir. 2005) (internal
quotation marks omitted).

the "cushion" that the conspirators, including Shelton, Corigliano, and Pember, had established.  STTr. 1400-01.  The conspirators planned to use that cushion to fraudulently inflate the publicly reported earnings of the former CUC divisions (now operating divisions of Cendant) so that those earnings would meet the budgeted "targets" for the coming year.  STTr. 1399, 1401.

Shelton's request triggered a flurry of activity over the weekend.  On the evening of March 6, Scott Forbes reported Shelton's request to Michael Monaco, the Chief Financial Officer of Cendant.  FTTr. 2122-23; STTr. 592-93.  Scott Forbes and Monaco then contacted the Chief Executive Officer of Cendant, Henry Silverman, and told him about Shelton's proposal to "find a home" for the $165 million from the merger reserve.  FTTr. 1604; STTr. 590, 597.  Later that weekend, Silverman contacted Corigliano and demanded an explanation for Shelton's statement that the former CUC divisions had a $165 million earnings hole in their 1998 budget.  STTr. 1405-07.

Corigliano was unable to allay Silverman's concerns over the weekend, and a "very serious" meeting was held in New York City the following Monday morning, March 9, to discuss the matter.  First Trial Transcript ("FTTr.") 7476.  At that meeting, Silverman, who was "yelling and very upset," FTTr. 12484, expressed concern that the former CUC's accounting for its merger reserves, if improper, would prevent Cendant from meeting the filing deadline (March 31, 1998) for its annual report to the SEC

3

on Form 10-K.  FTTr. 12484.  Silverman demanded that if Forbes
and his colleagues from the former CUC had engaged in improper
accounting, they "should be men" about it and "go to the SEC."
STTr. 1408.  That comment "scared" Corigliano and made him "very
nervous" that the fraudulent scheme would be exposed.  FTTr.
7477.

        During the March 9 meeting, Silverman directed Shelton and
Corigliano to accompany Scott Forbes and Monaco to CUC's offices
in Connecticut in order to provide details about CUC's accounting
for a particular merger reserve, the "Ideon Reserve," established
during 1996.  FTTr. 7480; FTTr. 12485.  During the "very tense"
and "awkward" trip to Connecticut, Corigliano called Pember, told
her about Silverman's directive, and asked her to provide Monaco
and Scott Forbes with documentary support for CUC's accounting
for the Ideon Reserve.  FTTr. 7482; STTr. 933.  Pember, who was
not scheduled to be in the office that day, drove to her office,
and gave some documents to Monaco and Scott Forbes which
purported to justify CUC's accounting for the Ideon Reserve.
STTr. 933.

        Still dissatisfied, Monaco requested that someone from CUC's
outside auditor, E&Y, come to the CUC offices to satisfy Monaco
that the accounting for the Ideon Reserve had been proper.  FTTr.
7483.  Marc Rabinowitz, one of the senior E&Y auditors on the CUC
account, and Kenneth Wilchfort, another E&Y auditor, arrived at
the former CUC offices shortly thereafter.  FTTr. 7483; STTr.

934.  Rabinowitz explained to Monaco and Scott Forbes that E&Y
had audited CUC's analysis of the Ideon Reserve and had concluded
that it was "absolutely right" and "not an issue."  FTTr. 7484.
Shelton and Corigliano were present for Rabinowitz's
presentation, but Pember had left the meeting by then.  STTr.
934.

     After the meeting concluded, Pember saw Corigliano, Scott
Forbes and Monaco.  She was told that "everything went fine."
Monaco and Scott Forbes asked Pember for some additional
accounting schedules regarding the Ideon Reserve.  STTr. 935.
Shortly thereafter, Pember received a call from Shelton.  He told
her that the meeting "had gone well," and that Rabinowitz had
done a "really great" job and deserved an "Academy Award for his
performance in the meeting."  STTr. 937.  Shelton also expressed
his gratitude to Pember.  STTr. 937.  Shelton imparted the same
message about Rabinowitz's "performance" to Corigliano.  STTr.
1411-12.[2]

     A few weeks later, Cendant filed with the SEC its Form 10-K
annual report for the period ended December 31, 1997.  Pember had
previously signed Cendant's management representation letter to
E&Y that CUC's financial statements were prepared in accordance
with Generally Accepted Accounting Principles ("GAAP") and free

---

     [2] Forbes does not seek to preclude Corigliano from
testifying about Shelton's statement regarding that Rabinowitz
"deserved an Academy Award for his performance."  STTr. 1412.

from fraud.  That representation was false.  STTr. 940-41, 1442.

