UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | No. 3:02CR264 (AHN) |
| v. ) | |
| ) | June 15, 2006 |
| WALTER A. FORBES ) | |

**REPLY MEMORANDUM IN SUPPORT OF
MOTION OF DEFENDANT WALTER A. FORBES
TO PRECLUDE THE GOVERNMENT FROM PRESENTING
EVIDENCE, CROSS-EXAMINATION, OR ARGUMENT
CONCERNING (1) MR. FORBES' JULY 1998 SEVERANCE AGREEMENT
WITH CENDANT; (2) THE VALUE OF MR. FORBES' SEVERANCE;
(3) THE JULY 28, 1998 CENDANT BOARD MEETING; OR
(4) THE FINANCIAL AND OTHER PRESSURES ON CENDANT IN JULY 1998
<u>(Forbes Third Trial Motion In Limine No. 14)</u>**

Brendan V. Sullivan, Jr. (Bar No. ct17115)
Barry S. Simon  (Bar No. ct24159)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
Cowdery, Ecker & Murphy, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Oral Argument Requested                    Attorneys for Walter A. Forbes

Defendant Walter A. Forbes, through undersigned counsel, respectfully submits this memorandum in support of his motion in limine to preclude the government from presenting any evidence, cross-examination, or argument concerning: (1) Mr. Forbes' July 1998 severance agreement with Cendant; (2) the value of the severance; (3) the July 28, 1998 Cendant Board meeting; or (4) the pressures on Cendant at the time of the severance agreement.[1]

The government represents that it "will not offer the [s]everance [a]greement or testimony about the amount of the severance payment on direct examination of any witness during its case-in-chief." Opp. at 3.[2] Accordingly, this reply memorandum is limited to the remaining issues raised by Mr. Forbes' motion.

## ARGUMENT

I.  **THE COURT SHOULD REJECT THE GOVERNMENT'S SPECULATIVE AND ILLOGICAL ARGUMENTS IN SUPPORT OF THE POSSIBLE RELEVANCE OF THE JULY 1998 CENDANT BOARD MEETING AND RELATED EVENTS.**

The government does not dispute that Mr. Forbes' conduct at the July 1998 Cendant Board meeting, the Board fight that took place at that meeting, the views expressed by various Board members at the meeting, Mr Forbes' alleged refusal to resign without a severance, the resignations of other Cendant board members, and the financial pressures on Cendant in July 1998 have no relevance to either Mr. Forbes' credibility or the charges in the indictment.[3]

---

[1] This motion is not governed by the standards for reconsideration or law of the case. See Reply Supp. Forbes Third Trial Mot. In Limine No. 9 (filed June 15, 2006).

[2] Since the government asserts that it will not present evidence on these subjects in its case-in-chief, the Court should preclude the government from making any reference to these matters in its opening statement. See Docket No. 1845 at 4 ("there should be no mention of any of these matters during the opening statements").

[3] Evidence concerning the views of Cendant board members about whether Mr. Forbes should have accepted the severance also is inadmissible lay opinion and hearsay.

Indeed, the government represented prior to the 2005 trial that it did not intend to present any evidence on these subjects, see Docket No. 1719 (filed 9/20/05) at 3 n.1, and it made no attempt to do so during the 2005 trial. The government's only response to this portion of Mr. Forbes' motion is its contention that the motion is "premature," Opp. at 12, based on hypothetical scenarios in which the government contends that this information could possibly become relevant. As Mr. Forbes' third trial approaches, however, his motion in limine is hardly premature. The Court should reject the government's speculation that this evidence could become relevant under certain circumstances.

