UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | No. 3:02CR264 (AHN) |
| v. | ) ) ) |  |
|  | ) | June 15, 2006 |
| WALTER A. FORBES | ) ) ) |  |

**REPLY MEMORANDUM IN SUPPORT OF MOTION
OF DEFENDANT WALTER A. FORBES TO PRECLUDE THE GOVERNMENT
FROM ELICITING FALSE TESTIMONY FROM KEVIN KEARNEY OR, IN
THE ALTERNATIVE, FOR LEAVE TO PRESENT DOCUMENTARY
EVIDENCE TO IMPEACH FALSE TESTIMONY BY KEVIN KEARNEY
<u>(Forbes Third Trial Motion In Limine No. 6)</u>**

Brendan V. Sullivan, Jr. (Bar No. ct17115)
Barry S. Simon (Bar No. ct24159)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
Cowdery, Ecker & Murphy, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

Oral Argument Requested

The government's attempts to excuse or explain Kevin Kearney's testimony do not alter the fact that Mr. Kearney testified falsely in two trials.[1] The government either knows, or should know, that Mr. Kearney's testimony concerning the purported invocation of Mr. Forbes' name by three different individuals during conversations about unsupported topside adjustments was false. It cannot elicit that testimony and then withhold from the jury evidence that Mr. Kearney repeatedly told the government information that is inconsistent with those claims.

Government representatives -- some of whom participated in the 2004 trial -- conducted numerous interviews with Mr. Kearney over the course of several years prior to the 2004 and 2005 trials. To the extent the government has produced notes or correspondence concerning those interviews, they reflect that Mr. Kearney repeatedly made statements to the government that are fundamentally inconsistent with his trial testimony. Yet the government seeks to withhold this critical information from the jury, and to permit Mr. Kearney not only to testify falsely about Mr. Forbes, but to falsely claim that his testimony is consistent with his interviews.

Contrary to the government's contention that it "has been diligent to a fault in informing Forbes about anything that might enable him to impeach Kearney," Opp. at 3, and that it has given Mr. Forbes "carte blance access to [interview] notes," Opp. at 17, the government continues to withhold extremely important impeachment material concerning Mr. Kearney, including, inter alia, critical notes of a July 2001 interview in which Mr. Kearney indicated that he had no information concerning Mr. Forbes.[2] The Court should either preclude the government

---

[1] This motion is not governed by the standards for reconsideration or law of the case. See Reply Supp. Forbes Third Trial Mot. In Limine No. 9 (filed June 15, 2006).

[2] The government has failed or refused to produce any notes by the three other government representatives who were present at this significant interview -- SEC accountant Susan Markel, SEC attorney Roger Paszamont, and former FBI agent Mark Gerber. Although Mr. Gerber had a duty to prepare a Form 302 of that interview, see Manual of Administrative Operations and

from eliciting false testimony at Mr. Forbes' third trial or require the government to disclose <u>all</u> relevant information concerning Mr. Kearney's government interviews and permit Mr. Forbes to introduce that material into evidence.

I. **THE GOVERNMENT HAS A DUTY NOT TO PRESENT FALSE OR MISLEADING TESTIMONY BY MR. KEARNEY.**

The government attempts to rely on a four-part test for determining whether Mr. Kearney's testimony about the purported invocation of Mr. Forbes' name during conversations about topside adjustments is admissible. See Opp. at 4 (citing <u>United States v. Glover</u>, 588 F.2d 876, 879 (2d Cir. 1978)). That test, however, applies to whether a conviction should be <u>reversed</u> on due process grounds based on perjured testimony, not whether the government has a duty not to present false or misleading testimony at trial. As the Second Circuit explained in <u>Glover</u>, "even if [a witness's] testimony were not perjurious, but simply mistaken, and the government had not been aware of the inaccuracies until after the testimony was given, the government still would have a duty under the Fourteenth Amendment <u>not knowingly to allow false testimony to go uncorrected</u>." <u>Id.</u> (emphasis added).[3]

The current trial team also tries to avoid its obligations with respect to Mr. Kearney's testimony by distancing itself from the numerous prosecutors and government representatives who conducted interviews of Mr. Kearney beginning in 1998. While the government asserts that

---

<u>Procedure</u>, § 10-13.3(3), no Form 302 has been produced either.

