# EXHIBIT A

# TO

# MIL NO. 5

Daubert Challenge
Attest Standards

1-3

- AA was not engaged to examine, review or audit financial statements or elements for Cendant

- AA's opinions and views of what transpired is not the subject of my engagement.

- Management, not AA, has made certain assertions that its original accounting and disclosure complied with GAAP.

- My scope is to render an opinion on whether management's assertions comply with GAAP, not whether AA's opinion that they do not is reasonable.

- These services included: 1) a review of previously gathered evidence from the fact-finding of others 2) analyses of professional standards, 3) some additional fact-finding 4) computation of errors and nonconformity with GAAP amounts, and 5) Expert testimony

- These meet the Special Consulting Report 03-1 guidance as being governed by Consulting Standards, not the Attest Standards. At 47 & 7

KPMG 52361

DEFENDANT'S EXHIBIT
HECKLER
F-6
PENGAD 800-631-6989

Daubert Challenge
Attest Standards

2-3

- Application of consulting standards for Expert Witness Engagements is affirmed in Consulting Services Special Report 03-1 ⁋ 7.

- Although I come to similar conclusions and amounts as AA and USAO, I am not, "in effect", adopting their work as my opinion resulting in a requirement to "Attest".

- Similar to that apparently reached by the Court in Heller, I was not engaged nor did I need to perform a compilation, review or audit to derive my opinion for testimony.

- Special Report 03-1 separate fact findings, discovery from other services like expert testimony and analyses of professional standards. Therefore, professional standards.

- Rule 102 requires that I adhere to an ethical code free from corrupting influences and motives and that I do not serve as an advocate for the USAO's position Objectivity in assisting trier of fact understanding complex issues in this case.

KPMG 52362

Daubert Challenge
Attest Standards

3-3

- Special Report 03-1 ¶ 23 + 24 provide
guidence on the various sources of information
upon which the expert relies to provide.
a reasonable basis for conclusions
  - discovery, deposition, interrogatories
  review of relevant document, interviews
  - Nature & extent vary, may include
    practitioners own computations
  - May use assumptions on facts, presumptions
  from facts or assumptions provided from
  client/counsel (24b) like the
  proferred testimony of co-conspirators -
  information to be provided from other sources.

- ¶ 4f - providing expert opinion based on my
  judgement, experience, training & analyses in
  compliance with applicable standards. - different
  than the attest audience

- ¶ 46 - only apply attest standards where specifically
  engaged to provide an attest engagement

KPMG 52363

# EXHIBIT B

# TO

# MIL NO. 5

Johnson, Charity A

From:       Patel, Seema
  ent:       Thursday, May 02, 2002 9 59 PM
To:          Heckler, Bnan
Cc:          Hammond, Lynn
Subject:   Update - Project Cendant

Importance:    High


Hey Bnan--

Just wanted to drop you an email and give you an update on Project Cendant and our visit to the USAO.

Detailed "To Do List"
- Lynn and I reviewed the listing with Gerber & Pittman today (Carney was out of town)

- Overall comments were: 1) In terms of quantification of the errors, USAO does not want a third set of KPMG numbers (AA Report vs Indictment vs. KPMG) in terms of quantifying the error. They want us to use the USAO Indictment numbers and to use language such as "the irregularty relating to merger reserves was at least $x ($x being the Indictment number)  2) Our team should understand the differences between the AA Report and Indictment (obviously). Although they said it would be "scary" for the defense to ask you what the differences are when you are on the stand since the defense doesn't know what they are, that you should still understand the differences. We have yet to see the reconciliation; I am fairly confident that one does not exist 3) In terms of materiality of the irregularities in the financial statements, at this point in time they only want us to assess materiality on a total basis (i.e. as a % of operating income)  Gerber wants us to hold off on assessing materiality on a line-item basis until he talks to Carney 4) Wants us to leverage the use of interviews as much as possible. For example, instead of detail testing items for all three years, maybe test one year in addition to performing an interview of someone like Speaks 5) They did not feel that we missed any major critical items to be performed

- Comments to specific areas were: 1) Merger Reserves - no major comments that are not already included above 2) Operating Income/Materiality - no major comments that are not already included above. 3) Membership Reserves - understated reserve: leverage E&Y wps and Speaks as much as possible; rejects in transit: don't see the "bang for the buck" for reviewing every bank rec, bank stmt, etc; p-entries: delete this as a separate section from membership reserves since almost all p-entries are for merger-related 4) Revenue Recognition  no major comments that are not already included above besides to get BH "comfortable" with the amortization grids  Brian -- Lynn may be in the office tomorrow afternoon and will stop by to further discuss his areas w/you if he is in. 5) Deferral of expenses: We are not to spend any hrs on this until Gerber talks to Carney since this is not a number in the Indictment although it is mentioned.

