# EXHIBIT 1


**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

---

970 Broad Street, Suite 700          973/645-2700
Newark, NJ 07102

April 11, 2003

**VIA OVERNIGHT COURIER**

Martin J. Auerbach, Esq.
747 Third Avenue, 11th Floor
New York, New York 10017

Paul A. Engelmayer, Esq.
Wilmer, Cutler & Pickering
399 Park Avenue
New York, NY 10022

Barry S. Simon, Esq.
Williams & Connolly, LLP
725 Twelfth Street, N.W.
Washington, DC 20005-5901

        Re:  United States v. Forbes, et al.
             No. 3:02CR00264 (AWT)

Dear Counsel:

    We write to answer Mr. Simon's inquiries of March 28, 2003 and to provide you with additional information regarding Casper Sabatino. We have also included materials (K001-125) that augment the expert testimony summary of Brian Heckler, C.P.A.[1]

    Mr. Simon's correspondence seeks information concerning "the author, date and addressee" of the document identified by the numbers 460-469. The document, which has been disclosed to you in its original form, was supplied to the Government by counsel for Cendant. Should we obtain any further details concerning this document we will promptly advise you of such information.

    Please be advised that Casper Sabatino has indicated:

1.    He did not recall any substantial adjustments prior to his beginning to attend quarterly meetings and did not

---

    [1]    Notwithstanding this voluntary disclosure, the Government maintains that the expert testimony summary previously disclosed to you is sufficient to meet the requirements under Fed. R. Crim. P. 16.

    recall that he was aware of a desired earnings per share number prior to attending his first quarterly meeting with Cosmo Corigliano.

2. He doesn't know if Corigliano was directed to use merger reserves in 1996 and 1997 by anyone.

3. Once when Pember and Sabatino were in Shelton's office, Pember raised an issue and it seemed like Shelton did not want to hear it. The meeting was regarding projected 1998 results of CUC, the budget, in Shelton's office. Pember said in substance that the figures are not real. Sabatino believes she was saying the company is going to be short. Corigliano came up with an argument and Shelton believed him. Sabatino was surprised that Shelton did not take it more seriously. Sabatino indicated he did not recall what Corigliano said, not a lie, but he was misrepresenting things. In response to being asked could Shelton not know, Sabatino indicated Shelton has to have a feel for the actual operating results; he was not a naive guy.

4. Walter Forbes was a visionary, a large picture person, not a financial guy. Sabatino doubts he got the consolidation reports or that he looked at them if he did. He was hands off, asleep as far as details.

5. Shelton was very detailed, but Sabatino did not work closely with him. Shelton's financial acumen was very good, though he does not know technical accounting rules. Sabatino would give Shelton draft copies of the Q's and K's but does not know how involved Shelton got in these. Shelton got filed copies of the Q's and K's but Sabatino did not know what Shelton did with them. He never got comments on them from Shelton. Sabatino never sent Shelton copies before topside adjustments were made.

6. Sabatino does not recall Corigliano coming back from a meeting with Stu Bell and saying make adjustments which were not supported.

7. No sign the changes were coming from above Corigliano but Sabatino believes they were. Shelton got monthly statements from each subsidiary and they didn't equal what the quarterly numbers were.

8. Walter Forbes probably not involved. Sabatino can not

believe that Corigliano came up with the scheme (as versus the mechanics) on his own.

9. Sabatino explained there were consolidation adjustments you could argue were OK, were reviewed by auditors, e.g. deposits in transit, charges for services, etc., i.e. adjustments made initially topside and then pushed down. Typically these are made in consolidation topside for lack of time and then they send out memos to subs to make journal entries on their books. Moving up the recognition of revenue, these adjustments were made on the books of Comp-U-Card after the quarter, i.e. these are inserted into projection model so they go into initial consolidation.

10. They (Sabatino, Cosmo, Pember) made an effort to keep the topside adjustments from other people.

11. Sabatino explains that at his first Arthur Andersen meeting in April 98, he found it hard to give up the rationalizations that Corigliano had offered, the soft closes, the idea they would make it up in the end of the year. He went along with these rationalizations, allowed them to reassure him.

12. Sabatino explains that Corigliano paid little or no attention to the Board so far as their actually understanding anything was concerned.

13. So far as Sabatino knew, Shelton's role in the audit process was very limited.

14. There was a lack of cooperation with auditors primarily at Comp-U-Card. They were very good at blowing off the auditors. Pember was the queen of that. A lot of the information was not even available. Capparelli and Rabinowitz would complain about that to Sabatino, he would say go complain to Cosmo. The auditors would complain in particular regarding merger reserves.

15. CUC was required to show use of reserves, had to show it in 10 Q. Anytime there was a reduction in reserves, E & Y wanted to see charges. They could never get any information. Sabatino witnessed conversations between E & Y and Pember regarding utilization of reserves. This was a big issue with E & Y. Pember gave them half-assed schedules and inadequate supporting documents. One time Sabatino and Kearney sat in on a

meeting with Pember and E & Y on Ideon reserves. She gave them a bullshit explanation. Capparelli later said to Sabatino, he knew it was bullshit, which Sabatino understood to mean he knew he was being lied to. E & Y was caught in a bind - - was not getting information, could only refuse to sign the audit and lose the account.

16. The biggest issue with E & Y was merger reserves. E & Y was asking for all the charges against the reserves, or at least an adequate sample, coverage.

17. E & Y was stonewalled, left to draw their own conclusions. Sabatino thinks they had to know reserves were being bled into operating income because of the extent they were stonewalled. But he has no basis to say that they were ever told this. Also, he did not believe that they ever thought the problem was as large as it was. E & Y would not have signed off had they known the full extent. As far as E & Y was concerned, it was a hard thing to do, to accuse Corigliano of fraud.

