# EXHIBIT 1

1                    MR. CARPENITO:  Your Honor, I have no further

2        questions at this time.

3                    THE COURT:  Mr. Sullivan, once you're set up.

4                    MR. SULLIVAN:  Pardon me, Your Honor?

5                    THE COURT:  Once you're set up, start.

6                    MR. SULLIVAN:  Your Honor, what I propose to do

7        is take just about 10 minutes?

8                    THE COURT:  That will give me time to explain to

9        our jurors our schedule for tomorrow.

10                   MR. SULLIVAN:  Very well.

11                   May I approach, Your Honor?

12                   THE COURT:  Please do.

13

14                          CROSS-EXAMINATION

15       BY MR. SULLIVAN:

16       Q.   Hello, Mr. Kearney.

17       A.   Hello.

18       Q.   Is it fair to say you've been cooperating with the

19       government since about August 1998; am I correct?

20       A.   Yes.

21       Q.   And you have not been charged with any crime despite

22       the acts which you've described here today; am I correct?

23       A.   Yes.

24       Q.   And your cooperation has lasted between 1998 up to

25       this point; am I correct?

1    A.    Yes.

2    Q.    And as of August 2004, you've probably interviewed

3    with the government about 15 or 20 times; am I correct?

4    A.    Yes.

5    Q.    And you were asked many times about topside

6    adjustments during that period during those interviews; am

7    I correct?

8    A.    Yes.

9    Q.    You were asked what happened during those meetings

10   that you attended many times; am I correct?

11   A.    Yes.

12   Q.    Now, isn't it true that in at least seven or eight of

13   those meetings you never even mentioned that someone that

14   you dealt with had invoked Walter Forbes' name for any

15   purpose?

16   A.    I don't know.

17   Q.    You don't know.

18   A.    I don't remember.

19   Q.    You don't remember.

20         Okay, take a look at Tab Number 17, if you would,

21   sir, in that binder that I've just given you.

22         Take a look.  That's marked as Exhibit 2357 for

23   identification.  Do you see that?

24   A.    Yes.

25   Q.    And do you note that the date on the top, does it

# EXHIBIT 2

1      this witness after April 15, 1998.

2              I instruct you that any evidence of acts,

3      omissions, declarations or statements by this witness that

4      took place after April 15, 1998 is presented only for the

5      limited purpose of your revaluation of the witness's

6      credibility.  It may be considered by you for that limited

7      purpose.  You may not consider that evidence for any other

8      purpose.  In particular, it is not evidence at all of any

9      misconduct or wrongdoing by either Mr. Shelton or

10     Mr. Forbes.

11              Thank you for your attention.

12     BY MR. SCHECHTER:

13     Q.   Mr. Kearney, let me see if I can back up where we

14     were.  Why weren't you honest with the people who came to

15     your office to interview after April 15, 1990?

16     A.   Because I was scared of -- for myself.

17     Q.   Why were you scared for yourself?

18     A.   Because of -- again, of my involvement.

19     Q.   Just so the jury is clear, you said "your

20     involvement," your involvement in what?

21     A.   This fraudulent activity.

22     Q.   I need you to be specific.  What are you talking

23     about?

24     A.   The fraud at CUC.

25     Q.   Give me specifics.  What did you do?  What were your

1          Did Cosmo Corigliano ever indicate that Walter Forbes

2     wanted a topside adjustment made?

3     A.     Not a topside adjustment specifically.

4     Q.     And how about Casper Sabatino?

5     A.     No.

6     Q.     All right, sir.

7          Let me backtrack a little bit here.  Just at the end

8     of your testimony today you mentioned that you were

9     concerned about your own situation back in 1998; am I

10    correct?

11    A.     Right.

12    Q.     And then eventually, I gather, in connection with

13    these meetings there was a decision that you would not be

14    prosecuted; am I correct?

15    A.     Correct.

16    Q.     No doubt that was the happiest news you've ever

17    received?

