UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 3:02CR264 (AHN) |
| | ) | |
| WALTER A. FORBES | ) | October 6, 2006 |
| | ) | |

**MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANT WALTER A. FORBES
FOR RECONSIDERATION AND CLARIFICATION OF THE COURT'S SEPTEMBER
22, 2006 RULING
(Forbes Third Trial Motion No. 15)**

Defendant Walter A. Forbes, through undersigned counsel, respectfully submits

this memorandum in support of his motion for reconsideration and clarification of the Court's

September 22, 2006 ruling (the "Order").

## ARGUMENT

The Court should reconsider and clarify the Order to:  (1) preclude Steven

Kernkraut from testifying about what he would have done had he known CUC's reported

financial results were false; (2) preclude Mr. Kernkraut from testifying about what Mr. Forbes

allegedly said to him about CUC's membership numbers and renewal rates or, in the alternative,

issue Judge Thompson's limiting instruction contemporaneously; (3) preclude evidence about

Mr. Forbes' property transfers; and (4) compel production by the government of communications

between the SEC and Mr. Corigliano and/or his counsel.[1]

---

[1]     Reconsideration is appropriate where the moving party can point to controlling law or
evidence that "might reasonably be expected to alter the conclusion reached by the court."
Shrader v. CSX Transp., 70 F.3d 255, 257 (2d Cir. 1995).  A motion for reconsideration gives
the Court an opportunity to "correct manifest errors of law or fact."  LoSacco v. City of
Middletown, 822 F. Supp. 870, 876-77 (D. Conn. 1993) (quotation omitted), aff'd mem., 33 F.3d
50 (2d Cir. 1994).

Oral Argument Requested

## I.    THE COURT SHOULD PRECLUDE IMPROPER TESTIMONY BY STEVEN KERNKRAUT.

To date, the Court has adhered to all of Judge Thompson's rulings in favor of the government. But in the portion of the Order addressing Mr. Kernkraut's testimony, the Court appears to deviate from one of the few rulings that Judge Thompson made in favor of Mr. Forbes. Mr. Forbes respectfully seeks reconsideration and clarification of the portion of the Order denying his request to preclude Mr. Kernkraut from speculating what he would have done had he known CUC's reported financial results were false (Judge Thompson ultimately struck that testimony), and to preclude Mr. Kernkraut from testifying about what Mr. Forbes allegedly "said to him about CUC's membership numbers and renewal rates." Order at 9. Mr. Forbes also seeks clarification as to whether the Court will, as Judge Thompson did, issue a curative instruction regarding membership numbers and renewal rates if the testimony is permitted.

### A.    Mr. Kernkraut Cannot Speculate About What He Would Have Done Had CUC Contemporaneously Reported Lower Financial Results.

The Order initially states that "the government will not be permitted to elicit any testimony from Kernkraut that is similar or identical to the testimony that was stricken by Judge Thompson." Order at 8. Judge Thomson struck testimony in which Mr. Kernkraut testified that he would have "changed his analysis" if he had known that CUC's financial results were false, and testimony about how his analysis would have been different. Examples of such stricken testimony are set forth below.

> Q. If you knew the numbers -- if you knew there were accounting irregularities, would that have affected your analysis of CUC stock when you wrote your reports?
>
> A. Yes, it would have vastly changed my analysis of CUC if I knew of those financial irregularities. If I knew all through that '93 to '98 period what I found out after the financial irregularities were announced or revealed, it would have changed the totality of my analysis.

Tr. (10/18/05) at 215:16-23; compare Tr. (11/28/05) at 44 (striking testimony at Tr. (10/18/05) at

215:15-218:13).

