# Exhibit 5

1    correct?

2    A.   Yes.

3    Q.   Now, sir, from 1998 until you arrived here in 2005,

4    you were interviewed many times; am I correct?

5    A.   Yes.

6    Q.   And the very first time that you were interviewed was

7    on April 17th, 1998 by lawyers from the law firm of

8    Willkie, Farr & Gallagher; am I correct?

9    A.   Yes.

10   Q.   Would you turn to Tab 1 in the binder for a moment.

11        Now, that interview would have been shortly after the

12   announcement of accounting irregularities at CUC; am I

13   correct?

14   A.   Yes.

15   Q.   Do you remember certain lawyers being there and

16   interviewing you at the time?

17   A.   Yes.

18   Q.   And at the time you indicated -- strike that.

19        You talked about topsides; am I correct?

20   A.   I believe so.

21   Q.   Well, think back now.  It would have been the first

22   time that you would have had a session with anybody; am I

23   correct?

24   A.   Yes.

25   Q.   And you talked about topsides and you indicated who

1    was involved in the topsides; am I correct?

2    A.   Yes.

3    Q.   And you said that Mr. Corigliano was involved,

4    correct?

5    A.   Yes.

6    Q.   And that Mr. Sabatino was involved; am I correct?

7    A.   Yes.

8    Q.   And that Ms. Kathy Mills was involved in topsides; am

9    I correct?

10   A.   Yes.

11   Q.   And Mary Sattler was involved in topsides; am I

12   correct?

13   A.   Yes.

14   Q.   And Ms. Pember was involved in topsides; am I

15   correct?

16        MR. CARPENITO:  Your Honor, I'm going to object

17   to the witness reading a document.  He can ask him if he

18   remembers that and then show him the document, but just

19   showing it to him --

20        MR. SULLIVAN:   I'm not asking him to read the

21   document.

22        THE COURT:  He can close the book then.

23   BY MR. SULLIVAN:

24   Q.   Close the book and we'll come right back.

25        Now, you did mention that all those people were

**10/26/2005  Jury Trial Volume VII**

```
1     involved in the topsides; am I right?

2     A.   Yes.

3     Q.   Five people, including yourself; am I correct?

4     A.   Yes.

5     Q.   And you said nothing about Walter Forbes, did you?

6     A.   I don't know.

7     Q.   You don't know.

8          Well, open to Tab Number 1.  And take a look at

9     page number 2.

10         Before I point you to something specific, let me ask

11    you:  Did you indicate during that session that it was the

12    practice to make topside adjustments when you were

13    Director of Financial Reporting, and that the topside

14    adjustments were communicated to you from either Cosmo

15    Corigliano or Casper Sabatino?

16    A.   Yes.

17    Q.   And you said nothing in that session about any

18    reference to Walter Forbes or to Mr. Bell, for that

19    matter; am I correct?

20    A.   I'm not sure.

21    Q.   Do you recall indicating that after having named the

22    five persons, including yourself, that you indicated that

23    you did not know of anyone else who was aware of the

24    topside adjustments?

25    A.   I don't remember.
```

1    Q.    Take a look at page 3, if you would, sir, and see the

2    highlighted portion just above the title there?  Just read

3    that to yourself, not out loud.

4    A.    Okay.

5    Q.    My question to you:  Does that refresh your

6    recollection that you indicated that you did not know of

7    anyone else that was aware of the topside adjustments

8    other than the persons you've identified, the five persons

9    I asked you about a short time ago?

10    A.    It could be.

11    Q.    Now, did you also indicate during that first

12    interview that the topside adjustments were typically made

13    as a result of discussions with Casper Sabatino or Cosmo

14    Corigliano during which they would give you a number and

15    that you would pass on that number to Ms. Mills or

16    Ms. Sattler to key the number in?

17    A.    Yes.

18    Q.    You do recall indicating that to those people at the

19    time?

20    A.    It sounds right.

21    Q.    Now, sir, do you recall a second interview occurring

22    on May 26th, 1998?

