UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | No. 3:02CR264 (AHN) |
| ) | |
| WALTER A. FORBES ) | October 15, 2006 |
| ) | |

**MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANT WALTER A. FORBES FOR A MISTRIAL BASED ON BRADY/GIGILIO VIOLATIONS AND THE TESTIMONY OF KEVIN KEARNEY**
(Forbes Third Trial Motion No. 18)

Defendant Walter A. Forbes, through undersigned counsel, respectfully submits this memorandum in support of his motion for a mistrial based on the government's suppression of Brady/Giglio material, and the false and misleading testimony of Kevin Kearney. In the alternative, Mr. Forbes requests that the Court strike Mr. Kearney's testimony and issue a curative instruction.

## INTRODUCTION

Mr. Kearney, the former Director of Financial Reporting for CUC, testified that in almost every quarter from 1993-1994 Stuart Bell instructed him to make unsupported topside adjustments and invoked the name Walter Forbes in doing so. See Tr. (10/12/06) at 766-67. Mr. Kearney testified that in almost every quarter from 1993-97 Cosmo Corigliano gave him the same instructions and also invoked the name Walter Forbes. See id. at 769-72. Mr. Kearney also testified that he did not hope to receive anything in return for his testimony. Id. at 846.

On Friday October 13, 2006 during the lunch hour, the day after Mr. Kearney testified, defense counsel obtained information that would have refuted this testimony, but that the government failed to disclose. A "Case Log" obtained from the Connecticut State Board of

Oral Argument Requested

Accountancy (the "CSBA") indicates that (i) as of October 2002, Mr. Kearney had not implicated Mr. Forbes or Mr. Bell (a fact the government knew); and (ii) in October 2002, the lead prosecutor in the first trial of Mr. Forbes, at the request of Mr. Kearney's attorney, made favorable statements to the CSBA regarding Mr. Kearney's cooperation (a fact the government knew). See Ex. 1. The CSBA concluded that Mr. Kearney's cooperation with the government gave him a chance to have his CPA certificate reinstated. See id. These events took place before Mr. Forbes' first trial and Mr. Kearney's first sworn testimony against Mr. Forbes. Although they constitute clear Brady/Giglio material, and directly involved the lead government prosecutor after Mr. Forbes was already a defendant, they were never disclosed to the defense.[1]

## ARGUMENT

### I. THE GOVERNMENT SUPPRESSED BRADY/GIGLIO MATERIAL.

Due process prohibits the suppression of information favorable to the defendant that is material to guilt, irrespective of the good faith or bad faith of the government. See Brady v. Maryland, 373 U.S. 83, 87-88 (1963). This prohibition encompasses not only exculpatory evidence, but material impeachment evidence as well. See Giglio v. United States, 405 U.S. 150, 154 (1972). The Supreme Court has recognized that "if disclosed and used effectively, [impeachment evidence] may make the difference between conviction and acquittal." United States v. Bagley, 473 U.S. 667, 676 (1985).

The government plainly suppressed Brady/Giglio material that Mr. Forbes could have used to refute Mr. Kearney's testimony that in almost every quarter in the years 1993-97

---

[1] The government has consistently represented its supposed compliance with its Brady/Giglio obligations. See Tr. (10/12/06) at 861 (where the government most recently represented "that it has satisfied Brady and Giglio requirements"); see also Docket No. 481 at 6-9 (example where representations turned out to be inaccurate); Docket No. 1084 at 9 n.7 (same); Docket No. 2189 at 7-8, 12 n.11 (same). Despite these representations, the government suppressed (for three trials) the information regarding the lobbying of the CSBA.

Messrs. Bell and/or Corigliano instructed him to make unsupported topside adjustments and invoked the name Walter Forbes in connection with these supposed instructions. Mr. Forbes also could have used the suppressed evidence to undermine the government's efforts to paint Mr. Kearney as a disinterested witness.[2]

The government knew that Mr. Kearney <u>first</u> began making accusations regarding Messrs. Forbes and Bell <u>in 2003, after then-lead prosecutor John Carney spoke to the CSBA on Mr. Kearney's behalf and praised his "valuable" cooperation</u>. Ex. 1 (emphasis added). Mr. Carney knew this information and the current prosecution team is charged with that knowledge even if Mr. Carney did not disclose the information to them, see Giglio, 405 U.S. at 152-54, as part of what they claim was an unprecedented search for Brady/Giglio material. See Tr. (10/12/06) at 862 ("I have never done as much Brady and Giglio research than I have done in the case."). Although the government did not have a duty to obtain the "Case Log" from the CSBA, it did have an obligation to disclose its statements to the CSBA on Mr. Kearney's behalf and the fact that Mr. Kearney changed his story after that intervention. This is true even if the information had not been reduced to writing. See, e.g., Giglio, 405 U.S. at 151-53 (oral promise to witness).

