# PART 2 of EXHIBIT 5

Counsel of Record:
Thomas C. Newkirk, Esq., Securities and Exchange Commission,
450 Fifth St., NW, Washington, DC 20549-0801
(202) 942-4550                TN 7271

Local Counsel:
Susan Cassell, Assistant United States Attorney,
U.S. Attorney's Office, 970 Broad Street, Suite 900,
Newark, New Jersey 07102
(973) 645-2844                SC 8081

**FILED**

AT 8:30 _____ 6/14/00 _____ M
WILLIAM T. WALSH, CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

SECURITIES AND EXCHANGE COMMISSION
450 Fifth Street, NW
Washington, D.C. 20549,

:
:
:
:
:
:

                  Plaintiff,

:

**COMPLAINT**

                  v.

:

a Civ. No. 2873 (AJC)

COSMO CORIGLIANO, ANNE M. PEMBER,
CASPER SABATINO, and KEVIN T. KEARNEY,

:
:

                  Defendants.

:

---

Plaintiff, the Securities and Exchange Commission (the "Commission"), alleges as follows:

<u>SUMMARY</u>

1.    For more than twelve years, until its exposure in 1998, certain members of CUC International Inc. ("CUC") senior and middle management, including defendants Cosmo Corigliano (who resides at: 38 Watrous Point Road, Old Saybrook, Connecticut 06475), Anne M. Pember (who resides at: 485 Warpas Road, Madison, Connecticut 06443), Casper Sabatino (who resides at: 12 Highview Lane, Sherman, Connecticut 06784), and Kevin Kearney (who

resides at: 121 Peaceable Street, Reading, Connecticut 06896), devised and operated a fraudulent scheme that inflated quarterly and annual operating income reported to the Commission and to the public by CUC and, subsequently, by its corporate successor, Cendant Corporation ("Cendant"). CUC management inflated these income figures in order to meet the earnings expectations of Wall Street analysts and thereby artificially to maintain or increase the price of the company's stock. For the period 1995-1997 alone, pre-tax operating income reported to the public by CUC was inflated by an aggregate amount of over $500 million.

2.      Defendants Cosmo Corigliano, Anne M. Pember, and Kevin Kearney were unjustly enriched by, among other things, selling CUC and Cendant securities, including stock acquired through low-cost options, at prices that were inflated by the fraudulent scheme. Following the disclosure of the fraud in 1998, the price of Cendant common stock dropped dramatically.

3.      By virtue of the acts alleged herein, each defendant, among other things, violated, or aided and abetted violations of, statutes and rules prohibiting fraud in the securities markets, requiring maintenance of accurate books and records by public companies, and requiring that financial information be accurately reported by public companies to the Commission and the public.

## JURISDICTION

4.      This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77v(a)] and Sections 21(d) and (e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and (e) and 78aa].

5.      The defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the acts, practices, and courses of conduct alleged herein.

6.      Certain of the acts, practices, and courses of conduct constituting the violations of law alleged herein occurred within this judicial district.

## DEFENDANTS

7.      Cosmo Corigliano ("Corigliano"), age 40, was the Chief Financial Officer of CUC from 1995 until December 1997, when CUC merged with HFS Incorporated ("HFS") to form Cendant. From the merger until April 1998, Corigliano was an Executive Vice President of Cendant. Prior to becoming Chief Financial Officer, from 1983 to 1995, Corigliano was the Controller of CUC. He is licensed as a certified public accountant in Connecticut and resides in Old Saybrook, Connecticut.

8.      Anne M. Pember ("Pember"), age 40, was the Controller of CUC from June 1997 through the December 1997 Cendant merger. From the merger until March 1998, she was part of the management of the accounting unit at Cendant Membership Services, the post-merger name for the former CUC business units. Prior to becoming Controller of CUC, from 1989 to 1997, Pember was Controller of CUC's largest division, the Comp-U-Card division. Beginning in 1996, she also had the title of Senior Vice President. She is licensed as a certified public accountant in Connecticut and resides in Madison, Connecticut.

