# PART 4 of EXHIBIT 5

The Informations filed in court today describe several improper accounting methods used to inflate earnings. Although the companies purported to use Generally Accepted Accounting Principles (GAAP) in presenting earnings - as required under SEC regulations - the defendants admitted using the following improper and fraudulent methods:

**Method:** deliberately underfunding a reserve that CUC was required to maintain to allow for customers who cancelled or failed to pay for CUC's Comp-U-Card membership services. The amount not funded to the reserve was then reported as revenue.

**Result:** CUC overstated earnings for each fiscal year from the late 1980s through fiscal 1995 by millions of dollars, and by approximately $48 million in fiscal 1996 and $19 million in fiscal 1997. Cendant overstated earnings by approximately $12 million in the year ending Dec. 31, 1997.

**Method:** improperly accelerating recognition of revenues and deferring recognition of expenses arising from sales of certain Comp-U-Card membership programs.

**Result:** CUC overstated earnings for each fiscal year from the late 1980s through fiscal 1996 by millions of dollars, and overstated earnings by approximately $10 million in fiscal 1997. Cendant overstated earnings by approximately $17 million for the year ending Dec. 31, 1997.

**Method:** using excess funds that had been deliberately included in merger and acquisition reserves to increase operating income of CUC or CMS, either by applying the excess amounts against operating expenses; by using the funds to absorb the write-off of assets which would otherwise have required amortization or depreciation charges to operating income; or by crediting them directly to revenue.

**Result:** CUC overstated earnings for many of its fiscal years from the late 1980s through fiscal 1995 by millions of dollars, and overstated earnings by approximately $10 million in fiscal 1996 and at least $23 million in fiscal 1997. Cendant overstated earnings by at least $110 million in the year ending Dec. 31, 1997.

Beginning at least as early as in the late 1980's, according to the Informations, participants in the scheme sought to support and increase the price of CUC stock by consistently reporting that its operating income was growing by at least 25 percent a year. That caused the price of CUC stock to rise from a split-adjusted $1.56 per share on Aug. 23, 1989 - the first day CUC stock was traded on the New York Stock Exchange - to approximately $32.13 per share on Dec. 17, 1997, the date of the merger with HFS that created Cendant.



UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
WASHINGTON. D.C. 20549

OFFICE OF
THE CHIEF ACCOUNTANT

February 21, 2001

Mr. David Guay
Executive Secretary
Connecticut State Board of Accountancy
Secretary of State
30 Trinity Street
P.O. Box 150470
Hartford, CT  06115

Re:  Kevin T. Kearney and Paul Hiznay

Dear Mr. Guay:

As the result of a SEC investigation and subsequent civil and administrative proceedings (SEC v. Cosmo Corigliano, et al., In the Matter of Kevin T. Kearney and In the Matter of Paul Hiznay), (1) Mr. Kearney has been barred from practicing before the Commission as an accountant with the right to reapply to resume such practice after five years under provisions cited in the Commission's Order and (2) Mr. Hiznay has been Ordered to cease and desist from violating, and from causing future violations of, Section 13(a) of the Exchange Act and Rule 13a-1 thereunder.  Each of the respondents consented to the issuance of the Commission's Orders without admitting or denying the finding therein.

The Commission's complaint in SEC v. Cosmo Corigliano, et al., alleged, among other things, that Kearney, a former Director of Financial Reporting at CUC International Inc. (now: Cendant Corporation), was regularly present when Corigliano would calculate unsupported alterations to CUC's quarterly results and that, while he was part of the CUC financial reporting operations, Kearney supervised the lower-level managers who actually entered Corigliano's quarterly alterations.  The Complaint alleges that Kearney also profited from his own wrong-doing, selling CUC and Cendant stock at prices inflated by the fraud he had knowingly assisted.  The Commission's complaint alleges that Kearney, by his actions in furtherance of the fraud, violated, or aided and abetted violations of, the antifraud, periodic reporting, corporate record-keeping, and lying to auditors provisions of the federal securities laws.  Kearney has consented to entry of a Final Judgment that would enjoin him from future violations of those provisions, order him to pay disgorgement of $32,443 in ill-gotten gains (plus prejudgment

- 2 -

interest of $8,234), and order him to pay a civil money penalty of $35,000.

