# PART 7 of EXHIBIT 5

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 42935 / June 14, 2000

ACCOUNTING AND AUDITING ENFORCEMENT
Release No. 1274 / June 14, 2000

ADMINISTRATIVE PROCEEDING
File No. 3-10227

| | |
|---|---|
| In the Matter of | ORDER INSTITUTING PUBLIC ADMINISTRATIVE PROCEEDINGS PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 102(e) OF THE COMMISSION'S RULES OF PRACTICE, MAKING FINDINGS, AND IMPOSING SANCTIONS AND CEASE-AND-DESIST ORDER |
| STEVEN SPEAKS, C.P.A., | |
| Respondent. | |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate to institute public administrative proceedings pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 102(e) of the Commission's Rules of Practice[1] against Steven Speaks ("Speaks" or "Respondent"), a certified public accountant.

---

[1] Paragraph 1 of Rule 102(e)(1) provides, in relevant part, that:

> The Commission may . . . deny, temporarily or permanently, the privilege of appearing or practicing before it in any way to any person who is found by the Commission after notice and opportunity for hearing in the matter: . . . (ii) [t]o be lacking in character or integrity or to have engaged in unethical or improper professional conduct; or (iii) [t]o have willfully violated, or willfully aided and abetted the violation of any provision of the Federal securities laws or the rules and regulations thereunder.

## II.

In anticipation of the institution of these administrative proceedings, Speaks has submitted an Offer of Settlement ("Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings, and any other proceedings brought by or on behalf of the Commission, or in which the Commission is a party,[2] without admitting or denying the findings set forth below, except as to jurisdiction of the Commission over him and over the subject matter of these proceedings, which Respondent admits, Respondent consents to the entry of this Order Instituting Public Administrative Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934 and Rule 102(e) of the Commission's Rules of Practice, Making Findings, and Imposing Sanctions and Cease-and-Desist Order ("Order") set forth below.

Accordingly, it is ordered that proceedings pursuant to Section 21C of the Exchange Act and Rule 102(e) of the Commission's Rules of Practice be, and hereby are, instituted.

## III.

## FACTS

The Commission makes the following findings:[3]

### A.     RESPONDENT

Steven Speaks, C.P.A., age 37, was an employee of Ideon Group, Inc. at the time that it was acquired by CUC International Inc. ("CUC") in August 1996.  In early 1997, Speaks moved to Trumbull, Connecticut, to work in the accounting operations at CUC's largest division, the Comp-U-Card division, and, in June 1997, Speaks became controller of Comp-U-Card.  In December 1997, CUC became Cendant Corporation ("Cendant").  Speaks is licensed as a certified public accountant in North Dakota and resides in Trumbull, Connecticut.

### B.     OTHER RELEVANT ENTITIES

1. HFS Incorporated ("HFS") was a Delaware corporation that had its headquarters in Parsippany, New Jersey, and was principally a controller of franchise brand names in the hotel,

---

[2]  As part of the settlement of these proceedings, Respondent has also agreed to settle a civil action by consenting to a judgment ordering Respondent to pay a $25,000 civil money penalty based on the conduct described in this Order.

[3]  The Commission's findings herein are made pursuant to Respondent's Offer and are not binding upon any other person or entity in these or any other proceedings.

real estate brokerage, and car rental businesses. Its securities were registered pursuant to Section 12(b) of the Exchange Act and traded on the New York Stock Exchange ("NYSE").

2. CUC was a Delaware corporation that had its headquarters in Stamford, Connecticut, and was principally engaged in membership-based consumer services, such as auto, dining, shopping, and travel "clubs." CUC's securities also were registered pursuant to Section 12(b) and traded on the NYSE.

3. Cendant Corporation, a Delaware corporation with its headquarters in New York City, was created through the December 17, 1997, merger of HFS and CUC. Cendant provides certain membership-based and Internet-related consumer services and controls franchise brand names in the hotel, residential real estate brokerage, car rental, and tax preparation businesses. For corporate law purposes, Cendant is CUC. Pursuant to the Agreement and Plan of Merger between CUC and HFS, on December 17, 1997, HFS was merged with and into CUC, with CUC continuing as the surviving corporation and changing its name to Cendant Corporation. As of March 1, 2000, Cendant's common stock, Income PRIDES, and Growth PRIDES were registered pursuant to Section 12(b) of the Exchange Act and traded on the NYSE. Cendant's 6.45% Trust Originated Preferred Securities, 7 3/4% Notes due 2003, and 3% Convertible Subordinate Notes due 2002 were registered pursuant to Section 12(g) of the Exchange Act.

## C.    THE SCHEME

Beginning in at least 1985, certain members of CUC's senior management implemented a scheme designed to ensure that CUC always met the financial results anticipated by Wall Street analysts. The CUC managers utilized a variety of means to achieve their goals. In the earlier years of the scheme, management relied in large part on manipulating recognition of the company's membership sales revenue. Management also improperly utilized two liability accounts related to membership sales, consistently maintaining inadequate balances in the accounts and on occasion reversing the accounts directly into operating income. To hide the inadequate balances, management periodically kept certain membership sales transactions off-books. In what was the most significant category quantitatively, the CUC managers intentionally overstated merger and purchase reserves and subsequently reversed those reserves directly into operating expenses and revenues. Finally, management improperly wrote off assets -- including assets that were unimpaired -- and improperly charged the write-offs against its merger reserves. By manipulating the timing of the write-offs and by improperly determining the nature of the charges incurred, management used the write-offs to inflate operating income at CUC.

