UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:02CR00264 (AHN) |
| | : | |
| | : | |
| v. | : | October 30, 2006 |
| | : | |
| | : | |
| | : | |
| WALTER A. FORBES | : | |

**GOVERNMENT'S OPPOSITION TO FORBES' BLUNDERBUSS OBJECTIONS
TO GOVERNMENT CLOSING ARGUMENTS AND MOTION FOR MISTRIAL**

It is telling that, after improperly invoking the "Golden Rule" and vouching for defense witnesses, defendant Forbes now demands a mistrial on the basis of a 20-page compendium of objections to the Government's summation and rebuttal ("FObj."). None of Forbes' objections has any merit, as evidenced by his failure to request even a single curative instruction for any of them; they do not warrant the extraordinary relief of declaring a mistrial; and if anyone engaged in improper argument here, it was defense counsel, not the Government.

**1.   Defense Counsel's Improper "Golden Rule" Argument.**

During his summation, defense counsel repeatedly offered a variation on the "Golden Rule" argument that the Second Circuit has "long since rejected." United States v. Vario, 484 F.2d 1052, 1055 (2d Cir. 1973).  For example, defense counsel argued:

> Over the course of more than six years, a period
> in which he has not been sentenced and is hoping to
> earn a downward departure letter from the U.S. Attor-
> ney's Office in New Jersey, Cosmo Corigliano's testi-
> mony has evolved from guessing, no recall, speculating,
> flower, a flower blossoms here on the witness stand.

Now he has a memorable recollection.  And they ask you
to decide a man's life on that kind of testimony.  What
kind of testimony is that.

   It should be frightening.  Frightening testimony
that's what it should be.  Because today it's him
[pointing to Forbes] and then some other time it's me
or you or our families.

   MR. MARTINEZ:  Objection, your Honor.

   THE COURT:  Okay.  Noted.

TTTr. 3502-3503 (emphasis added).  Later, defense counsel argued:

forget the man you know is lying.  Forget worrying
about whether Henry Silverman is obsessed and is driven
with his anger.  Look at the absurdity of the testi-
mony, itself, and ask yourself, are you willing to make
a decision that affects a man's life and walk out of
that courthouse and have that on your shoulders for the
rest of your days?  When you wake up after the verdict
in this case, you want to be able to say I did the
right thing.  You don't want it haunting you that you
did not follow the law.  That the case was not proven
beyond a reasonable doubt.  If the case is proven
beyond a reasonable doubt to you, you're duty is to
vote to convict Walter Forbes.  But the evidence in
this case will not support it.  And it's that kind of
evidence from a Henry Silverman that's brought to the
stand that talk about -- talk about quality evidence.
No citizen should be subjected to that.

TTTr. 3537 (emphasis added).

   Such personal appeals to juror sympathy and bias are forbid-

den.  In Vario, the Second Circuit rejected a defendant's claim

"that the district court improperly commented upon his attorney's

closing argument":

In that argument defense counsel had reverted to the
"Golden Rule" standard for jury determination -- a
standard long since rejected by this Court.  Specifi-
cally, counsel in effect asked the jurors whether if
any of them, their friends, or members of their fami-
lies ran afoul of the law, they would not wish the jury
to apply the Golden Rule. . . . Since this is not an
applicable standard, the trial judge quite properly

<u>advised the jury that "You must be impartial and objec-
tive. No one is to judge themselves, that is not the
system of justice."</u>

<u>Vario</u>, 484 F.2d at 1055 (emphasis added). Rather than burden the
Court and the jury with a request for a curative instruction,
however, the Government concluded that this Court's fulsome
instructions to the jury concerning the weighing of properly
admitted evidence, following the law, and not treating arguments
by counsel as evidence would more than suffice to dilute the
prejudice caused by defense counsel's improper summation.

> **2.    <u>Defense Counsel's Improper Vouching.</u>**

Defense counsel also improperly vouched for the credibility
of defense witnesses. For example, defense counsel went out of
his way to thank certain defense witnesses for coming to court
and "say[ing] how it really happened":

> Now let's look about what really happened. Let's
> go back there as they lived it. Forget what Henry
> Silverman wants to portray here for a moment, eight or
> ten years later with his grandiose, unbelievable,
> laughable -- you could make a Broadway play out of
> three or four of his statements off the witness stand.
> Let's look at what happened.
>
> Walter Forbes, going along in his life, he has
> people trying to get him to a lunch for December 9th.
> Why. He's got a busy schedule. Walter's away a lot.
> He loves to play golf. He's thinking he's not running
> the day-to-day operation of the company. Someone wants
> him to have a lunch. <u>So they get him to have a lunch
> with Mr. Laskawy. Remember that lovely distinguished
> gentleman. I'm in awe of guys like that. They ran a
> company that -- what did he say? I don't know. How
> many employees, billions of dollars. Quite a gentle-
> man. He told it as it happened. You got lucky, a
> little glimpse of how it really happened.</u> . . .

