# EXHIBIT 11 continued

Mark Gerber
Roger _____
Susan _____
Other soc law
yes

(NYC) Cosmo Corigliano
Alan Friedman  5/14/01

He was always amazed that E & Y never asked about the in-transits. App. some staff person asked at a lower level, but it was answered i a way that allowed it never to get to him or AF.

Never discussed this 3-month lag c Ken or Mark R. It was a problem bec the no. was growing.

Kim = Internal Audit.

They did discuss cancel curves. At one point Kim did a report on this, Stu B. was upset bec Ken W wd get it & it wd show the problem. But Ken never said anything

wh. were

These reports, discussed at an Audit Committee meeting, = the real internal reports re cancellations, which they never told E&Y they had.

She concluded the reports (that E & Y didn't know about) were pretty accurate.

Kim reported to CC as Comptroller (& later still when he became CFO). She was in Nashville bec. her predecessor had had a staff there, they didn't want to start from scratch in Stamford. Not to keep her far away.

G3-01689

[margin calculations:]
16.5
13
49.5
16.5
214.5
...
130
-115
22.5
214.5
225
439.5  (540)

205
107
382
3
99.4

550
.075
275
385
41,250

(83)
41
38
20
94

112
.3
33.6
94
.75
470
658
7050

250
83
-36
94
(47)
10
37

32
365
30
10,950
12.7
.55
635
635
69.85

6
.5
32.
325
357.5

He was surprised at how definite & firm Rabinowitz was in defending the Falcon reserve no. on 3/6/98. He cd easily have been more in CYA mode. He & WS smiled at each other.

[margin: DNR if AP was here.]

At some point, Ken & Mark came to him & sd, SAD is over that threshold — they so we need to bring it down by X. They went over a list. As it turned out, they got it down, so they didn't need to worry.

He understood, between 3 & 5% on H SAD = worrisome; over 5% is a problem.

He DNR what solved the problem specifically. He gave them additional info + help the problem. But he DNR that they made anything up that was new to get them past this. But they were looking for help to help them explain things away.

Ken W. tried to find a successor who wd allow Ken to remain involved. Rejected someone (whom cc had met) — app. on this ground. Ken sd, nothing will change, so cc was never concerned about this. Ken sd, he wd have influence over Mark, cc wdn't notice any difference. In effect he sd, Mark will sign the report but other things will be the same. DNR that he sd, I'll still be in charge. But he sd he wd still be involved, he wd have influence over Mark, so things will be seamless.

[margin: ["Bruce"] Mantia (ph.)]

CWC — one of the top 3-5 audits in the Stamford office of E+Y.

[margin: G3-01690]

First met Ken interning at E+Y, maybe 1981. KW was then a senior, maybe a manager when CC went to CWC. (Manager then = one step away from a partner.

KW considered academically inclined, good on technical stuff. At one time, was the technical person for the office, or the region. Not particularly known as a rainmaker, a salesman; not particularly a people person.

But it wasn't that he wd find actual technical excuses for things. He was good at figuring out how to write things what was needed there, etc. — wd re-read things many times, often rewrite them or at least tweak them, etc.

They had drinks after work, etc. But otherwise they didn't socialize (except once when KW had separated from his wife & he went on an outing c̄ CC's family).

They were always talking about building cushions for tax reserves; & also "miscellaneous reserves." Stu talked, + Phil, who acc. to Stu sd, you shd have cushions for a rainy day. CC never talked to Phil.

Ken W. encouraged them to gradually increase their "miscellaneous reserve" account. (this = an account they had). Stu resisted this bec he didn't want

G3-01691

EY to know *where* this sort of reserve was.

EY documented the misc reserve account as one for unexpected liabilities, etc. — maybe within the spirit of GAAP (Roger P)? But SB just viewed it as a slush fund.

At one pt KW sd we need a laundry list of things that this reserve cd be for — potential liabilities, to justify reserve.

DNR what happened to this reserve and guess, at some pt it became so small EY didn't care about it. Was only $5 or 6 million?

Wherever they cd charge to special services (acquisitions, etc.) rather than the audit (wh. hit the bottom line), they moved. Special services = hourly charges, not a flat amount. DNK if they padded their hourly charges — they just paid the bills they got. Last couple of years audit fee = ~$1M; total billings (including tax) maybe ~$3M, or close to it at least.

① Certain features
② Moth vs. others
③

Anyway, not much of this.

