# EXHIBIT C

**Cary, Rob**

| | |
|---|---|
| **From:** | Cary, Rob |
| **Sent:** | Monday, October 02, 2006 5:04 PM |
| **To:** | BRIDGEPORT TRIAL TEAM |
| **Subject:** | FW: Proposed Voir Dire |
| **Attachments:** | Voir dire questions for Individuals.doc; Voir Dire Questions for Panel.doc |

**From:** Cary, Rob
**Sent:** Mon 10/2/2006 5:03 PM
**To:** lucia_brooks@ctd.uscourts.gov
**Cc:** Craig.carpenito@usdoj.gov; michael.martinez2@usdoj.gov; Simon, Barry
**Subject:** Proposed Voir Dire

Attorney Brooks:

We attach two documents.

The first document is Proposed Group Voir Dire to be asked of the entire panel of potential jurors reporting on October 4.

The second document is Proposed Individual Voir Dire to be asked of individual potential jurors as indicated.  The Proposed Individual Voir Dire arises from issues raised by potential jurors' responses (or in some cases non-responses) to their questionnaires.

Please note that we have provided Proposed Individual Voir Dire for a number of potential jurors that the Court considered pursuant to the parties' Joint Submission re Potential Jurors of September 27.  We did not have the complete results of that consideration when we prepared the Proposed Individual Voir Dire.  Thus, it is possible that it will not be necessary to use some of the Proposed Individual Voir Dire we have submitted.

We have also provided Proposed Individual Voir Dire for the potential jurors listed in our e-mail of September 29, who we have asked be excused before October 4.

Of course, it is possible that group voir dire of the entire panel will also give rise to the need for additional individual voir dire of some potential jurors.

Respectfully,

Rob Cary

## **General Voir Dire Questions for Entire Panel**

1. Has anyone heard, read or seen anything about this case since the time that you answered your questionnaire?

2. Does anyone need to update or change any information provided on their questionnaire – and if anyone needs to review their questionnaire again in order to respond to this question, we can provide a copy?

3. Is there anyone who believes that if accounting fraud is occurring within a corporation, the CEO should know of it?

4. Is there anyone who believes that a CEO should be held responsible for accounting fraud occurring during his tenure as CEO regardless of whether he actually knew about it?

ALI, #284

Q35. We had difficulty reading your writing on this question. Could you explain what you meant to be saying here?

Q37. We had difficulty reading your writing on this question. Could you explain what you meant to be saying here?

Q38. We had difficulty reading your writing on this question. Could you explain what you meant to be saying here?

Q47. We had difficulty reading your writing on this question. Could you explain what you meant to be saying here?

Q67. You state that you do some volunteer work with the police. Can you explain what type of volunteer work?

Q71. We had difficulty reading your writing on this question. Could you explain what you meant to be saying here?

Q92. How would you cover your living expenses if you were here each day rather than driving your cab?

K. ANDERSON, #52

Q19.  You state that you took some courses in the criminal justice program at Housatonic Community Tech College.  Do you want to work in law enforcement?

Q31.  You state that you were laid off, fired or asked to resign from your temp position with the US Postal Service.  Do you have any strong feelings about that experience?

Q64&65.  What do you think of when you think of a prosecuting attorney?  And what do you think of when you think of a defense attorney?[1]

---

[1] This question is appropriate for jurors who indicated either that they watch any of the legal shows which portray prosecutors or defense attorneys, or for jurors who state that they would be more willing to believe the testimony of a law enforcement or other government agent.  We will reference which is the appropriate reason for asking the question by referring either to Q64 & 65 (legal shows), or Q45 (law enforcement/government agent testimony).

<u>ANDREWS, #193</u>

No questions as long as group voir dire does not give rise to follow-up voir dire.

ARMSTRONG, #409

Q21.  What does your spouse do?  Where does your spouse work?[2]

Q80.  You indicate that your father-in-law sued Smith Barney over an account there.  Can you tell me about that?

