# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

———————————————————  )
)
UNITED STATES OF AMERICA,  )
)
v.  )
)        No. 3:02CR264 (AHN)
)
WALTER A. FORBES and  )
)        January 5, 2007
———————————————————  )


## SENTENCING MEMORANDUM OF WALTER A. FORBES


Brendan V. Sullivan, Jr. (Bar No. ct17115)
Barry S. Simon (Bar No. ct24159)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

-and-

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
COWDERY, ECKER & MURPHY, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

Pursuant to Fed. R. Crim. P. 32 and Local Crim. R. 32, Walter A. Forbes, through undersigned counsel, respectfully submits this sentencing memorandum.

## INTRODUCTION

Walter Forbes is 64 years old. Throughout those years, he has not only been gifted with inspiration, but has passed that gift on, motivating and helping others achieve their goals as well. The Court now faces the delicate challenge of determining a just sentence, a punishment that is "sufficient, but no greater than necessary" to effectuate the goals of criminal punishment. 18 U.S.C. § 3553(a). Both the facts of this case and Mr. Forbes' admirable character warrant a sentence below the Sentencing Guidelines range. We respectfully request that any sentence of incarceration be no more than E. Kirk Shelton's – ten years.

## ARGUMENT

### I.    TERM OF INCARCERATION

The Presentence Report ("PSR") calculated a total offense level of 34 and a criminal history category of I, for a range of 151 to 188 months.[1] Mr. Forbes respectfully submits that a sentence below this range – whether considered a downward departure, or a non-Guidelines sentence pursuant to United States v. Booker, 543 U.S. 220 (2005) – is appropriate for at least three reasons. First, while Mr. Forbes does not dispute that the jury verdict permits each of the sentencing enhancements applied by the PSR, the cumulative, overlapping impact of these adjustments warrants a reduction in the resulting sentencing range, as Judge Thompson found in the case of E. Kirk Shelton. Second, Mr. Forbes' admirable character and history of

---

[1] The Final Presentence Report has not yet been issued. Thus references to the PSR are based on what was stated in the Initial Presentence Report.

charitable giving warrant consideration in determining the length of his sentence.  Third, Mr.

Forbes' advanced age should be taken into consideration, particularly in light of the statutory

mandate that a punishment should be "sufficient, but no greater than necessary to effectuate the

goals of criminal punishment."  18 U.S.C. § 3553(a).

### A.  The Cumulative Impact of the Specific Offense Characteristics and the Role Adjustments Substantially Overlap, Warranting a Lesser Sentence.

When a defendant faces a sentence at the high end of the Guidelines' sentencing

table, the Second Circuit allows a sentencing court to implement a downward departure if two or

more of the applicable sentence enhancements are based upon overlapping conduct.  United

States v. Lauersen, 348 F.3d 328, 344 (2d Cir. 2003), aff'd on reh'g, 362 F.3d 160 (2004),

vacated on other grounds, 543 U.S. 1097 (2005).  Similarly, this overlapping impact can justify a

reduced, non-Guidelines sentence pursuant to Booker, 543 U.S. 220.

In Lauersen, the Second Circuit said that "we think that the cumulation of such

substantially overlapping enhancements, when imposed upon a defendant whose adjusted

offense level translates to a high sentencing range, presents a circumstance 'to a degree' not

adequately considered by the Commission, see 18 U.S.C. § 3553(b)(1), and therefore permits a

sentencing judge to make a downward departure."  Id.  The Court explained that enhancements

based on overlapping conduct can have a disproportionate impact upon a sentence at the high

end of the sentencing table because a change in offense level at the high end affects the sentence

much more than the same change in offense level at the low end of the table.[2]

---

[2] Defendant Lauersen was an obstetrician and gynecologist convicted of mail fraud, health care fraud and making false statements relating to health care matters.  The district court determined Lauersen's offense level to be 29, which included a thirteen level enhancement for the loss amount, and a two level enhancement for abuse of a position of trust.  On appeal, the Court ruled that the offense level should have been increased four points to 33 because Lauersen's conduct also affected a financial institution and he received more than $1 million in proceeds.  The

