# EXHIBIT 1

mandatory special assessment.

Ms. Cerullo, is the Court's statement of Sentencing Guidelines calculations in this case accurate?

THE PROBATION OFFICER: It is, Your Honor.

THE COURT: Thank you.

I did tell the parties that I would discuss the Lauersen departure early on in the proceedings and I'm going to do that now.

The defendant has moved for a downward adjustment -- downward departure, rather, on a number of grounds, one of which will be addressed now.

The defendant has moved for a downward departure pursuant to United States vs. Lauersen, 362 F.3d 160, Second Circuit 2004.

Under Lauersen, a court may depart based on the combined effect of substantially overlapping offense level adjustments and the increased extent of enhancement of the applicable sentencing range that occurs at the higher end of the sentencing table. Such substantially overlapping offense level adjustments do not constitute impermissible double counting. The Court is permitted to exercise its discretion to mitigate the effect of such substantially overlapping enhancements by making a downward departure. However, and I quote, "the extent of the departure can only diminish, and not eliminate, the added punishment

caused by the overlapping enhancements." And I'm quoting from Lauersen, 362 F.3d at 167.

I have decided to exercise my discretion to depart on this basis and I have adopted the following methodology:

First, I have concluded that there should be no mitigation with respect to the base offense level, the enhancement for the amount of the loss, and the enhancement for obstruction of justice. There is no issue as to an overlapping enhancement with respect to the base offense level, nor with respect to obstruction of justice.

With respect to the enhancement for amount of the loss, I believe there should be no mitigation by virtue of the fact that the amount of the loss is, at a minimum, in excess of $3 billion and the Sentencing Guidelines applicable in this case provide for no further increase once the amount of the loss is in excess of $80 million. The amount of the loss is thus more than 37 times $80 million.

Adding the offense levels for the base offense, i.e. 6, the amount of the loss, i.e. 18, and obstruction of justice, i.e. 2, results in an Offense Level of 26. The applicable range for Offense Level 26 is 63 months to 78 months.

Next, I compute how many months would be added

to the bottom of the range and the top of the range for a four-level increase from Offense Level 26 to Offense Level 30 based on Mr. Shelton's role in the offense. Such an enhancement would increase the bottom of the range by 34 months and the top of the range by 43 months.

Next, I compute how many months would be added to the bottom of the range and the top of the range for a two-level increase from Offense Level 26 to Offense Level 28 based on abuse of a position of trust. Such an enhancement would increase the bottom of the range by 15 months and the top of the range by 19 months.

Next, I compute how many months would be added to the bottom of the range and the top of the range for a two-level increase from Offense Level 26 to Offense Level 28 based on either more than minimal planning or a scheme to defraud more than one victim. Such an enhancement would increase the bottom of the range by 15 months and the top of the range by 19 months.

When I add the range for Offense Level 26, i.e. 63 months to 78 months, to the total of the three increases to the top and the bottom of the range for (1) role in the offense, (2) abuse of a position of trust, and (3) more than minimal planning or a scheme to defraud more than one victim, the result is a range which has as the bottom 127 months and the top 159 months.

The Court notes that if it had eliminated the enhancements for abuse of a position of trust and for more than minimal planning and scheme to defraud more than one victim, which under Lauersen is not permitted, the resulting total offense level would have been Level 30, for which the Sentencing Guidelines range is 97 months to 121 months. Because the range without mitigation for the effect of overlapping enhancements at the upper end of the table is 151 months to 188 months, the Court believes that a range of 127 months to 159 months represents a mitigation of, but not elimination of, the added punishment resulting from overlapping enhancements.

We're going to take a break in a moment, Mr. Puccio, but when we come back, first, it's my practice to hear from counsel for the defense and anyone else who wants to speak on behalf of the defense and then from counsel for the government.

I usually then take a break and think about things. I have a fairly long list of items I've jotted down that I have been thinking about and I go through and see if you've said anything that I haven't covered in my thought process so far.

So I think at this point we'll take about a 20-minute recess.

