# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CASE NO. 3:02CR264 (AHN) |
| V. | : | |
| WALTER A. FORBES | : | January 14, 2007 |

_____

## SENTENCING MEMORANDUM OF THE UNITED STATES
_____

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice
970 Broad Street
Newark, NJ 07102
(973) 645-2701

On the Brief:

MICHAEL MARTINEZ
CRAIG CARPENITO
MARK E. COYNE
Special Attorneys
U.S. Department of Justice

## PRELIMINARY STATEMENT

The United States submits this sentencing memorandum to address the application to this case of the advisory Sentencing Guidelines regime established by the Supreme Court in United States v. Booker, 125 S. Ct. 738 (2005), and to respond to arguments that the defendant, Walter A. Forbes, made in his sentencing memorandum of January 5, 2007.  In Booker, the Supreme Court held that the Sixth Amendment right to a jury trial, as construed in Blakely v. Washington, 124 S. Ct. 2531 (2004), attached to findings that enhance a defendant's sentence under the-then mandatory federal Sentencing Guidelines ("Guidelines").  The Booker Court found that it was the mandatory nature of the Guidelines that, when combined with judicial fact-finding, implicated the Sixth Amendment.  In order to remedy this problem, the Court invalidated those provisions of the Sentencing Reform Act that make the Guidelines mandatory, thereby rendering the Guidelines advisory.  The Booker Court emphasized, however, that district courts, while not bound to apply the Guidelines, must consult the Guidelines and take them into account when sentencing, 125 S. Ct. at 757, 764, 767, thus requiring the courts to make the factual and legal determinations necessary to calculate a defendant's Guidelines range.

In determining the sentence to be imposed on the defendant, this Court must therefore consider the provisions of the Guidelines as applied to the facts of this

case, and rule on any disputed Guidelines issues, including any departure motions. The Court then has the authority to impose any sentence that is reasonable under all of the factors in 18 U.S.C. § 3553(a), up to the maximum statutory penalties provided for the offenses on which the defendant was convicted.  In making that determination, this Court should give considerable weight to the Guidelines range recommended by the United States Probation Office in the Presentence Report ("PSR").  In this case, the sentencing range determined through the application of the Guidelines will yield a reasonable sentence, and the United States urges the Court to impose a sentence within that range.

On December 14, 2006, the Probation Office made its initial disclosure of the PSR.  The Probation Office made the following calculations regarding the application of the Sentencing Guidelines to this case.  In doing so, the Probation Office used the 1997 Guidelines Manual, as opposed to the current manual, because of ex post facto concerns.  PSR ¶ 98; <u>see</u> U.S.S.G. § 1B1.11(b)(1) ("If the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the <u>ex post facto</u> clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that

the offense of conviction was committed").[1]

The Probation Office determined that the defendant's base offense level was six and that an 18-level enhancement was appropriate under U.S.S.G. § 2F1.1(b)(1)(S) because the loss exceeded $80 million. PSR ¶¶ 99, 100. The Probation Office then determined that "[t]he offense involved repeated acts over a period that spanned from, at the very least, 1995 through 1997," that "[t]here were multiple victim shareholders," and that, as a result, a two-level enhancement was warranted for more than minimal planning/scheme to defraud more than one victim under § 2F1.1(b)(2)(A) or (B). PSR ¶ 101. The Probation Office then added four levels for the defendant's leadership role in the offense under § 3B1.1(a). PSR ¶ 102. The Probation Office also added two levels for abusing a position of trust under § 3B1.3. PSR ¶ 103. Lastly, the Probation Office found that the defendant committed perjury at trial and added two levels for obstruction of justice under § 3C1.1. PSR ¶ 105. According to the Probation Office's calculations, the defendant's total offense level was 34. PSR ¶ 108. The Probation Office also determined that the defendant was in criminal history category I and thus concluded that his sentencing range was 151 to 188 months. PSR ¶¶ 110, 130.

---

[1]    Unless otherwise stated, all references to the United States Sentencing Guidelines ("U.S.S.G.") are to the 1997 Guidelines Manual.

3

The defendant "does not dispute that the jury verdict permits each of the
sentencing enhancements applied by the PSR." DSM at 1.[2] He does, however,
make three arguments for a sentence that is at least 31 months – or 20 percent –
below the applicable Guidelines range, "whether considered a downward
departure, or a non-Guidelines sentence." DSM at 1-2. First, relying on United
States v. Lauersen, 348 F.3d 329 (2d Cir. 2003), aff'd on reh'g, 362 F.3d 160
(2004), vacated on other grounds, 543 U.S. 1097 (2005), and United States v.
Jackson, 346 F.3d 22 (2d Cir. 2003), aff'd on reh'g, United States v. Lauersen, 362
F.3d 160 (2004), vacated on other grounds, 543 U.S. 1097 (2005), the defendant
requests a downward departure or a lesser non-Guidelines sentence based on
supposed overlapping enhancements that result in a significant increase in the
sentencing range minimum. DSM 2-5. Second, the defendant requests a
downward departure or a lesser non-Guidelines sentence based on the defendant's
charitable contributions and good works, as reflected in his record of philanthropy,
his support of family, friends, and neighbors, and his support of entrepreneurs.
DSM 1-2, 5-14. Third, the defendant requests a downward departure or a lesser
non-Guidelines sentence based on his age of 64 years. DSM 2, 14. Lastly, the

---

[2]     "DSM" refers to the defendant's sentencing memorandum, dated January 5,
2007.

4

defendant argues that restitution is inappropriate in this case because all the shareholder victims have not been identified and fully compensated.  DSM at 14-20.

The defendant's arguments for a downward departure or a lesser non-Guidelines sentence lack are unpersuasive.  First, they fail to account for the tremendous sentencing benefit that the defendant has received by the mere use of the 1997 Guidelines Manual, as opposed to the current 2006 Guidelines Manual.  Under the 2006 Guidelines Manual, the defendant's Guidelines range would be life imprisonment capped at 25 years (or the equivalent of 300 months).  Under the 1997 Guidelines Manual, which the Probation Office used to calculate the defendant's Guidelines range due to ex post facto concerns, the defendant's Guidelines range is 151 to 188 months, which reflects a 112 to 149 month windfall.  Because sentencing judges may refer to the current wisdom of the Sentencing Commission, as embodied in the current Guidelines Manual, as a benchmark of reasonableness in determining a defendant's sentence, this Court could reasonably impose a sentence of 25 years.  A fortiori, a sentence within the Guidelines range of 151 to 188 months – including any discretionary denial of a downward departure or a lesser non-Guidelines sentence – is reasonable, if not lenient.  Indeed, if the defendant were being sentenced in the Seventh Circuit, the

more severe 2006 Guidelines Manual would be used to calculate the defendant's

Guidelines range, as the Seventh Circuit has held that the ex post facto clause does

not apply to the Sentencing Guidelines now that they are advisory and not

mandatory.

