UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA          :

          v.                      :          Criminal No. 3:02CR264(AHN)

WALTER A. FORBES                  :

## RULING ON DEFENDANT'S MOTION FOR A NEW TRIAL

Pending before the court in this criminal securities fraud case is the motion of defendant, Walter A. Forbes ("Forbes"), for a new trial pursuant to Fed. R. Crim. P. 33. Forbes asserts that the interests of justice require this court to vacate the judgment of conviction and grant him a new trial. For the following reasons, Forbes's motion is denied.

Rule 33 motions are disfavored. A district court must exercise its authority to grant a new trial sparingly and only in the most extraordinary circumstances. See United States v. Ferguson, 246 F.3d 129, 143 (2d Cir. 2001). As a general rule, relief under Rule 33 is warranted only where there has been error of a sufficient magnitude as to require reversal on appeal. See 3 Charles Alan Wright et al., Federal Practice & Procedure § 556 (3d ed. 2004). In apparent recognition of the fact that there is no error of that magnitude in the record of this case, Forbes maintains that the cumulative effect of dozens of alleged pretrial and trial errors warrants a new trial even though none of them, standing alone, would require reversal. However, even if there were authority in this circuit to justify application of

this standard in deciding a Rule 33 motion, cf. United States v. Lumpkin, 192 F.3d 280, 290 (2d Cir. 1999), the accumulation of the non-errors cited by Forbes does not warrant the relief he seeks.

Not only does Forbes fail to show that any of the court's pretrial and trial rulings are, in fact, erroneous, he also fails to demonstrate how any alleged errors in the aggregate warrant the extraordinary relief of a new trial. Moreover, Forbes's bald assertions do not satisfy his burden of showing the specific prejudice that resulted from the challenged court rulings or other alleged errors. To the contrary, the record demonstrates that Forbes suffered no prejudice, let alone prejudice that resulted in a fundamentally unfair trial. Surprisingly, his brief contains little or no argument, analysis, or legal citation. He merely rattles off a litany of alleged errors and refers the court to one or more of the 2,500-plus documents in the record where the issues were previously briefed and argued. In doing so, he imposes an unwarranted burden on the court requiring it to "play archaeologist with the record" in order to decipher his claims.[1]  De Silva v. Di Leonardi, 181 F.3d 865, 867 (7th Cir. 1999). Nonetheless, the court has carefully considered his claims and has determined that they are no more meritorious

_____

[1]It is also an impermissible attempt to circumvent the Court's page limit for briefs and memoranda. See D. Conn. L. Civ. R. 7(a)2.

now than when the court previously considered and rejected them. In sum, Forbes has failed to identify any errors, either singularly or collectively, that would justify a new trial.

DISCUSSION

Specifically, Forbes claims that this court should order a new trial because of the government's numerous Brady/Giglio and Fed. R. Crim. P. 16 violations, the court's errors in selecting the jury, the court's error in refusing to order the government to compel immunity on Stuart Bell, the court's numerous evidentiary errors, the government's improper arguments to the jury, and the court's errors in connection with the jury instructions. There is no merit to any of Forbes's claims.

I.    Alleged Disclosure Violations

At the outset, the court repeats an observation it made in a pretrial ruling denying one of Forbes's numerous discovery motions:  it is satisfied that the government was aware of and had complied with its discovery obligations and its continuing duty to turn over all exculpatory and impeachment evidence that Forbes was entitled to receive under Fed. R. Crim. P. 16, the Court's Standing Order, Brady, and Giglio.  Indeed, as the court then noted, the record reflects that the government gave Forbes, out of an abundance of caution as opposed to legal compulsion, far more discovery than a criminal defendant was entitled to receive.

Nonetheless, Forbes now maintains that the government violated its disclosure obligations under <u>Brady</u>, <u>Giglio</u>, and Rule 16 by withholding certain evidence that he could have used to impeach for bias the testimony of four government witnesses. Specifically, he complains that the government wrongfully failed to disclose: (1) information relating to communications between Henry Silverman ("Silverman") or Cendant and the government demonstrating efforts to "lobby" the government to prosecute Forbes, and communications between Cosmo Corigliano ("Corigliano") and the government regarding Corigliano's compliance with his plea and settlement agreements; (2) whether the government asked Kevin Kearney ("Kearney"), Michael Monaco ("Monaco"), and Corigliano certain questions during interviews and other information pertaining to Kearney; and (3) the substance of any communications between the government and Stuart Bell ("Bell") regarding proffers.

