UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:02CR00264 (AHN) |
| | : | |
| | : | |
| | : | |
| v. | : | February 16, 2007 |
| | : | |
| | : | |
| | : | |
| WALTER A. FORBES | : | |

**MEMORANDUM OF THE UNITED STATES IN OPPOSITION
TO FORBES' MOTION FOR BAIL PENDING APPEAL**

CHRISTOPHER J. CHRISTIE
NORMAN GROSS
MICHAEL MARTINEZ
CRAIG CARPENITO
MARK E. COYNE
Special Attorneys
U.S. Department of Justice
970 Broad Street, Room 700
Newark, New Jersey 07102
Tel:  (973) 645-2700
Fax:  (973) 645-2857

## TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

A.  Forbes Has Failed to Prove That His Appeal Is Not for Purpose of
    Delay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

B.  None of the Claimed Errors Briefed by Forbes Qualifies as a
    Substantial Issue Likely to Result in a Reversal or New Trial . . . . . . . . .   4

    1.  This Court Properly Admitted Evidence of Forbes' Asset
        Transfers, Especially Given His False Exculpatory Testimony
        Concerning Those Transfers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

    2.  This Court Properly Denied Forbes' J.E.B. Claim Because He Did
        Not Prove That Jurors Were Struck Because of Their Gender . . . . .   10

    3.  This Court Properly Excluded Statements That Did Not Qualify as
        Party Admissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

    4.  This Court Properly Admitted Evidence Concerning Shareholder
        Loss and Properly Declined to Give the Misleading Instruction
        That Forbes Sought . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

    5.  This Court Properly Precluded Cumulative and Misleading Cross-
        Examination of Cosmo Corigliano on Collateral Matters . . . . . . . . . .   32

    6.  This Court Properly Denied Forbes' Request for a Mistrial over
        the Government's Rebuttal Summation . . . . . . . . . . . . . . . . . . . . . .   36

C.  This Court Should Reject Forbes' Improper Attempt to Incorporate
    Hundreds of Other Issues into His Bail Motion . . . . . . . . . . . . . . . . . .   39

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

## TABLE OF AUTHORITIES

### Cases

Brown v. Kelly,
    973 F.2d 116 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Delaware v. Van Arsdall,
    475 U.S. 673 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Estelle v. McGuire,
    502 U.S. 62 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Galarza v. Keane,
    252 F.3d 630 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Hernandez v. New York,
    500 U.S. 352 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

In re United States,
    46 Fed. Appx. 133 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

J.E.B. v. Alabama,
    511 U.S. 127 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Jordan v. Lefevre,
    206 F.3d 196 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

McCrory v. Henderson,
    82 F.3d 1243 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 13, 17

Messiah v. Duncan,
    435 F.3d 186 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Old Chief v. United States,
    519 U.S. 172 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Palermo v. United States,
    360 U.S. 343 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Starling v. Delaware,
    882 A.2d 747 (Del. 2005), cert. denied, 126 S. Ct. 1433 (2006) . . . . . . . . 16

State v. Kincaid,
    55 S.E. 647 (N.C. 1906) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United States v. Abuhamra,
    389 F.3d 309 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

United States v. Adeniji,
    31 F.3d 58 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

United States v. Al-Sadawi,
    432 F.3d 419 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

United States v. Almonte,
    956 F.2d 27 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States v. Bayko,
    774 F.2d 516 (1st Cir 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 9, 10

United States v. Brown,
    352 F.3d 654 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 17

United States v. Colon-Munoz,
    292 F.3d 18 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

United States v. Concepcion,
    983 F.2d 369 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

United States v. Crowley,
    318 F.3d 401 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

United States v. Day,
    433 F. Supp. 2d 54 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

United States v. Deutsch,
    451 F.2d 98 (2d Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

United States v. Diaz,
    176 F.3d 52 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

United States v. Dittrich,
    100 F.3d 84 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United States v. El-Silimy,
    228 F.R.D. 52 (D. Me. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United States v. Forbes,
    2006 WL 680562 (D. Conn. Mar. 16, 2006) . . . . . . . . . . . . . . . . . . . . . . . . 3

United States v. Franklyn,
    157 F.3d 90 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 14, 17

United States v. GAF Corp.,
    928 F.2d 1253 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

United States v. Garcia,
    848 F.2d 1324 (2d Cir. 1988),
    rev'd on other grounds, 490 U.S. 858 (1989) . . . . . . . . . . . . . . . . . . . . . . 29

United States v. Giancola,
    754 F.2d 898 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 10

United States v. Gibbs,
    182 F.3d 408 (6th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

United States v. Greenberg,
    772 F.2d 340 (7th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

United States v. Hamaker,
    455 F.3d 1316 (11th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

United States v. Kahan,
    415 U.S. 239 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

United States v. Laljie,
    184 F.3d 180 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

United States v. Macklin,
    927 F.2d 1272 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

United States v. Malpeso,
    115 F.3d 155 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

United States v. McKeon,
    738 F.2d 26 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

United States v. Miller,
    753 F.2d 19 (3d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Mobley,
    462 F.2d 69 (2d Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

United States v. Perez,
    387 F.3d 201 (2d. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United States v. Perholtz,
    836 F.2d 554 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

United States v. Powell,
    761 F.2d 1227 (8th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

United States v. Purdy,
    144 F.3d 241 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

United States v. Ramirez,
    176 F.3d 1179 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

United States v. Randell,
    761 F.2d 122 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 5, 10

United States v. Reich,
    420 F. Supp. 2d 75 (E.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 39

United States v. Ross,
    123 F.3d 1181 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United States v. Salameh,
    152 F.3d 88 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

United States v. Salerno,
    937 F.2d 797 (2d Cir. 1991), reh'g on other grounds, 952 F.2d
    623 (2d Cir. 1991), rev'd on other grounds, 505 U.S. 317 (1992) . . . . . . . . 21

United States v. Santos,
    372 F.2d 177 (2d Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States v. Scheibel,
    870 F.2d 818 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

United States v. Scotti,
    47 F.3d 1237 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

United States v. Shelton,
    2005 WL 1983761 (D. Conn. Aug. 16, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 3

United States v. Sliker,
    751 F.2d 477 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

United States v. Smith,
    793 F.2d 85 (3d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Velazquez,
    246 F.3d 204 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

United States v. Wallach,
    935 F.2d 445 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 35

United States v. Wilson,
    11 F.3d 346 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

United States v. Yarmoluk,
    1997 WL 642564 (S.D.N.Y. Oct. 17, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 4

United States v. Yildiz,
    355 F.3d 80 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

Weeks v. New York (Div. of Parole),
    273 F.3d 76 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

**Statutes, Rules and Briefs**

18 U.S.C. § 3143 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4

Fed. R. Crim. P. 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Fed. R. Evid. 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Fed. R. Evid. 801 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Brief for Appellee in United States v. Ramirez,
    No. 98-50289 (9th Cir.), 1998 WL 34104335 (Nov. 12, 1998) . . . . . . . . . . . 8

## INTRODUCTION

In yet another regurgitation of his baseless claims in this case, Defendant Walter Forbes contends that he is entitled to bail pending appeal. He is wrong. Having been convicted of serious crimes after two days of jury deliberations, Tr. 3768, 3814,[1] Forbes has failed to prove that his appeal is not for purposes of delay, nor has he raised any substantial issues that likely will result in a reversal of his conviction. Rather, Forbes simply challenges discretionary rulings and factual findings that cannot be reversed absent an abuse of discretion or clear error. As the Government has shown many times previously and will show below once again, the rulings challenged by Forbes have ample legal and factual bases. Accordingly, Forbes' motion for bail pending appeal should be denied, and this Court should set a report date for Forbes to begin serving his sentence.

## ARGUMENT

The Bail Reform Act of 1984 ("BRA") "establishes a presumption in favor of detention" where, as here, a defendant has been convicted. United States v. Abuhamra, 389 F.3d 309, 319 (2d Cir. 2004). The Government has a "strong and obvious" interest "in detaining defendants who have been found guilty beyond a reasonable doubt of serious crimes." Id. at 320. Such "detention promotes public safety by removing a presumptively dangerous person from the community; it also encourages general respect for the law by signaling that a guilty

---

[1] Citations to "Tr." are to the transcript of the third trial. Citations to "FTTr." and "STTr." are to the transcripts of the first and second trials, respectively. Citations to "FBM" are to the Memorandum in Support of Motion of Defendant Walter A. Forbes for Release Pending Appeal.

person will not be able to avoid or delay imposition and service of the sentence prescribed by law." Id.

Moreover, "[t]he interest in ensuring that guilty persons receive and serve their sentences was . . . a significant impetus to the enactment of" the BRA. Id.; see, e.g., United States v. Powell, 761 F.2d 1227, 1231 (8th Cir. 1985) (en banc) (in enacting the BRA, Congress's intent "was, bluntly, that fewer convicted persons remain at large while pursuing their appeals"). Consequently:

> even when the conviction does not involve a crime of violence or drug offense, detention (following conviction and sentencing) is mandatory unless the judicial officer finds inter alia "that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in" a reversal, new trial, or reduced term of imprisonment that would expire during the expected duration of the appeal process.

