# ATTACHMENT A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 3:02CR264 (AHN) |
| | ) | |
| WALTER A. FORBES | ) | January 16, 2007 |
| | ) | **FILED UNDER SEAL** |
| | ) | |

## MOTION OF DEFENDANT WALTER A. FORBES FOR RELEASE PENDING APPEAL (FILED UNDER SEAL)

Defendant Walter A. Forbes, through undersigned counsel, respectfully moves the Court for release pending appeal. The grounds for this motion are set forth in the accompanying memorandum of points and authorities.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: _____
Brendan V. Sullivan, Jr. (Bar No. ct17115)
Barry S. Simon (Bar No. ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

Oral Argument Requested

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
COWDERY, ECKER & MURPHY, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)
(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Motion of Defendant Walter A. Forbes

for Release Pending Appeal to be sent on January 16, 2007 to the following via e-mail and

Federal Express:

> Norman Gross, AUSA
> Michael Martinez, AUSA
> Craig Carpenito, AUSA
> U.S. Attorney's Office
> District of New Jersey
> 401 Market Street, Fourth Floor
> Camden, NJ 08101

Barry S. Simon

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 3:02CR264 (AHN) |
| | ) | |
| WALTER A. FORBES | ) | January 16, 2007 |
| | ) | **FILED UNDER SEAL** |
| | ) | |

## MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANT WALTER A. FORBES FOR RELEASE PENDING APPEAL
## (FILED UNDER SEAL)

Defendant Walter A. Forbes, through undersigned counsel, respectfully submits this memorandum in support of his motion for release pending appeal. The Second Circuit granted co-defendant Kirk Shelton release pending appeal, and this Court should grant the same relief to Mr. Forbes.[1]

## ARGUMENT

Under 18 U.S.C. § 3143(b), a court "shall order the release" of a defendant pending appeal if: (1) the defendant is not likely to flee or pose a danger to the safety of any other person or the community; (2) the appeal is not for purpose of delay; (3) the appeal (a) raises a substantial question of law or fact; and (b) if that substantial question is determined favorably to the defendant on appeal, that decision is likely to result in reversal or an order for a new trial of all counts on which imprisonment has been imposed. See United States v. Randell, 761 F.2d 122, 125 (2d Cir. 1985). Mr. Forbes satisfies all of the criteria for release pending appeal.

---

[1] Judge Thompson denied release pending appeal following Mr. Shelton's conviction in the first trial. The Second Circuit reached a contrary decision.

Oral Argument Requested

### 1.    No Danger to the Community or Risk of Flight

Mr. Forbes is not likely to flee or pose a danger to the safety of any other person

or the community.  See 18 U.S.C. § 3143(b)(1)(A).  The government never has suggested

otherwise.  Mr. Forbes has no criminal history and has appeared in Court without fail.  He is

married and has four children.  He has extensive ties to this District, and has lived in Connecticut

for more than twenty-five years.  He was released on a $1 million unsecured bond for almost six

years and has complied fully with his conditions of release.  During the period between February

2001 and October 2006, Mr. Forbes received permission from the probation office to travel both

inside and outside the United States on numerous occasions.  Following Mr. Forbes' conviction,

his bond was modified to $1.2 million, secured by $500,000 in real property.  Since that time,

Mr. Forbes received permission from the Court and the probation office to travel to New York,

Wisconsin, Washington, D.C., and Massachusetts.

Mr. Forbes was released pending sentencing.  Release pending sentencing is

permissible when "the judicial officer finds by clear and convincing evidence that the person is

not likely to flee or pose a danger to the safety of any other person or the community."  18

U.S.C. § 3143(a)(1).  The standard for release pending appeal is identical and is met here.

### 2.    Appeal Not for Delay

Mr. Forbes' appeal will not be taken for the purpose of delay.  See 18 U.S.C.

§ 3143(b)(1)(B).  Mr. Forbes intends to file a prompt appeal that will raise several substantial

issues that call into question the validity of his conviction.

### 3.    Appeal Raises Substantial Question

Mr. Forbes' appeal will present several substantial questions that, if decided in his

favor, are likely to result in reversal or a new trial.  See 18 U.S.C. § 3143(b)(1)(B).  Because a

loss of liberty is irrevocable, release pending appeal does not depend upon convincing the Court

that it is likely to be reversed.  Randell, 761 F.2d at 124-25 ("[W]e do not believe [Congress] intended either to eliminate bail pending appeal or make such bail dependent upon the willingness of a trial court to certify that it is likely to be reversed." (quotation omitted)).

The Second Circuit concluded instead that the statute "requires a district court to determine first whether any question raised on appeal is a 'substantial' one." Id. at 125.  The Court explained the meaning of "substantial."

> The Miller court defined a substantial question as one which is either novel, which has not been decided by controlling precedent, or which is fairly doubtful.  Giancola held that a substantial question is one of more substance than would be necessary to a finding that it was not frivolous.  It is a close question or one that very well could be decided the other way.  Handy defined substantial as fairly debatable.  We do not believe that these definitions of substantial differ significantly from each other, but if we were to adopt only one, it would be the language of Giancola.

Randell, 761 F.2d at 125 (citations & quotations omitted); see also 2d Cir. R. 9 (application must include "showing that the questions on appeal are not frivolous").