**ARGUMENT**

I.  **PEMBER'S TESTIMONY OF SHELTON'S STATEMENT TO HER IS NOT INADMISSIBLE HEARSAY.**

Forbes claims that Pember's testimony about Shelton's statement that Rabinowitz deserved an "Academy Award" should be excluded as hearsay.  This claim should be rejected.  A statement is hearsay if: (1) it is made by someone other than the declarant while testifying at trial or a hearing and (2) it is offered in evidence to prove the truth of the matter asserted.  Fed. R. Evid. 801.  Where out-of-court statements are offered for some other purpose, the hearsay rules do not apply.  Here, contrary to Forbes' claim, Pember's testimony about Shelton's statement is admissible for several other, non-hearsay purposes.

**First**, Shelton's statement to Pember is admissible as a statement of a coconspirator, pursuant to Fed. R. Evid. 801(d)(2)(E).  Under the Rule, a statement is not hearsay if it is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(E).  To admit a statement under this Rule, the court must find that (1) there was a conspiracy, (2) its members included the declarant and the party against whom the statement is offered, and (3) the statement was made both during the course of and in furtherance of the conspiracy.  Forbes does not challenge the existence of the conspiracy, that the statement was

6

made by a coconspirator or that it was made during the course of the conspiracy. Thus, the only issue before this Court is whether the statement was made "in furtherance of the conspiracy."

To satisfy the "in furtherance" requirement, the statement must in some way have been designed to promote or facilitate achievement of the goals of the ongoing conspiracy. United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1199 (2d Cir. 1989); see also United States v. Rahme, 813 F.2d 31, 35 (2d Cir. 1987) (statement must "prompt the listener to respond in a way that facilitates the carrying out of criminal activity"). A statement can promote or facilitate the goals of the conspiracy by, for example: providing reassurance to a coconspirator; seeking to induce a coconspirator's assistance; serving to foster trust and cohesiveness among conspirators; or informing coconspirators as to the progress or status of the conspiracy. E.g., Beech-Nut, 817 F.2d at 1199 (finding trial court's admission of coconspirator statement proper because statement was designed to "cover up" the conspiracy by ensuring that third party not reveal incriminating information); Rahme, 813 F.2d at 35-36 (finding that statements were intended to allay fears or suspicions of coconspirator and thus satisfied the "in furtherance" requirement).

Shelton's statement satisfies the "in furtherance" requirement. While Shelton's statement alone could be

misinterpreted as a casual comment concerning everyday, ordinary happenings, considered in the context in which it was made, it is clear that his statement was no such thing.  A reasonable reading of Shelton's statement is that it was intended to reassure Pember that the fraud had not been exposed, and direct her to continue her fraudulent activities.  By conveying to Pember that there was nothing to worry about because Rabinowitz had given a great "performance," Shelton sought to prevent Pember from defecting from the conspiracy.  Shelton also signaled to Pember that he would not desert his fellow conspirators.

Rather than a "casual aside" that could have had no effect on the goals of the conspiracy, the "casual" nature of Shelton's statement only served to add levity to a very stressful situation.  This served to foster trust and cohesiveness among the conspirators, and ensured that Pember would continue to further the goals of the conspiracy.  Indeed, that is precisely what happened here: on March 31, 1998, Cendant filed its 10-K annual report with the SEC as scheduled.  That report included falsely inflated earnings for the former CUC divisions, based on adjustments that Pember made or directed.  STTr. 872-82, 940-41, 1412.  Pember's testimony about Shelton's conspiratorial statement was therefore properly admitted against Forbes pursuant to Fed. R. Evid. 801(d)(2)(E).  See Beech-Nut, 871 F.2d at 1999; Rahme, 813 F.2d at 35-36.