First, contrary to the government's suggestion, Opp. at 13, the events of July 1998 are irrelevant to the events that took place prior to April 1998 with respect to the merger between CUC and HFS. Events prior to April 15, 1998 concerning the CUC/HFS merger may be highly relevant to the charges in the indictment and to Mr. Forbes' knowledge, state of mind, and intent during the period at issue in the indictment.[4] The board fight that took place in July 1998, however, after Cendant's April 1998 announcement of accounting irregularities and the commencement of shareholder suits, at a time when there was clear animosity between representatives of the former HFS and representatives of the former CUC, has nothing to do with those issues. The Court should reject the government's claim that, by presenting relevant evidence concerning the relationship between CUC and HFS "after the Cendant merger

---

[4] For example, the government asserts that any actions that Mr. Forbes took with respect to Anne Pember's employment prior to April 1998 were motivated by a purported desire to keep Ms. Pember in place to further the fraud. See Tr. (10/17/05) at 42-44 (government opening statement). Mr. Forbes has explained that he acted in good faith with respect to Ms. Pember, who became a symbol to CUC employees of HFS treating the merger of equals like a corporate takeover. E.g., Tr. (11/15/05) at 3007-08. The introduction of evidence on this subject has nothing to do with the events of July 1998.

2

agreement was signed" in May 1997, Opp. at 13, but before the accounting irregularities were disclosed in April 1998, Mr. Forbes would somehow open the door to irrelevant evidence about the July 1998 Cendant Board fight.

Second, the Court should reject the government's contention that evidence concerning the events of July 1998 could become relevant in the event Mr. Forbes challenges the credibility of witnesses from the former HFS. See Opp. at 12. This theory of relevance assumes that the government would seek to establish the bias of its own witnesses by offering evidence to support the witness's bias against Mr. Forbes. It would be entirely illogical for the government to seek to undermine the credibility of its own witnesses by presenting evidence of their bias. While a party may impeach its own witnesses, any witnesses from the former HFS who would be called in the government case would not be hostile to the government, and the government presumably wants the jury to credit their testimony. Any effort by the government to present evidence concerning the July 1998 Board meeting as purported bias evidence would be a pretext for placing before the jury prejudicial and irrelevant evidence concerning the events of July 1998.[5] The Court should reject any such attempt by the government, and should preclude the government from presenting any evidence, cross-examination, or argument concerning the July 1998 Cendant Board meeting pursuant to Rule 401.

---

[5] Neither of the cases cited by the government supports its claim that it should be able to present evidence of the bias of its own witnesses to put any bias evidence "in proper context." Opp. at 12. Townsend v. Benya, 287 F. Supp. 2d 868 (N.D. Ill. 2003) (Opp. at 12), does not address the issue of bias and is entirely inapposite. There, the plaintiffs sought to introduce prior inconsistent statements of the defendants for impeachment purposes -- evidence that is entirely proper. Id. at 875. United States v. Ellis, 121 F.3d 908 (4th Cir. 1997) (Opp. at 12-13), addresses the unrelated issue of the admissibility of a witness's prior consistent statements following impeachment concerning prior inconsistent statement. Id. at 921.

3

Even assuming <u>arguendo</u> that the government's strained theories of relevance have any merit, the Court should preclude any evidence concerning the July 1998 Cendant Board meeting and the pressures on Cendant in July 1998 pursuant to Rule 403. As Mr. Forbes previously demonstrated, the government improperly used this evidence during the 2004 trial to attack Mr. Forbes' character, arguing that Mr. Forbes greedily refused to leave Cendant until he received his severance. <u>See</u> Opening Mem. at 4 & n.2. Evidence concerning the Board fight that took place at that meeting would be highly prejudicial to Mr. Forbes, because it would improperly suggest that Mr. Forbes acted unethically or wrongfully during the Board meeting and would confuse and mislead the jury. Jurors are not familiar with corporate Board fights or the myriad of political, legal, and interpersonal issues that may motivate Board members to take certain positions or make certain statements during such events. The introduction of evidence on this subject would lead the case far afield from the charges in the indictment, into mini-trials concerning irrelevant issues.