[3] Similarly, "[t]he prosecutor cannot be permitted to look at the case pretrial through the end of the telescope an appellate court would use post-trial. Thus, the government must always produce any potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed -- with the benefit of hindsight -- as affecting the outcome of the trial." <u>United States v. Safavian</u>, 233 F.R.D. 12, 16 (D.D.C. 2005).

2

"no member of the prosecution team has personal knowledge that any of Kearney's prior testimony was false," Opp. at 3, that is not the applicable standard. The government is charged with knowing all of the information made available to it by Mr. Kearney, irrespective of whether the current prosecution team has personal knowledge of Mr. Kearney's interviews. Cf. United States v. Safavian, 233 F.R.D. 12, 15 (D.D.C. 2005) ("In the course of their investigation, and in collecting and reviewing evidence, the prosecutors must ensure that any information relevant to this case that comes into the possession, control, or custody of the Justice Department remains available for disclosure."). The government also is responsible for information that it should know based on Mr. Kearney's interviews. See United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991) (Napue rule applies when the prosecutor "knew or should have known" that the evidence was false); United States v. Vozzella, 124 F.3d 389, 393 (2d Cir. 1997). The government cannot circumvent its constitutional obligation not to present false or misleading testimony simply by changing the members of its trial team.[4]

While the government attempts to distance itself from its own notes of Mr. Kearney's interviews, asserting that the notes are not verbatim statements and may not be complete, Opp. at 10, the government participated in Mr. Kearney's interviews. It has an obligation -- under Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), Napue v. Illinois, 360 U.S. 264, 269 (1959), and their progeny -- to know what Mr. Kearney told it at those interviews. The government should not speculate about whether Mr. Kearney was asked certain questions in his interviews (Opp. at 10) -- it should know whether it asked such questions, and

---

[4] Nor may the government circumvent its constitutional obligations by choosing not to make any inquiry where (as here) it has a basis to believe that a witness is committing perjury. See Morris v. Ylst, No. 05-99002, 2006 U.S. App. LEXIS 11465, at *20 (9th Cir. May 9, 2006).

3

what Mr. Kearney said in response.[5] Thus, if (as the notes reflect) Mr. Kearney was asked about Mr. Bell in his government interviews, and told the government that he did not meet with Mr. Bell to discuss topside adjustments, the government is charged with notice of that fact, and has a duty not to elicit contrary testimony at trial. Similarly, if (as the notes reflect), Mr. Kearney told the government that he had no information concerning Mr. Forbes, the government has a duty not to elicit testimony to the contrary. At a minimum, the government should not be permitted to conceal that fact from the jury as the jury attempts to evaluate Mr. Kearney's credibility.

The Court also should reject the government's contention that it cannot be charged with knowing whether Mr. Kearney's testimony is true or false because it was not present at the time of the purported events about which Mr. Kearney testified. Opp. at 14. While the government was not present during the underlying events, it certainly was present during Mr. Kearney's numerous government interviews. The government either knows, or should know, that Mr. Kearney repeatedly related information to the government that was completely inconsistent with the claims he made at trial. It has a duty to disclose that information <u>to the jury</u>, so that the jury will be able to evaluate the credibility of Mr. Kearney's testimony based on the full record of his prior inconsistent statements in numerous government interviews.

## II. MR. KEARNEY'S STATEMENTS TO THE GOVERNMENT ARE FUNDAMENTALLY INCONSISTENT WITH HIS TRIAL TESTIMONY.

The government asserts that the interview notes and government correspondence cited by Mr. Forbes merely "omi[t]," Opp. at 6 n.3, or "fail[] to describe," Opp. at 5, the purported

---

[5] While the government chastises Mr. Forbes for failing to supply the Court with "the questions that were put to Kearney during th[e] interviews," Opp. at 10, Mr. Forbes did not participate in those interviews. The government did, and it should know the questions it asked.

conversations to which Mr. Kearney testified at trial. That is not the case. The interview notes and government letters reflect that Mr. Kearney gave the government information that was completely inconsistent with his trial testimony.[6]