Miscellaneous
- Interview Questions -- Gerber and Pittman are in the process of reviewing, don't feel that we have to "soften" down the tone of our questions  Carney has still to review. Interviews have yet to be scheduled  Gerber wanted to talk to Carney prior to scheduling sometime the week of May 20th
- Fee Letter -- Carney & Gerber to discuss further next week
- Staff -- Chris Cianella is going to be helping out Lynn and I next week
- Timing -- USAO will find out at the earliest in 6 weeks (latest 3 months) the new schedule for the timing of deadlines and trial if there is a new schedule.


Overall, visit out here has been productive data collecting and reviewing items w/Pittman and Gerber.

I think that about sums it up-- finally!  If you have any questions tomorrow, please leave me a voicemail as I we do not have access to email at the USAO office

Thanks,
  eema


ı

CONFIDENTIAL

· KPMG 16647

# EXHIBIT C

# TO

# MIL NO. 5

Note: The purpose of this workpaper is to document the reconciling items between the AA Report & the Indictment.

Reconciliation between AA Report and Indictment
The purpose of this workpaper is to document the reconciling items between the AA Report & the Indictment

Impact on financial statements: Improper Restructuring Reversals
(in millions of $)

| Per AA Report | 1995 | 1996 | 1997 | Total |
|---|---|---|---|---|
| Reversals into Income | $ 11 | $ 59 | $ 115 | $ 185 |
| Jan 97 Impact of Reversals | | | 32 (f) | 32 |
| Other Improper Utilizations | 6 | 12 | 29 | 47 |
| Total Per AA Report | 17 | 71 | 177 | 264 |
| Per Indictment | $ 16 (c) | $ 23 (d) | $ 116 (e) | 143 |
| AA Report vs. Indictment | $ (8) | $ (48) | $ (67) | (121) |

Reconciling items b/w AA Report & Indictment

| | 1995 | 1996 | 1997 | Total |
|---|---|---|---|---|
| Other Improper Utilizations | 1 | (6) (a) | (12) (a) | (19) (k) | (37) |
| CUC Europe | (0.4) (b) | | | (0.4) |
| Comp-U-Card Expenses | | (14.1) (g) | | (14.1) |
| Welcome Wagon & NCO | | (7.8) (h) | | (7.8) |
| Safecard | | (12.6) (i) | | (12.6) |
| Sierra Davidson | | (1.1) (j) | | (1.1) |
| Cendant | | | (3.6) (l) | (3.6) |
| Berkeley | | | (5.4) (m) | (5.4) |
| Ideon | | | (6.8) (n) | (6.8) |
| January Impact of Reversals | | | (32.0) (f) | (32.0) |
| Other | | 0.3 | (0.1) | 0.4 |
| Difference between AA Report & Indictment | $ - | $ - | $ - | $ - |

The following comments are based on discussions with Mark Gerber and John Pheran of the USAO:

(a) [illegible text]

(b) [illegible text]

(c) [illegible text]

(d) [illegible text] (See next page)

(e) [illegible text]

(f) [illegible text]

(g) [illegible text]

(h) [illegible text]

(i) [illegible text]

(j) [illegible text]

(k) [illegible text]

(l) [illegible text]

(m) [illegible text]

(n) [illegible text]

File: Restructuring_Rev.xls Tab: Reconciliation

CONFIDENTIAL

KPMG 09345

Reconciliation between AA Report and Indictment
The purpose of this workpaper is to document the reconciling items between the AA Report & the Indictment

Impact on financial statements - Improper Restructuring Reversals
(in millions of $$)

| | 1995 | | 1996 | | 1997 | | Total |
|---|---|---|---|---|---|---|---|
| **Per AA Report:** | | | | | | | |
| **Reversals into Income** | $ 11 | $ | 59 | $ | 115 | $ | 185 |
| Jan 97 impact of Reversals | | | | | 32 (f) | | 32 |
| Other Improper Utilizations | 6 | | 12 | | 29 | | 47 |
| **Total Per AA Report** | $ 17 | $ | 71 | $ | 177 | $ | 264 |
| **Per Indictment** | $ 10 (c) | $ | 23 (d) | $ | 110 (e) | $ | 143 |
| **AA Report vs. Indictment** | $ (6) | $ | (48) | $ | (67) | $ | (121) |
| **Reconciling Items btw AA Report & Indictment:** | | | | | | | |
| Other Improper Utilizations | $ (6) (a) | $ | (12) (a) | $ | (19) (k) | $ | (37) |
| CUC Europe | (0.4) (b) | | | | | | (0.4) |
| Comp-U-Card Expenses | | | (14.1) (g) | | | | (14.1) |
| Welcome Wagon & NCCI | | | (7.8) (h) | | | | (7.8) |
| Safecard | | | (12.6) (i) | | | | (12.6) |
| Sierra Davidson | | | (1.1) (j) | | | | (1.1) |
| Cendant | | | | | (3.0) (l) | | (3.0) |
| Berkeley | | | | | (5.4) (m) | | (5.4) |
| Ideon | | | | | (6.6) (n) | | (6.6) |
| January Impact of Reversals | | | | | (32.0) (f) | | (32.0) |
| Other | | | (0.3) | | (0.1) | | (0.4) |
| Difference between AA Report & Indictment: | $ - | $ | - | $ | - | $ | - |