18. Sabatino did not recall that after the meeting with Capparelli, Pember said, whew, that was close.

19. Sabatino describing page 3 of Ex. 127 to the Arthur Andersen ("AA") report: he is sure all these expenses were incurred and got charged to merger reserves but he believes some were not actually merger-related.

20. Quarterly results sometimes analytically showed bizarre fluctuations. They just dragged their heels regarding providing E & Y information regarding these. Sabatino knows that they also delayed providing information, so that E & Y could not make effective use of it. Sabatino was told at times hold off giving E & Y information. In general, E & Y was not allowed to see anything until Corigliano blessed the numbers. Many times E & Y could not get into a place such as Software, EPub, even though it was the date Sabatino had originally set up. They called to E & Y Stamford to complain and they complained to him - - all he could say was Corigliano has not signed off. It could drag on.

21. Simon Wood was frustrated at not getting information re: the Cendant reserve. Wood came to Sabatino and complained, asked if he could do something to help.

       Bruce Botti also expressed frustration with the reserves.

22. Sabatino thinks relationship with E & Y was too cozy only between Corigliano and Wilchfort.

23. Sabatino thinks it could have been feasible to break out Privacy Guard solicitation costs but does not know how expensive it would have been. He thinks that Pember and Corigliano were happy to have the opportunity to manipulate results.

24. It was decided by Corigliano to recognize revenues immediately. Sabatino remembers discussions between Corigliano and Wilchfort regarding this.

25. Sabatino thinks it was not right to recognize all revenues for Privacy Guard up front but he never voiced these concerns to anyone.

26. Sabatino says Pember told him in substance that she knew the figures (cancellation reserve rates) she was using were not accurate. Corigliano and Pember said this is one of the last things E and Y audits because they did not give them the information until the last minute.

27. Sabatino explains that E and Y was misled, no doubt in his mind. With information regarding membership on a separate system, not integrated with the financial system, the systems do not talk to each other and E and Y does not see this information.

28. Sabatino says he learned about reallocation of revenue to immediate recognition programs in late 1997 when Kevin Kearney brought it to his attention. Kearney supplied accrual schedules to auditors for deferred recognition programs, not immediate recognition programs. It should have been obvious to the auditors, at least it was to Sabatino, that there had been a reclassification from deferred recognition program to immediate recognition programs because number would have been very low for a given month.

29. E and Y got the grids, the amortization schedules, they had the months, if they picked out the months that looked strange, they could go back to billing logs in accounting and MIS. They can not test 100% or even

close but they could have tested the numbers that looked strange, strange because they were too low.

30. Since E and Y knew rejects in transit were 3 months behind, they would have known that reserves were understated. They did not try to look at the ripple effects. They are accruing revenue for the rejects, they know they are rejects and yet the reserve is lower than the rejects.

31. Sabatino knows that they held off giving sample information to E and Y to audit the cancellation rates on membership reserves. Pember and Corigliano said they would drag their heels in turning over records. Sabatino knows this was Corigliano's idea.

32. Sabatino calls Pember Teflon Anne because she was always blaming others.

33. Sabatino was not aware of any approach by Pember to Shelton about the adjustments. Pember mentioned that CUC was going to be short $160 million in fiscal year 1998. Pember had concerns about this. She communicated to Sabatino that she was going to approach Shelton regarding this.

34. Sabatino believes Pember did tell Sabatino that she had mentioned concern about cancellations in transit to Shelton.

35. Sabatino is pretty sure the adjustments began when Corigliano became CFO.

36. Sabatino explains that sometimes revenues had to be decreased to keep the trend line right. This appears to have happened in Oct. 95.

37. Sabatino thinks there was a meeting with Shelton where Pember had prepared a document. Shelton was sitting at his desk, someone said the document was confidential, Shelton tore it up, it could have been a summary of Sabatino's budget but it was prepared by Pember. It was a document reflecting potential exposures. Afterwards, Pember was aghast that Shelton was not taking things seriously and did not want to keep the document.

38. Corigliano pooh-poohed the SEC, said who cares about an

-6-

    SEC document. Sabatino figured, though he was uncomfortable, Corigliano along with Walter Forbes was signing it.

39. Sabatino says there was an understanding that E and Y was not going to get the projection model. Sabatino can not say how this started.

40. When Shelton ripped up a document (Ex. 41 to the AA report), Shelton commented, in substance, that he never saw this document.

41. Corigliano felt too comfortable with Ken Wilchfort. Cosmo said many times if Rabinowitz gives me a hard time, I will just call Ken. Ken would help Cosmo in grey areas, would support him in grey areas.

42. Sabatino does not recall telling Mary Sattler that the earnings per share needed to be a certain number to meet analysts' forecasts.

43. Sabatino does not recall Corigliano mentioning Walter Forbes' name or Kirk Shelton's name when giving Sabatino directions to make topside adjustments. In

Sabatino's opinion, it was not Corigliano's style to invoke the name of Walter Forbes or Kirk Shelton when providing directions to Sabatino.

44. Sabatino recalls that Corigliano was present when Shelton ripped up Ex. 41 to the AA report.

> Very truly yours,
>
> CHRISTOPHER J. CHRISTIE
> Special Attorney
> U.S. Department of Justice
>
> By: JOHN J. CARNEY
> Special Attorney
> U.S. Department of Justice
>
> By: JAMES MCMAHON
> Special Attorney
> U.S. Department of Justice
>
> By: RICHARD J. SCHECHTER
> Special Attorney
> U.S. Department of Justice

-8-