18    A.     Perhaps.

19    Q.     Perhaps?  I'll say.

20         It was good news, wasn't it?

21    A.     Yes.

22    Q.     About when were you told that you wouldn't be

23    prosecuted?

24    A.     I was told I was not a target of the investigation

25    pretty early on.

1    Q.    Do you remember the year, where in the cycle of

2    interviews that that would have occurred?

3    A.    I believe it was, you know, in '98.

4    Q.    All right.  So there was no criminal action brought

5    against you.  But you testified that there was an SEC

6    action, right?

7    A.    Right.

8    Q.    And in connection with the SEC action, just to make

9    sure we're dealing with the correct figures here, if you

10   turn to the Binder Number 2, Tab Number 14, you'll see

11   there Defendants' Exhibit 2369.

12        If you would look at page 6 of that document, right

13   at paragraph Roman numeral VII, I'd like to ask you to

14   tell us again the amount that the SEC decided, I think in

15   your words, ill-gotten gain, were those your words?

16   A.    Yes.

17   Q.    Do you recall what the amount of ill-gotten gain

18   would have been on some small stock sales, right?

19   A.    32,000.

20   Q.    32,000.  That's rounded out, correct?

21   A.    Right.

22   Q.    Okay.  And on top of that I think you said that --

23   that was essentially all of your profits, right?

24   A.    The way they calculated, yes.

25   Q.    Yes.  They calculate what you thought were even more

1    to divide that into a series of interviews and then the

2    real preparation sessions that might have occurred in the

3    what is couple of months.

4        Do you follow my question?

5    A.    So what's your question?

6    Q.    My question is:  Have you recently prepared for your

7    testimony and about how many times?

8    A.    I met with the government a couple times over the

9    last couple weeks.

10   Q.    Okay.  And, say, the last month or so, can you give

11   us an idea, last two months, how many times you would have

12   met?

13   A.    Two or three.

14   Q.    Two or three.  Is that six, roughly, six times over

15   the last month or two?

16   A.    No, two or three.

17   Q.    Two or three total over the last two months?

18   A.    Yes.

19   Q.    During those sessions you would be asked questions

20   and told how you were going to present the direct

21   testimony and there's nothing wrong with that, right?

22   A.    I was asked questions.

23   Q.    And you gave answers?

24   A.    Yes.

25   Q.    And you knew this was in anticipation of coming to

1    court, right?

2    A.    Yes.

3    Q.    Well, in any of the preparation sessions, did anybody

4    go back to the prior 13 interviews that you had to refresh

5    your recollection about anything that you might have said

6    that was different than what you intended to say in court?

7    A.    No.

8    Q.    Did anyone point out to you that the things you would

9    say in court yesterday and today might be different than

10   what you said before?

11   A.    No.

12   Q.    Did anyone go and get any memos or notes, typed memos

13   or notes which reflected what happened in some of those 13

14   or more sessions in order to assist you in preparing for

15   your testimony here yesterday and today?

16          MR. SCHECHTER:  Your Honor, I'm going to object

17   to the question.  Assumes facts that are not in evidence.

18          THE COURT:  Sustained.

19   BY MR. SULLIVAN:

20   Q.    Let's go look at this document -- strike that.

21          I've asked you to open to Tab 1, but don't look at it

22   yet, okay?

23   A.    Okay.

24   Q.    Do you remember being interviewed by people about

25   this matter back there in 1998?

9887

# EXHIBIT 3

1      Q.    Now, Mr. Sullivan also referred to many questions to

2      you about meetings you had with the government.  Do you

3      remember that?

4      A.    Yes.

5      Q.    And he asked you about meetings that you had with

6      Mr. Paul Weissman, who's a federal prosecutor; is that

7      correct?

8      A.    Yes.

9      Q.    Do you remember those questions?

10     A.    Yes.

11     Q.    How many meetings have you had with me?

12     A.    Two.

13     Q.    How many meetings have you had with Mr. Martinez?

14     A.    None.

15     Q.    In fact, when did you first meet Mr. Martinez?

16     A.    Yesterday.

17     Q.    Now, during those meetings you were asked questions

18     by Mr. Sullivan about those meetings as to whether or not

19     the government asked you questions.  Do you remember that?