> Q.  Now, I believe the question that I asked before the instruction
> was: Why would that have affected your analysis of CUC stock,
> the fact that there was announcement that there were accounting
> irregularities?
>
> \* \* \*
>
> A.  Okay.  Yeah, the analysis would have been changed on a
> number of levels.  First and foremost, the size of how much CUC
> earned was misstated to me, and the financial irregularities said
> that they were much lower than was actually reported.  So if --
> without citing the exact numbers, if the financial report said that
> CUC had earned $100 million, the amount of the earnings may
> have only been 60 or $70 million, a vastly lower number in terms
> of how much they really earned.  So that was very important.
> Secondly, the earnings growth rate was much lower than was
> reported where the earnings growth rate had been reported
> historically from that '92 to '97 period as 20, 25, 30 percent,
> numbers in those range, and the growth rate was far lower than
> that.  And the number of members that they had added was
> overstated and the renewal rate of how many members had actually
> renewed the following year, how many members they retained had
> been overstated significantly, where the actual renewal rate was
> closer to 50 percent.  So all those numbers would have led to a
> significantly different conclusion where we would have had -- the
> company's earnings would have been lower than what was
> reported, our earnings estimates going forward would have been
> far lower, and the earnings growth rate for the company would
> have been far lower, and the stock price would have never attained
> the stock price that it did.

Tr. (10/18/05) at 216:23-218:10 (objection omitted); compare Tr. (11/28/05) at 44 (striking

testimony at Tr. (10/18/05) at 215:15-218:13).[2]

---

[2]    Striking this testimony was legally correct because it violated all three of the foundation
requirements of Rule 701:  (1) personal knowledge; (2) helpfulness; and (3) not based on
scientific, technical, or other specialized knowledge within the scope of Rule 702.  See United
States v. Garcia, 413 F.3d 201, 211 (2d Cir. 2005).  As set forth in Mr. Kernkraut's testimony
quoted above, the basis for the change in his analysis is his understanding that the financial
results were false, which is based on his review of the Restatement, not on personal knowledge.
Only an expert witness can testify without personal knowledge.  The testimony is not helpful to
the jury because the basis for his testimony was wrong; the Restatement does not date back to

At oral argument before this Court, the government acknowledged that Judge

Thompson struck this testimony and stated that it was not seeking reconsideration of Judge

Thompson's ruling, and the Court indicated that the testimony would be precluded.

> MR. GROSS:  . . . Judge Thompson ruled that Mr. Kernkraut
> would not be allowed to testify that had he known the actual
> earnings and financial results of CUC, and this should c[o]me as
> no surprise to anybody, he would not have been recommending the
> stock as he was . . . . Judge Thompson said we could not ask him
> that question.  And we're not here to argue that this Court should
> reconsider Judge Thompson's ruling on that issue.  Mr. Simon
> pointed out a mistake in our brief.  I frankly admit he's correct that
> Judge Thompson did exclude that testimony about what Mr.
> Kernkraut would have done if he had known the actual results.
> The only thing that's left here is whether or not the government
> can elicit testimony from Mr. Kernkraut about his conversations
> with Mr. Forbes as Mr. For[bes] was fully conversant,
> knowledgeable, up to date about CUC's membership growth.
>
> THE COURT:  Okay.  Do you agree that's [the] issue?
>
> MR. SIMON:  Yes, your Honor.  For the record, Judge Thompson
> didn't exclude it.  He permitted it and six weeks later, he struck it.
>
> THE COURT:  It is out.  It is not an issue.

Tr. (07/27/06) at 96-97 (emphasis added).

The Order, however, ruled that it is "in," stating that "Kernkraut will be permitted

to testify that he would have 'changed his analysis' if he had known that CUC's reported

financial results were fraudulent and how his analysis would have been different."  Order at 9.

---

1992 or 1993 as his testimony indicates, and the membership numbers and renewal rates were
not overstated.  Opinions regarding the impact on CUC's stock price and earnings projections are
based on specialized knowledge and are not "the product of reasoning processes familiar to the
average person in everyday life."  Garcia, 413 F.3d at 215.  Moreover, as the testimony quoted
above illustrates, permitting Mr. Kernkraut to testify about what he would have done had he
known CUC's reported results were false virtually guarantees letting in through the backdoor
what the Order precludes—testimony by Mr. Kernkraut that "CUC's publicly reported financial
results were false," Order at 8, and were false in ways and time periods not covered by the
Restatement.

- 4 -

Mr. Forbes requests that the Court clarify its Order and exclude such testimony (as it indicated it would).