23    A.    I don't remember.

24    Q.    Take a look at Tab Number 3.  There you have for

25    identification Defendant's Exhibit 2351.

1        Does that refresh that you had a second interview,

2    which would have been the first interview with government

3    agents?

4    A.   Yes.

5    Q.   Is it fair to say that during that interview you

6    didn't make any reference to someone in a meeting invoking

7    Walter Forbes' name or attributing anything to Walter

8    Forbes?

9    A.   I don't remember.

10   Q.   Well, take a look at Defendant's Exhibit 2351 for

11   identification and don't read it out loud.  Look at it and

12   see if it refreshes your recollection.

13   A.   I don't remember exactly what I said during that

14   meeting.

15   Q.   Well, it's hard to remember anything exact from many,

16   many years ago.  My question is:  Do you recall at that

17   meeting that you said nothing about Walter Forbes; you

18   never indicated that anyone with whom you met invoked

19   Walter Forbes' name for any purpose?

20   A.   No, I don't recall.

21   Q.   You have no recollection?

22   A.   No.

23   Q.   Do you remember the first meeting with government

24   agents?

25   A.   Yes.

1    Q.   Did you, in the preparation for your testimony here,

2    besides reading your testimony in a prior proceeding, did

3    you look at this defendant's exhibit to refresh yourself

4    about what you said?

5    A.   No.

6    Q.   Now, sir, do you recall a third interview on

7    July 15th, 1998?  This would have been the second

8    interview with government agents, including Assistant U.S.

9    Attorney Paul Weissman.

10        Do you recall giving an interview to Mr. Weissman and

11   other government representatives on or about July 15th,

12   1998?

13   A.   Yes.

14   Q.   And that would have been the first time you met

15   Mr. Weissman; am I correct?

16   A.   Yes.

17   Q.   And he asked you lot of questions that day, didn't

18   he?

19   A.   Yes.

20   Q.   Did you observe him taking copious notes?

21   A.   I don't remember.

22   Q.   You met with him at least five times, didn't you,

23   this being the first?

24   A.   Probably.

25   Q.   Isn't it a fact that during that session you never

1    mentioned the name Walter Forbes?

2    A.    I don't know.

3    Q.    Isn't it a fact that during that session you never

4    indicated that some person you met with had invoked the

5    name of Walter Forbes in any respect?

6    A.    I don't remember.

7    Q.    Take a look at the highlighted portion of Defendant's

8    Exhibit 2352.

9         Before you read it, let me ask you:  Is it a fact

10   that Cosmo Corigliano would tell you what adjustments to

11   make and that you and Casper Sabatino would meet with

12   Cosmo?

13   A.    Yes.

14   Q.    Do you remember indicating that at that session?

15   A.    I don't remember specifically.

16   Q.    Well, you just said yes.  Did that mean --

17   A.    With respect to meeting with Casper and Cosmo, yes.

18   Q.    You do remember meeting with Casper and Cosmo?

19   A.    Yes.

20   Q.    What you don't remember is whether you told the

21   investigator, Paul Weissman, and other people there that

22   day?

23   A.    Right.

24   Q.    So would you -- do you recall a fourth interview

25   meeting which occurred on or about August 24th, 1998 with

1    various government representatives, including Paul

2    Weissman again and representatives of SEC and the FBI and

3    others?

4    A.   I don't remember.

5    Q.   You don't remember that meeting at all?

6    A.   There were so many, they all kind of -- I don't

7    remember each one specifically.

8    Q.   I see.  Hard to remember when there are so many

9    meetings?

10   A.   Yes.

11   Q.   Is that because the meetings kind of blend together

12   and you don't remember what was said at one or the other?

13   A.   Right.

14   Q.   Is it fair to say that during this particular

15   interview, Number 4 interview, and the second that you had

16   with Mr.  Weissman, that you said nothing at all about

17   Walter Forbes?

18   A.   I don't remember.

19   Q.   Isn't it a fact that during this session you never

20   attributed to any of the persons you met any statement

21   allegedly made about Walter Forbes?