Mr. Kearney began cooperating with the government in 1998, and the government interviewed him on numerous occasions leading up to the first trial. Tr. (10/12/06) at 788-89. During these interviews, the government repeatedly asked Mr. Kearney about unsupported

---

[2] The Court will recall that in the prior two trials the government agreed to and requested a jury instruction that Mr. Kearney was an interested witness because the government had promised that he would not be prosecuted in exchange for his testimony, but in this third trial the government did an about face and claimed that there was no factual basis for the instruction. See Docket No. 2452. Whether or not the government made an express promise of non-prosecution, it rewarded Mr. Kearney's cooperation by not charging him despite his admitted criminal conduct, and by speaking with the CSBA on his behalf. Mr. Kearney is far from a disinterested witness. He had ample motive to falsify and curry favor with the government.

topside adjustments at CUC and the quarterly meetings he attended to discuss these adjustments. Id. at 789. The suppressed Brady/Giglio material demonstrates that despite these inquiries, as of 2002, Mr. Kearney had not attempted to implicate Messrs. Forbes or Bell in any wrongdoing regarding topside adjustments. In early April 2002, the CSBA notified Mr. Kearney that he was under investigation and that his CPA certificate could be revoked. Ex. 2. Mr. Kearney's attorney, Robert Fettweis, promptly called the CSBA to argue for leniency based on Mr. Kearney's cooperation with the government. Ex. 1. Specifically, Mr. Fettweis represented that because of Mr. Kearney's cooperation, Cosmo Corigliano, Anne Pember, and Casper Sabatino pleaded guilty and they, in turn, implicated Messrs. Forbes and Shelton. Id. ("because he cooperated three people above him pleaded guilty & implicated the 2 highest"). Mr. Fettweis said nothing about his client implicating Messrs. Forbes or Bell. Mr. Fettweis said that he would have the government confirm Mr. Kearney's cooperation. See id.

Then-lead prosecutor John Carney confirmed what Mr. Fettweis had reported earlier. He told the CSBA that Mr. Kearney was "very coop[erative]" and "valuable," but he said nothing about Mr. Kearney implicating Messrs. Forbes or Bell. Id. The CSBA's understanding from these conversations was that Mr. Kearney's cooperation "led to guilty pleas by 3 conspirators immediately above him [Corigliano, Pember and Sabatino] & their testimony implicated 2 highest who are about to go on trial [Forbes and Shelton]." Id. (emphasis added). The CSBA determined that Mr. Kearney's "participation in the fraud should cost him his certificate; his cooperation may get him a chance to get it back some time in the future." Id. (emphasis added). In November 2002, less than one month after the government spoke to the CSBA on behalf of Mr. Kearney, the CSBA offered to settle the enforcement case against him on terms that would allow him to seek reinstatement of his CPA certificate in slightly more than

two-and-a-half years. Id. Mr. Kearney accepted that agreement in November 2002 and signed the agreement in December 2002. Exs. 1, 3. The CSBA entered an order formally accepting the settlement and the order contained in it relating to Mr. Kearney's certificate on April 1, 2003. Ex. 3.

This evidence refutes the heart of Mr. Kearney's trial testimony—that nearly every quarter between 1993 and 1997 Mr. Bell and/or Mr. Corigliano invoked the name Walter Forbes in connection with unsupported topside adjustments. Moreover, the evidence provides an explanation for why Mr. Kearney's testimony morphed from, in substance, "I never met with Mr. Bell about topside adjustments" and "I have nothing on Mr. Forbes" to "I met with Mr. Bell almost every quarter and he and Mr. Corigliano invoked the name Walter Forbes in connection with unsupported topside adjustments."

Following the government's intervention with the CSBA in October 2002 and the CSBA's favorable settlement, Mr. Kearney began to change his story. An August 2003 letter is the first suggestion that Mr. Kearney started to claim that Mr. Corigliano invoked the name Walter Forbes in connection with topside adjustments. Docket No. 2274, Ex. 24 at 2 ¶ 5. An October 2003 letter is the first suggestion that Mr. Kearney started to claim that he received instructions from Mr. Bell about topside adjustments, but at that time, he told the government that he "does not recall whether Stu Bell invoked Walter Forbes' name when giving the directive . . . ." Docket No. 2274, Ex. 25 at 1, 2. From these modest beginnings, Mr. Kearney's testimony expanded like wildfire to what it is now—quarterly meetings with Mr. Bell and/or Mr. Corigliano for several years in which they purportedly instructed him to make unsupported topside adjustments and invoked the name Walter Forbes in doing so.