9.      Casper Sabatino ("Sabatino"), age 47, held the title of CUC Vice President of Accounting and Reporting at the time of the Cendant merger. Sabatino joined CUC in 1985 as a Manager of Financial Reporting. A couple of years later, he was promoted to Director of Financial Reporting.

10.     Kevin T. Kearney ("Kearney"), age 33, was Director of Financial Reporting at CUC from 1995 through 1997. Prior to that, from 1993 to 1995, he was a Manager of Financial Reporting at CUC. He is licensed as a certified public accountant in Connecticut and resides in Reading, Connecticut.

## OTHERS

11.     CUC, a Delaware corporation that had its headquarters in Stamford, Connecticut, was principally engaged in membership-based consumer services, such as auto, dining, shopping, and travel "clubs." CUC's largest division, Comp-U-Card, marketed individual memberships in these clubs. CUC's securities were registered pursuant to Section 12(b) of the Exchange Act and traded on the New York Stock Exchange ("NYSE").

12.     HFS, a Delaware corporation that had its headquarters in Parsippany, New Jersey, was principally engaged in the business of controlling the rights to franchise brand names in the hotel, real estate brokerage, and car rental businesses. Its securities were registered pursuant to Section 12(b) of the Exchange Act and traded on the NYSE.

13.     Cendant, a Delaware corporation with its headquarters in New York City, was created through the December 17, 1997 merger of HFS and CUC. Cendant provides membership-based and Internet-related consumer services and owns the rights to franchise brand names in the hotel, residential real estate brokerage, car rental, and tax preparation businesses. Cendant's common stock and certain other securities issued by Cendant are registered pursuant to Section 12(b) of the Exchange Act and trade on the NYSE. Certain additional securities issued by Cendant are registered pursuant to Section 12(g) of the Exchange Act.

## I.    DESCRIPTION OF THE FINANCIAL FRAUD

A.    Inflating Quarterly Results

14.    Beginning in at least 1988, at the end of each of the first three quarters of a fiscal year, CUC's senior management regularly ordered unsupported adjustments to the company's quarterly results. Management arrived at the adjustments by calculating the amounts needed to bring the company's quarterly income and earnings up to the levels expected by Wall Street analysts. The quarterly changes were made solely as "top-side" adjustments in an electronic spreadsheet maintained at the company's financial reporting operations in Stamford, Connecticut -- that is, no journal entries were made, the company's general ledger was not altered, and the changes were not carried down to the books of the company's divisions.

15.    The spreadsheet was then used to generate inflated consolidated financial statements for the company, and those inflated consolidated financial statements were used for the company's press releases and quarterly reports.

16.    The quarterly top-side adjustments resulted in a gap between CUC's reported quarterly results and the results reflected in its books and records. Therefore, at the end of each fiscal year, prior to completion of the company's annual audit, CUC management had to make corrective adjustments to ensure that the company's books and records matched the company's reported results.

B.    Inflating Annual Results

17.    In addition, apart from the quarterly adjustments and beginning as early as 1985, management made year-end adjustments to inflate the company's reported annual results and ensure that the company's reported income and earnings for the fiscal year would match the expectations of Wall Street analysts.

18.    CUC management used five principal methods to inflate the company's annual results.  Specifically, management manipulated (1) recognition of revenue from its membership products sales; (2) a reserve related to cancellations of its membership sales; (3) a liability account related to commissions payable on its membership sales; (4) reserves established in connection with the company's mergers and purchase acquisitions; and (5) asset write-offs.  The first three methods were the most significant during the earliest stages of the scheme.  The last two methods became increasingly significant during the last years of the scheme, when management needed ever-larger adjustments in order to keep inflating annual earnings to the levels expected by analysts.

### Manipulation of Revenue Recognition

19.    Manipulation of revenue recognition involved fraudulently altering the accounting for membership sales revenue and membership sales cancellations at CUC's Comp-U-Card division.  Central to this practice was allocation or shifting of revenue from products for which CUC recognized revenue over a period of time to products for which revenue was recognized immediately.