The Commission found that Hiznay, a former Accounting Manager at CUC's largest division, aided and abetted violations of the periodic reporting provisions of the federal securities laws, in connection with actions that he took at the direction of his superiors at CUC. Among other things, the Commission alleges that Hiznay made unsupported journal entries as directed by Anne Pember, the former CUC Controller.

Since Messrs. Kearney and Hiznay are certified public accountants licensed to practice accounting Connecticut, I am enclosing copies of (1) the Commission's Orders, (2) the related Complaint in SEC v. Cosmo Corigliano, et al.. with Kearney's Injunction and Consent thereto, (3) 3 related releases, and (4) a "sample letter" to be used should the Board desire access to the Commission's investigative files in this case.

If I can provide any additional public documentation please contact me on (202) 942-4423.

Should the Board desire access to the Commission's investigative files in this case, please submit your request to:

      Mr. Thomas C. Newkirk
      Associate Director
      Division of Enforcement, Stop 0801
      U.S. Securities and Exchange Commission
      450 Fifth Street, N.W.
      Washington, DC  20549

This letter and the enclosed documents are for the information of the board. Such submission does not constitute the filing of a complaint by the Commission or its staff.

Please provide this office with a copy of your access request, if filed, and advise us of the results of the Board's review in this matter.

      Sincerely,

      Lawrence E. Soper
      Lawrence E. Soper
      State Board Liaison

Enclosure - 9

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 42934 / June 14, 2000

ACCOUNTING AND AUDITING ENFORCEMENT
Release No. 1273 / June 14, 2000

ADMINISTRATIVE PROCEEDING
File No. 3-10226

| | |
|---|---|
| In the Matter of | ORDER INSTITUTING PUBLIC ADMINISTRATIVE PROCEEDINGS PURSUANT TO SECTION 21C OF THE |
| PAUL HIZNAY, | SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING |
| Respondent. | A CEASE-AND-DESIST ORDER |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate that public administrative proceedings be, and hereby are, instituted pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") against Paul Hiznay ("Hiznay" or "Respondent").

II.

In anticipation of the institution of these administrative proceedings, Hiznay has submitted an Offer of Settlement ("Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings, and any other proceedings brought by or on behalf of the Commission, or in which the Commission is a party, without admitting or denying the findings set forth below, except as to jurisdiction of the Commission over him and over the subject matter of these proceedings, which Respondent admits, Respondent consents to the entry of this Order Instituting Public Administrative Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order") set forth below.

Accordingly, it is ordered that proceedings pursuant to Section 21C of the Exchange Act be, and hereby are, instituted.

III.

## FACTS

The Commission makes the following findings:[1]

### A.    RESPONDENT

Paul Hiznay, age 37, was a mid-level Accounting Manager at the Comp-U-Card division of CUC International Inc. ("CUC") from July 1995 until October 1997. During that time he ran the day-to-day activities of Comp-U-Card's accounting operations in Trumbull, Connecticut. Hiznay is a certified public accountant and resides in Trumbull, Connecticut.

### B.    OTHER RELEVANT ENTITIES

1. HFS Incorporated ("HFS") was a Delaware corporation that had its headquarters in Parsippany, New Jersey, and was principally a controller of franchise brand names in the hotel, real estate brokerage, and car rental businesses. Its securities were registered pursuant to Section 12(b) of the Exchange Act and traded on the New York Stock Exchange ("NYSE").

2. CUC was a Delaware corporation that had its headquarters in Stamford, Connecticut, and was principally engaged in membership-based consumer services, such as auto, dining, shopping, and travel "clubs." CUC's securities also were registered pursuant to Section 12(b) and traded on the NYSE.