CUC senior management supervised the scheme over the course of each fiscal year. Beginning in at least 1988, management regularly made certain aggregate changes to CUC's reported quarterly financial results. Accordingly, at the end of each of the company's first three fiscal quarters, senior managers directed mid-level financial reporting managers at CUC corporate headquarters to add whatever amounts were needed in order to bring CUC's quarterly income up to analysts' expectations. Thus, for each of the first three quarters of a CUC fiscal

year, the managers artificially inflated revenues and decreased operating expenses. In conjunction with these income statement changes, the managers also cosmetically altered certain CUC balance sheet items.

At the end of each fiscal year, the CUC managers implementing the scheme inflated the company's annual results as recorded on its books and records, so that the books and records would be consistent with the financial results already released and so that CUC's reported annual income would, in fact, meet the expectations of Wall Street analysts. As the scheme progressed over the course of several years, larger and larger year-end adjustments were required. The scheme added more than $500 million to the company's pre-tax operating income during the fiscal years ended January 31, 1996; January 31, 1997; and December 31, 1997.[4] Of that amount, more than half -- approximately $260 million -- was added to the fiscal year ended December 31, 1997.[5]

## D.    SPEAKS' INVOLVEMENT

### 1.    The January 1998 Unsupported Entries

Speaks was not part of the management structure at CUC corporate headquarters and was not involved in the aggregate adjustments of CUC's reported quarterly results. Speaks joined CUC in August of 1996 and did not became controller of the Comp-U-Card division until June of 1997. Nevertheless, after joining Comp-U-Card, and especially in connection with Cendant's December 31, 1997, year-end close, Speaks took, or directed others to take, significant actions in furtherance of the scheme.

On Friday, January 16, 1998, shortly after Speaks had sent Comp-U-Card's year-end reporting package to the CUC financial reporting personnel in Stamford, Connecticut, CUC's controller gave Speaks a page of handwritten instructions directing him to make a series of unsupported post-closing entries totaling approximately $100 million.[6] As part of those instructions, Speaks was directed to reverse approximately $19.6 million out of the Ideon reserve (a merger reserve established in connection with various acquisitions that CUC completed in

---

[4]  CUC's fiscal year ended on January 31. After the December 17, 1997, merger, Cendant adopted a fiscal year ending December 31.

[5]  Due to a variety of factors, such as changes in accounting methodology or comparability issues related to acquisitions or to dispositions of discontinued business operations, income impact figures used in this Order may not necessarily tie to figures set forth in CUC and Cendant financial statements included in filings with the Commission.

[6]  For purposes of this Order, "post-closing journal entries" means entries made after a reporting period had ended, with effective dates spread retroactively over prior weeks or months.

1996) and approximately $20.7 million out of the Cendant reserve (a merger reserve established in connection with the December 1997 merger of HFS and CUC). To off-set these reversals, Speaks was directed to increase Comp-U-Card revenue accounts by $33.3 million and to decrease Comp-U-Card operating expense accounts by $7 million.[7] Speaks created ninety-two individual entries designed to effectuate the instructions. The CUC controller had directed Speaks to back-date the entries, and Speaks gave the entries effective dates spread retroactively over October, November, and December of 1997. The controller left to Speaks decisions about the particular Comp-U-Card revenue and expense accounts to be credited and the specific amounts of the individual entries.

The CUC controller's handwritten instructions also directed Speaks to reverse an additional $48.4 million out of the Ideon reserve and to off-set those reversals by crediting CUC intercompany payable accounts with four different subsidiaries of CUC. To implement the instructions, Speaks created an additional thirteen entries that Friday night, bringing the total number of fabricated entries to one hundred and five. Speaks assigned the additional thirteen entries effective dates spread over the entire previous fiscal year, from February through December of 1997. Speaks also created a four-page balance sheet analysis, to record the general ledger balances prior to the entries and to help him track the account balances after the entries had been recorded.

On the morning of Saturday, January 17, Speaks had one of his employees key the one hundred and five unsupported journal entries into the general ledger. Upon discovery that the book-keeping system would not allow back-dating past August, those entries assigned effective dates between February and July were modified to show effective dates from August through December. As a result of this flurry of activity, $88.7 million had been reversed out of CUC merger reserves in a single weekend, and the Ideon reserve balance had been reduced to $479,000.[8] Comp-U-Card division operating income had been increased by $40.3 million at that point.

On Tuesday, January 20, the CUC controller sent Speaks a one-page handwritten facsimile transmission with additional instructions. The first part of those instructions directed Speaks to debit the newly created intercompany payables in an aggregate amount of $15.1 million, with the off-sets being credits to various Comp-U-Card revenue accounts. This time the instructions set forth the specific revenue accounts to be credited. The entries were to be back-

---

[7] Because the Comp-U-Card division general ledger served as the general ledger for CUC, entries made at Comp-U-Card could reverse the largest CUC merger reserve accounts directly into income accounts at Comp-U-Card.

[8] This result was consistent with the CUC controller's handwritten instructions, which concluded with a statement that, upon posting of the entries, the Ideon reserve should have "about $500,000 left in Balance."

- 5 -

dated, with effective dates spread over October, November, and December. Speaks directed his staff to make the entries, and the entries were posted the next day. With the additional $15.1 million, the January post-closing entries now had inflated Comp-U-Card division operating income for the fiscal year ended December 31, 1997, by $50.4 million.