What does Laskawy say.  We had a social lunch basically, I raised the issue that Ernst & Young would like to be the auditor for the new company going for-ward and how does he describe the lunch.  The guy, Walter Forbes, was supposed to be fighting for Ernst & Young, he describes the lunch as, Walter was unenthusi-astic. Unenthusiastic.  Basically said Henry's the CEO, it's going to be -- Henry's got the choice.  Even Cosmo said that Ernst & Young left the lunch of December 9th with the feeling that Walter wasn't very supportive or enthusiastic.  You remember the description.  <u>That's what really happened out there.  Thank heavens we have a few people that come and say how it really happened.</u>

TTTr. 3538-3539 (emphasis added).

Such vouching by defense counsel for the integrity of a defense witness was improper.  Although "the defense [is] gener-ally entitled to wide latitude during closing arguments," defense counsel may "not misstate the evidence."  <u>United States v. Tocco</u>, 135 F.3d 116, 130 (2d Cir. 1998); <u>accord</u> <u>United States v. Myer-son</u>, 18 F.3d 153, 163 (2d Cir. 1994).  This Court's fulsome instructions to the jury concerning the weighing of properly admitted evidence, following the law, and not treating arguments by counsel as evidence, however, will more than suffice to dilute any prejudice caused by defense counsel's improper summation.

### 3.  Defendant's Meritless Objections to the Government's Summation and Rebuttal.

Defendant raises 44 objections to the Government's summation and rebuttal, the vast majority of which are baseless in light of this Court's (not to mention Judge Thompson's) prior rulings. Tellingly, Forbes has not requested any curative instructions.

### a.   Summary Chart.

For the Court's convenience, the chart below contains the Government's response to Forbes' objections.  The Government will address one objection in greater detail after the chart.

| FObj. | Government's Response |
|-------|----------------------|
| A.1 | The Government's summation and rebuttal arguments were proper.  This Court properly denied Forbes' repeated requests to compel the Government to immunize Stuart Bell or to give a missing witness instruction.  E.g., Docket 2466, at n.1; TTTr. 1478-1483, 2565, 3366-3383, 3406.  Forbes has offered no basis to reconsider those prior rulings, which, in light of such cases as United States v. Ebbers, 458 F.3d 110, 117-120 (2d Cir. 2006), were eminently correct. |
| A.2 | Same as above. |
| A.3 | Same as above. |
| A.4 | Same as above. |
| B.1 | The Government's rebuttal argument was proper.  Unlike the cases cited by Forbes, FObj. at 3, the Government did not vouch for its witnesses, ask Forbes to comment on the veracity of Government witnesses, or argue that the jury could not acquit Forbes unless they found that the Government's witnesses were lying.  Rather, the Government properly contrasted the consistent testimony of Government witnesses with Forbes' unequivocal denial of the substance of that testimony and asked the jury to determine which testimony to believe.  See United States v. Shareef, 190 F.3d 71, 79 (2d Cir. 1999) (rejecting argument that prosecutor engaged in improper summation by arguing that if the jury believed defendant's "testimony, it had to conclude that other witnesses were lying").  Furthermore, "the government is allowed to respond to an argument that impugns its integrity or the integrity of its case, and when the defense counsel have attacked the prosecutor's credibility or the credibility of the government agents, the prosecutor is entitled to reply with rebutting language suitable to the occasion." United States v. Carr, 424 F.3d 213, 227 (2d Cir. 2005), cert. denied, 126 S. Ct. 1447 (2006); see Tocco, 135 F.3d at 130 ("where the defense summation makes arguments and allegations against the government, the prose- |