They did some MIS, but not much; DNR any consulting? Basically audit, acquisitions, + tax.

G3-01692

<u>Ken</u> once asked him for a pre-payment of part of the audit fee, so the EY office wd make its number. Then they did the same thing every year -- they had to just to stay even -- the number even got bigger, till it was $200-300K.

They (EY) were on a cash basis. But still, this = like accrual things.

When it was apples + oranges, they (E wdn't take audit expenses + mislabel them as special services so that the payment wdn't hit the P&L. But if it was apples + apples (e.g. in billing for the Sanvan calendarization, it cd be <u>either</u> for the audit or the merger) they wd pull expenses into the merger expenses.

$1m at $250/hr. = 4,000 hours.

EY charged ~$1m us connection w/ the Cendant merger. On 4-5 months we agree this seems like a lot.

Ed Colson = the pooling expert at national office of EY.

The last two EY bills they asked CC to sign off on so they wdn't have to go through HFS.

They billed $250k for the Cendant reserve. Ken + Mark probably spent more time on this than CC + AP. Process went from June or July 1997 to Sept or Oct 1997 -- but then it became part

G3-01693

(YE) re.,

of the audit, & the justification of
~[the establishment of] the reserve = part of the audit. Ken
& Mark wd talk to them, to get
info re justifying the size of the
reserve (not the takedown of it).

(Ken)
He wd take what they sd, but wd
embellish it, put it in the right way
etc. There were no details to give
him, so it's not clear what they
based it on.

CC 10043 = CC's first attempt at
listing the expenses for a certain
~~merger~~ reserve. He gave this to AP,
maybe KS; AP then put it in her
format, c̄ some of her own thoughts
& that's the doc. EY ~~saw~~ saw (the
~~DNB~~ EY saw this one).

He hasn't talked to KW since
4/98?.

Marc (?) Rabinowitz                  (?1983 audit?)

First remembers MR from 1993 audit
though maybe they were at EY together

~~Had~~ the impression MR was not as
bright or as reflective as KW, but
was more practical.

MR was a little more vocal than KW. He
& MR had ~~much~~ less of a personal rel.
than he had c̄ KW. He had known KW much
longer. But no conflicts c̄ MR.

G3-01694

(for Cendant)

He & KW talked about the possibility that KW could become the audit partner ~~when~~ cd rotate back on after a couple of years. The idea = that it's the same team reconstituted they can work together again. DNR discussing this in terms of KW's own career prospects.

[This = early 1998]

MR at the end of the 2d year sd he was disappointed c̄ AP, sh wasn't being cooperative, esp. c̄ documents. MR was very emphatic that she was incompetent. He was surprised that MR was so wrong about this, but it must be bec. AP was the one who had to hold EY off? It's not that he thinks MR was being disingenuous & really shd not have expected to get the documentation.

Caspar first tried his hand at the 1/97 accounting. It was completely unusable, so CC had to do it again from scratch. Then it was extensively reviewed, vetted, altered? by EY?

He DNK much about Simon Wood. The quarters memo = by Simon.

[The quarters memo]

KW + MR said, they have to be able to say litigation went down as integration went up. CC sd, I can't doc that. They sd, can you say it.

G3-01695

he said    (202) 942-4797

The memo documents their summary of what cd be possible.

What is fictitious about this (i.e., what EY knew was fictitious) = the suggestion that the increased integration costs cd be tracked in this way, that they were reallocated quarter by quarter as explained here. They knew we hadn't done this.

DNR if he talked to us about the memo? He did talk to AP.

CC sd, since we think it was ratable let's just make it ratable. So then wrote the memo reclassifying approx $10m - $15m per quarter.

This was designed to avoid nondisclosure issues in the first 3 q's. This way, in any one quarter, they're always using the entire litigation + integration for that quarter -- so they don't have to say there's unused reserves, wh. they have to release.

He told them they had no records of this, i.e., if they looked at the GL account they wdn't see this the integration costs.

Cendant 000673 - EYS 12/97 002482: EY sd they needed something like this

Caparelli wasn't happy working for KW -- felt he had been given a bad deal re becoming a partner; finally became one later. But he said a few times he wanted to leave EY, was having trouble finding a job bec he'd stayed too long, etc. Used to joke, don't you have a job for me at CUC, showed CC a resume, etc; thinks he wd have taken a job if CC had offered one.

He wanted to help Cap., thought he was brighter than many people thought he was, but thought he wasn't the brightest so didn't want to hire him and also thought he wdn't fit in at CUC bec. people thought he wasn't that bright. E.g. Amy Lipton, who dealt c̄ him re litigation stuff.