Q92. Will your employer pay you while you are on jury duty?

---

[2] This second question is appropriate for any juror who indicates that his or her spouse works in the legal, accounting or financial fields.

ATHERLAY, #180

Q11.  Where have you heard of Kevin Kearney?  Is the Kevin Kearney you know from Redding?

Q12.  Do you have any strong feelings about Match.com based on your experience?

Q13. What do you do on your job?

Q29. What government agents do you know and how?  Why do you think you might not be able to consider the evidence impartially?

Q32.  You state that your father was laid off in his last job due to an acquisition.  How did that affect your family and its financial situation?  Do you have any strong feelings about companies that make acquisitions as a result of this experience?

Q59. Which judges and lawyers do you know?  What type of law do the lawyers practice?

Q64&65.  What do you think of when you think of a prosecuting attorney?  And what do you think of when you think of a defense attorney?

BARBER, #411

Q15.  When did you work at Trilegiant?  What did you do for the company?

Q31.  How did you feel about your treatment at Trilegiant?

Q92. Will your employer pay you while you are on jury duty?

BARNEY, #212

Q21.  What does your spouse do?  Where does she work?

Q21.  What type of office work does your daughter Lisa do?  Does she work for a corporation?  If so, which one?

Q13. Are you currently working full time?

Q17.  No answer

Q35. What do you mean when you state "should not be cheated out of pension or health insurance?"  Do you believe the CEO of a company is responsible whenever employees lose their pension or health insurance?

Q92. Will your employer pay you while you are on jury duty?

BOGAN, #218

Q9.   How well do you know Harold Pickerstein?  How often do you see him?

Q21.   Do you know Judge Alvin Thompson?  If so, do you socialize with him?  How often?

Q36.   How were you or a family member negatively impacted by a merger or acquisition?

Q50.   What kind of law does your wife practice?  Where does she work?

Q53.   What do you mean by "respect" when you refer to the accounting profession?

Q92.   Will your employer pay you while you are on jury duty?

BREITWEISER, #423

Q4.  What was your general reaction to what you read about this case?

Q8.  What have you heard about other cases that you considered similar?  Do you understand that this case has nothing to do with any of the other cases you may have heard or read about, and that you must judge this case on its own facts, not based upon anything you may have learned about another case?

Q21. What type of shows does your daughter produce?

Q21. Does your daughter who is a literary agent specialize in a particular type of book or author?

Q21. What type of account executive is your husband?  Where does he work?

Q35. What do you mean when you refer to corporations that operate with greed and lack of consideration for their workers at the lower levels of the business?  Do you believe this is generally true with regard to corporations?

Q45. You state that you would give more weight to the testimony of a law enforcement officer or government agent.  Do your views concerning government agent testimony extend to prosecuting attorneys?  What about defense counsel?

BRINTON, #100

Q8.  What is it about this case that strikes you as similar to Enron and Worldcom?  Do you understand that this case has nothing to do with any of the other cases you may have heard or read about, and that you must judge this case on its own facts, not based upon anything you may have learned about another case?

Q10. What was your experience with the FASB standards?

Q36. How much did your uncle lose on ENRON stock?  Are you close to your uncle?

Q42.  What does your brother do with the FBI?

Q45. You state that you would give more weight to the testimony of a law enforcement officer or government agent.  Do your views concerning government agent testimony extend to prosecuting attorneys?  What about defense counsel?

BRYANT, #431

Q37.  Why do you think executives are not always worth what they make?

Q54-56.  Why did you close your Smith Barney account?  Had you sustained any losses?

Q28 & 41.  What's your overall view of the justice system after your own exposure to it, and then your son's accident?

BURGESS, #432

Q35.  You've expressed some strong views concerning those who have been found guilty of accounting fraud.  What is your view of those who have been charged with accounting fraud?

Q37.  Can you explain what responsibilities you believe executives have toward their employees and shareholders?  How should they be held accountable?