The Second Circuit applied the same doctrine in United States v. Jackson, 346 F.3d 22 (2d Cir. 2003) aff'd on reh'g, 362 F.3d 160 (2004). The defendant in Jackson was convicted of bank fraud, credit card fraud, mail fraud, wire fraud, and conspiracy. The sentencing judge imposed a 10-point enhancement for the loss amount, a 2-point enhancement because the offense involved more than minimal planning, a 4-point enhancement because Jackson was an organizer or leader of an extensive criminal activity, and a 2-point enhancement for use of sophisticated means. Although the Court affirmed these enhancements, it noted that "they are little more than different way of characterizing closely related aspects of Jackson's scheme." Id. at 26. The Court emphasized that "any one enhancement increases the sentencing range by a far greater amount when the enhancement is combined with other enhancements than would occur if only one enhancement is imposed." Id. Thus, the Court determined that the case should be remanded for the sentencing court to reconsider whether a downward departure was warranted.

The Second Circuit granted rehearing in both Lauersen and Jackson and affirmed those decisions in a single opinion. In that opinion, the Court stated that "we continue to believe that when the addition of substantially overlapping enhancements results in a significant increase in the sentencing range minimum (as it does at the higher end of the sentencing table), a departure may be considered." United States v. Lauersen, 362 F.3d 160, 164 (2d Cir. 2004), vacated on other grounds, 543 U.S. 1097 (2005). With respect to its ruling in Jackson, the Court noted that:

_____

appeals court noted, however, that a downward departure may be warranted on remand because Lauersen faced a sentence at the high end of the sentencing table and these enhancements were based on overlapping conduct. See Lauersen, 348 F.3d at 344.

> the cumulative effects of the overlapping enhancements for
> the amount of the loss, more than minimal planning,
> sophisticated means, and leadership of an extensive
> criminal activity, combined with the significant impact of
> these enhancements at the higher end of the sentencing
> table permitted consideration of a departure by the District
> Court. As we pointed out, 'Most fraud schemes that obtain
> more than one half million dollars involve careful planning,
> some sophisticated techniques, and are extensive."

Lauersen, 362 F.3d at 162-63 (quoting Jackson, 346 F.3d at 25-26).[3]

   The arguments in connection with enhancement for (i) abuse of a position of trust,

(ii) organizer or leader, and (iii) more than minimal planning all rely upon the allegation that Mr.

Forbes was an officer and director of CUC who supervised a large and complex corporate fraud.

Accordingly, a Lauersen departure is appropriate for this overlapping conduct that significantly

impacts Mr. Forbes' sentence at the high end of the sentencing table. Indeed, Judge Thompson

already concluded that these enhancements substantially overlapped and warranted a downward

departure in the case of Mr. Shelton, who stood in an almost identical position to Mr. Forbes

with respect to these enhancements. Tr. 7/26/2005 at 509-512, attached as Ex. 1. In order to

eliminate the effect of the overlap without eliminating the effect of the enhancements altogether,

Judge Thompson analyzed the enhancements in terms of how many months each would add to

the sentencing range, rather than in terms of points. Thus Judge Thompson began with an

offense level of 26 – the offense level before adding these three enhancements – and a sentencing

range of 63-78 months. To this range, he added on the months that each enhancement would add

if added alone, as follows:

---

[3] Although the Supreme Court later vacated Lauersen in light of Booker, the policies underlying
the Lauersen decision remain good law. Nothing in the Supreme Court's ruling indicates its
disagreement with the Second Circuit's finding that the existence of numerous enhancements
based on overlapping conduct presents a mitigating circumstance warranting downward
departure from the otherwise applicable Guidelines range.

|                          | **Min.** | **Max.** |
|--------------------------|----------|----------|
| Offense Level 26         | 63       | 78       |
| Role in the Offense      | +34      | +43      |
| Position of Trust        | +15      | +19      |
| More than Min. Planning  | +15      | +19      |
|                          | ———      | ———      |
|                          | 127      | 159      |

Judge Thompson thus concluded "that a range of 127 months to 159 months represents a mitigation of, but not elimination of, the added punishment resulting from overlapping enhancements," and reduced Mr. Shelton's sentencing range accordingly. Id. at 512. Mr. Forbes respectfully submits that at least the same reduction in sentencing range is warranted here.