Do you have an idea as to how long your

# EXHIBIT 2

801

FILED
AUG 15 2000
AT 8:30 M
WILLIAM T. WALSH
CLERK

FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

IN RE CENDANT CORPORATION SECURITIES LITIGATION

Civ. No. 98-1664 (WHW)
OPINION

Walls, District Judge

Pursuant to Federal Rule of Civil Procedure 23(e), Lead Plaintiffs, the New York State Common Retirement Fund ("NYSCRF"), the California Public Employees' Retirement System ("CalPERS") and the New York City Pension Fund ("NYCPF"), move for (i) approval of two settlements, one with Cendant Corporation ("Cendant") and the HFS Individual Defendants named below, and one with Ernst & Young LLP ("E&Y"), and (ii) approval of the Plan of Allocation of the Net Settlement Fund. The Cendant settlement provides for a payment to the class of $2,851,500,000 in cash, provides for additional payment to the class from Cendant and the HFS Individual Defendants in the event they recover damages in their suits against E&Y--50% of any recovery--and imposes certain corporate governance changes on Cendant. The E&Y settlement provides for a cash payment of $335,000,000 to the class. For the reasons stated, the settlements and Plan of Allocation are approved.

*A. The Action*

Cendant was formed by the merger of CUC International, Inc. ("CUC") and HFS Incorporated ("HFS") on December 17, 1997. CUC, the surviving corporation, was renamed

against E&Y for class members who purchased after this date. These purchasers, however, will receive payment from the Cendant settlement.

Further, the plan recognizes Section 11 claims of those who acquired Cendant common stock in exchange for HFS shares at merger. The interests of these class members will be calculated under the damages provision of Section 11. See n.10. If Section 11 damages are greater than losses determined under Section 10(b), a plaintiff will receive Section 11 statutory damages, if not, he or she will receive Section 10(b) damages.

3. Assessment

Lead Plaintiffs assert that the proposed settlements are fair, reasonable and adequate and should be approved by the Court. See In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768 (3d Cir. 1995). Factors to be considered are:

> (1) the complexity, expense, and likely duration of the litigation . . . ; (2) the reaction of the class to the settlement . . . ; (3) the stage of the proceedings and the amount of discovery completed . . . ; (4) the risks of establishing liability . . . ; (5) the risks of establishing damages . . . ; (6) the risks of maintaining the class action through the trial . . . ; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . . ; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975); see also Coffee Decl. ¶ 17.

In regard to the first factor, Lead Plaintiffs assert that the claims "involve[] numerous complex legal and technical accounting issues." Additionally, "because this case settled prior to the taking of depositions and pre-trial preparation, there is no question that continued litigation would have greatly increased the expense and duration of this action." Brf. at 13; see also In re IKON Office Solutions, Inc. Securities Litig, 194 F.R.D. 166, 2000 WL 567104 (E.D. Pa. May 9,

2000), cited in Coffee Decl. ¶ 17 ("in the absence of a settlement, this action will likely extend for months or even years longer"). Finally, even if a larger judgment were received at trial, additional delay would likely occur through the appellate process.

The second factor is linked to the number of objectors to settlement. Here, out of 478,000 notices of settlement sent, three class members object to the settlements (Tere Throenle, Betty Duncan (to the E&Y settlement) and Robert and Janice Davidson (objecting on behalf of themselves and various trusts)). An additional class member objects to the Plan of Allocation (Ann Mark). Two other objections by non-class members were filed, one by Martin Deutch, derivative action plaintiff, and the other by the State Board of Administration of Florida. Lead Plaintiffs state that the four class member objectors "collectively have losses constituting less than 1/10,000 of 1% of the Class's damages." Reply Brf. at 2. The objectors' holdings are described:

- Tere Throenle purchased 100 shares of Cendant stock on April 17, 1998 and lost approximately $600;
- Betty Duncan, trustee of the Esther J. Johnston Trust, bought an unspecified number of CUC 3% Notes and claims a $1,294 loss;
- The Davidsons, as individuals and trustees, received CUC stock in July 1996 when their business was merged into the company, "and by year end had sold over 80% of it for $635 million--most of that profit";
- Ann Mark exchanged 100 HFS shares for 240 CUC shares in the merger and also purchased 400 shares in the open market.

Lead Plaintiffs add "[p]erhaps most telling is the reaction of institutional investors to the settlements. . . . Here, not one of the over 1,700 institutional investors [who owned between 78% and 98% of Cendant stock during the class period] in the Class has objected to the Settlements." Id. at 3. Lead Plaintiffs conclude: "The class's near unanimous support of the Settlements confirms the superior results achieved by Lead Plaintiffs and Lead Counsel." Id. at 3; see also

Miller Decl. ¶ 16. The objections and Lead Plaintiffs' responses are discussed below.

The third factor looks to the stage of the proceedings. Here, Lead Counsel contend that they "conducted a thorough and efficient investigation and analysis" of all claims. As example, they hired a damages expert and an investment banking expert to evaluate Cendant's ability to contribute to settlement. See Joint Decl. ¶¶ 112-17. They conclude "this case had advanced to a stage where the parties 'certainly [had] a clear view of the strengths and weaknesses of their cases.'" Brf. at 16 (quoting In re Warner Communications Securities Litig., 618 F. Supp. 735, 745 (S.D.N.Y. 1985), aff'd, 798 F.2d 35 (2d Cir. 1986)).