Second, the defendant's argument that a downward departure or lesser non-

Guidelines sentence is warranted based on supposed overlapping enhancements is

also unpersuasive.  The defendant contends that three of his enhancements

substantially overlap: (1) leadership role; (2) abuse of position of trust; and (3)

more than minimal planning.  The Second Circuit has held that two of these

enhancements – i.e., leadership role and abuse of position of trust – do not

substantially overlap.  As for the remaining two enhancement combinations, the

same set of facts do not trigger the application of leadership role and more than

minimal planning, nor do the same set of facts trigger the application of abuse of

position of trust and more than minimal planning.  Accordingly, this Court should

reject the defendant's argument, particularly in view of the 112 to 149 month

sentencing benefit that the defendant has already received through the use of the

1997 Guidelines Manual.

Third, the defendant's argument that his alleged extraordinary philanthropy

and good works warrant a downward departure or a lesser non-Guidelines sentence

6

lacks merit. To start, charitable contributions and good works are discouraged grounds for departure. Even were it not so, the defendant's charitable contributions and good works are hardly extraordinary. The defendant, who testified that he had a net worth of $200 million in November 1997 and who reported $85 million in income from 1995 to 1999 alone, contributed only $2.5 million to charity in 17 years. Courts have denied departures when a defendant has tithed 10 percent of his income, and the defendant's donations are significantly less than tithing. Indeed, the defendant stole more from Cendant's shareholders in a single day and transferred more assets to his family than he ever donated to charity. Turning to his good works, the defendant relies on the support that he gave to family, friends, neighbors, and entrepreneurs. While laudable, the defendant presents an incomplete picture. In particular, he fails to mention the broken promises and the lack of support that he gave to fellow entrepreneurs, Jan and Bob Davidson. Even more telling, he fails to mention his role in mentoring and corrupting a generation of executive leadership at CUC to commit the largest accounting fraud of the 1990s.

Fourth, the defendant's argument that he warrants a downward departure or lesser non-Guidelines sentence based on age is wholly meritless. Not only is age a discouraged departure ground, but the defendant is not elderly. He is only 64.

Unsurprisingly, the defendant cites to no case in which a downward departure was granted based on age alone. The Guidelines state that "age may be a reason to impose a sentence below the applicable guideline range when the defendant is elderly <u>and</u> infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration." U.S.S.G. § 5H1.1 (emphasis added). The defendant does not argue, however, that he is infirm. To the contrary, the PSR reports that the defendant is in good health.

Fifth, this Court should reject the defendant's argument that restitution is inappropriate because all the shareholder victims have not been identified and fully compensated. DSM at 14-20. This Court need only determine restitution with a reasonable approximation. In this case, the Court may rely on the compensation that Cendant and Ernst & Young paid to settle the shareholder litigations arising from the accounting irregularities at the former CUC businesses. In total, Cendant and Ernst & Young paid shareholders $3.35 billion. Contrary to defendant's argument, the Mandatory Victims Restitution Act does not bar restitution to identified victims merely because other possible victims remain unidentified.

For all these reasons, this Court should impose a sentence of incarceration within the Guidelines range of 151 to 188 months and order the defendant to pay $3.335 billion in restitution.

## ARGUMENT

## I.     APPLICABLE LAW ON SENTENCING POST-BOOKER

In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court considered whether the Sixth Amendment right to a jury trial, as construed in Blakely v. Washington, 124 S. Ct. 2531 (2004), attaches to findings that enhance a defendant's sentence under the Guidelines and, if so, whether and under what circumstances the Guidelines can operate in accordance with the requirements of the Sixth Amendment.  Booker, 125 S. Ct. at 747 & n.1.  The Court addressed these questions in two separate majority opinions.

On the first question, Justice Stevens (joined by Justices Scalia, Souter, Thomas, and Ginsburg) held that the Sixth Amendment, as construed in Blakely, applied to the then-mandatory Guidelines.  Booker, 125 S. Ct. at 745-56.  The Court reaffirmed Blakely's holding that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt."  Id. at 756.  The Court

9

noted that it is the mandatory nature of the Guidelines that, when combined with judicial fact-finding, implicates the Sixth Amendment.  Id. at 749-50.  The Court reaffirmed, however, that "when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant."  Id. at 750.

On the second question, Justice Breyer (joined by Chief Justice Rehnquist and by Justices O'Connor, Kennedy, and Ginsburg) invalidated 18 U.S.C. § 3553(b)(1), the section of the Sentencing Reform Act that made the federal Guidelines mandatory, and 18 U.S.C. § 3742(e), the section of the Act that provided for de novo appellate review, which was based on the mandatory nature of the Guidelines.  Booker, 125 S. Ct. at 756-69.  So modified, the Court concluded, the Act "makes the Guidelines effectively advisory."  Id. at 756.  Under Booker, the Guidelines are advisory in all cases, even where they could be applied without judicial fact-finding.  Id. at 768.  The Court expressly declined to engraft onto the Guidelines system the Sixth Amendment procedures required by Blakely, reasoning that to require upward enhancements to be proven to a jury beyond a reasonable doubt would "undermine the sentencing statute's basic aim," 125 S. Ct. at 760, and "would so transform the scheme that Congress created that Congress likely would not have intended the Act as so modified to stand."  Id. at 759.  See

10

also id. at 763 ("Congress would not have enacted sentencing statutes that make it more difficult to adjust sentences upward than to adjust them downward.") (emphasis in original).

While Booker excised 18 U.S.C. §§ 3553(b)(1) and 3742(e) of the Sentencing Reform Act, thus rendering the Guidelines advisory, the Court reaffirmed that "the remainder of the Act satisfies the Court's constitutional requirements." Booker, 125 S. Ct. at 764. The Court reaffirmed that "when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant." Id. at 750. The Court therefore ruled that "[t]he district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." Id. at 767 (emphasis added). The Court emphasized that the Act still "requires judges to consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' . . . the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims." Id. at 765 (citing 18 U.S.C. §§ 3553(a)(1), (3), (4)-(7)).

Similarly, the Second Circuit, in interpreting the Supreme Court's opinion in

Booker, has commented:

> [I]t is important to bear in mind that Booker/Fanfan and section
> 3553(a) do more than render the Guidelines a body of casual advice,
> to be consulted or overlooked at the whim of a sentencing judge.
> Thus, it would be a mistake to think that, after Booker/Fanfan, district
> judges may return to the sentencing regime that existed before 1987
> and exercise unfettered discretion to select any sentence within the
> applicable statutory maximum and minimum.  On the contrary, the
> Supreme Court expects sentencing judges faithfully to discharge their
> statutory obligation to "consider" the Guidelines and all of the other
> factors listed in section 3553(a).  We have every confidence that the
> judges of this Circuit will do so, and that the resulting sentences will
> continue to substantially reduce unwarranted disparities while now
> achieving somewhat more individualized justice.