Forbes demands that the court now order the government to provide this information to him or to the court <u>in</u> <u>camera</u> to determine whether the government's alleged nondisclosure warrants a new trial. However, the court need not review this material, assuming it even exists, because it concludes that either (1) the government fully satisfied its disclosure obligations with respect to the evidence; (2) the evidence was not discoverable under <u>Brady/Giglio</u> or Rule 16; or (3) assuming it was

discoverable, its suppression would not require a new trial.  See
United States v. Coppa, 267 F.3d 132, 139 (2d Cir. 2001) (holding
that a Brady/Giglio violation occurs only where the government
suppresses evidence that could reasonably have been taken to put
the whole case in such a different light as to undermine
confidence in the verdict) (quoting Kyles v. Whitley, 514 U.S.
419, 435 (1995)); see also Strickler v. Greene, 527 U.S. 263, 281
(1999) (noting that strictly speaking, there is never a real
Brady violation unless the government's nondisclosure was so
serious that there is a reasonable probability that the
suppressed evidence would have produced a different verdict);
United States v. Rivas, 377 F.3d 195, 199 (2d Cir. 2004).

    A.   Disclosure of Bias Evidence re Silverman & Corigliano

With regard to the nondisclosure of evidence of Silverman's
efforts to lobby the government to prosecute Forbes, Forbes has
not and cannot show that such evidence was material or that its
alleged nondisclosure caused him specific prejudice.  To the
contrary, any additional evidence relating to Silverman's bias
would have been cumulative in light of the fact that Silverman
admitted his bias at trial.  Indeed, Silverman testified, inter
alia, that he was enraged by the fraud because it caused him to
lose approximately one billion dollars, his reputation, and his
credibility; that he expected the former CUC officials [i.e.,
Forbes] to go to jail and that he would receive an "emotional

-5-

lift" when they did; that he personally monitored the criminal

investigation of the fraud and wanted the wrongdoers identified

and punished; and that he looked to the courts for retribution.

In light of this and other evidence of Silverman's alleged

bias, evidence pertaining to a meeting between Silverman and

former United States Attorney Robert Cleary[2] would have been

merely cumulative and as such, immaterial.  See United States v.

Jackson, 345 F.3d 59, 74 (2d Cir. 2003) (noting that suppressed

evidence is not material if it merely furnishes an additional

basis on which to impeach a witness); United States v. Gambino,

59 F.3d 353, 366 (2d Cir. 1995) (noting that a Brady/Giglio

violation only serves as grounds for a new trial where the

omitted evidence is material).  Further, there is more than a

reasonable likelihood that, when assessed in light of the entire

record, the alleged nondisclosure of evidence that Silverman

---

[2]In this regard, the court notes that, after Silverman
testified that a then-sitting United States Senator from New
Jersey arranged for him to meet with the United States Attorney
for New Jersey to discuss the fraud, the government made inquiry
and the following day advised Forbes that former U.S. Attorney
Cleary recalled a meeting with Silverman, but did not recall that
Silverman requested the U.S. Attorney's Office to investigate or
prosecute Forbes.  While it is doubtful that the government was
required to disclose this meeting, the evidence was disclosed
during trial and Forbes had the opportunity to use it in his
defense.  Thus, it cannot even be said that the evidence was
suppressed.  See United States v. Gonzalez, 110 F.3d 936, 944 (2d
Cir. 1997) ("[E]vidence is not considered to have been suppressed
within the meaning of the Brady doctrine if the defendant or his
attorney knew, or should have known, of the essential facts
permitting him to take advantage of [that] evidence.").

lobbied the U.S. Attorney to prosecute Forbes had no effect on the outcome of the trial.  See Coppa, 267 F.3d at 141; United States v. Diaz, 176 F.3d 52, 108 (2d Cir. 1999); United States v. Locascio, 6 F.3d 924, 949-50 (2d Cir. 1993).

This is also the case with regard to evidence pertaining to Corigliano's alleged non-compliance with his plea and settlement agreements.  Forbes's claims in this regard were extensively briefed and argued prior to the third trial as well as the prior trials.  The court rejected his claims then and, in the absence of any showing by Forbes as to why the court should revisit the issue, the court rejects his claims now for the same reasons.

Moreover, because Forbes had an overwhelming amount of evidence which he used in his vigorous efforts to impeach and discredit Corigliano, both as to bias and credibility, any evidence that was not disclosed would be merely cumulative and not material.  Indeed, when assessed in light of the entire record, the nondisclosure of this evidence had no effect on the outcome of the trial.  See, e.g., Coppa, 267 F.3d at 141.