United States v. Colon-Munoz, 292 F.3d 18, 20 (1st Cir. 2002) (first emphasis added) (quoting 18 U.S.C. § 3143(b)(1)).

Accordingly, Forbes' motion for bail pending appeal may be granted only if this Court finds: (1) by clear and convincing evidence that he is neither a risk of flight nor a danger to the community; and (2) that the contemplated appeal is not for purposes of delay and raises a substantial question of law or fact likely to result in reversal, a new trial, or a new sentence less than the expected duration of the appeal process. See 18 U.S.C. § 3143(b). Forbes bears "the burden of persuasion" for "all the criteria set out" in § 3143(b). United States v. Randell, 761 F.2d 122, 125 (2d Cir. 1985). As demonstrated below, he has not carried that burden.

**A.    Forbes Has Failed to Prove That His Appeal Is Not for Purpose of Delay.**

Although Forbes claims that his "appeal will not be taken for the purpose of delay," FBM2, his actions speak louder than his words.  Forbes was indicted in February 2001 in the District of New Jersey, where Cendant is based.  During the last six years, Forbes has deployed almost limitless funds to delay the disposition of this case, including transferring the case to the District of Connecticut over the Government's repeated and strenuous objections, see In re United States, 46 Fed. Appx. 133 (3d Cir. 2002), filing innumerable pre-trial, mid-trial and post-trial motions during the first, second and third trials — nearly sixty concerning the third trial alone — and declining to ask this Court to adopt Judge Thompson's rulings provided that Forbes' previously-filed motions preserved his objections to those rulings.  These actions delayed and prolonged all three trials.  Along the way, Judge Thompson chastised Forbes for his failures to describe fairly the law and facts pertinent to disputed issues[2] and "the pattern of unseemly tactics employed by" his counsel "in this case."  United States v. Forbes, 2006 WL 680562, at *2 (D. Conn. Mar. 16, 2006).

Under these circumstances, Forbes should be required to proffer more than ipse dixit that his appeal is not undertaken for purposes of delay.  See United States v. Shelton, 2005 WL 1983761, at *1 (D. Conn. Aug. 16, 2005) (finding "the question of whether" Forbes' co-defendant could "establish that his

---

[2] E.g., Docket 1907, at 1 ("the court is not comfortable relying on representations of counsel for defendant Forbes where counsel for the parties and/or non-parties whose interests are adverse to those of defendant Forbes have not had an opportunity to review and/or respond to those representations"); see FTTr. 8812-8815.

appeal is not for purpose of delay to be a close one" but disposing of bail motion on other grounds).[3]  That is especially so given this Court's conclusion that "there is no merit to any" of the claims that Forbes asserted in his Rule 33 motion, Docket 2636, at 3, including all six of the claims discussed in his bail motion. See United States v. Reich, 420 F. Supp. 2d 75, 88 (E.D.N.Y. 2006) ("whether or not an appeal is made to delay the sentence depends in large part on whether any substantial appeal questions are presented"); United States v. Yarmoluk, 1997 WL 642564, at *2 (S.D.N.Y. Oct. 17, 1997) (frivolous claim in bail motion bore "eloquent testimony not only to the baseless nature of the motion but also to the fact that the appeal is taken for purposes of delay").[4]

**B.    None of the Claimed Errors Briefed by Forbes Qualifies as a Substantial Issue Likely to Result in a Reversal or New Trial.**

To "raise[] a question of law or fact likely to result in" a "reversal" or "an order for a new trial," 18 U.S.C. § 3143(b), Forbes must do two things.  First, he must identify "'a 'close' question or one that very well could be decided the other way.'"  Randell, 761 F.2d at 125 (quoting United States v. Giancola, 754 F.2d

---

[3] Although the Second Circuit granted Shelton bail, FBM1, the 'substantial' issues he raised in his bail motion concerned a willful blindness charge, which was not given in this trial, and the testimony of John Oller, who was not a witness at this trial.  Shelton's conviction was affirmed by summary order, in any event.

[4] The Government does not concede that Forbes poses no flight risk.  FBM2. Forbes — who is 64, has no dependent minor children and faces more than 12 years in prison — has much more incentive to flee than did Shelton — who is a decade younger, has dependent minor children and received a significantly shorter sentence.  Moreover, Forbes' delay in disclosing his finances to Probation has hampered efforts to determine whether he transferred more assets besides those described at trial or sheltered them offshore, factors which would increase the risk of flight.

898, 901 (11th Cir. 1985), and expressing preference for <u>Giancola</u>'s definition of 'substantial question').  That is, the question must be "a toss-up or nearly so." <u>United States v. Greenberg</u>, 772 F.2d 340, 341 (7th Cir. 1985) (Posner, J.). <u>Second</u>, Forbes must demonstrate that the question is "so integral to the merits of" his conviction "that a contrary appellate holding is likely to require reversal of the conviction or a new trial."  <u>Randell</u>, 761 F.2d at 125 (internal quotation marks omitted).  That is, "the claimed error" must "not be harmless or unprejudicial." <u>United States v. Bayko</u>, 774 F.2d 516, 523 (1st Cir 1985).

None of the errors claimed by Forbes satisfies these requirements.

**1.    This Court Properly Admitted Evidence of Forbes' Asset Transfers, Especially Given His False Exculpatory Testimony Concerning Those Transfers.**

In denying Forbes' Rule 33 motion, this Court reiterated that it had "denied Forbes's motion <u>in limine</u> to exclude evidence of [his] property transfers and held that, in light of the circumstances in which they were made, those transfers constituted circumstantial evidence that was probative of whether Forbes had a consciousness of guilt."  Docket 2636, at 16.  Because "[e]videntiary determinations . . . are reviewed by the court of appeals for abuse of discretion," they are "less likely to result in reversal on appeal than a district court's resolution of an issue of law which is reviewed <u>de novo</u>."  <u>United States v. Day</u>, 433 F. Supp. 2d 54, 57 (D.D.C. 2006).  Here, Forbes cannot show an abuse of discretion, that is, that this Court "acted arbitrarily or irrationally."  <u>United States v. Malpeso</u>, 115 F.3d 155, 162 (2d Cir. 1997) (internal quotation marks omitted).

First, Forbes disregards that the evidence concerning his asset transfers was intertwined with his perjurious testimony in the first trial that his attorney, Greg Danilow, told him that transferring the assets would be "proper and lawful and a reasonable thing to do," despite Forbes' awareness of the pending criminal investigation. FTTr. 14432-14433, 14473. "A defendant's fabrication of exculpatory evidence" is admissible as "evidence of consciousness of guilt." United States v. Scheibel, 870 F.2d 818, 822 (2d Cir. 1989) (internal quotation marks omitted); see, e.g., United States v. Kahan, 415 U.S. 239, 241 (1974) (per curiam) (trial court properly admitted "[a]s part of the Government's case [defendant's] statements to the court as to his lack of funds" as, inter alia, "false exculpatory statements evincing [defendant's] consciousness that the bank deposits were incriminating"). Surely, if "evasive conduct aimed at concealing" a relevant "transaction" is "circumstantial evidence of guilty consciousness," United States v. Deutsch, 451 F.2d 98, 116 (2d Cir. 1971), as is engaging in conduct before trial designed to hinder the truth-seeking process, e.g., United States v. Wilson, 11 F.3d 346, 353 (2d Cir. 1993); United States v. Macklin, 927 F.2d 1272, 1279-80 (2d Cir. 1991), then lying to a jury is evidence of consciousness of guilt, too.[5]

---

[5] Forbes waived any objection to Danilow testifying in the Government's case-in-chief by failing to timely raise this issue prior to trial. Tr. 586 ("The defendant was on notice and has been on notice for a long time, that all evidentiary issues were to be resolved prior to trial. . . . The defendant has also known that the government definitely intended to call Mr. Danilow since the government filed its witness list many weeks ago. Raising this issue, literally, on the morning that the trial was to commence will not be countenanced.").

Second, although the Second Circuit apparently has not addressed in a precedential opinion the admissibility of evidence of asset transfers to show consciousness of guilt, Forbes ignores the fact that the Second Circuit has "upheld the admission of various kinds of evidence on the ground that it demonstrated consciousness of guilt." United States v. Perez, 387 F.3d 201, 209 (2d. Cir. 2004). Other Circuits, too, recognize that "[e]vidence of consciousness of guilt is routinely admitted against defendants in criminal cases, in the form of flight, threatening a witness, subornation of perjury, and the like." United States v. Dittrich, 100 F.3d 84, 86-87 (8th Cir. 1996).