If a question raised on appeal is "substantial," a district court must then determine whether "a contrary appellate holding is likely to require reversal of the conviction or a new trial." Randell, 761 F.2d at 125; see also United States v. Hart, 906 F. Supp. 102, 106 (N.D.N.Y. 1995) ("[T]he correct approach is to ask whether a new trial or reversal would likely result, assuming the appellate court rules in defendant's favor.").[2]

Mr. Forbes' appeal will present several "substantial" questions.  Those questions, which already have been briefed extensively for the Court, are set forth in Mr. Forbes' Motion

---

[2]     See also United States v. DeSimone, 424 F. Supp. 2d 344, 353 (D.R.I. 2006) ("At this stage of the proceedings, it is not for this Court to become an advocate for its prior rulings"; granting release pending appeal because "close questions" presented); United States v. Hicks, 611 F. Supp. 497, 499 (S.D. Fla. 1985) ("In order to obtain bond, a defendant is not required to convince a trial court that it committed reversible error.").

for a New Trial, which is incorporated herein by reference. Docket Nos. 2605, 2607 (filed

11/30/06). Although the Court previously ruled against Mr. Forbes on each of these questions,

that is irrelevant to whether they are "substantial" within the meaning of § 3143(b)(1)(B). The

issues identified below provide good examples of how the standard on the merits differs from the

issue presented here—whether those questions are substantial. A contrary appellate holding on

any one of these substantial issues likely would result in reversal or a new trial. This was a close

case. The first two trials against Mr. Forbes resulted in hung juries after lengthy deliberations.

Each of these issues relates to Mr. Forbes' conviction on every count.

### a.    Property Transfers

After extensively briefing this issue in three trials, the government conceded

during oral argument before the third trial that it had "not found a reporte[d] case of the Second

Circuit dealing with evidence of transfer of assets as consciousness of guilt in a criminal case."

Tr. (7/27/06) at 86. The government further acknowledged that "[i]t may well be an issue of first

impression at least from an appellate perspective." Id. at 87; see also Docket No. 1841, at 2

(acknowledgment by Judge Thompson that "there was no authority directly on point"). At least

one federal court of appeals has held that an asset transfer to a family member made after the

defendant was arrested was not probative of consciousness of guilt. See United States v.

Ramirez,176 F.3d 1179, 1182-83 (9th Cir. 1999) (harmless error to admit evidence that

defendant's sister registered title to his vehicles in her name six days following his arrest;

evidence not admissible to show "consciousness of guilt, i.e., he was trying to cover up the fact

that on September 14, 1997, he owned personal vehicles he could have used for his trip to

Mexico instead of renting a vehicle"). Moreover, the Second Circuit recently expressed

skepticism regarding the admission of consciousness of guilt evidence. See United States v. Al-

Sadawi, 432 F.3d 419, 424 (2d Cir. 2005).

- 4 -

Because the question of the admissibility of property transfers as purported
consciousness of guilt evidence will be an issue of first impression in the Second Circuit, and
authority from another circuit holds that such evidence is not admissible, it is, a fortiori, a
substantial question on appeal.  See Randell, 761 F.2d at 125 (substantial question is "one which
is either novel, which has not been decided by controlling precedent, or which is fairly doubtful"
(quotation omitted)); United States v. Powell, 761 F.2d 1227, 1237 (8th Cir. 1985) (en banc)
(substantial question presented when argument "has been accepted by at least one other circuit,
and there is no authority directly on the point in this circuit" (citation omitted)); see also United
States v. Alfonzo-Reyes, 427 F. Supp. 2d 41, 45-46 (D.P.R. 2006) (substantial question
presented where issue "has not been authoritatively answered by the Supreme Court or a Court
of Appeals"); United States v. Quinn, 416 F. Supp. 2d 133, 136 (D.D.C. 2006) (substantial
question presented where issue was novel); United States v. Moncrief, 289 F. Supp. 2d 1311,
1313 (M.D. Ala. 2003) (substantial issue raised where court resolved issue "without the benefit
of clear Eleventh Circuit precedent"), aff'd, 127 F. App'x 470 (11th Cir. 2004), vacated on other
grounds, 126 S. Ct. 412 (2005).

                              *        *        *

If the Second Circuit follows the Ninth Circuit and resolves this question of first
impression in Mr. Forbes' favor, reversal or a new trial is likely.  The government emphasized
the property transfer evidence in opening, in its case-in-chief, in cross-examination of Mr. Forbes
and in summation when it argued that the evidence constituted one of "six reasons" for the jury
to conclude that Mr. Forbes had knowledge of the fraud at CUC.  See Tr. (10/26/06) at 3416,
3463-68.

b.    **Batson**

The Court's denial of Mr. Forbes' <u>Batson</u> motion based on the government's use of peremptory challenges to strike female jurors will raise several substantial questions on appeal. A determination by the Second Circuit that any of the government's strikes was based on gender will result in a reversal on appeal. "[U]nder <u>Batson</u> and its progeny, striking even a single juror for a discriminatory purpose is unconstitutional . . . ." <u>Walker v. Girdich</u>, 410 F.3d 120, 123 & n.3 (2d Cir. 2005). Mr. Forbes made a <u>prima facie</u> showing of gender discrimination with respect to the government's pattern of peremptory strikes. <u>See</u> Tr. (10/5/06) at 5; Docket No. 2625, at 19-20 n.14 ("[T]his Court has already determined that there was a prima facie case of discriminatory strikes against female venire persons during the third trial."). As a result, the burden shifted to the government to articulate a "clear and reasonably specific explanation of [its] legitimate reasons for exercising the challenge[s]." <u>Miller-El v. Dretke</u>, 545 U.S. 231, 239 (2005) (quoting <u>Batson v. Kentucky</u>, 476 U.S. 79, 98 n.20 (1986)).

1)    **AG(F)**

The government failed to satisfy its burden of articulating a gender-neutral reason for striking AG(F). It gave <u>no</u> reason for striking her. Instead, the government pointed to two answers in AG(F)'s questionnaire that it viewed as <u>positive</u>: "People's Bank for 25 years so we liked that fact that she worked in a large organization and understands hierarchies. 46 has significant life experience." Tr. (10/05/06) at 11. The government explained that corporate world experience and an appreciation of how hierarchies work were desirable attributes that it sought out in jurors. <u>Id.</u> at 5.