**Second**, Shelton's statement to Pember is admissible to show

the effect it had on her.  Testimony offered to show the effect
on the listener and the listener's subsequent conduct is not
hearsay.  See United States v. Puzzo, 928 F.2d 1356, 1365 (2d
Cir. 1991) (concluding that district court erred in not admitting
statements offered for the effect on defendant).  Here, the
events leading up to Shelton's statement show that it was an
incredibly tense time for the coconspirators, in which they were
concerned that the fraud might be exposed and they would suffer
serious consequences.  Corigliano testified that Silverman's
comment about contacting the SEC "shocked" him and caused him
stress, and that Rabinowitz's comments in the meeting with HFS
gave him a "sense of relief."  STTr. 1411, 7477.

    Given that Pember was the person responsible for "using the
merger reserves to fill the gap," STTr. 1395, her fate also hung
in the balance.  Pember was aware of Monaco's and Scott Forbes'
inquiry and the possibility that they might discover the fraud.
Shelton's statement gave Pember comfort that the inquiry had not
uncovered the fraud, reassured her that he remained committed to
the conspiracy, and sought to induce her to do the same.  Thus,
Pember's testimony of what Shelton said to her is not hearsay and
was properly admitted for the fact that it was made.  See Fed. R.
Evid. 801(c), Advisory Comm. Notes ("Under the Federal Rules of
Evidence, '[i]f the significance of an offered statement lies
solely in the fact that it was made, no issue is raised as to the
truth of anything asserted, [then] the statement is not

9

hearsay.'"); <u>United States v. Sorrentino</u>,72 F.3d 294, 298 (2d Cir. 1995) ("[t]he statements of the CI were not offered to prove the truth of the matters asserted but only to render what Sorrentino said in these conversations intelligible"; they thus were not "hearsay evidence"); <u>United States v. Cardascia</u>, 951 F.2d 474, 486 (2d Cir. 1991) (quoting Fed. R. Evid. 801(c) Advisory Committee's note); <u>United States v. Press</u>, 336 F.2d 1003, 1011 (2d Cir. 1964) ("statements admissible to prove the truth of the matter they assert may be admitted if the fact of the assertion is in itself relevant").[3]

In sum, Shelton's statement to Pember is admissible for a number of reasons, none of which includes showing that Rabinowitz actually deserved an Academy Award for his performance in the meeting, or that Rabinowitz or anyone from E&Y willfully or intentionally "concealed" material information from anyone.[4]

---

[3] <u>Accord</u> <u>United States v. Faulkner</u>, 439 F.3d 1221, 1226 (10th Cir. 2006); <u>United States v. Saada</u>, 212 F.3d 210, 212 n.8 (3d Cir. 2000); <u>Macuba v. Deboer</u>, 193 F.3d 1316, 1324 n.15 (11th Cir. 1999); <u>United States v. Branham</u>, 97 F.3d 835, 851 (6th Cir. 1996); <u>United States v. Cantu</u>, 876 F.2d 1134, 1137 (5th Cir. 1989); <u>United States v. Legarda</u>, 17 F.3d 496, 499 (1st Cir. 1994).

[4] The cases cited by Forbes are inapposite, as they include statements that could not have had any effect on the goals of the conspiracy. <u>E.g.</u>, <u>United States v. Urbanik</u>, 801 F.2d 692, 698 (4th Cir. 1986) (identification of the marijuana supplier could not have affected the conspiratorial relationship).

10

## II. FORBES HAS FAILED TO DEMONSTRATE THAT PEMBER'S TESTIMONY ABOUT SHELTON'S STATEMENT TO HER WILL CAUSE A CONSTRUCTIVE AMENDMENT OF OR A PREJUDICIAL VARIANCE FROM THE INDICTMENT.