Any reference to the notion that certain Board members sought to terminate Mr. Forbes in July 1998 for cause, <u>see</u> Opp. at 11, also would be prejudicial and misleading. In fact, the Board was advised by counsel at the meaning that it did <u>not</u> have grounds for dismissing Mr. Forbes for cause. <u>See</u> Ex. 2 to Opening Mem. at 8. To the extent that certain Board members held contrary views, their opinions are inadmissible lay opinion and hearsay. Evidence concerning the detrimental effect on Cendant of its announcement of accounting irregularities in April 1998, Opp. at 10 n.3, also has no probative value in this case but would be extremely prejudicial. It would serve no legitimate purpose, and would arouse juror emotion and anger against Mr. Forbes for the harms suffered by Cendant and its employees.

In sum, there is no legitimate basis for permitting the government to present evidence concerning the July 1998 Cendant Board meeting or the financial and other pressures on Cendant at that time. The government does not even attempt to argue that these events, which took place months after the conclusion of the period at issue in the indictment, have any relevance to the charges against Mr. Forbes. At most, the government offers speculative and illogical hypotheticals concerning the potential relevance of this information. The Court should preclude any evidence, cross-examination, or argument on these subjects pursuant to Fed. R. Evid. 401 and 403.

II. **THE COURT SHOULD PRECLUDE ANY CROSS-EXAMINATION OF MR. FORBES CONCERNING THE SEVERANCE PURSUANT TO FED. R. EVID. 401 AND 403.**

Acknowledging that the severance cannot be introduced as substantive evidence, Opp. at 3, the government repeats its contention that Mr. Forbes' $47 million severance is relevant to his credibility because he stands to lose the severance if he is convicted. Opp. at 9. That argument obscures the government's real purpose for seeking to offer this evidence, which was revealed in two prior trials -- to inflame juror anger and resentment against Mr. Forbes based on his wealth and the fact that he accepted a large severance payment at a time when stockholders were suffering significant losses. It is not a coincidence that the government contrasted Mr. Forbes' acceptance of the severance with shareholder losses in both the 2004 and 2005 trials. See Tr. (10/19/04) at 15,116; Tr. (11/29/05) at 3091-92. In the 2005 trial, the government also argued, improperly, that Mr. Forbes' acceptance of the severance -- which the presiding judge allowed into evidence only for purposes of impeachment -- was purported substantive evidence of guilty knowledge. Tr. (11/29/05) at 3091-92. The government's reference to the severance on the issue

5

of credibility was an afterthought, made in summation only <u>after</u> Judge Thompson struck the government's improper arguments based on the severance. <u>Id.</u> at 3092.[6]

If the government truly seeks to impeach Mr. Forbes' credibility based on his interest in the outcome of the criminal case, it is certainly free to do so. It is evident that Mr. Forbes has a great deal at stake in this case, including his liberty, and that he would face financial ruin from both criminal fines and civil judgments in the event he were convicted.[7] But there is no legitimate reason for the government to single out the amount of Mr. Forbes' severance in order to conduct such a cross-examination.

As Mr. Forbes pointed out in his opening memorandum, the severance agreement only authorizes Cendant to <u>bring an action</u> against Mr. Forbes for recovery of the severance in the event he were convicted of a crime. The government concedes that Cendant <u>has already sued Mr. Forbes for recovery of his severance</u>. <u>See</u> Opp. at 9 ("Cendant has already sued Forbes"). Accordingly, the severance agreement does <u>not</u> give Mr. Forbes any motive to testify falsely. To the extent that Mr. Forbes could lose the suit seeking recovery of the severance in the event of a conviction, that suit is no different from the other civil suits pending against Mr. Forbes, and the government offers no legitimate reason why it should single out this $47 million claim to the exclusion of all others.

---

[6]   Even then, the government argued only that, "[i]f the defendant were to plead guilty to committing the fraud, or if the defendant were found guilty of committing the fraud, then Cendant could sue the defendant to get the $47 million back." Tr. (11/29/05) at 3092. That argument also was improper and misleading, because the government was fully aware that Cendant had sued Mr. Forbes years earlier, in 1999, "to get the $47 million back."