For example, it is clear from the interview notes that Mr. Kearney was repeatedly asked about the process by which unsupported topside adjustments were made at CUC. It also is clear that Mr. Kearney was repeatedly asked about Mr. Bell's alleged role in this process and about whether Mr. Kearney discussed topside adjustments with Mr. Bell. The notes reflect that, prior to October 2003 (more than eight years after Mr. Bell last acted as CFO of CUC), Mr. Kearney consistently told the government that (1) Mr. Kearney (a low-level accountant who reported to Mr. Sabatino) did not deal directly with Mr. Bell (the CFO); (2) Mr. Kearney did not meet with Mr. Bell to discuss quarterly topside adjustments; (3) Mr. Kearney met with Messrs. Corigliano and Sabatino to discuss the adjustments; and (4) Mr. Corigliano, the company controller (who reported to Mr. Bell) -- not Mr. Kearney -- met with Mr. Bell.[7] The Court should preclude the

---

[6]     The situation here bears no resemblance to that in United States v. Bortnovsky, 879 F.2d 30 (2d Cir. 1989) (Opp. at 8), where the witness's testimony "differed from, but did not contradict, what he said earlier." Id. at 33. Mr. Kearney's testimony directly contradicts the information he provided in numerous government interviews between 1998 and 2003. In any event, the cases cited by the government involve whether a convicted defendant may obtain a reversal based on perjured testimony, and do not address the situation presented here.

[7]     See, e.g., Ex. 3 at PAW0732 ("Cosmo would have them make topside adjustments. Cosmo told him what adjustments to make (he + Casper w[oul]d meet [with] Cosmo")); Ex.4 at PAW0716 ("[a]t ends of q[uarter]'s, he + Casper w[oul]d meet [with] Cosmo; Cosmo w[oul]d then go over results [with] Stu Bell"); Ex. 6 at XMW004 ("Casper, Kevin would meet with Cosmo, not with Stu Bell"); Ex. 7 at PAW0699, PAW0701, PAW0703 (quarterly meetings involved "him, Casper, + Cosmo" and that Mr. Kearney "DNB [does not believe] he ever met [with] Cosmo and Bell"); Ex. 9 at MG00171-72 ("Qtrly meetings. Attended by Cosmo, Casper + Kevin"; "After this process was complete, Cosmo would get a clean set of adjusted financials and then Cosmo would take them to Stu Bell"); Ex. 23 at MGR 181 ("K² [KK, or Kearney] dealt with C² [CC, or Corigliano] when Bell there"); id. at MGR 182 (Greiner notes that while Mr.

5

government from suggesting during Mr. Kearney's examination that he was not asked about Mr. Bell in his government interviews or that he was not asked questions that would have called for this information.

Contrary to the government's claim that the notes of Mr. Kearney's interviews "do not exclude the possibility that Kearney also discussed the subject with Bell," Opp. at 7, the notes make clear that Mr. Kearney consistently described a process in which he and Mr. Sabatino met with Cosmo Corigliano to discuss topside adjustments and Cosmo Corigliano then met separately with Mr. Bell. The July 10, 2001 Greiner notes also make clear that Mr. Kearney indicated that he simply <u>did not deal with Mr. Bell</u>, and that, while Mr. Kearney <u>suspected</u> that someone above Mr. Corigliano was involved in the process, he had <u>no information</u> to support that belief. See Ex. 23 at MGR 181-82. These statements are directly inconsistent with Mr. Kearney's trial testimony -- many years after the events -- that he regularly met with Mr. Bell to discuss improper topside adjustments. Moreover, if Mr. Kearney did not interact with Mr. Bell, and did not discuss topside adjustments with Mr. Bell, he certainly could not have heard Mr. Bell make purported comments about Mr. Forbes during those non-existent discussions.[8]

---

Kearney "doesn't think $C^2$ doing this on his own," he "DK [doesn't know] more").

[8] The notion advanced by the government that the government representatives who interviewed Mr. Kearney may have simply "fail[ed] to capture," Opp. at 11, information from Mr. Kearney about Mr. Bell, is fanciful, and underscores the extent to which the government will distort the facts in an attempt to salvage its case. Mr. Kearney was <u>repeatedly</u> asked about both Mr. Bell and the process by which topside adjustments were made at CUC. Mr. Weissman, who took notes of five Kearney interviews, testified that the topside adjustment process was "a central focus" of what he talked to Mr. Kearney about. Tr. (11/14/05) at 2647. The government certainly would have deemed it important to write down information suggesting that the CFO of the company, Mr. Bell, met with Mr. Kearney to discuss topside adjustments, or that the CFO of the company was invoking the name of the company's CEO when discussing unlawful activity. The government appears to have forgotten the fundamental principle that, while a prosecutor