*The following comments are based on discussions with Mark Gerber and John Pittman of the USAO:*

(a) - Per the AA Report, "Other Improper Utilizations" primarily relate to asset impairments that were incorrectly charged against the Cendant Reserve. These irregularities were not quantified and included as part of the USAO's Indictment number for merger irregularities w/exception to amounts included in tickmarks e & k below. Per Mark Gerber, asset impairments were removed by the USAO when considering the Indictment irregularity number.

(b) - Adjustment of $0.4 from AA Report to Indictment due to conversation with CUC Europe CFO on the CUC Europe & Purchase Reserves. CFO stated that $0.4 of the charges AA identified as irregular were "true" merger charges that were valid charges against the reserve.

(c)Indictment number of $10 includes an impact to the following: $5.9 - CUC Europe & Sentinel Reserves; $2.3 - Welcome Wagon & $2.1 - Essex Reserves.

(d) - Based on USAO's conversation w/Anne Pember, the Indictment includes $23 broken out as follows: $21.1 based on E&Y *wp 1-97-002587*. This wp breaks out $80.5 that was charged against the Ideon Reserve as of 1/31/97. Of this amount, $21.1 is labeled as "operation integration charges not detailed above." There is no detail breakout provided for this amount, thus, the USAO included this amount in the Indictment number. $2.2 relates to Plextel Reserve (as in AA Report). See wp **M-3** for additional support related to the $2.2.

(e) - Amount includes an impact to the following: $56 - Ideon Reserve, $9.5 - Spark, $34.7 - Cendant Reserve, $6.0 Amortization relating to Epub improper asset writeoffs to the Cendant reserve & $3.7 relating to LTPC Bad Debt improper writeoff to the Cendant reserve

(f) - $11 of the $32 relating to the January 1997 impact is included in the "Other Matters" section of the Indictment. Please see "Other Matters" wps for discussion of the $11. The $11 relates only to the impact on the Ideon Reserve for the month of January 1997.

(g) - As noted in tickmark d above, the Indictment number includes $21.1 related to the unsupported entries to decrease the Ideon reserve and decrease Comp-U-Card expenses. AA identified $35.2; difference of $14.1.

(h) - AA number includes $7.8 related to the reversal of the Ideon reserve to decrease Welcome Wagon & NCCI expenses; the Indictment number does not include this amount.

(i) - AA number includes $12.6 related to the reversal of the Ideon reserve& other liabilities to decrease Safecard expenses; the Indictment number does not include this amount.

(j) - AA number includes $1.1 related to the reversal of the Ideon reserve to decrease Sierra Davidson expenses; the Indictment number does not include this amount.

(k) - AA numbers include $29 relating to "Other Improper Utilizations", Indictment number includes $10 which includes the following: amortization of $6.0 relating to Epub assets that were not impaired and were charge against the Cendant reserve and $4.0 relating to uncollection FISI receivables that were written off to the Cendant reserve instead of to operating expense. See wp section **M-5** for additional information on "Other Improper Utilizations".
Difference between AA number of $29 and Indictment number of $10 is $19 difference.

(l) - AA number includes $37.7 related to the reversal of the Cendant reserve to increase revenues; the Indictment number includes $34.7; difference of $3.0. $3.0 relates to WorldEx (a subsidiary of Interval) whose revenues were increased through the use of intercompany accounts; the offset was to the Cendant Reserve. Due to complexity issues surrounding this entry, the USAO indictment did not include the $3.0 in their number. (Note: WorldEx was sold as part of the divestiture of Interval that occurred in Dec 97. Per the AA Report, pg 136, the $3 million was accounted for within the calculation performed on the sale of Interval and did not need to be credited to retained earnings of WorldEx in order for retained earnings to roll)

(m) - AA number includes $5.4 related to the reversal of the Berkeley reserve to revenues via intercompany accounts; the Indictment number does not include this amount.

(n) - AA number includes $62.6 related to the reversal of the Ideon reserve to increase revenues; the Indictment number includes $56; difference of $6.6. Reason for difference is not known.