20     A.    Yes.

21     Q.    And did the government ask you questions?

22     A.    Yes.

23     Q.    And did you answer those questions?

24     A.    Yes.

25     Q.    At those meetings, did you make any speeches or give

# EXHIBIT 4

*Law Offices of*

*Roth & Fettweis, LLC*

*744 Broad Street, Suite 701*

*Newark, New Jersey 07102*

THOMAS G. ROTH †
ROBERT J. FETTWEIS
———
† MEMBER N. J. AND N.Y. BARS

ROBIN A. NEWMAN
LOUISE ARKEL*
———
BRUCE M. MERRILL ▲
OF COUNSEL

▲ MEMBER N. J., PA. AND ME. BARS
* MEMBER N. J. & ME. BARS

TELEPHONE: (973) 565-9495

FAX: (973) 565-9616

May 5, 2000

<u>Via Fax and Overnight Delivery</u>

Richard H. Walker, Director
Division of Enforcement
U.S. Securities and Exchange Commission
450 Fifth Street, N.W.
Washington, D.C.  20549

    Re:  In the Matter of Cendant Corporation and Trading
         in Its Securities - File No. HO-3401
         <u>Kevin T. Kearney</u>

Dear Mr. Walker:

    Please accept this letter in lieu of a more formal Wells Submission on behalf of Kevin T. Kearney.

    The Staff of the S.E.C. Division of Enforcement ("the Staff") has proposed that Kearney settle the prospective federal civil action against him and others on extremely harsh terms.  By letter dated April 19, 2000, the Staff has demanded: (1) a $47,685.00 disgorgement payment; (2) prejudgment interest, subsequently calculated at $12,670.00; (3) a disgorgement penalty of $47,685.00; and (4) an additional penalty of $40,000.00.  The total comes to $148,040.00.

    Kearney is prepared to pay the proposed amounts for disgorgement and prejudgment interest.  But the Staff's additional

May 5, 2000
Page - 2 -

insistence upon two staggering civil penalties is entirely inappropriate under the circumstances of this case. Kearney's relative youth during the period of the offense, his prior unblemished record, his non-involvement in the decision-making underlying the wrongdoing, his minimal financial gain from any trading in company stock, and his consistent and meaningful cooperation with the SEC in its ongoing investigation of this matter all militate toward the Commission's accepting a settlement that would be far less financially devastating to him and his family.

A.    <u>Kearney's Role in the CUC Wrongdoing Was Relatively Minor</u>.

Kevin Kearney was 26 years old when he joined CUC International, Inc. ("CUC") as Manager of Financial Reporting in 1993. His starting salary was $47,000 per year. By 1998, the last year during which the scheme in this case continued, his salary had risen only to $65,000 per year. Throughout his tenure with CUC, he was always subordinate to, and received directions from, several people within the upper and middle management of the company. Kearney was, in short, no more than a mid-level CUC employee throughout his tenure there.

Any actions of Kearney in furthering the improper accounting practices at CUC and its subsidiaries were carried out pursuant to the direct instructions of his corporate superiors. Kearney did not initiate the wrongdoing. Neither did he direct nor supervise its overall execution. He merely followed orders.

May 5, 2000
Page - 3 -

B.   Kearney's Trading in CUC Stock Was Only Minimally Profitable To Him, and Does Not Evidence any Intent to Defraud the Investing Public.

The Staff's proposed resolution would exact a draconian penalty upon Kearney for ostensible insider trading. The Staff, in utilizing a loss avoidance calculation, has computed the amount of required disgorgement at $47,685.00. For settlement purposes, Kearney does not dispute the methodology the Staff utilized. But it should be remembered that the Staff's loss avoidance figure is far higher than Kearney's actual in-pocket gain from the buying and selling of CUC shares.