**B.     Mr. Kernkraut Cannot Testify About What Mr. Forbes Allegedly Told Him About CUC's Membership Numbers and Renewal Rates.**

The Order is mistaken when it concludes that evidence regarding what Mr. Forbes allegedly said about CUC's membership numbers and renewal rates is "relevant to prove Forbes's knowledge of the charged fraud," Order at 9, because, as the government concedes, the indictment does not charge that the membership numbers or renewal rates were overstated. See, e.g., Tr. (11/28/05) at 52 ("THE COURT: . . . It's certainly not in the indictment, correct?  MR. GROSS:  That's correct, Your Honor."); Gov't Opp'n to Forbes Third Trial Mot. In Limine No. 3 [Docket No. 2355] at 12 ("the indictment does not allege that CUC's publicly reported membership and membership renewal numbers were false").  Moreover, as Judge Thompson instructed, "[t]here is no evidence at all that the membership numbers reported by CUC or Cendant were false or inflated in any respect, and there is no evidence at all that the membership renewal rates reported by CUC or Cendant were false or inflated in any [respect.]"  Tr. (12/08/05) at 3,801.  CUC's reporting of membership numbers and renewal rates was not improper, much less "within the core of criminality charged in the indictment," as the Order erroneously concludes.  Order at 10.

The Order also states incorrectly that the evidence is relevant to impeach Mr. Forbes' purported testimony that he "did not concern himself with past financial performance." Order at 9.  Mr. Forbes never testified that he was ignorant of CUC's reported financial results, and the government (and the Order) fail to cite any such testimony or even argument by his counsel to that effect.  Mr. Forbes' defense is that he had no knowledge that the reported

financial results were false.[3] Moreover, membership numbers and renewal rates are operational numbers, not financial numbers based on GAAP accounting like the allegedly false financial numbers at issue in this case. Evidence that Mr. Forbes discussed CUC's publicly reported membership numbers and renewal rates does not "rebut[]," Order at 9, anything because those operational numbers are not alleged to be false, are not at issue in this case, and provide no support for the proposition that Mr. Forbes knew that the financial numbers were false.

The Order also gives insufficient consideration to Mr. Forbes' Rule 403 argument. Any theoretical probative value arising from Mr. Kernkraut's testimony that Mr. Forbes discussed what CUC had accurately reported about its membership numbers and renewal rates is substantially outweighed by the danger of confusion of the issues and misleading the jury. Because there is an allegation in the case that the membership cancellation reserves were underfunded, see Redacted Indict. ¶¶ 44-48, and because Mr. Corigliano often referred to these as "membership accounting issues," there is a substantial risk that the jury will erroneously conflate that issue with membership numbers and renewal rates. The government did not concede the Rule 403 argument, but recognized the risk of juror confusion. Tr. (07/27/06) at 106 ("As for prejudicial, the jury might be confused because one witness is talking about membership cancellation reserves and historical cancellation rates and Mr. Kernkraut is talking

---

[3]        The government has mischaracterized the defense in various ways in a number of pleadings. See, e.g., Order of 9/28/06 (relying on government's inaccurate characterization that Mr. Forbes had presented a "no harm, no foul" defense; evidence of financial health of company, unlike widely reported cases such as Enron and WorldCom that resulted in bankruptcy, is relevant to show why Mr. Forbes would be unaware of fraudulent accounting, just like other executives such as Mr. McLeod and Mr. Menchaca were unaware); Tr. (10/05/06) at 14 (erroneously asserting that Mr. Forbes put on a "dummy" defense). Mr. Forbes has stated unequivocally that "although [he] was a visionary, he has not raised a defense that he was unconcerned with CUC's past performance." Docket No. 2397, at 4. On such a critical issue, the government should not be permitted to mischaracterize the defense in an attempt to justify the admission of otherwise misleading and inadmissible evidence.

about membership growth. This is a complicated case. There's no way around it.").
Accordingly, the testimony should be precluded.