22   A.   I don't remember.

23   Q.   Did you indicate during that session that at the end

24   of the quarters, you and Casper Sabatino would meet with

25   Cosmo and that Cosmo would then go over the results with

1       Stu Bell?

2       A.    I don't remember.

3       Q.    Would you take a look at Defendant's Exhibit 2353 for

4       identification at page 716 where it's highlighted.  Just

5       read that to yourself.

6       A.    Tab 5 is it?

7       Q.    Yes, sir.  Tab 5.

8             Look at Bates stamp page 716.  Do you see the

9       highlighted three lines there?

10      A.    Yes.

11      Q.    Okay.

12            You've read that to yourself?

13      A.    Yes.

14      Q.    Does that refresh your recollection that you

15      indicated on that occasion that at the end of the quarters

16      you and Casper Sabatino would meet with Cosmo and then

17      Cosmo would then go over the results with Stu Bell?

18      A.    Yes.

19      Q.    And was that an accurate and truthful statement when

20      you provided it to the investigators?

21      A.    Yes.

22      Q.    Now, sir, when you first started at CUC, did

23      Mr. Corigliano provide you with some rationalizations for

24      the topside adjustments that he was asking to you make?

25      A.    Yes.

**10/26/2005  Jury Trial Volume VII**

1    Q.    And at the outset, these rationalizations that he

2    gave to you sounded legitimate from your perspective as a

3    CPA; am I correct?

4    A.    Yes.

5    Q.    And Mr. Corigliano never told you flat out that We're

6    committing a fraud here; am I correct about that?

7    A.    Yes.

8    Q.    And for example, he would tell you on occasion that

9    it was okay to make topside adjustments because he knew

10   there was a receivable at BCI which would justify the

11   adjustments; am I correct?

12   A.    Yes.

13   Q.    And he would give examples like that from time to

14   time in order to convince you that what he was asking to

15   you do was proper; am I correct?

16   A.    Yes.

17   Q.    And indeed, on occasion he would tell you that there

18   was an excess in merger reserves, correct?

19   A.    Yes.

20   Q.    And you wouldn't know for sure whether there was; you

21   relied upon him in that instance that there was such an

22   excess, am I correct?

23   A.    Yes.

24   Q.    And sometimes he would use that as an excuse for why

25   there should be a topside adjustment, indicating that it

1    was a proper thing to do; am I correct?

2    A.    Yes.

3    Q.    And isn't it also true that from time to time he told

4    you that the numbers would equal out in the end, something

5    along those lines?  Do you recall that?

6    A.    Yes.

7    Q.    And you understood from him when he made such

8    statements that he was telling you that he was acting

9    properly and you were acting properly by making these

10   topside adjustments; am I correct?

11   A.    Yes.

12   Q.    And these explanations sounded legitimate to you at

13   that time, didn't they?

14   A.    To a degree.

15   Q.    Do you recall testifying in a prior proceeding at

16   page 995 -- excuse me, yes, 9955 at line 1.

17        "Question:  And these were all rational explanations

18   that sounded legitimate to you?

19        "Answer:  Yes."

20        Was that truthful testimony?

21   A.    Yes.

22   Q.    At the fourth interview on or about August 24th,

23   1998, did you indicate at the time that you did not recall

24   that big adjustments were made in the 1994 year-end?

25   A.    Could be.  I don't remember.

1    Q.    Take a look at page 719 at Tab 5, which is

2    Defendant's Exhibit for Identification 2353, and look at

3    the highlighted portion on page 719, just reading it to

4    yourself.

5    A.    Okay.

6    Q.    Does that refresh your recollection that you

7    indicated that you did not recall that big adjustments

8    were made at the end of 1994 year-end?