There is no question that prior inconsistent and exculpatory statements constitute Brady material. See, e.g., United States v. Serv. Deli, 151 F.3d 938, 943 (9th Cir. 1998); United States v. Vozzella, 124 F.3d 389, 392 (2d Cir. 1997) (reversing conviction and stating that the undisclosed "statements made by Pietrosanti during the proffer session were highly exculpatory as to [defendant's] participation in a conspiracy"). In addition, evidence that Mr. Kearney changed his story <u>after</u> the government intervened on his behalf with the CSBA powerfully discredits his testimony, shows why he has a reason to please the government, and puts the lie to the suggestion that Mr. Kearney is a disinterested witness. See Bagley, 473 U.S. at 683 ("This possibility of a reward gave [the government witnesses] a direct, personal stake in respondent's conviction."); Benn v. Lambert, 283 F.3d 1040, 1057 (9th Cir. 2002) ("The Brady rule requires prosecutors to disclose any benefits that are given to a government informant, including any lenient treatment."; evidence of benefits could have allowed jury to conclude that witness "had a motive other than altruism" (quotation omitted)).

The possibility of reinstatement of his CPA certificate was not a trivial benefit. It could have a significant professional and financial impact on Mr. Kearney for the rest of his career. This was unquestionably Brady/Giglio information which was known to the government and which was suppressed for four years. Because the government suppressed this information and Mr. Forbes did not learn about it until after Mr. Kearney testified in this trial, the Court should grant a mistrial or, in the alternative, strike Mr. Kearney's testimony and issue a curative instruction. This remedy is particularly appropriate given the suppression of this information for three trials, and the deliberate suppression of the information in at least the first trial.

## II. MR. KEARNEY GAVE FALSE AND MISLEADING TESTIMONY.

Due process is violated when the government introduces, or fails to correct, false or misleading evidence. See, e.g., Napue v. Illinois, 360 U.S. 264, 269 (1959). The prosecutor

therefore has a "duty to correct the false testimony of a Government witness," and "[t]hat duty arises when (the false evidence) appears." United States v. Sanfilippo, 564 F.2d 176, 178 (5th Cir. 1977) (quotation omitted); see also Napue, 360 U.S. at 269-70 ("A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth." (quotation omitted)). The Napue rule is implicated whenever the prosecutor "knew or should have known" that the evidence was false or misleading. United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991).

Mr. Kearney's testimony—that in almost every quarter in the years 1993-97 Messrs. Bell and/or Corigliano instructed him to make unsupported topside adjustments and invoked the name Walter Forbes in connection with these supposed instructions—was false. In none of the interviews conducted between 1998 and 2002 did Mr. Kearney claim that he met with former CUC Chief Financial Officer Bell regarding topside adjustments or that anyone supposedly invoked Mr. Forbes' name. See Forbes Third Trial Motion In Limine No. 6 [Docket No. 2274]. To the contrary, Mr. Kearney told investigators that "Casper, Kevin would meet with Cosmo, not with Stu Bell," XMW004 (attached as Ex. 6 to Docket No. 2274), that he "DNB he ever met [] Cosmo + Bell," PAW0701 (attached as Ex. 7 to Docket No. 2274), that he "dealt w/ $C^2$ when Bell there," MGR181 (attached as Ex. 23 to Docket No. 2274), and that "he had no evid he could pt. to involving WAF." DF0375 (attached as Ex. 5 to Docket No. 2274). See also MGR173 (attached as Ex. 23 to Docket No. 2274) (Mr. Kearney had "nada w/r/t Walter"). The suppressed Brady/Giglio material confirms that as of 2002 Mr. Kearney had not attempted to implicate Messrs. Forbes or Bell in any wrongdoing, that the government was aware of that fact, and that he changed his testimony only after the government praised his cooperation to the

CSBA and assisted him in obtaining a favorable settlement preserving the possibility of having his professional certificate restored. Mr. Kearney's testimony was fabricated.

The government also caused Mr. Kearney to mislead the jury about the government's role in helping him regain his CPA certificate. The prosecution team knew or should have known that the testimony was misleading because the former lead prosecutor knew of the suppressed information. On direct examination, the government elicited the following testimony, which made the revocation and reinstatement of his certificate appear to be a routine matter in which the government played no role:

> Q. And we'll get back later as to why your license was suspended because of that employment. Was your license permanently suspended?
> A. No, it was suspended for five years.
> Q. And what's going to happen after those five years?
> A. I can reapply. Actually last week I appeared before the Connecticut State Board of Accountancy and had my certificate reinstated, so now I'm getting the license reinstated, just I have to fill out an application and send that in.