20.    The manipulation of revenue recognition resulted in overstatement of pre-tax operating income by $26.7 million for CUC's fiscal year ended January 31, 1996; by $22.7 million for CUC's fiscal year ended January 31, 1997; and by $41.4 million for Cendant's fiscal year ended December 31, 1997.

### Manipulation of the Membership Cancellation Reserve

21.    The second method of inflating revenues involved manipulating CUC's membership cancellation reserve.  Sales for Comp-U-Card membership products were processed through various financial institutions that billed members' credit cards.  Total sales revenues

were offset by a cancellation reserve to reflect membership cancellations and credit card rejections. In the late 1980s, CUC began to delay recognizing cancellations and rejections by periodically keeping them off of CUC's books. Over time, CUC management instituted a practice of keeping all cancellations and rejections off-books during the last fiscal quarter each year.

22.    By not booking rejections and cancellations against the membership cancellation reserve during the final three months of each fiscal year, CUC management was able to hide the fact that the reserve was dramatically understated at each fiscal year-end. CUC management thus avoided the charges needed to bring the cancellation reserve balance up to its proper amount.

23.    In some years, CUC management depleted the membership cancellation reserve even further by directing the entry of unsupported back-dated journal entries that reversed the reserve directly into revenue accounts and operating expense accounts. The unsupported entries thereby artificially inflated operating income at CUC.

24.    The manipulation of the membership cancellation reserve resulted in overstatement of income by $48 million for CUC's fiscal year ended January 31, 1996; by $19 million for CUC's fiscal year ended January 31, 1997; and by $12 million for Cendant's fiscal year ended December 31, 1997.

### Manipulation of the Commissions Payable Account

25.    CUC management also manipulated the company's commissions payable liability account in order to inflate earnings. CUC paid financial institutions for sales of its products made through those institutions and reflected the liability for these payments in a "commissions payable" account. CUC management used phony schedules and other devices to understate the

commissions payable account. These practices allowed CUC management to hide the fact that the account was significantly understated and to avoid the charges needed to bring the account balance up to its proper amount.

26.    At times, CUC management directed the entry of unsupported back-dated journal entries that moved amounts from the reserve directly into revenues. For example, in connection with the January 31, 1997, fiscal year-end, CUC managers directed unsupported back-dated journal entries moving $9.12 million from the commissions payable liability to revenue. These unsupported journal entries therefore improperly inflated operating income at CUC.

### Reversals of Merger and Purchase Reserves

27.    The fourth and most quantitatively significant method of manipulation of accounts involved the overstatement of merger and purchase reserves. During the period 1995 through 1997, CUC completed a series of increasingly significant mergers and purchase acquisitions. Generally Accepted Accounting Principles ("GAAP") allow companies to record liabilities to recognize costs that result directly from the combination or integration of businesses, such as transactional and severance costs, if certain criteria are met. These costs are recorded as unusual or transaction-related expenses separate from operating expenses. CUC management routinely overstated these costs and the resultant merger and purchase reserves. CUC management customarily referred to these excess reserves as "cushions." CUC management would routinely direct the entry of certain unsupported back-dated journal entries that reduced these reserves and decreased unrelated operating expenses or increased revenues, with a resulting increase in operating income. At times, the managers used CUC intercompany payable accounts as an intermediate step in this process.

28.    The improper reversal of merger and purchase reserves resulted in overstatement of pre-tax operating income by $11 million for CUC's fiscal year ended January 31, 1996, by $59 million for CUC's fiscal year ended January 31, 1997, and by $147 million for Cendant's fiscal year ended December 31, 1997.

### Manipulation of Asset Write-offs

29.    The fifth method of manipulation was used primarily in connection with the merger of HFS and CUC.  GAAP requires that the carrying value of an impaired asset be reduced, and a corresponding expense be recognized, by the impairment amount in the period in which the asset becomes impaired.  CUC management directed that assets which had become impaired in periods prior to the Cendant merger be written off as related to the merger.  Thus, CUC management overstated the company's prior period income by improperly failing to record asset impairments in the proper periods, instead waiting until the Cendant merger to record them as one-time, non-operating merger costs.