3. Cendant Corporation, a Delaware corporation with its headquarters in New York City, was created through the December 17, 1997, merger of HFS and CUC. Cendant provides certain membership-based and Internet-related consumer services and controls franchise brand names in the hotel, residential real estate brokerage, car rental, and tax preparation businesses. For corporate law purposes, Cendant is CUC. Pursuant to the Agreement and Plan of Merger between CUC and HFS, on December 17, 1997, HFS was merged with and into CUC, with CUC continuing as the surviving corporation and changing its name to Cendant Corporation. As of March 1, 2000, Cendant's common stock, Income PRIDES, and Growth PRIDES were registered pursuant to Section 12(b) of the Exchange Act and traded on the NYSE. Cendant's 6.45% Trust Originated Preferred Securities, 7 3/4% Notes due 2003, and 3% Convertible Subordinate Notes due 2002 were registered pursuant to Section 12(g) of the Exchange Act.

### C.    THE SCHEME

Beginning in at least 1985, certain members of CUC's senior management implemented a scheme designed to ensure that CUC always met the financial results anticipated by Wall Street analysts. The CUC senior managers utilized a variety of means to achieve their goals. In the earlier years of the scheme, they relied in large part on manipulating recognition of the

---

[1] The Commission's findings herein are made pursuant to Respondent's Offer and are not binding upon any other person or entity in these or any other proceedings.

- 2 -

company's membership sales revenue. The CUC senior managers also improperly utilized two liability accounts related to membership sales, consistently maintaining inadequate balances in the accounts and on occasion reversing the accounts directly into operating income. To hide the inadequate balances, senior management periodically kept certain membership sales transactions off-books. In what was the most significant category quantitatively, the CUC senior managers intentionally overstated merger and purchase reserves and subsequently reversed those reserves directly into operating expenses and revenues. Finally, CUC senior management improperly wrote off assets -- including assets that were unimpaired -- and improperly charged the write-offs against the company's merger reserves. By manipulating the timing of the write-offs and by improperly determining the nature of the charges incurred, the CUC senior managers used the write-offs to inflate operating income at CUC.

CUC senior management supervised the scheme over the course of each fiscal year. Beginning in at least 1988, senior management regularly made certain aggregate changes to CUC's reported quarterly financial results. Accordingly, at the end of each of the company's first three fiscal quarters, CUC senior managers directed subordinate financial reporting personnel at CUC corporate headquarters to add whatever amounts were needed in order to bring CUC's quarterly income up to analysts' expectations. Thus, for each of the first three quarters of a CUC fiscal year, the CUC senior managers artificially inflated revenues and decreased operating expenses. In conjunction with these income statement changes, the senior managers also cosmetically altered certain CUC balance sheet items.

At the end of each fiscal year, the CUC senior managers implementing the scheme inflated the company's annual results as recorded on its books and records, so that the books and records would be consistent with the financial results already released and so that CUC's reported annual income would, in fact, meet the expectations of Wall Street analysts. As the scheme progressed over the course of several years, larger and larger year-end adjustments were required. The scheme added more than $500 million to pre-tax operating income during the fiscal years ended January 31, 1996; January 31, 1997; and December 31, 1997.[2]

## D.    HIZNAY'S INVOLVEMENT

### 1. Making Unsupported Post-closing Entries

Although Hiznay was not a senior manager at CUC and was not involved in the aggregate adjustments of CUC's reported quarterly results, from July 1995 to October 1997 Hiznay took steps which helped to carry out CUC senior managers' scheme to inflate earnings.

In early 1997, at the direction of senior management, Hiznay approved a series of entries reversing the commissions payable liability account into revenue at Comp-U-Card. CUC paid commissions to certain institutions on sales of Comp-U-Card membership products sold through those institutions. Accordingly, at the time that it recorded revenue from those sales, CUC

---

[2] CUC's fiscal year ended on January 31. After the December 17, 1997, merger, Cendant adopted a fiscal year ending December 31.

created a liability to cover its commissions payable obligation. Comp-U-Card senior management used false schedules and other devices to support their understating of the commissions payable liability and to avoid the impact that would have resulted if the liability had been properly calculated. Furthermore, in connection with the January 31, 1997, fiscal year-end, senior management utilized this liability account by directing post-closing entries moving amounts from the liability directly into revenue.[3]

Accordingly, in February 1997, Hiznay received a schedule from the Comp-U-Card controller setting forth the amounts, effective back-dates, and accounts for a series of post-closing entries reducing the commissions payable account by $9.12 million and off-setting that reduction by increases to Comp-U-Card revenue accounts. Hiznay approved the entries and had his staff enter them. Save for his superior's written instructions, the entries were unsupported. They all carried effective dates spread retroactively over prior months. The entries reversed the liability account directly into revenues, a treatment that, under the circumstances, was not in accordance with Generally Accepted Accounting Principles.