The January 20 facsimile also instructed Speaks to reverse an additional $17 million out of the Cendant reserve. To off-set these reversals, Speaks was directed to credit CUC intercompany payable accounts with certain subsidiaries. Speaks directed his staff to make these unsupported entries, and they were posted on January 21. With the completion of those postings, Speaks and his staff, in a period of a few days, had created $65.4 million in CUC intercompany payables. From those payables, $15.1 million had been reversed into Comp-U-Card operating income, leaving $50.3 million in intercompany payables remaining. That $50.3 million also found its way into CUC's reported income for the fiscal year ended December 31, 1997, but the remaining steps in its journey to that destination were not effected by Speaks or by his staff.[9]

The original, January 16 handwritten instructions contained some additional directions for Speaks. The most significant of these were directions to move $6.5 million of sales revenue from membership products whose revenues were recognized over an extended period of several months to a category of products whose revenues were recognized immediately. Speaks was also directed to decrease the solicitation expenses for the immediate recognition membership products by $3 million. Speaks understood the expense decrease to mean taking expenses that should have been recognized in the current year and moving them to the next year. Speaks made the adjustments, thereby increasing Comp-U-Card operating income by more than $9 million. In all, the January 1998 post-closing entries and membership sales adjustments had increased Comp-U-Card division operating income for the fiscal year ended December 31, 1997, by approximately $60 million.

The January 1998 entries were unsupported. They all materialized after the books were closed, and they all carried effective dates spread retroactively over prior months. The aggregate amounts were large. In some cases, the entries reversed merger reserves directly into revenues -- something not permissible under Generally Accepted Accounting Principles ("GAAP"). Not only that, but, in some cases, the Comp-U-Card revenue accounts being credited with these large amounts were revenue accounts for some of Comp-U-Card's more insignificant membership product lines.[10] When the merger reserves were reversed into operating expense accounts, the

---

[9] The remaining steps were accomplished by financial reporting personnel at CUC corporate headquarters in Stamford and by various divisional controllers at divisions other than Comp-U-Card.

[10] The CUC controller had directed Speaks to make the credits to less noticeable, relatively insignificant accounts.

entries were hardly more defensible.[11]  Finally, if an issuer is able to ascertain that reserves were overstated and are, in fact, not needed, the proper accounting treatment is a specifically designated line item that discloses that the entry is a reversal of a reserve -- not hiding the reversal by putting it into operating income.  In short, the entries had no accounting rationale.

Speaks, a certified public accountant, realized this.  When initially presented with the January 16 handwritten instructions, he noted to the CUC controller that it would be difficult to make such entries in a manner that did not stand out.  Speaks was skeptical.  Nevertheless, when the CUC controller gave him instructions, and some guidance, on how to make the improper entries, Speaks made them, or directed his staff to make them.

## 2.    The Membership Cancellation Reserve

As controller of Comp-U-Card division after June of 1997, Speaks inherited, but then himself oversaw, a complex set of procedures used by CUC management to inflate income by using the membership cancellation reserve.  Certain Comp-U-Card membership products were processed through various financial institutions that billed their members' credit cards for new sales and charges related to the various membership products.  When Comp-U-Card recorded membership sales revenue from such a sale, it would allocate a percentage of the recorded revenue to cover estimated cancellations of the specific membership product being sold, as well as allocating a percentage to cover estimated rejects and chargebacks.[12]  The result of these Comp-U-Card percentage allocations was the Comp-U-Card membership cancellation reserve.

Over the years, CUC management had developed a policy of keeping rejects and cancellations off the Comp-U-Card general ledger during the last three months of each fiscal year.  Instead, during that quarter, the rejects and cancellations appeared only on cash account bank reconciliations compiled by the Comp-U-Card accounting personnel in Trumbull, Connecticut.  Because the rejects and cancellations for the final three months were not recorded

---

[11]  GAAP permits a debit to a merger reserve, with an off-setting entry to an operating expense account, in the event that a cost that should have been charged against the reserve instead had been mistakenly treated as an operating expense.  For such events to have been the justification for the January 1998 entries sent to Speaks, it would have had to have been the case that $7 million worth of such incorrect previous charges had occurred, putting to one side the facts that no support was being provided and that the decisions as to which specific accounts were being credited were being left to Speaks.  If these charges were due to mistakes and exceptions, then, at CUC, exceptions were well on their way to becoming the norm.

[12]  Rejects resulted when the credit card to be charged was over its limit, closed, or reported as lost or stolen.  Chargebacks resulted when a credit card holder disputed specific charges related to a particular membership program.

against the membership cancellation reserve, the policy allowed CUC to hide the fact that the reserve was dramatically understated at each fiscal year-end.[13]

Holding rejects and cancellations off-books in the fourth quarter each year was just one step in an annual ritual that CUC used to exploit the membership cancellation reserve. In the first three months of each ensuing fiscal year, the previously held rejects and cancellations were booked against the reserve. Because the reserve was significantly understated, however, those bookings required simultaneous remedial entries designed to inflate the reserve. Accordingly, at the same time CUC was booking the rejects and cancellations, the company also was creating fictitious accounts receivable and crediting the cancellation reserve. Finally, as each fiscal year drew to a close, the annual cycle would begin to repeat itself: the fictitious accounts receivable would be reversed and the company would begin to hold rejects and cancellations off its books. This annual ritual allowed the company to avoid the charges needed to bring the cancellation reserve up to the proper amount. For the fiscal year ended December 31, 1997, alone, these actions resulted in the company overstating income by $12 million.

E.    DISCLOSURE AND ASSISTANCE

In April 1998, Speaks took steps to disclose various improper CUC practices to Cendant officers who previously had been members of management at HFS. He urged his supervisor to bring the practices to the attention of more senior management. When that effort failed to bring results, Speaks took it upon himself to make the disclosure. On April 9, 1998, Speaks drove to Parsippany, New Jersey and did just that. The disclosure set in motion a rapid series of events leading to Cendant's April 15, 1998, announcement that it had discovered accounting irregularities at former CUC business units. Subsequent to that announcement, Speaks assisted the Commission and other authorities in the investigation of accounting irregularities at CUC.