| | |
|---|---|
| | cutor may respond to them in rebuttal"). Given defense counsel's repeated reference to one Government witness as a "serial liar," "practiced liar," and "con man" and defense counsel's description of another Government witness's testimony as "preposterous," "stupid," and "insult[ing] to the intelligence of a four-year-old," TTTr. 3477, 3479, 3495, 3497, 3507, 3525-3526, 3537, 3558, 3568, 3575, the Government's rebuttal argument was a fair and invited response. |
| B.2 | The Government's rebuttal argument was proper. This Court properly denied Forbes' request to preclude any reference to the truth-telling provisions of Cosmo Corigliano's plea agreement because "Forbes's claim . . . is based on a self-created fiction" and that "Forbes is the only one who believes that Corigliano has breached his plea agreement and testified falsely. Docket 2466, at 4. This Court also denied Forbes' motion to cross-examine Corigliano about certain alleged breaches of his plea agreement. Docket 2466, at 10-11. And this Court denied Forbes' motion to preclude cooperating witnesses who pled guilty from mentioning that this Court, not some other court, will be sentencing them. Docket 2477, at 11-12. Forbes has offered no basis to reconsider those prior rulings. |
| B.3 | Same as above. |
| B.4 | The Government's summation and rebuttal were proper for the same reasons noted in B.2 above. |
| C.1 | The Government's summation and rebuttal arguments were proper. As the very authority cited by Forbes confirms, "'[u]se of the words "liar" and "lie" to characterize disputed testimony when the witness's credibility is clearly in issue is ordinarily not improper unless such use is excessive or likely to be inflammatory.'" Floyd v. Meachum, 907 F.2d 347, 354 (2d Cir. 1990) (quoting United States v. Peterson, 808 F.2d 969, 977 (2d Cir. 1987)). Given defense counsel's scathing portrayal of Corigliano as a "serial liar," a "practiced liar," and a "con man," as well as defense counsel's portrayal of Silverman's testimony as "preposterous," "stupid," and "insult[ing] to the intelligence of a four-year-old," TTTr. 3477, 3479, 3495, 3497, 3507, 3525-3526, 3537, 3558, 3568, 3575, the Government's characterization of Forbes as a liar because he unequivocally denied under oath during trial the testimony of Silverman, Michael Monaco, Greg Danilow, and Jan Davidson was hardly excessive or inflammatory. Furthermore, this Court properly |

| | |
|---|---|
| | ruled that evidence of Forbes' asset transfers and the false testimony he gave at the first trial concerning the legal advice he received from Danilow was admissible to prove Forbes' consciousness of guilt.  Docket 2466, at 5-8; TTTr. 586-587.  Forbes has offered no basis to reconsider those prior rulings. |
| D.1 | The Government's summation and rebuttal arguments were proper.  The evidence at trial showed that Anne Pember received more than $600,000 in benefits that Forbes personally authorized -- benefits that Pember neither expected nor (save one) sought.  TTTr. 924-940; TTTr. 3441-3444.  Given that Pember held the keys to the fraud, it was fair comment for the Government to describe Forbes' extraordinary gesture as a "payoff" to keep Pember in the conspiracy.  See, e.g., Myerson, 18 F.3d at 163 (holding that prosecutors are entitled to "broad latitude in the inferences they may suggest to the jury during closing arguments, provided they do not misstate the evidence" (internal quotation marks omitted)); United States v. Smith, 778 F.2d 925, 929 (2d Cir. 1986) ("we have repeatedly held that final arguments of counsel may be vigorous and robust if based on the evidence in the record"). |
| D.2 | Same as above. |
| D.3 | Same as above. |
| D.4 | The Government's summation argument was proper.  Pember's testimony and other evidence at trial proved that she was not a "key employee" of CUC for any legitimate business reason, and would not be a key employee at Cendant for any legitimate business reason following the CUC/HFS merger.  TTTr. 895-942 (Pember testimony); TTTr. 1246-1250 (Silverman testimony); TTTr. 1549-1555 (Forbes' letters to compensation committee concerning "key" employees, none of whom is Pember). |
| D.5 | The Government's rebuttal argument was proper.  The evidence at trial proved that Monaco wanted Pember removed from the consolidation function long before the consummation of the CUC/HFS merger, and that Forbes nonetheless began lobbying Monaco in September 1997 to retain Pember in that function. |
| D.6 | The Government's summation argument was proper.  Pember testified at trial that Forbes told her in London in November 1997 "don't worry, we'll take care of you."  TTTr. 893-895, 924, 940.  Why Forbes reassured Pember that she would be "taken care of" was a proper subject |