KW was supportive of Cap. But Cap blamed him for his stalled career -- for not being aggressive enough.

Joe asked more q's than the rest of the group. Was more skeptical. He tended to make a joke of it, & CC was happy to leave it on that level.

Profit-sharing accrual was always aggressively reserved for at BCI. He flew out there c̄ Ken. An EY manager out there had made an issue of it. Ken just told the manager he was wrong.

G3-01697

(This may have been during 1/31/94 audit)

This = while CC is still Comptroller
It was overstated, but the Q. is
now much; not sure whether the Birarag
was right or not.

Henry was very interested in spinning
off software bec. of the accounting
benefits it wd generate. EY was actually
the one who opposed this -- sd it
wd create pooling issues, so ulti-
mately they didn't do it.

G3-01698

Mark Gerber
Susan —
Roger —
Other SEC lawyer

Cosmo Corigliano
Alan Friedman

After-tax had to be under 5%. Pre tax didn't so much matter. He never tested what they wd do if they can't get under 5% after tax.

EYS 12/97, 000849 – 860: EY papers on 12/31/97 audit differences.

EYS 12/97 000850: handwriting is Sim Wood's, except "and Kirk Shelton, President, CMS," is added in MR's handwriting. Evidently MR talked to KS about this. KS wd just have said, fine

Why isn't the $10 million they objected to i the takedown of the Ideon reserve included i the SAD? CC: vaguely remembers they argued, bec. this related to a below-the-line entry?

At first, the discussion c EY was whether various elements of the proposed Cendant merger reserve were within the rules. Then, as they got into the audit EY sd, we need memos on these matters. Anne probably said, why, we talked about all this already. This may be why KW wound up doing the memos himself.

They didn't usually cite rules. Once i a while they wd give him a

copies of ETTF. 94-3(?) or 95-3(?) but it was a joke that CC didn't have the rules in his office, didn't spend a lot of time c them. EY knew that CC was relying on them to keep within the rules.

(see CC's schedule, CC 10431 (11/19/98 meeting c MR & KW))

Kim Ames was upset bc she wanted to be the internal auditor, learned she was going to report to the HFS internal auditor.

CC 10441: CC's schedule for 3/6/98. MR was coming re some tax project, unrelated to meeting c Scott Forbes.

(?? Did CC know in advance what Shelton wd say at the 3/6 meeting)

Then he heard from AP, there wd be a meeting c Scott Forbes that afternoon — so he realized he wd have to get MR out promptly (didn't want him sitting in on a meeting re use of reserves), and he did this.

CC 10443:
3/10/98 -- "Lunch mtg with Ken W." This must be the meeting where KW talked about lack of growth, though he wd have thought it was later. (to KW)

He explained that he, WF, KS, Anny, Sasha were going to set up an office to do deals.

3/8/98: "Dinner meeting re Bank Channel issues." This = the dinner he had to go to when he was doing his document that

weekend.

Stu called a few times afterward, maybe in 6/98, then stopped calling.

In one conv. (after a N/T article quoting WF as saying he was shocked, didn't know what was going on) $B sd WF & KS wd always deny they knew anything.

John Fullmer called & they had lunch. He sd Stu was elated when he saw that Casper sd, topside adjustments started on in 1995.

In 1998, he probably hadn't been to Trumbull in a couple of years.

Closing Conferences -- quarterly.

Informal, basically. First it was just he & Stu; then he & AP. DNR KS or WF being there? They wd come in w/ a list of items, like EYS D 109612, & just talk about them. They wd last only 30-60 mins.

CD-0011005-015: memo EY prepared in an effort to retain a position at Cendant.

G3-01701

He believes EY was aware there were some adjustments made topside at ends of quarters.

They were able to make the adjustments bec. EY never asked for the Comp-U-Car GL at ends of quarters.

What's clear is, they didn't approach it with a critical eye.

He agrees that a typical scenario is as follows:
a) EY says they need CUC to provide a statement
b) CUC makes the statement knowing it's false
c) EY accepts the statement at face value even though circumstances suggest that the statement may be fabricated (e.g., EY originally gets an orange, they say they need a pear, & CUC promptly comes up w/ the pear)

In short, EY never exercised the skepticism required of an independent auditor.

AA Ex. 17 -- something AP & he did based on ~~B~~ EY's request.

G3-01702