Q42.  Where in the federal government do your brother and sister-in-law work?

Q90.  Why do you think you would be "very comfortable" with someone like yourself on the jury?

CALIA, # 364

Q21.  What does your wife do?  Where does she work?

Q33.  Do you have any negative feelings regarding corporations or corporate mergers generally based upon your own negative experience with a merger or acquisition?

Q37.  Why do you think that executives don't always make decisions in the best interest of their employees?

Q54-56.  You state that you have sustained some losses in the stock market.  Do you blame anyone for those losses?

Q90.  Why do you think you would be "uncomfortable" with someone like yourself on the jury?

Q92.  Can you afford to serve if your employer is only going to pay for 15 days?

CAMMAROTA, No. 436

Q8.   Why does this case remind you of the Enron and the Telecom cases?  Do you understand that this case has nothing to do with any of the other cases you may have heard or read about, and that you must judge this case on its own facts, not based upon anything you may have learned about another case?

Q28.  When were your relatives investigated?  How close are you to them?

Q45.  Why do you think you would give greater weight to the testimony of a law enforcement officer?  Would that view extend to prosecuting attorneys?  What about defense counsel?

Q46.  Can you explain what you mean about your view of a cooperator's testimony depending on what the crime was and what the plea agreement involved?

Q63.  Have you ever heard Jim Cramer discuss either Cendant, Kirk Shelton or this case?

Q67.  Why are you a member of the United Auto Workers Union?

CATINO, #439

Q22. Where does your son work?  What does he do as a portfolio manager?

Q35. What do you mean when you say any wrongdoing should be justly punished?

Q37. What do you mean when you say that executives make wrong decisions?

Q38. Why do you think people who make over $1M are overcompensated?  What does justify compensation over $1M?

Q51. What kind of Sarbanes Oxley work did you do?

Q55. How much did you lose on Worldcom stock?  Who do you blame for those losses?

Q58.  What does your wife do?  Where does she work?

Q70.  What was your reaction to the Enron movie?

CAZZOLLA, #440

Q21.  What does your wife do?

Q32.  No answer

Q33.  No answer

Q35.  Do you believe that the CEO of a corporation is responsible when people lose their employment or investments as a result of corporate wrongdoing?

Q64.  What do you think of when you think of a prosecuting attorney?  And what do you think of when you think of a defense attorney?

<u>CHANDLER, #443</u>

Q34.  You state that you have followed reports of corporate wrongdoing "very closely".  Do you attribute the decline in your own financial situation to any of this corporate wrongdoing?  Why have you followed it "very closely"?

Q64&65.  What do you think of when you think of a prosecuting attorney?  And what do you think of when you think of a defense attorney?

Q73. Why "NA?"

Q74. Why "NA?"

Q75. Why "NA?"

Q76. Why "NA?"

Q77. Why "NA?"

Q86. Why "NA?"

Q87. Why "NA?"

Q88. Why "NA?"

Q89. Why "NA?"

Q91. Why "NA?"

Q92. Will your employer pay you while you are on jury duty?

Q90.  Why do you think you would be "very comfortable" with someone like yourself on the jury?

Q93. Why don't you feel you can be fair to both sides?

COE, #448

Q21.  What does your spouse do for a living?  Where did your spouse work?

Q37-38.  Why do you think executives are overpaid?  Does any work justify compensation over $1 million.

Q87 & 94.  Why do you believe that important evidence is suppressed from the jury in some cases?  If you were selected for this jury, do you think you might be preoccupied by wondering about what evidence is not presented to you – speculating about what could have been suppressed?  If you were instructed to disregard evidence, would you be able to follow that instruction?

<u>COLEMAN, #225</u>

Q64&65.  What do you think of when you think of a prosecuting attorney?  And what do you think of when you think of a defense attorney?

Q80. What was the civil case that Jerry was involved in about?  How do you feel about the outcome?