## B.     Mr. Forbes' Admirable Life Warrants a Lesser Sentence.

The Court, in determining the particular sentence to be imposed, shall consider, inter alia, "the history and characteristics of the defendant." 18 U.S.C. § 3553(a). Even under a mandatory Guidelines system, which discouraged departures based on good works and public service, the Second Circuit expressly recognized that a sentencing court was authorized to grant a downward departure when the factor was present to an exceptional degree. See United States v. Canova, 412 F.3d 331, 358-59 (2d Cir. 2005) (affirming a 6-point downward departure for good works and public service). Cf. United States v. Jones, 460 F.3d 191, 195 (2d Cir. 2006) (recognizing the "enhanced scope of a sentencing judge's discretion in the post-Booker world of advisory Guidelines," and affirming a downward departure where sentencing court had a "gut feeling" about the defendant).

The allegations of the offense in this case do not provide an adequate picture of the life of Walter Forbes. As a father, husband, brother and friend, he has exemplified what most

Americans hope to achieve in their lives. And even more importantly, Walter Forbes has repeatedly responded to the needs of his community, volunteering both his time and his money to charitable causes.

> Steven Gilbert describes his admiration for Walter Forbes in unreserved terms:
>
> If I were to leave this earth tomorrow, Walter is the first person I would want to watch over my family. Everyone else would be in second place. I have found him to be indefatigable in the pursuit of honesty and fairness, undeterred in the search for sense and reason in this world and unreserved in his charity and assistance to friends, family and the community. . . . I have met a lot of fine people, but none finer than Walter. None more generous, more thoughtful, more straightforward or more forgiving. My greatest frustration is my inability to explain Walter in words. Failing that, if I had been lucky enough to have an older brother, I would have hoped it could have been Walter.[4]
>
> The descriptions of Walter Forbes by his family and other friends are consistent

with what Mr. Gilbert reports:

- Walter's two oldest daughters describe their father as "not complicated" "with very little pretense;" and as "a positive thinker who always looks for the best in people and in situations." (Letter of Alison Forbes and Laura Carlin)
- Bob Nielsen describes Walter Forbes as "fair-minded, kind, considerate and most unselfish"; "a mentor to many, a friend to all";
- John Sculley describes him as "an extremely above board, and highly ethical executive," and "a good family man";
- Bill Lipner states that he has "always known him to be honest, fair, of good judgment, charitable and a solid person one could count on.";
- Eriberto Scocimara writes: "I can only say that the Walter Forbes I have known intimately for 25 years was always a man of integrity, who was sincerely concerned about [the] welfare of others and doing the right thing."

---

[4] The defense has received a number of letters on behalf of Mr. Forbes which are being submitted to the Court and to the government under separate cover.

Indeed, contrary to the speculation in the Presentence Report that Mr. Forbes was "a man driven

by money and his own success," those who know Walter Forbes best describe him as someone

who never took his success too seriously. Genaro Rubino describes Walter as "never consumed

by the success that he had achieved, and never wavering from the ideals, integrity and values that

were instilled in him at a young age." Similarly, Steven Gilbert wrote that when Walter's "star

was on the rise, he never forgot his friends who were not so fortunate. He never surrounded

himself with his success and left his pals behind. His friends today are the same friends he had

when he was scraping up the payroll for CUC from his American Express Card." And Daniel

Nissan explains that after 9/11, Walter was the one investor who stood by his decision not to fire

his employees – even though it would have been the right decision from a strictly financial point

of view – coming forward with the money to make the payroll until the company could get back

on its feet.

### 1.    Walter Forbes Has Demonstrated Extraordinary Philanthropy.

Many years ago – long before the current proceedings were ever contemplated –

Walter's wife, Caren, described him as "the most generous person I have ever known." These

words so captured the essence of Walter Forbes that they were remembered by William Lipner,

who repeated these words in his letter to you. But Walter Forbes has always believed that the

world needs more than words, and has been generous with both his time and money when it

comes to charitable causes. Since 1990, he has contributed in excess of $2.5 million in cash,

stock and gifts to the non-profit sector and devoted a substantial amount of his time to numerous

non-profit organizations. In the early 1990s, he served as Chairman of the United Way of

Stamford – a commitment to which he devoted a large amount of his time and energy. In 1995

and 1996 he donated over $250,000 to the New Canaan Country Day School, primarily for the

construction of a new library.  From 1992 through 2001 he gave over $145,000 to the Vail

Valley Foundation – an organization committed to enhancing life in the Vail Valley through

grants to non-profits who assist the local population, and through educational and cultural events.