Lead Plaintiffs next address the fourth factor--the risks of establishing liability:

> While Lead Counsel believe there is substantial evidence to support the Class's claims . . . the complexities and uncertainties of this litigation clearly warrant approval of the Settlements. In particular . . . the claims against E&Y and all but two of the Individual Defendants were less [strong].

Brf. at 16-17. Moreover, because of the Private Securities Litigation Reform Act's prohibition against collection of damages in excess of a defendant's determined liability, "a key factor for Lead Plaintiffs and Lead Counsel was the proportion of liability a jury was likely to assess against Cendant, E&Y and the 28 Individual Defendants." See 15 U.S.C. § 78u-4(f); see generally The Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §§ 77k, 77*l*, 77z-1, 77z-2, 78j-1, 78t, 78u, 78u-4, & 78u-5. Lead Plaintiffs add that the difficulty of establishing E&Y's liability is even greater due to defenses accorded to accounting firms under the PSLRA. See Coffee Decl. ¶ 17(c). As for the director-defendants, "of the 28 Individual Defendants, 18 were non-employee, or 'outside' directors of Cendant who were named as defendants only on claims charging violations of Section 11 of the Securities Act and Section 14 of the Securities

Exchange Act." Brf. at 18. And these outside director-defendants possess a "due diligence" defense. Joint Decl. ¶ 131. Moreover, the HFS inside directors could assert this defense to Section 11 and Section 14 claims. Finally, "[o]f the five CUC Individual Defendants who were not outside directors . . . only [two] were identified by the Investigation as having played an active role" in the fraud. Brf. at 19.

With reference to the fifth factor, the risks of establishing damages, Lead Plaintiffs remark that Cendant and E&Y vigorously disputed plaintiffs' expert's conclusion that the maximum class damages total approximately $8.5 billion. Plaintiffs conclude that proof of damages at trial would, at best, result in a battle of experts with unpredictable results.

Although Lead Plaintiffs detail why defendants would be unable to withstand a greater judgment (the seventh settlement factor), their position can be summed up in three words--"Pennzoil *vs.* Texaco." In 1985, Pennzoil obtained an $11.1 billion judgment in Texas state court against Texaco for interference with contract. Texaco was unable to post bond for appeal equal to the entire amount. It instead sought bankruptcy protection and Pennzoil eventually agreed to accept a $3 billion settlement. Lead Plaintiffs allege that even if the maximum recovery were obtained at trial, Cendant would be unable to post the necessary bond for appeal, let alone pay the amount to the class.

Lead Plaintiffs next address the final factors concerned with the range of reasonableness of the settlement(s). They repeat that the current recovery is 37% of their expert's maximum recoverable damages, which could rise if Cendant or the HFS Defendants obtain additional recovery from E&Y. They add that the recovery includes corporate governance reforms that "would not have been available remedies . . . under the federal securities laws . . . and were

obtained without sacrificing any monetary award." Brf. at 24.

Plaintiffs' reply brief expands their argument that 37% of the maximum damages is a "superior result." Reply Brf. at 5. They refer to a study of 377 securities class action settlements between January 1991 and June 1996 made by the National Economic Research Association, Inc. ("NERA"), which "revealed that the average settlement comprises between 9% and 14% of plaintiffs' claimed damages." Denise Martin et al., National Econ. Research Ass'n, Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions 10-11 (NERA 1996). See also In re Prudential Securities, Inc. L.P. Litig., MDL No. 1005, 1995 WL 798907 (S.D.N.Y. 1995) (approving settlement of between 1.6% and 5% of claimed damages); In re Crazy Eddie Securities Litig., 824 F. Supp. 320 (E.D.N.Y. 1993) (settlement of between 6% and 10% of damages); In re Michael Milken & Assocs. Securities Litig., 150 F.R.D. 57 (S.D.N.Y. 1993) (7.5%).