United States v. Crosby, 397 F.3d 103, 113-14 (2d Cir. 2005).

Under the non-mandatory Guideline regime established by Booker and
Crosby, the sentencing judge is empowered to make the factual findings necessary
for determining what the recommended Guidelines sentence is in a particular case.
Crosby, 397 F.3d at 113 ("the sentencing judge is entitled to find all the facts
appropriate for determining either a Guidelines sentence or a non-Guidelines
sentence.").  Thus, following the decisions in Booker and Crosby, sentencing
judges are to determine sentences by discharging their statutory obligation to
consider not only the guidelines, but all of the other factors listed in section
3553(a).

## II.    THE DEFENDANT DESERVES A SENTENCE WITHIN THE APPLICABLE GUIDELINES RANGE.

Assuming that this Court intends to use the 1997 Guidelines Manual, as recommended by both the Probation Office and the United States, the defendant is receiving a tremendous sentencing benefit.  If the defendant were sentenced using the 2006 Guidelines Manual, his guidelines range would be life imprisonment, which would be capped at 25 years (or 300 months) because of the statutory maximums that apply to the defendant's three offenses of conviction.[3]  By simply using the 1997 Guidelines Manual, which results in a Guidelines range of 151 to 188 months, the defendant enjoys a 112 to 149 month windfall.

It bears noting that this 112 to 149 month windfall is not a benefit that the defendant would enjoy in the Seventh Circuit.  In <u>United States v. Demaree</u>, 459

---

[3]    Under the 2006 Guidelines Manual, the defendant's base offense level is seven.  U.S.S.G. § 2B1.1(a)(1).  Thirty levels would be added for an amount of loss that is greater than $400 million.  U.S.S.G. § 2B1.1(b)(1)(P).  Another four levels would be added because the offense involved 250 or more victims, U.S.S.G. § 2B1.1(b)(2)©, and four more levels would be added because the defendant was an officer or director of a publicly traded company at the time of the offense, U.S.S.G. § 2B1.1(b)(15)(A).  After adding another four levels for leadership role, U.S.S.G. § 3B1.1(a), and two levels for obstruction of justice, U.S.S.G. § 3C1.1, the defendant's total offense level would be 51.  Given the defendant's criminal history category of I, a total offense level of 51 is eight levels higher than necessary to place the defendant in a Guidelines range of life imprisonment, U.S.S.G. Ch. 5, Pt. A, which would be capped at 25 years because of the statutory maximums that apply to his offenses of conviction, U.S.S.G. § 5G1.2(d).

13

F.3d 791 (7th Cir. 2006), the Seventh Circuit held that, in the wake of <u>Booker</u>

rendering the Guidelines advisory, a change to the Guidelines Manual that

increases the Guidelines range for a crime is not an ex post facto law, and it may be

applied to a defendant who committed the crime before the change. <u>Id.</u> at 792,

795. The Seventh Circuit, in an opinion by Judge Posner, explained that "[i]f any

regulation traceable to Congress that disadvantages a criminal defendant is . . . an

ex post facto law, even if it is purely advisory, the constitutional prohibition will be

unmoored from both its purpose and the circumstances in which statutes and

regulations have heretofore been deemed to be ex post facto laws." <u>Id.</u> at 794. The

Seventh Circuit added that the sentencing judge could accomplish the same result

under section 3553(a):

> a rule that a guidelines change cannot be applied retroactively if it
> would be adverse to the defendant would have in the long run a purely
> semantic effect. Instead of purporting to apply the new guideline, the
> judge who wanted to give a sentence based on it would say that in
> picking a sentence consistent with section 3553(a) he had used the
> information embodied in the new guideline. For when the Sentencing
> Commission changes a guideline, it does so for a reason; and since it
> is a body expert in criminal punishments, its reason is entitled to the
> serious consideration of the sentencing judge. A judge who said he
> was persuaded by the insight that informed the new guideline to give a
> sentence within the range established by it could not be thought to be
> acting unreasonably. So to the other reasons for rejecting the ex post
> facto argument we add futility: whenever a law or regulation is
> advisory, the judge can always say not that he based his sentence on it
> but that he took the advice implicit in it. A judge is certainly entitled

14

to take advice from the Sentencing Commission.

Demaree, 459 F.3d at 795.

The Second Circuit has not adopted the rule in Demaree, and the United States is not asking this Court to do so. Nevertheless, it is reasonable, as the Demaree Court observed, for a sentencing judge to take advice from the Sentencing Commission, "a body expert in criminal punishments," in imposing a sentence. Demaree, 459 F.3d at 795. Other courts of appeals, including a prior Seventh Circuit panel, have also acknowledged the reasonableness of considering the benefit that a defendant receives when a prior, more lenient Guidelines Manual is used. See, e.g., United States v. Larrabee, 436 F.3d 890, 894 (8th Cir. 2006) ("Here we do not apply the amended guidelines, but reference them because they are instructive as to the range of reasonableness."); United States v. Johnson, 427 F.3d 423, 427 (7th Cir. 2005) ("Johnson's sentence is substantially longer than the guidelines range as calculated by reference to § 2G2.2 as it existed when he committed his crimes, but that would not be true if he engaged in the identical conduct today. Viewing the current version of § 2G2.2 as one benchmark to gauge the reasonableness of Johnson's sentence, . . . the sentence Johnson received would fall within the advisory guidelines range instead of substantially above it.") (emphasis in original); United States v. Giaquinto, 441 F.3d 195, 197 (3d Cir.

15

2006) (affirming sentence, in part, because defendant "received a great benefit from application of the 1998 guidelines range, which had a lower guideline than the 2004 Manual").  Given that the current Sentencing Commission wisdom is that the defendant has earned a 25-year sentence, even a sentence at the top of the 1997 Guidelines range – i.e., 188 months – would be a lenient sentence, reflecting a 112-month windfall to the defendant.  At a minimum, the 25-year Guidelines range recommended by the current 2006 Guidelines Manual strongly militates against the granting of a discretionary downward departure or the imposition of a lesser non-Guidelines sentence on the three grounds advanced by the defendant.

III.    **THIS COURT SHOULD REJECT THE DEFENDANT'S REQUEST FOR A DOWNWARD DEPARTURE OR A LESSER NON-GUIDELINES SENTENCE BASED ON SUPPOSED OVERLAPPING ENHANCEMENTS.**

The defendant seeks a downward departure to mitigate the alleged accumulation of substantially overlapping enhancements, pursuant to United States v. Lauersen, 348 F.3d 329 (2d Cir. 2003), aff'd on reh'g, 362 F.3d 160 (2004), vacated on other grounds, 543 U.S. 1097 (2005), and United States v. Jackson, 346 F.3d 22 (2d Cir. 2003), aff'd on reh'g, United States v. Lauersen, 362 F.3d 160 (2004), vacated on other grounds, 543 U.S. 1097 (2005).  DSM at 2-5.  Specifically, the defendant seeks a downward departure of 24 months under

16

Lauersen and Jackson on the ground that the enhancements for abuse of a position

of trust, leadership role in the offense, and more than minimal planning

substantially overlap.  Moreover, the defendant notes that Judge Alvin W.