B.    Disclosure of Whether Questions Were Asked & Other Information re Kearney

Similarly baseless are Forbes's allegations that the government violated its Brady/Giglio obligations by failing to disclose whether it asked Kearney, Monaco, and Corigliano certain questions; whether it informally offered Kearney immunity; and by failing to produce work product material containing information

about Kearney.  Not only are these claims factually unsupported, Forbes does not establish that this evidence was willfully or inadvertently suppressed by the government, was favorable to him, and that he suffered prejudice by its suppression.  Without such a showing, Forbes has not established a Brady/Giglio violation.

First, contrary to Forbes's contention, the government did not violate its disclosure obligations under Brady/Giglio and Rule 16 with regard to Kearney.  Prior to trial, the government produced hundreds of pages of hand-written notes of prosecutors, FBI agents, and SEC officials which summarized their interview sessions with him.  Not surprisingly, the notes were not verbatim transcripts of the interviews and did not set forth the substance of the interviews in a question and answer format.  Forbes was not satisfied with this disclosure and demanded the government advise him if any government official asked Kearney certain questions.

In response, the government represented to Forbes and the court that all information that could be construed as subject to the government's disclosure obligations under Brady, Giglio, the Jencks Act, or Rule 16, including all information that could be construed to exculpate Forbes or used to impeach any of the government's witnesses, had been disclosed to Forbes and that no further discovery was required.  The government also identified four memoranda that had been prepared by members of the

prosecution team that contained their assessments of the case. The government stated that the memoranda contained the same Brady/Giglio material that had previously been disclosed to Forbes, but declined to produce the memoranda on the grounds that they constituted attorney work product that was not subject to production. Thereafter, as well as now, Forbes maintained that the government's failure to state whether it asked Kearney specific questions and to produce the four memoranda violated Brady/Giglio and Rule 16. This claim is meritless and evidences a fundamental misunderstanding of the government's disclosure obligations.

Under Rule 16(a)(2), the government is not required to disclose reports, memoranda, or other internal government documents made by attorneys for the government or other government agents in connection with the investigation or prosecution of a case. As the government acknowledges, this rule does not relieve it of its duty under Brady/Giglio to disclose material exculpatory or impeachment evidence. See United States v. Jackson, 850 F. Supp. 1481, 1505 (D. Kan. 1994); United States v. Milikowsky, 896 F. Supp. 1285, 1308 (D. Conn. 1994). But this does not mean that under Brady/Giglio the government is required to disclose all evidence that might assist defense preparation. United States v. Middlemiss, 217 F.3d 112, 123 (2d Cir. 2000).

Where, as here, a defendant's only justification for

invading the work product privilege is that the work product
contains the same Brady/Giglio material that the government
already disclosed, there is no basis to order production of the
work product.  Indeed, the Supreme Court has "never held that the
Constitution demands an open file policy."  Kyles v. Whitley, 514
U.S. 419, 437 (1995).  And neither Brady nor Giglio require the
government to produce every shred of paper that contains
exculpatory or impeachment evidence that has otherwise been
disclosed.  Rather, under Brady and Giglio, due process is
violated only where the prosecution suppresses material evidence
that is favorable to the defendant, including evidence that is
exculpatory, i.e., going to the heart of the defendant's guilt or
innocence, and evidence that is useful for impeachment, i.e.,
having the potential to alter the jury's assessment of the
credibility of a significant prosecution witness.  See, e.g.,
United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998).
Merely because Forbes was denied access to this work product does
not mean that he was denied access to exculpatory and impeachment
evidence known only to the government.  See United States v.
Zackson; 6 F.3d 911, 918 (2d Cir. 1993).

In addition, because the government produced all material
exculpatory and impeachment evidence pertaining to Kearney, it
did not violate Brady/Giglio by not stating whether certain
questions were posed to him.

There was also no <u>Brady/Giglio</u> violation with regard to the issue of whether Kearney was orally promised informal immunity. Prior to trial, the government represented, and Kearney's counsel confirmed, that no such promises were made.  At trial, Kearney also confirmed that fact.

Forbes also fails to establish a <u>Brady/Giglio</u> violation with regard to whether Monaco was asked prior to the 2005 trial about Forbes's "lobbying" efforts to keep Anne Pember ("Pember") in her accounting role at CUC.  During trial, when the government represented that it had already responded in the negative to Forbes's inquiry on this issue, the court ruled that the government's response was sufficient.  The court still finds that the government's response was sufficient under <u>Brady/Giglio</u>.

Similarly, there was no <u>Brady/Giglio</u> violation in connection with information about whether, before 2006, the government asked Corigliano about quarterly earnings conference calls prior to mid-1997.  In a letter dated August 24, 2006, the government informed Forbes that Corigliano did not recall quarterly conference calls with stock analysts before 1997.  Corigliano also testified at trial that he did not remember any such quarterly conference calls before 1997.