Third, other courts, like this Court and Judge Thompson, have acknowledged that transferring assets after committing a crime can manifest consciousness of guilt. For example, in United States v. Ross, 123 F.3d 1181 (9th Cir. 1997), the Ninth Circuit rejected a sufficiency challenge to the defendant's conviction because, in addition to other evidence of "consciousness of guilt" and "fear of apprehension," the defendant "transferred all of his property to his wife within two weeks of the" crime. Id. at 1184. And in United States v. El-Silimy, 228 F.R.D. 52 (D. Me. 2005), the district court denied a motion to strike allegations in an indictment that the defendant had moved a substantial "amount of money" from one account to another "shortly after significant investigative actions in this case" because, inter alia, "these allegations provide circumstantial evidence of . . . consciousness of guilt." Id. at 59-60; see also State v. Kincaid, 55 S.E. 647,

647 (N.C. 1906) (no error where defendant "was asked by the solicitor of the state if he had not transferred his property to avoid the result of this indictment").

Fourth, United States v. Ramirez, 176 F.3d 1179 (9th Cir. 1999) — the only asset transfer case cited by Forbes, FB4 — did not categorically prohibit such evidence.  There, the Ninth Circuit upheld on a consciousness of guilt theory the admission of evidence that the defendant "chose to use a rental vehicle rather than one of the personal vehicles titled in his name" to transport drugs across the U.S./Mexico border, given "that personal vehicles containing narcotics are seized at the border, whereas rental vehicles containing narcotics are returned to the rental agency." Id. at 1182.  But admission of evidence that the defendant's "sister registered his cars in her name six days after his arrest was harmless error," despite the Government's argument that "he was trying to cover up" owning "personal vehicles he could have used" for the trip "instead." Id. at 1182-83.  Unlike here, the Ramirez prosecutors did not contend that the defendant transferred his assets to shield them against loss as a consequence of his prose-cution.[6]  Thus Ramirez never addressed the relevance theory that this Court (and

---

[6] See Brief for Appellee in United States v. Ramirez, No. 98-50289 (9th Cir.), 1998 WL 34104335, at *13 (Nov. 12, 1998) ("Ramirez was arrested driving a rental car[;] immediately following this he transferred ownership of his cars to his sister. The fact that [th]is occurred only six days after his arrest shows his conscious attempt to cover up the fact that he owned two cars during the period he rented cars.  It is reasonable to infer that Ramirez did this so that questions would not be raised regarding his rental of cars while he owned two.").

Judge Thompson) adopted here, and merely held that admission of asset transfer evidence was improper but harmless in the circumstances of that case.[7]

Fifth, citing United States v. Al-Sadawi, 432 F.3d 419 (2d Cir. 2005), Forbes claims that the Second Circuit has "expressed skepticism regarding the admission of consciousness of guilt evidence" generally. FBM4. Not so. Al-Sadawi is a 'flight' case, which cases even Forbes says "are inapposite." Docket 2185, Memo. at 5 n.7. Moreover, in Al-Sadawi, there was too "thin" an "evidentiary reed" that the "defendant's behavior" constituted "flight." 432 F.3d at 424-25. Here, in contrast, Forbes has admitted that just seven weeks after Cendant launched its internal investigation, he began transferring out of his name for nominal consideration assets worth by his own estimate $17 million. And Forbes' role in the fraud at CUC is the only misconduct by him that could possibly have been at issue when he transferred those assets. Just weeks after the bulk of those transfers, Forbes agreed that if he was "convicted of . . . any crime based upon any of" the "accounting issues at CUC," Cendant could sue him, jeopardizing his entire net worth. Docket 2493, Exhibit A, at 1, 3.

Sixth, that an issue may be one "of first impression in the Second Circuit" does not "a fortiori" make it "a substantial question on appeal." FBM5. An "issue may be without controlling precedent largely because that issue is so patently without merit that it has not been found necessary for it to have been resolved."

---

[7] Of course, a decision from another Circuit affirming a conviction after deeming admission of asset transfer evidence to be harmless error hardly supports a claim that the admission of asset transfer evidence here is 'likely to result' in a reversal of Forbes' conviction. See Bayko, 774 F.2d at 523.

Giancola, 754 F.2d at 901; accord Bayko, 774 F.2d at 523.  "Similarly, there might be no precedent in this circuit, but there may also be no real reason to believe that this circuit would depart from unanimous resolution of the issue by other circuits."  Giancola, 754 F.2d at 901; accord Bayko, 774 F.2d at 523.  Here, Forbes has cited no authority categorically precluding evidence of asset transfers to show consciousness of guilt; the evidence provided necessary background for the jury to evaluate Forbes' perjurious testimony from the first trial concerning those transfers; consciousness of guilt evidence is generally admissible; and to obtain reversal of his conviction on this ground, Forbes must show that this Court acted arbitrarily or irrationally.[8]

Thus, this Court's admission of evidence of Forbes' asset transfers does not present a substantial issue likely to result in a reversal or a new trial.

> **2.      This Court Properly Denied Forbes' J.E.B. Claim Because He Did Not Prove That Jurors Were Struck Because of Their Gender.**

In denying Forbes' Rule 33 motion with regard to his J.E.B. challenge to the Government's exercise of peremptory strikes, this Court reiterated that:

---

[8] Contrary to Forbes' assertion, Randell did not hold that a "substantial question 'is one which is either novel, which has not been decided by controlling precedent, or which is fairly doubtful.'"  FBM5.  That was how the Third Circuit defined 'substantial question' in United States v. Miller, 753 F.2d 19 (3d Cir. 1985), which definition Randell found wanting compared to Giancola's.  Randell, 761 F.2d at 125.  Moreover, after Randell, the Third Circuit clarified that "a question which is not governed by controlling precedent nonetheless must be significant" to qualify as substantial under 18 U.S.C. § 3143(b)(1)(B).  United States v. Smith, 793 F.2d 85, 89 (3d Cir. 1986); see id. at 91 (Hunter, J., concurring) ("[j]ust because a question is 'one which is either novel, which has not been decided by controlling precedent, or which is fairly doubtful,' Miller, 753 F.2d at 23, does not automatically . . . make it a substantial question").

> Forbes did not carry his burden of establishing purposeful discrimi-
> nation. In making that determination, the court credited the govern-
> ment's specific, gender-neutral reasons for exercising peremptory
> strikes against several female venire persons. See Messiah v. Dun-
> can, 435 F.3d 186, 198 (2d Cir. 2006) (citing Galarza v. Keane, 252
> F.3d 630, 636 (2d Cir. 2001); Jordan v. Lefevre, 206 F.3d 196, 200
> (2d Cir. 2000)). Forbes has not given the court any reason to now
> reconsider its conclusion that the government's gender-neutral
> explanations were believable, legitimate, and not pretextual.

Docket 2636, at 14. Forbes cannot show that this Court committed clear error.

First, Forbes waived his J.E.B. claim. In this Circuit, to raise a timely

J.E.B. claim, "a lawyer must challenge an adversary's use of peremptory chal-

lenges before the completion of jury selection, in part so that the court can (i)

contemporaneously assess the adversary's conduct; and (ii) remedy any improper

conduct without having to repeat the jury selection process." United States v.

Franklyn, 157 F.3d 90, 97 (2d Cir. 1998). Thus, "the failure to object to an

adversary's use of peremptory challenges until after the completion of jury

selection waives the right to do so." McCrory v. Henderson, 82 F.3d 1243, 1245

(2d Cir. 1996); accord id. at 1249 ("Batson challenges are waived if not raised

during jury selection" and "failure to object to the discriminatory use of peremp-

tory challenges prior to the conclusion of jury selection waives the objection").

Here, even though "the nature of the peremptory challenge mandates that

any objection to its use be raised and ruled upon promptly," id. at 1247, Forbes

waited until after this Court had identified the 12 jurors and four alternates to

raise his J.E.B. claim. 10/04/06 Tr. at 238-240. At Forbes' urging, the 46

members of the final jury pool had already been dismissed with instructions to

call the next day to learn whether they had been selected.  10/04/06 Tr. at 229-

236.  Although the jury had not yet been sworn, that is not dispositive.  See Weeks

v. New York (Div. of Parole), 273 F.3d 76, 89 (2d Cir. 2001) (affording "trial

judges discretion to deny Batson motions unless they are made during voir dire,

or very shortly afterward — regardless of whether a jury has yet been sworn").

Indeed, "[m]any of the reasons that justify the contemporaneous objection

rule adopted in McCrory and reaffirmed in Franklyn apply with equal force here."

Weeks, 273 F.3d at 89.  As "McCrory recognized," prosecutors "may have diffi-

culty in articulating reasons for the strikes after time has passed."  Weeks, 273

F.3d at 89-90.  Because of Forbes' dilatory tactics, the prosecutors' notes from

voir dire were not in the courtroom and their recollections of the selection

process had already begun to fade, forcing the prosecutors to reconstruct their

reasons for striking particular persons after the fact.  10/04/06 Tr. at 240-241.

Forbes' "delayed objection" also "handicapped this Court's ability to make correct

rulings."  Weeks, 273 F.3d at 90.  As this Court noted, "the defendant's failure to

raise the issue earlier in the process when the challenges were being exercised"

made it "much more difficult for the court to determine whether the strikes were

in reaction to the defendant's challenges or whether they were discriminatory."