The only explanation proffered by the government in connection with its strike of AG(F) was that it wanted to use a strike in order to get to other (male) jurors on the list. <u>See id.</u> at 11 ("The time that we made the [AG(F)] pick, I know we were at that point coming down our

list and we were near the end and very concerned about getting our A's. [TD(M)] and

[JL(M)]."). That, however, was not a reason for striking AG(F). Rather, it was a reason for

striking <u>any</u> remaining juror.[3]

      The Sixth Circuit has determined that an explanation that a juror was struck in

order to get to other jurors on the list is not adequate under <u>Batson</u>. <u>See</u> <u>United States v. Gibbs</u>,

182 F.3d 408, 440 (6th Cir. 1999). It appears that the Second Circuit has never decided this

issue. Irrespective of how this Court determined the merits of the issue, it presents a substantial

question on appeal given the state of circuit court authority. <u>See</u> <u>Randell</u>, 761 F.2d at 125

(substantial question is "one which is either novel, which has not been decided by controlling

precedent, or which is fairly doubtful" (quotation omitted)); <u>Powell</u>, 761 F.2d at 1237

(substantial question presented when argument "has been accepted by at least one other circuit,

and there is no authority directly on the point in this circuit" (citation omitted)).[4]

---

[3]    There were only 46 jurors remaining in the panel at the time the parties exercised their strikes. As long as the parties used all of their strikes, every potential juror would either be stricken or on the jury. Similarly, every potential alternate juror would either be stricken or would be an alternate juror.

[4]    The dismissal of AG(F) also raises the additional substantial question of whether the government's proffered "reason" (even if arguably sufficient) was pretextual. It is undisputed that the government struck AG(F), whom it had assigned a B- grade, at a time when it could have stricken a male juror, GP(M), whom the government had subjectively assigned a <u>lower</u> grade (a C+). <u>See</u> Docket No. 2603, Ex. 1. If the government had followed <u>its own subjective grading system</u>, and the government merely sought to exercise a strike in order to get to other jurors, it would have stricken the remaining juror whom it had given the lowest grade, GP(M). Furthermore, the government's proffered explanation cannot be reconciled with the record. The government asserted that it struck AG(F) to get to "our A's. [TD(M)] and [JL(M)]." Tr. (10/05/06) at 11. But JL(M) was stricken by the defense in the seventh round of strikes, two rounds <u>before</u> the government struck AG(F). <u>See</u> Cary Decl. (Docket No. 2627). Thus, the government could not have stricken AG(F) in order to get to JL(M). Its reliance on a purported reason for striking AG(F) that is contrary to the record is further evidence that the government struck AG(F) based on her gender.

### 2)    AI(F)

AI(F) has a degree in business administration, has studied accounting, and works in a corporate environment—all qualities that the government stated it sought out in jurors. See Docket No. 2610, Ex. 22, Questions 13, 15, 19, 52; Tr. (10/05/06) at 5-6. AI(F) also invests in a 401K plan and is a member of a professional organization. See Docket No. 2610, Ex. 22, Questions 56d, 67. The government asserted that it struck AI(F) (and assigned her an "F" grade) because "she's 43 and her mother makes all of her financial decisions." Tr. (10/05/06) at 11. The government did not exercise a strike against FH(M), who responded in his questionnaire (like AI(F)) that his mother made the day-to-day financial decisions in his home. See Docket No. 2610, Exs. 4, 22, Question 24.

Both the Supreme Court and federal courts of appeals have reversed convictions based on a finding of pretext where the explanation proffered by the government for exercising a peremptory strike applied equally to other jurors who were not stricken. See, e.g., Miller-El, 545 U.S. at 252; United States v. Alanis, 335 F.3d 965, 969 (9th Cir. 2003); McClain v. Prunty, 217 F.3d 1209, 1222 (9th Cir. 2000); Davidson v. Harris, 30 F.3d 963, 966 (8th Cir. 1994); Jones v. Ryan, 987 F.2d 960, 973 (3d Cir. 1993). Accordingly, the government's striking of AI(F) raises a substantial question.[5]

---

[5]    The government's assertion that it did not notice that FH(M) had given the same answer as AI(F) on his juror questionnaire, Tr. (10/05/06) at 20-21, does not obviate the substantial question raised by the identical response in FH(M)'s and AI(F)'s questionnaires. Assuming arguendo that the government's representation was accurate, it demonstrates that the government's stated reason for striking AI(F) was pretextual. If AI(F)'s response to Question 24 were so disturbing that it caused the government to give her an "F" grade, notwithstanding her numerous desirable attributes (business education, corporate world experience, and investments), then the government surely would have noticed the identical answer and found it disqualifying in FH(M)'s questionnaire, particularly in light of the fact that his questionnaire reflected that he had no corporate world experience, no investments, and no education in business or accounting. The government's attempt to differentiate between AI(F) and FH(M), id. at 20, is unavailing. While the government asserted that FH(M) appeared savvy in person, id., its contention was not

### 3)    BE(F)

The government asserted that it struck BE(F) because she "was pregnant."  Tr. (10/05/06) at 13.  BE(F) did not raise any medical issues concerning her pregnancy during <u>voir dire</u>.  She indicated that she is expecting her third child and is due in February.  Tr. (10/04/06) at 46.  There is a substantial question whether the government's proffered explanation for striking BE(F) was gender neutral.  Mr. Forbes is not aware of any appellate decision addressing this issue, which appears to be one of first impression.[6]