Forbes claims that Shelton's statement should be precluded because the jury could construe it to mean that Rabinowitz "knew of the fraud, and helped conceal it." FM 6. This, Forbes claims, is inconsistent with the conspiracy charged in the indictment. FM 6. This argument is meritless.

**First**, the third trial jury will be prohibited from finding that Forbes conspired with anyone from E&Y because this Court, like Judge Thompson, will presumably instruct the jury that such a finding is impermissible. Jury instructions are the principal protection against possible confusion regarding the nature and scope of the charges. See United States v. Coyne, 4 F.3d 100, 111-12 (2d Cir. 1993) (admission of relevant evidence regarding pre-conspiracy conduct did not constructively amend the indictment, in light of the district court's limiting instructions).

During the first and second trials, Judge Thompson instructed the jury that the charged conspiracy in this case involved a discrete number of persons, identified those persons, and further instructed that there were no other conspirators. FTTr. 16293-95; STTr. 3731. No one from E&Y is included in that list of conspirators. Id. The Government will not oppose the giving of the same instruction during the third trial, and the jury will presumably follow that instruction if given. Weeks v.

11

Angelone, 528 U.S. 225, 234 (2000).  An instruction that limits
the universe of Forbes' coconspirators will prevent the jury from
convicting him of conspiring with anyone from E&Y.  See United
States v. Lutz, 621 F.2d 940, 942-43 (9th Cir. 1980) (the risk of
a variance arising from the admission of evidence of the
defendants' participation in uncharged fraudulent conduct was
eliminated by jury instructions that the defendants could be
convicted only for the "single scheme . . . involving each of the
defendants" that was charged in the indictment); see generally
United States v. Salameh, 152 F.3d 88, 145-46 (2d Cir. 1998) (no
constructive amendment of the indictment where the Government's
summation and the final charge closely tracked the indictment,
and the jury was given a copy of the indictment for use during
deliberations).

Second, even if the challenged testimony suggested that
Rabinowitz was "involved in the conspiracy," FM 5, Forbes'
constructive amendment argument still fails.  A constructive
amendment of the indictment occurs only "when the charging terms
are altered, either literally or constructively," United States
v. Clemente, 22 F.3d 477, 482 (2d Cir. 1994), i.e., when the
trial evidence "modif[ies] essential elements of the offense
charged to the point that there is a substantial likelihood that
the defendant may have been convicted of an offense other than
the one charged by the grand jury."  United States v. Vebeliunas,

12

76 F.3d 1283, 1290 (2d Cir. 1996).[5]  So long as "the allegations

and the proof substantially correspond," and the trial evidence

is consistent with the "core of criminality" alleged in the

indictment, there can be no constructive amendment.  United

States v. Danielson, 199 F.3d 666, 670 (2d Cir. 1999).[6]  As the

Second Circuit has reiterated:

> Because proof at trial need not, indeed cannot, be a
> precise replica of the charges contained in the
> indictment, this court has consistently permitted
> significant flexibility in proof, provided that the
> defendant was given notice of the core of criminality
> to be proven at trial.

United States v. Frank, 156 F.3d 332, 338 (2d Cir. 1998).[7]

    Measured against these legal standards, Forbes' argument

fails as a matter of law.  The three elements of conspiracy to

violate the laws of the United States, 18 U.S.C. § 371, are: (1)

an agreement between two or more persons to commit an unlawful

act; (2) knowingly engaging in the conspiracy intending to commit

those offenses that were the objects of the conspiracy; and (3)

---

[5] Accord United States v. Joyner, 201 F.3d 61, 69 (2d Cir.
2000); United States v. Mucciante, 21 F.3d 1228, 1234 (2d Cir.
1994); United States v. Weiss, 752 F.2d 777, 787 (2d Cir. 1985).

[6] Accord United States v. Salmonese, 352 F.3d 608, 620 (2d
Cir. 2003); United States v. Delano, 55 F.3d 720, 729-30 (2d Cir.
1995).