[7]   The government itself asserts that the severance is only "one of Forbes' many possible motives to falsely exonerate himself." Opp. at 1. It also asserts that "Forbes could face other severe penalties if he was convicted." Opp. at 8.

It is telling that the government did not even bother to ask Mr. Forbes about the possible loss of liberty or the possibility of financial ruin in the event of a conviction during his cross-examination in the 2005 trial. Instead, the government focused only on the $47 million severance and sought to link Mr. Forbes' acceptance of the severance to shareholder losses, Tr. (11/15/05) at 3000-04, just as it did in summation, Tr. (11/29/05) at 3091-92. Where, as here, the government's real purpose for offering evidence concerning Mr. Forbes' severance is an improper one, the Court should preclude the government from discussing either the severance agreement or the amount of the severance in its cross-examination of Mr. Forbes.[8]

While the government asserts that Mr. Forbes will not suffer undue prejudice from reference to the $47 million severance, Opp. at 14, the government cannot reconcile that claim with its conduct in the 2004 and 2005 trials. In both trials, the government emphasized the amount of the severance and the fact that Mr. Forbes accepted it at a time when shareholders suffered losses in an effort to inflame jurors and portray Mr. Forbes as a person of poor character. E.g., Tr. (9/30/04) at 14,377 ("You were going to try to negotiate your way out, a nice big severance on the way out?"); id. at 14,405 ("But even though you felt bad for the shareholders and you were still a multimillionaire by tens of millions of dollars, isn't it true you still wanted more money out of the company before you would agree to leave?");[9] Tr. (10/4/04) at 14,488 ("Well, when you left were you given the $47 million?"); Tr. (10/19/04) at 15,116 (Mr. Forbes "wouldn't

---

[8] The government cannot, and does not, respond to the point that, had Mr. Forbes not accepted his severance, the government likely would argue that such conduct demonstrated consciousness of guilt. Given the Catch-22 nature of the situation, it is both misleading and fundamentally unfair for the government to emphasize the amount of the severance or to suggest that Mr. Forbes acted improperly by accepting it.

[9] Mr. Forbes' objection to this question was sustained.

7

leave the company; wouldn't leave the company, ladies and gentlemen, unless he got one more payment, one more chance to get paid."); id. ("Mr. Forbes tells us he was sorry for the shareholders. Felt sorry for them. He was so sorry that he wanted to take $47 million with him as part of his severance."); Tr. (11/15/05) at 3000-04 (asking Mr. Forbes how he felt about shareholders who lost money, and highlighting that Mr. Forbes accepted his severance a few months after the collapse of Cendant's stock price); Tr. (11/29/05) at 3092) (" The evidence shows that the defendant took another $47 million in severance from the company and then he walked away.").

The government's conduct in two trials distinguishes this case from United States v. Quattrone, 441 F.3d 153 (2d Cir. 2006) (Opp. at 13). There, the government was careful to inform the jury that evidence of compensation "was to be used for the limited purpose of establishing a motive to obstruct." Id. at 187. Here, the proffered evidence has no relevance to Mr. Forbes' motive to commit the charged offenses, because it deals with events that took place after the conclusion of the period at issue in the indictment.[10] The government seeks to use this evidence to "appeal to the potential bias of not-so-wealthy jurors" by emphasizing the defendant's wealth and "equat[ing] wealth with wrongdoing." United States v. Stahl, 616 F.2d 30, 31 (2d Cir. 1980).[11]

---

[10] For this reason, the government's reliance on other cases in which evidence was presented "of the defendant's financial motive to engage in unlawful conduct," Opp. at 16 n.6, also is misplaced.