In October 2003 -- <u>five</u> years after he first met with the government and <u>eight</u> years after Mr. Bell ceded his position as CFO -- Mr. Kearney claimed for the first time that he met with Mr. Bell in <u>one quarter</u>. See Ex. 25 at 1, ¶ 1. Mr. Kearney also informed the government that he "<u>does not recall</u> whether Stu Bell invoked Walter Forbes's name when giving the directive . . . ." Id. at 2 (emphasis added). Thus, while the government asserts that "the interview notes do not state that Kearney was asked if, and denied that, Bell invoked Forbes' name when discussing topside adjustments," Opp. at 10, the government inquired about <u>precisely</u> that matter, and Mr. Kearney told the government that he had <u>no recollection</u> of Mr. Bell purportedly invoking Mr. Forbes' name. It is clear from the government's correspondence, as well as the interview notes, that Mr. Kearney's testimony that he met with Mr. Bell <u>every quarter</u> to discuss topside adjustments, and that Mr. Bell invoked Mr. Forbes' name in <u>every quarter</u>, bears no resemblance to the information he consistently provided to the government over many years.[9]

Mr. Kearney's testimony that he "answered that way in several interviews," Tr. (8/5/04) at 9876-77, was false. The government engages in revisionist history by asserting that this testimony involved "informing his interlocutors about his conspiratorial conversations in which Forbes was implicated," Opp. at 15, and that this testimony "was undisputably correct." Id. In fact, Mr. Kearney's testimony that he had "answered that way in several interviews" related to his claim that <u>Mr. Bell</u> repeatedly invoked Mr. Forbes' name, Tr. (8/5/04) at 9876-77, something

---

"may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." Berger v. United States, 295 U.S. 78, 88 (1935).

[9] In March 2004, Mr. Kearney modified his story to claim that he met with Mr. Bell on more than one occasion. See Ex. 27 at 2, ¶ 4. Even then, however, he did not claim that Mr. Bell invoked Mr. Forbes' name during such meetings. See id.

7

that he had <u>never</u> told the government prior to the 2004 trial, according to the interview notes and the government's correspondence.[10] This testimony was false and the government had a duty to correct it. Even if it was mistaken, the government had a duty to correct it, <u>United States v. Glover</u>, 588 F.2d 876, 879 (2d Cir. 1978), and it has a duty not to elicit it at a third trial.

The notes of Mr. Kearney's government interviews also reflect that Mr. Kearney indicated that he had <u>no information with respect to Mr. Forbes</u>. <u>See</u> Ex. 23 at MGR 173 ("nada w/r/t Walter"). While the government engages in speculation about possible ways in which Mr. Greiner's notes of this interview could be construed as something other than an admission by Mr. Kearney that he does not know anything with respect to Mr. Forbes, Opp. at 7-8, the only reasonable reading of these notes is that Mr. Kearney told the government that he did not have any information concerning Mr. Forbes. The interview was conducted in July 2001, <u>after Mr. Forbes had been indicted</u>, and <u>after the SEC had filed suit against Mr. Forbes</u>. The government's lead agent, FBI Special Agent Gerber, attended the interview. The notion that, at that time, no one asked any questions about what Mr. Kearney knew about Mr. Forbes' alleged unlawful conduct, does not pass the straight-face test.

Mr. Greiner's claim that the note could mean that Mr. Kearney simply said nothing during the interview about Mr. Forbes also cannot be reconciled with the fact that the "nada w/r/t Walter" notation appears in the <u>middle</u> of a voluminous set of notes. Mr. Greiner could not have known, in the middle of an ongoing interview, that Mr. Kearney would not say anything during the interview concerning Mr. Forbes. Nor can Mr. Greiner explain why, if he was not focused on

---

[10] The government's citation to Exhibits 24, 25, and 27 (Opp. at 15) is unavailing. None of those letters indicates that Mr. Kearney told the government that Mr. Bell invoked Mr. Forbes' name during conversations about topside adjustments.

8

Mr. Forbes during this interview, Tr. (11/14/05) at 2670, he would bother to write down in the midst of the interview that Mr. Kearney had not said anything about Mr. Forbes. The only plausible interpretation of the notes is that Mr. Kearney told the government that he had no information concerning Mr. Forbes.[11]

### III. AT A MINIMUM, THE COURT SHOULD REQUIRE THE GOVERNMENT TO PRODUCE ADDITIONAL INFORMATION CONCERNING MR. KEARNEY'S GOVERNMENT INTERVIEWS AND PERMIT MR. FORBES TO INTRODUCE EVIDENCE CONCERNING MR. KEARNEY'S GOVERNMENT INTERVIEWS.