Kearney's record of trading in CUC stock amply demonstrates that he was not looking to utilize insider information to defraud the public or to derive large financial benefits for himself. Beginning in June 1993 and continuing until October 1997, Kearney purchased CUC stock through an in-house plan that made the stock available at a discount price to all CUC employees. His actual realized gain -- after subtracting his purchase price from the subsequent sales price -- totaled $28,182.38 as of February 1998, the date of his last sale before the CUC scheme became public knowledge.

Surely, had Kearney been looking to obtain a significant financial benefit from his inside knowledge of the accounting irregularities at CUC, he would have and could have engaged in much more extensive trading in CUC stock. Instead, over the roughly four and one half years in which he bought and sold small

May 5, 2000
Page - 4 -

quantities of CUC stock, his average gain approximated $6,000 per year.

Moreover, Kearney's status in mid-level management at CUC entitled him to receive and exercise options in CUC stock. Pursuant to the terms of the options, he could have purchased additional CUC stock during each year of his employment. The dates and amount of the options so awarded are as follows:

| Date | Number of Options |
|------|-------------------|
| October 1993 | 500 |
| November 1994 | 750 |
| December 1995 | 1,500 |
| February 1997 | 2,000 |

At no time from 1993 to 1998, however, did Kearney exercise any portion of these options. Had he at that time been seeking to derive financial advantage from his knowledge of the CUC accounting improprieties, he could have utilized the options and sold the acquired stock as soon as possible. Indeed, had he exercised the options and then held all the stock acquired thereby until CUC stock reached its maximum per-share price in 1997, he would have realized approximately $82,000. That he did not do so amply demonstrates the absence of a connection in his mind between the CUC accounting practices and the market price of CUC shares.

May 5, 2000
Page - 5 -

C.     In Seeking to Impose Draconian Financial Penalties on Kearney,
the Staff Has Failed to Give any Deference Whatever to the U.S.
Attorney's Determination of His Relative Culpability.

The U.S. Attorney's perspective of Kearney's relative
culpability is also instructive.  For approximately the last two
years, the Office of the United States Attorney in New Jersey has
conducted an extensive and thorough investigation of the underlying
fraud in this case.  As early as August 1998, that Office made the
decision that Kearney's role in a criminal prosecution would be as
a witness, not as a defendant.  That decision was necessarily
premised in large part upon the U.S. Attorney's determination that
the degree of Kearney's apparent culpability relative to others was
low.  Cf. U.S. Attorney's Manual, ¶9-27.620.

To be sure, the Commission is not bound by the U.S. Attorney's
view of Kearney's role and relative culpability.  But it makes
little sense for the Staff to formulate a settlement proposal that,
in effect, is premised upon an outright rejection of the
perspective of the Government's prosecuting attorneys in this case.
In assessing the appropriate financial burden to be placed upon
Kearney, the Commission ought to weigh seriously the U.S.
Attorney's decision that Kearney's level of involvement in
wrongdoing was so low that he is not an appropriate subject for
criminal prosecution.

Case 3:02-cr-00264-AHN    Document 2472-2    Filed 09/27/2006    Page 18 of 21

May 5, 2000
Page - 6 -

D.   The Staff's Recommendation Completely and Improperly Ignores the Cooperation that Kearney Has to Date Rendered to the Commission.

Throughout the negotiations on a possible settlement of the Commission's claim against Kearney, the Staff has steadfastly maintained that its proposals do not and should not take into account Kearney's cooperation with the Government's investigation. That cooperation, the Staff has maintained, has been rewarded by the U.S. Attorney's Office in its decision not to prosecute Kearney. The Staff therefore has insisted that, despite Kearney's valuable cooperation, it is nevertheless appropriate for the Commission to seek devastating civil penalties from him.