At the very least, to avoid misleading the jury, the Court should clarify its Order
to state that it will issue the following contemporaneous curative instruction if Mr. Kernkraut
testifies about membership numbers and renewal rates, as Judge Thompson did: "There is no
evidence at all that the membership numbers reported by CUC or Cendant were false or inflated
in any respect, and there is no evidence at all that the membership renewal rates reported by
CUC or Cendant were false or inflated in any [respect] and I instruct you that there is no issue in
the case with respect to those matters." Tr. (12/08/05) at 3,801.[4]

## II.    THE COURT SHOULD PRECLUDE EVIDENCE CONCERNING MR. FORBES' PROPERTY TRANSFERS.

Mr. Forbes respectfully seeks reconsideration of the Order denying his request to
preclude evidence concerning his property transfers because the Order applies the wrong legal
standard and relies upon a mistaken view of the facts. No appellate decision supports the
admission of this evidence to show consciousness of guilt. See Tr. (07/27/06) at 86-87 ("MR.
COYNE:  I have not found a reporte[d] case of the Second Circuit dealing with evidence of
transfer of assets as consciousness of guilt in a criminal case . . . . It may well be an issue of first
impression at least from an appellate perspective.").

The Order holds that evidence of the property transfers constitutes consciousness
of guilt evidence because "the transfers, and the financial risk Forbes took by divesting himself
of millions of dollars worth of property, tends to prove that he sought to protect the property

---

[4]    Judge Thompson's curative instruction was not issued contemporaneously because he
overruled the contemporaneous objections to Mr. Kernkraut's testimony, but later struck certain
testimony and issued a curative instruction when he considered the parties' written submissions
and the law.

from the claims of persons who suffered pecuniary loss from the fraud." Order at 7. But the law requires that the evidence tend to establish <u>consciousness of guilt of the crime charged, not consciousness of civil liability.</u> <u>See</u> <u>United States v. Al-Sadawi</u>, 432 F.3d 419, 424 (2d Cir. 2005) (evidence must support an inference of "consciousness of guilt," "consciousness of guilt concerning the crime charged," and "actual guilt of the crime charged" (quotation omitted)); <u>United States v. Skeddle</u>, 981 F. Supp. 1074, 1078 (N.D. Ohio 1997) ("defendants' purported spoliation of evidence could have been in response to fear of civil prosecution or ethical reprimand, and therefore evidence only of their consciousness of general wrongdoing").

        <u>United States v. Perez</u>, 387 F.3d 201 (2d Cir. 2004), relied upon by the Court, does not dispense with the requirement that the evidence must tend to establish consciousness of guilt <u>of the crime charged</u> (as opposed to consciousness of potential civil liability). In that case, the defendant, after indictment, moved unsuccessfully to exclude evidence seized from his house. The district court admitted at trial evidence that the defendant had paid a witness to make false statements to investigators regarding whether the search was consensual. The Second Circuit stated that "[e]vidence of a party's consciousness of guilt may be relevant <u>if reasonable inferences can be drawn from it and if the evidence is probative of guilt</u>." <u>Id.</u> at 209 (emphasis added). Because the evidence in that case (witness tampering) was prior bad act evidence, the Court immediately proceeded to state that "[s]uch evidence is admissible if the court (1) determines that the evidence is offered for a purpose other than to prove the defendant's bad character or criminal propensity, (2) decides that the evidence is relevant and satisfies Rule 403, and (3) provides an appropriate instruction to the jury as to the limited purposes for which the evidence is introduced, if a limiting instruction is requested." <u>Id.</u> (citing <u>United States v. Mickens</u>, 926 F.2d 1323, 1328-29 (2d Cir. 1991)).

The three factors cited in Perez are not the factors that govern the determination of whether evidence is probative of consciousness of guilt; rather, these factors govern the admissibility of Rule 404(b) evidence, as a review of Mickens makes clear. The cited passage from Mickens states as follows:

> Evidence, such as the former attorney's testimony, offered under Fed. R. Evid. 404(b) may be admitted if the court: 1) determines that the evidence is offered for a purpose other than to prove the defendant's bad character or criminal propensity; 2) determines that the evidence is relevant under Fed. R. Evid. 401 & 402, and is more probative than unfairly prejudicial under Fed. R. Evid. 403; and 3) provides an appropriate limiting instruction to the jury, if one is requested.