9    A.    Yes.

10   Q.    Was that a truthful statement when made?

11   A.    Yes.

12   Q.    Now, sir, is it a fact that after the year-end 1994

13   financials were completed, that your recollection is that

14   the adjustments became larger in the years in which Cosmo

15   Corigliano was the chief financial officer?

16   A.    Yes.

17   Q.    Do you recall that he was the chief financial officer

18   as of February 1, 1995?

19   A.    Yes.

20   Q.    And that the adjustments became larger and quite

21   different when he was CFO than they were in any prior

22   year?

23   A.    Yes.

24   Q.    Now, sir, do you recall a fifth interview with

25   government agents that occurred on or about March 4th,

1    1999, which would have been the third time that you met

2    with Assistant U.S. Attorney Paul Weissman?

3    A.    I don't remember.

4    Q.    You remember meeting with Mr. Weissman many times,

5    correct?

6    A.    Yes.

7    Q.    Do you recall that during a fifth interview that you

8    never indicated anything whatsoever with respect to any

9    person invoking Walter Forbes' name as you alleged in your

10   testimony here in this trial?

11   A.    I don't remember.

12   Q.    Would you turn, please, to Tab Number 7, and find

13   Exhibit 2354 for identification.

14   A.    Okay.

15   Q.    Looking at the very top of the page, tell me

16   whether -- just read it to yourself and tell me whether

17   that refreshes your recollection that you had a meeting,

18   Interview Number 5, on March 4th, 1999?

19   A.    Okay.

20   Q.    Do you recall such a meeting?

21   A.    Not specifically.

22   Q.    Do you recall indicating that after you arrived at

23   CUC you attended quarterly meetings with Casper Sabatino

24   and Cosmo Corigliano but that you never indicated

25   attending such a meeting with Mr. Bell?

1    A.    I don't remember.

2    Q.    Take a look, if you would, at page 699 of Defendant's

3    2354 for Identification at Tab 7.  Look at the first

4    highlighted section, reading it to yourself, and tell me

5    whether that refreshes your recollection.

6    A.    It could be.

7    Q.    It could be that you would have participated in that

8    Interview Number 5 with Mr. Weissman and others and never

9    indicated that you met with Mr. Bell about such matters?

10   A.    I don't remember.

11   Q.    Is it fair to say that each month at the end of the

12   quarter you went through the process whereby you and

13   Mr. Sabatino would sit down with Mr. Corigliano?

14   A.    Yes.

15   Q.    And is it also true that Mr. Bell was not present at

16   such meetings?

17   A.    No.

18   Q.    Is it also true that during the sessions which you

19   had with Mr. Sabatino and Cosmo Corigliano that you would

20   give the unadjusted consolidated schedule, namely the true

21   numbers, to Mr. Sabatino?

22   A.    Yes.

23   Q.    And you would also give those numbers to

24   Mr. Corigliano; am I correct?

25   A.    Yes.

**10/26/2005  Jury Trial Volume VII**

1     Q.    So is it fair to state that Mr. Corigliano would have

2     the true and accurate numbers each and every quarter?

3     A.    Yes.

4     Q.    Now, is it accurate to say that the process that you

5     went through with Casper Sabatino was that you would show

6     Cosmo Corigliano the consolidation and then Cosmo

7     Corigliano would do a bottoms-up analysis comparing it to

8     what he wanted it to be?

9     A.    Yes.

10    Q.    And in these meetings you would actually observe

11    Mr. Corigliano right there in your presence physically

12    mark up the unadjusted consolidating schedule; am I

13    correct?

14    A.    Yes.

15    Q.    He would actually take out a pen and pencil and he'd

16    make handwritten notations on the schedule which you

17    brought him, correct?

18    A.    Yes.

19    Q.    And he would set the revenue figure, wouldn't he?

20    A.    Yes.

21    Q.    And he would set right there in your presence the

22    expense figures, wouldn't he?

23    A.    Yes.

24    Q.    And he would set right there, in your presence

25    watching him, pencil it in, the bottom line income figure;

1    am I correct?