Tr. (10/12/06) at 733-34.

This testimony left the jury with the false impression that Mr. Kearney's cooperation and testimony played no role in the CSBA's decisions regarding his certificate. Mr. Kearney said nothing about the good word the government put in with the CSBA, and said nothing about the CSBA's conclusion that Mr. Kearney's "participation in fraud should cost him his certificate; his cooperation may get him a chance to get it back some time in the future." Ex. 1.

The government's redirect examination exacerbated the problem when it suggested that Mr. Kearney did not hope to obtain any benefits by virtue of his testimony. See Tr. (10/12/06) at 846 ("Q. You are not here in the hopes of receiving anything in return for your

- 8 -

testimony? A. No."). Although this testimony may have been literally truthful because he had already received (just days earlier) the reinstatement of his CPA certificate, Ex. 4, literal truth is not the standard by which the testimony of a government witness is judged. See Vozzella, 124 F.3d at 393 (reversing convictions when government "should have known that introduction of the records with Stirling's unqualified testimony concerning their significance conveyed a message so misleading as to amount to falsity"); Dupart v. United States, 541 F.2d 1148, 1150 (5th Cir. 1976) (per curiam) (reversing denial of motion for post-conviction relief when government witness offered testimony concerning cooperation and benefits that "even though technically not perjurious, would surely be highly misleading to the jury . . .").[3] This testimony was highly misleading because the reinstatement of Mr. Kearney's CPA certificate was influenced, at least in part, by his cooperation in this matter.[4]

## CONCLUSION

For the reasons set forth above, Mr. Forbes respectfully requests that the Court grant a mistrial. In the alternative, Mr. Forbes requests that the Court strike Mr. Kearney's testimony and issue a curative instruction.[5]

---

[3]    Moreover, Mr. Kearney gave essentially the same testimony in the first two trials, <u>before</u> his certificate was reinstated. See Tr. (10/26/05) at 1194 ("And you're not here in the hopes of receiving anything in return for your testimony, are you? A. No."); id. at 1198 ("Q. And do you expect to receive any benefit whatsoever for being a witness in this case? A. No."); Tr. (08/16/04) at 9994 ("Q. Do you expect to receive any benefit for being a witness in this federal criminal case? A. No.").

[4]    The government also elicited testimony that the fact that Mr. Kearney testified had "no bearing upon your second civil case." Tr. (10/12/06) at 847. It is not clear what "civil case" this testimony was referencing, but it could have been the CSBA's civil enforcement case against Mr. Kearney.

[5]    If the Court declines these requests, it should, at the very least, issue the following curative instruction: "The government interviewed Mr. Kearney on multiple occasions between 1998 and 2002. Although the government repeatedly asked Mr. Kearney about the process by which unsupported topside adjustments were supposedly made at CUC, and the quarterly

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: _____
Brendan V. Sullivan, Jr. (Bar No. ct17115)
Barry S. Simon (Bar No. ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bbsimon@wc.com (e-mail)

- and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
COWDERY, ECKER & MURPHY, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

---

meetings he attended to discuss these alleged adjustments, Mr. Kearney said that he had no evidence regarding Mr. Forbes, said that he did not meet with Mr. Bell on this subject, and he never claimed that anyone invoked the name Walter Forbes. In 2002, the Connecticut State Board of Accountancy threatened to revoke Mr. Kearney's CPA certification. The prosecutor advised the Board that Mr. Kearney was a valuable cooperating witness. Following this discussion with the prosecutor, the Board decided to allow Mr. Kearney the opportunity to seek reinstatement of his CPA certificate after approximately two-and-a-half years. Sometime after the government spoke to the Board on Mr. Kearney's behalf, Mr. Kearney began to change his story."

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Memorandum in Support of Motion of Defendant Walter A. Forbes for a Mistrial Based on Brady/Giglio Violations and the Testimony of Kevin Kearney (Forbes Third Trial Motion No. 18) to be filed electronically and to be served on October 15, 2006 to the following via e-mail:

> Norman Gross, Esq. (norman.gross@usdoj.gov)
> Michael Martinez, Esq. (michael.martinez2@usdoj.gov)
> Craig Carpenito, Esq. (craig.carpenito@usdoj.gov)

_____
Barry S. Simon