30.    CUC management also used the Cendant merger reserve by writing off against the reserve various CUC assets that were not impaired.  These write-offs increased the one-time non-operating charge related to the merger by overstating the merger reserve liability.  The overstated liability created a cushion to increase operating income as needed.  The write-offs also reduced the company's depreciation expense amounts and thus increased operating income.

31.    The write-off of assets to the Cendant merger reserve at year-end December 31, 1997, artificially inflated pre-tax operating income by $6 million for CUC's fiscal year ended January 31, 1996; by $12 million for CUC's fiscal year ended January 31, 1997; and by $29 million for Cendant's fiscal year ended December 31, 1997.

## II.  -  KNOWLEDGE AND PARTICIPATION OF DEFENDANTS

32.    Each defendant knew of and actively participated in some part of the fraudulent scheme to inflate the company's quarterly and annual income and earnings as described above.

### A.    Corigliano

33.    During its latter years, Corigliano was one of the senior CUC officers who engineered the scheme.  From 1985 to 1995, while he was Controller of CUC, Corigliano assisted senior CUC officers who initiated the scheme.  Then, from 1995 until 1998, in his role as Chief Financial Officer, Corigliano proceeded to orchestrate and refine the scheme.  In that role, Corigliano was the CUC officer responsible for creating and maintaining the schedule that management used to track the scheme during the course of each fiscal year.  Accordingly, it was Corigliano who was responsible in the first instance for managing the resources available for the inflation of CUC income and keeping more senior CUC officers apprised about the progress of the scheme.

34.    While he was Chief Financial Officer, Corigliano was also the CUC officer who directed the quarterly top-side adjustments.  During that time, Corigliano gathered CUC mid-level financial reporting managers in his office at the end of each of the company's first three fiscal quarters each year and, in their presence, calculated the aggregate adjustments that he wanted made to various line items in the consolidated quarterly income statement and balance sheet.

35.    As Chief Financial Officer, Corigliano also instructed less senior CUC managers to make unsupported journal entries effectuating year-end adjustments that improperly inflated CUC's operating income and earnings.

36.    During his tenure as Chief Financial Officer, and while he was engaged in the activities described above, Corigliano signed CUC's periodic reports filed with the Commission.

37.    Corigliano, while an officer of CUC, also made materially false statements to CUC's auditors. He signed management representation letters given to CUC's and Cendant's auditors that contained material statements Corigliano knew to be false. He knowingly misrepresented CUC's consolidated quarterly financial results and its annual financial statements as accurately reflecting the company's results and financial condition. He directed less senior managers to restrict and to withhold material information sought by CUC's auditors.

B.    **Pember**

38.    Especially during the last two years of the scheme, when approximately $384 million was added fraudulently to pre-tax operating income at CUC, Pember was the CUC manager most indispensable in carrying out the directives of Corigliano and other senior officers of CUC.

39.    While she was Controller of the Comp-U-Card division, Pember oversaw the fraudulent manipulation of Comp-U-Card's membership sales revenue recognition, the manipulation of the membership cancellation reserve, and the manipulation of the commissions payable liability account.

40.    In addition, both as Controller of Comp-U-Card, and, subsequently, as Controller of CUC itself, Pember directed massive reversals of the company's merger and purchase reserves. In January 1998 alone, she directed less senior CUC managers to make journal entries reversing approximately $100 million of merger reserves into income accounts.

41.    Both as Controller of Comp-U-Card and as Controller of CUC, Pember reported directly to Corigliano. During the last years of the scheme, Pember was its most important

tactician -- the CUC manager most responsible for fashioning specific entries to carry out general directives she received from Corigliano.

42.    Pember, while an officer of CUC, made materially false statements to CUC's and Cendant's auditors. For example, she signed a management representation letter given to CUC's and Cendant's auditors that contained material statements Pember knew to be false. She directed less senior managers to restrict and to withhold material information sought by CUC's auditors. Before she became a CUC officer, Pember aided and abetted others in providing false information to auditors, or in keeping material information from auditors, by overseeing the preparation of false schedules and by directing others to keep certain trial balances and other information from being given to auditors.