Because the entries carried effective dates spread retroactively over November and December of 1996 and January of 1997, they inflated CUC income by $9.12 million for the fiscal year ended January 31, 1997. After the Cendant merger, however, the company changed from a CUC fiscal year-end of January 31 to a Cendant fiscal year-end of December 31. As a function of that change, CUC's January 1997 financial results were reported in both the CUC fiscal year ended January 31, 1997, and the Cendant fiscal year ended December 31, 1997. Because $2.85 million of the improper February 1997 commissions payable reversals had effective dates in January 1997, that $2.85 million also inflated Cendant's income for the fiscal year ended December 31, 1997.

Hiznay received a second schedule of post-closing entries from the Comp-U-Card controller in February 1997. This second schedule listed the amounts, effective back-dates, and accounts for seventy-seven journal entries reducing a large CUC merger reserve by $35 million, with off-setting entries decreasing various Comp-U-Card operating expense accounts. Again, Hiznay approved the entries and had his staff enter them. Again, save for his superior's written instructions, the entries were unsupported, and they all carried effective dates spread retroactively over prior months.

Because these merger reserve reversal entries carried effective dates spread over November and December of 1996 and January of 1997, they inflated CUC income by $35 million for the fiscal year ended January 31, 1997. Again, however, the December 1997 change in fiscal year-end meant that some of the entries inflated income twice. Because $10 million of the improper merger reserve reversals had effective dates in January 1997, that $10 million also inflated Cendant's income for the fiscal year ended December 31, 1997.

---

[3] For purposes of this Order, "post-closing journal entries" means entries that are made after a reporting period has ended, but before the financial statements for the period have been filed, and that have effective dates spread retroactively over prior weeks or months.

## 2. Keeping Rejects and Cancellations Off-Books

During his time at the Comp-U-Card division, Hiznay inherited, but then supervised, a long-standing Comp-U-Card practice of keeping membership sales cancellations and rejects off Comp-U-Card's books during part of each fiscal year. Certain Comp-U-Card membership products were processed through various financial institutions that billed their members' credit cards for new sales and charges related to the various membership products. When Comp-U-Card recorded membership sales revenue from such a sale, it would allocate a percentage of the recorded revenue to cover estimated cancellations of the specific membership product being sold, as well as allocating a percentage to cover estimated rejects and chargebacks.[4] Comp-U-Card used these percentage allocations to establish a membership cancellation reserve.

Over the years, CUC senior management had developed a policy of keeping rejects and cancellations off the Comp-U-Card general ledger during the last three months of each fiscal year. Instead, during that quarter, the rejects and cancellations appeared only on cash account bank reconciliations compiled by the Comp-U-Card accounting personnel in Trumbull, Connecticut. The senior managers then directed the booking of those rejects and cancellations against the membership cancellation reserve in the first three months of the next fiscal year. Because rejects and cancellations were not recorded against the membership cancellation reserve during the final three months of the fiscal year, the policy allowed CUC to hide the fact that the reserve was dramatically understated at each fiscal year-end. At its January 31, 1997, fiscal year-end, the balance in the CUC membership cancellation reserve was $29 million, and the Comp-U-Card accounting personnel were holding $100 million in rejects and $22 million in cancellations off-books.[5] Failing to book cancellations and rejects at each fiscal year-end also had the effect of overstating the company's cash position on its year-end balance sheet.

## E.    FALSE FILINGS AND STATEMENTS

Between Hiznay's arrival at Comp-U-Card in July 1995 and the discovery of the fraudulent scheme by Cendant management in April 1998, CUC and Cendant filed with the Commission false and misleading periodic reports and other filings. Those reports and filings included, directly or by incorporation, financial statements that misrepresented the companies' financial conditions and results of operations, overstating their income and their earnings.