F.    FALSE FILINGS AND STATEMENTS

Between the company's December 31, 1997, fiscal year-end and the discovery of the fraudulent scheme by Cendant management in April 1998, the company filed with the Commission a false and misleading annual Report on Form 10-K and other false and misleading filings. Those filings included, directly or by incorporation, financial statements that misrepresented the company's financial results, massively overstating its income from operations and its earnings.

---

[13]  Failing to book cancellations and rejects at each fiscal year-end had the added effect of overstating the company's cash position on its year-end balance sheet. As a result, at the fiscal year-end December 31, 1997, Cendant had an approximate $100 million overstatement in cash on its balance sheet for the year then ended.

IV.

A.    **VIOLATIONS OF THE ANTIFRAUD PROVISIONS**

Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit a person, in connection with the purchase or sale of a security, from making an untrue statement of a material fact or from omitting to state a material fact necessary to make statements made, in light of the circumstances under which they were made, not misleading.  To violate Section 10(b) or Rule 10b-5, a defendant must act with scienter, *Aaron v. SEC*, 446 U.S. 680, 695, 701-02 (1980), which the Supreme Court has defined as "a mental state embracing intent to deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  Subsequent to the actions taken by Speaks and described above, between the company's December 31, 1997, fiscal year-end and the discovery of the fraudulent scheme by Cendant management in April 1998, the company violated the antifraud provisions by filing with the Commission filings that were materially misstated and that misrepresented the company's financial condition and results of operations.[14]  During this period, the company's securities were listed and traded on the NYSE.

Although Speaks was aware that certain CUC practices were improper, he nevertheless helped in carrying out those practices.  Those who assist such practices "cannot escape culpability by asserting that they acted as 'good soldiers' and, thereby, rely upon the fact that the violative conduct was condoned, or even ordered, by their corporate superiors."  *In the Matter of Benny Aguirre*, Exchange Act Release No. 24535 (June 2, 1987), *quoted in In the Matter of Collins Indus., Inc.*, Exchange Act Release No. 34934 (Nov. 3, 1994); *see In the Matter of Thomas C. Runge*, Exchange Act Release No. 23061 (Mar. 26, 1986); *see also SEC v. Kalvex Inc.*, 425 F. Supp. 310, 315 (S.D.N.Y. 1975) ("just 'following orders' " does not excuse such actions (citing *SEC v. Pearson*, 426 F.2d 1339 (10th Cir. 1970))).  By his conduct described above, Speaks caused, and willfully aided and abetted, the company's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

B.    **VIOLATIONS OF THE EXCHANGE ACT REPORTING AND RECORD-KEEPING PROVISIONS**

Section 13(a) of the Exchange Act and Rule 13a-1 thereunder require issuers with securities registered under Section 12 of the Exchange Act to file annual reports with the Commission and to keep this information current.  The obligation to file such reports embodies the requirement that they be true and correct.  *See, e.g., SEC v. Savoy Indus., Inc.*, 587 F.2d 1149,

---

[14]  A fact is material if there is a substantial likelihood that a reasonable investor would consider the information to be important.  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).  Information regarding a company's income is among the most important information for making an investment decision.

1165 (D.C. Cir. 1978), *cert. denied*, 440 U.S. 913 (1979). Exchange Act Rule 12b-20 further requires the inclusion of any additional material information that is necessary to make required statements, in light of the circumstances under which they were made, not misleading. Information regarding the financial condition of a company is presumptively material. *SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985).

As discussed above, between the company's December 31, 1997, fiscal year-end and the discovery of the fraudulent scheme by Cendant management in April 1998, the company filed false and misleading filings with the Commission that misrepresented the financial results of the company, overstating operating income and earnings and failing to disclose that the financial results were falsely represented. By his conduct described above, Speaks caused, and willfully aided and abetted, the company's violations of Section 13(a) of the Exchange Act and Rules 13a-1 and 12b-20 thereunder.

Section 13(b)(2)(A) of the Exchange Act requires Section 12 registrants to make and keep books, records, and accounts that accurately and fairly reflect the transactions and dispositions of their assets. Section 13(b)(5) of the Exchange Act provides that no person shall knowingly falsify any such book, record, or account or circumvent internal controls. Rule 13b2-1 also prohibits the falsification of any book, record, or account subject to Section 13(b)(2)(A).

Subsequent to the actions taken by Speaks and described above, between the company's December 31, 1997, fiscal year-end and the discovery of the fraudulent scheme by Cendant management in April 1998, the company's books and records reflecting the transactions and dispositions of its assets were not merely inaccurate, they were intentionally falsified. Based on the conduct described above, Speaks willfully violated Section 13(b)(5) of the Exchange Act and Rule 13b2-1 thereunder, and caused, and willfully aided and abetted, the company's violations of Section 13(b)(2)(A) of the Exchange Act.

## V.

Based on the foregoing, the Commission finds that Speaks (a) willfully violated Section 13(b)(5) of the Exchange Act and Rule 13b2-1 promulgated thereunder; and (b) caused, and willfully aided and abetted, the company's violations of Sections 10(b), 13(a), and 13(b)(2)(A) of the Exchange Act, and Rules 10b-5, 12b-20, and 13a-1 promulgated thereunder.

## VI.

In view of the foregoing, the Commission deems it appropriate to accept Speaks' Offer and to impose the sanctions agreed to therein. In determining to accept the Offer, the Commission considered remedial acts promptly undertaken by Speaks and cooperation afforded the Commission and other authorities.