| | |
|---|---|
| | for comment by the Government.  <u>See</u>, <u>e.g.</u>, <u>Myerson</u>, 18 F.3d at 163; <u>Smith</u>, 778 F.2d at 929. |
| E.1 | The Government's summation argument was proper.  The Government did not ask the jury to treat Pember's and Corigliano's guilty pleas as evidence of Forbes' guilt.  Moreover, the Government specifically asked the jury "look at the testimony of Cosmo Corigliano and Anne Pember carefully" and reiterated that Corigliano was "a criminal."  TTTr. 3468, 3626.  Moreover, this Court has instructed the jury "to draw no conclusions from the fact that a prosecution or a defense witness pled guilty to similar charges" and that such evidence "may not be used by you in any way as evidence against or unfavorable to Mr. Forbes."  Final Jury Charge IV.P |
| F.1 | The Government's summation argument was proper.  In denying Forbes' motion to preclude Kevin Kearney's testimony at the third trial, this Court noted that "[o]nce again Forbes relies upon his self-created fictional portrayal of a witness's testimony as grounds for the relief he seeks" and that Judge Thompson has "summarily rejected" similar claims by Forbes "'because on each of the repeated occasions when [Forbes] raised it the court . . . concluded that he failed to demonstrate that [Kearney] gave perjured testimony . . . [and] continuously repeating the assertion does nothing to make it meritorious."  Docket 2476, at 5-6.  Forbes has offered no basis to reconsider this prior ruling. |
| F.2 | Same as above. |
| F.3 | Same as above. |
| F.4 | The Government's summation argument was proper.  Kearney testified at trial that Corigliano and, before that, Bell would instruct Kearney to make unsupported topside adjustments to meet Forbes' directive that earnings per share be a certain number.  TTTr. 765-766, 770, 773.  Thus, Kearney corroborated Corigliano. |
| G.1 | The Government's rebuttal argument was proper, for substantially the same reasons set forth in B.2 above.  In addition, defense counsel's arguments on this issue were very misleading in light of the testimony of SEC employees during the first trial that the settlement the SEC obtained from Corigliano was favorable to the SEC and was more than the SEC likely would have received had it litigated its disgorgement suit to a final verdict.  FTTr. 13522-13531 (James Kidney), FTTr. 13600-13611 (David Frohlich). |

| | |
|---|---|
| G.2 | The Government's rebuttal argument was proper.  Defense counsel excoriated Corigliano as having "received extraordinary benefits in three agreements that you have a right to find sickening" and being a "$5 million witness."  TTTr. 3477-3478.  Defense counsel also claimed that Corigliano would lie to save his "millions" of dollars in assets," that he "has no limits to buy his freedom and to keep his assets," and that "he's been rewarded" for his supposed lies during this trial.  TTTr. 3480, 3483.  It was wholly proper to contrast the "benefits" that Corigliano purportedly received with Forbes' own admissions (without objection) that he "hadn't paid a dime to the SEC, much less $14 million," that he  "wouldn't be surprised" if the SEC had already laid claim to all of his assets, and that he had no agreement with the SEC prohibiting him from dissipating his assets.  TTTr. 3321-3322.  Whereas Corigliano had already settled with the SEC, Forbes had not, giving him a powerful financial incentive to lie.  See Docket 2477, at 2 (noting "Forbes's assurance that there would be no objection" if the government "question[ed] Forbes about the fact that, if he is convicted, he . . . would be 'wiped out' financially"). |
| G.3 | The Government's rebuttal argument was proper.  The Government was merely placing into its proper context Corigliano's recollection that he disclosed to analysts individually, rather than in an analyst conference call, as Forbes contends, that CUC was planning to set a $100 million merger reserve for its acquisition of Ideon. |
| G.4 | The Government's summation and rebuttal arguments were proper, for substantially the same reasons set forth in B.2 above. |
| H.1 | The Governments's summation and rebuttal arguments were proper.  Monaco was not asked during the first trial whether he had such a conversation with Forbes, and when asked during the second and third trials whether he had such a conversation with Forbes, Monaco testified that he did.  TTTr. 416-431 (cross examination); TTTr. 665-674 (redirect examination); TTTr. 715-721 (re-cross examination); TTTr. 727-729 (re-redirect examination).  Apart from Forbes' self-serving denials, Forbes has presented no evidence that Monaco's testimony is even mistaken, let alone perjurious.  Contrast United States v. Wallach, 935 F.2d 445, 447 (2d Cir. 1991).  Forbes' attempt to liken Monaco's testimony to that of the perjurious witness in Wallach insults not just Monaco but the prosecutors who tried this case and this Court. |