And even more important, he has worked to instill a commitment to charity in his daughters, not

only by his example, but also by volunteering with them each year for an Americare Home Front

day – a day devoted to helping rehabilitate the homes of impoverished families in the local

community.

The large number of organizations which have benefited from Mr. Forbes'

generosity is admirable.  Yet three areas have been of particular focus for Walter, and constitute

the largest portion of his giving:  organizations devoted to helping impoverished children,

medical research and treatment, and the arts.

Walter Forbes has long been devoted to providing money to groups devoted to

assisting impoverished children.  Indeed, even as his financial situation dramatically changed

during the course of undergoing three criminal trials, requiring Mr. Forbes to cut back on his

philanthropic giving, he remained committed to these organizations.  Between 1994 and 2004, he

contributed more than $300,000 to organizations devoted to children, including substantial

contributions to The Inner City Foundation of Bridgeport, the McGiveny Community Center,

Save the Children, the Boys & Girls Club, Horizons Students, the YMCA, and a new museum

for children – the Stepping Stones Museum in Norwalk.

Walter Forbes has similarly been committed to providing money for medical

research and treatment, particularly in the area of cancer.  Most notably, he has given over

$100,000 to the St. Joseph's Medical Center, and an additional $30,000 to the Stamford Health

Foundation which has now combined its efforts with St. Joseph's.  He also gave of his time to

this important institution, agreeing to serve on the hospital's Advisory Board for several years. In addition, he has been extraordinarily generous with organizations such as the Sloan-Kettering Cancer Center, Cancer Care of CT, the Lahey Clinic, the Vail Valley Medical Center, the Juvenile Diabetes Foundation, the MS Society and the Jewish Guild for the Blind.

Always a believer in the importance of the arts to the cultural fabric of our nation, Walter Forbes has given generously in this area as well. Not only has he been willing to donate items from his personal collection to museums around the United States, but he has made substantial contributions over the years to numerous cultural organizations. Particularly close to his heart is the American Craft Museum (now known as the Museum of Arts and Design). Mr. Forbes has long been interested in persons who make crafts, and began collecting American crafts years ago. He has donated over $400,000 to the American Craft Museum, and gave generously of his time to serve on the museum's board for many years as well.

Walter Forbes' generosity has been noticed not only by the many institutions that have benefited from it, but by his friends as well. Many of the letters written on his behalf discuss how willing Mr. Forbes has been to contribute to worthy causes.

- Fred Green writes that he has "observed Walter step up eagerly to give generously of his own resources to benefit charitable endeavors and to aid persons in need. And I have seen Walter give freely of his time and keen mind in working through civic issues and developing solutions to community problems."
- Bill Lipner writes that "Walter is a person that gives to others, and causes, that are worthwhile, expecting nothing in return."
- Bob Nielsen describes Walter Forbes as always demonstrating "an extremely charitable way of life," and as "an honest, sincere man, a true and loyal friend. Walter is a 'man-of-his-word' who would always go out of his way to help anyone in need."
- Genaro Rubino notes that he saw CUC's employees become active in the Stamford community, "led by the example set by Walter."

2.    **Walter Forbes Has Provided Extraordinary Support to His Friends,**
      **Family and Neighbors.**

Throughout the letters written to you on behalf of Walter Forbes you will find

stories demonstrating how Mr. Forbes' friends, family and neighbors have come to depend upon

him, and how he has proven always to be there for them in their times of need.

While Mr. Forbes was enduring one the most difficult challenges of his life –

undergoing three separate criminal trials – he was simultaneously serving as the primary

emotional and financial support for his brother, James Forbes, who was diagnosed with ALS

(Lou Gehrig's) disease.  Although James Forbes lived in remote Wisconsin, Walter Forbes

played a critical role in his care and treatment.  Walter regularly visited his brother, arranged for

around-the-clock care when it became necessary, and assisted in paying for that care.  James

Forbes succumbed to his disease earlier this week, but a few days prior to his death, he dictated a

letter to the Court to describe what Walter has meant to him:

> Walter, as he always has throughout my entire life, is taking care
> of me.  He is doing so, not only by helping me financially with my
> affairs, but also just being by my side as much as he can.  He is
> providing comfort for me during an extremely trying time.
>
> Our parents died when I was a teenager and my brother took over
> the role of watching over me for more than twenty years.  He has
> always been caring and generous, which is the way we were
> brought up.  There has never been a time when I needed help that
> he didn't take the time to get involved. . . . no one has ever had a
> better brother.