Alternatively, they propose that reasonableness of settlements may be evaluated by determining the corporate payor's contribution as a percentage of its market capitalization. According to plaintiffs, Cendant's $2.85 billion contribution represents 21% of its 1999 average capitalization and 27% of its July 19, 2000 market capitalization. (Plaintiffs' full amount of damages--between $8.5 billion and $8.8 billion--represents approximately 95% of Cendant's market capitalization of $9.21 billion as of the close of trading August 10, 2000.) By contrast, mega-fund settlements which involved companies with capitalizations of over $1 billion ranged from 1% (In re Waste Management, Inc., No. 97-7709 (N.D. Ill. 1999)) to 7.6% (In re Informix Corp. Securities Litig., No. 97-1289 (N.D. Cal. 1999)) of total capitalization. Reply Brf. at 6-7. A securities case in the Eastern District of Pennsylvania, In re IKON Office Solutions, Inc.

Securities Litig., 194 F.R.D. 166, 2000 WL 567104 (May 9, 2000), recently settled for 6.2% of IKON's average 1999 market capitalization of $1.8 billion and between 5.2% and 8.7% of over $1 billion in claimed damages.

Lead Plaintiffs add "a final yardstick in considering the quality of a settlement is how much was available from insurance to cover the claims." Here, they state that the $3.18 billion total settlement is 12 times available insurance coverage. In contrast, the NERA report determined that class actions settlements typically amount to 3.4 times total insurance proceeds. Reply Brf. at 7.

They then address approval of the Plan of Allocation, "governed by the same standards of review applicable to the approval of the settlement as a whole: the plan must be fair, reasonable and adequate." In re Oracle Securities Litig., [1994-1995 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 98,355 at 90,446 (N.D. Cal. June 18, 1994) (Walker, J.). This plan is briefly explained above. Lead Plaintiffs, relying on the work of Forensic Economics, Inc., assert that this plan is fair, reasonable and adequate and should be approved.

C. *E&Y's Brief in Support*

E&Y's brief in support of settlement focuses mainly on the risks of establishing liability and damages against it. In a preview of what will surely be argued in the Cendant-E&Y suit, the accounting firm stresses that it too was a victim of Cendant's fraud: "Plaintiffs would face daunting, and perhaps insurmountable, hurdles in attempting to prove at trial that E&Y should be liable for Cendant's admitted fraud." E&Y Brf. at 11. It agrees with Lead Plaintiffs that the estimation of damages at trial would lead to a battle of experts. Further, it asserts that "E&Y's proportional share of plaintiffs' damages is exceedingly small." Id. at 13. In all other respects,

# EXHIBIT 3

4/13/98

per NRS to Jack Nussbaum
NRS objectives:
1. Preservation of Co.
2 Protect mgt
3. CUC mgt - fix appropriate responsibility and punish
4 CUC D&O [illegible] - handle as appropriate

per Jack Nussbaum: - Process is:
1. Determine the facts
a. Not criticize if act properly
b. Can't sit; must take steps
c. Want cooperation of people (staff)

2. [illegible]

since don't know, don't go to SEC yet

3. [illegible] judgment.
Determine
Once determined, [illegible]
B Management [illegible]

[illegible] includes getting General:
a. [illegible]
b. [illegible]

EXHIBIT
Nusbaum 1
3/21/01

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
IN Civil Action No. 98-1664 (WHW)

# EXHIBIT 4

- have plan
- Staffing
-

acquisition of CUC (auditor E+Y)
After acquisition - same drove. 923 M.

Young
EXHIBIT NO. 1
3/26/01

10K issued
Thursday -- bigger issue
- False rec/revenue
- Non-acquisition expenses / Privacy board - Accelerated revenue (cash basis) / amortized expense (12 months) (accrual basis)
- Reclassification of revenue ("Inter-segment")
- Tapping into reserves (Lit.)
- Expensing non-acquisition costs to acquisition reserve

In on it
- Kirk Shelton -- COO (Had to know)
- Cosmo Corigliano -- CFO [negotiating resignation]
- Anne Pember -- Controller [resigned 2 weeks ago]
- (Casper Sabatino) - VP. - Consolidation. Met w/ Cosmo to reach analyst #s.
- (Steve Speaks)

- only w/ Scott

Jon Buchan - G.C.
Scott Forbes
Mike Monaco
CEO - Silverman

- Non / rec; - Third parties
- Reclassification
- Accelerated revenue w/ spread out exp.

B & Y - OK.
D & T - 10 OK w/ rev.
need final w/ 10K. Unqualified opinion
D & T: [illegible] it [illegible]; not do it on [illegible] basis. Not settled.

Look forward.
Pen on 1st Q 1998.
Membership business.
Adjustment - reduce reserve [illegible] [illegible] unfavorable reserve in cost center.
- will close [illegible] / eliminate product.
[illegible] reserve.
[illegible] - [illegible] fund
[illegible]
D) not [illegible] correct
classified correct
- [illegible] settled.
[illegible] not correct
O what's wrong.