Thompson granted this departure in the case of E. Kirk Shelton.  DSM at 4 (citing

Tr. 7/26/2005 at 509-512).  Although this Court has the power to depart or grant a

lesser non-Guidelines sentence on this ground, this Court should decline to do so.

Upon a motion for rehearing, the Second Circuit panel that decided Lauersen

and Jackson reiterated its original position that:

> when the addition of substantially overlapping enhancements results
> in a significant increase in the sentencing range minimum (as it does
> at the higher end of the sentencing table), a departure may be
> considered.  What is present to a degree not adequately considered by
> the Commission is the combined effect of the aggregation of the
> substantially overlapping enhancements and the large increase in the
> sentencing range minimum at the higher end of the sentencing table.

United States v. Lauersen, 362 F.3d 160, 164 (2d. Cir. 2004) (emphasis in

original).  The Second Circuit, however, emphasized that "not many combinations

of enhancements will be substantially overlapping."  Id. at 167.  For example, the

Court made clear that enhancements for leadership role and abuse of trust do

not substantially overlap with each other.  Id. at 168 n.12.  Accordingly, the

defendant's argument that the enhancements for leadership role and abuse of trust

substantially overlap is contrary to Second Circuit precedent and should be rejected

17

by this Court.

The defendant's remaining two enhancement combinations – <u>viz.</u>, (1) more than minimal planning and abuse of position of trust, and (2) more than minimal planning and leadership role – also are not substantially overlapping, as they are not triggered by the same facts.  <u>Cf.</u> <u>Lauersen</u>, 348 F.3d at 343-44 (13-level loss enhancement and 4-level enhancement for affecting a financial institution were both "significantly trigger[ed]" by "large amount of money involved in the fraud").  The defendant's enhancement for more than minimal planning is based on the defendant's repeated criminal acts over a period of at least three years.  PSR ¶ 101.  By contrast, the defendant's enhancement for abuse of position of trust is based on his position as Chief Executive Officer and Chairman of the Board of Directors for CUC and his subsequent position as Chairman of the Board of Directors for Cendant.  The abuse of position of trust enhancement applies regardless of the facts underlying the more than minimal planning enhancement – <u>i.e.</u>, repeated criminal acts over a multiple-year conspiracy.  Logically, frauds that involve more than minimal planning do not necessarily involve an abuse of position of trust.  For example, Kevin Kearney's conduct in this case involved more than minimal planning, but he did not abuse a position of trust.

Similarly, enhancements for more than minimal planning and for leadership

18

role are not necessarily triggered by the same set of facts. The defendant's

enhancement for leadership role is based on the substantial managerial discretion

with which he was entrusted. That enhancement applies regardless of the facts

underlying the enhancement for more than minimal planning. Obviously, the facts

supporting an enhancement for more than minimal planning do not necessarily

trigger an enhancement for leadership role. Once again, Kevin Kearney's conduct

in the offense involved more than minimal planning, but he did not possess the

substantial managerial discretion that is required for a leadership role

enhancement.

**IV.   THIS COURT SHOULD REJECT THE DEFENDANT'S REQUEST FOR A DOWNWARD DEPARTURE OR A LESSER NON-GUIDELINES SENTENCE BASED ON THE DEFENDANT'S RECORD OF CHARITABLE CONTRIBUTIONS AND GOOD WORKS.**

The defendant requests that this Court, in considering "the history and

characteristics of the defendant," either depart downward or impose a lesser non-

Guidelines sentence based on the defendant's charitable contributions and good

works. DSM at 1-2, 5-14. In particular, the defendant argues that he has

demonstrated extraordinary philanthropy, has provided extraordinary support to

family, friends, and neighbors, and has made substantial contributions to

entrepreneurship. DSM at 5-14. Specifically, the defendant argues: (1) that his

19

philanthropy is extraordinary because over the past 17 years he has given over $2.5 million to charity, DSM at 7; (2) that his "friends, family and neighbors have come to depend upon him" and that "that he has proven always to be there for them in their times of need," DSM at 10; and (3) that he has provided guidance and financial support to entrepreneurs, DSM 12-14. Based on these arguments, the defendant requests a sentence of no more than 10 years, or the equivalent of a 31-month departure or variance. The defendant's arguments lack merit, and the United States respectfully requests that this Court reject them.

The Sentencing Guidelines explicitly provide that "civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.11; see United States v. Rioux, 97 F.3d 648, 663 (2d Cir. 1996). Thus, the Guidelines treat a defendant's record of charitable contributions and good works as a "discouraged" basis for downward departure. Where the ground for a requested departure is "discouraged," the Supreme Court has directed that "the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." Koon v. United States, 518 U.S. 81, 96 (1996).

Numerous courts of appeals have ruled that departing in white collar cases based on the type of record that the defendant has made is an abuse of discretion. "[I]t is <u>usual</u> and <u>ordinary</u>, in the prosecution of similar white-collar crimes involving high-ranking corporate executives such as [the defendant], to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts." <u>United States v. Kohlbach</u>, 38 F.3d 832, 838-39 (6th Cir. 1994). White-collar criminals "enjoy sufficient income and community status so that they have the opportunities to engage in charitable and benevolent activities." <u>United States v. Haversat</u>, 22 F.3d 790, 796 (8th Cir. 1994). "Likewise, excellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her." <u>United States v. McClatchey</u>, 316 F.3d 1122, 1135 (10th Cir. 2003). "[W]e expect the district courts to view such evidence with the skepticism of experience in sentencing executives who commit white-collar offenses." <u>Id.</u>

In <u>Kohlbach</u>, the District Court departed based on testimonial letters "showering encomia upon [the defendant] for his charitable works, community involvements, public good deeds, and church activities." 38 F.3d at 839. The record showed that the defendant "has performed many fine deeds in his life and

21

has won the devotion of people who he has helped and who have honored him with

positions of community leadership." Id.  The Sixth Circuit reversed the downward

departure as an abuse of discretion, recognizing that the sentencing guidelines

"already considered the nature of white-collar crime and criminals when setting the

offense levels that govern this offense." Id.[4]

---

[4]     See also United States v. Millar, 79 F.3d 338, 345 (2d Cir. 1996) (refusing to
review District Court's decision not to depart based upon priest's charitable works
and public service, noting that District Court recognized authority to depart but
decided not to do so because defendant "had benefits that few defendants have,
including education, respect in his work, skills of advocacy, intelligence, and the
calling to serve as a priest"); United States v. Morken, 133 F.3d 628, 630 (8th Cir.
1998) ("On the subject of Morken's service to his community, the letters [received
by the district court at sentencing] document a commendable record.  In addition to
being an accommodating neighbor and a good friend, Morken advised local
business owners, hired young people, served on his church council, and raised
money for charity . . . .  Although laudable, Morken's record of good works is
neither exceptional nor out of the ordinary for someone of his income and
preeminence in a small Minnesota town with a population barely over a
thousand.").