C.  <u>Disclosure re Bell</u>

Finally, there was no <u>Brady/Giglio</u> violation in connection with information about Stuart Bell's alleged proffers.  The

government advised Forbes that Bell had not provided any Brady/Giglio information and that neither Bell nor his counsel had told the government that Bell did not have any incriminating information to provide.

In sum, a new trial is not warranted on the basis of any alleged violations of the government's disclosure violations.

## II. Alleged Errors in Jury Selection

There is no merit to Forbes's claims that the court erred by (1) not conducting individual voir dire of all potential jurors whom he challenged for cause; (2) denying Forbes's cause challenges to five jurors; (3) denying his request to pose two specific voir dire questions; and (4) denying his Batson challenge based on the government's peremptory strikes of female prospective jurors. Forbes does not explain how the court abused its discretion in connection with these rulings. See United States v. Rubin, 37 F.3d 49, 54 (2d Cir. 1994) (noting that the process of empaneling a jury is firmly entrusted to the sound discretion of the trial judge and will not be disturbed on appeal absent an abuse of discretion). Moreover, Forbes's failure to establish that the jury that eventually convicted him was not impartial is fatal to his claims. See id.; see also United States v. Towne, 870 F.2d 880, 885 (2d Cir. 1989); United States v. Brown, 644 F.2d 101, 104-05 (2d Cir. 1981).

Because federal judges are not required to ask every

question that counsel believes is appropriate, see United States v. Lawes, 292 F.3d 123, 128 (2d Cir. 2002), the court did not err in refusing to ask certain voir dire questions. Not only did Forbes's counsel have information about the potential jurors from their answers to the questionnaires that had been mailed before jury selection to all prospective jurors, at jury selection the court asked additional and follow-up questions that substantially covered the area of Forbes's requests. Indeed, in conducting jury selection, the court allowed additional voir dire questions that it believed were necessary to provide counsel with enough information about each potential juror to enable them to reasonably exercise their challenges and exclude persons whose viewpoints they believed might impair their impartial weighing of the evidence. But the court was also careful to avoid counsel's use of voir dire questions to conduct a mini-trial that would delay the presentation of evidence. See id. In doing so, the court did not abuse its discretion. And Forbes's failure to demonstrate any prejudice resulting from the court's failure to ask certain questions further establishes that there was no reversible error in this regard.

The court also did not err in denying Forbes's cause challenges to five jurors. Those five individuals were asked, along with all other potential jurors, about their ability to judge the case fairly, and none of them said they could not do

so.  Moreover, Forbes does not point to anything in their questionnaires that would indicate otherwise.  Those five jurors were not excused for cause because the court was satisfied that they were able to be fair and impartial.

But even assuming that the court should have upheld the cause challenges, such an error would be harmless and would not provide a ground for a new trial because Forbes has not, and cannot, establish that the jury that heard his case was biased.  See United States v. Jackson, 38 Fed. Appx. 59, 61 (2d Cir. 2002) (summary order); Rubin, 37 F.3d at 54.

Finally, with regard to Forbes's Batson challenge, as the court previously ruled, Forbes did not carry his burden of establishing purposeful discrimination.  In making that determination, the court credited the government's specific, gender-neutral reasons for exercising peremptory strikes against several female venire persons.  See Messiah v. Duncan, 435 F.3d 186, 198 (2d Cir. 2006) (citing Galarza v. Keane, 252 F.3d 630, 636 (2d Cir. 2001); Jordan v. Lefevre, 206 F.3d 196, 200 (2d Cir. 2000)).  Forbes has not given the court any reason to now reconsider its conclusion that the government's gender-neutral explanations were believable, legitimate, and not pretextual.[3]

---

[3]In reaching this conclusion there was, and is, no reason to consider the government's peremptory challenges from the first two trials.  Even if there was a pattern of striking women during those trials, that would not undermine the court's credibility finding that the government's proffered explanations for striking

-14-

Forbes has not shown any errors in connection with his jury selection, and a new trial is not justified on these claims.

III. <u>There Was No Error With Regard to Bell</u>

The court did not err when it concluded that Forbes's motion to compel the government to confer use immunity on Stuart Bell was meritless. In denying that motion, the court found that the government had legitimate and compelling law enforcement concerns and interests for not immunizing him and that it had not engaged in discriminatory use of immunity. The court also found that Forbes had not shown that the immunized testimony of Bell would be material or exculpatory of Forbes. Thus, it concluded that there was no basis to order the government to confer use immunity on Bell or to sanction the government for its refusal to do so by making it forego using certain evidence or giving a missing witness instruction.