10/05/05 Tr. at 22.  And Forbes has no plausible excuse for the delay in making

his J.E.B. claim:  his counsel conceded that the pattern of purportedly discrimi-

natory strikes became clear once five of the Government's first six peremptory

strikes happened to be of women.  10/05/06 Tr. at 4-5.

Forbes should not be rewarded for such gamesmanship.  "The decision to exercise a peremptory challenge, in contrast to a challenge for cause, is subjective; and, often, the reasons behind that decision cannot be easily articulated." McCrory, 82 F.3d at 1247 (internal quotation marks omitted).  Because peremptory "challenges are often based on . . . subtle, intangible impressions, the reasons for exercising the challenges may be quite difficult to remember if an objection is not raised promptly." Id. at 1248.  And "[g]iven the often subtle reasons for the exercise of peremptory challenges, a court's determination of whether a prosecutor has used them in a discriminatory fashion will often turn on the judge's observations of prospective jurors and the attorneys during voir dire and an assessment of their credibility." Id.  Thus, this Court may find that Forbes waived his J.E.B. claim, a finding reviewed for clear error.  Weeks, 273 F.3d at 90 & n.4.

Second, Forbes has no hope of prevailing on the merits.  A trial court's "decision on the factual question of discriminatory animus, largely based on determinations of credibility, is ordinarily given great deference." Brown v. Kelly, 973 F.2d 116, 120 (2d Cir. 1992); see Hernandez v. New York, 500 U.S. 352, 364 (1991) (plurality) ("the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal"); accord id. at 372 (O'Connor and Scalia, JJ., concurring).  "This is so in large part because a court's determination . . . will often turn on the judge's observations of prospective jurors and the attorneys during voir dire and an assessment of their credibility." United States v. Brown, 352 F.3d 654, 661 (2d

Cir. 2003) (internal quotation marks omitted); see Hernandez, 500 U.S. at 365 (plurality) ("decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed" and "best evidence often will be the demeanor of the attorney who exercises the challenge").  Thus, "[o]nce a trial court finds that a prosecutor has exercised his peremptory challenges without discriminatory intent, that finding 'may not be disturbed on appeal unless it is clearly erroneous.'"  Brown, 352 F.3d at 661 (quoting Franklyn, 157 F.3d at 97).

Here, there is nothing about the nature of charges in this case, or the gender of the witnesses or the lawyers, which would suggest that the Government had any motive to intentionally exclude women from the jury.  Compare J.E.B. v. Alabama, 511 U.S. 127, 129 (1994) (petitioner had been sued for paternity and child support, the respondent (the State of Alabama) used 9 of 10 peremptory strikes on males, and the petitioner was tried by an all-female jury).  Moreover, this Court's finding that the Government's proffered, gender-neutral reasons for exercising peremptory strikes against several female venire persons were sincere was based on the Court's first-hand assessment of the explanations when they were offered, the logic of those explanations, and the Court's unique ability, sitting as the finder of fact, to determine whether those explanations were consistent with the Court's own assessment of the voir dire.

Third, contrary to FBM6-7, the Government's decision to strike A.G. (female) to help seat T.D. (male), whom the Government had rated highly after voir dire, poses no issue under J.E.B.  When the Government struck A.G. during

the ninth round, Forbes had not waived any challenges and had already struck almost every other juror whom the Government had rated highly: T.K. (male), who had an MBA and a degree in economics; D.B. (male), a partner at Robinson & Cole who seemed "smart" and "extroverted"; T.M. (male), "a lawyer who was on [the] Bridgeport City Council"; P.B. (female), who "expressed that white collar crime isn't a victimless crime"; D.M. (male), who had an MBA and understood that prosecutors sometimes have to plea bargain "with people who could potentially get them to the bigger question," 10/04/06 Tr. at 26, 190; and J.L. (male), who had an MBA, worked at a large corporation, did mergers and acquisitions work and seemed "very financially savvy." 10/05/06 Tr. at 5-7. Moreover, unlike the Sixth Circuit case cited by Forbes, FBM7, the prosecutors here offered "more detail with respect to" their "tactical decision" proving that the decision was not based upon a preference for male jurors. United States v. Gibbs, 182 F.3d 408, 440 (6th Cir. 1990). T.D. owned five restaurants, had been in the Greek army before that and, having run restaurants for 37 years, 10/04/06 Tr. at 63, impressed the prosecutors as unlikely to fall for a 'dummy' defense. 10/05/06 Tr. at 6-8, 13-14.

Fourth, the Government did not strike B.E. (female) "simply because she [was] pregnant." FBM9 n.6. During voir dire, B.E. explained that she was in her second trimester of pregnancy, with the baby "due in February" 2007 — just four months later. 10/04/06 Tr. at 46. As the prosecutors noted, Forbes' second trial had lasted from October 2005 until February 2006, including some 27 days of

deliberations.  10/05/06 Tr. at 13.  Although the Government hoped that the third

trial would proceed more quickly, it "didn't want to lose someone down the road

if this went a long time" like the previous trials and, as a result, "lose an alter-

nate."  10/05/06 Tr. at 13.  The Government also did not want to lose "the

personal experiences of" T.D., who might not have been selected if the Govern-

ment waived even one of its peremptory challenges.  Id.; see FBM7 n.3.  These

reasons would have applied equally had B.E. been a man with a significant

surgery scheduled in four months.  Moreover, there is at least one "appellate

decision addressing this issue" overlooked by Forbes, FBM9, and that decision

does not support him.  See Starling v. Delaware, 882 A.2d 747, 754 (Del. 2005)

(rejecting J.E.B. claim regarding pregnant venireperson because striking her was

"not gender-based"; "the State cited the pregnancy and the ill effects of stress at

trial to justify its challenge"), cert. denied, 126 S. Ct. 1433  (2006).

     Fifth, Forbes conceded during the October 5th hearing that the Government

had "a good basis to strike" B.A. (female).  10/05/06 Tr. at 19.  Forbes overlooks,

however, that one of the legitimate concerns prompting the Government to strike

B.A. also applied to A.I. (female) and V.C. (female).  FBM8, 10-11.  The Govern-

ment struck B.A. in part because she was "not financially savvy" — and struck

P.R. (male) in part for the very same reason.  10/05/06 Tr. at 8-9.  Likewise, the

Government struck A.I. because, having admitted that her mother made all

financial decisions for her, A.I. did not appear to be savvy financially."  10/05/06

Tr. at 11.  Similarly, V.C., "a school bus driver," appeared "not financially savvy."

10/05/06 Tr. at 11.  Though Forbes speculates that the prosecutors must have remembered when they struck A.I. that F.H. (male) also allowed his mother to make his financial decisions for him, FBM8,[9] this Court properly credited the prosecutors' explanation that F.H.'s jury questionnaire "had been left behind at the government's Newark office and was not available to counsel during the selection process" and "did not factor into their decision."  10/05/06 Tr. at 21-22.[10]

Sixth, this Court did not clearly err by crediting the prosecutors' explanation that they struck P.S. (female) because "she dealt with auditors."  10/05/06 Tr. at 10.  As the Government elaborated:  "Our problem is we didn't know how she would react to the argument that auditors accepted shoddy work or that the defendant relied on auditors and whether it is reasonable to rely on auditors."  10/05/06 Tr. at 10.  Although Forbes now complains that D.C. (male), T.K., D.B., J.L. and J.C. (male) also worked or interacted with auditors, FBM10, Forbes

---

[9] During voir dire, Forbes had eight people at counsel's table, including a jury consultant.  10/04/06 Tr. at 14.  In contrast, the Government was represented by two AUSAs and an agent; did not retain the services of a jury consultant; and had not prior to voir dire ranked prospective jurors in any order other than to identify those whom should be struck for cause.

[10] Forbes claims that F.H., P.R. (male), J.M. (male) and D.W. (male) were "not financially savvy," either.  FBM10-11.  This Court heard and rejected this very argument during the October 5th hearing, 10/05/06 Tr. at 18-19, and such quibbles do not raise a substantial claim.  See Franklyn, 157 F.3d at 97 ("Franklyn quibbles over a number of these explanations, but these are arguments that were properly addressed to the district court"); cf. Brown, 352 F.3d at 661 ("Under a clearly erroneous standard, we cannot conclude that the prosecutor was incapable of distinguishing between people with more, from those with less, of a connection to their churches.  And we certainly cannot say that the district court clearly erred in finding that the prosecutor had done just that.").

never raised that argument during the October 5th hearing and should not be allowed to do so now.  In any event, D.C. was "a lead business analyst" while P.S. was not; T.K., D.B. and J.L. had advanced degrees while P.S. did not; and J.C. had worked for 15 years for company that focused on financial markets while P.S. had not.  10/04/06 Tr. at 40, 47, 50, 67-68, 78.