### 4)    PS(F)

PS(F) has several qualities that the government asserted it looked for in jurors. She is educated, has studied accounting, works in the corporate world, works with people, invests in the stock market, has a 401K, considers herself a knowledgeable investor, reads <u>Money</u> magazine, and visits financial websites.  <u>See</u> Docket No. 2610, Ex. 18, Questions 13-15, 19, 52, 54-55, 62, 63.  PS(F) should have been an ideal government juror.  <u>See</u> Tr. (10/05/06) at 5 ("Category A were jurors who were strong in one of the [four] categories, financial savvy, corporate world experience, appreciated how hierarchies worked in organiz[ations] and extroverted."); <u>Miller-El</u>, 545 U.S. at 247 (rejecting prosecutor's explanations for striking black

---

supported by anything FH(M) said in his extremely brief introduction during <u>voir dire</u>.  Nor did FH(M) say anything in <u>voir dire</u> that contradicted the numerous answers in his juror questionnaire that reflected a lack of financial sophistication.  <u>See, e.g.</u>, Docket No. 2610, Ex. 4, Questions 52, 54, 55, 56a, 62, 63.  In any event, even if FH(M) was not identical to AI(F) in every respect, he was a comparable juror for purposes of a <u>Batson</u> analysis based on his identical response to Question 24 in the questionnaire.  <u>See Miller-El</u>, 545 U.S. at 247 n.6 ("None of our cases announces a rule that no comparison is probative unless the situation of the individuals compared is identical in all respects, and there is no reason to accept one.").

[6]    In <u>Cleveland Board of Educ. v. LaFleur</u>, 414 U.S. 632 (1974), the Supreme Court held that a school board policy that mandated leave for pregnant schoolteachers in the fourth month of pregnancy was unconstitutional.  Given the lack of any indication that BE(F)'s pregnancy was problematic, the Second Circuit could well conclude that striking a female juror simply because she is pregnant is unconstitutional.

juror who "should have been an ideal juror in the eyes of a prosecutor seeking a death sentence").

      The government asserted that it struck PS(F), despite her positive attributes, for a single reason—she dealt with auditors. See Tr. (10/05/06) at 10. The government did not exercise a strike against a male juror, DC(M), who works with auditors. See Docket No. 2610, Ex. 51. Moreover, the government gave high grades to potential jurors TK(M) (A), DB(M) (A), see Tr. (10/05/06) at 5, JL(M) (A-), id. at 7, and JC(M) (B+), id. at 12, although all responded that their jobs involved interacting with auditors. See Docket No. 2610, Exs. 29, 39, 43, 44, Question No. 51. The fact that the government did not exercise strikes against male jurors who shared the same objective characteristic as PS(F), and gave "A" to "B+" grades to four male potential jurors who shared that characteristic, raises a substantial question as to whether the government's explanation for striking PS(F) was pretextual.[7]

### 5)    VC(F)

      The government asserted that it struck VC(F) because she was "[n]ot financially savvy," "drives a school bus," and "[d]oesn't work in a large organization." Tr. (10/05/06) at 11.[8] The government failed to exercise a strike against male potential jurors, including FH(M), PR(M), JM(M), and DW(M), who were not financially savvy according to their juror questionnaire responses and who did not work in large organizational settings. As set forth

---

[7]     The government's decision to give PS(F) a "C" grade, despite having numerous qualities that should have placed her in the "A" category according to the government's grading system, also calls into serious question the gender-neutrality of the government's grading system.

[8]     VC(F) is employed by the City of Bridgeport, a large organization. Mr. Forbes takes the government's response to mean that VC(F) works independently rather than in an office environment. The government further asserted that "[VC(F)] was a strike where we were really looking to use our strikes at that point to get to our A category jurors." Id. That explanation is insufficient. See Section 3.b.1, supra.

above, FH(M) indicated in his questionnaire that his mother made the day-to-day financial

decisions in his home. FH(M), PR(M), JM(M) and DW(M) each answered that they (i) were not

knowledgeable investors (Question 54), (ii) never invested in the stock market (Question 55),

(iii) did not participate in any retirement plans or own any mutual funds (Questions 56a-b),

(iv) did not read any financial publications (Question 62), and (v) did not watch programs or visit

websites about finance or investing (Question 63). Docket No. 2610, Exs. 4, 6, 7, 16. None of

the four works in an office environment. Id. (Question 15). FH(M) works as an assistant

physical therapist, PR(M) and JM(M) work as laborers and DW(M) works as a beer delivery

person. Id.

When compared to FH(M), PR(M), JM(M), and DW(M), VC(F)'s responses to

her jury questionnaire reflect that she was no less financially savvy than they were. Indeed,

VC(F) reported—unlike FH(M), PR(M), JM(M), and DW(M)—that she has a 401K retirement

plan and that she keeps track of the investments in her plan through quarterly statements. See

Docket No. 2610, Ex. 20, Questions 56d, 56e. The government's assertion that it struck VC(F)

because she drives a school bus fares no better. There is no logical connection between driving a

school bus and an attitude unfavorable to the government's case. The government did not strike

DW(M), who also held a job that involved driving. This record raises a substantial question

regarding pretextual explanations.

### 6)    Summary

When the government's strikes against women are considered in their totality,

"[t]he strikes correlate with no fact as well as they correlate with [gender]." Miller-El, 545 U.S.

at 266; see id. at 265 (when pattern of strikes is considered cumulatively, "its direction is too

powerful to conclude anything but discrimination"). Twelve of the government's fifteen

peremptory strikes (80%) were against women. The government struck only 11% of the men in

the final group of 46 (3 out of 26), while striking 57% of the women (12 out of 21). Five of the government's first six strikes (83%) were against women—a pattern identical to that in the 2004 and 2005 trials. The issue of whether the government's peremptory strikes of women were the product of discrimination will raise substantial questions on appeal.