[7] In assessing a constructive amendment claim, the court
must examine the totality of the indictment, and not merely a
particular averment which allegedly conflicts with the trial
evidence.  United States v. Ansaldi, 372 F.3d 118, 127 (2d Cir.
2004); United States v. Teitler, 802 F.2d 606, 617 (2d Cir.
1986).

commission of an "overt act" by one or more members of the conspiracy in furtherance of the conspiracy. <u>United States v. Reyes</u>, 302 F.3d 48, 53 (2d Cir. 2002). The identity and number of conspirators are not elements of the conspiracy charged in the indictment. Thus, there can be no constructive amendment based on a change in the number or identity of Forbes' coconspirators. <u>See</u> <u>United States v. Cahalane</u>, 560 F.2d 601, 605-06 (3d Cir. 1977) (by naming additional co-conspirators and identifying twenty additional overt acts on the eve of trial, "which was explanatory and descriptive rather than inconsistent . . . to the charges in the indictment," the Government did not constructively amend the indictment). Forbes' claim is insufficient to demonstrate a prejudicial variance, much less a constructive amendment of the indictment. <u>See</u> <u>United States v. Lippner</u>, 676 F.2d 456, 465 (11th Cir. 1982) (stating that defendant's claim that he suffered a prejudicial variance between the number of conspirators alleged in the indictment and proved at trial "borders on the frivolous").[8]

**Third**, the trial evidence will not confuse the jury into convicting Forbes of conspiring with Rabinowitz or anyone else

_____

[8] <u>See</u> <u>also</u> <u>United States v. Schurr</u>, 775 F.2d 549, 554 (3d Cir. 1985) (inconsistency between the conspirators identified in the indictment and proved by the trial evidence was a non-prejudicial variance); <u>United States v. Melekh</u>, 193 F. Supp. 586, 599 (N.D. Ill. 1961) ("It has been consistently held that an indictment is not subject to an attack of variance where it is disclosed by the evidence that the jury in fact knew the name of a co-conspirator but failed to state it.")

from E&Y.  Evidence does not constructively amend the indictment

unless it causes the jury to convict the defendant for a crime

other than the one charged in the indictment.  <u>See</u> <u>United States</u>

<u>v. Bryser</u>, 954 F.2d 79, 87 (2d Cir. 1992).  The Government has

charged a conspiracy that does not include anyone from E&Y.

<u>See</u> Redacted Indictment, ¶ 17.  The Government has not argued,

and will not argue, that anyone from E&Y was a member of the

conspiracy.  The Government has not argued, and will not argue,

that Forbes is guilty because he conspired with anyone from E&Y.

Rather, the Government will offer Shelton's statement to Pember

for the following proper reasons:

- Shelton's statement will be offered through Pember's
  testimony to corroborate the testimony of other witnesses
  that the coconspirators falsified CUC's books and records
  and took measures to hide their conspiratorial acts.  Her
  testimony will demonstrate not only the existence of the
  conspiracy, but also the actions of the coconspirators in
  furtherance of that conspiracy.

- Shelton's statement will be offered to show that the
  coconspirators understood that E&Y, which failed to expose
  the massive fraud perpetrated on its watch, would continue
  to rubber-stamp CUC's financials and would do so even if
  questioned.  As such, this testimony is highly relevant,
  because it explains why Forbes sought to ensure that E&Y
  remain as CUC's auditor after its merger with HFS.  It also
  corroborates the testimony of other witnesses that Forbes
  lobbied Henry Silverman and Michael Monaco to retain E&Y as
  CUC's auditor after the merger.  FTTr. 1625-34; STTr. 576-
  86.  Evidence regarding Forbes' motive to play his part in
  the charged fraud has substantial probative value.  <u>See</u>
  <u>generally</u> <u>Salameh</u>, 152 F.3d at 111 (noting that motive
  evidence is "commonly admitted"); <u>United States v. Reed</u>, 639
  F.2d 896, 907 (2d Cir. 1981) (affirming the admission of
  motive evidence in a prosecution for conspiracy to commit
  securities fraud).