[11] While the government observes that a limiting instruction could be given concerning the issue of wealth, Opp. at 15, the Stahl jury was given an instruction "against drawing adverse inferences from the defendant's wealth or social status." 616 F.2d at 32. The Second Circuit nevertheless concluded that the government's emphasis on the defendant's wealth and its appeals to class prejudice required a new trial. Id. at 33. The government should not be

8

While the government claims that it made arguments linking Mr. Forbes' severance to shareholder losses only "to impeach Forbes' self-serving and false contention that he felt sorry for the shareholders who lost money as a result of the fraud," Opp. at 17, the government injected this issue into the case in the 2005 trial by asking Mr. Forbes on cross-examination how he felt about the shareholders. Tr. (11/15/05) at 3003. Judge Thompson correctly concluded that it would be improper for the government to make arguments that contrasted Mr. Forbes' compensation with financial losses suffered by Cendant shareholders. See Tr. (11/29/05) at 3080. The government's continuing desire to use evidence concerning the severance for the improper purpose of contrasting Mr. Forbes' compensation with losses to shareholders is evident from the arguments it advances in its opposition memorandum, which are far removed from the supposedly legitimate purpose for which the government seeks to offer this evidence. E.g., Opp. at 17 ("Forbes' claims of supposed remorse were at least arguably inconsistent with his refusal to resolve the management crises at Cendant without a substantial buy-out.").

The government breezes by its improper attempt during the 2005 trial to use Mr. Forbes' acceptance of the severance as purported substantive evidence of Mr. Forbes' guilt by representing that it will not repeat this argument. Opp. at 17. The fact remains, however, that the government sought to use evidence concerning the severance for improper purposes at two trials, and sought to have jurors draw an inference of guilt based on Mr. Forbes' acceptance of the severance. See Tr. (11/29/05) at 3091-92. Indeed, this was the government's lead argument on the critical issue of Mr. Forbes' knowledge. See id. It is clear from the arguments advanced by

---

permitted to make improper arguments concerning Mr. Forbes' severance on the theory that the prejudice caused by those arguments could be "cured" (a legal fiction). The improper argument should be precluded in the first place.

9

the government at the 2005 trial that this evidence creates a serious risk that jurors will draw the precise conclusion that the government previously asked them to draw-- that Mr. Forbes is a bad person, and is more likely to be guilty of the charged offenses, because he accepted a substantial severance at a time when shareholders were suffering significant losses. There is a significant risk that jurors will construe this evidence, which at best is admissible only with respect to Mr. Forbes' credibility, as substantive evidence against Mr. Forbes. Because this evidence has, at best, minimal probative value, but is extremely prejudicial, the Court should preclude the government from making any reference to Mr. Forbes' severance at Mr. Forbes' third trial.

## CONCLUSION

For the foregoing reasons, and the reasons set forth in Mr. Forbes' opening memorandum, the Court should preclude the government from presenting evidence, cross-examination, or argument concerning: (1) Mr. Forbes' July 1998 severance agreement with Cendant; (2) the value of the severance Mr. Forbes received from Cendant; (3) the July 28, 1998 Cendant Board meeting; or (4) the financial and other pressures on Cendant in July 1998.

        Respectfully submitted,

        WILLIAMS & CONNOLLY LLP

By: _____
  Brendan V. Sullivan, Jr. (Bar No. ct17115)
  Barry S. Simon (Bar No. ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
Cowdery, Ecker & Murphy, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

11

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Reply Memorandum in Support of Motion of Defendant Walter A. Forbes to Preclude the Government from Presenting Evidence, Cross-Examination, or Argument Concerning (1) Mr. Forbes' July 1998 Severance Agreement with Cendant; (2) the Value of Mr. Forbes' Severance; (3) the July 28, 1998 Cendant Board Meeting; or (4) the Financial and Other Pressures on Cendant in July 1998 (Forbes Third Trial Motion <u>In Limine</u> No. 14) to be filed electronically and to be served on June 15, 2006 to the following via e-mail:

> Norman Gross, Esq. (norman.gross@usdoj.gov)
> Michael Martinez, Esq. (michael.martinez2@usdoj.gov)
> Craig Carpenito, Esq. (craig.carpenito@usdoj.gov)

_____
Barry S. Simon