The government asserts that "Forbes' ability to attack Kearney's testimony at the third trial is the proper remedy for his allegations of perjury, and the jury is the proper body to resolve any issues regarding the credibility of Kearney's trial testimony." Opp. at 17-18. But Mr. Forbes cannot attack Mr. Kearney's testimony at the third trial unless the government discloses the full record of Mr. Kearney's prior inconsistent statements and Mr. Forbes is permitted to offer those inconsistent statements into evidence, irrespective of any evidentiary objections that the government might otherwise have. Unless Mr. Forbes is able to introduce those materials into evidence, the jury will never learn that Mr. Kearney's trial testimony is contradicted by his numerous prior government interviews, and Mr. Kearney will continue to falsely claim that his testimony is consistent with his earlier interviews.

The government has not produced the full record of Mr. Kearney's prior government interviews. It is withholding all of the interview notes taken by the members of the 2004 trial team, notes of the critical July 10, 2001 interview at which Mr. Kearney said he had "nada" with

---

[11] In light of the government's failure to produce any other contemporaneous notes of this interview, or a Form 302 of the interview, any purported ambiguity in the Greiner notes should be construed against the government in any event.

9

respect to Mr. Forbes, and the interview notes taken by the members of the 2005 trial team. The government should be required to produce all of those notes, as well as any other documents that identify the factual information the government received from Mr. Kearney concerning topside adjustments, Mr. Bell, Mr. Forbes, and/or purported conversations in which Mr. Forbes' name was invoked in connection with topside adjustments. See Docket Nos. 2189, 2341.[12]

If the government again elicits false or misleading testimony from Mr. Kearney, it cannot invoke evidentiary rules to withhold the truth about Mr. Kearney's government interviews from the jury. See Wallach, 935 F.2d at 456-57. Given the government's failure to create Forms 302 of virtually all of its interviews of Mr. Kearney, the government should not be permitted to conceal his prior inconsistent statements from the jury by claiming that the contemporaneous notes of his interviews do not reflect his statements.

The jury cannot make a reliable credibility determination with respect to Mr. Kearney unless it learns that Mr. Kearney repeatedly made statements during numerous government interviews that were fundamentally inconsistent with his trial testimony. If the government will not disclose that information to the jury, then, at a minimum, Mr. Forbes should be permitted to introduce evidence of Mr. Kearney's prior inconsistent statements at Mr. Forbes' third trial.

---

[12] These materials include, inter alia, prosecution memos, government summaries of evidence and expected trial testimony, any government memoranda or summaries regarding Mr. Kearney's interviews that were prepared after the conclusion of the interview(s), and any other documents that discuss Mr. Kearney as a witness or that summarize the government's evidence concerning Mr. Forbes. See United States v. Jackson, 850 F. Supp. 1481, 1505 (D. Kan. 1994); United States v. Goldman, 439 F. Supp. 337, 350 (S.D.N.Y. 1977); United States v. Eley, 335 F. Supp. 353, 354, 357-58 (N.D. Ga. 1972); 2 Charles Alan Wright, Federal Practice & Procedure § 254.2, at 141 (3d ed. 2000). At a minimum, those materials should be supplied to the Court in camera. See United States v. American Cyanamid Co., No. 60 Civ. 3857-CLB, 1975 WL 987, at *1 (S.D.N.Y. Oct. 28, 1975), modified, 1975 WL 992 (S.D.N.Y. Nov. 12, 1975).

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: _____
    Brendan V. Sullivan, Jr. (Bar No. ct17115)
    Barry S. Simon  (Bar No. ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
Cowdery, Ecker & Murphy, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

11

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Reply Memorandum in Support of Motion of Defendant Walter A. Forbes to Preclude the Government from Eliciting False Testimony from Kevin Kearney or, in the Alternative, for Leave to Present Documentary Evidence to Impeach False Testimony by Kevin Kearney (Forbes Third Trial Motion in Limine No. 6) to be filed electronically and to be served on June 15, 2006 to the following via e-mail:

    Norman Gross, Esq. (norman.gross@usdoj.gov)
    Michael Martinez, Esq. (michael.martinez2@usdoj.gov)
    Craig Carpenito, Esq. (craig.carpenito@usdoj.gov)

_____
Barry S. Simon