The Staff's position is indefensible both as a matter of law and as a matter of policy.  In determining whether to impose civil penalties, a Court would look, among other things, to a defendant's cooperation both in the litigation and settlement phases of a case as "a factor to be considered with all other relevant factors." Securities and Exchange Commission v. Custable, 1995 W.L. 117935, *6 (N.D. Ill. March 15, 1995).  The Commission, in formulating its settlement policy in this case, should apply the law; it should give due deference to the nature and extend of Kearney's cooperation in this case.

Kearney has, from the outset, provided important cooperation not just to the U.S. Attorney's Office, but to the Commission as well.  When Kearney began his cooperation with the U.S. Attorney's Office in August 1998, the Staff specifically solicited his simultaneous cooperation with the Commission.  Thus, as early as

SEC0091

May 5, 2000
Page - 7 -

August 24, 1998 debriefing session at the U.S. Attorney's Office in
Newark, two representatives of the Staff were in attendance, with
Kearney's specific consent. From that day until this one, the U.S.
Attorney's meetings with Kearney have always been attended by
members of the Staff as well. In the course of these debriefing
sessions, Kearney has provided to the Staff significant information
that, without a doubt, has substantially assisted the Commission in
preparing its case against more culpable violators. Now, having
obtained the benefit of two years worth of cooperation from
Kearney, the Staff somehow thinks it would be fair to ignore that
cooperation in assessing penalties against him.

It should be noted, moreover, that at no time did the U.S.
Attorney's Office condition its own agreement with Kearney upon his
simultaneous willingness to cooperate with the Commission. Both
Staff personnel and U.S. Attorney's Office representatives made it
clear to Kearney that his decision about whether to cooperate with
the Commission would be independent of his cooperation with the
criminal prosecutors. His status as a non-target in the criminal
investigation, in other words, was not dependent in any way upon
the nature and extent of his cooperation with the Staff. In the
same way that the Commission independently solicited Kearney's
cooperation, it should also independently weigh the value of that
cooperation to it in deciding whether to continue to insist upon
Kearney's paying such harsh financial penalties.

It would be incredibly shortsighted for the Division of
Enforcement to solicit cooperation from a relatively minor

May 5, 2000
Page - 8 -

participant like Kearney and thereafter refuse to weigh that cooperation in connection with settlement of the case against him. Such a practice, if applied in all Commission cases, would ultimately have a devastating impact on the Commission's future ability to obtain cooperation from anyone. Moreover, in joint investigations like this one with the U.S. Attorney's Office, that practice could have a counterproductive impact on the Government's quest to arrive at the truth.

When someone involved in criminal wrongdoing agrees to cooperate with the U.S. Attorney's Office, that Office necessarily demands that the cooperating individual be as frank and as open as possible regarding his own participation in the criminality under investigation. Anything short of complete candor would be potentially disastrous to the Government's construction of a successful criminal prosecution. Usually, through the vehicle of a preliminary proffer or some other similar device, the cooperating witness knows in advance what penalty he can expect in the criminal case. Thus, the witness's participation in U.S. Attorney debriefing sessions creates no disincentive to truthful testimony. The Staff's policy in this case, on the other hand, would provide a strong motive for a would-be cooperating witness to do what Kevin Kearney absolutely did not do here: to hold back the full truth from Government investigators and thereby attempt to place himself in a better, less incriminatory light in the hope of avoiding ruinous SEC sanctions thereafter.

May 5, 2000
Page - 9 -

The Staff's notion that no benefit should be given to Kevin Kearney for his cooperation with the SEC is, simply put, bad public policy. Kearney's cooperation with the Commission should prompt it to offer him a resolution that will not wreak financial devastation upon him and his family. There is no reason in law or public policy for the Division of Enforcement to persist in a demand that Kearney pay ruinous civil penalties.

Kearney is prepared to pay disgorgement at the level sought by the Staff. He is additionally prepared to pay prejudgment interest on his disgorgement remittance. However, in light of all of the circumstances of this case, the additional civil penalties that the Staff would impose upon him are unnecessary, unfair, and unwise.

Very truly yours,

Robert J. Fettweis

RJF:ik
cc: David Frolich, Esq.