926 F.2d at 1328-29 (citations & quotations omitted) (court properly admitted evidence that defendant made a hand gesture in the form of a gun as the former attorney entered the courtroom to testify).

The Order cites the three 404(b) factors, Order at 6, without reference to the predicate requirements that "reasonable inferences can be drawn from" the proposed consciousness of guilt evidence and that the evidence be "probative of guilt." Perez, 387 F.3d at 209 (emphasis added). As the Second Circuit emphasized in a case decided after Perez, "the requirement of a sufficient factual predicate ensures that the evidence is probative in a legal sense and protects the defendant against the possibility of the jury drawing unsupported inferences from otherwise innocuous behavior." Al-Sadawi, 432 F.3d at 424 (quotation omitted). The evidence must sturdily support the inferences of consciousness of guilt, consciousness of guilt concerning the crime charged, and actual guilt of the crime charged. Id. The proposed inferences are not supported here and the evidence is not probative of guilt.

In applying the wrong legal standard, the Order also restates Judge Thompson's flawed factual assumptions in permitting the government to present evidence of Mr. Forbes'

property transfers. For example, Judge Thompson cited the purported fact that Mr. Forbes was

interviewed by Cendant Audit Committee investigators on June 11, 1998 and transferred his

interest in one property to his wife on June 8, 1998. See Docket No. 1841 at 2; Order at 7. In

fact, Mr. Forbes was not interviewed on that date, but on June 15, 1998. See Tr. (10/4/04) at

14,532-33. There is no evidence in the record about when Mr. Forbes received notice of that

interview, whether the June 8, 1998 transfer had anything to do with that interview, or (even

assuming arguendo that it did), why a transfer on June 8, 1998—almost three years before any

indictment was returned against Mr. Forbes, and at a time when he was not the focus of any

criminal investigation—has any probative value with respect to purported consciousness of guilt.

Judge Thompson also cited the fact that a transfer took place in December 1998, after the

Cendant Audit Committee's report had been issued. See Docket No. 1841 at 2; Order at 7. The

Audit Committee Report, however, disclosed that the investigators found no evidence that

Mr. Forbes either participated in or had knowledge of the fraud, a point the government

concedes. See Docket No. 2348, at 9 ("the Audit Committee Report all but exonerated him").

The fact that Mr. Forbes transferred his interest in a property after the issuance of a report that

effectively exonerated him of intentional wrongdoing does not support a conclusion that

Mr. Forbes' conduct evidences consciousness of guilt. Finally, while Judge Thompson cited "the

June 18, 1999 guilty plea by Casper Sabatino" and "the September 23, 1999 guilty plea by Anne

Pember," Docket No. 1841 at 7 (emphasis added); Order at 7, neither Mr. Sabatino nor

Ms. Pember has ever claimed to have any knowledge about any purported wrongdoing by

Mr. Forbes (and Mr. Sabatino has repeatedly provided exculpatory information about

Mr. Forbes). Even more significant, as Mr. Forbes pointed out in his reply, see Docket No.

2340, at 5 n.8, the cited dates were not the dates of public guilty pleas, but the dates on which

Pember and Sabatino signed plea <u>agreements</u> with the government.  Mr. Sabatino and

Ms. Pember did not enter guilty pleas until June 2000, and there is no evidence that Mr. Forbes

had knowledge in 1999 of their plea agreements.  These are undisputed and objectively verifiable

factual errors that this Court, apparently in reliance on Judge Thompson, erroneously repeats in

support of the decision.

## III.   THE COURT SHOULD COMPEL PRODUCTION OF COMMUNICATIONS BETWEEN THE SEC AND MR. CORIGILIANO AND/OR HIS COUNSEL.

Mr. Forbes respectfully seeks reconsideration of the Order denying his request for

disclosure of communications between the SEC and Mr. Corigliano and/or his counsel.  This is

not a category where the government can state accurately that all communications have been

produced.  <u>Mr. Forbes has identified specific correspondence between the SEC and counsel for

Mr. Corigliano that has not been produced</u>, but that should be produced pursuant to Rule 16 and

pursuant to <u>Brady/Giglio</u>.[5]  The Order does not address these documents and applies the wrong

legal standard.