2    A.   Yes.

3    Q.   And in your presence would you observe Cosmo

4    Corigliano pull out financial statements for prior

5    quarters and prior years and compare them to the

6    consolidating schedule that he had in front of him; am I

7    correct?

8    A.   Yes.

9    Q.   And he actually would be thinking out loud with you,

10   wouldn't he?

11   A.   Yes.

12   Q.   He would pull out the analysts' reports and use them

13   as a reference guide while he was making his changes to

14   the schedule you brought him; am I correct?

15   A.   I saw him do that once.

16   Q.   When did he do that?

17   A.   When he was CFO.

18   Q.   Do you recall -- strike that.

19        Did you provide this answer to a question posed in a

20   prior proceeding at page 9950, line 17 or line 20:

21        "He would pull out an analysts' reports and use them

22   as a reference guide while making his changes, right?

23        "Answer:  Yes."

24        Was that a truthful answer at the time?

25   A.   Yes.

1    Q.    And did you indicate at the time that it happened

2    only once?

3    A.    I guess not.

4    Q.    Isn't it also true that on occasion he would indicate

5    that the analysts are expecting a higher earnings per

6    share figure?

7    A.    Yes.

8    Q.    When you were asked in a prior proceeding about Cosmo

9    indicating that the analysts are expecting a higher EPS

10   figure, you didn't mention that Walter Forbes' name came

11   up in the discussion, did you?

12   A.    I don't know.

13   Q.    Do you remember this testimony from a prior

14   proceeding and did you give this answer at page 9950?

15        "Question:  On occasions he would say the analysts

16   are expecting a higher EPS figure?

17        "Answer:  Yes."

18        Did you indicate on that occasion that Cosmo

19   Corigliano said that Walter Forbes had indicated what the

20   EPS figure would be?

21   A.    No.

22   Q.    Isn't it also true that you would observe Cosmo

23   Corigliano, when he met with you, actually doing

24   arithmetic on the documents you gave him and looking at

25   something trying to figure out what the number was or what

1      it should be?

2      A.    Yes.

3      Q.    Now, did you observe Cosmo Corigliano holding

4      anything when he gave instructions regarding unsupported

5      topside adjustments?

6      A.    I saw him with those analysts' reports once.

7      Q.    And what did you observe Cosmo holding when he gave

8      you directions to make certain unsupported topside

9      adjustments?  What was he holding?

10     A.    The analysts' reports.

11     Q.    And what do you mean by "analysts' reports"?

12     A.    They were earnings projections from the Wall Street

13     analysts that had he had published.

14     Q.    And when he was holding those analysts' reports and

15     you were going through the process of making topside

16     adjustments to get to the EPS number, did he mention

17     Walter Forbes' name then?

18     A.    I don't remember that specific instance at that

19     meeting.

20     Q.    You don't remember?

21     A.    No.

22     Q.    Wouldn't that have been something that would have

23     been significant, if Walter Forbes' name had been

24     mentioned at the time when Cosmo was looking at analysts'

25     reports and figuring out what the topside adjustments

1    should be?

2    A.    Well, he had mentioned it during several other

3    quarterly meetings.  So it didn't stick out in my mind

4    whether he mentioned it in that specific meeting or not.

5    Q.    Well, what did Mr. Corigliano say as he was holding

6    The Wall Street Journal -- strike that.

7         What did he say when he was holding these Wall Street

8    analysts' reports?

9    A.    He said something along the lines of, you know,

10   Wall Street is expecting this number so that's -- that's

11   where we need to be.

12   Q.    That Wall Street is expecting the number?

13   A.    Yes.

14   Q.    Not that Walter Forbes was expecting a certain

15   number; that's what you remember?

16   A.    Yes.

17   Q.    And on those occasions -- on the occasion or more --

18   is it one occasion or more than one occasion that he held

19   analysts' reports?

20   A.    One that I witnessed.

21   Q.    Well, on the one you witnessed, did he try to derive

22   the earnings per share figure from the analysts' reports

23   so that he would hit it at a certain target?