C.    <u>Sabatino</u>

43.    Sabatino was part of CUC financial reporting management from 1985 until 1998. From 1995 to the time of the Cendant merger -- while Corigliano was Chief Financial Officer of CUC -- Sabatino was one of the managers regularly present when Corigliano calculated the aggregate top-side quarterly adjustments at the end of each of the first three fiscal quarters each year. Corigliano regularly gave Sabatino general instructions for those adjustments, and Sabatino passed the directions on to lower-level financial reporting managers at CUC. Sabatino understood the purpose of the adjustments and knew that they had no factual support. Sabatino, on instructions from Corigliano, also directed controllers and other financial reporting managers at CUC subsidiaries to make various unsupported year-end journal entries, in furtherance of the scheme.

44.    In addition, Sabatino, while an officer of CUC, made or caused others to make materially false statements to CUC's auditors and caused material information to be kept from

CUC's auditors. Prior to becoming an officer at CUC, Sabatino aided and abetted officers of

CUC in making false statements to auditors, or in keeping material information from CUC's

auditors.

### D.    Kearney

45.    Kearney was part of CUC financial reporting management from 1993 to March

1997. From 1995 to the time of the Cendant merger -- while Corigliano was Chief Financial

Officer of CUC -- Kearney was the other manager who, together with Sabatino, was regularly

present when Corigliano calculated the aggregate top-side quarterly adjustments at the end of

each of the first three fiscal quarters each year. Kearney understood the purpose of the

adjustments and knew that they had no factual support. While he was at CUC corporate,

Kearney supervised the financial reporting personnel who entered the unsupported top-side

quarterly adjustments.

46.    Kearney and Sabatino also had the job of canvassing the various CUC

subsidiaries throughout the year to find out if the subsidiaries had "excess" reserves that CUC

corporate could use to inflate operating income at CUC. Like Sabatino, Kearney occasionally

instructed controllers at CUC subsidiaries to make certain unsupported year-end journal entries

directed by Corigliano.

47.    In addition, Kearney aided and abetted officers of CUC in making materially false

statements to CUC's auditors, or in keeping material information from the auditors.

### FALSE FILINGS AND STATEMENTS

48.    From 1985 through April of 1998, CUC and Cendant, aided and abetted by each

of the defendants, filed with the Commission false and misleading periodic reports, proxy

statements, and registration statements. Those reports and statements included, directly or by

incorporation, financial statements that materially misrepresented the company's financial results, significantly overstating its income from operations and its earnings.

49.     Due to the manipulation of financial results by each of the defendants, CUC and Cendant made materially false and misleading public statements, including, without limitation, earnings press releases and statements to financial analysts. Those statements included, directly or by incorporation, financial statements that misrepresented the company's financial results, materially overstating its income from operations and its earnings.

50.     For the last three fiscal years of the scheme, the scheme caused CUC and Cendant pre-tax income to be artificially overstated by nearly one-third, an aggregate misstatement of approximately one-half billion dollars.

51.     During those last three fiscal years, CUC's quarterly Reports on Form 10-Q reported income reflecting management's unsupported top-side quarterly adjustments. Those adjustments alone caused CUC's reported quarterly pre-tax income to be misstated by an aggregate amount of $31 million for the first three quarters of CUC's fiscal year ended January 31, 1996; by an aggregate amount of $87 million for the first three quarters of CUC's fiscal year ended January 31, 1997; and by an aggregate amount of $176 million for the first three quarters of Cendant's fiscal year ended December 31, 1997.

52.     During that same period, as a result of management's fraudulent scheme, CUC's and Cendant's annual Reports on Form 10-K misstated annual pre-tax income from operations by $127 million for CUC's fiscal year ended January 31, 1996; by $122 million for CUC's fiscal year ended January 31, 1997; and by $262 million for Cendant's fiscal year ended December 31, 1997.