---

[4]  Rejects resulted when the credit card to be charged was over its limit, closed, or reported as lost or stolen. Chargebacks resulted when a credit card holder disputed specific charges related to a particular membership program.

[5]  Although the reserve was already seriously understated, in February 1997, Hiznay, again at the direction of the Comp-U-Card controller, approved a series of unsupported post-closing entries that reduced the membership cancellation reserve by $15 million, with the off-setting entries decreasing Comp-U-Card expense accounts or increasing Comp-U-Card revenue accounts.

IV.

VIOLATIONS OF THE<br>
<u>EXCHANGE ACT REPORTING PROVISIONS</u>

Section 13(a) of the Exchange Act and Rule 13a-1 thereunder require issuers with securities registered under Section 12 of the Exchange Act to file annual reports with the Commission and to keep this information current. The obligation to file such reports embodies the requirement that they be true and correct. *See, e.g., SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1165 (D.C. Cir. 1978), *cert. denied*, 440 U.S. 913 (1979).

As discussed above, between Hiznay's arrival at Comp-U-Card in July 1995 and the discovery of the fraudulent scheme by Cendant management in April 1998, CUC and Cendant filed false and misleading annual reports with the Commission that misrepresented their financial results, overstating operating income and earnings and failing to disclose that the financial results were falsely represented. Based on the conduct described above, Hiznay was a cause of the companies' violations of Section 13(a) of the Exchange Act and Rule 13a-1 thereunder.

V.

Based on the foregoing, the Commission finds that Hiznay caused CUC's and Cendant's violations of Section 13(a) of the Exchange Act and Rule 13a-1 promulgated thereunder.

VI.

In view of the foregoing, the Commission deems it appropriate to accept Respondent's Offer and to impose the sanctions agreed to therein. In determining to accept the Offer, the Commission considered remedial acts undertaken by Respondent and cooperation afforded the Commission and other authorities.

Accordingly, **IT IS HEREBY ORDERED** that

Hiznay, pursuant to Section 21C of the Exchange Act, cease and desist from violating, and from causing future violations of, Section 13(a) of the Exchange Act and Rule 13a-1 promulgated thereunder.

By the Commission.

Jonathan G. Katz<br>
Secretary

- 6 -

Counsel of Record:

Thomas C. Newkirk, Esq., Securities and Exchange Commission,
450 Fifth St., NW, Washington, DC 20549-0801
(202) 942-4550                         TN 7271

Local Counsel:

Susan Cassell, Assistant United States Attorney,
U.S. Attorney's Office, 970 Broad Street, Suite 900,
Newark, New Jersey 07102
(973) 645-2844                   SC 8081

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

FILED

AT 8:30 ___6/4/06___ M
WILLIAM T. WALSH, CLERK

SECURITIES AND EXCHANGE COMMISSION                   :
450 Fifth Street, NW                                 :
Washington, D.C. 20549,                              :
                                                     :
                              Plaintiff,             :        COMPLAINT
                                                     :
                         v.                          :        02 Civ. No. 2873 (AJC)
                                                     :
COSMO CORIGLIANO, ANNE M. PEMBER,                    :
CASPER SABATINO, and KEVIN T. KEARNEY,               :
                                                     :
                              Defendants.            :
                                                     :

Plaintiff, the Securities and Exchange Commission (the "Commission"), alleges as follows:

## SUMMARY

1.     For more than twelve years, until its exposure in 1998, certain members of CUC International Inc. ("CUC") senior and middle management, including defendants Cosmo Corigliano (who resides at: 38 Watrous Point Road, Old Saybrook, Connecticut 06475), Anne M. Pember (who resides at: 485 Warpas Road, Madison, Connecticut 06443), Casper Sabatino (who resides at: 12 Highview Lane, Sherman, Connecticut 06784), and Kevin Kearney (who

Counsel of Record:
Thomas C. Newkirk, Esq., Securities and Exchange Commission,
450 Fifth St., NW, Washington, DC 20549-0801
(202) 942-4550                    TN 7271