Accordingly, **IT IS HEREBY ORDERED** that

A.      pursuant to Section 21C of the Exchange Act, Respondent cease and desist from violating, and from causing future violations of, Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(5) of the Exchange Act, and Rules 10b-5, 12b-20, 13a-1, and 13b2-1 promulgated thereunder; and

B.      pursuant to Rule 102(e) of the Commission's Rules of Practice

1.      Respondent be denied the privilege of appearing or practicing before the Commission as an accountant.

2.      After three years from the date of the Order, Respondent may request that the Commission consider his reinstatement by submitting an application (attention: Office of the Chief Accountant) to resume appearing or practicing before the Commission as:

a.      a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission.  Such an application must satisfy the Commission that Respondent's work in his practice before the Commission will be reviewed either by the independent audit committee of the public company for which he works or in some other acceptable manner, as long as he practices before the Commission in this capacity; and/or

b.      an independent accountant.  Such an application must satisfy the Commission that:  (a) Respondent, or the firm with which he is associated, is a member of the SEC Practice Section of the American Institute of Certified Public Accountants Division for CPA Firms ("SEC Practice Section"); (b) Respondent, or the firm, has received an unqualified report relating to his, or the firm's, most recent peer review conducted in accordance with the guidelines adopted by the SEC Practice Section; and (c) As long as Respondent appears or practices before the Commission as an independent accountant he will remain either a member of the SEC Practice Section or associated with a member firm of the SEC Practice Section, and will comply with all applicable SEC Practice Section requirements, including all requirements for periodic peer reviews, concurring partner reviews, and continuing professional education.

- 11 -

3.    The Commission's review of an application by Respondent to resume appearing or practicing before the Commission may include consideration of, in addition to the matters referenced above, any other matters relating to Respondent's character, integrity, professional conduct, or qualifications to appear or practice before the Commission.

By the Commission.

Jonathan G. Katz
Secretary

- 12 -

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 42936 / June 14, 2000

ACCOUNTING AND AUDITING ENFORCEMENT
Release No. 1275 / June 14, 2000

ADMINISTRATIVE PROCEEDING
File No. 3-10228

| | |
|---|---|
| In the Matter of<br><br>MARY SATTLER POLVERARI,<br>C.P.A.,<br><br>Respondent. | ORDER INSTITUTING PUBLIC ADMINISTRATIVE PROCEEDINGS PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 102(e) OF THE COMMISSION'S RULES OF PRACTICE, MAKING FINDINGS, AND IMPOSING SANCTIONS AND CEASE-AND-DESIST ORDER |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate to institute public administrative proceedings pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 102(e) of the Commission's Rules of Practice[1] against Mary Sattler Polverari ("Polverari" or "Respondent"), a certified public accountant.

---

[1] Paragraph 1 of Rule 102(e)(1) provides, in relevant part, that:

> The Commission may . . . deny, temporarily or permanently, the privilege of appearing or practicing before it in any way to any person who is found by the Commission after notice and opportunity for hearing in the matter: . . . (ii) [t]o be lacking in character or integrity or to have engaged in unethical or improper professional conduct; or (iii) [t]o have willfully violated, or willfully aided and abetted the violation of any provision of the Federal securities laws or the rules and regulations thereunder.

## II.

In anticipation of the institution of these administrative proceedings, Polverari has submitted an Offer of Settlement ("Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings, and any other proceedings brought by or on behalf of the Commission, or in which the Commission is a party,[2] without admitting or denying the findings set forth below, except as to jurisdiction of the Commission over her and over the subject matter of these proceedings, which Respondent admits, Respondent consents to the entry of this Order Instituting Public Administrative Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934 and Rule 102(e) of the Commission's Rules of Practice, Making Findings, and Imposing Sanctions and Cease-and-Desist Order ("Order") set forth below.

Accordingly, it is ordered that proceedings pursuant to Section 21C of the Exchange Act and Rule 102(e) of the Commission's Rules of Practice be, and hereby are, instituted.

## III.

## FACTS

The Commission makes the following findings:[3]

### A.    RESPONDENT

Mary Sattler Polverari, C.P.A., age 29, was hired as Supervisor of Financial Reporting at CUC International Inc. ("CUC") in December 1995 and worked in the company's financial reporting operations at corporate headquarters in Stamford, Connecticut.[4] In the Fall of 1997, Polverari was promoted to Manager of Financial Reporting. Polverari continued to hold that title after CUC became Cendant Corporation ("Cendant") in December 1997. Polverari is licensed as a certified public accountant in New York and resides in Brewster, New York.

### B.    OTHER RELEVANT ENTITIES

---

[2] As part of the settlement of these proceedings, Respondent has also agreed to settle a civil action by consenting to a judgment ordering Respondent to pay a $25,000 civil money penalty based on the conduct described in this Order.

[3] The Commission's findings herein are made pursuant to Respondent's Offer and are not binding upon any other person or entity in these or any other proceedings.

[4] At the time of Respondent's conduct discussed herein, Respondent's name was Mary Sattler. Her name subsequently changed to Mary Sattler Polverari.

- 2 -

HFS Incorporated ("HFS") was a Delaware corporation that had its headquarters in Parsippany, New Jersey, and was principally a controller of franchise brand names in the hotel, real estate brokerage, and car rental businesses. Its securities were registered pursuant to Section 12(b) of the Exchange Act and traded on the New York Stock Exchange ("NYSE").

CUC was a Delaware corporation that had its headquarters in Stamford, Connecticut, and was principally engaged in membership-based consumer services, such as auto, dining, shopping, and travel "clubs." CUC's securities also were registered pursuant to Section 12(b) and traded on the NYSE.