| | |
|---|---|
| | <u>Wallach</u> involved the reversal of "a conviction on the ground that the prosecution should have known that a Government witness's trial testimony was false." <u>United States v. Wallach</u>, 979 F.2d 912, 913 (2d Cir. 1992). During the <u>Wallach</u> trial, defense counsel "placed before the government and the court powerful evidence that [the witness] was lying." 935 F.2d at 457. Here, in contrast, far from proffering "powerful evidence" contradicting Monaco's testimony, Forbes has offered only his self-serving denials, which the Government reasonably believes are perjurious. |
| H.2 | The Government's rebuttal argument was proper. Far from "personal[y] vouch[ing]" that Monaco was not asked certain questions until the second trial, FObj. at 13, the Government was commenting on the evidence presented to the jury at **this** trial. TTTr. 416-431 (cross examination); TTTr. 665-674 (redirect examination); TTTr. 715-721 (re-cross examination); TTTr. 727-729 (re-redirect examination). For example: |
| | Q. Did any lawyer, in that 2004 trial, ask you any questions about whether you had a conversation with the defendant in September 1997 in which the defendant lobbied to keep Ms. Pember in the consolidation? |
| | A. No. |
| | Q. So you were never asked about it in that 2004 trial? |
| | A. That's correct. |
| | TTTr. 666. |
| I.1 | The Government's summation argument was proper. In Docket 2477,at 4-6, this Court properly denied Forbes' motion to preclude GX 11007 (the Botti review); Forbes has offered no basis to reconsider that ruling; and the Government's challenged remarks were fair comment on, and drew reasonable inferences from, GX 11007. Furthermore, Pember testified that she was able to slip shoddy accounting by E&Y, and Corigliano testified that to keep the fraud concealed following the CUC/HFS merger, it was crucial to keep E&Y as the auditor of at least CUC's side of the business. TTTr. 966-979, 987-1007 (Pember); TTTr. 1687-1689, 1725-1726 (Corigliano). |
| I.2 | The Government's summation argument was proper. This Court properly rejected Forbes' repeated claims that testimony concerning E&Y would constitute a constructive |

| | |
|---|---|
| | amendment of, or prejudicial variance from, the redacted superseding indictment. Docket 2477, at 4-8. Forbes has offered no basis to reconsider those prior rulings. |
| J.1 | The Government's summation and rebuttal arguments were proper, for substantially the same reasons set forth in B.2 above. |
| J.2 | This Court properly excluded the purported Government "admissions" that Forbes cites in this objection. Docket 2532, at 1-3; TTTr. 3172. Forbes has offered no basis to reconsider those prior rulings. Moreover, Forbes waived this objection by declining to call former AUSA John Carney as a witness, who, as this Court noted, would then have had an "opportunity to explain himself." TTTr. 2919; see TTTr. 2918-2922. |
| K.1 | The Government's summation and rebuttal arguments were proper. As noted in C.1 above, this Court properly admitted evidence of Forbes' asset transfers and the false testimony he gave at the first trial concerning the legal advice he received. Docket 2466, at 5-8; TTTr. 586-587. Forbes has offered no basis to reconsider those prior rulings. |
| L.1 | The Government's summation and rebuttal arguments were proper. This Court properly admitted Davidson's and Silverman's testimony concerning Forbes' manifest familiarity with financial matters concerning CUC. Tellingly, Forbes did not even object to this aspect of Silverman's testimony when it was elicited at trial. TTTr. 1222-1228. This Court also overruled defense counsel's Rule 701 objection to this aspect of Davidson's testimony when it was elicited at trial, striking only her testimony concerning what Forbes and her husband "knew" as opposed to whether Forbes answered questions about CUC's financial performance. TTTr. 96-98. |
| L.2 | The Government's summation and rebuttal arguments were proper. Tellingly, Forbes did not even object to this aspect of Davidson's testimony when it was elicited at trial. TTTr. 144-152. |
| L.3 | The Government's summation and rebuttal arguments were proper. The Court properly overruled Forbes' objection to Casper Sabatino's testimony on this subject. TTTr. 2943-2945 (overruling objections based upon Rule 701(b) and (c)). The testimony was "not based on scientific, technical, or other specialized knowledge," and it went Sabatino's state of mind, making it "helpful to a clear understanding of the witness' testimony." Fed. R. Evid. |