Walter Forbes' daughters similarly describe how, despite the heavy toll three

criminal trials have taken on their father's life, it was he who supported them throughout the

trials, not vise versa.  "We cannot begin to describe the difficult emotions that we have

experienced the past six years and how extremely hard these trials have been on each of us, and

yet our father has done everything he can to stay positive to help and support us, while clearly he

was the one that could have used the most support." (Letter of Alison Forbes and Laura Forbes Carlin).

He has also reached out to provide financial support to his nieces and nephews, providing funds for their education, much as he has done through some of his charitable giving. And in the case of his nephew, Jake Utzig, who lost his mother approximately ten years ago, Walter has provided the financial assistance needed to make it possible for him to attend Westminster School in Simsbury, CT.

Jeff Apple describes how Walter was one of the very first people to call when Mr. Apple's son was born with cerebral palsy, and how Walter "has since provided me with moral support during really difficult times. I have also known him as a devoted husband, a loving father of four daughters and now a grandfather."

Similarly, Steven Gilbert tells how Walter was there for him both when he had cancer, and again when his wife had a stroke. "I didn't even have to call, Walter was there." He goes on to write, "I doubt I can remember all the things Walter has done for me, in part, because it was never on a ledger. It was all done without expectation of a favor in return. In my case, it appeared I would never have the capacity to return his favors. It never mattered."

Eriberto Scocimara describes how Walter Forbes similarly supported him through a series of personal crises in the mid- to late 1980s, despite the constraints imposed by Walters' own growing young family and expanding business. He credits Walter in helping him to keep his family together: "Through his continuous support and counsel, Walter played an important part in these achievements. I am happy and proud to consider him a friend." And Roswitha Rodrigues writes of how Walter went out of his way to help to expedite letters of support on her

11

behalf so that she could file her green card application on time, even though Walter's own life hung in the balance at the time as he sat and waited for the second jury to return a verdict.

Rodd Evonsky describes how he met Walter Forbes while Mr. Evonsky was working at the local Baskin Robbins. Mr. Evonsky had just graduated high school, and was undecided about going to college. With the help of Mr. Forbes' encouragement, Mr. Evonsky decided to go ahead and pursue a college education. But Mr. Forbes did not leave it there. He and Mr. Evonsky remained in contact while Mr. Evonsky was in school, and Mr. Forbes ultimately offered him a job at CUC, where he continued to be available to talk with Mr. Evonsky and provide whatever advice he could.

Walter Forbes has been there for his neighbors as well. Bill Lipner describes an extraordinary event that occurred while he and others were gathered at Mr. Forbes' family home in Wisconsin. A local family called Mr. Forbes at the house to report that their restaurant had just caught fire. Mr. Forbes immediately rounded up his guests and led them into town to help put out the fire. Although Walter Forbes never mentioned it to his guests, the local family informed Mr. Lipner that Mr. Forbes had given them the money to build the restaurant in the first place – never expecting anything in return. They too had experienced the enormous generosity Mr. Forbes bestowed on his family and friends, and chose to call Walter Forbes first in their time of need. Not only did Walter respond to their call that night, but he also once again provided them the financial support they needed to rebuild their fire-damaged business.

### 3.     Walter Forbes Is Well Regarded in the Community for His Substantial Contributions to Entrepreneurship.

As we heard from multiple trial witnesses – including the government's witnesses – Walter Forbes is a visionary. He has a special knack for anticipating where the consumer

market is headed – often two or three turns in the road ahead of others in the industry.  But Walter Forbes has not used this gift solely for his own profit – he has shared it with other entrepreneurs, providing both guidance and financial support to promote new ideas in all realms of the marketplace.  And he has used this gift to build new businesses that have employed hundreds of persons across the United States.

Roswitha Rodrigues describes the help Walter Forbes has provided her as follows:  "Without any personal gain beyond the satisfaction of having helped to initiate successful business relationships, he has been a mentor to my company and a dear friend to me since.  In the last six years I have seen him bring together people who would greatly benefit from each other's expertise.  In my own case, he has organized dinners and/or meetings on several occasions to develop contacts and facilitate the exchange of ideas, be it with companies that my studio later developed brand identities for . . . or companies, where a partnership or affiliation might hold benefits for both."