[illegible] them to be analysts. Membership business.
George last yr; 1998 results.

[illegible] Deliver - ~~Friday after~~ Thursday April 9th. 2 P.M.
3:30
Certain events likely to [illegible] 1998; adj to close 1997 results.
X | 1997 - Build reserve; A/Rec from [illegible] 3d parties.
Reduced accrued exp. to external vendors.
"Classified"
Thur 3 PM

1st Q 1998 - [illegible] for membership product
"[illegible]" - [illegible] credit files [illegible] customers.
"Privacy Guard"
Amortize revenue over 12 months.
Acquisition costs amortized over 12 months.
Other costs - expense [illegible]
Atty
[illegible]
J.C.

Privy board – Code basis for revenue.
Big [illegible] are amortized only 12 mon.
So restated.
Dismissed at 3PM

Phone ring. Henry. asked for Scott.
Burke.
Scott too him [illegible] 135 pct – [illegible].
Don't send [illegible].
Let Henry [illegible]. 4:15. Take Henry [illegible] on the phone.
Henry: An issue. Need facts.
Asked Controller of [illegible]. [illegible] Div.
Going on for a couple years
– Mismatched Rev/Exp
– '97 at best – revenue/exp that [illegible].
That's [illegible] '97 #s.

Privy board – asked controller to better match Rev/Exp.
– [illegible] for 1998 135 Q
[illegible] in '98 or [illegible].
[illegible] 3 yr [illegible].

[illegible] other products.

133M in [illegible] product
80M last year for full year.
50+M of [illegible] in the growth of rev [illegible] – 1/2
45-46M in '98 [illegible] CBS.
22M of [illegible].
[illegible] 93-94% in 135 year. [illegible] ≈ [illegible].
3B [illegible]. Not [illegible].

[illegible]
[illegible]

Bogus [illegible]

2

CONFIDENTIAL WFG 0064949

[illegible]

1st Q
Amazing [illegible] for 12 months to [illegible] category.
1998 - [illegible] [illegible]
[illegible] [illegible] the [illegible].
Not anticipated so no [illegible] in 1st Q.

Cosmo Corigliano
Casper Sabatino
Amy Pember

Who's "they"?
old CFO (Cosmo Corigliano)
[illegible] (Casper Sabatino) - VP Consolidations.
[illegible]
[illegible] / Q - get results. What's that? [illegible]
Cosmo also Horse (Kirk Shelton) had to know.

(Ann Pember) Controller. Became resp. for CEC Corp group financial reporting.

SEM with CO?
Pember resigned 2 weeks ago
Cosmo - [illegible] his resignation. (In press release)

[illegible] of [illegible]
[illegible] | [illegible] | [illegible] -- [illegible]
"[illegible]"

Kirk in CUC F/S before we [illegible] them?
[illegible] [illegible].

4 objectives
1) [illegible] co.
2) [illegible] not tainted
3) Top 4-5 at CUC in [illegible], all out of CUC gone.
4) All Os/Ds totally gone. Our s/h totally [illegible]
[illegible] -

[illegible] A/A.
D:T - [illegible] [illegible]
B: Y in [illegible]
My 5-6 -- [illegible] 1st Q #5. [illegible]. Stk trading.

The pass alone, 1ST a ... in line.
... not time.

Cosgrove / The Speaker > ... Scott.

Latter Father - ... Lots 80M to go.

- Severance

R:Y
D:T

Tom Kristopal - Pass alter.

From CUC Director - update last night.
Card - ... No B/D ... what want.

Rittenhouse

w/G. Mgt groups terminated. No separated issues.
No ... by sr. people ...

R:Y Event.

1997 - ... only. 4 + B:F. Not ...
D:T - accept.

Item 2 - ... to auditor. NATE ...
Other Fund - ... in 75/25.
... no ...

... last Thurs.
Issue: what to do.

... Thurs -- ... w/auditor
... - Thurs.

CONFIDENTIAL WFG 0064951

2d Q must be [illegible]. 50 [illegible] - 8 & 7 M.

- [illegible] to [illegible]
- Affir.

1) Bogus [illegible] revenue
2) Misclassify revenue => inflated EPS.
(Privacy Guard [illegible] Slippage)

[illegible] down [illegible] => [illegible] revenue.

Bogus A/Rec.
Flinted [illegible].

~~[illegible]~~

Quantify this sheet
Quality of [illegible] Issue: [illegible] on [illegible] '98.

| Scott

[illegible]: [illegible].
[illegible] in the [illegible]

CONFIDENTIAL WFG 0064952