     Moreover, Courts of Appeals have reversed departures predicated on service
to the public arguably much more compelling than, though dissimilar from, that
credited to the defendant.  See, e.g., United States v. Winters, 105 F.3d 200, 209
(5th Cir. 1997) (reversing departure based on the defendant's distinguished nat-
ional service in the military, including service in which he was twice wounded in
combat and awarded two purple hearts); United States v. Rybicki, 96 F.3d 754,
758-59 (4th Cir. 1996) (reversing departure based on the national service of "a
highly decorated Vietnam War veteran who had saved a civilian's life during the
My Lai incident and had an unblemished record of 20 years of service to his
country, both in the military and in the Secret Service"); United States v. Ziegler,
39 F.3d 1058, 1062 (10th Cir. 1994) (reversing departure based on the
distinguished national service of a recipient of the National Defense Medal for

These decisions are grounded in the recognition that individuals with sufficient stature, ability, and opportunity to commit white-collar crimes are commonly involved in community service and charitable endeavors, and such activities do not remove the defendant from the contemplated heartland of defendants charged with white-collar offenses. It is widely recognized that "the [Sentencing] Commission intended its guidelines and policy statements to equalize punishments for white collar and blue collar crime," and courts have endeavored to implement that intention in sentencing. United States v. Thurston, 358 F.3d 51, 80 (1st Cir. 2004) (internal quotation marks omitted) (reversing district court's granting of downward departure for charitable good works where white-collar defendant's good works, although "admirable," were insufficient to qualify as exceptional in light of, among other things, his status as a prominent corporate executive with the means to make financial contributions and engage in civic and charitable activities), vacated on other grounds, 125 S. Ct. 984 (2005); see also United States v. Wright, 363 F.3d 237, 248-49 (3d Cir. 2004) (upholding district court's denial of a downward departure for charitable works where good works of the defendant minister, although "profound," "substantial," and "sustained," were not so extraordinary as to justify a downward departure).

─────────────────────

service in the U.S. Army).

23

The defendant has been blessed with tremendous wealth and success. The defendant testified that by 1997 he had been "rich for quite a while" and his net worth could have been as high as $200 million. First Trial Tr. at 14076. The PSR reflects that the defendant declared nearly $85 million in income in the five years between 1995 and 1999 alone. Amended PSR, 1/5/07, ¶ 128. In a May 19, 2006 submission, the defendant claimed that real estate assets that he transferred to his family – which totaled more than $14.5 million[5] – comprised a "small portion of [his] net worth." Docket 2340, at 3. The defendant now argues that the $2.5 million in charitable contributions that he made over the span of the 17 years is so extraordinary that he deserves a downward departure or a lesser non-Guidelines sentence.

The defendant's argument is unpersuasive, to say the least. To characterize the defendant's charitable giving as "extraordinary" defies the ordinary meaning of the word.[6] Even tithing is not considered extraordinary, and the defendant donated substantially less than that. See Thurston, 358 F.3d at 79 (reversing District

---

[5]    See Third Trial Tr. at 1529-30, 3314.

[6]    See United States v. Tocco, 200 F.3d 401, 434 (6th Cir. 2000) (commenting that contribution of money, not time and energy, could be considered a factor involving socio-economic status, which consideration is prohibited by the Guidelines).

Court's decision to depart downward, holding that defendant's acts of tithing 10%

of his income to his church, among other things, was not sufficiently extraordinary

to warrant a downward departure).  Indeed, the defendant stole more money from

Cendant shareholders on a single day – e.g., his March 6, 1998 sale of more than

$11 million of artificially inflated Cendant stock – than he contributed to charity

over the course of 17 years.  Finally, it is difficult to reconcile the defendant's

position that $2.5 million in charitable donations is "extraordinary" while $14.5

million in asset transfers constitutes a "small portion of [his] net worth," Docket

2340, at 3.

     Turning to the defendant's other "good works" – providing support to

friends, family, neighbors, and entrepreneurs – the United States does not dispute

that the defendant's sentencing memorandum presents a laudable record.   It is,

however, a one-sided presentation.  The defendant makes no mention of the lack of

support that he provided to fellow entrepreneurs, Jan and Bob Davidson, when he

terminated them from their executive positions at CUC, despite their business

unit's outstanding performance, and despite his own promises to keep them in

executive positions.  Third Trial Tr. at 82, 141-42, 193.

     The defendant, who presents himself as a man of "integrity" in his

sentencing memorandum, fails to apply to himself the same standards of integrity

that he applied to Cosmo Corigliano.  During the summation in the second trial,

defense counsel argued:

> Walter Forbes put in place, as any CEO of a company or chairman of
> a board, put in place a structure.  That structure should have worked.
> It didn't work because there was a dishonest CFO.  And he corrupted
> a couple of young people.  Instead of being a mentor, a[n] honest
> guide to young people growing up, giving them an opportunity to
> grow up in their profession, he corrupted them and co-opted them:
> Anne Pember, Casper Sabatino, Kevin Kearney.  What other disgrace
> could this man do?  Corrupts younger people, puts them and their
> families at risk.

Second Trial Tr. at 3158.  Ironically, defense counsel's moral condemnation

applies with even greater force to his own client.  The trial evidence demonstrates

that it was the defendant who "corrupted a couple of young people," namely,

Cosmo Corigliano, Kirk Shelton, and Stuart Bell.  The trial evidence demonstrates

that "[i]nstead of being a mentor, a[n] honest guide to young people growing up,

giving them an opportunity to grow up in their profession, he corrupted them and

co-opted them."  Indeed, Cosmo Corigliano was only 23 years old when he began

working for the defendant.  Third Trial Tr. at 1571.  Lastly, defense counsel asked

a fitting – seemingly rhetorical – question: "What other disgrace could this man

do?"  In the case of Walter Forbes, this man could further undermine his integrity

by lying about his criminal conduct in not one, but three trials; this man could

refuse to accept responsibility and show genuine contrition for his crimes and his

26

victims; this man could continue to authorize his lawyers to call government witnesses liars; and for the coup de grace, this man could have the audacity to present himself as a man of integrity at this sentencing proceeding.