Contrary to Forbes's contention, the court did not preclude Forbes from making any argument in summation concerning the government's failure to call Bell. Rather, the court correctly ruled that if he made such an argument, it would give an "equally unavailable" instruction. Based on the government's correct decision not to immunize Bell, this court's correct decision not to give a missing witness instruction, <u>see</u> <u>United States v.</u> <u>Myerson</u>, 18 F.3d 153, 160 (2d Cir. 1994), the absence of any

_____

females in this trial were not pre-textual.

showing that Bell's testimony would be favorable to Forbes, and Bell's invocation of the Fifth Amendment privilege, the court properly concluded that Bell was equally unavailable to both Forbes and the government and thus no negative inference could be drawn from the government's failure to call him.  See id. at 158.

Further, there was nothing improper in the government's summation and rebuttal summation arguments concerning Bell and pre-1995 accounting at CUC.  Those arguments were supported by substantial evidence in the record relating to the pre-1995 fraud and as such, were permissible.  Cf. United States v. Rosa, 17 F.3d 1531, 1548-49 (2d Cir. 1994) (holding that it is improper for a prosecutor in summation to mischaracterize the evidence or to refer to facts not in evidence, but even if he does, such impropriety is not grounds for reversal unless the remarks caused the defendant substantial prejudice).

Forbes has not established any errors with regard to the court's ruling as to Bell and these claims also do not justify a new trial.

IV.  Evidence of Forbes's Property Transfers Was Properly
     Admitted

The court denied Forbes's motion in limine to exclude evidence of Forbes's property transfers and held that, in light of the circumstances in which they were made, those transfers constituted circumstantial evidence that was probative of whether Forbes had a consciousness of guilt.  Forbes does not provide any

argument that now convinces the court that its ruling was erroneous or that it should not have permitted the government to introduce this evidence during its case-in-chief and in its cross-examination of Forbes.

There was also no error in allowing the government to introduce evidence that Forbes lied on the witness stand regarding his conversations with his attorney about the transfers.  That evidence was also probative of his consciousness of guilt and was admissible in the government's case in chief.

Because this evidence was properly admitted, the government was entitled to refer to it during its summation, and Forbes's objections to those portions of the government's summation were properly overruled.  See Rosa, 17 F.3d at 1548-49.

V.    There Was No Basis to Allow Forbes to Offer Government Pleadings as Admissions

The court did not abuse its discretion by refusing to allow Forbes to offer into evidence certain unsworn, out-of-court statements of government attorneys contained in letters written by prosecutors to Forbes setting forth summaries of what certain witnesses said during their interviews.  These letters were neither government admissions under Fed. R. Evid. 801(d)(2), see United States v. Yildiz, 355 F.3d 80, 82 (2d Cir. 2004), or prior inconsistent statements of the witnesses, see, e.g., United States v. Almonte, 956 F.2d 27, 29 (2d Cir. 1992).  The court gave Forbes wide latitude to examine, under oath outside the

presence of the jury, several government agents to whom various government witnesses made prior statements, and Forbes was then allowed to call a number of those government agents at trial to impeach the government witnesses. Nothing more was required.

The court also did not abuse its discretion by excluding as admissions under Rule 801(d)(2), the government's written submissions from the first trial in which it mistakenly agreed with Forbes's proposed jury instructions that Kevin Kearney had benefitted from an informal immunity agreement. As previously discussed, Kearney did not, as a matter of undisputed fact, receive any form of immunity. Thus, because there was an innocent explanation for the supposed inconsistency that Forbes sought to take advantage of, the court did not abuse its discretion in ruling that the government submissions were not admissible under Rule 801(d)(2), see United States v. Salerno, 937 F.2d 797, 784 (2d Cir. 1991), or pursuant to United States v. Wallach, 935 F.2d 445 (2d Cir. 1991).

Further, the court did not commit error by denying Forbes's request to admit into evidence as government admissions under Rule 801(d)(2) certain statements made by a former prosecutor at the first trial or an excerpt from a submission concerning the government's position regarding Forbes's identity as the person who told Amy Lipton to alter board minutes. The court was not wrong in concluding that the prosecutor's statements were

"speculation of counsel" and not the equivalent of testimonial assertions and that there was no indication that what the prosecutor said constituted a verbatim statement of a government witness.  As the court noted then, and notes now, Forbes was free to call the former prosecutor to impeach the government witness's trial testimony on this issue.

None of these claims establish error that justifies a new trial.