<u>Seventh</u>, that even Forbes' counsel did not believe that the Government discriminated against women during jury selection is clear from the relief Forbes sought and — ironically enough — effectively received.  When this Court expressed concern that, because of Forbes' delay, the only possible remedy was striking the jury and "start[ing] all over again," counsel assured the Court that allowing Forbes "one or two additional peremptory strikes from the jury pool[,] which would bring in one or two of the alternates," would be a sufficient remedy.  10/05/06 Tr. at 3.  Of course, such a remedy necessarily requires only one or two gender-based strikes — not the five that Forbes now alleges.  Moreover, despite Forbes' claim that "the Second Circuit" had deemed his proposal "an appropriate possible remedy for this issue," 10/05/06 Tr. at 3, such a remedy requires "additional jurors" to be "called to the venire," too.  <u>McCrory</u>, 82 F.3d at 1247.  In any event, Forbes got his wish:  during the trial, two male jurors — both of whom the Government preferred based on the prosecutors' observations during voir dire — were excused and two alternates — a woman and a man — took their place, leaving five women and seven men on the jury.  10/05/06, at 6, 20; Tr. 866, 3325.

Eighth, Forbes cannot concoct a substantial issue by misstating or distort-
ing the record.  There were 21 women and 25 men (not 26, FBM12) in the final
jury pool of 46.  10/04/06 Tr. at 222-227.  Contrary to Forbes' assertion, FBM12,
the Government struck 9 of the 21 women in the final pool, not 12.  10/05/06 Tr.
at 8-14.  Thus, the Government struck 43% of the women in the final pool, not
the 57% that Forbes asserts, FBM12.  Although the Government struck just three
men from the final pool, that statistic is misleading in isolation.  Forbes used 10
of his first 15 peremptory challenges (67%) against men in the final pool and just
five against women.  Docket 2631-2, at ¶ 7.  Thus, Forbes' strikes during that
stretch left only 15 men (48%) and 16 women (52%) in the final pool.  Moreover,
after the parties exercised their combined first 24 peremptory challenges, 13 men
and 9 women remained in the pool, undermining Forbes' "claim that the govern-
ment's peremptory strikes raise an inference of discrimination."  United States v.
Diaz, 176 F.3d 52, 77 (2d Cir. 1999) (affirming this Court).[11]  Although the
Government used two of its last three peremptory challenges against women, so
did Forbes, Docket 2631-2, at ¶ 8; Docket 2631-3, at 2, leaving 5 women and 11
men selected as jurors and alternates.

------

[11] As it did in denying Forbes' Rule 33 motion, Docket 2636, at 14, this Court
should reject Forbes' improper reference to the Government's peremptory chal-
lenges from the first two trials.  FBM12.  The lead prosecutors during the third
trial had no involvement in the first trial.  Moreover, Forbes never challenged the
Government's exercise of peremptory strikes during the first two trials, suggesting
that he believed those challenges were non-discriminatory.  And because Forbes
did not raise a J.E.B. claim during the first two trials, the Government did not
make a contemporaneous record regarding the gender composition of the venires
in those prior trials and the reasons for the strikes, which would have refuted any
claim that the strikes were discriminatory.

Thus, Forbes' untimely and meritless <u>J.E.B.</u> claim will not present a substantial issue on appeal likely to result in a reversal or a new trial.

### 3. This Court Properly Excluded Statements That Did Not Qualify as Party Admissions.

In denying Forbes' Rule 33 motion, this Court rejected his claims that he should have been allowed to introduce at trial certain purported admissions:

> The court . . . did not abuse its discretion by excluding as admissions under Rule 801(d)(2)[] the government's written submissions from the first trial in which it mistakenly agreed with Forbes's proposed jury instructions that Kevin Kearney had benefitted from an informal immunity agreement.  As previously discussed, Kearney did not, as a matter of undisputed fact, receive any form of immunity.  Thus, because there was an innocent explanation for the supposed inconsistency that Forbes sought to take advantage of, the court did not abuse its discretion in ruling that the government submissions were not admissible under Rule 801(d)(2), <u>see</u> <u>United States v. Salerno</u>, 937 F.2d 797, 784 (2d Cir. 1991), or pursuant to <u>United States v. Wallach</u>, 935 F.2d 445 (2d Cir. 1991).
>
> Further, the court did not commit error by denying Forbes's request to admit into evidence as government admissions under Rule 801(d)(2) certain statements made by a former prosecutor at the first trial or an excerpt from a submission concerning the government's position regarding Forbes's identity as the person who told Amy Lipton to alter board minutes.  The court was not wrong in concluding that the prosecutor's statements were "speculation of counsel" and not the equivalent of testimonial assertions and that there was no indication that what the prosecutor said constituted a verbatim statement of a government witness.  As the court noted then, and notes now, Forbes was free to call the former prosecutor to impeach the government witness's trial testimony on this issue.

Docket 2636, at 18-19.  Once again, Forbes cannot show that these evidentiary rulings were arbitrary or irrational.

Forbes' reliance on cases where a counsel's prior in-court statements and filings were deemed 'admissions' of the represented party are inapposite.  A prior

statement or written submission by a prosecutor can be admitted into evidence in order to demonstrate that the Government has taken inconsistent positions on a particular factual dispute only if the defendant can establish that "the inference" he "wishes to draw 'is a fair one and that an innocent explanation for the inconsistency does not exist.'" <u>Salerno</u>, 937 F.2d at 811 (quoting <u>United States v. McKeon</u>, 738 F.2d 26, 33 (2d Cir. 1984)), <u>reh'g on other grounds</u>, 952 F.2d 623 (2d Cir. 1991), <u>rev'd on other grounds</u>, 505 U.S. 317 (1992).  The basis for admitting such statements is that a party should not be able to conceal from the jury "a fundamental change in its version of the facts between trials" if that change is undertaken "wholly without explanation." <u>United States v. GAF Corp.</u>, 928 F.2d 1253, 1260 (2d Cir. 1991).  Excluding such statements would impair "the function of trials as truth-seeking proceedings." <u>McKeon</u>, 738 F.2d at 31.

Here, as to the Government's first trial brief and proffer by then-AUSA John Carney, FBM13, Cosmo Corigliano's testimony at the third trial was the first time that he ever testified about who had ordered Amy Lipton to delete a reference to merger reserves from a set of Board minutes.  Docket 2529, at 7-8 (citing FTTr. 9609-9617).  During the first trial, Judge Thompson precluded as beyond the scope of cross-examination the Government's belated attempt to explore this event with Corigliano on redirect, and the Government did not examine Corigliano about this event during the second trial.  Docket 2529, at 7-8.  Moreover, during the third trial, defense counsel grilled Corigliano about his recollection of this event.  Tr. 2191.  Defense counsel then tried to impeach Corigliano's recollection

with a slew of interview notes neither written nor adopted by him.  Tr. 2191-

2196.  Forbes declined, however, this Court's invitation "to call AUSA Carney and

inquire about the claimed inconsistency between what he 'speculated' Corigliano

would say and what Corigliano said at trial."  Docket 2537, at 3.

Under these circumstances, this Court properly concluded that neither the

statements in the Government's June 16, 2004 brief nor former AUSA Carney's

cursory proffers in the heat of trial should qualify as Government admissions

concerning Corigliano's recollection of this event.  Docket 2537; Tr. 3172.  "To

bind the Government forever to a preliminary investigative theory" would only

"discourage further investigation and thereby impede the truth-finding process."

United States v. Purdy, 144 F.3d 241, 246 (2d Cir. 1998).  At most, the evidence

proffered by Forbes shows that, in 2004, former AUSA Carney believed that

Corigliano could not recall whether it was Forbes or Shelton who ordered Lipton

to delete the reference.  That Corigliano corrected this when he finally had the

chance to testify on this subject should not "open[] the door to defense proof of

the Government's having previously entertained a" different theory.  Id.

The criminal cases cited by Forbes, FBM12, are not to the contrary.  See

United States v. Yildiz, 355 F.3d 80, 81-82 (2d Cir. 2004) (acknowledging that

"the government's attorneys can bind the government with their in-court state-

ments and filings" but not holding that such statements always qualify as party

admissions); GAF Corp., 928 F.2d at 1260 (bill of particulars from first trial

admissible because the government made "a fundamental change in its version of

the facts between trials"); <u>McKeon</u>, 738 F.2d at 33 (where in-court statements involve "speculation of counsel," they "should not be admitted").[12]  None of them authorizes what Forbes improperly sought to do here:  impeach a witness with another person's summary of the witness's prior statements without proving that the witness had adopted that summary.  <u>See</u> <u>United States v. Almonte</u>, 956 F.2d 27, 29 (2d Cir. 1992) (per curiam); <u>cf.</u> <u>Palermo v. United States</u>, 360 U.S. 343, 350 (1959) ("grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations, and interpolations").