*       *       *

If any one of these substantial <u>Batson</u> questions is resolved in Mr. Forbes' favor, reversal is mandatory. "Harmless error analysis is inappropriate in [the <u>Batson</u>] context . . . ." <u>Tankleff v. Senkowski</u>, 135 F.3d 235, 239-40 (2d Cir. 1998). The exclusion of a potential juror on a constitutionally impermissible ground, such as race or gender, "is a structural error that can never be harmless." <u>Id.</u>; <u>accord</u> <u>United States v. Harris</u>, 192 F.3d 580, 588 (6th Cir. 1999); <u>Ford v. Norris</u>, 67 F.3d 162, 170 (8th Cir. 1995).

### c.    Statements of Party Opponent

The exclusion of statements made by the government in briefs and oral proffers presents a substantial question. The Second Circuit repeatedly has held that such statements and filings are admissible as statements of a party opponent. <u>See, e.g.</u>, <u>United States v. Yildiz</u>, 355 F.3d 80, 82 (2d Cir. 2004) ("the government's attorneys can bind the government with their in-court statements and filings" (citations omitted)); <u>United States v. GAF Corp.</u>, 928 F.2d 1253, 1262 (2d Cir. 1991) (error for trial court to exclude, in third trial, bill of particulars submitted by government prior to first trial); <u>United States v. McKeon</u>, 738 F.2d 26, 33 (2d Cir. 1984) (prior opening statement of defense counsel admissible); <u>see also</u> <u>Andrews v. Metro N. Commuter R.R.</u>, 882 F.2d 705, 707 (2d Cir. 1989) ("[T]he district court's refusal to permit the jurors to be informed of the amendment and to examine the original complaint so that they could contrast it with the amended complaint was a substantial abuse of discretion."); <u>Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc.</u>, 32 F.2d 195, 198 (2d Cir. 1929) ("A pleading prepared by an

- 12 -

attorney is an admission by one presumptively authorized to speak for his principal"; even if later amended or withdrawn, pleading "still remains as a statement once seriously made by an authorized agent, and as such it is competent evidence of the facts stated."). Whatever this Court's view on the merits, an appeal plainly raises a substantial question when binding authority supports the defendant's position.

*    *    *

Resolving this question in Mr. Forbes' favor is likely to result in reversal or a new trial. This substantial question relates to two of the government's "six reasons" for the jury to conclude that Mr. Forbes had knowledge of the accounting fraud at CUC: Mr. Forbes' alleged "sensitivity" when "the topic of merger reserves was raised at a board of directors meeting on April 9th, 1997," Tr. (10/26/06) at 3423, and Mr. Corigliano's testimony, as allegedly corroborated by Kevin Kearney. Id. at 3416-18.

The government argued based on Mr. Corigliano's testimony that Mr. Forbes directed Amy Lipton to remove references to the merger reserve issue from the Board minutes. Id. at 3428-29. The party admissions excluded by the Court included a government brief (signed by five prosecutors) that it would present "direct evidence of Shelton's involvement with the deletions," Docket No. 851, at 7 (emphasis added), and repeated representations by the government that Mr. Corigliano had a "general recollection" that it was either Mr. Shelton or Mr. Forbes who purportedly instructed Ms. Lipton to alter the Board minutes. See Tr. (07/12/04) at 7042; Tr. (08/04/04) at 9609; see also id. at 9613. There was no evidence presented in the first two trials concerning Mr. Forbes' purported involvement in the alteration. When a jury heard this evidence for the first time, it convicted Mr. Forbes.

- 13 -

In the first two trials, the juries were instructed that Mr. Kearney had a motive to falsify his testimony because of his relationship with the government.  See Tr. (11/04/04) at 16414-15; Tr. (12/08/05) at 3811-12.  The jury at Mr. Forbes' third trial was entitled to know that, at two prior trials, the government took the position that it had conferred informal immunity on Mr. Kearney.  The jury also was entitled to know that the government previously agreed to and proposed a jury instruction stating that Mr. Kearney's testimony should be viewed with "suspicion" because he has "a motive to falsify his testimony" due to his receipt of informal immunity.  See id.  The first jury to consider the evidence without this instruction convicted Mr. Forbes.

### d.    Drop in Stock Price and Alleged Shareholder Losses

The admission of testimony from Mr. Silverman quantifying the drop in Cendant's stock price the day following the announcement of accounting irregularities and from Mr. Monaco claiming that the fraud caused $14 billion in shareholder losses in one day, the government's improper and misleading use of that evidence, and the Court's refusal to give a contemporaneous limiting instruction concerning any purportedly permissible use of this testimony presents a substantial question.

The probative value of the evidence was slight because the unfounded testimony about an alleged $14 billion shareholder loss was not reliable or accurate,[9] shareholder loss is not an element of the charges in this case, and materiality—the only issue to which the opinion

---

[9]    Admitting that it was unable to quantify the loss without expert testimony, the government in Mr. Shelton's sentencing claimed that the loss was closer to half the amount argued to the jury.  Docket No. 1604, at 8 ("[T]he loss in this case was at least $8 billion."); see also In re Cendant Corp. Litig., 264 F.3d 201, 239 (3d Cir. 2001) (lead plaintiff presented evidence that damages ranged between $8.5 and $8.8 billion but cautioned "that establishing damages at trial would lead to a 'battle of experts'").  In the Sentencing Memorandum the government just submitted to the Court, it argued that $3.35 billion is a "reasonable estimate of the loss."  Docket No. 2634, at 42.

testimony even arguably related—was uncontested and supported by abundant alternative evidence. See Old Chief v. United States, 519 U.S. 172, 184-85 (1997). The prejudicial impact in the post-Enron era of opinion testimony regarding billions of dollars of shareholder losses is obvious and the government exacerbated the prejudice by using the evidence for an improper and misleading purpose—to show Mr. Forbes' alleged knowledge, the only contested issue in the case. The government's misleading and prejudicial argument was quite simple: there was a $14 billion fraud and Mr. Forbes was the boss. Its unstated conclusion was "of course he knew."[10] Despite this improper use of the evidence, the Court declined to give a contemporaneous limiting instruction under Fed. R. Evid. 105. Id. ("When evidence which is admissible . . . for one purpose but not . . . for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.").