- The challenged testimony provides support for the

15

Government's argument that Forbes used E&Y as a layer of protection to shield himself from liability for fraud.  Not only did Forbes rely on receiving E&Y's clean audit opinions, but Forbes also believed that E&Y, even if questioned, would not disclose the fraud.  That Rabinowitz defended the audit E&Y had performed on the Ideon Reserve validates that argument.

- The challenged testimony will be offered to rebut a central theme of Forbes' defense: that Forbes relied in good faith on E&Y's issuance, during the conspiracy period, of "clean audit opinions."  See FTTr. 16382 (jury instructions regarding Forbes' "Theory of the Case"); STTr. 83, 60-61.  During the prior two trials, Forbes has pointed to the fact that E&Y issued clean audit opinions "year after year, quarter after quarter" of CUC's publicly disclosed financial statements, and that Forbes relied on those audit opinions in concluding that CUC's financial statements complied with GAAP and were free from fraud.  E.g., STTr. 61, 83.  According to Forbes, if Cosmo Corigliano and the other coconspirators were able to conceal the fraud even from the certified public accountants from E&Y who audited CUC's accounting records, how could Forbes, a non-accountant who did not audit those records, detect the fraud?

Shelton's statement to Pember, however, supports the Government's argument that the conspirators knew E&Y would not seriously question or expose the fraud at CUC.  Such evidence is relevant to rebut Forbes' claim that he relied in good faith on E&Y's audit opinions in concluding that CUC's financial statements complied with GAAP and were not false or misleading.  See United States v. Khalil, 214 F.3d 111, 122 (2d Cir. 2000) (admitting rebuttal evidence); United States v. Rubin, 37 F.3d 49, 53 (2d Cir. 1994) (same).  Having presented a defense of good faith reliance on E&Y's clean audit opinions, Forbes should not be heard to preclude evidence offered to rebut his claim of good faith.  "[E]vidence . . . [used by the Government] to rebut

16

defense theories" could not have constructively amended the indictment.  <u>United States v. McAnderson</u>, 914 F.2d 934, 945 (7th Cir. 1990).

That Shelton's statement to Pember can be construed to suggest that Rabinowitz knew of the fraud at CUC (and even took measures to conceal it) does not render it inadmissible.  Forbes opened the door wide to such testimony when his lawyer stated during his opening statement before the second trial that the auditors did not know of or even see the fraud happening at CUC:

> There is no credible evidence that Walter Forbes saw
> Cosmo and the accounting staff manipulating the books
> and records.  He hid it so well that these **auditors . .**
> **. never saw it**.  They never saw it.  Walter didn't see
> it.  The auditors who were paid, trained, skilled
> people, examining the books every quarter, every year
> didn't see it.

STTr. 68 (emphasis added).  Forbes thereby put E&Y's knowledge of the fraud at issue.  He should not now be permitted to complain that evidence tending to show that E&Y suspected or knew about the fraud will constructively amend or cause a prejudicial variance from the indictment.  In other words, Forbes should not be permitted to use evidence as a sword when he likes it, and as a shield when he does not.

Forbes' constructive amendment and prejudicial variance claims should once again be rejected.

17

**III. THE PROBATIVE VALUE OF PEMBER'S TESTIMONY OF SHELTON'S STATEMENT TO HER FAR OUTWEIGHS ANY CLAIM OF PREJUDICE.**

Forbes claims that the jury "would take this statement to mean that Rabinowitz was involved in the conspiracy," and that therefore the danger of unfair prejudice far outweighs the "minimal probative value" of Shelton's statement.  FM 5.  This claim is meritless and should likewise be rejected.

Evidence may be excluded under Rule 403 only if its "probative value is <u>substantially outweighed</u> by the danger <u>of unfair prejudice</u>."  Fed. R. Evid. 403 (emphasis added).  Unfair prejudice "means any undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  <u>United States v. Brady</u>, 26 F.3d 282, 287 (2d Cir. 1994).  Relevant evidence introduced by the Government is "meant to be prejudicial" to a criminal defendant; "it is only unfair prejudice which must be avoided" under Rule 403.  <u>United States v. Rodriguez-Estrada</u>, 877 F.2d 153, 156 (1st Cir. 1989).  Any prejudicial effect can be minimized by an instruction that limits the jury's consideration of the evidence to the purposes for which it is admitted.  <u>See</u> <u>United States v. Pitre</u>, 960 F.2d 1112, 1120 (2d Cir. 1992).