Letters between Mr. Corigliano's attorneys and the SEC concerning Mr.

Corigliano's negotiations with the SEC—which the government did not produce, but which Mr.

Corigliano's attorney attached to a pleading on November 6, 2005—reference additional

correspondence with the SEC that the government is withholding.  <u>See</u> Exs. 1-2.[6]  One of the

---

[5]     It is one thing for courts generally to rely on the government's representation that no documents exist, but here it is <u>undisputed that the documents do exist</u>.  Moreover, the assertion that the government has supposedly produced discovery to which Mr. Forbes is not entitled (Mr. Forbes disputes this assertion), <u>see</u> Order at 2, provides no basis for withholding documents to which Mr. Forbes is entitled.

[6]     The first of the letters makes reference to a May 15, 2000 letter from Thomas Newkirk of the SEC to Kramer Levin and at least three letters dated March 30, 2000, none of which has been produced by the government or Mr. Corigliano.  <u>See</u> Ex. 1.  The letter also makes reference to a May 2, 2000 communication between Mr. Corigliano's counsel and Director Walker of the SEC.  <u>Id.</u> at 2.  The second letter appended to the pleading makes reference to a meeting between Mr.

letters, on its face, references additional correspondence in which the SEC apparently questions whether Mr. Corigliano was complying with his plea agreement. See Ex. 1 (responding to the undisclosed May 15, 2000 letter from the SEC, Mr. Corigliano's counsel writes that "what the plea agreement says is that Mr. Corigliano, prior to his sentencing will use his 'best efforts' to settle claims that the SEC may assert for recovery of 'certain proceeds' from his sales of Cendant stock. We have plainly complied with that provision and the other provisions of the plea [agreement] . . . . I reiterate my request for a prompt meeting with Mr. Walker so that we can attempt to avoid the unseemly prospect of adversary litigation between the Commission and a significant cooperating witness who has provided substantial assistance to your ongoing investigations."). Another letter indicates that Paul Weissman, the lead prosecutor, was required to intervene on Mr. Corigliano's behalf, Ex. 3, which the government concedes happened. Tr. (07/27/06) at 33 ("Evidently, Mr. Weisman who was one of the prosecutors in this case early on contacted the SEC and tried to intervene on behalf of Mr. Corigliano with respect to certain financial I think it was quarterly financial reports.").[7]

## A.    The Withheld Communications Should Be Produced Under Rule 16.

The Order applied the wrong legal standard under Rule 16. Order at 2 ("the court is satisfied that the government has given Forbes all <u>material exculpatory and impeachment evidence</u> that he is entitled to receive under Rule 16, the Court's Standing Order, <u>Brady</u>, and

---

Corigliano's counsel and the SEC on May 19, 2000. See Ex. 2. Neither the government nor Mr. Corigliano has supplied any information to the defense concerning those communications.

[7]    Disclosure of the withheld communications may well undermine the Court's conclusion that "Forbes is the only one who believes that Corigliano has breached his plea agreement." Order at 4. In any event, the issue here is not the government's stated belief designed to protect its key cooperating witness; the issue is whether there is evidence that is discoverable.

Giglio, and which the court has ruled Forbes may use at trial for impeachment purposes"
(emphasis added)).

Rule 16(a)(1)(E)(i) requires the government "[u]pon a defendant's request" to
produce all documents "material to preparing the defense." Contrary to the suggestion of the
Order, the materiality standard for Rule 16 is lower than the standard under Brady/Giglio, and
there is no requirement under Rule 16 that the documents be admissible at trial. Evidence is
material under Rule 16 if it "will play an important role in uncovering admissible evidence,
aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal."
United States v. Lloyd, 992 F.2d 348, 351 (D.C. Cir. 1993) (quotation omitted); United States v.
Clegg, 740 F.2d 16, 18 (9th Cir. 1984) ("relevant to the development of a possible defense.");
United States v. Zanfordino, 833 F. Supp. 429, 432 (S.D.N.Y. 1993) ("failure to provide
reasonably available material that might be helpful to the defense and which does not pose any
risks to witnesses or to ongoing investigation is contrary to requirements of due process and to
the purpose of the Confrontation Clause").[8]