24   A.    Yes.

25   Q.    And when he was doing that and reading these reports

1    to find the target, did he say anything about, Well,

2    Walter Forbes wants it to be a certain number?

3    A.    I don't remember.

4    Q.    In the fifth interview with Mr. Weissman present,

5    isn't it a fact that you told them that you didn't believe

6    you ever met with Cosmo and Bell together?

7    A.    No.

8    Q.    Take a look at page 701, Tab 7, Defendant's Exhibit

9    for Identification 2354.  Read the highlighted part to

10    yourself and tell me whether that refreshes your

11    recollection.

12    A.    No, it does not.

13    Q.    You have no recollection of indicating to

14    Mr. Weissman that you don't recall ever meeting with Cosmo

15    and Bell together?

16    A.    No.

17    Q.    Do you remember indicating -- strike that.

18         Is it true that in some of the meetings with

19    Mr. Cosmo Corigliano that would last an hour or an hour

20    and a half, that he would occasionally ask you questions,

21    but that basically you and Mr. Sabatino would be an

22    audience?

23    A.    Yes.

24    Q.    And so what you observed as an audience was

25    Mr. Corigliano going through this process of determining

1     what the topside adjustments should be; am I correct?

2     A.   Yes.

3     Q.   And it was a process that took thought and

4     evaluation; am I correct?

5     A.   Yes.

6     Q.   Is it a fact that in the initial meetings you had

7     with Cosmo Corigliano and Mr. Sabatino in the time frame

8     '93-'94 which you testified about, that it was always the

9     three of you together, not including Mr. Bell?

10    A.   I don't remember.

11    Q.   Is it accurate to say Cosmo Corigliano saw what the

12    raw results were every quarter and decided what the final

13    number would be every quarter; it wasn't Casper Sabatino

14    who did that?

15    A.   Yeah, Cosmo would tell us what it needs to be.

16    Q.   Now, sir, isn't it also true that you misrepresented

17    certain information to the auditors, Ernst & Young?

18    A.   Yes.

19    Q.   Same auditing firm where you learned how to be an

20    accountant?

21    A.   Yes.

22    Q.   To the same people that you grew up with as a young

23    accountant?

24    A.   Yes.

25    Q.   You looked right at them and lied?

1    A.    Yes.

2    Q.    And Mr. Sabatino taught you how do that, didn't he?

3    A.    Yes.

4    Q.    And Anne Pember, to some extent; am I right?

5    A.    Yes.

6    Q.    And then in April, about April 14th, 1999, you had

7    your sixth meeting with -- for an interview; am I correct?

8    A.    I don't remember.

9    Q.    Do you remember meeting with Mr. Weissman and certain

10   other officials of the government on or about April 14th,

11   1999?

12   A.    Don't remember.

13   Q.    Take a look at Volume 2 there and take a look at Tab

14   Number 24.

15        Look at the very top of the page and tell me -- I'm

16   looking at Defendant's Exhibit 2355 -- tell me whether

17   that indicates that you gave an interview on or about

18   April 14th, 1999.

19   A.    It could be.

20   Q.    Do you recall whether this was the fourth meeting you

21   had with Mr. Weissman and the sixth interview altogether?

22   A.    Don't remember.

23   Q.    Do you recall that at that meeting you didn't mention

24   one word about Walter Forbes or that any person that you

25   met with had used his name in a meeting with you?

1      A.   I don't remember.

2      Q.   Do you recall having a seventh interview on

3      April 29th, 1999?  This would have been the fifth one with

4      Mr. Weissman?

5      A.   I don't remember.

6      Q.   Take a look at Tab 29 in Volume 2.

7           Looking at the very top and reading it to yourself,

8      does it refresh your recollection that you had an

9      interview on April 29th, 1999?

10     A.   Could be.  I don't remember.

11     Q.   Isn't it a fact, sir, that after the topside

12     adjustments were done or other financial information

13     prepared, that it would only go to Ernst & Young once you

14     got Cosmo Corigliano's blessing?