## UNLAWFUL ENRICHMENT OF THE DEFENDANTS

53.    Defendants Corigliano, Pember, and Kearney were each unlawfully enriched by virtue of participation in the manipulative scheme. Each was an officer or employee responsible for maintaining accounting books and records for the purpose of accurately reporting to the public and to shareholders the financial performance of CUC and, later, of Cendant. Each of Corigliano, Pember, and Kearney not only breached professional obligations to his or her employer and to shareholders, but each was unlawfully enriched by, among other things, selling stock in CUC and Cendant at prices that had been artificially inflated by the very scheme in which they had knowingly participated.

54.    For example, between February 1995 and the initial public disclosure of the fraud on April 15, 1998, Corigliano sold at least 645,000 shares (not accounting for splits) of CUC or Cendant common stock. Similarly, between February 1995 and the initial public disclosure of the fraud on April 15, 1998, Pember sold at least 129,003 shares (not accounting for splits) of CUC and Cendant common stock. Between February 1995 and the initial public disclosure of the fraud, Kearney sold at least shares 2,834 shares (not accounting for splits) of CUC or Cendant common stock.

55.    After the public disclosure of the fraud in 1998, the price of Cendant common stock dropped dramatically.

## COUNT I

### FRAUD
Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];
Sections 10(b) and 14(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78n(a)]; and
Rules 10b-5 and 14a-9 [17 C.F.R. §§ 240.10b-5 and 240.14a-9] Promulgated Thereunder

56.    Plaintiff realleges and incorporates herein by reference paragraphs 1 through 55 above.

57.     The Securities Act and the Exchange Act prohibit use of a manipulative or deceptive device in connection with the purchase or sale of stock.

58.     By reason of the foregoing, Corigliano, Pember, and Sabatino, directly and indirectly, violated, and unless restrained will violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]; and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder.

59.     By reason of the foregoing, Kearney aided and abetted violations, and unless restrained will continue to aid and abet violations, of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder.

60.     By reason of the foregoing, Corigliano, Pember, Sabatino, and Kearney aided and abetted violations, and unless restrained will continue to aid and abet violations, of Section 14(a) of the Exchange Act  [15 U.S.C. § 78n(a)] and Rule 14a-9 [17 C.F.R. § 240.14a-9] promulgated thereunder.

## COUNT II

### REPORTING
**Violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13] Promulgated Thereunder**

61.     Plaintiff realleges and incorporates herein by reference paragraphs 1 through 55 above.

62.     The Exchange Act and rules promulgated thereunder require every issuer of a registered security to file reports with the Commission which accurately reflect the issuer's financial performance and provide other information to the public.

63.     By reason of the foregoing, Corigliano, Pember, Sabatino, and Kearney aided and abetted violations, and unless restrained will continue to aid and abet violations, of Section 13(a)

of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R.

§§ 240.12b-20, 240.13a-1, and 240.13a-13] promulgated thereunder.

## COUNT III

### RECORD KEEPING
**Violations of Section 13(b) of the Exchange Act [15 U.S.C. § 78m(b)] and
Rules 13b2-1 and 13b2-2 [17 C.F.R. §§ 240.13b2-1 and 240.13b2-2]
Promulgated Thereunder**

64.    Plaintiff realleges and incorporates herein by reference paragraphs 1 through 55

above.

65.    The Exchange Act and rules promulgated thereunder require each issuer of

registered securities to make and keep books, records, and accounts which, in reasonable detail,

accurately and fairly reflect the business of the issuer and to devise and maintain a system of

internal accounting controls sufficient to provide reasonable assurances that, among other

things, transactions are recorded as necessary to permit preparation of financial statements

and to maintain the accountability of assets.

66.    By reason of the foregoing, Corigliano, Pember, Sabatino, and Kearney aided and

abetted violations, and unless restrained will continue to aid and abet violations, of

Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

67.    By reason of the foregoing, Corigliano, Pember, Sabatino, and Kearney, directly

and indirectly, violated, and unless restrained will violate, Section 13(b)(5) of the Exchange Act

[15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1] promulgated thereunder.