Local Counsel:
Susan Cassell, Assistant United States Attorney,
U.S. Attorney's Office, 970 Broad Street, Suite 900,
Newark, New Jersey 07102
(973) 645-2844                    SC 8081

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

**FILED**

AT 8:30 ___ 6/14/00 ___ M
WILLIAM T. WALSH, CLERK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION<br>450 Fifth Street, NW<br>Washington, D.C. 20549, | : <br> : <br> : |
| Plaintiff, | : |
| v. | : |
| COSMO CORIGLIANO, ANNE M. PEMBER,<br>CASPER SABATINO, and KEVIN T. KEARNEY, | : <br> : <br> : |
| Defendants. | : |

**COMPLAINT**

02 Civ. No. 2873 (AJC)

Plaintiff, the Securities and Exchange Commission (the "Commission"), alleges as follows:

## SUMMARY

1.       For more than twelve years, until its exposure in 1998, certain members of CUC International Inc. ("CUC") senior and middle management, including defendants Cosmo Corigliano (who resides at: 38 Watrous Point Road, Old Saybrook, Connecticut 06475), Anne M. Pember (who resides at: 485 Warpas Road, Madison, Connecticut 06443), Casper Sabatino (who resides at: 12 Highview Lane, Sherman, Connecticut 06784), and Kevin Kearney (who

resides at: 121 Peaceable Street, Reading, Connecticut 06896), devised and operated a fraudulent scheme that inflated quarterly and annual operating income reported to the Commission and to the public by CUC and, subsequently, by its corporate successor, Cendant Corporation ("Cendant"). CUC management inflated these income figures in order to meet the earnings expectations of Wall Street analysts and thereby artificially to maintain or increase the price of the company's stock. For the period 1995-1997 alone, pre-tax operating income reported to the public by CUC was inflated by an aggregate amount of over $500 million.

2.      Defendants Cosmo Corigliano, Anne M. Pember, and Kevin Kearney were unjustly enriched by, among other things, selling CUC and Cendant securities, including stock acquired through low-cost options, at prices that were inflated by the fraudulent scheme. Following the disclosure of the fraud in 1998, the price of Cendant common stock dropped dramatically.

3.      By virtue of the acts alleged herein, each defendant, among other things, violated, or aided and abetted violations of, statutes and rules prohibiting fraud in the securities markets, requiring maintenance of accurate books and records by public companies, and requiring that financial information be accurately reported by public companies to the Commission and the public.

## JURISDICTION

4.      This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77v(a)] and Sections 21(d) and (e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and (e) and 78aa].

5.    The defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the acts, practices, and courses of conduct alleged herein.

6.    Certain of the acts, practices, and courses of conduct constituting the violations of law alleged herein occurred within this judicial district.

## DEFENDANTS

7.    Cosmo Corigliano ("Corigliano"), age 40, was the Chief Financial Officer of CUC from 1995 until December 1997, when CUC merged with HFS Incorporated ("HFS") to form Cendant. From the merger until April 1998, Corigliano was an Executive Vice President of Cendant. Prior to becoming Chief Financial Officer, from 1983 to 1995, Corigliano was the Controller of CUC. He is licensed as a certified public accountant in Connecticut and resides in Old Saybrook, Connecticut.

8.    Anne M. Pember ("Pember"), age 40, was the Controller of CUC from June 1997 through the December 1997 Cendant merger. From the merger until March 1998, she was part of the management of the accounting unit at Cendant Membership Services, the post-merger name for the former CUC business units. Prior to becoming Controller of CUC, from 1989 to 1997, Pember was Controller of CUC's largest division, the Comp-U-Card division. Beginning in 1996, she also had the title of Senior Vice President. She is licensed as a certified public accountant in Connecticut and resides in Madison, Connecticut.

9.    Casper Sabatino ("Sabatino"), age 47, held the title of CUC Vice President of Accounting and Reporting at the time of the Cendant merger. Sabatino joined CUC in 1985 as a Manager of Financial Reporting. A couple of years later, he was promoted to Director of Financial Reporting.