Cendant Corporation, a Delaware corporation with its headquarters in New York City, was created through the December 17, 1997, merger of HFS and CUC. Cendant provides certain membership-based and Internet-related consumer services and controls franchise brand names in the hotel, residential real estate brokerage, car rental, and tax preparation businesses. For corporate law purposes, Cendant is CUC. Pursuant to the Agreement and Plan of Merger between CUC and HFS, on December 17, 1997, HFS was merged with and into CUC, with CUC continuing as the surviving corporation and changing its name to Cendant Corporation. As of March 1, 2000, Cendant's common stock, Income PRIDES, and Growth PRIDES were registered pursuant to Section 12(b) of the Exchange Act and traded on the NYSE. Cendant's 6.45% Trust Originated Preferred Securities, 7 3/4% Notes due 2003, and 3% Convertible Subordinate Notes due 2002 were registered pursuant to Section 12(g) of the Exchange Act.

## C.   THE SCHEME

Beginning in at least 1985, certain members of CUC's senior management implemented a scheme designed to ensure that CUC always met the financial results anticipated by Wall Street analysts. The CUC managers utilized a variety of means to achieve their goals. In part, CUC management met it goals by manipulating recognition of the company's membership sales revenue. Management also improperly utilized two liability accounts related to membership sales, consistently maintaining inadequate balances in the accounts and on occasion reversing the accounts directly into operating income. In addition, the CUC managers intentionally overstated merger and purchase reserves and subsequently reversed those reserves directly into operating expenses and revenues. Finally, management improperly wrote off assets -- including assets that were unimpaired -- and improperly charged the write-offs against its merger reserves. By manipulating the timing of the write-offs and by improperly determining the nature of the charges incurred, management used the write-offs to inflate operating income at CUC.

CUC senior management supervised the scheme over the course of each fiscal year. Beginning in at least 1988, management regularly made certain aggregate changes to CUC's reported quarterly financial results. Accordingly, at the end of each of the company's first three fiscal quarters, senior managers directed mid-level financial reporting managers at CUC corporate headquarters to add whatever amounts were needed in order to bring CUC's quarterly

- 3 -

income up to analysts' expectations. Thus, for each of the first three quarters of a CUC fiscal year, the managers artificially inflated revenues and decreased operating expenses. In conjunction with these income statement changes, the managers also cosmetically altered certain CUC balance sheet items.

At the end of each fiscal year, the CUC managers implementing the scheme inflated the company's annual results as recorded on its books and records, so that the books and records would be consistent with the financial results already released and so that CUC's reported annual income would, in fact, meet the expectations of Wall Street analysts. As the scheme progressed over the course of several years, larger and larger year-end adjustments were required. The scheme added more than $500 million to pre-tax operating income during the fiscal years ended January 31, 1996; January 31, 1997; and December 31, 1997.[5]

## D.    POLVERARI'S INVOLVEMENT

### 1. The Quarterly Top-Side Adjustments

Polverari's principal responsibilities at CUC involved creating consolidating financial reports for all CUC business units, doing balance sheet and income statement consolidations, and performing intercompany account reconciliations. Each month, each of the CUC business units would submit a reporting package to the financial reporting personnel in Stamford, Connecticut. As part of her duties, Polverari took those reporting packages and, using an electronic spreadsheet, compiled a monthly consolidating report showing the financial results for every business unit. At the end of each of the company's first three fiscal quarters each year, Polverari would follow similar procedures to generate a quarterly consolidating report.[6] After generating a quarterly consolidating report, Polverari would give it to her supervisors.

The process never ended there. Instead, Polverari would receive back from her supervisors written or oral instructions detailing aggregate adjustments that Polverari was to make to various line items in the quarterly consolidating report. Typically, the instructions included adjustments increasing revenue by a certain amount and decreasing particular expense line items by certain amounts. The adjustments were made almost entirely in that column of the spreadsheet devoted to the results of CUC's largest division, the Comp-U-Card division. The

---

[5]  CUC's fiscal year ended on January 31. After the December 17, 1997, merger, Cendant adopted a fiscal year ending December 31.

[6]  At CUC, the monthly consolidating reports were considered far less important than the quarterly consolidating reports. Accordingly, Polverari did not enter the numbers for the Comp-U-Card division, CUC's largest division, into her spreadsheet every month -- on occasion she would skip that process and simply make sure that all Comp-U-Card results were entered into the spreadsheet in time for the quarterly consolidating report.

changes always had the effect of increasing CUC earnings and were never accompanied by support. The adjustments were entirely top-side adjustments. That is, the adjustments were simply entered into Polverari's spreadsheet at Stamford -- no journal entries were created, no entries were made to CUC's general ledger, and the adjustments were not carried down to the books and records of Comp-U-Card or any of the company's other divisions.[7]

At each of those quarters, Polverari made the adjustments detailed in her instructions. She then printed a revised quarterly consolidating report and again gave it to her supervisors. The revised report usually resulted in a second wave of instructions from her supervisors. The additional instructions fine-tuned the report, directing Polverari to make additional, usually smaller, adjustments to various line items. In addition to the instructions affecting profit-and-loss line items, Polverari would receive similar, unsupported instructions to make adjustments to various line items in the quarterly consolidated balance sheet.