|       | 701(b) and (c).  Nor did the Government use this testi- mony as "substantive evidence" of Forbes' guilt during its summation and rebuttal, FObj. at 16.  Quite the contrary:  the Government asked the jury to consider Sabatino's "state of mind" when he "decided to blow the whistle" on the massive fraud.  TTTr. 3625-3626. |
|-------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| M.1   | The Government's summation and rebuttal arguments were proper.  This Court properly denied Forbes' motion to preclude evidence and argument concerning shareholder losses because "this evidence is highly probative and relevant to the issue of materiality" and because "this evidence is relevant to counter Forbes' claim that CUC was a good company with excellent cash flow that was never on the verge of bankruptcy."  Docket 2476, at 12. This Court also denied Forbes' motion for a mistrial raising essentially the same objection.  TTTr. 464-465. Forbes has offered no basis to reconsider those prior rulings.  Moreover, both Monaco and Silverman testified that Cendant shareholders suffered more than $14 billion in losses the day after Cendant publicly disclosed the massive fraud.  TTTr. 410, 1281. |
| M.2   | Same as above.  In addition, this Court properly de- clined to give the "curative" instruction proposed by Forbes, which misstated this Court's prior ruling con- cerning the permissible use of evidence of shareholder loss.  TTTr. 314-317.  Moreover, this Court instructed the jurors that they could not consider such evidence in assessing Forbes' knowledge or willfulness:  You have heard evidence about alleged shareholder losses and the drop in Cendant's stock price after the public announcement of alleged accounting ir- regularities.  You may not consider this evidence at all with respect to the question of whether the defendant was a knowing and willful participant in the alleged conspiracy or whether the defendant knowingly and willfully engaged in any wrongdoing.  Final Jury Charge IV.G. |
| M.3   | Same as above.  In addition, this Court properly re- jected Forbes' efforts to preclude admission of evidence or argument concerning Forbes' compensation, which was relevant to "his knowledge, intent, and motive to commit the charged fraud," Docket 2478, at 1, and which poses only a "minimal danger of unfair prejudice to Forbes in the form of juror anger or class resentment."  Docket 2476, at 12; see Docket 2478 at 2.  Forbes has offered no basis to reconsider those prior rulings. |

| | |
|---|---|
| N.1 | The Government's rebuttal argument was proper.  This Court properly denied as "completely baseless" Forbes' motion to preclude the admission of GX 616.  Docket 2477, at 9.  Forbes has offered no basis to reconsider that prior ruling. |
| N.2 | The Government's rebuttal argument was proper.  As explained more fully below, there is no material contra-diction between Silverman's testimony and the testimony from the first trial of Scott Forbes that Forbes belat-edly proffered during this trial.  Furthermore, this Court properly excluded the excerpts from Scott Forbes' testimony from the first trial because Scott Forbes was an available witness.  TTTr. 2924-2925.  Forbes has offered no basis to reconsider that prior ruling. |
| O.1 | The Government's rebuttal argument was proper.  The Government relied upon Part II.C.2.b.i of the Final Jury Charge; this Court overruled Forbes' objection to that charge; and Forbes has offered no basis to reconsider that prior ruling. |
| P.1 | The Government's rebuttal argument was proper.  In summation, defense counsel asked the jury whether, based upon Forbes' appearance "on the stand," they could think that "he's the kind of a guy that goes into the office and focuses on the details."  TTTr. 3491.  Defense counsel also argued that, although Forbes was "good at something," it was not managing CUC:<br><br>    But even the board of directors didn't want him running the company on a day-to-day basis.  And he didn't run the company.  He had the title of CEO. He was the face of the company to the world.  And he would go out there and he would talk about it.<br><br>TTTr. 3491.  Defense counsel also emphasized that Forbes was "away a lot," "love[d] to play golf," and was "not running the day-to-day operation of the company."  TTTr. 3538.  And defense counsel called Forbes "a thinker" who "[i]magines."  TTTr. 3575. |
| P.2 | Same as above.  Moreover, defense counsel addressed this issue in his summation:<br><br>    Now the government says, well, he knew the numbers. Ladies and gentlemen, knew the numbers.  Look at any one of those press releases at the quarter.  It has a page of numbers on the front.  Anyone could know those numbers.  You could read it three times and you could walk out and you could say here are the numbers for the company.  Walter got the prod- |

| | |
|---|---|
| | uct of the audits.  He got the product of these family of companies sending their materials in and at the end of the month after everybody put it together and reviewed it, he had the numbers. We're not saying Walter doesn't know the numbers. Of course he knows the numbers.  He knows the numbers of the company.  They are presented there. They are written there.  They are publicized.  What we're saying is he didn't know the financial manipulation behind those numbers.  And no one except Cosmo said he did. <br><br>TTTr. 3491-3492. |
| Q.1 | The Government's summation and rebuttal arguments were proper.  This Court properly denied Forbes' motion to preclude the expert testimony of Brian Heckler.  Docket 2476, at 2-5.  Forbes has offered no basis to reconsider that prior ruling. |
| R.1 | The Government's summation was proper, for substantially the same reasons set forth in M.1 above.  In addition, there is no dispute that Forbes was CEO and Chairman of CUC during the massive fraud, and as CEO and Chairman of CUC, Forbes had a duty "to disclose truthfully . . . and to tell the truth" about CUC's financial condition. Docket 2476, at 13.  Finally, pursuant to Forbes' request, this Court gave the jury a detailed "No Respondeat Superior Liability" charge, which instructed the jury that they "may not vote to convict the defendant based solely on the position or positions that he held at CUC."  Final Jury Charge II.B. |

**b.  Forbes' latest, baseless perjury claim.**

Forbes claims that the Government "either knows, or should know, that Mr. Silverman's testimony is false" concerning whether Forbes suggested to Silverman in or about February 1998 that Corigliano be "brought back into the accounting function to help Ms. Pember." FObj. at 17.  To support this latest accusation that a witness testifying against Forbes has committed perjury, Forbes points to Scott Forbes' testimony from the first trial.