Even after Walter Forbes came under the cloud of the indictment, he continued to work to promote entrepreneurship, both big and small.  In addition to coordinating venture capital financing for dozens of entrepreneurial companies, he also founded two new companies while awaiting trial:

- Jet Equity:  In December 2002, Mr. Forbes raised the financing to begin a new company named Jet Equity.  He founded and built the company up from scratch, ultimately employing approximately 40-50 persons.  The company has since been sold, but it continues to be a thriving, productive business.

- Quintess/DreamCatchers:  Mr. Forbes put together the financing and founded a new company called Quintess (known as DreamCatchers).  It is a vacation home club with more than 300 members, and employs approximately 70 persons.  It recently merged with another vacation club, and continues to prosper and grow.

13

Indeed several letters from young entrepreneurs speak of how Mr. Forbes was willing to put aside his own troubles during this time period in order to provide them the insight, support and guidance to help make their fledging businesses a success.

### C.     Mr. Forbes' Age Warrants a Lesser Sentence.

Mr. Forbes is 64 years old.  With a ten year sentence or less, Mr. Forbes can still be productive upon release.  But the chances of such productivity (particularly after a long prison service) substantially diminish with each additional year he receives.  Indeed, a sentence over 10 years in his circumstances is equivalent to a life term – a punishment far exceeding that necessary to effectuate the goals of criminal punishment.  18 U.S.C. § 3553(a).  Accordingly, Mr. Forbes requests a reduced sentence on this basis as well.

## II.     FINE

As will be demonstrated by the financial information to be submitted, Mr. Forbes' assets have been substantially depleted during the time period following his indictment, and he has a negative net worth.  Accordingly, he does not have the resources to pay a substantial fine, and respectfully requests that any fine imposed be within the Guidelines range of $17,500 to $175,000.

## III.     RESTITUTION

Restitution is inappropriate in this case.  Although restitution is generally mandated in cases where a defendant has been convicted of a crime involving fraud or deceit, the statutory scheme authorizing such restitution explicitly exempts from restitution those cases where determining the amount of the loss of all victims of the offense would unduly complicate or prolong the sentencing process.  Judge Thompson attempted to avoid this problem by naming Cendant as the beneficiary of the restitution order imposed upon E. Kirk Shelton.  Mr. Shelton

did not brief the issue for Judge Thompson, however, and as discussed in more detail below, the

Mandatory Victims Restitution Act precludes the naming of Cendant as a beneficiary of a

restitution order in this case.

In short, Cendant cannot recover for its payment to the shareholders until the

shareholders themselves have been identified and fully compensated. Moreover, before anyone

can be named a beneficiary of restitution all victims must be identified and each victim's full loss

must be determined. As the government concedes, such a task is impractical in this case.

Recovery by the victims must be left to the civil process.

### A.    An Order of Restitution Would Unduly Complicate and Prolong the Sentencing Process, and Therefore Is Neither Mandated Nor Appropriate.

The Mandatory Victims Restitution Act ("MVRA") explicitly provides that

mandatory restitution is not applicable when:

> (A)  the number of identifiable victims is so large as to make restitution impracticable; or

> (B)  determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

18 U.S.C. § 3663A(c)(3). The government has already conceded that both of these factors exist

in this case. In its Sentencing Memorandum concerning Kirk Shelton, the government stated:

> the number of identifiable victims is extremely large, and may number in the tens and possibly hundreds of thousands. The Government does not presently know the identity, let alone the location, of all or even most of the persons who were shareholders of Cendant stock in April 1998, and ascertainment of that information would be highly impracticable. Additionally, determining the amount of loss attributable to each of the many thousands of victims would certainly require a determination of "complex issues of fact related to the cause or amount of the victim's losses." U.S.S.G. § 3663A(c)(3). Moreover, devoting the time and resources required to identify such a large number of persons and entities would be highly impracticable for the

> Government, and would substantially delay and burden the
> sentencing. Id. Finally, if the Court required Shelton to make
> restitution periodic [sic] payments to each of the tens or hundreds
> of thousands of victims of his crimes, the administrative costs of
> making such payments would substantially deplete the assets from
> which restitution should be made.

Sentencing Memorandum of the United States (Docket No. 1604) at 82-83.