In the final analysis, the defendant's record of good works falls far short of qualifying for a downward departure or a lesser non-Guidelines sentence. Most of the good works cited by the defendant – showing kindness and compassion for friends, family, staff, and colleagues going through difficult times, and providing guidance and support for others in their professional lives – are what one should expect of decent, hardworking people. The defendant clearly has gathered during his life a group of loyal and dedicated friends and colleagues, which reflects well on him. However, this does not distinguish his good works from what would ordinarily be expected of any individual who claims to care about others, and particularly those with the means to devote time and resources to assisting others in need. Nor does the fact that many of the defendant's friends and colleagues think highly of him as a person and as a professional distinguish him from other white-collar criminals. See McClatchey, 361 F.3d at 1135 ("excellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her"). Indeed, as described above,

27

the case law is legion with convicted felons who, other than their criminal conduct, appear to be otherwise compassionate and praiseworthy people.  Nonetheless, neither a downward departure nor a lesser non-Guidelines sentence is warranted merely because a defendant has shown kindness, even considerable kindness, to others or because he or she has had an otherwise successful career.

## V.    THIS COURT SHOULD REJECT THE DEFENDANT'S REQUEST FOR A DOWNWARD DEPARTURE OR A LESSER NON-GUIDELINES SENTENCE BASED ON THE DEFENDANT'S AGE.

The defendant requests a downward departure or a lesser non-Guidelines sentence based solely on the fact that he is 64 years old.  DSM 2, 14.  The defendant argues that "[w]ith a ten year sentence or less, [he] can still be productive upon release."  DSM at 14.  The defendant's argument fails, and the United States respectfully requests that this Court reject it.

Under U.S.S.G. § 5H1.1, "[a]ge (including youth) is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range.  Age may be a reason to impose a sentence below the applicable guideline range when the defendant is elderly <u>and</u> infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration."  U.S.S.G. § 5H1.1 (emphasis added).  The language of the guideline dictates that this Court not depart downward from the applicable Guidelines range.

28

Specifically, the defendant, who is only 64 years old, hardly qualifies as elderly, and the defendant makes no claim that he is "infirm." To the contrary, the defendant reported to the Probation Office that he is in "generally good health" and "exercises daily by walking on a treadmill and lifting weights." PSR ¶ 121.

The defendant cites to no case, and the United States has not discovered any, where a district court departed downward on the basis of age alone. By contrast, the case law is replete with denials of downward departures based, at least in part, on age. See, e.g., United States v. Tocco, 200 F.3d 401, 434 (6th Cir. 2000) (concluding that defendant's age of 72 alone "should not be considered as a basis for a substantial downward departure" and "observ[ing] in passing in this regard that eight judges of this court, still in service, are seventy years old or older"); United States v. Fierro, 38 F.3d 761, 775 (5th Cir. 1994) (reversing District Court's downward departure under U.S.S.G. § 5H1.1 for a 43-year-old defendant where the Court stated that any sentence over 20 years would amount to a life sentence); United States v. Rimell, 21 F.3d 281, 288 (8th Cir. 1994) (affirming District Court's refusal to depart downward based solely on fact that the defendant was 62 years old and that the defendant was in good health); United States v. Booher, 962 F. Supp. 629, 633-34 (D.N.J. 1997) (denying downward departure motion under U.S.S.G. § 5H1.1 for 64-year-old defendant with coronary heart disease).

29

## VI.   THIS COURT SHOULD IMPOSE RESTITUTION IN THE AMOUNT OF $3.335 BILLION.

The defendant argues that restitution is inappropriate because all the shareholder victims have not been identified and fully compensated.  DSM at 14-20.  This Court should reject the defendant's argument.  Restitution is mandatory in this case under the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. §§ 3663A, 3664, and this Court need only determine restitution with reasonable approximation.  In doing so, this Court should rely on the compensation that Cendant and Ernst & Young paid to settle the shareholder litigations arising from the accounting irregularities at the former CUC businesses, which accounting irregularities the defendant directed.  Contrary to the defendant's argument, the MVRA does not bar restitution to identified victims merely because other possible victims remain unidentified.

Under the MVRA, this Court is required to impose an order of restitution for the full amount of losses sustained by the defendant's victims.  18 U.S.C. § 3664(f)(1)(A) ("In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant.").[7]  This

_____

[7]     The MVRA provides in pertinent part:

Court may not reduce the restitution amount on the ground that payment of the full

restitution would be difficult or even impossible for the defendant.  United States

v. Harris, 302 F.3d 72, 75 (2d Cir. 2002) ("When restitution is mandatory, the

amount of restitution can only be challenged on the ground that it does not reflect

losses to the victims.").[8]

Additionally, when "more than one defendant has contributed to the loss of a

victim, the Court may make each defendant liable for payment of the full amount

---

Notwithstanding any other provision of law, when sentencing a defendant
convicted of an offense described in subsection (c), the court shall order, in
addition to, or in the case of a misdemeanor, in addition to or in lieu of, any
other penalty authorized by law, that the defendant make restitution to the
victim of the offense or, if the victim is deceased, to the victim's estate.

18 U.S.C. § 3663A(a)(1).

Subsection (c) of § 3663A includes among the categories of crimes for
which victim restitution is mandatory "any offense committed by fraud or deceit."
18 U.S.C. § 3663A(c)(1)(A)(ii).  Accordingly, the defendant's crimes of making
false statements to the SEC and conspiring to make false statements to the SEC and
to commit securities fraud are subject to the MVRA.  See United States v. Walker,
353 F.3d 130, 132 (2d Cir. 2003) (applying MVRA to securities fraud
prosecution); United States v. Lino, 327 F.3d 208, 209 (2d Cir. 2003) (applying
MVRA in a racketeering prosecution based on a "fraudulent scheme to inflate the
price of selected stocks").

[8]    Because the conspiracy in this case extended beyond April 24, 1996, the
effective date of the MVRA, the requirements of that statute apply in this case,
even though the conspiracy began before the effective date of the statute.  United
States v. Boyd, 239 F.3d 471, 472 (2d Cir. 2001) (per curiam).

31

of restitution or may apportion liability among the defendants to reflect the level of

contribution to the victim's loss and economic circumstances of each defendant."

18 U.S.C. § 3664(h); see United States v. Boyd, 222 F.3d 47, 51 (2d Cir. 2000)

(affirming an order which required the defendant to pay restitution in the full

amount of the victims' losses caused by the conspiracy as a whole, even with

regard to losses caused by conduct that was the subject of substantive counts as to

which the defendant was either not charged or acquitted).  This provision confers

substantial discretion upon the sentencing court to decide whether to impose full or

joint and several liability for restitution on each defendant.  United States v. Nucci,

364 F.3d 419, 422 (2d Cir. 2004); United States v. Lucien, 347 F.3d 45, 54 (2d Cir.

2003).

     This Court need not determine restitution with exactitude, but only with

reasonable approximation.  United States v. Williams, 292 F.3d 681, 688 (10th Cir.

2002) ("[T]he determination of an appropriate restitution is by nature an inexact

science."); United States v. Futrell, 209 F.3d 1286, 1292 (11th Cir. 2000) ("In light

of the difficulties in determining exactly how much Mr. Futrell could have earned,

we hold that the district court did not abuse its discretion by accepting a reasonable

estimate of the amount of government loss caused by his fraud."); United States v.