VI.  Evidence of Shareholder Losses Was Properly Admitted

The court did not abuse its discretion in admitting evidence and argument regarding the losses suffered by Cendant shareholders and the decline in Cendant's stock price on or after April 15, 1998.  As the court concluded in overruling Forbes's objections to this evidence, it was highly probative and relevant to the issue of materiality.  And because the court instructed the jury that it could not consider such evidence at all with respect to whether Forbes was a knowing and willful participant in the conspiracy or engaged in any wrongdoing, there was little or no risk that the jury would improperly use this evidence for purposes other than the limited purpose for which it was admitted.  Thus, its admission posed little or no risk of prejudice to Forbes's defense and Forbes does not demonstrate that it actually caused the requisite prejudice.

Because this evidence was properly admitted, it was

permissible for the government to refer to it during its opening statement.  Accordingly, the government's comments did not require a mistrial or a curative instruction.

Likewise, the court properly overruled Forbes's objection and motion for mistrial based on Michael Monaco's testimony about the extent of shareholder losses.  His testimony on this issue did not constitute improper lay opinion testimony because it was not based on specialized knowledge.  Rather, his calculation of the drop in market capitalization was based on simple arithmetic. See United States v. Hamaker, 455 F.3d 1316, 1331-1332 (11th Cir. 2006) (finding no error in the admission of lay testimony of a witness who simply added and subtracted numbers and made a simple comparison).  His testimony was also competent to establish the amount of shareholder losses and that the fraud caused most, if not all, of the $14 billion loss he identified.  And contrary to Forbes's contention, Monaco's testimony was not contradicted or undermined by the government's expert witness, Brian Heckler, who testified that the fraud caused CUC's and Cendant's pre-tax income to be overstated by approximately $252 million.  The $14 billion in shareholder losses is entirely different from the $252 million overstatement of the company's pre-tax income.

For these reasons, the government had a good faith basis to cross-examine Forbes regarding shareholder losses and to mention those losses in its arguments to the jury.

VII. <u>There Was No Error Relating to Scott Forbes's Testimony</u>

There is no merit to Forbes's claim that the court erroneously precluded him from reading an excerpt of Scott Forbes's prior trial testimony to the jury pursuant to Fed. R. Evid. 804(b)(1). The court properly concluded Forbes could have arranged for Scott Forbes to testify at trial through the exercise of reasonable diligence and thus he was not unavailable.

VIII. <u>The Court Did Not Improperly Restrict Cross-Examination of Cosmo Corigliano</u>

The court correctly restricted Forbes's cross-examination of Corigliano with regard to his compliance with his plea and settlement agreements. As the court stated in ruling on this issue prior to trial, Forbes's assertion that Corigliano breached these agreements was based on his unilateral interpretation of the agreements and constituted a "self-created fiction" that was without factual support and was not shared by either the U.S. Attorney's Office or the SEC. And as Judge Thompson observed, during the prior trials Forbes had ample opportunity to try to demonstrate that Corigliano breached these agreements, but that "everything that came out showed that [Forbes's] contentions lacked merit." Thus, the evidence regarding this issue did not constitute proper impeachment by contradiction or bias and was properly precluded regardless of the testimony elicited from Corigliano by the government during his direct examination. Besides this single issue, the court gave Forbes virtually

unrestricted latitude to challenge Corigliano's credibility and
bias on cross-examination.  Contrary to Forbes's contention, the
court did not abuse its discretion by limiting his cross-
examination of Corigliano in this one respect.  See, e.g., United
States v. Crowley, 318 F.3d 401, 417 (2d Cir. 2003).

Moreover, because Corigliano's alleged lack of credibility
was central to Forbes's defense, it was proper to allow the
government to question him about the truth-telling provisions of
his plea agreement and his compliance with the agreement's terms.
And, as noted, there was no evidence that Corigliano gave false
testimony about his compliance with his plea agreement and the
reasons he did not settle with the SEC until 2004.  Further,
Forbes has not shown either that Corigliano lied about the sweeps
for eavesdropping devices at CUC or about Forbes's conversation
with Amy Lipton regarding the alteration of board minutes.

Further, the court properly exercised its discretion by
allowing Forbes to refer to the fact that he had been tried two
prior times, but by excluding, under Fed. R. Evid. 403, evidence
that the juries in those trials had failed to reach a verdict as
to him.  See United States v. Wilkerson, 361 F.3d 717, 734 (2d
Cir. 2004); United States v. Giovanelli, 945 F.2d 479, 488-89 (2d
Cir. 1991).  Forbes was permitted to cross-examine Corigliano
about his allegedly inconsistent testimony at the prior two
trials.  The fact that the prior juries failed to reach a verdict

as to Forbes had no bearing on Corigliano's alleged motive to testify falsely against him at the third trial. The court's exclusion of this evidence under Rule 403 was not an abuse of discretion even if its preclusion might have hindered Forbes's ability to impeach Corigliano's direct testimony that the outcome of the trial had no bearing on the government's assessment of whether he provided substantial assistance.