As for Kevin Kearney, FBM14, adopting Forbes' proposal would not have furthered the truth-seeking process; it would have perverted that process.  As this Court ruled, the evidence established beyond cavil that Kearney was <u>not</u> promised immunity in exchange for his testimony.  Tr. 3170 ("At this trial, Mr. Kearney . . . has testified unequivocally . . . that he received no offers of immunity from the government either formal or informal, oral or written in exchange for his testi-mony.").  Additionally, the Government provided an explanation for its change in position — its inadvertent failure to notice that the Kearney instruction was erroneous as a matter of fact.  Accordingly, this Court properly excluded any evidence regarding the Government's change of position, because it was "inno-cently explained" and admission of the evidence merely would have permitted

---

[12] Notably, <u>Yildiz</u> reaffirmed <u>United States v. Santos</u>, 372 F.2d 177, 180 (2d Cir. 1967), in which the Second Circuit rejected the defendant's claim that a "sworn affidavit" was "an admission against the Government."  <u>Santos</u>, 372 F.2d at 179.

Forbes to urge falsely that Kearney was promised immunity when in fact he was not.  Tr. 3172 ("There is no more innocent explanation than admitting a mistake in order to eliminate the apparent inconsistency between the government's assertions in its court filings and Mr. Kearney's testimony.").

Thus, this Court's rulings excluding purported Government 'admissions' do not present a substantial issue likely to result in a reversal or a new trial.

### 4.    This Court Properly Admitted Evidence Concerning Shareholder Loss and Properly Declined to Give the Misleading Instruction That Forbes Sought.

In denying Forbes' Rule 33 motion, this Court rejected his claim that "evidence and argument regarding the losses suffered by Cendant shareholders and the decline in Cendant's stock price" following disclosure of the massive CUC accounting fraud should have been precluded:

> As the court concluded in overruling Forbes's objections to this evidence, it was highly probative and relevant to the issue of material-ity.  And because the court instructed the jury that it could not consider such evidence at all with respect to whether Forbes was a knowing and willful participant in the conspiracy or engaged in any wrongdoing, there was little or no risk that the jury would improperly use this evidence for purposes other than the limited purpose for which it was admitted.  Thus, its admission posed little or no risk of prejudice to Forbes's defense and Forbes does not demonstrate that it actually caused the requisite prejudice.
>
> Because this evidence was properly admitted, it was permissi-ble for the government to refer to it during its opening statement. Accordingly, the government's comments did not require a mistrial or a curative instruction.
>
> Likewise, the court properly overruled Forbes's objection and motion for mistrial based on Michael Monaco's testimony about the extent of shareholder losses.  His testimony on this issue did not constitute improper lay opinion testimony because it was not based

on specialized knowledge.  Rather, his calculation of the drop in
market capitalization was based on simple arithmetic. . . .

Docket 2636, at 19-20.  Once again, Forbes cannot show that these evidentiary

rulings were arbitrary or irrational.

First, contrary to Forbes' assertion, Michael Monaco did not testify "that the

fraud caused $14 billion in shareholder losses in one day."  FBM14.  Rather,

Monaco testified that after the fraud was disclosed, Cendant lost $14 billion in

market capitalization the next business day:

> Q.  Mr. Monaco, do you recall whether Cendant issued a press
> release on April 15th, 1998?
>
> A.  Yes.
>
> *   *   *
>
> Q.  And what did Cendant say to the public in that press release?
>
> A.  That there — we found and uncovered accounting irregularities at
> the CUC companies, that I think there was a reference to a number,
> an amount in question, and that an investigation was in process to
> determine if, in fact, that was the extent of the items and amounts in
> question.
>
> MR. SULLIVAN:  Excuse me, your Honor, limiting instruction No. 3,
> please.
>
> THE COURT:  Any objection to this Mr. Martinez?
>
> MR. MARTINEZ:  No, your Honor.
>
> THE COURT:  Ladies and gentlemen, the testimony you've just heard
> may be considered only with respect to the question of whether any
> allegedly false statement was material.  I will provide you with spe-
> cific instructions including a definition concerning the element of
> materiality in my final instructions and you may not consider this
> evidence for any other purpose.
>
> BY MR. MARTINEZ:
>
> Q.  Mr. Monaco, after Cendant made the announcement regarding the
> potential accounting irregularities, what happened to Cendant stock
> price?

> A.  It dropped like a rock.  It basically was cut in half from what it had been trading at.  In one day.
>
> Q.  In one day?
>
> A.  Yes.
>
> Q.  What was the loss to Cendant shareholders in that one day?
>
> A.  North of $14 billion.

Tr. 409-410; see also Tr. 1281 (testimony of Henry Silverman that Cendant's market capitalization "declined in value by about 14 or 15 billion dollars" the day after Cendant announced the fraud).  Especially given the cautionary instruction that this testimony could be considered only in assessing materiality, Forbes cannot complain that the testimony was unduly prejudicial.

Second, the transcript excerpt quoted above puts the lie to Forbes' claim that this Court refused "to give a contemporaneous limiting instruction concerning" such testimony.  FBM14.  Moreover, this Court instructed the jury in the final jury charge that evidence of shareholder losses and the drop in Cendant's stock price could not be considered in determining whether Forbes participated in the fraud or acted knowingly and willfully:

> You have heard evidence about alleged shareholder losses and the drop in Cendant's stock price after the public announcement of alleged accounting irregularities.  You may not consider this evidence at all with respect to the question of whether the defendant was a knowing and willful participant in the alleged conspiracy or whether the defendant knowingly and willfully engaged in any wrongdoing.

Tr. 3750.  The jurors each received a copy of the jury charge to consult during their deliberations.  Tr. 3643, 3646-3647.  Because Forbes' primary defense was that Corigliano had kept him in the dark about the fraud, and because the jury

was forbidden by the limiting instruction from considering evidence of the loss amount to assess that defense, the challenged evidence posed little if any risk of prejudice. After all, "[f]ew tenets are more fundamental to our jury trial system than the presumption that juries obey the court's instruction." United States v. Adeniji, 31 F.3d 58, 63 (2d Cir. 1994) (internal quotation marks omitted).

Third, the probative value of evidence concerning the $14 billion shareholder loss was not "slight."  FBM14.  Although loss causation is not an essential element of the offenses for which Forbes was tried, materiality most certainly is. FBM15.  That Forbes ultimately did not contest materiality is of no moment, FBM15, because "the prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense." Estelle v. McGuire, 502 U.S. 62, 69 (1991).  Moreover, having not stipulated to materiality, Forbes cannot rely upon Old Chief v. United States, 519 U.S. 172 (1997).  FBM15.  As Old Chief emphasized, "the prosecution is entitled to prove its case free from any defendant's option to stipulate the evidence away" because "[a] syllogism is not a story, and a naked proposition in a courtroom may be no match for the robust evidence that would be used to prove it." 519 U.S. at 189.  Here, "details of [the victim's] injuries were legally and morally relevant to the conduct constituting the offenses committed by" Forbes.  United States v. Velazquez, 246 F.3d 204, 211 (2d Cir. 2001).

Fourth, Monaco did not need to be an expert in quantifying shareholder losses in order to testify about the $14 billion shareholder loss.  That testimony

was based on a simple arithmetic calculation, multiplying the number of out-

standing shares of Cendant stock by the loss in price per share to obtain the total

drop in market capitalization.  Monaco's testimony on this issue therefore was not

based on specialized knowledge, but on knowledge available to a lay person.  See

United States v. Hamaker, 455 F.3d 1316, 1331-32 (11th Cir. 2006) (affirming

admission of lay opinion testimony under Fed. R. Evid. 701 of a witness who

"simply added and subtracted numbers from a long catalogue of . . . records, and

then compared those numbers in a straightforward fashion"; although the wit-

ness's "expertise" made "him more efficient at reviewing [business] records, his

review itself was within the capacity of any reasonable lay person").

Fifth, whether the fraud committed by Forbes caused all or merely substan-

tial portions of the $14 billion shareholder loss, FBM15-19, misses the point.

There was no dispute that the value of all outstanding Cendant shares lost $14

billion on the day after the accounting irregularities at the former CUC were

publicly announced.  Docket 2365, at 2-3.  Even assuming that some factor other

than Cendant's highly publicized announcement had any measurable impact on

the precipitous drop on Cendant's share price — and Forbes points to none — the

jury could reasonably infer from the proximity of the announcement and the

immediate and precipitous drop in the share price that the fraud was material,

whether or not it caused all of the $14 billion loss identified by Monaco and

referred to by the Government.

Sixth, Forbes' complaints about the Government's opening statement and rebuttal summation, FBM15, 18, verge on the frivolous. Although the Government used the phrase "$14 billion fraud" three times during its 30-minute opening statement, Tr. 34, 35, 53, the Government also noted three times that the $14 billion figure represented the loss suffered by shareholders following the disclosure of the fraud, Tr. 32-33, 51-52, and added that Forbes had caused CUC to overstate its income by $250 million during the three years preceding the disclosure of the fraud, Tr. 32. During its summation, the Government reiterated that Forbes had caused CUC to overstate its revenue by "a quarter of a billion dollars," Tr. 3407; see Tr. 3414, 3419, and that after disclosure of the fraud, Cendant's market capitalization declined by $14 billion, Tr. 3413, 3415, 3469. The Government's single reference in rebuttal to the shareholders' loss responded to Forbes' 'blame the victim' attack on Silverman. Tr. 3614. Moreover, immediately preceding the Government's opening statement, this Court instructed the jury that "statements, arguments and questions by lawyers are not evidence" and "must not be considered" when assessing the evidence in the case. Tr. 26. This Court reiterated that instruction in the final jury charge. Tr. 3744.