      The testimony about an alleged $14 billion shareholder loss also violated Fed. R. Evid. 701. A lay witness may present opinion testimony only if it is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). The Second Circuit recently has found lay opinion testimony inadmissible when the government, as the proponent of the testimony, failed to establish this foundation requirement. See United States v. Garcia, 413 F.3d 201, 215-17 (2d Cir. 2005); United States v. Glenn, 312 F.3d 58, 66-67 (2d Cir. 2002).

      Opinion testimony regarding the magnitude of alleged shareholder losses in a fraud-on-the-market case requires technical and specialized knowledge. The government

---

[10]    In opening, the government stated that shareholders lost more than $14 billion. Tr. (10/10/06) at 33, 51. The government also argued that Mr. Forbes "directed" and "coordinated" a "$14 billion fraud," id. at 34, 35, 53, misleadingly conflating the magnitude of the alleged losses ($14 billion in a day) with the magnitude of the fraud ($250 million over three years according to the government's expert witness).

effectively conceded this point elsewhere. During Mr. Shelton's sentencing, the government

characterized the amount of the loss as "one that does not lend itself to easy loss calculations"

and acknowledged that it "would have to undertake additional, substantial expenses to hire

expert witnesses to calculate the exact amount." Docket. No. 1604 at 20. In the Sentencing

Memorandum just submitted to the Court, the government again argued that "there is no simple

formula for determining the amount of the loss." Docket No. 2634, at 33.

    The government's concession finds ample support in the case law. Determining

shareholder loss in a fraud-on-the-market case is a complicated exercise requiring technical and

specialized knowledge.

> If the purchaser sells later after the truth makes its way into the
> marketplace, an initially inflated purchase price <u>might</u> mean a later
> loss. But that is far from inevitably so. When the purchaser
> subsequently resells such shares, even at a lower price, that lower
> price may reflect, not the earlier misrepresentation, but changed
> economic circumstances, changed investor expectations, new
> industry-specific or firm-specific facts, conditions, or other events,
> which taken separately or together account for some or all of that
> lower price.

Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 342-43 (2005). Absent an event study[11] or similar

analysis by an expert to account for these factors and quantify the loss caused by the fraud,

expert testimony on shareholder loss would fail the reliability requirements of Rule 702. See,

e.g., In re N. Telecom Ltd. Sec. Litig., 116 F. Supp. 2d 446, 460 (S.D.N.Y. 2000) (expert's

testimony "fatally deficient in that he did not perform an event study or similar analysis to

remove the effects on stock price of market and industry information and he did not challenge

---

[11]  "An event study uses regression analysis and other statistical techniques to model the
effect that public statements have on a particular company's trading experience and normalizes
that experience to factor out performance of the stock market generally or of stocks in relevant
related indices." In re N. Telecom Ltd. Sec. Litig., 116 F. Supp. 2d 446, 456-57 (S.D.N.Y.
2000).

the event study performed by defendants' expert"); In re Executive Telecard, Ltd. Sec. Litig., 979 F. Supp. 1021, 1026 (S.D.N.Y. 1997) (expert testimony inadmissible because witness failed "adequately to distinguish between fraud related and non-fraud related company specific influences on EXTL's stock price").

The government cannot make an end-run around these requirements by offering the same opinion through a lay witness. Indeed, Rule 701(c) is designed "to prevent a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702 and the pre-trial disclosure requirements set forth in Fed. R. Crim. P. 16 and Fed. R. Civ. P. 26." Garcia, 413 F.3d at 215. Based on the strong Second Circuit precedent concerning Rule 701 and the government's own concession about the need for expert testimony, this presents a substantial issue.

*    *    *

The testimony about a $14 billion shareholder loss was the only testimony in three trials that drew an audible gasp from the jury. Tr. (10/11/06) at 465. No one testified in the first two trials about alleged shareholder losses totaling $14 billion.[12] In the second trial, the government repeatedly referred to a "quarter billion dollar fraud." See, e.g., Tr. (10/17/05) at 35. That reference was insufficient to convince a jury to convict on any count. In the third trial, the government decided to inflate that number fifty-six times, and asserted in opening that Mr.

---

[12]    During the second trial, Judge Thompson sustained an objection to a government question regarding its allegation that "shareholders lost billions." Tr. (11/15/05) at 3004. Judge Thompson "requested that the government not refer to billions of dollars of losses to investors." Id. at 3054-55. In the third trial, Mr. Forbes renewed his objections to argument or testimony concerning shareholder losses. Docket No. 1855 (incorporated by reference in Docket No. 2266); Docket No. 2266; Docket No. 2394; Tr. (10/10/06) at 21. The Court overruled Mr. Forbes' objections, declining to follow Judge Thompson's prior ruling. Tr. (10/10/06) at 22.

Forbes directed a "$14 billion fraud." Tr. (10/10/06) at 35.  In closing, the government argued

that "[t]he shareholders in one day lost 14 billion dollars.  Ladies and gentlemen, that's a crime.

That's absolutely a crime." Tr. (10/26/06) at 3615.  Hearing these new and improper arguments

and testimony, the third jury voted to convict on three counts.