As shown above, Shelton's statement is probative evidence of Forbes' motive for seeking to retain E&Y as CUC's auditor after its merger with HFS to form Cendant and his reliance on E&Y as a way to distance himself from the fraud.  It also serves to rebut

18

Forbes' claim of good faith reliance on E&Y's clean audit opinions.  As noted above, Forbes has argued that, if E&Y did not know about the fraud, he could not have known about it either. Evidence that E&Y auditors turned a blind eye towards the fraud properly rebuts the argument advanced by Forbes.  Thus, Shelton's statement clearly has "a tendency to make the existence of any fact that is of consequence . . . more probable."  Fed. R. Evid. 401.

The probative value of the challenged evidence is not substantially outweighed by any unfair prejudice.  Shelton's statement contains no criticism whatsoever of Forbes, and therefore cannot possibly evoke an improper emotional response against him.  See United States v. Zichettello, 208 F.3d 72, 101 (2d Cir. 2000) (rejecting a Rule 403 challenge to evidence that cooperating coconspirators participated in related but uncharged crimes, where the evidence did not implicate the defendants in that conduct); Brady 26 F.3d at 287 (rejecting a Rule 403 challenge to evidence of murders committed by the defendants' coconspirators, which did not directly implicate the defendant). Nor does Shelton's statement establish that Rabinowitz or anyone else from E&Y engaged in any conduct that is more sensational than the crimes with which Forbes is charged.  See United States v. Perez, 387 F.3d 201, 210 (2d Cir. 2004) (rejecting a Rule 403 challenge to evidence that "was no more sensational than other evidence of" the charged crimes).

Most important, having introduced the issue of E&Y's knowledge of the fraud into the case, Forbes is not entitled to exclude evidence relevant to that issue on the grounds of supposed prejudice.  Although evidence refuting a defense theory may undermine the defense, that is hardly a basis to exclude the evidence under Rule 403.  See United States v. Gelzer, 50 F.3d 1133, 1139 (2d Cir. 1995) (although all inculpatory evidence "is prejudicial to the interests of that defendant," Rule 403 addresses only that prejudice which creates "some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence"); Rodriguez-Estrada, 877 F.2d at 156 ("[t]hat the evidence helped the prosecution and hurt the defendant's chances cannot be gainsaid -- but that did not require exclusion").

Finally, any prejudice Forbes may suffer can easily be dissipated with appropriate instructions to the jury.  The Government will not argue that Forbes should be convicted because he conspired with Rabinowitz or anyone else from E&Y.  Nor will the Government argue that anyone from E&Y is guilty of conspiracy.  Accordingly, Forbes' claim of unfair prejudice is meritless.

20

## CONCLUSION

The Government respectfully requests that this Court deny Forbes' Third Trial Motion in Limine No. 18.

Respectfully submitted,

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice

*Norman Gross/s*

NORMAN GROSS
Federal Bar Number 24933
MICHAEL MARTINEZ
Federal Bar Number PHV0423
MARK E. COYNE
Federal Bar Number PHV01079
Special Attorneys
U.S. Department of Justice
970 Broad Street
Room 700
Newark, N.J.  07102
(973) 645-2701

Newark, New Jersey
Date: May 26, 2006

21

## CERTIFICATE OF SERVICE

The undersigned certifies that on this day I caused to be served a copy of the Government's Opposition to Forbes' Motion to Preclude the Government from Introducing the Hearsay Statements of E. Kirk Shelton (Opposition to Forbes Third Trial Motion <u>In Limine</u> No. 18) via email on:

Barry S. Simon, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C.  20005-5901
(202) 434-5005
bsimon@wc.com

*Norman Gross/s*

NORMAN GROSS

Dated: May 26, 2006
       Camden, New Jersey