The communications with the SEC are relevant to Mr. Corigliano's compliance
with the requirements in his plea agreement that he "truthfully disclose all information he
possesses concerning any matters about which . . . the SEC may inquire of him," that he "use his
best efforts" to settle any claims by the SEC, and that he "provide to the SEC, upon request, with
complete and accurate information regarding his ability to pay any such settlement in the form
ordinarily required by the SEC." See Corigliano Plea Agreement at 2 & Schedule A ¶ 12
(attached as Ex. 3 to Docket No. 2187). This is a prototypical area for cross-examination because

---

[8]    Furthermore, unlike the materiality standard used for Brady/Giglio, materiality under
Rule 16 includes both exculpatory and inculpatory evidence. See United States v. Marshall, 132
F.3d 63, 68 (D.C. Cir. 1998).

evidence that Mr. Corigliano is in breach of his plea agreement contradicts his testimony on

direct examination that he is in compliance. See, e.g., United States v. Benedetto, 571 F.2d

1246, 1250 (2d Cir. 1978) (impeachment by contradiction). In addition, it exposes an

unexplored area of bias. See, e.g., United States v. Harvey, 547 F.2d 720, 722 (2d Cir. 1976)

(bias). Because Mr. Corigliano breached his plea agreement, he has an additional reason to curry

favor with the government to avoid revocation of his agreement. See, e.g., United States v.

Lynn, 856 F.2d 430, 432-34 (1st Cir. 1988). If the government believes that he breached the

agreement, but has done nothing, this is evidence of another extraordinary benefit bestowed upon

this corrupt witness. Evidence of such a benefit would be different than the other benefits

conferred on Mr. Corigliano because it would communicate to him that he can lie and—at least

as far as the government is concerned—get away with it. At the very least, production of these

documents "might be helpful to the defense and [would] not pose any risks to witnesses or to

ongoing investigation." Zanfordino, 833 F. Supp. at 432.

       **B.**     **The Withheld Communications Should Be Disclosed Under Brady/Giglio.**

       There is no admissibility requirement under Brady/Giglio either, see United States

v. Gil, 297 F.3d 93, 104 (2d Cir. 2002), and the evidence is favorable and material for the

reasons set forth above.

       **C.**     **The Court Should Review the Documents In Camera and Make Them Part
of the Record.**

       Because it is clear that the documents exist and relate to prototypical forms of

impeachment of a key cooperating witness, the Court should, at the very least, review the

documents in camera. If the Court still declines production, copies of the documents should be

sealed and made part of the record.

Mr. Forbes also requests that the Court employ the same procedure with respect to any notes of interviews of Kevin Kearney that have been withheld, especially the notes of the July 10, 2001 interview, which was attended by at least four government representatives.  Only Mr. Greiner's notes, which state "nada w/r/t Walter," have been produced.  MGR 173 (attached as Ex. 23 to Docket No. 1091).[9]

## CONCLUSION

For the reasons set forth above, Mr. Forbes respectfully requests that the Court reconsider and clarify its September 22, 2006 ruling.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By:  _Brendan A. Sullivan/rn_

Brendan V. Sullivan, Jr. (Bar No. ct17115)
Barry S. Simon (Bar No. ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
COWDERY, ECKER & MURPHY, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

---

[9]    The government has represented that it could not locate any notes of Mr. Gerber from this meeting.

- 15 -

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Memorandum in Support of Motion of

Defendant Walter A. Forbes for Reconsideration and Clarification of the Court's September 22,

2006 Ruling (Forbes Third Trial Motion No. 15) to be filed electronically and to be served on

October 6, 2006 to the following via e-mail:

Norman Gross, Esq. (norman.gross@usdoj.gov)
Michael Martinez, Esq. (michael.martinez2@usdoj.gov)
Craig Carpenito, Esq. (craig.carpenito@usdoj.gov)

Barry S. Simon