15     A.   Yes.

16     Q.   Is it accurate to say that your understanding was,

17     over the years, that until Cosmo Corigliano gave the word,

18     it was understood that you could not turn stuff over to

19     the accountants?

20     A.   Yes.

21     Q.   And often you would ask if you could turn things over

22     to the accountants, you'd ask him outright and the answer

23     would be "no"; am I correct?

24     A.   Yes.

25     Q.   Do you recall having an eighth interview on

1    July 10th, 2001 or thereabouts?

2    A.   Don't remember.

3    Q.   Do you recall indicating to anyone at that meeting

4    that you had nothing to say about Walter Forbes?

5    A.   I don't remember.

6            MR. SULLIVAN:   Your Honor, this would be a good

7    breaking point.

8            THE COURT:   Very well.  We'll stay on schedule.

9    We'll take our break.

10               (Whereupon, a recess followed)

11

12           THE COURT:   Are we ready for the jury?

13           We'll have our witness retake the stand.

14               (Whereupon, the jury entered the

15               courtroom.)

16           THE COURT:   Please be seated everyone.

17   BY MR. SULLIVAN:

18   Q.   Mr. Kearney, is it fair to say that Cosmo Corigliano

19   would be the person who gave you instructions as to how to

20   handle topside adjustments and make the adjustments

21   necessary to arrive at an earnings per share figure, as

22   you testified?

23   A.   Yes.

24   Q.   And is it fair to say he's the one you would always

25   have direct conversations with?

# Exhibit 6

1    Mr. Kearney said.

2    Q.    Well, is it fair to say that Mr. Kearney did not

3    provide any information about Walter Forbes during this

4    interview?

5    A.    I think that's -- I think it's broader than I can

6    testify to given that I don't remember ever having talked

7    to the guy.

8    Q.    Based on your notes, did you write down that

9    Mr. Kearney had given any information about Walter Forbes?

10   A.    I haven't looked through every single word of these

11   notes so I don't know that I can answer that fairly.

12   Q.    We provided you these notes over the weekend so you

13   could review them; isn't that correct?

14   A.    I saw these notes for the first time -- let me be

15   careful.  I saw these notes for the first time in a long

16   time this morning.  And I focused upon, one, the front

17   page, just to see what it was I was doing; and two, this

18   particular page with this "nada with regard to Walter"

19   reference, I didn't read through the entire thing.

20   Q.    So can you explain again why you think you wrote

21   "nada with respect to Walter," if it wasn't coming from

22   Kevin Kearney?

23   A.    I think -- I mean, I think that I would have -- I

24   think that I wrote this either because Mr. Kearney said

25   nothing about Mr. Forbes, or he in fact said, Mr. Forbes

1    wasn't involved in these conversations.  It's either

2    reflecting an absence of commentary or affirmative

3    representation of a lack of involvement.  And between

4    those two, I can't speak.

5    Q.   And if you -- if it were the former, if it were just

6    an absence of commentary, and you were not focusing on

7    Walter Forbes, why would you write that down?

8    A.   I don't know.  You write down what you can when you

9    have to write this fast.

10   Q.   But if it was something that somebody didn't say on a

11   topic that you weren't interested in, why would you note

12   that the witness didn't say it when he didn't say lots of

13   other things either?

14   A.   That's a good point.  Someone may have asked, as

15   lawyers typically do in a discovery case in a civil case

16   or investigation, a variety of broad questions, Can you

17   tell me about this person?  What about this person?  Was

18   this other person involved?  And this may have been in

19   response to that.  I really don't know at this point.

20   It's been, what, five years?  Four years?

21   Q.   Yes, it has.

22        Isn't it fair to say it's more likely that somebody

23   asked some kind of question about Mr. Forbes and

24   Mr. Kearney responded that he didn't know anything than

25   that you just decided to write down that Mr. Kearney