68.    By reason of the foregoing, Corigliano, Pember, and Sabatino aided and abetted

violations, and unless restrained will continue to aid and abet violations, of Section 13(b)(2)(B) of

the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

69.    By reason of the foregoing, Corigliano, Pember, and Sabatino, directly and indirectly, violated, and unless restrained will violate, Rule 13b2-2 [17 C.F.R. § 240.13b2-2] promulgated under Section 13(b) of the Exchange Act [15 U.S.C. § 78m(b)].

70.    By reason of the foregoing, Pember, Sabatino, and Kearney aided and abetted violations, and unless restrained will continue to aid and abet violations, of Rule 13b2-2 [17 C.F.R. § 240.13b2-2] promulgated under Section 13(b) of the Exchange Act [15 U.S.C. § 78m(b)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

### I.

Permanently restrain and enjoin Corigliano, and his agents, servants, employees, attorneys, and assigns, and those persons in active concert or participation with him, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b) and 13(b)(5) of the Exchange Act, and Exchange Act Rules 10b-5, 13b2-1, and 13b2-2 [17 C.F.R. §§ 240.10b-5, 240.13b2-1, and 240.13b2-2], and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Exchange Act, and Exchange Act Rules 12b-20, 13a-1, 13a-13, and 14a-9 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13, and 240.14a-9].

### II.

Permanently restrain and enjoin Pember, and her agents, servants, employees, attorneys, and assigns, and those persons in active concert or participation with her, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b) and 13(b)(5) of the Exchange Act, and Exchange Act Rules 10b-5, 13b2-1 and 13b2-2 [17 C.F.R. §§ 240.10b-5, 240.13b2-1, and 240.13b2-2], and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), 78m(b)(2)(B), and 78n(a)], and Exchange Act Rules 12b-20, 13a-1, 13a-13, 13b2-2, and 14a-9 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13, 240.13b2-2, and 240.14a-9].

### III.

Permanently restrain and enjoin Sabatino, and his agents, servants, employees, attorneys, and assigns, and those persons in active concert or participation with him, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)], and Exchange Act Rules 10b-5, 13b2-1 and 13b2-2 [17 C.F.R. §§ 240.10b-5, 240.13b2-1, and 240.13b2-2], and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), 78m(b)(2)(B), and 78n(a)], and Exchange Act Rules 12b-20, 13a-1, 13a-13, 13b2-2, and 14a-9 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13, 240.13b2-2, and 240.14a-9].

### IV.

Permanently restrain and enjoin Kearney, and his agents, servants, employees, attorneys, and assigns, and those persons in active concert or participation with him, and each of them, from violating Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)], and Exchange Act Rule 13b2-1 [17 C.F.R. §§ 240.13b2-1], and from aiding and abetting violations of Sections 10(b), 13(a), 13(b)(2)(A), and 14(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), and 78n(a)], and Exchange Act Rules 10b-5, 12b-20, 13a-1, 13a-13, 13b2-2, and 14a-9 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-13, 240.13b2-2, and 240.14a-9]..

### V.

Order each of defendants Corigliano, Pember, and Kearney to provide a complete accounting of and to disgorge the unjust enrichment realized by him or her, plus prejudgment interest thereon.

## VI.

Order each of the defendants to pay a civil penalty under Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VII.

Enter an order under Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] barring each of defendants Corigliano, Pember, and Sabatino from acting as an officer or a director of any issuer required to file public reports pursuant to Sections 12 or 15(d) of the Exchange Act.

## VIII.

Grant such other relief as this Court may deem just and appropriate.

Dated: June 14, 2000

Respectfully submitted,

Thomas C. Newkirk   TN 7271
James A. Kidney
James T. Coffman
David Frohlich
Roger Paszamant

Attorneys for Plaintiff
Securities and Exchange Commission
450 Fifth Street, NW
Washington, D.C. 20549-0801
(202) 942-4550 (Newkirk)

Local Counsel:
Susan Cassell,   SC 8081
Assistant United States Attorney
U.S. Attorney's Office
970 Broad Street, Suite 900
Newark, New Jersey   07102
(973) 645-2844