Polverari was never given any accounting rationale for the quarterly top-side adjustments she was instructed to make. Instead, her supervisors told her that CUC's chief financial officer had generated the adjustments to inflate CUC's quarterly results so that the results would meet the earnings expectations of Wall Street analysts. The supervisors also told her that some of the adjustments were created by the chief financial officer simply to make cosmetic adjustments in the income statement and balance sheet. For example, she was told that the chief financial officer had specific percentage targets for each major expense category, which required that each of the categories be set at approximately the same percentage of revenues as that particular category had held in the previous quarter. Polverari was also told that the chief financial officer made the balance sheet adjustments to ensure that items such as receivables and cash were at levels he thought desirable.

For each of the first three quarters of a CUC fiscal year, once all the instructed adjustments had been made, Polverari used the spreadsheet to generate quarterly consolidated financial statements for CUC. Those financial statements were set forth in the summary format used in CUC's quarterly Reports on Form 10-Q and in its quarterly earnings press releases. As a result of the unsupported quarterly top-side adjustments Polverari had entered, therefore, for each of those quarters, CUC's reported quarterly results matched the consensus quarterly expectations of analysts on Wall Street. The adjustments also resulted, however, in CUC's quarterly Reports

---

[7] To make a specific adjustment, Polverari would go into the appropriate cell of the electronic spreadsheet and manually enter the adjustment she had been instructed to make. For example, if revenues were to be increased by $50 million, Polverari would go to the cell for Comp-U-Card membership fees revenue for the last month of the quarter and enter "+50,000." (The spreadsheet recorded amounts in thousands.) By making the adjustments in this way, rather than just entering new aggregate numbers into the affected cells, it was possible to go into the individual cells in the spreadsheet and determine what changes had been made and which specific cells had been altered.

on Form 10-Q and its quarterly earnings press releases being largely works of fiction. A gap existed between CUC's reported quarterly results and its actual results of operations. That gap grew from quarter to quarter and from one fiscal year to the next. The quarterly top-side alterations aggregated $31 million for CUC's fiscal year ended January 31, 1996; an additional $87 million for its fiscal year ended January 31, 1997; and another $176 million for Cendant's fiscal year ended December 31, 1997.[8]

### 2. The 1998 Entries to Retained Earnings Accounts

At each fiscal year-end, CUC management had to make certain that journal entries were made raising CUC's income to the annual earnings levels Wall Street analysts expected. Moreover, since most of the artificial CUC income created during the year had simply been added top-side at the quarters, and did not appear on CUC's books, corrective measures were needed prior to the company being audited by its outside auditors. In connection with Cendant's fiscal year ended December 31, 1997, Polverari played a role in these year-end adjustments as well.

In January 1998, Cendant managers formerly associated with CUC directed approximately $115 million in unsupported post-closing journal entries reversing the company's merger reserves.[9] The managers directed that more than $50 million of these reversals were to be off-set by credits to intercompany payable accounts with various Cendant Membership Services subsidiaries. (After the December 1997 merger, the former CUC business units were known as Cendant Membership Services or CMS.) Ultimately, the entire $50 million of intercompany payables was used to inflate Cendant's reported income for the fiscal year ended December 31, 1997.[10] Polverari was instructed by the Cendant Membership Services controller to increase revenues of three CMS subsidiaries by a total of $34 million by making top-side adjustments in her spreadsheet, thereby increasing income in the consolidated financial reports. Polverari made top-side adjustments decreasing the intercompany payables by $34 million and increasing the revenues of the CMS subsidiaries. Then, on April 6, 1998, after Cendant's annual report incorporating its annual financial statements had been filed, Polverari sent a series of memoranda to financial reporting officers of the affected subsidiaries. The memoranda, among

---

[8] Due to a variety of factors, such as changes in accounting methodology or comparability issues related to acquisitions or to dispositions of discontinued business operations, income impact figures used in this Order may not necessarily tie to figures set forth in CUC and Cendant financial statements included in filings with the Commission.

[9] For purposes of this Order, "post-closing journal entries" means entries made after a reporting period had ended, with effective dates spread retroactively over prior weeks or months.

[10] Actually, the entire $115 million in January 1998 merger reversals eventually was used, through various means, to inflate Cendant income for the fiscal year ended December 31, 1997.

other things, directed the financial reporting officers to make post-closing entries debiting their respective intercompany receivable accounts with CMS corporate and crediting their retained earnings accounts. Polverari directed the subsidiaries to give the entries March 1998 effective dates and stated that the entries that "would normally be charged to the P&L can be charged directly to Retained Earnings to avoid opening last year's books."

E.     FALSE FILINGS AND STATEMENTS

Between Polverari's arrival at CUC in December 1995 and the discovery of the fraudulent scheme by Cendant management in April 1998, CUC and Cendant filed with the Commission false and misleading periodic reports and other filings. Those reports and filings included, directly or by incorporation, financial statements that misrepresented the companies' financial conditions and results of operations, massively overstating their income and their earnings.

IV.

A.     VIOLATIONS OF THE ANTIFRAUD PROVISIONS

Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit a person, in connection with the purchase or sale of a security, from making an untrue statement of a material fact or from omitting to state a material fact necessary to make statements made, in light of the circumstances under which they were made, not misleading. To violate Section 10(b) or Rule 10b-5, a defendant must act with scienter, *Aaron v. SEC*, 446 U.S. 680, 695, 701-02 (1980), which the Supreme Court has defined as "a mental state embracing intent to deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). Between Polverari's arrival at CUC in December 1995 and the discovery of the fraudulent scheme by Cendant management in April 1998, CUC and Cendant violated the antifraud provisions by filing with the Commission and releasing to the public periodic reports and filings that were materially misstated and that misrepresented the companies' financial conditions and results of operations.[11]

Although Polverari was aware that certain CUC practices were improper, she nevertheless helped in carrying out those practices. Those who assist such practices "cannot escape culpability by asserting that they acted as 'good soldiers' and, thereby, rely upon the fact that the violative conduct was condoned, or even ordered, by their corporate superiors." *In the Matter of Benny Aguirre*, Exchange Act Release No. 24535 (June 2, 1987), *quoted in In the Matter of Collins Indus., Inc.*, Exchange Act Release No. 34934 (Nov. 3, 1994); *see In the Matter of Thomas C. Runge*, Exchange Act Release No. 23061 (Mar. 26, 1986); *see also SEC v.*

---

[11]  A fact is material if there is a substantial likelihood that a reasonable investor would consider the information to be important. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). Information regarding a company's income is among the most important information for making an investment decision.