But it is hard to see how Scott Forbes' testimony contradicted Silverman's on a material matter in this case.

Judging from the portion of Scott Forbes' testimony that Forbes improperly proffered under Fed. R. Evid. 804(b), the only possible tension between Scott Forbes' testimony and Silverman's concerns Cosmo Corigliano's role in CUC/Cendant accounting in February 1998. Silverman testified as follows:

> Q. Did you have a telephone conversation with the defendant in February 1998 regarding Ms. Pember's role in the consolidation?
>
> A. Yes.
>
> Q. Was anyone else on the phone?
>
> A. No.
>
> Q. What did you say in substance to the defendant about Ms. Pember?
>
> A. I had received reports during the period after the close of 1997 in early 1998 from Mike Monaco and Scott Forbes, who was controller, that we, Cendant, were having difficulties in getting financial information from CUC that was required in order to file the Form 10-K on a timely basis and they were quite concerned about that issue.
>
> Q. Why was there a concern about the issue of filing a 10-K on time?
>
> A. If you don't file your 10-K on time, only bad things can happen to public companies. One is that you are not able to access the capital markets to raise money and sell stocks or bonds. Two is probably couldn't do a transaction like an acquisition or certainly couldn't use your stock to do an acquisition, I should say. Three, it is a very bad warning sign for investors that something bad must be happening, that the company controls or budgets or systems are not appropriate, so it is really very bad thing for public companies.
>
> Q. After you told the defendant that Ms. Pember is an impediment to filing this 10-K on time or could be, what was the defendant's response?

-15-

A.   Walter Forbes suggested that he agreed that filing the 10-K late would be a very bad idea.  Suggested that we bring Cosmo Corigliano back into the financial mix, so to speak, to try to accelerate the information flow.

Q.   Once the merger closed, wasn't Mr. Corigliano in the financial mix?

A.   No.  He was really relegated more to other roles, including looking at consolidation issues in Europe.

Q.   After the merger closed, then, did he have any financial reporting responsibilities?

A.   Not that I recall.

Q.   Did the defendant's proposal basically move Mr. Corigliano back into a financial reporting function?

A.   Yes.

TTTr. 1252-1254.

The portions of Scott Forbes' prior testimony that Forbes belatedly proffered, in turn, discuss Corigliano's role in providing last-minute changes to Scott Forbes concerning the former CUC's revenues, just a day before Cendant was to announce its earnings:

Q.   Did you ever discuss the differences in these numbers that are reflected on Government Exhibit 376 with Mr. Corigliano?

A.   Yes.

Q.   When did you do that?

A.   On February 3rd.

Q.   Okay.  And when on February 3rd did you discuss these changes with Mr. Corigliano?

A.   After the Audit Committee meeting.

Q.   All right.  And was anyone else present for your conversation with Mr. Corigliano about the changes?

A.   Henry Silverman and Michael Monaco.

*   *   *

Q.   All right.  Now, at this point when you're talking with Mr. Corigliano after the Audit Committee meeting

-16-

on February 3rd, how much time do you have left before you're supposed to get your earnings release out?

A.   The earnings release was due on the morning of February the 4th, so about 20 hours.

Q.   All right.  And did you consider putting that deadline off and releasing your earnings release at a later date?

A.   No.

Q.   Why not?

A.   We had already announced that earnings would be released on the 4th of February.

Q.   Okay.  So, here you are, you now had your numbers from Mr. Corigliano that are different than your draft earnings release.  What did you do?

A.   Well, still at the meeting I told Henry Silverman, with Cosmo Corigliano and Mike Monaco present, that it was going to take a good amount of work and we probably would have to work through the night to update the earnings release for these changes.

FTTr. 5732-5735.

Scott Forbes' testimony thus shows that Corigliano in early February 1998 provided last-minute changes to certain financial information concerning the former CUC divisions, and that the fact of these last-minute changes were discussed in Silverman's presence.  That hardly contradicts Silverman's testimony, however, that to the best of his recollection, Corigliano had no financial reporting responsibilities following the CUC/HFS merger until Forbes "move[d] Mr. Corigliano back into a financial reporting function" to allay Silverman's concerns about Anne Pember's timeliness in providing necessary financial information for preparing and filing Cendant's Form 10K.  TTTr. 1254.  If anything, Scott Forbes' testimony corroborates Silverman's, by

showing that, by the first week of February, Corigliano was at least unofficially "back" in "a financial reporting function."