The government similarly stipulated in three cooperating witnesses' plea agreements that "[a]n order of restitution would be inappropriate in the context of a criminal proceeding . . . because the number of identifiable victims is so large as to make restitution impracticable and determining complex issues of fact related to the cause or amount of the victims' losses would complicate and prolong the sentencing process to a degree that the need to provide restitution to any victim in the context of a criminal proceeding is outweighed by the burden on the sentencing process." See Schedule A of Plea Agreement of Cosmo Corigliano at ¶ 11 (DX300), Schedule A of Plea Agreement of Anne Pember at ¶ 10 (DX1162) and Schedule A of Plea Agreement of Casper Sabatino at ¶ 11 (DX1621).

**B.     The Court Cannot Avoid the Impracticality of Restitution by Ignoring the Shareholders in Favor of Cendant.**

The impracticality of a restitution order cannot be avoided by naming Cendant as the sole beneficiary of restitution. First, the MVRA expressly sets forth a process for imposing restitution which requires as a first step that the full amount of the loss for all victims be considered as a threshold matter, not just the losses of one or two victims.[5]

Pursuant to the MVRA, the probation officer shall include in his presentence report "to the extent practicable, a complete accounting of the losses to each victim." 18 U.S.C.

---

[5] As noted in the Presentence Report, the shareholders claim that they have yet to be fully compensated for their losses. While Cendant and Ernst & Young paid the shareholders approximately $3.2 billion, the shareholders claimed damages in excess of $8 billion.

§ 3664(a) (emphasis added).  And "[i]f the number or identity of victims cannot be reasonably ascertained, or other circumstances exist that make this requirement clearly impracticable, the probation officer shall so inform the court."  Id.[6]

        The probation office is required to obtain information on the full losses of all victims because the statute expressly states that all orders of restitution "shall order restitution to each victim in the full amount of each victim's losses", and that "[i]n no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source be considered in determining the amount of restitution."  18 U.S.C. § 3664(f)(1) (emphasis added).  Accordingly, prior to any order of restitution being imposed, every victim must be identified, and the full amount of each victim's loss must be calculated.

        United States v. Catoggio, 326 F.3d 323 (2d. Cir. 2003) is illustrative.  There, the defendant stipulated in his plea agreement that his crime caused losses in excess of $80 million, but there was no evidence concerning the identity of the victims or their actual losses.  The sentencing court nonetheless imposed restitution in the amount of $80 million, relying upon the stipulation in the plea agreement.  On appeal, the government defended the sentencing court's actions on the grounds that the actual amount of loss was irrelevant since it clearly exceeded $80 million, and the defendant could never pay full restitution in any event.  The Second Circuit rejected this argument, remanding for a determination of who the exact victims were, and their actual losses, prior to the imposition of any restitution order.  Id. at 328-29.

        As the government concedes, such a task is impossible in this case.  For example, while the plaintiffs in the Cendant securities class action claimed that they were due $8.5 billion

---

[6] The statute further provides that the probation officer shall provide notice to all identified victims, and provide them an opportunity to submit evidence of their losses. 18 U.S.C. § 3664(d)(2).

or more, the plaintiffs also recognized that Ernst & Young "vigorously disputed plaintiffs' expert conclusion that the maximum class damages total approximately $8.5 billion." Ex. 2 at 11 (excerpts of Opinion).  Thus, to determine the correct loss here would require, among other things, substantial fact and expert discovery that would unduly extend and complicate the sentencing of Mr. Forbes.  As the MVRA makes clear, that determination is better left to the civil process.  See also Legislative History of Victim Restitution Act of 1995, S. Rep. 104-179, 1996 U.S.C.C.A.N. 924 at 18, 931 ("It is the committee's intent that courts order full restitution to all identifiable victims of covered offenses, while guaranteeing that the sentencing phase of criminal trials do not become fora for the determination of facts and issues better suited to civil proceedings.").  See also U.S. v. George, 403 F.3d 470, 473 (7th Cir. 2005) (Restitution is not a criminal punishment but "a civil remedy administered for convenience by courts that have entered criminal convictions.").