Sapoznik, 161 F.3d 1117, 1122 (7th Cir. 1998) (affirming restitution that "ke[pt]

within reasonable bounds the rough approximation that is all that is feasible in the computation of loss in a case such as this"); <u>see</u> <u>also</u> <u>United States v. Catoggio</u>, 326 F.3d 323, 329 (2d Cir. 2003) (citing <u>Futrell</u>, 209 F.3d at 1292, for proposition that "restitution could be based on a reasonable estimate of losses when it would be impossible to determine the precise amount"); <u>United States v. Savoie</u>, 985 F.2d 612, 617 (1st Cir. 1993) (commenting, in interpreting predecessor statute, that "[s]o long as the basis for reasonable approximation is at hand, difficulties in achieving exact measurements will not preclude a trial court from ordering restitution"). A reasonable estimate is particularly proper here, where there is no simple formula for determining the amount of loss. <u>Cf.</u> <u>United States v. Ebbers</u>, 458 F.3d 110, 127-28 (2d Cir. 2006) (describing difficulties in determining loss suffered by investors who purchased or held WorldCom securities during the fraud period; "Determining this amount is no easy task.").

The Court must also fix a schedule for payment of restitution, and in so doing, must consider the following statutory factors:

(A) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled;

(B) projected earnings and other income of the defendant; and

(C) any financial obligations of the defendant; including obligations to dependents.

33

18 U.S.C. § 3664(f)(2).[9]  If the Court intends to establish a schedule of periodic

payments, it must do so expressly and clearly, as the failure to set forth such a

schedule creates a presumption that the entire restitution amount is payable

immediately.  Nucci, 364 F.3d at 421.  That such a schedule necessarily involves

some guesswork on the part of the Court regarding the defendant's future income

is no impediment to the court making a reasonable prediction, based on

information available at sentencing, regarding the amount of that income.  Id.

This Court should impose restitution in the amount of $3.335 billion.  This

restitution amount breaks down into three components:

- $2.85 billion that Cendant paid to settle a securities fraud class action involving more than 119,000 members, including 1,700 institutional investors, arising from the accounting irregularities in the former CUC businesses, In re Cendant Corp. Litig., 109 F. Supp. 2d 235, 242 (D.N.J. 2000);

- $335 million that Ernst & Young paid to settle a securities fraud class action involving more than 119,000 members, including 1,700 institutional investors, arising from the accounting

---

[9]    Although the sentencing court "need not make detailed factual findings on each factor, the record must disclose some affirmative act or statement allowing an inference that the district court in fact considered the defendant's ability to pay." Lucien, 347 F.3d at 53 (internal quotation marks omitted).  The sentencing court may not satisfy this requirement merely by stating that it has reviewed information regarding the  defendant's financial condition set forth in the pre-sentence report. United States v. Tran, 234 F.3d 798, 812-14 (2d Cir. 2000), overruled on other grounds, United States v. Thomas, 274 F.3d 655 (2d Cir. 2001).

irregularities in the former CUC businesses, In re Cendant Corp. Litig., 109 F. Supp. 2d, 235, 242 (D.N.J. 2000); and

- in excess of $150 million that Cendant paid in resolving other class claims and individual investor claims arising from the accounting irregularities in the former CUC businesses, see Exhibit A (12/5/2006 Letter from Counsel for Cendant to United States Attorney's Office), at 2.[10]

Given that this $3.335 billion figure has already been paid to identifiable

victims, it represents a reasonable – indeed conservative – estimate of the loss.

Because Cendant and Ernst & Young have compensated these identified victims

---

[10]    This $3.335 billion figure does not include losses to plaintiffs in three remaining lawsuits against Cendant regarding the accounting irregularities in the former CUC businesses:  Trestman et al. v. Cendant, E.D. La., Civ. No. 99-1393; Alexander, Bock et al. v. CUC, et al., E.D. Cal., Civ. Nos. F00-5415, F99-5500; and Reliant Trading v. Cendant, E.D. Wis., Civ. No. 99-C-0381.  The United States spoke with plaintiffs' counsel in each of the litigations, and obtained the plaintiffs' estimated demand for damages.  Specifically, plaintiffs' counsel in Trestman anticipates a seven-figure demand; plaintiffs' counsel in Alexander, Bock anticipates a $40 to $50 million demand; and plaintiffs' counsel in Reliant Trading anticipates a $20 million demand.  In total, plaintiffs' counsel anticipate demands between $61 to $80 million for the remaining shareholder litigations arising from the accounting irregularities in the former CUC businesses.  The United States spoke to Cendant's counsel, who confirmed that there is no reasonable expectation of settling these three lawsuits in the next 90 days.  Thus, the United States has not requested this Court to set a hearing for a final determination of the victims' losses within 90 days of the sentencing, as section 3664(d)(5) allows.  Section 3664(d)(5), however, authorizes the victims or the party compensating the victims to petition the court for an amended restitution order within 60 days of the discovery of losses.  Accordingly, if Cendant were to settle these lawsuits with the plaintiffs at a future date, Cendant could petition the Court within 60 days of the settlement for an amended restitution order.

for the $3.335 billion loss, this Court should order that the defendant pay restitution to Cendant and Ernst & Young, in accordance with 18 U.S.C. § 3664(j)(1) ("If a victim has received compensation from insurance or <u>any other source</u> with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation . . . .) (emphasis added).[11]

The defendant does not argue that the $3.335 billion restitution amount is an excessive estimate of the total losses that the victims suffered.  Rather, the defendant argues that the total number of victims (and by logical extension the total amount of loss) is much larger – so large as to make restitution impractical. The defendant's argument relies, in large measure, on 18 U.S.C. § 3663A(c)(3)(A), which provides that mandatory restitution is inapplicable when "the number of identifiable victims is so large as to make restitution impracticable."  18 U.S.C. § 3663(c)(3)(A).  DSM at 14-17.  The defendant's argument also relies on 18 U.S.C. § 3663A(c)(3)(B) insofar as he argues that determining the <u>full loss</u> to the victims is too complicated and would prolong the sentencing process.  DSM at 14-17.

---

[11]     Any restitution that the defendant pays should be allocated between Cendant and Ernst & Young based on their respective payments to the victim shareholders. Specifically, Cendant should receive 90 percent of the restitution, because it paid $3 billion of the total to victim shareholders, and Ernst & Young should receive the remaining 10 percent.