The court also properly exercised its discretion in allowing the government to elicit testimony from Corigliano that he understood that this court would sentence him for the crimes to which he had pleaded guilty. See United States v. Miller, 116 F.3d 641, 682-83 (2d Cir. 1997).

In addition, the court properly rejected Forbes's contention that the crime/fraud exception to the attorney-client privilege required disclosure of Corigliano's communications with his lawyers. The court correctly found that Forbes had not made the required preliminary showing of probable cause to even warrant further inquiry into the issue.

Finally, the court did not err in precluding Forbes from calling a witness to testify about statements Corigliano allegedly made in connection with an appraisal of his property in Old Saybrook, Connecticut. As the court noted, such extrinsic evidence was not relevant to Corigliano's bias and was not material, but was being offered merely on the issue of

Corigliano's credibility or to impeach him by contradiction, and as such, was not admissible.

The court did not commit reversible error with regard to any of these rulings and thus they do not furnish grounds for a new trial.

IX.  The Government Did Not Elicit Perjured Testimony From Kevin Kearney

        As the court explained in denying Forbes's motion in limine with regard to Kevin Kearney's alleged "perjured" testimony, his motion was, once again, based on his self-created fictional portrayal of a witness's testimony.  The court summarily rejected this claim then, as it does now, because Forbes totally failed to demonstrate that Kearney's testimony was perjured, and that continuously repeating the accusation did nothing to make it meritorious.

        Forbes has failed to demonstrate that Kearney's testimony generated errors requiring a new trial.

X.  The Testimony Relating to Ernst & Young Was Proper

        Contrary to Forbes's contention, the court properly admitted GX 11007 to show that, despite the auditors' frustration with the co-conspirators' failures to provide complete and truthful financial information, Ernst & Young issued clean audit opinions quarter after quarter.  The court did not err in concluding that this evidence was relevant to explain Forbes's motive to lobby Cendant to retain Ernst & Young as the auditor for the former CUC

divisions after the merger, and to rebut a central theme of Forbes's defense – that he relied in good faith on Ernst & Young's clean audit opinions. The evidence also corroborated the cooperating witnesses' testimony that they lied to Ernst & Young to conceal the fraud.

The court also properly overruled Forbes's objection to Anne Pember's testimony regarding her conversations with Ernst & Young auditors that showed they were suspicious of the financial information she and others provided. The evidence did not suggest that Ernst & Young was complicit in the fraud and did not constructively amend the indictment by expanding membership in the conspiracy. Not only are the identity and number of conspirators not elements of a conspiracy under 18 U.S.C. § 371, see United States v. Cahalane, 560 F.2d 601, 605-06 (3d Cir. 1977), evidence that Ernst & Young may have known of the fraud without proof that they agreed to advance the objects of the conspiracy would not make them co-conspirators. See United States v. Svoboda, 347 F.3d 471, 476 (2d Cir. 2003). Thus, this evidence did not constructively amend the indictment because it did not modify the essential elements of the charged offenses in a way that created a substantial likelihood that Forbes could be convicted of a crime other than the ones charged. See United States v. Bryser, 954 F.2d 79, 87 (2d Cir. 1992).

The court also properly allowed Pember and Corigliano to

testify to a hearsay statement that another co-conspirator, Kirk Shelton ("Shelton"), made about one of the Ernst & Young auditors. Shelton made the statement during the course and in furtherance of the charged conspiracy and it was not mere idle chatter. Indeed, as the court ruled, when considered in the context in which it was made, the statement was designed to promote or facilitate the goals of the conspiracy by providing reassurance to his co-conspirators and to inform them of the status of the conspiracy. See United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1199 (2d Cir. 1989). Thus, the statement was admissible to prove the truth of the matters asserted and to show the effect it had on Pember. Moreover, Forbes's claim that allowing the statement constructively amended the indictment is baseless.

There are no grounds for a new trial based on the admission of this evidence relating to Ernst & Young.