Seventh, this Court properly refused to give the misleading contemporaneous limiting instruction that Forbes proposed following the opening statements. FBM15. The timing of "limiting instructions" is "best left to the trial court's discretion." United States v. Garcia, 848 F.2d 1324, 1334-35 (2d Cir. 1988), rev'd on other grounds, 490 U.S. 858 (1989); accord United States v. Sliker, 751

F.2d 477, 487 (2d Cir. 1984).  Here, this Court later gave a limiting instruction concerning shareholder loss during the case-in-chief, and another in the final charge.  Moreover, contrary to Forbes' proposal, it was not true that "evidence of shareholder losses may be considered by [the jury] only with respect to the question of whether any allegedly false statement was material," nor was it true that the jury "may not consider this evidence . . . for any other purpose other than with respect to the question of whether any allegedly false statement was mate-rial."  Tr. 315.  This Court had ruled before trial that evidence of shareholder losses was "relevant to counter Forbes's claim" — which he repeated in his open-ing statement, Tr. 73 — "that CUC was a good company with excellent cash flow that never was on the verge of bankruptcy," implying "'no harm no foul.'"  Docket 2476, at 12.  Thus, the jury could consider the shareholder losses both for materiality of particular misstatements and to assess any arguments or evidence suggesting that no harm happened in this case.

Eighth, Forbes' hyperbole about the $14 billion shareholder loss testimony drawing "an audible gasp from the jury," FBM17, is not even supported by his counsel's nearly contemporaneous description of that event.  Tr. 465 ("I can't be certain — I did hear from that side of the room, and I think it came from a juror, an audible response when that was stated.  Like 'whoosh' [—] [l]ike somebody letting out wind.  An actual audible response when that answer was given to the jury.").  Besides, the supposed 'gasp' came from a juror who just two days later was excused for medical reasons.  Tr. 465 ("MR. SULLIVAN:  Your Honor, I attest

to that myself.  The juror that sits right in the back there."); Tr. 853 (alerting counsel that "the gentleman in the back row, second from the right" might have to be excused); Tr. 866 (excusing same juror).  How the 'audible response' of a juror who was excused <u>two weeks</u> before deliberations began (and who might have been suffering from a kidney stone, too, Tr. 866) possibly could have prejudiced Forbes is a mystery.

<u>Ninth</u>, Forbes was happy to refer to a '$14 billion fraud' whenever it suited his purposes.  In claiming that the Government had not complied with its <u>Giglio</u> obligations by withholding that former AUSA Carney purportedly had lobbied Michael Kozik of the Connecticut State Board of Accountancy ("CSBA") to treat Kevin Kearney leniently, counsel for Forbes emphasized:

> This is 14 billion dollar fraud according to the government's opening statement, and this witness played a critical role in it.  The idea that he has the opportunity to reapply for his license or his certificate is something that's a huge benefit to him that will affect the rest of his career.

Tr. 1817.  Based in part on that argument, this Court ordered the Government to recall Kearney and permitted the Government to call Kozik as a witness so that Forbes could explore whether Carney in fact had lobbied the CSBA on Kearney's behalf.[13]  Likewise, while cross-examining Henry Silverman and during summa-

---

[13] Kearney and Kozik confirmed that there was no such lobbying.  When recalled to the stand, Kearney was adamant that the Government promised him nothing in exchange for his testimony.  Tr. 2105-2107.  Moreover, when asked whether former AUSA "Carney in any way attempt[ed] to influence the [CSBA's] investigation into" Kearney, Kozik testified "[a]bsolutely not"; according to Kozik, Carney "didn't want to comment in any way upon [Kozik's] investigation."  Tr. 2118-2119.

tion, defense counsel emphasized Silverman's losses following disclosure of the fraud as evidence of his bias against Forbes.  Tr. 1404-1408, 3523.

Thus, this Court's rulings concerning shareholder losses do not present a substantial issue likely to result in a reversal or a new trial.

### 5.    This Court Properly Precluded Cumulative and Misleading Cross-Examination of Cosmo Corigliano on Collateral Matters.

In denying Forbes' Rule 33 motion, this Court rejected his claim that he should have been permitted even more cross-examination of Corigliano:

> The court correctly restricted Forbes's cross-examination of Corigliano with regard to his compliance with his plea and settlement agreements.  As the court stated in ruling on this issue prior to trial, Forbes's assertion that Corigliano breached these agreements was based on his unilateral interpretation of the agreements and constituted a "self-created fiction" that was without factual support and was not shared by either the U.S. Attorney's Office or the SEC.  And as Judge Thompson observed, during the prior trials Forbes had ample opportunity to try to demonstrate that Corigliano breached these agreements, but that "everything that came out showed that [Forbes's] contentions lacked merit."  Thus, the evidence regarding this issue did not constitute proper impeachment by contradiction or bias and was properly precluded regardless of the testimony elicited from Corigliano by the government during his direct examination.  Besides this single issue, the court gave Forbes virtually unrestricted latitude to challenge Corigliano's credibility and bias on cross-examination.  Contrary to Forbes's contention, the court did not abuse its discretion by limiting his cross-examination of Corigliano in this one respect.

Docket 2636, at 21-22.  Once again, Forbes cannot show that this Court acted arbitrarily or irrationally in so ruling.

This Court has broad discretion in setting the boundaries of defense cross-examination, so long as the defendant has an opportunity to establish a basis to challenge the credibility of the witness.  E.g., United States v. Crowley, 318 F.3d

401, 417 (2d Cir. 2003); United States v. Salameh, 152 F.3d 88, 131 (2d Cir.

1998) (per curiam); United States v. Concepcion, 983 F.2d 369, 391 (2d Cir.

1992).  Forbes plainly had that opportunity.  This Court, like Judge Thompson,

permitted extremely wide-ranging cross-examination of Corigliano.  Even though

Corigliano testified for only 268 or so transcript pages on direct and redirect

examination, Tr. 1565-1798, 1828-1831, 2440-2472, he testified for more than

500 transcript pages on cross-examination and recross-examination, Tr. 1831-

2068, 2125-2240, 2262-2305, 2313-53, 2373-2439, 2473-2474.  Consequently,

this Court properly exercised its discretion in setting minor limits on Forbes'

cross-examination of Corigliano.  Docket 2466, 10-11 (denying Forbes's motion at

Docket 2273); see also Docket 2360 (Govt. Opp. to Docket 2273).

Forbes was not entitled to "'cross-examination that is effective in whatever

way, and to whatever extent, the defense might wish,' but rather 'an opportunity

for effective cross-examination.'"  United States v. Laljie, 184 F.3d 180, 192-93

(2d Cir. 1999) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986) (inter-

nal quotation marks omitted)).  Here, this Court "did no more than keep the

cross-examination within reasonable bounds," giving Forbes ample opportunity

"to attack and impeach" Corigliano's "credibility and to expose his motivations to

testify falsely in aid of the Government's case."  United States v. Mobley, 462 F.2d

69, 71 (2d Cir. 1972) (per curiam).  Furthermore, the narrow area that Forbes

was "not allowed to explore" was "largely cumulative or of dubious relevancy."  Id.

(rejecting claim "that the trial court committed reversible error in limiting . . .

cross-examination of" key witness where "the cross-examination and the eviden-
tiary discussions incidental to it covered more than two full court days and filled
considerably more than 300 pages of transcript"); see Laljie, 184 F.3d at 192
(cross-examination "not improperly curtailed if the jury" possesses "facts suffi-
cient to make a discriminating appraisal of the particular witness's credibility").

Moreover, "[t]he trial court may, in its discretion, preclude questions for
which the questioner cannot show a good faith basis." United States v. Scotti, 47
F.3d 1237, 1248 (2d Cir. 1995) (quoting Concepcion, 983 F.2d at 391).  Here, as
Judge Thompson found during the second trial, Forbes cannot allege in good
faith that Corigliano breached his plea agreement in his dealings with the SEC
because the SEC, the only party that was adverse to Corigliano in the civil lawsuit,
never asserted that Corigliano had violated his plea agreement.  STTr. 11/7/05 at
19.  Likewise, this Office has concluded that Corigliano had not breached his plea
agreement.  Id.

Although Forbes argued that the SEC's and the U.S. Attorney's views in this
regard should not be credited because they were "interested parties," Judge
Thompson disagreed:

> You say they are interested parties.  The SEC and the U.S. Attorney's
> Office are obviously both the government, but I think we did have a
> — we did have Mr. Kidney's testimony, we had Mr. Frohlich's testi-
> mony at the last trial, and I think the defense had quite an opportu-
> nity to probe and try to demonstrate that Corigliano had not been
> living up to his obligations under the — his obligations to the SEC,
> I'll say, which he's required to live up to under the plea agreement.  I
> think everything that came out showed that the defense's contentions
> lacked merit.