**e.    Preclusion of Cross-Examination**

The Court's preclusion of significant cross-examination of Mr. Corigliano, the

government's key witness and the only person to claim personal knowledge of alleged

wrongdoing by Mr. Forbes, see Docket No. 2466, at 10-11; Tr. (10/20/06) at 2372-73, raises a

substantial question.  Mr. Forbes sought to cross-examine Mr. Corigliano concerning matters

about which the government elicited testimony on direct examination—his compliance with his

plea agreement and his settlement negotiations with the SEC.  See Tr. (10/17/07) at 1746-51,

1766-72.  The cross-examination would have called Mr. Corigliano's direct testimony into

serious question by showing that (1) Mr. Corigliano's proffered explanation for his failure to

settle with the SEC for more than four years after entering into his plea agreement was false and

(2) Mr. Corigliano's claimed compliance with his obligations under the plea agreement,

including his obligation to provide complete and accurate financial information to the SEC, was

false.  See Docket Nos. 2000, 2189, 2273, 2341, 2396; Tr. (10/19/06) at 2100, 2355-59; Tr.

(10/20/06) at 2372-73, 2542-43.

The Court's preclusion of all cross-examination on these subjects was highly

prejudicial to Mr. Forbes and will raise a substantial question on appeal.  See Delaware v. Van

Arsdall, 475 U.S. 673, 679 (1986) (preclusion of cross-examination about matter that "a jury

might reasonably have found furnished the witness a motive for favoring the prosecution in his

testimony" violated Confrontation Clause); United States v. Lynn, 856 F.2d 430, 432-34 (1st Cir.

1988) (Confrontation Clause violated when district court precluded cross-examination

- 18 -

concerning witness' failure to comply with plea agreement). This ruling and the subsequent

conviction also raise substantial issues under United States v. Wallach, 935 F.2d 445 (2d Cir.

1991). The government elicited testimony that it knew or should have known was false or

misleading because the testimony was contradicted by documents in the government's

possession that Mr. Forbes was not permitted to use at trial.

## f.    Improper Rebuttal Summation

The government's improper rebuttal summation concerning a purported

September 1997 conversation between Mr. Forbes and Michael Monaco in Parsippany, New

Jersey in which Mr. Forbes supposedly lobbied to keep Anne Pember raises a substantial

question.

Mr. Forbes cross-examined Mr. Monaco about his "springing" recollection of this

alleged conversation and discredited him in closing. The government argued in rebuttal

summation—at a time when defense counsel had no opportunity to respond to the government's

arguments—that Mr. Monaco was not asked about the matter until the 2005 trial, and that every

time he has been asked about this issue he has consistently reported the Parsippany conversation:

> in 2004, Mr. Monaco was on the witness stand and he was never
> asked about the Parsippany conversation. Can you believe it? He
> never mentioned it. You have seen how it works between lawyers
> and witnesses. Witnesses aren't there to tell free-flowing
> narratives. They answer questions. There was no evidence he was
> ever asked that question. He wasn't asked that question until a
> later trial with a whole different team of prosecutors, me and Mr.
> Carpenito. That's when he was asked. And every time he's been
> asked he says, yeah, that conversation happened. What's so
> frightening about that? How does that undermine Mr. Monaco's
> credibility?

Tr. (10/26/06) at 3604 (emphasis added).

Given the longstanding prominence of the "Saving Private Pember" theme in this

matter, it is not believable that the government, in numerous interviews, never previously asked

- 19 -

Mr. Monaco questions that would have elicited the Parsippany lobbying story.[13]  In any event,

the prosecutor's statements were not supported by the record and were inconsistent with Mr.

Monaco's testimony.  There is no evidence in the record that Mr. Monaco was not asked "that

question until a later trial," id., or that "every time he's been asked he says, yeah, that

conversation happened."  Id.  Mr. Monaco testified that he did not recall whether he had been

asked questions that would have called for that information prior to his preparation for the 2005

trial.  See Tr. (10/11/06) at 427-29.[14]

    "It is error for counsel to make statements in closing argument unsupported by

evidence, to misstate admitted evidence, or to misquote a witness' testimony."  United States v.

Watson, 171 F.3d 695, 699 (D.C. Cir. 1999).  It also is error for a prosecutor to "convey the

impression that evidence not presented to the jury, but known to the prosecutor, supports the

charges against the defendant."  United States v. Young, 470 U.S. 1, 18 (1985); see also United

States v. Eyster, 948 F.2d 1196, 1207 (11th Cir. 1991) ("Implying the existence of additional

evidence not formally before the jury severely impairs the likelihood of a fair trial." (citing

Berger v. United States, 295 U.S. 78, 88-89 (1935))); United States v. Modica, 663 F.2d 1173,

1179 (2d Cir. 1981) (prosecutor's comments were "especially improper" where they left the

impression that information in the investigative file supported the argument).

---

[13]  Alleged lobbying for Ms. Pember was a critical issue in the first trial.  See Tr. (5/10/04)
at 57 ("it was important that Anne Pember stay in place in the CUC accounting department."); id.
at 65 ("And you'll hear how Anne Pember wanted to quit CUC in the fall of 1997.  You'll also
hear about the lengths that Walter Forbes, Shelton, and Corigliano went to keep her, to keep her
in her critical role in the fraud."); Tr. (10/18/04) at 14923-24, 14939-42 (government
summation); Tr. (11/01/04) at 16039 (government rebuttal summation).

[14]  Mr. Forbes recently renewed his Brady/Giglio request for that information.  See Docket
No. 2607, at 7-9.