*Kalvex Inc.*, 425 F. Supp. 310, 315 (S.D.N.Y. 1975) ("just 'following orders' " does not excuse such actions (citing *SEC v. Pearson*, 426 F.2d 1339 (10th Cir. 1970))). Based on the conduct described above, Polverari caused, and willfully aided and abetted, the companies' violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## B.    VIOLATIONS OF THE EXCHANGE ACT REPORTING AND RECORD-KEEPING PROVISIONS

Section 13(a) of the Exchange Act and Rules 13a-1 and 13a-13 thereunder require issuers with securities registered under Section 12 of the Exchange Act to file annual and quarterly reports with the Commission and to keep this information current. The obligation to file such reports embodies the requirement that they be true and correct. *See, e.g., SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1165 (D.C. Cir. 1978), *cert. denied*, 440 U.S. 913 (1979). Exchange Act Rule 12b-20 further requires the inclusion of any additional material information that is necessary to make required statements, in light of the circumstances under which they were made, not misleading. Information regarding the financial condition of a company is presumptively material. *SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985).

As discussed above, between December 1995 and the discovery of the fraudulent scheme by Cendant management in April 1998, CUC and Cendant filed false and misleading periodic reports with the Commission that misrepresented their financial results, overstating operating income and earnings and failing to disclose that the financial results were falsely represented. Based on the conduct described above, Polverari caused, and willfully aided and abetted, the companies' violations of Section 13(a) of the Exchange Act and Rules 13a-1, 13a-13, and 12b-20 thereunder.

Section 13(b)(2)(A) of the Exchange Act requires Section 12 registrants to make and keep books, records, and accounts that accurately and fairly reflect the transactions and dispositions of their assets. Section 13(b)(5) of the Exchange Act provides that no person shall knowingly falsify any such book, record, or account or circumvent internal controls. Rule 13b2-1 also prohibits the falsification of any book, record, or account subject to Section 13(b)(2)(A).

As a result of the conduct described above, between December 1995 and the discovery of the fraudulent scheme by Cendant management in April 1998, the companies' books and records reflecting the transactions and dispositions of their assets were not merely inaccurate, they were intentionally falsified. Based on the conduct described above, Polverari willfully violated Section 13(b)(5) of the Exchange Act and Rule 13b2-1 thereunder, and caused, and willfully aided and abetted, the companies' violations of Section 13(b)(2)(A) of the Exchange Act.

### V.

Based on the foregoing, the Commission finds that Polverari (a) willfully violated Section 13(b)(5) of the Exchange Act and Rule 13b2-1 promulgated thereunder; and (b) caused,

and willfully aided and abetted, CUC's and Cendant's violations of Sections 10(b), 13(a), and 13(b)(2)(A) of the Exchange Act, and Rules 10b-5, 12b-20, 13a-1, and 13a-13 promulgated thereunder.

VI.

In view of the foregoing, the Commission deems it appropriate to accept Polverari's Offer and to impose the sanctions agreed to therein. In determining to accept the Offer, the Commission considered remedial acts undertaken by Polverari and cooperation afforded the Commission and other authorities.

Accordingly, **IT IS HEREBY ORDERED** that

A.       pursuant to Section 21C of the Exchange Act, Respondent cease and desist from violating, and from causing future violations of, Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(5) of the Exchange Act, and Rules 10b-5, 12b-20, 13a-1, 13a-13, and 13b2-1 promulgated thereunder; and

B.       pursuant to Rule 102(e) of the Commission's Rules of Practice

1.       Respondent be denied the privilege of appearing or practicing before the Commission as an accountant.

2.       After three years from the date of the Order, Respondent may request that the Commission consider her reinstatement by submitting an application (attention: Office of the Chief Accountant) to resume appearing or practicing before the Commission as:

a.       a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission. Such an application must satisfy the Commission that Respondent's work in her practice before the Commission will be reviewed either by the independent audit committee of the public company for which she works or in some other acceptable manner, as long as she practices before the Commission in this capacity; and/or

b.       an independent accountant. Such an application must satisfy the Commission that: (a) Respondent, or the firm with which she is associated, is a member of the SEC Practice Section of the American Institute of Certified Public Accountants Division for CPA Firms ("SEC Practice Section"); (b) Respondent, or the firm, has received an unqualified report relating to her, or the firm's, most recent peer review conducted in accordance with the guidelines adopted by the SEC Practice Section; and (c) As long as Respondent appears or practices before

the Commission as an independent accountant she will remain either a member of the SEC Practice Section or associated with a member firm of the SEC Practice Section, and will comply with all applicable SEC Practice Section requirements, including all requirements for periodic peer reviews, concurring partner reviews, and continuing professional education.

3.    The Commission's review of an application by Respondent to resume appearing or practicing before the Commission may include consideration of, in addition to the matters referenced above, any other matters relating to Respondent's character, integrity, professional conduct, or qualifications to appear or practice before the Commission.

By the Commission.


Jonathan G. Katz
Secretary