Moreover, Forbes never confronted Silverman with any purported tension between Silverman's recollection and the information available to defense counsel through Scott Forbes' prior testimony.  No doubt this is because Silverman's testimony was corroborated by other witness, including Corigliano himself:

> Q.  Mr. Corigliano, when the merger agreement was announced in May of 1997, what did you think your job would be once the merger closed in December 1997?
>
> A.  I thought I was going to be the CFO of the old CUC businesses.
>
> Q.  Did that happen?
>
> A.  No, it did not.
>
> Q.  Do you recall a meeting that you had with Mr. Monaco in the summer of 1997 regarding your future role at Cendant?
>
> A.  Yes, I do.
>
> Q.  Where did that meeting take place?
>
> A.  It happened in HFS offices in New York City.
>
> Q.  Who was present?
>
> A.  Scott Forbes, Mike Monaco and myself.
>
> Q.  What did Mr. Monaco say to you at that meeting?
>
> A.  He indicated that he thought it would be a good idea if I didn't have any financial responsibilities once the merger was complete and he just thought that would be a good way for him to take over the financial area.
>
> Q.  What was your reaction -- your response to that?
>
> A.  I was surprised.  I didn't think that's what he was going to say, so I was surprised.
>
> Q.  For how long did you remain as the chief financial officer of CUC?
>
> A.  Through the completion of the merger which happened in December of 1997.

TTTr. 1689-1690.

Corigliano also testified that by October 1997, he under-
stood that he "wasn't going to have any responsibility in the
financial area at all with respect to Cendant" and that once the
CUC/HFS merger closes, he "did not" have "any financial reporting
job" at Cendant.  TTTr. 1695-1696.  And Corigliano testified
that, although he had no formal role in Cendant's accounting
during February 1998, he was helping Anne Pember close out the
prior year:

> Q.  Mr. Corigliano, I would like to take you forward
> now to February 1998.  Had the merger closed at that
> point?
>
> A.  Yes, it had.
>
> Q.  What was the name of the newly combined company?
>
> A.  Cendant.
>
> Q.  What was your position at Cendant?
>
> A.  I was responsible for the international operations.
>
> Q.  Now did you have an official financial role in
> February 1998?
>
> A.  No, I did not.
>
> Q.  Did you have an informal financial role?
>
> A.  Yes, I continued to help Anne close out the 1997
> year with respect to the audit.
>
> Q.  And when was the 10-K for the 1997 year filed,
> approximately?
>
> A.  Approximately March 31st.

TTTr. 1700.

Moreover, that Forbes waited until after the close of the
Government's case-in-chief even to raise this issue speaks
volumes about the collateral nature of any attack on Silverman's

-19-

credibility that Forbes intended to mount using Scott Forbes' testimony from the first trial.  In any event, Forbes has presented no evidence, much less "powerful evidence," that Silverman's testimony was even mistaken, let alone perjurious.  <u>Wallach</u>, 935 F.2d at 447.  Indeed, when invited by the Government to explain how Scott Forbes' anticipated testimony might contradict Silverman's on a material matter so as to merit the issuance of a subpoena under 28 U.S.C. § 1783, Forbes expressly declined to make such an application.  TTTr. 2897-2898, 2922-2924.

<u>**CONCLUSION**</u>

For these reasons, the Government respectfully requests that Forbes' objections to the Government's summation and rebuttal arguments be overruled and his motion for a mistrial denied.

Respectfully submitted,

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice


MICHAEL MARTINEZ
Federal Bar Number phv0243
CRAIG CARPENITO
Federal Bar Number phv0244
MARK E. COYNE
Federal Bar Number phv01079
NORMAN GROSS
Federal Bar Number 24933
Special Attorneys
U.S. Department of Justice

Bridgeport, Connecticut
Date:  October 30, 2006

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this day I caused to be served a copy of the Government's Opposition to Forbes' Blunder-buss Objections to Government Closing Arguments and Motion for Mistrial by email on:

> Barry S. Simon, Esq.
> Williams & Connolly LLP
> 725 Twelfth Street, N.W.
> Washington, D.C. 20005-5901
> (202) 434-5005
> bsimon@wc.com

_____
Mark E. Coyne

Dated: October 30, 2006
       Bridgeport, CT