Second, even if every victim could be identified and the total loss to those victims determined, the balance due to those victims would have to be paid prior to Cendant being entitled to any money as a result of its civil settlement with the shareholders.  While the statute provides that the Court can order restitution in favor of one who has compensated victims, "the restitution order shall provide that all restitution of victims required by the order be paid to the victims before any restitution is paid to such a provider of compensation."  18 U.S.C. § 3664(j)(1) (emphasis added).  Because there is no hope that Mr. Forbes will ever have the means to complete full restitution to the other victims, any right Cendant might have to

compensation as a result of the shareholder settlement will never be triggered.[7]

Third, Cendant cannot obtain restitution for the other damages it seeks in its letter of December 5, 2006. Again, as set forth above, before any order of restitution can be imposed, all victims must be considered as a threshold matter, not only the losses of one or two victims. Moreover, none of the damages Cendant seeks in its letter of December 5, 2006 are appropriate for an order of restitution, as explained below.

- The Internal Investigation: The internal investigation was motivated by numerous factors, including the desire to avoid any taint of the former HFS officers. Contemporaneous notes of a Cendant accounting officer (from the HFS-side of the company) and an outside lawyer at the initial meeting of the investigation indicate that objectives of the investigation were to "protect [HFS] mgt [i.e. management]," put the "top 4-5 at CUC in iron [i.e. prison]" and to make sure that CUC management was "gone." See Ex. 3 (April 13, 1998 notes of Cendant chief accounting officer Scott Forbes referring to "protect mgt") and Ex. 4 (April 13, 1998 notes of Willkie Farr & Gallagher partner Michael Young referring to objectives of "room [i.e. HFS management] not tainted" "Top 4-5 at CUC in iron" and "all out of CUC gone"). Thus these costs cannot be said to have directly resulted from the crimes of which Mr. Forbes was convicted.

  Moreover, Cendant has not provided any evidence of its costs for the investigation. Rather, Cendant simply states on page one that it spent "approximately $20 million," and then contradicts this two pages later, stating that it spent "approximately $25 million." Cendant Letter of 12/5/2006.

- The Costs of Litigation: Like the internal investigation, the cost of the litigation which ensued cannot be tied directly to the charges against Mr. Forbes. The litigation resulted for a variety of reasons, and called into question not only the actions of the former CUC management, but those of the former HFS management as well. Moreover, determining the reasonableness of the substantial costs incurred would involve complex issues of both fact and law.

- The Restatement: The defense has long maintained that the Restatement was tainted by the same biases as the Internal Investigation. Moreover, it is undisputed that the Restatement addressed many issues wholly unrelated to the CUC accounting irregularities. The Restatement itself does not identify which changes in Cendant's

---

[7] None of these arguments were raised before Judge Thompson, who sentenced Mr. Forbes' former co-defendant Kirk Shelton. Nor do they appear to have been raised in U.S. v. Cummings, 189 F. Supp.2d 67 (S.D.N.Y. 2002), the case relied upon by Cendant in its letter request to be named a victim for purposes of restitution.

reported numbers relate to the accounting irregularities, and which changes relate to other issues, a fact that was confirmed by <u>both</u> of the government's accounting experts. <u>See</u> Tr. 3/10/2004 at 1348-52 (<u>Daubert</u> hearing testimony of Brian Heckler); Tr. 2/19/2004 at 584-85, 661-62 (<u>Daubert</u> hearing testimony of Robert Sack). Nor has Cendant provided any evidence upon which to base an apportionment of Deloitte & Touche's fees. Any attempt to perform such an apportionment now would require extensive factual discovery and expert testimony.

In sum, the plain terms of the MVRA provide that restitution should not be imposed in this case as it would unduly delay and complicate the sentencing process. Any claims – whether by Cendant or others – should be left to the civil process.

## CONCLUSION

For the foregoing reasons, Mr. Forbes respectfully requests that his sentence be limited to (1) no more than 10 years of incarceration; and (2) a fine no greater than the Guidelines range of $17,500 to $175,000.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By:

Brendan V. Sullivan, Jr. (Bar No. ct17115)
Barry S. Simon (Bar No. ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
COWDERY, ECKER & MURPHY, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

Dated:  January 5, 2007

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Sentencing Memorandum of Walter A. Forbes to be filed electronically and to be served on January 5, 2007 to the following via e-mail:

Norman Gross, Esq. (norman.gross@usdoj.gov)
Michael Martinez, Esq. (michael.martinez2@usdoj.gov)
Craig Carpenito, Esq. (craig.carpenito@usdoj.gov)


Margaret A. Keeley