The defendant's argument lacks merit for three reasons.  First, the defendant's reading of the MVRA is absurd.  The statute is designed to protect victims, not convicted felons.  Cf. United States v. Grimes, 173 F.3d 634, 639 (7th Cir. 1999) ("[T]he intended beneficiaries [of the MVRA] are the victims, not the victimizers.").  The MVRA does not preclude restitution to identifiable victims simply because some victims remain unidentified.  The defendant's suggested interpretation would reward defendants who commit fraud on an overwhelming scale (like Forbes), but punish those who commit frauds on a smaller scale.  This Court should not read the statute to produce such an absurd result.  See Yerdon v. Henry, 91 F.3d 370, 376 (2d Cir. 1996) ("Where an examination of the statute as a whole demonstrates that a party's interpretation would lead to absurd or futile results plainly at variance with the policy of the legislation as a whole, that interpretation should be rejected.") (internal citation and quotation omitted).  As the Second Circuit has found, a reasonable reading of the statute limits restitution to reasonable losses to identifiable victims.  See Catoggio, 326 F.3d at 328 ("The MVRA is clear that restitution can only be imposed to the extent that the victims of a crime are actually identified, 18 U.S.C. § 3663A(c)(1)(B)."); accord Grimes, 173 F.3d at 640 ("The statute limits the order of restitution to the sum of losses to identifiable victims . . . .").

37

Second, as Judge Posner explained in interpreting § 3663(c)(3)(A), "[i]t could not have been the intention behind the provision . . . to bar restitution to those victims who are identifiable merely because others are not." <u>Grimes</u>, 173 F.3d at 639.  That is exactly the defendant's position here.  In <u>Grimes</u>, the defendant was convicted of mail fraud and using a false name or address in connection with mail fraud.  <u>Grimes</u>, 173 F.3d at 635.  The District Court ordered the defendant to pay $500,000 in restitution.  <u>Id.</u>  On appeal, the defendant admitted that he defrauded thousands of persons, and he did not contend that the $500,000 was "an extravagant estimate of the total losses that the victims incurred."  <u>Id.</u> at 638.  "His quarrel with the $500,000 figure [was] based on the provision of the Mandatory Victims Restitution Act that requires that 'in each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant.'"  <u>Id.</u> at 639 (quoting 18 U.S.C. § 3664(f)(1)(A)).  At the time of Grimes's sentencing, the total amount of loss attributable to the victims whom the government had identified was $345,000, which was $155,000 short of the District Court' s restitution amount. <u>Id.</u>  The defendant argued that the restitution order violated the MVRA, because "the statute does not authorize an order of restitution that does not make each

victim whole." Id.

The Seventh Circuit, in an opinion by Judge Posner, rejected the defendant's

argument.  The Seventh Circuit observed that the statute confers rights on the

victims, not the criminals:

> That is what the statute says, all right, but the intended beneficiaries
> are the victims, not the victimizers. . . . The criminal has no rights
> under the quoted provision.  If the district judge violated it by failing
> to name some of the victims in the order of restitution, he has
> wronged the victims, not [the defendant].  [The defendant] cites other
> subsections of § 3664 as well, but they too confer rights on victims,
> not on criminals.

Grimes, 173 F.3d at 639.  Here, defendant Forbes also relies on § 3664(f)(1)(A) to

argue that "prior to any order of restitution being imposed, every victim must be

identified, and the full amount of each victim's loss must be calculated."  DSM at

17.  As in Grimes, defendant Forbes has no rights under § 3664(f)(1)(A) and is not

harmed if the restitution order fails to include every possible victim.  Moreover,

this Court should not countenance the defendant's self-serving attempt to avoid

paying his identified victims on the ground the total number of victims and the

total amount of compensation is not enough.  This is particularly so when the

defendant is also claiming that he has a negative net-worth and thus, by his own

admission, could not even pay the $3.335 billion to the clearly identified victims.

The Seventh Circuit also rejected Grimes's argument that the restitution

order violated the MVRA because the defendant's reliance on section

3664(f)(1)(A) of the MVRA was misplaced.  Grimes, 173 F.3d at 639.  The

controlling provision of the MVRA, the Seventh Circuit concluded, was section

3663A(c)(3)(A), which, as already noted, provides that restitution is not required if

"'the number of identifiable victims is so large as to make restitution

impracticable.'"  Id. (quoting 18 U.S.C. § 3663A(c)(3)(A)).  Judge Posner

explained:

> The present case may be one in which so many of the defendant's
> victims are unidentifiable that full restitution is impossible.  But it
> could not have been the intention behind the provision just quoted to
> bar restitution to those victims who are identifiable merely because
> others are not.

Id.

Here, defendant Forbes relies on section 3663A(c)(3)A) to make exactly the

argument that the Seventh Circuit rejected in Grimes – that the MVRA does not

authorize restitution to identified victims if every victim has not been identified.

This Court should adopt the reasoning of the Seventh Circuit in Grimes and reject

the defendant's attempt to avoid paying restitution to identified victims merely

because some victims may remain unidentified.  To accept the defendant's

interpretation of the statute would allow the defendant to victimize the victims yet

again by not paying restitution.

Third, the defendant's argument that determining the full loss to the victims is too complicated and would prolong the sentencing process also lacks merit.  This Court need make only a reasonable approximation of the loss to the defendant's victims.  See Williams, 292 F.3d at 688; Futrell, 209 F.3d at 1292; Sapoznik, 161 F.3d at 1122; see also Catoggio, 326 F.3d at 329 (citing Futrell, 209 F.3d at 1292, for proposition that "restitution could be based on reasonable estimate of losses when it would be impossible to determine the precise amount").  The amount that Cendant and Ernst & Young paid to settle the securities fraud actions arising from the accounting irregularities in the former CUC businesses is a conservative estimate of the loss.  Indeed, the District Court that approved the securities fraud class action settlement of approximately $3.2 billion found that, by comparison to the $8.8 billion that it determined to be the maximum amount of damages, the plaintiff class's recovery rate was 36 to 37 percent.  In re Cendant Corp. Litig., 264 F.3d 201, 241 (3d Cir. 2001).  The class evidently decided that, in light of the litigation risks associated with a trial, particularly the risk that a jury might accept the defense experts' lower calculations of damages, the settlement amount was fair and reasonable.  See id., at 241-242.  Indeed, the District Court noted that a 36 to 37 percent recovery rate by the plaintiff class "'far exceeds recovery rates of any case cited by the parties.'"  Id. at 241 (quoting In re Cendant Corp. Sec. Litig., 109

41

F. Supp. 2d at 263). Given that the $3.35 billion number is based on settlements with clearly identified plaintiffs, this Court should accept the $3.35 billion figure as reasonable estimate of the loss to the defendant's victims and reject the defendant's argument.

## CONCLUSION

For the all the foregoing reasons, this Court should impose a sentence of incarceration within the Guidelines range of 151 to 188 months and order the defendant to pay $3.335 billion in restitution.

Respectfully submitted,

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice


/s/ Michael Martinez
By: MICHAEL MARTINEZ
Federal Bar Number PHV0243
CRAIG CARPENITO
Federal Bar Number PHV0244
MARK E. COYNE
Federal Bar Number PHV01079
Special Attorneys
U.S. Department of Justice
970 Broad Street, Suite 700
Newark, New Jersey  07102