XI. The Court Did Not Err in Restricting Extrinsic Evidence re Henry Silverman

The court acted within its discretion in precluding Forbes from calling attorney Thomas Puccio ("Puccio"), counsel for Forbes's co-defendant Kirk Shelton, to testify about a conversation that Puccio allegedly had with Herbert Stern ("Stern"), Silverman's attorney, in which Stern said Silverman said if Shelton testified against Forbes, Silverman would make a recommendation that Shelton get a lesser sentence. The court's

reasons for not permitting this extrinsic evidence were that (1) Puccio had no direct knowledge of Silverman's true intention with regard to his alleged offer to exchange Shelton's testimony for leniency in sentencing; (2) it was not sufficiently probative of Silverman's asserted bias and was not Silverman's prior inconsistent statement because there was no showing that Silverman authorized Stern to make it; (3) its admission would create an impermissible mini trial; (4) its minimal probative value was substantially outweighed by the prejudice it would cause the parties; and (5) it was cumulative of other evidence of Silverman's alleged bias.

In this regard, the court did, however, grant Forbes's request to call another of Shelton's attorneys, Steven Kaufman ("Kaufman"), to attempt to elicit testimony that Silverman tried to persuade Kaufman to enlist Shelton to testify against Forbes. But when Kaufman was questioned outside the presence of the jury, he denied that he had any conversations with Silverman that were inconsistent with Silverman's trial testimony. Thereafter, the court acted within its discretion in precluding Forbes from presenting the testimony of Martin Auerbach, another of Shelton's lawyers, and Shelton, assuming he would even testify, to testify about the alleged hearsay statement that Silverman supposedly made to Kaufman. Not only did Auerbach and Shelton not have firsthand knowledge of Silverman's alleged statement, their

testimony would have been collateral and would have merely impeached Kaufman, not Silverman.  The court did not err in connection with its rulings as to Silverman's alleged statement about Shelton's cooperation.

Finally, the court did not err in precluding cross-examination of Silverman on the collateral issue of legal fees that Cendant paid on behalf of Corigliano or Cendant's alleged discriminatory payment of legal fees.

XII. <u>The Court Did Not Allow Any Improper Lay Opinion Testimony</u>

No improper lay opinion testimony was admitted at trial, either by Jan Davidson, Henry Silverman, or Casper Sabatino. Further, any testimony of Davidson or Silverman regarding Forbes's knowledge of financial matters was based on their personal, subjective interpretations and was rationally based on their perceptions and did not involve matters requiring scientific, technical, or specialized knowledge.

Moreover, the court properly overruled Forbes's lay opinion objections to the factual testimony of Forbes's co-conspirators about the accounting irregularities or how they intended to and did "cook the books" for the specific purpose of inflating the publicly reported results so the price of the stock would go up.

XIII. <u>Government Counsels' Closing Remarks Were Not Improper</u>

Prosecutorial misconduct during summation is grounds for a new trial only when the remarks caused substantial prejudice to

the defendant.  <u>United States v. Tutino</u>, 883 F.2d 1125, 1136 (2d

Cir. 1989); <u>United States v. Nersesian</u>, 824 F.2d 1294, 1327 (2d

Cir. 1987).  It is well settled that both the prosecution and the

defense are entitled to broad latitude in the inferences they may

suggest to the jury during closing arguments provided they do not

misstate the evidence.  <u>Myerson</u>, 18 F.3d at 163.

Not only has Forbes failed to demonstrate the required

prejudice, Forbes's objections to the prosecutors' closing

arguments were baseless and were properly overruled.

XIV. <u>There Was No Error in the Jury Instructions</u>

Finally, Forbes has not shown how the court committed

reversible error by denying his requests for certain jury

instructions.  Significantly, he fails to show with regard to

each charge requested but not given, that it is legally correct,

represents a theory of defense with a basis in the record that

would lead to acquittal, and that the theory is not effectively

presented elsewhere in the charge.  <u>See United States v. Doyle</u>,

130 F.3d 523, 540 (2d Cir. 1997) (quoting <u>United States v.</u>

<u>Vasquez</u>, 82 F.3d 574, 577 (2d Cir. 1996)).  For the reasons

previously given, the court properly declined to give the

requested instructions.

The court finds, and Forbes does not argue otherwise, that

when viewing the charge in its entirety as it was given, it did

not fail to adequately inform the jury of the law or mislead it

as to a correct legal standard, <u>see</u> <u>Doyle</u>, 130 F.3d at 535, and that there was no prejudicial error requiring reversal or a new trial. <u>See, e.g.</u>, <u>United States v. Tropeano</u>, 252 F.3d 653, 657-58 (2d Cir. 2001).

<u>CONCLUSION</u>

For the foregoing reasons, Forbes's motion for a new trial [doc. # 2606] is DENIED.

SO ORDERED this 17th day of January, 2007 at Bridgeport, Connecticut.

/s/_____<br>
    Alan H. Nevas<br>
United States District Judge