STTr. 11/7/06 at 22.  Likewise, in granting a motion to quash by the SEC, Judge
Thompson found that:

> defendant Forbes ignores the fact the SEC, as reflected in Frolich's
> testimony, does not view Corigliano as having failed to comply with
> his obligations under the plea agreement.  Rather, defendant Forbes
> is the only person taking the position that Corigliano has failed to live
> up to his obligations under the plea agreement to provide complete
> and accurate information to the SEC, and defendant Forbes' conten-
> tion is premised on what he argues is the appropriate way to inter-
> pret the Final Judgment in Corigliano's SEC case and other docu-
> ments the SEC has itself received and found acceptable.  Because
> both the SEC and Corigliano disagree with defendant Forbes' inter-
> pretation of these documents, it is apparent that defendant Forbes'
> line of inquiry is calculated solely to bolster his attack on Corigliano's
> credibility and, possibly, to attack the credibility of the government.
> This is far removed from a legitimate, good faith inquiry into motive
> on the part of Corigliano to fabricate testimony in the hope that the
> government will not find him in breach of . . . the plea agreement.

Docket 1939 at 5-6; see Docket 1927 at 3.  Those findings had ample support.
FTTr. 13523, 13528-13531, 13603-13604, 13609.

Forbes' invocation once again of Wallach, FBM19, is no more persuasive
now than the many times he has cited it before.  This Court, as did Judge Thomp-
son, properly rejected Forbes' contentions that Corigliano committed perjury.
Docket 2466, at 4; see, e.g., Docket 1839 at 5 ("on each of the repeated occasions
when defendant Forbes has raised it the court has concluded that he failed to
demonstrate that [Corigliano] gave perjured testimony"; "[c]ontinuously repeating
the assertion does nothing to make it meritorious").  Given the opportunity to
refine their cross-examination of Corigliano during the first two trials, Forbes'
lawyers again threw the proverbial kitchen sink at Corigliano on cross-examina-
tion during the third trial, then demanded during summation that the jury

disbelieve Corigliano's testimony.  Tr. 3475-3483.  The jury declined the invitation, as did this Court.  The Government did nothing wrong in concluding that Corigliano did not perjure himself at this — or any other — trial.

Thus, this Court's reasonable restriction on Corigliano's cross-examination does not present a substantial issue likely to result in a reversal or a new trial.

### 6.    This Court Properly Denied Forbes' Request for a Mistrial over the Government's Rebuttal Summation.

In denying Forbes' Rule 33 motion, this Court reiterated that his "objections to the prosecutors' closing arguments were baseless."  Docket 2636, at 29.  Given the "broad latitude" counsel have "in the inferences they may suggest to the jury during closing arguments provided they do not misstate the evidence," id., Forbes cannot show that he should have received the extraordinary relief of a mistrial on the basis of the Government's rebuttal remarks concerning Michael Monaco — just one of Forbes' 44 baseless objections concerning the Government's closing arguments.  See Docket 2547 (addressing all 44 objections).

Contrary to Forbes' contention, the rebuttal remarks in question were "supported by the record" and were not "inconsistent with Mr. Monaco's testimony."  FBM20.  On redirect examination, Monaco testified that he was not asked during the first trial whether he had a conversation with Forbes in September 1997 in Parsippany, New Jersey in which Forbes lobbied to keep Anne Pember in her consolidation function:

> Q.  Did any lawyer, in that 2004 trial, ask you any questions about whether you had a conversation with the defendant in September

1997 in which the defendant lobbied to keep Ms. Pember in the consolidation?

A.  No.

Q.  So you were never asked about it in that 2004 trial?

A.  That's correct.

Tr. 665.[14]  Monaco also testified on redirect that he had never denied having such

a conversation with Forbes:

Q.  In the 2004 trial, did you deny having this conversation with the defendant in September 1997?

A.  No.

Q.  Have you ever, outside of the courtroom, denied having that conversation?

A.  No.

Tr. 665.  On recross-examination, Monaco did not waver:

Q.  Isn't it a fact that in trial number one, Mr. Forbes in the court-room, you said nothing about any conversation between you and him regarding the consolidation of Anne Pember's function that occurred in Parsippany, New Jersey, or anywhere else?

A.  I wasn't asked and yes.

Q.  That's a yes, isn't it?

A.  I wasn't asked and yes.

Tr. 718.  On the other hand, Monaco testified that when asked during the second

trial whether he had such a conversation with Forbes, Monaco testified that he

did.  Tr. 416-431 (cross-examination); Tr. 665-674 (redirect examination); Tr.

---

[14] Defense counsel conceded this point.  When AUSA Martinez represented that he had "reviewed the examination of Mr. Monaco" from the first trial and that Monaco "was never asked the question about the September 1997 Parsippany conversation in trial one," counsel replied:  "Your Honor, that is accurate."  Tr. 696; see Tr. 700 (Mr. Sullivan:  "I agree that he wasn't asked the question.  He wasn't asked the question, your Honor, because he never disclosed it.").

715-721 (recross-examination); Tr. 727-729 (re-redirect examination).  And
Monaco testified that neither AUSA Martinez nor AUSA Carpenito helped him
prepare for the first trial.  Tr. 727-728.

Equally baseless is Forbes' claim that the Government's rebuttal remarks
were "contrary to information known to the government."  FBM21.  The August
27, 2003 letter appended to Forbes' brief does not say that Monaco was asked
whether Forbes, as opposed to Shelton, lobbied to retain Pember in the consoli-
dation function.  FBM Exh. 1.  Moreover, prior to eliciting Monaco's testimony in
the second trial about Forbes' lobbying efforts concerning Pember, the Govern-
ment inquired whether former members of the prosecution team asked Monaco
about this subject:

> MR. MARTINEZ:  . . . . Before trial two — I was trial counsel in trial
> two.  I was the one who did the questioning of Mr. Monaco, and at
> that point in time I asked and I was drilling down in the particular
> area, I discovered this information.  I realize[d] it hadn't been in the
> prior trial, and I called up prior trial counsel, and it never had been
> asked to the best of their recollection . . . .

Tr. 858.  The Government added that if Forbes wanted to pursue the matter, he
could call to the stand any of the former AUSAs whom he had under subpoena,
including former AUSA Carney, who signed the August 27th letter, and former
AUSA Paul Weissman, who headed this Office's Cendant investigation through
Forbes' February 2001 indictment.  Tr. 859-860, 2655, 2675.  Forbes, however,
elected not to call Carney (and represented that he had not intended "to call Mr.
Carney on" any "matters" other than those concerning Corigliano and Kearney)
and did not ask Weissman about Monaco.  Tr. 2654-2667, 2671-2676, 2918.

Thus, this Court's refusal to grant a mistrial on the basis of the Government's rebuttal comments concerning Monaco does not present a substantial issue likely to result in a reversal or a new trial.  See United States v. Perholtz, 836 F.2d 554, 559-60 (D.C. Cir. 1988) (per curiam) (denying bail pending appeal where defendant argued, inter alia, that prosecutor's summation was improper).

**C.   This Court Should Reject Forbes' Improper Attempt to Incorporate Hundreds of Other Issues into His Bail Motion.**

Finally, this Court should reject Forbes' attempt to incorporate by reference the arguments set forth in his Rule 33 motion, FBM3-4, which in turn purported to incorporate by reference literally thousands of pages of briefing, transcripts, and opinions by this Court and Judge Thompson.  It should not be this Court's or the Government's burden to "delve into unarticulated numerous other issues which had been litigated prior to, and during the course of the trial, as it is Defendant's burden to overcome the presumption of post-trial detention pending appeal." Reich, 420 F. Supp. 2d at 88 n.5 (internal quotation marks omitted).

As this Court explained in rejecting similar tactics by Forbes in his Rule 33 motion, merely rattling "off a litany of alleged errors and" referring the Court "to one or more of the 2,500-plus documents in the record where the issues were previously briefed and argued" both "imposes an unwarranted burden" on the Court "requiring it to 'play archaeologist with the record'" and is "an impermissible attempt to circumvent the Court's page limit for briefs and memoranda." Docket 2636, at 2 & n.1.  Consequently, this Court should focus upon only those six claims that Forbes actually briefed in this motion.  FBM4-22.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Government respectfully requests that Forbes' motion for bail pending appeal be denied.  Having staved off punishment for his crimes for nine years, it is high time that Forbes began paying his debt to society.

Respectfully submitted,

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice


NORMAN GROSS
Federal Bar Number 24933
MICHAEL MARTINEZ
Federal Bar Number phv0243
CRAIG CARPENITO
Federal Bar Number phv0244
MARK E. COYNE
Federal Bar Number phv01079
Special Attorneys
U.S. Department of Justice

Newark, New Jersey
Date:  February 26, 2007

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this day I caused to be served a copy of

the forgoing memorandum by email on:

Barry S. Simon, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005-5901
(202) 434-5005
bsimon@wc.com


_____
Mark E. Coyne

Date:  February 26, 2007
       Newark, New Jersey