In addition to making arguments based on purported information outside of the record, the government argued "facts" that are contrary to information known to the government. The government interviewed Mr. Monaco in 2003 about the subject of "lobbying" for Ms. Pember. See Ex. 1 (8/27/03 government letter). In both Mr. Monaco's 2003 interview and the 2004 trial, Mr. Monaco reported that Mr. Shelton lobbied him about Ms. Pember. See Ex. 1 at 1; Tr. (05/20/04) at 1570-72. He said nothing about any purported Parsippany meeting with Mr. Forbes. The assertion that Mr. Monaco never was asked about alleged lobbying by Mr. Forbes until the 2005 trial, and that his responses about the matter have always been consistent, raises a substantial question of whether the government misleadingly and erroneously made arguments to the jury that are inconsistent with information known to the government. See United States v. Valentine, 820 F.2d 565, 571 (2d Cir. 1987) (reversing conviction where prosecutor's summation misrepresented both trial testimony and grand jury testimony that was not presented at trial); see also United States v. Earle, 375 F.3d 1159, 1165 (D.C. Cir. 2004) (reversing where "the prosecutor clearly had every reason to doubt, and no good reason to support, the inferences he propounded to the jury in his closing arguments"); United States v. Blueford, 312 F.3d 962, 968 (9th Cir. 2002) (reversing based on improper government argument; "it is decidedly improper for the government to propound inferences that it knows to be false, or has very strong reason to doubt").

*       *       *

The government acknowledged during trial that Mr. Forbes' alleged efforts to fight for Anne Pember, including the purported Parsippany conversation, were critical to its case and its most powerful evidence. Tr. (10/12/06) at 701-02. The government addressed the Parsippany conversation three times during Mr. Monaco's testimony, on direct, re-direct and re-

- 21 -

re-direct examination. It cross-examined Mr. Forbes about the purported Parsippany meeting and argued that Mr. Forbes testified falsely because he denied the purported Parsippany conversation. Tr. (10/26/06) at 3263-64, 3434-35. It addressed the issue in opening statement, summation, and rebuttal summation, as evidence of Mr. Forbes' alleged three-part plan to continue the fraud after the merger with HFS. Tr. (10/10/06) at 44-45; Tr. (10/26/06) at 3431, 3434-35, 3603-04. It personally vouched for Mr. Monaco's credibility on a critical issue, a claim that "carr[ies] much weight against the accused." Berger, 295 U.S. at 88; see also United States v. Forlorma, 94 F.3d 91, 96 (2d Cir. 1996) (reversing where "the prosecutor's unsupported arguments caused substantial prejudice to the defendant").

## CONCLUSION

For the reasons set forth above, Mr. Forbes respectfully requests that the Court grant his motion for release pending appeal.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By:

Brendan V. Sullivan, Jr. (Bar No. ct17115)
Barry S. Simon (Bar No. ct24159)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (phone)
(202) 434-5029 (fax)
bsimon@wc.com (e-mail)

- and -

James T. Cowdery (Bar No. ct05103)
Thomas J. Murphy (Bar No. ct07959)
COWDERY, ECKER & MURPHY, L.L.C.
750 Main Street
Hartford, CT 06103-2703
(860) 278-5555 (phone)

- 22 -

(860) 249-0012 (fax)
tmurphy@cemlaw.com (e-mail)

Attorneys for Walter A. Forbes

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Memorandum in Support of Motion of

Defendant Walter A. Forbes for Release Pending Appeal to be sent on January 16, 2007 to the

following via e-mail and Federal Express:

> Norman Gross, AUSA
> Michael Martinez, AUSA
> Craig Carpenito, AUSA
> U.S. Attorney's Office
> District of New Jersey
> 401 Market Street, Fourth Floor
> Camden, NJ 08101

Barry S. Simon

# EXHIBIT  1



**U.S. Department of Justice**



*United States Attorney*
*District of New Jersey*

*970 Broad Street, Suite 700*      *(973) 645-2700*
*Newark, New Jersey 07102*

August 27, 2003

**VIA FEDERAL EXPRESS**

Thomas P. Puccio, Esq.
230 Park Avenue
Suite 301
New York, New York 10169

Barry S. Simon, Esq.
Williams & Connolly, LLP
725 Twelfth Street, N.W.
Washington, DC 20005

> Re:  United States v. Forbes, et al.
>      <u>No. 3:02CR264 (AWT)</u>

Dear Mr. Counsel:

Please note that in August 2003, Michael Monaco met with the United States.  Present for this discussion was Monaco, his counsel James Kreissman and Herb Stern, John Carney, Richard Schechter, James McMahon, Mark Gerber, John Pittman and Pat Matthews.  During this session, please be advised that Mr. Monaco indicated to the United States that:

(1) he recalls meeting with Walter Forbes and Kirk Shelton in the Spring of 1997 to discuss a possible merger of HFS and CUC.  At the meeting, Walter Forbes addressed broad topics and deferred detailed issues to Kirk Shelton;

(2) After the agreement to merge was executed, Monaco recalls Shelton being extremely detail oriented and that Shelton bragged that he knew every detail about CUC;

(3) In the Fall of 1997, Kirk Shelton lobbied Monaco to retain Anne Pember as the person in charge of accounting for the CUC side of Cendant.  Shelton felt strongly that Pember was important to the business and that keeping her would be good for morale; and

(4) On March 9, 1998, during the morning meeting that Henry Silverman called to discuss Shelton's revelations of March 6, 1998 both Walter Forbes and Kirk Shelton explained that they were aware that a significant portion of CUC's income from the previous two years was non-recurring in nature.

Very truly yours,

CHRISTOPHER J. CHRISTIE
Special Attorney
U.S. Department of Justice

By:  JOHN J. CARNEY
Special Attorney
U.S. Department of Justice

2